Hearing Date: June 15, 2006, 1:00 p.m.
Objection Deadline: June 5, 2006 at 4:00 p.m. (E.T.)

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC. TO SELL MONTGOMERY DISTRIBUTION CENTER AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND (B) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), file this motion for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing WD Logistics, Inc. ("WD Logistics") to sell a distribution center located in Montgomery, Alabama (together with all related improvements) to the party submitting the highest or best offer of at least $7 million, free and clear of liens, claims and interests and (b) granting related relief (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

## Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.   An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005 was subsequently disbanded by notice dated January 11, 2006.

4.      WD Logistics owns a distribution center in Montgomery, Alabama (the "Montgomery Distribution Center").  Since the Petition Date, the Debtors have consolidated their distribution process and no longer need the Montgomery Distribution Center.

5.      The Debtors have marketed the Montgomery Distribution Center extensively through DJM Asset Management, Inc. ("DJM"). DJM sent over 2,500 sale notices for the Montgomery Distribution Center to potential purchasers.

### Relief Requested

6.      By this Motion, WD Logistics requests authority to sell their fee simple title interest in the Montgomery Distribution Center, together with all related improvements (collectively, the "Assets"), free and clear of liens, claims and interests at an auction to the bidder submitting the highest or best offer in an amount of no less than $7 million (the "Auction").

7.      In the marketing process and Auction, the Debtors will comply with the bidding procedures approved by the Court by Order dated June 21, 2005 (Docket No. 1801) (the "Bidding Procedures Order"). A copy of the Bidding Procedures Order is attached as Exhibit A. A qualified bidder must execute a facility purchase agreement (i) substantially in the form attached as Exhibit B (the "Facility Agreement"), marked to show any changes sought by the bidder. The Debtors' proposed form of Facility Agreement contains customary terms, conditions and defaults for sales of this type.

8.      The terms of the form of Facility Agreement include the following:[2]

  (a)    Assets. The assets to be sold and transferred to the Purchaser
          include:

---

[2]  This summary of the Facility Agreement is provided as a convenience only. To the extent that this summary differs in any way from the terms of the Facility Agreement, the terms of the Facility Agreement Control.

> > (i)    WD Logistic's fee simple title in the land and buildings known as the Montgomery Distribution Center; and
> >
> > (ii)    all attached improvements.
> >
> > (b)    <u>Purchase Price</u>. On the terms and subject to the conditions set forth in the Facility Agreement, the net aggregate purchase price for the Assets is $[to be completed with successful bid amount](the "Purchase Price").
> >
> > (c)    <u>Sale Free and Clear</u>. The Facility Agreement provides that the Assets are to be transferred free and clear of any liens, claims, interests and encumbrances other than the Permitted Encumbrances, as defined in the Facility Agreement.

9.     In accordance with the Bidding Procedures Order, the Debtors will conduct the Auction for the Distribution Center at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida, on June 14, 2006. The Debtors will conduct the Auction in consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors. In no event will the Assets be sold at the Auction for less than $7 million.

**Applicable Authority**

**A.    Bankruptcy Code Section 363(b) Authorizes the Sale.**

10.     Bankruptcy Code section 363(b)(1) provides:    "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1). *See* 11 U.S.C. § 1107(a).

4

11.    A debtor's sale under section 363(b)(1) should be approved when supported by a sound business reason. *See In re B.D.K. Health Mgmt., Inc.* ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Fulton State Bank v. Schipper (In re Schipper),* 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991).

12.    Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the Debtor has provided interested parties with adequate and reasonable notice. *Del. & Hudson,* 124 B.R. at 175-176.

13.    The Debtors have a sound business reason for the sale of the Assets. The Debtors no longer use the Montgomery Distribution Center and remain liable

for the costs associated with the center, such as insurance, maintenance and taxes. If the Motion is granted and the Auction is successful, the Debtors will bring in at least $7 million for their estates.

14.     The fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by an auction process—the best means for establishing whether a fair and reasonable price is being paid.

15.     In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets; (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP Lender; (e) counsel for the Creditors' Committee; (f) all known holders of interests and claims in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (i) the Office of United States Trustee.

## B.     Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.

16.     The Debtors request that their sale of the Assets be approved free and clear of any liens, claims or interests. Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing. *See In re Parrish*, 171 B.R. 138 (Bankr. M.D. Fla. 1994).

17.     The Debtors believe that with the exception of the Permitted Encumbrances (as defined in the Facility Agreement), there are no interests in or

6

claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender"). The interest of the DIP Lender will be satisfied because the Debtors will cause the net proceeds from the sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

## C.    Good Faith Purchaser.

18.    The Debtors request that the Court find that the party who ultimately submits the highest or best offer for the Assets, acted in good faith within the meaning of Bankruptcy Code section 363(m).

19.    Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

7

> appeal, unless such authorization and such sale or lease
> were stayed pending appeal.

11 U.S.C. § 363(m)

20.    The Bankruptcy Code does not define the term "good faith." Courts, however, indicate that a party would have to show fraud or collusion between the purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . .
> speaks to the integrity of his conduct in the course of the
> sale proceedings. Typically, the misconduct that would
> destroy a purchaser's good faith status at a judicial sale
> involves fraud, collusion between the purchaser and
> other bidders or the trustee, or an attempt to take grossly
> unfair advantage of other bidders.

> *In re Apex Oil Co.*, 2 B.R. 847, 865
> (Bankr. E.D. Mo. 1988)

*Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.* (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997). No such facts exist here.

21.    The Debtors assert that: (a) the Assets were marketed extensively and the Purchase Price is fair and reasonable; (b) the marketing process that occurred and the notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors. Accordingly, at the Sale Hearing the Debtors will request that the Court find that the party submitting the highest or best offer for the Assets acted in good faith within the meaning of Bankruptcy Code section 363(m). *See B.D.K. Health Mgmt.*, 1998 WL, at *4 (finding that the purchaser is entitled to the protections of Bankruptcy Code section 363(m) because the sale was negotiated

at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

### D.      Elimination of 10-Day Stay Under Rules 6004(g)

22.      Pursuant to Fed. R. Bankr. P. 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to Bankruptcy Code section 363 are automatically stayed for ten days after entry of the order.  Given the requirements of the Facility Agreement and the need to close the sale as promptly as possible, the Debtors request that the Court waive the 10-day stay period.

### E.      Objection Deadline

23.      Only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by June 5, 2006 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

## Conclusion

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit C, (a) granting the Motion and authorizing the sale of the Assets at the Auction to the entity submitting the highest or best offer of no less than $7 million in accordance with the Facility Agreement, (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Facility Agreement, and (c) granting such other and further relief as the Court deems just and proper.

Dated: May 26, 2006

SKADDEN, ARPS, SLATE, MEAGHER       SMITH HULSEY & BUSEY
& FLOM LLP

By   _/s/ D. J. Baker_            By   _/s/ Cynthia C. Jackson_
     D. J. Baker                    Stephen D. Busey
     Sally McDonald Henry         James H. Post
     Rosalie Walker Gray           Cynthia C. Jackson  (F.B.N. 498882)

Four Times Square                225 Water Street, Suite 1800
New York, New York 10036        Jacksonville, Florida  32202
(212) 735-3000                    (904) 359-7700
(212) 735-2000 (facsimile)       (904) 359-7708 (facsimile)
djbaker@skadden.com           cjackson@smithhulsey.com

Co-Counsel for Debtors          Co-Counsel for Debtors

00531557

**EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER ESTABLISHING BIDDING
## PROCEDURES FOR THE SALE OF ASSETS

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004, establishing bidding procedures for the Debtors' sale of (i) any unexpired lease or executory contract or (ii) any other asset with a value greater than $150,000, and authorizing the Debtors, in their reasonable discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals (each as defined in the attached Bidding Procedures), to offer bid protections to prospective purchasers (the "Motion"). The Court has read the Motion and considered the representations of counsel. Upon the representations of counsel, without objection from the United States Trustee, and upon the representations that any other objections have been resolved, the Court makes the following findings of fact:

A. This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.  The Debtors have provided interested parties with proper notice of the Motion, in accordance with 11 U.S.C. §§ 102(1), 105(a), and 363, Fed. R. Bankr. P. 2002 and 6004, Local Rule 2002-1 and the Notice Procedures Order. [1]

C.  The Debtors have demonstrated that implementing the Bidding Procedures, including the Bid Protections, is an exercise of their sound business judgment, complies with section 363 of the Bankruptcy Code, and that such procedures are in the best interests of their estates, their creditors and other parties in interest.

