# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF (STORE NOS. 208, 211, 339 AND 2330)

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 6004 and 6006 (a) Authorizing the Sale of Additional Stores and Related Equipment Free and Clear of Liens, Claims and Interests, (b) Authorizing the Assumption and Assignment or Alternatively, the Rejection of Leases and Establishing a Claim Bar Date, and (c) Granting Related Relief filed with the Court on April 26, 2006 (the "Motion") (Docket No. 7517).   The Court held a hearing on the Motion on May 18 and 19, 2006 to approve the sale (the "Sale Hearing").   The Court has reviewed the Motion and heard the representations of counsel.   Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.    The Debtors solicited the highest or otherwise best offer for the Leases in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). The Debtors held an auction for the Additional Stores on May 9, 2006 (the "Auction"). Sunrise Properties, LLC (the "Purchaser") submitted the highest and best offer for the leases for Store Numbers 208, 211, 339 and 2330 (collectively, the "Leases"). The affected landlords were given until April 25, 2006 to object to the Debtors' proposed cure amount. The landlords for Store Nos. 211 and 339 filed an objection to the proposed cure amounts (Docket No. 7408) (the "Cure Objections") and to the Debtors' ability to assume and assign their leases to the Purchaser (the "Sale Objections"). The landlords for Store Nos. 208 and 2330 failed to file an objection. By agreement, the landlord for Store No. 2330 did not file any objection, having approved the terms and conditions with respect to assumption and assignment of its lease contained in this Order. Undisputed cure amounts, if any, will be paid at Closing. Unless resolved by the parties, the Court will schedule a hearing on the Cure Objections.

C.    To resolve the Sale Objections, the Debtors and Sunrise entered into an Amended Purchase Agreement pursuant to which Sunrise agreed to exercise its right to designate an assignee for the lease for Store No. 211 (the "211 Lease") and certain equipment located at such store (the "211 Equipment") to a party or parties

2

designated by the landlord for the store (the "211 Landlord") and reduce the purchase price to $2,000,000 (the "Amended Purchase Agreement").

D.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Leases, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

E.    The Debtors marketed the Assets and conducted the sale process in compliance with the Order approving the Bidding Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction, as modified by the Amended Asset Purchase Agreement, represented the highest or otherwise best offer for the Assets.

F.    The Debtors (i) have full corporate power and authority to execute and consummate the Amended Purchase Agreement attached as Exhibit A and the Assumption and Assignment Agreement attached as Exhibit F to the Amended Purchase Agreement, and all related documents, and the sale of the Assets and the assumption and assignment of the Leases has been duly and validly authorized by all necessary corporate

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Amended Purchase Agreement, are required to consummate the transactions contemplated by the Amended Purchase Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither the Purchaser nor any of their affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Debtors, and the Purchaser proposed, negotiated and entered into the Amended Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors, the Purchaser, the 211 Landlord, nor any other party has engaged in any conduct that would cause or permit the Amended Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser and its designees are good faith purchasers within the meaning of 11 U.S.C. § 363(m) and, as such, are entitled to the protections afforded by that section.

K.    The consideration the Purchaser and its designees are providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

L.    The Debtors' transfer of the Assets to the Purchaser and its designees pursuant to the Amended Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser and its designees vests the Purchaser and such designees with good and valid title in and to the Assets free and clear of any liens,

4

claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Amended Purchase Agreement. Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

M.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Amended Purchase Agreement free and clear of all Liens, Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities), including, but not limited to (i) that certain mortgage executed by Winn-Dixie Stores, Inc., a Florida corporation, in favor of Wachovia Bank, National Association, as Administrative Agent and Collateral Monitoring Agent, recorded July 1, 2005, in Book 18842, page 1397, of the public records of Palm Beach County, Florida; (ii) that certain mortgage executed by Winn-Dixie Stores, Inc., a Florida corporation in favor of Wachovia Bank, National Association, as Administrative Agent and Collateral Monitoring Agent, recorded June 27, 2005, in Book 39946, page 1255, of the public records of Broward County, Florida; (iii) that certain mortgage executed by Winn-Dixie Stores, Inc., a Florida corporation, in favor of Wachovia Bank, National

Association, as Administrative Agent and Collateral Monitoring Agent, recorded June 27, 2005, in Book 39946, page 1255, of the public records of Broward County, Florida; and (iv) that certain mortgage executed by Winn-Dixie Stores, Inc., a Florida corporation, in favor of Wachovia Bank, National Association, as Administrative Agent and Collateral Monitoring Agent, recorded June 20, 2005, in Book 5486, page 4392, of the public records of Brevard County, Florida.  Any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Leases) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

N.     The Debtors will cause the proceeds from the Sale, to the extent required, to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final

6

Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.    The Debtors' assumption and assignment of the Leases in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.    The Debtors have provided the applicable landlords of the Leases with adequate assurance that they will promptly cure any defaults under the Leases pursuant to 11 U.S.C. §§ 365(b)(1).

Q.    Once the Debtors pay the cure amounts due for Store Numbers 208, 211, 339 and 2330 (if any), no other amounts are due and owing by the Debtors under the Leases.

R.    The Debtors and the Purchaser have provided or will provide in accordance with the terms and conditions of this Order the landlords for the Leases with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B). Specifically with respect to Store No. 2330, the Purchaser shall provide an irrevocable letter of credit in the amount of $260,000.00 issued by a financial institution reasonably acceptable to the landlord and in the form and content reasonably acceptable to the landlord, for a term of three years, to secure all of the Purchaser's obligations under the lease for Store No. 2330 (the "Store No. 2330 Adequate Assurances").

S.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Leases.

7

T.     Except as expressly set forth in the Amended Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser and its designees will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Leases by virtue of the transfer of the Assets and the assumption and assignment of the Leases to the Purchaser or its designees.   The Purchaser and its designees will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Leases to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Leases from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors.   Neither the Purchaser nor its designees is acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Amended Purchase Agreement or in any assigned Leases.

U.     The Court's approval of the Amended Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.     The Motion is granted.

2.     All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed cure amounts (except for the cure objections of the Landlord for store numbers 211 and 339), that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

8

3.     The Amended Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects.  Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Amended Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser and its designees, and as to Store No. 2330, conditioned on the Purchaser providing Adequate Assurances to the landlord for Store No. 2330 at or prior to Closing, pursuant to and in accordance with the terms and conditions of the Amended Purchase Agreement.

4.     Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Leases to Purchaser and its designees.

5.     The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.     The Leases will be assumed and assigned to the Purchaser and/or its designees, in accordance with their respective terms.  The assigned Leases will remain in full force and effect notwithstanding any provision in the Leases to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer).  All non-debtor parties to the Leases are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Amended Purchase Agreement.

7.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Amended Purchase

9

Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Amended Purchase Agreement. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Leases to Purchaser and/or its designees.

