28. <u>Recordation of Lease.</u>

Landlord and Tenant agree that this lease agreement or a mutually agreeable memorandum form of same (if such memorandum can be legally used to serve as a substitute for the recordation of the full lease) shall be recorded in the proper recording office of the county or parish in which the Demised Premises are located within sixty (60) days from date of Landlord's acquisition of the land on which the Shopping Center will be developed (but in all events prior to the recordation of any construction loan mortgage made by Landlord) and Landlord agrees to pay all recording fees, expenses and taxes imposed in connection with the recordation thereof. Unless Tenant requests Landlord to effect such recordation, Tenant shall record this lease agreement or memorandum thereof, and upon the recordation thereof shall bill Landlord therefor, and Landlord agrees within thirty (30) days from the date of such bill to reimburse Tenant for the cost of recording of same including the aforesaid recording fees, expenses and taxes. If Landlord fails to reimburse Tenant, Tenant shall have the right to deduct all such costs from rentals next becoming due and payable under this lease agreement and such deductions shall not be deemed to constitute a default hereunder even if it be later determined that such deductions or any part thereof, were illegal, unauthorized or improper. Landlord further agrees to pay all costs and fees for recording any amendments to this lease and the time and procedure for recording such amendments shall be the same as provided for the recording of this lease.

29. <u>Subordination and Non-Disturbance.</u>

At the option of Landlord, Tenant agrees that this lease may be made subject and subordinate to the lien of any first mortgage (which term shall include all first security instruments) that may be placed on the Demised Premises by Landlord, and Tenant agrees upon demand and without cost to execute such instruments as may be required to effectuate such subordination; provided, however, as a condition to such subordination, Landlord shall obtain from any such mortgagee and deliver to Tenant an agreement in writing providing in substance that so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy and rights under this lease shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations under this lease.

30. <u>Trash Disposal Facilities.</u>

Tenant shall store all trash, rubbish and garbage on or at the rear of the Demised Premises, and shall provide for the prompt and regular removal thereof for disposal outside the area of the Shopping Center; provided, however, Tenant shall have the right to burn or otherwise dispose of any trash, waste, rubbish or garbage in approved incinerators located as shown on the plans and specifications, provided such disposal operations are not lawfully prohibited. A change in law or regulation prohibiting such operations shall not constitute a default by Landlord, nor give Tenant a right to terminate this lease.

31. <u>Trade Names.</u>

Tenant may operate its store under any trade or business name it may choose and may from time to time change such name.

32. <u>Successors and Assigns.</u>

Every provision of this lease applicable to Landlord and every provision thereof applicable to Tenant shall also bind, apply to and run in favor of their respective heirs, successors, assigns and successors in interest as fully as if said words were inserted after the words "Landlord" and "Tenant" whenever and wherever the same appear herein.

33. <u>Nonwaiver.</u>

Any assent, express or implied, by Tenant or Landlord to any breach of any specific covenant or condition herein contained, shall not be construed as an assent or waiver of any such covenant or condition generally or any subsequent breach thereof.

34. <u>Gender.</u>

Pronouns used herein denoting one gender shall include other genders whenever and wherever the context so admits or requires.

35. <u>Transfer of Landlord's Interest.</u>

Should Landlord sell or otherwise transfer to any party its interest in the Shopping Center, the Demised Premises or this lease, Tenant shall not be required to recognize such party as its landlord hereunder (nor pay to said party rent or any other sums due hereunder) until and unless Tenant shall have been furnished by the Landlord or the first mortgagee (a) the name and address of such party and to whom the rents and other sums due hereunder are to be paid, and (b) a true and correct copy of the fully executed instrument of conveyance or transfer, evidencing to Tenant's reasonable satisfaction that such party has succeeded to the rights and obligations of Landlord hereunder.

