Exhibit C

BK 15719 PG 158

GEORGIA INTANGIBLE TAX PAID $I$

$ _14,160.00_

TOM LAWLER
SUPERIOR COURT GWINNETT
COUNTY, GEORGIA

Location:  Lawrenceville, Georgia

98 MAR 30  PM 2:00
TOM LAWLER, CLERK

DEED TO SECURE DEBT, SECURITY AGREEMENT AND FIXTURE FILING

From

PRINCIPAL MUTUAL LIFE INSURANCE COMPANY,
as grantor,

To

FIRST SECURITY BANK, National Association

and

VAL T. ORTON,
as trustees
as grantee

~~Dated as of March 20, 1998~~

This instrument prepared by, recording requested by and
when recorded return to:
Roger L. Ellison, Esq.
MANATT, PHELPS & PHILLIPS, LLP
11355 W. Olympic Boulevard
Los Angeles, CA 90064

204351-54

N:\BBN\S6BBN422.6\031898\1549

LAW OFFICES
ROWE, FOLTZ & MARTIN, P.C.

FIVE PIEDMONT CENTER · SUITE 750
ATLANTA, GEORGIA 30305-1509

# TABLE OF CONTENTS

BK 15719 PG0159

*Pages*

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GRANTING CLAUSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Granting Clause First . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Granting Clause Second . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Granting Clause Third . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Granting Clause Fourth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE 1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Alterations" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Assignment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Basic Rent" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Claims" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "default" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Environmental Laws" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    "Event of Default" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Expansion Notes" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Grant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Granted Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Grantee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Guarantor" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Hazardous Condition" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Hazardous Substances" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Improvements" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Indenture" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Installment Payments" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    "Institutional Investor" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Interest Payments" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Landlord's Equipment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Land Parcel" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Lease" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Lease Guaranty" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Lessee" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Letter Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "lien of this Deed to Secure Debt" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Make Whole Amount" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    "Net Award" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Net Proceeds" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Note Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Note Holder" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Note Purchasers" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Notes" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Original Notes" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "outstanding" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    "Owner" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

BK 15719 PG 0160

## TABLE OF CONTENTS (cont'd)

"Permitted Exceptions" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Person" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Principal Mutual" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Property" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Purchase Offer" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Remedial Work" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Store Expansion" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Substitution Date" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
"Successor Owner" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
"Tenant's Equipment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 2    The Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Section 2.1    The Notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Section 2.2    Certificate of Authentication . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 3    Particular Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.1    Title to the Granted Property . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.2    Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.3    Recording . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.4    Payment of the Notes . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.5    The Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Section 3.6    Existence; Compliance with Laws . . . . . . . . . . . . . . . . . . 12
        Section 3.7    After-acquired Property . . . . . . . . . . . . . . . . . . . . . . . . . 12
        Section 3.8    Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        Section 3.9    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Section 3.10   Advances by Grantee . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Section 3.11   Negative Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        Section 3.12   Lease Basic Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        Section 3.13   Financial Statements; Books and Records; Notice of Default . . . . . . . . 14
        Section 3.14   Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . 15
        Section 3.15   Security Agreement; Fixture Filing . . . . . . . . . . . . . . . . . . 15
        Section 3.16   Environmental Compliance . . . . . . . . . . . . . . . . . . . . . . . 15
        Section 3.17   Successor Owner; Separate Existence . . . . . . . . . . . . . . . 17

ARTICLE 4    Possession, Use and Release of the Property . . . . . . . . . . . . . . . . . 17
        Section 4.1    Lease Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        Section 4.2    Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Section 4.3    Transfer of Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        Section 4.4    Substitution of Properties . . . . . . . . . . . . . . . . . . . . . . . . 20
        Section 4.5    Release of the Property . . . . . . . . . . . . . . . . . . . . . . . . . 20
        Section 4.6    Expansion Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE 5    Application of Moneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        Section 5.1    Moneys Under the Lease or Lease Guaranty . . . . . . . . . . . 22
        Section 5.2    Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        Section 5.3    Proceeds of Insurance, Condemnation Awards, Proceeds of
                       Mortgage Title Insurance . . . . . . . . . . . . . . . . . . . . . . . . 23

## <u>TABLE OF CONTENTS</u> (cont'd)     BK 15719 PG 0161

Section 5.4    Other Purchase Price Payment . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE 6    Prepayment of Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 6.1    Prepayments Generally . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 6.2    Notice of Prepayment: Deposit of Money . . . . . . . . . . . . . 24
    Section 6.3    Optional Prepayment . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 7    Events of Default and Remedies . . . . . . . . . . . . . . . . . . . . . 24
    Section 7.1    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Section 7.2    Application of Proceeds . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 7.3    Purchase by Grantee . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 7.4    Receivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 7.5    Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 7.6    Waiver of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 7.7    Suits by Grantee . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 7.8    Principal Mutual's Cure Rights . . . . . . . . . . . . . . . . . . . 29

ARTICLE 8    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 8.1    Immunity from Liability . . . . . . . . . . . . . . . . . . . . . . . . 29
    Section 8.2    Notices: Modifications; Waiver . . . . . . . . . . . . . . . . . . . 30
    Section 8.3    Illegal Provision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.4    Maximum Interest Payable . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.5    Satisfaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.6    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.7    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.8    Table of Contents; Headings . . . . . . . . . . . . . . . . . . . . 31
    Section 8.9    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.10   Future Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 8.11   Exhibits and Schedules . . . . . . . . . . . . . . . . . . . . . . . . 31

EXHIBIT A

    Legal Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

SCHEDULES
    A-1    Series A Note Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    A-2    Series B Note Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
    A-3    Expansion Note Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

N:\BBN\S6BBN422.6\031898\1711

BK 15719 PG0162

THIS DEED TO SECURE DEBT, SECURITY AGREEMENT AND FIXTURE FILING, dated as of March 20, 1998 (herein, together with all amendments and supplements thereto, called this "Deed to Secure Debt"), from PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, an Iowa corporation (herein, together with its successors and assigns called "Principal Mutual" and, together with its successors as owner of any interest in the Property (as hereinafter defined), including any transferees and Successor Owners (as hereinafter defined), called "Owner"), having an address at 711 High Street, Des Moines, Iowa 50392, Attention: Real Estate Equity Team -- Southeast, as grantor, to FIRST SECURITY BANK, National Association and VAL T. ORTON as trustees for the benefit of the Note Holders (herein, together with their successors and assigns, collectively called "Grantee"), each having an address at 79 South Main Street, Salt Lake City, Utah 84111.

PRELIMINARY STATEMENT

Capitalized terms used herein but not otherwise defined have the meanings set forth in Article 1.

Principal Mutual has acquired a fee simple interest in the Land Parcel and in the Improvements located and to be located thereon. In order to reimburse itself for a portion of the cost of acquiring and financing its interests in the Property, Principal Mutual has sold to the Note Purchasers pursuant to the Note Agreement an aggregate original principal amount of $4,347,556.00 of its 6.73% Secured Notes Due October 1, 2015 (the "Series A Notes") and its 6.92% Secured Notes Due January 1, 2018 (the "Series B Notes"). The Series A Notes and the Series B Notes, together with any note or notes issued in exchange or substitution therefor pursuant to the Indenture are herein collectively called the "Original Notes." The Series A Notes are in the aggregate original principal amount of $3,518,537.00 and the Series B Notes are in the aggregate original principal amount of $829,019.00.

Principal Mutual is duly authorized to issue the Notes and to execute and deliver this Deed to Secure Debt, and all actions required by law and all actions of Principal Mutual required therefor have been duly taken.

GRANTING CLAUSES

NOW, THEREFORE, THIS DEED TO SECURE DEBT WITNESSETH:  that Principal Mutual, in consideration of the premises and the purchase and acceptance of the Notes by the Note Purchasers and the acceptance by the Grantee of the trusts created by the Indenture and this Deed to Secure Debt, and in order to secure the payment of the principal and interest and any Make Whole Amount and other sums payable on the Notes (including any renewals, extension or modification thereof and all future advances that may subsequently be made hereunder or under the Indenture) and in order to secure the performance of all of the covenants and agreements to be performed or observed by Principal Mutual or any other Owner pursuant to the Notes, the Note Agreement, this Deed to Secure Debt, the Assignment and the Indenture, has executed and delivered this Deed to Secure Debt.

1

BK 15719 PG 0163

Principal Mutual has created and granted a security interest in favor of Grantee, in, and has granted, mortgaged and warranted, conveyed, assigned, bargained, sold, pledged, given, transferred and set over, and by these presents does hereby create and grant a security interest in favor of Grantee, in, and does hereby grant, mortgage and warrant, convey, assign, bargain, sell, pledge, give, transfer and set over unto Grantee, for the equal and ratable benefit and security of the Notes, the property described in the following Granting Clauses, subject only to Permitted Exceptions of the character described in clauses (a) through (d) of the definition of Permitted Exceptions.

Granting Clause First

The entire right, title and interest of Principal Mutual and any other Owner in and to the land parcel described in Exhibit A attached hereto (the "Land Parcel"), together with (a) all right, title and interest of Principal Mutual and any other Owner in and to all buildings, structures and other improvements now standing or at any time hereafter constructed or placed upon the Land Parcel, including, without limitation, all right, title and interest of Principal Mutual and any other Owner in and to all building equipment and building fixtures of every kind and nature on the Land Parcel or in any such building, structure or other improvements including Landlord's Equipment but excluding Tenant's Equipment (said buildings, structures, other improvements and building equipment and building fixtures being herein collectively called the "Improvements"); (b) all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and replacements thereof now or at any time hereafter owned by Principal Mutual and any other Owner, now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable use, enjoyment, occupancy or operation of the Improvements on the Property including Landlord's Equipment but excluding Tenant's Equipment; (c) all right, title and interest of Principal Mutual and any other Owner in and to all and singular the tenements, hereditaments, easements, rights-of-way, rights, privileges and appurtenances in and to the Property, now or at any time hereafter belonging or in any way appertaining thereto, and all right, title and interest of Principal Mutual and any other Owner in, to and under any streets, ways, alleys, vaults, gores or strips of land adjoining the Property; (d) all claims or demands of Principal Mutual and any other Owner, in law or in equity, in possession or expectancy of, in and to the Property; and (e) all rents, income, revenues, issues, awards, proceeds and profits from and in respect of the property described in this Granting Clause First, all of which are hereby specifically assigned, transferred and set over to Grantee, it being the intention of the parties hereto that, so far as may be permitted by law, all property of the character hereinabove described which is now owned or held or is hereafter acquired by Principal Mutual and any other Owner and is affixed, attached and annexed to the Property shall be and remain or become and constitute a portion of the Granted Property and the security covered by and subject to the lien hereof. The Land Parcel, together with the Improvements located thereon described in this Granting Clause First relating to the Land Parcel and the Improvements and Landlord's Equipment located and to be located thereon described in this Granting Clause First, are herein called the Property.

Granting Clause Second

The entire right, title and interest of Principal Mutual and any other Owner in and to the Lease and the Lease Guaranty, including the right to all extensions and renewals of the term of the Lease, including, without limitation, the present and continuing right (i) to make claim for,

BK 15719 PG0164

collect, receive and receipt for any and all of the rents, income, revenues, issues, awards, proceeds and profits and other sums of money payable or receivable by the lessor under the Lease or pursuant to the Lease Guaranty, whether payable as rent or otherwise, including, without limitation, sums of money receivable thereunder or pursuant thereto by virtue of paragraphs 7(f), 7(g) and 10 of the Lease, (ii) to accept or reject any offers made pursuant to the Lease to purchase any interest in the Property, (iii) to bring actions and proceedings under the Lease or the Lease Guaranty or for the enforcement thereof, (iv) to pursue and collect any claim in the bankruptcy or other insolvency proceeding of Lessee or Guarantor, and (v) to do anything which Principal Mutual and any other Owner or any lessor is or may become entitled to do under the Lease or the Lease Guaranty, provided that the assignment made by this Granting Clause Second shall not impair or diminish any obligation of Principal Mutual and any other Owner under the Lease, the Assignment or the Lease Guaranty nor shall any such obligation be imposed upon Grantee.

