EXHIBIT  C

Hearing Date: April 20, 2006
Objection Deadline: April 13, 2006

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors[1]. | ) | Jointly Administered |

## DEBTORS' MOTION (I) FOR AUTHORITY TO (I) REJECT NON-RESIDENTIAL REAL PROPERTY LEASE, (II) TO ESTABLISH BAR DATE FOR ANY REJECTION DAMAGE CLAIMS, AND (III) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order (i) under 11 U.S.C. § 365(a), authorizing the Debtors to reject a non-residential real property lease and (ii) under Rule 3002(c)(4), Federal Rules of Bankruptcy Procedure, establishing a bar date for rejection damage claims for the lease (the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

## Background

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103. An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005 was subsequently disbanded by the U.S. Trustee by notice dated January 11, 2006.

3.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. As of the Petition Date, the Debtors were considered the eighth-largest food retailer in the United States and one of the largest in the Southeast with more than 900 stores.

4.    The Debtors have announced and are engaged in a footprint reduction that is expected to result in the sale or closure of 361 stores and related facilities (the "Targeted Stores"). To date, the Debtors have sold more than 100 Targeted Stores and sent rejection notices for another 300 Targeted Stores.

00526804

2

5.      On or about November 21, 1997, Winn-Dixie Raleigh, Inc. a Florida Corporation ("WD Raleigh") and Gem Cedar, L.L.C., a Virginia limited liability company (the "Landlord"), entered into a lease for Store No. 997 (the "Lease"), a copy of which is attached as Exhibit A.  Pursuant to the terms of the Lease, WD Raleigh pays the Landlord $503,782 in rent per year.

6.      On August 21, 2002, WD Raleigh subleased the premises to Cornerstone Christian Church (the "Subtenant") (the "Sublease").   Under the Sublease, the Subtenant is required to pay WD Raleigh monthly rent at graduated rates in the range of between $8,297.50 and $23,744.  The Subtenant was in default for failing to pay the correct amount of rent prepetition and stopped paying any rent since the Petition Date.  As of March 14, 2006, the Subtenant owes WD Raleigh approximately $405,780.00 in past due rent.  On February 27, 2006, WD Raleigh notified the Subtenant of the default.  The Subtenant failed to cure the default and as a result, WD Raleigh terminated the Sublease effective March 14, 2006.  The Debtors now have no subtenant in the store and have exited this market area.  The Debtors therefore have no further need for the Lease and by rejecting it, will save the estates approximately $500,000 a year.

7.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.    The statutory predicates for the relief requested in the Motion is sections 365(a) of the Bankruptcy Code and Rule 3002(c), Federal Rules of Bankruptcy Procedure.

## Relief Requested

9.    By this Motion, the Debtors seek entry of an order (i) pursuant to section 365(a) of the Bankruptcy Code, authorizing the Debtors to reject the Lease effective April 20, 2006, and (ii) establishing a bar date for the Landlord to file any rejection damage claim arising in connection with the Lease.

## Basis for Relief

10.    Pursuant to sections 365(a) and 1107(a) of the Bankruptcy Code, a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." A debtor-in-possession's right to reject unexpired leases is a fundamental component of the bankruptcy process, as it provides a debtor with a mechanism to eliminate financial burdens to the estate. *See In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); *In re Hardie*, 100 B.R. 284, 285 (Bankr. E.D.N.C. 1989); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 699 (Bankr. W.D. Tex. 1988).

11.    The decision to reject an unexpired lease is primarily administrative and should be given great deference by a court, subject only to review under the "business judgment" rule. *See In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Cent. Fla. Fuels, Inc.*, 89 B.R. 242, 245 (Bankr. M.D. Fla. 1988);

00526804

4

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Sundial Asphalt Co. v. V.P.C. Investors Corp.* (*In re Sundial Asphalt Co.*), 147 B.R. 72, 78, 83-84 (E.D.N.Y. 1992). The business judgment rule requires the debtor to establish that rejection of the agreement will likely benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 39-40; *In re Kong*, 162 B.R. 86, 96 (Bankr. E.D.N.Y. 1993); *In re Cent. Fla. Fuels, Inc.*, 89 B.R. at 245. Courts universally regard the business judgment rule as a low standard to meet, and therefore, absent a finding of bad faith, will not disturb the decision to reject an unexpired lease by substituting their own judgment for that of the debtor. *See In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994), aff'd sub nom. *Pubelo Chem, Inc. v. III Enters. Inc. V*, 169 B.R. 551 (E.D. Pa. 1994); *In re Hardie*, 100 B.R. at 287.

12.    The Debtors' business judgment supports a rejection of the Lease. The Lease is for a store no longer within the continuing footprint of the Debtors and failure to reject the Lease will result in the Debtors' continuing liability for administrative rental expenses.

### Rejection Damages

13.    Pursuant to Rule 3002(c)(4), Federal Rules of Bankruptcy Procedure, the Court may fix a deadline for filing any rejection damage claim. The Debtors request that the Court establish the deadline for the Landlord to file a proof of claim for any rejection damages at 30 days after entry of an order approving this motion.

00526804

## EXHIBIT A

BK3605PG380

001670

This Instrument was prepared by
P. Christopher Wrenn, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

TAX $ 1,183.50    L TAX $ 394.50

(Reserved for Clerk)

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made this *November 21*, 1997, between GEM CEDAR, L.L.C., a Virginia limited liability company ("Landlord") and WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant did enter into a Lease, dated as of *November 21*, 19 *97* (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on attached Exhibit "B" and as depicted on the Site Plan attached as Exhibit "A", together with all improvements now or hereafter located thereon (collectively the "Premises").

The term of the lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on the date which is exactly twenty (20) years following the Commencement Date. Annual rent, payable in monthly installments on the first day of each calendar month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of six (6) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each.

o:\transfer\raleigh\0997\memlse.sfl
November 19, 1997

BK 3605 PG 381

The Lease contains the following provision:

Liens.        TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT
TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN
(OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE,
OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT
CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR
ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED
PREMISES OR ANY BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE
BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL
NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE
FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH
OR UNDER TENANT, OTHER THAN LABOR, SERVICES OR MATERIAL FURNISHED IN
CONNECTION WITH CONSTRUCTION OF THE LEASED PREMISES DESCRIBED IN ARTICLE
7B OF THIS LEASE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH
LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF
LANDLORD IN THE LEASED PREMISES.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein
by this reference for all purposes as though written out at length herein, and both the Lease
and this Memorandum of Lease shall be deemed to constitute a single instrument or document.
This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any
of the provisions of the Lease and, to the extent there may be any conflict or inconsistency
between the Lease or this Memorandum of Lease, the Lease shall control.

        IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease
to be executed as of the date and year first above written.

Witnesses:

Print name: EVETTE N. JANA

Print name: Elizabeth A. Matulenas

GEM CEDAR, L.L.C., a Virginia limited
liability company

By: _____

Its: _____


Print name: Jane E. DeWitte

Printed Name: Rebecca L. Sawyer

WINN-DIXIE RALEIGH, INC.,

By: _____
    James Kufeldt
Its: Vice President

Attest: _____
Its: Assistant Secretary

o:\transfer\raleigh\0997\memlse.sfl
November 19, 1997

BK 3605 PG 382

STATE OF _Virginia_ )
~~COUNTY~~ OF _Virginia Beach_ )

I, _Evette N. Jana_, a Notary Public, State and County aforesaid, do hereby certify that _John L. Gibson III_ personally appeared before me this day and acknowledged that he/she is a Member of GEM CEDAR, L.L.C.., a Virginia limited liability company, and that, by authority duly given and, as the act of the company, the foregoing instrument was signed in its name by _John L. Gibson III_, its Member, with full authority.

Witness my hand and official seal, this the _20th_ day of _Navember_, 1997.

Printed Name: _EVETTE N. JANA_
Notary Public, State and County aforesaid
My commission expires: _October 31, 1998_
(NOTARIAL SEAL)


STATE OF FLORIDA )
COUNTY OF DUVAL )

I, _Rebecca L. Sawyer_, a Notary Public, State and County aforesaid, do hereby certify that _Mallory Gayle Holm_ personally appeared before me this day and acknowledged that he/she is _ASST._ Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _Vice_ President, sealed with its corporate seal, and attested by her/himself as its _ASST._ Secretary.

Witness my hand and official seal, this the _21_ day of _November_, 1997.

Printed Name: _Rebecca L. Sawyer_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310

o:\transfer\raleigh\0997\memrise.sfl
November 19, 1997



BK 3605 PG 383

EXHIBIT "A"

PROPOSED WINN-DIXIE SITE
LAS GAVIOTAS BLVD.
PRELIMINARY SITE PLAN
TAX MAP NO. 0460000000001

BK 3605 PG 384

**EXHIBIT "B"**
**Legal Description**

ALL THAT certain lot, piece or parcel of land, situate in the Pleasant Grove Borough of the City of Chesapeake, Virginia, and designated as "PARCEL 18", consisting of 8.426 acres, as shown on that certain plat entitled, "Subdivision Plat of Las Gaviotas Commerce Center," dated October 27, 1987, and prepared by Centerline Associates, Ltd., which plat is recorded in the Clerk's Office of the Circuit Court of the City of Chesapeake, Virginia, on December 2, 1987, in Map Book 89, at page 89, reference to which is hereby made for a more particular descripton thereof.

IT BEING a part of the same property conveyed to SSR Cedar Road, J. V., a Virginia general partnership by deed from Vidcorp, Inc., formenrly known as Vidco of Virginia, Inc., a Virginia corporation, dated and recorded December 16, 1987, in the Clerk's Office of the Circuit Court of the City of Chesapeake, Virginia, in Deed Book 2355, page 810.

RECORDED WITH
CERTIFICATE ANNEXED

98 JAN 20 PM 1: 29

§58.1-802 TAXES PAID $_____
CHESAPEAKE, VA.
TESTE: _Julie M. Hart_
CLERK, CIRCUIT COURT

## COMMONWEALTH OF VIRGINIA



```
                           OFFICIAL RECEIPT
                     CHESAPEAKE CIRCUIT COURT
                           DEED RECEIPT

DATE: 01/20/98 TIME: 14:04:31 ACCOUNT: 550CLR980001670    RECEIPT: 980000289D
CASHIER: CCM   REG: CK12  TYPE: 46L     PAYMENT: FULL PAYMENT
INSTRUMENT : 980001674  BOOK:         PAGE:        RECORDED: 01/20/98 AT 13:26
GRANTOR NAME : GEM CEDAR LLC                       EX: N LOCALITY: 01
GRANTEE NAME : WINN-DIXIE RALEIGH INC              EX: N PERCENT: 100%
  AND ADDRESS :
RECEIVED OF : WINN-DIXIE STORES INC
          CHECK :      $1,595.00
DESCRIPTION 1:
           2:
CONSIDERATION:     789,000.00    ASSUME/VAL:          .00    MAP:
CODE DESCRIPTION              PAID  CODE DESCRIPTION                PAID
301  DEEDS                   13.00  145  VSLF                       1.00
039  DEEDS AND CONTRACTS   1,183.50  214  CITY GRANTEE TAX        394.50
106  TECHNOLOGY FUND FEE      3.00

                                     TENDERED   :   1,595.00
                                     AMOUNT PAID:   1,595.00
                                     CHANGE AMT :        .00

                 CLERK OF COURT: LILLIE M. HART
```

DC-16 (3/97)

NOV-20-97 THU 16:48                                                    P. 01/01

## LEASE SUBMISSION FORM

| Landlord: **GEM CEDAR, L.L.C.,** a Virginia limited liability company<br><br>Tenant: **WINN-DIXIE RALEIGH, INC.,** a Florida corporation<br><br>Guarantor: Winn-Dixie Stores, Inc., a Florida corporation | APPROVED<br><br>Headquarters Officer<br>No. of Signatures        No. of Initials<br>Division President        Research Manager<br>Drafting Attorney        Reviewing Attorney<br>Drafting Attorney Ext        Secretary Ext<br>5585        5695 |
|---|---|

| Lease & Short Form Lease & Guaranty | EC Approval | Form | Exec. Copy |
|---|---|---|---|
| New Store #997, most easterly corner intersection of Cedar Road and Las Gaviotas Blvd, Chesapeake, VA | 9/12/97 | | 11/21/97 |
| **Premises Size:**<br>Initial:<br>Expansion<br>Total (before expansion): | 222 × 231<br>60 × 231<br>51,262 (plus vestibule & rear receiving) | | same |
| **Term:**<br>Initial:<br>Extension. | 20 years<br>5/5 yr. options | same | same |
| **Rent:**<br>Basic:<br><br>Percentage:<br><br><br><br>Additional: | $472,939.00<br><br>amount by which 1% of Gross Sales exceeds Basic Rent<br><br>$1.20 per s.f. | _____<br><br>none provided<br><br><br><br>Bond lease—Tenant responsible for all maintenance, insurance coverage (self-insurance), and taxes on its 8.426 acre parcel | same<br><br>amount by which 1% of Gross Sales exceeds Basic Rent<br><br>same |
| **Use:**<br>General:<br><br>Exclusives:<br><br><br><br>Prohibitions: | <br><br><br><br><br><br>n/a | retail facility or any other lawful purpose<br><br>n/a—free standing lease parcel<br><br><br>n/a—free standing lease parcel | same<br><br>same, but Declaration of Restrictions imposes grocery restriction on land controlled by Landlord within 1/4 mile<br><br>same |

| | | | |
|---|---|---|---|
| Title insurance | n/a | | |
| Survey | n/a | Landlord to provide | same |
| Environmental Audit | n/a | Landlord to provide | same |
| Construction by Landlord | | Landlord to provide | same |
| Maintenance | n/a | | beg 3-01-98<br>end 3-01-99<br>o.c. 5-21-99 |
| Site Plan Approved by Store Design by Joe Dismuke | | Tenant responsible for all maintenance | Same |
| Assignment/Subletting | free right to assign, sublet or vacate | | November 19, 1997<br>November 20, 1997 |
| Guaranty of Tenant's Obligations by Winn-Dixie Stores, Inc. | n/a | n/a | Same<br><br>Yes |
| Other:<br>Tenant's Purchase Offer/Substitution Option | | Under certain circumstances (substantial property loss, substantial condemnation, unsuitability of premises for Tenant's business use), Tenant may terminate the Lease, but Tenant is also permitted (i) to present Landlord with a Purchase Offer for the leased premises in accordance with an established amortization schedule or (ii) to substitute other equally or greater valued property for the leased premises. | Tenant retains termination rights in event of substantial property loss or substantial condemnation only. Option to substitute property deleted. Right to submit Purchase Offer limited. |





# LEASE

STORE #997

## Cedar Road and Las Gaviotas Boulevard
# CHESAPEAKE, VIRGINIA

# TABLE OF CONTENTS

Page No.

