UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
|  | ) |  |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

### ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASE AND (C) RELATED RELIEF (STORE NO. 217)

This matter came before the Court on May 18, 2006 and June 15, 2006 on the amended motion, dated April 26, 2006, of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order (Docket No. 7517) under 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 3002, 6004 and 6006 (a) authorizing the Debtors to sell certain leasehold interests, including the assets described in the asset purchase agreement attached as Exhibit A (the "Purchase Agreement") between Winn-Dixie Stores, Inc. and Wal-Mart Stores, Inc. (the "Purchaser"), free and clear of liens, claims, interests and encumbrances, (b) authorizing the Debtors to assume and assign the unexpired lease identified in the Purchase Agreement (the "Lease") in connection with such sale, (c) fixing a cure amount for the applicable lease and (d) granting related relief (the "Motion"). By the Motion, the Debtors asserted that the only cure required under the Lease for Store No. 217 was payment of $757.37 (the "Undisputed Cure Amount"). By the Motion, landlords were given until April 25, 2006 to object to the Undisputed Cure Amount. The landlord for Store No. 217 filed a timely objection and asserted a cure amount greater than the Undisputed Cure Amount. (The excess of the cure amount demanded by the landlord over the Undisputed Cure Amount is referred to as the

3235442.12

"Disputed Cure Amount.")   Unless resolved by the parties, the matter will be set for hearing

before the Court at a future date. The Court held a hearing on the Motion on May 18, 2006 and

June 15, 2006 to approve the sale of the Assets[1] (the "Sale Hearing").   The Court has reviewed

the Motion, and heard arguments of counsel.   After due deliberation and good and sufficient

cause existing, the Court makes the following findings of fact:

       A.    This Court has jurisdiction over the Motion and the transactions

contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

       B.    The Debtors solicited the highest or otherwise best offer for the assets

described in the Purchase Agreement (the "Assets"), in accordance with bidding procedures (the

"Bidding Procedures") approved by the Court by order (Docket No. 1801) dated June 20, 2005

(the "Bidding Procedures Order").   Competing bids were received for the Assets, and the Debtors

conducted an auction for the Assets on May 9, 2006 (the "Auction").   At the Auction, the

Purchaser submitted the final aggregate bid of $625,000 representing the highest or otherwise best

offer received for the Assets.

       C.    The Debtors have provided interested parties (including all parties asserting

claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing, the

Auction, the assumption and assignment of the Lease, and the fixing of any cure amount, in

accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a)

and 6006(c), Local Rule 2002-1, the Notice Procedures Order entered by the Court in these cases

and the Bidding Procedures Order.   Such notice was good and sufficient, appropriate under the

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Purchase Agreement.

3235442.12

circumstances and no other or further notice of the Motion, the Sale Hearing, the Auction, the assumption and assignment of the Lease, or the fixing of any cure amount is or shall be required. A reasonable opportunity to object or be heard on the relief requested was afforded to all parties in interest.

D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other applicable Orders entered in these cases. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the purchase price provided in the Purchase Agreement was the highest or otherwise best offer for the Assets.

E.    Following the Auction, in accordance with the Bidding Procedures, the Debtors provided notice of the Successful Bid (as defined in the Bidding Procedures), the Purchase Agreement, and the proposed terms of this Order to (i) the Committee's Professionals, (ii) the DIP Lender Agent Representatives, (iii) the U.S. Trustee, (iv) all applicable taxing authorities and other governmental agencies, (v) all non-debtor parties to the Lease and (vi) all other relevant parties. Such notice was good and sufficient, appropriate under the circumstances and no other or further notice of the Successful Bid, the Purchase Agreement, or this Order is or shall be required. A reasonable opportunity to object or be heard on the relief requested was afforded to all parties in interest.

F.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the assumption and assignment agreement attached as Exhibit F to the Purchase Agreement (the "Assumption and Assignment

3235442.12

Agreement"), and all related documents, and the sale of the Assets (the "Sale") and the assumption and assignment of the Lease, as described in the Purchase Agreement, has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

G.       The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.       Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.       The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.       The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the benefits and protections afforded by that section.

