# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC. TO SELL LOUISVILLE WAREHOUSE FACILITY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND (B) GRANTING RELATED RELIEF

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Logistics, Inc ("WD Logistics") to sell the Louisville Warehouse Facility and attached improvements to Seay Properties, LLC (the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances, and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on June 15, 2006 (the "Sale Hearing").  The Court has read the Motion and has considered the representations of counsel.  Upon the representations of counsel and without objection by the

---

[1]    All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Facility Agreement.

United States Trustee or any other interested party, the Court makes the following findings of fact:

A.  This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.  The Debtors solicited the highest or otherwise best offer for the Assets described in the Facility Agreement (the "Assets") in accordance with bidding procedures approved by order of the Court (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order").  No competing bid was received for the Assets and the Debtors have determined that the bid by the Purchaser is the highest or best offer for the Assets.

C.  The Debtors have provided interested parties (including all parties asserting claims or interests in, to or against the Assets, if any) with proper notice of the Motion, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the notice procedures order, approved by order of the Court (Docket No. 254) dated March 4, 2005 (the "Notice Procedures Order").

D.  A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims, as such terms are defined below, in, to or against the Assets, if any).

E.    The Debtors marketed the Assets and conducted the Auction process in compliance with the Bidding Procedures Order.  The bidding on the Assets was conducted in a non-collusive, fair and good faith manner.  Through the Debtors' marketing efforts, the Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

F.    WD Logistics (i) has full corporate power and authority to execute and consummate the Facility Agreement attached as Exhibit A to this Order and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of WD Logistics, and (ii) no consents or approvals, other than those expressly provided for in the Facility Agreement, are required to consummate the transactions contemplated by the Facility Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Facility Agreement was proposed, negotiated and entered into by WD Logistics and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Facility Agreement to be avoided under 11 U.S.C. § 363(n).

3

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

L.    WD Logistics' transfer of the Assets to the Purchaser pursuant to the Facility Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Facility Agreement.

M.    WD Logistics may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

4

N.    The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

O.    The Court's approval of the Facility Agreement and the Sale of the Assets to the Purchaser are in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

2.    Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.    The terms and conditions of the Facility Agreement are approved.  Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Facility Agreement.

4.    WD Logistics is authorized to consummate and implement fully the Facility Agreement, together with all additional instruments and documents that may be necessary to implement the Facility Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Facility Agreement.

5.    Any agreements, documents, or other instruments executed in connection with the Facility Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender, and (ii) the Creditors' Committee, which consent will not be unreasonably withheld, and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.    WD Logistics will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).   The only Claims and/or Interests in the Assets are those with the DIP Lender.   The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds from the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.     WD Logistics' transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all right, title and interest of WD Logistics in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.     The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.     The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.     Upon Closing of the Sale in accordance with the Facility Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m). Accordingly, the reversal or modification on appeal of the authorization to consummate the Sale of the Assets will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.     All entities that are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided

7

that the taking of such actions do not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist. In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12. WD Logistics' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Facility Agreement and this Order.

13. Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Facility Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets. WD Logistics' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.    This Order is effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

15.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Facility Agreement.

16.    This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction to (a) enforce and implement the Facility Agreement and any agreements and instruments executed in connection with the Facility Agreement, (b) compel delivery of possession of the Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or

relating to the Facility Agreement, and (d) interpret, implement, and enforce the provisions of this Order.

18.    All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.    The failure specifically to include any particular provision of the Facility Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Facility Agreement be authorized and approved in its entirety.

21.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims, or (ii) for any period commencing before and concluding prior

10

to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Facility Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Facility Agreement.

22.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Facility Agreement and this Order, the provisions contained in this Order will control.

23.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this 15 day of June 2006 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

00527890

11

**EXHIBIT A**

FINAL

## FACILITY PURCHASE AGREEMENT
[Louisville Warehouse Facility]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made effective as of the Effective Date, by and between:

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation ("Seller"), and

**SEAY PROPERTIES, LLC**, a Kentucky limited liability company, or its permitted assignee pursuant to paragraph 12.3 of this Agreement ("Buyer").

## R E C I T A L S:

A.  Seller owns fee simple title to the real property described on attached Exhibit A (the "Land"), together with all easements, appurtenances and hereditaments thereto, located at 720 Locust Lane, Jefferson County, Kentucky, and all improvements located thereon (the "Facility"). The Facility and the Land together are referred to as the "Property."

B.  Seller desires to convey and sell to Buyer, and Buyer desires to acquire (directly or through an Affiliate designated by Buyer) and purchase, the Property, subject to the terms and conditions contained in this Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION** and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.  **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

    1.1  "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

    1.2  "Broker" will mean the real estate broker(s) identified in paragraph 10 of this Agreement as the broker for the transaction contemplated hereunder.

    1.3  "Business Day" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Jacksonville, Florida.

    1.4  "Buyer's Counsel" will mean the law firm or firms engaged by Buyer as its legal counsel (including local counsel) in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transaction.

1.5 "Closing" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Deed and other documents contemplated by paragraph 9 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.6 "Closing Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as closing agent for the transactions contemplated hereunder.

1.7 "Closing Statement" will mean a statement to be delivered by Buyer and Seller at Closing, reflecting the net amount due from Buyer to Seller at Closing for the Assets, and the proper allocation of Buyer's Closing Costs (as defined in Section 9.8) and Seller's Closing Costs (as defined in Section 9.8), after making the adjustments as provided in this Agreement.

1.8 "Consent" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any Contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Property are governed or bound.

1.9 "Delivery Deadline" will mean 5:00 p.m., Eastern Time, on April 21, 2006, constituting the deadline for Seller's delivery of certain documents and materials to Buyer pursuant to paragraphs 4.2.5, 4.4 and 4.5 of this Agreement.

1.10 "Effective Date" will mean April 13, 2006.

1.11 "Environmental Laws" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law. In particular, and without limitation, Environmental Laws will include the Louisiana Department of Environmental Quality (Surveillance Division) Underground Storage Tank Closure/Change In Service Guidance Document (Revision 3).

2

1.12 "Environmental Permits" will mean all Consents required under any Environmental Law.

1.13 "Escrow Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as escrow agent.

1.14 "Excluded Personal Property" will mean all items of furniture, furnishings and office computers and related equipment, and other tangible and intangible personal property, but shall not include any other equipment, tools, parts, or supplies, any computers or computer system parts or tangible or intangible personal property related to the refrigeration system at the Facility on the Effective Date.

1.15 "Facility" will have the meaning assigned in Recital A of this Agreement.

1.16 "Governmental Authority" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.17 "Hazardous Material" will mean any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.18 "Initial Deposit" will have the meaning assigned in paragraph 3.2.1 of this Agreement.

1.19 "Interest" will mean any and all interests (including any successor, transferee or similar liability), liens (including but not limited to any and all "liens" as defined in 11 U.S.C. § 101(37)), liabilities, mortgages, deeds, trusts, guarantees, security agreements, security interest, rights of setoff or recoupment, pledges, privileges, options, rights of first refusal, preemptive rights, easements, servitudes, encroachments, hypothecations, charges, obligations, rights, restrictions, charges and encumbrances of any kind or nature or other matter causing a defect or imperfection in title.

1.20 "Investigation Period" will have the meaning assigned in paragraph 4.2.1 of this Agreement.

3

1.21    "Knowledge" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the executive officers of Seller and of Winn-Dixie, of Michael Chiebovec, as Director - Excess Properties, and of Keith Cherry, as Vice President, Design and Construction, and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers and named individuals.

1.22    "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

1.23    "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien or interest against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) construction liens or Interests that have attached to and become a lien or Interest against Seller's interest in the Property; (iv) judgments that have attached to and become a lien or Interest against Seller's interest in the Assets; and (v) any other Interest against Seller's interest in the Assets that can be satisfied by Seller with the payment of money out of the Purchase Price.

1.24    "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.25    "Sale Order" will mean that certain non-appealable Sale Order approved by the United States Bankruptcy Court Middle District of Florida Jacksonville Division in accordance with 11 U.S.C. Section 363.

