# EXHIBIT 4

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT __Middle__ DISTRICT OF __Florida__ | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Winn-Dixie Stores, Inc. | Case Number<br>**05-3817 (JA)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>AIB Deltona, Ltd.<br><br>Name and address where notices should be sent:<br>Robert D. Wilcox, Esq.     Annelie Menke, Esq.<br>6817 Southpoint Pkwy., # 1302    1980 Post Oak Blvd., Suite 720<br>Jacksonville, FL 32216          Houston, TX 77056<br>Telephone number: (904) 281-0700 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Last four digits of account or other number by which creditor identifies debtor: **20153127** | Check here ☐ replaces<br>if this claim ☐ amends    a previously filed claim, dated:_____ |
|---|---|

**1.   Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☒ Taxes __11,043.68__
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
         (date)                         (date)

| **2.   Date debt was incurred:**<br>01/01/2005 | **3.   If court judgment, date obtained:** |
|---|---|

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

**Unsecured Nonpriority Claim** $ __11,043.68__

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**Unsecured Priority Claim**

☒ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $ _____

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other_____

Value of Collateral: $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☒ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| **5.    Total Amount of Claim at Time Case Filed:** | $_____ | 11,043.68 | | 11,043.68 |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| **6.  Credits:**  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br><br>**7.  Supporting Documents:**  *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br><br>**8.  Date-Stamped Copy:**  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Date<br><br>05/29/2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>*Robert D. Wilcox, Esquire* |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## AIB DELTONA LTD. PROOF OF CLAIM

The claim relates to amounts AIB Deltona, Ltd. paid on property leased by Winn-Dixie Stores, Inc. ("Tenant") located at the northeast corner of Howland Avenue and Catalina Boulevard in the City of Deltona, County of Volusia, State of Florida. Upon information and belief, the Debtor refers to the location as "**Store No. 2313**".

In 2006, AIB Deltona, Ltd. learned that the Tenant had not paid the 2005 Ad Valorem Taxes in full, but had paid only $62,073.36 of the $73,117.04 due, leaving a remainder due of $11,043.68. Under the lease on the property (and related assignments), a copy of which are attached as Exhibit A, Tenant is responsible for the payment of real estate taxes.

On March 16, 2006, AIB Deltona, Ltd. paid the remaining $11,043.68 to the Volusia County Florida Tax Collector. A copy of the record from the Volusia County Florida Tax Collector's website reflecting the payment and that no 2005 taxes are due is attached as Exhibit B. The $11,043.68 payment is properly chargeable to the Tenant under the Lease and is entitled to priority under 11 U.S.C. Section 507.

Upon information and belief, the Tenant believes that the $11,043.68 is a pre-petition amount that should only be paid under the priorities of the Bankruptcy Code or as part of a confirmed plan of reorganization.

AIB Deltona, Ltd. also asserts that the $11,043.68 must be included in the "cure amount" if Tenant seeks to assume the Lease. This claim does not include any amounts due elated to the result of any possible rejection of the Lease, and includes only taxes due as of March 20, 2006.

EXHIBIT A



*Subject Lease*

**LEASE**

**BETWEEN**

**DMH PARTNERS, INC.**

**"LANDLORD"**

**AND**

**WINN-DIXIE STORES, INC.**

**"TENANT"**

*Don Hoover*

## TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CONSTRUCTION OF SHOPPING CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FIXTURES AND INTERIOR ALTERATIONS ................................................................... 9

INDEMNIFICATION ................................................................................................ 9

CASUALTY ........................................................................................................... 9

LANDLORD'S INSURANCE ...................................................................................... 11

QUIET ENJOYMENT .............................................................................................. 12

TAXES AND LIENS ............................................................................................... 13

CONDEMNATION ................................................................................................. 13

DEFAULT ........................................................................................................... 14

CONSTRUCTION RISKS ......................................................................................... 18

NOTICES ............................................................................................................ 18

ASSIGNMENT AND SUBLEASING .............................................................................. 19

SUBORDINATE .................................................................................................... 19

ESTOPPEL CERTIFICATE ....................................................................................... 19

LENDER'S CURE .................................................................................................. 19

BENEFIT ............................................................................................................ 19

TRANSFER BY LANDLORD ..................................................................................... 20

SHORT FORM LEASE ............................................................................................ 20

MARGINAL TITLES ............................................................................................... 20

COMPLETE AGREEMENT ....................................................................................... 20

DECLARATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FLORIDA MANDATED PROVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NO JOINT VENTURE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NO MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

JK2 112277.3 80130 00932
12/18/97 4:38 pm

## LEASE

**THIS LEASE** is made this ⅛0 day of December, 1997, between **DMH PARTNERS, INC.**, a Florida corporation ("Landlord") and **WINN-DIXIE STORES, INC.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H :

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1.       Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 200 feet in width by 242 feet in depth and containing 48,467 square feet, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided (collectively, the "Store"), together with exterior pads at the rear for installation of freezers and coolers, a loading dock area, and the land on which all of the same shall stand  and Landlord hereby grants to Tenant a nonexclusive right and easement to use during the Term as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities, drainage facilities, sewer facilities including, but not limited to, a wastewater treatment plant, and related improvements shown on the Site Plan, as hereinafter defined (the "Common Areas" and together with the Store, collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by Design Services Group on April 22, 1997 (the "Site Plan"), known as Winn-Dixie Marketplace (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the northeast corner of Howland Avenue and Catalina Boulevard in the City of Deltona , County of Volusia, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

Landlord and Tenant acknowledge that the Premises and the Shopping Center will be subject to and benefitted by that certain Declaration of Easements and Restrictive Covenants for Winn-Dixie Marketplace in the form attached hereto as Exhibit "I" (the "Declaration").

**TERM**

2.       (a)       <u>Initial Term.</u>  The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)       <u>Extension Term(s).</u>  Tenant, at its option, shall be entitled to the privilege of six (6) successive extensions of the Term of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.  If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)     Return of Premises. Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)     Holding Over. Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at one hundred fifty percent (150%) of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

RENT

3.     Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)     Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $458,879.25 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $38,239.94 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)     Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (i) Common Area Maintenance Expenses, (ii) Real Estate Taxes and, (iii) Shopping Center Insurance, (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one (1) full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts or other evidences of payment by Landlord (the "Payment Evidence"). On or before ninety (90) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Tenant shall have the right, within one hundred eighty (180) days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than three percent (3%), Landlord shall also pay to Tenant the reasonable, out-of-pocket cost of Tenant's audit.

