SUBLEASE AGREEMENT

by and between
MANCHESTER MALL, Joint Venture, a
Massachusetts general partnership

as LANDLORD


and


WINN-DIXIE RALEIGH, INC.,
as TENANT


Dated: December    , 1986


EXHIBIT "B"

Exhibit A

TABLE OF CONTENTS

|  | | Page |
|---|---|---|
| Parties | | 1 |
| 1. | Demise of Premises | 1 |
| 2. | Certain Definitions | 1 |
| 3. | Title and Condition | 4 |
| 4. | Use of Leased Premises; Quiet Enjoyment | 7 |
| 5. | Term | 7 |
| 6. | Rent | 8 |
| 7. | Net Lease; Non-Terminability | 10 |
| 8. | Payment of Impositions; Compliance with Law | 11 |
| 9. | Liens; Recording and Title | 13 |
| 10. | Indemnification | 14 |
| 11. | Maintenance and Repair | 15 |
| 12. | Alterations | 17 |
| 13. | Condemnation | 18 |
| 14. | Insurance | 20 |
| 15. | Restoration | 26 |
| 16. | Subordination to Financing | 28 |
| 17. | Assignment, Subleasing and Vacating | 29 |
| 18. | Permitted Contests | 30 |
| 19. | Conditional Limitations; Default Provision | 32 |
| 20. | Additional Rights of Landlord | 37 |
| 21. | Notices | 38 |
| 22. | Estoppel Certificate | 38 |
| 23. | Surrender and Holding Over | 39 |
| 24. | Risk of Loss | 40 |
| 25. | No Merger of Title | 40 |
| 26. | Non-Recourse | 41 |
| 27. | Security Agreement under Uniform Commercial Code | 41 |
| 28. | Investment Tax Credit | 41 |
| 29. | Right of First Refusal | 42 |
| 30. | Miscellaneous | 43 |
| Execution Clause | | 45 |

Exhibit "A" - Premises
Exhibit "B" - Machinery & Equipment
Exhibit "C" - Permitted Encumbrances
Exhibit "D" - Basic Rent Payment Schedule
Exhibit "E" - Investment Tax Credit Items

THIS SUBLEASE AGREEMENT (hereinafter called "Lease") made
as of this 30th day of _____ December _____, 19 86 , between
MANCHESTER MALL, Joint Venture, a Massachusetts general partnership
("Landlord"), with an address of c/o Stephen R. Karp, #1 Wells
Avenue, Newton, Massachusetts 02159

and WINN-DIXIE RALEIGH, INC., a Florida corporation duly quali-
fied to transact business in the Commonwealth of Virginia ("Ten-
ant"), with an address of P. O. Box 25511, Raleigh, North
Carolina 27611;

    In consideration of the rents and provisions herein
stipulated to be paid and performed, Landlord and Tenant
hereby covenant and agree as follows:


    1.  Demise of Premises.  Landlord hereby demises and
lets to Tenant, and Tenant hereby takes and leases from
Landlord, for the term or terms and upon the provisions
hereinafter specified, the following described property
(collectively, the "Leased Premises"):  (i) the premises
described in Exhibit "A" attached hereto and made a part
hereof, together with the easements, rights and appurte-
nances thereunto belonging or appertaining (collectively,
the "Land"); (ii) the buildings, structures and other
improvements constructed and to be constructed on the Land
(collectively, the "Improvements"); and (iii) the machinery
and equipment described in Exhibit "B" attached hereto
and made a part hereof and installed in and upon the Im-
provements, together with all additions and accessions
thereto, substitutions therefor and replacements thereof
permitted by this Lease (collectively, the "Equipment").

    2.  Certain Definitions.

        (a)  "Additional Rent" shall mean Additional Rent
as defined in Paragraph 6.

        (b)  "Adjoining Property" shall mean all side-
walks, curbs, gores and vault spaces adjoining any of the
Leased Premises.

tions, improvements or repairs to, all alterations, recon-
structions, renewals or removals of and all substitutions or
replacements for any of the Improvements or Equipment, both
interior and exterior, structural and non-structural, and
ordinary and extraordinary.

     (d) "Assignment" shall mean any Assignment of
Rents and Lessor's Interest in Leases hereafter executed
from Landlord to Lender.

     (e) "Basic Rent" shall mean Basic Rent as defined
in Paragraph 6.

     (f) "Basic Rent Payment Dates" shall mean the
Basic Rent Payment Dates as defined in Paragraph 6.

     (g) "Casualty Termination Date" shall mean the
Casualty Termination Date as defined in paragraph 14(i).

     (h) "Commencement Date" shall mean Commencement
Date as defined in Paragraph 5.

     (i) "Condemnation" shall mean a Taking and/or
a Requisition.

     (j) "Default Rate" shall mean the Default Rate
as defined in Paragraph 6.

     (k) "Event of Default" shall mean an Event of
Default as defined in Paragraph 19(a).

     (l) "Final Payment" shall mean the final payment
to Landlord of Net Proceeds or of a Net Award or of a
Remaining Sum, as applicable.

     (m) "Final Payment Date" shall mean the first
Basic Rent Payment Date occurring after the Final Payment.

     (n) "Impositions" shall mean the Impositions as
defined in Paragraph 8.

     (o) "Law" shall mean any constitution, statute or
rule of law.

     (p) "Legal Requirements" shall mean all present
and future Laws, codes, ordinances, orders, Judgments,
decrees, injunctions, rules, regulations and requirements,

-2-

even if unforeseen or extraordinary, of every duly consti-
tuted governmental authority or agency (but excluding those
by their terms not applicable to Tenant or the Leased
Premises as a result of some grandfather or some similar
provision) and all covenants, restrictions and conditions
now or hereafter of record which may be applicable to Tenant
or to any of the Leased Premises, or to the use, manner of
use, occupancy, possession, operation, maintenance, altera-
tion, repair or reconstruction of any of the Leased Pre-
mises, even if compliance therewith necessitates structural
changes or improvements or results in interference with
the use or enjoyment of any of the Leased Premises.

(q) "Lender" shall mean an entity which makes a
Loan to Landlord, secured by a Mortgage and evidenced by a
Note.

(r) "Loan" shall mean a loan made by a Lender
to Landlord, secured by a Mortgage and evidenced by a
Note.

(s) "Mortgage" shall mean a mortgage or similar
security instrument, hereafter executed covering the Leased
Premises, from Landlord to Lender.

(t) "Net Award" shall mean the entire award
payable to Landlord by reason of a Condemnation, less any
expenses incurred by Landlord in collecting such award.

(u) "Net Proceeds" shall mean the entire proceeds
of any insurance, including those due to permitted self-
insurance, required under clauses (i) and (ii) of Paragraph
14(a), less any expenses incurred by Landlord in collecting
such proceeds, plus the amount of any deductible related to
such insurance.

(v) "Note" shall mean a Promissory Note hereafter
executed from Landlord to Lender, which Note will be secured
by a Mortgage and an Assignment.

(w) "Offer Amount" shall mean Offer Amount as de-
fined in Paragraph 13(b) and 14(h).

covenants, restrictions, reservations, liens, conditions and easements listed in Exhibit "C" attached hereto and made a part hereof.

(y)  "Remaining Sum" shall mean the Remaining Sum as defined in Paragraph 15(a).

(z)  "Replaced Equipment" shall mean the Replaced Equipment as defined in Paragraph 11.

(aa)  "Replacement Equipment" shall mean the Replacement Equipment as defined in Paragraph 11.

(bb)  "Requisition" shall mean any temporary requisition or confiscation of the use or occupancy of any of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

(cc)  "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(dd)  "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding, or by any other means, or any de facto condemnation.

(ee)  "Term"  shall mean the Term as defined in Paragraph 5.

(ff)  "Termination Date" shall mean the Termination Date as defined in Paragraph 13(b).

3.  Title and Condition.

(a)  The Leased Premises are demised and let subject to (i) the rights of any parties in possession of any of the Leased Premises, (ii) the existing state of title of the Leased Premises, including the Permitted Encumbrances, as of the commencement of the Term, (iii) any state

-4-

of facts which the survey of the Leased Premises might show, (iv) all Legal Requirements, including any existing violation of any thereof, and (v) the condition of the Leased Premises as of the commencement of the Term, without representation or warranty by Landlord; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b)     Tenant acknowledges that the Leased Premises are in good condition and repair at the inception of this Lease, having been constructed on behalf of Tenant by a contractor of its choice.  LANDLORD HAS NOT MADE AND WILL NOT MAKE ANY INSPECTION OF ANY OF THE LEASED PREMISES, AND LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES AS IS, AND TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTA-TION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO ITS FITNESS FOR USE OR PURPOSE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, AS TO LANDLORD'S TITLE THERETO, OR AS TO VALUE, COMPLIANCE WITH SPECIFICA-TIONS, LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION, IT BEING AGREED THAT, ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE LEASED PREMISES ARE OF ITS SELECTION AND TO ITS SPECIFICATIONS AND THAT THE LEASED PREMISES HAVE BEEN INSPECTED BY TENANT AND ARE SATISFACTORY TO IT.  IN THE EVENT OF ANY DEFECT OR DEFICIENCY IN ANY OF THE LEASED PREMISES OF ANY NATURE, WHETHER PATENT OR LATENT, LANDLORD SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR CONSEQUENTIAL

-5-

SIONS OF THIS PARAGRAPH 3(b) HAVE BEEN NEGOTIATED; AND THE
FOREGOING PROVISIONS ARE INTENDED TO BE A COMPLETE EXCLUSION
AND NEGATION OF ANY WARRANTIES BY LANDLORD, EXPRESS OR
IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, ARISING
PURSUANT TO THE UNIFORM COMMERCIAL CODE OR ANY OTHER LAW NOW
OR HEREAFTER IN EFFECT OR OTHERWISE.

(c)  Tenant represents to Landlord that Tenant has
examined the title to the Leased Premises prior to the ex-
ecution and delivery of this Lease and has found the same to
be satisfactory for the purposes contemplated hereby, and
acknowledges that title is in Ridgeview, Incorporated, a
Virginia corporation, that the premises are leased to Land-
lord by virtue of a Ground Lease dated July 3, 1985, and
that Tenant has only the right of possession and use of the
Leased Premises as provided in this Lease.

(d)  Landlord hereby assigns, without recourse
or warranty whatsoever, to Tenant all warranties, guaranties
and indemnities, express or implied, and similar rights
which Landlord may have against any manufacturer, seller,
engineer, contractor or builder in respect of any of the
Leased Premises, including any rights and remedies existing
under contract or pursuant to the Uniform Commercial
Code.  Such assignment shall remain in effect so long as no
Event of Default exists hereunder or until the termination
of this Lease, whereupon Tenant shall reassign any interest
so assigned hereunder to Landlord.  Landlord shall also
retain the right to enforce any such warranty, guaranty, or
indemnity assigned in the name of Tenant.  Landlord hereby
agrees to execute and deliver at Tenant's expense such
further documents, including powers of attorney, as Tenant
may reasonably request (and which, in the good faith judg-
ment of Landlord, do not adversely affect a substantial
general interest of Landlord) in order that Tenant may have
the full benefit of the assignment effected or intended to
be effected by this Paragraph 3(d).

4. <u>Use of Leased Premises; Quiet Enjoyment.</u>

4. <u>Use of Leased Premises; Quiet Enjoyment.</u>

(a)  The Leased Premises shall be used for any
legal purpose, subject to the provisions of Paragraph 17
hereof.  In no event shall the Leased Premises be used for
any purpose which shall violate the provisions of any
recorded covenants, restrictions or agreements appli-
cable to the Leased Premises or to the shopping center of
which the Leased Premises are a part.

