# Report

## Submitted To

# The Official Committee of Unsecured Creditors of Winn-Dixie Stores Inc., __et__ __al__.

June 29, 2006

TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1
II.    OVERVIEW OF COMPANY AND BANKRUPTCY CASE ............................. 1
III.   ROLE OF COMMITTEE IN INVESTIGATION ................................................ 2
       A.    STATUTORY POWERS ........................................................................... 2
       B.    WHY INVESTIGATION WAS UNDERTAKEN ...................................... 2
       C.    ISSUES INVESTIGATED ......................................................................... 3
       D.    PROCESS FOLLOWED BY COMMITTEE COUNSEL ......................... 5
       E.    APPLICABLE LEGAL STANDARDS ..................................................... 7
IV.    EXECUTIVE SUMMARY AND CONCLUSIONS ............................................ 8
V.     INVESTIGATION ............................................................................................ 10
       A.    PATH TO CHAPTER 11 AND RESTRUCTURING EFFORTS ............ 10
       B.    DISCLOSURE OF COMPANY FINANCIAL CONDITION AND
             RESTRUCTURING EFFORTS ............................................................... 13
       C.    DIVIDEND PAYMENTS ........................................................................ 18
             1.    Contractual Restrictions On Payment Of Dividends ................... 20
             2.    Legal Restrictions On Payment Of Dividends ............................. 20
             3.    Analysis ....................................................................................... 22
       D.    SALARIES AND BONUS RECEIVED BY DIRECTORS AND OFFICERS ... 23
             1.    Management Compensation ......................................................... 23
             2.    Rowland Payment ....................................................................... 25
             3.    Board of Directors' Compensation .............................................. 27
       E.    ASSET IMPAIRMENT ............................................................................ 27
             1.    Process ........................................................................................ 27
             2.    Asset Impairment Charges ........................................................... 29
       F.    SELF-INSURANCE RESERVE AND EXPENSE .................................. 32
       G.    MATERIAL WEAKNESS IN INTERNAL CONTROLS ...................... 39
             1.    Disclosure ................................................................................... 39
             2.    Nature of Material Weakness ...................................................... 40
             3.    How Material Weakness Was Discovered And Actions Taken ... 41
       H.    INDEPENDENCE OF BOARD OF DIRECTORS .................................. 44
       I.    COMPANY-OWNED LIFE INSURANCE POLICIES .......................... 45
       J.    IRS AUDIT OF YEARS 2000-2002 ........................................................ 47
       K.    ERISA CLAIMS ...................................................................................... 52
             1.    Winn-Dixie Stock Holdings ........................................................ 53
             2.    Plan Investment Options .............................................................. 53
             3.    Risk And Performance ................................................................ 54
       L.    MANAGEMENT SECURITY PLAN AND SUPPLEMENTAL RETIREMENT
             PLAN ...................................................................................................... 54
             1.    MSP/Life Insurance Policies ....................................................... 55
             2.    Susceptibility Of SRP Accounts To Company Creditors' Claims ........... 57
       M.    FEDERAL CHARGES AND SENTENCING FOR ILLEGAL IMPORTATION,
             DISTRIBUTION, SALE OF FLORIDA SPINY LOBSTERS ............. 58
VI.    CONCLUSION ................................................................................................. 61

## I.    INTRODUCTION

Milbank, Tweed, Hadley & M$^c$Cloy LLP ("Milbank") and Akerman Senterfitt ("Akerman," together with Milbank, "Committee Counsel") submit this report to the Official Committee of Unsecured Creditors of Winn-Dixie Stores Inc., et al. (the "Committee"). The Committee Counsel investigated possible claims of the Debtors' (as defined below) estates arising primarily from actions by Winn-Dixie Stores Inc.'s directors and officers in the period leading up to the filing of a chapter 11 petition by Winn-Dixie Stores Inc. and 23 of its corporate subsidiaries (collectively, "Winn-Dixie," the "Debtors," or the "Company") in February 2005. The procedures followed by Committee Counsel and the results obtained are described in detail below.

## II.    OVERVIEW OF COMPANY AND BANKRUPTCY CASE

According to public filings, Winn-Dixie has been in the grocery business since 1928. Since that time, it has grown into what has been described as one of the largest food retailers in the country. By the end of the 20th century, Winn-Dixie had expanded its presence from Florida to include 13 other states primarily in the south-eastern United States and also in the Bahamas. For several years, the Company struggled to maintain market share as a result of increased competitive pressure, among other factors. Winn-Dixie and its directors and officers tried to regain the success the Company enjoyed in the past through marketing, strategic initiatives, and expense reduction, which met with moderate success. However, in February 2005, due to an increasingly competitive environment and a decrease in sales, the Board of Directors decided that a filing under chapter 11 of title 11 of the United States code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") was the best course of action for the

1

Company and all interested parties. Winn-Dixie filed for chapter 11 protection on February 21, 2005 (the "Petition Date").

## III.   ROLE OF COMMITTEE IN INVESTIGATION

### A.   STATUTORY POWERS

Under section 1103(c)(2) of the Bankruptcy Code, the Committee is statutorily empowered to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan. Committee Counsel carried out an investigation (the "Investigation") of Winn-Dixie pursuant to section 1103(c)(2) of the Bankruptcy Code, on behalf of the Committee. The United States Trustee (the "UST") and the Debtors supported and encouraged the Investigation.

### B.   WHY INVESTIGATION WAS UNDERTAKEN

In most chapter 11 cases, creditors investigate possible claims against those persons who were responsible for the operations and governance of the debtor prior to the bankruptcy filing. In addition, in this case, prior to the bankruptcy filing, allegations of wrongdoing were made against the current and former directors and officers of the Company in class action lawsuits and in a demand by shareholders that the Company commence litigation against certain former directors and officers. The Investigation was undertaken to determine what viable claims, if any, the Debtors' estates may hold against current and former directors and officers of the Company, which, if pursued, could bring additional distributable value into the Debtors' estates.[1] In addition, the draft plan of reorganization being negotiated currently

---

[1]     Whether or not individual creditors have viable claims against the Company or its current and former directors and officers was beyond the scope of the Investigation. The scope of the Investigation also did not include claims the estate may have against any parties other than current and former directors and

2

contemplates that certain former directors and officers be released from liability related to the execution of their duties to the Debtors prior to bankruptcy. This Report endeavors to provide the Committee with sufficient information to render an informed decision regarding the propriety of supporting a plan of reorganization containing such releases.

C.     **ISSUES INVESTIGATED**

In a letter dated January 26, 2006 to the UST (the "UST Letter") (attached hereto as "Exhibit A"), Matthew Barr, Esq. of Milbank delineated, on behalf of the Committee, the issues that Committee Counsel would examine in the Investigation. However, Committee Counsel did not limit the scope of the Investigation to these issues alone. Committee Counsel also investigated the allegations raised against the Debtors and their current and former directors and officers in (i) the shareholder demand letter sent to the Company on July 23 2004 (the "Demand Letter") (attached hereto as "Exhibit B")[2], (ii) the numerous class action lawsuits filed against the Debtors prior to bankruptcy regarding allegations that certain directors and officers violated securities laws[3] and the Employee Retirement Income Security Act of 1974 ("ERISA"), (iii) the Motion for Examination of Debtor Under Bankr. R. 2004 filed in the current bankruptcy case by former Winn-Dixie employees (the "2004 Motion"), and (iv) the Motion of the Official Committee of Equity Security Holders for Order Appointing an Examiner Pursuant to Section

---

*... cont'd ...*

    officers of the Company, which if exist, are assets of the estate and would continue to be available to the reorganized Company.

[2]    The Company informed Committee Counsel that it had hired King & Spalding LLP ("King & Spalding") to investigate claims made in the Demand Letter. King & Spalding drafted a report of their investigation and their conclusions. Due to issues of attorney-client privilege raised by the Company, Committee Counsel were unable to view the report. The Company did provide Committee Counsel a list of witnesses that were interviewed by King & Spalding in the course of their investigation.

[3]    No less than 10 class action lawsuits alleging violations under the Securities and Exchange Act of 1934 have been filed against Winn-Dixie and certain of its current and former directors and officers. These class action suits put forth mostly identical claims.

1104 of the Bankruptcy Code.[4] Committee Counsel also pursued certain previously unidentified issues that arose during the course of the Investigation and that potentially could give rise to a cause of action against any current or former directors or officers.

Specifically, the legal issues we investigated and discuss herein are as follows:

- The deterioration of the Company's business that led it to seek chapter 11 protection and the restructuring efforts undertaken by the Company from 2001 through bankruptcy.

- Whether certain public statements regarding the Company's financial condition and restructuring efforts from 2002 through bankruptcy were materially false and misleading.

- The propriety of certain dividend payments from 2002 through bankruptcy.

- The propriety of certain compensation received by directors and officers from 2002 through bankruptcy.

- The process for determining and the related conclusions regarding asset impairment charges from 2002 through bankruptcy.

- Decisions regarding the Company's self-insurance reserves made from 2002 through bankruptcy.

- The disclosure of a material weakness in the Company's internal controls announced in the 2005 Form 10K.

- Independence of the Board of Directors generally or with respect to certain transactions.

- The Company's practice of purchasing Company-owned life insurance and the subsequent IRS action regarding the Company's policy.

- IRS audits of years 2000-2002 including, but not limited to, tax implications of store retrofit expenses.

- Management's decisions regarding the administration and investment options of the Company's 401(k) plan from 2002 through bankruptcy.

---

[4]    The UST disbanded the Official Committee of Equity Security Holders on January 11, 2006.

- The operation and administration of the Management Security Plan and the Supplemental Retirement Plan.

- The alleged trafficking of undersized lobsters and the subsequent legal action regarding such alleged trafficking.

The legal aspects of these matters are collectively referred to as the "Issues."

**D.    PROCESS FOLLOWED BY COMMITTEE COUNSEL**

Shortly after Milbank sent the UST Letter, Committee Counsel commenced the Investigation. Committee Counsel initially met with current Winn-Dixie management on February 7, 2005 at the Company's headquarters in Jacksonville, Florida. Committee Counsel met and interviewed Larry Appel, General Counsel, Jay Castle, Group Leader - Litigation, Bennett Nussbaum, Chief Financial Officer, and Mike Byrum, Chief Accounting Officer, at the initial meeting.

Committee Counsel also issued a document request to the Debtors. After receiving and reviewing documents from the Company in response to the document request, Committee Counsel (i) conducted additional interviews, both in-person and telephonically, and (ii) requested additional documents from the Debtors, certain former employees of the Debtors, and KPMG LLP ("KPMG"), the Debtors' public accountant during the period subject to the Investigation.

In response to the document requests, Committee Counsel received and reviewed more than 8,000 pages of documents. In addition to the documents produced from the Debtors, certain former employees of the Debtors and KPMG, Committee Counsel reviewed certain publicly filed documents and press releases from 2001 through the date of this Report. Committee Counsel interviewed the following people, several of them on multiple occasions:

- Larry Appel, General Counsel
- Jay Castle, Group Leader - Litigation
- Bennett Nussbaum, Chief Financial Officer

- Michael Byrum, Chief Accounting Officer
- Kellie Hardee, VP of Strategic Planning and Treasurer
- Jeffrey Gleason, Director of Internal Audit
- Dale Bitter, Senior Director of Risk Management
- Angela Baragona, Assistant Tax Director
- Frank Lazaran, former Chief Executive Officer
- Richard McCook, former Chief Financial Officer
- Allen Rowland, former Chief Executive Officer (written questionnaire/response)
- Ronald Townsend, Director
- Ed Mehrer, Director
- A. Dano "Dan" Davis, former Chairman of the Board of Directors
- Armando Codina, former Director
- Travis Storey, KPMG partner responsible for audit
- Joe Paradise, former KPMG Auditor
- Pat Teufel, former KPMG Special Actuary
- Thomas Crichton, IV, Partner, Vinson & Elkins, L.L.P.
- George Turner, Company's former Third Party Actuary
- Richard Ehster, former VP Division President of Orlando Division
- Larry May, former VP Director of Associate Relations/Human Resources
- Raphael Sanson, former Corporate Assistant Controller
- Jim Pringle, former Division Controller of South Florida Division
- Terry Qualls, former Director of Accounting
- Bob Dufek, former National Sales Manager
- Gary Osborne, former Director of General Marketing, Jacksonville
- Paul Chisholm, former Senior Director of Construction and Retail Maintenance
- Thomas Watts-FitzGerald – Assistant United States Attorney

Committee Counsel notes that every person interviewed was cooperative, and we found no basis to conclude that the information conveyed was intentionally inaccurate. The interviews were not conducted under oath and were neither recorded nor transcribed. Committee Counsel, however, prepared file memoranda summarizing the information obtained. To the extent the Report refers to information gathered from an interview, a citation to the corresponding file memorandum is provided.

It should be noted that near the end of the Investigation certain retirees filed the 2004 Motion, and at a hearing on that request the Court suggested that the Investigation include

discussions with certain of the retired executives to ascertain whether they had any information that merited further investigation. Committee Counsel interviewed eight additional retirees, and in some cases conducted further interviews of current Company personnel as a result of issues raised in the retiree interviews. Pertinent matters that came to light in those interviews are discussed below.

E.    **APPLICABLE LEGAL STANDARDS**

The Issues span a wide range of legal issues with corresponding legal standards by which the Issues are measured. This section of the Report highlights two legal concepts that are broadly applicable to a number of the Issues: (i) operation of the business judgment rule in reviewing the execution of director and officer fiduciary duties, and (ii) standards for securities law disclosure violations.

Directors and officers have fiduciary duties to the companies they serve, and in carrying out their duties they must act with due care and in what they believe to be the best interests of their company. In assessing whether the actions of directors and officers are consistent with these requirements, courts do not revisit the substance of decisions made. The business judgment rule protects directors and officers from liability based upon decisions which, with the clarity of hindsight, prove to be imprudent or incorrect so long as they acted in good faith and with due care. (*See* Florida Statute 607.0831; In re Bal Harbour Club, Inc., 316 F.3d 1192, 1194 (11th Cir. 2003).

In the related area of whether a company's disclosures are false and misleading, including its financial disclosures, liability for an individual responsible for such disclosures cannot be predicated on falsity alone. The individual must also be shown to have had actual knowledge of the falsity of the subject disclosure. This requirement, labeled as *scienter*, is an

important aspect of any consideration of liability for false and misleading statements.[5] (*See*

Theoharous v. Fong, 256 F.3d 1219, 1224 (11th Cir. 2001), Bryant v. Avado Brands, Inc., 187

F.3d 1271, 1287 (11th Cir. 1999)).

## IV.   EXECUTIVE SUMMARY AND CONCLUSIONS

All conclusions, both general and specific, in this Report are based on facts

reported by persons we interviewed and from documents produced to us or available publicly.

Committee Counsel concludes that on balance there are likely no viable causes of action by the

Debtors' estates against any current or former director or officer of the Company that have a

reasonable probability of success in producing a benefit for the Debtors' estates.  Unless new

facts are proven or come to light, claims related to the issues are not likely to prevail.

From a broader perspective the Committee Counsel concludes that the Company's

bankruptcy was not directly precipitated by the misconduct of current or former directors or

officers of the Company.  Winn-Dixie operates in a market with intense competition and small

margins.  As the marketplace changed over the past decade, the Company, not for lack of trying,

did not successfully adapt and ultimately found itself unable to maintain profitability.  The

conclusion that current and former directors and officers did not commit any wrongdoing does

not change when considering the numerous specific issues examined, the bulk of which are

encapsulated in this summary.

