UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In Re:                                      Case No.: 05-03817-3F1

WINN-DIXIE STORES, INC.,                    Chapter 11

        Debtor.                             Jointly Administered

_____/

### OBJECTION BY SKINNERS OF POINT MEADOWS, INC. TO PROPOSED CURE AMOUNT LISTED IN DEBTORS' AMENDED OMNIBUS MOTION FOR ORDER TO (I) ASSUME NON-RESIDENTIAL REAL PROPERTY LEASES, (II) FIX CURE AMOUNTS, AND (III) GRANT RELATED RELIEF (STORE NO. 6)

SKINNERS OF POINT MEADOWS, INC. ("Skinners"), the landlord for the grocery store identified by the Debtors as Store No. 6, objects to the Proposed Cure Amount set forth in Exhibit B of the Debtors' Amended Omnibus Motion for Order to (I) Assume Non-Residential Real Property Leases, (II) Fix Cure Amounts, and (III) Grant Related Relief (the "Assumption Motion"), and states as follows:

1.     Skinners is the owner and landlord of the shopping center located at 10915 Baymeadows Road in Jacksonville, Florida, and Debtor Winn-Dixie Stores, Inc. is a tenant at that shopping center pursuant to that certain lease dated September 17, 2002 (the "Lease") for the grocery store which the Debtors identify as Store No. 6. A true and correct copy of the Lease (without exhibits) is attached hereto as Exhibit "1".

2.     The Lease of Store No. 6 is one of the leases listed on Exhibit A of the Assumption Motion which the Debtors seek to assume.

3.    The Proposed Cure Amount that the Debtors show for Store No. 6 in Exhibit B of the Assumption Motion is **$93,213.00.** That sum is comprised of the tenant's pro rata share of real estate taxes and shopping center insurance for 2004. Skinners objects to this Proposed Cure Amount because it fails to include the following:

(a)    The sum of $11,645.11 due for the tenant's pro rata share of real estate taxes for the period of January 1, 2005 to February 21, 2005;

(b)    Skinners' reasonable attorney's fees and costs relating to the uncured defaults under the Lease, as authorized by paragraph 27(c) of the Lease, and which to date total $2,988.00; and

(c)    Interest on the sums owed for (i) unpaid real estate taxes and insurance for 2004 that has accrued from March 15, 2005 and (ii) unpaid real estate taxes for 2005 that has accrued from February 9, 2006, at the rate established by the prime rate published in the Wall Street Journal from time to time plus four percent, as authorized by paragraph 27(a)(5) of the Lease.

4.    The correct cure amount owed by the Debtors to Skinners is **$107,846.11,** plus accrued interest, additional attorney's fees, and any other sums, including rent, that will accrue and be unpaid before the Lease is assumed and the cure amount is paid.

5.    Skinners reserves the right to amend, supplement or modify this objection as may be necessary.

WHEREFORE, Skinners requests the Court to sustain its objection and require the Debtors to pay Skinners the correct cure amount at the time its Lease is assumed and for such other relief as is just and proper.

Dated:  June 30, 2006

/s/Betsy C. Cox
Betsy C. Cox
Florida Bar No. 307033
ROGERS TOWERS, P.A.
1301 Riverplace Blvd., Suite 1500
Jacksonville, Florida 32207
(904) 398-3911 (telephone)
(904) 396-0663 (facsimile)
bcox@rtlaw.com (email)

Attorneys for Skinners of Point
Meadows, Inc.

## LEASE

THIS LEASE is made this September !7, 2002 between SKINNERS OF POINT MEADOWS, INC., a Florida corporation, whose address is 2970 Hartley Road, Suite 302, Jacksonville, Florida 32257 ("Landlord"), and WINN-DIXIE STORES, INC. a Florida corporation, whose address is 5050 Edgewood Court, Post Office Box B, Jacksonville, Florida 32203-0297 ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H :

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

1.   PREMISES

Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 220 feet in width by 200 feet in depth, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided (collectively the "Store"), together with exterior pads at the rear for installation of freezers, coolers, and a mechanical/equipment room, if any, a loading dock area, and the land on which all of the same shall stand (together, with the Store, the "Premises").

Additionally, Landlord hereby establishes for, and grants and conveys to Tenant, its employees, agents, contractors, deliverymen, customers, invitees, licensees, successors and assigns, a non-exclusive right and easement appurtenant to the Store to use during the Term as hereinafter defined, all ramps, foundations, sidewalks, streets, entrances, exits, roadways, walkways, pylon or monument signs identifying the Shopping Center, as hereinafter defined, trash collection facilities and dumpsters, if any, malls, cart storage areas, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities, related improvements, appurtenant easements benefiting the Shopping Center, and any other common areas and common facilities available for common use with occupants of the Shopping Center, and as shown on the Site Plan, as hereinafter defined (the "Common Areas").

The Premises are located in a shopping center development shown in detail on Exhibit "A", a site plan prepared by Prosser Hallock Planners & Engineers dated January 2001, last revised August 21, 2002 (Project No. 100151.12) (the "Site Plan"), known as Point Meadows Shopping Center, located at the northwest corner of Baymeadows Road and State Road 9A in the City of Jacksonville, County of Duval, State of Florida, (the "Shopping Center"). The legal description of the Shopping Center is set forth on Exhibit "B".

2.   TERM

(a)   Initial Term. The term of this Lease shall commence on the Commencement Date, as hereinafter defined, and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)   Extension Term(s). Tenant, at its option, shall be entitled to the right and privilege of five (5) successive extensions of the Term of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the applicable rent provided in Article 3(a) hereinafter, but otherwise upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term"). Tenant may extend the Term by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document; provided, however that if Tenant shall fail to give any such notice within the aforesaid time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option to extend the Term of the Lease at any time until the

**Exhibit 1**

expiration of said thirty (30) day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term under any of the five (5) options set forth in this Article 2(b) through inadvertent failure to give notice of exercise thereof within the time limits prescribed. Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the Term for any of the aforesaid option periods, and if Landlord shall fail to give notice to Tenant of Landlord's election to terminate Tenant's right to extend this Lease under the option applicable thereto, then until such notice from Landlord and the expiration of thirty (30) days notice period provided above, or until Tenant either exercises its option to extend or notifies Landlord that it does not intend to exercise said option to extend, the Term shall be extended automatically from month to month upon all the terms and conditions then in effect.

(c)    Return of Store. Tenant will yield up the Store and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Store to its original state. Tenant shall surrender to Landlord all keys to or for the Store.

(d)    Holding Over. Any holding over by Tenant of the Store after the expiration of the Term shall operate and be construed as a tenancy from month to month, upon the same terms and conditions applicable to the Term, except that Basic Rent (as defined below) payable during any period of holding over shall be in the amount of 150% of the Basic Rent payable during the immediately preceding Term, and Percentage Rent (as defined below) shall be payable on a monthly basis for any period of holding over, in the amount of 1/12 of the Percentage Rent paid or payable by Tenant for the immediately preceding Fiscal Year.

3.    RENT

Tenant shall pay to Landlord:

(a)    Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord basic rent for the Premises during the Initial Term and any Extension Terms (if exercised by Tenant) ("Basic Rent"), in twelve (12) equal monthly installments, as follows:

| Term | Basic Rent Per Annum | Monthly Installments |
| --- | --- | --- |
| Initial Term | $555,000.00 | $46,250.00 |
| Extension Term 1 | $568,875.00 | $47,406.25 |
| Extension Term 2 | $583,096.88 | $48,591.41 |
| Extension Term 3 | $597,674.30 | $49,806.19 |
| Extension Term 4 | $612,616.15 | $51,051.35 |
| Extension Term 5 | $627,931.56 | $52,327.63 |

All installments of Basic Rent shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Percentage Rent. In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) for any Fiscal Year exceeds annual Basic Rent for such Fiscal Year ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within ninety (90) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within ninety (90) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. In the event of an abatement of Base Rent, in whole or in part, the dollar amount of Gross Sales, over which Percentage Rent is payable ("the Breakpoint") shall be ratably reduced. For purposes of calculating the Percentage Rent due hereunder, Tenant's fiscal year shall be from Thursday, approximately July 1st, to Wednesday, approximately June 30th, of the following calendar year (the "Fiscal Year").

JK 202197.1 80130 00307 09/10/02 02:37pm

Notwithstanding anything to the contrary in this Lease, Tenant shall be entitled to deduct from the amount of Percentage Rent otherwise due in any partial or full Fiscal Year the amount paid or payable by Tenant during the same partial or full Fiscal Year for Additional Rent as hereinafter defined.

"Gross Sales" shall mean the aggregate sales price of all merchandise sold and services provided by Tenant in or from the Store during each Fiscal Year of the Term, both for cash and on credit (less bad debt expenses), subject to the following exclusions. Gross Sales shall not include (i) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (ii) transfers of merchandise made by Tenant from the Store to any other stores or warehouses of Tenant or its affiliated companies; (iii) credits or refunds made to customers for merchandise returned or exchanged; (iv) all sales of cigarettes and tobacco; (v) all fees, charges, income and receipts from vending machines, banks, automatic teller machines and public telephones; (vi) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, money orders, government bonds, savings stamps, or similar items; (vii) returns of merchandise to suppliers, producers or manufacturers; (viii) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (ix) merchandise or other things of value issued as a premium in connection with any sales promotion program; (x) gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise; (xi) proceeds received by Tenant from sale of lottery tickets, or sports or entertainment admission tickets; (xii) sale of Tenant's trade fixtures or equipment; (xiii) all sums and credits received in settlement of claims for loss or damage to merchandise; (xiv) sales of prescription drugs; (xv) finance, interest, service, or carrying charges on credit cards or charges related to electronic fund transfers; and (xvi) uncollectable credit accounts and bad checks written off by Tenant. Tenant makes no representation or warranty as to the amount of sales or mix or merchandise and services it expects to make from the Store. Landlord acknowledges that it has no expectations as to Percentage Rent, and that Basic Rent is adequate for all purposes herein and Tenant has no implied or express obligation to operate or make sales from the Store, except Tenant's obligation to open the Store for business for one (1) day, fully fixtured and stocked, as hereinafter provided.

Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Shopping Center and to others whom Landlord is required by law to make such disclosure (collectively "Interested Parties") provided that such Interested Parties are legally obligated or are instructed by Landlord, to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. Within ninety (90) days after the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Landlord shall have the right, within one hundred eighty (180) days of receiving Tenant's statement of Gross Sales, to audit Tenant's Gross Sales figures for up to the last three (3) preceding Fiscal Years. Such audit shall be conducted at Landlord's cost and expense, at Tenant's corporate offices during normal business hours, in a manner not to unreasonably interfere with Tenant's business, and by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall execute a confidentiality agreement with Tenant and further provide Tenant a copy of its findings and report of audit. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, for the immediately preceding Fiscal Year, and Tenant does not contest such underpayment, Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the Fiscal Year in question by more than three percent (3%), Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's audit. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall pay the amount of any such overpayment to Tenant within thirty (30) days of such finding.

3

(c)      Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay a portion of (1) Common Area Maintenance Expenses, (2) Real Estate Taxes, (3) Shopping Center Insurance, and (4) Approved Security Expenses (collectively "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of three (3) full calendar years from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all paid invoices, receipts and other evidences of payment by Landlord (collectively the "Payment Evidence").

