LEASE

THIS IS A LEASE ("Lease") dated June _15_, 1995, by and between H. C. PLUNKETT, an individual ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

1. LEASE. For and in consideration of the mutual covenants, conditions and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of all of which are acknowledged, Landlord does hereby lease and demise to Tenant, and Tenant does hereby take and lease from Landlord, a storeroom which is to be constructed by Landlord on that certain parcel of land ("Land") situated on the South side of Lakeland Drive (MS Hwy 25) immediately East of its intersection with Castlewoods Boulevard (Grants Ferry Road) in the County of Rankin and State of Mississippi, being more particularly described in EXHIBIT A attached hereto and made a part hereof, together with all rights, privileges, easements and appurtenances thereto (with the Land, collectively, "Premises").

2. CONSTRUCTION. Landlord shall, at Landlord's expense, construct the Premises according to plans and specifications heretofore approved by Landlord and Tenant. Landlord covenants and agrees that the Premises will be well built, properly constructed, structurally safe and sound, and suitable and fit. It shall be the responsibility of Landlord to insure that the Premises, when completed, satisfy the requirements set forth in said plans and specifications, and are complete and ready for installation of all Tenant's fixtures and equipment.

3. TERM. The primary term of this Lease shall be for a period of twenty (20) years commencing on the earlier of: (a) sixty (60) days after the date the Premises are ready for occupancy (as hereinafter defined); or (b) on the date Tenant opens for business in the Premises; and shall end on the last day of the month following the twentieth (20th) anniversary of the date of commencement. The term "ready for occupancy" shall mean that the Premises are fully completed in accordance with the plans and specifications as provided herein, that all tools, scaffolding, surplus building materials, waste, debris and rubbish of every sort in or about the Premises resulting from Landlord's construction have been removed, that all required certificates of inspection or similar approvals have been delivered to Tenant, and that Tenant is in exclusive possession of the Premises. Landlord shall give Tenant notice specifying the date on which the Premises will be ready for occupancy as hereinabove provided at least seven (7) days in advance thereof. It is understood and agreed that within thirty (30) days after the commencement date of the primary term of this Lease, Landlord and Tenant shall execute a supplemental agreement setting forth the actual commencement date hereof.

4. RENEWAL OPTIONS. Tenant shall be entitled to four (4) successive renewals hereof, each for a term of five (5) years, upon the same terms and conditions as herein set forth, except as to rent, term and number of renewals and, unless Tenant shall notify Landlord not less than one hundred eighty (180) days prior to the expiration of the primary term, or of any renewal thereof, of its intention not to exercise its right to renew this Lease, Tenant shall be deemed to have exercised its option to renew this Lease for the next ensuing term and shall not be required to give Landlord any further notice of its intention to avail itself of such renewal term. In the event Tenant shall give notice of its intention not to exercise its right to renew this Lease, all succeeding renewals shall thereupon terminate.

5. RENT. Tenant shall pay to Landlord as rent for the Premises:
(a) During the primary term of this Lease, the sum of Thirty-four Thousand Eight Hundred Thirty-three and 33/100 Dollars ($34,833.33) per month payable in advance; and
(b) During each renewal term, the sum of Thirty-seven Thousand Two Hundred Seventy-one and 66/100 Dollars ($37,271.66) per month payable in advance.
Rent for any period less than a calendar month shall be prorated.

6. OVERAGE PAYMENT. Tenant agrees to make as additional payment to Landlord a sum of money computed and payable as follows: within sixty (60) days following the end of each lease year, and also within sixty (60) days following any termination of this Lease, Tenant agrees to deliver to the Landlord a statement showing the gross sales (as herein defined) made in or from the Premises during the preceding lease year. Tenant shall pay to Landlord, at the time such statement is delivered, an amount, if any, by which one percent (1%) of gross sales made by Tenant during the preceding lease year exceeds the annual rent and all amounts paid by Tenant for real estate taxes and insurance during such period. The term "gross sales" as used herein, shall mean the total amount of all sales made in or from the Premises after deducting therefrom rebates; refunds; allowances to customers; sales taxes imposed by any governmental authority; cash discounts; sales of tobacco products and alcoholic beverages; cost of trading stamps; receipts from sales of money orders, U.S. Postage stamps or postal or similar services; income from check cashing, collection of utility bills or banking activities; or sales of lottery tickets, hunting or fishing licenses or insurance; or receipts from video or vending machines; or income, sales or excise taxes. The term "lease year" shall mean a period of twelve (12) successive months. If this Lease commences other than on the first day of the month, then the gross sales of the fractional part of the first month shall be included with the gross sales made in the next twelve (12) month period. In the event the Premises are ever occupied under a month-to-month tenancy, the percentage payment hereunder shall either be calculated on an annual basis if the Premises are occupied for a full year or, if not occupied for a full year, shall be calculated on the basis of the sales made in or from the Premises during the proportionate part of the year in which rent is paid for the Premises by Tenant. Payment in such case shall be made within sixty (60) days following the end of each year of such tenancy or other earlier termination of such tenancy. Nothing herein contained shall be construed to indicate that such payments are rentals and Tenant shall at no time be liable for any such payments except those specified herein resulting from actual sales (as hereinabove defined) by Tenant.

7. FIXTURES. Prior to completion of construction by Landlord, Tenant shall have the right and privilege to receive, store and install its trade fixtures in or on the Premises; provided, however, such receiving, storing, and installing shall be in a manner that shall not interfere with Landlord's work. It is expressly agreed by the parties hereto that such action by Tenant shall not constitute acceptance of the Premises. All fixtures and equipment, of whatsoever nature, placed or installed in or upon the Premises by Tenant shall remain its property, and Tenant shall have the right to remove the same at any time; provided, however, Tenant shall repair any damage to the Premises caused by such removal, normal wear and tear excepted.

