*от ос а*

BOOK **766** PAGE **214**

## ABSOLUTE ASSIGNMENT OF RENTS AND PROFITS
## AND COLLATERAL ASSIGNMENT OF LEASES

THIS ABSOLUTE ASSIGNMENT OF RENTS AND PROFITS AND COLLATERAL ASSIGNMENT OF LEASES (this "Assignment") is dated as of __May 13, 1996__, and is by and between __H. CONNELY PLUNKETT__, a resident of the State __of Mississippi__ ("Assignor") and JEFFERSON-PILOT LIFE INSURANCE COMPANY, a North Carolina corporation ("Assignee").

### R E C I T A L S

Assignor is the owner in fee simple of that certain parcel of real property and all improvements thereon situated in __Rankin County, Mississippi__ more particularly described in Exhibit A attached hereto and by this reference incorporated herein (said land together with all rights and appurtenances thereto and all improvements presently located or hereafter constructed thereon being collectively referred to as the "Property").

Simultaneously with the execution and delivery of this Assignment, Assignee has loaned to Assignor the principal sum of __Three Million__ Dollars ("Loan"), which loan is evidenced by that certain promissory note of even date herewith, executed by Assignor in favor of Assignee (said note and any and all renewals, replacements, modifications and extensions thereof are collectively referred to as the "Note").

Simultaneously with the execution and delivery of this Assignment, Assignor has executed and delivered a __Deed of Trust__, Security Agreement and Fixture Filing of even date herewith ("Indenture") as security for the debt as evidenced by the Note (the Note and Indenture being hereinafter sometimes collectively referred to, together with this Assignment, as the "Loan Documents").

Assignor has entered into certain leases reflected in the rent roll attached hereto as Exhibit B and by this reference incorporated herein.

In order to induce Assignee to make the Loan, Assignor desires to absolutely assign to Assignee all rents and income from the Property and to collaterally assign all present and future leases covering all or any part of the Property.

NOW, THEREFORE, in consideration of the above stated premises and of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor hereby covenants and agrees with Assignee as follows:

Exhibit "C"

BOOK 766 PAGE 215

1. Absolute Assignment of Rents and Profits. Assignor hereby absolutely, presently and unconditionally grants, assigns, transfers and sets over unto Assignee, and not as additional security for the Note, subject to all of the terms, covenants and conditions set forth herein, all of Assignor's right, title and interest in and to the following, whether arising under the Leases (as hereinafter defined), by statute, at law, in equity, or in any other way:

All of the rents, income, profits, revenue, judgments, condemnation awards, insurance proceeds, unearned insurance premiums and any other fees or sums payable to Assignor or any other person as landlord and other benefits and rights of the Property arising from the use, occupancy, operation or management of all or any portion thereof or from all the Leases and any proceeds, deposits or security deposits (subject to the rights, if any, of tenants) relating thereto, including, without limitation, any award to Assignor made hereafter in any court involving any of the tenants under the Leases in any bankruptcy, insolvency, or reorganization proceeding in any state or federal court, and Assignor's right to appear in any action and/or to collect any such award or payment, and all payments by any tenant in lieu of rent (collectively, "Rents and Profits").

The assignment of Rents and Profits set forth herein shall be an absolute, present and unconditional assignment and shall, immediately upon execution, give Assignee the right to collect all Rents and Profits without the necessity of instituting legal proceedings of any kind whatsoever to enforce the provisions of this Assignment. Assignor hereby irrevocably appoints Assignee its true and lawful attorney, such appointment being coupled with an interest, to act on behalf of Assignor, should Assignee so elect, to, at any time, demand, receive and enforce payment, give receipts, releases and satisfactions, and sue, either in the name of Assignor or in the name of Assignee, for all such Rents and Profits and apply the same to the indebtedness evidenced by the Loan.

2. Collateral Assignment of Leases. Assignor hereby absolutely, presently and unconditionally grants, assigns, transfers and sets over unto Assignee, as additional security for the Note, subject to all of the terms, covenants and conditions set forth herein, all of Assignor's right, title and interest in and to the following, whether arising under the Leases, by statute, at law, in equity, or in any other way:

(a) All of the leases of the Property which are in effect on the date hereof, and entered into or in effect from time to time after the date hereof, including, without limitation, all amendments, extensions, replacements, modifications and renewals thereof and all subleases, concession agreements, any ground leases or ground subleases and all other agreements affecting the same and all guaranties thereunder (the "Leases"); and

(b) All contracts, agreements, management, operating and maintenance agreements, warranties, licenses, permits, guaranties and sales contracts relating to the Property, entered into by or inuring to the benefit of Assignor (the "Contracts").

3.   <u>Purpose of Collateral Assignment of Leases</u>.  Assignor hereby agrees that this Assignment is given by Assignor to Assignee to secure the following in such order of priority as Assignee may elect:

(a)   The repayment of the indebtedness evidenced by the Note, the terms of which are incorporated herein by this reference, of even date herewith, payable to the order of Assignee, in the principal sum of ___Three Million_____ and 00/100 Dollars with interest thereon, as provided therein, and all late charges, prepayment premiums and fees required under the Note and all extensions, renewals, modifications, amendments and replacements thereof;

(b)  The payment of all other sums which may be advanced by or otherwise be due to Assignee under any provision of the Note, the Indenture or under any other instrument or document referred to in clause (c) below, with interest thereon at the rate provided herein or therein;

(c)  The performance of each and every of the covenants and agreements of Assignor contained (i) in the Note, the Indenture, or (ii) in any and all pledges or other security agreements, loan agreements, supplemental agreements, assignments, affidavits and all instruments of indebtedness or security now or hereafter executed by Assignor, or any of the parties constituting Assignor, or any general partners of such parties, in connection with any indebtedness referred to in clauses (a) or (d) of this paragraph or for the purpose of supplementing or amending the Indenture or any instrument secured hereby (but specifically excluding from all of the foregoing the Environmental Indemnity Agreement) (all of the foregoing in this clause (ii) as the same may be amended, modified or supplemented from time to time, collectively referred to as "Related Agreements"); and

(d)   The repayment of any other loans or advances, with interest thereon, hereafter made to Assignor (or any successor in interest to Assignor as the owner of the Property or any part thereof), by Assignee when the promissory note evidencing the loan or advance specifically states that said Note is secured by the Indenture, together with all extensions, renewals, modifications, amendments and replacements thereof.

4.   <u>Representations, Warranties and Agreements</u>.  Assignor hereby represents, warrants and agrees that:

(a)   Assignor has the right, power and capacity to make this Assignment and that no person, firm or corporation or other entity other than Assignor has or will have any right, title or interest in or to the Leases or the Rents and Profits;

(b)   Assignor has made no assignment other than this Assignment of any of Assignor's rights in any of the Rents and Profits or the Leases;

BOOK **766** PAGE **217**

(c)    The rent roll attached hereto as Exhibit B is a true, accurate and complete list of all Leases now in full force and effect; and

(d)    With respect to each Lease in effect at the date hereof: (i) the Lease is in full force and effect and is valid, binding and enforceable in accordance with its terms; (ii) the Lease has not been modified or amended in any respect, nor has any provision thereof been waived; (iii) neither the tenant nor lessor thereunder is in default under the terms of the Lease; (iv) no rent has been prepaid under the Lease for more than one month in advance; and (v) the tenant thereunder has no deduction, claim, counterclaim, set-off, or defense against the lessor thereunder or against the rents or other sums payable or to be payable thereunder.

5.    Covenants.

(a)    Assignor shall not, without the prior written consent of Assignee, which consent shall not be unreasonably withheld or delayed, (i) enter into, or consent to or permit the assignment or subletting of, any Leases; (ii) modify, extend, cancel, consent to any surrender, or in any way alter the terms of the Leases previously approved by Assignee, or take any action under or with respect to any such Leases which would materially decrease either the obligation of the tenant thereunder or the rights or remedies of the landlord or otherwise fail to perform the landlord's obligations under the Leases; (iii) alter, modify, change or terminate the terms of any guaranties of the Leases; (iv) create or permit any lien or encumbrance which, upon foreclosure, would be superior to any such Leases or in any other manner impair Assignee's right, title and interest in the Rents and Profits; (v) pledge, transfer, mortgage or otherwise encumber or assign the Leases or the Contracts or attempt to pledge, transfer, mortgage or otherwise encumber or assign the Rents and Profits; or (vi) collect rents more than thirty (30) days prior to their due date. Specifically included in (ii) above is Assignor's covenant not to terminate the Jitney-Jungle Lease identified in Exhibit "B" attached hereto without the prior written consent of Assignee.

(b)    Assignor shall, at its sole cost and expense, perform and discharge all of the obligations and undertakings of the landlord under the Leases.* Assignor shall use reasonable efforts to enforce the performance of each obligation of the tenants under the Leases and will appear in and prosecute or defend any action connected with the Leases or the obligations of the tenants thereunder. Assignee shall have the right, but not the obligation, to cure any default of Assignor under any of the Leases and all amounts disbursed in connection with said cure shall be deemed to be indebtedness secured by the Indenture.

(c)    Assignor shall not take any action which will cause or permit the estate of any tenant under the Leases to merge with Assignor's interest in the Property.

(d)    Assignor agrees, from time to time, to execute and deliver, upon demand, all assignments and any and all other writings as Assignee may reasonably deem necessary or desirable to carry out the purpose and intent hereof, or to enable Assignee to enforce any right or rights hereunder.

*Specifically including all of Assignor's obligations and undertakings under Paragraph 20 of the Jitney-Jungle Lease identified in Exhibit "B" attached hereto.

6.    Events of Default.    The term "Event of Default" as used herein shall mean the occurrence of any one of the following:

(a)    If a default by failure to pay or otherwise shall occur under the Note, the Indenture or any other instrument evidencing or securing the Loan and shall not be cured within any applicable curative period stated therein;

(b)    If Assignor shall fail to comply with any of the covenants, duties or obligations of Assignor herein and such default shall continue for thirty (30) days or more after written notice to Assignor from Assignee specifying the nature of such default; provided, however, that if such default is of a nature that it cannot be cured within the thirty (30) day period, then Assignor shall not be in default if it commences good faith efforts to cure the default within the thirty (30) day period, demonstrates continuous diligent efforts to cure the default in a manner satisfactory to Assignee and, within a reasonable period, not to exceed ninety (90) days after the date of the original written notice of such default, completes the cure of such default; or

(c)    If at any time any representation, warranty, statement, certificate, schedule and/or report to Assignee in or pursuant to this Assignment, the Indenture or any Related Agreement is false or misleading in any material respect as of the date made or furnished.

7.    Revocable License to Collect Rents and Profits.

(a)    Notwithstanding any provision to the contrary contained elsewhere herein, so long as no Event of Default has occurred hereunder, Assignor shall have a license ("License") to manage the Property, to collect, receive and use all Rents and Profits in accordance with the terms of the Leases; to let the Property and to take all actions which a reasonable and prudent landlord would take in enforcing the provisions of the Leases and Contracts; provided, however, that all amounts so collected shall be applied toward operating expenses, real estate taxes and insurance relating to the Property, capital repair items necessary to the operation of the Property, and the payment of sums due and owing under the Note, the Indenture and this Assignment prior to any other expenditure or distribution by Assignor. From and after the occurrence of an Event of Default (whether or not Assignee shall have exercised Assignee's option to declare the Note immediately due and payable), the License shall be automatically revoked without any notice to Assignor or any other action by Assignee. Assignor hereby irrevocably authorizes and directs (i) each of the tenants under the Leases, upon receipt of a written notice from Assignee so demanding, to pay all Rents and Profits due or which becomes due under its Lease directly to Assignee, and (ii) each property manager of any part of the Property, upon receipt of a written notice from Assignor so demanding, to pay all Rents and Profits thereafter received by such property manager directly and promptly to Assignee.

BOOK 766 PAGE 219

(b)     Any amounts received by Assignor or its agents in the performance of any acts prohibited by the terms of this Assignment, including, but not limited to, any amounts received in connection with any cancellation, modification or amendment of any of the Leases prohibited by the terms of this Assignment and any amounts received as rents, income, issues or profits from the Property in Assignor's or its agents' possession from and after the occurrence of an Event of Default under this Assignment, shall be held by Assignor in trust as trustee for Assignee and all such amounts shall be accounted for to Assignee and shall not be commingled with other funds of the Assignor. Any person acquiring or receiving all or any portion of such trust funds shall acquire or receive the same in trust for Assignee as if such person had actual or constructive notice that such funds were impressed with a trust in accordance herewith.

8.   Remedies of Assignee.     Notwithstanding and in addition to the Assignee's absolute right to the Rents and Profits, upon the occurrence of any Event of Default, Assignee in person or by agent or by court-appointed receiver (and Assignee shall have the right to the immediate appointment of such a receiver without regard to the adequacy of the security, and Assignor hereby irrevocably consents to such appointment and waives notice of any application therefor) may, at its option, without any action on its part being required, without in any way waiving such default, with or without the appointment of a receiver, or an application therefor:

(a)     take possession of the Property and have, hold, conduct tests of, manage or hire a manager to manage, lease and operate the Property, on such terms and for such period of time as Assignee may deem proper, with full power to make, from time to time, all alterations, renovations, repairs or replacements thereto as may seem proper to Assignee;

(b)     with or without taking possession of the Property, collect and receive all Rents and Profits, notify tenants under the Leases, or any other parties in possession of the Property, to pay Rents and Profits directly to Assignee, its agent or a court-appointed receiver and apply such Rents and Profits as Assignee sees fit in Assignee's sole discretion, which may include to the payment of:

(i)     all costs and expenses incident to: taking and retaining possession of the Property; management and operation of the Property; keeping the Property properly insured; all alterations, renovations, repairs and replacements to the Property, including, without limitation, reasonable compensation for all of Assignee's employees and other agents working in connection with the Property; reasonable and actual attorneys' fees; and management and rental commissions;

(ii)     all taxes, charges, claims, assessments, and any other liens which may be prior in lien or payment to the Loan, and premiums for insurance for the Property, with interest on all such items; and

BOOK 766 PAGE 220

(iii)   the indebtedness evidenced by the Loan, together with all costs and attorneys' fees in such order or priority as to any of such items as Assignee in its sole discretion may determine, any statute, law, custom or use to the contrary notwithstanding.

(c)   exclude Assignor, its agents and servants wholly from the Property;

(d)   have joint access with Assignor to the books, papers and accounts of Assignor relating to the Property at the expense of Assignor;

(e)   commence, appear in and/or defend any action or proceedings purporting to affect the interests, rights, powers and/or duties of Assignee hereunder, whether brought by or against Assignor or Assignee;

(f)   pay, purchase, contest or compromise any claim, debt, lien, charge or encumbrance which in the judgment of Assignee may affect or reasonably appear to affect the interest of Assignee or the rights, power and/or duties of Assignee hereunder;

(g)   perform as landlord under the Leases and as a party under the Contracts, but Assignee shall not have the obligation to do so;

(h)   demand, receive and enforce payment, give receipts, releases and satisfactions, and sue, either in the name of Assignor or in the name of Assignee, for all such Rents and Profits and apply the same to the indebtedness evidenced by the Loan;

(i)   take whatever measures Assignee from time to time deems necessary or desirable to exercise, enforce, perform or protect Assignee's rights, titles or interests in any or all of the Loan Documents and Related Agreements; and

(j)   exercise any other remedies permitted to Assignee under applicable law.

Assignee owns the Rents and Profits, and the collection and the receipt by Assignee of any Rents and Profits pursuant to this Assignment after the institution of foreclosure proceedings under the Indenture shall not cure any such Event of Default or affect such proceedings or any sale pursuant thereto. This Assignment is an absolute assignment of the Rents and Profits, and the election by Assignee to exercise one or more or none of its remedies shall not diminish such absolute assignment or Assignee's ownership of the Rents and Profits.

9.   Application of Proceeds.   Any proceeds collected by Assignee hereunder shall be applied by Assignee to pay, in such order as Assignee shall elect, the following: (i) all costs and expenses of controlling, managing and operating the Property, including, but not limited to, debt service on the Note, Assignor's obligations under the Indenture, the Loan Documents and the Related Agreements, and attorneys' fees, including any fees in the

BOOK 766 PAGE 221

representation of Assignee in any proceeding under Title 11, United States Code; (ii) satisfying the requirements of the Leases, including, but not limited to, all costs and expenses for maintenance, repairs, replacements and alterations; (iii) special assessments, taxes, insurance, all amounts evidenced, secured, permitted or required to be spent, escrowed or reimbursed pursuant to any of the Note, Indenture, Loan Documents or the Related Agreements; (iv) fees of representatives designated by Assignee to manage and operate the Property; and (v) all other expenses pertaining to any part or all of the Property and the Leases.

    10.   Indemnity and Assignee's Disclaimer.

    (a)   Assignee shall not be obligated to perform or discharge nor does it hereby undertake to perform or discharge any obligation, duty or liability under the Leases or under or by reason of this Assignment. Assignor shall and does hereby agree to indemnify Assignee for and to defend and hold Assignee harmless from any and all obligations, liabilities, losses, costs, expenses, civil fines, penalties or damages (including attorneys' fees) which Assignee may incur under the Leases or under or by reason of this Assignment, and from any claims whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in the Leases, excluding claims arising out of Assignee's sole gross negligence and intentional misconduct. Should Assignee incur any such obligation, liability, loss, cost, expense, civil fine, penalty or damage under the Leases or under or by reason of this Assignment, or in the defense of any of such claims or demands, the amount thereof, including costs, expenses and attorneys' fees, shall be secured hereby; and Assignor shall reimburse Assignee therefor immediately upon demand and upon failure of Assignor to do so, Assignee may declare all sums so secured to be immediately due and payable. The foregoing indemnity shall not be applicable to any such claim, liability, loss, cost, expense or damage arising solely from Assignee's gross negligence or willful misconduct in exercising its remedies hereunder. In the event Assignee acquires title to the Property, the foregoing indemnity shall not be applicable to claims, liability, loss, cost, expense or damage arising from Assignee's actions taken thereafter under the Leases.

    (b)   This Assignment shall not be deemed or construed to constitute Assignee as mortgagee-in-possession of the Property or to obligate Assignee to take any action hereunder, to incur expenses or to perform or discharge any obligation, duty or liability hereunder or under the Leases, and Assignee is not required to take possession of the Property as a condition to the assignment contained herein.

    11.   Waiver and Discretion.   The failure of Assignee to enforce any of the terms, covenants or conditions hereof shall not be construed or deemed to be a waiver of any rights or remedies hereunder. Assignee shall have the full right, power and authority to enforce this Assignment, or any of the terms, covenants or conditions hereof, at any time or times that Assignee shall deem fit.

a:FORMS\absolute                -8-

BOOK 766 PAGE 222

12. <u>Notices.</u>   All notices expressly provided hereunder to be given by Assignee to Assignor and all notices and demands of any kind or nature whatever which Assignor may be required or may desire to give to or serve on Assignee shall be served in the manner set forth in the Indenture, reference to which is made for all purposes.

13. <u>Performance and Release.</u>   The full repayment of the indebtedness evidenced by the Note and the performance of all of the obligations set forth in the Indenture and the duly recorded release thereof or reconveyance of the Property described therein shall constitute a reassignment of the Leases hereby assigned to Assignee.

