FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT  Middle | DISTRICT OF  Florida | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: Winn Dixie Stores, Inc., et al | Case Number 05-03817-3F1 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property): Shoppes at Lake Avenue, Inc. | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent: Donald A. Nohrr, Esq. P.O. Box 1870 Melbourne, FL 32902 Telephone number: 321-727-8100 | ☐ Check box if you have never received any notices from the bankruptcy court in this case. ☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Last four digits of account or other number by which creditor identifies debtor: | Check here ☐ replaces if this claim ☒ amends  a previously filed claim, dated: 7/27/05 | |

**1.   Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other  Real property lease    (CAM charges/ real estate taxes)

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)              (date)

**2.   Date debt was incurred:**  2004

**3.   If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

Unsecured Nonpriority Claim $ 17,774.01
- ☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

Unsecured Priority Claim
- ☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.

Amount entitled to priority $_____

Specify the priority of the claim:
- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

Secured Claim
- ☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate  ☐ Motor Vehicle  ☐ Other............
Value of Collateral:  $..................

Amount of arrearage and other charges at time case filed included in secured claim, if any:  $..................

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5.   Total Amount of Claim at Time Case Filed:**

| $ 17,774.01 | | | 17,774.01 |
|---|---|---|---|
| (unsecured) | (secured) | (priority) | (Total) |

- ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**6.   Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**7. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date 2/1/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): Donald A. Nohrr, Esq. Attorney for Creditor | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



November 17, 2005

Shoppes at Lake Avenue, Inc.
P.O. Box 320219
Cocoa Beach, Florida 32932

*Via Telecopy with Confirmation and*
*Certified mail, Return Receipt*
7100 6921 9020 0006 3563

Re:    Store #2215

Dear Landlord:

On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors"), filed petitions for relief under Chapter 11 of the United States Bankruptcy Code. These cases are being jointly administered in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, as Case no. 05-03817-3F1 (the "Bankruptcy Court").

The Debtors have received your request for reimbursement of the amount of $112,049.76, representing state or local property taxes you report that you have paid to the applicable taxing authority in connection with the Lease. A portion of the taxes for which you seek reimbursement are for taxes which accrued prior to the Petition Date. Because these taxes accrued prior to the Petition Date, the Debtors are not at this time authorized by the Bankruptcy Code to reimburse you. If the Debtors assume the Lease pursuant to section 365 of the Bankruptcy Code, you will be reimbursed in full at the time of the assumption. If the Debtors reject the Lease, you will receive a distribution only if (i) you filed a timely proof of claim for the taxes (ii) the claim is allowed by the Bankruptcy Court and (iii) a plan of reorganization is confirmed by the Bankruptcy Court. The Debtors will make any such distribution at that time and in the amount and form provided by the confirmed plan.

As to your reimbursement request for taxes which accrued after the Petition Date (through 12/31/05), a check is enclosed.

Sincerely,

Richard M. Tansi
Winn-Dixie Stores, Inc.

$15,963.1/8

**Check Date:** 30.Nov.2005

**Check No.** 008135515

| Division | Invoice Number | Invoice Date | Voucher ID | Gross Amount | Discount Available | Paid Amount |
|----------|----------------|--------------|------------|--------------|--------------------|-------------|
| WDHDQ | 2215CAM12010001 | 01.Dec.2005 | 00681000 | 3,000.00 | 0.00 | 3,000.00 |
| WDHDQ | 2215RBNT12010001 | 01.Dec.2005 | 00681001 | 73,781.18 | 0.00 | 73,781.18 |
| WDHDQ | 2215RET2005 | 17.Nov.2005 | 00681823 | 96,086.28 | 0.00 | 96,086.28 |

| Vendor Number | Name | | Total Discounts | |
|---------------|------|--|------------------|--|
| 0000810033 | SHOPPES AT LAKE AVENUE INC | | $0.00 | |
| **Check Number** | **Date** | | **Total Amount** | **Discounts Taken** | **Total Paid Amount** |
| 008135515 | 30.Nov.2005 | | $172,867.46 | $0.00 | $172,867.46 |

Winn Dixie Stores, Inc.
Debtor-In-Possession
PO Box B
Jacksonville, Florida 32203-0297

WACHOVIA BANK, N.A.
Pensacola, FL 32534

008135515
63-1012/632

**Date** 30.Nov.2005

**Pay Amount** $172,867.46***

Pay     ***ONE HUNDRED SEVENTY-TWO THOUSAND EIGHT HUNDRED SIXTY-SEVEN AND 46/100 US DOLLAR***

To The Order Of

Winn Dixie Stores, Inc. Consolidated Disbursement Account

SHOPPES AT LAKE AVENUE INC
PO BOX 120219
COCOA BEACH, FL 32932-0219

KDHardee

Authorized Signature

VOID IF NOT PRESENTED WITHIN 90 DAYS

⑈008135515⑈ ⑈063210125⑈ 20799400002225⑈

# Shoppes at Lake Avenue, Inc.

Post Office Box 320219

Cocoa Beach, Florida 32932

Ph.  321-452-0888        Fax  321-453-3618

November 14, 2005

via fax: (904) 783-5646
Hardcopy to follow via post

Ms. Telsa Tinsley
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254-3699

**RE:  Store #2215 – Shoppes at Lake Avenue**
**RE:  2005 Real Estate Taxes – Winn Dixie pro rata share**

## REVISED

Dear Telsa:

Pursuant to the Lease, Winn Dixie shall pay its pro rata share of the Real Estate Taxes (Ad Valorem and Non Ad Valorem) within thirty (30) days of receipt of Landlord's notice, copy of Tax assessment invoice, and proof of Landlord's payment.

Shoppes at Lake Avenue is comprised of five (5) parcels for tax assessment purposes. Winn Dixie's pro rata share is **81.9506%**. Please find copies of the tax bills attached.

| Parcel Tax ID (Acct #) | Shopping Center Assessed Taxes | Winn Dixie Prorata Share |
|---|---|---|
| 246997-9 | $86,261.82 | $70,692.08 |
| 246998-7 | $8,290.21 | $6,793.88 |
| 246999-5 | $17,058.08 | $13,979.20 |
| 247001-2 | $24,762.74 | $20,293.21 |
| 053776-4 | $355.57 | $291.39 |
| | | |
| Totals: | $136,728.42 | $112,049.76 |

These invoices will be paid today (please see enclosed check copies). Therefore, please reimburse Shoppes at Lake Avenue, Inc. in the amount of **$112,049.76.** Please make checks payable to **Shoppes at Lake Avenue, Inc.** and mail to **Shoppes at Lake Avenue, PO Box 863891, Orlando, FL 32886-3891.**

Thank you for your time and attention to this matter.  Should you have any questions or require further information, please call.

Sincerely,


Karen E. Matroni, CSM
Property Manager

KEM/mk

# Shoppes at Lake Avenue, Inc.

Post Office Box 320219

Cocoa Beach, Florida 32932

Ph. 321-452-0888          Fax 321-453-3618

enclosures

# Shoppes at Lake Avenue, Inc.

Post Office Box 320219

Cocoa Beach, Florida 32932

Ph.  321-452-0888        Fax  321-453-3618

November 3, 2005

via fax: (904) 783-6646
Hardcopy to follow via post

Ms. Telsa Tinsley
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254-3699

RE:  Store #2215 – Shoppes at Lake Avenue
RE:  2005 Real Estate Taxes – Winn Dixie pro rata share

Dear Telsa:

Pursuant to the Lease, Winn Dixie shall pay its pro rata share of the Real Estate Taxes (Ad Valorem and Non Ad Valorem) within thirty (30) days of receipt of Landlord's notice, copy of Tax assessment invoice, and proof of Landlord's payment.

Shoppes at Lake Avenue is comprised of five (5) parcels for tax assessment purposes. Winn Dixie's pro rata share is 82.0430%. Please find copies of the tax bills attached.

| Parcel Tax ID (Acct #) | Shopping Center Assessed Taxes | Winn Dixie Prorata Share |
|---|---|---|
| 246997-9 | $86,261.82 | $70,771.78 |
| 246998-7 | $8,290.21 | $6,801.64 |
| 246999-5 | $17,058.08 | $13,994.96 |
| 247001-2 | $24,762.74 | $20,316.09 |
| 053776-4 | $355.57 | $291.72 |
| **Totals:** | **$136,728.42** | **$112,176.09** |

*81.9506*

*112,049.76*

These invoices will be paid today (please see enclosed check copies). Therefore, please reimburse Shoppes at Lake Avenue, Inc. in the amount of **$112,176.09**. Please make checks payable to **Shoppes at Lake Avenue, Inc.** and mail to **Shoppes at Lake Avenue, PO Box 863891, Orlando, FL 32886-3891.**

Thank you for your time and attention to this matter.  Should you have any questions or require further information, please call.

Sincerely,

Karen E. Matroni, CSM
Property Manager

KEM/ink

enclosures

**SHOPPES AT LAKE AVENUE, INC.**
OPERATING ACCOUNT
P.O. Box 320319
Cocoa Beach, FL 32932-0319

WACHOVIA
WACHOVIA BANK, N.A.
ACH F/T 063107513
63-751/631

2048

11/2/2005

PAY TO THE
ORDER OF___   Earl K. Wood, Tax Collector                                   $ **86,261.82

Eighty-Six Thousand Two Hundred Sixty-One and 82/100****************************************************
DOLLARS

Earl K. Wood, Tax Collector
P.O. Box 2551
Orlando, FL 32802

MEMO
2005 RET 246997-9

AUTHORIZED SIGNATURE

⑈002048⑈ ⑈063107513⑈ 20000 2116 2255⑈

---

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

Earl K. Wood, Tax Collector

2048

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 86,261.82 | 86,261.82 | | 86,261.82 |
| | | | | Check Amount | | 86,261.82 |

11/2/2005

Wachovia - Operating   2005 RET 246997-9                        86,261.82

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

Earl K. Wood, Tax Collector

2048

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 86,261.82 | 86,261.82 | | 86,261.82 |
| | | | | Check Amount | | 86,261.82 |

11/2/2005

Wachovia - Operating   2005 RET 246997-9                        86,261.82

LMP12   MP CHECK

NOV. 3,2005   2:53PM   TRICON DEVELOPMENT                                      NO.139   P.3

## EARL K. WOOD, Tax Collector   2005 REAL ESTATE
### ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | EXEMPTIONS | C.I.S. EXEMPTION | TAXABLE VALUE | TOTAL VALUE |
|---|---|---|---|---|
| 246997-9 | 0 | | 4,788,747 | 4,788,747 |

| MARCH GROSS TAX 89,856.06 | JAN DISCOUNT 2% 88,058.94 | 15-24-28-7876-00010 SHOPPES AT LAKE AVENUE 49/36 PARCEL |
| NOV DISCOUNT 4% 86,261.82 | FEB DISCOUNT 1% 88,957.50 | 1 |
| DEC DISCOUNT 3% 87,160.38 | INTEREST/ADVT 92,564.74 | |

| SITUS ADDRESS | 11957 S APOPKA VINELAND RD | | ESCROW CODE | MILLAGE CODE | 350RG |

********AUTO**3-DIGIT 328

5 - 172946

R   SHOPPES AT LAKE AVENUE INC
    PO BOX 320637
    COCOA BEACH FL 32932-0637
    [mailing barcode]

Return with payment.    Make check payable to:  Earl K. Wood, Tax Collector • PO Box 2551 • Orlando FL 32802
Your check may be converted to ACH debit. If you wish to "opt out" of this conversion, enclose a letter along with your payment.

Earl K. Wood, Tax Collector   ▼ RETAIN FOR YOUR RECORDS ▼   2005 REAL ESTATE

SHOPPES AT LAKE AVENUE INC                    15-24-28-7876-00010
PO BOX 320637                                 SHOPPES AT LAKE AVENUE 49/36 PARCEL
COCOA BEACH FL 32932-0637                      1

SITUS ADDRESS: 11957 S APOPKA VINELAND RD                    Receipt will be mailed upon request.

### AD VALOREM TAXES

| TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED | TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED |
|---|---|---|---|---|---|
| GEN COUNTY | 5.1639 | 24,728.61 | | | |
| SCHOOL | 7.7610 | 37,165.47 | | | |
| LIBRARY | 0.4325 | 2,071.13 | | | |
| SFWM | 0.6970 | 3,337.76 | | | |
| CNTY FIRE | 2.5862 | 12,384.66 | | | |
| UTD | 2.1234 | 10,168.43 | | | |

| TOTAL MILLAGE*: | 18.764 | *DOLLARS PER $1,000 OF TAXABLE VALUE | AD VALOREM TOTAL: | 89,856.06 |

### NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | AMOUNT | LEVYING AUTHORITY | AMOUNT |
|---|---|---|---|
| | | To pay by credit card, call 1-800-2PAY-TAX (272-9829), (The jurisdiction code is 1309.) or visit www.octaxcol.com. A fee will be charged by Official Payments for this service. | |

| NON-AD VALOREM TOTAL: | |
| COMBINED TAXES AND ASSESSMENTS: | 89,856.06 |

### ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | MILLAGE CODE | ASSESSED VALUE | EXEMPTIONS | C.I.S. EXEMPTION | TAXABLE VALUE |
|---|---|---|---|---|---|
| 246997-9 | 350RG | 4,788,747 | 0 | | 4,788,747 |
| MARCH GROSS TAX 89,856.06 | NOV DISCOUNT 4% 86,261.82 | DEC DISCOUNT 3% 87,160.38 | JAN DISCOUNT 2% 88,058.94 | FEB DISCOUNT 1% 88,957.50 | INTEREST/ADVT 92,564.74 | ESCROW CODE |

**SHOPPES AT LAKE AVENUE, INC.**
OPERATING ACCOUNT
P.O. Box 320219
Cocoa Beach, FL 32932-0219

WACHOVIA
WACHOVIA BANK, N.A.
ACH P/T 063107513
63-751/631

2051

11/2/2005

PAY TO THE
ORDER OF_____ Earl K. Wood, Tax Collector

$  **8,290.21

Eight Thousand Two Hundred Ninety and 21/100**************************************************** DOLLARS

Earl K. Wood, Tax Collector
P.O. Box 2551
Orlando, FL 32802

MEMO
2005 RET 246998-7

AUTHORIZED SIGNATURE

⑈00 2 0 5 ⑈⑈  ⑆063 1 0 7 5 1 3⑆  2 0 0 0 0 2 1 1 ⑇ 7 2 5 5⑈

---

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

2051

Earl K. Wood, Tax Collector

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 8,290.21 | 8,290.21 | | 8,290.21 |
| | | | | | Check Amount | 8,290.21 |

Wachovia - Operating   2005 RET 246998-7

8,290.21

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

2051

Earl K. Wood, Tax Collector

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 8,290.21 | 8,290.21 | | 8,290.21 |
| | | | | | Check Amount | 8,290.21 |

Wachovia - Operating   2005 RET 246998-7

8,290.21

LMP12   WP CHECK

**SHOPPES AT LAKE AVENUE, INC.**
OPERATING ACCOUNT
P.O. Box 320219
Cocoa Beach, FL 32932-0219

WACHOVIA
WACHOVIA BANK, N.A.
ACH R/T 063107513
63-751/631

2049

11/2/2005

PAY TO THE
ORDER OF_____ Earl K. Wood, Tax Collector

$ **17,058.08

Seventeen Thousand Fifty-Eight and 08/100*********************************************************************** DOLLARS

Earl K. Wood, Tax Collector
P.O. Box 2551
Orlando, FL 32802

MEMO
2005 RET 246999-5

AUTHORIZED SIGNATURE

⑈00 2049⑈ ⑆063107513⑆ 20000 2⑈162255⑈

---

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

2049

Earl K. Wood, Tax Collector

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 17,058.08 | 17,058.08 | | 17,058.08 |
| | | | | | Check Amount | 17,058.08 |

Wachovia - Operating   2005 RET 246999-5

17,058.08

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

2049

Earl K. Wood, Tax Collector

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 17,058.08 | 17,058.08 | | 17,058.08 |
| | | | | | Check Amount | 17,058.08 |

Wachovia - Operating   2005 RET 246999-5

17,058.08

LMH12   MP CHECK

**EARL K. WOOD, Tax Collector**  **2005** REAL ESTATE
ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | EXEMPTIONS | L.I.G. EXEMPTION | TAXABLE VALUE | TOTAL VALUE |
|---|---|---|---|---|
| 246999-5 | 0 | | 946,964 | 946,964 |

| MARCH GROSS TAX | JAN DISCOUNT 2% | 15-24-28-7876-00080 |
|---|---|---|
| 17,768.89 | 17,413.46 | SHOPPES AT LAKE AVENUE 49/86 PARCEL |
| NOV DISCOUNT 4% | FEB DISCOUNT 1% | 3 |
| 17,058.08 | 17,591.14 | |
| DEC DISCOUNT 3% | INTEREST/ADVT | |
| 17,235.77 | 18,314.89 | |

| SITUS ADDRESS | 11969 S APOPKA VINELAND RD | | ESCROW CODE | MILLAGE CODE | 950RG |
|---|---|---|---|---|---|

SHOPPES AT LAKE AVENUE INC
PO BOX 320897
R    COCOA BEACH FL 32932-0897

Return with payment.    Make check payable to:  Earl K. Wood, Tax Collector • PO Box 2551 • Orlando FL 32802
Your check may be converted to ACH debit. If you wish to "opt out" of this conversion, enclose a letter along with your payment.

Earl K. Wood, Tax Collector    ▼ RETAIN FOR YOUR RECORDS ▼    2005 REAL ESTATE

SHOPPES AT LAKE AVENUE INC
PO BOX 320897
COCOA BEACH FL 32932-0897

15-24-28-7876-00080
SHOPPES AT LAKE AVENUE 49/86 PARCEL
3

SITUS ADDRESS:  11969 S APOPKA VINELAND RD

Receipt will be mailed upon request.

