# EXHIBIT A

SC-1

# LEASE

THIS LEASE, made this ___1st___ day of ___September___, 19 _93_

between __BIRMINGHAM REALTY COMPANY, an Alabama corporation,__ _____

_____

_____ ("Landlord")

and ___WINN-DIXIE MONTGOMERY, INC., a corporation organized and___

__existing under the laws of the State of Kentucky and qualified__

__to do business within the State of Alabama,__ _____ ("Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or

plural, and the heirs, legal representatives, successors and assigns of the respective parties;

WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto

Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified,

the following described premises:

That certain store building, approximately ___220___ feet in width by ___200___

feet in depth, __together with a vestibule entry approximately 77 feet in__

__width by 12 feet in depth, together with rear additions, concrete pads__

__for coolers, freezers and compactor or baler at the rear,__ _____

and the land on which the same shall stand (hereinafter collectively called "demised premises"),

which store building and related improvements are to be constructed by the Landlord according

to plans and specifications to be approved by the parties as herein provided, and shall be in

the location and of the dimensions as outlined in red on the Plot Plan __entitled__ _____

__"OAK MOUNTAIN MARKETPLACE, Pelham, Alabama," prepared by Charles A.__

__Cline, Architect, drawn on March 4, 1993, last revised August 26, 1993,__

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as ___OAK MOUNTAIN MARKETPLACE_____

("shopping center"), located __at the northwest corner of Highway #31 and__

__Highway #119__ _____

in the City of __Pelham_____, County of ___Shelby_____,

State of _____Alabama_____, the legal description of the shopping center being set

forth on Exhibit "B" attached hereto and by this reference made a part hereof.



APPROVED
AS TO FORM
Division Manager

Legal Dept.
Winn-Dixie Stores
wo sfce nove
· 8/26/93

SC-2

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of ___twenty (20)___ years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of _____

TWO HUNDRED EIGHTY SIX THOUSAND and No/100----------------------- Dollars ($_286,000.00___) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of __TWENTY THREE THOUSAND EIGHT HUNDRED THIRTY___

THREE and 33/100 --------------------------------------------------- Dollars ($_23,833.33___) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which___one___ per cent ( ----- 1 %) of such gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones, (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

(this exclusion is based upon typical supermarket practices as of the date of this Lease, with only incidental vending machine sales, and shall be inapplicable to such sales in excess of one percent (1%) of Tenant's gross sales.)

**RECORD**
**OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, an audit time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

Upon reasonable request and notice to Tenant, such books and records shall be open to the inspection of Landlord and its duly authorized representatives, who shall have the right to audit such books and records. In the event such an audit reveals an understatement by Tenant in the gross sales made by Tenant from the demised premises during the applicable fiscal year in excess of three percent (3%), Tenant shall pay the cost of such audit. Otherwise, Landlord shall bear the cost of the audit.

Notwithstanding the foregoing, Landlord may reveal Tenant's sales figures to its bona fide mortgagees and prospective mortgagees and purchasers of the demised premises who agree to hold such information as confidential.

**USE**

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses) *

* , not restricted under Article 7 hereof; provided, however, except as a supermarket, the demised premises shall not be used, or assigned, or subleased under the terms of Article 26 hereof, for any primary use or business which shall be in direct competition with the primary use or business engaged in by any other tenant in the shopping center to whom Landlord has granted a right of exclusive use, to which Tenant has consented in this Lease (which consent will not be unreasonably withheld) or otherwise in writing, or a replacement or successor tenant for such exclusive use. Tenant shall have the non-exclusive right to operate a drug store or pharmacy.

Tenant covenants to open as provided for hereinafter, and to operate a food supermarket in the Demised Premises for a period of not less than six (6) months after such opening.

Tenant shall not generate, handle, use, store, treat, discharge, release or dispose of any Hazardous Material at the demised premises except in full compliance with all Environmental Laws (defined below).

For purposes of this Section, the term "Hazardous Material" shall mean all hazardous, toxic or dangerous waste, substance or material defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act of the United States Congress, or in any other law, regulation or order, now or hereafter in effect, of any governmental authority regulating or imposing liability or standards of conduct relating to, any hazardous, toxic or dangerous waste, substance or material, all of said laws, regulations and orders being referred to herein as "Environmental Laws".

, landscaping, exterior lighting facilities,

substantially

**CONSTRUCTION OF SHOPPING CENTER** 3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

substantially

, unless such change results from a taking by the exercise of the right of eminent domain, in which event the provisions of Article 20 shall apply.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job."

Tenant shall furnish, install and connect its own trade fixtures and its compactor (or baler) on concrete pads to be erected by Landlord.

**COMPLETION DATE** 4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than____September 1, 1993_____and shall be completed not later than ____July 1, 1994_____; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than____October 1, 1994_____ (the "outside completion date"), this option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured.

If pursuant to this Article Tenant shall cancel or terminate this Lease, then Landlord agrees ·to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of written notice of the terms and conditions thereof from Landlord, to occupy any premises within the shopping center which Landlord may offer

-4-

for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the lease term provisions shall be the same as this Lease.

If the term has not commenced by December 1, 1994, this Lease shall automatically terminate and neither party shall be liable to the other thereafter.

**COMMENCE-** 5. The Tenant shall open its store for business within sixty (60) days following performance of the
**MENT DATE** following:

(a) Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant completed in accordance with the plans and specifications, and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c) All drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices shown on Exhibit "A" in or connecting the common areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic.

(d) Construction of at least_____297_____ lineal feet of store frontage and____20,000____ sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A";

(e) The stores to be operated by each of the following tenants shall have been completed and opened for business simultaneously with Tenant: NONE

(but may be left as shells with completed store fronts until leased)

(f)     The "Outlot" as shown on Exhibit "A" is made subject to the use restrictions in accordance with Articles 7 and 28 hereof. Buildings constructed on such "Outlot" shall not exceed one (1) story in height, or exceed twenty-two (22) feet in height, excepting cupolas, weather vanes, and similar architectural adornments. A document containing these restrictions will be recorded prior to any liens and other encumbrances which could eliminate the provisions thereof through foreclosure. Said document shall provide that it shall not be modified, amended, or cancelled without the prior written consent of Tenant, and all of said restrictions shall expire upon termination of this Lease.

