# EXHIBIT B

DOCSBHM\1417480\1\

# LEASE

THIS LEASE, made this ___30___ day of _____March_____, 19_94_

between ___FS PARTNERSHIP, LTD., an Alabama limited partnership___

("Landlord") and ___WINN-DIXIE MONTGOMERY, INC.___, a corporation organized and existing

under the laws of the State of Kentucky, and qualified to transact business in the State of Alabama

("Tenant"); which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires,

singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the

term hereinafter specified, the following described premises:

That certain store building, approximately ___220___ feet in width by ___200___ feet in

depth, together with a vestibule entry approximately 82 feet in width by 12 feet in depth, together

with rear additions, with concrete pads for coolers, freezers and compactor or baler at the rear,

and the land on which the same shall stand (hereinafter collectively called "demised premises"),

which store building and related improvements are to be constructed by the Landlord according

to plans and specifications to be approved by the parties as herein provided, and shall be in the

location and of the dimensions as outlined in red on the Plot Plan entitled "A Proposed Shopping

Center: The Village at Moody I-20 and U.S. 411, Moody, Alabama," dated January 28, 1994,

last revised March 14, 1994, attached hereto marked Exhibit "A" and by this reference made a

part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as The Village at Moody Shopping Center ("shopping center"), located near

the northeasterly corner of the intersection of Interstate Highway I-20 and U.S. Highway 411,

in the City of Moody, County of St. Clair, State of Alabama, the legal description of the

shopping center being set forth on Exhibit "B" attached hereto and by this reference made a part

hereof.

APPROVED
AS TO FORM

Division Manager

Legal Dept.

Winn-Dixie   Moody, se
3/21/94

This Instrument was prepared by
P. Christopher Wrenn, Attorney-
at-Law, whose address is 5050
Edgewood Court, Jacksonville,
Florida 32205.



EXHIBIT "B"

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of <u>Twenty</u> (20) years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1.    The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of <u>Three Hundred Eight Thousand and No/100</u> Dollars ($308,000.00) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of <u>Twenty-Five Thousand Six Hundred Sixty-Six and 67/100</u> Dollars ($25,666.67 ) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which __one__ per cent (_1_%) of gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a.    The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones (this exclusion is based upon typical supermarket practices as of the date of this Lease, with only incidental vending machine sales, and shall be inapplicable to such sales in excess of one percent (1%) of Tenant's gross sales in any lease year); (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b.    The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the

2

Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

Notwithstanding the foregoing, Landlord may reveal Tenant's sales figures to its bona fide mortgagees and prospective mortgagees and purchasers of the demised premises who agree to hold such information as confidential.

**USE**   2.   The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses) , not restricted under Article 7 hereof; provided, however, except as a supermarket, the demised premises shall not be used, or assigned, or subleased under the terms of Article 26 hereof, for any primary use or business which shall be in direct competition with the primary use or business engaged in by any other tenant in the shopping center to whom Landlord has granted a right of exclusive use, to which Tenant has consented in this Lease or otherwise in writing, or a replacement or successor tenant for such exclusive use. Tenant shall have the non-exclusive right to operate a drug store or pharmacy.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

Tenant covenants to open as provided for hereinafter, and to operate a food supermarket in the Demised Premises for a period of not less than six (6) months after such opening.

Tenant shall not generate, handle, use, store, treat, discharge, release or dispose of any Hazardous Material at the demised premises except in full compliance with all Environmental Laws (defined below).

For purposes of this Section, the term "Hazardous Material" shall mean all hazardous, toxic or dangerous waste, substance or material defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act of the United States Congress, or in any other law, regulation or order, now or hereafter in effect, of any governmental authority regulating or imposing liability or standards of conduct relating to, any hazardous, toxic or dangerous waste, substance or material, all of said laws, regulations and orders being referred to herein as "Environmental Laws".

**CONSTRUCTION OF SHOPPING CENTER**   3.   The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities, landscaping, exterior lighting facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as substantially shown on Exhibit "A" and shall not be substantially changed without the written consent of the Tenant unless such change results from a taking by the exercise of the right of eminent domain, in which event the provisions of Article 20 shall

3

apply. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

Tenant shall furnish, install and connect its own trade fixtures and its compactor (or baler) on concrete pads to be erected by Landlord.

The rentals reserved under Article I have been negotiated on the basis of Tenant's typical "Market Place" store as of November 22, 1993, as generally shown on the original guide plans for the Winn-Dixie Market Place currently under construction in Alabaster, Alabama by the same contractor which Landlord has employed to build the demised premises. It is understood and agreed that Tenant may require changes or refinements in such store design, but that all costs associated with such changes or refinements, including the net effect of any change orders under Landlord's contract, shall be borne by Tenant.

**COMPLETION DATE**

4.    Landlord covenants and agrees that the construction of the shopping center shall begin not later than May 1, 1994, and shall be completed not later than November 1, 1994; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than May 1, 1995, (the "outside completion date"), this option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. The foregoing construction start date and completion dates are based upon the expectation of Landlord and Tenant that agreed-upon plans and specifications will be completed prior to April 1, 1994. If such plans and specifications are not completed by April 1, 1994, each of the foregoing dates shall be extended by the amount of time elapsing between April 1, 1994, and the date agreed-upon plans and specifications are completed. If construction of the shopping center has not commenced by September 1, 1994, this Lease may be cancelled by either party, and, thereafter, neither party shall be liable to the other under this Lease.

If pursuant to this Article Tenant shall cancel or terminate this Lease, then Landlord agrees to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of written notice of the terms and conditions thereof from Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the lease term provisions shall be the same as this Lease.

**COMMENCEMENT DATE**

5.    The Tenant shall open its store for business within sixty (60) days following performance of the following:

(a)    Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant,

4

at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b)    Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c)    All drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices shown on Exhibit "A" in or connecting the common areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    Construction of at least 280 lineal feet of store frontage and 16,800 sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A" (but may be left as shells with completed store fronts until leased);

(e)    The land described as "Future Development" on Exhibit "A" shall have been made subject to the use restrictions in accordance with Articles 7 and 28 hereof. The outparcels identified as Outparcel "X", Outparcel "Y," and Outparcel "Z," shall be restricted against building exceeding one story or 25 feet in height, excepting cupolas, weather vanes, and similar architectural adornments. A document containing these restrictions will be recorded prior to any liens or other encumbrances which could eliminate the provisions thereof through foreclosure. Said document shall provide that it shall not be modified, amended, or cancelled without the prior written consent of Tenant, so long as this Lease remains in effect.

