# EXHIBIT C



# LEASE

### STORE # 597

**Columbiana Square**
**Northwest corner of the intersection of**
**Highway #70 and Highway #25**
## COLUMBIANA, SHELBY CO., ALABAMA

## TABLE OF CONTENTS

PREMISES ................................................................. 1

TERM ................................................................... 1

RENT .................................................................. 2

TITLE ................................................................. 5

SURVEY ................................................................ 6

ENVIRONMENTAL AUDIT ................................................... 6

USE ................................................................... 6

COMPLIANCE WITH LAWS .................................................. 7

CONSTRUCTION OF SHOPPING CENTER ....................................... 8

COMPLETION DATE ....................................................... 9

COMMENCEMENT DATE ..................................................... 9

OTHER TENANTS ........................................................ 10

PARKING AND COMMON AREAS ............................................. 10

SERVICE AREA ......................................................... 10

UTILITIES ............................................................ 11

TENANT'S MAINTENANCE ................................................. 11

LANDLORD'S MAINTENANCE ............................................... 11

SIGNS ................................................................ 12

FIXTURES AND INTERIOR ALTERATIONS .................................... 12

INDEMNIFICATION ...................................................... 12

CASUALTY ............................................................. 13

LANDLORD'S INSURANCE ................................................. 13

QUIET ENJOYMENT ...................................................... 14

TAXES AND LIENS ...................................................... 14

CONDEMNATION ......................................................... 15

DEFAULT .............................................................. 15

CONSTRUCTION RISKS ................................................... 16

NOTICES ................................................................ 16

ASSIGNMENT AND SUBLEASING ............................................. 17

SUBORDINATE ........................................................... 18

ESTOPPEL CERTIFICATE .................................................. 18

LENDER'S CURE ......................................................... 19

BENEFIT ............................................................... 19

TRANSFER BY LANDLORD .................................................. 19

SHORT FORM LEASE ...................................................... 19

MARGINAL TITLES ....................................................... 19

COMPLETE AGREEMENT .................................................... 20

DECLARATION ........................................................... 20

EXHIBITS .............................................................. 20

FORCE MAJEURE ......................................................... 20

ENVIRONMENTAL CONDITION ............................................... 21

NO BROKERS ............................................................ 22

INDIVIDUAL STATE MANDATED PROVISIONS .................................. 22

FLORIDA ............................................................... 22

EXPANSION ............................................................. 22

LIMITATION OF LIABILITY ............................................... 25

SELF-HELP ............................................................. 25

CONTINGENCY ........................................................... 25

# LEASE

**THIS LEASE** is made this February 4, 1997 between **BIRMINGHAM REALTY COMPANY**, an Alabama corporation ("Landlord") and **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## W I T N E S S E T H :

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**   1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain store building, approximately 220 feet in width by 200 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers, and the land on which the same shall stand, which store building and related improvements (collectively, the "Store") are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, together with the non-exclusive right to use the Common Areas, as hereinafter defined (collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by  Charles A. Cline on November 6, 1995 and last revised on _____, 19_____, the "Site Plan"), known as Columbiana Square (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located near at the northwest corner of the intersection of Highway #70 and Highway #25 in the City of Columbiana , County of Shelby, State of Alabama.  The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**   2.    (a)    <u>Initial Term.</u>  The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)    <u>Extension Term(s).</u>  Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term by giving to Landlord a notice in writing at least  two hundred seventy (270) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c)    <u>Return of Premises.</u>  Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean, good  condition, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct.  Tenant shall not be required to restore the Premises to their original state.

O:\TRANSFER\0597\lease.04
8/02/96
1/24/97

(d)    Holding Over.  Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy from month to month, at the same rent and upon the same terms and conditions applicable to the Term.  Notwithstanding the foregoing, in the event Tenant has not exercised its next available option for an Extension Term in accordance with the provisions hereof or if Tenant does not have an Extension Term available to be exercised by it under the Lease and Landlord notifies Tenant at least ninety (90) days prior to the expiration of the Term of this Lease that Landlord desires Tenant to vacate the Store on the date this Lease terminates and Tenant fails to do so, then Tenant shall be liable to Landlord for damages which Landlord suffers by reason of Tenant's failure to vacate, including, but not limited to, loss of rents, which Landlord may have received by reason of Tenant's failure to vacate.

**RENT**

3.    (a)    Basic Rent.  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $374,000.00 per annum ("Basic Rent").  Basic Rent shall be paid in twelve (12) equal monthly installments of $31,166.67 per month, plus all applicable sales taxes, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term, without offset, counterclaim or abatement, except as provided by law or specifically set forth herein.

(b)    Percentage Rent.  In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent").  Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined.  However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term.  The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year.  For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

"Gross Sales" shall mean the aggregate sales price of all merchandise sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less customary reserves for bad debts).  Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines not exceeding one percent (1%) of gross sales, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program.  Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises.  Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential.  Landlord may, however, disclose Gross Sales to lenders, prospective lenders, and to prospective

purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each fiscal year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding fiscal year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor. Additionally, if the audit discloses that Tenant has under reported its Gross Sales by more than three percent (3%), Tenant shall pay the reasonable cost of the audit. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant. If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent, as hereinafter defined, due under this Lease.

(c)    Additional Rent. Beginning on the Commencement date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Property Taxes, and (3) Shopping Center Insurance (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts, canceled checks, and other evidences of payment by Landlord (the "Payment Evidence"). On or before sixty (60) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay Additional Rent. Tenant shall have the right, within ninety (90) days of receiving Landlord's statement of Additional Rent, to receive copies of the Payment Evidence and to audit Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it appears that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report. If Landlord fails to so pay the amount of such overpayment to Tenant, Tenant may offset the amount of such overpayment against all Basic Rent, Additional Rent, and Percentage Rent due under this Lease.

(d)    Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Additional Rent to be due for the upcoming year which, for the first year, is estimated to be $1,283.33 per month. Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this

Lease, including, without limitation, lighting, painting, cleaning, traffic control, policing, inspecting, landscaping (only as shown on the Site Plan), repaving the parking areas, and otherwise repairing the Common Areas.    With respect to landscaping and plant/grass maintenance, cleaning/sweeping services. and any other service provided and billed as part of Common Area Maintenance Expenses the amount billed for which exceeds $5,000.00 annually, Landlord shall contract for such services based upon competitive, arms-length bids obtained no more infrequently than once per year. Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work to the extent reimbursed by insurance, costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center,  the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, special services or excess utilities provided to other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses,  penalties for or the cost (including attorneys' fees, of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges  on mortgages to which the Shopping Center is subject, the replacement of capital investment items or new capital improvements unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term or unless such improvements are necessary to comply with Legal Requirements (hereinafter defined) applicable to the Common Areas, in which case, the cost thereof shall be amortized over the maximum allowable useful life of such improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, as opposed to costs of operating the Shopping Center, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges, travel expenses, or any single expense over $5,000.00 incurred without the prior written consent of Tenant (unless competitively bid as set forth hereunder), which consent shall not unreasonably be withheld or delayed.

(e)    Real Property Taxes.    Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Real Property Taxes." Real Property Taxes includes all ad valorem real estate taxes, less any abatements, discounts, or refunds permitted by law but excludes special assessments. Real Property Taxes does not include Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense.  Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing.  If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion. If Tenant grants its approval, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(f)    Shopping Center Insurance.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance".  Shopping Center Insurance means the reasonable cost of fire, casualty, liability, and vandalism insurance required to be maintained for the Shopping Center under the terms of this Lease.  Shopping

Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption. , or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in other than an arm's length transaction between Landlord and an insurer.

Tenant's "Pro-rata Share" shall be the ratio of the gross rentable square footage of the Store to the total gross rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan, existing from time to time.

Tenant will pay any tax imposed by state or local governmental authority on Basic Rent or Percentage Rent.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated.

**TITLE**

4.        On or before fifteen (15) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are reasonably acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the title defects; or (2) terminate this Lease. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $3,000,000.00 (the "Title Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease.

**SURVEY**

5.    On or before fifteen (15) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the Store, the Common Areas, and the other buildings to be included in the Shopping Center shown on the Site Plan (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such Survey defects, or (2) terminate this Lease. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the Survey defects; or (2) terminate this Lease. Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built".

**ENVIRONMENTAL
AUDIT**

6.    On or before fifteen (15) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing. Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure any environmental condition objected to by Tenant. If Landlord fails to so cure such environmental conditions, to Tenant's satisfaction, Tenant may terminate this Lease.

**USE**

7.    The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

Tenant shall have the exclusive right to operate a supermarket in the Shopping Center and any enlargement thereof, and the non-exclusive right to operate a pharmacy or prescription

drug concession, photo lab or film development business and an automatic teller machine and banking business in the Shopping Center. Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within one-quarter (¼) of one (1) mile of any exterior boundary thereof, except as provided in Article 38, for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of such items does not exceed the lesser of 1,000 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant located no closer than 40 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site. With the exception of package stores and a drugstore, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Notwithstanding the provisions of the foregoing paragraph, Landlord shall be permitted to lease or use retail spaces in the shopping center for an ice cream/frozen yogurt shop, a doughnut or bagel shop, or a health food store not selling perishables, so long as none of such uses exceeds 2,400 square feet. Additionally, the foregoing paragraph shall not be construed to prohibit Landlord's lease or use of retail shop space in the shopping center for a sandwich shop, or a pizza shop, or to prohibit a restaurant with seating capacity not exceeding 48 persons.

Without the prior written consent of both Landlord and Tenant, which may be withheld or conditioned in either Landlord's or Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities. Notwithstanding the foregoing, business or professional offices are not restricted on the Future Development Area or on the Outparcel, and business and professional offices (including finance company offices, dentist/physicians offices, or insurance offices) of a type dealing with the public and with no more than ten (10) employees or owners using each individual space at a time may be located in up to 3,000 square feet of space located in line with the Store within the Shopping Center, provided no such business or professional office is located within 40 feet of any exterior wall of the Store. Notwithstanding the foregoing such a business or professional office may be operated on the "Building Pad 4,200 S. F." identified on Exhibit "A" to this Lease.

