**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                              Case No. 3:05-bk-03817-JAF

WINN-DIXIE STORES, INC., <u>et al.</u>,              Chapter 11

      Debtors.                                 Jointly Administered

_____/

**FINAL RESPONSE OF MILBANK, TWEED, HADLEY & M<u>C</u>CLOY**
**LLP, TO FEE EXAMINER'S FINAL REPORT OF REVIEW**
**AND ANALYSIS OF FIRST INTERIM FEE APPLICATION**
**SUBMITTED BY MILBANK, TWEED, HADLEY & M<u>C</u>CLOY**
**LLP FOR INTERIM PERIOD MARCH 1, 2005 THROUGH**
<u>**AND INCLUDING MAY 31, 2005**</u>

Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP ("<u>Milbank</u>") submits

this response (the "<u>Response</u>") to Stuart, Maue, Mitchell &

James, Ltd.'s (the "<u>Fee Examiner</u>") final report of the review

and analysis of the first interim application submitted by

Milbank for the interim period of March 1, 2005 through and

including May 31, 2005 (the "<u>Report</u>"), and in support thereof,

respectfully represents as follows:

<u>**BACKGROUND**</u>

1.  <u>Bankruptcy Filing</u>.  On February 21, 2005 (the

"<u>Petition Date</u>"), Winn-Dixie Stores, Inc. and certain of its

affiliated direct and indirect subsidiaries (collectively,

"<u>Winn-Dixie</u>" or the "<u>Debtors</u>") each filed a voluntary petition

for relief under chapter 11 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>")

in the United States Bankruptcy Court for the Southern District of New York (the "Ner York Bankruptcy Court").

    2.    Statutory Committees.  On March 1, 2005, the United States Trustee duly appointed the Official Committee of Unsecured Creditors (the "Committee") (Docket No. 176).  On August 17, 2005, the United States Trustee appointed the Equity Security Holders' Committee (the "Equity Committee") (Docket No. 3027), which was disbanded on January 11, 2006 (Docket No. 5098).

    3.    Venue Transfer.  By order dated April 13, 2005, the New York Bankruptcy Court transferred venue of these cases to the Bankruptcy Court for the Middle District of Florida (Jacksonville Division) (the "Bankruptcy Court").  The Debtors' cases are being jointly administered for procedural purposes only.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

    4.    Milbank's Retention.  On April 12, 2005, pursuant to the Order Under 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002, Authorizing Retention and Employment of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP as Counsel to Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc., et al. (Docket No. 702) (the "Retention Order"), the Bankruptcy Court

authorized the Committee's retention of Milbank as its counsel in these cases effective as of March 1, 2005.[1]

5.    <u>First Interim Fee Application</u>.  On July 15, 2005, Milbank submitted the First Application of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, for Interim Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred During Period from March 1, 2005 Through and Including May 31, 2005 (the "<u>First Interim Compensation Period</u>," and such interim fee application being the "<u>First Interim Fee Application</u>") (Docket No. 2242).

6.    On August 5, 2005, the Bankruptcy Court granted the First Interim Fee Application and allowed Milbank's request for $1,194,617.50 in fees and $108,654.51 in expenses, for a total award of $1,303,272.01 (Docket No. 2811).

7.    <u>Fee Examiner</u>.  On August 10, 2005, the Bankruptcy Court ordered the appointment of a fee examiner, pursuant to the Order Granting Motion To Appoint Fee Examiner (Docket No. 2933). On December 14, 2005, the Bankruptcy Court entered the Order Authorizing Debtors to Employ and Retain Stuart, Maue, Mitchell & James Ltd. as Fee Examiner (Docket No. 4599) (the "<u>Fee Examiner</u>"), pursuant to which certain procedures were

---

[1]    On March 30, 2005, the New York Bankruptcy Court entered an order (Docket No. 607) approving Milbank's retention on an interim basis

established for the Fee Examiner's review of all interim fee applications, including Milbank's First Interim Fee Application.

