**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**<u>NOTICE OF FILING</u>**

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates, as debtors and debtors in possession, give notice of filing the attached Fourth Interim Fee Application for Allowance and Payment of Compensation and Reimbursement of Expenses of XRoads Solutions Group, LLC, as Financial and Operations Restructuring Consultants for the Period from January 29, 2006 Through May 27, 2006.

Dated: July 21, 2006.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By ___*s/ D. J. Baker*___
     D. J. Baker
     Sally McDonald Henry
     Rosalie Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By ___*s/ Cynthia C. Jackson*___
     Stephen D. Busey
     James H. Post
     Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

00525867

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | CASE NO.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et. al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

**SUMMARY OF FOURTH INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD JANUARY 29, 2006 TO MAY 27, 2006**

1.  Name of Applicant:  XRoads Solutions Group, LLC

2.  Role of Applicant:   Financial Advisors and Operations Restructuring Consultants for the Debtors

3.  Name of Certifying Professional:   Holly Felder Etlin

4.  Date Case Filed:   February 21, 2005

5.  Date of Application for Employment:   February 21, 2005

6.  Date of Order Approving Employment:   June 2, 2005 (final Order)

7.  If Debtors' counsel, date of disclosure of Compensation form:  N/A

8.  Date of this Application:   July 20, 2006

9.  Dates of Services Covered:   January 29, 2006 through May 27, 2006[1]

**FEES:**

10.  Amount of 100% compensation sought
     as actual, reasonable and necessary:                    $ 3,716,110.50

**EXPENSES:**

11.  Amount of 100% expense reimbursement sought
     as actual, reasonable and necessary:                    $    236,989.35

**TOTALS:**

12.  Total Amount Requested for 4th Interim:                 **$3,953.099.85**

13.  Total of Fees and Expenses for this period paid to date:   ($2,665,528.47)

14.  **Total Balance Due for 4th Interim Period:**            **$ 1,287,571.38**

---

[1] Time and Expenses covered in the monthly fee application of May, 2006 is for the dates of  April 30, 2006 through May 27, 2006, due to XRoads' month end reporting cycle.

1

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **CASE NO.  05-03817-3F1** |
| | ) | |
| **WINN-DIXIE STORES, INC., et. al.,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

**FOURTH INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP,
LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS
FOR THE PERIOD JANUARY 29, 2006 TO MAY 27, 2006**

XRoads Solutions Group, LLC ("XRoads" or "Applicant"), financial advisors and operations restructuring consultants to the Debtors and Debtors-in-possession in the above-captioned cases (Winn-Dixie Stores, Inc. is hereinafter sometimes referred to as the "Company", and the Debtors-in-possession are collectively referred to as the "Debtors"), hereby makes its Fourth Interim Application for Allowance and Payment of Compensation and Reimbursement of Expenses for services rendered and costs incurred in this Chapter 11 proceeding from January 29, 2006 through May 27, 2006 (the "Application")[2].  This Application is filed pursuant to 11 U.S.C §  330 and Federal Rule of Bankruptcy Procedure 2016, as well as the Court's Order Establishing Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 professionals entered on March 15, 2005.  Three previous applications have been heard and approved by this Court.  This is the Fourth interim application filed by the XRoads, financial and operations restructuring consultants for the Debtors and is not an amendment or supplement to a previous Fee Application.  The Exhibits attached to this Application, pursuant to the Guidelines are:

**Exhibit "1"** – Retention Order

**Exhibit "2"** – Application to Employ XRoads

**Exhibit "3"** – Summary of Professionals' Time

**Exhibit "4"** – Summary of Requested Reimbursement of Expenses

**Exhibit "5"** – XRoads' complete time records, in chronological order, by activity code for the time period covered in this Application.  The requested fees are itemized to the tenth of an hour.

**Exhibit "6"** – XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

In support of this Application, XRoads respectfully represents as follows:

---

[2] Time and Expenses covered in the monthly fee application for May 2006 is for the dates of April 30, 2006 through May 27, 2006, due to XRoads' month end reporting cycle.

## GENERAL BACKROUND

1.     The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2.     The Debtors will continue in possession of their property and will operate and manage their businesses as Debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.     The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate approximately 539 stores in the United States, and 12 in the Bahamas (down from over 900 at the commencement of these cases).  Substantially all of the Debtors' store locations are leased rather than owned.

4.     The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins.  The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar super centers, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

5.     XRoads has filed three previous interim fee applications for services rendered and costs incurred in this Chapter 11 proceeding from February 21, 2005 through January 28, 2006 which included professional and non-professional services totaling $14,945,355.30.  The overall hourly rate charged during this period averaged $371 based on total gross hours incurred, both billable and non-billable.  No objections were filed and XRoads' fees were approved as presented.

6.     As authorized in the Order approving Interim Compensation Procedures for Professionals in Debtors' Case, XRoads has submitted monthly requests for payment of fees and reimbursement of expenses to the Debtors during the Application Period, with copies to the Office of the United States Trustee, counsel to the Committee of Unsecured Creditors, counsel for the Debtors and the Fee Examiner.  No objections to XRoads' monthly requests for payment have been submitted.  As such, the Company has paid XRoads 80% of its fees and 100% of its expenses incurred for the months of February through April, 2006 in the amount of $2,665,528.47.  It is anticipated that XRoads will receive payment of a portion of the May, 2006 fees and expenses pursuant to the Fee Procedure Order prior to the hearing on this Application.  All payments received will be identified and credited before the hearing.

