## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## <u>JACKSONVILLE DIVISION</u>

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

## <u>NOTICE OF FILING</u>

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates, as debtors and debtors in possession, give notice of filing the attached Fourth Interim Application of Skadden, Arps, Slate, Meagher & Flom LLP for Allowance and Payment of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period from February 1, 2006 Through May 31, 2006.

Dated:  July 21, 2006.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

SMITH HULSEY & BUSEY

By   *s/ D. J. Baker*
　　　D. J. Baker
　　　Sally McDonald Henry
　　　Rosalie Gray

By   *s/ Cynthia C. Jackson*
　　　Stephen D. Busey
　　　James H. Post
　　　Cynthia C. Jackson (FBN 498882)

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

Co-Counsel for Debtors

00525867

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

**SUMMARY OF FOURTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED (FEBRUARY 1, 2006 THROUGH MAY 31, 2006)**

| | |
|---|---|
| Name of applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to provide professional services to: | Winn-Dixie Stores, Inc., et al., Debtors |
| Date of retention: | February 21, 2005, Petition Date |
| Period for which compensation and reimbursement are sought: | 02/01/06 – 05/31/06 |
| Amount of compensation sought as actual, reasonable, and necessary: | $3,154,861.00 |
| Amount of reimbursement sought as actual, reasonable, and necessary: | $59,318.42 |
| Amount of compensation paid/to be paid as actual, reasonable, and necessary: | $2,523,888.80 |
| Amount of reimbursement paid/to be paid as actual, reasonable, and necessary: | $59,318.42 |
| Total amount of holdback fees sought: | $630,972.20 |
| This is a: | X  Interim Application      __ Final Application |

---

[1]  In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

Summary of monthly statements:

| DATE SUBMITTED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | FEES PAID/ TO BE PAID (80%) | EXPENSES PAID/TO BE PAID (100%) | HOLDBACK FEES TO BE SOUGHT |
|---|---|---|---|---|---|
| May 24, 2005 First Monthly 02/21/05 – 02/28/05 | $226,065.50 | $2,790.83 | $180,852.40 | $2,790.83 | $45,213.10 |
| May 23, 2005 Second Monthly 03/01/05 - 03/31/05 | $1,602,540.00[2] | $87,053.45 | $1,282,032.00 | $87,053.45 | $320,508.00 |
| June 17, 2005 Third Monthly 04/01/05 - 04/30/05 | $1,212,305.50 | $54,639.91 | $969,844.40 | $54,639.91 | $242,461.10 |
| **Interim Subtotal**[3] | **$3,012,628.00** | **$144,484.19** | **$2,410,102.40** | **$144,484.19** | **$602,525.60** |
| September 13, 2005 Fourth Monthly 05/01/05 – 05/31/05 | $1,157,668.00 | $25,844.71 | $926,134.40 | $25,844.71 | $231,533.60 |
| September 13, 2005 Fifth Monthly 06/01/05 - 06/30/05 | $1,001,608.00 | $34,312.07 | $801,286.40 | $34,312.07 | $200,321.60 |
| October 25, 2005 Sixth Monthly 07/01/05 - 07/31/05 | $658,542.50 | $40,860.71 | $526,834.00 | $40,860.71 | $131,708.50 |
| October 28, 2005 Seventh Monthly 08/01/05 - 08/31/05 | $663,027.00 | $30,805.51 | $530,421.60 | $30,805.51 | $132,605.40 |
| November 9, 2005 Eighth Monthly 09/01/05 - 09/30/05 | $677,167.00 | $13,232.82 | $541,733.60 | $13,232.82 | $135,430.40 |
| **Interim Subtotal** | **$4,158,012.50** | **$145,055.82** | **$3,326,410.00** | **$145,055.82** | **$831,599.50** |
| December 5, 2005 Ninth Monthly 10/01/05 - 10/31/05 | $445,878.00 | $7,869.83 | $356,702.40 | $7,869.83 | $89,175.60 |
| December 20, 2005 Tenth Monthly 11/01/05 - 11/30/05 | $410,747.50 | $7,023.24 | $328,598.00 | $7,023.24 | $82,149.50 |
| January 30, 2006 Eleventh Monthly 12/01/05 - 12/31/05 | $443,190.00 | $11,280.88 | $354,552.00 | $11,280.88 | $88,638.00 |
| March 1, 2006 Twelfth Monthly 01/01/06 - 01/31/06 | $603,701.00 | $13,812.23 | $482,960.80 | $13,812.23 | $120,740.20 |
| **Interim Subtotal** | **$1,903,516.50** | **$39,986.18** | **$1,522,813.20** | **$39,986.18** | **$380,703.30** |
| June 6, 2006 Thirteenth Monthly 02/01/06 - 02/28/06 | $695,695.50 | $15,893.03 | $556,556.40 | $15,893.03 | $139,139.10 |
| June 26, 2006 Fourteenth Monthly 03/01/06 - 03/31/06 | $820,266.50 | $10,640.68 | $656,213.20 | $10,640.68 | $164,053.30 |

---

[2]      Subsequently, Skadden, Arps voluntarily made a reduction in the fees requested in the amount of $28,283.00, reflecting the amount previously charged for non-working travel time.

[3]      The total takes into account the adjustment described in Note 2, above.

| DATE SUBMITTED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | FEES PAID/ TO BE PAID (80%) | EXPENSES PAID/TO BE PAID (100%) | HOLDBACK FEES TO BE SOUGHT |
|---|---|---|---|---|---|
| July 7, 2006 Fifteenth Monthly 04/01/06 - 04/30/06 | $782,708.50 | $15,186.75 | $626,166.80 | $15,186.75 | $156,541.70 |
| July 18, 2006 Sixteenth Monthly 05/01/06 - 05/31/06 | $856,190.50 | $17,597.96 | $684,952.40 | $17,597.96 | $171,238.10 |
| **Interim Subtotal** | **$3,154,861.00** | **$59,318.42** | **$2,523,888.80** | **$59,318.42** | **$630,972.20** |
| **GRAND TOTALS** | **$12,229,018.00** | **$388,844.61** | **$9,783,214.40** | **$388,844.61** | **$2,445,800.60** |

Summary of interim applications:

| DATE FILED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | TOTAL FEES ALLOWED | TOTAL EXPENSES ALLOWED | TOTAL FEES/EXPENSES DISALLOWED |
|---|---|---|---|---|---|
| July 16, 2005 First Interim 02/21/05 – 04/30/05 | $3,012,628.00 | $144,484.19 | $3,012,628.00 | $144,484.19 | $0.00 |
| November 11, 2005 Second Interim 05/01/05 - 09/30/05 | $4,158,012.50 | $145,055.82 | $4,158,012.50 | $145,055.82 | $0.00 |
| March 17, 2006 Third Interim 10/01/05-1/31/06 | $1,903,516.50 | $39,986.18 | $1,903,516.50 | $39,986.18 | $0.00 |
| July 21, 2006 Fourth Interim 2/1/06 – 5/31/06 | $3,154,861.00 | $59,318.42 | N/A | N/A | N/A |

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE TIME SUMMARY**
**(FEBRUARY 1, 2006 THROUGH MAY 31, 2006)**

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|------|---------|--------|-------|--------|
| **PARTNERS*** | | | | |
| D. J. (Jan) Baker (1980) | 1973 | $835 | 449.90 | $375,666.50 |
| Ronald C. Barusch (1987) | 1978 | 795 | 88.30 | 70,198.50 |
| Katherine M. Bristor (1988) | 1981 | 835 | 22.30 | 18,620.50 |
| Sally McDonald Henry (1991) | 1983 | 730 | 376.80 | 275,064.00 |
| Peter J. Neckles (1987) | 1978 | 835 | 30.50 | 25,467.50 |
| Regina Olshan (1998) | 1989 | 755 | 11.70 | 8,833.50 |
| Wallace L. Schwartz (1985) | 1978 | 820 | 16.50 | 13,530.00 |
| | | | | |
| * The year after each partner's name indicates the year in which the individual became a partner at Skadden, Arps or at a previous firm. | | | | |
| | **TOTAL PARTNERS** | | **996.00** | **$787,380.50** |
| | | | | |
| **COUNSEL** | | | | |
| Tiffany Tran Boydell | 1995 | $560 | 20.70 | $11,592.00 |
| Stephanie R. Feld | 1982 | 560 | 68.50 | 38,360.00 |
| Rosalie W. Gray | 1982 | 560 | 603.90 | 338,184.00 |
| Alexandra Margolis | 1997 | 560 | 13.40 | 7,504.00 |
| Suzanne E. Rothwell | 2001 | 560 | 22.80 | 12,768.00 |
| Anthony Saldana | 2000 | 560 | 138.90 | 77,784.00 |
| | | | | |
| | **TOTAL COUNSEL** | | **868.20** | **$486,192.00** |
| **ASSOCIATES** | | | | |
| Tiffany Tran Boydell | 1995 | $540 | 88.70 | $47,898.00 |
| Jessica N. Cohen | 2004 | 510 | 33.60 | 17,136.00 |
| Steven Eichel | 1988 | 540 | 328.30 | 177,282.00 |
| Ronald Falls, Jr. | 2005 | 295 | 13.50 | 3,982.50 |
| Lisa A. Gootee | 2004 | 375 | 12.10 | 4,537.50 |
| Danny J. Hart, Jr. | 2005 | 335 | 218.80 | 73,298.00 |
| Jillian E. Hooper | 2005 | 335 | 7.60 | 2,546.00 |
| Denise Kaloudis | 2003 | 440 | 95.30 | 41,932.00 |
| Kelley M. Keller | 1989 | 540 | 188.70 | 101,898.00 |

