# EXHIBIT 1



# LEASE

STORE #___

Northwesterly corner of the intersection of
Highway #98 and Whispering Pines

# DAPHNE, BALDWIN COUNTY, ALABAMA

# TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

CONSTRUCTION OF SHOPPING  CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FIXTURES AND INTERIOR ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ZONING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TAXES AND LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUBORDINATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

LENDER'S CURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TRANSFER BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

LIMITATION OF LIABILITY/SELF-HELP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NO MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NO JOINT VENTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NO WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# LEASE

**THIS LEASE** is made this __April 13th__, 1999, between **DAPHNE PINES, L.L.C.**, an Alabama limited liability company ("Landlord") and **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## W I T N E S S E T H :

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

PREMISES

1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain parcel of land more particularly described on Exhibit "B", including all ramps, sidewalks, entrances, exits, roadways, walkways, malls, landscaped areas, parking areas, service areas, driveways, curb cuts, access points, utility lines, water detention and retention facilities and related improvements located on said parcel and shown on the Site Plan, as hereinafter defined (collectively, the "Common Areas"), together with a store building, approximately 232 feet in width by 231 feet in depth, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, together with exterior pads at the rear of the Store for installation of Tenant's freezers and coolers, a loading dock area (collectively, the "Store"). The Common Areas and the Store, collectively, are hereinafter known as the "Premises."

The Premises (shown in detail on Exhibit "A," a site plan prepared by Reynolds & Rawson, Inc., Architects, dated January 21,1999, and last revised on April 1, 1999, the "Site Plan"), are located at the northwesterly corner of the intersection of Highway #98 and Whispering Pines in the City of Daphne, County of Baldwin, State of Alabama. The legal description of the Premises is set forth on Exhibit "B".

TERM

2.    (a)    <u>Initial Term.</u>  The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of 20 years (the "Initial Term").

(b)    <u>Extension Term(s).</u>  Tenant, at its option, so long as it is not in material or monetary default under this Lease, shall be entitled to the privilege of 5 successive extensions of the Term of this Lease, each extension to be for a period of 5 years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease by giving to Landlord a notice in writing at least 180 days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document. If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)    <u>Return of Premises.</u> Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in good repair and condition, broom clean, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)    <u>Holding Over.</u> Any holding over by Tenant of the Store after the expiration of the Term shall operate and be construed as a tenancy from month to month, at 150% of the Total Rent, but otherwise upon the same terms and conditions applicable to the Term. Notwithstanding the foregoing, in the event Tenant has not exercised its next available option for an Extension Term in accordance with the provisions hereof or if Tenant does not have an Extension Term available to be exercised by it under the Lease and Landlord notifies Tenant at least ninety (90) days prior to the expiration of the Term of this Lease that Landlord desires Tenant to vacate the Store on the date this Lease terminates and Tenant fails to do so, then Tenant shall be liable to Landlord for damages which Landlord suffers by reason of Tenant's failure to vacate, including, but not limited to, loss of rents, which Landlord may have received by reason of Tenant's failure to vacate.

**RENT**

3.    Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)    <u>Basic Rent.</u> Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $487,179.00 per annum  ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $40,598.25 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    <u>Percentage Rent.</u> In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within 60 days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within 60 days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation of the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store during each fiscal year of the Term, both for cash and on credit (less bad debt expenses). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged;

2

(4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (9) merchandise or other things of value issued as a premium in connection with any sales promotion program; and (10) gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Premises (collectively, "Interested Parties") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. Within ninety (90) days following the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within 90 days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within 30 days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than 3%, Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.

(c)    Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord, within 30 days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, "Real Estate Taxes" assessed upon the Premises. Real Estate Taxes includes all ad valorem and general real estate taxes, and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Premises, Landlord's income taxes or any taxes levied upon the personal property of Landlord. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge

3

shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion. If Tenant grants its approval, Tenant shall pay the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

At Landlord's option, Tenant agrees to pay directly to the taxing authority the Real Estate Taxes on the Premises. If Landlord makes this election, it shall (i) notify Tenant in writing on or before October 1st of said year; and (ii) have the statement issued by the taxing authority directly to the Tenant at the same time that such statement would otherwise be issued to the Landlord, so that Tenant may take advantage of the maximum allowable discount. In such event Tenant shall, simultaneously with paying such Real Estate Taxes, provide Landlord with written evidence thereof. If Landlord has the address for the tax bill changed to Tenant's address, Landlord shall not be required to notify Tenant each subsequent year of such taxes provided Landlord has not revoked its billing instructions to the taxing authority.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a 365 day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

TITLE

4.    On or before 15 days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and thereafter deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before 30 days after the Execution Date (the "Delivery Deadline"), and Tenant shall have 15 days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have 10 days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, Tenant shall have twenty (20) days to elect by written notice to Landlord whether to: (a) waive the unsatisfied objections and occupy the Premises subject thereto; or (b) terminate this Lease. Notwithstanding the foregoing, Landlord shall cure or cause to be removed any Exceptions that can be cured solely by the payment of money (i.e. taxes due and payable, mortgages or other encumbrances (unless all payments due under any such mortgage or encumbrance are current and Tenant obtains an SNDA as hereinafter defined), mechanics' or construction liens, etc.), shall terminate and cause the eviction of any tenants under any other leases to the Store, shall deliver evidence

4

of Landlord's status, power, and authority as required by the Title Company, and shall execute and deliver an owners and nonforeign affidavit. On or before the Commencement Date, Landlord, at Tenant's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Premises and insuring Tenant's leasehold and any easements granted in connection therewith subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy").

**SURVEY**

5.    On or before 15 days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Premises is located and thereafter deliver to Tenant's counsel at the address provided hereunder for copies of notices, 6 sealed copies of an actual survey of the real property comprising the Premises conducted or updated within 90 days of the date of the Commitment, showing all improvements currently located thereon (the "Survey") together with a site plan showing the projected location of the Store, the Common Areas, and the other buildings to be included in the Premises consistent with and on the same scale as the Survey. Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Premises as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, shall bear the certificate and comply with the survey protocol attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have 10 days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, Tenant shall have twenty (20) days to elect by written notice to Landlord whether to: (a) waive the unsatisfied objections and occupy the Premises subject thereto; or (b) terminate this Lease. Within 60 days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant 6 sealed copies of the Survey revised to show the Store "as built" (the "As-Built Survey").

**ENVIRONMENTAL AUDIT**

6.    On or before 15 days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Premises addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the 6 month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition that, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation") Tenant shall notify Landlord in writing by the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Environmental Objection Notice"). If Tenant timely sends to Landlord Tenant's Environmental Objection Notice, Landlord shall have ten (10) days after the date of receipt of Tenant's Environmental Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections within sixty (60) days prior to

5

the Commencement Date ("Landlord's Environmental Objection Response"). If Landlord states in Landlord's Environmental Objection Response that it is unable or unwilling to cure such objections by such deadline, then Tenant shall have twenty (20) days to elect by written notice to Landlord whether to: (a) waive the unsatisfied objections and occupy the Premises subject thereto; or (b) terminate this Lease. Landlord shall use reasonable efforts and shall have until 60 days prior to the Commencement Date to cure any such Environmental Violation.

