*Daytona Promenade/
Daytona Beach Fl
Store # 2312
Landlord: Great Oak LLC*

**ORIGINAL**

### FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "Amendment") is made as of ___June 15___, 1998 by and between Great Oak, LLC, a Delaware limited liability company ("Landlord") and Winn-Dixie Stores, Inc , a Florida corporation ("Tenant").

### RECITALS:

A.    Landlord and Tenant are parties to that certain Lease dated July 24, 1987, as amended and/or evidenced by: (a) Short Form Lease dated July 24, 1987, recorded in Volume 3056, page 319 of the public records of Volusia County, Florida; (b) Letter Agreements dated September 23, 1987 and June 20, 1988; (c) Addendum to Lease and Second Addendum to Lease, each dated December 28, 1988; and (d) Supplemental Lease Agreement dated April 11, 1989 (as amended and evidenced, the "Original Lease"), pursuant to which Tenant has occupied and rented from Landlord the premises consisting of approximately 45,056 square feet, more particularly described in the Original Lease (the "Premises") and located in a shopping center commonly known as Promenade Shopping Center (f/k/a The Shoppes of Towne South) and described in the Original Lease (as the same may be altered or expanded  the "Shopping Center").

B.    The term of the Original Lease expires at midnight on March 29, 2009 (the "Scheduled Expiration Date"), subject to Tenant's right to renew for 5 subsequent extension periods of 5 years each (collectively, the "Term")

C.    Tenant is permitted under the terms of the Original Lease to expand the Premises to include approximately 12,000 square feet of additional space located to the south of the Premises in the Shopping Center (the "Additional Space," and together with the Premises, the "Expanded Premises")  The Expanded Premises will consist of a total of approximately 57 000 leasable square feet. Landlord has agreed to lease to Tenant the Additional Space.

D.    Landlord and Tenant have agreed to amend the Original Lease upon the terms and conditions of this Amendment (the Original Lease  as amended by this Amendment is herein called the "Lease").

E.    Capitalized terms not otherwise defined herein shall have the meanings attributed to such terms in the Original Lease.

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which hereby are acknowledged, Landlord and Tenant agree, covenant, represent  and warrant  as applicable, as follows:

1.    Recitals. The foregoing recitals are true and correct in every respect and incorporated herein by reference.

2.    Additional Space. Landlord hereby leases the Additional Space to Tenant and Tenant hereby rents the Additional Space from Landlord upon the terms and conditions of the Lease.

3.    Tenant's Improvements. Tenant shall, at its own initial cost and expense (except for Landlord's Contribution and the Roof Contribution, as hereinafter defined), construct or cause to be constructed certain improvements ("Tenant's Improvements") upon the Additional Space, substantially in accordance with plans and specifications previously reviewed and approved by Landlord ("Tenant's Plans") and as shown on the Site Plan prepared by Tipton Associates, Incorporated, dated June 20, 1996, last revised September 10, 1996, and attached hereto as Exhibit "A" and incorporated herein by reference (the "Site Plan"). Landlord's and Tenant's execution of this Amendment constitutes their respective approval of the Site Plan and the development or redevelopment of the Shopping Center consistent therewith, and Landlord's and Tenant's consent to the submission of the Site Plan to the City of Daytona.  Landlord and Tenant acknowledge and agree that the Site Plan may need to be revised (collectively, "Governmental Revisions") in order to obtain approval of the Site Plan by the City of Daytona, or any other appropriate governmental authority (collectively, the "Governmental Site Plan Approvals"). Landlord and Tenant each agree that any such Governmental Revisions shall be subject to Landlord's and Tenant's written approval  which approval

JK2 108728.11 80130 00846
5/6/98 8:45 am

**Exhibit "A"**

shall not be unreasonably delayed or withheld; provided however, that no such Governmental Revisions shall be approved by Tenant if the revision in question would have a material adverse effect on Tenant's business operations in, parking for, or ingress or egress to or from the Expanded Premises. Landlord s and Tenant's approval of the Site Plan (and any Governmental Revisions thereto) shall survive any termination of this Amendment.   In addition, Tenant may and shall make such other changes (such changes subject to Landlord's prior approval, which approval shall not be unreasonably withheld, delayed, or conditioned), and interior modifications as are necessary or desirable to make the entire Expanded Premises suitable for Tenant's use in the conduct of its business  Tenant will perform or cause to be performed all construction of Tenant's Improvements in a good and workmanlike manner and in accordance with all applicable governmental laws, rules. and regulations. Pursuant to Section 713.10, Florida Statutes, the interest of the Landlord in the Shopping Center and the Expanded Premises shall not be subject to liens for improvements made by Tenant. At the Landlord's request, Tenant shall execute a written instrument, in form and content agreeable to Tenant, to be recorded for the purpose of providing notice of existence of the provisions of the preceding sentence in accordance with Section 713 10, Florida Statutes. Tenant shall hold Landlord and Landlord's interest in the Shopping Center harmless from any lien or encumbrance arising out of or in connection with Tenant's Improvements and will, at Landlord's request, record a memorandum of such indemnification in the public records of the county in which the Shopping Center is located. Tenant shall indemnify and hold Landlord harmless from and against any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant's Improvements

Paragraph 38 of the Original Lease. *Option for Expansion*. provides that in the event Landlord constructs a building in the Additional Space, then said building will have, among other things, a roof and ceiling heights the same as Tenant's Premises. The building constructed in the Additional Space was not constructed to the specifications set forth in the Original Lease and, therefore it will be necessary for Tenant to rebuild the roof in the Additional Space in order to make it compatible with Tenant's existing Store. It is anticipated that this additional roof work will cost approximately $90,000 00   As part of Tenant's Improvements. Tenant will rebuild the roof in the Additional Space so that it is the same height as the Premises. Landlord shall reimburse Tenant $90,000.00 to compensate Tenant for this additional roof work (the "Roof Contribution"). The Roof Contribution shall be Tenant's sole claim for any defect or deficiency in the physical condition of the Additional Space

4.   Deadlines.   Landlord shall deliver to Tenant possession of the Additional Space no later than the Construction Commencement Date (as defined below) in the condition existing as of the date of this Amendment, without representation or warranty except as specifically provided in this Amendment. Construction of Tenant's Improvements shall be completed on or before the date which is 270 days after the Construction Commencement Date (the "Construction End Date"). If Landlord fails to timely deliver the Additional Space to Tenant, Tenant may, at its option exercisable by written notice to Landlord and as Tenant s sole remedy, either (i) extend to Landlord such additional time to deliver the Additional Space as Tenant deems reasonable, in Tenant's sole discretion, and the Construction Commencement Date and Construction End Date shall automatically be extended for any delay in Landlord's delivery of the Additional Space, or (ii) terminate this Amendment, in which case the Original Lease will continue in effect; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit (all as hereinafter defined), and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution. Promptly following the execution of this Amendment, Landlord shall submit the Site Plan to the appropriate municipal and/or county governmental authorities for approval. The "Construction Commencement Date" shall be the date which is 180 days after the Execution Date, as hereinafter defined, of this Amendment. If Landlord fails to obtain the Governmental Site Plan Approvals on or before the Construction Commencement Date, then Tenant may, at its option, exercisable by written notice to Landlord and as Tenant's sole remedy, either (i) extend to Landlord such additional time to obtain the Governmental Site Plan Approvals as Tenant deems reasonable, in Tenant's sole discretion, or (ii) terminate this Amendment, in which case the Original Lease will continue in effect; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey and the Audit (all as hereinafter defined), and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution.

Upon obtaining the Governmental Site Plan Approvals (including approval by Landlord and Tenant of any Governmental Revisions), the Original Lease shall be deemed automatically amended so that all references to "Exhibit A", the "Plot Plan", or the "Site Plan" shall mean and refer to the Site Plan incorporating any Governmental Revisions. Such amendment to the Original Lease shall survive any termination of this Amendment  Landlord shall use good faith and due diligence to obtain the Governmental Site Plan Approvals

5      Landlord's Improvements.  On or before the Construction End Date, Landlord shall  at its own cost and expense, reseal and restripe the parking lot in the area labeled as Phase 1 on the Site Plan ("Landlord's Improvements")

6.      Force Majeure.  Neither Landlord nor Tenant shall be liable or responsible for any delay in performing or completing their respective nonmonetary obligations under this Amendment due to strikes  riots acts of God, shortages of labor or materials, theft, fire, public enemy, injunction, insurrection  court order, laws, or any other factor or force beyond their respective control

7.      Completion.  Upon the earlier of (i) the Construction End Date, or (ii) the completion of Tenant's Improvements and commencement of Tenant's doing business in the Additional Space (such earlier date being the "Remodel and Enlargement Sale Date"):

(a)      All references in the Original Lease to "Tenant's store building," "the building," "Tenant's Food Store," "the demised premises" and any other term referring to the Premises shall be deemed and interpreted to apply and refer to the Expanded Premises and the land upon which the Expanded Premises are constructed;

(b)      The Scheduled Expiration Date shall be a date which is 15 years from and after the Remodel and Enlargement Sale Date and Tenant shall retain the right to renew and extend the Term beyond such Scheduled Expiration Date for 5 subsequent extension periods of 5 years each as provided in the Original Lease;

(c)      Landlord shall not designate any portion of the parking areas in the Shopping Center (but excluding Outparcels "J," "K," and "L" which, pursuant to the terms of the Original Lease are not part of the Shopping Center, but are subject to the Declaration of Restrictions and Grant of Easement recorded at O.R. Book 3056, Page 309, of the public records of Volusia County, Florida, and certain restrictions or limitations as set forth in the Lease) for the exclusive use of any party and shall at all times provide and  maintain a surfaced parking area and the number of parking spaces as shown on the Site Plan. Notwithstanding the foregoing, if any applicable laws, rules, or regulations  (collectively, "Legal Requirements") mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control.  Without Tenant's prior written  consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements.  If any portion of the Phase 1's parking area is reduced by an amount in excess of ten percent (10%), Tenant may, at its option, terminate the Lease within 60 days of the reduction and shall be liable for Basic  Additional, and Percentage Rent only up to the time of such reduction.  In the case of a reduction in Phase 1's parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate the Lease, however, Tenant shall notify Landlord and Landlord shall have 30 days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and the Lease shall continue.  If the alternative parking area does not meet with Tenant's reasonable approval and such deficiency of parking facilities shall continue for 30 days after Tenant sends written notice thereof to Landlord giving reasonable details of the alternative parking deficiencies, Tenant shall have the right to terminate the Lease, provided that the termination of the Lease for such a default may be prevented and the Lease reinstated by Landlord curing the default within 30 days after the receipt of such notice of termination.

8.      Landlord's Contribution.  Within 30 days of the later of (i) the Remodel and Enlargement Sale Date, or (ii) the date on which Tenant has provided Landlord with: (a) a certificate from Tenant's architect stating that the Expanded Premises have been constructed in substantial accordance with Tenant's Plans, (b) a Certificate of Occupancy or its equivalent for the Expanded Premises, and (c) a final affidavit and lien

waiver from Tenant's general contractor and from any parties who have provided a notice to owner, Landlord shall pay to Tenant the sum of $1,197,700.00 ("Landlord's Contribution") and the Roof Contribution to partially reimburse Tenant for a portion of Tenant's Improvements. Simultaneously with Landlord paying Landlord's Contribution and the Roof Contribution to Tenant, Landlord and Tenant shall enter into a Second Supplemental Lease Agreement in the form attached hereto as Exhibit "C" and Tenant shall issue to Landlord an Estoppel Certificate in the form attached hereto as Exhibit 'D'

9.    Rent. Following the Remodel and Enlargement Sale Date, and further upon completion of Landlord's Improvements and receipt by Tenant of Landlord's Contribution and the Roof Contribution:

Rent for the Expanded Premises shall be due and payable in accordance with the following:

(a)    Basic Rent:

(i) Basic Rent: Tenant shall pay to Landlord as annual basic rent for the Expanded Premises the sum of $411,164.00 per annum, payable in advance on the first day of each and every calendar month of the remainder of the Term, in equal monthly installments of $34,263.67.00 per month ("Basic Rent") Basic Rent shall be subject to adjustments as set forth in (a)(ii) below.

(ii) Basic Rent Adjustment:

(A)    Increase in Basic Rent.   If the actual final construction cost of Tenant's Improvements (excluding the additional roof work contemplated in the last grammatical paragraph of paragraph 3 above) following completion thereof is more than $1,197,700.00 (the "Anticipated Construction Cost"), then Tenant may elect by written notice to Landlord, in Tenant's sole discretion, either to (1) pay the difference between the actual construction cost of Tenant's Improvements (excluding the additional roof work contemplated in the last grammatical paragraph of paragraph 3 above) and the Anticipated Construction Cost out-of-pocket or (2) require Landlord to pay such difference to Tenant (such payment being referred to as the "Cost Overage"); provided, however, that in no event shall Landlord be required to make any Cost Overage payment in excess of $500,000.00. Effective upon Landlord's payment of the Cost Overage to Tenant pursuant to (2) above, Basic Rent shall be increased by an amount per annum necessary to amortize the Cost Overage (using a 365 day or 366 day year) over the remaining term of the Lease to the Scheduled Expiration Date at an annual rate of interest of 12 percent, payable in equal monthly installments.

If the effective date of such increase in Basic Rent is on a day other than a Basic Rent due date, then the next payment of Basic Rent, as adjusted for such increase, shall also include an amount representing the monthly installment amount of such increase prorated for the number of days between the effective date of such increase and the next due date for payment of Basic Rent.

(B)    Decrease in Basic Rent.   If the actual final construction cost of Tenant's Improvements (excluding the additional roof work contemplated in the last grammatical paragraph of paragraph 3 above) following completion thereof is less than the Anticipated Construction Cost (the "Cost Savings"), then Landlord's Contribution shall be reduced by the Cost Savings and Tenant may, upon written notice to Landlord, decrease Basic Rent by an amount per annum necessary to amortize the Cost Savings (using a 365 day or 366 day year) over the remaining term of the Lease to the Scheduled Expiration Date at an annual rate of interest of 12 percent, deducted from Basic Rent in equal monthly installments; provided, however, that Tenant shall not be entitled to a reduction in Basic Rent, and Landlord shall not be entitled to a reduction in the Landlord's Contribution, for any portion of such Cost Savings equal to or less than $10,000.00 (an amount equivalent to Tenant's $10,000 miscellaneous construction contingency).

If the effective date of such decrease in Basic Rent is on a day other than a Basic Rent due date, then the next payment of Basic Rent, as adjusted for such decrease shall also reflect a deduction representing the monthly amount of such decrease, prorated for the number of days between the effective date of such decrease and the next due date for payment of Basic Rent.

(C)    Following completion of construction of Tenant's Improvements, Tenant shall promptly provide Landlord with a certification letter from Tenant and a contractor's affidavit each setting forth the actual construction cost of Tenant's Improvements (excluding the additional roof work contemplated in the last grammatical paragraph of paragraph 3 above). In the event of an adjustment of Basic Rent, the Second Supplemental Lease Agreement shall set forth the adjusted Basic Rent, as determined in accordance with (A) and (B) above, for the Expanded Premises.

