# EXHIBIT  1

# LEASE

**THIS LEASE**, made this 13ᵀᴴ day of _April_ , 1996 between **SRC REALTY, L.L.C.,** an Alabama limited liability company ("**Landlord**") and **WINN-DIXIE MONTGOMERY, INC.,** a Kentucky corporation authorized to do business in the plural and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

## PREMISES

That the Landlord, in consideration of the rents herein reserved and the covenants of the Tenant, does hereby lease and demise unto Tenant, for the term hereinafter specified, the following described land and improvements thereon:

That certain piece, parcel or tract of land located near the northeasterly corner of the intersection of U.S. Highway #231 and Transmitter Road in the City of Panama City, Bay County, Florida, more particularly described as:

> A parcel of land containing 6.45 Acres (281,135.08 Square feet), more or less, located within Lots 24, 25 and 40 of The St. Andrew's Bay Development Company's Plat of Section 24, Township 3 South, Range 14 West, Bay County, Florida as recorded in Plat Book 6, Page 16; more particularly described as follows:
>
> Commence at the Northeast corner of Lot 24 of the St. Andrews Bay Development Company's Plat of Section 24, Township 3 South, Range 14 West, Bay County, Florida; thence run N 90°00' E, 247.51 feet; thence S 38°58' E, 334.41 feet to the Northwesterly Right-of-Way of U.S. Highway No. 231; thence S 52°26' W along said R.O.W. a distance of 630.46 feet; thence N 89°28'24" W, 88.73 feet to the Point of Beginning; thence S 28°45'40 E, 56.95 feet to the Northwesterly R.O.W. of U.S. Highway No. 231; thence S 52°26' W, 515.96 feet along said R.O.W. line; thence N 30°20'25" W, 165.45 feet; thence N 86°31'17" W, 86.29 feet to the Easterly R.O.W. of Transmitter Road; thence N 3°23'32" E, 238.82 feet along said R.O.W.; thence S 86°35'29" E, 27.90 feet; thence N 3°32'45" E, 289.68 feet along said Transmitter Road R.O.W. to the Southerly R.O.W. of 37th Plaza; thence S 88°24'35" E, 510.94 feet along said Southerly R. O. W. to the Northwest corner of the property described in deed to Richardson Cabinet Supply, Inc. recorded in O.R. Book 1430, Page 984, Bay County Records; thence S 3°45'06" W, 295.84 feet and along the West line of said Richardson Cabinet Supply, Inc property to the Point of Beginning.

Together with a store building, approximately 220 feet in width by 200 feet in depth, together with vestibule and rear receiving room, parking area, sidewalks, service areas and other improvements to be constructed thereon by Landlord according to plans and specifications to be approved by the parties as herein provided, such land, store, building, parking area, sidewalks, service areas and other improvements being hereinafter known as the "demised premises."



APPROVED
AS TO FORM PANAMA 2
10/10/95
Ev. by: for 2/1/96
2/1/96
2/1/96
Legal Dept. 4/04/96
Winn-Dixie Stores,
Inc.

THIS INSTRUMENT WAS PREPARED BY
P. CHRISTOPHER WRENN, ATTORNEY-
AT-LAW, WHOSE ADDRESS IS 5050
EDGEWOOD COURT, JACKSONVILLE,
FLORIDA 32254

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of ____Twenty____ (20) years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

**RENTAL**

1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of Three Hundred Seventy-Four Thousand and No/100 Dollars ($374,000.00) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of Thirty-One Thousand One Hundred Sixty-Six and 67/100 Dollars ($31,166.67) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which one_____ per cent (_____1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to

2

unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

USE

2.    The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses), including a pharmacy.

Notwithstanding the foregoing, the demised premises shall be initially opened and used for a retail food store, commonly referred to as "supermarket", and shall continue to be so operated for such purpose only for a period of six (6) months provided, however, Tenant shall not thereafter be required to continue to remain open for business even for the operation of a food supermarket or otherwise.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

Tenant shall not generate, handle, use, store, treat, discharge, release or dispose of any Hazardous Material at the demised premises except in full compliance with all Environmental Laws (defined below).

For purposes of this Section, the term "Hazardous Material" shall mean all hazardous, toxic or dangerous waste, substance or material defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act of the United States Congress, or in any other law, regulation or order, now or hereafter in effect, of any governmental authority regulating or imposing liability or standards of conduct relating to, any hazardous, toxic or dangerous waste, substance or material, all of said laws, regulations and orders being referred to herein as "Environmental Laws".

CONSTRUCTION OF STORE BUILDING

3.    The Landlord, at its sole cost and expense, shall diligently proceed to construct a store building, parking area, sidewalks, service area and other improvements for use and occupancy by Tenant as shown on the site plan attached hereto marked Exhibit "A" and in conformity with the plans and specifications to be approved by both Landlord and Tenant.  Said plans and specifications will be initialed by the parties hereto and when initialed shall constitute a part of this lease.  Said plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".  Tenant shall furnish, install and connect its own trade fixtures and its compactor (or baler) on concrete pad to be erected by Landlord.

The Landlord, at its sole cost and expense, shall grade and pave the parking areas, together with the sidewalks, driveways and service area, and shall provide proper and adequate water drainage and lighting system and operations therefor.

TITLE

3A.    On or before thirty (30) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment").  It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions").  Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment.  Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment.  If title is found to be objectionable to Tenant, Tenant shall notify

3

Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the demised premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the demised premises subject to the title defects; or (2) terminate this Lease. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the demised premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $3,842,000.00 (the "Title Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease.

