

# LEASE

**Waterford Lakes Village Shopping Center**
**Southeast Corner of Alafaya Trail Boulevard and**
**Lake Underhill Road**

# Orlando, Orange County, FL



APPROVED
RVB
Division Mgr.
NGH
Legal Dept.
Winn-Dixie Stores,
Inc.

## TABLE OF CONTENTS

| | |
|---|---|
| PREMISES | 1 |
| TERM | 1 |
| RENT | 1 |
| TITLE | 3 |
| SURVEY | 4 |
| ENVIRONMENTAL AUDIT | 4 |
| USE | 5 |
| COMPLIANCE WITH LAWS | 5 |
| CONSTRUCTION OF SHOPPING CENTER | 5 |
| COMPLETION DATE | 6 |
| COMMENCEMENT DATE | 6 |
| DECLARATION | 7 |
| PARKING AND COMMON AREAS | 7 |
| SERVICE AREA | 7 |
| UTILITIES | 8 |
| TENANT'S MAINTENANCE | 8 |
| LANDLORD'S MAINTENANCE | 8 |
| SIGNS | 8 |
| FIXTURES AND INTERIOR ALTERATIONS | 9 |
| INDEMNIFICATION | 9 |
| CASUALTY | 9 |
| LANDLORD'S INSURANCE | 10 |
| QUIET ENJOYMENT | 10 |
| TAXES AND LIENS | 10 |
| CONDEMNATION | 11 |
| DEFAULT | 11 |
| BANKRUPTCY | 11 |
| CONSTRUCTION RISKS | 11 |
| NOTICES | 12 |
| ASSIGNMENT AND SUBLEASING | 12 |
| SUBORDINATE | 12 |
| ESTOPPEL CERTIFICATE | 12 |
| LENDER'S CURE | 12 |
| BENEFIT | 13 |
| TRANSFER BY LANDLORD | 13 |
| SHORT FORM LEASE | 13 |

MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . 13

COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . 13

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . 13

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . 14

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

INDIVIDUAL STATE MANDATED PROVISIONS . . . . . . . . . . . . . 15

CONTINGENCY . . . . . . . . . . . . . . . . . . . . . . . . . . 15

EXPANSION OPTION . . . . . . . . . . . . . . . . . . . . . . . . 15

## LEASE

**THIS LEASE** is made between **FAISON CAPITAL DEVELOPMENT, INC.**, a North Carolina corporation ("**Landlord**") and **WINN-DIXIE STORES, INC.**, a Florida corporation ("**Tenant**"). "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain store building, approximately 222 feet in width by 231 feet in depth, with irregularly configured entrances at the front and coolers, freezers, annexes, and loading dock in the rear, with parking area, sidewalks, service areas, and other improvements to be constructed thereon by Landlord according to plans and specifications ("Tenant's Plans") to be approved by Landlord and Tenant on or before sixty (60) days after the full execution of this Lease (the "Execution Date"), and the approximately 6 acres of land on which the same shall stand, which store building and related improvements (collectively, the "Store"and together with the Common Areas, as hereinafter defined, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A", the "Site Plan", known as Waterford Lakes Village (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the southeasterly corner of Alafaya Trail Boulevard and Lake Underhill Road in or near the City of Orlando, County of Orange, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**

2.    (a) Initial Term.    The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20 ) years (the "Initial Term").

(b) Extension Term(s). Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term by giving to Landlord a notice in writing at least 180 days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c) Return of Premises.    Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties, and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state.

(d) Holding Over.    Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy from month to month, at the same rent and upon the same terms and conditions applicable to the Term.

**RENT**

3.    (a) Basic Rent. Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of Four Hundred Eight Thousand Four Hundred and Fifty-two Dollars ($408,452.00) per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of Thirty-four Thousand Thirty-seven Dollars and sixty-seven cents ($34,037.67) per month, plus all applicable sales taxes, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b) Percentage Rent.    In addition, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one per cent (1%) of Gross Sales (as hereinafter defined) exceeds the Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each fiscal year of Tenant. However,

O:\TRANSFER\WATERFRD.LS

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each fiscal year shall be calculated separately and without reference to any other year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year.

"Gross Sales" shall mean the aggregate sales price of all merchandise sold in or from the Premises during each fiscal year of the Term, both for cash and on credit (less customary reserves for bad debts). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises.

Tenant shall keep complete and accurate books and records of its Gross Sales at the office address designated for notices under this Lease. At the end of each fiscal year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding fiscal year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit the Tenant's Gross Sales figures. The Landlord may then, at its cost and expense, cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant. If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent due under this Lease.

(c)  Additional Rent.    Tenant shall pay as Additional Rent its Pro-rata Share, as hereinafter defined, of (i) Common Area Maintenance Expenses, (ii) Real Property Taxes, and (iii) Shopping Center Insurance (collectively, "Additional Rent"). With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts, canceled checks, and other evidences of payment by Landlord (the "Payment Evidence"). On or before thirty (30) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year. Tenant shall have the right, within one hundred and eighty days of receiving Landlord's statement of Additional Rent, to receive copies of the Payment Evidence and to audit Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it appears that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report. If Landlord fails to so pay the amount of such overpayment to Tenant, Tenant may offset the amount of such overpayment against all Basic Rent, Additional Rent, and Percentage Rent due under this Lease.

(i)  Common Area Maintenance Expenses.    Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses." Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Additional Rent to be due for the upcoming year. Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as

2

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

hereinafter defined, including those maintenance functions required to be performed under this Lease, including, without limitation, lighting, painting, cleaning, traffic control, policing, inspecting, landscaping, and repairing and replacing the Common Areas. Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, management or administrative fees, the costs of individual tenant improvements, special services or excess utilities provided to other tenants, any utility expense paid for directly by Tenant, advertising or marketing expenses, penalties for Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal or interest on mortgages to which the Shopping Center is subject, the replacement of capital investment items or new capital improvements unless such items and improvements result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term or unless such improvements are necessary to comply with Legal Requirements (hereinafter defined) applicable to the Common Areas, in which case, the cost thereof shall be amortized over the maximum allowable useful life of such improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, or any expense over $5,000.00 incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed. Landlord shall use reasonable efforts to minimize Common Area Maintenance Expenses.

(ii)  Real Property Taxes.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Real Property Taxes." Real Property Taxes includes all ad valorem real estate taxes, less any abatements, discounts, or refunds permitted by law. Real Property Taxes does not include special assessments, taxes, and other charges of any community development district levied against the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord, or any other tenant of the Shopping Center, which shall be the responsibility of Landlord or such other tenant. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion. If Tenant grants its approval, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(iii)  Shopping Center Insurance.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance." Shopping Center Insurance means the liability, fire, casualty, flood, and vandalism insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption or rent loss insurance carried by Landlord.

Tenant's "Pro-rata Share" shall be the ratio of the net rentable square footage of the Store to the total net rentable square footage of all buildings in the Shopping Center. Notwithstanding the foregoing, if Landlord sells any portion of the Shopping Center (an "Outparcel") to another party, the purchaser of the Outparcel shall maintain such Outparcel and such Outparcel shall not be included in the Shopping Center for purposes of calculating Tenant's Pro-rata Share.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated.

**TITLE**          4 .  On or before ten (10) days after the Execution Date, Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company"), a title insurance commitment naming Tenant as the proposed insured and committing to insure Tenant's leasehold and its interests in the Easements, if any (as hereinafter defined) and shall provide Tenant with copies of all title exceptions (the "Commitment"). Landlord shall deliver the Commitment to Tenant on or before sixty (60) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to

3

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Acquisition Deadline, as hereinafter defined ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections before the Acquisition Deadline, then Tenant shall have ten (10) days thereafter, to elect by written notice to Landlord whether to (i) waive the unsatisfied objections and lease the Premises subject to title defects, or (ii) terminate this Lease, or (iii) grant Landlord such additional time to cure as Tenant deems reasonable in its sole discretion, but in any event, not more than five (5) days. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Acquisition Deadline. If Landlord fails to so cure such objections, then Tenant may, at is sole option, either (i) waive its objections and lease the Premises subject to the title defect; or (ii) terminate this Lease. It shall be a condition to Tenant's paying rent under this Lease that the Premises and Tenant's interest in the Easements, if any, be subject only to exceptions reasonably satisfactory to Tenant ("Permitted Exceptions"). Prior to the Commencement Date, Landlord shall satisfy all requirements of Schedule B-1 of the Commitment and shall execute such affidavits, documents, instruments, or forms as the Title Company may reasonably require to permit the deletion of all but the Permitted Exceptions. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy insuring Tenant's leasehold subject only to the Permitted Exceptions in the amount of $300,000.00 (the "Title Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease.

| SURVEY | 5. | On or before ten (10) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located, an actual survey of the real property comprising the Shopping Center, showing all improvements currently located thereon and in conjunction with an engineer engaged by Landlord, the projected location of the Premises, the Common Areas, the Easements, if any, and the other buildings to be included in the Shopping Center (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit D. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey shows any matters which are objectionable to Tenant, in its reasonable judgment, Tenant shall notify Landlord in writing specifying survey defects on orr before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Acquisition Deadline, as hereinafter defined ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections before the Acquisition Deadline, then Tenant shall have ten (10) days thereafter, to elect by written notice to Landlord whether to (i) waive the unsatisfied objections and lease the Premises subject to title defects, or (ii) terminate this Lease, or (iii) grant Landlord such additional time to cure as Tenant deems reasonable in its sole discretion, but in any event, not more than five (5) days. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Acquisition Deadline. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (i) waive its objections and lease the Premises subject to the Survey defect; or (ii) terminate this Lease. |

| ENVIRONMENTAL AUDIT | 6. | On or before ten (10) days after the Execution Date, Landlord shall order, and shall deliver to Tenant on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, Landlord, and Landlord's lender, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Alternatively to providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month |

4

period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant may terminate this Lease by written notice to Landlord on or before ten (10) days after receipt of the Audit or Prior Audit.

