# ORIGINAL

### UNITED STATES BANDURPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:                                )
                                      )     Case No. 05-03817-3FI
WINN-DIXIE STORES, INC., *et al.*,)
                                      )     *Chapter 11*
Debtors                               )
                                      )     Jointly Administered
_____)

**OPPOSITION OF CREDITOR, PAY CENTERS LLC, TO FOURTEENTH OBJECTION TO (A) NO LIABILITY CLAIMS AND (B) NO LIABILITY MISCLASSIFIED CLAIMS WITH REFERENCE TO CLAIM # 11208**

NOW COMES creditor, Pay Centers LLC, and herewith opposes the disallowance of its claim in the amount of $1,558,599.00.  This opposition is based on the following:

1.  Attached as Exhibit 1 is the claim of Pay Centers LLC.

2.  Attached as Exhibit 2 is the contract out of which Pay Centers' claim arises.

3.  The obligor on Exhibit 2 is Save Rite Grocery Warehouse, Inc., a then division of the Debtor or wholly owned subsidiary of the debtor that was apparently folded into the Debtor pre-bankruptcy.

4.  The Debtor is the successor in interest to the obligor on Exhibit 2, and responsible for the contract in Exhibit 2 as further indicated by the correspondence, Exhibit 3. Indeed, the Debtor purported to operate Save Rite Grocery Warehouse, Inc., as a division and not a subsidiary.  Exhibit 4.

5.  The contract, Exhibit 2, was breached through anticipatory repudiation as noted in Exhibit 3, and further exemplified in the correspondence attached as Exhibit 5.

6.  Under penalty of perjury, I attest that all of the correspondence and exhibits attached to this opposition are true and accurate copies of documents that actually exist and were executed and/or transmitted in accord with their terms.  Exhibit 4 was retrieved

EXHIBIT 2

## "PCL" PUBLIC INTERNET KIOSK SERVICES AGREEMENT

This agreement ("Agreement") is entered into this 0 2 day of DEC 2003 by and between PayCenters LLC (hereinafter "PCL"), a Limited Liability Company, duly organized and existing under the laws of the State of Nevada with its principal place of business located at 6363 S. Pecos Rd Suite 203, Las Vegas, Nevada 89120, and Save Rite Grocery Warehouse, Inc., duly organized and existing under the laws of the State of Florida, with its principal place of business located at 5050 Edgewood Court, Jacksonville, FL 32254 ("Save Rite") (hereinafter PCL and Save Rite each may be referred to individually as "a Party" or collectively as "the Parties").

### Recitals

WHEREAS, "PCL" is the owner and holder of certain rights, title and interest, including intellectual property, to public high-speed Internet access bill payment and money transfer technology and

WHEREAS, "Save Rite" owns or otherwise controls various facilities throughout the United States, principally used for the retail sales of Grocery products and

WHEREAS, "PCL" and "Save Rite" seek to establish a business relationship to provide such services to "Save Rite's" customers; and

WHEREAS, "Save Rite" seeks to grant "PCL" the exclusive right to provide such services throughout "Save Rite" locations under the terms of this Agreement; and

NOW THEREFORE, in exchange for valuable consideration, the Parties hereby agree upon the following:

### I. Definitions

1.1.    **Kiosk Service.** "PCL"'s Kiosk Service includes the installation of kiosk unit(s) throughout "Save Rite" locations designed to provide the general public with a broad range of Internet access, e-mail, bill payment services, money orders, and any other services the Parties mutually agree can be provided by "PCL's" automated kiosks.

1.2.    **Pay Per Use Services.** Financial services designed to generate revenues through "Save Rite" customers' usage by sending and retrieving electronic payment and money transfer transactions and other processable functions as mutually agreed to by the parties.

1.3.    **Monthly Revenues.** Revenues collected by "PCL" each calendar month arising out of "Save Rite" customer usage generated by the transactions included as services offered net of third party provider processing and operational fees.

1.4    **Breach of Covenants.** PCL shall be in violation of this agreement by failing to perform the contractual covenants of this agreement as defined under the obligations in paragraph III. below, and PCL cannot remedy the violation within 30 days.

