Hearing Date: August 24, 2006, 1:00 p.m.
Objection Deadline: August 14, 2006 at 4:00 p.m. (E.T.)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC. TO SELL HARAHAN WAREHOUSE FACILITY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND (B) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing Winn-Dixie Logistics, Inc. ("WD Logistics") to sell WD Logistics' fee simple title in a warehouse facility located in Jefferson Parish, Louisiana, (the "Harahan Warehouse Facility"), together with all attached improvements, as more particularly described on Exhibit A attached to this Motion (collectively, the "Assets") to Ackel Real Estate, LLC and John Georges (collectively, the "Purchaser"), or to the party submitting a higher or better offer, free and clear of liens, claims and interests and (b) granting related relief.   In support of the Motion, the Debtors respectfully state as follows:

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

**Background**

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

4.      Prior to the Petition Date, the Debtors used the Harahan Warehouse Facility to supply stores located in Louisiana.  Since the Petition Date, the Debtors have consolidated their warehouse operations for this area into their Hammond, Louisiana Facility and no longer need the Harahan Warehouse Facility.

5.      Since the Petition Date, the Debtors have marketed the Harahan Warehouse Facility extensively through DJM Asset Management, Inc. ("DJM"). DJM sent over 2,500 sale notices for the Harahan Warehouse Facility to potential purchasers.  Through DJM's efforts, the Debtors have received 4 offers, including

the offer by the Purchaser for $6,750,000.  The Purchaser's offer is the highest or otherwise best offer for the Harahan Warehouse Facility.

### Relief Requested

6.      By this Motion, the Debtors request authority to sell the Assets free and clear of liens, claims and interests, subject to higher or better offers.  The Assets are more fully described in the Facility Agreement (defined below).

### The Facility Purchase Agreement

7.      On August 3, 2006, WD Logistics and the Purchaser entered into the Facility Agreement attached as Exhibit A.

8.      The terms of the transaction with the Purchaser include the following:[2]

    (a)    Assets.  The assets to be sold and transferred to the Purchaser include:

        (i)    WD Logistics' fee simple title in the land and buildings known as the Harahan Warehouse Facility;

        (ii)    all attached improvements.

    (b)    Purchase Price.  On the terms and subject to the conditions set forth in the Facility Agreement, the net aggregate purchase price for the Assets is $6,750,000 (the "Purchase Price").  The Purchaser has deposited the sum of $2,000,000 in escrow.

    (c)    Sale Free and Clear.  The Facility Agreement provides that the Assets are to be transferred free and clear of any liens, claims, interests and encumbrances other than the Permitted Encumbrances, as defined in the Facility Agreement.

---

[2]      This summary of the Facility Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Facility Agreement, the terms of the Facility Agreement control.

(d)     Investigation Period.  The Purchaser has inspected the Assets and has determined the same to be satisfactory to the Purchaser.

(e)     Overbid Protection.  The initial minimum overbid that may be accepted by the Debtors at any auction must have a value of at least $6,952,500.

(f)     Termination Fee.  WD Logistics has agreed to pay the Purchaser a termination fee of $50,000 for Purchaser's expenses incurred in the event Purchaser is not the successful bidder at the Auction for the Assets.

9.     The Debtors move for authority to consummate the sale of the Assets with the Purchaser or, alternatively, to the party submitting a higher or better offer for the Assets.

### Solicitation of Higher and Better Offers

10.     Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher and better bids for the Assets.  Any person or entity interested in submitting a higher and better bid for the Assets must submit such bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747, with a copy to undersigned counsel for the Debtors, no later than 12:00 p.m. (prevailing Eastern Time) on August 21, 2006.  All bids must comply with the bidding procedures approved by the Court by order dated June 21, 2005 (Docket No. 1801) (the "Bidding Procedures").  To qualify as a competing bid, the offer must net the Debtors' estates at least $6,952,500 and be accompanied by a certified check made out to Smith, Gambrell & Russell, LLP, as Escrow Agent, in an amount not less than $2,000,000.

11.    If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets in accordance with the Bidding Procedures.  The Auction will take place at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida, on Tuesday, August 23, 2006.  The Debtors will conduct the Auction in consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

## Applicable Authority

### A.    Bankruptcy Code Section 363(b) Authorizes the Sale.

12.    Bankruptcy Code section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 1107(a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  *See* 11 U.S.C. § 1107(a).

13.    A debtor's sale under section 363(b)(1) should be approved when supported by a sound business reason.  *See In re B.D.K. Health Mgmt., Inc.* ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b)

application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

14.    Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the Debtor has provided interested parties with adequate and reasonable notice.  *Del. & Hudson*, 124 B.R. at 175-176.

15.    The Debtors have a sound business reason for the sale of the Assets. The Debtors no longer have a need for the Harahan Warehouse Facility and remain liable for the costs associated with the Harahan Warehouse Facility, such as maintenance and taxes (approximately $95,000 per year).

16.    The sale of the Assets to the Purchaser is subject to competing bids, ensuring that the Debtors will receive the highest or best value for the Assets. Thus, the fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by an auction process—the best means for establishing whether a fair and reasonable price is being paid.

17.     In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets; (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP Lenders; (e) counsel for the Creditors Committee; (f) all known holders of interests and claims in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (i) the Office of United States Trustee.

**B.     Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

18.     The Debtors request that the sale of the Assets be approved free and clear of any liens, claims or interests.   Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing.   *See In re Parrish*, 171 B.R. 138 (Bankr. M.D. Fla. 1994).

19.     The Debtors believe that with the exception of the Permitted Encumbrances (as defined in the Facility Agreement), there are no interests in or claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender").   The interest of the DIP Lender will be satisfied because the Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

## C.    Good Faith Purchaser.

20.    The Debtors request that the Court find that the Purchaser, or the party who ultimately submits the highest or best offer for the Assets, acted in good faith within the meaning of Bankruptcy Code section 363(m).

21.    Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m)

22.    The Bankruptcy Code does not define the term "good faith." Courts, however, indicate that a party would have to show fraud or collusion between the purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

> *In re Apex Oil Co.*, 2 B.R. 847, 865 (Bankr. E.D. Mo. 1988)

*Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997). No such facts exist here.

