# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

### DEBTORS' MOTION FOR ORDER (A) AUTHORIZING THE SALE OF ADDITIONAL STORES AND RELATED EQUIPMENT FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OR ALTERNATIVELY, THE REJECTION OF LEASES AND ESTABLISHING A CLAIMS BAR DATE AND (C) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors"), file this motion for entry of one or more orders pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 3002, 6004 and 6006: (i) authorizing the sale of their leasehold interests in seven additional stores (collectively, the "Additional Stores") and the equipment located at such stores, free and clear of claims, liens and interests, (ii) authorizing the assumption and assignment of leases in connection with the sales and determining any requisite cure for leases being assumed and assigned, (iii) if no sale is consummated, authorizing the rejection of such leases effective August 24, 2006 (the "Rejection Date"), and establishing a claims bar date for any rejection damage claims at 30

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

days after the Rejection Date, and (iv) granting related relief (the "Motion").  In support of

the Motion, the Debtors respectfully represent:

## Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary

petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code (as

amended, the "Bankruptcy Code").  The Debtors' cases are being jointly administered for

procedural purposes only.

2.      The Debtors operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No

request has been made for the appointment of a trustee or examiner.  On March 1, 2005,

the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee") to serve in these cases

pursuant to sections 1102 and 1103 of the Bankruptcy Code.

3.      The Debtors are grocery and pharmaceutical retailers operating in the

southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie

Marketplace" banners.

## Marketing Process

4.      Since the Petition Date, the Debtors have engaged in a footprint reduction

by which they have exited non-core market areas as well as unprofitable stores located in

core market areas.  To date, the Debtors have sold or rejected over 361 leases.  The

Debtors have now determined that seven additional stores should be closed and the leases

2

either sold or rejected (the "Additional Stores").  Attached as Exhibit A is a schedule identifying each of the Additional Stores.[2]

5.      The Debtors have extensively marketed the Additional Stores through The Food Partners ("TFP") and DJM Asset Management ("DJM").  These brokers have directly contacted over 2,500 potential purchasers.

6.      On July 27, 2006, the Debtors posted information on the Additional Stores on an internet website as part of their efforts to market the Additional Stores (the "Merrill Site").  Potential purchasers who have signed a confidentiality agreement may access the Merrill Site.  The Merrill Site includes financial performance information, copies of the applicable leases and amendments, a site and fixture plan for each store, a summarized environmental assessment, a form asset purchase agreement, and, when available, real property title information.

## Relief Requested

7.      The Debtors request authority to sell the Additional Stores and assume and assign the applicable leases for the highest or best offer which the Debtors receive and find acceptable at or before the Auction (as defined below).  If no bid is received for any one or more of the Additional Stores, upon notice to the Creditors' Committee, the Debtors will ask the Court (at a hearing scheduled for August 24, 2006, the "Rejection Hearing"), to approve the Debtors' rejection of such leases effective on the Rejection Date and to establish a claims bar date for any rejection damage claims at 30 days after the Rejection Date.

---

[2] The Debtors moved to assume each of these leases by motion dated June 30, 2006 (Docket No. 8941) (the "Second Omnibus Motion").  As a result of this motion, the Debtors will withdraw the Second Omnibus Motion as to these seven stores.

8.      In the marketing process and Auction, the Debtors will comply with the bidding procedures approved by the Court by Order dated June 21, 2005 (Docket No. 1801) (the "Bidding Procedures").  A copy of the Bidding Procedures is attached as Exhibit B.  Any bidder who desires to submit a bid on any one or more of the Additional Stores must do so by 5:00 p.m. E.T. on August 23, 2006.  A qualified bidder must execute an asset purchase agreement substantially in the form attached as Exhibit C (the "Purchase Agreement"), marked to show any changes sought by the bidder.  The Debtors' proposed form of Purchase Agreement contains customary terms, conditions and defaults for sales of this type and has been posted on the Merrill Site since July 27, 2006.

9.      The terms of the form of Purchase Agreement include the following: [3]

(a)     <u>Purchase Price</u>.  The purchase price of the Assets.

(b)     <u>Assets</u>.  The assets to be sold and transferred to the Purchaser include:

(i)      the Debtors' leasehold interests in the applicable lease and any leasehold improvements; and

(ii)     the Debtors' interest in all fixtures and equipment located in store buildings existing on the Debtors' leased premises and the Debtors' interest in the buildings including but not limited to any improvements, as defined in the Purchase Agreement, and any trade fixtures and equipment.  Items (i) and (ii) above, collectively (the "Assets").

(c)     <u>Sale Free and Clear</u>.  The Purchase Agreement provides that the Assets are to be transferred free and clear of any liens, claims, interests and encumbrances (other than any Permitted Encumbrances) pursuant to section 363 of the Bankruptcy Code.

---

[3] This summary of the form of Purchase Agreement is provided as a convenience only.  The form is subject to negotiation by bidders.  To the extent that this summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement and related documents control.  Capitalized terms are defined in the form of Purchase Agreement.  No party should rely on this summary in submitting a bid on Additional Stores.

4

(d) <u>Sales Tax</u>.  Any sales tax resulting from the transfer of Assets will be paid by the Purchaser to the extent permitted by law.

(e) <u>Assumption and Assignment of the Leases; Cure Costs</u>.  On the closing date, the Debtors will assume and assign the relevant lease to the Purchaser.  In connection with the assumption and assignment of the lease, the Debtors are responsible for any cure required pursuant to section 365(b) of the Bankruptcy Code.

(f) <u>Court Order</u>.  The sale of the Assets to the Purchaser is subject to entry of an order of the Bankruptcy Court authorizing the sale pursuant to the terms of the Purchase Agreement.

(g) <u>Allocation</u>.  To the extent the bidder is purchasing more than one of the Additional Stores, the Purchase Agreement will include an allocation of the purchase price on a store by store basis.

11.    The Purchase Agreement provides for the assumption and assignment of the relevant lease to the Purchaser.  The Debtors will pay any undisputed cure amount due at closing (provided however, that the Debtors have a right to terminate any Purchase Agreement to the extent the cure amount is excessive).  Attached as Exhibit D is a schedule reflecting any cure amounts the Debtors believe are owed as to each landlord of Additional Stores and any other cure required.  All landlords of the Additional Stores will be served with a copy of this Motion.  Landlords who dispute the proposed cure amount for their lease are required to file with the Court and serve on the Debtors an objection to this Motion on or before August 23, 2006.  Any unresolved objection to a proposed cure will be adjudicated by the Court at a hearing to be scheduled and separately noticed by the Debtors (the "Cure Hearing").  If a landlord fails to timely file and serve an objection to this Motion contesting its scheduled cure, the landlord will be deemed to have consented to the cure for its respective lease as scheduled on Exhibit D and will be barred from asserting a larger claim for such cure.

12.     The Debtors will hold an Auction on August 29, 2006 at 10:00 a.m. E.T. at the Omni Hotel, 225 Water Street, Jacksonville, Florida 32202, for any of the Additional Stores on which the Debtors have received an acceptable bid.

13.     At the conclusion of the Auction, the Debtors will determine, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals (as defined in the Bidding Procedures), which, if any, is the highest or best offer for any particular store or group of stores (a "Successful Bid"). The Debtors will file the proposed purchase agreement for each Successful Bid and serve by electronic or overnight mail or by hand delivery, a copy of the proposed purchase agreement and a declaration regarding adequate assurance of future performance on (a) the landlord for the relevant store, (b) the Committee's Professionals, (c) the U.S. Trustee, and (d) the DIP Lender Agent Representatives. A hearing to approve the Successful Bid(s) will be held before the Bankruptcy Court at 1:00 p.m. E.T. on September 7, 2006 (or such other later date as the Debtors designate) (the "Sale Hearing").

14.     At the Sale Hearing, the Debtors will request entry of one or more orders substantially in the form attached as Exhibit E (a) authorizing the Debtors to sell the Additional Stores and the equipment located at such stores free and clear of liens, claims and interests to the entity submitting the Successful Bid, (b) approving the assumption and assignment of the relevant lease, and (c) finding that the Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and has demonstrated adequate assurance of future performance under section 365(b) of the Bankruptcy Code.

6

**Notice**

15.     The Debtors will serve this Motion, together with a notice of hearing, upon (a) all entities known to have expressed an interest in any of the Additional Stores in the last twelve months, (b) all nondebtor parties to the leases and subleases of the Additional Stores, (c) all entities known to assert any lien, claim, or interest in any of the Assets, (d) all federal, state and local regulatory or taxing authorities relating to these leased locations, and (e) all parties on the Master Service List. **Objection Deadline:** Except as set forth below, only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by **August 23, 2006**, will be considered by the Bankruptcy Court at the Sale Hearing. Notwithstanding anything to the contrary in this Motion, **any landlord** whose lease is sold at the **August 29, 2006**, auction has until **12:00 p.m. E.T. on September 6, 2006**, to file an objection as to adequate assurance of future performance under section 365 of the Bankruptcy Code.

**Applicable Authority**

A.     **Authority to Enter into the Purchase Agreement and Sell the Assets**

16.     Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 1107(a) of the Bankruptcy Code gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).

7

17.    A debtor's sale under section 363(b)(1) should be approved when supported by a sound business reason. *See In re BDK Health Mgmt., Inc.,* Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a Section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession may sell assets of his estate outside the ordinary course of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that the business judgment test is the proper standard to apply when considering a debtor's motion to sell assets outside the ordinary course of business); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale").

18.    Once a court is satisfied that a sound business reason for the sale exists, the court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser

8

is proceeding in good faith, and (c) the debtor has provided interested parties with adequate and reasonable notice. *Delaware & Hudson*, 124 B.R. at 175-76.

19.     The Debtors have a sound business reason for selling the Additional Stores in the manner proposed by this Motion.  The Additional Stores are not profitable and the Debtors have determined that the Additional Stores should not be included in the new reduced footprint.  The Debtors' sale of their leasehold interests in the Additional Stores and the equipment located in the Additional Stores will bring value to the Debtors' estates and creditors.  Delay of the sale will, based on the Debtors' prepetition experience, result in a significant loss of value for the stores.  Accordingly, there is a sound business purpose for the requested relief.

**B.      The Sale Free and Clear of All Liens and Encumbrances**

20.     The Debtors request that the sale of any of the Additional Stores, the equipment located at the Stores, and the transfer of any Assets pursuant to such sale, be approved free and clear of any lien, claim, or interest.  This relief is consistent with the provisions of section 363(f) of the Bankruptcy Code.

21.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate free and clear of all liens and encumbrances, after notice and a hearing.  *See In re Parrish*, 171 B.R. 138, 140 (Bankr. M.D. Fla. 1994) (noting that compliance with the requirements of section 363(f) is a prerequisite to a sale free and clear of liens).

22.     The Debtors believe that there are no interests in or claims against the Assets, other than those of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender") and the nondebtor parties to

9

the leases.  Any undisputed claims of the landlord will be paid by the Debtors upon

closing (subject to the provisions of paragraph 11), in accordance with the terms and

conditions of the Purchase Agreement and section 365 of the Bankruptcy Code.  Any

disputed cure will be satisfied upon adjudication by the Bankruptcy Court at the Cure

Hearing or by resolution of the Debtors and the affected landlord.  The interests of the DIP

Lender will be satisfied because the Debtors will cause the net proceeds from any of these

sales to be paid to the DIP Lender to the extent required, in accordance with the terms of

the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the

Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure

(I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority

Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use

Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III)

Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured

Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the

Loan Documents (as defined in the Final Financing Order).

   23.  To the extent that any other interests in or claims against the Assets exist,

the Debtors will satisfy section 363(f) of the Bankruptcy Code.  Moreover, any holder of

any interests or claims will be adequately protected because interests and claims, if any,

will attach to the proceeds of the Sale, with the same validity, enforceability, priority,

force and effect they now have as against the Assets, subject to any rights, claims,

defenses and objections of the Debtors and all interested parties.  Accordingly, the

requirements of section 363(f) of the Bankruptcy Code will be satisfied, and the sale of

10

the Assets free and clear of any lien, claim, or interest is appropriate.  Thus, the proposed

sale process satisfies section 363(f) of the Bankruptcy Code.

**C.      Good Faith Purchaser**

24.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease
> of property does not affect the validity of a sale or lease
> under such authorization to an entity that purchased or
> leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

25.      The Bankruptcy Code does not define the term "good faith".  Courts,

however, have held that a party would have to show fraud or collusion between the

purchaser and other bidders or the Debtors to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . . speaks
> to the integrity of his conduct in the course of the sale
> proceedings.  Typically, the misconduct that would destroy a
> purchasers' good faith status at a judicial sale involves fraud,
> collusion between the purchaser and other bidders or the
> trustee, or an attempt to take grossly unfair advantage of
> other bidders.

*In re Apex Oil Co.*, 92 B.R. 847, 869
(Bankr. E.D. Mo. 1988).

*Accord Kabro Assoc. of W. Islip, LLC v. Colony Hill Assoc. (In re Colony Hill Assoc.)*, 111

F.3d 269, 276 (2d Cir. 1997).

26.      The Debtors submit that: (a) the Additional Stores and equipment were

marketed extensively and (b) the marketing process that occurred and the notice of the

Sale Hearing ensure that no Purchaser has exerted undue influence over the Debtors.  If a

11

landlord objects to any proposed sale, the Debtors will also offer additional evidence of the Purchaser's good faith.  Accordingly, at the Sale Hearing the Debtors will request that the Court find that the respective purchaser acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.  *See BDK Health Mgmt.*, 1998 WL 34188241 at *4 (finding that purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

**D.      Authority to Assume and Assign the Leases**

27.      Section 365(a) and 1107(a) of the Bankruptcy Code authorizes a debtor to assume an unexpired lease subject to the Court's approval.

