FILED   1

AUG -9 A 9:32

BANKRUPTCY COURT

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

WINN-DIXIE STORES, INC.,       CASE NO.: 05-03817-3F1

          Debtor.
_____/


TRANSCRIPT OF PROCEEDINGS


          Hearing re:  Motion to approve Chapter 11
Disclosure Statement, and Motion for Order
Determining Dates, Procedures and Forms Applicable
to Solicitation, before the Honorable Jerry A. Funk,
U. S. Bankruptcy Judge, commencing at 9:30 a.m., on
Friday, August 4, 2006, at the United States
Courthouse, Room 4D, 300 North Hogan Street,
Jacksonville, Florida, as reported by Cindy Danese,
Notary Public in and for the State of Florida at
Large.

          -  -  -

**STATEWIDE REPORTING SERVICE**
606 BLACKSTONE BUILDING
JACKSONVILLE, FLORIDA 32202
(904) 353-7706                    249-9952
EXPERTS IN MEDICAL, TECHNICAL & EXPEDITED TRANSCRIPTS

ORIGINAL

1                    A P P E A R A N C E S

2

3         STEPHEN D. BUSEY, ESQUIRE

4              Attorney for the Debtors.

5

          DENNIS DUNNE, ESQUIRE
6
               Attorneys for the Unsecured Creditors
7              Committee.

8

          JASON BURNETT, ESQUIRE
9
               Attorney for Unarco Industries, Inc.
10

11        MARK KELLEY, ESQUIRE

12             Attorney for E&A Financing, II, et al.

13

          VINCENT ROLDAN, ESQUIRE
14
               Attorney for Ad Hoc Trade Committee.
15

16        ADAM FRISCH, ESQUIRE

17             Attorney for Catamount Rockingham, et al.

18

          DEBORAH MORRIS, ATTORNEY-AT-LAW
19
               Attorney for the Internal Revenue Service.
20

21        MARY JOANNE DOWD, ATTORNEY-AT-LAW

22             Attorney for FRO, LLC VII and FRO, LLC VIII.

23

          WILLIAM PORTER, ESQUIRE
24
               Attorney for the United States Trustee.
25

1                    APPEARANCES (Continued)

2

3

    BRIAN FITZGERALD, ESQUIRE
4
        Attorney for Florida Tax Collectors.
5

6   KAREN SPECIE, ATTORNEY-AT-LAW

7        Attorney for Terranova Corporation, et al.

8

9                        -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2  August 4, 2006                          9:30 a.m.

3                         - - -

4          THE COURT:  Good morning.  We're here today

5      on the case of Winn-Dixie Stores, Inc.

6          Court has before it two matters.  The first

7      is a motion for approval of the Chapter 11

8      disclosure statement.  We'll take that first.

9          MR. BUSEY:  Your Honor, Steve Busey on

10     behalf of the debtors.

11         By this motion, the debtors ask the Court to

12     approve the debtors' disclosure statement so that

13     the debtors can mail the disclosure statement and

14     the debtors proposed plan and ballots to more

15     than 20,000 parties in interest in this case to

16     solicit their acceptance of the debtors' plan of

17     reorganization.

18         The standard before the Court for this

19     motion is whether or not the disclosure statement

20     that has been proposed by the debtors provides

21     adequate information for the parties in interest

22     to consider the debtors' proposed plan and to

23     cast an informed vote.

24         You will see that the plan itself is about

25     approximately 40 pages long and single spaced.

1           The disclosure statement, which describes the

2           contents of the plan and provides information

3           about the debtors and their operations in this

4           proceeding, is approximately 120 pages long.

5                The intention in the drafting of a

6           disclosure statement to provide adequate

7           information to the parties in interest in this

8           case is, on the one hand, to make it consise,

9           approachable, readable and understandable to the

10          20,000 parties in interest, and on the other hand

11          to make sure it contains adequate information

12          about what is admittedly a huge case, a company

13          now that has 23 affiliates, 550 stores, and

14          approximately $8 billion a year in sales.

15               We think we tried to strike a balance

16          between those competing considerations.

17               We have served the disclosure statement and

18          notice of this hearing.  There was an objection

19          deadline of July 25th, and, in response to the

20          notice of hearing and service of the disclosure

21          statement, we received 21 objections to the

22          disclosure statement asking that we provide

23          additional or different information in the

24          disclosure statement.

25               Since the deadline, July 25th, we have

1       reached out to those objectors and tried to
2       answer their questions.  I talked with them about
3       additional information that we can put in the
4       disclosure statement that would satisfy their
5       concerns, and we have made changes to the
6       proposed disclosure statement to address those
7       concerns, what we thought would be useful to the
8       parties in interest and to the objectors.
9            We have on Wednesday of this week filed an
10      amended disclosure statement and plan which
11      contains those changes which we've made to
12      address the objections.  We filed and served it
13      electronically on Wednesday, and we've had
14      continuing discussions with the objectors.
15           We think we have in significant part
16      satisfied with those changes those objections,
17      but not entirely.
18           My suggestion to the Court for the procedure
19      this morning would be that the Court hear the
20      objectors that are remaining that want to speak
21      to the Court regarding their objections and
22      believe that we haven't satisfied them, and give
23      us and the creditors committee an opportunity to
24      respond to each of the objections, and, at the
25      end of the day, approve the disclosure statement

1      with whatever determinations you make today on

2      those remaining objections.  We'll make the

3      changes and we'll get it done and ask the Court

4      to approve it.

