**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | **CASE NO. 05-03817-3F1** |
| | ) | |
| **WINN DIXIE STORES, INC., <u>et</u> <u>al.</u>,** | ) | **CHAPTER 11** |
| | ) | |
| Debtor. | ) | **JOINTLY ADMINISTERED** |
| | ) | |

**OPPOSITION TO DEBTOR'S FIFTEENTH OMNIBUS OBJECTION TO**
**(A) NO LIABILITY CLAIMS, (B) OVERSTATED CLAIMS, AND**
**(C) OVERSTATED MISCLASSIFIED CLAIMS REGARDING CLAIM NUMBER 13187**

Merrill Lynch LP Holdings, Inc. ("<u>ML Holdings</u>"), by and through its undersigned counsel, opposes the Debtor's partial objection to Claim Number 13187 (the "<u>Claim</u>") as stated in the Debtor's Fifteenth Omnibus Objection (the "<u>Objection</u>") on the following grounds:

1.      On February 21, 2005 the Debtors filed the above-captioned Chapter 11 cases. As of February 28, 2005, Winn-Dixie Raleigh, Inc. (the "<u>Debtor</u>"), one of the above-captioned jointly administered debtors, became indebted and liable to ML Holdings, a holding company formed by Merrill Lynch, Pierce, Fenner & Smith, Inc. ("<u>Merrill Lynch</u>"), for (i) certain unpaid, pre-petition charges due and owing under the Bennettsville Lease (as defined below) and (ii) damages resulting from the rejection of the Bennettsville Lease.

2.      On August 26, 1999, the Debtor entered into that certain Lease Agreement (the "<u>Bennettsville Lease</u>")[1] with WD South Carolina LLC (successor-in-interest to Bennettsville 99-SC, LLC), a South Carolina limited liability company (the "<u>Landlord</u>"), pursuant to which the Debtor agreed to lease from the Landlord certain real property located in Bennettsville, South

---

[1]      The agreements referenced in this Opposition are confidential and constitute the proprietary business information of ML Holdings. For this reason, ML Holdings has not attached such agreements hereto. \

dc-459550

Carolina (the "Property"), to serve as the location for the Debtor's Bennettsville store (Store No. 2130).

3.        Pursuant to that certain Note Purchase Agreement, dated as of August 26, 1999, (the "Note Purchase Agreement"), between the Landlord and Merrill Lynch (as successor-in-interest by assignment from John Hancock Life Insurance Company, John Hancock Variable Life Insurance Company, and John Hancock Mutual Life Insurance Company), the Landlord issued and sold to Merrill Lynch its 7.57% Secured Notes due June 1, 2019, in the aggregate principal amount of $3,483,317.19 (the "Notes").

4.        The Notes were secured in part by (a) that certain Mortgage, Security Agreement and Fixture Filing, dated as of August 26, 1999 (the "Mortgage"), made by the Landlord to Wells Fargo Bank Northwest, N.A. (as successor to First Security Bank, National Association) and Val T. Orton (the "Individual Trustee," and collectively with the Trustee, together acting for the benefit of Merrill Lynch, the "Mortgagee") and (b) that certain Assignment of Lease and Agreement, dated as of August 26, 1999 (the "Lease Assignment"), also made by the Landlord to the Mortgagee in connection with the Bennettsville Lease.

5.        Pursuant to Paragraph 1 of the Lease Assignment, as security for the fulfillment of its payment obligations under, among other instruments, the Notes, the Landlord assigned and transferred to the Mortgagee all of the Landlord's right, title, and interest in, to, and under the Bennettsville Lease, together with all rights, powers, privileges, options, and other benefits of the Landlord under the Bennettsville Lease, including, inter alia, the right to pursue and collect any claim in a bankruptcy or other insolvency proceeding involving the Debtor or Winn-Dixie Stores, Inc., the guarantor of the Debtor's obligations under the Bennettsville Lease (the "Guarantor").

6.      Under the terms of that certain Indenture, dated as of August 26, 1999, also between the Landlord and the Mortgagee (the "Indenture"), all payments of Rent (as such term is defined in the Bennettsville Lease) (the "Rental Payments") rendered by the Debtor under the Bennettsville Lease were required to be applied by the Trustee in payment of the principal of and interest on the Notes.  The Debtor made all Rental Payments directly to Merrill Lynch, which applied the payments in reduction of the debt owed by the Landlord under the Notes.

7.      On April 22, 2005, Merrill Lynch and Walallan Holdings, Inc. ("Walallan"), a Delaware corporation that owned all of the membership interests (the "Member Interests") in the Landlord, entered into a Letter Agreement, pursuant to which Walallan agreed, inter alia, to transfer the Member Interests to ML Holdings.  In addition, under the terms of the Letter Agreement, Walallan agreed to assign and transfer to Merrill Lynch and/or ML Holdings any and all rights of the Landlord to assert and recover on any claims against the Debtor in relation to its chapter 11 case, including, without limitation, the rejection damages claim(s) of the Landlord arising from the Debtors' rejection of the Bennettsville Lease.  The assignment to ML Holdings of the Member Interests became effective on May 20, 2005.

8.      On or about February 23, 2005, the Court entered an order pursuant to section 365(a) of title 11 of the United States Code, 11 U.S.C. §§ 110 – 1330 (as amended, the "Bankruptcy Code"), authorizing the Debtors to reject, among other leases, the Bennettsville Lease, effective as of February 28, 2005.

9.      On August 1, 2005, ML Holdings, as the holder of all of the Member Interests in the Landlord, filed an unsecured, non-priority claim against the Debtor (Claim No. 9815) in the total amount of $745,161.77 for (i) certain unpaid, pre-petition charges due and owing under the Bennettsville Lease and (ii) damages resulting from the rejection of the Bennettsville Lease.

dc-459550

This proof of claim was subsequently amended in the aggregate amount of $887,027.04 pursuant to an amendment to the proof of claim dated April 14, 2006 (the "Amended Proof of Claim").

10.    In Exhibit B to the Objection, Debtor asserts that the claim amount should be reduced to $780,789.38, a deduction of $106,237.66 from the amended proof of claim amount:

| | | | | |
|---|---|---|---|---|
| WINN-DIXIE STORES, INC., ET AL. | | | | Page: 11 of 19 |
| FIFTEENTH OMNIBUS CLAIMS OBJECTION | | | | Date: 07/24/2006 |
| EXHIBIT B - OVERSTATED CLAIMS TO BE REDUCED | | | | |

| Name of Claimant | Claim No. | Claim Amount | Reduced Claim Amount | Reason for Reduction |
|---|---|---|---|---|
| Creditor Id: 410587 MERRILL LYNCH LP HOLDINGS, INC ATTN M MCINERNEYIN GRIFFINS 4 WORLD FINANCIAL CENTER NEW YORK NY 10080 | 13187 Debtor: | $887,027.04 WINN-DIXIE RALEIGH, INC. | $780,789.38 | REDUCED AMOUNT REFLECTS ACCURATE CALCULATION OF REJECTION DAMAGES. |

11.    It is entirely unclear from the Debtor's conclusory explanation why the Amended Proof of Claim (attached hereto as Exhibit 1) is inaccurate, and accordingly the Objection, on its face, is defective and should be denied.  To help clarify ML Holdings' calculation, below is an excerpt of the Claim setting forth the amended claim amount:

SUPPLEMENTAL INFORMATION SUPPORTING AMENDMENT TO PROOFS
OF CLAIM NUMBERS 9815 & 9818[1]

| | Pre-Petition | Annual | Monthly (/12) | Remaining Term Rejected 2/28/05-- 8/31/2019=174 Months (x 174) | 15% of 174 = 26.1 (x.15) |
|---|---|---|---|---|---|
| Base Rent | 0 | $311,656.40 | $25,971.37 | $4,519,017.60 | $677,852.64 |
| Taxes (Lease Para) | $53,037.59 (2005) + 7887.87 (January and February 2006)= $60,925.46 | $47,327.22 | $3,943.94 | $686,244.96 | $102,936.74 |
| Insurance (Lease Para) | $14,271.56 | $14,271.56 | $1,189.30 | $206,937.60 | $31,040.64 |
| | $75,197.02 | | | Total value of remaining lease $5,412,200.16 | $75,197.02 |
| | | | | Total capped claim per 502(b)(6). | $887,027.04 |

12.     Based on informal discussions with Debtor's counsel,[2] apparently the Debtor objects to the inclusion of tax and insurance costs as a component of the Claim[3] in the certain respective amounts of $75,197.02 (representing pre-petition insurance and tax amounts owed) and $31,040.64 (representing post petition insurance amounts owed).  ML Holdings respectfully asserts that the unpaid pre-petition tax and insurance arrearages (amounting to $75,197.02) and post petition insurance costs (amounting to $31,040. 64) were properly included in the amended claim amount, and accordingly, that the Debtor's objection is without merit.

A.      **Unpaid Pre-petition Tax and Insurance Arrearages Are Properly Included in the Claim Amount and are Not Capped under Section 502(b)(6).**

13.     The Bennettsville Lease is a "net" lease, which means that the Debtor is responsible for paying rent, taxes, and maintenance fees.  Specifically, the Bennettsville Lease at paragraphs 5(b) and 6(a) states:

> 6.    UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY; TRUE LEASE.
>
>      (a)    Net Lease; No Setoff or Counterclaim Against Rent. This Lease is an absolutely net lease and Tenant shall have an unconditional obligation to pay Rent, Additional Monetary Obligations and all other sums payable hereunder by Tenant, without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Rent, Additional Monetary Obligations and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected for any reason, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.
>
>      5.    RENT.

---

[2] Following the filing of the Objection, Counsel to ML Holdings contacted counsel to the Debtor to discuss the bases for the Objection.

[3] The $7,887.87 amount reflected in the "Pre-Petition" column under "Taxes" should read: (January and February 2005).

> **(b)**     <u>Additional Monetary Obligations</u>. In addition to Rent, Tenant shall pay and discharge when the same shall become due all other costs, fees, charges or expenses that Tenant is obligated to pay or discharge pursuant to this Lease or the Assignment, and every fine, penalty, interest and cost which may be added pursuant to this Lease, the Assignment, or Legal Requirements for nonpayment or late payment thereof (any such amounts being referred to herein as the "<u>Additional Monetary Obligations</u>"). In the event of any failure by Tenant to pay or discharge the Additional Monetary Obligations, Landlord shall have the same rights, powers and remedies provided by law as available to Landlord in the event of nonpayment of Rent.

(*See* Bennettsville Lease at Ex. 1, pp 2-3).  Exhibit E to the Bennettsville Lease sets forth the Schedule of Rent

14.     "Section 502(b)(6) is designed to compensate a landlord for the loss suffered upon termination of a lease, while not permitting large claims for breaches of long-term leases, which would prevent other general unsecured creditors from recovering from the estate." *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91, 97 (B.A.P. 9th Cir. 1995).  "Although Congress sought to limit the amount of damages that a landlord could recover from a bankrupt debtor, ***Congress only placed said limitations on a landlord's claims for post-petition damages***, 11 U.S.C. § 502(b)(6)(A), while ensuring that said landlord recovers on those damages incurred up to the earlier of lease termination or the petition filing." *Fifth Avenue Jewelers, Inc. v. Great East Mall, Inc. (In re Fifth Avenue Jewelers, Inc.)*, 203 B.R. 372, 379 (Bankr. W.D. Pa. 1996).  Thus, the statutory cap under 11 U.S.C. § 502(b)(6) limits only a landlord's claim for future damages sustained after the lease is rejected.

15.     ML Holdings submits that § 502(b)(6)(B) does not limit the pre-petition portion of the claim only to rent, but also includes all pre-petition amounts including real estate taxes and insurance — obligations of the Debtor which are set forth in the Bennettsville Lease.  *See also In re Smith*, 249 B.R. 328, 338 n.7 (Bankr. S.D.Ga. 2000) (stating that "CAM, taxes, and insurance . . . are generally held to be rent in net lease claims governed by § 502(b)(6).").

**B.     Postpetition Insurance Costs Are Properly Included Under the Section 502(b)(6) Cap.**

16.     This Court has found that a landlord's capped claim under a net lease is not limited to merely the base rent under the lease. *In re Clements*, 185 B.R. 895, 902-903 (Bankr. M.D. Fla. 1995) (stating that "as a matter of law, the actual damage claim of the [landlord] for termination of the lease, whether for non-payment of rent, taxes, costs . . . or other financial covenants, are limited by the damage cap in § 502(b)(6)(A)")(citation omitted). Rejection damages are not limited to base rent and properly include the cost of insurance and taxes, which the Debtor is required to pay under the terms of the Bennettsville Lease. *See id.* at 903 (net lease provision ". . . made the lessee responsible for paying the taxes, insurance, and maintenance on the property.").

17.     Because ML Holdings is entitled to include these components of rent as part of its Claim, the Objection is without merit and should be denied in its entirety.

18.     ML Holdings expressly reserves any and all defenses, counterclaims or objections with respect to the Claim and the Objection.[4]

---

[4]  Despite the Debtor's failure to state any basis for the asserted reduction, ML Holdings has responded herein to what it understands is the basis for the Objection.   Accordingly, it expressly reserves all if rights, defenses and counterclaims with respect to the Objection.

WHEREFORE, Merrill Lynch respectfully requests that the Court allow the Claim in the amount of $887,027.04 and prohibit the Debtor from further objecting to the Claim on other grounds.

/s/ Alexandra Steinberg Barrage
Attorney for Merrill Lynch LP Holdings, Inc.

**MORRISON & FOERSTER LLP**

By:  /s/ Larren M. Nashelsky
     Larren M. Nashelsky

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104
(212) 468-8000

Alexandra Steinberg Barrage

MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Suite 5500
Washington, DC  22209
(202) 887-1500

Attorneys for Merrill Lynch
 LP Holdings, Inc.

dc-459550

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon the following by U.S.

Mail, properly addressed and postage prepaid, on this the 14th day of August, 2006:

Cynthia C. Jackson
Stephen D. Busey
James H. Post
225 Water Street, Suite 1800
Jacksonville, FL 32202

D.J. Baker
Sally McDonald Henry
Rosalie W. Gray
Eric M. Davis
Jane Leamy
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036

/s/ Laura Santana

dc-459550

# **Exhibit 1**

dc-459550

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT ___Middle___ | DISTRICT OF ___Florida___ | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor Winn-Dixie Stores,Inc., Jointly Administered Winn-Dixie Raleigh, Inc. | Case Number 05-03817-3F1 (05-03839-3F1) | |
|---|---|---|

NOTE This form should not be used to make a claim for an administrative expense arising after the commencement of the case  A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property)·
Merrill Lynch LP Holdings, Inc.
4 World Financial Center, New York, NY 10080

Name and address where notices should be sent.
Mr. Nicholas Griffiths
Merrill Lynch, Pierce, et al.,
4 World Financial Center, New York, NY 10080

Telephone number: 212-449-8707    410587

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

DEBTOR WiNN - DIXIE STORES, INC
US BANKRUPTCY COURT M D -FLORIDA
JOINTLY ADMINISTERED UNDER
CASE  05-03817 (3F1)
CHAPTER 11
**CLAIM NO.: 13187**

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor
Store #2130

Check here ☐ replaces
if this claim ☑ amends    a previously filed claim, dated:8/1/05 Claim 9815

1.  **Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other  Real Property Lease _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #:
Unpaid compensation for services performed
from _____ to _____
    (date)              (date)

2.  **Date debt was incurred:**

3.  **If court judgment, date obtained:**

4.  **Total Amount of Claim at Time Case Filed:**  $  887,027.04 _____ _____ _____  887,027.04
                      (unsecured)    (secured)    (priority)    (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges

5. **Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
    ☐ Other_____
Value of Collateral.  $_____
Amount of arrearage and other charges at time case filed included in secured claim, if any  $_____

6.  **Unsecured Nonpriority Claim** $ 0
☑ Check this box if  a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority

7.  **Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority  $_____
Specify the priority of the claim
☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U S C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8)
☐ Other - Specify applicable paragraph of 11 U S C. § 507(a)(___)
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

8.  **Credits:**  The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

9.  **Supporting Documents:**    *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS If the documents are not available, explain. If the documents are voluminous, attach a summary.

10. **Date-Stamped Copy:**    To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED 2006 APR 19 AM 9:50 US BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA

LOGAN & COMPANY, INC AS AGENT

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|
| 4/17/06 | ___signature___  GABRIEL CALVETTI, JR. P.O A |

*Penalty for presenting fraudulent claim*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U S C  §§ 152 and 3571

BENNETTSVILLE, SC, STORE NO. 2130

## SUPPLEMENTAL INFORMATION SUPPORTING AMENDMENT TO PROOFS OF CLAIM NUMBERS 9815 & 9818[1]

| | Pre-Petition | Annual | Monthly (/12) | Remaining Term<br><br>Rejected 2/28/05--8/31/2019=174 Months (x 174) | 15% of 174 = 26.1<br><br>(x.15) |
|---|---|---|---|---|---|
| Base Rent | 0 | $311,656.40 | $25,971.37 | $4,519,017.60 | $677,852.64 |
| Taxes (Lease Para) | $53,037.59 (2005)<br><br>+ 7887.87 (January and February 2006)=<br><br>$60,925.46 | $47,327.22 | $3,943.94 | $686,244.96 | $102,936.74 |
| Insurance (Lease Para) | $14,271.56 | $14,271.56 | $1,189.30 | $206,937.60 | $31,040.64 |
| | $75,197.02 | | | Total value of remaining lease<br><br>$5,412,200.16 | $75,197.02 |
| | | | | Total capped claim per 502(b)(6) | $887,027.04 |

Supplemental Attached documentation:

　　1. Lease between Bennettsville 99 SC, LLC and Winn-Dixie Raleigh, Inc. dated August 26, 1999.

---

[1] This amendment does not replace the prior claim but merely provides a corrected calculation of lease rejection damages and additional documentary support.

823067 2

2. Assignment of Rents and Leases from Bennettsville 99 SC, LLC  to First Security Bank, National Association and Val T. Orton, individually, as Trustees dated August 26, 1999.

3. Indenture dated August 26, 1999.

[ABOVE SPACE RESERVED FOR RECORDING DATA]

After recording, return to:

_____

_____

_____

_____

## LIMITED POWER OF ATTORNEY

BY THIS POWER OF ATTORNEY, **MERRILL LYNCH LP HOLDINGS, INC.**, the sole member of WD Georgia LLC and WD South Carolina LLC (collectively, the "**LLCs**"), having its registered office at 4 World Financial Center, New York, NY 10080 (the "**Company**"), hereby constitutes and appoints Gabriel Calvetti, Jr. of 4 World Financial Center, Floor 7, New York, NY 10080 (the "**Attorney**"), as its true and lawful attorney-in-fact, in its name, place and stead, for and on behalf of the Company to:

1.      Approve, settle, consider, sign, execute, deliver and/or issue all documentation, agreements, certificates, filings, instruments and other documents or instruments which the Attorney considers necessary in connection with the Company and the LLCs right, title and interest in (a) 2400-2651 Hiram-Acworth Highway, Dallas, GA, as more fully described on Exhibit A attached hereto and made a part hereof (the "**Hiram Property**"); and (b) 1120 Oakwood Street, Bennettsville, SC, as more fully described on Exhibit B attached hereto and made a part hereof (the "**Bennettsville Property**", with the Hiram Property, the "**Properties**"), including, without limitation, the power to negotiate, execute and deliver leases, consents, amendments, assignments, continuations, escrow agreements, instruments of satisfaction, cancellations, partial or full releases, discharges, renewals, replacements, terminations, restatements, subordinations, and supplements, together with any affidavits, certificates, complaints, notices, pleadings, or other papers necessary or convenient for the enforcement of the Company and the LLCs rights in respect of the Properties;

IN WITNESS WHEREOF, the undersigned certifies that he has full power and authority duly to execute this Limited Power of Attorney on behalf of the Company and has hereto affixed and attached his signature and the duly registered corporate seal of the Company on this __1ST__ day of N OVEMBER 2005.

MERRILL LYNCH LP HOLDINGS, INC.

By: _Martin McInerny_

Name: Martin McInerny
Title: Vice President

Signed, sealed and delivered
In the presence of:

_____

Unofficial Witness

_____

[Affix Corporate Seal]

Notary Public   Robert Michael Denicola

My commission expires: __5/7/07__

Exact date of execution by Notary Public: __11/1/05__

[Affix Notarial Seal]

ROBERT MICHAEL DENICOLA
Notary Public, State of New York
No  02DE6058357
Qualified in New York County
Commission Expires  5/7/07

Record and Return to:

Peter L. Leepson, Esq.
25 Ford Road
Westport, CT 00880-1201

Prepared by:

Hiram 99-GA, LLC
c/o Principal Net Lease Investors, L.L.C.
711 High Street
Des Moines, IA 50392-1360
Attn: Johnna Ashby

## LIMITED WARRANTY DEED

THIS LIMITED WARRANTY DEED is made this 25 day of September 2001 by

HIRAM 99-GA, LLC, a Delaware limited liability company, whose post office address is c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, IA 50392-1360 ("Grantor")

to and in favor of

WD GEORGIA LLC, a Georgia limited liability company, whose post office address is One Rockefeller Plaza, Suite 2700, New York, NY 10020-2141 ("Grantee");

WITNESSETH, THAT Grantor for and in consideration of Ten Dollars ($10.00), and other valuable considerations, to it in hand paid by Grantee, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed to Grantee, its successors and assigns, forever, that parcel of land, situate, lying and being in the County of Paulding, State of Georgia, as more particularly described on Exhibit A attached hereto and incorporated herein (the "Land"), together with all of Grantor's rights, privileges and easements appurtenant to the Land, including, without limitation, as appropriate, the minerals, oil and gas, as well as all development rights, air rights, water rights relating to the Land and to any easements, rights-of-way or other appurtenances used in connection with the beneficial use and enjoyment of the Land; and all improvements and fixtures constructed or to be constructed on the Land, including, without limitation, all buildings, structures and open parking areas presently located or to be located on the Land, all fixed equipment installed or to be installed in connection with the operation or occupancy of the Land, such as heating and air conditioning systems and facilities used to provide any utility services, or other similar services on the Land (however, specifically excluding (i) coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty owned by Grantor or any tenant in possession, and (ii) furniture, fixtures and equipment owned

**EXHIBIT A**
Hiram, Georgia

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 251, 252 AND 254 OF THE 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT, SAID POINT BEING AN IRON PIN SET AT THE LAND LOT CORNER COMMON TO LAND LOTS 251, 252, 253 AND 254; THENCE RUNNING IN A SOUTHERLY DIRECTION ALONG THE EASTERLY LINE OF LAND LOT 254, SOUTH 01° 53' 18" WEST, A DISTANCE OF 27.55 FEET TO AN IRON PIN SET; THENCE LEAVING SAID LAND LOT LINE AND RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 43.06 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 46° 59' 38" WEST, A CHORD DISTANCE OF 42.67 FEET AND HAVING A RADIUS OF 93.14 FEET) TO AN IRON PIN SET; THENCE SOUTH 04° 51' 41" EAST, A DISTANCE AT 71.80 FEET TO AN IRON PIN SET; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 67.55 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 59° 17' 11" WEST, A CHORD DISTANCE OF 62.52 FEET, AND HAVING A RADIUS OF 50.00 FEET) TO A POINT; THENCE NORTH 70° 29' 26" WEST, A DISTANCE OF 27 66 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 38.65 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 12° 57' 29" WEST, A CHORD DISTANCE OF 38.57 FEET AND HAVING A RADIUS OF 169.00 FEET) TO A POINT; THENCE SOUTH 06° 24' 17" WEST, A DISTANCE OF 85.97 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 169.15 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 38° 04' 44" WEST, A CHORD DISTANCE OF 160.67 FEET AND HAVING A RADIUS OF 153.00 FEET) TO A POINT; THENCE SOUTH 67° 14' 52" WEST, A DISTANCE OF 9.80 FEET TO A POINT; THENCE SOUTH 64° 44' 16" WEST, A DISTANCE OF 68.50 FEET TO A POINT; THENCE SOUTH 30° 57' 55" WEST, A DISTANCE OF 18.59 FEET TO A POINT ON THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY), THENCE RUNNING WITH THE RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 112.61 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 23° 45' 12" WEST, A CHORD DISTANCE OF 112.60 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, SOUTH 75° 44' 58" EAST, A DISTANCE OF 50.65 FEET TO A POINT; THENCE NORTH 66° 31' 42" EAST, A DISTANCE OF 49.15 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 119.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 37° 09' 31" EAST, A CHORD DISTANCE OF 112.86 FEET AND HAVING A RADIUS OF 100.00 FEET) TO A POINT; THENCE NORTH 02° 48' 22" EAST, A DISTANCE OF 189.91 FEET TO A POINT; THENCE NORTH 87° 11' 38" WEST, A DISTANCE AT 175.15 FEET TO A POINT; THENCE SOUTH 73° 48' 00" WEST, A DISTANCE OF 82.62 FEET TO A POINT; THENCE SOUTH 24° 11' 47" WEST, A DISTANCE OF 15.46 FEET TO A POINT ON THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY); THENCE RUNNING WITH THE RIGHT-OF-WAY OF

#1829 Hiram, Georgia

## EXHIBIT B

### Permitted Encumbrances

1. All taxes for the year 2001 and subsequent years are liens which are not yet due and payable.

2. Any additional taxes, interest and/or penalties which may be assessed for prior tax years by virtue of adjustment, re-appraisal, re-assessment, appeal or other amendment to the tax records of the city or county in which the subject property is located.

3. Easements for drainage, maintenance and construction as contained in that Right-of-Way Deed from D. Ragsdale to State Highway Board of Georgia, dated 6-14-40 and recorded at Book 3-B, page 235, Office of the Clerk of the Superior Court of Paulding County, Georgia.

4. Permit to Cut or Trim Trees from Carlos Jones Construction Co., Inc. to Georgia Power Company, dated 1-22-75 and recorded at Deed Book 7-O, page 706, aforesaid records.

5. Title to any portion of the subject property lying in Land Lot 251. NOTE: The Warranty Deed from Mrs. W. O. Stansell to L. T. Moss, dated 1-17-34 and recorded at Deed Book XX, page 332, aforesaid records purports to convey "2 acres more or less out of the southeast corner" of Land Lot 251. Caption Property has more than 2 acres in Land Lot 251. No other conveyances were found into L. T. Moss for Land Lot 251. Furthermore, the Warranty Deed from D. Ragsdale to Viola Ragsdale, dated 2-12-23 and recorded at Deed Book 3-F, page 13, aforesaid records, purports to convey all of Land Lot 251.

6. Easement from Mrs. L. T. Moss by her attorney-in-fact Hazel Morris to Southern Bell Telephone and Telegraph Company, dated 3-X-85 and recorded at Deed Book 65, page 191, aforesaid records.

7. Right-of-Way Easement from Wallace W. Keys to Douglas County Electric Membership Corporation, dated 9-31-85 and recorded at Deed Book 73, page 740, aforesaid records.

8. Affidavit of William C. Hathcock, III, dated 1-25-95 and recorded at Deed Book 429, page 393, aforesaid records.

9. Right-of-Way Easement from Rhonda Graves Conn and Michael Lynn Conn, Sr. to Greystone Power Company, dated 1-15-96 and recorded at Deed Book 516, page 91, aforesaid records.

## EXHIBIT B

### BENNETTSVILLE PROPERTY

excluding (i) coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty owned by Grantor or any tenant in possession, and (ii) furniture, fixtures and equipment owned by any sublessee under any subleases) (collectively, the "Property"), subject only to the matters described in Exhibit B attached hereto and incorporated herein (the "Permitted Encumbrances").

AND Grantor does hereby fully warrant the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to the Permitted Encumbrances.

IN WITNESS WHEREOF, Grantor has signed and sealed these presents the day and year first above written.

BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company

By: PRINCIPAL NET LEASE INVESTORS, LLC, a Delaware limited liability company, its sole member

Signed, sealed and delivered in the presence of:

By: PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, its sole member

By: _____
Its: C.P. Franzenburg
     Director
     Asset Preservation

By: _____
Its: Brenda S. Tyler
     Assistant Director
     Commercial Real Estate

Witness Shawna L. Stevens

Witness Wanda N. Homan

[SEAL]



FILED, RECORDED, INDEXED
10/08/2001 01:56:46PM
Rec Fee: 14.00    St Fee: 267.00
Co Fee: 112.30    Pages: 8
Clerk of Court
William B. Funderburk

0002826  Bk: 0429  Pg: 0124

A CERTIFIED TRUE COPY
William B. Funderburk
CLERK OF COURT
MARLBORO COUNTY

**EXHIBIT A**
Bennettsville, SC

PARCEL A

A PIECE, PARCEL OR TRACT OF LAND CONTAINING 6.93 ACRES, SITUATE, LYING OR BEING IN THE CITY OF BENNETTSVILLE, MARLBORO COUNTY, SOUTH CAROLINA, AND BEING THAT TRACT OF LAND IDENTIFIED AS PARCEL A ON A PLAT OF SURVEY ENTITLED "ALTA/ACSM LAND TITLE SURVEY, URBAN CLASS BOUNDARY AND TOPOGRAPHIC", PREPARED FOR WINN-DIXIE CHARLOTTE, INC. AND LAWYERS TITLE INSURANCE CORPORATION, BY W.K. DICKSON & CO., INC., DATED FEBRUARY 23, 1998, REVISED MAY 12, 1998, SAID PLAT BEING INCORPORATED BY REFERENCE HEREIN AND MADE PART HEREOF, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON PIN ON THE SOUTHWESTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS AND THE SOUTHEASTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS BY PLAT RECORDED IN PLAT BOOK 43, AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SAID SOUTHWESTERLY RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS, SOUTH 33°39'23" WEST FOR A DISTANCE OF 357.87 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL B, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHERN LINE OF PARCEL B, NORTH 56°14'12" WEST (LINES REVERSED) FOR A DISTANCE OF 153.19 FEET TO A 5/8" IRON PIN. THENCE; WITH THE WESTERN LINE OF PARCEL B, SOUTH 58°43'40" WEST (LINES REVERSED) FOR A DISTANCE OF 11.28 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL C, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHWESTERN LINE OF PARCEL C, NORTH, 31°16'20" WEST (LINES REVERSED) FOR A DISTANCE OF 222.50 FEET TO A 5/8" IRON PIN AT THE NORTHWEST CORNER OF PARCEL C, SOUTH 58°43'40" WEST (LINES RESERVED) FOR A DISTANCE OF 190.00 FEET TO A 5/8" IRON PIN ON THE NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9. THENCE; WITH THE SAID NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9, THE FOLLOWING TWO COURSES AND DISTANCES; NORTH 31°16'20" WEST FOR A DISTANCE OF 39.56 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57" WEST FOR A DISTANCE OF 80.87 FEET TO A 5/8" IRON PIN AT THE SOUTHWESTERN CORNER OF PARCEL D, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE SOUTHEASTERN, EASTERN AND NORTHERN LINES OF PARCEL D. THE FOLLOWING THREE COURSES AND DISTANCES, NORTH 58°46'03" EAST (LINES REVERSED) FOR A DISTANCE OF 126.70 TO A 5/8" IRON PIN. THENCE; NORTH 01°28'10" EAST (LINES REVERSED) FOR A DISTANCE OF 69.41 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57" WEST (LINES REVERSED) FOR A DISTANCE OF 213.57 FEET TO A 5/8" IRON PIN ON THE SOUTHEASTERN LINE OF

0002826  Bk: 0429 Pg: 0126



## EXHIBIT B

### Permitted Encumbrances

1.  Taxes and assessments for the year 2001 and subsequent years.

2.  Restrictive covenants appearing of record in the Office of the Clerk of Court for Marlboro County in Deed Book 377, Page 79, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin to the extent such covenants, conditions or restrictions violate 42 USC 3604(c).

3.  Easements contained in Declaration of Reciprocal Easements and Restrictive Covenants, dated 5/12/1998 and recorded 5/14/1998 in the Office of the Clerk of Court for Marlboro County in Record Book 377, Page 79.

4.  Easement granted to Southern Bell Telephone & Telegraph Company by instrument dated 2/3/1922, recorded 2/15/1922, in the Office of the Clerk of Court for Marlboro County, South Carolina in Record Book 35, page 45.

5.  Easement granted to Carolina Power & Light Company by instrument dated 2/5/1962, recorded 3/17/1962, in the Office of the Clerk of Court for Marlboro County, South Carolina in Record Book 89, page 506.

