# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## ORDER (A) AUTHORIZING WINN-DIXIE LOGISTICS, INC. TO SELL HARAHAN WAREHOUSE FACILITY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND (B) GRANTING RELATED RELIEF

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Logistics, Inc. ("WD Logistics") to sell the Harahan Warehouse Facility and attached improvements to Ackel Real Estate, LLC and John Georges (collectively, the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances, and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on August 24, 2006 (the "Sale Hearing").  The Court has read the Motion and has considered the representations of counsel.  Upon the representations of counsel and without

---

[1]    All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Facility Agreement.

objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.    This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.    The Debtors solicited the highest or otherwise best offer for the Assets described in the Facility Agreement (the "Assets") in accordance with bidding procedures approved by order of the Court (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order").    No competing bid was received for the Assets and the Debtors have determined that the bid by the Purchaser is the highest or best offer for the Assets.

C.    The Debtors have provided interested parties (including all parties asserting claims or interests in, to or against the Assets, if any) with proper notice of the Motion, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the notice procedures order, approved by order of the Court (Docket No. 254) dated March 4, 2005 (the "Notice Procedures Order").

D.    A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims, as such terms are defined below, in, to or against the Assets, if any).

E.    The Debtors marketed the Assets and through the Debtors' marketing efforts, the Debtors afforded all interested parties a reasonable opportunity to make higher or better offers to purchase the Assets.

F.    WD Logistics (i) has full corporate power and authority to execute and consummate the Facility Agreement attached as Exhibit A to this Order and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of WD Logistics, and (ii) no consents or approvals, other than those expressly provided for in the Facility Agreement, are required to consummate the transactions contemplated by the Facility Agreement.

G.    Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.    The Facility Agreement was proposed, negotiated and entered into by WD Logistics and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Facility Agreement to be avoided under 11 U.S.C. § 363(n).

I.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

J.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best

3

J.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

K.    WD Logistics' transfer of the Assets to the Purchaser pursuant to the Facility Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Facility Agreement.

L.    WD Logistics may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

M.    The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361,

362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

N.     The Court's approval of the Facility Agreement and the Sale of the Assets to the Purchaser are in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.     The Motion is granted.

2.     Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.     The terms and conditions of the Facility Agreement are approved.  Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Facility Agreement.

4.     WD Logistics is authorized to consummate and implement fully the Facility Agreement, together with all additional instruments and

documents that may be necessary to implement the Facility Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Facility Agreement.

5.    Any agreements, documents, or other instruments executed in connection with the Facility Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender, and (ii) the Creditors' Committee, which consent will not be unreasonably withheld, and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.    WD Logistics will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances). The only Claims and/or Interests in the Assets are those with the DIP Lender. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds from the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.    WD Logistics' transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all

right, title and interest of WD Logistics in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.    The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.    The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.    Upon Closing of the Sale in accordance with the Facility Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).  Accordingly, the reversal or modification on appeal of the authorization to consummate the Sale of the Assets will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.    All entities that are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions do not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise

exist.  In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a certified copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12.    WD Logistics' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Facility Agreement and this Order.

13.    Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Facility Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets.  WD Logistics' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.    This Order is effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

8

15.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Facility Agreement.

16.     This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.     During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction to (a) enforce and implement the Facility Agreement and any agreements and instruments executed in connection with the Facility Agreement, (b) compel delivery of possession of the Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Facility Agreement, and (d) interpret, implement, and enforce the provisions of this Order.

18.     All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently

enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.    The failure specifically to include any particular provision of the Facility Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Facility Agreement be authorized and approved in its entirety.

21.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims, or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Facility Agreement.  No bulk

sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Facility Agreement.

22.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Facility Agreement and this Order, the provisions contained in this Order will control.

23.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this 24 day of August 2006 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

00539334

**EXHIBIT A**

## FACILITY PURCHASE AGREEMENT
[Harahan Warehouse Facility]

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of August _3_, 2006 (the "Effective Date"), between

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation ("Seller"), and

**ACKEL REAL ESTATE, L.L.C.,** a Louisiana limited liability company and **JOHN GEORGES,** an individual, or their permitted assignee pursuant to paragraph 12.3 of this Agreement (together as "Buyer").

