

# LEASE AGREEMENT

**CHESTER DIX FLORENCE CORP.,**
as Landlord

to

**WINN-DIXIE MIDWEST, INC.,**
as Tenant

Dated as of December 2, 1996

**Store No.1701**
**Florence, Kentucky**

JK2 86878.1 80130 00867
12/30/96 6:51 pm

# TABLE OF CONTENTS

Page No.

1.  DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  DEMISE OF LEASED PREMISES; PRIORITY OF LEASE . . . . . . . . . . . 1

3.  TENANT'S EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . . 1

4.  TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5.  RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    (a)  Basic Rent . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    (b)  Additional Rent . . . . . . . . . . . . . . . . . . . . . . . 2
    (c)  Effect of Nonpayment of Rent . . . . . . . . . . . . . . . . . 3
    (d)  Net Lease; No Setoff or Counterclaim Against Rent . . . . . . 3

6.  TITLE; LIENS; CONDITION OF PREMISES . . . . . . . . . . . . . . . 3
    (a)  Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    (b)  Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    (c)  Encroachments . . . . . . . . . . . . . . . . . . . . . . . . 4
    (d)  Condition of Leased Premises . . . . . . . . . . . . . . . . . 4
    (e)  Assignment of Warranties, Guaranties, Indemnities . . . . . . 5
    (f)  Granting of Easements . . . . . . . . . . . . . . . . . . . . 5
    (g)  Conveyances for Public Purposes . . . . . . . . . . . . . . . 6

7.  USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT . . . . . . . . 8
    (a)  Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    (b)  Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . 8
    (c)  Replacement Equipment . . . . . . . . . . . . . . . . . . . . 8
    (d)  Landlord's Covenant of Quiet Enjoyment . . . . . . . . . . . . 8
    (e)  Landlord's Right of Entry . . . . . . . . . . . . . . . . . . 8
    (f)  Subordination, Nondisturbance and Attornment . . . . . . . . . 9

8.  TENANT'S RIGHT OF FIRST REFUSAL . . . . . . . . . . . . . . . . . 9

9.  PURCHASE OFFER; PROCEDURE ON PURCHASE . . . . . . . . . . . . . . 10
    (a)  Title to be Conveyed . . . . . . . . . . . . . . . . . . . . . 10
    (b)  Payment of Purchase Price; Conveyance Documents; Other Costs  10

10. TENANT'S SUBSTITUTION OPTION . . . . . . . . . . . . . . . . . . 11

Page No.

11.  PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS;
     COMPLIANCE WITH LAW. . . . . . . . . . . . . . . . . . . . . . . . 13
     (a)  Impositions . . . . . . . . . . . . . . . . . . . . . . . . . 13
     (b)  Compliance with Law . . . . . . . . . . . . . . . . . . . 14
     (c)  Additional Obligations . . . . . . . . . . . . . . . . . . 14

12.  INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     (a)  Type of Insurance . . . . . . . . . . . . . . . . . . . . 14
     (b)  Insurance Requirements; "Self-Insurance". . . . . . . . 15
     (c)  Mortgagee Loss Payable Clauses; Cancellation of Insurance . . . . 16
     (d)  Payment of Premiums; Policy Replacements . . . . . . . 16
     (e)  Blanket Policies . . . . . . . . . . . . . . . . . . . . . 16

13.  PROPERTY LOSS . . . . . . . . . . . . . . . . . . . . . . . . . 16
     (a)  Property Loss Claims . . . . . . . . . . . . . . . . . . 16
     (b)  Termination Upon Loss . . . . . . . . . . . . . . . . . 17

14.  CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . 18
     (a)  Assignment of Condemnation Award . . . . . . . . . . 18
     (b)  Total or Substantial Condemnation . . . . . . . . . . . 18
     (c)  Partial Condemnation . . . . . . . . . . . . . . . . . . 19
     (d)  Landlord's Equipment Condemnation . . . . . . . . . . 19
     (e)  Proceedings . . . . . . . . . . . . . . . . . . . . . . . 20

15.  ECONOMIC ABANDONMENT . . . . . . . . . . . . . . . . . . . 20

16.  RESTORATION . . . . . . . . . . . . . . . . . . . . . . . . . . 20

17.  ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . 21

18.  PERMITTED CONTESTS. . . . . . . . . . . . . . . . . . . . . . 21

19.  ENVIRONMENTAL COVENANTS . . . . . . . . . . . . . . . . . 22

20.  INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . 24

21.  UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY . . . . . 24
     (a)  No Termination of Lease; No Defense to Tenant's Obligations . . . 24
     (b)  Continuing Obligations of Tenant . . . . . . . . . . . . 25
     (c)  Tenant's Waivers . . . . . . . . . . . . . . . . . . . . 25

22.  DEFAULT PROVISIONS . . . . . . . . . . . . . . . . . . . . . . 25
     (a)  Events of Default . . . . . . . . . . . . . . . . . . . . 25

**Page No.**

|       |     |                                            |     |
|-------|-----|--------------------------------------------|-----|
|       | (b) | Landlord's Remedies Upon Tenant Default    | 26  |
|       | (c) | No Relief of Obligations                   | 27  |
|       | (d) | Current Damages                            | 27  |
|       | (e) | Liquidated Final Damages                   | 28  |
|       | (f) | Alternative Liquidated Final Damages       | 29  |
| 23.   | **ADDITIONAL RIGHTS OF LANDLORD**          |     | 29  |
|       | (a) | Non-Exclusive, Cumulative Remedies         | 29  |
|       | (b) | Tenant's Waiver of Redemption              | 29  |
|       | (c) | Costs Upon Default and Litigation          | 30  |
| 24.   | **NOTICES.**                               |     | 30  |
| 25.   | **ESTOPPEL CERTIFICATE**                   |     | 31  |
| 26.   | **SURRENDER AND HOLDING OVER.**            |     | 31  |
| 27.   | **NO MERGER OF TITLE.**                    |     | 31  |
| 28.   | **ALTERATION AND EXPANSION**               |     | 32  |
|       | (a) | Alterations                                | 32  |
|       | (b) | Expansion                                  | 32  |
| 29.   | **CHANGE OF CONTROL**                      |     | 34  |
| 30.   | **MISCELLANEOUS.**                         |     | 34  |

EXHIBIT A - SCHEDULE OF DEFINED TERMS
EXHIBIT B - LEGAL DESCRIPTION OF LAND
EXHIBIT C - LANDLORD'S EQUIPMENT
EXHIBIT D - TENANT'S EQUIPMENT
EXHIBIT E - SCHEDULE OF RENT
EXHIBIT F - PURCHASE PRICES
EXHIBIT G - FORM OF ESTOPPEL CERTIFICATE
EXHIBIT H - FORM OF MEMORANDUM OF LEASE
EXHIBIT I - CONSTRUCTION REQUIREMENTS
SCHEDULE I-1 - FORM OF COMPLETION CERTIFICATE

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made as of the 2nd day of December, 1996, between

**CHESTER DIX FLORENCE CORP.**, a Delaware corporation ("Landlord"), whose address is c/o Lawrence Kadish Real Estate, Post Office Box 40, Westbury, New York 11590, Telefax No. 516-334-9738;

and

**WINN-DIXIE MIDWEST, INC.**, a Florida corporation ("Tenant"), whose address is 5050 Edgewood Court, Jacksonville, Florida  32254 Attention: Chief Financial Officer, Telefax No. 904-783-5294.

**IN CONSIDERATION** of the rents and mutual covenants herein contained to be paid and performed, Landlord and Tenant agree as follows:

1.     **DEFINED TERMS.**  Capitalized terms as used in this Lease will have the meanings assigned to such terms as set forth on attached Exhibit A.

2.     **DEMISE OF LEASED PREMISES; PRIORITY OF LEASE.**  Effective on the Commencement Date, Landlord hereby demises and lets unto Tenant, and Tenant hereby takes and leases from Landlord, for the term or terms and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"):  (i) real property more particularly described on attached Exhibit B, together with all easements, rights and appurtenances thereunto belonging or appertaining (the "Land"), (ii) the buildings, structures and other improvements now located or hereafter constructed on the Land (collectively, the "Improvements") and (iii) the machinery, equipment and fixtures described on attached Exhibit C, and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease ("Landlord's Equipment").  This Lease is subject to the Permitted Encumbrances and, except to the extent that Landlord, Tenant and Mortgagee enter into a subordination agreement pursuant to paragraph 7(f) below, is prior to the Lien of any Mortgage.

3.     **TENANT'S EQUIPMENT.**  The machinery, equipment and fixtures described on attached Exhibit D, and additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease, and Tenant's trade fixtures and equipment ("Tenant's Equipment") are and will remain the property of Tenant, and are intended by Landlord and Tenant to constitute personal property of Tenant, and not fixtures, attachments or Improvements or other interest in real property,

whether or not the same are attached or affixed to the Leased Premises and whether or not the same are deemed to constitute real property under State law.

4.   **TERM.**   Subject to the provisions of this Lease, Tenant shall have and hold the Leased Premises for an initial term (the "Initial Term") commencing on December 31, 1996 (the "Commencement Date"), and ending on December 31, 2016. As long as no Event of Default then exists, Tenant shall have the option, exercisable in accordance with the following provisions, to extend the Term for 6 additional terms (each an "Extended Term") of 5 years each by giving notice to Landlord not less than 6 months prior to the expiration of the then current Term.   If Tenant does not give any such notice to extend to Landlord in a timely fashion, the Term shall automatically terminate at the end of the then current Term.   Any such Extended Term shall be subject to all of the provisions of this Lease, all of which shall continue in full force and effect.   If Tenant does not exercise an option for an Extended Term, Landlord shall have the right during the remainder of the then current Term (i) to advertise the availability of the Leased Premises for sale or for reletting, and to erect upon the Leased Premises signs indicating such availability (provided that such signs do not unreasonably interfere with the use of the Leased Premises by Tenant), and (ii) to show the Leased Premises to prospective purchasers or tenants at reasonable times during normal business hours upon reasonable notice to Tenant.   If Tenant fails to timely exercise its right to extend the Term for any Extended Term, then Tenant's right to extend the Term for any further Extended Terms shall terminate and be null and void.

5.   **RENT.**

(a)   **Basic Rent.**   Tenant shall pay to Landlord, as rent for the Leased Premises during the Term, the amounts (the "Basic Rent") set forth in attached Exhibit E, commencing on January 1, 1997, and continuing on the first day of each calendar quarter thereafter during the Term (said days being referred to as the "Basic Rent Payment Dates").   If the Commencement Date or the final date of the Term is other than on a  regularly scheduled Rent payment date, the Rent shall be prorated to pay for the actual number of days that Rent is due.   Tenant shall pay the Basic Rent to Landlord at Landlord's address set forth above, or at such other place or to such other person as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America.

(b)   **Additional Rent.**   Tenant shall pay and discharge when the same shall become due, as additional rental (the "Additional Rent"), all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added for nonpayment or late payment thereof.   In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all

rights, powers and remedies provided by law in the even of nonpayment of Basic Rent.

(c)   Effect of Nonpayment of Rent.   In addition to Landlord's remedies in an Event of Default, if any installment of Basic Rent or any amount due as Additional Rent is an Overdue Payment, then, in addition to Tenant's obligation to pay such Basic Rent or Additional Rent, Tenant shall pay to Landlord, on demand, as Additional Rent, interest at the rate of 9.12% per annum (the "Default Rate") on all overdue installments of Basic Rent or unpaid Additional Rent from and including the due date thereof to and including the date of such payment in full; provided, however, that the Default Rate shall be payable on all overdue amounts of Additional Rent which Landlord or Mortgagee shall have paid on behalf of Tenant only from and including the date of payment thereof by Landlord or Mortgagee, to and including the date of such payment in full.

(d)   Net Lease; No Setoff or Counterclaim Against Rent.   This Lease is an absolutely net lease, it being intended that Landlord receive all rents and Additional Rents provided for herein free of any expense related to the Leased Premises, other than fees, costs, charges, expenses, reimbursements, or disbursements payable by Landlord under the Mortgage or other documents evidencing or securing any indebtedness of Landlord to Mortgagee, or under any other contracts or agreements of Landlord not consented to by Tenant, unless otherwise specifically agreed by Landlord and Tenant in this Lease or other written instrument executed contemporaneously with or subsequent to this Lease, Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

6.   TITLE; LIENS; CONDITION OF PREMISES.

(a)   Title.   The Leased Premises are demised and let subject to (i) the rights of parties in possession, (ii) the existing state of title as of the Commencement Date (including, without limitation, the Permitted Encumbrances), (iii) any state of facts which an accurate survey or physical inspection of the Leased Premises might show, (iv) all Legal Requirements, and (v) the condition of the Leased Premises as of the Commencement Date, all without representation or warranty by Landlord.  Tenant has examined the title to the Leased Premises on and as of the Commencement Date and has found the same to be satisfactory for all purposes.

(b)   Liens.   TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE) ON THE LEASED PREMISES OR ANY

BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE, WHICH ARISES OR EXISTS FOR ANY REASON, OTHER THAN THE MORTGAGE, THE ASSIGNMENT, AND ANY LIEN CREATED BY OR RESULTING FROM ANY ACT BY LANDLORD NOT CONSENTED TO BY TENANT. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

(c)     Encroachments. In the event that any Improvement now or hereafter constructed shall (i) encroach upon any property, street or right-of-way on or adjoining the Leased Premises, (ii) violate the provisions of any restrictive covenant affecting the Leased Premises, (iii) hinder or obstruct any easement or right-of-way to which the Leased Premises is subject, or (iv) impair the rights of others in, to or under any of the foregoing, then, promptly after written request of Landlord, Tenant shall either (x) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (y) take such action as shall be necessary to remove such encroachment, hindrance or obstruction and to end such violation or impairment. If such action is in the form of an Alteration, such Alteration shall conform to the provisions of paragraph 28.

