## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| WINN-DIXIE STORES, INC., et al., | ) | Case No. 3:05-bk-03817-JAF |
| Debtors. | ) | Jointly Administered |
| | ) | |

### NOTICE OF TRANSFER AND
### ASSIGNMENT OF CLAIM AND WAIVER OF
### NOTICE PURSUANT TO BANKRUPTCY RULE 3001(e)(2)

CWCapital Asset Management LLC, as Special Servicer for LaSalle Bank, N.A. as

Trustee for the Registered Holders of First Union-Lehman Brothers-Commercial Mortgage

Trust, Commercial Mortgage Pass-Through Certificates Series 1997-C1 gives notice

pursuant to Bankruptcy Rule 3001(e)(2) of the attached assignment of claim number 11962

from Oakwood Village Associates to CWCapital Asset Management LLC, as Special

Servicer for LaSalle Bank, N.A. as Trustee for the Registered Holders of First Union-

Lehman Brothers-Commercial Mortgage Trust, Commercial Mortgage Pass-Through

Certificates Series 1997-C1.

DATED this _13_ day of September, 2006.

**STUTSMAN THAMES & MARKEY, P.A.**

*/s/ Richard R. Thames*

By_____

Richard R. Thames

Florida Bar Number 0718459
50 N. Laura St., Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
RRT@stmlaw.net

60567

Attorneys for CWCapital Asset Management
LLC, as Special Servicer for LaSalle Bank,
N.A.

## ASSIGNMENT OF CLAIM

Bronze Centers L.P., a limited partnership organized under the laws of the State of Georgia having offices at 1853 Piedmont Road, Terrace Level, Marietta, Georgia 30066 (the "Assignor"), for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, does hereby assign, transfer and convey, without recourse, to CWCapital Asset Management LLC, as Special Servicer for LaSalle Bank, N.A., as Trustee for the Registered Holders of First Union-Lehman Brothers-Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates Series 1997-C1 (the "Assignee"), all of Assignor's rights, title and interest in and to its claim (the "Claim") against Winn-Dixie Stores, Inc. (the "Debtor") as described in the Proof of Claim dated October 11, 2005 and filed by Assignor (the "Proof of Claim").

The Assignor hereby represents and warrants that it is the sole and absolute owner of the Claim referred to above against the Debtor, free and clear of all liens, adverse claims and encumbrances and that it has made no prior assignments of such Claim to any person. This assignment shall be deemed an absolute and unconditional assignment of the Claim and shall not be deemed to create a security interest. Assignor agrees that Assignee shall have all rights to vote the Claim and to participate in the Debtor's case on account of the Claim, and Assignor conveys and relinquishes all of its rights thereto. The Assignor further warrants and represents that the execution and delivery of this Assignment has been entered into pursuant to all requisite corporate or other authority of the Assignor. Further, Assignor certifies that it has not relied on any statement made by the Chapter 11 Trustee, the Official Committee of Unsecured Creditors (the "Creditors Committee"), any member of the Creditors' Committee, any creditor or any other party or their attorneys, accountants, agents or representatives in determining whether to make this Assignment of Claim, but rather has made this Assignment of Claim based upon its own independent investigation and review of the bankruptcy case of the Debtor with its legal counsel.

Assignor agrees to execute such documents as may be necessary to effectuate this Assignment of Claim. Assignor has forwarded the Proof of Claim to Assignee and will forward notices received from the Debtor, Trustee, or any third party with respect to the Claim assigned herein. Assignor further agrees that any payment or distribution received by Assignor on account of the Claim shall constitute property of Assignee to which Assignee shall have an absolute right, and that Assignor will hold such property in trust and will, at its own expense, promptly deliver to Assignee any such payment or distribution in the same form received, together with any endorsements or documents necessary to transfer such property to Assignee. Assignor agrees that cash shall be delivered to the Assignee within two (2) business days of receipt by Assignor, and non-cash distributions shall be delivered to Assignee within five (5) business days of receipt.

Assignor has no actual knowledge of any defense, set-off or counterclaim against the Claim.  Upon request of the Assignee, Assignor agrees to provide reasonable cooperation to the Assignee in obtaining any other documents evidencing, supporting or relating to the Claim.  Assignor shall not be liable for any legal or collection expenses incurred by the Assignee in connection with defense and/or collection of the Claim.

This document represents the full and complete agreement of the Assignor and Assignee with respect to this matter, and such agreement is not subject to modification, amendment or supplementation, unless set forth in a subsequent writing, duly agreed to and signed by the Assignor and the Assignee.

IN WITNESS WHEREOF, the undersigned Assignor has hereunder set its hand and seal this _29__ day of August, 2006.

FOR:  BRONZE CENTERS L.P.
BY:   Bronze Holdings, Inc.,
      General Partner

BY:   _Glynda Blanton_
      GLYNDA BLANTON
ITS:  Executive Vice President

-2-

Form B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION | Chapter 11 PROOF OF CLAIM | DEADLINE FOR FILING PROOFS OF CLAIM IS: AUGUST 1, 2005 AT 5:00 P.M. EASTERN TIME |
|---|---|---|

Winn-Dixie Stores, Inc., et al., Case No. 05-03817-3F1 Jointly Administered

Name of Debtor Against Which You Assert Your Claim:

Debtor Name  Winn-Dixie Stores, Inc.                    Case No  05-03817-3F1
(See List of Names and Case Numbers on Reverse Side)

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. §503.

| Name and Address of Creditor (The person or other entity to whom the debtor owes money or property): | |
|---|---|
| [barcode] 19947981 Creditor Id  WDX-1669-B1-07 OAKWOOD VILLAGE ASSOCIATES C/O BRONZE CENTERS 1853 E PIEDMONT ROAD SUITE 300 MARIETTA, GA 30066 | (770) 565-8200 Telephone No of Creditor (770) 565-8863 Fax No of Creditor (If your address has changed or is incorrect as it appears in Item A, please provide corrections) |

**Your claim is scheduled as follows**

Debtor
Winn-Dixie Montgomery, Inc
Classification
Unsecured Non-Priority Claim
Scheduled Amount
. $ 00
Unliquidated

DEBTOR WINN - DIXIE STORES, INC
U S BANKRUPTCY COURT M D -FLORIDA
JOINTLY ADMINISTERED UNDER
CASE  05-03817 (3F1)
CHAPTER 11

# CLAIM NO.: 11962

Name and address of signatory or other person to whom notices must be served, if different from above (Check box if) ☐ replaces address above ☒ additional address

Name  Mitchell S. Rosen, Esq.

Company/Firm  Rosen Law Group, LLC

Address  950 E. Paces Ferry Rd., Ste. 3250, Atlanta,

Georgia 30326

Account or Other Number by Which Creditor Identifies Debtor

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim Attach a copy of statement giving particulars
☐ Check box if you have never received any notices in this case

Check here if this claim
☐ replaces ☒ amends   a previously filed claim, dated  06-01-05

If an amount is identified above, you have a claim scheduled by the Debtor as shown  If you agree with the amount and classification of your claim as scheduled by the identified Debtor and you have no other claims against any of the debtors, you do not need to file this proof of claim, EXCEPT AS FOLLOWS  If the amount shown is listed above as DISPUTED, UNLIQUIDATED, OR CONTINGENT, a proof of claim MUST be filed in order for you to receive any distribution on account of your claim  If you have already filed a proof of claim in accordance with the attached instructions, you need not refile your claim

| Basis for Claim | | |
|---|---|---|
| ☐ Goods sold to debtor(s) | ☐ Taxes | ☐ Retiree benefits as defined in 11 U S C § 1114(a) |
| ☐ Services performed for debtor(s) | ☐ Severance agreement | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Goods purchased from debtor(s) | ☐ Refund | Last four digits of SSN |
| ☐ Money loaned | ☒ Real property lease | Unpaid compensation for services performed from |
| ☐ Personal injury/property damage | ☐ Personal property lease | _____ to _____ |
| ☐ Other _____ | ☐ Other contract _____ | (date)      (date) |

Date debt was incurred:  Various

3  If claim is based on a Court Judgment, date obtained

Total Amount of Claim at Time Case Filed

$ 363,312.11   $_____   $_____   $ 363,312.11
(unsecured)     (secured)     (priority)     (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim  Attach itemized statement of all interest or additional charges

| Secured Claim ☐ Check this box if your claim is secured by collateral (including a right of setoff) Brief description of Collateral ☐ Real Estate  ☐ Motor Vehicle  ☐ Other _____ Value of Collateral  $_____ Amount of arrearage and other charges at time case filed included in secured claim, if any  $_____ Unsecured Nonpriority Claim $ 363,312.11 [ Check this box if a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority | 7. Unsecured Priority Claim. ☐ Check this box if you have an unsecured priority claim Amount entitled to priority $_____ Specify the priority of the claim ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C § 507 (a) (3) ☐ Contributions to an employee benefit plan – 11 U S C § 507 (a) (4) ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U S C § 507 (a) (6) ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U S C § 507 (a) (7) ☐ Taxes or penalties owed to governmental units – 11 U S C § 507 (a) (8) ☐ Other - Specify applicable paragraph of 11 U S C § 507 (a) ( ) *Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment |
|---|---|

| Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim Supporting Documents: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien DO NOT SEND ORIGINAL DOCUMENTS  If the documents are not available, explain  If the documents are voluminous, attach a summary ). Date-Stamped Copy. To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim | This Space Is For Court Use Only |
|---|---|
| Date  .0/11/05   Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) and to receive notice Print  Mitchell S. Rosen   Title  Attorney Signature  [signature] | [vertical stamp] 2005 OCT 13  AM 11: 29 |

Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571

**OAKWOOD VILLAGE**
**2004 CAM, TAX & INSURANCE RECONCILIATIONS**
**80,941 SQUARE FEET**

| TENANT NAME: | **Winn Dixie # 1904** | | |
|---|---|---|---|
| TENANT SQUARE FEET: | 47,307 | PRORATA SHARE: | 58.45% |

**COMMON AREA MAINTENANCE EXPENSES:**

| | | | |
|---|---|---|---|
| Electricity | $5,876.08 | | |
| Electrical Repair | $0.00 | | |
| Common Area Signs | $0.00 | | |
| Fire Sprinkler System | $0.00 | | |
| General Maint. Repairs | $125.00 | | |
| Parking Lot Cleaning | $7,794.00 | | |
| Parking Lot Repair | $3,686.00 | | |
| Landscape Maintenance | $9,350.00 | | |
| Miscellaneous | $0.00 | | |
| Administrative Fee - N/A | $0.00 | | |
| Total: | | $26,831.08 | |
| TENANT'S PRORATA SHARE: | | $15,681.77 | |
| LESS PAYMENTS MADE : | | $0.00 | |
| | | | |
| CAM BALANCE DUE: | | | $15,681.77 |

| | | | |
|---|---|---|---|
| **TOTAL INSURANCE EXPENSE:** | (NO UMBRELLA) | $8,392.00 | |
| | | | |
| TENANT'S PRORATA SHARE: | | $4,904.81 | |
| LESS PAYMENTS MADE : | | ($4,904.81) | |
| | | | |
| INSURANCE BALANCE DUE: | | | $0.00 |

| | | | |
|---|---|---|---|
| **TOTAL PROPERTY TAX EXPENSE:** | | $34,934.56 | |
| | | | |
| TENANT'S PRORATA SHARE: | | $20,417.95 | |
| LESS PAYMENTS MADE : | | $0.00 | |
| | | | |
| | | | $20,417.95 |

| | | |
|---|---|---|
| **TOTAL DUE:** | | $36,099.72 |

PLEASE MAKE CHECK PAYABLE TO:      BRONZE CENTERS, L.P.
1853 PIEDMONT ROAD
TERRACE LEVEL
MARIETTA, GA 30066



TENANT NAME:    **Winn Dixie # 1904**
TENANT SQUARE FEET:    47,307    PRORATA SHARE:    58.45%
*Tenant Rejected Lease on 9/24/05 - 296 Days - CAM is actual; Insurance &*
*Property Taxes are Prorated.*

**COMMON AREA MAINTENANCE EXPENSES:**

| | | |
|---|---:|---:|
| Electricity | $3,502.80 | |
| Electrical Repair | $0.00 | |
| Common Area Signs | $0.00 | |
| Fire Sprinkler System | $0.00 | |
| General Maint. Repairs | $92.95 | |
| Parking Lot Cleaning | $5,715.60 | |
| Parking Lot Repair | $300.00 | |
| Landscape Maintenance | $7,050.00 | |
| Miscellaneous | $0.00 | |
| Administrative Fee - N/A | $0.00 | |
| **Total:** | | $16,661.35 |
| TENANT'S PRORATA SHARE: | | $9,737.94 |
| LESS PAYMENTS MADE : | | $0.00 |
| CAM BALANCE DUE: | | $9,737.94 |

| | | |
|---|---:|---:|
| **TOTAL INSURANCE EXPENSE:** | (NO UMBRELLA) | $8,461.00 |
| TENANT'S PRORATA SHARE: | | $4,010.30 |
| LESS PAYMENTS MADE : | | $0.00 |
| INSURANCE BALANCE DUE: | | $4,010.30 |

| | | |
|---|---:|---:|
| **TOTAL PROPERTY TAX EXPENSE:** | | $40,281.00 |
| TENANT'S PRORATA SHARE: | | $19,092.20 |
| LESS PAYMENTS MADE : | | $0.00 |
| | | $19,092.20 |

**TOTAL DUE:**    $32,840.44

PLEASE MAKE CHECK PAYABLE TO:    BRONZE CENTERS, L.P.
1853 PIEDMONT ROAD
TERRACE LEVEL
MARIETTA, GA 30066

# LEASE

THIS LEASE, made this ___10th___ day of_____Nay_____ , 19 _83__

between _HUNTSVILLE OAKWOOD ASSOCIATES, LTD., a Georgia limited partnership___

_____ (hereinafter called "Landlord")

and _WINN-DIXIE ATLANTA, INC., a Florida corporation duly qualified to transact_

_business in the State of Alabama_____

_____ ___ ___ ___ ___ . ___ (hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singu-

lar or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**LEMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for

the term hereinafter specified, the following described premises:

That certain store building, approximately___200___ feet in width by __175_____

feet in depth, _together with concrete pads at rear of store building for_

_installation of Tenant's exterior coolers and/or freezers, and front_
_vestibule,_

and the land on which the same shall stand (hereinafter collectively called "demised pre-

mises"), which store building and related improvements are to be constructed by Land-

lord according to plans and specifications to be approved by the parties as herein pro-

vided, and shall be in the location and of the dimensions as outlined in red on the

Plot Plan _entitled "Oakwood Village", prepared by Gilbert Engineering Co.,_

_Huntsville, Alabama, dated April 9, 1983_____

_____

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in de-

tail on Exhibit "A"), known as _____Oakwood Village_____

(hereinafter called "shopping center"), located_on the southeasterly corner of_

_the intersection of Meridian Street and Oakwood Avenue_____

in the City of_____Huntsville_____, County of _____Madison_____,

State of_____Alabama_____ , the legal description of the shopping center being

set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM
Division Manager
Legal Dept
Winn Dixie Stores,
Inc.

D 33-36 Rev 4/79

This Instrument was prepared by
Charles P Whitford, Jr., Attorney
at law whose address is P O
Box B, Jacksonville, Florida 32203

TERM

FOR THE TENANT TO HAVE AND TO HOLD from the earlier of (i) the date when Tenant opens said premises for the transaction of its business as hereinafter provided or, (ii) the forty-sixth (46th) day after satisfaction by Landlord of the requirements of Article 5(a) through 5(d) hereof) for an initial term of twenty (20) years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

RENTAL

1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of __Two Hundred__

__Twenty-Four Thousand Five Hundred Twelve and No/100 Dollars__

Dollars ($ _224,512.00_____) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of __Eighteen Thousand Seven Hundred Nine and 33/100__

-------------------------------------------------------------------------------- Dollars ($ _18,709.33___) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to the amount, if any, by which_____one_____ per cent (    -1-    %) of Tenant's gross sales made from the demised premises in each fiscal year ending approximately June 30th during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rent due hereunder, the Tenant's fiscal year shall be from approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental

-2-

DEFINITION
OF "GROSS
SALES"

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged, ████████████ ████████ (4) all receipts from vending machines; (5) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (6) returns of merchandise to suppliers or manufacturers, (7) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value) and (g) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

RECORD
OF SALES

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof shall object thereto and within ninety (90) days after such objection shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

USE

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any general mercantile business; provided, however, except as a supermarket, the demised premises shall not be used, nor assigned, or subleased under the terms of Article 26 herein, for any primary use or business which shall be in direct competition with the primary use or business engaged in by any other then tenant in the shopping center to whom Landlord has granted a right of exclusive use, of which Tenant has been given written notice as herein provided. However, it is still further provided that the demised premises shall not be used as a pharmacy, drug store or free-standing health and beauty aid store or for the sale of prescription drugs or drugs required to be dispensed by a licensed pharmacist so long as a drug store tenant lease is in effect in the shopping center.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises.

