UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 3:05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., et al., | Chapter 11 |
| Debtors. | Jointly Administered |
| _____/ | |

**FINAL RESPONSE OF MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP,
TO FEE EXAMINER'S FINAL REPORT OF REVIEW
AND ANALYSIS OF THIRD INTERIM APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>C</sup>CLOY LLP FOR
INTERIM PERIOD OCTOBER 1, 2005 THROUGH
AND INCLUDING JANUARY 31, 2006**

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("Milbank") submits this response (the "Response") to Stuart, Maue, Mitchell & James, Ltd.'s (the "Fee Examiner") final report of the review and analysis of the third interim application submitted by Milbank for the interim period of October 1, 2005 through and including January 31, 2006 (the "Report"), and in support thereof, respectfully represents as follows:

**BACKGROUND**

1. Bankruptcy Filing. On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. and certain of its affiliated direct and indirect subsidiaries (collectively, "Winn-Dixie" or the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code")

in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").

2.  Statutory Committees.  On March 1, 2005, the United States Trustee duly appointed the Official Committee of Unsecured Creditors (the "Committee") (Docket No. 176).  On August 17, 2005, the United States Trustee appointed the Equity Security Holders' Committee (the "Equity Committee") (Docket No. 3027), which was disbanded on January 11, 2006 (Docket No. 5098).

3.  Venue Transfer.  By order dated April 13, 2005, the New York Bankruptcy Court transferred venue of these cases to the Bankruptcy Court for the Middle District of Florida (Jacksonville Division) (the "Bankruptcy Court").  The Debtors' cases are being jointly administered for procedural purposes only.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

4.  Milbank's Retention.  On April 12, 2005, pursuant to the Order Under 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002, Authorizing Retention and Employment of Milbank, Tweed, Hadley & M$^c$Cloy LLP as Counsel to Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc., et al. (Docket No. 702) (the "Retention Order"), the Bankruptcy Court

authorized the Committee's retention of Milbank as its counsel in these cases effective as of March 1, 2005.[1]

  5. <u>Third Interim Fee Application</u>.  On March 17, 2006, Milbank submitted the Third Application of Milbank, Tweed, Hadley & M$^c$Cloy LLP, Counsel to Official Committee of Unsecured Creditors, for Interim Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred During Period from October 1, 2005 Through and Including January 31, 2006 (the "<u>Third Interim Compensation Period</u>," and such interim fee application being the "<u>Third Interim Fee Application</u>") (Docket No. 6547).

  6. On April 6, 2006, this Court granted the Third Interim Fee Application and allowed Milbank's request for $832,307.50 in fees and $75,815.03 in expenses, for a total award of $908,122.53 (Docket No. 6966).

  7. <u>Fee Examiner</u>.  On August 10, 2005, the Bankruptcy Court ordered the appointment of a fee examiner, pursuant to the Order Granting Motion To Appoint Fee Examiner (Docket No. 2933). On December 14, 2005, the Bankruptcy Court entered the Order Authorizing Debtors to Employ and Retain Stuart, Maue, Mitchell & James Ltd. as Fee Examiner (Docket No. 4599) (the "<u>Fee Examiner</u>"), pursuant to which certain procedures were

---

[1] On March 30, 2005, the New York Bankruptcy Court entered an order (Docket No. 607) approving Milbank's retention on an interim basis

established for the Fee Examiner's review of all interim fee applications, including Milbank's Third Interim Fee Application.

## RESPONSE

8.  Milbank appreciates the opportunity to address the Report and to explain and clarify items that the Fee Examiner has identified, and to supplement its Third Interim Fee Application.  Milbank hopes that the supplemental information in this Response and in the attached exhibits will assist the Fee Examiner and the United States Trustee in their review of the reasonableness and necessity of the fees and expenses incurred by Milbank during the Third Interim Compensation Period.

9.  The balance of this submission will track the substantive portions of the Report.

### A. Recomputation Of Fees And Expenses

10.  The recomputed amount of total fees is $2,174.50 more than the amount requested by Milbank.  (Report at 4).  This difference is the result of a variance between task hours and entry hours.  <u>Accordingly, Milbank respectfully requests that any fees that it waives in response to the Report be offset by $2,174.50 to reflect this calculation error.</u>

---

subject to final approval, which occurred pursuant to the Retention Order.

