**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |
|---|---|
| In re: | Case No.  05-03817-JAF |
|  | Chapter 11 |
| WINN-DIXIE STORES, INC., <u>et</u> <u>al.</u>, | |
|  | Jointly Administered |
| Debtors. | |

_____

**OBJECTION OF LIQUIDITY SOLUTIONS, INC. TO CONFIRMATION**
**OF THE JOINT PLAN OF REORGANIZATION OF WINN-DIXIE**
<u>**STORES, INC. AND AFFILIATED DEBTORS DATED AUGUST 9, 2006**</u>

LIQUIDITY SOLUTIONS, INC. ("LSI"), a creditor holding "Landlord Claims" as further described in Paragraph 5 below, by and through its undersigned counsel, hereby objects  to confirmation of the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors dated August 9, 2006 (the "Objection"), and states as follows:

<u>**BACKGROUND**</u>

1.      On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. ("Stores" or "Parent"), Winn-Dixie Montgomery, Inc. ("Montgomery"), Winn-Dixie Raleigh, Inc. ("Raleigh"), and certain other affiliates of Stores (collectively, the "Debtors") filed Voluntary Petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq.</u> (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.  By order entered April 13, 2005, venue of the Debtors' chapter 11 cases was transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Court").

2.      On or about August 9, 2006, the Debtors filed their Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Plan")[1] and their Disclosure Statement with Respect to Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Disclosure Statement" or "DS") in these cases.

3.      As of the Petition Date, the Debtors operated over 900 retail food stores under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners in the southeastern United States and the Bahamas, see DS, §IV.A, pg. 19, with store locations primarily being leased. See DS, § IV.C, pg. 21.

4.      The Debtors' reorganization strategy during the pendency of these Chapter 11 cases has included exiting certain "noncore" markets with underperforming store locations, by either assuming and assigning the underlying leases to third parties for value, or alternatively, rejecting those leases in the "noncore" market for which acceptable bids could not be identified.  See DS, §V.F.3, pgs. 41-42.

5.      As of the date hereof, LSI is the holder (as assignee)[2] of Claims against multiple Debtors that include, but may not be limited to, the following:

| Original Creditor | Debtor Tenant | Debtor Guarantor | Claim #s | Amount |
|---|---|---|---|---|
| Albion Pacific Property Resources, LLC | Montgomery | Stores | 12312, 12313 | $1,444,403.47 |

---

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

[2] All relevant notices of transfer have been filed with this Court.

| Original Creditor | Debtor Tenant | Debtor Guarantor | Claim #s | Amount |
|---|---|---|---|---|
| Indian Trail Square LLC | Raleigh | Stores | 12834, 12835 | $482,638.80 |
| LN Piedmont Village | Montgomery | Stores | 9708, 9709 | $348,877.08 |
| McDonough Marketplace Partners | Montgomery/ Raleigh | Stores | 10825, 10826 | $53,457.46 |
| McDonough Marketplace Partners | Montgomery/ Raleigh | Stores | 12148, 12149 | $521,253.55 |
| Scottland Mall, Inc. | Raleigh | Stores | 1933, 11103 | $452,731.93 |
| Shoals Marketplace LLC | Montgomery | Stores | 8155, 8487 | $1,042,137.41 |

6.     Thus, as noted above, LSI holds claim against the Debtors' estates in the total approximate amount of $4.2 million.  The claims held by LSI against the estate of Montgomery are in the approximate amount of $3.3 million, and the claims held against the estate of Raleigh are in the approximate amount of $1.4 million.[3]  Winn-Dixie Stores guaranteed the lease obligations associated with these claims.

## PRELIMINARY STATEMENT OF ARGUMENT

7.     The Plan filed by the Debtors is predicated on substantive consolidation "for purposes of distributions under the Plan", whereby the various Debtors' assets and liabilities are "deemed" to be pooled in order to determine the appropriate percentage distribution for each class of creditors and thereafter make such payments.  DS, §VI.B,

---

[3] As noted in the chart, both Raleigh and Montgomery signed the lease for the premises let by McDonough Marketplace Partners.  Stores guaranteed this lease.  The Claim resulting from the rejection of this lease may be *sui generis*.

pg. 51.  The Debtors specifically seek approval of the compromise calling for substantive consolidation that was apparently reached among the Debtors and certain creditor groups. This compromise is termed the "Substantive Consolidation Compromise" (hereinafter, the "Compromise") in the Plan and is central to the terms of the proposed Plan.

