IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 05-03817-3F1 |
| ) | |
| WINN-DIXIE STORES, INC. et al., ) | (Chapter 11) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| _____ ) | |

OBJECTION OF ORIX CAPITAL MARKETS, LLC AND
KEYCORP REAL ESTATE CAPITAL MARKETS, INC.
TO JOINT PLAN OF REORGANIZATION OF
WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS

COMES NOW, ORIX Capital Markets, LLC ("ORIX") and KeyCorp Real Estate Capital Markets, Inc. ("KeyCorp"), solely in their capacity as servicers for various securitized mortgage trusts (as more fully described herein), by and through their undersigned counsel, file this Objection (the "Objection") to the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors and state as follows:

## FACTS

On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. and twenty-three of its affiliated entities (collectively, the "Debtor") filed Voluntary Petitions for Reorganization under Chapter 11 of Title 11 of the United States Code. The Debtors' cases are being jointly administered and the Debtors have operated their businesses and managed their properties as Debtors-in-Possession pursuant to §§ 1107(a) and 1108.

1

KeyCorp is the master servicer and ORIX is the special servicer for various securitized mortgage trusts which have elected to be treated as Real Estate Mortgage Investment Conduits under the Internal Revenue Code of 1986 (collectively, the "Trusts").[1] The Trusts are the holders of numerous mortgages on real property leased by the Debtor. The Trusts file this Objection both as the direct holders of certain Class 13 Landlord Claims (as defined in the Plan) and as the assignee of certain landlord rights under the mortgages.[2]

On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"). In July, 2005, certain retirees formed an ad hoc retiree committee that has participated in certain aspects of this Chapter 11 case (the "Retirees' Committee"). In March, 2006, certain of the Debtor's trade and other creditors joined together to form an ad hoc trade committee (the "Trade Committee") which has also participated in this case.

On May 11, 2006, the Trade Committee filed a Motion for Order Pursuant to § 105(a) of the Bankruptcy Code Substantively Consolidating Debtors' Estates (the "Consolidation Motion"). Docket No. 7763. On the same date the Trade Committee filed a Motion to File Documents in Support of its Consolidation Motion Under Seal (the "Motion to Seal"). Docket No. 7765. Specifically, the

---

[1] The Trusts making this Objection are listed in Exhibit A.
[2] The Trusts directly hold claims relating to Winn-Dixie store numbers 1076 and 2095 represented by proof of claim numbers 11290, 11291, and 12349. These claims have been assigned to the Trusts by various landlords. The mortgages held by the Trusts prohibit alteration or assignment of the Winn-Dixie leases without Trust approval. A copy of a the relevant portions of a representative mortgage held by one of the Trusts on property leased to Winn-Dixie is attached as Exhibit B.

Motion to Seal sought authorization to file a Memorandum of Law (the "Brief") and an affidavit of M. Freddie Reiss (the "Reiss Affidavit") in Support of the Consolidation Motion under seal. The only justification offered in support of the Motion to Seal is that the Brief and the Reiss Affidavit are in part based upon "non-public, confidential and proprietary information about the Debtor that has been voluntarily disclosed to the Trade Committee by the Debtor, but that are subject to the confidentiality agreement." Motion to Seal at paragraph 6.

The Motion to Seal was originally scheduled for a hearing on May 18, 2006. On May 18, 2006, the hearing was adjourned to June 1, 2006. Docket No. 7939. On June 1, 2006, the hearing was adjourned to June 15, 2006. Docket No. 8137. On June 15, 2006, the hearing was adjourned until further notice. Docket No. 8530. To date the Court has not ruled on either the Consolidation Motion or the Motion to Seal and neither the Brief nor the Reiss Affidavit has been filed with the Clerk of the Court or made available to creditors who do not serve on a committee.

On August 9, 2006, the Debtor filed its Disclosure Statement With Respect to Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Disclosure Statement"). The Disclosure Statement and its related Plan of Reorganization (the "Plan") are premised, in part, on a settlement of the Consolidation Motion (the "Settlement") which provides that the Debtor's estates will be consolidated for purposes of claim allowance and distribution. However, contrary to the principals of substantive consolidation, the Plan also divides general unsecured claims into a number of different classes, including Noteholder Claims, Landlord Claims, Vendor/Supplier Claims, Retirement Plan Claims and Other

Unsecured Claims and proposes the following distributions to each of these unsecured classes:[3]

| Noteholder Claims | 95.6% of Allowed Claim |
|---|---|
| Landlord Claims | 70.6% of Allowed Claim |
| Vendor/Supplier Claims | 70.6% of Allowed Claim |
| Retirement Plan Claims | 59.1% of Allowed Claim |
| Other Unsecured Claims | 53.2% of Allowed Claim |

Disclosure Statement at page 53.

