# EXHIBIT B

**SHEPHERDSVILLE MALL ASSOCIATES, LIMITED PARTNERSHIP**, as mortgagor
(Borrower)

to

**LEHMAN BROTHERS HOLDINGS, INC. D/B/A LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS, INC.**, as mortgagee
(Lender)

## MORTGAGE AND SECURITY AGREEMENT

Dated:        December 31, 1997
Location:     Shepherdsville, Kentucky

Section:      _____
Block:        _____
Lot:          _____
County:       Bullitt

UPON RECORDATION RETURN TO:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attention:    Oumar Diop

PREPARED BY:

593521v2

to be made by Borrower pursuant to Sections 3.2 and 3.3 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.2 and 3.3 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. No earnings or interest on the Escrow Fund shall be payable to Borrower.

(b) Borrower shall comply with the Replacement and Leasing Reserve Requirements set forth on Exhibit "B" attached hereto and made a part hereof.

3.5 **CONDEMNATION.** Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.

3.6 **LEASES AND RENTS.** (a) Except as otherwise consented to by Lender, all Leases shall be written on the standard form of lease which shall have been approved by Lender. Upon request, Borrower shall furnish Lender with executed copies of all Leases. No material changes may be made to the Lender-approved standard lease without the prior written consent of Lender, which approval shall not be unreasonably withheld or delayed. In addition, all renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and terms and shall be arms-length transactions with bona fide, independent third party tenants. All proposed leases and renewals of existing Leases, other than Minor Leases (hereinafter defined), shall be subject to the prior approval of Lender and its counsel, at Borrower's expense, which approval shall not be unreasonably withheld or delayed if the proposed Lease or renewal Lease (i) is on the Lender-approved form, subject only to commercially reasonable variations therefrom, (ii) is negotiated in an arms-length transaction with an independent third party tenant and (iii) provides for rental rates and terms comparable to existing local market terms. All Leases entered into after the date hereof shall provide that they are subordinate to this Security Instrument and that the lessee agrees to attorn to Lender. Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; Borrower may terminate, however, Minor Leases as the result of a default by lessee thereunder; (iv) shall not collect any of the Rents more than one (1) month in advance: (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall not alter, modify or change the terms of the Leases without the prior written consent of Lender, or cancel or terminate the Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Land or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (vii) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to the Leases (the "Lease Guaranty") or cancel or terminate such Lease

Guaranty without the prior written consent of Lender; and (viii) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior written consent of Lender.

(b) Notwithstanding the provisions of Subsection 3.6(a) above, renewals of existing commercial Leases and proposed leases for commercial space covering less than ten percent (10%) of the total rentable space for the Property and accounting for rental income which in the aggregate is less than ten percent (10%) of the total rental income for the Property ("Minor Leases") shall not be subject to the prior approval of Lender provided that (i) the renewal Lease or proposed lease shall have a lease term not to exceed ten (10) years including options to renew, (ii) the renewal Lease or proposed lease shall provide for rental rates and terms comparable to existing local market rates and terms, and (iii) the renewal Lease or proposed lease shall be an arms-length transaction with a bona fide, independent third party tenant. Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within thirty (30) days after the execution of the Lease.

(c) All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

3.7 MAINTENANCE OF PROPERTY. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property and tenant improvements made in connection with a Lease which has been entered into by Borrower in accordance with the terms hereof) without the consent of Lender. Subject to the provisions of Subsection 3.2(g) and Section 3.5, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.5 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

3.8 WASTE. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument.

3.9 COMPLIANCE WITH LAWS. Borrower shall (i) promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, or the use thereof including, but not limited to, the Americans with Disabilities Act ("ADA") (collectively, the "Applicable Laws"), (ii) from time to time, upon Lender's request, provide Lender with evidence satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws, and (iv) take appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.

