EXHIBIT A

LEASE

THIS LEASE ("Lease") made and entered into this 7th day of September, 1993, by and between FW PARTNERS, LTD., a Kentucky limited partnership having its principal place of business at 3307 Clifton Avenue, Cincinnati, Ohio 45220 ("Lessor") and THRIFTWAY, INC., an Ohio corporation, having its principal place of business at 4901 Hunt Road, Cincinnati, Ohio 45242 ("Lessee").

WITNESSETH:

(1)  GRANT

Lessor, in consideration of the rents to be paid and the covenants to be performed on the part of the Lessee, does hereby lease to the Lessee, and the Lessee rents from the Lessor a storeroom ("Storeroom") in the Ft. Wright Shopping Center ("Shopping Center"), located on Dixie Highway, Ft. Wright, Kenton County, Kentucky, the Shopping Center more particularly described on the attached Exhibit A. The Storeroom sometimes referred to herein, together with all appurtenances, improvements, and easements, as the "Demised Premises," shall consist of approximately Sixty-Three Thousand Five Hundred (63,500) square feet of building area located and shown as the cross-hatched area on the plot plan of the Shopping Center attached hereto as Exhibit B, containing One Hundred Twenty Thousand (120,000) square feet and being part of a building ("Building") containing approximately Seventy-Five Thousand (75,000) square feet. Prior to the Commencement Date

- 2 -

(later defined), the Lessor will provide the Lessee with a survey
of the Demised Premises to determine the exact area ("Demised
Area") and the parties will execute addenda to this Lease defining
the Demised Area and the Commencement Date.

(2)  TERM AND PLAN APPROVAL

The term ("Term") of this Lease shall be for a period of
Twenty (20) consecutive years, commencing on the earlier of the
following events ("Rent Commencement Date"): (a) the date Lessee
opens the Demised Premises for business or (b) April 1, 1994
provided all of the Contingencies (later defined) have been removed
to the complete satisfaction of Lessee or the Lessee has waived the
Contingencies or such later date required for Lessor to remove the
Contingencies not waived by Lessee.  The Lease shall commence,
except for the purposes of the payment of Minimum Rent and
Percentage Rent, upon the execution of this Lease ("Commencement
Date"), but the Term shall not commence until Rent Commencement
Date.

Lessee shall provide Lessor with a complete set of plans and
specifications for the proposed improvements to the facade and
interior of the Demised Premises on or before Ninety (90) days from
the Commencement Date hereof for the reasonable review and approval
of Lessor.  Lessor shall approve or disapprove the plans within Ten
(10) days of receipt of the plans with the approval not to be
unreasonably withheld if the plans are in substantial conformance
with other new operations of Lessee in or around the Cincinnati

- 3 -

area, such as the Fairfield and Hyde Park storerooms. Failure of Lessor to respond in such time period shall be deemed approval. Lessee shall apply for a building permit within Ten (10) days of Lessor's approval of the plans, and will commence construction within thirty (30) days of receipt of a building permit.

Upon receipt of a building permit, Lessee shall commence its work to the Demised Premises and use reasonable efforts to complete same as quickly as possible. Upon completion, Lessee shall immediately proceed with its installation of the fixtures and stock the Demised Premises. With respect to any of Lessee's construction work that requires roof penetration Lessee agrees to use the roofing contractor engaged by Lessor to replace the roof, as provided in Item (3) herein, to perform all of said work so as not to disturb the integrity of the new roof installed by Lessor. At the conclusion of Lessee's construction obligations, Lessee will provide Lessor with lien waivers from all contractors and material-men employed by Lessee and, to the extent Lessee is unable to secure lien waivers, it will bond off any remaining obligations so as to prevent the filing of liens on the Shopping Center.

(3)  LESSOR'S CONSTRUCTION OBLIGATIONS

Except as herein otherwise provided, Lessee acknowledges that it has inspected the Demised Premises and is accepting the Demised Premises in its "as is" condition as of the date of the execution of this Lease, without any representation or warranty from Lessor, except that Lessor has the obligation i) to replace the roof on the

*

- 4 -

Demised Premises; ii) to repave the entire parking area servicing
the Storeroom (i.e. no less than a two (2) inch cap); iii) to
construct a demising wall separating the Demised Premises from the
remaining part of the Building; (iv) to separate the utilities
presently servicing the Building so as to provide separate
utilities service to the Demised Premises; (v) to construct a curb
cut at the north property line of the Shopping Center so as to
provide ingress and egress as shown on Exhibit B; and (vi) to
repair exterior walls. The parking area designated shall be laid
out as shown on the attached Exhibit C. The parking and driveway
areas shall be laid out and striped to provide appropriate signs,
directional arrows and other means to direct traffic through the
parking area so as to keep the area in front of the Demised
Premises and adjacent to the delivery areas of the Demised Premises
free from parking and open for traffic by Lessee's customers,
vendors and personnel. The parking and traffic plan as set forth
on the attached Exhibits B and C shall not be substantially altered
except with the prior written consent of Lessee, not to be
unreasonably withheld. This work is to be accomplished by Lessor
no later than March 1, 1994. Should this work not be accomplished
within that period of time, Lessee shall have the right to
accomplish the work and deduct the reasonable cost thereof from
Minimum Rent.

Lessee agrees to cause Lessee's contractors who are performing
Lessee's construction work to coordinate Lessee's construction work

- 5 -

with Lessor so that Lessor's and Lessee's construction work may be performed in the proper sequence, efficiently, and in a cooperative manner.

In the event Lessor constructs a pylon sign and if the pylon sign contains tenant names, Lessee shall have the right to the top position on the sign and a sign containing at least Fifty Percent (50%) of the total square foot area available to all tenants of the Shopping Center on the condition that, unless Lessor secures Lessee's prior written consent, no other individual tenant shall be entitled to any more then thirty five percent (35%) of the total square foot area available to all tenants of the Shopping Center.

Lessor further agrees that Lessee shall have the right to approve, not to be unreasonably delayed or withheld, (i) any construction of additions and additional construction on any portion of the Shopping Center other than in the permissible building area shown on Exhibit B, and (ii) any changes to the location of roadways, drives and parking as depicted on the attached Exhibit B.

(4)  REMAINDER AREA

Lessor shall have the right, subject to the provisions of Items 9 and 21 herein, to lease to one or more tenants the remainder of the Building, not presently being leased by Lessee ("Remainder Area"). The term Remainder Area when used hereinafter shall when the context so requires mean the Remainder Area, or part thereof which at any time may be available for leasing to a tenant.

- 6 -

In the event the Remainder Area, or any storeroom which may then be a part of the Remainder Area, should then subsequently become available for rental, the Lessee shall have the option ("Option") to lease the Remainder Area at the same rental paid by the immediately preceding tenant of the Remainder Area, and except for the lease term, with the remaining terms and conditions the same as then applicable to the Demised Premises. The term of the Lease for the Remainder Area shall be the remaining Term of this Lease, together with options, under this Lease, but in the event that there are less than five (5) Lease Years then remaining on the Term of this Lease, the term of this Lease for Remainder Area shall include the next succeeding five (5) year renewal term, and Lessee shall be deemed to have exercised its option to renew for such renewal term. Gross Receipts, as herein defined, shall be included (i.e. added to) Gross Receipts from the Demised Premises for purposes of determination of Percentage Rent owed by Lessee to Lessor. Lessor will notify Lessee, in writing, of the availability of the Remainder Area ("Option Notice") and the Lessee will have thirty (30) days from receipt of the Option Notice to accept or reject the Option. In the event of acceptance, the parties will amend this Lease to include the Remainder Area upon the terms set forth above. In the event of rejection (and Lessee will be deemed to have rejected in the event of inaction on its part) the Lessor shall be free, once again, to lease the Remainder Area to a third party, subject to the provisions of Items 9 and 21. Should,

however, the Remainder Area again become available for rental, Lessee shall continue to have the Option to lease the Remainder Area at the same rental paid by the immediately preceding tenant of the Remainder Area, and except as hereinabove provided with the remaining terms and conditions the same as then applicable to the Demised Premises and the same procedure for Option Notice and acceptance, as outlined above, shall be applicable. The term of the Lease for the Remainder Area shall commence on or before the later to occur of sixty (60) days after the date of the Option Notice, and the date the tenant then occupying the Remainder Area vacates the Remainder Area.

(5) MINIMUM RENT

The fixed annual minimum rent ("Minimum Rent") during the Term of this Lease shall be an amount determined by multiplying the Demised Area, as finally determined by survey, by a per square foot rental of Five and 73/100 Dollars ($5.73) payable in equal monthly installments on or before the first day of each month in advance at the office of Lessor or such other place designated by Lessor, with the first installment due on Rent Commencement Date; provided that if Rent Commencement Date occurs on other than the first day of a month, then the Lessee shall pay a partial rental payment in the proportion that the remaining number of days in said month bears to the total number of days in said month. All subsequent payments shall be due on the first day of each month thereafter. If any Minimum Rent payment or any Percentage Rent payment is not made

- 8 -

when due, Lessee agrees to pay a late charge of One Percent (1%) per month, or fraction thereof, on the amount of the delinquency, said late charge to continue so long as the delinquency exists.