D.  Notwithstanding the Bidding Procedures, the parties retain their right to assert any objection to a sale affecting their respective lease. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The relief requested in the Motion as modified by this Order and the attached bidding procedures is granted.

2.      The Objections filed by Victory Real Estate Investments, L.L.C. (Docket No. 1600); Conopco, et al (Docket No. 1618); Xerox Capital Services (Docket No. 1623); Prudential Insurance, et al (Docket No. 1625); Concord-Fund IV Retail, et al (Docket No. 1635); Developers Diversified Realty Corp., et al (Docket No. 1637) and LNR Partners, Inc. (Docket No. 1666) have been resolved and are each withdrawn.

3.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Bidding Procedures attached as Exhibit A  and the Bid Protections attached as Exhibit B are approved and the Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures and the Bid Protections.

---

[1]     All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion.

2

4.     The Court retains jurisdiction to hear and determine all matters arising from implementation of this Order.

5.     Notwithstanding anything to the contrary, any conflict between the terms and conditions of this Order and the Bidding Procedures attached as Exhibit A will be governed by the Bidding Procedures.

Dated this 20 day of June, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a
copy of this Order on all persons
served with the Motion.

3

495940.2

## EXHIBIT A

### Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") to be used by the debtors, Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") for the sale of any of the Debtors' assets in these cases including, (i) the assumption and assignment or termination of executory contracts and unexpired leases and (ii) any other assets that have a value greater than $150,000, either individually or as a group, as determined by the Debtors, after consultation with (i) Wachovia Bank, National Association, in its capacity as administrative agent and collateral monetary agent (**the "Agent"**) for itself and certain other financial institutions **from time to time** parties to the Credit Agreement, dated as of February 23, **2005, as may be amended or modified (the "Lenders", and collectively with the Agent, the "DIP Lenders") (Agent and its legal professionals shall be referred to as the "DIP** Lender Agent Representatives"), and (ii) the legal and financial advisors of the Official Committee of Unsecured Creditors of the Debtors (the "Committee's Professionals").

### The Bidding Process

The Debtors will (a) identify the assets to be sold, (b) solicit letters of interest for the assets, (c) review the letters of interest to designate which proposals are acceptable for the assets, (d) distribute bid packages to bidders with acceptable bids, (e) receive and review bid packages from acceptable bidders, (f) coordinate the efforts of acceptable bidders in conducting their respective due diligence investigations, (g) review, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, bid packages to determine initial bids and negotiate offers, (h) solicit qualified competing bids, and (i) ultimately determine, after consultation with the Committee's Professionals and the DIP Lender Agent Representatives, the successful bidder. The Debtors reserve the right, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, to amend these procedures and to adopt such other rules and procedures for the bidding process that will better promote the goals of the bidding process and maximize value received for any of the subject assets provided however, that the Debtors may not amend these procedures to change notice provisions or otherwise withdraw any rights given by these procedures to affected landlords (in their capacity as landlords).

### Due Diligence

The Debtors will provide confidential information on assets to be sold to potential purchasers (the "Initial Information"). Before receiving Initial Information, each potential purchaser must execute a confidentiality agreement, in a form satisfactory to the Debtors. The Debtors may make the Initial Information and other information available electronically. The Debtors may, but are not obligated to, furnish any due diligence information after the Bid Deadline for Qualified Competing Bids (as defined below) or to any person or entity that the Debtors determine is not reasonably likely to be a Acceptable Bidder (as defined below).

1

## Qualified Proposals, Qualified Bids, Initial Bids and Bid Packages

Any person or entity that seeks to acquire (i) a lease or executory contract (or if landlord, to terminate such a lease) or (ii) any other asset from the Debtors with a value of $150,000 or more, either individually or as a group (as determined by the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals), must submit a non-binding letter of interest to the Debtors, which must include (a) a proposed purchase or termination price for the asset, (b) an identification of any due diligence required by the proposed purchaser, (c) the proposed timing of the purchase or termination, and (d) any material conditions to which the proposed purchase or termination is subject (the "Proposal"). The Debtors will review each Proposal received to determine in its sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which, if any, represents an acceptable offer for the relevant asset (an "Acceptable Proposal").

If the Debtors determine, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, that one or more Acceptable Proposals for a particular asset has been received, the Debtors will provide each entity that submitted an Acceptable Proposal (an "Acceptable Bidder") with a bid package, including, among other things, (a) a deadline for receiving an initial bid (the "Initial Bid Deadline"), (b) a form asset purchase agreement tailored to the type of asset to be purchased (the "Purchase Agreement"), (c) a form financial declaration evidencing the bidder's financial wherewithal to consummate the transaction and satisfy all of the obligations required by the applicable asset purchase agreement and, if the bidder seeks to assume any unexpired lease or executory contract in connection with such sale, the bidder's ability to provide adequate assurance of future performance under Sections 365(b)(3) (if applicable) and 365(f)(2) of the Bankruptcy Code, and a detailed description of the intended use of the premises upon assignment of the lease (the "Declaration"), (d) if applicable, a form assumption and assignment agreement or lease termination agreement, and (e) a form sale order (the "Sale Order").

## Deadline for Initial Bids

Any Acceptable Bidder who wants to proceed with the sale process, must submit an initial bid by the Initial Bid Deadline to the representatives of the Debtors, the DIP Lender Agent Representatives and the Committee's Professionals identified in the bid package.

If required by the instructions included in the relevant bid package, to qualify for further bidding, each initial bid must (a) be received by the Initial Bid Deadline (unless the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, agree to an extension), and include: (b) a signed Purchase Agreement, (c) a blacklined Purchase Agreement showing changes from the applicable form provided by the Debtors, (d) a completed Declaration, (e) if applicable, a signed assumption and assignment agreement or lease termination agreement together with a blacklined version showing any changes from the form provided by the Debtors, (f) a cashiers check made out or a wire transfer to  the law firm or other escrow agent identified in the bid package, representing the earnest money deposit required under the particular Purchase Agreement, (g) a blacklined Sale Order showing changes from the form provided by the Debtors and (h) include any other information that the Debtors may have requested, including without limitation, evidence of financial wherewithal to

consummate each of the transactions contemplated by the Purchase Agreement and to satisfy each of the obligations thereunder.

No initial bid will be contingent upon any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval.

Each initial bid (except for a bid by a landlord for its own lease) must disclose the identity of the Acceptable Bidder's organization, including confirmation that its initial bid is made as principal for the Acceptable Bidder's account and, if not, the basis upon which the Acceptable Bidder is acting and the identities of all other participants (if any). Each initial bid must also disclose any agreements or understandings between the bidder and any third party with respect to the subject asset or assets or with respect to any possible transaction involving the Debtors.