8.      Any agreements, documents, or other instruments executed in connection with the Amended Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Amended Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser and its designees upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Leases being sold and assigned pursuant to the Amended Purchase Agreement, the senior liens and superpriority administrative claims of the DIP Lender, and tax liens, if any. The Claims and/or Interests of any such other landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Leases and the Debtors and the Purchasers demonstration of adequate assurance of future performance under 11 U.S.C. §365.

10

The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order). Tax liens, if any, will attach to the proceeds of the Sale pursuant to 11 U.S.C. § 363(f).

10.    The Debtors will cause the proceeds from the Sale to be paid, to the extent required, in accordance with the terms of the Final Financing Order and the Loan Documents.

11.    The Purchaser and its designees provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

12.    All defaults, claims or other obligations of the Debtors arising or accruing under the Leases, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Amended Purchase Agreement. No other or further monetary amounts or obligations are due or existing under the Leases by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.

13.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Leases to the Purchaser and its designees, (a) the Debtors, their estates, and all reorganized successors and assigns are relieved from any and all liability for any breach of the Leases (including the 211 Lease), including any related guaranty,

11

occurring after assignment to the Purchaser or its designees, and (b) the Purchaser or its designees, with respect to the 211 Lease, is responsible for any and all claims and obligations under the Leases occurring or arising after the assignment.

14.    Subject to the terms of this Order, the Amended Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Leases and its designees assumes all rights and obligations of the Debtors under the 211 Lease.

15.    All non-Debtor parties to the Leases are forever enjoined and estopped from contesting the cure amounts (except for the store 211 and 339 cure amounts which will be resolved by agreement of the parties, or by final order of this Court) and from asserting any default against the Purchaser or its designees which existed as of the date of the Sale Hearing.

16.    Upon the Debtors' assignment of the Leases to the Purchaser or its designees and payment of the cure amounts, no default will exist under the Leases.  Upon entry of this Order and the assumption and assignment of the Leases, the Purchaser and its designees are deemed to be in compliance with all terms and provisions of the Leases.

17.    Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and

12

Assumed Liabilities), if any.  In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf.  The Purchaser and its designees are also authorized to file, register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of the Amended Purchase Agreement and this Order.  Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

18.     Upon Closing of the Sale of Assets in accordance with the Amended Purchase Agreement and this Order, the Purchaser and its designees will be deemed to have acted in good faith in purchasing the Assets and Leases under the Amended Purchase Agreement as that term is used in 11 U.S.C § 363(m).  For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

19.     The Debtors' transfer of the Assets to the Purchaser and its designees will not result in (a) the Purchaser or its designees having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser or its designees having any liability to the Debtors except as expressly stated in the Amended Purchase Agreement and this Order.

13

20. Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser as set forth in the Amended Purchase Agreement and this Order, the Purchaser and its designees (and their respective affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Leases. The Debtors' transfer of the Assets to the Purchaser and its designees does not and will not subject the Purchaser, its designees or their respective affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

21. Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Leases and a bill of sale transferring good and marketable title in the Assets to Purchaser and its designees. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Amended Purchase Agreement.

22. This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

14

23. This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

24. This Court retains exclusive jurisdiction to (a) enforce and implement the Amended Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Amended Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser and its designees, (c) resolve any disputes, controversies or claims arising out of or relating to the Amended Purchase Agreement or Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order.

25. The terms and provisions of the Amended Purchase Agreement, the Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser, its designees and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

26. Except as may otherwise be provided for in the Amended Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's and its designees' performance and obligations under the Amended Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any

15

claims or causes of action against the Purchaser, its designees, their respective affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

27.     After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, its designees or any of their affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Amended Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Amended Purchase Agreement.

28.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Amended Purchase Agreement and this Order, the provisions contained in this Order will control.

29.     Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

30.     Notwithstanding anything to the contrary in this Order, nothing in this Order shall affect the obligations of the Debtors to pay the cure

amounts owing under the 211 and 339 leases.  If the parties are unable to agree on the cure amounts for the 211 and 339 leases, this Court will schedule a hearing to resolve any disputed cure amounts.

31.    Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _30_ day of May, 2006 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a copy of this Order on all parties who received copies of the Motion.

00531779.11

17

Store Nos.:
208
211
339
372

## SECOND ASSET PURCHASE AGREEMENT
[Sunrise Properties, LLC]

**THIS SECOND ASSET PURCHASE AGREEMENT** (this "Agreement") is made effective as of April 10, 2006 (the "Effective Date"), by and between

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Seller"), and

**SUNRISE PROPERTIES, LLC**, a Florida limited liability company, together with its Affiliate Mach Markets Inc. (a New York corporation) or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### RECITALS:

A.    Seller and Buyer initially entered into an Asset Purchase Agreement (the "First Agreement") concerning Winn-Dixie Stores #205, #215, and #2254. However, as Seller has agreed that Buyer may change the Assets it will purchase, Seller and Buyer have agreed to enter into this Agreement with respect to the transaction as contemplated herein.

B.    Seller is the tenant of the four (4) supermarket stores listed on Exhibit A-1 to this Agreement by Seller's designated Store number and street address (the "Stores"), under the respective leases, including amendments thereto described on Exhibit A-2 to this Agreement (the "Leases"). The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

C.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

D.    Seller (Winn-Dixie Stores, Inc. and its affiliated debtors) filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code") on February 21, 2005 (the "Petition Date") and has operated its business as debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Petition Date (the "Bankruptcy Cases"). The Bankruptcy Cases are being jointly administered in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court"), under Case No. 05-03817-3F1.

**IN CONSIDERATION OF $10.00** and other good and valuable consideration and of the mutual undertakings of the parties hereto, Buyer and Seller agree as follows:

1.0 **Defined Terms.** Capitalized terms not otherwise defined in this Agreement will have the meanings assigned to such terms below.

    1.1 "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured of Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code.

    1.2 "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

    1.3 "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

    1.4 "Allocation Schedule" will mean the allocation of the Purchase Price and the Deposit among the Stores as provided on Exhibit B to this Agreement.

    1.5 "Approval Condition" will have the meaning assigned in paragraph 5.2 of this Agreement.

    1.6 "Assets" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

    1.7 "Auction" will have the meaning assigned in paragraph 5.1 of this Agreement.

    1.8 "Bankruptcy Cases" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.9 "Bankruptcy Code" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.10 "Bankruptcy Court" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.11 "Bidding Procedures" will mean the bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases as approved by the Bankruptcy Court by Order dated June 20, 2005.

    1.12 "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

    1.13 "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

    1.14 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

2

1.15  "<u>Buyer</u>" will have the meaning assigned in the introductory paragraph of this Agreement.

1.16  "<u>Buyer's Closing Costs</u>" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (e) recording fees payable in connection with recording the Conveyance Instrument(s) in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; and (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment.

1.17  "<u>Buyer's Closing Direction</u>" will have the meaning assigned in <u>paragraph 14.6</u> of this Agreement.

1.18  "<u>Buyer's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

1.19  "<u>Closing</u>" with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement, as provided in <u>paragraph 14.0</u> of this Agreement.