36. <u>Common Area Maintenance Contribution.</u>

(a)   Tenant agrees to pay Landlord a pro rata share of the annual cost of common area maintenance performed by Landlord in accordance with the provisions of subparagraphs (a) and (b) of Paragraph 22 of this lease, determined as provided in subparagraphs (c) and (d) herein. For purposes of this paragraph, the term "cost of common area maintenance" shall mean the direct cost to Landlord for (i) paving repair, (ii) energy expense for lighting the parking areas and other common areas, (iii) painting the parking lines and driveways lanes, (iv) repair to lighting standards in the common areas and replacement of bulbs and/or lighting elements, (v) sweeping and cleaning the common areas, and (vi) maintenance of any landscaping. Said term shall not include (i) the cost of repair or restoration to the common areas resulting from fire, windstorm, accident or other casualty, nor (ii) any cost covered by the casualty insurance required to be carried by Landlord hereunder, nor (iii) the cost to Landlord for premiums for any liability insurance carried by Landlord, nor (iv) any overhead or salaries or expenses for Landlord's employees unless such employees are employed full time and engaged solely for the purpose of performing such common area maintenance, nor (v) the cost of replacement of trees, bushes or other plants or greenery. The cost of resurfacing the parking area within the common areas of the Shopping Center shall be deemed to be a cost of common area maintenance; provided however, that Tenant shall not be required to contribute to such cost when the total cost of such work is in excess of $10,000.00, unless (i) the work shall have been let on a competitive bid basis and (ii) Tenant shall have approved the contractor who made the successful bid.

(b)   Landlord shall cause all such common area maintenance to be performed at competitive prices and all such work performed by third parties shall

be contracted for at arm's length. Landlord shall furnish Tenant with a copy of the proposed budget for common area maintenance at the beginning of each lease year (and prior to the making of any third-party contracts or agreements), together with information reflecting the nature of the services, the amount or rate of computation for payment of same and the identity of any third parties proposed for the performance of same. In the event that Tenant deems any item in the proposed budget not to be based on competitive pricing, Landlord shall use its best good faith efforts to renegotiate or obtain new proposals at competitive prices, and in the event Landlord is unable to do so, Tenant shall have the right to perform such services or cause same to be performed at prices less than those proposed by Landlord. Should Tenant elect to exercise this right, the cost of maintenance incurred by Tenant shall be included in Landlord's cost of same, and Tenant's pro rata share shall be determined as provided in subparagraph (c) below, except that Tenant shall be allowed a credit against its pro rata share for costs expended by it, and in the event such costs so expended should exceed the amount determined to be Tenant's pro rata share, Landlord shall within ten (10) days from date of request therefor reimburse Tenant for such excess costs.

(c) Landlord shall furnish Tenant within thirty (30) days after the close of each lease year during the term hereof an itemized statement showing the total cost to Landlord of such common area maintenance. If requested by Tenant, Landlord shall also furnish copies of invoices, statements, contracts, expense vouchers and other supporting data to substantiate the itemized statement. Landlord agrees to use its best good faith efforts to cause all such maintenance to be done at competitive prices, and Tenant shall have the right to review and audit Landlords' books and records respecting such maintenance work, on an annual basis. Except for Tenant's share of the cost of energy expense for lighting the common areas [to be determined as provided in Subparagraph (e) herein], Tenant's pro rata share of such other cost shall be determined by multiplying the total common area maintenance cost by a fraction, the numerator of which shall be the number of square feet of area in the Demised Premises, and the denominator of which shall be the number of square feet of area in all of the buildings in the Shopping Center. The term "lease year" shall be deemed to mean the first twelve month calendar period commencing on the first day of the first full calendar month of the term hereof, and each twelve month calendar period thereafter. In the event the term of this lease commences on a day other than the first day of the month, then such partial month shall also be included in the first lease year of the term.

(d) Landlord shall have the right, based upon the budget prepared as provided in subparagraph (b) above, to estimate Tenant's pro rata share of Landlord's annual cost of common area maintenance, and Tenant agrees to pay to Landlord, on a monthly basis, at the time and at the place where fixed rent is then being paid, an amount equal to one-twelfth (1/12th) of such estimated pro rata share. In the event that the itemized statement of annual common area maintenance costs furnished pursuant to subparagraph (c) above reflects an amount due from Tenant in excess of the annual amount of Tenant's estimated payments, Tenant shall pay to Landlord the amount of such deficiency within thirty (30) days after receipt by Tenant of the itemized statement. Should the annual amount of Tenant's estimated payments exceed the amount of Tenant's pro rata share as reflected on said itemized statement, such excess shall be credited to the estimated monthly payments due from Tenant for the next lease year, if any are due to be paid, and, if not, said excess shall be paid to Tenant.