## Granting Clause Third

Any and all moneys and other property which may from time to time become subject to the lien hereof or which may come into the possession or be subject to the control of Grantee pursuant to this Deed to Secure Debt, the Assignment, the Lease Guaranty, the Letter Agreement or any other instrument included in the Granted Property, including, without limitation (but subject to the terms and provisions of the Lease), insurance proceeds and all awards which may at any time be made or assigned to Principal Mutual and any other Owner for the taking by eminent domain of the whole or any part of the Property or any interest or easement therein, and other property, if any, delivered to the Grantee by or on behalf of Principal Mutual and any other Owner, it being the intention of Principal Mutual and any other Owner and it being hereby agreed that all property hereafter acquired by Principal Mutual and any other Owner (including, without limitation, all right, title and interest of Principal Mutual or any other Owner in and to any Store Expansion) and required to be subjected to the lien of this Deed to Secure Debt or intended so to be shall forthwith upon the acquisition thereof by Principal Mutual and any other Owner be subject to the lien of this Deed to Secure Debt as if such property were now owned by Principal Mutual and any other Owner and were specifically described in this Deed to Secure Debt and Granted hereby or pursuant hereto.

## Granting Clause Fourth

All products, accessions, rents, issues, profits, returns, income and proceeds of and from any and all of the foregoing (including proceeds which constitute property of the types described in Granting Clauses First, Second and Third above).

Any person acquiring any right, title or interest in or to any interest in the Property, by acceptance of a transfer or conveyance of such interest confirms the Grant to Grantee contained in these Granting Clauses.

TO HAVE AND TO HOLD the Granted Property, whether now owned or held or hereafter acquired, unto Grantee and its successors and assigns for the equal and ratable benefit and security of the Notes without preference, priority or distinction as to lien or otherwise unless otherwise specifically provided herein or in such Notes.

N:\BBN\S6BBN422.6\031898\1549                    3

This instrument is intended to operate and is to be construed as a deed passing title to the Property to the Grantee with the power of sale, and not as a mortgage, is made under those provisions of the existing laws of the State of Georgia relating to deeds to secure debt and is given to secure the obligations of Grantor as hereinafter set forth.

IT IS HEREBY COVENANTED, DECLARED AND AGREED that the Notes are to be secured by this Deed to Secure Debt and that the Granted Property is to be held by Grantee upon and subject to the provisions of this Deed to Secure Debt.

ARTICLE 1
Definitions

Unless the context otherwise requires, the following terms have the meanings herein specified, such definitions to be applicable equally to the singular and the plural nouns and verbs of any tense:

"Alterations" has the meaning specified in the Lease.

"Assignment" means the Assignment of Lease and Agreement, relating to the Lease and the Lease Guaranty, dated as of the date hereof, from Principal Mutual, as assignor, to Grantee, as assignee, and consented to therein by Lessee and Guarantor, which assigns the Lease and the Lease Guaranty as additional security for the Notes, as the Assignment may be amended or supplemented from time to time as permitted hereby or thereby.

"Basic Rent" has the meaning specified in the Lease.

"Claims" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable attorneys' fees and costs, whether incurred in enforcing this Deed to Secure Debt, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Deed to Secure Debt or caused by any person or entity. Without limiting the generality of the foregoing definition, Claims specifically include claims, actions, whether by related or third parties, for personal injury or real or personal property damage, and capital , operating and maintenance costs incurred in connection with any Remedial Work. Notwithstanding the foregoing, Claims does not include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with any Hazardous Condition which is determined by proper judicial or administrative procedure to have been introduced to the Property after indefeasible payment in full of the Notes or during any period Grantee is in possession of the Property to the exclusion of Owner and Lessee after an Event of Default has occurred.

"default" means any act or occurrence which, with notice, lapse of time or both, would constitute an Event of Default.

"Environmental Laws" has the meaning specified in the Lease.

BK 15719 PG0166

"Event of Default" means any act or occurrence of the character specified in Section 7.1(a) through 7.1(k).

"Expansion Notes" means Notes issued by Owner pursuant to Section 4.6 hereof to finance the cost to Owner of acquisition of additions and Alterations to the Property of Improvements, land and Landlord's Equipment made by Lessee pursuant to paragraph 28 of the Lease as part of a Store Expansion, together with any note or notes issued in exchange or substitution therefor pursuant to the Indenture.

"Grant" means grant, mortgage, convey, assign, grant and create a lien or security interest in, bargain, sell, pledge, give, transfer and set over.

"Granted Property" means the property conveyed or intended to be conveyed at any time to the Grantee pursuant to the provisions hereof.

"Grantee" has the meaning specified in the first sentence hereof.

"Guarantor" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its asserts substantially as an entirety.

"Hazardous Condition" means the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Property, air, soil, groundwater, surface water or soil vapor on or about the Property, or which migrates, flows, percolates, diffuses or in any way moves onto or into the Property, air, soil, groundwater, surface water or soil vapor on or about the Property, or from the Property into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials, friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant or animal health or well-being, and those substances, materials and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law, including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws.

"Improvements" has the meaning specified in Granting Clause First.

"Indenture" means the Indenture, dated as of the date hereof, from Principal Mutual to Grantee, together with all supplements and amendments thereto.

"Installment Payments" has the meaning specified in the Notes.

"Institutional Investor" means any of the following persons existing under the laws of the United States or any state thereof or of the District of Columbia or Canada or any province thereof: (i) any bank, trust company, national banking association or savings and loan association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation, eleemosynary institution, church or fraternal order, (iii) any insurance company, (iv) any pension, profit-sharing, retirement trust or fund for which any bank, trust company, national banking association or saving and loan association or investment advisor registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, or if self managed, having funds of at least $50,000,000, (v) any investment company, as defined in the Investment Company Act of 1940, as amended, (vi) any college or university, or (vii) any government, any public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds.

"Interest Payments" has the meaning specified in the Notes.

"Landlord's Equipment" has the meaning specified in the Lease.

"Land Parcel" has the meaning specified in Granting Clause First.

"Lease" means the lease of the Property, dated as of the date hereof, between Principal Mutual, as lessor, and Lessee, as lessee, as amended or supplemented from time to time as permitted hereby or thereby, together with any short form or memoranda thereof for purposes of recording.

"Lease Guaranty" means a guaranty by Guarantor of the Lease in the form of Exhibit H to the Note Agreement, executed and delivered by Guarantor.

"Lessee" means WINN-DIXIE ATLANTA, INC., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Letter Agreement" means the letter of the Guarantor, dated as of the date hereof, in favor of Owner and Grantee, related to the Property, pursuant to which Guarantor agrees to pay certain costs and expenses associated with the transactions contemplated by the Note Agreement, the Indenture and this Deed to Secure Debt.

"lien of this Deed to Secure Debt" and terms of like import mean the lien or security interest or other interest or charge Granted to Grantee hereby (including the after-acquired property clauses hereof) or subsequently Granted hereunder or pursuant hereto to Grantee.

"Make Whole Amount" means an amount equal to the greater of (x) the amount, if any, by which (i) the present value of all future payments of principal and interest due on that portion of the unpaid principal amount of each Note to be prepaid, payable from the date of prepayment to the Maturity Date of such Note calculated by discounting each such future payment from the due date thereof to such date of prepayment at a rate per annum equal to 50 basis points over the Treasury Constant Maturity Yield Index as defined below exceeds (ii) 100% of that portion of the principal amount of such Note to be prepaid on the date of prepayment and (y) 0.5% of the amount of principal to be so prepaid.

BK 15719 PG0168

For purposes of this definition, the Treasury Constant Maturity Yield Index shall mean (i) the yields reported, as of 10:00 a.m. (New York City time) on the third business day preceding the date of prepayment, on the display designated as "USD" on the Bloomberg Financial Markets Commodities News Screen or the equivalent screen provided by Bloomberg Financial Markets News (or any nationally recognized publicly available on-line source of similar market data) for actively traded U.S. Treasury securities having a maturity equal to the remaining average life of the Note to be prepaid, or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the third business day preceding the date of prepayment, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury Securities having a maturity equal to the remaining average life of such Note. Such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security having a maturity closest to and greater than the remaining average life of such Note and (2) the actively traded U.S. Treasury security having a maturity closest to and less than the remaining average life of such Note.

"Net Award" has the meaning specified in the Lease.

"Net Proceeds" has the meaning specified in the Lease.

"Note Agreement" means the Note Purchase Agreement, dated as of the date hereof between Principal Mutual and each of the Note Purchasers providing for the purchase and sale of the Original Notes to finance the reimbursement to Principal Mutual of a portion of the cost previously incurred by Principal Mutual to acquire the Property.

"Note Holder" means any registered holder of a Note determined pursuant to the Indenture.

"Note Purchasers" means Metropolitan Life Insurance Company and The Paul Revere Life Insurance Company, as purchasers of the Original Notes.

"Notes" means the Original Notes together with any Expansion Notes.

"Original Notes" has the meaning specified in the Preliminary Statement and are described in Section 2.1.

"outstanding" means, as of any particular time, Notes theretofore issued pursuant to Article 2 and the Indenture and secured hereby except: (i) Notes theretofore duly surrendered for cancellation; (ii) Notes theretofore paid in full or required to be prepaid in full within 30 days (provided that cash sufficient for such prepayment shall theretofore have been paid to Owner or deposited with Grantee); (iii) Notes in exchange or substitution for which other Notes shall have been issued pursuant to the Indenture; and (iv) Notes registered in the name of Owner, Lessee, Guarantor, or their respective nominees or any affiliate of Owner, Lessee, Guarantor or any person that is the owner of greater than 10% of the voting securities of Owner, Lessee or Guarantor.

"Owner" has the meaning specified in the Preliminary Statement and includes Principal Mutual.

BK 15719 PG0169

"Permitted Exceptions" means:

(a)     easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other minor defects and irregularities in the title to the Property, or zoning laws or use regulations, none of which materially lessen the value of the Property or materially impair the use thereof for the purposes for which held by Owner and leased to Lessee under the Lease, including those matters set forth in Schedule B, Part I of the loan title insurance policy relating to the Property issued to the Grantee pursuant to Section 6.4 of the Note Agreement in connection with issuance of the Original Notes;

(b)     any condemnation right reserved to or vested in any municipality or public authority with respect to the Property or any interest therein;

(c)     any liens for taxes, assessments and other governmental charges and any liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Property which are not delinquent or the existence, amount or validity of which is being contested by Lessee pursuant to, and as permitted by, the Lease;

(d)     the rights of Lessee under the Lease;

(e)     any liens on the leasehold estate of Lessee under the Lease created pursuant to paragraph 28(e) of the Lease;

(f)     the lien hereof and any rights granted hereby; and

(g)     the Assignment.

"Person" or "person" means an individual, partnership, corporation, trust, estate, unincorporated association, syndicate, joint venture or organization, or a government or any department or agency thereof.

"Principal Mutual" has the meaning specified in the Preliminary Statement.

"Property" has the meaning specified in Granting Clause First.

"Purchase Offer" has the meaning specified in the Lease.

"Remedial Work" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person due to the existence or suspected existence of a Hazardous Condition.

"Store Expansion" has the meaning specified in the Lease.

"Substitution Date" has the meaning specified in the Lease.

N:\BBN\S6BBN422.6\031898\1549                    8

BK 15719 PG0170

"Successor Owner" means an Owner other than Principal Mutual.

"Tenant's Equipment" has the meaning specified in the Lease.

ARTICLE 2
The Notes

Section 2.1    The Notes.

(a)    The Notes shall be substantially in the form set forth in Schedules A-1, A-2 and A-3 hereto and may have such letters, numbers, other marks of identification or legends as the Owner issuing such Notes may reasonably request subject to the approval of the Grantee.