1.   DEFINED TERMS ............................................. 1

2.   DEMISE OF LEASED PREMISES; PRIORITY OF LEASE ............. 1

3.   TENANT'S EQUIPMENT ....................................... 1

4.   TERM ..................................................... 1

5.   RENT ..................................................... 2
     (a)   Basic Rent ......................................... 2
           (c)   Additional Rent .............................. 3
           (d)   Net Lease; No Setoff or Counterclaim Against Rent ... 3

6.   UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY ...... 3
           (a)   No Termination of Lease; No Defense to Tenant's Obligations ... 3
           (b)   Continuing Obligations of Tenant ............. 3
           (c)   Tenant's Waivers ............................. 4

7.   TITLE; SURVEY; ENVIRONMENTAL AUDIT ...................... 4

7A.  LIENS; CONDITION OF PREMISES ........................... 6

           (a)   Liens ........................................ 6
           (c)   Encroachments ................................ 6
           (d)   Condition of Leased Premises ................. 6
           (e)   Assignment of Warranties, Guaranties, Indemnities ... 7
           (f)   Granting of Easements ........................ 7
           (g)   Conveyances for Public Purposes .............. 8

7B.  CONSTRUCTION OF PREMISES ............................... 9

7C.  COMPLETION DATE ........................................ 9

7D.  COMMENCEMENT DATE ...................................... 10

8.   USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT ....... 10
           (a)   Use .......................................... 10
           (b)   Maintenance .................................. 10
           (c)   Replacement Equipment ........................ 11
           (d)   Landlord's Covenant of Quiet Enjoyment ....... 11
           (e)   Landlord's Right of Entry .................... 11
           (f)   Subordination, Nondisturbance and Attornment . 11

9.   SIGNS. ................................................. 11

10.  PURCHASE OFFER; PROCEDURE ON PURCHASE .................. 12
           (a)   Title to be Conveyed ......................... 12
           (b)   Payment of Purchase Price; Conveyance Documents; Other Costs ... 12

11.  TENANT'S SUBSTITUTION OPTION ........................... 12

12.   PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS; COMPLIANCE WITH LAW  12
      (a)   Title to be conveyed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      (b)   Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

13.   INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (a)   Type of Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      (b)   Insurance Requirements; "Self-Insurance" . . . . . . . . . . . . . . . . . . . . . . . . . 14
      (c)   Mortgagee Loss Payable Clauses; Cancellation of Insurance . . . . . . . . 14
      (d)   Payment of Premiums; Policy Replacements . . . . . . . . . . . . . . . . . . . . . . 14
      (e)   Blanket Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14.   PROPERTY LOSS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      (a)   Property Loss Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      (b)   Termination Upon Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

15.   CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      (a)   Assignment of Condemnation Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      (b)   Total or Substantial Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      (c)   Partial Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      (d)   Landlord's Equipment Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      (e)   Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16.   ECONOMIC ABANDONMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

17.   RESTORATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18.   ASSIGNMENT AND SUBLEASING; VACATION OF LEASED PREMISES . . . . . . . . . . 17

19.   PERMITTED CONTESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

20.   ENVIRONMENTAL COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21.   INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

22.   DEFAULT PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
(a)   Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
(b)   Landlord's Remedies Upon Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . 20
(c)   No Relief of Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
(d)   Measure of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

23.   ADDITIONAL RIGHTS OF LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
(a)   Non-Exclusive, Cumulative Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
(b)   Tenant's Waiver of Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
(c)   Costs Upon Event of Default and Litigation . . . . . . . . . . . . . . . . . . . . . . . . 22

24.   NOTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

25.   ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26.   SURRENDER AND HOLDING OVER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

27.   NO MERGER OF TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28.      ALTERATION AND EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
(a)      Alterations Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
(b)      Alterations Involving Expansion of Improvements . . . . . . . . . . . . . . . . . . . . . . . . . .  25

29.      CHANGE OF CONTROL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

30.      MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made this November 21, 1997, between **GEM CEDAR, L.L.C.**, a Virginia limited liability company ("Landlord") and **WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

**IN CONSIDERATION** of the rents and mutual covenants herein contained to be paid and performed, Landlord and Tenant agree as follows:

1.    **DEFINED TERMS.** Capitalized terms as used in this Lease will have the meanings assigned to such terms as set forth on attached Exhibit "A".

2.    **DEMISE OF LEASED PREMISES; PRIORITY OF LEASE.** Effective on the Commencement Date, Landlord hereby demises and lets unto Tenant, and Tenant hereby takes and leases from Landlord, for the term or terms and upon the provisions hereinafter specified the following described property in Chesapeake, Virginia (collectively, the "Leased Premises"): (i) real property more particularly described on attached Exhibit "B", together with all easements, rights and appurtenances thereunto belonging or appertaining (the "Land"), (ii) the store building, approximately 222 feet in width by 231 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers (collectively, the "Store")and all other structures and other improvements now located or hereafter constructed on the Land as more particularly shown on the attached Site Plan prepared by The TAF Group, last revised November 11, 1997 (collectively, the "Improvements"), and (iii) the machinery, equipment and fixtures described on attached Exhibit "C". and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease ("Landlord's Equipment"). This Lease is subject to the Permitted Encumbrances and, except to the extent that Landlord, Tenant and Mortgagee enter into a subordination agreement pursuant to paragraph 8(f) below, is prior to the Lien of any Mortgage. Landlord and Tenant have entered into a certain Short Form Lease of even date, which Short Form Lease shall be recorded in the official records at Tenant's expense.

3.    **TENANT'S EQUIPMENT.** The machinery, equipment and fixtures described on attached Exhibit "D", and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease, and Tenant's trade fixtures and equipment ("Tenant's Equipment") are and will remain the property of Tenant, and are intended by Landlord and Tenant to constitute personal property of Tenant, and not fixtures, attachments or improvements or other interest in real property, whether or not the same are attached or affixed to the Leased Premises and whether or not the same are deemed to constitute real property under State law.

4.    **TERM.** Subject to the provisions of this Lease, Tenant shall have and hold the Leased Premises for an initial term (the "Initial Term") commencing on the Commencement Date and ending on the date which is exactly twenty (20) years following the Commencement Date. As long as no Event of Default then exists, Tenant shall have the option, exercisable in accordance with the following provisions, to extend the Term for five (5) additional terms (each an "Extended Term") of five (5) years each by giving notice to Landlord not less than 180 days prior to the expiration of the then current Term. If Tenant does not give any such notice to extend to Landlord in a timely fashion, the Term shall automatically terminate at the end of the then current Term. Any such Extended Term shall be subject to all of the provisions of this Lease, all of which shall continue in full force and effect. If Tenant does not exercise an option for an Extended Term, Landlord shall have the right during the remainder of the then current Term (i) to advertise the availability of the Leased Premises for sale or for reletting, and to erect upon the Leased

o:\transfer\raleigh\0997\reebond.3
November 19, 1997

Premises signs indicating such availability (provided that such signs do not unreasonably interfere with the use of the Leased Premises by Tenant), and (ii) to show the Leased Premises to prospective purchasers or tenants at reasonable times during normal business hours upon reasonable notice to Tenant. If Tenant fails to timely exercise its right to extend the Term for any Extended Term, then Tenant's right to extend the Term for any further Extended Terms shall terminate and be null and void.

     5.    **RENT.** (a)    <u>Basic Rent</u>. Tenant shall pay to Landlord without demand or offset, except as provided by law or specifically set forth herein, as rent for the Leased Premises during the Term, the amounts (the "Basic Rent") set forth in attached Exhibit "E", commencing on the Commencement Date, and continuing on the first day of each calendar month thereafter during the Term (said days being referred to as the "Basic Rent Payment Dates"). Basic Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a 365 day year.

     (b)    <u>Percentage Rent</u>. In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

    "Gross Sales" shall mean the aggregate sales price of all merchandise sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less customary reserves for bad debts). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Leased Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Leased Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to lenders, prospective lenders, and to prospective purchasers of the Leased Premises (collectively, "Interested Parties") provided that such Interested Parties agree in writing to keep Gross Sales information confidential.

    Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within 180 days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant

2

contracted for and paid by Landlord or Landlord's chief financial officer (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor. Additionally, if the audit discloses that Tenant has under reported its Gross Sales by more than three percent (3%), Tenant shall pay the reasonable cost of the audit. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant. If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent, as hereinafter defined, due under this Lease.

If the Commencement Date or the final date of the Term is other than on a regularly scheduled Rent payment date, the Rent shall be prorated to pay for the actual number of days that Rent is due. Tenant shall pay the Basic Rent to Landlord at Landlord's address set forth above, or at such other place or to such other person as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America.

(c)    Additional Rent. Tenant shall pay and discharge when the same shall become due, as additional rental (the "Additional Rent"), all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided by law in the even of nonpayment of Basic Rent.

(d)    Net Lease; No Setoff or Counterclaim Against Rent. This Lease is an absolutely net lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

6.    UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY.

(a)    No Termination of Lease; No Defense to Tenant's Obligations. Except as otherwise expressly provided in this Lease, this Lease shall not terminate nor shall Tenant have any right to terminate this Lease, nor shall Tenant be entitled to any setoff, recoupment, abatement, suspension, deferment, diminution, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, nor shall the obligations of Tenant under this Lease be affected, any present or future law to the contrary notwithstanding, by reason of: (i) any damage to or destruction of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of the Leased Premises, (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of the Leased Premises other than pursuant to paragraphs 10 or 11, (vi) any Default on the part of Landlord hereunder or under any other agreement, (vii) any latent or other defect in, or any theft or loss of, the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Landlord's Equipment, or (ix) any other cause whether similar or dissimilar to the foregoing. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected for any reason, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

(b)    Continuing Obligations of Tenant. Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided

3

in this Lease, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, or (ii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord in any proceeding under the Federal Bankruptcy Act or any similar federal or state law, or by any trustee, receiver or liquidator of Landlord or by any court in any such proceeding.

(c)    Tenant's Waivers.    Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or the Leased Premises, and (ii) to any setoff, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein.

7.    TITLE; SURVEY; ENVIRONMENTAL AUDIT

(a)    The Leased Premises are demised and let subject to (i) the rights of parties in possession, (ii) the existing state of title as of the Commencement Date (including, without limitation, the Permitted Encumbrances), (iii) any state of facts which an accurate survey or physical inspection of the Leased Premises might show, (iv) all Legal Requirements, and (v) the condition of the Leased Premises as of the Commencement Date, all without representation or warranty by Landlord. Notwithstanding the foregoing, however,

(i)    Title.    On or before fifteen (15) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before sixty (60) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have twenty (20) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Leased Premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its

4

objections and proceed to occupy the Leased Premises subject to the title defects; or (2) terminate this Lease. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Leased Premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease; and

(ii)    Survey        On or before fifteen (15) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Leased Premises is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Leased Premises conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the Store and the Common Areas (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Leased Premises as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "J", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Leased Premises subject to such Survey defects, or (2) terminate this Lease. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Leased Premises subject to the Survey defects; or (2) terminate this Lease. On or before the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built".

(iii)    Environmental Audit.    On or before fifteen (15) days after the Execution Date, Landlord shall order and shall deliver within sixty (60) days to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Leased Premises addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing ("Tenant's Audit Objection Notice"). Landlord shall have ten (10) days after the date of receipt of such

5

Tenant's Audit Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Audit Objection Response"). If Landlord states in Landlord's Audit Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Leased Premises subject to such Audit defects, or (2) terminate this Lease. If Landlord states in Landlord's Audit Objection Response that Landlord is willing to cure the objections stated in Tenant's Audit Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the Audit defects; or (2) terminate this Lease.

7A.    **LIENS: CONDITION OF PREMISES.**

(a)    Liens. TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, OTHER THAN LABOR, SERVICES OR MATERIAL FURNISHED IN CONNECTION WITH CONSTRUCTION OF THE LEASED PREMISES DESCRIBED IN ARTICLE 7B OF THIS LEASE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

(c)    Encroachments. In the event that, following the Commencement Date and Tenant's acceptance and written approval of Landlord's construction, any improvement shall (i) encroach upon any property, street or right-of-way on or adjoining the Leased Premises, (ii) violate the provisions of any restrictive covenant affecting the Leased Premises, (iii) hinder or obstruct any easement or right-of-way to which the Leased Premises is subject, or (iv) impair the rights of others in, to or under any of the foregoing, then, promptly after written request of Landlord, Tenant shall either (v) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (vi) take such action as shall be necessary to remove such encroachment, hindrance or obstruction and to end such violation or impairment. If such action is in the form of an Alteration, such Alteration shall conform to the provisions of paragraph 28.

(d)    Condition of Leased Premises. Following Tenant's acceptance and written approval of the construction described in Article 7B of this Lease, Tenant will, upon Landlord's request, acknowledge in writing that it has received the Leased Premises in good condition and repair on the Commencement Date. IT IS AGREED THAT UPON TENANT'S ACCEPTANCE AND WRITTEN APPROVAL OF LANDLORD'S CONSTRUCTION, LANDLORD LEASES, AND TENANT TAKES, THE LEASED PREMISES "AS-IS". TENANT ACKNOWLEDGES THAT LANDLORD HAS NOT MADE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE LEASED PREMISES, ITS FITNESS FOR ANY USE OR PURPOSE, ITS DESIGN OR CONDITION FOR ANY USE OR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, ITS VALUE, COMPLIANCE WITH SPECIFICATIONS, ITS LOCATION,

6

USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION OR LANDLORD'S TITLE THERETO; IT BEING AGREED THAT ALL RISKS INCIDENT TO ALL OF THESE MATTERS ARE TO BE  BORNE BY TENANT.  TENANT ACKNOWLEDGES THAT THE LEASED PREMISES ARE OF ITS SELECTION AND HAVE BEEN OR WILL BE CONSTRUCTED TO ITS SPECIFICATIONS.  TENANT'S WRITTEN APPROVAL OF LANDLORD'S CONSTRUCTION SHALL BE DEEMED EVIDENCE THAT TENANT HAS INSPECTED THE LEASED PREMISES AND THEY ARE SATISFACTORY TO TENANT.  UPON SUCH WRITTEN APPROVAL, IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE LEASED PREMISES, WHETHER PATENT OR LATENT, LANDLORD SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING THEREFROM (INCLUDING STRICT LIABILITY IN TORT).  NOTHING HEREIN SHALL BE DEEMED TO RESTRICT TENANT'S RIGHTS AND REMEDIES UNDER ANY WARRANTY, GUARANTY OR INDEMNITY, AS HEREINAFTER PROVIDED.  THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY REPRESENTATIONS OR WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO THE LEASED PREMISES, ARISING PURSUANT TO ANY LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

(e)     Assignment of Warranties, Guaranties, Indemnities.  Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, for the duration of this Lease, all of Landlord's interest in all warranties (except warranties of title to the Leased Premises), guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of the Leased Premises, including, any rights and remedies existing by contract or pursuant to the Uniform Commercial Code in effect in the State.  As long as no Default has occurred and is continuing hereunder and until the expiration or termination of this Lease, Tenant shall have the right (at its sole cost and expense) to enforce any such warranty, guaranty or indemnity in the name of Landlord or Tenant.  Landlord hereby agrees to execute and deliver, at Tenant's expense, such further documents (including powers of attorney) as Tenant reasonably may request, to allow Tenant the full benefit of the assignment effected or intended to be effected by this paragraph and the ability to enforce such warranties, guaranties and indemnities.

(f)     Granting of Easements.  Landlord shall not grant any easements or other rights in the nature of easements in the Leased Premises without the prior written consent of Tenant, which consent shall not be delayed, withheld, or conditioned unreasonably.  As long as no Default has occurred and is continuing hereunder.  Landlord, at the request of Tenant, will grant or declare, amend or release easements, covenants, or restrictions for utilities, parking, or other matters as necessary or desirable for operation of the Leased Premises in Tenant's Business, subject to Landlord's approval, not to be unreasonably delayed, conditioned, or withheld, and execute and deliver to any person any instrument appropriate to confirm or effect such grant, declaration, release or amendment, upon receipt by Landlord of a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

(1)     that the Leased Premises (including all related easements), following such grant, declaration, release, or amendment, (i) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (ii) is a contiguous parcel of land, without gap or hiatus, (iii) has adequate access to and from public highways, and (iv) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

7

(2)      that, in the judgment of Tenant and Guarantor, such grant, declaration, release or amendment will not materially lessen the value of the Leased Premises;

(3)      the consideration, if any, to be received in connection with such grant, declaration, release or amendment;

(4)      that upon such grant, declaration, release or amendment, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Basic Rent, Additional Rent or any other sums payable under this Lease or the Guaranty; and

(5)      that Tenant will perform all of the obligations under such instrument of grant, declaration, release or amendment.

To the extent that consideration is received in connection with any such grant, declaration, release or amendment, Tenant may retain such consideration up to the amount of Tenant's professional fees and out-of-pocket expenses relating to such grant, declaration, release or amendment, or $5,000.00, whichever is greater, and the balance, if any, of such consideration, shall be paid to Landlord.