K.       The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

L.       The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement, any related bills of sale or other applicable transfer agreements, including the Assumption and Assignment Agreement, will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and

3235442.12

valid title in and to the Assets free and clear of any and all liens, claims, encumbrances, pledges, mortgages, security interests, charges, options, judgments or other interests of any kind or nature, including, but not limited to, that certain mortgage executed by Winn-Dixie Stores, Inc., a Florida corporation, in favor of Wachovia Bank, National Association, as Administrative Agent and Collateral Monitoring Agent, recorded June 27, 2005, in Book 39946, page 1255, of the public records of Broward County, Florida (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances, if any, as defined in the Purchase Agreement.  Any non-assumed Claims and/or Interests will attach to the proceeds of the sale of the Assets with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

M.     The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Lease) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Claims and/or Interests, if

3235442.12

any, who did not object, or who withdrew their objections to the Motion are deemed to have consented to the Sale pursuant to 11 U.S.C. § 363(f)(2).

N.      The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender, to the extent required, in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.      The Debtors' assumption and assignment of the Lease in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.      The Debtors have provided the landlord under the Lease with adequate assurance that they will promptly cure any defaults under the Lease pursuant to 11 U.S.C. § 365(b)(1), by agreeing to pay the landlord the Undisputed Cure Amount and escrow the Disputed Cure Amount from the proceeds of the Sale, prior to making the payments described in Paragraph N.

Q.      The Court will determine whether any portion of the Disputed Cure Amount is due by the Debtors under the Lease (any such amount, the "Cure Amount"). The Debtors will pay the Cure Amount, if any, from the escrow of the disputed cure amount, upon entry of a final order of the Court establishing any such Cure Amount and, until entry of such a

3235442.12

final order, the Debtors' obligations to pay the landlord for Store No. 217 the Cure Amount shall be secured by the escrowed proceeds. Upon payment of any such Cure Amount, all defaults, if any, under the Lease will be deemed cured.

R.    The Debtors and Purchaser have provided the landlord under the Lease with adequate assurance of its future performance under the Lease, and the assumption, assignment and sale of the Lease satisfies the requirements of 11 U.S.C. §§ 363, 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B), as applicable.

S.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease.

T.    Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, and except for any obligation Purchaser may have, under the Lease, to reimburse Landlord following the closing date for tenant's share of 2006 real estate taxes, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease by virtue of the transfer of the Assets and the assumption and assignment of the Lease to the Purchaser. The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease, to (i) be a successor to the Debtors (other than with respect to any obligations arising under the Lease from and after the Closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement.

3235442.12

U.      The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted to the extent set forth in this Order.

2.      All objections to the entry of this order or to the relief granted and requested in the Motion with respect to the Purchase Agreement, the Lease, the sale of the Assets to the Purchaser or any related matter addressed in this Order that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.      The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects.   Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale, including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.      The Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Lease to the Purchaser.

5.      The Debtors and the Purchaser have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2), including the provision of adequate assurance of future performance.  In particular, while the Court does not expressly decide the issue of whether the real property that is the subject of the Lease (the "Property") is part of a "shopping center" within the meaning of 11 U.S.C. § 365, all of the so-called "shopping center provisions" of the Bankruptcy Code with respect to the assumption of a shopping center

3235442.12

lease have been satisfied in connection with the assumption and assignment of the Lease and the Purchaser's use of the premises in a manner consistent with its typical retail operations (including the operation of a pharmacy), as described in the Purchase Agreement.

6.      The Lease will be assumed and assigned to the Purchaser, in accordance with its terms.  The assigned Lease will remain in full force and effect notwithstanding any provision therein to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer).  The DIP Lender and all non-debtor parties to the Lease are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.      Any rights contained in the Lease which purport to be personal only to the Debtors or to be exercisable only by the Debtors constitute unenforceable restrictions on assignment and may be freely exercised by the Purchaser, following Closing, to their full extent.