1.26    "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.27    "Title Insurer" will mean First American Title Insurance Company, Kentucky Agency in Louisville, Kentucky, by and through its agent Robert W. "Tad" Adams, III, Esq., who is also Buyer's counsel. Any actual or implied conflict of interest is waived by all parties executing this Agreement.

1.28    "Winn-Dixie" will mean Winn-Dixie Stores, Inc., a Florida corporation, the owner of all of the authorized and issued capital stock of Seller.

2.    **Assets.** Seller agrees to grant, bargain, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following real property interests (collectively, the "Assets"), free and clear of any and all claims and interests (other than Permitted Encumbrances) in accordance with 11 U.S.C. Section 363:

2.1    The Property; and

4

2.2     All fixtures located on the Property, including, but not limited to heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, flooring, supplies, equipment, tools and parts for the ammonia system located on the Property, but specifically excluding the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller.

3.    **Purchase Price; Payment.**

3.1     Purchase Price. Buyer agrees to pay Seller a purchase price of $3,750,000 for the Assets (the "Purchase Price"), payable to Seller on the Closing Date. Buyer shall not be liable for any obligations of Seller or have any further obligations beyond the payment of the Purchase Price, except as otherwise expressly set forth in this Agreement.

3.2     Deposit.

3.2.1   An earnest money deposit of $50,000 (the "Initial Deposit") will be due and payable to Escrow Agent within 3 Business Days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

3.2.2   If Buyer does not timely terminate this Agreement prior to expiration of the Investigation Period, then a second earnest money deposit of $75,000 (the "Second Deposit") will be due and payable to Escrow Agent within 3 Business Days after the expiration of the Investigation Period. The Second Deposit will be refundable to Buyer only as expressly provided in this Agreement.

3.2.3   The Initial Deposit and the Second Deposit together are referred to collectively as the "Deposit," which amounts Escrow Agent will place in an interest-bearing account. Any reference in this Agreement to the Initial Deposit, the Second Deposit or the Deposit will be deemed to include any interest accrued thereon. Interest accrued on the Deposit shall be attributed to Buyer, and Buyer will be responsible for payment of state and federal income taxes, if any, associated therewith, unless the Buyer shall default under this Agreement and the Deposit shall be paid to Seller as contemplated by paragraph 11.2, in such event the interest accrued on the Deposit shall then be attributed to Seller, and Seller shall be responsible for payment of state and federal income taxes, if any, associated therewith. Buyer's FEI number for federal income tax reporting purposes is 11-3736586. Seller's FEI number for federal income tax reporting purposes is 59-3652949.

3.2.4   At the Closing, the Deposit will be released to Seller and credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable by Buyer in cash, subject to any prorations.

5

3.3    Payment of Purchase Price. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "Closing Deposit") with Escrow Agent. Escrow Agent will deposit the Closing Deposit into a non-interest bearing escrow account and will disburse or apply the Closing Deposit as provided in this Agreement. At Closing, the Purchase Price will be credited and disbursed to Seller or as Seller directs.

4.    **Condition of Assets; Buyer's Due Diligence; Buyer's Financing.**

4.1    Condition of Assets. Except for the warranty of title, Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets "As Is, Where Is," with all faults, without representations or warranties expressed or implied, and there are no oral agreements, warranties or representations collateral to or affecting the Property by Seller or any third party. The terms and conditions of this paragraph will expressly survive the closing and not merge therein.

4.2    Investigation Period.

4.2.1    Investigation Period. Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m., Eastern Time, on May 2, 2006, to investigate and inspect the Assets and all matters relating thereto, to determine whether or not the same is satisfactory to Buyer (the "Investigation Period").

4.2.2    Access to Property. At all reasonable times during the Investigation Period, Seller will permit Buyer access to the Property as needed to inspect, examine and otherwise undertake those actions that Buyer deems necessary or desirable to determine the feasibility of acquiring the Assets, provided that: (i) Buyer has given Seller at least 24 hours prior notice of Buyer's proposed entry onto the Property; (ii) Buyer's notice includes the names of its agents or contractors who will be performing any evaluation, testing or inspection of the Property and the qualifications of such agents or contractors; (iii) such entry will be conducted during normal business hours; and (iv) such entry will be coordinated with Seller, and Buyer will be accompanied by Seller's representative during such entry. Buyer's physical inspection of the Property may include superficial samplings of building materials and soil, water and air quality conditions, provided that immediately following such sampling Buyer will repair and restore the area affected by such sampling. All such investigations, tests, verifications, copies and examinations will be made by Buyer at Buyer's sole expense.

4.2.3    Reporting of Investigations. If Buyer discovers any condition that affects any of the Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, will not contact or report to such agencies with

6

respect to such condition without Seller's prior written consent. Following Buyer's written notification to Seller of such condition, Seller agrees to report the same to the applicable governmental agencies to the extent required by law and to provide a copy of said notification(s) to the Buyer.

4.2.4   <u>Indemnification</u>. Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's investigation of the Property, including reasonable attorney's fees. Buyer further hereby indemnifies and agrees to defend and hold harmless Seller from and against all claims against Seller or the Property filed by contractors, materialmen or laborers performing work and tests for Buyer. If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will restore the Property to its original condition prior to such termination. The foregoing indemnification provisions will survive the expiration or termination of this Agreement and/or the Closing and not be merged therein.

4.2.5   <u>Seller's Deliveries</u>. By the Delivery Deadline, Seller will deliver to Buyer the following materials to the extent such items are in Seller's active possession and control at the Effective Date:

(a)   copies of as-built plans for the Facility, including the Facility Site Plan, as defined in <u>paragraph 4.7.1</u>;

(b)   copies of all fixture plans for the Facility;

(c)   copies of all warranties (roof, mechanical, electrical, etc.) in effect for the benefit of Seller with respect to any of the Assets;

(d)   specifications, operating manuals and operating records for the Refrigeration System;

(e)   copies of any licenses or permits issued by Governmental Authority relating to the Property;

(f)   that certain unrecorded license agreement referred to in <u>paragraph 4.7.1</u> below, affecting parking rights to the Facility;

(g)   that certain unrecorded Spur Track Agreement referred to in <u>paragraph 4.7.2</u> below;

(h)   if available, all record documentation which indicates all modifications or upgrades of the utilities, roof structure, and load bearing walls;

7

(i)     If available, a certification that the roof insulation is of R-value and any other documentation regarding its resistance to air penetration, to free water, and to vapor drive;

(j)     If available, an asbestos certification demonstrating that the Property complies with all health and safety laws and regulations; and

(k)     all other documentation affecting the Property in Seller's possession

It being understood that such materials have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or fitness for a particular purpose, and are not a substitute for Buyer's own investigation and inspection of the property using its own due diligence service providers. Buyer will deliver or return to Seller all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials within a reasonable time following termination of this Agreement prior to Closing for any reason.

4.2.6   Election to Proceed. If Buyer determines that it does not wish to proceed with the acquisition of the Assets for any reason, in Buyer's sole discretion, then Buyer may elect to terminate this Agreement by delivering written notice of such election to Seller at anytime on or before expiration of the Investigation Period. If Buyer timely elects to terminate this Agreement, then, provided Buyer shall have completed any restoration obligations it may have under paragraph 4.2.4 of this Agreement, Buyer's Deposit (and all interest accrued thereon) shall be returned promptly to Buyer and thereupon the parties will have no further obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination. If Buyer fails to terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Assets, and thereupon the Second Deposit will be due and payable and the Deposit will be nonrefundable to Buyer except as otherwise expressly provided in this Agreement.