(1)     Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term. There shall be no Common Area Maintenance Expenses as long as Tenant pays directly for services rendered by Landlord under the Lease. Otherwise, the basis for a year's Common Area Maintenance Expenses shall be based on an estimate for the first year and shall, for

succeeding years, be based on the amount actually paid by Tenant for the prior year.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, painting, cleaning, traffic control, inspecting, landscaping (only as shown on the Site Plan), maintaining any sprinkler and septic systems, wastewater treatment plant, and storm water detention facilities required for operation of the Shopping Center, restriping the parking areas, lighting during the Standard Hours, as hereinafter defined, and otherwise repairing and maintaining the Common Areas.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items or services benefit Tenant, expenses associated with keeping the Shopping Center or the common areas safe or secure, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, holiday decorations, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the addition of capital investment items or capital improvements (including repaving of asphalt parking areas or resurfacing concrete parking areas as opposed to repairing potholes or other day-to-day maintenance) unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized over the maximum allowable useful life of such capital improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses, or any single expense over fifteen percent (15%) of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed provided, however, that on or before ten (10) days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once per year.

(2)   Real Estate Taxes.   Tenant shall pay to Landlord, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment. Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)   Shopping Center Insurance.   Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

Tenant's "Pro-rata Share" shall be the ratio of the rentable square footage of the Store as it exists from time-to-time to the total rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan.

Basic Rent and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

**TITLE**   4.   Intentionally Omitted.

**SURVEY**   5.   Intentionally Omitted.

ENVIRONMENTAL    6.    Intentionally Omitted.
AUDIT

USE    7.    (a)    Permitted Use.  The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

    (b)    Exclusives.    Tenant shall have the exclusive right in the Shopping Center to:

        (1)    operate a supermarket, grocery, bakery, and delicatessen,

        (2)    sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

        (3)    operate a pharmacy or prescription drug concession,

        (4)    operate a photo lab or film development business, and

        (5)    operate an automatic teller machine and banking business;

        (6)    operate a dry cleaning facility, and

        (7)    sell beer and wine for off-premises consumption (each an "Exclusive Use").

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within one thousand (1,000) feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord).

    (c)    Prohibitions.    Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

        (1)    spa, health, sports, or exercise club;

        (2)    lounge, bar, "teen lounge" or social encounter club;

        (3)    bowling alley;

        (4)    pawn shop;

        (5)    skating rink;

        (6)    bingo or electronic or other game parlor;

        (7)    theater (either motion or legitimate);

        (8)    area or space for the sale or display of pornographic or "adult" material;

        (9)    business, professional, or medical offices;

(10)   abortion or HIV clinic;

(11)   automobile dealership;

(12)   church;

(13)   manufacturing or storage business;

(14)   public auditorium or other public entertainment facility;

(15)   tag office or other government service office;

(16)   exterior "pay" telephones, except the area located immediately in front of Tenant's stores;

(17)   restaurants;

(18)   any business requiring parking for delivery or service trucks on a routine or frequent basis.

**COMPLIANCE WITH LAWS**   8.   Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**   9.   Intentionally Omitted.

**COMPLETION DATE**   10.   Intentionally Omitted.

**COMMENCEMENT DATE**   11.   Basic Rent and Additional Rent shall begin to accrue on the date hereof.

**OTHER TENANTS**   12.   [Intentionally omitted]

**PARKING AND COMMON AREAS**   13.   Tenant, its employees, agents, suppliers, licensees, customers, and invitees, shall have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

Prior to construction of the Addition, as hereinafter defined:

(a)   a minimum ratio of at least 6.7 automobile parking spaces, the width of which is indicated on the Site Plan, for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 317 automobiles (minimum); on the basis of arrangement as provided on the Site Plan and

After construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 4.5 automobile parking spaces, the width of which is indicated on the Site Plan, for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 287 automobiles (minimum).

Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) relating to the adequacy of the parking spaces for the Shopping Center arising from actions of Landlord.

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

**SERVICE AREA**      **14.**    Landlord shall provide parking spaces for two (2) large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center. Tenant shall not use trailers for permanent merchandise storage.

**UTILITIES**      **15.**    Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted twenty-four (24) hours a day, seven (7) days a week. Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

**TENANT'S**      **16.**    Tenant shall keep the interior of the Store in reasonably neat and orderly, good
**MAINTENANCE**    condition, shall paint the exterior walls of the Store as needed, and shall repair or replace as needed the windows and plate glass, automatic doors, air conditioning and heating systems, roof, gutter, downspouts, floor surfacing and facade of the Store, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and interior wiring to the main disconnect or main electrical panel and plumbing, from, but not including, the water meter, excluding structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make

or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

**LANDLORD'S MAINTENANCE**

17.    (a)    Store. Landlord shall, at its cost and expense and not as part of Common Area Maintenance Expenses, keep and maintain in good condition and repair, and replace as necessary the exterior walls and structural portions of the Store (excluding painting of the exterior walls, roof, gutter, downspouts), masonry walls, foundation and structural members of the Store, the exterior plumbing (including and from the water meter for the Store and including septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store.

(b)    Common Areas. Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store). Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safeguarding or other security services, cleaning and sweeping as needed but at least three (3) times weekly, lighting during the Standard Hours in accordance with Tenant's Plans and this Lease and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Premises.

**SIGNS**

18.    Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Landlord shall maintain, at Tenants cost, one (1) electrically illuminated pylon sign(s) and one (1) monument sign in the locations marked on the Site Plan. The pylon sign(s) shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panel(s) in the uppermost spaces on such pylon sign(s) and may connect the sign panel(s) to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel(s) if billed as a portion of Additional Rent.

Notwithstanding the foregoing, Tenant shall reimburse Landlord for Tenant's pro rata share of the maintenance cost of each sign. Tenant's pro rata shall be based upon the proportion of the size of Tenant's business identification sign located on said monument or

pylon sign bears to the combined size of all business identification signs located on said monument or pylon sign, including any signage identifying the Shopping Center.

**FIXTURES AND INTERIOR ALTERATIONS**

19.      Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before ten (10) days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications.