(b)  Tenant shall not permit any unlawful occupa-
tion, business or trade to be conducted on any of the Leased
Premises or any use to be made thereof contrary to any
applicable Legal Requirement. Tenant shall not use or occupy
or permit any of the Leased Premises to be used or occupied,
nor do or permit anything to be done in or on any of the
Leased Premises, in a manner which would or might (i)
violate any certificate of occupancy affecting any of the
Leased Premises, (ii) make void or voidable any insurance
then in force with respect to any of the Leased Premises,
(iii) make it difficult or impossible to obtain fire or
other insurance which Tenant is required to furnish here-
under, (iv) cause structural injury to any of the Improve-
ments, or (v) constitute a public or private nuisance or
waste.

(c)  Subject to the provisions of Paragraphs 3 and
7(b), so long as no event of Default exists hereunder,
Landlord covenants to do no act to disturb the peaceful and
quiet occupation and enjoyment of the Leased Premises by
Tenant, provided that Landlord may enter upon and examine
any of the Leased Premises at reasonable times.

5.  <u>Term.</u>  Subject to the provisions hereof, Tenant
shall have and hold the Leased Premises for an initial term
(the "Term") commencing on the date on which Landlord com-
pletes the purchase of the Leased Premises (the "Commence-
ment Date") and ending at midnight twenty (20) years later.
Provided the Lease shall not have been terminated pursuant

to Paragraph 19, the Tenant shall have the option to extend
the Term for the next additional extension period by giving
written notice to Landlord in writing, six (6) months for
subsequent extensions prior to the expiration of the then
current Term.   The initial extension period shall be 60
months and thereafter the Term shall be extended by 5 con-
secutive periods of extension of 60 months each.   In the
absence of giving of such notice to extend by Tenant to
Landlord, the Term  shall be automatically terminated at the
end of the then current Term.   Any such extension or renewal
of the Term ("Renewal Term") shall be subject to and conti-
nue in full force and effect all the provisions of this
Lease.   In the event that Tenant does not exercise its
option to extend or to further extend the Term, as herein-
above provided, then Landlord shall have the right during
the remainder of the Term then in effect to (i) advertise
the availability of the Leased Premises for sale or for
reletting and to erect upon the Leased Premises signs
indicating such availability (provided that such signs do
not unreasonably interfere with the use or the Leased
Premises by Tenant), and (ii) show the Leased Premises to
prospective purchasers or tenants at such reasonable times
during normal business hours as Landlord may select.   If
Tenant shall fail to timely give such notice of its irre-
vocable election to exercise any renewal option, then
Tenant's right to exercise such option and all options
with regard to subsequent Renewal Terms shall expire and be
null and void.

        6.  Rent.

        (a)  Tenant shall pay to Landlord, as annual rent
for the Leased Premises during the Term the amounts deter-
mined in accordance with the schedule set forth in Exhibit
"D" attached hereto and made a part hereof ("Basic Rent"),
which schedule provides for the payment of percentage rent
as set forth thereon and is included in the definition of

same day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America. Pro rata Basic Rent shall be due for the period from the Commencement Date through the fifth day of the month next following the Commencement Date and shall be paid in advance on the Commencement Date. Notwithstanding the above, percentage rent shall be payable when and as provided in Exhibit "D".

(b)  Tenant shall pay and discharge when the same shall become due, as additional rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of non-payment of Basic Rent. If any installment of Basic Rent is not paid within ten days after the due date thereof, Tenant shall pay to Landlord, as additional rent, an amount equal to four percent of the amount of such installment. Additionally, Tenant shall pay to Landlord on demand, as additional rent, interest at fifteen percent (15%) (the "Default Rate") on all overdue amounts of additional rent pursuant to the foregoing sentence, on all overdue installments of Basic Rent from the respective due dates thereof, and on all overdue amounts of additional rent relating to obligations which Landlord shall have paid on behalf of Tenant, from the date

-9-

additional rent is ... sometimes ... termed "Additional
Rent". The requirements of Paragraph 19(e) regarding notice
and grace periods need not be satisfied prior to the imposi-
tion of the Additional Rent charges of this Paragraph 6(b).

7. Net Lease; Non-Terminability.

(a)   This is a net lease and Basic Rent, Ad-
ditional Rent and all other sums payable hereunder and under
the Ground Lease by Tenant shall be paid without notice or
demand, and without set-off, counterclaim, recoupment,
abatement, suspension, deferment, diminution, deduction, re-
duction or defense.

(b)   This Lease shall not terminate, Tenant shall
not have any right to terminate this Lease during the Term
(except as otherwise expressly provided herein), Tenant
shall not be entitled to any set-off, counterclaim, recoup-
ment, abatement, suspension, deferment, diminution, deduc-
tion, reduction or defense of or to Basic Rent, Additional
Rent or any other sums payable under this Lease (except as
otherwise expressly provided herein), and the obligations
of Tenant under this Lease shall not be affected by any
interference with Tenant's use of any of the Leased Premises
for any reason, including the following:  (i) any damage to
or destruction of any of the Leased Premises by any cause
whatsoever, (ii) any Condemnation, (iii) the prohibition,
limitation or restriction of Tenant's use of any of the
Leased Premises, (iv) any eviction by paramount title or
otherwise, (v) Tenant's acquisition of ownership of any of
the Leased Premises other than pursuant to an express pro-
vision of this Lease, (vi) any default on the part of Land-
lord hereunder or under any other agreement, (vii) any
latent or other defect in, or any theft or loss of, any of
the Leased Premises, (viii) the breach of any warranty of
any seller or manufacturer of any of the Equipment, (ix) any
violation of Paragraph 4(b) by Landlord, or (x) any other

-10-

cause, whether similar or dissimilar to the foregoing, any present or future Law to the contrary notwithstanding.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events (or, in lieu thereof, Tenant shall pay amounts equal thereto), and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

(c)   Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise.

(d)   Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, or (ii) to any set-off, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein.

8.    <u>Payment of Impositions; Compliance with Law.</u>

(a)   Subject to the provisions of Paragraph 18 hereof relating to contests Tenant shall, before interest or

every kind and nature (including real and personal property,
income, franchise, withholding, profits and gross receipts
taxes), all charges for any easement or agreement maintained
for the benefit of any of the Leased Premises including, but
not limited to, common area maintenance charges, all general
and special assessments, levies, permits, inspection and
license fees, all water and sewer rents and other utility
charges, all ground rents, and all other public charges
whether of a like or different nature, even if unforeseen or
extraordinary, imposed upon or assessed against Landlord,
Tenant or any of the Leased Premises as a result of or aris-
ing in respect of the acquisition, occupancy, leasing, use
or possession thereof or any activity conducted on the
Leased Premises or the Basic Rent or Additional Rent (in-
cluding without limitation, any gross income tax or excise
tax levied by any governmental body on or with respect to
such Basic Rent or Additional Rent)(collectively the "Im-
positions").

Nothing herein shall obligate Tenant to pay Federal,
State or local (i) franchise, capital stock or similar
taxes, if any, of Landlord, (ii) income, excess profits or
other taxes, if any, of Landlord, determined on the basis of
its net income, or (iii) any estate, inheritance, succes-
sion, gift, capital levy or similar tax unless the taxes
referred to in clauses (i) and (ii) above are in lieu of or
a subtitute for any other tax or assessment upon or with
respect to any of the Leased Premises which, if such other
tax or assessment were in effect, would be payable by Ten-
ant.  In the event that any assessment against any of the
Leased Premises may be paid in installments, Tenant shall
have the option to pay such assessment in installments; and
in such event, Tenant shall be liable only for those in-
stallments which become due and payable during the Term.
Tenant shall prepare and file all tax reports required by

-12-

Tenant shall furnish to Landlord, promptly upon re-
ceipt thereof, copies of all settlements and notices per-
taining to the Impositions which may be issued by any gov-
ernmental authority and receipts for payments of all Imposi-
tions made during each calendar year of the Term within
ninety days after payment.

(b)  Tenant shall promptly comply with and conform
to all of the Legal Requirements, subject to the provisions
of Paragraph 18 hereof.

9.  Liens; Recording and Title.

(a)  Tenant shall not, directly or indirectly,
create or permit to be created or to remain, and shall
promptly discharge any lien on any of the Leased Premises or
Basic Rent, Additional Rent or any other sums payable by
Tenant under this Lease, other than the Mortgage, the As-
signment, the Permitted Encubmrances and any mortgage, lien,
encumbrance or other charge created by or resulting from any
act or omission by Landlord.  NOTICE IS HEREBY GIVEN THAT
LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR
MATERIALS FURNISHED OR TO BE FURNSIHED TO TENANT, OR TO ANY-
ONE HOLDING ANY OF THE LEASED PREMISES THROUGH OR UNDER TEN-
ANT, AND THAT NO MECHANIC'S OR OTHER LIENS FOR ANY SUCH
LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE
INTEREST OF LANDLORD IN AND TO ANY OF THE LEASED PREMISE.

(b)  Tenant shall execute, deliver and record,
file or register from time to time all such instruments as
may be required by Landlord or any present or future law in
order to evidence the respective interest of Landlord and
Tenant in any of the Leased Premises, and shall cause a
memorandum of this Lease, and any supplement hereto or to
such other instrument, if any, as may be appropriate, to be
recorded, filed or registered and re-recorded, refiled or
re-registered in such manner and in such places as may be
required by Landlord or any present or future law in order

-13-

tion by Landlord shall be deemed or construed to mean that Landlord has granted to Tenant any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest or lien in or upon the estate of Landlord in any of the Leased Premises.

10.   Indemnification.   Tenant agrees to pay, protect, indemnify, save and hold harmless Landlord from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from (i) any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of the Leased Premises or Adjoining Property, and any injury to or death of any person or any loss of or damage to any property in any manner arising therefrom, connected therewith or occurring thereon, whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said injury, death, loss, damage or other claim, (ii) any violation by Tenant of any provision of this Lease or of any contract or agreement to which Tenant is a party or of any Legal Requirement or Permitted Encumbrance, or (iii) any cause other than the negligence or wilfull misconduct of Landlord or its employees.   In case any action or proceeding is brought against Landlord by reason of any such claim, Tenant covenants upon notice from Landlord to resist or defend Landlord in such action, with the expenses of such defense paid by Tenant, and Landlord will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.

The obligations of Tenant under this Paragraph 10 shall survive any termination of this Lease.

-14-

(a)   Tenant shall at all times, including any
Requisition period, maintain the entire Leased Premises (in-
cluding, without limiting the generality thereof, the build-
ing interior and exterior, landscaping, roof, walls and
structural components of the Leased Premises) and the Ad-
joining Property in good repair and appearance and, in the
case of the Equipment, in good mechanical condition, except
for ordinary wear and tear, and shall promptly make all
Alterations (substantially equivalent in quality and work-
manship to the original work) of every kind and nature,
whether foreseen or unforeseen, which may be required to be
made upon or in connection with any of the Leased Premises
in order to keep and maintain the Landlord and Improvements
in as good repair and appearance as they were originally,
and the Equipment in as good mechanical condition as it was
originally, except for ordinary wear and tear. Tenant shall
do or cause others to do all shoring of the Leased Premises
or Adjoining Property or of foundations and walls of the
Improvements and every other act necessary or appropriate
for preservation and safety thereof, by reason of or in
connection with any excavation or other building operation
upon any of the Leased Premises or Adjoining Property,
whether or not Landlord shall, by any Legal Requirements, be
required to take such action or be liable for failure to do
so. Landlord shall not be required to make any Alteration,
whether foreseen or unforeseen, or to maintain any of the
Leased Premises (except as provided above) or Adjoining
Property in any way, and Tenant hereby expressly waives the
right to make Alterations at the expense of Landlord, which
right may be provided for in any Law now or hereafter in
effect. Tenant shall make all repairs and Alterations for
which it is responsible hereunder promptly upon written
notice from Landlord, and all such work shall be in a good,
proper and workmanlike manner.