Committee Counsel examined the way in which the Company has accounted for

asset impairment and self-insurance, with a focus on the amount and timing of the expenses

taken.  Committee Counsel concluded that expenses related to both of these issues appear to be

---

[5]     Depending on the precise nature of the claim, scienter may require defendant to have acted in a "severely reckless manner," rather than with actual knowledge of the falsity of the subject disclosure.

appropriate.  Another accounting-related issue was the material weakness announced in the

Company's 2005 Form 10K related to accounting of vendor contracts.  Committee Counsel

agreed with the Company's conclusion that proper controls were not in place and we ultimately

conclude that because no Company assets were misappropriated, no cause of action exists that

could bring additional money into the estate.

Committee Counsel examined the Company's tax treatment for company-owned

life insurance policies and store retrofit expenses stemming from the accounting treatment

applied to them by Company management.  Committee Counsel believes the Company's tax

positions, although disputed by the IRS, were legitimate and taken in good faith.

Committee Counsel also investigated the management and administration of a

number of retirement plans offered by the Company.  The investigation suggests neither the

Management Security Plan – designed to provide retirement and death benefits to certain senior

management – nor the Supplemental Retirement Plan – a non-ERISA, Company-matching

retirement plan available to all employees – were managed or administered in any way which

gives rise to an actionable claim by the estate.  The same is true for the Company's 401(k) plan,

on which Committee Counsel focused particular attention on decisions related to investment in

Winn-Dixie stock.

The Investigation also examined the payment of dividends, which raises an issue

of prudence, considering the Company's performance at times when certain dividends were paid.

However, after investigation, Committee Counsel concludes the Company's dividend payments

were terminated before the Company was within the "zone of insolvency," and that the last

dividend paid in January, 2004, was so relatively small as to have no material impact on the

Company's financial performance.

V.    **INVESTIGATION**

A.    **PATH TO CHAPTER 11 AND RESTRUCTURING EFFORTS**

In the late 1990s, strong retailers with focused marketing strategies operated in Winn-Dixie's territories. Publix Super Markets, Inc. ("Publix"), a long time regional competitor of Winn-Dixie, was joined by Wal-Mart Stores, Inc. ("Wal-Mart") as the biggest competitive threats to the Company. Wal-Mart supercenters focused on the low-cost consumer, while Publix targeted consumers who would pay top dollar for a high quality, high service grocer. Winn-Dixie's profits began to show the effects of this competition in the late 1990s and early 2000. Winn-Dixie's management acknowledged that changes in marketing, a reduction in costs and a reevaluation of the Company's core business needed to be made for the Company to remain competitive. In particular, the Company needed to find a way to maintain its margins in a highly competitive environment in an industry in which margins were very thin. (See Nussbaum & Byrum at 22-35, McCook at 2, Lazaran at 2, Storey I at 3, Paradise at 3, 6).

Winn-Dixie's Board of Directors and management had been evaluating and pursuing strategies for the Company to remain successful for a number of years prior to the bankruptcy filing which resulted in three defined internal restructuring efforts in 2000, 2002 and 2004. The 2000 and 2002 restructuring efforts were conducted under Chief Executive Officer Allan Rowland. The 2004 restructuring was conducted under Chief Executive Officer Frank Lazaran.

In 2000, the Company commenced a program to raise profits by cutting costs. Page six of the Company's 2000 Form 10K indicates it eliminated three division offices through consolidation, reduced and realigned management, centralized procurement, marketing and merchandising, eliminated approximately 11,000 positions, closed approximately 116 unprofitable stores and closed some manufacturing and warehousing facilities. (See also

10

Rowland II at 14). It diminished deli operations and other service areas such as the salad bar, as they were identified as non-core business enterprises that were not producing sufficient returns. The sandwich counters were removed, and replaced with a potentially more profitable use, in order to maximize profitability per square foot. (See McCook at 3, Appel & Castle at 11, Davis at 5). In addition, the Company rolled-out new efforts in brand marketing and a customer rewards card program which initially showed a positive impact on Winn-Dixie's performance, particularly during fiscal 2002 and 2003.[6] (See Appel & Castle at 11).

On May 6, 2002, the Company announced plans to exit markets that were not core to the Company's footprint, which led to the divestiture of stores in Texas and Oklahoma, in addition to one distribution center and one dairy plant. The Company estimated that eliminating these operations would reduce annual losses by roughly $31 million. The estimate was based on losses from these stores over the past years. (See McCook at 4).

Certain retirees interviewed believe the Company made numerous strategic decisions in this time period which moved the Company away from its traditional strengths, making it more vulnerable to market forces. (See Dufek at 2, May I at 5, 7, Qualls at 3, 10). Certain retirees also claimed that the Company overspent on capital expenditures for renovations that were not necessary. (See Ehster at 5, Pringle at 3, Sanson at 6). To the extent either of these allegations are true, given that we found no evidence that such decisions were made in the absence of due care, such decisions would be protected by the business judgment rule.

Sales and profit initially increased from fiscal 2001 through fiscal 2003, presumably in response to these marketing and restructuring efforts. In fiscal 2004, however, the Company's performance faltered as the increase in sales due to the Company's marketing

---

[6]       The Company's fiscal year runs from July 1 through June 30.

11

initiatives proved unsustainable. (See Appel & Castle at 11). Adding to the drag on the Company's balance sheet were one-time charges for the self-insurance reserve (as discussed below) and quarterly charges for asset impairment necessitated by declining sales.

In fiscal 2004, the Company sought to implement major strategic initiatives. As described in the Q2 2004 Form 10Q, these initiatives included: (1) a review of business strategies and marketing programs being conducted in conjunction with an experienced brand marketing consulting firm; (2) an expense reduction plan designed to achieve a $100 million expense reduction rate based on current expense levels; (3) a market positioning review through which markets were identified as either core or non-core and evaluated for sale or closure; (4) an image makeover program; and (5) a process re-engineering initiative which, among other things, would focus on changes necessary to enable the central procurement function to better support Company business initiatives.

Despite the 2004 restructuring effort, the Company's sales and profit margins continued to decline through the second fiscal quarter of 2005. The Company over-invested in inventory, planning for large holiday sales during a period in which the Company historically earned much of its revenue. (See Appel & Castle at 14, Paradise at 6). The sales did not materialize and as a result, the Company's cash flows were not as expected. Vendors became nervous and began to restrict the availability and terms of trade debt. (See Appel & Castle at 11, Storey 1 at 3).

The Board of Directors reviewed and approved each restructuring effort. At the time each effort was approved, the Board felt they would improve the Company's sales and profitability. (See Mehrer at 3). Committee Counsel has found the Board of Directors' outlook on these restructuring efforts to be reasonable considering the level of care and review taken in

12

deciding what actions would be most effective for the Company. Furthermore, as a result of the 2000 and 2002 internal restructuring efforts, the Company did show signs of improvement which resulted in increased sales and profitability. The 2004 restructuring program was not fully implemented prior to the bankruptcy filing, and thus the Board of Directors did not have the opportunity to fully analyze the success or failure of this restructuring effort prior to filing bankruptcy.

**B.    DISCLOSURE OF COMPANY FINANCIAL CONDITION AND RESTRUCTURING EFFORTS**

The issue of the accuracy of the Company's disclosure of its financial condition can be material for several reasons – investors may have relied on those disclosures in purchasing securities or providing credit to the Company. Indeed, class action lawsuits filed by purchasers of Winn-Dixie stock (the "Plaintiffs") allege that directors and officers made false and misleading statements in public filings and press releases from the second quarter of 2002 through the third quarter of 2004 by suggesting that the Company's financial condition was improving, that restructuring efforts were showing positive results, and that the Company had a long-term plan for success. Committee Counsel reviewed the facts underlying the alleged false statements to determine as best they could given the available information whether they were materially false and misleading at the time they were made and if any directors or officers knew or should have known they were materially false and misleading.[7]

In a press release dated October 9, 2002, Rowland stated that, "[The Company's] increase in identical store sales, in the face of a weak economy, is evidence that we are

---

[7]    With the exception of some specific items discussed below (charges for asset impairment, and increases to the self-insurance reserve), there has been no allegation by any party that the Company's reported financial results for any period were materially false and misleading. Committee Counsel found no facts in the Investigation that would indicate that any such charge would be warranted.

improving operations and that our marketing efforts are in tune with our customers' needs. This is particularly rewarding when many of our major competitors' results are negative. We are committed to a strategic plan that provides for sustainable, profitable growth." Plaintiffs allege that this statement is false and misleading because Rowland knew the Company had no sustainable strategic plan to provide profitable growth. However, at this time, the Company was pursuing the restructuring initiative announced in May of 2002 in which it closed stores in Texas and Oklahoma. It had also implemented a new branding initiative and a customer reward card program. Furthermore, sales and profit had both increased as compared to the same period of the prior year. No facts were found in the Investigation that would support a claim by the estate that this October 9, 2002 statement was materially false or misleading, much less that any officer or director knew or should have known that it was.

Plaintiffs next allege that the Form 10Q filed on the next day, October 10, 2002, was false and misleading because it did not disclose the marketing and competitive problems the Company was experiencing. This ignores the statement on page 21 of the Form 10Q in question that, "heightened competition, the entry of new competitors, ... [and] the expansion of existing competitors in one or more [of the Company's] operating regions" were risk factors that could yield uncertainty as to the Company's future performance. It is difficult to credit any claim that investors were not aware of the competitive pressures on Winn-Dixie, and as such there does not appear to be any actionable claim.

In a press release dated October 21, 2002, Rowland states that "[the Company's] financial position continues to strengthen as a result of strong cash flow and our operations are improving each and every day. The declaration of the dividend by the Board shows confidence

14

that the Company is meeting its planned results." Committee Counsel found no indication that

anything occurred in the intervening period that would render the latter statement actionable.

In a press release dated January 29, 2003, Rowland states that the Company

"continue[s] to focus on consistent execution of the basics of supermarket operations, while

investing in effective marketing programs and experimenting with new departments and formats.

The early results from these new initiatives are encouraging." Since at this time the 2003 second

quarter results showed that sales and profits were continuing to rise and the customer rewards

card program was particularly successful, there seems little basis for this claim. Nor did

Committee Counsel find any basis for a claim that directors or officers knew that the

improvement would not continue.

In a press release dated April 21, 2003, Rowland states that the Company

"continues[s] to make progress in improving retail operations," and that, "[t]he declaration of the

dividend by the Board shows confidence that the Company is making progress towards its

financial goals." While sales and profit were down compared to the same quarter in fiscal 2002

(overall sales down 2.7%, comparable store sales down 2.0%; gross profit down 0.5%), sales and

profit were still up year-to-date. Committee Counsel found no indication that any director or

officer knew or should have known that the Company's long-term financial health was in

jeopardy. Moreover, the Company was still involved in branding initiatives, and the customer

rewards card was continuing to have a positive impact. Committee Counsel does not believe that

the Company's optimism in the face of a slight downturn, given these facts, gives rise to an

actionable claim.

In a press release dated July 21, 2003, Lazaran, as CEO, stated that in spite of a

competitive environment, "[the Company's] balance sheet continues to strengthen as we make

progress toward our financial goals." Plaintiffs allege that this statement is false and misleading because Lazaran knew or recklessly disregarded that the Company was in need of a near-complete overhaul, evidenced by a January 30, 2004 press release in which Lazaran states that, "'For the last six months I have led our senior management team in a comprehensive review of our entire business model....'" An examination of the Company's balance sheet as of June 25, 2003 reveals that the Company's outstanding liabilities had significantly declined as compared to the same period a year earlier. Furthermore, the Company was still executing its 2002 restructuring plan and Lazaran, as well as other directors and officers, believed completion of the 2002 restructuring plan would contribute to the long-term success of the Company. Given these facts, Lazaran's statement in early 2004 that his management team was undertaking a "comprehensive review" of the Company's business model does not appear sufficient to support the inference that the July 2003 statement was knowingly false and misleading.

Twelve days after essentially flat earnings were announced for the first quarter of 2004, the Board of Directors declared a $0.05 per share dividend. In the October 20, 2003 press release announcing the dividend, Lazaran stated that "[t]he declaration of the dividend by the Board shows confidence in the Company." Committee Counsel has found no reason to believe that the Board of Directors did not have confidence in the Company at that time, considering, as Lazaran puts forth in the October 8, 2003 earnings release, the Company, "initiated a plan to increase sales and improve earnings for the remainder of the fiscal year."

In a press release dated January 20, 2004, Lazaran states that "[p]ayment of the [quarterly] dividend is an indication of our Board of Directors' support for our long-term strategic plan." Plaintiffs have alleged that this statement is false and misleading because Lazaran knew the Company had no "long-term strategic plan" during this time period. During

16

this time, the Company was executing upon the divestiture of certain stores as part of the 2002 restructuring plan and the Company was preparing to commence the 2004 restructuring initiative. Soon thereafter on February 10, 2004, the long-term strategic plan was set forth in the Company's second quarter public filing, in which it identified strategic initiatives, including as follows: brand positioning, expense reduction, market positioning, image makeovers and central procurement processes reengineering. (See Section V.A.). Lazaran, as well as other directors and officers, could reasonably believe the Company's initiatives would contribute to the long-term success of the Company.[8] It therefore appears that the Company did in fact have a strategic plan in place, one that the directors and officers believed had a reasonable probability of success.

Although the reference to the payment of the quarterly dividend in Lazaran's January 2004 statement does raise a question of whether the declaration of the dividend itself could be deemed to be a device to mislead shareholders into believing the Company was in better shape than it really was, there is little legal basis for such a claim, and it would seem difficult to sustain in light of the announcement just nine days later that dividends would be suspended in the future.[9]

While there are no further specific allegations of misleading statements about the Company's financial condition, Committee Counsel reviewed the Company's public statements

---

[8]     Shortly after this press release, in April 2004, the Board formed the Finance Committee. The Finance Committee reviewed the annual operating plan and budget, analyzed how the Company was performing as compared to the budget from a cash perspective, and interfaced with consultants and investment bankers who were attempting to find a buyer for the Company. (Appel & Nussbaum at 4, 6-7, 10, 12-14). Based on information reviewed, Committee Counsel do not believe the Finance Committee was formed because the Board felt that the Company did not have a long term strategic plan.

[9]     The issue of the propriety of the January 2004 dividend declaration is discussed below.

through the bankruptcy filing. Comparison of those statements with the facts as found in the Investigation did not yield anything that would form the basis for a misleading disclosure claim. [10]

### C.    DIVIDEND PAYMENTS

The propriety of issuing dividends during a period when the Company was struggling to compete and was experiencing declining financial results has come into question. The decision to issue dividends, and in what amount, is at the discretion of the Company's Board of Directors and is subject to the business judgment rule, so long as all legal restrictions and requirements are satisfied. Committee Counsel examined the declaration and payment of dividends made by the Company from 2001 through January 30, 2004, when the Board of Directors announced that dividend payments would be suspended indefinitely.

Until 2001, the Company had a reputation for paying the largest increasing dividend on Wall Street. (See Appel & Castle at 25). On a quarterly basis, the Board of Directors would declare a monthly dividend in advance of the months for which they would be paid.

On September 25, 2001, the Company announced that the December 2001 dividend payment would be the Company's last monthly dividend. Going forward, dividends would be declared and paid quarterly in arrears. The Company announced its first quarterly dividend consistent with this new practice on January 22, 2002. Not only did the Company change the timing and frequency of dividend payments, but also the amount of the dividend significantly decreased. On an annual basis, the Company paid a dividend of $1.02 per share in

---

[10]    It should be noted that in response to the Demand Letter discussed above, which requested that the Company commence an action against certain directors because they approved false and misleading statements, the law firm of King & Spalding, after investigation, advised the Board of Directors that no such action was warranted.

fiscal 2001. Beginning with the January 22, 2002 dividend declaration, the dividend was reduced to $0.20 per share on an annual basis, or $0.05 per share on a quarterly basis. This was done in order to keep more cash in the Company to pay for capital expenditures related to restructuring efforts. (See Townsend at 15, Appel & Castle at 26).