Upon Tenant's written request, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior calendar year and copies of the Payment Evidence, and thereafter, shall continue to provide such information to Tenant on or before ninety (90) days after the end of each subsequent calendar year of the Term. Tenant shall not be liable with respect to any amount expended by Landlord which is not listed in such itemized statement or for which copies of Payment Evidence is not included. Failure of Landlord to deliver Payment Evidence within ninety (90) days after the end of any calendar year shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Subject to Tenant's audit rights set forth below, if the Landlord's reconciliation shows Tenant owing any more Additional Rent, Tenant shall pay the same to Landlord within thirty (30) days of receipt of said reconciliation. If Landlord's reconciliation shows that Tenant has overpaid Additional Rent for the preceding year, Landlord shall, within thirty (30) days of the date of the reconciliation, refund the overpayment to Tenant. Tenant shall have the right, within one hundred eighty (180) days of receiving Landlord's statement of Additional Rent, to audit Landlord's records regarding Additional Rent up to the last three (3) years at Landlord's offices during normal business hours. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report, and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than three percent (3%), Landlord shall also pay to Tenant the reasonable cost of Tenant's audit. If Tenant shall have overpaid Additional Rent and Landlord shall have failed to reimburse Tenant within thirty (30) days after delivery of the reconciliation or receipt of said audit, Tenant shall have the right to offset the overpayment against all future Basic Rent and Additional Rent until fully reimbursed.

Any payment of Additional Rent by Tenant to Landlord pursuant to this Article 3(c) shall be a non-cumulative credit against Percentage Rent payable pursuant to Article 3(b).

(1)      Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of the "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based on one-twelfth (1/12) of Landlord's Common Area Maintenance Expenses to be due for the first partial year, as provided in the budget attached hereto as Exhibit "L". Landlord's initial budget is based on Landlord's receipt of arms-length bids providing for commercially competitive rates for each budget line item. Landlord's initial budget includes total Common Area Maintenance Expenses of $94,355 annually for the Shopping Center. Tenant shall be responsible for its Pro-Rate Share of such amount. In the event any yearly budget (expense) line item is above $2,500.00 and such yearly budget (expense) line item increases by more than five percent (5%) over the amount for said item for the previous year, Tenant shall have the right to require Landlord to obtain at least three (3) arms-length bids providing commercially competitive rates for such items from qualified third party vendors. Tenant shall have the right to approve any such vendor and its bid, which approval shall not be unreasonably withheld. For succeeding years, the basis for Tenant's estimate for the year's Common Area Maintenance Expenses paid herein shall be the amount actually paid by Tenant for the prior year, less any extraordinary or non-recurring items. The year's actual Common Area Maintenance Expenses for the applicable calendar year shall be reconciled at the end of each of year pursuant to the terms of Article 3(c), above.

4

Notwithstanding any provision to the contrary contained herein, Tenant shall not be responsible for the payment of any Common Area Maintenance Expenses for any partial or full calendar year in excess of one hundred three percent (103%) of the Common Area Maintenance Expenses paid by Tenant for the prior partial or full calendar year.

Landlord shall, during the Term, operate and maintain the Common Areas in good condition and repair and provide therefor all such services as are reasonably required to maintain a first-class neighborhood shopping center. Common Area Maintenance Expenses shall mean and be limited to those expenses actually incurred by Landlord in the performance of the following: cleaning and sweeping as needed; lighting during the Standard Hours, as hereinafter defined; maintenance and cleaning of lighting fixtures, including light poles; snow and ice removal if necessary; general repair and maintenance of all paved surfaces (including resealing and minor resurfacing as needed); maintaining and repair of curbing; repainting of parking area striping; maintenance of Shopping Center signage (excluding panels, or power to panels, for other tenants); maintenance and irrigation of landscaped areas; repair and replacement of landscape materials (excluding landscape replacement for first year after the Commencement Date); and maintenance of irrigation system, lift station, drainage, storm water retention/detention facilities required for the operation of the Shopping Center; and an administrative fee not to exceed five percent (5%) of Common Area Maintenance Expenses for the current year.

(2)    Real Estate Taxes.  Within thirty (30) days following Tenant's receipt of Landlord's annual statement and a paid receipt therefor from the taxing authority, Tenant shall pay to Landlord the Real Estate Taxes levied on the Store, or if the Store is not a single tax parcel, Tenant's Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes include all ad valorem real estate taxes, less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes do not include any special assessments, late fees, tap in fees, impact fees, improvement liens, concurrency fees, or charges or any similar or related tax, fee, imposition or charge, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center or taxes levied upon any unimproved land within the Shopping Center which may be set aside by Landlord for expansion, sale, or otherwise.

Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. If Tenant's actions result in a reduction in Real Estate Taxes, Tenant shall be reimbursed by Landlord its out of pocket cost of Tenant's challenge including, but not limited to, consultants' fees, attorneys' fees, and court costs and fees. Promptly after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing, and Tenant shall have a period of ten (10) days following such notice by Landlord in which to evaluate such pending increase and decide whether Tenant will prepare and file and challenge to such increase. If Landlord should fail to provide to Tenant sufficient notice as required herein, Tenant shall not be responsible for payment of the increased portion of such Real Estate Taxes. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense unless (i) Landlord obtains Tenant's written approval in advance, which approval may be granted or withheld in Tenant's sole discretion or (ii) Landlord's challenge results in a savings to Tenant for the year in question. If Landlord's challenge results in a savings to Tenant, Tenant shall pay its Pro-rata Share of the out of pocket cost of Landlord's challenge, including reasonable consultants' fees and reasonable legal costs and fees not to exceed Tenant's savings for the year in question.

(3)    Shopping Center Insurance.  Within thirty (30) days following Tenant's receipt of Landlord's annual, quarterly or monthly statement, a paid receipt therefor, and a current Certificate of Insurance issued in accordance with Article 23(a) herein, Tenant shall

pay to Landlord Tenant's Pro-rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of insurance acquired after receipt of arms-length bids providing for commercially competitive rates and required to be maintained by Landlord under Article 23(a) of this Lease. Landlord shall obtain at least three (3) arms-length bids from qualified carriers providing for commercially reasonable rates of the Shopping Center Insurance every three (3) years of the Term and provide Tenant copies of the bids. Landlord shall acquire Shopping Center Insurance from the lowest bidder. Shopping Center Insurance shall not include any of the following: the cost of any increased insurance premiums resulting from the abnormal business operations of any tenant or occupant of the Shopping Center; wind storm buy-down insurance; business interruption insurance; directors and officers insurance; workers' compensation insurance; excess coverage; umbrella policies; rent loss insurance; or the excess cost of any insurance policies purchased from an affiliate of Landlord over that which could be purchased in an arm's length transaction between Landlord and a third-party insurer.

(4)    <u>Approved Security Expenses</u>.    Within thirty (30) days of receipt of Landlord's statement therefor, Tenant shall pay Tenant's Pro-rata Share of "Approved Security Expenses". Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety, security devices and personnel pre-approved by Tenant. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Lease to keep the Shopping Center and the Common Areas safe and secure, it shall submit a written plan for providing such services to Tenant. If the expense of the plan meets with the approval of Tenant, Tenant shall advise Landlord of the same. Tenant agrees to apply reasonable and prudent standards for personal and property safety and security in its evaluation of Landlord's proposed security expenses. No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment. Security devices shall be amortized over their respective useful lives, and the billing for such devices shall be made in accordance with such amortization. Approved Security Expenses shall not include any expenses not based upon arms-length bids providing for commercially competitive rates obtained less frequently than once per year. Landlord agrees that Landlord and not Tenant shall be responsible for providing adequate security for the Shopping Center or Common Areas and no approval or disapproval of the security plan by Tenant shall relieve Landlord of that responsibility or make Tenant responsible in any manner for the adequacy of security provided by Landlord. Tenant acknowledges that Tenant and not Landlord shall be responsible for providing adequate security within the Store.

(5)    <u>Pro-rata Share</u>. "Tenant's Pro-rata Share" shall be the ratio of the Floor Area of the Store as it exists from time-to-time to the total Floor Area of the Shopping Center to be constructed as shown on the Site Plan. In no event shall the Shopping Center Floor Area be less than 102,602 square feet. "Floor Area" shall mean heated and air-conditioned floor area measured in square feet, determined by the linear dimensions in feet from the center line of joint partitions, party walls or interior walls and the outsides of exterior building walls, including all floors of buildings and basements and mezzanines from which sales occur, storage areas, garden shops, enclosed loading areas and enclosed vestibules (excluding, however, entry vestibules, coolers, freezers and mechanical rooms).

Notwithstanding anything to the contrary contained in this Lease, during the period of any damage, destruction, razing, and the subsequent rebuilding, repairing, replacement or reconstruction to, on or of any building within the Shopping Center, the Floor Area of the Store and any other Shopping Center buildings shall be deemed to be the same as the Floor Area of the Store and any other Shopping Center buildings immediately prior to such period. Upon the completion of the rebuilding, repairing, replacement or reconstruction, a new determination of such Floor Area shall be made based upon a current as-built survey and provided the Shopping Center Floor Area does not decrease below the number provided above.

6

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year.

4.     TITLE

On or before the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment prepared by a title insurance company reasonably acceptable to Tenant (the "Title Company") naming Tenant as the proposed insured and committing to insure Tenant's leasehold interest in the Premises and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay Basic Rent, Percentage Rent and Additional Rent under this Lease that Tenant's leasehold interest in the Premises be subject only to those exceptions that are acceptable to Tenant (collectively the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before the Execution Date (the "Delivery Deadline"), and Tenant shall have thirty (30) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). Landlord shall have fifteen (15) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Title Objection Response"). If Landlord fails timely to provide Landlord's Title Objection Response, then Landlord shall be deemed to have agreed to cure Tenant's Title Objections. Notwithstanding the foregoing, Landlord shall cure or cause to be removed any exceptions that can be cured solely by the payment of money (i.e. taxes due and payable, mortgages or other encumbrances [unless all payments due under any such mortgage or encumbrance are current and Landlord provides Tenant with an SNDA as hereinafter defined], mechanics' or construction liens, etc.), shall terminate and cause the eviction of any tenants under any other leases to the Store, shall deliver evidence of Landlord's status, power, and authority as required by the Title Company, shall execute and deliver an owners and nonforeign affidavit and any other document required by the Title Company. On or before the Commencement Date, and as a condition to the occurrence of the Commencement Date, Landlord shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Shopping Center and insuring Tenant's leasehold in the Premises subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy"). Landlord and Tenant shall share equally in the cost of the Title Policy.

5.     SURVEY

On or before the Execution Date, Landlord shall deliver to Tenant's counsel at the address provided hereunder for copies of notices, four (4) sealed copies of an actual survey of the real property comprising the Shopping Center and any appurtenant easements benefiting the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all easements and exceptions shown in the Commitment that are capable of being so located, shall bear the certificate and comply with the survey protocol attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Survey Objection Response"). If Landlord fails timely to provide Landlord's Survey Objection Response, then Landlord shall be deemed to have agreed to cure Tenant's Survey Objections. Landlord shall provide to Tenant, within sixty (60) days following the Execution Date and as a condition to the occurrence of the Commencement Date, a revised Survey showing Landlord's cure of Tenant's Survey Objections. Within sixty (60) days after the

7

Commencement Date, as defined in this Lease, Landlord shall provide to Tenant four (4) sealed copies of the Survey revised to show the Store and Shopping Center "as built" (the "As-Built Survey").  Furthermore, Landlord agrees to provide Tenant an updated As-Built Survey within sixty (60) days after completion of construction following a condemnation or casualty; upon modification to the building and common area layout provided on the Site Plan; and with each sale, conveyance or re-financing of the Shopping Center.

6.    ENVIRONMENTAL ASSESSMENT

On or before the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices, from an environmental consultant reasonably satisfactory to and approved by Tenant, an environmental site assessment of the Shopping Center addressed to Tenant, which assessment analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Assessment"). Instead of providing the Assessment, Landlord may provide a copy of an Assessment issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Assessment stating that Tenant may rely thereon (the "Prior Assessment"). Tenant shall have until the Title/Survey Review Deadline to review either the Assessment or the Prior Assessment. If either reveals any environmental condition that, if unremedied, would or could in Tenant's opinion constitute a violation of applicable Legal Requirements (an "Environmental Violation") Tenant shall notify Landlord in writing.  Landlord shall have until sixty (60) days after the Execution Date to cure any such Environmental Violation and provide evidence of the cure to Tenant.