8. USE OF PREMISES. Tenant shall have the right, at Tenant's sole cost and expense, and in conformity with all applicable laws and ordinances: to use the Premises for any lawful purpose; to construct and install on the Premises any improvements, fixtures and equipment, including advertising signs and billboards, that Tenant may desire; and to make any alterations that Tenant may desire to the Premises and buildings, improvements, fixtures and equipment at any time located thereon, and Landlord hereby consents thereto. Structural changes to the Premises or any building addition or alteration which would reduce the parking area shown in the plans and specifications shall be made only with Landlord's written consent, which

1

Exhibit "A"

consent shall not be unreasonably withheld or delayed. Tenant shall be under no obligation to restore or remove any such alterations or additions at the expiration hereof.

9. **LANDLORD REPAIRS.** Landlord shall, at Landlord's expense, repair and/or replace all structural portions of the Premises constructed by Landlord, when such repair and/or replacement is due, directly or indirectly, to underlying soil conditions, structural movement or defects, or to defective materials or work of Landlord. Landlord has both the right and the responsibility to enter the Premises periodically, at any reasonable time, to inspect the condition of the Premises and make such repairs and/or replacements which shall be completed with due diligence and shall be performed so as to cause the least possible interference with Tenant's operation. Any damage to Tenant's property or otherwise due, directly or indirectly, to such underlying soil conditions, structural movement or defects, or to defective materials or work of Landlord shall be borne by Landlord.

10. **TENANT REPAIRS.** Except as otherwise expressly provided in Paragraph 9, Tenant shall, at Tenant's expense, maintain the Premises in good condition and repair.

11. **HOLD HARMLESS.** Landlord shall hold Tenant harmless from any and all claims which may arise from, on, in or about the Premises when such claims arise out of or are caused in whole or in part by a defective, dangerous, or unsafe condition of the Premises required by the terms hereof to be maintained in good repair by Landlord; and Tenant shall hold Landlord harmless from any and all claims which may arise from, on, in or about the Premises when such claims arise out of or are caused in whole or in part by a defective, dangerous, or unsafe condition of the Premises required by the terms hereof to be maintained in good repair by Tenant.

12. **NET LEASE.** Except as otherwise provided elsewhere in this Lease, it is understood and agreed this is a net lease; that Tenant shall, during the term of this Lease and any renewal thereof, pay all costs of any kind and description levied against the Premises or the uses Tenant makes of it including, but not limited to, all real estate, personal property and other taxes and assessments, utility bills and governmental charges; provided, however, Tenant shall not be required to pay any inheritance, estate, succession or transfer taxes that may be payable by reason of the devolution by descent or testamentary provisions of the Landlord's estate in the Premises, and Tenant shall not be required to pay any income, gift or capital levy or excess profits tax that may be payable by Landlord. Landlord agrees to participate with Tenant in seeking adjustments in real estate tax increases during the term of this Lease or any renewal thereof. Real estate taxes, whether or not then due or payable, shall be prorated at both the commencement and ending dates of the term hereof. At the close of each tax year, Tenant agrees to furnish Landlord, upon request, copies of paid receipts reflecting the payment of all real estate taxes and assessments, or other appropriate evidence of payment.

13. **INSURANCE.** Tenant shall, during the term of this Lease and any renewal thereof, at Tenant's sole cost and expense, carry and maintain:
    (a) Fire and Extended Coverage and Difference in Condition Insurance covering the Premises in an amount equal to at least eighty percent (80%) of the insurable value thereof;
    (b) Public Liability and Property Damage insurance covering the Premises with limits of not less than $1,000,000 Combined Single Limit Bodily Injury and Property Damage for a single accident or occurrence; and
    (c) Loss of Rents insurance for the benefit of Landlord in amount equal to the annualized monthly rent payable by Tenant to Landlord pursuant to the terms of this Lease.

All such insurance shall name Landlord as an additional insured. Blanket policies maintained by Tenant for not less than the amounts set forth above shall be sufficient to comply with the provisions hereof. If the Premises are at any time subject to the lien of a first mortgage, deed of trust or other similar security instrument ("mortgage") and such lienholder so requires, then each hazard insurance policy shall be endorsed with a standard mortgagee rider, or contain a standard mortgagee provision, in favor of such lienholder, but only if the mortgage provides by its terms, or such holder agrees by separate written instrument, that so long as this Lease remains in effect such lienholder shall, upon written request of Landlord or Tenant, release insurance proceeds for repair or restoration of the Premises, as provided herein. Tenant agrees that the term "insurable value" as used herein shall mean "actual replacement cost". Such lienholder shall be furnished with certificates of each insurance policy upon request.

14. **DAMAGE, DESTRUCTION.** In the event the Premises shall be damaged or destroyed, in whole or in part, by fire or other casualty, Tenant shall promptly restore the Premises to substantially the same condition as they were immediately prior to such damage or destruction and, until restored, there shall be an abatement or a proportionate reduction of the rent, and all proceeds of insurance required to be carried and maintained by Tenant hereunder, including any amounts paid to Landlord for its interest therein, shall be applied to such restoration, provided that, during the last two (2) years of the initial term and during any renewal term, said proceeds may, at the option of Tenant, in lieu of restoring the Premises, be applied as follows: (a) to the satisfaction in full of any first mortgage or deed of trust on the Premises; and (b) to Landlord; whereupon this Lease shall terminate and all obligations of the parties hereunder shall cease. Said option shall be exercised by Tenant by giving Landlord notice within thirty (30) days of such damage or destruction.