14. <u>Binding Effect.</u>   This Assignment applies to and binds the parties hereto and their respective heirs, administrators, executors, successors and assigns (including any trustee or debtor-in-possession appointed in any proceeding under Title 11, United States Code), as well as any subsequent owner of the Property (or any portion thereof), and any agreement creating rights in Assignee other than those created herein shall be deemed incorporated herein by reference and made a part hereof for all purposes.

15. <u>Actions by Assignee.</u>   Assignee may take or release any security, may release any party primarily or secondarily liable for any indebtedness evidenced by the Loan, may grant extensions, renewals or indulgences with respect to such indebtedness, and may apply any security therefor held by it to the satisfaction of such indebtedness, without prejudice to any of its rights hereunder.

16. <u>No Election of Remedies.</u>   Nothing herein contained and no act done or omitted by Assignee pursuant to the powers and rights granted it herein shall be deemed to be a waiver by Assignee of its rights and remedies under the Note and Indenture, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof. The right of Assignee to collect said indebtedness and to enforce any security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder. It is the intent of both Assignor and Assignee that this Assignment be supplementary to, and not in substitution or derogation of, any provision contained in the Indenture giving Assignee (as beneficiary thereunder) any interest in or rights with respect to the Property. Accordingly, this Assignment shall not be construed in any way to impair or limit any rights or interests which Assignee would otherwise have with respect to the Property by reason of the Indenture.

17. <u>Construction of Terms.</u>   In this Assignment, whenever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural.

18. <u>No Merger.</u>   Neither this Assignment nor pursuit of any remedy hereunder by Assignee shall cause or constitute a merger of the interests of the lessee and the lessor under

BOOK 766 PAGE 223

any of the Leases such that any of the Leases hereby assigned are no longer valid and binding legal obligations of the parties executing the same.

19.   Governing Law.  THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  IN ANY LITIGATION IN CONNECTION WITH OR TO ENFORCE THIS ASSIGNMENT, THE ASSIGNOR HEREBY IRREVOCABLY CONSENTS AND CONFERS PERSONAL JURISDICTION ON THE STATE COURTS OF THE COUNTY IN WHICH THE PROPERTY IS LOCATED, OR ON THE UNITED STATES DISTRICT COURT OR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT IN WHICH THE PROPERTY IS LOCATED.  ASSIGNOR EXPRESSLY WAIVES ANY OBJECTIONS AS TO VENUE IN ANY SUCH COURTS AND AGREES THAT SERVICE OF PROCESS MAY BE MADE ON THE ASSIGNOR BY MAILING A COPY OF THE SUMMONS AND COMPLAINT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ASSIGNOR'S ADDRESS.  NOTHING CONTAINED HEREIN SHALL, HOWEVER, PREVENT THE ASSIGNEE FROM BRINGING ANY ACTION OR EXERCISING ANY RIGHTS WITHIN ANY OTHER STATE OR JURISDICTION OR FROM OBTAINING PERSONAL JURISDICTION BY ANY OTHER MEANS AVAILABLE BY APPLICABLE LAW.

20.   Waiver of Jury Trial.    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE ASSIGNOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS ASSIGNMENT OR THE ACTS OR FAILURE TO ACT OF OR BY ASSIGNEE IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS ASSIGNMENT.

21.   Material Inducements.    ALL WAIVERS SET FORTH IN THIS ASSIGNMENT ARE MATERIAL INDUCEMENTS FOR THE ASSIGNEE TO ACCEPT THIS ASSIGNMENT.

22.   Severability.   In the event any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision hereof, and this Assignment shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, but only to the extent that is invalid, illegal or unenforceable.

23.   Modification.  This Assignment may not be amended or modified orally, but only by an agreement in writing signed by the party against whom enforcement of any amendment or modification is sought.

a:FORMS\absolute                           -10-

BOOK 766 PAGE 224

24. **Not Mortgagee-in-Possession.** Neither the assignment of Rents and Profits, Leases and Contracts to Assignee nor the exercise by Assignee of any of its rights or remedies hereunder shall be deemed to make Assignee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property, unless and until Assignee, in person or by agent, assumes actual possession thereof; nor shall appointment of a receiver for the Property by any court at the request of Assignee or by agreement with Assignor, or the entering into possession of the Property by such receiver, be deemed to make Assignee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property.

25. **Captions.** The captions of this Agreement are inserted only for the purpose of convenience, and in no way define, limit or prescribe the scope or extent of this Assignment or any part hereof.

IN WITNESS WHEREOF, Assignor has caused this instrument to be duly executed under seal as of the date first above written.

_____(SEAL)
H. CONNELY PLUNKETT

STATE OF MISSISSIPPI

COUNTY OF Hinds

Personally appeared before me, the undersigned authority in and for the said county and state, on this 13th day of May, 1996, within my jurisdiction, the within named H. Connely Plunkett, who acknowledged that he executed the above and foregoing instrument.

_____
Notary Public

My Commission Expires:
8-16-96

[NOTARIAL SEAL]

46240.016*::ODMA\PCDOCS\DOCS\10068\1
Rev. May 10, 19964

11

BOOK 766 PAGE 225

# EXHIBIT A
## LEGAL DESCRIPTION

A certain parcel of land being situated in the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19 Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 190.86 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, continue thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 46.90 feet to the Point of Curvature of a 10.4093 degree curve bearing to the left having a central angle of 18 degrees 07 minutes 00 seconds and a radius of 550.53 feet; run thence along said East right-of-way line of Castlewoods Boulevard and along the arc of said 10.4093 degree curve bearing to the left having a chord bearing of North 20 degrees 06 minutes 19 seconds West and a chord distance of 3.10 feet to the Southwest corner of the La Petite Academy property; run thence North 70 degrees 03 minutes 47 seconds East along the South line of said La Petite Academy property, for a distance of 219.90 feet to the Southeast corner thereof; run thence North 19 degrees 56 minutes 13 seconds West along the East line of the La Petite Academy property and its northerly extension thereof for a distance of 290.12 feet to a point on the South right-of-way line of Mississippi State Highway 25 (as now laid out and in use, November, 1995); run thence the following bearings and distances along said South right-of-way line of Mississippi State Highway 25: North 68 degrees 19 minutes 59 seconds East for a distance of 96.97 feet; North 75 degrees 30 minutes 17 seconds East for a distance of 349.54 feet; North 76 degrees 21 minutes 24 seconds East for a distance of 199.90 feet to a point being described as Point "DA" according to Mississippi State Highway Department Project #SP-0056-1(2); leaving said South right-of-way line of Mississippi State Highway 25, run thence South 13 degrees 38 minutes 36 seconds East for a distance of 76.19 feet to a point; run thence South 35 degrees 09 minutes 27 seconds West for a distance of 122.37 feet to the Point of Curvature of a 99.644722 degree curve bearing to the left having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 57.50 feet; run thence along the arc of said 99.644722 degree curve bearing to the left a chord bearing of South 05 degrees 48 minutes 08 seconds West and a chord distance of 81.32 feet to the Point of Tangency, of said curve; run thence South 39 degrees 11 minutes 52 seconds East for a distance of 99.00 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 170.00 feet to a point; run thence South 01 degrees 25 minutes 00 seconds East for a distance of 54.55 feet to a point; run thence South 70 degrees 33 minutes 04 seconds West for a distance of 120.99 feet to a point; run thence North 89 degrees 51 minutes 00 seconds West for a distance of 248.54 feet to a point; run thence North 60 degrees 56 minutes 05 seconds West for a distance of 60.80 feet to a point; run thence South

EXHIBIT A
Page 1 of 3 Pages

BOOK 766 PAGE 226

70 degrees 03 minutes 47 seconds West for a distance of 180.00 feet to the POINT OF BEGINNING, containing 5.534 acres, more or less.

**LESS AND EXCEPT:**

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 257.64 feet to a point; run thence North 02 degrees 00 minutes 00 seconds West for a distance of 162.88 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 34.38 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 97.45 feet to a point; run thence South 39 degrees 13 minutes 34 seconds East for a distance of 70.00 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 54.03 feet to a point; run thence North 89 degrees 51 minutes 00 seconds West for a distance of 56.19 feet to the POINT OF BEGINNING, containing 0.139 acres, more or less.

**AND ALSO:**

A certain twenty foot (20') wide sanitary sewer easement being situated in the Northwest 1/4 of the Northeast 1/4 of Section 20 and the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N, R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and use, November, 1995); run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 354.23 feet to a point; run thence North 20 degrees 00 minutes 00 seconds West for a distance of 44.96 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 20.00 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 50.41 feet to a point; run thence South 89 degrees 51 minutes 00 seconds East for a distance of 31.54 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 74.80 feet to the POINT OF BEGINNING, containing 0.029 acres, more or less.

And also the following easements granted H. C. Plunkett by Jitney-Jungle Stores Of America, Inc., in Warranty Deed dated November 28, 1995, and recorded in the office of the Chancery Clerk of Rankin County, Mississippi in Book 751 at Page 142 as corrected by instrument recorded in Book 758 at Page

BOOK **766** PAGE **227**

306, and as further corrected by that certain Second Correction of Warranty Deed executed May 10, 1996:

(a) To construct and maintain footings and adequate lateral support of the buildings and improvements to be constructed by H. C. Plunkett on the Property, along the common property lines between the Property and the adjacent property now or hereafter owned by Jitney-Jungle Stores Of America, Inc, its successors, assigns, and transferees;

(b) To construct and maintain canopies, roofs, building overhangs, exterior light fixtures, signs and other like projections and encroachments of the buildings and improvements to be constructed by H. C. Plunkett on the Property, over and across the adjacent property now or hereafter owned by the Jitney-Jungle Stores Of America, Inc, its successors, assigns, and transferees; and

(c) To construct and maintain utility lines serving the buildings and improvements to be constructed by H. C. Plunkett on the Property, over and across the adjacent property now or hereafter owned by Jitney-Jungle Stores Of America, Inc, its successors, assigns and transferees, provided the location of all such utility lines are approved in advance in writing by Jitney-Jungle Stores Of America, Inc.

E:\PLUNKETT\JITNEY\JIT.LEGAL.LGL-lj

**EXHIBIT A**
Page 3 of 3 Pages

BOOK 766 PAGE 228

## EXHIBIT "B"

## RENT ROLL

Lease between H.C. Plunkett, Landlord, and Jitney-Jungle Stores of America, Inc., Tenant, dated June 15, 1995, for a twenty (20) year primary term with renewal options as provided therein.

BOOK **766** PAGE **229**

## EXHIBIT "C"

Nonrecourse. Except as hereinafter in this Exhibit "C" and in Section 1.13 of the Indenture specifically provided, Assignor shall not be personally liable for the payment of any sums due hereunder or the performance of any obligations of Assignor hereunder or under the Indenture or the other Loan Documents. In any action to foreclose the Indenture or to otherwise realize upon any security furnished under the Loan Documents or to collect any amount payable hereunder or under the other Loan Documents, no judgment for the repayment of the Note or interest thereon or any other sum due under any of the Loan Documents or for damages for failure to perform any obligation of Assignor hereunder or under any of the Loan Documents will be enforced against Assignor personally or against any property of Assignor other than the Property and other security furnished under the Loan Documents. Notwithstanding the foregoing, nothing herein contained shall be construed as prohibiting Assignee from exercising any and all remedies which the Loan Documents permit, including the right to bring actions or proceedings against Assignor and to enter a judgment against Assignor; provided, however, that any judgment so entered must specify that it is limited to the security furnished under the Loan Documents and that it may not be levied against any other property of Assignor other than the security furnished under the Loan Documents.

Notwithstanding the foregoing provisions of this Exhibit "C" or any other agreement, Assignor shall be fully liable for damages to Assignee or the Property resulting from: (i) Assignor's fraud or misrepresentation, whether affirmative or by omission; (ii) the misapplication of (a) proceeds of insurance covering any portion of the Property, or (b) proceeds of condemnation of any portion of the Property or proceeds from the sale or conveyance of any portion of the Property, in lieu of condemnation, or (c) rentals received by or on behalf of Assignor subsequent to the date on which Assignee gives written notice of the revocation of the license granted in this Assignment to the extent such rentals are not applied to ordinary and necessary operational costs of the Property; (iii) for the return of all unearned advance rentals and security deposits paid by tenants of the Property and not refunded to or forfeited by such tenants; (iv) the amount of any loss caused by Assignor's failure to comply with any federal, state and local statute, ordinance or regulation applicable to the Property relating to hazardous waste and environmental laws, such loss to include expenses, clean up, penalties and damages incurred by Assignee and any diminution in the fair market value of the Property caused by Assignor, its agents and tenants as a result of non-compliance with such hazardous waste and environmental laws from and after the date hereof (specifically including any liability of Assignor under Section 1.13 of the Indenture); (v) a lien hereafter imposed upon any of the Property without Assignee's prior written consent and which has priority over any security for the payment of the Note, including, without limitation, all costs incurred by Assignee in the bonding, payment or release of any lien arising from the use, incorporation, storage or disposal of toxic, hazardous, chemical or nuclear waste or materials upon or in any portion of the Property caused by Assignor, its agents and tenants as a result of non-compliance with Hazardous Material Laws (as defined in the Indenture) from and after the period from the date hereof; (vi) the commission of waste; and (vii) failure of Assignor to pay real estate taxes and property insurance premiums relating to the Property.

46240 Forms*: ODMA\PCDOCS\DOCS\1 5000\1
Rev. May 9, 1996

BOOK 766 PAGE 230

**PREPARED BY:**

Parker, Johnson, Cook & Dunlevie
R. Russell Berry
1275 Peachtree Street, Suite 700
Atlanta, Georgia 30309
404/872-7000

**INDEXING INSTRUCTIONS:**

The real property described herein is situated in the Southwest Quarter of the Southeast Quarter
of Section 17, Township 5 North, Range 3 East of Rankin County, Mississippi

RANKIN COUNTY MS
THIS INSTRUMENT
WAS FILED FOR
RECORD

96    5-15    AM 12:35
IN B    766    P 214
MURPHY ADKINS, CHY. CLK.
BY    Myers    D.C.

BOOK**1119**PAGE**556**

LOAN NO. 96223

# DEED OF TRUST, SECURITY AGREEMENT

## AND

## FIXTURE FILING

## BY AND AMONG

H. CONNELY PLUNKETT      ("BORROWER"),

R. RUSSELL BERRY      ("TRUSTEE")

## AND

## JEFFERSON-PILOT LIFE INSURANCE COMPANY      ("LENDER")

**DATED:**    May 13, 1996

**LOAN AMOUNT:** $3,000,000.00

**PROPERTY ADDRESS:** 5653 Lakeland Drive (S.R. 25) Brandon, Rankin County, Mississippi

THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.

THE NAMES OF THE DEBTOR AND THE SECURED PARTY, THE MAILING ADDRESS OF THE SECURED PARTY FROM WHICH INFORMATION CONCERNING THE SECURITY INTEREST MAY BE OBTAINED, THE MAILING ADDRESS OF THE DEBTOR AND A STATEMENT INDICATING THE TYPES, OR DESCRIBING THE ITEMS, OF COLLATERAL, ARE DESCRIBED HEREIN, IN COMPLIANCE WITH THE REQUIREMENTS OF THE UNIFORM COMMERCIAL CODE.

    This Deed of Trust secures the indebtedness of that certain Promissory Note of even date herewith executed by BORROWER and payable to the order of LENDER in the principal sum of THREE MILLION _____ Dollars ($3,000,000.00 ) ("Note") with interest thereon and all late charges, loan fees, commitment fees, and prepayment premiums, maturing _____ June 1, 2016 _____.

IV-233

## DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING
### (COLLATERAL IS OR INCLUDES FIXTURES)

THIS DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING ("Deed of Trust") is made as of this 13th day of May, 1996 by and among H. CONNELY PLUNKETT, a Mississippi Resident whose mailing address is 1530 North State Street, Jackson, MS 39202 (herein "BORROWER"), R. RUSSELL BERRY (herein "TRUSTEE"), and JEFFERSON-PILOT LIFE INSURANCE COMPANY, a North Carolina corporation, whose mailing address is P. O. Box 20407, Greensboro, North Carolina 27420 (herein "LENDER").

BORROWER, in consideration of the indebtedness herein recited, hereby irrevocably grants, bargains, sells, conveys, transfers and assigns, to TRUSTEE, and to his successors and assigns, with power of sale and right of entry and possession, all of BORROWER'S estate, right, title and interest in, to and under that certain real property located in Rankin County, Mississippi, more particularly described in Exhibit A attached hereto and incorporated herein by this reference (the "Land");

TOGETHER with all of BORROWER'S now or hereafter acquired estate, right, title and interest in, to and under all buildings, structures, improvements and fixtures now existing or hereafter erected on the Land and all right, title and interest, if any, of BORROWER in and to the streets and roads, opened or proposed, abutting the Land to the center lines thereof, and strips within or adjoining the Land, the air space and right to use said air space above the Land, all rights of ingress and egress on or within the Land, all easements, rights and appurtenances thereto or used in connection with the Land, including, without limitation, air, lateral support, alley and drainage rights, all revenues, income, rents, cash or security deposits, advance rental deposits, and other benefits thereof or arising from the use or enjoyment of all or any portion thereof (subject however to the rights and authorities given herein to BORROWER to collect and apply such revenues, rents and other benefits), all interests in and rights, royalties and profits in connection with all minerals, oil and gas and other hydrocarbon substances thereon or therein, and water stock, all options to purchase or lease, all development or other rights relating to the Land or the operation thereof, or used in connection therewith, including all BORROWER'S right, title and interest in all fixtures, attachments, partitions, machinery, equipment, building materials, appliances and goods of every nature whatever now or hereafter located on, or attached to, the Land, all of which, including replacements and additions thereto, shall, to the fullest extent permitted by law and for the purposes of this Deed of Trust, be deemed to be real property and, whether affixed or annexed thereto or not, be deemed conclusively to be real property; and BORROWER agrees to execute and deliver, from time to time, such further instruments and documents as may be required by LENDER to confirm the legal operation and effect of this Deed of Trust on any of the foregoing. All of the foregoing property described in this section (the "Improvements"), together with the Land, shall be hereinafter referred to as the "Property."

BOOK**1119**PAGE**558**

TOGETHER with all of BORROWER'S now existing or hereafter acquired right, title and interest in the following:

(A)    All equipment, inventory, goods, instruments, appliances, furnishings, machinery, tools, raw materials, component parts, work in progress and materials, and all other tangible personal property of whatsoever kind, used or consumed in the improvement, use or enjoyment of the Property now or any time hereafter owned or acquired by BORROWER, wherever located and all products thereof whether in possession of BORROWER or whether located on the Property or elsewhere;

(B)    To the extent such general intangibles are assignable, all general intangibles relating to design, development, operation, management and use of the Property, including, but not limited to, (1) all names under which or by which the Property may at any time be owned and operated or any variant thereof, and all goodwill in any way relating to the Property and all service marks and logotypes used in connection therewith, (2) all permits, licenses, authorizations, variances, land use entitlements, approvals, consents, clearances, and rights obtained from governmental agencies issued or obtained in connection with the Property, (3) all permits, licenses, approvals, consents, authorizations, franchises and agreements issued or obtained in connection with the construction, use, occupation or operation of the Property, (4) all materials prepared for filing or filed with any governmental agency, and (5) the books and records of BORROWER relating to construction, or operation of the Property.