## AD VALOREM TAXES

| TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED | TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED |
|---|---|---|---|---|---|
| GEN COUNTY | 5.1689 | 4,895.03 | | | |
| SCHOOL | 7.7610 | 7,349.39 | | | |
| LIBRARY | 0.4325 | 409.56 | | | |
| SFWM | 0.6970 | 660.03 | | | |
| CNTY FIRE | 2.5882 | 2,449.04 | | | |
| UTD | 2.1234 | 2,010.78 | | | |

| TOTAL MILLAGE*: | 18.764 | *DOLLARS PER $1,000 OF TAXABLE VALUE | AD VALOREM TOTAL: | 17,768.83 |
|---|---|---|---|---|

## NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | AMOUNT | LEVYING AUTHORITY | AMOUNT |
|---|---|---|---|

To pay by credit card, call
**1-800-2PAY-TAX (272-9829),**
(The jurisdiction code is 1909.)
or visit www.octaxcol.com.
A fee will be charged by
Official Payments for this service.

| NON-AD VALOREM TOTAL: | |
|---|---|
| COMBINED TAXES AND ASSESSMENTS: | 17,768.83 |

SEE REVERSE FOR IMPORTANT INFORMATION.

## ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | MILLAGE CODE | ASSESSED VALUE | EXEMPT CODE | L.I.G. EXEMPTION | TAXABLE VALUE |
|---|---|---|---|---|---|
| 246999-5 | 950RG | 946,964 | 0 | | 946,964 |

| MARCH GROSS TAX | NOV DISCOUNT 4% | DEC DISCOUNT 3% | JAN DISCOUNT 2% | FEB DISCOUNT 1% | INTEREST/ADVT | ESCROW CODE |
|---|---|---|---|---|---|---|
| 17,768.89 | 17,058.08 | 17,235.77 | 17,413.46 | 17,591.14 | 18,314.89 | |

## EARL K. WOOD, Tax Collector    2005    REAL ESTATE
### ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | EXEMPTIONS | L.I.S. EXEMPTION | TAXABLE VALUE | TOTAL VALUE |
|---|---|---|---|---|
| 247001-2 | 0 | | 1,374,681 | 1,374,681 |

| MARCH GROSS TAX | JAN DISCOUNT 2% | | | |
|---|---|---|---|---|
| 25,794.52 | 25,278.83 | | | |
| NOV DISCOUNT 4% | FEB DISCOUNT 1% | | | |
| 24,762.74 | 25,536.57 | | | |
| DEC DISCOUNT 3% | INTEREST/ADVT | | | |
| 25,020.68 | 26,581.36 | | | |

15-24-28-7876-01001
SHOPPES AT LAKE AVENUE 49/36 TRACT A
1 (LESS COMM AT NW COR OF TRACT A2 T
SEE TAXROLL FOR COMPLETE LEGAL

| SITUS ADDRESS | | 250.00V CODE | MILLAGE CODE | 350ORG |
|---|---|---|---|---|

SHOPPES AT LAKE AVENUE INC
PO BOX 320637
R    COCOA BEACH FL 32932-0637

---

Return with payment.    Make check payable to:  Earl K. Wood, Tax Collector • PO Box 2551 • Orlando FL 32802
Your check may be converted to ACH debit.   If you wish to "opt out" of this conversion, enclose a letter along with your payment.

Earl K. Wood, Tax Collector    ▼ RETAIN FOR YOUR RECORDS ▼    2005 REAL ESTATE

SHOPPES AT LAKE AVENUE INC            15-24-28-7876-01001
PO BOX 320637                        SHOPPES AT LAKE AVENUE 49/36 TRACT A
COCOA BEACH FL 32932-0637            1 (LESS COMM AT NW COR OF TRACT A2 T
                                     SEE TAXROLL FOR COMPLETE LEGAL

SITUS ADDRESS:                                      Receipt will be mailed upon request.

## AD VALOREM TAXES

| TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED | TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED |
|---|---|---|---|---|---|
| GEN COUNTY | 5.1659 | 7,098.72 | | | |
| SCHOOL | 7.7610 | 10,668.90 | | | |
| LIBRARY | 0.4325 | 594.55 | | | |
| SFWM | 0.6970 | 958.15 | | | |
| CNTY FIRE | 2.5862 | 3,555.20 | | | |
| UTD | 2.1234 | 2,919.00 | | | |

| TOTAL MILLAGE*: | 18.764 | *DOLLARS PER $1,000 OF TAXABLE VALUE | AD VALOREM TOTAL: | 25,794.52 |
|---|---|---|---|---|

## NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | AMOUNT | LEVYING AUTHORITY | AMOUNT |
|---|---|---|---|
| | | To pay by credit card, call | |
| | | 1-800-2PAY-TAX (272-9829), | |
| | | (The jurisdiction code is 1909.) | |
| | | or visit www.octaxcol.com. | |
| | | A fee will be charged by | |
| | | Official Payments for this service. | |

| NON-AD VALOREM TOTAL: | |
|---|---|
| COMBINED TAXES AND ASSESSMENTS: | 25,794.52 |

### ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | MILLAGE CODE | ASSESSED VALUE | EXEMPTIONS | L.I.S. EXEMPTION | TAXABLE VALUE |
|---|---|---|---|---|---|
| 247001-2 | 350ORG | 1,374,681 | 0 | | 1,374,681 |
| MARCH GROSS TAX | NOV. DISCOUNT 4% | DEC DISCOUNT 3% | JAN DISCOUNT 2% | FEB DISCOUNT 1% | INTEREST/ADVT | ESCROW CODE |
| 25,794.52 | 24,762.74 | 25,020.68 | 25,278.83 | 25,536.57 | 26,581.36 | |

SEE REVERSE FOR IMPORTANT INFORMATION.

**SHOPPES AT LAKE AVENUE, INC.**
OPERATING ACCOUNT
P.O. Box 320219
Cocoa Beach, FL 32932-0219

WACHOVIA
WACHOVIA BANK, N.A.
ACH R/T 063107513
63-751/631

**2050**

11/2/2005

PAY TO THE
ORDER OF ___ Earl K. Wood, Tax Collector _____ $ **355.57

Three Hundred Fifty-Five and 57/100************************************************************

DOLLARS

Earl K. Wood, Tax Collector
P.O. Box 2551
Orlando, FL 32802

MEMO
2005 tangible personal property 053776-4

AUTHORIZED SIGNATURE

⑆002050⑆ ⑈063107513⑈ 20000 2116 2255 ⑆

---

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

Earl K. Wood, Tax Collector

**2050**

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 355.57 | 355.57 | | 355.57 |
| | | | | Check Amount | | 355.57 |

Wachovia - Operating   2005 tangible personal property 053776-4

355.57

SHOPPES AT LAKE AVENUE, INC./OPERATING ACCOUNT

Earl K. Wood, Tax Collector

**2050**

11/2/2005

| Date | Type | Reference | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---------------|-------------|----------|---------|
| 11/2/2005 | Bill | | 355.57 | 355.57 | | 355.57 |
| | | | | Check Amount | | 355.57 |

Wachovia - Operating   2005 tangible personal property 053776-4

355.57

LMP12   MIP CHECK

NOV. 3.2005   2:54PM   TRICON DEVELOPMENT   NO.139   P.11

**EARL K. WOOD, Tax Collector**   **2005**   TANGIBLE PERSONAL PROPERTY
ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | EXEMPTIONS | L.I.S. EXEMPTION | TAXABLE VALUE | TOTAL VALUE |
|---|---|---|---|---|
| 053776-4 | 0 | | 15,660 | 15,660 |

| MARCH GROSS TAX | JAN DISCOUNT 2% | | | |
|---|---|---|---|---|
| 367.32 | 361.44 | REG-117250 | | |
| NOV DISCOUNT 4% | FEB DISCOUNT 1% | 011957 S APOPKA VINELAND RD | | |
| 355.57 | 364.28 | U 32836-0000 | | |
| DEC DISCOUNT 3% | INTEREST/ADVT | | | |
| 358.50 | 371.73 | | PENALTY INC   25% | |

SITUS ADDRESS   11957 S APOPKA VINELAND RD   ESCROW CODE   VILLAGE CODE   360RG

SHOPPES AT LAKE AVENUE INC
PO BOX 320697
COCOA BEACH FL 32932-0697

Return with payment.   Make check payable to:  Earl K. Wood, Tax Collector • PO Box 2551 • Orlando FL 32802
Your check may be converted to ACH debit.  If you wish to "opt out" of this conversion, enclose a letter along with your payment.

Earl K. Wood, Tax Collector   ▼  **RETAIN FOR YOUR RECORDS**  ▼   2005 TANGIBLE PERSONAL PROPERTY

SHOPPES AT LAKE AVENUE INC
PO BOX 320697
COCOA BEACH FL 32932-0697

REG-117250
011957 S APOPKA VINELAND RD
U 32836-0000

PENALTY INC   25%

SITUS ADDRESS:   11957 S APOPKA VINELAND RD   Receipt will be mailed upon request.

## AD VALOREM TAXES

| TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED | TAX AUTHORITY | MILLAGE RATE* | TAX LEVIED |
|---|---|---|---|---|---|
| GEN COUNTY | 5.1639 | 80.87 | | | |
| SCHOOL | 7.7610 | 121.54 | | | |
| LIBRARY | 0.4325 | 6.77 | | | |
| SFWM | 0.6970 | 10.92 | | | |
| CNTY FIRE | 2.5862 | 40.50 | | | |
| UTD | 2.1234 | 33.25 | | | |
| PENALTY | 0.0000 | 73.47 | | | |

| TOTAL MILLAGE*: | 18.764 | *DOLLARS PER $1,000 OF TAXABLE VALUE | AD VALOREM TOTAL: | 367.32 |
|---|---|---|---|---|

## NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | AMOUNT | LEVYING AUTHORITY | AMOUNT |
|---|---|---|---|
| | | To pay by credit card, call | |
| | | 1-800-2PAY-TAX (272-9829), | |
| | | (The jurisdiction code is 1909.) | |
| | | or visit www.octaxcol.com. | |
| | | A fee will be charged by | |
| | | Official Payments for this service. | |

| NON-AD VALOREM TOTAL: | |
|---|---|
| **COMBINED TAXES AND ASSESSMENTS:** | 367.32 |

SEE REVERSE FOR IMPORTANT INFORMATION.

## ORANGE COUNTY NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

| ACCOUNT NUMBER | MILLAGE CODE | ASSESSED VALUE | EXEMPTIONS | L.I.S. EXEMPTION | TAXABLE VALUE |
|---|---|---|---|---|---|
| 053776-4 | 360RG | 15,660 | 0 | | 15,660 |

| MARCH GROSS TAX | NOV DISCOUNT 4% | DEC DISCOUNT 3% | JAN DISCOUNT 2% | FEB DISCOUNT 1% | INTEREST/ADVT | ESCROW CODE |
|---|---|---|---|---|---|---|
| 367.32 | 355.57 | 358.50 | 361.44 | 364.28 | 371.73 | |

# 2005 COMBINED TAX MEMORANDUM NOTICE

Miami-Dade County, Florida

## NOTICE OF AD VALOREM TAXES AND NON-AD VALOREM ASSESSMENTS

### SEE REVERSE SIDE FOR IMPORTANT INFORMATION

093641

| FOLIO NUMBER | MUNICIPALITY | MILL CODE | ASSESSED VALUE |
|---|---|---|---|
| 04-3002-000-0032 | HIALEAH | 0400 | 24,912,000 |

Mailing Address
FH: HIALEAH FEE COMMONS LTD
LESSEE: WESTLAND COMMONS
1800 SUNST HARBOUR DRIVE SUITE 2
MIAMI BCH FL 33139

Property Address
1700 W 49 ST

### AD VALOREM TAXES

| TAXING AUTHORITY | MILLAGE RATE PER $1,000 OF TAXABLE VALUE | | TAXES LEVIED |
|---|---|---|---|
| School Board | 7.94700 | 24,912,000 | 197,975.66 |
| School Board Debt Service | 0.49100 | 24,912,000 | 12,231.79 |
| Florida Inland Navigation Dist | 0.03850 | 24,912,000 | 959.11 |
| South Florida Water Mgmt District | 0.59700 | 24,912,000 | 14,872.46 |
| Everglades Construction Project | 0.10000 | 24,912,000 | 2,491.20 |
| Childrens Trust Authority | 0.42880 | 24,912,000 | 10,682.27 |
| County Wide Operating | 5.83500 | 24,912,000 | 145,361.52 |
| County Wide Debt Service | 0.28500 | 24,912,000 | 7,099.92 |
| Hialeah Operating | 6.80000 | 24,912,000 | 169,401.60 |

### NON-AD VALOREM ASSESSMENTS

| LEVYING AUTHORITY | RATE | FOOTAGE/UNITS | AMOUNT |
|---|---|---|---|
|  |  |  |  |

Combined taxes and assessments $561,075.53

4% Discount for November $538,632.51

---

BILL REQUESTED BY

Mortgage Co.: UNION PLANTERS BANK #2156
Mtg Co. # : 386      Loan # : 13121513

Your tax bill has been requested by the above noted mortgage service company for payment. Florida law requires mortgage service companies to make early payment for maximum discount, if sufficient funds are maintained in your escrow account.

04-3002-000-0032
FOLIO NUMBER

1700 W 49 ST
PROPERTY ADDRESS

If you no longer have an escrow account and are responsible for paying these taxes, you may detach this portion, mail or visit one of our office locations listed on back. Make check payable and mail to Miami-Dade Tax Collector, 140 W. Flagler Street, Miami, FL 33130. Your payment must be made prior to December 1 to obtain maximum discount.

FH: HIALEAH FEE COMMONS LTD
LESSEE: WESTLAND COMMONS
1800 SUNST HARBOUR DRIVE SUITE 2
MIAMI BCH FL 33139

LEGAL DESCRIPTION
2 53 40 17.96A AC
BEG 1207.23FTS OF NE COR OF NW1/4
W935FT S900FT E935FT N900FT LESS
E35FT & W30FT FOR R/W

50033 04300200000320 0056107553 00000000 0000000 0000000 00350 5

This instrument was prepared by
Kim Rice Bongiovanni, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

Orange Co FL 2001-0125994
03/23/2001    11:22:11am
OR Bk 6220 Pg 3349
Rec 24.00

RETURN TO:
PATRICK T. CHRISTIANSEN
Akerman, Senterfitt & Eidson, P.A.
P. O. Box 231, Orlando, FL 32802-0231

(Reserved for Clerk)

## SHORT FORM LEASE

**THIS SHORT FORM LEASE** is hereby executed this October 5, 2000, by and between   **CH Enterprises, L.L.C.,** a Florida limited liability company, whose mailing address is 17th Floor, Citrus Center, 255 South Orange Avenue, Orlando, Florida 32802 ("Landlord") and **Winn-Dixie Stores, Inc.,** a Florida corporation, whose mailing address is 3015 Coastline Drive, Orlando, Florida 32808 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**WHEREAS,** Landlord and Tenant did enter into a Lease, dated October 5, 2000 (the "Lease"); and

**WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right and easement to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended

O:\TRANSFER\ORLANDO\VINELAND\SFL.WPD
July 10, 2000

to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name: Denise J. Bouchard

Print Name: Margaret E. Malota

As to Landlord

Print Name: TANYA BEARD

Print Name: Rebecca L. Sawyer

As to Tenant

LANDLORD:

CH Enterprises, L.L.C.

By: _____
    Patrick T. Christiansen
Its: Manager

TENANT:

Winn-Dixie Stores, Inc.

By: _____
    DENNIS M. SHEEHAN
Its: Senior Vice-President

STATE OF Florida )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this July 24, 2000, by Patrick T. Christiansen, as Manager, of CH Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, who [PLEASE CHECK ONE] X is personally known to me or _____ has produced _____ as identification.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

Denise J. Bouchard
Notary Public, State of Florida
Commission No. CC 614254
My Commission Exp. 1/16/2001
Bonded Through Fla. Notary Service & Bonding Co.

O:\TRANSFER\ORLANDO\VINELAND\SFL.WPD
July 10, 2000

OR Bk 6220 Pg 3351
Orange Co FL 2001-0125994

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this Oct. 5, 2000, by
DENNIS M. SHEEHAN as Sr. Vice President of Winn-Dixie Stores, Inc., a Florida corporation,
on behalf of the corporation, who is personally known to me.