(g)     An ingress and egress easement in favor of the tenants, employees and invitees of the shopping center over and upon the land marked "36' DRIVE EASEMENT" as shown on Exhibit "A" in a form acceptable to Tenant providing for Landlord to maintain the easement as part of the common areas of the shopping center will be recorded prior to any liens or other encumbrances which could eliminate its provisions by foreclosure.

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this lease. However, this right to cancel this Lease shall automatically be revoked upon opening of the store by Winn-Dixie.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications. Tenant shall notify Landlord in writing of any defective work or materials as soon as practicable after Tenant's discovery of the same.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

**OTHER TENANTS**

6.   INTENTIONALLY DELETED

and Landlord

**RETAIL AND SERVICE STORES ONLY**

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, ~~except as hereinafter provided~~, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, skating rink, bingo or electronic or other game parlor, theatre (either motion picture or legitimate), pawn shops, business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted.        (including the demised premises)

Notwithstanding the foregoing, business and professional offices such as real estate sales and rental offices (but not schools), tax preparation offices, dentist offices, insurance offices, etc., of a type dealing with the public and with no more than seven (7) employees or owners using each individual space at a time may be located in the most northerly 8,400 square feet of retail shop space in the shopping center as shown on Exhibit "A," provided that no such business or professional office may exceed 2,800 square feet.

**PARKING AND COMMON AREAS**

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least_____5.5_____*_____ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least_____395_____**_____ automobiles (minimum);

*   (decreasing to not less than 4.8   after Tenant's expansion)
**  (decreasing to not less than 385   after Tenant's expansion)

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

(except as shown on Exhibit "A")

and one hour later, but in any event not later than 10:00 p.m., provided that such area will be lighted upon Tenant's request, but at its expense prorated on a square footage basis with other tenants, if any, open for business during such extended hours. The expense shall be based upon actual billings, if available, or upon the kilowatt usage of the fixtures times the hours of use times the applicable utility rate,

**SERVICE AREA**  9. Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

**UTILITIES**  10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility.    provided for in the plans and specifications

**TENANT'S REPAIRS**  11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Tenant's repair responsibilities shall include: the roof, heating and air-conditioning system, interior floor surfacing, the plate glass (except damage caused by settling or faulty construction or covered under Landlord's casualty insurance as required under Article 17 hereof), automatic doors, the automatic sprinkler system (and central alarm system therefor if required by governmental authority) the plumbing (from, but not including, the water meter and point of discharge into the sewer main), and wiring (from the various outlets in the store to and including the main panel). It is understood and agreed that Tenant's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

**LANDLORD'S REPAIRS**  12. The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the plumbing and wiring (except as described in Article 11), the store building in good condition and repair, and, except for the roof, shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same promptly upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

Landlord's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

Notwithstanding the other provisions in this Lease, Landlord shall not be responsible to Tenant for damages resulting from Landlord's failure to make repairs to Tenant's store building unless Landlord has received written notice of the requirements for repair and has failed to act with reasonable promptness to remedy the conditions described in said notice. The foregoing provision shall not apply to Landlord's common areas and parking area repair responsibilities, and shall not in any way diminish Tenant's right to make emergency repairs.

Tenant shall make reasonable efforts to notify Landlord of the need to make any emergency repairs before proceeding with them.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as to structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any structural changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated, except those necessary because of Tenant's expansion or alteration of the demised premises for use other than as a supermarket.

**SIGNS**

(but no signs painted on the exterior walls)

13. Tenant may place, erect and maintain any signs on the ~~roof, walls,~~ and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

with the prior approval of Landlord, which will not be unreasonably withheld,

Notwithstanding the foregoing, Landlord's approval to signs located in the interior of the demised premises shall not be required. Landlord shall construct and maintain the shopping center pylon sign in the location as shown on Exhibit "A", and Tenant shall be permitted to affix thereon its electrically illuminated sign panels advertising its business. Tenant shall maintain its own sign panels, and Landlord shall maintain the sign structure as a part of common area expense under Article 31 hereof.

interior

**FIXTURES AND ALTERATIONS**

14. The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant shall cause any mechanics' or materialmens' liens incurred as a result of its work to be promptly discharged, and Tenant hereby agrees to indemnify and hold Landlord harmless from any expense occasioned by such liens.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

or by reason of the negligence or wilful misconduct of Landlord, its agents or contractors,

**INDEMNIFI-CATION** 15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorneys' fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

\*  ., including costs of investigation, court costs and attorney's fees

\*\*  or by reason of the negligence or wilful misconduct of Tenant, its agents or contractors.

Landlord may utilize so-called "umbrella" policies in performance of its obligations herein, provided the cost of Tenant is not increased thereby.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's comprehensive general liability insurance above described. Tenant shall be responsible for its prorata share of such premiums. Tenant's prorata share of the premium shall be equal to the sum which the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center. Tenant's prorata share shall be reduced by any available abatements, discounts or refunds actually received by Landlord. Landlord shall use its best efforts to obtain liability coverage at competitive rates. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premium no later than nine (9) months after its due date. Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the declaration page of such insurance policy and such other information as Tenant may reasonably request.

**CLEANLINESS** 16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

Tenant shall not place rubbish, store fixtures, or equipment outside its store building. Tenant shall place all rubbish in dumpsters designated for that purpose.

-9-

FIRE     17.  In the event that the leased premises be partially damaged or totally destroyed by fire, casualty or other disaster, the term of this lease shall not be affected thereby except as hereinafter provided.  In the event that the building on the leased premises is damaged or destroyed by fire, casualty or other disaster, landlord shall promptly cause the same to be restored to the prior existing condition, due allowance, however, shall be made for a reasonable time necessary for Landlord to adjust the loss with the insurance companies insuring the leased premises at the time of the happening of the fire or other casualty, and due allowances shall be made for delay occasioned by strikes, walkouts and conditions beyond the control of Landlord.  In the event of total destruction of the leased premises and Landlord fails to completely restore and rebuild same within one (1) year after such fire, casualty or other disaster and rebuild then in that event Tenant may, at its option, exercised within sixty (60) days of the end of said one-year period, elect to terminate and cancel this lease, in which event this lease shall, upon written notice from the Tenant to Landlord, be terminated and cancelled and neither party shall thereafter have any further obligation with respect to the other.  Should the leased premises or a portion thereof be rendered untenantable by reason of damage of destruction thereof by fire, casualty or other disaster during the term of this lease, as provided in this section, the rent shall abate in proportion to the area of the leased premises rendered untenantable from the date of the happening of the fire or other casualty or disaster upon the date of the restoration of the premises; however, no rent shall accrue for any portion of the premises unless Tenant is able to conduct its usual business on that portion of the premises which remains tenantable.