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this Lease. However, this right to cancel this Lease shall automatically be revoked upon opening of the store by Winn-Dixie.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications. Tenant shall notify Landlord in writing of any defective work or materials as soon as practicable after Tenant's discovery of the same.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

**OTHER TENANTS**    **6.**    **INTENTIONALLY DELETED**

**RETAIL SERVICE STORES ONLY**    7.    Without the prior written consent of Tenant and Landlord herein only retail and/or service stores shall be allowed to operate in the shopping center, (including the demised premises), or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theatre (either motion or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted.

Notwithstanding the foregoing, up to 7,200 feet of retail space may be used for business or professional offices of a type typically found in retail shopping centers, such as, but not limited to, travel agencies, real estate sales and rental (but not schools), tax

5

preparation and similar office service centers and businesses, with no single office use in excess of 2,400 square feet, provided, however, that no business or professional offices may be within sixty (60) feet of the demised premises. No restaurant facility, other than a "health food" store, an ice cream shop, a frozen yogurt store, a sandwich shop or a pizza shop or a restaurant with seating capacity not exceeding 32 persons (none of which may exceed 2,000 square feet), may be operated in the shopping center.

**PARKING AND COMMON AREAS**

8.    Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services, so long as such use does not unreasonably interfere with pedestrian traffic upon such sidewalks. Likewise, other tenants of the shopping center may from time to time use the exterior surfaces of their buildings and the sidewalks immediately in front of their premises for the display and sale of merchandise and services, so long as such use does not unreasonably interfere with pedestrian traffic upon such sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a)    a minimum ratio of at least 5.4 (decreasing to 4.6 after Tenant's expansion) automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the shopping center, and

(b)    facilities for convenient parking of at least 373 (decreasing to 355 after Tenant's expansion) automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and one hour later, but in any event not later than 10:00 p.m., provided that such area will be lighted upon Tenant's request, but at its expense prorated on a square footage basis with other tenants, if any, open for business during such extended hours. The expense shall be based upon actual billings, if available, or upon the kilowatt usage of the fixtures times the hours of use times the applicable utility rate. Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

**SERVICE AREA**

9.    Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

**UTILITIES**

10.    The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities.  Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges provided for in the plans and specifications incident to providing access to any utility.

**TENANT'S**
**REPAIRS**

11.    Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Tenant's repair responsibilities shall include: the heating and air-conditioning system, interior floor surfacing, the plate glass (except damage caused by settling or faulty construction or covered under Landlord's casualty insurance as required under Article 17 hereof), automatic doors, the automatic sprinkler system (and central alarm system therefor if required by governmental authority) the plumbing (from, but not including, the water meter and point of discharge into the sewer main), and wiring (from the various outlets in the store to and including the main panel).  It is understood and agreed that Tenant's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

**LANDLORD'S**
**REPAIRS**

12.    The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the plumbing and wiring, (except as described in Article 11), of the store building in good and condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises.  If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same promptly upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

Landlord's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

Notwithstanding the other provisions in this Lease, Landlord shall not be responsible to Tenant for damages resulting from Landlord's failure to make repairs to Tenant's store building unless Landlord has received written notice of the requirements for repair and has failed to act with reasonable promptness to remedy the conditions described in said notice.  The foregoing provision shall not apply to Landlord's common areas and parking area repair responsibilities, and shall not in any way diminish Tenant's right to make emergency repairs.

Tenant shall make reasonable efforts to notify Landlord of the need to make any emergency repairs before proceeding with them.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs.  Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to

7

the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated, except those necessary because of Tenant's expansion or Tenant's alteration of the demised premises, or necessitated because of the use of the demised premises for a purpose other than as a supermarket.

**SIGNS**

13.    Tenant may, with the prior approval of Landlord, which will not be unreasonably withheld, place, erect and maintain any signs on the walls (but no signs painted on the exterior walls) and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord shall construct and maintain the shopping center pylon sign in the location as shown on Exhibit "A", and Tenant shall be permitted to affix thereon its electrically illuminated sign panels advertising its business, to be installed by Landlord and connected to power outlets to be installed by Landlord running from Tenant's building for Tenant's sign panels. Tenant shall maintain its own sign panels, and Landlord shall maintain the sign structure as a part of common area expense under Article 31 hereof.

**FIXTURES AND ALTERATIONS**

14.    The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, interior additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

Tenant shall cause any mechanics' or materialmens' liens incurred as a result of its work to be promptly discharged, and hereby agrees to indemnify and hold harmless landlord from any expense occasioned thereby.

**INDEMNIFI-CATION**

15.    Unless caused by the sole negligence or wilful misconduct of Landlord, its agents or contractors, Tenant agrees to indemnify and save harmless the Landlord from any claim or loss, including costs of investigation, court costs and attorney's fees, by reason of an accident or damage to any person or property happening in the demised premises or by reason of the negligence or wilful misconduct of Tenant, its agents or contractors. Likewise, unless caused by the sole negligence or wilful misconduct of Tenant, its agents or contractors, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorney's fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or

8

termination shall be furnished to Tenant.

Landlord may utilize so-called "umbrella" policies in performance of its obligations herein, provided the cost of Tenant is not increased thereby.

Tenant is a self-insurer, as a wholly-owned subsidiary of Winn-Dixie Stores, Inc., ("Guarantor"). So long as Tenant's or Guarantor's net worth exceeds $100,000,000.00, Tenant shall not be required to furnish insurance coverage. If both Tenant's and Guarantor's net worth is less than $100,000,000.00, Tenant shall furnish such insurance in the form and limits required herein of Landlord. If Tenant self-insures, Tenant agrees to furnish from time to time, upon Landlord's request, a letter setting forth the then existing excess liability and self-insured retention limits and a copy of Guarantor's latest annual statement. Any sublessee or assignee not affiliated with Tenant will be required to carry insurance in such limits, unless otherwise agreed in writing by Landlord.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's comprehensive general liability insurance above described. Tenant shall be responsible for its prorata share of such premiums. Tenant's prorata share of the premium shall be equal to the sum which the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center. Tenant's prorata share shall be reduced by any available abatements, discounts or refunds actually received by Landlord. Landlord shall use its best efforts to obtain liability coverage at competitive rates. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premium no later than six (6) months after its due date. Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the declaration page of such insurance policy and such other information as Tenant may reasonably request.