**COMPLIANCE WITH LAWS**      8.      Tenant shall at all times comply with all current and future applicable laws, ordinances, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to fulfillment of its obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.    Landlord, at its sole cost and expense, shall construct the Shopping Center, substantially as shown on the Site Plan, consisting of all the buildings shown thereon, except those shown as "Future Retail Shops" or "Future Building Expansion," and all ramps, sidewalks, streets, entrances, malls, parking areas, service areas, driveways, traffic signals, utility lines, water detention and retention facilities and related improvements (excluding the buildings, collectively, the "Common Areas"). Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the Common Areas, and shall provide proper and adequate water drainage and lighting therefor, and shall operate and maintain the same in good repair and usable condition during the Term.  Landlord may construct additional buildings and improvements within the Future Development Area as shown on Exhibit "A" without Tenant's consent, provided that such additional construction fully complies with all the use restrictions, parking requirements and other restrictions and requirements of this Lease. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld or delayed.  If not shown on the Site Plan, Tenant expressly reserves the right to approve the finish grade elevations of all buildings and the Common Areas within the Shopping Center.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct the Store in accordance with guidelines submitted by Tenant to Landlord's architect to be used to create Tenant's Plans, as hereinafter defined (the "Guideplans") and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease; provided, however, that in the event of a conflict between the Guideplans and Tenant's Plans, the Guideplans shall control. Tenant's Plans shall provide for a completed store building, commonly referred to as a "lock and key job". This Lease shall not be effective or enforceable against either party unless and until Landlord and Tenant have so approved Tenant's Plans.  Notwithstanding the foregoing, Tenant shall furnish, install and connect its own trade fixtures and its compactor (or bailer) on concrete pads to be erected by Landlord.  The parties agree that the Landlord's cost of the Store will not exceed One Million Nine Hundred Thousand and No/100 Dollars ($1,900,000.00) and that Tenant will provide, at its own cost and expense, the following equipment relating to construction items:

1.    Hoods, #1, 2, 3, and 4 and fans
2.    LCS panel
3.    American woodwork package
4.    Insectocuters
5.    Impact doors, installed
6.    Roll-up doors, installed
7.    Case bumpers, material only
8.    Dock seals and bumpers, installed
9.    Fire extinguishers and cabinets
10.   Stainless steel sinks and valves
11.   Light fixtures F3, F4, F6, and F8
12.   Sound system wiring and transformers
13.   FTV-1 control panel
14.   Water heater, #29, 30, and 31, including check valves, backflow valves and piping
15.   Metal canopies over receiving doors

**COMPLETION DATE**

10.    Construction of the Store and the Shopping Center shall begin not later than December 1, 1996 (the "Construction Start Date") and shall be completed not later than December 1, 1997 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than June 1, 1998 (the "Outside Completion Date"), this option to terminate shall not arise. The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an unrestricted building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto.    If, pursuant to this paragraph, Tenant shall terminate this Lease, then Landlord agrees to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days of receipt of written notice of the terms and conditions thereof from Landlord, to occupy any portion of the Shopping Center which Landlord may offer for use as a food supermarket. This first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the lease term provisions shall be the same as those contained in this Lease.

**COMMENCEMENT DATE**

11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in substantial accordance with Tenant's Plans (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Landlord shall have delivered to Tenant, at Landlord's expense, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(b)    Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    The Declaration and the Cross Easement as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction;

(e)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

If all the Conditions have not been met on or prior to the Outside Completion Date, Tenant, at its sole option, may terminate this Lease. If Tenant opens its store for business to the

public, then this right to terminate shall lapse and be no further force and effect upon the date Tenant opens its Store. Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J". No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or thirty (30) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

**OTHER TENANTS**   12.   INTENTIONALLY DELETED

**PARKING AND**   13.   Tenant, its employees, agents, suppliers, customers and invitees, shall have the
**COMMON AREAS**   nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use does not unreasonably interfere with pedestrian traffic upon such sidewalks. Likewise, other tenants in the shopping center may from time to time, use the exterior surfaces of their buildings and the sidewalks immediately in front of their premises with a display and sale of merchandise and services so long as such use does not unreasonably interfere with pedestrian traffic upon such sidewalks.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide a minimum ratio of at least 5.0 automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center.

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. If the parking area furnished should at any time be materially less,(except by reason of condemnation, in which event the provisions of Article 25 shall control) and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is sent to Landlord giving reasonable details, Tenant shall have the right to terminate this Lease, provided, however, if Landlord notifies Tenant of its intention to cure such deficiency, together with details concerning Landlord's plan for a course of action, Tenant's right to terminate shall not be exercisable unless Landlord fails to cure such deficiency within sixty (60) days following Tenant's written notice. No signboards or other construction shall be erected in any of the Common Areas or so as to obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

**SERVICE AREA**   14.   Landlord shall provide parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day

facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances.

**UTILITIES**

15.    Landlord shall cause to be separately metered and Tenant shall pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services used by Tenant at the Store, and Landlord agrees at all times to provide Tenant with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for any installation charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted by Landlord at its expense during the hours of ½ hour before dusk until 12:00 a.m. (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan.

**TENANT'S MAINTENANCE**

16.    Tenant shall keep the interior and exterior of the Store in reasonably neat and orderly, good condition and repair, including, but not limited to, the roof, masonry walls, foundation and structural members of the Store, its signs on the exterior of the Store (except the pylon sign, as set forth in Article 18 of this Lease) except those repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the service and delivery areas of the Store, including loading docks and/or truckwells, reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. If Tenant fails to maintain the exterior of the Store as above provided, and if Tenant fails to undertake such deficiency in maintenance within thirty (30) days after notice from Landlord, Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, undertake such maintenance for the account of Tenant, and any amount paid or contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant will reimburse Landlord such amount and indemnify Landlord from and against any and all liability arising from Landlord's undertaking such maintenance. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers. Tenant's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

**LANDLORD'S MAINTENANCE**

17.    Landlord shall operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, cleaning and sweeping as needed but at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center, other than the Store, clean and free of graffiti at all times. Landlord will complete such repairs immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or other parts of the Shopping Center rendered necessary by the fault, act, or negligence of Tenant, or any of its servants, agents, or employees, unless and to the extent Landlord is reimbursed for the cost thereof pursuant to Landlord's insurance policies covering the Shopping Center. Landlord's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to provide services which are the responsibility of Landlord under this Lease, or if Landlord within thirty (30) days after receipt of notice as above provided (or such longer time as may be necessary if such work cannot reasonably be completed within thirty (30) days, provided Landlord diligently prosecutes such work to completion) fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store or Common Areas, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

**SIGNS**        18.    Tenant may place, erect, and maintain any signs, antennae, and satellite dishes (collectively, the "Communication Equipment") on the roof, walls (except painted signs), and any other places on or about the Store, so long as the Communication Equipment complies with applicable Legal Requirements, which Communication Equipment shall remain the property of Tenant and may be removed at any time during the Term provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of the Communication Equipment, and provided that the Communication Equipment will be removed on or before the end of the Term, and the needed repairs or reimbursement made no later than thirty (30) days following the termination of this Lease or expiration of the Term. Tenant's agreement to so repair or reimburse shall survive termination of this Lease or expiration of the Term. Notwithstanding the forgoing, Landlord shall have the right, exercised reasonably, to approve the exterior signage of any assignee or sublessee of Tenant.

Landlord shall construct, install, and maintain, at its cost, an electrically illuminated pylon sign in the location marked on the Site Plan. The pylon sign shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, its sign panel in the uppermost space on such pylon sign and may connect the sign panel to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel if billed as a portion of Additional Rent.

**FIXTURES AND**    19.    Tenant, at its own expense, shall have the right from time to time during the Term to
**INTERIOR**    make any interior alterations, additions, and improvements, including additional or alternatively
**ALTERATIONS**    located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity ("Tenant Modifications"). Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural improvements shall belong to Landlord and become a part of the Store upon termination or expiration of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures and equipment of every kind and nature as may be necessary or desirable in Tenant's business (Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to remove all or any part of Tenant's Trade Fixtures at any time; provided, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures.

**INDEMNIFICATION**    20.    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store during

the Term unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property happening on or about all Common Areas or any portion of the Shopping Center other than the Store during the Term, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees. The indemnities contained in this Article 20 shall survive termination of this Lease and the expiration of the Term.

**CASUALTY**   21.    If the Store is damaged by fire or other casualty to the extent of seventy-five percent (75%) or more of the value or to an extent that renders the Store untenantable in Tenant's reasonable judgment, and (i) the Store cannot, with reasonable likelihood, be repaired within nine (9) months following the date of such damage, or (ii) there are fewer than three (3) years remaining in the Term at the date of such damage,  then Tenant may elect within thirty (30) days after such damage, to terminate this Lease by written notice. If  there are fewer than three (3) years remaining in the Term, Landlord may also elect to terminate the Lease within thirty (30) days after such damage by giving to Tenant written notice. If the Store shall suffer damage to any extent less than  seventy-five percent (75%) of the value thereof, or if Tenant or Landlord  does not elect to terminate in accordance with the  first and second sentences, respectively, in this paragraph, then Landlord shall  proceed promptly and without expense to Tenant to repair the damage or restore the Store, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. If Landlord repairs the damage, Tenant will re-stock and re-open the Store for business, provided, that Tenant shall not be required to operate in the Store for any period after re-opening. If all or a portion of the other buildings in the Shopping Center (exclusive of the Store) are damaged or destroyed, then Landlord may either (i) restore such buildings or portions of buildings to a condition comparable to that existing prior to the damage or destruction or (ii) raze the affected buildings and convert the area formerly occupied by them to paved parking or landscaped areas. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall abate in proportion to the percentage of the Common Areas damaged or destroyed until the damage or destruction is completely repaired or restored.  Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.

**LANDLORD'S**   22.    Landlord shall carry the types of insurance listed below, placed with a company licensed
**INSURANCE**   to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of <u>Best's Insurance Report</u>.  Certificates of insurance shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, as its interest may appear, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(a)    <u>Liability Insurance.</u>  Landlord shall carry,  comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $2,000,000.00.

(b)    <u>Casualty Insurance.</u>  Landlord shall carry all-risk commercial property insurance on the Premises and the Shopping Center and any additions, alterations, and improvements made thereto by Landlord or Tenant, in the amount of the full replacement cost thereof, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire,

explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

**QUIET ENJOYMENT**    23.    Landlord covenants, warrants and represents that:

(a)    the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent will be withheld or conditioned in Tenant's sole discretion;

(b)    Landlord is a duly organized corporation, validly existing in Alabama, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary directors' and officers' members' action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privilege intended to be granted under this Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the Term;

(e)    there is no zoning, comprehensive plan, or other restriction preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes.

If any representation or warranty made by Landlord in this Lease is determined during the Term to be false, and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, or the value of its leasehold estate, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

No such termination shall be effective until Tenant shall have provided Landlord and the holder of any first mortgage written notice of its intent to terminate, affording Landlord and the holder of such mortgage the right to cure. If the cure cannot be effected within such ninety (90) days period, Landlord and the holder of the first mortgage shall be afforded such additional time as is reasonable necessary to effect such cure provided that efforts to cure shall be diligently prosecuted to conclusion, and provided that such additional time shall, in no event, exceed sixty (60) days from the date of notice. Tenant shall be entitled to a proportionate abatement of rentals for any period during which Tenant is prevented or restricted from conducting its business within the Store.

**TAXES AND LIENS**    24.    All taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center shall be promptly paid by Landlord prior to delinquency.  Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which may threaten its use or enjoyment of

the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and shall promptly be reimbursed by Landlord for resulting expenses and disbursements, together with interest thereon at the rate of twelve percent (12%) per annum. If Tenant is not promptly reimbursed, it may offset the amount due against all Basic Rent, Percentage Rent, and Additional Rent due under this Lease.