**RESPONSE**

8.    Milbank appreciates the opportunity to address the Report and to explain and clarify items that the Fee Examiner has identified, and to supplement its First Interim Fee Application.  Milbank hopes that the supplemental information in this Response and in the attached exhibits will assist the Fee Examiner and the United States Trustee in their review of the reasonableness and necessity of the fees and expenses incurred by Milbank during the First Interim Compensation Period.

9.    The balance of this submission will track the substantive portions of the Report.

**A.    Recomputation Of Fees And Expenses**

10.    The recomputed amount of total fees is $5,154 lower than the amount requested by Milbank.  (Report at 4). This difference is the result of a variance between task hours within some entries and entry hours.  Milbank apologizes for the error and will reduce its fee request by $5,154.

11.    The Report notes that there is no discrepancy between the amount of expenses requested for reimbursement and amounts computed by the Fee Examiner.

---

subject to final approval, which occurred pursuant to the Retention Order.

B.    **Potential Double Billing**

12.    The Fee Examiner has identified 1.10 hours with $821 in associated fees as "potential double billing."  (Report at 5).  <u>As noted in the Report, Milbank does not believe that it double billed, but Milbank will voluntarily reduce its fee request by $821</u>.

C.    **Missing Task Description**

13.    The Fee Examiner has identified .2 hours with $27 in associated fees that does not include a task description. (Report at 5).  Milbank reviewed this time entry and determined that the .2 hours identified was not billed to the Debtors' estates.  Stuart Maue has determined that Milbank did not bill the foregoing entry to the Debtors (Report at 6).

D.    **Vaguely Described Conferences**

14.    The Fee Examiner has identified 4.9 hours with $2,494 in associated fees as "vaguely described conferences" that "either did not identify the participants or did not specify the subject-matter or purpose of the communication . . . ." (Report at 8-9, Exhibit E-1).  Milbank has carefully examined the entries identified by the Fee Examiner and attaches as Exhibit A hereto revised activity descriptions in accordance with the Fee Examiner's specifications.  As noted by Stuart Maue, all of the revised entries on Exhibit A, except one per Stuart Maue, are no longer considered vaguely described

conferences because they identify the participants and the subject matter or purpose of the communication.

     **E.**   **Other Vaguely Described Activities**

     15.  The Fee Examiner has identified 68.2 hours with $33,287.50 in associated fees as "other vaguely described activities." (Report at 9-11, Exhibit E-2). The Fee Examiner states that activity descriptions for the review of documents and correspondence should identify the person or party who prepared the document or correspondence and its subject-matter. (Report at 9). Additionally, if documents were not recently reviewed or were previously reviewed, the Fee Examiner requires that the activity description state the purpose of the review. (Report at 9-10) Furthermore, descriptions of correspondence should identify the correspondent and subject of the correspondence, and a description for preparing pleadings should identify the pleading. Id. The Fee Examiner also requires that activity descriptions for legal research include the issues researched, the purpose of the research and sufficient detail to allow a determination of whether research is case-related, familiar to experienced professionals or being performed by a professional with an appropriate experience level. Id. Finally, the Fee Examiner states that activity descriptions using the phrases "attention to", "follow-up" or "attend to" are generally insufficient to determine the actual activity that is being performed. Id. Milbank has carefully examined these

"other vaguely described activities" and has made a good faith
effort to revise the task entries to satisfy the Fee Examiner's
criteria.  Milbank believes that Exhibit B attached hereto
contains revised activity descriptions that are in accordance
with the Fee Examiner's specifications.  As noted by Stuart
Maue, most of the entries are no longer vaguely described
activities.  (Report at 11).

### F.    Blocked Entries

16.  The Fee Examiner identified 19.40 hours with
$9,828 in associated fees as "lumped" or "blocked entries" that
combine two or more activity descriptions into an entry with a
single time increment.  (Report at 11-12, Exhibit F).  Milbank
has on Exhibit C attached hereto allocated specific time
increments to each of the activity descriptions identified by
the Fee Examiner as blocked entries.  As noted by Stuart Maue,
the entries on Exhibit C are not "lumped" or blocked and each
revised entry includes a single activity with a separate
description and time allotment.  (Report at 12).