**RETENTION OF XROADS**

7.        By Final Order dated June 6, 2005 under section 327(a) of the Bankruptcy Code (the "Retention Order"), XRoads was authorized to be employed by the Debtors as Financial and Operations Restructuring Consultant in connection with the Chapter 11 cases *nunc pro tunc* to February 21, 2005.  A true and correct copy of the Retention Order is attached hereto as Exhibit "1." and true and correct copy of the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants is attached hereto as Exhibit "2." Pursuant to the Engagement Letter dated March 4, 2005, which was attached to the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants, the computation for XRoads' fees earned during this Application Period includes a base monthly rate of $200,000 for the first 400 hours of service plus $400 per hour for all hours over the 400 hour threshold.

8.         XRoads incurred a gross amount of 10,157.40 hours of professional services during this Application Period.  XRoads charged the Debtors a net amount of 8,597.70 hours (a voluntary reduction of 1,559.70 hours).  Pursuant to XRoads' engagement agreement, the first 1,600 hours (400 x 4 months) is capped at $800,000 ($200,000 per month).  The remaining 6,997.70 hours are billed at $400 per hour (or $2,799,080.00).

9.        In addition, non-professional services including database management, technical support and certain portions of the claims reconciliation process have been charged at rates of $85 to $160 per hour in accordance with XRoads' engagement agreement.  Clerical and secretarial services have been provided free of charge.  Costs incurred by the "on-client site" clerical and secretarial support while at the Debtors' location have not been charged to the Estate.  XRoads incurred a gross amount of 1,550.80 hours for non-professional services during this Application Period of which 1,400.60 were billed (or $185,655.50).

10.        Combined fees for professional and non-professional services for this Application Period total $3,716,110.50.  The overall hourly rate charged to the Debtors for this Application Period averages $371 based on net billable hours (or an average hourly rate of $317 based on total gross hours incurred).

**OVERVIEW OF XROADS' KEY ACCOMPLISHMENTS**

11.        During this Application Period, XRoads lead the five major initiatives outlined below, completing the majority of the work ahead of schedule and beating our initial estimates.  Below is a detailed description of XRoads' accomplishments during this billing period, but the highlights include the following:

**Overhead Cost Reductions:**  During this time period XRoads has managed several significant areas of cost reductions on behalf of the Debtors including sourcing, contract renegotiations and specific cost reduction initiatives.  The following is a brief outline of the quantifiable sourcing cost reductions that have been achieved to date by XRoads' Performance Improvement Group as well as the fees charged by XRoads associated with each portion of the project:

| Project | XRoads' Fees | Savings |
|---|---|---|
| Wave I of overhead cost savings targeted at: office supplies, paper, security guard services, temporary services, pallets, shrink films, lighting, temporary pharmacy services and store facility repairs. | $  800,000 | $2.4 million |
| Wave II of overhead cost savings targeted at commercial print, janitorial and store equipment purchases | $  800,000 | $19.4 million |
| Wave III of overhead cost savings. | $  800,000 | $2.5 to $5 million |
| Data Processing Center Consolidation | $  150,000 | $1.5 million |
| Winn-Dixie department savings under the direction of XRoads' Brad Boggess | $         0 | $6.5 million |
| **Total** | **$1,750,000** | **$32.3 to $34.8 million** |

XRoads is also responsible for the analysis and renegotiation of approximately three thousand executory contracts which represent potential claims totaling approximately $50 million. During this period XRoads made substantial progress in renegotiating a number of these key contracts resulting in annual savings to the Debtors in excess of $15 million. This process has been nearly completed. XRoads has also assisted management in a variety of specific supplemental cost reduction initiatives during this period targeted at reducing overhead by an additional $10 million.

**Increased Liquidity:**  Through successful negotiation and implementation of the Trade Lien Program for the reclamation claimants, XRoads was able to increase liquidity by approximately $170 million through:  (1) renewing trade terms previously provided but withdrawn after the bankruptcy petition was filed, (2) collection of post-petition deposits required by vendors and (3) collection of post-petition accounts receivable which had been withheld pending resolution of setoffs.

**Disposition of Excess/Unused Assets:**  Subsequent to the disposition of the 326 stores described in previous applications, XRoads has managed the disposition of 35 "bubble" stores, 10 subleases, two additional excess properties and the Pompano distribution center.  This effort has generated over $20 million in proceeds during this period and avoidance of several million dollars in potential claims.

**Resolution of Claims:**  During this period, the Debtors continued their full scale claims reconciliation process.  XRoads assisted management in managing and reporting on the ongoing process.  The Debtors have completed the initial reconciliation process for over 25,000 claims, well ahead of the Company's planned exit from Chapter 11.

**Plan of Reorganization Activities:**  During this period, XRoads, in conjunction with Blackstone and Debtors Counsel, performed substantial analysis of the Debtors' business practices, accounting records and other evidence associated with the assessment of the Debtors' potential substantive consolidation.  In addition, XRoads assisted the Debtors with analysis of their pre and post exit liquidity and the associated implications on the Debtors' exit financing structure.