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|---|---|---|---|---|
| Jessica Kempf | 2004 | 375 | 77.70 | 29,137.50 |
| Suling Lam | 1998 | 540 | 8.00 | 4,320.00 |
| Kimberly A. LaMaina | 2001 | 465 | 336.20 | 156,333.00 |
| Jane M. Leamy | 1995 | 540 | 520.40 | 281,016.00 |
| Jiten N. Naran | 2003 | 410 | 16.10 | 6,601.00 |
| Jessenia Paoli | 2004 | 375 | 16.20 | 6,075.00 |
| Carlos R. Pineiro | 2005 | 335 | 9.40 | 3,149.00 |
| Adam S. Ravin | 1995 | 540 | 599.00 | 323,460.00 |
| Abraham A.Reshtick | 2001 | 465 | 32.50 | 15,112.50 |
| Keith Sambur | 2005 | 375 | 624.10 | 234,037.50 |
| James S. Talbot | 1997 | 540 | 9.20 | 4,968.00 |
| David M. Turetsky | 2002 | 440 | 614.90 | 270,556.00 |
| | | | | |
| | **TOTAL ASSOCIATES** | | **3,850.30** | **$1,805,275.50** |
| | | | | |
| **SUMMER/WINTER ASSOCIATES** | | | | |
| Jennifer A. Karpe | | $170 | 6.60 | $1,122.00 |
| Richard L. Oliver | | 170 | 4.20 | 714.00 |
| | | | | |
| | **TOTAL SUMMER/ WINTER ASSOCIATES** | | **10.80** | **$1,836.00** |
| | | | | |
| **CLIENT SPECIALIST** | | | | |
| Jay Wasserman | | $260 | 0.80 | $208.00 |
| | | | | |
| | **TOTAL CLIENT SPECIALIST** | | **0.80** | **$208.00** |
| | | | | |
| **PARAPROFESSIONALS** | | | | |
| Stephen S. Brown | | $145 | 206.00 | $29,870.00 |
| Larry S. Morton | | 230 | 26.60 | 6,118.00 |
| Isaac Pirolo | | 175 | 30.80 | 5,390.00 |
| Joseph J. Roman | | 75 | 16.30 | 1,222.50 |

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|---|---|---|---|---|
| Johannes A. Wetzel | | 175 | 79.10 | 13,842.50 |
| Ronald E. Wittman, Jr. | | 230 | 76.20 | 17,526.00 |
| | | | | |
| | **TOTAL PARAPROFESSIONALS** | | **435.00** | **$73,969.00** |
| | | | | |
| | | **TOTAL** | **6,161.10** | **$3,154,861.00** |
| | **BLENDED HOURLY RATE** | | | **$512.06** |

** The firm adjusts its hourly rates from time to time. Hours billed for non-working travel time represent 50% of the actual time spent traveling.

vi

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE PROJECT CATEGORY SUMMARY**
**(FEBRUARY 1, 2006 THROUGH MAY 31, 2006)**

| Project Category | Total Hours | Total Fees |
|---|---:|---:|
| General Corporate Advice | 70.30 | $48,181.00 |
| Asset Dispositions / General | 328.90 | $189,519.00 |
| Automatic Stay / Relief Actions | 0.20 | $112.00 |
| Business Operations / Strategic Planning | 36.50 | $24,813.00 |
| Case Administration | 377.00 | $84,698.00 |
| Claims Administration / General | 820.50 | $411,485.00 |
| Claims Administration / Reclamation / Trust Funds | 61.60 | $33,352.50 |
| Claims Administration (PACA / PASA) | 0.10 | $54.00 |
| Creditor Meetings / Statutory Committees | 26.70 | $18,693.50 |
| Disclosure Statement / Voting Issues | 109.50 | $57,598.00 |
| Employee Matters / General | 346.60 | $199,010.00 |
| Executory Contracts / Personalty | 433.60 | $233,220.50 |
| Financing (DIP and Emergence) | 398.60 | $207,184.50 |
| Insurance | 60.10 | $34,716.50 |
| Investigations and Reviews | 278.90 | $156,775.50 |
| Lease (Real Property) | 438.80 | $230,941.50 |
| Litigation (General) | 1.00 | $464.00 |
| Non-Working Travel Time | 18.10 | $11,494.00 |
| Regulatory and SEC Matters | 1.80 | $1,008.00 |
| Reorganization Plan / Plan Sponsors | 1,370.70 | $752,055.00 |
| Reports and Schedules | 0.30 | $168.00 |
| Retention / Fee Matters (SASM&F) | 236.20 | $109,817.00 |
| Retention / Fee Matters / Objections (Others) | 139.30 | $65,311.00 |
| Tax Matters | 87.10 | $48,111.00 |
| U.S. Trustee Matters | 0.10 | $46.50 |

| Project Category | Total Hours | Total Fees |
|---|---:|---:|
| Utilities | 104.00 | $49,962.00 |
| Vendor Matters | 35.60 | $19,509.00 |
| Fee Examiner | 379.00 | $166,561.00 |
| **TOTAL** | **6,161.10** | **$3,154,861.00** |

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE EXPENSE SUMMARY**
**(FEBRUARY 1, 2006 THROUGH MAY 31, 2006)**

| Expense Category | Total Expenses |
|---|---|
| Computer Legal Research | $24,612.54 |
| Long Distance Telephone | $1,387.71 |
| In-House Reproduction (@ $.10 per page) | $11,357.00 |
| Reproduction – Color | $260.50 |
| Outside Reproduction | $8,686.19 |
| Outside Research | $1,839.19 |
| Filing / Court Fees | $196.25 |
| Court Reporting | $227.50 |
| Out of Town Travel | $7,409.80 |
| Business Meals | $819.28 |
| Courier & Express Carriers (e.g., Federal Express) | $2,347.00 |
| Postage | $175.46 |
| **TOTAL** | **$59,318.42** |

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

**FOURTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR
SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED
(FEBRUARY 1, 2006 THROUGH MAY 31, 2006)**

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), bankruptcy

counsel for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the

"Company"), files its fourth interim application for allowance and payment of compensation for

services rendered and reimbursement of expenses incurred (the "Fourth Application") for the

period from February 1, 2006 through May 31, 2006 (the "Application Period").  In support of

this Fourth Application, Skadden, Arps respectfully represents the following:

<u>JURISDICTION</u>

1.       This Court has jurisdiction to consider this Fourth Application under

28 U.S.C. §§ 157 and 1334.  Consideration of this Fourth Application is a core proceeding under

---

[1]       In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

28 U.S.C. § 157(b)(2).  The relief requested may be granted in accordance with the provisions of 11 U.S.C. §§ 330 and 331.

## BACKGROUND

A.  The Chapter 11 Cases

2.  On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

3.  The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors are operating their businesses and managing their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

4.  On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103.  On August 17, 2005, an official committee of equity holders (the "Equity Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103, but the Equity Committee was subsequently disbanded.

5.  The Debtors are filing monthly operating reports and paying their quarterly fees.  Ordinary course administrative obligations are being paid in the ordinary course of the Debtors' business, and fees and expenses incurred by professionals are or are anticipated to be paid under procedures established by the New York Court.

6.      On August 10, 2005, this Court entered an order providing for the appointment of a fee examiner in these cases.  The Debtors subsequently selected Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue") to serve as the fee examiner.  By order dated December 14, 2005, this Court authorized the retention of Stuart Maue in these cases (the "Fee Examiner Order").

7.      The Debtors filed their reorganization plan on June 29, 2006, and have a hearing on their Disclosure Statement (defined below) scheduled for August 4, 2006.

B.      Retention of Skadden, Arps

8.      On February 21, 2005, the Debtors filed the Application for Authority to Retain Skadden, Arps, Slate, Meagher & Flom LLP as Lead Restructuring and Bankruptcy Counsel to the Debtors (Docket No. 68, the "Employment Application").  A copy of the Employment Application is attached to this Fourth Application as Exhibit A.

9.      The Employment Application was supported by the Declaration of D. J. Baker and Disclosure of Compensation, a copy of which is included as part of Exhibit A.[2]

10.     On March 7, 2005, the New York Court entered an interim order approving the Employment Application.  On March 15, 2005, the New York Court entered a final order (the "Employment Order") authorizing the Debtors to retain Skadden, Arps effective as of the Petition Date.  A copy of the Employment Order is attached to this Fourth Application as Exhibit B.[3]

---

[2]     On May 18, 2005, Skadden, Arps filed its First Supplemental Declaration of D. J. Baker.  On August 2, 2005, October 10, 2005, February 23, 2006 and June 5, 2006, Skadden, Arps filed its Second, Third, Fourth and Fifth Supplemental Declarations of D. J. Baker, respectively.  These supplemental declarations are included as part of Exhibit A.

[3]     King & Spalding, LLP was originally to be retained as co-counsel for the Debtors to assist Skadden, Arps with a variety of matters pursuant to Bankruptcy Code section 327(a).  After Winn-Dixie filed King & Spalding's retention application, King & Spalding's role was limited.  As a result, some matters originally designated to be handled by King & Spalding were transferred to Skadden, Arps.  These matters included insurance and utilities issues.

3

11.     Skadden, Arps continues to hold prepetition retainer funds for application against prepetition fees and expenses, as permitted by the Employment Order.  As of the date of this Fourth Application, Skadden, Arps estimates that remaining retainer funds are in the amount of $341,350.

C.     Interim Payment Procedures

12.     The procedures governing the rights of Skadden, Arps and other professionals to obtain interim payment for services rendered and expenses incurred are set forth in the Final Order Approving Interim Compensation Procedures for Professionals (Docket No. 434, the "Interim Payment Order").

13.     Under the Interim Payment Order, professionals may be paid on a monthly basis, up to 80% of fees earned and 100% of expenses incurred, by the submission of monthly statements to the Debtors.  Such payments are subject to ratification, and the remaining 20% of fees are payable, after court approval of interim fee applications.  Interim fee applications are to be submitted approximately every four to six months.

14.     The first interim fee application covered the period from the Petition Date through April 30, 2005.  The first interim fee application was approved by the Court on August 4, 2005.

15.     The second interim fee application covered the period from May 1, 2005 through September 30, 2005.  The second interim fee application was approved by the Court on December 1, 2005.

16.     The third interim fee application covered the period from October 1, 2005 through January 31, 2006.  The third interim fee application was approved by the Court on April 6, 2006.