USE

7.    The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other lawful mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

COMPLIANCE WITH LAWS

8.    Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

CONSTRUCTION OF PREMISES

9.    Landlord, at its sole cost and expense, shall construct or cause to be constructed and diligently pursued to completion the Premises, substantially as shown on the Site Plan, shall grade and surface as provided in Tenant's Plans, as hereinafter defined, all paved portions of the Common Areas, and shall install proper and adequate water drainage and lighting for the Premises. All design, installation, and construction by or on behalf of Landlord shall comply in every respect with all applicable Legal Requirements, and shall be completed in a first-class manner by contractors, architects, and engineers, as required, which are licensed, bonded, and insured.  The arrangement and location of all buildings and Common Areas shall  be constructed at and at all times during the Term be maintained substantially as shown on the Site Plan and shall not be changed materially and Landlord shall not subdivide, parcel, or otherwise alter the Premises or create any easements in the Common Areas without the prior written consent of Tenant, which consent shall not unreasonably be withheld, conditioned, or delayed. The exterior facade of the Premises shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned, or delayed.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct or cause to be constructed the Store in accordance with guidelines submitted by Tenant to Landlord's architect to be used to create Tenant's Plans, as hereinafter defined (the "Guideplans") and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Premises showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Landlord shall cause the architect to notify Tenant in writing of any discrepancies between the Guideplans and the final plans prior to Tenant's approval.  Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease;  Tenant's Plans shall provide for a completed Store,

6

commonly referred to as a "turnkey" or "lock and key job". This Lease shall not be effective or enforceable against Tenant unless and until Landlord and Tenant have so approved Tenant's Plans. Tenant shall pay directly to Landlord the cost of any change to Tenant's Plans requested by Tenant (a "Change Order") and any deadlines for completion of the Store or the Premises contained in this Lease shall be extended for a reasonable time  for any delay caused by a Change Order.

Tenant will open and operate a supermarket in the Store following completion of the Store as described in this Lease, but Tenant shall not thereafter be obliged to operate within the Store as a supermarket or otherwise.

**COMPLETION DATE**    10.    Construction of the Store shall begin not later than June 15, 1999 (the"Construction Start Date") and shall be completed not later than January 15, 2000 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease prior to such beginning of completion, as the case may be, or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other  conditions beyond the control of the party required to perform  (each, a "Force Majeure"), and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than March 15, 2000 (the "Outside Completion Date"), this option to terminate shall not arise.  The Construction Start Date shall  be the date as of which (1) Landlord shall have obtained a building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto.  If, pursuant to this paragraph, Tenant shall terminate this Lease or if Landlord fails to commence or complete construction of the Store by the above dates, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Premises as a supermarket by any party other than Tenant.

**COMMENCEMENT DATE**    11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of 60 days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises, which include Common Areas  shall have been delivered to Tenant completed in substantial accordance with the Site Plan and Tenant's Plans, as certified by Landlord's architect  (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Tenant  shall have received, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(b)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(c)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises;

(d)    Landlord shall have executed and delivered an assignment, in a form reasonably satisfactory to Tenant, of all of Landlord's right, title, and interest in, to, and under any transferable guaranties or warranties relating to construction or the condition of the Store and the Common Areas;

(e)    The Declaration, as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction.

Provided that the conditions are timely fulfilled, Tenant shall open the Store for business on or before 60 days after the Conditions have been met, but Tenant shall not thereafter be obligated to operate within the store as a supermarket or otherwise.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J". No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or 60 days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

| OTHER TENANTS | 12.    [intentionally omitted] |

PARKING AND
COMMON AREAS

13.    Tenant, its employees, agents, suppliers, licensees, customers and invitees, shall have the exclusive right at all times to use (subject to the Permitted Exceptions), free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services.

Throughout the Term there shall be a surfaced parking area substantially as shown on the Site Plan, and of sufficient are to provide:

Subject to the provisions of Article 25 ("Condemnation"), prior to construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 7.24 10 foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Premises, and

(b)    facilities for convenient parking of at least 380 automobiles (minimum); on the basis of arrangement as provided on the Site Plan and

Subject to the provisions of Article 25 ("Condemnation"), after construction of the Addition, as hereinafter defined:

8

(a)    a minimum ratio of at least 5.24 10 foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Premises, and

(b)    facilities for convenient parking of at least 348 automobiles (minimum).

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Premises to seek a variance or waiver from the minimum parking requirements applicable to the Premises pursuant to such Legal Requirements. Except as shown on the Site Plan, no signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Premises.

**SERVICE AREA**    14.    [intentionally omitted]

**UTILITIES**    15.    Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other party to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall be responsible for environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility.

**TENANT'S MAINTENANCE**    16.    Tenant shall keep the interior and exterior of the Store in reasonably neat and orderly, good condition and repair, including, but not limited to, the roof, masonry walls, foundation and structural members of the Store, except those repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the service and delivery areas of the Store, including loading docks and/or truckwells, reasonably clean and free from rubbish and dirt. Tenant shall maintain in good condition and repair all Common Areas located on the Premises, and provide all such services therefor as are reasonably require, including, but not limited to, cleaning, sweeping, lighting, snow and ice removal as necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. If Tenant fails to maintain and repair the exterior of the Store, or the roof, walls, foundation or structural members as above provided, and if Tenant fails to undertake such deficiency in maintenance within thirty (30) days after notice from Landlord, Landlord may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, undertake such maintenance for the account of Tenant, and any amount paid or contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, and Tenant will reimburse Landlord such amount and indemnify Landlord from and against any and all liability arising from Landlord's undertaking such maintenance. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon

9

the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers. Tenant's maintenance responsibilities shall include replacement, where necessary, of the items to be maintained.

**LANDLORD'S MAINTENANCE**

17.    Intentionally deleted.

**SIGNS**

18.    Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises (including the roof) resulting from the installation or removal of such signs, antennae, and satellite dishes.

Landlord shall construct, install, and maintain, at its cost, one (1) electrically illuminated pylon sign in the locations marked on the Site Plan. Tenant shall contribute the sum of $5000.00 toward the cost of the pylon sign. The pylon sign shall be as shown on Tenant's Plans. Tenant may install, at its cost, its sign panel on such pylon sign and may connect the sign panel to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel if billed as a portion of Additional Rent. Tenant shall maintain its sign panel.

**FIXTURES AND INTERIOR ALTERATIONS**

19.    Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before 10 days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto and shall cause all liens arising from Tenant's Modifications to be promptly discharged or transferred to security. All structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the interior of the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket

10

cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications.

**INDEMNIFICATION**    20.    Tenant agrees to indemnify and save harmless Landlord and any Mortgagee from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store or the Common Areas unless caused by the negligence or wilful misconduct of Landlord, or such Mortgagee or their respective agents, or employees, or by Landlord's breach of its obligations under this Lease.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**    21.    If the Store is totally destroyed or damaged by fire or other casualty to the extent of 50% or more of the value thereof based upon replacement costs or to an extent that renders the Store untenantable in Tenant's reasonable judgment, (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

(a)    if a Major Casualty occurs during the first 17 years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Tenant shall proceed promptly (but in any event within 180 days of destruction or damage) and without expense to Landlord to repair the damage or restore the Store, or the Premises, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Landlord. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes until the earliest of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored or (z) the date a reasonable person using qualified construction contractors could reasonably have been expected to have completely repaired or restored the damage or destruction. This obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Premises or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)    if a Major Casualty occurs during the last 3 years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within 30 days of the date of the Major Casualty to terminate this Lease;

(i) If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within 15 days of receipt of Landlord's termination notice, to extend the Lease for the next successive Extension Term. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(ii) If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic, Additional, and Percentage Rent shall be pro-rated as of such date;

(iii) If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Tenant shall to proceed promptly (but in any event within 150 days of destruction or damage) and without expense to Landlord to repair the damage or restore the Store, or the Premises, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Landlord. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes until the earliest of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored or (z) the date a reasonable person using qualified construction contractors could reasonably have been expected to have completely repaired or restored the damage or destruction. The obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Premises or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable  mortgage documents, to the payment of any debt secured by such mortgage documents.

If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Tenant would be obligated to repair the Store, then Tenant shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

INSURANCE          22.    Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Premises is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of <u>Best's Insurance Report</u>. Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any Mortgagee.

(i)    <u>Liability Insurance.</u>    Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Premises, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord  for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(ii)    <u>Casualty Insurance.</u> Tenant shall carry or cause to be carried all-risk commercial property insurance on the Store and any permanent or structural additions,

alterations, and improvements made thereto and on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00 naming any Mortgagee as a loss payee. Tenant hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom. As to casualty losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

QUIET ENJOYMENT    23.    Landlord covenants, warrants and represents that:

(a)    as of the Commencement Date, the Premises will be and shall thereafter remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    as of the Execution Date, Landlord is a duly organized, validly existing limited liability company, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary limited liability company action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Premises or any portion thereof is bound.;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyways appertaining thereto, during the Term subject to the Permitted Exceptions and matters revealed by the Survey or the Audit and approved or waived in writing by Tenant;

(e)    there is no zoning, comprehensive plan, or other restriction or Legal Requirement preventing or restricting use of the Premises for a supermarket or use of the portion of Common Areas constituting parking areas for parking purposes, except as more particularly described in Article 23A hereof;

(f)    Landlord has not previously, either directly or indirectly, leased any portion of the Premises, sold any portion of the Premises, or otherwise permitted any portion of the Premises

13

or any other property owned or controlled by Landlord to be used in a manner as would be prohibited by or violate this Lease.