(b) Percentage Rent: Tenant shall pay Percentage Rent to Landlord equal to the amount by which one percent (1%) of Tenant's gross sales in each fiscal year exceed the Basic Rent. Any Percentage Rent due shall be calculated based upon and payable on or before 60 days after the expiration of each fiscal year of Tenant, which fiscal year currently is from July 1 to June 30 of each year

(c) Additional Rent:

(i) Additional Rent: Pursuant to the Original Lease, Tenant pays an amount on a monthly basis to partially compensate Landlord for its expenses in maintaining the Shopping Center common areas ("Additional Rent"). Tenant shall pay Additional Rent for this purpose in the amount of $5,700.00 per annum, payable on the first day of each and every calendar month of the remainder of the Term, in equal monthly installments of $475.00

(ii) Tenant shall pay, within 30 days of receipt of Landlord's statement therefor, its Pro-rata Share of "Real Estate Taxes." Real Estate Taxes includes all ad valorem real estate taxes, less any abatements, discounts, or refunds permitted by law but excludes special assessments. Real Estate Taxes does not include any late fees or penalties incurred by Landlord due to Landlord's untimely payment of Real Estate Taxes. Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing, stating whether or not Landlord intends to challenge the same. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, then if the reasonable out-of-pocket costs of such challenge is less than the amount of Real Estate Taxes saved as a result of the challenge, Tenant shall pay as a portion of Common Area Maintenance Expenses and Additional Rent its Pro-rata Share of such cost, but if such cost exceeds the amount of Real Estate Taxes saved as a result of the challenge, Landlord shall pay the entire cost of the challenge. If Landlord elects not to protest or challenge any Real Estate Taxes. Landlord's name if necessary, but at Tenant's sole cost and expense. Tenant's Pro-rata Share means a fraction, the numerator of which is 57,000 and the denominator of which is the number of gross leasable square feet in the entire Shopping Center, as it is portrayed on the Site Plan

10.    Conditions Precedent. Notwithstanding anything to the contrary in this Amendment Tenant shall have no liability hereunder and no obligation to commence Tenant's Improvements unless and until the following ((a) through (g)) ( the "Conditions Precedent") have been satisfied or complied with. Tenant shall have no right to commence construction of the Tenant Improvements until Tenant delivers written notice to Landlord that all of the Conditions Precedent have been satisfied, complied with by Landlord. and/or waived by Tenant. Tenant shall provide Landlord with written notice on or before the Construction Commencement Date stating whether the Conditions Precedent have been satisfied to Tenant's reasonable satisfaction provided that Landlord timely satisfies its obligations in connection with the same. If Tenant fails to timely notify Landlord of its acceptance or nonacceptance of the Conditions Precedent on or before the Construction Commencement Date, then Tenant shall be deemed to have waived the same. If all of the Conditions Precedent are not satisfied and Tenant delivers written notice of nonacceptance of the Conditions Precedent

to Landlord on or before the Construction Commencement Date, then Tenant may, at its option, exercisable by written notice to Landlord and as Tenant's sole remedy, either (i) if otherwise specifically provided in this Amendment, extend to Landlord such additional time to satisfy the unsatisfied Conditions Precedent(s) as Tenant deems reasonable, in Tenant's sole discretion. (ii) waive the unsatisfied Conditions Precedent(s), or (iii) terminate this Amendment, in which case the Original Lease will continue in effect; provided, however, that Tenant may exercise any further remedies available to Tenant as specifically provided in this Amendment.

(a) Title.  On or before 10 days after the date on which both Landlord and Tenant shall have executed this Amendment (the "Execution Date"), Tenant shall order from Lawyers Title Insurance Corporation (the "Title Company"), at Tenant's expense, a current title insurance commitment naming Tenant as the proposed insured, committing to insure Tenant's leasehold interest in the Expanded Premises and including copies of all title exceptions (the "Commitment").  Tenant shall have until 10 days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment which affect the Expanded Premises  It shall be a condition to Tenant's obligations under this Amendment that the Expanded Premises be subject only to exceptions reasonably satisfactory to Tenant ("Permitted Exceptions").  If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have 10 days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing or, in its reasonable judgment, able to cure the objections before the Construction Commencement Date ("Landlord's Title Objection Response").  If Landlord notifies Tenant that it is unwilling or unable to cure Tenant's objections, then Tenant may, as Tenant's sole remedy, either (i) terminate this Amendment, in which case the Original Lease shall continue in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution, or (ii) Tenant may elect to waive its objections.  Tenant shall make such election within 15 days after receipt of Landlord's notice. If Landlord notifies Tenant that it is willing and able to cure Tenant's objections, then it shall use reasonable efforts and shall have until the Construction Commencement Date to cure such objections.  If Landlord fails to cure Tenant's objections within such time, Tenant may, as Tenant's sole remedy, either (i) grant such additional time as it deems reasonable, in Tenant's sole discretion, (ii) may waive its objections, or (iii) may terminate this Amendment in which case the Original Lease shall continue in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution.  Notwithstanding the foregoing, Landlord shall cure or cause to be removed any exceptions (not caused by the act or omission of Tenant) that can be cured solely by the payment of money (i.e. taxes due and payable, mortgages or other encumbrances (unless Tenant obtains a subordination and nondisturbance agreement), mechanics' or construction liens, etc.), shall terminate and cause the eviction of any tenants under any other leases to the Additional Space, shall deliver evidence of Landlord's status, power, and authority as required by the Title Company, and shall execute and deliver an owner's and nonforeign affidavit as reasonably required by the Title Company

(b) Survey.  On or before 10 days after the Execution Date, Tenant shall order at its sole expense from a surveyor licensed in the state in which the Shopping Center is located, an actual survey of the real property comprising the Shopping Center, showing all improvements currently located thereon (the "Survey"). The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate and be prepared in accordance with the survey protocol attached hereto as Exhibit "B".  Tenant shall have until the Title/Survey Review Deadline to review the Survey.  If the Survey shows any matters relating to the Expanded Premises which are objectionable to Tenant, in its reasonable judgment, Tenant shall notify Landlord in writing specifying survey defects on or before the Title/Survey Review Deadline ("Tenant's Survey Objection Notice").  If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have 10 days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing or, in its reasonable judgment, able to cure the objections before the Construction Commencement Date ("Landlord's Survey Objection Response").  If Landlord notifies Tenant that it is unwilling or unable to cure Tenant's objections, then Tenant may, as Tenant's sole remedy, either (i) terminate this Amendment, in which case the Original Lease shall continue

in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution, or (ii) Tenant may elect to waive its objections. Tenant shall make such election within 15 days of receipt of Landlord's notice. If Landlord notifies Tenant that it is willing and able to cure Tenant's objections, Landlord shall use reasonable efforts, and shall have until the Construction Commencement Date to cure such objections. If Landlord fails to cure Tenant's objection within such time, Tenant may, as Tenant's sole remedy, either (i) waive its objections, or (ii) terminate this Amendment in which case the Original Lease shall continue in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution.

(c) Environmental Audit.  On or before 10 days after the Execution Date, Tenant shall order an update of the environmental audit of the Shopping Center provided by ICF Kaiser Engineers, Inc., addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental audit pursuant to current ASTM standards (an "Audit").  Tenant shall have until the Title/Survey Review Deadline to review the Audit.  If it reveals any environmental condition not acceptable to Tenant, in its reasonable judgment, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline ("Tenant's Environmental Objection Notice"), Landlord shall have 10 days after receipt of Tenant's Environmental Objection Notice to notify Tenant in writing whether Landlord is willing or, in its reasonable judgment, able to cure the objections before the Construction Commencement Date.  If Landlord notifies Tenant that it is unwilling or unable to cure such environmental condition, then Tenant may, as Tenant's sole remedy, either (i) terminate this Amendment in which case the Original Lease shall continue in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date, Landlord shall be liable to Tenant for the amount of the Roof Contribution, or (ii) Tenant may elect to waive its objections.  Tenant shall make such election within 15 days after receipt of Landlord's notice.  If Landlord notifies Tenant that it is willing and able to cure Tenant's objections, then it shall use reasonable efforts and shall have until the Construction Commencement Date to cure any environmental condition objected to by Tenant.  If Landlord fails to so cure Tenant's objections within such time, Tenant may, as Tenant's sole remedy, either (i) waive its objections, or (ii) terminate this Amendment in which case the Original Lease shall continue in effect as written; provided, however, that Landlord shall be liable to Tenant for the cost of Tenant's Plans, and the cost of the Commitment, the Survey, and the Audit, and additionally, if Tenant enlarges the Premises in accordance with the Original Lease at a later date  Landlord shall be liable to Tenant for the amount of the Roof Contribution.

(d) Zoning/Comprehensive Plan.   Tenant shall have received, prior to the Construction Commencement Date, written evidence from appropriate authorities that the zoning classification for the Premises allows for the operation of Tenant's business as permitted under the Lease and that the zoning classification is appropriate for and consistent with any existing state comprehensive plan future land use designation for the Expanded Premises (the "Zoning Letter").

(e) Notice Re: Governmental Site Plan Approvals.  Landlord has provided a notice to Tenant that the Governmental Site Plan Approvals have been obtained.

(f) Approval of Governmental Revisions.  Landlord and Tenant have approved any Governmental Revisions.

(g) Building Permit  Tenant has obtained a building permit for Tenant's Improvements.

11.    Construction Easement.  Landlord grants to Tenant, its agents, employees, contractors, and subcontractors a nonexclusive temporary construction easement over and across the areas of the Shopping Center shown as shaded areas on the Site Plan attached as Exhibit "E" as a "Construction Easement Area".  Such easement shall expire upon such completion of Tenant's Improvements

12.    Consent to Non-Retail Use.  Tenant hereby consents to any office or other non-retail use of (a) the Shopping Center actually in existence and being used as of the date of this Amendment and (b) the premises in the Shopping Center formerly occupied by Phillips College, as outlined on the Site Plan attached hereto as Exhibit "F" provided, however, (i) such premises may not be used for any use exclusive to Tenant as set forth in the Lease or any other recorded document affecting the Shopping Center or for any of the following uses: (1) spa, health, sports, or exercise club; (2) lounge, bar, "teen lounge" or social encounter club; (3) bowling alley; (4) pawn shop; (5) skating rink; (6) bingo or electronic or other game parlor; (7) theater (either motion or legitimate); (8) area or space for the sale or display of pornographic or "adult" material; (9) abortion or HIV clinic; (10) automobile dealership; (11) church; (12) manufacturing or storage business; (13) public auditorium or other public entertainment facility; (14) restaurant; or (15) any business requiring parking for delivery or service trucks on a routine or frequent basis such as a pizza delivery business; and (ii) such use shall be subject to the prior written consent of Tenant; and (iii) all parking for the premises in the Shopping Center formerly occupied by Phillips College and for the premises currently occupied by Evergreen Marketing shall be behind or in Phase 2 as shown on the Site Plan (or as otherwise approved by Tenant in writing) and shall not interfere with Tenant's delivery trucks' access to the Expanded Premises, and Landlord shall take all reasonable measures to enforce the same.  Landlord hereby agrees that, upon Tenant's written request, Landlord will engage a security service, at Landlord's sole cost and expense (Landlord shall not assess the cost of the security service as a common area maintenance expense to Tenant), to direct any patrons of any office or non-retail use in the Shopping Center to not use those parking facilities located in Phase 1 of the Shopping Center, and that Landlord shall continue to utilize a security service for this purpose during such times and occasions as may be reasonably requested by Tenant

13.    Authority/No Consents.

(a) Landlord represents and warrants to Tenant that:

(i)    it has the power and lawful authority to execute, deliver, and perform its obligations under this Amendment, such execution, delivery, and performance has been authorized by all necessary action, and no consent, authorization, approval, or notice to any other party is necessary in connection with such execution, delivery, or performance or as a prerequisite to the enforceability against Landlord of this Amendment; the person signing this Amendment on behalf of Landlord is/are authorized to do so;

(ii)    it has not, nor to the best of its knowledge has any other party, except in accordance with applicable law, used, stored, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or under the Shopping Center. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to the applicable Legal Requirements. "Hazardous Substance" also includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal; and

(iii)    to the best of its knowledge, the Additional Space is free of latent defects

(b) Tenant represents and warrants to Landlord that:

(i)    it is incorporated under Florida law and its status is active and current;

(ii)    it has the corporate power and authority to execute, deliver, and perform its obligations under the Original Lease and this Amendment, which execution, delivery, and performance has been authorized by all necessary corporate action and does not require any consent or approval of, or notice to, any third party; the person(s) signing this Amendment on behalf of Tenant is/are authorized to do so; and

(iii)    it has not, and will not, except in accordance with applicable law, use(d), store(d), or dispose(d) of any Hazardous Substance in, on, or under the Expanded Premises or the sewer system serving the Expanded Premises.

When used in this paragraph 13, the phrase "to the best of its knowledge" means the actual knowledge of Charles Carneal, being the asset manager of GE Capital Realty Group, Inc responsible for the general management of the Shopping Center.

14.    No Novation.  Except as expressly modified or amended by this Amendment, the Original Lease remains in full force and effect.

15.    Headings.  The headings appearing in this Amendment are for reference only and do not modify or affect the terms hereof.

16    Exhibits.    The following Exhibits are attached hereto and incorporated herein:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Surveyor's Protocol and Certificate |
| Exhibit "C" | - | Second Supplemental Lease Agreement |
| Exhibit "D" | - | Estoppel Certificate |
| Exhibit "E" | - | Construction Easement and Non-Retail Use Areas |
| Exhibit "F" | - | Premises formerly occupied by Phillips College |

**IN WITNESS WHEREOF,** Landlord and Tenant have executed and delivered this Amendment as of the date first above written

Signed, sealed and delivered
in the presence of:

Printed Name: _____

Printed Name: ___Al Van Stein___

As to Landlord

**Landlord:**

**Great Oak, LLC**  a Delaware limited liability company

By: GE Capital Realty Group  Inc , a Texas corporation, as
    Servicer

By: _____
Printed Name: __J. E. JERNIGAN__
Its: __VICE__      President

**Tenant:**

**Winn-Dixie Stores, Inc.,** a Florida corporation

Printed Name: _____
    AMY P. WILEY

Printed Name: _____
    BRENDA J. BABCOCK

As to Tenant

By: __R. P. McCook__
Printed Name: __R. P. McCook__
Its: __Vice__      President

STATE OF _____ _Texas_____ )

COUNTY OF __Dallas__ )

    The foregoing instrument was acknowledged before me this _9_ day of _June_, 199_8_ by
__Gar Dermise___ the _VP_ President of GE Capital Realty Group, Inc., a Texas corporation, on
behalf of the corporation as Servicer on behalf of GREAT OAK, LLC, a Delaware limited liability company
He/she [Please check_ ✓ _is personally known to me or____ has produced _____ as identification

                    _Beth Jones_
Printed Name: _Beth Jones_
Notary Public, State and County aforesaid.
My Commission Expires: _12/31/2000_
Notary ID No : _____

(NOTARIAL SEAL)

**BETH JONES**
**NOTARY PUBLIC**
**State of Texas**
**Comm. Exp. 12-31-2000**

STATE OF FLORIDA )

COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _June_ _15_, 199_8_, by
_R. P. McCook_ _Vice_ President of WINN-DIXIE STORES, INC , a Florida corporation,
on behalf of the corporation who is personally known to me.