**SURVEY**

**3B.**    On or before thirty (30) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the demised premises is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the store building, parking area, sidewalks, and service areas, (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the demised premises as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "B", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the demised premises subject to such Survey defects, or (2) terminate this Lease. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the demised premises subject to the Survey defects; or (2) terminate this Lease. Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the store "as built".

**ENVIRON- MENTAL AUDIT**

**3C.**    On or before thirty (30) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the demised premises addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing. Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure

4

any environmental condition objected to by Tenant. If Landlord fails to so cure such environmental conditions, to Tenant's satisfaction, Tenant may terminate this Lease.

**CONSTRUCTION PERIOD**

4.    The final plans and specifications for construction of Tenant's store building and other improvements provided for herein shall be approved by both parties on or before April 15, 1996 and in the event the parties shall not approve the final plans and specifications to be evidenced by their initials thereon within said period, this lease shall be and become null and void and of no further force and effect unless the parties hereto shall mutually agree in writing to extend the period for approval of said plans and specifications.

The Landlord covenants and agrees that the construction of the store building, parking area and other improvements shall begin by  September 1, 1996  after the approval of the plans and specifications by the parties hereto and shall be completed and tendered to the tenant substantially completed and ready for occupancy by September 1, 1997; that failing therein, the Tenant may, at its option, cancel and terminate this lease by delivering to the Landlord a writing evidencing its election to so terminate and the Tenant shall thereupon be relieved of and from all liability hereunder; provided, however, that if the Landlord's failure to complete substantially said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events on or before December 1, 1997, said option to terminate shall not arise. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or substantially complete construction of the  store building by the above dates, Landlord agrees to give Tenant a "first right of refusal" on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises  on the demised premises which Landlord may offer for use as a food supermarket. The "first right of refusal" shall be effective for a period of three (3) years from the date of such cancellation.

**COMMENCE-MENT DATE**

5.    The Tenant shall open its store for business within sixty (60) days following substantial completion by the Landlord of the construction of the store building, parking area and other improvements and delivery of same to the Tenant as herein provided; and rent shall begin to accrue hereunder upon the date that the Tenant opens its store for business, or upon the expiration of sixty (60) days following substantial completion by the Landlord of the construction of the improvements and delivery of same to the Tenant, whichever date shall sooner occur. Notwithstanding the foregoing, Tenant shall have no obligation to open its store for business or commence paying rent until Landlord has recorded an enforceable agreement creating certain restrictive covenants and reciprocal easements for ingress and egress and parking between the demised premises and the outparcel identified on Exhibit "A" as "Not A Part of This Development," in a form substantially similar to that attached hereto marked Exhibit "C". No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

**UTILITIES**

6.    The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant  in its store building, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall  be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, but Landlord shall be responsible for  any "hook up" fees or other charges incident to providing access initially to any utility.

**TENANT'S REPAIRS**

7.    Upon completion of construction and acceptance of the demised premises by Tenant, Tenant agrees during the initial term hereby granted and extension or renewal thereof, to perform all maintenance necessary to keep and maintain, including replacements, if necessary, the interior and exterior of the demised premises in good condition and repair (including the roof, structural,  exterior parts of the demised premises,  HVAC, floor surfacing, plate glass,

5

automatic doors, plumbing and wiring), and to repair at or before the end of the initial term or any extension or renewal thereof, all injury done by the installation or removal of fixtures or property of Tenant. Tenant shall have the benefit of all manufacturer's, installer's or other warranties in connection with the items to be maintained by it. Additionally, Tenant shall keep and maintain in good condition and repair the parking area, sidewalks and service areas on the demised premises, including sweeping, cleaning, lighting, snow and ice removal, if necessary, general repair and maintenance of all paved surfaces, repainting and restriping, and maintenance of landscaped areas.

**LANDLORD'S REPAIRS**

**8.**    It is understood that this is intended to be a "net" lease as far as maintenance and repair of the demised premises. Landlord covenants that Tenant's store building, parking area, sidewalks and service areas will be initially constructed so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety ("governmental requirements").

**SIGNS**

**9.**    Tenant may, with the prior approval of Landlord, which approval will not unreasonably be withheld, place, erect and maintain any signs on the roof, walls, and any other places on or about the store building, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the store building resulting from the installation or removal of such signs.

Notwithstanding the foregoing, Landlord's approval of signs located in the interior of the demised premises shall not be required, and Landlord's approval of the standard signs used by a chain tenant, if required permitting has been obtained, shall not be required.

Tenant may construct a pylon sign shown on attached Exhibit "A" and located at the entrance of the demised premises from U.S. Highway #231 for containing an electrically illuminated sign advertising only Tenant's business. Landlord shall bear the expense of installing electrical power to the pylon area including wiring, but the installation of the pylon advertising Tenant's business shall be at Tenant's expense. Landlord shall wire the pylon directly to Tenant's electrical panel located at store building. Tenant shall be responsible for the cost of electricity and the maintenance and operation of the pylon.

**FIXTURES AND ALTERATIONS**

**10.**    The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior alterations, additions and improvements or exterior alterations, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

6

**INDEMNIFI-CATION**

11.    Tenant agrees to indemnify and save harmless the Landlord from any claim or loss, including reasonable attorney's fees, court costs and the reasonable cost of investigation, by reason of an accident or damage to any person or property happening in the demised premises and Tenant agrees to carry, at its expense, comprehensive general liability insurance coverage on the demised premises, in a company qualified to transact business in Florida, stipulating limits of liability of not less than $2,000,000.00.  Landlord and Landlord's mortgagee shall be named as additional insureds.  Certificates of such coverage from the insurer providing 30-days notice to Landlord and Landlord's mortgagee prior to cancellation or termination shall be furnished to Landlord and Landlord's mortgagee.