**SE**

7.      The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

Tenant shall have the exclusive right to operate in the Shopping Center a supermarket, pharmacy or prescription drug concession, photo lab or film development business and an automatic teller machine (except for any financial institution opened within the Shopping Center). Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, pharmacy or prescription drug concession, photo lab or film development business, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (i) by a business or businesses for which the sale of such items does not exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, (ii) by a restaurant as prepared, ready-to-eat food items, for consumption either on or off site, or (iii) the sale of food items by a health food store or nutrition center, an ice cream parlor or frozen yogurt store, a bagel shop, or by a gas station/convenience store, provided that the floor area of such gas station/convenience store which is dedicated to food does not exceed 1,700 square feet and that such gas station/convenience store is located on the portion of the Shopping Center labeled "Parcel A" on the Site Plan. With the exception of package stores and the permitted gas station/convenience store referred to above, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center; provided, however that a delicatessen restaurant which does not substantially duplicate those items sold by Tenant's delicatessen business may be located in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof. No spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices (other than one free-standing medical office not exceeding 12,500 square feet and up to 3,000 square feet of space in the area designated as "Retail C" on the Site Plan), automobile dealership, church, or health, recreational or entertainment-type activities shall be permitted in the Shopping Center.

Upon any assignment or subletting of the Premises for a use other than the exclusive uses granted to Tenant hereunder, such exclusive use rights shall terminate and shall be of no further force or effect against Landlord or against the Shopping Center.

**COMPLIANCE WITH LAWS**

8.      Tenant shall at all times comply with all applicable laws, ordinances, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to fulfillment of its obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.      Landlord, at its sole cost and expense, shall construct the Shopping Center, substantially as shown on the Site Plan, consisting of all the buildings shown thereon, and all ramps, sidewalks, streets, entrances, malls, parking areas, service areas, driveways, traffic signals, utility lines, water detention and retention facilities and related improvements (excluding the

5

buildings, collectively, the "Common Areas"). Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the Common Areas, and shall provide proper and adequate water drainage and lighting therefor, and shall operate and maintain the same in good repair and usable condition during the Term. The arrangement and location of all buildings and Common Areas shall at all times during the Term be maintained as shown on the Site Plan and shall not be changed, unless mandated by applicable Legal Requirements, without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenants sole discretion. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which may be withheld or conditioned in Tenant's sole discretion. If not shown on the Site Plan, Tenant expressly reserves the right to approve the finish grade elevations of all buildings and the Common Areas within the Shopping Center. If the arrangement or location of the buildings or Common Areas are changed or the exterior facade modified without Tenant's prior written consent, Tenant may terminate this Lease by written notice to Landlord if, in Tenant's reasonable judgement such change or modification will materially and adversely affect Tenant's business.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct the Store in accordance with Tenant's Plans. Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease. Tenant's Plans shall provide for a completed store building, commonly referred to as a "lock and key job". This Lease shall not be effective or enforceable against Tenant unless and until Landlord and Tenant have so approved Tenant's Plans.

**COMPLETION DATE**

10.    Construction of the Store and the Shopping Center shall begin not later than 120 days after the Acquisition Deadline and shall be completed not later than 180 days following that date on which construction begins; and if not begun or completed by these respective dates, Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store within the stipulated time shall be due to Force Majeure, as hereinafter defined, and provided further construction shall be completed with all due diligence and in any event not later than October 31, 1996 (he "Outside Completion Date"), this option to terminate shall not arise. "Construction of the Store " shall be deemed to have begun when the first concrete footings have been poured. If, pursuant to this paragraph, Tenant shall terminate this Lease or if Landlord fails to commence or complete construction of the Store by the above dates, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

**COMMENCEMENT DATE**

11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed in paragraphs (a ) - ( f ) below (the "Conditions"), whichever date shall later occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in accordance with Tenant's Plans and Landlord shall have delivered to Tenant, at Landlord's expense, (i) the Title Policy, (ii) the Survey, and (iii) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store ;

(b)    Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    Construction of at least 236 lineal feet of store frontage of the area marked "Retail B" on the Site Plan shall have been completed as shown on the Site Plan;

(e)    Tenant shall have insurable easement rights, if necessary, for ingress and egress via Alafaya Trail and Lake Underhill Drive.

6

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(f)    The Declaration, as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction.

If all the Conditions shall not have been met on or prior to the Outside Completion Date, Tenant, at its sole option, may terminate this Lease.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date. No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1 of any year and on or before January 31 of the succeeding year, rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

Tenant shall open its Store for business within thirty (30) days after the Conditions are met.

DECLARATION    12.    Landlord shall have recorded in the public records of the county in which the Shopping Center is located declaration(s) of covenants and restrictions (collectively, the "Declaration") as a primary encumbrance and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that:

(a)    no portion of the Shopping Center shall be used for any of the activities or uses prohibited by this Lease;

(b)    no structure constructed on the tract designated on the Site Plan as an Outparcel shall exceed a maximum size of 25% of the land area thereof or a maximum vertical height of 25 feet as measured from ground level;

(c)    no drilling or mining for oil, gas, or minerals may take place in any manner upon the Shopping Center or any portion thereof.

PARKING AND    13.    Tenant, its employees, agents, suppliers, customers and invitees, shall have the
COMMON AREAS    nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

(a)    a minimum ratio of at least 5.5 automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 534 automobiles (minimum).

If the parking area furnished should at any time be materially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is sent to Landlord giving reasonable details, Tenant shall have the right to terminate this Lease. No signboards or other construction shall be erected in any of the Common Areas or so as to obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

SERVICE AREA    14.    Landlord shall provide parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances.

7

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**TILITIES**

15.    Landlord shall cause to be separately metered and Tenant shall pay all charges measured by its consumption or use for telephone, electricity, water, gas, refuse removal, and other utilities and services used by Tenant at the Store, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any installation charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted by Landlord at its expense during the hours of ½ hour before dusk until 12:00 a.m. (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area designated on the Site Plan.

**TENANT'S**
**MAINTENANCE**

16.    Tenant shall keep the interior of the Store, including, without limitation, the windows, plate glass, automatic doors, and the heating, ventilating, and air conditioning system ("HVAC") in reasonably neat and orderly, good condition and repair, excepting structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Landlord shall assign to Tenant all warranties received by Landlord in connection with construction of the Store, including the HVAC warranty, for those items which Tenant is responsible for maintaining. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**LANDLORD'S**
**MAINTENANCE**

17.    Landlord shall, at its cost and expense, keep and maintain in good condition and repair the facade of the Shopping Center, the exterior and structural portions of the Store, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system and monitoring charges therefor, if required by governmental authority), the plumbing (including septic tank, if any), wiring, not including any plumbing fixtures or wiring in the interior of the Store, and floor surfacing of the Store and shall make any and all structural repairs to both the exterior and interior of the Store and the Shopping Center. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. Landlord will complete such repairs immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store rendered necessary by the fault, act, or negligence of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to Landlord's insurance policies covering the Shopping Center and/or the Premises.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to perform acts of maintenance or to provide services which are the responsibility of Landlord under this Lease, or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store or Common Areas, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

**SIGNS**

18.    Subject to applicable Legal Requirements and approval of any architectural review committee disclosed by the Commitment as having sign approval authority over the Shopping Center, Tenant may place, erect, and maintain any signs on the roof, walls, and any other places on or about the Store, which signs shall remain the property of Tenant and may be removed at any time during the Term provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs.

8

**IXTURES AND
NTERIOR
LTERATIONS**

19.    Tenant, at its own expense, shall have the right from time to time during the Term to make any interior or exterior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity ("Tenant Modifications"). Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural improvements shall belong to Landlord and become a part of the Premises upon termination or expiration of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures and equipment of every kind and nature as may be necessary or desirable in Tenant's business (Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to remove all or any part of Tenant's Trade Fixtures at any time; provided, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures.

**NDEMNIFICATION**

20.    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the uninsured negligence or wilful misconduct of Tenant, its agents or employees.

**CASUALTY**

21.    If (a) the Store is totally destroyed or damaged by fire or other casualty to the extent of 50% or more of the value or to an extent that renders the Store untenantable, or (b) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use, then Tenant may elect within thirty (30) days after such damage, to terminate this Lease by written notice. If the Store shall suffer damage to any extent less than 50% of the value thereof, or if Tenant does not elect to terminate in accordance with the previous sentence, then Landlord shall to proceed promptly and without expense to Tenant to repair the damage or restore the Premises in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall abate in proportion to the percentage of the Common Areas damaged or destroyed until the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**LANDLORD'S
INSURANCE**

22.    Landlord shall carry the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(a)  Liability Insurance.  Landlord shall carry, at its expense, comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $2,000,000.00.

(b)  Casualty Insurance.  Landlord shall carry all-risk commercial property insurance on the Premises and the Shopping Center and any additions, alterations, and improvements made thereto by Landlord or Tenant in the amount of the full replacement cost thereof, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

**QUIET
ENJOYMENT**

23.    Landlord covenants, warrants and represents that:

(a)  the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion except with respect to a Mortgage for which Tenant has received an SNDA as hereinafter defined;

(b)  Landlord is a duly organized, validly existing North Carolina corporation has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary corporate action;

(c)  no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privilege intended to be granted under this Lease;

(d)  Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the Term;

(e)  there is no zoning, comprehensive plan, or other restriction preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes.

If any representation or warranty made by Landlord in this Lease is determined during the Term to be false, and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, or the value of its leasehold estate, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

**TAXES AND
LIENS**

24.    All taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center shall be promptly paid by Landlord prior to delinquency. Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which may threaten its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and shall promptly be reimbursed by Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

CONDEMNATION    **25.**    If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled, within thirty (30) days of such taking, to terminate this Lease at its option, and any unearned rent or other charges paid in advance shall promptly be refunded to Tenant. If Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion any repairs and restoration reasonably necessary to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances, and if Landlord and Tenant cannot agree as to what is just and equitable, Tenant may terminate this Lease by written notice to Landlord.