### II. Duration

II.1.  **Commencement.** This Agreement shall take effect upon the date of execution and shall continue for a term of three (3) years commencing upon the completion of the initial 60 Kiosks installation which shall take no longer than 6 months to complete. The initial installation of kiosks shall commence within 30 business days from the date of execution.

~~This Agreement shall take effect upon the date of execution and shall continue for a term of three (3) year commencing upon installation completion. [This needs to be defined. Some if or date of last install] The initial installation of kiosk shall commence within 30 days from the date of execution.~~

II.2.    Termination. This agreement shall terminate upon the expiration of three years from the date set forth in paragraph II.1 above.

II.3.    Additions and Extension. The parties agree they will follow the same guidelines of this Agreement and any modifications must be made in writing and mutually agreed to. This Agreement may be renewed by mutual Agreement of the parties.

## III. "PCL"'s Obligations

III.1    Installation. "PCL" shall install its Kiosk Service as agreed upon throughout "Save Rite" properties at no cost of installation to "Save Rite".

III.2.    Maintenance. "PCL" shall maintain the hardware and software it installs at "Save Rite" locations in accordance with the terms set forth in this agreement.

III.3.    Repair. "PCL" shall use its best efforts to keep the Kiosk Service in "Save Rite's" locations operational and in good repair. In the event of any general malfunctions, "PCL" will commence repairs and/or services the equipment within twenty-four (24) hours, excluding weekend and holidays, of receiving notification of a breakdown from "Save Rite". If the repair time will exceed 24 hours, "PCL" will inform "Save Rite" of the nature of the problem and will use its best efforts to restore such unit to operation as soon as possible.

III.4.    Marketing. "PCL" may place marketing materials such as tent card instructions and signs as agreed upon throughout "Save Rite's" locations promoting the Kiosk Service. "Save Rite" shall retain the right to reject such marketing materials. Advertising the services through the market area of each location shall be allowed directing customers to the locations. All advertising will be subject to the approval of "Save Rite".

III.5.    Compensation. "PCL" shall compensate "Save Rite" as set forth in Exhibit (A) of this Agreement.

III.6.    Costs. "PCL" shall pay for the set-up, installation, and all monthly operational and maintenance costs of the Kiosk Service.

III.7.    Refund. "PCL" shall refund to users the amount paid by same users of the Kiosk Service who are dissatisfied due to "PCL"'s equipment malfunction or any outage. Any such refund will only be given if user's claim of loss is verified by "PCL"'s monitoring system. "PCL" will provide a toll-free contact telephone number on its equipment accessible to users for such users to directly contact "PCL" for any questions and/or problems with its services.

III.8.    Books and Records; Audit. "PCL" shall keep an accurate set of books and records of monthly transactions and revenues associated with the equipment installed at "Save Rite" locations. All such books and records shall be retained and preserved for at least twenty-four (24) months following each calendar year to which they relate, and shall be subject to inspection, audit and copying by "Save Rite" and its agents upon reasonable notice.

III.9.    Insurance. "PCL" shall add "Save Rite" as an additional insured on its Commercial General Liability Insurance policy, which contains a minimum of $2,000,000 per occurrence General

Liability limit.  "PCL" shall also insure each of its employees as is required under the applicable Worker's Compensation statues of the State of operation.

III.10.  Limitations on "Save Rite" Use.  "PCL" shall limit its use of the space "Save Rite" provides to the installation and operations of the Kiosk Service within the location and used solely for the purpose of serving "Save Rite" customers.

III.11.  Training.  "PCL", at "Save Rite's" request, may train "Save Rite" employees, staff or others representatives "Representatives" in the use of "PCL's" Kiosk Service equipment and services to assist customers.  Such training shall be provided to the "Representatives" of "Save Rite" at the sole discretion of "Save Rite" and at no cost to "Save Rite". Additionally, "PCL shall provide training to "Save Rite" customers at each location with Kiosk Services for a maximum of 120 days and at no cost to "Save Rite".

III.12  Kiosk Ownership.  "PCL" shall purchase the Kiosk at no cost to "Save Rite". "PCL" at its expense will operate, service and maintain the Kiosks as provided for in this section III of this agreement and will compensate "Save Rite" as provided for in Exhibit (A) of this agreement.