23.    The Debtors assert that: (a) the proposed sale is the subject of arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser has no affiliation with the Debtors; (c) the Assets were marketed extensively and the Purchase Price is fair and reasonable; (d) to the best of the Debtors' knowledge, the Purchaser has taken no action to chill or otherwise collude with any other party to restrict bidding on the Assets; and (e) the marketing process that occurred and the notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors. Accordingly, the Debtors request that the Court find that the Purchaser, or the party submitting a higher or better offer, acted in good faith within the meaning of Bankruptcy Code section 363(m). *See B.D.K. Health Mgmt.,* 1998 WL, at \*4 (finding that the purchaser is entitled to the protections of Bankruptcy Code section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

**D.      Elimination of 10-Day Stay Under Rules 6004(g)**

24.      Pursuant to Fed. R. Bankr. P. 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to Bankruptcy Code section 363 are automatically stayed for ten days after entry of the order.    Given the requirements of the Facility Agreement and the need to close the sale as promptly as possible, the Debtors request that the Court waive the 10-day stay period.

**E.      Objection Deadline**

25.      Only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by August 14, 2006 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

## **Conclusion**

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit B (a) granting the Motion and authorizing the sale of the Assets to the Purchaser in accordance with the Facility Agreement, or to the party submitting a higher or otherwise better offer for the Assets; (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Facility Agreement; and (c) granting such other and further relief as the Court deems just and proper.

Dated: August 3, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By    */s/ D. J. Baker*
      D. J. Baker
      Sally McDonald Henry
      Rosalie Walker Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By    */s/ Cynthia C. Jackson*
      Stephen D. Busey
      James H. Post
      Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

00539332

**EXHIBIT A**

## FACILITY PURCHASE AGREEMENT
[Harahan Warehouse Facility]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of August 3, 2006 (the "Effective Date"), between

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation ("Seller"), and

**ACKEL REAL ESTATE, L.L.C.,** a Louisiana limited liability company and **JOHN GEORGES**, an individual, or their permitted assignee pursuant to paragraph 12.3 of this Agreement (together as "Buyer").

### R E C I T A L S :

A.     Seller owns fee simple title to the real property described on attached Exhibit A (the "Land"), located at 600 Edwards Avenue, Jefferson Parish, Louisiana, together with all and singular the rights, interests, benefits, privileges, servitudes, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining thereto, all right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the bed of any street, right-of-way, road or alley, open or proposed, adjoining such Land, and all improvements located on the Land (the "Facility"). The Facility and the Land together are referred to as the "Property."

B.     Seller desires to convey and sell to Buyer, and Buyer desires to acquire (directly or through an Affiliate designated by Buyer) and purchase, the Property, subject to the terms and conditions contained in this Agreement. Buyer contemplates effectuating acquisition of the Property pursuant to a 1031 tax deferred transaction.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION** and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.     **Defined Terms.** Capitalized terms as used in this Agreement will have the meanings assigned to such terms as they appear in this Agreement, except that the following capitalized terms will have the meanings set forth below:

   1.1     "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

   1.2     "Broker" will mean the real estate broker(s) identified in paragraph 10 of this Agreement as the broker for the transaction contemplated hereunder.

   1.3     "Business Day" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Jacksonville, Florida.

1.4    "Claim" will mean any claim (including without limitation as defined by 11 U.S.C. Section 101(5)), demand, action, complaint, suit, lawsuit, litigation, inquiry, hearing, investigation or proceeding, whether formal or informal, commenced, brought or threatened.

1.5    "Closing" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Act of Sale with limited warranties and other documents contemplated by paragraph 9 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.6    "Closing Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as closing agent for the transactions contemplated hereunder.

1.7    "Closing Statement" will mean a statement to be delivered by Buyer and Seller at Closing, reflecting the net amount due from Buyer to Seller at Closing for the Assets, and the proper allocation of Buyer's Closing Costs and Seller's Closing Costs, after making the adjustments as provided in this Agreement.

1.8    "Consent" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any Contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Property are governed or bound.

1.9    "Environmental Laws" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

1.10    "Environmental Permits" will mean all Consents required under any Environmental Law.

1.11    "Escrow Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as escrow agent.

2

1.12   "Excluded Personal Property" will mean those items of furniture, furnishings and movable equipment, including all computer and related equipment, and all other tangible and intangible personal property, as more particularly described on Exhibit B.

1.13   "Governmental Authority" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.14   "Hazardous Material" will mean any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.15   "Interest" will mean any and all interests (including any successor, transferee or similar liability), liens (including but not limited to any and all "liens" as defined in 11 U.S.C. § 101(37)), liabilities, mortgages, deeds, acts of sale, trusts, guarantees, security agreements, security interest, rights of setoff or recoupment, pledges, privileges, leases, possessory licenses, options, rights of first refusal, preemptive rights, easements, servitudes, encroachments, hypothecations, charges, obligations, rights, restrictions, charges and encumbrances of any kind or nature or other matter causing a defect or imperfection in title.

1.16   "Knowledge" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the executive officers of Seller and of Winn-Dixie Stores, Inc., and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers.

1.17   "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

1.18   "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien or Interest against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) construction liens or Interests that have attached to and become a lien or Interest against Seller's interest in the Property; (iv) judgments that have attached to and become a lien or Interest against Seller's interest in the Assets; and (v) any other Interest against Seller's

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

interest in the Assets that can be satisfied by Seller with the payment of money out of the Purchase Price.

1.19   "Outside Date" will mean August 30, 2006.

1.20   "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.21   "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.22   "Title Insurer" will mean Title Depot of Eastbank, Inc., through Landamerica/Commonwealth Land Title Insurance Company, Metairie, Louisiana.

2.   **Assets.** Seller agrees to grant, bargain, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following property interests (collectively, the "Assets"), free and clear of any and all Claims and Interests (other than Permitted Encumbrances) in accordance with 11 U.S.C. Section 363:

2.1   The Property; and

2.2   All fixtures attached to the Property, including, but not limited to heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, and flooring located on the Property, but specifically excluding the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller.

3.   **Purchase Price; Payment.**

3.1   Purchase Price. Buyer agrees to pay Seller a purchase price of $6,750,000 for the Assets (the "Purchase Price"), payable to Seller on the Closing Date. Buyer shall not be liable for any obligations of Seller or have any further obligations beyond the payment of the Purchase Price, except as otherwise expressly set forth in this Agreement.

3.2   Deposit.

3.2.1   An earnest money deposit of $2,000,000 (the "Deposit") will be due and payable to Escrow Agent within three (3) Business Days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

3.2.2   At the Closing, the Deposit will be released to Seller and credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable by Buyer in cash.