28.      The standard that is applied in determining whether an unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in the debtors' economic best interest.  *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984).  The Debtors' assumption and assignment of any lease connected to an Additional Store is an integral part of the proposed sale and, therefore, within the Debtors' sound business judgment.

29.      Section 365(b)(1) of the Bankruptcy Code codifies the requirements for assuming an unexpired lease of a debtor:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

12

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

> 11 U.S.C. § 365(b)(1).

30.    By the Purchase Agreement, the Debtors have agreed to comply with section 365(b)(1)(A) and (B) of the Bankruptcy Code by curing any defaults under the respective lease.

31.    At the Sale Hearing, the Debtors will also satisfy section 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code, by demonstrating adequate assurance of future performance by each Purchaser.  Section 365(f)(2) of the Bankruptcy Code provides:

> The trustee may assign an executory contract or unexpired lease of the debtor only if:
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

> 11 U.S.C. § 365(f)(2).

32.    The meaning of "adequate assurance" depends on the facts and circumstances of each case, but should "be given a practical pragmatic construction". *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).  The assurance that rent will be paid is a chief determinant in assessing adequate assurance of future performance.  *Id*.

13

33.    Adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

Thus, if a store is located in a shopping center, adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding).

34.    If a landlord of any affected lease or sublease objects to any proposed sale, the Debtors will offer evidence at the Sale Hearing to demonstrate the financial wherewithal of any Purchaser, including its experience in the industry and its willingness and ability to perform. At the Sale Hearing, the Court and interested parties will have the

14

opportunity to evaluate and, if necessary, challenge the ability of the respective Purchaser to provide adequate assurance of future performance under the particular lease to be assumed. The Court will therefore have sufficient bases to find that adequate assurance of future performance exists.

**E.    Authority to Reject Leases the Debtors are Unable to Sell and to Establish Claims Bar Date**

35.    Pursuant to sections 365(a) and 1107(a) of the Bankruptcy Code, a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." A debtor-in-possession's right to reject unexpired leases is a fundamental component of the bankruptcy process, as it provides a debtor with a mechanism to eliminate financial burdens to the estate. *See In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); *In re Hardie*, 100 B.R. 284, 285 (Bankr. E.D.N.C. 1989); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 699 (Bankr. W.D. Tex. 1988).

36.    The decision to reject an unexpired lease is primarily administrative and should be given great deference by a court, subject only to review under the "business judgment" rule. *See In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Cent. Fla. Fuels, Inc.*, 89 B.R. 242, 245 (Bankr. M.D. Fla. 1988); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Sundial Asphalt Co. v. V.P.C. Investors Corp. (In re Sundial Asphalt Co.)*, 147 B.R. 72, 78, 83-84 (E.D.N.Y. 1992). The business judgment rule requires the debtor to establish that rejection of the agreement will likely benefit the estate. *See Sharon Steel Corp.*, 872 F.2d at 39-40; *In re Kong*, 162 B.R. 86, 96 (Bankr. E.D.N.Y. 1993); *In re Cent. Fla. Fuels, Inc.*, 89 B.R. at 245. Courts universally regard the business judgment rule as a low standard to meet, and therefore, absent a finding of bad faith, will not disturb the decision to reject an unexpired

15

lease by substituting their own judgment for that of the debtor.  See *In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994), aff'd sub nom. *Pubelo Chem, Inc. v. III Enters. Inc. V*, 169 B.R. 551 (E.D. Pa. 1994); *In re Hardie*, 100 B.R. at 287.

37.    The Debtors' business judgment supports their rejection of any of the Additional Store leases the Debtors are unable to sell (the "Unsold Leases").  The Unsold Leases are for stores the Debtors no longer operate and failure to reject the leases will result in continuing liability for administrative rental expense.

38.    Pursuant to Fed. R. Bankr. P. 3002(c)(4), the Court may fix a deadline for filing any rejection damage claim for the Unsold Leases.  The Debtors request that the Court establish the deadline for landlords for any Unsold Leases rejected by the Debtors to file proofs of claim at 30 days after the Rejection Date.

**F.    Elimination of 10-Day Stay Under Rules 6004(g) and 6006(d)**

39.    Pursuant to Fed. R. Bankr. P. 6004(g),  unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Fed. R. Bankr. P. 6006(d), provides a similar ten-day automatic stay period with respect to the assumption and assignment of executory contracts.  Given the requirements of the Purchase Agreement and the need to close the sale and assume and assign the leases as promptly as possible, the Debtors request that the Court order and direct a waiver of the 10-day stay period.

### Conclusion

For the foregoing reasons, the Debtors respectfully request that (i) at the applicable Cure Hearing, the Court enter an order establishing any cure due under the leases, (ii) at

16

the Sale Hearing, the Court enter one or more orders substantially in the form attached as Exhibit E (a) authorizing the Debtors to sell any one or more Additional Stores and equipment located at such stores free and clear of all liens, claims and encumbrances and (b) authorizing the Debtors to assume and assign the relevant leases to the relevant Purchaser, (iii) at the Rejection Hearing, the Court enter an order substantially in the form attached as Exhibit F authorizing the Debtors to reject any of the Unsold Leases effective on the Rejection Date and establishing a deadline for landlords to file any rejection damage claim for such leases within 30 days after the Rejection Date, and (iv) granting such other and further relief as the Court deems just and proper.

Dated:  August 3, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By    _/s/ D. J. Baker_____
      D. J. Baker
      Sally McDonald Henry
      Rosalie W. Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Attorneys for Debtors

SMITH HULSEY & BUSEY

By    _/s/ Cynthia C. Jackson_____
      Stephen D. Busey
      James H. Post
      Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Attorneys for Debtors

17

## EXHIBIT A

# EXHIBIT A

| Store No. | Address | City | St |
|---|---|---|---|
| 124 | 2910 KERRY FOREST PARKWAY | TALLAHASSEE | FL |
| 162 | 14286 BEACH BOULEVARD | JACKSONVILLE | FL |
| 202 | 13841 WELLINGTON TRACE | WEST PALM BEACH | FL |
| 380 | 12141 PEMBROKE ROAD | PEMBROKE PINES | FL |
| 565 | 400 NORTH NAVY BOULEVARD | PENSACOLA | FL |
| 605 | 1199 EAST BAY DRIVE | LARGO | FL |
| 2308 | 2820 DOYLE ROAD | DELTONA | FL |

**EXHIBIT B**

## Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") to be used by the debtors, Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") for the sale of any of the Debtors' assets in these cases including, (i) the assumption and assignment or termination of executory contracts and unexpired leases and (ii) any other assets that have a value greater than $150,000, either individually or as a group, as determined by the Debtors, after consultation with (i) Wachovia Bank, National Association, in its capacity as administrative agent and collateral monetary agent (the "Agent") for itself and certain other financial institutions **from time to time** parties to the Credit Agreement, dated as of February 23, **2005, as may be amended or modified (the "Lenders", and collectively with the Agent, the "DIP Lenders") (Agent and its legal professionals shall be referred to as the "DIP** Lender Agent Representatives"), and (ii) the legal and financial advisors of the Official Committee of Unsecured Creditors of the Debtors (the "Committee's Professionals").

## The Bidding Process

The Debtors will (a) identify the assets to be sold, (b) solicit letters of interest for the assets, (c) review the letters of interest to designate which proposals are acceptable for the assets, (d) distribute bid packages to bidders with acceptable bids, (e) receive and review bid packages from acceptable bidders, (f) coordinate the efforts of acceptable bidders in conducting their respective due diligence investigations, (g) review, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, bid packages to determine initial bids and negotiate offers, (h) solicit qualified competing bids, and (i) ultimately determine, after consultation with the Committee's Professionals and the DIP Lender Agent Representatives, the successful bidder. The Debtors reserve the right, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, to amend these procedures and to adopt such other rules and procedures for the bidding process that will better promote the goals of the bidding process and maximize value received for any of the subject assets provided however, that the Debtors may not amend these procedures to change notice provisions or otherwise withdraw any rights given by these procedures to affected landlords (in their capacity as landlords).

## Due Diligence

The Debtors will provide confidential information on assets to be sold to potential purchasers (the "Initial Information"). Before receiving Initial Information, each potential purchaser must execute a confidentiality agreement, in a form satisfactory to the Debtors. The Debtors may make the Initial Information and other information available electronically. The Debtors may, but are not obligated to, furnish any due diligence information after the Bid Deadline for Qualified Competing Bids (as defined below) or to any person or entity that the Debtors determine is not reasonably likely to be a Acceptable Bidder (as defined below).

1

## Qualified Proposals, Qualified Bids, Initial Bids and Bid Packages

Any person or entity that seeks to acquire (i) a lease or executory contract (or if landlord, to terminate such a lease) or (ii) any other asset from the Debtors with a value of $150,000 or more, either individually or as a group (as determined by the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals), must submit a non-binding letter of interest to the Debtors, which must include (a) a proposed purchase or termination price for the asset, (b) an identification of any due diligence required by the proposed purchaser, (c) the proposed timing of the purchase or termination, and (d) any material conditions to which the proposed purchase or termination is subject (the "Proposal"). The Debtors will review each Proposal received to determine in its sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which, if any, represents an acceptable offer for the relevant asset (an "Acceptable Proposal").

If the Debtors determine, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, that one or more Acceptable Proposals for a particular asset has been received, the Debtors will provide each entity that submitted an Acceptable Proposal (an "Acceptable Bidder") with a bid package, including, among other things, (a) a deadline for receiving an initial bid (the "Initial Bid Deadline"), (b) a form asset purchase agreement tailored to the type of asset to be purchased (the "Purchase Agreement"), (c) a form financial declaration evidencing the bidder's financial wherewithal to consummate the transaction and satisfy all of the obligations required by the applicable asset purchase agreement and, if the bidder seeks to assume any unexpired lease or executory contract in connection with such sale, the bidder's ability to provide adequate assurance of future performance under Sections 365(b)(3) (if applicable) and 365(f)(2) of the Bankruptcy Code, and a detailed description of the intended use of the premises upon assignment of the lease (the "Declaration"), (d) if applicable, a form assumption and assignment agreement or lease termination agreement, and (e) a form sale order (the "Sale Order").

## Deadline for Initial Bids

Any Acceptable Bidder who wants to proceed with the sale process, must submit an initial bid by the Initial Bid Deadline to the representatives of the Debtors, the DIP Lender Agent Representatives and the Committee's Professionals identified in the bid package.

If required by the instructions included in the relevant bid package, to qualify for further bidding, each initial bid must (a) be received by the Initial Bid Deadline (unless the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, agree to an extension), and include: (b) a signed Purchase Agreement, (c) a blacklined Purchase Agreement showing changes from the applicable form provided by the Debtors, (d) a completed Declaration, (e) if applicable, a signed assumption and assignment agreement or lease termination agreement together with a blacklined version showing any changes from the form provided by the Debtors, (f) a cashiers check made out or a wire transfer to  the law firm or other escrow agent identified in the bid package, representing the earnest money deposit required under the particular Purchase Agreement, (g) a blacklined Sale Order showing changes from the form provided by the Debtors and (h) include any other information that the Debtors may have requested, including without limitation, evidence of financial wherewithal to

2

consummate each of the transactions contemplated by the Purchase Agreement and to satisfy each of the obligations thereunder.

No initial bid will be contingent upon any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval.

Each initial bid (except for a bid by a landlord for its own lease) must disclose the identity of the Acceptable Bidder's organization, including confirmation that its initial bid is made as principal for the Acceptable Bidder's account and, if not, the basis upon which the Acceptable Bidder is acting and the identities of all other participants (if any). Each initial bid must also disclose any agreements or understandings between the bidder and any third party with respect to the subject asset or assets or with respect to any possible transaction involving the Debtors.

The submission of an initial bid is deemed to be the bidder's consent for the Debtors and their advisors to share any and all information submitted by such bidder to the DIP Lender Agent Representatives and the Committee's Professionals, the Wachovia DIP Lender and any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such bidder.

The Debtors will review, in consultation with the DIP Lender Agent Representatives and the Committee's Professionals, each initial bid and, in the Debtors sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, will select the bidder for the asset that has made the highest or best offer (the "Initial Bidder," the bid of such Initial Bidder is the "Initial Bid."). Once the Debtors identify an Initial Bidder for a specific asset, the Debtors will file a motion with the Bankruptcy Court for an order (a) authorizing the sale of such asset under Sections 363 and 365 of the Bankruptcy Code free and clear of liens, claims and encumbrances, except as may be set forth in the applicable Purchase Agreement, and (b) approving the applicable Purchase Agreement. In the alternative, the Debtors may file a motion for the sale of one or more assets regardless of whether the Debtors have received an Initial Bid for any particular Asset and the Debtors may continue to market any such assets and seek Initial or Competing Bids through the date of an auction (in either event, the "Sale Motion"). On the same date the Debtors file a Sale Motion, the Debtors will deliver a copy of any Initial Bid by electronic mail or overnight delivery to each affected landlord. Unless the Bankruptcy Court enters an order shortening the notice period for any particular asset sale, the Debtors will set a hearing for each Sale Motion on a date that is not less than 23 days after the Debtors file and serve the Sale Motion (the "Sale Hearing").

## Requirements for Qualified Competing Bids

Other than a landlord bidding on its own unexpired lease, any Acceptable Bidder or other entity (in the Debtors' sole discretion) that desires to submit a competing bid for an asset that is the subject of a Sale Motion may do so in writing, provided that such bid:

(a) must include an executed Purchase Agreement, blacklined to show changes from the Initial Bidder's Purchase Agreement and clearly setting forth any conditions for closing.