5           THE COURT:  Thank you.

6           Are there any objectors to this revised

7      disclosure statement?

8           MR. BURNETT:  Yes, Your Honor.

9           THE COURT:  Ma'am, you stood up first.

10     Would you like to come forward?

11          MS. BOX:  Yes.  I have my letter on file

12     with my objections.

13          THE COURT:  Ma'am, I can't hear you.  You

14     have to come step behind this lectern and tell me

15     who you are.

16          State your name.

17          MS. BOX:  My name is Sarah H. Box.

18          THE COURT:  And you represent yourself?

19          MS. BOX:  Yes, I do.

20          THE COURT:  What is your objection to the

21     disclosure statement?

22          MS. BOX:  My objection is on file.  I object

23     to Winn-Dixie keeping the name of Winn-Dixie if

24     they're not going to include the stockholders in

25     the new procedure that they're following.

```
1            THE COURT:  Okay.

2            MS. BOX:  And I have a list if you'd like me

3       to read my objections.  You have them on file.

4            THE COURT:  I'd rather you --

5            MS. BOX:  There are just four.

6            THE COURT:  -- tell me those now in open

7       court so the Court can --

8            MS. BOX:  All right.  I say that I do not

9       want the new company to operate under the name of

10      Winn-Dixie, and that this new organization, the

11      process that you're proclaiming, does not offer

12      an equitable settlement to the shareholders of

13      the company.

14           It fails to penalize the officers, directors

15      and other insiders for the sale of their personal

16      stock of Winn-Dixie prior to the filing of

17      bankruptcy.

18           And it provides any form of compensation or

19      settlement, whether in cash or in stock, to the

20      officers, directors and other insiders of

21      Winn-Dixie.

22           This whole process is a tragic loss to the

23      community and to the mentors who are looking up

24      to Winn-Dixie for the standards that have been

25      set by the Davis brothers.
```

1        THE COURT:  Thank you.  Ms. Box, I think

2    your objections are probably well placed.  These

3    are objections to confirmation of the plan, and

4    so I'm going to have to overrule your objection

5    as to the disclosure statement.  That's just

6    saying what they want to do.

7        You're going to have an opportunity to vote

8    on the plan, and then we're going to have a

9    confirmation hearing somewhere down the road, and

10   then these matters would be relevant at

11   confirmation.

12       MS. BOX:  I'm sorry I misunderstood.

13       THE COURT:  That's quite all right.  I'm

14   glad that you --

15       MS. BOX:  You said objections, and these are

16   my objections.

17       THE COURT:  I understand.  I just want you

18   to understand I'm not putting you down, I will

19   hear them at confirmation.

20       MS. BOX:  All right.  So I'll have an

21   opportunity to say them again.

22       THE COURT:  If you're here, I'll give you an

23   opportunity.

24       MS. BOX:  I'll be here.  Thank you.

25       THE COURT:  Thank you.

1           Anybody else want to make an objection

2       before I approve the disclosure statement?

3           (General laughter.)

4           MR. BURNETT:  Yes, Your Honor.  I have a

5       very good client that is --

6           THE COURT:  Excuse me, sir.  Who you are?

7           MR. BURNETT:  Your Honor, may it please the

8       Court, Jason Burnett of the firm GrayRobinson,

9       appearing on behalf of Unarco Industries,

10      Incorporated.

11          THE COURT:  Thank you.

12          MR. BURNETT:  I have a client that has

13      objected to the disclosure statement due to the

14      inability of the debtor to identify and classify

15      their claim.

16          Frankly, all my client was looking for was

17      whether or not their claim as an unsecured

18      creditor fell into the trade creditor program or

19      not, and hence they believe that the disclosure

20      statement did not provide sufficient information

21      -- the debtor did not provide sufficient

22      information for the disclosure statement to go

23      forward.

24          That is the basis of the objection, Your

25      Honor.

11

1           THE COURT:  Thank you.

2           Mr. Busey, you want to respond to that?

3           MR. BUSEY:  Yes, Your Honor.

4           In response to this objection, we've added

5     language which you will see on Pages 64 and 65 of

6     the revised disclosure statement.

7           In each of the unsecured classes, we've

8     specified a procedure so that, when the unsecured

9     creditors receive their ballot, it will have on

10     the ballot which class they're in.

11           And if the unsecured creditor disagrees with

12     that classification, there's a procedure we've

13     put into the disclosure statement that they will

14     file a motion questioning the classification, and

15     the debtors will either resolve it satisfactorily

16     to them or we'll have a Court hearing if there's

17     a dispute about it to determine the

18     classification prior to the voting deadline.

19           And we put a description about that process

20     in each of the unsecured classes describing that

21     for them.