6.  Terms and conditions of lease from Bennettsville 99-SC, LLC to Winn-Dixie Raleigh, Inc , a Memorandum of which was recorded 9/10/1999, in the Office of the Clerk of Court for Marlboro County in Record Book 399, Page 33, and any failure to comply with same.

7.  Plat of survey made by W.K. Dickson & Co., Inc., Surveyor, dated 2/23/1998, last revised 5/12/1998.

0002826 Bk: 0489 Pg: 0128

7. The deed recording fee due is based on the amount listed on Line 6(c) above and the deed recording fee due is: $381.15

8. As required by Code Section 12-24-70, I state that I am a responsible person who was connected with the transaction as: local agent

9. I understand that a person required to furnish this affidavit who wilfully furnishes a false or fraudulent affidavit is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars or imprisoned not more than one year, or both.

_Susan J. Davis_
Responsible Person Connected with the Transaction  Local Agent

_Susan F Davis_
Print or Type Name Here

SWORN to before me this __27th__
day of __September__, 2001
_Lisa E. Shaffer_
Notary Public for S.C.
My Commission Expires: 9-26-06

FILED, RECORDED, INDEXED
10/02/2001 03:36:44PM
Doc Fees 14.70      St Fees 257.10
Co Fees 113.30      Pages: 6
Clerk of Court
William R. Funderburk

0002826 Bk: 0429 Pg: 0130

# EXHIBIT "A"

# LEASE AGREEMENT

## BENNETTSVILLE 99-SC, LLC,
as Landlord

to

## WINN-DIXIE RALEIGH, INC.,
as Tenant

Dated as of August 26, 1999

Store #2130
Bennettsville, Marlboro County, South Carolina

JK 128864 1 80130 02051
8/1/99 10 48 AM

# TABLE OF CONTENTS

Page No.

1. DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. DEMISE OF LEASED PREMISES; PRIORITY OF LEASE . . . . . . . . . . . . . . 1

3. TENANT'S EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4. TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5. RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   (a)   Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   (b)   Additional Monetary Obligations . . . . . . . . . . . . . . . . . . . . . . . . . 2
   (c)   Effect of Nonpayment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6. UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY; TRUE
   LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   (a)   Net Lease; No Setoff or Counterclaim Against Rent . . . . . . . . . . . . 3
   (b)   No Termination of Lease; No Defense to Tenant's Obligations . . . . . . 3
   (c)   Continuing Obligations of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . 3
   (d)   Tenant's Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   (e)   True Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7. TITLE; LIENS; CONDITION OF PREMISES . . . . . . . . . . . . . . . . . . . . . . 4
   (a)   Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   (b)   Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   (c)   Encroachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   (d)   Condition of Leased Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   (e)   Assignment of Warranties, Guaranties, Indemnities . . . . . . . . . . . . 6
   (f)   Granting of Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (g)   Conveyances for Public Purposes . . . . . . . . . . . . . . . . . . . . . . . . . 7

8  USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT . . . . . . . . 9
   (a)   Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (b)   Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (c)   Replacement Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (d)   Landlord's Covenant of Quiet Enjoyment . . . . . . . . . . . . . . . . . . . . 9
   (e)   Landlord's Right of Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (f)   Subordination, Nondisturbance and Attornment . . . . . . . . . . . . . . . 10
   (g)   Utilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9. TENANT'S RIGHT OF FIRST REFUSAL . . . . . . . . . . . . . . . . . . . . . . . . 11

10. PURCHASE OFFER; PROCEDURE ON PURCHASE . . . . . . . . . . . . . . . . 11

(a)  Title to be Conveyed .................................... 11
(b)  Payment of Purchase Price; Conveyance Documents; Other Costs ... 12

11.  TENANT'S SUBSTITUTION OPTION ............................. 12

12.  PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS;
     COMPLIANCE WITH LAW ..................................... 14
(a)  Impositions ............................................ 14
(b)  Compliance with Law .................................... 15
(c)  Additional Obligations ................................. 15
(d)  Year 2000 Compliance ................................... 15

13.  INSURANCE ............................................... 16
(a)  Type of Insurance ...................................... 16
(b)  Insurance Requirements; "Self-Insurance" ............... 16
(c)  Mortgagee Loss Payable Clauses; Cancellation of Insurance ....... 17
(d)  Payment of Premiums; Policy Replacements ............... 17
(e)  Blanket Policies ....................................... 18

14.  PROPERTY LOSS ........................................... 18
(a)  Property Loss Claims ................................... 18
(b)  Termination Upon Loss .................................. 19

15.  CONDEMNATION ............................................ 19
(a)  Assignment of Condemnation Award ....................... 19
(b)  Total or Substantial Condemnation ...................... 20
(c)  Partial Condemnation ................................... 21
(d)  Landlord's Equipment Condemnation ...................... 21
(e)  Proceedings ............................................ 21

16.  ECONOMIC ABANDONMENT .................................... 22

17.  RESTORATION ............................................. 22

18.  ASSIGNMENT AND SUBLEASING; VACATION OF LEASED PREMISES . 23
(a)  Assignment and Subleasing .............................. 23
(b)  Vacation of Leased Premises ............................ 23

19.  PERMITTED CONTESTS ...................................... 24

20.  ENVIRONMENTAL COVENANTS; INDEMNITY ...................... 25

21.  GENERAL INDEMNIFICATION ................................. 27

22.    **DEFAULT PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    (a)    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    (b)    Landlord's Remedies Upon Tenant Default  . . . . . . . . . . . . . . . . . . . . 29
    (c)    No Relief of Obligations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    (d)    Current Damages  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    (e)    Liquidated Final Damages  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    (f)    Alternative Liquidated Final Damages . . . . . . . . . . . . . . . . . . . . . . . . 32

23.    **ADDITIONAL RIGHTS OF LANDLORD** . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    (a)    Non-Exclusive, Cumulative Remedies  . . . . . . . . . . . . . . . . . . . . . . . . 33
    (b)    Tenant's Waiver of Redemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    (c)    Costs Upon Default and Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

24.    **NOTICES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

25.    **ESTOPPEL CERTIFICATE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

26.    **SURRENDER AND HOLDING OVER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

27.    **NO MERGER OF TITLE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

28.    **ALTERATION AND EXPANSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    (a)    Alterations Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    (b)    Alterations Involving Expansion of Improvements . . . . . . . . . . . . . . . . 36
    (c)    Mortgagee's Financing of Alterations Involving Expansion . . . . . . . . . . 36
    (d)    Third Party Financing of Alterations Involving Expansion . . . . . . . . . . . 38
    (e)    Tenant's Self-Funding of Alterations Involving Expansion  . . . . . . . . . . 38
    (f)    New Store Construction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

29.    **MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

EXHIBIT A - SCHEDULE OF DEFINED TERMS
EXHIBIT B-1 - LEGAL DESCRIPTION OF LAND
EXHIBIT B-2 - SITE PLAN
EXHIBIT C - LANDLORD'S EQUIPMENT
EXHIBIT D - TENANT'S EQUIPMENT
EXHIBIT E - SCHEDULE OF RENT
EXHIBIT F - PURCHASE PRICE
EXHIBIT G - FORM OF ESTOPPEL CERTIFICATE
EXHIBIT H - FORM OF MEMORANDUM OF LEASE
EXHIBIT I - FORM OF COMPLETION CERTIFICATE

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of August 26, 1999, between

**BENNETTSVILLE 99-SC, LLC**, a Delaware limited liability company ("Landlord"), whose address is c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301  Attention: Gary Lines, Telefax No.  515 248 8090;

and

**WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Tenant"), whose address is 5050 Edgewood Court, Jacksonville, Florida  32254 Attention: Chief Financial Officer, Telefax No. 904 783 5294.

**IN CONSIDERATION** of the rents and mutual covenants herein contained to be paid and performed, Landlord and Tenant agree as follows:

1.    **DEFINED TERMS.**  Capitalized terms as used in this Lease will have the meanings assigned to such terms as set forth on attached Exhibit A.

2.    **DEMISE OF LEASED PREMISES; PRIORITY OF LEASE.**  Effective on the Commencement Date, Landlord hereby demises and lets unto Tenant, and Tenant hereby takes and leases from Landlord, for the term or terms and upon the provisions hereinafter specified, the following described property (collectively, the "Leased Premises"):  (i) real property more particularly described on attached Exhibit B-1, together with all easements, rights and appurtenances thereunto belonging or appertaining (the "Land"), (ii) the buildings, structures and other improvements now located or hereafter constructed on the Land (collectively, the "Improvements"), as generally depicted on the Site Plan attached as Exhibit B-2 (the "Site Plan"), and (iii) the machinery, equipment and fixtures described on attached Exhibit C, and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease ("Landlord's Equipment").  This Lease is subject to the Permitted Encumbrances and, except to the extent that Landlord, Tenant and Mortgagee enter into a subordination agreement pursuant to paragraph 8(f) below, is prior to the Lien of any Mortgage.

3.    **TENANT'S EQUIPMENT.**  The machinery, equipment and fixtures described on attached Exhibit D, and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease, and Tenant's trade fixtures and equipment ("Tenant's Equipment") are and will remain the property of Tenant, and are intended by Landlord and Tenant to constitute personal property of Tenant, and not fixtures, attachments or Improvements or other interest in real property, whether or not the same

are attached or affixed to the Leased Premises and whether or not the same are deemed to constitute real property under State law.

4.    **TERM.** Subject to the provisions of this Lease, Tenant shall have and hold the Leased Premises for an initial term (the "Initial Term") commencing on August 26, 1999 (the "Commencement Date"), and ending on August 31, 2019. As long as no Event of Default then exists, Tenant shall have the option, exercisable in accordance with the following provisions, to extend the Term for 6 additional terms (each an "Extended Term") of 5 years each by giving notice to Landlord not less than 6 months prior to the expiration of the then current Term. If Tenant does not give any such notice to extend to Landlord in a timely fashion, the Term shall automatically terminate at the end of the then current Term. Any such Extended Term shall be subject to all of the provisions of this Lease, all of which shall continue in full force and effect. If Tenant does not exercise an option for an Extended Term, Landlord shall have the right during the remainder of the then current Term (i) to advertise the availability of the Leased Premises for sale or for reletting, and to erect upon the Leased Premises signs indicating such availability (provided that such signs do not unreasonably interfere with the use of the Leased Premises by Tenant), and (ii) to show the Leased Premises to prospective purchasers or tenants at reasonable times during normal business hours upon reasonable notice to Tenant. If Tenant fails to timely exercise its right to extend the Term for any Extended Term, then Tenant's right to extend the Term for any further Extended Terms shall terminate and be null and void.

5.    **RENT.**

(a)    Rent   Tenant shall pay to Landlord, as rent for the Leased Premises during the Term, the amounts (the "Rent") set forth in attached Exhibit E. Rent (other than the prorated Rent provided in Exhibit E) shall be due and payable in advance commencing on September 1, 1999, and continuing on the 1st day of each December, March, June and September thereafter during the Term (said payment days being referred to as the "Rent Payment Dates"). Tenant shall pay the Rent to Landlord at Landlord's address set forth above, or at such other place or to such other person as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America.

(b)    Additional Monetary Obligations. In addition to Rent, Tenant shall pay and discharge when the same shall become due all other costs, fees, charges or expenses that Tenant is obligated to pay or discharge pursuant to this Lease or the Assignment, and every fine, penalty, interest and cost which may be added pursuant to this Lease, the Assignment, or Legal Requirements for nonpayment or late payment thereof (any such amounts being referred to herein as the "Additional Monetary Obligations"). In the event of any failure by Tenant to pay or discharge the Additional Monetary Obligations, Landlord shall have the same rights, powers and remedies provided by law as available to Landlord in the event of nonpayment of Rent.

(c)     Effect of Nonpayment of Rent. In addition to Landlord's remedies in an Event of Default, if any installment of Rent or any amount due as Additional Monetary Obligations is an Overdue Payment, then, in addition to Tenant's obligation to pay such Rent or Additional Monetary Obligations, Tenant shall pay to Landlord, on demand, as Additional Monetary Obligations, interest at the Default Rate on each such Overdue Payment from and including the due date thereof to and including the date of such payment in full; provided, however, that the Default Rate shall be payable on all overdue amounts of Additional Monetary Obligations which Landlord or Mortgagee shall have paid on behalf of Tenant only from and including the date of payment thereof by Landlord or Mortgagee, to and including the date of such payment in full.

6.    **UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY; TRUE LEASE.**

(a)     Net Lease; No Setoff or Counterclaim Against Rent. This Lease is an absolutely net lease and Tenant shall have an unconditional obligation to pay Rent, Additional Monetary Obligations and all other sums payable hereunder by Tenant, without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Rent, Additional Monetary Obligations and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected for any reason, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

(b)     No Termination of Lease; No Defense to Tenant's Obligations. Except as otherwise expressly provided in this Lease, this Lease shall not terminate nor shall Tenant have any right to terminate this Lease, nor shall the obligations of Tenant under this Lease be affected, any present or future law to the contrary notwithstanding, by reason of: (i) any damage to or destruction of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of the Leased Premises, (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of the Leased Premises other than pursuant to paragraphs 10 or 11, (vi) any Default on the part of Landlord hereunder or under any other agreement, (vii) any latent or other defect in, or any theft or loss of, the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Landlord's Equipment, or (ix) any other cause whether similar or dissimilar to the foregoing

(c)     Continuing Obligations of Tenant. Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that,

except as otherwise expressly provided in this Lease, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, or (ii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord in any proceeding under the Federal Bankruptcy Act or any similar federal or state law, or by any trustee, receiver or liquidator of Landlord or by any court in any such proceeding.

(d)    Tenant's Waivers.  Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or the Leased Premises, and (ii) to any setoff, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Rent, Additional Monetary Obligations or any other sums payable under this Lease, except as otherwise expressly provided herein.

(e)    True Lease.  Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement.  Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financial" treatment.

7.    TITLE; LIENS; CONDITION OF PREMISES.

(a)    Title.  The Leased Premises are demised and let subject to (i) the rights of parties in possession, (ii) the existing state of title as of the Commencement Date (including, without limitation, the Permitted Encumbrances and such other matters as may be set forth in Schedule B, Part I of the owner's title insurance policy relating to the Leased Premises issued to Landlord in connection with Landlord's acquisition of the Leased Premises, (iii) any state of facts which an accurate survey or physical inspection of the Leased Premises might show, (iv) all Legal Requirements, and (v) the condition of the Leased Premises as of the Commencement Date, all without representation or warranty by Landlord.  Tenant has examined the title to the Leased Premises on and as of the Commencement Date and has found the same to be satisfactory for all purposes.

(b)    Liens.  TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY

OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

(c)     Encroachments.  In the event that any Improvement now or hereafter constructed shall (i) encroach upon any property, street or right-of-way on or adjoining the Leased Premises, (ii) violate the provisions of any restrictive covenant affecting the Leased Premises, (iii) hinder or obstruct any easement or right-of-way to which the Leased Premises is subject, or (iv) impair the rights of others in, to or under any of the foregoing, then, promptly after written request of Landlord, Tenant shall either (x) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (y) take such action as shall be necessary to remove such encroachment, hindrance or obstruction and to end such violation or impairment.  If such action is in the form of an Alteration, such Alteration shall conform to the provisions of paragraph 28.

(d)     Condition of Leased Premises. Tenant acknowledges that it has received the Leased Premises in good condition and repair on the Commencement Date.  LANDLORD HAS NOT MADE, AND WILL NOT MAKE, ANY INSPECTION OF THE LEASED PREMISES, AND LANDLORD LEASES, AND TENANT TAKES, THE LEASED PREMISES "AS-IS".    TENANT ACKNOWLEDGES THAT LANDLORD HAS NOT MADE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE LEASED PREMISES, ITS FITNESS FOR ANY USE OR PURPOSE, ITS DESIGN OR CONDITION FOR ANY USE OR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, ITS VALUE, COMPLIANCE WITH SPECIFICATIONS, ITS LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION OR LANDLORD'S TITLE THERETO; IT BEING AGREED THAT ALL RISKS INCIDENT TO ALL OF THESE MATTERS ARE TO BE BORNE BY TENANT.    TENANT ACKNOWLEDGES THAT THE LEASED PREMISES ARE OF ITS SELECTION AND HAVE BEEN OR WILL BE CONSTRUCTED TO ITS SPECIFICATIONS. TENANT HAS INSPECTED THE LEASED PREMISES AND THEY ARE SATISFACTORY TO TENANT.   IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE LEASED PREMISES, WHETHER PATENT OR LATENT, LANDLORD SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY INCIDENTAL OR

CONSEQUENTIAL DAMAGES ARISING THEREFROM (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS PARAGRAPH HAVE·BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY REPRESENTATIONS OR WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO THE LEASED PREMISES, ARISING PURSUANT TO ANY LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

(e)     Assignment of Warranties, Guaranties, Indemnities. Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, for the duration of this Lease, all of Landlord's interest in all warranties (except warranties of title to the Leased Premises), guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of the Leased Premises, including, any rights and remedies existing by contract or pursuant to the Uniform Commercial Code in effect in the State. As long as no Default has occurred and is continuing hereunder and until the expiration or termination of this Lease, Tenant shall have the right (at its sole cost and expense) to enforce any such warranty, guaranty or indemnity in the name of Landlord or Tenant. Upon the occurrence of an Event of Default, all such rights shall be vested solely in Landlord, and any money received by Tenant during the continuance of any Event of Default shall be held in Trust by Tenant for the benefit of Landlord, and shall promptly be paid over to Landlord. Landlord hereby agrees to execute and deliver, at Tenant's expense, such·further documents (including powers of attorney) as Tenant reasonably may request, to allow Tenant the full benefit of the assignment effected or intended to be effected by this paragraph and the ability to enforce such warranties, guaranties and indemnities.

(f)     Granting of Easements. Landlord shall not grant any easements or other rights in the nature of easements in the Leased Premises without the prior written consent of Tenant, which consent shall not be delayed, withheld, or conditioned unreasonably. As long as no Default has occurred and is continuing hereunder, Landlord, at the request of Tenant: (i) will grant, amend or release easements for public utilities servicing the Leased Premises (e.g., electricity, natural gas, water and sewer, telephone and telecommunications and cable communications), (ii) subject to Landlord's approval, not to be unreasonably delayed, conditioned, or withheld, will grant or declare, amend or release easements (other than those described in subparagraph (i) above), covenants, or restrictions for ingress and egress, parking, or other matters as necessary or desirable for operation of the Leased Premises in Tenant's Business, (iii) will exercise a diligent and good faith effort to obtain the consent and joinder of Mortgagee to any such grant or declaration, amendment or release of easements, covenants or restrictions, and (iv) will execute and deliver to any person any instrument appropriate to confirm or effect such grant, declaration, release or amendment, upon receipt by Landlord of a certificate of Tenant and

Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

(A)     that the Leased Premises (including all related easements), following such grant, declaration, release, or amendment, (1) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (2) is a contiguous parcel of land, without gap or hiatus, (3) has adequate access to and from public highways, and (4) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

(B)     that, in the judgment of Tenant and Guarantor, such grant, declaration, release or amendment will not lessen the value of the Leased Premises beyond a *de minimus* reduction, and does not require any payment or performance by Landlord (unless Tenant pays or performs any such Landlord obligations in full);

(C)     the consideration, if any, to be received in connection with such grant, declaration, release or amendment;

(D)     that upon such grant, declaration, release or amendment, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Rent, Additional Monetary Obligations or any other sums payable under this Lease or the Guaranty; and

(E)     that Tenant will perform all of the obligations under such instrument of grant, declaration, release or amendment.

To the extent that consideration is received in connection with any such grant, declaration, release or amendment, Tenant may retain such consideration up to the amount of $100,000, plus Tenant's professional fees and out-of-pocket expenses relating to such grant, declaration, release or amendment, and the balance, if any, of such consideration, shall be paid to Landlord.

(g)     Conveyances for Public Purposes. As long as no Default has occurred and is continuing hereunder, Landlord will, at Tenant's request, (i) execute petitions to have the Leased Premises annexed to any municipal corporation or utility district, (ii) dedicate, transfer or release portions of the Leased Premises for road, highway or other public purposes, and (iii) execute and deliver to any person any instrument, containing special or limited warranties if applicable, appropriate to confirm or effect such sale, transfer, annexation or

dedication, upon receipt by Landlord of a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

     (A)    with respect to any action taken pursuant to clause (iii) above, (1) the consideration being paid for such interest, (2) that such consideration is not less than the fair market value of such interest, as determined by Tenant and Guarantor, and (3) such action is being taken in anticipation that such interest would otherwise be taken by Condemnation;

     (B)    that the Leased Premises (including all related easements), following such sale, transfer, annexation or dedication, (1) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (2) is a contiguous parcel of land, without gap or hiatus, (3) has adequate access to and from public highways, and (4) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

     (C)    that, in the judgment of Tenant and Guarantor, such sale, transfer, annexation or dedication will not lessen the value of the Leased Premises beyond a *de minimus* reduction;

     (D)    the consideration to be received in connection with such sale, transfer, annexation or dedication;

     (E)    that upon such sale, transfer, annexation or dedication, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Rent, Additional Monetary Obligations or other sums payable under this Lease or the Guaranty; and

     (F)    that Tenant will perform all of the obligations under any instrument to be executed and delivered pursuant to clause (iii) above or under such petition.

Tenant may retain any consideration received in connection with such sale, transfer, annexation or dedication, up to the amount of $100,000, plus Tenant's professional fees and out-of-pocket expenses relating to such sale, transfer, annexation or dedication, and the balance, if any, of such consideration, shall be paid to Landlord. If such sale, transfer, annexation or dedication occurs during the Initial Term, then, to the extent that any portion of such consideration is retained by Landlord, (i) Cost as set forth in Exhibit I hereto shall be reduced by the amount of such consideration retained by Landlord, and (ii) each installment of Rent, payable thereafter during the Initial Term commencing with the second Rent Payment Date subsequent to the date of such sale, transfer, annexation or dedication, shall be reduced by an amount

equivalent to the product resulting from an equation, the numerator of which is the amount of such consideration retained by Landlord, and the denominator of which is the number of Rent Payment Dates remaining in the Initial Term.

8.    **USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT.**

(a)    <u>Use</u>. The Leased Premises may be used as a retail supermarket store in Tenant's Business or for any other lawful purpose, except that the Leased Premises shall not be used for any purpose which shall (i) violate any Legal Requirement or any insurance policy in effect with respect to the Leased Premises, or any covenants, restrictions or agreements applicable to the Leased Premises; or (ii) constitute a public or private nuisance or waste. The foregoing use limitations shall not be construed to limit Tenant's ability to vacate the Leased Premises pursuant to <u>paragraph 18(b)</u>.

(b)    <u>Maintenance</u>. Tenant shall at all times maintain the Leased Premises in safe condition, and shall provide normal and customary maintenance and repair (which shall include structural or non-structural and foreseen or unforeseen repairs) of the Leased Premises consistent with good property management practices, ordinary wear and tear excepted. Landlord shall not be required to maintain, repair or rebuild the Leased Premises in any way, and Tenant hereby expressly waives the right to make repairs or Alterations at the expense of Landlord pursuant to any Legal Requirement now or hereafter in effect. All such repairs or Alterations by Tenant shall be done in a good and workmanlike manner.

(c)    <u>Replacement Equipment</u>. Tenant shall from time to time replace with other operational equipment or parts (the "<u>Replacement Equipment</u>") any of Landlord's Equipment (the "<u>Replaced Equipment</u>" ) which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation, or been lost, stolen, damaged or destroyed. Tenant shall repair, at its sole cost and expense, all damage to the Leased Premises caused by the removal of the Replaced Equipment or of Tenant's Equipment, or the installation of the Replacement Equipment. All Replacement Equipment shall become the property of Landlord, shall be free and clear of all Liens and rights of others, and shall become a part of the Landlord's Equipment to the same extent as the Replaced Equipment was part of the Landlord's Equipment.

(d)    <u>Landlord's Covenant of Quiet Enjoyment</u>. As long as no Event of Default exists hereunder, Landlord covenants to do no act nor to authorize any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

(e)    <u>Landlord's Right of Entry</u>. Landlord and any Mortgagee shall have the right (but not the obligation) to enter upon the Leased Premises for the purpose of inspection and/or making any repairs or Alterations which may be necessary by

reason of Tenant's failure to comply with the provisions of subparagraphs (b) or (c) above or in paragraphs 14 or 15 below. Except in case of emergency, the right of entry shall be exercised at reasonable times, at reasonable hours and upon reasonable prior notice to Tenant. In case of emergency, Landlord shall not be obligated to provide prior notice of entry upon the Leased Premises; however, as soon as reasonably practical following such entry, Landlord shall notify Tenant of such entry, the nature of the emergency, and the action taken. Except as provided in the next sentence, all costs and expenses relating to Landlord's or Mortgagee's inspections shall be borne by Landlord and Mortgagee, respectively. Tenant agrees to pay all reasonable costs and expenses of inspections by Landlord or Mortgagee if Tenant is in monetary Default or Landlord or Mortgagee have reason to believe that Tenant is in material non-monetary Default and as a result of any such inspection, the Leased Premises is determined or confirmed to be in material non-compliance with applicable requirements set forth in this Lease. If as a result of any inspection by Landlord or Mortgagee it is determined that repairs or Alterations are necessary, the cost of all such work, if not paid by Tenant in accordance with this Lease, shall be Additional Monetary Obligations, and Tenant shall pay the same to Landlord (or Mortgagee), together with interest thereon at the Default Rate from the time of demand for payment by Landlord (or Mortgagee) to Tenant, until paid by Tenant, immediately upon written demand therefor and upon submission to Tenant of evidence of Landlord's (or Mortgagee's) payment of such costs. Landlord also shall have the right to conduct, at is sole cost and expense, such environmental audits or assessments of the Leased Premises as Landlord may elect, and if such audit or assessment discloses any Hazardous Condition, then Tenant's obligations with respect thereto shall be governed by paragraph 20. Any such audits or assessments conducted by Landlord shall not unreasonably interfere with the continuing operation of Tenant's Business on the Leased Premises, and the written report of such audit or assessment shall name Tenant as an intended beneficiary of such report.

(f)     Subordination, Nondisturbance and Attornment.  Upon the request of Mortgagee, Landlord, Tenant and Mortgagee shall enter into a "subordination, nondisturbance and attornment" agreement in form and content reasonably acceptable to Landlord, Tenant and Mortgagee, pursuant to which Tenant shall subordinate its leasehold interest in the Leased Premises to the lien of the Mortgage, and shall agree to attorn to Mortgagee, as successor landlord, if Mortgagee succeeds to Landlord's interest in the Leased Premises, provided that Tenant's tenancy will not be disturbed as long as Tenant is performing its obligations under this Lease.

(g)     Utilities.  Tenant shall, at Tenant's sole expense, supply, the Leased Premises with electricity, water, sewer, heating, ventilating and air conditioning, telephone and other communication services, and pay the cost thereof as Additional Monetary Obligations.

9.    **TENANT'S RIGHT OF FIRST REFUSAL.**  Tenant shall have the right of first refusal to purchase the Leased Premises as hereinafter set forth.  If at any time during the Term Landlord shall receive a bona fide offer (other than at public auction) from a third person (except in lieu of exercise of the power of eminent domain) for the purchase of the Leased Premises, which offer Landlord desires to accept, Landlord shall promptly deliver to Tenant a copy of such offer.  Within 5 Business Days after Tenant's receipt of a copy of such offer delivered to Tenant prior to the second anniversary of the Commencement Date, or within 15 days after Tenant's receipt of a copy of such offer delivered to Tenant on or after the second anniversary of the Commencement Date, Tenant may elect to purchase the Leased Premises on the same terms and conditions as those set forth in such offer.  The foregoing right of first refusal shall not apply to an offer incidental to the enforcement of a Mortgage.  If Tenant does not accept such offer within the time herein specified, then Tenant's right of first refusal shall be considered waived as to such purchase offer; provided, however, that Tenant's right of first refusal shall be a continuing right as to any subsequent purchase offer subject to this paragraph 9.  The right of first refusal in this paragraph 9 shall be inapplicable to a transfer upon foreclosure of the Mortgage, including the giving by Landlord of a deed in lieu of foreclosure or to any subsequent transfer by Mortgagee to a third person.  In the event that Tenant elects to exercise such right of first refusal, then Landlord shall be obligated to sell to Tenant, and Tenant shall be obligated to purchase from Landlord, the Leased Premises, in accordance with the terms, covenants and conditions set forth in such bona fide offer.

10.    **PURCHASE OFFER; PROCEDURE ON PURCHASE.**  If Tenant elects or is required to make a Purchase Offer pursuant to paragraphs 14, 15 or 16 of this Lease, then Tenant shall be deemed to have made such Purchase Offer in accordance with the terms of this paragraph 10, at a price equal to the amount determined in accordance with attached Exhibit F.  Unless Landlord shall have rejected such Purchase Offer by notice to Tenant given not later than the 10th day prior to the Termination Date, Landlord shall be conclusively presumed to have accepted such Purchase Offer.  Upon acceptance of such Purchase Offer, Landlord shall transfer the Leased Premises to Tenant or Tenant's designee by special or limited warranty deed, and assign to Tenant or Tenant's designee, without recourse, Landlord's interest in any Net Award or Net Proceeds, if applicable, on the Termination Date upon payment by Tenant of the purchase price therefor, together with all installments of Rent, all Additional Monetary Obligations, and all other sums due and payable under this Lease through and including the Termination Date (however, no Rent will be payable on the Rent Payment Date that is the Termination Date).

(a)    Title to be Conveyed.  Upon any such purchase of the Leased Premises by Tenant or its nominee (excluding any purchase pursuant to paragraph 9), Landlord need not transfer and convey to Tenant or its nominee any better title thereto than Landlord received, and Tenant shall accept such title, subject, however, to all Liens, exceptions and restrictions on, against or relating to the Leased Premises and to all applicable Legal Requirements, but free of the

Lien of the Mortgage and free of any Liens, exceptions and restrictions which have been created by or resulted from acts of Landlord taken without the consent of Tenant.

(b)    Payment of Purchase Price; Conveyance Documents; Other Costs. On the date fixed for Tenant's purchase of the Leased Premises (other than pursuant to paragraph 9), Tenant shall pay to Landlord at its address set forth above, or at any other place designated by Landlord, the purchase price therefor specified herein, in immediately available funds and Landlord shall thereafter deliver to Tenant or Tenant's nominee a special or limited warranty deed which describes the Leased Premises then being sold to Tenant, and conveys and transfers the title thereto which is described in subparagraph (a) above, together with such other instruments as shall be necessary to transfer or assign to Tenant or its designee (without recourse) any other property then required to be sold by Landlord pursuant to this Lease. Tenant shall pay all charges incident to such conveyance and transfer (including, without limitation, reasonable attorneys' fees, escrow fees, recording fees, title insurance premiums and all applicable federal, state and local taxes (other than any net income tax, capital gains tax, or franchise tax levied upon or assessed against Landlord)) which may be incurred or imposed by reason of such conveyance and transfer and other instruments.    Upon the completion of such purchase, this Lease and all obligations hereunder (including the obligations to pay Rent and Additional Monetary Obligations) shall terminate, except with respect to obligations and liabilities of Tenant, actual or contingent, under this Lease which arose on or prior to such date of purchase.

11.    **TENANT'S SUBSTITUTION OPTION.** Tenant's election of the Substitution Option pursuant to paragraph 14, 15 or 16 of this Lease will be subject to the prior written approval of Mortgagee, which approval shall not be unreasonably withheld, conditioned or delayed. If Tenant elects to exercise the Substitution Option pursuant to paragraph 14, 15 or 16 of this Lease, and Mortgagee has approved the same, then, on the date for substitution set forth in Tenant's notice of such election, Landlord shall transfer the Leased Premises to Tenant or Tenant's nominee by special or limited warranty deed, and assign to Tenant or Tenant's nominee, without recourse, Landlord's interest in any Net Award or Net Proceeds, if applicable, and Tenant shall transfer or cause to be transferred to Landlord, by special or limited warranty deed, other real property and Improvements thereon and equipment therein (other than Tenant's Equipment) used or to be used in Tenant's Business (the "Substitute Property"), provided that all of the following conditions shall have been satisfied:

(a)    No Event of Default has occurred and is continuing under this Lease.