### R E C I T A L S :

A.  Seller owns fee simple title to the real property described on attached Exhibit A (the "Land"), located at 600 Edwards Avenue, Jefferson Parish, Louisiana, together with all and singular the rights, interests, benefits, privileges, servitudes, easements, tenements, hereditaments, and appurtenances thereon or in any way appertaining thereto, all right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the bed of any street, right-of-way, road or alley, open or proposed, adjoining such Land, and all improvements located on the Land (the "Facility"). The Facility and the Land together are referred to as the "Property."

B.  Seller desires to convey and sell to Buyer, and Buyer desires to acquire (directly or through an Affiliate designated by Buyer) and purchase, the Property, subject to the terms and conditions contained in this Agreement. Buyer contemplates effectuating acquisition of the Property pursuant to a 1031 tax deferred transaction.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION** and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.  **Defined Terms.** Capitalized terms as used in this Agreement will have the meanings assigned to such terms as they appear in this Agreement, except that the following capitalized terms will have the meanings set forth below:

    1.1  "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

    1.2  "Broker" will mean the real estate broker(s) identified in paragraph 10 of this Agreement as the broker for the transaction contemplated hereunder.

    1.3  "Business Day" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Jacksonville, Florida.

1.4    "Claim" will mean any claim (including without limitation as defined by 11 U.S.C. Section 101(5)), demand, action, complaint, suit, lawsuit, litigation, inquiry, hearing, investigation or proceeding, whether formal or informal, commenced, brought or threatened.

1.5    "Closing" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Act of Sale with limited warranties and other documents contemplated by paragraph 9 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.6    "Closing Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as closing agent for the transactions contemplated hereunder.

1.7    "Closing Statement" will mean a statement to be delivered by Buyer and Seller at Closing, reflecting the net amount due from Buyer to Seller at Closing for the Assets, and the proper allocation of Buyer's Closing Costs and Seller's Closing Costs, after making the adjustments as provided in this Agreement.

1.8    "Consent" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any Contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Property are governed or bound.

1.9    "Environmental Laws" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

1.10    "Environmental Permits" will mean all Consents required under any Environmental Law.

1.11    "Escrow Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as escrow agent.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

1.12 "Excluded Personal Property" will mean those items of furniture, furnishings and movable equipment, including all computer and related equipment, and all other tangible and intangible personal property, as more particularly described on Exhibit B.

1.13 "Governmental Authority" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.14 "Hazardous Material" will mean any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.15 "Interest" will mean any and all interests (including any successor, transferee or similar liability), liens (including but not limited to any and all "liens" as defined in 11 U.S.C. § 101(37)), liabilities, mortgages, deeds, acts of sale, trusts, guarantees, security agreements, security interest, rights of setoff or recoupment, pledges, privileges, leases, possessory licenses, options, rights of first refusal, preemptive rights, easements, servitudes, encroachments, hypothecations, charges, obligations, rights, restrictions, charges and encumbrances of any kind or nature or other matter causing a defect or imperfection in title.

1.16 "Knowledge" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the executive officers of Seller and of Winn-Dixie Stores, Inc., and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers.

1.17 "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

1.18 "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien or Interest against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) construction liens or Interests that have attached to and become a lien or Interest against Seller's interest in the Property; (iv) judgments that have attached to and become a lien or Interest against Seller's interest in the Assets; and (v) any other Interest against Seller's

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

interest in the Assets that can be satisfied by Seller with the payment of money out of the Purchase Price.

1.19   "Outside Date" will mean August 30, 2006.

1.20   "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.21   "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.22   "Title Insurer" will mean Title Depot of Eastbank, Inc., through Landamerica/Commonwealth Land Title Insurance Company, Metairie, Louisiana.