(d)     Condition of Leased Premises. Tenant acknowledges that it has received the Leased Premises in good condition and repair on the Commencement Date. LANDLORD HAS NOT MADE, AND WILL NOT MAKE, ANY INSPECTION OF THE LEASED PREMISES, AND LANDLORD LEASES, AND TENANT TAKES, THE LEASED PREMISES "AS-IS". TENANT ACKNOWLEDGES THAT LANDLORD HAS NOT MADE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE LEASED PREMISES, ITS FITNESS FOR ANY USE OR PURPOSE, ITS DESIGN OR CONDITION FOR ANY USE OR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, ITS VALUE, COMPLIANCE WITH SPECIFICATIONS, ITS LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION OR LANDLORD'S TITLE THERETO; IT BEING AGREED THAT ALL RISKS INCIDENT TO ALL OF THESE MATTERS ARE TO BE BORNE BY TENANT. TENANT ACKNOWLEDGES THAT THE LEASED PREMISES ARE OF ITS SELECTION AND HAVE BEEN OR WILL BE CONSTRUCTED TO ITS SPECIFICATIONS. TENANT HAS INSPECTED THE LEASED PREMISES AND THEY ARE SATISFACTORY TO TENANT. IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE LEASED PREMISES, WHETHER PATENT OR LATENT, LANDLORD SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY

INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING THEREFROM (INCLUDING STRICT LIABILITY IN TORT). THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY REPRESENTATIONS OR WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO THE LEASED PREMISES, ARISING PURSUANT TO ANY LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

(e)   Assignment of Warranties, Guaranties, Indemnities. Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, for the duration of this Lease, all of Landlord's interest in all warranties (except warranties of title to the Leased Premises), guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of the Leased Premises, including, any rights and remedies existing by contract or pursuant to the Uniform Commercial Code in effect in the State. As long as no Default has occurred and is continuing hereunder and until the expiration or termination of this Lease, Tenant shall have the right (at its sole cost and expense) to enforce any such warranty, guaranty or indemnity in the name of Landlord or Tenant. Landlord hereby agrees to execute and deliver, at Tenant's expense, such further documents (including powers of attorney) as Tenant reasonably may request, to allow Tenant the full benefit of the assignment effected or intended to be effected by this paragraph and the ability to enforce such warranties, guaranties and indemnities.

(f)   Granting of Easements. As long as no Default has occurred and is continuing hereunder, Landlord, at the request of Tenant, will (i) grant easements and other rights in the nature of easements provided that the duration of the easement does not extend past the Term or termination of this Lease; provided however, if the easement is for a term longer than the Term or termination of this Lease, Landlord shall have the right to refuse to grant such easements, but Landlord shall not unreasonably delay, condition, or withhold its approval and execution of such an easement, (ii) release existing easements or other rights in the nature of easements which are for the benefit of the Leased Premises, (iii) execute amendments to any covenants and restrictions affecting the Leased Premises, (iv) grant party wall rights for the benefit of any land adjoining the Land, and (v) execute and deliver to any person any instrument appropriate to confirm or effect such grant, release or amendment, upon receipt by Landlord of a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

(A)   that the Leased Premises (including all related easements), following such grant, release or amendment, (1) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (2) is a

contiguous parcel of land, without gap or hiatus, (3) has adequate access to and from public highways, and (4) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

(B)   that, in the judgment of Tenant and Guarantor, such grant, release or amendment will not materially lessen the value of the Leased Premises;

(C)   the consideration, if any, to be received in connection with such grant, release or amendment;

(D)   that upon such grant, release or amendment, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Basic Rent, Additional Rent or any other sums payable under this Lease or the Guaranty; and

(E)   that Tenant will perform all of the obligations under such instrument of grant, release or amendment.

To the extent that consideration is received in connection with any such grant, release or amendment, Tenant may retain such consideration up to the amount of Tenant's professional fees and out-of-pocket expenses relating to such grant, release or amendment, or $5000.00, whichever is greater, and the balance, if any, of such consideration, shall be paid to Landlord.

To the extent that the consent of Landlord is contemplated above, Tenant's sole remedy if Landlord has withheld its consent unreasonably is the remedy of specific performance, and Tenant's remedies will not include damages or termination of this Lease, which remedies are expressly waived as to the foregoing.

(g)   Conveyances for Public Purposes. As long as no Default has occurred and is continuing hereunder, Landlord will, at Tenant's request, (i) execute petitions to have the Leased Premises annexed to any municipal corporation or utility district, (ii) dedicate, transfer or release portions of the Leased Premises for road, highway or other public purposes, and (iii) execute and deliver to any person any instrument, containing special or limited warranties if applicable, appropriate to confirm or effect such sale, transfer, annexation or dedication, upon receipt by Landlord of a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor stating:

(A)     with respect to any action taken pursuant to clause (iii) above, (1) the consideration being paid for such interest, (2) that such consideration is not less than the fair market value of such interest, as determined by Tenant and Guarantor, and (3) such action is being taken in anticipation that such interest would otherwise be taken by Condemnation;

(B)     that the Leased Premises (including all related easements), following such sale, transfer, annexation or dedication, (1) constitutes an integrated economic unit for use in Tenant's Business, including sufficient parking and all necessary and required utilities, (2) is a contiguous parcel of land, without gap or hiatus, (3) has adequate access to and from public highways, and (4) is not in violation of any Legal Requirement or any restrictive covenant or other agreement applicable thereto;

(C)     that, in the judgment of Tenant and Guarantor, such sale, transfer, annexation or dedication will not materially lessen the value of the Leased Premises;

(D)     the consideration to be received in connection with such sale, transfer, annexation or dedication;

(E)     that upon such sale, transfer, annexation or dedication, this Lease and the Guaranty shall remain in full force and effect and Tenant and Guarantor shall remain fully obligated under this Lease and the Guaranty without any reduction of Basic Rent, Additional Rent or other sums payable under this Lease or the Guaranty; and

(F)     that Tenant will perform all of the obligations under any instrument to be executed and delivered pursuant to clause (iii) above or under such petition.

Tenant may retain any consideration received in connection with such sale, transfer, annexation or dedication, up to the amount of Tenant's professional fees and out-of-pocket expenses relating to such sale, transfer, annexation or dedication, or $5000.00, whichever is greater, and the balance, if any, of such consideration, shall be paid to Landlord. If such sale, transfer, annexation or dedication, occurs during the Initial Term, then, to the extent that any portion of such consideration is retained by Landlord, (i) Cost as set forth in Exhibit I hereto shall be reduced by the amount of such consideration retained by Landlord, and (ii) each installment of Basic Rent, payable thereafter during the Initial Term commencing with the second Basic Rent Payment Date subsequent to the date of such sale, transfer, annexation or dedication, shall be reduced by an amount equivalent to the product resulting from an equation, the

numerator of which is the amount of such consideration retained by Landlord, and the denominator of which is the number of Basic Rent Payment Dates remaining in the Initial Term.

7.    USE AND MAINTENANCE OF PREMISES; QUIET ENJOYMENT.

(a)    Use.  The Leased Premises may be used as a retail facility in Tenant's Business or for any other lawful purpose, except that the Leased Premises shall not be used for any purpose which shall violate any Legal Requirement, any insurance policy in effect with respect to the Leased Premises, or any covenants, restrictions or agreements applicable to the Leased Premises or constitute a public or private nuisance or waste.

(b)    Maintenance.  Tenant shall at all times maintain the Leased Premises in safe condition, and in good repair (which shall include structural or non-structural and foreseen or unforeseen repairs) and appearance, except for ordinary wear and tear.  Landlord shall not be required to maintain, repair or rebuild the Leased Premises in any way, and Tenant hereby expressly waives the right to make repairs or alterations at the expense of Landlord pursuant to any Legal Requirement now or hereafter in effect.  All such work of repair or rebuilding by Tenant shall be done in a good and workmanlike manner.

(c)    Replacement Equipment.  Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of Landlord's Equipment (the "Replaced Equipment" ) which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation, or been lost, stolen, damaged or destroyed.  Tenant shall repair, at its sole cost and expense, all damage to the Leased Premises caused by the removal of the Replaced Equipment or of Tenant's Equipment, or the installation of the Replacement Equipment.  All Replacement Equipment shall become the property of Landlord, shall be free and clear of all Liens and rights of others, and shall become a part of the Landlord's Equipment to the same extent as the Replaced Equipment was part of the Landlord's Equipment.

(d)    Landlord's Covenant of Quiet Enjoyment.  As long as no Event of Default exists hereunder, Landlord covenants to do no act nor to authorize any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

(e)    Landlord's Right of Entry.  Landlord and any Mortgagee shall have the right (but not the obligation) to enter upon the Leased Premises for the purpose of inspection and/or making any repairs or rebuilding which may be necessary by reason of Tenant's failure to comply with the provisions of subparagraphs (b) or (c) above or in paragraphs 13 or 14 below.  Except in

case of emergency, the right of entry shall be exercised at reasonable times, at reasonable hours and upon reasonable prior notice to Tenant.  In case of emergency, Landlord shall not be obligated to provide prior notice of entry upon the Leased Premises; however, as soon as reasonably practical following such entry, Landlord shall notify Tenant of such entry, the nature of the emergency, and the action taken.  Except as provided in the next sentence, all costs and expenses relating to Landlord's or Mortgagee's inspections shall be borne by Landlord and Mortgagee, respectively.  Tenant agrees to pay all reasonable costs and expenses of inspections by Landlord or Mortgagee if Tenant is in monetary Default or Landlord or Mortgagee have reason to believe that Tenant is in material non-monetary Default and as a result of any such inspection, the Leased Premises is determined or confirmed to be in material non-compliance with applicable requirements set forth in this Lease.  If as a result of any inspection by Landlord or Mortgagee it is determined that repairs or rebuilding are necessary, the cost of all such work, if not paid by Tenant in accordance with this Lease, shall be Additional Rent, and Tenant shall pay the same to Landlord (or Mortgagee), together with interest thereon at the Default Rate from the time of demand for payment by Landlord (or Mortgagee) to Tenant, until paid by Tenant, immediately upon written demand therefor and upon submission to Tenant of evidence of Landlord's (or Mortgagee's) payment of such costs.  Landlord also shall have the right to conduct, at is sole cost and expense, such environmental audits or assessments of the Leased Premises as Landlord may elect, and if such audit or assessment discloses any Hazardous Condition, then Tenant's obligations with respect thereto shall be governed by paragraph 19.  Any such audits or assessments conducted by Landlord shall not unreasonably interfere with the continuing operation of Tenant's Business on the Leased Premises, and the written report of such audit or assessment shall name Tenant as an intended beneficiary of such report.

(f)    *Subordination, Nondisturbance and Attornment*.  Upon the request of Mortgagee, Landlord, Tenant and Mortgagee shall enter into a "subordination, nondisturbance and attornment" agreement in form and content reasonably acceptable to Landlord, Tenant and Mortgagee, pursuant to which Tenant shall subordinate its leasehold interest in the Leased Premises to the lien of the Mortgage, and shall attorn to Mortgagee, as successor landlord, if Mortgagee succeeds to Landlord's interest in the Leased Premises, provided that Tenant's tenancy will not be disturbed as long as Tenant is performing its obligations under this Lease.

8.    **TENANT'S RIGHT OF FIRST REFUSAL**.  Tenant shall have the right of first refusal to purchase the Leased Premises as hereinafter set forth.  If at any time during the Term Landlord shall receive a bona fide offer (other than at public auction) from a third person (except in lieu of exercise of the power of eminent domain) for the purchase of the Leased Premises, which offer Landlord desires to accept, Landlord shall promptly deliver to Tenant a copy of such offer.  Tenant may, within

15 days after receipt of such offer, elect to purchase the Leased Premises on the same terms and conditions as those set forth in such offer. If Tenant does not accept such offer within the time herein specified, then Tenant's right of first refusal shall terminate, but the Term of this Lease shall continue; provided, however, that if the transaction contemplated by such bona fide offer to purchase the Leased Premises fails to close in accordance with the terms, covenants and conditions of such bona fide offer for any reason (subject, however, to closing delays or adjournments), then Tenant's right of first refusal shall be deemed reinstated. The right of first refusal in this paragraph 8 shall be inapplicable to a transfer upon foreclosure of the Mortgage, including the giving by Landlord of a deed in lieu of foreclosure or to any subsequent transfer to a third person. In the event that Tenant elects to exercise such right of first refusal, then Landlord shall be obligated to sell to Tenant, and Tenant shall be obligated to purchase from Landlord, the Leased Premises, in accordance with the terms, covenants and conditions set forth in such bona fide offer.

9.    **PURCHASE OFFER; PROCEDURE ON PURCHASE.**   If Tenant elects or is required to make a Purchase Offer pursuant to paragraphs 13, 14, 15 or 29 of this Lease, then Tenant shall be deemed to have made such Purchase Offer in accordance with the terms of this paragraph 9, at a price equal to the amount determined in accordance with attached Exhibit F. Except as otherwise provided in paragraph 29, unless Landlord shall have rejected such Purchase Offer by notice to Tenant given not later than the 10th day prior to the Termination Date then Landlord shall be conclusively presumed to have accepted such Purchase Offer. Upon acceptance of such Purchase Offer, Landlord shall transfer the Leased Premises pursuant to a special or limited warranty deed, and assign, without recourse, Landlord's interest in any Net Award or Net Proceeds, if applicable, on the Termination Date upon payment by Tenant of the purchase price therefor, together with all installments of Basic Rent, all Additional Rent, and all other sums due and payable under this Lease to and including the Termination Date.