**CONSTRUCTION** 3 The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as
**OF SHOPPING** shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps,
**CENTER** sidewalks, streets, entranceways, malls, parking areas, service areas, driveways and related im-
provements, said improvements (excluding buildings) being sometimes hereinafter referred to as
"common areas". The Landlord, at its sole cost and expense, shall grade and surface with top
quality materials all paved portions of the common areas (including parking area), and shall pro-
vide proper and adequate water drainage and lighting system and operations therefor and shall
operate and maintain the same in good repair and usable condition for use by the patrons of the
shopping center and the tenants and their employees during the term of this lease and any exten-
sions thereof. The arrangement and location of all store buildings and common areas (including
parking area) within the shopping center shall at all times during the term of this lease, or any
extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the
written consent of the Tenant If not shown on Exhibit "A", Tenant expressly reserves the right to
approve the finish grade elevations of all store buildings and common areas (including parking and
service areas) within the shopping center which are to be constructed concurrently with Tenant's
store building.  Notwithstanding the foregoing, it is understood that Landlord
intends initially to construct only Tenant's store building and the further
store buildings required under Articles 5 and 6 herein, together with all the
common areas other than "future parking" as shown on Exhibit "A".  Landlord re-
serves the right, but shall not be required, to construct additional buildings
in the locations and of the dimensions reserved therefore on Exhibit "A", pro-
vided, however, any such additional buildings shall be of like structural and
architectural quality as the building for Tenant and shall be located only in
the locations and of the dimensions as shown on Exhibit "A".  Landlord agrees
that Tenant shall have uninterrupted use and enjoyment of the demised premises
and the common areas during any such additional construction without unreason-
able interference therewith by reason of such construction work.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to
construct the store building for occupancy by Tenant in accordance with the plans and specifica-
tions to be approved by both Landlord and Tenant. Plans and specifications shall be approved
when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans
and specifications shall provide for a completed store building, commonly referred to as a "lock
and key job", and shall include, but without limitation the following: air conditioning and
heating systems and equipment including insulated duct work, registers and
grilles and roof or ceiling structural system adequately designed to support
the same; plumbing and plumbing fixtures; drains; interior walls and partition
electrical wiring; lighting fixtures to Tenant's requirements; vinyl asbestos
tile floor surfacing (color at Tenant's option); automatic sliding doors;
sprinkler system; manager's customer service office; heat reclaim coil; Onan
emergency generator; delicatessen department; music and P. A. system (except
microphones and amplifiers, to be furnished by Tenant); connection of air
conditioning and heating equipment and connections to all utilities.  Tenant
at its expense shall provide its own trade fixtures which shall be connected
by Landlord and its own baler or compactor.  All equipment and fixtures pro-
vided by Tenant shall remain the property of Tenant and may be removed by the
Tenant from the demised premises at any time, provided Tenant is not in default
hereunder.  In addition, the wall to be erected on the westerly side of Tenant
store building shall be the "knockout" type wall to allow for future expansion
pursuant to Article 38 herein.

within thirty (30) days thereafter

**COMPLETION** 4. Landlord covenants and agrees that the construction of the shopping center shall begin not later
**DATE** than_____August 1, 1983_____and shall be completed not later than\_____
_____April 2, 1984_____; and if the same shall not be begun or completed by the respective dates,
the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may
extend the Landlord additional time for the beginning or completion of construction, provided,
however, that if after the beginning of construction the Landlord's failure to complete said im-
provements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war,
delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings
which are beyond the control of Landlord, and provided further that the improvements shall be com-
pleted with all due diligence commensurate with such delay and in all events not later
than_____June 1, 1984_____, said option to terminate shall not arise "Construc-
tion of the shopping center" shall be deemed to have begun when the first concrete footings have
been poured If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Land-

-4-

lord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees to give Tenant a "first right of refusal" on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The "first right of refusal" shall be effective for a period of three (3) years from the date of such cancellation.

COMMENCE-
MENT DATE

5. The Tenant shall open its store under the "Winn-Dixie" trade name for business within forty-five (45) days following performance of the following:

    (a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

    (b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

    (c) Construction of at least 430 lineal feet of store frontage and 31,200 sq. ft. of total building area (excluding Tenant's store building) shall have been substantially completed (which shall be deemed to exclude tenant fixturing and finish) as shown on Exhibit "A" and said area readied for leasing; and

    (d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant:

        Revco Drugs

In the event that all the above requirements shall not have been met on or prior to June 1, 1984, the Tenant at its sole option may cancel and terminate this lease, within thirty (30) days thereafter. If Tenant fails to exercise such option within the aforesaid thirty (30) day period, Tenant shall be deemed to have extended to Landlord a reasonable period of time within which to satisfy such requirements under circumstances then existing.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of forty-five (45) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications; provided, however, any such acceptance of possession, opening for business or payment of rent shall constitute an acknowledgement by Tenant that the conditions at paragraph 5(a) through (d) have been satisfied or are waived by Tenant, excepting latent construction defects in the building.

HER
NANTS

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated:

| Name | Minimum Term Years | Minimum Floor Area (sq ft) |
|---|---|---|
| Revco Drugs | 15 | 8,450 |

-5-

initially

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into a non-cancellable lease, except for default, condemnation, or destruction of the premises or upon conditions similar to those provided herein, with such tenant.

RETAIL
AND
SERVICE
STORES
ONLY

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no ▮▮▮ bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, or non-retail or non-service type activities, shall be permitted.

It is still further agreed that not in excess of 8,500 sq. ft. of office space shall be allowed in the shopping center. It is finally agreed that not more than one health spa shall be allowed to operate in the shopping center.

PARKING
AND
COMMON
AREAS

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide.

(a) a minimum ratio of at least____5.0____ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least____330____ automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during customary food store shopping hours (but in no event later than the earlier of 45 minutes after Tenant closes its store, or one o'clock a.m.). In the event Tenant desires to keep its store building oper after such times, it agrees to reimburse Landlord for the cost of lighting of such portion of the common areas (including parking areas) as is requested by Tenant to be lighted after such times. Landlord further agrees that no sign boards or construction shall be erected in any of the common areas (including parking area) shown on Exhibit "A" or so as to obstruct view of the demised premises from the adjoining public streets, except for the buildings shown on Exhibit "A" hereto, provided that such buildings are constructed in accordance with the dimensions, location and height shown on Exhibit "A" hereto.

SERVICE
AREA

9. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery servic entrances parking spaces for two large trailer trucks for continuous use and further agrees the Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised pre mises and the exclusive right to such spaces as may be reasonably needed by Tenant for loadir and unloading merchandise for its store into and from trucks and trailers at such service entrances

UTILITIES  10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities

TENANT'S  11. Upon completion of construction by Landlord and acceptance of the demised
REPAIRS  premises by Tenant, Tenant agrees to keep the interior and exterior of its demised premises in good condition and repair excepting structural repairs, all repairs to the roof, and all repairs made necessary by reason of fire and other unavoidable casualties covered by Landlord's fire and extended coverage insurance and also excepting reasonable wear and tear. It is agreed that Tenaht, in its reasonable judgment, shall determine what is "reasonable wear and tear" within the meaning of this article. Within the repair responsibilities of Tenant shall be included automatic doors, windows and plate glass, except such damage as is caused by faulty construction or settling of the building or covered by Landlord's fire and extended coverage insurance, which shall be Landlord's responsibility; and the normal, routine maintenance of the air conditioning and heating equipment. Tenant shall also be responsible for the first One Thousand and No/100 Dollars ($1,000.00) only (parts and labor) of the expense to repair the air conditioning and heating equipment in each repair instance, with Landlord to be responsible for the cost of repair and maintenance of such systems and equipment in excess of such sum. For any expenditure for repairs over $800.00 (materials and labor), Tenant agrees to put such work out for at least three competitive bids.

LANDLORD'S  12. The Landlord shall, at its cost and expense, keep and maintain, in good con-
REPAIRS  dition and repair, the common areas of the shopping center and the structural parts and roof of the demised store building. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance, to the extent of such insurance coverage.

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter, passed, adopted or promulgated; provided, however, that Tenant shall make such changes or alterations in the premises as are required by such governmental authority solely concerning the use of the premises, except that nothing herein contained shall in any wise impair or affect Tenant's option to terminate this Lease contained in Article 18 hereof.

-7-

With the consent of Landlord, which consent shall not be unreasonably withheld,

SIGNS

13. Tenant may place, erect and maintain any signs on the outside walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs. Landlord agrees to construct a shopping center pylon sign advertising the shopping center in a location to be mutually agreed upon by Landlord and Tenant. In the event Landlord allows any tenants in the shopping center to affix their own sign panels to the shopping center pylon sign, then Tenant shall be permitted to affix thereon an electrically illuminated sign panel advertising its business. Tenant shall install its sign panel, which shall be connected to power outlets to be installed by Landlord. The design of Tenant's sign panel to be affixed to the pylon sign shall be subject to the approval of Landlord, not to be unreasonably withheld, it being contemplated that such approval shall be accorded to sign designs usual to Tenant's business.

FIXTURES
AND
INTERIOR
ALTERATIONS

14. The Tenant, at its own expense, may from time to time during the term of this Lease make any non-structural interior alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this Lease.