11.  The Report notes that there is no discrepancy between the amount of expenses requested for reimbursement and amounts computed by the Fee Examiner.

**B.  Technical Billing Discrepancies**

12.  The Report notes that there were no technical billing discrepancies identified (e.g., double billing, wrong case billings and missing task descriptions).

**C.  Hourly Rate Increases**

13.  The Report notes that hourly rates for 15 timekeepers increased during the Third Interim Compensation Period.  The Report notes that such increases were effective January 1, 2006 and ranged from $10 to $100 per hour, leading to $32,553.50 in additional fees being incurred during the Third Interim Compensation Period.  Milbank does not believe that it would be appropriate to deny the Firm compensation that is based on the usual and customary hourly rates charged by the Firm to its bankruptcy and non-bankruptcy clients.  Milbank's hourly rates are adjusted in the normal course of the Firm's business at least annually, usually on or around January 1 of each year, and services rendered thereafter would be billed at the new hourly rates.  The new hourly rates charged by Milbank were increased effective January 1, 2006 in accordance with Milbank's established billing practices and procedures.  Milbank submits that work done for the Committee on and after January 1, 2006 is properly charged at the rates then in effect.

5

**D.   Time Increments; Complete and Detailed Descriptions**

14.  The Report notes that all billing entries were in tenths-of-an-hour increments as required by U.S. Trustee Guidelines and task descriptions were sufficiently detailed and included the type of activity and subject-matter.

**E.   Blocked Entries**

15.  The Report notes that there were no "lumped" or "blocked entries".

**F.   Multiple Professionals At Hearings And Conferences (Intraoffice Conferences)**

16.  The Fee Examiner has identified 132 entries describing intraoffice conferences, which represents 37.1 hours with $19,125 in associated fees.  (Report at 9-11, Exhibit C).  The Fee Examiner further notes that most of the intraoffice conferences were for .5 hours or less.  (Report at 10).  Furthermore, no conferences exceeded 1.0 hour.  (See Exhibit C to Report).

17.  As the Fee Examiner notes, "[i]ntraoffice conferences are necessary and appropriate . . . ."  (Report at 10).  Additionally, there is nothing in the Bankruptcy Court's local rules or the U.S. Trustee Guidelines that mandates the disallowance of such fees.  The Fee Examiner only requires that conferences identify the participants, the subject matter of the conference and the need for multiple attendees.  That has been done with respect to these activity description on Exhibit A attached hereto.

6

18.  Committee representation in cases as large and complex as those of the Debtors cannot possibly be handled by a single attorney, and clients understand and expect that a team of highly-qualified and capable attorneys are necessary to provide proper representation in complex cases.  As such, in order to maximize efficiency and cohesiveness, intra-office conferences and meetings are necessary in order to coordinate complex tasks and delegate work to ensure non-duplication. Milbank has used its best efforts to ensure intra-office conferences are employed only when necessary, as reflected by both length -- most intra-office conferences were billed at .5 hours or less -- and number -- intraoffice conferences represent only 2% of the total fees requested during the Third Interim Compensation Period.  As such, Milbank respectfully submits its use of intra-office conferences were limited, necessary and appropriate.  Milbank believes that Exhibit A attached hereto contains revised activity descriptions that are in accordance with the Fee Examiner's specifications for certain of the identified time entries.

**G. Multiple Professionals At Hearings And Conferences (Non-Firm Conferences, Hearings and Events)**

19.  The Fee Examiner has identified 118.4 hours, with $64,649.50 in associated fees where more than one Milbank timekeeper attended a conference, hearing or other event that was also attended by non-Firm personnel.  (Report at 11-12, Exhibit D).  Furthermore, the Fee Examiner notes that Milbank

only incurred 72.1 hours with associated fees of $36,402 for participants other than the apparent primary timekeeper. Milbank has carefully reviewed the non-Firm conferences, hearings and events identified by the Fee Examiner on Exhibit D to the Report and has prepared Exhibit B attached hereto to better identify and explain the role of each timekeeper who billed for that attendance and the need for multiple attendees. These involved meetings and hearings (not intra-office conferences) as follows:

- Court hearings
- Committee meetings
- Discussions regarding asset sales
- Discussions regarding the Debtors' key employee compensation plan
- Discussions regarding pending motions
- Discussions regarding treatment of reclamation creditors
- Meetings regarding substantive consolidation
- Meeting with the Debtors

Milbank believes that the level of staffing was appropriate for the tasks involved and that Milbank would not have been able competently to handle the particular meetings and hearings at issue with only one lawyer.  For example, the resolution of substantive consolidation issues required the participation of both Robert Winter and Michael Comerford to ensure that voluminous documents could be timely reviewed, interviews of the Debtors' personnel could be completed and a related presentation prepared for the Committee in connection with its evaluation of

substantive consolidation issues.  Additionally, Matthew Barr's participation, a partner at Milbank, was also required for additional analysis and oversight purposes on the substantive consolidation project.