8.      The Disclosure Statement states that noteholders, landlords, trade creditors and retiree claimants are most affected by consolidation of the Debtors' estates and the Compromise.  As related to the noteholders and landlords, consolidation, generally speaking, affects their interests in that corporate guarantees obtained by these creditors are rendered moot and valueless, although the noteholders are compensated for this invalidation by being paid an estimated percentage recovery of 95%. See DS, §II.B, pg. 9.

9.      The landlords, however, are not provided any benefit for the invalidation or release of the guarantees obtained by them.  As outlined in the Compromise, the landlords are receiving an estimated percentage recovery of 70.6%, the same recovery being proposed in connection with trade creditors' claims against a *single* Debtor.  In addition, all landlord claims, guaranteed and non-guaranteed, are receiving the same estimated percentage recovery of 70.6%.

10.     It does not appear from the Disclosure Statement that the trade creditors negotiated for or obtained guarantees of their claims.  Rather, the Debtors acknowledge that these creditors "largely hold claims against Debtors with high debt-to-asset ratios." The consolidation effected by the Compromise, therefore, positively affects the amount of their recovery.  DS, §VI.B, pg. 52.  Pursuant to the Compromise, the trade creditors are benefiting from debtor entities with lower debt-to-asset ratios, against whom the trade

creditors may not hold a claim, being brought into the pool of assets for distribution purposes. The Disclosure Statement reveals this benefit was conferred because "this group had the means and desire to pursue a substantive consolidation even if it required protracted and costly litigation." DS, §VI.B, pg. 52.

11.     Pursuant to the Compromise, the noteholders are receiving the benefit of their guarantees and the trade creditors are receiving the benefit of pooled assets. The landlords, who presumably are in a better position than the trade creditors and in a somewhat similar position with the noteholders on account of corporate guarantees, are not receiving any of the benefits being conferred by the Debtors in their Plan.

12.     As further provided in §VI.B of the Disclosure Statement, claims against each separate debtor entity are deemed to be claims against the "consolidated" Debtors. Any proof of claim filed against a particular Debtor is deemed to be a single claim filed against the "consolidated" estates, and the duplicate claims filed against more than one debtor entity will be deemed expunged. Expanding on this, the Plan goes on to provide that claims grounded on a pre-petition unsecured guaranty by one Debtor in favor of another (such as the Parent's guaranty of a subsidiary) will be eliminated resulting in no distribution being made on account of the guaranty. DS, §VI.B, pg. 54.

13.     Creditors, therefore, having filed claims against various debtor entities on account of guarantees will be deemed to have filed one claim to be collected from the pooled assets of all Debtors, with liabilities of all Debtors competing for the same pooled assets. As noted above, however, the noteholders are not significantly affected by this provision since they are receiving significant benefit for their guarantees on account of the proposed 95% payout to them.

14.     Notably, the "deemed consolidation" of the Debtors is only for distribution purposes, and the Debtors will emerge post-Effective Date with their corporate structure substantially intact.  <u>See</u> DS, §VI.B, pg. 54.  Similarly, the invalidation of corporate guaranties only relates to those claims arising out of executory contracts or unexpired leases that were <u>rejected</u>; counterparties whose agreements were assumed or have not expired by their own terms will be able to enforce such guaranties going forward.  <u>See</u> DS, §VI.B, pg. 54.

## OBJECTION TO CONFIRMATION

15.     The Plan fails to meet the tests for confirmation imposed by §1129(a) of the Bankruptcy Code and is not capable of confirmation pursuant to §1129(b) of the Bankruptcy Code should any class fail to accept the Plan.[4]  Each of the Debtors has the burden of proving each element of §1129(a) in each of such Debtor's cases, and the Court has an independent obligation to find that each element has been met regardless of whether any objections are filed.[5]  LSI does not waive compliance with these requirements.  The failure of LSI to specifically raise any issue should not be construed to eliminate the heavy burden that Congress placed upon the Debtors to prove up their confirmation case.  LSI, therefore, demands strict proof of each element of §1129(a).