The Disclosure Statement indicates that the Settlement is the product of negotiations among the Creditors' Committee, the Trade Committee, the Retirees' Committee and the Debtor. Disclosure Statement at pgs. 52, 53. The Disclosure Statement further indicates that the professionals and financial analysts employed by the Creditors' Committee performed an extensive analysis of the Settlement. Disclosure Statement at pg. 52. No analysis or any summary thereof is included in the Disclosure Statement or the Plan.

In addition to imposing the Settlement on claims resulting from rejected leases, the Plan provides that each assumed lease will be assigned to a special purpose entity ("SPE"), with the original Debtor-lessee and any applicable guarantors remaining financially responsible for performance under the lease. Plan at pgs. 10, 24.

---

[3] Capitalized terms not defined herein shall have the meanings given to them in the Disclosure Statement.

## ARGUMENT

In order to confirm a consensual plan of reorganization a debtor must demonstrate by a preponderance of the evidence that the plan complies with each element of § 1129(a) of the Bankruptcy Code.[4] In re Gulfstar Industries, Inc., 236 B.R. 75, 77 (M.D. Fla. 1999); In re Celotex Corp., 204 B.R. 586 (Bankr. M.D. Fla. 1996). A debtor which seeks to "cramdown" its plan over the objection of a dissenting class of creditors must make a "convincing" showing that the plan complies with all of the requirements of § 1129(b). In re Immenhausen Corp., 172 B.R. 343, 347 (Bankr. M.D. Fla. 1994).

### I. The Plan Improperly Provides for Separate Classification and Disparate Treatment of Similar Claims in Violation of § 1129(a)(1).

Section 1122(a) of the Bankruptcy Code requires all claims in a particular class to be substantially similar. Although not expressly mandated by the Bankruptcy Code, courts also generally require that similar claims be classified together. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990) ("There must be some limit on a debtor's power to classify creditors...The potential for abuse would be significant otherwise"), quoting, In re U.S. Truck Co., 800 F.2d 581, 586 (6th Cir. 1986); In re Porcelli, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004) ("The adopted rule of classification is that 'dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason'"), quoting, In re

---

[4] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code") as published in Bankruptcy Code, Rules and Forms (Thomson West 2006 Ed.). As of October 17, 2005, certain provisions of the Bankruptcy Code referenced in this pleading have been altered by the Bankruptcy Abuse Prevention and Consumer Protection Act. All statutory references are to the Bankruptcy Code as it existed on the filing date of this case, February 21, 2005.

BA3DOCS/337468s3                              5

Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996); In re Austin Ocala Ltd., 152 B.R. 773, 776 (Bankr. M.D. Fla. 1993) ("Separate classification of similarly situated claims violates § 1122 and is deemed to be an improper separation of claims to manipulate voting").

### A. The Plan improperly discriminates among general unsecured claims.

A plan "cannot provide for the disparate treatment of claims that have identical legal rights." Porcelli, at 11; In re Tucson Self-Storage, Inc., 166 B.R. 892, 898 (9th Cir. B.A.P. 1994). The proponent of a plan must demonstrate a compelling reason for the disparate treatment of claims that otherwise appear to be similar in order to satisfy §§ 1122(a) and 1129(a)(1). Porcelli, at 10, Austin, at 776. It is not enough to merely state that legitimate business reasons exists to separately classify similar claims. Such reasons must be specifically demonstrated before the court. See Porcelli, at 10.

In the present case, the Plan separately classifies Noteholder, Landlord, Vendor/Supplier, Retirement Plan and Other Unsecured Claims even though all of these classes are general unsecured claims. In Austin, the Court rejected the very same approach, holding that lender, contract rejection and trade claims are all general unsecured claims that must be classified together and treated equally. Austin, at 775; see also Holywell, at 880. Disregarding this requirement, the Plan proposes substantially different treatment for these classes, offering to pay Noteholder claims at 95.6%, Landlord Claims and Vendor/Supplier claims at 70.6%,

Retiree claims at 59.1% and Other Unsecured Claims at 50.3% of face value. This classification scheme is not confirmable.