3.10 BOOKS AND RECORDS. (a) Borrower shall keep adequate books and records of account in accordance with methods of accounting reasonably acceptable to Lender and furnish to Lender:

(i) quarterly operating statements of the Property, prepared and certified by Borrower in the form required by Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for that

applicable law. To the full extent permitted by law, Borrower agrees that it will not, by invoking or utilizing any applicable law or laws or otherwise, hinder, delay or impede the exercise of any right, power or remedy herein or otherwise granted or delegated to Lender, but will permit the exercise of every such right, power and remedy as though no such law or laws have been or will have been made or enacted. To the full extent permitted by law, Borrower hereby agrees that no action for the enforcement of the lien or any provision hereof shall be subject to any defense which would not be good and valid on an action at law upon the Note. If the Borrower is a trustee, Borrower represents that the provisions of this Section 23.1 (including the waiver of redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons named above. Borrower acknowledges that the Property does not constitute agricultural real estate as defined in Section 15-1201 of the Act or residential real estate as defined in Section 15-1219 of the Act.

24.2 Future Advances. Without limitation to anything contained herein, at all times, regardless of whether any loan proceeds have been disbursed, this Security Instrument secures as part of the Debt the payment of all loan commissions, service charges, liquidated damages, attorney's fees, expenses and advances due to or incurred by lender in connection with the Debt, all in accordance with the Note, this Security Instrument, and the Other Security Documents, provided, however, that in no event shall be total amount of the Debt, including loan proceeds disbursed plus any additional charges, exceed two hundred percent (200%) of the face amount of the Note.

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower as of the day and year first above written.

BORROWER:

WESTERN SPRINGS NATIONAL BANK AND TRUST, not personally but as Trustee under Trust Agreement dated August 1, 1996 and known as Trust No. 3548, an Illinois land trust

By: _____
Name: Jerry F. Micel
Title: Trust Officer

5600 FULLERTON CORP., an Illinois corporation

By: _____
Name: Peter Markos
Title: President

MORTGAGE.6\97 (0600864.02)

27

## ACKNOWLEDGMENTS

STATE OF _Illinois_ )
) ss.:
COUNTY OF _DuPage_ )

I, _Carole M. Bull_, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that Peter Markos, President of 5600 Fullerton Corp., is personally known to me to be the same person whose name is subscribed to the foregoing instrument, and as such president appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal, this _4th_ day of December, 1997.

_____
Notary Public

My Commission expires: _____

> OFFICIAL SEAL
> CAROLE M BULL
> NOTARY PUBLIC STATE OF ILLINOIS
> MY COMMISSION EXP. DEC 15 2001

STATE OF _Illinois_ )
) ss.:
COUNTY OF _DuPage_ )

I, _Carole M. Bull_, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that _Jerry F. Kuiecki_, a _EVP_ of Western Springs National Bank and Trust, is personally known to me to be the same person whose name is subscribed to the foregoing instrument, and as such _EVP_ appeared before me this day in person and acknowledged that s/he signed and delivered said instrument as his/her own free and voluntary act and as the free and voluntary act of said person, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal, this _4th_ day of December, 1997.

_____
Notary Public

My Commission expires: _____

> OFFICIAL SEAL
> CAROLE M BULL
> NOTARY PUBLIC STATE OF ILLINOIS
> MY COMMISSION EXP. DEC 15 2001

MORTGAGE.6\97  (0600864.02)

28

EXHIBIT A

(Description of Land)

ALL of that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate, lying and being in Cook County, Illinois, and being more particularly described as follows:

A TRACT OF LAND IN THE SOUTH EAST 1/4 OF THE SOUTH EAST 1/4 OF SECTION 29, TOWNSHIP 40 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTH LINE OF SECTION 29 WITH THE EAST LINE OF SAID SECTION; RUNNING THENCE NORTH ALONG THE EAST LINE OF SAID SECTION 29, A DISTANCE OF 255.25 FEET; RUNNING THENCE WEST ALONG A LINE PARALLEL TO THE SOUTH LINE OF SAID SECTION, A DISTANCE OF 297.93 FEET; RUNNING THENCE RUNNING SOUTH, A DISTANCE OF 255.25 FEET MORE OR LESS TO A POINT IN THE SOUTH LINE OF SAID SECTION, WHICH IS 297.95 FEET (MEASURED ALONG THE SOUTH LINE OF SAID SECTION) WEST OF THE POINT OF BEGINNING; RUNNING THENCE EAST ALONG THE SOUTH LINE OF SAID SECTION, A DISTANCE OF 297.95 FEET TO THE POINT OF BEGINNING (EXCEPT THE SOUTH 50 FEET THEREOF AND ALSO EXCEPT THE EAST 33 FEET THEREOF), IN COOK COUNTY, ILLINOIS.