(6) PERCENTAGE RENT

In addition to the payment of the fixed Minimum Rent as hereinbefore provided, Lessee shall pay to the Lessor in the manner and upon the conditions and at the times hereinafter set forth, each year of the term hereof as additional rent ("Percentage Rent") a sum equivalent to One and One-Half Percent (1½%) of Gross Receipts, as later defined, from all business done on and from the Demised Premises as shall be in excess of Forty-Eight Million and 00/100 Dollars ($48,000,000.00) per year (the "Gross Sales Base"). The Percentage Rent shall be payable annually, within Sixty (60) days of the end of any calendar year, at the office of the Lessor or such other place as the Lessor may designate without any prior demand therefor, and without any setoff or deduction whatsoever In the event the Demised Premises are used by Lessee or any assignee or sublessee of Lessee, for a retail purpose other than a retail supermarket and drugstore, then Percentage Rent shall be computed on a Gross Sales Base and percentage factor that would be applicable in the industry to such retail use by reference to e.g. Dollars and Cents of Shopping Centers as published by the Urban Land Institute. Based on said Urban Land Institute publication or similar publication selected by Lessor, if the Urban Land Institute publication is then no longer available, Lessor shall designate

- 9 -

the Gross Sales Base and percentage factor by notice to the assignee or sublessee, which notice shall be given promptly after any such assignment or sublease.

The term "Lease Year" as used herein shall mean, with respect to the first Lease Year, the period commencing on the Rent Commencement Date and ending at midnight on the next succeeding December 31st; provided, that, if the Rent Commencement Date occurs subsequent to September 1, 1993, then the Lessee shall be liable for no Percentage Rent for the first Lease Year. Thereafter, the Lease Year shall consist of periods of Twelve (12) full calendar months and, at the end of the Term, the remaining portion of such Twelve (12) full calendar months included in the Term.

The term Gross Receipts as used herein, means the gross charge (i.e. actual sales price) for all sales and/or rentals, including all services performed and the gross selling price of all merchandise, including but not limited to all goods, foods and beverages sold, leased or delivered by Lessee through its operation on the Demised Premises, or through the operation of any licensee or concessionaire operating on the Demised Premises, whether for cash or credit or otherwise, without reserve or reduction for failure or inability to collect, including, but not limited to, such sales and charges:

(a)  Where the orders therefor originate in, at, or from the Demised Premises, whether delivery or performance is made from the Demised Premises or from some other place.

(b)  By means of mechanical or other similar device.

Each sale upon installment or credit shall be treated as a
sale for the full price when such sale was made, irrespective of
the time when Lessee shall receive payment therefor.  Gross
Receipts shall not, however, include any sums collected and paid
out for any sales or retail excise tax imposed by any duly
constituted governmental authority nor the amount of any cash or
credit refund made upon any sale where the merchandise sold, or
some part thereof, is thereafter returned by the purchaser and
accepted by the Lessee.

Lessee may also exclude from its computation of Gross Receipts
the following items: coupons (to the extent they are included in
Gross Receipts), fees received in connection with returned checks,
any rebates or discounts for personal property and sales tax
payments, sales from four (4) beverage vending machines, postage
stamp and money order sales, pay telephone receipts, premiums or
"slotting allowances" from suppliers, any refunds or rebates from
utility companies, receipts from sales of stamps, cigarettes and
post cards, manufacturers rebates, promotional allowances, and rent
paid by The Provident Bank for its "Bank Mart".

(7)  MAINTENANCE OF RECORDS AND EXAMINATION

Lessee covenants that it shall utilize computerized cash
registers equipped to record all cash sales and Lessee shall keep
in its general office, for at least Twelve (12) months after the
expiration of each Lease Year, records conforming to usual

- 11 -

accounting practices showing all of the Gross Receipts at, in, from
and upon the Demised Premises for such Lease Year, including all
tax reports, sales slips, sales checks, bank deposit records and
other supporting data. Lessee further covenants and agrees that
not later than Forty-Five (45) days after the close of each Lease
Year and after termination of the Lease, it will deliver to the
Lessor a certificate of an officer of the Lessee showing the amount
of the Gross Receipts specifically stated to be as above defined
for the preceding Lease Year and being in such form and style and
containing such details and breakdown as the Lessor may reasonably
determine. Lessor shall have the right from time to time by its
accountants or representatives to audit all statements of Gross
Receipts and, in connection with such audits to examine all of the
Lessee's records of gross sales disclosed in any statement given to
Lessor by Lessee, and Lessee shall make all such records readily
available for such examination. If any such audit discloses that
the actual Gross Receipts by Lessee exceeded those reported by more
than Two Percent (2%), Lessee shall pay the cost of such audit and
examination. Lessee shall promptly pay to Lessor any deficiency in
rent shown by any such audit. Any information obtained by Lessor
pursuant to the provisions of this section shall be treated as
confidential, except in any litigation or arbitration proceedings
between the parties and except further than Lessor may disclose
such information to its mortgagee or mortgagees and bona fide
prospective buyers and lenders.

- 12 -

(8)   USE OF PREMISES

Lessee shall use the Demised Premises solely for the purpose
of conducting thereon the business of the operation of a Thriftway
combination retail supermarket and drugstore, including the sale of
prescription drugs, similar to other Thriftway stores currently
being operated by Lessee or, in the case of a permitted assignment
or sublease as set forth in Item (25)(f), any other lawful retail
purpose, exclusive of car dealerships, thrift stores and flea
markets.  Neither Lessor nor Lessee shall violate any covenants or
restrictions of any other lease currently in effect with respect to
the Shopping Center, except as provided in Item 25(f).

On or before the Rent Commencement Date, Lessee agrees fully
to stock and open for business a Thriftway supermarket/drugstore
comparable to Lessee's other new operations in the Cincinnati area.
Thereafter, for a period of Three (3) years Lessee shall continu-
ously stock and operate the business in the Demised Premises during
hours similar to a majority of Lessee's other stores in the
metropolitan Cincinnati area   In the event Lessee should determine
to "go dark" at any time following the three (3) year period, then
the Lessee agrees to cooperate with the Lessor, at Lessee's sole
cost, in causing parking lot lighting which is wired to meters
located in the Storeroom, as set forth in the Item 10 herein, to be
re-wired to common area meters controlled by the Lessor, so as to
be charged as part of common area maintenance.   Further, Lessee

- 13 -

will leave all exterior lighting and parking lot lights in place, fully operational.

Lessee shall, at all times, maintain merchandising standards consistent with the operation of its other Storerooms, and during the term of this Lease shall not; use any advertising medium that may constitute a nuisance; conduct auction, fire, "going out of business," or bankruptcy sales, other than in the instance of the bankruptcy of Lessee, a fire or other destruction of the Demised Premises or the termination of the Lease; store or burn trash or garbage outside the Demised Premises; park trucks or delivery vehicles outside the Demised Premises so as to unreasonably interfere with the use of any driveways, walks, roadways, highways, streets, or parking areas forming a part of the Shopping Center; or use any part of the Shopping Center outside the Demised Premises for solicitations or demonstrations, except that the Lessee shall have the right to use that portion of the parking lot cross-hatched and designated on the attached Exhibit D-1 as an outside selling area, for home and garden sales, and the area cross-hatched and designated on the attached Exhibit D-2 as its tree lot for Christmas tree sales. Lessee shall further have the right to use the area cross-hatched and designated on the attached Exhibit D-3 as a parcel pick up area and for cart storage and outside sales. Lessee agrees that it will be responsible for the cleanliness, maintenance and upkeep of the outside selling area, when the same is in use as an outside selling area by Lessee, and that it will be

- 14 -

responsible for the management and control of its shopping carts in
and about the Shopping Center.

Lessee shall, at its own expense, comply with the requirements
of law and with all ordinances, statutes, regulations, directives,
orders, or other lawful enactments or pronouncements of any
Federal, State, Municipal, or other lawful authority affecting the
Demised Premises and of any insurance company insuring the Demised
Premises or insuring the Lessor against liability for accident or
injury in or upon the Demised Premises; and shall hold Lessor in
all respects harmless therefrom.  In the event Lessee does or
permits anything to be done on the Demised Premises which increases
the premiums payable for any insurance which the Lessor might then
be carrying, either by way of fire and extended coverage, or by way
of liability insurance, Lessee agrees to pay any such increases in
premium caused by its use of the Demised Premises, in addition to
amounts which it is obligated to pay as provided herein.  Lessee
shall obtain and maintain in effect all permits and licenses
necessary for the operation of Lessee's business as herein
provided.  Lessee shall pay all licenses, fees and tax arising out
of its business or its use and occupancy of the Demised Premises.
In the event that during the term of this Lease, any addition,
alteration, change, repair or other work of any nature, except
structural changes to the foundation, perimeter walls, and roof,
shall be required or ordered or become necessary on account of any
federal, state, or local governmental law, rule, regulation, code,

order, ordinance, or the like (including but not limited to the Americans with Disabilities Act) now in effect or hereafter adopted, passed, or promulgated, or on account of any other reason, Lessee shall promptly make such changes regardless of when the same shall be incurred or become due, and the entire costs thereof shall be the liability of Lessee.