The submission of an initial bid is deemed to be the bidder's consent for the Debtors and their advisors to share any and all information submitted by such bidder to the DIP Lender Agent Representatives and the Committee's Professionals, the Wachovia DIP Lender and any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such bidder.

The Debtors will review, in consultation with the DIP Lender Agent Representatives and the Committee's Professionals, each initial bid and, in the Debtors sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, will select the bidder for the asset that has made the highest or best offer (the "Initial Bidder," the bid of such Initial Bidder is the "Initial Bid."). Once the Debtors identify an Initial Bidder for a specific asset, the Debtors will file a motion with the Bankruptcy Court for an order (a) authorizing the sale of such asset under Sections 363 and 365 of the Bankruptcy Code free and clear of liens, claims and encumbrances, except as may be set forth in the applicable Purchase Agreement, and (b) approving the applicable Purchase Agreement. In the alternative, the Debtors may file a motion for the sale of one or more assets regardless of whether the Debtors have received an Initial Bid for any particular Asset and the Debtors may continue to market any such assets and seek Initial or Competing Bids through the date of an auction (in either event, the "Sale Motion"). On the same date the Debtors file a Sale Motion, the Debtors will deliver a copy of any Initial Bid by electronic mail or overnight delivery to each affected landlord. Unless the Bankruptcy Court enters an order shortening the notice period for any particular asset sale, the Debtors will set a hearing for each Sale Motion on a date that is not less than 23 days after the Debtors file and serve the Sale Motion (the "Sale Hearing").

3

## Requirements for Qualified Competing Bids

Other than a landlord bidding on its own unexpired lease, any Acceptable Bidder or other entity (in the Debtors' sole discretion) that desires to submit a competing bid for an asset that is the subject of a Sale Motion may do so in writing, provided that such bid:

(a) must include an executed Purchase Agreement, blacklined to show changes from the Initial Bidder's Purchase Agreement and clearly setting forth any conditions for closing.

(b) must, if the bidder intends to take assignment of any executory contract or unexpired lease, include an executed assumption and assignment or lease termination agreement, blacklined to show any changes from the Initial Bidder's assumption and assignment agreement or lease termination agreement.

(c) must exceed the purchase price agreed to by the successful Initial Bidder by a minimum percentage designated by the Debtors (in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) in the applicable Sale Motion;

(e) shall not be contingent upon any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval;

(f) must include an executed Declaration;

(g) must include a cashier's check or be accompanied by a wire transfer (or, if by landlord for its own lease, value) in an amount equal to the greater of (1) the amount of the deposit paid by the Initial Bidder or (ii) 10% of the purchase price proposed by the bidder and an acknowledgement by the bidder that if such bidder becomes the Successful Bidder at the Auction, the deposit will be increased, if applicable, to 10% of the final purchase price;

(h) must disclose the identity of the bidder's organization, including confirmation that the competing bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any).

(i) must disclose any agreements or understandings between the bidder and any third party with respect to the subject asset or assets or with respect to any possible transaction involving the Debtors.

If the competing bid includes each of the documents and conditions set forth in subparagraph (a) – (i) above, the bid will constitute a "Qualified Competing Bid". Notwithstanding the foregoing, a landlord is deemed to be a Qualified Competing Bidder as to its own lease if the landlord submits a written bid by the deadline set forth in the applicable Sale Motion (the "Landlord Bid"). To qualify, the Landlord Bid must identify the leases on which the landlord seeks to bid (the landlord may only bid on its own leases) and the proposed offer (whether by credit against default amounts or by other value). The submission of a competing bid will be deemed to be the bidder's consent for the Debtors and their advisors to share any information submitted by the competing bidder to the Committee's Professionals, the DIP Lender and any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such competing bidder.

### Deadline for Competing Bids

Qualified Competing Bids must be served upon and actually received by, the representative of the Debtors, the DIP Lender Agent Representatives and the Committee's Professionals specified in the Sale Motion, on or before 5:00 p.m., Eastern Time, on the date that is set forth in the applicable Sale Motion. The Debtors may extend (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) the bid deadlines for the delivery of competing bids once or successively, without further notice and for one or more bidders, but shall not be obligated to do so.

### Reservation of Rights

Notwithstanding the Debtors' receipt of an Initial Bid and/or any Qualified Bids for any particular asset, the Debtors may continue to negotiate and solicit offers for the asset, including package offers that encompass more than one asset. The Debtors reserve the right in the exercise of their sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals to enter into agreements for the sale of any of their assets, either individually or as part of a package prior to an Auction (as defined below), without further notice to any party, which agreements, if any, will be subject to higher or otherwise better bids at the Auction (including evaluation on a package or individual basis) but which may be subject to bid protections or breakup fees as authorized by the Bankruptcy Court. The Debtors retain the right, in the exercise of their sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, to withdraw one or more assets from the Auction, including in connection with a package offer, up to the date of the Auction. This includes the right to withdraw an unexpired lease where the only bid is by the landlord. Notwithstanding anything to the contrary in these procedures, the Debtors also reserve the right, in the exercise of their sole discretion after consulting with the DIP Lender Agent Representatives and the Committee's Professionals, to reject any and all bids for any particular asset. Nothing in these Bidding Procedures will or will be construed to, in any way, modify, limit, impair, prejudice or adversely affect the rights and remedies of the DIP Lenders **in accordance with the provisions of the Final Financing Order (as defined herein) and the Loan Documents (as defined in the Final Financing Order)**. Formal approval of a bid will not occur unless and until the Bankruptcy Court enters an order approving and authorizing the Debtors to consummate the transaction. All bids, including those of the Initial Bidder, are subject to Bankruptcy Court approval. The Debtors retain all rights to any assets that are not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court at the Sale Hearing.

### Sale Motion and Notice

For each Purchase Agreement, the applicable Sale Motion will seek approval of, among other things, the sale of the asset free and clear of liens, claims and encumbrances under section 363 of the Bankruptcy Code. For each Purchase Agreement that contemplates the assumption, assumption of assignment or termination of executory contracts or unexpired leases, the applicable Sale Motion will also seek approval of (a) any cure obligation required by 11 U.S.C. § 365(f)(2), if any, to the extent not previously determined by the Court and (b) assumption or assumption and assignment of

5

the applicable executory contract or unexpired lease or approval of any lease termination agreement.

In each instance, the Debtors give notice and an opportunity to object to any known lienholders, and if the sale involves an executory contract or lease, the non-debtor parties to each of these contracts and leases. Any objection with respect to a Purchase Agreement, including with respect to the cure obligations or the proposed assumption, assumption and assignment, termination, or rejection of executory contracts or unexpired leases in connection with such Purchase Agreement must be filed with the Bankruptcy Court and served upon and received by the Debtors, the Debtors' counsel, the DIP **Lender Agent Representatives** and the Committee's counsel on or before 5:00 p.m., Eastern Time, on the date that is set forth in the applicable Sale Motion before the applicable Sale Hearing. If no objection is timely received by the Debtors, all proposed cure obligations provided in the Sale Motion will be deemed to be correct and binding upon all interested parties.

Unless otherwise ordered by the Bankruptcy Court with respect to a particular Sale Motion, a notice of a Sale Motion and the applicable Sale Hearing (the "Sale Notice") will be given electronically or by U.S. mail: (a) to each party that expressed an interest in an asset that is the subject of the particular Sale Motion (and their counsel of record in these Chapter 11 cases, if any); (b) if the Sale Motion seeks the assumption, assumption and assignment, termination, or rejection of executory contracts or unexpired leases or approval of any lease termination agreement, to each non-debtor party to such contract or lease (and their counsel of record in these Chapter 11 cases, if any); (c) to parties in interest entitled to receive notice under Bankruptcy Rule 2002 Bankruptcy Rule 6004, Local Rule 2002-1 and the Notice Procedures Order; and (d) if the Purchase Price for any asset exceeds $5,000,000, by publishing notice in the national edition of the Wall Street Journal. The Sale Notice (other than a published Sale Notice) shall also include a copy of these Bidding Procedures and with appropriate modifications, including deadlines and contact persons.