1.20  "<u>Closing Date</u>" will have the meaning assigned in <u>paragraph 14.1</u>  of this Agreement.

1.21  "<u>Closing Escrow Date</u>" with respect to one or more Stores will mean the date that is 2 Business Days prior to the Closing Date for such Store or Stores or such earlier date after satisfaction of the Approval Condition as Buyer and Seller may designate.

1.22  "<u>Closing Statement</u>" will mean a statement in the form of <u>Exhibit D</u> to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due to Seller at each Closing, after making the adjustments described in <u>paragraphs 3.4.2 and 3.4.3</u> of this Agreement and in other provisions of this Agreement.

1.23  [Intentionally deleted]

1.24  "<u>Confidentiality Agreement</u>" will mean the Confidentiality Letter Agreement dated effective March 2, 2006, between Winn-Dixie and Buyer, a complete and correct copy of which is attached as <u>Exhibit F</u> to this Agreement, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

3

1.25    "Conveyance Instrument" will mean the Assignment and Assumption of Lease substantially in the form of Exhibit E to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease as to each Store or Stores, together with Seller's interest in any Improvements.

1.26    "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and the DIP Lender, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27    "Cure Costs" will mean amounts (if any) payable by Seller pursuant to Section 365(b) of the Bankruptcy Code upon Seller's assumption of the Leases and the Subleases.

1.28    "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29    "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.30    "DIP Lender" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.31    "Due Diligence Materials" will mean, collectively, (i) the Leases and the Subleases (if any), (ii) the Title Reports, (iii) the Environmental Reports, (iv) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Stores, on the Merrill Website, or otherwise and (v) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32    "Effective Date" will have the meaning assigned in the introductory paragraph of this Agreement.

1.33    "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34    "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35    "Escrow Agent" will mean Smith, Gambrell & Russell, LLC, Jacksonville office, acting as escrow and closing agent.

1.36    "Excluded Personal Property" will mean the items or categories of items identified on Exhibit G to this Agreement, which are expressly excluded from the Assets to be sold to Buyer under this Agreement.

1.37    "Execution Date" will have the meaning assigned in paragraph 3.2 of this Agreement.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

4

1.38    "First Agreement" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.39    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.40    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.41    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.42    "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.43    "Inventory" will mean all inventories of goods and merchandise within the Stores and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers.

1.44    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of all senior officers of Buyer and its Affiliates having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.45    "Landlords" will mean the lessors under the Leases.

1.46    "Leased Premises" will have the meaning assigned in paragraph B of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.0 of this Agreement.

1.47    "Leases" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

1.48    "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.49    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation any or all of the Stores for their current use, taken individually or as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby;

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

5

(d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Cases; (f) the conversion or dismissal of any or all of the Bankruptcy Cases; (g) the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Cases; or (h) the Wind-up Procedures; provided, however, that a Material Adverse Effect with respect to any Store, or any group of Stores, will not be deemed to have or constitute a Material Adverse Effect with respect to any or all of the other Stores.

1.50   "Merrill Website" will mean the Internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther 06" with respect to the disposition of the Stores and other properties.

1.51   "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem real and personal property taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.52   "Ordinary course of business" means the ordinary course of business of Seller after the Filing Date, subject to the Wind-up Procedures.

1.53   "Outside Date" means May 31, 2006, as such date may be extended by the written agreement of Seller and Buyer.

1.54   "Permit" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.55   "Permitted Encumbrances" will mean (i) all matters listed on Exhibit H to this Agreement, (ii) all other matters set forth as exceptions in the Title History, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in the Title Commitments, other than Monetary Liens.

1.56   "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.57   "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.58   "Real Property" will mean the Leased Premises and the Improvements together.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

6

1.59  "Sale Hearing" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.60  "Sale Motion" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.61  "Sale Order" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.62  "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.63  "Seller" will have the meaning assigned in the Introductory paragraph of this Agreement.

1.64  "Seller's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.65  "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and The Blackstone Group, L.P.

1.66  "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.67  "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.68  "Stores" will have the meaning assigned in paragraph B of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty department operated by Seller at the Leased Premises.

1.69  "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.70  "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.71  "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement,

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. a/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

7

as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.72 "Successful Bidder" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.73 "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, located within the Stores and owned by Seller on the Closing Date, excluding, however, all packaging materials and supplies relating to the preparation or merchandising of Inventory, or any other supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.74 "Terminated Store" will mean any Store that is removed and withdrawn from the Assets that are subject to transfer pursuant to this Agreement, pursuant to any provision of this Agreement that provides for the termination of this Agreement as to any one or more Stores but not all of the Stores.

1.75 "Title Commitments" will mean those current leasehold title insurance commitments, including, without limitation, the most legible available copies of all documents evidencing any exception matter identified in Schedule B-II thereof, to be obtained by Seller from Title Insurer, committing to insure Buyer's leasehold interest in the Real Property upon Closing, as made available to Buyer for review on the Merrill Website within 10 days following the Execution Date.

1.76 "Title History" will mean those materials evidencing the state of title to the Real Property, including existing title reports, title abstracts, title insurance policies and/or title insurance commitments, if any, with respect to the Stores, that Seller has made available to Buyer for review on the Merrill Website prior to the Effective Date. Buyer understands that the Title History may include previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.77 "Title Insurer" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company as designated by Seller.

1.78 "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.79 "Title Reports" will mean, collectively, (i) the Title History and (ii) the Title Commitments.

1.80 "Wind-up Procedures" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down, liquidation or removal of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

8

relevant Store or Stores, and closing of the relevant Stores. Notwithstanding any language set forth herein to the contrary, the Wind-up Procedures shall not include shutting off any equipment to be sold to the Buyer hereunder which, in accordance with sound operating principles, must be in continuous operation in order to avoid damage thereto.

1.81 "Winn-Dixie" will mean Winn-Dixie Stores, Inc., a Florida corporation.

2.0 **Property Included in Sale.** Seller agrees to assign, transfer, sell and convey the Assets to Buyer, and Buyer agrees to assume and purchase the Assets from Seller. The Assets are comprised of the following:

2.1 Seller's leasehold interest, as tenant, under the Leases, and Seller's interest in any leasehold improvements.

2.2 Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, walk in coolers and flooring (collectively, the "Improvements"), (ii) Seller's trade fixtures and equipment located in the Buildings, including but not limited to display coolers and refrigeration equipment (the "Equipment"); and the Supplies;

2.3 Seller's interest, as sublessor, in the Subleases (if any).

Excluded Personal Property is expressly excluded from the Assets to be assigned and transferred by Seller to Buyer under this Agreement.