(e) Reference is hereby made to subparagraph (d) of Paragraph 22 providing for separate metering of "Landlord's Lamps" and "Tenant's Lamps" (as those terms are defined therein). In view of the fact that Tenant will be bearing the full costs of the energy expense for the Tenant's Lamps, which will be of benefit to Landlord, it is agreed that Tenant's pro rata share of the energy expense for the lighting of Landlord's Lamps shall not be based upon the size of the Demised

Premises in relation to the other premises in the Shopping Center, but instead shall be determined as follows:

       (i)     There shall first be determined the percentage of building area that the Demised Premises bears to the building area of all buildings in the Shopping Center, such percentage being referred to herein as the "Base Percentage".

       (ii)    The total number of lamps in the Shopping Center (meaning Landlord's Lamps and Tenant's Lamps) shall be multiplied by the Base Percentage, and the product thereof (expressed in number of lamps including fractions thereof) shall be referred to herein as the "Gross Pro Rata".

       (iii)   There shall then be subtracted from the number of lamps in the Gross Pro Rata a sum equal to the number of Tenant's Lamps, and the result of such subtraction shall be referred to herein as the "Excess Lamps".

       (iv)   There shall then be determined the percentage that the Excess Lamps bears to the total number of Landlord's Lamps, such percentage being referred to herein as the "Net Pro Rata".

       (v)    Tenant's share of Landlord's costs of lighting the Landlord's Lamps shall be determined by multiplying such costs by the Net Pro Rata.

37.   <u>Tax Contribution.</u>

       (a)    Tenant agrees to pay all ad valorem taxes on the fixtures and equipment owned or leased by Tenant located in the Demised Premises. Landlord shall assess the Shopping Center for real estate ad valorem taxes; and Tenant agrees, subject to the terms and conditions herein contained, to pay to Landlord Tenant's pro rata share of such taxes during the term hereof, computed by multiplying the total amount of such taxes by a fraction, the denominator of which shall be the aggregate square feet of gross leasable area in the Shopping Center (whether or not leased) and the numerator of which shall be the total number of square feet in the Demised Premises. In the event the commencement of the term of this lease does not coincide with the tax year of the taxing authority, Tenant's pro rata share of taxes for the first and last years of the term hereof shall be prorated so that Tenant shall be charged only for that portion of the tax year during which the term of this lease is in effect. Tenant shall have the right to request Landlord to obtain a separate assessment of Tenant's building and Landlord shall use its best efforts to do so. If Tenant's building is separately assessed, Tenant shall pay to Landlord the taxes attributable to said building together with Tenant's pro rata share of the real estate taxes on the common areas, such pro rata share to be computed using the same formula as hereinabove set forth.

       (b)    Landlord shall at the end of each tax year furnish Tenant a copy of the paid tax bills for such tax year and a copy of the assessments on which such tax bills are based and all facts, data and information needed to calculate Tenant's pro rata share of the ad valorem taxes. Payment from Tenant shall be due thirty (30) days thereafter.

       (c)    Tenant shall have the right in the name of Landlord, but at Tenant's expense, to take whatever action (including litigation) Tenant deems necessary to contest the validity or amount of the assessed valuation of the Demised Premises or of the Shopping Center or of the ad valorem tax for any tax year, and Tenant at its cost and expense may undertake by appropriate proceedings in the name of Landlord, or Tenant, to contest or effect a review of the validity or amount of the assessed valuation of the ad valorem tax for any tax year. Any documents required to enable Tenant to prosecute any such proceedings shall be executed and delivered by Landlord within a reasonable time after demand therefor. Landlord

shall inform Tenant in time to permit Tenant to undertake such contest or review, and shall furnish all pertinent data required to undertake such contest or review.

     (d)    Real estate ad valorem taxes for the purpose of this paragraph shall not include assessments for public improvements.

     (e)    If there is any remission or refund of all or any part of Tenant's tax payment for any tax year for which Tenant's tax payment has been paid, Tenant shall be entitled, without demand, to an appropriate refund for such taxes.

     (f)    Should any dispute ever exist as between Landlord and Tenant as to the amount of any ad valorem taxes due by Tenant to Landlord, and Tenant fails to pay such taxes on demand, the parties agree that the failure of Tenant to pay such taxes, in the absence of a final, unappealable court judgment that Tenant is liable therefor, shall not be deemed to constitute a default under this lease, unless Tenant fails to make payment within thirty (30) days after the rendition of an adverse, final unappealable court judgment.