(b)    The Series A Notes shall:

(i)    be designated the 6.73% Secured Notes Due October 1, 2015, and shall be limited in aggregate original principal amount to $3,518,537.00

(ii)    be issuable only as fully registered Notes in denominations of $500,000 or any amount in excess thereof;

(iii)    be dated the date of issuance thereof (except as provided in Section 2.7 of the Indenture);

(iv)    mature, unless sooner paid in full pursuant to the Indenture or this Deed to Secure Debt, on October 1, 2015;

(v)    bear interest on the unpaid principal amount thereof from the date of issuance thereof to maturity at the rate of 6.73% per annum (computed on the basis of a 360-day year consisting of twelve 30-day months);

(vi)    be due and payable in one payment of interest accrued and unpaid thereon on April 1, 1998 and be due and payable as to principal and accrued and unpaid interest, on July 1, 1998 and on the first day of each October, January, April and July thereafter to and including October 1, 2015 in seventy equal (as nearly as may be) Installment Payments of principal and interest such that upon the due and punctual payment thereof, there shall have been paid to the Note Holder of each such Note 100% of the original principal amount thereof and all accrued interest thereon; and

(vii)    not be subject to prepayment except as expressly provided in this Deed to Secure Debt.

(c)    The Series B Notes shall:

(i)     be designated the 6.92% Secured Notes Due January 1, 2018, and shall be limited in aggregate original principal amount to $829,019.00.

(ii)    be issuable only as fully registered Notes in denominations of $500,000 or any amount in excess thereof;

(iii)   be dated the date of issuance thereof (except as provided in Section 2.7 of the Indenture);

(iv)    mature, unless sooner paid in full pursuant to the Indenture or this Deed to Secure Debt, on January 1, 2018;

(v)     bear interest on the unpaid principal amount thereof from the date of issuance thereof to maturity at the rate of 6.92% per annum (computed on the basis of a 360-day year consisting of twelve 30-day months);

(vi)    be due and payable in seventy-one quarter-annual payments of interest accrued and unpaid thereon, on April 1, 1998 and on the first day of each July, October, January and April thereafter to and including October 1, 2015, and be due and payable in nine equal (as nearly as may be) quarter-annual Installment Payments of principal and accrued and unpaid interest on January 1, 2016 and on the first day of each April, July, October and January thereafter to and including January 1, 2018 such that upon the due and punctual payment thereof, there shall have been paid to the Note Holder of each such Note 100% of the original principal amount thereof and all accrued interest thereon; and

(vii)   not be subject to prepayment except as expressly provided in this Deed to Secure Debt.

(d)     each Expansion Note shall be of the series of Expansion Notes, be designated, be in such denominations, be dated, bear interest, mature, be due and payable as to interest and principal, and otherwise be as may be provided in the indenture supplement and amendment to this Deed to Secure Debt creating such series of Expansion Notes.

Section 2.2    Certificate of Authentication.  No Note shall be valid or become obligatory for any purpose or be binding upon Owner, or be entitled to the benefits and security of the Indenture, this Deed to Secure Debt and the Assignment, unless and until such Note has been authenticated by the Grantee's execution of the certificate of authentication thereon in the form prescribed herein and in the Notes.  The authentication and delivery by the Grantee of any Note shall be conclusive and the only competent evidence that such Note has been duly issued and is entitled to the benefits and security of the Indenture, this Deed to Secure Debt and the Assignment.

GX 15719 PG0172

## ARTICLE 3
## Particular Covenants

A.    Principal Mutual and each Successor Owner hereby represents, warrants, covenants and agrees as follows:

Section 3.1    Title to the Granted Property.  Owner has a good and marketable fee simple interest in and to the Property free and clear of all liens, encumbrances, charges and other exceptions to title except Permitted Exceptions. Owner has and will have full power and lawful authority to Grant the Granted Property to Grantee in the manner and form herein done or intended. Owner will preserve its title to the Property subject only to Permitted Exceptions and except as permitted by this Deed to Secure Debt. Owner will forever warrant and defend the same to Grantee against the claims of all persons. This Deed to Secure Debt constitutes a valid first lien on the Granted Property, subject only to Permitted Exceptions of the character described in clauses (a) through (d) of the definitions of Permitted Exceptions.

Section 3.2    Further Assurances.  Owner will, at its expense, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, instruments and assurances reasonably required by Grantee for the better Granting to Grantee of the Granted Property or for carrying out the intention of, or facilitating the performance of, this Deed to Secure Debt.

Section 3.3    Recording.  Owner will, upon the execution and delivery hereof and thereafter from time to time, cause this Deed to Secure Debt, the Lease (or a short form or memorandum thereof), the Assignment, each supplement and amendment to each of said instruments and financing statements and continuation statements with respect thereto (collectively called the "Recordable Documents"), to be recorded as may be required by law to publish notice of and maintain the lien hereof upon the Granted Property and to publish notice of and protect the validity of the Lease and the Assignment. Owner will, from time to time, perform or cause to be performed any other act as required by law and will execute or cause to be executed any and all further instruments (including financing statements, continuation statements and similar statements with respect to any of said documents) reasonably requested by Grantee for such purposes. If Owner shall fail to comply with this Section, Grantee shall be and is hereby irrevocably appointed the agent and attorney-in-fact of Owner to comply therewith (including the execution, delivery and filing of such financing statements and other instruments), but this sentence shall not prevent any default in the observance of this Section from constituting a default. Owner will pay all recording taxes and fees incident thereto and all expenses, taxes and other governmental charges incident to or in connection with the preparation, execution, delivery or acknowledgment of the Recordable Documents, any instruments of further assurance and the Notes.

Section 3.4    Payment of the Notes.  Owner will punctually pay, or cause to be paid, when due the principal, interest, Make Whole Amount, if any, and all other sums to become due in respect of the Notes in accordance with this Deed to Secure Debt, the Indenture, the Notes, the Note Agreement and the Assignment. Owner will punctually pay and perform its obligations under this Deed to Secure Debt, the Assignment, the Indenture and the Note Agreement.

Section 3.5    The Lease.  At all times the Property shall be leased to Lessee under the Lease, and the Lease shall be guaranteed pursuant to the Lease Guaranty, provided that the Property may be subleased or the Lease assigned upon compliance with the terms of the

Lease. Owner will punctually perform all obligations, covenants and agreements by it to be performed as lessor under the Lease in accordance therewith, will at all times do all things necessary to compel performance by Lessee of all its obligations, covenants and agreements under the Lease and of Guarantor of all of its obligations, covenants and agreements under the Lease Guaranty. In the event notice of any obligations referred to in paragraph 12(a) of the Lease is given to Owner and not to Lessee, Owner covenants to give prompt notice thereof to Lessee. Owner will maintain the validity and effectiveness of the assignment to Grantee of the Lease and the Lease Guaranty made by this Deed to Secure Debt, the Assignment and the Indenture, and (except as expressly permitted by the Lease, this Deed to Secure Debt or the Assignment) will take no action, will permit no action to be taken by others and will not omit to take any action, which action or omission would release Lessee or the Guarantor from its obligations or liabilities under the Lease, the Assignment, or the Lease Guaranty or would result in the termination, amendment or modification or impair the validity of the Lease, the Assignment, or the Lease Guaranty.

Section 3.6    Existence; Compliance with Laws. So long as Owner owns any interest in the Granted Property, Owner will keep in full force and effect its existence, franchises, rights and privileges as a corporation or other entity under the laws of the state of its incorporation or organization and its qualification to do business in the State in which the Property is located, and will do or cause to be done all things necessary to preserve and keep in full force and effect its right to own, lease, mortgage and grant and create a security interest in the Granted Property and to enforce contracts in the state where the Property is located. Except as otherwise permitted by Section 3.16, Owner will comply with or cause to be complied with (a) all laws, or other legal requirements or orders of the United States, or of any state or any other governmental authority applicable to Owner or the Property, and (b) all contracts, agreements or other instruments, applicable to Owner or the Property or to which Owner is a party or has given its consent, unless in each case, Lessee is contesting such compliance in accordance with the Lease.

Section 3.7    After-acquired Property. All right, title and interest of Owner in and to all improvements, alterations, substitutions, restorations and replacements of, and all additions and appurtenances to the Property (including, without limitation, all Alterations or Store Expansion, hereafter acquired by or released to Owner) immediately upon such acquisition or release and without any further Granting by Owner shall become part of the Property and the Granted Property and shall be subject to the lien hereof fully, completely and with the same effect as though now owned by Owner and specifically described in the Granting Clauses hereof; at any time Owner will execute and deliver to Grantee any document Grantee may reasonably require to subject the same to the lien hereof.

Section 3.8    Taxes. Owner shall do or cause to be done everything necessary to preserve the lien hereof without expense to Grantee, including, without limitation, paying and discharging or causing to be paid and discharged, whether or not payable directly by Owner or subject to withholding at the source, (i) all governmental taxes (other than income taxes of the Note Holders or the Grantee), assessments, levies, fees, water and sewer rents and charges and all other governmental charges, general, special, ordinary or extraordinary, and all charges for utility or communications services, which may at any time be assessed, levied or imposed upon Owner, the Granted Property, this Deed to Secure Debt, the Indenture, the Assignment, the indebtedness secured hereby or the revenues, rents, issues, income, awards, proceeds and profits of the Granted Property or which may arise in respect of the occupancy, use, possession or operation of the Property or the Granted Property (but excluding income and franchise taxes

BK 15719 PG0174

of Lessee and Guarantor), (ii) all income, excess profits, sales, gross receipts and other taxes, duties or imports, whether similar or not in nature (other than income taxes of the Note Holders or the Grantee), assessed, levied or imposed by any governmental authority on Owner, the Granted Property or the revenues, rents, issues, income, awards, proceeds and profits of the Granted Property and (iii) all lawful claims and demands of mechanics, laborers, materialmen and others which, if unpaid, might create a lien on the Property, the Granted Property, or on the revenues, rents, issues, income, awards, proceeds and profits of the Property or the Granted Property, unless, in each case, Lessee is contesting the existence, the amount or validity thereof in accordance with the Lease.

Section 3.9    <u>Insurance</u>.

(a)    Owner shall maintain or cause to be maintained with respect to the Property insurance of the character and with the coverage, provisions and grantee endorsement required to be maintained by Lessee under the Lease, whether or not the Lease shall be in effect; provided, however, that so long as the Lease shall be in effect, Owner's obligations under this Section 3.9(a) will be satisfied as, to the extent and so long as Lessee is entitled to elect and does elect to self-insure pursuant to paragraph 13(b) of the Lease.

(b)    Insurance claims by reason of damage to or destruction of the Property shall be adjusted by Lessee in accordance with the Lease, but Grantee shall have the right to join in adjusting any such claim and Owner shall, at Grantee's request and at Owner's expense, cooperate with Grantee in any such adjustment.

(c)    Owner shall not take out any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 3.9 unless Grantee is included therein as named insured, with loss payable to Grantee as provided in the Lease. Owner shall immediately notify Grantee whenever any such separate insurance is taken out, specifying the insurer and full particulars as to the policies evidencing the same, and shall deliver to Grantee certificates of insurers evidencing such insurance.

(d)    So long as Owner shall be required to maintain any insurance under this Section 3.9, Owner shall deliver or cause to be delivered to Grantee original copies of all policies of insurance or original certificates of insurance as may be required pursuant hereto to be maintained or to be caused to be maintained by Owner, and at least 30 days prior to the expiration of such insurance and within 10 days after the issuance of any additional policies or amendments or supplements to any of such policies, Owner will deliver or cause to be delivered original copies of the same (or certificates of the insurers under such policies evidencing the same) to Grantee.

Section 3.10   <u>Advances by Grantee</u>. If Owner shall fail to perform or cause to be performed any of the covenants contained in Section 3.3, 3.6, 3.8 or 3.9, Grantee may (but shall not be obligated to) make advances to perform the same in Owner's behalf, and all sums so advanced shall be secured hereby; and Owner will repay on demand all sums so advanced on its behalf with interest at the rate per annum of 2.0% in excess of the weighted average of the interest rate payable on the Notes then outstanding (or at the maximum rate not prohibited by law, whichever is less), such interest to be computed from and including the date of the making of such advance to and including the date of such repayment.