(g)      Conveyances for Public Purposes.  As long as no Default has occurred and is continuing hereunder, Landlord will, at Tenant's request, (i) execute petitions to have the Leased Premises annexed to any municipal corporation or utility district, (ii) dedicate, transfer or release portions of the Leased Premises for road, highway or other public purposes, and (iii) execute and deliver to any person any instrument, containing special or limited warranties if applicable, appropriate to confirm or effect such sale, transfer, annexation or dedication, upon receipt by Landlord of a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

(1)      with respect to any action taken pursuant to clause (3) above, (i) the consideration being paid for such interest, (ii) that such consideration is not less than the fair market value of such interest, as determined by Tenant and Guarantor, and (iii) such action is being taken in anticipation that such interest would otherwise be taken by Condemnation;

(2)      that the Leased Premises (including all related easements), following such sale, transfer, annexation or dedication, (i) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (ii) is a contiguous parcel of land, without gap or hiatus, (iii) has adequate access to and from public highways, and (iv) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

(3)      that, in the judgment of Tenant and Guarantor, such sale, transfer, annexation or dedication will not materially lessen the value of the Leased Premises;

(4)      the consideration to be received in connection with such sale, transfer, annexation or dedication;

8

(5)    that upon such sale, transfer, annexation or dedication, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Basic Rent, Additional Rent or other sums payable under this Lease or the Guaranty; and

(6)    that Tenant will perform all of the obligations under any instrument to be executed and delivered pursuant to clause (3) above or under such petition.

Tenant may retain any consideration received in connection with such sale, transfer, annexation or dedication, up to the amount of Tenant's professional fees and out-of-pocket expenses relating to such sale, transfer, annexation or dedication, or $5,000.00, whichever is greater, and the balance, if any, of such consideration, shall be paid to Landlord. If such sale, transfer, annexation or dedication, occurs during the Initial Term, then, to the extent that any portion of such consideration is retained by Landlord, each installment of Basic Rent, payable thereafter during the Initial Term commencing with the second Basic Rent Payment Date subsequent to the date of such sale, transfer, annexation or dedication, shall be reduced by an amount equivalent to the product resulting from an equation, the numerator of which is the amount of such consideration retained by Landlord, and the denominator of which is the number of Basic Rent Payment Dates remaining in the Initial Term.

7B.    **CONSTRUCTION OF PREMISES.**    Landlord  agrees, at its sole cost and expense, to construct the Leased Premises in accordance with Tenant's Plans, as hereinafter defined, which shall be drawn based on guidelines submitted by Tenant to Landlord's architect (the "Guideplans"), and with the final plans and specifications to be approved by both Landlord and Tenant, which  shall include complete civil engineering drawings for the Store and Leased Premises showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Minor deviations in  Tenant's Plans which do not materially affect Tenant will  not be deemed violations of Tenant's Plans.  Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease; provided, however, that in the event of a conflict between the Guideplans and Tenant's Plans,  Tenant's Plans shall control.  Tenant's Plans shall provide for a completed store building, commonly referred to as a "lock and key job". Tenant shall furnish, install and connect its own trade fixtures, and its own compactor (or baler) on concrete pads to be installed by Landlord. This Lease shall not be effective or enforceable against Tenant or Landlord unless and until Landlord and Tenant have so approved Tenant's Plans. Nothing herein shall be construed to prevent Tenant's modification or amendment of Guideplans at any time prior to approval by both Landlord's and Tenant's initialing  of Tenant's Plans.

7C.    **COMPLETION DATE.**    Construction of the Store shall begin not later than March 1, 1998 (the "Construction Start Date") and shall be completed not later than March 1, 1999 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than May 21, 1999 (the "Outside Completion Date"), this option to terminate shall not arise.  The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an unrestricted building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured. If, pursuant to this paragraph, Tenant shall terminate this Lease, then Landlord agrees to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days of receipt of written notice of the terms and conditions thereof from Landlord, to occupy any portion of the Premises which Landlord may offer for use as a food supermarket. This first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation.

9

However, if offered to Tenant within six (6) months after cancellation of this Lease, the lease term provisions shall be the same as those contained in this Lease.

7D.    **COMMENCEMENT DATE.**    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Leased Premises shall have been delivered to Tenant and Landlord shall have completed construction of the Leased Premises in accordance with Tenant's Plans (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence), and Tenant shall have given its written approval of Landlord's construction, and Landlord shall have delivered to Tenant, at Landlord's expense, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease);

(b)    Tenant shall have received a Certificate of Occupancy or equivalent document for the Store;

(c)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "K", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Leased Premises.

(d)    Landlord shall have recorded in the public records of Chesapeake, Virginia, declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration") as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "L". No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or thirty (30) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

8.    USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT.

(a)    Use.    The Leased Premises may be used as a retail facility in Tenant's Business or for any other lawful purpose, except that the Leased Premises shall not be used for any purpose which shall violate any Legal Requirement, any insurance policy in effect with respect to the Leased Premises, or any covenants, restrictions or agreements applicable to the Leased Premises or constitute a public or private nuisance or waste.

(b)    Maintenance.    Tenant shall at all times maintain the Leased Premises in safe condition, and in good repair and appearance, except for ordinary wear and tear. Landlord shall not be required to maintain, repair or rebuild the Leased Premises in any way, and Tenant hereby expressly waives the right to make repairs or Alterations at the expense of Landlord pursuant to any Legal Requirement now or hereafter in effect. All such repairs or Alterations by Tenant shall be done in a good and workmanlike manner.

10

(c)    Replacement Equipment.  Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of Landlord's Equipment (the "Replaced Equipment" ) which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation, or been lost, stolen, damaged or destroyed.  Tenant shall repair, at its sole cost and expense, all damage to the Leased Premises caused by the removal of the Replaced Equipment or of Tenant's Equipment, or the installation of the Replacement Equipment.  All Replacement Equipment shall become the property of Landlord, shall be free and clear of all Liens and rights of others, and shall become a part of the Landlord's Equipment to the same extent as the Replaced Equipment was part of the Landlord's Equipment.

(d)    Landlord's Covenant of Quiet Enjoyment.  As long as no Event of Default exists hereunder, Landlord covenants to do no act nor to authorize any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

(e)    Landlord's Right of Entry.  Landlord and any Mortgagee shall have the right (but not the obligation) to enter upon the Leased Premises for the purpose of inspection and/or making any repairs or Alterations which may be necessary by reason of Tenant's failure to comply with the provisions of subparagraphs (b) or (c) above or in paragraphs 14 or 15 below.  Except in case of emergency, the right of entry shall be exercised at reasonable times, at reasonable hours and upon reasonable prior notice to Tenant.  In case of emergency, Landlord shall not be obligated to provide prior notice of entry upon the Leased Premises; however, as soon as reasonably practical following such entry, Landlord shall notify Tenant of such entry, the nature of the emergency, and the action taken.  Except as provided in the next sentence, all costs and expenses relating to Landlord's or Mortgagee's inspections shall be borne by Landlord and Mortgagee, respectively.  Tenant agrees to pay all reasonable costs and expenses of inspections by Landlord or Mortgagee if Tenant is in monetary Default or Landlord or Mortgagee have reason to believe that Tenant is in material non-monetary Default and as a result of any such inspection, the Leased Premises is determined or confirmed to be in material non-compliance with applicable requirements set forth in this Lease.  If as a result of any inspection by Landlord or Mortgagee it is determined that repairs or Alterations are necessary, the cost of all such work, if not paid by Tenant in accordance with this Lease, shall be Additional Rent, and Tenant shall pay the same to Landlord (or Mortgagee), together with interest thereon at the Default Rate from the time of demand for payment by Landlord (or Mortgagee) to Tenant, until paid by Tenant, immediately upon written demand therefor and upon submission to Tenant of evidence of Landlord's (or Mortgagee's) payment of such costs.  Landlord also shall have the right to conduct, at is sole cost and expense, such environmental audits or assessments of the Leased Premises as Landlord may elect, and if such audit or assessment discloses any Hazardous Condition, then Tenant's obligations with respect thereto shall be governed by paragraph 20.  Any such audits or assessments conducted by Landlord shall not unreasonably interfere with the continuing operation of Tenant's Business on the Leased Premises, and the written report of such audit or assessment shall name Tenant as an intended beneficiary of such report.

(f)    Subordination, Nondisturbance and Attornment.  Upon the request of Mortgagee, Landlord, Tenant and Mortgagee shall enter into a "subordination, nondisturbance and attornment" agreement in form and content reasonably acceptable to Landlord, Tenant and Mortgagee, pursuant to which Tenant shall subordinate its leasehold interest in the Leased Premises to the lien of the Mortgage, and shall agree to attorn to Mortgagee, as successor landlord, if Mortgagee succeeds to Landlord's interest in the Leased Premises, provided that Tenant's tenancy will not be disturbed as long as Tenant is performing its obligations under this Lease.

9.    SIGNS.  Tenant may, subject to applicable Legal Requirements, place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs shall remain the property of Tenant and may be removed at any time during the Term provided Tenant

11

shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Leased Premises resulting from the installation or removal of such signs, antennae, and satellite dishes.

Tenant shall construct, install, and maintain, at its cost, its own electrically illuminated pylon sign in the location marked on the Site Plan.  The pylon sign shall be of the maximum height and size permitted by applicable Legal Requirements.

10.    **PURCHASE OFFER; PROCEDURE ON PURCHASE.**  If Tenant elects or is required to make a Purchase Offer pursuant to paragraph 29 of this Lease, then Tenant shall be deemed to have made such Purchase Offer in accordance with the terms of this paragraph 10, at a price equal to the amount determined in accordance with attached Exhibit "F".  Upon acceptance of such Purchase Offer, Landlord shall transfer the Leased Premises to Tenant or Tenant's nominee by special or limited warranty deed, and assign to Tenant or Tenant's nominee, without recourse, Landlord's interest in any Net Award or Net Proceeds, if applicable, on the Termination Date upon payment by Tenant of the purchase price therefor, together with all installments of Basic Rent, all Additional Rent, and all other sums due and payable under this Lease to and including the Termination Date.

(a)    Title to be Conveyed.  Upon any such purchase of the Leased Premises by Tenant or its nominee, Landlord need not transfer and convey to Tenant or its nominee any better title thereto than Landlord received, and Tenant shall accept such title, subject, however, to all Liens, exceptions and restrictions on, against or relating to the Leased Premises and to all applicable Legal Requirements, but free of the Lien of the Mortgage and free of any Liens, exceptions and restrictions which have been created by or resulted from acts of Landlord taken without the consent of Tenant.

(b)    Payment of Purchase Price; Conveyance Documents; Other Costs.  On the date fixed for Tenant's purchase of the Leased Premises (other than pursuant to paragraph 8), Tenant shall pay to Landlord at its address set forth above, or at any other place designated by Landlord, the purchase price therefor specified herein, in immediately available funds and Landlord shall thereafter deliver to Tenant or Tenant's nominee a special or limited warranty deed which describes the Leased Premises then being sold to Tenant, and conveys and transfers the title thereto which is described in subparagraph (a) above, together with such other instruments as shall be necessary to transfer or assign to Tenant or its designee (without recourse) any other property then required to be sold by Landlord pursuant to this Lease.  Tenant shall pay all charges incident to such conveyance and transfer (including, without limitation, reasonable attorneys' fees, escrow fees, recording fees, title insurance premiums and all applicable federal, state and local taxes (other than any net income tax, capital gains tax, or franchise tax levied upon or assessed against Landlord)) which may be incurred or imposed by reason of such conveyance and transfer and other instruments.  Upon the completion of such purchase, this Lease and all obligations hereunder (including the obligations to pay Basic Rent and Additional Rent) shall terminate.

11.    **TENANT'S SUBSTITUTION OPTION.**    Intentionally deleted.

12.    **PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS; COMPLIANCE WITH LAW.**

(a)    Impositions.  Subject to the provisions of paragraph 19, and except as otherwise provided in this paragraph 12(a), Tenant shall, before delinquency thereof, pay and discharge any of the following which became due and payable  on or after the Commencement Date (collectively, the "Impositions"): all taxes (including sales, use, and gross rental taxes), assessments, levies, fees, water and sewer rents and charges, including stormwater management fees, utilities and communications taxes and charges and all other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, which are, at any time, prior to or during the Term, imposed upon or assessed against (i) the Leased Premises, (ii) any Basic Rent, Additional

12

Rent or other sum payable hereunder, (iii) this Lease, the leasehold estate created hereby, or (iv) the acquisition, occupancy, leasing, use, possession or operation of the Leased Premises (including without limitation, any taxes on revenues, rents, income, awards, proceeds, capital gains, profits, excess profits, gross receipts, sales, use, excise and other taxes, duties or imports whether similar or not in nature, assessed, levied or imposed against Tenant, Landlord or the Leased Premises by any governmental authority, subject, however, to the next sentence). Notwithstanding the foregoing, Tenant shall have no obligation to pay federal, state or local (v) franchise, capital stock or similar taxes, of Landlord, (vi) income, capital gains, excess profits, or other taxes, of Landlord, determine on the basis of its net income or (vii) any estate, inheritance, succession, gift, capital levy or similar tax, unless such taxes referred to in clauses (vi) and (vii) above are in lieu of, or a substitute for, any tax, assessment, levy or charge which, if it were in effect on the Commencement Date, would be payable by Tenant. If any assessment may be paid in installments, Tenant shall have the option to pay such assessment in installments; in such event, Tenant shall be liable only for those installments which become due and payable during the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions. Landlord shall either request the applicable taxing authority to deliver tax notices or tax bills directly to Tenant, or provide Tenant with complete and correct copies of such tax notices or tax bills promptly upon Landlord's receipt thereof, and Tenant shall not be deemed in Default under this paragraph 12(a) for failure to pay or discharge any Imposition, the notice or bill for which Tenant failed to receive due to Landlord's failure to take such action.

(b)     Compliance with Law. Subject to the provisions of paragraph 19, Tenant shall at all times comply with and cause the Leased Premises to comply with and conform to all Legal Requirements applicable to the Leased Premises.

13.     INSURANCE.
        (a)     Type of Insurance. Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

        (1)     Insurance against all risk of direct physical loss or damage to the Improvements and Landlord's Equipment in amounts not less than the full replacement cost of the Improvements and Landlord's Equipment, if the same are actually replaced or actual cash value (replacement cost minus depreciation) if the same are not replaced, excluding footings and foundations and other parts of the Improvements which are not insurable.

        (2)     General public liability insurance against claims for bodily injury, death or property damage occurring on, in, or about the Leased Premises with combined single limit coverage of not less than $5,000,000.00. Policies for such insurance shall be for the mutual benefit of Landlord, Tenant and any Mortgagee.

        (3)     Workers' compensation insurance covering all persons employed in connection with any work done on or about the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises, or in lieu of such workers' compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State.

        (4)     Such other insurance as is customarily carried by owners or tenants of similar properties in the same geographic area and engaged in businesses similar to Tenant's Business.

13

(b)    <u>Insurance Requirements; "Self-Insurance"</u>.  Except as provided in the second paragraph of this subparagraph (b) the insurance required by paragraph 13(a) shall be written by companies of recognized financial standing which are rated A-1 or better by Standard & Poors corporation or A-3 or better by Moody's Investor Service with asset size rating of "X" or better by Best's Rating Service.  The insurance (i) shall be for a term of not less than six (6) months, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the workers' compensation insurance referred to in subparagraph (a)(3) above) name Landlord, Tenant and any Mortgagee as insured parties, as their respective interests may appear.  If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or unsafe by reason of the failure or impairment of the capital of any insurer, or if for any other reasonable cause said insurance shall become unsatisfactory to Landlord or Mortgagee, Tenant shall promptly obtain new or additional insurance satisfactory to Landlord and mortgagee.  Tenant shall provide Landlord with a copy of all such insurance policies.

Notwithstanding the above, as long as Tenant is not in Default hereunder and Winn-Dixie's net worth determined in accordance with generally accepted accounting principles exceeds $100,000,000.00, Tenant may "self-insure" each of the coverages described in paragraph 13(a).  Upon request, Tenant will furnish to Landlord not more than once annually Winn-Dixie's annual report disclosing Winn-Dixie's net worth.  If Tenant has "self-insured" and a claim is made or a loss incurred which would be covered by the insurance described in paragraph 13(a) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom.  As to Property Losses, Tenant shall pay the full replacement cost thereof.  Sums due from Tenant in lieu of insurance proceeds because of such "self-insurance" shall be treated as insurance proceeds for all purposes under this Lease.