8.      Notwithstanding any provision in any lease, contract, reciprocal easement agreement ("REA") or applicable law, the Purchaser is authorized to allow the Leased Premises to remain dark for up to eighteen (18) months after Closing, notwithstanding any subsequent assignment or disposition of the Leased Premises in accordance with the terms of the Lease (unless the Lease or such contract, REA or local law would allow the Leased Premises to remain dark for a period in excess of eighteen (18) months following Closing, in which case such longer period shall apply).  The fact that the Leased Premises remains dark for up to eighteen (18) months after Closing shall not result in the termination or

3235442.12

forfeiture of any restrictions encumbering other parcels which benefit the Leased Premises.

9.      In connection with the opening and operating of a retail store at the Leased Premises, the Purchaser is authorized to perform alterations and remodeling to the extent necessary to conduct its typical retail operations, including alterations necessary to provide two prototypical truck loading dock/wells at the Leased Premises, and to replace and modify existing signage, notwithstanding any provision to the contrary in the Lease or any related document, including any provision requiring the consent of any non-Debtor party for such work.

10.     Provisions contained in the Lease which are or could have the effect of being provisions which restrict "going dark," alteration and recapture provisions contained in the Lease, provisions requiring consent or otherwise restricting the rights provided for in this Order (including "go-dark," alteration and remodeling rights), or clauses which impose a fee or a penalty or a profit sharing upon assignment or limit or condition extension or renewal options, clauses which seek to increase the rent (including percentage rent clauses) or impose a penalty or to modify or terminate the Lease or terminate or otherwise impair any exclusive rights of the tenant under the Lease as a result of going dark or upon assignment, provisions which directly or indirectly limit or condition or prohibit assignment, continuous operating covenants, covenants that any user of the Debtors' premises operate under the name of "Winn-Dixie," and/or operate with a use similar to a "Winn-Dixie," and similar provisions contained in any other documents with respect to the Assets shall not restrict, limit, or prohibit the sale or assumption and

3235442.12

assignment of the Assets to the Purchaser and such clauses are hereby deemed and found to be unenforceable anti-assignment clauses within the meaning of 11 U.S.C. § 365(f).

11.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement.  The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets, including the Lease, to the Purchaser.

12.    Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) if necessary, the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

13.    The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances).  The only known Claims and/or Interests in the Assets are those of the landlord with respect to the Lease, the senior liens and superpriority administrative claims of the DIP Lender and any liens of the Broward County Tax Collector for unpaid taxes.  The Claims and/or Interests of the landlord will be satisfied upon Closing by the Debtors' payment of the Undisputed Cure Amount, (and the later payment of the Cure Amount, if any), and the Debtors' and the Purchasers' demonstration

3235442.12

of adequate assurance of future performance under 11 U.S.C. § 365. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender, and any other liens, claims or interests with respect to the Assets, will attach to the proceeds of the Sale, in the case of the DIP Lender in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order). The liens, if any, of the Broward County Tax Collector on the Debtors' interest in the Leased Premises shall attach to the proceeds of the sale of the Lease to the Purchaser, and the claims, if any, related to such liens shall be treated and resolved in these cases.

14.     Except for the payment of the Undisputed Cure Amount to the landlord and the escrow of the Disputed Cure Amount from the proceeds of the Sale, the Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender, to the extent required, in accordance with the terms of the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

15.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia, without collusion. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

16.     All defaults, claims or other obligations of the Debtors arising or accruing under the Lease, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors by paying the Undisputed Cure Amount and the Cure Amount, if any. No other or further monetary amounts or obligations are due or existing under the

3235442.12

Lease or any other Assigned Agreement by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.

17.    Provided the Undisputed Cure Amount is paid to the landlord and the Disputed Cure Amount is escrowed from the proceeds of the Sale, an objection regarding a "cure issue" to the assumption and assignment of the Lease shall not affect the assumption and assignment of the Lease.  The Debtors will hold the Purchaser harmless from any failure by the Debtors to pay any applicable cure amount.