4.3     Title. At Closing, Seller will, pursuant to the terms of the Sale Order, transfer, convey and assign to Buyer, and Buyer will accept, all of Seller's right, title and interest in the Assets, subject only to those matters listed on Exhibit B and to any other matters approved or waived in writing by Buyer as provided in this Agreement (collectively, the "Permitted Encumbrances"). Seller's interest in the Property will be conveyed with special warranties of title to the extent provided in the Deed. Evidence of the delivery of marketable and insurable title to Seller's interest in the Property will be pursuant to Title Insurer's issuance of a policy of title insurance for the Property (in the form of a marked Title Commitment evidencing the Title

8

Insurer's binding obligation to issue its title policy), insuring the interest of Buyer in the Property as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for a survey reading reflecting matters disclosed on the Survey obtained by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Property is located, in the amount of the Purchase Price (the "Title Policy").

4.4    Title Commitment.  Not later than the Delivery Deadline, Seller will obtain and deliver to Buyer a title insurance commitment (the "Title Commitment") from the Title Insurer committing to insure Buyer's fee simple title to the Property for the amount of the Purchase Price, and stating all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, and certain documents executed by Winn-Dixie or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens") (all to be satisfied and released by Closing), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances affecting title that are accepted by Buyer (collectively, the "Exceptions").  The Commitment delivered to Buyer will include copies of all Exceptions.  Buyer will have until April 29, 2006 (the "Review Deadline"), to examine the Commitment. If Buyer reasonably determines that any matter (other than Permitted Encumbrances) renders Seller's title to the Property unmarketable, Buyer will notify Seller in writing on or before the Review Deadline of Buyer's objections (the "Objection Notice").

4.5    Survey.  Not later than the Delivery Deadline, Seller will obtain and deliver to Buyer and Title Insurer a current ALTA or "as-built" survey of the Property (the "Survey").  The Survey will be prepared by a licensed surveyor, prepared in accordance with the minimum technical standards for surveys under the laws of the Commonwealth of Kentucky, certified to Buyer, Seller and Title Insurer, and show a metes and bounds legal description for the Property (the "Legal Description") and the location of all easements, parking, and other items identified on Exhibit B attached hereto and made a part hereof.  Buyer will have until the Review Deadline to review the Survey and to deliver in the Objection Notice its objections to any matter (other than Permitted Encumbrances) that renders Seller's title to the property unmarketable as disclosed by such Survey, including, without limitation, objections as to the accuracy or consistency with the Commitment or the Legal Description.

4.6    Seller's Cure of Objections.  If Buyer timely delivers the Objection Notice to Seller, Seller will have until the day before the end of the Investigation Period to attempt to cure such objections, it being understood, however, that the Credit Agreement Liens and Other Liens will not be cured until Issuance of the Sale Order and Closing.  If Seller is unable or unwilling to cure any objections other than the Credit Agreement Liens and Other Liens prior to the end of the Investigation Period, then Buyer will have until the expiration of the

9

Investigation Period to elect, by written notice to Seller, whether to (i) waive the unsatisfied objections and complete the purchase of the Property subject to the objectionable matters, or (ii) terminate this Agreement and cause the Deposit to be refunded to Buyer.

4.7     Special Covenants and Conditions. Buyer acknowledges the following special covenants and conditions relating to the Property:

    4.7.1   Reciprocal Parking Easement. Certain portions of the Land as more particularly delineated on attached Exhibit C (the "Facility Site Plan") as reciprocal parking area, are subject to an existing license agreement with 4th Presbyterian Church (the "Church") allowing members of the Church congregation to park within such parking areas on the Land on Sundays, and allowing workers employed at the Facility to park within adjacent parking areas located on property owned by the Church, as delineated on the Facility Site Plan, during business hours at the Facility. At or prior to Closing, Seller desires to enter into a reciprocal parking easement with the Church, pursuant to which Seller and the Church will grant perpetual reciprocal easements over its own parking area as delineated on the Facility Site Plan for the use and benefit of the other, on such terms, covenants and conditions as may be agreed between Seller and the Church, and subject to Buyer's approval, not to be unreasonably withheld, conditioned or delayed, prior to expiration of the Investigation Period (the "Reciprocal Parking Easement"). Buyer will have the right to engage in direct negotiation of the Reciprocal Parking Easement with representatives of the Church, on behalf of Seller. However, Buyer will not hold itself out as an agent of Seller during any negotiations in which Buyer participates, and no such agreement reached between Buyer and the Church will be binding upon Seller unless and until Seller and the Church have duly executed and delivered such agreement at or prior to Closing. In the event that Buyer is not able to reach an acceptable agreement with the Church, Buyer will proceed to Closing without cause for delay. The Reciprocal Parking Easement will constitute a Permitted Encumbrance.

    4.7.2   Spur Track Agreement. The Facility is served by spur tracks as shown on the Facility Site Plan for rail service by applicable rail providers (the "Railroad"), pursuant to that unrecorded spur track agreements between such Railroad and Seller or its predecessors in interest (the "Spur Track Agreement"). Seller agrees to use its best efforts in good faith to obtain, prior to the expiration of the Investigation Period, the Railroad's undertaking to cooperate with Buyer in terminating the Spur Track Agreement and removing the tracks from the Property after Closing; provided, however, that if Seller is unable to obtain such undertaking, then Buyer's only remedy will be to terminate this Agreement prior to expiration of the Investigation Period.

10

4.7.3 <u>Refrigeration System</u>. The Property includes an ammonia-based refrigeration system together with operating manuals and protocols (the "<u>Refrigeration System</u>"). Seller shall maintain all ammonia and other gases, liquids and solids from the Refrigeration System in a manner to properly satisfy all Environmental Laws prior to Closing and to maintain such system in good working order, normal wear and tear expected. During the Investigation Period, at Buyer's request, Seller will provide Buyer with reasonable technical assistance at Seller's expense, relating to the specifications and operation of the Refrigeration System. At Closing, Buyer may retain the services of Seller's on-site Refrigeration System technicians, as employees or consultants of Buyer, and at no cost to Seller. Seller will have no liability to Buyer in connection with the Refrigeration System, except as provided in Seller's limited representations and warranties contained in <u>paragraph 5</u> below.

5.    **<u>Representations and Warranties of Seller and Buyer</u>.**

5.1    Seller warrants to Buyer as follows:

5.1.1 <u>Corporate Existence and Authority</u>. Seller is a Florida corporation and its status is active. Subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein

5.1.2 <u>Title to Property</u>. Seller owns fee simple title to the Property, subject to the Permitted Encumbrances and the Credit Agreement Liens (which will be satisfied and released at Closing).

5.1.3 <u>Power to Convey</u>. To Seller's Knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in <u>paragraph 7</u> below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

11

5.1.4 <u>Hazardous Materials</u>. To Seller's Knowledge, after reasonable investigation, the Property is free from any and all Hazardous Materials that require remediation or clean-up under Environmental Laws because of any action or actions by Seller and/or its predecessors and, to Seller's Knowledge, because of any action of any other Person. Additionally, except as expressly authorized by an effective permit or by applicable Laws, to Seller's Knowledge, there have been no releases, discharges or emissions, or any threats of releases, discharges or emissions of any Hazardous Material, or any other harmful substance, into, onto, under or from the Property caused by Seller or by any other Person.

5.1.5 <u>Compliance with Environmental Laws</u>. To Seller's Knowledge, Seller is in material compliance with all Environmental Laws with respect to the Property, including all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material or asbestos-containing materials; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.

5.2 Buyer warrants to Seller as follows:

5.2.1 <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's permitted assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation

5.2.2 <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto

12

5.2.3 <u>Financial Condition</u>. Buyer represents, warrants and covenants that as of the Effective Date and continuing through the Closing Date, Buyer has and expects to have the financing and/or equity necessary for the Deposit and the Closing, including payment of the Purchase Price at Closing, based upon its principals' prior business dealings and reputation in the community.

6. **Survival of Warranties.** The respective warranties of Buyer and Seller above will not survive the Closing, and will be deemed to have merged into the Deed delivered at Closing.

7. **Closing Conditions.**

7.1 <u>Approval Condition</u>.

7.1.1 <u>Chapter 11 Cases</u>. Seller (Winn-Dixie and certain of its affiliated companies) filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 et seq., as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "<u>Bankruptcy Cases</u>"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "<u>Bankruptcy Court</u>") where they are being jointly administered under Case No. 05-03817-3F1.