**INDEMNIFI- CATION**

20.      Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**

21.      If (i) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent (50%) or more of the value thereof based upon replacement costs or to an extent that renders the Store untenantable in Tenant's reasonable judgment, or (ii) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

(a)      if a Major Casualty occurs during the first seventeen (17) years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Landlord shall proceed

promptly (but in any event within one hundred eighty (180) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)     if a Major Casualty occurs during the last three (3 ) years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within thirty (30) days of the date of the Major Casualty to terminate this Lease;

(1)     If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within fifteen (15) days of receipt of Landlord's termination notice, to extend the Lease for the next successive Extension Term. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(2)     If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic Additional, and Percentage Rent shall be pro-rated as of such date;

(3)     If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Landlord shall to proceed promptly (but in any event within one hundred fifty (150) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

(4)     If fire or other casualty destroys or damages any portion of the Common. Areas at any time during the term and if, had such destruction or damage occurred to the Store, Landlord would be obligated to repair the Store, then Landlord shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

LANDLORD'S NSURANCE

22.     (a)     *Landlord.*  Landlord shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report.  Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(1)     Liability Insurance.  Landlord shall carry comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than nor more than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00.  Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(2)     Casualty Insurance.  Landlord shall carry or cause to be carried all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)     *Tenant.*  Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report.  Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests.  Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any such Mortgagee.

(1)     Liability Insurance.  Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles

of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(2)     Casualty Insurance. Tenant shall carry or cause to be carried all-risk commercial property insurance on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom. As to casualty losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

**QUIET ENJOYMENT**

23.     Landlord covenants, warrants and represents that:

(a)     the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)     As of the Execution Date Landlord is a duly organized, validly existing corporation, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary corporation action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Shopping Center or any portion thereof is bound;

(c)     no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

(d)     Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyways appertaining thereto, during the Term subject to the Permitted Exceptions and matters revealed by the Survey or the Audit and approved or waived in writing by Tenant;

(e)     As of the Execution Date, there is no zoning, comprehensive plan, or other restriction or Legal Requirement preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes;

(f)     As of the Execution Date, Landlord has not previously, either directly or indirectly, leased any portion of the Shopping Center, sold any portion of the Shopping Center, or otherwise permitted any portion of the Shopping Center or any other property owned or controlled by Landlord to be used in a manner as would be prohibited by or violate this Lease.

**TAXES AND LIENS**

**24.**     Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

**CONDEM-NATION**

**25.**     If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within sixty (60) days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue.

If any portion of the Common Areas or any drive, entrance, median cut, access point, route or mode of access thereto depicted on the Site Plan, is obstructed for longer than one hundred eighty (180) days or appropriate governmental authorities notify Tenant that the same will be obstructed for one hundred eighty (180) days or longer or taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or prevent its use of or access to or through the Common Areas, or any drive, entrance, median cut, access point whether or not the same is compensable under applicable Legal Requirements or so as to reduce the required parking area by an amount in excess of ten percent (10%), Tenant may, at its option, terminate this Lease within sixty (60) days of the obstruction, taking, or purchase and shall be liable for Basic, Additional, and Percentage Rent only up to the time of such obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Lease, however, Tenant shall notify Landlord and Landlord shall have fifteen (15) days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Lease shall continue. If the alternative parking area does not meet with Tenant's reasonable approval, Tenant may terminate this Lease as above provided.

If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for the Permitted Use or its use of or access to the Common

Areas (collectively, a "Zoning Change"), then any such Zoning Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease in accordance with the foregoing provisions of this Section.

Except with respect to the Addition, as hereinafter defined, if constructed and financed by Tenant, any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

**DEFAULT**

26.     Tenant:

    (a)     Tenant shall be in default under this Lease if:

    (1)     Tenant fails to pay any Basic Rent or Additional Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

    (2)     Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

    Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

    (i)     Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic or Additional Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary brokerage commissions paid in connection with re-letting the Premises.

    (ii)    Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic or

Additional Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(iii)    Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

(b)    Landlord: Landlord shall be in default under this Lease if:

(1)    Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within ten (10) days after receipt of a written statement from Tenant (a "Repayment Default"); or

(2)    Landlord fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(i)    In the case of a Repayment Default, Tenant, Tenant shall be entitled to offset such amount against all Basic and Additional Rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.

If Landlord fails, following notice as outlined above, to:

(ii)    timely commence or complete construction of the Store or the Shopping Center or reconstruction of the Store or the Shopping Center (following a casualty or condemnation if obligated to do so under this Lease), Tenant may either (i) extend to Landlord such additional time to complete such construction or reconstruction, as Tenant deems reasonable, in its reasonable discretion, (ii) cause the same to be completed, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the same until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset or (iii) terminate this Lease by written notice to Landlord without waiving Tenant's rights to damages against Landlord.

(iii)    timely provide the Commitment or the Title Policy or cure to the defects properly objected to by Tenant, Tenant shall notify

Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Commitment or the Title Policy, as the case may be, Tenant may either (i) extend to Landlord such additional time to deliver the Commitment or the Title Policy as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease or (iii) obtain the Commitment or the Title Policy from another source, in which case Tenant shall be entitled to offset the cost of the Commitment and/or the Title Policy against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the Commitment and/or the Title Policy and the cost of curing defects until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(iv)     timely provide the Survey or to timely cure survey defects or to timely provide the As-Built-Survey as required under this Lease, Tenant shall notify Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Survey or if Landlord still has not cured survey defects, as the case may be, Tenant may either (i) extend to Landlord such additional time to so deliver or cure as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease; or (iii) obtain the Survey or the As-built Survey from another source or undertake the cure of the survey defects, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(v)     timely provide the Audit or to cure Environmental Violations revealed thereby to Tenant's reasonable satisfaction, as required by this Lease, Tenant may (i) extend to Landlord such additional time to obtain the Audit or to cure such Environmental Violations as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease (iii) obtain the Audit from another source or undertake the cure of the Environmental Violations, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(vi)     If Tenant is prevented or prohibited from constructing or enjoying the Addition by any acts or omissions of Landlord (including any prior or successor landlord), or by reason of a breach of any covenant, representation, or warranty made or given by Landlord in this Lease or failure of any condition to be performed by Landlord under this Lease, then Tenant may terminate this Lease.

(vii)     If any representation or warranty made by Landlord in paragraph 23(a), 23(d), 23(f) or 41(a) of this Lease is determined during the Term to be false, or if any other representation or warranty made by Landlord in this Lease is determined to have been false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the material

adverse effects to Tenant's reasonable satisfaction within thirty (30) days of written notice from Tenant, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

(viii)    Tenant shall have the termination rights provided for in the paragraphs of this Lease relating to Casualty and Condemnation.

(ix)    If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store, the Shopping Center, or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse Tenant for the reasonable out-of-pocket cost therefor within ten (10) days of receipt of a written statement therefore, shall constitute a Repayment Default.