(b)   In the event that any Improvement, now or hereafter constructed, shall encroach upon any property, street or right-of-way adjoining any of the Leased Premises or Adjoining Property, shall violate the provisions of any restrictive covenant affecting any of the Leased Premises, shall hinder or obstruct any easement or right-of-way to which any of the Leased Premises is subject, or shall impair the rights of others in, to or under any of the foregoing then, promptly after written request of Landlord, Tenant shall either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (ii) take such action as shall be necessary to remove such encroachments, hindrances or obstructions and to end such violations or impairments, including, if necessary, an Alteration.   Any such Alteration shall be made in conformity with the provisions of Paragraph 12.

(c)   Landlord shall have the right, upon notice to Tenant (or without notice in case of emergency), to enter upon any of the Leased Premises for the purpose of making any Alterations which may be necessary by reason of Tenant's failure to comply with the provisions of subparagraphs (a) and (b) of this Paragraph 11.   Except in case of emergency, the right of entry shall be exercised at reasonable times and at reasonable hours.   The cost of all such Alterations shall be Additional Rent; and Tenant shall pay the same to Landlord, together with interest thereon at the Default Rate from the time of notice of payment by Landlord to Tenant until paid by Tenant, immediately upon written demand therefor and upon submission of evidence of Landlord's payment of such costs.

(d)   Tenant shall, from time to time, replace with other operational equipment or parts (the "Replacement Equipment") any of the Equipment (the "Replaced Equipment")

which shall have become worn out, obsolete or unusable for
the purpose for which it is intended, been taken by a Con-
demnation as provided in Paragraph 13(d), or been lost,
stolen, damaged or destroyed as provided in Paragraph 14(h).
Tenant shall repair at its sole cost and expense all damage
to the Leased Premises caused by the removal of Replaced
Equipment or other personal property of Tenant or the
installation of Replacement Equipment. All Replacement
Equipment shall become the property of Landlord, shall be
free and clear of all liens and rights of others and shall
become a part of the Equipment to the same extent as the
Replaced Equipment had been.

12. <u>Alterations.</u> Except as otherwise provided in
Paragraphs 11, 29 and this Paragraph 12, Tenant shall not
(i) make any Alterations, (ii) install equipment in the Im-
provements or accessions to the Equipment, or (iii) do any
other act which would tend to impair the value of the Leased
Premises. Notwithstanding the above, Tenant may make non-
structural Alterations, but not structural alterations,
without the prior written consent of the Landlord. In the
event that Landlord gives its prior written consent to
any of the actions enumerated in clauses (i), (ii) and
(iii) above or if such consent is not required, Tenant
agrees that (i) the market value of the Leased Premises
shall not be lessened by any such Alteration, construction
or installation, or its usefulness or structural integrity
impaired; (ii) all such Alterations, construction and in-
stallations shall be performed in a good and workmanlike
manner, (iii) all such Alterations, construction and instal-
lations shall be expeditiously completed in compliance with
all Legal Requirements, (iv) all work done in connection
with any such Alteration, construction or installation shall
comply with the requirements of any insurance policy re-
quired to be maintained by Tenant hereunder, (v) Tenant
shall promptly pay all costs and expenses of any such

-17-

all liens filed against any of the Leased Premises arising
out of the same, (vi) Tenant shall procure and pay for all
permits and licenses required in connection with any such
Alteration, construction or installation, (vii) all such
Alterations, construction and installations shall be the
property of Landlord and shall be subject to this Lease.

13. Condemnation.

(a) Tenant, immediately upon obtaining knowledge of
the institution of any proceeding for Condemnation, shall
notify Landlord thereof and Landlord shall be entitled to
participate in any Condemnation proceeding at Tenant's ex-
pense. Landlord, immediately upon obtaining knowledge of
the institution of any proceeding for Condemnation, shall
notify Tenant thereof. Subject to the provisions of this
Paragraph 13 and Paragraph 15, Tenant hereby irrevocably as-
signs to Landlord any award or payment to which Tenant is or
may be entitled by reason of any Condemnation, whether the
same shall be paid or payable for Tenant's leasehold inter-
est hereunder or otherwise but nothing in this Lease shall
be deemed to (a) assign to Landlord any award or payment on
account of Tenant's trade fixtures, equipment or other tan-
gible property, moving expenses, loss of business and simi-
lar claims, if available, to the extent Tenant shall have a
right to make a separate claim therefor against the condem-
nor or (b) impair Tenant's right to any such award or pay-
ment so long as such claim is not based upon the value of
Tenant's leasehold interest.

(b) If (i) the entire Leased Premises or (ii) any
substantial portion of the Leased Premises, which portion is
substantially adverse to the business operations of Tenant
shall be taken by a Taking from a duly constituted govern-
mental authority or agency having jurisdiction, then Tenant
shall, not later than sixty days after Landlord gives Tenant
notice that Landlord has received a notice of a Taking or

-13-

Tenant receives notice of a Taking, give notice to Landlord
of its intention to terminate this Lease on any Basic Rent
Payment Date specified in such notice, which date (the "Ter-
mination Date") shall be the latter of the first Basic Rent
Payment Date after the actual date of the Taking or the ef-
fective date of the Taking under the law of the State.  In
such event, the condemnation proceeds shall be retained by
Landlord, and the term of the Lease shall end as of the Ter-
mination Date, with Tenant paying all sums and charges
otherwise due hereunder through the Termination Date whether
or not the Leased Premises are usable in part.  Any such
termination shall not, however, relieve Tenant of its obli-
gation to pay Impositions to the extent that Landlord con-
tinues to be liable for same.

(c)  In the event of any other Condemnation of any
of the Land or Improvements which does not result in a ter-
mination of this Lease, the Term shall nevertheless continue
and there shall be no abatement or reduction of Basic Rent,
Additional Rent or any other sums payable by Tenant here-
under, except as specifically provided in this subparagraph
(c).  Subject to the requirements of Paragraph 15, the Net
Award of such Condemnation shall be retained by Landlord
and, promptly after such Condemnation, Tenant, as required
in Paragraph 11(a), shall commence and diligently continue
to restore the Land and Improvements as nearly as possible
to their value, condition and character immediately prior
to such Condemnation, in accordance with the provisions of
clauses (i) through (iv) of Paragraph 15(a).

Upon the final payment to Landlord of the Net Award of
a Taking which falls within the provisions of this subpara-
graph (c), then, Landlord shall make the Net Award available
to Tenant for restoration, in accordance with the provisions
of Paragraph 15(a).

In the event of a Requisition of any of the Land or
Improvements, Landlord shall apply the Net Award of such

-19-

Requisition, to the extent available, to the installments of
Basic Rent, Additional Rent or other sums payable by Tenant
hereunder thereafter payable and any balance remaining
thereafter shall be paid to Landlord.  Upon the expiration
of the Term any portion of such Net Award which shall not
have been previously credited to Tenant on account of the
Basic Rent shall be retained by Landlord.

(d)   If any of the Equipment shall be taken by a
Condemnation other than a Condemnation which falls within
the provisions of Paragraph 13(b), the Term shall neverthe-
less continue and there shall be no abatement or reduction
of Basic Rent, Additional Rent or any other sums payable by
Tenant hereunder.  Tenant shall, whether or not the Net
Award is sufficient for the purpose, promptly replace the
Equipment so taken, in accordance with the provisions of
Paragraph 11(c), and the Net Award of such a Condemnation
shall thereupon be payable to Tenant.

(e)   Except with respect to an award or payment to
which Tenant is entitled pursuant to the provisions of Para-
graph 13(a), no agreement with any condemnor in settlement
of or under threat of any Condemnation shall be made by
either Landlord or Tenant without the written consent of the
other, which consents shall not be unreasonably withheld or
delayed.

14.   Insurance.

(a)   Tenant shall maintain at its sole cost and
expense the following insurance on the Leased Premises:

(i)   Insurance against loss or damage to
the Improvements and Equipment by fire and other risks from
time to time included under standard extended and addi-
tional extended coverage policies, vandalism and malicious
mischief and flood, in amounts not less than the actual re-
placement value of the Improvements and Equipment excluding
footings and foundations and other parts of the Improvements
which are not insurable.  Such policies shall contain re-

deductible.

(ii)   General public liability insurance against claims for bodily injury, death or property damage occurring on, in or about any of the Leased Premises or the Adjoining Property, in an amount not less than $1,000,000 for bodily injury or death to any one person, not less than $5,000,000 for any one accident, and not less than $1,000,000 for property damage. Policies for such insurance shall be for the mutual benefit of Landlord, Tenant, and any Lender.

(iii)   Workmen's compensation insurance covering all persons employed in connection with any work done on or about any of the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or any of the Leased Premises, or in lieu of such workmen's compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State.

(b)   The insurance required by Paragraph 14(a) shall be written by companies of recognized financial standing which are approved by Landlord and are authorized to do an insurance business in the State.  Notwithstanding the above, so long as Tenant is not in default hereunder and its stockholders' equity exceeds $100,000,000, it may self-insure each of the coverages described in Paragraph 14(a) if such self-insurance does not violate any Legal Requirements and is permitted by Landlord's lender, if any.  The insurance policies (i) shall be for a term of not less than six months, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the workmen's compensation insurance referred to in Paragraph 14(a)(iii) hereof) name Landlord, Tenant and any Lender as insured parties, as their respective interests may appear.  If said insurance or any part thereof shall expire, be withdrawn, become void by breach of

reason of the failure or impairment of the capital of any insurer, or if for any other reason whatsoever said insurance shall become unsatisfactory to Landlord, Tenant shall immediately obtain new or additional insurance satisfactory to Landlord.

(c)   Each insurance policy referred to in clauses (i), (iv) and (v) of Paragraph 14(a) shall contain standard non-contributory mortgagee clauses in favor of any Lender. Each policy shall provide that it may not be cancelled except after 30 days prior notice to Landlord and any Lender. Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises.

(d)   Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 14, shall renew or replace each policy, shall deliver to Landlord such renewal or replacement policy and evidence of the payment of the full premium therefor at least twenty days prior to the expiration date of each policy; and in the event of Tenant's failure to comply with any of the foregoing requirements, Landlord shall be entitled to procure such insurance.  Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate from the time of payment by Landlord until fully paid by Tenant, immediately upon written demand therefor by Landlord.

notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 14(a) may be the subject of self-insurance if permitted by Paragraph 14(b) or be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 14 and the Leased Premises are identified on such policies with a separate stated value and coverage.