Several retirees expressed the belief that the Company had a severe cash shortage in the 2002 period and was on the verge of seeking bankruptcy protection.[11] They therefore expressed concern about the continued payment of dividends at that time. However, upon further investigation after hearing those allegations, Committee Counsel found that while there were some changes in the Company's credit arrangements at that time, there was no sense that the Company was close to insolvency. In any event, as noted, the Company did significantly reduce dividends in 2002.

The Company paid a $0.05 per share quarterly dividend until the Board of Directors decided to stop paying a dividend altogether in January of 2004. At a meeting on January 19, 2004 the Board of Directors decided to declare the final dividend. The $0.05 dividend was announced on January 20, 2004. At the January 29, 2004 Board meeting, the Board of Directors received the final quarterly financial results from management that yielded a

---

[11]    Counsel to the retirees interviewed by Committee Counsel reported that certain retirees who wished to remain anonymous recalled that an email was sent out by someone at the Company stating that the Company was about to file bankruptcy. Committee Counsel investigated this allegation, and did obtain a personal email from a Winn-Dixie retiree to a then current Winn-Dixie employee (sent from a non-Company email address to another non-Company email address), that referenced a press release allegedly issued in 2000-2001 announcing a Winn-Dixie bankruptcy filing which was then quickly retracted. Counsel to the retirees informed Committee Counsel that this was the email referred to by the retirees. Committee Counsel researched this issue and conducted additional interviews with KPMG and the Company. Research revealed that in 2000, KPMG operated an Internet Retail Bulletin Board (the "Bulletin Board") that provided summaries of corporate news releases. The Bulletin Board was administered by a third party. In the summer of 2000 when Winn-Dixie announced they would take a substantial restructuring charge related to their internal restructuring efforts, the third party administrator of the Bulletin Board mistakenly interpreted this to mean the Company was filing a chapter 11 restructuring, and posted a summary on the Bulletin Board reflecting this erroneous interpretation of the Company's press release. The posting was retracted once the error was discovered.

loss of $0.57 per share. This was the first quarterly loss the Company had experienced during the period covered by the Investigation. The Board of Directors at that point resolved to suspend any future dividend payments.

### 1.    Contractual Restrictions On Payment Of Dividends

During the period investigated, Winn-Dixie was party to certain credit agreements and a bond indenture containing covenants that restrict the payment of dividends depending on the Company's ability to meet certain financial ratios or benchmarks. Kellie Hardee, VP of Strategic Planning and Treasurer, was responsible for performing the financial calculations required by these debt agreements. Although Hardee was aware that failing to satisfy certain of the financial covenants would restrict the Company's ability to pay a dividend, it was not her responsibility to determine whether dividends could be paid. Her charge was only to determine if the Company was in compliance with the financial covenants. (See Hardee 1 at 5). According to Hardee and the information we reviewed, Winn-Dixie was in compliance with all contractual covenants regarding dividend payments whenever a dividend was declared from 2001 through 2004, including the final dividend announced on January 20, 2004. (See Hardee 1 at 6).

### 2.    Legal Restrictions On Payment Of Dividends

Winn-Dixie is also restricted by Florida statutes regarding the payment of dividends. Florida Statute 607.06401, forbids the payment of dividends under certain circumstances. Florida Statute 607.06401 states in relevant part:

Distributions to shareholders.

(3)    No distribution may be made if, after giving it effect:

   (a)    The corporation would not be able to pay its debts as they become due in the usual course of business; or

   (b)    The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit

otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

Hardee is not aware that the Company specifically performed a liquidity test as detailed in (3)(a), or a balance sheet insolvency test as detailed in (3)(b) before declaring each dividend. (See Hardee at 5.) The Company did begin performing quarterly liquidity analyses in January 2004. It was not until the eve of the bankruptcy filing that liquidity became an immediate concern. Considering this, it appears to Committee Counsel that the Company was in compliance with FL 607.06401(3)(a) liquidity test at all times when dividends were paid. In addition, Committee Counsel did not discover any evidence to indicate that the Company was not in compliance with FL 607.06401(3)(b) balance sheet insolvency test at all times when dividends were paid.

However, even though it appears the Company was legally empowered to pay dividends, it could well be argued that the Board of Directors' decision to pay a dividend on January 20, 2004 only to suspend all dividends nine days later shows that the January dividend should not have been declared and that the cash paid out should have been retained in the Company. After all, the Board's reason for suspending dividends on January 29, 2004 was precisely that – the need to retain cash. But this is exactly the type of business decision protected by the business judgment rule.

3.    **Analysis**

Company documents reveal that the decision to pay the Q2 2004 dividend was not taken lightly by management or the Board despite the fact that the amount contemplated to be paid out as a dividend would be less than $8 million.  As evidenced by a letter from Lazaran to the Board dated January 16, 2004 (the "Dividend Letter," attached hereto as "Exhibit C"), management consulted with the Abernathy MacGregor Group ("Abernathy") (an investor relations consulting firm) regarding payment of the dividend.  As indicated in the Dividend Letter and in Board minutes, the Board was aware of the pending Q2 2004 loss at the time the dividend payment was considered.[12]  (See Davis at 9).  Abernathy counseled that cutting the dividend would send a message to the financial community that the Company was facing a liquidity crisis, which would have a significant negative impact on the Company's stock.  In Abernathy's opinion, the dividend should be paid so long as the Company believes it will have sufficient cash flow to fund operations over the next few quarters.  Lazaran concludes the Dividend Letter with a review of preliminary projections for the next two quarters indicating slightly positive earnings.  Considering these projections and Abernathy's advice, management recommended to the Board that the quarterly dividend be paid.

Although an argument could be made that the decision to pay the dividend on January 19, 2004 was a breach of the directors' duty of care and even perhaps a breach of the duty of good faith for those directors who stood to benefit significantly from the payment of the dividend, there are several reasons, why such a claim could be difficult to maintain.  Under the business judgment rule described above in Section III.E., the directors could argue that there was

---

[12]    Townsend did not recall that the Board was aware of the anticipated quarterly loss at the time the Board decided to declare the dividend.  (Townsend at 16).

no issue of inadequate liquidity and that distributing cash to shareholders was reasonable. They could also argue that failure to pay the second quarter dividend without warning could have led to a devastating drop in the stock price, as Abernathy cautioned, and that the more prudent process was to do as they did – declare the dividend and then give ample warning that future dividends would not be forthcoming. While some of the directors do not recall going through that judgment process, there is evidence that there was discussion of these considerations on January 20. (See Davis at 9).

**D.    SALARIES AND BONUS RECEIVED BY DIRECTORS AND OFFICERS**

The Demand Letter criticizes Rowland, Lazaran and McCook for receiving millions of dollars in bonuses, incentives and equity compensation as a reward for poor performance. Committee Counsel examined the compensation of all directors and officers to determine whether their annual compensation was reasonable for a company in Winn-Dixie's industry, of Winn-Dixie's size and of Winn-Dixie's financial situation from 2002 through the Petition Date.

**1.    Management Compensation**

During the period prior to January 2004, the Company consulted with Watson Wyatt & Company ("Watson Wyatt") regarding management compensation. Watson Wyatt provided analyses of management's compensation. The analyses revealed that the Company's management compensation usually fell within the bottom quartile as compared to other retail grocers of similar size to Winn-Dixie. The bonus portion of compensation was based on achieving financial results, which was standard in the industry. (See Mehrer at 19, Townsend at 7).

As the Company began to encounter financial difficulties in January 2004, the Board of Directors became aware that key management personnel had the opportunity to take

positions with other companies where they stood to receive greater annual compensation than they did at Winn-Dixie. (See Townsend at 9). If the Board of Directors did not ensure that management's compensation remained competitive, the Company stood to lose the very people who were needed to implement the programs designed to return the Company to higher levels of profitability. To address this issue, the Board of Directors asked Watson Wyatt to provide the Compensation Committee with an analysis of the Company's compensation plan. (See Townsend at 6).

Based in part on its consultation with Watson Wyatt, the Compensation Committee recommended a change to the Company's bonus structure. Considering Winn-Dixie's falling performance, management could not reasonably expect the Company's performance to reach the levels required to trigger bonus compensation. (See Mehrer at 20, Townsend at 8). To motivate management to remain with the Company and to accomplish the Company's restructuring goals, the Compensation Committee recommended to the Board of Directors, and the Board of Directors approved, a management by objective, or MBO, incentive program at the April 2004 Board of Directors meeting. Among the objectives that could be rewarded under the MBO incentive program adopted by the Company was the accomplishment of certain restructuring goals such as closing or remodeling stores on schedule. (See Mehrer at 20).

In addition to the MBO program, the Board of Directors also issued retention bonuses to certain key employees, to stem the immediate threat of their departure. The retention bonus would be paid to the employee if he or she remained employed by the Company through a certain date. (See Townsend at 9, Mehrer at 20).

24

Given the record of Board consideration regarding management's compensation, Committee Counsel does not believe any claim of excessive compensation payments could survive.

## 2.    Rowland Payment

Upon his retirement from the Company, Al Rowland received a payment in excess of $5,000,000. The Demand Letter alleges that this payment was undeserved, as Rowland's misconduct contributed to the Company's demise. Irrespective of how "deserving" of the payment Rowland may have been, the payment was not discretionary – it was triggered by a clause in Rowland's employment contract that required the payment if the Company terminated Rowland "without good reason." Rowland was terminated by the Board of Directors for "no good reason," which is suggested on page 33 of the publicly filed Form 14A filed in September 2003.[13] Although Board minutes reflect a voluntary retirement that would not have triggered the payment clause, McCook, Townsend, Davis,[14] and Rowland[15] each corroborate that the disclosure in the Form 14A indicates Rowland's retirement was treated as a termination "without good reason" because it was in fact a termination "without good reason." (See Townsend at 27, McCook at 39, Davis at 15, Rowland II). Townsend, Davis, and Rowland provide similar explanations regarding the Board's decision to terminate Rowland. The Board of Directors decided the Company needed new leadership to succeed, and asked Rowland to step

---

[13]    "Mr. Rowland also received certain payments stemming from his retirement at the end of fiscal 2003, which was treated as a termination without cause under his employment agreement."

[14]    Dan Davis was Chairman of the Board at the time Rowland was terminated.

[15]    Due to ailing health and memory, Rowland was interviewed via written questions and responses. Committee Counsel were not satisfied with the detail provided in Rowland's initial written response, (Rowland I), or convinced Rowland paid appropriate attention to the terminology in the questions posed. We asked Rowland's counsel to review his initial response with him and amend Rowland I to the extent Rowland felt he could provide more detailed answers. Rowland reviewed his answers and amended his response as set forth in Rowland II.

down "without good reason," but agreed to allow the Board minutes to reflect a voluntary retirement out of respect to the years of service Rowland had given to the Company. (See Townsend at 27-28, Davis at 12-17, Rowland II).

Rowland and Davis also recount a private conversation they had which first raised the issue of Rowland leaving the Company. They discussed Lazaran's progression at the Company and whether he might one day become Chief Executive Officer – but at that time Rowland did not offer to retire, although he did indicate that he, "wasn't going to work forever." Subsequent to this conversation, Davis privately discussed the issue of Lazaran succeeding as Chief Executive Officer with other Board members who agreed that they would be more comfortable with Lazaran as Chief Executive Officer. The Board ultimately terminated Rowland without cause and paid him the payment required under his employment contract upon a termination "without good reason." (See Davis at 10, 14, Rowland II).

It does not appear that the references in the Board minutes or in Rowland I to a voluntary retirement accurately describe the true circumstances of Rowland's departure from the Company. Based on interviews with Davis, Townsend and Rowland, Committee Counsel believes Rowland was in fact terminated by the Board of Directors "without good reason" as defined in his employment contract, but allowed to conduct his retirement in a voluntary manner as a courtesy, extended to him by the Board of Directors. (See Davis at 15, Townsend at 27). Rowland's retirement payment would therefore be contractually required, and the Company had no discretion to withhold or diminish the payment.[16]

---

[16]     According to Davis, the Company had no basis to terminate Rowland "for good reason" as defined in his employment agreement. (Davis at 17). Upon review of his employment agreement, Committee Counsel believe if Rowland could be terminated "for good reason," he would forego any contractual retirement payment for monies not already earned.

### 3.    Board of Directors' Compensation

Compensation for the Board of Directors has not changed since at least 2000. In 2003 the Governance Committee, after consulting with a board compensation expert, recommended that director compensation be increased. The Board voted against that proposal. Under these circumstances it is difficult to see a basis for a claim of excessive compensation for directors.

### E.    <u>ASSET IMPAIRMENT</u>

In the period under investigation, the Company took significant charges for impairment of assets. This has led to a claim that some of these charges should have been taken earlier, resulting in an inflated balance sheet for earlier periods. Committee Counsel reviewed the process for taking these charges with Company financial personnel and with KPMG representatives.

### 1.    Process

According to SFAS No. 144, long lived assets shall be tested for recoverability whenever events or changes in circumstances indicate that their carrying amounts may not be recoverable. When a triggering event occurs, the Company tests a store's assets for recoverability pursuant to SFAS No. 144. A triggering event could be any of the following:

(1)    A significant decrease in the market price of a long lived asset.

(2)    A significant adverse change in the intent or manner in which a long lived asset is being used or in its physical condition.

(3)    A significant adverse change in legal factors or in the business climate that could affect the value of a long lived asset, including an adverse action or assessment by a regulator.

(4)    An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long lived asset.

(5)    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long lived asset.

(6)    A current expectation that more likely than not a long lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated life.

(SFAS No. 144, paragraph 7).

When a store's assets are examined for impairment, Company management creates a projection of the present value of future cash flows from the store based on prior operating history and budget numbers. This projection is then compared to the carrying or book value of the store's assets on an aggregate basis. If the book value exceeds the projected present value of cash flows, impairment of the store's assets is necessary unless an exception exists, such that the Company believes the store has long term positive cash flow potential. Exceptions the Company might recognize include: a new store that has not had time to develop, a store that was faced with a temporary handicap such as road construction that makes ingress/egress difficult for customers, or a reasonable belief that improvement is likely. The Company's management determines if an exception to impairment applies on a store-by-store basis. If no exception is applied, the assets are impaired from their book value to the net present value of cash flows – but not lower than current fair market value of the store's assets, determined on an aggregate basis. (See McCook at 30-33, Byrum I at 37-38, 40-41, Byrum III at 1, Nussbaum & Byrum at 1-3, 9, 11, Storey I at 31 and 35).

Prior to 2002, impairment was periodically analyzed on an aggregate Company-wide basis. (See Nussbaum & Byrum at 6). Starting in 2002, the Company's asset impairment policy was to review the bottom 10 performing stores for impairment on an annual basis, and more frequently upon a triggering event. (See Storey I at 31, McCook at 30, 32). Since the

Company started experiencing losses in fiscal 2004, it has reviewed every store for impairment on a quarterly basis. (See Byrum I at 30).

Not all asset impairment charges result from the process described above. Asset impairment can generally be broken down into continuing operations and discontinued operations. Discontinued operations generally include assets associated with stores or other facilities that have been closed. Continuing operations generally include stores and other facilities that are currently operating, but also include asset impairment related to stores and other facilities which have been closed, but do not qualify as discontinued operations,[17] and asset impairment related to stores and other facilities which the Company plans to close shortly, but at the moment continue to operate.[18] The following break-down of asset impairment charges attempts to recognize these different components when possible.