7.    ZONING LETTER

On or before the Execution Date, Landlord shall deliver to Tenant a letter, substantially in the form attached hereto as <u>Exhibit "F"</u>, from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises (the "Zoning Letter").

8.    USE

(a)    <u>Permitted Use</u>.  The Store may be used for any lawful purpose whatsoever, except the Prohibited Uses, as defined below (the "Permitted Use").

(b)    <u>Exclusives</u>.  Tenant shall have the exclusive right in the Shopping Center to each of the following (each an "Exclusive Use"):

(1)    operate a supermarket, grocery, bakery, fish market and delicatessen;

(2)    sell meat, seafood, vegetables/fruit/produce, dairy products, frozen foods, pet products, paper products and cleaning products;

(3)    operate a pharmacy or prescription drug concession;

(4)    sell beer, wine and liquor for off-premises consumption, provided, however, that notwithstanding the foregoing, the operation of a liquor store shall only be a Permitted Use (and not an exclusive use) until such time as Tenant provides to Landlord written notice of its intent to operate a liquor store. Thereafter, the operation of a liquor store shall be an Exclusive Use in favor of the Tenant, except that such Exclusive Use shall revert to a Permitted Use if Tenant fails to open such liquor store within twelve (12) months of the aforesaid written notice to Landlord or if, after opening such liquor store, Tenant ceases to operate the liquor store for a period of one hundred eighty

8

(180) consecutive days during the Term (other than in connection with a casualty event, condemnation event, Force Majeure, renovation or remodeling). Notwithstanding the foregoing, prior to Tenant's delivery to Landlord of its notice of intent to operate a liquor store, if Landlord has entered into a bonafide lease with a third party for the operation of a liquor store in the Shopping Center, then Tenant's notice shall be deemed null and void and the operation of the liquor store shall remain a Permitted Use and not an exclusive use. Further, notwithstanding the foregoing, the sale of beer and wine in sandwich shops or restaurants as part of take-out orders, if lawful, shall be permitted; and

(5)     operate a photo lab or film development business; provided, however, that a film development business or photo lab shall be permitted as incidental to the operation of a retail camera store, provided that such film development or photo lab business shall constitute not more than fifteen percent (15%) of the gross sales of such retail camera store, and further provided that such film development or photo lab business shall not occupy more than 3,000 square feet of gross floor area.

With the exception of Tenant, only full service bank, savings association or credit union facilities located within the Shopping Center shall be entitled to have automatic teller machines within or contiguous to the respective premises.

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center, except as specifically permitted in this Article 8. In addition, for a period of five (5) years from the Commencement Date of this Lease, Landlord and others will restrict certain surrounding lands (the "Skinner Land") from direct or indirect use by any party other than Tenant for the operation of a "grocery supermarket", as stated in and subject to the terms and conditions of the Agreement of Restrictive Covenant to be executed and delivered by Landlord and any entity controlled by, controlling, or under common control with Landlord that has an interest in the Skinner Land (each such entity being referred to herein as a "Landlord Affiliate"), in the form attached hereto as Exhibit "N" (the "Restrictive Covenant Agreement"). For the purpose of such restriction, the term "grocery supermarket" shall mean any conventional full-line grocery store or supermarket having gross floor area in excess of 15,000 square feet, operated in a manner similar to those ordinarily operated by Tenant, Albertson's or Publix on the date of execution of this Lease; except that the term "grocery supermarket" shall not include price clubs such as Sam's Club, BJ's or Costco. Further, the term "grocery supermarket" shall not include business operations such as Wal-Mart, K-Mart or Target unless such operations include a grocery department or departments as operated by Super Wal-Mart, Super K-Mart or Super Target. Landlord shall cause each Landlord Affiliate to execute and deliver the Restrictive Covenant Agreement to and for the benefit of Tenant, its successors and assigns, establishing such use restrictions as a matter of public record, to be recorded contemporaneously with the Short Form Lease, as herein contemplated. Prior to execution of this Lease by Tenant, Landlord has provided Tenant with a list of the Landlord Affiliates, together with title evidence of such ownership interest, which list and title evidence Landlord represents is complete and correct as of the date of this Lease.

(c)     Prohibited Uses. None of the following uses shall be permitted within the Shopping Center, including the Premises, during the Term of this Lease (each, a "Prohibited Use"):

(1)     animal raising or storage, or veterinary hospital;

(2)     lounge, bar, "teen lounge", social encounter club, dance hall, nightclub, amusement gallery, or pool room;

(3)     pawn shop, flea market, junk yard, "second hand", or surplus store;

(4)     funeral parlor;

(5)    bingo, electronic or other game parlor;

(6)    theater (movie, legitimate or other);

(7)    massage parlor; bookstore, video store or other store selling, renting or offering sexually explicit materials, devices, apparel or the like; "peep show" store, topless or strip club; a so-called "head" shop, off-track betting, gambling or gaming facility (other than lawful government sponsored lottery games as an incidental part of the primary business conducted on the premises), or check cashing facility; provided, however, that Tenant may sell books, magazines and videos containing non-pornographic sexually explicit materials, and may offer check cashing services, within the Premises, as an incidental part of Tenant's primary business;

(8)    abortion or HIV clinic;

(9)    automobile, boat, trailer, mobile home, or truck leasing, display, repairs or sales;

(10)    church or house of worship, school, library, reading room or day care center; provided, however, that a child day care center shall be permitted in the location behind Stein Mart depicted and delineated on the Site Plan;

(11)    manufacturing, assembling, distribution, warehouse or storage business;

(12)    public auditorium or other public entertainment facility;

(13)    driver's license or tag office or other government service office; provided, however, that a Mailboxes, Etc. or other non-governmental retail business providing post office boxes shall not be prohibited by the foregoing;

(14)    exterior "pay" telephones;

(15)    dry cleaning processing plant; or

(16)    gun range or sale of fireworks.

(d)    Restricted Uses. Without the prior written consent of Tenant, which may be granted, withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and in furtherance thereof, none of the following uses shall be permitted within the Shopping Center, except within the Store (each a "Restricted Use"):

(1)    spa, health, sports, tanning, racquet or exercise club, fitness center, skating rink, bowling alley, or other sports or recreational facility; provided, however, that one (1) spa, health club or tanning facility having a gross floor area not to exceed 1,400 square feet shall be permitted in the Shopping Center;

(2)    business, financial services (e.g. H&R Block, State Farm), medical or professional offices, provided, however, that business, financial services, medical or professional offices having an aggregate gross floor area of not more than 5,000 square feet and with no single office having a gross floor area in excess of 1,800 feet shall be permitted in the "in-line" retail space in the Shopping Center; further provided that there shall be no limitations on the size of business, financial services, medical or professional offices located in any of the out-buildings depicted on the Site Plan; and further provided that no "call centers" shall be permitted in the Shopping Center;

10

(3)    restaurants, other than those of the sizes and types, and in the locations, as specifically described and delineated on the Site Plan and as further described in detail on attached Exhibit "I"; and

(4)    any business that involves parking of delivery or service vehicles within the Shopping Center on a routine or frequent basis for deliveries or services to customers located outside the Shopping Center, except (i) restaurant delivery vehicles parked in rear service areas only (e.g. Pizza Hut, Domino's, Steak Out), and (ii) temporary parking of delivery or service vehicles in rear service areas only for deliveries or services provided to businesses located in the Shopping Center.

In the event Landlord or any tenant in the Shopping Center shall violate the Exclusive Use or Restricted Use provisions, or Landlord, Tenant or any other tenant in the Shopping Center shall violate any Prohibited Use provisions, and upon Landlord's receipt of notice of such violation, Landlord shall promptly commence and expeditiously pursue any and all remedies available to Landlord for the enforcement of the Exclusive Use, Restricted Use and Prohibited Use provisions, including, without limitation, injunctive relief. Furthermore, Tenant shall have the right, but not the obligation, to pursue enforcement of the Exclusive Use, Restricted Use and Prohibited Use provisions in Tenant's own right or in the name of Landlord, and Landlord hereby agrees to cooperate and, to the extent required, participate with Tenant. Any expense, including, without limitation, reasonable attorney's fees and court costs, incurred by Tenant in the enforcement of the rights set forth in this Article 8 shall be deemed paid or incurred for the account of Landlord, and Landlord agrees to reimburse Tenant therefor on demand and save Tenant harmless therefrom. In the event Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder within thirty (30) days after receipt from Tenant of bills or written notice of claim for reimbursement, said amount may be deducted by Tenant from the next or any succeeding installment payments of Basic Rent, Additional Rent or Percentage Rent due.

9.    COMPLIANCE WITH LAWS

(a)    Tenant shall at all times comply with all applicable federal, state and local current and future laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's business operations within the Store, including, without limitation, Legal Requirements for compliance with the federal Americans with Disabilities Act, and its state law equivalent, if any, and regulations and guidelines promulgated thereunder (collectively, the "ADA"), as specifically applicable to the operation of a grocery supermarket store, as opposed to those applicable to commercial businesses generally.

(b)    Landlord shall at all times fully comply with all Legal Requirements applicable to the real property and the improvements in the Shopping Center (including the Store), except for Tenant's obligations in Article 9(a) above and to fulfillment of Landlord's obligations under this Lease, including, without limitation, Legal Requirements for compliance with the ADA, as applicable to commercial businesses generally.

10.    CONSTRUCTION OF SHOPPING CENTER

(a)    Landlord shall construct, at Landlord's sole cost and expense (i) Tenant's Store in a turn-key state of completion, ready for installation by Tenant, at Tenant's expense, of its trade fixtures; (ii) the Common Area improvements for the Shopping Center depicted on the Site Plan; (iii) the other in-line buildings within the Shopping Center depicted on the Site Plan; and (iv) the freestanding buildings within the Shopping Center depicted on the Site Plan which may be constructed, at Landlord's option, provided, however, until such construction, the building pads on which such buildings may be constructed shall be graded to an elevation which does not materially and adversely impair the visibility of the Shopping Center and such building pads shall be sodded and maintained at Landlord's sole expense or paved in a manner consistent with the

11

Common Areas (collectively "Landlord's Work"). Landlord's Work shall be constructed by Landlord all in full compliance with: (1) the final plans and specifications therefor developed by Landlord and approved by Tenant as hereinafter set forth, (2) the Site Plan, (3) Tenant's Guide Plans and Guide Plan Specifications as to a prototype store, (4) Tenant's Development Criteria, and (5) Legal Requirements.

(b)     Within ten (10) days following the Execution Date, Tenant will deliver to Landlord Tenant's Guide Plans and Guide Plan Specifications and Tenant's Development Criteria (collectively the "Guide Plans"). Within thirty (30) days of receipt of the Guide Plans, Landlord shall prepare and deliver to Tenant for approval detailed preliminary plans and specifications prepared in accordance with the Guide Plans at Landlord's expense by registered architects or engineers approved by Tenant, licensed to practice in the state in which the Store is located, with proposed elevations of the façade of the Store and delineation of the other Shopping Center buildings and the Common Areas. Landlord's preliminary plans and specifications shall highlight any and all deviations from the Guide Plans. In addition to the preliminary plans and specifications, Landlord shall provide to Tenant samples of materials and color for the proposed Store façade/canopy. Tenant shall have thirty (30) days from receipt of the preliminary plans and specifications in which to review and approve them or, alternatively, to disapprove any portion(s) of them. Landlord will cooperate with Tenant in accommodating any request for changes to the preliminary plans and specifications and shall resubmit to Tenant proposed final plans and specifications for Tenant's Store and the Common Areas, incorporating any alternative agreed to in writing by Landlord and Tenant. Tenant shall have ten (10) days from receipt of the proposed final plans and specifications to approve the same or to object to any portion of them. In the event of an objection to any portion of them, Landlord and Tenant agree to cooperate to promptly finalize mutually acceptable final plans and specifications for the Store, the location of other Shopping Center buildings and the Common Area improvements (collectively "Tenant's Plans"). Tenant's Plans shall be approved when initialed by both parties and, when initialed, shall constitute a part of this Lease. Tenant's Plans shall provide for a completed Store, commonly referred to as a "turnkey" or "lock and key job".