15. **CONDEMNATION.** In the event that, during the term of this Lease and any renewal thereof, the entire Premises is taken by any governmental or quasi-governmental authority by exercise of the power of eminent domain, Tenant may terminate this Lease by reason of such taking at the time possession is surrendered to such authority. In the event that only such portion of the Premises is acquired by such authority by the exercise of such power as will leave the remaining Premises, after alterations and repairs, in a condition suitable for use by Tenant in its business, Landlord agrees to make promptly, at Landlord's sole cost and expense, all necessary alterations and repairs which shall be required, because of such partial acquisition, to restore the Premises to proper tenantable condition. Until the Premises are restored to proper tenantable condition, rent shall abate. Thereafter the rent shall be reduced in proportion to the area of the Premises lost. For the purposes of this paragraph, acquisition of all or part of the Premises by governmental or quasi-governmental authority by means of voluntary negotiations or contract shall be deemed to be acquisition by exercise of the power of eminent domain. If any street or adjoining right-of-way is obstructed or blocked for construction, repairs, reconstruction or otherwise, to the extent the operation of Tenant's business is adversely affected, a proportionate reduction of rent shall be made. If customer access to the Premises is blocked, rent shall abate. Notwithstanding anything herein to the contrary, there shall be no reduction or abatement of rent if Tenant's business shall be adversely affected by any of the enumerated events if such events are caused by third parties over whom Landlord has no control, provided Landlord uses its best efforts to prevent or minimize any such interference.

16. **LANDLORD'S WARRANTIES.** Landlord and Tenant acknowledge that Landlord, as Buyer, and Tenant, as Seller, have entered into a Purchase and Sale Agreement of even date herewith covering the Land, and that this Lease is subject to Landlord acquiring the Land pursuant to the terms of said agreement. Landlord covenants that Landlord will acquire good and marketable title to the Land and the right to enter into this

2

Lease for the term aforesaid and upon the conditions set forth herein; that upon the commencement of the term of this Lease, the Premises shall be free and clear of any and all encumbrances except those set forth in the deed of conveyance contemplated by the Purchase and Sale Agreement; and that Landlord shall put Tenant into complete and exclusive possession of the Premises at the commencement of the term hereof, free from all orders, restrictions and notices of any public or quasi-public authority; that if Tenant shall pay the rental and perform all of the covenants and provisions of this Lease to be performed by Tenant, Tenant shall, during the term demised, freely, peaceably and quietly occupy and enjoy the full possession of the Premises, and the tenements, hereditaments and appurtenances thereto belonging and the rights and privileges granted without molestation or hindrance, lawful or otherwise; and that if, at any time during the term demised the title of the Landlord shall fail or for any reason it shall appear that Landlord is unable to make this Lease for the term or on the conditions set forth herein, such shall constitute a default by Landlord hereunder.

17. **RECORDING.** A Memorandum of Lease, for recording only, has been executed simultaneously with this Lease and shall be recorded prior to the recording of any mortgage, deed of trust, lease or other lien or encumbrance against the Premises (except those set forth in Paragraph 16 hereof) so that said mortgage, deed of trust, lease or other lien or encumbrance shall be subject and subordinate to this Lease. Landlord and Tenant agree that only the Memorandum of Lease shall be recorded.

18. **SUBORDINATION.** Tenant agrees that this Lease may be made subject and subordinate to the lien of any first mortgage or deed of trust that may be placed on the Premises by Landlord; provided, however, as a condition to such subordination, Landlord shall obtain from any such mortgagee or trustee a subordination, non-disturbance and attornment agreement, in a form acceptable to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, its tenancy shall be and remain undisturbed, that this Lease shall not be affected by any default under any such mortgage or deed of trust, and that in the event of foreclosure or any enforcement of any such mortgage or deed of trust, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect. Tenant agrees that it will give notice to any holder of a first mortgage or deed of trust encumbering the Premises (provided Tenant has first been given notice of the name and address of such holder) of any defaults of the Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage or deed of trust shall have the right, but not the obligation, to cure such default, and Tenant will not terminate this Lease or abate the rental payable hereunder by reason of such default unless and until it has afforded such holder thirty (30) days after such notice in which to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty (30) day period.

19. **ESTOPPEL CERTIFICATES.** Tenant agrees, at any time and from time to time, upon not less than fifteen (15) days prior notice by Landlord, to execute, acknowledge and deliver, without charge, to Landlord or to any person designated by Landlord, estoppel certificates to the effect that this Lease is unmodified (or, if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that no notice of default has been served on Landlord (or if Tenant has served such notice, that the same has been revoked, if such be the case), that Tenant has no claims, defenses or offsets against Landlord hereunder (or, if Tenant has any such claims, defenses or offsets specifying the same), the date to which any rentals or other amounts payable by Tenant hereunder have been paid by Tenant, and the current addresses to which notices hereunder should be sent.

20. **RESTRICTIVE COVENANT.** Landlord covenants and agrees, from and after the date hereof and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any other premises owned or controlled, directly or indirectly, either by Landlord, their successors, heirs, or assigns, or Landlord's principal owners, partners, stockholders, directors, or officers, or their assigns ("Owners"), which are within five (5) miles of the Premises for the purpose of conducting therein, or for use as, a food store, food department or pharmacy, or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, or for the storage or sale of prescription drugs and medical supplies, or any of them; and further, that if Landlord or Owners own any land, or hereinafter during the term of this Lease, Landlord or Owners acquire any land within such distance of the Premises, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this Lease; provided, however, that if the initial first Mortgagee shall become the owner of the Premises, this paragraph shall not be applicable to any property, other than the Premises, which such Mortgagee may then or thereafter own. If Tenant shall have received notice of assignment of its Lease to such Mortgagee, Tenant shall give notice to both Landlord and Mortgagee of any current violation hereof, and shall allow sixty (60) days after the date of such notice for rectification of such violation prior to exercising other rights provided hereunder. This covenant shall run with the land. Landlord acknowledges that in the event of any breach hereof Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled to terminate this Lease or to relief by injunction, or otherwise at Tenant's option, and Tenant's remedies shall be cumulative rather than exclusive.