(C)    All shares of stock or partnership interest or other evidence of ownership of any part of the Property that is owned by BORROWER in common with others, including all water stock relating to the Property, if any, and all documents or rights of membership in any owners' or members' association or similar group having responsibility for managing or operating any part of the Property; provided, however, that the foregoing shall not include any ownership interests in the BORROWER;

(D)    All accounts, deposit accounts, tax and insurance escrows held pursuant to this Deed of Trust, accounts receivable, instruments, documents, documents of title, general intangibles, rights to payment of every kind, all of BORROWER'S rights, direct or indirect, under or pursuant to any and all construction, development, financing, guaranty, indemnity, maintenance, management, service, supply and warranty agreements, commitments, contracts, subcontracts, insurance policies, licenses and bonds now or anytime hereafter arising from construction on the Land or the use or enjoyment of the Property to the extent such are assignable;

(E)    All of BORROWER'S interest in and to all causes of action, claims, compensation, proceeds and recoveries for any damage or injury to the Property or any part thereof or for any loss or diminution in value of the Property;

-2-

BOOK 1119 PAGE 559

(F)    All condemnation proceeds and insurance proceeds related to the Property;

(G)    All articles of personal property now or hereafter attached to, placed upon for an indefinite term or used in connection with the Land, appurtenances to the Land, and the Improvements together with all goods and other property which are or at any time become so related to the Property that an interest in them arises under real estate law as fixtures.

TOGETHER with all additions to, substitutions for and the products of all of the above, and all proceeds therefrom, whether cash proceeds or noncash proceeds, received when any such property (or the proceeds thereof) is sold, exchanged, leased, licensed, or otherwise disposed of, whether voluntarily or involuntarily. Such proceeds shall include any of the foregoing specifically described property of BORROWER acquired with cash proceeds. Together with, and without limiting the above items, all Goods, Accounts, Documents, Instruments, Money, Chattel Paper and General Intangibles arising from or used in connection with the Property, as those terms are defined in the Uniform Commercial Code from time to time in effect in the state in which the Property is located. (All of the foregoing, including such products thereof, are collectively referred to as "Collateral".)

The personal property in which LENDER has a security interest includes goods which are or shall become fixtures on the Property. This Deed of Trust is intended to serve as a fixture filing pursuant to the terms of the applicable provisions of the Uniform Commercial Code of the state in which the Property is located. This filing is to be recorded in the real estate records of the appropriate city, town or county in which the Property is located. In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor: | H. CONNELY PLUNKETT |
| Address of Debtor: | See Section 4.02 hereof. |
| Name of Secured Party: | Jefferson-Pilot Life Insurance Company |
| Address of Secured Party: | See Section 4.02 hereof. |

BORROWER warrants and agrees that there is no financing statement or chattel mortgage covering the foregoing Collateral, the Property, or any part thereof, on file in any public office.

BOOK 1119 PAGE 560

HOWEVER, THIS IS A DEED OF TRUST AND THIS CONVEYANCE IS MADE FOR THE FOLLOWING USES AND FOR THE PURPOSE OF SECURING IN SUCH ORDER OF PRIORITY AS LENDER MAY ELECT:

(A)     The repayment of the indebtedness evidenced by that certain Promissory Note ("Note") of even date herewith with a maturity date of _____ June 1, 2016 _____ executed by BORROWER and payable to the order of LENDER, in the principal sum of Three Million _____ DOLLARS ($3,000,000.00   ) with interest thereon, as provided therein and all late charges, loan fees, commitment fees, Prepayment Premiums (as described in the Note), and all extensions, renewals, modifications, amendments and replacements thereof;

(B)     The payment of all other sums which may be advanced by or otherwise be due to LENDER under any provision of this Deed of Trust or under any other instrument or document referred to in clause (C) below, with interest thereon at the rate provided herein or therein;

(C)     The performance of each and every covenant and agreement of BORROWER contained (1) herein, in the Note, or in any note evidencing a Future Advance (as hereinafter defined), and (2) in the obligations of BORROWER upon any and all pledge or other security agreements, loan agreements, disbursement agreements, supplemental agreements (the foregoing shall not include the Commitment Letter between BORROWER and LENDER), assignments (both present and collateral) and all instruments of indebtedness or security now or hereafter executed by BORROWER in connection with any indebtedness referred to in clauses (A), (B) or (D) of this section or for the purpose of supplementing or amending this Deed of Trust or any instrument secured hereby (all of the foregoing in this clause (C), as the same may be amended, modified or supplemented from time to time, being referred to hereinafter as "Related Agreements") and all costs and expenses, including reasonable attorneys' fees, with respect to all such documents, including, without limitation, the negotiation and drafting of any loan settlement or workout agreement; and

(D)     The repayment of any other loans or advances, with interest thereon, hereafter made to BORROWER (or any successor in interest to BORROWER as the owner of the Property or any part thereof) by LENDER when the promissory note evidencing the loan or advance specifically states that said note is secured by this Deed of Trust, together with all extensions, renewals, modifications, amendments and replacements thereof (herein and in the Related Agreements, "Future Advance").

TO HAVE AND TO HOLD the Property to the use, benefit, and behoof of TRUSTEE, his successors and assigns, forever, in Fee Simple.

BORROWER warrants that BORROWER has good title to the Property, is lawfully seized and possessed of the Property and every part thereof, and has the right to convey the same; that the Property is unencumbered except as may be expressly provided in the

-4-

BOOK 1119 PAGE 561

Permitted Exceptions described in Exhibit B attached hereto and incorporated herein by this reference (the "Permitted Exceptions"); and, except for such Permitted Exceptions, that BORROWER will forever warrant and defend title to the Property unto TRUSTEE, his successors and assigns, against the claims of all persons whomsoever.

## ARTICLE I

## COVENANTS OF BORROWER

To protect the security of this Deed of Trust, BORROWER covenants and agrees as follows:

1.01. Performance of Obligations Secured. BORROWER shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, the principal of and interest on any Future Advance, any Prepayment Premium and late charges provided for in the Note or in any note evidencing a Future Advance, and shall further perform fully and in a timely manner all other obligations of BORROWER contained herein or in the Note or in any note evidencing a Future Advance or in any of the Related Agreements.

1.02. Insurance. For all times during the period there remains any indebtedness under the Note, or any and all other indebtedness (including, without limitation, Future Advances) secured by this Deed of Trust, BORROWER* shall keep the Property insured against all risks or hazards as LENDER may require. Such insurance shall be in policy form, amount and coverage satisfactory to LENDER, including, but not limited to:

(A)     Fire and extended coverage property damage insurance, including, but not limited to, all risk insurance in an amount equal to the full replacement value of the Improvements, without coinsurance or deducting for depreciation, containing a waiver of subrogation clause and a deductible amount acceptable to LENDER;

(B)     Public liability insurance, in such form, amount and deductible satisfactory to LENDER, and naming LENDER c/o LENDER'S servicing agent, if any, as additional insured covering LENDER'S interest in the Property;

(C)     Business interruption or rent loss insurance endorsement in an amount at least equal to twelve (12) months' anticipated gross rental income or twelve (12) months' gross business earnings, whichever is applicable;

(D)     Flood insurance if any part of the Property is now or is hereafter determined by the Secretary of Housing and Urban Development (HUD) or the Director of the Federal Emergency Management Agency (FEMA) to be in a "Special Flood Hazard Area," such insurance providing coverage at least equivalent to that provided under the National Flood Insurance Program (NFIP), in the Special Flood Hazard Area, provided that the aggregate amount of flood insurance must equal, at a minimum, the lesser of the

*or his tenant, Jitney-Jungle Stores of America, Inc. pursuant to Lease dated June 15, 1995, as amended,                    -5-

BOOK 1119 PAGE 562

insurable value of all buildings or the indebtedness evidenced by the Note; or, if only part of the Property is in a Special Flood Hazard Area, the insurable buildings exposed to flood hazards must be covered by flood insurance in an aggregate amount equal to a minimum of the lesser of the insurable value of the exposed building or that prorated portion of the unpaid indebtedness on the entire Property determined by the ratio of square foot area of the exposed buildings to the square footage of all buildings comprising the Property.

        (E)    "Dram shop" insurance if alcoholic beverages are sold on the Property;

        (F)    Boiler and machinery insurance when risks covered thereby are present and LENDER requires such insurance; and

        (G)    Earthquake insurance if LENDER requires such insurance.

The insurance coverages described in Subsections (A), (C), (D), (F) and (G) above shall name LENDER c/o LENDER'S servicing agent, if any, under a standard noncontributory mortgagee clause or otherwise directly insure LENDER'S interest in the Property. All policies of insurance required under this Section 1.02 shall be with a company or companies satisfactory to LENDER and authorized to do business in the state in which the Property is located. All policies of insurance shall provide that they will not be canceled or modified without thirty (30) days' prior written notice to LENDER. Originals of the above mentioned insurance policies satisfactory to LENDER shall be delivered to and held by LENDER. Originals of all renewal and replacement policies shall be delivered to LENDER at least thirty (30) days before the expiration of the expiring policies. If any renewal or replacement policy is not obtained as required herein, LENDER is authorized to obtain the same in BORROWER'S name, in which event BORROWER shall, on demand of LENDER, repay such premium or premiums to LENDER and such repayment shall be secured by the lien of this Deed of Trust. LENDER shall not by the fact of failing to obtain any insurance, incur any liability for or with respect to the amount of insurance carried, the form or legal sufficiency of insurance contracts, solvency of insurance companies, or payment or defense of lawsuits, and BORROWER hereby expressly assumes full responsibility therefor and all liability, if any, with respect thereto. If BORROWER fails to maintain the level of insurance required under this Deed of Trust, then BORROWER shall indemnify LENDER to the extent that a casualty occurs and insurance proceeds would have been available had such insurance been maintained.

### 1.03. Casualty Awards.

        (A)    In the event of loss under any policies referenced in Section 1.02, BORROWER shall give immediate written notice to the insurance carrier and to LENDER. In the event any such loss occurs, LENDER shall be entitled to receive and retain all insurance proceeds to be applied by LENDER, at LENDER'S option, either (i) upon any indebtedness secured hereby in such order as LENDER may determine or (ii) to payment for

BOOK **1119** PAGE **563**

the replacing, repairing or restoring the improvements partially or totally destroyed to a condition and upon such terms of payment as may be satisfactory to LENDER.

(B)    BORROWER hereby assigns to LENDER all monies recoverable under each such insurance policy and authorizes each insurance company to make payment for all such losses directly to LENDER instead of to LENDER and BORROWER jointly. In the event any insurance company fails to disburse insurance proceeds directly and solely to LENDER but disburses instead either to BORROWER alone or to BORROWER and LENDER jointly, BORROWER agrees immediately to transfer and endorse such proceeds to LENDER, and upon any failure of BORROWER to do so, LENDER may execute such transfers and endorsements for and in the name of BORROWER and BORROWER hereby irrevocably appoints LENDER as BORROWER'S agent and attorney-in-fact (which appointment is coupled with an interest) for such purposes. BORROWER shall cooperate with LENDER in obtaining for LENDER the benefits of any insurance or other proceeds lawfully or equitably payable to LENDER in connection with the transaction contemplated by the Loan Documents and the collection of any indebtedness or obligation of BORROWER to LENDER incurred thereunder. At LENDER'S option, LENDER shall be entitled and BORROWER hereby authorizes LENDER at BORROWER'S expense, to take all necessary and proper steps (including, without limitation, the engaging, at BORROWER'S expense, of appraisers to conduct independent appraisals on behalf of LENDER and the engaging, at BORROWER'S expense, of attorneys and other professionals and consultant) to obtain any insurance or other proceeds, and LENDER is hereby authorized and entitled to compromise or adjust any loss under any such insurance policy.

(C)    Upon any foreclosure of this Deed of Trust or any sale of the property in lieu thereof, LENDER shall become the owner of all insurance policies on the Property, and BORROWER hereby irrevocably appoints LENDER as its attorney-in-fact, which appointment is coupled with an interest, to assign each such policy in such event.

1.04.    Escrow Fund for Casualty Proceeds.

(A)    Notwithstanding anything to the contrary in Section 1.03(A) above, LENDER agrees to make available to BORROWER for restoration of the Property any net insurance proceeds received by LENDER under this Deed of Trust as a result of any partial casualty loss provided an uncured Event of Default does not then exist and if no condition then exists which will, with the passage of time, the giving of notice or both, constitute an Event of Default, and provided further, that (x) BORROWER demonstrates to LENDER that the Property can be restored to an economically feasible operation, (y) such proceeds are sufficient to complete the rebuilding or restoration or, if insufficient, that BORROWER has funds which, together with the available proceeds, are sufficient to complete such rebuilding or restoration and (z) BORROWER satisfies such other conditions to the use of such proceeds to reimburse BORROWER as LENDER may impose thereon. If LENDER or its agent makes such proceeds available to reimburse BORROWER for the cost of the rebuilding or restoration of the Improvements on the Property, such proceeds shall be made available in

BOOK **1119** PAGE **564**

the manner and under the conditions that the LENDER may require, including, without limitation, (i) that in the event such proceeds shall be insufficient to restore or rebuild the Improvements, BORROWER shall deposit promptly with LENDER or its agent funds which, together with such proceeds, shall be sufficient in LENDER'S judgment to restore and rebuild the Property; (ii) that BORROWER shall use its best efforts to obtain a waiver of the right of subrogation from any insurer under such policies of insurance who, at that time, claims that no liability exists as to BORROWER or the then owner or the insured under such policies; (iii) that the excess of such proceeds above the amount necessary to complete such restoration and to compensate BORROWER for all other losses shall be applied at LENDER'S option on account of the indebtedness or obligation hereby secured (in inverse order of maturity without payment of any prepayment premium); (iv) BORROWER shall have delivered to LENDER and LENDER shall have reviewed and approved in writing the plans and specifications for the restoration work and the same shall have been approved by all governmental authorities having jurisdiction; (v) BORROWER shall have furnished to LENDER for LENDER'S approval a detailed budget and cost breakdown for said restoration work signed by BORROWER and describing the nature and type of expenses and amounts thereof estimated by BORROWER for said restoration work including, but not limited to, the cost of material and supplies, architect and designer fees, general contractor's fees, and the anticipated monthly disbursement schedule, and LENDER shall have given to BORROWER written approval of such budget and cost breakdown (if BORROWER determines that its actual expenses differ from its estimated budget, it will so advise LENDER promptly); (vi) in LENDER'S reasonable judgment, such restoration work can be completed prior to the maturity of the Note; and (vii) BORROWER shall have furnished to LENDER evidence satisfactory to LENDER that all leases of the Property in effect immediately prior to such damage will remain in full force and effect subject only to abatement of rent during the repair period in accordance with the provisions of said leases. In the event any of the conditions described above are not or can not be satisfied, then such proceeds shall be disposed of as otherwise provided in this Section 1.04. Under no circumstances shall LENDER become obligated to take any action to restore the Property.

(B)    All proceeds released or applied by the LENDER or its agent to the restoration of the Improvements pursuant to the provisions of this Section 1.04 shall be released and/or applied on the cost of restoration (including within the term "restoration" any repair, reconstruction or alteration) as such restoration progresses, in amounts which shall equal ninety percent (90%) of the amounts from time to time certified by an architect approved by LENDER to have been incurred in such restoration of any and all of said property (i.e., 90% of the total amount expended by the contractor for the project under a contract approved by LENDER and billed by the contractor to BORROWER) and performed by a contractor reasonably satisfactory to LENDER and who shall furnish such corporate surety bond, if any, as may be reasonably required by LENDER, in accordance with the plans and specifications therefore previously approved by LENDER and the remaining ten percent (10%) upon completion of such restoration and delivery to LENDER of evidence reasonably satisfactory to LENDER that no mechanics' lien exists with respect to the work of such restoration; that the restoration work has been completed in accordance with the plans

-8-

BOOK**1119**PAGE**565**

and specifications for said work approved by LENDER; that all of the leases referred to in the preceding paragraph are in full force and effect, with all tenants in occupancy and paying full lease rental thereunder; and that all governmental approvals required for the completion of said restoration work have been obtained and the same are in form and substance reasonably satisfactory to LENDER.

(C)     If within a reasonable period of time after the occurrence of any loss or damage to the Property which constitutes less than a total loss, BORROWER shall not have submitted to LENDER and received LENDER'S approval of plans and specifications for the repair, restoration or rebuilding of such loss or damage or shall not have obtained approval of such plans and specifications from all governmental authorities whose approval is required, or if, after such plans and specifications are approved by LENDER and by all such governmental authorities, BORROWER shall fail to commence promptly such repair, restoration or rebuilding, or if thereafter BORROWER fails to carry out diligently such repair, restoration or rebuilding or is delinquent in the payment to mechanics, materialmen or others of the costs incurred in connection with such work, or if any other condition of this Section 1.04 is not satisfied within a reasonable period of time after the occurrence of any such loss or damage, then LENDER, in addition to all other rights herein set forth, and, after giving BORROWER at least thirty (30) days' written notice of the nonfulfillment of one or more of the foregoing conditions may, failing BORROWER'S fulfillment of said conditions within said thirty (30) day period, and failing BORROWER'S commencement of fulfillment of said conditions within said thirty (30) day period and thereafter diligently pursuing the same, at LENDER'S option, (i) may declare that an event of default has occurred and/or apply all proceeds to the payment of any indebtedness hereby secured, and/or (ii) LENDER, or any lawfully appointed receiver of the Property, may at their respective options, perform or cause to be performed such repair, restoration or rebuilding, and may take such other steps as they deem advisable to carry out such repair, restoration or rebuilding, and may enter upon the Property for any of the foregoing purposes, and BORROWER hereby waives, for itself and all others holding under it, any claim against LENDER and such receiver (other than a claim based upon the alleged gross negligence or intentional misconduct of LENDER or any such receiver) arising out of anything done by them or any of them pursuant to this Section 1.04, and LENDER may in its discretion apply any proceeds held by it to reimburse itself and/or such receiver for all amounts expended or incurred by it in connection with the performance of such work, including attorney's fees, and any excess costs shall be paid by BORROWER to LENDER and BORROWER'S obligation to pay such excess costs shall be secured by the lien of this Indenture and shall bear interest at the rate specified in Section 3.11.

1.05.   Condemnation Awards.     BORROWER shall promptly notify TRUSTEE and LENDER of any action or proceeding relating to any condemnation or other taking of the Property or any part thereof, and BORROWER shall appear in and prosecute any such action or proceeding unless otherwise directed or consented to by LENDER in writing. At LENDER'S option, LENDER shall be entitled, and BORROWER hereby authorizes LENDER at BORROWER'S expense, to take all necessary and proper steps (including,

BOOK 1119 PAGE 566

without limitation, the engaging, at BORROWER'S expense, of appraisers to conduct independent appraisals on behalf of TRUSTEE and LENDER and the engaging of attorneys and other professionals and consultants) to appear in, prosecute, compromise and discharge any such action or proceeding. As further security for the payment of the indebtedness and performance of the obligations, covenants and agreements secured hereby, BORROWER hereby assigns to LENDER all judgments, awards or damages or settlements hereafter made resulting from condemnation proceedings or in lieu of any taking of the Property or any part thereof under the power of eminent domain, or for any damage, whether caused by such taking or otherwise, to the Property, including the improvements thereon, or any part thereof, or of any streets appurtenant thereto, including any award for change of grade of streets. LENDER shall have the right either (i) to apply any such sums or any part thereof so received after payment of all of its expenses, including costs and reasonable attorneys' fees, to the indebtedness secured hereby or (ii) apply all or any part of any amount received to the restoration or repair of the Property, in such manner as it elects.