Printed Name: BRENDA J. BABCOCK
Notary Public, State and County aforesaid.
My Commission Expires: 11|20|03
Notary ID No.: _____
(NOTARIAL SEAL)



BRENDA J. BABCOCK
Notary Public, State of Florida
My comm. expires Nov. 20, 2003
Comm. No. CC 871970

O:\TRANSFER\ORLANDO\VINELAND\SFL.WPD
July 10, 2000

EXHIBIT A

OR Bk 6220 Pg 3352
Orange Co FL 2001-0125994

SOUTH APOPKA VINELAND ROAD (R/W VARIES)
(C-435)





WINN—DIXIE STORE DESIGN

6050 EDGEWOOD COURT — — — JACKSONVILLE, FLORIDA 32254

LEGAL DESCRIPTION (WINN-DIXIE LEASE PARCEL)

THAT PORTION OF BLOCKS 10, 11, 12, 13, 22, 23, AND 35; ALSO THOSE PORTIONS OF
UNIMPROVED RIGHT OF WAYS AND ALLEYS, PLATTED AS TENTH STREET, ELEVENTH
STREET, CHESTNUT STREET AND MAPLE STREET LYING WITHIN OR ADJACENT TO THE
AFOREMENTIONED BLOCKS; SAID BLOCKS AND RIGHT OF WAYS, LYING WITHIN ORANGE
CENTER, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK D, PAGE 143,
OF THE PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA;

TOGETHER WITH:
THAT PORTION OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE 28 EAST, ORANGE COUNTY,
FLORIDA, LYING WEST OF AND CONTIGUOUS TO BLOCKS 22, 23 AND ELEVENTH STREET
OF THE AFOREMENTIONED ORANGE CENTER AND EASTERLY OF THE EASTERLY RIGHT
OF WAY OF APOPKA— VINELAND ROAD PER THE ORANGE COUNTY RIGHT OF WAY MAPS
BY DARBY AND WAY DATED SEPTEMBER, 1990; SAID LANDS BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE
28 EAST, ORANGE COUNTY, FLORIDA; THENCE RUN S 89°57'29" E, ALONG THE SOUTH
LINE OF THE SOUTHWEST 1/4 OF SECTION 15, A DISTANCE OF 602.76 FEET; THENCE
DEPARTING SAID SOUTH LINE RUN N04°25'44"E, A DISTANCE OF 25.07 FEET TO THE
INTERSECTION OF THE EASTERLY RIGHT OF WAY OF APOPKA—VINELAND ROAD AND THE
NORTHERLY RIGHT OF WAY OF TWELFTH STREET (AKA LAKE STREET); THENCE CONTINUE
N 04°25'44" E, ALONG THE EASTERLY RIGHT OF WAY OF APOPKA—VINELAND ROAD,
A DISTANCE OF 200.59 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE
N04°25'44"E, A DISTANCE OF 339.19 FEET TO A POINT OF CURVATURE OF A CURVE
CONCAVE SOUTHEASTERLY   HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 3434.91
FEET, A CENTRAL ANGLE OF 01°52'23". A CHORD LENGTH OF 112.29 FEET AND A CHORD
BEARING OF N 05°21'56" E; THENCE RUN NORTHEASTERLY ALONG THE ARC OF SAID
CURVE A DISTANCE OF 112.30 FEET; SAID POINT LYING AT THE INTERSECTION OF THE
SOUTHERLY RIGHT OF WAY OF TENTH STREET AND THE EASTERLY RIGHT OF WAY OF
APOPKA — VINELAND ROAD; THENCE DEPARTING SAID CURVE RUN S 89° 57' 29" E
ALONG THE SOUTHERLY RIGHT OF WAY OF TENTH STREET A DISTANCE OF 284.18 FEET
TO THE EAST RIGHT OF WAY OF CHESTNUT STREET (50' RIGHT OF WAY); SAID POINT
BEING THE NORTHWEST CORNER OF BLOCK 11, ORANGE CENTER; THENCE RUN N 00°02'23" W,
ALONG SAID EAST RIGHT OF WAY, A DISTANCE OF 100.00 FEET TO THE NORTHWEST
CORNER OF LOT 14, BLOCK 35; THENCE DEPARTING SAID EAST RIGHT OF WAY RUN
S 89°57'29" E, A DISTANCE OF 256.00 FEET TO THE NORTHEAST CORNER OF LOT 11,
BLOCK 35 AND THE WESTERLY RIGHT OF WAY OF MAPLE STREET ( 50' RIGHT OF WAY);
THENCE RUN S 00°02'23" E, ALONG SAID RIGHT OF WAY 50.00 FEET TO THE SOUTHEAST
CORNER OF LOT 12, BLOCK 35 AND THE NORTHERLY RIGHT OF WAY OF TENTH STREET;
THENCE RUN N 89°57'29" W, ALONG SAID NORTHERLY RIGHT OF WAY, A DISTANCE OF
136.00 FEET TO THE SOUTHEAST CORNER OF LOT 13, BLOCK 35; THENCE DEPARTING
SAID RIGHT OF WAY RUN S 00°02'23" E, A DISTANCE OF 100.00 FEET TO THE SOUTHEAST
CORNER OF LOT 23 BLOCK 11; THENCE RUN S 89°57'29" E, A DISTANCE OF 186.00
FEET TO THE SOUTHWEST CORNER OF LOT 23, BLOCK 10 AND THE EASTERLY RIGHT OF WAY
OF THE AFOREMENTIONED MAPLE STREET; THENCE RUN N 00°02'23" W, ALONG SAID
RIGHT OF WAY A DISTANCE OF 50.00 FEET TO THE NORTHWEST CORNER OF LOT 24, BLOCK
10 AND THE SOUTHERLY RIGHT OF WAY OF TENTH STREET; THENCE RUN S 89°57'29" E,
ALONG SAID SOUTHERLY RIGHT OF WAY, A DISTANCE OF 256.00 FEET TO THE NORTHEAST
CORNER OF LOT 1, BLOCK 10, AND THE WESTERLY RIGHT OF WAY OF MAIN STREET
(AKA RUBY LAKE ROAD — 50' RIGHT OF WAY); THENCE RUN S 00°02'23" E, ALONG SAID
WESTERLY RIGHT OF WAY, A DISTANCE OF 200.00 FEET TO THE SOUTHEAST CORNER OF
LOT 8, BLOCK 10; THENCE DEPARTING SAID RIGHT OF WAY RUN N 89° 57' 29" W, A
DISTANCE OF 136.00 FEET TO THE SOUTHEAST CORNER OF LOT 17, BLOCK 10; THENCE RUN
S 00°02'23" E, A DISTANCE OF 275.00 FEET ALONG THE WESTERLY SIDE OF A 16.00 FOOT
WIDE PLATTED ALLEY TO THE SOUTHEAST CORNER OF LOT 20, BLOCK 13; THENCE
DEPARTING SAID WESTERLY LINE RUN N 89°57'29" W, A DISTANCE OF 170.00 FEET TO
THE NORTHEAST CORNER OF LOT 5, BLOCK 12 AND THE WESTERLY RIGHT OF WAY OF ▓▓▓▓▓
MAPLE STREET; THENCE RUN S 00°02'23" E, ALONG SAID RIGHT OF WAY A DISTANCE OF
50.00 FEET TO THE SOUTHEAST CORNER OF LOT 7, BLOCK 12; THENCE RUN N 89°57'29" W,
A DISTANCE OF 281.00 FEET TO THE CENTERLINE OF THE AFOREMENTIONED CHESTNUT
STREET, THENCE RUN N 00°02'23" W, ALONG SAID CENTERLINE, A DISTANCE OF 75.00
FEET; THENCE DEPARTING SAID CENTERLINE RUN N 89°57'29" W, ALONG THE SOUTH LINE
OF LOTS 4 AND 21, BLOCK 23, A DISTANCE OF 296.18 FEET TO THE POINT OF BEGINNING.

CONTAINING: 390,276.445 S.F. (8.960 ACRES MORE OR LESS)

REVISED: 8-1-00

RETURN TO:
PATRICK T. CHRISTIANSEN
Akerman, Senterfitt & Eidson, P.A.
P. O. Box 231, Orlando, FL 32802-0231

Orange Co FL 2001-0125996
03/23/2001    11:22:11am
OR Bk 6220 Pg 3362
Rec 10.50

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** ("Amendment") is made as of _January 17, 2001_ by CH Enterprises, L.L.C., a Florida limited liability company ("Landlord") and Winn-Dixie Stores, Inc., a Florida corporation, ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1.    Landlord and Tenant are parties to that certain Lease dated October 5, 2000, as amended and/or evidenced by Short Form Lease dated October 5, 2000, recorded in Volume 226 page 3379 of the public records of Orange County, Florida; (the "Lease"), Tenant leased from Landlord the "demised premises" (as defined in the Lease) located in Orange County, Florida.

2.    The Lease established certain deadlines for commencement and completion of the improvements and Landlord has requested and Tenant has agreed to extend those deadlines and alter those parameters.

**NOW THEREFORE**, Landlord and Tenant agree as follows:

1.    The foregoing recitals are true and correct and incorporated herein by reference.

2.    Paragraph 10 of the Lease is hereby amended and restated in its entirety so that from and after the date hereof such Paragraph 10 shall read and provide as follows:

**COMPLETION
DATE**    **10.**    Construction of the Store and the Shopping Center shall begin not later than March 1, 2001 (the "Construction Start Date") and shall be substantially completed not later than December 1, 2001 (the "Construction Deadline"). The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" attached to the Lease.

3.    Except as expressly modified by this Amendment, the Lease remains in full force and effect.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Amendment as of the date first above written.

Signed, sealed and delivered
in the presence of:

Print name: _Tracy D. Sovar_

Print name: _MARY FAITH PINSON_

CH Enterprises, L.L.C.

By: _____
    Patrick T. Christiansen
Its: _Managing Member_
Date: _12-28-00_

OR Bk 6220 Pg 3363
Orange Co FL 2001-0125996
Recorded - Martha O. Haynie

_Rebecca L. Lawson_
Print name: Rebecca L. Lawson

**Winn-Dixie Stores, Inc.**

_Brenda J. Babcock_
Print name: BRENDA J. BABCOCK

By: _Dennis M. Sheehan_
   DENNIS M. SHEEHAN
Its: Senior Vice-President
Date: 1-15-01

STATE OF _Florida_ )
COUNTY OF _Orange_ )

The foregoing instrument was acknowledged before me this _Jan. 2_, 2001, by _Patrick T. Christiansen_, as _Managing Member_ of CH Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, who [PLEASE CHECK ONE] ✓ is personally known to me or N/A has produced _____ as identification.

_Mary Faith Pinson_
Printed Name: MARY FAITH PINSON
Notary Public, State and County aforesaid.
My Commission Expires: 5/3/01
Notary ID No.: _____
(NOTARIAL SEAL)

Mary Faith Pinson
My Commission CC832510
Expires May 3, 2001

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _Jan. 15_, 2001, by _DENNIS M. SHEEHAN_, as _Sr. Vice_ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_Brenda J. Babcock_
Printed Name: BRENDA J. BABCOCK
Notary Public, State and County aforesaid.
My Commission Expires: 11/20/03
Notary ID No.: _____
(NOTARIAL SEAL)

BRENDA J. BABCOCK
Notary Public, State of Florida
My comm. expires Nov. 20, 2003
Comm. No. CC 871970

2



# LEASE

### The Shops of Lake Avenue
### Northeast Corner Apopka-Vineland Road and Lake Avenue

# Orlando, Orange County, Florida

October 5, 2000

## TABLE OF CONTENTS

PREMISES ................................................................................. 1

TERM .................................................................................... 1

RENT .................................................................................... 2

TITLE .................................................................................... 6

SURVEY .................................................................................. 7

ENVIRONMENTAL AUDIT ...................................................................... 7

USE ..................................................................................... 8

COMPLIANCE WITH LAWS ...................................................................... 9

CONSTRUCTION OF SHOPPING CENTER ........................................................... 9

COMPLETION DATE ........................................................................... 10

COMMENCEMENT DATE ........................................................................ 10

PARKING AND COMMON AREAS ................................................................. 11

SERVICE AREA ............................................................................. 12

UTILITIES ................................................................................ 12

TENANT'S MAINTENANCE ...................................................................... 12

LANDLORD'S MAINTENANCE .................................................................... 12

SIGNS ................................................................................... 13

FIXTURES AND INTERIOR ALTERATIONS ......................................................... 14

October 5, 2000

INDEMNIFICATION ................................................................. 14

CASUALTY ....................................................................... 14

INSURANCE ...................................................................... 16

QUIET ENJOYMENT ............................................................... 17

TAXES AND LIENS ................................................................ 18

CONDEMNATION .................................................................. 18

DEFAULT ........................................................................ 20

CONSTRUCTION RISKS ............................................................ 21

NOTICES ........................................................................ 22

ASSIGNMENT AND SUBLEASING .................................................... 22

SUBORDINATE .................................................................... 22

ESTOPPEL CERTIFICATE .......................................................... 23

LENDER'S CURE .................................................................. 23

BENEFIT ........................................................................ 23

TRANSFER BY LANDLORD .......................................................... 23

SHORT FORM LEASE .............................................................. 24

MARGINAL TITLES ................................................................ 24

COMPLETE AGREEMENT ........................................................... 24

October 5, 2000

DECLARATION .................................................................. 24

EXHIBITS ..................................................................... 24

FORCE MAJEURE .............................................................. 24

ENVIRONMENTAL CONDITION ................................................. 25

NO BROKERS ................................................................. 26

FLORIDA MANDATED PROVISION ............................................. 26

EXPANSION ................................................................... 26

TAKE OVER AND RELEASE ................................................... 28

GOVERNING LAW .............................................................. 28

NO JOINT VENTURE .......................................................... 28

NO MERGER .................................................................. 28

NO WAIVER ................................................................... 28

EXCULPATION ................................................................ 29

October 5, 2000

## LEASE

**THIS LEASE** is made this _____, 2000, between **CH Enterprises, L.L.C.**, a Florida limited liability company ("Landlord") and **Winn-Dixie Stores, Inc.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## W I T N E S S E T H:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1.       Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 220 feet in width by 230 feet in depth, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided (collectively, the "Store"), together with exterior pads at the rear and/or the side of the Store as set forth in said plans and specifications for installation of freezers, coolers, and a mechanical/equipment room, a loading dock area, and the land on which all of the same shall stand and Landlord hereby establishes for, and grants and conveys to Tenant a non-exclusive right and easement appurtenant to the Store to use during the Term as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements for use in common with all other tenants of the Shopping Center, as hereinafter defined, and as shown on the Site Plan, as hereinafter defined (the "Common Areas" and together with the Store, collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by Winn-Dixie Store Design on September 18, 2000 (the "Site Plan"), known as Shops of Lake Avenue (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the NEC Apopka-Vineland Road and Lake Avenue in the City of Orlando , County of Orange, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**

2.       (a)       Initial Term. The term of this Lease shall commence on the Commencement Date, as hereinafter defined, and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)       Extension Term(s). Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the Term of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term"). Tenant may extend the Term by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c)       Return of Store. Tenant will yield up the Store and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other

condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Store to its original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)     Holding Over.  Any holding over by Tenant of the Store after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at one hundred fifty percent (150%) of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

**RENT**

3.     Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)     Basic Rent.  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $885,374.16 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $73,781.18 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)     Percentage Rent.  In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculating the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year"). Notwithstanding anything to the contrary in this Lease, Tenant shall be entitled to deduct from the amount of Percentage Rent otherwise due in any Fiscal Year the amount paid or payable by Tenant during the same Fiscal Year for Real Estate Taxes and Shopping Center Insurance, each as hereinafter defined.

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store by Winn-Dixie Stores, Inc. during each fiscal year of the Term, both for cash and on credit (less bad debt expenses) together with any basic rental received from any subtenant, licensee or concessionaire of a portion, but not all, of the Store. Gross Sales shall not include (i) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (ii) transfers of merchandise made by Tenant from the Store to any other stores or warehouses of Tenant or its affiliated companies; (iii) credits or refunds made to customers for merchandise returned or exchanged; (iv) all sales of cigarettes and tobacco; (v) all fees, charges, income and receipts from vending machines, banks, automatic teller machines and public telephones; (vi) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (vii) returns of merchandise to suppliers or manufacturers; (viii) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (ix) merchandise or other things of value issued as a premium in connection with any sales promotion program; (x) gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise; and (xi) basic rent received from

a subtenant of the entire Store. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. Within a reasonable time after the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than three percent (3%), Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall pay the amount of any such overpayment to Tenant within thirty (30) days of such finding.

(c)     Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay a portion of (i) Common Area Maintenance Expenses, (ii) Real Estate Taxes, (iii) Shopping Center Insurance, and (iv) Approved Security Expenses (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one (1) full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all paid invoices, receipts and other evidences of payment by Landlord (the "Payment Evidence"). On or before ninety (90) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to deliver such itemized statement within 180 days after the end of any calendar year (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Subject to Tenant's audit rights set forth below, if the Landlord's reconciliation shows Tenant owing any more Additional Rent, Tenant shall pay the same to Landlord within thirty (30) days of receipt of said reconciliation. If Landlord's reconciliation shows that Tenant has overpaid Additional Rent for the preceding year, Landlord shall, within thirty (30) days of the date of the reconciliation, refund the overpayment to Tenant. Tenant shall have the right, within one hundred eighty (180) days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30)

days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than three percent (3%), Landlord shall also pay to Tenant the reasonable cost of Tenant's audit.

(1)     Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth (1/12) of Landlord's estimate of the amount of such Common Area Maintenance Expenses to be due for the upcoming year which, for the first year, is estimated to be $3,000.00 per month. For succeeding years, the basis for Tenant's estimate for the year's Common Area Maintenance Expenses shall be the amount actually paid by Tenant for the prior year, less any extraordinary or non-recurring items. The year's actual Common Area Maintenance Expenses for the applicable calendar year shall be reconciled at the end of each of year pursuant to the terms of paragraph 3(c), above.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, but not limited to, Landlord's common area maintenance responsibilities set forth in paragraph 17(b), below, but specifically excludes those costs set forth in the next paragraph.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, expenses associated with keeping the Shopping Center or the common areas safe or secure, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or capital improvements (including repaving or resurfacing of asphalt parking areas or repaving or resurfacing concrete parking areas as opposed to repairing potholes or other day-to-day maintenance) unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized on a straight line basis over the maximum allowable useful life of such capital improvements, the cost of investigating, testing for, removing, abating, or

otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses, or any single expense over fifteen percent (15%) of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed provided, however, that on or before ten (10) days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once per year.