If the Tenant shall have paid any rent for a period beyond the date of the happening of the fire or other casualty or other disaster, Tenant shall be entitled to a proportionate refund.

If, however, such damage occurs during the last two (2) years of the original term hereof and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building as certified to by a reputable registered architect selected by Landlord and Tenant, Tenant shall have the right to terminate this lease upon written notice to Landlord within ten (10) days after the rendition of certification by such architect, and Landlord shall have the right to terminate this lease upon written notice to the Tenant given within forty (40) days after the rendition of such certificate, unless Tenant shall elect to exercise its first option to renew this lease for an additional period of five (5) years, in which event the Landlord shall have no option to terminate this lease and shall be obligated to restore the premises with due diligence.  Should Tenant have paid any rent beyond the date of termination, as in this section provided, Tenant shall be entitled to a proportionate refund.

In the event the damage occurs within the last two (2) years of the first renewal term and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building, as certified aforesaid, either party shall have the right to terminate this lease in the manner aforesaid, unless Tenant shall elect to renew this lease for the next renewal period, in which event the Landlord shall have no option to terminate this lease and shall be obligated to restore the premises as aforesaid.  In the event the damage occurs in the last two (2) years of the second renewal term and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building, as certified aforesaid, either party shall have the right to terminate this lease upon written notice to the other, given within the times set forth above.

Landlord agrees to carry fire and extended coverage and vandalism and malicious mischief insurance on Tenant's buildings and insurable improvements in the common areas within the shopping center in the amount of not less than the full insurable value thereof, above foundation walls, and hereby expressly waivers any and all claims against the Tenant for

loss or damage due to fire, explosion, windstorm or other casualty covered by insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

Tenant hereby expressly waives any and all claims against Landlord for loss or damage to Tenant's merchandise, fixtures and equipment due to fire, explosion, windstorm or other casualty normally covered by standard fire and extended coverage insurance policies, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of the Landlord, its agents, servants or employees.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental Tenant's prorata share of the amount of the premium for Landlord's fire and extended coverage insurance carried by Landlord for the shopping center. Tenant's prorata share shall be equal to the sum which bears the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center which are insured under such policy or policies carried by Landlord.   Tenant's prorata share shall be reduced by any available abatements, discounts or refunds actually received by Landlord.  Landlord shall use its best efforts to obtain fire and extended coverage insurance from companies acceptable to Landlord at the competitive rates.  Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums.  Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice from such insurance premium no later than nine (9) months after it is due.  Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the applicable insurance policy, including the declaration page of such insurance policy and such other information as Tenant may reasonably request.

**QUIET ENJOYMENT**    18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

except as provided under Article 29 hereof, and except for current taxes, not yet payable, leases with other tenants (which do not conflict with Tenant's rights hereunder), and easements and restrictions reviewed and approved in writing by Tenant (which Landlord agrees not to amend or grant consents under without Tenant's prior written consent);

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

Tenant's option to so terminate shall become effective, however, only if Tenant is actually prevented from conducting its business as permitted herein, and such option shall not arise if the property may be used as permitted herein by reason of a nonconforming use.

**TAXES AND LIENS**

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

Tenant agrees to pay taxes assessed upon its inventory, fixtures and other property, provided, however, that Tenant may object to or appeal such assessment when, in Tenant's sole discretion, it deems necessary or prudent.

more than two percent (2%)

**CONDEM-NATION**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

exercised not later than thirty (30) days after the effective date of such taking,

Whether or not this lease shall be terminated, the entire compensation award therefor, both leasehold and reversion, shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest to any such award, Tenant shall, however, be entitled to claim, prove and receive (but not from Landlord) such awards as may be allowed for leasehold improvements, fixtures and other equipment installed by it, moving, business interruption and similar awards but only if, and to the extent that such awards shall be in addition to the award for the land and building and other improvements (or portions thereof) constituting the demised premises.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ___ten___ per cent ( 10 %) or reduce the number of cars which may be conveniently parked to less than___355___ * , the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

* (or to _346_, if such taking occurs subsequent to Tenant's expansion),

exercised within sixty (60) days after such taking,

-12-

**DEFAULT**    21.  In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, ~~making reasonable efforts therefor~~ and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

use reasonable efforts to

, after Landlord first deducts its reasonable expenses incurred in reletting.

Landlord's remedies and Tenant's remedies as set forth in this Lease are not exclusive, and Landlord and Tenant reserve all remedies available at law or in equity.

**BANKRUPTCY**    22.  The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**    23.  Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

**NOTICES**    24.  All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at _____

Birmingham Realty Company

2118 1st Avenue North

Birmingham, Alabama  35203

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at

Winn-Dixie Montgomery, Inc.

Post Office Box 2029
Montgomery, Alabama  36102-2029

Attention:  Real Estate Manager

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

Notwithstanding the foregoing, in the event Tenant has not exercised on option to renew the term of this Lease or if Tenant does not have any remaining options to extend the term of this Lease and Landlord notifies Tenant at least ninety (90) days prior to the expiration of the term of this Lease that Landlord desires Tenant to vacate the demised premises on the date this Lease terminates and Tenant fails to do so, then Tenant shall be liable to Landlord for damages which Landlord suffers by reason of Tenant's failure to vacate, including, but not limited to, loss of rents, which Landlord may have received by reason of Tenant's failure to vacate.