**CLEANLINESS**      16.    Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**FIRE**      17.    In the event that the leased premises be partially damaged or totally destroyed by fire, casualty or other disaster, the term of this lease shall not be affected thereby except as hereinafter provided. In the event that the building on the leased premises is damaged or destroyed by fire, casualty or other disaster, Landlord shall promptly cause the same to be restored to the prior existing condition, due allowance, however, shall be made for a reasonable time necessary for Landlord to adjust the loss with the insurance companies insuring the leased premises at the time of the happening of the fire or other casualty, and due allowances shall be made for delay occasioned by strikes, walkouts and conditions beyond the control of Landlord. In the event of total destruction of the leased premises and Landlord fails to completely restore and rebuild same within one (1) year after such fire, casualty or other disaster and rebuild, then in that event, Tenant may, at its option, within sixty (60) days of said one (1) year period, elect to terminate and cancel this Lease, in which event this Lease shall, upon written notice from the Tenant to Landlord, be terminated and cancelled and neither party shall thereafter have any further obligation with respect to the other. Should the leased premises or a portion thereof be rendered untenantable by reason of damage of destruction thereof by fire, casualty or other disaster during the term of this Lease, as provided in this section, the rent shall abate in proportion to the area of the leased premises rendered untenantable from the date of the happening of the fire or other casualty or disaster upon the date of the restoration of the premises; however, no rent shall accrue for any portion of the premises unless Tenant is able to conduct its usual business on that portion of the premises which remains tenantable.

If the Tenant shall have paid any rent for a period beyond the date of the happening

9

of the fire or other casualty or other disaster, Tenant shall be entitled to a proportionate refund.

If, however, such damage occurs during the last two (2) years of the original term hereof and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building as certified to by a reputable registered architect selected by Landlord and Tenant, Tenant shall have the right to terminate this Lease upon written notice to Landlord within ten (10) days after the rendition of certification by such architect, and Landlord shall the right to terminate this Lease upon written notice to the Tenant given within forty (40) days after the rendition of such certificate, unless Tenant shall elect to exercise its first option to renew this Lease for an additional period of five (5) years, in which event the Landlord shall have no option to terminate this Lease and shall be obligated to restore the premises with due diligence.  Should Tenant have paid any rent beyond the date of termination, as in this section provided, Tenant shall be entitled to a proportionate refund.

In the event the damage occurs within the last two (2) years of the first renewal term and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building, as certified aforesaid, either party shall have the right to terminate this Lease in the manner aforesaid, unless Tenant shall elect to renew this Lease for the next renewal period, in which event the Landlord shall have no option to terminate this Lease and shall be obligated to restore the premises as aforesaid.  In the event the damage occurs in the last two (2) years of the second renewal term and the cost of restoration amounts to more than one-third (1/3) of the replacement value of the building, as certified aforesaid, either party shall have the right to terminate this Lease upon written notice to the other, given within the times set forth above.

Landlord agrees to carry fire and extended coverage and vandalism and malicious mischief insurance on Tenant's buildings and insurable improvements in the common areas within the shopping center in the amount of not less than the full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

Landlord shall have no obligation to repair or restore any damage or destruction resulting from any cause not covered by a standard fire and extended coverage insurance policy.  In addition, Landlord shall have no obligation to restore or rebuild the demised premises or any portion of the shopping center unless Tenant or its assignee or subtenant is then operating a business within the demised premises permitted by Article 2 of this Lease, and unless Tenant intends to repair, restore or replace the Tenant Improvements and Equipment within the demised premises upon complete restoration by Landlord, and intends to restock and restaff the store and open for business as soon as practicable following the restoration of such damage.

Tenant hereby expressly waives any and all claims against Landlord for loss or damage to Tenant's merchandise, fixtures and equipment due to fire, explosion, windstorm or other casualty normally covered by standard fire and extended coverage insurance policies, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of the Landlord, its agents, servants or employees.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental Tenant's prorata share of the amount of the premium for Landlord's fire and extended coverage insurance carried by Landlord for the shopping center.  Tenant's prorata share shall be equal to the sum which bears the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center which are insured under such policy or policies carried by Landlord.  Tenant's prorata share shall be reduced by any available abatements, discounts or refunds actually received by Landlord.  Landlord shall use its best efforts to obtain fire and extended coverage insurance from companies acceptable to Landlord at the competitive rates.  Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums.  Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice from such insurance premium no later than six (6) months after it is due.  Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the applicable insurance policy, including the declaration page of such

10

Insurance policy and such other information as Tenant may reasonably request.

**QUIET ENJOYMENT**

18.    The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created except for current taxes, not yet payable, leases with other tenants (which do not conflict with Tenant's right hereunder), and easements and restrictions reviewed and approved in writing by Tenant (which Landlord agrees not to amend or grant consents under without Tenant's prior written consent); that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

Tenant's option to so terminate shall become effective, however, only if Tenant is actually prevented from conducting its business as permitted herein, and such option shall not arise if the property may be used as permitted herein by reason of a nonconforming use.

**TAXES AND LIENS**

19.    All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

Tenant agrees to pay taxes assessed upon its inventory, fixtures and other property, provided, however, that Tenant may object to or appeal such assessment when, in Tenant's sole discretion, it deems necessary or prudent.