**CONDEMNATION**      **25.**      If more than two percent (2%) of the Store or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option, exercised not later than forty-five (45) days following the effective date of the taking, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion any repairs and restoration reasonably necessary to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of Basic Rent, Percentage Rent, Additional Rent, and other adjustments as shall be just and equitable under all circumstances.

Whether or not this Lease is terminated, the entire compensation award therefor, both leasehold and reversion, shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest to any such award. Tenant shall, however, be entitled to claim, prove and receive (but not from Landlord) such awards as may be allowed for leasehold.improvements, fixtures and other equipment installed by it, moving, business interruption, and similar awards, but only if, and to the extent, that such awards are in addition to the award for the land and building and other improvements (or portions thereof) constituting the Premises. Except as to repair and restoration of any part of the Store less than or equal to 2% as set forth above, Landlord shall have no obligation to expend sums in excess of its compensation award to repair and restore buildings within the Shopping Center taken, in whole or in part, under any statute or by right of eminent domain, or privately purchased in lieu thereof.

If any portion of the Common Areas or route or mode of access thereto, is obstructed or taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or its use of or access to or through the Common Areas, or so as to reduce the required parking spaces by an amount in excess of ten percent (10%). Tenant may, at its option, terminate this Lease and shall be liable for rent only up to the time of such obstruction or taking.

Tenant's option to terminate hereunder, however, shall not arise if, within 180 days after possession is required by the condemning authority, Landlord shall provide equivalent substitute parking spaces satisfactory to Tenant and located on property contiguous to the Common Areas and situated within comparable proximity to the Store, thereby fulfilling the minimum parking requirements hereunder.

**DEFAULT**      **26.**      Tenant shall be in default under this Lease if:

    (a)      Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure).

Following an uncured default by Tenant, Landlord, at its option, may either (1) terminate this Lease or (2) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom. Tenant shall remain liable for the deficiency, if any, between the Basic Rent due hereunder and the total rent obtained by Landlord on reletting, after Landlord deducts its reasonable expenses in reletting.

The remedies provided above are non-exclusive and are in addition to all other remedies available to Landlord at law or in equity. Upon Landlord's default, Tenant shall have all remedies available to it at law or in equity.

Notwithstanding the foregoing, a default (except as to payment of rent) shall be deemed cured if Tenant in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter with reasonable diligence proceeds to cure such default.

**CONSTRUCTION RISKS**

27.    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof.

In the event Tenant commences fixturing or performing other improvements in the Store simultaneously with the Landlord performing its work required under this Lease, Landlord shall not be liable for any injury to persons or damage to property of Tenant, Tenant's employees, licensees or invitees, from any cause whatsoever occurring during such period as a result of Tenant's negligence upon or about the Store. Tenant will indemnify and save Landlord harmless from any and all liability and claims arising out of or connected with such injury or damage. Notwithstanding the foregoing, Landlord shall not be indemnified from any injury or damage resulting from the negligence of Landlord.

**NOTICES**

28.    All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the

recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    Birmingham Realty Company
     2118    248 First Avenue North
              Birmingham, Alabama 35203

              or such other address as Landlord may direct from time to time.

Tenant:       WINN-DIXIE MONTGOMERY, INC.
              1550 Jackson Ferry Road
              Montgomery, Alabama  36104

With a copy to: Winn-Dixie Stores, Inc.
              Attn: General Counsel,  Esquire
              5050 Edgewood Court
              P.O. Box B
              Jacksonville, FL 32203-0297

              Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND**    29.    Tenant may  vacate the Premises in whole or in part without the consent of Landlord,
**SUBLEASING**    provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

Tenant, without the consent of Landlord, may assign this Lease or sublease the Premises at any time for use as a food supermarket, and, subject to the stipulations hereinafter set forth in subsections (a), (b) and (c), Tenant may also, without the consent of Landlord, assign this Lease or sublease the Premises for use other than as a food supermarket, subject to the provisions of Article 7 of this Lease.

a) In the event Tenant  voluntarily vacates the Premises or ceases selling merchandise for in excess of a period of six (6) months while the Premises can be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord shall have the continuing option (unless Tenant has reoccupied the Premises) to terminate this Lease commencing on the day after the Premises has been vacant for six (6) months by written notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of Landlord's  notice. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the Premises to a third party.  Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 29.

b) In the event Tenant desires to assign this Lease or to sublease the Premises for the conduct of a business other than a food supermarket, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee.  Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended

17

assignment or sublease or elect to terminate this Lease by giving written notice to Tenant of such election, provided, that, if sublease or assignment to the intended sublessee or assignee would ordinarily be prevented by the provisions of Article 7 of the Lease, Landlord may disapprove such use and not be required to terminate the Lease . In the event Landlord elects to terminate this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the Premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such ninety (90) days in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the Premises. Upon surrender of possession of the Premises by Tenant, this Lease shall be deemed terminated without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it except for liabilities which may have accrued prior to such termination, provided that Tenant shall have no liability for the payment of Rent which would have accrued but for such termination. If Tenant gives Landlord written notice of its intention to assign or sublease the Premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to terminate this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to terminate this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for performance of all obligations of Tenant under this Lease notwithstanding Tenant's assignment or sublease pursuant to this Article 29.

　　　　　c) Anything else in this Lease to the contrary notwithstanding, in the event Tenant (i) closes the Store for business, (except for temporary cessation reasons beyond Tenant's reasonable control or for repairs or for remodeling), or (ii) sublets the Premises or assigns this Lease (except to a parent or affiliated or subsidiary corporation or corporation to which Tenant sells all of its business in the State), then the total annual rent due under the Lease, from and after the first day the Store is closed, shall be a fixed sum which is equal to the average rent (including both Basic Rent and Percentage Rent) paid for the two most recent complete Fiscal Years of Tenant, immediately preceding such closing, subletting or assignment, payable in equal monthly installments. Notwithstanding the foregoing, Tenant shall continue to be responsible for payment of Additional Rent.

**SUBORDINATE**　　30.　　Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

**ESTOPPEL**　　31.　　Within a reasonable time, but no less than ten (10) business days, after Landlord's written
**CERTIFICATE**　　request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel

Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

32.    Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the rent payable hereunder by reason of such default unless and until it has afforded the Mortgagee thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty (30) day period, provided, however, that the Mortgagee notifies Tenant that it intends to cure such default, in fact undertakes such a cure, and diligently prosecutes such cure to completion. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

34.    If Landlord transfers Landlord's interest in the Premises, the Shopping Center, or this Lease, Landlord agrees to promptly provide Tenant with satisfactory documentary evidence of such transfer, together with the agreement of Landlord's transferee to assume all of Landlord's obligations under this Lease (except as otherwise agreed to in an SNDA).

Landlord shall have the privilege of assigning this Lease provided that at the time of such assignment, the assignee executes and delivers to Tenant a valid assumption agreement in recordable form in which the assignee assumes all the responsibilities and obligations of Landlord. This provision applies to all reassignments of this Lease by Landlord and all subsequent landlords, but does not apply to an assignment of this Lease as collateral for a mortgage loan. Any landlord, including Landlord , executing the assignment of lease and receiving a valid assumption agreement shall be released from all liability under this Lease subsequent to the date of the assignment and the date of the assumption agreement by the assignee. However, Landlord will be responsible to Tenant for any violations of Landlord's obligations under this Lease which shall accrue prior to the sale or transfer of Landlord's interest provided that Tenant notifies Landlord of any such violation within ten (10) days after notice from Landlord of such sale or transfer of Landlord' s interest. Notwithstanding the foregoing, Landlord will be responsible to Tenant for latent defects in the building for a period of one (1) year from commencement of the term of this Lease.

**SHORT FORM LEASE**

35.    Landlord agrees that any time on request of Tenant it will execute a short form of this Lease in the form attached hereto as Exhibit "G", and permit its recording in the public records of the county or parish in which the Premises are located.

**MARGINAL TITLES**

36.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

37.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date.  No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

38.    Landlord shall have recorded in the public records of Shelby County, Alabama, declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration") and cross easement agreement(s) (collectively, the "Cross Easement"), as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that:

(a)    no portion of the Shopping Center nor any portion of the tracts of land designated on the Site Plan as "Outlot" or "Future Development Area" shall be used for any of the activities or uses prohibited by this Lease, except that a gasoline <u>and</u> convenience store, which may sell beer and wine, may be operated on the Outlot so long as it does not offer for sale fresh meats, fish, seafood, vegetables or fruits, except in less than ten percent (10%) of its square foot area, and so long as it is not otherwise used for any activities or uses prohibited by this Lease;

(b)    no structure constructed in the Shopping Center (other than the Store) or on the tract designated on the Site Plan as "Outlot" shall exceed a maximum building area of twenty-five percent (25%) of the ground area thereof or exceed a maximum vertical height of  25 feet as measured from ground level;

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE MAJEURE**

40.    If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other similar conditions (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

20

**ENVIRONMENTAL**
**CONDITION**

41.    (a)    Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center. If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents or employees, which release or environmental condition materially impairs Tenant's ability to use the Premises for the Permitted Use, Tenant may abate all rent due under this Lease during the time Tenant's use is impaired. If a release, such as the one described in the preceding sentence, materially impairs Tenant's ability to use the Premises for the Permitted Use for more than ninety( 90) days, then Tenant may terminate this Lease by written notice to Landlord and any first mortgagee.    Landlord shall be permitted to cure or attempt to cure such release resulting in material impairment within such ninety (90) days so long as such cure is prosecuted in full compliance with applicable Legal Requirements, and, if such cure is so completed, Tenant's right to terminate this Lease due to such release shall be extinguished.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in, or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents or employees , Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, proceedings, actions, suits, defenses, damages fines, judgments, penalties, costs, disbursements (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's

business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store) obligations, litigation, and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent that results in contamination, Tenant, at its sole expense, shall promptly take any and all necessary actions to return the Premises or the Common Areas, as the case may be, to the same condition that existed prior to the presence of any such Hazardous Substance on, in, or about the Premises. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination resulting from Landlord's ownership, use or operation, or the use of operation by any third party in, or under the Premises, the Common Areas or any other portion of the Shopping Center.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration of the Term or the termination of this Lease.

**NO BROKERS**

42.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee, except the Cleveland Group, which is entitled to a broker's commission from Landlord pursuant to a separate agreement. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**INDIVIDUAL STATE MANDATED PROVISIONS**

43.    Certain states mandate the inclusion of various provisions in all leases of real property located in such states. The following provisions are included to satisfy such individual state requirements and are applicable only if the Premises are located in the state named opposite the provisions appearing below.

**FLORIDA**

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**

44.    As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant

the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the most southwesterly side of the Store measuring approximately 60 feet in width by 200 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the easterly wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice one hundred eighty (180) days prior to the expiration of the seventh year from the Commencement Date or one hundred eighty (180) days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").