### G.    Multiple Professionals At Hearings And Conferences (Intraoffice Conferences)

17.  The Fee Examiner has identified 277 entries
describing intra-office conferences, which represents 86.55
hours with $41,579.25 in associated fees.  (Report at 13,
Exhibit G).  The Fee Examiner further identifies that "all but
seven of the activities identified as intra-office conferences

were billed at .5 or less.  The remaining seven entries were
billed at .9 or less."  (Report at 13-14).

18.  As the Fee Examiner notes, "[i]ntraoffice
conferences are necessary and appropriate . . . ."  (Report at
13).  Additionally, there is nothing in the Bankruptcy Court's
local rules or the U.S. Trustee Guidelines that mandates the
disallowance of such time.  The Fee Examiner only requires that
conferences identify the participants and the subject matter of
the conference.  That has been done with respect to these
activity descriptions on Exhibit D attached hereto.

19.  Committee representation in cases as large and
complex as those of the Debtors cannot possibly be handled by a
single attorney, and clients understand and expect that a team
of highly-qualified and capable attorneys are necessary to
provide proper representation in complex cases.  As such, in
order to maximize efficiency and cohesiveness, intra-office
conferences and meetings are necessary in order to coordinate
complex tasks and delegate work to ensure non-duplication.
Milbank has used its best efforts to ensure intra-office
conferences are employed only when necessary, as reflected by
both length -- all but 7 intra-office conferences were billed at
.5 hours or less -- and number -- intraoffice conferences
represent only 3% of the total fees requested during the First
Interim Compensation Period.  As such, Milbank respectfully

submits its use of intra-office conferences were limited, necessary and appropriate.

**H.    Multiple Professionals At Hearings And Conferences (Nonfirm Conferences, Hearings and Events)**

20.   The Fee Examiner has identified 239.4 hours with $141,678.50 in associated fees where more than one Milbank timekeeper attended a conference, hearing or other event that was also attended by non-firm personnel. (Report at 15, Exhibit H). Milbank has carefully reviewed the non-firm conferences, hearings and events identified by the Fee Examiner on Exhibit H to the Report and has prepared Exhibit E attached hereto to better "identify and explain the role of each timekeeper who billed for that attendance and the need for multiple attendees." (Report at 12). The time entries identified by the Fee Examiner involved meetings and hearings (not intra-office conferences) as follows:

- Court hearings
- Committee meetings
- Discussions regarding asset sales
- Discussions regarding pending motions, including the Debtors' "First-Day" motions
- Meetings with the United States Trustee

Milbank believes that the level of staffing was appropriate for the tasks involved, and that Milbank would not have been able to competently handle the particular meetings and hearings at issue with only one lawyer.

21.   None of the matters involving the participation of multiple professionals that have been identified by the Fee

Examiner on Exhibit H to the Report were routine.  Generally,
Milbank's counterparties with respect to the identified
activities were also represented by multiple lawyers; multiple
professionals were required because of the complexity,
significance and multi-disciplinary aspects of the activities.
As noted, Milbank has attached an annotated version of Exhibit E
to assist the Fee Examiner in this regard.

**I.    Personnel Who Billed 10.00 Or Fewer Hours**

22.    The Fee Examiner notes (Report at 16, Exhibit I)
that three timekeepers billed 10 or fewer hours during the First
Interim Compensation Period, which represents 21.7 aggregate
hours with associated fees of $5,785.50.  The Fee Examiner
suggests that a review of these timekeepers may be appropriate
to allow a determination of whether they are (i) duplicating the
work of others, (ii) increasing the cost to the Debtors' estates
because of orientation or the "getting-up-to-speed" that may be
required, or (iii) not contributing to the advancement of the
cases.  Milbank has attached hereto as Exhibit F further
information regarding these individuals and the services they
have performed to assist the Fee Examiner in its review.  As
Exhibit F shows, of the three timekeepers at issue, 2 were
paraprofessionals and 1 addressed discreet legal issues
regarding substantive consolidation early in the Debtors' cases.
None of these timekeepers were rotated in and out of the
engagement, and the fact that they devoted relatively small

amounts of time to the matter is not indicative of inefficient staffing.