12.     While these efforts initially appeared to be in jeopardy following the August 29, 2005 landfall of Hurricane Katrina which impacted 120 of Winn-Dixie's stores in the New Orleans operating area, the tremendous efforts of Winn-Dixie's executive management, area leaders and store staff, combined with strong leadership from XRoads' real estate group brought about favorable results under extremely difficult circumstances.  Within 2 months all except 12 damaged stores were reopened – some also serving as FEMA bases.  In many of these locations, Winn-Dixie was the first to reopen its doors and in some cases continues to be the only major supermarket in the affected areas.  The result of efforts of both Winn-Dixie and XRoads during this difficult period has been an increase in sales and customer loyalty in these devastated areas.

13.     In addition to a rapid recovery from Hurricane Katrina, by October 2005, the bulk of the footprint downsizing and asset disposition was completed by XRoads.  This result was achieved through strong leadership, combined with communication and cooperation throughout the entire organization, from finance, supply chain, real estate and merchandising.  XRoads also assisted the Debtor in developing a secondary list of "bubble stores" that were placed on a watch list and resulted in thirty-five (35) supplemental store closures, which was completed in May 2006, with proceeds to the Debtors in excess of $16 million.

14.     XRoads, Blackstone and Winn-Dixie worked together to complete the Business Plan, which was presented to the Creditors' Committee and other key constituents in early November 2005 and updated in May 2006.  The Business Plan forms the basis for the development of the Plan of Reorganization and exit strategy.

15.     The major initiatives lead by XRoads include:  (1) non-merchandise cost reductions and outsourcing, (2) disposition of excess/unused assets, (3) real estate and occupancy cost reductions, and (4) claims settlement negotiations.

a.  **Non-Merchandise Cost Reductions and Outsourcing:**

    i.  XRoads strategic sourcing group identified alternative sourcing opportunities in 3 major phases (Wave 1, Wave 2, and Wave 3) resulting in the identification of approximately $29 million of savings.  In order to track sourcing savings and the soft benefits, XRoads designed a scorecard system and trained Winn-Dixie's staff in the use of these tools.  XRoads then transitioned the resulting contracts from this first phase of cost reductions to the Winn-Dixie personnel.  In order to effectuate a sustainable program, XRoads developed a standard set of tools and templates to facilitate industry analysis, supplier research, RFP creation, negotiation execution, and savings tracking.

    ii.  XRoads completed work with Winn-Dixie IT to evaluate outsourcing opportunities for shelf tags and related Data Processing responsibilities.  The recommendation associated with this work has identified an additional $1.5 million savings for the Company.

    iii.  XRoads is currently working to develop a robust implementation plan for the consolidation of Data Processing Centers and their related activities.

    iv.  In addition to achieving the results outlined above, XRoads has developed a standard set of tools and templates to facilitate industry analysis, supplier research, RFP creation, negotiation execution, and savings tracking and has trained Winn-Dixie's staff in these methodologies in order to effectuate a sustainable program.

b.  **Disposition of Excess/Unused Assets:**  The footprint reduction is now complete, on time and on budget.  In addition to closing 326 stores and all of the related negotiations with each of the landlords and computation of rejection damages, XRoads also managed the supplemental asset disposition process, including;

    i.  The sale of 35 "bubble" stores, resulting in sale proceeds of approximately $16.3 million.

    ii.  The sale of two excess owned properties, resulting in bids of approximately $5.9 million.

    iii.  The sale of the Pompano distribution center, resulting in a winning bid of approximately $51.3 million.

c.  **Real Estate and Occupancy Cost Reductions:**  To date, over 455 real estate leases have been rejected (with creditor committee and court approval), resulting in the reduction of the monthly

lease payments by approximately $19.3 million and reduction of total lease liabilities by approximately $1.8 billion.   In addition, XRoads managed the lease disposition process, including negotiations with landlords, equipment sales, the orderly closure of stores and the GOB process.  XRoads' real estate team continues to actively pursue elimination of sandwich leases with rent subsidies and negotiated and executed transactions for 9 additional subleases, eliminating an annual cash burn of approximately $500,000 and avoiding lease rejection claims of approximately $2.5 million.  These negotiations were completed by the end of June 2006.  In addition, XRoads continued negotiations with all landlords on the go-forward stores to resolve claims and potential cure payments for lease assumptions expected with the Plan of Reorganization.

d.   **Claims Settlement:**  XRoads completed the analysis and reconciliation of over 4,100 claims, totaling approximately $2.2 billion, with an estimated allowed amount of $431.6 million. XRoads completed the majority of the reconciliation of reclamation claims by December 2005, although additional vendors expressed a desire to opt into the Trade Lien Program during the Application Period.  XRoads continues to be responsible for generating the documents (term memos, reconciliation worksheets and addendums to stipulations) for each vendor opting into the Trade Lien Program.  XRoads is also the primary liaison between the vendors and Winn-Dixie's merchandising group to effectuate the changes in terms as vendors opt into the Trade Lien Program.  During the Application Period, the Debtors nearly completed their claims reconciliation process.  XRoads manages the teams associated with reclamation, real estate, and contract claims. XRoads is responsible for monitoring and reporting to management the progress in the claims reconciliation process, estimating the ultimate claims amount and preparing reporting for management and the constituencies on the process. The Debtors substantially completed the initial reconciliation process for over 25,000 claims by the end of June, 2006.