17.     This Fourth Application covers the period from February 1, 2006 through May 31, 2006.  Under the monthly statement procedures of the Interim Payment Order, for the

4

period of February 1, 2006 through February 28, 2006, the Debtors are authorized to pay

Skadden, Arps an aggregate amount of $572,449.43, representing 80% of fees ($556,556.40) and

100% of expenses ($15,893.03) for services rendered and expenses incurred.  For the period of

March 1, 2006 through March 31, 2006, the Debtors are authorized to pay Skadden, Arps an

aggregate amount of $666,853.88, representing 80% of fees ($656,213.20) and 100% of

expenses ($10,640.68) for services rendered and expenses incurred.  For the period of April 1,

2006 through April 30, 2006, the Debtors are authorized to pay Skadden, Arps an aggregate

amount of $641,353.55, representing 80% of fees ($626,166.80) and 100% of expenses

($15,186.75) for services rendered and expenses incurred, assuming no objections are received

by Skadden, Arps by July 31, 2006.  For the period of May 1, 2006 through May 31, 2006, the

Debtors are authorized to pay Skadden, Arps an aggregate amount of $702,550.36, representing

80% of fees ($684,952.40) and 100% of expenses ($17,597.96) for services rendered and

expenses incurred, assuming no objections are received by Skadden, Arps by August 8, 2006.

<u>COMPENSATION AND REIMBURSEMENT REQUESTED</u>

18.    By this Fourth Application, Skadden, Arps requests that this Court authorize and

order, on an interim basis: (a) allowance of compensation for professional services rendered by

Skadden, Arps during the Application Period on behalf of the Debtors in the amount of

$3,154,861.00, representing 100% of the fees earned, and payment of such fees to the extent not

previously paid, and (b) allowance of actual necessary expenses incurred by Skadden, Arps

during the Application Period in connection with the rendition of such professional services in

the amount of $59,318.42, representing 100% of expenses incurred by Skadden, Arps during the

Application Period and payment of such expenses to the extent not previously paid.

19.    All legal services performed by Skadden, Arps were performed for and on behalf

of the Debtors and not for or on behalf of any other individual or entity.  These services were rendered in discharge of Skadden, Arps' professional responsibilities as bankruptcy counsel for the Debtors in these cases.  Skadden, Arps' services have been substantial, necessary and of significant benefit to the Debtors and their estates.

20.     No agreement or understanding exists between Skadden, Arps and any other entity for the sharing of compensation to be received for services rendered in connection with these cases.  See Exhibit A.

21.     Skadden, Arps expended an aggregate of 6,161.10 hours during the Application Period, resulting in an average billing rate of $512.06 per hour.  The rates charged by Skadden, Arps are the normal hourly bundled billing rates that were in effect during the Application Period.  The summary preceding this Fourth Application contains a list of the attorneys and paraprofessionals who have performed services on behalf of the Debtors during the Application Period, as well as a breakdown of the hours, hourly rates and fees attributable to those individuals.  Also included is a summary of total hours and fees by project category.

22.     Skadden, Arps maintains written records of the time expended by attorneys and paraprofessionals in the rendition of professional services to the Debtors.  Such time records are made contemporaneously with the rendition of services by the person rendering such services.  Skadden, Arps' daily time records for each monthly segment of the Application Period, allocated by matter, listing the name of the attorney or paraprofessional, the date on which the services were performed, and the amount of time expended in performing the services, are attached to this Fourth Application as Exhibit C-1 for the period of February 1, 2006 through February 28, 2006, Exhibit D-1 for the period of March 1, 2006 through March 31, 2006, Exhibit E-1 for the period

of April 1, 2006 through April 30, 2006, and Exhibit F-1 for the period of May 1, 2006 through May 31, 2006.

23.    Skadden, Arps also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with its rendition of services on behalf of the Debtors.  The summary preceding this Fourth Application includes a breakdown of expenses incurred during the Application Period.  The detail for such expenses is attached to this Fourth Application as Exhibit C-2 for the period of February 1, 2006 through February 28, 2006, Exhibit D-2 for the period of March 1, 2006 through March 31, 2006, Exhibit E-2 for the period of April 1, 2006 through April 30, 2006, and Exhibit F-2 for the period of May 1, 2006 through May 31, 2006. Skadden, Arps has included in this Fourth Application all compensation for fees and disbursements processed by its accounting department for the Application Period.  Skadden, Arps reserves the right to seek additional compensation for services rendered and reimbursement for additional expenses that may have been incurred during these cases.

<u>SUMMARY OF SERVICES RENDERED</u>

24.    Throughout the Application Period, Skadden, Arps has worked closely with the Debtors and their advisors to administer these estates and maximize the return for estate creditors and has acted at all times in the best interests of creditors and other parties in interest in these cases.  Skadden, Arps' services have been directed toward a myriad of tasks necessary to achieve this result.  To meet the Debtors' needs, Skadden, Arps provided multi-disciplinary services on a daily basis, often working nights and weekends.  Throughout this process, certain of the principal Skadden, Arps professionals working on the cases were required to devote the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of the efforts of the

7

Debtors, Skadden, Arps, and the Debtors' other professionals, the Debtors have made significant

strides for its creditors.

25.    The daily time records attached as Exhibit C-1, Exhibit D-1, Exhibit E-1 and

Exhibit F-1 provide a detailed description of the services rendered by Skadden, Arps during the

Application Period.  For the convenience of the Court, the following summary[4] identifies the

areas to which Skadden, Arps devoted substantial time and attention during the Application

Period:[5]

     (a)    <u>General Corporate Advice</u>

       During the Application Period, Skadden, Arps attended board of directors
meetings and governance meetings with the Debtors.  Skadden, Arps assisted the Debtors
with reviewing board materials and advising on board of directors issues.  Skadden, Arps
also advised the Company concerning the selection of an appropriate stock exchange to
list the stock of Winn-Dixie Stores, Inc. upon emergence from chapter 11.  Similarly,
Skadden, Arps advised the Company on charter documents and by-laws for the
reorganized Debtors.

       In addition, Skadden, Arps assisted the Debtors on a wide variety of general
corporate bankruptcy issues, including, without limitation, the fiduciary duties of the
Debtors and their management, issues implicating the Debtors' corporate structure and
matters of corporate governance.

       Skadden, Arps also prepared, reviewed and commented upon the Debtors' filings
with the Securities and Exchange Commission and reviewed the Debtors' quarterly
financial statements as well as press releases.

       During the Application Period, Skadden, Arps professionals devoted a total of
70.30 hours to this category, for which compensation is sought in the aggregate amount
of $48,181.00.

---

[4]    The summary is presented in matter number order, consistent with the order in which the time records are
organized.

[5]    The summary necessarily does not include a description or discussion of all Skadden, Arps' services during
the Application Period.  To the extent the following summary does not encompass a particular Skadden,
Arps service, the service is contained in the corresponding time detail at Exhibits C-1, D-1, E-1 and F-1.
Skadden, Arps seeks compensation for all of its services in these cases as detailed in exhibits submitted
with its interim fee applications.

(b)    Asset Dispositions / General

During the Application Period, Skadden, Arps assisted the Debtors in selling unnecessary or noncore assets.  After the Debtors determined that their Bahamas operations are not necessary for their reorganization efforts and that it is in the best interest of the estates to sell these assets, Skadden, Arps assisted the Debtors in obtaining maximum value for these assets.  In connection with the sale, Skadden Arps (i) prepared the motion, allowing the Debtors to sell their Bahamas operations to BK Foods, Ltd., subject to higher and better offers, (ii) reviewed issues pertaining to the transition of services under the transition services agreement and prepared the accompanying transition services agreement, (iii) drafted the non-competition agreement, (iv) assisted in the preparation of the underlying sale documents, (v) assisted the Debtors to work to avoid negative tax implications that could have arisen in connection with the sale, (vi) with The Blackstone Group, L.P. ("Blackstone"), conducted the auction, (vii) assisted the Debtors in determining the "highest and best" offer for the assets, and (viii) prepared an order that was entered by the court on May 18, 2006, authorizing the transaction with the successful bidder.

As a result of Skadden, Arps' efforts, in conjunction with Blackstone, the Debtors entered into an agreement to sell their interest in the Bahamas operations for approximately $54 million.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. For example, it was necessary for Skadden, Arps to hold (i) conferences with Blackstone in order to draft the applicable sale documents, including the motion and order related to the sale of the Bahamas assets and (ii) intraoffice conferences to coordinate work among professionals working on various aspects of the sale from different departments within Skadden, Arps, which were needed to address non-bankruptcy issues.  By coordinating the work among the professionals, Skadden, Arps effectively resolved issues that arose, such as banking, corporate and tax, in a cost-effective manner.

During the Application Period, Skadden, Arps professionals devoted a total of 328.90 hours to this category, for which compensation is sought in the aggregate amount of $189,519.00.

(c)    Business Operations / Strategic Planning

During the Application Period, Skadden, Arps reviewed and advised on legal issues relating to the Debtors' business operations and the restructuring of their operations.

Skadden, Arps also engaged in weekly conference calls with the Debtors' management and advisors to strategize regarding upcoming matters and business issues, including emergence, employee, insurance and public relations issues.  These weekly

calls necessarily involved more than one Skadden, Arps professional to address the numerous issues raised (on which different Skadden, Arps lawyers were working) and to ensure that strategy issues and client concerns were communicated to the appropriate attorneys.

Moreover, Skadden, Arps assisted the Debtors' management in addressing legal issues relating to the Debtors' plan for emergence from these chapter 11 cases.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. Specifically, it was necessary for Skadden, Arps to speak with the Debtors' management regarding business operations and strategic planning and to communicate, where necessary and appropriate, with other Skadden, Arps professionals.

During the Application Period, Skadden, Arps professionals devoted a total of 36.50 hours to this category, for which compensation is sought in the aggregate amount of $24,813.00.

(d)     Case Administration

During the Application Period, Skadden, Arps spent time on case administration matters typical of the time necessarily expended in any large chapter 11 case.

In particular, Skadden, Arps devoted time during the Application Period to (i) coordinating required notices and mailings, (ii) reviewing creditor correspondence and responding to creditor inquiries, (iii) preparing for hearings, (iv) monitoring the Court's docket, (v) updating and distributing on a weekly basis a case calendar of upcoming events and deadlines, (vi) monitoring the status and staffing of pending matters, (vii) maintaining on a daily basis various files and databases critical to running the Debtors' chapter 11 cases, and (viii) coordinating case responsibilities between various professionals of the Debtors.

Skadden, Arps also spent time on necessary services designed to promote efficiency in these cases, including preparing for and attending meetings on significant case events and reviewing recent events outside of filed pleadings to ensure that issues affecting these cases were handled promptly.  Skadden, Arps also spent time coordinating appropriate staffing to avoid duplicative or unnecessary services.

Due to the size and complexity of these cases, Skadden, Arps professionals necessarily communicated internally in order to coordinate case responsibilities and to ensure efficient administration of these cases.