**ZONING**

23A.    Landlord represents and warrants to Tenant as follows:

(1)    The Premises is zoned "B-1" under the current Zoning Ordinance of the City of Daphne, Alabama.  A B-1 zoning classification permits the operation of an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses.

(2)    Approximately 3.52 acres of the Premises was rezoned to a B-1 classification pursuant to that certain Ordinance No. 1998-35, which was adopted and approved on December 7, 1998, by the City Council of the City of Daphne, Alabama.

(3)    On October 29, 1998, a lawsuit was filed in the Circuit Court of Baldwin County, Alabama, styled "Avanell C. Haley v. Daphne Planning Commission, et al.," Case No. CV98-982, in which the plaintiff ("Haley") claimed  that the Daphne Planning Commission had rezoned that portion of the Premises in violation of a provision of the Zoning Ordinance which provides, inter alia, that no more than one initiation of action for a zoning reclassification relating to a particular parcel may occur per year.  (Landlord's two applications for rezoning occurred within one year, but the first was withdrawn in compliance with the Ordinance prior to consideration by the Commission.)

(4)    On December 15, 1998, the trial court issued its Order finding that the Daphne Planning Commission and the City Council of the City of Daphne lawfully and appropriately interpreted and applied the contested provisions of the Zoning Ordinance and that the rezoning of the 3.52 acre tract to B-1 classification was proper.

(5)    On or about January 5, 1999, Haley appealed to the Alabama Court of Civil Appeals.  Landlord expects affirmance of the trial court's order.  The Alabama Court of Civil Appeals will rule on or before June 14, 1999.

(6)    The Zoning Ordinance permits Landlord to apply to the Planning Commission and the City Council for a confirmation of the 3.52 acre B-1 classification rezoning on June 19, 1999.  Landlord will make such application for confirmation of rezoning on such date.

(7)    Tenant shall be obligated, upon the performance of all Conditions of Article 11(a)-(e) of this Lease,  to proceed to ready and open the Store for business  notwithstanding the pendency of the appeal, the pendency of any subsequent appeal to the Alabama Supreme Court, or the pendency of the application of the confirmation of rezoning.

If Tenant is prevented from operating a food supermarket and/or other Permitted Use in the Store for more than thirty (30) days without violating Legal Requirements as the result of the failure of the B-1 zoning  classification of the 3.52 acre tract, Tenant may, at its option excerciseable thereafter, by notice to Landlord as provided in this Lease, terminate the Lease and shall be liable for Rent only through the later of (a) the date it ceases operating a food supermarket and/or Permitted Use in the Store as the direct result of such failure or (b) the date upon which it is prevented from operating a food supermarket and/or Permitted Use in the Store

14

as the direct result of such failure. Landlord shall give Tenant notice of any such failure of the B-1 zoning classification on the date it is notified of such failure by nationally recognized or reputable overnight delivery service, and Landlord, upon such date, shall diligently undertake and thereafter pursue all reasonable efforts to confirm Tenant's right to operate in the Store under a non-conforming use or similar zoning classification. Tenant's termination shall not impair its rights under any indemnity agreement existing in connection with this matter. Notwithstanding the foregoing, if Tenant fails to terminate the Lease as set forth hereinabove prior to the date upon which Tenant's right to operate in the Store as a non-conforming use or as otherwise permitted by Legal Requirements, Tenant shall have no further right to terminate arising pursuant to the failure of the B-1 zoning classification as more particularly described in the Lease.

**TAXES AND LIENS**    24.    Except for taxes to be paid directly by Tenant as provided elsewhere in this Lease including Real Estate Taxes, all other taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Premises (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which may threaten its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and shall promptly be reimbursed by Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law. If Tenant is not promptly reimbursed, it may offset the amount due against all Basic Rent, Percentage Rent, and Additional Rent due under this Lease.

**CONDEMNATION**    25.    If more than 2% of the Store is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within 60 days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Tenant shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises in a condition comparable to their condition at the time of taking and this Lease shall continue but Basic Rent shall be reduced in proportion to the floor area taken compared to the floor area of the Store existing prior to the taking.

If any material portion of the Common Areas or route or mode of access thereto depicted on the Site Plan, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the Store or to materially or substantially interfere with its use of or access to or through the Common Areas, or so as to reduce the required parking area by an amount in excess of ten percent (10%) or reduce the number of cars which may be conveniently parked to less than 342 (or 313 after construction of the Addition), Tenant may, at its option, exercised not later than forty-five (45) days following the effective date

15

of the taking, terminate this Lease and shall be liable for Rent only up to the time of such obstruction or taking.

Tenant's option to terminate hereunder, however, shall not arise if, within 180 days after possession is required by the condemning authority, Landlord shall provide equivalent substitute parking spaces satisfactory to Tenant and located on property contiguous to the Common Areas and situated within comparable proximity to the Store, thereby fulfilling the minimum parking requirements hereunder.

Except as otherwise provided in Article 23A hereof, If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for a supermarket or its use of or access to the Common Areas (collectively, a "Zoning Change"), then any such Zoning Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease in accordance with the foregoing provisions of this Section.

Except with respect to the Addition, as hereinafter defined, if constructed and financed by Tenant, Tenant shall not be entitled to any award for loss of or loss in value of its leasehold, but only to an award from the condemning authority (and not from Landlord) for loss or damage to its trade fixtures and for the un-amortized cost of any improvements made by Tenant and moving, business interruptions or similar expenses if allowable.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

**DEFAULT**       26.    Tenant shall be in default under this Lease if:

(a)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided Tenant commences to cure within thirty (30) days and thereafter diligently pursues such cure to completion).

Following an uncured default by Tenant, Landlord, at its option, may either (1) terminate this Lease or (2) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom. Tenant shall remain liable for the deficiency, if any, between the Basic Rent and Additional Rent due hereunder and the total rent obtained by Landlord on reletting, after Landlord first deducts its reasonable expenses in reletting.

The remedies provided above are non-exclusive and are in addition to all other remedies available to Landlord at law or in equity.

Upon Landlord's default, Tenant shall give Landlord notice of default and, except as to emergency repairs, a reasonable opportunity to cure such default. Otherwise, upon Landlord's default, Tenant shall have all remedies available to it at law or in equity.

A default (except as to payment of rent) shall be deemed cured if the defaulting party in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter with reasonable diligence proceeds to cure such default.

**CONSTRUCTION RISKS**

27.     Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Premises, Tenant shall have no control or authority over the construction of the Store or the Premises, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen's, employees, agents, or servants by reason of Landlord's constructing the Store or the Premises pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen's, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Premises, or from any faulty construction thereof.

Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined, or any other construction activities engaged in by Tenant pursuant to the terms of this Lease. No interest of Landlord shall be subject to any lien for mechanics, materialmen's, contractor's or subcontractor's or similar liens or any claims or suits in connection with construction activities engaged in by Tenant pursuant to this Lease. Tenant shall inform all of its agents and contractors of the provisions of this Section of this Lease and Landlord may record a memorandum hereof without Tenant's signature or consent.

**NOTICES**

28.     All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    DAPHNE PINES, L.L.C.
2800 Zelda Road, Suite 200-4
Montgomery, Alabama 36106
Attn: Charlie Trotman

or such other address as Landlord may direct from time to time.