              _Lucy W. McCook_
Printed Name: _LUCY W McCOOK_
Notary Public, State and County
aforesaid.
My Commission Expires:_____
Notary ID No :_____

(NOTARIAL SEAL)

EXHIBIT "B"

WINN-DIXIE SURVEY PROTOCOL AND ORDER FORM
(Form SP-1)

This protocol presents the minimum scope of work Winn-Dixie Stores, Inc. or its subsidiaries or affiliates require for its boundary and improvements surveys. The following protocol has been developed to assist the surveyor in the preparation of the survey. The survey should include the following:

1    A Surveyor's Certificate in the form attached hereto should be included on the face of the map. No other certifications should appear on the face of the map which deal with the same issues that are contained within the Surveyor's Certificate, except those otherwise required by this protocol.

2.    The survey must be certified to the persons or entities listed below or as otherwise requested by Winn-Dixie:

Winn-Dixie Stores, Inc.
Winn-Dixie _____, Inc
_____ (Title Company)
_____ (Legal Counsel serving as Title Agent)
_____ (Other)

3.    The Surveyor's Certificate should refer to the title commitment, a copy of which (together with copies of the exceptions listed therein) will be provided to the surveyor as soon as possible.

4    The legal description should refer to County, range, township, section and/or lot, and should match the legal description contained in the title commitment. If the legal description in the title commitment is not a metes and bounds description, the legal description on the map should also include the metes and bounds description, including a point of beginning and all of the calls therefor, together with a certification that both descriptions describe one and the same property. The metes and bounds calls should be labeled on the boundary lines and the metes and bounds description should be printed separately on the survey. The survey should show interior lot lines, if any. If the property is made up of several different parcels or lots, the following will be required: (a) separate descriptions for each parcel or lot, (b) a legal description that tracks around the outer boundary of the overall parcel, and (c) a surveyor's certification that they are one and the same property and that the parcels or lots are contiguous. If the record legal description and the actual measurements differ, both should be labeled as to each call and should be separately printed on the map, together with a certification that both descriptions describe one and the same property.

5.    The legal description should include a statement of acreage.

6    The map should show the size (including gross square footage), location, and type of all existing buildings and the distance of such buildings from each boundary line, and show all "permanent" and significant improvements other than buildings, such as signs, parking areas or structures, etc. If there are existing improvements on the subject property, the map should indicate the number of existing and required handicapped, motorcycle, regular and other parking spaces. A note should be added indicating the number of parking spaces required by applicable zoning regulations.

7.    The map should indicate the location of water/gas/sewer mains of telephone/electric/utility lines or irrigation lines serving the subject property as evidenced by on-site observation by showing manholes, catch basins, crossing wires or cables, valve vaults and other surface indications.

8.    The map should show fences or walls and their dimensions and nature of use.

JX2 108728.11 80130 00846
5/6/98 8:45 am

12

9.    The map should indicate any encroachments onto the subject property from any exterior source or onto adjacent property from the subject property and should indicate any visible easements or rights-of-way (other than those of record)

10.    The map should show the widths of all streets and identify all streets as being either public or private rights of way and include arrows from all rights of way up to the edge of the property line to indicate that there are no gaps. The map should show points of access (curb cuts) from public rights of way (street or road) into the subject property. The map should contain a vicinity map showing the property surveyed in reference to nearby highway(s) or major street intersection(s). If the property is not abutted by a public roadway, the survey should show the location of the nearest public roadway and its distance from the property.

11.    The map should identify and show setback, height and bulk restrictions of record or disclosed by applicable zoning or building codes (in addition to those recorded in subdivision maps) (and should note the source of same)  If none. the map should so state.

12.    The map should show all easements of record, including those that benefit the property, and identify same with the applicable recording information (Official Records Book and Page number). If an easement or other recorded document listed in the title commitment does not affect the subject property  is blanket in nature, or is not locatable  this should be noted

13.    Monuments must be placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

14.    The map should show any retention or detention ponds or drainage structures or facilities.

15.    The map should indicate names of all adjoining property owners on all sides of the subject property.

16.    The map should indicate the flood zone designation for the subject property (with proper annotation based on Federal Flood Insurance Rate Maps or the state or local equivalent, by scaled map location and graphic plotting only).

17    The map should state the street address of the subject property or state that no street address has been assigned

18.    Significant observations not otherwise required to be disclosed should be noted on the map.

19.    If checked below, a separate topographical survey should be completed.

        Topographical Required:   _____ yes      _____ no

20    If the property is unimproved at the time the survey is prepared. in an effort to assist Winn-Dixie in correctly locating the proposed improvements, the surveyor should contact Winn-Dixie's Store Design Department. Upon the surveyor's receipt of information from either Winn-Dixie's Store Design Department or their architect, the surveyor should prepare, in addition to the survey, a separate map showing the following:

    (a)    the projection of the location of the footprint of the contemplated improvements.

    (b)    If the contemplated improvements are used as a [check one] _____ supermarket; _____ warehouse; _____ manufacturing facility, the following applies with respect to parking spaces:

|  | Existing Parking Spaces | Required (by applicable building and zoning codes) |
|---|---|---|
| Regular (10') | | |
| Handicapped | | |
| Motorcycle | | |
| Other | | |

21      The survey should note and the separate map (if any is prepared) should note any encroachments of existing (or proposed) improvements onto the subject property, onto adjacent property or over established building setback lines or easement areas.

22.     In addition to the above, the surveyor should furnish a copy of the declarations page of the surveyor's professional liability insurance policy.

## SURVEYOR'S CERTIFICATE

Certified to: _____

Re:  File #_____   Drawing #_____   Title:_____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that:

1.  This survey was prepared from an actual on-the-ground survey of the real property shown hereon (the 'Property") and was conducted by the Surveyor or under the Surveyor's supervision;

2.  Monuments have been duly located or placed and actually exist at all major corners of the boundaries of the Property and such monuments are located, are of the size, and consist of the materials, as shown on this Survey;

3.  The survey and the legal description of the Property, including the point of beginning and all calls, is true, correct, and accurate, is identical to the legal description contained in _____ Title Insurance Company's commitment for title insurance No. _____ dated _____ (the "Commitment") and there are no visible discrepancies, conflicts, shortages in area, boundary line conflicts, visible encroachments onto or protruding from the Property, or visible easements or rights-of-way (other than those which exist pursuant to recorded instruments) except as noted hereon;

4.  All recorded easements or other instruments or exceptions noted in the Commitment ("Exceptions") and capable of being located have been correctly located hereon and are indicated by official recording information [book and page], and those Exceptions which cannot be located or do not affect the Property are noted hereon either as "blanket" Exceptions that affect the entire Property or as not affecting the Property;

5.  The following, if they exist on the Property, have been located on this Survey:

(a)  buildings (labeled as to type dimensions and gross square footage. and distance from each boundary line);

(b)  significant other improvements other than buildings, such as signs, parking areas or other structures such as fences or walls (labeled as to dimensions and nature of use);

(c)  water/gas/sewer mains and telephone/electric/utility lines (as determined by on site surface observation only);

(d)  water retention or detention ponds;

(e)  high water marks, if the Property is located on or contains a body of water;

(f)  interior lot lines; and

(g)  any natural or constructed objects affecting the Property;

6.  Lines indicating all setback restrictions of record or disclosed by applicable building or zoning codes are drawn hereon and any height or bulk restrictions of record or disclosed by applicable building or zoning codes, if any, are noted hereon and the source for either type of restriction is indicated on this Survey If no such restrictions affect or apply to the Property. a note has been placed hereon to so indicate;

7.  If a street address has been assigned for the Property, it is noted on this Survey;

8.  A vicinity map is contained on this Survey and such vicinity map shows the Property in reference to nearby public rights-of-way and major street intersections. This Survey shows the names and widths of all rights-of-way bounding the Property and indicates (a) whether such rights-of-way are public or private; (b) by use of arrows drawn to the Property boundary line that there are no gaps between the Property boundaries and the borders of such rights-of-way; (c) existing curb cut access points to any such rights-of-way which are public; and (d) that the Property has access to and from a public roadway as shown on the Survey. This Survey shows the distance to and location of the nearest intersecting public street or road [if access is by easement or private right of way];

9.  Based upon a review of Federal Flood Insurance Rate Maps (or the state or local equivalent if no federal map exists). the Surveyor has determined by scaled map location and graphic plotting only that the Property is not located in a 100 year Flood Plain or in an identified "flood prone area" as defined by the U S. Department of Housing

and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated
_____, which such map panel covers the area in which the Property is situated;

   10.    The  Property  contains  approximately  _____  acres  and  currently  is  zoned
_____;

   11.    The name of the owners of the properties adjoining the Property are indicated on this Survey;

   12.    This Survey meets or exceeds the minimum technical standards established pursuant to the laws of
the state in which the Property is located and meets the requirements set forth in the Winn-Dixie Survey Protocol (Form
SP-1)

   13.    This is to certify that this map or plat and the survey on which it is based were made (i) in accordance
with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by
ALTA and ACSM in 1992, and includes items 1, 2, 3, 4, 6, 7,  8,  and 10 of Table A thereof, and (ii) pursuant to the
Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of a(n) [insert
"Urban," "Suburban," "Rural," or "Mountain/Marshland" here] Survey

Signature:_____ Registered Land Surveyor
No _____

Address:_____

Phone:_____
Fax:_____

EXHIBIT "C"

Second Supplemental Lease Agreement

**THIS SECOND SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made as of _____ (the "Effective Date"), between **WINN-DIXIE STORES, INC.** a Florida corporation (the "Tenant") and **GREAT OAK, LLC**, a Delaware limited liability company (the "Landlord")

**R E C I T A L S:**

1.    Landlord and Tenant are parties to that certain lease dated July 24, 1987, as amended and/or evidenced by: (a) Short Form Lease dated July 24, 1987, recorded in Volume 3056, page 319 of the public records of Volusia County, Florida; (b) Letter Agreements dated September 23, 1987 and June 20, 1988; (c) Addendum to Lease and Second Addendum to Lease, each dated December 28, 1988; (d) Supplemental Lease Agreement dated April 11, 1989; (e) First Amendment to Lease dated _____; (the "First Amendment" and collectively the "Lease").

2.    The First Amendment provided for the property leased to Tenant to be expanded (the "Expanded Premises") for certain construction activities to be performed by Tenant ("Tenant's Improvements") and, upon completion of Tenant's Improvements and Tenant's commencement of business. for the Lease to be amended to fix the date for commencing the new Basic Rent, Additional Rent, Percentage Rent and Real Estate Taxes payable as provided in the First Amendment.

3.    Tenant's Improvements were completed and Tenant began doing business in the Expanded Premises on _____ and received Landlord's Contribution, as defined in the First Amendment, on the Effective Date

**NOW THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.    The foregoing recitals are true and correct in every respect and incorporated herein by reference.

2    The term of the Lease, subject to Tenant's rights of extension as provided in the First Amendment, shall expire on _____ (the "Term").

3.    Beginning on the Effective Date and continuing throughout the Term, Tenant shall pay to Landlord the Basic Rent, Additional Rent, Percentage Rent, and Real Estate Taxes payable as provided in the First Amendment

4    Except as expressly modified herein  the Lease remains in full force and effect as written.

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement on the date first set forth above

| | |
|---|---|
| **Signed, sealed and delivered in the presence of:** | **Landlord:** |
| | **Great Oak, LLC, a Delaware limited liability company** |
| | By:  GE Capital Realty Group, Inc.  a Texas corporation  as Servicer |
| Printed Name:_____ | |
| | By:_____ |
| Printed Name:_____ | Printed Name:_____ |
| | Its:  _____  President |
| As to Landlord | |

JK2 108728.11 80130 00846
5/6/98 8:45 am

**Tenant:**

**Winn-Dixie Stores, Inc.**, a Florida corporation

Printed Name:_____

By:_____
Printed Name:_____
Its: _____   President

Printed Name:_____

As to Tenant

STATE OF _____ )

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 199__, by _____ the _____ President of GE Capital Realty Group, Inc., a Texas corporation, on behalf of the corporation, as Servicer on behalf of GREAT OAK, LLC, a Delaware limited liability company  He/she [Please check]_____ is personally known to me or____ has produced _____ as identification

Printed Name: _____
Notary Public, State and County aforesaid
My Commission Expires:_____
Notary ID No : _____

(NOTARIAL SEAL)

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____ _____, 199__, by _____ President of WINN-DIXIE STORES  INC  a Florida corporation, on behalf of the corporation  who is personally known to me.

Printed Name: _____
Notary Public, State and County
aforesaid.
My Commission Expires:_____
Notary ID No :_____

(NOTARIAL SEAL)

JK2 109728.11 80130 00846
5/6/98 8:15 am

EXHIBIT "D"

Estoppel Certificate

WINN-DIXIE STORE #_____
Volusia County, Florida
Promenade Shopping Center

The undersigned officer of WINN-DIXIE STORES, INC., a Florida corporation ("WINN-DIXIE") hereby certifies, on behalf of WINN-DIXIE, that as of _____, 19__, (the "Certificate Date"), the following is true and correct:

1.    That WINN-DIXIE is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with GREAT OAK, LLC, a Delaware limited liability company, as the current landlord ("Landlord") dated July 24, 1987, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Promenade Shopping Center (the "Shopping Center"), and the Lease has been amended or is evidenced only by [TO BE EDITED TO REFLECT ACTUAL DOCUMENTS WHEN PREPARED]:

    (a)    Short Form Lease dated July 24, 1987, recorded in Official Records Volume 3056
           page 319 of the public records of Volusia County, Florida;
    (b)    Letter Agreements dated September 23, 1987 and June 20, 1988;
    (c)    Addendum to Lease and Second Addendum to Lease each dated December 28, 1988;
    (d)    Supplemental Lease Agreement dated April 11, 1989;
    (e)    First Amendment to Lease dated _____;
    (f)    Second Supplemental Lease Agreement dated _____.

2.    That the term of the Lease commenced March 30, 1989, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for 5 terms of 5 years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease.

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

6.    Tenant has received no notice of any sale, transfer, assignment or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____

7.    Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.    Notwithstanding anything to the contrary herein:

    (a)    No acceptance or possession of the Premises, opening for or operation of business
           by Tenant therein, execution of this certificate, or payment of rent under the Lease
           constitutes or will constitute acceptance by Tenant of work or materials that are
           defective or not completed in accordance with Tenant's plans and specifications, or
           a waiver of Tenant's rights against Landlord in connection therewith except in
           connection with the Additional Space and the Roof Contribution as such terms are
           defined and discussed in the First Amendment to Lease dated _____.