So long as Tenant's guarantor, Winn-Dixie Stores, Inc. maintains a net worth in excess of $100,000,000.00, Tenant shall be permitted to self-insure against the risks insured against by such comprehensive general liability insurance covering claims or losses occurring within the demised premises.

**CLEANLINESS**

12.    Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas of the building reasonably clean and free from rubbish and dirt.  Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**FIRE**

13.    In the event that Tenant's store building is totally destroyed or partially damaged by fire, windstorm, or other casualty during the first 18 years of the lease term, then Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until the store building is completely reinstated or restored

If damage to the store building in excess of fifty percent (50%) of the value thereof occurs during the last two (2) years of the initial term or during any of the option extension periods provided herein, Tenant may terminate the Lease.  However, if Tenant gives notice to Landlord within thirty (30) days after such damage of its desire to extend the term of this Lease for an additional period so as to expire ten (10) years from the date of completion by Landlord of restoration of such damage on the same conditions and for the same rentals, then upon such notice, Landlord agrees to repair and restore Tenant's store building with all due diligence and this Lease shall continue.  Thereafter, the remaining option periods, if any, shall be construed to follow upon the end of such extended term.  The extension shall be in addition to and not by exercise of option extensions under Article 23 hereof.

If damage of Tenant's building is fifty percent (50%) or less of the value for a casualty during the last two (2) years of the initial term or within any extension term, then Landlord shall restore the building as contemplated by the first paragraph of this Article 13.

Landlord shall carry fire and extended coverage insurance on Tenant's store building, and other improvements on the demised premises, and any additions, alterations and improvements made thereto by Landlord or Tenant in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees  Likewise, Tenant expressly waives any and all claims against Landlord for loss or damage due to fire, etc , to its trade fixtures, equipment and inventory.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's fire and extended coverage insurance above described attributable to the demised premises  Tenant's payment shall be reduced by any abatements, discounts or refunds actually received by Landlord  Landlord shall use its best efforts

to obtain liability coverage at competitive rates. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the foregoing provisions, Tenant's obligation to pay is expressly conditioned upon receipt from Landlord of the written invoice from such insurance premium no later than six (6) months after it is due. Further, Tenant shall not be required to pay unless and until Tenant is furnished with photocopies of the applicable insurance policy, including the declaration page of such insurance policy and such other information as Tenant may reasonably request.

**QUIET ENJOYMENT**

14.    The Landlord covenants, warrants and represents that upon commencement of the lease term, the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created except Permitted Encumbrances; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common parking area, sidewalks or service areas in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder. Tenant's option to terminate shall be effective, however, only if Tenant is actually prevented from conducting its supermarket business as permitted in this Lease, and such option shall not arise if the property may be used as a supermarket by reason of a non-conforming use.

**TAXES AND LIENS**

15.    All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law. Additionally, if Tenant so elects, it may pay ad valorem real property taxes directly to the taxing authority.

**CONDEMNATION**

16.    If any part of the store building located on the demised premises to be taken for any public quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, or in the event that any portion in excess of fifteen percent (15%) of the overall parking constructed for Tenant's use on the demised premises be so taken, or in the event that any portion of the demised premises (including parking area) be so taken so as to interfere materially or substantially with the conduct of Tenant's business in the demised premises, then in any such event, the Tenant shall be entitled to termination of this lease at its option, but within sixty (60) days of its receipt of notice of the condemnation, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as above provided, or in the event of any taking which does not permit a termination by the Tenant, the Landlord shall promptly restore the premises to a condition comparable to the condition at the time of taking, and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

Notwithstanding the foregoing, Tenant shall not be entitled to any award for loss of or loss in value of its leasehold, but only to separate awards for loss or damage to its trade fixtures and for the unamortized cost of any improvements made by Tenant and moving, business interruptions or similar expenses, if allowable

8

**DEFAULT**
17.    In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than twenty (20) days after Landlord has given Tenant written notice of such default demanding payment of such installment of rent, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default. The foregoing shall not limit any remedy available to Landlord by law or at equity and Tenant shall be responsible for all Landlord's costs of collection (including attorneys' fees).

**BANKRUPTCY**
18.    The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**
19.    Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

**NOTICES**
20.    All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at:

2100 Riverchase Center, Suite 230A
Birmingham, Alabama 35244

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

9

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at:

> 1550 Jackson Ferry Road
> Montgomery, Alabama  36104-1718
> Attention:  Real Estate Manager

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

21.    The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted.  It is understood, however, that Tenant shall not be required to restore the demised premises to their original state.  Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

**ASSIGNMENT AND SUBLEASING**

22.    The Tenant may without the consent of the Landlord assign this lease, or sublease to a supermarket or food store or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event Tenant desires to assign its lease or to sublease  the demised premises for the conduct of some business other than a supermarket or food store (except for an assignment or sublease to any corporation or entity which is the parent of, subsidiary to, or affiliated with Tenant or to any entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the county in which the demised premises are situated), Tenant shall give written notice to Landlord of its desire to assign or sublease and shall disclose the identity of the intended assignee or sublessee, and the terms of the intended assignment or sublease.  Within two (2) months after the delivery of such notice, Landlord may either approve or disapprove the intended assignment or sublease.  If Landlord approves the intended assignment or sublease, Tenant shall proceed to effect it.  If Landlord disapproves the intended assignment or sublease, Landlord agrees to accept assignment of or sublease of the demised premises on the same terms as those offered by Tenant's intended assignee or sublessee.  If Landlord fails to approve or disapprove the intended assignment or sublease within two (2) months of delivery of Tenant's notice, the intended assignment or sublease shall be deemed approved.