If any portion of the Common Areas or route or mode of access thereto, is obstructed or taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or its use of or access to or through the Common Areas, or so as to reduce the required parking area by an amount in excess of ten percent (10%) or reduce the number of cars which may be conveniently parked to less than 480, Tenant may, at its option exercised within thirty (30) days of such taking or obstruction, terminate this Lease and shall be liable for rent only up to the time of such obstruction or taking.

DEFAULT    **26.**    Tenant shall be in default under this Lease if:

(a) Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b) Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure; or

(c) Tenant ceases to operate a business within the Store for a period of more than ninety (90) days (except if due to casualty, remodeling, or force majeure).

Following an uncured default by Tenant, Landlord, at its option, may either (a) terminate this Lease or (b) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom. Tenant shall remain liable for the deficiency, if any, between the Basic Rent due hereunder and the total rent obtained by Landlord on reletting.

Notwithstanding the foregoing, a default (except as to payment of rent) shall be deemed cured if Tenant in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to cure such default.

BANKRUPTCY    **27.**    If, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may, at its option, declare the Term at an end and shall forthwith be entitled to immediate possession of the Premises.

CONSTRUCTION    **28.**    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in
RISKS    constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof.

11

**NOTICES**

29. All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :   Faison Capital Development, Inc.
225 East Robinson Street #500
Orlando, FL 32801
Attn: John M. Joyce

Telecopy: (407) 425-3167

or such other address as Landlord may direct from time to time.

Tenant:   Winn-Dixie Stores, Inc.
Attn: G. B. Inclan
3015 Coastline Drive
Orlando, FL 32808

Telecopy: (407) 578-4090

With a copy to: Winn-Dixie Stores, Inc.
Attn: Mallory Gayle Holm, Esq.
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297

Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

30. Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease. Notwithstanding the foregoing, if Tenant assigns this Lease to an assignee with a net worth of the greater of $50 Million or Tenant's net worth at the time of such assignment, Tenant shall be released from all liability hereunder accruing after such assignment.

**SUBORDINATE**

31. Provided that, with respect to any mortgage or security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

**ESTOPPEL CERTIFICATE**

32. Within a reasonable time after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year.

**LENDER'S CURE**

33. Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant

12

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the rent payable hereunder by reason of such default unless and until it has afforded the Mortgagee thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, that the Mortgagee notifies Tenant that it intends to cure such default, in fact undertakes such a cure, and diligently prosecutes such cure to completion. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

34.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

35.    If Landlord transfers Landlord's interest in the Premises, the Shopping Center, or this Lease, Landlord agrees to promptly provide Tenant with satisfactory documentary evidence of such transfer, together with the agreement of Landlord's transferee to assume all of Landlord's obligations under this Lease.

**SHORT FORM LEASE**

36.    Landlord agrees that any time on request of Tenant it will execute a short form of this Lease in form permitting its recording in the public records of the county or parish in which the Premises are located.

**MARGINAL TITLES**

37.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

38.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |

**FORCE MAJEURE**

40.    If there shall occur, during the Term, (a) strike(s), lockout(s), or labor dispute(s); (b) the inability to obtain labor or materials or reasonable substitutes therefor; (c) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other similar conditions (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

13

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**ENVIRONMENTAL 41.**    (a) LANDLORD.    Landlord represents and warrants to Tenant that it has not prior
**CONDITION**    to the commencement of this Lease, and will not during the term of this Lease or any renewal
thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous substance,
as hereinafter defined, in, on, or about the Shopping Center. Landlord certifies to Tenant that
to its knowledge no other tenant of the Shopping Center has caused or permitted to be used,
stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or
about the Shopping Center. "Hazardous Substance" includes, without limitation, any and all
material or substances which are defined as "hazardous waste", "extremely hazardous waste" or
a "hazardous substance" pursuant to state, federal or local governmental law. "Hazardous
Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"),
chlorofluorocarbons, and petroleum.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant harmless
against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation,
demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including,
without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any
kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be
imposed upon, incurred by or asserted against Tenant and arising from or out of any
Hazardous Substances on, in, under or affecting all or any portion of the Premises or the
Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of
the Premises. This indemnification includes, without limitation, any and all costs incurred due
to any investigation of the site or any cleanup, removal, or restoration mandated by a federal,
state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information
concerning Hazardous Substances in connection with the Shopping Center which Landlord
receives from any governmental unit or agency overseeing environmental matters and copies
received by landlord of any such notices, letters, or requests for information sent to any other
tenant of the Shopping Center. If a release of Hazardous Substances or other environmental
condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents or
employees acting within the scope of their employment, which release or environmental condition
materially impairs for more than 7 days Tenant's ability to use the Premises for the Permitted
Use, Tenant may (a) abate all rent due under this Lease during the time Tenant's use is impaired
and/or (b) terminate this Lease by written notice to Landlord.

(b) TENANT. Tenant shall not cause or permit any Hazardous Substance to be used,
stored, generated, or disposed of on, in or about the Premises without obtaining Landlord's prior
written consent, which consent, except as to reasonable quantities of cleaning fluids or a grease
tank, may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored,
generated, or disposed of on, in, or about the Premises except as permitted above, or if the
Premises or the Shopping Center become contaminated in any manner as a result of any breach
of the foregoing covenant or any act or omission of Tenant or any of its agents or employees
acting within the scope of their employment, Tenant shall indemnify and hold harmless Landlord
from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including
attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any
decrease in value of the Shopping Center, damages due to loss or restriction of rentable or usable
space, or any damages due to adverse impact on marketing of the space in the Shopping Center),
and expenses arising during or after the term of this Lease and arising as a result of such
contamination. This indemnification includes, without limitation, any and all costs incurred due
to any investigation of the site or any cleanup, removal, or restoration mandated by a federal,
state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant
causes the presence of any Hazardous Substance on, in or about the Premises that results in
contamination, Tenant, at its sole expense, shall promptly take any and all necessary actions to
return the Premises or the Common Areas, as the case may be, to the same condition that existed
prior to the presence of any such Hazardous Substance on, in, or about the Premises. Tenant
shall first obtain Landlord's approval for any such remedial action, which approval shall not
unreasonably be withheld or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by
Hazardous Substances resulting from Tenant's use and operation of the Premises. Nothing herein
contained shall be held to indemnify Landlord from liability for Hazardous Substances
contamination resulting from Landlord's ownership, use or operation, or the use of operation by

14

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

any third party in, or under the Premises, the Common Areas or any other portion of the Shopping Center.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease.

**NO BROKERS**    42.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee.

**INDIVIDUAL STATE MANDATED PROVISIONS**    43.    Certain states mandate the inclusion of various provisions in all leases of real property located in such states. The following provisions are included to satisfy such individual state requirements and are applicable only if the Premises are located in the state named opposite the provisions appearing below.

**ALABAMA**

**FLORIDA**    Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**GEORGIA**

**KENTUCKY**

**LOUISIANA**

**ETC.**

**CONTINGENCY**    44.    This Lease is contingent upon Landlord's acquisition of the Shopping Center on or before December 31, 1995 (the "Acquisition Deadline"). If Landlord does not acquire the Shopping Center on or before the Acquisition Deadline, this Lease shall be null and void and the parties hereto shall have no further obligations hereunder.

**EXPANSION**    45.    Tenant is granted the option and privilege (Tenant's Enlargement Option"), five (5) years from the Commencement Date and at five (5) year intervals thereafter, during the Term of requiring the enlargement of the Store by incorporating therein an addition consisting of the area to the south side of the Store (the "Addition"). The Addition shall not exceed eighty (80) feet in width by two hundred thirty-one (231) feet in depth, which area shall be reserved for such enlargement and pending same may be partially paved for parking or rented to other tenants. Tenant may exercise Tenant's Enlargement Option by giving to Landlord a notice in writing ninety (90) days prior to the expiration of the fifth year from the Commencement Date or ninety (90) days prior to expiration of each five year interval thereafter of its exercise of such option, and upon receipt of such notice, the Landlord agrees to construct such Addition, at its sole cost for occupancy by Tenant, in accordance with plans and specifications to be approved in writing by the parties hereto, with the Addition to be completed with all due diligence and of a like quality of construction as the original Store.

15

To facilitate construction of the Addition, Landlord agrees that the south wall of the Store shall initially be constructed with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Upon completion of such Addition, or tender of the Addition space to Tenant, if there shall not at such date remain at least ten (10) years of the Term, such Term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date and Tenant's remaining Extension Terms, if any, shall be preserved. Thereafter the annual Base Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the Addition, or an amount equal to $7.95 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified to by the general contractor performing the work.  Upon completion of the Addition, it shall become a portion of the Store and this Lease shall be construed to be amended to so provide.

If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant, at its option, shall have the right to at its own expense to construct the Addition of the size and quality set forth above.  If Tenant constructs the Addition, Tenant shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby.  Thereafter, during the Term there shall be no Basic Rent payable by Tenant in respect of such Addition.

If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (a) sewerage and water permits, (b) allocations of sewerage and water or (c) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition.  If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year written below.