III.13  Customer Payments.  "PCL" shall provide payment to "Save Rite" as set forth in Exhibit (B) of this Agreement.

III.14  Payment & Reporting.  "PCL" shall provide payment or Reporting to "Save Rite" as set forth in Exhibit (B) of this Agreement.

### IV.  "Save Rite's" Obligations

IV.1.  Kiosk Placement.  "Save Rite" shall insure that the placement of the "PCL" Kiosk within the locations will be in an area that will provide prominent exposure to customers and that is mutually agreed to.

IV.2.  Working Conditions.  "Save Rite" shall provide suitable working areas (staging area) for "PCL" representatives prior to installation of its equipment. "Save Rite" shall also provide "PCL" at "PCL's cost, with the appropriate space, electric outlet(s), and phone/data jack(s) within the location to allow "PCL" to commence the installation process and maintain its equipment and services following installation.

IV.3.  Notification.  "Save Rite" shall use its best efforts to notify "PCL" of any problems or complaints with the equipment and/or services with a carbon copy of the notification to Winn Dixie's Legal Department, at the following address:

> 5050 Edgewood Court
> Jacksonville, FL 32254.

IV.4.  Site Access.  "Save Rite" shall provide "PCL" with access to common areas of the location as may be reasonably necessary for "PCL" to perform its obligations under this Agreement. Following any termination of this Agreement, "Save Rite" shall grant "PCL" reasonable access to its locations to remove "PCL"'s property. "PCL" shall be granted 10 business days to remove "PCL's property from the "Save Rite" premises upon termination of this Agreement.

IV.5.  Exclusivity.  "PCL" shall be the exclusive Kiosk System and hardware provider and exclusive operator offering such services as provided for and defined in section 1.1 of this agreement at "Save Rite" locations. In the event that "Save Rite" considers the installation of any other internet based

services, not covered by this agreement, "Save Rite" shall allow "PCL" to bid to provide for those services.

IV.6.   Termination Through Breach. Save Rite" may suspend or terminate this agreement upon a breach by "PCL" of any of these Obligations under paragraph III. above which "PCL" does not remedy within thirty days of notification by Save Rite of such breach.

IV.7.   Termination for Convenience. Either Party may suspend or terminate this agreement for convenience provided that 90 days of written notice is given the other Party. If "Save Rite" terminates the Agreement for other than Cause prior to the initial term of such Agreement, "Save Rite" shall be liable for and pay to "PCL", with respect to the Communications Providers Service, an amount equal to the average amount invoiced for the Communications Providers Service for the preceding three months, multiplied by the number of months remaining in the term, up to a maximum of twelve months.

## Y. Other Provisions

V.1.    Valid Entity. The Parties jointly represent and warrant to the other that (i) it is an entity duly formed, validly existing, and in good standing under the laws of the jurisdiction in which it exists and that it has the power and authority to enter into this Agreement and fully to perform its respective obligations hereunder; and (ii) all necessary corporate action duly to approve the execution, delivery, and performance of this Agreement has been taken by it, and this Agreement constitutes a valid and binding Agreement of such party enforceable against it in accordance with its terms.

V.2.    Interruptions in Services. The Parties acknowledge that interruptions in utility, Internet connection and local telephone company services are not uncommon and the parties agree that such interruption may occur from time to time.

V.3.    Notices. Notices provided by this Agreement shall be given in writing and delivered via certified mail, return receipt requested, or by hand delivery to the addresses below:

| | |
|---|---|
| Company | PayCenters LLC |
| Address | 6363 S. Pecos Road #203 |
| | Las Vegas, NV 89120 |
| Contact | Ken Antos |
| Office Phone | 702-326-4809 |
| Fax Phone | 866-824-9357 |

| | |
|---|---|
| Company | Save Rite Grocery Warehouse, Inc. |
| Address | 5050 Edgewood Court |
| | Jacksonville, FL 32254 |
| Contact | Dennis Madsen |
| Office Phone | 404-346-2486 |
| Fax Phone | 404-346-3251 |

V.4.    Legal Forum. This contract shall be deemed made in the state of Florida and shall be governed by and construed in accordance with the laws of the state of Florida. The parties agree and consent to the jurisdiction of the courts in Duval County, Florida to resolve regarding the language and payments to be made under this Agreement.