3.3   Payment of Purchase Price. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "Closing Deposit") with Escrow Agent. Escrow Agent

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

will deposit the Closing Deposit into a non-interest bearing escrow account and will disburse or apply the Closing Deposit as provided in this Agreement. At Closing, the Purchase Price will be credited and disbursed to Seller or as Seller directs.

4. **Condition of Assets; Buyer's Due Diligence; Buyer's Financing.**

4.1    <u>Condition of Assets</u>.    Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets "As Is, Where Is," with all faults, and, except as expressly provided herein, without representations or warranties expressed or implied as to redhibitory defects in the Property, and, except as expressly provided or referred to herein, there are no oral agreements, warranties or representations collateral to or affecting the Property by Seller or any third party. The terms and conditions of this paragraph will expressly survive the closing and not merge therein.

4.2    <u>Investigation Period</u>. Buyer has inspected the Property and waives all further investigation of the Property and has determined that the same is satisfactory to Buyer.

4.3    <u>Title</u>.  At Closing, Seller will, pursuant to the terms of the sale order, convey and assign to Buyer, and Buyer will accept, all of Seller's right, title and interest in the Assets, subject only to those matters listed on <u>Exhibit C</u> and to any other matters approved or waived by Buyer as provided in this Agreement (collectively, the "<u>Permitted Encumbrances</u>"). Seller's interest in the Property will be conveyed by Act of Sale with limited warranties substantially in the form attached as <u>Exhibit D</u> as required by Title Insurer to properly insure Buyer's title to the Property (the "<u>Act of Sale</u>"). Evidence of the delivery of marketable and insurable title to Seller's interest in the Property will be pursuant to Title Insurer's issuance of a policy of title insurance for the Property (in the form of a marked Title Commitment evidencing the Title Insurer's binding obligation to issue its title policy), insuring the interest of Buyer in the Property as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for a survey reading reflecting matters disclosed on the Survey obtained by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Property is located, in the amount of the Purchase Price (the "<u>Title Policy</u>").

4.4    <u>Title Commitment</u>. Buyer has examined a title insurance commitment (the "<u>Commitment</u>") from Landamerica/Commonwealth Land Title Insurance Company (the "<u>Title Insurer</u>") committing to insure fee simple title to the Property and has determined that the same is satisfactory to Buyer.  The Title Commitment states all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Seller and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "<u>Credit Agreement Liens</u>"), any other liens and encumbrances affecting the Property ("<u>Other Liens</u>"), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances (collectively, the "<u>Exceptions</u>".

5

4.5     <u>Boundary Survey</u>. Buyer has examined a survey of the Property (the "<u>Survey</u>") and has determined that the same is satisfactory to Buyer.

4.6     <u>Special Covenants and Conditions</u>. Buyer acknowledges the following special covenants and conditions relating to the Property:

   4.6.1   <u>Parking License Agreement</u>. Certain parking spaces on the Land as more particularly delineated on attached <u>Exhibit E</u> (the "<u>Facility Site Plan</u>") as licensed parking area, are subject to an existing license agreement with Belfor USA Group, Inc. ("<u>Belfor</u>") allowing Belfor to park no more than twenty-five (25) 53 foot long tractor trailers within such parking areas on the Land. At or prior to Closing, Seller will at Buyer's request, either (i) terminate the existing license agreement with Belfor and will hold Buyer harmless from any claim by Belfor relating to the same, or (ii) assign the license agreement to Buyer at Closing, to the extent assignable.

   4.6.2   <u>Railroad Spur Tracks</u>. Railroad spur tracks are located within the Facility, as shown on the Facility Site Plan. There is no spur track agreement in effect between Seller and the rail service provider and no rail service is provided to the Facility at this time. The railroad spur tracks are considered a Permitted Encumbrance.

   4.6.3   <u>Refrigeration System</u>.

      (a)   <u>System Requirements</u>. The Property includes an ammonia-based refrigeration system (the "<u>Refrigeration System</u>"). The ammonia has been removed and the Refrigeration System has been shut down. Removal or operation of the Refrigeration System is a highly technical and hazardous process, and requires the supervision of highly trained refrigeration specialists.

      (b)   <u>Indemnification</u>. Buyer acknowledges the special requirements and hazards of the Refrigeration System under Environmental Laws. Buyer's acceptance of the Facility at Closing will constitute Buyer's assumption of responsibility for the operation, maintenance, repair and removal of the Refrigeration System from and after the Closing Date, and Seller will have no further obligations relating thereto. Buyer agrees to release, indemnify and hold harmless Seller from all claims, loss, cost, damages or expense asserted against Seller relating to Buyer's inspection of the Refrigeration System during the Investigation Period, and, from and after Closing, to Buyer's operation or removal of the Refrigeration System from the Facility, and to actions required under Environmental Laws.

6

4.6.4  Underground Storage Tanks.

    (a)   UST's. The Facility historically has contained underground storage tanks ("UST's"), which either have been removed, withdrawn from service and filled with inert material, or remain in service. A schedule of all UST's known to Seller to be presently or formerly located on the Facility, and the applicable Environmental Permits associated with the UST's, is set forth on attached Exhibit F.

    (b)   Contaminant Levels. The Louisiana Department of Environmental Quality closed a specific area of the Land due to contaminant levels present, in accordance with Louisiana Administrative Code, as more particularly described on attached Exhibit G (the "Restricted Area"). Closure of the Restricted Area is considered a Permitted Encumbrance.

    (c)   Environmental Law Compliance. Notwithstanding any other provisions of this Agreement, Seller makes no representations or warranties to Buyer as to the compliance of the UST's with applicable Environmental Laws.

    (d)   Indemnification. Buyer acknowledges the special requirements and hazards of the UST's under Environmental Laws. Buyer's acceptance of the Facility at Closing will constitute Buyer's assumption of responsibility for the operation, maintenance, repair, closure and removal of the UST's from and after the Closing Date, and Seller will have no further obligations relating thereto. Buyer agrees to release, indemnify and hold harmless Seller from all claims, loss, cost, damages or expense asserted against Seller from and after Closing, to Buyer's use, maintenance, repair, closure and removal of the UST's from the Facility, and to actions required under Environmental Laws.