(b) must, if the bidder intends to take assignment of any executory contract or unexpired lease, include an executed assumption and assignment or lease termination agreement, blacklined to show any changes from the Initial Bidder's assumption and assignment agreement or lease termination agreement.

(c) must exceed the purchase price agreed to by the successful Initial Bidder by a minimum percentage designated by the Debtors (in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) in the applicable Sale Motion;

(e) shall not be contingent upon any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval;

(f) must include an executed Declaration;

(g) must include a cashier's check or be accompanied by a wire transfer (or, if by landlord for its own lease, value) in an amount equal to the greater of (1) the amount of the deposit paid by the Initial Bidder or (ii) 10% of the purchase price proposed by the bidder and an acknowledgement by the bidder that if such bidder becomes the Successful Bidder at the Auction, the deposit will be increased, if applicable, to 10% of the final purchase price;

(h) must disclose the identity of the bidder's organization, including confirmation that the competing bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any).

(i) must disclose any agreements or understandings between the bidder and any third party with respect to the subject asset or assets or with respect to any possible transaction involving the Debtors.

If the competing bid includes each of the documents and conditions set forth in subparagraph (a) – (i) above, the bid will constitute a "Qualified Competing Bid". Notwithstanding the foregoing, a landlord is deemed to be a Qualified Competing Bidder as to its own lease if the landlord submits a written bid by the deadline set forth in the applicable Sale Motion (the "Landlord Bid"). To qualify, the Landlord Bid must identify the leases on which the landlord seeks to bid (the landlord may only bid on its own leases) and the proposed offer (whether by credit against default amounts or by other value). The submission of a competing bid will be deemed to be the bidder's consent for the Debtors and their advisors to share any information submitted by the competing bidder to the Committee's Professionals, the DIP Lender and any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such competing bidder.

4

### Deadline for Competing Bids

Qualified Competing Bids must be served upon and actually received by, the representative of the Debtors, the DIP Lender Agent Representatives and the Committee's Professionals specified in the Sale Motion, on or before 5:00 p.m., Eastern Time, on the date that is set forth in the applicable Sale Motion. The Debtors may extend (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) the bid deadlines for the delivery of competing bids once or successively, without further notice and for one or more bidders, but shall not be obligated to do so.

### Reservation of Rights

Notwithstanding the Debtors' receipt of an Initial Bid and/or any Qualified Bids for any particular asset, the Debtors may continue to negotiate and solicit offers for the asset, including package offers that encompass more than one asset. The Debtors reserve the right in the exercise of their sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals to enter into agreements for the sale of any of their assets, either individually or as part of a package prior to an Auction (as defined below), without further notice to any party, which agreements, if any, will be subject to higher or otherwise better bids at the Auction (including evaluation on a package or individual basis) but which may be subject to bid protections or breakup fees as authorized by the Bankruptcy Court. The Debtors retain the right, in the exercise of their sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, to withdraw one or more assets from the Auction, including in connection with a package offer, up to the date of the Auction. This includes the right to withdraw an unexpired lease where the only bid is by the landlord. Notwithstanding anything to the contrary in these procedures, the Debtors also reserve the right, in the exercise of their sole discretion after consulting with the DIP Lender Agent Representatives and the Committee's Professionals, to reject any and all bids for any particular asset. Nothing in these Bidding Procedures will or will be construed to, in any way, modify, limit, impair, prejudice or adversely affect the rights and remedies of the DIP Lenders **in accordance with the provisions of the Final Financing Order (as defined herein) and the Loan Documents (as defined in the Final Financing Order)**. Formal approval of a bid will not occur unless and until the Bankruptcy Court enters an order approving and authorizing the Debtors to consummate the transaction. All bids, including those of the Initial Bidder, are subject to Bankruptcy Court approval. The Debtors retain all rights to any assets that are not subject to a bid accepted by the Debtors and approved by the Bankruptcy Court at the Sale Hearing.

### Sale Motion and Notice

For each Purchase Agreement, the applicable Sale Motion will seek approval of, among other things, the sale of the asset free and clear of liens, claims and encumbrances under section 363 of the Bankruptcy Code. For each Purchase Agreement that contemplates the assumption, assumption of assignment or termination of executory contracts or unexpired leases, the applicable Sale Motion will also seek approval of (a) any cure obligation required by 11 U.S.C. § 365(f)(2), if any, to the extent not previously determined by the Court and (b) assumption or assumption and assignment of

5

the applicable executory contract or unexpired lease or approval of any lease termination agreement.

In each instance, the Debtors give notice and an opportunity to object to any known lienholders, and if the sale involves an executory contract or lease, the non-debtor parties to each of these contracts and leases. Any objection with respect to a Purchase Agreement, including with respect to the cure obligations or the proposed assumption, assumption and assignment, termination, or rejection of executory contracts or unexpired leases in connection with such Purchase Agreement must be filed with the Bankruptcy Court and served upon and received by the Debtors, the Debtors' counsel, the DIP **Lender Agent Representatives** and the Committee's counsel on or before 5:00 p.m., Eastern Time, on the date that is set forth in the applicable Sale Motion before the applicable Sale Hearing. If no objection is timely received by the Debtors, all proposed cure obligations provided in the Sale Motion will be deemed to be correct and binding upon all interested parties.

Unless otherwise ordered by the Bankruptcy Court with respect to a particular Sale Motion, a notice of a Sale Motion and the applicable Sale Hearing (the "Sale Notice") will be given electronically or by U.S. mail: (a) to each party that expressed an interest in an asset that is the subject of the particular Sale Motion (and their counsel of record in these Chapter 11 cases, if any); (b) if the Sale Motion seeks the assumption, assumption and assignment, termination, or rejection of executory contracts or unexpired leases or approval of any lease termination agreement, to each non-debtor party to such contract or lease (and their counsel of record in these Chapter 11 cases, if any); (c) to parties in interest entitled to receive notice under Bankruptcy Rule 2002 Bankruptcy Rule 6004, Local Rule 2002-1 and the Notice Procedures Order; and (d) if the Purchase Price for any asset exceeds $5,000,000, by publishing notice in the national edition of the Wall Street Journal. The Sale Notice (other than a published Sale Notice) shall also include a copy of these Bidding Procedures and with appropriate modifications, including deadlines and contact persons.

## Auction

If one or more Qualified Competing Bids which is higher or otherwise better than the Initial Bid, are timely received, an auction will be conducted for the particular asset at the time and location specified in the Sale Motion (an "Auction"). The Debtors will provide notice of any Auction at least two business days before the Auction to all parties who have submitted a Qualified Competing Bid.

Based upon the terms of the Initial Bid and the Qualified Competing Bids and such other information as the Debtors deem (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) relevant, the Debtors may conduct an Auction in any manner (and upon any terms and conditions) the Debtors believe (after consultation with the DIP Lender Agent Representatives and the Committee's Professionals) will achieve the maximum value for the particular asset to be sold.

The Debtors may (a) determine, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which Qualified Competing Bid or Initial Bid, if any, is the highest or best offer with respect to one or more of the assets, and (b) reject in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, any bid (including an Initial Bid) that, in the Debtors' sole discretion (but after consultation with the DIP Lender Agent Representatives and the Committee's Professionals), is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

At the conclusion of an Auction, the Debtors after consultation with their advisors, the Committee's Professionals and the DIP Lender Agent Representatives, will review each Qualified Competing Bid and the Initial Bid and identify the highest or best offer for the particular asset (each a "Successful Bid"; such bidder is the "Successful Bidder"). The Debtors reserve the right to refuse to consider any bid that fails to comply with the Bidding Procedures or any other procedures established by the Debtors at any Auction. Where the Successful Bid includes a proposed assumption and assignment of a nonresidential real property lease or executory contract, the Debtors will send a copy of the Successful Bid to all non-debtor parties to such lease or contracts by e-mail or overnight express delivery so that it is received by the non-debtor party to such contract or lease no later than eight days prior to the earlier of (i) the deadline to object to any such Sale (but not the deadline to object to any proposed cure) set forth in the applicable Sale Motion or (ii) the Sale Hearing.

If no Qualified Competing Bids are received for a particular asset, the Debtors may determine that, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals that the Initial Bid is the Successful Bid and seek Bankruptcy Court approval of the relevant Purchase Agreement without conducting an Auction or, may reject the Initial Bid and not proceed with any sale of the particular asset. If no Successful Bid is received for a particular asset the Debtors have included in any Sale Motion (including a bid by a landlord for its use), the Debtors may withdraw, in their sole discretion, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, withdraw the Motion as to that asset and may, in the Debtors' sole discretion after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, continue to market the asset.

The Auction may be adjourned as the Debtors, after consultation with the DIP Lender Representatives and the Committee's Professionals, deem appropriate. Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all participants and to the DIP Lender Agent Representatives and the Committee's Professionals.

## Sale Hearing

At the Sale Hearing, the Debtors will request that the Bankruptcy Court approve (a) (i) the Successful Bid, (ii) the applicable Purchase Agreement, and (iii) if the sale includes an executory contract or unexpired lease, the proposed assumption, assumption and assignment, termination or rejection of any executory contract or unexpired leases, and (b) authorize the Debtors to consummate the proposed transaction.  If the Sale includes an unexpired lease, the Bankruptcy Court shall also determine:

(a)     any cure required under 11 U.S.C. §365(b) if the affected landlord timely filed an objection to the Debtors' proposed cure; and

(b)     if applicable, whether the Debtor has demonstrated adequate assurance of future performance under 11 U.S.C. §§ 365(b)(3) and 365(f)(2).

If the Debtors elect to proceed without an Auction, and no objection to the proposed transaction is filed with the Court within the applicable time, the Debtors will file a certificate of no objection and a proposed order (a) approving (i) the sale of the asset set forth in the applicable Purchase Agreement, (ii) the applicable Purchase Agreement, and (iii) if applicable, the assumption, assumption and assignment, termination or rejection of any executory contract or unexpired leases under the applicable Purchase Agreement and (b) authorizing the Debtors to consummate the transaction contemplated by the Purchase Agreement.  In that event, the Court may enter the Sale Order without holding a Sale Hearing.  If timely objections to the proposed transaction are received, then the Debtors will seek Bankruptcy Court approval at a Sale Hearing.

If the Successful Bidder fails to consummate the Successful Bid in accordance with the terms of its Purchase Agreement, the Debtors (i) will retain the earnest money deposit of such bidder, to the extent provided by the purchase agreement, and (ii) maintain the right to pursue all available remedies against the bidder.  In such event, and upon consultation with the DIP Lender Agent Representatives and the Committee's Professionals, the Debtors may consummate the proposed transaction with the next highest or best bidder at the Auction and consummate the transaction with such bidder at the highest price bid by such bidder at the Auction without the need for further Bankruptcy Court approval (or, if that bidder is unable to consummate the transaction at that price, the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, may consummate the transaction with the next highest bidder, at the Auction and so forth) (the "Alternate Bid").  Notwithstanding anything to the contrary in the foregoing, if the respective sale includes the assumption and assignment of an unexpired lease, the Debtors may not proceed with the Alternate Bid until the Debtors provide the affected landlord with a copy of the Alternate Bid.  The affected landlord has no less than eight days after receipt of the Alternate Bid to file a written objection with the Court.  If no such objection is filed, the Debtors may proceed to consummate the Alternate Bid.  If the landlord files a timely objection, the Alternate Bid will be set for hearing and the Debtors may not proceed absent Court order.

8

Any bidders submitting bids will bear their own expenses in connection with the sale, regardless of whether the sale is approved, in accordance with the terms of the applicable Purchase Agreement.

### Additional Conditions Applicable to the Initial Bid and all Qualified Competing Bids

Notwithstanding anything to the contrary in these procedures, the bid of the Successful Bidder will remain irrevocable in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. All other bids will be irrevocable until the earlier to occur of (i) 60 days after entry of a Sale Order approving the sale of the assets or (ii) closing of the sale of assets in accordance with the Successful Bid. Notwithstanding the foregoing, the right of the Initial Bidder will be governed by the terms of its Purchase Agreement.

Notwithstanding anything to the contrary in these procedures, the earnest money deposit of the Successful Bidder will be retained by the Debtors in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. Deposits of all other bidders will be retained by the Debtors until the earlier to occur of (i) 60 days after entry of a Sale Order approving the sale of the assets or (ii) closing of the sale of assets in accordance with the Successful Bid. Notwithstanding the foregoing, the deposit of the Initial Bidder will be governed by the terms of its Purchase Agreement.

Notwithstanding anything to the contrary, the Debtors, after consultation with the DIP Lender Agent **Representatives** and the Committee's Professionals, have the right to entertain bids that do not conform to one or more of the requirements set forth in these procedures and to deem such bids Qualified Competing Bids.

All Bids, the Auction and the Bidding Procedures are subject to such other terms and conditions as are announced by the Debtors, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals provided however, that the Debtors may not amend these procedures to change notice provisions or otherwise withdraw any rights given by these procedures to affected landlords (in their capacity as landlords).

### "As Is, Where Is"

The proposed transfer of any of the Debtors' assets will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates, except to the extent set forth in the applicable Purchase Agreement of each Successful Bidder as accepted by the Debtors and approved by the Bankruptcy Court. Except as otherwise provided in a Purchase Agreement, all of the Debtors' right, title and interest in and to the respective asset will be transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests in accordance with Section 363 of the Bankruptcy Code. The Debtors will cause all net proceeds from any such sale to be paid to the DIP Lenders to the extent required in accordance with the terms of the Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the

9

Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).  Any other claim, lien or encumbrance will attach to the net proceeds of the sale of the particular asset.