22           THE COURT:  Mr. Burnett, anything further?

23           MR. BURNETT:  Nothing further, Your Honor.

24           THE COURT:  Objection overruled.

25           Yes, sir.

1        MR. KELLEY:  Good morning, Your Honor.  I'm

2     Mark Kelley.  I represent several landlords, and

3     specifically E&A Financing II, LP; E&A Southeast,

4     LP; Shields Plaza, Inc.; Woodberry, LLC; Bank of

5     America as trustee for Betty Holland; E&A

6     Acquisition II, LP; Westridge, LLC; Villa Rica of

7     Retail Properties, LLC.

8        All of these landlords have claims against a

9     Winn-Dixie subsidiary, either Winn-Dixie Raleigh

10    or Winn-Dixie Montgomery, that was guaranteed by

11    Winn-Dixie Stores, except for E&A Acquisition II,

12    LP which only has an lease termination claim

13    against Winn-Dixie Stores, Inc.

14       As Mr. Busey indicated, adequate information

15    requires that the creditors who seek information

16    of the kind and in sufficient detail as far as is

17    reasonably practical in light of the nature and

18    history of the debtor and the condition of the

19    debtor's books that will enable a creditor to

20    make an informed judgment about the plan.

21       This disclosure statement does not provide

22    adequate information.  Specifically, the corner-

23    stone of the plan is a, quote, deemed

24    consolidation.  And under the deemed

25    consolidation, the landlords who have two

1      separate claims, a claim on a lease against one

2      entity and their assets, and a separate claim

3      based on a separate contract, a guarantee,

4      against a separate debtor and that debtor's

5      assets are going to have a loss of one of those

6      claims.   Instead of having two claims, they will

7      have one claim in the deconsolidated plan.

8         The creditors want to know how that what the

9      debtor refers to as expunging or eliminating one

10     of those claims will affect their recovery in the

11     case.   Specifically, they want to know what is

12     the difference in their treatment as a result of

13     the deemed consolidation.

14        Now, the Court should be aware of the fact

15     that the disclosure statement reveals that this

16     issue of deemed consolidation is primarily an

17     intracreditor issue, and that's because it has no

18     real effect on the debtor.

19        The debtor is going to pass out 50 million

20     shares of stock that they estimate is worth $749

21     million, and that's all the equity in their

22     company, and that's what the creditors are going

23     to get.

24        Any adjustments, any tweaking of how that

25     money is passed out, is taking money from one

1     creditor to give it to another creditor, because

2     that's the only source of money.

3         The pie is the same size, and what the

4     debtor's deemed consolidation proposes to do is

5     rearrange the sizes of the slices that are

6     attributable to the various groups.

7         And the debtor is very up front.  This is

8     not a real consolidation.  There will not be a

9     merged entity.  Every entity that exists today

10    will still exist when the plan is over.

11        The distribution that's based on this

12    modified version of substantive consolidation

13    includes several tweaks or enhancements to

14    various creditors.  Some creditors that have

15    guarantees will lose their whole claim, such as

16    the landlords.  Other creditors that have

17    guarantees, such as the noteholders, will receive

18    a substantial distribution based on those

19    guarantees.

20        Noteholders are receiving an almost 95-

21    percent distribution, whereas landlords, after

22    their guarantee claims are wiped out, receive

23    only a 70-percent distribution.

24        The disclosure statement is not clear as to

25    the nature of all -- this is all of the

1     enhancements and how exactly the, quote, deemed

2     consolidation differs in every respect from a

3     substantive consolidation.

4          The debtor does disclose that the settlement

5     deemed consolidation was done to avoid litigating

6     the issue of an actual consolidation with the ad

7     hoc creditors committee, and they've said that

8     this deemed consolidation is a fair settlement of

9     that issue.

10          But landlords with guarantees, as far as I

11     know, were not represented in this negotiation.

12     And it seems from reading between the lines of

13     the disclosure statement, which is what one has

14     to do given the lack of information, that the

15     enhancements to the other creditors came

16     primarily from wiping out the landlords'

17     guarantees.

18          The disclosure statement does state that,

19     quote, the guaranteed landlords only have one

20     claim instead of the two they bargained for.

21          The landlord with the single claim against

22     Winn-Dixie Stores, my one client could be harmed

23     because it appears that other creditors that had

24     claims against other subsidiaries, which the

25     debtor describes as entities with high-debt-to-

1   asset ratios, which means probably a distribution

2   substantially less than 50 percent, is now going

3   to be allowed to make their claim against all of

4   Winn-Dixie's assets, and, as a result of that,

5   these trade vendor creditors or ad hoc committee

6   members are going to have their distribution

7   raised from some unspecified low number to 70.6

8   percent.

9        THE COURT:  Excuse me, Mr. Kelley.  That's

10  fine, you're getting into confirmation.  I mean,

11  you can vote against the plan.

12       The issue is what do they need to add to the

13  disclosure statement in your mind so that you can

14  decide are we better off with this deal, or

15  should we not have it.

16       MR. KELLEY:  Here's exactly what they need

17  to tell us.  I have clients that have claims

18  against one subsidiary with a guarantee from

19  Winn-Dixie Stores.

20       What I would like to know is: What would my

21  clients have received in the absence of

22  consolidation?

23       THE COURT:  Like a chart, under A you would

24  get -- the total result may be what they're

25  getting under the plan, but you need to have that

1       spelled out.

2           MR. KELLEY:  Exactly, and with

3       particularity.  And what they've said is I'm

4       going to get substantially less.