(b)    The Substitute Property is, or will be at the time of Tenant's occupancy thereof, operated in Tenant's Business.

(c)     The lower of Cost or fair market value of the Substitute Property, as indicated in the appraisal provided pursuant to subparagraph (e) below, shall equal or exceed the higher of: (i) the original Cost of the Leased Premises (plus the Expansion Cost, if applicable), and (ii) the then appraised value of the Leased Premises based on land value and building replacement cost.

(d)     With respect to any Substitute Property on which construction of the Improvements was completed within 2 years of the Substitution Date, Landlord and Mortgagee shall have received a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor, setting forth the cost to Tenant of acquiring the land portion of such Substitute Property, of construction of the Improvements thereon, and of acquisition and installation of the landlord's equipment therein, if any, which may include such items as are included in the definition of Cost with respect to the Leased Premises.

(e)     With respect to any Substitute Property on which construction of the Improvements was completed more than 2 years prior to the Substitution Date, Landlord and Mortgagee shall have received an appraisal, made by an independent appraiser at Tenant's expense selected by Tenant and approved by Landlord and Mortgagee, meeting standards generally accepted at the time by institutional mortgage lenders, of the fair market value of such Substitute Property based on land value and building replacement cost as of a date within 90 days prior to the Substitution Date.

(f)     With respect to the Leased Premises, Landlord and Mortgagee shall have received an appraisal, made by an independent appraiser at Tenant's expense selected by Tenant and approved by Landlord and Mortgagee, meeting standards generally accepted at the time by institutional mortgage lenders, of the fair market value of the Leased Premises based on land value and building replacement cost as of a date within 90 days prior to the Substitution Date.

(g)     With respect to the Substitute Property, Landlord shall have received, in the form of this Lease and the Guaranty, a substitute lease (the "Substitute Lease") and a substitute guaranty (the "Substitute Guaranty") duly authorized, executed and delivered by Tenant and Guarantor, and Mortgagee shall have received, in the form of the Loan Documents, substitute Loan Documents (the "Substitute Loan Documents") duly authorized, executed and delivered by Landlord, creating a first lien on the Substitute Property, and which shall otherwise be in form and substance satisfactory to Mortgagee.

(h)     Landlord and Mortgagee shall have received evidence that, on the Substitution Date, Landlord has good and marketable and indefeasible fee simple title to the Substitute Property, subject only to Permitted Encumbrances (other than matters described in clause (ii) of the defined term "Permitted Encumbrances") and that all appropriate recordings, registrations and filings with

respect to the Substitute Lease and Substitute Loan Documents have been made. A title insurance policy evidencing such marketable and indefeasible fee simple title and the priority of Mortgagee's lien, together with an ALTA "as built" survey, shall be provided by Tenant, at its expense. Landlord and Mortgagee each shall have received an as-built survey and an owners and loan policy of title insurance, respectively, in the forms and with the endorsements required with respect to the Leased Premises on the Commencement Date.

(i)     Landlord and Mortgagee shall have received an ASTM standard "phase I" environmental assessment of the Substitute Property, prepared by an environmental engineering firm selected by Tenant and reasonably acceptable to Landlord and Mortgagee, and engaged at Tenant's expense, showing that the Substitute Property is free of Hazardous Substances, except as may be permitted pursuant to the provisions of paragraph 20 below.

(j)     All necessary approvals, authorizations and consents of all governmental bodies (including courts) having jurisdiction with respect to the transactions contemplated by this paragraph 11 shall have been obtained and all taxes, fees and other charges payable in connection therewith shall have been paid.

(k)     Landlord and Mortgagee shall have received all other documentation, including opinions and evidence of corporate authorizations, required to be furnished by Tenant and Guarantor with respect to the Leased Premises, this Lease and the Guaranty on the Commencement Date to the same extent, with the same effect and subject to the same approvals as if the Substitute Property had been the Leased Premises and such other documents and evidence of facts relevant to underwriting decisions as they may reasonably request. Tenant shall be obligated to pay all costs and expenses incurred by it, Landlord or Mortgagee in connection with the transaction contemplated by this paragraph 11, including the reasonable fees and expenses of counsel to Landlord and Mortgagee.

12.  **PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS; COMPLIANCE WITH LAW.**

(a)     Impositions. Subject to the provisions of paragraph 19, and except as otherwise provided in this paragraph 12(a), Tenant shall, before delinquency thereof, pay and discharge the following whether the same became due and payable before, on or after the Commencement Date (collectively, the "Impositions"):   all taxes (including sales, use, and gross rental taxes), assessments, levies, fees, water and sewer rents and charges, utilities and communications taxes and charges and all other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, which are, at any time, prior to or during the Term, imposed upon or assessed against (i) the

Leased Premises, (ii) any Rent, Additional Monetary Obligations or other sum payable hereunder, (iii) this Lease, the leasehold estate created hereby, or (iv) the acquisition, occupancy, leasing, use, possession or operation of the Leased Premises (including without limitation, any taxes on revenues, rents, income, awards, proceeds, capital gains, profits, excess profits, gross receipts, sales, use, excise and other taxes, duties or imports whether similar or not in nature, assessed, levied or imposed against Tenant, Landlord or the Leased Premises by any governmental authority). If any assessment may be paid in installments, Tenant shall have the option to pay such assessment in installments; in such event, Tenant shall be liable only for those installments which become due and payable during the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions. Tenant shall deliver to Landlord copies of all receipts for payment of ad valorem real and personal property taxes that are Impositions, and upon Landlord's request, shall deliver to Landlord copies of receipts for payment of any other Imposition. Landlord shall either request the applicable taxing authority to deliver tax notices or tax bills directly to Tenant, or provide Tenant with complete and correct copies of such tax notices or tax bills promptly upon Landlord's receipt thereof. Notwithstanding the foregoing, Impositions will not include federal, state or local (i) franchise, capital stock or similar taxes, of Landlord, (ii) net income, net rental, excess profits or other taxes, of Landlord, or (iii) any estate, inheritance, succession, gift, capital levy or similar tax, unless such taxes referred to in clauses (i) and (ii) above are in lieu of, or a substitute for, any tax, assessment, levy or charge which, if it were in effect on the Commencement Date, would be payable by Tenant under this Lease.

(b)    Compliance with Law. Subject to the provisions of paragraph 19, Tenant shall at all times comply with and cause the Leased Premises to comply with and conform to all Legal Requirements applicable to the Leased Premises or its ownership, occupancy or use, including those which require structural, unforeseen or extraordinary changes to the Leased Premises.

(c)    Additional Obligations. Subject to the provisions of paragraph 5(b), paragraph 7 and paragraph 12(a) above, Tenant shall pay and perform all obligations of Landlord, as the owner of the Leased Premises, that may now or hereafter exist under any Permitted Encumbrances or any other matter that would be a Permitted Encumbrance created by or with the consent of Tenant.

(d)    Year 2000 Compliance. Tenant shall take all action necessary to assure that, on or before October 1, 1999, its material computer based systems are Year 2000 Compliant and Ready, except to the extent that non-compliance with this covenant will not have and could not reasonably be expected to have a Material Adverse Effect. Upon Landlord's request, Tenant shall provide Landlord with commercially reasonable assurance of Tenant's Year 2000 compatibility consistent with the requirements of this paragraph 12(d).

13.    **INSURANCE**.

(a)    <u>Type of Insurance</u>.    Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i)    Insurance (including flood insurance) against all risk of direct physical loss or damage to the Improvements and Landlord's Equipment in amounts not less than the full replacement cost of the Improvements and Landlord's Equipment, if the same are actually replaced or actual cash value (replacement cost minus depreciation) if the same are not replaced, excluding footings and foundations and other parts of the Improvements which are not insurable.

(ii)    General public liability insurance against claims for bodily injury, death or property damage occurring on, in, or about the Leased Premises with combined single limit coverage of not less than $10,000,000.    Policies for such insurance shall be for the mutual benefit of Landlord, Tenant and any Mortgagee.

(iii)    Workers' compensation insurance covering all persons employed in connection with any work done on or about the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises, or in lieu of such workers' compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State.

(iv)    Any other insurance coverage that is customarily carried by owners or tenants of similar properties in the same geographic area and engaged in businesses similar to Tenant's Business.

(b)    <u>Insurance Requirements; "Self-Insurance"</u>.    Except as provided in the second paragraph of this <u>subparagraph (b)</u> the insurance required by <u>paragraph 13(a)</u> shall be written by companies of recognized financial standing which are rated A- or better by A.M Best Company or A3 or better by Moody's Investors Services, in either case with asset size rating of "VIII" or better by A.M. Best Company. The insurance (i) shall be for a term of not less than 12 months, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the workers' compensation insurance referred to in <u>subparagraph (a)(iii)</u> above) name Landlord, Tenant and any Mortgagee as insured parties, as their respective interests may appear.  If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or unsafe by reason of the failure or impairment of the capital of any insurer, or if for any other

reasonable cause said insurance shall become unsatisfactory to Landlord or Mortgagee, Tenant shall promptly obtain new or additional insurance satisfactory to Landlord and Mortgagee. Tenant shall provide Landlord with a copy of all such insurance policies.

Notwithstanding the above, as long as Tenant is not in Default hereunder and Winn-Dixie's Consolidated Tangible Net Worth exceeds $500,000,000, Tenant may "self-insure" each of the coverages described in paragraph 13(a). If Tenant has "self-insured" and a claim is made or a loss incurred which would be covered by the insurance described in paragraph 13(a) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom. As to Property Losses, Tenant shall pay the full replacement cost thereof, if the same are actually replaced or actual cash value (replacement cost minus depreciation) if the same are not replaced. Sums due from Tenant in lieu of insurance proceeds because of such "self-insurance" shall be treated as insurance proceeds for all purposes under this Lease.

(c)     Mortgagee Loss Payable Clauses; Cancellation of Insurance. Each insurance policy referred to in clause (i) of subparagraph (a) above shall contain a mortgagee loss payable clause in favor of any Mortgagee. Each policy shall provide that it may not be canceled except after 30 days prior notice to Landlord and any Mortgagee. Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Mortgagee pursuant to any provision of the Mortgage upon the happening of an event of default thereunder, or (iv) any change in title or ownership of the Leased Premises.

(d)     Payment of Premiums; Policy Replacements. Tenant shall pay as they become due all premiums for the insurance required by this paragraph 13, shall renew or replace each policy at least 40 days prior to the expiration of such policy, and shall deliver to Landlord a renewal certificate on ACORD-27 Form or its equivalent at least 30 days prior to the expiration of the preceding policy. Tenant shall provide Landlord with reasonable proof of payment of such premiums promptly following Tenant's payment of such premiums. In the event of Tenant's failure to comply with any of the foregoing requirements within 15 business days after notice to Tenant thereof, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Monetary Obligations and shall be repaid by Tenant immediately upon demand therefor by Landlord, together with interest thereon

at the Default Rate, from and including the date of payment by Landlord to and including the date such sums are fully paid by Tenant.

(e)    Blanket Policies.  Any insurance which Tenant is required to obtain pursuant to paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant or Guarantor, provided that such "blanket" policy or policies otherwise comply with the provisions of this paragraph 13.  If any such blanket policy contains an aggregate limits clause, then Tenant will provide Landlord and Mortgagee a reserved amount endorsement to such policy that provides an allocation of blanket coverage on a per location or per project basis.

14.    PROPERTY LOSS.

(a)    Property Loss Claims.  In the event of any Property Loss, Tenant shall give Landlord and Mortgagee immediate notice thereof.  Landlord, and Mortgagee by its acceptance of this Lease, hereby authorize Tenant, subject to Landlord's and any Mortgagee's approval of any proposed terms, to negotiate, in its name or in Landlord's or Mortgagee's name, the adjustment, collection, settlement, compromise or payment of all Property Loss claims under any of the insurance policies required by paragraph 13 and to execute and deliver on behalf of Landlord and Mortgagee all necessary proofs of loss, receipts, vouchers and releases required by the insurers in connection with a Property Loss.  Landlord and Mortgagee agree to sign, upon request of Tenant, all such proofs of loss, receipts, vouchers and releases.  Landlord and Mortgagee may elect to monitor or participate in the adjustment, collection, settlement, compromise or claims payment process, and the reasonable costs and expenses thereof, including Landlord's and Mortgagee's reasonable attorneys' fees and costs, shall be chargeable to and paid by Tenant.

Except as provided in subparagraph (b) below, in the event of any Property Loss (whether or not insured against), this Lease shall continue in full force and effect without abatement or reduction of Rent, Additional Monetary Obligations or any other sums payable by Tenant hereunder.

Any Net Proceeds received for any Property Loss shall be payable to, and held by Mortgagee, subject to the provisions of this paragraph 14.  Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to Mortgagee instead of to Landlord and Tenant jointly; and Landlord and Tenant hereby appoint Mortgagee as attorney-in-fact to endorse any draft therefor.

Promptly after any Property Loss, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to its value, condition and character immediately prior to such Property Loss, or as otherwise

reasonably acceptable to Landlord and otherwise in accordance with all Insurance Requirements and legal requirements and the provisions of this Lease, whether or not the Net Proceeds are sufficient to cover the cost of restoration, and Mortgagee shall make available to Tenant any Net Proceeds for such Property Loss received by Mortgagee, subject to the terms and conditions set forth in paragraph 17.

(b)     Termination Upon Loss.  If a substantial portion of the Leased Premises suffers a Property Loss such that it would be uneconomic for Tenant to restore the Leased Premises to its condition prior to such Property Loss for use in Tenant's Business, then Tenant may, not later than 60 days after such Property Loss, give to Landlord notice of its intention to terminate this Lease on a Termination Date specified in such notice, and Tenant shall thereupon have no obligation to restore the Leased Premises.  Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor, rebuilding, restoring or repairing the Leased Premises for continued use and occupancy in the business carried on by Tenant on the Leased Premises immediately prior to such Property Loss would be uneconomic.  As used in this subparagraph (b), "substantial portion" means 50% or more of the replacement cost of the Improvements.  If the Termination Date occurs during the Initial Term, as part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer, (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 11, or (z) elect to make a termination payment on the Termination Date equal to the purchase price which Tenant would be obligated to pay as the purchase price for the Leased Premises pursuant to attached Exhibit F had Tenant made a Purchase Offer pursuant to clause (x) above (the "Property Loss Termination Payment").  In the event that (1) the Termination Date occurs during an Extended Term, or if Landlord rejects such Purchase Offer pursuant to paragraph 10, then the Net Proceeds shall belong to Landlord, or (2) Tenant elects to make the Property Loss Termination Payment as provided in clause (z) above, then the Net Proceeds shall belong to Tenant and Landlord shall assign any and all rights of Landlord therein to Tenant, and in either event this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Rent, all Additional Monetary Obligations and all other sums then due and payable under this Lease through and including the Termination Date (however, no Rent will be payable on the Rent Payment Date that is the Termination Date).

15.   CONDEMNATION.

(a)     Assignment of Condemnation Award.  Tenant shall notify Landlord and Mortgagee promptly upon Tenant's receipt of notice served by a condemning authority of a condemnation proceeding affecting the Lease Premises, but Tenant's failure to give such notice shall not constitute an Event of Default hereunder.  Subject to the provisions of this paragraph 15 and

paragraph 17, Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant is or may be entitled by reason of any Condemnation, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise; but nothing in this Lease shall be deemed to (i) assign to Landlord any award or payment on account of Tenant's Equipment or other tangible property, moving expenses, loss of business, and similar claims to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, or (ii) impair Tenant's right to any award or payment resulting from such separate claim. If Landlord receives notice of any proposed Condemnation from any person having the power of eminent domain, Landlord shall promptly give Tenant notice of such proposed Condemnation; the failure of Landlord to give such notice to Tenant shall not affect Tenant's obligations under this paragraph 15 or any other provision of this Lease.

(b)     Total or Substantial Condemnation.    If (i) the entire Leased Premises, or (ii) at Tenant's election, any substantial portion of the Leased Premises, shall be subject to a Taking, then Tenant shall, not later than 60 days after notice of such Taking, give notice to Landlord of its intention to terminate this Lease on a Termination Date specified in such notice and after such Termination Date shall not use the Leased Premises in its business. Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor: (A) the conditions referred to in clause (i) or (ii) above exist with respect to the Leased Premises by reason of such Taking, and (B) continued use and occupancy in the Tenant's Business after restoration would be uneconomic. As used in this subparagraph (b), "substantial portion" means (a) 5% or more of the building space contained in the Improvements, (b) 10% or more of the parking area, (c) 15% or more of the building space and parking area in any combination, (d) taking (other than a temporary taking that, in the judgment of the Executive Committee of the Board of Directors of Tenant, does not cause the continued use and occupancy of the Leased Premises in Tenant's Business to be uneconomic) of any material access to the Leased Premises for which no reasonable alternative is available at a reasonable cost, (e) any Taking that would cause the remainder of the Leased Premises to be in material non-compliance with Applicable Laws, including, without limitation, minimum parking requirements or minimum access requirements, or (f) any Taking following which the Leased Premises cannot reasonably be restored due to the nature of such Taking. If the Termination Date occurs during the Initial Term, as part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer, (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 11, or (z) elect to make a termination payment on the Termination Date equal to the purchase price for the Leased Premises pursuant to attached Exhibit F had Tenant made a Purchase Offer pursuant to clause (x) above (the "Condemnation Termination Payment"). In the event that (1) the Termination Date occurs during an Extended Term, or if Landlord rejects such Purchase Offer pursuant to paragraph 10, then the Net Award for such Taking shall belong

to Landlord, or (2) Tenant elects to make the Condemnation Termination Payment as provided in clause (z) above, then the Net Award shall belong to Tenant and Landlord shall assign any and all rights of Landlord therein to Tenant, and in either event this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Rent, all Additional Monetary Obligations and all other sums then due and payable under this Lease through and including the Termination Date (however, no Rent will be payable on the Rent Payment Date that is the Termination Date).

(c)    Partial Condemnation.  In the event of any Taking of the Land or Improvements which does not result in a termination of this Lease pursuant to subparagraph (b) above, the Term shall nevertheless continue and there shall be no abatement or reduction of Rent, Additional Monetary Obligations or any other sums payable by Tenant hereunder, except as specifically provided in paragraph 17.  Any Net Award for such Taking shall be retained by Mortgagee, subject to the provisions of this subparagraph (c).  Promptly after such Taking, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to their value, condition and character immediately prior to such Taking, whether or not the Net Award is sufficient therefor, and Mortgagee shall make available to Tenant any Net Award received by Mortgagee, subject to the terms and conditions set forth in paragraph 17.

In the event of a Requisition of the Leased Premises, the Net Award for such Requisition allocable to the Term shall be paid to Tenant and this Lease shall continue in full force and effect without any abatement or reduction of the Rent, Additional Monetary Obligations or other sums payable by Tenant hereunder.  Any portion of such Net Award allocable to any period after the expiration or termination of the Term shall belong to Landlord.

(d)    Landlord's Equipment Condemnation.  In the event of any Taking of Landlord's Equipment which does not fall within the provisions of subparagraph (b) above, this Lease shall continue in full force and effect and without any abatement or reduction of Rent, Additional Monetary Obligations or any other sums payable by Tenant hereunder.  Tenant shall, whether or not the Net Award is sufficient for the purpose, promptly replace Landlord's Equipment so taken, in accordance with the provisions of paragraphs 8(c) and 17, and the Net Award for such a Condemnation shall thereupon be payable to Tenant.

(e)    Proceedings.  Tenant shall take all appropriate actions with respect to each Condemnation proceeding, action, negotiation, prosecution and adjustment and shall pay all cost and expenses thereof, including the reasonable cost of Landlord's and Mortgagee's participation therein, provided that Landlord's and Mortgagee's consents shall be required to any settlement or agreement with the condemning authority (except one involving solely an award or payment to which Tenant is entitled under subparagraph (a) above), such consent not to be unreasonably withheld or delayed.

16.    **ECONOMIC ABANDONMENT.** As long as no Default then exists hereunder, if the Leased Premises shall have become uneconomic or unsuitable for continued use and occupancy in the business operations of Tenant or in the business operations of any Affiliate of Tenant, and if the Executive Committee of the Board of Directors of Tenant and Guarantor have decided to and agree to discontinue the use of the Leased Premises in its business operations within one year or less after the date of the delivery of the notice hereinafter referred to in this paragraph 16, or if Tenant, on or before such date of delivery, has already discontinued such use, then Tenant may notify Landlord of its intention to terminate this Lease on a Termination Date specified in such notice. As part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer pursuant to paragraph 10, or (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 11. If Landlord rejects such Purchase Offer pursuant to paragraph 10, then this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Rent, all Additional Monetary Obligations and all other sums then due and payable under this Lease through and including the Termination Date (however, no Rent will be payable on the Rent Payment Date that is the Termination Date).

17.    **RESTORATION.** In the event of any Property Loss referred to in paragraph 14(a) or Taking referred to in paragraph 15(c), Tenant shall, so long as no Event of Default shall have occurred and be continuing, be entitled to receive from Mortgagee periodic disbursements of the Net Proceeds payable in connection with such loss and the Net Award payable in connection with such Taking, but only on the basis of certificates of Tenant, signed by the President or any Vice President of Tenant, delivered to Mortgagee from time to time as such rebuilding, restoration and repair progresses or is completed. Each such certificate shall describe the work for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith, and shall state that such work has been performed in conformity with the requirements of paragraphs 7(b), 7(c), 8(b), 8(c), and 28, the estimated cost of completing such work, and that Tenant has not theretofore received payment for such work. Upon completion of the work described in this paragraph 17, if any Net Proceeds or Net Award remaining after the final payment has been made for such work is less than $100,000, such remaining Net Proceeds or Net Award shall be paid to Tenant. If such remaining Net Proceeds or Net Award is $100,000, or greater than $100,000, such remaining Net Proceeds or Net Award shall, at Landlord's option, be paid to Tenant or retained by Landlord; if retained by Landlord then (i) Cost as set forth in Exhibit I hereto shall be reduced by the amount of such remaining Net Proceeds or Net Award so retained by Landlord, and (ii) each installment of Rent, payable thereafter during the Initial Term commencing with the second Rent Payment Date subsequent to the final payment to Tenant for such work, shall be reduced by 2.1305468500% of such remaining Net Proceeds or Net Award retained by Landlord. If not retained by Landlord, such remaining Net Proceeds or Net Award shall be paid to Tenant. If the cost of any such work required to be done by Tenant pursuant to this paragraph shall exceed the amount of such Net Proceeds or Net Award, the deficiency shall be paid by Tenant. No payments shall be made to Tenant pursuant to this paragraph 17 if any Default

exists under this Lease unless and until such Default shall have been cured or removed.

18.   **ASSIGNMENT AND SUBLEASING; VACATION OF LEASED PREMISES.**

(a)   <u>Assignment and Subleasing</u>.  This Lease may be assigned and the Leased Premises may be sublet in whole or in part without the consent of Landlord, (i) as long as the Guaranty and the liability of Guarantor thereunder shall not be reduced thereby, or (ii) if Winn-Dixie is Tenant under this Lease.  Each sublease of the Leased Premises shall be subject and subordinate to the provisions of this Lease; provided, however, that furniture, fixtures and equipment installed or provided by any sublessee under such sublease shall be the property of such sublessee and shall not be subject to this Lease.  No assignment or sublease of the Leased Premises as permitted by this <u>paragraph 18</u> shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease or vacancy had occurred.  No assignment or sublease of the Leased Premises shall impose any obligations on Landlord under this Lease. In the event of an assignment of the Lease, or "material sublease" of the Leased Premises, Tenant shall deliver to Landlord a copy of such assignment or material sublease, but Tenant's failure to deliver such copy shall not constitute an Event of Default hereunder.  In the event of a sublease of the Leased Premises that is not a "material sublease", Tenant shall provide written notice to Landlord of such sublease, but shall not be required to provide a copy of such sublease unless an Event of Default exists.  At any time during an Event of Default, full copies of all subleases will be delivered to Landlord upon request.  For purposes of the foregoing, the term "material sublease" will mean a sublease or subleases that, either alone or in the aggregate with all other subleases, occupies more than 25% of the Leased Premises; provided, however, that an in-store branch banking facility sublease that occupies less than 10% of the Leased Premises will not constitute a "material sublease".

Tenant hereby irrevocably and unconditionally assigns to Landlord all rents and other sums payable under any sublease of the Leased Premises as additional security for the payment and performance of Tenant's obligations under this Lease; provided, however, that Landlord hereby grants Tenant a license to collect all such rents and other sums solely for Tenant's account so long as no Event of Default has occurred and is continuing.  Except as may be permitted under <u>paragraph 28(e)</u> below, Tenant shall not mortgage or pledge this Lease or the leasehold estate created hereby, and any such mortgage or pledge made in violation of this <u>paragraph 18</u> shall be void.

(b)   <u>Vacation of Leased Premises</u>.  Subject to the provisions of this <u>subparagraph (b)</u>, Tenant may vacate the Leased Premises without exercising its rights under <u>paragraph 16</u>, provided that the same is made reasonably secure from unauthorized entry during periods of vacancy and the other terms of this Lease (specifically including <u>paragraph 8(b)</u>) are observed and performed.  For purposes of this paragraph, the term "vacation" or "vacancy" will mean a partial or complete

termination or cessation of physical occupancy of the Leased Premises. No vacation of the Leased Premises as permitted by this paragraph 18 shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no vacancy had occurred. No vacation of the Leased Premises shall impose any obligations on Landlord under this Lease.

19.   **PERMITTED CONTESTS.**   After prior written notice to Landlord and Mortgagee, Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any Lien referred to in paragraphs 7(b) or 28, or (iv) take any action with respect to any encroachment, violation, hindrance, obstruction or impairment referred to in paragraph 7(c) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the collection of, or other realization upon, the Imposition or Lien so contested, (B) the sale, forfeiture or loss of any of the Leased Premises, any interest therein, any Rent or any Additional Monetary Obligations to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such encroachment, violation, hindrance, obstruction or impairment, (C) any interference with the use or occupancy of the Leased Premises, (D) any interference with the payment of any Rent, any Additional Monetary Obligations or any other sum payable hereunder, and (E) the cancellation of any fire or other insurance policy. If Winn-Dixie's Consolidated Tangible Net Worth shall be less than $500,000,000 at the time of commencement of any such contest, Tenant shall provide to Landlord and Mortgagee a bond of a surety acceptable to Landlord and Mortgagee in an amount satisfactory to Landlord and Mortgagee. While any such proceedings are pending, neither Landlord nor Mortgagee shall have the right to pay, remove or cause to be discharged the Imposition or Lien thereby being contested. Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as the conditions of the first sentence of this paragraph 19 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Landlord and Mortgagee harmless against any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof. No such contest shall subject Landlord or Mortgagee to the risk of any material civil liability or any criminal liability, penalty or sanction.

20.   **ENVIRONMENTAL COVENANTS; INDEMNITY.** Except as set forth in the second sentence of this paragraph 20, and except as disclosed to Landlord and the Mortgagee in writing prior to the Commencement Date, Tenant hereby represents, warrants, covenants and agrees to and with Landlord and the Mortgagee that all operations or activities upon, or any use or occupancy of the Leased Premises by Tenant, or to Tenant's knowledge any other tenant or occupant, is presently and will at all times be in compliance with all Environmental Laws; that Tenant has not at any time engaged in or permitted, and will not engage in or permit, nor to Tenant's knowledge has any existing or previous tenant or occupant of the Leased Premises engaged in or permitted, the occurrence of any Hazardous Condition; and that, to Tenant's knowledge, there does not now exist nor is there suspected to exist any Hazardous Condition on or about the Leased Premises. Tenant discloses to Landlord that Tenant does, or intends to, store, use and sell in Tenant's Business certain products or substances that may be considered Hazardous Substances, and Landlord acknowledges Tenant's right to do so, provided, however, that any such storage, use or sale of such products or substances shall at all times be in compliance with all Environmental Laws. If any past, present or future activity conducted at the Leased Premises, any past, present or future use of the Leased Premises, or any occurrence whether on or off the Leased Premises, (i) causes the Leased Premises to become a hazardous waste treatment storage or disposal facility within the meaning of, or otherwise bring the Leased Premises within the ambit of, any Environmental Laws, (ii) causes the release or threatened release of Hazardous Substances from the Leased Premises within the meaning of, or otherwise bring the Leased Premises within the ambit of, any Environmental Laws, (iii) causes the discharge into any water source or system or the air of any Hazardous Substances which would require a permit under the any Environmental Laws or which would otherwise be a violation of any Environmental Laws, or (iv) creates a Hazardous Condition on the Leased Premises which is in violation of any Environmental Laws, Tenant agrees to promptly notify Landlord and Mortgagee, if any, of any claim made in respect thereof. If Tenant discovers that any Hazardous Condition exists on the Leased Premises in violation of any applicable law (whether or not disclosed in any environmental report issued on or prior to the Commencement Date), Tenant shall promptly notify Landlord and Mortgagee of such condition, and shall with all due diligence, take all remedial, removal and other actions necessary to remediate, remove, contain or clean up such Hazardous Condition in a manner and to the extent required by the applicable Environmental Laws. Tenant agrees to comply with each of the recommendations contained in all environmental reports issued relating to the Leased Premises if such recommendations are necessary to comply with applicable Environmental Laws. Notwithstanding the foregoing, if any Hazardous Condition is or becomes the subject matter of a federal or state "no-action letter," then Tenant shall not be obligated to undertake Remedial Action with respect to, or to investigate further, such known Hazardous Condition, unless subsequently directed by the federal or state agency having jurisdiction over such known Hazardous Condition. TENANT FURTHER AGREES TO PROTECT, INDEMNIFY, SAVE HARMLESS AND

DEFEND LANDLORD AND MORTGAGEE AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MEMBERS AND EMPLOYEES, IF ANY, FROM AND AGAINST ALL LIABILITIES, OBLIGATIONS, CLAIMS, DAMAGES, PENALTIES, CAUSES OF ACTION, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) IMPOSED UPON OR ARISING OUT OF (X) THE EXISTENCE OF HAZARDOUS SUBSTANCES OR HAZARDOUS CONDITIONS ON THE LEASED PREMISES, OR (Y) ANY ACTION OR OMISSION OF TENANT, ITS AGENTS OR EMPLOYEES, WHICH CONSTITUTES A VIOLATION OF, OR CREATES A CONDITION ON THE LEASED PREMISES WHICH IS IN VIOLATION OF, ANY ENVIRONMENTAL LAWS; provided, however, that the foregoing indemnification shall not be deemed to include claims, actions, administrative proceedings, judgments, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with (i) any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of Tenant after an Event of Default has occurred or after expiration of the Term or earlier termination of this Lease, or (ii) solely as to Tenant's indemnification of Landlord (and with no effect whatsoever on that indemnification of Mortgagee) as provided above, any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord during the Term.

In the event that any Remedial Action with respect to any Hazardous Conditions that could result in a Claim is required under any Environmental Laws by any judicial order, or by any governmental entity, or in order to comply with the terms, covenants and conditions of this Lease or of any other agreements affecting the Leased Premises, Tenant will perform or cause to be performed the Remedial Action in compliance with such law, regulation, order or agreement. All Remedial Action (other than payment of money) will be performed by one or more contractors, selected by Tenant and under the supervision of a consulting environmental engineer selected by Tenant. All costs and expenses of such Remedial Action will be paid by Tenant including without limitation the charges of such contractor(s) and the consulting environmental engineer, and Landlord's and Mortgagee's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Action. If Tenant fails to timely commence, or cause to be commenced, or fails to diligently prosecute to completion, such Remedial Action, then, but not before, Landlord or Mortgagee may, but will not be required or have any obligation to, cause such Remedial Action to be performed, and all costs and expenses thereof, or incurred in connection therewith, will thereupon constitute Claims. All such Claims will be due and payable by Tenant upon demand therefor by Landlord or Mortgagee.