2.   **Assets**. Seller agrees to grant, bargain, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following property interests (collectively, the "Assets"), free and clear of any and all Claims and Interests (other than Permitted Encumbrances) in accordance with 11 U.S.C. Section 363:

2.1   The Property; and

2.2   All fixtures attached to the Property, including, but not limited to heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, and flooring located on the Property, but specifically excluding the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller.

3.   **Purchase Price; Payment**.

3.1   Purchase Price. Buyer agrees to pay Seller a purchase price of $6,750,000 for the Assets (the "Purchase Price"), payable to Seller on the Closing Date. Buyer shall not be liable for any obligations of Seller or have any further obligations beyond the payment of the Purchase Price, except as otherwise expressly set forth in this Agreement.

3.2   Deposit.

3.2.1   An earnest money deposit of $2,000,000 (the "Deposit") will be due and payable to Escrow Agent within three (3) Business Days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

3.2.2   At the Closing, the Deposit will be released to Seller and credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable by Buyer in cash.

3.3   Payment of Purchase Price. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "Closing Deposit") with Escrow Agent. Escrow Agent

4

will deposit the Closing Deposit into a non-interest bearing escrow account and will disburse or apply the Closing Deposit as provided in this Agreement. At Closing, the Purchase Price will be credited and disbursed to Seller or as Seller directs.

4.    **Condition of Assets; Buyer's Due Diligence; Buyer's Financing.**

4.1    Condition of Assets.  Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets "As Is, Where Is," with all faults, and, except as expressly provided herein, without representations or warranties expressed or implied as to redhibitory defects in the Property, and, except as expressly provided or referred to herein, there are no oral agreements, warranties or representations collateral to or affecting the Property by Seller or any third party. The terms and conditions of this paragraph will expressly survive the closing and not merge therein.

4.2    Investigation Period.  Buyer has inspected the Property and waives all further investigation of the Property and has determined that the same is satisfactory to Buyer.

4.3    Title.  At Closing, Seller will, pursuant to the terms of the sale order, convey and assign to Buyer, and Buyer will accept, all of Seller's right, title and interest in the Assets, subject only to those matters listed on Exhibit C and to any other matters approved or waived by Buyer as provided in this Agreement (collectively, the "Permitted Encumbrances"). Seller's interest in the Property will be conveyed by Act of Sale with limited warranties substantially in the form attached as Exhibit D as required by Title Insurer to properly insure Buyer's title to the Property (the "Act of Sale"). Evidence of the delivery of marketable and insurable title to Seller's interest in the Property will be pursuant to Title Insurer's issuance of a policy of title insurance for the Property (in the form of a marked Title Commitment evidencing the Title Insurer's binding obligation to issue its title policy), insuring the interest of Buyer in the Property as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for a survey reading reflecting matters disclosed on the Survey obtained by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Property is located, in the amount of the Purchase Price (the "Title Policy").

4.4    Title Commitment.  Buyer has examined a title insurance commitment (the "Commitment") from Landamerica/Commonwealth Land Title Insurance Company (the "Title Insurer") committing to insure fee simple title to the Property and has determined that the same is satisfactory to Buyer.  The Title Commitment states all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Seller and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens"), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances (collectively, the "Exceptions".

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

4.5    <u>Boundary Survey</u>. Buyer has examined a survey of the Property (the "<u>Survey</u>") and has determined that the same is satisfactory to Buyer.

4.6    <u>Special Covenants and Conditions</u>. Buyer acknowledges the following special covenants and conditions relating to the Property:

    4.6.1  <u>Parking License Agreement</u>. Certain parking spaces on the Land as more particularly delineated on attached <u>Exhibit E</u> (the "<u>Facility Site Plan</u>") as licensed parking area, are subject to an existing license agreement with Belfor USA Group, Inc. ("<u>Belfor</u>") allowing Belfor to park no more than twenty-five (25) 53 foot long tractor trailers within such parking areas on the Land. At or prior to Closing, Seller will at Buyer's request, either (I) terminate the existing license agreement with Belfor and will hold Buyer harmless from any claim by Belfor relating to the same, or (II) assign the license agreement to Buyer at Closing, to the extent assignable.