(a)    Title to be Conveyed.   Upon any such purchase of the Leased Premises by Tenant or its designee (excluding any purchase pursuant to paragraph 8), Landlord need not transfer and convey to Tenant or its designee any better title thereto than Landlord received, and Tenant shall accept such title, subject, however, to all Liens, exceptions and restrictions on, against or relating to the Leased Premises and to all applicable Legal Requirements, but free of the Lien of the Mortgage and free of any Liens, exceptions and restrictions which have been created by or resulted from acts of Landlord taken without the consent of Tenant.

(b)    Payment of Purchase Price; Conveyance Documents; Other Costs.   Upon the date fixed for Tenant's purchase of the Leased Premises (other than pursuant to paragraph 8), Tenant shall pay to Landlord at its address set forth above, or at any other place designated by Landlord, the purchase price therefor specified herein, in immediately available funds and Landlord shall

thereafter deliver to Tenant a special warranty deed which describes the Leased Premises then being sold to Tenant, and conveys and transfers the title thereto which is described in subparagraph (a) above, together with such other instruments as shall be necessary to transfer or assign to Tenant or its designee (without recourse) any other property then required to be sold by Landlord pursuant to this Lease. Tenant shall pay all charges incident to such conveyance and transfer (including, without limitation, reasonable attorneys' fees, escrow fees, recording fees, title insurance premiums and all applicable federal, state and local taxes (other than any net income tax or franchise tax levied upon or assessed against Landlord)) which may be incurred or imposed by reason of such conveyance and transfer and other instruments. Upon the completion of such purchase, but not prior thereto, this Lease and all obligations hereunder (including the obligations to pay Basic Rent and Additional Rent) shall terminate, except with respect to obligations and liabilities of Tenant, actual or contingent, under this Lease which arose on or prior to such date of purchase.

10.    **TENANT'S SUBSTITUTION OPTION**. If Tenant elects to exercise the Substitution Option pursuant to paragraph 13, 14 or 15 of this Lease, then, on the date for substitution set forth in Tenant's notice of such election, Landlord shall transfer the Leased Premises by special or limited warranty deed, and assign, without recourse, Landlord's interest in any Net Award or Net Proceeds, if applicable, to Tenant, and Tenant shall transfer or cause to be transferred to Landlord, by special or limited warranty deed, other real property and Improvements thereon and equipment therein (other than Tenant's Equipment) used or to be used as a retail food store in Tenant's Business (the "Substitute Property"), provided that all of the following conditions shall have been satisfied:

(a)    No Event of Default has occurred and is continuing under this Lease.

(b)    The Substitute Property is, or will be at the time of Tenant's occupancy thereof, operated as a retail food store in Tenant's Business.

(c)    The Cost or fair market value of the Substitute Property, as indicated in the appraisal provided pursuant to subparagraph (d) below, shall equal or exceed (i) the original Cost of the Leased Premises and (ii) the then appraised value of the Leased Premises.

(d)    With respect to any Substitute Property on which construction of the Improvements was completed within 2 years of the Substitution Date, Landlord and Mortgagee shall have received a certificate of Tenant and Guarantor, signed by the President or a Vice President of Tenant and Guarantor, setting forth the cost to Tenant of acquiring the land portion of such Substitute Property, of construction of the Improvements thereon, and of

acquisition and installation of the landlord's equipment therein, if any, which may include such items as are included in the definition of Cost with respect to the Leased Premises.

(e)    With respect to any Substitute Property on which construction of the Improvements was completed more than 2 years prior to the Substitution Date, Landlord and Mortgagee shall have received an appraisal, made by an independent appraiser at Tenant's expense selected by Tenant and approved by Landlord and Mortgagee, meeting standards generally accepted at the time by institutional mortgage lenders, of the fair market value of such Substitute Property as of a date within 90 days prior to the Substitution Date.

(f)    With respect to the Leased Premises, Landlord and Mortgagee shall have received an appraisal, made by an independent appraiser at Tenant's expense selected by Tenant and approved by Landlord and Mortgagee, meeting standards generally accepted at the time by institutional mortgage lenders, of the fair market value of the Leased Premises as of a date within 90 days prior to the Substitution Date.

(g)    With respect to the Substitute Property, Landlord shall have received, in the form of this Lease and the Guaranty, a substitute lease (the "Substitute Lease") and a substitute guaranty (the "Substitute Guaranty") duly authorized, executed and delivered by Tenant and Guarantor, and Mortgagee shall have received, in the form of the Note, the Mortgage and the Assignment related to the Leased Premises, a substitute Note (the "Substitute Note"), substitute Mortgage (the "Substitute Mortgage") and a substitute Assignment (the "Substitute Assignment") duly authorized, executed and delivered by Landlord, which Substitute Mortgage shall create a first lien on the Substitute Property, and which shall otherwise be in form and substance satisfactory to Mortgagee.

(h)    Landlord and Mortgagee shall have received evidence that, on the Substitution Date, Landlord has good and marketable fee simple title to the Substitute Property, subject only to Permitted Encumbrances (other than matters described in clause (ii) of the defined term "Permitted Encumbrances") and that all appropriate recordings, registrations and filings with respect to the Substitute Lease, Substitute Mortgage and Substitute Assignment have been made. Evidence of such marketable title shall be provided by Tenant, at its expense. The Landlord and the Mortgagee each shall have received an as-built survey and an owners and loan policy of title insurance, respectively, in the forms and with the endorsements required with respect to the Leased Premises on the Commencement Date.

(i)    Landlord and Mortgagee shall have received an ASTM standard "phase I" environmental assessment of the Substitute Property, prepared by an

environmental engineering firm reasonably acceptable to Landlord and Mortgagee, and engaged at Tenant's expense, showing that the Substitute Property is free of Hazardous Substances, except as may be permitted pursuant to the provisions of paragraph 19 below.

(j)    All necessary approvals, authorizations and consents of all governmental bodies (including courts) having jurisdiction with respect to the transactions contemplated by this paragraph 10 shall have been obtained and all taxes, fees and other charges payable in connection therewith shall have been paid.

(k)    Landlord and Mortgagee shall have received all other documentation, including opinions and evidence of corporate authorizations, required to be furnished by Tenant and Guarantor with respect to the Leased Premises, this Lease and the Guaranty on the Commencement Date to the same extent, with the same effect and subject to the same approvals as if the Substitute Property had been the Leased Premises.  Tenant shall be obligated to pay all costs and expenses incurred by it, Landlord or Mortgagee in connection with the transaction contemplated by this paragraph 10, including the reasonable fees and expenses of counsel to Landlord and Mortgagee.

(l)    The general socio-economic characteristics of the area within a 10-mile radius of the Substitute Property shall be equal to or better than the general socio-economic characteristics of the area within a 10-mile radius of the Leased Premises.

11.    **PAYMENT OF IMPOSITIONS AND ADDITIONAL OBLIGATIONS; COMPLIANCE WITH LAW.**

(a)    Impositions.  Subject to the provisions of paragraph 18, and except as otherwise provided in this paragraph 11(a), Tenant shall, before delinquency thereof, pay and discharge the following whether the same became due and payable before, on or after the Commencement Date (collectively, the "Impositions"): all taxes (including sales, use, and gross rental taxes), assessments, levies, fees, water and sewer rents and charges, utilities and communications taxes and charges and all other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, which are, at any time, prior to or during the Term, imposed upon or assessed against (i) the Leased Premises, (ii) any Basic Rent, Additional Rent or other sum payable hereunder, (iii) this Lease, the leasehold estate created hereby, or (iv) the acquisition, occupancy, leasing, use, possession or operation of the Leased Premises (including without limitation, any taxes on revenues, rents, income, awards, proceeds, profits, excess profits, gross receipts, sales, use, excise and other taxes, duties or imports whether similar or not in nature, assessed, levied or imposed against Tenant, Landlord or the Leased Premises

by any governmental authority, subject, however, to the next sentence). Notwithstanding the foregoing, Tenant shall have no obligation to pay federal, state or local (x) franchise, capital stock or similar taxes, of Landlord, (y) net income or excess profits, of Landlord, or (z) any estate, inheritance, succession, gift, capital levy or similar tax, unless such taxes referred to in clauses (x) and (y) above are in lieu of, or a substitute for, any tax, assessment, levy or charge which, if it were in effect on the Commencement Date, would be payable by Tenant. If any assessment may be paid in installments, Tenant shall have the option to pay such assessment in installments; in such event, Tenant shall be liable only for those installments which become due and payable during the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions. Tenant shall, within 30 days after payment thereof, deliver to Landlord copies of all receipts for payment of Impositions. Landlord shall either request the applicable taxing authority to deliver tax notices or tax bills directly to Tenant, or provide Tenant with complete and correct copies of such tax notices or tax bills promptly upon Landlord's receipt thereof, and Tenant shall not be deemed in Default under this paragraph 11(a) for failure to pay or discharge any Imposition, the notice or bill for which Tenant failed to receive due to Landlord's failure to take such action.

(b)   Compliance with Law. Subject to the provisions of paragraph 18, Tenant shall at all times comply with and cause the Leased Premises to comply with and conform to all Legal Requirements applicable to the Leased Premises or its ownership, occupancy or use, including those which require structural, unforeseen or extraordinary changes to the Leased Premises.

(c)   Additional Obligations. Subject to the provisions of paragraph 6 and paragraph 11(a) above, Tenant shall pay and perform all obligations of Landlord, as the owner of the Leased Premises, that may now or hereafter exist under any Permitted Encumbrances or any other matter that would be a Permitted Encumbrance created by or with the consent of Tenant.

## 12.   INSURANCE.

(a)   Type of Insurance. Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i)   Insurance (including flood insurance) against all risk of direct physical loss or damage to the Improvements and Landlord's Equipment in amounts not less than the full replacement cost of the Improvements and Landlord's Equipment, if the same are actually replaced or actual cash value (replacement cost minus depreciation) if the same are not replaced, excluding footings and foundations and other parts of the Improvements which are not insurable.

(ii)    General public liability insurance against claims for bodily injury, death or property damage occurring on, in, or about the Leased Premises with combined single limit coverage of not less than $10,000,000. Policies for such insurance shall be for the mutual benefit of Landlord, Tenant and any Mortgagee.

(iii)    Workers' compensation insurance covering all persons employed in connection with any work done on or about the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises, or in lieu of such workers' compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State.

(iv)    Such other insurance as is customarily carried by owners or tenants of similar properties in the same geographic area and engaged in businesses similar to Tenant's Business.

(b)    Insurance Requirements; "Self-Insurance".  Except as provided in the second paragraph of this subparagraph (b) the insurance required by paragraph 12(a) shall be written by companies of recognized financial standing which are rated A-1 or better by Standard & Poors corporation or A-3 or better by Moody's Investor Service with asset size rating of ["X"] or better by Best's Rating Service. The insurance (i) shall be for a term of not less than 6 months, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the workers' compensation insurance referred to in subparagraph (a)(iii) above) name Landlord, Tenant and any Mortgagee as insured parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant, or become void or unsafe by reason of the failure or impairment of the capital of any insurer, or if for any other reasonable cause said insurance shall become unsatisfactory to Landlord or Mortgagee, Tenant shall promptly obtain new or additional insurance satisfactory to Landlord and mortgagee. Tenant shall provide Landlord with a copy of all such insurance policies.

Notwithstanding the above, as long as Tenant is not in Default hereunder and the tangible net worth (as determined under generally accepted accounting principles in effect on the Commencement Date) of Winn-Dixie exceeds $500,000,000, Tenant may "self-insure" each of the coverages described in paragraph 12(a). If Tenant has "self-insured" and a claim is made or a loss incurred which would be covered by the insurance described in paragraph 12(a) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting

therefrom.   As to casualty losses, Tenant shall pay the full replacement cost thereof. Sums due from Tenant in lieu of insurance proceeds because of such "self-insurance" shall be treated as insurance proceeds for all purposes under this Lease.

(c)    Mortgagee Loss Payable Clauses; Cancellation of Insurance.  Each insurance policy referred to in clause (i) of subparagraph (a) above shall contain a mortgagee loss payable clause in favor of any Mortgagee.  Each policy shall provide that it may not be canceled except after 30 days prior notice to Landlord and any Mortgagee.  Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Mortgagee pursuant to any provision of the Mortgage upon the happening of an event of default thereunder, or (iv) any change in title or ownership of the Leased Premises.

(d)    Payment of Premiums; Policy Replacements.  Tenant shall pay as they become due all premiums for the insurance required by this paragraph 12, shall renew or replace each policy at least 30 days prior to the expiration of such policy, and shall deliver to Landlord such renewal certificate within 10 days following inception. Tenant shall provide Landlord with reasonable proof of payment of such premiums promptly following Tenant's payment of such premiums. In the event of Tenant's failure to comply with any of the foregoing requirements within 30 days after notice to Tenant thereof, Landlord shall be entitled to procure such insurance.  Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant immediately upon demand therefor by Landlord, together with interest thereon at the Default Rate, from and including the date of payment by Landlord to and including the date such sums are fully paid by Tenant.

(e)    Blanket Policies.  Any insurance which Tenant is required to obtain pursuant to paragraph 12(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant or Guarantor, provided that such "blanket" policy or policies otherwise comply with the provisions of this paragraph 12.  Upon the request of Landlord or Mortgagee, Tenant will provide a specific allocation of coverage among the various properties covered by such blanket policy.