, provided it is not in default under this Lease,

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

INDEMNIFI-
CATION

15. Unless caused by the sole negligence of the Landlord, its servants, agents or employees, Tenant agrees to indemnify and save harmless the Landlord from a claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, unless caused by the sole negligence of the Tenant, its servants, agents or employees, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common area (as defined in Article 3 hereof) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability o not less than $250,000.00 for an accident affecting any one person; and not le than $500,000.00 for an accident affecting more than one person; and $50,000.00 property damage. Certificate of such coverage from the insurer providing 30 d. notice to Tenant prior to cancellation or termination shall be furnished to Te During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's liability insurance above described. Tenant shall be responsible for its pro-rata share of such premiums, Tenant's pro-rata share to be an apportionment made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premium for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its best and earnest efforts to obtain such coverage at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums.

-8-

derly condition and s    keep the entryways and delivery are    ~~~~~~~ the building ~~~~ ~~~
clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or
permit anything to be done in or upon the demised premises creating a nuisance thereon, and
Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the
premises for the purpose of making repairs and for examining or showing the same to prospective
purchasers.

full insurable

RE     17.  In the event that Tenant's building shall be totally destroyed or damaged
to the extent of 75% or more of the value thereof by fire or other casualty, the
either party to this Lease may elect within thirty (30) days after such damage,
to terminate this Lease by giving to the other party a written notice of
termination, and thereupon both parties shall stand released of and from all further liability under
this lease. If Tenant's building shall thereby suffer damage to any extent less than 75% of the
value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to
proceed promptly and without expense to the Tenant to repair the damage or restore the im-
provements, remitting a fair and just portion of the rent, according to the unusable space, until
said premises are completely reinstated or restored. If at any time during the term of this lease or
any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's store build-
ing, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence
and diligently prosecute to completion repair of all such damage and shall restore said improve-
ments to their condition prior to such damage.

If damage to Tenant's building in excess of fifty percent (50%) of the value
thereof shall occur within the last five (5) years of the initial term or any
of the option extension periods provided herein, the obligation of Landlord
to restore the demised premises shall not arise unless Tenant shall give notice
to Landlord within thirty (30) days after such damage of its desire to extend
the term of this Lease for an additional period so as to expire ten (10) years
from the date of completion by Landlord of restoration of such damage, and on
the same conditions and for the same rentals. Upon such notice, Landlord agree
with all due diligence to repair and restore Tenant's building and the Lease
shall continue and the remaining option periods, if any, shall be construed to
follow upon the end of such extended term. Failing such notice to extend,
Landlord at its option shall have the right to terminate this Lease or to re-
store the premises and the Lease shall continue for the remainder of the then
unexpired term.

Landlord shall carry fire and extended coverage insurance on Tenant's building and any addi-
tions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings
within the shopping center in the amount of full insurable value thereof, above foundation walls,
and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire,
explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such
damage, including without limitation, damage resulting from the negligence of the Tenant, its
agents, servants or employees.

During the term of this lease and any extensions thereof, Tenant agrees to pay
to Landlord as additional rental the amount of the premium for Landlord's fire
and extended coverage insurance allocable to the demised premises. If such pre
miums shall not be billed separately upon Tenant's demised store premises the
same shall be fairly apportioned to determine Tenant's share thereof. Such ap-
portionment shall be made in the ratio which the square footage of the ground
floor of Tenant's store building bears to the total square footage of the groun
floor of all buildings from time to time existing in the shopping center. The
amount of premiums for which Tenant is to reimburse Landlord shall be less any
available abatements, discounts or refunds thereon. Landlord shall at all time
use its earnest and best efforts to obtain such fire and extended coverage in-
surance at the most reasonable rates available. Tenant shall be entitled to re
ceive from the Landlord copies of the statements from such insurance premiums.

-9-

**QUIET ENJOYMENT**

18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created, that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein, and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES AND LIENS**

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the rate allowed by Alabama law.

(And see Article 37 hereof).

exercisable within
ninety (90) days after
such taking,

**CONDEMNATION**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

The right of Tenant to a division of condemnation proceeds shall extend only to such portions of the award as may be attributable by the court to the disturban of Tenant's established business, to Tenant's trade fixtures, equipment, leasehold improvements and moving expenses. Tenant shall not thereby be entitled to any portion of the award attributable to the land and buildings, or to the valu of the unexpired portion of Tenant's lease term.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ____ten____ per cent ( -10- %) or reduce the number of cars which may be conveniently parked to less than ____300____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.  exercisable within ninety (90) days after such taking,

Tenant's option to terminate this Lease under this Article shall not arise if, within two (2) months after such taking, Landlord shall provide equivalent substitute parking spaces satisfactory to Tenant and located on property contiguous to or located within the original shopping center area, and located in comparat proximity to Tenant's building, thereby fulfilling the minimum parking requirements hereunder.

-10-

FAULT    21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if such failure or violation shall have continued for a period of ten (10) days as to non-payment of rent or thirty (30) days after any such failure or violation after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default. The remedies provided above are non-exclusive and are in addition to all other remedies available to Landlord to law or in equity.

NKRUPTCY    22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

NSTRUCTION
<S    23. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

ICES    24. All notices required to be given to Landlord hereunder shall be sent by registered or certified

mail to, and all rent payments shall be made to Landlord at _____

```
           1827 Powers Ferry Road
           Building #8
           Marietta, Georgia 30067
```

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

    All notices required to be given to Tenant shall be sent by registered or certified mail to

Tenant at ____ P. O. Box 4809 _____

```
           Atlanta, Georgia 30302
```

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

END OF.
TENANCY

25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

ASSIGNMENT
AND
SUBLEASING

26. Subject to the provisions of Article 2 hereof, Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease. In the event Tenant shall voluntarily vacate the entire demised premises or cease selling merchandise therein for a period in excess of six (6) months while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the continuing option thereafter (unless Tenant shall have reoccupied the premises) to terminate and cancel this lease upon fifteen (15) days' written notice to Tenant of its election so to do, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months.

EXTENSIONS

27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ __four__ ( 4 ) successive extensions of this lease, each extension to be for a period of __five__ ( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at least __six (6) months__ before the expiration of the initial term, and if extended, at least __six (6) months__ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document; provided, however, that Tenant shall not at the time of any such option exercise be in default under the terms of this Lease.

primarily

EXCLUSIVE
SUPERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof. With the exception of bars and package stores and Revco Drugs (together with its successors, assignees and subtenants), only Tenant herein may sell beer and wine in the shopping center for off-premises consumption. Notwithstanding the foregoing, as to the storeroom to be occupied by Revco Drugs only, the permitted sale of such food items shall be expanded to 1,500 sq. ft. of its sales area.

It is specifically agreed that Tenant herein shall have the exclusive right to operate a bakery and/or delicatessen or equivalent department or concession in the shopping center, including any enlargement thereof.

-12-

gage shall encumbe    .e demised premises, and notwithstanc    g any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

UBORDINATE    29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

)TICE TO    30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall in-
NDIR    clude all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease. Tenant also agrees to give notice to such holder of a first mortgage encumbering the demised premises of the exercise by Tenant of its right herein provided to deduct from rental payments any amounts expended by Tenant for repairs, taxes or other expenses which are properly the Landlord's under the provisions of this Lease.

-13-

us herein defined, and provide therefor all such services as are reasonably required, including without limitation, safe-guarding, cleaning and sweeping, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein  For such services, Tenant shall pay to Landlord at the end of each lease year, as additional rental hereunder and as reimbursement for the annual cost thereof (which shall include ad valorem real estate taxes for the shopping center common areas if they are assessed separately from the buildings in the shopping center), the amount of Tenant's pro-rata share thereof, computed in the proportion which the square footage of Tenant's store building bears to the total square footage of all buildings (including additional floor levels) existing in the shopping center from time to time.  Such amount shall be payable on a non-cumulative basis at the end of each lease year for the expenses of the year and within fifteen (15) days following the furnishing by Landlord to Tenant of a detailed statement of such costs, and Tenant shall have the right to audit at its own expense any such costs and expenses within six (6) months following submission of such statement.

ENEFIT

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

RANSFER
BY
ANDLORD

33. The Landlord shall have the privilege of assigning this Lease provided that at the time of such assignment, the assignee thereof shall execute and deliver to the Tenant an assumption agreement in recordable form in and by which the assignee shall assume all the responsibilities and obligations of the Landlord hereunder.  This provision shall apply to all reassignments of this Lease by this Landlord and all subsequent landlords,  Upon compliance with the above the Landlord executing the assignment of lease shall be released from all liabs herein subsequent to the date of said assignment and the date of such assumptic agreement by the assignee.  It is understood, however, that Landlord shall be responsible to Tenant for any violations of Landlord's obligations under this Lear which shall have accrued prior to the sale or transfer of Landlord's interest provided that Tenant notified Landlord of any such violation within ten (10) d, after notice from Landlord of such sale or transfer of Landlord's interest and notwithstanding the foregoing, Landlord shall be responsible to Tenant for late defects in the building for a period of one (1) year from the commencement dat of the term of this Lease.