20.  None of the matters involving the participation of multiple professionals that have been identified by the Fee Examiner on Exhibit D to the Report were routine.  Generally, Milbank's counterparties with respect to the identified activities were also represented by multiple lawyers; multiple professionals were required because of the complexity, significance and multi-disciplinary aspects of the activities.  As noted, Milbank has attached an annotated version of Exhibit D to assist the Fee Examiner in this regard.

### H. Personnel Who Billed 10 Or Fewer Hours

21.  The Fee Examiner notes (Report at 13, Exhibit E) that two timekeepers billed 10 or fewer hours during the Third Interim Compensation Period in an aggregate of 13.3 hours with associated fees of $6,320 and suggests a review of these timekeepers may be appropriate to allow a determination of whether they are (i) duplicating the work of others, (ii) increasing the cost to the Debtors' estates because of orientation or the 'getting-up-to-speed' that may be required, or (iii) not contributing to the advancement of the cases. Milbank has attached hereto as Exhibit C further information regarding these individuals and the services they have performed

to assist the Fee Examiner in its review.  As Exhibit C shows, of the two timekeepers at issue, one is an associate at Milbank and has continued to have involvement with respect to these cases and one was an associate who recently left the Firm.  One associate has assisted the Committee in connection with an investigation of certain prepetition Debtor activities and the second associate, prior to leaving the Firm in June 2006, assisted in the review and documentation of various asset sales by the Debtors.  None of these timekeepers were rotated in and out of the engagement, and the fact that they devoted relatively small amounts of time to the matter is not indicative of inefficient staffing.

### I.     Long Billing Days

22.   Lawyers in large firms like Milbank and complex reorganization cases like those of the Debtors do not work five-day weeks or eight-hour days.  The professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.  As such, on many occasions, "long billing days" cannot be avoided.

23. The Fee Examiner has identified four (4) days on which individuals billed more than 12 hours during the Third Interim Compensation Period. (Report at 14, Exhibit F-1). The Fee Examiner further notes that these entries total 52.2 hours with $24,322.50 in associated fees. The hours billed by individuals on these days relate to extraordinary activity levels associated with particular matters of critical importance, including the consideration of and preparation for (i) interviews with Company personnel in connection with substantive consolidation issues, (ii) preparing on short notice objections to the reappointment of the disbanded equity committee and (iii) time necessary to attend meetings scheduled in Jacksonville, Florida.

24. If a "12-hour rule" were imposed on counsel in these chapter 11 cases, the concern regarding inefficiencies by timekeepers who bill low hours discussed above in section H of this Response would become a significant concern. More lawyers working fewer hours is inefficient and simply does not make sense from the client's perspective; it would not be tolerated by Milbank's non-bankruptcy clients.

**J.    Administrative/Clerical Activities**

25. The Fee Examiner has identified 141.85 hours with $20,575.75 in associated fees as activities describing administrative and clerical activities performed by paraprofessionals. (Report at 15-16, Exhibit G). Milbank had

11

staff performing administrative and clerical tasks throughout the Third Interim Compensation Period.  In addition, Milbank submits that the administrative and clerical activities in question are activities that Milbank does not include as overhead.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  Milbank represents that it does in fact charge its non-bankruptcy clients for the items identified by the Fee Examiner.

      26.   The Fee Examiner did not identify any entries describing administrative clerical activities performed by professionals.

**K.**    **<u>Legal Research</u>**

      27.   The Fee Examiner had identified 147.2 hours with associated fees of $64,373, describing legal research time entries.  (Report at 17).  The Fee Examiner did not identify any time entries that were considered vague in describing the research and its purpose.