---

[4] The deadline for casting ballots is the same as the deadline for filing objections to confirmation.  Thus, LSI does not know the results of the balloting.

[5] <u>In re Williams</u>, 850 F.2d 250, 253 (5th Cir. 1988)("the court has a mandatory independent duty to determine whether the plan has met all the requirements necessary for confirmation").  <u>Accord</u>, <u>In re Piper Aircraft Corp.</u>, 244 F.3rd 1289, 1300 n. 4 (11th Cir. 2001).  Bankruptcy Rule 3015(f) provides a limited exception to this requirement in cases where no objection to confirmation have been filed.  Rule 3015(f) does not apply in this case in light of this and other objections to confirmation.

16.    LSI adopts and incorporates the arguments of E.A. Financing, II, L.P., et al, in opposing confirmation of the Debtors' Joint Plan of Reorganization with respect to (a) the unfair discrimination and improper classification of landlord claims under §1123(a)(4) of the Bankruptcy Code, (b) the impropriety of using Bank.R. 9019 to attempt to bind non-parties to the Substantive Consolidation Compromise set forth in the Plan, and (c) the failure of the Plan and the proposed compromise to meet the "fair and equitable" standard.

17.    Additionally, LSI specifically objects to confirmation of the Debtors' Plan on the following grounds:

(a)    The plan improperly classifies claims.[6]  To the extent that the Plan places creditors of one Debtor (i.e. Stores) in a class consisting of

---

[6] Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply "with the applicable provisions" of the Bankruptcy Code.  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing the classification of claims and interests and the contents of the plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962, 6368 (1977); In re Texaco Inc., 84 B.R. 893, 905 (Bankr. S.D.N.Y.1988) ("In determining whether a plan complies with section 1129(a)(1), reference must be made to [Bankruptcy] Code §§ 1122 and 1123 with respect to classification of claims and the contents of a plan of reorganization."), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988) (citing In re Toy & Sports Warehouse Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)); In re Greater Bay Hotel & Casino, Inc., 251 B.R. 213, 223 (Bankr. D.N.J. 2000) (citing legislative history).  Section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  This provision does not, of course, allow the claims of a non-creditor to be classified with the claims of actual creditors of a particular debtor.  Landlords with Claims against Montgomery should not be classified with Landlords having claims against Raleigh.  Moreover, it is clear that a plan proponent may not manipulate the classification system to ensure a particular outcome with respect to a plan vote.  See In re Snyders Drug Stores, Inc., 307 B.R. 889, 893 ("A debtor may not classify similar claims differently solely to gerrymander an affirmative vote on a plan").  The Debtors' classification under the Plan has been impermissibly crafted, and the Plan fails to satisfy sections 1122(a) and 1129(a)(1) of the Bankruptcy Code, mandating a denial of confirmation.

creditors of an entirely different Debtor (i.e., Montgomery), such classification is improper under §1122, §1123, and §1129.  It also improperly places four or more distinct and disparate types of Landlord Claims in a single class:   Landlord Claims against Montgomery with a guaranty from Stores, Landlord Claims against Raleigh with a guaranty from Store, Landlord Claims against Montgomery without any guaranty, Landlord Claims of Raleigh without any guaranty, and the *sui generis* claim of LSI against both Montgomery and Raleigh with a corporate guaranty;

(b)      The Plan does not treat similarly situated claims equally;

(c)      The Plan does not comply with the provisions of the Bankruptcy Code;

(d)      The compromise and the "deemed consolidated" provisions contained in the Plan should not be approved under §1129, under Bankruptcy Rule 9019, or under applicable law; and

(e)      The Plan has not been proposed in good faith as to the Claims of the Landlords.[7]

---

[7]      Section 1129(a)(3) of the Bankruptcy Code provides, in pertinent part that the court shall confirm a plan only if it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. §1129(a)(3).  Although "good faith" is not defined in the Bankruptcy Code, courts have held that a plan is proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  In re Texaco, Inc., 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988) (quoting In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)).  In addition, courts have stated that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000) (citing In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.5 (3rd Cir. 1986)) (quoting In re Madison Hotel Assocs., 749 F.2d. 410, 425 (7th Cir. 1984)) (alteration in original).