### B. The Settlement is not fair and equitable and does not satisfy Rule 9019.

The reason given for the disparate treatment of general unsecured claims is that the Plan embodies the Settlement of the Consolidation Motion. Any such settlement must comply with § 1123 and Rule 9019.[5] As with the elements of § 1129(a), the burden of proof is on the Debtor to demonstrate by a preponderance of the evidence that a settlement proposed under Rule 9019 is fair and equitable. In re Dengenaars, 261 B.R. 316, 319, 320 (Bankr. M.D. Fla. 2001). When considering approval of a settlement, a court must make an independent determination that the resolution is fair, equitable and in the best interests of the bankruptcy estate. In re Kay, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998); In re Vazquez, 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005). The support of a majority of the creditors for a proposed settlement, while relevant, is not binding on a court. Vazquez, at 36.

The instant Settlement appears to improperly divert value from the Landlords to the Noteholders, Trade Creditors, Retirees, and Other Unsecured Claimants. The figures provided in the Disclosure Statement indicate that all unsecured creditors would receive a payout of 76% of the value of their claims in a pure substantive consolidation.[6] Disclosure Statement at pgs. 8-10. The Disclosure

---

[5] All references to "Rules" refer to the Federal Rules of Bankruptcy Procedure as published in Bankruptcy Code, Rules and Forms (Thompson West 2006 Ed.).

[6] The Disclosure Statement shows that a total of $748.5 million in value is being distributed to the five primary classes of unsecured creditors. These classes hold an estimated total of $985.4 million in claims. Thus, a pure substantive consolidation should yield a payout of 748.5/985.4 which equals 75.96%.

Statement acknowledges that both the Noteholders and the Landlords have bargained for credit-enhancing inter-company guarantees. Disclosure Statement at 53. However, while the Settlement provides an enhanced payout of 95.6% to the Noteholders on account of their guarantees, *the Settlement actually penalizes the Landlords with a lower payout than they would receive if these cases were consolidated.*[7] In addition, the Vendor/Supplier claims, which do not have the benefit of guarantees, are paid at exactly the same rate as the Landlords. This treatment of Landlord Claims is neither fair nor equitable.

C.  **The Debtor has failed to disclose critical information.**

The Debtor's disregard for the above requirements is compounded by the stark absence of available information. Impacted creditors have never been able to review the pleadings and records upon which the Settlement is based. The right of access to judicial records is a well established feature of the common law. Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-9 (1978); Wilson v. American Motors Corp., 759 F.2d 1568 (11th Cir. 1985); In re Global Vending, Inc., 2006 Bankr. LEXIS 1249 at *2 (Bankr. S.D. Fla. 2006). The right of public access to bankruptcy court records is codified by §107(a) which provides:

> Except as provided in subsection (b) of this section, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

---

[7] Notably, no Landlord committee exists and only two Landlords sit on the Creditors' Committee. Thus, it appears that value is flowing from the only constituency without a committee to those with committees. In addition, the Settlement provides for payment of $250,000 to the two Landlords on the Creditors' Committee to reimburse them for expenses incurred as committee members. Disclosure Statement at pg. 55.

Section 107(b) provides relief from the blanket right of access granted in §107(a) in certain exceptional circumstances stating, in pertinent part, that:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –
>
> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information . . .

Courts construing §107(b) are in nearly unanimous agreement that the wholesale sealing of judicial records is an extraordinary remedy that should be employed only when no less drastic means are available to achieve the desired protection. In re Nunn, 49 B.R. 963, 964 (Bankr. E.D. Va. 1985).

The Debtor in this case does not offer any justification for the Motion to Seal other than alleging that the Brief and the Reiss Affidavit are based on "non-public, confidential and proprietary information" which was disclosed to the Trade Committee under the terms of a confidentiality agreement. Motion to Seal at paragraph 6. The Disclosure Statement also indicates that the Settlement is based on extensive financial analyses prepared by advisors to the Creditors' Committee. Disclosure Statement at page 52. These analyses are not attached to the Plan or Disclosure Statement and have never been provided to the creditors at large. ***Creditors not serving on a committee have no access to any of the pleadings or records which the Debtor claims support the Settlement.***

In order for the Debtor's Plan to be confirmed, the Debtor must justify the total nondisclosure of these documents to creditors and the general public as the least invasive remedy available and explain how disclosure would harm the Debtor.