(9) COMMON AREA

Lessor will operate, repair, restore and maintain (all "Maintenance") the Common Areas which shall include, but not be limited to the parking lots, driveways, walkways and other common facilities, as shown on the attached Exhibits D-1 through D-3, which Maintenance shall include, but not be limited to, all cost and expense of operation, insuring, repairing, restoring, lighting, cleaning, painting, striping, removal of snow, ice and debris, and shall include normal and customary management fees.

Maintenance shall also include, but not be limited to, cost of uniforms, equipment and employment taxes; alarm systems; insurance, including without limitation, liability insurance for personal injury, death and property damage, worker's compensation insurance covering personnel, fidelity bonds for personnel, plate glass insurance for glass exclusively serving the Common Areas; removal of snow, ice, trash and debris; regulation of traffic; costs and expenses in connection with maintaining federal, state or local governmental environmental standards; the cost of all materials, supplies and services purchased or hired therefor; installing and

renting of signs; fire protection; maintenance, repair and replacement of utility systems serving the Common Areas, including, but not limited to, water, sanitary sewer and storm water lines and retention facilities and other utility lines, pipes and conduits; costs and expenses of inspecting and depreciation of machinery and equipment used in the operation and maintenance of the Common Areas and personal property taxes and other charges (including, without limitation, leasing, financing or rental costs) incurred in connection with such equipment; costs and expenses of repair or replacement of paving, curbs, walkways, landscaping, drainage pipes, ducts, conduits and similar items, and plate glass, lighting facilities and the roof; costs and expenses of planting, replanting and replacing flowers, shrubbery and planters; costs of providing light and power to the Common Areas; cost of water services, if any, furnished by Lessor for the non-exclusive use of all Lessees;

Lessor shall at all times have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to all facilities and areas provided in the Common Areas. Lessee acknowledges that Lessor does not and will not provide security services at the Shopping Center. With respect to the lease of the additional rental space in the Shopping Center, except as herein otherwise permitted, no part of said space shall be used as a bowling alley, health club, fitness center or other similar activity, nightclub, disco, theater, restaurant,

- 17 -

skating rink or any other business requiring extensive parking. Notwithstanding the foregoing with respect to restaurants, the Lessor will be permitted to sell to or lease to a fast food operation provided that no fast food operation will be permitted that requires long-term parking, such as T.G.I. Friday's   With respect to the outlots cross-hatched on the attached Exhibit B, Lessor shall be permitted to sell to or lease to a fast food operation so long as Lessor provides parking for the outlot operations as required by applicable building codes, and so long as such parking requirements for the outlot operations do not unreasonably impact Lessee's parking requirements   Lessee acknowledges the existence of a Pizza Hut operation in the Shopping Center and that this operation will continue.  In the event that the Pizza Hut and/or the Star Bank lease expires or is terminated Lessor shall have the right to replace either or both tenants with similar tenants.  Lessee further acknowledges the existence of a Star Bank facility in the Shopping Center, and that this operation will continue.  Lessor acknowledges and agrees that Lessee desires to locate a Provident Bank Mart in the Demised Premises and consents to such a sublease so long as Lessee secures the consent of Star Bank and indemnifies Lessor from any liability to Star Bank arising from the Sublease to Provident Bank.  Lessee acknowledges the existence of a Walgreens store in the Shopping Center and that this operation will continue.  Additionally, Lessor intends to relocate the existing Walgreens store to a new store building that

- 18 -

will be located west of the Lessee's store.   The new location of
the Walgreens store is shown on the plat plan of the Shopping
Center (Exhibit "B" hereto) and will include a drive through
facility.   Lessor shall have the right to restrict Lessee and other
tenants, their officers, agents, and employees to tenant parking
areas; to discourage non-customer parking; and to do and perform
such other acts in and to said areas and improvements as, in the
use of good business judgment, the Lessor shall determine to be
advisable with a view to the improvement of the convenience and use
thereof by tenants, their officers, agents, employees, and
customers.

As used in this Lease, Lessee's Proportionate Share shall mean
the proportion that the square foot area in the Demised Premises
bears to the square foot area of all leasable space in the Shopping
Center.   Lessor and Lessee agree that initially Lessee's Propor-
tionate Share shall be __53.34__ percent ( __%). In the event that
there shall be any additions to or deletions from the Shopping
Center, then Lessor shall redetermine Lessee's Proportionate Share
and promptly so notify Lessee.   Lessee shall pay its share (herein
"Lessee's Share") of the cost to Lessor of Common Area Maintenance
in the Shopping Center which the parties agree shall be in an
amount per year equal to Sixty-Five Cents ($.65) times the Demised
Area during the first Ten (10) years of the Term; Seventy-Eight
Cents ($.78) times the Demised Area during year Eleven (11); with

- 19 -

the amount increasing two percent (2%) per year after the Eleventh (11th) year of the Term and during any renewal period.

(10) UTILITIES

Lessee shall promptly pay for all public utilities rendered or furnished to the Demised Premises during the term of this Lease, including water, gas, electricity and sewer charges, including any deposits or related fees. In addition, Lessee shall be required to pay all utility charges in connection with the parking lot lighting which is wired to meters located in the Storeroom unless the Lessee should determine to "go dark" at any time following the third (3rd) annual anniversary of Rent Commencement Date, as provided in Item 3 herein, in which event the parking lot lighting will be re-wired by Lessee, at its cost, to common area meters controlled by Lessor and the utility charges will then be charged as common area maintenance. Lessor may install re-registering meters and collect any and all charges aforesaid from Lessee, making returns to the proper public utility company or governmental unit, provided that the Lessee shall not be charged more than the rates it would be charged for the same services if furnished direct to the Demised Premises by such companies or governmental units.

The Lessee agrees to maintain and keep in good repair and replace as necessary during the entire term of this Lease, all the heating and air conditioning, electric and plumbing equipment and systems located in the Demised Premises.

(11) REAL ESTATE TAXES

Lessor agrees to pay the real estate taxes and assessments levied against the Shopping Center. Lessee shall be obligated to pay Lessor Lessee's Proportionate Share of all of such taxes and assessments within Ten (10) days of receipt of a billing from Lessor. Lessee shall be furnished with a copy of the paid tax bills as evidence of payment thereof. Lessor shall further notify Lessee of any increase in real estate taxes, and if the Lessee so elects by notice to Lessor, the Lessor will join with the Lessee in proceedings to protest such increase. Real estate taxes and assessments will be prorated at the termination of this Lease in the same manner as at the commencement on the basis that the Lessee will be paying its proportionate share of current tax bills even though said bills represent a period prior to the billing.

(12) REPAIRS AND MAINTENANCE

The Lessor shall maintain and keep in a good state of repair the exterior and structural portions of the Demised Premises, including the roof, gutters and downspouts, exterior walls of the Demised Premises, but excluding the vestibule, any doors, whether swinging, overhead, electric or manual, and any other windows or glass, which shall be Lessee's responsibility, except that any repair to the same necessitated because of the fault of or negligence of Lessee, its agents and employees, shall be made at Lessee's expense. Lessee will assign to Lessor any warranties from contractors or materialmen with respect to that portion of the Storeroom for which Lessor has repair and maintenance obligations.

- 21 -

Lessee shall maintain and keep in a good state of repair the interior of the Demised Premises, including, all of Lessee's improvements, and all equipment, fixtures and appliances therein, and all electrical, plumbing and other mechanical installations therein, including heating, ventilating and air conditioning, and will make all replacements thereto, at its own expense, except that any repair to the same necessitated because of the fault or negligence of Lessor, its agents and employees, shall be made at Lessor's expense.   Lessee will repair and maintain any door closures forming a part of said Demised Premises.   Lessee will further make all repairs, alterations, additions or replacements to the Demised Premises required by any law or ordinance or any order or regulation of any public authority because of Lessee's use of the Demised Premises.

Following completion of Lessee's Construction, Lessee shall make no structural alterations to the building or to the improvements at any time located on the Demised Premises without the prior written consent of the Lessor, which approval will not be unreasonably withheld.  The building and other improvements erected on the Demised Premises (as distinguished from personal property, trade fixtures, and equipment used in the conduct of Lessee's business) and all alterations, additions or improvements made thereon at any time shall remain upon the Demised Premises and shall be surrendered as part of the real estate to Lessor at the end of the term of this Lease or any renewal thereof.

ı

At the expiration of this Lease, or any renewal thereof, the Lessee shall surrender the Demised Premises to the Lessor "broom clean" in as good condition as they are at Rent Commencement Date, ordinary wear and tear excepted. Lessee shall be obligated to secure all permits in connection with its construction on the Demised Premises and shall also be obligated to present Lessor Lien Waivers on all such construction work.

(13) <u>SIGNS</u>

Subject to all applicable city or other municipal approvals, and with Lessor's prior written approval, not to be unreasonably withheld, Lessee shall have the right to install, operate, and remove, at its own cost and expense, up to Three (3) exterior building signs of the type that Lessee is presently employing at its other Storeroom locations. If the Lessor erects a pylon sign for the Shopping Center, Lessee shall have the right to erect its identification sign on the sign of a size and location and at a cost as described in Item 3 herein. In addition to the Shopping Center pylon sign, the Lessee shall have the right to construct its own pylon sign, if permitted by local authorities as to zoning, etc. as shown on Exhibit E and such other signs as shall be agreed to in writing by the Lessor as to location and design. All such signs shall be removed by the Lessee upon the termination of this Lease or any renewal term, if so requested by Lessor and Lessee shall likewise restore the Demised Premises to their previous conditions.