## Auction

If one or more Qualified Competing Bids which is higher or otherwise better than the Initial Bid, are timely received, an auction will be conducted for the particular asset at the time and location specified in the Sale Motion (an "Auction"). The Debtors will provide notice of any Auction at least two business days before the Auction to all parties who have submitted a Qualified Competing Bid.

Based upon the terms of the Initial Bid and the Qualified Competing Bids and such other information as the Debtors deem (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) relevant, the Debtors may conduct an Auction in any manner (and upon any terms and conditions) the Debtors believe (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) will achieve the maximum value for the particular asset to be sold.

6

The Debtors may (a) determine, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which Qualified Competing Bid or Initial Bid, if any, is the highest or best offer with respect to one or more of the assets, and (b) reject in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, any bid (including an Initial Bid) that, in the Debtors' sole discretion (but after consultation with the DIP Lender Agent Representatives and the Committee's Professionals), is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

At the conclusion of an Auction, the Debtors after consultation with their advisors, the Committee's Professionals and the DIP Lender Agent Representatives, will review each Qualified Competing Bid and the Initial Bid and identify the highest or best offer for the particular asset (each a "Successful Bid"; such bidder is the "Successful Bidder"). The Debtors reserve the right to refuse to consider any bid that fails to comply with the Bidding Procedures or any other procedures established by the Debtors at any Auction. Where the Successful Bid includes a proposed assumption and assignment of a nonresidential real property lease or executory contract, the Debtors will send a copy of the Successful Bid to all non-debtor parties to such lease or contracts by e-mail or overnight express delivery so that it is received by the non-debtor party to such contract or lease no later than eight days prior to the earlier of (i) the deadline to object to any such Sale (but not the deadline to object to any proposed cure) set forth in the applicable Sale Motion or (ii) the Sale Hearing.

If no Qualified Competing Bids are received for a particular asset, the Debtors may determine that, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals that the Initial Bid is the Successful Bid and seek Bankruptcy Court approval of the relevant Purchase Agreement without conducting an Auction or, may reject the Initial Bid and not proceed with any sale of the particular asset. If no Successful Bid is received for a particular asset the Debtors have included in any Sale Motion (including a bid by a landlord for its use), the Debtors may withdraw, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, withdraw the Motion as to that asset and may, in the Debtors' sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, continue to market the asset.

The Auction may be adjourned as the Debtors, after consultation with the DIP Lender Representatives and the Committee's Professionals, deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all participants and to the DIP Lender Agent Representatives and the Committee's Professionals.

## Sale Hearing

At the Sale Hearing, the Debtors will request that the Bankruptcy Court approve (a) (i) the Successful Bid, (ii) the applicable Purchase Agreement, and (iii) if the sale includes an executory contract or unexpired lease, the proposed assumption, assumption and assignment, termination or rejection of any executory contract or unexpired leases, and (b) authorize the Debtors to consummate the proposed transaction. If the Sale includes an unexpired lease, the Bankruptcy Court shall also determine:

(a)    any cure required under 11 U.S.C. §365(b) if the affected landlord timely filed an objection to the Debtors' proposed cure; and

(b)    if applicable, whether the Debtor has demonstrated adequate assurance of future performance under 11 U.S.C. §§ 365(b)(3) and 365(f)(2).

If the Debtors elect to proceed without an Auction, and no objection to the proposed transaction is filed with the Court within the applicable time, the Debtors will file a certificate of no objection and a proposed order (a) approving (i) the sale of the asset set forth in the applicable Purchase Agreement, (ii) the applicable Purchase Agreement, and (iii) if applicable, the assumption, assumption and assignment, termination or rejection of any executory contract or unexpired leases under the applicable Purchase Agreement and (b) authorizing the Debtors to consummate the transaction contemplated by the Purchase Agreement. In that event, the Court may enter the Sale Order without holding a Sale Hearing. If timely objections to the proposed transaction are received, then the Debtors will seek Bankruptcy Court approval at a Sale Hearing.

If the Successful Bidder fails to consummate the Successful Bid in accordance with the terms of its Purchase Agreement, the Debtors (i) will retain the earnest money deposit of such bidder, to the extent provided by the purchase agreement, and (ii) maintain the right to pursue all available remedies against the bidder. In such event, and upon consultation with the DIP Lender Agent Representatives and the Committee's Professionals, the Debtors may consummate the proposed transaction with the next highest or best bidder at the Auction and consummate the transaction with such bidder at the highest price bid by such bidder at the Auction without the need for further Bankruptcy Court approval (or, if that bidder is unable to consummate the transaction at that price, the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, may consummate the transaction with the next highest bidder, at the Auction and so forth) (the "Alternate Bid"). Notwithstanding anything to the contrary in the foregoing, if the respective sale includes the assumption and assignment of an unexpired lease, the Debtors may not proceed with the Alternate Bid until the Debtors provide the affected landlord with a copy of the Alternate Bid. The affected landlord has no less than eight days after receipt of the Alternate Bid to file a written objection with the Court. If no such objection is filed, the Debtors may proceed to consummate the Alternate Bid. If the landlord files a timely objection, the Alternate Bid will be set for hearing and the Debtors may not proceed absent Court order.

8

Any bidders submitting bids will bear their own expenses in connection with the sale, regardless of whether the sale is approved, in accordance with the terms of the applicable Purchase Agreement.

**Additional Conditions Applicable to the
Initial Bid and all Qualified Competing Bids**

Notwithstanding anything to the contrary in these procedures, the bid of the Successful Bidder will remain irrevocable in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. All other bids will be irrevocable until the earlier to occur of (i) 60 days after entry of a Sale Order approving the sale of the assets or (ii) closing of the sale of assets in accordance with the Successful Bid. Notwithstanding the foregoing, the right of the Initial Bidder will be governed by the terms of its Purchase Agreement.

Notwithstanding anything to the contrary in these procedures, the earnest money deposit of the Successful Bidder will be retained by the Debtors in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. Deposits of all other bidders will be retained by the Debtors until the earlier to occur of (i) 60 days after entry of a Sale Order approving the sale of the assets or (ii) closing of the sale of assets in accordance with the Successful Bid. Notwithstanding the foregoing, the deposit of the Initial Bidder will be governed by the terms of its Purchase Agreement.

Notwithstanding anything to the contrary, the Debtors, after consultation with the DIP Lender Agent **Representatives** and the Committee's Professionals, have the right to entertain bids that do not conform to one or more of the requirements set forth in these procedures and to deem such bids Qualified Competing Bids.

All Bids, the Auction and the Bidding Procedures are subject to such other terms and conditions as are announced by the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals provided however, that the Debtors may not amend these procedures to change notice provisions or otherwise withdraw any rights given by these procedures to affected landlords (in their capacity as landlords).

**"As Is, Where Is"**

The proposed transfer of any of the Debtors' assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates, except to the extent set forth in the applicable Purchase Agreement of each Successful Bidder as accepted by the Debtors and approved by the Bankruptcy Court. Except as otherwise provided in a Purchase Agreement, all of the Debtors' right, title and interest in and to the respective asset will be transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests in accordance with Section 363 of the Bankruptcy Code. The Debtors will cause all net proceeds from any such sale to be paid to the DIP Lenders to the extent required in accordance with the terms of the Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the

9

Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order). Any other claim, lien or encumbrance will attach to the net proceeds of the sale of the particular asset.