3.0 **Purchase Price.**

3.1 Amount. The purchase price to be paid by Buyer to Seller for the Assets will be the fixed sum of Two Million Five Hundred Thousand ($2,500,000.00) Dollars (the "Purchase Price"). The Purchase Price is hereby allocated to each Store in the manner set forth on the Allocation Schedule. If this Agreement is terminated prior to the conclusion of the Auction in accordance with its terms as to any Store, then it will, at the election of Buyer exercisable, if at all, by written notice to Seller, be deemed to have been terminated as to all Stores and shall be of no further force and effect. If Buyer fails to elect to terminate this Agreement as to all Stores, makes no election or makes an election to terminate this Agreement as to one or more, but not all, of the Stores, then (i) the aggregate Purchase Price will be adjusted based on the Allocation Schedule to exclude the Terminated Stores; and (ii) the Assets associated with such Terminated Stores likewise will be deemed excluded from the Assets remaining subject to this Agreement.

3.2 Contract Consideration and Deposit. As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer will deliver to Escrow Agent, no later than 2 Business Days after April 24, 2006 (the "Execution Date"), an initial

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

earnest money deposit with respect to each Store in the amount set forth in the Allocation Schedule (the "Initial Deposit"), towards which Buyer will receive a credit of $105,000.00 against its initial deposit payment made under the First Agreement. Furthermore, within 1 Business Day after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit with respect to each Store in the amount set forth in the Allocation Schedule (the "Second Deposit"). The Initial Deposit by itself, and together with the Second Deposit if required to be delivered pursuant to this paragraph, will be referred to herein as the "Deposit." Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent. The Initial Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 4.4, 13.0, 15.0, 16.0 and 22.0. Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except pursuant to paragraph 16.2. The applicable portion of the Deposit will be credited against the Purchase Price at the relevant Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.

3.3   Competitive Bidding Procedures. Buyer acknowledges that Seller's obligations under this Agreement are subject to the Bidding Procedures and the Bankruptcy Approval Procedures as described in paragraph 5.0 below. Accordingly, the purchase and sale of the Assets may become involved in a competitive bidding process which will entitle Seller, in its sole discretion, to select a higher or otherwise better offer for the Assets than the Purchase Price and other terms and conditions set forth in this Agreement. The Seller acknowledges that if, as a result of the Bidding Procedures or the Bankruptcy Approval Procedures as described in paragraph 5.0 below, the Buyer is not entitled to purchase any one or more Stores hereunder, then the Buyer may elect, prior to the conclusion of the Auction by written notice to the Seller, to terminate this Agreement as to all or any of the Stores then remaining subject to the terms and conditions of this Agreement.

3.4   Payment. The Purchase Price will be paid in the following manner:

3.4.1   Purchase Price. On the Closing Escrow Date, Buyer will deliver to Escrow Agent the Purchase Price with respect to such Store or Stores, net of the Deposit, and as adjusted as provided under the Closing Statement. Such funds will be transferred by wire transfer to an account designated in writing by Escrow Agent. Subject to the conditions set forth in paragraph 10 of this Agreement, on the Closing Date, Seller and Buyer will instruct Escrow Agent to deliver the escrowed funds with respect to such Store or Stores in payment of the Purchase Price and disbursement of same in accordance with the Closing Statement.

3.4.2   Certain Transaction Costs. All relevant rent, taxes (including real and personal property taxes), utilities and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. a/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

10

be a credit or debit, as the case may be, against the Purchase Price payable at such Closing to the extent thereof. Ad valorem real and personal property taxes shall be prorated based upon 105% of such taxes for tax year 2005. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as and when due, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller. There will be no post-Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.4.2 that apply to the period after the Closing for any Store will survive such Closing.

3.4.3   *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.

3.5   Allocation of Purchase Price Among Assets at each Store.  Buyer will have the right to allocate the Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store; provided, however, that such allocation will not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Cases. The allocation contemplated in the immediately preceding sentence will be set forth with respect to the Assets at each Store on the applicable Closing Statement.

4.0   **Buyer's Due Diligence.**

4.1   Acknowledgment; Access to Premises.

4.1.1   In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Stores and the Assets and that Buyer has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Stores and the Assets and to acquire such additional information about the Stores and the Assets as Buyer has reasonably requested. Physical access to the Stores will be permitted for Buyer's site visits and inspections, provided that Buyer arranges such access in advance with Seller.

4.1.2   Direct contact with any members of management, employees or stakeholders of Seller or visits to any Store are not permitted, except

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

11

upon prior arrangement with Seller's agent, The Food Partners.  To arrange for access to a Store for inspection or to interview Seller's employees, Buyer must contact Seller's representative at The Food Partners:   Doug Herman at telephone 202-589-0438, or at email dherman@thefoodpartners.com.  Such pre-arranged site access will be subject to the following conditions: (a) Buyer will have given Seller at last 24 hours' notice of Buyer's proposed entry into a Store or interview of Employees, (b) such entry or interviews will be conducted during normal business hours, (c) Buyer will be accompanied by Seller's representative during such entry and interviews, (d) Buyer's entry will not include any invasive testing or measurements, and (e) Buyer will conduct such investigations and interviews in such a manner so as to avoid disruption of the Seller's business operations in the Store.  Furthermore, any such access will comply in all respects with Confidentiality Agreement, except as otherwise may be provided in this paragraph 4.1.

4.2    Title.  Buyer confirms and acknowledges that Seller has made the Title History available to Buyer through the Merrill Website prior to the Effective Date. Seller will deliver the Title Commitments to Buyer within 10 days after the Execution Date. At the Closing, the Seller shall cause the Title Insurer to modify the Title commitments so as to (i) delete the "Gap" exception, (ii) delete all other "standard" exceptions thereon and (iii) reflect that the Buyer is the owner of record of insurable leasehold interests under each Lease. Seller shall, at Seller's expense, cause the Title Insurer to provide title insurance covering Buyer's leasehold interest in each Lease (the "Title Policies") at Closing, based on the Title Commitments.

4.2.1    If any matter set forth in a Title Commitment for a particular Store would have a Material Adverse Effect upon the present use or occupancy of such Store, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 5 Business Days after the Title Commitment is delivered to Buyer. To be effective, any such notice of objection must be directed to Seller using email address catherineibold@winn-dixie.com, with a copy using email address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" (with the appropriate Store number set forth).

4.2.2    If Buyer timely notifies Seller of any valid objection to any matter set forth in the Title Commitment for any Store, then Seller will have a period of 3 Business Days after such notice in which to notify Buyer in writing either that: (i) Seller declines or is unable to cure such objection (other than Monetary Liens, which Seller will be obligated to cure at or prior to Closing), or (ii) Seller intends to cure or resolve such objection at or prior to Closing.  If written notice is given by Seller pursuant to clause (i) above, then Buyer may elect, within 5 Business Days after Seller's notice, either to terminate this Agreement with respect to such Store, with no liability to Buyer or Seller, or to waive such objection and proceed with the transactions hereunder, and in the latter event, then Buyer will be deemed to have waived any

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

12

objection made under this paragraph 4.2 to any matter and such matter will constitute a Permitted Encumbrance.