     (g)    Landlord agrees to promptly notify Tenant in writing should Landlord receive from any taxing authority any notice that such taxing authority proposes to increase, modify or change any of the ad valorem tax assessments.

     (h)    Landlord agrees that Tenant may actively participate in any hearing before any taxing authority, including, without limitation, the tax assessor, board of equalization or other public authority, relative to any modification or change of assessments or rate of taxation. Landlord further agrees not to enter into any agreement or understanding with respect to any increase in, or change or modification of, the ad valorem taxes without having first secured the written consent of Tenant.

     (i)    For purposes of subparagraph (a) hereof and Tenant's obligation to contribute, the term of this lease shall not be deemed to commence until the date that Landlord shall have completed the buildings and improvements in the Shopping Center as shown on Exhibit 1, notwithstanding that Tenant may have elected to open for business in the Demised Premises and pay rent therefor.

38.    Fire and Extended Coverage Insurance Premium Contribution.

     (a)    Subject to the provisions of subparagraph (b) herein, Tenant agrees to reimburse Landlord for Tenant's pro rata share of the cost of the annual premium paid by the Landlord for the fire and extended coverage insurance required to be carried by Landlord covering the buildings in the Shopping Center and Demised Premises, as provided in Paragraph 17(a) of this lease. Landlord shall furnish Tenant with duplicate copies or certificates of said insurance policies, which shall provide that said policy or policies may not be cancelled or modified except on at least twenty (20) days' prior written notice to Tenant. Tenant agrees to make such annual reimbursement to Landlord within thirty (30) days from receipt of written request from Landlord, together with a copy of the premium notice reflecting payment of same. Upon the expiration of the term of this lease, or upon the cancellation or termination hereof (except by reason of default of Tenant), Landlord shall pay to Tenant the amount of any unearned premium for which Tenant has reimbursed Landlord pursuant to the provisions hereof.

     (b)    Landlord agrees to procure all such insurance coverage required to be carried pursuant to the terms of this paragraph from agents or brokers dealing at arm's length and at usual and customary rates for such insurance coverage. Prior to effecting such coverage and prior to each subsequent renewal of such coverage, Landlord shall first notify Tenant in writing of the name of the insurer, the amount, form and extent of such coverage, and the cost of the premium therefor; and Tenant

shall have the right to require Landlord to effect such coverage in the same amount, form and extent of coverage, but with a different insurer and/or through a different agent or broker, provided (i) the premium cost is less than that quoted by Landlord and (ii) Landlord and Landlord's first mortgagee approve any different insurer proposed by Tenant (but the right of approval shall arise only if such proposed insurer has an "insurance rating" less than the insurer proposed by Landlord, and in that event, such approval shall not be unreasonably withheld). However, Landlord can nullify Tenant's election if it then obtains a premium cost equal to or less than that quoted by Tenant.

39. <u>Additional Rent.</u>

(a)  In addition to the rent provided for in Paragraph 1 of this lease, Tenant agrees to pay Landlord a percentage rent computed and payable as follows: On or before the last day of the second calendar month next succeeding each twelve (12) month period during the term hereof, and also on or before the expiration of sixty (60) days after the termination hereof, Tenant agrees to deliver to Landlord a full, true and correct statement certified to by one of its officers, showing the gross sales (as herein defined) made by Tenant in or from the Demised Premises during the preceding twelve (12) month period. Subject to the limitation and to the credits provided for hereinafter, Tenant shall pay Landlord as additional rent, at the time such statement is delivered, an amount equal to one (1%) percent of gross sales made by Tenant during each such twelve (12) month period.

(b)  In no event shall the additional rent provided herein exceed in any twelve (12) month period an amount equal to one hundred fifty (150%) percent of the annual rental provided in Paragraph 1 of this lease; and further, there shall be credited against any additional rent due hereunder an amount equal to said annual rent and any payments or contributions made by Tenant for common area maintenance, ad valorem taxes and insurance premiums during such twelve (12) month period, it being the intent of the parties that Landlord shall be only entitled to such additional rent over and above the aforesaid basic payments.