OK 15719 PG0175

Section 3.11    Negative Covenants.

(a)      Owner shall not (i) sell, assign, lease or otherwise transfer the Granted Property or any part thereof or interest therein, except in compliance with Article 4 hereof; (ii) claim any credit on, or make any deduction from interest or Make Whole Amount or premium, if any, on the principal of the Notes by reason of payment of any taxes levied or assessed or to be levied or assessed on the Granted Property or any part thereof; or (iii) create or suffer to be created, directly or indirectly, any mortgage, lien, encumbrance or charge relating to the Granted Property, other than Permitted Exceptions and as expressly permitted by this Deed to Secure Debt.

(b)      No Successor Owner shall (i) engage directly or indirectly in any business other than the acquisition, ownership, leasing and disposition of the Granted Property; (ii) create, assume or suffer to exist any indebtedness for borrowed money, except the Notes; (iii) amend or modify its formation documents; or (iv) engage in any transaction with an affiliate on terms that are less favorable to such Successor Owner than the terms that would be obtained on an arm's length basis with a party who is not such an affiliate.

Section 3.12    Lease Basic Rent.  Each payment of Basic Rent on each date for the payment thereof shall, on or about such date, be sufficient to make payment of the Interest Payments and Installment Payments due on the Notes on or about such date.  The purchase price which would be payable by Lessee upon the purchase of the Property pursuant to the Lease (other than a purchase subject to the lien of this Deed to Secure Debt pursuant to paragraph 9 of the Lease) on any date shall not be less than the unpaid principal amount of the Notes, together with accrued and unpaid interest thereon and any applicable Make Whole Amount.

Section 3.13    Financial Statements; Books and Records; Notice of Default.

(a)      Each Successor Owner will deliver to Grantee, in duplicate:  (i) within 90 days after the close of each fiscal year of such Successor Owner, its balance sheet as at the end of its previous fiscal year and its income statement for such year, setting forth, in each case, in comparative form, figures for the preceding fiscal year, all in reasonable detail and satisfactory in scope to Grantee, certified to be true and complete by independent certified public accountants selected by such Successor Owner and copies of all detailed reports, if any, which shall be prepared by such Successor Owner in connection with any annual or interim audit of the books of such Successor Owner; and (ii) with reasonable promptness after receipt of a request from Grantee, such other financial information with respect to such Successor Owner as Grantee may reasonably request from time to time.  Within 30 days after the close of each fiscal year, each Successor Owner shall deliver to Grantee a certificate of a senior financial officer of such Successor Owner stating whether, to such officer's knowledge, (A) any default or Event of Default has occurred and is continuing, (B) any default or Event of Default has occurred since the delivery of the immediately preceding certificate of such Successor Owner delivered pursuant to this Section, or, if any such default has occurred, describing the same in reasonable detail, (C) if any default or Event of Default has occurred and is continuing, specifying the nature and the period of existence thereof and what action such Successor Owner has taken or is taking with respect thereto, and (D) except as otherwise stated, that such Successor Owner has fulfilled all its obligations under this Deed to Secure Debt, the Notes, the Note Agreement, the Assignment and the Indenture.

BX 15719 PG0176

(b)     Owner will permit Grantee, by its agents, accountants and attorneys, at Owner's expense (A) to inspect the Property and (B) to examine its records and books of account related to the Property and to discuss its affairs, finances and accounts related to the Property with its senior financial officers at such reasonable times as may be requested by Grantee. Each Successor Owner shall (i) keep accurate records and books of account reflecting all its financial transactions and (ii) permit Grantee, by its agents, accountants and attorneys, at such Successor Owner's expense, to examine all of its records and books of accounts, whether or not related to the Property, and to discuss its affairs, finances and accounts, whether or not related to the Property, with its senior financial officers and accountants at such reasonable times as may be requested by Grantee.

(c)     Promptly upon becoming aware thereof, Owner will notify Grantee of the occurrence of any default or Event of Default under this Deed to Secure Debt, the Indenture, the Note Agreement or the Assignment which does not result from the action or omission of Lessee under the Lease or of the Guarantor under the Lease Guaranty.

Section 3.14   <u>Maintenance and Repair</u>.  Owner will maintain the Property (or cause it to be maintained) in good repair and condition, except for ordinary wear and tear, and will make or cause to be made all structural and nonstructural, foreseen and unforeseen and ordinary and extraordinary changes and repairs which may be required with respect to the Property to keep the Property in good repair and condition, ordinary wear and tear excepted.

Section 3.15   <u>Security Agreement; Fixture Filing</u>.

(a)     This Deed to Secure Debt is intended to be a security agreement pursuant to the Uniform Commercial Code with respect to any fixtures or items of personal property specified as part of the Granted Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code.

(b)     This Deed to Secure Debt constitutes a financing statement filed as a fixture filing in the Official Records of the County in which the Property is located with respect to any and all fixtures included within the Granted Property and with respect to any goods or other personal property that may now be or hereafter become fixtures.

Section 3.16   <u>Environmental Compliance</u>.

(a)     Except as set forth in the second sentence of this Section 3.16 and except as to any matters disclosed by the environmental reports delivered pursuant to Section 6.11 of the Note Agreement or as to any matters disclosed in writing to Grantee by Lessee prior to the date hereof or set forth in the Lease: Owner hereby represents, warrants, covenants and agrees to and with Grantee that all operations or activities upon, or any use or occupancy of the Property is presently and will at all times be in compliance with all Environmental Laws; that Owner has not at any time engaged in or permitted, nor to Owner's knowledge has any existing or previous tenant or occupant of the Property engaged in or permitted the occurrence of any Hazardous Condition; and that to Owner's knowledge, there does not now exist nor is there suspected to exist any Hazardous Condition on or about the Property. Owner discloses to Grantee that Lessee does, or intends to, store, use or sell in Lessee's business certain products or substances that may be considered Hazardous Substances, and Grantee acknowledges Lessee's right to do so, in accordance with the Lease. If Owner discovers that any Hazardous Condition exists on the Property in violation of any applicable law (whether or not disclosed in

any environmental report referred to above), Owner shall, with all due diligence, take or cause to be taken all remedial, removal and other actions necessary to remediate, remove, contain or clean up such Hazardous Condition in a manner and to the extent required by the applicable Environmental Laws. Owner agrees to comply or cause compliance with each of the recommendations contained in all environmental reports issued relating to the Property if such recommendations are necessary to comply with then current requirements of applicable Environmental Laws. Notwithstanding the foregoing, if any Hazardous Condition is or becomes the subject matter of a federal or state "no-action letter," then Owner shall not be obligated to undertake Remedial Work with respect to, or to investigate further, such known Hazardous Condition, unless subsequently directed by the federal or state agency having jurisdiction over such known Hazardous Condition. OWNER FURTHER AGREES TO PROTECT, INDEMNIFY, SAVE HARMLESS AND DEFEND GRANTEE, IF ANY, FROM AND AGAINST ALL LIABILITIES, OBLIGATIONS, CLAIMS, DAMAGES, PENALTIES, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) HEREIN IMPOSED UPON OR OUT OF (X) THE EXISTENCE OF HAZARDOUS SUBSTANCES OR HAZARDOUS CONDITIONS ON THE PROPERTY, OR (Y) ANY ACTION OR OMISSION OF OWNER, ITS AGENTS OR EMPLOYEES, WHICH CONSTITUTES A VIOLATION OF, OR CREATES A CONDITION OF THE PROPERTY WHICH IS IN VIOLATION OF, ANY ENVIRONMENTAL LAWS; provided, however, that the foregoing indemnification shall not be deemed to include claims, actions, administrative proceedings, judgments, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Property during any period while Grantee is in possession of the Property to the exclusion of Owner and Lessee after an Event of Default has occurred.

(b)    In the event that any Remedial Work that could result in a Claim is required under any Environmental Laws by any judicial order, or by any governmental entity, or in order to comply with the terms, covenants and conditions of this Deed to Secure Debt or of any other agreements affecting the Property, Owner will perform or cause to be performed the Remedial Work in compliance with such law, regulation, order or agreement. All Remedial Work will be performed by one or more contractors, selected by Owner or Lessee and under the supervision of a consulting environmental engineer selected by Owner or Lessee. Owner will pay or cause to be paid all costs and expenses of such Remedial Work, including without limitation the charges of such contractor(s) and the consulting environmental engineer, and Grantee's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event that Owner or Lessee fails to timely commence, or cause to be commenced, or fails to diligently prosecute to completion, such Remedial Work, Grantee may, but will not be required or have any obligation to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, will thereupon constitute Claims. All such Claims will be due and payable upon demand therefor by Grantee.

(c)    The provisions of Section 3.16(a) shall survive the payment in full of the Notes and the cancellation of the lien of this Deed to Secure Debt and release or reconveyance of the Granted Property to Owner pursuant to Section 8.5, but shall finally terminate and cease upon the expiration of any applicable statute of limitation of actions which has not been waived by Owner as to any potential and unasserted Claim.

BK 15719 PG0178

(d)    Notwithstanding any provision of this Deed to Secure Debt to the contrary, Lessee may contest or cause to be contested, by appropriate action and in the manner set forth in the Lease, the application, interpretation or validity of any Environmental Laws or any agreement requiring any Remedial Work as provided in the Lease and Lessee and Owner may delay performance of Remedial Work or compliance with the Environmental Laws or agreement requiring such Remedial Work, provided that the conditions for such delay set forth in the Lease are satisfied by Lessee. Subject to the terms and conditions set forth above, during the pendency of any such permitted contest resulting in a delay of performance of any required Remedial Work, Grantee agrees that it will not perform such Remedial Work requirement.

(e)    Owner agrees that, upon the occurrence of an Event of Default and, if such Owner is Principal Mutual, after the expiration of any period in which Principal Mutual is entitled pursuant to Section 7.8 hereof to cure any default by Lessee under the Lease, Grantee may, at Owner's expense, obtain an environmental audit of the Property from a qualified engineer.

Section 3.17    Successor Owner; Separate Existence. Each Successor Owner shall: (a) keep separate books, records and bank accounts, and refer to themselves as separate and distinct in all reports and communications to third parties; (b) engage in all transactions solely on arm's-length terms (affording fair value to both side) and pursuant to appropriate documentation; (c) be adequately capitalized in light of its present and reasonably foreseeable business operations; (d) conduct its business affairs as a single purpose entity for the purpose of acquiring, holding title to and leasing the Property, without making any representation that the assets of any other Person are available to satisfy its obligations; (e) bear its respective overhead expenses for any items or services (including employment) shared with any other Person on the basis of its respective actual use; (f) avoid commingling its assets with the assets of any other Person; (g) maintain separate and distinct bank accounts and other depository accounts; (h) avoid payment of the operating expenses of any other Person, except when paid and charged pursuant to an allocation based upon actual use; and (i) demonstrate respect for its separate existence by observing corporate and organizational formalities, including maintaining its valid existence and good standing in all relevant jurisdictions.

## ARTICLE 4
### Possession, Use and Release of the Property

Section 4.1    Lease Termination.