(c)    <u>Mortgagee Loss Payable Clauses; Cancellation of Insurance</u>.  Each insurance policy referred to in clause (1) of subparagraph (a) above shall contain a mortgagee loss payable clause in favor of any Mortgagee.  Each policy shall provide that it may not be canceled except after thirty (30) days prior notice to Landlord and any Mortgagee.  Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Mortgagee pursuant to any provision of the Mortgage upon the happening of an event of default thereunder, or (iv) any change in title or ownership of the Leased Premises.

(d)    <u>Payment of Premiums; Policy Replacements</u>.  Tenant shall pay as they become due all premiums for the insurance required by this paragraph 13, shall renew or replace each policy at least thirty (30) days prior to the expiration of such policy, and shall deliver to Landlord such renewal certificate within ten (10) days following inception.  Tenant shall provide Landlord with reasonable proof of payment of such premiums promptly following Tenant's payment of such premiums.  In the event of Tenant's failure to comply with any of the foregoing requirements within thirty (30) days after notice to Tenant thereof, Landlord shall be entitled to procure such insurance.  Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant immediately upon demand therefor by Landlord, together with interest thereon at the Default Rate, from and including the date of payment by Landlord to and including the date such sums are fully paid by Tenant.

(e)    <u>Blanket Policies</u>.  Any insurance which Tenant is required to obtain pursuant to paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant or Guarantor, provided that such "blanket" policy or policies otherwise comply with the provisions of this paragraph 13.  Upon the request of Landlord or Mortgagee, Tenant will provide a specific allocation of coverage among the various properties covered by such blanket policy.

14

14.    **PROPERTY LOSS.**

(a)    <u>Property Loss Claims</u>. In the event of any Property Loss, Tenant shall give Landlord and Mortgagee immediate notice thereof. Tenant, and Mortgagee by its acceptance of this Lease, hereby authorize Landlord, subject to Tenant's and any Mortgagee's approval of any proposed terms, to negotiate, in its name or in Tenant's or Mortgagee's name, the adjustment, collection, settlement, compromise or payment of all Property Loss claims under any of the insurance policies required by paragraph 13 and to execute and deliver on behalf of Tenant and Mortgagee all necessary proofs of loss, receipts, vouchers and releases required by the insurers in connection with a Property Loss. Tenant and Mortgagee agree to sign, upon request of Landlord, all such proofs of loss, receipts, vouchers and releases. Tenant and Mortgagee may elect, at the sole cost and expense of Tenant and Mortgagee, respectively, to monitor or participate in the adjustment, collection, settlement, compromise or claims payment process.

Except as provided in subparagraph (b) below, in the event of any Property Loss (whether or not insured against), this Lease shall continue in full force and effect without abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder.

Any Net Proceeds received for any Property Loss shall be payable to, and held by Mortgagee, subject to the provisions of this paragraph 14. Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to Mortgagee instead of to Landlord and Tenant jointly; and Landlord and Tenant hereby appoint Mortgagee as attorney-in-fact to endorse any draft therefor.

Promptly after any Property Loss, Landlord shall commence and diligently continue to restore the Leased Premises as nearly as possible to its value, condition and character immediately prior to such Property Loss, or as otherwise reasonably acceptable to Landlord, whether or not the Net Proceeds are sufficient to cover the cost of restoration, and Mortgagee shall make available to Landlord any Net Proceeds for such Property Loss received by Mortgagee, subject to the terms and conditions set forth in paragraph 17.

(b)    <u>Termination Upon Loss</u>. If, during the last three years of either the Initial Term or any Extended Term, a substantial portion of the Leased Premises suffers a Property Loss such that it would be uneconomic in Tenant's judgment for Landlord to restore the Leased Premises to its condition prior to such Property Loss for use in Tenant's Business, then Tenant may, not later than sixty (60) days after such Property Loss, give to Landlord notice of its intention to terminate this Lease on a Termination Date specified in such notice, and Landlord shall thereupon have no obligation to restore the Leased Premises. Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor, rebuilding, restoring or repairing the Leased Premises for continued use and occupancy in the business carried on by Tenant on the Leased Premises immediately prior to such Property Loss would be uneconomic in Tenant's judgment. As used in this subparagraph (b), "substantial portion" means fifty percent (50%) or more of the replacement cost of the Improvements. The effect of Tenant's notice shall be that the Net Proceeds shall belong to Landlord and this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including the Termination Date.

15.    **CONDEMNATION.**

(a)    <u>Assignment of Condemnation Award</u>. Subject to the provisions of this paragraph 15 and paragraph 17, Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant is or may be entitled by reason of any Condemnation, whether the same shall be

selected by Tenant. All costs and expenses of such Remedial Work will be paid by Tenant including without limitation the charges of such contractor(s) and the consulting environmental engineer, and Landlord's and Mortgagee's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event that Tenant fails to timely commence, or cause to be commenced, or fails to diligently prosecute to completion, such Remedial Work, Landlord or Mortgagee may, but will not be required or have any obligation to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, will thereupon constitute Claims. All such Claims will be due and payable by Tenant upon demand therefor by Landlord or Mortgagee.

Notwithstanding any provision of this Lease to the contrary, provided that (i) no Default has occurred and is continuing under this Lease, (ii) neither Landlord nor Mortgagee will be exposed or subjected to civil or criminal liability, and (iii) the respective interests of Landlord and Mortgagee in the Leased Premises is not jeopardized or in any way adversely affected, Tenant may contest or cause to be contested, by appropriate action, the application, interpretation or validity of any Environmental Laws or any agreement requiring any Remedial Work pursuant to a good faith dispute regarding such application, interpretation or validity of such Environmental Laws or agreement requiring such Remedial Work. During the pendency of any such permitted contest, Tenant may delay performance of Remedial Work or compliance with the Environmental Laws or agreement requiring such Remedial Work, provided that (i) Tenant actually contests and prosecutes such contest by appropriate proceedings conducted in good faith and with due diligence to resolution, (ii) prior to any such delay in compliance with any Environmental Laws or any Remedial Work requirement on the basis of a good faith contest of such requirement, Tenant will have given Landlord and Mortgagee written notice that Tenant intends to contest or will contest or cause to be contested the same, and will have given such security or assurances as Landlord or Mortgagee reasonably may request to ensure compliance with the Legal Requirements pertaining to the Remedial Work (and payment of all costs, expenses, interest and penalties in connection therewith) and to prevent any sale, forfeiture or loss of all or any part of the Leased Premises by reason of such noncompliance, delay or contest, and (iii) prior to any such delay in compliance with any Environmental Laws or any Remedial Work requirement on the basis of a good faith contest of such requirement, Tenant will have taken such steps as may necessary to prevent or mitigate any continuing occurrence of any existing or suspected Hazardous Condition giving rise to the contested Remedial Work requirement. Subject to the terms and conditions set forth above, during the pendency of any such permitted contest resulting in a delay of performance of any required Remedial Work, Landlord agrees that it will not perform such Remedial Work requirement on behalf of Tenant.

The foregoing provisions shall survive the expiration or earlier termination of this Lease, but shall finally terminate and cease upon the expiration of any applicable statute of limitation of actions as to any potential and unasserted Claim.

21.    **INDEMNIFICATION.** Tenant agrees, at its sole cost and expense, to pay, protect, indemnify, save and hold harmless Landlord and Mortgagee from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising in or about the Leased Premises during the Term or Extended Term, whether or not arising from (i) any injury to, or death of, any person, or any loss of, or damage to, any property on the Leased Premises, or on adjoining sidewalks, streets or ways, or connected with the use, condition or occupancy thereof (unless caused by the negligence or improper conduct of Landlord or Mortgagee), whether or not Landlord or Mortgagee has or should have knowledge or notice of the defect or conditions causing or contributing to such injury, death, loss or damage, (ii) any Claims, (iii) any Default under this Lease, or any violation by Tenant of any provision of any contract or agreement to which Tenant is a party or by which it is bound, affecting this Lease or the Leased Premises, or (iv) any contest referred to in paragraph 19 or 20. The obligations of Tenant under this paragraph 21 shall survive the expiration or termination of this Lease until the expiration of the applicable statute of limitations for such action.

19

paid or payable for Tenant's leasehold interest hereunder or otherwise; but nothing in this Lease shall be deemed to (i) assign to Landlord any award or payment on account of Tenant's Equipment or other tangible property, moving expenses, loss of business, and similar claims to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, or (ii) impair Tenant's right to any award or payment resulting from such separate claim. If Landlord receives notice of any proposed Condemnation from any person having the power of eminent domain, Landlord shall promptly give Tenant notice of such proposed Condemnation; the failure of Landlord to give such notice to Tenant shall not affect Tenant's obligations under this paragraph 15 or any other provision of this Lease.

(b)    Total or Substantial Condemnation. If (i) the entire Leased Premises, or (ii) at Tenant's election, any substantial portion of the Leased Premises, shall be subject to a Taking, then Tenant shall, not later than sixty (60) days after notice of such Taking, give notice to Landlord of its intention to terminate this Lease on a Termination Date specified in such notice. Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor: (ii) the conditions referred to in clause (1) or (2) above exist with respect to the Leased Premises by reason of such Taking, and (ii) continued use and occupancy in the Tenant's Business after restoration would be uneconomic. As used in this subparagraph (ii), "substantial portion" means (i) five percent (5%) or more of the building space contained in the Improvements, (ii) ten percent (10%) or more of the parking area, (iii) fifteen percent (15%) or more of the building space and parking area in any combination, (iv) taking (other than a temporary taking that, in the judgment of the Executive Committee of the Board of Directors of Tenant, does not cause the continued use and occupancy of the Leased Premises in Tenant's Business to be uneconomic) of any material access to the Leased Premises for which no reasonable alternative is available at a reasonable cost, or (v) any taking that would cause the remainder of the Leased Premises to be in material non-compliance with Applicable Laws, including, without limitation, minimum parking requirements or minimum access requirements. The effect of Tenant's notice shall be that the Net Award for such Taking shall belong to Landlord and this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including the Termination Date.

(c)    Partial Condemnation. In the event of any Taking of the Land or Improvements which does not result in a termination of this Lease pursuant to subparagraph (b) above, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder, except as specifically provided in paragraph 17. Any Net Award for such Taking shall be retained by Mortgagee, subject to the provisions of this subparagraph (c). Promptly after such Taking, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to their value, condition and character immediately prior to such Taking, whether or not the Net Award is sufficient therefor, and Mortgagee shall make available to Tenant any Net Award received by Mortgagee, subject to the terms and conditions set forth in paragraph 17.

In the event of a Requisition of the Leased Premises, the Net Award for such Requisition allocable to the Term shall be paid to Tenant and this Lease shall continue in full force and effect without any abatement or reduction of the Basic Rent, Additional Rent or other sums payable by Tenant hereunder. Any portion of such Net Award allocable to any period after the expiration or termination of the Term shall belong to Landlord.

(d)    Landlord's Equipment Condemnation. In the event of any Taking of Landlord's Equipment which does not fall within the provisions of subparagraph (b) above, this Lease shall continue in full force and effect and without any abatement or reduction of Basic Rent, Additional

16

Rent or any other sums payable by Tenant hereunder. Tenant shall, whether or not the Net Award is sufficient for the purpose, promptly replace Landlord's Equipment so taken, in accordance with the provisions of paragraphs 8(c) and 17, and the Net Award for such a Condemnation shall thereupon be payable to Tenant.

(e)    Proceedings. Tenant shall take all appropriate actions with respect to each Condemnation proceeding, action, negotiation, prosecution and adjustment and shall pay all cost and expenses thereof, including the reasonable cost of Landlord's and Mortgagee's participation therein, provided that Landlord's and Mortgagee's consents shall be required to any settlement or agreement with the condemning authority (except one involving solely an award or payment to which Tenant is entitled under subparagraph (a) above), such consent not to be unreasonably withheld or delayed.

16.    **ECONOMIC ABANDONMENT.** Intentionally deleted.

17.    **RESTORATION.** In the event of any Property Loss referred to in paragraph 14(a) or Taking referred to in paragraph 15(c), Tenant shall be entitled to receive from Mortgagee periodic disbursements of the Net Proceeds payable in connection with such loss and the Net Award payable in connection with such Taking, but only on the basis of certificates of Tenant, signed by the President or any Vice President of Tenant, delivered to Mortgagee from time to time as such rebuilding, restoration and repair progresses or is completed. Each such certificate shall describe the work for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith, and shall state that such work has been performed in conformity with the requirements of paragraphs 7(b), 7(c), 8(b), 8(c), and 28, the estimated cost of completing such work, and that Tenant has not theretofore received payment for such work. Upon completion of the work described in this paragraph 17, if any Net Proceeds or Net Award remaining after the final payment has been made for such work is less than $100,000.00, such remaining Net Proceeds or Net Award shall be paid to Tenant. If such remaining Net Proceeds or Net Award is $100,000.00, or greater than $100,000.00, such remaining Net Proceeds or Net Award shall, at Landlord's option, be paid to Tenant or retained by Landlord; if retained by Landlord then each installment of Basic Rent, payable thereafter during the Initial Term commencing with the second Basic Rent Payment Date subsequent to the final payment to Tenant for such work, shall be reduced by ten percent (10%) of such remaining Net Proceeds or Net Award retained by Landlord. If not retained by Landlord, such remaining Net Proceeds or Net Award shall be paid to Tenant. If the cost of any such work required to be done by Tenant pursuant to this paragraph shall exceed the amount of such Net Proceeds or Net Award, the deficiency shall be paid by Tenant. No payments shall be made to Tenant pursuant to this paragraph 17 if any Default exists under this Lease unless and until such Default shall have been cured or removed.

18.    **ASSIGNMENT AND SUBLEASING; VACATION OF LEASED PREMISES.** This Lease may be assigned and the Leased Premises may be sublet in whole or in part without the consent of Landlord, (i) as long as the Guaranty and the liability of Guarantor thereunder shall not be reduced thereby, or (ii) if Winn-Dixie is Tenant under this Lease. Tenant will notify Landlord upon any such assignment. Additionally, Tenant may vacate the Leased Premises, provided that the same is made reasonably secure from unauthorized entry during periods of vacancy. Each sublease of the Leased Premises shall be subject and subordinate to the provisions of this Lease. No assignment or sublease, or vacation of the Leased Premises as permitted by this paragraph 18 shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease or vacancy had occurred. No assignment or sublease or vacation of the Leased Premises shall impose any obligations on Landlord under this Lease. Tenant shall, within ten (10) days after the execution and delivery of any such assignment or sublease, deliver a duplicate original copy thereof.

Notwithstanding the foregoing, if Tenant or its assignee or sublessee fails to operate a business in the Store for 180 days or longer, and such failure to operate is not due to permitted remodeling or enlargement,

17

or a result of casualty or other Force Majeure (a "Store Closing"), then following such Store Closing Landlord may terminate this Lease by written notice to Tenant and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

19.    **PERMITTED CONTESTS.** Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any Lien referred to in paragraphs 7(b) or 28, or (iv) take any action with respect to any encroachment, violation, hindrance, obstruction or impairment referred to in paragraph 7(c) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (i) the collection of, or other realization upon, the Imposition or Lien so contested, (ii) the sale, forfeiture or loss of any of the Leased Premises, any interest therein, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such encroachment, violation, hindrance, obstruction or impairment, (iii) any interference with the Use or occupancy of the Leased Premises, (iv) any interference with the payment of any Basic Rent, any Additional Rent or any other sum payable hereunder, and (v) the cancellation of any fire or other insurance policy. If Winn-Dixie's net worth determined in accordance with generally accepted accounting principles shall be less than $100,000,000.00 at the time of commencement of any such contest, Tenant shall provide to Landlord and Mortgagee a bond of a surety acceptable to Landlord and Mortgagee in an amount satisfactory to Landlord and Mortgagee. While any such proceedings are pending, neither Landlord nor Mortgagee shall have the right to pay, remove or cause to be discharged the Imposition or Lien thereby being contested. Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as the conditions of the first sentence of this paragraph 19 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Landlord and Mortgagee harmless against any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof. No such contest shall subject Landlord or Mortgagee to the risk of any material civil liability or any criminal liability.