18.    The failure of any party to: (a) allege in these proceedings any pre-assumption and assignment default under the Lease, other than the Undisputed Cure Amount and the Disputed Cure Amount; (b) identify any amendment, modification, sublease or other agreement relating to or affecting the Assets, other than those listed on Exhibit A-4 to the Purchase Agreement, (c) assert any material waiver, failure to act, or act or statement contrary to that presented in the Motion by the Debtors or (d) assert any objection or defense to the entry of this Order, shall forever bar and estop said party, its heirs, successors and assigns, and any predecessor in interest, of itself and anyone claiming by, through or under it or them, from asserting any claims or attempting to enforce any rights based thereon in any subsequent cases, proceedings, or actions against the Debtors or the Purchaser (or parties claiming through the Purchaser), in law or in equity in this or before any other court or tribunal, and any such claim(s) shall be and are terminated, exonerated, barred and adjudicated against such person.  No party shall be entitled to enforce against the Purchaser any pre-closing document, instrument or agreement with respect to the Assets other than a document, instrument or agreement listed on Exhibit A-4 to the Purchase Agreement, and all parties shall be enjoined from

3235442.12

attempting to enforce any such document, instrument or agreement against Purchaser or any of its affiliates, related parties, successors or assigns.

19.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease occurring after assignment to the Purchaser, and (b) subject to the terms of this Order, the Purchaser is responsible for any and all claims and obligations under the Lease occurring or arising after the assignment.

20.    Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease on and after the Closing Date.

21.    All non-Debtor parties to the Lease are forever enjoined and estopped from contesting the Undisputed Cure Amount and the Cure Amount (except as may be permitted by the Court) and from asserting any default against the Purchaser which existed prior to the Closing Date.

22.    Upon the Debtors' assignment of the Lease to the Purchaser, no default will exist under the Lease.  Upon entry of this Order and the assumption and assignment of the Lease, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease.

23.    Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets

3235442.12

(except for the Permitted Encumbrances), if any. In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order upon Closing. Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances).

24.      The Purchaser acted in good faith, as that term is used in 11 U.S.C. § 363(m), in purchasing the Assets, including the Lease, under the Purchase Agreement. For that reason, any reversal or modification of this Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

25.      The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

26.      Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including the Lease. The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates,

3235442.12

successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

27.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets, including the Lease, and a bill of sale transferring good and marketable title in the Assets to Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

28.    This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

29.    This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

30.    The landlord under the Lease is directed to sign any instruments, applications, consents or other documents which may be required by any public or quasi-public authority or other party or entity, for purposes of obtaining any permits, approvals or other necessary documentation and/or action required for the alterations and remodeling permitted under this Order.

31.    This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other

3235442.12

agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or the Assumption and Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order.

32.    The terms and provisions of the Purchase Agreement, the Assumption and Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

33.    Except with respect to Permitted Encumbrances, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

34.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims and/or Interests or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or

3235442.12

(iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

35.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement will control; provided, however, that the provisions of this Order regarding (a) the payment of the Undisputed Cure Amount to the Landlord and the escrow of the Disputed Cure Amount from the proceeds of the Sale and (b) any obligation Purchaser may have, under the Lease, to reimburse Landlord following the closing date for tenant's share of 2006 real estate taxes, shall control over the Purchase Agreement.

36.    Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f) of the Federal Rules of Bankruptcy Procedure.

37.    Notwithstanding Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of June, 2006 in Jacksonville, Florida.


Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed to serve
a copy of this Order on counsel for the

3235442.12

Purchaser and all parties who received
copies of the Motion.

**EXHIBIT A**

<u>Store No.</u>:
217

## ASSET PURCHASE AGREEMENT
### [Wal-Mart Stores, Inc.]

**THIS ASSET PURCHASE AGREEMENT** is made effective as of May 9, 2006 (the "<u>Effective Date</u>"), by and among

**WINN-DIXIE STORES, INC.,** a Florida corporation ("Seller"), and

**WAL-MART STORES, INC.,** a Delaware corporation, or its permitted assignee pursuant to <u>paragraph 18.5</u> of this Agreement ("Buyer").