7.1.2 <u>Competitive Bid Process</u>. By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "<u>Bidding Procedures</u>"). This Agreement is subject to the competitive bid process described in the Bidding Procedures. Promptly following expiration of the Investigation Period, provided that Buyer has not earlier terminated this Agreement in accordance with paragraph 4 above, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Liens and the Other Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "<u>Sale Motion</u>"). The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "<u>Sale Hearing</u>"). The Sale Motion and Sale Order shall be mutually satisfactory to Buyer and Seller. Prior to the Sale Hearing, the debtors will conduct an Auction, if necessary, pursuant to the Bidding Procedures.

Real Estate Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Seay Properties, LLC
Louisville KY Distribution Center
April 11, 2006
SGRJAX\77724.5

7.1.3 <u>Overbid Protection</u>.  As authorized by the Bidding Procedures, Seller agrees that the initial minimum overbid that may be accepted by Seller in the Auction will be at least $3,862,500.

7.1.4 <u>Sale Order Approving Agreement</u>.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Approval Condition</u>").

7.1.5 <u>Continuing Effectiveness of Agreement</u>. Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by June 30, 2006 (the "<u>Outside Date</u>") through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, Seller will pay a termination fee of $100,000 to Buyer in accordance with the Bidding Procedures, and the parties thereafter will have no further obligations to the other, except with respect to the indemnifications as set forth in <u>paragraph 4.2.4</u> and <u>paragraph 10</u>, which indemnifications will survive separately from termination of this Agreement.

7.2 <u>Conditions Precedent to Seller's Obligations</u>. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

7.2.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard.  All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

14

7.2.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Property will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with paragraph 11 of this Agreement.

8.   **Casualty; Condemnation.** If, prior to Seller's legal delivery of the Deed and Buyer's delivery of the Purchase Price, the Property or any material part thereof, are destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within 5 business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the immediate return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Assets are sold to Buyer pursuant to the terms of this Agreement, then as Buyer's sole remedies, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds received by it.

9.   **Closing.**

9.1   The consummation of the transactions contemplated herein by Buyer and Seller (the "Closing") will be held on or before that date which is 10 days following the satisfaction of the Approval Condition (the "Closing Date"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Closing Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Closing Agent.

9.2   Possession of the Assets will be delivered to Buyer on the Closing Date free and clear of all Claims and Interests and rights of third parties whatsoever, subject only to the Permitted Encumbrances.

9.3   At the Closing, Seller will deliver to Buyer or Buyer's designee the following:

(i)   An appropriate instrument of assignment and conveyance of the Property as set forth on attached Exhibit D (the "Deed"), as required by Title Insurer to properly insure title to Buyer or Buyer's designee its interest in the Property as transferred, assigned and conveyed by

15

Seller with special warranties of title to the extent provided in the Deed;

(ii)     The Reciprocal Parking Easement;

(iii)    Documents evidencing the ability to terminate the Spur Track Agreement;

(iv)     The Closing Statement;

(v)      Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered;

(vi)     All keys and codes for the Property;

(vii)    A Bill of Sale evidencing the transfer of title for all fixtures and personal property purchased as part of the sale of the Property from Seller to Buyer;

(viii)   Ordinary and customary title documents; and

(ix)     Any other documentation required of Seller under local law.

Buyer may waive compliance by Seller as to any of the foregoing items by an instrument in writing.

9.4     At the Closing, Buyer will execute and deliver to Seller the following:

(i)      The Purchase Price;

(ii)     The Deed, to the extent that Buyer is required to join in the execution and delivery of same;

(iii)    The Closing Statement;

(iv)     Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered; and

(v)      Any other documentation required of Buyer under local law.

Seller may waive compliance by Buyer as to any of the foregoing items by an instrument in writing.

9.5     On the Closing Date, Seller and Buyer will each deposit such other instruments with Closing Agent as are reasonably required by the Title Insurer to consummate the conveyance of the Property to Buyer in accordance with the terms hereof.

16

9.6    All 2006 ad valorem taxes will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based on estimates using 2005 tax amounts with the earliest payment discounts, if any. All 2005 and all prior ad valorem taxes will be paid prior to Closing. Buyer agrees to notify the taxing authority promptly after Closing of the transfer and assignment of Seller's interest in the Assets to Buyer for purposes of proper tax assessment notifications. Buyer will be responsible for payment of 2006 ad valorem taxes when the same become due and payable.

9.7    Any matter specified in <u>paragraph 9.6</u> of this Agreement that cannot reasonably be determined and apportioned between Seller and Buyer on the Closing Date will be specified by Buyer and Seller in writing at Closing, and will be subject to settlement at such time as such matter is finally determined (but in no event later than 90 days after the Closing Date). Additionally, any apportionments, prorations or adjustments that are miscalculated (through mathematical error) at Closing will be subject to recalculation and final settlement at such time as such miscalculation is discovered (but in no event later than 90 days after the Closing Date). Such apportionments will be effective as of the Closing Date.

9.8    At or prior to Closing, Seller will pay all the cost of the deed transfer taxes on the Deed, the cost of the title commitment, the cost of the Survey, the cost of the commission payable to Buyer's Broker and Seller's Broker as disclosed in <u>paragraph 10</u>, and Seller's attorneys' fees and costs and all other fees, costs and expenses incurred by the Seller in connection herewith (collectively, "<u>Seller's Closing Costs</u>"). At or prior to Closing, Buyer will pay the cost of the title insurance policy to be issued pursuant to the Commitment in the amount of the Purchase Price, the cost of its due diligence investigations of the Property, recording fees, all financing costs of Buyer incurred to purchase the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith (collectively, "<u>Buyer's Closing Costs</u>"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

10.    **Brokers; Commissions.** Seller and Buyer acknowledge that Buyer has retained Harry K. Moore Co. Colliers ("<u>Buyer's Broker</u>") with respect to the sale of the Property, and Seller has retained DJM Asset Management, LLC ("<u>Seller's Broker</u>") pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "<u>Retention Order</u>"). Seller will be responsible for payment of the brokerage commission due to Buyer's Broker only if the transaction is consummated at the date and time of Closing, in the amount of three percent (3%) of the Purchase Price. Seller also will be responsible for payment of commission due to the Seller's Broker pursuant to the Retention Order. Each party indemnifies and agrees to hold harmless the other from any claim made by any other broker or agent who claims to act for the party sought to be charged for a commission, compensation, brokerage

17

fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim, and said indemnifications by Seller and Buyer will survive the Closing of this transaction or earlier termination of this Agreement. Neither Seller or Buyer will owe any commissions if the transaction does not close.

11. **Default; Remedies**.

11.1 <u>Seller's Default</u>. If Seller fails to materially comply with or perform any of the covenants, agreements or obligations to be performed by Seller under this Agreement, then Buyer will be entitled to terminate this Agreement by written notice to Seller and promptly following such termination and Buyer's completion of any restoration obligations it may have under <u>paragraph 4.2.4</u> of this Agreement, without any other action being necessary, Escrow Agent will return the Deposit (and all interest accrued thereon) to Buyer. Additionally, following satisfaction of the Approval Condition, if Seller's default is Seller's refusal to close the transaction contemplated herein, and Buyer otherwise is ready, willing and able to close, then Buyer further will be entitled to recover from Seller all of Buyer's actual documented out-of-pocket expenses, including, but not limited to, reasonable attorneys' fees and costs, incurred in negotiating this Agreement, investigating the feasibility of acquiring the Property, and preparation for closing, up to a maximum amount of $50,000. Buyer waives all other remedies it may have at law or in equity.

11.2 <u>Buyer's Default</u>. If Buyer fails to materially comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under this Agreement, then Seller may elect to terminate this Agreement by written notice to Buyer and thereupon Escrow Agent will deliver the Deposit to Seller as Seller's agreed liquidated final damages, and not as a penalty, it being understood that Seller's actual damages in the event of such default may be difficult or impossible to ascertain. Seller waives all other remedies it may have at law or in equity.