(x)    If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, or employees, which release or environmental condition materially impairs for more than thirty (30) days after written notice of same to Landlord Tenant's ability to use the Premises for the Permitted Use (the "Impairment Period") and, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation"), Tenant may (i) abate all rent due under this Lease during the Impairment Period and/or (ii) terminate this Lease by written notice to Landlord on or before thirty (30) days after the end of the Impairment Period.

(xi)    Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

**CON-
STRUCTION
RISKS**

27.     Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen's, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen's, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof. Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined.

**NOTICES**

28.     All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

      Landlord :    DMH PARTNERS, INC.
                     Post Office Box 730
                     Windermere, Florida  34786

      With a copy to:  Mr. Donald Huber
                     P. O. Box 807
                     Windermere, Florida 34786

      or such other address as Landlord may direct from time to time.

      Tenant:     WINN-DIXIE STORES, INC.  Re: #2313
                     3015 Coastline Drive
                     Orlando, Florida  32080

      With a copy to:  Winn-Dixie Stores, Inc.
                     Attn: General Counsel
                     5050 Edgewood Court
                     P.O. Box B
                     Jacksonville, FL 32203-0297
                     Telecopy: (904) 783-5138

      or to such other address as Tenant may direct from time to time.

**ASSIGNMENT**
**AND**
**SUBLEASING**

29.     Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

**SUBORDINATE**

30.     Provided that, with respect to any first priority or primary mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL**
**CERTIFICATE**

31.     Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S**
**CURE**

32.     Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33.     This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY**
**LANDLORD**

**34.**    If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

**SHORT FORM**
**LEASE**

**35.**    Landlord shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its recording in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL**
**TITLES**

**36.**    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE**
**AGREEMENT**

**37.**    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date and supersedes any prior agreement with respect to the subject matter hereof.  No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

**38.**    Landlord shall have recorded in the public records of Volusia County, Florida , declaration(s) of covenants, restrictions and cross easements substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration"), as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that:

    (a)    no portion of the Shopping Center shall be used for any of the activities or uses prohibited by this Lease;

    (b)    no structure constructed in the Shopping Center (other than the Store) shall exceed a maximum building area of twenty-five percent (25%) of the ground area thereof or exceed a maximum vertical height of twenty-four (24) feet (one story only) as measured from ground level;

    (c)    Tenant shall have an insurable nonexclusive easement for parking of vehicles in the parking areas;

    (d)    Tenant shall have an insurable nonexclusive easement for ingress and egress of pedestrian and vehicular traffic from the Shopping Center to Catalina Boulevard and Howland Avenue.

**EXHIBITS**

**39.**    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

|  |  |  |
|---|---|---|
| Exhibit "A" | - | **Site Plan** |
| Exhibit "B" | - | **Legal Description of Shopping Center** |

| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |
| Exhibit "K" | - | Developer's Agreement |

**FORCE MAJEURE**

**40.** If there shall occur, during the Term, (i) strike(s), lockout(s), or labor dispute(s); (ii) the inability to obtain labor or materials or reasonable substitutes therefor; (iii) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENT- AL CONDITION**

**41.** (a)  Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental

matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder.

**NO BROKERS**    42.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**FLORIDA MANDATED PROVISION**    43.    The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**

44.    As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege ("Tenant's Enlargement Option") of enlarging the Store to incorporate therein an addition consisting of the area to the north side of the Store measuring approximately 80 feet in width by 200 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building.

Provided that Tenant is not in material or monetary default under this Lease, Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice one hundred eighty(180) days prior to the expiration of the fifth year from the Commencement Date or one hundred eighty (180) days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree.

If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (i) sewerage and water permits, (ii) allocations of sewerage and water or (iii) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with updates or endorsements to the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped its total cost of the Addition in Percentage Rent that would otherwise be due under this Lease. Upon completion of the Addition by Tenant, Tenant shall maintain the entire Addition, including the roof and structure, but excluding reasonable wear and tear and damage covered by fire or other casualty.

Upon completion of the Addition, it shall become a portion of the Store for all purposes and any references in this Lease to the Store shall refer to and include the Addition, and Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

**`AKE OVER
`ND RELEASE**

44.    If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for ninety (90) continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this Lease by written notice to Tenant within ninety (90) days of such Store Closing and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

JK2 112277.3 80130 00932
12/18/97 4:38 pm

23

**GOVERNING**      **45.**    This Lease shall be governed by and construed in accordance with the laws of the
**LAW**            State in which the Store is located.

**NO JOINT**       **46.**    This is a Lease between a landlord and a Tenant and not an agreement of
**VENTURE**        partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

**TIME**           **47.**    Time is of the essence of this Lease.

**NO MERGER**      **48.**    In the event that Tenant becomes the owner of fee title to the Store or the Shopping
                   Center, the fee title and the leasehold granted hereunder shall not merge but shall remain
                   separate and distinct interests and estates.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:

Print Name: SUSAN F. HUBERT

Print Name: JEANETTE F. FELTON

LANDLORD:

**DMH PARTNERS, INC.**, a Florida corporation

By: _____

Its: PRESIDENT
Date: 12/23/97

Print Name: BRENDA J. BABCOCK

Print Name: Rebecca L. Sawyer

TENANT:

**WINN-DIXIE STORES, INC.**, a Florida corporation

By: _____
      G. E. Clerc, Jr.
Its: VICE PRESIDENT
Date: 12/30/97

STATE OF West Virginia )
COUNTY OF Pocahontas )

The foregoing instrument was acknowledged before me this December 23, 199 7, by Donald Huber, as President of DMH PARTNERS, INC., a Florida corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** ✓ who is personally known to me or _____ who has produced _____ as identification.