(f)  In the event of any casualty loss, Tenant shall give Landlord immediate notice thereof.  Landlord is hereby authorized to adjust, collect and compromise, in its all claims under any of the insurance policies required by this Paragraph 14 (except the public liability and workmen's compensation insurance) and to execute and deliver on behalf of Tenant all necessary proofs of loss, receipts, vouchers and releases required by the insurers; and Tenant agrees to sign, upon request of Landlord, all such proofs of loss, receipts, vouchers and releases.  However, if Landlord so elects, Tenant shall adjust, collect and compromise any and all such claims, and Landlord shall have the right to join with Tenant therein.  Any adjustment, settlement or compromise of any such claim shall be subject to the prior written approval of Landlord and any Lender and Landlord and any Lender shall have the right to prosecute or contest, or to require Tenant to prosecute or contest, any such claim, adjustment, settlement or compromise.  All proceeds of any insurance required under clauses (i), (ii) of Paragraph 14(a) together with the amount of any deductible shall be payable to a trustee selected by Landlord and Tenant and reasonably satisfactory to Lender.  Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to such trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such trustee as Tenant's attorney-in-fact to endorse any draft therefor.

sured against) resulting in damage to any of the Leased
Premises, the Term shall nevertheless continue and there
shall be no abatement or reduction of Basic Rent, Additional
Rent or any other sums payable by Tenant hereunder, except
as hereinafter in this subparagraph (f) specifically pro-
vided. The Net Proceeds of such casualty shall be retained
by the above-mentioned trustee and, promptly after such
casualty, Tenant, as required in Paragraph 11(a), shall com-
mence and diligently continue to restore the Land and Im-
provements as nearly as possible to their value condition
and character immediately prior to such damage, in accord-
ance with the provisions of clauses (i) through (iv) of
Paragraph 15(a). Upon the final payment to the trustee of
such Net Proceeds, then the trustee shall make the Net Pro-
ceeds available to Tenant for restoration, in accordance
with the provisions of Paragraph 15(a). In the event of any
loss of any of the Equipment which does not fall within the
provisions of the immediately preceding paragraph, the Term
shall nevertheless continue and there shall be no abatement
or reduction of Basic Rent, Additional Rent or any other
sums payable by Tenant hereunder. Tenant shall, whether or
not the Net Proceeds are sufficient for the purpose, prompt-
ly repair or replace such Equipment, in accordance with the
provisions of Paragraph 11(c), and the Net Proceeds of such
loss shall thereupon be payable to Tenant, subject to the
provisions of Paragraph 15 hereof.

(g) If the Leased Premises are damaged to the
extent of 50% or more of the value thereof within such time
as less than three (3) years remains in any term, then in
such event Tenant shall have no obligation to restore the
Leased Premises if it shall give notice Landlord of its
intent not to so restore not later than ninety (90) days
after such casualty, but all Net Proceeds payable in con-
nection with such casualty shall be delivered to Landlord,

-24-

and the term of this Lease shall terminate upon such payment
and payment of all sums otherwise due and payable by Tenant
hereunder through the Casualty Termination Date.   Any such
termination shall not, however, relieve Tenant of its obli-
gation to pay Impositions to the extent that Landlord con-
tinues to be liable for same.

Notwithstanding anything to the contrary herein
above contained, if, prior to the Casualty Termination Date
stated in Tenant's notice of intention to terminate, Land-
lord or the trustee shall not have received the full amount
of the Net Proceeds payable by reason of the Casualty, the
Casualty Termination Date shall automatically be extended to
the first Basic Rent Payment Date after receipt by Landlord
of the full amount of the Net Proceeds.   Such extension
shall occur regardless of the reason for the trustee's fail-
ure to receive the full amount of the Net Proceeds prior to
the originally stated Casualty Termination Date; and Land-
lord shall have the right to contest the amount of any Net
Proceeds.

(h)  Landlord releases Tenant and Tenant's of-
ficers, directors, employees and agents from liability for
loss or damage to the Leased Premises that is covered by
valid and collectible fire insurance with an extended cover-
age endorsement.   Tenant releases Landlord, the partners of
Landlord, and Landlord's employees and agents from liability
for loss or damage to any of Tenant's property situated in
the Leased Premises that is covered by valid and collectible
fire insurance with an extended coverage endorsement.   The
release shall not be limited to the liability of the parties
to each other; it shall also apply to any liability to any
person claiming through or under the parties pursuant to a
right of subrogation or otherwise.   The release shall apply
even if the loss or damage shall have been caused by the
fault or negligence of a party or any person for whom a
party may be responsible.   The release shall apply only with

ance company. The release shall not apply to loss or damage to property of a party unless the loss or damage occurs when the applicable insurance policy of the party contains a clause or endorsement to the effect that the release will not adversely affect or impair the policy or prejudice the right of the insured to recover under the policy. Each fire insurance policy carried by Landlord with respect to the Leased Premises or by Tenant with respect to Tenant's property at the Leased Premises shall include this clause or endorsement if the insurance company is willing to include the clause or endorsement in the policy without an increase in premium. The following shall apply if an insurance company is willing to include the clause or endorsement in a policy carried by a party only on condition that the premium be increased. The party required to carry the insurance shall give notice to the other party of the need for an increased premium and of the amount of the increase. The clause or endorsement shall be required only if the other party pays the increase within twenty (20) days after the notice is given.

15. Restoration; Reduction of Rent.

(a) In the event that Net Proceeds or a Net Award are made available by Landlord for the restoration of any of the Land or Improvements, the trustee shall disburse such proceeds or award only in accordance with the following conditions:

(i) prior to commencement of restoration, the architects, contracts, contractors, plans and specifications for the restoration shall have been approved by Landlord, which approval shall not be unreasonably withheld;

(ii) at the time of any disbursement, no Event or Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged;

-26-

to time in an amount not exceeding the cost of the work completed since the last disbursement, upon receipt of (1) satisfactory evidence, including architects' certificates, of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) waivers of liens, (3) contractors' and subcontractors' sworn statements, (4) a satisfactory bringdown of title insurance, and (5) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed, in place and free and clear of mechanic's lien claims;

(iv)   each request for disbursement shall be acccompanied by a certificate of Tenant, signed by the President or any Vice President of Tenant, describing the work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work; the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease;

(v)   Landlord may retain ten percent of the restoration fund until the restoration is fully completed;

(vi)   the restoration fund shall be kept in a separate interest bearing account by the trustee;

(vii)   at all times the undisbursed balance of the restoration fund held by Landlord shall be not less than the cost of completing the restoration work free and clear of all liens.

In addition, prior to commencement of restoration and at any time during restoration, if the estimated cost of restoration, as determined by Landlord, exceeds the amount of the Net Proceeds or the Net Award available for such

restoration, the amount of such excess shall be paid by Tenant to Landlord to be added to the restoration fund. Any sum in the restoration fund added by Tenant which remains in the restoration fund upon the completion of restoration shall be returned to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of restoration, the Net Proceeds or the Net Award shall be deemed to be disbursed prior to any amount added by Tenant..

(b)   In the event that there are funds remaining undisbursed upon completion of restoration and full payment therefor, then such sum shall be credited to Basic and Additional Rent subsequently accruing hereunder.

16.   <u>Subordination to Financing.</u>   Tenant agrees that this Lease and Tenant's rights hereunder, including, but not limited to, Tenant's right of first refusal as set forth in paragraph 30 hereof, shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments that may be placed upon the Leased Premises by the Landlord, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination, provided, however, as a condition to this subordination, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such mortgage, and in the event of a foreclosure or other enforcement of any such mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this Lease, and any extensions thereof, and the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as Tenant fully performs all of its obligations hereunder.   Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law.

-28-

Tenant agrees that it will give notice to any holder of
a mortgage (which terms shall include all security instru-
ments) encumbering the Leased Premises, provided that Tenant
has been notified in writing of the name and address of such
mortgage holder, of any defaults of the Landlord or other
circumstances which would entitle Tenant to terminate this
Lease or abate the rental payable hereunder, specifying the
nature of the default by Landlord, and thereupon the holder
of the mortgage shall have the right, but not the obliga-
tion, to cure any such default by Landlord, and Tenant will
not terminate this Lease or abate the rental payable here-
under by reason of such default unless and until it has
afforded the mortgage holder thirty (30) days after such
notice to cure such default, in a reasonable period of
time in addition thereto if circumstances are such that said
default cannot be reasonably cured within such 30-day per-
iod. No such lender shall, upon assuming title to the
Leased Premises, be liable for any act or omission of any
prior landlord (including Landlord), or subject to any
offsets or defenses which Tenant may have against any prior
landlord, or be bound by any rent or additional rent paid
for more than the then current period to any prior landlord,
or be bound by any agreement or modification of this Lease
made without such lender's consent after Tenant has been
given written notice of such lender's interest in such a way
as to reduce rent, accelerate rent payments, shorten the
original term or change any renewal option. Nothing herein
shall be construed to be in conflict with the provisions of
paragraph 7 hereof.

17. <u>Assignment, Subleasing and Vacating</u>. The Tenant
may without the consent of the Landlord assign this Lease,
or sublease or vacate the Demised Premises in whole or in
part, provided the Tenant herein shall continue to remain
liable and responsible for the payment of rentals and due
performance of all other terms, covenants and conditions of
this Lease.

of the entire Premises, the annual rental thereafter shall be the sum of: (a) the average percentage rental, if any, paid by Tenant for the two full fiscal years of Tenant immediately preceding such assignment, vacating or subletting; and (b) the minimum guaranteed rental provided for herein; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the Demised Premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the Demised Premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the Demised Premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined.

Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any permitted sublease of any of the Leased Premises and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default. Tenant shall not mortgage or pledge this Lease, and any such mortgage or pledge made in violation of this Paragraph shall be void.

18. **Permitted Contests.** Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any lien referred to in Paragraph 9 or 12, or (iv) take any action with respect to any encroachment, violation, hindrance, obstruction or im-

shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (i) the collection of, or other realization upon, the Imposition or lien so contested, (ii) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such encroachment, violation, hindrance, obstruction or impairment, (iii) any interference with the use or occupancy of any of the Leased Premises, (iv) any interference with the payment of any Basic Rent or any Additional Rent, and (v) the cancellation of any fire or other insurance policy. Tenant shall provide Landlord security satisfactory in the sole opinion of Landlord assuring the payment, compliance, discharge, removal and/or other action, including all costs, attorneys' fees, interest and penalties in the event that the contest is unsuccessful. While any such proceedings are pending and the required security is held by Landlord, Landlord shall not have the right to pay, remove or cause to be discharged the Imposition or lien thereby being contested. Tenant further agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as the conditions of the first sentence of this Paragraph are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay, and save Landlord harmless against, any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied,

therein or in connection therewith, together with all penal-
ties, fines, interest, costs and expenses thereof or in con-
nection therewith, and perform all acts the performance of
which shall be ordered or decreed as a result thereof.  No
such contest shall subject Landlord to the risk of any civil
or criminal liability.

19.    Conditional Limitations; Default Provision.

(a)  The occurrence of any one or more of the fol-
lowing shall constitute an Event of Default under this
Lease:  (i) a failure by Tenant to make (regardless of the
pendency of any bankruptcy, reorganization, receivership,
insolvency or other proceedings, in law, in equity, or be-
fore any administrative tribunal, which have or might have
the effect of preventing Tenant from complying with the pro-
visions of this Lease) any payment of Basic Rent, Additional
Rent or other sum herein required to be paid by Tenant; (ii)
a failure by Tenant to duly perform and observe or a viola-
tion or breach of any other provision hereof; (iii) any
representation or warranty made by Tenant herein proves to
be incorrect, now or hereafter, in any material respect; (iv
Tenant or any guarantor of Tenant's obligations hereunder
shall (a) voluntarily be adjudicated a bankrupt or insol-
vent, (b) seek or consent to the appointment of a receiver
or trustee for itself or for any of the Leased Premises,
(c) file a petition seeking relief under the bankruptcy or
other similar laws of the United States any state or any
jurisdiction, (d) make a general assignment for the benefit
of creditors, or (e) be unable to pay its debts as they
mature; (v) a court shall enter an order, judgment or de-
cree appointing, with the consent of Tenant, a receiver or
trustee for it or for any of the Leased Premises or ap-
proving a petition filed against Tenant which seeks relief
under the bankruptcy or other similar laws of the United
States, any state or any jurisdiction, and such order,

-32-

unstayed, sixty days after it is entered; (vi) the Leased
Premises shall have been vacated or abandoned; (vii) Tenant
shall be liquidated or dissolved or shall begin proceedings
towards its liquidation or dissolution; or (viii) the estate
or interest of Tenant in any of the Leased Premises shall be
levied upon or attached in any proceeding and such estate or
interest is about to be sold or transferred or such process
shall not be vacated or discharged within sixty days after
such levy or attachment.