2.    **Asset Impairment Charges**

In fiscal 2002, the Company exited the Texas and Oklahoma markets. As a result, an impairment review under SFAS 144 was triggered by the current expectation that more likely than not a long lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated life. (See Nussbaum & Byrum at 6, Byrum I at 33). The Company recorded $15.39 million in asset impairment attributable to the closed stores, and $21.57 million

---

[17]    Mike Byrum provided two examples of this. A manufacturing plant is closed because the Company decided to outsource the production of the item made by the manufacturing plant. The Company has not discontinued the operation of acquiring and selling the product in question, so it would not qualify as a discontinued operation. A second example is a closed store located in close proximity to another Winn-Dixie store that remains open. If the Company believes a sufficient percentage of customers will migrate to the remaining store, the Company would not have discontinued the operation of serving the customers of the closed store, so it would not qualify as a discontinued operation. (Byrum III at 4).

[18]    Undiscounted future cash flows for stores and other facilities which are planned to be closed are based on an estimate of the remaining period of their operation. (Byrum III at 6). Asset impairment recorded under continuing operations for stores or other facilities the Company plans to close, but has not yet closed, is dropped down to discontinued operations when the stores or other facilities actually close. (Byrum III at 5).

in asset impairment attributable to inactive equipment associated with continuing operations. (See Storey I at 34).

In fiscal 2003, the Company, following their internal policy, reviewed their lowest performing stores for impairment. Despite the fact that 38 stores were identified as having negative profit before tax, administration expense and rent, the Company determined that each store had the potential to become cash flow positive. No impairment was taken in fiscal 2003. (See Byrum I at 34, Storey I at 33).

During the second quarter of 2004, which was historically the most profitable time period for the Company, the Company suffered a significant downturn in operations. As a result of this triggering event, Winn-Dixie undertook a Company-wide store-by-store asset impairment review. (See Byrum I at 30, Storey I at 32 and 35). The Company identified 166 stores for potential impairment. After applications of exceptions, the Company impaired 130 stores for a total of $36.4 million.

During the third quarter of 2004, the Company undertook an asset rationalization plan to exit non-core markets. The plan included the closure of certain stores, warehouses, manufacturing plants and other real estate assets. The Company conducted an impairment analysis in the third quarter and found no impairment necessary for continuing operations. (See Storey I at 33). The Company did impair closed stores and facilities in the amount of $13.1 million.

Additional asset impairment was taken in the fourth quarter of 2004, resulting in total asset impairment in fiscal 2004 of $63.2 million of which $35.0 million was attributable to continuing operations. As a result of quarterly impairment reviews in the first two quarters of fiscal 2005 prior to the bankruptcy filing, the Company booked asset impairment of $14.0

million of which $9.0 million was attributable to continuing operations. Total asset impairment for fiscal 2005 was $185.2 million of which $177.7 million[19] was attributable to continuing operations.

In each quarter that impairment charges were booked, KPMG would test the Company's procedures and the mathematical accuracy of the Company's impairment calculations. At annual reviews, KPMG would also check that source data included in the Company's general ledger was correct, and check that assumptions are consistent with the Company's forecasts. (See Storey I at 36, Storey II at 3-4, 6, 10, 12, Byrum I at 39). Interviews with KPMG and review of their work papers show that KPMG was satisfied with both the process and results of the Company's asset impairment. (See Paradise at 24). Given that the Company did in fact perform the impairment analyses in prior years, it cannot be claimed that the possibility of taking a charge was ignored.

The Company's directors and officers are entitled to rely on KPMG and on accounting standards in creating a process to determine whether an impairment charge should be taken, and it appears that they did so. Committee Counsel discovered no indication that the Company's use of triggers to initiate an impairment investigation was improper or applied in an arbitrary way. Furthermore, based on information provided in interviews and documents, Committee Counsel believes the Company took asset impairment charges when appropriate, and refrained from taking such charges when they were not warranted.

---

[19]    According to Mike Byrum, most of this impairment was attributable to stores to be closed under the asset rationalization plan, and as such would eventually be dropped down to discontinued operations. (Byrum III at 5).

F.    **SELF-INSURANCE RESERVE AND EXPENSE**

The Company participates in a self-insurance program that encompasses workers' compensation, general liability and automobile liability.  Under the self-insurance program, the Company is required to maintain a self-insurance reserve for payments that are made for claims under these insured risks.  The self-insurance reserve is a liability account on the Company's balance sheet, not a capital item.  It is not a segregated pot of money.  (See Appel & Castle at 20, McCook at 16).[20]

In general, the Company's self-insurance program works as follows.  The general liability claims are processed internally by the Company.  When a workers' compensation claim is filed, it is processed by the Risk Management Department, which is currently headed by Dale Bitter.  A claim notice is then sent to the Company's third party administrator, which is currently Sedgwick Claims Management Services, Inc. ("Sedgwick").  Sedgwick sets a case reserve for the claim, based on their own practices and guidelines.  The Company requires Sedgwick to report claims for which case reserves are set at $50,000 or above.  Case reserves between $50,000 and $250,000 must be approved by a Winn-Dixie Vice President.  Case reserves above $750,000 are reviewed by the Company's Risk Management Committee.  At the time case reserves are set, the Company does not record any expense or increase its reserves.  (See Bitter at 4-9).

At the beginning of each fiscal year, the Company's financial management projects the self-insurance expense for the year, based largely on the self-insurance expense for

---

[20]    The same is true of the reserve account held by Winn General Insurance ("Winn General") (a non-debtor). (See Nussbaum & Byrum at 50).  Winn General was capitalized by the Company with $2.7 million. Nussbaum and Byrum assert that a Winn-Dixie entity borrowed the $2.7 million back from Winn General through 3 loan agreements and used the funds to make a utility deposit on behalf of the Company.  (See Nussbaum & Byrum at 48-50).  See subsection below for more on segregation of funds.

the prior year.  The goal of this projection is to determine how much should be expensed to the self-insurance reserve during the year, such that at the end of the year, the reserve will match the liability on outstanding claims.  To do this, the annual projection must estimate the new claims that may be filed during the year and any positive or adverse change in experience on existing claims, such as an increase in medical inflation.  That projection is then booked and expensed every four weeks over the course of the year.  (See Byrum I at 7, Storey I at 9).  The directors play no role in this calculation.  As claims are paid during the course of the year, the reserve account is debited, with no immediate effect on expenses.  (See Byrum I at 11-12).

Historically, at the end of each year the Company would, if necessary, adjust the self-insurance reserve to match the self-insurance reserve requirement which will differ from the requirement from the prior year considering (i) the difference between claims payments anticipated at the beginning of the year and the actual amount paid during the year and (ii) any increase or decrease in the reserve requirement attributable to claim experience.  (See Byrum I at 14-15).  The amount of self-insurance reserve required is decided after a review and recommendation by a third party actuary, which is currently Willis of Maryland, Inc. ("Willis").  The third party actuary gathers data about current claims (including case reserves), and historical data about payments made on claims from Sedgwick and from the Company.  (See Turner at 11).  This information is then used to find a range of ultimate payouts with corresponding confidence levels.  The third party actuary provides this range to the Company with a recommended reserve at a confidence level that is reasonable according to industry best practices.  (See Teufel at 13, Turner at 14-15, Bitter at 11, Nussbaum & Byrum at 14).  Although the Company has discussions with the third party actuary regarding the recommended reserve and can have them adjust the calculations to account for certain experiences if they are not taken into account, the

33

Company has always adjusted the reserve to the point estimate recommended by the third party actuary. (See Turner at 12).

At the end of fiscal year 2003, in Q2 2004, and in Q3 2004, the Company increased its self-insurance expense by approximately $30 million, $21 million and $7 million, respectively, above and beyond what had been anticipated by the annual projection. Plaintiffs in the class actions allege that these shortfalls were the result of an intentional ploy by management and/or directors to underestimate these expenses and thus inflate earnings in prior periods.

The Company spent $34.8 million more on self-insurance in fiscal 2003 than it did in fiscal 2002. Approximately $4 million of this expense was due to the Company increasing its projected annual self-insurance expense between fiscal 2002 and fiscal 2003. Approximately $30 million of this difference is attributable to a charge taken by the Company at the end of fiscal 2003 to match the actual reserve to the third party actuary's recommendation. (See Byrum I at 25).

Of the $30 million increase, approximately $25 million was due to a spike in workers' compensation claims filed as a result of the Company exiting the Texas and Oklahoma markets and an increase in general liability claims that the Company did not anticipate at the start of the fiscal year. (See Storey I at 19, Turner at 19-20, 24, Byrum I at 25). Approximately $5 million of the year-end charge was associated with adjustments to offset the effect of certain claim settlement practices by the Director of Risk Management at that time.[21] (See Storey I at 17, Storey II at 17, Byrum I at 25).

---

[21] At the Company's request, the name of this Director of Risk Management has been omitted from the Report to protect his/her privacy, but was known to Committee Counsel. As detailed in the Report, this Director of Risk Management is no longer employed by the Company. He/she will be referred to as the "Former Director of Risk Management" throughout the remainder of the Report.

The settlement practices of the Former Director of Risk Management involved settling a greater percentage of cases than had historically been settled in a manner Company management and KPMG believed to be inconsistent with generally accepted claim settlement philosophies.[22] The Company and KPMG believe the Former Director of Risk Management thought that a higher settlement rate would lead to the Company's lower self-insurance reserve requirement, which would reflect well on him.[23] (See Gleason at 10, Storey I at 22, McCook at 26).

The impact of the Former Director of Risk Management's practices on the self-insurance reserve was limited to $5 million because George Turner of Merlino & Turner, Inc., the third-party actuary at the time, calculated the self-insurance reserve range and point estimate weighted toward paid claims, not case reserves. Had Turner used a different methodology in calculating the reserve requirement, the impact of the Former Director of Risk Management's practices could have been greater. (See Storey I at 21, Storey II at 16, 23).

---

[22]  Based on information provided by KPMG, the Former Director of Risk Management's questionable practices generally consisted of the following: (i) instructing adjusters to close inactive claims prematurely; (ii) instructing adjusters to settle claims in amounts greater than their estimated value; (iii) although case reserves should be adjusted to reflect settlement offers when made, instructing adjusters not to adjust the case reserves until the final settlement was paid; and (iv) instructing adjusters not to open claim files for "incidents" (minor occurrences that stood a chance to be settled with gift certificates or other minor concessions) unless they could not be settled within 3 days. (See Storey II at 18, 25).

[23]  The Former Director of Risk Management's practices raised the suspicion of the internal claims administrator, who reported her suspicions to the Company's hotline. (See Gleason at 3, McCook at 24). This report led to an investigation by the Company's Internal Audit Department in July 2005, prior to filing the Company's Form 10K. (See Gleason at 4-8, McCook at 23). The internal investigation concluded that the Former Director of Risk Management was not following industry best practices in his aggressive claims settlement, and in his establishment and maintenance of reserves for workers' compensation and general liability claims. (See Gleason at 10). Gleason made sure Turner had accurate data from which to estimate the reserve. (See Gleason at 4, 5, 12). The results of the Company's investigation into the Former Director of Risk Management were summarized in a one page report created by Jeff Gleason, head of the Internal Audit Department. (See Internal Audit Report Review of Risk Management attached hereto as "Exhibit D," Gleason at 17). The Former Director of Risk Management was terminated as a result of the Company's inquiry. (See Gleason at 9).

KPMG reviewed the Company's finding regarding the Former Director of Risk Management's settlement practices to determine if the Former Director of Risk Management's practices created a significant risk of misstatement or misrepresentation of assets in the Company's 2003 Form 10K. KPMG determined there was no such risk, in part because the Former Director of Risk Management's practices were accounted for by the third party actuary prior to filing the 2003 Form 10K. (See Storey II at 25).

After the increase in fiscal year 2003, the Company kept a close watch on the self-insurance reserve level. (See Appel & Castle at 19, Bitter at 16, Storey I at 11, 23). Management decided in November 2003 to have the third party actuary perform a mid-year review. (See Bitter at 17, Byrum I at 22, 24, Storey I at 11, 23, Turner at 31, 32). The mid-year review indicated that the self-insurance expense for fiscal 2004 was underestimated and an additional increase to the self-insurance reserve of approximately $21 million was needed. (See Turner at 24). The Company booked this increase in Q2 2004. The Company was very concerned that they experienced a second large shortfall in the reserve level so soon after the fiscal 2003 increase. To better understand how and why this could happen, the Board hired Pat Teufel, the Lead Partner of Actuarial Services Practices at KPMG, to review the Company's self-insurance activities. (See Paradise at 22, Townsend at 10, Teufel at 6).

In Q3 2004, while Teufel was investigating the Company's self-insurance program, the Company hired Willis as its new third-party actuary. To smooth the transition from Turner to Willis, the Company had both firms perform a reserve analysis for the period spanning Q1 2004 through February 28, 2004. As a result of these reviews, the Company took an additional self-insurance expense charge of $7.2 million in the third quarter of fiscal 2004. The

Company performed regular semi-annual reviews of the self-insurance reserve beginning in fiscal 2005. (See Bitter at 3, 16-17).

In August 2004, Teufel presented her analysis to management. She reviewed Turner's qualifications and the appropriateness of his estimates and assessed the Company's self-insurance reserve activities. (See Teufel at 4, 14). She found that Turner was qualified and his reserve estimates were reasonable.[24] Teufel felt that a $30 million adjustment in fiscal 2003 and a $20 million adjustment in Q2 2004 was not surprising given a self-insurance program the size of the Company's and also considering the heightened uncertainty the Company was facing in estimating its self-insurance reserve due to changes in claim reserves and settlement philosophy, changes in operations, and changes to workers' compensation statutory benefits, among others. (See Teufel at 21, 22). Teufel felt that the $30 million adjustment at the close of fiscal 2003 was an appropriate area of concern for the Company – but it should not have set off "bells and whistles."[25] (See Teufel at 22).

Teufel stressed that a reserve estimate offered by the actuary is just that – an estimate. As such, the best the Company can hope for is that the estimate will fall within an acceptable range of variability. (See Teufel at 7, 22). Over the fiscal 2003 and 2004 time periods, the Company's reserve estimates, though significantly low, were acceptable.

This leaves the question of whether management should have anticipated a higher self-insurance expense at the beginning of 2003 and 2004, which would have been reflected in quarterly financials throughout the year and would have reduced the earnings reported in those

---

[24]    Teufel felt Turner's assumptions regarding general liability claims were somewhat aggressive – but not unreasonable. (See Teufel at 10).

[25]    Turner and Byrum also felt that a $30 million adjustment was large, but not relative to the outstanding reserves held by the Company. (See Turner at 17, Byrum I at 1).

interim reports.[26]  Of course, the underestimation of the self-insurance reserves does not mean that any assets of the Company were misappropriated – merely that more was spent on these matters than had been anticipated.  The Former Director of Risk Management's settlement practices may have been aggressive, which appears not to have been the best business practice, but there is no indication that settlement funds were used for something other than settling Company obligations.  There is no indication that those involved in projecting the self-insurance expense were motivated by a desire to make earnings appear higher, or that their projections were knowingly false.

Committee Counsel also examined whether the Company's pre-petition self-insurance reserves were segregated funds available to the Debtors' estates and creditors. Committee Counsel also examined whether any such reserves were held by Winn General, a non-debtor affiliate of the Debtors.  Committee Counsel has concluded that at no time were there segregated funds relating to self-insurance reserves held by either the Debtors or Winn General.

Under their self-insurance program, the Company maintained on its balance sheet aggregate loss and allocated loss adjustment expense ("ALAE") reserves for workers' compensation, general liability and automobile liability claims as a liability account.  The loss and ALAE reserves were expensed as liabilities when booked by the Company – cash was not put aside in an earmarked asset account.  (See McCook at 16).

Committee Counsel researched the applicable state regulations of certain states in which the Company conducted business as of and prior to the petition date,[27] to determine

---

[26]   This would not have been a concern for Q2 and Q3 2004 as interim reserve reviews were performed.