Notwithstanding that Tenant has furnished the Guide Plans and Tenant's approval of Tenant's Plans, Landlord and not Tenant, shall be solely responsible for the design and construction of the Store, the other Shopping Center buildings and the Common Areas. Neither Tenant nor Tenant's architect shall have responsibility for design errors relating to the Store or the other improvements in the Shopping Center, or for the failure of the Store or other improvements to comply with Legal Requirements. In the event of any inconsistency between Tenant's Plans and this Lease, Tenant's Plans shall control.

(c)     All design, installation, and construction of Landlord's Work by or on behalf of Landlord shall be completed in a first-class manner by contractors, sub-contractors, architects, and engineers which are licensed, bonded, and insured. All contractors, architects and engineers shall be approved in writing by Tenant, which approval shall not be unreasonably withheld. Landlord's Work on the Store and the Shopping Center shall be assured by Payment and Performance Bonds; provided, however, that if Landlord contracts with any of Beers Construction, Brasfield & Gorrie Construction, Kenyon Construction, or Elkins Construction for construction of Landlord's Work, Tenant agrees to waive such requirement for Payment and Performance Bonds.

(d)     Tenant shall have the right at any time after the approval of Tenant's Plans to request and receive Landlord's agreement to changes to Tenant's Plans for its Store which may increase or decrease the construction cost (each request, a "Change Order"). Change Orders may be negotiated directly by Tenant with Landlord's contractor, but shall be coordinated through Landlord, and Tenant shall pay Landlord's contractor, through Landlord, any net increase in the construction cost. Landlord's contractor shall invoice Tenant for a Change Order within thirty (30) days of completion of the work contemplated thereunder and delivery of lien waivers therefor. Tenant will remit the amount due to Contractor through Landlord, within thirty (30) days of receipt of the invoice and lien waivers. If, as a result of a Change Order there is an anticipated delay in the Delivery Date for the Store, the contractor shall so advise Tenant and Landlord in writing prior to such Change Order being effective and upon instructions by Tenant to proceed with such Change Order, the Delivery Date for Tenant's Store shall be extended by a number of days of estimated delay in the Delivery Date resulting from such Change Order.

(e)    During the course of construction of the Store and the Common Areas, Landlord shall allow, and the construction contract between Landlord and the general contractor shall permit, Tenant, its employees, agents, contractors or subcontractors to have access to the Store for purposes of inspecting, monitoring, measuring, installing, or arranging for the placement or installation of fixtures, equipment, materials, supplies, and inventory. Provided, however, Tenant's activity shall not unreasonably interfere with construction of the Store or the Common Areas.  By permitting access to the Premises by Tenant, its employees, agents, or contractors, prior to completion of construction and delivery of the Premises to Tenant as herein provided, no access shall be deemed as acceptance of the Premises by Tenant and, further, Tenant has the right to reject in writing to Landlord any inferior or non-conforming work.  With the exception of Landlord's gross negligence and intentional acts, Landlord assumes no responsibility or liability for injury to persons or damage to property caused by the exercise of the rights and privileges granted, and Tenant hereby indemnifies Landlord and agrees to hold Landlord harmless from and against any loss, cost, damage, liability, or expense suffered or incurred by Landlord as a result of the exercise by Tenant of said rights and privileges. Subject to the foregoing indemnity, Tenant shall not be obligated to pay to Landlord, and Landlord shall not be entitled to charge Tenant, Basic Rent or any other amounts which may otherwise be due and payable under this Lease by virtue of the exercise by Tenant of the rights and privileges set forth herein.  All fixtures, equipment, materials, supplies, or inventory placed or installed in the Store pursuant to the provisions of this Article may be removed by Tenant at any time; provided, however, Tenant shall repair any damage to the Store caused by such removal, but shall not be responsible for installation of floor, wall or ceiling finishes in areas exposed by removal of Tenant's fixtures.

## 11.    DELIVERY DATE

Construction of the Store and the Shopping Center shall begin not later than January 1, 2003 (the "Construction Start Date").  The Construction Start Date shall be the date as of which (i) Landlord shall have obtained a building permit issued by the appropriate governmental authorities, (ii) the first concrete footings have been poured, and (iii) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto.  Landlord shall use its best efforts to Substantially Complete the Store and the Common Areas and deliver exclusive possession of the Store to Tenant, subject to Force Majeure on or before November 1, 2003 (the "Delivery Date").  "Substantial Completion" or Substantially Complete" shall be deemed to have occurred when the Store, the Common Areas or the required buildings are completed in accordance with Tenant's Plans except for minor items of detail, finish or correction, the non-completion of which shall not materially interfere with Tenant's use and occupancy of the Store, and as to the Store, a temporary certificate of occupancy (or its equivalent) is issued or if not issued, the only conditions to the issuance of the certificate of occupancy being the completion of work to be performed by Tenant hereunder.

If Landlord shall not have Substantially Completed and delivered exclusive possession of the Store to Tenant on or before the Delivery Date or shall not have Substantially Completed the Common Areas by the Delivery Date, subject to Force Majeure, then in either of such events, Tenant shall be entitled to a credit against Basic Rent and Additional Rent equal to two (2) days of Basic Rent and Additional Rent for each one (1) day after the Delivery Date either the Store is not Substantially Completed and delivered to Tenant or the Common Areas are not Substantially Completed, as the case may be.

Landlord shall notify Tenant in writing at least ninety (90) days in advance of the Delivery Date of the date on which Tenant should schedule delivery of Tenant's Trade Fixtures (the "Anticipated Delivery Date"). Landlord and Tenant acknowledge that if Tenant's Store is not delivered to Tenant as required hereunder by the Anticipated Delivery Date, Tenant shall suffer substantial damages, which will be difficult to quantify. Accordingly, Landlord agrees that in the event the Store is not delivered to Tenant by the Anticipated Delivery Date, in addition to the free rent and charges provided for above, Tenant shall be entitled to a credit against Basic Rent and Additional Rent equal to three (3) days of Basic Rent and Additional Rent for each one (1) day after the Anticipated Delivery Date until the Delivery Date.  The parties agree that the rent credit provided for herein is not a penalty and is a fair estimate of Tenant's anticipated damages.

JK 202197.1 80130 00307 09/10/02 02:37pm

Additionally, if Landlord shall not have Substantially Completed the Store and the Common Areas and delivered exclusive possession of the Store to Tenant on or before June 1, 2004 (the "Outside Delivery Date"), Tenant shall have the right to terminate this Lease at any time thereafter until the Store has been Substantially Completed and delivered to Tenant and the Common Areas have been Substantially Completed. The Outside Completion Date shall not be extended for any reason, including impossibility of performance or Force Majeure. Upon said termination of this Lease, neither party shall have any further obligations hereunder, except that Tenant's right to claim damages for Landlord's default of this Section 11 shall specifically survive.

Provided that Tenant has not earlier exercised any termination right set forth above, Tenant covenants that it shall open the Store for business for at least one (1) day, fully fixtured and stocked, not later than the Commencement Date (as defined below), subject to a day-for-day extension of such time period for any delay in Tenant's performance resulting from Force Majeure.

## 12.    COMMENCEMENT DATE

Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to be due hereunder upon the earliest to have occurred of the following: (i) Tenant has opened the Store for business or (ii) sixty (60) days after Landlord has satisfied all the requirements listed below (collectively the "Conditions"), (the "Commencement Date").

(a)    The Premises and the Common Areas shall have been delivered to Tenant Completed in accordance with the Site Plan and Tenant's Plans;

(b)    Tenant shall have received, (i) the Title Policy, (ii) the Survey, (iii) the Assessment, and (iv) the Zoning Letter all in conformity of the Lease requirements;

(c)    Landlord has provided to Tenant a Certificate of Occupancy or equivalent document for the Store and a fully executed Architect's Certification in the form attached hereto as Exhibit "K";

(d)    Landlord has assigned to Tenant all contractor and other warranties for those items Tenant is obligated to maintain under Article 17, below;

(e)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(f)    Construction of the entire Shopping Center with all in-line store frontages and in-line building shells shall have been completed as shown on the Site Plan

(g)    The Short Form Lease, as hereinafter defined, and any easements benefiting or burdening the Store or the Shopping Center shall have been recorded prior in time to all encumbrances except the Permitted Exceptions, and evidence of recordation provided to Tenant's satisfaction; and

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J". No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

Notwithstanding the foregoing, Tenant shall not be required to initially open for business in the Store between December 17th of any year and January 5th of the next year, nor shall Tenant be required to pay Basic Rent, Percentage Rent or Additional Rent during such period, unless Tenant elects to open its Store for all or part of such period and all of the Conditions have been satisfied.

13.    INTENTIONALLY OMITTED

14.    PARKING AND COMMON AREAS

(a)    Landlord represents and warrants that on or before the Commencement Date, the Shopping Center shall be completed as depicted on the Site Plan and Landlord agrees that without Tenant's prior written consent, which Tenant may withhold in Tenant's sole discretion, Landlord will neither alter the arrangement, size or location of the buildings from those indicated on the Site Plan nor make changes to the Common Areas, including but not limited to changes to the drives, entrances and exits designated on the Site Plan.

(b)    Landlord agrees that it will not grant cross-parking easements or licenses over any portion of the Shopping Center for the benefit of outparcels within or property outside the Shopping Center without the prior written consent of Tenant which Tenant may withhold in Tenant's sole discretion.

(c)    Landlord agrees that it will not subdivide or parcel the Common Areas or otherwise alter the Common Areas without the prior written consent of Tenant, which shall not be unreasonably withheld.

(d)    Landlord covenants that Landlord will operate the Shopping Center in a first-class manner in accordance with the standards for first-class neighborhood shopping centers.

(e)    Landlord will not impair the visibility of the Store or Tenant's signage from any public roadway adjacent to the Shopping Center.

(f)    Landlord agrees to maintain within the Shopping Center the greater of: (i) the number of parking spaces required to meet applicable Legal Requirements; or (ii) five (5) parking spaces for each 1,000 square feet of Floor Area within the Shopping Center. All parking spaces shall be as shown on the Site Plan (standard spaces to be minimum of nine feet (9') in width, and spaces located within the 5 parking rows in front of the Store to be minimum of ten (10') feet in width). Landlord further agrees that, except for minimal, non-material modifications, Landlord shall not modify the layout, configuration, size or number of parking spaces from that shown on the Site Plan without Tenant's prior written consent, which may be given or withheld in Tenant's sole discretion. Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking imposed by Legal Requirements.

(g)    Landlord with Tenant's prior written approval, shall designate on the Site Plan parking areas within which employees of all Shopping Center tenants shall park and enforce adherence thereto. Tenant, but no other tenant, (except Stein Mart, but only as to the parking lot) may use the parking lot, the sidewalks adjacent to the Store and the exterior surfaces of the Store for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate or permit any portion of the Common Areas for the exclusive use of any party, except as provided in Article 14 and Article 15.

Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales (except by Stein Mart) shall be allowed in the Common Areas.