21. **ASSIGNMENT, SUBLEASING.** Tenant may assign this Lease, in whole or in part, and/or may sublease in whole or in part, the Premises, without Landlord's consent, but in the event of such assignment and/or subleasing, Tenant will still remain liable to Landlord for performance of all of the terms and conditions of this Lease.

22. **NOTICES.** Rent and other sums due hereunder shall be sent to Landlord at:

> 1520 North State Street
> Jackson, MS 39202

All notices required under this Lease shall be in writing and shall be deemed properly served if hand delivered, or sent certified or Express Mail, or by Federal Express or similar courier service, with acknowledgment of receipt, postage or fee prepaid, to Landlord at the above address or to Tenant at:

> P. O. Box 3409 (Zip: 39207)
> 453 North Hill Street
> Jackson, MS 39202
> Attn: C. O. Staley

or to any subsequent address which either may designate by notice to the other for such purpose. Date of service of any notice shall be the date on which such notice is deposited in the mail or with the courier service directed to the appropriate address as set forth herein.

23. **DEFAULT BY TENANT.** The failure of Tenant to pay any rent or other charges payable under this Lease on or before the due date of the same and the continued failure to pay the same for ten (10) days after notice thereof, or the failure of Tenant to fully and promptly perform any other act required of it in

3

the performance of this Lease or to otherwise comply with any other term or provision hereof and the continuance of such default remains uncorrected for a period of thirty (30) days after notice thereof (unless such default is of a nature that cannot be cured within thirty (30) days and Tenant has within said period of time commenced to cure the same and thereafter, with due diligence, effects the curing of same) shall constitute a default by Tenant. In the event of any such default by Tenant, Landlord may: (a) perform such obligations on behalf, and at the expense, of Tenant, and Tenant shall reimburse Landlord promptly upon demand any and all amounts so paid by Landlord as additional rents secured hereunder; or (b) terminate this Lease and Tenant's rights hereunder, and declare all matured rents and other matured sums due and payable; or (c) re-enter Premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet the Premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of the Premises and of any repairs and alterations necessary to prepare the Premises for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. Landlord's remedies as provided herein shall not be deemed to be all-inclusive of Landlord's remedies as Landlord, in addition, shall have all remedies available to Landlord at law and in equity provided Landlord shall, in all instances, be required to mitigate damages. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within one hundred eighty (180) days after such appointment then, in that event, Landlord may terminate this Lease by notice to Tenant; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall effect this Lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or any person claiming by or through Tenant.

24. **DEFAULT BY LANDLORD.** The failure of Landlord to fully and promptly perform any act required of Landlord in the performance of this Lease including, but not limited to repairs and/or replacements required of Landlord pursuant to Paragraph 9 hereof, or to otherwise comply with any other term or provision hereof and such default continues for a period of thirty (30) days after notice thereof (unless such default is of a nature that cannot be cured within thirty (30) days and Landlord has within said period of time commenced to cure the same and thereafter, with due diligence, effects the curing of same) shall constitute a default by Landlord. In the event of any such default by Landlord, Tenant may: (a) make such repairs and/or replacements and/or perform such other obligations all on behalf, and at the expense, of Landlord and Landlord shall reimburse Tenant promptly upon demand any and all amounts so paid by Tenant failing which Tenant may, without liability or forfeiture of its term or terms herein, deduct such amounts from the rent thereafter payable; (b) abate the rent for such time as such default shall continue after the expiration of said thirty (30) day period; (c) terminate this Lease by giving Landlord written notice thereof; and/or (d) sue for injunctive relief, specific performance, and/or damages, as the case may be. Tenant's remedies as provided herein shall not be deemed to be all-inclusive of Tenant's remedies as Tenant, in addition, shall have all remedies available to Tenant at law and in equity. The performance of each and every agreement herein contained on the part of Landlord to be performed shall be a condition precedent to the right of Landlord to collect rent and other sums hereunder and/or to enforce the terms of this Lease against Tenant. Notwithstanding anything contained herein to the contrary, Tenant may, at any time, make emergency repairs otherwise required to be made by Landlord on behalf, and at the expense, of Landlord and Landlord shall reimburse Tenant promptly upon demand any and all amounts so paid by Tenant failing which Tenant may, without liability or forfeiture of its term or terms herein, deduct such amounts from the rent thereafter payable. Tenant agrees to give simultaneous notice to any first mortgagee of the Premises (whose name and address shall have been furnished Tenant) of Tenant's demand of Landlord for reimbursement. Emergency repairs shall be deemed those necessary for prevention of eminent injury of persons or damage to property. Landlord hereby releases Tenant from any and all liability with respect to any repairs, replacements and/or other obligations undertaken by Tenant on behalf of Landlord.

25. **PURCHASE REFUSAL.** If at any time during the term of this Lease or any renewal thereof, or any tenancy thereafter, Landlord receives from a ready, willing and able purchaser (other than a member of Landlord's immediate family or a corporation whose stock is wholly owned by Landlord and/or members of such family) an acceptable bona fide offer to purchase, or makes a bona fide offer to sell to such purchaser, the Premises; Landlord shall give Tenant notice, specifying the name and address of the purchaser and the price and terms of the offer, accompanied by Landlord's affidavit that the proposed sale is in good faith. Tenant shall thereupon have the prior option to purchase the Premises, at the price and on the terms of the offer which option Tenant may exercise by giving Landlord notice within thirty (30) days after Tenant's receipt of Landlord's notice of the offer. Tenant's failure, at any time, to exercise its option hereunder shall not affect this Lease or the continuance of Tenant's rights and options under this paragraph. Any sale of the Premises shall be subject to the terms of this Lease.