### 1.06. Taxes, Liens and Other Items.

(A)    BORROWER shall pay any and all taxes, bonds, assessments, fees, liens, charges, fines, impositions and any accrued interest or penalty thereon, and any and all other items which are attributable to or affect the Property by making payment when due directly to the payee thereof and promptly furnish copies of paid receipts for these to LENDER, unless such payments are to be made by LENDER as otherwise provided herein. BORROWER shall promptly discharge or bond any lien or encumbrance on the Property whether said lien or encumbrance has or may attain priority over this Deed of Trust or not. This Deed of Trust shall be the sole encumbrance on the Property and, if with the consent of LENDER it is not the sole encumbrance, then it shall be prior to any and all other liens or encumbrances on the Property. Provided that the priority of this Deed of Trust is not in any way affected, BORROWER may in good faith protest the payment of any tax or lien which it believes is unwarranted or excessive ("Contested Sum") and may defer payment of such tax pending conclusion of such contest if legally permitted to do so and provided LENDER'S security is not jeopardized in LENDER'S sole opinion. During such contest, BORROWER shall not be deemed in default hereunder if (i) prior to the delinquency of the Contested Sum, BORROWER deposits with LENDER or LENDER'S nominee cash or other security in form reasonably satisfactory to LENDER, adequate to cover the payment of such Contested Sum and any obligation, whether matured or contingent, of BORROWER or LENDER therefor, together with interest, costs and penalties thereon, and (ii) BORROWER promptly causes to be paid any amounts adjudged to be due, together with all costs, penalties and interest thereon, on or before such judgment becomes final and before any writ or order is issued under which the Property could be sold pursuant to such judgment. Notwithstanding the foregoing, BORROWER shall immediately upon the request of LENDER pay any such Contested Sum, regardless of such contest, if in the reasonable opinion of LENDER, the Property shall be in jeopardy or in danger of being forfeited or foreclosed.

(B)    As further security for the payment of the Note and the payment of real estate taxes, regular or special assessments and insurance premiums, BORROWER shall be required to deposit, with each payment on the Note, an amount which shall, when multiplied by the number of loan payments due under the Note each year, be sufficient, in the estimation of LENDER (as determined each year) to pay all such charges not less than thirty (30) days prior to the date on which such items become due and payable. LENDER shall be furnished evidence to allow it to estimate such amounts, including paid receipts, assessment notices and tax receipts. All funds so deposited (i) shall be held free of any liens or claims on the part of creditors of the BORROWER; and (ii) shall not be, or deemed to be, a trust fund; and such funds shall, until applied to the payment of the aforesaid items, as hereinafter provided, be held by LENDER without interest (except to the extent required under applicable law) and may be commingled with other funds of LENDER. All funds so deposited shall be applied to the payment of the aforesaid items only upon the satisfaction of the following conditions: (1) no Event of Default or event, which, with notice or the passage of time or both, could become an Event of Default, shall have occurred; (2) LENDER shall have sufficient funds to pay the full amounts of such items (which funds may include amounts paid solely for such purpose by BORROWER in addition to the escrowed funds); and (3) BORROWER shall have furnished LENDER with prior written notification that such items are due and with the bills and invoices therefor in sufficient time to pay the same before any penalty or interest attaches, and shall have deposited any additional funds as LENDER may determine as necessary to pay such items.

(C)    If for any reason the funds on deposit with LENDER under this Section 1.06 shall not be sufficient to pay all charges specified herein within the time specified in this Section 1.06, then BORROWER shall, within ten (10) days after demand by LENDER, deposit sufficient sums so that LENDER may pay all such charges in full, together with any penalty and interest thereon. If the funds on deposit with LENDER shall from time to time exceed the amounts needed to pay all charges specified herein, then such excess shall be held by LENDER for further payments of such charges as specified in this Section 1.06.

(D)    LENDER expressly disclaims any obligation to pay the aforesaid items unless and until BORROWER complies with all of the provisions set forth in Subsections 1.06(A) and (B). Payments of all charges specified herein will, at the discretion of LENDER, be made as the same become due and payable even though subsequent owners of the Property may benefit therefrom. LENDER may, in refunding any part of the funds deposited hereunder as a result of the Note being paid in full, or for any other reason at the discretion of LENDER, pay the amount being refunded to whoever is represented to be the owner of the Property or any portion thereof at the time such refund is made. BORROWER hereby pledges any and all monies now or hereafter deposited pursuant to Subsection 1 06(B) as additional security for the Note and Related Agreements. If any Event of Default shall have occurred, or if the Note shall be accelerated as herein provided, all funds so deposited may, at LENDER'S option, be applied as determined solely by LENDER or to cure said Event of Default or as provided in this Section 1.06. In no event shall BORROWER claim

BOOK**1119**PAGE**568**

any credit against the principal and interest due hereunder for any payment or deposit for any of the aforesaid items.

1.07. Acceleration Upon Sale or Encumbrance. If BORROWER shall (A) sell or convey the Property or any part thereof, or any interest in the Property or in BORROWER (other than limited partnership interests); (B) be divested of its title to the Property or any interest therein; (C) further encumber the Property or the ownership interests in the BORROWER; (D) enter into any*lease giving the tenant any option to purchase the Property or any part thereof; (E) encumber, grant a security interest in, transfer, permit the transfer of, or change or permit the change in: (1) the ownership of interests in the BORROWER (other than limited partnership interests) or (2) the amount of the general partnership interests in: BORROWER or the general partners of the BORROWER or the beneficiary thereof, or (F) file any notices, or commence any procedures or actions which, if completed, would result in the Property being converted to a condominium or cooperative form of ownership, without the prior written consent of LENDER, then LENDER shall have the right, at its option, to declare the indebtedness secured by this Deed of Trust, irrespective of the maturity date specified in the Note, immediately due and payable. Except as expressly consented to in writing by LENDER, BORROWER shall not permit any additional encumbrances on the Property.

1.08. Preservation and Maintenance of Property. BORROWER shall hire competent and responsive property managers who shall be reasonably acceptable to LENDER. BORROWER or its property manager, if applicable, shall keep the Property and every part thereof in good condition and repair, in accordance with sound property management practices and shall promptly and faithfully comply with and obey all laws, ordinances, rules, regulations, requirements and orders of every duly constituted governmental authority or agent having jurisdiction with respect to the Property. BORROWER shall not permit or commit any waste, impairment, or deterioration of the Property, nor commit, suffer or permit any act upon or use of the Property in violation of law or applicable order of any governmental authority, whether now existing or hereafter enacted, or in violation of any covenants, conditions or restrictions affecting the Property or bring or keep any article in the Property or cause or permit any condition to exist thereon which would be prohibited by or invalidate the insurance coverage required to be maintained hereunder. BORROWER shall not make any structural modifications or improvements whatsoever to the Property which will diminish its utility, adversely affect its appearance or reduce its quality or value without the prior written consent of LENDER. BORROWER shall not remove or demolish the Improvements or any portion thereof without the prior written consent of LENDER. Subject to Sections 1.03 and 1.05, BORROWER shall promptly restore any portion of the Property which may be damaged or destroyed. BORROWER shall promptly bond or discharge any mechanics' liens against the Property.

Unless required by applicable law or unless LENDER has otherwise first agreed in writing, BORROWER shall not make or allow any changes which will adversely affect the value of the Property to be made in the nature of the occupancy or use of the Property or

*future

-12-

BOOK**1119**PAGE**569**

any part thereof for which the Property or such part was intended at the time this Deed of Trust was delivered. BORROWER shall not initiate or acquiesce in any change which will adversely affect the value of the Property in any zoning or other land use classification now or hereafter in effect and affecting the Property or any part thereof without in each case obtaining LENDER'S prior written consent thereto.

     1.09. <u>Offset Certificates</u>. BORROWER, within ten (10) days upon request in person or within fifteen (15) days upon request by mail, shall furnish a written statement duly acknowledged and notarized, of all amounts due on any indebtedness secured hereby or secured by any of the Related Agreements, whether for principal or interest on the Note or otherwise, and stating whether any offsets or defenses exist against the indebtedness secured hereby and covering such other matters with respect to any such indebtedness as LENDER may reasonably require.

     1.10. <u>Protection of Security, Costs and Expenses</u>. BORROWER and its property manager, if applicable, shall appear in and defend any action or proceeding purporting to affect the security of this Deed of Trust or any additional or other security for the obligations secured hereby, or the rights or powers of the TRUSTEE or LENDER, and shall pay all costs and expenses reasonably and actually incurred, including, without limitation, cost of evidence of title and reasonable, actual attorneys' fees, in any such action or proceeding in which TRUSTEE or LENDER may appear, and in any suit brought by TRUSTEE or LENDER to foreclose this Deed of Trust or to enforce or establish any other rights or remedies of TRUSTEE or LENDER hereunder or under any other security for the obligations secured hereby. If BORROWER fails to perform any of the covenants or agreements contained in this Deed of Trust, or if any action or proceeding is commenced which affects TRUSTEE'S or LENDER'S interest in the Property or any part thereof, including eminent domain, code enforcement, or proceedings of any nature whatsoever under any federal or state law, whether now existing or hereafter enacted or amended, relating to bankruptcy, insolvency, arrangement, reorganization or other form of debtor relief, or to a decedent, then LENDER may, but without obligation to do so and without notice to or demand upon BORROWER, perform such covenant or agreement and compromise any encumbrance, charge or lien which in the judgment of LENDER appears to be prior or superior hereto. BORROWER shall further pay all expenses actually incurred, or contracted to be paid, by LENDER (including reasonable and actual fees and disbursements of counsel) incident to the protection or enforcement of the rights of TRUSTEE and LENDER hereunder, and enforcement or collection of payment of the Note or any Future Advance whether by judicial or nonjudicial proceedings, or in connection with any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding of BORROWER, or otherwise. Any amounts disbursed by LENDER pursuant to this Section 1.10 shall be additional indebtedness of BORROWER secured by this Deed of Trust and each of the Related Agreements as of the date of disbursement and shall bear interest at the Default Rate set forth in the Note, from demand until paid. All such amounts shall be payable by BORROWER within ten (10) days of LENDER'S demand. Nothing contained in this section

shall be construed to require TRUSTEE or LENDER to incur any expense, make any appearance, or take any other action.

### 1.11. BORROWER'S Covenants Respecting Collateral.

(A)     BORROWER shall execute and deliver financing and continuation statements covering the Collateral from time to time and in such form as LENDER may require to perfect and continue the perfection of LENDER'S security interest with respect to such property, and BORROWER shall pay all reasonable costs and expenses of any record searches for financing statements LENDER may require.

(B)     Without the prior written consent of LENDER, BORROWER shall not create or suffer to be created any other security interest in the Collateral, including replacements and additions thereto.

(C)     Without the prior written consent of LENDER or except in the ordinary course of business, BORROWER shall not sell, transfer or encumber any of the Collateral, or remove any of the Collateral from the Property unless BORROWER shall promptly substitute and replace the property removed with similar property of at least equivalent value on which LENDER shall have a continuing security interest ranking at least equal in priority to LENDER'S security interest in the property removed.

(D)     BORROWER shall (1) upon reasonable notice (unless an emergency or Event of Default exists) permit LENDER and its representatives to enter upon the Property to inspect the Collateral and BORROWER'S books and records relating to the Collateral and make extracts therefrom and to arrange for verification of the amount of Collateral, under procedures acceptable to LENDER, directly with BORROWER'S debtors or otherwise at BORROWER'S expense; (2) promptly notify LENDER of any attachment or other legal process levied against any of the Collateral and any information received by BORROWER relative to the Collateral, BORROWER'S debtors or other persons obligated in connection therewith, which may in any way affect the value of the Collateral or the rights and remedies of LENDER in respect thereto; (3) reimburse LENDER within ten (10) days of LENDER'S demand for any and all costs actually incurred, including, without limitation, reasonable and actual attorneys' and accountants' fees, and other expenses incurred in collecting any sums payable by BORROWER under any obligation secured hereby, or in the checking, handling and collection of the Collateral and the preparation and enforcement of any agreement relating thereto; (4) notify LENDER of each location at which the Collateral is or will be kept, other than for temporary processing, storage or similar purposes, and of any removal thereof to a new location, including, without limitation, each office of BORROWER at which records relating to the Collateral are kept; (5) provide, maintain and deliver to LENDER originals of the policies of insurance and certificates of insurance insuring the Collateral against loss or damage by such risks and in such amounts, from and by such companies as LENDER may require and with loss payable to LENDER, and in the event LENDER takes possession of the Collateral, the insurance policy or policies and any unearned or returned

-14-

BOOK **1119** PAGE **571**

premium thereon shall at the option of LENDER become the sole property of LENDER; and (6) do all acts necessary to maintain, preserve and protect all Collateral, keep all Collateral in good condition and repair and prevent any waste or unusual or unreasonable depreciation thereof.

(E)     Until LENDER exercises its right to collect proceeds of the Collateral pursuant hereto, BORROWER will collect with diligence any and all proceeds of the Collateral. If an Event of Default exists, any proceeds received by BORROWER shall be held in trust for LENDER, and BORROWER shall keep all such collections separate and apart from all other funds and property so as to be capable of identification as the property of LENDER and shall deliver to LENDER such collections at such time as LENDER may request in the identical form received, properly endorsed or assigned when required to enable LENDER to complete collection thereof.

(F)     LENDER shall have all the rights and remedies granted to a secured party under the Uniform Commercial Code of the state in which the Collateral is located, as well as all other rights and remedies available at law or in equity. During the continuance of any Event of Default hereunder or under the Note, LENDER shall have the right to take possession of all or any part of the Collateral, to receive directly or through its agent(s) collections of proceeds of the Collateral (including notification of the persons obligated to make payments to BORROWER in respect of the Collateral), to release persons liable on the Collateral and compromise disputes in connection therewith, to exercise all rights, powers and remedies which BORROWER would have, but for the security agreement contained herein, to all of the Collateral and proceeds thereof, and to do all other acts and things and execute all documents in the name of BORROWER or otherwise, deemed by LENDER as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

(G)     After any Event of Default hereunder or under the Note, BORROWER shall, at the request of LENDER, assemble and deliver the collateral and books and records pertaining to the Property at a place designated by LENDER, and LENDER may, with reasonable notice to BORROWER (unless an emergency or Event of Default exists), enter onto the Property and take possession of the Collateral. It is agreed that public or private sales, for cash or on credit to a wholesaler or retailer or investor, or user of collateral of the types subject to the security agreement, or public auction, are all commercially reasonable since differences in the sales prices generally realized in the different kinds of sales are ordinarily offset by the differences in the costs and credit risks of such sales. The proceeds of any sale of the Collateral shall be applied first to the expenses of LENDER actually incurred in retaking, holding, preparing for sale, or selling the Collateral or similar matters, including reasonable and actual attorneys' fees, and then, as LENDER shall solely determine.

-15-

BOOK **1119** PAGE 572

1.12. Covenants Regarding Financial Statements.

(A)    BORROWER shall keep accurate books and records in accordance with generally accepted accounting principles consistently applied (or other basis of accounting practices prescribed or permitted by LENDER), in which full, true and correct entries shall be promptly made as to all operations of the Property and shall permit all such books and records to be inspected and copied by LENDER, its designees or its representatives during customary business hours. BORROWER shall deliver or cause to be delivered to LENDER (i) within 90 days of the end of each calendar year, financial statements of all guarantors of the Loan, and (ii) within 90 days after the close of its financial year a statement of condition or balance sheet of BORROWER relating solely to the Property as at the end of such year and an annual operating statement showing in reasonable detail all income and expenses of BORROWER with respect to the Property, both certified as to accuracy by either an independent certified public accountant acceptable to LENDER (if requested by LENDER) or the senior financial officer or partner of BORROWER; and a current list of all persons then occupying portions of the Property under their Leases, the rentals payable by such tenants and the unexpired terms of their Leases, certified as to their accuracy by a representative of BORROWER acceptable to LENDER, and in form and substance satisfactory to LENDER.

(B)    In the event such statements are not in a form reasonably acceptable to LENDER or BORROWER fails to furnish such statements and reports, then LENDER, consistent with the requirements of this Section 1.12, shall have the immediate and absolute right to audit the respective books and records of the Property and BORROWER at the expense of BORROWER.

1.13    Environmental Covenants.

(A)    BORROWER represents and warrants and covenants and agrees that (i) BORROWER has not used and will not use and, to the best of BORROWER'S knowledge, no prior owner or current or prior tenant, subtenant, or other occupant of all or any part of the Property has used or is using Hazardous Material (as that term is hereinafter defined) on, from or affecting the Property in any manner that violates any Hazardous Material Laws (as that term is hereinafter defined) applicable to BORROWER or to the Property; (ii) to the best of BORROWER'S knowledge, no Hazardous Materials have been disposed of on the Property nor have any Hazardous Materials migrated onto the Property, in either event in violation of any Hazardous Material Laws applicable to BORROWER or to the Property; and (iii) BORROWER will not permit or suffer any such violation of any Hazardous Material Laws applicable to BORROWER or to the Property.

For purposes of this Deed of Trust, "Hazardous Materials" means and includes asbestos or any substance containing asbestos, polychlorinated biphenyls, any explosives, radioactive materials, chemicals known or suspected to cause cancer or reproductive toxicity, pollutants, effluents, contaminants, emissions, infectious wastes, any petroleum or petroleum-derived waste or product or related materials and any items defined as hazardous, special or

--16--

toxic materials, substances or waste under any Hazardous Material Law, or any material which shall be removed from the Property pursuant to any administrative order or enforcement proceeding or in order to place the Property in a condition that is suitable for ordinary use. "Hazardous Material Laws" collectively means and includes any present and future local, state, federal or international law or treaty applicable to the Property or to the BORROWER and relating to public health, safety or the environment including, without limitation, the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. §6901 et seq., the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. §1801 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Clean Air Act, as amended, 42 U.S.C. §7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Safe Drinking Water Act, 42 U.S.C. §300f et seq., the Uranium Mill Tailings Radiation Control Act, 42 U.S.C. §7901 et seq., the Occupational Safety and Health Act, 29 U.S.C. §655 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §135 et seq., the National Environmental Policy Act, 42 U.S.C. §4321 et seq., the Noise Control Act, 42 U.S.C. §4901 et seq., and the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §11001 et seq., and the amendments, regulations, orders, decrees, permits, licenses or deed restrictions now or hereafter promulgated thereunder.

(B)    BORROWER represents and warrants that to the best of its knowledge that no generation, treatment, storage or disposal of any Hazardous Materials has occurred or is occurring on the Property in violation of any Hazardous Material Laws applicable to BORROWER or to the Property, and that BORROWER will not permit or suffer any such generation, treatment, storage or disposal of Hazardous Materials on the Property in violation of any Hazardous Material Laws applicable to BORROWER or the Property, or permit any lien under the laws of the state in which the Property is located to attach to the Property or any portion thereof or any interest therein as a result of any such Hazardous Materials activity. BORROWER represents and warrants that it has not received any notice from any governmental agency or any tenant of the Property with regard to such Hazardous Materials, and has received no notice that the environmental and ecological condition of the Property is in violation of any Hazardous Material Laws applicable to BORROWER or the Property.

(C)    BORROWER represents and warrants to the best of BORROWER'S knowledge and belief (i) that the Property does not contain, and has not in the past contained, any asbestos containing material in friable form in violation of any Hazard Material Laws applicable to BORROWER or to the Property, and (ii) that there is no current or potential airborne contamination of the Property by asbestos fiber, including any potential contamination that would be caused by maintenance or tenant finish activities in the improvements in violation of any Hazardous Material Laws applicable to BORROWER or to the Property.