(2)     Real Estate Taxes.  Tenant shall pay to Landlord, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center.  Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site by the taxing authorities as a part of a special improvement district (e.g. special assessments for sidewalks or for road widening), any special fees associated with the Tenant's business and paid as a part if the ad valorem tax bill for the Shopping Center, less any abatements, early payment discounts, or refunds permitted by law.  Real Estate Taxes do not include any special assessments for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Shopping Center, or impact or similar fees associated with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center.  To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-Rata Share of each installment. · Any annual special assessment deemed payable after expiration or termination of this Lease shall not be Tenant's obligation.  Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense.  Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing.     If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)     Shopping Center Insurance.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance".    Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping

Center under the terms of this Lease. Shopping Center Insurance shall not include: the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center; business interruption insurance; rent loss insurance carried by Landlord; or the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

(4)   Approved Security Expenses.   Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Approved Security Expenses". Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety and security devices and personnel pre-approved by Tenant's designated security officer. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Lease to keep the Shopping Center and the common areas safe and secure, it shall submit a written plan for providing such services to Tenant. Tenant shall submit such plan to its security officer for review. If the plan meets with the approval of Tenant's security officer, Tenant shall advise Landlord of the same. No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment. Approved Security Expenses shall not include any expenses not based upon competitive, arms-length bids obtained less frequently than once per year. Payment of Approved Security Expenses or nonpayment of unapproved security expenses by Tenant shall not be interpreted and Landlord shall not claim that such payment or nonpayment should be interpreted as assertion of control over the common areas by Tenant.

Tenant's "Pro-rata Share" shall be the ratio of the rentable square footage of the Store as it exists from time-to-time to the total rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

TITLE

4.   On or before ten (10) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails timely to object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have thirty (30) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which

it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have fifteen (15) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Title Objection Response"). If Landlord fails timely to provide Landlord's Title Objection Response, then Landlord shall be deemed to have agreed to cure Tenant's Title Objections. Notwithstanding the foregoing, Landlord shall cure or cause to be removed any Exceptions that can be cured solely by the payment of money [i.e. taxes due and payable, mortgages or other encumbrances (unless all payments due under any such mortgage or encumbrance are current and Landlord provides Tenant with an SNDA as hereinafter defined), mechanics' or construction liens, etc.], shall terminate and cause the eviction of any tenants under any other leases to the Store, shall deliver evidence of Landlord's status, power, and authority as required by the Title Company, and shall execute and deliver an owners and nonforeign affidavit. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Shopping Center and insuring Tenant's leasehold and any easements granted in connection therewith subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy").

**SURVEY**

5.     On or before ten (10) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, four (4) sealed copies of an actual survey of the real property comprising the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all easements and exceptions shown in the Commitment that are capable of being so located, shall bear the certificate and comply with the survey protocol attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Survey Objection Response"). If Landlord fails timely to provide Landlord's Survey Objection Response, then Landlord shall be deemed to have agreed to cure Tenant's Survey Objections. Landlord shall provide to Tenant, on or before the Commencement Date, a revised Survey showing Landlord's cure of Tenant's Survey Objections. Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant four (4) sealed copies of the Survey revised to show the Store and Shopping Center "as built" (the "As-Built Survey").

**ENVIRONMENTAL AUDIT**

6.     On or before ten (10) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental site assessment of the Shopping Center addressed to Tenant, which assessment analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Assessment"). Instead of providing the Assessment, Landlord may provide a copy of an Assessment issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Assessment stating that Tenant may rely thereon (the "Prior Assessment"). Tenant shall have until the Title/Survey Review Deadline to review either the Assessment or the Prior Assessment.

October 5, 2000                                                  7

If either reveals any environmental condition that, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation") Tenant shall notify Landlord in writing. Landlord shall have until sixty (60) days prior to the Commencement Date to cure any such Environmental Violation and provide evidence of the cure to Tenant by such date.

**USE**

7.    (a)    <u>Permitted Use.</u>  The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

(b)    <u>Exclusives.</u>    Tenant shall have the exclusive right in the Shopping Center to each of the following (each an "Exclusive Use"):

(1)    operate a supermarket, grocery, bakery, and delicatessen;

(2)    sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods;

(3)    operate a pharmacy or prescription drug concession;

(4)    sell beer and wine for off-premises consumption;

(5)    operate a liquor store; and

(6)    operate a photo lab.

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within one thousand (1,000) feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord).

(c)    <u>Prohibitions.</u>    Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

(1)    spa, health, sports, or exercise club;

(2)    lounge, bar, "teen lounge" or social encounter club;

(3)    bowling alley;

(4)    pawn shop;

(5)    skating rink;

(6)    bingo or electronic or other game parlor;

(7)     theater (motion picture, legitimate or other);

(8)     the sale or display of pornographic or "adult" material;

(9)     business, medical or professional offices in excess of 3,000 square feet;

(10)    abortion or HIV clinic;

(11)    sale of motor vehicles and boats;

(12)    church;

(13)    manufacturing or storage business;

(14)    public auditorium or other public entertainment facility;

(15)    tag office or other government service office;

(16)    exterior "pay" telephones, except In "Retail A" and "Retail B", as shown on the Site Plan;

(17)    restaurants, except as set forth below;

(18)    dry cleaning processing plant or business; or

(19)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

Notwithstanding the foregoing, Landlord shall be permitted to have in the last bay of "Retail B" as shown on the Site Plan, one Starbucks or Barnie's coffee bar. Tenant shall be entitled to have a bank and automatic teller machines.

**COMPLIANCE WITH LAWS**

8.      Tenant shall at all times comply with all applicable current and future laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to the Shopping Center and to fulfillment of Landlord's obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.      Landlord, at its sole cost and expense, shall: construct and diligently pursue to completion the Shopping Center, as shown on the Site Plan; grade and surface, as provided in Tenant's Plans (as hereinafter defined) all paved portions of the Common Areas; and install proper and adequate water drainage and lighting for the Shopping Center. All design, installation, and construction by or on behalf of Landlord shall comply in every respect with all Legal Requirements, and shall be completed in a first-class manner by contractors, architects, and engineers, which are licensed, bonded, and insured. All work on the Store and the Shopping Center shall be backed by Payment and Performance Bonds. The arrangement and

October 5, 2000                9

location of all buildings and Common Areas shall be constructed and maintained as shown on the Site Plan. Landlord shall not subdivide, parcel, create any easements in the Common Areas, or otherwise alter the Shopping Center without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed. The exterior facade of the buildings in the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned or delayed.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct the Store in accordance with guidelines submitted by Tenant to Landlord's architect (the "Guideplans") to be used to create Tenant's Plans, as hereinafter defined, and in accordance with the final plans and specifications to be approved by both Landlord and Tenant, which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Landlord shall cause the architect to notify Tenant in writing of any discrepancies between the Guideplans and Tenant's Plans prior to Tenant's approval. Tenant's Plans shall be approved when initialed by both parties and, when initialed, shall constitute a part of this Lease. Tenant's Plans shall provide for a completed Store, commonly referred to as a "turnkey" or "lock and key job". Tenant shall pay directly to Landlord's contractor the cost of any change to Tenant's Plans requested by Tenant (a "Change Order"). Any deadlines for completion of the Store or the Shopping Center contained in this Lease shall be extended for a reasonable time for any delay caused by a Change Order.

**COMPLETION DATE**  **10.**  Construction of the Store and the Shopping Center shall begin not later than January 1, 2001(the"Construction Start Date") and shall be substantially completed not later than October 1, 2001 (the "Construction Deadline"). The Construction Start Date shall be the date as of which (i) Landlord shall have obtained an building permit issued by the appropriate governmental authorities, (ii) the first concrete footings have been poured and (iii) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto.

**COMMENCEMENT DATE**  **11.**  Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, and upon satisfaction of all the requirements listed below (collectively, the "Conditions"), (the "Commencement Date").

(a)  The Premises shall have been delivered to Tenant completed in substantial accordance with the Site Plan and Tenant's Plans, (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence);

(b)  Tenant shall have received, (i) the Title Policy, (ii) the Survey, and (iii) the Assessment (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(c)  Landlord has provided to Tenant a fully executed Architect's Certification in the form attached hereto as Exhibit "K";

(d)  Landlord has assigned to Tenant all contractor and other warranties for those items Tenant is obligated to maintain under paragraph 16, below;

(e)    All requirements of the Guideplans and Tenant's Plans to be performed by Landlord have been satisfied;

(f)    Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(g)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(h)    Construction of at least 100 lineal feet of store frontage and 6,000 square feet of total building area (excluding the Store) in the Shopping Center shall have been completed as shown on the Site Plan;

(i)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises;

(j)    The Declaration, as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction; and

(k)    The platted roads as shown on the Site Plan across the Shopping Center shall have been vacated and the rights of way from Lake Street shall have been vacated and easements for ingress and egress from Lake Street to the Shopping Center shall have been obtained and recorded or in the alternative the rights of way shall be maintained for accesses.

Provided that the conditions are timely fulfilled, Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

Notwithstanding the foregoing, if, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or sixty (60) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

**PARKING AND COMMON AREAS**    12.    Tenant, its employees, agents, suppliers, licensees, customers, and invitees, shall have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

Prior to construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 5.2 ten (10) foot wide automobile parking spaces for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 340 automobiles (minimum), on the basis of size and arrangement as provided on the Site Plan; and

After construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 4.3 ten (10) foot wide automobile parking spaces for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 340 automobiles (minimum), on the basis of size and arrangement as provided on the Site Plan.

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants or vendors utilizing vehicles or booths shall be allowed in the Common Areas.

**SERVICE AREA**    **13.**    Landlord shall provide parking spaces for two (2) large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear or side, as the case may be, as set forth on the Site Plan, of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center. Tenant shall not use trailers for permanent merchandise storage.

**UTILITIES**    **14.**    Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for environmental impact charges, or any "hook up" fees, "tap" fees, or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted during the hours of ½ hour before dusk until midnight (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan. Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

**TENANT'S**    **15.**    Tenant shall keep the interior of the Store in reasonably neat and orderly condition but
**MAINTENANCE**    excluding reasonable wear and tear. Tenant shall repair or replace as needed: windows and plate glass; automatic doors; air conditioning and heating systems; floor surfacing; the automatic sprinkler system (including central alarm system therefor, if required by governmental authority); interior wiring to the main disconnect or main electrical panel; and plumbing, from, but excluding, the water meter. Tenant's repair obligations shall exclude:

structural repairs; repairs which are the responsibility of Landlord; and repairs made necessary by reason of fire, the elements or any insured casualty. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Store or permit anything to be done in or upon the Store creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter the Store for making repairs or for examining or showing the same to prospective purchasers or lenders.

**LANDLORD'S MAINTENANCE**

16.    (a)    Common Areas. Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store), the facade of the Store, the exterior walls and structural portions of the Store (including painting of the exterior walls as needed), roof, gutter, downspouts, masonry walls, foundation and structural members of the Store, the exterior plumbing (including and from the water meter for the Store and including septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding or other security services, cleaning and sweeping as needed but at least three (3) times weekly, lighting during the Standard Hours in accordance with Tenant's Plans and this Lease and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, traffic control, general repair and maintenance of all paved surfaces (including resealing and resurfacing as needed), repainting of parking area striping, and maintenance of landscaped areas (but only as shown on Tenant's Plans) maintaining any sprinkler and septic systems and drainage, storm water retention/detention facilities required for the operation of the Shopping Center (which may include any off-site retention/detention facilities used for the benefit of the Shopping Center), and, painting of the Common Areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Store.

(b)    If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs (which shall include, but not be limited to, any roof repairs) or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance or repairs required of it hereunder to the Store, the Shopping Center, or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse Tenant for the reasonable out-of-pocket cost therefor within ten (10) days of receipt of a written statement therefor, shall constitute a Repayment Default, as hereinafter defined.

**SIGNS**

17.    Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Store resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish

requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Landlord shall construct, install, and maintain, at its cost, one (1) electrically illuminated monument sign in the location marked on the Site Plan. Additionally, Landlord agrees to use its best faith efforts to assist Tenant in obtaining a monument sign on the ABC parcel at the intersection of Lake Street and Chestnut Street as shown on the Site Plan. Said sign will be at Tenant's sole cost and expense. The monument sign shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panel(s) in the uppermost spaces on such pylon sign(s) and may connect the sign panel(s) to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel(s) if billed as a portion of Additional Rent.

**FIXTURES AND INTERIOR ALTERATIONS**

18.    Tenant, at its own expense, shall have the right from time to time during the Term to make any alterations, additions and improvements, in, to or about the Store which do not adversely affect its structural integrity ("Non-Structural Modifications"). Tenant may make any other alterations, additions or improvements ("Tenant Modifications") provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed). If Landlord's consent is required in connection with any Tenant Modifications, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to its commencement. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before ten (10) days after the date of Tenant's request for Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Non-Structural Modifications or Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Non-Structural Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term. Tenant shall indemnify and hold the Landlord harmless from all costs and expenses associated with said Modifications and shall immediately cause to be removed any claims of lien which may be recorded on the Shopping Center as a result of said Modifications.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Store resulting from the installation or removal of Tenant's Trade Fixtures or Tenant Modifications.

**INDEMNIFICATION**

19.    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance, required to be maintained under this Lease, to any person or property happening in the Store, unless caused by the negligence, wilful misconduct or the failure to comply with the terms of this Lease, by Landlord, its agents, or employees.

Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance, required to be maintained under this Lease, happening on or about all Common Areas or any portion of the Shopping Center, other than the Store, unless caused by the negligence, wilful misconduct, or the failure to comply with the terms of this Lease, by Tenant, its agents or employees.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**

20. If (i) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent (50%) or more of the value thereof based upon replacement cost or to an extent that renders the Store untenantable in Tenant's reasonable judgment, or (ii) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use (a "Major Casualty") (with anything less being hereinafter referred to as a "Minor Casualty") then:

(a) if a Major Casualty occurs during the first seventeen (17) years of the Initial Term or if a Minor Casualty occurs at any time during the Term, then Landlord shall, without expense to Tenant, promptly commence, and complete within one hundred eighty (180) days of such casualty, the repair of the damage or restoration of the Store and the Shopping Center, as applicable, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by such casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b) if a Major Casualty occurs during the last three (3) years of the Initial Term or during any Extension Term then either Landlord or Tenant may elect, by written notice to the other within thirty (30) days of the date of the Major Casualty, to terminate this Lease;

(1) If Landlord elects to terminate this Lease, Tenant may nevertheless void Landlord's election to terminate by electing, within fifteen (15) days of receipt of Landlord's election notice, to extend the Lease for the next successive Extension Term. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(2) If Tenant terminates this Lease, or does not void Landlord's timely election to terminate, then this Lease shall terminate as of the date of the Major Casualty and all Basic, Additional and Percentage Rent shall be pro-rated as of such date;

(3)     If neither Tenant nor Landlord timely terminates this Lease or if Tenant voids Landlord's election to terminate, then Landlord shall, without expense to Tenant, promptly commence and complete within one hundred eighty (180) days of such casualty, the repair of the damage or restoration of the Store and the Shopping Center, as applicable, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant.  Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by such casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.  Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

(4)     If fire or other casualty destroys or damages any portion of the Common Areas at any time during the Term, Landlord shall promptly repair the destruction or damage to the Common Areas, without expense to Tenant.

**INSURANCE**     21.     (a)     *Landlord.*  Landlord shall obtain and keep in full force and effect the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report.  Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(1)     Liability Insurance.  Landlord shall carry commercial general liability insurance coverage on the Shopping Center, stipulating limits of liability of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00.  If Landlord desires additional liability insurance coverage, Landlord may obtain the same at its sole cost and expense.  Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage including, without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(2)     Property Insurance.  Landlord shall carry all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area; in the amount of the full replacement cost thereof, but in the case of flood, windstorm or earthquake coverage, only up to the amount provided for in any government sponsored program, and deductibles of not more than $100,000.00.  Landlord hereby

expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)    *Tenant.*    Tenant shall obtain and keep in full force and effect the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of Insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests.

(1)    Liability Insurance.    Tenant shall carry, at its sole expense, commercial general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(2)    Property Insurance.    Tenant shall carry all-risk commercial property insurance on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would have been covered if such insurance had been obtained and maintained as required by this Lease, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc., if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant may self-insure and shall not be required to provide any insurance certificates to Landlord or any Mortgagee. If Tenant has "self insured" and a claim is made or a loss incurred which would have been covered by the insurance described in subparagraphs (b)(1) or (2) above, then Tenant shall be liable to, and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss, and Tenant shall pay any settlement or judgment resulting therefrom up to the aforementioned policy limits. As to property losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

17

QUIET ENJOYMENT    22.    Landlord covenants, warrants and represents that:

(a)    the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    Landlord is and shall remain duly organized and validly existing and is duly authorized to transact business in the state in which the Shopping Center is located; has and shall have full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein; such execution, delivery, performance, and grant have been duly authorized by all necessary action and does not and will not constitute a breach of or default under any contract, mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges granted under this Lease;

(d)    Tenant, on paying the rent and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or appertaining thereto, during the Term;

(e)    there is no zoning, comprehensive plan, other restriction or Legal Requirement preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes;

(f)    Landlord has not previously and shall not, either directly or indirectly, lease any portion of the Shopping Center, sell any portion of the Shopping Center, or otherwise permit any portion of the Shopping Center or any other property owned or controlled by Landlord to be used in a manner prohibited by or in violation of this Lease.

TAXES AND LIENS    23.    Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes, assessments, charges on land and improvements, and obligations secured by mortgage or other lien upon the Shopping Center (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency. If Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall timely pay the same in order to take maximum advantage of any rebate, abatement, or early payment discount available.

CONDEMNATION    24.    If any part of the Store or more than twenty percent (20%) of the total square footage of buildings in the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease, at its option, by written notice to Landlord within sixty (60) days following such taking or purchase. Any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion any repairs and restoration necessary to return the Store and the Shopping Center to a condition comparable to their condition at the time of taking and this Lease shall continue.