**Assignment and Subletting**

26. Tenant may, without the consent of Landlord, vacate or cease doing business in the demised premises at any time. Tenant, without the consent of Landlord, may assign this Lease or sublease the demised premises at any time for use as a retail food store, commonly referred to as a supermarket, and, subject to the stipulations hereinafter set forth in subsections (a), (b) and (c), Tenant may also, without the consent of Landlord, assign this Lease or sublease the demised premises for use other than as a retail food store, subject to the provisions of Article 2 of this Lease.

a) In the event Tenant shall voluntarily vacate the entire demised premises or cease selling merchandise for in excess of a period of six (6) months while the demised premises can be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord shall have the continuing option (unless Tenant has reoccupied the premises) to terminate and cancel this Lease commencing on the day after the premises have been vacant for six (6) months by written

notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of the notice letter. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the demised premises to a third party. Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 26.

b)  In the event Tenant desires to assign this Lease or to sublease the demised premises for the conduct of some business other than a retail food store, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to cancel or terminate this Lease by giving written notice to Tenant of such election within such period. In the event Landlord elects to cancel this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such period in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the demised premises. Upon surrender of possession of the premises by Tenant, this Lease shall be deemed terminated and canceled without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease the demised premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to cancel this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to cancel this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for the performance of all obligations of Tenant hereunder notwithstanding Tenant's assignment or sublease pursuant to this Article 26.

c)  Anything else in this Lease to the contrary notwithstanding, in the event Tenant (i) closes its store for business, (except for temporary cessation reasons beyond Tenant's reasonable control or for repairs or for remodeling), or (ii) sublets the demised premises or assigns this Lease (except to a parent or affiliated or subsidiary corporation or corporation to which Tenant sells all of its business in the State), then the rental provided in Article 1, from and after the first day said store is closed, shall be an annual fixed sum which is the average of total rent due (including both minimum guaranteed rental and percentage rental) for the two most recent complete years of Tenant, immediately preceding such closing, subletting or assignment, payable in equal monthly installments.

**EXTENSIONS** 27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ _____five_____ ( 5 ) successive extensions of this lease, each extension to be for a period of _____five_____ ( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least _____six (6) months_____ before the expiration of the initial term, and if extended, at least_six (6) months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

**EXCLUSIVE SUPERMARKET** 28. Landlord covenants and agrees that so long as a supermarket is operated in the demised premises the Tenant shall have the exclusive right to operate a food supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a food supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores and a drug store, only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center. Only Tenant may operate a seafood market or seafood department in the shopping center.

Landlord's covenant not to lease any property located within 1,000 feet of the exterior boundary of the shopping center for occupancy as a food supermarket, grocery stores, meat, fish, or vegetable market shall not be construed to prevent the operation of a Wal-Mart, K Mart, Target, Sam's Club, or Pace Store within 1,000 feet of the exterior boundary of the shopping center.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights or recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

reasonably

**SUBORDINATE** 29.  The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**NOTICE TO LENDER** 30.  Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE** 31.  If Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas.  If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

Tenant shall pay to Landlord Tenant's prorata share thereof, computed in the proportion which the square footage of Tenant's store building and vestibule entry area bears to the total square footage of all buildings (including vestibule areas and additional floor levels) existing in the shopping center from time time.

Tenant's payments with respect to common area maintenance service costs shall be paid monthly in advance based on an estimate furnished Tenant by Landlord. For the first year of the lease term, such payments shall be $916.67 a month. Such payments shall be prorated for fractional years and months occurring at the commencement and end of the term of the lease. Within sixty (60) days following the end of each calendar year, Landlord shall submit to Tenant an itemized listing of all common area expenses, and appropriate adjustments for overpayment or underpayment of such costs shall be made promptly thereafter. Should Landlord not make reimbursement to Tenant for any overpayment within ninety (90) days at the end of each calendar year, Tenant shall have the right to deduct such sum from rentals due under this lease.

Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Rental insurance premiums and shopping center management fees and administrative costs are examples of expenses not reasonably connected to necessary maintenance and repair. In the event that Landlord wishes to make capital acquisitions of goods to provide such services, such as lawn mowers or the like, the equipment shall be used only at the shopping center under this Lease or proper records showing the amount of use of such equipment chargeable to the shopping center under the Lease shall be maintained, and only that prorata share charged against common area maintenance of the shopping center. The charge therefor shall also be less any depreciation or similar tax benefits to Landlord, and shall include a credit for any recovery of the cost thereof upon disposition of the equipment.

Notwithstanding Tenant's obligation to pay a portion of Landlord's common area maintenance expenses hereunder, Tenant shall in no way be responsible for cost of testing, removing, abating, or otherwise dealing with hazardous substances or other violations of environmental laws, ordinances, rules, regulations or written policies now or hereafter existing, including, but not limited to, the Toxic Substance Control Act, Comprehensive Environmental Response Compensation and Liability Act, Clean Water Act, Rivers and Harbors Act of 1989, Clean Air Act or the like, except for those caused by the intentional or negligent activities of Tenant, its employees, officers an agents.

**BENEFIT**     32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY** 33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide
**LANDLORD**    Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

If Landlord assigns this Lease (except as security for a loan), then Landlord shall thereupon be released from all liability and obligations of Landlord hereunder arising after such assignment.

and at the cost

**SHORT**    34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease
**FORM**    in form permitting its recording.
**LEASE**

**MARGINAL**    35. The marginal titles appearing in this lease are for reference only and shall not be considered as part
**TITLES**    of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE**    36. This written lease contains the complete agreement of the parties with reference to the leasing of the
**AGREEMENT**    demised premises, except plans and specifications for Tenant's store and related improvements to be for-
mally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant
herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**REAL**    37. During the term of this Lease and any extensions, if the
**ESTATE**    demised premises are separately assessed for real estate tax
**TAXES**    purposes, Tenant agrees to pay to Landlord as additional rental
the amount of ad valorem real estate taxes levied against the
demised premises and a prorata share of the common areas. Tenant
shall be responsible for its prorata share of such taxes for
fractional years occurring at the commencement and expiration of
the term of this Lease and any extensions.