**CONDEMNATION**

20.    If more than two percent (2%) of the demised premises or more than twenty percent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, exercised not later than thirty (30) days after the effective date of such taking, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

Whether or not this lease shall be terminated, the entire compensation award therefor, both leasehold and reversion, shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest to any such award, Tenant shall, however, be entitled to claim, prove and receive (but not from Landlord) such awards as may be allowed for

leasehold improvements, fixtures and other equipment installed by it, moving, business interruption and similar awards but only if, and to the extent that such awards shall be in addition to the award for the land and building and other improvements (or portions thereof) constituting the demised premises.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ten percent (10%) or reduce the number of cars which may be conveniently parked to less than 335 , (or to 319, if such taking occurs subsequent to Tenant's expansion), the Tenant may, at its option exercised not later than thirty (30) days after the effective date of such taking, terminate this lease and shall be liable for rent only up to the time of such taking.

Tenant's option to terminate hereunder, however, shall not arise if, within one hundred eighty (180) days after possession is required by the condemning authority, Landlord shall provide equivalent substitute parking spaces satisfactory to Tenant and located on property contiguous to the initial parking areas and situated within comparable proximity to Tenant's building, thereby fulfilling the minimum parking requirements hereunder.

**DEFAULT**          21.    In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and use reasonable efforts to relet the premises at the best possible rent obtainable, and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting, after Landlord first deducts its reasonable expenses incurred in reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

Landlord's remedies and Tenant's remedies as set forth in this lease, are not exclusive, and Landlord and Tenant reserve all remedies available at law or in equity.

**BANKRUPTCY**       22.    The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**       23.    Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for

damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

In the event Tenant commences fixing or performing other tenant work in the demised premises simultaneously with the Landlord performing its work required under this Lease, Landlord shall not be liable for any injury to persons or damage to property of Tenant, Tenant's employees, licensees or invitees, from any cause whatsoever occurring during such period as a result of Tenant's negligence upon or about the demised premises. Tenant will indemnify and save Landlord harmless from any and all liability and claims arising out or connected with such injury or damage.  Notwithstanding the foregoing, Landlord shall not be indemnified from any injury or damage resulting from the negligence of Landlord.

**NOTICES**

24.    All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at:

TWO RIVERCHASE OFFICE PLAZA
Suite 206
Birmingham, Alabama  35244

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at:

WINN-DIXIE MONTGOMERY, INC.
Post Office Box 2029
Montgomery, Alabama  36102-2029
Attention:  Real Estate Manager

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

25.    The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state.  Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

Notwithstanding the foregoing, in the event Tenant has not exercised on option to renew the term of this Lease or if Tenant does not have any remaining options to extend the term of this Lease and Landlord notifies Tenant at least ninety (90) days prior to the expiration of the term of this Lease that Landlord desires Tenant to vacate the demised premises on the date this Lease terminates and Tenant fails to do so, then Tenant shall be liable to Landlord for damages which Landlord suffers by reason of Tenant's failure to vacate, including, but not limited to, loss of rents, which Landlord may have received by reason of Tenant's failure to vacate.

13

**ASSIGNMENT AND SUBLEASING**

**26.**    Tenant may, without the consent of Landlord, vacate or cease doing business in the demised premises at any time. Tenant, without the consent of Landlord, may assign this Lease or sublease the demised premises at any time for use as a retail food store, commonly referred to as a supermarket, and, subject to the stipulations hereinafter set forth in subsections (a), (b) and (c), Tenant may also, without the consent of Landlord, assign this Lease or sublease the demised premises for use other than as a retail food store, subject to the provisions of Article 2 of this Lease.

a)    In the event Tenant shall voluntarily vacate the entire demised premises or cease selling merchandise for in excess of a period of six (6) months while the demised premises can be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord shall have the continuing option (unless Tenant has reoccupied the premises) to terminate and cancel this Lease commencing on the day after the premises have been vacant for six (6) months by written notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of the notice letter. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the demised premises to a third party. Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 26.

b)    In the event Tenant desires to assign this Lease or to sublease the demised premises for the conduct of some business other than a retail food store, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to cancel or terminate this Lease by giving written notice to Tenant of such election within such period. In the event Landlord elects to cancel this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such period in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the demised premises. Upon surrender of possession of the premises by Tenant, this Lease shall be deemed terminated and canceled without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease the demised premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to cancel this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to cancel this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties.

c)    Anything else in this Lease to the contrary notwithstanding, in the event Tenant (i) closes its store for business, (except for temporary cessation reasons beyond Tenant's reasonable control or for repairs or for remodeling), or (ii) sublets the demised premises or assigns this Lease (except to a parent or affiliated or subsidiary corporation or corporation to which Tenant sells all of its business in the State), then the rental provided in Article 1, from and after the first day said store is closed, shall be an annual fixed sum which is the average of total rent due (including both minimum guaranteed rental and percentage rental) for the two most recent complete years of Tenant, immediately preceding such closing, subletting or assignment, payable in equal monthly installments.

**EXTENSIONS**

**27.**    It is further agreed that Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this lease, each extension to be for a period of five (5) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least six (6) months before the expiration of the initial term, and if extended, at least six (6) months before the expiration of such extended term, stating the intention of

the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

**EXCLUSIVE SUPERMARKET**  28.    Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a food supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a food supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores and a drug store in the "drug store" space, only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center. Only Tenant may operate a seafood department or seafood market in the shopping center.

Notwithstanding any provision contained herein to the contrary, Tenant acknowledges and agrees that Landlord may enter into a lease with one drug store either in the "drug store" space or on Outparcels X, Y, or Z, but such drug store may not sell fresh or frozen meat, fish, vegetables or fruit ("perishables").

Notwithstanding the foregoing, Landlord may also have an ice cream shop, a yogurt store, a "health foods" store not selling perishables and not exceeding 2,000 square feet, a sandwich shop or pizza shop.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

**SUBORDINATE**  29.    The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects

continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**NOTICE TO LENDER**

30.    Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE**

31.    Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. Landlord will also maintain in good condition and operation the detention areas, which are not part of the shopping center, but which Landlord covenants it will have the right to maintain and operate. Such detention areas are shown on Exhibit "A" and described in Exhibit "B." If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

Tenant shall pay to Landlord Tenant's prorata share of all the foregoing costs, computed in the proportion which the square footage of Tenant's store building and vestibule entry area (initially 44,932 square feet) bears to the total square footage of all buildings (including vestibule areas and additional floor levels) existing in the shopping center from time to time.