On or before thirty (30) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost. The Amendment shall include, among other things, the following:

(a)    If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), but Landlord constructs the Addition, Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease. Upon completion of the Addition and commencement of business therein by Tenant, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the Addition, or an amount equal to $8.50 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of four percent (4%) plus the prime rate at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. For purposes of this Article 44 (a), the term "Construction Cost" shall mean the direct cost of construction of the addition paid by Landlord to the contractor performing such work, third party architectural and engineering fees, insurance and bond premiums, permit fees, governmental approval fees, utility tap-in fees, and all other costs, except financing costs, directly related to the construction of the Addition.

Causing any Addition to be constructed is the sole obligation of the Landlord, its successors and assigns. However, nothing contained in this Lease shall constitute any expressed or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the Store, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Article 44. Additionally, Landlord's obligation shall not

limit Tenant's right to undertake and complete the Addition at its own cost, as described in subparagraph (b) below. Tenant shall, prior to Landlord's commencement of construction of the Addition, satisfy itself, at its sole cost and expense, as to the status of the title, zoning, environmental condition, and boundaries of the land upon which the Addition shall be constructed.

(b)     If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant shall, as its sole remedy against Landlord, have the right but not the obligation to construct the Addition at its sole cost and expense. If Landlord has failed to construct the Store to accommodate Tenant's enlargement, as provided in the first paragraph of this Article 44, or if Landlord has leased the Additional Space in a manner inconsistent with the second paragraph of this Article 44, then Tenant may terminate this Lease by written notice to Landlord. However, Landlord shall have the right to prevent such termination by curing, at its sole cost and expense, the Landlord's said failure or said inconsistent leasing within thirty (30) days of Tenant's notice of termination. If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby. Landlord shall provide, in consideration of Tenant's constructing the Addition, an endorsement to the Title Policy, the Survey, and the Audit. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped the cost of the Addition in Percentage Rent that would otherwise be due under this Lease; and

(c)     From the date of delivery by Landlord to Tenant of any previously constructed rental space lying within the Additional Space and continuing through the end of the Term, Basic Rent (and the base for computation of Percentage Rent hereunder) shall increase by an amount equal to the annual guaranteed rentals paid by the last tenant(s) occupying any such rental space under a fide written lease with a term not less than three (3) years ("annual replacement rentals"), adjusted for Additional Rent payable by reason of the increased size of the Store, but not for common area maintenance charges, insurance premiums or real estate taxes payable under the replaced leases. If such previously constructed rental space has not been leased, so that annual replacement rentals may not be calculated and the parties cannot agree on the amount of annual replacement rentals, Landlord and Tenant shall each select one MAI appraiser, and the two selected shall choose a third appraiser to determine the reasonable annual rental value, and such reasonable annual rental value shall constitute annual replacement rentals for purposes of this paragraph.

(d)     Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not remain at least ten (10) years of the Term then in effect, the Term then in effect shall be extended so as to provide exactly ten (10) years remaining on the Term then in effect upon completion of the Addition. Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

**LIMITATION OF LIABILITY**

45.   Notwithstanding anything to the contrary provided in this Lease, if Landlord or any successor-in-interest of Landlord shall be an individual, tenancy-in-common, firm or partnership, general or limited, corporation, or corporation, there shall be absolutely no personal liability on the part of such individual, tenancy-in-common, firm, corporation, partnership, corporation or the members of any such firm, partnership , joint venture, corporation or corporation with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the equity of Landlord or such successor-in-interest in the Shopping Center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

**SELF-HELP**

46.   If Landlord fails to perform any of its material obligations under this Lease, and if Landlord fails to undertake performance of such material obligation within thirty (30) days after notice from Tenant specifying the default (or fails within such period to commence to cure such default and thereafter to prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord. Landlord agrees to reimburse Tenant such amount and indemnify Tenant from and against any and all liability arising from Tenant's cure. Tenant may cure any default prior to the expiration of said thirty (30) days which is reasonably necessary to protect the Premises or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord, pursuant to this Article, such amount may be deducted by Tenant from the next or any succeeding installment of Basic Rent due under this Lease. This Article shall not be construed to abrogate the lender notice requirements imposed by Article 32 of this Lease.

**CONTINGENCY**

47.   This Lease is conditioned and contingent upon the ability of the Landlord to acquire the Shopping Center Site and to develop the Shopping Center Site for a retail shopping center. If Landlord is unable, on or prior to November 15, 1996, to obtain satisfactory financing for the acquisition and development of the Shopping Center Site, Landlord reserves the right, on or before November 15, 1996, by written notice to Tenant to terminate this Lease, whereupon neither party shall have any further obligations to the other. Notwithstanding the foregoing, if, pursuant to this paragraph, Landlord shall terminate this Lease, then Landlord agrees to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days of receipt of written notice of the terms and conditions thereof from Landlord, to occupy any portion of the Shopping Center which Landlord may offer for use as a food supermarket. This first right of refusal shall be operative and effective for a period of three (3) years from the date of such termination. However, if offered to Tenant within six (6) months after the termination of this Lease, the lease term provision shall be the same as those contained in this Lease.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease the day and year indicated

below.

Witnesses:

*Donna P. Cox*
Print name: Donna P. Cox

*Bobby L. Sargent*
Print name: Bobby L. Sargent

*Cynthia N. Crossland*
Print name: Cynthia N. Crossland

*Rebecca L. Sawyer*
Print name: Rebecca L. Sawyer

LANDLORD: BIRMINGHAM REALTY COMPANY,
an Alabama Corporation

~~COLUMBIANA ASSOCIATES, L.L.C., an Alabama limited liability company~~

By: *Charles M. Miller Jr.*
    Charles M. Miller Jr.
Its: Vice President
Date: 1/10/97

TENANT:

WINN-DIXIE MONTGOMERY, INC.

By: *R. P. McCook*
    R. P. McCook
Its: Vice President
Date: 2-4-97

26

STATE OF FLORIDA
COUNTY OF DUVAL

I, _____Rebecca L. Sawyer_____, a Notary Public in and for said County, in said State, hereby certify that _____R. P. McCook_____, whose name as _____Vice President_____ of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this _____ day of _____February_____, 1997.

_____
Printed Name: _____Rebecca L. Sawyer_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310

STATE OF _____Alabama_____
COUNTY OF _____Jefferson_____

I, _____Marsha Gail Stone_____, a Notary Public in and for said County, in said State, hereby certify that _____Charles N. Miller Jr._____, whose name as _____V/P_____ President of BIRMINGHAM REALTY COMPANY, an Alabama corporation, is signed to the foregoing instrument, and who is known to me, acknowledge before me on this day that, being informed of the contents of the instrument, he/she, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this _____30th_____ day of _____January_____, 1997.

_____
Printed Name: _____Marsha Gail Stone_____
Notary Public, State and County aforesaid
My Commission Expires: MY COMMISSION EXPIRES OCTOBER 11, 1998
Notary ID No.:_____
(NOTARIAL SEAL)

27

## CORPORATE GUARANTY OF LEASE OBLIGATIONS

THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS ("Guaranty") is given as of the date indicated below by WINN-DIXIE STORES, INC., a Florida corporation ("Guarantor") to and in favor of BIRMINGHAM REALTY COMPANY, an Alabama corporation, ("Landlord") on behalf and for the account of WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation ("Tenant").

### R E C I T A L S:

1.     Landlord and Tenant intend to be parties to that certain lease dated _2-4-99_ (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Shelby County, Alabama, as more particularly described in the Lease (the "Premises").

2.     Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.     Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.     The foregoing recitals are true and correct and incorporated herein.

2.     If Tenant fails, after notice and an opportunity to cure as provided in the Lease, to timely perform its obligations under the Lease, then Guarantor shall:

(a)     With respect to monetary defaults, following ten (10) days written notice from Landlord, cure such monetary default(s) of Tenant to the extent that Tenant does not have a right, under the Lease, to offset any amount due to Landlord because of any default by Landlord under the Lease;

(b)     With respect to nonmonetary defaults, following thirty (30) days written notice from Landlord, cure such nonmonetary default(s) of Tenant, provided, however, that if the nature of such nonmonetary default is such that the default is not capable of a cure within thirty (30) days, then Guarantor's obligation under this Guaranty shall be to commence a cure and diligently prosecute the same to completion within a reasonable time after receipt of Landlord's notice.

3.     This Guaranty shall be absolute, continuing and unlimited, and the Landlord shall not be required to take any proceedings against the Tenant, or give any notice to the undersigned before the Landlord has the right to demand payment or performance by the undersigned upon default by the Tenant. The Guaranty and the liability of the undersigned hereunder shall in nowise be impaired or affected by any assignment which may be made of said Lease, or any subletting thereunder, or by any extension(s) for the payment of any rental or any other sums provided to be paid by Tenant, or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of said Lease or any amendment, modification or revision of said Lease. No action or proceeding brought or instituted under this Guaranty against the undersigned, and no recovery obtained in pursuance thereof shall be any bar or defense to any further action or proceeding which may be brought under this Guaranty by reason of any further defaults to Tenant. The liability of the undersigned shall not be deemed to be waived, released, discharged, impaired or affected by reason of the release or discharge of the Tenant in any creditors, receivership, bankruptcy or other proceedings, or the rejection or disaffirmance of the Lease in any proceedings.

No amendment, modification, or extension of the Lease which has the effect of increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

5.     All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) or telecopy number(s) set forth below.  All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time to time.  Each communication shall be deemed duly given and received:  (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :     Birmingham Realty Company
    2118       ~~210~~ First Avenue North
               Birmingham, Alabama 35203
               Attn:_____

               or such other address as Landlord may direct from time to time.

Guarantor:     Winn-Dixie Stores, Inc.
               Attn: General Counsel,  Esquire
               5050 Edgewood Court
               P.O. Box B
               Jacksonville, FL 32203-0297

               or such other address as Guarantor  may direct from time to time.

6.     This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall

29

bind Guarantor, its successors and assigns.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date indicated below.

WINN-DIXIE STORES, INC.

By: _R. P. McCook_____

Its: _Vice President_____

Date: _2-4-97_____

STATE OF FLORIDA
COUNTY OF DUVAL

I, _Rebecca L. Sawyer_____, a Notary Public in and for said County, in said State, hereby certify that _R. P. McCook_____, whose name as President of Winn-Dixie Stores, Inc., a Florida corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this _4_ day of _February_____, 1997.