**J.    Long Billing Days**

23.    Lawyers in large firms like Milbank and complex reorganization cases like those of the Debtors do not work five-day weeks or eight-hour days.  The professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.  As such, on many occasions, "Long Billing Days" cannot be avoided.

24.    The Fee Examiner has identified ten (10) days on which individuals billed more than 12 hours during the First Interim Compensation Period.  (Report at 17 and Exhibit J-1 to the Report).  The Fee Examiner further notes that these entries total 128.70 hours with $63,183.50 in associated fees.  The hours billed by individuals on these days relate to extraordinary activity levels associated with particular matters of critical importance, including the consideration of (i) certain "first-day" motions, including the motion for debtor-in-possession financing, (ii) the motion to transfer venue from the

New York Bankruptcy Court and (iii) certain motions regarding the appointment of an equity committee.

25. If a "12-hour rule" were imposed on counsel in these chapter 11 cases, the concern regarding inefficiencies by timekeepers who bill low hours discussed above in section I of this Response would become a significant concern. More lawyers working fewer hours is inefficient and simply does not make sense from the client's perspective; it would not be tolerated by Milbank's non-bankruptcy clients.

### K.   Administrative/Clerical Activities

26. The Fee Examiner has identified 221.6 hours with $33,039.50 in associated fees as activities describing administrative and clerical activities by paraprofessionals. Furthermore, the Fee Examiner has identified 6.7 hours with $2,834 in associated fees as activities describing administrative and clerical activities by professionals. The Report correctly notes that time spent by attorneys on clerical or secretarial tasks generally constitutes non-billable time. (Report at 19).

27. 2.2 hours of the identified time entries of the professionals is not for administrative or clerical tasks. For example, Exhibit K-2 to the Report identifies two time entries each of which uses the word "assignment." Each describes a task involving the direction by a supervisory lawyer of a more junior lawyer with respect to legal research (i.e., providing direction

and guidance on an assignment), and Milbank respectfully
disagrees that supervisory activities are "generally
administrative in nature". (Report at 20). There is no
"administrative" or "clerical" component to any of these tasks.
Additionally, Dennis O'Donnell billed 1.9 hours to these cases
during the period immediately after the Committee retained
Milbank.  Mr. O'Donnell's time entries reflect an effort to
fulfill the demands of the Committee with respect to retention
of financial advisors for the Committee.  The time constraints
and ability to respond to questions from the Committee regarding
retention of financial advisors necessitated the use of a
professional.  <u>With respect to the remaining 4.5 hours of
potential administrative/clerical activities by professionals,
Milbank will voluntarily reduce its fee request by $1,751.50.</u>

28.  With respect to the 221.6 hours with $33,039.50
in associated fees performed by paraprofessionals, Milbank had
staff performing administrative and clerical tasks throughout
the First Interim Period.  In addition, Milbank submits that the
administrative and clerical activities in question are
activities that Milbank does not include as overhead.  Milbank
submits that it is market practice for firms like Milbank to
charge for such expenses.  Milbank represents that it does in
fact charge its nonbankruptcy clients for the items identified
by the Fee Examiner.

L.    **Legal Research**

29.   The Fee Examiner believes that "many of the
entries referencing legal research activities by Milbank . . .
timekeepers were vague in that they failed to include a
description of the research and its purpose."  (Report at 21).
Milbank has addressed this issue above in section E of this
Response.  Additionally, Exhibit B attached hereto includes
descriptions of the legal research activities identified by the
Fee Examiner as "vague."  Please note, however, that the amount
of detail provided is limited to the extent that certain
information is considered attorney-work product or subject to
attorney-client privilege.

30.   The Fee Examiner has identified 203.8 hours with
$91,026.50 in associated fees of legal research.  The Fee
Examiner does not suggest any abuses or non-compensable time for
legal research.  The question is whether such charges were
reasonable and appropriate.  This is an area where there is no
substitute for the Court's and the United States Trustee's
experience with the conduct of bankruptcy cases generally and
their respective knowledge of the issues raised in these
reorganization cases in particular.  To help them in this
analysis, Milbank notes that the hours expended for legal
research approximate 12% of the total hours and approximate 7.7%
of the total fees.  Milbank submits that such amounts are

reasonable and that the research was necessary to the administration of the cases.