### ROLES AND RESPONSIBILITIES OF THE CROSS-FUNCTIONAL TEAMS

16.     XRoads established cross-functional teams to oversee and manage the initiatives outlined above.  XRoads' teams include: (1) real estate planning and management, (2) treasury and finance, which covers vendor management, cash management and financial reporting and lender communications, (3) strategic advisory, (4) procurement/strategic sourcing, and (5) claims

management services and (6) contract management.  These activities of the cross-functional teams and initiatives are discussed in more detail below.

a.   **Real Estate Management:**  XRoads is tasked with reducing occupancy costs and cash outflows and maximizing asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization.  In addition, XRoads is managing the lease disposition process, including negotiations with landlords, equipment sales, the orderly closure of stores and the GOB process.  XRoads developed and implemented a work-plan and timeline for store dispositions including coordination between functional areas of Debtors to ensure that disposition proceeds are maximized and that other goals of the Debtors are met.  XRoads negotiated all liquidation agreements and conducted the auctions for lease interests, pharmacy assets, and manufacturing / distribution equipment.  XRoads also established a due diligence data site for potential purchasers of leases, and improved the quality and accuracy of the Company's real property database in order to produce a comprehensive and timely reporting tool for internal and external constituencies.

b.   **Treasury and Finance:**  XRoads' financial analysis team has been focused more on:  (1) liquidity, (2) cash management, (3) serving as a liaison between the DIP bank agent and the financial advisors to the UCC regarding progress of the reorganization relative to the Business Plan and (4) substantive consolidation.  For example, during the Application Period, XRoads continued to evaluate Winn-Dixie key supply contracts to determine if they should be assumed, rejected or renegotiated.  The process included the evaluation of existing contract terms and assessing the need for potential rejection, assumption or renegotiation in order to address inequities in the contracts due to the Company's new footprint and related vendor claims and cure cost.  XRoads is also responsible for cash management, borrowing base computations, covenant reporting and forecasting.  In addition to the credit facility reporting requirements, the financial reporting is a key piece of the Debtors' external communications to creditors and lenders.

c.   **Strategy and Advisory:**  This XRoads team integrates the information provided by other XRoads groups and the Company to develop strategic alternatives and recommendations.  Specifically, this team prepared and presented the Business Plan (along with Blackstone and Winn-Dixie) that was presented and distributed in November 2005 and revised in May 2006.

XRoads has also been responsible for the production of documents and responses to questions from the UCC regarding substantive consolidation, as well as questions from the Ad Hoc Trade Committee. In support of the substantive consolidation issue, XRoads' spent considerable time in collecting and analyzing information requested by the UCC professionals, particularly questions regarding how the Company's intercompany accounting works and what is transacted through the accounts.

d.  **Procurement/Strategic Sourcing:** As outlined above, XRoads continues to manage the Corporate Sourcing and Procurement function. Working with the Debtors, XRoads continued the analysis of the indirect spend to establish categories for sourcing opportunities and began a reset of the spend information from Fiscal Year 2006. This analysis will serve as the basis for future sourcing strategy for the Debtors and will reflect the spending patterns associated with the new footprint of the Debtors' business.

e.  **Claims Management Services:** In addition to the work previously completed on the PACA claims and reclamation demands, the Case Management team focused on four major projects: (1) working with Winn-Dixie to oversee the claims reconciliation teams, (2) preparation of reports for management to reflect the progress of each reconciliation team and also to estimate the dollar amount of claims in each major category for the purposes of drafting the plan of reorganization, (3) reconciliation of the general unsecured portion of the reclamation claims, reconciliation of claims involving executory contracts including real estate 502(b)(6) rejection damages, rejection damages and cure payments for non-real estate executory contracts  and (4) contract and real estate claims management including extensive renegotiation.

f.  **Contract Management and Analysis:** XRoads has been responsible for reviewing and analyzing approximately 3,000 additional executory contracts for Winn-Dixie. In connection with the Debtors' Plan of Reorganization, Winn-Dixie Stores, Inc. will file a Motion to Assume Executory contracts, along with an identification of cure amounts. To date, the XRoads Contracts Team has reviewed approximately 3,000 contracts and identified agreements in which Winn-Dixie plans to either reject the contract, assume the contract, or terminate active agreements. Additionally, the Contracts Team has identified approximately

several hundred contracts in which a renegotiation with the creditor will result in substantial cost-savings to the debtor.