During the Application Period, Skadden, Arps professionals devoted a total of 377.00 hours to this category, for which compensation is sought in the aggregate amount of $84,698.00.

(e)    Claims Administration / General

During the Application Period, Skadden, Arps continued to assist the Debtors with numerous issues relating to chapter 11 claims and claims-related processes and procedures.

Skadden, Arps worked extensively with the Company, XRoads (defined below) and Logan & Company, Inc. (the claims agent) in reviewing and analyzing filed claims. Skadden, Arps monitored updated claims reports prepared by Logan & Company, Inc., reflecting new proof of claim filings and analyzed certain significant claims appearing on the reports.  As a result of the identification of additional potential claimants after the August 1, 2005 bar date for filing proofs of claim, Skadden, Arps arranged for the establishment of two additional special bar dates, and coordinated with Logan & Company, Inc. on providing notice of the special bar date to the potential claimants.

The review of claims necessarily required Skadden, Arps to spend considerable time analyzing and performing legal research on numerous issues associated with the claims, including claim classification, priority status and other issues.

During the Application Period, Skadden, Arps, drafted and filed several omnibus claim objections.  The claim objections resulted in the disallowance, or other resolution, of over 1000 claims.  This, in turn, reduced the estates' potential liability by millions.

In connection with this process, Skadden, Arps responded to numerous filed responses and other inquiries from creditors generated by the claim objections.  Skadden, Arps spent considerable time working with various parties in interest and counsel for the claimants to resolve claim objections that were filed in the interim period and that were filed previously but not yet resolved.

Skadden, Arps also coordinated with co-counsel as to the handling of certain claim objections that were not appropriate for omnibus procedures, including drafting an objection with respect to several proofs of claim filed by the State of Louisiana Department of Revenue.  With the assistance of Skadden, Arps, the Debtors made significant progress during the Application Period in the claims reconciliation and objection process.

In addition to the above, Skadden, Arps spent time strategizing on methods to obtain money owed to the estate from various claimants, including preparing demand letters.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. The sheer amount of claims alone filed in these cases (over 13,000) explains the necessity for, at times, more than one Skadden, Arps professional.

During the Application Period, Skadden, Arps professionals devoted a total of 820.50 hours to this category, for which compensation is sought in the aggregate amount of $411,485.00.

(f)    Claims Administration / Reclamation / Trust Funds

In the ordinary course of the Debtors' business, the Debtors purchase materials, supplies, goods, products and other related items (collectively, the "Goods") from various vendors for use and sale in their stores. Before and after the Petition Date, the Debtors received demands from their vendors asserting a right to reclaim their Goods under Section 2-720(2) of the Uniform Commercial Code and Bankruptcy Code section 546(c). The deadline to assert a reclamation demand was March 14, 2005 (the "Reclamation Demand Deadline"). The Debtors received approximately 480 reclamation demands asserting aggregate claims of approximately $125 million on or before the Reclamation Demand Deadline.

To maintain normal business operations and prevent the vendors from reclaiming their Goods, as well as costly and distracting litigation relating to the reclamation claims, which would have negatively affected the Debtors' business, the Debtors sought to consensually resolve their vendors' reclamation claims. In this regard, Skadden, Arps negotiated with several of the Debtors' reclamation vendors and reached a resolution of reclamation procedures to be applied in these cases, which is reflected in the final reclamation order, dated April 4, 2005 (the "Final Reclamation Order").

Under the Final Reclamation Order, as modified by order dated May 19, 2005, extending the Debtors' time to file statements of reclamation until June 30, 2005, Skadden, Arps assisted XRoads Solution Group LLC ("XRoads") and the Debtors in reviewing, analyzing and reconciling, from the Debtors' perspective, each vendor's reclamation claim (including asserting appropriate defenses with respect to each reclamation claim) and subsequently served approximately 480 statements of reclamation upon the reclamation vendors.

To facilitate a global resolution of the reclamation issues that would provide the Debtors with additional trade credit, Skadden, Arps, on behalf of the Debtors, and certain reclamation trade vendors entered into discussions which resulted in an agreement for, among other things, (i) the establishment of a trade vendor lien program and (ii) procedures for the calculation and treatment of trade vendors' reclamation claims (the "Reclamation/Trade Lien Program"). By order dated August 5, 2005 (the "Reclamation/Trade Lien Order"), this Court granted the motion approving the Reclamation/Trade Lien Program, which benefited the Debtors by (i) virtually eliminating reclamation litigation, except for two omnibus reclamation motions filed since the Court entered the Reclamation/Trade Lien Order, (ii) significantly increasing the amount of trade credit available to the Debtors from those vendors who opted into the Reclamation Trade/Lien Program and (iii) fostering good vendor relations.

During the Application Period, Skadden, Arps assisted XRoads in resolving numerous reclamation claims asserted against the Debtors.  In connection therewith, Skadden, Arps (a) continually communicated with XRoads and the reclamation vendors regarding (i) the reconciliation of the vendors' reclamation claims, and (ii) the vendors opting into the Reclamation Trade/Lien Program, and (b) reviewed XRoads' vendor reclamation analysis and reconciliations, as appropriate.  As a result of the overall efforts of Skadden, Arps and XRoads, more than 95% of the reclamation claims have been resolved to date and approximately 68% of those reclamation vendors opted into the Reclamation/Trade Lien Program.

During the Application Period, Skadden, Arps professionals devoted a total of 61.60 hours to this category, for which compensation is sought in the aggregate amount of $33,352.50.

(g)     Creditor Meetings / Statutory Committees

During the Application Period, Skadden, Arps provided a variety of services relating to committee issues.

Skadden, Arps continued to advise and assist the Debtors in their dealings with the Creditors Committee and its advisors, including: (a) meeting with the Creditors Committee and its advisors to discuss significant issues related to the Debtors' businesses and the ongoing chapter 11 cases; (b) assisting in the preparation of a presentation regarding the Debtors and their businesses; and (c) addressing and researching numerous inquiries from the Creditors Committee's advisors.  As a result of Skadden, Arps' efforts, as well as the efforts of the Debtors' other professionals, the Debtors continued to resolve a number of issues raised by, and to maintain a constructive relationship with, the Creditors Committee.

Skadden, Arps also assisted the Debtors in addressing a variety of inquiries from both the ad hoc committee of Winn-Dixie retirees and the ad hoc committee of Winn-Dixie trade and other creditors.  In this vein, Skadden, Arps drafted confidentiality agreements that allowed each of these ad hoc committees to receive information that would otherwise have been inaccessible to them.  In addition, Skadden, Arps assisted the Debtors in responding to document production requests from the ad hoc committee of Winn-Dixie retirees.  To facilitate a consensual resolution of plan issues, Skadden, Arps coordinated the production of thousands of pages of documents to the ad hoc committees.  Skadden, Arps' efforts allowed the Debtors to reach a consensual resolution with each of the ad hoc committees regarding the treatment of their constituencies' respective claims under a reorganization plan.

In addition to the foregoing, Skadden, Arps also advised the Debtors regarding issues arising from the disbandment of, and the Court's refusal to reappoint, the Equity Committee.

During the Application Period, Skadden, Arps professionals devoted a total of 26.70 hours to this category, for which compensation is sought in the aggregate amount of $18,693.50.

(h)     Disclosure Statement / Voting Issues

During the Application Period, Skadden, Arps began drafting a detailed disclosure statement (the "Disclosure Statement") containing information about the Debtors' history, business operations, management structure, debt structure and chapter 11 cases, as well as information concerning the voting and confirmation processes, special securities and tax issues, and risk factors. These efforts involved a review of the Debtors' historical financial information, securities filings and other background materials necessary to the drafting of the Disclosure Statement.

Applicable information pulled from these materials was then summarized by Skadden, Arps and incorporated into the Disclosure Statement. Additionally, in an effort to be able to accurately describe the numerous important events that had taken place during the pendency of the chapter 11 cases, Skadden, Arps spent significant time during the Application Period reviewing and analyzing previously filed pleadings and then drafting descriptions of such events for insertion into the Disclosure Statement. In other instances, Skadden, Arps worked directly with the Debtors and their other advisors to obtain information related to matters such as insurance coverage and store closures. All of the aforementioned efforts during the Application Period provided the framework for the Disclosure Statement that was ultimately filed with the Court on June 29, 2006, and that is scheduled to be heard before this Court on August 4, 2006.

Because numerous Skadden, Arps professionals work on many aspects of these cases and this work is pivotal to formulating the Disclosure Statement, it was necessary for Skadden, Arps professionals to conduct intraoffice conferences and attend non-firm conferences with other parties in interest to develop the Disclosure Statement.

During the Application Period, Skadden, Arps professionals devoted a total of 109.50 hours to this category, for which compensation is sought in the aggregate amount of $57,598.00.

(i)     Employee Matters / General

During the Application Period, Skadden, Arps provided a variety of services relating to employee matters.

Skadden, Arps assisted the Debtors in analyzing a variety of employee-related issues, including: (i) advising the Debtors with respect to issues related to the Management Security Plan and the Supplemental Retirement Plan (together, the "Non-Qualified Plans"), such as (a) continuing to analyze the impact of the chapter 11 filings upon the Non-Qualified Plans, (b) addressing inquiries from employees and retirees concerning the Non-Qualified Plans, (c) advising the Debtors with respect to information

14

materials to be sent to participants in the Non-Qualified Plans, and (d) analyzing and advising the Debtors with respect to issues related to the treatment of claims under the Non-Qualified Plans under an eventual reorganization plan, including the impact of substantive consolidation upon such claims; (ii) advising the Debtors, together with certain of the Debtors' other professionals, with respect to a variety of employee compensation issues; (iii) advising the Debtors with respect to the disposition of Company-owned life insurance policies; (iv) advising the Debtors with respect to a variety of ERISA issues; (v) advising the Debtors with respect to the disposition of employee benefit programs (other than the Non-Qualified Plans) and of claims arising pursuant to such programs under a reorganization plan; (vi) advising the Debtors with respect to certain severance issues; (vii) advising the Debtors with respect to an equity incentive plan to be implemented following the Debtors' emergence from chapter 11; and (viii) reviewing numerous employment-related contracts, identifying potential issues related to such contracts, and advising the Debtors with respect to their assumption/rejection decisions in connection with such contracts.  With the assistance provided by Skadden, Arps, the Debtors were able to make significant progress and, in some cases, come to closure with respect to these difficult issues during the Application Period, as reflected by the terms of the Debtors' first proposed reorganization plan that was filed on June 29, 2006.