Tenant:    WINN-DIXIE MONTGOMERY, INC.  Re: Store _____
1550 Jackson Ferry Road
Montgomery, Alabama 36104
(334) 240-6304

With a copy to:  Winn-Dixie Stores, Inc.
Attn: General Counsel
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297
Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**    29.    Tenant may  vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

Tenant, without the consent of Landlord, may assign this Lease or sublease the Premises at any time for use as a food supermarket, and, subject to the stipulations hereinafter set forth in subsections (a), (b) and (c), Tenant may also, without the consent of Landlord, assign this Lease or sublease the Premises for use other than as a food supermarket, subject to the provisions of Article 7 of this Lease.

a) In the event Tenant  voluntarily vacates the Premises or ceases selling merchandise for in excess of a period of six (6) months while the Premises can be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord shall have the continuing  option (unless Tenant has reoccupied the Premises) to terminate this Lease commencing on the day after the Premises has been vacant for six (6) months by written notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of Landlord's notice. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the Premises to a third party.  Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 29.

b) In the event Tenant desires to assign this Lease or to sublease all or substantially all of the Premises for the conduct of a business other than a food supermarket, Tenant shall give written notice to Landlord of its intention and reveal the identity of any such intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to terminate this Lease by giving written

18

notice to Tenant of such election. In the event Landlord elects to terminate this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the Premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such ninety (90) days in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the Premises. Upon surrender of possession of the Premises by Tenant, this Lease shall be deemed terminated without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease all or substantially all of the Premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to terminate this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to terminate this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties, but shall not include any sublease by Tenant of a portion of the Store for operation of a retail banking facility or other use permitted under this Lease. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for performance of all obligations of Tenant under this Lease notwithstanding Tenant's assignment or sublease pursuant to this Article 29.

c) Anything else in this Lease to the contrary notwithstanding, in the event Tenant (i) closes the Store for business, (except for temporary cessation reasons beyond Tenant's reasonable control or for repairs or for remodeling), or (ii) sublets the Premises or assigns this Lease (except to a parent or affiliated or subsidiary corporation or corporation to which Tenant sells all of its business in the State), then the total annual rent due under the Lease, from and after the first day the Store is closed or sublet or assigned, shall be a fixed sum which is equal to the average of Basic Rent and Percentage Rent paid for the two most recent complete Fiscal Years of Tenant, immediately preceding such closing, subletting or assignment, payable in equal monthly installments. Notwithstanding the foregoing, Tenant shall continue to be responsible for payment of Additional Rent.

SUBORDINATE    30.    Provided that, with respect to any first priority or primary mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord hereby irrevocably consents to Tenant's complying with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby releases Tenant and shall indemnify and hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim by Landlord based upon or in connection with Tenant's

compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby. This provision shall not be construed to subordinate the rights or claims of Tenant under any indemnity agreement described in Article 23A hereof to the rights and claims of Mortgagee arising pursuant to the Mortgage or any guaranty executed in connection therewith.

**ESTOPPEL CERTIFICATE**    31.    Within a reasonable time, but no less than 10 business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than 2 Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**    32.    Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that Tenant has first been notified in writing of the name and address of such Mortgagee, and provided, further, that if the mortgage is superior to this Lease such Mortgagee has entered into an Subordination, Nondisturbance, and Attornment Agreement with Tenant) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**    33.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**    34.    If Landlord transfers Landlord's interest in the Premises or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements. Any

future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Premises or any portion thereof is bound.

**SHORT FORM LEASE**    35.    Landlord shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its recording at Tenant's expense in the public records of the county or parish in which the Premises are located.  Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL TITLES**    36.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**    37.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date and supersedes any prior agreement with respect to the subject matter hereof.  No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**    38.    Landlord shall have recorded in the public records of Baldwin County, Alabama, declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration") as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant.

**EXHIBITS**    39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| Exhibit "A" | - | Site Plan |
|---|---|---|
| Exhibit "B" | - | Legal Description of Premises |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE MAJEURE**    40.    If there shall occur, during the Term a "Force Majeure, as hereinabove defined, and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money and except that the obligation to complete the Store, as provided in Article 10 of this Lease by May 1, 1999, is subject to extension as provided therein), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

ENVIRONMENTAL
CONDITION

41.    a)    Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous substance, as hereinafter defined, in, on, or about the Premises except in accordance with all applicable Legal Requirements. "Hazardous Substance" refers to any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant that arises from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises which Hazardous Substances are not the result of Tenant's use or operation of the Premises or are not otherwise caused by Tenant, its agents, contractors, servants, employees, invitees or licensees. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Premises. If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents or employees acting within the scope of their employment, which release or environmental condition materially impairs Tenant's ability to use the Premises for the Permitted Use, Tenant may abate all rent due under this Lease during the time Tenant's use is impaired. If a release, such as the one described in the preceding sentence, materially impairs Tenant's ability to use the Premises for the Permitted Use for more than 270 days, then Tenant may terminate this Lease by written notice to Landlord.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Premises become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents contractors, servants, employees, invitees or licensees, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from and against any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Premises or the Store), and expenses that arise during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal,

state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises that results in contamination, Tenant, at its sole expense, shall promptly take any and all necessary actions to return the lands affected thereby, as the case may be, to the same condition that existed prior to the presence of any such Hazardous Substance on, in, or about the Premises. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or otherwise caused by Tenant, its agents, contractors, servants, employees, invitees or licensees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination resulting from Landlord's ownership, use or operation of the Premises, or otherwise caused by Landlord, its agents, contractors, servants, employees, invitees or licensees, acting within the scope of their employment. Nothing in this Article 41 shall be held to indemnify Landlord or Tenant from liability for Hazardous Substances contamination resulting from the use or operation by any third party not operating within the scope of his employment with Landlord or Tenant of the Premises.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

If a release of Hazardous Substances or other environmental condition occurs that is the result of Tenant's action or the action of Tenant's agent, contractors, servants, invitees, licensees or employees, which release or environmental condition materially impairs the Common Areas and the same exists for more than six (6) months, then Landlord may terminate this Lease by written notice to Tenant.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease.

NO BROKERS          42.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

GOVERNING LAW       43.    This Lease shall be construed in accordance with and governed by Alabama law.

EXPANSION           44.    As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the southerly side of the Store measuring approximately 60 feet in width by 231 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the east wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall

23

supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice at any time together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition (including Landlord's right to approve the plans and specifications, such approval not to be unreasonably withheld, delayed or conditioned) as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").

On or before thirty (30) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost. The Amendment shall include, among other things, the following:

(a)     If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease. Upon completion of the Addition and commencement of business therein by Tenant, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greatest of: an amount equal to ten percent (10%) of the cost of the Addition, or an amount equal to $9.50 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of four percent (4%) plus the prime rate, as published in the Wall Street Journal, or similar public source, at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. On or before sixty (60) days following the Tenant's delivery of the Option Exercise Notice, Tenant shall obtain, at its cost and expense, such information or investigations concerning the status of the title, environmental condition, and boundaries of the land upon which the Addition shall be constructed as it shall deem reasonably necessary, and it shall be a condition to Landlord's commencing construction of the Addition that Tenant shall have so satisfied itself; or

(b)     If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant, as its sole remedy, shall have the right but not the obligation to construct the Addition at its sole cost and expense. If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped the cost of the Addition in Percentage Rent that would otherwise be due under this Lease.

24

(c)      Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not remain at least ten (10) years of the Term then in effect, the Term then in effect shall be extended so as to provide exactly ten (10) years remaining on the Term then in effect upon completion of the Addition. Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

**TAKE OVER AND RELEASE**      45.    Intentionally deleted.

**LIMITATION OF LIABILITY/ SELF-HELP**      46.  Notwithstanding anything to the contrary provided in this Lease, if Landlord or any successor-in-interest of Landlord shall be an individual, tenancy-in-common, firm or partnership, general or limited, limited liability company, or corporation, there shall be absolutely no personal liability on the part of such individual, tenancy-in-common, firm, corporation, partnership, limited liability company or the members or partners of any such firm, partnership, joint venture, corporation or limited liability company with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the interest of Landlord or such successor-in-interest in the Premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

**TIME**      47.    Time is of the essence of this Lease.

**NO MERGER**      48.    In the event that Tenant becomes the owner of fee title to the Store or the Premises, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates.