    (b)    Tenant makes no representation or warranty that the Premises or the Shopping
           Center or any portion thereof is in compliance with the Americans With Disabilities Act

or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.  The address for notices to Tenant is Real Estate Manager, Winn-Dixie Orlando Division, 3015 Coastline Drive, Orlando, Florida 32808, with a copy to: General Counsel Winn-Dixie Stores Inc., 5050 Edgewood Ct , P.O. Box B  Jacksonville  FL 32203-0297

10.  This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE STORES, INC.**

By:_____
Printed Name:_____
Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge.  Further, Landlord certifies that, to the best of Landlord's knowledge, Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

**GREAT OAK, LLC**

By: GE Capital Realty Group, Inc., a Texas corporation as Servicer

By:_____
Printed Name:_____
Its:_____ President

JK2 108728.11 80130 00846
5/6/98 8:45 am



Shaded Area = Construction Easement Area

EXHIBIT "E"

BEVILLE ROAD

| | SITE PLAN | WINN DIXIE @ |
| | (LIMIT of WINN DIXIE WORK) | 1415 NOVA RD & BEVILLE |
| | | DAYTONA BEACH, FLORIDA |



SUPPLEMENTAL LEASE AGREEMENT

THIS AGREEMENT, made this ___11th___ day of ___APRIL___, 1989, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, (hereinafter called 'Landlord') and WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter called 'Tenant"); which terms 'Landlord' and 'Tenant" shall include the heirs, legal representative, successors and assigns of the respective parties;

WITNESSETH:

WHEREAS, by Lease dated July 24, 1987, Landlord did lease and demise unto Tenant those certain premises, therein more particularly described, located in a shopping center development known as The Shoppes of Towne South, located at the northeast corner of Nova and Beville Roads, in the City of Daytona Beach, County of Volusia and State of Florida, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and for such rentals and upon such terms and conditions as more particularly set forth therein, a short form of said Lease being recorded in Official Record Book 3056, pages 0319 through 0325 of the Public Records of Volusia County, Florida; and

WHEREAS, the Lease has been amended to date by letter agreements dated September 23, 1987 and June 20, 1988, and by Addendum to Lease and Second Addendum to Lease each respectively dated December 22, 1988; and

WHEREAS, the said construction has been completed and the Tenant has now opened for business in the demised premises and the parties hereto desire to fix the commencement date of said Lease, as hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) and other good and valuable considerations, in hand paid by the Tenant to the Landlord,

PROVED
TO FORM

Plan Mgr.

al Dept.
Ine Dept.
Inc.

This instrument was prepared by
Ronald D. Peterson Attorney-at-Law
whose address is 5050 Edgewood
Court Jacksonville Florida 32205

the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed as follows:

    1.  The commencement date of the above described Lease dated July 24, 1987 is fixed at March 30, 1989, and the expiration of the initial term of twenty (20) years demised therein shall be March 29, 2009 at twelve o'clock midnight.

    2.  It is mutually understood and agreed that the Lease dated July 24, 1987, as amended, shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the Lease, as previously amended, not modified or amended by this Supplemental Lease Agreement, are hereby ratified and confirmed.

    IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written

Signed, sealed and delivered
in the presence of:

                                    SHOPPES OF TOWNE SOUTH, INC.

As to Landlord

                                    By
                                    Its                  President
                                    Attest:
                                    Its                  Secretary

                                    (CORPORATE SEAL)

                                      LANDLORD

                                  WINN-DIXIE STORES, INC.

                                    By
                                    Its                  President

As to Tenant

                                    Attest:
                                    Its                  Secretary

                                      (CORPORATE SEAL)

                                        TENANT

STATE OF   *Florida*   )
                       )
COUNTY OF  *Broward*   )

The foregoing instrument was acknowledged before me this
___*11*___ day of ___*April*___, 1989, by *Ralph Chernin*___
and *Alan Chernin*_____, *The*___ President and *The*___
Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC., a
Florida corporation, on behalf of the corporation.

(NOTARIAL SEAL)

                                   _____
                                   NOTARY PUBLIC, State and County
                                   aforesaid

                                   My Commission Expires:
                                   *4-30-90*


STATE OF   FLORIDA    )
                      )
COUNTY OF  _____    )

The foregoing instrument was acknowledged before me this
_____ day of _____, 1989, by _____
and _____, _____ President and _____
Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation.

(NOTARIAL SEAL)

                                   _____
                                   NOTARY PUBLIC, State and County
                                   aforesaid

                                   My Commission Expires:

SUPPLEMENTAL LEASE AGREEMENT

THIS AGREEMENT, made this _11th_ day of _APRIL_, 1989, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, (hereinafter called "Landlord") and WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter called "Tenant"); which terms "Landlord" and "Tenant" shall include the heirs, legal representative, successors and assigns of the respective parties;

WITNESSETH:

WHEREAS, by Lease dated July 24, 1987, Landlord did lease and demise unto Tenant those certain premises, therein more particularly described, located in a shopping center development known as The Shoppes of Towne South, located at the northeast corner of Nova and Beville Roads, in the City of Daytona Beach, County of Volusia and State of Florida, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and for such rentals and upon such terms and conditions as more particularly set forth therein, a short form of said Lease being recorded in Official Record Book 3056, pages 0319 through 0325 of the Public Records of Volusia County, Florida; and

WHEREAS, the Lease has been amended to date by letter agreements dated September 23, 1987 and June 20, 1988, and by Addendum to Lease and Second Addendum to Lease each respectively dated December 22, 1988; and

WHEREAS, the said construction has been completed, and the Tenant has now opened for business in the demised premises and the parties hereto desire to fix the commencement date of said Lease, as hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) and other good and valuable considerations, in hand paid by the Tenant to the Landlord,



This instrument was prepared by
Ronald E. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed as follows:

    1. The commencement date of the above described Lease dated July 24, 1987 is fixed at March 30, 1989, and the expiration of the initial term of twenty (20) years demised therein shall be March 29, 2009 at twelve o clock midnight.

    2 It is mutually understood and agreed that the Lease dated July 24, 1987, as amended, shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the Lease, as previously amended, not modified or amended by this Supplemental Lease Agreement, are hereby ratified and confirmed.

    IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____
Its _____ President

Attest: _____
Its _____ Secretary

As to Landlord

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

By _____
Its _____ President

Attest: _____
Its _____ Secretary

As to Tenant

(CORPORATE SEAL)

TENANT

STATE OF *Florida* )
)
COUNTY OF *Broward* )

    The foregoing instrument was acknowledged before me this

*11* day of *April*, 1989, by *Karen Chopin*

and *Alan Chopin*, *The* President and *The*

Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC., a

Florida corporation, on behalf of the corporation.

(NOTARIAL SEAL)

                                        
NOTARY PUBLIC, State and County
aforesaid

My Commission Expires:
*4-30-90*

STATE OF   FLORIDA )
)
COUNTY OF  *Duval* )

    The foregoing instrument was acknowledged before me this

*27th* day of *April*, 1989, by  James Kufeldt

and   U. S. Bryan, Jr.       ,       President and

Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida

corporation, on behalf of the corporation.

(NOTARIAL SEAL)

        Susan G. Clarkson
NOTARY PUBLIC, State and County
aforesaid

Notary Public, State of Florida
My Commission Expires My Commission Expires Apr 11, 1997

## NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made this 5th day of _October_, 1987, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation ("Landlord"), WINN-DIXIE STORES, INC., a Florida corporation ("Tenant"), and MIDATLANTIC NATIONAL BANK ("Mortgagee") which terms "Landlord", "Tenant" and "Mortgagee" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties.

### RECITALS

A.   Shoppes of Towne South, Inc., is named as Landlord in the Lease described below, which Lease demises certain described store premises located in a shopping center development situated at the northeasterly corner of the intersection of Nova Road and Beville Road in Daytona Beach, Volusia County, Florida.

B.   The Tenant has entered into a Lease with the Landlord for certain store premises, which Lease is dated July 24, 1987, for an initial term of twenty (20) years, commencing upon Tenant's opening for business in the demised store premises as specified in the Lease and a short form of the Lease will be recorded in the public records of Volusia County, Florida, (which Lease is hereinafter referred to as the "Lease").

C.   Mortgagee has accepted a mortgage (which together with any modifications, consolidations, extensions, increases or renewals is referred to in this Agreement as the "Mortgage") made by Landlord to Mortgagee, dated _July 10_, 1987, and recorded in Official Records Book 3007, page 1001, of the public records of Volusia County, Florida, securing a loan made by Mortgagee covering the entire premises under the Lease, but Tenant is requiring that this Agreement be executed and delivered.

D.   The Lease and Short Form Lease have not been amended to date.



This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

IN CONSIDERATION of the above and the mutual promises below, the parties, intending to be legally bound, covenant and agree as follows:

1.    The Lease is in full force and effect in accordance with its terms. Mortgagee has approved the terms of the Lease and has agreed that Landlord may enter into the Lease with Tenant.

2.    Neither the Landlord nor the Tenant will, without the prior written consent of the holder of the Mortgage: (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce the rent, accelerate rent payments, shorten the original term or change any renewal option; (ii) terminate the Lease except as provided by its terms; (iii) tender or accept a surrender of the Lease or a prepayment in excess of one month of any rental due under the Lease; or (iv) subordinate or permit subordination of the Lease to any lien subordinate to the Mortgage. Any such purported action without such consent shall be void as against the holder of the Mortgage.

3.    Any notice required to be given to the Landlord by the Tenant shall be given also to the holder of the Mortgage, provided such holder (other than the Mortgagee) shall have notified the Tenant in writing of its name and address, and any right of the Tenant dependent upon notice shall take effect only after notice so given. Performance or commencement to cure such default within thirty (30) days of said notice by the holder of the Mortgage in accordance with the conditions of the Lease shall satisfy such conditions of the Lease requiring performance by the Landlord.

4.    Always provided Tenant shall not be in default under the Lease, Tenant's right to possession of the leased premises and Tenant's rights arising out of the Lease shall not be affected or disturbed by the Mortgagee, or any other holder of the Mortgage, in the exercise of any of their rights under the Mortgage, or the note secured thereby; nor shall Tenant be named

as a party defendant in any foreclosure of the lien of the Mortgage nor in any other way be deprived of its rights under the Lease. Also, in the event that the Mortgagee or any other person acquires title to the leased premises pursuant to the exercise of any remedy provided for in the Mortgage, the Lease shall not be terminated or affected by the foreclosure or sale or any such proceeding and the Mortgagee hereby covenants that any sale of the leased premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of the Tenant thereunder, and Mortgagee or such other person acquiring title to the leased premises shall be bound by the Lease to perform the covenants and obligations of Landlord required therein. The Tenant will attorn to the Mortgagee or any other holder of the Mortgage who has acquired the premises through foreclosure or otherwise. This provision shall be self-operative but the Tenant will execute and deliver any additional instruments required to evidence such attornment.

5. At such time as the Tenant accepts and occupies the premises demised under the Lease, the Tenant agrees to furnish the Landlord and/or the holder of the Mortgage with an estoppel certificate stating that the Tenant has accepted said premises,



is in possession of same, is paying rent and knows of no offsets or defenses against the Landlord, except as set forth in said estoppel certificate.

This Agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their heirs, legal representatives, successors and assigns.

IN WITNESS WHEREOF, this Non-Disturbance and Attornment Agreement has been duly executed by the parties hereto.

Signed, sealed and delivered in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____ Its _____ President
Attest _____ Its _____ Secretary

(CORPORATE SEAL)

LANDLORD

As to the "Landlord"

WINN-DIXIE STORES, INC.

By _____ Its _____ President
Attest _____ Its _____ Asst. Secretary

(CORPORATE SEAL)

TENANT

As to the "Tenant"

MIDATLANTIC NATIONAL BANK

By _____ Its ASSISTANT VICE President
Attest _____ Its Assistant Cashier Secretary

(CORPORATE SEAL)

MORTGAGEE

As to the "Mortgagee"

-4-

STATE OF FLORIDA

COUNTY OF BROWARD

    The foregoing  instrument was acknowledged before me this _3_ day of _SEPTEMBER_, 1987 by _CALE H CHECNIN_ and _ALAN CHECNIN_, the _____ President and _____ Secretary of SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, known to me to be the persons who subscribed to the foregoing instrument and acknowledged to me that they executed the same on behalf of SHOPPES OF TOWNE SOUTH, INC.

                      _Judee Demile_

(Notarial Seal)               Notary Public
                            My Commission Expires:

                                NOTARY PUBLIC, STATE OF FLORIDA
                                MY COMMISSION EXPIRES MAR. 21, 1991,
                                BONDED THRU NOTARY PUBLIC UNDERWRITERS


STATE OF FLORIDA

COUNTY OF DUVAL

    The foregoing  instrument was acknowledged before me this _14th_ day of _October_, 1987 by _R. Saw Lewis_ and _J. J. Gooden_, the _.._ President and _Asst._ Secretary of WINN-DIXIE STORES, INC., a Florida corporation, known to me to be the persons who subscribed to the foregoing instrument and acknowledged to me that they executed the same on behalf of WINN-DIXIE STORES, INC.



                      _Diana K. Wilson_
                      Notary Public
                      My Commission Expires:

STATE OF *New Jersey*
COUNTY OF *Middlesex*

The foregoing instrument was acknowledged before me this
5th day of *October*, 1987 by ASSISTANT VICE PRESIDENT
~~CAIHERINE BROTHERTON~~ ANTHONY MININNI

and ~~Assistant Cashier~~, the *1st Vice* President and *1st Cashier*

of MIDATLANTIC NATIONAL BANK, known to me to be the

persons who subscribed to the foregoing instrument and

acknowledged to me that they executed the same on behalf of

MIDATLANTIC NATIONAL BANK.

(Notarial Seal)

Notary Public
My Commission Expires:

SHARON WOJTASZEK
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires June 19 1992

SECOND ADDENDUM TO LEASE

THIS SECOND ADDENDUM TO LEASE is made and entered into this 28 day of Dec , 198 8, by and between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, as Landlord, and WINN-DIXIE STORES, INC., a Florida corporation, as Tenant.

W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into that certain Shopping Center Lease dated July 24, 1987 relative to the rental of space in that certain Shopping Center known as "The Shoppes of Towne South" in the City of Daytona Beach, County of Volusia, State of Florida; a Short Form thereof having been recorded November 4, 1987 in O.R. Book 3056, at Page 319 of the Public Records of Volusia County, Florida (hereinafter referred to as "Lease"); and

WHEREAS, Landlord and Tenant entered into that certain Addendum to Lease dated ___December 22___, 198 8 ; and

WHEREAS, Landlord and Tenant desire to modify the terms and provisions of the Lease.

NOW THEREFORE, in consideration of the sum of Ten ($10.00) Dollars and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. That the above recitals are true and correct.

2. That paragraph 4 of the Lease is hereby deleted, and substituted in its place as paragraph 4 is the following:

"4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than September 1, 1987 and shall be completed not later than February 28, 1989; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than March 31, 1989, said option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees to give the Tenant the first right of refusal, on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the Lease terms and provisions and rentals shall be the same as this Lease."

3. Except as otherwise modified herein, the terms and provisions of the Lease and the Addendum to Lease remain in full force and effect.

APPROVED
AS TO FORM
Division Mgr.
Winn Dixie Stores Inc.

4.    In the event of a conflict between the terms and provisions of the Lease, the Addendum to Lease and this Second Addendum, the terms and provisions of this Second Addendum shall be controlling.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year above written.