In the event the entire demised premises are vacated or merchandise or services are not sold therein for a period in excess of six (6) months, while the demised premises may be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the option thereafter for a period of sixty (60) days (unless the premises shall have been reoccupied by Tenant for use as a supermarket) to terminate and cancel this lease upon not less than thirty (30) nor more than ninety (90) days' written notice to Tenant of its election so to do, unless within fifteen (15) days of receipt of such notice Tenant advises Landlord that Tenant, prior to receipt of such notice, had in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months from such notice.

In the event of any assignment, sublease or vacating of the entire premises, the annual rental thereafter shall become a fixed rent which is the sum of: (a) the average percentage rental, if any, paid by Tenant for the two full fiscal years of Tenant immediately preceding such assignment, vacating or subletting, and (b) the minimum guaranteed rental and additional rentals provided for herein.  This provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the county where the demised premises are situated.  This

10

provision shall not limit or restrict the right of Tenant to sublease portions or departments of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales (or the income to Tenant from service businesses) of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined in Article 1a

**EXTENSIONS**  23.    It is further agreed that Tenant, at its option, shall be entitled to the privilege of _five (5)_ successive extensions of this lease, each extension to be for a period of _five (5)_ years and at the same rentals and upon the same terms and conditions as required herein for the initial term

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least _six (6) months_    before the expiration of the initial term, and if extended, at least _six (6) months_    before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document

**EXCLUSIVE SUPERMARKET**  24.    The Landlord agrees that, if it owns or controls any property located within 1,000 feet of the demised premises, it will not, without the written permission of the Tenant, directly or indirectly, lease or rent such property to any person, firm or corporation to be used for or occupied by any business dealing in or which shall keep in stock or sell any staple or fancy groceries, meats, fish, fruits, vegetables, dairy products, bakery goods, or frozen foods; nor will the Landlord permit any tenant of any such property to sublet in any manner, directly or indirectly, any such property to any person, firm or corporation to be used for or occupied by any business dealing in or which shall keep in stock or sell any of the above listed items

**SUBORDINATE**  25.    The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord: and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination: provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder

**NOTICE TO LENDER**  26.    Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period.

**BENEFIT**  27.    This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto  Each provision hereof shall be deemed both a covenant and a condition and shall run with the land

11

**TRANSFER BY LANDLORD**

28.    In the event Landlord transfers Landlord's interest in this lease. Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE**

29.    The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**

30.    The marginal titles appearing in this lease are for reference only and shall not be considered as part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**

31.    This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**REAL ESTATE TAXES**

32.    During the term of this Lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises. Tenant shall be responsible only for its prorata share of such taxes for fractional years occurring at the commencement and expiration of the term of this Lease and any extensions thereof.

The taxes, for which Tenant is to reimburse Landlord, shall be less any abatements, discounts (whether or not taken) or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens and the like shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on leases.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than June 1 of the calendar year following the year in which the taxes were due.

**EXPANSION OPTION**

33.    Tenant is hereby granted the option and privilege at any time during the term of this Lease or any extensions thereof, of enlarging its store building by incorporating the area on its westerly (left) side with an addition not exceeding sixty (60) feet in width by two hundred (200) feet in depth. Thereafter, Landlord agrees to construct such addition for occupancy by Tenant, in accordance with plans and specifications to be approved by the parties, with all due diligence. The addition shall be of like quality of construction as Tenant's original building. Landlord agrees that the wall of Tenant's store building adjoining the expansion areas shall be constructed with steel column equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building, and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

If, at the date of completion of any such building addition, fewer than ten (10) years of the term of this Lease remain, the term of this Lease shall be extended for the period of time necessary to provide a full ten (10) years from that date. Thereafter, for the balance of the term, including extensions, the annual minimum guaranteed rental (and the base for computation of percentage rental) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the addition, or an amount equal to $8.50 per square foot of the enlarged area, or an amount equal to a computed percentage multiplied by the cost of such addition, such percentage

12

being equal to four percent (4%) plus the current prime interest rate (as published by the Federal Reserve or in the Wall Street Journal or similar public source) at the time of the exercise of the option. At Tenant's request, the construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable by Tenant. The final cost of the addition upon completion shall be certified by the general contractor performing the work. If the term of this Lease is extended to provide a full ten (10) year term, the provisions of the Lease shall remain in effect, and the option periods, if any, shall follow upon the end of the extended term. Rentals, as adjusted by reason of the addition, shall continue. Upon completion, the addition shall be a part of the demised premises, and all references to the demised premises contained in this Lease shall be construed to include both Tenant's store building and the addition.

Causing any addition to be constructed is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns. However, nothing contained in this Lease shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Article 33. Additionally, Landlord's obligation shall not limit Tenant's right to undertake and complete the addition at its own cost, as described later in this Article 33.

If Landlord, for any reason, fails or refuses to construct the building addition contemplated after Tenant has properly exercised its option, Tenant, as its sole remedy and at its option, and at its own expense, shall have the right to construct the building addition of the size and quality set forth above. If Tenant constructs the addition, Tenant agrees to cause any mechanics' liens incurred by and in connection with such addition to be promptly discharged, Tenant further agrees to indemnify and hold Landlord harmless from any expense occasioned by Tenant's construction. If, upon completion and occupancy of a building addition by Tenant, fewer than ten (10) years of the term of this Lease remain, the lease term shall be extended for a period of time necessary to provide a full ten (10) year term. For ten (10) years following the date of completion of the addition, there shall be no increase in minimum guaranteed rental and the base for calculation of percentage rental, if any, shall be increased by an amount equal to the greatest of the three (3) factors set forth in the second paragraph of this Article 33. Upon expiration of ten (10) years following the date of completion of the addition, the base for calculation of percentage rental shall revert to the minimum annual guaranteed rental established in Article 1 of this Lease.