Witnesses:

Print name: ELIZABETH M. SPEED

Print name: Barbara J. Simverie

Print name: Sharon B. Van Hoek

Print name: Cynthia N. Crossland

Landlord:

Faison Capital Development, Inc.,
a North Carolina corporation

By: _____
Name:  JAMES H. CULPEPPER, IV
Title:  VICE PRESIDENT
Date:  Oct 10, 1995

Tenant:

Winn-Dixie Stores, Inc., a Florida
corporation

By: _____
Name:  R. P. McCook
Title:  Vice President
Date:  Sept. 26, 1995

16

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**EXHIBIT B**

LEGAL DESCRIPTION OF SHOPPING CENTER

COMMENCE AT THE WEST 1/4 CORNER OF SECTION 27. TOWNSHIP 22 SOUTH. RANGE 31 EAST. ORANGE COUNTY, FLORIDA. THENCE RUN S00°16'13" E. ALONG THE WEST LINE OF THE SOUTHWEST 1/4 OF SAID SECTION 27. A DISTANCE OF 122.50 FEET TO A POINT ON THE CENTERLINE OF LAKE UNDERHILL ROAD AS RECORDED IN O.R. BOOK 3401 - PAGE 1609. PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA. THENCE RUN N89°31'37"E. ALONG SAID CENTERLINE AND ITS EASTERLY EXTENSION. A DISTANCE OF 2576.53 FEET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF ALAFAYA TRAIL AS RECORDED IN O.R. BOOK 3409. PAGE 1329. PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA. THENCE RUN SOUTH ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 60.00 FEET FOR A POINT OF BEGINNING. THENCE RUN N 89°31'37" E. A DISTANCE OF 509.67 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE SOUTHERLY, HAVING A RADIUS OF 1210.00 FEET. THENCE THROUGH A CENTRAL ANGLE OF 41°49'20", RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 883.22 FEET. THENCE DEPARTING SAID CURVE. RUN S45° 07'15" W. A DISTANCE OF 284.81 FEET. THENCE S44°52'45"E. A DISTANCE OF 50.00 FEET. THENCE S45°07'15"W. A DISTANCE OF 235.00 FEET THENCE N86°54'59"W. A DISTANCE OF 100.00 FEET. THENCE N03°05'01E. A DISTANCE OF 140.63 FEET. THENCE N86°54'59"W. A DISTANCE OF 908.27 FEET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF ALAFAYA TRAIL. SAID POINT BEING ON A CURVE. CONCAVE NORTHWESTERLY HAVING A RADIUS OF 1932.00 FEET. THENCE FROM A TANGENT BEARING OF N06° 43' 16"E. THROUGH A CENTRAL ANGLE OF 06°43'16", RUN NORTHEASTERLY ALONG THE ARC OF SAID CURVE AND SAID RIGHT-OF-WAY LINE. A DISTANCE OF 226.63 FEET TO THE POINT OF TANGENCY; THENCE RUN NORTH. A DISTANCE OF 278.84 FEET TO THE POINT OF BEGINNING.

**EXHIBIT C**

**SUBORDINATION, NONDISTURBANCE,**
**AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT
AGREEMENT (this "Agreement"), made this _____, 199___, between _____
_____, a _____, whose address is _____,
(together with its successors, assigns, and transferees "Lender") and WINN-DIXIE STORES,
INC., a Florida corporation, whose address is _____ (together with
its successors and assigns, "Winn-Dixie");

**R E C I T A L S :**

1.    Lender has made a loan to _____, a _____
("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument
recorded at Book _____, page _____ of the Official Records of _____ County, _____
(together with any modifications, consolidations, extensions, replacements, or renewals thereof,
the "Mortgage"), encumbering the real estate known as "_____" shopping center at
_____ and more particularly described in the Mortgage and on Exhibit
"A" attached hereto and incorporated herein (the "Shopping Center"); and

2.    By lease dated _____, (as amended by _____ and as
otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie,
as tenant, those certain premises which constitute a portion of the Shopping Center and are more
particularly described in the Lease (the "Premises"); and

3.    Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall
remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any
transfer of the Premises is made in lieu thereof;

NOW THEREFORE, for valuable consideration the receipt and sufficiency of which are
hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.    Provided Winn-Dixie is not in material default under the terms of the Lease, then
in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale
of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises
thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

19

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(a)    The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)    Winn-Dixie shall not be named as a party defendant.

(c)    The Lease shall not be terminated or affected by any Foreclosure Event.

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender.  Notwithstanding the foregoing, Lender  shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord) or

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease.  Notwithstanding the foregoing, subordintation of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto.  However, Winn-Dixie agrees to

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

   **IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

**Signed, sealed and delivered**
**in the presence of:**

_____

By _____
    Its        President
Printed Name:_____
Printed Name:_____

_____
Printed Name:_____

**WINN-DIXIE STORES, INC.**

By _____
    Its        President
Printed Name:_____
Printed Name:_____

_____
Printed Name:_____

21

STATE OF _____ )

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ _____, 1995, by _____, _____ President of _____, on behalf of the corporation, who is [Please check]____ personally known to me or ____ who has produced _____ as identification.

Printed Name: _____
Notary Public, State and County
aforesaid.
My Commission Expires:_____
Notary ID No.: _____

(NOTARIAL SEAL)

**STATE OF FLORIDA )**

**COUNTY OF DUVAL )**                                                                                      †

The foregoing instrument was acknowledged before me this _____ _____, 1995, by _____, _____ President of **WINN-DIXIE STORES, INC.**, a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _____
Notary Public, State and County
aforesaid.
My Commission Expires:_____
Notary ID No.: _____

(NOTARIAL SEAL)

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**EXHIBIT D**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    Winn-Dixie Stores, Inc.      ("Owner")
_____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

            The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (a) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (b) such survey was conducted by the Surveyor, or under his supervision; (c) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (d) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (e) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (f) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (g) the Point of Beginning of the Property Description is accurate; (h) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (i) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (j) the boundaries, dimensions and other details shown herein are true and correct; (k) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated; (l) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (m) the Property is zoned _____; (n) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (o) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____.

            Executed this the _____ day of _____, 19___.

                                    _____
                                    Registered Land Surveyor No._____
                                    Address:_____

                                            **(SURVEYOR'S SEAL)**

23

This Instrument was prepared by
Mallory Gayle Holm, Attorney-
at-Law whose address is P. O.
Box B, Jacksonville, Florida 32203

(Reserved for Clerk)

## SHORT FORM LEASE

THIS SHORT FORM LEASE, made this *40* day of *October*, 1995, between

*Inc.,*

Faison Capital Development, a North Carolina corporation whose address is 222 East Robinson,

#500, Orlando, FL 32801, ("Landlord") and WINN- DIXIE STORES, INC., a Florida

corporation whose address is P.O. Box B, Jacksonville, FL 32203 ("Tenant"); which terms

"Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or

plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

That Landlord, in consideration of the covenants of Tenant, does hereby lease and demise

unto Tenant and Tenant hereby agrees to take and lease from Landlord, for the term hereinafter

specified, the following described premises:
≈ 51,282 SF ?

That certain store building, approximately 222 feet in width by 231 feet in depth,
together with concrete pads at rear of store building for installation of Tenant's
exterior freezers and/or coolers, and the land on which the same shall stand
(collectively the "Demised Premises"), which Demised Premises are to be
constructed by Landlord according to plans and specifications to be approved by
the parties hereto and shall be in the location and of the dimensions as outlined in
red on the Site Plan attached as Exhibit "A" to a certain lease executed by the
parties hereto and of even date herewith (the "Lease") and on Exhibit "A" attached
hereto and made a part hereof.

The Demised Premises are located in a shopping center development known as
Waterford Lakes Village (the "Shopping Center"), located at the Southeast corner
of Alafaya Trail Boulevard and Lake Underhill Road in the Orange County,
Florida, the legal description of the Shopping Center being attached hereto as
Exhibit "B" and by this reference made a part hereof.

FOR TENANT TO HAVE AND TO HOLD from the Commencement Date as defined in

o:\transfer\wtrfrd.sht

R.B.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the Lease for an initial term of twenty (20) years thereafter. Tenant, pursuant to the Lease and at its option, is entitled to the privilege of (5) successive extensions of this Lease, each extension to be for a period of (5) years.

This Short Form Lease evidences the Lease which contains additional covenants, representations, and warranties between Landlord and Tenant; in the event of a conflict between this Short Form Lease and the Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this instrument the day and year first above written.

Witnesses:

Faison Capital Development, Inc.,

a North Carolina corporation

Print Name: AMY B. HOWLAND

By: _____

Its   Vice   President

Print Name: Barbara L. Westphal

Attest: _____

Its   ASST.   Secretary

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.,

a Florida corporation

Print Name: Shawn B. Van Hoek

By: R. P. McCook

Its   Vice   President

R. P. McCook

Print Name: Cynthia N. Crossland

TENANT

STATE OF _North Carolina_ )

COUNTY OF _Mecklenburg_ )

    The foregoing instrument was acknowledged before me this _Oct_ _10_ , 1995 _Vice_
by _James N. Culpepper III_ , _Vice_ President of _First Capital Div._ on behalf of
the corporation, who is [Please check] ✓ personally known to me or ____ who has produced
_____ as identification.