V.5.   **Confidentiality.** For purpose of this Agreement, "Confidential Information" shall be defined as all information of either party hereto (the "Disclosing Party") which is disclosed to the other party (the "Receiving Party") and is of a confidential or proprietary nature and if it is marked or is not marked "Confidential" or "Proprietary" or which, if given orally, is confirmed promptly in writing as confidential or proprietary. Except as otherwise set forth in this Agreement, (i) all Confidential Information of the Disclosing Party acquired by the Receiving Party or its employees or agents in connection with this Agreement or in contemplation thereof shall be and shall remain the Disclosing Party's exclusive property, and (ii) the Receiving Party shall keep, and have its employees and agents keep, any and all such Confidential Information confidential, and shall not copy or publish or disclose it to others, or authorize its employees, agents, or anyone else to copy, publish, or disclose it to others, without the Disclosing Party's prior written approval. The Receiving Party agrees to use at least the same care and precaution in protecting Confidential Information of the Disclosing Party as the Receiving Party uses to protect its other proprietary information and trade secrets. Nothing herein shall limit the Receiving Party's use or dissemination of Confidential Information which (i) was known by the receiving Party prior to its receipt from the disclosing Party; (ii) is or becomes public knowledge through no fault of the receiving Party; or (iii) is independently developed by the Receiving without any use by the Receiving Party of any such Confidential Information.

Receiving Party may use Confidential Information within its own organization on a need-to-know basis for reasonable use in the purchasing, selling, and service effort of "PCL" System.

The Parties shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages. Furthermore, Receiving Party acknowledges that it is liable for all actual, incidental and consequential damages resulting from a material breach of this agreement, including, without limitation, lost profits resulting from a breach hereof, and that the Disclosing Party has a right to such punitive damages in the event of a willful material breach. In the event of legal action, Receiving Party agrees to pay Disclosing Party for such reasonable attorney's fees and cost as Disclosing Party may incur.

V.6.   **Nonwaiver.** Any Failure by either party to enforce at any time any of the provisions, including, without limitation, the termination provisions of this Agreement shall not be construed to be a waiver of such provision or of the right of either party thereafter to enforce such provision.

V.7.   **Severability.** All provisions of this Agreement shall be considered as separate terms and conditions, and, in the event any one shall be held illegal, invalid or unenforceable, all the other provisions hereof shall remain in full force as if the illegal, invalid, or unenforceable provisions were not a part hereof.

V.8.   **Right to Cure.** In the event of any perceived breach by either party, the aggrieved party must provide a written notice to the breaching party of the breach and the breaching party shall have a 30-day time period from the date of notice to cure.

V.10.   **Warranties.** The Parties warrant that they shall not use the services outlined in this Agreement to: (i) engage in any illegal activities; (ii) defraud one another, (iii) engage in abusive or harassing behavior toward the agents, employees, or representatives of the other Party.

V.11.   **Arbitration.** Any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination, or validity hereof, shall be finally settled by arbitration in accordance with the then-prevailing Commercial Arbitration Rules of the American Arbitration Association, as modified herein (the "Rules"). The place of arbitration shall be Jacksonville, Florida. There shall be three arbitrators, of whom "PCL" shall appoint one and "Save Rite" shall appoint one. The two arbitrators so appointed shall select the chairman of the tribunal within 30 days of the appointment of the second arbitrator. If any arbitrator is not appointed within the time limits provided herein or in the Rules, such arbitrator shall be appointed by the American Arbitration Association. By agreeing to

arbitration, the parties do not intend to deprive any court of its jurisdiction to issue a prearbitral injunction, prearbitral attachment or other order in aid of arbitration proceedings. Judgment upon the award of the arbitrators may be entered in any court of competent jurisdiction.

V.12. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

V.13. Force Majeure. "PCL" and "Save Rite" shall not be liable for any performance delay or failure, loss, or damage due to fire, explosion, power blackout, earthquake, flood, the elements, strike, embargo, labor disputes, acts of civil or military authority, acts of God, acts, omissions, or failures of carriers, communications services, acts of regulatory or governmental authorities, or other causes beyond "PCL" or "Save Rite"'s reasonable control.