5.  **Representations and Warranties of Seller and Buyer.**

5.1  Seller warrants to Buyer as follows:

5.1.1  Corporate Existence and Authority. Seller is a Florida corporation and its status is active. Subject to satisfaction of the Approval Condition pursuant to paragraph 7.1 below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

5.1.2  Title to Property. Seller owns fee simple title to the Property, subject to the Permitted Encumbrances, the Credit Agreement Liens and the Other Liens.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

5.1.3  <u>Power to Convey</u>. To Seller's Knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in <u>paragraph</u> below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

5.1.4  <u>Compliance with Environmental Laws</u>. To Seller's Knowledge, and subject to the matters disclosed in <u>paragraphs 4.7.3 and 4.7.4</u> above, Seller has not been notified by any Governmental Authority of any noncompliance of the Property with Environmental Laws, including all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material or asbestos-containing materials; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.

5.2  Buyer warrants to Seller as follows:

5.2.1  <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's permitted assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

5.2.2  <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7.1</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

8

5.2.3 <u>Financial Condition</u>. Buyer represents, warrants and covenants that as of the Effective Date and continuing through the Closing Date, Buyer has or will have the sufficient funds on hand to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

6. **Survival of Warranties.** The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Act of Sale, and will have no further force or effect after the Closing. Therefore, the Buyer waives all rights in the nature of redhibition which might create a cause of action by Buyer against Seller based on any type of defect in the property, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement and the Act of Sale.

7. **Closing Conditions.**

7.1 <u>Approval Condition</u>.

7.1.1 <u>Chapter 11 Cases</u>. Winn-Dixie Stores, Inc. and certain of its affiliated companies, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "<u>Bankruptcy Cases</u>"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "<u>Bankruptcy Court</u>") where they are being jointly administered under Case No. 05-03817-3F1.

7.1.2 <u>Competitive Bid Process</u>. By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "<u>Bidding Procedures</u>"). This Agreement is subject to the competitive bid process described in the Bidding Procedures. Promptly following the Effective Date, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Liens and the Other Liens, other than Permitted Encumbrances, pursuant, <u>inter alia</u>, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "<u>Sale Motion</u>"). The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "<u>Sale Hearing</u>"). Prior to the Sale Hearing, the debtors will conduct an Auction pursuant to the Bidding Procedures.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

7.1.3 <u>Overbid Protection</u>. As authorized by the Bidding Procedures, and as an inducement to Buyer to enter into this Agreement to acquire the Property at an effective purchase price of $6,750,000, Seller agrees that it will not accept any initial minimum bid that represents an effective purchase price of less than $6,952,500.

7.1.4 <u>Sale Order Approving Agreement</u>. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Approval Condition</u>").

7.1.5 <u>Continuing Effectiveness of Agreement</u>. Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other. Furthermore, following satisfaction of the Approval Condition, if Seller nonetheless refuses to close the transaction contemplated herein and Buyer otherwise is ready, willing and able to close, then this Agreement automatically will terminate, subject, however, to Buyer's remedies for Seller's default as provided in <u>paragraph 11.1</u> below.

7.2 <u>Conditions Precedent to Seller's Obligations</u>. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

7.2.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

7.2.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect

10

7.2.3 As of the Closing, there shall have been no material adverse change in any of the items reviewed by Buyer during the Inspection Period. No later than one Business Day prior to the Closing Date (or such earlier date as provided herein), Seller shall have tendered all deliveries to be made at Closing.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with paragraph 11 of this Agreement.

8.     **Casualty; Condemnation**.  If, prior to Seller's legal delivery of the Act of Sale and Buyer's delivery of the Purchase Price, the Assets or any portion thereof are destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within five (5) business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the return from Escrow Agent of the Deposit. If neither party exercises its right of termination and the Assets are sold to Buyer pursuant to the terms of this Agreement, then as Buyer's sole remedies, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds received by it.

9.     **Closing**.

9.1     The consummation of the transactions contemplated herein by Buyer and Seller (the "Closing") will be held on or before September 1, 2006, subject to earlier satisfaction of the Approval Condition (the "Closing Date"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Closing Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Closing Agent.

9.2     Possession of the Assets will be delivered to Buyer on the Closing Date free and clear of all Claims and Interests and rights of third parties whatsoever, subject only to the Permitted Encumbrances.

9.3     At the Closing, Seller will deliver to Buyer or Buyer's designee the following:

(i)     The Act of Sale;

(ii)    The Bill of Sale;

(iii)   An Affidavit of Seller in recordable form, setting forth the specific terms of the Sale Order;

(iv)    The Closing Statement;

11

(v)     Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered;

(vi)    All keys and codes for the Property; and

(vii)   Any other documentation required of Seller under local law.

Buyer may waive compliance by Seller as to any of the foregoing items by an instrument in writing.

9.4     At the Closing, Buyer will execute and deliver to Seller the following:

(i)     The Purchase Price;

(ii)    The Closing Statement;

(iii)   Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered; and

(iv)    Any other documentation required of Buyer under local law.

Seller may waive compliance by Buyer as to any of the foregoing items by an instrument in writing.

9.5     On the Closing Date, Seller and Buyer will each deposit such other instruments with Closing Agent as are reasonably required by the Title Insurer to consummate the conveyance of the Property to Buyer in accordance with the terms hereof.

9.6     All ad valorem taxes for the year in which the Closing occurs will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). The tax proration at Closing may be based on an estimate using the previous year's tax amount.  Buyer agrees to notify the taxing authority promptly after Closing of the transfer and assignment of Seller's interest in the Assets to Buyer for purposes of proper tax assessment notifications.

9.7     Any matter specified in paragraph 9.6 of this Agreement that cannot reasonably be determined and apportioned between Seller and Buyer on the Closing Date will be specified by Buyer and Seller in writing at Closing, and will be subject to settlement at such time as such matter is finally determined (but in no event later than ninety (90) days after the Closing Date). Additionally, any apportionments, prorations or adjustments that are miscalculated (through mathematical error) at Closing will be subject to recalculation and final settlement at such time as such miscalculation is discovered (but in no event later than ninety (90) days after the Closing Date). Such apportionments will be effective as of the Closing Date.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

9.8    At or prior to Closing, Seller will pay the cost of the commission payable to Seller's Broker as disclosed in <u>paragraph 10</u>, and Seller's attorneys' fees and costs ("<u>Seller's Closing Costs</u>"). At or prior to Closing, Buyer will pay the cost of the transfer taxes on the Act of Sale, the cost of the title commitment and insurance policy to be issued pursuant to the Commitment in the amount of the Purchase Price, the cost of the Survey, the cost of its due diligence investigations of the Property, all recording fees, all financing costs of Buyer incurred to purchase the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("<u>Buyer's Closing Costs</u>"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

10.    **<u>Brokers; Commissions</u>**. Seller and Buyer warrant each to the other (and it is agreed that this warranty will survive delivery of the Act of Sale) that no broker or agent has been employed with respect to the sale of the Property, other than Seller's broker, DJM Asset Management, LLC ("<u>Seller's Broker</u>"), pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "<u>Retention Order</u>"). Seller will be responsible for payment of commission due to Seller's Broker pursuant to the Retention Order. Each party indemnifies and agrees to hold harmless the other from any claim made by any other broker or agent who claims to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim, and said indemnifications by Seller and Buyer will survive the Closing of this transaction or earlier termination of this Agreement.