Each bidder for any of the Debtors' assets will be deemed to acknowledge and represent that it (a) has had an opportunity to conduct such due diligence regarding the asset prior to making its offer as provided in the Purchase Agreement, (b) has relied solely upon its own independent review, investigation and/or inspection of any document including, without limitation, executory contracts and unexpired leases in making its bid, and (c) did not rely upon or receive any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the asset, or the completeness of any information provided in connection with the asset sale or the Auction, except as expressly stated in the particular Purchase Agreement.

Exhibit A to Motion to Establish Bidding Procedures - WD (00498628-5).DOC.5

**Exhibit B**

**Bid Protections**

1.     A termination fee of up to 3% of the cash portion of the purchase price set forth in the bidder's Asset Purchase Agreement (the "Termination Fee");

2.     Initial overbid protection not to exceed 105% of the purchase price set forth in such bidder's Asset Purchase Agreement (the "Overbid Protection"); and/or

3.     In the case of bids on multiple leases, the ability to reduce the purchase price set forth in such bidder's Asset Purchase Agreement by up to 115% of the allocated purchase price for a particular Lease, to the extent such Lease is sold to another entity and the bidder is still the Successful Bidder with respect to the remaining Leases bid on as a group (the "Release Protection").

**EXHIBIT C**

Single Store APA Template
(7.28.06 update)

Store No.:
[no.]

## ASSET PURCHASE AGREEMENT
[Buyer's Name]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made effective as of [_____] [____], 2006 (the "Effective Date"), by and between

**WINN-DIXIE [_____], INC.,** a Florida corporation ("Seller"), and

[_____], a [_____], or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### R E C I T A L S :

A.    Seller is the tenant of the supermarket store located at [_____] (the "Store"), under the respective lease, including any amendments thereto, as described in Exhibit A to this Agreement (the "Lease"). The Store occupies the respective leased premises as described in the Lease (the "Leased Premises"), within the respective parcel of real property described in Exhibit A to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets".

B.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.    Seller (Winn-Dixie Stores, Inc. and its affiliated debtors) filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code") on February 21, 2005 (the "Petition Date") and has operated its business as debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Petition Date (the "Bankruptcy Cases"). The Bankruptcy Cases are being jointly administered in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court"), under Case No. 05-03817-3F1.

**IN CONSIDERATION OF $10.00** and other good and valuable consideration and of the mutual undertakings of the parties hereto, Buyer and Seller agree as follows:

1.0    **Defined Terms.** Capitalized terms not otherwise defined in this Agreement will have the meanings assigned to such terms below.

      1.1    "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that the Landlord and any Subtenants are adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including, if appropriate, a Replacement Guaranty of Buyer's obligations under the Lease and (where applicable) the Subleases by

an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2     "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3     "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4     "Allocation Schedule" will mean the allocation of the Purchase Price and the Deposit among the Assets as provided in Exhibit B to this Agreement.

1.5     "Approval Condition" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.6     "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7     "Auction" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.8     "Bankruptcy Cases" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9     "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10    "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11    "Bidding Procedures" will mean the bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases as approved by the Bankruptcy Court by Order dated June 20, 2005.

1.12    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Equipment and other tangible and intangible personal property constituting a portion of the Assets.

1.13    "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.14    "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.15    "Buyer" will have the meaning assigned in the introductory paragraph of this Agreement.

1.16    "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigation of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

2

for the Title Policy (and the cost of any simultaneously issued mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (e) recording fees payable in connection with recording the Conveyance Instrument(s) in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on any note or mortgage; and (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment.

1.17   "Buyer's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.18   "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.19   "Closing" will mean the consummation of the assignment, assumption, sale, and purchase of the Assets pursuant to this Agreement, as provided in paragraph 14.0 of this Agreement.

1.20   "Closing Date" will have the meaning assigned in paragraph 14.1 of this Agreement.

1.21   "Closing Escrow Date" will mean the date that is 2 Business Days prior to the Closing Date or such earlier date after satisfaction of the Approval Condition as Buyer and Seller may designate.

1.22   "Closing Statement" will mean a statement in the form of Exhibit D to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due to Seller at Closing, after making the adjustments described in paragraph 3.4.2 and 3.4.3 of this Agreement and in other provisions of this Agreement.

1.23   [Intentionally deleted]

1.24   "Confidentiality Agreement" will mean the Confidentiality Letter Agreement dated effective _____, 2006, between Winn-Dixie and Buyer, a complete and correct copy of which is attached as Exhibit E to this Agreement, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.25   "Conveyance Instrument" will mean the Assignment and Assumption of Lease substantially in the form of Exhibit F to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease, together with Seller's interest in any Improvements.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX90711.1

3

1.26   "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and the DIP Lender, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27   "Cure Costs" will mean amounts (if any) payable by Seller pursuant to Section 365(b) of the Bankruptcy Code upon Seller's assumption of the Lease and any Subleases.

1.28   "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29   "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.30   "DIP Lender" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.31   "Due Diligence Materials" will mean, collectively, (i) the Lease and any Subleases, (ii) the Title Report, (iii) the Environmental Report, (iv) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or otherwise, and (v) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32   "Effective Date" will have the meaning assigned in the introductory paragraph of this Agreement.

1.33   "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34   "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35   "Escrow Agent" will mean Smith, Gambrell & Russell, LLC, Jacksonville office, acting as escrow and closing agent.

1.36   "Excluded Personal Property" will mean the items or categories of items identified on Exhibit G to this Agreement, which are expressly excluded from the Assets to be sold to Buyer under this Agreement.

1.37   "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.38   "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.39   "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

4

1.40    "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.41    "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.42    "Knowledge" will mean (I) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of all senior officers of Buyer and its Affiliates having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.43    "Landlord" will mean the lessor under the Lease.

1.44    "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.0 of this Agreement.

1.45    "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.46    "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.47    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change, or event, that such fact, circumstance, change, or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transaction contemplated herein, or on the continued operation of the Store for its current use, except to the extent that fact, circumstance, change, or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery, or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transaction contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transaction contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Cases; (f) the conversion or dismissal of any or all of the Bankruptcy Cases; (g) the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Cases; or (h) the Wind-up Procedures.

1.48    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther 06 Kitty Subfile" with respect to the disposition of the Store and other properties.



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

5

1.49    "<u>Monetary Liens</u>" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through, or under Seller: (A) mortgages on any of Seller's leasehold interests and/or on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease and/or on the Assets; and (D) judgments that have attached to and become a lien against Seller's interest under the Lease and/or the Assets.

1.50    "<u>Ordinary course of business</u>" means the ordinary course of business of Seller after the Filing Date, subject to the Wind-up Procedures.

1.51    "<u>Outside Date</u>" means September 30, 2006, as such date may be extended by the written agreement of Seller and Buyer.

1.52    "<u>Permit</u>" will have the meaning assigned in <u>paragraph 7.2</u> of this Agreement.

1.53    "<u>Permitted Encumbrances</u>" will mean (i) all matters listed on <u>Exhibit H</u> to this Agreement, (ii) all other matters set forth as exceptions in the Title History, other than Monetary Liens, and (iii) subject to the provisions of <u>paragraph 4.2</u> of this Agreement, all other matters set forth as exceptions in the Title Commitment, other than Monetary Liens.

1.54    "<u>Person</u>" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, or non-incorporated organization or government or any agency or political subdivision thereof.

1.55    "<u>Purchase Price</u>" will mean the amount set forth in <u>paragraph 3.1</u> of this Agreement.

1.56    "<u>Real Property</u>" will mean the Leased Premises and the Improvements together.

1.57    "<u>Replacement Guaranty</u>" will mean any guaranty of Buyer's payment and performance obligations under the Lease or any Sublease, given by a parent Affiliate of Buyer as may be required either to obtain Landlord's approval of the Adequate Assurance Information or to obtain Landlord's consent to the release of Winn-Dixie as a guarantor under the Lease or Sublease, as the case may be.

1.58    "<u>Sale Hearing</u>" will have the meaning assigned in <u>paragraph 5.1</u> of this Agreement.

1.59    "<u>Sale Motion</u>" will have the meaning assigned in <u>paragraph 5.1</u> of this Agreement.

1.60    "<u>Sale Order</u>" will have the meaning assigned in <u>paragraph 5.1</u> of this Agreement.



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

6

1.61    "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.62    "Seller" will have the meaning assigned in the Introductory paragraph of this Agreement.

1.63    "Seller's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.64    "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and The Blackstone Group, L.P.

1.65    "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.66    "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.67    "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including, if applicable, any associated fuel center operated by Seller at the Leased Premises.

1.68    "Sublease" will mean, with respect to the Store, each sublease of a portion of the Leased Premises listed on Exhibit A to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.69    "Subtenant" will mean any subtenant or sublessee under the Sublease. If no sublease is listed on Exhibit A to this Agreement, then the Conveyance Instrument to any Subtenant at such the Store will be disregarded.

1.70    "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.71    "Successful Bidder" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.72    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, located within the Store and owned by Seller on the Closing Date, excluding, however, all packaging materials and supplies relating to the preparation or merchandising of Inventory, or any other supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of its Affiliates.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

7

1.73    [Intentionally deleted]

1.74    "Title Commitment" will mean that current leasehold title insurance commitment obtained by Seller from Title Insurer, committing to insure Buyer's leasehold interest in the Real Property upon Closing, as made available to Buyer for review on the Merrill Website within 10 days following the Effective Date.

1.75    "Title History" will mean those materials evidencing the state of title to the Real Property, including any existing title report, title abstract, title insurance policy, and/or title insurance commitment with respect to the Store that Seller has made available to Buyer for review on the Merrill Website prior to the Effective Date.    Buyer understands that the Title History may include previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.76    "Title Insurer" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company as designated by Seller.

1.77    "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.78    "Title Reports" will mean, collectively, (i) the Title History and (ii) the Title Commitment.

1.79    "Wind-up Procedures" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down, liquidation or removal of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the Store, and closing of the Store.

1.80    "Winn-Dixie" will mean Winn-Dixie [_____], Inc., a Florida corporation.

2.0    **Property Included in Sale.**  Seller agrees to assign, transfer, sell, and convey the Assets to Buyer, and Buyer agrees to assume and purchase the Assets from Seller. The Assets are comprised of the following:

2.1    Seller's leasehold interest, as tenant, under the Lease, and Seller's interest in any leasehold improvements, including the release of Winn-Dixie from any guaranty of Seller's payment and performance obligations under the Lease, which Buyer acknowledges may require delivery of a Replacement Guaranty by a parent Affiliate of Buyer;

2.2    Seller's interest in all fixtures and all equipment located in the store building now existing on the Leased Premises (the "Building"), including but not

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

8

limited to Seller's interest in (i) any heating and air conditioning system or any facility used to provide a utility service or any other similar service to the Building, elevators, docks, lifts, doors, storefront, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), (ii) Seller's trade fixtures and equipment located in the Building (the "Equipment"), and (iii) the Supplies; and

2.3 Seller's interest, as sublessor, in any Sublease.

Excluded Personal Property is expressly excluded from the Assets to be assigned and transferred by Seller to Buyer under this Agreement.

## 3.0 **Purchase Price.**

3.1 <u>Amount</u>. The purchase price to be paid by Buyer to Seller for the Assets will be the fixed sum of $[_____] (the "Purchase Price"). The Purchase Price will be allocated to the Store as set forth in the Allocation Schedule.

3.2 <u>Contract Consideration and Deposit</u>. As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer will deliver to Escrow Agent, no later than 2 Business Days after the Effective Date, an initial earnest money deposit with respect to the Store in the amount set forth in the Allocation Schedule (the "Initial Deposit"). Furthermore, within 1 Business Day after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit in the amount set forth in the Allocation Schedule (the "Second Deposit"). The Initial Deposit by itself, and together with the Second Deposit, if required to be delivered pursuant to this paragraph, will be referred to herein as the "Deposit". Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent. The Initial Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 4.4, 13.0, 15.0, 16.0 and 22.0. Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except pursuant to paragraph 16.2. The applicable portion of the Deposit will be credited against the Purchase Price at Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to Closing.

3.3 <u>Competitive Bidding Procedures</u>. Buyer acknowledges that Seller's obligations under this Agreement are subject to the Bidding Procedures and the Bankruptcy Approval Procedures as described in paragraph 5.0 below. Accordingly, the purchase and sale of the Assets may become involved in a competitive bidding process which will entitle Seller, in its sole discretion, to select a higher or otherwise better offer for the Assets than the Purchase Price and other terms and conditions set forth in this Agreement.

3.4 <u>Payment</u>. The Purchase Price will be paid in the following manner:

3.4.1 *Purchase Price*. On the Closing Escrow Date, Buyer will deliver to Escrow Agent the Purchase Price, net of the Deposit, and as adjusted



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

9

as provided under the Closing Statement.    Such funds will be transferred by wire transfer to an account designated in writing by Escrow Agent.  Subject to the conditions set forth in paragraph 10 of this Agreement, on the Closing Date, Seller and Buyer will instruct Escrow Agent to deliver the escrowed funds in payment of the Purchase Price and disbursement of same in accordance with the Closing Statement.

3.4.2  *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes), utilities, and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly, or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at the Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as and when due, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller.    There will be no post-Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes.    The provisions of this paragraph 3.4.2 that apply to the period after the Closing will survive the Closing.

3.4.3  *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.

3.5  Allocation of Purchase Price Among Assets.    Buyer will have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets at the Store; provided, however, that such allocation will not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Cases. The allocation contemplated in the immediately preceding sentence will be set forth with respect to the Assets on the Closing Statement.