5           They say that the landlords that, their

6       words, lose credit enhancing guarantees,

7       distribution will be substantially lower and they

8       have an incentive to vote against the plan, but

9       they don't tell us how much.

10          When I asked for additional information, and

11      they gave it to me in an e-mail, they sent me a

12      chart which says that my recovery in a

13      substantive consolidation would actually be two

14      tenths of a percent higher.  So they're giving me

15      inconsistent information.

16          And what I want the Court to understand is

17      the information I want is absolutely available.

18      They have disclosed in their modifications to the

19      disclosure statement that, to help negotiate this

20      compromise, the creditors committee made

21      estimations about what everybody would receive

22      under various scenarios.

23          This report was made to the committee, and

24      they said that the committee used these

25      estimations not to compare recoveries but to

1     merely check and be comfortable that the

2     settlement was in a range of reasonableness.

3          Now, they have teed this issue up to the

4     Court in a plan.  They're asking my clients to

5     vote on a plan that has this deemed consolidation

6     as part of the plan.

7          They have information which they said they

8     had to review to decide whether this was

9     reasonable.  I have asked for that information.

10    They are not going to give it to me unless the

11    Court directs them to do it.

12         Specifically, I would like a chart that

13    shows what landlords with lease claims against

14    Winn-Dixie Montgomery or Winn-Dixie Raleigh with

15    a guarantee from Winn-Dixie Stores would receive

16    in a deconsolidated plan, in a court-ordered

17    consolidation, and in their deemed consolidation,

18    because only with that information can my client

19    truly understand how they're being treated and

20    how much they're giving up to fund these

21    enhancements to the other creditors.

22         If it's two percent, they may say:  It isn't

23    that bad, I'll go along with it.  If it's 22

24    percent, we're probably going to be in here

25    talking about this further.

1        But I cannot get a number, I can get like a

2   general description.  And they have the numbers.

3        So my clients would like to have the

4   information that was given to the committee that

5   they used to decide whether the settlement was

6   reasonable.

7        Another thing they would like to have is,

8   the ad hoc committee filed a motion to

9   consolidate the case.  There were documents filed

10  with that, and they were all filed under seal.

11  So my clients do not even know what the motion

12  was, what the basis for it was, why they were

13  complaining and what they asked for.

14       So in addition to giving us the information

15  that the committee used to decide that the

16  settlement was reasonable and fair, we would like

17  to see all that sealed information.  I don't

18  understand what purpose there can be to seal the

19  motion that we're settling.  We should at least

20  be entitled to see that.

21       I mean, it's all new stock.  There's no

22  secrets anymore.  There's no reason that

23  Winn-Dixie needs to have secrets about their

24  financial condition at the time when they're

25  filing their disclosure statement.

1          So that's my clients' objection.  We would

2     like the additional information so we can

3     understand the difference in treatment we would

4     receive under the three scenarios of a

5     deconsolidated plan, a court-ordered consolidated

6     plan, and the sort of tweaked version of that

7     that the debtor is proposing in this plan.

8          Thank you.

9          THE COURT:  Thank you.

10         Mr. Busey.

11         MR. BUSEY:  As Mr. Kelley indicated, Your

12    Honor, the plan and the disclosure statement

13    contains a compromise, a solution to the issue of

14    whether or not the case should be substantively

15    consolidated or should not be substantively

16    consolidated.

17         It was a compromise brokered by the

18    creditors committee among the various

19    constituencies represented by the creditors

20    committee.

21         We have described in some detail that issue

22    and that compromise and what led to the

23    compromise in the disclosure statement.

24         In response to Mr. Kelley's objection, we've

25    added additional language, at Page 52 of the

1          revised disclosure statement, providing more

2          information regarding the substantive

3          consolidation compromise.

4              The information that Mr. Kelley just

5          specified, however, that he wanted additionally

6          put in the disclosure statement is not

7          information that is available to the debtors, is

8          not information that we have.  If you told me to

9          create a chart, we couldn't do it.

10             Let me try give you an idea of why that's

11         so.

12             In the process of deciding what the case

13         would look like under a substantive

14         consolidation, if they're all substantively

15         consolidated, we could do that.  That's

16         essentially what's in the disclosure statement.

17             But what the case would look like if it were

18         not substantively consolidated, if we have 23

19         stand-alone entities, separately reorganized

20         plans and disclosure statements is not something

21         that we can readily picture for the Court for the

22         reason that it involves the resolution of a

23         myriad number of assumptions that it would have

24         to go through.

25             I'll just give you an example so you can try

1        to picture it.

2            Which entities own the inventory?  That's a

3        subject of dispute that's very litigable in this

4        case, whether or not it's Winn-Dixie Procurement

5        who buys the inventory, or Winn-Dixie Logistics

6        who is distributes the inventory, or Winn-Dixie

7        Montgomery, or Winn-Dixie Stores, Inc. which

8        operates stores.

9            There are huge issues of fact regarding

10       where that inventory lies.

11           What did you do with inner-company

12       accounts?  There are inner-company accounts which

13       are washed away through a substantive

14       consolidation.  But if you're not substantively

15       consolidated, are the inner-company accounts

16       valid?

17           Some of them have been washed out on an

18       annual basis, some go back to the beginning of

19       time.  It's very litigable as to how that value

20       should be allocated among the various entities.