Notwithstanding any provision of this Lease to the contrary, provided that (i) no Default has occurred and is continuing under this Lease, (ii) neither Landlórd nor Mortgagee will be exposed or subjected to civil or criminal liability, and (iii) the respective interests of Landlord and Mortgagee in the Leased Premises are not jeopardized or in any way adversely affected, Tenant may contest or cause to be contested, by appropriate action, the application, interpretation or validity of any Environmental Laws or any agreement requiring any Remedial Action pursuant to a good faith dispute regarding such application, interpretation or validity of such Environmental Laws or agreement requiring such Remedial Action. During the pendency of any such permitted contest, Tenant may delay performance of Remedial Action or compliance with the Environmental Laws or agreement requiring such Remedial Action, provided that (i) Tenant actually contests and prosecutes such contest by appropriate proceedings conducted in good faith and with due diligence to resolution, (ii) prior to any such delay in compliance with any Environmental Laws or any Remedial Action requirement on the basis of a good faith contest of such requirement, Tenant will have given Landlord and Mortgagee written notice that Tenant intends to contest or will contest or cause to be contested the same, and will have given such security or assurances as Landlord or Mortgagee reasonably may request to ensure compliance with the Legal Requirements pertaining to the Remedial Action (and payment of all costs, expenses, interest and penalties in connection therewith) and to prevent any sale, forfeiture or loss of all or any part of the Leased Premises by reason of such noncompliance, delay or contest, and (iii) prior to any such delay in compliance with any Environmental Laws or any Remedial Action requirement on the basis of a good faith contest of such requirement, Tenant will have taken such steps as may necessary to prevent or mitigate any continuing occurrence of any existing or suspected Hazardous Condition giving rise to the contested Remedial Action requirement. Subject to the terms and conditions set forth above, during the pendency of any such permitted contest resulting in a delay of performance of any required Remedial Action, Landlord agrees that it will not perform such Remedial Action requirement on behalf of Tenant.

The foregoing provisions shall survive the expiration or earlier termination of this Lease, but shall finally terminate and cease upon the expiration of any applicable statute of limitation of actions which has not been waived by Tenant as to any potential and unasserted Claim.

21.    **GENERAL INDEMNIFICATION.**    Tenant agrees, at its sole cost and expense, to defend, pay, protect, indemnify, save and hold harmless Landlord and Mortgagee from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising in or about the Leased Premises during the Term or Extended Term, whether or not arising from (i) any injury to, or death of, any person, or any loss of, or damage to, any property on the Leased Premises, or on adjoining

sidewalks, streets or ways, or connected with the use, condition or occupancy thereof (unless caused by the negligent acts or improper conduct of Landlord or Mortgagee), whether or not Landlord or Mortgagee has or should have knowledge or notice of the defect or conditions causing or contributing to such injury, death, loss or damage, (ii) any Claims, (iii) any Default under this Lease, or any violation by Tenant of any provision of any contract or agreement to which Tenant is a party or by which it is bound, affecting this Lease or the Leased Premises, or (iv) any contest referred to in <u>paragraph 19 or 20</u>. The obligations of Tenant under this <u>paragraph 21</u> shall survive the expiration or termination of this Lease until the expiration of the applicable statute of limitations which has not been waived by Tenant for such action.

22.    **DEFAULT PROVISIONS.**

(a)    <u>Events of Default</u>. The occurrence of any one or more of the following shall constitute an Event of Default under this Lease:

(i)    if any installment of Rent or any payment of Additional Monetary Obligations due from Tenant is an Overdue Payment that is not paid within 10 days following the due date thereof; or

(ii)    a failure by Tenant to duly perform and observe, or a violation or breach of, any other material provision hereof which failure, violation or breach shall continue for a period of 30 days after notice to Tenant thereof; provided that if such failure, violation or breach cannot be cured by mere payment of money and cannot with diligence be cured within such 30-day period, the period to cure such failure, violation or breach shall be extended for such longer period of time not to exceed 12 months from the date of such failure, violation or breach, as is reasonably necessary to cure such failure, violation or breach so long as Tenant shall commence to cure such failure, violation or breach within said 30-day period and actively, diligently and in good faith proceed with continued curing thereof until it shall be fully cured;

(iii)    any representation or warranty made by Tenant or Guarantor in this Lease, the Guaranty or any other document delivered in connection with the execution and delivery of this Lease or the Guaranty or pursuant to this Lease or the Guaranty proves to be incorrect in any material respect;

(iv)    Tenant or Guarantor shall voluntarily be adjudicated a bankrupt or insolvent, seek or consent to the appointment of a receiver or trustee for Tenant, Guarantor or the Leased Premises, file a petition seeking relief under the bankruptcy or other similar laws of the United

States, any state or any jurisdiction, make a general assignment for the benefit of creditors, or admit in writing its inability to pay its debts as they mature;

(v)     a court shall enter an order, judgment or decree appointing a receiver or trustee for Tenant, Guarantor or the Leased Premises or approving a petition filed against Tenant or Guarantor which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, 60 days after it is entered;

(vi)    Tenant or Guarantor shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution, or shall, in any manner, permit the divestiture of all or substantially all of its assets other than in connection with a merger or consolidation of Tenant into, or a sale of all or substantially all of Tenant's assets to, another corporation provided that the survivor of such merger or consolidation, or the purchaser of such assets, shall assume all of Tenant's obligations under this Lease by a written instrument, in form and substance satisfactory to Landlord and Mortgagee, accompanied by an opinion of counsel, satisfactory to Landlord and Mortgagee, stating that such instrument of assumption is valid, binding and enforceable against the parties thereto in accordance with its terms, and provided further that, immediately after giving effect to any such merger or consolidation or sale of such assets, the survivor of such merger or consolidation, or the purchaser of such assets, as the case may be, shall have a Consolidated Tangible Net Worth of not less than $1 billion;

(vii)   the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such proceeding shall not be vacated or discharged within sixty 60 days after such levy or attachment; or

(viii)  Guarantor shall default under the Guaranty.

(b)     Landlord's Remedies Upon Tenant Default.  If an Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter during the continuance of such Event of Default, to do any one or more of the following without demand upon or notice to Tenant:

(i)     Landlord may give Tenant notice of Landlord's intention to terminate this Lease on a date specified in such notice.  Upon the date therein specified, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such

date were the date hereinbefore fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder, including its liability for Rent, Additional Monetary Obligations or any other sums payable under this Lease, as hereinafter provided.

(ii)     Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (i) above, (x) give Tenant notice to surrender the Leased Premises to Landlord immediately or on a date specified in such notice, at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord, or (y) reenter and repossess the Leased Premises by summary proceedings, ejectment or any other means or procedure. Upon or at any time after taking possession of the Leased Premises, Landlord may remove any persons or property therefrom. Landlord shall be under no liability for, or by reason of, any such entry, repossession or removal.   No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (i) above.

(iii)    After repossession of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord shall have the right to relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine; and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be responsible or liable for any failure to relet the Leased Premises or any part thereof or for any failure to collect any rent due upon any such reletting.   Landlord may make such Alterations as Landlord in its sole discretion may deem advisable. Tenant agrees to pay Landlord, as Additional Monetary Obligations, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting the Leased Premises, including reasonable fees and commissions of attorneys, architects, agents and brokers.

(iv)    After repossession of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord shall have the right to sell the Leased Premises at public or private sale, as

Landlord may determine, or otherwise dispose of, use, operate, lease to others, or keep idle, all or any part of the Leased Premises, as Landlord may determine, all free and clear of any rights of Tenant except as hereinafter set forth in this paragraph 22 and without any duty to account to Tenant with respect to such action or inaction or any proceeds with respect thereto; provided, however, that any such sale or other disposition shall be made in compliance with any mandatory provisions of applicable law which may not be waived.

(v)     Landlord may exercise any other right or remedy now or hereafter existing by law or in equity.

(c)     No Relief of Obligations.  No expiration or termination of this Lease, or repossession or reletting of the Leased Premises pursuant to this paragraph 22 or any other provision of this Lease, by operation of law or otherwise, shall relieve Tenant of any of its liabilities and obligations hereunder, including the liability for payment of Rent, Additional Monetary Obligations and all other sums payable hereunder, all of which shall survive such expiration, termination, repossession or reletting.

(d)     Current Damages.  In the event of any expiration or termination of this Lease or repossession of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord all Rent, all Additional Monetary Obligations and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages (i) all Rent, all Additional Monetary Obligations and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the amount Tenant can prove to be nêt proceeds, if any, of any reletting pursuant to this paragraph 22, after deducting from such proceeds all of Landlord's expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alterations and expenses of preparation for reletting).  Tenant hereby agrees to be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(e)   Liquidated Final Damages.  At any time after any such expiration or termination of the Term or repossession of the Leased Premises by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any current damages pursuant to this paragraph 22, Landlord shall be entitled to recover from Tenant, and Tenant will pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's Default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages and it being further agreed that the amount herein described is a reasonable estimate of the amount of Landlord's probable damages), an amount equal to the excess, if any, of (i) the Rent, Additional Monetary Obligations and other sums which would be payable under this Lease from the date of such demand (or, if it be earlier, the date to which Tenant shall have satisfied in full its obligations under this paragraph 22 to pay current damages) for what would be the then unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of 5% per annum over (ii) the then fair net rental value of the Leased Premises for the same period and (y) an amount equal to the then applicable Make-Whole Amount, if any, payable to the Mortgagee.  The discount rate to be used in determining such fair rental value shall be 5% per annum.  If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(f)   Alternative Liquidated Final Damages.  At any time after any such expiration or termination of the Term or repossession of the Leased Premises by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any current damages pursuant to this paragraph 22, if Landlord shall have sold the Leased Premises pursuant to paragraph 22(b)(iv), then Landlord, as an alterative to paragraph 22(e), shall be entitled to recover from Tenant, and Tenant will pay to Landlord on the date of such sale, as and for liquidated and agreed final damages for Tenant's Default and in lieu of all current damages beyond the date of such sale (it being agreed that it would be impracticable or extremely difficult to fix the actual damages and it being further agreed that the amount herein described is a reasonable estimate of the amount of Landlord's probable damages), any unpaid installments of Rent for the Leased Premises up to and including the Rent Payment Date occurring immediately prior to the date of such sale, plus the amount of any deficiency between (x) the proceeds of such sale and (y) an amount equal to the purchase price for the Leased Premises pursuant to attached Exhibit F had Tenant made a Purchase Offer pursuant to paragraph 16 to purchase the Leased Premises on the date of such sale and such Purchase Offer had been accepted. If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, then Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

23.   **ADDITIONAL RIGHTS OF LANDLORD.**

(a)   Non-Exclusive, Cumulative Remedies.   No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease. No delay or failure by Landlord to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof. In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)   Tenant's Waiver of Redemption.   Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

(c)   Costs Upon Default and Litigation.   Tenant shall pay to Landlord and Mortgagee as Additional Monetary Obligations all expenses incurred by Landlord or Mortgagee in connection with any Default or Event of Default or the exercise of any remedy by reason of any Default or Event of Default, including reasonable attorneys' fees and expenses. If Landlord or Mortgagee shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or the Leased Premises, at the option of Landlord and Mortgagee, Tenant, at its expense, shall provide Landlord or Mortgagee with counsel approved by Landlord and Mortgagee and shall pay all reasonable costs incurred or paid by Landlord and Mortgagee in connection with such litigation.

24.   **NOTICES.**   All notices, requests, consents, demands, offers and other communications required or permitted to be given pursuant to this Lease shall be in writing and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telefax, the day when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party prior to or during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if after normal business hours for the recipient; (iii) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same, addressed to Landlord or Tenant at their

respective addresses stated in the introductory paragraph of this Lease, or addressed to Mortgagee or Guarantor at their respective addresses stated below:

If to Mortgagee:    First Security Bank, National Association
        and Val T. Orton, Trustees
79 South Main Street
Salt Lake City, Utah 84111
Telefax No.: 801 246 5053

If to Guarantor:    Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida  32254
Attention: General Counsel
Telefax No.: 904 783 5294

For the purposes of this paragraph 24, any person may substitute its address by giving 15 days' notice to the other persons in the manner provided above.

25.    **ESTOPPEL CERTIFICATE.**  Landlord and Tenant shall, at any time and from time to time, upon not less than 20 days' prior request by the other, execute, acknowledge and deliver to the other, an estoppel certificate substantially in the form attached as Exhibit G.  It is intended that any such statements may be relied upon by Mortgagee, the recipient of such statements or their assignees, or by any prospective purchaser or mortgagee of the Leased Premises.

26.    **SURRENDER AND HOLDING OVER.**  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except for any portion thereof with respect to which this Lease has previously terminated) to Landlord in broom clean condition, and otherwise in the same condition in which the Leased Premises were originally received from Landlord on the Commencement Date, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear.  Tenant shall remove, at Tenant's sole cost and expense, from the Leased Premises on or prior to such expiration or earlier termination all property situated thereon which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Property not so removed at the end of the Term or within 30 days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises.  The cost of removing and disposing of such property and repairing any damage to the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof shall operate and be construed as a tenancy from month to month only, at double the Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over shall entitle Landlord, in addition to collecting double rentals, to exercise all rights and remedies provided by law or in equity, including the remedies of paragraph 22(b).

27.    **NO MERGER OF TITLE.** There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (ii) the fee estate or ownership of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities (including any Mortgagee) having any interest in (x) this Lease or the leasehold estate created by this Lease, and (y) the fee estate in or ownership of the Leased Premises sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

28.    **ALTERATION AND EXPANSION.**

(a)    Alterations Generally. ·'Tenant may, at its expense make any Alterations, construct upon the Land any additions to the Improvements or install equipment in the Improvements or accessions to the Landlord's Equipment without Landlord's consent, provided that (i) the character of the Leased Premises shall not be materially changed and the market value of the Leased Premises shall not be materially lessened by any such Alteration, construction or installation (it being agreed that a Store Expansion, or any expansion or enlargement referred to in subparagraph (b) below, shall not be deemed to constitute a material change in the character of the Leased Premises), nor shall the usefulness or structural integrity of the Leased Premises be impaired thereby, (ii) all such work of Alteration, construction and installation shall be performed in a good and workmanlike manner, (iii) all such Alterations, construction and installation shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with any such Alteration, construction or installation shall comply with the requirements of any insurance policy required to be maintained by Tenant hereunder, (v) Tenant shall promptly pay all costs and expenses of any such Alteration, construction or installation, and Tenant shall discharge all Liens filed against the Leased Premises arising out of the same, and (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, construction or installation. In the case of any other proposed Alteration, construction or installation, Tenant shall first obtain Landlord's and Mortgagee's consents, which consents may be withheld in Landlord's or Mortgagee's sole

discretion.  All such Alterations, construction and installations (except Tenant's Equipment) shall be the property of Landlord and shall be subject to this Lease.

(b)    Alterations Involving Expansion of Improvements.  It is understood that Tenant may at future times during the Term wish to enlarge the Improvements by a Store Expansion or otherwise by constructing Alterations and additions thereto. Except as provided in paragraphs 28(c) and (d) below, Tenant shall have the sole responsibility for negotiating and providing for such Store Expansion, Alterations or additions as may be necessary for its expansion plans.  If Tenant is able to obtain agreements and contracts for the Alterations and additions at a cost satisfactory to it, Tenant may then request that Landlord purchase such Alterations and additions and incorporate the same into this Lease upon terms and conditions negotiated by the parties; provided, however, that Landlord shall have no obligation to purchase such Alterations and additions.  If the parties are unable to agree on the purchase of such Alterations and additions, then Tenant shall have the right to construct Alterations and additions at its own expense and to make such changes as are necessary to make the entire enlarged building suitable for use and occupancy by Tenant in the conduct of its business; but Tenant shall not have the right to mortgage or pledge this Lease or the leasehold estate created hereby or its interest in such Alterations to finance such Alterations, except as herein permitted.  Prior to commencement of construction of such Alterations, Tenant shall provide Landlord and Mortgagee with a set of plans and specifications for such Alterations. Following substantial completion of such Alterations, Tenant shall provide Landlord and Mortgagee with (i) copies of certificates of occupancy or completion, if required by Legal Requirements, (ii) an as-built survey of the Alterations demonstrating that the Alterations do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises, and (iii) a modification of the Site Plan to materially reflect such Alterations.  Subject to the following sentence, all such Alterations and additions shall be subject to the terms of this Lease to the same extent as if owned by Landlord and leased under this Lease. Title to such Alterations and additions as necessary to meet any Legal Requirements shall pass to Landlord without cost or expense to Landlord, Tenant shall execute additional documents as necessary to complete such transfer.

(c)    Mortgagee's Financing of Alterations Involving Expansion.  Subject to the conditions set forth below, during the Initial Term, Tenant may construct a Store Expansion at its own initial expense, and upon written notice by Tenant given to Landlord not later than 90 days prior to the anticipated date of substantial completion of such Store Expansion, Landlord shall reimburse Tenant for the Expansion Cost pursuant to the Expansion Financing.  The Expansion Financing obtained by Landlord shall be evidenced by an Expansion Note made by Landlord payable to Mortgagee, having a term commencing on the Expansion Financing Date and expiring on the last day of the Initial Term, with payments of principal and interest payable quarterly in amounts necessary to fully amortize the Expansion

Note with interest over the remainder of the Initial Term. The interest rate under the Expansion Note shall be a fixed rate determined by agreement among Landlord, Tenant and Mortgagee based on the same or substantially similar standards as used to determined the interest rate under the Note, with appropriate and reasonable adjustments based on Tenant's then-current debt rating, and then-current market factors and applicable indexes for similar debt instruments with similar maturities. Funding of the Expansion Financing will occur on the Expansion Financing Date, which shall be a Rent Payment Date unless otherwise agreed among Landlord, Tenant and the Mortgagee providing such Expansion Financing. All costs and expenses of the Expansion Financing, including, without limitation, the reasonable attorneys fees of Landlord and Mortgagee, shall be paid by Tenant on the Expansion Financing Date, and at Tenant's election, may be considered part of the Expansion Cost to be financed pursuant to the Expansion Financing, subject to the remaining conditions of this paragraph 28(c). Landlord shall have no obligation to reimburse Tenant for the Expansion Cost unless Landlord is able to satisfy the conditions and requirements of the Mortgage for issuance of the Expansion Notes and the following conditions shall have been satisfied by Tenant on or before the Expansion Financing Date:

(A)    Tenant shall have materially complied with the requirements for Alterations as set forth in paragraphs 28(a) and (b) above, and with the requirements set forth in this paragraph 28(c), and shall have delivered the Completion Certificate substantially in the form attached as Exhibit I.

(B)    The Expansion Cost shall be at least $1,000,000, as certified to Landlord pursuant to the Completion Certificate delivered pursuant to subparagraph (A) above.

(C)    Prior to the Expansion Financing Date, Tenant shall deliver to Landlord and Mortgagee, at Tenant's sole cost and expense, an appraisal of the Store Expansion prepared by an appraiser reasonably acceptable to Landlord and Mortgagee, which shall indicate that the value of the Store Expansion, when completed, is not less than the Expansion Cost, or alternatively, that the value of the Leased Premises including the Store Expansion, is not less than the Cost, including the Expansion Cost. If the Expansion Cost exceeds the value of the Store Expansion, or if the Cost exceeds the value of the Leased Premises, as indicated by such appraisal, Tenant shall pay the amount by which the Expansion Cost or Cost exceeds such appraised value.

(D)    On or before the Expansion Financing Date, Tenant shall deliver to Landlord and Mortgagee, at Tenant's sole cost and expense, a commitment to endorse Landlord's and Mortgagee's existing title insurance policies (or to issue replacement title insurance policies, if required by

applicable state title insurance regulations), to increase the coverage amounts for each policy by the amount of the Expansion Cost reimbursed to Tenant, and to reflect the modification of the Loan Documents and this Lease free and clear of any construction liens or other liens or encumbrances (other than those created by Landlord) arising subsequent to the effective dates of such policies.

(E)    There is no Default or Event of Default existing under this Lease as of the Expansion Financing Date.

(F)    Tenant shall have delivered, or caused to be delivered, such documents, certificates, legal opinions or affidavits as reasonably may be requested by Landlord or Mortgagee to facilitate the Expansion Financing, of the same or similar nature to those required in connection with the Loan.

Effective on the Expansion Financing Date, Rent will be increased in accordance with the provisions of attached Exhibit E, the Cost of the Leased Premises as set forth on attached Exhibit F will be adjusted to account for the addition of the Expansion Cost to the original Cost, and the Leased Premises shall be as delineated on the modified Site Plan delivered pursuant to paragraph 28(b). At Landlord's request, on the Expansion Financing Date, Landlord and Tenant shall enter into an amendment of this Lease and/or a modification of any memorandum of this Lease, to reflect the foregoing adjustments and modifications.

(d)    Third Party Financing of Alterations Involving Expansion.  If all of the conditions in paragraph 28(c) above have been satisfied but Landlord, Tenant and Mortgagee are unable to reach an agreement, in good faith, on the interest rate or other material financial terms of the Expansion Financing, then Landlord shall, upon Tenant's written request, obtain the Expansion Financing from an Institutional Investor selected by Tenant or from Guarantor but otherwise on the same terms, covenants and conditions as set forth in paragraph 28(c) above, which Expansion Financing shall be secured by a mortgage lien encumbering the Leased Premises which is pari passu (as between the Mortgagee and such Institutional Investor or Guarantor) with the Mortgage, subject to the terms of an intercreditor agreement to be entered between Mortgagee and such Institutional Investor or Guarantor, which intercreditor agreement shall provide that decisions shall be made by the holders of 51% of the aggregate principal amount of debt secured by such Mortgages. The Loan Documents given by Landlord to Mortgagee shall include provisions permitting Landlord to issue such a parity mortgage on the Leased Premises in accordance with the foregoing terms and conditions, and governing the terms of an intercreditor agreement between Mortgagee and such Institutional Investor or Guarantor.

(e)    Tenant's Self-Funding of Alterations Involving Expansion.  If, after the exercise of diligent and good faith efforts, Landlord is unable to obtain the Expansion Financing either from the Mortgagee or from an Institutional Investor or

Guarantor in accordance with the foregoing provisions, then Tenant may pay for the Store Expansion without reimbursement by Landlord, and the failure to have obtained financing with either the Mortgagee or an Institutional Lender shall not be considered a default of Landlord hereunder.  In the event of such self-funding by Tenant, and provided that Tenant first has subordinated its leasehold interest in the Leased Premises to the lien of the Mortgage pursuant to <u>paragraph 8(f)</u> above, Tenant may finance the Expansion Cost by mortgaging its leasehold interest in the Leased Premises, notwithstanding the provisions of <u>paragraph 18</u> above.

(f)    <u>New Store Construction</u>.  If construction of the Improvements and installation of Landlord's Equipment and Tenant's Equipment has not commenced, or has commenced but has not been completed as of the Commencement Date, the following provisions shall apply:

(A)    Tenant shall substantially complete construction of the Improvements in accordance with the Site Plan, in the same manner as if the Improvements were Alterations, and subject to the requirements of <u>paragraph 28(a) and 28(b)</u> above.

(B)    Within 30 days after the date of substantial completion of the Improvements, Tenant shall deliver to Landlord and Mortgagee a Certificate of Completion substantially in the form of attached <u>Exhibit I</u>, a certificate of occupancy or its equivalent issued by the applicable governmental agencies, if required by Legal Requirements, and an as-built survey of the Land demonstrating that the Improvements do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises or the additional land, and an as-built survey of the Leased Premises showing the completed Improvements.

(C)    If Tenant fails to substantially complete construction of the Improvements or deliver the documentation to Landlord and Mortgagee as required by this <u>paragraph 28(f)</u>, and Tenant shall have notified Landlord of Tenant's election to exercise the Substitution Option pursuant to <u>paragraph 11</u> above on a Termination Date specified in such notice, Tenant shall and shall be deemed to have elected to make a Purchase Offer (which shall be subject to <u>paragraph 10</u> above) to purchase the Leased Premises on the Termination Date stated in such notice.

29.    **MISCELLANEOUS.**  The paragraph headings in this Lease and the Table of Contents preceding this Lease are for convenience only and are not to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease, the singular shall include the plural as the context requires, and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions"

shall mean "provisions, terms, agreements, covenants and/or conditions"; and (iii) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition". Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought and consented to by Mortgagee. The covenants of this Lease shall run with the land and bind Tenant and all successors and assigns of Tenant and shall inure to the benefit of and bind Landlord, its successors and assigns. If any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Lease may be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes. This Lease shall be governed by and construed according to the laws of the State. All Exhibits and attachments to this Lease are by reference incorporated into, and form a part of, this Lease. A memorandum of this Lease substantially in the form attached as <u>Exhibit H</u> shall be recorded in the records of the appropriate public office having custody of the real property records of the county in which the Leased Premises is located.

[THIS SPACE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

WITNESSES:                    LANDLORD:

                              BENNETTSVILLE 99-SC, LLC, a Delaware limited
                              liability company

                              By:    PRINCIPAL NET LEASE INVESTORS,
                                     L.L.C., a Delaware limited liability company,
                                     its sole member

                              By:    PRINCIPAL LIFE INSURANCE
                                     COMPANY, an Iowa corporation, its
                                     sole member

Name: _L.S.Uskabn_____

                              By: _____
                              Name: _____
Name: __Julia L. McDonald__   Its:    CLARE TANDE
                                      COUNSEL

Name: _L.S.Uskabn_____

                              By: _Karen A Pearston_
                              Name: _____
Name: __Julia L. McDonald__   Its:    KAREN A. PEARSTON
                                      COUNSEL

                              [CORPORATE SEAL]

STATE OF _IOWA_____ )
                                          )
COUNTY OF _POLK_____ )

I, the undersigned, a Notary Public, do hereby certify that PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, by _CLARE TANDE_____ _____, its duly authorized _COUNSEL_____, as the sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, the sole member of BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and seal this _11th_ day of August, 1999.

_____

NOTARY PUBLIC, State of _Iowa_____
Printed Name: _Helen L. Boles_____

[NOTARIAL SEAL]

Commission No.: _007065_

My commission expires: 
<table>
<tr><td>HELEN L. BOLES<br>MY COMMISSION EXPIRES<br>April 7, 2002</td></tr>
</table>

STATE OF _IOWA_____ )
                                          )
COUNTY OF _POLK_____ )

I, the undersigned, a Notary Public, do hereby certify that PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, by _KAREN A. PEARSTON_ _____, its duly authorized _COUNSEL_____, as the sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, the sole member of BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and seal this _11th_ day of August, 1999.

_____

NOTARY PUBLIC, State of _Iowa_____
Printed Name: _Helen L. Boles_____

[NOTARIAL SEAL]

Commission No.: _007065_

My commission expires: _____
<table>
<tr><td>HELEN L. BOLES<br>MY COMMISSION EXPIRES<br>April 7, 2002</td></tr>
</table>

WITNESSES:

Name: R. U. Peterson

Name: danie R. Long

TENANT:

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By: R - P. McCook
Name: R. P. McCook
Title: Vice President

STATE OF _____FL_____ )
                                               )
COUNTY OF ___Duval_____ )

    I, the undersigned, a Notary Public, do hereby certify that WINN-DIXIE RALEIGH, INC., a Florida corporation, by _R. P. McCook_____, its duly authorized _Vice President_, personally appeared before me this day and acknowledged the due execution of the foregoing instrument. He either [ ] is personally known to me or [ ] has produced _____ state drivers license as identification.

    Witness my hand and seal this _5th_ day of August, 1999.

NOTARY PUBLIC, State of ____FL_____
Printed Name: _____

[NOTARIAL SEAL]    Commission No.: _____
My commission expires: _____

Mary Kay Vega
MY COMMISSION # CC577749 EXPIRES
September 29, 2000
BONDED THRU TROY FAIN INSURANCE, INC

EXHIBIT A TO LEASE AGREEMENT - SCHEDULE OF DEFINED TERMS

"Additional Monetary Obligations" shall have the meaning assigned to such term in paragraph 5(b) of this Lease.

"Affiliate" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with any other specified person.

"Alterations" means all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of, and all substitutions or replacements for, any of the Improvements or Landlord's Equipment, whether interior or exterior, structural or non-structural, or ordinary or extraordinary.

"Assignment" means an assignment of this Lease and any related Guaranty executed by Landlord in favor of a Mortgagee.

"Business Day" means any day on which financial institutions located in New York, New York, are open for regular business.

"Claims" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable attorneys' fees and costs, whether incurred in enforcing this Lease, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Lease or caused by any person or entity. Without limiting the generality of the foregoing definition, Claims specifically will include claims, whether by related or third parties, for personal injury or real or personal property damage, and capital, operating and maintenance costs incurred in connection with any Remedial Work. However, notwithstanding the foregoing, Claims will not be deemed to include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with (i) any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord or during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of the Tenant after an Event of Default has occurred or after expiration of the Term or earlier termination of the Lease, or (ii) solely as to Tenant's indemnification of Landlord (and with no effect whatsoever on that indemnification of Mortgagee) as provided in paragraph 20, any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord during the Term.

"Commencement Date" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Condemnation" means a Taking or a Requisition.

"Consolidated Tangible Net Worth" means the tangible net worth, as determined on a consolidated basis under generally accepted accounting principles consistently applied, of a business organization and its subsidiaries.

"Construction Requirements" if applicable, are set forth in paragraph 28(f) of this Lease.

"Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with the construction and acquisition of the Leased Premises, including, without limitation, all fees and expenses in connection with the initial placement, issuance and sale of the Note and any interim financing of the Leased Premises, title transfer fees, title insurance premiums and recording expenses and taxes (including transfer taxes), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction, and fees and costs of professionals such as attorneys, architects, engineers, surveyors and appraisers; together with the Expansion Cost, if any, applicable to the Leased Premises.

"Default" shall mean any breach of any term, covenant or condition of, or obligation under, this Lease which, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean 9.57%.

"Environmental Laws" will mean any applicable present or future federal, state or local laws, ordinances, rules or regulations pertaining to Hazardous Substances, industrial hygiene or environmental conditions, including without limitation the following statutes and regulations, as amended from time to time: (i) the Federal Clean Air Act, 42 U.S.C. Section 7401 et seq.; (ii) the Federal Clean Water Act, 33 U.S.C. Section 1151 et seq.; (iii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); (iv) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("SARA"); (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; (vi) the National Environment Policy Act, 42 U.S.C. Section 1857 et seq.; (vii) The Toxic Substance Control Act of 1976, 15 U.S.C. Section 2601 et seq.; (viii) the regulations of the Environmental Protection Agency, 33 CFR

and 40 CFR; (ix) regulations of the Occupational Safety and Health Administration ("OSHA") relating to asbestos; and (x) similar statutes, rules and regulations of the State.

"Event of Default" means the occurrence of any of the events described in paragraph 22(a) of this Lease, and the giving of notice or the passage of any applicable grace or cure period, or both, as provided in said paragraph.

"Expansion Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with a Store Expansion, including, without limitation, direct construction costs of the Store Expansion, all fees and expenses in connection with the issuance of the Expansion Note, title insurance fees and premiums and recording expenses and taxes (including transfer taxes, if any), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction, and fees and costs of professionals such as attorneys, architects, engineers, surveyors and appraisers.

"Expansion Financing" means the mortgage financing, if any, obtained by Landlord from a Mortgagee to finance the Expansion Cost, pursuant to the Expansion Note, on terms (other than interest rate, amortization and other payment terms of the Expansion Notes) substantially equivalent to the terms of the Loan Documents.

"Expansion Financing Date" means the effective date of funding of the Expansion Financing and Landlord's reimbursement of the Expansion Cost to Tenant, which date shall be on a Rent Payment Date.

"Expansion Note" means the note, if any, made by Landlord payable to a Mortgagee to evidence the Expansion Financing, as secured by the Mortgage, as modified to describe the Expansion Note as an additional obligation of Landlord, or by a separate mortgage having *pari passu* status with the Mortgage.

"Extended Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Guarantor" means Winn-Dixie; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guarantor in this Lease shall be deemed deleted and of no effect.

"Guaranty" means the guaranty of this Lease, dated this date, executed by Guarantor in favor of Landlord; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guaranty in this Lease shall be deemed deleted and of no effect.

"Hazardous Condition" will mean the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or that migrates, flows, percolates, diffuses or in any way moves onto or into the Leased Premises, or from the Leased Premises into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials, friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant, or animal health or well-being, and those substances, materials, and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws

"Impositions" shall have the meaning assigned to such term in paragraph 12(a) of this Lease.

"Improvements" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Initial Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Institutional Investor" shall mean any of the following persons existing under the laws of the United States or any state thereof or of the District of Columbia or Canada or any province thereof: (i) any bank, trust company, national banking association or savings and loan association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation, eleemosynary institution, church or fraternal order, (iii) any insurance company, (iv) any pension, profit-sharing, retirement trust or fund for which any bank, trust company, national banking association or savings and loan association or investment advisor registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, or if self-managed, having funds of at least $50,000,000, (v) any investment company, as defined in the Investment Company Act of 1940, as amended, (vi) any college or university, or (vii) any government, any public

employees' pension or retirement system, or any other governmental agency supervising the investment of public funds.