    4.6.2  <u>Railroad Spur Tracks</u>. Railroad spur tracks are located within the Facility, as shown on the Facility Site Plan. There is no spur track agreement in effect between Seller and the rail service provider and no rail service is provided to the Facility at this time. The railroad spur tracks are considered a Permitted Encumbrance.

    4.6.3  <u>Refrigeration System</u>.

        (a)  <u>System Requirements</u>.    The Property includes an ammonia-based refrigeration system (the "<u>Refrigeration System</u>").    The ammonia has been removed and the Refrigeration System has been shut down.    Removal or operation of the Refrigeration System is a highly technical and hazardous process, and requires the supervision of highly trained refrigeration specialists.

        (b)  <u>Indemnification</u>.    Buyer acknowledges the special requirements and hazards of the Refrigeration System under Environmental Laws.    Buyer's acceptance of the Facility at Closing will constitute Buyer's assumption of responsibility for the operation, maintenance, repair and removal of the Refrigeration System from and after the Closing Date, and Seller will have no further obligations relating thereto. Buyer agrees to release, indemnify and hold harmless Seller from all claims, loss, cost, damages or expense asserted against Seller relating to Buyer's inspection of the Refrigeration System during the Investigation Period, and, from and after Closing, to Buyer's operation or removal of the Refrigeration System from the Facility, and to actions required under Environmental Laws.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2

4.6.4  <u>Underground Storage Tanks</u>.

    (a)    <u>UST's</u>. The Facility historically has contained underground storage tanks ("<u>UST's</u>"), which either have been removed, withdrawn from service and filled with inert material, or remain in service. A schedule of all UST's known to Seller to be presently or formerly located on the Facility, and the applicable Environmental Permits associated with the UST's, is set forth on attached <u>Exhibit F</u>.

    (b)    <u>Contaminant Levels</u>. The Louisiana Department of Environmental Quality closed a specific area of the Land due to contaminant levels present, in accordance with Louisiana Administrative Code, as more particularly described on attached <u>Exhibit G</u> (the "<u>Restricted Area</u>"). Closure of the Restricted Area is considered a Permitted Encumbrance.

    (c)    <u>Environmental Law Compliance</u>. Notwithstanding any other provisions of this Agreement, Seller makes no representations or warranties to Buyer as to the compliance of the UST's with applicable Environmental Laws.

    (d)    <u>Indemnification</u>. Buyer acknowledges the special requirements and hazards of the UST's under Environmental Laws. Buyer's acceptance of the Facility at Closing will constitute Buyer's assumption of responsibility for the operation, maintenance, repair, closure and removal of the UST's from and after the Closing Date, and Seller will have no further obligations relating thereto. Buyer agrees to release, indemnify and hold harmless Seller from all claims, loss, cost, damages or expense asserted against Seller from and after Closing, to Buyer's use, maintenance, repair, closure and removal of the UST's from the Facility, and to actions required under Environmental Laws.

5.  **Representations and Warranties of Seller and Buyer.**

5.1  Seller warrants to Buyer as follows:

5.1.1  <u>Corporate Existence and Authority</u>. Seller is a Florida corporation and its status is active. Subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7.1</u> below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

5.1.2  <u>Title to Property</u>. Seller owns fee simple title to the Property, subject to the Permitted Encumbrances, the Credit Agreement Liens and the Other Liens.

7

5.1.3 <u>Power to Convey</u>. To Seller's Knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in <u>paragraph</u> below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

5.1.4 <u>Compliance with Environmental Laws</u>. To Seller's Knowledge, and subject to the matters disclosed in <u>paragraphs 4.7.3 and 4.7.4</u> above, Seller has not been notified by any Governmental Authority of any noncompliance of the Property with Environmental Laws, including all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material or asbestos-containing materials; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.

5.2   Buyer warrants to Seller as follows:

5.2.1 <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's permitted assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

5.2.2 <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7.1</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

Facility Purchase Agreement
Winn-Dixie Logistics, Inc. S/T Ackel Real Estate, LLC
Harahan Warehouse Facility – New Orleans, Louisiana
July 31, 2006
SGRJAX\90510.2