13.    **PROPERTY LOSS.**

(a)    Property Loss Claims.  In the event of any property loss, Tenant shall give Landlord and Mortgagee immediate notice thereof.  Landlord, and

Mortgagee by its acceptance of this Lease, hereby authorize Tenant, subject to Landlord's and any Mortgagee's approval of any proposed terms, to negotiate, in its name or in Landlord's or Mortgagee's name, the adjustment, collection, settlement, compromise or payment of all claims under any of the insurance policies required by paragraph 12 and to execute and deliver on behalf of Landlord and Mortgagee all necessary proofs of loss, receipts, vouchers and releases required by the insurers. Landlord and Mortgagee agree to sign, upon request of Tenant, all such proofs of loss, receipts, vouchers and releases. Landlord and Mortgagee may elect to monitor or participate in the adjustment, collection, settlement, compromise or claims payment process, and the expenses of Landlord and Mortgagee (including reasonable attorneys fees and costs) incurred in connection with such action by Landlord or Mortgagee shall be paid by Tenant.

Except as provided in subparagraph (b) below, in the event of any loss (whether or not insured against) resulting in damage to the Leased Premises, this Lease shall continue in full force and effect without abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder.

Any Net Proceeds received for such loss shall be payable to, and held by Mortgagee, subject to the provisions of this paragraph 13. Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to Mortgagee instead of to Landlord and Tenant jointly; and Landlord and Tenant hereby appoint Mortgagee as attorney-in-fact to endorse any draft therefor.

Promptly after such loss, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to their value, condition and character immediately prior to such loss, or as otherwise reasonably acceptable to Landlord, whether or not the Net Proceeds are sufficient to cover the cost of restoration, and Mortgagee shall make available to Tenant any Net Proceeds of such loss received by Mortgagee, subject to the terms and conditions set forth in paragraph 16.

(b)    Termination Upon Loss. If a substantial portion of the Leased Premises is damaged or destroyed such that it would be uneconomic for Tenant to restore the Leased Premises to its condition prior to such damage or destruction for use in Tenant's Business, then Tenant may, not later than 60 days after such loss, give to Landlord notice of its intention to terminate this Lease on a Termination Date specified in such notice, and Tenant shall thereupon have no obligation to restore the Leased Premises. Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor, rebuilding, restoring or repairing the Leased Premises for continued

use and occupancy in the business carried on by Tenant on the Leased Premises immediately prior to such loss would be uneconomic. As used in this subparagraph (b), "substantial portion" means 50% or more of the replacement cost of the Improvements. If the Termination Date occurs during the Initial Term, as part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer, or (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 10. If the Termination Date occurs during an Extended Term, or if Landlord rejects such Purchase Offer pursuant to paragraph 9, then the Net Proceeds shall belong to Landlord and this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including the Termination Date.

## 14.    CONDEMNATION.

(a)    Assignment of Condemnation Award. Subject to the provisions of this paragraph 14 and paragraph 16, Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant is or may be entitled by reason of any Condemnation, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise; but nothing in this Lease shall be deemed to (i) assign to Landlord any award or payment on account of Tenant's Equipment or other tangible property, moving expenses, loss of business, and similar claims to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, or (ii) impair Tenant's right to any award or payment resulting from such separate claim. If Landlord receives notice of any proposed Condemnation from any person having the power of eminent domain, Landlord shall promptly give Tenant notice of such proposed Condemnation; the failure of Landlord to give such notice to Tenant shall not affect Tenant's obligations under this paragraph 14 or any other provision of this Lease.

(b)    Total or Substantial Condemnation. If (i) the entire Leased Premises, or (ii) at Tenant's election, any substantial portion of the Leased Premises, shall be subject to a Taking, then Tenant shall, not later than 60 days after notice of such Taking, give notice to Landlord of its intention to terminate this Lease on a Termination Date specified in such notice. Such notice shall be accompanied by a certificate of Tenant and Guarantor, signed by the President or any Vice President of Tenant and Guarantor, stating that, in the judgment of the Executive Committee of the Board of Directors of Tenant and Guarantor: (A) the conditions referred to in clause (i) or (ii) above exist with respect to the Leased Premises by reason of such Taking, and (B) continued use and occupancy in the Tenant's Business after restoration would be uneconomic. As used in this subparagraph (b), "substantial portion" means (a) 5% or more of the building space contained in the Improvements, (b) 10% or more of the parking area, (c) 15% or more of the building space and parking

area in any combination, or (d) taking (other than a temporary taking that, in the judgment of the Executive Committee of the Board of Directors of Tenant, does not cause the continued use and occupancy of the Leased Premises in Tenant's Business to be uneconomic) of any material access to the Leased Premises for which no reasonable alternative is available at a reasonable cost. If the Termination Date occurs during the Initial Term, as part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer, or (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 10. If the Termination Date occurs during an Extended Term, or if Landlord rejects such Purchase Offer pursuant to paragraph 9, then the Net Award for such Taking shall belong to Landlord and this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including the Termination Date.

(c)    Partial Condemnation. In the event of any Taking of the Land or Improvements which does not result in a termination of this Lease pursuant to subparagraph (b) above, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder, except as specifically provided in paragraph 16. Any Net Award for such Taking shall be retained by Mortgagee, subject to the provisions of this subparagraph (c). Promptly after such Taking, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to their value, condition and character immediately prior to such Taking, whether or not the Net Award is sufficient therefor, and Mortgagee shall make available to Tenant any Net Award received by Mortgagee, subject to the terms and conditions set forth in paragraph 16.

In the event of a Requisition of the Leased Premises, the Net Award for such Requisition allocable to the Term shall be paid to Tenant and this Lease shall continue in full force and effect without any abatement or reduction of the Basic Rent, Additional Rent or other sums payable by Tenant hereunder. Any portion of such Net Award allocable to any period after the expiration or termination of the Term shall belong to Landlord.

(d)    Landlord's Equipment Condemnation. In the event of any Taking of Landlord's Equipment which does not fall within the provisions of subparagraph (b) above, this Lease shall continue in full force and effect and without any abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder. Tenant shall, whether or not the Net Award is sufficient for the purpose, promptly replace Landlord's Equipment so taken, in accordance with the provisions of paragraphs 7(c) and 16, and the Net Award for such a Condemnation shall thereupon be payable to Tenant.

(e)    Proceedings.    Tenant shall take all appropriate actions with respect to each Condemnation proceeding, action, negotiation, prosecution and adjustment and shall pay all cost and expenses thereof, including the reasonable cost of Landlord's and Mortgagee's participation therein, provided that Landlord's and Mortgagee's consents shall be required to any settlement or agreement with the condemning authority (except one involving solely an award or payment to which Tenant is entitled under subparagraph (a) above), such consent not to be unreasonably withheld or delayed.  To the extent that the consent of Landlord is contemplated above, Tenant's sole remedy if Landlord has withheld its consent unreasonably is the remedy of specific performance, and Tenant's remedies will not include damages or termination of this Lease, which remedies are expressly waived as to the foregoing.

15.    **ECONOMIC ABANDONMENT.**    So long as no Default then exists hereunder, if the Leased Premises shall have become uneconomic or unsuitable for continued use and occupancy in the business operations of Tenant and in the business operations of any affiliate of Tenant, and if the Executive Committee of the Board of Directors of Tenant and Guarantor have decided to discontinue the use of the Leased Premises in its business operations within one year or less after the date of the delivery of the notice hereinafter referred to in this paragraph 15, or if Tenant, on or before such date of delivery, has already discontinued such use, then Tenant may notify Landlord of its intention to terminate this Lease on a Termination Date specified in such notice.  As part of such notice, Tenant shall elect to either (x) give to Landlord a Purchase Offer pursuant to paragraph 9, or (y) exercise its Substitution Option with respect to the Leased Premises pursuant to paragraph 10.  If Landlord rejects such Purchase Offer pursuant to paragraph 9, then this Lease shall terminate on the Termination Date upon the payment by Tenant of all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including the Termination Date.

16.    **RESTORATION.**  In the event of any loss referred to in paragraph 13(a) or Taking referred to in paragraph 14(c), Tenant shall be entitled to receive from Mortgagee periodic disbursements of the Net Proceeds payable in connection with such loss and the Net Award payable in connection with such Taking, but only on the basis of certificates of Tenant, signed by the President or any Vice President of Tenant, delivered to Mortgagee from time to time as such rebuilding, restoration and repair progresses or is completed. Each such certificate shall describe the work for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith, and shall state that such work has been performed in conformity with the requirements of paragraphs 6(b), 6(c), 7(b), 7(c), and 28, the estimated cost of completing such work, and that Tenant has not theretofore received payment for such work. Upon completion of the work described in this paragraph 16, if any Net Proceeds or Net Award remaining after the final payment has been made for such work is less than $100,000, such remaining Net Proceeds or Net Award shall be paid to Tenant. If such remaining Net Proceeds or Net Award is $100,000, or greater than

$100,000, such remaining Net Proceeds or Net Award shall, at Landlord's option, be paid to Tenant or retained by Landlord; if retained by Landlord then (i) Cost as set forth in Exhibit I hereto shall be reduced by the amount of such remaining Net Proceeds or Net Award so retained by Landlord, and (ii) each installment of Basic Rent, payable thereafter during the Initial Term commencing with the second Basic Rent Payment Date subsequent to the final payment to Tenant for such work, shall be reduced by 2.31265% of such remaining Net Proceeds or Net Award retained by Landlord. If not retained by Landlord, such remaining Net Proceeds or Net Award shall be paid to Tenant. If the cost of any such work required to be done by Tenant pursuant to this paragraph shall exceed the amount of such Net Proceeds or Net Award, the deficiency shall be paid by Tenant. No payments shall be made to Tenant pursuant to this paragraph 16 if any Default exists under this Lease unless and until such Default shall have been cured or removed.

17.    **ASSIGNMENT AND SUBLEASING.** This Lease may be assigned and the Leased Premises may be sublet in whole or in part without the consent of Landlord, (i) as long as the Guaranty and the liability of Guarantor thereunder shall not be reduced thereby, or (ii) if Winn-Dixie is Tenant under this Lease. Each sublease of the Leased Premises shall be subject and subordinate to the provisions of this Lease. No assignment of this Lease shall be effective unless the assignee specifically has assumed Tenant's obligations under this Lease. No assignment or sublease made as permitted by this paragraph 17 shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. No assignment or sublease shall impose any obligations on Landlord under this Lease. Tenant shall, within 10 days after the execution and delivery of any such assignment or sublease, deliver a duplicate original copy thereof (including any assignee's assumption of Tenant's obligations under this Lease) to Landlord. Tenant hereby irrevocably and unconditionally assigns to Landlord all rents and other sums payable under any sublease of the Leased Premises; provided, however, that Landlord hereby grants Tenant a license to collect all such rents and other sums so long as no Event of Default has occurred and is continuing. Tenant shall not mortgage or pledge this Lease or the leasehold estate created hereby, and any such mortgage or pledge made in violation of this paragraph 17 shall be void.

18.    **PERMITTED CONTESTS.** Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any Lien referred to in paragraphs 6(b) or 28, or (iv) take any action with respect to any encroachment, violation, hindrance, obstruction or impairment referred to in paragraph 6(c) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the collection of, or other realization upon, the Imposition or Lien so contested, (B) the sale, forfeiture or loss of any of the Leased Premises, any interest therein, any Basic Rent or any

Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such encroachment, violation, hindrance, obstruction or impairment, (C) any interference with the Use or occupancy of the Leased Premises, (D) any interference with the payment of any Basic Rent, any Additional Rent or any other sum payable hereunder, and (E) the cancellation of any fire or other insurance policy. If Winn-Dixie's tangible net worth (determined in accordance with generally accepted accounting principles in effect on the Commencement Date) shall be less than $500,000,000 at the time of commencement of any such contest, Tenant shall provide to Landlord and Mortgagee a bond of a surety acceptable to Landlord and Mortgagee in an amount satisfactory to Landlord and Mortgagee. While any such proceedings are pending, neither Landlord nor Mortgagee shall have the right to pay, remove or cause to be discharged the Imposition or Lien thereby being contested. Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as the conditions of the first sentence of this paragraph 18 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Landlord and Mortgagee harmless against any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof. No such contest shall subject Landlord or Mortgagee to the risk of any material civil liability or any criminal liability.

19.   **ENVIRONMENTAL COVENANTS.** Except as set forth in the second sentence of this paragraph 19, Tenant hereby represents, warrants, covenants and agrees to and with Landlord and Mortgagee that all operations or activities upon, or any use or occupancy of the Leased Premises by Tenant, or to the best of Tenant's knowledge any other tenant or other occupant, is presently and will at all times be in compliance with all Environmental Laws; that Tenant has not at any time engaged in or permitted, nor to the best of Tenant's knowledge has any existing or previous tenant or occupant of the Leased Premises engaged in or permitted the occurrence of any Hazardous Condition; and that to the best of Tenant's knowledge, there does not now exist nor is there suspected to exist any Hazardous Condition on or about the Leased Premises. Tenant discloses to Landlord that Tenant does, or intends to, store, use or sell in Tenant's Business certain products or substances that may be considered Hazardous Substances, and Landlord acknowledges Tenant's right to do so, provided, however, that any such storage, use or sale of such products or substances shall at all times be in compliance with all Environmental Laws. Tenant hereby indemnifies and agrees to protect, defend and hold harmless Landlord and Mortgagee, which for purposes of this paragraph will be deemed to include the directors, officers, shareholders, trustees, beneficiaries, employees and agents of

Landlord and Mortgagee, from and against any Claims. In the event that Landlord or Mortgagee suffers or incurs any Claims, Tenant will pay to Landlord or Mortgagee the total of all such Claims suffered or incurred by Landlord or Mortgagee upon demand therefor by Landlord or Mortgagee.