                              but shall not be applicable to an assignment
                            - of this Lease as collateral for a Mortgage
                              Loan.

IORT
)RM
ASE

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

ARGINAL
ILES

35. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

COMPLETE
AGREEMENT

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

TAXES

37. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of Landlord's ad valorem real estate taxes levied against the demised premises. Tenant shall be responsible for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time upon notice to the Landlord and any mortgagee of the Landlord to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord; and provided still further, that Tenant shall take no contest or protest action which results in the institution of any foreclosure proceedings or similar action by the holder of a security deed against the demised premises; and provided further, that Tenant shall have afforded Landlord a prior opportunity to contest such taxes or assessments and Landlord shall have failed or refused to conduct such a contest.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax increase contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

It is understood and agreed that any additional rentals payable by virtue of this Article 37 by Tenant may be credited on a non-cumulative basis against any and all percentage rentals, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the lease term or any extensions thereof, shall be pro-rated on the basis of the annual credit. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the expiration of the term of this lease, and any extensions thereof.

-15-

, provided Tenant shall not
then be in default hereunder,

TION FOR
PANSION

38. Tenant is hereby granted the option and privilege at any time during the
term of this lease, or any extensions thereof, of enlarging its store building
by incorporating therein the area to the westerly          side thereof, such
addition not to exceed      thirty-five      ( 35  ) feet in width by one
hundred seventy-five  ( 175 ) feet in depth. This option may be exercised only
at such times as the adjoining storerooms may be vacant, or at five (5) year
intervals, it being contemplated that Landlord shall not lease such area to
other tenants for in excess of five (5) years, and that Tenant shall have the
expansion privilege herein described no later than five (5) years from the com-
mencement date hereof and at five (5) year intervals thereafter. Landlord shall
give notice to Tenant of any such expiration date and, during the period between
six (6) months and three (3) months prior to such expiration date, afford to
Tenant the opportunity to exercise this option, and upon Tenant giving to Land-
lord a notice in writing of its exercise thereof, Landlord agrees to construct
such addition, or prepare such enlargement area for occupancy by Tenant, in ac-
cordance with plans and specificaions to be approved by the parties hereto, with
the construction to be completed with all due diligence following the vacation
of the necessary area by any other tenant, and the enlarged portion of the build
ing to be of a like quality of construction as the original building for Tenant.
In order to facilitate the expansion of Tenant's demised store building as
herein contemplated, Landlord agrees that any adjacent building or buildings with
in the expansion area shall be of like structural quality and in architectural
harmony with Tenant's store building, shall front on a line which is the interic
sidewalk line of Tenant's demised store building extended and shall have a finis
floor level, roof and ceiling heights which shall be at the same elevations as
the finish floor level, roof and ceiling heights of Tenant's demised store build
ing. Further, Landlord agrees that the wall of Tenant's demised store building
adjoining the expansion area shall be constructed with steel column supports
therein equivalently spaced to the nearest row of steel column supports within
the open area of Tenant's demised store building and such wall supports shall be
of sufficient load bearing capacity to carry the roof support system across the
full span of the original and of the expanded building width. Upon completion
of such building addition, or tender of such additional space to Tenant, if
there shall not at such date remain at least ten (10) years of the then term
of this lease, such term shall be extended for such period of time as shall be
necessary to provide a full ten (10) years from such date. Thereafter, during
such extended term, the annual minimum guaranteed rental (and the base for compu
tation of percentage rental hereunder) shall be increased by the greater of:
an amount equal to twelve percent (12%)     of the cost of such addition, or
an amount equal to $ 6.25        per square foot of the enlargement area, or an
amount equal to a computed percentage times the cost of such addition, such per-
centage consisting of     four percent (4%)     plus the current prime inter-
est rate charged by New York City banks at the time of the exercise of the op-
tion. At Tenant's request, construction cost shall be established by bids ob-
tained by Landlord from at least three (3) reputable contractors acceptable to
Tenant, with the final cost of the addition upon completion to be certified to
by the general contractor performing the work. During such extended term the
provisions of this lease shall remain in effect and the option periods herein
provided, if any shall remain, shall be construed to follow upon the end of the
extended term and the rentals to remain as adjusted in consequence of the ad-
dition. Upon completion of the addition, it shall be and become a portion of
the demised premises and this lease thereby be taken and construed as so amended

Nothing herein contained shall constitute any express or implied obligation on
the part of the holder of a first mortgage encumbering the fee simple title to
the demised premises or of any purchaser at a sale under foreclosure of such mor
gage, to comply with the terms and provisions of this Article, it being the un-
derstanding of the parties that the obligation to cause such expansion is the
sole obligation of the Landlord, its heirs, legal representatives, successors
and assigns.

ADJACENT
PROPERTY

40. Landlord and Tenant agree that notwithstanding anything to the contrary contained herein or depicted in the Site Plan attached hereto, the term "Shopping Center" as used herein shall mean and refer only to the land described in Exhibit "B" hereto and excluding Tract 2, 3 and 4, as shown on the Site Plan. Tenant acknowledges that its rights as to said Tract 2, 3 and 4 shall be governed by a Declaration of Restrictions and Grant of Easements of even date as to said Tracts, and that Landlord reserves the right to grant easements over the common areas of the Shopping Center for the benefit of said Tract(s) for the purpose of (i) access, ingress and egress for their owners, customers, invitees, licenses, agents, and employees, but not parking; (ii) utility line construction repair, operation, and reconstruction; and (iii) surface water run-off and drainage.



-17-A-

## G U A R A N T Y

In consideration of the sum of Ten Dollars ($10.00) paid by _____

HUNTSVILLE OAKWOOD ASSOCIATES, LTD., a Georgia limited partnership, _____

hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with

its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter

called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor

does hereby guarantee unto Landlord, its heirs, legal representatives, successors and

assigns, the due performance and observance by WINN-DIXIE ATLANTA, INC., a Florida ____

corporation duly qualified to transact business in the State of Alabama _____

hereinafter called "Tenant", of all the terms, covenants and conditions on the part of

Tenant to be performed and observed including, without limitation, payment of rentals

under the attached and foregoing lease agreement dated _____ May 10, 1983 _____,

covering certain premises located in a shopping center development known as "Oakwood

Village" situated at the southeasterly corner of the intersection of Meridian Street

and Oakwood Avenue, in the City of Huntsville, County of Madison and State of Alabama.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its

corporate name and its corporate seal to be hereunto affixed and attested by its officers

thereunto duly authorized this ___19th___ day of _____ May _____, 19 __83___.

Signed, sealed and delivered
in the presence of:

_____

_____
As to Guarantor

NOTARY PUBLIC, STATE OF FLORIDA AT LARGE
MY COMMISSION EXPIRES JAN. 20, 1984

WINN-DIXIE STORES, INC.

By _____
   Its _____ President

Attest _____
       Its _____ Secretary

(CORPORATE SEAL)

GUARANTOR

EXHIBIT "B"

LEGAL DESCRIPTION OF SHOPPING CENTER

TRACT I        All that part of the South half of Section 25, Township 3 South,
Range 1 West in the city of Huntsville, Madison County, Alabama, parti-
cularly described as beginning at a point on the West margin of Southern
Railroad right-of-way, said point is further described as being located
South 2 degrees 54 minutes East 474.65 feet and South 68 degrees 02
minutes East 289.44 feet from the center of said Section 25;

Thence from the point of true beginning North 68 degrees 02 minutes
West 83.0 feet;

Thence South 21 degrees 53 minutes West 43.02 feet;

Thence North 68 degrees 02 minutes West 179.75 feet;

Thence South 21 degrees 53 minutes West 12.0 feet;

Thence North 68 degrees 02 minutes West 370.26 feet;

Thence North 18 degrees 34 minutes East 153.0 feet;

Thence North 68 degrees 02 minutes West 190.0 feet to a point on the
East margin of Meridian Street right-of-way;

Thence North 18 degrees 34 minutes East along the East margin of said
Meridian Street right-of-way a distance of 40.07 feet;

Thence South 68 degrees 02 minutes East 190.0 feet;

Thence North 18 degrees 34 minutes East 57.22 feet;

Thence North 0 degrees 44 minutes East 143.44 feet to a point on the
South margin of Oakwood Avenue right-of-way;

Thence South 89 degrees 20 minutes East along the South margin of
said Oakwood Avenue right-of-way a distance of 594.71 feet;

Thence South 21 degrees 53 minutes West 143.71 feet;

Thence South 68 degrees 07 minutes East 145.0 feet to a point on the
west margin of Southern Railroad right-of-way;

Thence South 21 degrees 53 minutes West along the west margin of
said Southern Railroad right-of-way a distance of 401.02 feet to the true
point of beginning and containing 321,298.32 square feet, or 7.376 acres.