      28.   With respect to the 147.2 hours with $64,373 in associated fees of legal research, the Fee Examiner does not suggest any abuses or non-compensable time for legal research. The question is whether such charges were reasonable and appropriate.  This is an area where there is no substitute for the Bankruptcy Court's and the United States Trustee's experience with the conduct of bankruptcy cases generally and their respective knowledge of the issues raised in these

reorganization cases in particular. To help them in this analysis, Milbank notes that the hours expended for legal research approximate 8% of the total hours and 8% of the total fees. Milbank submits that such amounts are reasonable and that the research was necessary to the administration of the cases.

  **L.** **Travel**

   29. The Fee Examiner has identified 17 tasks describing non-working travel time and an aggregate of 82.8 hours with $49,554. in associated fees of travel time. (Report at 17). Milbank notes that the time billed for travel was for necessary trips by Milbank attorneys for Bankruptcy Court hearings, for meetings with the Debtors' employees and representatives and for store auctions. The hours expended for travel time approximate 5% of the total hours and 8% of the total fees. Milbank submits that such amounts are reasonable and that the travel was necessary to the administration of the cases.

  **M.** **Travel Expenses**

   30. The Fee Examiner identifies (Report at 23-24 and Exhibit K to the Report) out-of-town travel expenses totaling $15,176.34. The Fee Examiner notes that $11,962,81 of the out-of-town travel expenses are described only as "travel" and "did not include a separate itemization for airfare, hotel accommodations, or other travel-related expenses." Milbank has reviewed all of the entries identified by the Fee Examiner as

13

out-of-town travel and attaches as Exhibit D hereto revised travel expense descriptions that identify the nature of the expenses.

            31.   <u>In addressing the Fee Examiner's concerns regarding separate itemization for airfare, hotel accommodations, other travel-related expenses, or vague expenses Milbank will voluntarily waive its request for reimbursement of $20</u>.

       **N.    Computer-Assisted Legal Research**

            32.   The Fee Examiner identified computer database research totaling $29,886.66 and indicated that the application does not disclose the method used to calculate such amounts or whether the amount requested is at actual cost or a discounted rate.  For database services provided by entities such as Lexis and Westlaw (the "<u>Providers</u>"), Milbank pays the Providers for access to such databases pursuant to flat rate subscription agreements.  For a specific Lexis or Westlaw search run on behalf of a client, Milbank charges the client for the cost of the search at a rate assigned by the Provider.  On an annualized basis, the expenses incurred by Milbank that it attributes to computer-assisted legal research are greater than the disbursements related to such research for which Milbank seeks reimbursement from its clients.

### O. Local Travel

33. The Fee Examiner has indicated that Milbank sought reimbursement for local travel expenses in the amount of $3,766.16. (Report at 26-27, Exhibit N-1). The Fee Examiner contends that "[w]hile the Firm may reimburse its employees for commuting expenses [when working after regular business hours], this type of expenses is generally considered part of Firm overhead." (Report at 27).

34. Milbank submits that overtime transportation expenses incurred in connection with legitimate client business may be charged to the client. Milbank provides transportation assistance to personnel who arrive at or leave work during off-peak hours. "Off-peak travel" is defined as beginning or ending work during the period from 8:30 p.m. to 6:00 a.m., Monday through Friday, or at any time on a Saturday, Sunday or Firm-observed holiday. Persons who start and end work during off-peak hours are entitled to transportation assistance for one-way travel only. When a person who is eligible for transportation reimbursement elects to travel by private automobile or public transportation, Milbank provides fixed reimbursement of $12.00 to persons residing within the five boroughs of New York City and $21.00 to persons residing outside the of New York City.

35. In light of the number of long billing days during the Third Interim Compensation Period, Milbank submits that reimbursement for local travel expenses are reasonable and

reflect the exercise of sound billing judgment by Milbank personnel. Such overtime expenses are charged by Milbank to its non-bankruptcy clients. Milbank submits that it is market practice for firms like Milbank to charge for such expenses.

36. <u>In an effort to address the Fee Examiner's concerns noted on page 21 of the Report, Milbank will voluntarily waive its request for reimbursement by $70.02</u>.

37. In addition, the Fee Examiner notes that "several of the [local travel] entries did not identify the origination or destination of the local travel." Report at 27. Milbank notes that these entries reflect days on which timekeepers eligible for transportation reimbursement elected to travel by private automobile or public transportation, and sought fixed reimbursement of $12.00 for travel within the five boroughs of New York City and $21.00 for travel to outside the of New York City.