In determining whether a plan is proposed in good faith, the Court must find – in each of these non-consolidated cases – there has been "fundamental fairness" in dealing with creditors. Leslie Fay Cos., 207 B.R. 764, 781 (S.D.N.Y. 1997) (citations omitted); In re Genesis Health Ventures, Inc., 266 B.R. 591, 609 (Bankr. D. Del. 2001) (citing In re Stolrow's Inc., 84 B.R. 167, 172 (9th Cir. BAP 1988)).

The Debtors' Plan fails to meet the requirements of good faith as it is discriminates unfairly against and is not fair and equitable to landlords holding claims against multiple debtors. As discussed more fully above, the Plan proposes, pursuant to the Compromise, that noteholders with multiple claims receive virtually full payment of their claims with only a token 5% discount. The noteholders are clearly receiving a benefit for these bargained-for guarantees, while the

18.     Without limiting its other objections, LSI expressly objects to the classification of its claims in a unitary class of Landlord Claims.

19.     The unfortunate effect of the "deemed consolidated" compromises is to give Landlords neither the advantage of consolidation, which would eliminate all inter-company guaranties and make the additional considerations to be paid to Noteholders available for distribution to all creditors, nor the benefit of the enhanced distribution they would receive if consolidation were to be denied.

### THE DEBTORS' PLAN DOES NOT COMPLY WITH THE "CRAMDOWN" PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

20.     Because the Voting Deadline and the deadline for objections to the Plan are contemporaneous, it is not known, as of the filing of this Objection, whether Class 13 (Landlord Claims) – or any other Class, for that matter – has accepted or rejected the Plan.  LSI contends that, if its arguments regarding classification are accepted, this Court must look at the acceptance on a case-by-case basis (i.e., for each Debtor).  Assuming that one or more classes has rejected the Plan, the Debtors will not be able to confirm the Plan over their objections.

21.     Section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8)

---

landlords are not.  In addition, the landlord claims are receiving the same percentage as trade creditors, which did not receive bargained-for guarantees.   This gross disparity in treatment hardly evidences the "fundamental fairness" envisioned by the Bankruptcy Code.

(affirmative plan vote of an impaired class) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of . . . [section 1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Thus, to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to nonaccepting impaired classes.

22.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C) further explain that a plan is fair and equitable with respect to a class of interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claims or interest.  See 11 U.S.C. § 1129(b)(2)(B)(ii) and 1129(b)(2)(C).  However, the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  See In re 203 N. LaSalle St. Ltd. P'ship, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), aff'd, 195 B.R. 692 (N.D. Ill. 1996), aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); In re Greate Bay Hotel & Casino, Inc., 251 B.R. at 228 (noting that the concept of "unfair discrimination" is not defined under the Bankruptcy Code).  Rather, courts typically examine the facts and

circumstances of the particular case to determine whether unfair discrimination exists. See, e.g., In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

23.    Within the five classes of unsecured creditors, the range of proposed recovery on a percentage basis ranges from 95.6% to 67%.  As noted above, the trade creditors' claims are being treated in the same fashion as the landlord claims, some of which are guaranteed by the corporate Parent, and no justification is given for this treatment.  In addition, as part of the Compromise, the legal fees of the Ad Hoc Trade Committee in an amount not to exceed $1.3 million are being paid by the Debtors.  Taking this into account, the recovery of the trade creditors is actually greater than the landlord claimants who have no similar concession from the Debtors.

24.    Furthermore with consolidation of the Debtors' assets, the concessions made by the Debtors to trade creditors and retirees, provided in the Disclosure Statement, are hereby satisfied by drawing from the asset pool from which the landlords may be able to assert a greater draw.  A concession granted to one creditor group necessarily decreases the recovery to be enjoyed by another creditor group.  Therefore, the concession granted to the retiree group, a junior creditor to the landlords, has decreased the recovery to the landlords.  Other than concessions made in order to prevent protracted litigation regarding substantive consolidation issues, no other justification has been given for eviscerating the corporate guarantees of the landlords.

25.    Based on the foregoing, the Plan is not fair and equitable, and confirmation should be denied.

### THE PLAN'S "COMPROMISE" LACKS FAIRNESS AND
### IS DEVOID OF A LEGAL OR FACTUAL BASIS

26.    In the Disclosure Statement, the Debtors state their recognition from the inception of these cases that "an important issue … would be whether the Debtors' assets and liabilities should be substantively consolidated."  D.S., § V.G., pg. 48.