By failing to obtain a ruling on the Motion to Seal and refusing to file the alleged confidential information with the Court, under seal or otherwise, the Debtor and the committees are effectively circumventing the burdens of § 1129(a) and Rule 9019 and, from an appellate perspective, swapping the strict scrutiny given to orders to seal for the broad discretion afforded courts in confirming plans and approving settlements. See Wilson at 1571; In re Pergrine Systems, Inc., 311 B.R. 679, 687 (D. Del. 2004) (Compelling disclosure of documents filed under seal and pursuant to a confidentiality agreement). This evasion of § 107 undermines the ability of an appellate court to review the Debtor's decision to withhold the Brief, the Reiss Affidavit, and the analyses in support of the Settlement from the creditors.

## II. The Plan Unfairly Discriminates Against Landlord Claims in Violation of § 1129(b)(1).

If one or more classes of creditors votes against the Plan, the Debtor must then satisfy all of the elements of § 1129(b) to confirm the Plan. Section 1129(b)(1) provides that a debtor cannot confirm a plan over the objection of an impaired class of creditors unless "the plan does not discriminate unfairly." In re Armstrong World Inc., 2006 WL 2365731 (D. Del. 2006); In re Tuscan Self-Storage, Inc., 166 B.R. 892, 898 (9th Cir. B.A.P. 1994). A rebuttable presumption of unfair discrimination exists where there is (i) a dissenting class; (ii) another class of the same priority; and (iii) a material difference in the plan's treatment of the two classes.[8] Armstrong, at *6.

---

[8] Some courts have employed a four part test for unfair discrimination considering (i) whether there is a reasonable basis for the discrimination; (ii) whether the debtor could confirm a plan without the discrimination; (iii) whether the discrimination is proposed in good faith; and (iv) the

In the present case, there is a substantial likelihood that the Landlord class will reject the Plan. The Disclosure Statement observes that both the Noteholders and the Landlords have bargained for credit-enhancing inter-company guarantees of their claims. Disclosure Statement at 52. Yet, in spite of the apparent identity of these claims and without explanation, the Plan proposes to pay 95.6% of Noteholder Claims and only 70.6% of Landlord Claims. Moreover, the Plan proposes to pay Landlords at exactly the same rate as Vendor/Suppliers who do not have any guarantees.

The presumption of unfair discrimination may be rebutted by a showing that the dissenting class would receive similarly less outside of bankruptcy. Armstrong, at *6, citing, In re Dow Corning Corp. 249 B.R. 696, 702 (Bankr. E.D. Mich. 1999). The discrimination is apparent from the face of the Plan. It is the Debtor's burden to prove that such treatment is not unfair, which the Plan wholly fails to do. Id.

### III. The Plan Impermissibly Alters the Debtor's Obligations Under the Leases.

The Plan's assignment of leases to SPEs increases the likelihood of default, provides the Debtor with easy access to bankruptcy to limit damages and eviscerates the inter-company guarantees. "It is black letter law that an executory contract must be either assumed in its entirety, cum onere, or completely rejected." In re Marande Enterprises, Inc., 335 B.R. 188, 192 (Bankr. M.D. Fla. 2005), quoting, In re Beverage Caumens Int'l Corp. 255 B.R. 89, 95 (Bankr. S.D. Fla 2000).

---

relationship between the discrimination and its basis or rationale. In re Ambanc La. Mesa L.P., 115 F.3d 650, 656 (9th Cir. 1997).

Although a debtor's right to assign a lease is, under certain circumstances, protected by § 365(f), a proposed assignment cannot violate other enforceable provisions of the lease or applicable law. Marande, at 191 ("Courts have held that § 365(f) does not apply to provisions that have justifications beyond any incidental restrictions on assignments").

Assigning each lease to an individual SPE changes the lessee from a primary Winn-Dixie entity with access to all of the assets and income of the company to a shell entity with no assets and no income. Such an assignment obviously fails to provide adequate assurance of future performance and cannot be approved. See 11 U.S.C. § 365(b)(1)(C), (3)(A); **In re Joshua Slocum Ltd.**, 922 F.2d 1081, 1091 (3d Cir. 1990). In the event of a default, the Plan gives the Debtor the ability to use § 502(b)(6) to limit damages without the expense and disruption of putting one of the main Winn-Dixie companies into bankruptcy. This unfettered access to the bankruptcy courts also destroys the effectiveness of the guarantees. See In re ACE Electrical Acquisition, LLC, 342 B.R. 831, 833 (Bankr. M.D. Fla. 2005) (Holding that guarantors are entitled to the benefit of the § 502(b)(6) cap).