(14) <u>CONDEMNATION</u>

In the event that the entire Demised Premises are taken or otherwise appropriated under the power of Eminent Domain or by any other proceedings of a paramount authority, whether by agreement or pursuant to litigation, or are conveyed to any authority under threat of condemnation, this Lease shall terminate as of the date that the Lessee is required to yield possession.

In the event that twenty percent (20%) or more of the Demised Premises, or twenty percent (20%) or more of the parking spaces located on the Common Areas (unless with regard to the Common Areas Lessor provides an equal number of substitute parking spaces in an area adjacent to the Common Areas) be taken and Lessee determines in its reasonable judgment that the Demised Premises would in such event be unsatisfactory for Lessee's business operation, then Lessee may either (a) cancel the term of this Lease by giving Lessor written notice of such termination on or before thirty (30) days after Lessee is notified of such appropriation, with such cancellation to be effective on the date Lessor is required to deliver possession of that part of the Demised Premises, and/or the Common Areas to the condemning Authority or (b) at Lessee's option remain a tenant of the Demised Premises remaining after the appropriation. If this Lease should not be so canceled under the above conditions, or if less than Twenty Percent (20%) of the Demised Premises or of the Common Area be taken, providing that

- 24 -

parking ratio never falls below five (5) car parking spaces per One
Thousand (1,000) square feet to total leasable area in the Shopping
Center, the Lessor, at its expense, shall restore the Demised
Premises and/or Common Area so far as practicable to the condition
existing just prior to the taking so as to effect thereby an
operating and architectural unit similar to said premises before
such taking.

In the instance of a taking of a portion of the Storeroom or
in Common Areas, and there are after such taking fewer parking
spaces, and for a continuous period of six (6) months after
delivery of possession of the property so taken to the condemning
authority Lessee's average monthly Gross Receipts are more than
five percent (5%) less than Gross Receipts for the immediately
preceding twelve (12) month period, the parties will negotiate a
reasonable adjustment in the rentals.

In the event the Demised Premises, or any part thereof, are
taken or otherwise appropriated in whole or in part, under the
power of eminent domain, or by paramount authority, whether by
agreement or pursuant to litigation, all damages and compensation
for such taking, whether for the whole or a part of the Premises,
shall belong to and be the property of Lessor, whether such damages
shall be awarded as compensation for diminution in value to the
leasehold or to the fee of the Demised Premises. The Lessee shall
be entitled to make a separate claim for the value of its improve-
ments to the Demised Premises, for loss of business, moving

expense, damages for economic loss suffered from depreciation of chattel equipment, and for termination of its leasehold, provided that, to the extent the compensation awarded in the condemnation is sufficient, Lessor will in no event receive less than the fair market value of land and buildings comprising the Demised Premises, and for improvements made by Lessor to the building, the roof, and parking lot, exclusive of Lessee's improvements to the Demised Premises and if a dispute arises between Lessor and Lessee as to the allocation of any award as between them, the parties agree to submit the issue of allocation to binding arbitration according to the rules of the American Arbitration Association.

(15) FIRE OR OTHER DESTRUCTION

In the event that the Demised Premises are destroyed or are damaged so that they could not be repaired or reconstructed, with reasonable diligence being exercised, within Six (6) months from the date of said destruction or damage by reason of fire or other casualty contemplated to be covered under the insurance policy or policies referred to herein, the Lessee shall have the option either to terminate the Lease or cause Lessor to reconstruct the Demised Premises; provided that the latter option will only be available to Lessee if there remains at least seven (7) years on the Term or Lessee has agreed to an extension of the Term to provide for a Term of at least seven (7) years.  In the event Lessee elects to terminate the Lease, it is agreed that the Lessee shall immediately surrender the Demised Premises to the Lessor, and

- 26 -

shall pay Rent only until the date of such surrender of said premises and no longer. If, however, the Lessee elects to reconstruct the Demised Premises, then the procedure for partial destruction, as provided in the following paragraph, shall be applicable to Lessee's election to cause Lessor to reconstruct.

In the event of a partial destruction or damage to the Demised Premises and same being repairable or able to be reconstructed in the exercise of reasonable diligence within Six (6) months from the date of said destruction or damage, said Lessee shall then pay a rental based upon the proportionate area of the Demised Premises remaining useable, the Lessor will immediately undertake the restoration of the Demised Premises and will diligently pursue the completion of same, and such rental shall continue in effect until such time as the Demised Premises are restored to their original condition for occupancy by the Lessee.

(16) INSURANCE

During the term of this Lease, the Lessor agrees that it shall insure the Shopping Center and other improvements now or at any time forming a part of the Shopping Center, as the same exist upon the date hereof, against loss or damage by fire or other hazards by extended coverage endorsements to the full insurable value thereof on a replacement cost basis, in an amount satisfactory to Lessor, and shall furnish to Lessee a copy of said policies of insurance, naming Lessee as an additional insured. Lessee shall pay Lessee's Proportionate Share of Lessor's cost in providing this insurance

- 27 -

within Ten (10) days of a billing by Lessor. In the event of an increase in these premiums, the Lessor will at Lessee's request, seek competitive bids and will allow Lessee to join in this process.

Lessor agrees to furnish to Lessee, upon written request, information stating the amount of insurance premiums applicable to the fire and extended coverage insurance for covering the Demised Premises. If Lessee can demonstrate that it can obtain comparable coverage (under either a separate policy or under Lessee's blanket policy) for a lower premium than that being paid by Lessor for such coverage, then, in that event, Lessee shall have the right to furnish such insurance for the Demised Premises provided that the insurance company furnishing such coverage is reasonably acceptable to Lessor, the insurance coverages are comparable to those under Lessor's insurance coverages, Lessor is named as the named insured with respect to the Demised Premises, an appropriate mortgagee's endorsement is furnished in favor of Lessor's mortgagee, Lessor is given the sole right to negotiate and settle any loss and receive the proceeds (subject to any provision of Lessor's mortgage on the Demised Premises), Lessor is furnished the original of such policy and the insurance company agrees to notify Lessor not less than Thirty (30) days in advance of any modification or cancellation thereof

The Lessee shall, during the term of this Lease, at its sole cost and expense, carry comprehensive public liability insurance

for both the protection of Lessor and Lessee with limits of at least One Million Dollars ($1,000,000) for injury (including death) to any person, and One Million Dollars ($1,000,000) for injury (including death) developing from one accident, and One Million Dollars ($1,000,000) property damage, and Five Million Dollars ($5,000,000) umbrella coverage for personal injury and property damage, and shall furnish to Lessor certificates of insurance, which reflect Lessor and Lessor's mortgagee as additional insureds.

Lessee shall replace at its own expense all plate and other glass windows in the Demised Premises broken for whatever cause, other than the negligence of Lessor or Lessor's agents or employees.

Lessee agrees that all Lessee's insurance policies applicable in any way to the Demised Premises, Lessee's business therein or Lessee's property therein, shall waive, and Lessee hereby waives any right of subrogation against Lessor. All of Lessor's insurance policies applicable in any way to the Demised Premises or the Shopping Center development, Lessor's business therein, or Lessor's property therein, shall contain waivers of subrogation against Lessee.

All of Lessor's and Lessee's insurance policies shall be in a form reasonably satisfactory to the other and shall provide that they will not be subject to cancellation, termination, or change, except after at least Thirty (30) days prior written notice, sent by certified mail, to the other party. Lessee and Lessor shall

each supply to the other party certificates of insurance required
to be maintained by them, together with satisfactory evidence of
the payment of the premiums thereon. If either party fails, for
any reason, to comply with this section, then following Ten (10)
days prior written notice, the other party may obtain the insurance
that the other party was required to maintain and charge the
defaulting party the cost of the same as additional rental or as a
credit against rental.

(17) RIGHT TO CURE DEFAULT

In the event of a default on the part of either party to pay
and discharge any of its obligations under this Lease, which
obligations require the expenditure of money by the defaulting
party, the non-defaulting party may, at its option, after Ten (10)
days prior written notice sent certified to the defaulting party,
pay and discharge such obligations and any expenditures so made by
the non-defaulting party, together with an administration fee of
Fifteen Percent (15%) with interest thereon at the rate of Ten
Percent (10%) per annum from the date of making such payment, and
such amounts so paid are hereby agreed and declared to be so much
additional rental or a credit against rental and, in the event of
default by Lessee, shall be due and payable by Lessee with the next
installment of rental becoming due after the date of such expendi-
ture, or, in the event of default by Lessor, credited against the
next installment of rental becoming due after the date of such
expenditure.