Each bidder for any of the Debtors' assets will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct such due diligence regarding the asset prior to making its offer as provided in the Purchase Agreement, (b) has relied solely upon its own independent review, investigation and/or inspection of any document including, without limitation, executory contracts and unexpired leases in making its bid, and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the asset, or the completeness of any information provided in connection with the asset sale or the Auction, except as expressly stated in the particular Purchase Agreement.

Exhibit A to Motion to Establish Bidding Procedures - WD (00498628-5).DOC.5

**Exhibit B**

**Bid Protections**

1.      A termination fee of up to 3% of the cash portion of the purchase price set forth in the bidder's Asset Purchase Agreement (the "Termination Fee");

2.      Initial overbid protection not to exceed 105% of the purchase price set forth in such bidder's Asset Purchase Agreement (the "Overbid Protection"); and/or

3.      In the case of bids on multiple leases, the ability to reduce the purchase price set forth in such bidder's Asset Purchase Agreement by up to 115% of the allocated purchase price for a particular Lease, to the extent such Lease is sold to another entity and the bidder is still the Successful Bidder with respect to the remaining Leases bid on as a group (the "Release Protection").

**EXHIBIT B**

FORM CONTRACT

## FACILITY PURCHASE AGREEMENT
[Montgomery Distribution Center and Dairy Plant]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made effective as of the date on which the latter of the parties executes this Agreement as indicated on the signature page hereof (the "Effective Date"), by and between:

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation ("Seller"), and

_____, a _____, or its permitted assignee pursuant to paragraph 12.3 of this Agreement ("Buyer").

### R E C I T A L S :

A.   Seller owns fee simple title to the real property described on attached Exhibit A (the "Land"), together with all easements, appurtenances and hereditaments thereto, located at 1550 Jackson Ferry Road, Montgomery, Alabama, and all improvements located thereon (the "Facility"). The Facility and the Land together are referred to as the "Property."

B.   Seller desires to convey and sell to Buyer, and Buyer desires to acquire (directly or through an Affiliate designated by Buyer) and purchase, the Property, subject to the terms and conditions contained in this Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION** and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.   **Defined Terms.** Capitalized terms as used in this Agreement will have the meanings assigned to such terms as they appear in this Agreement, except that the following capitalized terms will have the meanings set forth below:

   1.1   "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

   1.2   "Broker" will mean the real estate broker(s) identified in paragraph 10 of this Agreement as the broker for the transaction contemplated hereunder.

   1.3   "Business Day" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Duval County, Florida.

1

1.4   "Buyer's Counsel" will mean the law firm or firms engaged by Buyer as its legal counsel (including local counsel) in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transaction.

1.5   "Claim" will mean any claim (including without limitation as defined by 11 U.S.C. Section 101(5)), demand, action, complaint, suit, lawsuit, litigation, inquiry, hearing, investigation or proceeding, whether formal or informal, commenced, brought or threatened.

1.6   "Closing" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Deed and other documents contemplated by paragraph 9 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.7   "Closing Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as closing agent for the transactions contemplated hereunder.

1.8   "Closing Statement" will mean a statement to be delivered by Buyer and Seller at Closing, reflecting the net amount due from Buyer to Seller at Closing for the Assets, and the proper allocation of Buyer's Closing Costs and Seller's Closing Costs, after making the adjustments as provided in this Agreement.

1.9   "Consent" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Property are governed or bound.

1.10  "Environmental Laws" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

2

1.11    "Environmental Permits" will mean all Consents required under any Environmental Law.

1.12    "Escrow Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as escrow agent.

1.13    "Excluded Personal Property" will mean those items of furniture, furnishings and movable equipment, including all computer and related equipment, and all other tangible and intangible personal property, as more particularly described on Exhibit B.

1.14    "Governmental Authority" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.15    "Hazardous Material" will mean any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.16    "Interest" will mean any and all interests (including any successor, transferee or similar liability), liens (including but not limited to any and all "liens" as defined in 11 U.S.C. § 101(37)), liabilities, mortgages, deeds, trusts, guarantees, security agreements, security interest, rights of setoff or recoupment, pledges, privileges, options, rights of first refusal, preemptive rights, easements, servitudes, encroachments, hypothecations, charges, obligations, rights, restrictions, charges and encumbrances of any kind or nature or other matter causing a defect or imperfection in title.

1.17    "Knowledge" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the executive officers of Seller and of Winn-Dixie Stores, Inc., and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers.

1.18    "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

3

1.19 "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien or Interest against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) construction liens or Interests that have attached to and become a lien or Interest against Seller's interest in the Property; (iv) judgments that have attached to and become a lien or Interest against Seller's interest in the Assets; and (v) any other Interest against Seller's interest in the Assets that can be satisfied by Seller with the payment of money out of the Purchase Price.

1.20 "Outside Date" will mean June 28, 2006.

1.21 "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.22 "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.23 "Title Insurer" will mean First American Title Insurance Company, and its agent, Smith, Gambrell & Russell, LLP, Jacksonville, Florida office.

2. **Assets.** Seller agrees to grant, bargain, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following described property (collectively, the "Assets"), free and clear of any and all Claims and Interests (other than Permitted Encumbrances) in accordance with 11 U.S.C. Section 363:

2.1 The Property; and

2.2 All fixtures, furniture and equipment located on the Property, including, but not limited to heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, and flooring located on the Property, but specifically excluding the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller.

3. **Purchase Price; Payment.**

3.1 Purchase Price. Buyer agrees to pay Seller a purchase price of $_____ for the Assets (the "Purchase Price"), payable to Seller on the Closing Date. Buyer shall not be liable for any obligations of Seller or have any further obligations beyond the payment of the Purchase Price, except as otherwise expressly set forth in this Agreement.

4

3.2    Deposit.

3.2.1  An earnest money deposit of $500,000 (the "Deposit") will be due and payable to Smith, Gambrell & Russell, LLP, through its Jacksonville, Florida office, as escrow agent ("Escrow Agent") under the provisions of paragraph 14 within 3 days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

3.2.2  At Closing, the Deposit will be credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable in cash (as adjusted by prorations and payment of expenses as herein provided).

3.3    Payment of Purchase Price. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "Closing Deposit") with Escrow Agent. Escrow Agent will deposit the Closing Deposit into a non-interest bearing escrow account and will disburse or apply the Closing Deposit as provided in this Agreement. At Closing, the Purchase Price will be credited and disbursed to Seller or as Seller directs.

4.    **Condition of Assets; Buyer's Due Diligence; Buyer's Financing.**

4.1    Condition of Assets. Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets "As Is, Where Is," with all faults, without representations or warranties expressed or implied, and there are no oral agreements, warranties or representations collateral to or affecting the Property by Seller or any third party. The terms and conditions of this paragraph will expressly survive the closing and not merge therein.

4.2    Investigation Period.    Buyer has inspected the Property and has determined that the same is satisfactory to Buyer.

4.3    Title. At Closing, Seller will, pursuant to the terms of the Sale Order, convey and assign to Buyer, and Buyer will accept, all of Seller's right, title and interest in the Assets, subject only to those matters listed on Exhibit C and to any other matters approved or waived by Buyer as provided in this Agreement (collectively, the "Permitted Encumbrances"). Seller's interest in the Property will be conveyed by special warranty deed substantially in the form attached as Exhibit D as required by Title Insurer to properly insure Buyer's title to the Property (the "Deed"). Evidence of the delivery of marketable and insurable title to Seller's interest in the Property will be pursuant to Title Insurer's issuance of a policy of title insurance for the Property (in the form of a marked Title Commitment evidencing the Title Insurer's binding obligation to issue its title policy), insuring the interest of Buyer in the Property as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for a survey reading reflecting

5

matters disclosed on the Survey obtained by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Property is located, in the amount of the Purchase Price (the "Title Policy").