4.3    **Environmental Reports.** Seller has, to the extent of available information, posted historical environmental reports on the Merrill Website covering the Real Property relating to each Store. Within 10 days after the Execution Date, Seller will deliver to Buyer and post on the Merrill Website current phase I environmental site assessment reports for each Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located (each, an "**Environmental Report**").

4.3.1    If Buyer determines that any matter set forth in an Environmental Report for a particular Store would have a Material Adverse Effect upon the present use or occupancy of such Store, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 5 Business Days after the Environmental Report is delivered to Buyer. To be effective, any such notice of objection must be directed to Seller using email address catherineibold@winn-dixie.com, with a copy to email address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "ENVIRONMENTAL REPORT OBJECTION NOTICE – WINN-DIXIE STORE #____" (with the appropriate Store number set forth).

4.3.2    If Buyer timely notifies Seller of any valid objection to any matter set forth in the Environmental Report for any Store, then Seller will have a period of 3 Business Days after such notice in which to notify in writing Buyer either that: (i) Seller declines or is unable to cure such objection, or (ii) Seller intends to cure or resolve such objection at or prior to Closing. If written notice is given by Seller pursuant to clause (i) above, then this Agreement will be deemed terminated automatically with respect to such Store, with no liability to Buyer or Seller. If the Environmental Report discloses any condition that affects the Real Property or other Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, Buyer will not contact or report to such agencies with respect to such condition without Seller's prior written consent; provided, however, that in no event will Buyer or its representatives contact such agencies without providing Seller with prior notice of Buyer's intention to make such contact or report, and providing Seller the opportunity to make such contact or report itself in lieu of Buyer.

4.4    **Termination Rights.** In the event that Buyer provides timely written notice of its election to terminate this Agreement as to any Store or all of the Stores pursuant to paragraphs 3.1, 3.3, 4.2.2, or 4.3.2 above and prior to the conclusion of the Auction, then this Agreement will be deemed terminated as to the Terminates Store(s), and thereafter neither of the parties will have any further rights or obligations hereunder as to such Terminated Store(s);

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

13

provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that, if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to the Terminated Store(s).

4.5   Return of Reports and Documents.   If this Agreement is terminated with respect to any Store or Stores for any reason, then, as to the Terminated Stores, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph will not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

5.0   **Bankruptcy Approval Procedures.**

5.1   Competitive Bid Process. This Agreement is subject to the competitive bid process described in the Bidding Procedures.   Promptly following the expiration of the Review Period, if this Agreement has not otherwise terminated in accordance with its terms as to all of the Assets, then Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105 and 363 (the "Sale Motion"). The Bankruptcy Court will set a date for hearing on the Sale Motion (the "Sale Hearing") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding Procedures. The Bidding Procedures allow Seller to accept competitive bids on the Assets. If an acceptable competitive bid is received, Seller may conduct an auction prior to the Sale Hearing pursuant to the Bidding Procedures (the "Auction"). The party submitting the Successful Bid for the Assets as selected by Seller is referred to as the "Successful Bidder." Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder. Prior to the Sale Hearing, upon consultation with the Creditors' Committee and the lender holding the Credit Agreement Liens (the "DIP Lender"), Seller will select the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid. Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Assets by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

5.2   Sale Order Approving Agreement. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. a/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

14

conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

5.3  **Continuing Effectiveness of Agreement.** Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer or if the sale of the Assets closes with another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

5.4  Notwithstanding any language set forth herein to the contrary, except that Buyer must provide written notice to Seller prior to the conclusion of the Auction of Buyer's election not to close on any of the Stores, Buyer shall not be obligated to close on its acquisition of any Store hereunder unless it is the Successful Bidder as to all such Stores.

6.0  **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1  On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

   (a)  copies of the Title History for the Stores;

   (b)  copies of environmental history for the Stores;

   (c)  copies of the site plans or boundary surveys for the Stores;

   (d)  copies of the fixture plans for the Stores; and

   (e)  a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

   it being understood that the materials described in this paragraph 6.1 have been provided for informational purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

6.2  At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens and other encumbrances other

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

15

than the Permitted Encumbrances, to the extent provided under Section 363 of the Bankruptcy Code.

7.0 **General Representations and Warranties of Seller.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1 Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to satisfaction of the Approval Condition, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to satisfaction of the Approval Condition, been duly authorized by all required corporate action on behalf of Seller.

7.2 No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained by the Seller and are in full force and effect, (ii) approvals, if any, required under the HSR Act, which the Seller covenants to obtain, if necessary, at its expense and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

7.3 Subject to satisfaction of the Approval Condition, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4 To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5 None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

16

7.6    Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

8.0    **Buyer's Representations and Warranties.** In order to induce Seller to enter into this Agreement and to sell, assign and convey the Assets to Buyer as provided herein, Buyer represents and warrants to Seller as follows:

8.1    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida, and is licensed to transact business in the State(s) in which the Assets are located, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required limited liability company action on behalf of Buyer.

8.2    No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated, other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

8.3    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4    There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

17

8.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

9.0    **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

9.1    Subject to the Wind-up Procedures, Seller will maintain the Stores in their present operating condition, reasonable wear and tear, casualty loss and condemnation impacts excepted.

9.2    Subject to the Wind-up Procedures, Seller will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the ordinary course of business.

9.3    During implementation of the Wind-up Procedures, Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Stores on or before the relevant Closing Date, except that Buyer will remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 10.2 of this Agreement.

9.4    Following satisfaction of the Approval Condition, Seller will release to Buyer a schedule of Seller's current employees at the relevant Store or Stores, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested in potential employment with Buyer, to interview with Buyer.

9.5    Seller will transfer or terminate all of its employees working at each Store on or before the relevant Closing Date, except to the extent otherwise required by the Family Medical Leave Act.

9.6    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.0 of this Agreement.

9.7    The Seller shall comply, in all respects and at its expense, with the provisions of the WARN Act, if applicable.

The covenants set forth in this paragraph 9.0 that relate to any period after Closing for a Store or Stores will survive such Closing.

10.0    **Covenants of Buyer.** Buyer hereby covenants for the benefit of Seller as follows:

10.1    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11.0 of this Agreement.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

18

10.2  Within 48 hours after the Closing Date for a Store or Stores, Buyer will, at Buyer's sole cost and expense, remove from such Stores, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property.    Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement will encompass any breach by Buyer of this paragraph 10.2.

10.3  Buyer will use commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

10.4  Buyer will provide the Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as reasonably may be requested.

The covenants set forth in this paragraph 10.0 that relate to any period after Closing for a Store or Stores will survive such Closing.

11.0  **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement as to each Store are subject to satisfaction of the Approval Condition, and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

11.1  Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 6.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2  No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect, and, if the transactions contemplated herein are

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

19

determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

11.3    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

11.4    The Buyer has been determined to be the Successful Bidder as to each of the Stores identified herein.

11.5    The Seller has not terminated this Agreement as to any Store in accordance with any right of termination afforded the Seller hereunder.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer will have the right to terminate this Agreement, by written notice prior to the conclusion of the Auction, pursuant to paragraph 15.4 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.4.