(c)  The term "gross sales" as used herein is hereby defined to mean the total amount of all sales of merchandise made in or from the Demised Premises after deducting therefrom (to the extent that the same are or have been included in the computation of gross sales): the total amount of all refunds to customers and all credits granted for the return of merchandise; all discounted sales to employees; all sales taxes of federal, state, municipal and other political subdivisions; all federal excise taxes and any other tax collected for a government agency; and all sales of liquor, wine, beer or packaged alcoholic beverages. Further, the receipts from transactions made by any sub-post office, banking facilities, automated teller machines, and the like, that may be located on the Demised Premises shall not be deemed to be a part of "Gross Sales".

(d)  If this lease commences other than on the first day of the month, then the gross sales of the fractional part of the first month shall be included with the gross sales made in the next twelve (12) month period for the first computation of additional rent under this lease.

(e)  All books and records of Tenant pertaining to sales of merchandise from the Demised Premises shall be open for inspection and audit by an authorized representative of Landlord. Said inspection and audit shall be conducted at the general office of Tenant at 305 Delchamps Drive, Mobile, Alabama, or at such other place as may be designated by Tenant in writing. Any inspection or audit shall be made only during regular business hours and Landlord agrees not to divulge any figures, audit reports or statement furnished by Tenant but agrees to keep all of the same confidential. Tenant shall not be required to keep or preserve or cause to be kept or preserved the records on which the additional rent is based for more than six

(6) months after expiration of the period to which such records relate. Unless Landlord shall object in writing within said six (6) month period, Landlord shall be deemed to have waived any right to examine or require production of such records, and Tenant shall not be liable for any additional rent for the period to which said records relate except such additional rental as Tenant may have actually paid.

40. <u>Exculpation</u>.

From and after the accomplishment of Landlord's obligations respecting the construction of the Demised Premises and the other improvements in the Shopping Center in accordance with the terms of this lease, Tenant agrees that Tenant shall look solely to Landlord's interest in the Demised Premises and in the Shopping Center and in Landlord's personal property used in connection therewith for the satisfaction of any claim, judgment or decree requiring the payment of money by Landlord based upon any default hereunder, and no other property or assets of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of such claim, judgment or decree. Nothing contained herein shall diminish the rights of Tenant under any provision of this lease to withhold any and all rental payments and other payments becoming due to Landlord pursuant to the provisions of this lease. As used in this paragraph, the phrase "Demised Premises" and "Shopping Center" and "Landlord's personal property used in connection therewith" shall include all additions to any of same and all substitutions thereof including any award payable as a result of a partial or total taking under the power of eminent domain and the proceeds of all fire and extended coverage insurance policies.

41. <u>Investment Tax Credit</u>.

The entire investment tax credit allowed by law for the property leased shall be passed on to Tenant. Landlord shall execute, upon request of Tenant, an election to pass on to Tenant the investment tax credit in the form attached hereto as Exhibit B.

42. <u>Expansion of Demised Premises</u>.

Reference is hereby made to the area located adjacent to the Demised Premises and designated as "Expansion Area" on Exhibit 1. Tenant shall have the right, at its option, to cause to be constructed on all or a part of the Expansion Area an addition to the store building now situated on and constituting a part of the Demised Premises, such addition (the "Addition") to be accomplished in accordance with the following procedure:

(a) Tenant's right to cause the Addition to be constructed shall be effective only on the fifth (5th) anniversary of the last day of the calendar month in which the term of this lease commences, or only at intervals of each third (3rd) year after such fifth (5th) anniversary, as Tenant may designate (such designated date being referred to herein as the "Expansion Date"). Should Tenant elect to cause the Addition to be constructed, Tenant shall give Landlord written notice of such election no later than six (6) months prior to any Expansion Date, and Landlord and Tenant agree to use their respective good faith best efforts for a period of three (3) months thereafter within which to agree upon the terms and conditions upon which the Addition shall be constructed.

(b) Should the parties reach mutual agreement as to the terms and conditions for construction of the Addition, the Demised Premises shall be expanded to include and incorporate the Addition, and this lease shall be amended to reflect the agreement of the parties respecting the terms and conditions as to the Demised Premises as expanded.

(c) Should Tenant fail to exercise its option as to any Expansion Date, or having exercised same, should the parties fail to agree upon the terms and conditions concerning the Addition, neither such failure shall constitute a waiver or forfeiture of Tenant's right to cause the Addition to be made at any subsequent Expansion Date as provided hereinabove. Moreover, Landlord acknowledges that Tenant may desire to cause an Addition to be made at a time other than an Expansion Date, and should Tenant so desire, the parties agree to use their respective good faith best efforts to agree upon the terms and conditions upon which such Addition shall be constructed.