(a)    Within 10 business days after receipt by Owner of a Purchase Offer from Lessee pursuant to paragraph 10 of the Lease (except a Purchase Offer arising under paragraph 29 of the Lease, with respect to which Section 4.1(b) below shall apply), which Purchase Offer, pursuant to the provisions of the Lease, constitutes an irrevocable offer to purchase Owner's interest in the Property (or any Net Award or Net Proceeds), Owner shall furnish or cause to be furnished to Grantee a copy of such Purchase Offer and any certificate delivered in connection therewith. Not later than the 10th day prior to the expiration date of the period within which the Lease permits the lessor thereunder to reject any such Purchase Offer, Owner will either (i) notify Lessee of the acceptance of such offer or (ii) pay to Grantee in

BK 15719 PG0179

immediately available funds an amount sufficient to pay or prepay the outstanding principal of the Notes, together with the accrued and unpaid interest thereon to the date of such payment, together with any applicable Make Whole Amount.  If Owner shall not make said payment or shall fail to notify Lessee of its acceptance of such Purchase Offer prior to the date referred to above, or if after notifying Lessee of such acceptance, Owner shall fail to comply with the applicable provisions of the Lease or shall otherwise fail to cause the same to be complied with, Grantee may, and shall have the right and power (which right and power are coupled with an interest) to, and are hereby irrevocably appointed the agent and attorney-in-fact of Owner and of any and every future assignee or owner of any interest in the Property, to notify Lessee of any such acceptance of any such Purchase Offer and take all actions necessary to comply with the applicable provisions of the Lease, including, without limitation, the execution and delivery, in the name and on behalf of Owner or other assignee or owner of any interest in the Property, of a deed or other instrument of conveyance or assignment conveying and assigning the interest of Owner in the Property (and any Net Award or Net Proceeds) to Lessee or its designee; but the provisions of this sentence shall not prevent any default in the observance or performance of any covenant, condition or agreement contained in this Section 4.1(a) from constituting a default.  If Lessee shall purchase the interest of Owner in the Property (or any Net Award or Net Proceeds) pursuant to the Lease and shall make payment of the purchase price therefor to Grantee and otherwise shall be in compliance with the Lease, or if Owner shall make the payment referred to in clause (ii) of this Section 4.1(a), then Grantee shall execute and deliver to Owner instruments releasing the interest of Owner in the Property and the Lease from the lien of this Deed to Secure Debt, the Indenture, the Assignment and any UCC financing statements promptly after receipt of such payment, together with all other sums then due and payable under the Notes, the Note Agreement, this Deed to Secure Debt and the Indenture.  If there shall be paid to Grantee the payment referred to in clause (ii) of this Section 4.1(a), then Grantee shall promptly execute and deliver to Lessee its written consent to the rejection made by Owner of such Purchase Offer.  Payments received by Grantee pursuant to this Section 4.1(a) shall be applied pursuant to Article 5. If such Purchase Offer shall be received by Grantee from Lessee, Grantee shall promptly furnish a copy thereof to Owner, and the provisions of this Section shall be applicable to the same extent as if such Purchase Offer had been received by Owner from Lessee upon the furnishing of such copy to Owner.

          (b)     Within 10 business days after receipt by Owner of any Purchase Offer pursuant to paragraph 29 of the Lease, Owner shall furnish or cause to be furnished to Grantee a copy of such Purchase Offer and any notice delivered in connection therewith.  Not later than the tenth day prior to the expiration date of the period within which the Lease permits the lessor thereunder to reject any Purchase Offer made pursuant to paragraph 29 of the Lease, Grantee shall, at the request of the Note Holders of more than 50% of the aggregate unpaid principal amount of the outstanding Notes, direct Owner to accept the Purchase Offer. If Grantee does not so direct Owner to accept such Purchase Offer, Owner may, at its option, accept or reject such Purchase Offer.  If Owner has been directed by Grantee to accept such Purchase Offer and shall fail to notify Lessee of such acceptance prior to the date referred to above, or if after notifying Lessee of such acceptance, Owner shall fail to comply with the applicable provisions of the Lease or shall otherwise fail to cause the same to be complied with, Grantee may, and shall have the right and power (which right and power are coupled with an interest) to, and are hereby irrevocably appointed the agent and attorney-in-fact of Owner and of any and every future assignee or owner of any interest of Owner in the Property, to notify Lessee of such acceptance of any such Purchase Offer and take all actions necessary to comply with the applicable provisions of the Lease, including, without limitation, the execution and delivery, in the name and on behalf of Owner or other assignee or owner of any interest in the Property, of

OK 15719 PG 0180

a deed or other instrument of conveyance or assignment conveying and assigning such interest in the Property to Lessee or its designee; but the provisions of this sentence shall not prevent any default in the observance or performance of any covenant, condition or agreement contained in this Section 4.1(b) from constituting a default. If Lessee shall purchase the interest of Owner in the Property pursuant to paragraph 29 of the Lease and shall make payment of the purchase price therefor to Grantee and otherwise shall be in compliance with the Lease, then Grantee shall execute and deliver to Owner instruments releasing the interest of Owner in the Property and the Lease from the lien of this Deed to Secure Debt, the Indenture, the Assignment and any UCC financing statements promptly after receipt of such payment, together with all other sums then due and payable under the Notes, the Note Agreement, this Deed to Secure Debt and the Indenture. Payments received by Grantee pursuant to this Section 4.1(b) shall be applied pursuant to Article 5. If such Purchase Offer shall be received by Grantee from Lessee, Grantee promptly shall furnish a copy thereof to Owner, and the provisions of this Section shall be applicable to the same extent as if such notice or Purchase Offer had been received by Owner from Lessee.

(c)    Each deed or other instrument of conveyance or assignment executed and delivered by Grantee pursuant to this Section 4.1 shall be binding upon Owner with the same effect as if Owner had personally executed and delivered the same, and every such Owner by receipt or acquisition of any right, title or interest in the Property hereby irrevocably appoints Grantee its agent and attorney-in-fact with power and authority (which power and authority are coupled with an interest) to execute and deliver such deeds or other instruments of conveyance or assignment in its behalf and name.

Section 4.2    Condemnation. Owner, immediately upon obtaining knowledge of any proceedings for the taking of the Property or any part thereof in condemnation or other eminent domain proceeding, shall notify Grantee of the pendency thereof. Grantee may participate in such proceedings as and to the extent permitted under the Lease, and Owner will deliver or cause to be delivered to Grantee all instruments requested by it to permit such participation. Any award or compensation payable in such proceedings to Owner or assigned to Owner pursuant to the Lease is hereby assigned to and shall be paid to Grantee, subject to the rights of Lessee thereto pursuant to the Lease. Grantee shall be under no obligation to question the amount of the award or compensation and may accept the same. In any such proceeding Grantee may be represented by counsel satisfactory to it and Owner shall pay the reasonable fees and expenses of such counsel. Any award or compensation so received shall be applied pursuant to Article 5.

Section 4.3    Transfer of Property. If no default shall have happened and be continuing, Owner may sell, assign or otherwise transfer all or any part of its interest in all or a part of the Property subject to the lien hereof and of the Indenture, the Lease and the Assignment to any transferee (other than an individual) which is a "bankruptcy-remote" entity having as its sole purpose the ownership of the Property (which may be a corporation, a limited partnership, a Delaware Business Trust, a limited liability company, or any other entity having similar characteristics of limited liability and whose organizational documents shall restrict its activities to the purposes set forth above and incorporate the provisions of Sections 3.11(b) and 3.17 or is otherwise approved by the Note Holders of all of the outstanding principal amount of the Notes), provided that upon any sale, assignment or transfer the purchaser, assignee or transferee shall execute and deliver to Grantee an instrument, in form and substance satisfactory to Grantee, irrevocably appointing Grantee as agent and attorney-in-fact with the right and power (which right and power are coupled with an interest) to take all actions and do

all things in the name and on behalf of such purchaser, assignee or transferee of the character which Grantee is authorized hereby to do as agent and attorney-in-fact of Owner, and to execute and deliver in the name and on behalf of such purchaser, assignee or transferee any notice, deed or other instrument which, pursuant to the terms hereof, Grantee is authorized to execute and deliver in the name and on behalf of Owner. In connection with a sale by an Owner of its interest in the Property its transferee (x) shall expressly agree that the interest or estate so acquired is subject to this Deed to Secure Debt to the Indenture, the Lease and the Assignment and (y) shall, subject to the nonrecourse provisions of each such instrument, expressly assume and be bound by all of the obligations and undertakings of Owner contained herein and in the Indenture, the Lease, the Notes, the Note Agreement and the Assignment. Notwithstanding the foregoing, Owner may transfer the Property to Lessee, pursuant to paragraph 9 of the Lease; provided that the transferee accepts title to the Property subject to this Deed to Secure Debt, the Lease, the Assignment and the Indenture and that such transfer does not result in a termination of the Lease or the Lease Guaranty. Upon any transfer of all of an Owner's interest in the Property in accordance with the provisions of this Section 4.3, the transferor shall be released from its obligations under the Notes and shall thereupon cease to be the "Owner" hereunder. A transferee pursuant to this Section 4.3 shall thereupon become "Successor Owner" and "Owner" for purposes of this Deed to Secure Debt.

Section 4.4    Substitution of Properties. If Lessee elects, pursuant to the Lease, to exercise a substitution option, substituting a land parcel operated as a retail food store in Lessee's business, together with the improvements thereon (the "Substitute Property") for the Property (the "Replaced Property"), then, after receipt by Grantee of notice thereof, Grantee shall, on the Substitution Date, execute and deliver to Owner a release of the interest of Owner in the Replaced Property from the lien of this Deed to Secure Debt, the Assignment, the Indenture and the related UCC financing statements; provided, however, that such substitution shall have been effected in accordance with the applicable provisions of the Lease.

Section 4.5    Release of the Property. If, at any time, Owner prepays the Notes in full as provided in Section 6.3, then Owner may obtain (at Owner's expense) the release of the Property from the lien of this Deed to Secure Debt, the Assignment, the Indenture and the related UCC financing statements upon deposit with the Grantee of funds in an amount equal to 100% of the outstanding principal amount of the Notes, together with the accrued and unpaid interest thereon, plus any applicable Make Whole Amount and all other sums then due and owing under the Notes, the Note Agreement, the Indenture and this Deed to Secure Debt.

Section 4.6    Expansion Notes.

(a)    If Lessee constructs a Store Expansion pursuant to paragraph 28 of the Lease and requests that Owner reimburse it for all or a portion of the Expansion Cost (as defined in the Lease) then Owner may issue Expansion Notes, pursuant to and secured by the Indenture, this Deed to Secure Debt and the Assignment equally and ratably with any Notes theretofore issued upon compliance of Lessee with the terms of paragraph 28 of the Lease and upon compliance with this Section 4.6. All such additions, Alterations and Store Expansions financed in whole or in part by the issuance of Expansion Notes shall become and remain part of the Property and the Granted Property and shall be subject to the lien of this Deed to Secure Debt. Expansion Notes to be issued at any one time shall constitute one or more separate series of Expansion Notes. Expansion Notes shall not be issued and sold on any one occasion in an aggregate amount less than $1,000,000. Each series of Expansion Notes shall be equally and ratably secured by this Deed to Secure Debt, the Indenture and the Assignment with all

other Notes, without preference, priority or distinction as to lien or otherwise, except as expressly provided herein or therein, and may mature earlier or later than any other Notes.

(b)   Expansion Notes may be issued only if the conditions of paragraph 28 of the Lease have been fully satisfied and only if the following conditions shall have been fully satisfied:

(i)   The Store Expansion and Alterations with respect thereto shall constitute real property and fixtures permanently affixed to or part of the Property (or an integral part thereof).

(ii)   The aggregate principal amount of the Expansion Notes issued on any date shall not exceed the aggregate of the Expansion Cost of the Store Expansion.

(iii)   The Store Expansion and Alterations with respect thereto shall not have been otherwise required to be made by Lessee pursuant to the Lease.

(iv)   No other Notes or Expansion Notes shall have been issued and sold to finance such Expansion Cost.

(v)   Owner shall have executed and delivered to Grantee a supplement to this Deed to Secure Debt, the Assignment and the Indenture, satisfactory in form and substance to Grantee, which subjects such Alterations, Store Expansion and the Lease and the Lease Guaranty as amended or supplemented in connection therewith to the lien of this Deed to Secure Debt, the Indenture and the Assignment and includes such other provisions as Grantee shall deemed necessary or appropriate by reason of the issuance of such Expansion Notes.