20.    **ENVIRONMENTAL COVENANTS.** Except as set forth in the second sentence of this paragraph 20, Tenant hereby represents, warrants, covenants and agrees to and with Landlord and Mortgagee that all operations or activities upon, or any use or occupancy of the Leased Premises by Tenant, or to Tenant's knowledge any other tenant or other occupant, is presently and will at all times be in compliance with all Environmental Laws; that Tenant has not at any time engaged in or permitted, nor to Tenant's knowledge has any existing or previous tenant or occupant of the Leased Premises engaged in or permitted the occurrence of any Hazardous Condition; and that to Tenant's knowledge, there does not now exist nor is there suspected to exist any Hazardous Condition on or about the Leased Premises. Tenant discloses to Landlord that Tenant does, or intends to, store, use or sell in Tenant's Business certain products or substances that may be considered Hazardous Substances, and Landlord acknowledges Tenant's right to do so, provided, however, that any such storage, use or sale of such products or substances shall at all times be in compliance with all Environmental Laws.

In the event that any Remedial Work with respect to any Hazardous Conditions that could result in a Claim is required under any Environmental Laws by any judicial order, or by any governmental entity, or in order to comply with the terms, covenants and conditions of this Lease or of any other agreements affecting the Leased Premises, Tenant will perform or cause to be performed the Remedial Work in compliance with such law, regulation, order or agreement. All Remedial Work will be performed by one or more contractors, selected by Tenant and under the supervision of a consulting environmental engineer

18

22.    **DEFAULT PROVISIONS.**

(a)    <u>Events of Default</u>.  The occurrence of any one or more of the following shall constitute an Event of Default under this Lease:

(1)    if any installment of Basic Rent or any payment of Additional Rent due from Tenant is an Overdue Payment; or

(2)    if Winn-Dixie's net worth determined in accordance with generally accepted accounting principles shall be less than $100,000,000.00 and any one or more of the following events shall have occurred:

(A)    a failure by Tenant to duly perform and observe, or a violation or breach of, any other provision hereof which failure, violation or breach shall continue for a period of thirty (30) days after notice to Tenant thereof; provided that if such failure, violation or breach cannot be cured by mere payment of money and cannot with diligence be cured within such thirty (30) day period, the period to cure such failure, violation or breach shall be extended for such longer period of time, as is reasonably necessary to cure such failure, violation or breach so long as Tenant shall commence to cure such failure, violation or breach within said thirty (30) day period and actively, diligently and in good faith proceed with continued curing thereof until it shall be fully cured;

(B)    any representation or warranty made by Tenant or Guarantor in this Lease, the Guaranty or any other document delivered in connection with the execution and delivery of this Lease or the Guaranty proves to be incorrect in any material respect;

(C)    Tenant or Guarantor shall voluntarily be adjudicated a bankrupt or insolvent, seek or consent to the appointment of a receiver or trustee for Tenant, Guarantor or the Leased Premises, file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, make a general assignment for the benefit of creditors, or admit in writing its inability to pay its debts as they mature;

(D)    a court shall enter an order, judgment or decree appointing a receiver or trustee for Tenant, Guarantor or the Leased Premises or approving a petition filed against Tenant or Guarantor which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, sixty (60) days after it is entered;

20

(E)    Tenant or Guarantor shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(F)    the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such proceeding shall not be vacated or discharged within sixty sixty (60) days after such levy or attachment; or

(G)    Guarantor shall default under the Guaranty.

(b)    <u>Landlord's Remedies Upon Tenant Default</u>.  If an Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter during the continuance of such Event of Default, to do any one or more of the following without demand upon or notice to Tenant:

(1)    Landlord may give Tenant notice of Landlord's intention to terminate this Lease on a date specified in such notice.  Upon the date therein specified, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date hereinbefore fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder, including its liability for Basic Rent, Additional Rent or any other sums payable under this Lease, as hereinafter provided.

(2)    Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (1) above, (i) give Tenant notice to surrender the Leased Premises to Landlord immediately or on a date specified in such notice, at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord, or (ii) reenter and repossess the Leased Premises by summary proceedings, ejectment or any other means or procedure.  Upon or at any time after taking possession of the Leased Premises, Landlord may remove any persons or property therefrom.  Landlord shall be under no liability for, or by reason of, any such entry, repossession or removal.  No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (1) above.

(3)    After repossession of the Leased Premises pursuant to clause (2) above, whether or not this Lease shall have been terminated pursuant to clause (1) above, Landlord shall have the right to relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such term, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine; and Landlord may collect and receive any rents payable by reason of such reletting.  Landlord shall not be responsible or liable for any failure to relet the Leased Premises or any part thereof or for any failure to collect any rent due upon any such reletting.  Landlord may make such Alterations as Landlord in its sole discretion may deem advisable.  Tenant agrees to pay Landlord, as Additional Rent, immediately upon demand, all reasonable

21

expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting the Leased Premises, including reasonable fees and commissions of attorneys, architects, agents and brokers.

(4)    Landlord may exercise any other right or remedy now or hereafter existing by law or in equity.

(c)    No Relief of Obligations.  No expiration or termination of this Lease, or repossession or reletting of the Leased Premises pursuant to this paragraph 22 or any other provision of this Lease, by operation of law or otherwise, shall relieve Tenant of any of its liabilities and obligations hereunder, including the liability for payment of Basic Rent, Additional Rent and all other sums payable hereunder, all of which shall survive such expiration, termination, repossession or reletting.

(d)    Measure of Damages.  In the event of any expiration or termination of this Lease or repossession of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord all Basic Rent, all Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages (i) all Basic Rent, all Additional Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to this paragraph 22, after deducting from such proceeds all of Landlord's expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alterations and expenses of preparation for reletting).  Tenant hereby agrees to be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

23.    ADDITIONAL RIGHTS OF LANDLORD.

(a)    Non-Exclusive, Cumulative Remedies.  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease.  No delay or failure by Landlord to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.  In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)    Tenant's Waiver of Redemption.  Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

(c)    Costs Upon Event of Default and Litigation.  Tenant shall pay to Landlord and Mortgagee as Additional Rent all expenses incurred by Landlord or Mortgagee in connection with

22

any Event of Default or the exercise of any remedy by reason of any Event of Default, including reasonable attorneys' fees and expenses. If Landlord or Mortgagee shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or the Leased Premises, at the option of Landlord and Mortgagee, Tenant, at its expense, shall provide Landlord or Mortgagee with counsel approved by Landlord and Mortgagee and shall pay all reasonable costs incurred or paid by Landlord and Mortgagee in connection with such litigation.

24.    NOTICES. All notices, requests, consents, demands, offers and other communications required or permitted to be given pursuant to this Lease shall be in writing and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telefax, the day when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party prior to or during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if after normal business hours for the recipient; (iii) if delivered by United States Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same, addressed to Landlord, Tenant, Mortgagee, or Guarantor at their respective addresses stated below:

Landlord :    GEM CEDAR, L.L.C.
207 Business Park Drive, #101
Virginia Beach, Virginia 23462
Attention: John Gibson
Telecopy: 757-497-2943

or such other address as Landlord may direct from time to time.

Tenant:    Winn-Dixie Raleigh, Inc.    (Re: Store #811)
2201 South Wilmington Street
Raleigh, NC 27603

With a copy to: Winn-Dixie Stores, Inc.
Attn: General Counsel
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297
Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.


If to Mortgagee:    _____  _____
_____
_____
_____
_____

23

If to Guarantor: Winn-Dixie Stores, Inc.
 5050 Edgewood Court
 Jacksonville, Florida 32254
 Attention: General Counsel
 Telefax No. 904-783-5138

For the purposes of this paragraph 24, any person may substitute its address by giving fifteen (15) days notice to the other persons in the manner provided above.

25. **ESTOPPEL CERTIFICATE.** Landlord and Tenant shall, at any time and from time to time, upon not less than twenty (20) days prior request by the other, execute, acknowledge and deliver to the other, an estoppel certificate substantially in the form attached as Exhibit "G". It is intended that any such statements may be relied upon by Mortgagee, the recipient of such statements or their assignees, or by any prospective purchaser or mortgagee of the Leased Premises.

26. **SURRENDER AND HOLDING OVER.** Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except for any portion thereof with respect to which this Lease has previously terminated) to Landlord in broom clean condition, and otherwise in the same condition in which the Leased Premises were originally received from Landlord on the Commencement Date, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear. Tenant shall remove from the Leased Premises on or prior to such expiration or earlier termination all property situated thereon which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Property not so removed at the end of the Term or within thirty (30) days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property and repairing any damage to the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof shall operate and be construed as a tenancy from month to month only, at double the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over shall entitle Landlord, in addition to collecting double rentals, to exercise all rights and remedies provided by law or in equity, including the remedies of paragraph 22(b).

27. **NO MERGER OF TITLE.** There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (ii) the fee estate or ownership of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities (including any Mortgagee) having any interest in (i) this Lease or the leasehold estate created by this Lease, and (ii) the fee estate in or ownership of the Leased Premises sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

28. **ALTERATION AND EXPANSION.**

(a) <u>Alterations Generally</u>. Tenant may, at its expense make any Alterations, construct upon the Land any additions to the Improvements or install equipment in the Improvements or

24

accessions to the Landlord's Equipment without Landlord's consent, provided that (i) the character of the Leased Premises shall not be materially changed and the market value of the Leased Premises shall not be materially lessened by any such Alteration, construction or installation (it being agreed that any expansion or enlargement referred to in subparagraph (b) below shall not be deemed to constitute a material change in the character of the Leased Premises), nor shall the usefulness or structural integrity of the Leased Premises be impaired thereby, (ii) all such work of Alteration, construction and installation shall be performed in a good and workmanlike manner, (iii) all such Alterations, construction and installation shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with any such Alteration, construction or installation shall comply with the requirements of any insurance policy required to be maintained by Tenant hereunder, (v) Tenant shall promptly pay all costs and expenses of any such Alteration, construction or installation, and Tenant shall discharge all Liens filed against the Leased Premises arising out of the same, and (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, construction or installation. In the case of any other proposed Alteration, construction or installation, Tenant shall first obtain Landlord's and Mortgagee's consents, which consents may be withheld in Landlord's or Mortgagee's sole discretion. All such Alterations, construction and installations (except Tenant's Equipment) shall be the property of Landlord and shall be subject to this Lease.

(b)     Alterations Involving Expansion of Improvements. It is understood that Tenant may at future times during the Term wish to enlarge the Improvements by constructing Alterations and additions thereto and that such enlarging may require purchase of additional land. Tenant shall have the sole responsibility for negotiating and providing for the purchase, renovation and construction of such Alterations and additions and of such land as is necessary for its expansion plans. If Tenant is able to obtain agreements for the purchase of such additional land and contracts for the Alterations and additions at a cost satisfactory to it, Tenant may then request that Landlord purchase such Alterations, additions and land and incorporate the same into this Lease upon terms and conditions negotiated by the parties; provided, however, that Landlord shall have no obligation to purchase such Alterations, additions and land. If the parties are unable to agree, then Tenant shall have the right to construct Alterations and additions at its own expense and to make such changes as are necessary to make the entire enlarged building suitable for use and occupancy by Tenant in the conduct of its business; but Tenant shall not have the right to mortgage or pledge this Lease or the leasehold estate created hereby or its interest in such Alterations to finance such Alterations. Prior to commencement of construction of such Alterations, Tenant shall provide Landlord and Mortgagee with a set of plans and specifications for such Alterations. Following substantial completion of such Alterations, Tenant shall provide Landlord and Mortgagee with (i) copies of certificates of occupancy or completion, if required by Legal Requirements, and (ii) an as-built survey of the Alterations and additional land demonstrating that the Alterations do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises or the additional land. Subject to the following sentence, all such Alterations and additions and such land shall be subject to the terms of this Lease to the same extent as if owned by Landlord and leased under this Lease. With respect to Alterations constructed on land other than the Land, if Tenant can demonstrate, to the reasonable satisfaction of Landlord and Mortgagee, that the original Leased Premises, prior to any such Alterations, reasonably can be operated as an economic unit separate and apart from such Alterations in compliance with Legal Requirements and with relatively minor modifications to permit such separate operation, then such separate Alterations and land shall not be considered part of or subject to this Lease. Except as provided in the preceding sentence, at the end of the Term of this Lease, title to such Alterations, additions and land as necessary to meet any Legal Requirements shall pass to Landlord without cost or expense to Landlord, Tenant shall execute additional documents as necessary to complete such transfer, and Tenant shall provide a title insurance policy insuring Landlord's fee simple title interest in such additional land. If title to such Alterations, additions and land is to be retained by Tenant at the end of the Term of this Lease,

25

then, not earlier than two hundred forty (240) days, and not later than sixty (60) days, prior to the end of the Term of this Lease, Tenant shall make such alterations, or construct or erect such improvements, as may be necessary to divide the Leased Premises and such Alterations and land into separate units in compliance with the requirements set forth above and Legal Requirements. Following substantial completion of such dividing improvements, Tenant shall provide Landlord and Mortgagee with (i) a copy of a new certificate of occupancy or completion for the Leased Premises, if required by Legal Requirements, and (ii) an as-built survey of the dividing improvements demonstrating that the centerline of the dividing improvements is constructed on the common boundary of the Leased Premises and additional land owned by Tenant.

29.    **CHANGE OF CONTROL.** In the event that, at any time during the Initial Term, a Change of Control shall occur, Tenant shall, not later than thirty (30) days after such Change of Control, give to Landlord a Purchase Offer, at a price determined in accordance with Exhibit "F". Unless Landlord shall accept such Purchase Offer by notice to Tenant given not later than the tenth day prior to the Termination Date specified in such Purchase Offer, this Lease shall remain in full force and effect. Unless Landlord shall have accepted such Purchase Offer by notice to Tenant given not later than the tenth day prior to the Termination Date, Landlord shall be conclusively presumed to have rejected such Purchase Offer. If Landlord shall so accept such Purchase Offer, Landlord shall transfer and convey the Leased Premises to Tenant or its designee upon the terms and provisions set forth in paragraph 10, against payment by Tenant of the purchase price therefor and all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including such Termination Date.

30.    **MISCELLANEOUS.** The paragraph headings in this Lease and the Table of Contents preceding this Lease are for convenience only and are not to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease, the singular shall include the plural as the context requires, and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; and (iii) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition". Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought. The covenants of this Lease shall run with the land and bind Tenant and all successors and assigns of Tenant and shall inure to the benefit of and bind Landlord, its successors and assigns. If any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Lease may be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes. This Lease shall be governed by and construed according to the laws of the State. All Exhibits and attachments to this Lease are by reference incorporated into, and form a part of, this Lease. A memorandum of this Lease substantially in the form attached as Exhibit "H" shall be recorded in the records of the appropriate public office having custody of the real property records of the county in which the Leased Premises is located.

26

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

Witnesses:

Print name: _EVETTE N. JANA_

Print name: _Elizabeth A. Matukras_

**GEM CEDAR, L.L.C.**, a Virginia limited liability company

By: _____

Its: _____


Print name: _Jane E. DeWitt_

Printed Name: _Rebecca L. Sawyer_

**WINN-DIXIE RALEIGH, INC.**,

By: _____
    James Kufeldt

Its: Vice President

Attest: _____

Its: Assistant Secretary

27

STATE OF _Virginia_ )
~~COUNTY~~ OF _Virginia_ ~~beach~~ )
_city_

    I, _Evette N. Jana_ , a Notary Public, State and County aforesaid, do hereby certify that _John L Lakovan III_ personally appeared before me this day and acknowledged that he/she is a Member of GEM CEDAR, L.L.C.., a Virginia limited liability company, and that, by authority duly given and as the act of the company, the foregoing instrument was signed in its name by _John L Lakovan III_ , its Member, with full authority.

    Witness my hand and official seal, this the _20th_ day of _November_ , 1997.