### R E C I T A L S:

A.      Seller is the tenant of the supermarket store (the "Store"), which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the lease, including amendments thereto and all related documents listed on Exhibit A-2 to this Agreement (the "Lease"). The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel of real property described on Exhibit A-2 to this Agreement. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.1 of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "Assets."

B.      Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.      Buyer intends to use the Store as a prototypical "Neighborhood Markets" store operated by Buyer, which may include the sale of groceries, general merchandise and related items as well as the operation of a pharmacy (the "Use").

D.      Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0   **Defined Terms.** Capitalized terms as used in this Agreement will have the following meanings when used herein.

    1.1.   "Adequate Assurance Information" will mean financial and other information provided by Buyer in connection with this Agreement, and any other information as may be reasonably requested by Seller to demonstrate to the Bankruptcy Court that the Landlord is adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

    1.2.   "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

    1.3.   "Agreement" will mean this Asset Purchase Agreement, dated as of the Effective Date, including all Exhibits hereto.

    1.4.   "Approval Condition" will have the meaning assigned in paragraph 5.2 of this Agreement.

    1.5.   "Approval Hearing" will mean a hearing to occur on May 18, 2006 and to be held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

    1.6.   "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

    1.7.   "Auction" will have the meaning assigned in paragraph 5.1 of this Agreement.

    1.8.   "Bankruptcy Case" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.9.   "Bankruptcy Code" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.10.   "Bankruptcy Court" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

    1.11.   "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Store by the Bankruptcy Court.

    1.12.   "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court by Order dated June 20, 2005, which will govern the selection by Seller of the Successful Bid relating to a particular Store.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Wal-Mart Stores, Inc.
Store No. 217
May 9, 2006
SGRJAX\85244.4

2

1.13. "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at Closing the Improvements relating to the Store.

1.14. "Building" will have the meaning assigned in paragraph 2.1.2 of this Agreement.

1.15. "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.16. "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.17. "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (e) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (f) cost of the Environmental Reports, including any supplements or updates, not to exceed $1,500.00 in total, provided that Buyer receives a "reliance letter" from the issuer of the respective Environmental Report on or before each Closing; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages, and (h) the fees and costs of the Closing Escrow Agent.

1.18. "Buyer's Escrowed Items" will have the meaning assigned in paragraph 15.3 of this Agreement.

1.19. "Closing" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 15 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.20. "Closing Date" will have the meaning assigned in paragraph 15.1 of this Agreement.

1.21. "Closing Statement" will mean a statement in the form of Exhibit C to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due Seller at Closing, after making the adjustments described in paragraph 3.3.2 of this Agreement and in other provisions of this Agreement.

1.22.   "Confidentiality Agreement" will mean the Confidentiality Letter Agreement dated effective May 18, 2004, as modified July 11, 2005, and subsequently modified _____, 2006, between Winn-Dixie and Buyer, a complete and correct copy of which is attached as Exhibit G to this Agreement, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.23.   "Conveyance Instrument" will mean the Assignment and Assumption of Lease substantially in the form of Exhibit F to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease, including any SNDA, together with Seller's interest in any Improvements.

1.24.   "Credit Agreement Liens" will mean liens and encumbrances created by Seller pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Seller and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Seller in connection with such Credit Agreement.

1.25.   "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease.

1.26.   "Damages" will have the meaning assigned in paragraph 17.5 of this Agreement.

1.27.   "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.28.   "Due Diligence Materials" will mean, collectively, (i) the Lease, the Title History and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, on the Merrill Website, or otherwise prior to the date hereof and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.29.   "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.30.   "Environmental Reports" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.31.   "Equipment" will mean Seller's trade fixtures and equipment located in the Building.

1.32.   "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.33.   "Excluded Personal Property" will mean all of items of personal property used by Seller in the operation of the Store at or in the Building, including without

limitation, the Equipment, the Inventory and the Supplies, whether owned or leased by Seller, but excluding the Improvements and any item of personal property necessary to the use of the Improvements.

1.34.  "Filing Date" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.35.  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.36.  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.37.  "Improvements" will have the meaning assigned in paragraph 2.1.2 of this Agreement.