11.3 <u>Remedies Cumulative</u>. The foregoing remedies are in addition to any rights afforded either of the parties pursuant to Seller's indemnity under <u>paragraph 10</u>, and Buyer's indemnities under <u>paragraphs 4.2.4 and 10</u> and repair obligations otherwise provided under this Agreement.

12. **Miscellaneous**

12.1 <u>Attorneys' Fees</u>. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the substantially nonprevailing party will pay to the substantially prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.

18

12.2    Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will be in writing and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a written receipt evidencing delivery thereof; (ii) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

> Winn-Dixie Logistics, Inc.
> 5050 Edgewood Court
> Jacksonville, Florida 32254-3699
> Attn:  Catherine Ibold
> Telefax No. (904) 783-5138

With a copy to:

> Smith, Gambrell & Russell, LLP
> 50 N. Laura Street, Suite 2600
> Jacksonville, Florida 32202
> Attention: Douglas Stanford
> Telefax No.: (904) 598-6226

If to Buyer:

> Seay Properties, LLC
> 2908 Brownsboro Rd., Suite 100
> Louisville, Kentucky 40206
> Attn: Benton Seay
> Telefax No. (502) 897-1066

With a copy to:

> Harry K. Moore Co. Colliers
> 7316 New LaGrange Road
> Louisville, Kentucky  40222
> Attn: Matt Hartlage
> Telefax No. (502) 426-8543

19

And to:

Valenti Hanley & Crooks, PLLC
One Riverfront Plaza, Suite 1950
401 Main Street
Louisville, KY 40202
Attn: Robert W. "Tad" Adams, III
Telefax No. (502) 568-2101

If to Escrow Agent or Closing Agent:

Smith, Gambrell & Russell, LLP
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
Attention: Douglas Stanford
Telefax No.: (904) 598-6226

or such other address as any of the foregoing parties may from time to time specify by notice to the others.

12.3   Successors And Assigns; Assignment Of Agreement. All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns. Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other. Notwithstanding the foregoing to the contrary, Buyer may freely assign its rights under this Agreement to an Affiliate, without Seller's consent, as long as Buyer remains liable under this Agreement, and Buyer and its permitted assignee have executed a written instrument pursuant to which such assignee expressly assumes Buyer's obligations hereunder, and a copy of such written assignment is delivered to Seller.

12.4   Changes And Modifications; Prior Agreements. This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

12.5   Governing Law. This Agreement will be governed by and construed in accordance with the laws of the state in which the Property is located. Any dispute arising out of or under this Agreement will be litigated in the Bankruptcy Court.

12.6   Time Is of the Essence. Time is of the essence of this Agreement.

20

12.7 <u>Captions</u>. The captions of this Agreement are inserted for convenience or reference only and not to define, describe or limit the scope or the intent of this Agreement or any term hereof.

12.8 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument; facsimiles of this Agreement as so executed will be deemed to constitute a counterpart hereof.

12.9 <u>Waiver Of Trial By Jury</u>. Buyer and Seller each agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or the Assets undesirable. Accordingly, Buyer and Seller each specifically waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the Assets. The foregoing waiver is made knowingly, voluntarily and intentionally by both Buyer and Seller.

13. <u>**Consent to Jurisdiction.**</u> **UNTIL THE BANKRUPTCY CASE IS CLOSED, THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyer and Seller further agree that, until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, service of any process, summons, notice or document by U.S. Registered Mail to any such party's respective address set forth in <u>paragraph 12.2</u> of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

14. <u>**Escrow Agent**</u>.

14.1 <u>Duties</u>. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Escrow Agent agrees to promptly deposit the Initial Deposit and the Second Deposit, upon receipt thereof, in an interest bearing account, to hold the same in escrow, and disburse the same in accordance with this Agreement. Escrow Agent will release the Deposit only as expressly provided in this Agreement.

21

14.2  <u>Limitations of Liability</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

14.3  <u>Role as Counsel</u>.  The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

14.4  <u>Withdrawal</u>.  No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

14.5  <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefore. In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal).

**[Signature Page follows]**

22

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Signed, sealed and delivered in
the presence of:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

Name: REBECCA L. SAWYER

By:_____
Name: Bennett L. Nussbaum
Title: Vice President

Name: SUSAN MAGADDINO

LEGAL APPROVED
ATTY: CBF
DATE: 4/13/06

Signed, sealed and delivered in
the presence of:

**BUYER:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

Name:_____

By:_____
Name:
Title:

Name:_____

SCHEDULE OF EXHIBITS

| Exhibit A | - | Legal Description of Land |
| Exhibit B | - | Schedule of Permitted Encumbrances |
| Exhibit C | - | Facility Site Plan |
| Exhibit D | - | Form of Deed |

Reviewed By
XRoads
Date: 7/7/06

23

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Signed, sealed and delivered in the presence of:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

By:_____
Name:
Title: Vice President

Name:_____

Name:_____

Signed, sealed and delivered in the presence of:

**BUYER:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

By: _____
Name: H. Benton Seay
Title: Member

Name: _____

Name: _____

**SCHEDULE OF EXHIBITS**

Exhibit A    -    Legal Description of Land
Exhibit B    -    Schedule of Permitted Encumbrances
Exhibit C    -    Facility Site Plan
Exhibit D    -    Form of Deed

24

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Facility Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____

Name: Douglas G. Stanford

Title: Partner

Dated: April ___, 2006

24

## EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

Beginning at the intersection of the South line at Locust Lane with the West line of the first alley 15 feet wide West of Preston Street; thence with said West line, South 27 degrees 26 minutes 03 seconds East 250.03 feet to a point in same; thence leaving said West line and with the North line of the tract now or formerly owned by the 4th Presbyterian Church, South 62 degrees 27 minutes 57 seconds West 125.11 feet to its intersection with the line common to Lots 6 and 7, as shown the plat of the Division of Estate of Joseph Schneider, of record in Deed Book 798, Page 628, in the Office of the Clerk of Jefferson County, Kentucky; thence with said common line, South 27 degrees 26 minutes 03 seconds East 197.51 feet to its intersection with the North line of Cardinal Subdivision, a plat of record in Plat and Subdivision Book 5, Page 49, in the Office aforesaid; thence with said North line, South 67 degrees 25 minutes 37 seconds West 797.98 feet to its intersection with the Northeasterly line of the Southern Railroad; thence with said Northeasterly line, North 57 degrees 35 minutes 06 seconds West 171.96 feet to its intersection with the East line of the tract conveyed to Fetter Printing Company, by Deed of record in Deed Book 4503, Page 155, in office aforesaid, said line also being the West line of the Division of Estate aforesaid; thence with same, North 02 degrees 49 minutes 00 seconds East 694.76 feet to its intersection with the South line of Locust Lane aforesaid; thence with said South line, South 88 degrees 07 minutes 00 seconds East 753.02 feet to the point of beginning.

Being a portion of the same property conveyed to Winn-Dixie Charlotte Transitory "B", Inc., a Florida corporation, by deed dated June 29, 2000, recorded on June 30, 2000, in Deed Book 7472, Page 447, said deed having been re-recorded on August 25, 2000, in Deed Book 7503, Page 160, in the Office of the Clerk of Jefferson County.

25

**EXHIBIT B**

SCHEDULE OF PERMITTED ENCUMBRANCES

1. Taxes and assessments for the year **2006** and subsequent years, which are not yet due and payable.

2. Reservation of the coal, oil, gas and other minerals underlying said land, and all rights and easements thereunder by said holder of the coal, oil, gas and mineral estate or by any party claiming by, through or under said holder

3. Declaration of Covenants, Conditions, Restrictions and Easements, recorded in Deed Book 1209, Page 133 , but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

4. Subject to any underlying matters as shown on plat of record in Plat Book 798, Page 628.

5. Easement for Louisville and Jefferson County MSD, recorded in Deed Book 3689, Page 64.

6. Easement for Louisville and Jefferson County MSD, recorded in Deed Book 3836, Page 95.

7. Easement for Louisville and Jefferson County MSD, recorded in Deed Book 3836, Page 97.

8. Easement for Louisville Gas & Electric Company, recorded in Deed Book 6041, Page 243.

9. Easement for Louisville Gas & Electric Company, recorded in Deed Book 3278, Page 277, this easement has been released by LG& E in Deed Book 5765, Page 447 and Deed Book 6601, Page 635.