Printed Name: Pamela G. Buzzard
Notary Public, State and County aforesaid.
My Commission Expires: 12-20-2005
Notary ID No.: _____
(NOTARIAL SEAL)

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PAMELA G. BUZZARD
821 TENTH AVENUE
MARLINTON, WV 24954
My Commission Expires December 20, 2005

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _Dec. 30_, 199_7_, by _G.E. Clerc Jr._, as _Vice_ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _BRENDA J. BABCOCK_
Notary Public, State and County aforesaid.
My Commission Expires: _11/20/99_
Notary ID No.: _____
(NOTARIAL SEAL)



Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp. Nov. 20, 1999
Comm. No. CC 511004

# EXHIBIT "A"

Site Plan

CF-0133570

# EXHIBIT "A"

## 08-99-4053

TRACT "D", DELTONA LAKES, UNIT THIRTY-NINE ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 27, PAGES 209-212 OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA; SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF THE AFOREMENTIONED TRACT "D", DELTONA LAKES UNIT THIRTY-NINE; THENCE RUN NORTH 51°33'32" WEST ALONG THE SOUTHERLY LINE OF TRACT "D" AND THE NORTHERLY RIGHT OF WAY OF HOWLAND BOULEVARD (STATE ROAD 444 PER PLAT) A DISTANCE OF 360.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE NORTHEASTERLY HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 90°00'00", A CHORD LENGTH OF 35.36 FEET AND A CHORD BEARING OF NORTH 06°35'53" WEST; THENCE DEPARTING SAID NORTHERLY RIGHT OF WAY RUN NORTHERLY ALONG THE ARC OF SAID CURVE A DISTANCE OF 39.27 FEET TO A POINT OF TANGENCY; SAID POINT BEING ON THE EASTERLY RIGHT OF WAY OF CATALINA BOULEVARD; THENCE RUN NORTH 38°26'28" EAST ALONG SAID RIGHT OF WAY AND THE WESTERLY LINE OF TRACT "D", A DISTANCE OF 565.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE SOUTHERLY HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 90°00'00", A CHORD LENGTH OF 35.36 FEET AND A CHORD BEARING OF NORTH 83°26'28" EAST; THENCE DEPARTING SAID EASTERLY RIGHT OF WAY RUN EASTERLY ALONG THE ARC OF SAID CURVE A DISTANCE OF 39.27 FEET TO A POINT OF TANGENCY; SAID POINT ALSO BEING ON THE SOUTHERLY RIGHT OF WAY OF BONKIRK DRIVE; THENCE RUN SOUTH 51°33'32" EAST, ALONG SAID SOUTHERLY RIGHT OF WAY AND THE NORTHERLY LINE OF TRACT "D", A DISTANCE OF 360.00 FEET; SAID POINT BEING THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY OF BONKIRK DRIVE AND THE WESTERLY RIGHT OF WAY OF AN UNNAMED ALLEY; THENCE RUN SOUTH 38°26'28" WEST ALONG SAID WESTERLY RIGHT OF WAY AND THE EASTERLY LINE OF TRACT "D", A DISTANCE OF 615.00 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH:
LOTS 1 THRU 4 BLOCK 1023, DELTONA LAKES, UNIT THIRTY-NINE, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 27, PAGES 209-212 OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA.

**EXHIBIT "B"**

Legal Description

## LEGAL DESCRIPTION

TRACT "D", DELTONA LAKES, UNIT THIRTY-NINE ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 27, PAGES 209-212 OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA; SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF THE AFOREMENTIONED TRACT "D", DELTONA LAKES UNIT THIRTY-NINE; THENCE RUN NORTH 51°33'32" WEST ALONG THE SOUTHERLY LINE OF TRACT "D" AND THE NORTHERLY RIGHT OF WAY OF HOWLAND BOULEVARD (STATE ROAD 444 PER PLAT) A DISTANCE OF 360.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE NORTHEASTERLY HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 90°00'00", A CHORD LENGTH OF 35.36 FEET AND A CHORD BEARING OF NORTH 06°35'53" WEST; THENCE DEPARTING SAID NORTHERLY RIGHT OF WAY RUN NORTHERLY ALONG THE ARC OF SAID CURVE A DISTANCE OF 39.27 FEET TO A POINT OF TANGENCY; SAID POINT BEING ON THE EASTERLY RIGHT OF WAY OF CATALINA BOULEVARD; THENCE RUN NORTH 38°26'28" EAST ALONG SAID RIGHT OF WAY AND THE WESTERLY LINE OF TRACT "D", A DISTANCE OF 565.00 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE SOUTHERLY HAVING THE FOLLOWING ELEMENTS:  A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 90°00'00", A CHORD LENGTH OF 35.36 FEET AND A CHORD BEARING OF NORTH 83°26'28" EAST; THENCE DEPARTING SAID EASTERLY RIGHT OF WAY RUN EASTERLY ALONG THE ARC OF SAID CURVE A DISTANCE OF 39.27 FEET TO A POINT OF TANGENCY; SAID POINT ALSO BEING ON THE SOUTHERLY RIGHT OF WAY OF BONKIRK DRIVE; THENCE RUN SOUTH 51°33'32" EAST, ALONG SAID SOUTHERLY RIGHT OF WAY AND THE NORTHERLY LINE OF TRACT "D", A DISTANCE OF 360.00 FEET; SAID POINT BEING THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY OF BONKIRK DRIVE AND THE WESTERLY RIGHT OF WAY OF AN UNNAMED ALLEY; THENCE RUN SOUTH 38°26'28" WEST ALONG SAID WESTERLY RIGHT OF WAY AND THE EASTERLY LINE OF TRACT "D", A DISTANCE OF 615.00 FEET TO THE POINT OF BEGINNING.

CONTAINING 236,507 SQUARE FEET/ 5.43 ACRES MORE OR LESS.

TOGETHER WITH:
LOTS 1 THRU 4 BLOCK 1023, DELTONA LAKES, UNIT THIRTY-NINE, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 27, PAGES 209-212 OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA.

CONTAINING 31,450 SQUARE FEET/0.72 ACRES MORE OR LESS.

### EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE,
### AND ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT** (this "Agreement"), made this December 31, 1997, between **Indianapolis Life Insurance Company,** a _____ corporation, whose address is _____ (together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE STORES, INC.,** a Florida corporation, whose address is 3015 Coastline Drive, Orlando, Florida  32080 (together with its successors and assigns, "Winn-Dixie");

### R E C I T A L S :

1.       Lender has made or is about to make a loan to DMH PARTNERS, INC., a Florida corporation ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Volusia County, Florida (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Winn-Dixie Marketplace" Shopping Center at the northeast corner of Howland Avenue and Catalina Boulevard, in Deltona, Volusia County, Florida, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.       By Lease dated December __, 1997 (as amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.       Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

**NOW THEREFORE,** for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.       Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

        (a)      The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

        (b)      Winn-Dixie shall not be named as a party defendant unless required by law.

        (c)      The Lease shall not be terminated or affected by any Foreclosure Event.

2.      Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)     subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)     bound by any rent or additional rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)     bound by any modification of the Lease made after the date hereof without Lender's consent.