(b)  If an Event of Default shall have occurred,
Landlord shall have the right at its option, then or at
any time thereafter to do any one or more of the following
without demand upon or notice to Tenant:

(1)  Landlord may give Tenant notice of Land-
lord's intention to terminate this Lease on a date specified
in such notice. Upon the date therein specified, the Term,
the estate hereby granted and all rights of Tenant here-
under, shall expire and terminate as if such date were the
date herein before fixed for the expiration of the Term, but
Tenant shall remain liable for all its obligations hereunder
including its liability for Basic Rent, Additional Rent, Im-
positions and all other sums and charges otherwise due here-
under, as hereinafter provided.

(2)  Landlord may, whether or not the Term of
this Lease shall have been terminated pursuant to clause (1)
above, (a) give Tenant notice to surrender any of the Leased
Premises to Landlord immediately or on a date specified in
such notice, at which time Tenant shall surrender and de-
liver possession of the Leased Premises to Landlord or (b)
re-enter and repossess any of the Leased Premises by force,
summary proceedings, ejectment or any other means or pro-
cedure. Upon or at any time after taking possession of any
of the Leased Premises, Landlord may remove any persons
or property therefrom. Landlord shall be under no liability

-33-

for or by reason of such entry or repossession.
No such entry or repossession shall be construed as an elec-
tion by Landlord to terminate this Lease unless Landlord
gives a written notice of such intention to Tenant pursuant
to clause (1) above.

       (3)   After repossession of any of the Leased
Premises pursuant to clause (2) above, whether or not this
Lease shall have been terminated pursuant to clause (1)
above, Landlord shall have the right (but shall be under no
obligation) to relet the Leased Premises or any part thereof
to such tenant or tenants for such term or terms (which may
be greater or less than the period which would otherwise
have constituted the balance of the Term) for such rent,
on such conditions (which may include concessions or free
rent) and for such uses as Landlord, in its absolute discre-
tion, may determine; and Landlord may collect and receive
any rents payable by reason of such reletting.   Landlord
shall have no duty to mitigate damages and shall not be
responsible or liable for any failure to relet the Leased
Premises or any part thereof or for any failure to collect
any rent due upon any such reletting.   Landlord may make
such Alterations as Landlord, in its sole discretion may
deem advisable.   Tenant agrees to pay Landlord, as Addi-
tional Rent, immediately upon demand, all reasonable expense
incurred by Landlord in obtaining possession, in performing
Alteration and in reletting any of the Leased Premises, in-
cluding fees and commissions of attorneys, architects,
agents and brokers.

       (4)   Landlord may exercise any other right or
remedy now or hereafter existing by Law or in equity.

    (c)   No expiration or termination of this Lease
pursuant to Paragraph 19(b)(1) or any other provision of
this Lease, by operation of law or otherwise, repossession
of and of the Leased Premises pursuant to Paragraph 19(b)(2)
or otherwise, or reletting of any of the Leased Premises

-34-

pursuant to Paragraph (19)(b)(3), or exercise of any other right or remedy pursuant to Paragraph (19)(b)(4), shall relieve Tenant of any of its liabilities and obligations hereunder, including the liability for Basic and Additional Rent, Impositions and all other sums and charges otherwise due hereunder all of which shall survive such expiration, termination, repossession or reletting.

(d) In the event of any expiration or termination of this Lease or repossession of any of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord Basic Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages (i) Basic Rent, Additional Rent, Impositions and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to Paragraph 19(b)(3), after deducting from such proceeds all of Landlord's expense in connection with such reletting (including all repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alterations and expenses of preparation for reletting). Tenant hereby agrees to be and remain liable for all sums aforesaid; and Landlord may recover such damages from Tenant and to institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages. Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expire by limitation had there been no such Event of Default.

the provisions contained herein and Landlord so elects, Tenant shall pay Landlord "Liquidated and Agreed Final Damages". As used in this Lease, "Liquidated and Agreed Final Damages" means the Basic Rent, Additional Rent, Impositions and all other charges which would have been paid by Tenant from the date of the election to the date when this Lease would have expired if it had not been so cancelled, minus the fair rental value of the Leased Premises for the same period, both discounted to present worth at an annual interest factor of four percent (4%). Upon payment of Liquidated and Agreed Final Damages, Tenant shall be under no other further liability with respect to the period after the date of cancellation. For the purpose of computing percentage rent after an Event of Default, gross sales shall be deemed to be the average of Tenant's gross sales during all of the fiscal years preceding the lease term in which the Event of Default occurred.

(f) Before an Event of Default shall exist under this Paragraph 19 or any other Paragraph hereof by reason of a Default under clauses (i) and (ii) and subparagraph (a) of this Paragraph 19, Landlord shall give Tenant notice thereof and Tenant shall have failed to cure the Default within the applicable grace period stated below. If the cure consists of payment of money or furnishing of insurance coverage required in Paragraph 14, the applicable grace period shall be 5 business days from the date on which the notice is given in the manner required herein for the giving of notices. If the cure consists of something other than payment of money (but not the failure to provide insurance), the applicable grace period shall be thirty days from the date on which the notice is given in the manner required herein for the giving of notices or, such longer time as reasonably necessary to cure the default, provided that Tenant shall commence to cure the default within said thirty day period

the actively, diligently and in good faith proceed with continued curing of the default until it shall be fully cured.

20. <u>Additional Rights of Landlord.</u>

(a)  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease shall be construed as a waiver, modification or relinquishment thereof.  In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable Law, to injunctive relief in case of the violation, or attempted or threatened violation, of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)  Tenant hereby waives and surrenders, for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future Law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future Law which exempts property from liability for debt or for distress for rent.

(c)  Tenant shall pay to Landlord, as Additional Rent, all the expenses incurred by Landlord in connection with any Event of Default or the exercise of any remedy by reason of an Event of Default including attorneys' fees and expenses.  If Landlord shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or any of the Leased Premises, at the option of Landlord, Tenant, at its expense, shall provide Landlord with counsel approved by Landlord and shall pay all costs incurred or paid by Landlord in connection with such litigation.

21. Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease shall be in writing and shall be deemed to have been given for all purposes when delivered in person or when deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address stated above and with copies as provided below. For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party, in the manner provided above:

IF TO LANDLORD:     c/o Stephen R. Karp
                    #1 Wells Avenue
                    Newton, MA 02159

IF TO TENANT:       P. O. Box 25511
                    Raleigh, North Carolina 27611


22. Estoppel Certificate. Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by a President or a Vice President or the authorized general partner, certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, and setting forth such modifications), (ii) the dates to which Basic Rent, Additional Rent and all other sums payable hereunder have been paid, (iii) that to the knowledge of the signer of such certificate no default by either Landlord or Tenant exists hereunder or specifying each such default of which the signer may have knowledge; and (iv) with respect to a certificate signed on behalf of Tenant that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or

-38-

by any court or administrative agency which if so
decided, would materially and adversely affect the financial
condition and operations of Tenant, or if any such proceed-
ings are pending or threatened to said signer's knowledge,
specifying and describing the same.  It is intended that any
such statements may be relied upon by Lender, the recipient
of such statements or their assignees or by any prospective
purchaser of the Leased Premises.

23.  Surrender and Holding Over.  Upon the expiration
or earlier termination of this Lease, Tenant shall peaceably
leave and surrender the Leased Premises (except for any por-
tion thereof with respect to which this Lease has previously
terminated) to Landlord in the same condition in which the
Leased Premises were originally received from Landlord at
the commencement of this Lease, except as repaired, rebuilt,
restored, altered, replaced or added to as permitted or re-
quired by any provision of this Lease, and except for ordin-
ary wear and tear.  Tenant shall remove from the Land and
Improvements on or prior to such expiration or earlier ter-
mination all property situated thereon which is owned by
Tenant or third parties other than Landlord and Tenant and,
at its expense, shall, on or prior to such expiration or
earlier termination, repair any damage caused by such re-
moval.  Property not so removed at the end of the Term or
within thirty days after the earlier termination of the Term
for any reason whatsoever shall become the property of Land-
lord, and Landlord may thereafter cause such property to be
removed from the Leased Premises and the cost of removing
and disposing of such property and repairing any damage to
any of the Leased Premises caused by such removal shall be
borne by Tenant.  Landlord shall not in any manner or to any
extent be obligated to reimburse Tenant for any property
which becomes the property of Landlord as a result of such
expiration or earlier termination.  Tenant shall not commit
waste of the Leased Premises.

-39-

the expiration or earlier termination of the term of this
Lease, or any extensions thereof, shall operate and be con-
strued as a tenancy from month to month only at double the
Basic Rent reserved herein and upon the same terms and con-
ditions as contained in this Lease.   Notwithstanding the
foregoing, any holding over shall entitle Landlord, in ad-
dition to collecting double rentals, to exercise all rights
and remedies provided by law or in equity, including the
remedies of paragraph 19(b)(2)(b).

24.  <u>Risk of Loss</u>.  The risk of loss or of decrease in
the enjoyment and beneficial use of any of the Leased Premi-
ses in consequence of the damage or destruction thereof by
fire, the elements casualties, thefts, riots, wars or other-
wise, or in consequence of foreclosure, attachments, levies
or executions (other than by Landlord and those claiming
from, through or under Landlord other than the Tenant) is
assumed by Tenant, and Landlord shall in no event be answer-
able or accountable therefor.  Except as otherwise spe-
cifically provided in this Lease, none of the events men-
tioned in this Paragraph shall entitle Tenant to any abate-
ment of Basic Rent, Additional Rent, Impositions or other
charges required to be paid hereunder.

25.  <u>No Merger of Title</u>.  There shall be no merger of
this Lease nor of the leasehold estate created by this Lease
with the fee estate in or ownership of any of the Leased
Premises by reason of the fact that the same person, cor-
poration, firm or other entity may acquire or hold or own,
directly or indirectly, (a) this Lease or the leasehold
estate created by this Lease or any interest in this Lease
or in such leasehold estate, and (b) the fee estate or
ownership of any of the Leased Premises or any interest in
such fee estate or ownership; and no such merger shall occur
unless and until all persons, corporations, firms and other
entities having any interest in (i) this Lease or the lease-

-40-

or ownership of the Leased Premises or any part thereof

sought to be merged shall join in a written instrument ef-
fecting such merger and shall duly record the same.

26. <u>Non-Recourse.</u> Anything contained herein to the
contrary notwithstanding, any claim based on or in respect
of any liability of Landlord under this Lease shall be
enforced only against the Leased Premises and not against
any other assets, properties or funds of Landlord or any
director, officer, general partner, limited partner, em-
ployee or agent of Landlord (or any legal representative,
heir, estate, successor or assign of any thereof).