[27]   Alabama, Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas and Virginia.

whether the Company was statutorily required to segregate funds for its self-insurance reserves. Several states required minimum financial responsibility thresholds only as to automobile liability and workers' compensation claims, including posting letters of credit or providing other financial security. No jurisdiction, however, required any entity providing self-insurance to segregate its self-insurance reserves if the minimum financial responsibility requirements were satisfied. The Investigation indicates the Company satisfied the minimum financial responsibility in each jurisdiction that required it. Based on the information reviewed, Committee Counsel concludes the Company did not have a statutory obligation to segregate self-insurance reserves, nor did it choose to do so.

### G.    MATERIAL WEAKNESS IN INTERNAL CONTROLS

#### 1.    Disclosure

The Company disclosed a material weakness related to internal controls in its 2005 Form 10K filing.[28] As described by KPMG in its report to the Board of Directors dated October 25, 2005:

> [a] material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

The material weakness was reported by the Company as follows:

> As of June 29, 2005, we did not have appropriate policies and procedures in place to review terms in multi-year incentive contracts in order to determine the proper application of generally accepted accounting principles. As a result of the deficiency, errors occurred in the Company's accounting for multi-year

---

[28]    A material weakness indicates a greater risk that a misstatement of financials could occur than a significant deficiency. A significant deficiency results in more than remote likelihood that a misstatement of financials, that is more than inconsequential in amount, will not be prevented or detected, as opposed to a material weakness that results in more than a remote likelihood that a material misstatement of the financials will not be prevented or detected.

contract incentives when preparing the Company's financial statements as of and for the year ended June 29, 2005. The deficiency results in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected.

(2005 Form 10K, page 95). In other words, the Company's controls were such that, in the opinion of KPMG, there was more than a remote likelihood that there could be a material misstatement in financial statements if an error was made in accounting for multi-year contract incentives. This does not mean that there was a finding that such a misstatement in the Company's financials had occurred or even that an error in accounting for multi-year contract incentives was made, only that the controls might not be sufficient to prevent a misstatement from occurring if an accounting error was made. According to publicly filed documents, the material weakness has now been remedied.

### 2.    Nature of Material Weakness

During the fiscal 2005 audit, KPMG determined that certain multi-year vendor contracts were not properly accounted for under GAAP and EITF 02-16. GAAP and EITF 02-16 provide guidance as to how to account for multi-year vendor contracts with conditional repayment provisions. When EITF 02-16 was issued in 2002 and interpreted in 2003 and 2004, this gave further guidance as to how multi-year vendor contracts with conditional repayment provisions should be accounted for under GAAP. The Company adopted EITF 02-16 prospectively in 2003. The Company states that the accounting for the vendor contracts in question was correct at the time the Company entered into them.[29] (See Appel & Nussbaum at 27).

---

[29]    KPMG takes the position that the Company's accounting for the contracts in question was not in accordance with GAAP at the time they were entered into. (See Storey II at 26, 32). This difference of opinion between KPMG and the Company has no impact on the Report. KPMG and the Company do agree

After further investigation, KPMG determined that not only were the contracts accounted for incorrectly, but there was no process in place that could guarantee there would be less than a remote possibility of a material misstatement occurring as a result of multi-year vendor contracts with continual repayment provisions. This lack of process is the material weakness disclosed by the Company.

According to the Company's Q2 Form 10Q, "[a]s of January 11, 2006, the Company has fully remediated [the] material weakness in internal control over financial reporting." (See also Nussbaum & Byrum at 44). Committee Counsel takes this statement to indicate that the Company has a process in place to review multi-year vendor contracts and determine accounting treatment that guarantees there is less than a remote possibility of a material misstatement occurring as a result of multi-year vendor contract accounting.

### 3.    How Material Weakness Was Discovered And Actions Taken

The Company entered into a multi-year vendor contract with Hallmark in fiscal 2002. Based on a review of Company and KPMG documents, it appears the Hallmark contracts consisted of (i) two signing bonus payments of approximately $3.4 million each and (ii) a $14.3 million payment as a replacement allowance to reduce the cost associated with removing items relating to Gibson Greeting Cards, the Company's former preferred greeting card vendor. The $3.4 million signing bonus payments were recognized in May 2002 and September 2002. Approximately $7.5 million of the $14.3 million replacement allowance was recognized in Q1 2003, and the remaining approximately $6.8 million was recognized in Q2 2003.

---

... cont'd ...

that any accounting errors that existed have been corrected, those errors did not amount to a need to restate the Company's financial statements, and all disclosures made regarding the material weakness were sufficient and accurate. (See Storey II at 38).

Pursuant to the terms of the Hallmark contract, the Company was required to repay a pro rata portion of the signing bonus if the square footage of retail space allocated to the Hallmark display fell below 95,000 square feet. When the Company announced the closure or sale of 156 stores in the fourth quarter of 2004, the Hallmark square footage was reduced to less than 95,000 square feet. At that point, the Company booked a $2.9 million repayment obligation to Hallmark (See Storey II at 26). KPMG[30] investigated the Company's accounting of the Hallmark contract and its other multi-year vendor contracts as part of its fiscal 2005 audit. (See Storey II at 26). KPMG determined that for the Hallmark contracts to be properly accounted for, all of the $21 million received from Hallmark should have been deferred over the life of the contracts. (See Storey II at 26, 32).

To test the accounting on the Company's other multi-year vendor contracts, the Company and KPMG each reviewed a sample of vendor contracts during Q1 and Q2 of 2006. The Company used a sample size of 60, from which they determined there was a significant deficiency, not a material weakness, regarding multi-year vendor contract accounting. KPMG used its own sample of approximately 50 contracts, and based upon their review, was not satisfied that a material weakness was not present. KPMG asked the Company to review all of their executory contracts to be certain. Based on this global review, the Company identified 12 contracts that were not accurately accounted for. Eleven contracts overstated revenue, and 1 understated revenue. The cumulative effect of these 12 contracts was to overstate revenue by approximately $22.2 million, which, according to the Company, constituted a material weakness.

---

[30] This inquiry may have been spurred by the Public Companies Accounting Oversight Board. (See Nussbaum & Byrum at 44, Paradise at 14).

KPMG reviewed the Company's global review and agreed with the process and results of the review. (See Storey II at 30-31, Paradise at 8, Gleason at 29).

Because a material weakness was discovered, the Company performed a Staff Accounting Bulletin ("SAB") 99 analysis to determine if the material weakness in the process resulted in a material impact on prior financial statements that would require a restatement. The results of the Company's SAB 99 analysis indicated that a restatement was not necessary. KPMG reviewed the Company's SAB 99 analysis, performed their own SAB 99 analysis, and agreed with the Company's conclusion that a restatement was not required. (See Storey I at 27, Storey II at 29, Paradise at 16, Appel & Nussbaum at 22, Gleason at 30, Byrum I at 26-27).

Instead of restating prior financial statements, the Company recorded an adjustment in the fourth quarter of 2005 that reduced previously recognized income by approximately $22.2 million, as disclosed on page 88 of the 2005 Form 10K. Approximately $14.0 million of the $22.2 million was attributable to an adjustment relating to the Hallmark contracts.

Committee Counsel has found no reason to disagree with the Company's and KPMG's conclusions. As stated above, the Company and KPMG assert the material weakness has been remedied and all necessary adjustments have been made. Committee Counsel concludes that there is no viable cause of action by the estate against any directors or officers concerning this issue, considering no evidence indicating anyone knew that the accounting for these contracts was improper has been uncovered. Moreover, the material weakness only relates to when and whether income should have been recognized, not if any assets were diverted from the Company.

## H.    **INDEPENDENCE OF BOARD OF DIRECTORS**

Committee Counsel examined the independence of the Board of Directors and each of its sub-committees and based on information provided in interviews and documents, conclude that the Company has complied with NYSE listing requirements related to director independence at all times during the period examined in the Investigation.  Currently, Chief Executive Officer Peter Lynch is the only member of the Board of Directors that is not independent according to the Company's Proxy Statement filed on October 26, 2005.

In 2005, before the October 26, 2005 Proxy Statement was filed, the Company repealed a voluntary internal corporate governance principle, established in April 2003, that declared that a person related to Winn-Dixie's founding family could not be considered an independent Director.  Pursuant to this voluntary restriction, A. Dano Davis, T. Wayne Davis, Charles Stephens, and H. Jay Skelton were not considered independent by the Company.[31]  The voluntary restriction was instituted at a time when the Company considered Davis family holdings in the Company to be a significant percentage of the Davis family's wealth, and Davis family members sat on the Board and were also members of Company management.  The Company repealed the voluntary restriction after Dan Davis left the Board because Skelton, the new chairman, had never been a member of management and it had been over two years since any member of the Davis family had been a member of management.[32]  Also, as a result of

---

[31]    A. Dano "Dan" Davis and T. Wayne Davis are members of the founding family of the Company.  Charles Stephens' spouse is a member of the founding family of the Company.  H. Jay Skelton is a director and officer of D.D.I., Inc., the largest shareholder of the Company that is beneficially owned by the founding family of the Company.

[32]    As chairman, Dan Davis was a member of Company management until Spring 2003, when chairman was changed from a management position to a non-management position.  (See Davis at 1, Appel & Nussbaum at 32).

significant changes in stock value, the Davis family holdings had changed such that the Company felt the voluntary restriction was no longer necessary. (See Appel & Nussbaum at 32).

## I.   COMPANY-OWNED LIFE INSURANCE POLICIES

Committee Counsel examined and reviewed the Company's purchase of certain Company Owned Life Insurance Policies for certain Company employees ("COLI Policies"). The Company ultimately paid approximately $52 million in settlement of taxes and interest to the Internal Revenue Service related to tax deductions taken by the Company in connection with its COLI Policies.

During 1993-1997, the Company held COLI Policies which it had purchased from AIG Life Insurance Company ("AIG"). (See May II at 15-16).[33] At the time the Company purchased the COLI Policies, the Company self-insured certain employee medical and life insurance benefits. Byrum asserts AIG promoted the COLI Policies as a way to fund these benefits. According to the Company, these types of insurance policies were widely marketed, and many large, publicly traded companies entered into arrangements similar to the COLI Policies. (See Nussbaum & Byrum at 40). The COLI Policies were non-participating, fixed premium, universal-type individual life insurance policies, for which the Company paid the premiums.

The Company was the owner and beneficiary of the COLI Policies, and was entitled to receive death benefits upon the death of the insured. Byrum asserts that during the insured's life the Company could borrow against and withdraw portions of the cash value and that the Company borrowed against the cash value ("COLI Loans") and used the COLI Loan

---

[33]   The general factual background of the COLI Policies derives substantially from the Company's Brief of Appellant filed with the Eleventh Circuit Court of Appeals in the appeal referenced herein, except where references are made herein to other sources.

45

proceeds to fund a large portion of the premiums during the first few years of the COLI Policies. (See Byrum III at 12).

One benefit of the COLI Policies was the ability to deduct the administrative expenses associated with the COLI Policies and the interest payable on the COLI Loans. (See Byrum III at 12). In 1996, however, Congress enacted the Health Insurance Portability and Accountability Act of 1996 which generally eliminated (phased out over 3 years) interest deductions on the COLI Loans. Due in part to this change in federal tax law, the Company stopped purchasing COLI Policies and surrendered a substantial number of the existing COLI Policies in December 1997.

In fiscal 1993, the Internal Revenue Service disallowed the Company's federal income tax deductions for (i) interest expense on the COLI Loans and (ii) administrative expense associated with the COLI Policies. Commencing in fiscal 2000 the Company began accruing for the potential liability should the disallowance of the Company's deductions be sustained. (See Byrum III at 8). In <u>Winn-Dixie Stores Inc. et al v. Comm'r.</u>, 113 T.C. 254 (10/19/1999), the United States Tax Court held that the Company's COLI program lacked economic substance and business purpose (other than tax reduction) and disallowed the deductions for interest expense on the COLI Loans and the deductions for administrative expenses associated with the COLI Policies. The Company appealed the unfavorable decision of the Tax Court to the Eleventh Circuit Court of Appeals. In <u>Winn-Dixie Stores, Inc. v. Comm'r</u>, 254 F.3d 1313 (11th Cir Ct. App. 6/28/2001), *cert. denied,* 535 U.S. 986 (2002), the Eleventh Circuit Court of Appeals affirmed the decision of the Tax Court and denied the Company's deductions for interest expense and administrative expenses. As a result of the adverse court decisions, in fiscal year 2003 the Company paid approximately $52 million in taxes and interest to the Internal Revenue Service,

from its accrued reserve, and released the balance of the accrual of approximately $28.5 million to general funds.

It appears to Committee Counsel that the Company attempted to comply with the statutory provisions of the Internal Revenue Code at the time by deducting the interest associated with COLI Loans, and by deducting the administrative expenses associated with the COLI Policies. Despite the fact that the Tax Court and the Eleventh Circuit Court of Appeals ultimately disallowed the deductions based on the judicial doctrines of lack of economic substance and lack of business purpose, there does not appear to be a sustainable claim that the Company acted improperly in purchasing the COLI Policies and deducting the interest expense on the COLI Loans and the administrative expense associated with the COLI Policies based on the information reviewed by Committee Counsel. Moreover, by establishing a reserve for the potential COLI liability, from which the ultimate tax and interest obligation was paid, the Investigation indicates the Company acted prudently in anticipating the impact of a potential adverse ruling on the COLI issue.

### J.    IRS AUDIT OF YEARS 2000-2002

Committee Counsel reviewed the IRS audit of the Company for fiscal years 2000 through 2002 which resulted in a proposed assessment of taxes and penalties against the Company of $49 million. As a result of the Company's confidence in its position, and with the concurrence of KPMG, the Company determined not to accrue any amounts with respect to this matter pending a protest which the Company is pursuing. (See Byrum III at 15; Storey III at 9).

The IRS has audited each fiscal year of the Company since approximately the early 1970's. (See Baragona & Crichton at 14). On or about April 2003, the IRS issued an audit notice and an initial request for information to the Company for fiscal years 2000, 2001 and 2002. Between April 2003 and January 2005, the Company received numerous Notices of

Proposed Adjustment ("NOPA")(IRS Form 5701) from the IRS. During this period, the Company addressed the various NOPAs with the IRS. (See Baragona & Crichton at 24).

After the audit was completed, in February, 2005, the IRS sent a "30 Day Letter" (IRS Form 4549A) to the Company asserting proposed adjustments of $115,469,334. These proposed adjustments resulted in proposed tax and penalties to the Company of approximately $49 million. In response to the 30 Day Letter, the Company filed a protest with the IRS dated March 31, 2005, in which it protested approximately $110 million of the proposed adjustments. The remaining $5 million of proposed adjustments related primarily to depreciation adjustments and certain LIFO inventory issues which the Company agreed required adjustment. (See Baragona & Crichton at 32).

The approximately $110 million of proposed adjustments which the Company is protesting consist primarily of the following proposed adjustments: (i) approximately $71 million (fiscal years 2000 and 2001) of "retrofit" expenditures which the Company deducted currently and which the IRS asserts should have been capitalized (the "Retrofit Proposed Adjustment"); (ii) approximately $19.5 million (fiscal year 2000) of deductions related to the abandonment of certain leasehold improvements upon the closure of certain stores which the IRS asserts were not irrevocably abandoned, yielding a net proposed adjustment of approximately $14.8 million as a result of approximately $4.7 million of adjustments in the Company's favor if the $19.5 million adjustment is upheld (the "Leasehold Improvement Proposed Adjustment"); (iii) approximately $9.8 million (fiscal year 2000) of deductions related to the abandonment of idle equipment which the IRS asserts were not irrevocably abandoned (the "Idle Equipment Proposed Adjustment"); (iv) approximately $9.1 million (fiscal year 2001) of adjustments related to the Company's LIFO inventory computation; (v) approximately $3 million (fiscal years 2000

48

and 2001) of deductions related to the abandonment of equipment at certain closed facilities which the IRS asserts was not irrevocably abandoned; (vi) approximately $1.3 million of miscellaneous restructuring costs (fiscal years 2000 and 2001) related to the Company's deductions for construction delays and certain damage payments made by the Company; and (vii) an approximately $1 million loss (fiscal year 2000) associated with the closure of the Company's Tampa, Florida warehouse and office which the IRS seeks to disallow based on the IRS's assertion that the Company did not irrevocably abandon the assets. (See Baragona & Crichton at 33, 38-40).