15.    SERVICE AREA

Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading

and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center.

16.    UTILITIES

Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store, including any utility deposits required in connection therewith. Landlord shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for environmental impact charges, or any "hook up" fees, "tap" fees, impact fees, similar fees or other charges incident to providing access to any utility. Upon request from Tenant, Landlord shall grant all necessary utility easements reasonably required for Tenant's operations. The grant of such easements after the Commencement Date shall be at no cost to Landlord. Landlord shall provide Tenant any available information including but not limited to recording data and surveys related to or delineating existing utility lines. All of the Common Areas (including Shopping Center pylon and monument signs, entrance and exit signs) shall be adequately lighted during the hours of 1/2 hour before dusk until 1:00 a.m. (the "Standard Hours").    Standard Hours do not apply to "night light" fixtures. For purposes of this Article 16, "adequately lighted" shall mean the greater of the following intensity levels: (i) three (3) foot candles minimum at the darkest point or (ii) the minimum levels required under the Legal Requirements, unless otherwise agreed between Landlord and Tenant based on the results of a lighting intensity study to be procured by Landlord. Neither Landlord nor Tenant shall tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

17.    TENANT'S MAINTENANCE

Tenant shall keep the interior non-structural portions of the Store in good condition and repair as needed for Tenant's operations.    Tenant shall repair or replace as needed: windows and plate glass; automatic doors; air conditioning and heating systems; floor surfacing; interior wiring to the main disconnect or main electrical panel; the automatic sprinkler system (including central alarm system and monitoring therefor) interior water and sewer system to a point five feet (5') outside the Store, and grease traps. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. If, during the last three (3) years of the Term, as extended by any Extension Term, Tenant determines that the heating and air conditioning system ("HVAC") requires replacement, then Tenant shall notify Landlord of such determination and the basis therefore. Landlord thereupon shall elect within ten (10) days following Tenant's notice, either (a) to make such replacement to the HVAC within thirty (30) days following Landlord's election, at Landlord's sole cost and expense, or (b) for Tenant to make such replacement to the HVAC, at Tenant's sole cost and expense, subject, however, to the remaining terms of this Article 17. Landlord's failure to make an election within the foregoing ten (10) day period, or upon Landlord's timely election to make such replacement as contemplated in clause (a) above and Landlord's failure to make such HVAC replacement within the foregoing thirty (30) day period, will be deemed to constitute an election for Tenant to make such replacement as contemplated in clause (b) above. If Tenant replaces the HVAC as provided in clause (b) above, and Tenant does not elect to extend the Term pursuant to any applicable Extension Term, then, during the last one hundred eighty (180) days of the Term, Tenant shall have the right to offset against the next succeeding and any future installments of Basic Rent, Percentage Rent and Additional Rent (and to recover from Landlord after expiration of this Lease any remaining balance of) the value of the remaining useful life of the HVAC after expiration of this Lease, unless Landlord otherwise has provided a payment alternative satisfactory to Tenant, in Tenant's sole discretion. For purposes of this Article 17, the HVAC system shall be deemed to have a useful life of 15 years, with each year equal to 1/15 of its value. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter the Store for making repairs or for examining or showing the same to prospective purchasers or lenders.

JK 202197.1 80130 00307 09/10/02 02:37pm

18.    LANDLORD'S MAINTENANCE

Landlord shall, at its sole cost and expense and _not_ as part of Common Area Maintenance Expenses (except as specifically provided in Article 3(c)(1)), keep and maintain in good condition and repair and replace as necessary all portions of the Common Areas and the Store which are not specifically the responsibility of Tenant under Article 17 herein, including but not limited to the facade of the Store (including canopies and awnings), the exterior walls and structural portions of the Store (including painting of the exterior walls, as needed and consistent with Tenant's specifications, but no less than once every five years), if repairs made necessary by Landlord's failure to fulfill Landlord's repair responsibilities to the Store as required herein, roof, gutter, downspouts, masonry walls, foundation and structural members of the Store, the exterior water and sewer systems, including lift stations, and septic tanks, sewer treatment plants (but excluding grease traps), exterior doors (other than automatic doors), the exterior wiring including and beyond the main disconnect or electrical panel of the Store and exterior pest control and the cost of repair of damage caused by pests. In making repairs hereunder, Landlord shall use all reasonable efforts to minimize any interference with Tenant's normal business operations within the Store.

In addition to any of its other obligations under this Lease, Landlord, at its own cost and expense, shall implement a preventive maintenance program for the Store roof. Landlord, at its own cost and expense, shall obtain a roof inspection report from an independent, certified roof inspector approved in writing by Tenant, which approval shall not be unreasonably withheld, conditioned, or delayed, once every five (5) years commencing on the fifth anniversary of the Commencement Date and, additionally, upon request of Tenant. The roofing inspection report shall be certified by the inspector to Landlord and Tenant, and Landlord, at its own cost and expense, shall promptly implement the recommendations set forth in said inspection report which are required to keep the roof in watertight condition.

If, in order to protect persons or property, it shall be necessary to make emergency repairs or if Tenant, in its reasonable discretion, determines that Landlord has defaulted in the performance of any obligation imposed on it by this Lease and has not cured such default within thirty (30) days after written notice from Tenant (or does not within said period commence and diligently proceed to cure such default), then Tenant, without waiver of or prejudice to any other right or remedy it may have, shall have the right at any time thereafter to cure such default for the account of Landlord, and Landlord shall reimburse Tenant for any amount paid and any expense or contractual liability so incurred within 10 days after invoice, together with interest thereon at the Default Rate, as hereinafter defined, from the date due until paid. Any and all amounts expended by Tenant on behalf of Landlord and not reimbursed by Landlord as provided above may be set off by Tenant against the next succeeding or any future installments of Basic Rent, Percentage Rent and Additional Rent due and owing under this Lease.

19.    SIGNS

Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, change, add and maintain any signs on the walls, and any other places on or about the Store, and antennae and satellite dishes on the roof, which signs, antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Store resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Landlord shall construct, install, and maintain, at its cost, two (2) electrically illuminated Shopping Center monument signs in the locations marked on the Site Plan. The monument signs shall be of the maximum height and size permitted by applicable Legal Requirements and shall be constructed in accordance with the Monument Sign Plan attached hereto as Exhibit "M". All monument signs shall be limited to the name of the Shopping Center, if applicable, Tenant's signage and the names of no more than two (2) other Shopping Center tenants. Menu type monument signs shall not be permitted. All landscaping in the Shopping Center and on any outparcel or outlot shall be planted and maintained so as to not block the visibility of the monument

17

signs. Tenant may install, at its cost, sign panels in the uppermost spaces on any current and future monument sign(s), occupying Tenant's Pro rata Share of the total space available for signage, but in no case less than fifty (50) square feet. Tenant may connect the sign panels to power outlets installed by Landlord, or may elect to connect Tenant's individual cabinet to Tenant's electrical system. Tenant shall pay the cost of the electric power for its sign panels if billed as a portion of Additional Rent unless Tenant has elected to connect its cabinet to Tenant's electrical system. Landlord shall construct and install the monument signs and make the same available for Tenant's installation of its sign panels not later than ninety (90) days in advance of the Anticipated Delivery Date.

20.    FIXTURES AND INTERIOR ALTERATIONS

Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions and improvements, in, to or about the Store which do not adversely affect its structural integrity ("Non-Structural Modifications"). Tenant may make any other structural alterations, additions, or improvements ("Tenant Modifications") provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed). For purposes herein, structural alterations, additions or improvements shall not include moving non-load bearing partitions, relocation of existing or creation of new doors (including exterior doors), plumbing and electrical work or other minor changes. If Landlord's consent is required in connection with any Tenant Modifications, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to its commencement. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before ten (10) days after the date of Tenant's request for Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications. Tenant shall make all Non-Structural Modifications or Tenant Modifications in a good, workmanlike manner.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to remove all or any part of Tenant's Trade Fixtures at any time, and shall remove all of Tenant's Trade Fixtures upon expiration of this Lease.

21.    INDEMNIFICATION

(a)    Subject to Tenant's waiver contained in Article 23(b)(2) hereof, Landlord hereby agrees and covenants to protect, defend, hold harmless and indemnify Tenant and its directors, officers and employees from and against any and all claims, actions, liabilities, losses and expenses relating to any and all losses or damages (including, without limiting the foregoing, costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy, injury to or death of persons and damage to or destruction of property), allegedly or actually suffered by any person or persons occurring on or about the Common Areas or any portion of the Shopping Center, other than within the Store, unless as a result of Tenant's failure to fulfill its repair responsibilities, if any, or the intentional or negligent acts or omissions of Tenant, its employees, agents and contractors.

(b)    Subject to Landlord's waiver contained in Article 23(a)(2) hereof, Tenant hereby agrees and covenants to protect, defend, hold harmless and indemnify Landlord and its directors, officers and employees from and against any and all claims, actions, liabilities, losses and expenses relating to any and all losses or damages (including without limiting the foregoing, costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy, injury to or death of persons and damage to property) allegedly or actually suffered by any person or persons occurring within the Store, unless as a result of Landlord's failure to fulfill its repair responsibilities, or the intentional or negligent acts or omissions of Landlord, or Landlord's employees, agents and contractors.

18

(c)    The indemnities under this Article 21 shall survive the expiration or earlier termination of this Lease.

22.    CASUALTY

(a)    <u>Damage or Destruction of Tenant's Store</u>. If Tenant's Store shall be damaged or destroyed by fire or any other cause whatsoever, Landlord shall with due diligence (but in any event within one hundred and eighty (180) days following the date of damage or destruction) remove any resulting debris and repair or rebuild, as the case may be, the same in accordance with Tenant's Plans to the extent permitted by then applicable Legal Requirements. Until thirty (30) days after the Tenant's Store is repaired, rebuilt and put in good and tenantable order and Tenant reopens the entire Store for business, all Basic Rent and Additional Rent, or a fair and just proportion thereof, according to the nature and extent of the damage sustained, shall be abated.

(b)    <u>Damage or Destruction to Common Areas or Other Portions of the Shopping Center</u>. If the Common Areas or any of the buildings located in the Shopping Center (exclusive of the Store) shall, prior to the Commencement Date or during the Term, be damaged or destroyed by fire or any cause whatsoever, either in whole or in part, Landlord shall with due diligence (but in any event within ninety (90) days following the damage or destruction) remove any resulting debris and commence repair and/or rebuild, as the case may be, the damaged or destroyed Common Areas and other buildings substantially in accordance with Tenant's Plans and pursuant to which they were originally constructed to the extent then permitted by applicable governmental laws and regulations. Until such time as such buildings and the Common Areas are substantially repaired, rebuilt and put in good order, a fair and just proportion of the Basic Rent and Additional Rent, commensurate with the interference with Tenant's business operations shall be abated. If Landlord does not commence the repair and restoration work required pursuant to this Article 22 promptly, and in all events within ninety (90) days after the date of damage or destruction, or if Landlord thereafter does not diligently pursue such work to completion, then Tenant shall have the right, at Tenant's option, to: (i) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the State in which the Shopping Center is located; (ii) terminate this Lease by thirty (30) days' written notice to Landlord without waiving Tenant's right to damages for Landlord's failure to perform its covenants and obligations hereunder; (iii) undertake the repair and restoration work on Landlord's behalf offsetting the full and continuing costs of the repair and restoration work against Tenant's succeeding obligations to pay Basic Rent, Additional Rent and Percentage Rent.