If the Premises are at any time subject to the lien of a first mortgage, deed of trust or other similar security instrument ("mortgage"), notwithstanding the provisions of this paragraph, Tenant's right of first refusal to purchase the Premises shall not apply to a purchase at a foreclosure sale or similar proceeding or to a conveyance in lieu thereof by such lienholder, but shall survive such sale or conveyance and thereafter apply to any subsequent bona fide offer to purchase received by and acceptable to the successor landlord.

In order for Tenant to exercise its right to purchase the Premises hereunder, Tenant agrees either, at the sole option of the Tenant: (a) to pay off the outstanding indebtedness including principal and interest and any prepayment penalty of the mortgage; or (b) to take title subject to the mortgage and expressly assume all of the terms, covenants and conditions of such mortgage and expressly agrees to become fully liable on the promissory note or other evidence of indebtedness. In the event Tenant exercises such right to purchase the Premises, Tenant agrees to notify the holder of the mortgage simultaneously when notifying Landlord of its election.

26. **SURRENDER, HOLDOVER.** At the expiration or any prior termination of the term of this Lease, and any renewal thereof, Tenant shall surrender possession of the Premises to Landlord, together with all buildings and improvements thereon in as good condition and repair as when received, normal wear and tear and damage and/or destruction by casualty excepted, subject, however, to Tenant's rights under Paragraphs 7 and 8 hereof. Failure by Tenant to surrender the Premises and any holding over by Tenant shall not operate, except by express mutual agreement between the parties hereto, to extend or renew this Lease and in the absence of such agreement, either party may thereafter terminate such occupancy at the end of any calendar month by first giving to the other party at least thirty (30) days notice of the intention to so terminate. Surrender of the Premises by Tenant shall likewise include surrender of the Premises by any subtenant(s) holding over through Tenant.

27. **FORCE MAJEURE.** Anything in this Lease to the contrary notwithstanding, neither Landlord nor Tenant shall be deemed in default with respect to the performance of any of the terms, conditions or covenants of this Lease to be performed by either of them if such failure or performance shall be due to any strike, labor dispute, picketing, inability to obtain necessary materials, Act of God, or due to any other similar

4

cause whatever beyond the control of either party, and the time for performing by Landlord and/or Tenant shall be extended by the period of delay resulting from or due to any of said causes

28. **GENERAL PROVISIONS.** Time is of the essence of this Lease, but no delay or failure of either party to exercise any right hereunder or to insist upon strict compliance with the terms and provisions hereof shall constitute a waiver of any right hereunder or a waiver of the right thereafter to insist upon strict compliance with the terms and provisions hereof. No obligation not stated herein shall be imposed on either party hereto.

The headings in this Lease are for convenience only and are not part of this Lease and do not in any way limit or amplify the terms and provisions hereof.

Landlord shall not be construed or held to be a partner or associate of Tenant in the conduct of Tenant's business, it being expressly understood and agreed that the relationship between the parties hereto is, and shall at all times remain during the term of this Lease, that of Landlord and Tenant.

In the event of any litigation between the parties involving this Lease, the non-prevailing party to such litigation shall reimburse the prevailing party for its reasonable attorney fees.

This is a Mississippi contract and is to be construed in accordance with, and governed by, the laws of the State of Mississippi.

29. **ENTIRETY, EXECUTION, SUCCESSION.** This Lease merges and supersedes all prior representations and agreements, and constitutes the entire contract between Landlord and Tenant concerning the leasing of the Premises and the consideration therefor. Neither this Lease nor any agreement amending, supplementing or terminating this Lease shall be binding on Tenant unless and until it is signed in Tenant's behalf by a representative duly authorized by its Board of Directors. This Lease and all options herein shall bind and inure to the benefit of Landlord, his heirs, executors, administrators, successors and assigns, and Tenant, its successors and assigns.

30. **AUTHORITY.** Each party executing this Lease represents and warrants that they are a party hereto, or an agent of a party hereto, duly authorized to execute this Lease on behalf of such party and to bind that party to the performance of such party's obligation hereunder.

EXECUTED as of the date first herein specified.

LANDLORD:

By: _____
N. C. Plunkett

TENANT:

JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____
W. H. Holman, Jr., President

Attest: _____
Roger P. Friou, Secretary

## EXHIBIT A

A certain parcel of land being situated in the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi and being more particularly described as follows:

Commence at the Northwest corner of Lot 19 Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, August, 1995) run thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 198.86 feet to the POINT OF BEGINNING of the parcel of land herein described, from said POINT OF BEGINNING, continue thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 46.90 feet to the Point of Curvature of a 10.4093 degree curve bearing to the left having a central angle of 18 degrees 07 minutes 00 seconds and a radius of 550.43 feet, run thence along said East right-of-way line of Castlewoods Boulevard and along the arc of said 10.4093 degree curve bearing to the left having a chord bearing of North 29 degrees 00 minutes 19 seconds West and a chord distance of 3.10 feet to the Southwest corner of the La Petite Academy property, run thence North 70 degrees 03 minutes 47 seconds East along the South line of said La Petite Academy property for a distance of 219.90 feet to the Southeast corner thereof, run thence North 19 degrees 56 minutes 13 seconds West along said South line of the La Petite Academy property and its northerly extension thereof for a distance of 190.12 feet to a point on the South right-of-way line of Mississippi State Highway 25 (as now laid out and in use, August, 1995), run thence the following bearings and distances along said South right-of-way line of Mississippi State Highway 25: North 68 degrees 19 minutes 59 seconds East for a distance of 96.97 feet, North 75 degrees 30 minutes 17 seconds East for a distance of 349.54 feet, North 76 degrees 21 minutes 24 seconds East for a distance of 199.90 feet to a point being described as Point "DA" according to Mississippi State Highway Department Project #SP-0056-1(2), leaving said South right-of-way line of Mississippi State Highway 25, run thence South 13 degrees 38 minutes 36 seconds East for a distance of 76.19 feet to a point, run thence South 35 degrees 09 minutes 27 seconds West for a distance of 120.06 feet to the Point of Curvature of a 99.644722 degree curve bearing to the left having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 57.50 feet, run thence along the arc of said 99.644722 degree curve bearing to the left a chord bearing of South 05 degrees 48 minutes 88 seconds West and a chord distance of 81.32 feet to the Point of Tangency of said curve, run thence South 39 degrees 11 minutes 52 seconds East for a distance of 99.00 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 170.00 feet to a point; run thence South 01 degrees 25 minutes 00 seconds East for a distance of 53.55 feet to a point, run thence South 70 degrees 33 minutes 04 seconds West for a distance of 120.99 feet to a point, run thence North 89 degrees 51 minutes 00 seconds West for a distance of 248.54 feet to a point, run thence North 19 degrees 56 minutes 13 seconds West for a distance of 35.00 feet to a point, run thence South 85 degrees 19 minutes 49 seconds West for a distance of 41.34 feet to a point, run thence South 70 degrees 03 minutes 47 seconds West for a distance of 180.00 feet to the POINT OF BEGINNING containing 5.518 acres, more or less.

Less and Except

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, August, 1995), run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 157.64 feet to a point, run thence North 02 degrees 00 minutes 00 seconds West for a distance of 162.88 feet to the POINT OF BEGINNING of the parcel of land herein described, from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 34.38 feet to a point, run thence North 50 degrees 48 minutes 08 seconds East for a distance of 124.00 feet to a point; run thence South 39 degrees 11 minutes 52 seconds East for a distance of 100.60 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 43.96 feet to a point, run thence North 89 degrees 51 minutes 00 seconds West for a distance of 103.51 feet to the POINT OF BEGINNING, containing 0.234 acres, more or less.

And Also

A certain twenty foot (20') wide sanitary sewer easement being situated in the Northwest 1/4 of the Northeast 1/4 of Section 20 and the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, August, 1995), run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 363.34 feet to a point, run thence North 20 degrees 00 minutes 00 seconds West for a distance of 37.55 feet to the POINT OF BEGINNING of the parcel of land herein described, from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 20.00 feet to a point, run thence North 50 degrees 48 minutes 08 seconds East for a distance of 56.45 feet to a point, run thence South 39 degrees 51 minutes 00 seconds East for a distance of 31.54 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 50.84 feet to the POINT OF BEGINNING containing 0.032 acres, more or less.

MEMORANDUM OF LEASE

THIS IS A LEASE ("Lease") dated June 15, 1995, by and between H. C. PLUNKETT, an individual ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

LANDLORD has leased and demised, and does hereby lease and demise to Tenant, a storeroom which is to be constructed by Landlord on that certain parcel of land ("Land") situated on the South side of Lakeland Drive (MS Hwy 25) immediately East of its intersection with Castlewoods Boulevard (Grants Ferry Road) in the County of Rankin and State of Mississippi, being more particularly described in EXHIBIT A attached hereto and made a part hereof, together with all rights, privileges, easements and appurtenances thereto (with the Land, collectively, "Premises"), for a period of twenty (20) years commencing on the earlier of: sixty (60) days after the date the storeroom is ready for occupancy, or on the date Tenant opens for business; with options in Tenant to renew the Lease for four (4) additional periods of five (5) years each; and upon all other covenants and conditions of the Lease between Landlord and Tenant of even date herewith which is, by this reference, incorporated herein and made a part hereof. Said Lease also contains certain subordination requirements and the following restrictive covenant:

"Landlord covenants and agrees, from and after the date hereof and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any other premises owned or controlled, directly or indirectly, either by Landlord, their successors, heirs, or assigns, or Landlord's principal owners, partners, stockholders, directors, or officers, or their assigns ("Owners"), which are within five (5) miles of the Premises for the purpose of conducting therein, or for use as, a food store, food department or pharmacy, or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, of for the storage or sale of prescription drugs and medical supplies, or any of them; and further, that if Landlord or Owners own any land, or hereinafter during the term of this Lease, Landlord or Owners acquire any land within such distance of the Premises, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this Lease; provided, however, that if the initial first Mortgagee shall become the owner of the Premises, this paragraph shall not be applicable to any property, other than the Premises, which such Mortgagee may then or thereafter own. If Tenant shall have received notice of assignment of its Lease to such Mortgagee, Tenant shall give notice to both Landlord and Mortgagee of any current violation hereof, and shall allow sixty (60) days after the date of such notice for rectification of such violation prior to exercising other rights provided hereunder. This covenant shall run with the land. Landlord acknowledges that in the event of any breach hereof Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled to terminate this Lease or to relief by injunction, or otherwise, at Tenant's option, and Tenant's remedies shall be cumulative rather than exclusive."

EXECUTED as of the date first herein specified.

LANDLORD:

By: _____
H. C. Plunkett

TENANT:

JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____
W. H. Holman, Jr., President

Attest: _____
Roger P. Friou, Secretary

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named H. C. Plunkett, an individual, who acknowledged that he signed, executed and delivered the above and foregoing instrument as his voluntary act and deed.

Given under my hand and seal of office, this 15th day of June, 1995.

*Sandra Pierro*
Notary Public

My commission expires:

NOTARY PUBLIC STATE OF MISSISSIPPI AT LARGE
MY COMMISSION EXPIRES: May 29, 1998.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.


STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this 29TH day of JUNE, 1995.

Notary Public

My commission expires:

MY COMMISSION EXPIRES JULY 25, 1995

## EXHIBIT A

A certain parcel of land being situated in the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods 1-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, August, 1995), run thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 190.86 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, continue thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 46.90 feet to the Point of Curvature of a 10.4093 degree curve bearing to the left having a central angle of 18 degrees 03 minutes 00 seconds and a radius of 550.53 feet, run thence along said East right-of-way line of Castlewoods Boulevard and along the arc of said 10.4093 degree curve bearing to the left having a chord bearing of North 20 degrees 06 minutes 19 seconds West and a chord distance of 3.10 feet to the Southwest corner of the La Petite Academy property, run thence North 70 degrees 03 minutes 47 seconds East along the South line of said La Petite Academy property for a distance of 219.99 feet to the Southeast corner thereof, run thence North 19 degrees 56 minutes 13 seconds West along said South line of the La Petite Academy property and its northerly extension thereof for a distance of 290.12 feet to a point on the South right-of-way line of Mississippi State Highway 25 (as now laid out and in use, August, 1995), run thence the following bearings and distances along said South right-of-way line of Mississippi State Highway 25: North 65 degrees 19 minutes 59 seconds East for a distance of 96.97 feet, North 75 degrees 30 minutes 17 seconds East for a distance of 349.54 feet, North 76 degrees 21 minutes 24 seconds East for a distance of 199.90 feet to a point being described as Point "DA" according to Mississippi State Highway Department Project #SP-0056-1(2) leaving said South right-of-way line of Mississippi State Highway 25, run thence South 13 degrees 35 minutes 36 seconds East for a distance of 76.19 feet to a point, run thence South 35 degrees 59 minutes 27 seconds West for a distance of 126.06 feet to the Point of Curvature of a 99.644722 degree curve bearing to the left having a central angle of 99 degrees 00 minutes 00 seconds and a radius of 57.50 feet, run thence along the arc of said 99.644722 degree curve bearing to the left a chord bearing of South 05 degrees 48 minutes 08 seconds West and a chord distance of 81.32 feet to the Point of Tangency of said curve, run thence South 39 degrees 11 minutes 52 seconds East for a distance of 99.00 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 178.00 feet to a point, run thence South 01 degrees 15 minutes 00 seconds East for a distance of 54.55 feet to a point, run thence South 70 degrees 33 minutes 04 seconds West for a distance of 130.79 feet to a point, run thence North 89 degrees 51 minutes 00 seconds West for a distance of 248.54 feet to a point, run thence North 19 degrees 56 minutes 13 seconds West for a distance of 35.00 feet to a point, run thence South 25 degrees 19 minutes 48 seconds West for a distance of 41.34 feet to a point, run thence South 70 degrees 03 minutes 47 seconds West for a distance of 180.00 feet to the POINT OF BEGINNING, containing 5.518 acres, more or less.

Less and Except

Commence at the Northwest corner of Lot 19, Castlewoods 1-B, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use August, 1995), run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods 1-D for a distance of 257.64 feet to a point, run thence North 02 degrees 00 minutes 00 seconds West for a distance of 162.58 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 34.38 feet to a point, run thence North 50 degrees 48 minutes 03 seconds East for a distance of 124.00 feet to a point, run thence South 39 degrees 11 minutes 52 seconds East for a distance of 100.00 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 43.96 feet to a point, run thence North 89 degrees 51 minutes 00 seconds West for a distance of 103.51 feet to the POINT OF BEGINNING, containing 0.224 acres, more or less.

And Also

A certain twenty foot (20') wide sanitary sewer easement being situated in the Northwest 1/4 of the Northeast 1/4 of Section 20 and the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E Rankin County Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods 1-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7, said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and use, August, 1995), run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods 1-D for a distance of 363.34 feet to a point, run thence North 20 degrees 00 minutes 00 seconds West for a distance of 37.55 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 20.00 feet to a point, run thence North 50 degrees 48 minutes 03 seconds East for a distance of 56.45 feet to a point, run thence South 89 degrees 51 minutes 00 seconds East for a distance of 71.43 feet to a point, run thence South 50 degrees 48 minutes 08 seconds West for a distance of 80.83 feet to the POINT OF BEGINNING, containing 0.032 acres, more or less.

### MEMORANDUM OF LEASE

THIS IS A LEASE ("Lease") dated June __15__, 1995, by and between H. C. PLUNKETT, an individual ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant")

LANDLORD has leased and demised, and does hereby lease and demise to Tenant, a storeroom which is to be constructed by Landlord on that certain parcel of land ("Land") situated on the South side of Lakeland Drive (MS Hwy 25) immediately East of its intersection with Castlewoods Boulevard (Grants Ferry Road) in the County of Rankin and State of Mississippi, being more particularly described in EXHIBIT A attached hereto and made a part hereof, together with all rights, privileges, easements and appurtenances thereto (with the Land, collectively, "Premises"), for a period of twenty (20) years commencing on the earlier of: sixty (60) days after the date the storeroom is ready for occupancy, or on the date Tenant opens for business; with options in Tenant to renew the Lease for four (4) additional periods of five (5) years each, and upon all other covenants and conditions of the Lease between Landlord and Tenant of even date herewith which is, by this reference, incorporated herein and made a part hereof. Said Lease also contains certain subordination requirements and the following restrictive covenant:

"Landlord covenants and agrees, from and after the date hereof and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any other premises owned or controlled, directly or indirectly, either by Landlord, their successors, heirs, or assigns, or Landlord's principal owners, partners, stockholders, directors, or officers, or their assigns ("Owners"), which are within five (5) miles of the Premises for the purpose of conducting therein, or for use as, a food store, food department or pharmacy, or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, or for the storage or sale of prescription drugs and medical supplies, or any of them, and further, that if Landlord or Owners own any land, or hereinafter during the term of this Lease, Landlord or Owners acquire any land within such distance of the Premises, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this Lease, provided, however that if the initial first Mortgagee shall become the owner of the Premises this paragraph shall not be applicable to any property other than the Premises, which such Mortgagee may then or thereafter own. If Tenant shall have received notice of assignment of its Lease to such Mortgagee, Tenant shall give notice to both Landlord and Mortgagee of any current violation hereof, and shall allow sixty (60) days after the date of such notice for rectification of such violation prior to exercising other rights provided hereunder. This covenant shall run with the land. Landlord acknowledges that in the event of any breach hereof Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled to terminate this Lease or to relief by injunction, or otherwise at Tenant's option, and Tenant's remedies shall be cumulative rather than exclusive."

EXECUTED as of the date first herein specified

LANDLORD:

By: _____[signature]_____
    H. C. Plunkett

TENANT:

JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____[signature]_____
    W. H. Holman, Jr., President

Attest _____[signature]_____
    Roger P. Friou, Secretary

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named H. C. Plunkett, an individual, who acknowledged that he signed, executed and delivered the above and foregoing instrument as his voluntary act and deed.

Given under my hand and seal of office this 15th day of June, 1995.

_____
Notary Public

My commission expires:

NOTARY PUBLIC STATE OF MISSISSIPPI AT LARGE.
MY COMMISSION EXPIRES May 29, 1998.
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this 29TH day of JUNE, 1995.

_____
Notary Public

My commission expires

MY COMMISSION EXPIRES JULY 25, 1995

## EXHIBIT A

A certain parcel of land being situated in the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and on use, November, 1995); run thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 190.85 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, continue thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 46.99 feet to the Point of Curvature of a 10.1093 degree curve bearing to the left having a central angle of 13 degrees 07 minutes 00 seconds and a radius of 550.53 feet; run thence along said East right-of-way line of Castlewoods Boulevard and along the arc of said 10.1093 degree curve bearing to the left having a chord bearing of North 26 degrees 06 minutes 19 seconds West and a chord distance of 5.19 feet to the Southwest corner of the La Petite Academy property; run thence North 70 degrees 03 minutes 47 seconds East along the South line of said La Petite Academy property for a distance of 215.90 feet to the Southeast corner thereof; run thence North 19 degrees 56 minutes 13 seconds West along said South line of the La Petite Academy property and its northerly extension thereof for a distance of 290.12 feet to a point on the South right-of-way line of Mississippi State Highway 25 (as now laid out and in use, November, 1995); run thence the following bearings and distances along said South right-of-way line of Mississippi State Highway 25: North 68 degrees 19 minutes 59 seconds East for a distance of 56.97 feet; North 75 degrees 30 minutes 17 seconds East for a distance of 349.54 feet; North 76 degrees 31 minutes 31 seconds East for a distance of 199.90 feet to a point being described as Point "DA" according to Mississippi State Highway Department Project #SP-0056-1(2), leaving said South right-of-way line of Mississippi State Highway 25; run thence South 13 degrees 38 minutes 34 seconds East for a distance of 76.19 feet to a point; run thence South 25 degrees 09 minutes 27 seconds West for a distance of 122.37 feet to the Point of Curvature of a 99.644722 degree curve bearing to the left having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 57.50 feet; run thence along the arc of said 99.644722 degree curve bearing to the left a chord bearing of South 69 degrees 50 minutes 06 seconds West and a chord distance of 81.32 feet to the Point of Tangency of said curve; run thence South 39 degrees 11 minutes 52 seconds East for a distance of 99.06 feet to a point; run thence South 50 degrees 48 minutes 46 seconds West for a distance of 170.00 feet to a point; run thence South 01 degrees 25 minutes 00 seconds East for a distance of 54.35 feet to a point; run thence South 70 degrees 13 minutes 04 seconds West for a distance of 120.99 feet to a point; run thence North 89 degrees 31 minutes 05 seconds West for a distance of 148.51 feet to a point; run thence North 68 degrees 56 minutes 05 seconds West for a distance of 60.80 feet to a point; run thence South 78 degrees 13 minutes 49 seconds West for a distance of 180.90 feet to the POINT OF BEGINNING, containing 5.431 acres, more or less.

Less and Except

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 76 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 257.64 feet to a point; run thence North 22 degrees 00 minutes 00 seconds West for a distance of 162.34 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 34.33 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 99.00 feet to a point; run thence South 39 degrees 11 minutes 52 seconds East for a distance of 72.00 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 55.33 feet to a point; run thence North 39 degrees 51 minutes 06 seconds West for a distance of 56.19 feet to the POINT OF BEGINNING containing 0.141 acres, more or less.

And Also

A certain twenty foot (20') wide sanitary sewer easement being situated in the Northwest 1/4 of the Northwest 1/4 of Section 20 and the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 76 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 363.24 feet to a point; run thence North 20 degrees 00 minutes 00 seconds West for a distance of 37.55 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 20.00 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 38.45 feet to a point; run thence South 39 degrees 51 minutes 00 seconds East for a distance of 31.56 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 10.84 feet to the POINT OF BEGINNING containing 0.023 acres, more or less.