(D)    In the event that any investigation, site monitoring, containment, clean-up, removal, restoration or other remedial work of any kind or nature (hereinafter referred to

-17-

BOOK**1119**PAGE**574**

as the "Remedial Work") is required under any Hazardous Material Laws applicable to
BORROWER or to the Property, because of, or in connection with, the current or future
presence, suspected presence, release or suspected release of a Hazardous Material in or
about the air, soil, ground water, surface water or soil vapor at, on, about, under or within
the Property (or any portion thereof), BORROWER shall within the time periods required by
the applicable Hazardous Material Laws, commence and thereafter diligently prosecute to
completion, all such Remedial Work. All Remedial Work shall be performed by contractors
reasonably approved in advance by LENDER and under the supervision of a consulting
engineer reasonably approved by LENDER. All costs and expenses of such Remedial Work
shall be paid by BORROWER including, without limitation, LENDER'S reasonable
attorneys' fees and costs incurred in connection with monitoring or review of such Remedial
Work. In the event BORROWER shall fail to timely prosecute to completion such Remedial
Work, LENDER may, but shall not be required to, cause such Remedial Work to be
performed and all costs and expenses thereof, or incurred in connection therewith, shall be
immediately due and payable by BORROWER to LENDER and shall become part of the
indebtedness.

       (E)    BORROWER shall provide LENDER with prompt written notice (a)
upon BORROWER'S becoming aware of any release or threat of release of any Hazardous
Materials upon, under or from the Property in violation of any Hazardous Material Laws
applicable to BORROWER or to the Property, (b) upon BORROWER'S receipt of any notice
from any federal, state, municipal or other governmental agency or authority in connection
with any Hazardous Materials located upon or under or emanating from the Property; and (c)
upon BORROWER'S obtaining knowledge of any incurrence of expense, for which
BORROWER or the Property could be liable, by any governmental agency or authority in
connection with the assessment, containment or removal of any Hazardous Materials located
upon or under or emanating from the Property.

       (F)    Nothing in this Section 1.13 shall create a liability or obligation on the
part of BORROWER with regard to any violation of Hazardous Material Laws resulting
solely from either (i) the actions of LENDER or its agents, or (ii) circumstances in no way
caused by matters occurring prior to LENDER'S acquiring the Property pursuant to
foreclosure of the lien of this Deed of Trust, sale under power of sale or acceptance of a
deed in lieu of foreclosure.

BOOK**1119**PAGE**575**

## ARTICLE II

### EVENTS OF DEFAULT

Each of the following shall constitute an event of default ("Event of Default") hereunder:

2.01    Monetary and Performance Defaults.

(A)    Failure to make any payment of any installment of principal or interest due under the Note, or payment of any other sum due under the Note (other than the final payment and Prepayment Premium), under this Deed of Trust or under any of the other Related Agreements to LENDER or any other party, including without limitation, payment of escrow deposits, if any, within ten (10) days from the date when such payment is due; or

(B)    Failure to make the final payment or the Prepayment Premium due under the Note when such payment is due whether at maturity, by reason of acceleration, as part of a prepayment or otherwise (the defaults in (A) and (B) hereinafter "Monetary Default"); or

(C)    Breach or default in the performance of any of the covenants or agreements of BORROWER contained herein or in any Related Agreement ("Performance Default"), if such Performance Default shall continue for thirty (30) days or more after written notice to BORROWER from LENDER specifying the nature of the Performance Default; provided, however, that if such Performance Default is of a nature that it cannot be cured within the thirty (30) day period, then BORROWER shall not be in default if it commences good faith efforts to cure the Performance Default within the thirty (30) day period, demonstrates continuous diligent efforts to cure the Performance Default in a manner satisfactory to LENDER and, within a reasonable period, not to exceed ninety (90) days after the date of the original written notice of the Performance Default, completes the cure of such Performance Default.

2.02    Bankruptcy, Insolvency, Dissolution.

(A)    Any court of competent jurisdiction shall sign an order (1) adjudicating BORROWER, or any person, partnership or corporation holding an ownership interest in BORROWER or in any partnership comprising BORROWER, or any guarantor (which term when used in this Deed of Trust shall mean guarantor of payment of the indebtedness) bankrupt or insolvent, (2) appointing a receiver, trustee or liquidator of the Property or of a substantial part of the property of BORROWER, or any person, partnership or corporation holding an ownership interest in BORROWER, or in any partnership comprising BORROWER, or any guarantor, or (3) approving a petition for, or effecting an arrangement in bankruptcy, or any other judicial modification or alteration of the rights of LENDER or of other creditors of BORROWER, or any person, partnership or corporation holding an

-19-

ownership interest in BORROWER, or in any partnership comprising BORROWER or any guarantor; or

       (B)    BORROWER, any partnership or corporation holding an ownership interest in BORROWER or in any partnership comprising BORROWER, shall (1) apply for or consent to the appointment of a receiver, trustee or liquidator for it or for any of its property, (2) as debtor, file a voluntary petition in bankruptcy, or petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it and any proceeding under such law, (3) admit in writing an inability to pay its debts as they mature, or (4) make a general assignment for the benefit of creditors; or

       (C)    An involuntary petition in bankruptcy is filed against BORROWER or any person, partnership or corporation holding an ownership interest in BORROWER or in any partnership comprising BORROWER and the same is not vacated or stayed within 60 days of the filing date.

    2.03   <u>Misrepresentation.</u>   BORROWER, and in each case as applicable, any general partner of BORROWER, any guarantor of the indebtedness, or any party acting in or on behalf of BORROWER, makes or furnishes a representation, warranty, statement, certificate, schedule and/or report to LENDER in or pursuant to this Deed of Trust or any of the Related Agreements which is false or misleading in any material respect as of the date made or furnished.

    2.04   <u>Process Against the Property.</u>   The levy of any execution, attachment, sequestration or other writ against the Property or any part thereof.

    2.05   <u>Foreclosure or Maturity of Other Liens.</u>   If the holder of any lien or security interest on the Property, other than LENDER (whether or not LENDER has consented to the existence of such lien or security interest and without hereby implying LENDER'S consent to the existence, placing, creating or permitting of any such lien or security interest) institutes or completes foreclosure or other proceedings for the enforcement of its remedies with respect to such lien or security interest, or accelerates maturity of such lien or security interest for any reason.

    2.06   <u>Prohibited Transfer.</u>  The Property, any interest in the Property, or any interest in BORROWER is transferred, sold, assigned or conveyed, unless specifically permitted herein.

BOOK**1119**PAGE**577**

### ARTICLE III

### REMEDIES

Upon the occurrence of any Event of Default, TRUSTEE or LENDER, as applicable, shall have the following rights and remedies set forth in Sections 3.01 through 3.12:

3.01    Acceleration.    Notwithstanding the stated maturity date in the Note, LENDER may without notice or demand, declare the entire principal amount of the Note and/or any Future Advances then outstanding and accrued and unpaid interest thereon, and all other sums or payments required thereunder including, but not limited to the Prepayment Premium described in the Note, to be due and payable immediately, and, at LENDER'S option, (i) to bring suit therefor, or (ii) to bring suit for any delinquent payment of or upon the indebtedness, or (iii) to take any steps and institute any and all other proceedings in law or in equity that LENDER deems necessary to enforce payment of the indebtedness and performance of other obligations secured hereunder and to protect the lien of this Deed of Trust.

3.02    Entry.    Irrespective of whether LENDER exercises the option provided in Section 3.01 above, LENDER in person or by agent or by court-appointed receiver (and LENDER shall have the right to the immediate appointment of such a receiver without regard to the adequacy of the security and BORROWER hereby irrevocably consents to such appointment and waives notice of any application therefor) may, at its option, without any action on its part being required, without in any way waiving such Event of Default, with or without the appointment of a receiver, or an application therefor:

(A)    take possession of, conduct tests of, manage or hire a manager to manage, lease and operate the Property or any part thereof, on such terms and for such period of time as LENDER may deem proper, with full power to make, from time to time, all alterations, renovations, repairs or replacements thereto as may seem proper to LENDER;

(B)    with or without taking possession of the Property, collect and receive all Rents and Profits, notify tenants under the Leases or any other parties in possession of the Property to pay Rents and Profits directly to LENDER, its agent or a court-appointed receiver and apply such Rents and Profits to the payment of:

(1)    all costs and expenses incident to taking and retaining possession of the Property, management and operation of the Property, keeping the Property properly insured and all alterations, renovations, repairs and replacements to the Property;

(2)    all taxes, charges, claims, assessments, and any other liens which may be prior in lien or payment to this Deed of Trust or the Note, and premiums for insurance for the Property, with interest on all such items; and

-21-

BOOK 1119 PAGE 578

(3)    the indebtedness secured hereby together with all costs and attorneys' fees, in such order or priority as to any of such items as LENDER in its sole discretion may determine, any statute, law, custom or use to the contrary notwithstanding;

(C)    exclude BORROWER, its agents and servants, wholly from the Property;

(D)    have joint access with BORROWER to the books, papers and accounts of BORROWER relating to the Property, at the expense of BORROWER;

(E)    commence, appear in and/or defend any action or proceedings purporting to affect the interests, rights, powers and/or duties of TRUSTEE or LENDER hereunder, whether brought by or against BORROWER, TRUSTEE or LENDER; and

(F)    pay, purchase, contest or compromise any claim, debt, lien, charge or encumbrance which in the judgment of LENDER may affect or appear to affect the interest of LENDER or the rights, powers and/or duties of LENDER hereunder.

The receipt by LENDER of any Rents and Profits pursuant to this Deed of Trust after the institution of foreclosure or other proceedings under the Deed of Trust shall not cure any such Event of Default or affect such proceedings or any sale pursuant thereto. After deducting the expenses and amounts set forth above in this Section 3.02 as well as just and reasonable compensation for all LENDER'S employees and other agents (including, without limitation, reasonable and actual attorneys' fees and management and rental commissions) engaged and employed in the operation of the Property, the moneys remaining, at the option of LENDER, may be applied to the indebtedness secured hereby. Whenever all amounts due on the Note and under this Deed of Trust shall have been paid and all Events of Default have been cured and any such cure has been accepted by LENDER, LENDER shall surrender possession to BORROWER. The same right of entry, however, shall exist if any subsequent Event of Default shall occur; provided, however, LENDER shall not be under any obligation to make any of the payments or do any of the acts referred to in this Section 3.02.

3.03    Judicial Action.    TRUSTEE or LENDER, as applicable, may bring an action in any court of competent jurisdiction to foreclose this instrument or to enforce any of the covenants and agreements hereof. The Property may be foreclosed in parts or as an entirety.

3.04    Power of Sale.    TRUSTEE may elect to cause the Property or any part thereof to be sold under the power of sale herein granted in any manner permitted by applicable law at one or more public sale or sales at the usual place for conducting sales at the courthouse of the county in which the Land or any part of the Land is situated, to the highest bidder for cash, in order to pay the indebtedness secured hereby, and all expenses of sale and of all proceedings in connection therewith, including trustee's and attorneys' fees, after advertising the time, place and terms of each sale in accordance with the laws of the

BOOK**1119**PAGE**579**

state in which the Land is located, all other notice, including judicial notice, being hereby waived by BORROWER. If the Land is situated in more than one county, then notices shall be given in both or all of such counties, and the Property may be sold in either county, and such notices shall designate the county where the Property will be sold. Upon the expiration of such time and the giving of such notice of sale, and without the necessity of any demand on BORROWER, TRUSTEE, at the time and place specified in the notice of sale, shall sell the Property or any part thereof. The foregoing notwithstanding, TRUSTEE or LENDER, as applicable, may sell, or cause to be sold, any tangible or intangible personal property or any part thereof, and which constitutes a part of the security hereunder, in the foregoing manner, or as may otherwise be provided by law. If the indebtedness secured hereby is now or hereafter further secured by any chattel mortgages, pledges, contracts of guaranty, assignments of lease or other security instruments, LENDER may at its option exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as LENDER may determine. TRUSTEE or LENDER, as applicable, may, from time to time, postpone any sale hereunder by public announcement thereof at the time and place noticed therefor or by giving notice of the time and place of the postponed sale in the manner required by law. If the Property consists of several lots, parcels or items of property, TRUSTEE may designate the order in which such lots, parcels or items shall be offered for sale or sold. Any person, including BORROWER or LENDER, may purchase at any sale hereunder, and LENDER shall have the right to purchase at any sale hereunder by crediting upon the bid price the amount of all or any part of the indebtedness hereby secured plus interest, late charges, prepayment fees, trustee's fees and reasonable attorneys' fees, as herein provided. Should LENDER desire that more than one sale or other disposition of the Property be conducted, TRUSTEE or LENDER, as the case may be, may, at its option, cause the same to be conducted simultaneously, or successively, on the same day, or at such different times and in such order as LENDER may deem to be in its best interests, and no such sale shall terminate or otherwise affect the security of this Deed of Trust on any part of the Property not sold until all indebtedness secured hereby has been fully paid. In the event of default of any purchaser, TRUSTEE shall have the right to resell the Property as set forth above. Upon any sale hereunder, TRUSTEE shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold in fee simple, with or without any covenant or warranty whatever, express or implied, whereupon such purchaser or purchasers shall be let into immediate possession; and the recitals of facts in any such deed or deeds such as default, the giving of notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or disposition, shall be conclusive proof of the truth of such facts and any such deed or deeds shall be conclusive against all persons as to such facts recited therein. BORROWER hereby constitutes and appoints TRUSTEE the agent and attorney-in-fact of BORROWER to make such recitals, sale and conveyance, and thereby to divest BORROWER of all right, title and equity that BORROWER may have in and to the Property and to vest the same in the purchaser or purchasers at such sale or sales. The conveyance to be made by TRUSTEE, or its assigns, (and in the event of a deed in lieu of foreclosure, then as to such conveyance) shall be effective to bar all right, title and interest, equity or redemption, including all statutory redemption, homestead, dower, courtesy, and all other exemptions of BORROWER, or its successors in interest, in and to the Property. The

-23-

BOOK1119 PAGE580

aforesaid power of sale and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise and shall not be exhausted by one exercise thereof, but may be exercised until full payment of all sums secured hereby.

3.05    Rescission of Notice of Default.    LENDER, from time to time before any such public sale or deed in lieu of foreclosure, may rescind any such notice of breach or default and of election to cause the Property to be sold. LENDER may evidence such rescission, among other methods, by executing and delivering to BORROWER a written notice of such rescission, which notice, when recorded, shall also constitute a cancellation of any prior declaration of default and demand for sale or such documents as may be required by the laws of the state in which the Property is located. The exercise by LENDER of such right of rescission shall not constitute a waiver of any breach or Event of Default then existing or subsequently occurring, or impair the right of LENDER to execute and deliver to BORROWER, as above provided, other declarations of default and demand for sale, and notices of breach or default, and of election to cause the property to be sold to satisfy the obligations hereof, nor otherwise affect any provision, agreement, covenant or condition of the Note and/or of this Deed of Trust or any of the rights, obligations or remedies of the parties hereunder.

3.06    LENDER'S Remedies Respecting Collateral.    LENDER may realize upon the Collateral, enforce and exercise all of the BORROWER'S rights, powers, privileges and remedies in respect of the Collateral, dispose of or otherwise deal with the Collateral in such order as LENDER may in its discretion determine, and exercise any and all other rights, powers, privileges and remedies afforded to a secured party under the laws of the state in which the Property is located as well as all other rights and remedies available at law or in equity.

3.07    Proceeds of Sales.    The proceeds of any sale made under or by virtue of this Article III, together with all other sums which then may be held by LENDER under this Deed of Trust, whether under the provisions of this Article III or otherwise, shall be applied as follows:

(A)    To the payment of the costs, fees and expenses of sale and of any judicial proceedings wherein the same may be made, including a reasonable trustee's fee and the cost of evidence of title in connection with the sale, and to the payment of all expenses, liabilities and advances made or incurred by LENDER under this Deed of Trust, together with interest on all advances made by LENDER at the interest rate applicable under the Note, but limited to any maximum rate permitted by law to be charged by LENDER;

(B)    To the payment of any and all sums expended by LENDER under the terms hereof, not then repaid, with accrued interest at the Default Rate set forth in the Note, and all other sums (except advances of principal and interest thereon) required to be paid by BORROWER pursuant to any provisions of this Deed of Trust, or the Note, or any of the Related Agreements, including, without limitation, all expenses, liabilities and advances

-24-

BOOK **1119** PAGE **581**

made or incurred by LENDER under this Deed of Trust or in connection with the enforcement thereof, together with interest thereon as herein provided; and

(C)    To the payment of the entire amount then due, owing or unpaid for principal and interest upon the Note, and any other obligation secured hereby, with interest on the unpaid principal at the rate set forth therein from the date of advancement thereof until the same is paid in full; and then

(D)    The remainder, if any, to the person or persons, including the BORROWER, legally entitled thereto.

3.08    Condemnation and Insurance Proceeds.    All condemnation proceeds, insurance proceeds and any interest earned thereon shall be paid over either by the condemning authority, insurance company or escrow agent to LENDER and shall be applied in the sole and absolute discretion of LENDER and without regard to the adequacy of its security under this Deed of Trust (A) to the payment or prepayment of all or any portion of the Note including the Prepayment Premium described in the Note; (B) to the reimbursement of expenses incurred by LENDER in connection with the restoration of the Property; or (C) to the performance of any of the covenants contained in this Deed of Trust as LENDER may determine.  Any prepayment of the Note or portion thereof pursuant to LENDER'S election under this section shall be subject to the Prepayment Premium described in the Note.

3.09    Setoff.    LENDER may apply any balances in each and every account held by LENDER, including, but not limited to, the escrow account referred to in section 1.06, in satisfaction of the indebtedness secured hereby.

3.10    Other Remedies.    TRUSTEE and LENDER, as applicable, shall, in addition to the remedies set forth in this Article III and in Exhibit C attached hereto and incorporated herein by this reference ("Applicable State Law Provisions"), have all other remedies available to them at law or in equity.

3.11    Acceleration Interest.    In addition to any default rate of interest which may be due under the Note, BORROWER shall pay interest on all sums (other than the sums due under the Note) due hereunder or under any other Loan Document at a rate (hereinafter referred to as the "Default Rate") equal to the lesser of (i) the Contract Rate of the Note plus four percent (4%) per annum compounded monthly, or (ii) the maximum rate permitted by law, from and after the first to occur of the following events:  If LENDER elects to cause the acceleration of the Indebtedness; if a petition under Title 11, United States Code, shall be filed by or against BORROWER or if BORROWER shall seek or consent to the appointment of a receiver or trustee for itself or for any of the Property, file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, make a general assignment for the benefit of creditors, or be unable to pay its debts as they become due; if a court shall enter an order, judgment or decree appointing, with or without the consent of BORROWER, a receiver or trustee for it or for any of the Property or

-25-

approving a petition filed against BORROWER which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and any such order, judgment or decree shall remain in force, undischarged or unstayed, sixty (60) days after it is entered; or if all sums due hereunder are not paid on the Maturity Date as set forth in the Note.