If: (a) any drive, entrance, median cut, access point, route or mode of access to or through the Common Areas depicted on the Site Plan is:

October 5, 2000                    18

(i) taken for any public or quasi-public use under any Legal Requirement, right of eminent domain, or private purchase in lieu thereof, or

(ii) obstructed (or to be obstructed pursuant to notice from appropriate governmental authority):

(A) for more than one hundred eighty (180) days, or

(B) in a manner which unreasonably interferes with the conduct of Tenant's business in the Store or prevents Tenant's use of or access to or through the Common Areas; or

(b) any portion of the Common Areas depicted on the Site Plan is:

(i) taken for any public or quasi-public use under any Legal Requirement, right of eminent domain, or private purchase in lieu thereof, so as to reduce the required number of parking spaces by:

(A) an amount in excess of ten percent (10%) of the number required under Section 13 of this Lease, or

(B) an amount that results in a violation of applicable Legal Requirements, or

(ii) obstructed in a manner or for an interval which unreasonably interferes with the conduct of Tenant's business in the Store or Tenant's use of the Common Areas,

then Tenant, at its option, may terminate this Lease. Tenant shall terminate pursuant to this paragraph by written notice within sixty (60) days following the date of such taking, purchase or obstruction, unless Tenant terminates by reason of notice of a pending obstruction from appropriate governmental authority, as provided above, in which case Tenant may terminate by written notice prior to the occurrence of such obstruction, but such termination shall not be effective until the first occurrence of such obstruction. Tenant shall not be liable for Basic, Additional, and Percentage Rent at any time following termination of the Lease.

If Tenant gives written notice of its termination of this Lease as the result of a reduction in the required number of parking spaces as set forth above, Landlord shall have fifteen (15) days following the date of Tenant's notice to propose alternative replacement parking. If such alternative replacement parking meets with Tenant's approval, Landlord shall have thirty (30) days in which to complete such parking for use. Upon timely completion of such parking, the Lease shall continue. If the alternative replacement parking does not meet with Tenant's approval, Tenant's termination shall proceed as provided above.

Tenant's option to terminate the Lease pursuant to this Section shall apply without regard to whether the taking, purchase or obstruction is compensable under applicable Legal Requirements.

If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for the Permitted Use or its use of or access to the Common Areas

(collectively, a "Zoning Change"), then any such Zoning Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease in accordance with the foregoing provisions of this Section.

Tenant waives its rights to the proceeds of any condemnation award granted to Landlord, except with respect to: a) the unamortized cost of the Addition, as hereinafter defined, to the extent financed by Tenant; (b) any business damages, business loss, or loss of goodwill claimed by Tenant; (c) the cost of dislocation and moving and relocation expenses of Tenant; (d) the unamortized cost of Tenant Modifications, Tenant's Trade Fixtures, fixtures installed by Tenant and Tenant's personal property; and (e) Tenant's attorneys' fees, costs and expenses in the eminent domain proceedings.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those awarded to Tenant) to ensure their proper application to restoration or repair as required by this Lease, unless Tenant terminates this Lease, in which case such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents.

**DEFAULT**

25.    (a)    Tenant shall be in default under this Lease if:

(1)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

(2)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and promptly prosecutes the same to completion in a reasonable manner).

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(A)    Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic, Additional, or Percentage Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs to the Store necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary

brokerage commissions paid in connection with re-letting the Store.

(B)    Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic, Additional, or Percentage Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default occurring prior to the date of termination.

Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

(b)    Landlord shall be in default under this Lease if:

(1)    Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within ten (10) days after receipt of a written statement from Tenant (a "Repayment Default"); or

(2)    Landlord breaches any representation, warranty or covenant set forth in this Lease or fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Tenant (or, provided Tenant can continue to fully operate its business as contemplated under this Lease, then Landlord shall have such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and promptly prosecutes the same to completion in a reasonable manner).

Following an uncured default by Landlord, in addition to all other rights and remedies in favor of Tenant otherwise provided under this Lease, Tenant may (a) terminate this Lease, (b) exercise any and all remedies available at law or in equity, or (c) without waiving any other rights or remedies otherwise available to Tenant, cure such default for the account of Landlord, and any amount paid or any contractual liability incurred shall be deemed paid or cured for the account of Landlord and Landlord agrees to reimburse Tenant therefor or hold Tenant harmless therefrom, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

In the case of a Repayment Default, or in the event Tenant has incurred any expense in curing a default of Landlord as hereinabove provided, Tenant shall be entitled to offset such amount against all Basic, Additional, and Percentage Rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.  The liability of the Landlord under this Lease is limited to the interest of the Landlord in the Shopping Center.

(c)    In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

**CONSTRUCTION RISKS**

26.    Nothing in this Lease shall constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center. Tenant shall have no control or authority over the construction of the Store or the Shopping Center beyond the right to reject the tender of the Store for the causes stated in this Lease and to request change orders to be paid by Tenant. Tenant shall not be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify, defend and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen, or any of their respective employees, agents, or servants during the construction of the Store and the Shopping Center, or from any faulty construction thereof. Tenant shall indemnify and hold Landlord harmless from and against mechanics', materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Non-Structural Modifications, Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined, if constructed by Tenant.

**NOTICES**

27.    All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below.    Each communication shall be deemed duly given and received: (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    CH Enterprises, L.L.C.
17th Floor, Citrus Center
255 South Orange Avenue
Post Office Box 231
Orlando, Florida 32801

or such other address as Landlord may direct from time to time.

Tenant:    Winn-Dixie Stores, Inc. Re: [describe location or insert Store #]
3015 Coastline Drive
Orlando, Florida 32808

With a copy to:    Winn-Dixie Stores, Inc.
Attn: General Counsel
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297
Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

28.    Tenant may assign this Lease, or sublease or vacate the Store in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

**SUBORDINATE**

29.    Provided that, with respect to any first mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant a Subordination, Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing Tenant to pay Basic, Additional, or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, in bankruptcy or in any other action) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall receive full credit under this Lease for any and all Basic, Additional, and Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures, inventory, equipment, or any nonpermanent, Non-Structural Modifications or Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL CERTIFICATE**

30.    Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the foregoing, Landlord shall not request, and Tenant shall not be required to deliver, more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

31.    Simultaneously with any notice to Landlord, Tenant shall give notice to any Mortgagee (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided under this Lease to Landlord. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

32.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each

provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**
33.    If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of the recorded deed or a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, and (d) such other information as Tenant may reasonably require (collectively, the "Transfer Requirements"). Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

**SHORT FORM LEASE**
34.    Landlord shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its recording in the public records of the county or parish in which the Premises are located. The original recorded Short Form Lease shall be returned to Tenant. Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL TITLES**
35.    The marginal titles appearing in this Lease are for reference only and shall not in any way modify or amend the provisions of this Lease.

**COMPLETE AGREEMENT**
36.    This Lease contains the complete agreement of the parties and supersedes any prior agreement with respect to the subject matter hereof.

**DECLARATION**
37.    Landlord shall have recorded in the public records of Orange County, Florida , a declaration of covenants, restrictions and easements in the form attached hereto as Exhibit "I" (the "Declaration") as a primary encumbrance not subject to foreclosure, removal or amendment without the express written permission of Tenant.

**EXHIBITS**
38.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |

October 5, 2000                                    24

Exhibit "H"    -    "Coming Soon" Sign Specifications
Exhibit "I"    -    Declaration
Exhibit "J"    -    Supplemental Lease Agreement
Exhibit "K"    -    Architect's Certification

**FORCE**
**MAJEURE**

39.    If there shall occur, during the Term, (a) strike(s), lockout(s), or labor dispute(s); (b) the inability to obtain labor or materials or reasonable substitutes therefor; (c) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL**
**CONDITION**

40.    (a)    Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other party has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord further represents and warrants that no leak, spill, release, discharge, emission or disposal of any Hazardous Substance has occurred in, on or about the Shopping Center to date, and that the soil, groundwater and soil vapor on or under the Shopping Center is free of any Hazardous Substance. Landlord further represents and warrants that neither Landlord nor the Shopping Center is subject to any existing, pending or threatened investigation or inquiry by any governmental authority or agency, or subject to any remedial or other obligation under any Legal Requirement. Further there are no facts, conditions or circumstances known to Landlord which could result in any such investigation or inquiry if such facts and circumstance, if any, were fully disclosed to the applicable governmental authority.

"Hazardous Substance" is defined as any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, toxic substances, wastes, solid wastes and biohazard wastes.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by Legal Requirements as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, settlements, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements and any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision) of any kind or nature whatsoever which may at any time be imposed upon, incurred by, or asserted or awarded against Tenant and arising from or out of any breach of the foregoing representations and warranties.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by Landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Tenant shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by Legal Requirements as a result of any breach of the foregoing representation and warranty and shall indemnify, protect, and save Landlord, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, settlements, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements and any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision) of any kind or nature whatsoever which may at any time be imposed upon, incurred by, or asserted or awarded against Landlord and arising from or out of any breach of the foregoing representation and warranty. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, the indemnification in this paragraph 41(b) shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

(c)    Notwithstanding anything to the contrary in this Lease, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests under this Lease.

**NO BROKERS**    41.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**FLORIDA MANDATED**    42.    The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

October 5, 2000    26

PROVISION                       Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has
accumulated in a building in sufficient quantities, may present health risk to persons who are
exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been
found in buildings in Florida. Additional information regarding radon and radon testing may be
obtained from your county public health unit.

EXPANSION        43.    As a material inducement to Tenant's entering into this Lease, Landlord grants to
Tenant the option ("Tenant's Expansion Option") to expand the Store to incorporate therein an
addition within the area to the north side of the Store measuring approximately 60 feet in width
by 234 feet in depth (the "Expansion Area"), as shown on the Site Plan (the "Expansion"). The
Expansion Area shall be reserved for construction of the Expansion except that pending same
may be partially paved for parking or, if shown on the Site Plan, Landlord may construct a
building thereon and rent space in such building subject to the terms of this Article. To facilitate
construction of the Expansion, Landlord initially shall construct the north wall of the Store with
steel column supports equivalently spaced to the nearest row of steel column supports in the
open front sales area of the Store and such wall supports shall be of sufficient load bearing
capacity to carry the roof support system across the full span of the original Store and the
Expansion. In order to facilitate the expansion of the Store as herein contemplated, any
adjacent building or buildings within the Expansion Area: shall be of like structural quality and
in architectural harmony with the Store; shall front on a line which is the interior sidewalk line of
the Store extended; and shall have a finish floor level, roof height and ceiling height which shall
be the same elevations as the finish floor level, roof height and ceiling height of the Store.

                Tenant may exercise Tenant's Expansion Option by giving written notice thereof to
Landlord: at least ninety (90) days prior to the expiration of the tenth year following the
Commencement Date; at least ninety (90) days prior to expiration of any five year interval
thereafter; or at any time the Expansion Area is vacant and Tenant has not received prior
written notice from Landlord that Landlord has leased the Expansion Area to another tenant in
a manner consistent with this Lease. The construction of the Expansion shall not unreasonably
interfere with the other tenants in the Shopping Center.

                Tenant shall have the right, but not the obligation, to construct the Expansion. Except
for Landlord's Contribution, as defined below, construction of the Expansion shall be at Tenant's
sole cost and expense. If for any reason Tenant is prohibited, prevented or unable to construct
the Expansion as a result of any act or omission of Landlord, then Tenant may either rescind the
exercise of Tenant's Expansion Option or terminate this Lease by written notice to Landlord.
Tenant's construction of the Expansion shall be subject to: Tenant's satisfaction with updates
to the Title Policy, the Survey and the Audit; the provisions of then applicable zoning and land
use regulations; and Tenant obtaining any necessary building and other permits, consents and
approvals without any conditions objectionable to Tenant. Landlord grants to Tenant, its agents,
employees, contractors, and subcontractors a non-exclusive temporary construction easement
over and across such areas of the Shopping Center as may be reasonably necessary to enable
Tenant to construct the Expansion. Such non-exclusive easement shall terminate upon
completion of the Expansion.

                The Expansion Date shall be the date upon which the last of all of the following events
has occurred: the completion of the Expansion or the issuance of a Certificate of Occupancy or
equivalent document for the Expansion, if applicable. Upon the Expansion Date:

        (a)    All references in the Lease to the Store shall refer to the original Store together
with the Expansion;

(b)     If there are fewer than ten (10) years remaining on the then current Term of the Lease, the expiration date of said Term shall be extended to be that date which is ten (10) years following the Expansion Date; and

(c)     Tenant's remaining Extension Terms under the Lease, if any, shall be preserved, and Tenant shall be entitled to the privilege of three (3) additional Extension Terms of five (5) years each.

Within thirty (30) days following the Expansion Date, Landlord shall pay to Tenant Landlord's Contribution, as hereinafter defined. Landlord's Contribution shall be equal to Tenant's total hard and soft costs of constructing the Expansion (the "Expansion Construction Cost").

Upon Tenant's receipt of Landlord's Contribution, Basic Rent, in the amount specified in Article 3(a), above, and the base for computation of Percentage Rent hereunder shall be increased by the greatest of: (a) an amount equal to ten percent (10%) of Landlord's Contribution actually received by Tenant, (b) an amount equal to $16.72 per square foot of the Expansion, or (c) an amount equal to a computed percentage multiplied by Landlord's Contribution actually received by Tenant, such percentage being equal to the sum of four percent (4%) plus the current prime interest rate (as published by the Federal Reserve or in the Wall Street Journal or similar public source) on the date of Tenant's exercise of Tenant's Expansion Option.

If, for any reason, Landlord fails or refuses to pay timely Landlord's Contribution, then: (a) no Basic Rent shall be payable by Tenant in respect of the Expansion for the remainder of the Term; (b) the base for computation Percentage Rent hereunder shall be increased by the greatest of the three (3) factors set forth in the immediately preceding paragraph of this Article; and (c) no Percentage Rent shall be payable until Tenant shall have recouped the amount of Landlord's Contribution, plus interest at the Default Rate, from Percentage Rent that would otherwise be due and payable under this Lease.

**TAKE OVER AND RELEASE**     **44.**     If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for ninety (90) continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this Lease by written notice to Tenant within ninety (90) days of such Store Closing and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

**GOVERNING LAW**     **45.**     This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located.

**NO JOINT VENTURE**     **46.**     This is a Lease between a landlord and a Tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

**TIME**     **47.**     Time is of the essence of this Lease.

**NO MERGER**    48.    In the event that Tenant becomes the owner of fee title to the Store or the Shopping Center, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates.

**NO WAIVER**    49.    No waiver hereunder of any condition or breach shall be deemed to be a continuing waiver or a waiver of any subsequent breach.

**EXCULPATION**    50.    If Tenant's claims against Landlord for any sum due from Landlord to Tenant pursuant to this Lease, or for the collection of any judgement, are not satisfied by the provisions for offset from rentals as provided in this Lease, then Tenant shall look solely to the estate and property of Landlord in the Shopping Center (including, without limitation, all rents, profits, proceeds and the proceeds from the sale or transfer of the Shopping Center) for the satisfaction thereof. No other property or assets of the Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies and neither Landlord nor any of its partners, members, managers, officers, agents or employees, or their successors and assigns shall be personally liable hereunder. This paragraph shall not apply: (i) if Landlord fails to maintain the insurance coverages required by this Lease; or (ii) if Landlord fails to maintain equity in the Shopping Center of at least $4,000,000.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:

Print name: _Dennis J. Bouchard_

Print name: _Margaret E. Malota_

LANDLORD:

CH Enterprises, L.L.C.

By: _Patrick T. Christiansen_
Patrick T. Christiansen
Its: _Manager_
Date: _7.24.00_

Print name: _TANYA BEARD_

Print name: _Rebecca L. Sawyer_

TENANT:

Winn-Dixie Stores, Inc.

By: _Dennis M. Sheehan_
DENNIS M. SHEEHAN
Its: _Senior Vice-President_
Date: OCT - 5 2000

STATE OF _Florida_ )
COUNTY OF _Orange_ )

The foregoing instrument was acknowledged before me this _July_ _24_, 2000, by _Patrick T. Christiansen_ , as _Manager_ of CH Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, **[PLEASE CHECK ONE]** _✗_ who is personally known to me or ____ who has produced _____ as Identification.

_____
Printed Name:
Notary Public, State and County aforesaid.
My Commission Expires:___
Notary ID No.:
(NOTARIAL SEAL)

Denise J. Bouchard
Notary Public, State of Florida
Commission No. CC 614254
My Commission Exp. 1/16/2001
Bonded Through Fla. Notary Service & Bonding Co.


STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _Oct. 5_, 2000, by DENNIS M. SHEEHAN , as Sr. Vice President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____
Printed Name: BRENDA J. BABCOCK
Notary Public, State and County aforesaid.
My Commission Expires: 11/20/03
Notary ID No.:
(NOTARIAL SEAL)

BRENDA J. BABCOCK
Notary Public, State of Florida
My comm. expires Nov. 20, 2003
Comm. No. CC 871970

BRENDA J. BABCOCK
Notary Public, State of Florida
My comm. expires Nov. 20, 2003
Comm. No. CC 871970

O:\TRANSFER\ORLANDO\WINELAND\LEASE7.WPD

EXHIBIT A



*LEGAL DESCRIPTION: (WINN-DIXIE LEASE PARCEL)*

THAT PORTION OF BLOCKS 10, 11, 12, 13, 22, 23, AND 35; ALSO THOSE PORTIONS OF UNIMPROVED RIGHT OF WAYS AND ALLEYS, PLATTED AS TENTH STREET, ELEVENTH STREET, CHESTNUT STREET AND MAPLE STREET LYING WITHIN OR ADJACENT TO THE AFOREMENTIONED BLOCKS; SAID BLOCKS AND RIGHT OF WAYS, LYING WITHIN ORANGE CENTER, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK D, PAGE 143, OF THE PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA;

TOGETHER WITH:
THAT PORTION OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE 28 EAST, ORANGE COUNTY, FLORIDA, LYING WEST OF AND CONTIGUOUS TO BLOCKS 22, 23 AND ELEVENTH STREET OF THE AFOREMENTIONED ORANGE CENTER AND EASTERLY OF THE EASTERLY RIGHT OF WAY OF APOPKA-- VINELAND ROAD PER THE ORANGE COUNTY RIGHT OF WAY MAPS BY DARBY AND WAY DATED SEPTEMBER, 1990; SAID LANDS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE 28 EAST, ORANGE COUNTY, FLORIDA; THENCE RUN S 89°57'29" E, ALONG THE SOUTH LINE OF THE SOUTHWEST 1/4 OF SECTION 15, A DISTANCE OF 602.76 FEET; THENCE DEPARTING SAID SOUTH LINE RUN N04°25'44"E, A DISTANCE OF 25.07 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT OF WAY OF APOPKA--VINELAND ROAD AND THE NORTHERLY RIGHT OF WAY OF TWELFTH STREET (AKA LAKE STREET); THENCE CONTINUE N 04°25'44" E, ALONG THE EASTERLY RIGHT OF WAY OF APOPKA--VINELAND ROAD, A DISTANCE OF 200.59 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE N04°25'44"E, A DISTANCE OF 339.19 FEET TO A POINT OF CURVATURE OF A CURVE CONCAVE SOUTHEASTERLY   HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 3434.91 FEET, A CENTRAL ANGLE OF 01°52'23" A CHORD LENGTH OF 112.29 FEET AND A CHORD BEARING OF  N 05°21'56" E;  THENCE RUN NORTHEASTERLY ALONG THE ARC OF SAID CURVE A DISTANCE OF 112.30 FEET; SAID POINT LYING AT THE INTERSECTION OF THE SOUTHERLY RIGHT OF WAY OF TENTH STREET AND THE EASTERLY RIGHT OF WAY OF APOPKA -- VINELAND ROAD; THENCE DEPARTING SAID CURVE RUN S 89° 57' 29" E ALONG THE SOUTHERLY RIGHT OF WAY OF TENTH STREET A DISTANCE  OF 284.18 FEET TO THE EAST RIGHT OF WAY OF CHESTNUT STREET (50' RIGHT OF WAY); SAID POINT BEING THE NORTHWEST CORNER OF BLOCK 11; ORANGE CENTER; THENCE RUN N 00°02'23" W, ALONG SAID EAST RIGHT OF WAY, A DISTANCE OF 100.00 FEET TO THE NORTHWEST CORNER OF LOT 14, BLOCK 35; THENCE DEPARTING SAID EAST RIGHT OF WAY RUN S 89°57'29" E, A DISTANCE OF 256.00 FEET TO THE NORTHEAST CORNER OF LOT 11, BLOCK 35 AND THE WESTERLY RIGHT OF WAY OF MAPLE STREET ( 50' RIGHT OF WAY); THENCE RUN S 00°02'23" E, ALONG SAID RIGHT OF WAY 50.00 FEET TO THE SOUTHEAST CORNER OF LOT 12, BLOCK 35 AND THE NORTHERLY RIGHT OF WAY OF TENTH STREET; THENCE RUN N 89°57'29" W, ALONG SAID NORTHERLY RIGHT OF WAY, A DISTANCE OF 136.00 FEET TO THE SOUTHEAST CORNER OF LOT 13, BLOCK 35; THENCE DEPARTING SAID RIGHT OF WAY RUN S 00°02'23" E, A DISTANCE OF 100.00 FEET TO THE SOUTHEAST CORNER OF LOT 23 BLOCK 11; THENCE RUN S 89°57'29" E, A DISTANCE OF 186.00 FEET TO THE SOUTHWEST CORNER OF LOT 23, BLOCK 10 AND THE EASTERLY RIGHT OF WAY OF THE AFOREMENTIONED MAPLE STREET; THENCE RUN N 00°02'23" W, ALONG SAID RIGHT OF WAY A DISTANCE OF 50.00 FEET TO THE NORTHWEST CORNER OF LOT 24, BLOCK 10 AND THE SOUTHERLY RIGHT OF WAY OF TENTH STREET; THENCE RUN S 89°57'29" E, ALONG SAID SOUTHERLY RIGHT OF WAY, A DISTANCE OF 256.00 FEET TO THE NORTHEAST CORNER OF LOT 1, BLOCK 10, AND THE WESTERLY RIGHT OF WAY OF MAIN STREET (AKA RUBY LAKE ROAD -- 50' RIGHT OF WAY); THENCE RUN S 00°02'23" E, ALONG SAID WESTERLY RIGHT OF WAY, A DISTANCE OF 200.00 FEET TO THE SOUTHEAST CORNER OF LOT 8, BLOCK 10; THENCE DEPARTING SAID RIGHT OF WAY RUN N 89° 57' 29" W, A DISTANCE OF 136.00 FEET TO THE SOUTHEAST CORNER OF LOT 17, BLOCK 10; THENCE RUN S 00°02'23" E, A DISTANCE OF 275.00 FEET ALONG THE WESTERLY SIDE OF A 16.00 FOOT WIDE  PLATTED  ALLEY  TO THE SOUTHEAST CORNER OF LOT 20,  BLOCK 13; THENCE DEPARTING SAID WESTERLY LINE RUN N 89°57'29" W, A DISTANCE OF 170.00 FEET TO THE NORTHEAST CORNER OF LOT 5, BLOCK 12 AND THE WESTERLY RIGHT OF WAY OF  MAPLE  STREET; THENCE RUN S 00°02'23" E, ALONG SAID RIGHT OF WAY A DISTANCE OF 50.00 FEET TO THE SOUTHEAST CORNER OF LOT 7, BLOCK 12; THENCE RUN N 89°57'29" W, A DISTANCE OF 281.00 FEET TO THE CENTERLINE OF THE AFOREMENTIONED CHESTNUT STREET; THENCE RUN N 00°02'23" W, ALONG SAID CENTERLINE, A DISTANCE OF 75.00 FEET; THENCE DEPARTING SAID CENTERLINE RUN N 89°57'29" W, ALONG THE SOUTH LINE OF LOTS 4 AND 21, BLOCK 23, A DISTANCE OF 296.18 FEET TO THE POINT OF BEGINNING.

CONTAINING:   390,276.445 S.F. (8.960 ACRES MORE OR LESS)

## EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE,
### AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this _____, between _____, a _____ _____, whose address is _____ (together with its successors, assigns, and transferees "Lender") and **Winn-Dixie Stores, Inc.**, a Florida corporation, whose address is 3015 Coastline Drive, Orlando, Florida 32808 (together with its successors and assigns, "Winn-Dixie");

#### RECITALS:

1.     Lender has made or is about to make a loan to CH Enterprises, L.L.C., a Florida limited liability company ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Orange County, Florida (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Shops of Lake Avenue" shopping center at the NEC Apopka-Vineland Road and Lake Avenue, in Orlando, Orange County, Florida, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.     By Lease dated _____ (as amended by _____ and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.     Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

**NOW THEREFORE**, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.     Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)     The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)     Winn-Dixie shall not be named as a party defendant unless required by law.

(c)     The Lease shall not be terminated or affected by any Foreclosure Event.

October 5, 2000                                    33

2.      Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

    (a)     liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

    (b)     subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

    (c)     bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

    (d)     bound by any modification of the Lease made after the date hereof without Lender's consent.

3.      Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.      The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease. Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.      The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.      Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any. Any such purported action without such consent shall be void as against Lender.

7.      Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.      If Lender, or its assignee, obtains Landlord's interest in the Shopping Center or enforces it right to collect rent under this Lease, Lender agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require.  Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

9.      If Lender notifies Winn-Dixie in writing that it should pay the rent and other payments due from Winn-Dixie under the Lease to Lender, Winn-Dixie shall thereafter pay such payments as and when they become due and payable to Lender or as Lender directs.  **[IF NO INDEMNITY/WAIVER FROM LANDLORD FOR THIS IN LEASE, ADD ONE HERE]**

IN WITNESS WHEREOF, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

Print name:_____

By:_____
Print name:_____
Its:_____
Date:_____

**Winn-Dixie Stores, Inc.**
Print name:_____

By:_____
Print name:_____
Its:_____
Date:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing Instrument was acknowledged before me this _____ _____, 2000, by
_____, as _____ __ _____ of
_____, a _____ _____, on behalf of the _____,
**[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced
_____ as identification.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)


STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing Instrument was acknowledged before me this _____ ___, 2000, by
_____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation,
on behalf of the corporation, who is personally known to me.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)


October 5, 2000                                36

## EXHIBIT "D"

### SURVEYOR'S CERTIFICATE

Certified to: _____

RE:    File #_____ Drawing No. _____ Title:_____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that:

1.    This survey was prepared from an actual on-the-ground survey of the real property shown hereon (the "Property") and was conducted by the Surveyor or under the Surveyor's supervision;

2.    Monuments have been duly located or placed and actually exist at all major corners of the boundaries of the Property and such monuments are located, are of the size, and consist of the materials, as shown on this Survey;

3.    The survey and the legal description of the Property, including the point of beginning and all calls, is true, correct, and accurate, is identical to the legal description contained in _____ Title Insurance Company's commitment for title insurance No. _____, dated _____ (the "Commitment") and there are no visible discrepancies, conflicts, shortages in area, boundary line conflicts, visible encroachments onto or protruding from the Property, or visible easements or rights-of-way (other than those which exist pursuant to recorded instruments) except as noted hereon;

4.    All recorded easements or other instruments or exceptions noted in the Commitment ("Exceptions") and capable of being located have been correctly located hereon and are indicated by official recording information [book and page], and those Exceptions which cannot be located or do not affect the Property are noted hereon either as "blanket" Exceptions that affect the entire Property or as not affecting the Property;

5.    The following, if they exist on the Property, have been located on this Survey:

    (a)    buildings (labeled as to type, dimensions and gross square footage, and distance from each boundary line;

    (b)    significant other improvements other than buildings, such as signs, parking areas, or other structures such as fences or walls (labeled as to dimensions and nature of use);

    (c)    water/gas/sewer mains and telephone/electric/utility lines (as determined by on site surface observation only);

    (d)    water retention or detention ponds;

    (e)    high water marks, if the Property is located on or contains a body of water;

    (f)    interior lot lines; and

    (g)    any natural or constructed objects affecting the Property.

6.    Lines indicating all setback restrictions of record or disclosed by applicable building or zoning codes are drawn hereon and any height or bulk restrictions of record or disclosed by applicable building or zoning codes, if any, are noted hereon and the source for either type of restriction is indicated on this Survey. If no such restrictions affect or apply to the Property, a note has been placed hereon to so indicate;

7.    If a street address has been assigned for the Property, it is noted on this Survey;

8.    A vicinity map is contained on this Survey and such vicinity may shows the Property in reference to nearby public rights-of-way and major street intersections. This Survey shows the names and widths of all rights-of-way bounding the Property and indicates (a) whether such rights-of-way are public or private; (b) by use of arrows drawn to the Property boundary line that there are no gaps between the Property boundaries and the borders of such rights-of-way; (c) existing curb cut access points to any such rights-of-way which are public; and (d) that the Property has access to and from a public roadway as shown on the Survey. This Survey shows the distance to and location of the nearest intersecting public street or road (if access is by easement or private right of way);

9.    Based upon a review of Federal Flood Insurance Rate Maps (or the state or local equivalent if no federal map exists), the Surveyor has determined by scaled map location and graphic plotting only that the Property is not located in a 100 year Flood Plain or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban

October 5, 2000                                37

Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____ ____, which such map panel covers the area in which the Property is situated;

10.     The    Property    contains    approximately    _____    acres    and    currently    is    zoned
_____.

11.     The name of the owners of the properties adjoining the Property are indicated on this Survey;

12.     This Survey meets or exceeds the minimum technical standards established pursuant to the laws of the state in which the Property is located and meets the requirements set forth in the Winn-Dixie Survey Protocol (Form SP-1).

13.     This is to certify that this map or plat and the survey on which it is based were made (i) in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM in 1999, and includes items 1, 2, 3, 4, 6, 7, 8, and 10 of the Table A thereof, and (ii) pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of a(n) _____ [insert "Urban", "Suburban," " "Rural," or "Mountain/Marshland" here] Survey.

Signature:_____    Registered Land Surveyor No._____

Address:_____

Phone:_____    Fax:_____

## EXHIBIT "E"

### ESTOPPEL CERTIFICATE

WINN-DIXIE STORE #_____

Shops of Lake Avenue

Orlando, Florida

The undersigned officer of Winn-Dixie Stores, Inc., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.    That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with CH Enterprises, L.L.C., a Florida limited liability company, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Shops of Lake Avenue (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

        (a)    Short Form Lease dated _____, recorded in Official Records Volume _____, page ____ of the public records of Orange, Florida;

        (b)    Letter Agreement(s) dated _____;

        (c)    Supplemental Lease Agreement dated _____;

        (d)    First Amendment to Lease dated _____;

        (e)    Second Amendment to Lease dated _____.

2.    That the term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease.  Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199___, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

        (a)    _____

        (b)    _____

        (c)    _____

        (d)    _____

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

October 5, 2000

6.     Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and
_____.

7.     Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.     Notwithstanding anything to the contrary herein:

(a)    No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)    Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.     The address for notices to Tenant is 3015 Coastline Drive, Orlando, Florida 32808, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.    This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate on behalf of Tenant.

**Winn-Dixie Stores, Inc.**

By:_____  _____

_____

Its:_____  _____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

October 5, 2000                                    40

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

> CH Enterprises, L.L.C.
>
> By:_____
>
> Its:_____

## EXHIBIT "F"

### (ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re:    _____, Orange County, State of Florida

To Whom It May Concern:

This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Orange, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Orange, relating to uses permitted in the _____ District. The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above. The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations. Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments

- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

## EXHIBIT "G"

### SHORT FORM LEASE

THIS SHORT FORM LEASE is hereby executed this _____, by and between CH Enterprises, L.L.C., a Florida limited liability company, whose mailing address is 17th Floor, Citrus Center, 255 South Orange Avenue, Orlando, Florida 32802 ("Landlord") and Winn-Dixie Stores, Inc., a Florida corporation, whose mailing address is 3015 Coastline Drive, Orlando, Florida 32808 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### WITNESSETH:

WHEREAS, Landlord and Tenant did enter into a Lease, dated _____(the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

_____         CH Enterprises, L.L.C.
Print Name:_____

_____         By:_____
Print Name:_____              Its:_____

    As to Landlord

_____         Winn-Dixie Stores, Inc.
Print Name:_____

_____         By:_____
Print Name:_____              Its:_____

    As to Tenant

STATE OF _____ )
COUNTY OF _____ )
    The foregoing instrument was acknowledged before me this _____ _____, 2000, by
_____, as _____ of CH
Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, [PLEASE
CHECK ONE] _____ who is personally known to me or _____ who has produced
_____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _____ _____, 2000, by
_____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation,
on behalf of the corporation, who is personally known to me.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

October 5, 2000                          44

## EXHIBIT "H"

Coming Soon Sign Specifications


**Text of** Sign: Coming Soon --

Winn-Dixie

Marketplace


**Size:** Maximum size permitted by applicable law and

restrictions of record and otherwise reasonably

acceptable to Landlord and Tenant

## EXHIBIT "I"

## DECLARATION OF RESTRICTIVE CONVENANTS

**THIS DECLARATION RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 2000 by **CH Enterprises, L.L.C.**, a Florida limited liability company whose mailing address is 17th Floor, Citrus Center, 255 South Orange Avenue, Orlando, Florida 32802 (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## RECITALS

1.      Owner is the owner of that certain real property located in the County of Brevard, State of Florida as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), is or may become the owner of certain other real property located within one thousand (1,000) feet of any boundary of the Shopping Center ("Owner's Remaining Land"), and those abutting parcel or parcels, if applicable, described on Exhibit "C" attached hereto. (collectively the "Outparcel").

2.      Owner is the landlord under that certain lease dated _____, 2000 between Owner and Winn-Dixie Stores, Inc., a Florida corporation (together with its successors and assigns, "Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

3.      Owner intends by this Declaration to grant certain easements and other rights and impose certain use restrictions upon the Shopping Center, the Outparcel and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

4.      The Shopping Center, the Outparcel, the Owner's Remaining Land shall herein be collectively referred to as the "Project".

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Project shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

## I.
## RESTRICTIONS

1.1     Restrictions on Use.

(a)     Permitted Use.  The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

(b)     Exclusives.  Tenant shall have the exclusive right in the Project to each of the following (each an "Exclusive Use"):

        (1)     operate a supermarket, grocery, bakery, and delicatessen,

        (2)     sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

        (3)     operate a pharmacy or prescription drug concession,

        (4)     sell beer and wine for off-premises consumption;

        (5)     operate a liquor store; and

        (6)     operate a photo lab.

Owner will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within  the Shopping Center (or any property located within 1,000 feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Owner or any entity controlled by, controlling, or under common control with Owner).

(c)     Prohibitions.  Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Owner shall permit none of the following:

        (1)     spa, health, sports, or exercise club;

        (2)     lounge, bar, "teen lounge" or social encounter club;

        (3)     bowling alley;

        (4)     pawn shop;

        (5)     skating rink;

        (6)     bingo or electronic or other game parlor;

        (7)     theater (motion picture, legitimate, or other);

        (8)     area for the sale or display of pornographic or "adult" material;

        (9)     business, medical or professional offices;

       (10)     abortion or HIV clinic;

(11)    sale of motor vehicles or boats;

(12)    church;

(13)    manufacturing or storage business;

(14)    public auditorium or other public entertainment facility;

(15)    tag office or other government service office;

(16)    exterior "pay" telephones, except in "Retail A" and "Retail B", as shown on the site plan;

(17)    restaurants, except as set forth below;

(18)    dry cleaning processing plant or business; or

(19)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

Notwithstanding the foregoing, Owner shall be permitted to have in the last bay of "Retail B" as shown on the Site Plan, one Starbucks or Barnie's coffee bar. Tenant shall be entitled to have a bank and automatic teller machines.