If such taxes are not assessed separately, but are included within
an assessment of the demised premises and others, the assessment
shall be fairly apportioned to determine Tenant's prorata share.
Tenant's prorata share shall be equal to the sum which bears the
same ratio to the total assessment for ad valorem real estate
taxes as the square footage of Tenant's store building bears the
total quare footage of all store buildings (including additional
floor levels) included within the assessment. Tenant's prorata
share shall be reduced by any abatements, discounts or refunds.
Upon request of Tenant, Landlord agrees to exhibit to Tenant the
paid tax statements and an "as built" survey of the shopping
center. All taxes, other than ad valorem real estate taxes,
including special assessments, improvement liens, and the like,
shall remain the sole responsibility of the Landlord. However,
Tenant shall remain responsible for sales taxes on rentals levied
by law on lessees.

Notwithstanding anything contained herein to the contrary, Tenant
shall, in addition to paying its portion of the real estate taxes,
also pay any amount assessed against Landlord as a "gross
receipts" or "rental tax" on the rent payable by Tenant to
Landlord hereunder. Such payments shall be paid within fifteen
(15) days after Landlord submits to Tenant an invoice therefore.

**OPTION FOR**
**EXPANSION**

38.  Tenant is hereby granted the option and privilege at any time during the term of this Lease or any extensions thereof, of enlarging its store building by incorporating the area on its southerly side with an addition not exceeding sixty (60) feet in width by two hundred (200) feet in depth provided Tenant is operating a supermarket within the demised premises, and provided Tenant is not in default in the payment of rentals due hereunder beyond and time to cure.  This option may be exercised only at such times as the adjoining retail shop space in the enlargement area may be vacant, or on the seventh (7th) anniversary of the commencement date, and at five (5) year intervals thereafter (the "option date").  Landlord shall not lease such retail shop space to other tenants for any term which would expire subsequent to any option date.  Tenant shall be entitled to exercise this option by giving notice in writing at least six (6) months prior to any option date. Thereafter, Landlord agrees to construct such addition for occupancy by Tenant in accordance with plans and specifications to be approved by the parties, with all due diligence following the vacation of the necessary area by any other tenant.  The addition shall be of like quality of construction as Tenant's original building.  In order to facilitate the expansion of Tenant's store building, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on the line which is the interior sidewalk line of Tenant's store building, and shall have a finish floor level, and roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's store building.  Further, Landlord agrees that the wall of Tenant's store building adjoining the expansion areas shall be constructed with steel column supports equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building, and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

If, at the date of completion of any such building addition, fewer than ten (10) years of the term of this Lease remain, the term of this Lease shall be extended for the period of time necessary to provide a full ten (10) year term from that date. Thereafter, for the balance of the term, including extensions, the annual minimum guaranteed rental (and the base for computation of percentage rental) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the addition, or an amount equal to $6.85 per square foot of the enlarged area, or an amount equal to a computed percentage multiplied by the cost of such addition, such percentage being equal to four percent (4%) plus the current prime interest rate (as published by the Federal Reserve or in the Wall Street Journal or similar public source) at the time of the exercise of the option.  At Tenant's request, the construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable by Tenant.  The final cost of the addition upon completion shall be certified by the general contractor performing the work.  If the term of this Lease is extended to provide a full ten (10) year term, the provisions of the Lease shall remain in effect, and the option periods, if any, shall follow upon the end of the extended term.  Rentals, as adjusted by reason of the addition, shall continue.  Upon completion, the addition shall be a part of the demised premises, and all references to the demised premises contained in this Lease shall be construed to include both Tenant's store building and the addition.

Causing any addition to be constructed is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.  However, nothing contained in this Lease shall constitute any express or implied obligation on the part of the

holder of a first mortgage encumbering the fee simple title to the demised premises, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Article 38. Additionally, Landlord's obligation shall not limit Tenant's right to undertake and complete the addition at its own cost, as described later in this Article 38.

If Landlord, for any reason, fails or refuses to construct the building addition contemplated after Tenant has properly exercised its option, Tenant, at its option, at its own expense, and as its sole remedy against Landlord, shall have the right to construct the building addition of the size and quality set forth above. If Tenant constructs the addition, Tenant agrees to cause any mechanics' liens incurred by and in connection with such addition to be promptly discharged. Tenant further agrees to indemnify and hold Landlord harmless from any expense occasioned by mechanics' liens. If, upon completion and occupancy of a building addition by Tenant, fewer than ten (10) years of the term of this Lease remain, the lease term shall be extended for a period of time necessary to provide a full ten (10) year term. For ten (10) years following the date of completion of the addition by Tenant, there shall be no change in the minimum guaranteed annual rental, and the base for calculation of percentage rental, if any, shall be increased by an amount equal to the greatest of the three (3) factors set forth in the second paragraph of this Article 38 (in addition to the adjustment for the replacement rentals). Upon expiration of ten (10) years following the date of completion of the addition, the base for calculation of percentage rental shall revert to the minimum annual guaranteed rental established in Article 1 of this Lease as adjusted for annual replacement rentals.

Regardless of which party constructs Tenant's addition, and in addition to all the foregoing provisions in this Article 38, from the date of delivery by Landlord to Tenant of any rental space lying within Tenant's expansion area and continuing through the remaining lease term and any extensions, minimum guaranteed annual rental and the base for percentage rentals payable by Tenant shall increase by an amount equal to the annual guaranteed rentals paid by the last tenant(s) occupying any rental space lying within the expansion area under a bona fide written lease with a term not less than three (3) years ("annual replacement rentals"), adjusted for any common area maintenance, insurance, tax or other payments to be made by Tenant under the last paragraph of this Article 38 but not under the replaced leases. If rental space lying within the expansion area prior to the addition has not been leased, so that annual lost rentals may be calculated and the parties cannot agree on a replacement rental, Landlord and Tenant shall each select one MAI appraiser, and the two selected shall choose a third appraiser to determine the reasonable annual rental value, and such reasonable annual rental value shall constitute lost rentals for purposes of this paragraph.

Regardless of which party constructs Tenant's addition, the size of the premises as expanded shall be used to calculate Tenant's prorata share of real estate taxes, insurance premiums and common area maintenance charges.