Tenant's payments with respect to common area maintenance service costs shall be paid monthly in advance based on an estimate furnished Tenant by Landlord. For the first year of the lease term, such payments shall be $916.67 a month. Such payments shall be prorated for fractional years and months occurring at the commencement and end of the term of the lease. Within sixty (60) days following the end of each calendar year, Landlord shall submit to Tenant an itemized listing of all common area expenses, and appropriate adjustments for overpayment or underpayment of such costs shall be made promptly thereafter. Should Landlord not make reimbursement to Tenant for any overpayment within ninety (90) days at the end of each calendar year, Tenant shall have the right to deduct such sum from rentals due under this lease.

Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Rental insurance premiums and shopping center management fees and administrative costs are examples of expenses not reasonably connected to necessary maintenance and repair. In the event that Landlord wishes to make capital acquisitions of goods to provide such services, such as lawn mowers or the like, the equipment shall be used only at the shopping center under this Lease or proper records showing the amount of use of such equipment chargeable to the shopping center under the Lease shall be maintained, and only that prorata share charged against common area maintenance of the shopping center. The charge therefor shall also be less any depreciation or similar tax benefits to Landlord, and shall include a credit for any recovery of the cost thereof upon disposition of the equipment.

Notwithstanding Tenant's obligation to pay a portion of Landlord's common area maintenance expenses hereunder, Tenant shall in no way be responsible for cost of testing, removing, abating, or otherwise dealing with hazardous substances or other violations of environmental laws, ordinances, rules, regulations or written policies now or hereafter existing, including, but not limited to, the Toxic Substance Control Act, Comprehensive Environmental Response Compensation and Liability Act, Clean Water Act, Rivers and Harbors Act of 1989, Clean Air Act or the like, except for those caused by the intentional or negligent activities of Tenant, its employees, officers an agents.

**BENEFIT**

32.    This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD**

33.    In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

If Landlord assigns this Lease (except as security for a loan), then Landlord shall thereupon be released from all liability and obligations of Landlord hereunder arising after such assignment.

**SHORT FORM LEASE**

34.    The Landlord agrees that at any time on request and at the cost of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**

35.    The marginal titles appearing in this lease are for reference only and shall not be considered as part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**

36.    This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**REAL ESTATE TAXES**

37.    During the term of this Lease and any extensions, if the demised premises are separately assessed for real estate tax purposes, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises and a prorata share of the common areas. Tenant shall be responsible for its prorata share of such taxes for fractional years occurring at the commencement and expiration of the term of this Lease and any extensions.

If such taxes are not assessed separately, but are included within an assessment of the demised premises and others, the assessment shall be fairly apportioned to determine Tenant's prorata share. Tenant's prorata share shall be equal to the sum which bears the same ratio to the total assessment for ad valorem real estate taxes as the square footage of Tenant's store building bears the total quare footage of all store buildings (including additional floor levels) included within the assessment. Tenant's prorata share shall be reduced by any abatements, discounts or refunds. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements and an "as built" survey of the shopping center. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

17

Notwithstanding anything contained herein to the contrary, Tenant shall, in addition to paying its portion of the real estate taxes, also pay to Landlord any amount assessed against Landlord as a "gross receipts" or "rental tax" on the rent payable by Tenant to Landlord hereunder. Such payments shall be paid within fifteen (15) days after Landlord submits to Tenant an invoice therefore.

**OPTION FOR EXPANSION**

38.    Provided a supermarket is operating in the demised premises, and provided Tenant is not in default in the payment of rentals beyond any time to cure, Tenant is granted the option and privilege at any time during the term of this Lease or any extensions thereof, of enlarging its store building by incorporating the area on its northerly side with an addition not exceeding sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised only at such times as the adjoining retail shop space in the enlargement area may be vacant, or on the fifth anniversary of the commencement date, and at five (5) year intervals thereafter (the "option date"). Landlord shall not lease such retail shop space to other tenants for any term which would expire subsequent to any option date. Tenant shall be entitled to exercise this option by giving notice in writing at least six (6) months prior to any option date. Thereafter, Landlord agrees to construct such addition for occupancy by Tenant in accordance with plans and specifications to be approved by the parties, with all due diligence following the vacation of the necessary area by any other tenant. The addition shall be of like quality of construction as Tenant's original building. In order to facilitate the expansion of Tenant's store building, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on the line which is the interior sidewalk line of Tenant's store building, and shall have a finish floor level, and roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's store building. Further, Landlord agrees that the wall of Tenant's store building adjoining the expansion areas shall be constructed with steel column supports equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building, and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

If, at the date of completion of any such building addition, fewer than ten (10) years of the term of this Lease remain, the term of this Lease shall be extended for the period of time necessary to provide a full ten (10) year term from that date. Thereafter, for the balance of the term, including extensions, the annual minimum guaranteed rental (and the base for computation of percentage rental) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the addition, or an amount equal to $7.00 per square foot of the enlarged area, or an amount equal to a computed percentage multiplied by the cost of such addition, such percentage being equal to four percent (4%) plus the current prime interest rate (as published by the Federal Reserve or in the Wall Street Journal or similar public source) at the time of the exercise of the option. At Tenant's request, the construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant. The final cost of the addition upon completion shall be certified by the general contractor performing the work. If the term of this Lease is extended to provide a full ten (10) year term, the provisions of the Lease shall remain in effect, and the option periods, if any, shall follow upon the end of the extended term. Rentals, as adjusted by reason of the addition, shall continue. Upon completion, the addition shall be a part of the demised premises, and all references to the demised premises contained in this Lease shall be construed to include both Tenant's store building and the addition.

Causing any addition to be constructed is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns. However, nothing contained in this Lease shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Article 38. Additionally, Landlord's obligation shall not limit Tenant's right to undertake and complete the addition at its own cost, as described later in this Article 38.