_Rebecca L. Sawyer_____

Printed Name: _Rebecca L. Sawyer_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp.          1998
Comm. No. CC 372310

30



EXHIBIT "B"

Legal Description

SHOPPING CENTER SITE
WINN DIXIE, COLUMBIANA, AL

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:  COMMENCE AT THE NE CORNER OF THE NW 1/4 OF SAID SECTION 26; THENCE IN A NORTHERLY DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION 26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED BOOK 12, PAGE 496; THENCE 137 DEGREES 14 MINUTES 28 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 30.06 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG LAST DESCRIBED COURSE AND SAID RIGHT OF WAY LINE, A DISTANCE OF 40.09 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION A DISTANCE OF 200.73 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION A DISTANCE OF 77.68 FEET; THENCE 21 DEGREES 21 MINUTES 23 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 171.49 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF ALABAMA HIGHWAY NO. 25; THENCE 90 DEGREES RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 571.64 FEET TO A 1" SOLID IRON AT THE NORTHEAST CORNER OF THAT PARCEL DESCRIBED IN VOLUME 305, PAGE 237; THENCE 59 DEGREES 03 MINUTES 43 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF SAID PARCEL, A DISTANCE OF 289.44 FEET TO AN OPEN TOP IRON; THENCE 0 DEGREES 11 MINUTES 30 SECONDS LEFT IN A WESTERLY DIRECTION ALONG THE NORTHERLY LINE OF A PARCEL DESCRIBED IN VOLUME 228, PAGE 49, A DISTANCE OF 96.94 FEET; THENCE 69 DEGREES 48 MINUTES 55 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 412.28 FEET; THENCE 51 DEGREES 18 MINUTES 52 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 462.07 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT OF WAY LINE OF SOUTHERN RAILWAY; THENCE 30 DEGREES 06 MINUTES 20 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 235.48 FEET TO A POINT ON THE WEST LINE OF SAID ELLIOT LOT; THENCE 81 DEGREES 15 MINUTES 03 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID WEST LINE OF THE ELLIOT LOT, AND PARALLEL WITH THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET, A DISTANCE OF 146.98 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 10.02 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT, IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 130.06 FEET; THENCE 86 DEGREES 13 MINUTES 39 SECONDS LEFT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 200.73 FEET TO THE POINT OF BEGINNING, CONTAINING 10.79 ACRES, MORE OR LESS.

32

This Instrument was prepared by
P. Christopher Wrenn, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203



(Reserved for Clerk)

### SUBORDINATION, NONDISTURBANCE,
### AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this January 13, 1998, between **NATIONWIDE LIFE INSURANCE COMPANY,** an Ohio corporation, whose address is P.O. Box 11007, Birmingham, Alabama 35288, Attention Commercial Real Estate Loan Department, 34T (together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation, whose address is 1550 Jackson Ferry Road, Montgomery, Alabama 36104 (together with its successors and assigns, "Winn-Dixie");

### R E C I T A L S:

1.     Lender has made or is about to make a loan to Birmingham Realty Company, an Alabama corporation ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Shelby County, Alabama (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Columbia Square" shopping center at the northwest corner of the intersection of Highway #70 and Highway #25, in Columbiana, Shelby County, Alabama, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.     By Lease dated February 4, 1997 (as amended by Short Form Lease dated February 4, 1997, recorded in Official Records Volume _1997_, page _07205_ of the public records of Shelby County, Alabama, and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant,

those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.    Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

**NOW THEREFORE**, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.    Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)    The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)    Winn-Dixie shall not be named as a party defendant unless required by law.

(c)    The Lease shall not be terminated or affected by any Foreclosure Event.

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender.  Notwithstanding the foregoing, Lender shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord);

2

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent; or

(e)    liable to Tenant if Lender acquires ownership of the Premises through foreclosure or any transfer of the Premises made in lieu thereof for any violation of the 1/4 mile use restriction set forth in Section 7 of the Lease.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease.  Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto.  However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.    Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any.  Any such purported action without such consent shall be void as against Lender.

7.    Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.    If Lender, or its assignee, obtains Landlord's interest in the Shopping Center, Lender agrees to promptly provide or cause to be provided to Tenant  (a) a copy of any current marked title commitment or

3

title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to _temporarily_ withhold rent in trust pending receipt of Transfer Requirements.

9.    If Lender enforces any right under the Mortgage to collect rent under the Lease, without obtaining title to the Premises, Lender shall provide to Tenant a W-9 form or its equivalent setting forth its proper name and tax identification number, signed by an authorized person, and/or such other information as Tenant may reasonably require (collectively, the "Tax Data"). The Tax Data must be obtained by Tenant to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to _temporarily_ withhold rent in trust pending receipt of the Tax Data.

**IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____    **NATIONWIDE LIFE INSURANCE COMPANY**
Print name:_____

_____    By:_____
Print name:_____        Its:_____
                                                              Date:_____

_Laura L. Andrews_                          **WINN-DIXIE MONTGOMERY, INC.**
Print name:___LAURA L. ANDREWS___

_Laura E. Baughman_                       By:___R. P. McCook_____
Print name:_Laura E. Baughman_              R. P. McCook
                                                             Its:__Vice President_____
                                                             Date:__1-13-98_____

4

STATE OF _____
COUNTY OF _____

      I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of Nationwide Life Insurance Company, an Ohio corporation, is signed to the foregoing instrument, and who is known to me, acknowledge before me on this day that, being informed of the contents of the instrument, he/she, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand this _____ day of _____, 1998.

Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)


STATE OF FLORIDA
COUNTY OF DUVAL

      I, _____Laura E. Baughman_____, a Notary Public in and for said County, in said State, hereby certify that _____R. P. McCook_____, whose name as Vice President of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand this _13_ day of January, 1998.

Printed Name:_Laura E. Baughman_
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

O:\TRANSFER\MONTGOME\0597\SNDA.WPD

LAURA E. BAUGHMAN
My Comm. Exp. July 17, 1998
Comm. No. CC 388830

5

EXHIBIT "A"

SHOPPING CENTER SITE
WINN DIXIE, COLUMBIANA, AL

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:  COMMENCE AT THE NE CORNER OF THE NW 1/4 OF SAID SECTION 26; THENCE IN A NORTHERLY DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION 26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED BOOK 12, PAGE 496; THENCE 137 DEGREES 14 MINUTES 28 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 30.06 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG LAST DESCRIBED COURSE AND SAID RIGHT OF WAY LINE, A DISTANCE OF 40.09 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 200.73 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION A DISTANCE OF 77.68 FEET; THENCE 21 DEGREES 21 MINUTES 23 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 171.49 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF ALABAMA HIGHWAY NO. 25; THENCE 90 DEGREES RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 571.64 FEET TO A 1" SOLID IRON AT THE NORTHEAST CORNER OF THAT PARCEL DESCRIBED IN VOLUME 305, PAGE 237; THENCE 59 DEGREES 03 MINUTES 43 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF SAID PARCEL, A DISTANCE OF 289.44 FEET TO AN OPEN TOP IRON; THENCE 0 DEGREES 11 MINUTES 30 SECONDS LEFT IN A WESTERLY DIRECTION ALONG THE NORTHERLY LINE OF A PARCEL DESCRIBED IN VOLUME 228, PAGE 49, A DISTANCE OF 96.94 FEET; THENCE 69 DEGREES 48 MINUTES 55 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 412.28 FEET; THENCE 51 DEGREES 18 MINUTES 52 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 462.07 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT OF WAY LINE OF SOUTHERN RAILWAY; THENCE 30 DEGREES 06 MINUTES 20 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 235.48 FEET TO A POINT ON THE WEST LINE OF SAID ELLIOT LOT; THENCE 81 DEGREES 15 MINUTES 03 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID WEST LINE OF THE ELLIOT LOT, AND PARALLEL WITH THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET, A DISTANCE OF 146.98 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 10.02 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT, IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 130.06 FEET; THENCE 86 DEGREES 13 MINUTES 39 SECONDS LEFT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 200.73 FEET TO THE POINT OF BEGINNING, CONTAINING 10.79 ACRES, MORE OR LESS.

6



SITE PLAN

COLUMBIANA SQUARE
COLUMBIANA, ALABAMA

charles a. cline.

**EXHIBIT "D"**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    WINN-DIXIE MONTGOMERY, INC. ("Owner")
       _____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No._____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is located at a ground elevation of _____; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

Executed this the _____ day of _____, 199___.

_____

Registered Land Surveyor No._____
Address:_____

**(SURVEYOR'S SEAL)**

39

(

## ESTOPPEL CERTIFICATE

WINN-DIXIE STORE #597
Columbia Square
Columbiana, Alabama

The undersigned officer of Winn-Dixie Montgomery, Inc., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of January 13, 1998 (the "Certificate Date"), the following is true and correct:

1.    That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with Birmingham Realty Company, a Alabama corporation, as the current landlord ("Landlord") dated February 4, 1997, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Columbia Square (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

    (a)    Short Form Lease dated February 4, 1997, recorded in Official Records Volume _1997_, page _9445_ of the public records of Shelby County, Alabama.

2.    That the term of the Lease commenced November 12, 1997, and is scheduled to expire on November 11, 2017 unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including January 31, 1998, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease.

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

6.    Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: AmSouth Bank and Nationwide Life Insurance Company.

7.    Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.    Notwithstanding anything to the contrary herein:

    (a)    No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

    (b)    Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.    The address for notices to Tenant is 1550 Jackson Ferry Road, Montgomery, Alabama 36104, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.    This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE MONTGOMERY, INC.**

By: _R. P. McCook_

R. P. McCook

Its: **Vice President**

The undersigned, on behalf of Winn-Dixie Stores, Inc., a Florida corporation, guarantor of the Lease ("Guarantor"), hereby affirms that, to the best of Guarantor's knowledge, the foregoing statements are true and correct.

**WINN-DIXIE STORES, INC.**

By: _R. P. McCook_

R. P. McCook

Its: **Vice President**

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Landlord.

**BIRMINGHAM REALTY COMPANY**

By: _Charles M Miller Jr_

Charles M Miller Jr

Its: _Vice President_

Date: _1/14/98_

O:\TRANSFER\MONTGOME\0597\ESTOPPEL.2

# CITY OF COLUMBIANA

107 Mildred Street
COLUMBIANA,  ALABAMA  35051
TELEPHONE  205 669 5800

ADMINISTRATIVE ASSISTANT
HILRY KING

MAYOR
LEWIS B. WALKER

COUNCIL
JOHNNY LEE
DANNY KELLEY
JOHN D. AVERETT
KERRY NIVENS
JOHNNY FARR

July 16, 1996

## EXHIBIT "F"

Re:    Proposed Shopping Center at intersection of Alabama Highway 25
and Depot Street in Columbiana, Alabama as described on attached
Exhibit A

**To Whom it May Concern:**   .

This is to advise you that the zoning and use of the above captioned Premises is
governed by the laws and regulations of the City of Columbiana, Alabama and the Premises
have been zoned to allow an establishment or facility which includes the retail sale of food
and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine
for off site consumption, video rental, and similar uses, a bank, and a dry cleaning business
under Article 2, Section 23 of the Zoning Ordinance of the City of Columbiana, relating to
uses permitted in the M-1 (Light Industry) District.  The aforesaid zoning permits the use of
the improvements to be located on the Premises as described above. The aforementioned
Zoning district is appropriate for this state's comprehensive plan's future land use designation
(if any exists).

As of the date hereof, we are not aware of any facts with respect to the Premises that
constitute a violation of any building or zoning laws, rules, or regulations.  Any non-
conforming elements of the development are considered valid non-conforming elements under
the current building and zoning law.

Should you have further questions in this regard, please advise.

Sincerely,

Lewis H. King, Jr.