**M.    Travel**

31.   The Fee Examiner has identified 40.2 hours with $25,225.50 in associated fees of travel time.  The Fee Examiner states that a review of entries for travel may allow a determination of whether the time billed for travel was reasonable and necessary.  To help in this analysis, Milbank notes that the time billed for travel was for necessary trips by Milbank attorneys for Bankruptcy Court hearings, for depositions of the Debtors' employees and for meetings with the Debtors' employees and representatives.  In addition, Dennis Dunne made one trip to and from Dallas, Texas on March 8, 2005 to meet with the former Committee Chair at its offices.  The hours expended for travel time approximate 2% of the total hours and 2% of the total fees.  Milbank submits that such amounts are reasonable and that the travel was necessary to the administration of the cases.

**N.    Potential Double-Billed Expenses**

32.   The Fee Examiner identifies (Report at 26) a total of $25 as potentially double-billed expenses.  As noted by the Fee Examiner, Milbank does not believe it double-billed, but Milbank will voluntarily reduce its request for reimbursement of expenses by $25.

O.   **Travel Expenses**

33.   The Fee Examiner identifies (Report at 27-28 and Exhibit P to the Report) out-of-town travel expenses totaling $7,655.33.  The Fee Examiner notes that $728.95 is described as cab fare, $72.20 is described as meals and $6,854.18 of the out-of-town travel expenses are described as "travel", and Milbank "did not include a separate itemization for airfare, hotel accommodations, or other travel-related expenses."  Milbank has reviewed all of the entries identified by the Fee Examiner as out-of-town travel and attaches as Exhibit G hereto revised travel expense descriptions that identify the nature of the expenses.

P.   **Courier Services, Photocopies, Facsimiles and Postage**

34.   The Fee Examiner identifies (Report at 29 and 35) charges for courier services, photocopies, facsimiles and postage.  These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that these expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well.  That is the market practice. Milbank represents that it does in fact charge its non-bankruptcy clients for the items listed above and identified by the Fee Examiner.

### Q.    Computer-Assisted Legal Research

35.    The Fee Examiner identified computer database research totaling $44,386.85 and indicated that the application does not disclose the method used to calculate such amounts or whether the amount requested is at actual cost or a discounted rate.   For database services provided by entities such as Lexis and Westlaw (the "Providers"), Milbank pays the Providers for access to such databases pursuant to flat rate subscription agreements.   For a specific Lexis or Westlaw search run on behalf of a client, Milbank charges the client for the cost of the search at a rate assigned by the Provider.   On an annualized basis, the expenses incurred by Milbank that it attributes to computer-assisted legal research are greater than the disbursements related to such research for which Milbank seeks reimbursement from its clients.

### R.    Local Travel

36.    The Fee Examiner has indicated that Milbank sought reimbursement for local travel expenses in the amount of $6,241.95.  (Report at 30-31, Exhibit S-1).   The Fee Examiner contends that "[w]hile the firm may reimburse its employees for commuting expenses [when working after regular business hours], this type of expenses is generally considered part of firm overhead."  (Report at 30-31).

37.    Transportation expenses incurred in connection with legitimate client business may be charged to the client.

Milbank provides transportation assistance to personnel who arrive at or leave work during off-peak hours.  "Off-peak travel" is defined as beginning or ending work during the period from 8:30 p.m. to 6:00 a.m., Monday through Friday, or at any time on a Saturday, Sunday or Firm-observed holiday.  Persons who start and end work during off-peak hours are entitled to transportation assistance for one-way travel only.  When a person who is eligible for transportation reimbursement elects to travel by private automobile or public transportation, Milbank provides fixed reimbursement of $12 to persons residing within the five boroughs of New York City and $21 to persons residing outside of New York City.