## THE FOURTH INTERIM APPLICATION

17.    For the Fourth Interim Application Period beginning January 29, 2006 and ending May 27, 2006, XRoads incurred professional and non-professional fees of $3,716,110.50 and expenses of $236,989.35 for a total of $3,953,099.85.  XRoads has received payment in the amount of $2,474,067.20 for professional fees (approximately 80% fees) and $191,461.27 for expenses (100% expenses) for a total of $2,665,528.47 for the period of January 29, 2006 through April 29, 2006.  It is anticipated that XRoads will receive payment of 80% fees and 100% expenses for May, 2006 in the amount of $544,349.28 pursuant to the Fee Procedure Order prior to the hearing on this Application.  All payments received will be identified and credited before the hearing.  Accordingly, XRoads requests an interim allowance of compensation for professional services XRoads rendered to the Debtors for the period January 29, 2006 to May 27, 2006 in the amount of $3,953,099.85 and payment for the balance of the 20% holdback for January 29, 2006 through May 27, 2006, totaling $743,222.10.

18.    XRoads seeks approval of the fees and expenses incurred during the Application Period in the amounts as summarized in the following table:

| Monthly Statements | Capped Fees to 400 hours | Fees over 400 Hours @ $400 per hr | Admin Fees | Total Fees | Expenses | Total Fees & Expenses | Payments 80% Fees – 100% Exp |
|---|---|---|---|---|---|---|---|
| February, 2006 | $200,000.00 | $ 931,543.60 | $ 65,449.50 | $1,196,993.10 | $ 66,783.48 | 1,263,776.58 | $1,024,377.96 |
| March, 2006 | $200,000.00 | $ 760,031.40 | $ 50,474.00 | $1,010,505.40 | $ 62,466.28 | 1,072,971.68 | $ 870,870.60 |
| April, 2006 | $200,000.00 | $ 646,120.00 | $ 38,965.50 | $ 885,085.50 | $ 62,211.51 | 947,297.01 | $ 770,279.47 |
| May, 2006 | $200,000.00 | $ 392,760.00 | $ 30,766.50 | $ 623,526.50 | $ 45,528.08 | 669,054.58 | $ 0.00 |
| Totals | $800,000.00 | $2,730,455.00 | $185,655.50 | $3,716,110.50 | $236,989.35 | 3,953,099.85 | $2,665,528.47 |
| Amount Due for 4th Interim Period | | | | | | | $1,287,571.38 |

19.    The professional services and related expenses for which XRoads requests an interim allowance of compensation and reimbursement of expenses were rendered and incurred in connection with this case in the discharge of XRoads' professional responsibilities as financial and operations restructuring consultants for the Debtors in these Chapter 11 cases.  XRoads' services have been substantial, necessary and beneficial to the Debtors and their estates, creditors and other parties-in-interest.

20.     XRoads has maintained written records of the time expended by its professionals and staff in this case as required in the Middle District of Florida.  Time records are maintained contemporaneously with the rendering of services by each of XRoads' professionals and staff in the ordinary course of business.  Such records set forth in detail the services rendered on behalf of the Debtors, the dates upon which services were rendered, the nature of the services, the time spent and the identity of the professional or staff who performed such services during the Fourth Interim Application Period, and are annexed hereto as Exhibits 3 to 5.  A schedule setting forth the number of hours expended by the individual professional and staff personnel during the Fourth Interim Application Period are annexed hereto as Exhibit 3.

<u>**SUMMARY OF SERVICES RENDERED**</u>

21.     During the Fourth Interim Application Period, XRoads provided extensive services to the Debtors in furtherance of XRoads' professional responsibilities as financial and operations restructuring consultants.  Moreover, the number of hours expended by XRoads' professionals and staff were actual, necessary and beneficial to the Debtors.  XRoads encountered numerous complex financial advisory, restructuring and case management issues during the Application Period.  XRoads was called upon to respond, often upon very short notice, to a host of issues and demands.  XRoads professionals have rendered advice in all of these areas with skill and great dispatch.  The single most important factor this Court should consider when determining Applicant's allowance in these proceedings is the value of XRoads' services as measured by the results obtained.  XRoads can show that the work it is performing in these bankruptcy cases is beneficial to the Debtors. The full breadth of XRoads services are described in detail in the attached XRoads time records, and annexed hereto as Exhibit "5".

22.     The following summary of services rendered during the Application Period is not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are more fully available by reviewing Exhibit "5".  Rather, it is merely an attempt to highlight certain of those areas in which services were rendered to the Debtors, as well as to identify some of the issues that XRoads was required to address.  XRoads has attempted to place the services it has provided to the Debtor in the particular category that best relates to such services.  However, because certain services may relate to one or more categories, services pertaining to one category may be included in another category.

A.  <u>**ASSET SALE (714.60 hours):**</u>  This billing category includes time spent on the inventory GOB sale process, the sale of on-going store operations and overseeing the closing of all of the

sales approved by the Court.  This category also includes the disposition of the Pompano distribution center.

**B.**  **BUSINESS ANALYSIS (3643.20 hours):**  This is the largest billing category and includes work done by all of the cross-functional teams described above, including:  modeling and cash flow analyses done by the treasury and finance team, analysis of real property leases done by the real estate group, preparation of the business plan and analysis of alternative scenarios done by the strategic planning team and analysis of other contracts and vendor agreements done by the procurement group.  During this period, this category includes substantial hours spent analyzing the business practices, accounting records and other evidence associated with the Debtors and Committee's assessment of substantitive consolidation, as well as revising the May Business Plan.