Skadden, Arps also advised the Debtors on a variety of issues relating to the Debtors' efforts to ensure the continued service of their President and Chief Executive Officer, Peter L. Lynch ("Mr. Lynch").  To begin, Skadden, Arps advised the Debtors with respect to payment to Mr. Lynch of a retention incentive (the "CEO Retention Incentive").  The CEO Retention Incentive was designed to induce Mr. Lynch to remain in the Debtors' employ and was an integral component of the Debtors' efforts to assure Mr. Lynch's continued leadership.  While the original motion seeking authority to pay the CEO Retention Incentive was filed before the Application Period, during the Application Period, Skadden, Arps drafted an amended motion (the "Amended Motion") seeking authority to pay the CEO Retention Incentive, which reflected changes to the original motion that were designed to address the Creditors Committee's concerns regarding the CEO Retention Incentive.  As a result of the changes reflected in the Amended Motion, the Debtors obtained the Creditors Committee's consent and support for paying the CEO Retention Incentive.  Furthermore, Skadden, Arps, together with the Debtors' co-counsel, Smith Hulsey & Busey ("SH&B"), assisted the Debtors in attempting to negotiate a consensual resolution to an objection to the CEO Retention Incentive brought by an ad hoc committee of Winn-Dixie retirees (the "Retiree Objection") and, thereafter, in obtaining the Court's authorization to pay the CEO Retention Incentive over the Retiree Objection.  Finally, Skadden, Arps drafted a letter agreement on behalf of the Debtors memorializing the terms under which Mr. Lynch was to be paid the CEO Retention Incentive.  In large part as a result of Skadden, Arps' efforts, the Debtors were able to implement an integral component of their strategy to retain Mr. Lynch by paying the CEO Retention Incentive.

15

Moreover, during the Application Period, Skadden, Arps, together with certain of the Debtors' other professionals, also advised the Debtors in making progress toward a new employment agreement with Mr. Lynch (a "New Employment Agreement"). In this vein, Skadden, Arps provided the Debtors with legal advice regarding appropriate terms for a New Employment Agreement and assisted the Debtors with negotiations with both Mr. Lynch and his counsel, as well as the Creditors Committee and its advisors. Although negotiations are continuing, the execution of a New Employment Agreement remains a pivotal component of the Debtors' efforts to retain Mr. Lynch.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional, including professionals from Skadden, Arps' employee benefits and restructuring departments. Further, the breadth of issues involved necessarily required intraoffice conferences among Skadden, Arps professionals and non-firm conferences with parties in interest in these cases, such as the Company.

During the Application Period, Skadden, Arps professionals devoted a total of 346.60 hours to this category, for which compensation is sought in the aggregate amount of $199,010.00.

(j)     Executory Contracts / Personalty

The Debtors estimate that, as of the Petition Date, they were parties to at least 2,800 executory contracts and leases of personal property. The contracts pertain to almost all aspects of the Debtors' business, including supply contracts with vendors for thousands of different products sold in the Debtors' stores and contracts with independent contractors that provide numerous services to the Debtors. The personal property leases include leases of several different types of computer equipment, customer check-out equipment, security equipment and other items. In certain instances, the Debtors lease hundreds of pieces of equipment under these leases.

During the Application Period, Skadden, Arps assisted the Debtors with various executory contract and personal property lease issues, including providing information as to their rights and obligations under the Bankruptcy Code, the ability to assume or reject and the consequences of either course of action, the treatment of prepetition arrearages in the event of assumption or rejection, and related matters.

Skadden, Arps worked closely with the Debtors and XRoads in (i) evaluating multiple contracts and leases for assumption or rejection, (ii) drafting language for proposed contract amendments, and (iii) drafting agreements to assume contracts on amended terms. Skadden, Arps also responded to inquiries from certain contract and lease parties and coordinated with the Debtors to resolve issues raised by such parties.

During the Application Period, Skadden, Arps drafted and filed on February 17, 2006 and April 13, 2006, respectively, two omnibus motions to reject approximately

16

twenty unprofitable or unnecessary contracts and leases.  The Court approved these motions on March 9, 2006, and May 4, 2006, respectively.

In addition, after reviewing proofs of claim filed by many lease contract parties and the underlying contracts, Skadden, Arps assisted the Debtors with assuming and entering into modified contracts with entities such as AT&T, Cisco Systems Capital Corporation and Hallmark Marketing Corporation.  This required Skadden, Arps to draft multiple assumption motions, such as the Motion for Order Approving Assumption of Modified Agreement with Hallmark Marketing Corporation, approved by the Court on May 24, 2006, and draft and negotiate the provisions of the modified contracts.

As a result of Skadden, Arps' services, the Debtors were able to reject unnecessary or unprofitable contracts and leases and assume contracts at significant cure cost savings to the Debtors, their estates and creditors.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. Due to the complexity of the number of executory contracts reviewed by Skadden, Arps professionals, it became necessary to conduct intraoffice conferences to ensure proper assumption and negotiation of modified leases.

During the Application Period, Skadden, Arps professionals devoted a total of 433.60 hours to this category, for which compensation is sought in the aggregate amount of $233,220.50.

(k)     Financing (DIP and Emergence)

During the Application Period, Skadden, Arps advised the Company regarding a structure for the exit financing.  As part of the advisory process, Skadden, Arps worked with the Company on a frequent basis and participated in numerous external teleconferences and other correspondence with the Company and Blackstone (among others), as well as numerous internal conferences among its bankruptcy, banking and real estate specialists (among others).  These communications were necessary and essential to the services provided because of the complexity and structure of the potential exit financing.  Additionally, Skadden, Arps analyzed various issues related to the exit financing (including issues related to the potential real estate and general exit financing collateral packages, as well as other security matters) that required significant due diligence, legal research and other considerable actions by Skadden, Arps.

The Company received initial exit financing proposals from approximately 14 potential lenders.  Upon receipt of these proposals, Skadden, Arps reviewed and analyzed each proposal and communicated its analysis to the Company and Blackstone and assisted the Company and Blackstone in the Company's selection of an exit financing lender.

17

Following the initial exit financing proposals, the Company received a second round of proposals from the same potential lenders. Skadden, Arps, in conjunction with Blackstone, assisted the Company in securing exit financing by reviewing each second round proposal in the same manner as the initial proposals.

Also, during the Application Period, Skadden, Arps negotiated confidentiality agreements with the potential exit lenders. These efforts included numerous teleconferences and correspondence with representatives of the lending institutions as well as with the representatives of Blackstone, the Debtors' financial advisor, who was charged with the responsibility of coordinating the Debtors' exit financing search effort. Efforts in connection with obtaining exit financing for the Debtors were successful. After the Application Period, the Debtors filed a motion for authority to commit to exit financing, on terms beneficial to the Debtors, for emergence from chapter 11.

Additionally, during the Application Period, Skadden, Arps coordinated efforts related to entry into a postpetition premium finance agreement with AFCO Premium Credit LLC ("AFCO"). Specifically, the Debtors sought consent (from the U.S. Trustee, the Creditors Committee and the Debtors' postpetition secured lender) to finance approximately $29 million in property insurance premiums pursuant to a streamlined notice/consent procedure that had been established by prior orders of this Court. To this end, Skadden, Arps devoted time during the Application Period to corresponding with AFCO, the Debtors' insurance brokers, and the key constituent groups noted above regarding the terms of the Debtors' premium finance agreement with AFCO. As a result of Skadden, Arps' efforts, the Debtors entered into a premium finance agreement with AFCO to finance the property insurance premiums.

Further, during the Application Period, Skadden, Arps coordinated the Debtors' entry into a commercial surety agreement with RLI Insurance Company ("RLI"). In connection therewith, Skadden, Arps prepared the motion that was approved by this Court on April 20, 2006. The surety agreement with RLI provided the Debtors with additional financing options and allowed them to operate their businesses in accordance with applicable federal and state regulations.

During the Application Period, Skadden, Arps professionals devoted a total of 398.60 hours to this category, for which compensation is sought in the aggregate amount of $207,184.50.

(l)    Insurance

During the Application Period, Skadden, Arps assisted the Debtors in developing a strategy for the treatment of claims asserted by entities that posted surety bonds for the Debtors prepetition. In connection with this analysis, Skadden, Arps prepared memoranda of law, reviewed entities' proofs of claim and assisted with the assessment of the validity of those claims.

Further, during the Application Period, Skadden, Arps advised the Debtors on issues regarding their property and business interruption insurance policies and researched issues pertaining to directors' and officers' policies.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases. Specifically, intraoffice conferences were necessary in order to coordinate the efforts being taken by Skadden, Arps professionals in analyzing the treatment of insurance policies and insurance claims.

During the Application Period, Skadden, Arps professionals devoted a total of 60.10 hours to this category, for which compensation is sought in the aggregate amount of $34,716.50.

(m)     Investigations and Reviews

During the Application Period, Skadden, Arps facilitated and monitored an investigation by the Creditors Committee of, among other things, (i) Winn-Dixie Stores, Inc.'s ("Winn-Dixie") prepetition financial condition and the events leading up to the filing of these cases; (ii) the Internal Revenue Service's (the "IRS") audit of fiscal years 2000 through 2002, including, but not limited to, Winn-Dixie's appeal of the IRS's decisions; (iii) the issuance of dividends from 2000 through 2004 and whether Winn-Dixie complied with corporate governance requirements in issuing dividends; (iv) Winn-Dixie's company-owned life insurance policies and any IRS investigation of such policies; (v) class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under federal securities laws; (vi) class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), relating to Winn-Dixie's Profit Sharing/401(k) Plan; (vii) the shareholder demand referenced in Winn-Dixie's Annual Report on Form 10-K ("Form 10-K") for the fiscal year 2005, alleging that Winn-Dixie's board of directors and officers and directors who served from May 6, 2002 through July 23, 2004 violated their fiduciary duties to Winn-Dixie and requesting that a derivative proceeding be commenced against such parties; (viii) the federal grand jury investigation referenced in Winn-Dixie's Form 10-K for the fiscal year 2005, regarding possible violations of federal criminal law arising out of activities related to illegal importation, possession, transportation, and sale of undersized lobsters; and (ix) such other matters as the examiner deemed appropriate (the matters identified in (i) through (ix) being the "Investigation Topics") (the "Committee Investigation").