**NO JOINT VENTURE**  49.  This is a Lease between a landlord and a tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

**NO WAIVER**      50.    No waiver by either Landlord or Tenant of any default by Tenant or Landlord, as the case may be, shall constitute a waiver by either Landlord or Tenant of any other then existing or future default by the other party.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease the day and year

25

indicated below.

Witnesses:

_Debra L Malone_
Print name: _Debra L Malone_

_Elizabeth T George_
Print name: _Elizabeth T George_

LANDLORD:

**DAPHNE PINES, L.L.C.,** an Alabama limited liability company

By: _Charles R. Trotman_
    Charles R. Trotman
Its: _Manager_
Date: _April 14, 1999_

_Laura L Andrews_
Print name: _LAURA L ANDREWS_

_Lucy W McCook_
Print name: _LUCY W. McCOOK_

TENANT:

**WINN-DIXIE MONTGOMERY, INC.**

By: _James Kufeldt_
    James Kufeldt
Its: Vice President
Date: _4-13-99_

STATE OF ALABAMA
COUNTY OF BALDWIN

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that _Charles R. Tatum_, whose name as _Manager_ of DAPHNE PINES, L.L.C., an Alabama limited liability company, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such _Manager_ and with full authority, executed the same voluntarily for and as the act of said company on the day the same bears date.

Given under my hand and official seal this _14th_ day of _April_, 19_99_.

_Elizabeth T. George_
Printed Name: _Elizabeth T. George_
Notary Public, State and County aforesaid
My Commission Expires: _4/8/2002_
Notary ID No.: _____
(NOTARIAL SEAL)


STATE OF FLORIDA
COUNTY OF DUVAL

I, _Rebecca L. Sawyer_, a Notary Public in and for said County, in said State, hereby certify that _James Kufeldt_, whose name as _Vice President_ of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this _13_ day of _April_, 19_99_.

_Rebecca L. Sawyer_
Printed Name: _Rebecca L. Sawyer_
Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

O:\TRANSFER\MONTGOME\DAPHNE\FREESTAN.LS5

27

## CORPORATE GUARANTY OF LEASE OBLIGATIONS

THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS ("Guaranty") is given as of the date indicated below by **WINN-DIXIE STORES, INC.**, a Florida corporation ("Guarantor") to and in favor of **DAPHNE PINES, L.L.C.**, an Alabama limited liability company, ("Landlord") on behalf and for the account of **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation ("Tenant").

### R E C I T A L S :

1.    Landlord and Tenant intend to be parties to that certain lease dated <u>April 13</u>, 19 <u>99</u> (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Baldwin County, Alabama, as more particularly described in the Lease (the "Premises").

2.    Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.    Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.    The foregoing recitals are true and correct and incorporated herein.

2.    Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by Tenant of all the terms, covenants and conditions on the part of the Tenant to be performed and observed under the Lease, including, without limitation, payment of Basic Rent, Percentage Rent, and Additional Rent, all as is more particularly provided therein.

3.    No amendment, modification, or extension of the Lease which has the effect of materially increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

4.    All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) set forth below. All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time to time. Each communication shall be deemed duly given and received:  (a) as of the date and time the same is personally delivered with a receipted copy; (b) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or  (c) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    DAPHNE PINES, L.L.C.
2800 Zelda Road, Suite 200-4
Montgomery, Alabama 36106
Attn: Charlie Trotman

or at such other address as Landlord may direct from time to time.

Guarantor:    Winn-Dixie Stores, Inc.
                Attn: General Counsel
                5050 Edgewood Court
                P.O. Box B
                Jacksonville, FL 32203-0297

or to such other address as Guarantor may direct from time to time.

5.    This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date indicated below.

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
     James Kufeldt
Its: _____
Date: 4-13-99

STATE OF FLORIDA
COUNTY OF DUVAL

I, _____, a Notary Public in and for said County, in said State, hereby certify that _James Kufeldt_____, whose name as _____ of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this 13 day of _April_____, 1999.

_____
Printed Name: _____
Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 2002
Comm. No. CC 372310



EXHIBIT "B"

LEGAL DESCRIPTION

LOT 1, DAPHNE PINES SUBDIVISION AS RECORDED ON SLIDE NUMBER 1870A IN THE RECORDS OF JUDGE OF PROBATE, BALDWIN COUNTY, ALABAMA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 7, TOWNSHIP 5 SOUTH, RANGE 2 EAST, BALDWIN COUNTY, ALABAMA; THENCE RUN SOUTH 89°-41'-25" WEST, 264.34 FEET TO A POINT; THENCE RUN NORTH 00°-22'-31" WEST, 30.0 FEET TO A POINT ON SAID NORTH RIGHT-OF-WAY LINE OF WHISPERING PINES ROAD, FORMERLY OLD SPANISH TRAIL; THENCE RUN SOUTH 89°-45'-28" WEST, 378.68 FEET ALONG SAID NORTH RIGHT-OF-WAY LINE; THENCE RUN NORTH 89°-24'-05" WEST, 317.36 FEET TO A CONCRETE RIGHT-OF-WAY MARKER ON THE NORTH RIGHT-OF-WAY OF WHISPERING PINES ROAD (FORMERLY OLD SPANISH TRAIL) AND THE WEST RIGHT-OF-WAY LINE OF U.S. HIGHWAY NUMBER 98 (4-LANE); THENCE RUN SOUTH 89°-56'-56" WEST, 341.20 FEET ALONG SAID NORTH RIGHT-OF-WAY TO A CAPPED STEEL ROD FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89°-56'-56" WEST, 535.46 FEET ALONG SAID NORTH RIGHT-OF-WAY TO A CAPPED STEEL ROD; THENCE RUN NORTH 545.25 FEET TO A CAPPED STEEL ROD; THENCE RUN NORTH 89°-42'-08" EAST, 705.27 FEET TO A CAPPED STEEL ROD ON THE WEST RIGHT-OF-WAY LINE OF SAID U.S. HIGHWAY NUMBER 98 (4-LANE); THENCE RUN SOUTH 21°-08'-50" EAST, 364.28 FEET ALONG SAID WEST RIGHT-OF-WAY TO A CAPPED STEEL ROD; THENCE RUN SOUTH 89°-59'-43" WEST, 300.19 FEET TO A CAPPED STEEL ROD; THENCE RUN SOUTH 00°-17' WEST, 208.87 FEET TO THE POINT OF BEGINNING, CONTAINING 8.56 ACRES MORE OR LESS.

TOGETHER WITH A 15.0 FOOT DRAINAGE AND UTILITY EASEMENT DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE ABOVE DESCRIBED PROPERTY, RUN THENCE SOUTH 15.0 FEET TO A POINT; THENCE RUN SOUTH 89°-42'-08" WEST, 385.27 FEET TO A POINT ON THE EAST RIGHT-OF-WAY OF BALDWIN COUNTY HIGHWAY NUMBER 11; THENCE RUN NORTHWESTWARDLY ALONG THE ARC OF A CURVE TO THE RIGHT ALONG SAID EAST RIGHT-OF-WAY 16.60 FEET, SAID CURVE HAVING A RADIUS OF 1982.91 FEET, A CHORD BEARING OF NORTH 25°-39'-58" WEST TO AN IRON PIPE; THENCE RUN NORTH 89°-42'-08" EAST, 392.40 FEET TO THE POINT OF BEGINNING, CONTAINING 0.13 ACRES MORE OR LESS.

## EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this_____, between _____, a _____ _____, whose address is _____, together with its successors, assigns, and transferees "Lender") and WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation, whose address is 1550 Jackson Ferry Road, Montgomery, Alabama 36104-1718 (together with its successors and assigns, "Winn-Dixie");

### R E C I T A L S:

1.    Lender has made or is about to make a loan to DAPHNE PINES, L.L.C., an Alabama limited liability company ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument to be recorded in the Office of the Judge of Probate of Baldwin County, Alabama (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate located at the northwesterly corner of the intersection of Highway #98 and Whispering Pines in Daphne, Alabama, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Premises"); and

2.    By Lease dated _____ (as amended by _____and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, the Premises; and

3.    Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

NOW THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.    Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Premises, or any transfer of the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)    The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)    Winn-Dixie shall not be named as a party defendant.