WITNESSES:

SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, Landlord

By_____

(CORPORATE SEAL)

WINN-DIXIE STORES, INC., a Florida corporation, Tenant

By_____

(CORPORATE SEAL)

ADDENDUM TO LEASE

THIS ADDENDUM TO LEASE is made and entered into this 28 day of June , 198 8 , by and between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, as Landlord, and WINN-DIXIE STORES, INC., a Florida corporation, as Tenant.

W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into that certain Shopping Center Lease dated July 24, 1987 relative to the rental of space in that certain Shopping Center known as "The Shoppes of Towne South" in the City of Daytona Beach, County of Volusia, State of Florida; a Short Form thereof having been recorded November 4, 1987 in O.R. Book 3056, at Page 319 of the Public Records of Volusia County, Florida (hereinafter referred to as "Lease"); and

WHEREAS, Landlord and Tenant desire to modify the terms and provisions of the Lease.

NOW THEREFORE, in consideration of the sum of Ten ($10.00) Dollars and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  That the above recitals are true and correct.

2.  That the following language is added as paragraph 39 to the Lease:
    "39.  Notwithstanding any item in this Lease to the contrary, the interest of the Landlord shall not, under any circumstances, be subject to liens for improvements made by or on behalf of Tenant (except for Landlord's construction of the premises as required under this Lease and the approved plans and specifications).

3.  Except as otherwise modified herein, the terms and provisions of the Lease remain in full force and effect.

4.  In the event of a conflict between the terms and provisions of the Lease and this Addendum, the terms and provisions of this Addendum shall be controlling.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year above written.

WITNESSES:

SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, Landlord

By _____ pres

(CORPORATE SEAL)

WINN-DIXIE STORES, INC., a Florida corporation, Tenant

By _____

(CORPORATE SEAL)

APPROVED
AS TO FORM

Division Mgr.

Legal Dept.
Winn-Dixie Stores,
Inc.

## NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made this 5 b day of _October_, 1987, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation ("Landlord"), WINN-DIXIE STORES, INC., a Florida corporation ("Tenant"), and MIDATLANTIC NATIONAL BANK ("Mortgagee") which terms "Landlord", "Tenant" and "Mortgagee" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties.

### RECITALS

A.    Shoppes of Towne South, 'Inc., is named as Landlord in the Lease described below, which Lease demises certain described store premises located in a shopping center development situated at the northeasterly corner of the intersection of Nova Road and Beville Road in Daytona Beach, Volusia County, Florida.

B.    The Tenant has entered into a Lease with the Landlord for certain store premises, which Lease is dated July 24, 1987, for an initial term of twenty (20) years, commencing upon Tenant's opening for business in the demised store premises as specified in the Lease and a short form of the Lease will be recorded in the public records of Volusia County, Florida, (which Lease is hereinafter referred to as the "Lease").

C.    Mortgagee has accepted a mortgage (which together with any modifications, consolidations, extensions, increases or renewals is referred to in this Agreement as the "Mortgage") made by Landlord to Mortgagee, dated _July 10_____, 1987, and recorded in Official Records Book 3007, page 1001, of the public records of Volusia County, Florida, securing a loan made by Mortgagee covering the entire premises under the Lease, but Tenant is requiring that this Agreement be executed and delivered.

D.    The Lease and Short Form Lease have not been amended to date.

APPROVED
AS TO FORM
DIV. MANGR.
LEGAL DEPT.
WINN-DIXIE STORES,
INC.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court Jacksonville Florida 32205

IN CONSIDERATION of the above and the mutual promises below, the parties, intending to be legally bound, covenant and agree as follows:

1.    The Lease is in full force and effect in accordance with its terms.   Mortgagee has approved the terms of the Lease and has agreed that Landlord may enter into the Lease with Tenant.

2.    Neither the Landlord nor the Tenant will, without the prior written consent of the holder of the Mortgage:  (i)  modify the Lease or any extensions or renewals thereof in such a way as to reduce the rent, accelerate rent payments, shorten the original term or change any renewal option; (ii) terminate the Lease except as provided by its terms; (iii) tender or accept a surrender of the Lease or a prepayment in excess of one month of any rental due under the Lease; or (iv) subordinate or permit subordination of the Lease to any lien subordinate to the Mortgage.  Any such purported action without such consent shall be void as against the holder of the Mortgage.

3.    Any notice required to be given to the Landlord by the Tenant shall be given also to the holder of the Mortgage, provided such holder (other than the Mortgagee) shall have notified the Tenant in writing of its name and address, and any right of the Tenant dependent upon notice shall take effect only after notice so given.  Performance or commencement to cure such default within thirty (30) days of said notice by the holder of the Mortgage in accordance with the conditions of the Lease shall satisfy such conditions of the Lease requiring performance by the Landlord.

4.    Always provided Tenant shall not be in default under the Lease, Tenant's right to possession of the leased premises and Tenant's rights arising out of the Lease shall not be affected or disturbed by the Mortgagee, or any other holder of the Mortgage, in the exercise of any of their rights under the Mortgage, or the note secured thereby; nor shall Tenant be named

as a party defendant in any foreclosure of the lien of the Mortgage nor in any other way be deprived of its rights under the Lease. Also, in the event that the Mortgagee or any other person acquires title to the leased premises pursuant to the exercise of any remedy provided for in the Mortgage, the Lease shall not be terminated or affected by the foreclosure or sale or any such proceeding and the Mortgagee hereby covenants that any sale of the leased premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of the Tenant thereunder, and Mortgagee or such other person acquiring title to the leased premises shall be bound by the Lease to perform the covenants and obligations of Landlord required therein. The Tenant will attorn to the Mortgagee or any other holder of the Mortgage who has acquired the premises through foreclosure or otherwise. This provision shall be self-operative but the Tenant will execute and deliver any additional instruments required to evidence such attornment.

5. At such time as the Tenant accepts and occupies the premises demised under the Lease, the Tenant agrees to furnish the Landlord and/or the holder of the Mortgage with an estoppel certificate stating that the Tenant has accepted said premises,



is in possession of same, is paying rent and knows of no offsets or defenses against the Landlord, except as set forth in said estoppel certificate.

This Agreement shall be binding upon and shall inure to the benefit of the respective parties hereto, their heirs, legal representatives, successors and assigns.

IN WITNESS WHEREOF, this Non-Disturbance and Attornment Agreement has been duly executed by the parties hereto.

Signed, sealed and delivered  SHOPPES OF TOWNE SOUTH, INC.
in the presence of:

By _____
  Its                President

Attest _____
   Its               Secretary

As to the "Landlord"

(CORPORATE SEAL)

LANDLORD


WINN-DIXIE STORES, INC.

By _____
  Its                President

Attest _____
   Its    Ass.      Secretary

As to the "Tenant"

(CORPORATE SEAL)

TENANT


MIDATLANTIC NATIONAL BANK

By _____
  Its ANTHONY MINISI    President
    ASSISTANT VICE PRESIDENT

Attest _____
   Its CATHERINE BROWN  Secretary
      Assistant Credit

As to the "Mortgagee"

(CORPORATE SEAL)

MORTGAGEE

-4-

STATE OF FLORIDA

COUNTY OF BROWARD

    The foregoing instrument was acknowledged before me this
_3_ day of _SEPTEMBER_ , 1987 by _RALPH CHERNIN_
and _ALAN CHERNIN_ , the _____ President and _____
Secretary of SHOPPES OF TOWNE SOUTH, INC., a Florida corporation,
known to me to be the persons who subscribed to the foregoing
instrument and acknowledged to me that they executed the same on
behalf of SHOPPES OF TOWNE SOUTH, INC.

Juliet De Melio
Notary Public
My Commission Expires:

(Notarial Seal)

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21, 1991.
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF FLORIDA

COUNTY OF DUVAL

    The foregoing instrument was acknowledged before me this
_14th_ day of _October_ , 1987 by _____
and _____ , the _____ President and _____
Secretary of WINN-DIXIE STORES, INC., a Florida corporation,
known to me to be the persons who subscribed to the foregoing
instrument and acknowledged to me that they executed the same on
behalf of WINN-DIXIE STORES, INC.

Notary Public
My Commission Expires:

(N........A.K..........)
NOTARY
EXP.1/15/91
PUBLIC
STATE OF FLORIDA

-5-

STATE OF New Jersey

COUNTY OF Middlesex

    The foregoing instrument was acknowledged before me this 5th day of October , 1987 by ASSISTANT VICE PRESIDENT and CATHERINE RICHARDSON Assistant Cashier , the Asst Vice President and Asst Cashier of MIDATLANTIC NATIONAL BANK, known to me to be the persons who subscribed to the foregoing instrument and acknowledged to me that they executed the same on behalf of MIDATLANTIC NATIONAL BANK.

    (Notarial Seal)

Notary Public

My Commission Expires:

SHARON WOJTASZEK
NOTARY PUBLIC OF NEW JERSEY.
My Commission Expires June 17, 1992

-6-

## SHORT FORM LEASE

THIS SHORT FORM LEASE, made this 24th day of July,
1987, between SHOPPES OF TOWNE SOUTH, INC. a Florida corporation
(hereinafter called "Landlord") and WINN-DIXIE STORES, INC., a
Florida corporation (hereinafter called "Tenant"); which terms
"Landlord" and "Tenant" shall include, wherever the context
admits or requires, singular or plural, and the heirs legal
representatives, successors and assigns of the respective
parties:

### WITNESSETH:

That the Landlord, in consideration of the covenants of the
Tenant, leases and demises to the Tenant and the Tenant agrees to
take and lease from the Landlord, for the term specified later in
this agreement, the following described premises:

> That certain store building, approximately 220 feet in
> width by 200 feet in depth, together with concrete pads
> for coolers and freezers at the rear and vestibule at
> the front and the land on which the same shall stand
> (hereinafter collectively called "demised premises"),
> which store building and related improvements are to be
> constructed by Landlord according to plans and speci-
> fications to be approved by the parties hereto and
> shall be in the location of the dimensions as outlined
> in red on the plot plan attached as Exhibit "A" to a
> certain collateral lease agreement executed by the
> parties hereto and of even date herewith.

> The demised premises are located in a shopping center
> development known as The Shoppes of Towne South
> (hereinafter called "shopping center"), located at the
> northeast corner of Nova and Beville Roads, in Daytona,
> Volusia County, Florida, the legal description of the
> shopping center being attached hereto as Exhibit "B"
> and by this reference made a part hereof.

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant
opens said premises for the transaction of its business for an
initial term of twenty (20) years.

It is further agreed that Tenant, at its option, shall be
entitled to the privilege of five (5) successive extensions of
this Lease, each extension to be for a period of five (5) years.

Landlord covenants and agrees that the Tenant shall have the
exclusive right to operate a supermarket in the shopping center



APPROVED
S TO FORM
IVISION MGR.
LEGAL DEPT.
WN-DIXIE STORES,
INC.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, drug store or pharmacy, meat, fish or vegetable market or bakery/delicatessen, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant. Tenant and National Drug shall have the exclusive right in the shopping center, including any enlargement thereof, to sell prescription drugs which require the presence of a licensed pharmacist. Tenant shall have the exclusive right to operate a bakery/delicatessen in the shopping center and only Tenant and National Drug may sell beer and wine in the shopping center for off-premises consumption; provided however, that the provisions of this paragraph are expressly subject to and conditioned upon certain modifications thereof as particularly set forth in the collateral lease agreement of even date herewith below mentioned.



IT IS UNDERSTOOD AND AGREED that this is a Short Form Lease which is for the rents and upon the terms, covenants and condi- tions contained in the aforesaid collateral lease agreement executed by the parties hereto and bearing even date herewith, which collateral lease agreement is and shall be a part of this instrument as fully and completely as if the same were set forth herein.

Signed, sealed and delivered
in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____
Its                    President

Attest _____
Its                    Secretary

(CORPORATE SEAL)

LANDLORD

_____
_____
As to Ralph Chernin Company, Inc.

WINN-DIXIE STORES, INC.

By _____
Its                    President

Attest _____
Its    Ass't Secretary

(CORPORATE SEAL)

TENANT

_____
_____
As to Winn-Dixie Stores, Inc.

-3-

STATE OF FLORIDA )
COUNTY OF BROWARD )

The foregoing instrument was acknowledged before me this
24 day of JULY , 1987, by RALPH CHEKNIN and
ALAN CHEKNIN , the _____ President and _____
Secretary of SHOPPES OF TOWNE SOUTH, INC. a Florida corporation,
on behalf of the corporation.

_____
NOTARY PUBLIC, State and County
(NOTARIAL SEAL)                          aforesaid

My Commission Expires:

NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21, 1991.
BONDED THRU NOTARY PUBLIC UNDERWRITERS


STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this
14th day of Aug , 1987, by A. Diane (Koralik) and
J. P. Nimmitt , _____ President and Asst
Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation.

_____
NOTARY PUBLIC, State and County
(NOTARIAL SEAL)                          aforesaid

Commission Expires:

EXHIBIT "B"

'That certain piece, parcel or tract of land situate, lying and
being in the City of Daytona Beach, Volusia County, Florida,
more particularly described as follows:

SHOPPING CENTER

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the
Easterly R/W of State Road No. S-5A (Nova Road) and Northerly of State road NO. 400 (Beville Road),
Bethune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of
Volusia County, Florida and being more particularly described as follows: As a point of reference
commence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the
Public Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said
Fairway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25°
32' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence
S 25° 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence S 64°
29' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of
a curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance
of 200.46 feet, said arc being subtended by a chord bearing of S 65° 30' 23" W and a chord distance
of 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the
PC of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an
arc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a
chord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly
along said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet,
an arc distance of 63.95 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and
a chord distance of 63.95 feet to the PC of a curve to the right; thence Northerly along said Easterly
R/W and said curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84
feet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 188.80
feet to the PT of said curve; thence N 06° 41' 27" W along said Easterly R/W, a distance of 20.45
feet; thence N 11° 24' 06' W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42'
39" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence
Northerly along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance
of 429.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14" W and a chord distance
of 429.27 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning.
Containing 18.22 acres more or less.

All of the above described premises being shown on plat of survey
dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc.,
New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027,
incorporated herein by this reference.

LESS AND EXCEPT:

OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5,
Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road
No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road),
Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12,
Page 41) Public Records of Volusia County, Florida and being more
particularly described as follows: As a point of reference commence at
the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35,
Page 93 of the Public Records of Volusia County, Florida; Thence
South 25°32'25" East along the Westerly Line of said Fairway Unit No.
6, a distance of 950.00 feet; Thence South 64°27'35" West a distance
of 689.89 feet, to the Easterly Right-of-Way Line of State Road No.
S-5A, as now occupied and established; Thence South Easterly along a
curve concave to the right, said curve having a central angle of
02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79
feet, to the Point of Tangency of said curve; Thence South 06°44'14"
East continuing along the aforesaid Easterly Right-of-Way Line a
distance of 80.00 feet to the Point of Beginning; Thence North 64°27'35"
East a distance of 170.00 feet; Thence South 25°32'25" East a distance
of 140.00 feet; Thence South 64°27'35" West a distance of 220.51 feet,
to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39"
West, along the aforesaid Easterly Right-of-Way Line a distance of
148.83 feet, to the Point of Beginning , containing 0.63 Acres, more or
less.