Regardless of which party constructs Tenant's addition, the size of the premises as expanded shall be used to calculate Tenant's payment of real estate taxes and insurance premiums.

**LIMITATION OF LIABILITY**   34   Notwithstanding anything to the contrary provided in this lease, if Landlord or any successor in interest of Landlord is an individual, joint venture, limited liability company, tenancy in common, firm or partnership, general or limited, there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, limited liability company, partnership or joint venture with respect to any of the terms, covenants and conditions of this Lease. Tenant shall look solely to the equity of Landlord or such successor in interest in the demised premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease. This exculpation of personal liability is absolute and without any exception whatsoever.

**SELF-HELP**   35.   If Landlord defaults in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed, and if Landlord fails to cure such default within thirty (30) days after receipt of written notice from Tenant specifying the default (or fails within said period to commence to cure such default and thereafter to prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord. Landlord agrees to reimburse Tenant therefor or save Tenant harmless from such liability. Tenant may cure any default as aforesaid prior to the expiration of said thirty (30) days, but after said notice to Landlord, if the curing of such default prior to the expiration of said thirty (30) days is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by Tenant from the next or any succeeding payments of rent due hereunder.

13

**ESTOPPEL**
**CERTIFICATE**

36.    Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "B" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

    **IN WITNESS WHEREOF**, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

Printed Name: Theresa C. Millican

Printed Name: Robert D. Jenkins


SRC REALTY, L.L.C., an Alabama limited
liability company

By: _____
    Its    Member
Printed Name: E. Paul Strempel, Jr.
Address: 2100 Riverchase Center, Suite 230A
Birmingham, Al 35244

Attest: _____
    Its    Member
Printed Name: Rick L. Griffith
Address: 2100 Riverchase Center, Suite 230A
Birmingham, Al 35244

**LANDLORD**

**(CORPORATE SEAL)**


WINN-DIXIE MONTGOMERY, INC.

By: _____
    Its    Vice President
Printed Name: James Kufeldt
Address: 1550 Jackson Ferry Road
Montgomery, AL 36104-1718

Attest: _____
    Its    Assistant Secretary
Printed Name: W. O. Scaife, Jr.
Address: 1550 Jackson Ferry Road
Montgomery, AL 36104-1718

**TENANT**

**(CORPORATE SEAL)**

Printed Name: Cynthia N. Crossland

Printed Name: Rebecca L. Sawyer

14

STATE OF _Alabama_

COUNTY OF _Shelby_

The foregoing instrument was acknowledged before me this _13_ day of _April_, 19__, by _E Paul Stringel Jr_ and _Rita L Stafford_ Member and ____ Member, respectively, of SRC REALTY, L.L.C., an Alabama company, who is [Please check] ____ personally known to me or ✓ who has produced _Drivers License_ as identification.

Given under my hand and official seal this _13_ day of _April_ _1996_

_Carla Michelle Noyes_

Printed Name: _Carla Michelle Noyes_

(NOTARIAL SEAL)

Notary Public, State and County aforesaid.
My Commission Expires: _Dec 14, 1998_
Notary ID No : _____


STATE OF FLORIDA

COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this _May 10_, 1996, by _James Kufeldt_ President and _W. G. Scaife, Jr._, Assistant Secretary, respectively, of WINN-DIXIE MONTGOMERY, INC , a Kentucky corporation, on behalf of the corporation, who is personally known to me.

Given under my hand and official seal this _10_ day of _May_, 1996

_Rebecca L. Sawyer_

Printed Name: _Rebecca L Sawyer_

(NOTARIAL SEAL)

Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No : _____

REBECCA L SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372338

15



EXHIBIT A
PLOT PLAN

DATE
APPROVED BY:

LANDLORD

TENANT

APPROVED
AS TO FORM

Division Mgr

Legal Dept.
Winn-Dixie Stores,
Inc.

GONZALEZ
ENGINEERING

2100 RIVERCHASE
SUITE 250
BIRMINGHAM, ALABAMA
PHONE:(205)985-
FAX:(205)985-7

SEAL

PROJECT | DWG.NO.
94PSD04 | C1-R4

Sent original
site plan
to H. Martin

**EXHIBIT " B"**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    RBDI 4] ("Owner")

_____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

Executed this the _____ day of _____, 199___.

_____

Registered Land Surveyor No._____
Address:_____

**(SURVEYOR'S SEAL)**

## COVENANT AND EASEMENT AGREEMENT

BAUMAN CHIROPRACTIC CLINIC, P.A. ("Seller"), is the owner of the land described in Exhibit A attached hereto. The Seller is selling a portion of the property to SRC REALTY, LL.C., an Alabama limited liability company (referred to, together with any successor or assign, as the "Developer"), for the proposed construction of a retail grocery store (the "retail development"). The Seller is retaining a portion of the land, which portion is described in Exhibit B and referred to as the "Outparcel". An office building is now located on the Outparcel, which is adjacent to the front parking area of the proposed retail development. The purpose of this agreement is to set forth certain restrictions, easements, covenants and agreements (collectively referred to as "Easements and Restrictions") respecting the Outparcel. Seller, together with any future owner of any right, title or interest in and to the Outparcel, is referred to as the "Owner". The land being sold to Developer, being the land described in Exhibit A less and except the Outparcel, is referred to as the "Adjacent Tract".