_Barbara J. Simoncic_

Printed Name: _BARBARA J. SIMONCIC_
Notary Public, State and County
aforesaid.
My Commission Expires: My Commission Expires May 15, 1996
Notary ID No.: _____

                                          (NOTARIAL SEAL)


STATE OF FLORIDA )

COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _September_ _26_ ,
1995, by _R. P. McCook_ , _Vice_ President of WINN-DIXIE STORES,
INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

_Cynthia N. Crossland_

Printed Name: _Cynthia N. Crossland_
Notary Public, State and County
aforesaid.
My Commission Expires:_____
Notary ID No.: _____

CYNTHIA N. CROSSLAND
Notary Public, State of Florida
My Comm. Exp. Nov. 14, 1998
Comm. No. CC 420337

                                          (NOTARIAL SEAL)

EXHIBIT "A"



EXHIBIT "B"

LEGAL DESCRIPTION

COMMENCE AT THE WEST 1/4 CORNER OF SECTION 27. TOWNSHIP 22 SOUTH. RANGE 31 EAST. ORANGE COUNTY, FLORIDA. THENCE RUN S00°16'13" E. ALONG THE WEST LINE OF THE SOUTHWEST 1/4 OF SAID SECTION 27. A DISTANCE OF 122.50 FEET TO A POINT ON THE CENTERLINE OF LAKE UNDERHILL ROAD AS RECORDED IN O.R. BOOK 3401 - PAGE 1609. PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA. THENCE RUN N89°31'37"E. ALONG SAID CENTERLINE AND ITS EASTERLY EXTENSION. A DISTANCE OF 2576.53 FEET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF ALAFAYA TRAIL AS RECORDED IN O.R. BOOK 3409. PAGE 1329. PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA. THENCE RUN SOUTH ALONG SAID RIGHT-OF-WAY LINE, A DISTANCE OF 60.00 FEET FOR A POINT OF BEGINNING. THENCE RUN N 89°31'37" E. A DISTANCE OF 509.67 FEET TO THE POINT OF CURVATURE OF A CURVE, CONCAVE SOUTHERLY, HAVING A RADIUS OF 1210.00 FEET. THENCE THROUGH A CENTRAL ANGLE OF 41°49'20", RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE, A DISTANCE OF 883.22 FEET. THENCE DEPARTING SAID CURVE. RUN S45° 07'15" W. A DISTANCE OF 284.81 FEET. THENCE S44°52'45"E. A DISTANCE OF 50.00 FEET. THENCE S45°07'15"W. A DISTANCE OF 235.00 FEET THENCE N86°54'59"W. A DISTANCE OF 100.00 FEET. THENCE N03°05'01E. A DISTANCE OF 140.63 FEET. THENCE N86°54'59"W. A DISTANCE OF 908.27 FEET TO A POINT ON THE EASTERLY RIGHT-OF-WAY LINE OF ALAFAYA TRAIL. SAID POINT BEING ON A CURVE. CONCAVE NORTHWESTERLY HAVING A RADIUS OF 1932.00 FEET. THENCE FROM A TANGENT BEARING OF N06° 43' 16"E. THROUGH A CENTRAL ANGLE OF 06°43'16", RUN NORTHEASTERLY ALONG THE ARC OF SAID CURVE AND SAID RIGHT-OF-WAY LINE. A DISTANCE OF 226.63 FEET TO THE POINT OF TANGENCY; THENCE RUN NORTH. A DISTANCE OF 278.84 FEET TO THE POINT OF BEGINNING.

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("Amendment") is made as of April 24, 1996 by **FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP ("Landlord")** and **WINN-DIXIE STORES, INC.,** a Florida corporation (**"Tenant"**). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1.    Landlord and Tenant are parties to that certain Lease dated October 10, 1995 (the "Lease"), pursuant to which Landlord leased to Tenant and Tenant rented from Landlord certain real property and improvements more particularly described in the Lease.

2.    The Lease established certain deadlines for commencment and completion of the improvements.

3.    Landlord has requested and Tenant has agreed to extend those deadlines.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.    The foregoing recitals are true and correct and incorporated herein by reference.

2.    Paragraph 10 of the Lease is hereby amended and restated in its entirety so that from and after the date hereof such Paragraph 10 shall read and provide as follows:

**COMPLETION DATE**    Construction of the Store and the Shopping Center shall begin 12.1.96 not later than June 1, 1996 and shall be completed not later than 180 days following that date on which construction begins; and if not begun or completed by these respective dates, Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store within the stipulated time shall be due to Force Majeure, as hereinafter defined, and provided further construction shall be completed with all due diligence and in any event not later than January 31, 1997 (the "Outside Completion Date"), this option to terminate shall not arise. "Construction of the Store " shall be deemed to have begun when the first concrete footings have been poured. If, pursuant to this paragraph, Tenant shall  terminate this Lease or if Landlord fails to commence or complete construction of the Store by the above dates, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

3.    Except as expressly modified by this Amendment, the Lease remains in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date first above written.

Signed, sealed and delivered
in the presence of:

Print name: STEPHANIE VINES

**FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP**

Print name: ELIZABETH M. SPEED

**ASSISTANT SECRETARY**

By: FAISON CAPITAL DEVELOPMENT, INC.,
    general partner

By: _____
Printed Name: JAMES H. CULPEPPER, III
Its: VICE PRESIDENT
Date: May 20, 1996

Print name: BRENDA J. BABCOCK

Print name: Lonette Brannon

**WINN-DIXIE STORES, INC.**

By: _____
Printed Name: James Kufeldt
Its: PRESIDENT
Date: 6-28-96

STATE OF North Carolina )

COUNTY OF Mecklenburg )

I, Barbara J. Simoncic _____, a Notary Public, State and County aforesaid, do hereby certify that Elizabeth M. Speed _____ personally appeared before me this day and acknowledged that he/she is Asst Secretary of FAISON CAPITAL DEVELOPMENT, INC., a North Carolina corporation, and sole general partner of FAISON-WATERFORD LAKES VILLAGE, a North Carolina limited partnership, and that by authority duly given and as the act of the corporation, and on behalf of the limited partnership as its general partner the foregoing instrument was signed in its name by its vice President, sealed with its corporate seal, and attested by her/himself as its Asst Secretary.

Witness my hand and official seal, this the 20 day of May _____ 1996.

Printed Name: Barbara J. Simoncic
Notary Public, State and County aforesaid
My commission expires: 5/15/01
(NOTARIAL SEAL)

2

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this April 29, 1996, by
James Kufeldt _____ President of WINN-DIXIE STORES, INC., a Florida corporation,
on behalf of the corporation, who are personally known to me.

Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp. Nov. 20, 1999
Comm. No. CC 511004

Printed Name: BRENDA J. BABCOCK
Notary Public, State and County
aforesaid.
My Commission Expires: 11/20/99
Notary ID No.:_____

(NOTARIAL SEAL)

3

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("Amendment") is made as of _____, 1996 by **FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP ("Landlord")** and **WINN-DIXIE STORES, INC.,** a Florida corporation ("**Tenant**"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1. Landlord and Tenant are parties to that certain Lease dated October 10, 1995 as amended from time to time (the "Lease"), pursuant to which Landlord leased to Tenant and Tenant rented from Landlord certain real property and improvements more particularly described in the Lease.

2. The Lease established certain deadlines for commencment and completion of the improvements.

3. Landlord has requested and Tenant has agreed to extend those deadlines.

NOW THEREFORE, Landlord and Tenant agree as follows:

1. The foregoing recitals are true and correct and incorporated herein by reference.

2. Paragraph 10 of the Lease is hereby amended and restated in its entirety so that from and after the date hereof such Paragraph 10 shall read and provide as follows:

**COMPLETION DATE**    Construction of the Store and the Shopping Center shall begin not later than July 3, 1996 and shall be completed not later than 180 days following that date on which construction begins; and if not begun or completed by these respective dates, Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store within the stipulated time shall be due to Force Majeure, as hereinafter defined, and provided further construction shall be completed with all due diligence and in any event not later than February 28, 1997 (the "Outside Completion Date"), this option to terminate shall not arise. "Construction of the Store " shall be deemed to have begun when the first concrete footings have been poured. If, pursuant to this paragraph, Tenant shall terminate this Lease or if Landlord fails to commence or complete construction of the Store by the above dates, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

3. Except as expressly modified by this Amendment, the Lease remains in full force and effect.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date first above written.

Signed, sealed and delivered
in the presence of:

Print name: ELIZABETH M. SPEED

Print name: Barbara C Drapeau

**FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP**

By: FAISON CAPITAL DEVELOPMENT, INC.,
    general partner

By: _____
Printed Name: JAMES H. CULPEPPER, IV
Its: VICE-PRESIDENT
Date: 9/5/96

Print name: BRENDA J. BABCOCK

Print name: Jane E. DeWitte

**WINN-DIXIE STORES, INC.**

By: _____
Printed Name: James Kufeldt
Its: PRESIDENT
Date: 4/23/96

STATE OF North Carolina )
COUNTY OF Mecklenburg )

I, K. G. Baldwin _____, a Notary Public, State and County aforesaid, do hereby certify that James H. Culpepper IV _____ personally appeared before me this day and acknowledged that he/she is Vice President Secretary of FAISON CAPITAL DEVELOPMENT, INC., a North Carolina corporation, and sole general partner of FAISON-WATERFORD LAKES VILLAGE, a North Carolina limited partnership, and that by authority duly given and as the act of the corporation, and on behalf of the limited partnership as its general partner the foregoing instrument was signed in its name by its Vice President, sealed with its corporate seal, and attested by her/himself as its Vice President Secretary.

Witness my hand and official seal, this the 5th day of September, 1996.

Printed Name: K. G. Baldwin
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

My Commission Expires August 9, 2001.

K. G. BALDWIN
NOTARY PUBLIC
MECKLENBURG COUNTY, NC

STATE OF FLORIDA )

COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _August    23_, 1996, by
_James Kufeldt          .  —    _ President of WINN-DIXIE STORES, INC., a Florida corporation,
on behalf of the corporation, who are personally known to me.



Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp. Nov. 20, 1999
Comm. No. CC 511004

_Brenda J Babcock_

Printed Name: _Brenda J. Babcock_
Notary Public, State and County
aforesaid.
My Commission Expires: _11/20/99_
Notary ID No.: _____

(NOTARIAL SEAL)

This Instrument was prepared by
Patrick G. Emmanuel, Jr., Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

Orange Co FL 1997-0316995
040817     12:52:53pm
OR Bk 5315 Pg 1163
Rec 24.00

(Reserved for Clerk)

## AMENDMENT TO SHORT FORM LEASE

THIS AMENDMENT TO SHORT FORM LEASE, is made this May 21, 1997, between WINN-DIXIE STORES, INC., a Florida corporation, (the "Tenant") and FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP, a North Carolina limited partnership (the "Landlord"), recites and provides as follows:

### RECITALS:

1.      Tenant and Landlord entered into a Lease dated October 10, 1995, as amended and/or evidenced by: (a) Short Form Lease dated October 10, 1995, recorded in Volume 4972, page 2735, of the public records of Orange County, Florida; (b) First Amendment to Lease dated April 24, 1996; (c) Second Amendment to Lease dated September 5, 1996 (the "Lease"), located in Orange County, Florida.