V.14. Assignment. Neither party may assign any of its rights under the Agreement without the prior written consent of the other. Any assignment made in violation of the foregoing shall be void.

This Agreement supersedes all prior or contemporaneous written or verbal proposals and or negotiations and constitutes the entire Agreement between the Parties.

IN WITNESS WHEREOF the parties hereof have caused this Agreement to be duly executed as of the day year first above written

| PayCenters LLC | "Save Rite" Grocery Warehouse, Inc. |
|---|---|
| Signature: | Signature: |
| Name: Lew Sutton | Name: Robert A. Rowe |
| Title: CEO | Title: V.P. Division Manager |
| Date: 12/02/03 | Date: Nov 2, 2003 |

# EXHIBIT 3



## America's Supermarket*

RICHARD P. McCOOK
Financial Vice President

December 11, 2003

**Sent via facsimile and overnight delivery**

PayCenters, LLC
6363 S. Pecos Road #203
Las Vegas, NV 89120
Attn: Mark Hill

RE:  "PCI" Public Internet Kiosk Services Agreement

Dear Mr. Hill:

As you were advised orally yesterday, the Agreement dated December 2, 2003 between Save Rite Grocery Warehouse, Inc. and PayCenters, LLC is void and of no effect since the individual who signed on behalf of Save Rite Grocery Warehouse, Inc. was not authorized to execute the document.  Notwithstanding that, this letter is formal notice pursuant to clause IV.7, that the Agreement is terminated.

Sincerely,

Richard P. McCook
Financial Vice President

RPM:dav
Cc:   Jim Thatcher
      Blake Clark

EXHIBIT 4

Locate a Store | C



## Special Features

Weekly Ad
Pharmacy
Coupons
Gift Cards
Reward Card
Reward Clubs
Promotions & Sweepstakes
FTD Flowers
Winn-Dixie Brands

## Entertainment & Food

Recipes
Party Online Party Platters
Party Ideas
Cooking & Kitchen Tips
Food Safety & Nutrition
Gift Ideas



## In the Neighborhood

Local Events
Upromise
Community Involvement
Hurricane Resources

## Winn-Dixie 2003 News Releases

(NYSE): WIN
Release Date: December 4, 2003

**Media Contact:**
Kathy Lussier - (904) 370-6025 x3

Website: www.winn-dixie.com

### WINN-DIXIE ANNOUNCES NEW DIVISION MANAGER OF SAVERITE GROCERY WAREHOUSE, INC.

JACKSONVILLE, FL (December 4, 2003) - Winn-Dixie Stores, Inc. today announced Jim Thatcher as Division Manager of SaveRite Grocery Warehouse, Inc., effective immediately.

Thatcher will be responsible for overseeing the operations and merchandising of Winn-Dixie's SaveRite division. SaveRite stores showcase Winn-Dixie's price impact format offering a supermarket selection of groceries with cost-saving efficiencies built into operations. The first SaveRite opened in October 2000 in Orlando, FL. Currently, there are 59 SaveRite stores and five Sack-and-Save stores, located in Florida, Georgia and Mississippi. Thatcher will report to John Sheehan, Senior Vice President of Operations.

He was most recently with Fleming Foods, Inc., where he served as President of Southern Operations for Fleming Retail and President of Fleming IGA. He was responsible for operation of the Fleming-owned Price Impact stores in Texas and New Mexico as well as for Fleming's largest independent customer base, IGA, representing $2.1 billion in wholesale transfers.

Prior to joining Fleming Foods, Thatcher was President of University Foods, a Food 4 Less subsidiary of Fleming, Inc. His retail career also includes experience with Kash-N-Karry and Albertson's, Inc. where he served as Director of Retail Operations for the Florida Division.

"Jim brings a strong background in operating supermarket formats similar to SaveRite," said Sheehan. "His experience in operations, procurement, merchandising and his leadership skills will move our SaveRite stores forward to the next level of performance and customer satisfaction, underscoring our company's commitment to be the best supermarket in the neighborhood."