11.    **<u>Default; Remedies</u>**.

11.1    <u>Seller's Default</u>. If Seller fails to materially comply with or perform any of the covenants, agreements or obligations to be performed by Seller under this Agreement, then Buyer will be entitled to terminate this Agreement by written notice to Seller and promptly following such termination, without any other action being necessary, Escrow Agent will return the Deposit to Buyer. Buyer waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided in <u>paragraph 10</u> above, which indemnification will survive separately from the termination of this Agreement.  Buyer waives all other remedies it may have at law or in equity.

11.2    <u>Buyer's Default</u>. If Buyer fails to make the Deposit when due or to comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under the terms and provisions of this Agreement, then the Deposit will be paid to Seller as reasonable liquidated damages. Seller waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided under <u>paragraph 4.2.4</u> and

13

paragraph 10 above, which indemnifications will survive separately from the termination of this Agreement.

11.3    Break-up Fee.  If Buyer is not the Successful Bidder and Buyer has not breached this Agreement, upon Closing of the sale of the Property to the Successful Bidder, Seller shall pay to Buyer the sum of $50,000 as an agreed-upon fee for Buyer's costs and expenses related to entering into this Agreement.

11.4    Remedies Cumulative. The foregoing remedies are in addition to any rights afforded either of the parties pursuant to Seller's indemnity under paragraph 10, and Buyer's indemnities under paragraphs 4.6.3 and 10.

## 12.    **Miscellaneous**

12.1    Attorneys' Fees. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the substantially nonprevailing party will pay to the substantially prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.

12.2    Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will be in writing and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by United States Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Logistics, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Catherine Ibold
Telefax No. (904) 783-5138

With a copy to:

Smith, Gambrell & Russell, LLP
50 N. Laura Street, Suite 2600
Jacksonville, Florida 32202
Attention: Douglas Stanford
Telefax No.: (904) 598-6226

14

If to Buyer:

> George Ackel
> 1000 Veterans Boulevard
> Suite 304
> Metairie, Louisiana 70005
> Telefax No. (504) 455-4357

If to Escrow Agent or Closing Agent:

> Smith, Gambrell & Russell, LLP
> 50 N. Laura Street, Suite 2600
> Jacksonville, Florida 32202
> Attention: Douglas Stanford
> Telefax No.: (904) 598-6226

or such other address as any of the foregoing parties may from time to time specify by notice to the others.

12.3    <u>Successors And Assigns; Assignment Of Agreement</u>. All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns.  Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other.  Buyer may assign its rights and obligations under this Agreement to an affiliate of Buyer, provided, however, that Buyer shall remain fully liable for performance of the obligations, including indemnifications, of the "Buyer" hereunder.

12.4    <u>Exchange Provision</u>.  Buyer and Seller acknowledge that either or both of them may desire to structure the sale contemplated hereby as a tax-deferred exchange pursuant to section 1031 of the Internal Revenue Code, as amended.  Accordingly, Buyer and Seller agree that they shall cooperate with and assist one another in accomplishing any such exchange provided that (a) the consummation of the transactions contemplated hereby is not thereby delayed, and (b) no party hereto shall be obligated to incur any expense or liability (actual or potential) beyond that which it is otherwise obligated to incur hereunder, and (c) in no event shall Seller be obligated to contract for the purchase of or to take title to any so-called "replacement property".

12.5    <u>Changes And Modifications; Prior Agreements</u>. This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

15

14. **Escrow Agent**.

14.1   Duties. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Escrow Agent agrees to promptly deposit the Deposit, upon receipt thereof, in an interest bearing account, to hold the same in escrow, and disburse the same in accordance with this Agreement. Although interest accrued on the Deposit will be payable to the party entitled to the Deposit at such time as the Deposit it paid, interest accrual will be deemed to belong to Buyer for federal and state income tax purposes. Escrow Agent will release the Deposit only as expressly provided in this Agreement.

14.2   Limitations of Liability. Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

14.3   Role as Counsel. The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller. In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

14.4   Withdrawal. No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

14.5   Dispute. If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefore. In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal).

**[Signature Page follows]**

17

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Signed, sealed and delivered in the presence of:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

By: _____
Name:  SUSAN MAGADDINO

Name: JACQUES NICOLARSON

By: _____
Name: Bennett L. Nussbaum
Title: Vice President

[Corporate Seal]

Signed, sealed and delivered in the presence of:

**BUYER:**

**ACKEL REAL ESTATE, L.L.C.,** a Louisiana limited liability company

Name:_____

Name:_____

By: _____
Name: _____
Title: _____

[Seal]

Name:_____

Name:_____

_____ [SEAL]
**JOHN GEORGES**, individually

Reviewed By
_SK_
XRoads
Date: _8/2/06_

LEGAL APPROVED
ATTY: _CBF_
DATE: _8/2/06_

18

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Signed, sealed and delivered in the presence of:

**SELLER:**

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation

By: _____
Name: _____
Name: _____
Title: Vice President

Name: _____

[Corporate Seal]

Signed, sealed and delivered in the presence of:

**BUYER:**

**ACKEL REAL ESTATE, L.L.C.,** a Louisiana limited liability company

Name: _Jamie J. Wheeler_

Name: _Sharon Daigle_

By: _____
Name: _____ MEMBER _ George Ackel_
Title: _____

[Seal]

Name: _Jamie J. Wheeler_

Name: _Sharon Daigle_

_____ [SEAL]
**JOHN GEORGES,** Individually



18

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

SCHEDULE OF EXHIBITS

| Exhibit A | - | Legal Description of Land |
| Exhibit B | - | Schedule of Excluded Personal Property |
| Exhibit C | - | Schedule of Permitted Encumbrances |
| Exhibit D | - | Form of Act of Sale |
| Exhibit E | - | Facility Site Plan |
| Exhibit F | - | Schedule of Underground Storage Tanks |
| Exhibit G | - | Description of Restricted Area |

19

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Facility Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: August ___, 2006

## EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

A tract of land which is a portion of LAFRENIERE PLANTATION, located in Section 41, T13S, RIOE, Jefferson Parish, Louisiana.