## 4.0  **Buyer's Due Diligence.**

4.1  Acknowledgment; Access to Premises.

4.1.1  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and that Buyer has had the opportunity to consult with Buyer's legal, financial, and tax advisors with respect to the transaction contemplated by this Agreement.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

10

Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Physical access to the Store will be permitted for Buyer's site visits and inspections, provided that Buyer arranges such access in advance with Seller.

4.1.2 Direct contact with any members of management, employees, or stakeholders of Seller or visits to the Store are not permitted, except upon prior arrangement with Seller's agent, The Food Partners. To arrange for access to the Store for inspection or to interview Seller's employees, Buyer must contact Seller's representative at The Food Partners: Doug Herman by telephone at 202-589-0438 or by e-mail at dherman@thefoodpartners.com. Such pre-arranged site access will be subject to the following conditions: (a) Buyer will have given Seller at last 24-hours notice of Buyer's proposed entry into a Store or interview of Employees, (b) such entry or interviews will be conducted during normal business hours, (c) Buyer will be accompanied by Seller's representative during such entry and interviews, (d) Buyer's entry will not include any invasive testing or measurements, and (e) Buyer will conduct such investigations and interviews in such a manner so as to avoid disruption of the Seller's business operations in the Store. Furthermore, any such access will comply in all respects with Confidentiality Agreement, except as otherwise may be provided in this paragraph 4.1.

4.2    Title. Buyer confirms and acknowledges that Seller has made the Title History available to Buyer through the Merrill Website prior to the Effective Date. Seller will deliver the Title Commitment to Buyer within 10 days after the Effective Date. Buyer may request Title Insurer to provide title insurance covering Buyer's leasehold interest in the Lease (the "Title Policy") at Closing, based on the Title Commitment.

4.2.1 If any matter set forth in the Title Commitment for the Store would have a Material Adverse Effect upon the present use or occupancy of such Store, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Title Commitment either is delivered to Buyer or is posted on the Merrill Website. To be effective, any such notice of objection must be directed to Seller using e-mail address catherinelbold@winn-dixie.com, with a copy using e-mail address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #[_____]".

4.2.2 If Buyer timely notifies Seller of any valid objection to any matter set forth in the Title Commitment, then Seller will have a period of 3 Business Days after such notice in which to notify Buyer in writing



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

11

either that: (i) Seller declines or is unable to cure such objection (other than Monetary Liens, which Seller will be obligated to cure at or prior to Closing), or (ii) Seller intends to cure or resolve such objection at or prior to Closing. If written notice is given by Seller pursuant to clause (i) above, then Buyer may elect, within 3 Business Days after Seller's notice, either to terminate this Agreement, with no liability to Buyer or Seller, or to waive such objection and proceed with the transaction hereunder, and in the latter event, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter will constitute a Permitted Encumbrance.

4.3     Environmental Reports.  Seller has, to the extent of available information, posted historical environmental reports on the Merrill Website covering the Real Property.  Within 10 days after the Effective Date, Seller will deliver to Buyer and post on the Merrill Website current phase I environmental site assessment reports for the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located (the "Environmental Report").

   4.3.1  If Buyer determines that any matter set forth in the Environmental Report would have a Material Adverse Effect upon the present use or occupancy thereof, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Environmental Report either is delivered to Buyer or is posted on the Merrill Website.  To be effective, any such notice of objection must be directed to Seller using e-mail address catherineibold@winn-dixie.com, with a copy to e-mail address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "ENVIRONMENTAL REPORT OBJECTION NOTICE - WINN-DIXIE STORE #[_____]".

   4.3.2  If Buyer timely notifies Seller of any valid objection to any matter set forth in the Environmental Report, then Seller will have a period of 3 Business Days after such notice in which to notify in writing Buyer either that: (i) Seller declines or is unable to cure such objection, or (ii) Seller intends to cure or resolve such objection at or prior to Closing.  If written notice is given by Seller pursuant to clause (i) above, then this Agreement will be deemed terminated automatically, with no liability to Buyer or Seller.   If the Environmental Report discloses any condition that affects the Real Property or other Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, Buyer will not contact or report to such agencies with respect to such condition without Seller's prior written consent; provided, however, that in no event will Buyer or its representatives contact such agencies without providing Seller with prior notice of Buyer's intention to make such contact or report, and providing Seller the opportunity to make such contact or report itself in lieu of Buyer.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

12

4.4    <u>Termination Rights</u>.  In the event that Buyer provides timely written notice of its election to terminate this Agreement pursuant to <u>paragraphs 4.2.2 or 4.3.2</u> above, then this Agreement will be deemed terminated as to the Store, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit.

4.5    <u>Return of Reports and Documents</u>.  If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph will not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

## 5.0    <u>Bankruptcy Approval Procedures</u>.

5.1    <u>Competitive Bid Process</u>.  This Agreement is subject to the competitive bid process described in the Bidding Procedures.  Promptly following the expiration of the Review Period, if this Agreement has not otherwise terminated in accordance with its terms as to all of the Assets, then Seller will file a motion with the Bankruptcy Court seeking approval of the transaction contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, <u>inter alia</u>, to 11 U.S.C. Sections 105 and 363 (the "<u>Sale Motion</u>").  The Bankruptcy Court will set a date for hearing on the Sale Motion (the "<u>Sale Hearing</u>") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding Procedures.  The Bidding Procedures allow Seller to accept competitive bids on the Assets.  If an acceptable competitive bid is received, Seller may conduct an auction prior to the Sale Hearing pursuant to the Bidding Procedures (the "<u>Auction</u>").  The party submitting the Successful Bid for the Assets as selected by Seller is referred to as the "<u>Successful Bidder</u>".  Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder.  Prior to the Sale Hearing, upon consultation with the Creditors' Committee and the lender holding the Credit Agreement Liens (the "<u>DIP Lender</u>"), Seller will select the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid.  Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Assets by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transaction contemplated herein, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "<u>Sale Order</u>").



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

13

5.2     Sale Order Approving Agreement. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transaction contemplated herein, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

5.3     Continuing Effectiveness of Agreement. Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer or if the sale of the Assets closes with another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

6.0     **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1     On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format, or on the Merrill Website: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)     copies of the Title History;

(b)     copies of environmental history for the Store;

(c)     copies of the site plans or boundary surveys for the Store;

(d)     copies of the fixture plans for the Store; and

(e)     a list of the Equipment (other than Excluded Personal Property) as reflected in Seller's current records;

it being understood that the materials described in this paragraph 6.1 have been provided for informational purposes only with no representations or warranties by Seller as to accuracy, completeness, or otherwise.

6.2     At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens and other encumbrances, other than the Permitted Encumbrances, to the extent provided under Section 363 of the Bankruptcy Code.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

14

7.0    **General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1    Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida and, subject to satisfaction of the Approval Condition, has the power and authority to consummate the transaction contemplated herein.  This Agreement and any closing document to which Seller is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have, subject to satisfaction of the Approval Condition, been duly authorized by all required corporate action on behalf of Seller.

7.2    No consent, license, approval, or authorization of, or filing, registration, or declaration with, or exemption or other action by any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery, or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party to the transaction herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

7.3    Subject to satisfaction of the Approval Condition, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5    None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement, or other labor agreement.

7.6    Seller has not engaged any brokers in connection with the transaction contemplated by this Agreement, except Seller's Brokers.

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

15

8.0  **Buyer's Representations and Warranties.**  In order to induce Seller to enter into this Agreement and to sell, assign, and convey the Assets to Buyer as provided herein, Buyer represents and warrants to Seller as follows:

   8.1  Buyer is a [_____] duly organized, validly existing, and in good standing under the laws of the State of [_____], and is licensed to transact business in the State in which the Assets are located, and has the power and authority to consummate the transaction contemplated herein. This Agreement and each of the closing documents to which Buyer is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have been duly authorized by all required [corporate/partnership/limited liability company] action on behalf of Buyer.

   8.2  No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transaction herein or therein contemplated, other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

   8.3  This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

   8.4  There is no action, suit, or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

   8.5  Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX90711.1

16

8.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it herein.

9.0    **Covenants of Seller.**  Seller hereby covenants for the benefit of Buyer as follows:

9.1    Subject to the Wind-up Procedures, Seller will maintain the Store in its present condition, reasonable wear and tear, casualty loss, and condemnation impacts excepted.

9.2    Subject to the Wind-up Procedures, Seller will not sell, dispose of, abandon, or remove the Assets from the Store or agree to do so except in the ordinary course of business.

9.3    During implementation of the Wind-up Procedures, Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the Closing Date, except that Buyer will remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 10.2 of this Agreement.

9.4    Following satisfaction of the Approval Condition, Seller will release to Buyer a schedule of Seller's current employees at the Store, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested in potential employment with Buyer, to interview with Buyer.

9.5    Seller will transfer or terminate all of its employees working at each Store on or before the Closing Date, except to the extent otherwise required by the Family Medical Leave Act.

9.6    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.0 of this Agreement.

The covenants set forth in this paragraph 9.0 that relate to any period after Closing for the Store will survive the Closing.

10.0    **Covenants of Buyer.**  Buyer hereby covenants for the benefit of Seller as follows:

10.1    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11.0 of this Agreement.

10.2    Within 48 hours after the Closing Date, Buyer will, at Buyer's sole cost and expense, remove from the Store, destroy, and lawfully dispose of all signs and panels that are part of the Excluded Personal Property.    Without

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

17

limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement will encompass any breach by Buyer of this paragraph 10.2.

10.3    Buyer will use commercially reasonable efforts to take or cause to be taken all actions to assist and cooperate with Seller in doing all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transaction contemplated by this Agreement.

10.4    Buyer will provide the Adequate Assurance Information to Seller, the Bankruptcy Court, Landlord, and any Subtenants as reasonably may be requested.

The covenants set forth in this paragraph 10.0 that relate to any period after Closing for the Store will survive the Closing.

11.0    **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement are subject to satisfaction of the Approval Condition, and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

11.1    Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 6.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2    No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

18

11.3    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer will have the right to terminate this Agreement pursuant to paragraph 15.1.4 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.4.

12.0    **Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement are subject to satisfaction of the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2    No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

12.3    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement pursuant to paragraph 15.1.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations,

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

19

including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.5.

13.0    **Loss by Fire or Other Casualty; Condemnation**.  Prior to the Closing, if the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, then either Buyer or Seller will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction, or condemnation proceedings, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from Escrow Agent of the Deposit.  If neither party exercises such right of termination as affected by such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, then, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0    **Closing Date and Closing**.

14.1    Closing Date; Procedures.  Promptly following satisfaction of the Approval Condition, Seller will designate a Business Day reasonably acceptable to Buyer that falls on or before the Outside Date as the closing date for the Store.  Such designated closing date is referred to herein as the "Closing Date."  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2    Seller's Closing Deliveries.  Subject to the conditions contained in paragraph 12.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date, Seller will deliver the following ("Seller's Escrowed Items") into escrow with Escrow Agent:

(i)     Two counterparts of the Conveyance Instrument, executed by Seller;

(ii)    The Bill of Sale, executed by Seller;

(iii)   Two counterparts of the Closing Statement, executed by Seller;

(iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

20

(v)     Any other documents, instruments, or agreements called for herein for delivery by Seller that have not previously been delivered.

Buyer may waive Seller's compliance as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement.  Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of paragraph 12.0 of this Agreement have been fulfilled or waived until Seller's Closing Direction is delivered.

14.3    Buyer's Closing Deliveries.  Subject to the conditions contained in paragraph 11.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date, Buyer will deliver the following ("Buyer's Escrowed Items") into escrow with Escrow Agent:

   (i)     Two counterparts of the Conveyance Instrument, executed by Buyer;

   (ii)    Two counterparts of the Replacement Guaranty, if required, executed by the requisite parent Affiliate of Buyer;

   (iii)   Two counterparts of the Closing Statement, executed by Buyer;

   (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof;

   (v)     Any other document, instrument, or agreement called for herein for delivery by Buyer that has not previously been delivered; and

   (vi)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3.0 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement.  Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will not be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11.0 of this Agreement have been fulfilled or waived until Buyer's Closing Direction is delivered.

14.4    Title Insurer Requirements.  On the Closing Date, Seller and Buyer will each deposit with Escrow Agent such other instruments as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the Assets in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.5    Payment of Closing Costs.  Except as provided in paragraph 16.0 of this Agreement, at or before Closing for the Store, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms, (i)

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

21

Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

14.6    Closing Direction.  On the Closing Date, Escrow Agent will notify Buyer and Seller, if this be the case, that Escrow Agent is in possession of all of Seller's Escrowed Items and all of Buyer's Escrowed Items and is prepared to release such items for legal delivery subject only to receipt of (i) written notice from Seller or Seller's counsel to Escrow Agent and Buyer confirming that Seller is prepared to proceed to closing and that all of the conditions of paragraph 12.0 of this Agreement have been fulfilled or otherwise waived ("Seller's Closing Direction"), and (ii) written notice from Buyer or Buyer's counsel to Escrow Agent and Seller confirming that Buyer is prepared to proceed to closing and that all of the conditions of paragraph 11.0 of this Agreement have been fulfilled or otherwise waived ("Buyer's Closing Direction").  Upon receipt of Buyer's Closing Direction and Seller's Closing Direction, Escrow Agent will be deemed authorized and directed to release and disburse, as appropriate, the Seller's Escrowed Items and the Buyer's Escrowed Items, without further condition, on the Closing Date.