21           Which vendors are creditors of which

22       entities is the subject of huge dispute.  Are

23       they creditors of Winn-Dixie Procurement, which

24       is not a stand-alone entity?  Are they creditors

25       of the entities where the invoices show?  Are

1    they creditors of the entities with which they

2    actually do business?

3        This is just an example of the number of

4    assumptions that you would have to sort through

5    and make assumptions, and you could probably list

6    50 or 100 such issues.  And depending on every

7    assumption of every issue, you're going to come

8    out with a different result.

9        And so it would be very misleading for us to

10   create a chart, as Mr. Kelley says, and say this

11   is what it would look like, without a thousand

12   pages of description of the various assumptions

13   and how they were built.

14       That was the reason this compromise was

15   reached, because it really wasn't practical to

16   try to sort through that and come to the ultimate

17   true answer.

18       If we had to, and that's what the

19   substantive consolidation litigation would be

20   about, that's why we said it would take years of

21   litigation and millions and millions of dollars

22   in professional fees and, at the end of the day,

23   destroy the value of the enterprise before we

24   could come to the answer that Mr. Kelley wants us

25   to derive and put in the disclosure statement.

1          Instead of going through that process, the
2     creditors committee determinedly sat down and did
3     what amounts to old-fashioned horse trading,
4     because there are sophisticated people on that
5     committee who could look at this picture and
6     determine what the values are and should be and
7     could reach a compromise among themselves to
8     avoid the expense and destruction of value to
9     this estate that would be portended by the
10    process that Mr. Kelley wants us to do so that
11    we can answer his questions.
12         If he has an objection to the confirmation
13    of this plan, if he thinks it's not in his
14    clients' interest, he can vote against it.  And
15    in the process of getting to confirmation, he can
16    engage in whatever discovery he chooses to do
17    from the creditors committee or its
18    constituencies who engaged in that process, but
19    it's not information the debtors have.
20         We believe we have adequately and fairly
21    described the issue, described the process of
22    compromise, said why it needed to be compromised
23    and what the result was in our plan.
24         We ask the Court to approve that description
25    of the process and the result.  And if there are

1        creditors who are at the end of the day aggrieved

2        by it, give them their opportunity to do whatever

3        they choose in discovery, and we can resolve

4        discovery disputes, and then we can have an

5        objection to confirmation heard at confirmation.

6            But we think that our disclosure statement

7        adequately describes what has happened to date in

8        reaching a compromise of those issues.  And I

9        invite the creditors committee counsel to speak

10       to this as well.

11           MR. DUNNE:  May it please the Court, Dennis

12       Dunne from Milbank, Tweed, Hadley & McCloy on

13       behalf of the official committee of unsecured

14       creditors.

15           I agree with what Mr. Busey has said, but I

16       think I'm in a better position to provide both

17       the Court and others comfort, if you will, that

18       one master agreed-upon set of assumptions that

19       dictated what's in the plan does not exist.

20           With that as the headline, let me tell you

21       why that is.

22           Why that is is because the committee is made

23       up of various groups of creditors.  We have

24       landlords on the creditors committee, we have

25       bondholders and we have trade creditors.  And, by

1     the way, I must point out we do have landlords

2     with guarantees.  I think the opposite was said

3     earlier.

4          And each of those parties -- and this is all

5     in the disclosure statement -- each of those

6     groups, if you will, had their own counsel apart

7     from committee counsel and committee financial

8     advisor.

9          The Piper Rudnick, for instance, represented

10    Kraft and Pepsi.  Imperial Capital was the

11    financial advisor and Nixon Peabody legal counsel

12    to Deutche Bank and New Plan Realty, the

13    landlords on the committee.  Wilmington Trust had

14    Capstone and Curtis Mallet as advisors, and Capri

15    had Paul Wise.

16         Each of those groups with their respective

17    sophisticated advisors looked at both the raw

18    data that the debtors provided to the committee,

19    as well as some of the models that Houlihan

20    Lokey, advisor to the official committee, was

21    asked to run.

22         At the end of the day, and again the

23    disclosure statement says this, there was no

24    agreement among the committee members on which

25    criteria in favor or against substantive

1    consolidation was present here, what the correct

2    assumptions should be.

3        I can guarantee you that, with respect to

4    each potential assumption, you'll have some

5    groups that say that might be okay, and some that

6    said that just doesn't make sense to me.  But it

7    shaped the table, if you will.  It allowed each

8    of them to come to their own views at the end of

9    the day as to what they thought was appropriate.

10   And they all had an economic interest to maximize

11   their claims.

12       So what we did was, we had a series of kind

13   of Kissinger shuttle diplomacy among those groups

14   to decide what would be acceptable to them.  Not

15   trying to convince them that their legal position

16   was wrong or right or that they didn't work the

17   arithmetic correctly, but just at the end of the

18   day, having given the raw data to them, would

19   they be willing to do a plan along the lines that

20   we described.

21       And the point here is that there is no set

22   of assumptions that we can put in to say this was

23   it, everything flows from that.  We're prepared

24   to defend it in detail at the confirmation

25   hearing.  And I'd like to also make the point

1       that a lot of this goes to discovery between now

2       and then as opposed to adequate information in

3       the disclosure statement.