"Land" shall have the meaning assigned to such term in paragraph 2 of this Lease, and which is legally described on attached Exhibit B-1.

"Landlord" shall have the meaning assigned to such term in the introductory paragraph of this Lease.

"Landlord's Assignee" shall mean a Mortgagee which takes an Assignment as additional collateral for its loan to Landlord.

"Landlord's Equipment" shall have the meaning assigned to such term in paragraph 2 of this Lease, and will include the Replacement Equipment.

"Lease" shall have the meaning assigned to such term in the introductory paragraph of this Lease and shall include all supplements and amendments permitted by this Lease.

"Leased Premises" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Legal Requirements" means all present and future laws (including Environmental Laws), codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision), and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith necessitates structural changes to the Improvements or results in interference with the use or enjoyment of the Leased Premises.

"Lien" means charge, encumbrance, title retention agreement, pledge, lien, security interest, mortgage and/or deed of trust.

"Loan" means the mortgage loan, if any, obtained by Landlord from a Mortgagee to finance the acquisition of the Leased Premises, as evidenced by the Loan Documents, or in connection with the Expansion Financing, if any.

"Loan Documents" means the Note, the Note Agreements, the Mortgage and the Assignment, collectively.

"Make-Whole Amount" means the greater of (x) the amount, if any, by which (i) the present value of all future payments of principal and interest due on that portion of the unpaid principal amount of the Note to be prepaid, payable from the date of prepayment to the Maturity Date calculated by discounting each such future payment from the due date thereof to such date of prepayment at a rate per annum equal to 50 basis points over the Treasury Constant Maturity Yield Index exceeds (ii) 100% of that portion of the principal amount of the Note to be prepaid on the date of prepayment and (y) 0.5% of the amount of principal to be so prepaid.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), assets, liabilities or operations of Tenant or Guarantor, if any, on a consolidated basis, which has caused or could reasonably be expected to cause the Consolidated Tangible Net Worth of Tenant or Guarantor, if any, to decline by ten percent (10%) or more from its level immediately prior to the event causing such decline, (b) the ability of Tenant and Guarantor, if any, taken together, to perform Tenant's obligations under this Lease, (c) the validity or enforceability of this Lease or the rights and remedies of Landlord hereunder, or (d) the value, utility or useful life of the Leased Premises, which has caused or could reasonably be expected to cause a decline in the fair market value of the Leased Premises by five percent (5%) or more from the fair market value of the Leased Premises immediately prior to the event causing such decline, or the use, or ability to use, the Leased Premises for the purpose for which it was intended.

"Mortgage" means a first mortgage, deed of trust, deed to secure debt or similar security instrument issued with respect to and creating a Lien on the Leased Premises in favor of a Mortgagee.

"Mortgagee" means a person or entity that is the trustee for the holder(s) of the Loan Documents; however, if there is no Mortgagee, then any reference to Mortgagee or Mortgage in this Lease shall be deemed deleted and of no effect except to the extent that the context of this Lease contemplates that Mortgagee will act as an escrow agent for the holding and disposition of any Net Award or Net Proceeds, in which event such term shall be deemed to refer to a title insurance company or financial institution, reasonably acceptable to Landlord and Tenant, serving as escrow agent for the purposes contemplated in this Lease.

"Net Award" means the entire award payable by reason of a Condemnation, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such award, and less any portion of such award retained by Tenant pursuant to paragraph 15.

"Net Proceeds" means the entire proceeds of any insurance required under paragraph 13, together with any self-insurance payment required of Tenant, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such proceeds or payment.

"Note" means any secured note or notes or promissory note relating to the Leased Premises executed by Landlord in favor of a holder and secured by a Mortgage and an Assignment issued with respect to the Leased Premises.

"Note Agreement" means any Note Purchase Agreement or similar agreement between Landlord and the purchaser or purchasers of any Note or Notes relating to the Leased Premises.

"Overdue Payment" means any installment of Rent or any payment of Additional Monetary Obligations (including Additional Monetary Obligations which Landlord or Mortgagee shall have paid on behalf of Tenant) due from Tenant that is not paid when due.

"Permitted Encumbrances" means:

   (i)    easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other defects and irregularities in the title to the Leased Premises, none of which materially lessens the value of the Leased Premises or materially impairs the use of the Leased Premises for the purposes held by Tenant;

   (ii)   matters set forth in Schedule B, Part I of the loan title insurance policy relating to the Leased Premises issued to the Mortgagee pursuant to the Note Agreement in connection with the issuance of the Notes;

   (iii)  any condemnation right reserved to or vested in any municipality or public authority with respect to the Leased Premises or any interest therein; and

   (iv)   any Liens for Impositions not then delinquent and any Liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Leased Premises which are not then overdue or the existence, amount or validity of which is being contested by Tenant pursuant to, and as permitted by, paragraph 19.

"Property Loss" means any physical damage to or destruction of the Leased Premises or any part thereof by fire, windstorm, flood, earthquake, war or civil insurrection, accident, or other casualty.

"Purchase Offer" means an irrevocable offer by Tenant to Landlord to purchase the Leased Premises on the Termination Date specified therein and, in case a Purchase Offer is made pursuant to paragraph 14(b) or 15(b), any Net Proceeds or Net Award, as applicable, and at the purchase price therefor determined pursuant to Exhibit F.

"Remedial Action" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person, or any fines, penalties, or cost contributions paid or payable by any nongovernmental entity or person, due to the existence or suspected existence of a Hazardous Condition.

"Rent" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Rent Payment Dates" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Replaced Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Replacement Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Requisition" means any temporary requisition or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"Site Plan" shall have the meaning assigned to such term in paragraph 2 of this Lease, and which is shown on attached Exhibit B-2.

"State" means the state in which the Leased Premises is located.

"Store Expansion" means Tenant's construction of an addition to the Improvements to expand the floor area or other facilities of the retail supermarket store building constituting Improvements, which may be within the area(s) delineated on the Site Plan as "Expansion" or "Expansion Area," or within other areas within the Leased Premises or, subject to the conditions of paragraph 28(b) above, on additional land adjacent to the Leased Premises.

"Substitute Guaranty" shall have the meaning assigned to such term in paragraph 11(f) of this Lease; however, if Winn-Dixie is the Tenant under this Lease, then any

reference to Substitute Guaranty in this Lease shall be deemed deleted and of no effect.

"Substitute Lease" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Loan Documents" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Property" shall have the meaning assigned to such term in paragraph 11 of this Lease.

"Substitution Date" means the date on which Landlord and Tenant effectuate the substitution of the Leased Premises for another premises pursuant to the Substitution Option.

"Substitution Option" means any right Tenant may have to substitute other premises for the Leased Premises pursuant to paragraph 11 and paragraph 14, 15 or 16 of this Lease.

"Taking" means any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

"Tenant" means the Tenant named in the introductory paragraph of this Lease together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Tenant's Business" means the retail grocery and supermarket business, including the distribution and warehousing, for eventual sale to consumers, of grocery items, delicatessen items, bakery items, meat and seafood, vegetable/fruit/produce, beer and wine sales, pharmacy items, and photographic items

"Tenant's Equipment" shall have the meaning assigned to such term in paragraph 3 of this Lease.

"Term" means the Initial Term, any Extended Term or the Initial Term together with any Extended Term.

"Termination Date" means the Rent Payment Date established in Tenant's Purchase Offer given pursuant to paragraph 14(g), 15(b) or 16 of this Lease, as the termination date of this Lease pursuant to any such paragraph, which date shall be

not less than 120 days nor more than 240 days after the effective date of such notice to Landlord.

"Treasury Constant Maturity Yield Index" means (i) the yields reported, as of 10:00 a.m. (New York City time) on the third Business Day preceding the date of prepayment, on the display designated as "USD" on the Bloomberg Financial Markets Commodities News Screen or the equivalent screen provided by Bloomberg Financial Markets News (or any nationally recognized publicly available on-line source of similar market data) for actively traded U.S. Treasury securities having a maturity equal to the remaining average life of the Note, or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day  for which such yields have been so reported as of the third Business Day preceding the date of prepayment, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury Securities having a maturity equal to the remaining life of the Note.  Such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security having a maturity closest to and greater than the remaining life of the Note and (2) the actively traded U.S. Treasury security having a maturity closest to and less than the remaining life of the Note.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Year 2000 Compliant and Ready" means that (a) Tenant's hardware and software systems with respect to the operation of its business and its general business plan will: (i) handle date information involving any and all dates before, during and/or after January 1, 2000, including accepting input, providing output, and performing date calculations in whole or in part; (ii) operate, accurately without interruption on and in respect of any and all dates before, during and/or after January 1, 2000 and without any change in performance; and (iii) store and provide date input information without creating any ambiguity as to the century; and (b) Tenant has developed alternative plans to ensure business continuity in the event of the failure of any or all of items (i) through (iii) above.

BENNETTSVILLE, SOUTH CAROLINA

PARCEL A

A PIECE, PARCEL OR TRACT OF LAND CONTAINING 6.93 ACRES, SITUATE, LYING OR BEING IN THE CITY OF BENNETTSVILLE, MARLBORO COUNTY, SOUTH CAROLINA, AND BEING THAT TRACT OF LAND IDENTIFIED AS PARCEL A ON A PLAT OF SURVEY ENTITLED "ALTA/ACSM LAND TITLE SURVEY, URBAN CLASS BOUNDARY AND TOPOGRAPHIC", PREPARED FOR WINN-DIXIE CHARLOTTE, INC. AND LAWYERS TITLE INSURANCE CORPORATION, BY W.K. DICKSON & CO., INC., DATED 2/23/98, REVISED 5/12/98, SAID PLAT BEING INCORPORATED BY REFERENCE HEREIN AND MADE PART HEREOF, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON PIN ON THE SOUTHWESTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS AND THE SOUTHEASTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS BY PLAT RECORDED IN PLAT BOOK 43, AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SAID SOUTHWESTERLY RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS, SOUTH 33°39'23" WEST FOR A DISTANCE OF 357 87 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL B, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHERN LINE OF PARCEL B, NORTH 56°14'12" WEST (LINES REVERSED) FOR A DISTANCE OF 153.19 FEET TO A 5/8" IRON PIN THENCE; WITH THE WESTERN LINE OF PARCEL B, SOUTH 58°43'40" WEST (LINES REVERSED) FOR A DISTANCE OF 11.28 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL C, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHWESTERN LINE OF PARCEL C, NORTH 31°16'20" WEST (LINES REVERSED) FOR A DISTANCE OF 222 50 FEET TO A 5/8" IRON PIN AT THE NORTHWEST CORNER OF PARCEL C, SOUTH 58°43'40" WEST (LINES RESERVED) FOR A DISTANCE OF 190.00 FEET TO A 5/8" IRON PIN ON THE NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9. THENCE; WITH THE SAID NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9, THE FOLLOWING TWO COURSES AND DISTANCES; NORTH 31°16'20" WEST FOR A DISTANCE OF 39 56 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57" WEST FOR A DISTANCE OF 80.87 FEET TO A 5/8" IRON PIN AT THE SOUTHWESTERN CORNER OF PARCEL D, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE SOUTHEASTERN, EASTERN AND NORTHERN LINES OF PARCEL D. THE FOLLOWING THREE COURSES AND DISTANCES, NORTH 58°46'03" EAST (LINES REVERSED) FOR A DISTANCE OF 126 70 TO A 5/8" IRON PIN  THENCE, NORTH 01°28'10" EAST (LINES REVERSED) FOR A DISTANCE OF 69 41 FEET TO A 5/8" IRON PIN  THENCE, NORTH 31°13'57"

**BENNETTSVILLE, SOUTH CAROLINA, CONT'D.**

WEST (LINES REVERSED) FOR A DISTANCE OF 213.57 FEET TO A 5/8" IRON PIN ON THE SOUTHEASTERN LINE OF LANDS CONVEYED TO H. J MUNNERLYN BY DEED RECORDED IN DEED BOOK 128 AT PAGE 454, MARLBORO COUNTY CLERK OF COURT.    THENCE, WITH THE SAID SOUTHEASTERN LINE OF MUNNERLYN, NORTH 58°46'27" EAST FOR A DISTANCE OF 425.98 FEET TO A 1-1/2" IRON PIN AT THE SOUTHWESTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS ESTATE BY PLAT RECORDED IN PLAT BOOK 43 AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SOUTHWESTERN LINE OF ROGERS, SOUTH 31°14'22" EAST FOR A DISTANCE OF 601.68 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH RECIPROCAL EASEMENTS AS SET FORTH AND DESCRIBED IN INSTRUMENT ENTITLED "RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS", RECORDED IN BOOK 377, PAGE 79, IN THE OFFICE OF THE REGISTER OF DEEDS FOR MARLBORO COUNTY, SOUTH CAROLINA.

THIS PROPERTY WAS OBTAINED BY SUNBELT-DIX, INC. BY DEED OF MARK S. AVENT, DATED MAY 12, 1998, RECORDED IN THE REGISTER OF DEEDS OFFICE OF MARLBORO COUNTY, SOUTH CAROLINA, AT BOOK 377, PAGE 74

Illustrative Site Plan

## EXHIBIT C TO LEASE AGREEMENT - LANDLORD'S EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment; fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements, but excluding Tenant's Equipment.

## EXHIBIT D TO LEASE AGREEMENT - TENANT'S EQUIPMENT

All coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty belonging to Tenant.

EXHIBIT E TO LEASE AGREEMENT - SCHEDULE OF RENT

A.    PRORATED RENT.  On the date of execution of this Lease by both Landlord and Tenant, Tenant shall pay Landlord prorated Rent in the amount of $732.47 per day for the period beginning on the date of execution of this Lease and ending August 31, 1999.

B.    RENT DURING INITIAL TERM.

Rent during the Initial Term shall be $311,656.40 per annum, payable quarterly on the first day of December, March, June and September of each calendar year, commencing September 1, 1999, and continuing thereafter throughout the Initial Term, in equal installments of $77,914.10.

C.    ADJUSTMENT TO RENT DURING INITIAL TERM FOLLOWING FINANCING OF STORE EXPANSION.

Effective immediately upon Landlord's payment of the Expansion Cost pursuant to paragraphs 28(c) or 28(d) of the Lease, Rent for the remainder of the Initial Term will be increased by an amount per annum equal to the annual debt service, including repayment of principal, payable by Landlord to the holder of the Note or Notes in connection with the Expansion Financing.  Increased Rent will be payable quarterly commencing on the first Rent Payment Date following the Expansion Financing Date, and continuing through the last Rent Payment Date of the Initial Term.  Additionally, upon Landlord's payment of the Expansion Cost pursuant to paragraphs 28(c) or 28(d) of the Lease, Tenant will pay to Landlord an amount representing Landlord's increased debt service obligation resulting from the Expansion Financing for the period beginning on the date of such payment by Landlord and ending on the day preceding the next Rent Payment Date.  Said amount will not be considered rent under the Lease.

D.    RENT DURING ANY EXTENDED TERM.

Rent during any Extended Term shall be $280,490.76 per annum, payable quarterly on the first day of December, March, June and September of each calendar year, commencing on the first day of the first calendar quarter of such Extended Term and continuing thereafter through each Extended Term(s), in equal installments of $70,122.69.

All local, state and federal sales tax, if any, due in connection with the payment of Rent or Additional Monetary Obligations will be paid by Tenant directly to the taxing authority as Impositions.

**EXHIBIT F TO LEASE AGREEMENT - PURCHASE PRICE**

The following schedule lists the Purchase Price on the applicable Termination Date as a percentage of the Cost of the Leased Premises stated below.

A.  Purchase Price in event of Casualty or Condemnation.
    For a Purchase Offer made pursuant to paragraphs 14 or 15 of this Lease, the Purchase Price is the Cost of the Leased Premises multiplied by the Percentage Amount listed below for the applicable Termination Date.

B.  Purchase Price in event of Economic Abandonment.
    For a Purchase Offer made pursuant to paragraph 16 of this Lease, the Purchase Price is the sum of (a) the Cost of the Leased Premises multiplied by the Percentage Amount listed below for the applicable Termination Date plus (b) the Make-Whole Amount required for prepayment of the Notes on the applicable Termination Date.

**Cost of the Leased Premises:** $   3,657,000.00       **Location:**   **Bennettsville**

| Sequential Number | Termination Date | Percentage Amount | Sequential Number | Termination Date | Percentage Amount |
|---|---|---|---|---|---|
| 1 | 9/1/99 | 102.30563081% | 41 | 9/1/09 | 91.25117773% |
| 2 | 12/1/99 | 102.10081295% | 42 | 12/1/09 | 90.88756426% |
| 3 | 3/1/00 | 101.89286666% | 43 | 3/1/10 | 90.51907776% |
| 4 | 6/1/00 | 101.68175158% | 44 | 6/1/10 | 90.14567599% |
| 5 | 9/1/00 | 101.46742708% | 45 | 9/1/10 | 89.76731750% |
| 6 | 12/1/00 | 101.24985232% | 46 | 12/1/10 | 89.38396123% |
| 7 | 3/1/01 | 101.02898519% | 47 | 3/1/11 | 88.99556659% |
| 8 | 6/1/01 | 100.80478429% | 48 | 6/1/11 | 88.60209338% |
| 9 | 9/1/01 | 100.57720787% | 49 | 9/1/11 | 88.20350272% |
| 10 | 12/1/01 | 100.34621338% | 50 | 12/1/11 | 87.79975584% |
| 11 | 3/1/02 | 100.11175882% | 51 | 3/1/12 | 87.39081474% |
| 12 | 6/1/02 | 99.87380122% | 52 | 6/1/12 | 86.97664211% |
| 13 | 9/1/02 | 99.63229750% | 53 | 9/1/12 | 86.55720202% |
| 14 | 12/1/02 | 99.38720477% | 54 | 12/1/12 | 86.13245868% |
| 15 | 3/1/03 | 99.13847905% | 55 | 3/1/13 | 85.70237799% |
| 16 | 6/1/03 | 98.88607755% | 56 | 6/1/13 | 85 26692609% |
| 17 | 9/1/03 | 98 62995620% | 57 | 9/1/13 | 84.82607056% |
| 18 | 12/1/03 | 98 37007086% | 58 | 12/1/13 | 84.37978067% |
| 19 | 3/1/04 | 98.10637738% | 59 | 3/1/14 | 83.92802557% |
| 20 | 6/1/04 | 97.83883139% | 60 | 6/1/14 | 83.47077671% |
| 21 | 9/1/04 | 97.56738862% | 61 | 9/1/14 | 83 00800638% |
| 22 | 12/1/04 | 97.29200448% | 62 | 12/1/14 | 82.53968871% |
| 23 | 3/1/05 | 97.01263406% | 63 | 3/1/15 | 82.06579848% |
| 24 | 6/1/05 | 96.72923255% | 64 | 6/1/15 | 81.58631274% |
| 25 | 9/1/05 | 96.44175554% | 65 | 9/1/15 | 81.10120988% |
| 26 | 12/1/05 | 96.15015774% | 66 | 12/1/15 | 80.61047013% |
| 27 | 3/1/06 | 95.85439420% | 67 | 3/1/16 | 80.11407523% |
| 28 | 6/1/06 | 95 55441977% | 68 | 6/1/16 | 79.61200920% |
| 29 | 9/1/06 | 95.25018952% | 69 | 9/1/16 | 79.10425747% |
| 30 | 12/1/06 | 94.94165853% | 70 | 12/1/16 | 78 59080793% |
| 31 | 3/1/07 | 94.62878169% | 71 | 3/1/17 | 78.07165037% |
| 32 | 6/1/07 | 94.31151438% | 72 | 6/1/17 | 77.54677779% |
| 33 | 9/1/07 | 93 98981170% | 73 | 9/1/17 | 77.01618393% |
| 34 | 12/1/07 | 93 66362832% | 74 | 12/1/17 | 76 47986600% |
| 35 | 3/1/08 | 93 33292048% | 75 | 3/1/18 | 75 93782411% |
| 36 | 6/1/08 | 92.99764337% | 76 | 6/1/18 | 75 39006019% |
| 37 | 9/1/08 | 92.65775258% | 77 | 9/1/18 | 74.83657904% |
| 38 | 12/1/08 | 92.31320422% | 78 | 12/1/18 | 74 27738924% |
| 39 | 3/1/09 | 91.96395447% | 79 | 3/1/19 | 73.71250145% |
| 40 | 6/1/09 | 91.60996026% | 80 | 6/1/19 | 73 14193041% |

8/18/99

EXHIBIT G TO LEASE AGREEMENT - FORM OF ESTOPPEL CERTIFICATE

_____, a _____ [insert "Landlord" or "Tenant" as applicable] hereby certifies to [insert "Landlord" or "Tenant" as applicable], that, as of _____ (the "Certificate Date"), the following is true and correct:

1.        _____, Inc., a _____ corporation, is the tenant under a currently effective lease (as amended as described below, the "Lease") with _____, a _____, as the current landlord, dated as of August ___, 1999, conveying a leasehold estate of the property described therein (the "Premises"), and the Lease has been amended or supplemented only as follows:

2.    The term of the Lease commenced August ___, 1999, and is scheduled to expire on August 31, 2019 unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for 6 successive terms of 5 years each.

3.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Tenant is not in material Default under the Lease, and all rent and other charges due from Tenant to Landlord have been paid through and including _____, ____, and Tenant currently as no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease, except as follows:

4.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Landlord is not in material Default under the Lease, except as follows:

5.    The Lease contains a right of first refusal in favor of Tenant, and other provisions requiring Tenant to offer to purchase the Premises or to substitute the Premises for other leased premises upon the occurrence of certain events.

6.    [Insert Landlord or Tenant, as applicable] has received no notice of any sale, transfer, assignment, or pledge of the interest of [insert Landlord or Tenant, as applicable] in the Lease [or in the case of Landlord's interest, in the rent due thereunder], except as follows:

7. [insert Landlord or Tenant, as applicable] is not the subject of any transfer for the benefit of creditors, or any bankruptcy or reorganization filing under any applicable bankruptcy law.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate, which may be relied upon by [insert Landlord or Tenant, as applicable] and any mortgagee, successor or assign of [insert Landlord or Tenant, as applicable].

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

EXHIBIT H TO LEASE AGREEMENT - FORM OF MEMORANDUM OF LEASE

[insert document headings as appropriate for recordation]

### MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is hereby executed this _____ day of August, 1999, by and between:

BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company ("Landlord"), whose mailing address is c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301 Attention: Gary Lines;

and

WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant"), whose mailing address is 5050 Edgewood Court, Jacksonville, Florida 32254 Attention: Chief Financial Officer;

which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant did enter into a Lease Agreement dated as of August ___, 1999 (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease as a matter of public record.

NOW, THEREFORE, FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant, and Tenant does hereby lease from Landlord, the property more particularly described on attached Exhibit A and as depicted on the Site Plan attached as an exhibit to the Lease, together with all Improvements now or hereafter located thereon (collectively the "Premises").

The Term of the Lease shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on August 31, 2019. Annual rent, payable in quarterly installments on the 1st day of each December, March, June and September during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of 6 successive extensions of the term of the Lease, each extension to be for a period of 5 years each. Tenant has a right of first refusal to purchase the Premises under the Lease.

The Lease contains the following provision:

    <u>Liens</u>.   TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE.   NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

    All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document.  This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

Witnesses:                                LANDLORD:

                                          **BENNETTSVILLE 99-SC, LLC,** a Delaware limited liability company

                                          By:    Principal Net Lease Investors, L.L.C., a Delaware limited liability company, its sole member

                                                  By:    Principal Life Insurance Company, an Iowa corporation, its sole member

_____
Name: _____          By: _____
                                       Name: _____
                                       Title: _____
_____
Name: _____


_____
Name: _____          By: _____
                                       Name: _____
                                       Title: _____
_____
Name: _____

                                          [CORPORATE SEAL]

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this ____ day of August, 1999, by _____ and _____, the _____ and _____, respectively, of PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, on behalf of the corporation, as the sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, the sole member of BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company. Each of them either [ ] is personally known to me or [ ] has produced a _____ state drivers license as identification.


                                       _____
                                       NOTARY PUBLIC, State of _____
                                       Printed Name: _____
[NOTARIAL SEAL]                        Commission No.: _____
                                       My commission expires: _____

TENANT:

**WINN-DIXIE RALEIGH, INC.,**
a Florida corporation

Name: _____

By: _____
Name: _____
Title: _____ President

Name: _____

[CORPORATE SEAL]

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____ day of August, 1999, by _____ , the _____ president of WINN-DIXIE RALEIGH, Inc., a Florida corporation, on behalf of the corporation. He either [  ] is personally known to me or [  ] has produced _____ state drivers license as identification.

_____
NOTARY PUBLIC, State of _____
Printed Name: _____

[NOTARIAL SEAL]

Commission No.: _____
My commission expires: _____

EXHIBIT I TO LEASE AGREEMENT - FORM OF COMPLETION CERTIFICATE

This Certificate is being delivered by _____ ("Tenant"), pursuant to paragraph 28 of the Lease Agreement dated as of August ___, 1999 (the "Lease"), between _____ ("Landlord") and Tenant  Tenant hereby warrants, represents and certifies to Landlord as of this ____ day of _____, ____, as follows (capitalized terms used herein and not otherwise defined have the meanings set forth in the Lease):

(a)     The Improvements are substantially complete in accordance with the provisions of paragraph 28 of the Lease and are ready for operation in Tenant's Business.

(b)     The Cost actually incurred as of the date hereof by Tenant with respect to the Leased Premises as set forth below [supply data as applicable]:

Cost of Land:

Cost of Improvements based upon an approved appraisal (including site work and architects' and engineers' fees):

Cost of Landlord's Equipment:

Capitalized Expenses (including capitalized interest, financing costs and other items included in the definition of Cost in the Lease):

TOTAL COST:

(c)     All certificates of occupancy and other governmental consents needed for the use of the Leased Premises have been obtained.

(d)     There are no claims of any person which are past due and unpaid relating to the construction of the Improvements or acquisition of the Landlord's Equipment except claims which are being contested as permitted by the Lease.

(e)     Title to the Improvements and the Landlord's Equipment is vested in Landlord free and clear of all Liens other than the Lease and Permitted Encumbrances and Tenant accepts the Leased Premises in accordance with the provision of the Lease.

(f)     The Lease is in full force and effect on the date hereof.  The Lease has not been amended and no Event of Default has occurred and is continuing thereunder.

IN WITNESS WHEREOF, the undersigned has duly executed, sealed and delivered this certificate on this the date first above written.

[Witness Signature Blocks]                        [Tenant's Signature Block]

# EXHIBIT "B"

INDENTURE

BENNETTSVILLE 99-SC, LLC

to

FIRST SECURITY BANK, NATIONAL ASSOCIATION
as Trustee

and

VAL T. ORTON,
as Individual Trustee

Dated as of
August 26, 1999

Prepared by and
Recording requested by and
when recorded return to:

Alan C. Sheppard, Jr., Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
50 North Laura Street, Suite 2800
Jacksonville, Florida 32202

JK 123820 5 80130 02051
8/16/99 11 32 AM

Store #2130, Bennettsville,
Marlboro County, South Carolina

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLEDGING CLAUSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLEDGING CLAUSE FIRST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PLEDGING CLAUSE SECOND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PLEDGING CLAUSE THIRD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE I         Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE II        The Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
                  Section 2.1      The Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
                  Section 2.2      Execution of Notes . . . . . . . . . . . . . . . . . . . . . . . . 7
                  Section 2.3      Home Office Payment . . . . . . . . . . . . . . . . . . . . . 7
                  Section 2.4      Register . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                  Section 2.5      Note Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
                  Section 2.6      Transfer and Exchange of Notes . . . . . . . . . . . . . 8
                  Section 2.7      New Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                  Section 2.8      Trustee as Agent . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  Section 2.9      Certificate of Authentication . . . . . . . . . . . . . . . . . 9

ARTICLE III       Particular Covenants of Owner . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  Section 3.1      Validity of Notes; Title to Pledged Property . . . . . . . 9
                  Section 3.2      Maintenance of Lien and Recording . . . . . . . . . . . 9
                  Section 3.3      Further Assurance . . . . . . . . . . . . . . . . . . . . . . . 10
                  Section 3.4      Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                  Section 3.5      Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                  Section 3.6      Negative Covenants . . . . . . . . . . . . . . . . . . . . . . 10
                  Section 3.7      Payment of Taxes and Other Charges . . . . . . . . . 11
                  Section 3.8      Performance of Certain Covenants by Trustee . . . 11
                  Section 3.9      Trustee's Fees . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARTICLE IV        Possession and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . 11
                  Section 4.1      Collection of Moneys . . . . . . . . . . . . . . . . . . . . . 11
                  Section 4.2      Trustee May Enforce . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE V       Application of Moneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
                Section 5.1    Moneys under the Lease  . . . . . . . . . . . . . . . . . . . . . .  12
                Section 5.2    Moneys under the Mortgage . . . . . . . . . . . . . . . . .  13
                Section 5.3    Prepayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
                Section 5.4    Optional Prepayments  . . . . . . . . . . . . . . . . . . . . . .  13

ARTICLE VI      Events of Default and Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
                Section 6.1    Events of Default . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
                Section 6.2    Waiver of Default  . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
                Section 6.3    Direction of Remedies . . . . . . . . . . . . . . . . . . . . . . .  13

ARTICLE VII     The Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
                Section 7.1    Rights and Obligations of Trustees . . . . . . . . . . . .  14
                Section 7.2    The Individual Trustee  . . . . . . . . . . . . . . . . . . . . . .  17
                Section 7.3    Resignation and Removal of Trustee  . . . . . . . . . .  18
                Section 7.4    Successor Trustee  . . . . . . . . . . . . . . . . . . . . . . . . .  18
                Section 7.5    Resignation and Removal of the Individual Trustee
                               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
                Section 7.6    Separate and Co-Trustees  . . . . . . . . . . . . . . . . . .  19
                Section 7.7    Liability of Trustee . . . . . . . . . . . . . . . . . . . . . . . . . .  20
                Section 7.8    Segregation and Investment of Moneys  . . . . . . . .  20
                Section 7.9    Illegal Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
                Section 7.10   Communications to be Sent to Note Holders  . . . .  20

ARTICLE VIII    Supplements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
                Section 8.1    Supplements Without Consent  . . . . . . . . . . . . . . .  20
                Section 8.2    Supplements with Consent  . . . . . . . . . . . . . . . . . .  21
                Section 8.3    Delivery of Supplements . . . . . . . . . . . . . . . . . . . . .  21

ARTICLE IX      Discharge of Indenture; No Recourse . . . . . . . . . . . . . . . . . . . . . . .  21
                Section 9.1    Discharge on Payment of Notes . . . . . . . . . . . . . .  21
                Section 9.2    Unclaimed Funds  . . . . . . . . . . . . . . . . . . . . . . . . . .  22
                Section 9.3    Immunity From Liability . . . . . . . . . . . . . . . . . . . . . .  22

ARTICLE X       Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
                Section 10.1   Illegal Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
                Section 10.2   Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
                Section 10.3   Waiver of Notice  . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
                Section 10.4   Maximum Interest Payable . . . . . . . . . . . . . . . . . .  23
                Section 10.5   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
                Section 10.6   Successors and Assigns . . . . . . . . . . . . . . . . . . . . .  24
                Section 10.7   Table of Contents; Headings  . . . . . . . . . . . . . . . .  24
                Section 10.8   Governing Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

ARTICLE XI      Paydown Rights and Payup Rights . . . . . . . . . . . . . . . . . . . . . . . . .  24
                Section 11.1   Terms and Conditions . . . . . . . . . . . . . . . . . . . . . .  24

INDENTURE, dated as of August 26, 1999, (herein, together with all amendments and supplements hereto, called this "Indenture"), by and between BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company (herein together with its successors and assigns of any interest in the Property (as hereinafter defined) including any entity succeeding thereto by merger, consolidation or acquisition of its assets substantially as an entirety called "Owner"), having an address at c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301, Attention: Gary Lines, as grantor, and FIRST SECURITY BANK, NATIONAL ASSOCIATION, as trustee (herein, together with its successors as such trustee, called the "Trustee"), and VAL T. ORTON, as trustee (herein, together with his successors as such trustee, called the "Individual Trustee"), each having an address at 79 South Main Street, Salt Lake City, Utah 84111. The Trustee and the Individual Trustee are collectively called the "Trustees."