In the event that any Remedial Work with respect to any Hazardous Conditions that could result in a Claim is required under any Environmental Laws by any judicial order, or by any governmental entity, or in order to comply with the terms, covenants and conditions of this Lease or of any other agreements affecting the Leased Premises, Tenant will perform or cause to be performed the Remedial Work in compliance with such law, regulation, order or agreement. All Remedial Work will be performed by one or more contractors, selected by Tenant and under the supervision of a consulting environmental engineer selected by Tenant. All costs and expenses of such Remedial Work will be paid by Tenant including without limitation the charges of such contractor(s) and the consulting environmental engineer, and Landlord's and Mortgagee's reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event that Tenant fails to timely commence, or cause to be commenced, or fails to diligently prosecute to completion, such Remedial Work, Landlord or Mortgagee may, but will not be required or have any obligation to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, will thereupon constitute Claims. All such Claims will be due and payable by Tenant upon demand therefor by Landlord or Mortgagee.

Notwithstanding any provision of this Lease to the contrary, provided that (i) no Default has occurred and is continuing under this Lease, (ii) neither Landlord nor Mortgagee will be exposed or subjected to civil or criminal liability, and (iii) the respective interests of Landlord and Mortgagee in the Leased Premises is not jeopardized or in any way adversely affected, Tenant may contest or cause to be contested, by appropriate action, the application, interpretation or validity of any Environmental Laws or any agreement requiring any Remedial Work pursuant to a good faith dispute regarding such application, interpretation or validity of such Environmental Laws or agreement requiring such Remedial Work. During the pendency of any such permitted contest, Tenant may delay performance Remedial Work or compliance with the Environmental Laws or agreement requiring such Remedial Work, provided that (i) Tenant actually contests and prosecutes such contest by appropriate proceedings conducted in good faith and with due diligence to resolution, (ii) prior to any such delay in compliance with any Environmental Laws or any Remedial Work requirement on the basis of a good faith contest of such requirement, Tenant will have given Landlord and Mortgagee written notice that Tenant intends to contest or will contest or cause to be contested the same, and will have given such security or assurances as Landlord or Mortgagee reasonably may request to ensure compliance with the Legal Requirements pertaining to the Remedial Work (and payment of all costs, expenses, interest and penalties in connection therewith) and to prevent any sale, forfeiture or loss of all or any part of the Leased

Premises by reason of such noncompliance, delay or contest, and (iii) prior to any such delay in compliance with any Environmental Laws or any Remedial Work requirement on the basis of a good faith contest of such requirement, Tenant will have taken such steps as may necessary to prevent or mitigate any continuing occurrence of any existing or suspected Hazardous Condition giving rise to the contested Remedial Work requirement. Subject to the terms and conditions set forth above, during the pendency of any such permitted contest resulting in a delay of performance of any required Remedial Work, Landlord agrees that it will not perform such Remedial Work requirement on behalf of Tenant.

The foregoing provisions shall survive the expiration or earlier termination of this Lease, but shall finally terminate and cease upon the expiration of any applicable statute of limitation of actions as to any potential and unasserted Claim.

20.   **INDEMNIFICATION.** Tenant agrees, at its sole cost and expense, to pay, protect, indemnify, save and hold harmless Landlord and Mortgagee from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising in or about the Leased Premises during the Term or Extended Term, whether or not arising from (i) any injury to, or death of, any person, or any loss of, or damage to, any property on the Leased Premises, or on adjoining sidewalks, streets or ways, or connected with the use, condition or occupancy thereof (unless caused by the active negligence or improper conduct of Landlord or Mortgagee), whether or not Landlord or Mortgagee has or should have knowledge or notice of the defect or conditions causing or contributing to such injury, death, loss or damage, (ii) any Claims, (iii) any Default under this Lease, or any violation by Tenant of any provision of any contract or agreement to which Tenant is a party or by which it is bound, affecting this Lease or the Leased Premises, or (iv) any contest referred to in paragraph 18 or 19.  The obligations of Tenant under this paragraph 20 shall survive the expiration or termination of this Lease until the expiration of the applicable statute of limitations for such action.

21.   **UNCONDITIONAL PAYMENT OBLIGATION; NON-TERMINABILITY.**

(a)   No Termination of Lease; No Defense to Tenant's Obligations. Except as otherwise expressly provided in this Lease, this Lease shall not terminate nor shall Tenant have any right to terminate this Lease, nor shall Tenant be entitled to any setoff, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, nor shall the obligations of Tenant under this Lease be affected, any present or future law to the contrary notwithstanding, by reason of: (i) any damage to or destruction of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of the Leased Premises,

(iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of the Leased Premises other than pursuant to paragraphs 9 or 10, (vi) any Default on the part of Landlord hereunder or under any other agreement, (vii) any latent or other defect in, or any theft or loss of, the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Landlord's Equipment, or (ix) any other cause whether similar or dissimilar to the foregoing.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected for any reason, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

(b)    Continuing Obligations of Tenant.  Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided in this Lease, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, or (ii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord in any proceeding under the Federal Bankruptcy Act or any similar federal or state law, or by any trustee, receiver or liquidator of Landlord or by any court in any such proceeding.

(c)    Tenant's Waivers.  Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or the Leased Premises, and (ii) to any setoff, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein.

22.   DEFAULT PROVISIONS.

(a)    Events of Default.  The occurrence of any one or more of the following shall constitute an Event of Default under this Lease: (i) if any installment of Basic Rent or any payment of Additional Rent due from Tenant is an Overdue Payment that is not paid within 10 days following the due date thereof; (ii) a failure by Tenant to duly perform and observe, or a violation or breach of, any other provision hereof which failure, violation or breach shall continue for a period of 30 days after notice to Tenant thereof; provided that if such failure, violation or breach cannot be cured by mere payment of money and cannot with diligence be cured within such 30-day period, the period to cure such failure, violation or breach shall be extended for such longer period of time, not to exceed 1 year from the date of such failure, violation or breach,

as is reasonably necessary to cure such failure, violation or breach so long as Tenant shall commence to cure such failure, violation or breach within said 30-day period and actively, diligently and in good faith proceed with continued curing thereof until it shall be fully cured; (iii) any representation or warranty made by Tenant or Guarantor in this Lease, the Guaranty or any other document delivered in connection with the execution and delivery of this Lease or the Guaranty proves to be incorrect in any material respect; (iv) Tenant or Guarantor shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) seek or consent to the appointment of a receiver or trustee for Tenant, Guarantor or the Leased Premises, (C) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, (D) make a general assignment for the benefit of creditors, or (E) admit in writing its inability to pay its debts as they mature; (v) a court shall enter an order, judgment or decree appointing a receiver or trustee for Tenant, Guarantor or the Leased Premises or approving a petition filed against Tenant or Guarantor which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, 60 days after it is entered; (vi) Tenant or Guarantor shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution; (vii) the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such proceeding shall not be vacated or discharged within sixty 60 days after such levy or attachment; (viii) Guarantor shall default under the Guaranty; or (ix) the Leased Premises shall have been left unattended and without adequate security for a period in excess of 30 consecutive days (it being understood, however, that the foregoing provision shall not be construed to prohibit Tenant from vacating the Leased Premises as long as the Leased Premises are reasonably secure from unauthorized entry during periods of vacancy).

(b)     Landlord's Remedies Upon Tenant Default.  If an Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter during the continuance of such Event of Default, to do any one or more of the following without demand upon or notice to Tenant:

(i)     Landlord may give Tenant notice of Landlord's intention to terminate this Lease on a date specified in such notice.  Upon the date therein specified, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date hereinbefore fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder, including its liability for Basic Rent, Additional Rent or any other sums payable under this Lease, as hereinafter provided.

(ii)     Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (i) above, (x) give Tenant

notice to surrender the Leased Premises to Landlord immediately or on a date specified in such notice, at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord, or (y) reenter and repossess the Leased Premises by summary proceedings, ejectment or any other means or procedure.  Upon or at any time after taking possession of the Leased Premises, Landlord may remove any persons or property therefrom.  Landlord shall be under no liability for, or by reason of, any such entry, repossession or removal.  No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (i) above.

(iii)    After repossession of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord shall have the right to relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine; and Landlord may collect and receive any rents payable by reason of such reletting.  Landlord shall not be responsible or liable for any failure to relet the Leased Premises or any part thereof or for any failure to collect any rent due upon any such reletting.  Landlord may make such Alterations as Landlord in its sole discretion may deem advisable.  Tenant agrees to pay Landlord, as Additional Rent, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting the Leased Premises, including reasonable fees and commissions of attorneys, architects, agents and brokers.

(iv)    Landlord may exercise any other right or remedy now or hereafter existing by law or in equity.

(c)    No Relief of Obligations.  No expiration or termination of this Lease, or repossession or reletting of the Leased Premises pursuant to this paragraph 22 or any other provision of this Lease, by operation of law or otherwise, shall relieve Tenant of any of its liabilities and obligations hereunder, including the liability for payment of Basic Rent, Additional Rent and all other sums payable hereunder, all of which shall survive such expiration, termination, repossession or reletting.

(d)    Current Damages.  In the event of any expiration or termination of this Lease or repossession of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord all Basic Rent,

all Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages (i) all Basic Rent, all Additional Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to this paragraph 22, after deducting from such proceeds all of Landlord's expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alterations and expenses of preparation for reletting). Tenant hereby agrees to be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages. Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(c)    Liquidated Final Damages. At any time after any such expiration or termination of the Term or repossession of the Leased Premises by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any current damages pursuant to this paragraph 22, Landlord shall be entitled to recover from Tenant, and Tenant will pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's Default and in lieu of all current damages beyond the date of such demand it being agreed that it would be impracticable or extremely difficult to fix the actual damages and it being further agreed that the amount herein described is a reasonable estimate of the amount of Landlord's probable damages), an amount equal to the excess, if any, of (i) the Basic Rent, Additional Rent and other sums which would be payable under this Lease from the date of such demand (or, if it be earlier, the date to which Tenant shall have satisfied in full its obligations under this paragraph 22 to pay current damages) for what would be the then unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of 5% per annum over (ii) the then fair net rental value of the Leased Premises for the same period and (y) an amount equal to the then applicable Make-Whole Amount, if any, payable to the Mortgagee. The discount rate to be used in determining such fair rental value shall be 5% per annum. If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(f)    <u>Alternative Liquidated Final Damages</u>.  At any time after any such expiration or termination of the Term or repossession of the Leased Premises by reason of the occurrence of an Event of Default, whether or not Landlord shall have collected any current damages pursuant to this <u>paragraph 22</u>, as an alterative to <u>paragraph 22(e)</u> Landlord shall be entitled to recover from Tenant, and Tenant will pay to Landlord on demand, as and for liquidated and agreed final damages for Tenant's Default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages and it being further agreed that the amount herein described is a reasonable estimate of the amount of Landlord's probable damages), an amount equal to the purchase price which Tenant would be obligated to pay as the purchase price for the Leased Premises pursuant to <u>Exhibit F</u> had Tenant made a Purchase Offer pursuant to <u>paragraph 29</u> to purchase the Leased Premises on the date of the earlier of such termination of the Term or the date of such demand and such Purchase Offer had been accepted.  If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, then Landlord shall be entitled to the maximum amount allowable under such statute or rule of law. If Landlord elects to recover the liquidated final damages amount in accordance with this <u>subparagraph (f)</u>, then, at Tenant's request, Landlord shall reconvey the Leased Premises to Tenant upon Tenant's payment of such liquidated final damages amount, such reconveyance to be made substantially in accordance with the provisions of <u>paragraph 9</u> above, except that such liquidated final damages amount shall be the consideration paid in lieu of the purchase price contemplated in such paragraph.

23.    **ADDITIONAL RIGHTS OF LANDLORD.**

(a)    <u>Non-Exclusive, Cumulative Remedies</u>.  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease.  No delay or failure by Landlord to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.  In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)    <u>Tenant's Waiver of Redemption</u>.  Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or

of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future law which exempts property from liability for debt or for distress for rent.

(c)    Costs Upon Default and Litigation.    Tenant shall pay to Landlord and Mortgagee as Additional Rent all the expenses incurred by Landlord or Mortgagee in connection with any Default or Event of Default or the exercise of any remedy by reason of any Default or Event of Default, including reasonable attorneys' fees and expenses.    If Landlord or Mortgagee shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or the Leased Premises, at the option of Landlord and Mortgagee, Tenant, at its expense, shall provide Landlord or Mortgagee with counsel approved by Landlord and Mortgagee and shall pay all costs incurred or paid by Landlord and Mortgagee in connection with such litigation.

24.    NOTICES.    All notices, requests, consents, demands, offers and other communications required or permitted to be given pursuant to this Lease shall be in writing and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telefax, the day when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party prior to or during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if after normal business hours for the recipient; (iii) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same, addressed to Landlord or Tenant at their respective addresses stated in the introductory paragraph of this Lease, or addressed to Mortgagee or Guarantor at their respective addresses stated below:

If to Mortgagee:    First Security Bank, Trustee
                    79 South Main Street
                    Salt Lake City, Utah  84111
                    Attention: Val T. Norton
                    Telefax No. 801-246-5053

If to Guarantor:    Winn-Dixie Stores, Inc.
                    5050 Edgewood Court
                    Jacksonville, Florida  32254
                    Attention: General Counsel
                    Telefax No. 904-783-5294

For the purposes of this paragraph 24, any person may substitute its address by giving 15 days' notice to the other persons in the manner provided above.

25.   **ESTOPPEL CERTIFICATE.** Landlord and Tenant shall, at any time and from time to time, upon not less than 20 days' prior request by the other, execute, acknowledge and deliver to the other, an estoppel certificate substantially in the form attached as Exhibit G. It is intended that any such statements may be relied upon by Mortgagee, the recipient of such statements or their assignees, or by any prospective purchaser or mortgagee of the Leased Premises.