The above described tract is subject to a 15.0-foot wide utility and
drainage easement along the east margin of Meridian Street and a 10.0-foot
wide utility and drainage easement along the south margin of Oakwood Avenue.

07/19/94

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE, made this _11_ day of _August_ , 1994, between **BRONZE CENTERS, L.P.,** a Georgia limited partnership, (hereinafter called "Landlord") and **WINN-DIXIE ATLANTA, INC.,** a Florida corporation duly qualified to transact business in the State of Alabama, (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## W I T N E S S E T H :

WHEREAS, by Lease dated May 10, 1983, Huntsville Oakwood Associates, Ltd., a Georgia limited partnership, as Landlord, did lease and demise unto Tenant those certain premises in said Lease more particularly described, located in a shopping center known as "Oakwood Village Shopping Center", situated at the southeasterly corner of the intersection of Meridian Street and Oakwood Avenue, in the City of Huntsville, County of Madison, and State of Alabama, for an initial term of twenty (20) years, set to commence upon a date dependent upon the completion of certain construction and upon such terms and conditions as are more particularly set forth in the Lease, a Short Form of which is recorded in Book 619, Page 0048 of the Office of Judge of Probate of Madison County, Alabama; and

WHEREAS, by virtue of Supplemental Lease Agreement dated May 14, 1984, the commencement and expiration dates of the twenty (20) year initial term of the Lease were fixed, respectively, at March 29, 1984 and March 28, 2004; and

WHEREAS, the interest of Landlord in said Lease vested in Landlord herein by virtue of Deed dated _____; and

WHEREAS, the parties hereto have agreed to an enlargement of Tenant's present demised store building, in consequence of which the parties desire to make certain amendments to the Lease, as hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations in hand paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed as follows:

1.    With the consent and approval of Landlord hereby evidenced, Tenant covenants and agrees to proceed at its own cost and expense (with partial reimbursement from Landlord as hereinafter provided) and with due diligence to erect or cause to be erected a permanent

APPROVED
AS TO FORM

Legal Dept  n \wpwin\docs\amd\lf904
n Dixie Stores,
Inc.

This Instrument was prepared by
Charles P  Milford, Jr , Attorney
at Law  whose address  P  O
Box B, Jackson

addition measuring 65 feet in width by 172 feet in depth on the westerly (right) side of Tenant's existing store building, together with such renovations and alterations of the existing building as are necessary to make the entire enlarged building suitable for use by Tenant in the conduct of its business. The building addition and related improvements shall be of like structural and architectural quality as the existing building for Tenant and all work shall be performed in a good and workmanlike manner and in conformity with plans and specifications therefor which have been prepared by Holmes, Wilkins Architects, Montgomery, Alabama, and which have already been approved by the parties hereto, having initialed the same.

2.    By virtue of substituting a new plot plan attachment to the Lease, for the purpose of graphically showing the contemplated enlargement of Tenant's store building in the increased dimensions thereof, the Lease is amended by deleting from the first page thereof the reference to "plot plan entitled "Oakwood Village", prepared by Gilbert Engineering Co , Huntsville, Alabama dated April 9, 1983" and substituting in lieu thereof the word "plot plan entitled "Alterations and Additions to: Atlanta Division/Winn-Dixie Store #1904", prepared by Holmes-Wilkins Architects, Montgomery, Alabama, dated March 21, 1994". The said plot plan dated March 7, 1994 is attached hereto as Exhibit "A" and by this reference made a part hereof. Henceforth, whereinsoever in said Lease reference is made to Exhibit "A" or to the plot plan of the shopping center, the same shall be construed to apply to the plot plan dated March 21, 1994, attached hereto as Exhibit "A".

3.    In order to permit such expansion, it is understood that Tenant will utilize adjacent storeroom space currently occupied by tenants. Landlord agrees to secure the removal of the tenants therefrom and turn over possession of such adjacent store space to Tenant herein no later than July 1, 1994. Landlord will guarantee to Tenant herein that prior to Tenant's commencing construction of the additions herein contemplated, such adjacent store spaces shall be vacant and free of lease. Should Landlord not secure the removal of the local tenants from such store space by said date, then Tenant may, at its sole option, either extend the Landlord time to do so or else cancel this First Amendment to Lease, whereby the said Lease shall continue in full force and effect as if this Amendment had not been executed.

4.    Tenant shall let the contract for the construction of the addition to its building. It is understood that Tenant has already received a firm bid for construction from McMichaels Construction Company, of the improvements herein contemplated in the amount of One Million Two Hundred Nine Thousand Four Hundred and NO/100 Dollars ($1,209,400.00). However, if for any reason, prior to commencement of construction, the contractor raises its firm bid from said amount, Tenant shall have the privilege of revising the plans and specifications for the construction work.

5.    Upon completion of the addition to Tenant's building and occupancy thereof by Tenant (such date of occupancy to be established by Tenant giving to Landlord written notice thereof) and the delivery to Landlord by Tenant of a certificate of occupancy, Landlord agrees

2

to partially reimburse Tenant for the cost of such construction work in the amount of Five Hundred Thousand and NO/100 Dollars ($500,000.00), with interest on the unpaid balance of such sums beginning on the thirty-first (31st) day following the date of Tenant's commencement of doing business in the addition. Such interest shall be at the rate of the current New York prime interest plus two percent (2%) compounded monthly. Such payment shall be made by cashier's or certified check or wire transfer or in any other such other manner as may be specified by Tenant to Landlord. Should Landlord not make full reimbursement of such sum within thirty (30) days after completion of the addition and commencement of doing business therein by Tenant, Tenant shall have the right to deduct from all increased rentals provided in Article 9(c) hereof, from all percentage rent payments due under the Lease and from all other payments due Tenant under the Lease, such portion of the Five Hundred Thousand and NO/100 ($500,000.00) not reimbursed by Landlord to Tenant.

6.      In connection with the construction work to be performed by Tenant, Tenant agrees to indemnify and hold Landlord harmless from and against:    all mechanics', materialmen's, subcontractor's and similar liens, all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Tenant, Tenant's contractors, subcontractors, or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereon. The work shall be performed so as to minimize any adverse impact on other tenants in the shopping center.

7.      Simultaneously with construction of the building addition herein by Tenant, Landlord will, at its sole cost and expense, undertake the following construction: (a) repairing, as needed, sealing and restriping the shopping center parking lot; (b) painting the store fronts of the other stores in the shopping center; and (c) provide and maintain improved lights in the shopping center parking lot as per a plan reasonably approved by Tenant. Landlord estimates construction of these items to total approximately One Hundred Thousand and NO/100 ($100,000.00).

In connection with such construction work to be performed by Landlord, Landlord agrees to indemnify and hold Tenant harmless from and against: all mechanics', materialmen's, subcontractor's and similar liens, all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, subcontractors, or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereon.

8.      Upon completion of the building addition for Tenant and commencement of doing business therein by Tenant, the responsibilities of the parties having to do with maintenance and repairs as set forth in Articles 11 and 12 shall apply to the building additions herein contemplated; provided that Landlord shall not be responsible for failure of the expansion to be

3

constructed in accordance with the approved plans or for latent defects in the construction of the expansion area for a period of two (2) years following completion and Tenant shall assign to Landlord any construction warranties received by Tenant relating to the expansion area. Further, the additions to Tenant's building, together with all the related improvements hereto which are contemplated herein, shall be and become a part of the demised premises, and whereinsoever in said Lease, reference is made to the demised premises, the same shall be construed to apply to the enlarged building and the land on which the same shall stand.

9.    Upon the earlier of (i) substantial completion of construction of the addition and commencement of doing business therein by Tenant and upon receipt by Tenant of Landlord's full reimbursement of the sum of Five Hundred Thousand and NO/100 Dollars ($500,000.00) as described in Article 5 hereof, or, failing such reimbursement, upon the date that Tenant has fully reimbursed itself for such sum from the rentals and other payments due under the Lease as set forth in Article 5 above, or, (ii) if Tenant receives the Five Hundred Thousand and NO/100 Dollars ($500,000.00) reimbursement from Landlord not later than six (6) months following the date of execution of this document by both parties, then effective on the 181st day after execution of this document by both parties, the following modifications to the Lease will become effective:

(a)    The initial term of the Lease shall be extended for a period of fifteen (15) years from the applicable date set forth above upon the same terms and conditions as provided in the original Lease, as amended herein. The parties hereto agree to execute a further supplement to the Lease for the purpose of fixing the commencement and expiration dates of the extended term of the Lease when determined as herein provided.

(b)    It is agreed that the option extensions previously granted the Tenant under the provisions of Article 27 of the said Lease are hereby revoked and in lieu thereof, it is agreed that Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the Lease term, each such extension to be for a period of five (5) years, and the same shall follow upon the lease term as extended hereunder upon the same terms and conditions as contained in the Lease but as herein amended. Such option extensions shall be exercised (if exercised) in the same manner as provided in Article 27 of the Lease.