**P.     Overtime and Local Meals**

38. The Fee Examiner has identified $1,446.41 in overtime meal expenses (Report at 29-30 and Exhibit N-2 to the Report) and suggests that "[w]hile the Firm may reimburse its employees for [overtime] meal expenses, this type of expense is generally considered part of Firm overhead." Report at 29).

39. Milbank's written policy regarding this category of expense provides that personnel who work past 8:00 p.m. on a client matter (not including time spent at dinner) can be

16

reimbursed for dinner expenses up to $25 in New York and California.  All such overtime meal expenses are charged by Milbank to its non-bankruptcy clients.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.

      40.  <u>In an effort to address the Fee Examiner's concerns on this issue, Milbank will voluntarily reduce the expenses requested by $107.48</u>.

      41.  The Fee Examiner also indicates (Report at 30 and Exhibit N-3 to the Report) that Milbank sought reimbursement for local meals in the amount of $338.93.  Milbank submits that the meals, as indicated on Exhibit N-3 to the Report, relating to a Committee meeting of approximately 20 people and charges for two meals while on a business trip, respectively, were reasonable and necessary expenses associated with Winn-Dixie related business meetings and/or Bankruptcy Court hearings.  The latter charge of $63.66 was submitted for two separate meals in connection with a trip to Florida by a Milbank attorney for a court hearing relating to the equity committee's formation.  As such, Milbank respectfully submits it should be reimbursed for the expenses in the amount of $338.93.

    **Q.**    **Document Processing/Overtime**

      42.  The Fee Examiner identifies (Report at 31-32 and Exhibit N-4 to the Report) a total of $7,993.70 in charges for secretarial and support staff overtime.  These are items that

Milbank does not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  As the Third Circuit held in Busy Beaver, not all clerical services are necessarily overhead.  19 F.3d at 848.  These expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well.  That is the market practice.  In considering the propriety of a professional's charges under section 330 for so-called "overhead expenses," the bankruptcy court should seek to determine if nonbankruptcy professionals charge their clients for these particular services.  Busy Beaver, 19 F.3d at 849.  Milbank represents that it does in fact charge its nonbankruptcy clients for the items identified by the Fee Examiner.

**R.     Expenses Associated With Multiple Attendance**

43.   The Fee Examiner identifies (Report at 33, Exhibit P) expenses associated with some conferences, hearings or other events for which multiple Milbank timekeepers billed totaling $7,498.89.  As addressed above in section G of this Response, Milbank submits that attendance by Milbank timekeepers was appropriate and similarly submits that reimbursement of each timekeepers' expenses is also reasonable.

**S.     Vaguely Described Expenses**

44.   The Fee Examiner has identified (Report at 32-33, Exhibit O) a total of 2 charges totaling $99.72 for which the

Firm did not provide an adequate description of the expenses. Milbank has reviewed both of the entries identified by the Fee Examiner and attaches as Exhibit E hereto revised descriptions.

### T.   Courier Services; Photocopies; Facsimiles; Binding

45.   The Fee Examiner identifies (Report at 25 and 32) charges for courier services, photocopies, facsimiles and binding.  These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that these expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well.  That is the market practice. Milbank represents that it does in fact charge its non-bankruptcy clients for the items listed above and identified by the Fee Examiner.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## CONCLUSION

46. Milbank has supplemented its fee application to address the asserted deficiencies noted by the Fee Examiner. Milbank appreciates the considerable efforts of the Fee Examiner and has itself made considerable effort to address the issues raised in the Report. Milbank hopes that the supplemental materials submitted herewith will enable the Fee Examiner to evaluate the reasonableness and necessity of the fees and expenses incurred during the Third Interim Compensation Period, in connection with the Fee Examiner's final report that was submitted to the Bankruptcy Court.

Dated:   New York, New York
         September 21, 2006

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**

By:   _/s/ Matthew S. Barr_____
      Matthew S. Barr (MB 9170)
      Michael E. Comerford (MC 7049)
      1 Chase Manhattan Plaza
      New York, New York 10005
      (212) 530-5000

      Co-counsel for Official Committee of
      Unsecured Creditors of Winn-Dixie
      Stores, Inc., et al.