27.    Indeed, substantive consolidation is not just an important issue, but rather is the issue.  Because disregarding separate corporate existence is generally not favored, a presumption exists against substantive consolidation, and the party seeking such consolidation has the burden of establishing its necessity.  See, e.g., Drabkin v. Midland-Ross (In re Auto-Train Corp., Inc.), 810 F.2d 270, 276 (D.C. Cir. 1987).  The Debtors sidestep the consolidation issue by spending several paragraphs of the Disclosure Statement questioning whether the more strict standards of In re Augie/Restivo Baking Company Ltd., 860 F.2d 515 (2d Cir. 1988) and In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) apply, as opposed to the somewhat lesser showing required by Eastgroup Props. v. Southern Motel Ass'n, Ltd., 935 F.2d 245, 249 (11th Cir. 1991).  See DS § VI.B, pg. 51.  Thereafter, the Debtors do little more than discuss the process by which the Creditors' Committee analyzed substantive consolidation, note (without description) that there are arguments on both sides of the issue and finally conclude that the Compromise was warranted "to avoid the uncertainty and substantial cost and delay that would be incurred if the complex issues associated with substantive consolidation were litigated."  See id.

28.    While courts may not agree on precisely which factors should be applied and how much weight each should be given, they are uniform in their view that

substantive consolidation is a drastic equitable remedy that should be used sparingly. See, e.g., In re Augie/Restivo Baking Co. Ltd., 860 F.2d at 518 (stating that "substantive consolidation is no mere instrument of procedural convenience[,] but a measure vitally affecting substantive rights [which is] to be used sparingly."). Apart from the conclusory discussion in the Disclosure Statement, the Debtors provide no reason for the necessity of this extraordinary remedy.

29.    Based on the limited information available to the general public, it does not seem that the Debtors could satisfy the heavy burden of proof that substantive consolidation should be imposed in these cases – even under the more liberal requirements espoused by Eastgroup Properties, Auto-Train and their progeny. Under this standard, the proponent of substantive consolidation must show that (i) there is substantial identity between the entities to be consolidated and (ii) consolidation is necessary to avoid some harm or to realize some benefit. See In re Auto-Train Corp., Inc., 810 F.2d at 276, Eastgroup Props., 935 F.2d at 249. However, even where there are demonstrable benefits to imposing the remedy, where creditors have relied on the separate existence of corporate entities in extending credit, or would suffer more than minimal harm from disregarding such separate existence, the balance of equities weighs against substantive consolidation. See In re Donut Queen, Ltd., 41 B.R. 706, 710 (Bankr. E.D.N.Y. 1984). The Eleventh Circuit, like the Second Circuit, has stressed creditor reliance and prejudice as the key factors in any consolidation analysis. Indeed, where an objecting creditor has made a showing of reliance on the separate credit of one entity, "the court may order consolidation only if it determines that the demonstrated benefits of

consolidation 'heavily' outweigh the harm." <u>Eastgroup Props.</u>, 935 F.2d at 249 (quoting <u>In re Auto-Train</u>, 810 F.2d at 276).

30.    Here, creditor reliance on the Debtors' separateness is abundantly clear. Corporate guaranties are not standard features inherent in every nonresidential real property lease; they are bargained-for exchanges specific to each transaction.    The abundant existence of guaranties in this case sharply undercuts the Debtors' argument in favor of the Compromise.  It is generally where Party A has investigated, and is wary of, the credit and financial wherewithal of its direct contract counterparty, that Party A seeks and obtains guaranty from a parent or affiliate of Party B – which is exactly what many landlords required of their Winn-Dixie tenants prior to the Petition Date.

31.    Surely cognizant of their inability to satisfy the rigorous standards for substantive consolidation, the Debtors instead seek approval of the Compromise as just that – a compromise purportedly governed by the different standards associated with Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").    As defined in Black's Law Dictionary, a "compromise" connotes "an agreement or arrangement by which, in consideration of mutual concessions, a controversy is terminated."  Deluxe Black's Law Dictionary, 6th edition.  Similarly, bankruptcy notions of "compromise", as Bankruptcy Rule 9019 has been interpreted, also envision a process of "give and take" on all sides.  The governing standard for settlements under Bankruptcy Rule 9019, enunciated in <u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414 (1986) (hereinafter, "<u>TMT Trailer</u>"), require more than conclusory assertions as to the probability of success in any litigation over the identified issues, and the complexity, expense and likely duration of litigation.