Taken as a whole, the Plan permanently amends the leases to include the § 502(b)(6) damage cap. The Debtor has not shown assignment of the leases to SPEs and the resulting dilution of landlord protections to be necessary to the Plan. Compare In re Sunrise Restaurants, Inc., 135 B.R. 149, 153 (Bankr. M.D. Fla. 1991) (Allowing assignment of a lease in spite of doubts about future performance because denying the assignment would "visit drastic economic consequences and doom on the entire estate"). Rather, the Plan assigns the leases to SPEs for no reason other

than to make it easier for the Debtor to breach these leases in the future. This cannot be construed as assuming the leases "cum onere" and is far beyond the power of a Debtor to accomplish under the Bankruptcy Code.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

The Court should refuse to confirm the Plan because it improperly provides separate classification and disparate treatment of general unsecured claims in violation of §§ 1122(a) and 1129(a)(1), is not fair and equitable under § 1129(b)(2), and impermissibly alters assumed leases.

Dated: September 25, 2006.

/s/ Richard R. Thames
Richard R. Thames, Esq.
Stutsman Thames & Markey, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000 (Phone)
(904) 358-4001 (Facsimile)
e-mail: RRT@stmlaw.net

Of Counsel:

Gregory A. Cross, Esq.
Brent W. Procida, Esq.
Heather Deans Foley, Esq.
Venable LLP
1800 Mercantile Bank & Trust Bldg.
Two Hopkins Plaza
Baltimore, Maryland 21201
(410) 244-7400 (Phone)
(410) 244-7742 (Facsimile)
e-mail: gacross@venable.com

*Attorneys for ORIX Capital Markets, LLC
and KeyCorp Real Estate Capital Markets, Inc.,
solely in their capacity as Servicers for the Trusts*

## Certificate of Service

I hereby certify on September 25, 2006, the foregoing notice was transmitted to the Clerk of the Court for uploading to the Case Management/Electronic Case Filing System, which will send a notice of electronic filing to:

Stephen D. Busey, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
busey@smithhulsey.com

John B. Macdonald, Esq.
Akerman, Senterfitt & Eidson, P.A.
50 North Laura Street, Suite 2500
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (facsimile)
john.macdonald@akerman.com

Elana L. Escamilla, Esq.
Assistant United States Trustee
135 West Central Boulevard, Room 620
Orlando, Florida 32801
(407) 648-6465
(407) 648-6323 (facsimile)
elana.l.escamilla@usdoj.gov

Cynthia C. Jackson, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

David Jennis, Esq.
Jennis & Bowen, P.L.
400 North Ashley Drive, Suite 2540
Tampa, Florida 33602
(813) 229-1700
(813) 229-1707 (facsimile)
ecf@jennisbowen.com

Patrick P. Patangan, Esq.
Akerman, Senterfitt & Eidson, P.A.
50 North Laura Street, Suite 2500
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (facsimile)
patrick.pantangan@akerman.com

Karol K. Denniston, Esq.
Paul, Hastings, Janofsky & Waler, LLP
600 Peachtree Street, Suite 2400
Atlanta, Georgia 30308
(404) 815-2347
(404) 685-5347 (facsimile)

Dennis F. Dunne, Esq.
Milbank, Tweed, Hadley & McCloy, LLP
1 Chase Plaza
New York, New York 10005
(212) 530-5000
(212) 530-5219 (facsimile)
ddunne@milbank.com

| | |
|---|---|
| Adam Ravin, Esq. | D.J. Baker, Esq. |
| Skadden, Arps, Slate, Meagher & Flom LLP | Skadden, Arps, Slat, Meagher, & Flom, LLP |
| Four Times Square | Four Times Square |
| New York, New York 10036 | New York, New York 10036 |
| (212) 735-3000 | (212) 735-3000 |
| (212) 735-2000 (facsimile) | (212) 735-2000 (facsimile) |
| aravin@skadden.com | dbaker@skadden.com |

/s/ *Richard R. Thames*

_____

Attorney

60837