(18) LESSEE TO SAVE LESSOR HARMLESS

Lessee will indemnify and save harmless Lessor against and
from all expenses, liabilities, obligations, damages, penalties,
claims, accidents, costs and expenses, including reasonable
attorney's fees, paid, suffered, or incurred by Lessor, or death or
damage or injury to person or property in whole or in part as a
result of any breach by Lessee, Lessee's agents, independent
contractors, servants, employees, or licensees, or any covenant or
condition of this Lease, or as the result of Lessee's use and
occupancy of the Demised Premises or any part thereof, or the
carelessness, negligence or improper conduct of Lessee, Lessee's
agents, servants, employees customers, visitors or licensees.
Lessee's liability under this Lease extends to the acts and
omissions of any sublessee, and any agent, servant, customer,
employee, visitor or licensee of any sublessee. In case any action
or proceeding is brought against Lessor by reason of any such
claim, Lessee upon written notice from Lessor, will at Lessee's
expense, resist or defend such action or proceeding. Lessee shall
use and occupy the Demised Premises at its own risk.

(19) DISCLAIMER OF LIABILITY

Lessor shall not be liable for, and Lessee's obligations
hereunder shall not be diminished because of, any loss to the
person or property of Lessee, its licensees, agents, or visitors,
by reason of its use and occupancy of the Demised Premises, and
arising or caused by water leakage, plumbing defects, gas or

electric wiring, on the Demised Premises, or on the Shopping
Center, nor shall Lessor be liable for any acts or omissions of
other tenants or occupants of the Lessor's property, or from losses
by theft unless such damage results from the failure by the Lessor
to perform its covenants of repair and maintenance under Item (12)
hereof, or unless such damage results from the failure by the
Lessor to provide a level of lighting consistent with the operation
of other comparable shopping centers in the greater Cincinnati
area.  Lessee acknowledges that the Lessor will not furnish any
security or guard service for the Shopping Center.

(20) QUIET POSSESSION

Lessor agrees with Lessee that the said Lessee, paying the
rents and observing and keeping the covenants of this Lease on
Lessee's part to be kept, shall lawfully, peaceably, and quietly
hold, occupy, and enjoy said premises during said term without any
let, hindrance, ejectment or molestation by the said Lessor or by
any person or persons lawfully claiming under it.

(21) NON-COMPETITION

Except for the existing Walgreens located in the Shopping
Center as shown on Exhibit A, which will be relocated as provided
in this Lease, Lessor, its successors and assigns, will not permit
any other supermarket or drug store/pharmacy to be located in the
Shopping Center, or on any other real property within one (1)
statute mile of the boundaries of the Shopping Center which is
owned or controlled by Lessor or by any affiliate of Lessor

("Restricted Area"), during the Term hereof, or any renewal so long
as Lessee operates a supermarket in the Demised Premises. Further,
Lessor, its successors and assigns, will not permit any other meat
market, produce store, delicatessen or convenience store to be
located in the Restricted Area. These shall be covenants running
with the land and shall be memorialized in the Memorandum of Lease
referenced in Item (25)(q) or in separate Declarations of Restric-
tions documents in form proper for recording. Notwithstanding the
foregoing, to the extent that the Lessor owns real property within
One (1) statute mile of the boundaries of the Shopping Center which
is presently occupied by a competing business either owned by
Lessor or by a third party leasing from Lessor, this competing
business shall be permitted to continue in operation.

(22) LESSEE'S ADDITIONAL AFFIRMATIVE COVENANTS

Lessee further covenants, at its expense, at all times during
the lease term, and any renewal thereof, as follows:

(a)   To store all trash and refuse in appropriate
containers within the Demised Premises and to attend to the daily
disposal thereof in the manner designated by Lessor; to keep all
drains inside the Demised Premises open; to receive and deliver
goods and merchandise only in the manner and areas designated by
Lessor; and to conform to all reasonable rules and regulations
which Lessor may make in the management and use of the Shopping
Center, requiring such conformance by Lessee and Lessee's
employees.

(b)   To pay promptly when due all taxes imposed upon its business operations and its personal property in the Demised Premises and also to pay promptly when due the entire cost of any work to the Demised Premises, including equipment, facilities and fixtures therein, undertaken by Lessee so that the Demised Premises shall at all times be free of liens for labor and materials; to procure all necessary permits before undertaking such work; to do all of such work in a good and workmanlike manner, employing materials of good quality; to perform such work in such manner as to insure proper maintenance of good labor relationships; to comply with all governmental requirements; and to save Lessor harmless and indemnified from all injury, loss, claims or damage to any person or property occasioned by or growing out of such work.

(c)   To permit Lessor and its agents to enter the Demised Premises at reasonable times for the purpose of inspecting the same or of making repairs to the building in which the same are located; and to show the Demised Premises to prospective purchasers, lenders, and tenants.

(d)   That this Lease shall be subject and subordinate to any mortgages or trust deeds that may now or hereafter be placed upon the Demised Premises and to any and all advances to be made thereunder, and to the interest thereon, and all renewals, replacements, consolidations and extensions thereof provided the mortgagee or trustee named in said mortgages or trust deeds shall agree to recognize the Lease of Lessee in the event of foreclosure

- 34 -

so long as the Lessee is not in default; and that Lessee shall promptly execute and deliver whatever instruments may be required for such purposes.

Provided a valid Lease is in full force and effect, Lessee agrees to promptly execute an estoppel or other certificate in reasonably acceptable form upon request of Lessor which will confirm that the Lease is in effect as well as the rental, remaining term and any options periods, together with the existence or non existence of any default at such time.

(23) LESSEE'S NEGATIVE COVENANTS

Lessee covenants, at all times during the term of this Lease any renewal hereof, as follows:

(a)  Not to injure, overload, deface or otherwise harm the Demised Premises; nor commit any nuisance; nor permit the emission of any objectionable odor.

(b)  Not to suffer any mechanic's lien to be filed against the Demised Premises by reason of any work, labor, service or materials performed at or furnished to the Demised Premises, the Lessee, or to anyone holding the Demised Premises through or under the Lessee.  If any such mechanic's lien shall at any time be filed against the Demised Premises, the Lessee shall forthwith cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction or otherwise, but the Lessee shall have the right to contest any and all such liens.  If the Lessee shall fail to cause such liens to be discharged within Thirty (30) days

- 35 -

after being notified of the filing thereof and before order of sale
thereunder, then, in addition to any other right or remedy of the
Lessor, the Lessor may, but shall not be obligated to, discharge
the same by paying the amount claimed to be due or by bonding or
other proceeding deemed appropriate by the Lessor, and the amount
so paid by the Lessor and/or all costs and expenses, including
reasonable attorneys' fees, incurred by the Lessor in procuring the
discharge of such lien, shall be treated in accordance with Item
(17) hereof. Nothing in this Lease contained shall be construed as
a consent on the part of the Lessor to subject the Lessor's estate
in the Demised Premises to any lien or liability under the Lien
Laws of the State of Kentucky.

(24) DEFAULT

In the event of any failure of the Lessee to pay any payment
due hereunder within Five (5) days after the same shall be due and
the continuance of said default for a period of Seven (7) days
after written notice of such default shall have been mailed to
Lessee by certified mail, or in the event of a failure by Lessee to
perform any of the other terms, conditions, or covenants of this
Lease to be observed or performed by Lessee and the continuance of
said default for more than Thirty (30) days after written notice of
such default shall have been mailed to Lessee by certified mail, or
if Lessee shall become bankrupt or insolvent or file any debtor
proceedings or take or have taken against Lessee, in any court
pursuant to any statute either of the United States or any State,

- 36 -

a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee for all or a portion of Lessee's property, or if Lessee shall make an assignment for the benefit of creditors or petitions for or enters into an arrangement, or if Lessee suffers this Lease to be taken under any writ of execution, then Lessor, besides other rights and remedies it may have at law and in equity, shall have the immediate right of re-entry and may remove all persons and property from the Demised Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Lessee, all without service of notice or resort to legal process without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby.

Should Lessor elect to re-enter as herein provided or should it take possession pursuant to legal proceedings or pursuant to any notice provided by law, it may either terminate this Lease or it may from time to time without terminating this Lease make such alterations and repairs as may be necessary in order to relet the Demised Premised and relet said premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals and upon such other terms and conditions as Lessor, in its sole discretion, may deem advisable; and upon such subletting all rentals received by the Lessor from such subletting shall be applied: First, to the payment of any indebtedness other than rent due hereunto from

Lessee to Lessor; Second, to the payment of any costs and expenses
of such reletting, including brokerage fees and attorneys fees and
costs of such alterations and repairs; Third, to the payment of
Rent due and unpaid hereunder; and the residue, if any, shall be
held by Lessor and applied in payment of future rents as the same
may become due and payable thereunder. If such rentals received
from such reletting during any month be less than that to be paid
during that month by Lessee hereunder, Lessee shall pay any such
deficiency to Lessor  Such deficiency shall be calculated and paid
monthly.  No such re-entry or taking possession of the Demised
Premises by Lessor shall be construed as an election on its part to
terminate this Lease unless a written notice of such intention be
given to Lessee or unless the termination thereof be decreed by a
court of competent jurisdiction.  Notwithstanding any such
reletting without termination, Lessor may at any time thereafter
elect to terminate this Lease for such previous breach.  Should
Lessor at any time terminate this Lease for any breach, in addition
to any other remedies it may have, it may recover from Lessee all
damages it may incur by reason of such breach, including the cost
of recovering the Demised Premises, reasonable attorneys' fees, and
including the worth at the time of such determination of the
excess, if any, of the amount of rent and charges equivalent to
rent reserved in this Lease for the remainder of the stated Term
over the then reasonable rental value of the Demised Premises for
the remainder of the stated Term.