4.4    Title Commitment. Buyer has examined a title insurance commitment (the "Commitment") from Fidelity National Title Insurance Company (the "Title Insurer") committing to insure fee simple title to the Property and has determined that the same is satisfactory to Buyer.    The Title Commitment states all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Seller and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens"), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances (collectively, the "Exceptions").

4.5    Boundary Survey. Buyer has examined a survey of the Property (the "Survey"), showing a metes and bounds legal description for the Property (the "Legal Description") and has determined that the same is satisfactory to Buyer.

4.6    Special Covenants and Conditions. Buyer acknowledges the following special covenants and conditions relating to the Property:

4.6.1    Railroad Spur Tracks.  Railroad spur tracks are located within the Facility, as shown on the Facility Site Plan, attached as Exhibit E. There is no spur track agreement in effect between Seller and the rail service provider and no rail service is provided to the Facility at this time.  The railroad spur tracks are considered a Permitted Encumbrance.

4.6.2    Refrigeration System.  The Property includes an ammonia-based refrigeration system together with operating manuals and protocols (the "Refrigeration System").    Seller will have no liability to Buyer in connection with the Refrigeration System.

4.6.3    Underground Storage Tanks.

(a)    UST's. The Facility historically has contained underground storage tanks ("UST's"), which either have been removed, withdrawn from service and filled with inert material, or remain in service.  A schedule of UST's presently or formerly located on the Facility, and the applicable Environmental Permits associated with the UST's, is set forth on attached Exhibit F.

6

(b) <u>Environmental Law Compliance</u>. Except as set forth in <u>paragraph 5.1.4</u> below, Seller makes no representations or warranties to Buyer as to the compliance of the UST's with applicable Environmental Laws.

(c) <u>Indemnification</u>. Buyer acknowledges the special requirements and hazards of the UST's under Environmental Laws. Buyer's acceptance of the Facility at Closing will constitute Buyer's assumption of responsibility for the operation, maintenance, repair, closure and removal of the UST's from and after the Closing Date, and Seller will have no further obligations relating thereto. Buyer agrees to release, indemnify and hold harmless Seller from all claims, loss, cost, damages or expense asserted against Seller from and after Closing, to Buyer's use, maintenance, repair, closure and removal of the UST's from the Facility, and to actions required under Environmental Laws.

5. **Representations and Warranties of Seller and Buyer.**

5.1 Seller warrants to Buyer as follows:

5.1.1 <u>Corporate Existence and Authority</u>. Seller is a Florida corporation, and its status is active. Subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

5.1.2 <u>Title to Property</u>. Seller owns fee simple title to the Property, subject to the Permitted Encumbrances, the Credit Agreement Liens and the Other Liens.

5.1.3 <u>Power to Convey</u>. To Seller's Knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in <u>paragraph 7</u> below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

7

5.1.4 <u>Compliance with Environmental Laws</u>. To Seller's Knowledge, Seller has not been notified by any Governmental Authority of any noncompliance of the Property with Environmental Laws, including all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material or asbestos-containing materials; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.

5.2     Buyer warrants to Seller as follows:

5.2.1 <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's permitted assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

5.2.2 <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

5.2.3 <u>Financial Condition</u>. Buyer represents, warrants and covenants that as of the Effective Date and continuing through the Closing Date, Buyer has and will have the sufficient funds on hand to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

6.     **Survival of Warranties.** The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Deed, and will have no further force or effect after the Closing, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement and the Deed.

8

7.    **Closing Conditions.**

7.1    Approval Condition.

7.1.1    Chapter 11 Cases. Winn-Dixie Stores, Inc. and certain of its affiliated companies, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "Bankruptcy Cases"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court") where they are being jointly administered under Case No. 05-03817-3F1.

7.1.2    Competitive Bid Process. By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "Bidding Procedures"). This Agreement is subject to the competitive bid process described in the Bidding Procedures. Promptly following the expiration of the Investigation Period, provided that this Agreement has not earlier terminated, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Agreement Liens and the Other Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "Sale Motion"). The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "Sale Hearing"). Prior to the Sale Hearing, the debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"). The Bidding Procedures allow Seller to accept competitive bids on the Property to determine the Successful Bid (as that term is defined in the Bidding Procedures) for the Property. The party submitting the Successful Bid for the Property as selected by Seller is referred to as the "Successful Bidder". Buyer may participate in the Auction and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder. Prior to the Sale Hearing, upon consultation with the Creditors' Committee and DIP Lender, Seller will select the highest or otherwise best offer to purchase the Property, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful

9

Bid. Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing for entry of a Sale Order with respect to the Property by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

7.1.3  Qualifying Bids.  Any person or entity interested in submitting a higher and better bid for the Assets must submit the bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747, no later than 12:00 p.m., EDST, on June 12, 2006.  To qualify as a competing bid, the offer must be an amount that, if it was the successful bid, would net the Debtors' estates at least $7,000,000.  Contemporaneously with submittal of the offer, the bidder must deliver an earnest money deposit in the amount of $500,000 by wire transfer to the trust account of Escrow Agent, pursuant to the wire transfer instructions attached hereto as Exhibit G.  The Auction will take place at 10:00 a.m., EDST, at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida, on Wednesday, June 14, 2006.  The Debtors will conduct the Auction in consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

7.1.4  Sale Order Approving Agreement.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

7.1.5  Continuing Effectiveness of Agreement.  Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will promptly refund the Deposit to Buyer, and the parties will have no further obligations to the other.

10

7.2   <u>Conditions Precedent to Seller's Obligations</u>. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

7.2.1   Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

7.2.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with <u>paragraph 11</u> of this Agreement.

8.   **Casualty; Condemnation**. If, prior to Seller's legal delivery to Buyer of the Deed (i.e. the release of the Deed to Buyer from escrow) and Buyer's delivery to Seller of the Purchase Price (i.e. the release of the Purchase Price to Seller from escrow), the Assets thereof, are destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within five (5) business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Assets are sold to Buyer pursuant to the terms of this Agreement, then as Buyer's sole remedies, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds received by it.

9.   **Closing.**

9.1   The consummation of the transactions contemplated herein by Buyer and Seller (the "<u>Closing</u>") will be held on or before that date which is ten (10) days following the satisfaction of the Approval Condition (the "<u>Closing Date</u>"), at a time and place mutually acceptable to the parties,

11

but if none is agreed to, at the offices of Closing Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Closing Agent.

9.2     Possession of the Assets will be delivered to Buyer on the Closing Date free and clear of all Claims and Interests and rights of third parties whatsoever, subject only to the Permitted Encumbrances.

9.3     At the Closing, Seller will deliver to Buyer or Buyer's designee the following:

    (i)     The Deed;

    (ii)    The Bill of Sale;

    (iii)   The Closing Statement;

    (iv)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered;

    (v)     All keys and codes for the Property; and

    (vi)    Any other documentation required of Seller under local law.

Buyer may waive compliance by Seller as to any of the foregoing items by an instrument in writing.

9.4     At the Closing, Buyer will execute and/or deliver to Seller the following:

    (i)     The Purchase Price;

    (ii)    The Closing Statement;

    (iii)   Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered; and

    (iv)    Any other documentation required of Buyer under local law.