12.0    **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement as to each Store are subject to satisfaction of the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect, and, if the transactions contemplated herein are determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. a/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

20

12.3    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement pursuant to paragraph 15.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.5.

13.0    **Loss by Fire or Other Casualty; Condemnation.**  Prior to the Closing, if any Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with any Store, then either Buyer or Seller will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Store affected by such loss, or as to all Stores.  If the Buyer elects to terminate this Agreement as to all Stores prior to the conclusion of the Auction, then thereafter neither of the parties will have any further rights or obligations hereunder and the Buyer shall be entitled to promptly receive the Deposit from the Escrow Agent. If the Buyer elects to terminate this Agreement as to such Store, then thereafter neither of the parties will have any further rights or obligations hereunder as to such Store; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that, if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores so affected.   If neither party exercises its right of termination with respect to any Store affected by such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, then, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0    **Closing Date and Closing.**

14.1    Closing Date: Procedures.  Promptly following satisfaction of the Approval Condition, Seller will designate a Business Day reasonably acceptable to Buyer that falls on or before the Outside Date as the closing date for each Store or group of Stores.  Such designated closing date for any particular Store or group of Stores is referred to herein as a "Closing Date."  Seller may designate multiple Closing Dates for multiple Store locations, as necessary to facilitate the timely and orderly conduct of Closing procedures.  The Closings will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

21

14.2 **Seller's Closing Deliveries.** Subject to the conditions contained in paragraph 12.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date for each Store or group of Stores, Seller will deliver the following ("Seller's Escrowed Items") into escrow with Escrow Agent:

    (i)    Two counterparts of the relevant Conveyance Instrument(s), executed by Seller;

    (ii)    The relevant Bill(s) of Sale, executed by Seller;

    (iii)    Two counterparts of the relevant Closing Statement(s), executed by Seller;

    (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

    (v)    Any other documents, instruments or agreements called for hereunder for delivery by Seller with respect to such Store that have not previously been delivered; and

    (vi)    The modified Title Commitments as provided for herein.

Buyer may waive Seller's compliance as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent will not be deemed to be an acknowledgement by Seller that the conditions of paragraph 12.0 of this Agreement have been fulfilled or waived until Seller's Closing Direction is delivered.

14.3 **Buyer's Closing Deliveries.** Subject to the conditions contained in paragraph 11.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date for each Store or group of Stores, Buyer will deliver the following ("Buyer's Escrowed Items") into escrow with Escrow Agent:

    (i)    Two counterparts of the relevant Conveyance Instrument(s), executed by Buyer;

    (ii)    Two counterparts of the relevant Closing Statement(s), executed by Buyer;

    (iii)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

    (iv)    Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered.

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

(v)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3.0 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will not be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11.0 of this Agreement have been fulfilled or waived until Buyer's Closing Direction is delivered.

14.4    Title Insurer Requirements. On each Closing Date, Seller and Buyer will each deposit with Escrow Agent such other instruments as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.5    Payment of Closing Costs. Except as provided in paragraph 16.0 of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

14.6    Closing Direction. On the Closing Date, Escrow Agent will notify Buyer and Seller, if this be the case, that Escrow Agent is in possession of all of Seller's Escrowed Items and all of Buyer's Escrowed Items, and is prepared to release such items for legal delivery subject only to receipt of (i) written notice from Seller or Seller's counsel to Escrow Agent and Buyer confirming that Seller is prepared to proceed to closing and that all of the conditions of paragraph 12.0 of this Agreement have been fulfilled or otherwise waived ("Seller's Closing Direction"), and (ii) written notice from Buyer or Buyer's counsel to Escrow Agent and Seller confirming that Buyer is prepared to proceed to closing and that all of the conditions of paragraph 11.0 of this Agreement have been fulfilled or otherwise waived ("Buyer's Closing Direction"). Upon receipt of Buyer's Closing Direction and Seller's Closing Direction, Escrow Agent will be deemed authorized and directed to release and disburse, as appropriate, the Seller's Escrowed Items and the Buyer's Escrowed Items without further condition, on the Closing Date.

14.7    Closing Turnover. Contemporaneously with delivery of the latter of Seller's Closing Direction and Buyer's Closing Direction to Escrow Agent, all right, title and interest of Seller in and to the Assets will pass to Buyer, and Seller thereafter will have no further right, title, interest or obligation with respect to the Store or the Assets, except as may be expressly provided in this Agreement. Promptly following Closing, Seller will turn over to Buyer exclusive physical possession of each Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody)

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

23

all keys, combinations to safes, security codes and passwords, and Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.8 <u>Closing Deliveries and Disbursements</u>. Subject to satisfaction of the requirements set forth in <u>paragraph 14.6</u> above, at the commencement of business on the Closing Date, Escrow Agent will release and disburse, as appropriate, the Buyer's Escrowed Items and the Seller's Escrowed Items, with disbursements of Buyer's Closing Costs, Seller's Closing Costs, and the Purchase Price, as provided in the Closing Statement.

15.0 <u>Termination</u>. This Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

15.1 by written consent of Seller and Buyer, in which case the applicable Deposit will be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the applicable Deposit, then Escrow Agent will pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Store or Stores);

15.2 at the election of Seller if and to the extent permitted under <u>paragraph 16.1</u> of this Agreement, in which case the applicable Deposit will be disbursed as provided in such <u>paragraph 16.1</u>;

15.3 at the election of Buyer if and to the extent permitted under <u>paragraph 16.2</u> of this Agreement, in which case the applicable Deposit will be disbursed as provided in such <u>paragraph 16.2</u>;

15.4 at the election of Buyer if any of the conditions set forth in <u>paragraph 11.0</u> of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, will be determined in accordance with <u>paragraph 16.0</u> of this Agreement rather than pursuant to this <u>paragraph 15.4</u>;

15.5 at the election of Seller if any of the conditions set forth in <u>paragraph 12.0</u> of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, will be determined in accordance with

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

24

paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.5;

15.6    at the election of Buyer or Seller as provided in paragraphs 3.1, 3.2, 4.2, 4.3, 13.0, or 22.0 of this Agreement, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.6;

15.7    at the election of Seller, with respect to any one or more of the Stores remaining under this Agreement, if this Agreement is terminated by Buyer with respect to any Store or Stores for any reason (including, without limitation, because of Seller's breach of this Agreement), in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.7;

15.8    at the election of Seller with respect to any particular Store or Stores (A) if this Agreement is not the Successful Bid with respect to such Store or Stores or (B) if the Approval Condition is not satisfied with respect to such Store or Stores or (C) if this Agreement is terminated by Seller with respect to any other Store or Stores for any reason other than as provided in paragraph 15.9 below, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.8;

15.9    at the election of Seller, if the Cure Costs with respect to any Lease exceed 15% of the Purchase Price for the relevant Store, as shown on the Allocation Schedule, provided that in such case Seller may terminate this Agreement under this paragraph 15.9 only with respect to such Store, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.9; or

15.10    at the election of Buyer or Seller, if the relevant Closing has not occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1 through 15.9 of this Agreement, in which case Seller will direct Escrow Agent to return the applicable Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.10 if such party's breach of this

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

25

Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.10.