(d) Tenant agrees that, to the extent the additional building area of the Addition causes a reduction in the parking ratio required in Paragraph 4(a) hereof, Tenant shall waive such requirement to the extent necessary to conform to the ratio caused by construction of the Addition.

43. <u>Environmental Matters.</u>

(a) Landlord represents and warrants to Tenant that, to the best of Landlord's knowledge and belief after due inquiry, the Shopping Center is in compliance with all federal, state and local laws, regulations and standards relating to the use, occupancy, production, storage, sale, disposal or transportation of any hazardous materials ("Hazardous Substance Laws"), including oil or petroleum products or their derivatives, solvents, PCB's, explosive substances, asbestos, radioactive materials or waste, and any other toxic, ignitable, reactive, corrosive, contaminating or polluting materials ("hazardous substances") which are now subject to any governmental regulation. For purposes of this subparagraph (a) the term "due inquiry" shall include the obtaining of a so-called Phase I environmental audit. Landlord represents to Tenant that said audit does not require or indicate the necessity for (i) a so-called Phase II audit or (ii) any remediation by reason of any environmental contamination (or if remediation is required or indicated, such remediation has been accomplished in compliance with applicable laws).

(b) Landlord shall indemnify, defend with counsel reasonably acceptable to Tenant, and hold Tenant harmless from any and all liabilities, damages, claims, penalties, fines, settlements, causes of action, cost or expense, including reasonable attorneys' fees, environmental consultant fees and laboratory fees, and costs and expenses of investigating and defending any claims or proceedings, resulting from or attributable to (i) the presence, disposal, release or threatened release of any hazardous substance that is on, from or affecting the Shopping Center including the soil, groundwater or buildings, and which occurred prior to or existed at the date Tenant entered into possession of the Demised Premises, or which occurs or exists thereafter due to any failure of Landlord to comply with any Hazardous Substance Laws; or (ii) any breach of Landlord's representations set forth in subparagraph (a) above.

(c) Landlord shall give written notice to Tenant within ten (10) days after the date on which Landlord learns or first has reason to believe that (i) enforcement, cleanup, removal or other governmental or regulatory action has been threatened or commenced against Landlord or with respect to the Shopping Center or any part thereof pursuant to any Hazardous Substances Laws; or (ii) any claim has been made or threatened by any person or entity against Landlord or the Shopping Center or any part thereof on account of any alleged loss or injury claimed to result from the alleged presence or release on any part of the Shopping Center of any hazardous substance; or (iii) any report, notice, or complaint has been made to or filed with any governmental agency concerning the presence, use or disposal of any hazardous substance on any part of the Shopping Center. Any such notice shall be accompanied by copies of any such claim, report, complaint, notice, warning or other communication that is in the possession of or is reasonably available to Landlord.

(d) If Landlord is responsible for the cleanup of any contamination of the Shopping Center or any part thereof, Landlord shall carry out and complete, at its own cost and expense, any repair, closure, detoxification, decontamination, or other cleanup of the Shopping Center required by Hazardous Substance Laws. Should Landlord fail to implement and diligently pursue any such cleanup promptly upon receipt of notice thereof, then Tenant shall have the right, but not the obligation, to carry out such cleanup, and to recover all of the costs and expenses thereof from Landlord as a setoff against rental payments under the lease if Tenant elects to cure. The foregoing right of setoff shall be in addition to all other remedies available to Tenant hereunder or under Hazardous Substance Laws or otherwise.

(e) Tenant shall indemnify and hold Landlord harmless from any and all liabilities, damages, claims, penalties, fines, settlements, causes of action, cost or expense, including reasonable attorneys' fees and legal expenses, environmental consultant fees and laboratory fees and costs and expenses of investigating and defending any claims or proceedings, resulting from or attributable to any failure of Tenant to comply with any Hazardous Substance Laws.

IN WITNESS WHEREOF, Landlord and Tenant have executed this lease in multiple original as of the day, month and year first above written.

LANDLORD:

THE MITCHELL COMPANY, INC.