(vi)   Grantee and special counsel for the Note Holders of the outstanding Notes, shall have received such documents, assurances, instruments, certificates (including a reasonably detailed certificate of Lessee and Guarantor as to the satisfaction of all provisions of the Lease, any Lease Guaranty, this Deed to Secure Debt and the Indenture with respect to the issuance of such Expansion Notes) and opinions of counsel, title insurance policies (or endorsements to existing policies), surveys, environmental audits and governmental approvals all of the scope and character as were required pursuant to the Note Agreement in connection with the original purchase and sale of the Notes and otherwise as Grantee and such special counsel shall deemed necessary or appropriate.  All such items shall be satisfactory in form and substance to Grantee and such special counsel.

(vii)   Every person purchasing an Expansion Note shall be an Institutional Investor and shall be required to make a

representation of the character specified in Section 7 of the Note Agreement.

(c)     Owner will not issue Expansion Notes to anyone other than the Note Holders of the Notes at the time Owner offers such Expansion Notes (the "Entitled Offerees") unless (i) Owner makes a written offer to sell to each Entitled Offeree a principal amount of the Expansion Notes of each series which bears the same proportion to the aggregate principal amount of all Expansion Notes of such series as the principal amount of the Notes then held by such Entitled Offeree bears to the aggregate principal amount of all the Notes then held by all such Entitled Offerees, (ii) such offer shall not expire or be revoked for a period (to be specified therein) of not less than 10 business days, and (iii) one or more of the Entitled Offerees shall not accept such offer within such period; provided, however, that if any Entitled Offeree accepts such offer within such period, it shall have an additional 5 business days to agree to purchase the principal amount of the Expansion Notes which no other Entitled Offeree agreed to purchase in the initial offering of such Expansion Notes (and in the event that more than one Entitled Offeree agrees to purchase the principal amount of the Expansion Notes which no Entitled Offeree agreed to purchase in the initial offering, such principal amount shall be divided pro rata among such Entitled Offerees based on the respective amounts of such series of Expansion Notes which such Entitled Offerees agreed to purchase). Any of such Expansion Notes which are not accepted by an Entitled Offeree within the periods described in clauses (ii) and (iii) above may then be offered to Institutional Investors upon terms substantially identical to those offered to the Entitled Offerees.  Neither Owner nor any agent on its behalf will sell or offer any Expansion Note for sale to, or solicit any offer to buy any thereof from, or otherwise approach or negotiate in respect thereof with, any other person so as thereby to bring the issue or sale thereof or of the Notes within the provisions of Section 5 of the Securities Act of 1933, as amended, or so as to require the qualification of this Deed to Secure Debt or the Indenture under the Trust Indenture Act of 1939, as amended.

ARTICLE 5
Application of Moneys

Section 5.1     Moneys Under the Lease or Lease Guaranty.

(a)     Unless and until an Event of Default shall have happened and be continuing, moneys received by Grantee as Basic Rent under the Lease and as interest on any overdue installment thereof shall be applied as follows:  (i) to the Interest Payments and Installment Payments (and interest on any overdue amount thereof) due on the Notes on or about the date on which such payment of Basic Rent is due; and (ii) the excess, if any, of any such installments of Basic Rent after the application thereof pursuant to clause (i) above, shall be paid to Owner or upon its written order, free of the lien hereof.

(b)     Any moneys received by Grantee as Additional Rent (as defined in the Lease) or as payments under the Lease Guaranty or the Letter Agreement shall be applied to the purposes for which such moneys were paid pursuant thereto.

Section 5.2     Purchase Price. Moneys received by Grantee (i) as a payment of the purchase price paid by Lessee for any interest in the Property pursuant to the Lease (other than paragraph 9 of the Lease) or (ii) as a payment from Owner pursuant to Section 4.1 hereof shall be applied first to the ratable prepayment of the Notes at a price equal to 100% of the

BK 15719 PG0184

outstanding principal amount to be prepaid, plus (x) the applicable Make Whole Amount if such payment is the result of a Purchase Offer made by Lessee pursuant to paragraph 16 of the Lease or (y) 1% of the unpaid principal amount of the Notes to be prepaid if such payment is the result of a Purchase Offer made by Lessee pursuant to paragraph 29 of the Lease; and second (if no Event of Default has occurred and is continuing), the excess, if any, shall be paid to Owner (or upon its written order) free of the lien hereof.  No Make Whole Amount or other premium shall be payable in connection with a purchase of the Property pursuant to paragraph 14 or 15 of the Lease or a payment made by Owner pursuant to Section 4.1(a) of this Deed to Secure Debt upon rejection of a Purchase Offer made pursuant to paragraph 14 or 15 of the Lease.

Section 5.3    Proceeds of Insurance, Condemnation Awards, Proceeds of Mortgage Title Insurance.  Moneys received by Grantee (a) as payment for loss under any policy of insurance (other than mortgage title insurance) or in lieu of any such policy and (b) as an award or compensation for the taking, in condemnation or other eminent domain proceedings, of the Property or any part thereof or interest therein or a conveyance to a condemning authority in lieu of such proceeding shall be paid over or applied to or for the benefit of Lessee to the extent and in the manner that Lessee is entitled to receive or apply the same under the Lease.  Any such moneys not so paid over or required to be paid over to Lessee pursuant to the preceding sentence (i) shall be held by Grantee in an interest-bearing account, with interest payable to Owner if no default shall have occurred and be continuing and (ii) shall be applied on the next interest Payment or Installment Payment date, but after the payment of the regular Interest Payment or Installment Payment on the Notes, due  on such date, to the ratable prepayment in whole or in part of the Notes at a price equal to 100% of the aggregate outstanding principal amount thereof to be prepaid, without payment of a Make Whole Amount.  Moneys received as proceeds of mortgage title insurance shall be applied on the next Interest Payment or Installment Payment date, but after the payment of the regular Interest Payment or Installment Payment due on such date, to the ratable prepayment in whole or in part of the Notes at a price equal to 100% of the aggregate outstanding principal amount thereof to be prepaid, without payment of a Make Whole Amount; and, if no Event of Default has occurred and is continuing, the excess, if any, shall be paid to Owner.

Section 5.4    Other Purchase Price Payment.  Moneys received by Grantee as the purchase price for any interest in the Property pursuant to paragraph 9 of the Lease shall be paid to Owner or upon its written order, free of the lien hereof, except to the extent such purchase price is to be applied to prepayment of the Notes as a result of an optional prepayment of the Notes pursuant to Section 6.3, in which case such purchase price shall be applied pursuant to Section  6.3, including payment of the Make Whole Amount.


ARTICLE 6
Prepayment of Notes

Section 6.1    Prepayments Generally.  No prepayment of Notes may be made except to the extent and in the manner expressly permitted or required, by this Article 6 or Article 4 or 5.  All prepayments shall be prorated by Grantee among the Notes in proportion to the outstanding principal amounts thereof.

BK 15719 PG0185

Section 6.2    Notice of Prepayment: Deposit of Money.

(a)    In case of any prepayment of the Notes pursuant to Section 6.3 hereof, notice thereof shall be given by Owner to Grantee as provided in Section 8.2 at least 30 days prior to the date fixed for prepayment. Any notice so given shall be valid and effective only when such notice is actually received. Each such notice shall specify the date fixed for prepayment, the outstanding principal amount to be prepaid and the estimated amount of the Make Whole Amount. Five days prior to the date fixed for prepayment, Owner shall confirm the amount of the Make Whole Amount. Not later than 12:00 noon, New York time, on the date fixed for any prepayment of Notes, the moneys required for such prepayment shall be deposited or caused to be deposited with the Grantee by Owner in an account in New York City designated by the Grantee in sufficient time to constitute collected funds on the date of such prepayment.

(b)    Upon any partial prepayment of the Notes, each Installment Payment which shall thereafter be payable on any Note shall be proportionately reduced so that upon the due payment of all remaining Installment Payments there shall have been paid to the Note Holder of such Note the entire unpaid outstanding principal amount thereof together with accrued interest thereon. On or prior to each date of such partial prepayment, Owner shall prepare or procure three copies of a new amortization schedule with respect to each such Note, setting forth the amount of the interest portion and the principal portion of each Interest Payment or Installment Payment thereafter to be made on such Note and the amount of the principal of such Note that will remain unpaid after each such Interest Payment or Installment Payment is made. Owner shall retain one of such copies and deliver the remaining two copies to Grantee. Grantee shall deliver a copy of the amortization schedule relating to each such Note to the registered holder thereof.

Section 6.3    Optional Prepayment. Owner may, at its option, ratably prepay the Notes, in whole or in part, on any business day, at a price equal to 100% of the aggregate outstanding principal amount thereof to be prepaid, plus accrued and unpaid interest on such amount, together with the applicable Make Whole Amount.

## ARTICLE 7
## Events of Default and Remedies

Section 7.1    Events of Default. If one or more of the following (each an "Event of Default") shall happen, that is to say:

(a)    if default shall be made in the payment of any Interest Payment or Installment Payment, when and as the same shall become due and payable, and such default shall continue for a period of 10 days or if default shall be made in any payment of interest, principal, Make Whole Amount or any other payment on any of the Notes, when and as the same shall become due and payable, whether at maturity, by acceleration or as part of any prepayment, as provided in such Note, the Indenture or this Deed to Secure Debt;

(b)    if an event of default under the Lease or a default under the Lease Guaranty or the Letter Agreement shall have occurred and be continuing;

BK 15719 PG0186

(c)     if the Lease or the Lease Guaranty shall in any way be amended or modified or shall be encumbered, assigned or pledged except as expressly contemplated hereby or permitted by the Lease or the Lease Guaranty;

(d)     if any representation or warranty of Owner, Guarantor or Lessee set forth in any notice, certificate, demand, request or document delivered in connection with the purchase of the Notes, including, without limitation, the Note Agreement, the Indenture, this Deed to Secure Debt, the Lease Guaranty, the Assignment and the Lease, shall be inaccurate in any material respect, as of the time when the same shall have been made;

(e)     if default by Owner shall be made in the due observance or performance of any covenant or agreement contained in the first or fourth sentence of Section 3.5 or in Section 3.11, 3.12, 4.1(a) or 4.1(b);

(f)     if default shall be made in the due observance or performance of any other covenant, condition or agreement of Owner contained herein or in any of the Notes, the Note Agreement, the Indenture or the Assignment and in any such case such default shall have continued for 30 days after receipt of written notice thereof to Owner; provided that in the case of any such default that cannot be cured by the payment of money and that cannot with diligence be cured within such 30-day period, if the cure of such default shall be promptly commenced and prosecuted with diligence, the period within which such default may be cured shall be extended for an additional period of time as may be necessary to cure such default with diligence and continuity provided that in no event shall such period be extended for a period of more than one year;

(g)     if default shall occur under the Lease by reason of which the lessor thereunder is given the right of termination or to re-enter and take possession of the Property, or if Grantee shall not actually receive directly any payment of Basic Rent under the Lease which has been paid, irrespective of the reason for such non-receipt;

(h)     if a receiver, trustee or liquidator (or other similar official) of the Granted Property or of Owner shall be appointed in any proceeding or by any federal or state officer or agency and shall not be discharged within 90 days after such appointment or if Owner shall consent to such appointment or if a custodian for purposes of any federal bankruptcy statute of substantially all of the assets of Owner is appointed or otherwise takes possession thereof and shall not be discharged within 90 days or if by decree of such court Owner shall be adjudicated a bankrupt or be declared insolvent under any federal or state bankruptcy law or if an order for relief shall be entered in any bankruptcy or insolvency proceeding;

(i)     (x) if Owner shall be dissolved; or (y) if Owner shall file a petition commencing a voluntary case under any bankruptcy or similar law or shall make an assignment for the benefit of its creditors or shall admit in

writing its inability to pay its debts generally as they become due or shall consent to the appointment of a receiver of the Granted Property, or if a petition or an answer proposing the reorganization or liquidation of Owner or its interests in the Property pursuant to the Federal Bankruptcy Code or any similar law, federal or state, shall be filed in, and approved by, any court;

(j)     if any of the creditors of Owner shall file a petition commencing an involuntary case to reorganize or liquidate Owner pursuant to the Federal Bankruptcy Code or any similar law, federal or state, and if such petition shall not be discharged or denied within 90 days after the date on which such petition was filed; or

(k)     if final judgment for the payment of money in excess of $50,000 shall be rendered against a Successor Owner and such Successor Owner shall not discharge the same or cause it to be discharged prior to the last day on which an appeal therefrom may be filed, or shall not appeal therefrom or from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal;

then in any and every such case, during the continuance of any Event of Default:

I.     (a)     At the option of Grantee by notice to Owner (except in the case of a sale of the interest of Owner in the Property by Owner in violation of any covenant or agreement contained in Section 4.3, in which case Owner hereby expressly waives notice), and (b) immediately upon the occurrence of any Event of Default set forth in clauses (h), (i) or (j) above, the entire outstanding principal amount of the Notes and all accrued and unpaid interest thereon, together with the Make Whole Amount shall become due and payable immediately, anything in this Deed to Secure Debt, the Indenture or the Notes to the contrary notwithstanding.