Printed Name: _EVETTE N. JANA_
Notary Public, State and County aforesaid
My commission expires: _October 31, 1998_
(NOTARIAL SEAL)


STATE OF FLORIDA )
COUNTY OF DUVAL )

    I, _Rebecca E. Sawyer_ , a Notary Public, State and County aforesaid, do hereby certify that _Mallory Gayle Holm_ personally appeared before me this day and acknowledged that he/she is _Asst._ Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _Vice_ President, sealed with its corporate seal, and attested by her/himself as its _Asst._ Secretary.

    Witness my hand and official seal, this the _21_ day of _November_ , 1997.

Printed Name: _Rebecca L. Sawyer_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

28

## CORPORATE GUARANTY OF LEASE OBLIGATIONS

THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS ("Guaranty") is given as of the date indicated below by WINN-DIXIE STORES, INC., a Florida corporation ("Guarantor") to and in favor of GEM CEDAR, L.L.C., a Virginia limited liability company ("Landlord") on behalf and for the account of WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant").

### RECITALS:

1.     Landlord and Tenant intend to be parties to that certain lease dated _//-2/_, 1997 (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Chesapeake, Virginia, as more particularly described in the Lease (the "Premises").

2.     Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.     Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.     The foregoing recitals are true and correct and incorporated herein.

2.     Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by Tenant of all the terms, covenants and conditions on the part of the Tenant to be performed and observed under the Lease, including, without limitation, payment of Basic Rent, Percentage Rent, and Additional Rent, when due, without offset or deduction except as provided in the Lease, and all as is more particularly provided therein.

3.     This Guaranty shall be absolute, continuing and unlimited, and the Landlord shall not be required to take any proceedings against the Tenant, or give any notice to the undersigned before the Landlord has the right to demand payment or performance by the undersigned upon default by the Tenant.  The Guaranty and the liability of the undersigned hereunder shall in nowise be impaired or affected by any assignment which may be made of said Lease, or any subletting thereunder, or by any extension(s) for the payment of any rental or any other sums provided to be paid by Tenant, or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of said Lease or any amendment, modification or revision of said Lease.  No action or proceeding brought or instituted under this Guaranty against the undersigned, and no recovery obtained in pursuance thereof shall be any bar or defense to any further action or proceeding which may be brought under this Guaranty by reason of any further defaults to Tenant.  The liability of the undersigned shall not be deemed to be waived, released, discharged, impaired or affected by reason of the release or discharge of the Tenant in any creditors, receivership, bankruptcy or other proceedings, or the rejection or disaffirmance of the Lease in any proceedings.

4.     No amendment, modification, or extension of the Lease which has the effect of increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

5.     All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time

29

to time. Each communication shall be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

|            |                              |
|------------|------------------------------|
| Landlord : | GEM CEDAR, L.L.C.            |
|            | 207 Business Park Drive, #101 |
|            | Virginia Beach, Virginia 23462 |
|            | Attention: John Gibson      |
|            | Telecopy: 757-497-2943      |

or at such other address as Landlord may direct from time to time.

|            |                                       |
|------------|---------------------------------------|
| Guarantor: | Winn-Dixie Stores, Inc.              |
|            | Attn: P. Christopher Wrenn, Esquire   |
|            | 5050 Edgewood Court                   |
|            | P.O. Box B                            |
|            | Jacksonville, FL 32203-0297           |
|            | Telecopy: (904) 783-5138              |

or to such other address as Guarantor may direct from time to time.

6.    This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date indicated below.

WINN-DIXIE STORES, INC.

By: _____

James Kufeldt

Its: President

Date: 11-21-97



PROPOSED WINN-DIXIE SITE
LAS GAVIOTAS BLVD.
PRELIMINARY SITE PLAN
TAX MAP NO. 0460000000001

### EXHIBIT "A"

### SCHEDULE OF DEFINED TERMS

"<u>Additional Rent</u>" shall have the meaning assigned to such term in paragraph 5(b) of this Lease.

"<u>Affiliate</u>" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with any other specified person.

"<u>Alterations</u>" means all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of, and all substitutions or replacements for, any of the Improvements or Landlord's Equipment, whether interior or exterior, structural or non-structural, or ordinary or extraordinary.

"<u>Assignment</u>" means an assignment of this Lease and any related Guaranty executed by Landlord in favor of a Mortgagee.

"<u>Basic Rent</u>" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"<u>Basic Rent Payment Dates</u>" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"<u>Business Day</u>" means any day on which financial institutions located in New York, New York, are open for regular business.

"<u>Change of Control</u>" means the acquisition by any person or more than one person, acting in concert, together with any Affiliates thereof, of (i) fifty percent (50%) or more of the beneficial interest in the voting capital stock of Winn-Dixie or (ii) the control of a majority of Winn-Dixie's Board of Directors, provided that such acquisition or control, directly or indirectly, by the Davis Family or Affiliates thereof shall not constitute a Change of Control. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing. "Davis Family" means relatives (by birth or marriage) and descendants of Mr. A.D. Davis, Mr. James E. Davis, Mr. M. Austin Davis and Tine W. Davis, trusts, estates, corporations and other entities involving any of them and their associates whether now living or existing or hereafter coming into existence.

"<u>Claims</u>" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable attorneys' fees and costs, whether incurred in enforcing this Lease, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Lease or caused by any person or entity. Without limiting the generality of the foregoing definition, Claims specifically will include claims, whether by related or third parties, for personal injury or real or personal property damage, and capital, operating and maintenance costs incurred in connection with any Remedial Work. However, notwithstanding the foregoing, Claims will not be deemed to include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises

32

by Landlord or during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of the Tenant after an Event of Default has occurred or after expiration of the Term.

"Commencement Date" shall have the meaning assigned to such term in Article 7D of this Lease.

"Condemnation" means a Taking or a Requisition.

"Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with the construction and acquisition of the Leased Premises, including, without limitation, all fees and expenses in connection with the placement, issuance and sale of the Note and any interim financing of the Leased Premises, title transfer fees, title insurance premiums and recording expenses and taxes (including transfer taxes), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction and fees to and disbursements of professionals such as attorneys, architects, engineers and surveyors.

"Default" shall mean any breach of any term, covenant or condition of, or obligation under, this Lease which, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean an interest rate of eight percent (8%) per annum.

"Environmental Laws" will mean any applicable present or future federal, state or local laws, ordinances, rules or regulations pertaining to Hazardous Substances, industrial hygiene or environmental conditions, including without limitation the following statutes and regulations, as amended from time to time: (i) the Federal Clean Air Act, 42 U.S.C. Section 7401 et seq.; (ii) the Federal Clean Water Act, 33 U.S.C. Section 1151 et seq.; (iii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); (iv) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("SARA"); (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; (vi) the National Environment Policy Act, 42 U.S.C. Section 1857 et seq.; (vii) The Toxic Substance Control Act of 1976, 15 U.S.C. Section 2601 et seq.; (viii) the regulations of the Environmental Protection Agency, 33 CFR and 40 CFR; (ix) regulations of the Occupational Safety and Health Administration ("OSHA") relating to asbestos; and (x) similar statutes, rules and regulations of the State.

"Event of Default" means the occurrence of any of the events described in paragraph 22(a) of this Lease, and the giving of notice or the passage of any applicable grace or cure period, or both, as provided in said paragraph.

"Extended Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Guarantor" means Winn-Dixie; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guarantor in this Lease shall be deemed deleted and of no effect.

"Guaranty" means the guaranty of this Lease, dated this date, executed by Guarantor in favor of Landlord; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guaranty in this Lease shall be deemed deleted and of no effect.

"Hazardous Condition" will mean the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or that migrates, flows, percolates, diffuses or in any way moves onto or into the

33

Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or from the Leased Premises into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials, friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant, or animal health or well-being, and those substances, materials, and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws.

"Impositions" shall have the meaning assigned to such term in paragraph 12(a) of this Lease.

"Improvements" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Initial Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Land" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Landlord" shall have the meaning assigned to such term in the introductory paragraph of this Lease.

"Landlord's Assignee" shall mean a Mortgagee which takes an Assignment as additional collateral for its loan to Landlord.

"Landlord's Equipment" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Lease" shall have the meaning assigned to such term in the introductory paragraph of this Lease and shall include all supplements and amendments permitted by this Lease.

"Leased Premises" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Legal Requirements" means all present and future laws (including Environmental Laws), codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision), and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of the Leased Premises.

"Lien" means charge, encumbrance, title retention agreement, pledge, lien, security interest, mortgage and/or deed of trust.

34

"Mortgage" means a first mortgage, deed of trust, deed to secure debt or similar security instrument creating a Lien on the Leased Premises in favor of a Mortgagee.

"Mortgagee" means a person or entity which is the holder of a Note of Landlord, secured by a Mortgage and an Assignment; however, if there is no Mortgagee, then any reference to Mortgagee or Mortgage in this Lease shall be deemed deleted and of no effect except to the extent that the context of this Lease contemplates that Mortgagee will act as an escrow agent for the holding and disposition of any Net Award or Net Proceeds, in which event such term shall be deemed to refer to a title insurance company or financial institution, reasonably acceptable to Landlord and Tenant, serving as escrow agent for the purposes contemplated in this Lease.

"Net Award" means the entire award payable by reason of a Condemnation, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such award, and less any portion of such award retained by Tenant pursuant to paragraph 15.

"Net Proceeds" means the entire proceeds of any insurance required under paragraph 13, together with any self insurance payment required of Tenant, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such proceeds or payment.

"Note" means a secured note or promissory note executed by Landlord in favor of Mortgagee secured by a Mortgage and an Assignment.

"Overdue Payment" means any installment of Basic Rent or any payment of Additional Rent (including Additional Rent which Landlord or Mortgagee shall have paid on behalf of Tenant) due from Tenant that is not paid within five (5) days after Landlord's notice to Tenant of nonpayment.

"Permitted Encumbrances" means:

      (i)    easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other defects and irregularities in the title to the Leased Premises, none of which materially lessens the value of the Leased Premises or materially impairs the use of the Leased Premises for the purposes held by Tenant;

      (ii)   matters identified as exceptions to title in the mortgagee title insurance policy delivered to and accepted by any Mortgagee on the Commencement Date;

      (iii)  any condemnation right reserved to or vested in any municipality or public authority with respect to the Leased Premises; and

      (iv)  any Liens for Impositions not then delinquent and any Liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Leased Premises which are not then overdue or the amount or validity of which is being contested by Tenant pursuant to, and as permitted by, paragraph 19.

"Property Loss" means any physical damage to or destruction of the Leased Premises or any part thereof by fire, windstorm, flood, earthquake, war or civil insurrection, accident, or other casualty.

"Purchase Offer" means an irrevocable offer by Tenant to Landlord to purchase the Leased Premises on the Termination Date specified therein and, in case a Purchase Offer is made pursuant to paragraph 14(b) or

15(b), any Net Proceeds or Net Award, as applicable, and at the purchase price therefor determined pursuant to Exhibit "F".

"Remedial Work" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person due to the existence or suspected existence of a Hazardous Condition.

"Replaced Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Replacement Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Requisition" means any temporary requisition or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"State" means the state in which the Leased Premises is located.

"Substitute Assignment" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Guaranty" shall have the meaning assigned to such term in paragraph 11(f) of this Lease; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Substitute Guaranty in this Lease shall be deemed deleted and of no effect.

"Substitute Lease" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Mortgage" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Note" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Property" shall have the meaning assigned to such term in paragraph 11 of this Lease.

"Substitution Date" means the date on which Landlord and Tenant effectuate the substitution of the Leased Premises for another premises pursuant to the Substitution Option.

"Substitution Option" means any right Tenant may have to substitute other premises for the Leased Premises pursuant to paragraph 11 and paragraph 14, 15 or 16 of this Lease.

"Taking" means any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

"Tenant" means the Tenant named in the introductory paragraph of this Lease together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Tenant's Business" means the business of operating retail food stores, commonly referred to as supermarkets, with grocery, delicatessen, bakery, meat and seafood, vegetable/fruit/produce, and beer and

36

wine sales operations, and sometimes including in-store pharmacy, photo lab, automated teller and/or bank, and dry-cleaning operations or concessions.

"Tenant's Equipment" shall have the meaning assigned to such term in paragraph 3 of this Lease.

"Term" means the Initial Term, any Extended Term or the Initial Term together with any Extended Term.

"Termination Date" means the Basic Rent Payment Date established in Tenant's Purchase Offer given pursuant to paragraph 14(g), 15(b), 16 or 29 of this Lease, as the termination date of this Lease pursuant to any such paragraph, which date shall be not less than one hundred twenty (120) days nor more than two hundred forty (240) days after the effective date of such notice to Landlord.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

**EXHIBIT "B"**

**LEGAL DESCRIPTION OF LAND**

ALL THAT certain lot, piece or parcel of land, situate in the Pleasant Grove Borough of the City of Chesapeake, Virginia, and designated as "PARCEL 18", consisting of 8.426 acres, as shown on that certain plat entitled, "Subdivision Plat of Las Gaviotas Commerce Center," dated October 27, 1987, and prepared by Centerline Associates, Ltd., which plat is recorded in the Clerk's Office of the Circuit Court of the City of Chesapeake, Virginia, on December 2, 1987, in Map Book 89, at page 69, reference to which is hereby made for a more particular descripton thereof.

IT BEING a part of the same property conveyed to SSR Cedar Road, J. V., a Virginia general partnership by deed from Vidcorp, Inc., formenrly known as Vidco of Virginia, Inc., a Virginia corporation, dated and recorded December 16, 1987, in the Clerk's Office of the Circuit Court of the City of Chesapeake, Virginia, in Deed Book 2355, page 810.

.

38

### EXHIBIT "C"

**LANDLORD'S EQUIPMENT**

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements, but excluding Tenant's Equipment.

39

## EXHIBIT "D"

### TENANT'S EQUIPMENT

All coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty belonging to Tenant.

40

**EXHIBIT "E"**

SCHEDULE OF RENT

Basic Rent during the Initial Term and any Extended Term shall be $472,939.00 per annum, payable in equal installments of $39,411.58 on the first day of each calendar month of the Initial Term and any Extended Term.