1.38.  "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.39.  "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.40.  "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel of Winn-Dixie, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Robert Bray, Senior Vice President, Real Estate, without any requirement of investigation or inquiry.

1.41.  "Landlord" will mean the lessor under the Lease.

1.42.  "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.43.  "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.44.  "Liquidated Deposit" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.45.  "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use or for Buyer's contemplated Use, taken as a whole, except to the extent that fact, circumstance, change or event results from or relates to: (a) general

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Wal-Mart Stores, Inc.
Store No. 217
May 9, 2006
SGRJAX\85244.4

economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates; or (h) the effect of the Wind-up Procedures on the operations of the Store (as opposed to any effect of the Wind-up Procedures on the Assets).

1.46.　"Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther" with respect to the disposition of the Store and other properties.

1.47.　"Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (E) any other liens against the Real Property that can be cured by the payment of money.

1.48.　"Ordinary Course of Business" means the ordinary course of business of Seller after the Filing Date.

1.49.　"Outside Date" as to the Store that is the subject of this Agreement means the date that is the later of ten (10) Business Days after the Approval Hearing for the Store or three (3) Business Days after Seller satisfies its pre-Closing obligations under this Agreement, including paragraph 9.2 of this Agreement, and all conditions to Closing under paragraph 11 are satisfied, with respect to the Store.

1.50.　"Permits" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.51.　"Permitted Encumbrances" will mean all matters listed on Exhibit D to this Agreement.

1.52.　"Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Wal-Mart Stores, Inc.
Store No. 217
May 9, 2006
SGRJAX\85244.4

1.53. "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.54. "Real Property" will mean the Leased Premises and the Improvements together.

1.55. "Sale Order" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.56. "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.57. "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.58. "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and the Blackstone Group, L.P.

1.59. "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 18.3 of this Agreement; and (c) the Cure Costs.

1.60. "Seller's Escrowed Items" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.61. "SNDA" will have the meaning assigned in paragraph 2.1.1 of this Agreement.

1.62. "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.63. "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.64. "Successful Bidder" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.65. "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller.

1.66. "Title Commitments" will mean any updated leasehold title insurance commitments obtained by Seller from Title Insurer, committing to insure Buyer's leasehold interest in the Real Property upon Closing, together with all documents referenced therein and any documents excepted from the

definition of the term Title History, to the extent any of the foregoing are either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer) within ten (10) days after Buyer is declared the Successful Bidder.

1.67.   "Title History" will mean all documents listed on Schedule B-II to the Title Commitment issued by First American Title Insurance Company, dated February 17, 2006, with respect to the Store, except for the document listed as exception #8, which was not available on the Merrill Website or otherwise provided to Buyer prior to the Effective Date.

1.68.   "Title Insurer" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company, as designated by Seller.

1.69.   "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.70.   "Title Reports" will mean, collectively, (i) the Title History and (ii) the Title Commitments.

1.71.   "Use" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.72.   "Wind-up Procedures" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down or liquidation of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the Store and closing of the Store.

## 2.0   Property Included in Sale.

2.1.   Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which are comprised of the following:

2.1.1   Seller's leasehold interest, as tenant, under the Lease, any Subordination, Non-Disturbance and Attornment Agreement or other similar agreement (each, an "SNDA") related thereto, and Seller's interest in any leasehold improvements;

2.1.2   Seller's interest in all fixtures (other than the Equipment) located in the Store building now existing on the Leased Premises (the "Building"), including but not limited to Seller's interest in heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Building, elevators, docks, lifts, doors,

storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"); and

Excluded Personal Property is expressly excluded from the Assets to be sold, assigned or transferred by Seller to Buyer under this Agreement.

2.2.    Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

## 3.0    Purchase Price.

3.1.    Amount.  The purchase price to be paid by Buyer to Seller for the Assets is Six Hundred Twenty-Five Thousand and No/100 Dollars ($625,000.00) (the "Purchase Price").