10. Reciprocal Parking Easement (pursuant to paragraph 4.7 of Purchase Agreement).

11. Spur Track Agreement (unrecorded)

26

**<u>EXHIBIT C</u>**

FACILITY SITE PLAN

27

Real Estate Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Seay Properties, LLC
Louisville KY Distribution Center
April 11, 2006
SGRJAX\77724.5

**EXHIBIT D**

FORM OF DEED

**SPECIAL WARRANTY DEED**

**THIS DEED** made this _____ day of _____, 2006, between

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("Grantor"), with a mailing address of 5050 Edgewood Court, Jacksonville, Florida 32254-3699, and

**SEAY PROPERTIES, LLC**, a Kentucky limited liability company ("Grantee"), with a mailing address of 2908 Brownsboro Rd., Suite 100, Louisville, Kentucky 40206 Attn: Benton Seay.

**W I T N E S S E T H:**

That for a total consideration of $3,750,000.00 paid in cash, the receipt of which is hereby acknowledged, Grantor does hereby grant, bargain, sell and convey, with covenants of SPECIAL WARRANTY, unto Grantee the following described real estate situated in Jefferson County, Kentucky, and being more particularly described as follows:

SEE EXHIBIT A ATTACHED HERETO

together with the easements, hereditatments, appurtenances, and improvements associated therewith or located thereon.

Grantor further covenants specially that Grantor is lawfully seized of the estate hereby conveyed, that Grantor has full right and power to convey the same, and that said estate is free from all encumbrances except those matters described on attached Exhibit B (the "Permitted Encumbrances"), and real estate taxes for the year 2006 and subsequent years.

To have and to hold the same unto Grantee, in fee simple, forever.

And Grantor does hereby fully warrant the title to the aforesaid property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to the Permitted Encumbrances.

28

**IN TESTIMONY WHEREOF, WITNESS** the signature of Grantor the date and year first above written.

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

GRANTOR:

**WINN-DIXIE    LOGISTICS,    INC.,**    a
Florida corporation

_____
Name: _____

By: _____
Name: _____
Title: Vice President

_____
Name: _____

[CORPORATE SEAL]

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

    The foregoing instrument was acknowledged before me this ___ day of _____, 2006, by _____, the Vice President of **Winn-Dixie Logistics, Inc.,** a Florida corporation, on behalf of the corporation. He is personally known to me.

Print Name:_____
Notary Public, State of Florida
My Commission Expires:_____
Commission No.:_____

[NOTARIAL SEAL]

THIS INSTRUMENT PREPARED BY:

_____
Douglas G. Stanford, Esq.
Smith, Gambrell & Russell, LLP
50 N. Laura Street, Suite 2600
Jacksonville, Florida  32202
904-598-6126

Real Estate Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Seay Properties, LLC
Louisville KY Distribution Center
April 11, 2006
SGRJAX\77724.5

## CERTIFICATE

**WE, SEAY PROPERTIES, LLC,** a Kentucky limited liability company, Grantee, and **WINN-DIXIE LOGISTICS, INC.,** a Florida corporation, Grantor, do hereby certify, pursuant to KRS Chapter 382, that the above-stated consideration in the amount of $3,750,000.00 is the true, correct and full consideration paid for the property herein conveyed.

**GRANTOR:**

**WINN-DIXIE LOGISTICS, INC., a Florida corporation**

By:_____
Name: _____
Title: Vice President

STATE OF FLORIDA   )
COUNTY OF DUVAL   )

    The foregoing instrument was acknowledged before me this ___ day of _____, 2006, by _____, the Vice President of **Winn-Dixie Logistics, Inc.,** a Florida corporation, on behalf of the corporation.  He is personally known to me.

_____
Print Name:_____
Notary Public, State of Florida
My Commission Expires:_____
Commission No.:_____

[NOTARIAL SEAL]

30

**GRANTEE:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

By: _____

Name: _____

Its: _____

[SEAL]

STATE OF _____ )

COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this ____ day of _____, 2006, by _____, the _____ of Seay Properties, LLC, a Kentucky limited liability company, on behalf of the company. He/she either [  ] is personally known to me or [  ] has produced _____ as identification.

Print Name:_____

Notary Public, State of _____

My Commission Expires: _____

Commission No.: _____

[NOTARIAL SEAL]

31

## AMENDMENT TO
## FACILITY PURCHASE AGREEMENT

**THIS AMENDMENT TO FACILITY PURCHASE AGREEMENT** (this "Amendment") is made effective as of May 1, 2006, by and between **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("Seller") and **SEAY PROPERTIES, LLC**, a Kentucky limited liability company ("Buyer").

### RECITALS:

A.    Seller and Buyer are parties to that certain Facility Purchase Agreement (the "Agreement") dated effective April 13, 2006, pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Jefferson County, Kentucky.

B.    The Agreement provided Buyer with a period expiring on May 2, 2006 (the "Investigation Period"), in which to investigate and inspect the Property to determine whether the same is satisfactory to Buyer.

C.    Buyer has requested an extension of the Investigation Period to May 10, 2006, and Seller has agreed to grant that extension.

D.    Seller and Buyer desire to amend the Agreement and enter into this Amendment for the purpose of evidencing such extension and to make other modifications to the Agreement as more specifically set forth in this Amendment.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Closing Date.  Paragraph 4.2.1 of the Agreement is amended as follows:

"Investigation Period. Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m., Eastern Time, on May 10, 2006, to investigate and inspect the Assets and all matters relating thereto, to determine whether or not the same is satisfactory to Buyer (the "Investigation Period")".

2.    Legal Description.  Exhibit A to the Agreement is deleted in its entirety and Exhibit A attached hereto is substituted in lieu thereof.

3.    Miscellaneous.  Except as expressly provided in this Amendment, the Agreement shall continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Amendment and the Agreement, the provisions of this Amendment shall be controlling.  Capitalized terms used in this Amendment without definition have the meanings assigned to such terms in the Agreement.

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

Name: REBECCA L. SAWYER

By:_____
Name: Bennett L. Nussbaum
Title: Vice President

Name: LAURA L. ANDREWS

[CORPORATE SEAL]

LEGAL APPROVED
ATTY: _____
DATE: 5-3-06

**BUYER:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

By:_____
Name:_____
Title:_____

Name:_____

Name:_____

[SEAL]

Reviewed By
_____
XRoads
Date:_____

2

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

| | |
|---|---|
| | By:_____. |
| Name:_____ | Name:_____ |
| | Title: Vice President |
| Name:_____ | [CORPORATE SEAL] |

**BUYER:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

| | |
|---|---|
| _Leah Watson_ | By:_ H. Benton S___ |
| Name:_Leah Watson_ | Name:_ H. Benton Seay_ |
| _Barry Bohannon_ | Title:_ Member_ |
| Name:_Barry Bohannon_ | [SEAL] |

2

The undersigned, Escrow Agent, hereby acknowledges the foregoing Amendment to Facility Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Facility Purchase Agreement.

**Smith, Gambrell & Russell, LLP**

By: _____

Name: _____
DOUGLAS E. STANFORD

Title: _____

Dated: May _2_, 2006

3

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

Beginning at the intersection of the South line at Locust Lane with the West line of the first alley 15 feet wide West of Preston Street; thence with said West line, South 27 degrees 26 minutes 03 seconds East 250.03 feet to a point in same; thence leaving said West line and with the North line of the tract now or formerly owned by the 4th Presbyterian Church, South 62 degrees 27 minutes 57 seconds West 125.11 feet to its intersection with the line common to Lots 6 and 7, as shown the plat of the Division of Estate of Joseph Schneider, of record in Deed Book 798, Page 628, in the Office of the Clerk of Jefferson County, Kentucky; thence with said common line, South 27 degrees 26 minutes 03 seconds East 197.51 feet to its intersection with the North line of Cardinal Subdivision, a plat of record in Plat and Subdivision Book 5, Page 49, in the Office aforesaid; thence with said North line, South 67 degrees 25 minutes 37 seconds West 797.98 feet to its intersection with the Northeasterly line of the Southern Railroad; thence with said Northeasterly line, North 57 degrees 35 minutes 06 seconds West 171.96 feet to its intersection with the East line of the tract conveyed to Fetter Printing Company, by Deed of record in Deed Book 4503, Page 155, in office aforesaid, said line also being the West line of the Division of Estate aforesaid; thence with same, North 02 degrees 49 minutes 00 seconds East 694.76 feet to its intersection with the South line of Locust Lane aforesaid; thence with said South line, South 88 degrees 07 minutes 00 seconds East 753.02 feet to the point of beginning.

### TOGETHER WITH:

Beginning at the intersection of the lines common to Lots 10 and 11, as shown on the plat on the Division of Estate of Joseph Schneider, of record in Deed Book 798, Page 628, in the Office of the Clerk of Jefferson County, Kentucky, with the West line of Preston Street, as widened; thence with said West line, South 27 degrees 18 minutes 59 seconds East 134.98 feet to its intersection with the North line of an alley 20 feet wide; thence with said North line, South 67 degrees 25 minutes 33 seconds West 140.14 feet to its intersection with the East line of another alley 15 feet wide; thence with said East line, North 27 degrees 26 minutes 02 seconds West 135.00 feet to its intersection with the line common to Lots 10 and 11 aforesaid; thence with said common line, North 67 degrees 25 minutes 33 seconds East 140.52 feet to the point of beginning.

Being a portion of the same property conveyed to Winn-Dixie Charlotte Transitory "B", Inc., a Florida corporation, by deed dated June 29, 2000, recorded on June 30, 2000, in Deed Book 7472, Page 447, said deed having been re-recorded on August 25, 2000, in Deed Book 7503, Page 160, in the Office of the Clerk of Jefferson County.

4

## SECOND AMENDMENT TO
## FACILITY PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO FACILITY PURCHASE AGREEMENT** (this "Second Amendment") is made effective as of May 10, 2006, by and between **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("Seller") and **SEAY PROPERTIES**, a Kentucky limited liability company ("Buyer").

### RECITALS:

A.    Seller and Buyer are parties to that certain Facility Purchase Agreement dated effective April 13, 2006, as amended May 1, 2006 (the "Agreement"), pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Jefferson County, Kentucky.

B.    The Agreement provided Buyer with a period expiring on May 10, 2006 (the "Investigation Period"), in which to investigate and inspect the Property to determine whether the same is satisfactory to Buyer.

C.    Buyer and Seller have opted for an extension of the Investigation Period to May 25, 2006, to allow the parties additional time to evaluate environmental issues relating to the Property.

D.    Seller and Buyer desire to amend the Agreement and enter into this Second Amendment for the purpose of evidencing such extension.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Amendment of Agreement. Seller and Buyer hereby amend paragraph 4.2.1 of the Agreement to state as follows:

"Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m., Eastern Time, on May 25, 2006, to investigate and inspect the Assets and all matters relating thereto, to determine whether or not the same is satisfactory to Buyer (the "Investigation Period")."

2.    Miscellaneous.    Except as expressly provided in this Second Amendment, the Agreement shall continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Second Amendment and the Agreement, the provisions of this Second Amendment shall be controlling. Capitalized terms used in this Second Amendment without definition have the meanings assigned to such terms in the Agreement.

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Second Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.**, a
Florida corporation

By:_____

Name:_____
Name: SUSAN MAGADDINO

Name:_____
Name: REBECCA L. SAWYER

Name:_____ SENIOR VICE PRESIDENT_____
Title: Vice President

[CORPORATE SEAL]

LEGAL APPROVED
ATTY:_____
DATE:_____

Reviewed By
_____
XRoads
Date:_____

**BUYER:**

**SEAY PROPERTIES**, a Kentucky limited
liability company

By:_____
Name:_____
Title:_____

Name:_____

[SEAL]

Name:_____

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Second Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation

By:_____
Name:_____
Title: Vice President

[CORPORATE SEAL]

Name:_____

Name:_____

**BUYER:**

**SEAY PROPERTIES**, a Kentucky limited liability company

Name: _Leah Watson_

By: _H. Benton_
Name: _H. Benton Seay_
Title: _Member_

Name: _JoAnn Oliver_

[SEAL]

The undersigned, Escrow Agent, hereby acknowledges the foregoing Second Amendment to Facility Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Facility Purchase Agreement.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____

Name: Douglas G. Stanford
Title: Partner
Dated: May 16, 2006

# THIRD AMENDMENT TO
# FACILITY PURCHASE AGREEMENT

**THIS THIRD AMENDMENT TO FACILITY PURCHASE AGREEMENT** (this "Amendment") is made effective as of May 24, 2006, by and between **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("Seller") and **SEAY PROPERTIES, LLC**, a Kentucky limited liability company ("Buyer").

## RECITALS:

A.    Seller and Buyer are parties to that certain Facility Purchase Agreement dated effective April 13, 2006, as amended from time to time (the "Agreement"), pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Jefferson County, Kentucky.

B.    Seller and Buyer desire to amend the Agreement as hereafter provided in this Third Amendment.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Purchase Price.  Paragraph 3.1 of the Agreement is amended to include the following additional provision:

"At Closing, Seller agrees to provide a credit in the amount of $150,000 to Buyer, for the purpose of contribution to the cost of Buyer's remediation of the Disclosed Matters, as described in paragraph 4.7.4 below."

2.    Environmental Matters.  The following paragraphs are added as new paragraph 4.7.4:

"4.7.4  Environmental Reports.  The parties have received and are familiar with the limited Phase II Environmental Site Assessment and asbestos survey issued by Linebach Funkhouser, Inc., on or about May 10, 2006 (collectively, the "Environmental Reports").  The Environmental Reports disclose the existence of certain actual or potential environmental contamination or other surface or subsurface conditions affecting the Property as more particularly described on attached Exhibit A (the "Disclosed Matters").  Buyer acknowledges that Seller's representations and warranties as set forth in paragraph 5 below are subject to the Disclosed Matters and to the provisions of this paragraph 4.7.4.  In consideration of the mutual covenants set forth in the Agreement, the parties agree as follows with respect to the Disclosed Matters:

(a)    As of Closing and except as otherwise stated in this Agreement as amended, Buyer and its Affiliates, and their respective successors and assigns (collectively, referred to as "Buyer Parties") releases and discharges Seller and its Affiliates, and their respective  successors and assigns (collectively, Seller Parties") from any and all liabilities, claims, demands, lawsuits, or actions that Buyer Parties may have against any of Seller Parties resulting from or arising out of the Disclosed Matters, excluding Governmental Fines or

Penalties as defined below.  After Closing, Buyer Parties will reimburse, defend, indemnify and hold harmless Seller Parties from and against any and all liabilities, losses, claims, costs, damages, or charges (including all costs of investigation, monitoring, legal fees, remedial response, removal, restoration or permit acquisition, but excluding Governmental Fines or Penalties as defined below), which, subsequent to Closing, are undertaken, suffered, or paid by, awarded or assessed against, or otherwise incurred by Seller Parties as a result of the Disclosed matters, including without limitation any claim for contribution for cost of assessment, remediation or response asserted by any governmental authority having jurisdiction (collectively, the "Indemnified Claims").  The release and indemnity in this paragraph 4.7.4 will survive Closing.  In connection with the foregoing release and discharge, Buyer will have the following obligations:

(i)     Within 30 days following Closing, Buyer will report to the applicable governmental agencies those previously unreported Disclosed Matters, if any, that Buyer reasonably believes are reportable under Applicable Laws.  If a governmental agency subsequently determines that an unreported Disclosed Matter is reportable under Applicable Laws, then Buyer will promptly report such unreported Disclosed Matter and will be responsible for payment of any Governmental Fines or Penalties relating to Buyer's failure to report such Disclosed Matter subsequent to Closing.

(ii)    Buyer will, within 2 years following Closing, commence and diligently prosecute to completion such action as may be required by applicable governmental agencies with respect to reported Disclosed Matters and unreported Disclosed Matters that such agencies determine are reportable.  However, to the extent such action cannot reasonably be completed within such period, then Buyer will have such additional time as reasonably may be necessary to complete the same, provided that Buyer is diligently and continuously prosecuting the same to completion; provided, however, if Seller has reasonable cause to believe that Buyer is not pursuing such remediation as required above, then Seller shall provide notice to Buyer of such concern and cause for such concern, and Buyer shall then have sixty (60) days in which to respond to Seller and offer proof that remediation is continuing as required or to reinitiate such remediation.  In the event that Buyer does not provide proof that such remediation is continuing or otherwise continue such, the Seller shall be permitted to enter onto the Property and cure such matters itself, and will have the right to charge the reasonable cost thereof to Buyer Parties as an indemnified claim.

(b)  Notwithstanding any other provision in this Agreement as amended, Buyer Parties do not assume or agree to pay, and will not be obligated to pay or reimburse, any Governmental Fines or Penalties (as defined below), if any, relating or attributable to Seller Parties':

(i)     delays or other actions or omissions prior to Closing in responding to

2

Facility Purchase Agreement – Third Amendment
Louisville Distribution Center
Winn-Dixie Stores, Inc. S/T Seay Properties, LLC
May 24, 2006
SGRJAX/84842.3

or reporting the Disclosed Matters, or

(ii)    intentional wrongful or grossly negligent conduct prior to Closing, it being understood that Seller will remain responsible for payment or defense, as the case may be, of, and Seller Parties will indemnify and hold Buyer Parties harmless for, any claim asserted by governmental authorities for payment of any such Governmental Fines or Penalties. However, Governmental Fines or Penalties, if any, relating to Buyer Parties' own delays, acts or omissions after Closing in response to or reporting of the Disclosed Matters will be Buyer Parties' responsibility. For purposes of this paragraph 4.7.4, the term "Governmental Fines or Penalties" means any amount claimed by any governmental agency having jurisdiction as a fine, penalty or imposition, payable as a punitive measure for failure to comply with the legal requirements of a governmental agency, relating to the Disclosed Matters, and will not include any amount claimed as a contribution or assessment for the costs of response to or remediation of the Disclosed Matters.

(c)    Seller will give prompt written notice to Buyer of any Indemnified Claim, including without limitation any potential, threatened, or asserted order, claim, liability, or other demand for which Seller intends to seek indemnity under paragraph 4.7.4.

(d)    Buyer will have the right, in its sole discretion, to deny, dispute, oppose, contest, or otherwise challenge or defend any claim, threat, assertion, or demand by any third party (including without limitation any governmental authority) against Buyer Parties or Seller Parties, of or relating to an Indemnified Claim (a "Third-Party Demand"). Buyer will have the right and the responsibility, in its sole discretion, to select appropriate counsel, consultants, and experts to provide the defense of Buyer Parties and Seller Parties from any Third-Party Demand. Seller will cooperate with Buyer in developing and maintaining a defense against any Third-Party Demand, including without limitation making available to Buyer employees, records and other information relating to the Third-Party Demand requested by Buyer, without cost or expense to Seller, it being understood that such cooperation will be "passive" in nature to the extent that Seller will not be obligated to initiate or actively pursue affirmative acts toward defense of any Third Party Demand. Seller agrees to preserve for a period of 5 years or as otherwise required by law or for a longer period in the event that a governmental clean-up investigation is in place from the date of Closing any records relating to the Disclosed Matters and the activities giving rise thereto and to provide copies of such records to Buyer as may be necessary to assist Buyer in responding to, or defending claims arising out of, the Disclosed Matters, excluding records covered by the attorney-client privilege.

(e)    Seller hereby assigns all claims, demands, and other rights Seller Parties may have to seek and obtain damages, losses, response costs, cost recovery, contribution, reimbursement, or indemnity against any third party arising out of or related to the Disclosed Matters, other than Indemnified

3

Claims.  Seller agrees, on behalf of Buyer, to apply for, and seek and determine eligibility for, reimbursement of assessment and remediation costs for which reimbursement may be sought under the Kentucky petroleum leaking underground storage tank cleanup funds or under any other applicable law; and, in connection with any such application, Seller agrees to:

(i)     sign all applications and other documents and take all steps in a timely manner (at the sole cost of Buyer) necessary to seek recovery of assessment and remediation costs and effect collection of reimbursements;

(ii)    provide any documents and information required by the reimbursing authority in connection with any application for reimbursement in a timely manner;

(iii)   immediately notify the reimbursing authority or other appropriate persons and sign any power of attorney or other document reasonably necessary to include Buyer as payee of any reimbursement; and

(iv)    endorse and assign and transmit to Buyer any reimbursement payment for Buyer's sole benefit and use, and release and relinquish any right to any such payment upon receipt.

The foregoing undertakings on the part of Seller will be limited to "passive" cooperation with Buyer to the extent that they will not obligate Seller to initiate or actively pursue affirmative acts (including, without limitation, actions, suits or proceedings) to obtain reimbursement of assessment and remediation costs. Any applications, notices, or other documents necessary or appropriate for obtaining reimbursement or assessment and remediation costs will be prepared by Buyer or its legal counsel at Buyer's sole cost and expense, and, upon approval by Seller and its legal counsel, which approval will not be unreasonably withheld or delayed, will execute such applications, notices, or other documents in its own name, for the benefit of Buyer. Buyer will pay the reasonable attorneys fees and costs incurred by Seller, as the case may be, in connection with the foregoing cooperative measures."

2.     <u>Miscellaneous</u>.   Except as expressly provided in this Third Amendment, the Agreement will continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Third Amendment and the Agreement, the provisions of this Third Amendment will be controlling.  Capitalized terms used in this Third Amendment without definition have the meanings assigned to such terms in the Agreement.

4

05/24/2006 07:57 FAX 7028661700        CAESARS BUSINESS CENTER                    ☒007
    05/24/2005  18:19   5025682101            VALENTI HANLEY                      PAGE  07/08

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Third Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

Name: _____

By: _____
Name: _____
Title: Vice President

Name: _____

[CORPORATE SEAL]

**BUYER:**

**SEAY PROPERTIES, LLC,** a Kentucky limited liability company

Name: _____

By: _____
Name: H. Benton Seay
Title: member

Name: _____

6

Facility Purchase Agreement – Third Amendment
Louisville Distribution Center
Winn-Dixie Stores, Inc. S/T Seay Properties, LLC
May 22, 2006
SGRJAX/84842.3

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Third Amendment as of the date first above written.

Witnesses:

Name: _A. K. DAU_

Name: _Pamela Brown_

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.**, a
Florida corporation

By: _____
Name:  Bennett L. Nussbaum
Title: Vice President

[CORPORATE SEAL]

**BUYER:**

**SEAY PROPERTIES, LLC**, a Kentucky
limited liability company

By: _____
Name: _____
Title: _____

Name: _____

Name: _____

Reviewed By

XRoads
Date: _____

LEGAL APPROVED
ATTY: _CSE_
DATE: _5/24/06_

5

Facility Purchase Agreement – Third Amendment
Louisville Distribution Center
Winn-Dixie Stores, Inc. S/T Seay Properties, LLC
May 24, 2006
SGRJAX/84842.3

The undersigned, Escrow Agent, hereby acknowledges the foregoing Third Amendment to Facility Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Facility Purchase Agreement.

**Smith, Gambrell & Russell, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: May 24, 2006

6