3.      Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.      The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease.  Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.      The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto.  However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.      Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any. Any such purported action without such consent shall be void as against Lender.

7.      Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.      If Lender, or its assignee, obtains Landlord's interest in the Shopping Center or enforces it right to collect rent under this Lease, Lender agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment, or title policy if any, showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, and/or (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "Transfer Requirements"). Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

9.      If Lender notifies Winn-Dixie in writing that it should pay the rent and other payments due from Winn-Dixie under the Lease to Lender, Winn-Dixie shall thereafter pay such payments as and when they become due and payable to Lender or as Lender directs.

**IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

**INDIANAPOLIS LIFE INSURANCE COMPANY**, a _____ corporation

_____
Print Name:_____

By:_____

_____
Its:_____
Date:_____

_____
Print Name:_____

**WINN-DIXIE STORES, INC.,** a Florida corporation

_____
Print Name:_____

By:_____

_____
Its:_____
Date:_____

_____
Print Name:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ _____, 199___, by _____, as _____ of _____, a _____ corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA  )
COUNTY OF DUVAL  )

     The foregoing instrument was acknowledged before me this _____ ___, 199___, by
_____, as _____ President of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation, who is personally known to me.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

EXHIBIT "D"

INTENTIONALLY OMITTED

## EXHIBIT "D"

SELLER CERTIFICATION AS TO LEASE
(to be attached to the Lease)

Seller hereby certifies as follows:

1.      Attached to this Agreement of Sale, and making up this Exhibit "D", is a true, current, and complete copy
of that certain Lease, dated    12/30/97    , by and between Seller and   Winn-Dixie Stores, Inc. together
with true, current, and complete copies of all amendments thereto, and guarantees or assignments thereof, and any
other agreement affecting said Lease.

2.      The foregoing documents represent the entire agreement between Seller as Lessor, and
as Lessee, with respect to the Property.

Dated: July 29 , 1999

Seller:     DMH Partners, Inc.

By: _____

B:_____
S:_____

Page 12 of 14

**EXHIBIT "E"**

### ESTOPPEL CERTIFICATE

WINN-DIXIE STORE #_____

Winn-Dixie Marketplace

Deltona, Florida

The undersigned officer of WINN-DIXIE STORES, INC., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.      That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with DMH PARTNERS, INC., a Florida corporation, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Winn-Dixie Marketplace (the "Shopping Center"); and the Lease has been amended or is evidenced only by:

(a)     Short Form Lease dated _____, recorded in Official Records Volume _____, page ___ of the public records of Volusia. Florida;

(b)     Letter Agreement(s) dated _____;

(c)     Supplemental Lease Agreement dated _____;

(d)     First Amendment to Lease dated _____;

(e)     Second Amendment to Lease dated _____.

2.      That the term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.      That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.      That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

(a)     _____

(b)     _____

(c)     _____

(d)     _____

5.      That the Lease contains no provision for purchase of the Premises by Tenant.

6.      Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease    or    the    rent    due    thereunder    to    any    party    except: _____    and _____.

7.  Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.  Notwithstanding anything to the contrary herein:

(a)  No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)  Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.  The address for notices to Tenant is 3015 Coastline Drive, Orlando, Florida 32080, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.  This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE STORES, INC.**

By:_____

_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

**DMH PARTNERS, INC.**

By:_____

_____

Its:_____

JK2 112277.3 80130 00932
12/18/97  4:38 pm

## EXHIBIT "F"

### (ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re: _____, Volusia County, State of Florida

To Whom It May Concern:

This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Volusia, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Volusia, relating to uses permitted in the _____ District. The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above. The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations. Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

**EXHIBIT "G"**

**SHORT FORM LEASE**

**THIS SHORT FORM LEASE** is hereby executed this December __, 1997 by and between **DMH PARTNERS, INC.**, a Florida corporation, whose mailing address is Post Office Box 730, Windermere, Florida  34786 ("Landlord") and **WINN-DIXIE STORES, INC.**, a Florida corporation, whose mailing address is 3015 Coastline Drive, Orlando, Florida 32080 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**W I T N E S S E T H :**

**WHEREAS,** Landlord and Tenant did enter into a Lease, dated December __, 1997 "Lease"); and

**WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter.  Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease.  Tenant, at its option, shall be entitled to the privilege of six (6) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each.  Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document.  This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:

Print Name: SUSAN F. HUBER

Print Name: JEANETTE E. FELTON

**LANDLORD:**

**DMH PARTNERS, INC.**, a Florida corporation

By: _____

Its: PRESIDENT
Date: 12/23/97

**TENANT:**

**WINN-DIXIE STORES, INC.**, a Florida corporation

By: _____

Print Name: BRENDA J. BABCOCK

Print Name: Rebecca L. Sawyer

Its: VICE PRESIDENT
Date: 12/18/97

STATE OF West Virginia )
COUNTY OF Pocahontas )

The foregoing instrument was acknowledged before me this December 23, 199 7, by Donald Huber, as President of DMH PARTNERS, INC., a Florida corporation, on behalf of the corporation. [PLEASE CHECK ONE] ✓ who is personally known to me or _____ who has produced _____ as identification.

Printed Name: Pamela H. Buzzard
Notary Public, State and County aforesaid.
My Commission Expires: 12-20-2005
Notary ID No.: _____
(NOTARIAL SEAL)

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PAMELA G. BUZZARD
521 TENTH AVENUE
MARLINTON, WV 24954
My Commission Expires December 20, 2005

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this Dec. 30, 199 7, by
G.E. Clerc, Jr. , as Vice President of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation, who is personally known to me.

Printed Name: BRENDA J. BABCOCK
Notary Public, State and County aforesaid.
My Commission Expires: 11 28 19 99
Notary ID No.: _____
(NOTARIAL SEAL)



Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp. Nov. 20, 1999
Comm. No. CC 511004

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT OF LEASE**, made this _____March 20_____, 2000 by and between **DMH Partners, Inc.**, a Florida corporation ("Landlord"), and **Winn-Dixie Stores, Inc.**, a Florida corporation, ("Tenant"), recites and provides as follows:

### WITNESSETH:

**WHEREAS**, by Lease dated December 30, 1997 (the "Lease"), Landlord did lease and demise unto Tenant those certain premises, therein more particularly described, located in the shopping center development known as the Winn-Dixie Marketplace located at the northeast corner of Howland Avenue and Catalina Boulevard in the City of Deltona, County of Volusia, State of Florida (the "Leased Premises"), for such rentals and upon such terms and conditions as more particularly set forth therein, as short form of Lease being recorded in Official Records Book _____, Page _____ of public records of Volusia County, Florida.

**WHEREAS**, Landlord and Tenant have agreed to Amend the Lease as hereinafter provided.

**NOW THEREFORE**, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. The recitals hereinabove are true and correct and are incorporated herein by reference.

2. All references in the Lease to Exhibits "H" and "K" shall be deleted.

3. Article 1 of the Lease is hereby amended to add at the end of the second paragraph the following sentence:

    "Landlord and Tenant acknowledge that the Premises is the only development within the Shopping Center and that for purposes of interpreting the term "Pro-rata Share" as used herein, the net rentable square footage of the Store shall be the same as the total rentable square footage of the Shopping Center."

4. Article 3(b) is deleted in its entirety and the following is substituted in lieu thereof:

    "Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, "Real Estate Taxes" assessed upon the Premises. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Premises, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Premises. To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment. Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary,

1

FROM: KENT JONES COMPANY   1-713-954-4851   JENKE   MORRIS LENDAIS HOUSTON   05-562-2000

but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant in which case, Tenant shall pay the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

Basic Rent, Percentage Rent and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year. Tenant shall pay any sales or rent tax due to Landlord, at Tenant's option, directly to the taxing authorities."

5.   Article 16 is deleted in its entirety and the following is substituted in lieu thereof:

"Tenant's Maintenance.   Tenant shall keep the exterior and interior of the Store in reasonably neat and orderly, good condition and shall repair or replace all facilities and components comprising the Store or the Common Areas as needed including, without limitation, the roof, the parking lot, the driveways, windows and plate glass, automatic doors, air conditioning and heating systems and floor surfacing of the Store, the facade of the Store, the exterior walls of the Store (including painting of the exterior walls as needed), the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and electrical an plumbing systems except for reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonable clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the of making repairs and for examining or showing the same to prospective purchasers or lenders."

6.   Article 17 is deleted in its entirety and the following is substituted in lieu thereof:

"Landlord's Maintenance.   Landlord shall, at its cost and expense, keep and maintain in good condition and repair, and replace as necessary the foundation and structural members of the Store."

7.   Article 20 is deleted in its entirety and the following substituted in lieu thereof:

"Indemnification.   Tenant agrees to indemnify and save harmless Landlord and any Mortgagee from any claim or loss (including costs of investigation, court costs and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store or Common Area unless caused by negligence or willful misconduct of Landlord or such Mortgagee, or their agents or employees or by Landlord's breach of its obligations under the Lease."

2

8.    Article 22 is deleted in its entirety and the following is substituted in lieu thereof:

"Insurance.    Tenant shall carry or cause to be carried the types of insurance coverage on the Premises listed below, placed with a company licensed to transact business in the state where the Premises is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of *Best's Insurance Report*. Certificates of Insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to landlord and any first mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or "Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100,000,000.00, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any Mortgagee.

(a)    Liability Insurance.    Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Premises stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(b)    Casualty Insurance.    Tenant shall carry or cause to be carried all-risk commercial property insurance on the Premises and any permanent or structural additions, alterations, and improvements made thereto and on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and /or its personal property, and Tenant's Trade Fixtures in the amount of full replacement cost thereof and deductibles of not more than $100,000.00 and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self-insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (a) or (b) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay the total amount of any settlement or judgment resulting therefrom. As to casualty losses, Tenant shall promptly pay the replacement cost thereof, if actually replaced, jointly to Landlord and to any first mortgagee. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 22 of this Lease."

5.    It is mutually agreed that the Lease shall be and remain in full force and effect except only as the same is specifically modified hereby. All covenants, terms, obligations and conditions of the Lease not changed by this Amendment are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be properly executed s of the day and year above written.

Signed, sealed and delivered
in the presence of:

Print name: _____Lucy W. McCook_____

Print name: _____Thurla M. Cross_____

DMH Partners, Inc.

By: _____Donald H._____

Its: _Pres iden t_
Date: _3-16-00_

Print name: _____Lucy W. McCook_____

Print name: _____BRENDA J. BABCOCK_____

Winn-Dixie Stores, Inc.

By: _____R. P. McCook_____
    R. P. McCook
Its: _VICE PRESIDENT_
Date: _March 20, 2000_

STATE OF _Florida_ )
COUNTY OF _Duval_ )

The foregoing instrument was acknowledged before me this _March_ _16_, 2000, by _Donald M. Huber_, as _President_ of DMH Partners, Inc., a Florida corporation, on behalf of the corporation, who [PLEASE CHECK ONE] ——— is personally known to me or X has produced _FDL # H16019347326O_ as identification.

_____Lucy W. McCook_____
Printed Name: _Lucy W. McCook_
Notary Public, State and County aforesaid.
My Commission Expires: _07/24/2000_
Notary ID No.: _571884_
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _March_ _20_, 2000, by _R. P. McCook_, as _Vice_ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____Lucy W. McCook_____
Printed Name: _Lucy W. McCook_
Notary Public, State and County aforesaid.
My Commission Expires: _07/24/2000_
Notary ID No.: _571884_
(NOTARIAL SEAL)

O:\TRANSFER\ORLANDO\2313\AMD.WPD
March 16, 2000

4

PTC-2
5-10-00

## ASSIGNMENT OF WINN DIXIE LEASE
(Winn-Dixie Lease No. 2313)

**THIS ASSIGNMENT OF WINN DIXIE LEASE** (the "**Assignment**") effective the 11th day of May, 2000 from:

> **DMH PARTNERS, INC.**, a Florida corporation, Post Office Box 730, Windermere, Florida 34786 (the "**Assignor**")

> to

> **H. SIEBER INVESTMENT CO.**, a Kentucky general partnership, c/o Klaus Thoma, Esquire, Morris, Lendais, Hollrah & Snowden, 1980 Post Oak Boulevard, Suite 700, Houston, Texas 77056 (the "**Assignee**").

## RECITALS:

A.     On or about December 30, 1997, the Assignor, as the Landlord, and **WINN-DIXIE STORES, INC.**, as the Tenant (the "**Tenant**") entered into a certain Lease Agreement (as amended or modified, the "**Lease**") pursuant to which the Tenant leased from the Landlord certain space located at the northeast corner of Howland Avenue and Catalina Boulevard in Deltona, Volusia County, Florida, which street address is 2880 Howland Boulevard, Deltona, Florida 32725.

B.     The Assignor has sold to the Assignee the real property or premises described in the Lease and the Assignor desires to assign to the Assignee all the rights of the Assignor under the Lease.

**NOW THEREFORE,** in consideration of Ten Dollars ($10.00), the mutual covenants contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     The above Recitals are true and correct.

OR278990;2

2.       The Assignor, as the Landlord under the Lease, does hereby assign, transfer, remise and set over unto Assignee all of the Assignor's right, title and interest as the Landlord under the Lease including, but not limited to, the right to receive all future rent payments under the Lease from and after the date hereof (the "**Effective Date**").

3.       The Assignee hereby accepts this Assignment and, by way of illustration and not limitation, the Assignee accepts, and agrees to perform, all of the Assignor's obligations as landlord under the Lease from and after the Effective Date, but Assignee assumes no responsibility for any obligations of the Assignor as landlord under the Lease prior to the Effective Date hereof.

4.       The Assignor makes no further representations or warranties of any nature whatsoever in regard to the Lease.

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment as of the day and year first set forth above.

Signed, sealed and delivered
in the presence of:

**DMH PARTNERS, INC.**


_____
(Signature of Witness)

**DENISE J. BOUCHARD**
_____
(Print Name of Witness)

By: _____
        Donald M. Huber,
        President

_____
(Signature of Witness)

**Patrick T. Christiansen**
_____
(Print Name of Witness)

As to the "Assignor"

## ACCEPTANCE OF ASSIGNMENT

The undersigned, H. Sieber Investment Co., being the **ASSIGNEE** as set forth above does hereby:

     1.    Accept the foregoing Assignment of Lease.

     2    Agreed to assume the obligations of the Landlord under the Lease as set forth above.

Dated this 11th day of May, 2000.

Signed, sealed and delivered
in the presence of:

_____
(Signature of Witness)

Michaela Carter
(Print Name of Witness)

_____
(Signature of Witness)

Annette MenBe
(Print Name of Witness)

As to the "Assignee"

**H. SIEBER INVESTMENT CO.**

By _____
(Signature of Partner)
Attorney and a pertain fact for Hans Sieber

Klaus Thoma
(Print Name & Title of Partner Signing)

OR278990;2

3

## *AIB DELTONA, LTD.*

### *Certificate of Limited Partnership*

Pursuant to Chapter 620, Florida Statues, the undersigned, being the sole general partner of the Limited Partnership, files this Certificate of Limited Partnership.

1.  The name of the Limited Partnership is *AIB Deltona, Ltd.*

2.  AIB Deltona, Ltd. was converted from the Kentucky general partnership H. Sieber **Investment Co.**

3.  The conversion was approved unanimously by the two partners of **H. Sieber Investment Co.**

4.  The name and address of the registered agent of the Limited Partnership is:  CT Corporation System, c/o CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

5.  The address of the registered office of *AIB Deltona, Ltd.* is c/o Klaus Thoma, 1980 Post Oak Boulevard, Suite 700, Houston, Texas 77056.

6.  The address of the principal office of the Limited Partnership in the United States where records are to be kept or made available is 1980 Post Oak Boulevard, Suite 700, Houston, Texas 77056.  **This is also the Limited Partnership's mailing address.**

7.  The name and street address of the business of the sole general partner is: AIB Management II, L.L.C., c/o Klaus Thoma, 1980 Post Oak Boulevard, Suite 700,  Houston, Texas 77056.

8.  The Partnership shall remain effective for a period of forty (40) years from the Effective Date unless the Partnership is sooner dissolved.

*Under penalties of perjury I declare that I have read the foregoing and know the contents thereof and that the facts stated herein are true and correct.*

EXECUTED this  __8__  th day of  ___April___ , 2003.

> AIB Management II, L.L.C.,
> a Texas limited liability company
> The sole GENERAL PARTNER
>
> _____
> Johann C. Sieber, President

EXHIBIT B

## Ad Valorem Taxes and Non-Ad Valorem Assessments

The information contained herein does not constitute a title search and should not be relied on as such.

| Account Number | Tax Type | Tax Year |
|---|---|---|
| 813039000040 | Real Estate | 2005 |

**Mailing Address**
AIB DELTONA, LTD
1980 POST OAK BLVD SUITE 720
HUSTON TX 77056

**Physical Address**
2880 HOWLAND
DEL
**Alternate Key**
2787058.0000

| Assessed Value | Exempt Amount | Taxable Value |
|---|---|---|
| $3,338,417.00 | $0.00 | $3,338,417.00 |

**Exemption Detail**
NO EXEMPTIONS

**Millage Rate**
016  20.75350

**Legal Description**
TRACT D DELTONA LAKES UNIT 39 MB 27 PGS 209 THRU 212 INC PER OR 4183 PG 1361-1363 TRACT D & INC LOTS 1 THRU 4 INC BLK 1023 DELT ONA LAKES UNIT 39 MB 27 PGS 209 THRU 212 PER OR 4183 PG 1361 & O R 4183 PG 1358 & OR 4183 PG 1909

### Tax Districts Detail

| Code | Description | Exemption Amount | Amount |
|---|---|---|---|
| 0057 | VOLUSIA FOREVER | $0.00 | $667.68 |
| 0058 | VOLUSIA ECHO | $0.00 | $667.68 |
| 0015 | SCHOOL-I&S | $0.00 | $1,081.65 |
| 0050 | COUNTY | $0.00 | $19,676.63 |
| 0130 | DELTONA | $0.00 | $13,854.43 |
| 0060 | ST JOHNS RIVER WATER MGMT | $0.00 | $1,542.35 |
| 0065 | FLORIDA INLAND NAVIGATION DIST | $0.00 | $128.53 |
| 0070 | W VOLUSIA HOSPITAL AUTHORITY | $0.00 | $5,174.55 |
| 0010 | SCHOOL | $0.00 | $26,490.34 |
| 0163 | STORMWATER VACANT PROPERTY | $0.00 | $238.00 |
| 0162 | STORMWATER IMPROVED PROPERTY | $0.00 | $3,595.20 |

| | Total Gross | $73,117.04 |
|---|---|---|

| If Paid By | Amount Due |
|---|---|
| | $0.00 |

| Date Paid | Transaction | Receipt | Amount Paid |
|---|---|---|---|
| 03/16/2006 | PAYMENT | 1003586.0001 | $73,117.04 |

### Prior Year Taxes Due

NO DELINQUENT TAXES