27. <u>Security Agreement Under Uniform Commercial</u>
<u>Code.</u> With respect to the personal property located on the
Leased Premises and owned by the Tenant, including heating,
air conditioning and ventilating equipment and other equip-
ment necessary for the operation of the Improvements but
excluding Tenant's trade fixtures and equipment and equip-
ment described in Paragraph 28 below, Tenant hereby grants
to Landlord a security interest in and to such property as
security for its obligations under this Lease. This Lease
constitutes a Security Agreement as defined in the Uniform
Commercial Code of the State. If requested by Landlord,
Tenant agrees to execute and deliver to Landlord financing
statements which, upon filing, will give notice to third
parties of such security interest.

28. <u>Investment Tax Credit.</u> Tenant has retained title
to certain equipment-related improvements subject to the
Investment Tax Credit, attached as Exhibit "E". Upon ter-
mination or expiration of the term of this Lease, Tenant
shall sell such equipment to Landlord for One Hundred and
00/100 Dollars ($100.00). The equipment retained shall
otherwise be maintained and replaced as required under Para-
graph 11 and otherwise under this Lease for Equipment.

29. **Right of First Refusal.** Tenant shall have the right of first refusal of the Leased Premises as hereinafter set forth. If at any time during the Term, Landlord shall desire to sell the Leased Premises, Landlord shall promptly deliver to Tenant a written notice of such intent, and Tenant may, within 15 days thereafter, elect to purchase the Leased Premises for its fair market value as determined by an M.A.I. appraiser selected by Landlord and Tenant. If Tenant shall not elect to purchase within the time herein specified, the aforesaid right of first refusal shall terminate and Landlord may sell its interest in the Leased Premises upon terms satisfactory to Landlord in its sole discretion, but the Term of this Lease shall otherwise continue.

The right of first refusal in this Paragraph 29 shall be inapplicable to a transfer by way of foreclosure or conveyance in lieu thereof, sale, gift, or devise, including a trust, to or for a party related to Landlord, or to any transfer from one such related party to another, but shall apply prior to any subsequent transfer to a third person. For the purpose of this Paragraph 29, if the then owner of the Leased Premises shall be an individual, a related party shall include a spouse, lineal descedant or spouse of such descendant, ancestor or sibling (whether by the whole or half blood), partnership of which such owner is a member, a joint ownership or ownership in common, which includes the then owner of the Leased Premises, or a corporation, the majority of whose securities is owned by the owner of the Leased Premises, or any one or more of the foregoing parties. If the then owner of the Leased Premises shall be a corporation, a related party shall include an affiliate, subsidiary or parent corporation, a successor by merger or consolidation, or the holder or holders of the majority of the security of such corporation. If the then owner of the Leased Premises shall be a partnership, a related party

-42-

shall include the affiliate, as that term is defined in the prospectus of Landlord, as the same may be amended from time to time.

30. **Miscellaneous.** The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease, the singular shall include the plural as the context requires and the following words and phrases shall have the following meanings: (a) "including" shall mean "including but not limited to"; (b) provisions shall mean "provisions, terms, agreements, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (d) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (e) "any of the Leased Premises" shall mean "the Leased Premises or any part thereof or interest therein"; (f) "any of the Land" shall mean "the Land or any part thereof or interest therein"; (g) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein"; (h) "any of the Equipment" shall mean "the Equipment or any part thereof or interest therein"; and (i) "any of the Adjoining Property" shall mean "the Adjoining Property or any part thereof or interest therein". Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord. Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. Each appointment of Landlord as attorney-in-fact for Tenant under this Lease is irrevocable and coupled with an interest. Landlord has the right to refuse to grant its consent whenever such consent is required under this Lease. This Lease may be modified, amended, discharg

party against whom enforcement of any such modification,
amendment, discharge or waiver is sought. The covenants of
this Lease shall run with the land and bind Tenant, the
heirs, distributees, personal representatives, successors
and assigns of Tenant, and all present and subsequent encum-
brances and subtenants of any of the Leased Premises, and
shall inure to the benefit of and bind Landlord, its suc-
cessors and assigns.  In the event there is more than one
Tenant, the obligation of each shall be joint and several.
In the event any one or more of the provisions contained in
this Lease shall for any reason be held to be invalid, il-
legal or unenforceable in any respect, such invalidity,
illegality or unenforceability shall not affect be invalid,
illegal or unenforceable in any respect, such invalidity,
illegality or unenforceability shall not affect any other
provision of this Lease, but this Lease shall be construed
as if such invalidity illegal or unenforceable provision had
never been contained herein. This Lease will be simultan-
eously executed in several counterparts, each of which, when
so executed and delivered, shall constitute an original,
fully enforceable counterpart for all purposes except that
only the counterpart stamped or marked "Counterpart Num-
ber 1" shall constitute "chattel paper" or other "col-
lateral" within the meaning of the Uniform Commercial Code
in effect in any jurisdiction.  This Lease shall be governed
by and construed according to the Laws of the State.

IN WITNESS WHEREOF, Landlord and Tenant have caused

this instrument to be executed as of the day and year first above written.

Case 3:05-bk-03817-JAF   Doc 8776-2   Filed 06/07/06   Page 47 of 72

Signed, sealed and delivered
in the presence of:

MANCHESTER MALL, Joint Venture, a
Massachusetts general partnership

By ___SEE NEXT PAGE_____ (SEAL)
   Title:_____

_____

As to Landlord

      (CORPORATE SEAL)
        LANDLORD

WINN-DIXIE RALEIGH, INC.

By_____

   Its_____ Vice President

Attest_____

   Its_____ Secretary

    (CORPORATE SEAL)
      TENANT

_Teresa J Gentry_

As to Tenant

By: _(signature)_
  Stephen R. Karp*
  General Partner

By: Steven Fischman
  Attorney-in-Fact for
  Stephen R. Karp, General Manager

Connecticut General Life Insurance
Company, a General Partner

By:  CIGNA Investments, Inc.,
  Its Authorized Agent

  By: _(signature)_
  Its: ASSISTANT VICE PRESIDENT

STATE OF _Massachusetts_____

COUNTY CITY OF _Suffolk_____, TO WIT:


    I, _Ethel Duszlak_____, a Notary Public for the

_____ aforesaid, in the State of _____

_Massachusetts_____, do certify that _Steven Fischman*_____,'

of MANCHESTER MALL, Joint Venture, a Massachusetts general partnership,

whose name(s) is(are) signed to the writing above, bearing date on the

_30th_ day of _December_____, _1986_, has (have) acknowledged

the same before me in my _Capacity_____ aforesaid.

    Given under my hand and official seal this _30th_ day of _December_

_____, _1986_.

    My term of office expires on the _21st_ day of _May_____, _913_.

*Attorney-in-Fact for Stephen R. Karp, General Manager

                         _Ethel Duszlak_____
                              Notary Public

(NOTARIAL SEAL)


MY COMMISSION EXPIRES MAY 21, 1993.

COMMONWEALTH OF MASSACHUSETTS   )
COUNTY OF SUFFOLK, *mr. ch.b*    )

        I, _Geraldine J. C. Cann_, a Notary Public in
and for the State and County aforesaid, do certifiy that
_____, a _____
of CIGNA INVESTMENTS, INC., an authorized agent of
CONNECTICUT GENERAL LIFE INSURANCE COMPANY, whose name is
signed to the writing above, bearing date on the _ _ day of
December, 1986, has acknowledged the same before me in my
County aforesaid.

        Given under my hand and official seal this ____ day of
December, 1986.

        My term of office expires on the _31st_ day of _MARCH_,
_1987_.



                        _Geraldine J C Cann_
                        Notary Public

                        (NOTARIAL SEAL)

    I, _____ DEBRA W. WISE _____, a Notary Public in

and for the State and County aforesaid, do certify that

_____ F. L. James _____ and _____ J. S. Bryan, Jr. _____, whose

names as _ever vice_ President and _____ Secretary of

WINN-DIXIE STORES, INC. _____

are signed to the writing above, bearing date on the _____

day of ____ December _____, 19 86 , have acknowledged

the same before me in my County aforesaid.

    Given under my hand and official seal this __22nd__

day of ____ December _____, 19 86 .

    My term of office expires on the _____ day of

_____ , 19 __ .


                    _____
                         Notary Public

        DEBRA W. WISE      (Notarial Seal)
    Notary ... Inc. State of Florida
    My Comm. Exp. Jan. 20, 1988

EXHIBIT "A"
LEGAL DESCRIPTION

ALL that certain piece or parcel of land, lying and being in Tuckahoe District, Henrico County, Virginia, near the South West corner of Gayton Road and Ridgefield Parkway, shown as Parcel "B" on a plat made by Bodie, Taylor and Puryear, Inc., Engineers and Surveyors, entitled "Map Showing Six Parcels of Land Containing a Total of 11.54 Acres at the South West Corner of Gayton Road and Ridgefield Parkway in Henrico County, Virginia", dated March 14, 1985, revised March 20, 1985, and bounded and described as follows:

Beginning at a point on the South side of Ridgefield Parkway, distant 318.55 feet westwardly from a point at the intersection of Gayton Road and Ridgefield Parkway, the latter point being the northwestern point of two closely adjacent points shown on the above referenced plat; thence S8° 06' 58" W 34.50 feet to a point; thence S 70° 22' 34" E 93.81 feet to a point; thence S 21° 23' 15" E 136.00 feet to a point; thence S 10° 40' 42" W 23.50 feet to a point; thence N 77° 00' 58" W 32.50 feet to a point; thence S 68° 36' 45" W 262.50 feet to a point; thence S 21° 23' 15" E 23.50 feet to a point; thence S 68° 36' 45" W 306.29 feet to a point; thence N 41° 13' 16" W 24.93 feet to a point; thence N 15° 48' 26" W 221.93 feet to a point; thence N 0° 04' 09" W 44.23 feet to a point; thence N 68° 36' 45" E 256.69 feet to a point; thence N 4° 55' 18" E 88.48 feet to a point; thence N 4° 55' 18" E 8.00 feet to a point; thence easterly along the Southern line of Ridgefield Parkway along a curve arcing to the right having a radius of 4573.76 feet a distance of 255.00 feet to the point and place of beginning.

MACHINERY AND EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements' but excluding trade fixtures, inventory, furniture and other personalty belonging to Tenant not shown on the plans and specifications for the building.

Those exceptions listed on Schedule B of Ticor
Title Insurance Corporation Policy Number _____.

Also any other easements, liens or other encum-
brances of record since the effective date of the above-
referenced insurance policy.

BASIC RENT PAYMENTS

1. __Basic Rent.__  Subject to the adjustment provided for
in Paragraph 2, Basic Rent shall be $156,098.00 per annum,
payable monthly in advance on each Basic Rent Payment Date,
in equal installments of $13,007.33 each, except that if
the Commencement Date shall not occur on the fifth day of a
calendar month, the installment of Basic Rent due on the
first Basic Rent Payment Date shall be equal to the product
of (a) the monthly rent installment and (b) the fraction
whose numerator is the number of days from (and including)
the Commencement Date through (and including) the fifth day
of the calendar month next following the first Basic Rent
Payment Date and whose denominator is thirty.

2. __Gross Sales Adjustments to Basic Rent.__  Basic Rent
shall be subject to adjustment, in the manner hereinafter
set forth, if one percent (1%) of the Gross Sales (as
hereinafter defined) exceeds the sum of $15,609,800.00 for
any of Tenant's fiscal years ending on or about June 30. In
such event, Tenant shall pay to Landlord a sum equal to the
difference between (a) one percent (1%) of the Gross
Sales for such fiscal year and (b) the sum set forth above.
(Such difference is hereafter called the "Percentage Rent").

"Gross Sales" as used herein shall mean the aggregate
gross sales of all merchandise sold, and gross charges for
all services rendered in or from the Leased Premises, both
for cash and on credit; provided, however, such terms shall
not include (1) any rental tax, or any sales tax, gross
receipts tax, or similar tax by whatever name called, the
amount of which is determined by the amount of sales made,
and which Tenant may be required to collect and account for
to any governmental agency; (2) transfers of merchandise
made by the Tenant from the Leased Premises to any other
stores or warehouses of Tenant or its affiliated companies;
(3) credits or refunds made to customers for merchandise
returned or exchanged; (4) all sales of cigarettes and
tobacco; (5) all receipts from vending machines for which
Tenant has no sales records; (6) accommodation check cashing
fees and accommodation sales, such as sales of postage
stamps, government bonds or savings stamps or similar items;
(7) returns of merchandise to suppliers or manufacturers;
(8) net amount of discounts allowed to any customers, in-
cluding discounts resulting from the issuance to customers
of trading stamps, receipts or coupons for exchange of mer-
chandise or other things of value but only to the extent
that Tenant is not reimbursed for these; and (9) merchandise
or other things of value issued as a premium in connection
with any sales promotion program.  Tenant makes no repre-
sentation or warranty as to the amount of sales it expects
to make in the Leased Premises.

Tenant shall submit to Landlord on or before the
sixtieth day following the end of each of Tenant's fiscal
years for accounting purposes a statement certified by an
officer of Tenant stating in reasonable detail the amount
of Gross Sales for the preceeding Lease Year as set forth in
Tenant's regularly maintained books and records.  Any Per-
centage Rent due for that Lease Year shall be immediately
payable within 60 days of the end of Tenant's fiscal year.
Notwithstanding the foregoing, Percentage Rent, if any,
shall be payable within 60 days following the end of each of
Tenant's fiscal quarters.

EXHIBIT "D"
PAGE 1 OF 2

Tenant shall keep at all times during the Term of this Lease, at the Leased Premises or at the principal office of Tenant, full, complete and accurate books of account and records in accordance with accepted accounting practices with respect to all operations of the business to be conducted in or from the Leased Premises, for at least three years from the end of the fiscal year to which they are applicable, or if any audit is required or a controversy should arise between the parties hereto regarding the Percentage Rent payable hereunder, until such audit or controversy is terminated. Such books and records shall at all reasonable times be open to the inspection of the Landlord or its duly authorized representatives, who shall have full and free access to such books and records, the right to audit such books and records and the right to require of Tenant, its agents and employees, such information or explanation with respect to such books and records as may be necessary for a proper examination and/or audit thereof.

If the examination and/or audit referred to in the immediately preceding paragraph shall disclose a liability for payment of Percentage Rent to the extent of three percent or more in excess of the Percentage Rent theretofore computed and paid by Tenant for the period being examined, Tenant shall pay to Landlord the cost of such examination and/or audit in addition to the deficiency of Percentage Rent.

No longer applicable since the investment tax credit became ineffective December 31, 1985.

# WINN (W/D) DIXIE

WINN-DIXIE STORES, INC.  5050 EDGEWOOD COURT  P. O. BOX 8  JACKSONVILLE, FLORIDA 32203-0297  (904) 783-5000

CHARLES P. MILFORD, JR.
Attorney

July 10, 1987

Robert D. Loventhal, Esq.
Loventhal & Shamban, P.C.
P. O. Box 967
25 Braintree Hill Park
Braintree, Massachusetts 02184

                    Re:  Winn-Dixie Store #875
                         Rocky Mount, North Carolina

                         Winn-Dixie Store #942
                         Henrico County, Virginia

Dear Mr. Loventhal:

        With reference to yours of July 2, I agree there is some confusion with respect to the matter of percentage rentals for the captioned Leases.  However, I really don't think an amendment to the Leases is necessary.  The percentage rental can be expressed in one of two ways.  In the Rocky Mount location (store #875), the percentage rental can be equally correctly expressed as follows:  (1)  Tenant agrees to pay to Landlord a percentage rental equal to the amount, if any, by which one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of the Lease, and any extensions thereof, exceeds the minimum guaranteed annual rental of $152,750.00 per year; or (2) Tenant agrees to pay to Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this Lease and any extensions thereof in excess of the sum of $15,275,000.00 per year.

        With respect to the Henrico County location (store #942), the rental can be expressed equally correctly as follows: (1)  Tenant agrees to pay to Landlord a percentage rental equal to the amount, if any, by which one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of the Lease, and any extensions thereof, exceeds the minimum guaranteed annual rental of $156,098.00 per year; or (2) Tenant agrees to pay to Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this Lease and any extensions thereof in excess of the sum of $15,609,800.00 per year.

Robert D. Loventhal, Esq.
July 10, 1987
Page 2


        I would suggest that if you would sign this letter in
the space provided below indicating your agreement with the con-
tents hereof, no amendments to the Leases will be necessary since
both parties understand the mechanics of the percentage rental
provisions required of us under the Leases.

                              Sincerely,

                              Charles F. Milford, Jr.

CPM/Rw
Enclosure



            Agreement with the foregoing is hereby acknowledged
this  15TH  day of  July        , 1987.

                              Robert D. Loventhal, Attorney
                              for DPJ Company, a Massachusetts
                              limited partnership

*dated*
*12/29/92*
*according b*
*estoppel*

## FIRST AMENDMENT TO DEED OF SUBLEASE

THIS FIRST AMENDMENT TO DEED OF SUBLEASE, made this _____ day of _____, 1992, between DPJ COMPANY LIMITED PARTNERSHIP, a Massachusetts Limited Partnership, (hereinafter called "Landlord") and WINN-DIXIE RALEIGH, INC., a Florida corporation duly qualified to transact business in the Commonwealth of Virginia, (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

W I T N E S E T H :

WHEREAS, by Sublease Agreement dated December 30, 1986, Manchester Mall Joint Venture, a Massachusetts general partnership, as landlord, did lease and demise unto Tenant those certain premises, in said Sublease Agreement more particularly described, located in a shopping center development known as "Gayton Center", situated on the westerly corner of the intersection of Gayton Road and Ridgefield Parkway, in the County of Henrico and Commonwealth of Virginia, on the terms and conditions set forth in said Sublease Agreement, a short form of which is recorded in Deed Book 2044, page 1353 of the Office of Clerk of Circuit Court of Henrico County, Virginia; and

WHEREAS, the current term of said Sublease Agreement as now fixed to expire at midnight on December 30, 2006; and

WHEREAS, the interest of Landlord in said Sublease Agreement passed to Landlord herein by virtue of Special Warranty Deed dated December 30, 1986; and

WHEREAS, the parties hereto have agreed to an enlargement of Tenant's present demised store building, in consequence of which the parties desire to make modifications to the Lease, as hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations, in hand paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed as follows:

1. Tenant, with the consent and approval of Landlord hereby evidenced, covenants and agrees to proceed at its own cost and expense (with partial reimbursement from Landlord as hereinafter provided) and with due diligence to erect or cause to be erected a permanent addition measuring approximately 50 feet in width by 160 feet in depth on the northerly side of Tenant's existing store building, together with such renovations and alterations of the existing building as necessary to make the entire enlarged building suitable for use by Tenant in the conduct of its business.

2. The new addition, together with the alterations, renovations and related improvements contemplated herein, shall be constructed in accordance with plans and specifications therefor which have already been approved by both Landlord and Tenant.

3. Tenant agrees that once construction of the renovations has commenced, Tenant will complete said renovations as quickly as is reasonably possible (given the standards of the construction trade).

2

4.   For the purposes hereof, the term "construction costs" shall be defined to include the entire cost of construction of the building addition, to include the removal of the existing wall between the present demised store premises of Tenant and the addition area, construction of new building area and such renovations and alterations of the existing building as necessary to make the entire enlarged building suitable for use by Tenant in the conduct of its business.   There shall be expressly excluded from the term "construction costs" the expense of any and all of Tenant's racks, counters, shelves and other merchandising fixtures and equipment.

5.   The total cost of the construction work having been certified to by the general or supervising contractor performing the same, and payment therefor having been made by Tenant in full, and the issuance to Tenant of a certificate of occupancy in respect of the addition area, Landlord shall forthwith reimburse Tenant the sum of Two Hundred Thousand and No/100 Dollars ($200,000.00).   Such payment shall be made by cashier's or certified check or wire transfer or in any other such manner as may be specified by Tenant to Landlord.   Should Landlord not make full reimbursement of the Two Hundred Thousand and No/100 Dollars ($200,000.00) sum to Tenant within thirty (30) days following completion of the addition and the related improvements contemplated hereunder (such date of completion to be established by Tenant giving to Landlord written notice thereof and a Certificate of Occupancy issuing for the additional premises, Tenant shall have the right to deduct from all

3

the <u>increased</u> rental payments hereinafter provided then due or thereafter to become due, such amount of Two Hundred Thousand and No/100 Dollars ($200,000.00) not reimbursed by Landlord, together with interest upon the unpaid balance beginning on the thirty-first (31st) day after completion of the addition. Interest shall be computed at the rate of the then current New York prime interest rate, plus two percent (2%), compounded monthly. It is understood that Tenant shall secure all necessary building permits for construction of the addition at its expense.

6. In connection with the construction work to be performed by Tenant, Tenant shall indemnify Landlord and save it harmless from and against: all mechanics', materialmen's, subcontractors; and similar liens; all claims and suits for damages to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Tenant, Tenant's contractors, subcontractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof. Tenant shall also secure a Builders Risk insurance policy naming Landlord as additional insured, which said policy shall be reasonably satisfactory to Landlord and be written for amounts which in Landlord's reasonable judgment, cover all foreseeable risks involved pursuant to the terms of this agreement. Said policy shall be delivered to Landlord at least fourteen (14) days prior to the commencement of construction.

4

7.  Upon completion of the building addition for general and occupancy thereof by Tenant, the following further modifications to the Lease shall become effective:

(a)  The addition to Tenant's building, together with all related improvements thereto as contemplated herein, shall be and become a part of the demised premises, and whereinsoever in said Sublease, as amended, reference is made to the demised premises, the same shall be construed to apply to the enlarged building and the land on which the same shall stand.

(b)  It is expressly agreed that the six (6) five (5) year option extension periods provided Tenant in said Sublease Agreement shall follow, if exercised, upon the conclusion of the initial term of the Sublease upon the same terms and conditions as contained in the said Sublease, but at the revised rentals and further lease modifications hereinafter provided in this amendment and upon the understanding that the current lease term shall be extended for a period of fifteen (15) years from the date of issuance of the Certificate of Occupancy on the building addition (and that the six(6) five (5) year option extension periods shall come thereafter).

(c)  The Lease is hereby amended to provide that instead of the rentals required in Exhibit "D" of the Sublease Agreement, for the remainder of the twenty (20) year lease term and during any exercised option extension periods thereafter, Tenant agrees to pay to Landlord as minimum annual guaranteed rental for the enlarged demised premises the sum of One Hundred Seventy-Seven Thousand

5

Ninety Eight and No/100 Dollars ($177,098.00) per year. Such minimum annual guaranteed rental shall be paid in twelve (12) equal monthly installments of Fourteen Thousand SEven Hundred Fifty-Eight and 17/100 Dollars ($14,758.17) per month, which installments shall be due and payable in advance on the first day of each and every month of the remaining initial lease term, and during any extensions thereof. This new rental represents an increase of Twenty-One Thousand and No/100 Dollars ($21,000.00) per year over the rental currently required in the Sublease Agreement.

In addition, instead of the percentage rentals as set forth in Exhibit "D" of the Sublease Agreement, Tenant agrees to pay to the Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the remaining initial term of this Lease and any extensions thereof in excess of the sum of Seventeen Million Seven Hundred Nine Thousand Eight Hundred and No/100 Dollars ($17,709,800.00). The percentage rentals, if any, shall be calculated and paid in like fashion as provided in the Lease. Rentals shall be calculated and paid under the present applicable rates of the original Lease until the rentals begin to accrue under the above substituted provisions, and the rentals for any month in which a change of rate occurs shall be prorated between the previously effective rates and the rates effective after the date of rental adjustment.

(d)   The parties hereto agree to execute a further supplement to the Sublease for the purpose of fixing the

6

commencement date for the new rentals as herein provided. Rentals shall be calculated and paid under the present applicable rates of the original Sublease Agreement until the rentals begin to accrue under the above substituted provisions, and the rentals for any month in which a change of rate occurs shall be pro-rated between the previously effective rates and the rates effective after the date of rental adjustment.

8.   It is mutually understood and agreed that the said Sublease Agreement shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby.   All covenants, terms, obligations and conditions of the said Sublease Agreement which are not modified or amended herein are hereby ratified and confirmed.

WINN-DIXIE STORES, INC., a Florida corporation, hereinafter called "Guarantor", joins in the execution hereof for the purpose of evidencing its consent to the execution hereof by Tenant, its wholly-owned subsidiary corporation, and for the further purpose of demonstrating unto Landlord and Landlord's successors and assigns the continuing guaranty by Guarantor and Guarantor's successors and assigns of due performance by Tenant and Tenant's successors and assigns of all the covenants and conditions including, without limitation, the payment of rentals required of Tenant by said Sublease Agreement and the within First Amendment to Sublease.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

7

Signed, sealed and delivered
in the presence of:

DPJ COMPANY LIMITED PARTNERSHIP,
a Massachusetts Limited Partnership

By _Wallace Joffe_____

Its Duly Authorized General Partner

_____
Witness

                                        LANDLORD

_____
As to Landlord


WINN-DIXIE RALEIGH, INC.

By _____

Its _____Vice_____ President

_____
Witness

_____    Attest _____
As to Tenant                         Its _____ Secretary

                                        (CORPORATE SEAL)

                                        TENANT

8

COMMONWEALTH OF VIRGINIA        )
                                )
COUNTY CITY OF                  )

      I, _____, a Notary Public in and for the Commonwealth of Virginia and County City aforesaid, do certify that _____ personally came before me this day and acknowledged that he is the duly authorized general partner of DPJ COMPANY LIMITED PARTNERSHIP, a Massachusetts Limited Partnership, and that, by authority duly given and as the act of the partnership.

      Given under my hand and official seal this _____ day of _____, 1992.

_____
Notary Public
My commission expires:                     (NOTARIAL SEAL)


STATE OF FLORIDA        )
                        )
COUNTY OF DUVAL         )

      I, Susan G. Clarkson _____, a Notary Public in and for the State and County aforesaid, do certify that Wayne E. Ripley, Jr. and J.W. Dixon _____, whose names as Vice President and Asst Secretary of WINN-DIXIE RALEIGH, INC., are signed to the writing above, bearing date on the 29th day of December _____, 1992, have acknowledged the same before me in my County aforesaid.

      Given under my hand and official seal this 29th day of December, 1992.

Susan G. Clarkson
Notary Public
My commission expires:                     (NOTARIAL SEAL)

..o.ary ..ublic, State of Florida
SUSAN G. CLARKSON
..i, Comm. Exp. Jan. 15, 1996
Comm. No. CC 174382

12

## SECOND AMENDMENT TO DEED OF SUBLEASE

THIS SECOND AMENDMENT TO DEED OF SUBLEASE, made this 7th day of February, 1996, between DPJ COMPANY LIMITED PARTNERSHIP, a Massachusetts limited partnership, (hereinafter called "Landlord") and WINN-DIXIE RALEIGH, INC., a Florida corporation duly qualified to transact business in the Commonwealth of Virginia, (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties:

### WITNESSETH:

WHEREAS, by Sublease Agreement dated December 30, 1986, Manchester Mall Joint Venture, a Massachusetts general partnership, as landlord, did lease and demise unto Tenant those certain premises, in said Sublease Agreement more particularly described, located in a shopping center development known as "Gayton Center," situated on the westerly corner of the intersection of Gayton Road and Ridgefield Parkway, in the County of Henrico and Commonwealth of Virginia, on the terms and conditions set forth in said Sublease Agreement, as Short Form of which is recorded in Deed Book 2044, Page 1353 of the Office of Clerk of Circuit Court of Henrico County, Virginia which Sublease has been amended by First Amendment to Deed of Sublease dated October 9, 1992; and

WHEREAS, the current term of said Sublease Agreement is now fixed to expire at midnight on December 30, 2006; and

WHEREAS, the interest of Landlord in said Sublease Agreement passed to Landlord herein by virtue of Special Warranty Deed dated December 30, 1986; and

WHEREAS, the construction of the Building Addition described in the First Amendment to Deed of Sublease has been completed and Tenant has occupied the Building Addition, and Landlord has not reimbursed Tenant the sum of $200,000.00, as is more particularly set forth in the First Amendment to Deed of Sublease, and the parties wish to supplement and memorialize certain agreements herein in compliance with paragraph 7(d) of the First Amendment to Deed of Sublease and otherwise.

NOW, THEREFORE, in consideration of the premises and the sum of $10.00 and other good and valuable consideration, in hand paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed as follows:

1. Notwithstanding the provisions of paragraph 7(c) of the First Amendment to Deed of Sublease, Tenant shall continue to pay as Basic Rent under the Deed of Sublease, as amended, for the balance of the lease term and during any exercised extension thereof, the sum of $156,098.00 per annum in equal monthly installments of $13,007.33, rather than the sum of $177,098.00 per annum in equal monthly installments of $14,758.17.

2. All of the other modifications set forth in paragraph 7 of the First Amendment to Deed of Sublease, including the increase in the base for calculation of Percentage Rent, the commencement of the new fifteen (15) year lease term and the availability of six (6) five (5) year option extension periods, shall be effective as of March 10, 1995.

3. The expiration of the new lease term is fixed at midnight on March 9, 2010, subject to six (6) successive five (5) year options to extend the Sublease upon the same terms and conditions as are set forth in the Sublease, as amended.

4.      It is mutually understood and agreed that the Sublease Agreement, as amended by First Amendment to Deed of Sublease shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the Sublease Agreement, as amended, which are not modified or amended herein are hereby ratified and confirmed.

WINN-DIXIE STORES, INC., a Florida corporation, hereinafter called "Guarantor." joins in the execution hereof for the purpose of evidencing its consent to the execution hereof by Tenant, its wholly-owned subsidiary corporation, and for the further purpose of demonstrating unto Landlord and Landlord's successors and assigns the continuing guaranty by Guarantor and Guarantor's successor and assigns of all the covenants and conditions including, without limitation, the payment of rentals required of Tenant by said Sublease Agreement, as amended, and the within Second Amendment to Deed of Sublease.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

Signed, sealed and delivered
in the presence of:

DPJ COMPANY LIMITED PARTNERSHIP,
a Massachusetts Limited Partnership

By: _____
Its Duly Authorized General Partner

LANDLORD

_____
Witness

_____
As to Landlord

WINN-DIXIE RALEIGH, INC.

By: _____
Its                    Vice President

Attest: _____
Its        Assistant Secretary

_____
Witness

_____
As to Tenant

(CORPORATE SEAL)
TENANT

WINN-DIXIE STORES, INC.

By: _____
Its                    President

Attest: _____
Its        Assistant Secretary

_____
Witness

_____
As to Guarantor

(CORPORATE SEAL)

GUARANTOR

COMMONWEALTH OF ~~VIRGINIA~~ MASSACHUSETTS
COUNTY CITY OF NORFOLK

I, TITINA HARATSIS, a Notary Public in and for the Commonwealth of Virginia and County City aforesaid, do certify that WALLACE YAFFE personally came before me this day and acknowledged that he is the duly authorized general partner of **DPJ COMPANY LIMITED PARTNERSHIP**, a Massachusetts limited partnership, and that, by authority duly given and as the act of the partnership.

Given under my hand and official seal this 21ST day of FEBRUARY, 1996.

Notary Public
My commission expires: 8/31/2001                (NOTARIAL SEAL)


STATE OF FLORIDA
COUNTY OF DUVAL

I, Rebecca L. Sawyer, a Notary Public in and for the State and County aforesaid, do certify that James Kufeldt and W. O. Scaife, Jr., whose names as Vice President and Assistant Secretary of **WINN-DIXIE RALEIGH, INC.**, a Florida corporation, are signed to the writing above, bearing date on the 7 day of February, 1996, have acknowledged the same before me in my County aforesaid.

Given under my hand and official seal this 7 day of February, 1996.

Notary Public
My commission expires:                (NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310


STATE OF FLORIDA
COUNTY OF DUVAL

I, Rebecca L. Sawyer, a Notary Public in and for the State and County aforesaid, do certify that James Kufeldt and W. O. Scaife, Jr. whose names as President and Assistant Secretary of **WINN-DIXIE STORES, INC.**, a Florida corporation, are signed to the writing above, bearing date on the 7 day of February, 1996, have acknowledged the same before me in my County aforesaid.

Given under my hand and official seal this 7th day of February, 1996.

Notary Public
My commission expires:                (NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310



**WILTON**

THE WILTON COMPANIES

*Developing your trust every day*

RODNEY M. POOLE
*Senior Vice President & General Counsel*

Phone: 804.237.1376
Fax: 804.237.1276
Email rodney@thewiltonco.com

August 11, 2005

VIA CERTIFIED MAIL

DPJ Company Limited Partnership
145 Rosemary Street, Suite K
Needham, MA 02194

Re: Winn Dixie Store

Dear Sirs:

PLEASE TAKE NOTICE that pursuant to the terms and conditions of the Ground Lease dated July 3, 1985 by and between Ridgeview, Incorporated and Winn-Dixie Raleigh, Inc. subsequently assigned to you on December 30, 1986, YOU ARE IN DEFAULT in the payment of Rent and Additional Rent in the following amounts:

| | | |
|---|---|---|
| 1. Rent | $ 8,417.99 | (through July 31, 2005) |
| 2. Real Estate Taxes (2003) | $27,418.78 | |
| 3. Real Estate Taxes (2004) | $30,207.16 | |
| 4. Real Estate Taxes (2005) | $19,160.47 | (through July 31, 2005) |
| 5. CAM (2003) | $ 6,118.89 | |
| 6. CAM (2004) | $20,192.44 | |
| 7. CAM (2005) | $ 8,259.52 | (through July 31, 2005) |

TOTAL                   $119,775.25

Failure to pay these amounts in full within TEN (10) days of the date of this letter will result in the termination of the aforesaid lease by the Landlord. A copy of this Notice is being sent simultaneously herewith to your lender Protective Life Insurance Company. They will have the same period of time as referenced above to remedy this Default.

Very truly yours,

*Rodney M. Poole*
Rodney M. Poole

cc: Protective Life Insurance Company

TEL: 804.741.RENT (7368) • FAX: 804.740.2879 • www.thewiltonco.com

4901 DICKENS ROAD, SUITE 100, RICHMOND, VIRGINIA 23230-1952
P.O. BOX 6895, RICHMOND, VIRGINIA 23230-6895



*Printed on Recycled Paper*