   As indicated above, more than $71 million of the protested adjustments are under the Retrofit Proposed Adjustment challenging the Company's decision to deduct as ordinary expenses specific costs incurred by the Company to "retrofit" approximately 50% of the Company's stores. It appears that the $71 million of proposed adjustments are significantly inflated because the IRS failed to take into account the allowable depreciation deductions which would otherwise be appropriate if the retrofit expenditures were required to be capitalized rather than deducted currently. (See Baragona & Crichton at 34). The Company's rough estimate of the depreciation deductions which would be allowable if the expenditures were required to be capitalized is approximately $35 million in the current audit period (approximately $13 million in fiscal year 2001 and approximately $22 million in fiscal year 2002). (See Baragona & Crichton at 36). The Company has determined to challenge the substantive issue of the deductibility of the expenditures before asserting applicable allowable depreciation deductions. (See Baragona & Crichton at 34). Substantively, the so-called "retrofit" expenditures related to work performed in various stores to modify the store floor plans by restructuring certain departments and eliminating other departments. These changes required the removal and/or

modification of equipment, shelving and related components of each impacted department. The Company deducted a portion of the costs of the retrofit (less than 50% of the overall costs) as current expenses in the year in which they occurred. The IRS asserts that these costs should not be expensed, but rather should be capitalized (and thus subject to depreciation deductions over a number of years, although the IRS has not initially provided for such depreciation) (See Baragona & Crichton at 34-37). Although there is substantial IRS guidance and case law regarding whether an expenditure may be deducted in the year incurred or whether it is required to be capitalized and thus "written off" over a number of years, the rules are not clear. Rather, the determination of whether an expenditure is currently deductible or required to be capitalized tends to be fact specific.

A significant portion of the remaining proposed adjustments (including, the Leasehold Improvement Proposed Adjustment and the Idle Equipment Proposed Adjustment) relate primarily to whether certain assets were sufficiently abandoned or retired by the Company so as to permit a deduction of the unrecovered cost of the assets. This issue is also substantially factual in nature in that the Company's acts and intentions with respect to each specific asset must be reviewed to determine whether the deduction is permitted. It also appears that the proposed adjustments related to these issues are significantly overstated, because if the cost of the assets is not permitted to be currently deducted, the costs will still continue to be permissibly depreciated over the applicable recovery period. The IRS again did not provide for these additional depreciation deductions which would be allowable to the Company. (See Baragona & Crichton at 38).

Committee Counsel has reviewed the Company's protest with respect to these issues. Although it is unclear whether the Company will ultimately prevail, Committee Counsel

believes the federal income tax positions taken by the Company were reasonable and resulted from the exercise of business judgment. Committee Counsel found no evidence of conscious manipulation of the tax treatment of the expenses and deductions by the Company to achieve any potential ulterior effect upon the Company's perceived financial performance. Instead, based on the information reviewed in the Investigation, it appears that the Company simply sought to ascertain the correct and appropriate tax treatment, but the IRS disagreed with the tax treatment. Accordingly, Committee Counsel does not foresee that the Company's decision to take deductions in the current year could yield any viable claims arising from the initial tax treatment and the tax returns now under audit.

In addition to the substantive tax positions, Committee Counsel reviewed the process which the Company utilized to determine the tax positions taken with respect to the issues under audit as well as the Company's decision not to accrue for any potential tax liability. In general, the Company's tax department advised the Company's accounting department of the accounts necessary to track various types of expenditures for tax purposes and the accounting department established various accounts for recording expenditures. (See Baragona & Crichton at 3, Byrum II at 2, 4). Each account was assigned the tax treatment determined by the Company's tax department. (See Byrum II at 5). The treatment of various expenditures for tax purposes was ultimately determined by the tax department and generally considered to be a relatively conservative approach. (See Baragona & Crichton at 5). The draft tax returns were prepared by the Company's tax department and reviewed by the Company's accountants, KPMG. (See Baragona & Crichton at 9, Storey II at 1, 2). There does not appear to have been any input or direction by the Company's management (outside of the tax and accounting departments) as to

the particular, substantive tax positions taken by the Company on the federal income tax returns. (See Baragona & Crichton at 5).

Committee Counsel also reviewed the Company's accounting (book) treatment of the retrofit expenditures and certain other expenditures which were deducted currently by the Company. The Company indicated that the accounting treatment was the same as the tax treatment such that there would be no "book/tax difference." (See Byrum II at 11, Storey II at 5). If the IRS were ultimately to prevail in requiring the Company to capitalize rather than deduct certain expenditures, the accounting treatment would not change, so the book net income would not change. (See Storey II at 7). The Company indicated that in determining whether to accrue for a potential tax liability, the Company followed the rules set forth in SFAS 5, which generally require accrual if the loss is "probable." (See Byrum II at 8, Storey II at 9). Based on this standard, the Company determined not to accrue for any of the protested tax assessments. In the Form 10K for fiscal year 2005, the Company disclosed that (i) the Company was assessed approximately $49 million in taxes and penalties in 2005, (ii) the Company filed a protest and believes that it is probable that its position will be sustained, and (iii) no amount in respect of this matter was accrued in the Consolidated Financial Statements. Based on information reviewed, Committee Counsel believes that the tax, accounting and accrual decisions made by the Company were reasonable. Committee Counsel found no evidence of conscious manipulation or wrongdoing with respect to the accounting treatment or the decision not to accrue for the tax assessment. Thus, it does not appear that any of these decisions could yield any viable claims.

**K.    ERISA CLAIMS**

ERISA class actions have been filed against former officers of the Company. In particular, the complaints name Allen Rowland, Frank Lazaran, and Richard McCook. The complaints allege that Defendants: (1) subjected the Company's 401(k) plan to improper

restrictions so Plaintiffs could not exercise independent control over the assets in the Plan, which were risky and unsuitable, (2) established the range of investments and directed the Plan's assets to be over invested in Winn-Dixie stock, (3) failed to investigate and monitor the suitability of the Company's common stock and (4) failed to resolve conflicts of interest.

### 1.    Winn-Dixie Stock Holdings

Historically, one of the eight investment options in the 401(k) plan was the Winn-Dixie Fund, which bought Winn-Dixie stock in the open market, and was the means by which Plan participants could invest in Winn-Dixie stock through the 401(k) plan (See Hardee at 10, 15, McCook at 34). Pursuant to Company policy enacted August 21, 1998, Plan participants could invest no more than 10 percent of their total account balance in the Winn-Dixie Fund. To the extent any individual had over 10 percent of their 401(k) plan holdings in the Winn-Dixie Fund at that time, they were not obligated to modify their current positions, but could not make additional contributions to the Winn-Dixie Fund until such time as their percentage holdings fell below 10 percent. (See Hardee at 10, McCook at 34 and 35, Appel & Castle at 3). In addition, any matching contribution that the Company made to an individual's 401(k) plan was done in cash, and not in Winn-Dixie stock. (See Hardee at 17, McCook at 38, Appel & Castle at 4).

Around the time of the bankruptcy filing, contributions to the Winn-Dixie Fund were discontinued. (See Hardee at 15, Appel & Castle at 3). US Trust, the fiduciary for the Winn-Dixie Fund, recently liquidated the Winn-Dixie stock held by the Winn-Dixie Fund after it determined liquidation was in the best interest of the Winn-Dixie Fund holders. (See Hardee at 16).

### 2.    Plan Investment Options

401(k) plan participants could self-direct their holdings in any of eight mutual funds available for investment. (See Hardee at 15). The Company's Administrative Committee

of the Winn-Dixie Stores, Inc. Profit Sharing / 401(k) Plan (the "Administrative Committee")
oversees the 401(k) plan and chooses the 401(k) plan's investment options. The Administrative
Committee performs these functions with the assistance of the plan administrator, T. Rowe Price,
and an investment advisor, Hewitt & Associates ("Hewitt"). (See Hardee at 18-19). Other than
the changes to the Winn-Dixie Fund, the 401(k) plan's investment options have not changed in
the past 5 years, although the Administrative Committee has considered whether the 401(k) plan
should offer different mutual funds from time to time. (See Hardee at 1, 19).

### 3. Risk And Performance

The Administrative Committee currently receives quarterly reports from Hewitt
regarding the performance of the 401(k) plan's investments. The quarterly reports compare the
performance of the 401(k) plan's mutual funds to the industry or index they are intended to track
(i.e., the S&P 500). Before Hewitt was hired as investment advisor, T. Rowe Price presented
semi-annual reports on the 401(k) plan's performance to the Administrative Committee. The
Administrative Committee has consistently found that each of the Company's currently available
mutual funds have been performing adequately compared to the industry or index they are
intended to track. (See Hardee at 18).

Based on information reviewed by Committee Counsel, there do not appear to be
any claims that the estate could seize on relating to the Company 401(k) plan. Even if the
investments made by the 401(k) plan were improper, no assets of the Company would be
involved.

### L. MANAGEMENT SECURITY PLAN AND SUPPLEMENTAL RETIREMENT PLAN

Numerous retired employees of the Company, including a group of retired
management level employees organized through the Ad Hoc Retiree Committee, have raised

questions regarding their respective rights and the Company's actions in connection with the Senior Corporate Officers' Management Security Plan ("MSP") and the Winn-Dixie Stores, Inc. Supplemental Retirement Plan ("SRP"). According to Byrum, both the MSP and SRP are nonqualified plans for deferred compensation under ERISA and the Internal Revenue Code (See Byrum III at 16). Committee Counsel addressed the following two issues.

### 1.    MSP/Life Insurance Policies

The MSP was designed to provide retirement and death benefits to certain senior management personnel of the Company. When employees reached a certain threshold management level within the Company, they were invited to become participants in the MSP. (See May II at 6). Participants claim they were required to purchase 500 shares of Company stock as a condition to MSP eligibility. (See May II at 6). Information was provided so that an employee could elect the desired level of participation and could elect less than 100%. The Company had the option to purchase life insurance on each individual who participated, but was not required to do so. Any life insurance policies purchased would be owned by the Company and the Company would be the beneficiary of any policy. (See May II at 10).

Most information regarding the MSP was communicated to prospective members by word-of-mouth through discussions with higher management, but the consensus understanding of participants was that as a result of the life insurance policies, the Company would never suffer financially from paying benefits under the Plan, for it would recoup them upon ultimate collection of the policy death benefits. (See May II at 11, Osborne at 14). MSP participants claim they were told that they need not buy their own term insurance or other retirement provisions because the MSP had the backing of the insurance policies. (See May II at 12). However, literature distributed to the participants advised them that the Company might purchase insurance on their lives to "hedge" part of their liability under the MSP, but that the

Company's purchase of such policies would have no effect on the participants' rights or benefits under the MSP, nor would the participants possess any interest of ownership in the policies.

Participants in the MSP have questioned the Company's actions in surrendering certain life insurance policies on the lives of the MSP participants and utilization of the cash value thereby recovered for general purposes of the Company, both pre-petition and post-petition.

The MSP participant policies were included within the larger group of COLI Policies discussed above. Due to the varying tax treatment afforded the polices depending upon their age, the MSP participant policies were grouped for reference purposes into pre-1986 Policies and post-1986 Policies. (Byrum III at 9). As a result of legislation changing the applicable tax treatment, the Company surrendered the Post-1986 Policies in fiscal year 2000, and invested the resulting cash surrender value in mutual funds for utilization in an "insurance wrap." (See Byrum III at 10). As the Company's cash requirements became more urgent, the Company liquidated the "insurance wrap" investments in January 2005, yielding approximately $39 million in proceeds for use as general funds. (See Byrum III at 11). The pre-1986 Policies remain substantially in effect, although the Company annually borrows substantially all accrued cash surrender value in the policies and uses the loan proceeds to pay premiums under the policies. (See Byrum III at 12). As a result, the present cash surrender value of the pre-1986 Policies totals approximately $300 million, but is subject to outstanding loans and accrued interest totaling approximately $297 million, leaving only a net of approximately $3 million in aggregate cash value. (See Byrum III at 13).

The MSP itself has not yet been rejected by the Company, but the MSP participants' claims for benefits are anticipated to be classified as general unsecured claims against the estate when and if the MSP is rejected by the Company.

Although the consensus of retirees interviewed by Committee Counsel conceded that the participants had no interest in the policies themselves, they asserted that they were induced to join and continue participation in the MSP by the representation that the insurance policies would provide the financial backing to assure payment of the MSP benefits, and that participation in the MSP was implicitly mandatory for advancement within the Company. (See May II at 7-12, Osborne at 10-15).

Committee Counsel has concluded that there are no claims available for the estate arising from the surrender of the life insurance policies by the Company.

**2.     Susceptibility Of SRP Accounts To Company Creditors' Claims**

Based on the provisions of the SRP plan documents, the SRP appears to be a nonqualified defined contribution plan, similar to a 401(k) plan without the salary and contribution limitations imposed by the Internal Revenue Code. Under the SRP, participants defer a portion of their compensation which is eligible for a matching contribution by the Company. The participants' deferrals are credited to a "Deferral Account," in which the individual is 100% vested at all times. The Company's matching contributions are credited to a "Company Account," in which the individual's vested interest is equal to his vested interest in his "Matching Contributions Account" under the Company's Profit Sharing/401(k) Plan. Although the SRP document provides that a member's vested interests are non-forfeitable, the SRP also provides that the Deferral Account and Company Account balances remain general assets of the Company and, in the event of insolvency of the Company, subject to the claims of the Company's creditors.

Subsequent to the filing of the bankruptcy cases, the retirees have been advised that benefits under the SRP have been frozen.  Although the SRP members are still permitted to direct investment decisions regarding their accounts, they have been advised by the Company that any monies, including their Deferral Accounts, may be subject to the claims of the Company's general creditors.  (See Byrum III at 15-18).  As a non-qualified plan, the SRP is exempt from certain provisions of ERISA and accordingly, the SRP participants appear to be bound by the written terms of the SRP plan document.  Committee Counsel has not identified any claims which could arise for the benefit of the estates in connection with administration of the SRP plan.

**M.    FEDERAL CHARGES AND SENTENCING FOR ILLEGAL
IMPORTATION, DISTRIBUTION, SALE OF FLORIDA SPINY
LOBSTERS**

The Company has periodically acquired imported frozen lobster product for sale throughout its distribution network, and historically imported portions of the product from Brazil through Mazzetta Company, LLC.  (See Watts-FitzGerald at 3).  Federal and state investigators determined that in some instances the Company had imported undersized frozen Florida spiny lobster product, and ultimately a federal grand jury was convened to examine the following representative transaction, out of which federal criminal charges against the Company emerged.

In February, 2004, officers of the Florida Fish and Wildlife Conservation Commission ("FWC") seized from a Company store in Deland, Florida, product identified as undersized Florida spiny lobster (Panulirus Argus).  (See Castle at 10).  Upon notification to the Company of the initial seizure, the Company cooperated with FWC officers to withdraw all of the imported product from its stores and to marshal the product at its distribution center in Baldwin, Florida.  (See Castle at 11-14).  The impounded product included some undersized Panulirus Argus, together with a similar species, the smooth tail spiny lobster, Panulirus

58

Lauvicauda, which is not subject to the same minimum size thresholds under the applicable state and federal laws. (See Castle at 13). However, a sampling of the subject product indicated that 80% of the impounded product was Panulirus Argus which was undersized both under Florida law as well as corresponding Brazilian law. (See Watts-FitzGerald at 7-8). The Miami Office of the United States Attorney determined that product from the same imported shipment had been distributed to a Company warehouse in Miami, and the investigation focused upon the transaction as it related to the Miami jurisdiction. (See Watts-FitzGerald at 4).

The Miami product derived from a shipment of frozen lobster product imported from Brazil and initially warehoused in Londonderry, New Hampshire. At the time of the initial order and importation of the product, the Company's policy required its buyers to assure that all product complied with applicable law. (See Castle at 4). At the time of receipt of the imported lobster the Company also received a certificate issued by officials of the Department of Commerce, acting in a private vendor capacity, certifying that the imported product had been inspected and was of "good quality." (See Castle at 7-8). Subsequent investigations revealed that the Department of Commerce certificate had been altered prior to its delivery to the Company, and that the certificate as originally issued identified the product as being "odiferous" and in some cases undersized. (See Castle at 24). Watts-Fitgerald asserts that there is no information of public record indicating the Company's complicity in the alteration of the Department of Commerce certificate. (See Watts-FitzGerald at 5).

Under a target letter issued April 26, 2005, the Office of the United States Attorney for the Southern District of Florida advised the Company that a federal grand jury was investigating possible violations by the Company of federal criminal law arising out of activities

related to illegal importation, possession, transportation and sale of undersized lobsters within the United States and the State of Florida.

The Company cooperated with the Attorney General's Office in the investigation of the circumstances of the importation of the alleged undersized product and the alteration of the certificate of compliance. Additionally, since commencement of the investigation, the Company has implemented a program to assure compliance with all applicable laws and regulations governing importation, possession, transportation and sale of lobster product, together with other seafood species. (See Castle at 28).

On April 27, 2006, the United States Attorney filed in the United States District Court, Southern District of Florida (Miami Division), an Information charging the Company with violations of misdemeanor provisions of the Lacey Act, which incorporates violation of applicable Florida statutory and regulatory law, by the knowing possession, transportation and sale of illegal spiny lobster product when the Company should have known in the exercise of due care that the product was illegal. On May 14, 2006, the Company entered into a plea agreement, which was entered by the Court at sentencing on May 22, 2006, under which the Company must pay a fine of $200,000 and is subject to probation for a period of two years, which probation period may be terminated upon the Company's implementation of an effective compliance program. The Company believes that its current compliance program will satisfy this condition. (See Castle at 29). The Attorney General's Office views the matter as concluded, subject to the Company's performance of its sentence. (See Watts-FitzGerald at 9).

Committee Counsel found no evidence that the Company's management directed the violation of any criminal laws in the initial importation for sale of the undersized product, and management has implemented appropriate compliance programs to prevent future violations.

Committee Counsel finds no basis for action against the Company's present or former officers and directors based upon the circumstances giving rise to the present grand jury investigation.

## VI.    **CONCLUSION**

In sum, based on the interviews conducted and the documents reviewed, Committee Counsel believes that there are likely no viable causes of action by the Debtors' estates against any current or former director or officer of the Company that have a reasonable probability of success in producing a benefit for the Debtors' estates.

# EXHIBIT A

# MILBANK, TWEED, HADLEY & McCLOY LLP

### 1 CHASE MANHATTAN PLAZA

### NEW YORK, N.Y. 10005-1413

212-530-5000
FAX: 212-530-5219

LOS ANGELES
213-892-4000
FAX 213-629-5063

PALO ALTO
650-739-7000
FAX: 650-739-7100

WASHINGTON, D.C.
202-835-7500
FAX: 202-835-7586

LONDON
44-207-448-3000
FAX: 44-207-448-3029

MUNICH
49-89-25559-3600
FAX: 49-89-25559-3700

FRANKFURT
49-69-7593-7170
FAX: 49-69-7593-8303

TOKYO
813-3504-1050
FAX: 813-3595-2790

HONG KONG
852-2971-4888
FAX: 852-2840-0792

SINGAPORE
65-6428-2400
FAX: 65-6428-2500

MATTHEW S. BARR
PARTNER
DIRECT DIAL NUMBER
212-530-5194
FAX: 212-822-5194
E-MAIL: mbarr@milbank.com

January 26, 2006

**BY E-MAIL**

Elena L. Escamilla, Esq.
Office of the United States Trustee
135 West Central Blvd.
Suite 620
Orlando, Florida 32801

Re: **In re Winn-Dixie Stores, Inc. *et al.*; Chapter 11
Case No. 05-03817 (JAF); Committee Investigation**

Dear Elena:

As you know, we are co-counsel to the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 cases of Winn-Dixie Stores, Inc. and it affiliated debtors (the "Debtors"). As discussed, in connection with the plan process, the Committee (with the full support and cooperation of the Debtors) intends to conduct an investigation (the "Investigation") into various matters to determine whether the Debtors' estates (or any one of them) have potential viable causes of action against certain parties, including, without limitation, the Debtors' officers, directors, members of senior management and professionals (collectively, the "Investigated Parties"). You asked that we outline the proposed scope of the Investigation, as well as identify the members of the team that would be conducting the Investigation on behalf of the Committee, and the proposed "end product" or report.

A. **Scope of Investigation**. The Committee proposes that the scope of the Investigation include the following areas:

1. The decline of the Debtors' financial condition that resulted in the chapter 11 filing.

Elena L. Escamilla, Esq.
January 26, 2006
Page 2

2.  The issuance of dividends to Winn-Dixie's shareholders from 2000 to 2004 despite its declining financial condition.

3.  The Internal Revenue Service's audit of fiscal years 2000 through 2002 that resulted in an assessment of taxes and penalties against the Debtors of $49 million, including the Debtors' decision not to accrue any amounts with respect to this matter, pending a protest they are pursuing.

4.  The Debtors' company-owned life insurance policies, the 2003 payment by the Debtors of $52 million in taxes and interest to the IRS in connection therewith, and the alleged irregularities with respect to the Debtors' maintenance of self-insurance reserves.

5.  Class action law suits pending in the United States District Court for the Middle District of Florida against the Debtors and certain of their officers alleging claims under securities laws (consolidated as In re Winn-Dixie Stores, Inc. Securities Litigation, Case No. 3:04-cv-71-J-HES-MCR).

6.  Class action law suits pending in the United States District Court for the Middle District of Florida brought on behalf of the class consisting of participants and beneficiaries of the Winn-Dixie's Profit Sharing/401(k) plan (the "401(k) Plan") and the 401(k) Plan itself against the Debtors and certain of their officers and employees alleging claims under ERISA (consolidated as In re Winn-Dixie Stores, Inc. ERISA Litigation, Case No. 3:04-cv-194-J-20HTS).

7.  Shareholder demand requesting that a derivative action be commenced against the Board of Directors and officers and directors who served from May 6, 2002 through July 23, 2004 asserting violations of fiduciary duties through the filing of false and misleading financial statements, causing the Debtors to engage in unlawful conduct (or failing to prevent such conduct), and through allegedly receiving certain compensation and benefits without entitlement.

8.  Federal grand jury investigation of possible violation of federal criminal law arising out of activities related to illegal importation, possession, transportation and sale of undersized lobsters.

9.  Winn-Dixie's disclosure in its Form 10K that the Debtors allegedly failed to maintain effective internal control over financial reporting and the resulting potentially material misstatements of the Debtors' annual and interim financial statements.

Elena L. Escamilla, Esq.
January 26, 2006
Page 3

    10. The internal controls instituted by the Board of Directors in light of the lack of independent status of several directors (including potential lack of independence of Jay Skelton in matters relating to the Debtors' relationship with KPMG).

    11. The Debtors' postpetition decision to re-elect current Class III directors and ratify KPMG's appointment as their independent auditors without investigation of any of the foregoing.

    12. The Debtors' prepetition self-insurance reserves to determine, among other things, if the self-insurance reserves are identifiable, segregated funds that were available as of the petition date and if such reserves, which are held by Win General Insurance (a non-debtor), are available to the Debtors' estates and creditors.

Please note that the above list is not intended to be all inclusive to the extent any of the foregoing leads the Committee to another area of inquiry it believes necessary to investigate.

### B. Team Members.

| | |
|---|---|
| Michael Diamond (Milbank Partner – Litigation) | Has defended and brought suit against officers and directors over a 30 year period on a wide range of issues relating to fiduciary duty, corporate governance and securities laws, including issues of financial disclosure. Also, has analyzed claims and liabilities in connection with advising potential acquirors of numerous companies and in advising Board committees. Served as general counsel of a public New York Stock Exchange listed company. |
| Dennis Dunne (Milbank Partner – Financial Restructuring) | Represents debtors in bankruptcy cases as well as companies in out-of-court restructurings; represents Official Committees of Unsecured Creditors; represents ad hoc committees, secured and unsecured lenders, among others. Extensive experience in negotiating and drafting plans and disclosure statements. |

Elena L. Escamilla, Esq.
January 26, 2006
Page 4

| | |
|---|---|
| Matthew Barr (Milbank Partner – Financial Restructuring) | Represents debtors in bankruptcy cases as well as companies in out-of-court restructurings; represents Official Committees of Unsecured Creditors; represents ad hoc committees, acquirers of assets, among others, in major bankruptcy cases. Extensive experience in negotiating and drafting plans and disclosure statements. |
| Lena Mandel (Milbank Senior Attorney – Financial Restructuring) | Represents debtors in bankruptcy cases and represents Official Committees of Unsecured Creditors. Extensive experience in negotiating and drafting plans and disclosure statements. |
| Sabina Chlorfein (Milbank Senior Attorney – Litigation) | Represents defendants in securities and business cases. Worked closely with Mr. Diamond on several cases, including a major trial involving corporate governance and financial disclosure issues. |
| Derek Talerico (Milbank Associate – Litigation) | Previously an associate in the Financial Restructuring Group, has been involved in analyzing possible claims on behalf of clients and participated in a large reinsurance arbitration. |
| Jeff Goldman (Milbank Associate – Litigation) | Has assisted in research in large securities cases and SEC investigations. |
| John Macdonald (Akerman Senterfitt Partner) | Represents debtors in bankruptcy cases as well as companies in out-of-court restructurings; represents Trustees, Official Committees of Unsecured Creditors, secured and unsecured lenders, among others. Broad experience in general corporate litigation, corporate governance, and fraudulent transfer law. |

We note that attorneys familiar with the Debtors' businesses and the case have been staffed on the team. We believe their prior knowledge will make this process more efficient and save the

Elena L. Escamilla, Esq.
January 26, 2006
Page 5

estates a substantial amount of money as our team will not need to spend significant time and expense becoming familiar with the Debtors and their businesses. Additional members may be added to the team as necessary. In addition, to the extent necessary, the team intends to use the financial advisory resources currently available to the Committee.

### C. Written Report.

Following the conclusion of the Investigation, the Committee anticipates preparing a written report setting forth its determinations as to whether potential viable causes of action may exist against any of the Investigated Parties. The Committee will file such report with the Bankruptcy Court and serve it on the Debtors and the Office of the United States Trustee. The Committee, however, reserves the right to seek to file such report under seal, should it determine it to be appropriate.

Please feel free to call Mike Diamond at 213-892-4500 or me at 212-530-5194 with any questions. Thank you.

Very truly yours,

Matthew S. Barr

cc: Laurence B. Appel, Esq.
    D. J. Baker, Esq.
    John Macdonald, Esq.
    Dennis Dunne, Esq.
    Michael Diamond, Esq.

EXHIBIT B

# ROBBINS UMEDA & FINK, LLP
### Attorneys at Law

BRIAN J. ROBBINS
MARC M. UMEDA
JEFFREY P. FINK

BRADLEY R. MATHEWS
CAROLINE A. SCHNURER

1010 SECOND AVE., SUITE 2360
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

July 23, 2004

<u>**VIA CERTIFIED U.S. MAIL**</u>

Board of Directors
c/o A. Dano Davis, Chairman of the Board
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254-3699

Re:     *Demand Letter Pursuant to Florida Statutes § 607.07401*

Dear Ladies and Gentlemen:

This demand letter is written pursuant to the above referenced statute and on behalf of Joanne Sussman a current shareholder of Winn-Dixie Stores, Inc. ("Winn-Dixie" or the "Company").

Winn-Dixie was at one time one of the leading food retail companies in the nation. As the Company steadily reported increasing revenues and earnings the Company's stock price advanced to over $17 per share on May 6, 2002, generating approximately $2.45 billion in shareholder equity. However, on January 30, 2004, Winn-Dixie's business was virtually destroyed when shareholders learned that the Company suffered a loss for second quarter fiscal year 2004. Furthermore, Winn-Dixie announced that it would suspend dividend payments indefinitely after assuring investors on January 20, 2004, that Winn-Dixie was moving forward in the execution of its business plan and that investors would receive their dividends. As a result, Winn-Dixie's market capitalization has been severely diminished by approximately 62%.

The Company's top officers and directors violated their fiduciary duties to Winn-Dixie beginning May 6, 2002 through the present (the "Relevant Period") by, among other things:

(a)     causing it to file and issue false and misleading financial statements pertaining to a strategic restructuring business plan which allegedly would positively impact annual net earnings by $31 million;

(b)     causing it to file and issue false and misleading financial statements which understated reserves for self-insurance; and

**WD 0226**

Board of Directors
July 23, 2004
Page 2

      (c)     causing it to file and issue false and misleading financial statements which failed to include a charge to earnings to provide for self-insurance losses.

As a result of this misconduct, Winn-Dixie has been named in large and costly class action securities fraud lawsuits. These actions have collectively exposed the Company to billions of dollars in potential liability.

In connection with these transactions, Winn-Dixie's officers and directors have received millions of dollars in cash bonuses, incentive and equity compensation, as well as proceeds from the sale of Winn-Dixie stock since May 6, 2002. For example, Winn-Dixie's former Chief Executive Officer ("CEO") and President, Allen R. Rowland ("Rowland") received $1,858,256 and $5,517,504 in total salary, bonus and other compensation for FY:02 and FY:03, respectively. Frank Lazaran ("Lazaran"), current CEO and President since June 2003 and former Executive Vice President and Chief Operating Officer received $181,819 and $1,014,088 in total salary, bonus and other compensation for FY:02 and FY:03, respectively. Richard P. McCook ("McCook") current Senior Vice President and Chief Financial Officer ("CFO") received $701,802 and $852,990 in total salary, bonus and other compensation for FY:02 and FY:03, respectively.

Winn-Dixie's demise is directly traceable to at least former President and CEO Rowland, current CEO and President Lazaran, current CFO McCook, and current and former Board members and committee members thereof during the Relevant Period. As a proximate cause of their misconduct, Winn-Dixie's once valuable enterprise and reputation has been irreparably tarnished by the refusal of the Winn-Dixie Board to cause Winn-Dixie to comply with applicable state and federal laws. Our analysis indicates that Winn-Dixie has suffered billions of dollars worth of damage and that the self-dealing behavior engaged in by Winn-Dixie's directors and officers in response to this crisis have only compounded these problems. The Board's unwillingness to remedy the source of these problems, in fact, threatens to destroy this once valuable franchise.

As a result of the wrongdoing perpetrated by Winn-Dixie's Board and its senior officers, we demand that the Company commence legal proceedings against the Winn-Dixie Board and Winn-Dixie's former officers and directors who served during the Relevant Period for their breaches of fiduciary duties, including the duty of loyalty and due care, for: (i) causing the Company to engage in unlawful conduct or failing to properly oversee the Company to prevent such misconduct, (ii) causing the Company to issue false statements, and (iii) for recovery of the tens of millions in improper retirement benefits, long-term compensation and bonuses paid for a job not well done. Compliance with §304 of the Sarbanes-Oxley Act of 2002 compels no less.

Such an action should seek to recover the Company's damages, past, ongoing and anticipated, the millions paid to Winn-Dixie's officers and directors. Additionally, the action should seek to enjoin such persons from subjecting the Company to any further liability. Moreover, Ms. Sussman demands that the Company call an election to have an independent board of directors elected.

WD 0227

Board of Directors
July 23, 2004
Page 3

In making the foregoing demands to commence litigation, our client does not concede that the Board or any member thereof is independent or disinterested in the claims raised herein.

Sincerely,

JEFFREY P. FINK
Counsel for Joanne Sussman

G:\Winn Dixie\Correspondence\JF_Demand Ltr.wpd

**WD 0228**

EXHIBIT C



**the real deal**

Frank Lazaran
President
Chief Executive Officer

January 16, 2004

TO THE MEMBERS OF THE BOARD OF
DIRECTORS OF WINN-DIXIE STORES, INC.

It is time for us to consider the declaration of our Company's quarterly dividend. As indicated below, Company management is recommending that the board declare a $.05/share dividend this quarter, which is consistent with our prior practice.

As you know from our prior Period Updates, second quarter operating results have been disappointing. As shown on the attached Dividend Payout Ratio Schedule, we anticipate a net loss of approximately $.50 per share in the second quarter. These results include increases to our self-insurance accrual and asset impairment writedowns, each of which negatively impacted earnings by approximately $.09 per share. We will discuss these accruals in greater detail at our upcoming Audit Committee meeting. Excluding these adjustments, earnings for Period 7 would have been approximately $.07/share.

I recognize that recent operating and financial results impact any decision regarding payment of a dividend. For that reason, Dan Davis and I have scheduled a meeting to allow us as a board to fully discuss the issue, rather than handling the dividend declaration by Unanimous Written Consent as we typically do. Dan requested I prepare this memorandum, and the attachments, to assist us in preparing for Monday's meeting.

In considering payment of the dividend this quarter, management consulted with The Abernathy MacGregor Group, the New York investor relations consulting firm we have retained. In summary, they advised that cutting the dividend was a significant step that would be viewed by Wall Street and other constituencies as a sign of a significant liquidity crisis, one that could have a meaningful impact on our stock valuation. As you would expect, they indicated that the decision should be driven by our businesses cash flows. If we believe cash flow over the next few quarters will be sufficient to fund operating needs, core strategic initiatives and payment of the dividend, then they recommend paying the dividend. On the other hand, if we believe cash flows will not be sufficient, then business needs supercede potential investor reactions and they recommend suspending the dividend.

Abernathy MacGregor assisted us in reviewing the financial situations of companies that have recently suspended their dividend. These companies faced not only disappointing operating results, but also a significant and immediate liquidity crises. From a liquidity standpoint, these companies were in positions similar to the one our Company faced at the time of our previous restructuring, when we carried an extremely large dividend in the face of over $700 million in debt and decided to significantly reduce our dividend. Discontinuing our dividend could lead Wall Street and other constituencies to conclude that we face a similar, immediate liquidity crisis at this time.

WD 8584
CONFIDENTIAL

To that end, a Merrill Lynch report released this week noted positively our "strong balance sheet, good EBITDA interest coverage and new $300 million credit facility." As a result, Merrill Lynch postured that the dividend "should be secure for now," but might be cut "if liquidity becomes more of an issue." In addition to a negative response from the analyst community, other factors also impact stock price when a dividend is suspended. For instance, we have attached a list of Income Funds invested in our stock. We believe many or all of these investors, owning approximately 411,000 shares of our stock, would be required to sell their Winn-Dixie holdings if we suspend the dividend. In addition, we believe there could be a significant negative reaction to such a move among retail stock owners, many of whom are our associates and our customers.

Our preliminary projections for the 3rd and 4th quarter, as shown on the Dividend Pay Out Ratio Schedule, are that we anticipate achieving slightly positive earnings in both quarters. In the 3rd quarter, these projections are based on ID store sales of (5.7%) and gross margin of 26.37%, as compared to ID store sales of (4.5%) and gross margin of 26.45% in Period 7. We also anticipate EBITDA levels sufficient to pay the dividend and fund existing IT projects and planned investments in real estate, including our image makeover program, without incurring borrowings under our existing line of credit. Our projections include $15,000,000 in aggregate benefit from cost-cutting initiatives currently underway that will be presented to you in greater detail at our January 29 meeting.

Given the changes we are continuing to implement in our business, it is difficult for us to be precise in projecting future quarter results. As such, because we have a limited margin of error in our free cash flow projections, the decision of whether or not to pay the dividend was a difficult one. On balance, however, we believe we should not send Wall Street a liquidity crisis message when our best efforts at projections suggest otherwise.

For all of the above reasons, management has reached the conclusion that it is in the best interest of our Company to continue paying our quarterly dividend. I look forward to discussing this issue with you at our telephonic meeting on Monday afternoon. If you have any questions prior to the call, please contact me.

Thanks,

Frank Lazaran

FL/bv

Attachments (3)

WD 8585
CONFIDENTIAL

## Winn-Dixie Stores, Inc.
## Dividend Pay Out Ratio

Dollar amounts in millions except per share data

| Historical: | 1994 | 1995 | 1996 | 1997 | 1998 | 1999* | 2000 | 2001 | 2002 | 2003 | Q1 2004 | Q2 2004 | Q3 2004 | Q4 2004 | Projected 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $ 11,082 | 11,788 | 12,955 | 13,219 | 13,617 | 14,137 | 13,698 | 12,903 | 12,334 | 12,168 | 2,669 | 3,561 | 2,667 | 2,798 | 11,695 |
| Net Earnings | $ 216 | 232 | 256 | 204 | 199 | 182 | -229 | 45 | 87 | 239 | 1 | -85 | 2 | 5 | -56 |
| % To Sales | 1.95% | 1.97% | 1.97% | 1.55% | 1.46% | 1.29% | -1.67% | 0.35% | 0.70% | 1.97% | 0.05% | -1.83% | 0.08% | 0.19% | -0.48% |
| E.P.S. | $ 2.90 | 1.58 | 1.72 | 1.36 | 1.33 | 1.23 | -1.57 | 0.32 | 0.62 | 1.70 | 0.01 | -0.46 | 0.02 | 0.04 | -0.40 |
| Dividends | $ 107 | 117 | 134 | 144 | 151 | 161 | 149 | 143 | 50 | 28 | 7 | 7 | 7 | 7 | 28 |
| Div. Per Share | $ 0.780 | 0.780 | 0.900 | 0.960 | 1.020 | 1.020 | 1.020 | 1.020 | 0.360 | 0.200 | 0.050 | 0.050 | 0.050 | 0.050 | 0.200 |
| Pay Out % | | | | | | | | | | | | | | | |
| Depr & Amort | 157 | 201 | 246 | 291 | 330 | 292 | 257 | 184 | 176 | 166 | 39 | 53 | 39 | 39 | 170 |
| Interest | 14 | 14 | 21 | 22 | 29 | 30 | 47 | 53 | 62 | 40 | 4 | 9 | 5 | 5 | 23 |
| Taxes | 132 | 122 | 132 | 115 | 119 | 114 | -74 | 28 | 45 | 81 | 1 | -40 | 1 | 3 | -38 |
| EBITDA | 520 | 569 | 657 | 633 | 677 | 619 | 1 | 310 | 369 | 527 | 45 | -43 | 48 | 53 | 101 |
| Pay Out % EBITDA | | | | | | | | | | | | | | | |
| # of Shares | 148.4 | 151.1 | 151.7 | 148.9 | 148.5 | 148.6 | 140.8 | 140.5 | 140.8 | 140.8 | 141.8 | 141.8 | 141.8 | 141.8 | 141.8 |

| Current Dividend | $0.200 |
|---|---|
| Dividend Increase | $0.000 |
| Recommended | $0.200 |

0.0%

* - 53 weeks

**WD 8586**
**CONFIDENTIAL**

Period: Most Recent
Rank

Security
Style: Income Value
US: All
Global: All

WIN
Yield
All
All

| Rank | Mutual Fund | Position | % O/S | Position Change | % Change | Style | Filing Date |
|---|---|---|---|---|---|---|---|
| 1 | Vanguard Windsor II Fund | 203,300 | 0.14 | 203,300 | NA | Income Value | 10/31/2003 |
| 2 | Lincoln Var. Insurance Products Tr. - Special Oppo | 164,000 | 0.12 | 73,500 | 81.22 | Income Value | 9/30/2003 |
| 3 | MML Blend Fund | 10,600 | 0.01 | -500 | -4.5 | Income Value | 6/30/2003 |
| 4 | VALIC Income & Growth Fund | 7,170 | 0.01 | -7,400 | -50.79 | Income Value | 5/31/2003 |
| 5 | AB (Annuity Board Funds) - Value Equity Fund | 4,000 | 0 | -11,200 | -73.68 | Yield | 9/30/2003 |
| 6 | GMO Intrinsic Value Fund | 3,900 | 0 | 0 | 0 | Income Value | 8/31/2003 |
| 7 | SEI Institutional Investments - Large Cap Value | 3,730 | 0 | -70 | -1.84 | Yield | 5/31/2003 |
| 8 | Hirtle Callaghan Value Equity-SSgA Funds | 3,100 | 0 | 700 | 29.17 | Income Value | 6/30/2003 |
| 9 | MassMutual Balanced Fund | 2,700 | 0 | -200 | -6.9 | Income Value | 6/30/2003 |
| 10 | MML Equity Fund | 2,200 | 0 | 0 | | Yield | 6/30/2003 |
| 11 | MassMutual Core Value Equity Fund | 2,100 | 0 | 0 | 0 | Income Value | 6/30/2003 |
| 12 | SBL Series W (Main Street Growth & Income Series) | 1,700 | 0 | 0 | 0 | Income Value | 6/30/2003 |
| 13 | IDEX American Century Income & Growth Fund | 871 | 0 | -435 | -33.31 | Income Value | 9/30/2003 |
| 14 | Aegon/Transamerica American Century Income & Growt | 824 | 0 | -184 | -18.25 | Income Value | 9/30/2003 |
| 15 | Seasons Series Trust Large Cap Value Portfolio | 750 | 0 | 80 | 11.94 | Yield | 9/30/2003 |
| 16 | BlackRock Large Cap Value Fund | 0 | 0 | -100,200 | -100 | Income Value | 9/30/2003 |
| 17 | TIAA-CREF Institutional Mid Cap Value Fund | 0 | 0 | -11,627 | -100 | Income Value | 9/30/2003 |
| 18 | CitiSelect Asia Tilt 300 Balanced | 0 | 0 | -80 | -100 | Income Value | 6/30/2003 |

Subtotal — 410,945 — 0.29 — 145,684
Total — 410,945 — 0.29 — 145,684
Number of Holders — 18

WD 8587
CONFIDENTIAL

**Winn-Dixie Stores, Inc.**
**Revised 2004 Forecast**
**Revised as of 01/15/2004**

| | Forecast Q3 2004 | Budget Q3 2004 | Variance Q3 2004 | Forecast Q4 2004 | Budget Q4 2004 | Variance Q4 2004 | Forecast 2nd Half | Actual 1st Half | Forecast 2004 | Budget 2004 | Variance 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | 2,667,255 | 2,849,533 | (182,278) | 2,798,214 | 3,079,984 | (281,770) | 5,465,469 | 6,229,603 | 11,695,072 | 12,300,575 | (605,503) |
| Cost of sales | 1,958,953 | 2,067,363 | (98,410) | 2,046,100 | 2,219,927 | (173,827) | 4,005,053 | 4,594,367 | 8,599,420 | 8,881,419 | (281,999) |
| Gross profit | 708,302 | 782,170 | (83,868) | 752,114 | 860,057 | (107,943) | 1,460,417 | 1,635,236 | 3,095,653 | 3,419,156 | (323,503) |
| Operating expense | 699,897 | 714,142 | (14,245) | 738,350 | 757,776 | (19,428) | 1,438,247 | 1,724,847 | 3,163,094 | 3,157,658 | 5,536 |
| Operating income | 8,405 | 78,028 | (69,623) | 13,764 | 102,281 | (88,517) | 22,169 | (89,611) | (67,442) | 261,998 | (329,040) |
| Interest | 4,995 | 5,365 | (370) | 4,995 | 5,365 | (370) | 9,990 | 13,234 | 23,224 | 23,248 | (24) |
| Income before tax benefit | 3,410 | 72,663 | (69,253) | 8,769 | 96,916 | (88,147) | 12,179 | (102,845) | (90,666) | 238,550 | (329,016) |
| Income tax | 1,296 | 25,795 | (24,499) | 3,332 | 32,975 | (29,643) | 4,628 | (39,061) | (34,433) | 83,184 | (117,617) |
| Net income | 2,114 | 46,868 | (44,754) | 5,437 | 63,941 | (58,504) | 7,551 | (63,784) | (56,213) | 155,366 | (211,379) |
| Operating income | 8,405 | 78,028 | (69,623) | 13,764 | 102,281 | (88,517) | 22,169 | (89,611) | (67,442) | 261,998 | (329,040) |
| Depreciation | 39,453 | 41,373 | (1,920) | 39,453 | 44,741 | (5,288) | 78,906 | 91,410 | 170,316 | 175,976 | (5,660) |
| EBITDA | 47,858 | 119,401 | (71,543) | 53,217 | 147,022 | (93,805) | 101,076 | 1,799 | 102,874 | 437,474 | (334,600) |

WD 8588
CONFIDENTIAL

EXHIBIT D

**INTERNAL AUDIT REPORT**
**REVIEW OF RISK MANAGEMENT**
**Confidential**

## Background and Objectives:

This review was initiated as a result of a variety of issues reported to the Security Department by the Company's Insurance Claims Manager. The issues included allegations of inappropriate insurance claims administration guidance directed by the Senior Director of Risk Management to the claims processing staff. Inappropriate claims administration procedures could influence the accuracy of the actuarial analysis of loss reserves performed each fiscal year.

The objectives of Internal Audit's review, as of July 2003, were to:

- Provide assurance that the actuary had been provided with the most complete and accurate information available regarding claims data and changes in claims administration procedures.
- Review critical claims administration practices against industry best practices and determine the extent to which there was a departure.
- Identify timelines and specific sources of the departures from best practices.
- Determine the extent to which incorrect information was communicated internally/externally as a result of the departures from best practices.
- Review internal controls relating to the claims administration process and make recommendations for improvement as appropriate.

## Methodology:

With assistance from KPMG, this review was completed through a series of interviews with claims administration management and staff, including those employed by the Company's third party administrator (TPA-Sedgwick). In addition, meeting notes regarding claims administration guidance changes, notes input into the claims management system by adjusters, and various emails were reviewed. Two conference calls took place between the review team and the actuary (George Turner) prior to the completion of the actuarial analysis of loss reserves.

## Conclusion and Summary:

At the conclusion of the review, we were able to reasonably assure that the actuary had the most complete and accurate information available to perform an analysis of loss reserves. In addition, there were no significant deficiencies in the design or operation of internal controls in the claims management process. However, we also concluded the following:

- Inappropriate claims practices relating to the establishment and maintenance of reserves for workers' compensation and general liability claims had been undertaken. These inappropriate practices had been at the specific direction of the Senior Director of Risk Management, and had the effect of understating reserve amounts when compared to best practice reserving guidelines.
- Closure of general liability claims had occurred earlier than outlined by industry best practices.
- Controls could be strengthened in the process by reestablishing clear procedural guidelines for communication between the Company's TPA-Sedgwick and executive management of the Company, particularly in those cases relating to insurance industry best practices; and a more frequent review (Quarterly) of claims data by the actuary.

Active monitoring by Internal Audit will continue as appropriate.

**WD 3395**
**CONFIDENTIAL**