(c)    <u>Damage During Last Three Years</u>. Notwithstanding the provisions of Articles 22(a) and 22(b) hereof, if during the last three (3) years of the Initial Term, or during the last three (3) years of any Extension Term, Tenant's Store or the Shopping Center is damaged to the extent of thirty-five percent (35%) or more of the replacement cost (exclusive of the costs of land and foundations), then this Lease may be terminated at the election of either Landlord or Tenant, provided that notice of such election shall be delivered by the electing party to the other within thirty (30) days after the occurrence of such damage or destruction. Upon the exercise of such option to terminate by either party hereto, this Lease shall be deemed null and void, the parties shall be released from all further liabilities thereafter arising under this Lease, and all Basic Rent, Additional Rent, Percentage Rent, and other charges paid by Tenant for periods after the date of destruction shall be promptly refunded. Notwithstanding the foregoing, however, if at the time of such damage or destruction either Tenant's Store was not materially damaged or Tenant has the right to extend the Term as provided herein, then Tenant may elect to exercise such right within thirty (30) days after receiving notice of Landlord's election to terminate pursuant to this Article 22(c), and in such event Landlord's notice of termination shall be void, and Landlord shall repair and restore Tenant's Store and/or the Shopping Center, as the case may be, as provided in Article 22(a) and 22(b) hereof.

(d)    <u>Termination</u>. In the event of any termination of this Lease as the result of the provisions of this Article 22, the parties, effective as of such termination, shall be released, each to the other, from all liability and obligations thereafter arising under this Lease, other than sums due at the date of damage or destruction and torts committed prior to thereto.

JK 202197.1 80130 00307 09/10/02 02:37pm

(e)     Occurrence.  The provisions of this Article 22 shall apply to each occurrence of damage or destruction of the Tenant's Store, the Common Areas or other portions of the Shopping Center by fire or any casualty and as often as any buildings or improvements thereon shall be so damaged or destroyed, in whole or in part, and upon each such occurrence Basic Rent, Percentage Rent and Additional Rent shall abate according to Articles 22(a) and 22(b) hereof.

23.     INSURANCE

(a)     Landlord.  Landlord shall obtain and keep in full force and effect the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant and Guarantor as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(1)     Liability Insurance.  Landlord shall carry commercial general liability insurance coverage on the Shopping Center, stipulating limits of liability of $3,000,000.00 single limit coverage and deductibles of not more than $50,000.00. If Landlord desires additional liability insurance coverage, Landlord may obtain the same at its sole cost and expense. Landlord hereby expressly waives any and all claims against Tenant and Guarantor for loss or damage covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage including, without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees. Landlord shall self-insure any deductible and defend any claim and pay any settlement or judgment falling within said deductible.

(2)     Property Insurance.  Landlord shall carry all-risk commercial property insurance on the Shopping Center including Tenant's Store and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00. Landlord hereby expressly waives any and all claims against Tenant and Guarantor for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance (including the amount of any applicable deductible), or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)     Tenant.  Tenant shall obtain and keep in full force and effect the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Upon written request, certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests.

(1)     Liability Insurance.  Tenant shall carry, at its sole expense, commercial general liability insurance coverage on the Store, stipulating limits of liability of not less than $3,000,000.00 single limit coverage and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of cause of such damage, including, without limitation, damage resulting from the negligence of Tenant, its agents, servants or

20

employees.  Tenant shall self-insure any deductible and defend any claim and pay any settlement or judgment falling within said deductible.

(2)    _Property Insurance_.  Tenant shall carry all-risk commercial property insurance on Tenant's Trade Fixtures and Tenant's equipment in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00.  Tenant hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty to the extent covered by such insurance (including the amount of any applicable deductible), or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc., if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant may self-insure all or any portion of Tenant's required insurance coverage and, in such event, Tenant shall not be required to provide any insurance certificates to Landlord or any Mortgagee.  If Tenant has "self insured" and a claim is made or a loss incurred which would have been covered by the insurance described in subparagraphs (b)(1) or (2) above, then Tenant shall defend against any such claim or loss, and Tenant shall pay any settlement or judgment resulting therefrom up to the aforementioned policy limits.  If requested by Landlord, Tenant shall provide to Landlord copies of audited financial statements evidencing that Tenant has satisfied the net worth requirement in order to self-insure as provided herein.

24.    QUIET ENJOYMENT

Landlord covenants, warrants and represents that the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to Tenant's leasehold interest hereby created, except for ad valorem property taxes for the current year, unless the lienor has executed an SNDA, as required hereunder, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion; and

So long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or appertaining thereto, during the Term.

25.    TAXES AND LIENS

(a)    Taxes.  Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes and assessments imposed upon the Shopping Center (collectively "Landlord's Tax Obligations") shall be promptly paid by Landlord prior to delinquency.  If Tenant is responsible under this Lease for reimbursing Landlord for any portion of any of Landlord's Tax Obligations, Landlord shall timely pay the same in order to take maximum advantage of any rebate, abatement, or early payment discount available.

(b)    Liens.  Landlord shall not permit any liens that may be senior in priority to Tenant's leasehold interest (other than liens for Landlord's Tax Obligations not yet delinquent, and mortgage liens of Landlord's lenders) to attach to the Premises, and shall promptly pay the same or transfer the same to security reasonably acceptable within twenty (20) days following imposition of the same.

26.    CONDEMNATION

If any part of the Store or more than twenty percent (20%) of the total square footage of buildings in the Shopping Center, exclusive of the Store or twenty percent (20%) of total land area, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof ("Taking"), Tenant shall be entitled to terminate this Lease, at its option, by written notice to Landlord within sixty (60) days following such taking or purchase. Any unearned Basic Rent, Percentage Rent, Additional Rent or other deposits or charges paid in advance shall promptly be refunded to Tenant. If a lesser Taking occurs or if Tenant does not elect to terminate this Lease, Tenant shall be entitled to a reduction of all Basic Rent and Additional Rent, in an amount proportionate to the nature and extent of the Taking, and Landlord shall promptly commence and diligently prosecute to completion (but in any event within sixty (60) days of the taking) any repairs and restoration necessary to return the Store and the Shopping Center to a comparable condition at the time of Taking to the satisfaction of the Tenant and, until completion of the repairs or restoration, all Basic Rent and Additional Rent, or a fair and just proportion thereof, according to the nature and extent of the Taking, shall be further abated.

If:    (a)    any drive, entrance, median cut, access point, route or mode of access within the Common Areas depicted on the Site Plan is obstructed (or to be obstructed pursuant to notice from appropriate governmental authority) or otherwise closed or materially changed:

(A) for more than ninety (90) days, or

(B) in a manner which unreasonably interferes with the conduct of Tenant's business in the Store or prevents Tenant's use of or access to or through the Common Areas; or

(b)    any portion of the Common Areas depicted on the Site Plan is:

(i) impacted by a Taking, so as to reduce the required number of parking spaces by:

(A) an amount in excess of ten percent (10%) of the number required under Section 14 of this Lease, or

(B) an amount that results in a violation of applicable Legal Requirements, or

(C) an amount that materially interferes with Tenant's normal business operations, or

(ii) obstructed or otherwise closed or changed in a manner or for an interval which unreasonably interferes with the conduct of Tenant's business in the Store or Tenant's use of the Common Areas, or

(c)    either (i) traffic signalization at the intersection of Baymeadows Road and Point Meadows Drive is removed, or (ii) the median cut at the intersection of Baymeadows Road and Point Meadows Drive is closed or removed, or (iii) the westerly curb cut between the Shopping Center and Point Meadows Drive is closed or removed, and Landlord has not provided an alternative means of access to and from the Shopping Center acceptable to Tenant in Tenant's sole discretion,

then Tenant, at its sole option, may either terminate this Lease, or reduce Basic Rent, Additional Rent and Percentage Rent in a fair and just proportion to the taking, purchase, obstruction or construction. Tenant shall make its election pursuant to this Article 26 by written notice to Landlord within sixty (60) days following the date of such Taking, purchase or obstruction. If Tenant terminates by reason of notice of a pending obstruction or construction from appropriate governmental authority, as provided above, in which case Tenant

22

may terminate by written notice prior to the occurrence of such obstruction or construction, but such termination shall not be effective until the first occurrence of such obstruction or construction. Tenant shall not be liable for Basic Rent, Additional Rent, and Percentage Rent at any time following termination of this Lease.

If Tenant gives written notice of its termination of this Lease as the result of a reduction in the required number of parking spaces or the taking or obstruction of any drive, entrance, median cut, access point, route or mode of access as set forth above, Landlord shall have fifteen (15) days following the date of Tenant's notice to propose alternative replacement parking, drive, entrance, median cut, access point, route or mode of access. If such alternative replacement parking, drive, entrance, median cut, access point, route or mode of access meets with Tenant's approval, in Tenant's sole discretion, Landlord shall have thirty (30) days in which to complete such parking, drive, entrance, median cut, access point, route or mode of access for use. Upon timely completion of such parking, drive, entrance, median cut, access point, route or mode of access, this Lease shall be amended to modify the site plan and the Term shall continue and Tenant's termination shall be deemed null and void. If the alternative replacement parking, drive, entrance, median cut, access point, route or mode of access does not meet with Tenant's approval, Tenant's termination shall proceed as provided above.

Tenant's option to terminate the Lease pursuant to this Section shall apply without regard to whether the taking, purchase, obstruction or construction is compensable under applicable Legal Requirements. This Lease shall not be interpreted to reduce the amount of compensation due to the Tenant, in connection with any taking, but rather to ensure that Tenant receives the full benefits of this Lease, regardless of what benefits or compensation may then be available under applicable law.

If any Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for the Permitted Use or its use of or access to the Common Areas (collectively a "Legal Requirement Change"), then any such Legal Requirement Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease in accordance with the foregoing provisions of this Section.

Tenant waives its rights to the proceeds of any condemnation award granted to Landlord, except with respect to: (a) the unamortized cost of the enlargement of the Store, if any, to the extent financed by Tenant; (b) any business damages, business loss, or loss of goodwill claimed by Tenant; (c) the cost of dislocation and moving and relocation expenses of Tenant; (d) the unamortized cost of Tenant Modifications, Tenant's Trade Fixtures, and Tenant repair responsibilities; (e) any apportionment of the foregoing; and (f) Tenant's attorneys' fees, costs and expenses in the eminent domain proceedings.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those awarded to Tenant) to ensure their proper application to restoration or repair as required by this Lease, unless Tenant terminates this Lease, in which case such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents.

27.    DEFAULT

(a)    Tenant shall be in default under this Lease if:

(1)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent or other sum due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

(2)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and promptly prosecutes the same to completion in a reasonable manner).

23

(b)    Following an uncured default by Tenant, Landlord shall have the following remedies (which remedies shall be cumulative and not exclusive); provided, however, any provision of this Lease to the contrary notwithstanding, Landlord shall not have any right to accelerate rent or other amounts due and payable hereunder, or to otherwise require payment of such amounts prior to the date on which such amounts would otherwise become due and payable hereunder had such event of default not occurred:

(1)    <u>Judicial Proceeding</u>.  Landlord may bring suit for the collection of rent or other amounts for which Tenant may be in default.

(2)    <u>Termination</u>.  Landlord may elect to terminate this Lease by giving Tenant written notice of such election, reenter the Premises and take possession thereof, without prejudice to any other remedy which Landlord may have under this Lease or at law, or in equity.  In such event, Tenant shall surrender and deliver up the Premises to Landlord and upon any default by Tenant in so doing, Landlord shall have the right to recover possession by summary proceedings or any other suitable action or proceeding by law, and to apply for the appointment of a receiver or for other ancillary relief in such action.  No reentry by Landlord shall be deemed an acceptance of a surrender of this Lease, provided that Tenant shall have ten (10) days written notice after any such application may have been filed and before any hearing thereon.

(3)    <u>Reletting the Premises</u>.  Whether or not Landlord may elect to terminate this Lease, Landlord or its agents, servants, or representatives may immediately or at any time thereafter reenter the Premises and take possession thereof and remove all persons and property therefrom, either by summary proceedings or by other suitable action or proceeding by law, and relet the Premises or any part thereof; provided, however, Landlord shall have the duty and obligation to exercise good faith efforts to mitigate its damages resulting from the occurrence of such event of default to the extent required by law.  No re-entry by Landlord shall be deemed an acceptance of a surrender of this Lease.  In such event, Landlord may in its own behalf relet the whole or any portion of the Premises for any period equal to, greater, or lesser than the remainder of the Term for any such suitable and satisfactory, and for any use and purpose which it deems appropriate, and in connection with any such lease, Landlord may make such changes in the character of the improvements on the Premises and may grant reasonable and customary concessions, including, but not limited to, free rent as the Landlord may determine to be appropriate or helpful in effecting such Lease.  Upon such reletting, all rentals received by Landlord from such reletting shall be applied:  (i) first to the payment of the reasonable and customary expenses of such reletting, including, without limitation, broker's commissions and the cost of repairing, renovating, and remodeling the Premises; (ii) secondly to the payment of Basic Rent or any other amounts due and payable hereunder (and, in the case of Percentage Rent, based upon the average Percentage Rent paid by Tenant during the immediately preceding three (3) Lease Years); (iii) thirdly to any other damages incurred by Landlord as a result of such event of default; and (iv) lastly, the residue, if any, shall be held by Landlord and applied in payment of Basic Rent or any other amounts which may thereafter become due and payable hereunder.  Tenant agrees to pay to Landlord on demand any deficiency between the amount received by Landlord from such reletting and the amount of Basic Rent or any other amounts due and payable hereunder; provided, however, such deficiency shall be paid by Tenant in monthly installments which shall not exceed the amount of Basic Rent or any other amounts due and payable hereunder as if such event of default had not occurred.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease by reason of the occurrence of such event of default.

(4)    <u>Self Help</u>.  Landlord may, at its option, without waiving any claim for damages incurred by Landlord by virtue of the occurrence of an event of default hereunder, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant agrees to reimburse Landlord therefore on demand and

24

save Landlord harmless therefrom. Landlord may remedy any such event of default prior to the expiration of the period within which Tenant may remedy such event of default if the remedy of such event of default prior to the expiration of said period is reasonably necessary to protect the Shopping Center or Landlord's interest therein, or to prevent injury to persons or damage to property; provided, however, Landlord shall first give Tenant reasonable notice of its intention to so remedy such event of default other than in the event of an emergency. In the event Tenant fails to reimburse Landlord upon demand for any amount paid for the account of Tenant hereunder, said amount shall be added to and become due as part of the next payment of Basic Rent due and payable hereunder.

(5)    Other Remedies. Such other remedies as are permitted under the terms and provisions of this Lease, by law, or in equity. The remedies of Landlord as set forth in this Lease shall be cumulative and not exclusive and shall be in addition to any and all other remedies which Landlord may have at law in or equity. Landlord shall be entitled to pursue such remedies whether or not this Lease be terminated, and, other sums due and payable hereunder, Landlord shall be permitted to maintain multiple causes of action; provided, however, Landlord shall not have any right to accelerate the Basic Rent or other amounts due and payable hereunder, or to otherwise require payment of such amounts prior to the date on which such amounts would otherwise become due and payable hereunder had such event of default not occurred.

Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the lower of (i) the rate established by the prime rate published in the Wall Street Journal from time to time plus four (4%) percent or (ii) highest rate allowed by law in the state in which the Shopping Center is located (the "Default Rate") on the unpaid, balance until the full amount, with applicable interest, is received from Tenant.

(b)    Landlord shall be in default under this Lease if:

(1)    Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within ten (10) days after receipt of a written statement from Tenant (a "Repayment Default"); or

(2)    Landlord breaches any representation, warranty or covenant set forth in this Lease or fails to perform any other of its obligations under this Lease within thirty (30) days after receipt of notice from Tenant (or, provided Tenant can continue to fully operate its business as contemplated under this Lease, then Landlord shall have such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and promptly prosecutes the same to completion in a reasonable manner).

Following an uncured default by Landlord, in addition to all other rights and remedies in favor of Tenant otherwise provided under this Lease, Tenant may (a) terminate this Lease, (b) exercise any and all remedies available at law or in equity, or (c) without waiving any other rights or remedies otherwise available to Tenant, cure such default and deduct the expense for the cure plus interest at the Default Rate from future Basic Rent, Additional Rent and Percentage Rent until fully reimbursed.

(c)    In the event of an uncured default or a dispute arising out of or in connection with this Lease, the non-defaulting party or in the event of litigation prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

JK 202197.1 80130 00307 09/10/02 02:37pm

28.    CONSTRUCTION RISKS

Nothing in this Lease shall constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center. Tenant shall have no control or authority over the construction of the Store or the Shopping Center beyond the right to reject the tender of the Store for the causes stated in this Lease and to request change orders to be paid by Tenant. Tenant shall not be answerable or accountable for any loss or damage arising from the willful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall protect, defend, hold harmless and indemnify Tenant from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or willful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen, or any of their respective employees, agents, or servants during the construction of the Store and the Shopping Center, or from any faulty construction thereof. Tenant shall protect, defend, hold harmless and indemnify Landlord from and against mechanics', materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or willful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Non-Structural Modifications, Tenant Modifications, and installation of Tenant's Trade Fixtures.

Nothing contained in this Lease shall be deemed, construed or interpreted to imply any consent or agreement on the part of Landlord to subject Landlord's interest or estate in the Premises or the Shopping Center to any liability under any construction, mechanic's or other lien law. In order to comply with the provisions of Section 713.10, Florida Statutes, it is hereby provided that neither Tenant nor anyone claiming by, through or under Tenant, including, but not limited to, contractors, sub-contractors, materialmen, mechanics and laborers, shall have any right to file or place any construction, mechanic's or materialmen's lien of any kind whatsoever upon the Premises or Shopping Center, or any part thereof, or any improvements within the Premises or the Shopping Center, and any such liens are hereby prohibited. All parties with whom Tenant may deal are put on notice that Tenant has no power to subject Landlord's interest to any construction, mechanic's or materialmen's lien of any kind or character, and all such persons so dealing with Tenant must look solely to the credit of Tenant, and not to Landlord's interest or assets. If any construction, mechanic's or other lien is filed against the Premises or the Shopping Center, or any part thereof on account of any work done by or for Tenant, or any person claiming by, through or under Tenant, for improvements or work, the cost of which is the responsibility of Tenant, or any person claiming by, through or under Tenant, Tenant agrees to have such notice or claim of lien canceled and discharged of record (either by payment, transfer to bond or otherwise as permitted by law) within ten (10) days after notice to Tenant by Landlord, and in the event Tenant shall fail to do so, in addition to other remedies available to Landlord hereunder, Landlord shall have the right to cause such lien to be discharged of record by payment, transfer to bond or otherwise, and all costs incurred in connection therewith shall be payable immediately as Additional Rent.

29.    ENVIRONMENTAL CONDITION

(a)    "Hazardous Substance" is defined as any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, toxic substances, wastes, solid wastes and biohazard wastes.

(b)    Landlord. Landlord represents and warrants to Tenant that Landlord has not prior to the Commencement Date, and will not during the Term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other party has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord further represents and warrants that, to its knowledge, no leak, spill,

26

release, discharge, emission or disposal of any Hazardous Substance has occurred in, on or about the Shopping Center to date, and that the soil, groundwater and soil vapor on or under the Shopping Center is free of any Hazardous Substance. Landlord further represents and warrants that, to its knowledge, neither Landlord nor the Shopping Center is subject to any existing, pending or threatened investigation or inquiry by any governmental authority or agency, or subject to any remedial or other obligation under any Legal Requirement. Further there are no facts, conditions or circumstances known to Landlord which could result in any such investigation or inquiry if such facts and circumstance, if any, were fully disclosed to the applicable governmental authority.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by Legal Requirements as a result of any breach of the foregoing representations and warranties and shall indemnify, defend, protect, hold harmless and indemnify Tenant and Guarantor, their officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, settlements, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements and any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision) of any kind or nature whatsoever which may at any time be imposed upon, incurred by, or asserted or awarded against Tenant or Guarantor and arising from or out of any breach of the foregoing representations and warranties. This indemnity shall specifically survive the expiration or early termination of this Lease.

(c) <u>Tenant</u>. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed on, in or about the Store except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Tenant shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by Legal Requirements as a result of any breach of the foregoing representation and warranty and shall indemnify, defend, protect, hold harmless and indemnify Landlord, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, settlements, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements and any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision) of any kind or nature whatsoever which may at any time be imposed upon, incurred by, or asserted or awarded against Landlord and arising from or out of any breach of the foregoing representation and warranty. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Store except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, the indemnification in this Article 29 shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Store or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Store, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

(d) Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by Landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(e) Notwithstanding anything to the contrary in this Lease, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests under this Lease.

27

30.    REPRESENTATIONS AND WARRANTIES

Landlord covenants, represents and warrants that;

(a)    Landlord is the owner of the Shopping Center, subject to the Permitted Exceptions and Landlord further represents and warrants that Landlord has the full right and authority to enter into this Lease and to grant Tenant the rights and easements granted hereunder for the use of the Common Areas within the entire Shopping Center for the full Term and that the provisions of this Lease do not violate or conflict with any mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Shopping Center is subject;

(b)    Landlord has the full right and lawful authority to enter into and perform Landlord's obligations under this Lease for the full Term;

(c)    That if the Premises is presently or shall be at the commencement of the Term, subject to any mortgage(s) or other lien(s), Landlord shall furnish to Tenant within thirty (30) days after the "Execution Date" an agreement of quiet possession or non-disturbance executed by the mortgagee(s) or lien holders, as the case may be, in a form substantially similar to the Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), as set forth in Exhibit "C" with only such changes from said form as shall be acceptable to Tenant. If such SNDA is not executed by the mortgagee(s) and a fully-executed copy thereof delivered to Tenant on or before the Commencement Date, then for the period of time from the Commencement Date until such fully-executed SNDA is delivered to Tenant, there shall not be due and Tenant shall not be required to pay any Basic Rent or Additional Rent.

31.    SUBORDINATE

Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender and securing a loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant a Subordination, Non-disturbance and Attornment Agreement in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Tenant shall comply with any notice received from any Mortgagee pursuant to an SNDA, requesting, requiring, or directing Tenant to pay Basic, Additional, or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, in bankruptcy or in any other action) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall receive full credit under this Lease for any and all Basic, Additional, and Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord.

No Mortgage shall encumber Tenant's Trade Fixtures, inventory, equipment, or any improvements or property that Tenant has the right to remove at the end of the Term. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

32.    ESTOPPEL CERTIFICATE

Each party will, upon not less than fifteen (15) business days after written request from the other party, advise any prospective purchaser, mortgagee, or assignee designated by said party, of the status of this Lease, whether or not the Lease is in full force and effect, whether or not the same has been amended, and to the signatories' knowledge, whether or not the other party is in default, and if in default, specifying the default, in the form attached hereto as Exhibit "E". As to the addressee of such statement, the same shall act as a waiver of any claim by the party furnishing the statement to the extent such claim is based upon facts contrary to those asserted in the statement, to the extent the claim is or could be asserted by a person without knowledge of facts to the contrary to those contained in the statement, who has acted in reasonable reliance upon the statement. Except as stated in the preceding sentence, the party furnishing such statement shall have no liability whatsoever for the failure of such party to disclose correct or relevant information in such statement. If a party requests more than two (2) estoppel certificates in any twelve (12) month period during the first two (2) years of the Term, or more than one (1) estoppel certificate in any twelve (12) month period after the first two (2) years of the Term, then the requesting party shall accompany any such request with a payment of $500.00 as compensation for reviewing and executing each such additional estoppel certificate.

33.    LENDER'S CURE

Contemporaneously with any notice to Landlord, and notwithstanding any provision of this Lease to the contrary, Tenant shall give notice to any Mortgagee (provided that Landlord previously has notified Tenant in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate or off-set the rent payable hereunder, specifying the nature of the default by Landlord. For purposes of the foregoing, Landlord's notice to Tenant shall include specific reference to this **Article 33**, including a statement that, upon such notice being given, the mortgagee named in such notice shall have the same notice and cure rights as Landlord upon a default by Landlord under this Lease. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided under this Lease to Landlord. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

34.    TRANSFER BY LANDLORD

If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of the recorded deed or a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, and (d) such other information as Tenant may reasonably require (collectively the "Transfer Requirements"). The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

No transfer or sale Landlord's interest hereunder shall release Landlord from any of its obligations or duties arising hereunder prior to the transfer. Landlord shall be released of any ongoing obligations hereunder from and after the date of such transfer upon the assumption of all such obligations and duties by the transferee of Landlord; provided, however, that in no event shall Landlord have the right to transfer or sell its interest hereunder prior to the Commencement Date without the written consent of Tenant.

35.    SHORT FORM LEASE

Landlord shall execute a short form of this Lease in the form attached hereto as <u>Exhibit "G"</u>, (the "Short Form Lease"), and cause its recording in the public records of the county or parish in which the Premises are located. The original recorded Short Form Lease shall be returned to Tenant. Neither Landlord nor Tenant shall record this entire Lease.

36.    INTENTIONALLY OMITTED

37.    NOTICES

Notices required or permitted hereunder must be in writing and sent by United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or by overnight express carrier (e.g. UPS, Federal Express, Express Mail) when such overnight express courier can provide evidence of the date of delivery and shall be effective upon delivery or refusal to accept delivery. All such notices shall be sent to the following addresses:

        Landlord :      Skinners of Jacksonville, Inc.
                        2970 Hartley Road, Suite 320
                        Jacksonville, Florida  32257

        or such other address as Landlord may direct from time to time.

        Tenant:         WINN-DIXIE STORES, INC. Re: Store #6
                        Attention:  Director of Asset Management
                        5050 Edgewood Court
                        P. O. Box B
                        Jacksonville, FL 32203-0297

        With a copy to:  Winn-Dixie Stores, Inc.
                        Attn: General Counsel
                        5050 Edgewood Court
                        P.O. Box B
                        Jacksonville, FL 32203-0297

        or to such other address as Tenant may direct from time to time.

38.    ASSIGNMENT AND SUBLEASING

Tenant may assign this Lease, or sublease or vacate the Store in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

If the entire Store is vacated or closed for one (1) year while the Store could have been used for the operation of a general mercantile business (excluding temporary vacations or closing caused by casualty, condemnation, remodeling or the like), then Landlord shall have the option for one hundred eighty (180) days following such vacation or closing, to elect, by written notice, to terminate this Lease.  Such termination notice shall provide for a date of termination not sooner than ninety (90) days following Tenant's receipt of such notice. Notwithstanding the foregoing, Tenant may rescind Landlord's termination notice if (a) Tenant advises Landlord that Tenant had, prior to receipt of such termination notice, been engaged in good faith negotiations to sublease the Premises or assign this Lease to a third party, and Tenant does enter into a binding agreement with such third party to sublease the Premises or assign this Lease within one hundred eighty (180) days of such termination notice, or (b) Tenant notifies Landlord that Tenant intends to reoccupy and reopen the Store and Tenant reoccupies and reopens the Store within two hundred seventy (270) days following

JK 202197.1 80130 00307 09/10/02 02:37pm

Tenant's notice to Landlord.   If Landlord terminates this Lease as provided in this Article 38, and Landlord directly or indirectly enters into a lease with a third party to use or occupy the Premises as a "grocery supermarket" (as that term is defined in Article 8(b) above) within two hundred seventy (270) days following the date of termination of this Lease, Landlord shall pay to Tenant, within thirty (30) days of the date of execution of such Lease, Tenant's unamortized cost of Tenant's leasehold improvements, fixtures and equipment that are not removed by Tenant.

## 39.    GOVERNING LAW

This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located.

## 40.    NO BROKERS

Landlord and Tenant each warrants and represents to the other that, except as specified below, there are no brokers' fees, finders' fees or real estate commissions due in connection with the negotiation or execution of this Lease. Each of Landlord and Tenant hereby agree to indemnify and hold the other harmless from and against any and all costs, expenses, liabilities, causes of action, claims or suit by any party for compensation, commissions, fees or other sums claimed to be due or owing by a person claiming by, through, or under the indemnifying party relating to the transaction contemplated by this Lease.  The sole broker involved  in connection with this Lease is Cantrell Real Estate (Chris Morgan); Landlord agrees that it is responsible for payment of all commissions due to said broker.

## 41.    NO JOINT VENTURE

This is a lease between a landlord and a tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

## 42.    BENEFIT

This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto.  Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

## 43.    TIME

Time of the performance of all covenants, conditions and agreements of this Lease is of the essence.

## 44.    MARGINAL TITLES

The marginal titles appearing in this Lease are for reference only and shall not in any way modify or amend the provisions of this Lease.

31

45.    COMPLETE AGREEMENT

This Lease contains the complete agreement of the parties and supersedes any prior agreement with respect to the subject matter hereof.  This Lease may not be amended or modified and none of its provisions may be waived except by agreement in writing duly executed  by Landlord and Tenant.

46.    NO MERGER

In the event that Tenant becomes the owner of fee title to the Store or the Shopping Center, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates.

47.    FORCE MAJEURE

If there shall occur, during the Term, (a) strike(s), lockout(s), or labor dispute(s); (b) the inability to obtain labor or materials or reasonable substitutes therefor; (c) acts of God, weather conditions, enemy or hostile governmental actions, terrorist acts, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then, except as otherwise provided in Article 11, the period for such performance shall be temporarily excused for such period of time as the Force Majeure exists, and shall be subject to a day-for-day extension of such time period for any delay in performance resulting from Force Majeure, but no longer.

Notwithstanding the foregoing, in order for Landlord to extend the Delivery Date due to an alleged or actual Force Majeure, Landlord must immediately notify Tenant at the commencement of the Force Majeure. Any such extension of the Delivery Date shall last for only so long as the Force Majeure, but in no event more than thirty (30) days.

48.    PARTIAL INVALIDITY

Should any part, term, or provision of this Lease be held illegal or in conflict with any law, the validity of the remaining provisions will not be affected.

49.    NO WAIVER

The exercise by Landlord or Tenant of any right or remedy or of any alternative rights or remedies, granted under this Lease to Landlord or Tenant will not affect or prejudice any other rights or remedies that Landlord and Tenant may have.  The failure of Landlord or Tenant to enforce a breach of a term or condition of this Lease shall not constitute a waiver or estoppel as to the enforcement of a subsequent breach of said term or condition.

50.    RIGHTS CUMULATIVE

All rights, privileges and remedies afforded the parties by this Lease will be deemed cumulative and the exercise of any one of the remedies will not be deemed to be a waiver of any other right, remedy or privilege.

JK 202197.1 80130 00307 09/10/02 02:37pm

51.    JOINT PREPARATION

Lease has been drafted and prepared through the joint efforts of the parties and shall be construed accordingly.

52.    NO THIRD PARTY BENEFITS

Nothing in this Lease, express or implied, is intended to confer upon any person, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Lease.

53.    INTENTIONALLY OMITTED

54.    EXHIBITS

The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | Form of SNDA |
| Exhibit "D" | - | Survey Protocol, including form of Surveyor's Certificate |
| Exhibit "E" | - | Form of Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Form of Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Shopping Center Restaurant Limitations |
| Exhibit "J" | - | Form of Supplemental Lease Agreement |
| Exhibit "K" | - | Architect's Certification |
| Exhibit "L" | - | Approved First Year's Budget |
| Exhibit "M" | - | Monument Sign Plan |
| Exhibit "N" | - | Form of Agreement of Restrictive Covenant |

55.    FLORIDA MANDATED PROVISION

The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

56.    SALES TAX

Tenant shall pay any sales or rent tax due or levied upon the Basic Rent, Additional Rent and other sum payable by Tenant under this Lease, if any, to the extent such sums are subject to sales or rent tax, to Landlord or, at Tenant's option, directly to the taxing authority.

57.    WAIVER OF JURY TRIAL

Landlord and Tenant shall, and they hereby do, knowingly, voluntarily and intentionally, waive trial by jury in any action, proceeding, or counterclaim brought by either of them against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use of the Premises or occupancy of the Store. This waiver of jury trial is a material inducement to the agreement of Landlord and Tenant to enter into this Lease.

58.    LIMITATION ON LANDLORD'S LIABILITY

If Tenant's claims against Landlord for any sums due from Landlord to Tenant pursuant to this Lease, or for the collection or satisfaction of a judgment in connection therewith, are not satisfied by the provisions for offset from rentals as provided herein, then Tenant shall look solely to the estate and property of Landlord and Shopping Center (including, without limitation, (a) all rents or profits from the Shopping Center collected or collectible subsequent to Tenant's notice to Landlord of a default by Landlord hereunder, and subject to the rights of Mortgagees with liens senior to Tenant's leasehold interest in the Premises, and (b) proceeds from the sale or transfer of the Shopping Center), for the satisfaction thereof. No other property or assets of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies and neither Landlord nor any of its partners, members, managers, officers, shareholders, agents or employees, or their successors or assigns, shall be personally liable hereunder. The foregoing shall not be construed to limit Tenant's rights to recover pursuant to any policy of insurance required hereunder.

59.    HEIGHT RESTRICTION

No structure, other than the Store, erected in the Shopping Center shall exceed a maximum vertical building height of twenty-two (22) feet, measured from ground level, unless otherwise approved by Tenant in its sole discretion, or as depicted in the Shopping Center elevations initially approved by Landlord and Tenant.

34

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year first above written.

LANDLORD:

Witnesses:

Print Name: Robert C. Callander, Jr

Print Name: Josh Clark

SKINNERS OF POINT MEADOWS, INC.

By: _____

Print Name: Bryant Skinner Jr.

Its: Vice President

STATE OF Florida    )
COUNTY OF Duval    )

The foregoing instrument was acknowledged before me this September 17, 2002, by Bryant B. Skinner Jr., as Vice President of SKINNERS OF POINT MEADOWS, INC., a Florida corporation, on behalf of the corporation, __X__ who is personally known to me or _____ who has produced _____ as identification.

Printed Name: Charles W. Skinner
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

Charles W. Skinner
Commission # DD089342
Expires Feb. 5, 2006
Bonded Thru
Atlantic Bonding Co., Inc.

35

**TENANT:**

**WINN-DIXIE STORES, INC.**

_Sheila P. Deshong_
Print Name: **SHEILA P. DESHONG**

By: _Dennis M. Sheehan_
Print Name: **DENNIS M. SHEEHAN**
Its: **SENIOR VICE PRESIDENT**

_Sandra K. Parker_
Print Name: **SANDRA K. PARKER**

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this September _17_, 2002, by ___DENNIS M. SHEEHAN___, as __Sr. Vice__ President of **WINN-DIXIE STORES, INC.**, a Florida corporation, on behalf of the corporation, who is personally known to me.

_Rebecca L. Sawyer_
Printed Name: **REBECCA L. SAWYER**
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)



REBECCA L. SAWYER
Notary Public, State of Florida
My comm. expires June 2, 2006
Comm. No. DD 114255

JK 202197.1 80130 00307 09/10/02 04:49pm