3.12    Late Charge.   In addition to any late charge which may be due under the Note, in the event any sums (other than sums due under the Note) due hereunder or under any other Loan Document, are not paid by BORROWER when due, without regard to any cure or grace period, BORROWER shall pay to LENDER for the month during which such payment is not made when due and for each month or fraction thereof that such sum remains unpaid, a late charge equal to the lesser of four percent (4%) of such installment or the maximum amount allowed by applicable law, as the reasonable estimate by LENDER and BORROWER of a fair approximation of the expense incurred by LENDER due to the failure of BORROWER to make timely payments, and such amount shall be secured hereby.   Such late charge shall be paid without prejudice to the right of LENDER to collect any other amounts provided to be paid or to declare an Event of Default under this Deed of Trust or any other Loan Document.

3.13    Waiver of Marshalling, Rights of Redemption, Homestead and Valuation.

(A)    BORROWER, for itself and for all persons hereafter claiming through or under it or who may at any time hereafter become holders of liens junior to the lien of this Deed of Trust, hereby expressly waives and releases all rights to direct the order in which any of the Property shall be sold in the event of any sale or sales pursuant hereto and to have any of the Property and/or any other property now or hereafter constituting security for any of the indebtedness secured hereby marshalled upon any foreclosure of this Deed of Trust or of any other security for any of said indebtedness.

(B)    To the fullest extent permitted by law, BORROWER, for itself and all who may at any time claim through or under it, hereby expressly waives, releases and renounces all rights of redemption from any foreclosure sale, all rights of homestead, exemption, monitoring reinstatements, forbearance, appraisement, valuation, stay and all rights under any other laws which may be enacted extending the time for or otherwise affecting enforcement or collection of the Note, the debt evidenced thereby, or this Deed of Trust.

3.14    Remedies Cumulative.       No remedy herein conferred is intended to be exclusive of any other remedy herein or by law provided, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.   No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any right or power or shall be construed to be a waiver of any Event of Default or any acquiescence therein.   Every power and remedy given by this Deed of Trust may be exercised separately, successively or concurrently from time to

BOOK 1119 PAGE 583

time as often as may be deemed expedient. If there exists additional security for the performance of the obligations secured hereby, LENDER, at its sole option, and without limiting or affecting any of its rights or remedies hereunder, may exercise any of the rights and remedies to which it may be entitled hereunder either concurrently with whatever rights and remedies it may have in connection with such other security or in such order as it may determine. Any application of any amounts or any portion thereof held by LENDER at any time as additional security or otherwise, to any indebtedness secured hereby shall not extend or postpone the due dates of any payments due from BORROWER to LENDER hereunder or under the Note, or under any of the Related Agreements, or change the amounts of any such payments or otherwise be construed to cure or waive any default or notice of default hereunder or invalidate any act done pursuant to any such default or notice.

## ARTICLE IV

### MISCELLANEOUS

4.01   Severability.   In the event any one or more of the provisions contained in the Deed of Trust shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, but only to the extent that it is invalid, illegal or unenforceable.

4.02   Notices.

(A)   All notices expressly provided hereunder to be given by LENDER to BORROWER and all notices, demands and other communications of any kind or nature whatever which BORROWER may be required or may desire to give to or serve on TRUSTEE or LENDER shall be in writing and shall be (1) hand-delivered, effective upon receipt, (2) sent by United States Express Mail or by private overnight courier, effective upon receipt, or (3) served by registered or certified mail, return receipt requested to the appropriate address set forth below, or at such other place as the BORROWER, TRUSTEE or LENDER, as the case may be, may from time to time designate in writing by ten (10) days' prior written notice thereof. Any such notice or demand served by registered or certified mail, return receipt requested, shall be deposited in the United States mail, with postage thereon fully prepaid and addressed to the party so to be served at its address above stated or at such other address of which said party shall have theretofore notified in writing, as provided above, the party giving such notice. Service of any such notice or demand so made shall be deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time. Rejection or other refusal to accept or inability to deliver because of

BOOK**1119**PAGE**584**

changed address of which no notice has been received shall also constitute receipt. Any notice required to be given by TRUSTEE or LENDER shall be equally effective if given by TRUSTEE'S or LENDER'S agent, if any.

       (B)    BORROWER hereby requests that any notice, demand, request or other communication (including any notice of an Event of Default and notice of sale as may be required by law) desired to be given or required pursuant to the terms hereof be addressed to BORROWER as follows:

                    H. Connely Plunkett
                    1530 North State Street
                    Jackson, MS 39202

       With a copy to:  Taylor, Covington & Smith
                    315 Tombigbee  Street
                    Jackson, MS 39201

       Attn:    Bobby L. Covington, Esq.

All notices and other communications to LENDER shall be addressed as follows:

                    Jefferson-Pilot Life Insurance Company
                    100 North Greene Street
                    Greensboro, N.C. 27401
       Attn:          Manager of Mortgage Loan Department

       With a copy to:    Jefferson-Pilot Life Insurance Company
                    P. O. Box 21008
                    Greensboro, N.C. 27420
       Attn:          Legal Department

All notices and other communication to TRUSTEE shall be addressed as follows:

BOOK **1119** PAGE **585**

4.03    BORROWER Not Released; Certain LENDER Acts.

(A)    Extension of the time for payment or modification of the terms of payment of any sums secured by this Deed of Trust granted by LENDER to any successor in interest of BORROWER shall not operate to release, in any manner, the liability of BORROWER. LENDER shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify the terms of payment of the sums secured by this Deed of Trust by reason of any demand made by BORROWER. Without affecting the liability of any person, including BORROWER, for the payment of any indebtedness secured hereby, or the legal operation and effect of this Deed of Trust on the remainder of the Property for the full amount of any such indebtedness and liability unpaid, LENDER is empowered as follows: LENDER, may from time to time and without notice or consent (1) release any person liable for the payment of any of the indebtedness; (2) extend the time or otherwise alter the terms of payment of any of the indebtedness; (3) accept additional or personal property of any kind as security therefor, whether evidenced by deeds of trust, mortgages, security agreements or any other instruments of security; or (4) alter, substitute or release any property securing the indebtedness.

(B)    LENDER may, at any time, and from time to time, (1) consent to the making of any map or plan of the Property or any part thereof, (2) join in granting any easement or creating any restriction thereon, (3) join in any subordination or other agreement affecting this Deed of Trust or the legal operation and effect or charge hereof, or (4) reconvey, without any warranty, all or part of the Property from the lien of this Deed of Trust.

4.04    Inspection.    Upon reasonable prior notice and subject to the inspection rights of tenants under the Leases, LENDER may at any reasonable time make or cause to be made entry upon and make inspections, reappraisals, surveys, construction and environmental testing of the Property or any part thereof in person or by agent, all at LENDER'S sole cost and expense; provided, however, if an Event of Default has occurred and is continuing under the Note, this Deed of Trust or any other Loan Document, such inspections, reappraisals, surveys, construction and environmental testing shall be at BORROWER'S sole cost and expense and, provided further, that BORROWER shall engage, at its sole cost and expense, a qualified environmental engineering or consulting firm acceptable to LENDER, to perform environmental testing of the Property at any time upon the request of LENDER, such request being made by LENDER on its good faith belief that Hazardous Materials may be present on the Property or that BORROWER has violated any Hazardous Material Laws.

4.05    Release or Reconveyance or Cancellation.    Upon the payment in full of all sums secured by this Deed of Trust, LENDER shall cancel this Deed of Trust and shall surrender this Deed of Trust and all notes evidencing indebtedness secured by this Deed of Trust to BORROWER. The duly recorded cancellation shall constitute a reassignment of the Leases by the LENDER to the BORROWER and BORROWER shall pay all costs of recordation, if any.

-29-

4.06    Statute of Limitations.    BORROWER hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to any and all obligations secured by this Deed of Trust.

4.07    Interpretation.    Wherever used in this Deed of Trust, unless the context otherwise indicates a contrary intent, or unless otherwise specifically provided herein, the word "BORROWER" shall mean and include both BORROWER and any subsequent owner or owners of the Property, the word "TRUSTEE" shall mean and include not only the original TRUSTEE hereunder but also any successor or assign, and the word "LENDER" shall mean and include not only the original LENDER hereunder but also any future owner and holder, including pledgees, of the Note or other obligations secured hereby. In this Deed of Trust whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the neuter includes the feminine and/or masculine, and the singular number includes the plural. In this Deed of Trust, the use of the word "including" shall not be deemed to limit the generality of the term or clause to which it has reference, whether or not limiting language (such as "without limitation," or "but not limited to," or words of similar import) is used with reference thereto.

4.08    Captions.    The captions and heading of the Articles and sections of this Deed of Trust are for convenience only and are not to be used to interpret, define or limit the provisions hereof.

4.09    Consent.    The granting or withholding of consent by LENDER to any transaction as required by the terms hereof shall not be deemed a waiver of the right to require consent to future or successive transactions. BORROWER covenants and agrees to reimburse LENDER promptly on demand for all legal and other expenses incurred by LENDER or its servicing agent in connection with all requests by BORROWER for consent or approval under this Deed of Trust.

4.10    Delegation to Subagents.    Wherever a power of attorney is conferred upon TRUSTEE or LENDER hereunder, it is understood and agreed that such power is conferred with full power of substitution, and TRUSTEE or LENDER may elect in their sole discretion to exercise such power themselves or to delegate such power, or any part thereof, to one or more subagents.

4.11    Successors and Assigns.    All of the grants, obligation, covenants, agreements, terms, provisions and conditions herein shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, administrators, executors, legal representatives, successors and assigns of BORROWER (but this shall not permit any assignment prohibited hereby) and TRUSTEE and shall apply to, bind and inure to the benefit of the endorsees, transferees, successors and assigns of LENDER. In the event BORROWER is composed of more than one party, the obligations, covenants, agreements, and warranties contained herein as well as the obligations arising therefrom are and shall be joint and several as to each such party.

4.12   Governing Law; Jurisdiction and Venue.   THIS DEED OF TRUST IS
INTENDED TO BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE
STATE IN WHICH THE PROPERTY IS LOCATED WITHOUT GIVING EFFECT TO
THE CONFLICT OF LAWS PRINCIPLES THEREOF.  IN ANY LITIGATION IN
CONNECTION WITH OR TO ENFORCE THIS DEED OF TRUST OR ANY OF THE
OTHER LOAN DOCUMENTS, THE BORROWER HEREBY IRREVOCABLE
CONSENTS AND CONFERS PERSONAL JURISDICTION ON THE STATE COURTS OF
THE COUNTY IN WHICH THE PROPERTY IS LOCATED, OR ON THE UNITED
STATES DISTRICT COURT OR THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT IN WHICH THE PROPERTY IS LOCATED.  BORROWER EXPRESSLY
WAIVES ANY OBJECTIONS AS TO VENUE IN ANY SUCH COURTS AND AGREES
THAT SERVICE OF PROCESS MAY BE MADE ON THE BORROWER BY MAILING A
COPY OF THE SUMMONS AND COMPLAINT BY REGISTERED OR CERTIFIED
MAIL, RETURN RECEIPT REQUESTED, TO THE BORROWER'S ADDRESS.
NOTHING CONTAINED HEREIN SHALL, HOWEVER, PREVENT TRUSTEE OR
LENDER FROM BRINGING ANY ACTION OR EXERCISING ANY RIGHTS WITHIN
ANY OTHER STATE OR JURISDICTION OR FROM OBTAINING PERSONAL
JURISDICTION BY ANY OTHER MEANS AVAILABLE BY APPLICABLE LAW.

4.13   Waiver of Jury Trial.   TO THE FULLEST EXTENT PERMITTED BY
APPLICABLE LAW, THE BORROWER HEREBY IRREVOCABLY AND
UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION,
SUIT, OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THE NOTE, THIS
DEED OF TRUST OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR THE
ACTS OR FAILURE TO ACT OF OR BY TRUSTEE OR LENDER IN THE
ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THE NOTE, THIS
DEED OF TRUST, OR ANY OF THE OTHER LOAN DOCUMENTS.

4.14   Changes in Taxation.   If, after the date of this Deed of Trust, any law is
passed by the state in which the Property is located or by any other governing entity,
imposing upon LENDER any tax against the Property, or changing in any way the laws for
the taxation of mortgages or deeds of trust, debts secured by mortgages or deeds of trust so
that an additional or substitute tax is imposed on LENDER or the holder of the Note,
BORROWER shall reimburse LENDER for the amount of such taxes within ten (10) days
after receipt of written notice from LENDER.  Provided, however, that such requirement of
payment shall be ineffective if BORROWER is permitted by law to pay the whole of such tax
in addition to all other payments required hereunder, without any penalty or charge thereby
accruing to LENDER and if BORROWER in fact pays such tax prior to the date upon which
payment is required by such notice.

4.15   Maximum Interest Rate.   No provision of this Deed of Trust or of the Note
or of any note evidencing a Future Advance shall require the payment or permit the
collection of interest in excess of the maximum non-usurious rate permitted by applicable
law.  In the event such interest does exceed the maximum legal rate, it shall be cancelled

BOOK 1119 PAGE 588

automatically to the extent that such interest exceeds the maximum legal rate and if theretofore paid, credited on the principal amount of the Note or, if the Note has been prepaid, then such excess shall be rebated to BORROWER.

    4.16   Payment on Account.    Acceptance by LENDER of any payment in an amount less than the amount then due on the indebtedness evidenced by the Note or due hereunder or under any other Loan Document shall be deemed an acceptance on account only, and the failure to pay the entire amount then due under the Note, hereunder, and under any other Loan Document shall be and continue to be a default. Until the entire amount due under all Loan Documents has been paid in full, LENDER shall be entitled to exercise all rights and remedies conferred upon it in this instrument upon the occurrence of an Event of Default.

    4.17   Assignment of Instrument.  LENDER shall have the right in its sole discretion at any time during the term of this Deed of Trust to sell, assign, syndicate or otherwise transfer and/or dispose of all or any portion of its interest in the Loan, and BORROWER hereby permits LENDER to submit to LENDER'S assignees the financial data and all other information being furnished by BORROWER to LENDER under the terms of this instrument.

    4.18   Subrogation.  To the extent that proceeds of the indebtedness secured hereby are used to pay any outstanding lien, charge or encumbrance affecting the Property, such proceeds having been advanced by LENDER, LENDER shall be subrogated to all rights, interest and liens owned or held by any owner or holder of such outstanding liens, charges and encumbrances, irrespective of whether such liens, charges or encumbrances are released of record; provided, however, that the terms and provisions hereof shall govern the rights and remedies of LENDER and shall supersede the terms, provisions, rights, and remedies under the lien or liens to which LENDER is subrogated hereunder.

    4.19   No Waiver.  Any failure by TRUSTEE or LENDER to insist upon the strict performance by BORROWER of any of the terms and provisions hereof shall not be deemed to be a waiver of any of the terms and provisions hereof, and TRUSTEE and LENDER, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by BORROWER of any and all of the terms and provisions hereof to be performed by BORROWER.

    4.20   Deed Extension.    The lien hereof shall remain in full force and effect during any postponement or extension of the time of payment of the indebtedness secured hereby, or of any part thereof, and any number of extensions or modifications hereof, or any additional notes taken by LENDER, shall not affect the lien hereof or the liability of BORROWER or of any subsequent obligor to pay the principal indebtedness unless and until such lien or liability be expressly released in writing by LENDER.

BOOK 1119 PAGE 589

4.21   Indemnification.    BORROWER shall indemnify and hold TRUSTEE and LENDER harmless from and against all obligations, liabilities, losses, costs, expenses, fines, penalties or damages (including attorneys' fees) which TRUSTEE and LENDER may incur by reason of this Deed of Trust or with regard to the Property prior to the exercise of any remedies under this Deed of Trust. BORROWER shall defend TRUSTEE and LENDER against any claim or litigation involving TRUSTEE or LENDER for the same, and should TRUSTEE or LENDER incur such obligation, liability, loss, cost, expense, fine, penalty or damage, then BORROWER shall reimburse TRUSTEE or LENDER upon demand. Any amount owed LENDER under this provision, or any amount paid, or contracted to be paid, by LENDER pursuant to this Section 4.21, shall bear interest at the Default Rate set forth herein and shall be secured hereby. Notwithstanding the foregoing, BORROWER shall not indemnify TRUSTEE or LENDER (i) for the consequences of any gross negligence or willful misconduct of TRUSTEE or LENDER (including any default of LENDER under any of the Loan Documents), or (ii) as to any income or franchise taxes or intangible taxes imposed upon LENDER under the jurisdiction wherein LENDER holds the Note.

4.22   Time of Essence.    Time is of the essence of the obligations of BORROWER in this Deed of Trust and each and every term, covenant and condition made herein by or applicable to BORROWER.

4.23   Reproduction of Documents.    This Deed of Trust and all documents relating thereto, specifically excluding the Note but including, without limitation, consents, waivers and modifications which may hereafter be executed, financial and operating statements, certificates and other information previously or hereafter furnished to LENDER, may be reproduced by LENDER by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process, and LENDER may destroy any original document ("Master") so reproduced. BORROWER agrees and stipulates that any such reproduction is an original and shall be admissible in evidence as the Master in any judicial or administrative proceeding (whether or not the Master is in existence and whether or not such reproduction was made or preserved by LENDER in the regular course of business).

4.24   Separate Absolute Assignment of Rents and Profits and Collateral Assignment of Leases.    The indebtedness secured hereby is additionally secured by, inter alia, an Absolute Assignment of Rents and Profits and Collateral Assignment of Leases of even date herewith executed by BORROWER herein, as Assignor, to LENDER, as Assignee.

4.25   Discontinuance of Proceedings.    In case TRUSTEE or LENDER, as applicable, shall have proceeded to enforce any right, power or remedy under this Deed of Trust by foreclosure, entry or otherwise or in the event TRUSTEE commences advertising of the intended exercise of the sale under power provided hereunder, and such proceeding or advertisement shall have been withdrawn, discontinued or abandoned for any reason, or shall have been determined adversely to TRUSTEE or LENDER, then in every such case (i) BORROWER, TRUSTEE and LENDER shall be restored to their former positions and rights, (ii) all rights, powers and remedies of TRUSTEE and LENDER shall continue as if

-33-

BOOK 1119 PAGE 590

no such proceeding had been taken, (iii) each and every Default declared or occurring prior or subsequent to such withdrawal, discontinuance or abandonment shall and shall be deemed to be a continuing Default and (iv) neither this Deed of Trust, nor the Note, nor the indebtedness secured hereby, nor any other instrument concerned therewith, shall be or shall be deemed to have been reinstated or otherwise BORROWER hereby expressly waives the benefit of any statute or rule of law now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the above.

4.26. Substitution of Trustee.    LENDER shall have the irrevocable right to remove at any time and from time to time without limit the TRUSTEE herein named without notice or cause and to appoint a successor by an instrument in writing, duly acknowledged, in such form as to entitle such written instrument to be recorded in the state in which the Property is located; and, in the event of the death or resignation of the TRUSTEE herein named, LENDER shall have the right to appoint a successor by such written instrument, and any TRUSTEE so appointed shall be vested with the title to the Property, and shall possess all the powers, duties and obligations herein conferred on the TRUSTEE in the same manner and to the same extent as though the successor trustee were named herein as TRUSTEE.

4.27    Modifications.    This Deed of Trust may not be amended or modified orally, but only by an agreement in writing signed by the party against whom enforcement of any amendment or modification is sought. The provisions of this Deed of Trust shall extend and be applicable to all renewals, amendments, extensions, consolidations, and modifications of the other Loan Documents, and any and all references herein to the Loan Documents shall be deemed to include any such renewals, amendments, extensions, consolidations or modifications thereof.

4.28    Exhibits.    Exhibits A, B, C, D and E are attached hereto and incorporated herein by reference.

BOOK 1119 PAGE 591

IN WITNESS WHEREOF, Assignor has caused this Security Deed to be duly executed under seal as of the day and year first hereinabove written.

_____(SEAL)
H. CONNELY PLUNKETT

STATE OF MISSISSIPPI

COUNTY OF Hinds

Personally appeared before me, the undersigned authority in and for the said county and state, on this 13th day of May, 1996, within my jurisdiction, the within named H. Connely Plunkett, who acknowledged that he executed the above and foregoing instrument.

_____
Notary Public

My Commission Expires:
8-16-96

[NOTARIAL SEAL]

46240.016*::ODMA\PCDOCS\DOCS\10069\1
Rev. May 10, 1996

35

BOOK1119 PAGE592

# EXHIBIT A
## LEGAL DESCRIPTION

A certain parcel of land being situated in the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N-R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19 Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 190.86 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, continue thence North 19 degrees 56 minutes 37 seconds West along said East right-of-way line of Castlewoods Boulevard for a distance of 46.90 feet to the Point of Curvature of a 10.4093 degree curve bearing to the left having a central angle of 18 degrees 07 minutes 00 seconds and a radius of 550.53 feet; run thence along said East right-of-way line of Castlewoods Boulevard and along the arc of said 10.4093 degree curve bearing to the left having a chord bearing of North 20 degrees 06 minutes 19 seconds West and a chord distance of 3.10 feet to the Southwest corner of the La Petite Academy property; run thence North 70 degrees 03 minutes 47 seconds East along the South line of said La Petite Academy property, for a distance of 219.90 feet to the Southeast corner thereof; run thence North 19 degrees 56 minutes 13 seconds West along the East line of the La Petite Academy property and its northerly extension thereof for a distance of 290.12 feet to a point on the South right-of-way line of Mississippi State Highway 25 (as now laid out and in use, November, 1995); run thence the following bearings and distances along said South right-of-way line of Mississippi State Highway 25: North 68 degrees 19 minutes 59 seconds East for a distance of 96.97 feet; North 75 degrees 30 minutes 17 seconds East for a distance of 349.54 feet; North 76 degrees 21 minutes 24 seconds East for a distance of 199.90 feet to a point being described as Point "DA" according to Mississippi State Highway Department Project #SP-0056-1(2); leaving said South right-of-way line of Mississippi State Highway 25, run thence South 13 degrees 38 minutes 36 seconds East for a distance of 76.19 feet to a point; run thence South 35 degrees 09 minutes 27 seconds West for a distance of 122.37 feet to the Point of Curvature of a 99.644722 degree curve bearing to the left having a central angle of 90 degrees 00 minutes 00 seconds and a radius of 57.50 feet; run thence along the arc of said 99.644722 degree curve bearing to the left a chord bearing of South 05 degrees 48 minutes 08 seconds West and a chord distance of 81.32 feet to the Point of Tangency, of said curve; run thence South 39 degrees 11 minutes 52 seconds East for a distance of 99.00 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 170.00 feet to a point; run thence South 01 degrees 25 minutes 00 seconds East for a distance of 54.55 feet to a point; run thence South 70 degrees 33 minutes 04 seconds West for a distance of 120.99 feet to a point, run thence North 89 degrees 51 minutes 00 seconds West for a distance of 248.54 feet to a point; run thence North 60 degrees 56 minutes 05 seconds West for a distance of 60.80 feet to a point; run thence South

BOOK**1119**PAGE**593**

70 degrees 03 minutes 47 seconds West for a distance of 180.00 feet to the POINT OF BEGINNING, containing 5.534 acres, more or less

## LESS AND EXCEPT:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and in use, November, 1995); run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 257.64 feet to a point; run thence North 02 degrees 00 minutes 00 seconds West for a distance of 162.88 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 34.38 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 97.45 feet to a point; run thence South 39 degrees 13 minutes 34 seconds East for a distance of 70.00 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 54.03 feet to a point; run thence North 89 degrees 51 minutes 00 seconds West for a distance of 56.19 feet to the POINT OF BEGINNING, containing 0.139 acres, more or less.

## AND ALSO:

A certain twenty foot (20') wide sanitary sewer easement being situated in the Northwest 1/4 of the Northeast 1/4 of Section 20 and the Southwest 1/4 of the Southeast 1/4 of Section 17, T6N, R3E, Rankin County, Mississippi, and being more particularly described as follows:

Commence at the Northwest corner of Lot 19, Castlewoods I-D, a subdivision according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Rankin County at Brandon, Mississippi, as now recorded in Plat Cabinet B at Slot 7; said corner also being on the East right-of-way line of Castlewoods Boulevard (as now laid out and use, November, 1995); run thence North 70 degrees 00 minutes 00 seconds East along the North line of said Castlewoods I-D for a distance of 354.23 feet to a point; run thence North 20 degrees 00 minutes 00 seconds West for a distance of 44.96 feet to the POINT OF BEGINNING of the parcel of land herein described; from said POINT OF BEGINNING, run thence North 39 degrees 11 minutes 52 seconds West for a distance of 20.00 feet to a point; run thence North 50 degrees 48 minutes 08 seconds East for a distance of 50.41 feet to a point; run thence South 89 degrees 51 minutes 00 seconds East for a distance of 31.54 feet to a point; run thence South 50 degrees 48 minutes 08 seconds West for a distance of 74.80 feet to the POINT OF BEGINNING, containing 0.029 acres, more or less.

And also the following easements granted H. C. Plunkett by Jitney-Jungle Stores Of America, Inc., in Warranty Deed dated November 28, 1995, and recorded in the office of the Chancery Clerk of Rankin County, Mississippi in Book 751 at Page 142 as corrected by instrument recorded in Book 758 at Page

EXHIBIT A
Page 2 of 3 Pages

BOOK1119 PAGE 594

306, and as further corrected by that certain Second Correction of Warranty Deed executed May 10, 1996:

(a)     To construct and maintain footings and adequate lateral support of the buildings and improvements to be constructed by H. C. Plunkett on the Property, along the common property lines between the Property and the adjacent property now or hereafter owned by Jitney-Jungle Stores Of America, Inc, its successors, assigns, and transferees;

(b)     To construct and maintain canopies, roofs, building overhangs, exterior light fixtures, signs and other like projections and encroachments of the buildings and improvements to be constructed by H. C. Plunkett on the Property, over and across the adjacent property now or hereafter owned by the Jitney-Jungle Stores Of America, Inc, its successors, assigns, and transferees; and

(c)     To construct and maintain utility lines serving the buildings and improvements to be constructed by H. C. Plunkett on the Property, over and across the adjacent property now or hereafter owned by Jitney-Jungle Stores Of America, Inc, its successors, assigns and transferees, provided the location of all such utility lines are approved in advance in writing by Jitney-Jungle Stores Of America, Inc.

E:\PLUNKETT\JITNEY\JITLEGAL.LGL-lj

**EXHIBIT A**
Page 3 of 3 Pages

BOOK **1119** PAGE **595**

## EXHIBIT "B"

1. Ad valorem taxes for the year 1996, which said taxes are not due or payable until January 1, 1997.

2. Any prior reservation or conveyance, together with release of damages, of minerals of every kind and character, including, but not limited to, oil, gas, sand and gravel in, on and under subject property.

3. Access to Mississippi Highway 25 is limited pursuant to that certain right-of-way grant to the State Highway Commission by instrument dated May 21, 1970, and recorded in Book 261, at Page 32, as shown on the as-built survey of H.D. Lang and Associates, Inc. dated March 5, 1996, last revised April 16, 1996. Said deed contains a release of damages clause.

4. The following easements reserved by MCFS Corp. for itself, its successors and assigns in that certain Warranty Deed to Jitney-Jungle Stores of America, Inc. recorded in Book 509, at Page 670, as shown on the as-built survey of H.D. Lang and Associates, Inc. dated March 5, 1996, last revised April 16, 1996:

    a. Perpetual utility easement fifteen (15) feet in width off of, across and adjacent to the North side of the above described property; and

    b. Sewer easement ten (10) feet in width across the Southwestern portion of the above described property.

5. Easement Agreement by and between Jitney-Jungle Stores of America, Inc. and Day Care Center Investors dated July 23, 1990, recorded in Book 603, at Page 668, granting a driveway easement over and across a portion of the land situated on the West side of the above described property, as shown on the as-built survey of H.D. Land and Associates, Inc. dated March 5, 1996, last revised April 16, 1996.

6. Twenty (20) foot easement with power line and poles located therein across the Western portion of the above described property granted in Right of Way to Mississippi Power & Light Company dated February 19, 1976, recorded in Book 332, at Page 103, as shown on the as-built survey of H.D. Lang and Associates, Inc. dated March 5, 1996, last revised April 16, 1996.

7. Memorandum of Lease by and between H.C. Plunkett and Jitney-Jungle Stores of America, Inc., filed for record December 5, 1995, at 10:25 A.M., and recorded in Book 751, at Page 149.

8. The following reservation of easements by Jitney-Jungle Stores of America, Inc. in deed dated November 28, 1995, to H.C. Plunkett recorded in Book 751, at Page 142, as corrected by

BOOK**1119**PAGE**596**

instrument dated February 26, 1996, recorded in Book <u>758,</u> at Page <u>306</u> and as further corrected by that certain Second Correction of Warranty Deed dated May 10, 1996:

"The Grantor does hereby reserve unto itself, its successors, assigns and transferees, perpetual non-exclusive easements of ingress, egress, parking and utility lines over, under and across all entrances, exits, driveways, accessways, parking lots and related common areas to be developed on the Property by Grantee, for the benefit of the following real property now owned by Grantor and adjacent to the Property: (a) that certain 0.139 acre tract of Grantor that is less and excepted from Exhibit "A" attached hereto and (b) all adjacent real property of Grantor lying east of the Property, provided that the parking easement reserved hereunder shall benefit a maximum of 15,000 square feet of improvements hereafter constructed by Grantor on such adjacent property lying east of the Property."

9.    Concrete A/C pad over 4.3 feet as shown on the as-built survey of H.D. Lang and Associates, Inc. dated March 5, 1996, last revised April 16, 1996.

10.   Gas line serving subject property is located on property to the South of subject property as shown on the survey of H.D. Lang and Associates, Inc. dated March 5, 1996, last revised April 16, 1996.

46240.016*::ODMA\PCDOCS\DOCS\17833\1
Rev. May 10, 1996

2

1119・・597

## EXHIBIT "C"

None.

BOOK **1119** PAGE **598**

## EXHIBIT "D"

If the Property is sold or otherwise transferred without the written consent of Lender, any such sale or transfer shall be considered a default hereunder at the option of the Lender. Lender may condition its consent to the sale or transfer of the Property upon its approval of the purchaser's or purchasers' credit worthiness, management experience and reputation, location and performance of the Property, and any other factors Lender, in its discretion, may consider, and further upon the payment of an assumption fee and an increase in the rate of the interest under the Note, as Lender requires in its sole discretion. Notwithstanding anything to the contrary herein contained, Lender hereby permits and grants the option to Borrower to make one sale of the Property, subject to a 1% fee and subject to the approval by Lender of the proposed purchaser and management of the Property.

To the extent that any of the terms and provisions of this Deed of Trust conflict with or are inconsistent with the terms and provisions of the Tri-Party Insurance Agreement of even date herewith between Borrower, Lender and Jitney-Jungle Stores of America, Inc., then the terms and provisions of said Tri-Party Insurance Agreement shall control.

46240.016*::ODMA\PCDOCS\DOCS\12464\1
Rev. April 4, 1996

᠃ᵥ**1119**ᵥᵣᵣ**599**

## EXHIBIT "E"

Nonrecourse. Except as hereinafter in this Exhibit "E" and in Section 1.13 of this Deed of Trust specifically provided, Borrower shall not be personally liable for the payment of any sums due hereunder or the performance of any obligations of Borrower hereunder or under the other Loan Documents. In any action to foreclose this Deed of Trust or to otherwise realize upon any security furnished under the Loan Documents or to collect any amount payable hereunder or under the other Loan Documents, no judgment for the repayment of the Note or interest thereon or any other sum due under any of the Loan Documents or for damages for failure to perform any obligation of Borrower hereunder or under any of the Loan Documents will be enforced against Borrower personally or against any property of Borrower other than the Property and other security furnished under this Deed of Trust and the Loan Documents. Notwithstanding the foregoing, nothing herein contained shall be construed as prohibiting Lender from exercising any and all remedies which this Deed of Trust and the Loan Documents permit, including the right to bring actions or proceedings against Borrower and to enter a judgment against Borrower; provided, however, that any judgment so entered must specify that it is limited to the security furnished under this Deed of Trust and the Loan Documents and that it may not be levied against any other property of Borrower other than the security furnished under this Deed of Trust and the Loan Documents.

Notwithstanding the foregoing provisions of this Exhibit "E" or any other agreement, Borrower shall be fully liable for damages to Lender or the Property resulting from: (i) Borrower's fraud or misrepresentation, whether affirmative or by omission; (ii) the misapplication of (a) proceeds of insurance covering any portion of the Property, or (b) proceeds of condemnation of any portion of the Property or proceeds from the sale or conveyance of any portion of the Property, in lieu of condemnation, or (c) rentals received by or on behalf of Borrower subsequent to the date on which Lender gives written notice of the revocation of the license granted in the Absolute Assignment of Rents and Profits and Collateral Assignment of Leases to the extent such rentals are not applied to ordinary and necessary operational costs of the Property; (iii) for the return of all unearned advance rentals and security deposits paid by tenants of the Property and not refunded to or forfeited by such tenants; (iv) the amount of any loss caused by Borrower's failure to comply with any federal, state and local statute, ordinance or regulation applicable to the Property relating to hazardous waste and environmental laws, such loss to include expenses, clean up, penalties and damages incurred by Lender and any diminution in the fair market value of the Property caused by Borrower, its agents and tenants as a result of non-compliance with such hazardous waste and environmental laws from and after the date hereof (specifically including any liability of Borrower under Section 1.13 of this Deed of Trust); (v) a lien hereafter imposed upon any of the Property without Lender's prior written consent and which has priority over any security for the payment of the Note, including, without limitation, all costs incurred by Lender in the bonding, payment or release of any lien arising from the use, incorporation, storage or disposal of toxic, hazardous, chemical or nuclear waste or materials upon or in any portion of the Property caused by Borrower, its agents and tenants as a result of non-compliance with Hazardous Material Laws (as defined in this Deed of Trust) from and after the period from the date hereof; (vi) the commission of waste; and (vii) failure of Borrower to pay real estate taxes and property insurance premiums relating to the Property.

46240.Forms*::ODMA\PCDOCS\DOCS\14903\1
Rev. April 4, 1996

BOOK **1119** PAGE **600**

**PREPARED BY:**

Parker, Johnson, Cook & Dunlevie
R. Russell Berry
1275 Peachtree Street, Suite 700
Atlanta, Georgia 30309
404/872-7000


**INDEXING INSTRUCTIONS:**

The real property described herein is situated in the Southwest Quarter of the Southeast Quarter
of Section 17, Township 5 North, Range 3 East of Rankin County, Mississippi

RANKIN COUNTY MS
THIS INSTRUMENT
WAS FILED FOR
RECORD

96 _5-15_ AM 2:35
IN B _1119_ P. 556
MURPHY ADKINS, CHY. CLK.
BY _____ D.C.

Loan Number:  96223

## PROMISSORY NOTE

$ 3,000,000.00                                May 13        , 1996

    **FOR VALUE RECEIVED,**   H. CONNELY PLUNKETT                    , a
Mississippi resident        (the "Maker"), hereby promises to pay to the order of
**JEFFERSON-PILOT LIFE INSURANCE COMPANY,** and any subsequent holder of this
Note ("Holder" or "Holders") in the manner hereinafter provided, the principal sum of
THREE MILLION                        Dollars ($3,000,000.00 together with interest on
the outstanding principal balance from the date of the initial disbursement (for purposes of this
Note, "disbursement" means the date funds are wire transferred from Holder's account) of all
or a part of the principal of this Note ("Disbursement Date") until maturity at the rate of seven and
seven eights        percent (·875%) per annum ("Contract Rate") in accordance with the
provisions hereinafter set forth.

    1.   Payment of Principal and Interest. Principal and interest hereunder shall be
payable as follows:

    (a) Commencing on the first day of      July , 1996    (the "First
Payment Date") and on the first day of each month thereafter until this Note matures,
principal and interest in consecutive equal installments of Twenty-Four Thousand Eight
Hundred Sixty and 32/100        DOLLARS ($24,860.32 (the initial payment
and each subsequent payment shall each hereinafter be referred to as "Monthly
Payment"); and

    (b) On      June 1, 2016    (the "Maturity Date"), the entire unpaid
principal amount, together with accrued and unpaid interest thereon, and all other sums
due under this Note or under any other documents evidencing or securing this Note
(collectively, the "Loan Documents"), shall be due and payable in full.

Interest shall be payable in arrears and calculated on the basis of a 360-day year
containing twelve 30-day months; provided, however, interest due on the First Payment
Date shall be calculated on the basis of the actual number of days elapsed between the
Disbursement Date and the First Payment Date. If the interest due and accrued on the
First Payment Date is more or less than one month, the Monthly Payment due on the
First Payment Date shall be increased or decreased to the extent that the amount of
interest then due exceeds or is less than one month's interest.

    2.   Payment Information. All payments required to be made hereunder shall be
made during regular business hours to Holder at its office at Greensboro, N.C., with sufficient

IV-45 (revised 9/95)                     1

information to identify the source and application of such payment to Holder's Loan No.
_____96233_____, or at such other place as Holder may from time to time designate in writing.
All payments shall be made in lawful currency of the United States of America, in immediately
available funds, without presentment or surrender of this Note. Payments to Holder received
after 1:00 P.M., local, Greensboro, N.C. time, shall be deemed to have been received by
Holder on the next business day and shall bear interest accordingly.

    3.    Security for Note. The payment of this Note and all other sums due Holder is
secured by the Indenture (as hereinafter defined) and the other Loan Documents. Except as
otherwise defined herein, all of the terms and provisions contained in the Indenture and the
other Loan Documents are hereby incorporated herein by express reference.

    4.    Late Charges. Should any Monthly Payment required under this Note not be
paid in full within ten (10) days from the date such payment is due, Maker acknowledges that
the Holder will incur extra expenses for the handling of the delinquent payment and servicing
the indebtedness evidenced hereby, and that the exact amount of these extra expenses is
extremely difficult and impractical to ascertain, but that a charge of four percent (4%) of the
amount of the delinquent payment ("Late Charge") would be a fair approximation of the
expense so incurred by Holder. If applicable law requires a lesser charge, however, then the
maximum charge permitted by such law may be charged by Holder for said purpose. If
applicable law requires that more than a ten (10) day period elapse from the date a payment is
due until the Late Charge can be imposed, Holder will impose the Late Charge at the earliest
date permitted by such law. Therefore, Maker shall, in such event, without further notice, and
without prejudice to the right of Holder to collect any other amounts provided to be paid
hereunder or under the Indenture or the other Loan Documents, or to declare an Event of
Default as defined below, pay to Holder the Late Charge to compensate Holder for expenses
incurred in handling delinquent payments.

    5.    Interest Payable Upon Default. If there occurs an Event of Default, under this
Note or the Indenture or under any of the other Loan Documents, then the unpaid principal
amount of this Note, and, to the extent permitted by applicable law, all accrued and unpaid
interest thereon, shall bear interest at the lesser of (i) the Contract Rate plus four percent (4%)
per annum compounded monthly, or (ii) the maximum rate permitted by applicable law
("Default Rate") from the date of expiration of any applicable cure or grace period until such
time, if any, as the Event of Default is cured and the Indenture and this Note are reinstated as
permitted by applicable law, or otherwise until such time as the unpaid principal amount of
this Note and all other indebtedness evidenced by this Note are fully repaid, whichever is
earlier.

    6.    Events of Default. An "Event of Default" shall exist under this Note (a) in the
event Maker shall fail to make any payment due under this Note, other than the final payment
and Prepayment Premium, within ten (10) days from the date when such payment is due; (b) in
the event Maker shall fail to make the final payment or the Prepayment Premium when such
payment is due; or (c) if there shall exist an Event of Default as that term is defined in the
Indenture or in any of the other Loan Documents.

7.    Additional Payments.  The additional payments called for under paragraphs 4 and 5 shall be in addition to, and shall in no way limit, any other rights and remedies provided for in this Note, the Indenture or in any of the other Loan Documents, as well as all other remedies provided by law.

8.    Payment of Taxes and Expenses.

(a)    Maker further promises to pay to Holder, immediately upon written notice from Holder, (i) all recordation, transfer, stamp, documentary or other fees or taxes levied on Holder (exclusive of Holder's income taxes) by reason of the making or recording of this Note, the Indenture or any of the other Loan Documents, and (ii) all intangible property taxes levied upon any Holder of this Note or mortgagee, beneficiary, or lender under the Indenture or secured party under the other Loan Documents.

(b)    Maker further promises to pay to Holder, immediately upon written notice from Holder, all actual costs, expenses, disbursements, escrow fees, title charges and reasonable legal fees and expenses actually incurred by Holder and its counsel in (i) the collection or attempted collection following an Event of Default, or negotiation and documentation of any settlement or workout of the principal amount of this Note, the interest thereon or any installment or other payment due hereunder, and (ii) in any suit or proceeding whatsoever in regard to this Note or to protect or sustain any instrument securing this Note following an Event of Default, including, without limitation, in any bankruptcy proceeding or judicial or nonjudicial foreclosure proceeding.  It is the intent of the parties that Maker pay all expenses and reasonable attorneys' fees incurred by Holder as a result of Holder's entering into the loan transaction evidenced by this Note.

9.    Application of Payments.  All payments from Maker shall be applied as follows:  (i) to unpaid Late Charges and costs of collection and to any other costs and expenses due and payable to Holder under the Loan Documents; (ii) to the Prepayment Premium due, if any; (iii) to interest accrued and unpaid on the unpaid balance hereof; and (iv) the balance to unpaid principal.

10.    Prepayment.  Maker may not prepay this Note in whole or in part except as specifically provided herein.

11.    Maker's Covenants.  Maker agrees that (a) the obligation evidenced by this Note is an exempted transaction under the Truth-in-Lending Act, 15 U.S.C § 1601, et seq. (1982); and (b) said obligation constitutes a business loan for the purpose of the application of any laws that distinguish between consumer loans and business loans and that have as their purpose the protection of consumers in the state in which the Property is located.

12.    Severability.  The parties hereto intend and believe that each provision of this Note comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or any portion of any provision contained in this Note is held by a court of law to be invalid, illegal, unlawful, void or unenforceable as written in any respect,

IV-45 (revised 9/95)                    3

then it is the intent of all parties hereto that such portion or provision shall be given force to the fullest possible extent that it is legal, valid and enforceable, that the remainder of the Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion or provision was not contained therein, and the rights, obligations and interests of Maker and Holder under the remainder of this Note shall continue in full force and effect.

13.    **Usury Laws.**

(a)    It is the intention of Maker and Holder to conform strictly to the usury laws now or hereafter in force in the state or commonwealth in which the Property is located, and any interest payable under this Note, the Indenture, or any other Loan Documents shall be subject to reduction to an amount not to exceed the maximum non-usurious amount for commercial loans allowed under the usury laws of the state or commonwealth in which the Property is located as now or hereafter construed by the courts having jurisdiction over such matters. In the event such interest (whether designated as interest, service charges, points, or otherwise) does exceed the maximum legal rate, it shall be (i) cancelled automatically to the extent that such interest exceeds the maximum legal rate; (ii) if already paid, at the option of the Holder, either be rebated to Maker or credited on the principal amount of the Note; or (iii) if the Note has been prepaid in full, then such excess shall be rebated to Maker.

(b)    It is further agreed, without limitation of the foregoing, that all calculations of the rate of interest contracted for, charged, or received under this Note, or under any instrument evidencing or securing the loan evidenced hereby, that are made for the purpose of determining whether such rate exceeds the maximum legal rate, shall be made, to the extent permitted by applicable law, by amortizing, prorating, allocating, and spreading throughout the full stated term (____twenty____ [ 20 ] years) of this Note (and any extensions of the term hereof that may be hereafter granted) all such interest at any time contracted for, charged, or received from the Maker or otherwise by the Holder so that the rate of interest on account of the indebtedness evidenced by this Note, as so calculated is uniform throughout the term hereof. If the Maker is exempt or hereafter becomes exempt from applicable usury statutes or for any other reason the rate of interest to be charged on this Note is not limited by law, none of the provisions of this paragraph shall be construed so as to limit or reduce the interest or other consideration payable under this Note or under the instrument securing payment hereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between the parties hereto.

14.    **Acceleration.** Upon an Event of Default, Holder shall have the right, without demand or notice, to declare the entire principal amount of this Note then outstanding, and all accrued and unpaid interest thereon, and all other sums, including without limitation, the Prepayment Premium required under this Note or the Indenture, to be immediately due and payable, and notwithstanding the stated maturity in this Note, all such sums declared due and payable shall thereupon become immediately due and payable. During the existence of such Event of Default, Holder may apply payments received on any amounts due under the Note, the Indenture, or any of the other Loan Documents as Holder may determine in its sole discretion.

IV-45 (revised 9/95)                                   4

15.   Waivers by Maker.  As to this Note, the Indenture, the Loan Documents and any other instruments securing the indebtedness, Maker and all guarantors, sureties, endorsers and other parties hereafter assuming or otherwise becoming liable under this Note, severally waive all applicable exemption rights, whether under any state constitution, homestead laws or otherwise, and also severally waive diligence, valuation and appraisement, presentment for payment, protest and demand, notice of protest, demand and dishonor and diligence in collection and nonpayment of this Note and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note (except notice of default specifically provided for in the Indenture and the other Loan Documents), and they agree that the liability of each of them shall be unconditional without regard to the liability of any other party and shall not be affected by an indulgence, extension of time, renewal, waiver, or modification granted to or consented to by the Holder; and Maker and all guarantors, sureties and endorsers hereof consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Holder with respect to the payment or other provisions of this Note, and to the substitution, exchange or release of the Collateral, or any part thereof, and consent to the release of any party primarily or secondarily liable hereon or the addition of makers, guarantors, sureties and endorsers as parties hereto without notice to them or affecting their liability hereunder.  To the extent permitted by law, Maker further waives all benefit that might accrue to Maker by virtue of any present or future laws exempting the Property, or any other property, real or personal, or the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution to be issued on any judgment recovered on this Note or in any action to foreclose the Indenture, injunction against sale pursuant to power of sale, exemption from civil process or extension of time for payment.  Maker agrees that any real estate that may be levied upon pursuant to a judgment obtained by virtue of this Note, or any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Holder.

16.   Maker Not Released.  No delay or omission of Holder to exercise any of its rights and remedies under this Note, the Indenture or any Loan Documents at any time following the happening of an Event of Default shall constitute a waiver of the right of Holder to exercise such rights and remedies at a later time by reason of such Event of Default or by reason of any subsequently occurring Event of Default.  This Note, or any payment hereunder, may be extended from time to time by agreement in writing between Maker and Holder without in any other way affecting the liability and obligations of Maker and endorsers, if any.

17.   Joint and Several Obligation; Successors and Assigns.  This Note shall be the joint and several obligation of all Makers, endorsers, guarantors and sureties, if any, as may exist now or hereafter in addition to Maker, and shall be binding upon them and their respective heirs, administrators, executors, legal representatives, successors and assigns and shall inure to the benefit of Lender and its successors, successors in title, and assigns.

18.   Remedies Cumulative.  The remedies of Holder as provided in this Note, or in the Indenture or the Loan Documents, and the warranties contained herein or therein shall be cumulative and concurrent, may be pursued singly, successively or together at the sole discretion of Holder, may be exercised as often as occasion for their exercise shall occur and

in no event shall the failure to exercise any such right or remedy be construed as a waiver or release of such right or remedy. No remedy under this Note, conferred upon or reserved to Holder is intended to be exclusive of any other remedy provided in this Note, the Indenture or any of the Loan Documents or provided by law, but each shall be cumulative and shall be in addition to every other remedy given under the Indenture or any of the Loan Documents or hereunder or now or hereafter existing at law or in equity or by statute.

19.     Notices. All notices or other communications under this Note shall be given as provided in the Indenture.

20.     Governing Law. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. IN ANY LITIGATION IN CONNECTION WITH OR TO ENFORCE THIS NOTE, THE MAKER HEREBY IRREVOCABLY CONSENTS AND CONFERS PERSONAL JURISDICTION ON THE STATE COURTS OF THE COUNTY IN WHICH THE PROPERTY IS LOCATED, OR ON THE UNITED STATES DISTRICT COURT OR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT IN WHICH THE PROPERTY IS LOCATED. MAKER EXPRESSLY WAIVES ANY OBJECTIONS AS TO VENUE IN ANY SUCH COURTS AND AGREES THAT SERVICE OF PROCESS MAY BE MADE ON THE MAKER BY MAILING A COPY OF THE SUMMONS AND COMPLAINT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE MAKER'S ADDRESS. NOTHING CONTAINED HEREIN SHALL, HOWEVER, PREVENT THE HOLDER FROM BRINGING ANY ACTION OR EXERCISING ANY RIGHTS WITHIN ANY OTHER STATE OR JURISDICTION OR FROM OBTAINING PERSONAL JURISDICTION BY ANY OTHER MEANS AVAILABLE BY APPLICABLE LAW.

21.     Waiver of Jury Trial.      TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE MAKER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS NOTE OR THE ACTS OR FAILURE TO ACT OF OR BY HOLDER IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS NOTE.

22.     Material Inducements.      ALL WAIVERS SET FORTH IN THIS NOTE ARE MATERIAL INDUCEMENTS FOR THE HOLDER TO GRANT THIS LOAN.

23.     No Oral Modification. This Note may not be modified or discharged orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, modification or discharge is sought.

24.     Time. Time is of the essence with regard to the performance of the obligations of Maker in this Note and each and every term, covenant and condition herein by or applicable to Maker.

25.    Captions.  The captions and headings of the paragraphs of this Note are for convenience only and are not to be used to interpret, define or limit the provisions hereof.

26.    Terminology.  As used in this Note the word "Indenture" means a Deed Of Trust    Security Agreement and Fixture Filing of even date herewith from Maker to, or for the benefit of, Lender, which secures Maker's obligations hereunder and which covers the property described therein ("Property").

27.    Replacement Note.  Upon receipt of evidence reasonably satisfactory to Maker of the loss, theft, destruction or mutilation of this Note, and in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to Maker or, in the case of any such mutilation, upon surrender and cancellation of this Note, Maker will execute and delivery to Holder in lieu thereof, a replacement note dated as of the date of this Note, identical in form and substance to this Note and upon such execution and delivery all references in the Indenture to this Note shall be deemed to refer to such replacement note.

28.    Exhibits.    Exhibit(s)  A and B  attached hereto are incorporated herein by reference.

    IN WITNESS WHEREOF, Maker has caused this Promissory Note to be duly executed under seal on the date first above written.

                                                                    (SEAL)
                                          H. CONNELY PLUNKETT

## EXHIBIT A

Nonrecourse. Except as hereinafter in this Exhibit A and in Section 1.13 of the Indenture specifically provided, Maker shall not be personally liable for the payment of any sums due hereunder or the performance of any obligations of Maker hereunder or under the Indenture or the other Loan Documents. In any action to foreclose the Indenture or to otherwise realize upon any security furnished under the Loan Documents or to collect any amount payable hereunder or under the other Loan Documents, no judgment for the repayment of this Note or interest thereon or any other sum due under any of the Loan Documents or for damages for failure to perform any obligation of Maker hereunder or under any of the Loan Documents will be enforced against Maker personally or against any property of Maker other than the Property and other security furnished under the Loan Documents. Notwithstanding the foregoing, nothing herein contained shall be construed as prohibiting Holder from exercising any and all remedies which the Loan Documents permit, including the right to bring actions or proceedings against Maker and to enter a judgment against Maker; provided, however, that any judgment so entered must specify that it is limited to the security furnished under the Loan Documents and that it may not be levied against any other property of Maker other than the security furnished under the Loan Documents.

Notwithstanding the foregoing provisions of this Exhibit A or any other agreement, Maker shall be fully liable for damages to Holder or the Property resulting from: (i) maker's fraud or misrepresentation, whether affirmative or by omission; (ii) the misapplication of (a) proceeds of insurance covering any portion of the Property, or (b) proceeds of condemnation of any portion of the Property or proceeds from the sale or conveyance of any portion of the Property, in lieu of condemnation, or (c) rentals received by or on behalf of Maker subsequent to the date on which Holder gives written notice of the revocation of the license granted in the Absolute Assignment of Rents and Profits and Collateral Assignment of Leases to the extent such rentals are not applied to ordinary and necessary operational costs of the Property; (iii) for the return of all unearned advance rentals and security deposits paid by tenants of the Property and not refunded to or forfeited by such tenants; (iv) the amount of any loss caused by Maker's failure to comply with any federal, state and local statute, ordinance or regulation applicable to the Property relating to hazardous waste and environmental laws, such loss to include expenses, clean up, penalties and damages incurred by Holder and any diminution in the fair market value of the Property caused by Maker, its agents and tenants as a result of non-compliance with such hazardous waste and environmental laws from and after the date hereof (specifically including any liability of Maker under Section 1.13 of the Indenture); (v) a lien hereafter imposed upon any of the Property without Holder's prior written consent and which has priority over any security for the payment of this Note, including, without limitation, all costs incurred by Holder in the bonding, payment or release of any lien arising from the use, incorporation, storage or disposal of toxic, hazardous, chemical or nuclear waste or materials upon or in any portion of the Property caused by Maker, its agents and tenants as a result of non-compliance with Hazardous Material Laws (as defined in the Indenture) from and after the period from the date hereof; (vi) the commission of waste; and (vii) failure of Maker to pay real estate taxes and property insurance premiums relating to the Property.

IV-45 (revised 9/95)                                    8

EXHIBIT __B__

1.    <u>Prepayment</u>. Maker is prohibited from prepaying this Note until __May 13__ , __2003__
(the "No-Prepayment Period"). Subsequent to the No-Prepayment Period, Maker may prepay
this Note in whole, but not in part, on any Monthly Payment date, provided Maker gives Holder
not less than thirty (30) nor more than sixty (60) days' written notice specifying the date of
prepayment ("Prepayment Date") and pays a prepayment fee ("Prepayment Premium") as
hereinafter calculated.

The Prepayment Premium shall be the greater of (a) two percent (2%) of the outstanding
principal balance of the Note on the Prepayment Date, or (b) the remainder of (i) the sum of the
present values (determined using periodic monthly intervals and a discount rate equal to the
Treasury Yield) of the then remaining unpaid Monthly Payments due under this Note to the
Maturity Date <u>minus</u> (ii) the outstanding principal balance of this Note as of the Prepayment
Date. The "Treasury Yield" is the yield in percent per annum of the Treasury Constant
Maturities for the length of time from the Prepayment Date to the Maturity Date ("Remaining
Term") as published in document H.15(519) (presently published by the Board of Governors of
the Federal Reserve System titled "Federal Reserve Statistical Release") for the calendar week
immediately preceding the calendar week in which the Prepayment Date falls. If the Remaining
Term does not equal one of the maturities of the Treasury Constant Maturities, then the Treasury
Yield will be determined by interpolating linearly between two Treasury Constant Maturities
reported in such Statistical Release, one having a maturity as close as possible to, but greater
than, the Remaining Term and one having a maturity as close as possible to, but less than, the
Remaining Term. If the publishing of the yield of Treasury Constant Maturities is ever
discontinued, then the Treasury Yield shall be based upon the index which the Board of
Governors of the Federal Reserve System publishes in replacement or, if no such replacement
index is published, the index which, in Holder's reasonable determination, most nearly
corresponds to the yield of the Treasury Constant Maturities.

Maker acknowledges that Holder (a) has advanced the amounts evidenced by this Note
with the expectation that such amounts would be outstanding for a period at least equal to the
No-Prepayment Period, (b) would not have been willing to advance such amounts on these terms
for a shorter period of time, (c) in making the loan evidenced by this Note, is relying on Maker's
creditworthiness and its agreement to pay in strict accordance with the terms set forth in the
Note, and (d) would not make the loan without full and complete assurance by Maker of its
agreement not to prepay all or a part of the principal of this Note except as expressly permitted
herein and in the Indenture. Maker has been advised and acknowledges that Holder is relying on
the receipt of payments under this Note to, among other things, match and support its obligations
under contracts entered into by Holder with third parties and that in the event of a prepayment,
Holder could suffer loss and additional expenses which are extremely difficult and impractical to
ascertain. The Prepayment Premium is a good faith resolution by Maker and Holder of the
damages Holder would suffer, and it is not intended as a penalty. Accordingly, should this Note
be paid for any reason, whether voluntary or involuntary, prior to the end of the No-Prepayment

IV-45 (revised 9/95)

Period then Maker shall pay to Holder a Prepayment Premium calculated in accordance with this paragraph 1, except as expressly permitted herein or in the Indenture.

Maker expressly acknowledges that pursuant to the provisions of this Note and except as otherwise provided in the Indenture, Maker has no right to prepay this Note in whole or in part without prepayment of the Prepayment Premium, and Maker shall be liable for the payment of the Prepayment Premium upon any payment of the outstanding principal of this Note before its due date, whether voluntary or involuntary or after acceleration of the Note whether the acceleration of the maturity hereof is due to Maker's default or otherwise. Furthermore, Maker waives any rights it may have under any applicable state laws as they relate to any Prepayment restrictions contained in this paragraph 1 or otherwise contained in this Note and expressly acknowledges that Holder has made the loan in reliance upon such agreements and waiver of Maker and that Holder would not have made the loan without such agreements and waiver of Maker. Maker acknowledges that specific weight has been given to the consideration given for such agreements, which consideration is the granting of the loan.

2.    Evasion of Prepayment Premium. Maker acknowledges that in the event of an acceleration of payment of this Note following an Event of Default by Maker, a tender of payment of an amount necessary to satisfy the entire indebtedness evidenced hereby, but not including the Prepayment premiums is required pursuant to the terms of this Note or the Indenture, made at any time prior to a foreclosure sale by Maker, its successors or assigns or by anyone on behalf of Maker, or by a buyer upon foreclosure or power of sale, shall be presumed to be and conclusively deemed to constitute a deliberate evasion of the prepayment provisions hereof and shall constitute a prepayment hereunder and shall therefore be subject to the Prepayment Premium as calculated in accordance with this Note with the date of prepayment being deemed the date of occurrence of the foreclosure sale or the tender of payment of the amount necessary to pay the entire indebtedness evidenced hereby in full, including the Prepayment Premium.