1.2    Restrictions on Building Height and Size.  Construction of buildings and other improvements in the Project other than the Store shall be restricted to a maximum building area of 25% of the ground area of each respective parcel, with the remainder of such parcel to be comprised of common areas consisting of driveways, entrances, exits, parking and landscaped areas (the "Common Areas"). No structure, other than the Store, erected in the Project shall exceed a maximum vertical building height of 22 feet measured from the mean ground level of the completed Shopping Center. No modification of the Site Plan nor sub-division or parceling or creation of easements in the Common Areas shall be permissible without the written consent of Tenant, which consent shall not be unreasonably withheld.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner or Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center, and the Outparcel, which modification or amendment shall become effective upon (i) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (ii) filing or recording the same in the appropriate public records of the county in which the Project is located.

## IV.
## EASEMENTS

4.1    Outparcel Ingress and Egress.

(a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Outparcel Common Areas.

(b)     Outparcel owner shall have the right to temporarily close any part of the Outparcel Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Outparcel owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(1)     Outparcel owner shall have the right to temporarily close any part of the Outparcel Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Outparcel.

4.2     Shopping Center Ingress and Egress.

(a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas.

(b)     Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(1)     Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

4.3     Parking.     Notwithstanding any contrary provision herein each parcel of the Project shall have sufficient onsite parking within the perimeter boundary to satisfy all legal requirements.

## V.
## GENERAL PROVISIONS

5.1     Covenants Run With the Land.     The provisions of this Declaration shall operate as covenants running with the land comprising the Project and shall inure to the benefit of Tenant.

5.2     Severability.     If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3    Duration.    This Declaration of Restrictive Covenants shall terminate on the first to occur of the following: (i) seventy-five (75) years after the date hereof, (ii) the date the Lease is permanently terminated in accordance with its terms or by agreement between the parties, or (iii) the date of a final non-appealable judicial determination.

5.4    Pronouns.    When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.5    Captions.    The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.6    Governing Law.    This Declaration shall be construed and enforced in accordance with, and governed by, the laws of the State in which the Project is located.

5.7    No Presumption.    This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.8    Exhibits.    The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

> Exhibit "A"  -   Site Plan
> Exhibit "B"  -   Legal Description of the Shopping Center
> Exhibit "C:      Not Applicable

## VI.
## NOTICES

All notices, requests, demands, and other communications required or permitted to be given under this Declaration shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments under Article V shall be sent to Winn-Dixie at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

> Owner:      CH Enterprises, L.L.C.
>             17th Floor, Citrus Center
>             255 South Orange Avenue
>             Orlando, Florida 32802
>             Telecopy:  (407) 843-6610

or such other address as the parties may direct from time to time.

> Winn-Dixie:   Winn-Dixie Stores, Inc. Re: Store # _____
>               3015 Coastline Drive
>               Orlando, Florida 32808
>               Attention:  Gary B. Inclan
>               Telecopy:  (407) 294-4241

With a copy to:    Winn-Dixie Stores, Inc.
                   Attn: General Counsel
                   5050 Edgewood Court
                   P.O. Box B
                   Jacksonville, FL 32203-0297
                   Telecopy: (904) 783-5138

or to such other address as Winn-Dixie may direct from time to time.

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Signed, sealed and delivered
in the presence of:

_____    **CH Enterprises, L.L.C.**

Print name:_____

_____    Print name:_____
Print name:_____    Its:_____
                                    Date:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____, 2000, by
_____ as _____ of _____ who
[PLEASE  CHECK  ONE] _____ is  personally  known  to  me  or  _____  has  produced
_____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

## EXHIBIT "J"

## SUPPLEMENTAL LEASE AGREEMENT

THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _____ __, 2000, between Winn-Dixie Stores, Inc., a Florida corporation, (the "Tenant") and CH Enterprises, L.L.C., a Florida limited liability company (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated _____, recorded in Volume _ __, page ___ of the public records of Orange County, Florida; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

NOW, THEREFORE, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____.

2.    The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

TENANT:

_____          **Winn-Dixie Stores, Inc.**
Print name:_____

_____          By:_____
Print name:_____          _____
                                               Its:_____
                                               Date:_____

                                               LANDLORD:

_____          **CH Enterprises, L.L.C.**
Print name:_____

_____          By:_____
Print name:_____          _____
                                               Its:_____
                                               Date:_____

STATE OF FLORIDA )
COUNTY OF DUVAL )

 The foregoing instrument was acknowledged before me this _____, 2000, by
_____, as _____ President of Winn-Dixie Stores, Inc., Florida corporation,
on behalf of the corporation, who is personally known to me.


Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)


STATE OF _____ )
COUNTY OF _____ )

 The foregoing instrument was acknowledged before me this _____, 2000, by
_____, as _____ of CH Enterprises, L.L.C., a Florida limited liability company,
on behalf of the limited liability company, who is personally known to me.


Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

## CONSENT

_____, a _____ _____ the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

Its:_____
Date:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ ____, 2000, by

_____ as _____ of _____, a _____
_____, on behalf of the _____, who [PLEASE CHECK ONE] _____ is
personally known to me or _____ has produced _____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

## EXHIBIT "K"

### ARCHITECT'S CERTIFICATION

As a material inducement to Winn-Dixie _____, Inc. ("Winn-Dixie") to enter into possession of and commence paying rent for a certain store building approximately _____ feet wide and _____ feet deep (the "Store") situated in a Shopping Center known as _____ (the "Shopping Center") located at _____ in the City of _____, State of _____, all as more fully described in that certain lease (the "Lease") dated _____ between Winn-Dixie, as tenant, and _____, as landlord, (the "Landlord") and having personal knowledge of the Store, the construction thereof, and the other facts recited herein, and after being duly sworn, deposes and states under oath as follows:

1.  The undersigned is duly licensed to practice architecture in the State of _____.

2.  All Plans and Specifications for the Store and the Shopping Center (the "Plans and Specifications") were prepared by or under the undersigned's supervision and direction and the undersigned is responsible for the same.

3.  The Plans and Specifications comply with all requirements of the Guideplans and are one and the same as Tenant's Plans, both as defined in paragraph 9 of the Lease.

4.  The Plans and Specifications were approved by the Building and Zoning Department for the City of _____, and by all other governmental authorities in connection with obtaining all permits, licenses and approvals for the construction thereof.

5.  All building and other permits, licenses and approvals were obtained for the construction of the Store and the same are duly, validly, and unconditionally issued.

6.  The Store has been completed pursuant to the Plans and Specifications approved in writing by Winn-Dixie except for:

       a)  Change orders approved in writing by Winn-Dixie; and

       b)  Minor punch list items set forth in Exhibit "A" attached hereto which will not interfere with Winn-Dixie's immediate use and occupancy of the Store as a grocery store and supermarket.

7.  All work on the Store was performed in a good and workmanlike manner and all work and materials were installed in accordance with the Plans and Specifications, except as noted in paragraph 6, above.

8.  The Store, as constructed, complies with all applicable zoning, environmental, building, land use, fire, safety, Americans With Disabilities Act of 1990 ("ADA"), subdivision and other applicable laws, ordinances, codes, rules and regulations.

9.      The Certificate of Occupancy for the Store has been issued and all other governmental approvals and permits have been obtained for the permanent and lawful use and occupancy of the Store for its contemplated use and is in all respects ready for immediate occupancy.

10.     The undersigned inspected the Store during all critical stages of construction, at all times required under the Plans and Specifications and at all other times necessary in the undersigned's professional judgment to make the representations set forth in this Certificate.

Executed this _____ day of _____, 2000.

_____
Architect

Sworn and subscribed before me
this _____ day of _____, 2000.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

EXECUTION
COPY

PTC-3
11-15-02

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (the "**Second Amendment**") made and entered into this 1st day of May, 2002, by and between **CH ENTERPRISES, L.L.C.**, a Florida limited liability company (the "**Landlord**") and **WINN-DIXIE STORES, INC.**, a Florida corporation (the "**Tenant**")

## R E C I T A L S:

1.    On October 5, 2000, the Landlord and the Tenant entered into a certain Lease, (as amended, the "**Lease**") pursuant to which the Tenant leased from the Landlord certain premises (the "**Demised Premises**") generally described as the Winn Dixie Store located in the Shoppes at Lake Avenue, Orlando, Orange County, Florida, as defined in the Lease.

2.    The Landlord and the Tenant wish to amend the Lease for the purposes set forth in this Second Amendment.

NOW, THEREFORE, the Landlord and the Tenant do hereby agree as follows:

1.    **DEFINITIONS.**    Unless expressly defined in this Second Amendment, capitalized terms contained herein shall have the meanings set forth in the Lease.

2.    **AMENDMENTS TO LEASE.** The Lease is hereby amended as follows:

(a)    The site plan attached to the Lease shows a certain outparcel denoted as a Retail Building consisting of approximately 1,000 square feet. The Landlord may expand the Retail Building to 1,200 square feet as shown in Exhibit "A" attached hereto, and said Retail Building may be used for restaurant purposes. Landlord shall reconfigure the parking lot and related common areas to be as shown on Exhibit "A".

(b)    Orange County has approved a development to the north of the Shopping Center denoted as the "Davis PD" which, on the development plan, shows cross-access between said Davis PD and the Shopping Center. The Davis PD and the Shopping Center are part of an overall development for which Orange County has imposed certain development guidelines, including the requirements of cross-access so as to minimize and reduce various access points along various streets including Apopka-Vineland Road. The Tenant does hereby approve the cross-access rights reflected in the Davis PD as set forth more fully in Exhibit "A"

attached hereto. Nothing in this Subparagraph (b) shall be deemed to grant any cross parking rights to any other parcel subject to the "David PD".

    (c)    Exhibit A attached hereto is solely for the limited purposes listed. Said Exhibit shall not be deemed to otherwise amend, modify or waive any other requirement of the Lease or the Site Plan attached as Exhibit "A" thereto.

3.    **RATIFICATION OF LEASE**. Except as modified pursuant to the terms of this Second Amendment, the Lease remains in full force and effect.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Second Amendment as of the date set forth above.

Signed, sealed and delivered
in the presence of:

_____
(Signature of Witness)

BARBARA J. BODEN

_____
(Print Name of Witness)

_____
(Signature of Witness)

DONNA J. SKORA
_____
(Print Name of Witness)

As to the "Landlord"

**CH ENTERPRISES, L.L.C.**

By: _____
Patrick T. Christiansen,
Its: Managing Member

Date: ~~July~~ _____, 2002

{OR500717;3}

2

**WINN-DIXIE STORES, INC.**

_Judith M. Parent_
(Signature of Witness)

By: _Dennis M. Sheehan_
Name: ___DENNIS M. SHEEHAN___
Its: ____Senior Vice-President____

November 18
Date: ~~July~~ ___, 2002

Judith M. Parent

(Print Name of Witness)

_Sheila P. Deshong_
(Signature of Witness)

**SHEILA P. DESHONG**

(Print Name of Witness)

As to the "Tenant"


STATE OF FLORIDA      )
                      )
COUNTY OF ORANGE      )

    The foregoing instrument was acknowledged before me this 24th day of ~~July~~ November, 2002, by Patrick T. Christiansen, as Managing Member of CH Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, who **[PLEASE CHECK ONE]** ☒ is personally known to me or ____ has produced _____ as identification.


_Barbara J. Boden_
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____

(NOTARIAL SEAL)

Barbara J. Boden
MY COMMISSION # DD073476 EXPIRES
November 19, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

3

{OR500717;3}

STATE OF FLORIDA          )
COUNTY OF DUVAL           )

    The foregoing instrument was acknowledged before me this November 18, 2002, by ___DENNIS M. SHEEHAN___, as Senior Vice President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.



Printed Name: ___Judith M. Parent___
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____

(NOTARIAL SEAL)

JUDITH M. PARENT
MY COMMISSION # DD 002001
EXPIRES: February 16, 2005
Bonded Thru Notary Public Underwriters

{OR500717;3}

EXHIBIT "A"

DAVIS PD

Do Not Enter
Signs (2)

RETAIL
BUILDING
(1,200 S.F.)
FF FL. 107.80

40'-0"

30'-0"    24'-0"

This Instrument was prepared by
Kim Rice Bongiovanni, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

(Reserved for Clerk)

## DECLARATION OF RESTRICTIVE COVENANTS

**THIS DECLARATION RESTRICTIVE COVENANTS** (this "Declaration") is made October 5, 2000 by **CH Enterprises, L.L.C.**, a Florida limited liability company whose mailing address is 17th Floor, Citrus Center, 255 South Orange Avenue, Orlando, Florida 32802 (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## RECITALS

1.    Owner is the owner of that certain real property located in the County of Brevard, State of Florida as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), is or may become the owner of certain other real property located within one thousand (1,000) feet of any boundary of the Shopping Center ("Owner's Remaining Land"), and those abutting parcel or parcels, if applicable, described on Exhibit "C" attached hereto. (collectively the "Outparcel").

2.    Owner is the landlord under that certain lease dated October 5, 2000 between Owner and Winn-Dixie Stores, Inc., a Florida corporation (together with its successors and assigns, "Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

3.    Owner intends by this Declaration to grant certain easements and other rights and impose certain use restrictions upon the Shopping Center, the Outparcel and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

4.    The Shopping Center, the Outparcel, the Owner's Remaining Land shall herein be collectively referred to as the "Project".

**NOW, THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Project shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

## I.
## RESTRICTIONS

1.1    Restrictions on Use.

(a)    Permitted Use. The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

(b)    Exclusives. Tenant shall have the exclusive right in the Project to each of the following (each an "Exclusive Use"):

(1)    operate a supermarket, grocery, bakery, and delicatessen,

(2)    sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

(3)    operate a pharmacy or prescription drug concession,

(4)    sell beer and wine for off-premises consumption;

(5)    operate a liquor store; and

(6)    operate a photo lab.

Owner will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within 1,000 feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Owner or any entity controlled by, controlling, or under common control with Owner).

(c)    Prohibitions. Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Owner shall permit none of the following:

(1)    spa, health, sports, or exercise club;

(2)    lounge, bar, "teen lounge" or social encounter club;

(3)    bowling alley;

(4)    pawn shop;

(5)    skating rink;

(6)    bingo or electronic or other game parlor;

(7)    theater (motion picture, legitimate, or other);

(8)    area for the sale or display of pornographic or "adult" material;

(9)    business, medical or professional offices;

(10)    abortion or HIV clinic;

(11)    sale of motor vehicles or boats;

(12)    church;

O:\TRANSFER\ORLANDO\VINELAND\DCR_2.WPD
August 21, 2000                                                        2

(13)    manufacturing or storage business;

(14)    public auditorium or other public entertainment facility;

(15)    tag office or other government service office;

(16)    exterior "pay" telephones, except in "Retail A" and "Retail B", as shown on the site plan;

(17)    restaurants, except as set forth below;

(18)    dry cleaning processing plant or business; or

(19)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

Notwithstanding the foregoing, Owner shall be permitted to have in the last bay of "Retail B" as shown on the Site Plan, one Starbucks or Barnie's coffee bar. Tenant shall be entitled to have a bank and automatic teller machines.

1.2     Restrictions on Building Height and Size. Construction of buildings and other improvements in the Project other than the Store shall be restricted to a maximum building area of 25% of the ground area of each respective parcel, with the remainder of such parcel to be comprised of common areas consisting of driveways, entrances, exits, parking and landscaped areas (the "Common Areas"). No structure, other than the Store, erected in the Project shall exceed a maximum vertical building height of 22 feet measured from the mean ground level of the completed Shopping Center. No modification of the Site Plan nor sub-division or parceling or creation of easements in the Common Areas shall be permissible without the written consent of Tenant, which consent shall not be unreasonably withheld.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner or Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center, and the Outparcel, which modification or amendment shall become effective upon (i) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (ii) filing or recording the same in the appropriate public records of the county in which the Project is located.

## IV.
## EASEMENTS

4.1     Outparcel Ingress and Egress.

(a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Outparcel Common Areas.

3

(b)     Outparcel owner shall have the right to temporarily close any part of the Outparcel Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Outparcel owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(1)     Outparcel owner shall have the right to temporarily close any part of the Outparcel Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Outparcel.

4.2     Shopping Center Ingress and Egress.

(a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas.

(b)     Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(1)     Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

4.3     Parking.     Notwithstanding any contrary provision herein each parcel of the Project shall have sufficient onsite parking within the perimeter boundary to satisfy all legal requirements.

## V.
## GENERAL PROVISIONS

5.1     Covenants Run With the Land.     The provisions of this Declaration shall operate as covenants running with the land comprising the Project and shall inure to the benefit of Tenant.

5.2     Severability.     If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     Duration.     This Declaration of Restrictive Covenants shall terminate on the first to occur of the following: (i) seventy-five (75) years after the date hereof, (ii) the date the Lease is permanently terminated in accordance with its terms or by agreement between the parties, or (iii) the date of a final non-appealable judicial determination.

5.4     Pronouns.     When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.5     Captions.    The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.6     Governing Law.    This Declaration shall be construed and enforced in accordance with, and governed by, the laws of the State in which the Project is located.

5.7     No Presumption.    This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.8     Exhibits.    The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

> Exhibit "A"  -  Site Plan
> Exhibit "B"  -  Legal Description of the Shopping Center
> Exhibit "C":   Not Applicable

# VI.
## NOTICES

All notices, requests, demands, and other communications required or permitted to be given under this Declaration shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments under Article V shall be sent to Winn-Dixie at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

> Owner:     CH Enterprises, L.L.C.
> 17th Floor, Citrus Center
> 255 South Orange Avenue
> Orlando, Florida 32802
> Telecopy:  (407) 843-6610

or such other address as the parties may direct from time to time.

> Winn-Dixie:    Winn-Dixie Stores, Inc.  Re: Store # _____
> 3015 Coastline Drive
> Orlando, Florida 32808
> Attention:  Gary B. Indian
> Telecopy:  (407) 294-4241

With a copy to:                 Winn-Dixie Stores, Inc.
                                Attn: General Counsel
                                5050 Edgewood Court
                                P.O. Box B
                                Jacksonville, FL 32203-0297
                                Telecopy: (904) 783-5138

or to such other address as Winn-Dixie may direct from time to time.

IN WITNESS WHEREOF, this Declaration has been executed as of the date first above written.

Signed, sealed and delivered
in the presence of:

Print name: _Denise J. Bouchard_                    CH Enterprises, L.L.C.

Print name: _Margaret E Malote_                     Print name: _Patrick T. Christlansen_
                                                    Its: _Manager_
                                                    Date: _7 · 24 · 00_

STATE OF _Florida_        )
COUNTY OF _Orange_        )

The foregoing instrument was acknowledged before me this _July 24,_ _____, 2000, by
_Patrick T. Christianson_____, as _Manager_____ of _____, who
[PLEASE CHECK ONE] __X__ is personally known to me or _____ has produced
_____ as identification.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

Denise J. Bouchard
Notary Public State of Florida
Commission No. CC 614254
My Commission Exp. 1/16/2001
Bonded Through Fla. Notary Service & Bonding Co.

EXHIBIT A





WINN—DIXIE STORE DESIGN

JACKSONVILLE, FLORIDA

# LEGAL DESCRIPTION

EXHIBIT "B"

THAT PORTION OF BLOCKS 10, 11, 12, 13, 22, 23, AND 35; ALSO THOSE PORTIONS OF
UNIMPROVED RIGHT OF WAYS AND ALLEYS, PLATTED AS TENTH STREET, ELEVENTH
STREET, CHESTNUT STREET, MAPLE STREET AND MAIN STREET (AKA RUBY LAKE ROAD)
LYING WITHIN OR ADJACENT TO THE AFOREMENTIONED BLOCKS; SAID BLOCKS AND
RIGHT OF WAYS LYING WITHIN ORANGE CENTER, ACCORDING TO THE PLAT THEREOF
AS RECORDED IN PLAT BOOK "O", PAGE 143 OF THE PUBLIC RECORDS OF ORANGE
COUNTY, FLORIDA;

TOGETHER WITH:
THAT PORTION OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE 28 EAST, ORANGE COUNTY,
FLORIDA, LYING WEST OF AND CONTIGUOUS TO BLOCKS 22, 23 AND ELEVENTH STREET
OF THE AFOREMENTIONED ORANGE CENTER AND EASTERLY OF THE EASTERLY RIGHT
OF WAY OF APOPKA— VINELAND ROAD PER THE ORANGE COUNTY RIGHT OF WAY MAPS
BY DARBY AND WAY DATED SEPTEMBER, 1990; SAID LANDS BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SECTION 15, TOWNSHIP 24 SOUTH, RANGE
28 EAST, ORANGE COUNTY, FLORIDA; THENCE RUN S 89°57'29" E, ALONG THE SOUTH
LINE OF THE SOUTHWEST 1/4 OF SECTION 15, A DISTANCE OF 602.76 FEET; THENCE
DEPARTING SAID SOUTH LINE RUN N04°25'44"E, A DISTANCE OF 25.07 FEET TO THE
INTERSECTION OF THE EASTERLY RIGHT OF WAY OF APOPKA—VINELAND ROAD AND THE
NORTHERLY RIGHT OF WAY OF TWELFTH STREET (AKA LAKE STREET); THENCE CONTINUE
N 04°25'44" E, ALONG THE EASTERLY RIGHT OF WAY OF APOPKA — VINELAND ROAD,
A DISTANCE OF 200.59 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE
N04°25'44"E, A DISTANCE OF 339.19 FEET TO A POINT OF CURVATURE OF A CURVE
CONCAVE SOUTHEASTERLY   HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 3434.91
FEET, A CENTRAL ANGLE OF 01°52'23", A CHORD LENGTH OF 112.30 FEET AND A CHORD
BEARING OF  N 05°21'56"E;   THENCE RUN NORTHEASTERLY ALONG THE ARC OF SAID
CURVE A DISTANCE OF 112.30 FEET; SAID POINT LYING ON THE SOUTH RIGHT OF WAY
LINE  OF TENTH STREET AND THE EASTERLY RIGHT OF WAY OF APOPKA—VINELAND
ROAD; THENCE DEPARTING SAID CURVE RUN S 89°57'29" E ALONG THE SOUTH RIGHT
OF WAY OF TENTH STREET A DISTANCE  OF 284.18 FEET; SAID POINT LYING ON THE SOUTH
RIGHT OF WAY LINE OF TENTH STREET AND THE EASTERLY RIGHT OF WAY LINE OF CHESTNUT
STREET; THENCE RUN N 00°02'23" W, ALONG SAID EASTERLY RIGHT OF WAY , A DISTANCE
OF 100.00 FEET TO THE NORTHWEST CORNER OF LOT 14, BLOCK 35, ORANGE CENTER
AND THE EASTERLY RIGHT OF WAY OF CHESTNUT  STREET ; THENCE DEPARTING
 SAID  EAST RIGHT OF  WAY RUN  S  89° 57' 29"  E, A DISTANCE OF 256.00 FEET
TO THE NORTHEAST CORNER OF LOT 11, BLOCK 35 AND THE WESTERLY  RIGHT OF WAY
OF MAPLE STREET; THENCE RUN S. 00° 02' 23" E, ALONG SAID WESTERLY RIGHT OF WAY
A DISTANCE OF 50.00 FEET TO THE NORTH RIGHT OF WAY OF THE AFOREMENTIONED
TENTH STREET; THENCE RUN N 89°57'29" W, ALONG SAID NORTH RIGHT  OF WAY A
DISTANCE OF 136.00 FEET; THENCE RUN S 00°02'23" E, A DISTANCE OF 100.00 FEET TO THE
SE CORNER OF LOT 23, BLOCK 11; THENCE RUN S 89°57'29" E, A DISTANCE OF 186.00 FEET
TO THE EAST RIGHT OF WAY OF MAPLE STREET (50' RIGHT OF WAY); THENCE RUN N 00°02'23" W,
ALONG SAID RIGHT OF WAY, A DISTANCE OF 50.00 FEET TO THE SOUTH RIGHT OF WAY LINE
OF TENTH STREET; THENCE RUN S 89°57'29" E ALONG SAID RIGHT OF WAY, A DISTANCE
OF 256.00 FEET TO THE WESTERLY RIGHT OF WAY OF MAIN STREET (50' RIGHT OF WAY)
(AKA RUBY LAKE ROAD); THENCE RUN S 00°02'23" E, ALONG SAID RIGHT OF WAY, A
DISTANCE OF 200.00 FEET TO THE SOUTHWEST CORNER OF LOT 8, BLOCK 10; THENCE
DEPARTING SAID RIGHT OF WAY, RUN N 89°57'29" W, A DISTANCE OF 136.00 FEET TO THE
NORTHEAST CORNER OF LOT 16, BLOCK 10; THENCE RUN S 00°02'23" E, A DISTANCE OF
275.00 FEET TO THE SOUTH EAST CORNER OF LOT 20, BLOCK 13; THENCE RUN N 89°57'29" W,
A DISTANCE OF 170.00 FEET TO THE NE CORNER OF LOT6, BLOCK 12 AND THE WESTERLY
RIGHT OF WAY LINE OF MAPLE STREET; THENCE RUN S 00°02'23" E ALONG SAID RIGHT OF WAY,
A DISTANCE OF 50.00 FEET TO THE SOUTHEAST CORNER OF LOT 7, BLOCK 12; THENCE DEPARTING
SAID RIGHT OF WAY RUN N 89°57'29" W, A DISTANCE OF 281.00 FEET TO THE CENTER LINE OF
CHESTNUT STREET; THENCE RUN S 00°02'23" E ALONG SAID CENTER LINE, A DISTANCE OF 75.00
FEET; THENCE RUN N 89°57'29" W, ALONG THE SOUTH LINE OF LOTS 4 AND 21, BLOCK 23 A
DISTANCE  OF 321.18 FEET TO THE POINT OF BEGINNING.

CONTAINING: (8.96 ACRES MORE OR LESS)        7 -19-00

## CONSENT

The undersigned, being the primary tenant of the real property located in Brevard County, Florida, subject to the Declaration of Restrictive Covenants dated August 5, 2000 to which this Consent is attached, joins in the execution of this instrument solely for the purpose of evidencing its consent to the terms and conditions thereof.

**WINN-DIXIE STORES, INC.**

By: _____

DENNIS M. SHEEHAN

Its:  Senior Vice President

Dated:  10-5-00

Print name:  Rebecca L. Sawyer

STATE OF FLORIDA
COUNTY OF DUVAL

I, BRENDA J. BABCOCK , a Notary Public in and for said County, in said State, hereby certify that DENNIS M. SHEEHAN , whose name as Senior Vice-President of Winn-Dixie Stores, Inc., a Florida corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this 5th day of Oct. , 2000.

Printed Name:  BRENDA J. BABCOCK

Notary Public, State and County aforesaid.

My Commission Expires: 11/20/03

Notary ID No.: _____

(NOTARIAL SEAL)

BRENDA J. BABCOCK
Notary Public, State of Florida
My comm. expires Nov. 20, 2003
Comm. No. CC 871970

O:\TRANSFER\ORLANDO\WINFLAND\DCR_2.WPD
August 21, 2000

7

EXECUTION
COPY

PTC-3
11-15-02

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** (the "**Second Amendment**") made and entered into this 1st day of May, 2002, by and between **CH ENTERPRISES, L.L.C.**, a Florida limited liability company (the "**Landlord**") and **WINN-DIXIE STORES, INC.**, a Florida corporation (the "**Tenant**")

### R E C I T A L S :

1.      On October 5, 2000, the Landlord and the Tenant entered into a certain Lease, (as amended, the "**Lease**") pursuant to which the Tenant leased from the Landlord certain premises (the "**Demised Premises**") generally described as the Winn Dixie Store located in the Shoppes at Lake Avenue, Orlando, Orange County, Florida, as defined in the Lease.

2.      The Landlord and the Tenant wish to amend the Lease for the purposes set forth in this Second Amendment.

**NOW, THEREFORE**, the Landlord and the Tenant do hereby agree as follows:

1.      **DEFINITIONS**.    Unless expressly defined in this Second Amendment, capitalized terms contained herein shall have the meanings set forth in the Lease.

2.      **AMENDMENTS TO LEASE**. The Lease is hereby amended as follows:

(a)      The site plan attached to the Lease shows a certain outparcel denoted as a Retail Building consisting of approximately 1,000 square feet. The Landlord may expand the Retail Building to 1,200 square feet as shown in Exhibit "A" attached hereto, and said Retail Building may be used for restaurant purposes. Landlord shall reconfigure the parking lot and related common areas to be as shown on Exhibit "A".

(b)      Orange County has approved a development to the north of the Shopping Center denoted as the "Davis PD" which, on the development plan, shows cross-access between said Davis PD and the Shopping Center. The Davis PD and the Shopping Center are part of an overall development for which Orange County has imposed certain development guidelines, including the requirements of cross-access so as to minimize and reduce various access points along various streets including Apopka-Vineland Road. The Tenant does hereby approve the cross-access rights reflected in the Davis PD as set forth more fully in Exhibit "A"

{OR500717:3}

attached hereto.  Nothing in this Subparagraph (b) shall be deemed to grant any cross parking rights to any other parcel subject to the "David PD".

(c)    Exhibit A attached hereto is solely for the limited purposes listed. Said Exhibit shall not be deemed to otherwise amend, modify or waive any other requirement of the Lease or the Site Plan attached as Exhibit "A" thereto.

3.    **RATIFICATION OF LEASE**. Except as modified pursuant to the terms of this Second Amendment, the Lease remains in full force and effect.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Second Amendment as of the date set forth above.

Signed, sealed and delivered
in the presence of:

_____
(Signature of Witness)

BARBARA J. BODEN
_____
(Print Name of Witness)

_____
(Signature of Witness)

DONNA J. SKORA
_____
(Print Name of Witness)


As to the "Landlord"

CH ENTERPRISES, L.L.C.

By_____
    Patrick T. Christiansen,
    Its:  Managing Member

Date:  November 24, 2002

2

{OR500717;3}

**WINN-DIXIE STORES, INC.**

_(Signature of Witness)_

Judith M. Parent

(Print Name of Witness)

By: _____

Name:  DENNIS M. SHEEHAN

Its:      Senior Vice-President

November 18

Date: ~~July~~ ___, 2002

_(Signature of Witness)_

**SHEILA P. DESHONG**

(Print Name of Witness)

As to the "Tenant"

STATE OF FLORIDA          )
                          )
COUNTY OF ORANGE          )

   The foregoing instrument was acknowledged before me this _19__ day of ~~July~~, _November_ 2002, by Patrick T. Christiansen, as Managing Member of CH Enterprises, L.L.C., a Florida limited liability company, on behalf of the limited liability company, who **[PLEASE CHECK ONE]** __✗__ is personally known to me or _____ has produced _____ as identification.

_____

Printed Name: _____

Notary Public, State and County aforesaid.

My Commission Expires:_____

Notary ID No.: _____

(NOTARIAL SEAL)

Barbara J. Boden
MY COMMISSION # CD073476 EXPIRES
November 19, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

3

{OR500717;3}

STATE OF FLORIDA     )
COUNTY OF DUVAL    )

    The foregoing instrument was acknowledged before me this November 18, 2002, by    DENNIS M. SHEEHAN   , as Senior Vice President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.



Printed Name:    **Judith M. Parent**
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____

(NOTARIAL SEAL)

JUDITH M. PARENT
MY COMMISSION # DD 002001
EXPIRES: February 16, 2005
Bonded Thru Notary Public Underwriters

4

{OR500717;3}

EXHIBIT "A"

DAVIS PD

RETAIL
BUILDING
(1,200 S.F.)
FF. EL. 107.80

Do Not Enter
Signs (2)
R5-1

30'-0"    24'-0"

## SUPPLEMENTAL LEASE AGREEMENT

THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _February 18_, 2002, between WINN-DIXIE STORES, INC., a Florida corporation, (the "Tenant") and CH ENTERPRISES, L.L.C., a Florida limited liability company (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Lease dated  October 5, 2000, as amended and/or evidenced by: (a) Short Form Lease dated October 5, 2000 recorded in O.R. Book 6220, page 3349 of Orange County, Florida; (b) First Amendment to Lease dated January 17, 2001 and recorded in O.R. Book 6220, page 3362 in the public records of Orange County, and as otherwise to be amended from time to time (the "Lease") for the use and occupancy of the Premises described therein;

NOW, THEREFORE, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1. The Commencement Date of the Term is December 6, 2001.

2. The Term shall expire at midnight Eastern Time on December 5, 2021 , unless earlier terminated or later extended as provided for in the Lease.

3. All undefined capitalized terms used herein are as defined in the Lease.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

Print name: REBECCA L. SAWYER

Print name: Kim L. Scoglio

TENANT:

**WINN-DIXIE STORES, INC.**

By: _____

Its: SENIOR VICE PRESIDENT

Date: 2/18/02

Print name: BARBARA J. BODEN

Print name: DONNA J. SKORA

LANDLORD:

CH ENTERPRISES, L.L.C.

By: _____
Patrick T. Christiansen

Its: Manager

Date: 2/8/02

\\WD21SVRA\W21G0400$\transfer\orlando\2215\SLA.doc

STATE OF FLORIDA  )
COUNTY OF DUVAL  )

The foregoing instrument was acknowledged before me this _Feb. 18_, 2002, by DENNIS M. SHEEHAN, as Senior Vice President of , **WINN-DIXIE STORES, INC., a Florida** corporation, on behalf of the corporation, who is personally known to me.

_Karen I. Norman_

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

KAREN I. NORMAN
Notary Public, State of Florida
My comm. expires Aug. 9, 2005
Comm. No. DD 048654

STATE OF _Florida_  )
COUNTY OF _Orange_  )

The foregoing instrument was acknowledged before me this _February 8_, 2002, by _Patrick J. Christian_, as _Manager_ of , CH ENTERPRISES, L.L.C., a Florida limited liability company, on behalf of the limited liability company, who **[PLEASE CHECK ONE]** ____ is personally known to me or _____has produced ____ _____ as identification.

_Barbara J. Boden_

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

Barbara J. Boden
MY COMMISSION # DD073476 EXPIRES
November 19, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

\\WD21SVRA\W21G04005\transfer\orlando\2215\SLA.doc

## CONSENT

FIRST UNION NATIONAL BANK, a NATIONAL BANKING ASSOCIATION the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

By: _____

    Stephen D. Baum

Its: Vice President

Date: 2/13/02

STATE OF Florida )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this Feb. 13 2002, by Stephen D. Baum as Vice President of FIRST UNION NATIONAL BANK, a national banking association, on behalf of the national banking assoication, who **[PLEASE CHECK ONE]** ✓ is personally known to me or _____ has produced _____ as identification.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

Lisa M. Bott
MY COMMISSION # CC999184 EXPIRES
February 20, 2005
BONDED THRU TROY FAIN INSURANCE, INC.

O:\NEWFORMS\LEASE\SLA.