SELF-HELP   39.   If Landlord defaults in the performance or observance of any agreement or condition contained in this Lease on its part to be performed or observed, and if Landlord fails to cure such default within thirty (30) days after notice from Tenant specifying the default (or fails within thirty (30) days to commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for Landlord's damages for breach of agreement, at any time thereafter, cure such default. Any amount paid or any contractual liability incurred by Tenant to cure Landlord's default shall be reimbursed by Landlord. Tenant may cure any default by Landlord prior to the expiration of the 30-day waiting period, but after notice to Landlord, if the curing of such default prior to the expiration of the waiting period is reasonably necessary to protect the real estate or Tenant's interest in it or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord, that amount may be deducted by Tenant from the next or succeeding payments of rent due under this Lease.

ESTOPPEL CERTIFI-CATE   40.   The parties shall promptly furnish each other estoppel certificates from time to time as to the term, standing, amendments and other material information in connection with the status of the Lease, specifying the facts and allegations of any alleged default, within ten (10) working days of written receipt of a request for such certificate.

LIMITATION OF LIABILITY   41.   Tenant shall look solely to Landlord's interest in the shopping center for the satisfaction of any judgment or decree requiring the payment of money by Landlord based upon any default under the Lease, and no other property or assets of Landlord, or of any partner or agent of Landlord, shall be subject to levy, execution or other enforcement procedure for the satisfaction of any such judgment or decree.

IN WITNESS WHEREOF, the Landlord and Tenant have executed

this instrument as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

**BIRMINGHAM REALTY COMPANY**

By: _____
    Its _____ President

Attest: _____
      Its _____ Secretary

(CORPORATE SEAL)

LANDLORD

_____
_____
As to Landlord

**WINN-DIXIE MONTGOMERY, INC.**

By: _____
    Its _____ Vice President

Attest: _____
      Its _____ Secretary

(CORPORATE SEAL)

TENANT

_____
_____
As to Tenant

G U A R A N T Y

In consideration of the sum of Ten Dollars ($10.00) paid by

BIRMINGHAM REALTY COMPANY, an Alabama corporation

hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by  Winn-Dixie Montgomery, Inc., a corporation organized and existing under the laws of the State of Kentucky and qualified to transact business in the State of Alabama hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the attached and foregoing lease agreement dated _September 1, 1993_ , covering certain premises located   at the northeast corner of Highway #31 and Highway #119 in the City of Pelham, County of Shelby, State of Alabama

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this

_1st_ day of _September_ , 19 _93_ .

Signed, sealed and delivered
in the presence of:

WINN-DIXIE STORES, INC.

By _____
Its                      President

Attest: _____
Its                      Secretary

(CORPORATE SEAL)

GUARANTOR

STATE OF *Alabama* )

COUNTY OF *Jefferson* )

I, *Meador Scit Stone*, a Notary Public in and for said
County, in said State, hereby certify that *Stephen W. Stone*,
whose name as *Sr. V.P* of BIRMINGHAM REALTY COMPANY, an
Alabama corporation, is signed to the foregoing conveyance, and
who is known to me, acknowledged before me on this day that,
being informed of the contents of the conveyance, he, as such
*Sr. V.P* and with full authority, executed the same
voluntarily for and as the act of said corporation.

GIVEN under my hand and seal of office this *30th* day of
*August*, 1993.

                                        *Meador Scit Stone*
                                        Notary Public, State and County
                                        aforesaid.
                                        My Commission Expires: _____

                                        MY COMMISSION EXPIRES OCTOBER 12, 1994

STATE OF FLORIDA )
                      )
COUNTY OF DUVAL )

I, <u>Laura E. Baughman</u>, a Notary Public in and
for said County, in said State, hereby certify that
<u>James Kufeldt</u>, whose name as Vice President of
WINN-DIXIE MONTGOMERY, INC., an Kentucky corporation qualified to
transact business in Alabama, is signed to the foregoing
conveyance, and who is known to me, acknowledge before me on this
day that, being informed of the contents of the conveyance, he,
as such _____ Vice President and with full authority, executed
the same voluntarily on the day the same bears date.

Given under my hand and official seal this *1st* day of
*September*, 1993.

                                     *Laura E. Baughman*
                                     NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____
    (NOTARIAL SEAL)

                    LAURA E. BAUGHMAN
                    My Comm. Exp. July 17, 1994
                    Comm. No. CC 021236

STATE OF *Florida* )
                )
COUNTY OF *Duval* )

      I, __Laura E. Baughman__, a Notary Public in and for said County, in said State, hereby certify that __James Kufeldt__, whose name as President of WINN-DIXIE STORES, INC., a Florida corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such President and with full authority, executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal this __1st__ day of __September__, 1993.



(NOTARIAL SEAL)
LAURA E. BAUGHMAN
My Comm. Exp. July 17, 1994
Comm. No. CC 021236

*Laura E. Baughman*
Notary Public, State and County aforesaid.

My Commission Expires _____

"EXHIBIT B"

*LEGAL DESCRIPTION*
*WINN DIXIE PARCEL*

Lot 1, Oak Mountain Commerce Place, as recorded in Map Book 18, Page 58, Instrument # 1994-11733 in the Office of the Judge of Probate Shelby County, Alabama. Said lot being located in the S.W. 1/4 of the S.W. 1/4 of Section 31, Township 19 South, Range 2 West, more particularly described as follows:  Commence at the Northwest corner of said 1/4 - 1/4 Section; thence in an easterly direction along the northerly line of said 1/4 - 1/4 Section, a distance of 514.26 feet to the Point of Beginning; thence 95 degrees, 55 minutes, 44 seconds right, in a southwesterly direction, a distance of 631.27 feet to the beginning of a curve to the right having a radius of 25.00 feet and a central angle of 90 degrees, 00 minutes, 00 seconds; thence in a Southwesterly direction along said curve a distance of 39.27 feet to end of said curve; thence in a Northwesterly direction along a line tangent to said curve a distance of 95.71 feet to the beginning of a curve to the right having a radius of 25.00 feet and a central angle of 82 degrees, 00 minutes, 06 seconds; thence in a northwesterly direction along said curve a distance of 35.78 feet to end of said curve; thence 180 degrees, 00 minutes, 00 seconds left in a Southerly direction a distance of 100.97 feet to the beginning of a curve having a radius of 25.00 feet and a central angle of 98 degrees, 00 minutes, 00 seconds; thence 180 degrees, 00 minutes, 00 seconds right to the tangent of said curve in a northeasterly direction along the arc of said curve to the right, a distance of 42.76 feet to end of said curve; thence in a Southeasterly direction along a line tangent to said curve, a distance of 816.65 feet to a point on the westerly right-of-way line of U.S. Highway 31 South; thence 90 degrees left, in a northeasterly direction along said right-of-way line, a distance of 385.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 200.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 190.00 feet; thence 90 degrees right, in an southeasterly direction, a distance of 200.00 feet to a point on the westerly right-of-way line of U.S. Highway 31 South; thence 90 degrees left, in a northeasterly direction along said right-of-way line, a distance of 37.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 250.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 142.04 feet to the northerly line of aforesaid 1/4 - 1/4 Section; thence 95 degrees, 55 minutes, 44 seconds left in a westerly direction along aforesaid 1/4 - 1/4 Section line a distance of 462.48 feet to the Point of Beginning.

4/15/94

These are corrected site plans
(w) north easement located.

Holding for W/D is approved;
then insert in lease file.

EXHIBIT "B"

Legal Descriptions of Property

A parcel of land located in the S.W. ¼ of the S.W. ¼ of Section 31, Township 19 South, Range 2 West, more particularly described as follows:  Commence at the Northwest corner of said ¼-¼ Section; thence in an easterly direction along the northerly line of said ¼-¼ Section, a distance of 514.26 feet to the Point of Beginning; thence 95 degrees, 55 minutes, 44 seconds right, in a southwesterly direction, a distance of 706.27 feet; thence 90 degrees left, in a southeasterly direction, a distance of 710.00 feet to a point on the westerly right-of-way line of U.S. Highway 31 South; thence 90 degrees left, in a northerly direction along said right-of-way  line, a distance of 422.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 200.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 190.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 50.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 142.04 feet to the northerly line of aforesaid ¼-¼ section; thence 84 degrees, 04 minutes, 16 seconds left in a westerly direction along aforesaid ¼-¼ section line a distance of 462.48 feet to the Point of Beginning.

SEE FILE FOR

EXHIBIT

( PLOT PLAN )

## SUPPLEMENTAL LEASE AGREEMENT

THIS SUPPLEMENTAL LEASE AGREEMENT made this _16th_ day of _August_ , 1994, by and between **BIRMINGHAM REALTY COMPANY, an Alabama corporation**, (Landlord"), and **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation qualified to transact business in the state of Alabama, ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## W I T N E S S E T H :

WHEREAS, by Lease Agreement dated September 1, 1993, Landlord did lease and demise unto Tenant certain premises located in Oak Mountain Marketplace at the northwest corner of Highway #31 and Highway #119, in the City of Pelham, Shelby County, Alabama, for a term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and upon such other terms and conditions as are set forth herein, a Short Form of said Lease being recorded in the Office of the Judge of Probate of Shelby County, Alabama; and

WHEREAS, Tenant has now opened for business in the demised premises and the parties desire to fix the commencement date of said Lease as hereinafter set forth; and

NOW, THEREFORE, in consideration of the premises and other good and valuable considerations in hand paid by Tenant to Landlord, it is mutually agreed as follows:

1.    The commencement date for the term of the above-described Lease, dated September 1, 1993, is fixed as of June 15, 1994, and the expiration of the initial term of twenty (20) years demised therein shall be midnight June 14, 2014.

2.    All covenants, terms and conditions of the above-described lease not modified or amended by this Supplemental Lease Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed

APPROVED
AS TO FORM
Division Manager
Legal Dept.n:\wp\win\docs\sla\547.sla
Winn-Dixie Stores/94
Inc.

This instrument was prepared by
P. Christopher Wrenn, Attorney-
at-Law, whose address is 5050
Edgewood Court, Jacksonville,
Florida 32205.

as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

BIRMINGHAM REALTY COMPANY, an
Alabama corporation

By _____
Its                              Vice President

Attest _____
Its                              Asst. Secretary

_____
As to Landlord

(CORPORATE SEAL)

LANDLORD


WINN-DIXIE MONTGOMERY, INC., a
Kentucky corporation qualified to do business
in the State of Alabama

By _____
Its                              Vice President

Attest _____
Its                              Secretary

_____
As to Winn-Dixie

(CORPORATE SEAL)

TENANT

2

**ACKNOWLEDGEMENTS:**

STATE OF _ALABAMA_

COUNTY OF _Jefferson)_

I, _Coffee Colvin_, a Notary Public in and for said County, in said State, hereby certify that _Russell R. Cunningham III_, whose name as ____ President of **BIRMINGHAM REALTY COMPANY**, an Alabama corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such ____ President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _10th_ day of _August_, 1994.

_Coffee Colvin_
NOTARY PUBLIC

(NOTARIAL SEAL)                    MY COMMISSION EXPIRES: _8/13/94_


STATE OF FLORIDA

COUNTY OF DUVAL

I, _Rebecca L. Sawyer_, a Notary Public in and for said County, in said State, hereby certify that _R. P. McCook_, whose name as Vice President of **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _23_ day of _August_, 1994.

_Rebecca L. Sawyer_
NOTARY PUBLIC

(NOTARIAL SEAL)                    MY COMMISSION EXPIRES: _6-2-98_

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310

FIRST AMENDMENT TO LEASE
AND
SHORT FORM LEASE

THIS FIRST AMENDMENT TO LEASE AND SHORT FORM LEASE made this 19th day of _August_____, 1994, by and between **BIRMINGHAM REALTY COMPANY, an Alabama corporation,** (Landlord"), and **WINN-DIXIE MONTGOMERY, INC.,** a Kentucky corporation qualified to transact business in the state of Alabama, ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

W I T N E S S E T H :

WHEREAS, by Lease Agreement dated September 1, 1993, Landlord did lease and demise unto Tenant certain premises located in Oak Mountain Marketplace at the northwest corner of Highway #31 and Highway #119, in the City of Pelham, Shelby County, Alabama, for a term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and upon such other terms and conditions as are set forth herein, a Short Form of said Lease being recorded in the Office of the Judge of Probate of Shelby County, Alabama; and

WHEREAS, Landlord and Tenant desire to modify the legal description of the shopping center to include a certain 37 foot wide accessway to the shopping center from U.S. Highway #31; and

WHEREAS, Landlord and Tenant desire to modify Article 29 of said Lease; and

WHEREAS, Landlord and Tenant desire to memorialize their intention that Tenant be a necessary party to any modification of Section 4.2(i) and Section 4.2(xxiii) of the Declaration of Protective Covenants executed by Birmingham Realty Company as of April 12, 1994 and recorded in the Office of the Judge of Probate of Shelby County, Alabama, affecting the following described property:

> Lots 2, 3, 4, and 4-A, Oak Mountain Commerce Place, as recorded in Map Book 18, Page 58, in the Office of the Judge of Probate of Shelby County, Alabama.

NOW, THEREFORE, in consideration of the premises and other good and valuable considerations in hand paid by Tenant to Landlord, it is mutually agreed as follows:

1.     Exhibit "B-1" attached hereto is hereby substituted in the place of Exhibit "A" to the Short Form Lease and Exhibit "B" to the Lease.

APPROVED
AS TO FORM
Division Manager
Legal Dept.
Winn-Dixie Sto. Inc.
h:\wp\win\docs\amend\547.amd

This instrument was prepared by P. Christopher Wrenn, Attorney-at-Law, whose address is 5050 Edgewood Court, Jacksonville, Florida 32205.

2.    Article 29 of the Lease is hereby deleted in its entirety and is replaced with the following:

> "29.    The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any first mortgage (which term shall include all security instruments), at such first mortgagee's discretion, that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form reasonably acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder."

3.    Landlord, its successors and/or assigns, shall not amend or modify Section 4.2(i) or Section 4.2 (xxiii) of the certain Declaration of Protective Covenants made by Landlord on April 12, 1994 and recorded in the Office of the Judge of Probate of Shelby County, Alabama, affecting the following described property:

> Lots 2, 3, 4, and 4-A, Oak Mountain Commerce Place, as recorded in Map Book 18, Page 58, in the Office of the Judge of Probate of Shelby County, Alabama.

4.    All covenants, terms and conditions of the above-described Lease and Short Form Lease not modified or amended by this Amendment to Lease and Short Form Lease are hereby ratified and confirmed.

**IN WITNESS WHEREOF,** the undersigned have caused this instrument to be executed



as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

BIRMINGHAM REALTY COMPANY, an
Alabama corporation

By _____
   Its                    ~~Vice~~ President

Attest _____
   Its              ~~Asst.~~ Secretary

As to Landlord

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE MONTGOMERY, INC., a
Kentucky corporation qualified to do business
in the State of Alabama

By _____
   Its                    Vice President

Attest _____
   Its                    Secretary

As to Winn-Dixie

(CORPORATE SEAL)

TENANT

**ACKNOWLEDGEMENTS:**

STATE OF _Alabama_

COUNTY OF _Jefferson_

I, _R Coffee Colvin_ , a Notary Public in and for said County, in said State, hereby certify that _Russel M. Cunningham III_ , whose name as ____ President of **BIRMINGHAM REALTY COMPANY**, an Alabama corporation., is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such ____ President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _19_ day of _August_ , 1994.

_R. Coffee Colvin_
NOTARY PUBLIC

(NOTARIAL SEAL)                          MY COMMISSION EXPIRES: _8/15/95_


STATE OF FLORIDA

COUNTY OF DUVAL

I, _Rebecca L. Sawyer_ , a Notary Public in and for said County, in said State, hereby certify that _R. P. McCook_ , whose name as Vice President of **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _23_ day of _August_ , 1994.

_Rebecca L. Sawyer_
NOTARY PUBLIC

(NOTARIAL SEAL)                          MY COMMISSION EXPIRES: _6-2-98_

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372810

4

EXHIBIT "B-1"

## OAK MOUNTAIN MARKETPLACE
### LEGAL DESCRIPTION

Lot 1, Oak Mountain Commerce Place, as recorded in Map Book 18, Page 58, Instrument # 1994-11733 in the Office of the Judge of Probate Shelby County, Alabama. Said lot being located in the S.W. 1/4 of the S.W. 1/4 of Section 31, Township 19 South, Range 2 West, more particularly described as follows:  Commence at the Northwest corner of said 1/4 - 1/4 Section; thence in an easterly direction along the northerly line of said 1/4 - 1/4 Section, a distance of 514.26 feet to the Point of Beginning; thence 95 degrees, 55 minutes, 44 seconds right, in a southwesterly direction, a distance of 631.27 feet to the beginning of a curve to the right having a radius of 25.00 feet and a central angle of 90 degrees, 00 minutes, 00 seconds; thence in a Southwesterly direction along said curve a distance of 39.27 feet to end of said curve; thence in a Northwesterly direction along a line tangent to said curve a distance of 95.71 feet to the beginning of a curve to the right having a radius of 25.00 feet and a central angle of 82 degrees, 00 minutes, 06 seconds; thence in a northwesterly direction along said curve a distance of 35.78 feet to end of said curve; thence 180 degrees, 00 minutes, 00 seconds left in a Southerly direction a distance of 100.97 feet to the beginning of a curve having a radius of 25.00 feet and a central angle of 98 degrees, 00 minutes, 00 seconds; thence 180 degrees, 00 minutes, 00 seconds right to the tangent of said curve in a northeasterly direction along the arc of said curve to the right, a distance of 42.76 feet to end of said curve; thence in a Southeasterly direction along a line tangent to said curve, a distance of 816.65 feet to a point on the westerly right-of-way line of U.S. Highway 31 South; thence 90 degrees left, in a northeasterly direction along said right-of-way line, a distance of 385.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 200.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 190.00 feet; thence 90 degrees right, in an southeasterly direction, a distance of 200.00 feet to a point on the westerly right-of-way line of U.S. Highway 31 South; thence 90 degrees left, in a northeasterly direction along said right-of-way line, a distance of 37.00 feet; thence 90 degrees left, in a northwesterly direction, a distance of 250.00 feet; thence 90 degrees right, in a northeasterly direction, a distance of 142.04 feet to the northerly line of aforesaid 1/4 - 1/4 Section; thence 95 degrees, 55 minutes, 44 seconds left in a westerly direction along aforesaid 1/4 - 1/4 Section line a distance of 462.48 feet to the Point of Beginning.