If Landlord, for any reason, fails or refuses to construct the building addition contemplated after Tenant has properly exercised its option, Tenant, as its sole remedy against Landlord, at its option and, at its own expense, shall have the right to construct the building addition of the size and quality set forth above. If Tenant constructs the addition,

18

Tenant agrees to cause any mechanics' liens incurred by and in connection with such addition to be promptly discharged. Tenant further agrees to indemnify and hold Landlord harmless from any expense occasioned by mechanics' liens. If, upon completion and occupancy of a building addition by Tenant, fewer than ten (10) years of the term of this Lease remain, the lease term shall be extended for a period of time necessary to provide a full ten (10) year term. For ten (10) years following the date of completion of the addition by Tenant, there shall be no change in the minimum guaranteed annual rental, and the base for calculation of percentage rental, if any, shall be increased by an amount equal to the greatest of the three (3) factors set forth in the second paragraph of this Article 38 (in addition to the adjustment for the replacement rentals). Upon expiration of ten (10) years following the date of completion of the addition, the base for calculation of percentage rental shall revert to the minimum annual guaranteed rental established in Article 1 of this Lease as adjusted for annual replacement rentals.

From the date of delivery by Landlord to Tenant of any rental space lying within Tenant's expansion area and continuing through the remaining lease term and any extensions, minimum guaranteed annual rental and the base for percentage rentals payable by Tenant shall increase by an amount equal to the annual guaranteed rentals paid by the last tenant(s) occupying any rental space lying within the expansion area under a bona fide written lease with a term not less than three (3) years ("annual replacement rentals"), adjusted for any common area maintenance, insurance, tax or other payments to be made by Tenant under the last paragraph of this Article 38 but not under the replaced leases. If rental space lying within the expansion area prior to the addition has not been leased, so that annual lost rentals may be calculated and the parties cannot agree on a replacement rental, Landlord and Tenant shall each select one MAI appraiser, and the two selected shall choose a third appraiser to determine the reasonable annual rental value, and such reasonable annual rental value shall constitute lost rentals for purposes of this paragraph.

Regardless of which party constructs Tenant's addition, the size of the premises as expanded shall be used to calculate Tenant's prorata share of real estate taxes, insurance premiums and common area maintenance charges.

**SELF-HELP**    39.    If Landlord defaults in the performance or observance of any agreement or condition contained in this Lease on its part to be performed or observed, and if Landlord fails to cure such default within thirty (30) days after notice from Tenant specifying the default (or fails within thirty (30) days to commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for Landlord's damages for breach of agreement, at any time thereafter, cure such default. Any amount paid or any contractual liability incurred by Tenant to cure Landlord's default shall be reimbursed by Landlord. Tenant may cure any default by Landlord prior to the expiration of the 30-day waiting period, but after notice to Landlord, if the curing of such default prior to the expiration of the waiting period is reasonably necessary to protect the real estate or Tenant's interest in it or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord, that amount may be deducted by Tenant from the next or succeeding payments of rent due under this Lease.

**ESTOPPEL CERTIFICATE**    40.    The parties shall promptly furnish each other estoppel certificates from time to time as to the term, standing, amendments and other material information in connection with the status of the Lease, specifying the facts and allegations of any alleged default, within ten (10) working days of written receipt of a request for such certificate.

19

**LIMITATION OF LIABILITY**

41. Notwithstanding anything to the contrary provided in this Lease, if Landlord or any successor in interest of Landlord shall be an individual, tenancy in common, firm or partnership, general or limited, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, partnership or joint venture with respect to any of the terms, covenants and conditions of this Lease, and that Tenant shall look solely to the equity of Landlord or such successor in interest in the shopping center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

FS PARTNERSHIP, LTD., an Alabama limited partnership

By: _____ (SEAL)

JACK FIORELLA, III,   General Partner

**LANDLORD**

WINN-DIXIE MONTGOMERY, INC.

By: _____

Its _____ Vice President

Attest: _____

Its _____ Secretary

(CORPORATE SEAL)

**TENANT**

20

ACKNOWLEDGMENTS

STATE OF

COUNTY OF

I, *Patricia E. Boyd*, a Notary Public in and for said County, in said State, hereby certify that *Jack Fiorella, III*, whose name as authorized general partner of FS PARTNERSHIP, LTD., an Alabama limited partnership, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he, as such general partner and with full authority, executed the same voluntarily for and as the act of said corporation.

GIVEN under my hand and seal of office this 24th day of *March*, 1994.

*Patricia C. Boyd*
Notary Public, State and County aforesaid.
My Commission Expires:
4-4-95

(NOTARIAL SEAL)


STATE OF FLORIDA

COUNTY OF DUVAL

I, Rebecca L. Sawyer, a Notary Public in and for said County, in said State, hereby certify that *Larry H. May*, whose name as Vice President of WINN-DIXIE MONTGOMERY, INC. a Kentucky corporation, whose name is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 30 day of *March*, 1994.

*Rebecca L. Sawyer*
Notary Public, State and County aforesaid

My Commission Expires 6-9-94

(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Ex. June 9, 1994
Comm. No. CC 012680

## GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by FS PARTNERSHIP, LTD., an Alabama limited partnership (hereinafter called "Landlord"), to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32254-3699, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation duly qualified to transact business in the State of Alabama, hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the attached and foregoing lease agreement dated _3/30/94_, 1994, covering certain premises located in a shopping center development known as "The Village at Moody Shopping Center", situated at the northeasterly corner of the intersection of Interstate Highway I-20 and U.S. Highway 411, in the City of Moody, County of St. Clair, State of Alabama.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this _30_ day of _May_, 1994.

Signed, sealed and delivered
in the presence of:

_Rebecca L. Dawson_
Witness

_Judy May_
As to Guarantor

WINN-DIXIE STORES, INC.

By _____
Its   Vice President

Attest _____
Its   Secretary

GUARANTOR

STATE OF FLORIDA

COUNTY OF DUVAL

I, _____, a Notary Public in and for said County, in said State, hereby certify that _LARRY H. MAY_, whose name as President of WINN-DIXIE STORES, INC., a Florida corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _30_ day of _March_, 1994.

_Rebecca L. Dawson_
Notary Public, State and Couty aforesaid.
My Commission Expires _6-9-94_

(NOTARIAL SEAL)

WINN DIXIE SHOPPING CENTER, VILLAGE AT MOODY, SITUATED IN THE N.E. 1/4 OF THE SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST, AND PART OF A VACATED RIGHT OF WAY OF VILLAGE DRIVE, ST. CLAIR COUNTY, ALABAMA.
DESCRIPTION: COMMENCE AT THE NORTHEAST CORNER OF S.E. 1/4 OF THE N.E. 1/4 OF SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST, ST. CLAIR COUNTY, ALABAMA; THENCE RUN SOUTH ALONG SAID 1/4 1/4 SECTION LINE FOR 750.00 FEET TO A POINT; THENCE TURN AN ANGLE TO THE RIGHT OF 90°-00'-00"  AND RUN WEST FOR 25.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG THE SAME COURSE FOR 713.67 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF VILLAGE DRIVE; THENCE TURN AN ANGLE TO THE RIGHT OF 110°-34'-19" AND RUN NORTHEASTERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF VILLAGE DRIVE FOR 111.34 FEET TO A POINT, SAID POINT BEING THE BEGINNING OF A VACATED RIGHT OF WAY ALONG VILLAGE DRIVE; THENCE CONTINUE ALONG THE SAME COURSE FOR 63.02 FEET TO A POINT; THENCE TURN AN ANGLE TO THE RIGHT OF 04°-24'-43" AND RUN NORTHEASTERLY FOR 61.30 FEET TO THE END OF THE VACATED RIGHT OF WAY VILLAGE DRIVE; THENCE TURN AN ANGLE TO THE LEFT OF 90°-00'-00" AND RUN NORTHWESTERLY FOR 50.00 FEET TO A POINT ON THE EAST LINE OF LOT 2, OF VILLAGE AT MOODY, AS RECORDED IN MAP BOOK "D", PAGE 147, IN THE PROBATE OFFICE OF ST. CLAIR COUNTY, ALABAMA; THENCE TURN AN ANGLE TO THE RIGHT OF 90°-00'-00" AND RUN NORTHEASTERLY ALONG THE EASTERLY PROPERTY LINES OF SAID LOT 2, AND OF LOTS 4 AND 1-A OF SAID VILLAGE AT MOODY FOR 389.79 FEET TO A POINT, SAID POINT BEING THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A CENTRAL ANGLE OF 23°-09'-50" AND HAVING A RADIUS OF 218.97 FEET; THENCE RUN NORTHEASTERLY ALONG THE ARC OF SAID CURVE AND ALONG THE EAST PROPERTY LINE OF SAID LOT 1-A FOR 88.53 FEET TO THE END OF SAID CURVE, SAID POINT ALSO BEING THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A CENTRAL ANGLE 90°-00'-00" OF AND HAVING A RADIUS OF 10.00 FEET; THENCE RUN ALONG THE ARC OF SAID CURVE AND ALONG THE EASTERLY PROPERTY LINE OF SAID LOT 1-A FOR 15.71 FEET TO THE END OF SAID CURVE, SAID POINT BEING ON THE SOUTHERLY RIGHT OF WAY LINE OF CARL JONES ROAD; THENCE AT TANGENT TO SAID CURVE RUN EAST ALONG SAID RIGHT OF WAY LINE FOR 238.47 FEET TO A POINT AT THE BEGINNING OF A CURVE TO THE RIGHT, SAID CURVE SUBTENDING A CENTRAL ANGLE OF 23°-09'-50" AND HAVING A RADIUS OF 155.78 FEET; THENCE RUN EASTERLY ALONG THE ARC OF SAID CURVE AND ALONG SAID RIGHT OF WAY LINE FOR 62.98 FEET TO THE END OF SAID CURVE, SAID POINT ALSO BEING THE BEGINNING OF A CURVE TO THE RIGHT, SAID CURVE SUBTENDING A CENTRAL ANGLE OF 65°-00'-58" AND HAVING A RADIUS OF 341.55 FEET; THENCE RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE AND ALONG SAID RIGHT OF WAY LINE FOR 387.57 FEET TO THE END OF SAID CURVE; THENCE AT TANGENT TO SAID CURVE RUN SOUTH ALONG SAID RIGHT OF WAY LINE FOR 337.41 FEET TO THE POINT OF BEGINNING. SAID PARCEL CONTAINS .367,0961.61 SQUARE FEET, INCLUDING VACATED RIGHT OF WAY, OR 8.43 ACRES, MORE OR LESS; LESS AND EXCEPT THE DETENTION POND SITES NUMBERS 1, 2, AND 3, AS DESCRIBED BELOW:

DETENTION POND #1, WINN DIXIE SITE, THE VILLAGE AT MOODY:
DESCRIPTION: A PART OF THE S.E. 1/4 OF THE N.E. 1/4 OF SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST, ST. CLAIR COUNTY, ALABAMA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE N.E. CORNER OF THE S.E. 1/4 OF THE N.E. 1/4 OF SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST; THENCE RUN SOUTERLY ALONG THE EAST LINE OF SAID 1/4 1/4 SECTION FOR 750.00 FEET TO A POINT IN THE CENTERLINE OF CARL JONES ROAD; THENCE 90°-00'-00" RIGHT AND RUN WEST FOR 647.88 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE WEST ALONG THE LAST STATED COURSE FOR 90.79 FEET TO A POINT ON THE EAST RIGHT OF WAY LINE OF VILLAGE DRIVE; THENCE 110°-34'-19" RIGHT  AND RUN NORTHEASTERLY ALONG SAID RIGHT OF WAY LINE FOR 155.00 FEET; THENCE 90°-00'-00" RIGHT AND RUN SOUTHEASTERLY FOR 85.00 FEET; THENCE 90°-00'-00" RIGHT AND RUN SOUTHWESTERLY FOR 123.10 FEET TO THE POINT OF BEGINNING.  SAID PARCEL CONTAINS 11,819.33 SQUARE FEET, OR 0.27 ACRE, MORE OR LESS.

WINN DIXIE SITE, THE VILLAGE AT MOODY, DETENTION POND #2:
DESCRIPTION: A PART OF THE S.E. 1/4 OF THE N.E. 1/4 OF SECTION 10, TOWNSHIP 17
SOUTH, RANGE 1 EAST, ST. CLAIR COUNTY, ALABAMA, BEING MORE PARTICULARLY DESCRIBED
AS FOLLOWS: COMMENCE AT THE N.E. CORNER OF THE S.E. 1/4 OF THE N.E. 1/4 OF
SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST; THENCE RUN SOUTH ALONG THE EAST LINE
OF SAID 1/4 1/4 SECTION FOR 750.00 FEET TO A POINT IN THE CENTERLINE OF CARL
JONES ROAD; THENCE 90°-00'-00" RIGHT AND RUN WEST FOR 738.67 FEET TO A POINT ON
THE EAST RIGHT OF WAY LINE OF VILLAGE DRIVE; THENCE 110°-34'-19" RIGHT AND RUN
NORTHEASTERLY ALONG SAID RIGHT OF WAY LINE FOR 111.34 FEET; THENCE CONTINUE
NORTHEASTERLY ALONG THE LAST STATED COURSE FOR 63.02 FEET; THENCE 04°-24'-43"
RIGHT AND RUN NORTHEASTERLY FOR 61.30 FEET; THENCE 90°-00'-00" LEFT AND RUN
NORTHWESTERLY FOR 50.00 FEET; THENCE 90°-00'-00" RIGHT AND RUN NORTHEASTERLY FOR
389.79 FEET TO THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A
CENTRAL ANGLE OF 23°-09'-50" AND HAVING A RADIUS OF 218.97 FEET; THENCE RUN
NORTHEASTERLY ALONG THE ARC OF SAID CURVE FOR 88.53 FEET TO THE END OF SAID CURVE
AND TO THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A CENTRAL
ANGLE OF 90°-00'-00" AND HAVING A RADIUS OF 10.00 FEET; THENCE RUN NORTHWESTERLY
ALONG THE ARC OF SAID CURVE FOR 15.71 FEET TO THE END OF SAID CURVE, SAID POINT
ALSO BEING ON THE SOUTH RIGHT OF WAY LINE OF CARL JONES ROAD; THENCE AT TANGENT
TO SAID CURVE REVERSE COURSE AND RUN EASTERLY ALONG SAID RIGHT OF WAY LINE FOR
52.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE EASTERLY ALONG THE LAST
STATED COURSE AND ALONG SAID RIGHT OF WAY LINE FOR 98.00 FEET; THENCE 90°-00'-00"
RIGHT AND RUN SOUTHWESTERLY FOR 80.00 FEET; THENCE 87°-21'-34" RIGHT AND RUN
SOUTHWESTERLY FOR 104.04 FEET; THENCE 96°-38'-26" RIGHT AND RUN NORTHEASTERLY FOR
85.00 FEET TO THE POINT OF BEGINNING.  SAID PARCEL CONTAINS 8,312.05 SQUARE FEET,
OR 0.19 ACRE, MORE OR LESS.

WINN DIXIE SITE, THE VILLAGE AT MOODY, DETENTION POND #3:
DESCRIPTION: A PART OF THE S.E. 1/4 OF THE N.E. 1/4 OF SECTION 10, TOWNSHIP 17
SOUTH, RANGE 1 EAST, ST. CLAIR COUNTY, ALABAMA, BEING MORE PARTICULARLY DESCRIBED
AS FOLLOWS: COMMENCE AT THE N.E. CORNER OF THE S.E. 1/4 OF THE N.E. 1/4 OF
SECTION 10, TOWNSHIP 17 SOUTH, RANGE 1 EAST; THENCE RUN SOUTH ALONG THE EAST LINE
OF SAID 1/4 1/4 SECTION FOR 750.00 FEET TO A POINT IN THE CENTER LINE OF CARL
JONES ROAD; THENCE 90°-00'-00" RIGHT AND RUN WEST FOR 738.67 FEET TO A POINT ON
THE EAST RIGHT OF WAY LINE OF VILLAGE DRIVE; THENCE 110°-34'-19" RIGHT AND RUN
NORTHEASTERLY ALONG THE LAST STATED COURSE FOR 63.02 FEET; THENCE 04°-24'-43"
RIGHT AND RUN NORTHEASTERLY FOR 61.30 FEET; THENCE 90°-00'-00" LEFT AND RUN
NORTHWESTERLY FOR 50.00 FEET; THENCE 90°-00'-00" RIGHT AND RUN NORTHEASTERLY FOR
389.79 FEET TO THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A
CENTRAL ANGLE OF 23°-09'-50" AND HAVING A RADIUS OF 218.97 FEET; THENCE RUN
NORTHEASTERLY ALONG THE ARC OF SAID CURVE FOR 88.53 FEET TO THE END OF SAID CURVE
AND TO THE BEGINNING OF A CURVE TO THE LEFT, SAID CURVE SUBTENDING A CENTRAL
ANGLE OF 90°-00'-00" AND HAVING A RADIUS OF 10.00 FEET; THENCE RUN NORTHWESTERLY
ALONG THE ARC OF SAID CURVE FOR 15.71 FEET TO THE END OF SAID CURVE, SAID POINT
ALSO BEING ON THE SOUTH RIGHT OF WAY LINE OF CARL JONES ROAD; THENCE AT TANGENT
TO SAID CURVE REVERSE COURSE AND RUN EASTERLY ALONG SAID RIGHT OF WAY LINE FOR
188.47 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE EASTERLY ALONG THE LAST
STATED COURSE AND ALONG SAID RIGHT OF WAY LINE FOR 50.00 FEET TO THE BEGINNING
OF A CURVE TO THE RIGHT, SAID CURVE SUBTENDING A CENTRAL ANGLE OF 09°-14'-06"
AND HAVING A RADIUS OF 155.78 FEET; THENCE RUN EASTERLY ALONG THE ARC OF SAID
CURVE AND ALONG SAID RIGHT OF WAY LINE FOR 25.11 FEET; THENCE FROM TANGENT OF
SAID CURVE 80°-45'-54" RIGHT AND RUN SOUTHWESTERLY FOR 75.98 FEET; THENCE 90°-
00'-00" RIGHT AND RUN NORTHWESTERLY FOR 75.00 FEET; THENCE 90°-00'-00" RIGHT AND
RUN NORTHEASTERLY FOR 78.00 FEET TO THE POINT OF BEGINNING.  SAID PARCEL CONTAINS
5,833.15 SQUARE FEET OR 0.13 ACRE, MORE OR LESS.

EXHIBIT "B"
Page 2 of 2