Attachment:    Zoning Regulations for Permitted Use of Premises

Exhibit "F"  1

ARTICLE 2   (Continued) DISTRICT REQUIREM⁞S

SECTION 23 - INDUSTRIAL DISTRICT REQUIREMENTS

| DISTRICT | U S E   R E G U L A T I O N S |
|---|---|
| M - 1<br><br>(Light<br>Industry) | USES PERMITTED:  Light industrial operations not obnoxious, offensive or detrimental to neighboring property by reason of dust, smoke, vibration, noise, odor, or effluents, and including the follow-ing types of business or industry: ice cream plants and cream-eries; cold storage plants; ice plants, bottling and central distribution plants; baking plants; textile mills; dyeing plants; warehouses; dry cleaners and laundries; trailer camps, and similar types of industries or businesses.<br><br>All business, service and manufacturing uses permitted in a B-2 Business District.<br><br>USES PERMITTED ON APPEAL:  Any manufacturing or business use not specifically prohibited herein.<br><br>Any use permitted or permitted on appeal in a R-2 Residential District, and subject to all district requirements of said district as specified in Section 21 hereof.<br><br>USES PROHIBITED:  Slaughter house; stockyard; bag cleaning; central mixing plant for cement, mortar, plaster, or paving material; curing, tanning or storage of hides; distillation of bones, coal, tar, or wood; fat rendering; forge plant; manufacture of acet-ylene, acid, alcohol, ammonia, bleaching powder, brick, pottery, terra cotta or tile, concrete blocks, candles, disinfectants, dyestuffs, fertilizers, illuminating or heating gas including storage, paint, turpentine, varnish, soap, and tar products; wool pulling or scouring; junk yards; cotton waste reclaiming; and similar types of plants or operations. |
| M - 2<br><br>(General<br>Industry) | USES PERMITTED:  Any industrial, service or commercial use, except those which in the opinion of the Building Inspector would cause noise, smoke, gas, vibration, fumes, dust, or other objection-able conditions which would affect a considerable portion of the city.<br><br>USES PERMITTED ON APPEAL:  Any industrial, service or commercial use, and subject to such conditions and safeguards as the Board of Adjustment may require to preserve and protect any portions of the city which otherwise could be adversely affected.<br><br>USES PROHIBITED:  Residences and apartments, excepting quarters for a watchman or custodian and his family. |

F - 2

SEC~~OPD~~#24| 2. That the Zoning Ordinance of the City of Columbiana, being Ordinance No. 215, be amended by striking Section 13, District Boundaries therefrom and by inserting in lieu thereof the following:

on

bou

or

lin

* Section 13. District Boundaries. The boundaries of the above districts are hereby established as shown on the Zoning Map of the City, as amended by Ordinance No. 241, adopted on the 14th day of Aug. 1967, to change the Zoning Classification of certain property in the City of Columbiana from R-1 Residential District to B-1 Business District based on petitions of J.B.L., Inc., H.S. Bristow, Sr. and Estelle Bristow, and Edward James Roberson, all of which petitions were filed with the Columbiana Zoning Commission, also known as Columbiana Town Planning Commission on the 5th day of June, 1967, making said amendment. Unless otherwise shown on said Zoning Map, the boundries of districts are lot lines, the center lines of streets or alleys or such lines extended, railroad right-of-way lines, or the corporate limit lines as they existed at the time of enactment of this ordinance. Questions concerning the exact location of district boundary lines shall be decided by the Board of Adjustment.

concerning the exact location of district boundary lines shall be decided by the Board of Adjustment.

SECTION 14. USES

In each district no other use other than the types specified as "permitted" or "permitted on appeal", shall be allowed. (See Article 2). Uses specified as "permitted" shall be permitted upon application to the building inspector. Uses specified as "permitted on appeal" are exceptions, and no permit shall be issued for such uses except with the written approval of the Board of Adjustment, and subject to such conditions as said Board may require to preserve and protect the character of the district.

Any use or structure existing at the time of enactment or of subsequent amendment to this ordinance, but not in conformity with its provisions, may be continued with the following limitations. Any use or structure which does not conform to the provisions of this ordinance shall not be:

        a. Changed to another non-conforming use.
        b. Re-established after discontinuance for one year.
        c. Extended except in conformity to this ordinance.
        d. Rebuilt after fire or damage exceeding its full
            value above the foundation for tax purposes.

SECTION 15. BUILDING LOTS, YARDS, AND OPEN SPACE

In each district each structure hereafter erected or altered shall be provided with the yards specified, and shall be on a lot of the area and width specified in Article 2. No open space or lot required for a building or structure shall during its life be occupied by or counted as open space for another building or structure.

F-3

ARTICLE 2 - (Continued) DISTRICT REQUIREMENTS

SECTION 22 - BUSINESS DISTRICT REQUIREMENTS

| DISTRICT | U S E   R E G U L A T I O N S |
|---|---|
| B - 1<br><br>(Local<br>Shopping<br>District) | USES <u>PERMITTED</u>:  Neighborhood retail stores and markets, including the following types of stores:  food; general merchandise; apparel; furniture; household and hardware; radio and television; drugs and sundries; jewelry and gifts; florists; sporting goods; gasoline service stations; and similar types.<br><br>Neighborhood services including the following types:  dry cleaning and laundry pickup stations; barber and beauty shops; shoe repair, offices, banks, post offices, theaters and similar services.<br><br>Any use permitted or permitted on appeal in a R-2 Residential District, and subject to all district requirements of a R-2 District as specified in Section 21, hereof.<br><br>USES <u>PERMITTED</u> ON APPEAL:  None expressly specified.<br><br>USES <u>PROHIBITED</u>:  Major auto repair; laundry and dry cleaning plants; manufacturing; any use prohibited in a B-2 Business District. |
| B - 2<br><br>(General<br>Business) | USES <u>PERMITTED</u>:  Any retail or wholesale business or service not specifically restricted or prohibited.<br>Major auto repair; places of amusement and assembly; any use permitted in a B-1 (Local Shopping) District.<br><br>USES <u>PERMITTED</u> ON APPEAL:  Dry cleaners and laundries.<br>Manufacturing incidental to a retail business where articles are sold at retail on the premises, not specifically prohibited herein.<br><br>USES <u>PROHIBITED</u>:  Stockyard; live animal sales; coal yard; lumber yard; or mill; auto wrecking; gasoline, oil or alcohol storage above the ground in excess of five hundred (500) gallons; grist or flour mill; junk, scrap paper, rag storage or baling. Any use prohibited in a M-1 Industrial District. |

F - 4

| S P A C E   A N D   H E I G H T   R E G U L A T I O N S | DISTRICT |
|---|---|
| MINIMUM LOT SIZE:  It is the intent of the ordinance that lots of sufficient size be used for any business or service use to provide adequate parking and loading space in addition to the space required for the other normal operations of the business or service.<br><br>MINIMUM YARD SIZE:  Front, 20 feet; rear, 20 feet; side, not specified, except on a lot adjoining along its side lot line a lot which is in a residential district, there shall be a side yard not less than eight (8) feet wide.<br><br>MAXIMUM HEIGHT:  35 feet or 2 stories.<br><br>OFF-STREET PARKING:  200 sq. ft. of parking space per each: 100 sq. ft. of one (1) story buildings, or per each 60 sq. ft. of two (2) story buildings.  Theaters; one car space per each five (5) seats.<br><br>OFF-STREET LOADING AND UNLOADING:  Shall use required rear or side yard for loading and unloading. | B - 1<br><br>(Local Shopping District) |
| MINIMUM LOT SIZE:  Same as for B-1 District.<br><br>MINIMUM YARD SIZE:  None specified.<br><br>MAXIMUM HEIGHT:  65 feet or 5 stories.<br><br>OFF-STREET PARKING:  Theaters, one car space per each ten (10) seats; hotels, one (1) car space per each four (4) rooms.<br><br>OFF-STREET LOADING AND UNLOADING:  Shall provide space for loading and unloading for structures hereafter erected or altered when same is on a lot adjoining a public or private alley. | B - 2<br><br>(General Business) |

F - 5

## EXHIBIT "G"

### SHORT FORM LEASE

    **THIS SHORT FORM LEASE** is hereby executed this _____, 1997, by and between **BIRMINGHAM REALTY COMPANY**, an Alabama corporation, whose mailing address is 2101 Highland Avenue, Suite 200, Birmingham, Alabama 35205 ("Landlord") and **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, whose mailing address is 1550 Jackson Ferry Road, Montgomery, Alabama 36104 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

    **WHEREAS**, Landlord and Tenant did enter into a Lease (the "Lease"), dated _____; and

    **WHEREAS**, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

    For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

    The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

    All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

42

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LANDLORD:**

_____

**BIRMINGHAM REALTY COMPANY**, an
Alabama corporation

Print Name:_____

_____

By:_____

Print Name:_____

Its:_____

     As to Landlord

**TENANT:**

_____

**WINN-DIXIE MONTGOMERY, INC.**

Print Name:_____

_____

By:_____

Print Name:_____

Its:_____

     As to Tenant

**ACKNOWLEDGMENTS**

43

EXHIBIT "B"

That certain store building, approximately 220 feet in width by 200 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers, and the land on which the same shall stand, which store building and related improvements (collectively, the "Store") located in that certain shopping center known as Columbia Square, which shopping center is more particularly described as follows:

SHOPPING CENTER SITE
WINN DIXIE, COLUMBIANA, AL

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE NE CORNER OF THE NW 1/4 OF SAID SECTION 26; THENCE IN A NORTHERLY DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION 26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED BOOK 12, PAGE 496; THENCE 137 DEGREES 14 MINUTES 28 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 30.06 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG LAST DESCRIBED COURSE AND SAID RIGHT OF WAY LINE, A DISTANCE OF 40.09 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION A DISTANCE OF 200.73 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION A DISTANCE OF 77.68 FEET; THENCE 21 DEGREES 21 MINUTES 23 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 171.49 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF ALABAMA HIGHWAY NO. 25; THENCE 90 DEGREES RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 571.64 FEET TO A 1" SOLID IRON AT THE NORTHEAST CORNER OF THAT PARCEL DESCRIBED IN VOLUME 305, PAGE 237; THENCE 59 DEGREES 03 MINUTES 43 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF SAID PARCEL, A DISTANCE OF 289.44 FEET TO AN OPEN TOP IRON; THENCE 0 DEGREES 11 MINUTES 30 SECONDS LEFT IN A WESTERLY DIRECTION ALONG THE NORTHERLY LINE OF A PARCEL DESCRIBED IN VOLUME 228, PAGE 49, A DISTANCE OF 96.94 FEET; THENCE 69 DEGREES 48 MINUTES 55 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 412.28 FEET; THENCE 51 DEGREES 18 MINUTES 52 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 462.07 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT OF WAY LINE OF SOUTHERN RAILWAY; THENCE 30 DEGREES 06 MINUTES 20 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 235.48 FEET TO A POINT ON THE WEST LINE OF SAID ELLIOT LOT; THENCE 81 DEGREES 15 MINUTES 03 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID WEST LINE OF THE ELLIOT LOT, AND PARALLEL WITH THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET, A DISTANCE OF 146.98 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 10.02 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT, IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 130.06 FEET; THENCE 86 DEGREES 13 MINUTES 39 SECONDS LEFT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 200.73 FEET TO THE POINT OF BEGINNING, CONTAINING 10.79 ACRES, MORE OR LESS.

5



**EXHIBIT "H"**

Coming Soon Sign Specifications

**Text of Sign:**        Coming Soon —
                         Winn-Dixie
                         Marketplace


**Size:**                Maximum size permitted by applicable law and
                         restrictions of record and otherwise reasonably
                         acceptable to Landlord and Tenant

46

EXHIBIT "I"

## DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS

THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS (this "Declaration") is made _____, 199__ by **BIRMINGHAM REALTY COMPANY**, an Alabama corporation (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

### R E C I T A L S

1.      Owner is the owner of that certain real property located in the County of Shelby, State of Alabama, as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), the Outparcel described on Exhibit "C" (the "Outparcel"), the Future Development Area described on Exhibit "D" (the "Future Development Area"),  and Owner may own certain other real property hereinafter referred to as  "Owner's Remaining Land", which term shall refer to all real property other than the Outparcel or Future Development Area  owned or controlled by Owner and located within one-quarter (1/4) of a mile of any boundary of the Shopping Center.

2.      Owner is the landlord under that certain lease dated _____ between Owner and WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation ("Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the  "Premises").

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center, the Outparcel, Future Development Area,  and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center, Outparcel, Future Development Area  and Owner's Remaining Land,  shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

### I.
### RESTRICTIONS

1.1      Restrictions on Use. (a) The Shopping Center and Outparcel shall be restricted against use of all or any portion thereof as any of the following: dance hall, bar, tavern or lounge; "teen lounge," pawn shop, massage parlor, strip joint, spa, health club,  or pornographic store; carnival, theater, fair or entertainment facility; church; flea market; pool hall, bowling alley, video arcade, bingo parlor, or game room; roller rink; funeral home or undertaking business; business or professional offices, except that  business and professional offices (including finance company offices, dentist/physician offices, or insurance offices) of a type dealing with the public and with no more than ten employees or owners using each individual space  at a time may be located in up to 3,000 square feet of space located in line with  the Store, but more than 40 feet  from any  exterior wall of the Store, or may be located on the Outparcel or Building Pad (without restriction as to the number of employees or owners provided above); penal or correctional institution; or storage or manufacture of explosives or other flammable or hazardous materials;  a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(b)  The Future Development Area shall be restricted against use of all or any portion thereof as a massage parlor, strip joint, pornographic store, flea market, or for storage or manufacture of explosives or other flammable or hazardous materials, a business or use which creates strong, unusual or offensive odors, fumes,  dust or vapors which  is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness

47

**EXHIBIT "I"**

**DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS**

THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS (this "Declaration") is made _____, 199__ by **COLUMBIANA ASSOCIATES, L.L.C.**, an Alabama limited liability company (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## R E C I T A L S

1.    Owner is the owner of that certain real property located in the County of Shelby, State of Alabama, as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), the Outparcel described on Exhibit "C" (the "Outparcel"), the Future Development Area described on Exhibit "D" (the "Future Development Area"), and Owner may own certain other real property hereinafter referred to as "Owner's Remaining Land", which term shall refer to all real property other than the Outparcel or Future Development Area owned or controlled by Owner and located within one-quarter (1/4) of a mile of any boundary of the Shopping Center.

2.    Owner is the landlord under that certain lease dated _____ between Owner and WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation ("Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Premises").

3.    Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center, the Outparcel, Future Development Area, and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center, Outparcel, Future Development Area and Owner's Remaining Land, shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

## I.
## RESTRICTIONS

1.1    Restrictions on Use. (a) The Shopping Center and Outparcel shall be restricted against use of all or any portion thereof as any of the following: dance hall, bar, tavern or lounge; "teen lounge," pawn shop, massage parlor, strip joint, spa, health club, or pornographic store; carnival, theater, fair or entertainment facility; church; flea market; pool hall, bowling alley, video arcade, bingo parlor, or game room; roller rink; funeral home or undertaking business; business or professional offices, except that business and professional offices (including finance company offices, dentist/physician offices, or insurance offices) of a type dealing with the public and with no more than ten employees or owners using each individual space at a time may be located in up to 3,000 square feet of space located in line with the Store, but more than 40 feet from any exterior wall of the Store, or may be located on the Outparcel or Building Pad (without restriction as to the number of employees or owners provided above); penal or correctional institution; or storage or manufacture of explosives or other flammable or hazardous materials; a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

48

(b)  The Future Development Area shall be restricted against use of all or any portion thereof as a massage parlor, strip joint, pornographic store, flea market, or for storage or manufacture of explosives or other flammable or hazardous materials, a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates creates unusual  or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(c)  No portion of the Shopping Center, Outparcel, Future Development Area or Owner's Remaining Land , except for the Premises, shall be used  as a supermarket, grocery store, meat market, fish, seafood, fruit or vegetable market, bakery, delicatessen, dairy products or frozen food business, with the exceptions that:  (1) a business or businesses may sell fancy or staple groceries, meats, fish, seafood, fruit, vegetables, bakery goods, dairy products or frozen foods in the lesser of 1000 square feet of sales area or ten percent (10%) of the square foot area of any storeroom incidental only to the conduct of another business; (2) a restaurant  located no closer than 40 feet of any boundary of the Store may sell prepared, ready-to-eat food items for consumption either on or off site; (3) a package store or a drug store in the Shopping Center or Future Development Area or a gasoline and convenience store on the Outparcel  may sell beer and wine for off-premises consumption; (4) an ice cream/frozen yogurt shop, a doughnut or bagel shop, and/or a health foods store not selling perishables shall be permitted on  any parcel, provided that if it is located in the Shopping Center, Outparcel or Future Development Area, such use may not exceed 2400 square feet; (5) a sandwich shop, pizza shop or restaurant shall be permitted in the Shopping Center so long as such use has a seating capacity of less than 48 persons, and a sandwich shop, pizza shop or restaurant shall be permitted on the Building Pad (4200 square feet) without regard to the number of persons.

(d)  Except as specified above, the Store shall be subject in all respects to all restrictions and other provisions of the foregoing paragraph 1.1.

1.2    Restrictions on Building Height and Size.  Construction of buildings and other improvements in the Outparcel  shall be restricted to 25% of the ground area of the Outparcel, with the remainder of the Outparcel to be comprised of Common Areas consisting of parking and landscaped areas.  No structure, other than the Store, erected in the Shopping Center or Outparcel shall exceed a maximum vertical building height of 25 feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and WD shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or WD commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

III.

49

## IV.
## EASEMENTS

4.1     Ingress and Egress.

(a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to WD, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas as shown on the Site Plan.

(b)     Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center or Future Development Area.

(c)     Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center or Future Development Area.

## V.
## GENERAL PROVISIONS

5.1     Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, Outparcel, Future Development Area, and Owner's Remaining Land and shall inure to the benefit of WD, its successors and assigns.

5.2     Severability.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     Pronouns.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4     Captions.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5     Governing Law.  This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of Alabama.

5.6     No Presumption.  This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7     Exhibits.  The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

49

or which creates creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(c) No portion of the Shopping Center, Outparcel, Future Development Area or Owner's Remaining Land , except for the Premises, shall be used as a supermarket, grocery store, meat market, fish, seafood, fruit or vegetable market, bakery, delicatessen, dairy products or frozen food business, with the exceptions that: (1) a business or businesses may sell fancy or staple groceries, meats, fish, seafood, fruit, vegetables, bakery goods, dairy products or frozen foods in the lesser of 1000 square feet of sales area or ten percent (10%) of the square foot area of any storeroom incidental only to the conduct of another business; (2) a restaurant located no closer than 40 feet of any boundary of the Store may sell prepared, ready-to-eat food items for consumption either on or off site; (3) a package store or a drug store in the Shopping Center or Future Development Area or a gasoline and convenience store on the Outparcel may sell beer and wine for off-premises consumption; (4) an ice cream/frozen yogurt shop, a doughnut or bagel shop, and/or a health foods store not selling perishables shall be permitted on any parcel, provided that if it is located in the Shopping Center, Outparcel or Future Development Area, such use may not exceed 2400 square feet; (5) a sandwich shop, pizza shop or restaurant shall be permitted in the Shopping Center so long as such use has a seating capacity of less than 48 persons, and a sandwich shop, pizza shop or restaurant shall be permitted on the Building Pad (4200 square feet) without regard to the number of persons.

(d) Except as specified above, the Store shall be subject in all respects to all restrictions and other provisions of the foregoing paragraph 1.1.

1.2    <u>Restrictions on Building Height and Size</u>. Construction of buildings and other improvements in the Outparcel shall be restricted to 25% of the ground area of the Outparcel, with the remainder of the Outparcel to be comprised of Common Areas consisting of parking and landscaped areas. No structure, other than the Store, erected in the Shopping Center or Outparcel shall exceed a maximum vertical building height of 25 feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and WD shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or WD commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center, Outparcel, Future Development Area, and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of WD, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of Shelby County, Alabama.

48

COLUMBIANA SQUARE
COLUMBIANA, ALABAMA

SITE PLAN

COLUMBIANA SQUARE
COLUMBIANA, ALABAMA

charles a. cline.

EXHIBIT "B"

## SHOPPING CENTER SITE
### WINN DIXIE, COLUMBIANA, AL

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:  COMMENCE AT THE NE CORNER OF THE NW 1/4 OF SAID SECTION 26; THENCE IN A NORTHERLY DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION 26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED BOOK 12, PAGE 496; THENCE 137 DEGREES 14 MINUTES 28 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 30.06 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG LAST DESCRIBED COURSE AND SAID RIGHT OF WAY LINE, A DISTANCE OF 40.09 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION A DISTANCE OF 200.73 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION A DISTANCE OF 77.68 FEET; THENCE 21 DEGREES 21 MINUTES 23 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 171.49 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF ALABAMA HIGHWAY NO. 25; THENCE 90 DEGREES RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 571.64 FEET TO A 1" SOLID IRON AT THE NORTHEAST CORNER OF THAT PARCEL DESCRIBED IN VOLUME 305, PAGE 237; THENCE 59 DEGREES 03 MINUTES 43 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE OF SAID PARCEL, A DISTANCE OF 289.44 FEET TO AN OPEN TOP IRON; THENCE 0 DEGREES 11 MINUTES 30 SECONDS LEFT IN A WESTERLY DIRECTION ALONG THE NORTHERLY LINE OF A PARCEL DESCRIBED IN VOLUME 228, PAGE 49, A DISTANCE OF 96.94 FEET; THENCE 69 DEGREES 48 MINUTES 55 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 412.28 FEET; THENCE 51 DEGREES 18 MINUTES 52 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 462.07 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT OF WAY LINE OF SOUTHERN RAILWAY; THENCE 30 DEGREES 06 MINUTES 20 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 235.48 FEET TO A POINT ON THE WEST LINE OF SAID ELLIOT LOT; THENCE 81 DEGREES 15 MINUTES 03 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID WEST LINE OF THE ELLIOT LOT, AND PARALLEL WITH THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET, A DISTANCE OF 146.98 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 10.02 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS LEFT, IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 130.06 FEET; THENCE 86 DEGREES 13 MINUTES 39 SECONDS LEFT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 200.73 FEET TO THE POINT OF BEGINNING, CONTAINING 10.79 ACRES, MORE OR LESS.

EXHIBIT "C"

**OUT PARCEL DESCRIPTION**
**WINN DIXIE, COLUMBIANA, AL**

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:  COMMENCE AT THE NE CORNER OF THE NW 1/4 OF SAID SECTION 26; THENCE IN A NORTHERLY DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION 26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED BOOK 12, PAGE 496; THENCE 137 DEGREES 14 MINUTES 28 SECONDS RIGHT IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 70.15 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG LAST DESCRIBED COURSE AND RIGHT OF WAY LINE, A DISTANCE OF 72.72 FEET; THENCE 86 DEGREES 37 MINUTES 09 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 15.05 FEET TO A CONCRETE MONUMENT WHICH IS 40 FEET FROM THE CENTERLINE OF SAID DEPOT STREET; THENCE 93 DEGREES 25 MINUTES 46 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF 47.55 FEET TO A MONUMENT AT THE INTERSECTION OF THE WESTERLY RIGHT OF WAY LINE OF DEPOT STREET AND ALABAMA HIGHWAY NO. 25; THENCE 43 DEGREES 45 MINUTES 52 SECONDS RIGHT IN A SOUTHERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 94.24 FEET TO A MONUMENT 60 FEET FROM THE CENTERLINE OF ALABAMA HIGHWAY NO. 25; THENCE 31 DEGREES 41 MINUTES 22 SECONDS RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY LINE A DISTANCE OF 77.00 FEET; THENCE 90 DEGREES RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 171.49 FEET; THENCE 21 DEGREES 21 MINUTES 23 SECONDS RIGHT IN A NORTHWESTERLY DIRECTION, A DISTANCE OF 77.68 FEET; THENCE 93 DEGREES 46 MINUTES 21 SECONDS RIGHT IN A NORTHEASTERLY DIRECTION, A DISTANCE OF 200.73 FEET TO THE POINT OF BEGINNING, CONTAINING 0.80 ACRES, MORE OR LESS.

EXHIBIT "D"

FUTURE DEVELOPMENT AREA
REMAINING LAND
COLUMBIANA WINN-DIXIE SITE

A PARCEL OF LAND LOCATED IN THE NE 1/4 OF THE NW 1/4 AND THE
NW 1/4 OF THE NE 1/4 OF SECTION 26, TOWNSHIP 21 SOUTH, RANGE 1
WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:   COMMENCE AT THE NE
CORNER OF THE NW 1/4 OF SAID SECTION 26;   THENCE IN A NORTHERLY
DIRECTION ALONG THE PROJECTION OF THE EASTERLY LINE OF SAID SECTION
26, A DISTANCE OF 2.82 FEET TO A POINT ON THE WESTERLY RIGHT OF WAY
LINE OF DEPOT STREET SAID POINT ALSO BEING AN OLD REBAR CORNER
WHICH IS ALSO THE SE CORNER OF THE ELLIOT LOT DESCRIBED IN DEED
BOOK 12, PAGE 496;  THENCE 137 DEGREES 28 MINUTES 28 SECONDS RIGHT
IN A SOUTHEASTERLY DIRECTION ALONG SAID RIGHT OF WAY LINE, A
DISTANCE OF 142.87 FEET;  THENCE 86 DEGREES 37 MINUTES 09 SECONDS
RIGHT IN A SOUTHWESTERLY DIRECTION AND ALONG SAID RIGHT OF WAY
LINE, A DISTANCE OF 15.05 FEET TO A CONCRETE MONUMENT WHICH IS 40
FEET FROM THE CENTERLINE OF SAID DEPOT STREET;  THENCE 93 DEGREES 25
MINUTES 46 SECONDS LEFT IN A SOUTHEASTERLY DIRECTION, A DISTANCE OF
47.55 FEET TO A MONUMENT AT THE INTERSECTION OF THE WESTERLY RIGHT
OF WAY LINE OF DEPOT STREET AND ALABAMA HIGHWAY NO. 25;  THENCE 43
DEGREES 45 MINUTES 52 SECONDS RIGHT IN A SOUTHERLY DIRECTION AND
ALONG SAID RIGHT OF WAY LINE, A DISTANCE OF 94.24 FEET TO A
MONUMENT 60 FEET FROM THE CENTERLINE OF ALABAMA HIGHWAY NO. 25;
THENCE 31 DEGREES 41 MINUTES 22 SECONDS RIGHT IN A SOUTHWESTERLY
DIRECTION AND ALONG SAID RIGHT OF WAY LINE A DISTANCE OF 648.64
FEET TO A 1" SOLID IRON AT THE NORTHEAST CORNER OF THAT PARCEL
DESCRIBED IN VOLUME 305, PAGE 237;  THENCE 59 DEGREES 03 MINUTES 43
SECONDS RIGHT IN A NORTHWESTERLY DIRECTION ALONG THE NORTHERLY LINE
OF SAID PARCEL, A DISTANCE OF 289.44 FEET TO AN OPEN END IRON;
THENCE 0 DEGREES 11 MINUTES 30 SECONDS LEFT IN A WESTERLY DIRECTION
ALONG THE NORTH LINE OF THAT PARCEL DESCRIBED IN VOLUME 228, PAGE
49, A DISTANCE OF 96.94 FEET TO THE POINT OF BEGINNING;   THENCE
CONTINUE ALONG LAST DESCRIBED COURSE, A DISTANCE OF 14.04 FEET TO
A 1" OPEN TOP IRON;  THENCE 0 DEGREES 14 MINUTES 42 SECONDS RIGHT IN
A WESTERLY DIRECTION ALONG THE NORTH LINE OF THAT PARCEL DESCRIBED
IN VOLUME 303, PAGE 411, A DISTANCE OF 170.30 FEET TO A 1" REBAR;
THENCE 5 DEGREES 48 MINUTES 53 SECONDS LEFT IN A SOUTHWESTERLY
DIRECTION ALONG THE NORTH LINE OF PARCELS DESCRIBED IN VOLUME 342,
PAGE 739 AND VOLUME 284, PAGE 863, A DISTANCE OF 180.02 FEET
(RECORDED 187.50') TO A 1 1/4" OPEN TOP IRON;  THENCE 3 DEGREES 09
MINUTES LEFT IN A SOUTHWESTERLY DIRECTION ALONG THE NORTH LINE OF
PARCELS DESCRIBED IN VOLUME 250, PAGE 379 AND VOLUME 262, PAGE 849,
A DISTANCE OF 170.89 FEET (RECORDED 171.34') TO A 1/2" REBAR;

55
PAGE 1 of 2

THENCE 1 DEGREE 58 MINUTES 56 SECONDS RIGHT IN A WESTERLY DIRECTION
ALONG THE NORTH LINE OF THAT PARCEL DESCRIBED IN VOLUME 300, PAGE
111, A DISTANCE OF 85.61 FEET (RECORDED 85.67') TO A POINT ON THE
EASTERLY LINE OF LOT 15 OF COLUMBIANA HOUSE INC., SUBDIVISION
RECORDED IN MAP BOOK 3, PAGE 82 IN THE OFFICE OF THE JUDGE OF
PROBATE IN SHELBY COUNTY, ALABAMA; THENCE 103 DEGREES 00 MINUTES 12
SECONDS RIGHT IN A NORTHERLY DIRECTION ALONG THE EASTERLY LINE OF
LOTS 15, 14 AND 13 OF SAID COLUMBIANA HOMES INC. SUBDIVISION, A
DISTANCE OF 271.08 FEET (RECORDED 260'); THENCE 99 DEGREES 02
MINUTES 50 SECONDS (RECORDED 98 DEGREES 56 MINUTES) LEFT IN A
WESTERLY DIRECTION ALONG THE NORTH LINE OF SAID LOT 13 AND ITS
WESTWARD EXTENSION, A DISTANCE OF 222.05 FEET (RECORDED 210.00');
THENCE 98 DEGREES 56 MINUTES RIGHT IN A NORTHERLY DIRECTION ALONG
THE EASTERLY LINE OF SAID COLUMBIANA HOMES INC., SUBDIVISION, A
DISTANCE OF 257.60 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT OF
WAY LINE OF THE SOUTHERN RAILWAY; THENCE 55 DEGREES 05 MINUTES
RIGHT IN A NORTHEASTERLY DIRECTION ALONG THE SAID SOUTHERN RAILWAY
RIGHT OF WAY (PARALLEL TO AND 50' AS MEASURED PERPENDICULARLY FROM
THE MAIN TRACK), A DISTANCE OF 624.31 FEET; THENCE 90 DEGREES RIGHT
IN A SOUTHEASTERLY DIRECTION ALONG SAID SOUTHERN RAILWAY RIGHT OF
WAY, A DISTANCE OF 50.00 FEET; THENCE 90 DEGREES LEFT IN A
NORTHEASTERLY DIRECTION ALONG SAID SOUTHERN RAILWAY RIGHT OF WAY,
A DISTANCE OF 300.00 FEET; THENCE 90 DEGREES RIGHT IN A
SOUTHEASTERLY DIRECTION, ALONG SAID SOUTHERN RAILWAY RIGHT OF WAY,
A DISTANCE OF 92.00 FEET; THENCE 59 DEGREES 53 MINUTES 40 SECONDS
RIGHT IN A SOUTHWESTERLY DIRECTION, A DISTANCE OF 462.07 FEET;
THENCE 51 DEGREES 18 MINUTES 52 SECONDS LEFT IN A SOUTHEASTERLY
DIRECTION, A DISTANCE OF 412.28 FEET TO THE POINT OF BEGINNING,
CONTAINING 10.57 ACRES, MORE OR LESS.

56

(Exhibit "D")
PAGE 2 of 2

## EXHIBIT "J"

## SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____, 199___, between **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, (the "Tenant") and **COLUMBIANA ASSOCIATES, L.L.C.**, an Alabama limited liability company  (the "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.  The Commencement Date of the Term is _____.

2.  The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.  All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

TENANT:

**WINN-DIXIE MONTGOMERY, INC.**

_____
Print name:_____

_____      By:_____
Print name:_____            Its:_____
                                                              Date:_____

LANDLORD:

**COLUMBIANA ASSOCIATES, L.L.C.**, an Alabama limited
liability company

_____
Print name:_____

_____      By:_____
Print name:_____            _____
                                                              Its:_____
                                                              Date:_____

**ACKNOWLEDGMENTS:**

57