38.  Except as noted below, in light of the long billing days during the First Interim Fee Period, Milbank submits that the local travel entries are reasonable and reflect the exercise of sound billing judgment by Milbank personnel. Nevertheless, in an effort to address the Fee Examiner's concerns set forth on pages 30-31 of the Report, Milbank is prepared to voluntarily waive $374.63.

**S.**   **Overtime and Local Meals**

39.  The Fee Examiner has identified $1,732.88 in overtime meal expenses (Report at 32-33, Exhibit S-2) and suggests that "[w]hile the firm may reimburse its employees for [overtime] meal expenses, this type of expense is generally considered part of firm overhead."  (Report at 32).

40.   Milbank's written policy regarding this category of expense provides that personnel who work past 8:00 p.m. on a client matter (not including time spent at dinner) can be reimbursed for dinner expenses up to $25 in New York and California.   All such expenses are charged by Milbank to its non-bankruptcy clients.   As such, Milbank respectfully submits it should be reimbursed for local meal expenses in the amount of $1,732.88.

41.   The Fee Examiner has also identified (Report at 32-33, Exhibit S-3) $98.85 in local meals expenses.   Milbank submits that the meal in question, as indicated on Exhibit S-3 to the report, was a reasonable and necessary expense associated with a meeting among professionals representing the DIP lender, certain trade creditors and the Debtors' counsel in connection with "first-day motions" including the Debtors' motion to approve DIP financing.   As such, Milbank respectfully submits it should be reimbursed for the local meal expense in the amount of $98.85.

42.   As noted by Stuart Maue, in an effort to address the Fee Examiner's concerns noted on page 33 of the Report, Milbank will voluntarily reduce its fee request by $100.

### T.   Document Processing/Overtime

43.   The Fee Examiner has identified (Report at 34, Exhibit S-4) a total of $20,751.25 in charges for secretarial and support staff overtime.   These are items that Milbank does

not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  As the Third Circuit held in Busy Beaver, not all clerical services are necessarily overhead.  19 F.3d at 848.  These expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well.  That is the market practice.  In considering the propriety of a professional's charges under section 330 for so-called "overhead expenses," the bankruptcy court should seek to determine if nonbankruptcy professionals charge their clients for these particular services.  Busy Beaver, 19 F.3d at 849.  Milbank represents that it does in fact charge its nonbankruptcy clients for the items identified by the Fee Examiner.

> U.   **Vaguely Described Expenses**

44.  The Fee Examiner has identified (Report at 35, Exhibit T) a total of two charges totaling $55.98 for which "the firm did not provide an adequate description of the expenses."  Milbank has reviewed both of the entries identified by the Fee Examiner and attaches as Exhibit H hereto revised descriptions that adequately describe the expenses.

> V.   **Expenses Associated With Multiple Attendance**

45.  The Fee Examiner has identified (Report at 35, Exhibit U) expenses associated with some conferences, hearings or other events for which multiple Milbank timekeepers billed

totaling $2,840.05.  As addressed above in section G of this Response, Milbank submits that attendance by Milbank timekeepers was appropriate and similarly submits that reimbursement of each timekeepers' expenses is also reasonable.

### CONCLUSION

46.  Milbank has supplemented its fee applications to address the deficiencies noted by the Fee Examiner.  Milbank appreciates the considerable effort of the Fee Examiner and has itself made considerable effort to address the issues raised in the Report.  Milbank hopes that the supplemental materials submitted herewith have enabled the Fee Examiner to evaluate the reasonableness and necessity of the fees and expenses incurred during the First Interim Compensation Period, in connection with the Fee Examiner's final report that was submitted to the Bankruptcy Court.

Dated:  New York, New York
        July 20, 2006

                          **MILBANK, TWEED, HADLEY & M$^{C}$CLOY LLP**

                          By: _/s/ Matthew S. Barr_____
                          Matthew S. Barr (MB 9170)
                          Michael E. Comerford (MC 7049)
                          1 Chase Manhattan Plaza
                          New York, New York 10005
                          (212) 530-5000

                          Co-counsel for Official Committee of
                          Unsecured Creditors of Winn-Dixie
                          Stores, Inc., et al.