**C.**  **BUSINESS OPERATIONS (948.30 hours):**  This billing category includes XRoads involvement in the management of on-going day-to-day operations of the Debtors' business.  A large portion of the time in this category has been incurred by the real estate team, who have essentially been running the Debtors' real estate department after the departure of several senior level real estate executives and the strategic sourcing group, which is currently managing the on-going day-to-day operations of the sourcing and purchasing groups.  This also includes work being done by the treasury group in the collection of accounts receivable and the strategic planning group in areas such as merchandising and vendor negotiations.

**D.**  **CASE ADMINISTRATION (54.60 hours):**  This billing category includes communications between the cross-functional teams to ensure that critical tasks are identified and coordinated as the reorganization initiatives are implemented.

**E.**  **CLAIMS (1898.30 hours):**  This billing category includes all of the work previously described above on the Reclamation Claims and the Debtors' general claims reconcilation process.  This billing category also includes all of the time spent by XRoads negotiating with trade vendors and exchanging documents to complete the process of opting into the Trade Lien Program and reconciling claims. A primary activity in this category during this period is the management of the Debtors' general claims reconciliation process.

F. **CLAIMS NEGOTIATION (18.60 hours):**   This billing category includes negotiations with claimants in connection with the omnibus objections to claims filed by the Debtors in attempts to resolve any disputes before the hearings on the objections.

G. **CORPORATE FINANCE (12.70 hours):**   This billing category captures the time incurred by XRoads in reviewing the financing proposals received by the Debtors in connection with its exit financing.

H. **CREDITOR MEETING (30.40 hours):**   This billing category not only includes the time spent at meetings with creditors, but the preparation for those meetings including the presentations for the Unsecured Creditor's Committee and the Bank Group.  It also includes meetings with the ad hoc committee representing the Reclamation Claimants.

I. **FEE APPLICATION (49.50 hours):**   This billing category includes the preparation of the Third Interim Fee Application, the narrative sections of the monthly fee statements as well as a portion of the accounting work done by Xroads' billing department to prepare and file the monthly fee statements.

J. **OPERATIONS IMPROVEMENT (1170.80 hours):**   This category captures the time incurred by XRoads strategic sourcing (vendor management) team to identify and effectuate overhead cost savings.

K. **PLAN (27.00 hours):**   This billing category includes time spent by XRoads on the initial planning and analysis of options for the Plan of Reorganization.  As the case moves into the next phase, we expect the hours billed to categories such as asset sales to decline, as the time spent on the Plan of Reorganization increases.

L. **TAX (29.70 hours):**   This billing category includes time incurred by XRoads in connection with the analysis of the Company's tax liabilities and identification of strategies for reducing the tax liabilities through reassessment as well as footprint reductions.

## SUMMARY OF EXPENSES REQUESTED

23.    Applicant seeks reimbursement for actual, necessary expenses (the "Expenses") incurred in rendering services during the Second Fee Application Period. The total amount of the Expenses is $236,989.35.

24.    Section 330 of the Bankruptcy Code authorizes "reimbursement for actual, necessary expenses" incurred by a professional person employed by the Debtors.  Attached hereto as Exhibit "6" are XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

25.    The following is a brief cost summary as to the different types of expenses for which XRoads is seeking reimbursement:

A.    <u>Airfare</u>:  All of XRoads professionals flew coach fare and booked flights in advance, whenever necessary and possible, to reduce costs for the Debtors. In this case, XRoads incurred airfare charges of $121,337.00 during the Application Period on behalf of the Debtors.

B.    <u>Ground</u>:  XRoads incurred the sum of $34,865.49 in ground transportation charges including car rentals, gas, taxi, mileage, parking and tolls.  XRoads' policy for car rentals is that whenever possible, XRoads' professionals share rental cars to lower the cost of car per person.  For the period January 29, 2006, through May 27, 2006, the total cost for rental cars was $36,886.97. XRoads voluntarily discounted the cost for the rental car expense in the amount of $39,929.77 to lower the car usage per professional to a ratio of 1:3.  In addition, XRoads' voluntarily discounted transportation to/from residence to the airport (capped at $35.00) and travel from the hotel to the Company's office (capped at $40.00) for ground transportation costs.

C.    <u>Lodging:</u>  XRoads entered into several short term apartment lease agreements to offset the cost of hotel charges to the estate.  XRoads conducted an analysis of the cost of hotel rates versus the cost of apartments.  The study indicated the estate would benefit if XRoads professionals reduced hotel stays and took apartments.  The actual effect is a savings realized in the amount of $37,173.00 to the estate for this Application Period. XRoads incurred total apartment costs in the amount of $31,834.25 for the months of February, 2006 through May, 2006. This amount is for 423 night stays or a daily average lodging cost of $75.26. Numerous XRoads professionals "doubled up" to reduce lodging costs to the estate.  In the event that XRoads professionals are not assigned to an apartment or one was not available, whenever possible, XRoads negotiated corporate rates to reduce the cost of lodging, however, hotel rates do fluctuate based on availability at the time of reservation. XRoads incurred total hotel expenses in the amount of $39,709.84 for the period January 29, 2006 through

May 27, 2006.  This amount is for 251 night stays or a daily average lodging cost of $158.21.  The total amount of lodging expenses incurred for the period January 29, 2006 through May 27, 2006 is $71,544.09.

D.   Meals:  XRoads incurred the sum of $30,664.52 in meal charges while traveling to and from and working at Company's offices, however, these meal charges were not billed to the Debtors.  Pursuant to the Bankruptcy Guidelines, XRoads did not charge the Debtors for breakfast, lunch or dinner unless XRoads was participating, during the meal, in a necessary meeting respecting the case. XRoads has only billed the sum of $4,584.82 in accordance with the Bankruptcy Guidelines.

E.   Telephone:  XRoads incurred the sum of $2,702.78 in conference charges related to this case.   XRoads did not charge cell phone or long distance calls during this Application Period.

F.   Federal Express:  XRoads incurred the sum of $1,795.42 in Federal Express charges directly related to this case and required by the circumstances.

G.   Photocopy Charges:   XRoads incurred the sum of $141.45 in photocopy charges directly related to this case.

26.   Applicant maintains the following policies with respect to Expenses:

a.   No amortization of the cost of any investment, equipment, or capital outlay is included in the Expenses.

b.   Applicant uses FedEx or similar express mail delivery only for emergency or exigent circumstances (i.e., when next-day response from the recipient was necessary) and when less costly than other available alternatives in light of the time constraints involved.

c.   In-house photocopying by Applicant is charged at $.15 per page.  To the extent practicable, Applicant generally uses and will continue to use less expensive, outside copying services.

d.   All expenses for which Applicant seeks reimbursement are of the kind, and at the least expensive rate, Applicant customarily charges nonbankruptcy/insolvency clients.

e.   All amounts paid to third party providers of goods and services are billed by Applicant at actual cost, without enhancements for handling or other administrative charges.

f.   No portion of the expenses represents secretarial time, secretarial overtime, word processing time, charges for after-hour and/or weekend air conditioning and other utilities, cost of meals or transportation provided to professionals and staff who work late or on weekends or other office overhead.

g.      Any and all automotive travel expenses are billed in accordance with the amount allowed by the Internal Revenue Service pursuant to IRC §274(d) and the current applicable I.R.B. Announcement.

## LEGAL ARGUMENT

27.     XRoads believes that the requested fee amount of $3,716,110.50 for 10,157.40 hours worked, is reasonable considering the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), made applicable to bankruptcy proceedings by In re *First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), as follows:

## TIME AND LABOR REQUIRED

28.     Applicant's professionals rendered a total of 8,597.70 hours of services on behalf of the Debtors during the Applicable Period.  The time expended and expenses incurred were necessary, reasonable and appropriate under the circumstances of these cases based on the complex and time sensitive matters addressed.

## THE NOVELTY AND DIFFICULTY OF THE SERVICE

29.     Applicant represents and would demonstrate to this Court that its role as financial and operations restructuring consultants to the Debtors' in these cases has involved significant sophistication and expertise.

## THE SKILL REQUISITE TO PERFORM THE SERVICES PROPERLY

30.     Due to the nature of the financial and operating issues presented in these cases, a relatively high degree of skill is required by Applicant in its representation of the Debtors.  Applicant's experience and expertise is facilitating and expediting the results being achieved in these cases, without incurring the extra time and expense had less experienced financial advisors handled these matters.

31.     Admittedly, the criterion of "the skill requisite to perform the services properly" is a subjective standard.  XRoads submits that the paramount factor that the Court should consider in applying this standard, however, is whether the results being achieved by Applicant are beneficial to the estates.  Applicant believes that the answer to such a query justifies allowance of the fees and costs requested in this Application.

### THE PRECLUSION OF OTHER EMPLOYMENT BY THE PROFESSIONAL

### DUE TO THE ACCEPTANCE OF THE CASE

32.     Due to the expedited manner in which these cases are being handled, work on other clients and matters were often deferred or delayed as a result.

### THE CUSTOMARY FEE

33.     Applicant represents and would demonstrate that the rates charged by Applicant for the services performed herein are competitive and customary for the degree of skill and expertise required in the performance of similar services rendered by other experienced financial advisors in bankruptcy matters and in the Middle District of Florida.

### WHETHER THE FEE IS FIXED OR CONTINGENT

34.     Applicant's fee is neither fixed nor contingent (other than the contingency of court-allowance and available assets to pay professionals).  It is based primarily upon the actual total number of hours worked, plus the actual costs incurred.

### TIME LIMITATIONS IMPOSED BY THE CLIENT

### OR OTHER CIRCUMSTANCES

35.     Throughout these bankruptcy cases and XRoads' involvement herein, there were many issues arising that needed immediate attention.  Because of the size and complexity of these cases, in many instances, XRoads has assisted the Debtors and Debtors' counsel in preparing for meetings and hearings covering a wide range of issues and impacting many constituencies.  These matters often placed increased time constraints on Applicant to effectively represent the Debtors' interests.

### EXPERIENCE, REPUTATION AND ABILITY OF APPLICANT

36.     The professionals who provided services on behalf of Applicant in this case are thoroughly experienced in all matters of bankruptcy, insolvency, and reorganization.  The ability of XRoads' professionals who have assisted the Debtors should be considered by this Court in measuring the results obtained.

### THE UNDESIRABILITY OF THE CASE

37.     The uncertainty of success or payment for services rendered, or for reimbursement of out-of-pocket expenses incurred in this case, could cause this case to be considered undesirable.  Notwithstanding

the difficulties imposed by the uncertainty of payment, Applicant was nevertheless willing to undertake these risks.

## THE NATURE AND LENGTH OF THE PROFESSIONAL
## RELATIONSHIP WITH THE CLIENT

38.    Applicant has been employed by the Debtors since the Court's entry of its Employment Order, effective February 21, 2005.  None of the members of the Debtors are members of Applicant, and Applicant has not agreed to share any fees received in the Bankruptcy Case with anyone other than members of Applicant.

## AWARDS IN SIMILAR CASES

39.    Applicant represents and would demonstrate that the compensation sought in connection with the services rendered and expenses incurred in these cases is not excessive and is commensurate with the compensation sought or awarded in similar cases under the Bankruptcy Code.  The amounts sought in this Application are based in part on the usual and customary hourly rates which Applicant charges other clients in similar matters.  Applicant routinely scrutinizes its bills to ensure that its fees are in compliance with the customary rates in this District and voluntarily writes off certain fees and all overhead expenses, including its use of counsel, secretarial overtime, after-hour utilities, tabs and binders, etc.  Moreover, Applicant believes its billing rates are equivalent to or may even be less than those charged by other nationally recognized financial advisors in the bankruptcy community.  Therefore, taking into consideration the time and labor spent, the nature and extent of the representation and the nature of this proceeding, Applicant believes the allowance prayed for herein is reasonable and just.

## REASONABLENESS OF XROADS' FEES

40.    The general areas of focus in this stage of the case as described earlier in this Application are certainly not exhaustive of the variety or number of issues and problems encountered in connection with its role as financial and operations restructuring consultants herein.  XRoads has been asked to assist, and represent the Debtors throughout these cases on time-consuming and difficult tasks.  Many of the issues have arisen under exigent circumstances and have required XRoads to dedicate significant resources exclusively to these cases within a very compressed period of time.

41.    XRoads represents and would demonstrate that the fees and expenses requested herein are not excessive and are, in its opinion, fair and reasonable in connection with the services provided by XRoads on behalf of the Debtors.

42.    XRoads would show that the work it has performed during the Application Period has been beneficial to the Debtors and its constituency as set forth above and in the Fee Statements attached hereto. Taking into consideration the time and labor spent, the nature and extent of the representation and the nature of these proceedings, XRoads believes the allowance prayed for herein is reasonable and just.

## **CONCLUSION**

43.    For the foregoing reasons, XRoads requests approval and allowance of the interim compensation requested herein in connection with its representation of the Debtors during the Application Period, representing all fees in the amount of $3,716,110.50 (100%) and actual and necessary out-of-pocket expenses in the amount of $236,989.35 (100%), for a total of $3,953,099.85 incurred during the time period beginning January 29, 2006 through May 27, 2006.

WHEREFORE, PREMISES CONSIDERED, XRoads respectfully requests that, after appropriate notice and a hearing, this Court approve and allow the interim compensation and reimbursement of expenses incurred on behalf of the Debtors during the Application Period, as more particularly set forth above, authorize and direct the Debtors to remit payment of such allowed fees and reimbursement of costs to XRoads as approved by the Court, and grant such other and further relief to which it may show itself to be justly entitled.

Dated:  July 20, 2006                                          Respectfully submitted:

By:_____

Holly Felder Etlin
XRoads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, CA   92614

FINANCIAL ADVISORS AND
OPERATIONS RESTRUCTURING
CONSULTANTS FOR THE DEBTORS

## **CERTIFICATION**

1.      I have been designated by Xroads Solutions Group, LLC (the "Applicant") as the professional with responsibility in this case for compliance with the "Guidelines for Fee Applications for Professionals in the Middle District of Florida in Bankruptcy Cases" (the Guidelines").

2.      I have read the Applicant's Application  for Compensation and Reimbursement of Expenses (the "Application").  The Application complies with the Guidelines, and the fees and expenses sought fall within the guidelines, except as specifically noted in this Certification and described in the Application.

3.      The fees and expenses sought are billed at rates and in accordance with practices customarily employed by the Applicant and generally accepted by the Applicant's clients.

4.      In seeking reimbursement for the expenditures described on Exhibit "2", the Applicant is seeking reimbursement only for the actual expenditure and has not marked-up the actual cost to provide a profit or to recover the amortized cost of invstment in staff time or equiptment or capital outlay (except to the extent that the Applicant has elected to charge for in-house photocopies and outgoing facsimily transmissions at the maximum rates permitted by the Guidelines).

5.      In seeking reimbursement for any service provided by a third party, the Applicant is seeking reimbursement only for the amount actually paid by the Application to third party.

6.      The following are the variances with the provisions of the Guidelines, the date of each Court Order approving the variance, and the justification for the variance: <u>NONE</u>

XRoads Solutions Group, LLC

_____
Holly Felder Etlin
XRoads Solutions Group, LLC
1821 East Dyer Road
Suite 225
Santa Ana, CA 92705

FINANCIAL ADVISORS AND OPERATIONS
RESTRUCTURING CONSULTANTS FOR THE
DEBTORS