Skadden, Arps advised the Debtors with respect to the legal issues raised by and the status of the Committee Investigation. Skadden, Arps also assisted the Creditors Committee in identifying persons with knowledge of particular Investigation Topics and in scheduling both in person and telephonic interviews. In addition, Skadden, Arps

participated in the Creditors Committee interviews of twenty witnesses, with certain witnesses being interviewed multiple times, and coordinated responses to follow up inquiries.

In connection with these interviews, Skadden, Arps advised the Debtors on issues such as attorney-client privilege, the scope of applicable directors' and officers' insurance policies and the Debtors' indemnification obligations to applicable directors and officers. During the Application Period, Skadden, Arps professionals discussed the nature of the investigation and its progress among themselves and performed legal research to advise on many matters throughout the Application Period.

Furthermore, Skadden, Arps responded to rolling document requests from the Creditors Committee regarding the Investigation Topics.  As a result of such requests, Skadden, Arps collected, reviewed, and produced to the Creditors Committee more than 8,600 pages of documents.

The Creditors Committee ultimately filed a report concluding that there were likely no viable causes of action available to the Debtors' estates against any current or former officers or directors of the Company that had a reasonable probability of success in producing a benefit for the Debtors' estates.

The work performed in this matter was extensive and required the assistance of professionals from Skadden, Arps' litigation department to efficiently handle the litigation issues raised.  Skadden, Arps professionals necessarily worked with other parties in interest to address and handle the bankruptcy and litigation matters involved.

During the Application Period, Skadden, Arps professionals devoted a total of 278.90 hours to this category, for which compensation is sought in the aggregate amount of $156,775.50.

(n)    Lease (Real Property)

During the Application Period, Skadden, Arps advised the Debtors with respect to various real property lease issues and their rights and obligations under the Bankruptcy Code with respect to such leases.  Specifically, Skadden, Arps spent significant time during the Application Period (i) analyzing issues related to the proper disposition of certain leases and the Debtors' rights to assume and assign or reject leases and subleases and (ii) drafting motions concerning the disposition of the Debtors' leases and/or the settlement of lease-related issues.

For example, Skadden, Arps assisted the Debtors by preparing a motion seeking approval of a settlement related to a property located in Summerville, South Carolina. The motion sought, among other things, the (i) assumption and assignment (to the sublessee) of a non-residential real property lease under which one of the Debtors was the tenant, (ii) termination of a related sublease that the Debtor was the sublessor, and (iii) compromise of past due rent amounts that the sublessee owed to such Debtor under

20

the sublease. After the Debtors filed the motion, the landlord filed a limited objection requesting that the proposed form of order specifically address the Debtor's cure obligations under the lease. Skadden, Arps worked with the landlord's counsel to resolve the issues raised in the objection and, ultimately, was successful in effectuating the landlord's withdrawal of the objection. On February 23, 2006, this Court entered an order approving the motion.

Skadden, Arps also assisted the Debtors during the Application Period by preparing a motion seeking approval of a settlement relating to a property located in Dalton, Georgia. The motion provided for (i) the rejection and termination of a non-residential real property lease under which one of the Debtors was a tenant, (ii) the assumption and assignment (to the landlord) of a related sublease under which the Debtor was the sublessor, and (iii) the fixing of unliquidated proofs of claim filed by the landlord. The Court approved that motion by order dated March 9, 2006.

Additionally, during the Application Period, Skadden, Arps addressed issues resulting from an objection that Buehler of Kentucky, LLC ("Buehler") had filed to several proofs of claim that the Debtors had filed in Buehler's bankruptcy case (which case is pending in the United States Bankruptcy Court for the Southern District of Indiana) (the "Indiana Bankruptcy Court"). The proofs of claim arose under several leases that were assigned by the Debtors to Buehler prepetition and then later rejected by Buehler in its bankruptcy case. Through Skadden, Arps' efforts, the parties were ultimately able to negotiate a stipulation that favorably resolved the issues raised in the objection, which stipulation was approved by the Indiana Bankruptcy Court on May 11, 2006. Additionally, during the Application Period, Skadden, Arps prepared and filed an application for administrative claims owed under several of the Buehler leases, which application is currently pending before the Indiana Bankruptcy Court.

Moreover, during the Application Period, Skadden, Arps continued to assist the Debtors in their efforts to extend the Debtors' deadline for assuming or rejecting unexpired leases under Bankruptcy Code section 365(d)(4). Skadden, Arps' work in this regard initially focused on the drafting of a motion (filed on February 17, 2006) seeking such approval (the "365(d)(4) Extension Motion"). Several formal and informal objections to the 365(d)(4) Extension Motion were raised or filed. After Skadden, Arps devoted significant time negotiating with the objecting parties, many of the objections were settled based upon the Debtors' agreement to limit their extension of time to move to assume or reject certain leases. An order approving the 365(d)(4) Extension Motion was entered on March 10, 2006, which order extended the Debtors' time to reject the vast majority of their unexpired nonresidential real property leases through the effective date of the Debtors' reorganization plan. Four objections, however, remained unresolved at the time of the hearing on the 365(d)(4) Extension Motion (the "Unresolved Objections"). Skadden, Arps expended significant time negotiating with these objecting parties and, to afford time to complete such negotiations, agreed to continue the hearing with respect to the Unresolved Objections. As to the Unresolved Objections, orders were ultimately entered on March 23, 2006 and April 6, 2006, respectively, which orders provided for the

terms under which the Debtors were required to move to assume or reject the leases that were the subject of the Unresolved Objections.  Thereafter, during the Application Period, Skadden, Arps worked with SH&B in preparing motions to assume the leases that were the subject of objections to the 365(d)(4) Extension Motion.

Additionally, Skadden, Arps assisted the Debtors by analyzing issues related to and drafting a motion seeking authorization for the retroactive rejection of several non-residential real property leases that had been assigned by the Debtors prepetition.  The motion that was ultimately filed on June 23, 2006, sought, among other things, to ensure that any continuing liabilities of the Debtors that arose under certain prepetition guarantees given to the landlords party to such leases, would be addressed in the Debtors' bankruptcy cases.  Work on this issue also required intraoffice communications among Skadden, Arps professionals with specialized knowledge of these issues.  These communications allowed Skadden, Arps to serve the Debtors more effectively and efficiently.

Finally, Skadden, Arps worked on numerous other matters during the Application Period relating to the Debtors' leased properties.  For instance, Skadden, Arps handled and responded to daily inquiries by landlords regarding their respective leases and assisted the Debtors in resolving disputes with various parties relating to leased properties, including disputes pertaining to postpetition rent, taxes and common area maintenance charges.  In this regard, during the Application Period, Skadden, Arps devoted time to the analysis of (and discussion with counsel to the Creditors Committee regarding) various applications and motions filed by the landlords seeking administrative expense treatment for certain claims arising under their respective leases.  In many instances, it was necessary for Skadden, Arps to communicate with counsel for those landlords and explain the legal and factual basis upon which the Debtors had determined that all or a portion of the claim was not entitled to administrative status.  In so doing, Skadden, Arps helped the Debtors to minimize their administrative claim liability.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases.  For example, Skadden, Arps professionals held conferences with SH&B and XRoads to determine the appropriate course of action to take with respect to the Debtors' numerous properties.  Similarly, professionals in Skadden, Arps' real estate and corporate restructuring departments held intraoffice conferences in order to provide the Debtors with the most efficient and cost-effective representation regarding the Debtors' numerous real properties.

During the Application Period, Skadden, Arps professionals devoted a total of 438.80 hours to this category, for which compensation is sought in the aggregate amount of $230,941.50.

(o)    Reorganization Plan / Plan Sponsors

During the Application Period, Skadden, Arps assisted the Debtors with the preparation and filing of a motion to further extend the Debtors' exclusive periods for plan proposal and plan acceptance (the "Exclusivity Motion"). The driving force behind the filing of the Exclusivity Motion was the Debtors' interest in affording the key constituent groups time to arrive at a negotiated solution of the issue of substantive consolidation, an effort designed to enable the Debtors to file a consensual reorganization plan. Indeed, as indicated in numerous filings with the Court, one of the most significant issues raised in these chapter 11 cases was the appropriateness of substantively consolidating the Debtors' estates. On April 20, 2006, the Court entered an order extending the Debtors' exclusive period to propose a plan and solicit acceptance on a plan to June 29, 2006, and August 29, 2006, respectively.

In connection with the substantive consolidation issue, numerous parties submitted informal discovery requests to Skadden, Arps. During the Application Period, Skadden, Arps, among other things, spent significant time (i) responding to these discovery requests, (ii) preparing voluminous documentary responses to such requests, (iii) discussing with the requesting parties the legal and factual issues surrounding the substantive consolidation issue, (iv) preparing the Debtors' employees for interviews conducted by these parties, and (v) attending those interviews. The two primary parties with whom Skadden, Arps communicated during the Application Period were an ad hoc committee consisting of certain of the Debtors' trade and other creditors (the "AHTC") and Wilmington Trust Company, as indenture trustee for the 8.875% senior notes due 2008 in the aggregate principal amount of $300,000,000 issued by Winn-Dixie (the "Indenture Trustee"). Also in connection with the substantive consolidation analyses, Skadden, Arps continued to research cutting edge issues as new concerns or questions were raised by creditors or new facts came to light.

In addition, because the Debtors, after consultation with Skadden, Arps, concluded that litigating the substantive consolidation issue was not in the best interests of the Debtors' estates, Skadden, Arps continued to explore alternatives to litigation. These substantive consolidation alternatives included analysis of the parameters and logistics of (i) a settlement of the issue that would satisfy the major constituencies in these cases, including the Indenture Trustee and the AHTC, and (ii) Court-ordered mediation. In connection therewith, during the Application Period, Skadden, Arps researched and drafted memoranda regarding the appropriate legal standards for pursuing these alternative resolutions.

On May 11, 2006, the AHTC filed a motion seeking to substantively consolidate the Debtors' estates (the "Consolidation Motion"). Prior to the Court reaching the merits of the Consolidation Motion, the members of the Creditors Committee reached a unanimous settlement regarding substantive consolidation and, on May 24, 2006, presented the proposed settlement to the Debtors. Thereafter, Skadden, Arps spent time analyzing the settlement to determine if it was fair and equitable and whether the Debtors

could include the proposed settlement in their reorganization plan.  After significant analysis, the Debtors determined that the proposed settlement could be incorporated into the Debtors' reorganization plan.

In addition to work spent during the Application Period relating to the resolution of the substantive consolidation issue, Skadden, Arps spent considerable time working on other matters pertaining to the reorganization plan.  Skadden, Arps assisted the Debtors with issues involving a timetable for formulation of potential exit strategies and possible terms of a reorganization plan, including efforts to draft a plan term sheet.

During the Application Period, Skadden, Arps spent considerable time drafting provisions of the reorganization plan and circulating the reorganization plan to parties in interest for comment to promote consensual resolution of these cases.  Thereafter, Skadden, Arps spent time reviewing parties' comments and continuing to work and advise on plan issues.  As a result of joint efforts by many parties interest, on June 29, 2006, the Debtors filed their reorganization plan.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases. Specifically, Skadden, Arps professionals participated in conference calls with professionals for the Creditors Committee, AHTC and Indenture Trustee regarding substantive consolidation issues.  Similarly, it was important for Skadden, Arps to participate in intraoffice conferences and conferences with SH&B to develop strategies related to substantive consolidation and other plan issues.

During the Application Period, Skadden, Arps professionals devoted a total of 1,370.70 hours to this category, for which compensation is sought in the aggregate amount of $752,055.00.

(p)    Retention / Fee Matters / Skadden, Arps

During the Application Period, Skadden, Arps performed services associated with the firm's compliance with the Bankruptcy Code's retention and compensation requirements.  Skadden, Arps continued reviewing disclosure parties to ensure with rules and procedures relating to its retention in these cases.  In connection therewith, Skadden, Arps prepared and filed two supplemental declarations disclosing connections with parties in interest and other necessary information.

In addition, under an administrative order governing payment of professionals, Skadden, Arps prepared monthly statements that contain detailed records of services rendered and expenses incurred.  Preparation of monthly statements is time-consuming, as it requires a review of all time and expense entries to ensure that they are properly charged to the Debtors, that they are recorded in the proper category and that they do not reveal privileged information.  Preparation of monthly statements was particularly time-

consuming in these cases due to the appointment of Stuart Maue in these cases. Skadden, Arps reviewed its records for compliance with Stuart Maue's billing guidelines.

Through the fee review process, Skadden, Arps refines its bills and voluntarily makes reductions in charges. For example, total voluntary reductions made with respect to the months covered by the Application Period for fees and expenses were approximately $340,000.00.

Skadden, Arps further spent time preparing its third interim fee application (consisting of hundreds of pages and multiple exhibits) in accordance with established procedures in these cases. To render the services provided in this category necessarily required the services of more than one Skadden, Arps professional because lawyers from various areas that had generated fees needed to assist in the fee application and review process.

During the Application Period, Skadden, Arps professionals devoted a total of 236.20 hours to this category, for which compensation is sought in the aggregate amount of $109,817.00.

(q)      Retention / Fee Matters / Objections (Others)

During the Application Period, Skadden, Arps performed services associated with retention and compensation issues involving professionals other than Skadden, Arps, including other professionals retained by the Debtors.

Skadden, Arps also assisted the Debtors with a variety of issues relating to the application to retain Deloitte Financial Advisory Services and Deloitte Consulting (collectively, "Deloitte") to provide fresh-start accounting services in connection with implementation of the Debtors' reorganization plan and emergence from chapter 11 (the "Deloitte Application"). In connection with the Deloitte Application, Skadden, Arps worked with counsel for the Creditors Committee, the U.S. Trustee and Deloitte on an agreed form of order authorizing the retention of Deloitte. As a result of Skadden, Arps' efforts, the Deloitte Application was ultimately approved on terms acceptable to the Debtors by order of the Court, dated May 4, 2006.

Further, during the Application Period, Skadden, Arps assisted the Debtors in analyzing the scope of the previously approved employment applications of professionals employed in these cases, including Blackstone and PricewaterhouseCoopers LLP. With respect to these two professionals, Skadden, Arps prepared revisions to their employment applications so that the Debtors could continue to duly employ these professionals for their necessary services.

Skadden, Arps also assisted the Debtors with the retention of ordinary course professionals. In this regard, Skadden, Arps communicated with the Debtors and the potential ordinary course professionals. As a result of Skadden, Arps' efforts, the Debtors retained an additional necessary ordinary course professional.

Finally, Skadden, Arps spent time communicating with professionals in these cases regarding compliance with established procedures for fee and employment applications. Skadden, Arps worked with SH&B and coordinated the timely notice and filing of such fee applications. Skadden, Arps also prepared a fourteenth supplement of completed retention questionnaires for filing with the Court.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and required intraoffice conferences and conferences with parties in interest in these cases. For example, Skadden, Arps had to hold conferences with the Debtors' outside professionals and intraoffice conferences to coordinate fee retention matters among the Debtors' other professionals to ensure the Debtors' other professionals were complying with applicable Court orders.

During the Application Period, Skadden, Arps professionals devoted a total of 139.30 hours to this category, for which compensation is sought in the aggregate amount of $65,311.00.

(r)    Tax Matters

During the Application Period, Skadden, Arps assisted the Debtors in analyzing claims of federal and state taxing authorities. In this regard, Skadden, Arps monitored and analyzed discussions that the Debtors' tax advisors had with taxing authorities, such as the IRS. This analysis required Skadden, Arps to assess the validity of such claims, including any related penalties, and the priority such claims would receive under a reorganization plan. Similarly, Skadden, Arps worked with the Debtors and their tax advisors on tax planning initiatives and the implications of the chapter 11 filings on certain tax treatment matters.

Further, during the Application Period, Skadden, Arps assisted the Debtors and their other tax advisors in considering alternative sale structures for a non-debtor subsidiary of Winn-Dixie. This required Skadden, Arps to assess the impact a sale would have on the Debtors' tax liability. These efforts will help the Debtors maximize creditor recovery once the Debtors consummate the sale and emerge from chapter 11.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases. In addition to discussing tax matters with the Debtors' other professionals, Skadden, Arps professionals held intraoffice conferences to efficiently assess and analyze issues impacting the Debtors' tax liability.

During the Application Period, Skadden, Arps professionals devoted a total of 87.10 hours to this category, for which compensation is sought in the aggregate amount of $48,111.00.

(s)    <u>Utilities</u>

During the Application Period, Skadden, Arps continued to assist the Debtors in pursuing resolutions with approximately nineteen (19) utility companies that provide, or had provided as of the Petition Date, utility services to the Debtors with respect to such utility companies' requests for adequate assurance or demands on surety bonds which backed payment of prepetition utility services to the Debtors (the "Bond Demands").

To reach a successful resolution with these utility companies, Skadden, Arps drafted, negotiated, revised, and finalized stipulations setting forth the terms of proposed settlements.  In connection therewith, Skadden, Arps coordinated with the Debtors to obtain the relevant information from the Debtors' records to verify and analyze the information obtained from such utility companies.  In accordance with an order, dated May 19, 2005, granting the Debtors authority to settle disputes with certain utility companies without further court order, Skadden, Arps prepared and furnished notice of each resolution to the parties specified in such order.  Following the passing of the applicable objection period, Skadden, Arps worked with the Debtors and the applicable utility company to consummate the terms of the settlement resolution.

Skadden, Arps also continued to update reports concerning the status of the resolutions of Bond Demands respecting bonds issued by Liberty Mutual Insurance Company ("Liberty") and periodically presented those reports to Liberty.

In addition, Skadden, Arps facilitated the resolutions of various issues regarding utility services, including misapplication payments and noncompliance with the order, dated March 10, 2005, prohibiting utility companies from altering or refusing service to the Debtors.

During the Application Period, Skadden, Arps professionals devoted a total of 104.00 hours to this category, for which compensation is sought in the aggregate amount of $49,962.00.

(t)    <u>Vendor Matters</u>

During the Application Period, Skadden, Arps continued to assist the Debtors with various matters involving their vendor relationships and the impact of the chapter 11 filings on such relationships.

Skadden, Arps assisted the Debtors in resolving vendor claims, including claims asserted by Golden Flake Snack Foods, Inc. ("Golden Flake") and Russell Stover Candies ("Russell Stover").  Before the Application Period, Golden Flake filed an application for allowance and payment of an administrative claim (the "Golden Flake Application").  Skadden, Arps further communicated with the Debtors regarding the Golden Flake Application, researched issues relating to recoupment as a defense to the Golden Flake Application, and communicated the Debtors' defenses to counsel for Golden Flake and the Creditors Committee.  During the Application Period, Skadden, Arps communicated

with the Debtors, the Creditors Committee and counsel for Golden Flake regarding Golden Flake's withdrawal of the Golden Flake Application.  As a result of Skadden, Arps' efforts, Golden Flake withdrew the Golden Flake Application.

The Debtors and Russell Stover dispute the amount of Russell Stover's claim, including the treatment of certain unsold candy purchased prior to the Petition Date. Skadden, Arps communicated with the Debtors and XRoads regarding Russell Stover's claim and the return of the Russell Stover candy, and analyzed issues relating to the dispute, including vendor requirements under the Reclamation/Trade Lien Program. Subsequent to the Application Period, the Debtors and Russell Stover conferred regarding the dispute, and the parties are close to reaching an agreement in principle with respect to the treatment of the Russell Stover claim and the unsold candy, as well as the trade credit to be provided by Russell Stover to the Debtors under the Reclamation/Trade Lien Program.

Skadden, Arps also assisted the Debtors in resolving issues relating to postpetition payments to vendors.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases to coordinate the work being done in connection with claims objections with the work that had been done with the vendor relations team.

During the Application Period, Skadden, Arps professionals devoted a total of 35.60 hours to this category, for which compensation is sought in the aggregate amount of $19,509.00.

(u)     Fee Examiner

During the Application Period, Skadden, Arps spent necessary time working on matters pertaining to the Court-appointed fee examiner, Stuart Maue, and the Fee Examiner Order.

Skadden, Arps conferred with Stuart Maue and with parties in interest to develop efficient means and protocol to establish compliance with the Fee Examiner Order while progressing through these cases.

Skadden, Arps also spent necessary and significant time reviewing preliminary reports submitted by Stuart Maue regarding Skadden, Arps' first through third interim fee applications.  In accordance with the Fee Examiner Order, Skadden, Arps worked with Stuart Maue and prepared and distributed responses to Stuart Maue's preliminary reports.

The preparation of the responses required considerable attention and detail by Skadden, Arps.  The reports, themselves, were voluminous raising numerous issues. Skadden, Arps spent considerable effort (i) addressing all issues raised in the reports,

28

(ii) producing additional documentation to Stuart Maue, and (iii) otherwise complying with Stuart Maue's guidelines under the Fee Examiner Order.

After submission of its responses, Skadden, Arps spent time addressing any outstanding issues in the reports and otherwise working with Stuart Maue in accordance with the Fee Examiner Order.

The work performed in this matter necessarily involved the services of multiple Skadden, Arps professionals and required Skadden, Arps' professionals to hold intraoffice conferences.

During the Application Period, Skadden, Arps professionals devoted a total of 379.00 hours to this category, for which compensation is sought in the aggregate amount of $166,561.00.

## SUPPORT FOR ALLOWANCE OF COMPENSATION

26.    Bankruptcy Code section 330 authorizes the Court to award "reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ." 11 U.S.C. § 330(a)(1)(A).  In order to evaluate services rendered by a professional person, a court must determine whether such services were necessary and reasonable.

27.    Skadden, Arps respectfully submits that the fees requested in this Fourth Application are allowable pursuant to the factors generally considered by courts in awarding compensation in chapter 11 cases.  Those factors and the applicability of each factor to the services performed by Skadden, Arps in these cases are set forth below:

(a)    Time and Labor Required

During the Application Period, Skadden, Arps expended an aggregate of 6,161.10 hours in the representation of the Debtors at a blended rate of approximately $512.06 per hour.  A detailed description of the services rendered during the Application Period is set forth fully in Exhibit C-1, Exhibit D-1, Exhibit E-1 and Exhibit F-1.  All of the services rendered were necessary to enable the Debtors to perform their statutory duties, fulfill their fiduciary obligations and progress through reorganization.

(b)    Nature and Complexity of the Cases

As should be evident from the summary of Skadden, Arps' services, as described above in this Application and previous applications, the Debtors' chapter 11 cases present

29

a particularly unique set of circumstances and are unquestionably large and complex cases. The chapter 11 cases require work in a broad range of fields, involving a vast array of legal issues. These cases involve 24 estates, thousands of creditors, shareholders and other parties in interest, and billions of dollars in assets and claims.

The nature and complexity of these cases have required Skadden, Arps to develop case management and staffing solutions at every stage of the proceedings. These tasks have been particularly daunting in light of the size and complexity of the Company's operations. Skadden, Arps, nonetheless, has assisted the Company by employing streamlined case management procedures and has assigned various professionals to discrete tasks, where possible, to avoid the performance of duplicative or unnecessary work.

Given the size of this case and the number of matters that continually need to be addressed, there have been occasions when a number of Skadden, Arps professionals must be present and participate in the discussions and negotiations. This is particularly true of the weekly business calls, case management meetings and other meetings involving cash collateral, sale of assets and lease issues, claims, litigation and plan-related issues. Skadden, Arps believes that, as evidenced by the summaries contained in this Application and the time entries attached hereto, it has demonstrated reasons for attendance by more than one Skadden, Arps professional.

During the Application Period, Skadden, Arps professionals researched a number of complex legal issues. The time spent on legal research was necessary and appropriate to resolve the issues to be addressed by Skadden, Arps professionals. For example, Skadden, Arps researched a number of issues relating to substantive consolidation. One significant issue was the effect of intercorporate guarantees on arguments for and against substantive consolidation. Moreover, in order to determine the appropriateness of eliminating intercorporate guarantees through substantive consolidation, Skadden, Arps professionals researched the law in other jurisdictions because there was no case law in the Eleventh Circuit on point. Similarly, substantive consolidation and the proposed compromise of substantive consolidation raised a host of complicated issues, including under what circumstances a court could approve a settlement as part of a plan. Furthermore, Skadden, Arps prepared a response to the Consolidation Motion, which raised important procedural issues that required research.

In addition, Skadden, Arps professionals researched other complex matters. For example, with respect to real property leases, Skadden, Arps researched (i) the effect of anti-assignment clauses in leases that would be part of the collateral under the Debtors' proposed exit facility and (ii) the effect of the Debtors' bankruptcy on real property leases assigned prepetition. Both of these issues involved novel issues of law. In addition, with respect to insurance, Skadden, Arps, professionals researched the appropriateness of allowing proofs of claim for attorneys' fees in connection with contingent claims of co-debtors. Again, this research involved legal theories unresolved in the Eleventh Circuit, necessitating additional research. Skadden, Arps did not undertake research on routine

issues because the Skadden, Arps team included a number of lawyers with years of restructuring experience.

(c)    Skill Requisite to Perform Legal Services

Skadden, Arps respectfully submits that it has the specialized skill necessary to perform the legal services required by the Debtors.  In order to address the issues presented during the Application Period, Skadden, Arps utilized its skills and expertise in bankruptcy, banking, corporate, employee, insurance, litigation and tax law.

Skadden, Arps is among the largest law firms, with one of the largest restructuring groups, in the country.  Skadden, Arps restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude of fast-paced issues that arise in chapter 11 cases.  Accordingly, Skadden, Arps' depth of experience in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly.

(d)    Preclusion from Other Employment

Skadden, Arps was not precluded from other employment during the Application Period, although it has been necessary to reduce other client commitments of certain attorneys on the team to ensure proper coverage of issues on behalf of the Debtors.

(e)    Customary Fee

The hourly rates at which Skadden, Arps' fees have been charged by each professional are set forth in the summary preceding this Fourth Application.  The rates are those customarily charged by Skadden, Arps to its clients in bankruptcy-related matters according to its bundled rate structure, as increased from time to time.  These hourly rates compare favorably with rates charged by other national law firms for similar legal services.

(f)    Whether the Fee is Fixed or Contingent

Skadden, Arps has agreed to be compensated, and has calculated its fee, on the basis of a fixed hourly rate for the services performed.  Skadden, Arps' fees are contingent only to the extent that they are subject to this Court's approval and an administratively solvent estate.

(g)    Time Limitations Imposed by Client or Circumstances

In general, the circumstances of these cases have at times imposed significant time constraints on Skadden, Arps' services.  Certain Skadden, Arps attorneys have committed almost all of their available time to providing services to the Debtors.

31

(h)    <u>Amounts Involved and Results Obtained</u>

Exhibit C-1, Exhibit D-1, Exhibit E-1 and Exhibit F-1 set forth detailed descriptions of the services rendered by Skadden, Arps and the charges associated with such services.  Skadden, Arps respectfully submits that the services provided were necessary to enable the Debtors to operate as debtors-in-possession, fulfill their fiduciary obligations and begin the process of restructuring their debts.

(i)    <u>Experience, Reputation and Ability of Attorneys</u>

Skadden, Arps respectfully submits that it and its attorneys are experienced, capable and have an excellent reputation in the national restructuring industry.  Skadden, Arps has extensive experience representing debtors in bankruptcy cases throughout the country.

(j)    <u>Undesirability of Case</u>

Skadden, Arps believes that this factor is not applicable to its representation of the Debtors in the current cases.

(k)    <u>Nature and Length of Relationship with Client</u>

On February 7, 2005, the Debtors retained Skadden, Arps for the specific purpose of assisting them with their reorganization efforts.  By order dated March 15, 2005, Skadden, Arps' retention in these cases was effective as of the Petition Date.

(l)    <u>Awards in Similar Cases</u>

Skadden, Arps submits that the fees requested in this Fourth Application are comparable to fees requested and awarded in other chapter 11 bankruptcy cases of this size, nature and complexity.

<u>SUPPORT FOR EXPENSE REIMBURSEMENT</u>

28.    Bankruptcy Code section 330(a)(1)(B) provides for reimbursement to approved professionals for all "actual, necessary expenses."  11 U.S.C. § 330(a)(1)(B).  According to the engagement agreement entered into between Skadden, Arps and the Debtors (the "Engagement Agreement"),[6] Skadden, Arps and the Debtors have agreed that Skadden, Arps' bundled rate structure will apply to these cases.  Therefore, Skadden, Arps is not seeking to be compensated

---

[6]    The Engagement Agreement is Exhibit A to the Employment Application, which is attached as Exhibit A to this Fourth Application.

separately for certain staff, clerical and resource charges.  Moreover, under the bundled rate structure applicable to the Debtors, copying costs are charged at $0.10 per page, computerized research and telephone calls are billed at provider cost without reference to Skadden, Arps' internal capital costs or overhead, and document production (including secretarial and word processing time), facsimile services, proofreading, overtime meals and overtime travel allowances are not charged for separately on an incurrence basis.

29.    Consistent with the firm's policy with respect to its other clients, Skadden, Arps is seeking compensation for other charges and disbursements incurred as out-of-pocket expenses in the rendition of necessary services to the Debtors and their estates.  These charges and disbursements include costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage and, when applicable, witness fees and other fees related to trials and hearings.

30.    A complete description of each disbursement is included in Exhibit C-2, Exhibit D-2, Exhibit E-2 and Exhibit F-2.  Skadden, Arps' policy requires all attorneys to retain and submit for review receipts and/or invoices for all disbursements incurred through outside vendors.  Skadden, Arps maintains all receipts and/or invoices related to each client's disbursement account in a central storage facility, and such records can be produced upon request.

NOTICE OF FOURTH APPLICATION

31.    Notice of this Fourth Application has been provided in accordance with the Interim Payment Order.

33

WHEREFORE, Skadden, Arps requests that the Court (i) approve Skadden, Arps' fees in the amount of $3,154,861.00, and expenses in the amount of $59,318.42, for the period of February 1, 2006 through May 31, 2006, (ii) authorize payment of the foregoing amounts in full and (iii) grant Skadden, Arps such other and further relief as the Court deems just and proper.

Dated:  July 21, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

/s/  *Sally McDonald Henry*
D. J. Baker
Sally McDonald Henry
Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

Attorneys for the Debtors

463121-Wilmington Server 1A - MSW