(c)    The Lease shall not be terminated or affected by any Foreclosure Event.

32

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease. Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

**IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

Lender:

_____

Print name:_____    By:_____
                                            Its:_____
Print name: _____       Date:_____


TENANT:

**WINN-DIXIE MONTGOMERY, INC.**

Print name:_____    By:_____
                                            Its:          Vice President

Print name: _____    Attest: _____
                                            Its       Assistant Secretary
                                            Date:_____

STATE OF _____

COUNTY OF _____

      I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ President of _____., a _____ corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such _____ President and with full authority, executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal this _____ day of _____, 19_____.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:

_____
   (NOTARIAL SEAL)

STATE OF FLORIDA

COUNTY OF DUVAL

      I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as Vice President of **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

      Given under my hand and official seal this _____ day of _____, 19_____.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:

_____
   (NOTARIAL SEAL)

EXHIBIT "A"

LOT 1, DAPHNE PINES SUBDIVISION AS RECORDED ON SLIDE NUMBER 1870A IN THE RECORDS OF JUDGE OF PROBATE, BALDWIN COUNTY, ALABAMA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SECTION 7, TOWNSHIP 5 SOUTH, RANGE 2 EAST, BALDWIN COUNTY, ALABAMA; THENCE RUN SOUTH 89°-41'-25" WEST, 264.34 FEET TO A POINT; THENCE RUN NORTH 00°-22'-31" WEST, 30.0 FEET TO A POINT ON SAID NORTH RIGHT-OF-WAY LINE OF WHISPERING PINES ROAD, FORMERLY OLD SPANISH TRAIL; THENCE RUN SOUTH 89°-45'-28" WEST, 378.88 FEET ALONG SAID NORTH RIGHT-OF-WAY LINE; THENCE RUN NORTH 89°-24'-05" WEST, 317.36 FEET TO A CONCRETE RIGHT-OF-WAY MARKER ON THE NORTH RIGHT-OF-WAY OF WHISPERING PINES ROAD (FORMERLY OLD SPANISH TRAIL) AND THE WEST RIGHT-OF-WAY LINE OF U.S. HIGHWAY NUMBER 98 (4-LANE); THENCE RUN SOUTH 89°-58'-58" WEST, 341.20 FEET ALONG SAID NORTH RIGHT-OF-WAY TO A CAPPED STEEL ROD FOR THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89°-58'-58" WEST, 535.46 FEET ALONG SAID NORTH RIGHT-OF-WAY TO A CAPPED STEEL ROD; THENCE RUN NORTH 545.25 FEET TO A CAPPED STEEL ROD; THENCE RUN NORTH 89°-42'-08" EAST, 705.27 FEET TO A CAPPED STEEL ROD ON THE WEST RIGHT-OF-WAY LINE OF SAID U.S. HIGHWAY NUMBER 98 (4-LANE); THENCE RUN SOUTH 21°-08'-50" EAST, 364.28 FEET ALONG SAID WEST RIGHT-OF-WAY TO A CAPPED STEEL ROD; THENCE RUN SOUTH 89°-59'-43" WEST, 300.19 FEET TO A CAPPED STEEL ROD; THENCE RUN SOUTH 00°-17' WEST, 208.67 FEET TO THE POINT OF BEGINNING, CONTAINING 8.56 ACRES MORE OR LESS.

TOGETHER WITH A 15.0 FOOT DRAINAGE AND UTILITY EASEMENT DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE ABOVE DESCRIBED PROPERTY, RUN THENCE SOUTH 15.0 FEET TO A POINT; THENCE RUN SOUTH 89°-42'-08" WEST, 385.27 FEET TO A POINT ON THE EAST RIGHT-OF-WAY OF BALDWIN COUNTY HIGHWAY NUMBER 11; THENCE RUN NORTHWESTWARDLY ALONG THE ARC OF A CURVE TO THE RIGHT ALONG SAID EAST RIGHT-OF-WAY 16.60 FEET, SAID CURVE HAVING A RADIUS OF 1982.91 FEET, A CHORD BEARING OF NORTH 25°-39'-58" WEST TO AN IRON PIPE; THENCE RUN NORTH 89°-42'-08" EAST, 392.40 FEET TO THE POINT OF BEGINNING, CONTAINING 0.13 ACRES MORE OR LESS.

## EXHIBIT "D"

### FORM OF SURVEYOR'S CERTIFICATE

TO:  WINN-DIXIE MONTGOMERY, INC. ("Owner")

_____ Title Insurance Corporation ("Title Company")

RE:  File No._____ Drawing No. _____ Title: _____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

Executed this the _____ day of _____, 199___.

_____

Registered Land Surveyor No._____

Address: _____

_____

(SURVEYOR'S SEAL)

**EXHIBIT "E"**

**ESTOPPEL CERTIFICATE**
**WINN-DIXIE STORE #_____**
Highway #98 and Whispering Pines
Daphne, Alabama

The undersigned officer of WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.    That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with DAPHNE PINES, L.L.C., a Alabama limited liability company, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a Premises known as _____ (the "Premises"), and the Lease has been amended or is evidenced only by:

      (a)      Short Form Lease dated _____, recorded in Official Records Volume _____, page ___ of the public records of Mobile, Alabama;

      (b)      Letter Agreement(s) dated _____;
      (c)      Supplemental Lease Agreement dated _____;
      (d)      First Amendment to Lease dated _____;
      (e)      Second Amendment to Lease dated _____.

2.    That the term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

      (a)      _____
      (b)      _____
      (c)      _____
      (d)      _____

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

6.    Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____.

7.    Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

38

8.      Notwithstanding anything to the contrary herein:

    (a)     No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

    (b)     Tenant makes no representation or warranty that the Premises or the Premises, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.      The address for notices to Tenant is 1550 Jackson Ferry Road, Montgomery, Alabama 36104, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.     This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

WINN-DIXIE MONTGOMERY, INC.

By:_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that, to the best of Landlord's knowledge, Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

DAPHNE PINES, L.L.C.

By:_____

Its:_____

<u>EXHIBIT "F"</u>

(ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re:    _____, Baldwin County, State of  Alabama

To Whom It May Concern:

      This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Baldwin, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Baldwin, relating to uses permitted in the _____ District.  The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above.  The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

      As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations.  Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

      Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

## EXHIBIT "G"

### SHORT FORM LEASE

THIS SHORT FORM LEASE is hereby executed this _____, 19_____, by and between DAPHNE PINES, L.L.C., a Alabama limited liability company, whose mailing address is 2800 Zelda Road, Suite 200-4, Montgomery, Alabama 36106 ("Landlord") and WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation, whose mailing address is 1550 Jackson Ferry Road, Montgomery, Alabama 36104 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant did enter into a Lease, dated _____, 19_____, (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Lan Jlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Lease to be executed

as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

LANDLORD:

DAPHNE PINES, L.L.C., an Alabama limited liability
company

_____
Print Name:_____

_____
Print Name:_____

    As to Landlord

By:_____
    _____
Its:_____

TENANT:

WINN-DIXIE MONTGOMERY, INC.

_____
Print Name:_____

_____
Print Name:_____

    As to Tenant

By:_____
    _____
Its:_____

STATE OF ALABAMA
COUNTY OF BALDWIN

     I,  the undersigned, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of DAPHNE PINES, L.L.C., an Alabama limited liability company, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company on the day the same bears date.

     Given under my hand and official seal this _____ day of _____ __, 19____.


_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)


STATE OF FLORIDA
COUNTY OF DUVAL

     I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

     Given under my hand this _____ day of _____, 19____.


_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

43

## EXHIBIT "H"

Coming Soon Sign Specifications


**Text of Sign:** Coming Soon --
Winn-Dixie
Marketplace


**Size:** Maximum size permitted by applicable law and
restrictions of record and otherwise reasonably
acceptable to Landlord and Tenant

44

## DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS

THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS (this "Declaration") is made as of April __, 1999 by DAPHNE PINES, L.L.C., an Alabama limited liability company (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner"),

### RECITALS

A.    Owner is the owner of all of the property (the "Property") shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), which includes the portion of property shown as Parcel A on the Site Plan and described on Exhibit "B-1" hereto ("Parcel A") and the portion of property shown as Parcel B on the Site Plan and described on Exhibit B-2" hereto ("Parcel B").

B.    Owner is the landlord of Parcel A under that certain lease dated April ___, 1999 between Owner and Winn-Dixie Montgomery, Inc., a Kentucky corporation (together with its successors and assigns, "Parcel A Tenant") pursuant to which the Parcel A Tenant leases Parcel A for the construction of a Winn-Dixie Marketplace (the "Supermarket").

C.    Owner has entered into a purchase agreement with Whispering Pines/Highway 98 Development Company, L.L.C. ("Purchaser") to sell Parcel B to Purchaser, which sale and conveyance will be made subject to the provisions of this Declaration, and Purchaser will be the landlord of Parcel B under that certain lease dated April ___, 1999 between Purchaser and Walgreen Co., an Illinois corporation (together with its successors and assigns, "Parcel B Tenant") pursuant to which the Parcel B Tenant leases Parcel B for the construction of a Walgreen Drug Store (the "Drug Store").

D.    Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Property for the benefit of Owner, the Tenants, and their successors, assigns, licensees, and invitees.

### DECLARATION

NOW, **THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Property shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

### I.
### RESTRICTIONS

1.1    Permitted Uses. Parcel A may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the

PDi-98:122300.6

conduct of any other mercantile, retail, or service business (including discount businesses). Parcel B may be used for a retail pharmacy, commonly referred to as a drug store, dealing primarily in, but not limited to the sale of prescription and non-prescription drugs, health and beauty aids, drug sundries, greeting cards and gift wrap and photographic film and photofinishing services, and medical diagnostic laboratory. In addition, either Parcel may be used for any other purposes, except as restricted by the provisions of Section 1.2 below.

1.2.  <u>Restricted Uses</u>.  (a)  The Property shall be restricted against use of any of the following: office (except incidental to retail use); dry cleaning facility (except that dry cleaning pickup and delivery shall be permitted); dance hall, restaurant, bar, tavern or cocktail lounge; sale, lease or storage of automobiles, mobile homes, boats or other vehicles; massage parlor, strip joint, spa, health club; adult or pornographic theater, amusement, book store; carnival, theater, fair or entertainment facility, church; second hand store or flea market; pool hall, bowling alley, video arcade, off-track betting establishment, bingo parlor, or game room; roller rink; funeral home or undertaking business; educational or training facility; penal or correctional institution; blood bank; sleeping quarters or lodging; outdoor housing of animals; storage or manufacture of explosives or other flammable or hazardous materials; any industrial use; car wash; assembly hall; a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(b)  If Parcel B ceases to be used for a pharmacy or drug store, but Parcel A continues to be used as a supermarket, Parcel B shall not be used (i) to operate a supermarket, grocery, bakery, and delicatessen, (ii) to sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods, or (iii) to sell beer and wine for off-premises consumption. Similarly, if Parcel A ceases to be used as a supermarket, but Parcel B continues to be used as a pharmacy or drug store, Parcel A shall not be used as a pharmacy or drug store.

1.3  <u>Building Height and Size Restrictions</u>.  Construction of buildings and other improvements on the Property shall be substantially as shown on the Site Plan. No building on Parcel B shall exceed a maximum vertical building height of 25 feet measured from ground level, excepting cupolas or other architectural adornments or rooftop equipment.

## II.
## EASEMENTS

2.1  <u>Ingress and Egress</u>.

(a)  Owner hereby grants to the Owners, the tenants and occupants, from time to time of Parcel A and Parcel B, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, perpetual and irrevocable easement

for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through (i) the driveway and ingress and egress thereto from the adjacent streets ("Driveway") shown on the Site Plan and (ii) all paved driveways, roadways and walkways ("Common Areas") existing from time to time on the Property. The Driveway and the ingress and egress thereto from the adjacent streets shall not be blocked, modified, moved or removed without the written consent of the Owners and the Parcel B Tenant.

(b)    Owner(s) shall have the right to close temporarily any part of the Common Areas (exclusive of the Driveway) located on the Property to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner(s) shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Property. Nothing in this paragraph shall be construed to augment or diminish maintenance obligations imposed on any Owner(s) under any lease.

(c)    Owner(s) shall have the right to close temporarily any part of the Common Areas (exclusive of the Driveway) located on the Premises as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner(s) uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Premises.

(d)    Each Owner having rights with respect to the easements granted hereunder shall indemnify and hold the Owner and Tenant whose Parcel is subject to the easements harmless from and against all claims, liabilities and expenses (including reasonable attorney's fees) relating to accidents, injuries, loss, or damage of or to any person or property arising therefrom.

2.2    Utilities. Owner hereby grants the Owner(s), Tenants and occupants of the Property a nonexclusive, irrevocable easement to connect into all utility lines on the Property, provided that no utility apparatus shall be placed above the surface of a particular Parcel or beneath any vertical improvement of a particular Parcel without the prior written consent of the Owner and the Tenant of said Parcel, which said consent shall not be unreasonably withheld, and provided, further, that any and all damage whatsoever to the Property occasioned by such connection or drainage shall be promptly repaired and restored at the sole cost and expense of the party benefited.

2.3    No Cross-Parking. No easements or rights of cross-parking between the Parcels are created by this Declaration.

## III.
## ATTORNEYS' FEES/ENFORCEMENT

3.1.    Each Owner(s) and/or Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other Owner(s) or Tenant.

3.2    If any Owner and/or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## IV.
## MODIFICATION

4.1    Except as provided above, this Declaration may be modified or amended by Owner(s) owning one hundred percent (100%) of the Property, which modification or amendment shall become effective upon (1) the written consent of (a) Parcel A Tenant, if Parcel A Tenant is a tenant of Parcel A, and (b) Parcel B Tenant, if Parcel B Tenant is a tenant of Parcel B, which consent may be granted or withheld by each in its sole discretion, and (2) filing same in the real property records of Baldwin County, Alabama.

## V.
## GENERAL PROVISIONS

5.1    Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Property, and shall inure to the benefit of the Owner(s) and Tenant(s) of the Property or any Parcel.

5.2    Severability.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3    Pronouns.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4    Captions.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5    Governing Law. This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of Alabama.

5.6    No Presumption. This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any Owner(s).

5.7    Exhibits. The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

        Exhibit "A" - Site Plan
        Exhibit "B-1" - Legal Description of Parcel A (Supermarket)
        Exhibit "B-2" - Legal Description of Parcel B (Drug Store)

        IN WITNESS WHEREOF, this Declaration has been executed as of the date first above written.


Witnesses:                                    Owner(s):


_____            DAPHNE PINES, L.L.C.
Print name:_____


_____            By: _____
Print name:_____            _____
                                              Its:_____
                                              Date:_____

STATE OF ALABAMA
COUNTY OF BALDWIN

     I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as of _____ of DAPHNE PINES, L.L.C., an Alabama limited liability company, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company on the day me same bears date.

     Given under my hand and official seal this _____ day of _____, 19\_\_\_\_.


_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No.:_____
(NOTARIAL SEAL)

**Exhibit "B-1"**
**(Parcel A)**

Lot 1, according to the Map of Daphne Pines Subdivision, as recorded in the Baldwin County Judge of Probate's Office on Slide Number 1870-A.

**Exhibit "B-2"**
**(Parcel B)**

Lot 2, according to the Map of Daphne Pines Subdivision, as recorded in the Baldwin County Judge of Probate's Office on Slide Number 1870-A.

## EXHIBIT "J"

## SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____, 199___, between **WINN-DIXIE MONTGOMERY, INC.**, a Kentucky corporation, (the "Tenant") and **DAPHNE PINES, L.L.C.**, a Alabama limited liability company (the "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated _____, recorded in Volume ___, page ___ of the public records of  Baldwin County, Alabama; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE**, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____.

2.    The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF**, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

TENANT:

_____          WINN-DIXIE MONTGOMERY, INC.
Print name:_____

_____          By:_____
Print name:_____              Its:_____
                                              Date:_____


LANDLORD:

_____          DAPHNE PINES, L.L.C.
Print name:_____

_____          By:_____
Print name:_____              Its:_____
                                              Date:_____

STATE OF ALABAMA
COUNTY OF BALDWIN

      I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of DAPHNE PINES, L.L.C., an Alabama limited liability company, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such _____ and with full authority, executed the same voluntarily for and as the act of said company on the day the same bears date.

      Given under my hand and official seal this _____ day of _____, 19____.


_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)


STATE OF FLORIDA
COUNTY OF DUVAL

      I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of Winn-Dixie Montgomery, Inc., a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand this _____ day of _____, 19____.


_____
Printed Name:_____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

## CONSENT

_____, a _____ _____ the owner and holder of a mortgage upon the Premises, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

_____

Its:_____

Date:_____

STATE OF _____

COUNTY OF _____

I, _____, a Notary Public in and for said County, in said State, hereby certify that _____, whose name as _____ of _____., a _____ corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand this _____ day of _____, 19_____.

_____

Printed Name:_____

Notary Public, State and County aforesaid

My Commission Expires:_____

Notary ID No.:_____

(NOTARIAL SEAL)

This Instrument was prepared by
P. Christopher Wrenn, Attorney-at-Law
whose address is P. O. Box B,
Jacksonville, Florida 32203

State of Alabama, Baldwin County
I certify this instrument was filed
and taxes collected on:

2000 May    -12   12:16PM
Instrument Number  545312   Pages   6
Recording   15.00  Mortgage
Deed               Min Tax
Index              DP                1.00
Archive
Adrian T. Johns, Judge of Probate

_____

(Reserved for Clerk)

## AMENDMENT TO LEASE AND SHORT FORM LEASE

THIS AMENDMENT TO LEASE AND SHORT FORM LEASE is made this _MAY 3_ , 2000, between **DAPHNE PINES, L.L.C.,** an Alabama limited liability company ("Landlord") and **WINN-DIXIE MONTGOMERY, INC.,** a Kentucky corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1.      Landlord and Tenant are parties to that certain Lease dated April 13, 1999, as amended and/or evidenced by Short Form Lease dated April 13, 1999, recorded in Instrument No. 488186, page in the Office of the Judge of Probate of Baldwin County, Alabama (the "Lease"), Tenant leased from Landlord the "Premises" (as defined in the Lease) located in Daphne, Baldwin County, Alabama.

2.      Landlord and Tenant desire to modify the Lease to modify Section 18 of the Lease and to substitute a revised site plan of the Shopping Center, as defined in the Lease.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.      The foregoing recitals are true and correct and incorporated herein by reference.

2.      The site plan depicting the Premises attached as Exhibit "A" to the Lease is hereby deleted and the site plan depicting the Premises entitled attached hereto as Exhibit "A-1" (the "Site Plan") is substituted in the place of Exhibit "A". From and after the date hereof, any and all references in the Lease to a site plan or plot plan shall refer to the Site Plan.

3.      The following language is hereby deleted from Article 18 ("Signs") of the Lease:

Landlord shall construct, install, and maintain, at its cost, one (1) electrically illuminated pylon sign in the locations marked on the Site Plan. Tenant shall contribute the sum of $5000.00 toward the cost of the pylon sign. The pylon sign shall be as shown on Tenant's Plans. Tenant may install, at its cost, its sign panel on such pylon sign and may connect the sign panel to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel if billed as a portion of Additional Rent. Tenant shall maintain its sign panel, and it is replaced by the following:

Tenant maintain, at its cost, one monument sign located along U. S. Highway 98 in the location now existing.  Tenant shall maintain its monument sign and shall pay the cost of the electric power for lighting the monument sign.

4.      Except as expressly modified by this Amendment to Lease and Short Form Lease, the Lease remains in full force and effect.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Amendment to Lease and Short Form Lease the day and year indicated below.

Witnesses:

Print name: _____

Print name: _Elizabeth T George_

LANDLORD:

**DAPHNE PINES, L.L.C.,** an Alabama limited liability company

By: _Charles R Trotman_
    Charles R. Trotman
Its: _Manager_
Date: _April 28, 2000_


Print name: _Lucy W. McCook_

Print name: _Thurla M. Gross_

TENANT:

**WINN-DIXIE MONTGOMERY, INC.**

By: _R. M. McCook_
    R. M. McCook
Its: _Vice President_
Date: _5/3/00_

STATE OF ALABAMA            )

COUNTY OF _Montgomery_ )

    I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that _Charles R. Trotman_ , whose name as _Manager_ of **DAPHNE PINES,** **L.L.C.,** an Alabama limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, _he_ , as such _Manager_ and with full authority, executed the same voluntarily for and as the act of said limited liability company.

    Given under my hand and seal this _21st_ day of _April_ , 2000.

                         _Tom Six_

(Seal)                Notary Public

                    My commission expires: _3/19/200_


STATE OF FLORIDA    )

COUNTY OF DUVAL    )

    I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that _R. P. McCook_ , whose name as _Vice President_ of **WINN-DIXIE** **MONTGOMERY, INC.,** a Kentucky corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, _____, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and seal this _3_ day of _May_ , 2000.

                    _Rebecca L. Sawyer_

(Seal) REBECCA L. SAWYER     Notary Public

My Comm. Exp. June 2, 2002     My commission expires: _6/2/02_

Comm. No. CC 372310

F:\USERS\150\TROTMAN.CO\DAPHNE.PIN\Winn-Dixie\LeaseAmendment

EXHIBIT "A"



Instrument 5453112 Page 4 of 6

## CONSENT

**WINN-DIXIE STORES, INC.**, a Florida corporation, the guarantor of the obligations of Tenant under that certain Lease described in the Amendment to Lease and Short Form Lease hereto attached, hereby consents to the terms and conditions of this Amendment to Lease and Short Form Lease.

Print Name: _____Lucy W. McCook_____

**WINN-DIXIE STORES, INC.**, a Florida corporation

Print Name: _____Thurla M. Gross_____

By: ____R. R. McC___

Its Vice President

Date: ___5/3/00___

STATE OF FLORIDA     )
                     :
COUNTY OF DUVAL      )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that _____R. R. McCook_____, whose name as Vice Presidnt of **WINN-DIXIE STORES, INC.**, a Florida corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, ___he___, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and seal this __3__ day of __May__, 2000.

(Seal)

Notary Public
My commission expires: ___6/2/02___

REBECCA L. SAWYER
My Comm. Exp. June 2, 2002
Comm. No. CC 9/2310

## CONSENT OF LENDER

**SOUTHTRUST BANK, NATIONAL ASSOCIATION,** a national banking association, the owner and holder of that certain Mortgage and Security Agreement dated as of April 15, 1999, recorded in the Office of the Judge of Probate of Baldwin County, Alabama, as Instrument Number 488195 (the "Security Instrument"), hereby consents to the terms and conditions of this Amendmnt to Lease and Short Form Lease (the "Lease Amendment") and agrees that any foreclosure under the Security Instrument shall be subject to this Lease Amendment.

SOUTHTRUST         BANK,        NATIONAL
ASSOCIATION, a national banking association

By: _____ Thomas R. Ledbetter _____
Print name: _____ Thomas R. Ledbetter _____
Its: _____ Vice President _____
Date: _____ 4/28/00 _____

STATE OF ALABAMA          )
                          :
COUNTY OF Montgomery      )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that _____ Thomas R. Ledbetter _____, whose name as Vice President of SOUTHTRUST BANK, NATIONAL ASSOCIATION, a national banking association, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the above and foregoing instrument, he , as such officer and with full authority, executed the same voluntarily for and as the act of said association.

Given under my hand and seal this 28th day of April , 2000.

(Seal)

_____ Beverly J. Ellis _____
Notary Public
My commission expires: April 28, 2003

F:\USERS\150\TROTMAN.CO\DAPHNE.PIN\Winn-Dixie\LeaseAmendment