Page 1 of 3

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence Southeasterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning; Thence North 64°27'35" East a distance of 140.00 feet; Thence South 25°32'25" East a distance of 150.00 feet; Thence South 64°27'35" West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:

From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South 25°32'25" East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet; Thence South 64°27'35" West a distance of 300.00 feet; Thence South 25°32'25" East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established; Thence South 64°29'43" West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature; Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of 00°37'46", a radius of 5679.65 feet, a chord bearing of South 64°48'36" West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning; Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central
angle of 01°23'34", a radius of 5679.65 feet, a
chord bearing of South 65°49'16" West, and a chord
distance of 138.07 feet, an arc distance of 138.07
feet, to a Point of Tangency; Thence South 66°31'03"
West, continuing along the Northerly Line of afore-
said State Road No. 400,  a distance of 135.55 feet,
to a Point of Curvature;  Thence continuing along
the Northerly line of aforesaid State Road No. 400,
along a curve concave to the left, said curve having
a central angle of 00°15'47", a radius of 5779.65
feet, a chord bearing os South 66°23'07" West, and
a chord distance of 26.53 feet, an arc distance of
26.54 feet, to the Easterly Line of aforesaid State
Road S5-A; Thence Northerly along the Easterly Line
of aforesaid Nova Road and along a curve concave to
the right, said curve having a central angle of
01°21'17", a radius of 2704.79 feet, a chord bearing
of North 07°26'04" West, and a chord distance of
63.95 feet, an arc distance of 63.95 feet to a Point
of Curvature;  Thence Northerly continuing along the
Easterly Line of aforesaid State Road S5-A, along a
curve concave to the right, said curve having a
central angle of 03°46'14", a eadius of 2704.93
feet, a chord bearing of North 07°48'19" West and a
chord distance of 177.98 feet, an arc distance of
178.01 feet;  Thence North 64°27'35" East, a distance
of 225.92 feet;  Thence South 25°32'25" East, a
distance of 239.34 feet, to the Point of Beginning.

All of the above described premises being shown on plat of survey
dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor
No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand,
Florida, and supplemented by Survey dated July 6, 1987, incorpor-
ated herein by this reference.

By _____
Its _____  Vice President

The foregoing Agreement is accepted and approved as of
OCT. 5 1987              , 1987.

SHOPPES OF TOWNE SOUTH, INC.

By _____ pres
          Authorized Representative

OPERATORS OF SUPERMARKETS ACROSS THE SUNBELT
LANDLORD

# LEASE

THIS LEASE, made this __n
4th__ day of _____July_____ , 19 _87_

between _____SHOPPES OF TOWNE SOUTH, INC, a Florida corporation_____

_____

_____ (hereinafter called "Landlord")

and_____WINN-DIXIE STORES, INC., a Florida corporation_____

_____

_____(hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singu-

lar or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for

the term hereinafter specified, the following described premises:

That certain store building, approximately _220_ feet in width by _200_

feet in depth, plus vestibule at front approx. 88' by 12' together

with concrete pads for coolers and freezers at rear

and the land on which the same shall stand (hereinafter collectively called "demised pre-

mises"), which store building and related improvements are to be constructed by Land-

lord according to plans and specifications to be approved by the parties as herein pro-

vided, and shall be in the location and of the dimensions as outlined in red on the

Plot Plan _entitled "The Shoppes of Towne South" prepared by_

Pate-Martin Architects, AIA, PA, Ft. Lauderdale, Florida,

dated March 13, 1987 (and stamped (in red) printed "Jul 9,
1987" for identification purposes.
attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in de-

tail on Exhibit "A"), known as ___The Shoppes of Towne South_____

(hereinafter called "shopping center"), located_at the northeast corner of_

Nova and Beville Roads

in the City of____Daytona Beach_____, County of _____Volusia_____,

State of_____Florida_____ , the legal description of the shopping center being

set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM

DIVISION MGR.

LEGAL DEPT.
WINN-DIXIE STORES,
INC.

WD 33-36 Rev. 4/79

This instrument was prepared by
Ronald D. Peterson. Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

M

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business as hereinafter provided for an initial term of _____ _____twenty (20)_____years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

ITAL

1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of ═══════════════

Two Hundred Seventy Thousand Six Hundred and 00/100───────────── Dollars ($270,600.00      ) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of ═══════════════════════════════════════════

Twenty-Two Thousand Five Hundred Fifty and 00/100──────────Dollars ($22,550.00    ) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof. Tenant shall be responsible for, and pay, Florida State Sales Tax imposed upon rentals due and paid to Landlord under terms of this Lease.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to the amount, if any, by which ─────────one─────── per cent ( ──1─────%) of Tenant's gross sales made from the demised premises in each fiscal year ending approximately June 30th during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**INITION "GROSS ES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**:ORD SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any general mercantile or retail (including discount operations) or service business. If permitted by local, state and federal laws Tenant or its licensee shall be permitted to sell beer and wine for off-premises consumption from the demised premises. Tenant shall be permitted at all times to install in its demised store premises an automatic bank teller machine (ATM) or equivalent electronic fund transfer unit or a manned banking facility. Tenant shall be permitted to sell prescription drugs and operate a pharmacy or drug department or concession in the demised store premises. The term "discount operations" shall, for the purpose of this paragraph, mean sales to the public generally at less than retail prices including reduced service and quantity packaging minimum purchases and including so-called "wholesale" pricing.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises.

STRUCTION 3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as
HOPPING shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps,
ER sidewalks, streets, entranceways, malls, parking areas, service areas, driveways and related im-
provements, said improvements (excluding buildings) being sometimes hereinafter referred to as
"common areas". The Landlord, at its sole cost and expense, shall grade and surface with top
quality materials all paved portions of the common areas (including parking area), and shall pro-
vide proper and adequate water drainage and lighting system and operations therefor and shall
operate and maintain the same in good repair and usable condition for use by the patrons of the
shopping center and the tenants and their employees during the term of this lease and any exten-
sions thereof. The arrangement and location of all store buildings and common areas (including
parking area) within the shopping center shall at all times during the term of this lease, or any
extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the
written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly reserves the right to
approve the finish grade elevations of all store buildings and common areas (including parking and
service areas) within the shopping center which are to be constructed concurrently with Tenant's
store building.

Notwithstanding the foregoing, it is understood that Landlord
intends initially to construct only Tenant's building and the
store buildings required under Articles 5 and 6 herein, together
with all the common areas of the shopping center, including
without limitation, all the sidewalks, drives, entranceways,
service areas and parking areas to the limits of the initial
paving within Phase I as shown on Exhibit "A", including all
customer and service drives connecting to Nova Road and Beville
Road. Landlord reserves the right, but shall not be required, to
construct additional buildings within the building areas reserved
therefor indicated on Exhibit "A", with the depth and interior
dimensioning of same to be at Landlord's discretion, provided,
however, such additional buildings shall be of like structural
and architectural quality as the building for Tenant, and all
such buildings shall be set back from the streets adjoining the
shopping center or the property lines thereof distant at least
within the sidewalk lines or building outlines as shown on
Exhibit "A". In the event Landlord shall expand the shopping
center into the Phase II property owned by it adjoining on the
south and west the initial development as shown on Exhibit "A"
hereto, Landlord reserves the right, but shall not be required,
to construct additional buildings and common areas upon such
property, with the location and placement of future buildings and
common areas thereon to be in Landlord's discretion, but upon the
condition that any such future buildings shall not exceed the
enlarged shopping center or the property lines thereof dis-
indicated sizes and shall be set back from the streets adjoining
tant at least within the sidewalk lines. Building outlines or
building setback lines as shown on Exhibit "A". Such future
buildings in such an expansion of the shopping center may be
joined to the buildings in Phase I of the shopping center on the
condition that at all times there shall be maintained a paved
through service drive a minimum of 30 feet in width permitting a
circular traffic pattern around all buildings from time to time
constructed in the shopping center, or any enlargement thereof,
Throughout the shopping center, or any additional buildings, in
connection with the construction of any additional buildings, at
least the ratio of automobile parking area to gross building area
as hereinafter required shall be maintained at all times; and
Landlord shall grade and pave such additional parking area as is
necessary for such purpose and shall also provide such additional
buildings with adequate service areas and drives. Landlord
agrees that Tenant shall have uninterrupted use and enjoyment of
the demised premises and the common areas during any such
additional construction without unreasonable interference there-
with by reason of such construction work.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to
construct the store building for occupancy by Tenant in accordance with the plans and specifica-
tions to be approved by both Landlord and Tenant. Plans and specifications shall be approved
when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans
and specifications shall provide for a completed store building, commonly referred to as a "lock
and key job", and shall include, but without limitation the following:

environmental control panel, heat reclaim coil, automatic sliding doors, interior partitions, all plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, connection of Tenant's trade fixtures to plumbing and electrical outlets, air conditioning and heating systems and equipment (including insulated ducts, registers and grilles), music and P.A. systems (except microphones and amplifiers to be furnished by Tenant), manager's office, delicatessen department, vinyl composite, quarry and ceramic tile floor coverings as specified (color at Tenant's option), automatic sprinkler system (including A.D.T. or other approved alarm system therefor if required by applicable building codes) concrete pad and connections for Tenant's baler/compactor; concrete truck unloading pads at rear of building and connection to all utilities. Tenant shall furnish and erect its own baler at the job site on the concrete pad therefor to be erected by Landlord, with all other installation and connection to electrical, water, plumbing and plumbing fuel systems, ready for use, to be performed by Landlord. Tenant shall also furnish its own trade fixtures. Any and all such equipment and fixtures furnished by Tenant shall remain its property and may be removed from the demised premises by Tenant at any time.

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than____September 1, 1987_____and shall be completed not later than_____ ____March 3, 1988_, and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than____April 28, 1988_____, said option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees to give the Tenant the first right of refusal, on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the Lease terms and provisions and rentals shall be the same as this Lease.

5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

substantially

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

-5-

(c) Construction of at least __1,333__ lineal feet of store frontage and __133,500__ sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A" and said area leased to other tenants and opened for business or readied for opening for business simultaneously with Tenant; and

(d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant:

> 1st Phase
> Ben Franklin
> 34,000 s.f. of local, retail and
> service store tenants (to be shelled
> and roofed but not necessarily leased)

(e) Landlord shall have installed and open to vehicular traffic, all drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices located in or from Nova Road and Beville Road and connecting the shopping center with said roadways substantially as shown on Exhibit "A" hereto and specifically as shown on the plans and specifications to be approved by the parties.

(f) Landlord shall have recorded upon the public records of Volusia County, Florida, and delivered to Tenant in form satisfactory to Tenant, a Declaration of Restrictions encumbering outparcels "J", "K" and "L" as shown on Exhibit "A" hereto prohibiting such parcels from being used in violation of the provisions in Articles 7 and 28 of this Lease and prohibiting any buildings constructed thereon from exceeding 20 feet maximum vertical height measuring from ground level prior to site preparations or exceeding 25% of the gross land area square footage in building size. Landlord agrees that the building areas and common and parking areas of such parcels shall be constructed in accord with the layout of such parcels shown on Exhibit "A" unless deviation is approved in writing by Tenant.

(g) Landlord shall have complied with local, state and county ordinances, rules, laws or regulations regarding construction of water runoff retention pond(s) for the shopping center and shall cause any retention pond(s) to be fenced around its entire perimeter if required by applicable ordinances, laws or regulations. Any easements or other agreements providing for ground water, street flow or drainage of water from the shopping center to other property shall be demonstrated to be effective and not subject to cancellation prior to the expiration of Tenant's initial Lease term plus option extension periods granted to Tenant.

(h) Landlord shall provide written proof of allocation of sewerage and water connections and use in sufficient quantity and capacity to allow future construction of the addition to Tenant's demised store premises contemplated by Article 38 of this Lease. Such allocations shall be in form and substance subject to approval by Tenant and shall not be subject to cancellation or termination by the issuing entities.

In the event that all the above requirements shall not have been met on or prior to _____ __April 28, 1988_____, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated:

| Name | Minimum Term Years | Minimum Floor Area (sq. ft.) |
|------|--------------------|------------------------------|
| 1st Phase Ben Franklin Retail & Service Store to be shelled and roofed but not necessarily leased | 10+10 variable | 15,000 34,000 |
| 2nd Phase Two Tenants consisting of Major Drug Retail & Service Stores to be shelled and roofed but not necessarily leased | not less than 20 variable | 25,000 10,350 18,000 |

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

GENERAL
MERCANTILE
STORES
ONLY

7. Without the prior written consent of Tenant herein only general mercantile stores or service businesses, or retail stores (including discount operations) shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational amusement and entertainment-type activities (including without limitation, bars, lounges, "teen lounges" and package stores), or non-retail or non-mercantile type activities, shall be permitted. Provided, however, Landlord shall be permitted to lease not more than a total of 5,000 square feet of rental space for office or professional office use in the shopping center or any enlargement thereof.

PARKING
AND
COMMON
AREAS

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least __5.0__ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least __894__ automobiles (minimum);

--7--

ond in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

Landlord agrees with respect to the areas labeled outparcels "J", "K" and "L" respectively, as shown on Exhibit "A" as follows:   No building to be located on any of the outparcels shall exceed 3,000 square feet;*no structures or buildings on any outparcel shall be allowed to exceed 1 story or 20 feet in height and parking ratios required by all governmental authorities shall be met by the owner of each respective outparcel. No buildings on any of the outparcels may be used for any business or activity which would violate the exclusive rights of Tenant as set forth in Article 28 of this Lease or the provisions of Article 7 of this Lease with the exception of use of the buildings for general office or professional office usage.   Further, Landlord agrees that pending such uses, the parcels shall be maintained as paved, or as grassed or landscaped areas and shall be maintained in sightly condition and kept free of weeds and debris.

*except for outparcel "L" which have no building which shall exceed 25% of the total square footage of the parcel.

:RVICE
:EA

9. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service entrances parking spaces for two large trailer trucks for continuous use and further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

[ILITIES

10.  The Tenant agrees to pay all charges measured by consumption or use for telephone, garbage collection, electricity, water, gas and other utilities and services furnished to or used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities.  Provided, Tenant shall not be required to pay any charges for static or flowing water in pipes to supply the fire sprinkler system, nor any "hook up" fees, environmental impact charges, system impact charges or initial connection charges incident to providing access to any utility system.

ENANT'S
:EPAIRS

11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire and other unavoidable casualties covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.   Tenant shall also be responsible for repair of its trade fixtures and equipment, including the baler/compactor.

**LORD'S RS**

**uding work rilles)**

12. The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the windows and plate glass, automatic doors, roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the plumbing (including septic tank, if any), wiring, air conditioning by governmental authority), the plumbing (including septic tank, if any), wiring, air conditioning and heating systems, and floor surfacing of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance. Landlord shall also be responsible for the extermination of termites.

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

**SNS**

13. Tenant may place, erect and maintain any signs on the roof, walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord agrees to construct and maintain, including painting, one (1) shopping center pylon in the shopping center located adjacent to the main entrance to the shopping center from Nova Road and Beville Road          as shown on Exhibit "A" hereto and Tenant shall be permitted to affix thereon electrically illuminated sign panels advertising its business, to be installed by Landlord. Landlord at its expense shall lay and install suitable underground conduit and wiring extending to the pylon site from Tenant's demised store building; Tenant shall maintain its own sign panels located on the pylon , and sign panels of other tenants may be located on said pylon below those of Tenant provided the other tenants' signs are connected to separate electrical supply lines.

**XTURES ID IN- RIOR .TERATIONS**

14. The Tenant, at its own expense, may from time to time during the term of this Lease make any interior non-structural alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this Lease. Tenant agrees to cause any mechanics' or materialmen's liens incurred as a result of construction work instigated by Tenant to be promptly discharged and agrees to indemnify and hold harmless Landlord from any expense occasioned thereby.

-9-

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

I-
ON

15.  Unless caused by the sole negligence of the Landlord, its servants, agents or employees, Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises and also any claim or loss by reason of an accident or damage to any person or property occasioned beyond the demised premises, but only if such damage or loss is caused by the sole negligent acts or omissions of Tenant, its agents, servants or employees.

Likewise, unless caused by the sole negligence of the Tenant, its servants, agents or employees, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (as defined in Article 3 hereof) of the shopping center, with the contractual liability endorsement on the policy, in a company qualified to transact business in Florida, stipulating limits of liability of not less than $500,000.00 for an accident affecting any one person; and not less than $1,000,000.00 for an accident affecting more than one person; and $100,000.00 property damage.  Certificate of such coverage from the insurer providing thirty (30) days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

!ANLINESS

16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

.RE

17.  In the event that Tenant's building shall be totally destroyed or damaged to any extent by fire or other casualty Landlord agrees to proceed promptly and without expense to Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored, provided however, if such damage to Tenant's building to the extent of fifty per cent (50%) or more occurs within the last three (3) years of the lease term hereof (whether the original lease term or an extension thereof), then in such event Landlord shall have no obligation to restore Tenant's building unless Tenant agrees to extend the lease term hereof on the same conditions and for the same rentals so as to expire ten (10) years from the date of completion of such restoration by Landlord, such extension to be in addition to and not in lieu of any renewal privileges then remaining available to Tenant, which renewal options shall not thereby be exercised.  Failing such notice to extend, Landlord at its option shall have the right to terminate this lease or to restore the premises and the lease shall continue for the remainder of the then unexpired term.

-10-

In the event that Landlord shall fail within a reasonable time, not to exceed ninety (90) days following such damage (except as in this paragraph provided), to proceed with and within a reasonable time commensurate with the amount of damage, not to exceed six (6) months following such damage, to complete any repairs and restoration of the demised premises as herein required Tenant may, at its option, in either of such events, terminate this Lease by giving to Landlord written notice thereof. If Landlord's failure to commence or complete said repairs within the stipulated times shall be due to strikes, war, material shortages, weather conditions, or similar happenings beyond its control, and provided further the repairs are completed with all due diligence commensurate with such delay, such option to terminate shall not arise. If the Lease shall terminate as aforesaid and any rent shall have been paid by Tenant in advance, Landlord agrees to refund to Tenant all rent so paid applicable to the period subsequent to such damage or destruction.

If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's store building, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage, or so much of such damaged buildings as necessary to meet the greater of the following requirements: (1) all those buildings required to be restored under the Lease agreements Landlord may have with the particular tenants affected (provided such tenants shall not have cancelled their leases), and (2) at least fifty per cent (50%) of the buildings then in the shopping center, exclusive of Tenant's store building. All buildings not required to be restored hereunder shall be razed, and the area therefor shall be used as paved parking area, grassed or landscaped area, free of weeds, trash and debris.

**HET JOYMENT**

18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

**EM- )N**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

The right of Tenant to a division of condemnation proceeds shall extend only to such portion of the award as may be attributable by the Court to disturbance of Tenant's established business and to Tenant's trade fixtures, equipment, leasehold improvements and moving expenses; and Tenant shall not thereby be entitled to any portion of the award attributable to the land or building or to the value of the unexpired portion of the lease term.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ——— ten ——— per cent ( ———10 %) or reduce the number of cars which may be conveniently parked to less than_____804_____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

**FAULT**

21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default. Enumeration of remedies in this paragraph shall not in any way restrict the right of Landlord to pursue any other remedies permitted under the laws of the State of Florida.

-12-

**UPTCY** 22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**RUCTION** 23. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

**ICES** 24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at _____

437 East Atlantic Boulevard, Suite 1 _____

Pompano Beach, Florida 33060 _____

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to

Tenant at _____ P. O. Box 15200 _____

Orlando, Florida 32808 _____

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

**ID OF NANCY** 25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

--13--

MENT
ID
SING

26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.



SIONS

27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ __five__ ( 5 ) successive extensions of this lease, each extension to be for a period of _____ __five__ ( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at least ___ __six (6) months__ before the expiration of the initial term, and if extended, at least ___ __six (6) months__ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

LUSIVE
ERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof. With the exception of bars and package stores, only Tenant and the National Drug may sell beer and wine in the shopping center for off-premises consumption. Tenant shall have the exclusive right in the shopping center to operate a bakery/delicatessen or any department or concession equivalent to the same. Provided, however, despite the above provisions in this Article, Landlord shall be permitted to lease up to 2,400 square feet to a package liquor store not located within 250 lineal feet from the exterior walls of Tenant's store building, which may sell beer and wine for off-premises consumption. Despite any other provisions of this Lease, Landlord may lease up to 1,600 square feet of store space not located within 250 lineal feet of Tenant's store building for use as an ice cream shop.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law; in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument

RDINATE    29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

Tenant agrees to attorn to the holder of any first mortgage encumbering the demised premises or any other purchaser who shall succeed to the interest of the Landlord under this Lease by reason of foreclosure or sale under such mortgage or by deed in lieu of foreclosure, provided Tenant is furnished with proper evidence of such foreclosure or purchase; and upon such attornment, the holder of the mortgage or other purchaser shall be bound to Tenant under all the terms, conditions and covenants of this Lease, to the extent of the then remaining balance of the term and any extensions or renewals thereof.

ITICE TO    30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall in-
NDER      clude all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonable be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

-15-

(at least twice weekly)

N
ENANCE

31. Landlord agrees to operate and maintain in good condition and repair all the common areas, as herein defined, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

For such services, Tenant shall pay the Landlord, as additional rental hereunder and as reimbursement for the cost thereof, the sum of $4,400.00 per year, payable in twelve (12) equal monthly installments of $366.67 per month in advance on the first day of each and every calendar month of the Lease term, and any extensions thereof. Any additional rental paid by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due under terms of this Lease, it being intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the Lease term or any extensions thereof shall be pro-rated on the basis of annual credit.

EFIT

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

NSFER BY
DLORD

33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

ORT
RM
ASE

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

AARGINAL
ITLES

35. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

-16-

ETE
MENT

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

37: During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises for the first full calendar year of the lease term in which both the value of the land and the buildings thereon shall be assessed for tax purposes and the amount of ad valorem real estate taxes levied against the demised premises in each year thereafter during the term of this Lease, and during any exercised option extensions thereof; provided, however, any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or payable, but if the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the Lease term or any extensions thereof, shall be prorated on the basis of the annual credit. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

PTION FOR
XPANSION

38. Tenant is hereby granted the option and privilege at any time during the term of this lease, or during any extensions thereof, of requiring the enlargement of its demised store premises by incorporating therein as an addition the area immediately adjacent on the southerly side of the existing demised store premises sixty (60) feet in width by two hundred (200) feet in depth. Landlord agrees that such area shall not be leased or otherwise encumbered in any manner which may prevent Tenant from exercising the option to expand. This option may be exercised at any time. Upon Tenant giving to Landlord a notice in writing of its exercise of this option, Landlord agrees to construct such

-17-

addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved in writing by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant.

In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is an extension of the interior sidewalk line of Tenant's demised store building and shall have a finish floor level, roof and ceiling heights of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports therein the open front sales area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not, at such date remain at least ten (10) years of the then term of this Lease, such term shall be extended for a period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve (12%) percent of the enlargement area, or an amount equal to $6.15 per square foot of the enlargement area, or any amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During the remaining term of during such extended term, the provisions of this Lease shall remain in effect and the option periods herein provided, if any shall remain, shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the additional. Upon completion of the addition, it shall be and become a portion of the demised store premises and this Lease be construed as so amended.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, the Tenant, at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above. If Tenant constructs the enlargement, Tenant agrees to cause any mechanic's lien incurred by and in connection with such expansion

-18-

to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition.

Landlord specifically agrees that it shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of such utilities, specifically including, but not limited to, (a) sewerage and water permits, (b) allocations of sewerage and water or (c) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the addition contemplated by this Option for Expansion. In the event Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may pay same, obtain any reasonably necessary waiver and deduct the amounts paid or costs incurred from all rentals payable under this Lease. Landlord shall be responsible for such items described above in this paragraph irrespective of whether Landlord or Tenant constructs such addition and improvements to the demised store premises.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____ Its                       President

Attest _____ Its                       Secretary

As to Ralph Chernin Company, Inc.

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

By _____ Its                       President

Attest _____ Its   Ass't Secretary

As to Winn-Dixie Stores, Inc.

(CORPORATE SEAL)

TENANT

-19-

STATE OF FLORIDA )

COUNTY OF BROWARD )

The foregoing instrument was acknowledged before me this
24 day of JULY , 1987, by RALPH CHECNIV and
ALAN CHECNIV , the _____ President and _____

Secretary of SHOPPES OF TOWNE SOUTH, INC. a Florida corporation,

on behalf of the corporation.

NOTARY PUBLIC, State and County
aforesaid

(NOTARIAL SEAL)

My Commission Expires:

NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21, 1991
BONDED THRU NOTARY PUBLIC UNDERWRITERS

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this
14th day of Aug. , 1987, by A. Dano Davis and
G. P. Hamilton , _____ President and Asst.

Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida

corporation, on behalf of the corporation.

NOTARY PUBLIC, State and County
aforesaid

(NOTARIAL SEAL)

My Commission Expires:

EXHIBIT "B"

That certain piece, parcel or tract of land situate, lying and
being in the City of Daytona Beach, Volusia County, Florida,
more particularly described as follows:

SHOPPING CENTER

portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the
sterly R/W of State road No. S-5A (Nova Road) and Northerly of State road No. 400 (Beville Road),
thune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of
)lusia County, Florida and being more particularly described as follows: As a point of reference
>mmence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the
iblic Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said
airway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25°
2' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence S 64°
25° 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence
9' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of
curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance
f 200.45 feet, said arc being subtended by a chord bearing of S 66° 30' 23" W and a chord distance
f 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the
C of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an
rc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a
hord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly
 long said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet,
 n arc distance of 63.96 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and
 chord distance of 63.95 feet to the PC of a curve to the right; thence Northerly along said Easterly
 1/W and curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84
feet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 20.45
feet to the PT of said curve; thence N 05° 41' 27" W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42'
feet; thence N 11° 24' 05" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence
39" W along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance
ortherly along said Easterly R/W and said curve being subtended by a chord bearing of N 06° 44' 14" W and a chord distance
f 428.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14" W and a chord distance
f 429.27 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning.
:ontaining 18.22 acres more or less.

All of the above described premises being shown on plat of survey
dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc.,
New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027,
incorporated herein by this reference.

LESS AND EXCEPT:

OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5,
Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road
No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road),
Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12,
Page 41) Public Records of Volusia County, Florida and being more
particularly described as follows: As a point of reference commence at
the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35,
Page 93 of the Public Records of Volusia County, Florida; Thence
South 25°32'25" East along the Westerly Line of said Fairway Unit No.
6, a distance of 950.00 feet; Thence South 64°27'35" West a distance
of 689.89 feet, to the Easterly Right-of-Way Line of State Road No.
S-5A, as now occupied and established; Thence South Easterly along a
curve concave to the right, said curve having a central angle of
02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79
feet, to the Point of Tangency of said curve; Thence South 05°44'14"
East continuing along the aforesaid Easterly Right-of-Way Line a
distance of 80.00 feet to the Point of Beginning; Thence North 64°27'35"
East a distance of 170.00 feet; Thence South 25°32'25" East a distance
of 140.00 feet; Thence South 64°27'35" West a distance of 220.51 feet,
to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39"
West, along the aforesaid Easterly Right-of-Way Line a distance of
148.83 feet, to the Point of Beginning , containing 0.63 Acres, more or
less.

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South $25°32'25"$ East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South $64°27'35"$ West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence Southeasterly along a curve concave to the right, said curve having a central angle of $02°07'13"$ and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South $06°44'14"$ East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning; Thence North $64°27'35"$ East a distance of 140.00 feet; Thence South $25°32'25"$ East a distance of 150.00 feet; Thence South $64°27'35"$ West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line; Thence North $05°42'39"$ West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:
From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South $25°32'25"$ East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet; Thence South $64°27'35"$ West a distance of 300.00 feet; Thence South $25°32'25"$ East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established; Thence South $64°29'43"$ West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature; Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of $00°37'46"$, a radius of 5679.65 feet, a chord bearing of South $64°48'36"$ West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning; Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central angle of 01°23'34", a radius of 5679.65 feet, a chord bearing of South 65°49'16" West, and a chord distance of 138.07 feet, an arc distance of 138.07 feet, to a Point of Tangency; Thence South 66°31'03" West, continuing along the Northerly Line of afore- said State Road No. 400, a distance of 135.55 feet, to a Point of Curvature; Thence continuing along the Northerly line of aforesaid State Road No. 400, along a curve concave to the left, said curve having a central angle of 00°15'47", a radius of 5779.65 feet, a chord bearing os South 66°23'07" West, and a chord distance of 26.53 feet, an arc distance of 26.54 feet, to the Easterly Line of aforesaid State Road S5-A; Thence Northerly along the Easterly Line of aforesaid Nova Road and along a curve concave to the right, said curve having a central angle of 01°21'17", a radius of 2704.79 feet, a chord bearing of North 07°26'04" West, and a chord distance of 63.95 feet, an arc distance of 63.95 feet to a Point of Curvature; Thence Northerly continuing along the Easterly Line of aforesaid State Road S5-A, along a curve concave to the right, said curve having a central angle of 03°46'14", a radius of 2704.93 feet, a chord bearing of North 07°48'19" West and a chord distance of 177.98 feet, an arc distance of 178.01 feet; Thence North 64°27'35" East, a distance of 225.92 feet; Thence South 25°32'25" East, a distance of 239.34 feet, to the Point of Beginning.


All of the above described premises being shown on plat of survey dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand, Florida, and supplemented by Survey dated July 6, 1987, incorpor- ated herein by this reference.

SUPPLEMENTAL LEASE AGREEMENT

THIS AGREEMENT, made this _11 th_ day of _APRIL_____, 1989, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, (hereinafter called "Landlord") and WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter called "Tenant"); which terms 'Landlord" and "Tenant' shall include the heirs, legal representative, successors and assigns of the respective parties;

### WITNESSETH:

WHEREAS, by Lease dated July 24, 1987, Landlord did lease and demise unto Tenant those certain premises, therein more particularly described, located in a shopping center development known as The Shoppes of Towne South, located at the northeast corner of Nova and Beville Roads, in the City of Daytona Beach, County of Volusia and State of Florida, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and for such rentals and upon such terms and conditions as more particularly set forth therein, a short form of said Lease being recorded in Official Record Book 3056, pages 0319 through 0325 of the Public Records of Volusia County, Florida; and

WHEREAS, the Lease has been amended to date by letter agreements dated September 23, 1987 and June 20, 1988, and by Addendum to Lease and Second Addendum to Lease each respectively dated December 22, 1988; and

WHEREAS, the said construction has been completed and the Tenant has now opened for business in the demised premises and the parties hereto desire to fix the commencement date of said Lease, as hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) and other good and valuable considerations, in hand paid by the Tenant to the Landlord,

APPROVED
AS TO FORM

Division Mgr.

Legend Dept.
Winn Dixie Stores,
Inc.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed as follows:

1.   The commencement date of the above described Lease dated July 24, 1987 is fixed at March 30, 1989, and the expiration of the initial term of twenty (20) years demised therein shall be March 29, 2009 at twelve o'clock midnight.

2.   It is mutually understood and agreed that the Lease dated July 24, 1987, as amended, shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby.   All covenants, terms, obligations and conditions of the Lease, as previously amended, not modified or amended by this Supplemental Lease Agreement, are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____ President
Its

Attest: _____ Secretary
Its

As to Landlord

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

By _____ President
Its

Attest: _____ Secretary
Its

As to Tenant

(CORPORATE SEAL)

TENANT

STATE OF _Florida_ )
COUNTY OF _Broward_ )
     The foregoing instrument was acknowledged before me this
_11_ day of _April_, 1989, by _Ralph Chernin_
and _Allan Chernin_, _The_ President and _The_
Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC., a
Florida corporation, on behalf of the corporation.

(NOTARIAL SEAL)

             NOTARY PUBLIC, State and County
             aforesaid

             My Commission Expires:
             4-30-90


STATE OF    FLORIDA   )
COUNTY OF  _____ )
     The foregoing instrument was acknowledged before me this
_____ day of _____, 1989, by _____
and _____, _____ President and _____
Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation.

(NOTARIAL SEAL)

             NOTARY PUBLIC, State and County
             aforesaid

             My Commission Expires:

DECLARATION OF RESTRICTIONS
AND GRANT OF EASEMENTS

Shoppes of Towne South, Inc., a Florida corporation qualified
to transact business in Florida, (hereinafter called "Declarant")
is the owner of four (4) adjoining and contiguous parcels of land
situated at the northeast corner of Nova Road and Beville Road,
near or in the City of Daytona Beach, Volusia County, Florida,
each parcel being more particularly described on Exhibit "A"
attached to this Declaration and by this reference included
herein as if set forth in full in this Declaration.

Declarant plans in the future to construct or to be per-
mitted to be constructed on the parcels various commercial store
buildings and improvements, which together in the future will
constitute a shopping center.

Declarant desires to declare, establish, grant and provide
for the benefit of:  (1) Declarant and any present or subsequent
owners of all or any portion of the parcels and the respective
heirs, legal representatives, successors and assigns of all of
them and any successors entitled to all or any portions of the
parcels (collectively called "Owners"); and also for the benefit
of:  (2) Winn-Dixie Stores, Inc., a Florida corporation duly
qualified to transact business in the State of Florida, and the
holder or holders of any first mortgage now or in the future
constituting a lien against all or any portion of the parcels;
and (3) the tenants and occupants from time to time of any of the
commercial buildings constructed within the building areas on any
of the parcels, their employees, successors and assigns, custom-
ers and invitees, which are collectively called "Beneficiaries";
certain restrictions, rights, obligations, easements and licenses
to run with the title to the parcels to create a mutually bene-
ficial building plans automobile parking plan and a compatible
plan for the arrangement and design of the improvements their

APPROVED
AS TO FORM

D.V.SION MGR.

LEGAL DEPT.
WINN-DIXIE STORES,
INC.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

permitted uses in the shopping center comprised of the composite
parcels above described.

Declarant has entered into a Lease with Winn-Dixie Stores,
Inc., ("Winn-Dixie") which demises to Winn-Dixie, as Tenant,
certain premises located in the parcel labeled "shopping center"
described on Exhibit "A" attached to this Declaration for an
initial term of twenty (20) years commencing upon the completion
of certain construction as set forth in the Lease. The initial
Lease term is subject to five (5) successive option extensions
each for a period of five (5) years. A short form of the Lease
will be recorded in the public records of Volusia County,
Florida.

The establishment of the restrictions, rights, privileges
and easements created in this Declaration of Restrictions and
Grant of Easements is one of the principal inducements to Winn-
Dixie to omit outparcels "J", "K" and "L" described on Exhibit
"A" attached to this Declaration from the legal description of
the shopping center attached to the Winn-Dixie Lease.

In consideration of the premises and the mutual benefits to
the Declarant and to the Beneficiaries, the Declarant, for it-
self, its heirs, personal representatives, successors, grantees
and assigns, grants, declares and provides as follows:

1. No above-ground buildings or structures of any kind
shall be erected on outparcels "J", "K" and "L" except in such
locations and of such dimensions as shall be approved in writing
by Winn-Dixie prior to construction. The remainder of the land
in outparcels "J", "K" and "L" not used for building construction
shall be reserved for use as common facilities' and no buildings
or structures of any kind shall be constructed within the areas
reserved for the common facilities, which may be used only as
vehicular parking areas, roadways, service areas, drives, en-
tranceways, exits and sidewalks and landscaped areas but per-

-2-

mitting those necessary appurtenances for such use including, without limitation, paving, light standards, curbings, directional signs, drainage facilities and underground facilities and pylon signs advertising the shopping center and the business or businesses conducted by the occupants of commercial buildings on the respective outparcels "J", "K" and "L". All buildings on outparcels "J", "K" and "L" shall be restricted to one story and twenty (20) feet in height.

2.    Declarant establishes and creates for Declarant, Owners and Winn-Dixie and gives, grants and conveys to each and every one of the Declarant, Owners and Winn-Dixie, and to their respective employees, servants, agents, suppliers, customers and invitees, a mutual, reciprocal and non-exclusive easement, rights license and privilege of passage and use, both pedestrian and vehicular, over, across and upon any and all portions of the common facilities for the purpose of ingress, egress and parking, and all common facilities from time to time existing upon the above described parcels are expressly reserved and set apart for such purpose or purposes, respectively. Nothing is intended to be construed to create any rights for the benefit of the general public in either of the parcels or improvements constructed thereon.

3.    Declarant establishes and creates for the benefit of the building areas and for the benefit of Declarant, Owners and Winn-Dixie and gives, grants and conveys to each and every Declarant, Owner and Winn-Dixie a mutual reciprocal and non-exclusive right and easement in, under, over, across, upon and through any and all portions of the common facilities for the installation, use, maintenance, repair and replacement of all utility lines, wires, pipes, conduits, sewers, drainage lines and other utilities necessary to serve the building areas; provided, however, that no pipes, conduits, sewers, drainage lines or other

utility apparatus shall be placed above the surface of the common
facilities without the prior consent of Declarant, Owners and
Winn-Dixie, which said consent shall not be unreasonably with-
held; and provided further, that any and all damage to the common
facilities or building areas occasioned by such work shall be
promptly repaired and restored at the sole cost and expense of
the party causing such work to be performed.

4.  Declarant agrees to indemnify and save harmless Winn-
Dixie from any claim or loss by reason of any accident or damage
to any person or property happening on or about the common
facilities as described in this document and Declarant also
agrees to carry at its expense, public liability insurance
coverage on all such common facilities on outparcels "J", "K" and
"L" with a contractual liability on the policy and issued by a
company qualified to transact business in Florida stipulating
limits of not less than $1,000,000.00 for an accident affecting
any one person, or not less than $1,000,000.00 for an accident
affecting more than one person, and $50,000.00 property damage.
In the event of any sale or transfer of title of all or any
portion or portions of the above described parcels any purchaser
or transferee shall expressly assume the obligations imposed by
this article as to the property so sold or transferred.

5.  For and during the term of the Lease to Winn-Dixie
Stores, Inc., and any extensions or renewals thereof, it shall
have the exclusive right to operate a supermarket on all of said
parcels, and no other portion or portions either parcel shall be
permitted to be occupied or be leased or rented, directly or
indirectly, for occupancy as a supermarket, grocery store, dairy
store, meat, fish, fruit or vegetable market, nor shall any
owner, tenant or occupant of any portion of either parcel be
permitted to lease or sublet in any manner, directly or in-
directly, all or any part of any parcel to any person, firm or

corporation engaged in such business without the prior written consent of Winn-Dixie.

Also, except as otherwise provided in the Winn-Dixie Lease, only retail and service shops and business and professional offices shall be allowed to operate on the outparcels, it being intended that no spa, bowling alley, skating rink, bingo parlor, or health or recreational and entertainment type activity shall be permitted thereon.

6.  The terms, covenants, conditions and provisions of these restrictions may be extended, abrogated, modified, rescinded or amended in whole or in part only with the consent of Declarant, Owner(s) and Winn-Dixie Stores, Inc. and the holder or holders of any first mortgage now or in the future constituting a lien against either parcel; but subject to such consent, Declarant, or its successor or successors in title, expressly reserves the right to extend, abrogate, modify, rescind or amend the covenants and restrictions herein by an instrument in writing duly executed by the appropriate parties in interest and duly recorded in the public records of Volusia County, Florida.

7.  These restrictions shall become effective on the date of this document and shall be binding upon all parties or persons claiming under them and shall run with the land for a period of forty-five (45) years from such date, or until such date as Winn-Dixie Stores, Inc., or its successors and assigns cease possession of the premises demised to it, whichever shall earlier occur (which fact shall be exclusively established by the true affidavit of Declarant or its successors and assigns).  The easements, rights, privileges, restrictions and benefits created or granted under these restrictions and each provision hereof shall be enforceable by Declarant, Owner(s) and Beneficiaries by injunction or by specific performance and shall be deemed covenants running with the title to the parcels so long as these

-5-

restrictions (as the same may be amended from time to time) shall be in effect, as above provided. This instrument shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of Declarant, Owner(s) and Winn-Dixie as above provided.

Declarant has executed this Declaration of Restrictions and Grant of Easements as of ___7/24/97___ , 1987.

Signed, sealed and delivered in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

_Leui Mecher_

By _____
Its                President

_Stanley F. Lupan_
As to Declarant

Attest _____
Its                Secretary

(CORPORATE SEAL)

DECLARANT

-6-

STATE OF FLORIDA     )

COUNTY OF BROWARD    )

The foregoing instrument was acknowledged before me this

24 day of JULY , 1987, by RALPH CHECNIV     and

ALAN CHECNIV          , _____ President and _____

Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC.a

Florida corporation, on behalf of the corporation.

NOTARY PUBLIC, State and County

(NOTARIAL SEAL)                    aforesaid

My Commission Expires:

NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21, 1991.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

EXHIBIT "A"

That certain piece, parcel or tract of land situate, lying and
being in the City of Daytona Beach, Volusia County, Florida,
more particularly described as follows:

SHOPPING CENTER

portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the
asterly R/W of State Road No. S-5A (Nova Road) and Northerly of State road No. 400 (Beville Road),
ethune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of
olusia County, Florida and being more particularly described as follows:  As a point of reference
ommence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the
ublic Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said
airway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25°
2' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence
25° 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence S 64°
9' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of
 curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance
f 200.46 feet, said arc being subtended by a chord bearing of S 65° 30' 23" W and a chord distance
f 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the
C of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an
rc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a
hord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly
long said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet,
n arc distance of 63.45 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and
 chord distance of 63.45 feet to the PC of a curve to the right; thence Northerly along said Easterly
/W and curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84
eet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 188.80
feet to the PT of said curve; thence N 05° 41' 27" W along said Easterly R/W, a distance of 20.45
feet; thence N 11° 24' 09" W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42'
39" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence
ortherly along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance
f 429.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14½ W and a chord distance
f 429.27 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning.
ontaining 18.22 acres more or less.

All of the above described premises being shown on plat of survey
dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc.,
New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027,
incorporated herein by this reference.

OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5,
Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road
No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road),
Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12,
Page 41) Public Records of Volusia County, Florida and being more
particularly described as follows:  As a point of reference commence at
the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35,
Page 93 of the Public Records of Volusia County, Florida;  Thence
South 25°32'25" East along the Westerly Line of said Fairway Unit No.
6, a distance of 950.00 feet;  Thence South 64°27'35" West a distance
of 689.89 feet, to the Easterly Right-of-Way Line of State Road No.
S-5A, as now occupied and established;  Thence South Easterly along a
curve concave to the right, said curve having a central angle of
02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79
feet, to the Point of Tangency of said curve;  Thence South 06°44'14"
East continuing along the aforesaid Easterly Right-of-Way Line a
distance of 80.00 feet to the Point of Beginning;  Thence North 64°27'35"
East a distance of 170.00 feet;  Thence South 25°32'25" East a distance
of 140.00 feet;  Thence South 64°27'35" West a distance of 220.51 feet,
to the aforesaid Easterly Right-of-Way Line;  Thence North 05°42'39"
West, along the aforesaid Easterly Right-of-Way Line a distance of
148.83 feet, to the Point of Beginning , containing 0.63 Acres, more or
less.

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 8 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence Southeasterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning; Thence North 64°27'35" East a distance of 140.00 feet; Thence South 25°32'25" East a distance of 150.00 feet; Thence South 64°27'35" West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:

From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South 25°32'25" East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet; Thence South 64°27'35" West a distance of 300.00 feet; Thence South 25°32'25" East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established; Thence South 64°29'43" West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature; Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of 00°37'46", a radius of 5679.65 feet, a chord bearing of South 64°48'36" West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning; Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central angle of 01°23'34", a radius of 5679.65 feet, a chord bearing of South 65°49'16" West, and a chord distance of 138.07 feet, an arc distance of 138.07 feet, to a Point of Tangency; Thence South 66°31'03" West, continuing along the Northerly Line of aforesaid State Road No. 400, a distance of 135.55 feet, to a Point of Curvature; Thence continuing along the Northerly line of aforesaid State Road No. 400, along a curve concave to the left, said curve having a central angle of 00°15'47", a radius of 5779.65 feet, a chord bearing os South 66°23'07" West, and a chord distance of 26.53 feet, an arc distance of 26.54 feet, to the Easterly Line of aforesaid State Road S5-A; Thence Northerly along the Easterly Line of aforesaid Nova Road and along a curve concave to the right, said curve having a central angle of 01°21'17", a radius of 2704.79 feet, a chord bearing of North 07°26'04" West, and a chord distance of 63.95 feet, an arc distance of 63.95 feet to a Point of Curvature; Thence Northerly continuing along the Easterly Line of aforesaid State Road S5-A, along a curve concave to the right, said curve having a central angle of 03°46'14", a radius of 2704.93 feet, a chord bearing of North 07°48'19" West and a chord distance of 177.98 feet, an arc distance of 178.01 feet; Thence North 64°27'35" East, a distance of 225.92 feet; Thence South 25°32'25" East, a distance of 239.34 feet, to the Point of Beginning.

All of the above described premises being shown on plat of survey dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand, Florida, and supplemented by Survey dated July 6, 1987, incorporated herein by this reference.