## WITNESSETH:

NOW, THEREFORE, to induce the Developer to purchase the Adjacent Tract, in consideration of the sale of the property to Developer, One Dollar, and other due, good and valuable considerations, the parties agree as follows:

1.     Plan Approval. No building, sign, or other improvement shall be erected, remodeled, expanded, repainted, or altered on the Outparcel without plans, specifications, and architectural designs therefor (including but not limited to a description of parking areas, signage, curb cuts, landscaping, building height and building areas) having been first submitted to and approved by Developer in writing prior to commencement of construction. No building, satellite dish, outbuildings, sign, or other improvements may be erected on the Outparcel in addition to the buildings and improvements now situated on the Outparcel.

2.     Subdivision. The Outparcel may not be subdivided by voluntary alienation, judicial sale or other proceedings.

3.     Damage to Improvements. If any building located on the Outparcel shall be damaged or destroyed (partially or totally) by fire or other casualty, then the Owner of the Outparcel shall either (a) repair, rebuild and restore the damaged or destroyed building to a condition at least equivalent to the condition of said building just prior to said fire or casualty, or (b) raze, clear and clean the Outparcel upon which the damaged or destroyed building is located and either pave the surface of the Outparcel at the same grade which existed just prior to said fire or casualty, or landscape (with grass or sod) the Outparcel in a tasteful manner.

4.     Maintenance. The Owner shall keep and maintain the Outparcel in a clean and sightly condition. Such obligations shall include, without limitation, the obligation to (1) maintain paved surfaces in a level, smooth and evenly-covered condition; (2) remove all papers, mud and sand, underbrush, debris, filth and refuse and police or sweep the area to the extent reasonably necessary to keep the Outparcel in a clean and orderly condition; (3) maintain all landscaped areas, make such replacements of shrubs and other landscaping as is necessary, plant grass or other suitable ground cover on any vacant areas and keep all grass or other cover mowed and trimmed in a clean and sightly condition; and (4) maintain in good operation order all sewer, electricity, natural gas, water, telephone and other utility lines, pipes and conduits crossing the Outparcel and/or serving any improvements located thereon, except utility lines and equipment owned by public utilities. If Owner defaults under this provision, the Developer shall have the right (but not the obligation) to perform such maintenance, in which case Owner shall reimburse Developer for the cost of the same, plus an administrative charge of ten percent (10%) of such costs, together with interest on such sum (including the administrative cost) at the prime rate of interest of SouthTrust Bank of Alabama, N.A., at its Birmingham office, plus four percent (4%).

5.     Use Restrictions. The following Easements and Restrictions shall apply to the Outparcel:

(a)     Only retail stores and office buildings shall be allowed to operate in the Outparcel. No spa, bowling alley, skating rink, bingo or electronic game parlor, sales of automobiles, or non-retail or non-service type activities, shall be permitted in the Outparcel. No part of the Outparcel shall be used, leased or rented, directly or indirectly, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, delicatessen, bakery, drug store, pharmacy, army-navy store, surplus store, or store for sale of cosmetics, health and beauty aids, convenience store, gas station, or car wash, nor will any Owner of the Outparcel permit any tenant or occupant of any such property to sublet or use in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business or use; and each Owner further covenants and agrees not to permit or suffer any property located within the Outparcel to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods.

(b)     No building on the Outparcel shall exceed one (1) story or 24 feet in height nor twenty-five percent (25%) of the square footage contained in the Outparcel (subject to other limitations above)

EXHIBIT "C"

(c)     Without limiting the foregoing, the Outparcel may not be used for any use or for any purpose or purposes which would produce nuisances, objectionable noises, obnoxious or toxic odors, any noxious, toxic, caustic, or corrosive fuel or gas, any dust, dirt or fly ash in excessive quantities, any fire hazards, nor shall the Outparcel or any part thereof be used as or for assembly, manufacturing, distilling, refining, smelting, agriculture or mining, mobile home or trailer court, junk yard, animal raising or stockyard, drilling, dumping or disposing, incinerating or reduction of garbage, pornographic bookstore or pornographic recreation facility, massage parlor, pool or billiard establishment, shooting gallery, second hand or surplus store, drug rehabilitation center or "halfway" house, off track betting parlors, bars (except as incidental to a full service restaurant). Spas, massage therapy, sale of health and beauty aid items, vitamins, and similar type products sold as an incidental to Bauman Chiropractic Clinic or Medical Office shall not be deemed in violation of this Paragraph 5.

6.     Access Areas, Common Areas, and Buildings.   At least six (6) parking spaces shall be maintained on the Outparcel for each 1,000 square feet of building area in the Outparcel.   All entranceways on the Outparcel, parking areas, curbs, driveways, and other parts of the Outparcel, all as presently constructed, shall be maintained by the Owner on the Outparcel.

7.     Surface Drainage.   The Owner of the Outparcel shall build and maintain any and all drainage facilities or devices which are necessary or which are required by any governmental authority to receive and channel the surface water drainage from the improvements on such Outparcel, provided said facilities do not impair parking requirements elsewhere herein defined or the permitted uses elsewhere defined herein.

8.     Successors/Duration.   These Restrictions and Easements shall be perpetual, shall run with, burden, and affect, touch and concern the Outparcel and Adjacent Tract and shall benefit and run with and are appurtenant to the Adjacent Tract.   The rights, obligations and easements provided for herein shall inure to the benefit of the Developer and all future owners of the Adjacent Tract and shall be binding upon the Owner of the Outparcel and the successors, assigns, heirs and representatives of each of the same.

9.     Waivers.   No delay or omission in exercising any right accruing under the provisions of this Agreement shall impair any such right or be construed to be a waiver thereof nor shall any waiver by Developer of any of the Easements and Restrictions (which shall not be effective unless in a writing executed by Developer addressing such a waiver) shall not be construed to be a waiver of any subsequent breach thereof or of any other covenant, condition or agreement herein contained.

10.     Costs.   If any action or any proceeding against any party arises out of this Agreement, or is made a party to any action or proceeding brought by a third party arising out of this Agreement, then the prevailing party shall be entitled to recover, as an element of its costs of suit and not as damages, reasonable attorneys' fees to be fixed by the court.   The "prevailing party" shall be the party who is entitled to recover its costs of suit, whether or not suit proceeds to final judgment

11.     No Benefit.   This instrument is not intended to and does not dedicate any portions of the Outparcel or Adjacent Tract to the general public or create any rights for the general public.   No beneficiary (other than Developer) shall have any rights or remedies hereunder, notwithstanding any provision to the contrary herein.

12.     Partial Invalidity.   If any term, provision or condition contained in this Agreement shall, to any extent, be invalid or unenforceable, the remainder of this Agreement (or the application of such term, provision or condition to persons or circumstances other than those in respect of which it is invalid or unenforceable) shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.     Right of First Refusal.   The Developer shall have the right of first refusal to purchase the Outparcel as follows:   Owner shall deliver to Developer a copy of any contract or other agreement ("Contract") for sale, lease, or other transfer of the Outparcel or any right, title, or interest therein or part thereof signed by the vendee, tenant or other transferee (but before signature or delivery by Owner); and Developer shall have ten (10) days after receipt thereof to sign a contract on terms identical to those contained in the Contract   If Developer declines to execute such a contract, Owner shall have sixty (60) days within which to close under the Contract, according to the terms of the Contract (with no material changes), failing which this right of first refusal shall remain in full force and effect respecting such Contract   If closing occurs, this right of first refusal shall continue with respect to any subsequent Contract signed by the new Owner.

14.     Construction Easements.   The Developer shall have a non-exclusive temporary construction easement over the outer forty (40) feet of the Outparcel, from time to time, and appurtenant to, and running with, such party's title to the Adjacent Tract for access, ingress, egress and movement of construction vehicles and equipment used for the construction of improvements on the Adjacent Tract.   The Developer shall also have the right to run utility lines under the outer forty (40) feet of the Outparcel (but not over any area where a building is located) to tie onto any public utility line in the roadway adjacent to the Outparcel.

15.    Encroachment Easement.  The Developer shall have a non-exclusive perpetual easement for encroachment of improvements or pavement over any common boundary line between the Outparcel and the Adjacent Tract, which arise out of, or are necessitated by, normal construction deviations and tolerances.

16.    Easements.  Included in the Outparcel is a "Cross Access Easement Area and Utility Easement Area" (referred to herein as the "Easement Area") which is cross-hatched on the site plan attached as Exhibit C (the "Site Plan").  Owner grants, bargains, sells and conveys to Developer, and Developer reserves, a permanent, non-exclusive easement for ingress and egress, running of utilities, and parking over the Easement Area.  No obstructions or changes of any nature shall be made to the Easement Area or to any of the improvements therein as shown on the Site Plan (including, inter alia, the entranceway to the Adjacent Tract from Transmitter Road, the parking areas, curbs, access areas, or other improvements located in the Easement Area as shown by the Site Plan) without in each instance the consent of Developer and Owner.  Provided, however, that the Developer shall have the right to relocate the curbing, access routes, grassed areas and parking areas as shown in the Easement Area at Developer's exclusive option; and the Owner shall have the right to remove curbing for up to three (3) parking spaces (adjacent to each other) from the Easement Area adjacent to the entrance to Transmitter Road, for the purpose of providing additional access to and from the Outparcel.  Owner shall not obstruct, diminish or relocate the entranceway to the Outparcel from Transmitter Road now in place as shown by the Site Plan.  Developer shall maintain the curbs, grassed areas, parking spaces, paving, and other improvements located in the Easement Area which serve the retail development.

17.    Site Plan.  Except as expressly set forth herein, Developer shall not be bound by any of the proposed building sizes or locations or parking areas or proposed development uses or other writings or matters shown on the Site Plan, all of which shall be subject to change at Developer's exclusive option.

IN WITNESS WHEREOF, the Owner has hereunto affixed its hand and seal this the _____ day of _____, 1996.

"OWNER:"

BAUMAN CHIROPRACTIC CLINIC, P.A.

By:_____[SEAL]
        Walter Reid Bauman, Its:_____

"DEVELOPER:"

SRC REALTY, L.L.C., an Alabama limited liability company

_____[SEAL]
E. Paul Strempel, Jr., a Managing Member

STATE OF _____    )
                                                    :
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this _____ day of February, 1996, by Walter Reid Bauman, the _____ of Bauman Chiropractic Clinic, P.A., on behalf of the corporation, who ( ) is personally known to me ( ) has produced _____ as identification and who ( ) did ( ) did not take an oath.

(NOTARIAL SEAL)        _____
                                      (Print Name:_____)
                                      NOTARY PUBLIC
                                      State of Florida ( ) at large ( ) _____
                                      Commission Number: _____
                                      My Commission expires: _____

3

STATE OF ALABAMA )
                 :
COUNTY OF JEFFERSON )

     The foregoing instrument was acknowledged before me this _____ day of February, 1996, by E. Paul Strompel, as a Managing Partner of SRC Realty, L.L.C., an Alabama limited liability company, who ( ) is personally known to me, ( ) has produced _____ as identification, and who ( ) did ( ) did not take an oath.

(NOTARIAL SEAL)

                               _____
                               (Print Name: _____ )
                               NOTARY PUBLIC
                               State of Florida ( ) at large ( ) _____
                               Commission Number: _____
                               My Commission expires: _____

## CONSENT TO COVENANT AND EASEMENT AGREEMENT

     THE UNDERSIGNED Lender, holder of the mortgage dated _____, recorded at Book \_\_\_\_, Page \_\_\_\_, in the official records of Bay County, Florida (the "Mortgage"), and other loan documents as described therein, on the Outparcel, hereby consents to the foregoing Covenant and Easement Agreement (the "Declaration"), executed by Bauman Chiropractic Clinic, P.A. and SRC Realty, L.L.C., to which this Consent is attached, and further agrees that such Mortgage shall be, and it hereby is, subject and subordinate to this Declaration.

### "LENDER:"

ATTEST:         _____

By:_____    By:_____    [SEAL]

Name:_____    Name:_____

Its:_____    Its:_____

STATE OF _____ )
                    :
COUNTY OF _____ )

     The foregoing instrument was acknowledged before me this _____ day of February, 1996, by _____, the _____ of _____ _____ on behalf of the corporation, who ( ) is personally known to me ( ) has produced _____ as identification and who ( ) did ( ) did not take an oath.

(NOTARIAL SEAL)

                               _____
                               (Print Name: _____ )
                               NOTARY PUBLIC
                               State of Florida ( ) at large ( ) _____
                               Commission Number: _____
                               My Commission expires: _____

EXHIBIT "A"

DESCRIPTION
PARCEL ONE

A parcel of land containing 6.45 Acres (281,135.08 Square feet), more or less, located within Lots 24, 25 and 40 of The St. Andrew's Bay Development Company's Plat of Section 24, Township 3 South, Range 14 West, Bay County, Florida as recorded in Plat Book 6, Page 16; more particularly described as follows:

Commence at the Northeast corner of Lot 24 of the St. Andrews Bay Development Company's Plat of Section 24, Township 3 South, Range 14 West, Bay County, Florida; thence run N 90°00' E, 247.51 feet; thence S 38°58' E, 334.41 feet to the Northwesterly Right-of-Way of U.S. Highway No. 231; thence S 52°26' W along said R.O.W. a distance of 630.46 feet; thence N 89°28'24" W, 88.73 feet to the Point of Beginning; thence S 28°45'40" E, 56.95 feet to the Northwesterly R.O.W. of U.S. Highway No. 231; thence S 52°26' W, 515.96 feet along said R.O.W. line; thence N 30°20'25" W, 165.45 feet; thence N 86°31'17" W, 86.29 feet to the Easterly R.O.W. of Transmitter Road; thence N 3°23'32" E, 238.82 feet along said R.O.W.; thence S 86°35'29" E, 27.90 feet; thence N 3°32'45" E, 289.68 feet along said Transmitter Road R.O.W. to the Southerly R.O.W. of 37th Plaza; thence S 88°24'35" E, 510.94 feet along said Southerly R.O.W.; thence S 3°45'06" W, 295.84 feet to the Point of Beginning.

EXHIBIT "B"

DESCRIPTION
PARCEL TWO

A parcel of land containing 0.71 Acres (30,875.08 Square feet),
more or less, located within Lot 40 of The St. Andrew's Bay
Development Company's Plat of Section 24, Township 3 South, Range
14 West, Bay County, Florida as recorded in Plat Book 6, Page 16;
more particularly described as follows:

Commence at the Northeast corner of Lot 24 of the St. Andrews Bay
Development Company's Plat of Section 24, Township 3 South, Range
14 West, Bay County, Florida; thence run N 90°00' E, 247.51 feet;
thence S 38°58' E, 334.41 feet to the Northwesterly Right-of-Way of
U.S. Highway No. 231; thence S 52°26' W along said R.O.W. a
distance of 630.46 feet; thence N 89°28'24" W, 88.73 feet; thence
S 28°45'40" E, 56.95 feet to the Northwesterly R.O.W. of U.S.
Highway No. 231; thence S 52°26' W, 515.96 feet to the Point of
Beginning along said R.O.W. line; thence continue S 52°26' W,
186.20 feet along said R.O.W. line; thence N 50°53'26" W, 46.39
feet to the Easterly R.O.W. of Transmitter Road; thence N 3°23'32"
E, 232.82 feet along said R.O.W.; thence S 86°31'17" E, 86.29 feet;
thence S 30°20'25" E, 165.45 feet to the Point of Beginning.

EXHIBIT "C"



EXHIBIT "D"

**ESTOPPEL CERTIFICATE**
WINN-DIXIE STORE #▓▓▓[42]
▓▓▓[8]
▓▓▓[10], ▓▓▓[12]

The undersigned officer of ▓▓▓[4], a ▓▓▓[5] corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.    That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with ▓▓▓[1], a ▓▓▓[2] ▓▓▓[3], as the current landlord ("Landlord") dated ▓▓▓[41], conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as ▓▓▓[6] (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

(a)    Short Form Lease dated ▓▓▓[41], recorded in Official Records Volume _____, page ____ of the public records of ▓▓▓[11], ▓▓▓[12];
(b)    Letter Agreement(s) dated _____;
(c)    Supplemental Lease Agreement dated _____;
(d)    First Amendment to Lease dated _____;
(e)    Second Amendment to Lease dated _____.

2.    That the term of the Lease commenced ▓▓▓[43], and is scheduled to expire on ▓▓▓[44] unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the lease for five (5) terms of five (5) years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

(a)    _____
(b)    _____
(c)    _____
(d)    _____

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

6.    Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____

7. Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8. Notwithstanding anything to the contrary herein:

(a) No acceptance or possession of the Premises, the opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b) Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9. The address for notices to Tenant is ▓▓▓▓[26], ▓▓▓▓[27], with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10. This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

▓▓▓▓[4]

By:_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

▓▓▓▓[1]

By:_____

Its:_____