2.      Landlord and Tenant desire to amend and modify the Lease as hereinafter set forth.

### WITNESSETH:

WHEREAS, for and in consideration of the sum of Ten and No/100 Dollars ($10.00), the mutual promises and agreements contained in the Lease, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Tenant and Landlord agree as follows:

WHEREAS, the site plan depicting the shopping center referenced in Article 1 of the Lease as being attached as Exhibit "A" thereof is hereby amended and restated such that the site plan of the shopping center attached hereto as Exhibit "A-1" is substituted in the place of  Exhibit "A".

WHEREAS, the Lease, as modified and amended by this Amendment to Short Form Lease shall remain in full force and effect and contains the entire agreement between the parties.

L bk **5319** Pg **1164**
Orange Co FL 1997-0315995

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment to Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

Print name: **Cynthia N. Crossland**

WINN-DIXIE STORES, INC.

Print name: **Rebecca L Sawyer**

By: _____

_____ **President  James Kufeldt**

Its: _____

Date: **8/22/97**

FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP,
a North Carolina limited partnership

Print name: **DAVID B. CHANDLER**

By: FAISON CAPITAL DEVELOPMENT, INC.,
a North Carolina corporation, its authorized general partner

Print name: **Cory Rodee**

By: _____

**Allen S. Jackson, Jr.**

Its: **Vice President**

Date: **8/21/97**

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this **August 2** 1997, by **James Kufeldt**
as _____ President of Winn-Dixie Stores, Inc., Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: **Rebecca L. Sawyer**
Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372218

Bk 5319 Pg 1165
Orange Co FL 1997-0316995

STATE OF North Carolina)
COUNTY OF Mecklenburg)

The foregoing instrument was acknowledged before me this August 21st, 1997, by Allen S Jackson, Jr. as Vice-President of Faison Capital Development, Inc., a North Carolina corporation, as authorized general partner for Faison-Waterford Lakes Village Limited Partnership, a North Carolina limited partnership, on behalf of the corporation and the partnership, who [PLEASE CHECK ONE] ✓ is personally known to me or _____ has produced _____ as identification.

Gail H. Helms
Printed Name: GAIL H. HELMS
Notary Public, State and County aforesaid.
My Commission Expires: 7/31/2000
Notary ID No.: 19952090063
(NOTARIAL SEAL)

GAIL H. HELMS
NOTARY PUBLIC
MECKLENBURG COUNTY, N.C.

L. Bk 5319 Pg 1166
Orange Co FL 1997-0316995

## CONSENT

SunTrust Bank Central Florida, National Association, a national banking association the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Third Amendment to Lease.

**SUNTRUST BANK CENTRAL FLORIDA, NATIONAL ASSOCIATION**

Print name: Zenaida Benta

Print name: Marianella Sauri

By: _____
Its: Jerome Stewart
First Vice President
Date: 8/21/97

STATE OF Florida )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this August 21st 1997, by Jerome Stewart as First Vice President of SunTrust Bank Central Florida, National Association, a national banking association, on behalf of the banking association, who [PLEASE CHECK ONE] X is personally known to me or _____ has produced _____ as identification.

Printed Name: Marianella Sauri
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

Marianella Sauri
My Commission CC541063
Expires April 28, 2001

O:\TRANSFER\ORLANDO\22703FL.AMD





## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE is made this August 22, 1997, between WINN-DIXIE STORES, INC., a Florida corporation, (the "Tenant") and FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP, a North Carolina limited partnership (the "Landlord").

### RECITALS:

1.  Tenant and Landlord entered into a Lease dated October 10, 1995, as amended and/or evidenced by: (a) Short Form Lease dated October 10, 1995, recorded in Volume 4972, page 2735, of the public records of Orange County, Florida; (b) First Amendment to Lease dated April 24, 1996; (c) Second Amendment to Lease dated September 5, 1995 (the "Lease") for the use and occupancy of the Premises described therein;

2.  Landlord and Tenant desire to amend and modify the Lease as hereinafter set forth.

### WITNESSETH:

For and in consideration of the sum of Ten and No/100 Dollars ($10.00), the mutual promises and agreements contained in the Lease, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Tenant and Landlord agree as follows:

1.  The foregoing recitals are true and correct and incorporated here by this reference.

2.  The site plan depicting the shopping center referenced in Article 1 of the Lease as being attached as Exhibit "A" thereof is hereby amended and restated such that the site plan depicting the shopping center entitled Waterford Lakes, prepared by Ivey, Harris & Walls, Inc., dated July 24, 1997, and attached hereto as Exhibit "A-1" (the "Site Plan") is substituted in the place of Exhibit "A". From and after the date hereof, any and all references in the Lease to a site or plot plan shall be deemed to and shall refer to the Site Plan. In consideration of Tenant's approving the Site Plan, Landlord agrees that on or before October 31, 1997, Landlord shall pave the thirty-eight (38) parking spaces designated as "DENOTES EXPANSION PARKING (TYPICAL)" on the Site Plan. The paving of said thirty-eight (38) spaces shall be at Landlord's sole cost and expense, and shall not be passed on to Tenant, as part of the Common Area Maintenance Expenses or otherwise.

3.  Paragraph 7 of the Lease is hereby amended and restated in its entirety as follows:

"USE        7.        The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

Tenant shall have the exclusive right to operate in the Shopping Center a supermarket, pharmacy or prescription drug concession, photo lab or film development business and an automatic teller machine (except for any financial institution opened within the Shopping Center). Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, pharmacy or prescription drug concession, photo lab or film development business, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

written permission of Tenant. Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (i) by a business or businesses for which the sale of such items does not exceed the lesser of 500 square feet of sales area or 10% of the square feet area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, (ii) by a restaurant as prepared, ready-to-eat food items, for consumption either on or off site, or (iii) the sale of food items by a health food store or nutrition center, an ice cream parlor or frozen yogurt store, a bagel shop, or by a gas station/convenience store, provided that the floor area of such gas station/convenience store which is dedicated to food does not exceed 1,700 square feet and that such gas station/convenience store is located on the portion of the Shopping Center labeled "Parcel A" on the Site Plan. With the exception of package stores and the permitted gas station/convenience store referred to above, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center; provided, however that a delicatessen restaurant which does not substantially duplicate those items sold by Tenant's delicatessen business may be located in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof. No spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, other than one free-standing medical office not exceeding 12,500 square feet located on an outparcel within the Shopping Center (provided, however, Landlord may lease not more than 5,000 aggregate square feet of space for professional or medical use in the area designated as Retail "A," "B," or "C" on the Site Plan [but not for an abortion or HIV clinic] with no single medical or professional office to be larger than 1,500 square feet), automobile dealership, church, or health, recreational or entertainment-type activities shall be permitted in the Shopping Center.

Upon any assignment or subleting of the Premises for a use other than the exclusive uses granted to Tenant hereunder, such exclusive use rights shall terminate and shall be of no further force or effect against Landlord or against the Shopping Center."

4.    Paragraph 45 of the Lease, "Expansion", is hereby modified by the inclusion of the following provisions:

45.    Pursuant to Paragraph 13 of the Lease, "Parking and Common Areas". Landlord is obligated to maintain a certain minimum parking ratio and a minimum number of parking spaces for the Shopping Center. One of the purposes of the same is to allow sufficient parking for Tenant's future Addition. Under the terms of this Paragraph 45. Pursuant to letter from Robert E. Wiegers, Chief Planner for Orange County, Florida, to Henry Antes, dated July 17, 1997, a copy of which is attached hereto as Exhibit "B", there is currently not sufficient parking to allow for the Addition without counting eight (8) parking spaces under the Declaration of

Covenants, Restrictions and Easements for Waterford Lakes Village Shopping Center as recorded in O.R. Book 9149, Pages 1239-1246 of the Public Records of Orange County, Florida. In the event Tenant elects to expand under this Paragraph 46, Landlord, at its sole cost and expense (and not as part of the Common Area Maintenance Expenses, or as part of the "cost of the Addition" used to calculate the new Base Rent), shall provide sufficient parking to allow for Tenant's Addition. Said obligation shall include, providing the additional parking, if any of the eight (8) referenced spaces in said letter are not available for any reason including, but not limited to, the fact that any building on any of said parcels has expanded or the use thereof has changed thereby requiring the "use" of any of said parking spaces in order to meet the parking requirements of any of the parcels. Notwithstanding the foregoing, Landlord shall not be responsible or obligated for providing any spaces in excess of the greater of those required by: (i) the current (i.e. as of the date of this Amendment) Orange County parking code; or (ii) Paragraph 13 of the Lease. Nothing in this paragraph shall be deemed a waiver of any of Landlord's obligations regarding parking as set forth elsewhere in this Lease, including but not limited to, said paragraph 13.

6.    The Lease, except as expressly modified and amended by this Third Amendment to Lease shall remain in full force and effect and contains the entire agreement between the parties.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Third Amendment to Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

WINN-DIXIE STORES, INC.

Print name: Cynthia N. Crossland

Print name: Rebecca L. Sawyer

By: _____

Names: Rufaldt

Its: President

Date: 9-23-02

FAISON-WATERFORD LAKES VILLAGE LIMITED
PARTNERSHIP, a North Carolina limited partnership

By: FAISON CAPITAL DEVELOPMENT, INC.,
    a North Carolina corporation,
    its authorized general partner

Print name: DAVID B. CHANDLER

By: _____
    Allan S. Jackson, Jr.
Its: VICE President
Date: 8/21/97

Print name: Cay Pate

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this August 30 1997, by
James Kufeldt          as _____ President of Winn-Dixie Stores, Inc., Florida corporation, on
behalf of the corporation, who is personally known to me.

Printed Name: Rebecca L. Sawyer
Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372910

STATE OF North Carolina )
COUNTY OF Mecklenburg )

The foregoing instrument was acknowledged before me this August 21st, 1997, by
Allan S. Jackson, Jr. as Vice-President of Faison Capital Development, Inc., a North Carolina
corporation, as authorized general partner for Faison-Waterford Lakes Village Limited Partnership, a North
Carolina limited partnership, on behalf of the corporation and the partnership, who [PLEASE CHECK ONE]
___ is personally known to me or _____ has produced _____ as identification.

Printed Name: GAIL H. HELMS
Notary Public, State and County aforesaid.
My Commission Expires: 7/31/2000
Notary ID No.: 19952098063
(NOTARIAL SEAL)

GAIL H. HELMS
NOTARY
PUBLIC

Jacksonville, FL 32203

Orange Co FL 1997-0316996
090817    12:32:53pa
OR Bk 5315 Pg 1168
August 21, 1996c 15.00

### SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this May 21, 1997, between **WINN-DIXIE STORES, INC.,** a Florida corporation, (the "Tenant") and **FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP,** a North Carolina limited partnership (the "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated October 10, 1995, as amended and/or evidenced by: (a) Short Form Lease dated October 10, 1995, recorded in Volume 4972, page 2735, of the public records of Orange County, Florida; (b) First Amendment to Lease dated April 24, 1996; (c) Second Amendment to Lease dated September 5, 1996; (d) Third Amendment to Lease dated May 21, 1997; (e) Amendment to Short Form Lease dated May 21, 1997, to be recorded in the public records of Orange County, Florida (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1. The Commencement Date of the Term is January 9, 1997.

2. The Term shall expire at midnight Eastern Time on January 8, 2017, unless earlier terminated or later extended as provided for in the Lease.

3. All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

Print name: Cynthia N. Crossland                    **WINN-DIXIE STORES, INC.**

Print name: Rebecca L. Sawyer

By: _____
Its: __James Kufeldt__
     __President__
Date: __8/22/97__

Print name: David B. Chandler

**FAISON-WATERFORD LAKES VILLAGE LIMITED PARTNERSHIP,** a North Carolina limited partnership

By: **FAISON CAPITAL DEVELOPMENT, INC.,**
    a North Carolina corporation,
    its authorized general partner

Print name: Cecy Fowler

By: _____
Its: __Allen S. Jackson, Jr.__
     __Vice President__
Date: __8/31/97__

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

L. Bk **5319** Pg **1169**
Orange Co FL 1997-0316996

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _August 22_ 1997, by
_James Kufeldt_, as _____ President of Winn-Dixie Stores, Inc., Florida corporation,
on behalf of the corporation, who is personally known to me.

_Rebecca L. Sawyer_

Printed Name: _Rebecca L. Sawyer_
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372210

STATE OF _North Carolina_ )
COUNTY OF _Mecklenburg_ )

The foregoing instrument was acknowledged before me this _August 26_ 1997, by
_Allen S. Jackson, Jr._, as _Vice-President_ of Faison Capital Development, Inc., a North Carolina
corporation, as authorized general partner for Faison-Waterford Lakes Village Limited Partnership, a North
Carolina limited partnership, on behalf of the corporation and the partnership, who [PLEASE CHECK ONE]
__✓__ is personally known to me or _____ has produced _____ as
identification.

_Gail H. Helms_

Printed Name: _GAIL H. HELMS_
Notary Public, State and County aforesaid.
My Commission Expires: _7/31/2000_
Notary ID No.: _19952690063_
(NOTARIAL SEAL)

GAIL H. HELMS
NOTARY PUBLIC
MECKLENBURG COUNTY, N.C.

L. BK 5319 Pg 1170
Orange Co FL 1997-0316996
Recorded - Martha O. Haynie

## CONSENT

SunTrust Bank Central Florida, National Association, a national banking association the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

SUNTRUST BANK CENTRAL FLORIDA, NATIONAL ASSOCIATION

Print name: Zocaida Renta

Print name: Marianella Sauri

By: Jerome Stewart

Its: First Vice President

Date: 8/21/97

STATE OF Florida )
COUNTY OF Orange )

The foregoing instrument was acknowledged before me this August 21st 1997, by Jerome Stewart as First Vice President of SunTrust Bank Central Florida, National Association, a national banking association, on behalf of the banking association, who [PLEASE CHECK ONE] __X__ is personally known to me or _____ has produced _____ as identification.

Printed Name: Marianella Sauri
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

Marianella Sauri
My Commission CC541083
Expires April 23, 2001

O:\TRANSFER\ORLANDO\2270SLA.WPD

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**ASSIGNMENT AND ASSUMPTION OF LEASES AND SECURITY DEPOSITS**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND SECURITY DEPOSITS ("**Assignment**") is made and entered into as of the 2₀ᵗʰ day of August, 2004 by and between U.S. Retail Income Fund IV, Limited Partnership, a Delaware limited partnership ("**Assignor**"), and KRG Waterford Lakes, LLC, an Indiana limited liability company ("**Assignee**").

## W I T N E S S E T H :

WHEREAS, contemporaneously with the execution hereof, Assignor has conveyed to Assignee certain real property commonly known as "Waterford Lakes Village Shopping Center" located in Orlando, Orange County, Florida , and more particularly described on **Exhibit "A"** attached hereto (the "**Property**") ; and

WHEREAS, in connection with said conveyance, Assignor desires to transfer and assign to Assignee all of Assignor's right, title and interest in and to certain leases affecting the Property, together with the security deposits and future leasing commission obligations associated therewith, and, subject to the terms and conditions hereof, Assignee desires to assume Assignor's obligations in respect of said leases, security deposits and leasing commission obligations;

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) in hand paid to Assignor by Assignee, Assignee's purchase of the Property and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by Assignor and Assignee, Assignor and Assignee hereby covenant and agree as follows:

1.     Assignor hereby unconditionally and absolutely assigns, transfers, sets over and conveys to Assignee, without warranty or representation of any kind, express or implied, except as set forth below and except for any warranty or representation contained in that certain Purchase and Sale Agreement dated June 11, 2004, between Assignor and KRG Capital, LLC, assigned by KRG Capital LLC to Assignee, as amended (the "**Contract**"), applicable to the property assigned herein, all of Assignor's right, title and interest in, to and under (a) those certain leases set forth on **Exhibit "B"** attached hereto and by this reference made a part hereof affecting or relating to the Property or the improvements thereon (the "**Leases**"), (b) those certain tenant deposits presently held by Assignor and enumerated on **Exhibit "B"** attached hereto (the "**Security Deposits**"), and (c) those certain leasing commission agreements more particularly described on **Exhibit "C"** attached hereto and made a part hereof (the "**Commission Agreements**"), subject to the matters more particularly described on **Exhibit "D"** attached hereto and made a part hereof.

2.     Assignee, by acceptance hereof, hereby assumes and agrees to perform all of Assignor's duties and obligations under the Leases arising from and after the date hereof, including, without limitation, Assignor's obligations to pay leasing commissions due and payable in respect of any renewal or expansion of any of the existing Leases, or any new lease with a tenant under any of the Leases, after the date hereof pursuant to the Commission Agreements, provided that any renewal or expansion of any of the Existing Leases, or any new

lease with a tenant under any of the Leases that was entered into after the Effective Date of the Contract (as defined therein) and prior to the date hereof was approved (or deemed approved) by Purchaser as required in the Contract.

3.     All representations and warranties of Assignor made in the Contract in respect of the Leases, the Security Deposits and Commission Agreements, as recertified to Assignee pursuant to that certain Seller's Certificate as to Representations of even date herewith from Assignor to Assignee, shall survive for a period of one (1) year from the date hereof, and upon the expiration thereof shall be of no further force or effect except to the extent that with respect to any particular alleged breach, Assignee shall give Assignor written notice prior to the expiration of said one (1) year period of such alleged breach with reasonable detail as to the nature of such breach and files an action against Assignor with respect thereto within ninety (90) days after the giving of such notice. Notwithstanding anything to the contrary contained in the Contract or this Assignment, in no event shall Assignor's total liability for any such breach or breaches exceed, in the aggregate, Seven Hundred Fifty Thousand and No/100 Dollars ($750,000). In no event shall Assignor be liable for, nor shall Assignee seek, any consequential, indirect or punitive damages; and in no event whatsoever shall any claim for a breach of any representation or warranty of Assignor be actionable or payable if the breach in question results from or is based on a condition, state of facts or other matter which was actually known to Assignee prior to the date hereof.

4.     This Assignment shall inure to the benefit of and be binding upon Assignor and Assignee, their respective legal representatives, successors and assigns.  This Assignment may be executed in counterparts, each of which shall be deemed an original and all of such counterparts together shall constitute one and the same Assignment.

**IN WITNESS WHEREOF,** the duly authorized representatives of Assignor and Assignee have caused this Assignment to be properly executed under seal as of this day and year first above written.

ASSIGNOR:

U.S. RETAIL INCOME FUND IV, LIMITED
PARTNERSHIP, a Delaware limited partnership

By:  BVT Institutional Investments, Inc., a Georgia
corporation, its general partner

By: _____
Name: _BRAD GARNER_____
Its: _VICE PRESIDENT_____

(CORPORATE SEAL)

ASSIGNEE:

KRG WATERFORD LAKES, LLC, an Indiana
limited liability company

By:  KITE REALTY GROUP, L.P., a Delaware
     limited partnership, Sole Member

    By:  KITE REALTY GROUP TRUST,
       general partner

      By:_____
      John A. Kite, President and Chief
      Executive Officer

**Exhibit "A"**
**Legal Description**

Lots 1, 2 and 3, together with Tracts A and B of the Plat of Waterford Lakes Tract D-1 as recorded in Plat Book 37, Page 41 in the Public Records of Orange County, Florida.

TOGETHER with all tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining.

\\REA\227280.1

**EXHIBIT B**

List of Leases and Security Deposits

# EXHIBIT B HAS BEEN REDACTED
# AND NOT PRODUCED IN FULL

# Rent Roll

As of 8/4/2004

Date: 8/4/2004
Time: 10:52:11AM

WATER0405 - Waterford Lakes Village

| Unit | GLA Unit Square Footage | Prorata Share | Current Tenant |
|---|---|---|---|

| | | | | Deposit Information | | |
|---|---|---|---|---|---|---|
| | | | | Deposit Type | Ref. | Dep/Int Balance |

| Unit | GLA Unit Square Footage | Prorata Share | Current Tenant |
|---|---|---|---|
| 12500 Retail | 51,703 | 66.53% | Winn-Dixie Winn-Dixie #2770 |

| Lease (Rev) | Charge Type | Effective Date | Frequency | Intended Lease End | Amount | $/Sq.Ft. | Annual Amount | Annual $/Sq.Ft. |
|---|---|---|---|---|---|---|---|---|
| | | Actual Lease Start 1/8/1997 | | Intended Lease End 1/8/2017 | | | | |
| WAT-12500-WIN ( | CAM | 1/1/2003 | Monthly | | 5,163.00 | 0.10 | 61,956.00 | 1.20 |
| WAT-12500-WIN ( | RNT | 1/1/2001 | Monthly | | 34,037.67 | 0.66 | 408,452.04 | 7.90 |
| | | | Unit Totals: | | 39,200.67 | | 470,408.04 | |

| | | | | Scheduled Increases | | |
|---|---|---|---|---|---|---|
| | | | | Charge Type | Eff Date | Amount | $/Sq.FL |
| | | | | RNT | 1/9/2017 | 34,037.67 | 7.90 |
| | | | | RNT | 1/9/2022 | 34,037.67 | 7.90 |
| | | | | RNT | 1/9/2027 | 34,037.67 | 7.90 |
| | | | | RNT | 1/9/2032 | 34,037.67 | 7.90 |
| | | | | RNT | 1/9/2037 | 34,037.67 | 7.90 |

RIFS

**EXHIBIT C**

Lease Commission Agreements

None

**EXHIBIT D**

**Permitted Exceptions for
Waterford Lakes**

1.  Rights of tenants, as tenants only, occupying all or part of the insured land under unrecorded leases or rental agreements in effect on the date hereof. .

2.  Amended and Restated Declaration of Covenants and Restrictions recorded in Official Records Book 4327, Page 3881, amended by Amendment filed in Official Records Book 4437, Page 3462, amended by Amendment filed in Official Records Book 4496, Page 3239, and Supplement filed May 25, 1994, in Official Records Book 4746, Page 222, and Scrivener's Affidavit recorded in Official Records Book 5319, Page 1153; and Supplement recorded in Official Records Book 5389, Page 143; Supplement in Official Records Book 5830, Page 1956, Amendment recorded in Official Records Book 5948, page 1323, all of the public records of Orange County, Florida. (NOTE: Only Article XV, Section 18 and Article VI, Section 7 apply, and they apply only as to the Lake/Retention Pond portion of the property described in Schedule "A").

3.  East Orange County Sewer MSTU resolution Number 82-SU-13, filed June 30, 1982, in Official Records Book 3292, page 516, of the public records of Orange County, Florida.

4.      Development Order and Agreement between Guaranty Properties and Orange County, dated June 21, 1983 (unrecorded) and First Amendment thereto filed in Official Records Book 4078, page 2557; Non-Substantial Deviation Amendment filed in Official Records Book 4200, page 1244, and also filed August 30, 1991, in Official Records Book 4321, page 2413; Amendment filed September 6, 1991, in Official Records Book 4323, page 2616; Amendment filed December 4, 1991, in Official Records Book 4350, page 3654; Amendment filed January 3, 1992, in Official Records Book 4360, page 4945; Amendment to Development Order filed November 2, 1992, in Official Records Book 4481, page 3567; Non-Substantial Deviation Amendment Development Order filed in Official Records Book 4549, page 4048; Amendment filed August 27, 1993, in Official Records Book 4610, page 3961; Non-Substantial Deviation Amendment to Development Order for the Waterford Lakes (f/k/a Huckleberry) Development of Regional Impact and Notice thereof dated June 1, 1995, recorded June 2, 1995, in Official Records Book 4899, page 2713; Non-Substantial Deviation Amendment to Development Order recorded in Official Records Book 6014, page 3844 and re-recorded in Official Records Book 6036, page 3915 all of the public records of Orange County, Florida.

5.  Resolution of the Orange County Board of County Commissioners establishing a Mutual Service Taxing Unit for the Purpose of Providing  Mandatory Refuse Collection and to Collect Special Assessments of Residential Properties therein filed April 9, 1985, in Official Records Book 3627, page 1224, and filed September 25, 1985, in Official Records Book 3693, page 2399, in the public records of Orange County, Florida.

\\REA\227889.1

6. Use Agreement by and between Lennar-Woodbury, Inc. and Huckleberry, Inc. d/b/a Huckleberry Land Joint Venture, and Orange County, recorded in Official Records Book 3750, page 88, of the public records of Orange County, Florida.

7. Use Agreement filed December 19, 1990, in Official Records Book 4246, page 2205, of the public records of Orange County, Florida.

8. Distribution Easement in favor of Florida Power Corporation filed March 20, 1990, in the Official Records Book 4166, page 4570, of the public records of Orange County, Florida, and shown on the Survey as hereinafter defined.

9. Entry Features, Landscaping and Signage Easement Agreement between Waterford Property Holdings, Inc., a Florida corporation, and Huckleberry (a/k/a Waterford Lakes) Community Association, Inc., a Florida not-for-profit corporation, recorded in Official Records Book 4971, page 684, of the public records of Orange County, Florida.

10. Deed Restrictions contained in the deed from Waterford Property Holdings, Inc., a Florida corporation, to Faison-Waterford Lakes Village Limited Partnership, a Florida limited partnership, recorded in Official Records Book 4971, page 693, of the public records of Orange County, Florida.

11. Lease between Faison Capital Development, Inc., a North Carolina corporation, as "Landlord", and Winn-Dixie Stores, Inc. as "Tenant", last dated October 10, 1995, a short form of which is recorded in Official Records Book 4972, page 2735, Assignment and Assumption of Lease from Faison Capital Development, Inc. to Faison-Waterford Lakes Village Limited Partnership, a Florida limited partnership, dated November 13, 1995, and recorded in Official Records Book 4975, page 2436, which lease has been amended and supplemented by Amendment to Short Form Lease recorded in Official Records Book 5319, page 1163, and Supplement Lease Agreement recorded in Official Records Book 5319, page 1168, all of the public records of Orange County, Florida.

12. Declaration of Covenants, Restrictions and Easements for Waterford Lakes Village Shopping Center, recorded in Official Records Book 5148, page 1239, First Amendment to Declaration of Covenants and Restrictions for Waterford Lakes Village recorded in Official Records Book 5168, page 4053, and re-recorded in Official Records Book 5319, page 1157, and Second Amendment to Declaration of Covenants, Restrictions and Easements for Waterford Lakes Village Shopping Center recorded in Official Records Book 5319, Page 1171, all of the public records of Orange County, Florida.

13. Matters shown on the plat of Waterford Lakes Tract D-1, recorded in Plat Book 37, page 41; as affected by Affidavit recorded in Official Records Book 5319, page 1155, of the public records of Orange County, Florida, including those shown on the Survey as hereinafter defined.

\\REA\227889.1

14. Declaration of Restrictions in favor of Investor Realty Company (7-11) recorded in Official Records Book 5168, page 4049, of the public records of Orange County, Florida. (Affects Lots 1 and 3 only).

15. Second Supplemental Declaration of Restrictions in favor of First Union National Bank of Florida recorded in Official Records Book 5194, page 340, of the public records of Orange County, Florida.

16. Restrictions in favor of McDonald's corporation, recorded in Official Records Book 5293, page 2684, of the public records of Orange County, Florida.

17. Sewer Line Easement in favor of Orange County recorded in Official Records Book 5223, page 4421, of the public records of Orange County, Florida.

18. Access and Utility Easement in favor or Orange County recorded in Official Records Book 5223, page 4417, of the public records of Orange County, Florida.

19. Subordination of Encumbrance to Property Rights to Orange County by Huckleberry Community Association, Inc., recorded in Official Records Book 5223, page 4431, of the public records of Orange County, Florida.

20. Assignment of Declarant's Rights in favor of U.S. Retail Income IV, Limited Partnership, dated August 21, 1997, and record in Official Records Book 5319, page 1183, of the public records of Orange County, Florida.

21. Amended and Restated By-Laws of Waterford Lakes Community Association, Inc., recorded in Official Records Book 5948, page 1302, of the public records of Orange County, Florida.

22. Distribution Easement to Florida Power Corporation record in O.R. Book 5641, page 4569.

23. Any rights, interests or claims arising from the following matters shown on survey prepared by Bowyer-Singleton & Associates, Incorporated, dated June 24, 2004, last revised June 14, 2004, under Project No. GP32:

    a)      FPC switch gears, electric boxes, electric transmission pads. water valves, telephone boxes, sanitary manholes and cable tv rises are located throughout the property either4 outside of easements of record or without the benefit of an easement or agreement of record.

    b)      Encroachment of PVC fence over southeast boundary of Tract A.

    c)      Encroachment of top of bank across the east boundary of Tract A.

    d)      Encroachment of curbing and curb inlet over the north boundary of Lot 2.

\\REA\227889.1

e)   Encroachments of curbing and parking spaces across easements recorded in Official Records Book 5223, page 4221, and per plat.

f)   Encroachment of traffic box over the west boundary of Lot 3.

g)   Encroachment of signs over the easements per plat.

h)   Encroachment of curbing over the northwesterly boundary of Lot 3.

\\REA\227889.1