 Thatcher replaces Rob Rowe, who has left the company.

Winn-Dixie Stores, Inc. (NYSE: WIN) is one of the largest food retailers in the nation and ranks 149 on the FORTUNE 500® list. Founded in 1925, the company is headquartered in Jacksonville, FL, and operates more than 1,070 stores in 12 states and the Bahamas. Frank Lazaran serves as President and Chief Executive Officer. For more information, please visit us on the web at www.winn-dixie.com..

# # #

News Release #4019

EXHIBIT 5

# NERSESIAN & SANKIEWICZ

ATTORNEYS AND COUNSELORS
528 SOUTH EIGHTH STREET
LAS VEGAS, NEVADA 89101

ROBERT A. NERSESIAN[1]
THEA MARIE SANKIEWICZ[1]

———————
[1] LICENSED IN NEVADA AND MICHIGAN

PHONE: (702) 385-5454
FAX: (702) 385-7667
E-MAIL: VEGASLEGAL@AOL.COM

September 21, 2004

Mr. Richard P. McCook
Financial Vice President
Winn Dixie Stores, Inc.
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203 0297

Re: Pay Centers v. Winn Dixie, d/b/a SaveRite
    Confidential settlement proposal and negotiations.

Dear Mr. McCook:

Be advised that I represent Paycenters LLC. This letter is written concerning Save Rite's breach of the PCL agreement of December 2, 2003. It is written to you at Winn Dixie because there have been no Save Rite contacts since Mr. Rowe left, and you seem to have taken over the matter despite no indication that you are affiliated with the contracting party (Save Rite). I have also carbon copied the person at Save Rite seems to be the person with whom I could be corresponding.

I have reviewed the transaction, and your purported excuses for the breach, and have been instructed by Paycenters to seek compensation for the breach. The attempts in your prior correspondence to assert a lack of breach appear of no import.

Concerning the purported excuse that Mr. Rob Rowe lacked authority to enter into the agreement, I have confirmed through your web site that Mr. Rowe was the most senior person at Save Rite. As I understand it, Save Rite is a wholey owned subsidiary of Winn Dixie. Your news releases acknowledge that Mr. Rowe reported directly to Winn Dixie senior management concerning his management of Save Rite. This made Mr. Rowe the most senior person at Save Rite. It is impossible that the most senior person at a corporation lacks actual, let alone apparent, authority to enter into agreements on behalf of the corporation. That being said, the deceitful attempts to avoid the contract on fabricated and fraudulent representations that Mr. Rowe was some clerk is not accepted by Paycenters, and I cannot fathom how it could ever be accepted in a court of law.

The other purported excuse will likely be that the contract was cancelled by your citation to termination in your correspondence of December 11, 2003. This, too, fails for a number of reasons. First, the contract is with Save Rite, not Winn Dixie, and there has never been a notice of cancellation from Save Rite. Second, the exercise of a cancellation provision after an anticipatory repudiation coupled with the total failure to commence performance is ineffectual

Page 2
9/22/04
R. McCook

because of the earlier breach of the agreement. Simply, this clause cannot retroactively cure the executed and full breach of the agreement. Third, the provision you cite, even if valid, has a ninety day notice provision, and no such notice has ever been given. Fourth, the breach is not cured by this notice, and even if the contract was somehow to expire ninety days after your letter of December 11, 2003, the start up expenses and payment provisions of the paragraph would still come into play. Fifth, the fact that in the same letter you repudiate the contract and attempt to exercise its terms is inconsistent such that there is no effect to the citation to ¶ IV.7 of the agreement. Simply, the overt attempts of Save Rite to extract itself from its contractual obligations is entirely ineffectual.

With the foregoing being said, Paycenters is not in the business of litigation. In this respect, they have instructed me to attempt to gain an early and unobtrusive settlement of this matter and provide Save Rite a substantial savings simultaneously.

At a minimum, Paycenters' current damages consist of the following:

|  |  |  |
|---|---|---|
| 1. Start up costs expended in reliance of contract: | $ 89,599 |
| 2. Pro-forma profits through ninety days from today as relied upon by parties in negotiations: | 275,000 |
| 3. Liquidated payments due under ¶ IV.7: | 144,000 |
| Total minimum damages: | $508,599 |

In addition to these minimum damages, in the event of arbitration there is every possibility that the arbitrators would award and additional $550,000.00 for the final two years profits under the contract, and the lost opportunity value of having Paycenters rollout of its product by nearly a year. This latter sum could easily exceed an additional $500,000.00. Lastly, discovery may well provide indications of tortious bad faith breach that would open the door for punitive damages. In short, the exposure to your subsidiary and Winn Dixie is astronomical, and easily crests $1,500,000.00. This should not be surprising in light of the fact that there was such an unequivocal breach before Paycenters could achieve any of its expectations. This expectation would also be borne out by the total investment into the concept towards rollout. Simply, if millions are invested in a new business, the new business is entirely reliant upon an executed agreement for its success, and the contracting party refuses to perform the contract, an amount of damages exceeding one and one-half million dollars is easily supported.

Now for the good news and the bad news for Save Rite. The good news is that for a fifty percent discount off of the total minimum damages, Paycenters will have done with this matter, and fully settle all disputes between the parties. Under this correspondence, that equals $254,299.50, and if this amount is paid, the matter will be settled and at an end. For the sake of ease of acceptance of this settlement proposal, Paycenters would even throw in a confidentiality agreement concerning the settlement if you so desire.

Page 3
9/22/04
R. McCook

The bad news is that absent acceptance of this settlement amount, I have taken this case on a contingency and been given *carte blanche* in my approach hereafter. I understand the arbitration process and do not find it daunting. I have worked as an AAA arbitrator myself, and I am fully prepared to take your breach to the wall and seek all damages available. Please run this by your lawyers together with a copy of the signed agreement, the acknowledgments concerning Mr. Rowe's authority as stated in prior Winn Dixie press releases, and the support documents that were provided by Paycenters during the negotiations. I am confident that they should view this proposal as more than reasonable on the part of Paycenters.

Also towards making this easier, I have included an acceptance line below. Should you accept this proposal, please have this document executed by the proper persons and return it by fax or mail. If you choose to reject this offer, accept this correspondence as a demand for arbitration, and have your attorneys contact me in order that the arbitrators can be selected, discovery commenced and this matter put on the course to resolution.

If you have any questions or comments, please feel free to call or write. Thank you for your attention.

Very Truly Yours,
Nersesian & Sankiewicz

Robert A. Nersesain

cc: Ken Antos
    Jim Thatcher, Save Rite

---

**The foregoing settlement proposal is agreed to by the undersigned.**

**Save Rite Grocery Warehouse, Inc.**

**By:**_____
             **Signature**
    **Print name:**_____
    **Print title:**_____

# NERSESIAN & SANKIEWICZ

ATTORNEYS AND COUNSELORS
528 SOUTH EIGHTH STREET
LAS VEGAS, NEVADA 89101

ROBERT A. NERSESIAN[1]
THEA MARIE SANKIEWICZ[1]

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[1]LICENSED IN NEVADA AND MICHIGAN

PHONE: (702) 385-5454
FAX: (702) 385-7667
E-MAIL: VegasLegal@AOL.COM

July 31, 2006

## VIA FEDERAL EXPRESS NEXT DAY DELIVERY

Clerk of the Court
United States Courthouse
300 North Hogan St.
Suite 3-350
Jacksonville, FL 32202

RECEIVED
CLERK, U.S. BANKRUPTCY COURT
AUG 0 1 2006
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Re: Winn-Dixie Stores, Inc.
Case No. 05-03817-3F1
Claim No. 11208
Claimant: Pay Centers LLC

Dear Clerk of the Court:

Enclosed please find an original, copy and courtesy copy of Pay Centers LLC's opposition to objection to the above referenced claim. Please process the same and return a file stamped copy in the enclosed self-addressed stamped envelope. Please note that this opposition is being filed directly by the claimant, and thus, hard copy filing is appropriate.

Please call with any questions or comments. Thank you for your attention.

Very truly yours,
Nersesian & Sankiewicz

Robert A. Nersesian

cc: Ms. Jane Leamy via fax ((888) 329-8399)
D.J. Baker via fax ((917) 777-2150)