THAT PORTION *OF* GROUND, together with all the buildings and improvements thereon, situated in the Parish of Jefferson, State of Louisiana, being a portion of a larger tract of land known as LAFRENIERE PLANTATION and located in Section 41, Township 13 South, Range 10 East of the Saint Helena Meridian, east of the Town of Harahan and north of the Jefferson Highway bounded and described as follows:

Beginning at a point in a line which is 56 feet southwesterly from the centerline of a northwesterly and southeasterly concrete roadway, measured at a right angle thereto, which point has coordinates based upon the La. Geodetic Survey of X = 2,361,591.55 East and Y = 468,827.28 North; thence South 71 degrees, 46 minutes, 19 seconds West, a distance of 1288.83 feet, to a point 50 feet northeasterly from the center line of the Illinois Central Railroad Company's lead track; thence South 18 degrees, 08 minutes, 29 seconds East, parallel with and 50 feet perpendicularly distant northeasterly from said center line of lead tract, a distance of 1140.33 feet, to a point 25 feet northeasterly from the center line of said railroad company's spur tract; thence South 45 degrees, 15 minutes, 29 seconds East, a distance of 75.27 feet; thence North 42 degrees, 01 minutes, 50 seconds East a distance of 1361.97 feet; thence North 71 degrees, 44 minutes, 19 seconds East, a distance of74.1 feet; thence North 18 degrees, 15 minutes, 41 seconds West, a distance of 531.69 feet, to the point of beginning.

That portion of ground hereinabove described is more fully shown on plan prepared by F. C. Gandolfo, *Jr.,* Surveyor, New Orleans, Louisiana, dated February 14, 1957, a print of which is annexed to act before A. *J.* Waechter, *Jr.,* N.P., dated September 4, 1957, recertified May 25, 1971, showing improvements and showing this property located in Section 41, all as more fully shown on a plan of survey made by John E. Walker, R.L.S. dated May 7, 1984, last recertified March 29, 1993 and recorded as instrument number 93-33888.

## EXHIBIT B

SCHEDULE OF EXCLUDED PERSONAL PROPERTY

All furniture, furnishings, trade fixtures and movable equipment and all other tangible and intangible personal property.

## EXHIBIT C

### SCHEDULE OF PERMITTED ENCUMBRANCES

1.  Taxes for 2006 and subsequent years not yet due and payable.

2.  Servitude granted by Illinois Central Railroad Company to Sewerage District No.2 of the Parish of Jefferson, State of Louisiana per act passed before Henry M. Hunley, Jr., N.P., dated June 22, 1954, filed June 25, 1954, registered in *COB* 359, folio 478, affecting servitude area only.

3.  Servitude granted by Illinois Central Railroad Company to Louisiana Power and Light Company, per act passed before B. F. Sullivan, dated May 4, 1956, filed May 9, 1956, registered in *COB* 400, folio 489, affecting the servitude area only.

4.  Rights of the railroad company servicing the railroad siding and/or spur track located on the land in and to the ties, rails and properties constituting said railroad siding and/or spur track and to the use thereof, and also rights of others, if any, thereto entitled to the use thereof as shown on the survey of John E. Walker dated May 7, 1984, last recertified on March 29, 1993.

5.  Apparent servitude of drain, as evidenced by the culverts and other drain facilities lying within the property lines of the land, as shown on plat of survey made by John E. Walker, RL.S., of the office of John E. Walker, Inc., dated May 7,1984, last recertified March 29,1993.

6.  Encroachment upon property adjoining on the ICRR Yard side by the fence appurtenant to the land, as shown on plan of survey made by John E. Walker, R.L.S., of the office of John E. Walker, Inc., dated May 7, 1984, last recertified March 29, 1993.

7.  Encroachment upon "G" Street by the fence and concrete appurtenant to the land, as shown on the plan of survey made by John E. Walker, RL.S., of the office of John E. Walker, Inc., dated May 7, 1984, last recertified March 29, 1993.

8.  Encroachment upon the Sewerage District No.2 servitude registered in *COB* 359, folio 478, and upon the Louisiana Power & Light Company servitude registered in *COB 400,* folio 489, by the concrete appurtenant to the land, as shown on the plat of survey made by John E. Walker, R.L.S. of the office of John E. Walker, Inc., dated May 7, 1984, last recertified March 29,1993.

9.  The following matters shown on the map by Steven M. Runnebaum, RPLS of Landmark Surveying, Inc. dated March 20, 2001, Job #01-0155 certified to Winn Dixie Stores, Inc., et a1: (1) encroachments along the Illinois Central Railroad Yard (westerly) sideline; (2) encroachments upon G Street side, including particularly the guard shack, and 13 parking spaces; (3) encroachments upon the Sewer District No.2 and the Louisiana Power and Light Company servitudes; (4) encroachment of parking spaces unto the unpaved portion of the right of way of Edwards Avenue; (5) encroachment of fence unto the Edwards Avenue Commerce Center, LLC property; and (6) apparent drainage, sewer and water servitudes because of the various culverts, ditches, drain lines, sewer drain holes, water valves, etc., as shown on the survey.

## EXHIBIT D

FORM OF ACT OF SALE

STATE OF FLORIDA  )
COUNTY OF DUVAL  )

## ACT OF SALE

On the dates and places set forth below, before the undersigned Notaries Public, and in the presence of the undersigned witnesses, personally appeared:

**WINN-DIXIE LOGISTICS, INC.,** taxpayer identification number 59-3652949, a Florida corporation, having its principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254-3699, being represented herein by and through Bennett Nussbaum, its Vice President (referred to herein as "Seller");

Who declared that for the price of Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00) Dollars, cash in hand paid, receipt of which is hereby acknowledged, Seller hereby grants, bargains, sells, delivers, transfers, assigns, sets over, and abandons without any warranty except as to Seller's own acts and deeds, but with full substitution and subrogation in and to all rights and actions of warranty against preceding owners and vendors other than Seller, unto:

_____, taxpayer identification number _____, a _____, being represented herein by and through _____, its _____, having its principal place of business at _____ (referred to herein as "Buyer");

here present, accepting and purchasing for itself, its successors and assigns, the Property, more fully described on **Schedule A** attached hereto, together with all servitudes, rights and appurtenances, all buildings and improvements now located on the property, and all of Seller's right, title and interest in all public ways adjoining the property, the possession and delivery of which Buyer acknowledges (the "Property").

The sale and purchase of the Property is made and accepted without any warranties of any kind whatsoever as to the condition, operability, safety, or fitness for intended purpose or use of the Property or the absence of apparent or hidden defects in the Property. Buyer hereby waives (i) the warranty against hidden defects or redhibitory vices in the Property otherwise imposed by Article 2476 of the Louisiana Civil Code (the "Civil Code") or other applicable law, and (ii) any rights it may otherwise have in redhibition or for reduction of the purchase price pursuant to Articles 2520 through 2548 of the Civil Code or other applicable law, and releases Seller from any liability which may otherwise arise out of such warranty and rights, in connection with the sale of the Property. Buyer then declared and acknowledged that such waivers and release of liability constitute a material part of the consideration for the sale of the Property and that such waivers and release of liability and the legal effect thereof have been explained in detail and Buyer voluntarily and knowingly has agreed thereto.

All ad valorem taxes for the year in which the Closing occurs will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). The tax proration at Closing may be based on an estimate using the previous year's tax amount. All parties signing the this contract have declared themselves to be of full legal capacity.

All agreements and stipulations herein, and all the obligations herein assumed shall inure to the benefit of and be binding upon the heirs, successors, and assigns of the respective parties, and the Buyer, its heirs, and assigns shall have and hold the described Property in full ownership forever.

This agreement may be executed in counterparts and all counterparts taken as a whole will constitute the entire agreement.

Signed this _____ day of _____, 2006, in Jacksonville, Florida, in the presence of the undersigned witness and Notary Public duly qualified in the County of Duval, State of Florida.

**Witnesses:**                                   **SELLER:**

                                                 **WINN-DIXIE LOGISTICS, INC.,**
                                                 a Florida corporation

_____                 By:_____
Print Name:_____                 Name: Bennett Nussbaum
                                                 Title: Vice President

_____
Print Name:_____


                        Print Name:_____
                        **Notary Public**

                        My Commission Expires:_____
                        Commission No.:_____

**Witnesses:**

**BUYER:**

_____, a
_____

_____        By:_____
Print Name:_____          Name: _____
                                        Its:  _____

_____
Print Name:_____


Print Name:_____
**Notary Public**

My Commission Expires:_____
Commission No.:_____

## EXHIBIT E

FACILITY SITE PLAN

[ATTACHMENT]



## EXHIBIT F

SCHEDULE OF UNDERGROUND STORAGE TANKS

All Underground Storage Tanks have been removed.

There were a total of six 12,000 gallon UST's and one 8,000 gallon UST associated with the Property.  The UST's were located south of the southern portion of the perishable storage facility at the location shown on Figure 2 (attached).

## EXHIBIT G

DESCRIPTION OF RESTRICTED AREA

The description of the Restricted Area is as set forth in the attached Conveyance Notification, as approved by the Louisiana Department of Environmental Quality and recorded in the Jefferson County Parish Public Records.

## CONVEYANCE NOTIFICATION

Winn-Dixie Logistics, Inc., (property owner) hereby notifies the public that the following described Area of Investigation (AOI), Louisiana Department of Environmental Quality (LDEQ) Agency Interest Number (AI No. 6896), was closed with contaminant levels present that are acceptable for industrial/commercial use of the property, as defined in LDEQ'S Risk Evaluation/Corrective Action Program (RECAP), October 20, 2003, Section 2.9. In accordance with LAC 33:I., Chapter 13, if land use changes from industrial to non-industrial, the responsible party shall notify the LDEQ within 30 days and the AOI shall be re-evaluated to determine if conditions are appropriate for the proposed land use.

This site was closed in accordance with the Louisiana Administrative Code, Title 33:I., Chapter 13. Information regarding this site is available in the LDEQ public record and may be obtained by contacting the LDEQ Records Manager at (225) 219-3168. Inquiries regarding the contents of this site may be directed to the General Counsel of Winn-Dixie Logistics, Inc. at 5050 Edgewood Court, Jacksonville, FL 32254-3699, and may be contacted at phone number (904) 783-5000.

**AOI Description:**

The legal description of the subject property is as follows:

The Winn-Dixie Distribution Center facility is located at 600 Edwards Avenue, Jefferson Parish, Harahan, Louisiana. That portion of ground, together with all the buildings and improvements thereon, situated in the Parish of Jefferson, State of Louisiana, being a portion of a larger tract of land known as LAFRENIERE PLANTATION and located in Section 41, Township 13 South, Range 10 East of the Saint Helena Meridian, east of the Town of Harahan and north of the Jefferson Highway bounded and described as follows:

Beginning at a point in a line which is 56 feet southwesterly from the centerline of a northwesterly and southeasterly concrete roadway, measured at a right angle thereto, which point has coordinates based upon the La. Geodetic Survey of $X = 2,361,591.55$ East and $Y = 468,827.28$ North; thence South 71 degrees, 46 minutes, 19 seconds West, a distance of 1288.83 feet, to a point 50 feet northeasterly from the center line of the Illinois Central Railroad Company's lead track; thence South 18 degrees, 08 minutes, 29 seconds East, parallel with and 50 feet perpendicularly distant northeasterly from said center line of lead track, a distance of 1140.33 feet, to a point 25 feet northeasterly from the center line of said railroad company's spur tract; thence South 45 degrees, 15 minutes, 29 seconds East, a distance of 75.27 feet; thence North 42 degrees, 01 minutes, 50 seconds East, a distance of 1361.97 feet; thence North 71 degrees, 44 minutes, 19 seconds East, a distance of 74.1 feet; thence North 18 degrees, 15 minutes, 41 seconds West, a distance of 531.69 feet, to the point of beginning.

That portion of ground hereinabove described is more fully shown on plan prepared By F.C. Gandolfo, Jr., Surveyor, New Orleans, Louisiana, dated February 14, 1957, a print of which is annexed to act before A.J. Waechter, Jr., N.P., dated September 4, 1957, recertified May 25, 1971, showing improvements and showing this property located in Section 41, all as more fully shown on a plan of survey made by John E. Walker, R.L.S. dated May 7, 1984, last recertified March 29, 1993 and recorded as instrument number 93-33888.

1

Constituents of Concern (COCs) that remain at the site and the RECAP standard that the COCs were compared to are shown in Table 1, Remaining COCs in Soil. Figure 1, Area Map (Attachment A, Figures) shows the site and adjacent properties. Figure 2, TPH-Diesel Concentrations Remaining On Site shows the COC concentrations remaining in the site soil.

**TABLE 1**
**REMAINING COCs IN SOIL**

| Constituents of Concern | Soil RECAP Standard (mg/kg)[1] | Highest Historical Exposure/Source Soil Concentration (mg/kg) |
|---|---|---|
| TPH-D | 510 | 440[2] |

[1] Soil RECAP standards are based on Soil$_{upbeat}$ screening standards.
[2] Soil concentrations at the site from samples collected on December 20, 2004.
TPH-D - Total Petroleum Hydrocarbons - Diesel Range Organics

WINN-DIXIE LOGISTICS, INC., a Florida corporation

By: _____
   Signature of Person Filing Parish Record
   Bennett L. Nussbaum
   Vice President

Typed Name and Title of Person Filing Parish Record

8-23-05

Date

LEGAL APPROVED
ATTY: XU
DATE: 8-23-05

Reviewed By
XR0808
Date: 8-23-05

2

**ATTACHMENT A**

**FIGURES**



EDWARDS BOULEVARD

NOT TO SCALE

AREA OF CONCERN

**NOTE:**
THE ONLY AREA THAT EXCEEDS NON-INDUSTRIAL STANDARDS IS THE AREA OF CONCERN, SHOWN ON THE MAP. THIS, THE CONVERSANCE NOTICE WILL ONLY RESTRICT LAND USE TO INDUSTRIAL FOR THE AREA OF CONCERN. THE REMAIN'G AREAS OF THE SITE CAN BE USED FOR BOTH INDUSTRIAL AND NON-INDUSTRIAL USES.

**LEGEND:**
- POWER POLE
- OVERHEAD POWER LINE
- FENCE

**AREA MAP**

WINN-DIXIE
WINN-DIXIE NO. 1341 HARAHAN FACILITY
600 EDWARDS AVENUE
HARAHAN, LOUISIANA

| | | |
|---|---|---|
| DRAWN BY: | MH | |
| DRAWN DATE: | 8/22/05 | |
| PROJECT MANAGER: | BLUE GROUP | |
| PROJECT NUMBER: | 685501 | CN |

PPM PPM CONSULTANTS, INC.

FIGURE NUMBER 1



**EXHIBIT B**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC. TO SELL HARAHAN WAREHOUSE FACILITY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND (B) GRANTING RELATED RELIEF

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Logistics, Inc. ("WD Logistics") to sell the Harahan Warehouse Facility and attached improvements to Ackel Real Estate, LLC and John Georges (collectively, the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances, and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on August 24, 2006 (the "Sale Hearing").  The Court has read the Motion and has considered the representations of counsel.  Upon the representations of counsel and without

---

[1]    All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Facility Agreement.

objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.      The Debtors solicited the highest or otherwise best offer for the Assets described in the Facility Agreement (the "Assets") in accordance with bidding procedures approved by order of the Court (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order").   No competing bid was received for the Assets and the Debtors have determined that the bid by the Purchaser is the highest or best offer for the Assets.

C.      The Debtors have provided interested parties (including all parties asserting claims or interests in, to or against the Assets, if any) with proper notice of the Motion, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the notice procedures order, approved by order of the Court (Docket No. 254) dated March 4, 2005 (the "Notice Procedures Order").

D.      A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims, as such terms are defined below, in, to or against the Assets, if any).

2

E.      The Debtors marketed the Assets and conducted the Auction process in compliance with the Bidding Procedures Order.  The bidding on the Assets was conducted in a non-collusive, fair and good faith manner.  Through the Debtors' marketing efforts, the Debtors afforded all interested parties a reasonable opportunity to make higher or better offers to purchase the Assets.

F.      WD Logistics (i) has full corporate power and authority to execute and consummate the Facility Agreement attached as Exhibit A to this Order and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of WD Logistics, and (ii) no consents or approvals, other than those expressly provided for in the Facility Agreement, are required to consummate the transactions contemplated by the Facility Agreement.

G.      Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.      The Facility Agreement was proposed, negotiated and entered into by WD Logistics and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Facility Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

J.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

K.    WD Logistics' transfer of the Assets to the Purchaser pursuant to the Facility Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Facility Agreement.

L.    WD Logistics may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

M.    The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361,

362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

N.    The Court's approval of the Facility Agreement and the Sale of the Assets to the Purchaser are in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

2.    Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.    The terms and conditions of the Facility Agreement are approved.  Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Facility Agreement.

4.    WD Logistics is authorized to consummate and implement fully the Facility Agreement, together with all additional instruments and

5

documents that may be necessary to implement the Facility Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Facility Agreement.

5.     Any agreements, documents, or other instruments executed in connection with the Facility Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender, and (ii) the Creditors' Committee, which consent will not be unreasonably withheld, and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.     WD Logistics will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).   The only Claims and/or Interests in the Assets are those with the DIP Lender.   The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds from the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.     WD Logistics' transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all

right, title and interest of WD Logistics in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.    The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.    The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.    Upon Closing of the Sale in accordance with the Facility Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).  Accordingly, the reversal or modification on appeal of the authorization to consummate the Sale of the Assets will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.    All entities that are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions do not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise

exist.  In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a certified copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12.    WD Logistics' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Facility Agreement and this Order.

13.    Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Facility Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets.  WD Logistics' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.    This Order is effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

15.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Facility Agreement.

16.    This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction to (a) enforce and implement the Facility Agreement and any agreements and instruments executed in connection with the Facility Agreement, (b) compel delivery of possession of the Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Facility Agreement, and (d) interpret, implement, and enforce the provisions of this Order.

18.    All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently

9

enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.    The failure specifically to include any particular provision of the Facility Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Facility Agreement be authorized and approved in its entirety.

21.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims, or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Facility Agreement.  No bulk

sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Facility Agreement.

22.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Facility Agreement and this Order, the provisions contained in this Order will control.

23.     Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ___ day of August 2006 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

00539334