14.7    Closing Turnover.  Contemporaneously with delivery of the latter of Seller's Closing Direction and Buyer's Closing Direction to Escrow Agent, all right, title, and interest of Seller in and to the Assets will pass to Buyer, and Seller thereafter will have no further right, title, interest, or obligation with respect to the Store or the Assets, except as may be expressly provided in this Agreement.    Promptly following Closing, Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith, including, to the extent in Seller's possession, control or custody, all keys, combinations to safes, security codes, and passwords, and Buyer may commence preparation for opening of the Store as a Buyer's store, including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.8    Closing Deliveries and Disbursements.    Subject to satisfaction of the requirements set forth in paragraph 14.6 above, at the commencement of business on the Closing Date, Escrow Agent will release and disburse, as appropriate, the Buyer's Escrowed Items and the Seller's Escrowed Items, with disbursements of Buyer's Closing Costs, Seller's Closing Costs, and the Purchase Price, as provided in the Closing Statement.

## 15.0    Termination.

15.1    Termination. This Agreement may be terminated, and the transaction contemplated herein abandoned, only as follows:

15.1.1    by written consent of Seller and Buyer, in which case the applicable Deposit will be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

22

Deposit, then Escrow Agent will pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

15.1.2    at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the Deposit will be disbursed as provided in such paragraph 16.1;

15.1.3    at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the Deposit will be disbursed as provided in such paragraph 16.2;

15.1.4    at the election of Buyer if any of the conditions set forth in paragraph 11.0 of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.1.4;

15.1.5    at the election of Seller if any of the conditions set forth in paragraph 12.0 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.1.5;

15.1.6    at the election of Buyer or Seller as provided in paragraph 4.4, 13.0, or 22.0 of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.6;

15.1.7    at the election of Seller, if this Agreement is terminated by Buyer for any reason, including, without limitation, because of Seller's breach of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

23

with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.7;

15.1.8   at the election of Seller (A) if this Agreement is not the Successful Bid with respect to the Store or (B) if the Approval Condition is not satisfied or (C) if this Agreement is terminated by Seller for any reason other than as provided in paragraph 15.1.9 below, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.8;

15.1.9   at the election of Seller, if the Cure Costs with respect to the Lease exceed 15% of the Purchase Price, provided that in such case Seller may terminate this Agreement under this paragraph 15.1.9, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made Buyer is in breach with respect to this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.9; or

15.1.10  at the election of Buyer or Seller, if the Closing has not occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1.1 through 15.1.9 of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1.10 if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.1.10.

15.2   Reservation of Remedies.  Upon any termination of this Agreement pursuant to paragraphs 15.1.3 through 15.1.10 of this Agreement, each party will retain those rights (if any) it may have under paragraph 16.0 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

## 16.0   Default and Remedies.

16.1   Buyer's Default.  If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement

Asset Purchase Agreement<br>
Winn-Dixie [_____], Inc. s/t [_____]<br>
Winn-Dixie Store #[no.]<br>
[_____] [___], 2006<br>
SGRJAX\90711.1

24

is terminated due to Buyer's breach of this Agreement, then Seller will be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement or (B) to receive the Deposit (the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it will not) sue Buyer: (a) for specific performance of this Agreement or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it will not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This paragraph 16.1 is subject to paragraph 16.3 and 16.4 of this Agreement.

16.2    Default by Seller.    In the event of Seller's breach of its covenants, representations, or warranties as provided in this Agreement, or if, following satisfaction of the Approval Condition, the sale of the Store as contemplated under this Agreement is not consummated due to Seller's refusal or inability to Close the transaction contemplated herein, then Buyer will be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Deposit, which return will operate to terminate this Agreement and release Seller from any and all liability under this Agreement.  Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote, or punitive damages.  This paragraph 16.2 is subject to paragraphs 16.3 and 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure.    Neither Seller nor Buyer will be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3: (i) will not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date and, accordingly, (ii) will not have the effect of extending the Closing Date or the due date of the Deposit.

16.4    Recoverable Damages.  In no event will the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

25

indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees, or expenses under the Confidentiality Agreement and paragraphs 3.4.2 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs. In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer asserts any claim or right to the Assets that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to the Assets, then Seller will have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage, or other consequence suffered by Seller as a result of such assertion.

16.5    Buyer Indemnification of Seller. Buyer will indemnify and save and hold harmless Seller and its Affiliates and representatives from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims, and expenses (whether or not arising out of third-party claims), including, without limitation, interest, penalties, reasonable attorneys' fees, and all amounts paid in investigation, defense, or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation, or commitment of any nature (absolute, accrued, contingent, or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on, or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.   Notwithstanding the foregoing, Buyer will not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a Material Adverse Effect on Buyer), or (ii) that is due to Seller's acts or omissions.  The provisions of this paragraph 16.5 will cover all obligations and liabilities of whatsoever kind, nature, or description relating, directly or indirectly, to product liability, third party litigation, or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets.  This paragraph 16.5 will survive the Closing or earlier termination of this Agreement.

16.6    Mutuality of Remedies.  Buyer and Seller each hereby knowingly, voluntarily, and intentionally waive and relinquish the right to assert mutuality of remedies as a defense to enforceability of this Agreement by either party.

## 17.0    Miscellaneous.

17.1    Notices. All notices, requests, demands, offers, and other communications required or permitted to be given pursuant to this Agreement will conform to



Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

26

the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie [_____], Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Michael Chlebovec, Director – Asset Management
Telefax No.: 904 783-5646
e-mail: michaelchlebovec@winn-dixie.com

With a copy to:

Winn-Dixie Stores, Inc. – Legal Department
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Catherine B. Ibold, Esquire, Group Leader - Real Estate
Telefax No.: 904-783-5138
e-mail: catherineibold@winn-dixie.com

and

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas G. Stanford, Esquire
Telefax No.: 904-598-6300
e-mail: dstanford@sgrlaw.com

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

27

If to Buyer:

[_____
_____
_____
Attn: _____
Telefax No.: _____
e-mail: _____]

With a copy to:

[_____
_____
_____
Attn: _____
Telefax No.: _____
e-mail: _____]

If to Escrow Agent:

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas G. Stanford, Esquire
Telefax No.: 904-598-6300
e-mail: *dstanford@sgrlaw.com*

or such other address as any party may from time to time specify by notice to the other.

17.2    Notice of Certain Inquiries.    If any party is contacted, whether before or after the Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to the transaction contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    Brokers and Finders.    The parties agree that there is no brokerage commission due in connection with the transaction contemplated by this Agreement other than that due by Seller to Seller's Brokers. Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to the Store only if, as and when the Closing contemplated by this Agreement occurs. Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant, or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement. Seller and Buyer hereby indemnify and agree to hold harmless

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

28

each other from and against any claims by any other Person for brokerage fees, commissions, or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closing or earlier termination of this Agreement.

17.4    <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

17.5    <u>Assignment</u>.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required.  No assignment by Buyer will release or relieve Buyer of its liabilities and obligations hereunder, which will remain in full force and effect notwithstanding any such assignment.

17.6    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to approval of the Bankruptcy Court, if applicable.

17.7    <u>Governing Law</u>.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which the Store is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8    <u>Merger of Prior Agreements</u>.  This Agreement, together with the Confidentiality Agreement which is hereby incorporated into this Agreement by reference, supersedes all prior agreements and understandings between the parties hereto and constitutes the entire agreement of the parties with respect to the matters contained herein.  **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

17.9    <u>Survival</u>.  Acceptance by Buyer of the Conveyance Instrument will constitute an acknowledgement by Buyer that all of Seller's representations, covenants, and obligations under this Agreement and all conditions to Buyer's obligations to close under this Agreement have been performed, satisfied, and/or waived.  Seller's representations, warranties, covenants, and obligations under this Agreement will not survive the Closing but will merge into the Conveyance Instrument, and will have no further force or effect after the Closing, except that those covenants of Seller under <u>paragraph 18.3</u> of this Agreement that are expressly provided to be performed after the Closing will survive.  All representations, warranties, and covenants of obligations of Buyer under this Agreement will survive the Closing.  In addition, all representations,

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

29

covenants, and obligations of Buyer under the Confidentiality Agreement will survive the termination or consummation of this Agreement.

17.10    <u>Time is of the Essence</u>.  Time is of the essence for this Agreement.

17.11    <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court other than as part of the process of satisfying the Approval Condition or in connection with any HSR Act requirement, except that upon default it may be presented to a court of competent jurisdiction.

17.12    <u>State Specific Provisions:</u>

17.12.1    ***With respect to Florida***: <u>Radon Gas</u>.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

17.12.2    [Other state-specific provisions as applicable; otherwise "[Intentionally deleted]".]

18.0    **Escrow Agent**.

18.1    <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2    <u>Indemnity</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability, or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable herein result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3    <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

30

and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Buyer each will be responsible for one-half of such costs and fees.

18.4 **Execution by Escrow Agent.** Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this paragraph 18.0. Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this paragraph 18.0 will not be required.

19.0 **Waiver of Jury Trial.** Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transaction contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily, and intentionally waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the transaction contemplated herein.

20.0 **Confidentiality.** Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie. The Confidentiality Agreement will be a continuing agreement of Buyer and Winn-Dixie, and will be applicable to the transaction that are the subject matter herein to the same extent as if the Confidentiality Agreement was fully incorporated into this Agreement.

21.0 **Consent to Jurisdiction.** THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTION AND THE INTERPRETATION, IMPLEMENTATION, AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice, or document by U.S. registered mail to any such party's respective address set forth in paragraph 17.1 of this Agreement will be effective service of process for any action, suit, or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waive and agree not to plead or claim in such court that any such action, suit, or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

31

will not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0   **HSR Filings.**   The parties anticipate that the transaction contemplated herein is exempt from review and filing under the HSR Act. However, if for any reason the transaction contemplated herein is determined to be subject to regulatory review and clearance or approval under the HSR Act, then either Buyer or Seller will have the right, exercisable prior to satisfaction of the Approval Condition by giving notice of such decision to the other within 5 Business Days after receiving written notice of such HSR Act requirements, to terminate this Agreement and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not then in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit. This termination right is not exercisable after satisfaction of the Approval Condition. If neither party exercises its right of termination as provided above, or if such right of termination is no longer exercisable, then Seller and Buyer will seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder, and it will be a condition precedent to the obligations of both Buyer and Seller that all such required HSR Act approvals or clearance are obtained, as provided in paragraph 11.2 and paragraph 12.2 above. In such latter event, Seller and Buyer will request expedited treatment of such HSR Filing by the Federal Trade Commission, will make promptly any appropriate or necessary subsequent or supplemental filings, and will furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority, except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds, or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

23.0   **Disclaimers and Waivers.**

23.1   **NO RELIANCE ON DOCUMENTS. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 6.0 AND 7.0 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY MATERIALS, DATA, OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA, AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT, OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA, OR INFORMATION BY BUYER WILL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER**

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

32

ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL, OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER WILL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER WILL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER, NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER, OR ANY AFFILIATE TO BUYER, WILL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

23.2    **Disclaimers.** EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS, OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS". BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT, OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

33

INVESTIGATIONS.    BUYER    REPRESENTS    TO    SELLER    THAT
NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED
SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY
ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE
OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH
RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON
OR  DISCHARGED  FROM  THE  ASSETS  (INCLUDING  WITHOUT
LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY
SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED
BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS, OR
EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT
WARRANTIES. UPON CLOSING, BUYER WILL ASSUME THE RISK THAT
ADVERSE    MATTERS,    INCLUDING,    BUT    NOT    LIMITED    TO,
CONSTRUCTION    DEFECTS    AND    ADVERSE    PHYSICAL    AND
ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY
BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, WILL BE
DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER
AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS,
DIRECTORS, SHAREHOLDERS, EMPLOYEES, AND AGENTS) FROM AND
AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION
(INCLUDING  CAUSES  OF  ACTION  IN  TORT  OR  UNDER  ANY
ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER
BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES,
LIABILITIES, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES
AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER,
KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR
ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR
RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES,
AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY
LATENT  OR  PATENT  CONSTRUCTION  DEFECTS  OR  PHYSICAL
CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING,
WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS), AND ANY AND
ALL  OTHER  ACTS,  OMISSIONS,  EVENTS,  CIRCUMSTANCES,  OR
MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP,
REMEDIATION, OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER
ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION
ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE
REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY
AFFILIATE WILL HAVE ANY LIABILITY TO BUYER TO PERFORM OR
PAY    FOR    SUCH    INVESTIGATION,    CLEAN-UP,    REMOVAL,    OR
REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY
CLAIM TO THE CONTRARY.

BUYER  FURTHER  ACKNOWLEDGES  THAT  (1)  THE  CONTRACT
WARRANTIES WILL NOT SURVIVE THE CLOSING BUT WILL MERGE
INTO THE CONVEYANCE INSTRUMENT, AND WILL HAVE NO FURTHER
FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE
LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

34

**WARRANTIES WILL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.**

**BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS, AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS, AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS, AND RELEASES IS FREE AND VOLUNTARY.**

23.3   Effect and Survival of Disclaimers.  Seller and Buyer acknowledge that the provisions of this paragraph 23.0 are an integral part of the transaction contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this paragraph 23.0.  Seller and Buyer agree that the provisions of this paragraph 23.0 will survive Closing or any earlier termination of this Agreement.

[SIGNATURE PAGE FOLLOWS]

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX90711.1

35

**IN WITNESS WHEREOF**, Buyer and Seller have executed this Agreement as of the Effective Date.

Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**SELLER:**

**WINN-DIXIE [_____], INC.,**
a Florida corporation

_____
Name: _____

By:    _____
Name: _____
Title:  _____

_____
Name: _____


Signed, sealed and delivered
in the presence of the following
subscribing witnesses:

**BUYER:**

[_____],
a [_____]

_____
Name: _____

By:    _____
Name: _____
Title:  _____

_____
Name: _____


[Note: Witnesses and other formalities of execution
to be conformed to applicable state requirements, if any.]

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [__], 2006
SGRJAX\90711.1

36

Acknowledged and agreed this _____ day of _____, 2006 for the limited purposes set forth in paragraph 18.0 of this Agreement:

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title:  Partner

Schedule of Exhibits

Exhibit A  –   Lease and Property Descriptions
Exhibit B  –   Allocation Schedule
Exhibit C  –   Form of Bill of Sale
Exhibit D  –   Form of Closing Statement
Exhibit E  –   Confidentiality Agreement
Exhibit F  –   Form of Conveyance Instrument
Exhibit G  –   Schedule of Excluded Personal Property
Exhibit H  –   Schedule of Permitted Encumbrances

Asset Purchase Agreement
Winn-Dixie [_____], Inc. s/t [_____]
Winn-Dixie Store #[no.]
[_____] [___], 2006
SGRJAX\90711.1

37

Single Store APA Exhibits Template
(7.28.06 update)

Store No.:
  [no.]

## LIST OF EXHIBITS

Exhibit A  –  Leases and Property Descriptions
Exhibit B  –  Allocation Schedule
Exhibit C  –  Form of Bill of Sale
Exhibit D  –  Form of Closing Statement
Exhibit E  –  Confidentiality Agreement
Exhibit F  –  Form of Conveyance Instrument
Exhibit G  –  Schedule of Excluded Personal Property
Exhibit H  –  Schedule of Permitted Encumbrances

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

<u>EXHIBIT A</u>
To Asset Purchase Agreement

<u>LEASES AND PROPERTY DESCRIPTIONS</u>

WINN-DIXIE STORE # _____
 <u>  (city)   </u>,  <u>   (state)   </u>

<u>Lease</u>:       _____ dated _____ between _____, as Landlord, and _____, as Tenant;

As evidenced by _____ dated _____, recorded in Book \_\_\_\_, Page \_\_\_\_, of the public records of _____ County, _____.

<u>Amendments</u>:

<u>Premises</u>:   That certain store building and related improvements located at _____, _____, _____ County,

<u>Legal Description</u>:   The real property as more particularly described as follows:

    SEE ATTACHED LEGAL DESCRIPTION

<u>Sublease(s)</u>:

<u>Amendments to Sublease(s)</u>:

Exhibit A
Page 1 of 1

EXHIBIT B
To Asset Purchase Agreement

ALLOCATION SCHEDULE

| Asset Description | Purchase Price | Initial Deposit [1] | Second Deposit [2] |
|---|---|---|---|
| | $ _____ | $ _____ | $ _____ |

---

[1]  **The Initial Deposit shall be the greater of (i) $35,000 or (ii) 10% of the
Purchase Price.**

[2]  **The Second Deposit shall be the greater of (i) $65,000 or (ii) 20% of the
Purchase Price.**

Exhibit B
Page 1 of 1

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____ ____, 2006
SGRJAX\90714.1

<u>EXHIBIT C</u>
To Asset Purchase Agreement

<u>FORM OF BILL OF SALE</u>

## **<u>BILL OF SALE</u>**

      **WINN-DIXIE _____, INC.**, a Florida corporation ("<u>Seller</u>"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 200___, among _____, a _____, ("<u>Buyer</u>") and Seller (the "<u>Agreement</u>"), does hereby grant, bargain, transfer, sell, assign, and convey unto Buyer all of Seller's right, title, and interest in the Assets described in the Agreement (other than the Leases and any sublease or permit, which are subject to separate instruments of conveyance and assignment), relating to Seller's store locations as more particularly described on attached <u>Schedule A</u>.

      This Bill of Sale is delivered by Seller to Buyer as required under the Agreement, and is made subject to the terms and conditions of the Agreement. All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

      This conveyance is made pursuant to the order of the Bankruptcy Court in *In re Winn-Dixie Stores, Inc., et al.,* Case No. 05-11063 (RDD)(Jointly Administered), United States Bankruptcy Court, Middle District of Florida, Jacksonville Division.

      **IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 200___.

"SELLER"

**WINN-DIXIE _____, INC.**, a Florida corporation

By: _____
Name: _____
Title: _____

Exhibit C
Page 1 of 1

<u>EXHIBIT D</u>
To Asset Purchase Agreement

<u>FORM OF CLOSING STATEMENT</u>

(Excel Spreadsheet Schedule D.XLS)

[TO BE ATTACHED]

Exhibit D
Page 1 of 1

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____ _____, 2006
SGRJAX\90714.1

<u>EXHIBIT E</u>
To Asset Purchase Agreement

<u>CONFIDENTIALITY AGREEMENT</u>

[TO BE ATTACHED]

Exhibit E
Page 1 of 1

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

<u>EXHIBIT F</u>
To Asset Purchase Agreement

<u>FORM OF CONVEYANCE INSTRUMENT</u>

**<u>ASSIGNMENT AND ASSUMPTION OF LEASE</u>**
[Store #_____]

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "<u>Assignment</u>") is made as of [x], 2006 (the "<u>Effective Date</u>"), by and between **WINN-DIXIE _____, INC.**, a Florida corporation ("<u>Assignor</u>"), and _____, a _____ ("<u>Assignee</u>").

## R E C I T A L S :

A.    Assignor, as Seller, and Assignee, as Buyer, are parties to that certain Asset Purchase Agreement dated effective [x] _____, 2006, as amended from time to time (the "<u>Agreement</u>"), pursuant to which Assignor has agreed to sell and assign, and Assignee has agreed to purchase and assume, certain assets in connection with Assignor's retail supermarket store location described on attached <u>Schedule A</u> (the "<u>Premises</u>").

B.    Under the Agreement, Assignor has agreed to assign to Assignee (i) all of Assignor's right, title, and interest, as tenant or lessee, in and to the Premises pursuant to that certain Lease, together with any and all amendments thereto, as described on the attached <u>Schedule A</u> (the "<u>Lease</u>"), and all of Assignor's right, title, and interest as sublandlord or sublessor, in and to the subleases, together with all amendments thereto, described on <u>Schedule A</u> (the "<u>Subleases</u>"), if any; and Assignee has agreed to assume and perform Assignor's liabilities and obligations arising under the Lease and the Subleases from and after the Effective Date, all subject to and in accordance with the terms of the Lease, the Subleases, the Agreement, and this Assignment.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    **<u>EFFECTIVE DATE</u>**.  This Assignment shall be effective as of the Effective Date.

2.    **<u>ASSIGNMENT</u>**.

      (a)    Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest, and obligation as tenant or lessee in and to the Lease and all of the rights, benefits, and privileges of the tenant or lessee thereunder.

      (b)    Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest and obligation as sublandlord or sublessor in

Exhibit F
Page 1 of 7

and to the Subleases and all of the rights, benefits, and privileges of the sublandlord or sublessor thereunder.

3.    **ASSUMPTION; ACCEPTANCE OF PREMISES**.

(a)    Assignee hereby accepts the aforesaid assignment of the Lease and assumes and agrees to pay and perform all liabilities and obligations of the tenant or lessee that accrue under the Lease from and after the Effective Date, and Assignee hereby indemnifies and agrees to save, insure, defend, and hold harmless Assignor from and against all liabilities and obligations of the tenant or lessee that accrue under the Lease on or after the Effective Date.

(b)    Assignee hereby accepts the aforesaid assignment of the Subleases and assumes and agrees to pay and perform all liabilities and obligations of the landlord or lessor that accrue under the Subleases from and after the Effective Date, and Assignee hereby indemnifies and agrees to save, insure, defend, and hold harmless Assignor from and against all liabilities and obligations of the sublandlord or sublessor that accrue under the Subleases on or after the Effective Date.

(c)    Assignee acknowledges that it has had opportunity to make such environmental, physical, zoning, topographical, land use, survey, title and other examinations, inspections, and investigations of the Premises as Assignee has determined, in its sole discretion, to be necessary and appropriate. Assignee acknowledges that the Premises is being assigned to Assignee in "AS-IS" condition, and that possession and use of the Premises is subject to the terms of the Lease and to applicable legal requirements, title matters, and rules and regulations. Taking the foregoing into consideration, Assignee has determined that the Premises is satisfactory to Assignee in all respects and has agreed to accept the Premises in accordance with the terms and conditions of this Assignment. In making such determination, Assignee has and will rely solely on Assignee's own independent examinations, inspections, and investigations of the Premises and has not relied and will not rely on any representations of Assignor. Assignee acknowledges and agrees that neither Assignor nor any of Assignor's agents, representatives, or employees have made any representations to Assignee with regard to the Premises or the improvements located thereon, including, but not limited to, representations concerning the condition of the Premises or its fitness for Assignee's intended use, except as otherwise set forth in this Assignment.

4.    **NOTICES**.    All notices, requests, demands, offers, and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 4 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business

EXHIBIT F
Page 2 of 7

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

hours for the recipient; (iii) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; or (iv) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

> If to Assignor:
>
> Winn-Dixie _____, Inc.; Re: Store #_____
> 5050 Edgewood Court
> Jacksonville, FL 32254-3699
> Attn: Chief Financial Officer
> Telefax No.: 904/783-5646
>
> With a copy to:
>
> Winn-Dixie Stores, Inc.
> 5050 Edgewood Court
> Jacksonville, FL 32254-3699
> Attn: Office of General Counsel
> Telefax No.: 904/783-5641
>
> If to Assignee:
>
> _____
> _____
> _____
> Attn: _____
> Telefax No. _____
>
> With a copy to:
>
> _____
> _____
> _____
> Attn: _____
> Telefax No. _____

or such other address as any party may from time to time specify by notice to the other.

5.    **NOTICE OF ASSIGNMENT.**  Promptly following the Effective Date, Assignor and Assignee shall execute and deliver a Notice of Assignment of Lease and record the same in the recording office of the county in which the Premises is located, for the purpose of placing third parties on notice of Assignor's assignment to Assignee of Assignor's right, title, and interest as tenant or lessee in and to the Lease, and of the existence of certain limitations on Assignee's rights under the Lease as set forth in this Assignment.

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

6.    **BINDING EFFECT.** This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

7.    **FURTHER ASSURANCES.** Assignor and Assignee each covenant and agree to execute or procure any additional documents as may be reasonably necessary to establish the rights of the other hereunder, provided however that under no circumstances shall Assignor be required to undertake any liability not expressly provided in this Agreement.

8.    **ATTORNEYS' FEES.** If Assignor becomes a party to any suit or proceeding affecting the Premises or involving this Assignment or Assignee's interest under this Assignment, other than a suit between Assignor and Assignee, or if Assignor engages counsel to collect any of the amounts owed under this Assignment, or to enforce performance of any of the agreements, conditions, covenants, provisions, or stipulations of this Assignment, without commencing litigation, then Assignor's costs, expenses, and reasonable attorneys' fees and disbursements incurred with respect thereto will be paid to Assignor by Assignee, on demand. All references in this Assignment to attorneys' fees will be deemed to include all legal assistants' and paralegals' fees and will include all fees incurred through all post-judgment and appellate levels and in connection with bankruptcy proceedings.

9.    **WAIVER OF JURY TRIAL.** Assignor and Assignee each acknowledge and agree that the nature of this Assignment, the Premises, the Lease, and the Subleases makes a jury determination of any dispute arising out of this Assignment, the Premises, the Lease, or the Subleases undesirable. Accordingly, Assignor and Assignee each knowingly, voluntarily, and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Assignment, the Premises, the Lease, or the Subleases.

[SIGNATURES TO FOLLOW]

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the Effective Date.

Signed, sealed, and delivered          **ASSIGNOR:**
in the presence of:

                                                 **WINN-DIXIE _____, INC.,**
                                                 a Florida corporation

_____          By: _____
Name:_____          Name: _____
                                        Title: _____

_____                             [CORPORATE SEAL]
Name:_____

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me under oath on this _____ day of _____, 2006 by _____, the _____ of Winn-Dixie _____, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

                                        _____
                                        Notary Public, State of Florida
                                        Seal:

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

Signed, sealed, and delivered
in the presence of:

**ASSIGNEE:**

**[Y], INC.,**
a [z] corporation

_____
Name:_____

By:    _____
Name: _____
Title:  _____

_____
Name:_____

[CORPORATE SEAL]

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me under oath on this _____ day of
_____, 2006 by _____, the _____ of [Y], Inc.,
a [z] corporation, on behalf of the corporation, (  ) who is personally known to me or (  )
who produced _____ as identification.

_____
Notary Public, State of _____
Seal:

EXHIBIT F
Page 6 of 7

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

<u>SCHEDULE A</u>
To Assignment and Assumption of Leases

<u>DESCRIPTION OF PREMISES AND LEASE</u>

<u>STORE #</u>:

<u>STREET ADDRESS</u>:

<u>SHOPPING CENTER</u>:

<u>LEASE</u>:

<u>AMENDMENTS TO LEASE</u>:

<u>SUBLEASES</u>:

<u>AMENDMENTS TO SUBLEASES</u>:

EXHIBIT F
Page 7 of 7

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____ ____, 2006
SGRJAX\90714.1

<u>EXHIBIT G</u>
to Asset Purchase Agreement

<u>SCHEDULE OF EXCLUDED PERSONAL PROPERTY</u>

(a)    Inventory;

(b)    packaging materials, and supplies not included in the term "Supplies";

(c)    store shelf tags and pricing cards;

(d)    leased or owned point-of-sale equipment, photo lab equipment and security equipment;

(e)    other leased equipment (including all other leased equipment described on attached <u>Schedule G-1</u> to this Agreement – See Excel Spreadsheet Schedule G-1.XLS);

(f)    sound intercom and music service equipment and contracts;

(g)    owned computers and routers, including Cisco 2651 routers, IBM 4029 (Pharmacy) servers, ACM BOSS (back office system servers), and 64k Frame circuits;

(h)    computer equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is not easily and effectively deleted or removed;

(i)    equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners, and equipment owned by product vendors;

(j)    shopping carts;

(k)    over-the-road motor vehicles;

(l)    computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property;

(m)    data files, including pharmacy prescription records and files;

(n)    lottery equipment and tickets;

(o)    accounts receivable, bank accounts, cash, and cash equivalents;

EXHIBIT G
Page 1 of 3

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

(p)    trademarks, trade names, private labels, logos, and designs of Seller, Winn-Dixie, or its Affiliates;

(q)    building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores;

(r)    intellectual property and rights relating to any of the foregoing;

(s)    service agreements;

(t)    leases of personal property; and

(u)    contracts and warranties relating to Seller's possession and operation of the Stores.

NOTES:

1.    Any equipment transferred from a Store to another Seller location must be accounted for using the proper equipment transfer forms. Seller's "Store Maintenance" department will undertake this task for Seller. No equipment is to be removed from the Store unless it has been determined to constitute "Excluded Personal Property" and has been approved and the proper equipment transfer forms have been completed by Store Maintenance.

2.    For any and all computers to remain in the Store, the following procedures will be performed:

(a)    All computers left behind will have data and software removed to a point at which the computers can no longer "boot" off an internal drive. Buyer is responsible for reloading any and all computer systems with Buyer's own software so that it will work in a new environment.

(b)    Generic POS files will be provided upon request. Buyer will get the same file. It will consist of UPC, item description, pack size, and department code. Seller will not provide any electronic price information.

(c)    Seller's 64k Frame circuits will not be transferred. Buyer will be responsible for installing its own frame, DSL, or VSAT data solution before the Store is transferred.

(d)    Any Verifone "Everest Plus" Pinpads left behind in the Store will have its encryption keys destroyed by the act of opening up the pinpad. Seller will not provide additional pinpads. Buyer is responsible for its own EPS solution.

(e)    Category 5 cabling will be left in place.

(f)    Seller will not train, assist, or otherwise help in the setup of Buyer's POS or back office environment.

EXHIBIT G
Page 2 of 3

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

**SCHEDULE G-1**
**To Exhibit G**

**EXCLUDED LEASED EQUIPMENT**


**(Excel Spreadsheet Schedule G-1.XLS)**


**[TO BE ATTACHED]**

EXHIBIT G
Page 3 of 3

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
Store No. _____
_____, 2006
SGRJAX\90714.1

<u>EXHIBIT H</u>
To Asset Purchase Agreement

<u>SCHEDULE OF PERMITTED ENCUMBRANCES</u>

1.     Taxes and assessments of any taxing authority that levies taxes or assessments on real property for the year 2006 and subsequent years.

2.     All applicable laws, ordinances, and regulations imposed by any applicable governmental authority, including, but not limited to, all applicable building, zoning, land use and environmental ordinances and regulations.

3.     Rights or claims of parties in possession, boundary line disputes, overlaps, encroachments, and any other matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey, site plan or Environmental Report.

4.     Rights of the landlord under the Lease, including the rights of any Landlord's mortgagee.

5.     Rights of Subtenants under the Subleases.

6.     All matters set forth as exceptions in the Title History or the site plans, other than Monetary Liens.

7.     All other matters not set forth in the Title History that are set forth as exceptions in the Title Commitment, other than Monetary Liens.

       **Note to Buyer: Buyer has limited rights to object to certain matters set forth in the Title Commitment pursuant to <u>paragraphs 4.2 and 4.4</u> of the Asset Purchase Agreement.**

8.     All other restrictions, reservations, covenants, agreements, easements, limitations, and other matters appearing of record as of the date of this Agreement, other than Monetary Liens, and which do not, individually or in the aggregate, interfere in a material and adverse way with the present use of or occupancy of the affected Store.

EXHIBIT H
Page 1 of 1

Exhibits to Asset Purchase Agreement
Winn-Dixie _____, Inc. s/t _____
                              Store No. _____
                              _____, 2006
                              SGRJAX\90714.1

**EXHIBIT D**

# EXHIBIT D

| Store No. | Address | City | St | Proposed Cure |
|---|---|---|---|---|
| 124 | 2910 KERRY FOREST PARKWAY | TALLAHASSEE | FL | $8,915.77 |
| 162 | 14286 BEACH BOULEVARD | JACKSONVILLE | FL | $8,410.52 |
| 202 | 13841 WELLINGTON TRACE | WEST PALM BEACH | FL | $6,685.65 |
| 380 | 12141 PEMBROKE ROAD | PEMBROKE PINES | FL | $24,908.69 |
| 565 | 400 NORTH NAVY BOULEVARD | PENSACOLA | FL | $0.00 |
| 605 | 1199 EAST BAY DRIVE | LARGO | FL | $15,466.96 |
| 2308 | 2820 DOYLE ROAD | DELTONA | FL | $50,932.19 |

1 of 1

00538151

**EXHIBIT E**

**EXHIBIT E**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER APPROVING DEBTORS' (A) SALE OF LEASEHOLD**
**INTEREST IN STORE NO. ___ AND RELATED EQUIPMENT FREE**
**AND CLEAR OF LIENS, CLAIMS AND INTERESTS (B) ASSUMPTION**
**AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores,

Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-

possession (collectively, the "Debtors"), for an order (Docket No. __) under 11 U.S.C.

§§ 363 and 365 and Fed. R. Bankr. P. 3002, 6004 and 6006, (a) authorizing the Debtors

to sell leasehold interests and equipment, including the assets described in the asset

purchase agreement attached as Exhibit A for Store No. _____ (the "Purchase

Agreement"), free and clear of liens, claims and interests to the entity submitting the

highest and or otherwise best offer (the "Purchaser"), (b) authorizing the Debtors to

assume and assign all unexpired leases identified in the Purchase Agreement in

connection with the sale, (c) fixing cure amounts for the applicable lease, and (d) granting

related relief (the "Motion"). By the Motion, the Debtors asserted that the only cure

required under the lease for Store No. _____ (the "Lease") was payment of $_____

(the "Cure Amount"). By the Motion, the landlord was given until _____

to object to the Cure Amount. **Alternatives:** [No objection was filed.] **or** [The landlord for Store No. _____ (the "Landlord") filed a timely objection and unless resolved by the parties, the matter will be set for hearing before the Court at a future date.] The Court held a hearing on the Motion on _____ to approve the sale (the "Sale Hearing"). **Alternatives:**    [The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact.] **or** [The Court has reviewed the Motion, considered the evidence and heard arguments of Counsel. After due deliberation and good and sufficient cause exists, the Court makes the following findings of fact.]

A.      This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Assets"), in accordance with bidding procedures approved by the Court by order dated June 16, 2005 (Docket No. 1801) (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction on _____ (the "Auction"). At the Auction, the Purchaser submitted the final aggregate bid of $_____, representing the highest or otherwise best offer received for the Assets.

C.      The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the

2

Sale Hearing,[1] the Auction, the assumption and assignment of the Lease, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

        D.      The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

        E.      The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the Assumption and Assignment Agreement attached as Exhibit B, and all related documents, and the sale of the Assets and the assumption and assignment of the Lease has been duly and validly authorized by all necessary corporate action of the applicable Debtors and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

        F.      Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

3

00528223.4

G.      The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

H.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

I.      The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

J.      The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances , if any, as defined in the Purchase Agreement. Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank, National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively,

4

"Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

        K.     The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances, if any) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the sale (including the assumption and assignment of the Lease) or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

        L.     The Debtors will cause the net proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

M.    The Debtors' assumption and assignment of the Lease in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

N.    The Debtors have provided the landlord of the Lease with adequate assurance that they will promptly cure any defaults under the Lease pursuant to 11 U.S.C. §365(b)(1).

O.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the Cure Amount set forth on Exhibit E to the Motion, if any, constitutes all amounts due and owing under the Lease and will be fixed and allowed for the Lease. No other amounts are due and owing by the Debtors under the Lease. The Debtors will pay the Cure Amount, if any, in accordance with the terms and provisions of the Purchase Agreement. Upon payment of the Cure Amount, all defaults, if any, under the Lease will be deemed cured.

P.    The Debtors and the Purchaser have provided the Landlord with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

Q.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease.

R.    Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease by virtue of the transfer of the Assets and the assumption and assignment of the Lease to the Purchaser. The Purchaser will not be deemed, as a result of any action taken

6

in connection with the purchase of the Assets or the assumption and assignment of the Lease to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Lease.

S.     The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.     The Motion is granted.

2.     All objections to the entry of this order or to the relief granted and requested in the Motion, including, to the extent the Landlord failed to file and serve a timely objection,  any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.     The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects.  Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

7

4.      Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Lease to Purchaser.

5.      The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.      The Lease will be assumed and assigned to the Purchaser, in accordance with their respective terms. The assigned Lease will remain in full force and effect notwithstanding any provision in the Lease to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1) which prohibit, restrict or condition such assignment or transfer). All non-debtor parties to the Lease are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Lease to Purchaser.

8.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase

8

Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances, if any). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender. The Claims and/or Interests of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Lease and the Debtors' and the Purchasers' demonstration of adequate assurance of future performance under 11 U.S.C. §365. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.     The Debtors will cause the net proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

11.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code

9

and applicable non-bankruptcy law.  For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

12.        **Alternatives:**  [The Cure Amount for the Lease is fixed in the respective amounts set forth on Exhibit E.]  **or**  [Unless resolved by the parties, the Court will schedule a hearing on the Landlord's objection to the proposed Cure Amount upon notice by the Debtors.  Once the cure objection is resolved by the parties or adjudicated by the Court, the Debtors will pay any such Cure Amount.]  All defaults, claims or other obligations of the Debtors arising or accruing under the Lease, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amount.  No other or further monetary amounts or obligations are due or existing under the Lease by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.  The Debtors will pay any Cure Amount in accordance with the terms and provisions set forth in the Purchase Agreement.

13.        Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Lease occurring or arising after the assignment.

10

14.     Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease.

15.     All non-Debtor parties to the Lease are forever enjoined and estopped from contesting the Cure Amount and from asserting any default against the Purchaser which existed as of the date of the Sale Hearing.

16.     Upon the Debtors assignment of the Lease to the Purchaser, no default will exist under the Lease. Upon entry of this Order and the assumption and assignment of the Lease, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease.

17.     Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for any Permitted Encumbrances). In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of the Purchase Agreement and this Order. Once this Order is so filed, registered or otherwise recorded in accordance with the

11

provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for any Permitted Encumbrances).

18.      Upon Closing of the sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Assets and Lease under the Purchase Agreement as that term is used in 11 U.S.C § 363(m).   For that reason, any reversal or modification of the Order on appeal will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

19.      The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for any Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

20.      Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease. The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims

12

and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

21.      Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Lease and a bill of sale transferring good and marketable title in the Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

22.      This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for any Permitted Encumbrances), will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

23.      This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

24.      This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or the Assumption and Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order.

13

25.      The terms and provisions of the Purchase Agreement, the Assumption and Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

26.      Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

27.      After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims and/or Interests, or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period

14

commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

        28.       To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

        29.       Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

        30.       Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of August, 2006 in Jacksonville, Florida.

 

                                    _____
                                      Jerry A. Funk
                                      United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a copy of this Order on all parties who received copies of the Motion.

15

**EXHIBIT F**

**EXHIBIT F**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**ORDER AUTHORIZING DEBTORS TO REJECT ADDITIONAL STORE
LEASES, ESTABLISHING REJECTION DAMAGE CLAIM BAR DATE
AND GRANTING RELATED RELIEF**

These cases came before the Court on the motion (Docket No. _____)
of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors
and debtors-in-possession (collectively, the "Debtors"), for, among other relief, entry
of an order (i) under 11 U.S.C. § 365 authorizing the Debtors to reject non-residential
real property leases of any of the seven Additional Stores[1] the Debtors are unable to sell
and (ii) pursuant to Rule 3002(c)(4), Federal Rules of Bankruptcy Procedure,
establishing a deadline by which the landlord for any such store must file any claim
for rejection damages (the "Motion"). Objections to the proposed cure amounts were
filed by a number of landlords whose leases will be rejected (Docket Nos.
_____, _____) (collectively, the "Cure Objections"). The Court has
reviewed the Motion and considered the representations of counsel. Based upon the
representations of counsel and without objection by the United States Trustee or any
other interested parties, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

---

[1] All capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the Motion.

2.      The Debtors are authorized to reject each of the Additional Store Leases identified on the attached Schedule A pursuant to 11 U.S.C. § 365(a), effective as of August 24, 2006 (the "Rejection Date").

3.      Because these leases are rejected, the Cure Objections are overruled as moot.

4.      Each of the respective landlords must file any claim resulting from the rejection of their respective lease no later than thirty (30) days after the date of this Order.

5.      Nothing in this Order constitutes a waiver of any claims the Debtors may have against any of the respective landlords or any of the landlords may have against any of the Debtors.

6.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

7.      The Court retains jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated August ____, 2006, in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge

00528344.2

## SCHEDULE A

| Winn-Dixie Store No. | Store Address | City | ST |
| --- | --- | --- | --- |

00528344.2