4           There were a comments from counsel that

5       they'd like to see information given to the

6       committee by the debtor.  We certainly don't have

7       an objection to that.  There were, I think,

8       10,000 pages of documents that can be provided,

9       and they can certainly have access to it.  They

10      can jump through the appropriate discovery

11      channels for that.

12          With respect to his comment on sealed

13      information for the ad hoc trade committee's

14      substantive consolidation motion, I obviously

15      don't represent them or speak to that, but,

16      again, he can make a request apart from the

17      disclosure statement to have that unsealed, and

18      he can certainly go down that path.

19          At the end of the day, Houlihan Lokey's work

20      product, a, is privileged from the committee --

21      of the committee.  And, second, it doesn't exist

22      to the degree he wants.

23          They were asked to run a series of models

24      for the landlord group or a series of models for

25      bondholder group, et cetera, and that is classic

1        work product of committee advisors.  And, again,

2        the kind of magic bullet that they're looking for

3        just doesn't exist.

4            And while the committee couldn't agree on

5        those criteria, they could agree on one thing,

6        which is that the consequences to this estate, if

7        we didn't resolve these issues now, would be

8        catastrophic.

9            If you look at how long these issues take to

10       litigate in World Access or Owens Corning, it

11       takes years.  It takes years to weave through the

12       substantive consolidation.

13           Even if substantive consolidation is denied,

14       then you have a whole bunch of deconsolidation

15       issues, which goes to the point of why don't we

16       just put a deconsolidated bunch of numbers.

17           I don't think anybody agrees as to what they

18       would be, because you would have the issue of

19       intercompany claims.  What are the assets of

20       Montgomery?  How do you allocate corporate over-

21       head?  Is it just a bunch of leases that couldn't

22       survive as an ongoing enterprise and would just

23       be liquidated?

24           That's certainly arguments that you can make

25       under the case law, and, if true, you come out at

1        values pretty close to the liquidation analysis.

2            So if all that counsel is asking is to come

3        up with a sensitivity range of, well, from

4        liquidation to we win the litigation, what would

5        these be, I think we can all do those numbers.

6            But I'm here to say that there was no

7        agreement as to what the outcomes in any piece of

8        that litigation would be, because everyone saw it

9        through different prisms, weighting different

10       facts, the case law is not clear.  There was no

11       agreement on that.

12           The last point, Your Honor, I'd like to make

13       is the loss of guarantees.  There were a couple

14       of comments about that the landlords are losing

15       their guarantees and that they weren't somehow

16       factored in.

17           Two points.  It is true that under a deemed

18       substantive consolidation plan, each creditor

19       will get one distribution even if they have

20       guarantees.

21           That, however, does not equate to a

22       supposition that we ignored the guarantees,

23       because the relative differences in recoveries

24       reflects to a great degree the presence or

25       absence of guarantees.

1          And to put it in other words, the landlords,

2     if they didn't have guarantees, would be in the

3     other unsecured claim, or if they didn't

4     otherwise have substantive consolidation

5     arguments.  Meaning the baseline, as we set out

6     in the disclosure statement, is the other

7     unsecured claim class.

8          Those are the creditors who clearly only

9     have an argument as to one particular legal

10    entity.  And those recoveries are 53 cents on the

11    dollar as estimated by the debtors, whereas the

12    landlords are getting 70.1 cents on the dollar in

13    large part because of the presence of the

14    guarantees and other arguments with respect to

15    substantive consolidation.

16         Your Honor, in sum, this was a long, I'll

17    say spirited, arduous process where it was a

18    series of negotiations to get to what's embodied

19    in the plan.  And we think that the process

20    whereby you had sophisticated individuals with

21    economics at risk here proves that what comes out

22    of this is a reasonable result.

23         I can tell you that the committee took a lot

24    of comfort from the fact that we had

25    representation of landlords, bondholders, ad hoc

1        retiree committees, vendors, and they were all

2        part of this negotiation.

3            They were all given an opportunity to state

4        out their position, and we have the support of

5        all those groups.  And between now and

6        confirmation is an opportunity for other

7        landlords to look at the raw data that the

8        debtors have made available to those various

9        camps and come to their own conclusion, and

10       we can argue about whether the settlement falls

11       outside the range of reasonableness at

12       confirmation.

13           Thank you, Your Honor.

14           MR. BUSEY:  Your Honor, just to punctuate

15       what Mr. Dunne has said, what he just described

16       to you is in the disclosure statement to the

17       point of today's hearing.  The process that Mr.

18       Dunne just described to you is what we put in the

19       disclosure statement to describe the compromise

20       and the process by which we got there, and we

21       think it's adequate.

22           THE COURT:  Yes, sir.

23           MR. ROLDAN:  May it please the Court, I'm

24       Vincent Roldan at DLA Piper.  We represent the ad

25       hoc trade committee in this case.

1        Your Honor, just a couple of points.  We

2    support the debtor's position with respect to

3    E&A's objection.  E&A mentioned our motion to

4    substantively consolidate these cases as well as

5    our motion to file those documents under seal.

6        Your Honor, the ad hoc trade committee filed

7    the motion, of course, under seal in order to

8    honor a confidentiality agreement existing with

9    the debtor as part of the substantive

10    consolidation compromise.  We agreed to adjourn

11    the motion to file those documents under seal

12    throughout the plan process.

13        There is a simple solution.  Mr. Kelley can

14    contact me or the debtors and enter into an

15    appropriate confidentiality agreement with the

16    debtors to obtain the information, as other

17    creditors have done.

18        THE COURT:  Thank you.

19        Anybody else want to speak to this issue,

20    the one issue raised by Mr. Kelley?

21        Let me hear from you, Mr. Frisch.

22        MR. FRISCH:  May it please the Court.  Good

23    morning, Your Honor.  Adam Frisch on behalf of

24    Catamount Rockingham, LLC; Catamount LS-KY, LLC;

25    Catamount Atlanta, LLC; and Prudential Insurance

1      Company of America.

2           Catamount et al and Prudential join in the

3      objection raised by E&A et al and Mr. Kelley, and

4      we also believe that the debtor and/or the

5      creditors committee should be required to

6      disclose the estimations they used about the non-

7      consolidated recoveries and the potential

8      distributions in a consolidated plan.

9           I can see that they used a bunch of

10     assumptions in determining these amounts.

11     However, they do say, once these estimations were

12     made, the creditors committee used these

13     estimations not to compare the recovery but

14     merely as a check to be comfortable that the

15     settlement was within the range of

16     reasonableness.

17          That's exactly what we're asking for, too.

18     We want to know -- you know, normally in the

19     context of a settlement the two parties involved

20     know the range of the amounts at issue.   If

21     someone says you owe me $100,000, the other

22     person says you owe me $50,000, a settlement

23     occurs somewhere in between that range.

24          We don't know the range we're dealing with

25     here.   We just want to know -- maybe they're

1        estimations.  That's fine.  We just want to know

2        the amount of recovery that they estimated would

3        be the ranges.

4            So we want to know whether it's reasonable

5        as to us, because without knowing that we can't

6        make an informed decision as to whether we should

7        vote to accept or reject the plan.  That's

8        exactly what the disclosure statement goes to.

9        It goes to adequate information.

10            I don't think it's a confirmation or a

11       discovery issue, because we -- this is dealing

12       with information that we should -- we have the

13       right to know to determine whether the settlement

14       is reasonable for us.

15            And therefore I believe that, granted, they

16       -- we understand they used estimations and there

17       are going to be litigable issues in this case.

18       However, they had to have -- the creditors

19       committee, by -- they have a duty to all the

20       creditors.  They have to look at everything and

21       determine whether it's reasonable as a whole.

22            Therefore, they had to have some sort of

23       numbers they're looking at.  They didn't just

24       pick out of a hat, go:  Oh, 70 percent is okay,

25       that seems about right for the landlords.

1          I don't think they did that.  They were

2     looking at specific numbers.  Using the

3     estimations that they used, they had numbers they

4     were using.  And without those numbers, we can't

5     make a decision.

6          They used those numbers to make the decision

7     that it was reasonable as a whole.  We need those

8     numbers as well to determine if it's reasonable

9     for us.

10          THE COURT:  Anyone else want to argue or

11     make a statement on behalf of the landlords?

12          MS. MORRIS:  Good morning, Your Honor.  I'm

13     Deborah Morris on behalf of the United States

14     with respect to the Internal Revenue Service.

15          We also in our objection to the disclosure

16     statement had raised objections regarding the

17     substantive consolidation issue.

18          In response to that, the debtors had

19     inserted additional language at Page 52 of the

20     disclosure statement stating that the creditors

21     committee had used certain assumptions as to five

22     different categories, including allocation of

23     value, appropriate obligors on particular claims,

24     et cetera, and so I'm a little bit confused now

25     with the creditors committee coming in and saying

1          that they didn't reach an agreement on

2          assumptions.

3               So I think now it's even more unclear as to

4          whether there were or were not assumption, and,

5          if there were, what were those assumptions and,

6          you know, how did they come up with those

7          assumptions.

8               We also had filed an objection to the ad hoc

9          trade committee's motion to file under seal and

10         requested the information to give us some idea of

11         where the ad hoc committee was coming from with

12         the substantive consolidation.

13              We discussed a confidentiality agreement.

14         The United States is not willing to execute such

15         an agreement in this case.  We've been given no

16         information indicating it's an appropriate

17         situation.  We only execute those in limited

18         circumstances, and they must be very limited in

19         their terms.  So we have not been given any of

20         the information that went to the substantive

21         consolidation.

22              We are not one of those five categories of

23         creditors listed.  We're not a vendor, a

24         landlord, even an other.  We're a separate class

25         under general unsecured claims, so we had no

1       representation on the creditors committee with

2       respect to this issue.

3           We have virtually no information as to the

4       underlying information what went into the

5       decision, what the compromise process was like.

6           And so we also think the disclosure

7       statement is inadequate with respect to at least

8       what the assumptions or nonassumptions the

9       creditors committee made in reaching this

10      proposed settlement.

11          THE COURT:  Thank you.

12          MS. DOWD:  Good morning, Your Honor.  Mary

13      Joanne Dowd from Arent Fox on behalf of two

14      landlord entities:  FRO, LLC VII and FRO, LLC

15      VIII.

16          My clients join in the objection to the

17      adequacy of the disclosure that was articulated

18      by Mr. Kelley and by Mr. Frisch.

19          Thank you.

20          THE COURT:  Thank you very much.

21          MR. KELLEY:  Your Honor, briefly --

22          THE COURT:  Wait a minute.  I've got

23      somebody else standing.

24          MR. KELLEY:  I'm sorry.  I thought we were

25      done with landlords.

1          THE COURT:  Your name, sir?

2          MR. BUTLER:  Rodney Butler.  I'm here under

3     personal injury because I'm in objection to the

4     debtor's proposal disclosure statement.

5          I'm in class in telling that they haven't

6     made any arrangements to help pay for the Army

7     TriCare medical bills, neither the Southeast

8     Georgia Health Care Hospital bills, neither the

9     doctor bills.

10         MS. BUTLER:  I'm Ethel Butler, Rodney

11    Butler's mother.

12         This been going on for a couple of years,

13    and I would never have imagined it being up in a

14    bankruptcy court.

15         Rodney's father been in the military for

16    over 23 years.  He's a CW-4 chief warrant

17    officer.  Right now he's in training for Iraq.

18         But in order for us to have TriCare, we have

19    to be in the military, and I don't think it

20    should be a part of Winn-Dixie to think that they

21    shouldn't have to pay the medical bills because

22    we have medical insurance.

23         Another thing is that Winn-Dixie haven't

24    even attempt to pay on any of the medical bills

25    that has already shown up on my credit report.  I

1    had creditors calling me about paying the bills,

2    which is something I didn't have, when they was

3    at fault.

4        I see that Winn-Dixie now do have a lot of

5    commercials on TV that I'd never seen before.  So

6    they're getting money from somewhere to run

7    commercials and to pay the actors or the

8    actresses to be on those commercials.

9        So I do object.  And I don't understand

10   anything that's in there that even can help with

11   -- that proposal statement doesn't state

12   anything about how they're going to pay it or

13   when they're going to pay it, or, you know, the

14   deadline or anything.  So I do object to it.

15       Thank you.

16       THE COURT:  Thank you very much.

17       Mr. Kelley, the floor is yours.

18       MR. KELLEY:  First thing I want to address

19   is the confidentiality -- the motion under seal.

20   That's a court order.  I don't know why in the

21   world I would have to sign a confidentiality

22   agreement to see the motion that's being settled,

23   because, if I do, then I can't discuss that with

24   other people that might vote.

25       There's no need to have that motion, which

1    has now been settled and is the subject of the

2    settlement agreement -- the creditors can't even

3    see what's being settled.

4         So I'd ask the Court to issue an order that

5    takes the seal off those documents and make them

6    available to everybody.  How can we evaluate the

7    reasonableness of a settlement if we can't even

8    see the motion?  That makes no sense.

9         And I am surprised that the debtor says that

10   they're agreeing to consolidate their case but

11   they don't know any of the underlying basis to do

12   it.  I think that that's -- they must know

13   something.  They put stuff in their disclosure

14   statement.

15        They actually say in their disclosure

16   statement that landlords who lose their credit-

17   enhancing guarantees will receive a distribution

18   that is substantially lower and that these people

19   would reasonably oppose the plan.  So for them to

20   say:  Well, we don't know how much that would be,

21   they do know how much that would be.

22        The creditors committee -- right, there are

23   several -- there are five levels of assumptions,

24   and my understanding from talking with the

25   committee, that they were presented with

1    different scenarios:  If the assumptions were

2    this, if the assumptions -- there weren't an

3    infinite number.

4        They have estimations under various

5    scenarios of what landlords with guarantees would

6    receive.  That's what we want.

7        They don't have to say:  This the one we

8    believe is true, but they can say -- if they give

9    us the scenarios that they considered, that they

10   admit they considered in deciding what was

11   reasonable, we can reach own conclusion as to

12   what the most reasonable was.

13       If we have a discussion with the Court, the

14   Court can look at those, and we'll have a context

15   within which we can discuss the settlement.

16       But to say these eight landlords have to go,

17   you know, tee it up and do a discovery battle

18   with the committee and the debtor's lawyers so

19   they will be able not to tell us this information

20   by the time we have to vote is ridiculous.

21       This is information that we need to make a

22   reasonable determination.  They have it.  We

23   shouldn't have to pull teeth to get it.  My

24   clients shouldn't have to go out and spend

25   hundreds of -- or tens of thousands of dollars in

1       attorneys fees to litigate this.

2           The committee got this information with

3       people that the estate paid -- with money that

4       was furnished by the estate.  They evaluated it.

5       This is the settlement that they're entering into

6       that they want the creditors to approve in a

7       plan.  It was their choice to do it in a plan.

8           They have a duty to disclose specific

9       information that we need to make a decision.  The

10      information is available, we need it, it should

11      be disclosed.

12          Thank you.

13          THE COURT:  Anything on behalf of the debtor

14      or the creditors committee?

15          MR. BUSEY:  Yes, sir, Your Honor, just

16      quickly.

17          The argument that you just heard is

18      misleading.

19          The issue that's being compromised in

20      substantive consolidation is fully disclosed in

21      the plan and the disclosure statement.  The

22      process by which the compromise was reached is

23      fully disclosed.

24          The disclosure statement contains a

25      liquidation analysis.  It makes reference to a