## PRELIMINARY STATEMENT

The defined terms used in this Indenture, if not elsewhere defined herein, have the meanings set forth in Article I.

Owner is borrowing an aggregate sum of $3,483,317.19 for its proper purposes and is issuing its Notes to evidence the indebtedness so incurred by it. Each Note is issued by Owner pursuant to the Note Purchase Agreement, this Indenture and the Mortgage and is secured by (i) the Mortgage and (ii) the Assignment (such documents, together with the Note Purchase Agreement, this Indenture and the Letter Agreement being herein collectively referred to as the "Loan Documents" and the collateral subject to the terms thereof being herein collectively referred to as the "Pledged Property"). Owner is herein confirming the Trustees' security interest in the Pledged Property pledged by Owner pursuant to the Loan Documents for the benefit of the Note Holders. The proceeds from the sale of the Notes will be used to reimburse Owner for a portion of the cost to Owner of the acquisition and financing of the Property. At all times the Pledged Property pledged by Owner, as it shall then exist, shall constitute security for the payment of the Notes, all as set forth in this Indenture and the Loan Documents. Owner is duly authorized to issue the Notes and to execute and deliver this Indenture and the other Loan Documents and all actions required by law and all actions of Owner required therefor have been duly taken.

## PLEDGING CLAUSES

NOW, THEREFORE, THIS INDENTURE WITNESSETH: Owner, in consideration of the premises, the acceptance by the Trustees of the trusts created hereby, the purchase and acceptance of the Notes by the Note Purchasers and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in order to secure the payment of the principal, interest, Make Whole Amount and all other sums payable on the Notes, the Mortgage and this Indenture according to the terms hereof and thereof and to declare the terms and conditions upon and subject to which the Notes are to be secured, has executed and delivered this Indenture, has granted, conveyed, mortgaged and warranted, assigned, transferred, bargained, sold, pledged, given, and set over unto the Trustees and has created and granted a lien and security interest in favor of the Trustees, for the benefit and security of the Note Holders in the Pledged Property, and

hereby grants, conveys, mortgages and warrants, assigns, transfers, bargains, sells, pledges, gives and sets over unto the Trustees and creates and grants a lien and security interest in favor of the Trustees, for the benefit and security of the Note Holders in the Pledged Property; provided that no obligation of Owner under the provisions thereof, or of the Lease or any Guaranty or with respect to any thereof shall be impaired or diminished by virtue hereof, nor any such obligation be imposed upon the Trustees or the Note Holders, all of which property (other than certain of the property described in Pledging Clauses Second and Third) has been delivered to the Trustees on the date of the execution and delivery hereof:

## PLEDGING CLAUSE FIRST

The Lease and any Guaranty of such Lease (including, without limitation, the right to pursue and collect any claim in the bankruptcy or other insolvency proceedings of the Lessee under the Lease and of Winn-Dixie under any Guaranty of the Lease).

## PLEDGING CLAUSE SECOND

The Letter Agreement and any and all moneys and other property which may from time to time become subject to the lien hereof (including, without limitation, any right, title and interest of Owner and any other Owner in and to any alterations to the Property constructed pursuant to the Lease) or which may come into the possession or be subject to the control of the Trustees pursuant to this Indenture, any other Loan Document or any instrument included in the Pledged Property, it being the intention of Owner and any other Owner and it being hereby agreed that all property hereafter acquired by Owner or any other Owner and required to be subjected to the lien of this Indenture or any other Loan Document or intended so to be shall forthwith upon the acquisition thereof by Owner or any other Owner be subject to the lien of this Indenture as if such property were now owned by Owner or any other Owner and were specifically described in this Indenture or any other Loan Document and Granted hereby or pursuant hereto; and the Trustees are hereby authorized to receive any and all such property as and for additional security for the payment of the Notes and all other sums payable and secured or intended to be secured hereby.

## PLEDGING CLAUSE THIRD

Together with all products, accessions, rents, issues, profits, returns, income and proceeds of and from any and all the Pledged Property.

Any person acquiring any right, title or interest in the Property or any of the Pledged Property, by acceptance of a transfer or conveyance of such interest confirms, ratifies and approves the Grant to the Trustees contained in these Pledging Clauses. Trustee hereby acknowledges that it holds the Mortgage in trust for the Noteholders.

TO HAVE AND TO HOLD all and singular the Pledged Property pursuant to the terms of this Indenture and the Loan Documents, whether now owned or held or hereafter acquired, unto the Trustees, their successors in the trusts created hereby and assigns

forever, in trust for the equal and ratable benefit and security of the Note Holders, except as otherwise expressly provided herein.

IN TRUST, NEVERTHELESS, with power of sale, upon the terms and trusts set forth herein or in the Loan Documents for the equal and ratable benefit and security of the Notes without preference, priority or distinction as to lien or otherwise unless expressly provided herein, and for enforcement of the payment of the Notes in accordance with their respective terms, and all other sums payable by Owner hereunder, under the Loan Documents or on the Notes and for the performance and observance of and compliance with the provisions of this Indenture, the Notes, and the Loan Documents, all as herein set forth.

IT IS HEREBY CONFIRMED, COVENANTED, DECLARED AND AGREED that the Notes are to be issued and secured and that the Pledged Property is to be held and disposed of by the Trustees, upon and subject to the provisions of this Indenture, the Notes and the Loan Documents.

## ARTICLE I
### Defined Terms

Unless the context otherwise specifies or requires, the following terms shall, when used in this Indenture, have the meanings set forth herein, such definitions to be applicable equally to the singular and plural nouns and verbs of any tense:

"Additional Monetary Obligations" has the meaning specified in the Lease.

"Alterations" has the meaning specified in the Lease.

"Assignment" means the Assignment of Lease and Agreement, relating to the Lease and any Guaranty of the Lease, dated as of the date hereof, from Owner, as assignor, to the Trustees, as assignees, and consented to by Lessee (and the Guarantor, if not the lessee under the Lease), as amended or supplemented from time to time as permitted hereby or thereby.

"Corporate Trust Office" means the office of the Trustee at which its corporate trust business is administered, which at the date hereof is located at 79 South Main Street, Salt Lake City, Utah 84111.

"Counsel" means any legal counsel satisfactory to the Trustee, who may be counsel to, or employed by, the Trustee.

"Debt", with respect to any person, means (i) all indebtedness for borrowed money (determined in accordance with generally accepted accounting principles) which is created, guaranteed or assumed by such person, directly or indirectly, or upon which it customarily pays interest charges, (ii) liabilities (including contingent liabilities) of such person to discharge indebtedness for borrowed money (determined in accordance with generally accepted accounting principles) of other persons, and (iii) all amounts secured by liens,

encumbrances or charges upon the property of such person, even though not assumed by such person.

"Default" means any act or occurrence which, with notice, lapse of time, or both would constitute an Event of Default.

"Default Rate" means the interest rate per annum payable on a Note plus 2% per annum.

"Event of Default" means any act or occurrence constituting an Event of Default under any Loan Document.

"Expansion Notes" is defined in the Mortgage.

"Grant" means grant, convey, mortgage and warrant, assign, create and grant a lien or security interest in, bargain, sell, pledge, give, transfer or set over.

"Guarantor" means Winn-Dixie.

"Guaranty" means the guaranty by Winn-Dixie of Lessee's obligations under the Lease (if Lessee is not Winn-Dixie), substantially in the form attached as Exhibit H to the Note Purchase Agreement.

"Improvements" has the meaning specified in the Mortgage.

"Individual Trustee" has the meaning specified in the first paragraph of this Indenture.

"Installment Payment Dates" means the dates on which the Installment Payments are due and payable in accordance with the terms of the Notes.

"Installment Payments" has the meaning specified in the Notes.

"Institutional Investor" means any of the following persons existing under the laws of the United States or any state thereof or of the District of Columbia or of Canada or any province thereof: (i) any bank, trust company or national banking association or savings and loan association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation, eleemosynary institution, church or fraternal order, (iii) any insurance company, (iv) any pension, profit sharing, retirement trust or fund for which any bank, trust company, national banking association or savings and loan association or investment adviser registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or agent, or if self-managed, having funds of at least $100,000,000, (v) any investment company, as defined in the Investment Company Act of 1940, as amended, (vi) any college or university, or (vii) any government, any public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds.

"Interest Payment Date" means the dates on which the Interest Payment is due and payable in accordance with the terms of the Notes.

"Interest Payment" has the meaning specified in the Notes.

"Land Parcel" has the meaning specified in the Mortgage.

"Lease" means the Lease Agreement relating to the Property, dated as of the date hereof, between Owner, as lessor, and Lessee, as lessee, as amended or supplemented from time to time, together with any short form or memorandum thereof for purposes of recording.

"Lessee" means Winn-Dixie Raleigh, Inc., a Florida corporation, and shall include any entity succeeding thereto by merger, consolidation or acquisition of its assets substantially as an entirety.

"Letter Agreement" means the letter of Winn-Dixie, dated as of the date hereof, in favor of Owner and the Note Holders, relating to the Property, pursuant to which Winn-Dixie agrees to pay certain costs and expenses associated with the transactions contemplated by the Note Agreement, this Indenture and the Operative Documents.

"Loan Documents" has the meaning specified in the Preliminary Statement of this Indenture.

"Make Whole Amount" has the meaning specified in the Mortgage.

"Mortgaged Property" has the meaning set forth in the Mortgage.

"Mortgage" means the Mortgage or Deed of Trust, Security Agreement and Fixture Filing relating to the Property, dated as of the date hereof, from Owner, as grantor or mortgagor, as applicable, to the Trustees, as trustees or mortgagees, as applicable, as amended or supplemented from time to time.

"Note Holders" means the registered owner of any outstanding Note as disclosed by the Register.

"Note Purchase Agreement" means the Note Purchase Agreement, dated as of the date hereof, between Owner and the original purchasers of the Notes providing for the purchase and sale of Notes with respect to the Property, together with any note purchase agreement providing for the issuance and sale by Owner of Expansion Notes.

"Notes" means as of any particular time, all of the Notes issued pursuant to Section 2.1 of the Mortgage, Expansion Notes issued pursuant to the Mortgage and any Note or Notes issued from time to time in exchange or substitution therefor pursuant to Section 2.6 hereof.

"Operative Documents" has the meaning specified in the Note Purchase Agreement.

"Outstanding" has the meaning specified in the Mortgage.

"Outstanding Principal Amount" means, at any time, the aggregate unpaid principal amount of any Note then outstanding.

"Owner" has the meaning specified in the first sentence of this Indenture and includes Owner.

"Permitted Encumbrances" means (i) all encumbrances permitted by the Mortgage and (ii) the security interests created by the Mortgage, the Assignment and this Indenture.

"Person" means any individual, partnership, limited liability company, corporation, trust, unincorporated association, joint venture or other organization, or a government or any department or agency thereof or any other entity.

"Pledged Property" means all of the property and interests therein set forth in the Pledging Clauses.

"Owner" has the meaning set forth in the first sentence of this Indenture.

"Property" means the Land Parcel or Land Parcels described in Exhibit A attached hereto and the Improvements located thereon, and includes all or any part thereof.

"Register" has the meaning set forth in Section 2.4 of this Indenture.

"Rent" has the meaning specified in the Lease.

"RVI" means R.V.I. America Insurance Company, its successors and/or assigns.

"Successor Owner" means an Owner other than Owner.

"Trustee" has the meaning specified in the first paragraph of this Indenture.

"Trustees" has the meaning specified in the first paragraph of this Indenture.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by merger, consolidation or acquisition of its assets substantially as an entirety.

### ARTICLE II
### The Notes

Section 2.1   <u>The Notes</u>. Each Note (a) may be issued only on the date of delivery of this Indenture and on the date of execution and delivery of a supplement hereto with respect to any series of Expansion Notes and as provided in Section 2.6 or 2.7 and (b) shall be of the tenor and otherwise in accordance with the provisions of the Loan

Documents. Each Note shall be substantially in the form set forth in Schedule A-1 or A-2 to the Mortgage.

Section 2.2    Execution of Notes. Each Note shall be signed on behalf of Owner by a person duly authorized by Owner to execute and deliver such Note.

Section 2.3    Home Office Payment. The principal of, Make Whole Amount, if any, and interest on the Notes shall be payable at the Corporate Trust Office in lawful money of the United States of America, without presentation of the Notes for notation of the payment or prepayment made thereon. Notwithstanding the foregoing sentence, if there shall be filed with the Trustee an executed copy of any agreement between Owner and the Note Holder of any Note or the person for whom such Note Holder is a nominee, or a conformed copy thereof certified by Owner to be a true and complete copy thereof, to the effect that (i) Owner will cause all amounts which become due and payable on such Note to be paid by wire transfer or by check of the Trustee in accordance with such agreement, duly mailed, delivered or made to such Note Holder at its address or account as provided in such agreement, without presentation of such Note, and (ii) such Note Holder or person will not sell, transfer or otherwise dispose of such Note, other than as provided in Section 2.6, then the Trustee shall, until such Note has been transferred on the Register in accordance with Section 2.6, pay all amounts which become due and payable on such Note in accordance with such agreement. The Note Purchase Agreement constitutes such an agreement. On a date on which the Trustee shall have received all or any portion of the amount due on a Note in immediately available funds from or on behalf of Owner, (a) if the Trustee receives such amount before 11:00 a.m. (local time) it shall distribute such amount to the Note Holders of such Notes on the same banking day and (b) if the Trustee receives such amount after 11:00 a.m. (local time) it will use its best efforts to distribute such amounts to the Note Holders of the Notes entitled thereto on the same banking day, but, in any event, will make such distribution either on the same banking day or the next succeeding banking day. If the Trustee shall fail to make such distribution on any Note on the same banking day as required in (a) above or on the same or the next succeeding banking day as required in (b) above, it shall be liable in its individual capacity to the Note Holder of such Note for interest thereon at a rate per annum equal to the Default Rate.

Section 2.4    Register. Owner shall cause to be kept at the Corporate Trust Office a register (the "Register") for the registration of transfer of Notes. The Register shall be maintained by the Trustee, and the names and addresses of the Note Holders, the transfers of the Notes and the names and addresses of the transferees of the Notes shall be registered in the Register under such reasonable regulations as the Trustee may prescribe.

Section 2.5    Note Holders. Owner and the Trustees may deem and treat the Note Holder of any Note as set forth in the Register as the absolute owner thereof (whether or not such Note shall be overdue) for all purposes, and neither Owner nor the Trustees shall be affected by any notice to the contrary, and payment of the principal of, Make Whole Amount, if any, and interest on such Note shall be made only to or upon the order of such Note Holder. All such payments so made, including, without limitation, all payments made

pursuant to the second sentence of Section 2.3, shall be valid and effectual to satisfy and discharge the liability of Owner upon such Note to the extent of the sum or sums so paid.

Section 2.6    Transfer and Exchange of Notes.

(a)    Notes may be transferred only on the Register. Any Note may be transferred on the Register if such Note is surrendered for cancellation at the Corporate Trust Office and is accompanied by an instrument of transfer satisfactory to the Trustee.  A new Note of like tenor shall be executed by the issuer thereof and registered in the name of the transferee in a principal amount equal to the original principal amount of such transferred Note and shall be delivered to the transferee in exchange for such transferred Note.

(b)    Any Note or Notes may be exchanged for a new Note or Notes if such Note or Notes to be so exchanged are surrendered for cancellation at the Corporate Trust Office accompanied by the request of the Note Holder of such Note specifying the denomination of each new Note to be issued in exchange therefor.  A new Note or Notes of like tenor shall be executed by Owner and payable to such Note Holder in the denominations so requested and in an aggregate principal amount equal to the original principal amount of such Note or Notes to be so exchanged and shall be delivered to such Note Holder in exchange for such Note or Notes to be so exchanged pursuant to Section 2.7.

(c)    If any Note shall become mutilated or be destroyed, lost or stolen, upon request of the Note Holder thereof, a new Note of like tenor shall be executed by the then Owner and payable to such Note Holder in the same original principal amount as such Note so mutilated, destroyed, lost or stolen, and shall be delivered to such Note Holder in exchange for such Note, if mutilated, or in substitution for such Note, if destroyed, lost or stolen, provided that (i) in the case of a mutilated Note, such Note shall be surrendered for cancellation at the Corporate Trust Office, and (ii) in the case of a destroyed, lost or stolen Note, the Note Holder of such Note shall furnish to the then Owner and the Trustees such security as may be reasonably required by them to save them harmless and to evidence to their satisfaction the destruction, loss or theft of such Note and the ownership thereof, provided, that, for any Note Holder which is an Institutional Investor the unsecured agreement of such Note Holder to indemnify such Owner and the Trustees under this Section 2.6 shall satisfy the conditions of this clause (ii).

Section 2.7    New Notes.  Each new Note (herein, in this Section, called a "New Note") issued pursuant to Section 2.6 in exchange for, in substitution for, or in lieu of, a Note (herein, in this Section, called an "Old Note") shall be dated the date of such Old Note. The Trustee shall mark on each New Note (i) the date to which principal and interest have been paid on such Old Note and (ii) all payments and prepayments of principal made on such Old Note which are allocable to such New Note.  Interest shall be deemed to have been paid on such New Note to the date to which interest was paid on such Old Note, and all payments and prepayments of principal marked on such New Note, as provided in clause (ii) above, shall be deemed to have been made thereon. All New Notes issued pursuant to Section 2.6 in exchange for or in substitution for or in lieu of Old Notes shall be valid obligations of Owner evidencing the same debt as such Old Notes and shall be

entitled to the benefits and security of this Indenture and the Loan Documents to the same extent as such Old Notes.

Section 2.8    <u>Trustee as Agent</u>.  The Trustee is hereby appointed the agent of Owner for the payment, registration, transfer and exchange of Notes.

Section 2.9    <u>Certificate of Authentication</u>.  No Note shall be valid or become obligatory for any purpose or be binding upon Owner, or be entitled to the benefits and security of this Indenture or the Mortgage, unless and until such Note has been authenticated by the Trustee's execution of the certificate of authentication thereon in the form prescribed in the Mortgage. The authentication and delivery by the Trustee of any Note shall be conclusive and the only competent evidence that such Note has been duly issued and is entitled to the benefits and security of this Indenture and the Loan Documents.

<div align="center">

ARTICLE III
<u>Particular Covenants of Owner</u>

</div>

In addition to the covenants undertaken pursuant to the Loan Documents, Owner represents, warrants, covenants and agrees as follows:

Section 3.1    <u>Validity of Notes; Title to Pledged Property</u>.  Owner is duly authorized under applicable law, its articles of organization, formation documents and its by-laws or regulations to execute and deliver this Indenture, the Loan Documents to which it is a party and to confirm the Grant of the Pledged Property to the Trustees; all corporate, or other action, authorization and governmental consents, authorizations and approvals necessary or required therefor have been duly and effectively taken or obtained. The Notes, the other Loan Documents and the Lease are legal, valid and binding obligations of Owner enforceable in accordance with their respective terms.

Section 3.2    <u>Maintenance of Lien and Recording</u>.

(a)    Owner will maintain and preserve the lien and security interest of this Indenture and the Loan Documents Granted by it so long as any Note is outstanding.

(b)    Owner will, forthwith after the execution and delivery of this Indenture and thereafter from time to time, cause this Indenture and any financing and continuation statements with this Indenture to be filed, registered and recorded in such manner and in such places, if any, as may be required by law in order to publish notice of and fully to protect the validity hereof and the interest and rights of the Trustees in the Pledged Property. Owner will pay or cause to be paid all taxes and fees incident to such filing, registration and recording, and all expenses incident to the preparation, execution and acknowledgment of this Indenture, the Notes and the Loan Documents and of any instrument of further assurance, and all federal or state stamp taxes and other taxes (except income taxes of parties other than Owner), duties and charges arising out of or in connection with the execution and delivery of this Indenture, the Notes and the Loan Documents.

Section 3.3    Further Assurance.  Owner will, at the request of the Trustee, execute and deliver, or cause to be executed and delivered, such further instruments and will do, or cause to be done, such further acts as the Trustee reasonably deems appropriate or advisable to maintain the lien and validity of this Indenture and the Loan Documents and to carry out more effectively the purposes of this Indenture, the Notes and the Loan Documents.  The Trustees shall have the right and power (which right and power are coupled with an interest) to, and are hereby irrevocably appointed the agent and attorney-in-fact of Owner to, file financing statements and continuation statements under the Uniform Commercial Code to accomplish the purposes of this Section 3.3 and Section 3.2 and to preserve its lien and security interests in the Pledged Property.

Section 3.4    Performance.  Owner will faithfully observe and perform, or cause to be observed and performed, all its covenants, agreements, conditions and requirements contained in this Indenture, the Notes, the Loan Documents, the Lease and any Guaranty strictly in accordance with the terms hereof and thereof.  Owner will not take any action, or permit any action to be taken, which will release any party to such instruments from any of its obligations or liabilities thereunder, or will result in the termination, modification or amendment, or will impair the validity of such instruments.  Owner will not inappropriately use monies from any employee benefit plan (as defined in the Employment Retirement Income Security Act of 1974, as amended, herein called ERISA) established by it to perform any of its obligations hereunder nor will Owner transfer its interests in the Pledged Property to any such employee benefit plan.

Section 3.5    Enforcement.  At the request of the Trustee, Owner will, at its expense, but subject to the direction and control of the Trustee, take such action, or at the Trustee's request furnish funds sufficient to enable the Trustees to take such action, as the Trustee may deem necessary or advisable for enforcing payment by any person of any moneys payable under or pursuant to the Notes and the Loan Documents, the Lease or any Guaranty.

Section 3.6    Negative Covenants.  Owner covenants and agrees that it will not:

(i)    Grant or permit to be created or to exist any security interest, lien or charge upon any part of the Pledged Property Granted by Owner or upon any proceeds, products, rents, income, revenues, issues or profits thereof, other than Permitted Encumbrances and as expressly permitted by this Indenture or the other Loan Documents; or

(ii)    claim any credit on, or make any deduction from, the interest or principal of the Notes by reason of the payment of any taxes levied or assessed or to be levied or assessed upon the Pledged Property or any part thereof, or for any other cause whatsoever.

Section 3.7    <u>Payment of Taxes and Other Charges</u>.

(a)    Owner will duly pay and discharge or cause to be paid or discharged, prior to delinquency, together with any interest and penalties thereon, all governmental taxes and other governmental charges of every kind and nature, general and special, levied upon or assessed against it or the Pledged Property or any part thereof or upon this Indenture, or upon the income from such Pledged Property (other than income taxes of the Note Holders) and Owner, in accordance with the provisions of the Loan Documents, will promptly discharge or cause to be discharged any security interest, lien, charge or encumbrance on the Pledged Property, other than Permitted Encumbrances.

(b)    After any such sum is required to have been paid pursuant to Section 3.7(a), the Trustee may at any time require Owner to produce and exhibit to the Trustee and, within 30 days after such request, Owner shall produce and exhibit to the Trustee, evidence satisfactory to the Trustee of the payment of all sums which are required to be paid by Owner pursuant to Section 3.7(a), other than any such amounts payable by Lessee pursuant to the Lease.

(c)    Nothing in this Section shall require the payment by Owner of any sum so long as Lessee shall contest the amount or the validity thereof in the manner provided in the Lease.

Section 3.8    <u>Performance of Certain Covenants by Trustee</u>.  If Owner shall fail to perform or cause to be performed any of the covenants contained in Section 3.2, 3.3, 3.5, or 3.7, the Trustee may (but shall not be obligated to) advance sums to perform the same in Owner's behalf (and if supplied with sufficient funds for such purpose by the Note Holders, the Trustee shall perform the same on behalf of Owner); and such Owner will repay all such advances with interest thereon at the rate per annum equal to the Default Rate, but in no event greater than the maximum rate not prohibited by law, such interest to be computed from the date of the making of such advance to and including the date of such repayment.  All such advances made by the Trustee and any interest thereon shall be a lien upon the Pledged Property and shall be secured hereby prior to the Notes.

Section 3.9    <u>Trustee's Fees</u>.  Owner will pay or cause to be paid, as the same become due and payable, all the Trustee's fees.  The Trustee acknowledges that arrangements, satisfactory to it, for the payment of its fees have been made.

<div align="center">

ARTICLE IV
<u>Possession and Use of Proceeds</u>

</div>

Section 4.1    <u>Collection of Moneys</u>.  The Trustee shall receive all moneys and property paid or payable to or received or receivable by the Trustee under or in respect of any Operative Document, and shall hold and disburse the same pursuant to said instrument, this Indenture and the Mortgage.  The Trustee may demand and enforce payment thereof and may take such other action as it deems necessary or advisable in connection therewith.

Section 4.2   Trustee May Enforce.  If default shall be made in the payment of any Rent or Additional Monetary Obligations under the Lease or of any other monies due under or pursuant to the Lease or any Guaranty, then subject to the provisions of Section 7.8 of the Mortgage, the Trustee upon the request of a Note Holder or Note Holders of 51% or more of the then unpaid principal amount of outstanding Notes, the due payment of which has been affected by such default, and upon the provision by such Note Holder of reasonable security for the cost thereof shall cause proper proceedings to be instituted and prosecuted in a court of competent jurisdiction to enforce such payment and collect all amounts due and payable by Lessee or Guarantor.

<div align="center">

ARTICLE V
Application of Moneys

</div>

Section 5.1   Moneys under the Lease.

(a)     Unless and until an Event of Default shall have occurred and be continuing to the Trustee's knowledge and unless otherwise provided in Section 5.1(d), moneys received by the Trustee as Rent under the Lease and interest on any overdue installment thereof shall be applied as follows:

(i)     to the Interest Payment and Installment Payments required to be made on the Notes (and such interest on any overdue amount thereof) due and payable on the date on which such Rent is due and payable; and

(ii)    the excess, if any, of any such Rent after the application thereof pursuant to clause (i) above (if no Event of Default has occurred and is continuing), and after the payment of the Trustees' fees in accordance with Section 3.9 hereof, shall be paid to Owner, or upon its written order, free of the lien hereof.

(b)     Moneys received by the Trustee as Additional Monetary Obligations under the Lease or pursuant to any Guaranty shall be applied to the purposes for which such moneys were paid pursuant thereto.

(c)     Moneys received by the Trustee (i) as the purchase price paid by Lessee pursuant to the Lease for any interest in a Property or (ii) from Owner pursuant to Section 4.1 of the Mortgage shall be applied first to the ratable prepayment of the Notes at a price equal to 100% of the outstanding principal amount to be prepaid, plus accrued and unpaid interest thereon to the date fixed for payment or prepayment, plus any applicable Make Whole Amount; and second (if no Event of Default has occurred and is continuing), the excess, if any, shall be paid to Owner or upon its written order, free of the lien hereof.

(d)     If an Event of Default shall have occurred and be continuing under the Mortgage, then all moneys described in this Section 5.1 shall be applied pursuant to Article 7 of the Mortgage.

Section 5.2   <u>Moneys under the Mortgage</u>. Moneys received by the Trustees under the Mortgage, including, but not limited to, moneys received pursuant to Section 4.3 and Article 5 of the Mortgage shall be applied pursuant to the terms of the Mortgage.

Section 5.3   <u>Prepayment</u>.   Moneys received by the Trustee as full or partial prepayment of the Notes shall be applied by the Trustee as provided in the Mortgage.

Section 5.4   <u>Optional Prepayments</u>.  Owner may prepay the Notes only to the extent permitted by, and in the manner set forth in, the Mortgage.  Except as so set forth in the Mortgage, Owner shall not have the right to prepay the Notes, in whole or in part.

<div align="center">ARTICLE VI<br>Events of Default and Remedies</div>

Section 6.1   <u>Events of Default</u>.  If any Event of Default under the Mortgage shall have occurred, then, in every such case, subject to the provisions of Section 7.8 of the Mortgage, during the continuance thereof, the Trustee by notice to Owner may, and upon the request of the Note Holders of at least 51% of the outstanding principal amount of the Notes shall, exercise any remedies available to it pursuant to the terms of the Mortgage and the Operative Documents.

Section 6.2   <u>Waiver of Default</u>.  Trustee, upon the request of the Note Holders of not less than 66⅔% in aggregate unpaid principal amount of the outstanding Notes, shall waive any default or Event of Default under the Mortgage and its consequences, except a default or Event of Default (i) in the payment or prepayment of the principal, interest and Make Whole Amount, if any, of any Note when and as the same shall become due and payable, (ii) depriving Trustee (or any Note Holder) of a lien upon the Mortgaged Property or the Pledged Property, (iii) in the due performance or observance of the covenants and obligations of Owner contained in the first and fourth sentences of Section 3.5 of the Mortgage, or in Section 3.1 1, 3.12 or in Section 4.1(a) of the Mortgage.  In case of any such waiver or in case any proceeding taken on account of any such default shall have been discontinued or abandoned or determined adversely to the Trustees then and in every such case, Owner, the Trustees and the Note Holders shall be restored to their former positions and rights under the Notes, the Loan Documents and hereunder respectively. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 6.3   <u>Direction of Remedies</u>.  The Note Holders of not less than a majority in aggregate unpaid principal amount of the outstanding Notes shall have the right by an instrument in writing delivered to the Trustees to direct the time, method and place of conducting any proceeding for any remedy available to the Trustees with respect to this Indenture or of exercising any power or trust conferred upon the Trustees under the Mortgage or other Operative Documents; subject to the provisions of Section 7.1 hereof, the Trustee shall have the right to decline to follow any such direction if the Trustee in good faith shall, by a Senior Vice President or a Vice President of Trustee, determine that the proceeding so directed would involve it in personal liability or would be unjustly prejudicial to the Note Holders not joining in such direction.  The Trustees, or any of them, shall not

be liable with respect to any action taken or omitted to be taken by them in good faith in accordance with any written instruction furnished to the Trustees, or any of them, by the Note Holders of a majority in aggregate unpaid principal amount of the Notes outstanding. If no such instrument or instruction has been received from the Note Holders of a majority in aggregate unpaid principal amount of the Notes outstanding, the Trustees, or any of them, may take such action, if any, as the Trustee shall determine.

<div align="center">

ARTICLE VII
The Trustees

</div>

Section 7.1    <u>Rights and Obligations of Trustees</u>.

(a)    The Trustees accept the trusts hereby created and agree to perform the duties herein required of them upon the terms and conditions hereof. Except as expressly provided herein, the Trustees shall not take any action, do anything, or perform any act in order to enforce the provisions of this Indenture or take any action with respect to an Event of Default, or institute, appear in or defend any suit or other proceeding with respect thereto, without the prior written consent of a majority in interest of the Noteholders in the outstanding amount then owed under the Notes. The Trustees shall not be answerable or accountable under any circumstances, except for their own bad faith, willful misconduct or negligence, and Owner agrees to indemnify and save harmless the Trustees against and from any liability and damages which they may incur or sustain, in good faith and without negligence, in the exercise and performance of any of their powers and duties hereunder; nor shall the Trustees be accountable for the use of any proceeds from the sale of the Notes. Except as otherwise expressly set forth in Section 7.1 (e), the Trustees shall be under no obligation to take any action to protect, preserve or enforce any rights or interests in the Pledged Property which, in their reasonable opinion, shall be likely to involve expense or liability, unless one or more of the Note Holders shall furnish to the Trustees reasonable indemnity against liability and expense. The Trustee in its individual or any other capacity, may become the payee, Note Holder or pledgee of Notes, with the same rights which it would have if it were not the Trustee hereunder, subject to its fiduciary duties hereunder.

(b)    The Trustees shall receive from Owner compensation at the rates previously agreed for all services rendered by them hereunder or under any Loan Document and shall be reimbursed for all out-of-pocket expenses (including, but not limited to, reasonable legal fees) prior to an Event of Default.

(c)    The Trustees shall be entitled to reasonable compensation from Owner for their services and reimbursement for all proper disbursements incurred by them upon or after an Event of Default under the Operative Documents or the Notes, or in instituting, appearing in or defending any suit or proceeding with respect thereto.  For such compensation and disbursements and for the indemnity referred to in Section 7.1 (a), the Trustees shall be secured hereunder prior to the Notes.

(d)    The Trustees shall incur no liability in acting upon any signature, notice, request, consent, certificate, opinion or other instrument reasonably believed by them, after

due investigation and inquiry, to be genuine. In administering the trusts created hereby, the Trustees may act directly or through their agents or attorneys and may, at the expense of Owner, consult with counsel, accountants and other skilled persons to be selected and employed by them, and the reasonable expenses thereof shall be paid by Owner. The Trustees shall not be liable for anything done, suffered or omitted in good faith by any of them in accordance with the opinion of any such person.

(e)     The recitals and statements in this Indenture, the Mortgage, the Assignment and the Notes (other than the Trustee's Certificate of Authentication thereon) are statements by Owner alone, and the Trustees shall not be held responsible for the legality or validity hereof or of the Mortgage, the Assignment or the Notes (other than the Trustee's Certificate of Authentication thereon). In executing this Indenture, the Trustees make no covenant or representation as to the rights of the Note Holders, or the title of Owner to, or the condition of, the Pledged Property or the sufficiency of the security for the Notes afforded thereby.

(f)     Whenever in administering the trusts, the Trustee shall deem it necessary or desirable that a matter be established prior to taking, suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively established by an instrument purporting to be signed by an Executive Officer of Owner and delivered to the Trustee, and such instrument shall be full warrant to the Trustees for any action taken, suffered or omitted by them in reliance thereon, but in its discretion the Trustee may accept other evidence of such fact or matter or may require such additional evidence as to it may seem reasonable.

(g)     Subject to Sections 2.3, 3.8 ,7.1(1) and 7.1(m) hereof, the Trustees shall have no duty to see to any recording or filing or registration of this Indenture or any financing statement or amendments or supplements hereto, or to see to the payment of any fees, charges or taxes in connection therewith, or to give any notice thereof, or to effect or renew any insurance or see to the collection or application of any insurance moneys or condemnation awards, or to ascertain whether the Property is adequately or properly insured, or to see to the payment of any tax, assessment or other governmental charge which may be levied or assessed on the Property, the Pledged Property or against Owner.

(h)     The Trustees shall have no duty to verify any amortization schedules or any financial or other statements or reports or certificates furnished pursuant to any provision hereof, and they shall be under no other duty in respect of the same, except to retain the same in their files, and permit the inspection thereof at reasonable times by the Note Holder of any Note.

(i)     The Trustees shall not be concerned with or accountable to any person for the use or application of any deposited moneys which shall be released or withdrawn in accordance with the provisions hereof or of the Mortgage.

(j)     In accepting this Indenture and the Loan Documents, the Trustees act solely as trustees and not in their individual capacities, and all persons, other than Owner and the

Note Holders, having any claim against the Trustees hereunder, shall look only to the Pledged Property for payment or satisfaction thereof.

(k)    Subject to Sections 2.3 and 7.1(1) hereof, the Trustees shall not be required to inquire as to the performance or observance of any of the covenants or agreements herein or in any other instruments to be performed or observed by Owner or Lessee. The Trustees shall not be deemed to have notice or knowledge of any default or Event of Default (except default in the payment of moneys to the Trustee which are required to be paid to the Trustee on or before a specified date or within a specified time after receipt by the Trustee of a notice or certificate which was in fact received and except default in the delivery of any certificate, opinion or other document expressly required to be delivered to the Trustee by any provision of the Loan Documents), unless the Trustee or any officer in the Corporate Trust Department of the Trustee shall have actual knowledge that, or shall receive from Owner or a Note Holder written notice stating that, a default or an Event of Default has occurred and specifying the same, and in the absence of such notice, the Trustees may assume that there is no such default or Event of Default. Promptly after obtaining such actual knowledge or notice, the Trustee shall send notice to each Note Holder and Owner of such default or Event of Default, specifying what actions, if any, the Trustee is taking or has taken with respect thereto and/or requesting instructions from such Note Holders with respect thereto.

(l)    Notwithstanding any provision of this Indenture or any Loan Document to the contrary, (i) if a payment of Rent is not received by the Trustee on the due date thereof, the Trustee shall immediately notify each Note Holder and Owner of the fact such payment was not received and shall immediately make reasonable inquiry of Winn-Dixie as to the status of such payment, and (ii) if Lessee or Guarantor shall, to the knowledge of the Trustee, be in default under any other provision of the Lease or any Guaranty, Trustee shall promptly notify Lessee, Guarantor, Owner and each Note Holder of such default. If the Trustee shall fail to so notify the Note Holders and Owner of non-receipt of such payment of Rent on the due date thereof or such other default, it shall be liable in its individual capacity to the Note Holders and Owner for any damages resulting from its failure to give such notice. Nothing in this Section 7.1(l) shall give Winn-Dixie or Lessee any right to receive notice or inquiry with respect to its failure to pay or cause the payment of such Rent to the Trustee on the due date thereof or of any other default under the Lease or any Guaranty except to the extent expressly provided in the Lease or any such Guaranty.

(m)    The Trustee shall timely file, or cause the timely filing of, all appropriate Uniform Commercial Code continuation statements with respect to the Pledged Property and the Loan Documents.

(n)    The Trustee represents and warrants that it is duly authorized under applicable law, its certificate of incorporation and its by-laws to accept the trusts under this Indenture and the Loan documents, to authenticate the Notes, and to execute and deliver this Indenture, and that all corporate action, necessary or required therefor has been duly and effectively taken or obtained.

(o)    The Trustee shall:

(i)    comply with the claims procedures set forth in the residual value insurance policy (the "Residual Value Policy") issued by RVI, the proceeds of which will be sufficient to cover the balloon payment on the Notes at maturity; and

(ii)    Trustee shall provide sixty (60) days written notice (the "First Notice") to Note Holders prior to the deadline to make any claim under the Residual Value Policy (the "Claim Deadline").  In the event Trustee has not received a response from one or more Note Holders with respect to such claim within twenty (20) days after the date of the First Notice, Trustee shall send such Note Holder(s) a second written notice via facsimile (the "Second Notice") at least thirty (30) days prior to the Claim Deadline.  In the event Trustee has still not received a response from any such Note Holder(s) within twenty (20) days after the date of the Second Notice, Trustee shall provide notice by telephone to such Note Holder(s) ten (10) days prior to the Claim Deadline. If one or more Note Holders fails to respond to Trustee by the Claim Deadline, Trustee shall submit a claim under the respective Residual Value Policy; and

(iii)    RVI shall promptly provide notice to Trustee upon its receipt of any notification that the Standard & Poor's Corporation ("S&P") or Fitch Investor Services, Inc. ("Fitch") claims paying ability for RVI has been reduced below A-.  Thereafter, RVI shall, within ninety (90) days of such downgrade, either (i) cause its rating to be restored to an S&P and Fitch claims paying ability of A- or better and provide evidence of such claims paying ability to Trustee; or (ii) provide Trustee with a reinsurance contract for the loss payee endorsement from an insurer with an S&P and Fitch claims paying ability of A or better.

Section 7.2    The Individual Trustee. The Individual Trustee shall be subject to the following terms and conditions:

(a)    Subject to the provisions of Section 7.6, all rights, powers, duties and obligations conferred or imposed upon the Trustees shall be conferred or imposed solely upon and solely exercised and performed by the Trustee, except as expressly provided otherwise in this Indenture and except to the extent that under any law of any jurisdiction in which any particular act is to be performed the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by the Individual Trustee.

(b)    No power granted by this Indenture to, or which this Indenture provides may be exercised by, the Individual Trustee shall be exercised by him except jointly with, or with the written consent of, the Trustee.

Section 7.3    Resignation and Removal of Trustee.  The Trustee may resign and be discharged of the trusts by giving written notice by mail, first class postage prepaid, to each Note Holder at its address appearing on the Register and to Owner of such resignation, specifying the date (which shall be not less than 60 days after the date of mailing such notice) when such resignation shall take effect.  Such resignation shall take effect on the date so specified, provided, however, that such resignation shall not take effect until such time as a successor trustee shall have been appointed by the Note Holders of a majority in unpaid principal amount of the Notes then outstanding as provided in Section 7.4.  The Trustee may be removed with or without cause at any time by a written instrument signed by the Note Holders of a majority of the unpaid principal amount of the Notes then outstanding.

Section 7.4    Successor Trustee.

(a)    If, at any time, the Trustee shall have given notice of its intention to resign, shall resign or be removed or if the Trustee shall be taken under the control of any public officer or a receiver appointed by a court, then (except as hereinafter provided) a successor may be appointed by the Note Holders of a majority of the unpaid principal amount of the Notes then outstanding by an instrument signed by such Note Holder; provided, that if the Note Holders shall not have appointed such successor prior to the effective date of such resignation, removal or taking under control, then the retiring Trustee or any Note Holder may apply to a court of competent jurisdiction to appoint a successor to act until a successor trustee shall be appointed by the Note Holders as provided herein.  After any such appointment by such court, Owner shall mail written notice thereof to the Note Holders at their respective addresses appearing on the Register; but any successor trustee so appointed by such court shall immediately and without further act be superseded by a successor trustee appointed by the Note Holders as provided above.

(b)    Any successor to the Trustee shall execute and deliver to its predecessor and Owner an instrument accepting such appointment, and thereupon such successor, without any further act, shall become vested with all the properties, rights, duties and trusts of its predecessor hereunder with like effect as if originally named as trustee herein; however, on the written request of Owner or the successor trustee, such predecessor shall execute and deliver an instrument transferring to such successor upon the trusts expressed in this Indenture, such properties, rights and trusts, and shall assign, transfer, deliver and pay over to such successor any property and moneys subject to the lien hereof and held by such predecessor.  Should any deed or conveyance from Owner be required by such successor for vesting in and confirming to such successor such properties, rights and trusts, then on request all such deeds, conveyances and instruments shall be executed, acknowledged and delivered by Owner.

(c)    Any successor to the Trustee, however appointed, shall always be a bank or trust company, organized under the laws of the United States or any of the States thereof, having a combined capital, surplus and undivided profits (as shown by its, most recent financial statement distributed to its shareholders) aggregating at least $100,000,000 and having a senior unsecured debt rating of A2 or better by Moody's Investors Service, Inc. and A or better by Standard & Poor's Corporation, if there shall be such a bank or trust

company willing and legally qualified to accept and perform the trusts and duties mentioned herein upon reasonable or customary terms.

(d)    Any corporation into which the Trustee may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which it shall be a party, shall be the successor to the Trustee without the execution of any document provided it meets the criteria set forth in clause (c) above.

Section 7.5    <u>Resignation and Removal of the Individual Trustee</u>.

(a)    The Individual Trustee may resign and be discharged of the trusts under this Indenture by mailing written notice thereof to Owner and the Trustee specifying the date (which shall be not less than 30 days after the date of such mailing) when such resignation shall take effect.  Such resignation shall take effect on the date so specified unless previously a person succeeding to the office of the Individual Trustee shall have been appointed by the Trustee or the Note Holders of a majority in principal amount of the Notes, in which event such resignation shall take effect immediately upon the appointment of such person.

(b)    The Individual Trustee may be removed with or without cause at any time and his successor appointed either by the Trustee (upon written notice to Owner and the Note Holders) or in the same manner as set forth in Section 7.4(a).

Section 7.6    <u>Separate and Co-Trustees</u>.

(a)    If at any time the Trustee shall deem it necessary, the Trustee may appoint one or more persons to act as separate trustees or co-trustees, jointly with the Trustees or any of them except as set forth in Section 7.6(b)(1), of any of the property subject to the lien hereof or any Loan Document; and such person shall have such powers and duties consistent with this Indenture and such Loan Documents as shall be specified in such instrument. If the Trustee shall request Owner to do so, Owner shall join with the Trustee in the execution of such instrument, but the Trustee shall have the power to make such appointment without making such request.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be subject to the following terms and conditions:

(1)    The rights, powers, duties and obligations conferred or imposed upon such separate or co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly, as shall be provided in the instrument appointing such separate trustee or co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed any non-resident trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such separate trustee or co-trustee;

(2)    All powers, duties, obligations and rights conferred upon the Trustees, in respect of the custody of all cash deposited hereunder, shall be exercised solely by the Trustee; and

(3)    The Trustee may at any time by written instrument accept the resignation of or remove any such separate trustee or co-trustee, and upon the request of the Trustee, Owner shall join with the Trustee in the execution of all instruments necessary to make effective such resignation, but the Trustee shall have the power to accept such resignation or make such removal without making such request. A successor to a separate trustee or co-trustee so resigning or removed may be appointed in the manner provided in this Section.

Section 7.7    Liability of Trustee. No trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder.

Section 7.8    Segregation and Investment of Moneys. All moneys received by the Trustees pursuant to this Indenture shall be held in trust for the purposes for which they were paid, and shall be segregated from any other moneys held by the Trustees, and may be deposited by the Trustees under such general conditions as may be prescribed by law in the general banking department of the Trustee, and the Trustee shall not be liable for any interest thereon.

Section 7.9    Illegal Acts. No provision of this Indenture or any amendment or supplement hereto shall be deemed to impose any duty or obligation on the Trustees to perform any act in the execution of the trust or to exercise any right, power, duty or obligation conferred or imposed on them, which under any present or future law shall be unlawful, or which shall be beyond the corporate powers, authorization or qualification of the Trustee, but any such act and any such exercise shall be performed and exercised by the Individual Trustee or by any separate trustee or co-trustee appointed as provided in Section 7.6, provided, that the same shall not be unlawful or beyond his or its powers, authorization and qualifications.

Section 7.10 Communications to be Sent to Note Holders. The Trustee, promptly upon the taking of any action pursuant to Section 3.8 or Article VI of this Indenture, shall send each Note Holder notice thereof.

ARTICLE VIII
Supplements

Section 8.1    Supplements Without Consent. Without the consent of the Note Holders, Owner and the Trustees may enter into supplements for any one or more of the following purposes provided such supplement does not materially and adversely affect the interests of the Note Holders under this Indenture or with respect to any Pledged Property:

(a)    to correct or amplify the description of any property subject to the lien hereof;

(b)    to confirm a Grant to the Trustees of any additional property;

(c)    to add other covenants and agreements thereafter to be observed by Owner or to surrender any right or power herein reserved to or conferred upon Owner; and

(d)    to properly authorize, describe or secure any series of Expansion Notes issued pursuant to Section 4.6 of the Mortgage.

Section 8.2  Supplements with Consent.  With the written consent of the Note Holders of not less than 66⅔% in unpaid principal amount of the Notes then outstanding, Owner and the Trustees may enter into supplements changing in any manner or eliminating any of the provisions of this Indenture, as amended and supplemented; provided, that without the consent of each Note Holder no such supplement shall (a) impair or affect the right of each Note Holder to receive payments or prepayments of the principal of and payments of the interest and Make Whole Amount, if any, on its Notes, as therein and herein provided, including, without limitation, the interest rate thereon and the date upon which such payments or prepayments are due and payable pursuant to the terms and conditions of the Notes, this Indenture and the Loan Documents, (b) except as otherwise expressly provided in this Indenture, deprive any Note Holder of the benefit of a lien on the Pledged Property securing such Note Holder's Notes or (c) change the percentage of principal amount of Notes required for action under Section 4.2, 6. 1, 6.2, 6.3 or this Section 8.2.  Upon the filing with the Trustees of consents of the requisite percentage of the Note Holders, the Trustees shall join with Owner in the execution of such supplement unless such supplement affects the Trustees' rights, duties or immunities hereunder, in which case the Trustees may, but shall not be obligated to, enter into such supplement.

Section 8.3  Delivery of Supplements.  Promptly after the execution of any supplement the Trustee shall mail, first class postage prepaid, a conformed copy of such supplement to each Note Holder at the address of such Note Holder appearing on the Register. Any failure of the Trustee to mail such conformed copy shall not, however, in any way impair or affect the validity of such supplement.

ARTICLE IX
Discharge of Indenture; No Recourse

Section 9.1  Discharge on Payment of Notes.  Upon payment in full of all the Notes and all sums payable by Owner under this Indenture and the other Loan Documents, this Indenture shall cease and terminate as a lien on the Pledged Property and the Trustees shall execute and deliver such deeds or other instruments as shall be requested by Owner to satisfy and discharge the lien hereof and the lien of the Loan Documents and any related UCC financing statements. For this purpose, the Notes shall be deemed to be paid if sufficient moneys shall have been set apart by or deposited in trust with the Trustees to pay the principal thereof and all other sums payable thereon, provided that, as to Notes to be prepaid, any notice provided for in respect of their prepayment shall have been given or arrangements satisfactory to the Trustees for the giving of such notice shall have been made. At or before the time of the delivery by the Trustees of the instrument satisfying and canceling this Indenture, the Trustees shall hold in trust for the benefit of the Note Holders of the unpaid Notes the moneys on deposit with it for the payment thereof.

Section 9.2  Unclaimed Funds.  At the expiration of six years following the date when all of the Notes shall have become due and payable (whether by lapse of time or by acceleration or by the exercise of the privilege of prepayment), the trust established hereby on moneys deposited for payment of such Notes shall automatically terminate and any moneys deposited for such purposes then remaining on deposit with the Trustees shall be paid to Owner and the person entitled to receive such moneys shall thereafter look only to Owner for the payment thereof; provided, that the Trustee before being required to make any such repayment may, at the expense of Owner, cause to be published at least once but not more than three times in a daily newspaper of general circulation in New York, New York or in Salt Lake City, Utah, a notice to the effect that said moneys have not been applied for the purpose for which they were deposited, that said trust has terminated, and that after a date named therein, which shall be not less than 10 days after the date of first publication of said notice, any unclaimed balance of said moneys then remaining in the hands of the Trustee will be paid to Owner.

Section 9.3  Immunity From Liability.  Anything contained herein or in the Notes, the Note Agreement, the Mortgage or the Assignment to the contrary notwithstanding, no recourse shall be had for the payment of the principal of or interest or Make Whole Amount, if any, on the Notes or for any claim based thereon or otherwise in respect thereof or based on or in respect of this Indenture against (i) any past, present or future officer, director, shareholder, partner, trustee or beneficiary of Owner; (ii) any legal representative, heir, estate, successor or assign of any thereof; or (iii) any person to whom the Mortgaged Property or part thereof or interest therein shall have been transferred pursuant to the Mortgage (or its officers, directors, shareholders, partners, members, trustees or beneficiaries), in each case for any deficiency or any other sum owing on the Notes or arising under or with respect to the Note Agreement, the Mortgage, this Indenture, or the Assignment. It is understood that the Notes and all obligations under or with respect to the Note Agreement, this Indenture, the Mortgage and the Assignment may not be enforced against any person or entity described in clauses (i) through (iii) above; however, the foregoing provisions of this paragraph shall not (x) prevent recourse to the Pledged Property or Mortgaged Property or the sums due or to become due under any Operative Document, including, without limitation, the right to proceed against Lessee and any Guarantor under the Lease, the Assignment and any Guaranty, or (y) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by the Loan Documents, but the same shall continue until paid or discharged, and, further, that the foregoing provisions of this Section shall not limit the right of any person to name any person referred to in clauses (i) through (iii) above as a party defendant in any action or suit for a judicial foreclosure of or in the exercise of any other remedy under the Notes or under the Note Agreement, this Indenture, the Mortgage or the Assignment so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such person. Notwithstanding anything to the contrary herein, in the Note Agreement, the Notes, the Mortgage or the Assignment, this agreement not to pursue personal or recourse liability shall be null and void and of no force or effect, in the event of any fraud, willful misrepresentation or misconduct by any person referred to in clauses (i) through (iii) above with respect to the Mortgaged Property or the Pledged Property or with respect to the making or delivery of the Notes or any other instrument or agreement by which the Notes are secured or upon the failure or refusal by

such person to promptly remit to the Trustee any payment of Rent, Additional Monetary Obligations or purchase price payable pursuant to the Lease where such payment comes within the control of (intentionally or unintentionally) such person other than pursuant to the Mortgage, the Assignment or this Indenture.

### ARTICLE X
#### Miscellaneous

Section 10.1 Illegal Provisions. In case any one or more of the provisions contained herein, in the Note Agreement, the Notes, the Mortgage or the Assignment shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Indenture shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

Section 10.2 Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telefax, the day when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party prior to or during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if after normal business hours for the recipient; (iii) if delivered by United States Mail, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same, addressed: (i) if to Owner at its address first sent forth above, Attention: Gary Lines (telefax number 515-248-8090) or (ii) if to Trustee, at such party's address first above set forth (telefax number 801-246-5053), or in any case at such other address as may be filed in writing by Owner with the Trustee or by the Trustee with Owner.

Section 10.3 Waiver of Notice. Whenever in this Indenture the giving of notice is required, the giving thereof may be waived in writing by the person or persons entitled to receive such notice.

Section 10.4 Maximum Interest Payable. No provision of this Indenture or of the Notes shall require the payment or permit the collection of interest in excess of the maximum not prohibited by law. If any excess of interest in such respect is herein or in the Notes provided for, or shall be adjudicated to be so provided for herein or in the Notes, such interest in excess of the amount permitted by law shall be applied to the principal amount of the Note on which such excess was paid. This provision shall control any other provision of this Indenture and the Notes.

Section 10.5 Counterparts. This Indenture may be executed in any number of counterparts and each thereof shall be deemed to be an original, and all such counterparts shall constitute but one and the same instrument.

Section 10.6 <u>Successors and Assigns</u>. All of the provisions herein contained shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, to the same extent as if each such successor and assign were in each case named as a party to this Indenture. Wherever used, the singular shall include the plural, the plural include the singular and the use of any gender include all genders.

Section 10.7 <u>Table of Contents; Headings</u>. The table contents preceding this Indenture and the headings appearing in this Indenture have been inserted for convenient reference only and shall not modify, define, limit or expand the express provisions of this Indenture.

Section 10.8 <u>Governing Law</u>. This Indenture shall be governed by the law of the State in which the Property is located.

<div align="center">

ARTICLE XI
<u>Paydown Rights and Payup Rights</u>

</div>

Section 11.1 <u>Terms and Conditions</u>. This Indenture, the Mortgage, and the Notes are intended to evidence a mortgage loan on the terms set forth therein and a revolving credit facility on the terms and conditions hereinafter set forth, meaning that the principal amount secured hereby and by the Mortgage may be paid down by Owner (other than through regularly scheduled Installment Payments as provided in the Notes), subject to the Note Holders' obligations to re-advance the sum so paid down, as hereinafter provided. To the extent permitted by law, the lien securing the re-advanced amount shall have the same priority as the lien hereof prior to such paydown. The maximum indebtedness secured by the Mortgage and this Indenture shall not exceed the original principal amount of the Notes secured thereby, plus interest and premium (if any) thereon, charges and expenses of collection incurred by the Trustee or the Note Holders, amounts advanced for taxes or insurance, and reasonable attorneys' fees. Owner shall have the right to repay all or a portion of the Note (the "Paydown Right"), to be exercisable one time (the "Paydown Date") during the period from the date of execution hereof to and including August 31, 2000, in connection with a sale of the Property or a transfer of all of the membership interests in the Owner (which has occurred or is anticipated to occur within ten (10) days of the Paydown Date). Such Paydown Right shall be exercised to prepay an amount up to 100% of the outstanding principal amount of the Notes (the amount actually so paid down is herein called the "Paydown Amount"). The Paydown Right may be exercised upon written notice no fewer than two (2) Business Days prior to the Paydown Date to the Trustee and Escrow Agent (as hereinafter defined) the "Paydown Notice"). The Paydown Notice shall set forth the (i) amount of the Paydown Amount, (ii) the Paydown Date, (iii) the amount of each of the Paydown Make-Whole Premium, the Interim Interest Fee, the Interest Accrual and the Administrative Fee (each as hereinafter defined and, together with the Paydown Amount, collectively called the "Total Paydown Amount"), and (iv) the "Paydown Period", which shall be a period of not more than 5 days from the Paydown Date and shall not include a date on which Rent under the Lease is payable (and if, contrary to the intent of the parties, Rent is received during the Paydown Period, it shall be held in trust by the Trustee for processing on the next scheduled Installment Payment date as if the Paydown Right had not been exercised). Notwithstanding the foregoing, the

Paydown Notice may elect a longer Paydown Period but in no event greater than 30 days (which shall in no event include a scheduled Rent Payment Date and if, contrary to the intent of the parties, Rent is received during the Paydown Period, it shall be held in trust by the Trustee for processing on the next scheduled Installment Payment Date as if the Paydown Right had not been exercised). If Owner elects any such longer Paydown Period, the Paydown Make-Whole Premium to be deposited in escrow shall, notwithstanding the definition of such term, be determined by using a discount rate 100 basis points lower than the discount rate that would otherwise have been used in calculating the Paydown Make-Whole Premium, and shall be recalculated on the business day before prepayment on the basis of the formula set forth in the definition of Paydown Make-Whole Premium (and any excess refunded to Owner and any deficiency paid by Owner). Notwithstanding the preceding two sentences, if Owner has elected a Paydown Period in excess of five days and if, during such Paydown Period, the yield on the actively traded U.S. Treasury obligation having a maturity approximating the average life of the Notes declines by 70 basis points or more, Trustee may give Owner a notice requiring Owner either (i) to post such additional amount in respect of the Paydown Make-Whole Premium as Trustee shall specify (at the direction of the holders of the Notes acting in their sole discretion), or (ii) to reborrow the Paydown Amount, or (iii) to affirmatively elect to decline to either post such additional amount or to reborrow the Paydown Amount and instead to direct the Trustee to make the application of funds specified in the immediately succeeding sentence. If Owner has not complied with such notice within two business days after its delivery, or has made the direction permitted by clause (iii) of the immediately preceding sentence, Trustee shall apply all funds deposited either with it or with the Escrow Agent in connection with this Article 11 to the prepayment of the Notes, together with accrued and unpaid interest thereon and together with a Paydown Make-Whole Premium; provided, however, that Trustee shall recalculate the Paydown Make-Whole Premium as of the date of such application on the basis of the formula set forth in the definition of Paydown Make-Whole Premium and any excess shall be promptly refunded to Owner. As a condition to Owner's exercise of its Paydown Right, Owner shall have deposited with Escrow Agent the Total Paydown Amount which shall nevertheless be subject to the lien hereof. Upon payment of the Total Paydown Amount by Owner, the Trustee shall instruct Escrow Agent to hold and invest the Total Paydown Amount in accordance with the terms of the Escrow Agreement.

The transferee of the Property or the Owner with a new beneficial owner (in either circumstance, "New Borrower") shall have the right (the "Payup Right") to borrow an amount equal to the Paydown Amount and no different amount (the "Payup Amount") on any Business Day during the Paydown Period. The Payup Right may be exercised by giving written notice to the Trustee and Escrow Agent no later than two (2) Business Days prior to the Payup Date, as hereinafter defined (the "Payup Notice") setting forth its name, address and wire transfer instructions. The Payup Notice shall set forth the Business Day upon which the Payup Right is to be exercised (the "Payup Date"). New Borrower may exercise its Payup Right upon completion of the following: (1) New Borrower shall have provided the Trustee and Escrow Agent with the Payup Notice; (2) New Borrower shall have delivered to the Trustee a title insurance endorsement confirming the continuation in effect of the original policy of mortgage title insurance insuring the Trustee for the benefit of the Note Holders and insuring no change in priority of lien as to the entire principal

amount of the Notes following the borrowing by New Borrower of the Paydown Amount; (3) the Trustee shall have received confirmation from RVI that the Residual Value Policy and the loss payee endorsement will continue in effect without modification following the borrowing by New Borrower of the Paydown Amount; (4) New Borrower shall provide the Transferee Documents (as hereinafter defined); (5) the Trustee shall have received an opinion of Day, Berry & Howard LLP or other counsel satisfactory to the Trustee and the Note Holders (as hereinafter defined) to the effect that the Trustee and the Note Holders will not be subject to income tax liability as a result of the transactions contemplated in this paragraph, and (6) an entity proposed by New Borrower who is creditworthy in Note Holders' judgment shall have delivered an agreement indemnifying the Trustee and the Note Holders against tax liability as a result of the transactions contemplated by this paragraph (except for tax liability for the Interim Interest Fee, Paydown Make-Whole Premium and any earning on the Total Paydown Amount, in each case if actually paid to the Note Holders, and except for tax liability for the portion of the Administrative Fee received by the Trustee). The requirements of the foregoing clauses (1) through (6) are collectively called the "Payup Requirements" and shall be in form and substance reasonably satisfactory to special counsel for the Note Holders.

Upon satisfaction of the Payup Requirements, the Trustee shall notify Escrow Agent of such fact and shall direct Escrow Agent to (1) advance the Payup Amount to New Borrower; (2) pay to the Owner, the Paydown Make-Whole Premium and Interest Accrual; (3) remit to the Trustee the earnings on the Total Paydown Amount as a fee for the benefit of the Note Holders as compensation for the transactions contemplated hereby and not as a payment with respect to the Notes; (4) pay the Interim Interest Fee to the Trustee for distribution to the Note Holders (in lieu of an equal amount otherwise payable out of Rents); and (5) pay to the Trustee and Escrow Agent their respective shares of the Administrative Fee in accordance with the terms of the Escrow Agreement.

In the event the Payup Requirements are not satisfied by the close of business on the last Business Day of the Paydown Period, the Trustee shall notify Escrow Agent of such fact and shall instruct Escrow Agent to (i) remit to the Trustee the Paydown Amount and the Paydown Make-Whole Premium as a prepayment of the Note and prepayment premium thereon to be remitted to the Note Holders in accordance with their respective participation interests; (ii) pay to the Trustee and Escrow Agent their respective shares of the Administrative Fee in accordance with the terms of the Escrow Agreement; and (iii) pay the Transaction Fee to the Trustee to be remitted to the Note Holders in accordance with their respective participation interests. If the Paydown Right is exercised by Borrower but the Payup Requirements, for whatever reason, are not satisfied, Borrower agrees to prepay, with Make-Whole Amount, any unpaid principal amount of the Notes, together with accrued interest thereon. Upon such prepayment and the payment of any other sums then owing under this Indenture and the Mortgage, the lien of this Indenture and the Mortgage shall be released in accordance with the terms of thereof.

For purposes of this paragraph, the Administrative Fee shall mean the fee in the amount of $1,250.00 paid to the Trustee and Escrow Agent in accordance with the Escrow Agreement (hereinafter defined). The "Transaction Fee" shall mean the sum of (x) an amount equal to the interest scheduled to accrue on the Notes from the date through which

interest thereon has been paid to the beginning of the Paydown Period (the "Interest Accrual"), (y) an amount equal to the interest on the Notes which would have accrued on the Notes during the Paydown Period if the Paydown Amount had not been paid (the "Interim Interest Fee"), and (z) earnings on the Paydown Amount, Interim Interest Fee and the Paydown Make-Whole Premium as invested pursuant to the Escrow Agreement. The "Paydown Make-Whole Premium" shall mean the Make-Whole Amount calculated in accordance with the terms of the Notes. The "Escrow Agent" shall mean shall mean LandAmerica Title Insurance Company, and its successors and assigns acting in accordance with the terms set forth in the Escrow Agreement of even date herewith between the Trustee and Escrow Agent (the "Escrow Agreement").

The "Transferee Documents" shall mean the following:

(i)     a certificate of New Borrower or the new beneficial owner of Owner, whichever is applicable, attaching true and complete copies of New Borrower's or the new beneficial owner of Owner's, whichever is applicable, organizational documents and authorizing resolutions and certifying that all of the representations and warranties of the Owner as set forth in the respective Operative Documents, the Lease and all other documents related thereto to which New Borrower or the new beneficial owner of Owner, whichever is applicable, has become a party are true and correct as of the Payup Date;

(ii)    good standing certificates from the Secretary of State of the state in which the New Borrower or the new beneficial owner of Owner, whichever is applicable, is organized, and if required, the state where the Property is located;

(iii)   an incumbency certificate of New Borrower or the new beneficial owner of Owner, whichever is applicable, setting forth the authorized signatories of New Borrower with specimen signatures;

(iv)    an opinion of outside counsel to New Borrower or the new beneficial owner of Owner, whichever is applicable, as to the enforceability of the Operative Documents and the Lease against New Borrower or the new beneficial owner of Owner, whichever is applicable, in form and content substantially identical to the opinions of Borrower delivered in connection with this Indenture; and

(v)     an opinion of outside counsel to New Borrower as to the substantive nonconsolidation of New Borrower with any of its direct or indirect partners, members, shareholders or controlling persons, in a form and content reasonably satisfactory to the Trustee's special counsel.

Notwithstanding anything in this Article 11 to the contrary, neither Owner nor New Borrower shall have the right to exercise the Paydown Right if there is a material adverse change in the financial condition, business or operations of Guarantor since the date of Guarantor's last audited financial statements.

Owner agrees to pay all reasonable legal fees and expenses incurred by the Trustee and the Escrow Agent and the Note Holders in connection with Owner's exercise of the Paydown Right, including without limitation reasonable attorneys' fees (including those legal fees of in-house counsel for the Note Holders).

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, BENNETTSVILLE 99-SC, LLC, a limited liability company, the Trustee and the Individual Trustee have caused this Indenture to be duly executed, all as of the day and year first above written.

BENNETTSVILLE 99-SC, LLC, a
Delaware limited liability company

By:    PRINCIPAL NET LEASE
       INVESTORS, L.L.C., a Delaware
       limited liability company, its sole
       member

   By:  PRINCIPAL LIFE INSURANCE
        COMPANY, an Iowa corporation,
        its sole member

        By:_____
        Name:_____
        Its:_____
                    COUNSEL

        By:_____
        Name:_____
        Its:_____DEBRA SVOBODA EPP_____
                    COUNSEL

        [CORPORATE SEAL]


FIRST SECURITY BANK, NATIONAL
ASSOCIATION


By:_____
Name:_____
Title:_____


_____
Val T. Orton, Individual Trustee

**IN WITNESS WHEREOF, BENNETTSVILLE 99-SC, LLC,** a limited liability company, the Trustee and the Individual Trustee have caused this Indenture to be duly executed, all as of the day and year first above written.

<div style="margin-left:40%">

BENNETTSVILLE 99-SC, LLC, a
Delaware limited liability company

By:   PRINCIPAL NET LEASE
      INVESTORS, L.L.C., a Delaware
      limited liability company, its sole
      member

    By:  PRINCIPAL LIFE INSURANCE
        COMPANY, an Iowa corporation,
        its sole member

        By:_____
        Name:_____
        Its:_____

        By:_____
        Name:_____
        Its:_____

[CORPORATE SEAL]


FIRST SECURITY BANK, NATIONAL
ASSOCIATION

By:_____
Name:_____Val T. Orton_____
Title:_____Vice President_____

_____
Val T. Orton, Individual Trustee

</div>

## EXHIBIT A

## BENNETTSVILLE, SOUTH CAROLINA

PARCEL A

A PIECE, PARCEL OR TRACT OF LAND CONTAINING 6.93 ACRES, SITUATE, LYING OR BEING IN THE CITY OF BENNETTSVILLE, MARLBORO COUNTY, SOUTH CAROLINA, AND BEING THAT TRACT OF LAND IDENTIFIED AS PARCEL A ON A PLAT OF SURVEY ENTITLED "ALTA/ACSM LAND TITLE SURVEY, URBAN CLASS BOUNDARY AND TOPOGRAPHIC", PREPARED FOR WINN-DIXIE CHARLOTTE, INC. AND LAWYERS TITLE INSURANCE CORPORATION, BY W.K. DICKSON & CO., INC., DATED 2/23/98, REVISED 5/12/98, SAID PLAT BEING INCORPORATED BY REFERENCE HEREIN AND MADE PART HEREOF, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON PIN ON THE SOUTHWESTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS AND THE SOUTHEASTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS BY PLAT RECORDED IN PLAT BOOK 43, AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SAID SOUTHWESTERLY RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS, SOUTH 33°39'23" WEST FOR A DISTANCE OF 357.87 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL B, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHERN LINE OF PARCEL B, NORTH 56°14'12" WEST (LINES REVERSED) FOR A DISTANCE OF 153.19 FEET TO A 5/8" IRON PIN. THENCE; WITH THE WESTERN LINE OF PARCEL B, SOUTH 58°43'40" WEST (LINES REVERSED) FOR A DISTANCE OF 11.28 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL C, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHWESTERN LINE OF PARCEL C, NORTH 31°16'20" WEST (LINES REVERSED) FOR A DISTANCE OF 222.50 FEET TO A 5/8" IRON PIN AT THE NORTHWEST CORNER OF PARCEL C, SOUTH 58°43'40" WEST (LINES RESERVED) FOR A DISTANCE OF 190.00 FEET TO A 5/8" IRON PIN ON THE NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9. THENCE; WITH THE SAID NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9, THE FOLLOWING TWO COURSES AND DISTANCES; NORTH 31°16'20" WEST FOR A DISTANCE OF 39.56 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57" WEST FOR A DISTANCE OF 80.87 FEET TO A 5/8" IRON PIN AT THE SOUTHWESTERN CORNER OF PARCEL D, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE SOUTHEASTERN, EASTERN AND NORTHERN LINES OF PARCEL D. THE FOLLOWING THREE COURSES AND DISTANCES, NORTH 58°46'03" EAST (LINES REVERSED) FOR A DISTANCE OF 126.70 TO A 5/8" IRON PIN   THENCE; NORTH 01°28'10" EAST (LINES REVERSED) FOR A DISTANCE OF 69.41 FEET TO A 5/8" IRON PIN   THENCE; NORTH 31°13'57"

**BENNETTSVILLE, SOUTH CAROLINA, CONT'D.**

WEST. (LINES REVERSED) FOR A DISTANCE OF 213.57 FEET TO A 5/8" IRON PIN ON THE SOUTHEASTERN LINE OF LANDS CONVEYED TO H. J. MUNNERLYN BY DEED RECORDED IN DEED BOOK 128 AT PAGE 454, MARLBORO COUNTY CLERK OF COURT.    THENCE; WITH THE SAID SOUTHEASTERN LINE OF MUNNERLYN, NORTH 58°46'27" EAST FOR A DISTANCE OF 425.98 FEET TO A 1-1/2" IRON PIN AT THE SOUTHWESTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS ESTATE BY PLAT RECORDED IN PLAT BOOK 43 AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SOUTHWESTERN LINE OF ROGERS, SOUTH 31°14'22" EAST FOR A DISTANCE OF 601.68 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH RECIPROCAL EASEMENTS AS SET FORTH AND DESCRIBED IN INSTRUMENT ENTITLED "RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS", RECORDED IN BOOK 377, PAGE 79, IN THE OFFICE OF THE REGISTER OF DEEDS FOR MARLBORO COUNTY, SOUTH CAROLINA

THIS PROPERTY WAS OBTAINED BY SUNBELT-DIX, INC. BY DEED OF MARK S. AVENT, DATED MAY 12, 1998, RECORDED IN THE REGISTER OF DEEDS OFFICE OF MARLBORO COUNTY, SOUTH CAROLINA, AT BOOK 377, PAGE 74.

# EXHIBIT "C"

# ASSIGNMENT OF LEASE AND AGREEMENT

From

## BENNETTSVILLE 99-SC, LLC

To

## FIRST SECURITY BANK, NATIONAL ASSOCIATION

and

## VAL T. ORTON, individually,

## as Trustees

Dated as of August _26_, 1999

**Prepared by and
Recording requested by and
when recorded return to:**

**Alan C. Sheppard, Jr., Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
50 North Laura Street, Suite 2800
Jacksonville, Florida 32202**

JX 123594 5 00130 02051

Store #2130, Bennettsville,
Marlboro County, South Carolina

ASSIGNMENT OF LEASE AND AGREEMENT, dated as of August _26_, 1999 (as amended, modified or supplemented from time to time, this "Agreement"), from BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company ("Assignor"), having an address at c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301, Attention: Gary Lines to FIRST SECURITY BANK, NATIONAL ASSOCIATION and VAL T. ORTON, individually (together being referred to herein, together with their respective successors and assigns, as "Assignee"), as trustees, each having an address at 79 South Main Street, Salt Lake City, Utah 84111.

To finance a portion of the cost to Assignor of acquiring a fee simple interest in the parcel of land described in Schedule A hereto (the "Land Parcel"), together with the improvements located thereon (the Land Parcel, together with the improvements located and to be located thereon, being referred to herein as the "Property"), Assignor, simultaneously with the execution and delivery hereof, is borrowing certain funds, such borrowing being evidenced by its 7.57% Secured Notes due June 1, 2019 (together with Expansion Notes (as defined in the Mortgage referred to below), issued by Assignor and any note or notes issued in exchange or replacement therefor pursuant to the Indenture referred to below, the "Notes"). The Notes are secured by a mortgage, deed of trust, or deed to secure debt, dated as of the date hereof (the "Mortgage"), from Assignor to Assignee, as trustee under the Indenture, dated as of the date hereof (the "Indenture"), between Owner and such trustee, for the benefit of the registered owners of the Notes (the "Note Holders"). The Mortgage creates a lien on Assignor's interest in the Property. The Property has been leased by Assignor to WINN-DIXIE RALEIGH, INC., a Florida corporation ("Lessee"), under a Lease, dated as of the date hereof (together with all supplements and amendments thereto, and any memorandum or short form thereof entered into for the purpose of recording, registration or filing, the "Lease"), between Assignor, as lessor, and Lessee, as lessee. The payment and performance of the obligations of Lessee under the lease have been guaranteed by Winn-Dixie Stores, Inc., a Florida corporation ("Guarantor") pursuant to a guaranty of Lease, dated as of the date hereof (the "Guaranty"). As additional security for the Notes, and in order to induce the purchasers of the Notes to purchase the Notes and to induce Assignee to accept the Mortgage, Assignor is entering into the undertakings herein set forth with Assignee and is assigning the Lease to Assignee.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor agrees as follows:

1.      Assignor, in furtherance of the covenants of the Mortgage and as security for the payment of the principal of, Make Whole Amount (as defined in the Mortgage), and interest and all other sums payable on the Notes, and of all other sums payable under the Mortgage and under the Indenture, and as security for the performance and observance

JK 123594 5 00130 02051

Store #2130, Bennettsville,
Marlboro County, South Carolina

of the provisions thereof, has, assigned, transferred, conveyed and set over, and by these presents does assign, transfer, convey and set over to Assignee, all of Assignor's estate, right, title and interest in, to and under the Lease and the Guaranty, together with all rights, powers, privileges, options and other benefits of Assignor as lessor under the Lease, including, but not by way of limitation, (i) the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, insurance proceeds, condemnation awards, moneys and security receivable by Assignor under the Lease or the Guaranty or pursuant to any of the provisions thereof, whether as rents or as the purchase price of Assignor's interest in the Property or otherwise (except sums payable directly to any person other than the lessor thereunder), subject to the rights of Lessee under the Lease, (ii) the right to accept or reject any offer by Lessee to purchase the Property, or any part thereof, or any award payable to Assignor in connection with a taking thereof, (iii) the right and power (which right and power are coupled with an interest) to execute and deliver, as agent and attorney-in-fact of Assignor, an appropriate deed or other instrument necessary to convey to Lessee Assignor's interest in the Property, any part thereof or any insurance proceeds or award payable to Assignor in connection with a casualty or taking thereof if Lessee becomes obligated to purchase Assignor's interest in the Property, any part thereof or any insurance proceeds or award payable to Assignor in connection with a casualty or taking thereof or exercises its Substitution Option pursuant to paragraph 11 of the Lease, (iv) the right to perform all other necessary or appropriate acts as said agent and attorney-in-fact with respect to any substitution purchase and conveyance referred to in clause (iii) above, (v) the right to make all waivers and agreements, (vi) the right to give all notices, consents and releases, (vii) the right to give all notices of default and to take any legal action upon the happening of a default under the Lease, including the commencement, conduct and consummation of proceedings at law or in equity as shall be permitted under any provision of the Lease or the Guaranty or by law or in equity (including, without limitation, the right to pursue and collect any claim in a bankruptcy or other insolvency proceeding involving Lessee or Guarantor) and (viii) the right to do any and all other things whatsoever which Assignor or any lessor is or may be entitled to do under the Lease or the Guaranty.

2.      While the assignment made in this Agreement is present, direct, exclusive and continuing, it has been made for the purpose of providing security to Assignee for the performance of Assignor's obligations under the Notes, the Mortgage and the Indenture and the execution and delivery hereof shall not in any way impair or diminish the obligations of Assignor under the provisions of the Lease nor shall any of the obligations contained in the Lease be imposed upon Assignee. Upon the due payment of the principal of and Make Whole Amount, if any, and all accrued interest on the Notes and of all other sums payable under the Mortgage and the Indenture, said assignment and all rights herein assigned to Assignee shall cease and terminate and all the estate, right, title and interest of Assignor in and to the above-described assigned property shall revert to Assignor, and Assignee shall, at the request and expense of Assignor, deliver to Assignor an instrument in recordable form canceling this Agreement and reassigning to Assignor the above-described assigned property.

JK 123594 5  00130 02051

3

Store #2130, Bennettsville,
Marlboro County, South Carolina

3.      Assignor hereby designates Assignee to receive all payments of Rent and Additional Monetary Obligations (as each such term is defined in the Lease), purchase prices and other sums payable to the lessor under the Lease or pursuant to the Guaranty (except sums payable directly to any person other than the lessor thereunder) and to receive duplicate original copies of all notices, undertakings, demands, statements, documents, financial statements and other communications which Lessee or Guarantor is required or permitted to give, make, deliver to or serve upon the lessor under the Lease or pursuant to the Guaranty. Assignor hereby directs Lessee and Guarantor to deliver to Assignee, at its address set forth above or at such other address as Assignee shall designate, (a) all such payments and sums and (b) duplicate original copies of all such notices, undertakings, demands, statements, documents and other communications. No delivery of the items referred to in clause (b) above by Lessee or Guarantor shall be of any force or effect unless made to Assignor and also made to Assignee, as herein provided.

4.      Assignor represents and warrants to Assignee that Assignor has not executed any other assignment of the subject matter of this Assignment other than the Mortgage and the Indenture and that the Lease and the Guaranty is in full effect and that no event of default has occurred thereunder and that Assignor has no knowledge of the occurrence of any default thereunder.

5.      Assignor agrees that the assignment made herein and the designation and direction to Lessee and Guarantor hereinabove set forth are irrevocable, and that it will not take any action as lessor under the Lease or otherwise which is inconsistent with said assignment, or make any other assignment, designation or direction inconsistent therewith, and that any assignment, designation or direction inconsistent therewith shall be void. Assignor will, from time to time upon the request of Assignee execute all instruments of further assurance and all such supplemental instruments with respect to this Agreement as Assignee may reasonably specify.

6.      Assignor hereby agrees, and hereby undertakes to obtain the agreements of Lessee and Guarantor to the following matters (capitalized terms used in this paragraph and not previously defined shall have the meanings specified in paragraph 6(h)), which undertaking shall be deemed satisfied by Lessee's and Guarantor's execution and delivery of the consent form at the foot of this Agreement:

(a)      Lessee and Guarantor consents to the provisions of this Agreement, acknowledges that the indemnities provided for in Sections 20 and 21 of the Lease run for the benefit of Assignee as well as Assignor. Lessee and Guarantor agrees to pay and deliver to Assignee all rentals and other sums assigned to Assignee pursuant to this Agreement, without offset, deduction, defense, deferment, abatement or diminution, subject to the provisions of the Lease, and will not, for any reason whatsoever, seek to recover from Assignee any moneys paid to Assignee by virtue of this Agreement. Lessee and Guarantor certifies to Assignee that Lessee's obligations to pay rent under the Lease are in effect, that Lessee has no defenses to the payment of rent under the Lease, and that

JK 123594 5 60130 02051

4

**Store #2130, Bennettsville,**
**Marlboro County, South Carolina**

Lessee has an obligation to pay rent under the Lease. Assignor hereby instructs Lessee and Guarantor to pay, and Lessee and Guarantor acknowledges such instruction and agrees that it shall pay, all sums due and payable under the Lease and the Guaranty directly to Assignee in lawful money of the United States by bank wire transfer of immediately available funds on each date on which such sums are due and payable, in accordance with the following Funds transfer instructions, accompanied by sufficient information to identify the source and application of such funds, or in accordance with such other instructions as may be specified by Assignee by written notice received by Lessee and Guarantor at the address and in the manner provided in the Lease, at least three (3) Business Days prior to the date on which such instructions are to become effective:

> First Security Bank, National Association
> Attn: Corporate Trust Services
> Reference: Winn-Dixie 1999 Spinoff-A Transaction
> ABA # 124-000-012
> Acct. # 0510922115

Lessee and Guarantor further agrees to deliver to Assignee duplicate original copies of all notices, financial statements and other instruments which it may deliver pursuant to the Lease or the Guaranty. No payment made by Lessee or Guarantor or delivery of a copy of any such notice or instrument shall be of any force or effect unless actually received by Assignee.

(b)    Assignor and Lessee and Guarantor will not enter into any agreement subordinating, amending, modifying or terminating (except as provided in the Lease and permitted by the terms of the Mortgage) the Lease or the Guaranty without the consent thereto in writing of Assignee and any such attempted subordination, amendment, modification or termination without such consent shall be void; provided, however, that Lessee will be entitled to subordinate its interest in the Lease to the interest of assignees of the Mortgage pursuant to paragraphs 8(f) or 28(e) of the Lease, and Assignee will consent to the subordination as provided in paragraph 8(f) of the Lease. In the event that the Lease or the Guaranty shall be amended as herein permitted, the Lease or the Guaranty as so amended shall continue to be subject to the provisions of this Agreement without the necessity of any further act by any of the parties hereto. Lessee and Guarantor will remain obligated under the Lease and the Guaranty in accordance with its terms, and will not take any action to terminate (except as expressly permitted by the Lease), rescind or avoid the Lease or the Guaranty, notwithstanding any action with respect to the Lease which may be taken by an assignee or receiver of Assignor or of any such assignee or by any court in any such proceeding. Upon any rejection of the Lease by a debtor or by a trustee in bankruptcy (or other similar official) of any debtor owning the interest of lessor under the Lease, Lessee agrees that it will, to the extent it lawfully may, affirmatively elect to continue the Lease and Guarantor will affirm the Guaranty, and will execute and deliver to Assignee any instrument or agreement required therefor, and Lessee and Guarantor hereby, to the extent it lawfully may, waives any and all rights it may have under the U.S.

JK 133594 3 60130 02051

5

Bankruptcy Code to treat the Lease or the Guaranty as terminated following any such rejection.

(c)     If, pursuant to the Lease, Lessee shall offer to purchase the Property (or any insurance proceeds or award payable in connection with a casualty or taking thereof), notice of acceptance or rejection of any such offer shall be deemed validly given for all purposes if given by Assignee as permitted by paragraph 1(ii) hereof and notice by Assignor of rejection of any such offer shall be void unless accompanied by the written consent of Assignee and no such offer shall be deemed rejected by Assignor without the written consent of Assignee.  If Lessee shall become obligated to purchase the Property (or any insurance proceeds or award payable in connection with a casualty or taking thereof) pursuant to any provision of the Lease, Lessee will promptly upon tender of delivery thereof, accept a deed and other instruments conveying and transferring the Property (or any insurance proceeds or award payable in connection with a casualty or taking thereof) or exercise a Substitution Option which are executed and delivered by Assignee as attorney-in-fact of Assignor as being in compliance with the provisions of the Lease, provided that said deed and other instruments shall otherwise be in compliance with the provisions of the Lease.  If it should become necessary for Assignee or any other party to institute any foreclosure or other judicial proceeding in order that title to the Property (or any insurance proceeds or award payable in connection with a casualty or taking thereof) may be conveyed to Lessee, the time within which delivery of the deed or other instruments relating to such conveyance may be made shall be extended to the extent necessary to permit Assignee or such other party to institute and conclude such foreclosure or other judicial proceeding, and the Lease and the Guaranty shall not terminate, but shall continue in full effect until the conveyance and purchase shall have been consummated.

(d)     Lessee will (i) keep adequate records and books of account reflecting all its financial transactions and in accordance with generally accepted accounting principles and (ii) permit Assignee and Note Holders, by their agents, accountants and attorneys (at Lessee's expense if an Event of Default under the Lease or a default under Section 6 of this Assignment has occurred and is continuing) to visit the Property (on reasonable advance notice) and to examine Lessee's records and books of account relating to the Property and to discuss its affairs, finances and accounts relating to the Property with its officers and accountants at such reasonable times as may be requested by Assignee or such Note Holder.

(e)     Promptly upon becoming aware of it, Lessee and Guarantor will notify Assignee of the occurrence of any Event of Default under the Lease or this Assignment, or of any offer by Lessee to purchase the Property pursuant to the Lease.

(f)     "Subsidiary" of a person means a corporation in which such person or such person and one or more of its Subsidiaries directly or indirectly owns voting stock

of such corporation and which, under generally accepted accounting principles would be consolidated with such person for financial reporting purposes.

(g)     Lessee and Guarantor covenant that they will pay or cause to be paid, and save Assignee and each Note Holder (and each person for whom such Note Holder is a nominee or designee)  harmless from and against any and all liability and loss with respect to or resulting from (x) any claim for or on account of the fees of any investment banker, broker, finder, advisor or consultant engaged or allegedly engaged by Lessee or Guarantor (including, without limitation, the investment banking fee of Price & Marshall, Inc., but excluding such firm's debt placement fee with respect to the Notes) with respect to the transactions contemplated by this Agreement, the Lease or the Mortgage, or (y) the nonpayment or delayed payment of any and all stamp and other similar taxes, fees and excises (except income or franchise taxes and any taxes occasioned by any sale or transfer of its Notes), if any, including any interest and penalties, which may be, or be determined to be, payable in connection with the transactions contemplated by this Agreement, the Lease or the Mortgage.

7.     This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in two or more counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the parties hereto, although it shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute but one and the same instrument. This Agreement shall be governed by the laws of the State in which the Property is located.

8.     In the event that the Property is conveyed pursuant to a foreclosure sale under the Mortgage (or pursuant to a deed in lieu of foreclosure), Lessee agrees that (a) the Lease shall remain in full force and effect and (b) Lessee shall attorn to and accept the foreclosure purchaser (or the grantee under the deed in lieu of foreclosure) as the lessor under the Lease

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

JK 123594 5 00130 02051

7

Store #2130, Bennettsville,
Marlboro County, South Carolina

IN WITNESS WHEREOF, Assignor has caused this Assignment of Lease and Agreement to be signed as of the date first above written.

WITNESSES:

BENNETTSVILLE 99-SC, LLC, a
Delaware limited liability company

By:    PRINCIPAL NET LEASE
       INVESTORS, L.L.C., a Delaware
       limited liability company, its sole
       member

By:    PRINCIPAL LIFE INSURANCE
       COMPANY, an Iowa corporation,
       its sole member

Name: L.S. Uhlenhopp

Name: Julia L. McDonald

By: _____
Name: _____ CLARE TANDE _____
Its: _____ COUNSEL _____

Name: L.S. Uhlenhopp

Name: Julia L. McDonald

By: _____
Name: KAREN A. PEARSTON
Its: _____ COUNSEL _____

[CORPORATE SEAL]

STATE OF _South_ )
                                                    )    **PROBATE**
COUNTY OF _POLK_ )

PERSONALLY appeared before me the undersigned witness who after first being duly sworn, deposes and says that s/he saw the within-named as the _COUNSEL_ of PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, sole member of BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company, sign seal and as its act and deed, deliver the within-written _ASSIGNMENT_ for the uses and purposes therein mentioned, and that s/he together with the other witness whose signature appears above, witnessed the execution thereof.

_Julia L. McDonald_
WITNESS

SWORN TO BEFORE ME THIS
_11th_ day of August, 1999.

_Phyllis A. Neck_ (L.S.)
Notary Public for _____

My commission expires: [stamp: FOR IOWA/NEEDA MY COMMISSION EXPIRES September 20, 1999]

JK 123594 2 00130 02051
8/4/99 4:29 PM

9

STATE OF _Iowa_____ )
                                           )          PROBATE
COUNTY OF _POLK_____ )

PERSONALLY appeared before me the undersigned witness who after first being duly sworn, deposes and says that s/he saw the within-named as the _Counsel_ of PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, sole member of BENNETTSVILLE 99-SC, LLC, a Delaware limited liability company, sign seal and as its act and deed, deliver the within-written _Assignment_ for the uses and purposes therein mentioned, and that s/he together with the other witness whose signature appears above, witnessed the execution thereof.

_____Julia R. McDonald_____
WITNESS

SWORN TO BEFORE ME THIS
_11th_ day of August, 1999.

_Phyllis A. Weeda_ (L.S.)
Notary Public for _____
My commission expires:

PHYLLIS A. WEEDA
MY COMMISSION EXPIRES
September 20, 1999

Store #2130, Bennettsville,
Marlboro County, South Carolina

WINN-DIXIE RALEIGH, INC. hereby consents to the foregoing Assignment of Lease and Agreement including without limitation paragraph 3 thereof and hereby accepts and agrees to each of the provisions set forth in paragraph 6 thereof.

WITNESS:                                        WINN-DIXIE RALEIGH, INC., a Florida
                                                corporation

_____
Print Name: _Janice R. Long____                 By: _K. P. McCook_____
                                                Name: ___R. P. McCook_____
_____                 Title: _VP VICE PRESIDENT_____
Print Name: _R.D. Peterson___
                                                        [CORPORATE SEAL]


STATE OF FLORIDA            )
                            )        PROBATE
COUNTY OF DUVAL             )

        PERSONALLY appeared before me the undersigned witness who after first being duly sworn, deposes and says that s/he saw the within-named as the _Vice_ President of WINN-DIXIE RALEIGH, INC., a Florida corporation, sign seal and as its act and deed, deliver the within-written _Assignment_ for the uses and purposes therein mentioned, and that s/he together with the other witness whose signature appears above, witnessed the execution thereof.

_____
                WITNESS


SWORN TO BEFORE ME THIS
_5th_ day of August, 1999.

_____ (L.S.)
Notary Public for _FL_

My commission expires:_____

Mary Kay Vega
MY COMMISSION # CC577749 EXPIRES
September 29, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

JK 123594 2 00130 02051
8/4/99 4 29 PM

11

Store #2130, Bennettsville,
Marlboro County, South Carolina

WINN-DIXIE STORES, INC. hereby consents and agrees to the foregoing Assignment of Lease and Agreement.

WITNESSES:

Print Name: _Janice R. Long_

Print Name: _R. D. Peterson_

WINN-DIXIE STORES, INC., a Florida corporation

By: _R. P. McCook_
Name: _R. P. McCook_
Title: ~~Vice~~ VICE PRESIDENT

[CORPORATE SEAL]

STATE OF FLORIDA          )
                          )          PROBATE
COUNTY OF DUVAL           )

PERSONALLY appeared before me the undersigned witness who after first being duly sworn, deposes and says that s/he saw the within-named as the _Vice_ President of WINN-DIXIE STORES, INC., a Florida corporation, sign seal and as its act and deed, deliver the within-written _Assignment_ for the uses and purposes therein mentioned, and that s/he together with the other witness whose signature appears above, witnessed the execution thereof.

WITNESS

SWORN TO BEFORE ME THIS
_5th_ day of August, 1999.

_____ (L.S.)
Notary Public for _FL_

My commission expires:_____

Mary Kay Vega
MY COMMISSION # CC577749 EXPIRES
September 29, 2000
BONDED THRU TROY FAIN INSURANCE, INC

This document was prepared by Alan C. Sheppard, Jr., Esq of LeBoeuf, Lamb, Greene & MacRae, L.L P., 50 North Laura Street, Suite 2800, Jacksonville, Florida 32202.

JX 123594 2 00130 03051
8/4/99 4 29 PM

12

Store #2130, Bennettsville,
Marlboro County, South Carolina

## BENNETTSVILLE, SOUTH CAROLINA

PARCEL A

A PIECE, PARCEL OR TRACT OF LAND CONTAINING 6.93 ACRES, SITUATE, LYING OR BEING IN THE CITY OF BENNETTSVILLE, MARLBORO COUNTY, SOUTH CAROLINA, AND BEING THAT TRACT OF LAND IDENTIFIED AS PARCEL A ON A PLAT OF SURVEY ENTITLED "ALTA/ACSM LAND TITLE SURVEY, URBAN CLASS BOUNDARY AND TOPOGRAPHIC", PREPARED FOR WINN-DIXIE CHARLOTTE, INC. AND LAWYERS TITLE INSURANCE CORPORATION, BY W.K. DICKSON & CO., INC., DATED 2/23/98, REVISED 5/12/98, SAID PLAT BEING INCORPORATED BY REFERENCE HEREIN AND MADE PART HEREOF, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 1" IRON PIN ON THE SOUTHWESTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS AND THE SOUTHEASTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS BY PLAT RECORDED IN PLAT BOOK 43, AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SAID SOUTHWESTERLY RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 38 BY-PASS, SOUTH 33°39'23" WEST FOR A DISTANCE OF 357.87 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL B, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHERN LINE OF PARCEL B, NORTH 56°14'12" WEST (LINES REVERSED) FOR A DISTANCE OF 153.19 FEET TO A 5/8" IRON PIN. THENCE; WITH THE WESTERN LINE OF PARCEL B, SOUTH 58°43'40" WEST (LINES REVERSED) FOR A DISTANCE OF 11.28 FEET TO A 5/8" IRON PIN AT THE NORTHEAST CORNER OF PARCEL C, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE NORTHWESTERN LINE OF PARCEL C, NORTH 31°16'20" WEST (LINES REVERSED) FOR A DISTANCE OF 222.50 FEET TO A 5/8" IRON PIN AT THE NORTHWEST CORNER OF PARCEL C, SOUTH 58°43'40" WEST (LINES RESERVED) FOR A DISTANCE OF 190.00 FEET TO A 5/8" IRON PIN ON THE NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9. THENCE; WITH THE SAID NORTHEASTERN RIGHT-OF-WAY OF SOUTH CAROLINA HIGHWAY 9, THE FOLLOWING TWO COURSES AND DISTANCES; NORTH 31°16'20" WEST FOR A DISTANCE OF 39.56 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57" WEST FOR A DISTANCE OF 80.87 FEET TO A 5/8" IRON PIN AT THE SOUTHWESTERN CORNER OF PARCEL D, AS SHOWN ON THE AFOREMENTIONED PLAT. THENCE; WITH THE SOUTHEASTERN, EASTERN AND NORTHERN LINES OF PARCEL D. THE FOLLOWING THREE COURSES AND DISTANCES, NORTH 58°46'03" EAST (LINES REVERSED) FOR A DISTANCE OF 126.70 TO A 5/8" IRON PIN. THENCE; NORTH 01°28'10" EAST (LINES REVERSED) FOR A DISTANCE OF 69.41 FEET TO A 5/8" IRON PIN. THENCE; NORTH 31°13'57"

**BENNETTSVILLE, SOUTH CAROLINA, CONT'D.**

WEST (LINES REVERSED) FOR A DISTANCE OF 213.57 FEET TO A 5/8" IRON PIN ON THE SOUTHEASTERN LINE OF LANDS CONVEYED TO H. J. MUNNERLYN BY DEED RECORDED IN DEED BOOK 128 AT PAGE 454, MARLBORO COUNTY CLERK OF COURT.    THENCE; WITH THE SAID SOUTHEASTERN LINE OF MUNNERLYN, NORTH 58°46'27" EAST FOR A DISTANCE OF 425.98 FEET TO A 1-1/2" IRON PIN AT THE SOUTHWESTERN CORNER OF LANDS OWNED NOW OR FORMERLY BY DRAKE H. ROGERS ESTATE BY PLAT RECORDED IN PLAT BOOK 43 AT PAGE 121, MARLBORO COUNTY CLERK OF COURT. THENCE; WITH THE SOUTHWESTERN LINE OF ROGERS, SOUTH 31°14'22" EAST FOR A DISTANCE OF 601.68 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH RECIPROCAL EASEMENTS AS SET FORTH AND DESCRIBED IN INSTRUMENT ENTITLED "RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS", RECORDED IN BOOK 377, PAGE 79, IN THE OFFICE OF THE REGISTER OF DEEDS FOR MARLBORO COUNTY, SOUTH CAROLINA

THIS PROPERTY WAS OBTAINED BY SUNBELT-DIX, INC. BY DEED OF MARK S. AVENT, DATED MAY 12, 1998, RECORDED IN THE REGISTER OF DEEDS OFFICE OF MARLBORO COUNTY, SOUTH CAROLINA, AT BOOK 377, PAGE 74

THIS PROPERTY WAS OBTAINED BY BENNETTSVILLE 99-SC, LLC, BY DEED OF SUNBELT-DIX, INC., DATED AUGUST __, 1999, RECORDED IN THE REGISTER OF DEEDS OFFICE OF MARLBORO COUNTY, SOUTH CAROLINA, AT _____