26.   **SURRENDER AND HOLDING OVER.** Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except for any portion thereof with respect to which this Lease has previously terminated) to Landlord in broom clean condition, and otherwise in the same condition in which the Leased Premises were originally received from Landlord on the Commencement Date, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear. Tenant shall remove from the Leased Premises on or prior to such expiration or earlier termination all property situated thereon which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Property not so removed at the end of the Term or within 30 days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property and repairing any damage to the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof shall operate and be construed as a tenancy from month to month only, at double the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over shall entitle Landlord, in addition to collecting double rentals, to exercise all rights and remedies provided by law or in equity, including the remedies of paragraph 22(b).

27.   **NO MERGER OF TITLE.** There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or

ownership of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (ii) the fee estate or ownership of the Leased Premises or any interest in such fee estate or ownership.    No such merger shall occur unless and until all persons, corporations, firms and other entities (including any Mortgagee) having any interest in (x) this Lease or the leasehold estate created by this Lease, and (y) the fee estate in or ownership of the Leased Premises sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

### 28.    ALTERATION AND EXPANSION.

(a)    <u>Alterations</u>.  Tenant may, at its expense make any Alterations, construct upon the Land any additions to the Improvements or install equipment in the Improvements or accessions to the Landlord's Equipment without Landlord's consent, provided that (i) the character of the Leased Premises shall not be materially changed and the market value of the Leased Premises shall not be materially lessened by any such Alteration, construction or installation (it being agreed that any expansion or enlargement referred to in <u>subparagraph (b)</u> below shall not be deemed to constitute a material change in the character of the Leased Premises), nor shall the usefulness or structural integrity of the Leased Premises be impaired thereby, (ii) all such work of Alteration, construction and installation shall be performed in a good and workmanlike manner, (iii) all such Alterations, construction and installation shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with any such Alteration, construction or installation shall comply with the requirements of any insurance policy required to be maintained by Tenant hereunder, (v) Tenant shall promptly pay all costs and expenses of any such Alteration, construction or installation, and Tenant shall discharge all Liens filed against the Leased Premises arising out of the same, and (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, construction or installation.  In the case of any other proposed Alteration, construction or installation, Tenant shall first obtain Landlord's and Mortgagee's consents, which consents may be withheld in Landlord's or Mortgagee's sole discretion.  All such Alterations, construction and installations (except Tenant's Equipment) shall be the property of Landlord and shall be subject to this Lease.

(b)    <u>Expansion</u>.  It is understood that Tenant may at future times during the Term wish to enlarge the Improvements by constructing Alterations and additions thereto and that such enlarging may require purchase of additional land.  Tenant shall have the sole responsibility for negotiating and providing for the purchase, renovation and construction of such Alterations and

additions and of such land as is necessary for its expansion plans. If Tenant is able to obtain agreements for the purchase of such additional land and contracts for the Alterations and additions at a cost satisfactory to it, Tenant may then request that Landlord purchase such Alterations, additions and land and incorporate the same into this Lease upon terms and conditions negotiated by the parties; provided, however, that Landlord shall have no obligation to purchase such Alterations, additions and land. If the parties are unable to agree, then Tenant shall have the right to construct Alterations and additions at its own expense and to make such changes as are necessary to make the entire enlarged building suitable for use and occupancy by Tenant in the conduct of its business; but Tenant shall not have the right to mortgage or pledge this Lease or the leasehold estate created hereby or its interest in such Alterations to finance such Alterations.    Prior to commencement of construction of such Alterations, Tenant shall provide Landlord and Mortgagee with a set of plans and specifications for such Alterations.    Following substantial completion of such Alterations, Tenant shall provide Landlord and Mortgagee with (i) copies of certificates of occupancy or completion, if required by Legal Requirements, and (ii) an as-built survey of the Alterations and additional land demonstrating that the Alterations do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises or the additional land. Subject to the following sentence, all such Alterations and additions and such land shall be subject to the terms of this Lease to the same extent as if owned by Landlord and leased under this Lease. With respect to Alterations constructed on land other than the Land, if Tenant can demonstrate, to the reasonable satisfaction of Landlord and Mortgagee, that the original Leased Premises, prior to any such Alterations, reasonably can be operated as an economic unit separate and apart from such Alterations in compliance with Legal Requirements and with relatively minor modifications to permit such separate operation, then such separate Alterations and land shall not be considered part of or subject to this Lease. Except as provided in the preceding sentence, at the end of the Term of this Lease, title to such Alterations, additions and land as necessary to meet any Legal Requirements shall pass to Landlord without cost or expense to Landlord, Tenant shall execute additional documents as necessary to complete such transfer, and Tenant shall provide a title insurance policy insuring Landlord's fee simple title interest in such additional land. If title to such Alterations, additions and land is to be retained by Tenant at the end of the Term of this Lease, then, not earlier than 240 days, and not later than 60 days, prior to the end of the Term of this Lease, Tenant shall make such alterations, or construct or erect such improvements, as may be necessary to divide the Leased Premises and such Alterations and land into separate units in compliance with the requirements set forth above and Legal Requirements.    Following substantial completion of such dividing improvements, Tenant shall provide Landlord and Mortgagee with (i) a copy of a new certificate of occupancy or completion for the Leased Premises, if required by Legal Requirements, and (ii)

an as-built survey of the dividing improvements demonstrating that the centerline of the dividing improvements is constructed on the common boundary of the Leased Premises and additional land owned by Tenant.

29.   **CHANGE OF CONTROL.** In the event that, at any time during the Initial Term, a Change of Control shall occur, Tenant shall, not later than 30 days after such Change of Control, give to Landlord a Purchase Offer, at a price determined in accordance with Exhibit F. Unless Landlord shall accept such Purchase Offer by notice to Tenant given not later than the tenth day prior to the Termination Date specified in such Purchase Offer, this Lease shall remain in full force and effect. Unless Landlord shall have accepted such Purchase Offer by notice to Tenant given not later than the tenth day prior to the Termination Date, Landlord shall be conclusively presumed to have rejected such Purchase Offer. If Landlord shall so accept such Purchase Offer, Landlord shall transfer and convey the Leased Premises to Tenant or its designee upon the terms and provisions set forth in paragraph 9, against payment by Tenant of the purchase price therefor and all installments of Basic Rent, all Additional Rent and all other sums then due and payable under this Lease to and including such Termination Date. If at any time during the Initial Term a Change of Control shall occur, Tenant shall immediately notify Landlord of such Change of Control, which notice shall include a Purchase Offer to purchase the Leased Premises on the Termination Date specified in such Purchase Offer.

30.   **MISCELLANEOUS.** The paragraph headings in this Lease and the Table of Contents preceding this Lease are for convenience only and are not to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease, the singular shall include the plural as the context requires, and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; and (iii) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition". Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought. The covenants of this Lease shall run with the land and bind Tenant and all successors and assigns of Tenant and shall inure to the benefit of and bind Landlord, its successors and assigns. If any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Lease may be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes. This Lease shall be governed by and construed according to the laws of the State. All Exhibits and attachments to this Lease are by reference incorporated into, and form a part of, this Lease. A

memorandum of this Lease substantially in the form attached as <u>Exhibit H</u> shall be recorded in the records of the appropriate public office having custody of the real property records of the county in which the Leased Premises is located.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

Witnesses:                                    LANDLORD:

                                              **CHESTER DIX FLORENCE CORP.,**
                                              a Delaware corporation

Name: _TERESA H. WEBB_                        By: _____

Name: _Maryann T. Huddleston_                      Irwin Reicher, President

                                                   [CORPORATE SEAL]


                                              TENANT:

                                              **WINN-DIXIE MIDWEST, INC.,**
                                              a Florida corporation

Name: _Teresa H. Webb_                        By: ___X.P. McGah_____

Name: _____                Name: _____

                                              Title: _____ President

                                                   [CORPORATE SEAL]

# EXHIBIT A - SCHEDULE OF DEFINED TERMS

"Additional Rent" shall have the meaning assigned to such term in paragraph 5(b) of this Lease.

"Affiliate" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with any other specified person.

"Alterations" means all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of, and all substitutions or replacements for, any of the Improvements or Landlord's Equipment, whether interior or exterior, structural or non-structural, or ordinary or extraordinary.

"Assignment" means an assignment of this Lease and any related Guaranty executed by Landlord in favor of a Mortgagee.

"Basic Rent" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Basic Rent Payment Dates" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Business Day" means any day on which financial institutions located in New York, New York, are open for regular business.

"Change of Control" means the acquisition by any person or more than one person, acting in concert, together with any Affiliates thereof, of (i) 50% or more of the beneficial interest in the voting capital stock of Winn-Dixie or (ii) the control of a majority of Winn-Dixie's Board of Directors, provided that such acquisition or control, directly or indirectly, by the Davis Family or Affiliates thereof shall not constitute a Change of Control. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing. "Davis Family" means relatives (by birth or marriage) and descendants of Mr. A.D. Davis, Mr. James E. Davis, Mr. M. Austin Davis and Tine W. Davis, trusts, estates, corporations and other entities involving any of them and their associates whether now living or existing or hereafter coming into existence.

"Claims" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable

attorneys' fees and costs, whether incurred in enforcing this Lease, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with any Default, or the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Lease or caused by any person or entity.  Without limiting the generality of the foregoing definition, Claims specifically will include claims, whether by related or third parties, for personal injury or real or personal property damage, and capital, operating and maintenance costs incurred in connection with any Remedial Work.  However, notwithstanding the foregoing, Claims will not be deemed to include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with any (i) Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of the Tenant after an Event of Default has occurred or after expiration of the Term, or (ii) solely as to Tenant's indemnification of Landlord (and with no effect whatsoever on that indemnification of Mortgagee) as provided in paragraph 20, any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord during the Term.

"Commencement Date" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Condemnation" means a Taking or a Requisition.

"Construction Requirements" if applicable, are set forth in Exhibit I.

"Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with the construction and acquisition of the Leased Premises, including, without limitation, all fees and expenses in connection with the placement, issuance and sale of the Note and any interim financing of the Leased Premises, title transfer fees, title insurance premiums and recording expenses and taxes (including transfer taxes), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction and fees to and disbursements of professionals such as attorneys, architects, engineers and surveyors.

"Default" shall mean any breach of any term, covenant or condition of, or obligation under, this Lease which, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean an interest rate of 9.12% per annum.

"Environmental Laws" will mean any applicable present or future federal, state or local laws, ordinances, rules or regulations pertaining to Hazardous Substances, industrial hygiene or environmental conditions, including without limitation the following statutes and regulations, as amended from time to time: (i) the Federal Clean Air Act, 42 U.S.C. Section 7401 et seq.; (ii) the Federal Clean Water Act, 33 U.S.C. Section 1151 et seq.; (iii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); (iv) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("SARA"); (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; (vi) the National Environment Policy Act, 42 U.S.C. Section 1857 et seq.; (vii) The Toxic Substance Control Act of 1976, 15 U.S.C. Section 2601 et seq.; (viii) the regulations of the Environmental Protection Agency, 33 CFR and 40 CFR; (ix) regulations of the Occupational Safety and Health Administration ("OSHA") relating to asbestos; and (x) similar statutes, rules and regulations of the State.

"Event of Default" means the occurrence of any of the events described in paragraph 22(a) of this Lease, and the giving of notice or the passage of any applicable grace or cure period, or both, as provided in said paragraph.

"Extended Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Guarantor" means Winn-Dixie; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guarantor in this Lease shall be deemed deleted and of no effect.

"Guaranty" means the guaranty of this Lease, dated this date, executed by Guarantor in favor of Landlord; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guaranty in this Lease shall be deemed deleted and of no effect.

"Hazardous Condition" will mean the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or that migrates, flows, percolates, diffuses or in any way moves onto or into the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or from the Leased Premises into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials,

friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant, or animal health or well-being, and those substances, materials, and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws.

"Impositions" shall have the meaning assigned to such term in paragraph 11(a) of this Lease.

"Improvements" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Initial Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Land" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Landlord" shall have the meaning assigned to such term in the introductory paragraph of this Lease.

"Landlord's Assignee" shall mean a Mortgagee which takes an Assignment as additional collateral for its loan to Landlord.

"Landlord's Equipment" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Lease" shall have the meaning assigned to such term in the introductory paragraph of this Lease and shall include all supplements and amendments permitted by this Lease and any Assignment as well as any memoranda of this Lease or any such supplement or amendment.

"Leased Premises" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Legal Requirements" means all present and future laws (including Environmental Laws), codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision), and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith necessitates structural changes or Improvements or results in interference with the use or enjoyment of the Leased Premises.

"Lien" means charge, encumbrance, title retention agreement, pledge, lien, security interest, mortgage and/or deed of trust.

"Make-Whole Amount" means the greater of (x) the amount, if any, by which (i) the present value of all future payments of principal and interest due on that portion of the unpaid principal amount of the Note to be prepaid, payable from the date of prepayment to the Maturity Date calculated by discounting each such future payment from the due date thereof to such date of prepayment at a rate per annum equal to 50 basis points over the Treasury Constant Maturity Yield Index exceeds (ii) 100% of that portion of the principal amount of the Note to be prepaid on the date of prepayment and (y) 0.5% of the amount of principal to be so prepaid.

"Maturity Date" means the maturity date of the Mortgage.

"Mortgage" means a first mortgage, deed of trust, deed to secure debt or similar security instrument creating a Lien on the Leased Premises in favor of a Mortgagee.

"Mortgagee" means a person or entity which is the holder of a Note of Landlord, secured by a Mortgage and an Assignment; however, if there is no Mortgagee, then any reference to Mortgagee or Mortgage in this Lease shall be deemed deleted and of no effect except to the extent that the context of this Lease contemplates that Mortgagee will act as an escrow agent for the holding and disposition of any Net Award or Net Proceeds, in which event such term shall be deemed to refer to a title insurance company or financial institution, reasonably acceptable to Landlord and Tenant, serving as escrow agent for the purposes contemplated in this Lease.

"Net Award" means the entire award payable by reason of a Condemnation, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such award, and less any portion of such award retained by Tenant pursuant to paragraph 14.

"Net Proceeds" means the entire proceeds of any insurance required under paragraph 12, together with any self insurance payment required of Tenant, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such proceeds or payment.

"Note" means a secured note or promissory note executed by Landlord in favor of Mortgagee secured by a Mortgage and an Assignment.

"Overdue Payment" means any installment of Basic Rent or any payment of Additional Rent (including Additional Rent which Landlord or Mortgagee shall have paid on behalf of Tenant) due from Tenant that is not paid by the due date thereof.

"Permitted Encumbrances" means:

    (i)    easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other defects and irregularities in the title to the Leased Premises, none of which materially lessens the value of the Leased Premises or materially impairs the use of the Leased Premises for the purposes held by Tenant;

    (ii)    matters identified as exceptions to title in the mortgagee title insurance policy delivered to and accepted by any Mortgagee on the Commencement Date;

    (iii)    any condemnation right reserved to or vested in any municipality or public authority with respect to the Leased Premises; and

    (iv)    any Liens for Impositions not then delinquent and any Liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Leased Premises which are not then overdue or the amount or validity of which is being contested by Tenant pursuant to, and as permitted by, paragraph 18.

"Purchase Offer" means an irrevocable offer by Tenant to Landlord to purchase the Leased Premises on the Termination Date specified therein and, in case a Purchase Offer is made pursuant to paragraph 13(b) or 14(b), any Net Proceeds or Net Award, as applicable, and at the purchase price therefor determined pursuant to Exhibit F.

"Remedial Work" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person due to the existence or suspected existence of a Hazardous Condition.

"Replaced Equipment" shall have the meaning assigned to such term in paragraph 7(c) of this Lease.

"Replacement Equipment" shall have the meaning assigned to such term in paragraph 7(c) of this Lease.

"Requisition" means any temporary requisition or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"State" means the state in which the Leased Premises is located.

"Substitute Assignment" shall have the meaning assigned to such term in paragraph 10(f) of this Lease.

"Substitute Guaranty" shall have the meaning assigned to such term in paragraph 10(f) of this Lease; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Substitute Guaranty in this Lease shall be deemed deleted and of no effect.

"Substitute Lease" shall have the meaning assigned to such term in paragraph 10(f) of this Lease.

"Substitute Mortgage" shall have the meaning assigned to such term in paragraph 10(f) of this Lease.

"Substitute Note" shall have the meaning assigned to such term in paragraph 10(f) of this Lease.

"Substitute Property" shall have the meaning assigned to such term in paragraph 10 of this Lease.

"Substitution Date" means the date on which Landlord and Tenant effectuate the substitution of the Leased Premises for another premises pursuant to the Substitution Option.

"Substitution Option" means any right Tenant may have to substitute other premises for the Leased Premises pursuant to paragraph 10 and paragraph 13, 14 or 15 of this Lease.

"Taking" means any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of

any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

"Tenant" means the Tenant named in the introductory paragraph of this Lease together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Tenant's Business" means the business of operating retail food stores, commonly referred to as supermarkets, with grocery, delicatessen, bakery, meat and seafood, vegetable/fruit/produce, and beer and wine sales operations, and sometimes including in-store pharmacy, photo lab, automated teller and/or bank, and dry-cleaning operations or concessions.

"Tenant's Equipment" shall have the meaning assigned to such term in ` of this Lease.

"Term" means the Initial Term, any Extended Term or the Initial Term together with any Extended Term.

"Termination Date" means the Basic Rent Payment Date established in Tenant's Purchase Offer given pursuant to paragraph 13(g), 14(b), 15 or 29 of this Lease, as the termination date of this Lease pursuant to any such paragraph, which date shall be not less than 120 days nor more than 240 days after the effective date of such notice to Landlord.

"Treasury Constant Maturity Yield Index" means (i) the yields reported, as of 10:00 a.m. (New York City time) on the third Business Day preceding the date of prepayment, on the display designated as "USD" on the Bloomberg Financial Markets Commodities News Screen or the equivalent screen provided by Bloomberg Financial Markets News (or any nationally recognized publicly available on-line source of similar market data) for actively traded U.S. Treasury securities having a maturity equal to the remaining average life of the Note, or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day  for which such yields have been so reported as of the third Business Day preceding the date of prepayment, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury Securities having a maturity equal to the remaining life of the Note.  Such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security having a maturity closest to and greater than the

remaining life of the Note and (2) the actively traded U.S. Treasury security having a maturity closest to and less than the remaining life of the Note.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

EXHIBIT B


GROUP NUMBER:    3323
PLAT SLIDE:      262-A

Parcel 1:

Being all of Parcel #1, Turfway Commercial Park, Section Six, as
shown on Plat Slide 262-A of the Boone County Clerk's records at
Burlington, Kentucky.

There is excepted from the aforedescribed property that parcel
conveyed to R.W. DEVELOPMENT, INC. by Deed recorded in Deed Book
592, Page 191 of the Boone County Clerk's records at Burlington,
Kentucky, being more particularly described as follows:

Beginning at a point on the north right of way line of Kentucky
Highway #18 at the southwest corner of a tract of land conveyed
to Frisch's Restaurant, Inc., in Deed Book 309, Page 231, as
recorded in the Office of the Boone County Court Clerk at
Burlington, Kentucky; thence with the north right of way line of
Kentucky Highway #18, S 49-38-50 W, 250.12 feet to a point;
thence S 41-54-11 W, 72.85 feet to the true point of beginning;
thence leaving the north right of way line of Kentucky Highway
#18, N 40-21-10 W, 132.59 feet to a point; thence N 49-34-59 E,
0.49 feet to a point; thence S 40-25-13 E, 67.71 feet to a point;
thence S 39-50-56 E, 64.88 feet to the true point of beginning,
containing 54.45 square feet.


Parcel 2:

Beginning at a point on the north right of way line of Kentucky
Highway #18 at the southwest corner of a tract of land conveyed
to Frisch's Restaurant, Inc., in Deed Book 309, Page 231, as
recorded in the Office of the Boone County Court Clerk at
Burlington, Kentucky; thence with the north right of way line of
Kentucky Highway #18, S 49-38-50 W, 250.12 feet to a point;
thence S 41-54-11 W, 72.85 feet to a point; thence leaving the
north right of way line of Kentucky Highway #18, N 40-21-10 W,
132.82 feet to the true point of beginning; thence S 40-21-10 E,
0.23 feet to a point; thence S 49-34-59 W, 166.33 feet to a
point; thence N 40-21-10 W, 0.42 feet to a point; thence N 49-38-
50 E, 166.33 feet to the true point of beginning, containing
54.45 square feet.

The aforedescribed Parcels 1 and 2 are also described as follows:

Beginning at a point, being the intersection of the southwest
right of way line of Turfway Road and the northwest right of way
line of Kentucky Highway No. 18; thence with the right of way
line of Kentucky Highway No. 18 S 46-29-56 W, 149.54 feet to a

point and S 49-38-50 W, 141.58 feet to the point of beginning.
Thence with the right of way line of Kentucky Highway No. 18 S
49-38-50 W, 250.12 feet to a point; thence along a chord S 41-54-
11 W, 72.85 feet to a point; thence leaving said right of way N
39-50-56 W, 64.88 feet to a point; thence N 40-25-13 W, 67.71
feet to a point; thence S 49-34-59 W, 166.82 feet to a point;
thence S 40-21-10 E, 159.87 feet to a point in northwest right of
way line of Kentucky Highway No. 18; thence with the right of way
line of Kentucky Highway No. 18, S 34-35-22 W, 51.32 feet to a
point; thence along a curve to the left, with a radius of 623.00
feet, the chord of which is S 37-03-03 W, 5.19 feet to a point;
thence with the northeast right of way line of Cavalier
Boulevard, along a curve to the right, with a radius of 25.00
feet, the chord of which is S 78-42-45 W, 33.39 feet to a point;
thence N 59-23-21 W, 42.79 feet to a point; thence along a curve
to the right, with a radius of 255.00 feet, the chord of which is
N 50-23-21 W, 79.78 feet to a point; thence N 41-23-21 W, 81.11
feet to a point; thence along a curve to the left, with a radius
of 275.00 feet, the chord of which is N 58-18-34 W, 159.77 feet
to a point; thence with the eastern right of way line of Cavalier
Court, along a curve to the right, with a radius of 25.00 feet,
the chord of which is N 36-25-15 W, 31.29 feet to a point, thence
N 02-19-21 E, 139.60 feet to a point; thence leaving said right
of way N 50-36-39 E, 209.94 feet to a point; thence N 05-55-04 W,
114.48 feet to a point; thence N 42-29-20 E, 69.10 feet to a
point; thence N 29-15-42 E, 138.02 feet to a point; thence N 29-
39-18 W, 131.39 feet to a point; thence N 66-34-34 E, 100.58 feet
to a point; thence S 29-39-18 E, 118.62 feet to a point; thence S
10-32-49 E, 155.02 feet to a point; thence S 40-21-10 E, 18.91
feet to a point; thence N 49-38-50 E, 110.00 feet to a point;
thence along a curve to the left with a radius of 100.00 feet,
the chord of which is N 42-37-04 E, 24.48 feet to a point; thence
N 35-35-18 E, 78.78 feet to a point; thence along a curve to the
right, with a radius of 100.00 feet, the chord of which is N 42-
37-04 E, 24.48 feet to a point; thence N 49-38-50 E, 114.48 feet
to a point in the southwest right of way line of Turfway Road;
thence with the right of way line of Turfway Road S 42-37-26 E,
141.24 feet to a point; thence leaving said right of way S 49-38-
50 E, 50.57 feet to a point; thence N 40-21-10 W, 76.00 feet to a
point; thence along a curve to the left, with a radius of 15.00
feet, the chord of which is N 85-21-10 W, 21.21 feet to a point;
thence S 49-38-50 W, 239.00 feet to a point; thence along a curve
the left, with a radius of 15.00 feet, the chord of which is S
04-38-50 W, 21.21 feet to a point; thence S 40-21-10 E, 76.00
feet to a point; thence N 49-38-50 E, 24.50 feet to a point;
thence S 40-21-10 E, 312.00 feet to the point of beginning.  This
tract contains 7.29 acres of land.

Together with those easements benefiting the aforedescribed
property and by virtue of that Cross-Easements and Restrictive
Covenants Agreement dated as of August 16, 1994 and recorded in
Easement Book 36, Page 259 as amended by Amendment to Cross-
Easements and Restrictive Covenants Agreement recorded in
Miscellaneous Book 507, Page 183 and as further amended by Cross-

Easements and Restrictive Covenants Agreement dated May 2, 1995 and recorded in Miscellaneous Book 507, Page 183 and as further amended by Cross-Easements and Restrictive Covenants Agreement dated December 22, 1995 and recorded in Easement Book 40, Page 225 and those Easements benefiting the aforedescribed property by virtue of that Cross-Easements and Restrictive Covenants Agreement dated March 31, 1994 and recorded in Easement Book 35, Page 133, all references being to the Boone County Clerk's records at Burlington, Kentucky.

## EXHIBIT C - LANDLORD'S EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements, but excluding Tenant's Equipment.

JK2 86878.1 80130 00867
12/30/96 6:51 pm

Florence, Kentucky

EXHIBIT D - TENANT'S EQUIPMENT

   All coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty belonging to Tenant.

JK2 86878.1 80130 00867
12/30/96 6:51 pm

Florence, Kentucky

EXHIBIT E - SCHEDULE OF RENT

Basic Rent payable on January 1, 1997 shall be $113,739.41.

Basic Rent during the remainder of the Initial Term shall be $451,099.84 per annum, payable quarterly on the first day of January, April, June and September of each calendar year, commencing April 1, 1997, and continuing thereafter throughout the Initial Term, in equal installments of $112,774.96.

Basic Rent during any Extended Term shall be $354,060.92 per annum, payable quarterly on the first day of January, April, June and September of each calendar year, commencing on the first day of the first calendar quarter of such Extended Term and continuing thereafter through each Extended Term(s), in equal installments of $88,515.23.

1701
Florence

## EXHIBIT F - PURCHASE PRICES

The following schedule lists the purchase price on the applicable Termination Date as a percentage of the Cost of the Leased Premises stated below. For a Purchase Offer made pursuant to paragraph 13 or 14 of this Lease, the purchase price is the amount listed below for the applicable Termination Date multiplied by the Cost of the Leased Premises. For a Purchase Offer made pursuant to paragraph 15 or 29 of this Lease, the purchase price is the sum of (a) the amount listed below for the applicable Termination Date multiplied by the Cost of the Leased Premises plus (b) the Make-whole Premium required for prepayment of the Note on the applicable Termination Date.

Cost of the Leased Premises: $5,245,347.00

| Sequential Number | Termination Date | Percentage Amount | Sequential Number | Termination Date | Percentage Amount |
|---|---|---|---|---|---|
| 1 | 1/1/97 | 103.1689% | 41 | 1/1/07 | 88.9570% |
| 2 | 4/1/97 | 102.6832% | 42 | 4/1/07 | 88.4109% |
| 3 | 7/1/97 | 102.3965% | 43 | 7/1/07 | 87.8563% |
| 4 | 10/1/97 | 102.1065% | 44 | 10/1/07 | 87.2930% |
| 5 | 1/1/98 | 101.8132% | 45 | 1/1/08 | 86.7210% |
| 6 | 4/1/98 | 101.5167% | 46 | 4/1/08 | 86.1400% |
| 7 | 7/1/98 | 101.2169% | 47 | 7/1/08 | 85.5499% |
| 8 | 10/1/98 | 100.9138% | 48 | 10/1/08 | 84.9506% |
| 9 | 1/1/99 | 100.6074% | 49 | 1/1/09 | 84.3420% |
| 10 | 4/1/99 | 100.2976% | 50 | 4/1/09 | 83.7239% |
| 11 | 7/1/99 | 99.9846% | 51 | 7/1/09 | 83.0961% |
| 12 | 10/1/99 | 99.6682% | 52 | 10/1/09 | 82.4586% |
| 13 | 1/1/00 | 99.3485% | 53 | 1/1/10 | 81.8112% |
| 14 | 4/1/00 | 99.0255% | 54 | 4/1/10 | 81.1537% |
| 15 | 7/1/00 | 98.6991% | 55 | 7/1/10 | 80.4861% |
| 16 | 10/1/00 | 98.3694% | 56 | 10/1/10 | 79.8080% |
| 17 | 1/1/01 | 98.0364% | 57 | 1/1/11 | 79.1194% |
| 18 | 4/1/01 | 97.7001% | 58 | 4/1/11 | 78.4202% |
| 19 | 7/1/01 | 97.3604% | 59 | 7/1/11 | 77.7101% |
| 20 | 10/1/01 | 97.0175% | 60 | 10/1/11 | 76.9890% |
| 21 | 1/1/02 | 96.6712% | 61 | 1/1/12 | 76.2568% |
| 22 | 4/1/02 | 96.3217% | 62 | 4/1/12 | 75.5132% |
| 23 | 7/1/02 | 95.9688% | 63 | 7/1/12 | 74.7582% |
| 24 | 10/1/02 | 95.6128% | 64 | 10/1/12 | 73.9915% |
| 25 | 1/1/03 | 95.2535% | 65 | 1/1/13 | 73.2130% |
| 26 | 4/1/03 | 94.8909% | 66 | 4/1/13 | 72.4225% |
| 27 | 7/1/03 | 94.5252% | 67 | 7/1/13 | 71.6197% |
| 28 | 10/1/03 | 94.1563% | 68 | 10/1/13 | 70.8047% |
| 29 | 1/1/04 | 93.7843% | 69 | 1/1/14 | 69.9771% |
| 30 | 4/1/04 | 93.4091% | 70 | 4/1/14 | 69.1367% |
| 31 | 7/1/04 | 93.0308% | 71 | 7/1/14 | 68.2835% |
| 32 | 10/1/04 | 92.6496% | 72 | 10/1/14 | 67.4171% |
| 33 | 1/1/05 | 92.2652% | 73 | 1/1/15 | 66.5375% |
| 34 | 4/1/05 | 91.8780% | 74 | 4/1/15 | 65.6444% |
| 35 | 7/1/05 | 91.4878% | 75 | 7/1/15 | 64.7376% |
| 36 | 10/1/05 | 91.0947% | 76 | 10/1/15 | 63.8169% |
| 37 | 1/1/06 | 90.6988% | 77 | 1/1/16 | 62.8821% |
| 38 | 4/1/06 | 90.3001% | 78 | 4/1/16 | 61.9331% |
| 39 | 7/1/06 | 89.8987% | 79 | 7/1/16 | 60.9695% |
| 40 | 10/1/06 | 89.4946% | 80 | 10/1/16 | 59.9912% |

EXHIBIT G - FORM OF ESTOPPEL CERTIFICATE

_____, a _____ [insert "Landlord" or "Tenant" as applicable] hereby certifies to [insert "Landlord" or "Tenant" as applicable], that, as of _____ (the "Certificate Date"), the following is true and correct:

     1.    Winn-Dixie _____, Inc., a _____, is the tenant under a currently effective lease (as amended as described below, the "Lease") with _____, a _____, as the current landlord, dated _____, 199___, conveying a leasehold estate of the property described therein (the "Premises"), and the Lease has been amended or supplemented only as follows:

2.    The term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Tenant is not in material Default under the Lease, and all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199___, and Tenant currently as no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease, except as follows:

4.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Landlord is not in material Default under the Lease, except as follows:

Florence, Kentucky

5.    The Lease contains a right of first refusal in favor of Tenant, and other provisions requiring Tenant to offer to purchase the Premises or to substitute the Premises for other leased premises upon the occurrence of certain events.

6.    [insert Landlord or Tenant, as applicable] has received no notice of any sale, transfer, assignment, or pledge of the interest of [insert Landlord or Tenant, as applicable] in the Lease [or in the case of Landlord's interest, in the rent due thereunder], except as follows:

7.    [insert Landlord or Tenant, as applicable] is not the subject of any transfer for the benefit of creditors, or any bankruptcy or reorganization filing under any applicable bankruptcy law.

   **IN WITNESS WHEREOF,** the undersigned has executed this certificate, which may be relied upon by [insert Landlord or Tenant, as applicable] and any mortgagee, successor or assign of [insert Landlord or Tenant, as applicable].

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

EXHIBIT H - FORM OF MEMORANDUM OF LEASE

[insert document headings as appropriate for recordation]

THIS MEMORANDUM OF LEASE is hereby executed this _____, by and between _____, a _____, whose mailing address is _____, _____ ("Landlord") and _____, a _____ corporation, whose mailing address is _____, _____ ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

W I T N E S S E T H:

WHEREAS, Landlord and Tenant did enter into a Lease, dated as of December ___, 1996 (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on attached Exhibit B and as depicted on the Site Plan attached as Exhibit C, together with all Improvements now or hereafter located thereon (collectively the "Premises").

The term of the lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on December 31, 2016. Annual rent, payable in quarterly installments on the 1st day of each January, April, July and October during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of six (6) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has a right of first refusal to purchase the Premises under the Lease.

The Lease contains the following provision:

Liens. TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE) ON THE LEASED PREMISES OR ANY BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE, WHICH ARISES OR EXISTS FOR ANY REASON, OTHER THAN THE

MORTGAGE, THE ASSIGNMENT, PERMITTED ENCUMBRANCES AND ANY LIEN CREATED BY OR RESULTING FROM ANY ACT BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document.  This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease to be executed as of the date and year first above written.

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

JK2 86878.1 80130 00867
12/30/96 6:51 pm

**Florence, Kentucky**

EXHIBIT I - CONSTRUCTION REQUIREMENTS

If construction of the Improvements and installation of Landlord's Equipment and Tenant's Equipment has not commenced, or has commenced but has not been completed as of the Commencement Date, the following provisions shall apply:

(a)    Tenant shall substantially complete construction of the Improvements in accordance with the Site Plan, in the same manner as if the Improvements were Alterations, and subject to the requirements of paragraph 28 of the Lease.

(b)    Tenant covenants that the Improvements will be substantially completed and ready for operation in Tenant's Business not later than _____, 199___ (the "Completion Date").

(c)    Tenant shall deliver to Landlord and Mortgagee on or prior to _____, 199___ the items listed in paragraph 13.2 of the Real Estate Purchase and Sale Agreement, dated as of December 2, 1996, between Landlord, as purchaser, and Sunbelt-Dix, Inc., a Delaware corporation, as seller, to the extent such items had not theretofore been delivered to Landlord, together with a Certificate of Completion substantially in the form of attached  Schedule I-1.

(d)    If Tenant fails to substantially complete construction of the Improvements or deliver the documentation to Landlord and Mortgagee as required by this Exhibit, and Tenant shall have notified Landlord of Tenant's election to exercise the Substitution Option pursuant to paragraph 10 of the Lease on a Termination Date specified in such notice, Tenant shall and shall be deemed to have elected to make a Purchase Offer (which shall be subject to paragraph 9 of the Lease) to purchase the Leased Premises on the Termination Date stated in such notice.

## SCHEDULE I-1 - FORM OF COMPLETION CERTIFICATE

This Certificate is being delivered by _____ ("Tenant"), pursuant to Exhibit I of the Lease Agreement dated December ___, 1996 (the "Lease"), between _____ ("Landlord") and Tenant. Tenant hereby warrants, represents and certifies to Landlord as follows (capitalized terms used herein and not otherwise defined have the meanings set forth in the Lease):

(a)    The Improvements are substantially complete in accordance with the Construction Requirements attached to the Lease as Exhibit I and are ready for operation in Tenant's Business.

(b)    The Cost actually incurred as of the date hereof by Tenant with respect to the Leased Premises is not less than as set forth below:

Cost of Land

Cost of Improvements based upon an approved appraisal (including site work and architects' and engineers' fees)

Cost of Landlord's Equipment

Capitalized Expenses (including capitalized interest, financing costs and other items included in the definition of Cost in the Lease)

TOTAL

(c)    All certificates of occupancy and other governmental consents needed for the use of the Leased Premises have been obtained.

(d)    There are no claims of any person which are past due and unpaid relating to the construction of the Improvements or acquisition of the Landlord's Equipment except claims which are being contested as permitted by the Lease.

(e)    Title to the Improvements and the Landlord's Equipment is vested in Landlord free and clear of all Liens other than the Lease and Permitted Encumbrances and Tenant accepts the Leased Premises in accordance with the provision of the Lease.

(f)     The Lease is in full force and effect on the date hereof.  The Lease has not been amended and no Event of Default has occurred and is continuing thereunder.

IN WITNESS WHEREOF, the undersigned has duly executed, sealed and delivered this certificate this day of _____, 199____.

[Witness Signature Blocks]                              [Tenant's Signature Block]

THIS INSTRUMENT PREPARED BY
AND RECORD AND RETURN TO:

Douglas G. Stanford, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
50 North Laura Street, Suite 2800
Jacksonville, FL 32202-3650

GROUP #3323

---

## NOTICE OF CHANGE OF TENANT UNDER LEASE

**THIS NOTICE OF CHANGE OF TENANT UNDER LEASE** (this "Notice") is given effective as of June 29, 2000, by **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation ("Successor Tenant"), as successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, as successor by merger between Winn-Dixie Midwest, Inc., a Florida corporation, and Winn-Dixie Charlotte, Inc., a Florida corporation, whose address for purposes of notice is 5050 Edgewood Court, Jacksonville, Florida 32254 Attention: Legal Department.

## R E C I T A L S :

A.    **WINN-DIXIE MIDWEST, INC.**, a Florida corporation, as tenant ("Original Tenant"), and Chester Dix Florence Corp., as landlord ("Landlord"), are parties to that certain Lease dated December 2, 1996, as amended from time to time (the "Lease"), a memorandum or short form of which is recorded in Book 587, Page 75 of the public records of Boone County, Kentucky (the "Lease Memorandum").

B.    Original Tenant merged with Winn-Dixie Charlotte, Inc., a Florida corporation, pursuant to which merger Winn-Dixie Midwest, Inc., a Florida corporation, was the surviving entity, effective as of June 29, 2000 (the "Merger").

C.    Following the Merger, Winn-Dixie Midwest, Inc., a Florida corporation, changed its name to Winn-Dixie Charlotte, Inc., a Florida corporation, effective as of June 29, 2000 (the "Name Change"). This resulting entity is Successor Tenant as defined above.

D.    As a result of the Merger and Name Change, Successor Tenant has sole right, title and interest as tenant under the Lease.

Group Number 3323, Plat Slide 262-A

#153236

BOONE COUNTY
**MC835    PG 517**    Store #1701, Boone County, KY

E.  Successor Tenant desires to place third parties on notice of the Merger and Name Change and Successor Tenant's interest as tenant under the Lease.

**ACCORDINGLY**, Successor Tenant hereby certifies and states the following:

1.  **Merger and Name Change**.  Notice is hereby given that, pursuant to the Merger and Name Change, successively, all right, title and interest as tenant under the Lease is vested in Successor Tenant.

2.  **Record Notice**.  This instrument is intended to place third parties on record notice of Successor Tenant's interest as tenant under the Lease pursuant to the Merger and Name Change, successively, and the Lease Memorandum is hereby supplemented to reflect the same as a matter of record.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Successor Tenant has caused this Notice to be executed as of the date first above written.

Witness:

*Heather Y. Sarta-Meyer*
Name: Heather Y. Sarta Meyer

*Laura L. Andrews*
Name: LAURA L. ANDREWS

SUCCESSOR TENANT:

**WINN-DIXIE CHARLOTTE, INC.**,
a Florida corporation

By ___R. P. McCook___
Name: ___R. P. McCook___
Its: ___VICE PRESIDENT___

[SEAL]

STATE OF FLORIDA      )
                      )
COUNTY OF DUVAL       )

The forgoing instrument was acknowledged before me this 21st of July, 2000, by ___R. P. McCook___, the ___Vice___ President of **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation, on behalf of the corporation, who either [ ✓ ] is personally known to me or [   ] has produced identification in the form of _____ driver's license.

_____
Notary Public, State of Florida
Printed Name: _____
Commission No.: _____
My commission expires: _____

[NOTARIAL SEAL] Mary Kay Vega
MY COMMISSION # CC577740 EXPIRES
September 29, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

DOCUMENT NO:    24093
RECORDED ON: SEPTEMBER 22,2000 09:45:06AM
TOTAL FEES:      $9.00
GROUP   : 3323
COUNTY CLERK: MARILYN K ROUSE
COUNTY:      BOONE
DEPUTY CLERK: REMA' PING
#153238
BOOK MC835    PAGES 517 - 519

3                  Store #1701, Boone County, KY