(c)    The said Lease is hereby amended to provide that instead of the rentals currently being paid, for the duration of the fifteen (15) year extended lease term herein provided and during any extensions thereof, Tenant agrees to pay to Landlord as minimum guaranteed rental for the enlarged demised premises, the sum of Three Hundred Twenty-Three Thousand Five Hundred Twelve and NO/100 Dollars ($323,512.00) per year. Such annual minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of Twenty-Six Thousand Nine Hundred Fifty-Nine and 33/100 Dollars ($26,959.33) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the fifteen (15) year extended lease term and any extensions thereof.

4

In addition, instead of the percentage rentals currently being paid as required by Article 1 of the Lease, Tenant agrees to pay to the Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the enlarged demised premises in each fiscal year of Tenant ending approximately June 30 during the fifteen (15) year extended term of the Lease and any extensions thereof in excess of the sum of Thirty-Two Million Three Hundred Fifty-One Thousand Two Hundred and NO/100 Dollars ($32,351,200.00).

(d)     The parties hereto agree to execute a further supplement to the Lease for the purpose of fixing the commencement date for the new rentals and new base for percentage rentals as above provided. Rentals shall be calculated and paid under the present applicable rates of the original Lease until the rentals begin to accrue under the above substituted provisions, and the rentals for any month in which a change of rate occurs shall be pro-rated between the previously effective rates and the rates effective after the date of rental adjustment.

(e)     It is understood and agreed that the contribution by the Tenant for portions of Landlord's common area liability insurance premiums, fire and extended coverage insurance premiums, common area maintenance expenses and ad valorem real estate taxes levied against the shopping center, as provided for in Articles 15, 17, 31, and 37 of the Lease, shall specifically apply to the enlarged demised premises.

(f)     In that the enlargement of Tenant's building will have been accomplished under the terms and provisions of this First Amendment to Lease, it is mutually understood and agreed that the option for expansion under different terms contained in Article 38 of the Lease shall be deemed null and void.

(g)     Landlord understands and agrees that Tenant may operate a pharmacy department in its demised premises.

10     It is mutually understood and agreed that the said Lease shall be and remain in full force and effect and unmodified except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the said Lease, which are not modified or amended by this First Amendment to Lease, are hereby ratified and confirmed.

WINN-DIXIE STORES, INC., a Florida corporation, hereinafter called "Guarantor", joins in the execution hereof for the purpose of evidencing its consent to the execution hereof by Tenant, its wholly-owned subsidiary corporation, and for the further purpose of demonstrating unto Landlord and Landlord's successors and assigns the continuing guaranty by Guarantor and Guarantor's successors and assigns of due performance by Tenant and Tenant's successors and assigns of all the covenants and conditions including, without limitation, the payment of rentals required of Tenant by said Lease dated May 10, 1983 and the within First Amendment to Lease.

5

## CONSENT

**PROTECTIVE LIFE INSURANCE COMPANY** as the holder of a mortgage encumbering the premises described in the foregoing First Amendment to Lease, and as holder of a certain collateral assignment of the Landlord's interest in the Lease therein described and the rents due thereunder, dated October 15, 1983, hereby consents to the foregoing First Amendment to Lease and agrees that it shall not be construed as a violation of any of the terms and conditions contained in its said mortgage or said collateral assignment of rents and lease.

IN WITNESS WHEREOF, Protective Life Insurance Company, has caused this consent to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this 4th day of _August_, 1994.

Signed, sealed and delivered
in the presence of:

PROTECTIVE LIFE INSURANCE
COMPANY

_Shawn Jones_
Witness

By _____
   Its Sr. Vice President / Treasurer

_Qumica Henderson_
Witness

Attest _____
   Its Asst. Secretary

(CORPORATE SEAL)

(LENDER)

STATE OF _Alabama_ )

COUNTY OF _Jefferson_ )

I, _Nancy C. Clarke_ , a Notary Public, State and County aforesaid, do hereby certify that _R. C. Fruechtenicht_ personally came before me this day and acknowledged that s/he is _Ass't_ Secretary of PROTECTIVE LIFE INSURANCE COMPANY, and that, by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _Sr_ _Vice_ President, sealed with its corporate seal, and attested by her/himself as its _Ass't_ Secretary.

Witness my hand and official seal, this the _4th_ day of _August_ , 1994.

_Nancy C. Clarke_
Notary Public
State and County aforesaid
My commission expires. _9-26-94_

(NOTARIAL SEAL)

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

Signed, sealed and delivered
in the presence of:

BRONZE CENTERS, L.P., by its
sole general partner

BRONZE HOLDINGS, INC., a
Georgia corporation

_Amy C. Hutsell_
Witness

By _____
Its              President

_Donna Wilson Pattosff_
As to Landlord

Attest _____
Its Ass't        Secretary

(CORPORATE SEAL)

**LANDLORD**

**WINN-DIXIE ATLANTA, INC.**

_Sally Reece_
Witness

By ___X.P. McGah____
Its     Vice President

_John E. Dewitt_
As to Tenant

Attest _____
Its              Secretary

(CORPORATE SEAL)

**TENANT**

**WINN-DIXIE STORES, INC.**

_Sally Reece_
Witness

By ___X.P. McGah____
Its     Vice President

_John E. Dewitt_
As to Guarantor

Attest _____
Its              Secretary

(CORPORATE SEAL)

**GUARANTOR**

6

STATE OF ·_____  )

COUNTY OF_____  )

    I, _____, a Notary Public in and for said County and in said State, hereby certify that _____, whose name as _____ President of BRONZE HOLDINGS, INC. is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _____ President and with full authority, executed the same voluntarily for and as the act of said corporation.
    Given under my hand and official seal this _____ day of _____, 1994.

_____
Notary Public
My commission expires:           (NOTARIAL SEAL)

STATE OF FLORIDA    )

COUNTY OF DUVAL    )

    I, **Jane Elizabeth DeWitte**, a Notary Public in and for said County and in said State, hereby certify that **R. P. McCook**, whose name as **Vice** President of WINN-DIXIE ATLANTA, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such **Vice** President and with full authority, executed the same voluntarily for and as the act of said corporation.
    Given under my hand and official seal this _12th_ day of _August_, 1994.

_Jane Elizabeth DeWitte_
Notary Public
My commission expires: 5/18/96

JANE ELIZABETH DeWITTE
My Comm Exp May 18, 1996
Comm No CC 201960

(NOTARIAL SEAL)

STATE OF FLORIDA    )

COUNTY OF DUVAL    )

    I, **Jane Elizabeth DeWitte**, a Notary Public in and for said County and in said State, hereby certify that **R. P. McCook**, whose name as _____ President of WINN-DIXIE STORES, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such **Vice** President and with full authority, executed the same voluntarily for and as the act of said corporation.
    Given under my hand and official seal this _12th_ day of _August_, 1994.

_Jane Elizabeth DeWitte_
Notary Public
My commission expires: 5/18/96

JANE ELIZABETH DeWITTE
My Comm Exp May 18, 1996
Comm No CC 201960

(NOTARIAL SEAL)

## CONSENT

**PROTECTIVE LIFE INSURANCE COMPANY** as the holder of a mortgage encumbering the premises described in the foregoing First Amendment to Lease, and as holder of a certain collateral assignment of the Landlord's interest in the Lease therein described and the rents due thereunder, dated October _____, 1983, hereby consents to the foregoing First Amendment to Lease and agrees that it shall not be construed as a violation of any of the terms and conditions contained in its said mortgage or said collateral assignment of rents and lease.

**IN WITNESS WHEREOF,** Protective Life Insurance Company, has caused this consent to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this _____ day of _____, 1994.

**Signed, sealed and delivered**
**in the presence of:**

                                        **PROTECTIVE LIFE INSURANCE**
                                        **COMPANY**

_____      By _____
Witness                             Its           President

_____      Attest _____
Witness                             Its           Secretary

                                               **(CORPORATE SEAL)**

                                                    **(LENDER)**

STATE OF _____ )

COUNTY OF _____ )

I, _____, a Notary Public, State and County
aforesaid, do hereby certify that _____
personally came before me this day and acknowledged that s/he is _____ Secretary of
PROTECTIVE LIFE INSURANCE COMPANY, and that, by authority duly given and as the
act of the corporation, the foregoing instrument was signed in its name by its _____ President,
sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____,
1994.

_____
Notary Public
State and County aforesaid
My commission expires:

                                    (NOTARIAL SEAL)

05/16/95

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE, made this 3/st day of _____ May _____, 1995, between BRONZE CENTERS, L.P., a Georgia limited partnership, (hereinafter called "Landlord") and WINN-DIXIE ATLANTA, INC., a Florida corporation duly qualified to transact business in the State of Alabama, (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## W I T N E S S E T H :

WHEREAS, by Lease dated May 10, 1983, Huntsville Oakwood Associates, Ltd , a Georgia limited partnership, as Landlord, did lease and demise unto Tenant those certain premises in said Lease more particularly described, located in a shopping center known as "Oakwood Village Shopping Center", situated at the southeasterly corner of the intersection of Meridian Street and Oakwood Avenue, in the City of Huntsville, County of Madison, and State of Alabama, for an initial term of twenty (20) years, set to commence upon a date dependent upon the completion of certain construction and upon such terms and conditions as are more particularly set forth in the Lease, a Short Form of which is recorded in Book 619, Page 0048 of the Office of Judge of Probate of Madison County, Alabama; and

WHEREAS, by virtue of Supplemental Lease Agreement dated May 14, 1984, the commencement and expiration dates of the twenty (20) year initial term of the Lease were fixed, respectively, at March 29, 1984 and March 28, 2004; and

WHEREAS, the interest of Landlord in said Lease vested in Landlord herein by virtue of Deed dated October 22, 1993, and

WHEREAS, by that certain First Amendment to Lease, dated August 11, 1994 the parties hereto agreed to an enlargement of Tenant's present demised store building, in consequence of which the parties desired to make certain amendments to the Lease, as hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the sum of Ten and NO/100 Dollars ($10 00) and other good and valuable considerations in hand paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed that, effective May 11, 1995, said Lease shall be and the same is hereby further amended as follows,

APPROVED AS TO FORM
Div Stop Mgr. n \wpwin\docs\amd\1904
Legal Dept.
Winn-Dixie Stores, Inc.

This instrument was prepared by
William O Scaife, Jr , Attorney-
at-Law, whose address is P O
Box B, Jacksonville, Florida 32203

which amendment shall supersede any provisions of said Lease, as heretofore amended, in conflict herewith.

1.      It is understood that by reason of the aforesaid addition the enlarged demised store building now contains a total gross floor area of approximately forty-seven thousand two hundred ninety-three (47,293) square feet.

2      Tenant agrees to pay Landlord as a minimum guaranteed rental for the said enlarged demised premises during the remainder of the term of said Lease and any extensions thereof the sum of Three Hundred Twenty-Three Thousand Five Hundred Twelve and NO/100 Dollars ($323,512 00) per annum, due in advance in equal monthly installments of Twenty-Six Thousand Nine Hundred Fifty-Nine and 33/100 Dollars ($26,959.33) on the first day of each and every calendar month of the lease term and any extensions thereof. In addition, Tenant agrees to pay Landlord a total percentage rental equal to the amount, if any, by which one percent (1%) of Tenant's gross sales made from said enlarged demised premises in each fiscal year of Tenant ending approximately June 30 during the remainder of the term of said Lease and any extensions thereof exceeds Three Hundred Twenty-Three Thousand Five Hundred Twelve and NO/100 Dollars ($323,512 00).

3      The term of said Lease is extended for a further and additional period of six (6) years, one (1) month, and thirteen (13) days, such extension to be on the same covenants and conditions except as herein stipulated, and except as stipulated in that certain First Amendment to Lease dated August 11, 1994, between the parties hereto, with the result that said term shall not expire on March 28, 2004 but shall instead expire at midnight on May 10, 2010, it being understood and agreed that such extension is in addition to the five (5) successive extension options presently remaining available to Tenant under the provisions of said Lease, as amended, which extension options are not hereby exercised.

4      It is mutually agreed that the said Lease dated May 10, 1983, as previously amended, shall be and remain in full force and effect and unmodified except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of said Lease, as amended, not modified and amended by this Second Amendment to Lease, are hereby ratified and confirmed

WINN-DIXIE STORES, INC., a Florida corporation, hereinafter called "Guarantor", joins in the execution hereof for the purpose of evidencing its consent to the execution hereof by Tenant, its wholly-owned subsidiary corporation, and for the further purpose of evidencing unto Landlord and Landlord's successors and assigns of due performance by Tenant and Tenant's successors and assigns of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the Lease dated May 10, 1983, as heretofore amended, and the within Second Amendment to Lease.

2

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

Signed, sealed and delivered
in the presence of:

BRONZE CENTERS, L.P., by its
sole general partner:

BRONZE HOLDINGS, INC., a
Georgia corporation

_____
Witness

By _____
    Its            President

_____
As to Landlord

Attest _____
     Its  Ass't  Secretary

                    (CORPORATE SEAL)

                    **LANDLORD**

WINN-DIXIE ATLANTA, INC.

_____
Witness

By _____
    Its   Vice  President

_____
As to Tenant

Attest _____
     Its  Asst.  Secretary

                    (CORPORATE SEAL)

                    **TENANT**

WINN-DIXIE STORES, INC.

_____
Witness

By _____
    Its          President

_____
As to Guarantor

Attest _____
     Its  Asst. Secretary

                    (CORPORATE SEAL)

                    **GUARANTOR**

3

STATE OF __GEORGIA__ )

COUNTY OF __FULTON__ )

I, __PATRICIA B SMITH__, a Notary Public in and for said County and in said State, hereby certify that __Stewart D Southern__, whose name as _____ President of BRONZE HOLDINGS, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _____ President and with full authority, executed the same voluntarily for and as the act of said corporation

Given under my hand and official seal this __31st__ day of __MAY__, 1995

__Patricia B Smith__
Notary Public
My commission expires

STATE OF FLORIDA )

COUNTY OF DUVAL )

I, __Jane Elizabeth DeWitte__, a Notary Public in and for said County and in said State, hereby certify that __James Kufeldt__, whose name as __Vice__ President of WINN-DIXIE ATLANTA, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such __Vice__ President and with full authority, executed the same voluntarily for and as the act of said corporation

Given under my hand and official seal this __9th__ day of __June__, 1995.

__Jane Elizabeth DeWitte__
Notary Public
My commission expires.

(NOTARIAL SEAL)

JANE ELIZABETH DeWITTE
My Comm Exp May 18, 1998
Comm No CC 201960

STATE OF FLORIDA )

COUNTY OF DUVAL )

I, __Jane Elizabeth DeWitte__, a Notary Public in and for said County and in said State, hereby certify that __James Kufeldt__, whose name as _____ President of WINN-DIXIE STORES, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _____ President and with full authority, executed the same voluntarily for and as the act of said corporation

Given under my hand and official seal this __9th__ day of __June__, 1995

__Jane Elizabeth DeWitte__
Notary Public
My commission expires.

(NOTARIAL SEAL)

JANE ELIZABETH DeWITTE
My Comm Exp May 18, 1998
Comm No CC 201960

## CONSENT

PROTECTIVE LIFE INSURANCE COMPANY as the holder of a mortgage encumbering the premises described in the foregoing Second Amendment to Lease, and as holder of a certain collateral assignment of the Landlord's interest in the Lease therein described and the rents due thereunder, dated October 22, 1983, hereby consents to the foregoing Second Amendment to Lease and agrees that it shall not be construed as a violation of any of the terms and conditions contained in its said mortgage or said collateral assignment of rents and lease

IN WITNESS WHEREOF, Protective Life Insurance Company, has caused this consent to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this _____ day of _____, 1995.

Signed, sealed and delivered
in the presence of:

PROTECTIVE LIFE INSURANCE
COMPANY

_____
Witness

By _____
     Its       President

_____
Witness

Attest _____
     Its      Secretary

(CORPORATE SEAL)

(LENDER)

STATE OF _____ )

COUNTY OF_____ )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____
personally came before me this day and acknowledged that s/he is _____ Secretary of PROTECTIVE LIFE INSURANCE COMPANY, and that, by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____,
1994

_____
Notary Public
State and County aforesaid
My commission expires:

(NOTARIAL SEAL)

# ROSEN LAW GROUP, LLC

950 E. PACES FERRY ROAD, SUITE 3250    ATLANTA, GEORGIA 30326
TELEPHONE 404 832.8410    FACSIMILE 404 832.8422

October 11, 2005

**Via Federal Express**

Attn: Winn-Dixie Claim Center
c/o Logan & Company, Inc.
546 Valley Road
Upper Montclair, New Jersey 07043

      In re: Winn-Dixie Stores, Inc.; United States Bankruptcy Court, Middle District of
      Florida, Jacksonville Division; Case Number: 05-03817-3F1

Dear Sir or Madam:

      Enclosed please find an original and one (1) copy of a proof of claim, as amended, filed
on behalf of Oakwood Village Associates (Store #1904) with respect to the above-referenced
matter. Please return a stamped "filed" copy of the proof of claim to me in the enclosed self-
addressed, stamped envelope.

      Please contact me should you have any questions.

      Thank you for your time and attention.

            Very truly yours,

            **ROSEN LAW GROUP, LLC**

            Mitchell S. Rosen

MSR/llm
Enclosures

cc:    Ms. Glynda Blanton (via first class mail w/enclosure)

{00002821 DOCv1}