14

Rather, in <u>TMT Trailer</u>, the Supreme Court held that not only is there a need to compare the terms of the compromise with the likely rewards of litigation, but that compromises reached during the course of insolvency proceedings must be "fair and equitable". 390 U.S. at 424.

32.    While the legal basis for implementing a "deemed consolidation" in these cases is dubious, its effects are clear – landlords (and their transferees) not only are being stripped of the economic benefits of the guaranties that were specific, bargained-for exchanges important to the landlords' decision to lease their property to the specific Debtor tenant, but they are also being disenfranchised, as guaranty claims have been eliminated for voting purposes in this Plan process as well.

33.    The improper imposition of substantive consolidation dilutes the claims of any contract counterparties holding valid Parent or affiliate guaranties and simultaneously dramatically enhances the claims of other creditors without sufficient justification. Holders of Guaranty Claims are being deprived of the benefit of their bargain by the invalidation of their guaranties, while other creditors are slated to receive a substantial windfall.

34.    In addition, it is only where landlords are holding claims on account of <u>rejected</u> leases that the Parent guaranties are deemed worthless. By contrast, as to contracts and leases that have been or will be assumed – and as to which the Debtors presumably have cured or will cure outstanding defaults at 100 cents on the dollar – the Debtors reassure their going-forward landlords that their guaranties are not impaired and will survive the bankruptcy. <u>See</u> DS, § VI.B, pg. 54 ("The compromise plan structure

will not (a) impair the validity or enforceability of guarantees that exist under or with respect to assumed executory contracts or unexpired leases…. ").

35.     The compromise proposed by the Plan does not comport with the notion of fairness envisioned by the Supreme Court in TMT Trailer, and more generally, is inconsistent with the objectives and purpose of the Bankruptcy Code.  The Debtors are unable to demonstrate the necessity for substantive consolidation under the tests for same and unable to demonstrate the fairness of the Compromise calling for consolidation.

### CONCLUSION

WHEREFORE, for the reasons set forth herein, LSI respectfully requests that this Court enter an order denying confirmation of the Plan, and granting such other and further relief as is just and proper under the circumstances.

Dated: September 25, 2006

Harley E. Riedel (Fla. Bar # 183628)
Elena P. Ketchum (Fla. Bar #0129267)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
PH      (813) 229-0144
FAX   (813) 229-1811
Email: hriedel@srbp.com
Email: eketchum@srbp.com

By:        /s/ Harley E. Riedel
          Harley E. Riedel (Fla. Bar # 183628)
          Counsel for Liquidity Solutions, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **OBJECTION OF LIQUIDITY SOLUTIONS, INC. TO CONFIRMATION OF THE JOINT PLAN OF REORGANIZATION OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS DATED AUGUST 9, 2006** has been furnished on this 25th day of September, 2006, via CM/ECF, U.S. Mail, Facsimile Transmission and Email Transmission to:

Rosalie Walker Gray
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, New York 10036
Fax Number: 917/777-3214
Email:  rgray@skadden.com

Cynthia C. Jackson
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, Florida 32202
Fax Number:  904/359-7708
Email:  cjackson@smithhulsey.com

Matthew Barr
Milbank, Tweed, Hadley & McCloy, LLP
1 Chase Manhattan Plaza
New York, New York 10005
Fax Number:  212/822-5194
Email:  mbarr@milbank.com

Elena L Escamilla
Kenneth C. Meeker
Office of the United States Trustee
135 W Central Blvd., Ste 620
Orlando, FL 32801
Fax Number:  407-648-6323
Email:  Elena.l.escamilla@usdoj.gov

John B. MacDonald
AKERMAN SENTERFITT
50 North Laura Street, Ste. 2500
Jacksonville, FL   32202
Fax Number:  904-798-3730
Email:  john.macdonald@akerman.com

/s/ Harley E. Riedel
Harley E. Riedel (Fla. Bar # 183628)