- 38 -

In case suit shall be brought for recovery of possession of the Demised Premises, for the recovering of rent or any other amount due under the provisions of this Lease or because of the breach of any other covenant herein contained on the part of Lessee to be kept or performed and a breach shall be established, Lessee shall pay to Lessor all expenses incurred therefor including a reasonable attorney's fee

### (25) MISCELLANEOUS PROVISIONS

(a) Waiver. The waiver by Lessor of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant, or condition or any subsequent breach of the same, or any other term, covenant and condition herein contained. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any previous breach by Lessee of any term, covenant, or condition of this Lease, other than the failure of Lessee to pay the particular rentals so accepted, regardless of Lessor's knowledge of such previous breach at the time of acceptance of such rent. No covenant, term, or condition of this Lease shall be deemed to have been waived by Lessor unless such waiver be in writing, signed by Lessor.

(b) Accord and Satisfaction. No payment by Lessee or receipt by Lessor of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall be deemed to be other than on

í

- 39 -

account of the earliest stipulated rent, nor shall any endorsement or any statement on any check or letter accompanying any check or payment as rent, be deemed an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's rights to recover the balance of such rent or to pursue any other remedy in this Lease provided.

(c) <u>Entire Agreement</u>. This Lease and the exhibits attached hereto and forming a part hereof set forth all of the covenants, promises, and agreements, conditions and understandings between Lessor and Lessee concerning the Demised Premises and there are no covenants, promises, agreements, conditions, or understandings either oral or written, between them, other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change, or addition to this Lease shall be binding upon Lessor or Lessee unless reduced to writing and signed by them.

(d) <u>Not a Joint Venture</u>. Any intention to create a joint venture or partnership relation between the parties hereto is expressly disclaimed, it being understood and agreed that the provisions of this Lease in regard to the payment by Lessee and the acceptance by Lessor of a percentage of the gross sales of Lessee is a reservation of rent for the use of the Demised Premises.

(e) <u>Excuse for Non-Performance</u> In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of

- 40 -

strikes, walkouts, labor trouble, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  The provisions of this section shall not operate to excuse Lessee from the prompt payment of Minimum Rent, Percentage Rent, additional rent, or any other payments required by the terms of this Lease.

#.75 —        (f)  Assignment or Subletting.  Lessee shall have the right to assign this Lease or sublet all or any part of the Demised Premises with the prior written consent of the Lessor, which consent will not be unreasonably withheld; provided that any such assignment or subletting shall, in no event, violate any existing exclusive granted to other tenants in the Shopping Center or damage the integrity of the Shopping Center. The Premises shall not at any time be divided into more than two (2) separate spaces for assignment or subletting to more than two (2) subtenants.  For purposes of this Lease, any assignment of this Lease by operation of law, and any change in control or management of Lessee by merger, consolidation, sale of stock, sale of partnership interests or other means of transferring ownership and control of Lessee or its business or the management of Lessee of Lessee's business shall

be deemed an assignment of this Lease. If an assignment of this Lease occurs by operation of law or by change in control or management of Lessee as aforesaid, Lessor's consent shall not be required if on the date of the assignment Lessee delivers to Lessor a sum equal to Minimum Rent for the next succeeding Lease Year ("Collateral") as security for payment of Minimum Rent for the next succeeding three (3) Lease Years. After expiration of such three (3) Lease Year period, if there is not then a continuing uncured default, the Collateral then being held by Lessor shall be returned to Lessee. The Collateral when delivered to Lessor shall be either (i) a certified check payable to Lessor, or (ii) an irrevocable letter of credit issued by a national banking association who maintains an office in Cincinnati, Ohio or a banking corporation with a net worth equivalent to at least the net worth of the Provident Bank, Cincinnati, Ohio, as of January 1, 1993. If there is any default by Lessee after delivery of the Collateral to Lessor, Lessor may, and is hereby authorized to apply the Collateral to sums owed Lessor, hereunder, without in any event waiving the default or accepting the Collateral as a cure of the default.

In the event of any assignment or subletting, Lessee shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants or conditions hereof.

Should the Lessee determine to "go dark" pursuant to Item (8) herein, then in order to protect the integrity of the Shopping Center, the Lessor and Lessee will cooperate in leasing the Demised Premises for a base rental not less than Lessee is obligated to pay hereunder, it being understood that any assignment, or subletting by Lessee will continue to be subject to Lessor's prior written consent not to be unreasonably withheld. In the event the parties are unsuccessful, during the one (1) year period, in leasing the entire Demised Premises then, to the extent not leased, the Lessee shall have the free, clear and unencumbered right, following the one (1) year period to assign or sublet to any third party, for any lawful use unless such use violates then existing exclusives granted to other tenants of the Shopping Center. Each permitted sublease or assignee shall agree, in a form reasonably satisfactory to Lessor, to assume, comply with and be bound by all of the terms, conditions and agreements of this Lease and Lessee shall deliver to Lessor, promptly after execution, an executed copy of each such sublease or assignment and an agreement, in recordable form, of assumption and compliance by each such subtenant or assignee. Lessee agrees to pay to Lessor, on demand, all reasonable costs incurred by Lessor in connection with any request by Lessee for Lessor to consent to any assignment or subletting. If Lessor consents to any proposed assignment or sublease Lessee shall pay Lessor as additional rent one hundred percent (100%) of all consideration, including the excess, if any, of the amount of rent

and all the payments received by Lessee from Lessee's assignee or sublease over the amount of rent due Lessor hereunder, less Lessee's "Cost Recovery" as hereinafter defined. Lessee's Cost Recovery shall mean all sums expanded by Lessee with regard to the assignment or subletting, including alterations and improvements to the Premises to accommodate the assignee or sublessee, rent and common area maintenance charges paid by Lessee during any period immediately preceding the period that the assignee or sublessee takes possession of the premises that Lessee does not conduct business in the Premises (i.e. Lessee has "gone dark"), and brokerage fees paid by Lessee with regard to the assignment or subletting.

If Lessee desires to assign this Lease or sublet the Premises in whole or in part, Lessee shall give Lessor notice at least ninety (90) days prior to the proposed effective date of the assignment or subletting. Lessee's notice shall state the name and address of the proposed assignee or subtenant, the nature of the business to be conducted on the Premises and include all of the terms and provisions of the proposed assignment or sublease. Included with Lessee's notice shall be the most recent financial statement or other equivalent financial information concerning the proposed assignee or subtenant so that Lessor can make an informed, intelligent decision as to the proposed assignee's or subtenant's financial condition and ability to successfully operate the Premises. Lessee shall deliver a true and complete copy of the

- 44 -

proposed assignment or sublease to lessor with lessee's notice. As provided in Item (6) herein Lessee shall determine the Percentage Rent payable by any such subtenant or assignee. Lessor shall have the right, to be exercised by giving notice to Lessee within thirty (30) days after receipt of Lessee's notice, to recapture the space described in Lessee's notice and such recapture notice shall, if given, cancel and terminate this Lease with respect to the affected space as of the date stated in Lessee's notice. In such event, Lessor shall have the right to enter into a direct lease with such subtenant or assignee for the affected part of the Premises. Lessee shall assign to Lessor any contract or agreement it may have with respect to such subtenant or assignee, and shall release Lessor of its obligations to Lessee under this Lease. If Lessee's notice covers all of the Premises, and Lessor exercises its recapture right, the term of this Lease shall expire on the date stated in Lessee's notice as if that date had been fixed for the expiration of the term. If however, this Lease is cancelled with respect to less than the entire Premises, the Base Rent and the Gross Sales Base shall be adjusted on the basis of the number of square feet retained by Lessee in proportion of the number of square feet contained in the Premises, and this Lease as so amended shall continue in full force and effect.

     (g)  <u>Notices</u>:

       1)  Any notice by Lessee to Lessor must be served by certified or registered mail, postage prepaid, addressed to

:

- 45 -

Lessor c/o FW Partners, Ltd., 3307 Clifton Avenue, Cincinnati, Ohio 45220, Attention: Alvin Lipson, or such other address as Lessor may designate by written notice.

ii)  Any notice by Lessor to Lessee must be served by certified or registered mail, postage prepaid, addressed to Lessee c/o Real Estate Department, at 4901 Hunt Road, Cincinnati, Ohio 45242 or at such other address as Lessee shall designate by written notice.

(h)  <u>Real Estate Commission</u>.  It is mutually agreed that the within Lease was negotiated between the parties without the effort of any real estate agent and that no commission is due to any real estate agent on account of the execution of this Lease.

(i)  <u>Partial Invalidity</u>.  If any term, covenant, or condition of this Lease or the application thereof to any persons or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term, covenant, or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term, covenant, or condition of this Lease shall be valid and shall be enforced to the fullest extent permitted by law.

(j)  <u>Successor and Assigns</u>.  This Lease and all of its terms, covenants and provisions shall inure to the benefit of and be binding upon the parties hereto and their respective successors

- 46 -

and assigns, provided that this provision shall not be deemed to infer upon Lessee the right of assignability.

(k)  Options to Renew.  The Lessee shall have Four (4) successive options to renew this Lease for additional terms of Five (5) years each.  In the event Lessee desires to renew any option, it shall have the obligation to notify the Lessor, by certified mail, of its intention to renew no later than Twelve (12) months prior to the expiration date of the then current term.  All of the terms and conditions shall apply for the renewal periods as are applicable for the original Term.  The foregoing notwithstanding in the event that Lessee renews this Lease for a renewal term, Lessee shall not have the right to "go dark" as permitted in item (8) of this Lease.

(l)  Contingencies.  The obligations of the Lessee hereunder are contingent upon satisfaction of the following conditions precedent ("Contingencies"):

i)  The termination of the lease presently existing with the Remke Super Markets for the exclusive operation of a super market in the Shopping Center.

ii)  The Lessee's securing all zoning, building permits and the required administrative approvals of the city of Fort Wright, Kentucky to allow it to remodel the Storeroom and to operate therein a combination retail supermarket and drugstore, including the sale of prescription drugs.

- 47 -

iii) The settlement of all pending litigation existing between the Lessor and Ft. Wright Associates, Ltd., in Kenton Circuit Court, Commonwealth of Kentucky and the acquisition by Lessor of the fee simple title to the Shopping Center.

iv) The amendment to the Walgreens Lease to allow Lessee to operate on the Demised Premises, its traditional combination food and drugstore.

v) The Lessor providing the Lessee with a Phase I Environmental Audit ("Audit") by a reputable environmental consultant chosen by Lessee; and the Lessee's being satisfied with the results of the Audit.

(m) <u>Lessor's Responsibility for Hazardous Materials</u>. Lessor warrants and represents to the Lessee that, to the best of its knowledge based on the Audit, a copy of which has been delivered to Lessee, the Demised Premises complies in all respects with all federal, state and local laws, ordinances, rules and regulations applicable to the generation, handling, manufacturing, treatment, use, transportation, presence and/or release into the air, soil, water at, above or below ground level (whether legal, illegal, accidental or intentional) asbestos, polychlorinated biphenyl ("PCB"), petroleum products and hazardous or toxic substances, materials and/or waste as defined by applicable federal, state and local laws, ordinances, rules and regulations, ("Hazardous Materials") except that Lessor shall not be responsible

or liable for any Hazardous Materials for which Lessee is responsible or occurring subsequent to the date of this Lease.

Lessor shall indemnify and hold Lessee harmless from any claims (including bodily injury or real or personal property damage) acts, administrative proceedings (including formal proceedings) judgments, damages (including punitive damages), penalties, fines, costs, liabilities, interest, expenses or losses, including reasonable attorneys' fees, together with all other costs and expenses of any kind and nature that arise, directly or indirectly from or in connection with a breach of the foregoing representations and warranties. This indemnity shall survive the termination of the Lease.

Any remedial work required to conform with the foregoing representations and warranties or indemnities by appropriate federal, state and/or local agencies or judicial orders shall be performed or caused to be performed by Lessor, at Lessor's sole cost, in a timely manner. The foregoing notwithstanding, in the event that Lessor reasonably determines that any such remedial work is prohibitive from a cost point of view (i.e. such work will cause Lessor to incur expenses equal to one half or more of the fair market value of the Shopping Center), Lessor can by notice to Lessee terminate this Lease effective on the earlier to occur of one hundred eighty (180) days from the notice of termination, or the date any governmental authority with jurisdiction over the Premises requires Lessee to vacate the premises.

*f*

- 49 -

(n)  <u>Restriction on Hazardous Wastes</u>.  Lessee shall not cause or permit any Hazardous Material (as defined herein) to be released, brought upon, stored, produced, emitted, disposed of or used upon, about or beneath the Premised by Lessee, its agents, employees, contractors or invitees.

(i)  Lessee shall indemnify, defend, and hold Lessor harmless from and against any and all Environmental Damages which arise from:  a) the presence upon, about or beneath the Premises of any "<u>Hazardous Materials</u>" (as defined in this Lease) if such Hazardous Material was released, brought upon, stored, produced, emitted, disposed of or used upon, about or beneath the Premises by Lessee, its agents, employees, contractors or invitees, or any agents, employees, contractors or invitees of any permitted sublessee or assignee of Lessee or of any chemical substance requiring remediation under any federal, state or local statute, regulation, ordinance or policy; or; b) the breach of any of the provisions of this Lease.  For the purpose of this Lease, "<u>Environ-mental Damages</u>" shall mean: (i) all claims, judgments, damages, penalties, fines, costs, liabilities and losses (including, without limitation, diminution in the value of the Premises, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises and from any adverse impact on Lessor's marketing of space); (ii) all sums paid for settlement of claims, attorneys fees, consultant's fees and expert's fees; and (iii) all costs incurred by Lessor in connection with investigation of

- 50 -

Hazardous Material (as defined herein) upon, about or beneath the Premises, the preparation of any feasibility studies or reports and the performance of any cleanup, remediation, removal or restoration work required by any federal, state or local governmental agency or political subdivision necessary for Lessor to make full economic use of the Premises, or otherwise required under this Lease. Lessee's obligations under this Section shall survive the expiration of this Lease.

Notwithstanding any other obligation of Lessee to indemnify Lessor pursuant to this Lease, Lessee shall, at its sole cost and expense, promptly take all actions required by any federal, state or local government agency or political subdivision or necessary for Lessor to make full economic use of the Premises, which requirements or necessity arise from the presence upon, about or beneath the Premises of any Hazardous Materials (as defined in this Lease) if such Hazardous Material was released, brought upon, stored, produced, emitted, disposed of or used upon, about or beneath the Premises by Lessee, its agents, employees, contractor or invitee, or any agent, employee, contractor or invitee of any permitted sublessee or assignee of Lessee. Such actions shall include, but not be limited to, the investigation of the environmental condition of the Premises, the preparation of any feasibility studies or reports and the performance of any cleanup, remedial, removal or restoration work. Lessee shall take all actions necessary to restore the Premises to the condition existing prior

- 51 -

to the introduction of the Hazardous Material upon, about or beneath the Premises, notwithstanding any lesser standard of remediation allowable under applicable law or governmental policies. Lessee shall nevertheless obtain Lessor's approval prior to undertaking any activities required by this Section, which approval shall not be unreasonably withheld so long as such actions would not potentially have a material long-term or short-term effect on the Premises. The obligations of Lessee pursuant to this Section shall not apply to situations where Hazardous Materials are released, brought upon, stored, produced, emitted, disposed of or used upon, about or beneath the Premises at a time or times other than during the term of this Lease except where such event occurs as a result of the acts or omissions of Lessee, its agents, employees, contractors or invitees or as a result of the acts or omissions of any agent, employee, contractor or invitee of any permitted sublessee or assignee of Lessee. Lessee's obligations under this Section shall survive the expiration of this Lease.

(o) <u>Acts of God</u>. All construction to be performed by Lessor or Lessee pursuant to this Lease shall be subject to extensions by acts of God, labor strikes or other causes beyond the control of the responsible party.

(p) <u>Lessor's Bankruptcy</u>. In the event of Lessor's filing or having filed against it a bankruptcy petition under Chapters 7, 11 or 13 of the United States Bankruptcy Code, and in the event Lessor or his bankruptcy trustee rejects this Lease, the Lessee may elect

to remain in possession of the Demised Premises pursuant to its right under Section 365(h) of the Bankruptcy Code and Lessor shall perform all duties and covenants pursuant to the terms of this Lease. In addition, the Lessee will have all of the rights of a tenant under applicable state law.

(q) Lessor's Warranty. Lessor represents and warrants that it will obtain good title to the Demised Premises, free and clear of all liens and encumbrances except current taxes and assessments and easements and deed restrictions and mortgages of record, and will forever defend and warrant title to the Demised Premises. Lessor further represents and warrants that, as of this date, to Lessor's knowledge, water pipes, water lines, sewers, and electrical service, and any site improvements required by Lessee's use of the Demised Premises are installed at the Demised Premises. If Lessee, within thirty (30) days after the date of this Lease determines that such facilities are not in good, workable order and condition and in compliance with the laws, rules, regulations, ordinances and orders of all governmental authorities, and the use of the Demised Premises as set forth herein will (i) violate any zoning laws, zoning rules, zoning regulations, zoning ordinances and zoning orders of any governmental authorities or (ii) violate any deed or lease restrictions affecting the Shopping Center, then Lessee, may on or before the thirtieth (30th) day after the date of this Lease so notify Lessor. Lessor shall have thirty (30) days from the date of such notice to cure the problem the subject of the

notice; provided however that if the cure cannot reasonably be accomplished within thirty (30) days, and Lessor demonstrates to Lessee's reasonable satisfaction that the cure can be completed within ninety (90) days, completion of the cure within such ninety (90) day period shall be deemed satisfactory to Lessee. If Lessor either declines to cure by notice to Lessee, or commences, but does not accomplish the cure the problem the subject of the notice, then Lessee may terminate this Lease by notice to Lessor and both parties shall be relieved of all obligation to on another hereunder. The foregoing notwithstanding, Lessor agrees that Lessor will exercise its best efforts to cure any construction related (i.e. physical) problem which is the subject of any such notice. Further the Lessor represents that there is no gas service installed and available for Lessee's use.

(r) <u>Memorandum of Lease</u>  The parties agree, concurrently with the execution of this Lease, to execute and record a Memorandum of Lease in form and substance satisfactory to counsel for the parties. The parties will further execute and record Declarations of Restrictions in form and substance satisfactory to counsel for the parties memorializing the restrictive covenants of Lessor set forth on Item 21.

(s) <u>Arbitration</u>.  Except in the event of default for which Lessor's remedies are provided for under Item (24) of this Lease, in case the Lessor and Lessee are unable to settle and resolve any and all differences which may arise between them, such differences

shall then be finally and conclusively settled and resolved by arbitration. Upon demand and written notice by either party, three arbitrators shall be selected, one of whom shall be chosen by the party making such demand and one by the other party and the third arbitrator by the two so chosen. If the two arbitrators so selected are unable to agree within a period of thirty (30) days after request therefor by a party of interest, upon the selection of an arbitrator, either party in interest may petition the Common Pleas Court of Hamilton County, Ohio for the appointment of such arbitrator. The party desiring to have such differences submitted to arbitration shall promptly select his appointee and notify the other party thereof. When so notified, the other party shall within thirty (30) days, likewise select his appointee and give notice thereof. In order to be eligible to appointment as an arbitrator, an appointee must be either a certified public accountant or an attorney-at-law, and he must be duly licensed to practice his profession. Except as otherwise herein provided such arbitration proceedings shall be governed by the Ohio Uniform Arbitration Act.

(t) <u>Competition</u>. Except for any currently operating grocery stores of Lessee, during the term of this Lease, Lessee, its successors, subtenants and assigns, shall not directly or indirectly operate a Food and Drug Supermarket, similar to the store Lessee will operate at the Premises, or engage or participate in or operate, manage, or control any such similar store, business,

enterprise or undertaking which is in any manner or degree
competitive with the operation and use of the Premises as a Food
and Drug Supermarket, if such business, enterprise or undertaking
is conducted or operated in Premises situated within a distance of
one (1) mile in any direction from any boundary line of the
Shopping Center.  Such prohibition shall encompass Lessee and its
successors, subtenants and assigns in any capacity whatsoever,
whether as owner, stockholder, partner, principal, agent, employee
or independent contractor, and any of same who own ten percent
(10%) or more of the stock, partnership, or other ownership
interest in Tenant.

        IN WITNESS WHEREOF, the Lessor and Lessee have signed this
Lease as of the day and year first above written.

WITNESSES:                          LESSOR:

                                    FW  PARTNERS,  LTD.,   an  Ohio
                                    limited partnership

                                    FW ASSOCIATES, INC.,
                                    General Partner

                                    BY:

                                    ITS:

                                    LESSEE:

                                    THRIFTWAY, INC.

                                    BY:

                                    Its:

- 56 -

STATE OF OHIO            )
                         :  SS:
COUNTY OF HAMILTON       )

BEFORE ME, the Subscriber, a Notary Public in and for said
County and State, personally appeared _Edwin Brown_,
President of F.W. ASSOCIATES, INC., a General Partner of FW
PARTNERS, LTD., an Ohio limited Partnership, and for himself as
such Partner and for and on behalf of said Partnership, acknowl-
edged that the signing and execution of the foregoing instrument is
his free and voluntary act and deed individually and as such
Partner, and the free and voluntary act and deed of said Partner-
ship.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and
affixed my Notarial Seal this ___ day of _____, 1993.

_____
Notary Public

PATRICIA L RAHTZ
Notary Public State of Ohio
My Commission Expires June 12, 1994

STATE OF OHIO            )
                         :  SS:
COUNTY OF HAMILTON       )

BEFORE ME, the Subscriber, a Notary Public in and for said
County and State, personally appeared _RICHARD E LINDNER_, _CHAIRMAN/CEO_
of Thriftway, Inc., the corporation which executed the foregoing
instrument, who acknowledged he did sign said instrument as such
officer on behalf of said corporation, and by authority of its
Board of Directors, and that the execution of said instrument is
his free and voluntary act and deed individually and as such
officer, and the free and voluntary act and deed of said corpora-
tion.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and
affixed my Notarial Seal this ___ day of _SEPT._, 1993

_____
Notary Public

This Instrument Prepared By:              RICHARD G VAUGHAN
                                          Notary Public, State of Ohio
Donald P. Klekamp                         My Commission Expires May 5, 1995

- 57 -

Keating, Muething & Klekamp
1800 Provident Tower
One East Fourth Street
Cincinnati, Ohio   45202
(513) 579-6400



FT. WRIGHT - SITE PLAN
N.T.S.



FT. WRIGHT - SITE PLAN
"N.T.S.



FT. WRIGHT - SITE PLAN
N.T.S



F.T. WRIGHT – SITE PLAN
N.T.S.



FT. WRIGHT – SITE PLAN
N.T.S.



F.T. WRIGHT - SITE PLAN
N.T.S.



F.T. WRIGHT - SITE PLAN
N.T.S.

76 sla-8/21/95

## SUPPLEMENTAL LEASE AGREEMENT

THIS SUPPLEMENTAL LEASE AGREEMENT, made this 14th day of September, 1995, between FW PARTNERS, LTD , a Kentucky limited partnership (hereinafter called Landlord'), and WINN-DIXIE MIDWEST, INC , a Florida corporation qualified to do business in the state of Kentucky (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties,

## WITNESSETH:

WHEREAS, by Lease dated September 7, 1993, Landlord did lease and demise unto Thriftway, Inc , an Ohio corporation, those certain premises, located in a shopping center development known as "Ft Wright Shopping Center", situated at 1967 Dixie Highway, in the

fixed at December 1, 1994 and the expiration of the initial term of twenty (20) years demised therein shall be at midnight on November 30, 2014

2    All covenants, terms, obligations and conditions of said lease not modified or amended by this Supplemental Lease Agreement, are hereby ratified and confirmed

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed the day and year first above written

Signed, sealed and delivered
in the presence of

FW PARTNERS, LTD., an Ohio
limited partnership

FW ASSOCIATES, INC.,
General Partner

By _____ President
Its

Attest _____ Secretary
Its

(Corporate Seal)

_Karen M. Berbins_

_Ruo D. Cl_
As to Landlord

LANDLORD

## RATIFICATION AGREEMENT RE: GUARANTY

THIS RATIFICATION AGREEMENT RE: GUARANTY is given effective as of June 29, 2000, by WINN-DIXIE STORES, INC., a Florida corporation ("Guarantor") to and in favor of FW PARTNERS, LTD., an Ohio limited partnership ("Landlord").

### R E C I T A L S :

A    Landlord, as landlord, and Winn-Dixie Midwest, Inc., a Florida corporation, as successor to Thriftway, Inc., an Ohio corporation, as tenant ("Tenant"), are parties to that certain Lease dated September 7, 1993 (the "Lease") relating to Winn-Dixie Store #1776, 1967 Dixie Highway, Ft. Wright, Kentucky, and sometimes known as Thriftway Store No 76 (the "Store")

B.    Guarantor has guaranteed the full and prompt payment and performance of Tenant's obligations under the Lease pursuant to that certain Guaranty dated March 27, 1995, a true and complete copy of which is attached hereto as Exhibit A (the "Guaranty")

C    Tenant merged with Winn-Dixie Charlotte, Inc., a Florida corporation, effective as of June 29, 2000, pursuant to which Tenant is the surviving entity Following such merger, Tenant changed its name to Winn-Dixie Charlotte, Inc., a Florida corporation ("Successor Tenant") Successor Tenant continues to be the tenant under the Lease and the operator of the Store  Successor Tenant continues to be a wholly-owned subsidiary of Guarantor  The foregoing merger and name change is referred to herein as the "Tenant Change")

D    As an express condition to Landlord's consent to the Tenant Change, Landlord has requested Guarantor to acknowledge and consent to the Tenant Change, and to ratify and confirm that the obligations of Guarantor under the Guaranty continue in full force and effect notwithstanding the Tenant Change

E    Guarantor desires to provide this instrument for the purpose of evidencing the foregoing

NOW, THEREFORE, for and in consideration of the covenants set forth in the Guaranty, and in pursuance of this Agreement and in consideration of the sum of Ten Dollars ($10 00), and other valuable consideration, Guarantor agrees as follows

1.    Recitals    The recitals set forth above are true and correct and are considered an integral part of this instrument

2    Consent to Assignment    Guarantor acknowledges that it is familiar with the Lease, the Guaranty and the Tenant Change, and hereby consents to the Tenant Change

3.   _Ratification of Continuing Obligations of Guarantor_.  Guarantor hereby ratifies and confirms that, notwithstanding the Tenant Change, the obligations of Guarantor under the Guaranty remain in full force and effect, on behalf of and for the account of Winn-Dixie Charlotte  Inc , as Successor Tenant, and all previous principals under the Guaranty.

IN WITNESS WHEREOF, Guarantor has executed and delivered  this instrument as of the date first above written

Witnesses

GUARANTOR:

WINN-DIXIE STORES, INC , a Florida corporation

Name
BRENDA J. BABCOCK

Name  Rebecca E. Seefin

By     R. P. McCook
Name       R. P. McCook
Title  Sr. Vice  President

[CORPORATE SEAL]

#152646