Seller may waive compliance by Buyer as to any of the foregoing items by an instrument in writing.

9.5     On the Closing Date, Seller and Buyer will each deposit such other instruments with Closing Agent as are reasonably required by the Title Insurer to consummate the conveyance of the Property to Buyer in accordance with the terms hereof.

12

9.6 All ad valorem taxes for the year in which the Closing occurs will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). The tax proration at Closing may be based on an estimate using the previous year's tax amount. Buyer agrees to notify the taxing authority promptly after Closing of the transfer and assignment of Seller's interest in the Assets to Buyer for purposes of proper tax assessment notifications.

9.7 Any matter specified in paragraph 9.6 of this Agreement that cannot reasonably be determined and apportioned between Seller and Buyer on the Closing Date will be specified by Buyer and Seller in writing at Closing and will be subject to settlement at such time as such matter is finally determined (but in no event later than ninety (90) days after the Closing Date). Additionally, any apportionments, prorations or adjustments that are miscalculated (through mathematical error) at Closing will be subject to recalculation and final settlement at such time as such miscalculation is discovered (but in no event later than ninety (90) days after the Closing Date). Such apportionments will be effective as of the Closing Date.

9.8 At or prior to Closing, Seller will pay the cost of the commission payable to Seller's Broker as disclosed in paragraph 10, and Seller's attorneys' fees and costs ("Seller's Closing Costs"). At or prior to Closing, Buyer will pay the cost of the documentary stamp taxes on the Deed, the cost of the Title Commitment and insurance policy to be issued pursuant to the Commitment in the amount of the Purchase Price, the cost of the Survey, the cost of its due diligence investigations of the Property, all recording fees, all financing costs of Buyer incurred to purchase the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("Buyer's Closing Costs"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

10. **Brokers; Commissions.** Seller and Buyer acknowledge that Seller has retained DJM Asset Management, LLC ("Seller's Broker") pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "Retention Order"). Seller will be responsible for payment of the Seller's Broker pursuant to the Retention Order. Each party indemnifies and agrees to hold harmless the other from any claim made by any other broker or agent who claims to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

13

11.    **Default; Remedies**.

11.1    Seller's Default. If Seller fails to materially comply with or perform any of the covenants, agreements or obligations to be performed by Seller under this Agreement, then Buyer will be entitled to terminate this Agreement by written notice to Seller and promptly following such termination of this Agreement, without any other action being necessary, Escrow Agent will return the Deposit to Buyer. Buyer waives all other remedies it may have at law or in equity.

11.2    Buyer's Default. If Buyer fails to materially comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under this Agreement, then Seller may elect to terminate this Agreement by written notice to Buyer and thereupon Escrow Agent will deliver the Deposit to Seller as Seller's agreed liquidated final damages, and not as a penalty, it being understood that Seller's actual damages in the event of such default may be difficult or impossible to ascertain. Seller waives all other remedies it may have at law or in equity.

11.3    Remedies Cumulative. The foregoing remedies are in addition to any rights afforded either of the parties pursuant to Seller's indemnity under paragraph 10, and Buyer's indemnities under paragraphs 4.6.2 and 10 and repair obligations otherwise provided under this Agreement.

12.    **Miscellaneous**

12.1    Attorneys' Fees. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the non-prevailing party will pay to the prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.

12.2    Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will be in writing and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by United States Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

14

If to Seller:

>Winn-Dixie Logistics, Inc.
>5050 Edgewood Court
>Jacksonville, Florida 32254-3699
>Attn:  Catherine Ibold
>Telefax No. (904) 783-5138

With a copy to:

>Smith, Gambrell & Russell, LLP
>50 N. Laura Street, Suite 2600
>Jacksonville, Florida 32202
>Attention: Douglas Stanford
>Telefax No.: (904) 598-6226

If to Buyer:

>_____
>_____
>_____
>Attn: _____
>Telefax No. _____

If to Escrow Agent or Closing Agent:

>Smith, Gambrell & Russell, LLP
>50 N. Laura Street, Suite 2600
>Jacksonville, Florida  32202
>Attention: Douglas Stanford
>Telefax No.: (904) 598-6226

or such other address as any of the foregoing parties may from time to time specify by notice to the others.

12.3    <u>Successors And Assigns; Assignment Of Agreement</u>. All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns.  Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other.  Buyer may assign its rights and obligations under this Agreement to an Affiliate as the "Buyer" hereunder, provided, however, that Buyer shall remain fully liable for performance of the obligations, including indemnifications, of the "Buyer" hereunder.

12.4    <u>Changes And Modifications; Prior Agreements</u>. This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof

15

will be valid unless in writing and signed by a party against whom it is to be enforced.

12.5   Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Alabama. Any dispute arising out of or under this Agreement will be litigated in the Bankruptcy Court.

12.6   Time is of the Essence. Time is of the essence of this Agreement.

12.7   Captions. The captions of this Agreement are inserted for convenience or reference only and not to define, describe or limit the scope or the intent of this Agreement or any term hereof.

12.8   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument; facsimiles of this Agreement as so executed will be deemed to constitute a counterpart hereof.

12.9   Waiver Of Trial By Jury. Buyer and Seller each agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or the Assets undesirable. Accordingly, Buyer and Seller each specifically waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the Assets.   The foregoing waiver is made knowingly, voluntarily and intentionally by both Buyer and Seller.

13.   **Consent to Jurisdiction. UNTIL THE BANKRUPTCY CASE IS CLOSED, THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyer and Seller further agree that, until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, service of any process, summons, notice or document by U.S. Registered Mail to any such party's respective address set forth in paragraph 12.2 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

16

14. **Escrow Agent**.

14.1    Duties. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Escrow Agent agrees to hold the Deposit in trust, and disburse the same in accordance with this Agreement. Escrow Agent will release the Deposit only as expressly provided in this Agreement.  Interest will not accrue on the Deposit.

14.2    Limitations of Liability. Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

14.3    Role as Counsel.  The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

14.4    Withdrawal. No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the closing or termination of this Agreement except in accordance with the terms of this Agreement.

14.5    Dispute. If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefore. In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal).

**[Signatures on following page]**

Facility Purchase Agreement
Winn-Dixie Logistics, Inc.
Montgomery Distribution Center and Dairy Plant Facility - Montgomery, AL
May 1, 2006
SGRJAX\83095.1

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the dates written below their respective names.

Signed, sealed and delivered in
the presence of:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

By: _____
Name: _____
Name:_____
Name: _____
Title: Vice President

Name:_____

[Corporate Seal]

Date of Execution: _____ ____, 2006

Signed, sealed and delivered in
the presence of:

**BUYER:**

_____, a _____

By: _____
Name: _____
Name:_____
Name: _____
Title: _____

Name:_____

[Seal]

Date of Execution: _____ ____, 2006

SCHEDULE OF EXHIBITS

| Exhibit A | - | Legal Description of Land |
| Exhibit B | - | Schedule of Excluded Personal Property |
| Exhibit C | - | Schedule of Permitted Encumbrances |
| Exhibit D | - | Form of Deed |
| Exhibit E | - | Facility Site Plan |
| Exhibit F | - | Underground Storage Tanks |
| Exhibit G | - | Wire Transfer Instructions |

18

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Facility Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**


By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: _____ _____, 2006

19

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

Lot BB, according to the Replat of Lot AA, and Additional Property West and North thereof in Northwest Quarter, Section 6, Township 16 North, Range 18 East and in Southwest quarter, Section 31, Township 17 North, Range 18 East, as said Plat appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 36, Page 53.

## **EXHIBIT B**

### SCHEDULE OF EXCLUDED PERSONAL PROPERTY

All furniture, furnishings, trade fixtures and movable equipment and all other tangible and intangible personal property.

## **EXHIBIT C**

### SCHEDULE OF PERMITTED ENCUMBRANCES

1.  Taxes for the tax year 2006 and subsequent years, which are not yet due and payable.

2.  Spur Track Agreement between the Western Railway of Alabama and Winn-Dixie Montgomery, Inc., as recorded in Deed Book 453, Page 518.

3.  Easement in favor of Alabama Power Company as set out in Deed Book 544, Page 446.

4.  Easement in favor of Alabama Gas Corporation as set out in Deed Book 391, Page 240; Deed Book 417, Page 410; Deed Book 609, Page 547; and Real Property Book 93, Page 537.

5.  Easement granted to Western Railway of Alabama as set out in Real Property Book 926, Page 706.

6.  Covenants regarding drainage system and implied easement as set out in Real Property Book 926, Page 703.

7.  Hold Harmless Agreement concerning flooding as set out in Real Property Book 1138, Page 219.

8.  Power lines and poles and sanitary sewer lines along the west and northwest lot lines as shown on survey.

9.  Encroachment of fence onto adjacent property along the north lot line as shown on survey.

10. Encroachment of fence onto adjacent property along the east lot line near the southern corner of subject property as shown on survey.

All official records book and page references are to public records of Montgomery County, Alabama.

## EXHIBIT D

FORM OF DEED

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED**, is given this __<sup>th</sup> day of ___, 2006, by **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation, whose address is 5050 Edgewood Court, Jacksonville, Florida 32254 ("Grantor") to _____, a _____, whose mailing address is _____ ("Grantee").

W I T N E S S E T H:

That Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, to it in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed unto Grantee, its successors and assigns, forever, that parcel or parcels of land, situate, lying and being in the County of Montgomery, State of Alabama, as more particularly described on Schedule A attached hereto ("Property"), together with all tenements, hereditaments and appurtenances belonging thereto.

TO HAVE AND TO HOLD the same unto Grantee in fee simple forever.

AND Grantor does hereby fully warrant the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to the permitted encumbrances identified on attached Schedule B.

**IN TESTIMONY WHEREOF, WITNESS** the signature of Grantor the date and year first above written.

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**GRANTOR:**

**WINN-DIXIE LOGISTICS, INC.**, a
Florida corporation

_____

Name: _____

By: _____
Name: _____
Title: Vice President

_____

Name: _____

[CORPORATE SEAL]


STATE OF FLORIDA   )
COUNTY OF DUVAL   )

  The foregoing instrument was acknowledged before me this __ day of _____, 2006, by _____, the Vice President of Winn-Dixie Logistics, Inc., a Florida corporation, on behalf of the corporation.  He is personally known to me.

           Print Name:
           Notary Public, State of Florida
           My Commission Expires:
           Commission No.:

           [NOTARIAL SEAL]

## **EXHIBIT E**

FACILITY SITE PLAN

[Attached]

## EXHIBIT F

UNDERGROUND STORAGE TANKS

All Underground Storage Tanks have been removed.

There were a total of five 12,000 gallon UST's, five 3,000 gallon UST's, one 4,000 gallon UST and one 2,000 gallon UST associated with the Property.  There were two former used oil UST's located at the southeastern corner of the garage facility, as shown on Figure 2 (attached).

## **EXHIBIT G**

WIRE TRANSFER INSTRUCTIONS

Wachovia  Bank, NA
225 Water Street
Jacksonville, Florida 32202
**ABA#063000021**
**Account # 2000015490881**
**Credit:** Smith, Gambrell & Russell, LLP, - IOTA Trust Account
Suite 2600 Bank of America Tower
50 N. Laura Street
Jacksonville, Florida 32202

**International SWIFT # PNBPUS33**

Reference: Please notify Elizabeth A. Locke @ (904) 598-6101
or Fax Conformation to 904-598-6201
ealocke@sgrlaw.com

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

**ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC.
TO SELL MONTGOMERY DISTRIBUTION CENTER AND
RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
AND INTERESTS AND (B) GRANTING RELATED RELIEF**

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Logistics, Inc. ("WD Logistics") to sell the Montgomery Distribution Center[1] (together with all related improvements) to  the Purchaser, or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances, and (b) granting related relief (the "Motion").  A hearing on the Motion was held by the Court on June 15, 2006 (the "Sale Hearing").  The Court has read the Motion and has considered the representations of counsel.  Upon the representations of counsel and without objection by the

---

[1]   All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Facility Agreement.

00532816

United States Trustee or any other interested party, the Court makes the following findings of fact:

A.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.    The Debtors solicited the highest or otherwise best offer for the Assets described in the Facility Agreement (the "Assets") in accordance with bidding procedures approved by order of the Court (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order"). The bid of $_____ (the "Purchaser") in the amount of $_____ was the highest or otherwise best offer for the Assets.

C.    The Debtors have provided interested parties (including all parties asserting claims or interests in, to or against the Assets, if any, with proper notice of the Motion, the Auction, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the Notice Procedures Order.

D.    The Debtors marketed the Assets and conducted the Auction process in compliance with the Bidding Procedures Order. The bidding on the Assets and the Auction (if any) were conducted in a non-collusive, fair and good faith manner. Through the Debtors' marketing efforts and Auction process, the

2

Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

E.      The Debtors (i) have full corporate power and authority to execute and consummate the Facility Agreement attached as Exhibit A to this Order and all related documents, and the Sale of the Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors and (ii) no consents or approvals, other than those expressly provided for in the Facility Agreement, are required to consummate the transactions contemplated by the Facility Agreement.

F.      The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.      Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.      The Facility Agreement was proposed, negotiated and entered into by the Debtors and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Facility Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

3

J.      The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

K.      The Debtors' transfer of the Assets to the Purchaser pursuant to the Facility Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Facility Agreement.

L.      WD Logistics may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

M.    WD Logistics will cause the proceeds from the Sale to be paid, to the extent required, in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of all Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

N.    The Court's approval of the Facility Agreement and the Sale of the Assets to the Purchaser is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

2.    Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.    The terms and conditions of the Facility Agreement are approved.  Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are

authorized to consummate the Sale in accordance with the terms and conditions of the Facility Agreement.

4.     WD Logistics is authorized to consummate and implement fully the Facility Agreement, together with all additional instruments and documents that may be necessary to implement the Facility Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Facility Agreement.

5.     Any agreements, documents, or other instruments executed in connection with the Facility Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender and (ii) the Creditors' Committee, which consent will not be unreasonably withheld, and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.     WD Logistics will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).  The only Claims and/or Interests in the Assets are those with the DIP Lender.  The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds from the Sale in accordance

with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.    WD Logistics' transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all right, title and interest of WD Logistics in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.    The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.    The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.    Upon Closing of the Sale in accordance with the Facility Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).  Accordingly, the reversal or modification on appeal of the authorization to consummate the Sale of the Assets will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.    All entities that are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each

7

of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions do not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist. In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12.    WD Logistics' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Facility Agreement and this Order.

13.    Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Facility Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets. WD Logistics' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the

Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.    This Order is effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

15.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Facility Agreement.

16.    This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction to (a) enforce and implement the

Facility Agreement and any agreements and instruments executed in connection with the Facility Agreement, (b) compel delivery of possession of the Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Facility Agreement and (d) interpret, implement, and enforce the provisions of this Order.

18.    All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.    The failure specifically to include any particular provision of the Facility Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Facility Agreement be authorized and approved in its entirety.

21.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a

lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Facility Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Facility Agreement.

22.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Facility Agreement and this Order, the provisions contained in the this Order will control.

23.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ___ day of June 2006 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.
00532816