15.11  **Reservation of Remedies.**   Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraphs 15.3 through 15.10 of this Agreement, each party will retain those rights (if any) it may have under paragraph 16.0 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

16.0  **Default and Remedies.**

16.1  **Buyer's Default.**  If the Closing for any one or more Stores as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Buyer's breach of this Agreement, then Seller will be entitled, as its sole and exclusive remedy for such breach, (A)(i) to terminate this Agreement with respect to such Store or Stores only (which will be considered Terminated Stores), or (ii) to terminate this Agreement with respect to all of the remaining Stores which, on the date of such election, are still owned by Seller (which will be considered Terminated Stores), and (B) to receive the Deposits for all Terminated Stores (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it will not) sue Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it will not) seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 16.1 is subject to paragraph 16.3 and paragraph 16.4 of this Agreement.

16.2  **Default by Seller.**   In the event of Seller's breach of its covenants, representations or warranties as provided in this Agreement, or if, following satisfaction of the Approval Condition, the sale of any one or more Stores as contemplated under this Agreement is not consummated due to Seller's refusal or inability to Close the transactions contemplated herein, then Buyer

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

26

will be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Deposit with respect to such Store or Stores, which return will operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages. This paragraph 16.2 is subject to paragraphs 16.3 and 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure. Neither Seller nor Buyer will be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3: (i) will not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, (ii) will not have the effect of extending the Closing Date or the due date of any Deposit.

16.4    Recoverable Damages. In no event will the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraphs 3.4.2 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs. In addition, if this Agreement is terminated for any reason with respect to any one or more Stores or in its entirety, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller will have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5    Buyer Indemnification of Seller. Buyer will indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

27

omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer. Notwithstanding the foregoing, Buyer will not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a Material Adverse Effect on Buyer), or (ii) that is due Seller's acts or omissions. The provisions of this paragraph 16.5 will cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This paragraph 16.5 will survive the Closings or earlier termination of this Agreement.

16.6   **Mutuality of Remedies.** Buyer and Seller each hereby knowingly, voluntarily and intentionally waive and relinquish the right to assert mutuality of remedies as a defense to enforceability of this Agreement by either party.

## 17.0   Miscellaneous.

17.1   **Notices.** All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Michael Chlebovec, Director – Asset Management
Telefax No.: 904-783-5646
e-mail: michaelchlebovec@winn-dixie.com

With a copy to:

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

28

Winn-Dixie Stores, Inc. – Legal Department
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Catherine Ibold, Group Leader - Real Estate
Telefax No. 904-783-5138
e-mail: catherineibold@winn-dixie.com

and

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas Stanford
Telefax No.: 904-598-6300
e-mail: dstanford@sgrlaw.com

If to Buyer:

Sunrise Properties, LLC
1809 E, Broadway Street, Suite 328
Oviedo, Florida 32765
Attn: Esmail Mobarak
Telefax No.: 914-667-5015
e-mail: amobarak@myfoodtown.com

With a copy to:

Sobering, White & Luczak, P.A.
558 West New England Ave. Suite 240
Winter Park, Florida 32789
Attn: Robert B. White, Jr.
Telefax No.: 407-647-9336
e-mail: robertbwhite@earthlink.net

If to Escrow Agent:

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas Stanford
Telefax No.: 904-598-6300
e-mail: dstanford@sgrlaw.com

or such other address as any party may from time to time specify by notice to the other.

17.2    **Notice of Certain Inquiries.**  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement,

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

29

such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    **Brokers and Finders.**    The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers. Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to a Store only if, as and when the relevant Closing contemplated by this Agreement occurs. Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement. Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

17.4    **Successors and Assigns.**    This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5    **Assignment.**    Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required. No assignment by Buyer will release or relieve Buyer of its liabilities and obligations hereunder, which will remain in full force and effect notwithstanding any such assignment.

17.6    **Amendments.**    Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to approval of the Bankruptcy Court, if applicable.

17.7    **Governing Law.**    The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8    **Merger of Prior Agreements.**    This Agreement, together with the Confidentiality Agreement which is hereby incorporated into this Agreement by reference, supersedes all prior agreements and understandings between the parties hereto and constitutes the entire agreement of the parties with respect to the matters contained herein. **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE**

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

30

AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.

17.9   **Survival.** Acceptance by Buyer of the Conveyance Instrument with respect to any Store will constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement with respect to such Store and all conditions to Buyer's obligations to close under this Agreement with respect to such Store have been performed, satisfied and/or waived. Seller's representations, warranties, covenants and obligations under this Agreement with respect to any Store will not survive the Closing for such Store but will merge into the Conveyance Instrument for such Store, and will have no further force or effect after the Closing for such Store, except that those covenants of Seller under paragraph 17.3 of this Agreement with respect to any Store that are expressly provided to be performed after the Closing for such Store will survive. All representations, warranties, covenants or obligations of Buyer under this Agreement with respect to any Store will survive the Closing for such Store. In addition, all representations, covenants and obligations of Buyer under the Confidentiality Agreement will survive the termination or consummation of this Agreement.

17.10   **Time is of the Essence.** Time is of the essence to this Agreement.

17.11   **No Recordation.** This Agreement will not be recorded in any public office or court other than as part of the process of satisfying the Approval Condition or in connection with any HSR Act requirement, except that upon default it may be presented to a court of competent jurisdiction.

17.12   **State Specific Provisions:**

17.12.1   ***With respect to any Store in Florida:*** **Radon Gas.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

17.12.2   [Intentionally deleted]

18.0   **Escrow Agent.**

18.1   **Duties.** By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2   **Indemnity.** Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss,

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

31

cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.                                    \

18.3    **Dispute.**  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each will be responsible for one-half of such costs and fees.

18.4    **Execution by Escrow Agent.**  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this **paragraph 18.0.**  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this **paragraph 18.0** will not be required.

19.0    **Waiver of Jury Trial.**  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    **Confidentiality.**  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.  The Confidentiality Agreement will be a continuing agreement of Buyer and Winn-Dixie, and will be applicable to the transactions that are the subject matter herein to the same extent as if the Confidentiality Agreement was fully incorporated into this Agreement.

21.0    **Consent to Jurisdiction.  THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\94197.2

32

Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court will not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0    **HSR Filings.**  The parties anticipate that the transactions contemplated herein are exempt from review and filing under the HSR Act.  However, if for any reason the transactions contemplated herein are determined to be subject to regulatory review and clearance or approval under the HSR Act, then either Buyer or Seller will have the right, exercisable prior to satisfaction of the Approval Condition by giving notice of such decision to the other within 5 Business Days after receiving written notice of such HSR Act requirements, to terminate this Agreement and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not then in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit.  This termination right is not exercisable after satisfaction of the Approval Condition.  If neither party exercises its right of termination as provided above, or if such right of termination is not longer exercisable, then Seller and Buyer will seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder, and it will be a condition precedent to the obligations of both Buyer and Seller that all such required HSR Act approvals or clearance are obtained, as provided in paragraph 11.2 and paragraph 12.2 above.  In such latter event, Seller and Buyer will request expedited treatment of such HSR Filing by the Federal Trade Commission, will make promptly any appropriate or necessary subsequent or supplemental filings, and will furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

23.0    **Disclaimers and Waivers.**

23.1    **NO RELIANCE ON DOCUMENTS.**   **EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 6.0 AND 7.0 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.**

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

33

BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER WILL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER WILL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER WILL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER WILL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

23.2    **Disclaimers.**  EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS". BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. a/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

34

OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.    BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, BUYER WILL ASSUME THE RISK THAT ADVERSE    MATTERS,    INCLUDING    BUT    NOT    LIMITED    TO, CONSTRUCTION    DEFECTS    AND    ADVERSE    PHYSICAL    AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, WILL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING    CAUSES    OF    ACTION    IN    TORT    OR    UNDER    ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT    OR    PATENT    CONSTRUCTION    DEFECTS    OR    PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL    OTHER    ACTS,    OMISSIONS,    EVENTS,    CIRCUMSTANCES    OR MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE WILL HAVE NO LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION,

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

35

AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES AS TO ANY STORE WILL NOT SURVIVE THE CLOSING FOR SUCH STORE BUT WILL MERGE INTO THE CONVEYANCE INSTRUMENT FOR SUCH STORE, AND WILL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES WILL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.

23.3    Effect and Survival of Disclaimers.  Seller and Buyer acknowledge that the provisions of this paragraph 23.0 are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this paragraph 23.0.  Seller and Buyer agree that the provisions of this paragraph 23.0 will survive Closing or any earlier termination of this Agreement.

24.0    "All or Nothing" Transaction.  Notwithstanding any language set forth in this Agreement to the contrary, except that Buyer must provide written notice to Seller prior to the conclusion of the Auction, Buyer shall be under no obligation to Close on the purchase of any Store hereunder unless the Buyer is able, on the Closing Date, to then Close on all Stores hereunder.

[SIGNATURE PAGE FOLLOWS]

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

36

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement as of the Effective Date.

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**SELLER:**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

Name: SUSAN MAGADDINO

By:
Name: Bennett L. Nussbaum
Title: Sr. Vice President

Name: REBECCA L. SAWYER

LEGAL APPROVED
ATTY:
DATE: 5/26/06

Reviewed By
XRoads
Date:

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**BUYER:**

**SUNRISE PROPERTIES, LLC,**
a Florida limited liability company

Name: _____

By: _____
Name: _____
Title: _____

Name: _____

[NOTE: WITNESSES AND OTHER FORMALITIES OF EXECUTION
TO BE CONFORMED TO APPLICABLE STATE REQUIREMENTS, IF ANY]

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

37

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement as of the Effective Date.

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**SELLER:**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Name: _____
_____     Title:  Vice President
Name: _____


_____
Name: _____


Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**BUYER:**

**SUNRISE PROPERTIES, LLC,**
a Florida limited liability company

By: _____
Name:  Esmail Mobarak
Name: Jorge Cesar          r     Title:  Member

Name: Geovanny Rodriguez


[NOTE: WITNESSES AND OTHER FORMALITIES OF EXECUTION
TO BE CONFORMED TO APPLICABLE STATE REQUIREMENTS, IF ANY]

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

37

Acknowledged and agreed this __26__ day of April, 2006 for the limited purposes set forth in paragraph 18.0 of this Agreement:

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

**SCHEDULE OF EXHIBITS**

| Exhibit A-1 | – | Schedule of Stores |
| Exhibit A-2 | – | Schedule of Leases; Property Descriptions |
| Exhibit B | – | Allocation Schedule |
| Exhibit C | – | Form of Bill of Sale |
| Exhibit D | – | Form of Closing Statement |
| Exhibit E | – | Form of Conveyance Instrument |
| Exhibit F | – | Confidentiality Agreement |
| Exhibit G | – | Schedule of Excluded Personal Property |
| Exhibit H | – | Schedule of Permitted Encumbrances |

Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84197.2

38

Store Nos.:
208
211
339
372

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | – | Schedule of Stores |
| Exhibit A-2 | – | Schedule of Leases; Property Descriptions |
| Exhibit B | – | Allocation Schedule |
| Exhibit C | – | Form of Bill of Sale |
| Exhibit D | – | Form of Closing Statement |
| Exhibit E | – | Form of Conveyance Instrument |
| Exhibit F | – | Confidentiality Agreement |
| Exhibit G | – | Schedule of Excluded Personal Property |
| Exhibit H | – | Schedule of Permitted Encumbrances |

EXHIBIT A-1
To Second Asset Purchase Agreement

List of Stores

| Store No. | Street Address | City | County | State |
|-----------|---------------|------|--------|-------|
| 208 | 5335 Military Trail, Bay 60 | West Palm Beach | Palm Beach | FL |
| 211 | 1885 N. Pine Island Road | Plantation | Broward | FL |
| 339 | 6431 Stirling Road | Davie | Broward | FL |
| 372 | 15900 West State Road #84 | Sunrise | Broward | FL |

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\64193.1

**EXHIBIT A-2**
To Second Asset Purchase Agreement

<u>DESCRIPTION OF LEASES AND RELATED LAND</u>

**WINN-DIXIE STORE # 208**
West Palm Beach, Florida

<u>Lease</u>:        Lease dated February 26, 1986 between Sabra/SCA Properties, Joint Venture, a Florida general partnership, acting by and through all of its Partners:  Sabra Realty Corporation, a Florida corporation and 45th SC Associates, a Florida corporation, as Landlord, and Winn-Dixie Stores, Inc., as Tenant;

As evidenced by Short Form Lease dated February 26, 1986, recorded in Book 4983, page 1361, of the public records of Palm Beach County, Florida.

<u>Amendments</u>:

Supplemental Lease Agreement dated December 10, 1987, between Sabra/SCA Properties, Joint Venture, a Florida general partnership, acting by and through all of its Partners:  Sabra Realty Corporation, a Florida corporation and 45th SC Associates, a Florida corporation, as Landlord, and Winn-Dixie Stores, Inc., as Tenant;

<u>Premises</u>:      That certain store building and related improvements located at 5335 Military Trail, Bay 60, West Palm Beach, Palm Beach County, Florida.

<u>Legal Description</u>:      The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

<u>Sublease(s)</u>:

None

Exhibit A-2
Page 1 of 4