By: _____
Don P. Kelly, Jr.
Senior Executive Vice President

ATTEST:

(AFFIX CORPORATE SEAL)

Its: _____ Secretary

TENANT:

DELCHAMPS, INC.

By: _____
Randy Delchamps
President, Chairman of the Board & Chief Executive Officer

ATTEST:

(AFFIX CORPORATE SEAL)

Its: _____ Assistant Secretary

- 23 -

STATE OF ALABAMA:

COUNTY OF MOBILE:

PERSONALLY, appeared before me, the undersigned authority in and for the aforesaid County and State, the within named Don P. Kelly, who acknowledged that he is duly constituted and acting as Senior Executive Vice President of The Mitchell Company, Inc., an Alabama corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, having first been duly authorized to do so.

GIVEN under my hand and official seal this the 27th day of April, 1994.

NOTARY PUBLIC
My Commission Expires: 1/23/96

NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: Jan. 23, 1996.
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF ALABAMA

COUNTY OF MOBILE

PERSONALLY, appeared before me, the undersigned authority in and for the aforesaid County and State, the within named Randy Delchamps, who acknowledged that he is duly constituted and acting as President, Chairman of the Board and Chief Executive Officer of Delchamps, Inc., an Alabama corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, having first been duly authorized to do so.

GIVEN under my hand and official seal this the 27th day of April, 1989.

NOTARY PUBLIC
My Commission Expires: 3/14/97

- 24 -

**EXHIBIT A
TO LEASE BETWEEN
THE MITCHELL COMPANY, INC., LANDLORD
AND DELCHAMPS, INC., TENANT
DATED APRIL 27, 1994**

EXHIBIT A
TO LEASE BETWEEN
THE MITCHELL COMPANY, INC., LANDLORD
AND DELCHAMPS, INC., TENANT
DATED April 27, 1994

A certain parcel of land situated in Sections 25 and 26, Township 8 south, Range 13 West, City of Pass Christian, Harrison County, Mississippi, more fully described as follows:

Beginning at the intersection of the west margin of Henderson Avenue and the north margin of U. S. Highway 90; thence along said north margin of U. S. Highway 90 N 83° 14' 07" W a distance of 336.57 feet; thence continue along said north margin of U. S. Highway 90 N 83° 37' 43" W a distance of 157.85 feet to the intersection of the north margin of U. S. Highway 90 and the east margin of Clarence Avenue; thence along said east margin of Clarence Avenue N 00° 52' 37" E a distance of 527.00 feet; thence N 89° 54' 11" E a distance of 157.13 feet; thence N 00° 52' 54" E a distance of 109.92 feet; thence N 90° 00' 00" E a distance of 165.56 feet; thence S 00° 52' 10" W a distance of 42.88 feet; thence S 77° 48' 39" E a distance of 71.39 feet; thence S 89° 56' 24" E a distance of 29.87 feet; thence S 77° 48' 29" E a distance of 71.37 feet to the west margin of Henderson Avenue; thence along said west margin S 00° 56' 05" W a distance of 282.27 feet, thence continue along said west margin of Henderson Avenue S 00° 55' 48" W a distance of 339.03 feet to the POINT OF BEGINNING.

Said parcel of land contains 6.89 acres.

## Assignment of Tenant Leases and Security Deposits

STATE OF MISSISSIPPI     }
                         :ss.:
COUNTY OF HARRISON       }

    This agreement is executed as of the 5th day of December, 1997, by and between The Mitchell Company, Inc., an Alabama corporation ("Seller") and LEC Properties, Inc., a Mississippi corporation and PC Properties, LLC, a Mississippi limited liability company (collectively "Purchaser").

    Purchaser is this day purchasing from Seller, and Seller is conveying to Purchaser, the real property described on Exhibit A attached hereto and made a part hereof together with all improvements thereon and appurtenances thereto (herein called the "Property"). The Property is occupied by various tenants (herein call the "Tenants") claiming under written space leases listed and described on Exhibit B attached hereto and made a part hereof (the "Leases"). Seller has required certain of the Tenants to pay and has collected from such Tenants a security or other deposit, a list of which deposits and the Tenants from whom the deposits were collected being set forth on Exhibit B attached hereto and made a part hereof (herein the total of all such deposits are referred to as the "Security Deposits"). Seller desires to transfer and assign all of Seller's right, title and interest in and to (i) the Leases and (ii) the Security Deposits not heretofore forfeited, credited or returned to the Tenants.

    NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby transfers and assigns to Purchaser all right, title and interest of Seller in and to (i) the Leases and (ii) the Security Deposits paid to and held by Seller which have not been heretofore forfeited, credited or returned to the Tenants, which Security Deposits hereby assigned are in the amounts as set forth on Exhibit B attached hereto.

    Seller, on behalf of itself, its successors and assigns, does hereby agree to indemnify and hold Purchaser, its successors and assigns, harmless from and against any and all claims, actions, proceedings, losses or liabilities arising under the Leases prior to the date hereof.

office\wpwin\wpdocs\passchri\leases.dep

Exhibit "B"

Purchaser, on behalf of itself, its successors and assigns, does hereby agree to indemnify and hold Seller, its successors and assigns, harmless from all liabilities arising under the Leases from and after the date hereof.

Purchases hereby assumes all obligations (i) of the landlord under the Leases arising from and after the date hereof and (ii) under the Leases to pay or account for the Security Deposits hereby transferred to Purchaser.

It is specifically agreed that Seller does not hereby transfer or assign to Purchaser, and Purchaser does not hereby assume liability for, any deposits other than as set forth on Exhibit B.

This document may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one instrument, and shall be binding and effective when all parties hereto have executed at least one counterpart.

The terms and provisions of this agreement shall be binding upon and inure to the benefit of the respective parties hereto and their respective successors and assigns.

WITNESS the signatures of Seller and Purchaser as of the day and year first written above.

SELLER:

THE MITCHELL COMPANY, INC.

By: _____
Donald P. Kelly, Jr.
Its Sr. Executive Vice President

(Corporate Seal)

PURCHASER:

LEC PROPERTIES, INC.

By: _____
Its _____

(Corporate Seal)


PC PROPERTIES, LLC

By: _____
Its _____

(Corporate Seal)


STATE OF ALABAMA

COUNTY OF MOBILE

    On this 5th day of December, 1997, before me, the undersigned notary public in and for the State of Alabama, personally appeared Donald P. Kelly, Jr., known to me to be the Senior Vice President of The Mitchell Company, Inc., whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

SEAL

_____
Notary Public
Debra T. Oberkirch
Printed/Typed Name

My commission expires:
NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: Oct. 10, 2001.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

STATE OF MISSISSIPPI

COUNTY OF Hinds

On this 9th day of December, 1997, before me, the undersigned notary public in and for the State of Mississippi, personally appeared Gary B. Cress, known to me to be the President of LEC Properties, Inc., a Mississippi corporation, whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public
Brenda O. Perry
Printed/Typed Name

My commission expires:
1-6-98

STATE OF MISSISSIPPI

COUNTY OF Hinds

On this 9th day of December, 1997, before me, the undersigned notary public in and for the State of Mississippi, personally appeared Gary B. Cress, known to me to be the Manager of PC Properties, LLC, a Mississippi limited

liability company, whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

Brenda O. Perry
Notary Public

Brenda O. Perry
Printed/Typed Name

My commission expires:
1-6-98



## EXHIBIT "A"

A certain parcel of land situated in Section 25 and 26, Township 8 South, Range 13 West, City of Pass Christian, Harrison County, Mississippi, more fully described as follows:

Beginning at the intersection of the west margin of Henderson Avenue and the north margin of U.S. Highway 90, thence along said north margin of U.S. Highway 90 S 74°49'47" W a distance of 336.57 feet, thence continue along said north margin of U.S. Highway 90 S 74°26'11" W a distance of 157.85 feet to the intersection of the north margin of U.S. Highway 90 and the east margin of Clarence Avenue, thence along said east margin of Clarence Avenue N 21°03'29" W a distance of 527.00 feet, thence N 67°58'05" E a distance of 157.13 feet, thence N 21°03'12" W a distance of 109.92 feet, thence N 68°03'54" E a distance of 165.56 feet, thence S 21°03'56" E a distance of 42.82 feet, thence N 80°15'15" E a distance of 71.39 feet, thence N 68°07'30" E a distance of 29.87 feet, thence N 80°15'25" E a distance of 71.34 feet to the west margin of Henderson Avenue, thence along said west margin S 21°00'21" E a distance of 621.29 feet to the POINT OF BEGINNING.

Said parcel of land contains 6.90 acres.