II.     Grantee personally, or by its respective agents or attorneys, may enter into and upon the Property and may exclude Owner and its agents and servants wholly therefrom; and, at the expense of the Granted Property, may use, operate, manage and control the same and conduct the business thereof, may maintain and restore the Property, may insure and reinsure the same and may make all necessary or proper repairs, renewals and replacements and any useful alterations, additions, betterments and improvements thereto and thereon, all as Grantee may deem advisable; and in every case, Grantee shall have the right to manage and operate the Granted Property and to carry on the business thereof and exercise all rights and powers of Owner with respect thereto either in the name of Owner or otherwise as Grantee shall deem best. Grantee shall be entitled to collect and receive all earnings, revenues, rents, issues, awards, proceeds, profits and income of the Granted Property and said earnings, revenues, rents, issues, awards, proceeds, profits and income are hereby assigned to Grantee and its successors and assigns. After deducting the expenses of conducting the business thereof and of all maintenance, repairs, renewals, replacements, alterations, additions, betterments and improvements and taxes, assessments, insurance and prior or other proper charges upon the Property, as well as reasonable compensation for the services of Grantee and all attorneys, servants and agents properly engaged and employed by Grantee (including

BK 15719 PG0188

compensation and expenses in connection with any appeal), the moneys arising as aforesaid shall be applied as follows:

(1)    in case an Event of Default described in clause (a) of this Section shall not have happened, first to the payment of any Interest Payment and Installment Payment and any other payments of the principal of the Notes and interest thereon, when and as the same shall become payable, and second to the payment of any other sums required to be paid by Owner under the Note Agreement, the Notes, this Deed to Secure Debt and the Indenture; or

(2)    in case an Event of Default described in clause (a) of this Section shall have happened, in the order of priorities set forth in clauses second, third and fourth of Section 7.2.

Grantee shall apply any moneys received as final liquidated damages pursuant to paragraph 22(e) or 22(f) of the Lease or pursuant to the Lease Guaranty in the order of priorities and amounts set forth in Section 7.2.

III.    Grantee, with or without entry, personally or by agents or attorneys, may sell the Granted Property and all estate, right, title, interest, claim and demand therein and right of redemption thereof at one or more sales conducted pursuant to applicable law, as an entirety or in parcels and at such times and places and upon such terms as may be specified in the notice or notices of sale to be given to Owner or as may be required by law. Any number of sales may be conducted from time to time.  The power of sale shall not be exhausted by any one or more such sale as to any part of the Granted Property remaining unsold, but shall continue unimpaired until all of the Granted Property shall have been sold or the Notes and all indebtedness secured hereby and by the Indenture shall have been paid.  In addition, Grantee, or any of them, shall have the statutory power of sale as provided by the laws of the state of Georgia.

IV.    Subject to Section 8.1, Grantee may take all steps to protect and enforce its rights and remedies provided hereby or by applicable law, whether by action, suit or proceeding in equity or at law (for the complete or partial foreclosure hereof, for the specific performance of any covenant, condition or agreement contained in the Note Agreement, the Indenture, the Assignment, the Notes or herein or in aid of the execution of any power herein or therein granted or for the enforcement of any other appropriate legal or equitable remedy) or otherwise as Grantee shall deem most effectual to protect and enforce the same.

V.    Grantee shall have all rights and remedies provided to a secured party by the Uniform Commercial Code with respect to such portion of the Granted Property, if any, as is governed by the Uniform Commercial Code.

VI.    In case of proceedings against or involving Owner in insolvency or bankruptcy (including any proceeding under any federal or state bankruptcy or insolvency statute or similar law) or any proceedings for its reorganization or involving the liquidation of its assets, Grantee shall be entitled to prove the whole amount of principal, interest, Make Whole Amount and other sums, if any, due upon the Notes to the full amount thereof and all other payments, charges and costs due under the Note Agreement, the Indenture or this Deed to Secure Debt without deducting therefrom any proceeds obtained from the sale of the whole or any part of the Granted Property; provided, however, that in no case shall Grantee receive a

BK 15719 PG0189

greater amount than such principal, interest, Make Whole Amount and other sums, charges and costs from the aggregate amount of the proceeds of all sales of the Granted Property.

VII.   If Grantee accelerates the payment of the whole or any part of the principal due under the Notes pursuant to this Section 7.1, Owner waives any right to prepay the principal sum in whole or in part without payment of the Make Whole Amount and agrees to pay the Make Whole Amount.

Section 7.2   <u>Application of Proceeds</u>. The purchase money or proceeds of any sale made under or by virtue of this Article, together with any other sums which then may be held by Grantee as part of the Granted Property or the proceeds thereof, shall be applied: first, to the payment of the costs and expenses of such sale, including reasonable compensation to Grantee and its agents and counsel and all amounts then owing to Grantee, and of any judicial proceeding wherein the same may be made; second, to the payment of the amount then owing on the Notes for the payment of interest currently due and payable; third, to payment of the Make Whole Amount; fourth, to the payment of the amount then owing on the Notes for the payment of the unpaid principal amount; fifth, to the payment of any other sums secured by this Deed to Secure Debt or the Indenture; and sixth, to the payment of the surplus, if any, to whosoever shall be lawfully entitled thereto.

Section 7.3   <u>Purchase by Grantee</u>. Upon any sale made under or by virtue of this Article (whether made under any power of sale herein granted or under or by any virtue of judicial proceedings or of a judgment or decree of foreclosure and sale), Grantee may bid for and acquire the Granted Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon sums secured by this Deed to Secure Debt the net proceeds of sale after deduction of all costs, expenses, compensation and other charges to be paid therefrom as herein provided. The person making such sale shall accept such settlement without requiring the production of the Notes and without such production there shall be deemed credited thereon the net proceeds of sale ascertained and established as aforesaid. Grantee upon so acquiring the Granted Property or any part thereof, shall be entitled to hold, deal with and sell the same in any manner permitted by applicable laws.

Section 7.4   <u>Receivers</u>. After the happening of any Event of Default, immediately upon the commencement of any legal proceeding by Grantee for or in aid of the enforcement of the Notes or of this Deed to Secure Debt or the Indenture, and without regard to the adequacy of the security of the Granted Property, Grantee shall be entitled to the appointment of a receiver or receivers of the Granted Property and of all the earnings, revenues, rents, issues, profits and income thereof, and Owner hereby consents to any such appointment.

Section 7.5   <u>Remedies Cumulative</u>. No remedy herein shall be exclusive of any other remedy or remedies, and each such remedy shall be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity; and every power and remedy of Grantee hereunder may be exercised from time to time and as often as may be deemed expedient by Grantee. No delay or omission of the Grantee to exercise any right or power accruing upon an Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein.

Section 7.6   <u>Waiver of Rights</u>. Owner agrees that it will not at any time or in any manner whatever claim or take any benefit of any stay, extension or moratorium law which may affect the terms of this Deed to Secure Debt; nor claim or take any benefit of any law providing

BK 15719 PG0190

for the valuation or appraisal of the Granted Property or any part thereof prior to any sale thereof; nor, prior to or after any such sale, claim or exercise any right to redeem the property so sold or to be sold or any part thereof; and Owner hereby expressly waives all benefit or advantage of any such law and covenants not to hinder, delay or impede the execution by Grantee of any power or remedy herein granted or available at law or in equity, but to suffer and permit the execution of every power and remedy as though no such law existed.  Owner waives all right to have the Granted Property marshaled upon any foreclosure hereof.

Section 7.7    Suits by Grantee.  All rights of action under this Deed to Secure Debt or under any of the Notes may be enforced by Grantee without the possession of any of the Notes and without the production thereof at any trial or other proceeding relative thereto.  A copy of any Note, if properly certified by Grantee to be true and correct, shall constitute conclusive evidence of all matters that could be proven by production of the original of that Note in any trial or proceeding relative thereto.

Section 7.8    Principal Mutual's Cure Rights.

(a)    Except during any period of time when an Event of Default of the character referred to in paragraph 22(a)(iv), (v), (vi) or (vii) of the Lease shall have occurred and be continuing, Principal Mutual (but not any Successor Owner) shall have the right to cure or cause to be cured (i) any four consecutive defaults by Lessee in the payment of Basic Rent (including any interest thereon at the Default Rate due pursuant to paragraph 5(c) of the Lease) under the Lease within 15 days after receipt of notice that such default has occurred and (ii) any other default or defaults by Lessee under the Lease within the same time period after notice referred to in Section 7.1(f) of this Deed to Secure Debt.

(b)    During any cure period in favor of Principal Mutual pursuant to  Section 7.8(a), Grantee shall not have the right to accelerate the maturity of the Notes or exercise any remedy hereunder or under the Indenture or the Assignment (including, without limitation, a judicial foreclosure or the exercise of any power of sale) so long as Principal Mutual conforms to the requirements of Section 7.8(a) and is timely curing such defaults.  Curing by Principal Mutual of any such default by Lessee under the Lease shall not be deemed to affect Lessee's obligations under the Lease or Guarantor's obligations under the Lease Guaranty or to excuse Lessee or Guarantor  from liability for such default and upon such cure  Principal Mutual may proceed against Lessee or Guarantor for specific performance of the obligation under the Lease and the Lease Guaranty with respect to which such default has occurred.

## ARTICLE 8
### Miscellaneous

Section 8.1    Immunity from Liability.  Anything contained herein or in the Notes, the Note Agreement, the Indenture or the Assignment to the contrary notwithstanding, no recourse shall be had for the payment of or interest or Make Whole Amount, if any, on the Notes, or for any claim based thereon or otherwise in respect thereof or based on or in respect of the Note Agreement, the Indenture, this Deed to Secure Debt or the Assignment against (i) Owner or any past, present or future officer, director, shareholder, partner, trustee, member or beneficiary of Owner; or (ii) any legal representative, heir, estate, successor or assign of any thereof; or (iii) any person to whom the Granted Property or any part thereof or interest therein shall have been transferred pursuant to Section 4.3 of this Deed to Secure Debt (or its officers,

BK 15719 PG0191

directors, shareholders, partners, members, trustees, or beneficiaries) in each case for any deficiency or any other sum owing on the Notes or arising under or with respect to the Note Agreement, the Indenture, this Deed to Secure Debt or the Assignment. It is understood that the Notes and all obligations under or with respect to the Note Agreement, the Indenture, this Deed to Secure Debt or the Assignment may not be enforced against any person or entity described in clauses (i) and (iii) above; provided, however, that the foregoing provisions of this paragraph shall not (x) prevent recourse to the Granted Property or the sums due or to become due under any instrument which is part of the Granted Property, including, without limitation, the right to proceed against Lessee under the Lease and the Assignment and against the Guarantor under the Lease Guaranty and the Assignment or (y) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes, or secured by the Indenture, this Deed to Secure Debt, or the Assignment, but the same shall continue until paid or discharged, and further, that the foregoing provisions of this paragraph shall not limit the right of any person to name any person referred to in clauses (i) through (iii) above as a party defendant in any action or suit for a judicial foreclosure of or in the exercise of any other remedy under the Notes, or under the Note Agreement, Indenture, this Deed to Secure Debt, or the Assignment, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or, if obtained, enforced against any such person. Notwithstanding anything to the contrary herein or in any other Note, the Note Agreement, the Indenture or other Assignment, this agreement not to pursue recourse liability shall be null and void and of no further force or effect in the event of any fraud, willful material misrepresentation or misconduct by any person referred to in clauses (i) through (iii) above with respect to the Granted Property or the making or delivery of the Notes or any other instrument or agreement by which the Notes are secured or upon the failure or refusal by such person to promptly remit to the Grantee any payment of Basic Rent, Additional Rent or purchase price payable pursuant to the Lease with respect to the Property where such payment comes within the control of such person (intentionally or unintentionally) other than pursuant to this Deed to Secure Debt, the Assignment or the Indenture.

        Section 8.2   <u>Notices: Modifications; Waiver</u>.

        (a)    All notices and other communications hereunder shall be in writing and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telefax, the day when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party prior to or during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if transmitted after normal business hours for the recipient; (iii) on the date received by the addressee if delivered by United States Mail, postage prepaid by certified mail, return receipt requested, addressed to the party to be notified, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same, addressed: (x) if to Owner at its address first set forth above (telefax number 515-248-8090) or (y) if to Grantee, at such party's address first above set forth (telefax number 801-246-5053), or in any case at such other address as may be filed in writing by Owner with Grantee or by Grantee with Owner.

        (b)    This Deed to Secure Debt may not be modified except by an instrument in writing executed by Owner and Grantee. No requirement hereof may be waived at any time except by a writing signed by the party against whom such waiver is sought to be enforced nor shall any waiver be deemed a waiver of any subsequent breach or default.

BK 15719 PG0192

Section 8.3    Illegal Provision.  If any provision herein or in the Notes, the Indenture, the Note Agreement or the Assignment shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Deed to Secure Debt shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 8.4    Maximum Interest Payable.  Neither this Deed to Secure Debt nor the Notes nor the Indenture shall require the payment or permit the collection of interest in excess of the maximum not prohibited by law.  If herein or in the Notes or in the Indenture any excess of interest in such respect is provided for or shall be adjudicated to be so provided for, such excess shall, to the extent not prohibited by law, be applied to the principal amount of the Notes with respect to which such excess interest was paid.  This provision shall control any other provision of this Deed to Secure Debt or the Notes or the Indenture.

Section 8.5    Satisfaction.  If and when the Notes shall have become due and payable (whether by lapse of time or by acceleration or by the exercise of the privilege of prepayment), Owner shall pay or cause to be paid (provided such payment is permitted or required hereby) the full amount of the aggregate principal, interest and any applicable Make Whole Amount on the Notes and shall also pay or cause to be paid all other sums payable by Owner under this Deed to Secure Debt, under the Notes, under the Note Agreement, and under the Indenture, then and in that case (or upon a substitution of properties pursuant to Section 4.4) this Deed to Secure Debt shall become null and void and Grantee, at the sole cost and expense of Owner, shall cancel the same as a lien on the Property and release or reconvey the Granted Property to Owner and execute and deliver such instruments as shall be requested by Owner to satisfy and discharge the lien hereof as well as that of the Assignment and any UCC financing statements.

Section 8.6    Binding Effect.  The covenants, conditions and agreements herein contained shall bind, and the benefits and advantages shall inure to, the respective successors and assigns of the parties hereto.  Whenever used, the singular shall include the plural, the plural include the singular and the use of any gender shall include all genders.

Section 8.7    Counterparts.  This Deed to Secure Debt may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.

Section 8.8    Table of Contents; Headings.  The table of contents contained herein and the headings of the various Articles, Sections and Schedules herein have been inserted for reference only and shall not to any extent have the effect of modifying or amending the express terms and provisions hereof.  The dating of this Deed to Secure Debt "as of March 20, 1998" is for convenience of reference only and this Deed to Secure Debt shall become effective only upon its execution and delivery by Owner.

Section 8.9    Governing Law.  This Deed to Secure Debt shall be governed by the law of the State of Georgia.

Section 8.10   Future Advances.  This Deed to Secure Debt is given to secure not only existing indebtedness, but also such future advances, whether such advances are obligatory or are to be made at the option of the Grantee, or otherwise, as are made within twenty years from the date hereof, to the same extent as if such future advances were made on the date of the execution of this Deed to Secure Debt.  The total amount of indebtedness that may be so

BK 15719 PG0193

secured may decreased or increase from time to time, but the total unpaid balance so secured at one time shall not exceed twice the aggregate face amount of the Notes, plus interest thereon, and any disbursements made for the payment of taxes, levies or insurance on the Granted Property, with interest on such disbursements at the rate per annum of 2.0% in excess of the weighted average of the interest rate payable on the Notes then outstanding (or at the maximum rate not prohibited by law, whichever is less), such interest to be computed from and including the date of the making of such advance to and including the date of such repayment. Owner hereby agrees that it shall not execute or file for record any notice limiting the maximum principal amount that may be so secured, and that no such notice shall be of any force and effect whatsoever unless Grantee shall have consented thereto in writing signed by Grantee and recorded in the public records of the county in which the Property is situated.

Section 8.11    Exhibits and Schedules.  Attached hereto are Exhibit A and Schedules A-1, A-2 and A-3 referred to in this Deed to Secure Debt.

[Remainder of page intentionally left blank; signature page follows.]

BK 15719 PG0194

IN WITNESS WHEREOF, Principal Mutual Life Insurance Company has caused this Deed to Secure Debt to be duly executed and delivered, under seal, as of the day and year first above written.

PRINCIPAL   MUTUAL   LIFE   INSURANCE COMPANY (L.S.)

By: _Karen A Pearston_

Name:

Title:     KAREN A. PEARSTON
           COUNSEL

By: _Stephen G. Skrivanek_

Name:

Title:

           STEPHEN G. SKRIVANEK, Counsel

Signed, sealed and delivered in the presence of:

_Noelle M. Plante_

Witness

_Barbara M. Seamands_

Notary Public

BARBARA M. SEAMANDS
MY COMMISSION EXPIRES
September 27, 1999

This document has been prepared by Roger L. Ellison of Manatt, Phelps & Phillips, LLP, 11355 West Olympic Boulevard, Los Angeles, CA  90064.

Lawrenceville, Georgia

EXHIBIT A

BK 15719 PG0195

L E G A L   D E S C R I P T I O N
WINN DIXIE - LAWRENCEVILLE

All that tract or parcel of land lying and being in Land Lot 47 and 48 of the Seventh Land District in Gwinnett County, Georgia, containing approximately 10.384 acres of land and being more particularly described as follows:

Commencing at the mitered intersection of the Northerly margin of the 100 foot wide right of way for Riverside Parkway with the Westerly margin of the varied right of way for Lawrenceville Suwanee Road;

THENCE South 45 degrees 06 minutes 00 seconds West for a distance of 159.74 feet to a 1/2"rebar set along the Northerly margin of the 110 foot wide right of way for Riverside Parkway, said 1/2" rebar BEING THE TRUE POINT OF BEGINNING;

THENCE South 45 degrees 06 minutes 00 seconds West for a distance of 197.75 feet to a 1/2"rebar set along the Northerly margin of the 110 foot wide right of way for Riverside Parkway;

THENCE along a curve to the left having a radius of 1492.76 feet and an arc length of 18.24 feet, being subtended by a chord of South 44 degrees 44 minutes 30 seconds West for a distance of 18.24 feet to a point on the Northerly margin of the 110 foot wide right of way for Riverside Parkway;

THENCE North 33 degrees 31 minutes 04 seconds West for a distance of 54.22 feet to a 1/2"rebar set;

THENCE North 62 degrees 11 minutes 22 seconds West for a distance of 249.58 feet to a 1/2"rebar set;

THENCE South 47 degrees 53 minutes 04 seconds West for a distance of 133.58 feet to a 1/2"rebar found;

THENCE North 67 degrees 16 minutes 16 seconds West for a distance of 134.11 feet to a 1/2"rebar found;

THENCE South 70 degrees 26 minutes 56 seconds West for a distance of 134.51 feet to a 1/2"rebar found;

THENCE North 44 degrees 12 minutes 45 seconds West for a distance of 151.53 feet to a 1/2"rebar found;

THENCE North 15 degrees 30 minutes 14 seconds West for a distance of 200.18 feet to a 1/2" rebar found;

THENCE North 18 degrees 00 minutes 39 seconds East for a distance of 130.98 feet to a 1/2" rebar found;

THENCE North 29 degrees 21 minutes 33 seconds West for a distance of 38.13 feet to a 1/2 rebar set;

THENCE North 60 degrees 33 minutes 20 seconds East for a distance of 594.87 feet to a 1/2"rebar set along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;

THENCE along a curve to the left having a radius of 3879.72 feet and an arc length of 144.16 feet, being subtended by a chord of South 38 degrees 31 minutes 28 seconds East for a distance of 144.15 feet to a point along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;

THENCE along a curve to the left having a radius of 28.00 feet and an arc length of 10.62 feet, being subtended by a chord of South 83 degrees 00 minutes 19 seconds West for a distance of 10.56 feet to a point;

THENCE South 50 degrees 29 minutes 41 seconds West for a distance of 65.86 feet to a point;

THENCE South 27 degrees 48 minutes 37 seconds West for a distance of 142.53 feet to a point;

THENCE South 62 degrees 11 minutes 23 seconds East for a distance of 124.79 feet to a point;

THENCE North 27 degrees 48 minutes 37 seconds East for a distance of 22.73 feet to a point;

THENCE along a curve to the left having a radius of 148.00 feet and an arc length of 27.67 feet, being subtended by a chord of North 22 degrees 27 minutes 17 seconds East for a distance of 27.63 feet to a point;

BK 15719 PG 0196

THENCE North 17 degrees 05 minutes 58 seconds East for a distance of 23.03 feet to a point;

THENCE along a curve to the right having a radius of 102.00 feet and an arc length of 35.14 feet, being subtended by a chord of North 26 degrees 58 minutes 11 seconds East for a distance of 34.97 feet to a point;

THENCE along a curve to the right having a radius of 212.00 feet and an arc length of 36.74 feet, being subtended by a chord of North 41 degrees 48 minutes 15 seconds East for a distance of 36.69 feet to a point;

THENCE along a curve to the left having a radius of 38.00 feet and an arc length of 30.60 feet, being subtended by a chord of North 23 degrees 41 minutes 54 seconds East for a distance of 29.78 feet to a point along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;

THENCE along a curve to the left having a radius of 3879.72 feet and an arc length of 267.76 feet, being subtended by a chord of South 43 degrees 00 minutes 00 seconds East for a distance of 267.70 feet to a point along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;

THENCE South 44 degrees 58 minutes 37 seconds East for a distance of 40.11 feet to a 1/2" rebar set along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;

THENCE South 28 degrees 05 minutes 50 seconds West for a distance of 168.31 feet to a point;

THENCE along a curve to the left having a radius of 30.00 feet and an arc length of 38.22 feet, being subtended by a chord of South 08 degrees 24 minutes 05 seconds East for a distance of 35.69 feet to a point;

THENCE South 44 degrees 54 minutes 00 seconds East for a distance of 117.61 feet to a 1/2"rebar set along the Northerly margin of the 110 foot wide right of way for Riverside Parkway, said 1/2"rebar ALSO BEING THE TRUE POINT OF BEGINNING.


TOGETHER WITH all that right, title and interest in that certain Reciprocal Easement Agreement between Bronze/Lawrenceville-Suwanee, L.P. and Sunbelt-Dix, Inc. dated May 14, 1996, recorded May 15, 1996 in Deed Book 12698, page 226, aforesaid records.