41

NOV-20-97 THU 11:04                                                                P. 02/06

## EXHIBIT "F"

### PURCHASE OFFERS

The amount of Tenant's Purchase Offer shall be obtained by multiplying the factor set forth below attributable to the month of the Initial Term in which the Purchase Offer is made by $5,250,000.00.

| MONTH | FACTOR |
|-------|--------|
| 1 | .98 17 |
| 2 | .99 00 |
| 3 | .98 83 |
| 4 | .98 65 |
| 5 | .98 48 |
| 6 | .98 31 |
| 7 | .98 13 |
| 8 | .97 95 |
| 9 | .97 78 |
| 10 | .97 60 |
| 11 | .97 42 |
| 12 | .97 24 |
| 13 | .97 05 |
| 14 | .96 87 |
| 15 | .96 68 |
| 16 | .96 50 |
| 17 | .96 31 |
| 18 | .96 12 |
| 19 | .95 93 |
| 20 | .95 74 |
| 21 | .95 55 |
| 22 | .95 35 |
| 23 | .95 16 |
| 24 | .94 96 |
| 25 | .94 76 |
| 26 | .94 57 |
| 27 | .94 36 |
| 28 | .94 16 |
| 29 | .93 96 |
| 30 | .93 76 |
| 31 | .93 55 |
| 32 | .93 34 |
| 33 | .93 13 |
| 34 | .92 92 |
| 35 | .92 71 |
| 36 | .92 50 |
| 37 | .92 29 |
| 38 | .92 07 |
| 39 | .91 85 |
| 40 | .91 63 |
| 41 | .91 41 |
| 42 | .91 19 |
| 43 | .90 97 |

| | |
|---|---|
| 44 | .90 75 |
| 45 | .90 52 |
| 46 | .90 29 |
| 47 | .90 06 |
| 48 | .89 83 |
| 49 | .89 60 |
| 50 | .89 37 |
| 51 | .89 13 |
| 52 | .88 90 |
| 53 | .88 66 |
| 54 | .88 42 |
| 55 | .88 18 |
| 56 | .87 93 |
| 57 | .87 69 |
| 58 | .87 44 |
| 59 | .87 19 |
| 60 | .86 94 |
| 61 | .86 69 |
| 62 | .86 44 |
| 63 | .86 19 |
| 64 | .85 93 |
| 65 | .85 67 |
| 66 | .85 41 |
| 67 | .85 15 |
| 68 | .84 89 |
| 69 | .84 62 |
| 70 | .84 35 |
| 71 | .84 09 |
| 72 | .83 82 |
| 73 | .83 54 |
| 74 | .83 27 |
| 75 | .82 99 |
| 76 | .82 72 |
| 77 | .82 44 |
| 78 | .82 16 |
| 79 | .81 87 |
| 80 | .81 59 |
| 81 | .81 30 |
| 82 | .81 01 |
| 83 | .80 72 |
| 84 | .80 43 |
| 85 | .80 13 |
| 86 | .79 84 |
| 87 | .79 54 |
| 88 | .79 24 |
| 89 | .78 93 |
| 90 | .78 63 |
| 91 | .78 32 |
| 92 | .78 01 |
| 93 | .77 70 |
| 94 | .77 39 |
| 95 | .77 08 |

42-a

| | |
|---|---|
| 96 | .75 76 |
| 97 | .76 44 |
| 98 | .76 12 |
| 99 | .75 80 |
| 100 | .75 47 |
| 101 | .75 14 |
| 102 | .74 81 |
| 103 | .74 48 |
| 104 | .74 15 |
| 105 | .73 81 |
| 106 | .73 47 |
| 107 | .73 13 |
| 108 | .72 79 |
| 109 | .72 44 |
| 110 | .72 09 |
| 111 | .71 74 |
| 112 | .71 39 |
| 113 | .71 03 |
| 114 | .70 68 |
| 115 | .70 32 |
| 116 | .69 96 |
| 117 | .69 59 |
| 118 | .69 22 |
| 119 | .68 85 |
| 120 | .68 48 |
| 121 | .68 11 |
| 122 | .67 73 |
| 123 | .67 35 |
| 124 | .66 97 |
| 125 | .66 59 |
| 126 | .66 20 |
| 127 | .65 81 |
| 128 | .65 42 |
| 129 | .65 02 |
| 130 | .64 62 |
| 131 | .64 22 |
| 132 | .63 82 |
| 133 | .63 42 |
| 134 | .63 01 |
| 135 | .62 60 |
| 136 | .62 18 |
| 137 | .61 77 |
| 138 | .61 35 |
| 139 | .60 93 |
| 140 | .60 50 |
| 141 | .60 07 |
| 142 | .59 64 |
| 143 | .59 21 |
| 144 | .58 77 |
| 145 | .58 34 |
| 146 | .57 89 |
| 147 | .57 45 |

| | |
|---|---|
| 148 | .57 00 |
| 149 | .56 55 |
| 150 | .56 10 |
| 151 | .55 64 |
| 152 | .55 18 |
| 153 | .54 72 |
| 154 | .54 26 |
| 155 | .53 78 |
| 156 | .53 31 |
| 157 | .52 83 |
| 158 | .52 35 |
| 159 | .51 87 |
| 160 | .51 39 |
| 161 | .50 90 |
| 162 | .50 41 |
| 163 | .49 91 |
| 164 | .49 41 |
| 165 | .48 91 |
| 166 | .48 41 |
| 167 | .47 90 |
| 168 | .47 39 |
| 169 | .46 87 |
| 170 | .46 36 |
| 171 | .45 83 |
| 172 | .45 31 |
| 173 | .44 78 |
| 174 | .44 25 |
| 175 | .43 71 |
| 176 | .43 17 |
| 177 | .42 63 |
| 178 | .42 08 |
| 179 | .41 53 |
| 180 | .40 98 |
| 181 | .40 42 |
| 182 | .39 86 |
| 183 | .39 29 |
| 184 | .38 72 |
| 185 | .38 15 |
| 186 | .37 58 |
| 187 | .37 00 |
| 188 | .36 41 |
| 189 | .35 82 |
| 190 | .35 23 |
| 191 | .34 63 |
| 192 | .34 03 |
| 193 | .33 43 |
| 194 | .32 82 |
| 195 | .32 21 |
| 196 | .31 59 |
| 197 | .30 97 |
| 198 | .30 35 |
| 199 | .29 72 |

42-c

| 200 | .29 09 |
| 201 | .28 45 |
| 202 | .27 81 |
| 203 | .27 16 |
| 204 | .26 51 |
| 205 | .25 86 |
| 206 | .25 20 |
| 207 | .24 54 |
| 208 | .23 87 |
| 209 | .23 20 |
| 210 | .22 52 |
| 211 | .21 84 |
| 212 | .21 16 |
| 213 | .20 47 |
| 214 | .19 77 |
| 215 | .19 07 |
| 216 | .18 37 |
| 217 | .17 66 |
| 218 | .16 95 |
| 219 | .16 23 |
| 220 | .15 51 |
| 221 | .14 78 |
| 222 | .14 05 |
| 223 | .13 31 |
| 224 | .12 57 |
| 225 | .11 82 |
| 226 | .11 07 |
| 227 | .10 31 |
| 228 | .9 55 |
| 229 | .8 78 |
| 230 | .8 01 |
| 231 | .7 23 |
| 232 | .6 45 |
| 233 | .5 66 |
| 234 | .4 87 |
| 235 | .4 07 |
| 236 | .3 27 |
| 237 | .2 46 |
| 238 | .1 65 |
| 239 | .0 83 |
| 240 | .0 00 |

42-d

EXHIBIT "G"

FORM OF ESTOPPEL CERTIFICATE

_____, a _____ [insert "Landlord" or "Tenant" as applicable] hereby certifies to [insert "Landlord" or "Tenant" as applicable], that, as of _____ (the "Certificate Date"), the following is true and correct:

1.    Winn-Dixie _____, Inc., a _____, is the tenant under a currently effective lease [as amended as described below, the "Lease"] with _____, a _____, as the current landlord, dated _____, 199___, conveying a leasehold estate of the property described therein (the "Premises"), and the Lease has been amended or supplemented only as follows:

2.    The term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease.  Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Tenant is not in material Default under the Lease, and all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently as no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease, except as follows:

4.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Landlord is not in material Default under the Lease, except as follows:

5.    The Lease contains provisions requiring Tenant to offer to purchase the Premises or to substitute the Premises for other leased premises upon the occurrence of certain events.

6.    [insert Landlord or Tenant, as applicable] has received no notice of any sale, transfer, assignment, or pledge of the interest of [insert Landlord or Tenant, as applicable] in the Lease [or in the case of Landlord's interest, in the rent due thereunder], except as follows:

7.    [insert Landlord or Tenant, as applicable] is not the subject of any transfer for the benefit of creditors, or any bankruptcy or reorganization filing under any applicable bankruptcy law.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate, which may be relied upon by [insert Landlord or Tenant, as applicable] and any mortgagee, successor or assign of [insert Landlord or Tenant, as applicable].

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

44

## EXHIBIT "H"

### FORM OF MEMORANDUM OF LEASE

[insert document headings as appropriate for recordation]

THIS MEMORANDUM OF LEASE is hereby executed this _____, by and between _____, a _____, whose mailing address is _____, _____ ("Landlord") and WINN-DIXIE _____, INC., a _____ corporation, whose mailing address is _____, _____ ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant did enter into a Lease, dated as of _____, 19___ (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on attached Exhibit "B" and as depicted on the Site Plan attached as Exhibit "C", together with all improvements now or hereafter located thereon (collectively the "Premises").

The term of the lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on the date which is exactly twenty (20) years following the Commencement Date. Annual rent, payable in monthly installments on the first day of each calendar month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each.

The Lease contains the following provision:

Liens. TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, OTHER THAN LABOR, SERVICES OR MATERIAL FURNISHED IN CONNECTION WITH CONSTRUCTION OF THE LEASED PREMISES DESCRIBED IN ARTICLE 7B OF THIS LEASE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

45

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document. This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease to be executed as of the date and year first above written.

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

46

**EXHIBIT "I"**

## DECLARATION OF RESTRICTIVE COVENANTS

THIS **DECLARATION OF RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 199\_\_ by **GEM CEDAR, L.L.C.**, a Virginia limited liability company (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

### R E C I T A L S

1.      Owner is the owner of that certain real property located in the City of Chesapeake, Commonwealth of Virginia, as described on Exhibit "B" attached hereto (the "Premises") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), and Owner may own certain other real property hereinafter referred to as "Owner's Remaining Land", which term shall refer to all real property other than the Outparcels owned or controlled by Owner and located within one-quarter (1/4) of a mile of any boundary of the Premises.

2.      Owner is the landlord under that certain lease dated _____ between Owner and WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant") pursuant to which Tenant leases the Premises.

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Premises and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

**NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Premises and Owner's Remaining Land, shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

I.
### RESTRICTIONS

1      Restrictions on Use. (a) The Premises shall be restricted against use of all or any portion thereof as any of the following: dance hall, bar, tavern or lounge; "teen lounge," pawn shop, massage parlor, strip joint, spa, health club, or pornographic store; carnival, theater, fair or entertainment facility; church; flea market; pool hall, bowling alley, video arcade, bingo parlor, or game room; roller rink; funeral home or undertaking business; penal or correctional institution; or storage or manufacture of explosives or other flammable or hazardous materials; a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(b)      No portion of Owner's Remaining Land shall be used as a supermarket, grocery store, meat market, fish, seafood, fruit or vegetable market, bakery, delicatessen, dairy products or frozen food business, with the exceptions that a restaurant located on Owner's Remaining Land may sell prepared, ready-to-eat food items for consumption either on or off site.

47

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and WD shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or WD commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Premises and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of WD, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of Chesapeake, Virginia.

## IV.
## EASEMENTS

4.1    Ingress and Egress.

(a)    Owner hereby grants to each tenant of the Premises (but only so long as such tenant remains a tenant of the Premises), to WD, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the drives existing from time to time on the Premises.

(b)    Owner shall have the right to temporarily close any part of said drives to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Premises.

(c)    Owner shall have the right to temporarily close any part of the said drives as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Premises.

## V.
## GENERAL PROVISIONS

48

5.1    Covenants Run With the Land. The provisions of this Declaration shall operate as covenants running with the land comprising the Premises and Owner's Remaining Land and shall inure to the benefit of WD, its successors and assigns.

5.2    Severability. If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3    Pronouns. When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4    Captions. The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5    Governing Law. This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of Virginia.

5.6    No Presumption. This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7    Exhibits. The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit "A" -    Site Plan

Exhibit "B" -    Legal Description of the Premises

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses:                                Owner:

                                          **GEM CEDAR, L.L.C.**, a Virginia
                                          limited liability company

_____
Print name:_____

_____      By:_____
Print name:_____
                                          Its:_____
                                          Date:_____

49

**EXHIBIT "J"**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    WINN-DIXIE RALEIGH, INC. ("Owner")

        _____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

      The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

      Executed this the _____ day of _____, 199\_\_\_.

                                 Registered Land Surveyor No._____
                                 Address:_____

                                 **(SURVEYOR'S SEAL)**

**EXHIBIT "K"**

**(ZONING/LAND USE AGENCY LETTERHEAD)**

(DATE)

Re:    _____, Chesapeake, Commonwealth of Virginia

To Whom It May Concern:

    This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Wake, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the City of Chesapeake, relating to uses permitted in the _____ District. The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above. The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

    As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations. Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

    Should you have further questions in this regard, please advise.

Very truly yours,


(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

51

**EXHIBIT "L"**

**SUPPLEMENTAL LEASE AGREEMENT**

THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _____, 199___, between **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, (the "Tenant") and **STATES PROPERTIES, LLC.,** a Virginia limited liability company (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated , recorded in Volume ___, page ___ of the public records of _____ County, _____; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

NOW, THEREFORE, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____.

2.    The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Witnesses:

_____          **GEM CEDAR, L.L.C.,** a Virginia limited
Print name:_____          liability company

_____          By:_____
Print name:_____
                                              Its:_____


_____          **WINN-DIXIE RALEIGH, INC.,**
Print name: _____

_____          By:_____
Printed Name:_____
                                              Its:_____

52

STATE OF_____ )
COUNTY OF_____ )

    I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is a Member of GEM CEDAR, L.L.C., a Virginia limited liability company, and that, by authority duly given and as the act of the company, the foregoing instrument was signed in its name by _____ _____, its Member, with full authority.

    Witness my hand and official seal, this the _____ day of _____, 1997.

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)


STATE OF FLORIDA   )
COUNTY OF DUVAL   )

    I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is _____ Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

    Witness my hand and official seal, this the _____ day of _____, 1997.

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

53

## CONSENT

_____, a _____, the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

Its:_____

Date:_____

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

    I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is _____ Secretary of _____, a _____ corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

    Witness my hand and official seal, this the _____ day of _____, 1997.

_____

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

54

#997

## SUBLEASE

THIS SUBLEASE, is made as of August 21, 2002, between WINN-DIXIE RALEIGH, INC., a Florida corporation ("Lessor"), and MICHAEL BLANCHARD, ERMA BLANCHARD, JUAN RAYFORD, MICHAEL FENTRESS, SHERRITTA FENTRESS and OTELIA CHERRY, Trustees of CORNER STONE CHRISTIAN CENTER ("Lessee"). The terms "Lessor" and "Lessee" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

That Lessor, in consideration of the rents reserved herein and the covenants of Lessee, does hereby lease and demise unto Lessee for the term hereinafter specified, the following described property to-wit:

### PREMISES

The following described property in Chesapeake, Virginia (collectively, the "Leased Premises"): (i) real property more particularly described on attached Exhibit "A", together with all easements, rights and appurtenances thereunto belonging or appertaining (the "Land"); (ii) the store building, approximately 222 feet in width by 231 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers (collectively, the "Store"); and (iii) the machinery, equipment and fixtures described on the attached Exhibit "B." The legal description of the Leased Premises is set forth in the Underlying Lease, as hereinafter defined.

Lessor and Lessee hereby mutually covenant and agree, each with the other, as follows:

### TERM

1.    The term of this Sublease shall commence August 13, 2002 (the "Commencement Date"), and the term shall expire at midnight November 17, 2018 (the "Sublease Term"). Lessee shall return the Leased Premises to Lessor at the end of the Sublease Term in as good condition and repair as the same were at the beginning of the Sublease Term, reasonable wear and tear excepted.

### RENT

2.    Lessee shall pay rent, in lawful money of the United States, without offset, reduction, or counterclaim as follows:

(a)    <u>Base Rent</u>. Lessee shall pay to Lessor minimum guaranteed rent ("Base Rent") for the Leased Premises as follows:

(i)    No Base Rent shall be due or payable from August 21, 2002, to November 21, 2002 (the "Free Rent Period");

(ii)    $99,570.00 per annum ($8,297.50 per month) November 21, 2002,  to May 21, 2003;

(iii)    $199,140.00 per annum ($16,595.00 per month) from May 21, 2003, to May 21, 2011;

(iv)    $284,938.00 per annum ($23,744.83 per month) from May 21, 2011, through November 17, 2018.

O:\transfer\raleigh\0997\SUBLEASE9.doc

1

Base Rent shall be paid in equal monthly installments, each of which shall be due and payable in advance on the first day of each and every calendar month of the Sublease Term. Base Rent for any partial month during the Sublease Term shall be prorated and paid for the actual number of days.

(b)     Additional Rent. In addition, Lessee shall pay to Lessor throughout the Term Additional Rent as defined in the Underlying Lease when the same shall become due ("Additional Rent"). Additional Rent for any partial month during the Sublease Term shall be prorated and paid for the actual number of days. Notwithstanding the foregoing, Lessee shall not be obligated to pay any Additional Rent accruing from August 21, 2002, to November 21, 2002, and Lessee shall be obligated to pay only one-half of the Additional Rent accruing from November 21, 2002, to May 21, 2003. Lessee's obligation to pay Additional Rent shall not include any obligation to fulfil the requirements to maintain insurance or self-insure  described in Article 13(a)(2) imposed upon Lessor pursuant to the Underlying Lease.  Lessee's only obligation to provide public liability insurance shall be as set forth in paragraph 8 hereof.

(c)     Security Deposit. On the Execution Date, Lessee shall deposit with Lessor upon execution of this Sublease the sum of $49,785.00 (the "Deposit") for Lessee's faithful performance of Lessee's obligations under this Sublease. If Lessee fails to pay rent or other charges due under this Sublease or otherwise defaults with respect to any provision of this Sublease, Lessor may use, apply, or retain all or any portion of the Deposit to pay any rent or other charge in default or for the payment of any other sum to which Lessor may become obligated by reason of Lessee's default or to compensate Lessor for any loss or damage that Lessor may suffer thereby. If Lessor so uses or applies all or any portion of the Deposit, Lessee shall, within ten (10) days after written demand therefor, deposit with Lessor an amount sufficient to restore the Deposit to the full amount. Lessee's failure to so restore shall be a material breach of this Sublease. Lessor shall not be required to keep the Deposit separate from its general accounts. If Lessee performs all of Lessee's obligations under this Sublease, the Deposit, or so much of it as has not been applied by Lessor as provided shall be returned to Lessee at the expiration of the Sublease Term without payment of interest or other increment for its use.

Base Rent, Additional Rent and the Deposit are collectively referred to as the "Rent".

Lessee shall pay to Lessor any sales, use, excise, or similar tax, levied or assessed on the Rent payable hereunder. Such tax shall be paid to Lessor with each payment of Rent herein and shall be calculated on the Rent paid with such payment. Default in payment of such tax shall constitute an event of default to the same extent as would a default in payment of Rent. Such tax and Rent shall be payable by Lessee without prior notice or demand at the office of Lessor at P. O. Box B, Jacksonville, Florida 32203-0297, Attention:  Lease Accounting, unless and until otherwise directed in writing by Lessor.

**UNDERLYING LEASE**

3.     Lessor is in possession of the Leased Premises by virtue of a Lease Agreement dated November 21, 1997, as evidenced by Memorandum of Lease dated November 21, 1997, and recorded in Book 3605, page 380 in the Office of the Clerk of Chesapeake Circuit Court, Virginia. A true copy of such Lease Agreement and all amendments thereto (with financial information deleted) has been reviewed and accepted by Lessee and is attached hereto as Exhibit "A"  (the "Underlying Lease"). Lessee acknowledges that it has been provided a copy of the Underlying Lease for Lessee's review prior to this Sublease. Except for the rent payment provisions of the Underlying Lease, Lessee hereby

2

assumes and agrees to comply with and be bound by all of the terms, covenants, and conditions of the Underlying Lease and to do and perform all the terms, covenants, and conditions of the Underlying Lease on the part of tenant therein to be performed and observed during the Sublease Term; and all of the terms, covenants, and conditions of this Sublease are made expressly subject to the Underlying Lease. In the event of any event giving rise to a right of cancellation or termination under the Underlying Lease, such right shall be exercisable by Lessor only, in Lessor's sole discretion, and the decision of Lessor to exercise or not to exercise the right shall control the rights of the parties under this Sublease. In the event of the termination of the Underlying Lease, this Sublease shall likewise terminate, and Lessee shall immediately vacate the Leased Premises.

## AS-IS CONDITION/REPAIR

4.      It is understood that Lessee has examined the Leased Premises before taking possession and that Lessee's entry into possession is conclusive evidence that as of the date thereof the Leased Premises were in good order and satisfactory condition. Lessor makes no representations or warranties as to the condition of the Leased Premises or their fitness for Lessee's intended use.

Except as provided hereinafter, Lessor assumes all risks associated with storing the contents of the machine room at the Leased Premises and removing them therefrom, including all risk of bodily harm to agents and employees of Lessee and Lessor, and risk of damage to the Leased Premises. Lessor agrees to indemnify and hold harmless Lessee from and against any liability associated with Lessor's storing or the contents of the machine room at the Leased Premises and/or removing them therefrom, except as may arise as a result of the negligence, intentional act or intentional omission of Lessee, its agents, employees and invitees. Lessor shall exercise all reasonable efforts to remove the contents from the Leased Premises by September 1, 2002.

Lessee agrees at all times to keep the Leased Premises in a neat, clean and orderly condition, and in a good state of repair; and Lessee will not make or suffer any waste of the Leased Premises or make or suffer additions or alterations in or to the Leased Premises not permitted under the Underlying Lease without the prior written consent of Lessor and the landlord under the Underlying Lease. The agreements in this paragraph are not intended to restrict Lessee's maintenance obligations pursuant to the Underlying Lease.

## USE

5.      The Leased Premises during the Sublease Term shall be used only as a Christian church comprised of the congregants or members, from time to time, of Cornerstone Christian Center only. The Leased Premises shall not be used as a child care or day care facility (other than in connection with the Center's regular worship services and gatherings) or as a school (other than a weekly Sunday school or the like) without the prior written consent of Lessor, which consent shall be in Lessor's sole discretion.

## QUIET ENJOYMENT

6.      Lessor hereby covenants that Lessee, upon complying with the provisions of this Sublease, may quietly have and enjoy the Leased Premises during and throughout the Sublease Term, without any interruption by Lessor or any persons claiming by, through or under Lessor.

## DEFAULT

7.      If any Rent payable hereunder shall be due and unpaid for ten (10) days after its due date; or if Lessee shall become bankrupt or insolvent; or if Lessee shall vacate or abandon the Leased Premises; or if any default shall be made in any of the covenants and agreements herein contained (except as to payment of Rent) on the part of Lessee to be kept and performed and Lessee fails to cure such default or violation within ten (10) days after notice thereof is given to Lessee in the manner herein provided for notices; then, and at any time thereafter, in any such event or events, Lessor may, at its option, without any other or further notice, (a) terminate this Sublease and immediately retake possession

3

of the Leased Premises, or (b) re-enter the Leased Premises by summary proceedings or as otherwise allowed by applicable law, and remove all property of Lessee, at Lessee's expense, and relet the Leased Premises. Lessee shall indemnify and hold harmless Lessor for any costs, loss, or damage which Lessor may suffer during the remainder of the Sublease Term by reason thereof, including without limitation the loss of Rent. Lessee waives any legal and other protections it has or may in the future have arising from its status as a religious organization in the event of default. The enumeration of remedies herein shall in no way limit or restrict Lessor's right to pursue other remedies provided at law or in equity.


## INDEMNITY

8.    Lessee shall indemnify and hold harmless Lessor and the landlord of the Underlying Lease from any claim, demand, liability or loss by reason of the Lessee's use or misuse of the Leased Premises or from any claim or loss by reason of an accident or damage to any person (including death) or property happening on or about the Leased Premises, except that Lessee shall not indemnify or hold harmless Lessor or the landlord of the Underlying Lease from or against any claim, demand, liability or loss resulting solely from the negligence or intentional wrongdoing of Lessor or the landlord of the Underlying Lease, respectively. Lessee further agrees to carry public liability insurance coverage on the Leased Premises with a contractual liability endorsement on the policy in a company satisfactory to Lessor, stipulating limits of not less than $2,000,000.00. Lessee shall furnish Lessor a certificate of such coverage (Form ACORD-25 or equivalent) from the insurer showing Lessor as an additional insured and requiring 30 days' notice to Lessor prior to cancellation or termination.

Lessor has paid all of the Rent and Impositions (as defined in the Underlying Lease) and has met the obligations required of Lessor under the Underlying Lease to the date of this Sublease. Lessor agrees to indemnify and hold harmless the Lessee from and against any loss whatsoever sustained by Lessee as a result of Lessor's failure to have paid such Rent or Impositions or to have met such obligations to the date of this Sublease. Notwithstanding the foregoing, Lessor shall have no obligation to indemnify Lessee for any loss sustained by Lessee arising in connection with physical condition of the Leased Premises.


## ENVIRONMENTAL

9.    Lessee shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in, or about the Leased Premises except in strict accordance with applicable law, statute, rule or ordinance. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Leased Premises during the Sublease Term except as permitted above, or if the Leased Premises become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Lessee, its agents or employees, Lessee shall indemnify and hold harmless Lessor, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages, fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses including, without limitation, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Leased Premises and resulting expenses arising during or after the term of this Sublease or arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Lessee, its agent or employees, cause the presence of any Hazardous Substance on, in or about the Leased Premises except in strict accordance with applicable law, statute, rule, or ordinance and the same results in contamination of the Leased Premises, Lessee, at its sole expense, shall promptly perform all remediation necessary to return the Leased Premises to their original state. Lessee shall first obtain Lessor's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed. "Hazardous Substance" includes, without limitation, any and all material or substances which are or may hereafter be

4

defined as "hazardous waste," "extremely hazardous waste" or a "hazardous substance" pursuant to applicable local, state, or federal law. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any law, statute or rule or ordinance requires a permit or special handling in its use, storage, treatment, or disposal.

Lessee shall provide to Lessor copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Leased Premises which Lessee receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Sublease and the transfer of Lessor's interest under the Underlying Lease.

**ASSIGNMENT/SUBLEASE**

10.    Lessee may not assign this Sublease or sublet all or any part of the Leased Premises without first obtaining the written consent of Lessor. Any such assignment or subletting without such prior written approval shall be, at Lessor's election, void and of no force or effect. Any assignment or subletting with the consent of Lessor as hereinabove provided shall not release or relieve Lessee herein of any of the obligations, covenants and agreements herein contained and on the part of Lessee to be kept and performed.

**UTILITIES**

11.    Lessee shall, at its own cost and expense, pay and discharge any and all charges for all utilities used by Lessee in or about the Leased Premises, including, but without limitation, telephone, water, gas, electricity, and sewerage.

**NOTICES**

12.    All notices, requests, demands, and other communications required or permitted to be given under this Sublease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

|  |  |
|---|---|
| Lessor : | WINN-DIXIE RALEIGH, INC., Re: Store #430<br>1550 Jackson Ferry Road<br>RALEIGH, Alabama  36104-1718<br>Telecopy: (334) 240-6304 |
| With a copy to: | WINN-DIXIE STORES, INC.<br>Attn: General Counsel<br>5050 Edgewood Court<br>P.O. Box B<br>Jacksonville, Fl. 32203-0297<br>Telecopy: (904) 783-5138 |

or to such other address as Lessor may direct from time to time.

5

Lessee:        CORNERSTONE CHRISTIAN CENTER, INC.
215 Las Gaviotas Boulevard
Chesapeake, VA 23322
Telecopy: (____) _____

or to such other address as Lessee may direct from time to time.

## CONSTRUCTION

13.     Lessee contemplates making certain alterations and renovations to the Leased Premises at its expense in order to make the Leased Premises suitable for use by Lessee for the use permitted by the provisions of this Sublease. Provided Lessee obtains prior written consent as set forth hereinafter, Lessee shall have the right to install any and all fixtures which may be necessary in the Lessee's business which shall be and remain the property of Lessee; and Lessee, provided it is not in default hereunder, may remove same from the Leased Premises at the termination of the Sublease, provided that Lessee shall, at its sole cost and expense, repair or reimburse the Lessor for the cost of repairing any and all damage to the Leased Premises resulting from the construction, installation or removal of such fixtures. All alterations and renovations shall be performed in a good and workmanlike manner and in accordance with all applicable building codes and all requirements of governmental authorities. Lessee shall obtain prior written consent from Lessor and the landlord of the Underlying Lease as to any such alterations and renovations. Lessee shall not permit any mechanics' or materialmen's or laborers' or other liens to be filed against the Leased Premises for any labor, material or services in connection with any work performed on or furnished to the Leased Premises by or at the direction of Lessee or anyone claiming to hold the Leased Premises through or under Lessee; and in the event any such lien shall at any time be filed against the Leased Premises, Lessee shall not permit foreclosure thereof, but shall promptly cause same to be discharged of record by paying same or by posting bond to secure the payment thereof. Lessee shall indemnify and hold Lessor and the landlord under the Underlying Lease harmless from and against any and all liability, penalties, claims or demands of whatsoever nature arising in or about the Leased Premises during the period of and resulting from the construction of any such alterations and renovations, except that Lessee shall not indemnify or hold harmless Lessor or the landlord of the Underlying Lease from or against any claim, demand, liability or loss resulting solely from the negligence or intentional wrongdoing of Lessor or the landlord of the Underlying Lease, respectively.

## NO OPTIONS

14.     It is understood and expressly agreed that no lease term renewal options available to Lessor under the Underlying Lease shall be made available to Lessee, and Lessee agrees not to exercise or attempt to exercise any of the lease extension options available to Lessor under the Underlying Lease.

## NO MERGER

15.     There shall be no merger of this Sublease or of the leasehold estate hereby created by reason of the fact that the same person or entity may acquire or hold, directly or indirectly, this Sublease, the Underlying Lease or the leasehold estates thereby created or any interest in this Sublease or such leasehold estate.

## COMPLETE AGREEMENT

16.     This written Sublease contains the complete agreement of the parties with reference to the leasing of the Leased Premises. No waiver of any breach of any covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

## FLORIDA DISCLOSURE

6

17. Intentionally deleted.

**NO BROKERS**

18. The parties acknowledge that there were no brokers or agents involved in obtaining this Sublease and each agree to hold the other harmless from any claims for commission asserted through it.

**ENTRY**

19. Lessee shall permit Lessor, the landlord under the Underlying Lease, or their respective agents to enter upon the Leased Premises at all reasonable times for purposes of inspection or for showing the same to prospective tenants or purchasers or for any other reasonable purpose.

**TIME OF ESSENCE**

20. Time is of the essence in regard to each provision of this Sublease.

**IN WITNESS WHEREOF**, the Lessor and Lessee have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

Print name: _William L. Dad_

Print name: _P. L. WRENN_

LESSOR:

**WINN-DIXIE RALEIGH, INC.,**
a Florida corporation

By: _Dennis M. Sheehan_
Dennis M. Sheehan
Its: Vice President
Date: _8/21/02_

7

Print name: Gwendolyn Beale
Print Name: Lashuna Spence

As to Michael Blanchard

Print name: Lashuna Spence
Print Name: Gwendolyn Beale

As to Erma Blanchard

Print name: Lashuna Spence
Print Name: Gwendolyn Beale

As to Juan Rayford

Print name: Lashuna Spence
Print Name: Gwendolyn Beale

As to Michael Fentress

Print name: Lashuna Spence
Print Name: Gwendolyn Beale

As to Sherritta Fentress

Print name: Lashuna Spence
Print Name: Gwendolyn Beale

As to Otelia Cherry

LESSEE:

MICHAEL BLANCHARD, as Trustee of
Corner Stone Christian Center
Date: 08-21-02

ERMA BLANCHARD, as Trustee of
Corner Stone Christian Center
Date: 03-02-02

JUAN RAYFORD, as Trustee of
Corner Stone Christian Center
Date:

MICHAEL FENTRESS, as Trustee of
Corner Stone Christian Center
Date: 08-21-02

SHERRITTA FENTRESS, as Trustee of
Corner Stone Christian Center
Date: 08-21-02

OTELIA CHERRY, as Trustee of
Corner Stone Christian Center
Date: 08-21-02

8

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors[1]. | ) | Jointly Administered |

**ORDER AUTHORIZING DEBTORS TO REJECT LEASE,
ESTABLISHING REJECTION DAMAGE CLAIM BAR DATE
AND GRANTING RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order under 11 U.S.C. § 365 authorizing the Debtors to reject a non-residential real property lease and, pursuant to Rule 3002(c)(4), Federal Rules of Bankruptcy Procedure, establishing a deadline by which the landlord must file any claim for rejection damages (the "Motion")[2]. The Court has reviewed the Motion and considered the representations of counsel. Based upon the representations of counsel and without objection by the United States Trustee or any other interested parties, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

---

[2] All capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the Motion.

2.    The Debtors are authorized to reject the Lease pursuant to 11 U.S.C. § 365(a).  The Lease is rejected effective April 20, 2006.

3.    The Landlord must file any claim resulting from the rejection of the Lease no later than thirty (30) days after entry of this Order.

4.    Nothing in this Order constitutes a waiver of any claims the Debtors may have against the Landlord, whether or not related to the Lease.

5.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

6.    The Court retains jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated April ____, 2006, in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge

00526804                              4