3.2.    Contract Consideration and Deposit.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement and in accordance with the Bidding Procedures, Buyer has delivered, to Escrow Agent an initial earnest money deposit in the aggregate amount of Twenty Thousand and No/100 Dollars ($20,000.00) (the "Initial Deposit").  Furthermore, within 3 Business Days after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit such that the total deposit, including the Initial Deposit, shall be equal to thirty percent (30%) of the Purchase Price (the "Second Deposit").  The Initial Deposit by itself, and together with the Second Deposit if required to be delivered pursuant to this paragraph, will be referred to herein as the "Deposit."  Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Initial Deposit will be subject to refund to Buyer to the extent and in the circumstances described herein, including paragraphs 4.0, 13.0, 16.0, and 17.0.  Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except to the extent and in the circumstances described herein, including paragraphs 4.0, 13.0, 16.1.1, 16.1.3, 16.1.4, 16.1.6 and 17.2.  The applicable portion of the Deposit will be credited against the Purchase Price at the relevant Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.

3.3.    Payment.  The Purchase Price will be paid in the following manner:

3.3.1    Purchase Price.  On the Closing Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Purchase Price (less the Deposit and with any adjustments with respect to the Purchase Price contemplated by the Closing Statement), and will, subject to the conditions set forth in paragraph 11 of this Agreement, instruct Escrow Agent to transfer and

deliver the escrowed Purchase Price (as so adjusted), by wire transfer to an account designated in writing by Seller.

3.3.2 *Certain Transaction Costs.*  All relevant rent, taxes (including real and personal property taxes and assessments), common area maintenance expenses and all other items of additional rent, utilities and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at the Closing to the extent thereof.  Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate.  Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller.  There will be no post Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes.  The provisions of this paragraph 3.3.2 which apply to the period after the Closing shall survive the Closing.

3.3.3 *Sales Tax.*  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.  This paragraph 3.3.3 shall survive the Closing.

3.4. Allocation of Purchase Price Among Assets.  Seller shall have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets related to the Store.

4.0 **Buyer's Due Diligence.**

4.1. Acknowledgment.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence, through the Merrill Website, regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be reasonably limited by and shall

comply in all respects with the reasonable written instructions and requirements of Seller.

4.2. _Title_.  Buyer confirms and acknowledges that Seller has made the Title History and other documents evidencing the state of title of the Store available to Buyer through the Merrill Website prior to the Effective Date. Seller will deliver the Title Commitments to Buyer within ten (10) days after Buyer is declared the Successful Bidder.  Buyer may negotiate with the Title Insurer, or another title insurer of its choosing, to obtain a title insurance policy with respect to the Store (the "_Title Policy_") at Closing.  If any matter set forth in the Title Commitments that was not included in the Title History, individually or in the aggregate with other matters, interferes in a material and adverse way with the Buyer's proposed Use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller within three (3) business days of the date the Title Commitment is either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer).  To be effective, any such notice of objection must be directed to Seller using email address catherinelbold@winn-dixie.com, with a copy using email address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #217" (with the appropriate Store number set forth).  If Buyer timely notifies Seller of any valid objection to any such matter set forth in the Title Commitment with respect to the Store, and if Seller declines or is unable to cure any such objection prior to the Closing Date, then Buyer will have the right to terminate this Agreement on or prior to the Closing Date and receive the Deposit, with no liability to Buyer.  If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this _paragraph 4.2_ to any matter, other than a Monetary Lien, set forth as an exception in the Title Commitment for which notice has been provided in accordance with this _paragraph 4.2_, and such matter shall constitute a Permitted Encumbrance.

4.3. _Environmental Reports_.  Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website, that certain Phase I Environmental Site Assessment, dated March 17, 2006, issued by Golder Associates Inc. and that certain Phase I Environmental Site Assessment, dated January 27, 1998, issued by ICF Kaiser Engineers, Inc. (each, an "_Environmental Report_"), covering the Real Property relating to the Store.

5.0  **Bankruptcy Approval Procedures**.

5.1. _Competitive Bid Process_.  Seller has filed a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, _inter alia_, to 11 U.S.C. Sections 105 and 363 (the "_Sale Motion_").  The Bankruptcy Court has set May 18, 2006 as the date for hearing on the Sale Motion (the "_Sale Hearing_") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding