# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## PLAN SUPPLEMENT PURSUANT TO SECTION 12.18 OF JOINT PLAN OF REORGANIZATION OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS

 Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (the "Debtors") submit the Plan Supplement required by Section 12.18 of the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors dated August 9, 2006 (the "Plan"). Capitalized terms used herein but not defined have the meanings ascribed to such terms in the Plan.

 The Plan Supplement includes forms for the following documents: the New Winn-Dixie Charter, the New Winn-Dixie By-laws, the Registration Rights Agreement, and the New Equity Incentive Plan. Such forms are non-binding drafts that are continuing to be reviewed and revised by the Debtors and the Creditors Committee. Until such drafts are finalized, all rights are reserved. Pursuant to Section 10.2 of the Plan, it is a condition precedent to the Effective Date that the New Winn-Dixie Charter, the New Winn-Dixie By-laws, and the Registration Rights Agreement be in form and substance reasonably acceptable to the Debtors and the Creditors Committee.

 The Plan Supplement also includes the designation of directors required by Section 6.7(a) of the Plan, the claim settlement protocols required by Section 12.20(c) of the Plan, and a copy of the commitment letter for the Exit Facility required by Section 6.3 of the Plan.

Dated: October 3, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By   *s/ D. J. Baker*
  D. J. Baker
  Sally McDonald Henry
  Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for the Debtors

SMITH HULSEY & BUSEY

By   *s/ Cynthia C. Jackson*
  Stephen D. Busey
  James H. Post
  Cynthia C. Jackson (Bar # 498882)
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for the Debtors

## INDEX TO PLAN SUPPLEMENT

NEW WINN-DIXIE CHARTER                                          A

NEW WINN-DIXIE BY-LAWS                                          B

REGISTRATION RIGHTS AGREEMENT                                   C

NEW EQUITY INCENTIVE PLAN                                       D

DESIGNATION OF DIRECTORS                                        E

CLAIM SETTLEMENT PROTOCOLS                                      F

COMMITMENT LETTER FOR EXIT FACILITY                            G

A

NEW WINN-DIXIE CHARTER

AMENDED AND RESTATED ARTICLES OF INCORPORATION

OF

WINN-DIXIE STORES, INC.


Pursuant to Section 607.1008 of the Florida Business Corporation Act, Winn-Dixie Stores, Inc. hereby sets forth the following: (a) The name of the corporation is Winn-Dixie Stores, Inc. (the "Corporation"). The Corporation was incorporated by the filing of its original Articles of Incorporation with the Secretary of State of the State of Florida on December 24, 1928.  Restated Articles of Incorporation of the Corporation were filed with the Secretary of State of the State of Florida on [        ]; (b) The amendments reflected in the following Amended and Restated Articles of Incorporation both amend and restate the provisions of the Corporation's Restated Articles of Incorporation and were duly adopted pursuant to Section 607.1008 of the Florida Business Corporation Act in order, among other things, to put into effect and carry out the confirmation order entered on [        ] by the United States Bankruptcy Court for the Middle District of Florida in the reorganization case styled *In re: Winn-Dixie, Inc., et al.*, Case No. 05-03817-3F1, which confirmed the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors, dated August 9, 2006, as modified, which order approved these Amended and Restated Articles of Incorporation; (c) The United States Bankruptcy Court for the Middle District of Florida has jurisdiction over the Corporation pursuant to the confirmation order and under Chapter 11 of Title 11 of the United States Code; and (d) The Articles of Incorporation of the Corporation are hereby amended and restated to read in their entirety as follows:


**FIRST:**

The name of the Corporation is WINN-DIXIE STORES, INC.


**SECOND:**

The purpose for which the Corporation is organized is to engage in any lawful business for which corporations may be organized under the Florida Business Corporation Act.

**THIRD:**

Section 1.  Capital Stock.

The total number of shares which the Corporation is authorized to issue is 400,000,000 shares of common stock (the "Common Stock"), each having a par value of $0.001 per share. Shares of Common Stock may from time to time be issued for such consideration, payable in either cash or property (including shares of stock or other securities of the Corporation or any other corporation), labor or services, having a value as in the judgment of the Board of Directors shall be at least equivalent to the full par value of the stock so issued, and all shares so issued and paid for

1

shall thenceforth be fully paid and non-assessable. Except as to shareholders having some contractual right of subscription, no holders of Common Stock shall have any preemptive right, as such holders, to purchase, subscribe for or otherwise acquire any part of any new or additional issue of capital stock of any class whatsoever, or of securities convertible into capital stock of any class whatsoever, whether now or hereafter authorized, or whether issued for cash, property, labor or services.

Section 2. Restrictions on Transfer of Capital Stock.

(a) Certain Definitions.

As used in this Section 2:

"5-Percent Stockholder" means a "5-percent shareholder" of the Corporation as defined in Treasury Regulation Section 1.382-2T(g).

"Business Day" means any day, other than a Saturday, Sunday or day on which banks located in New York, New York, are authorized or required by law to close.

"Completion" occurs, and a Transfer is "Completed," when all steps have been taken to effect the Transfer of beneficial ownership.

"Effective Date" means October [        ], 2006.

"Entity" means an entity within the meaning of Treasury Regulation Section 1.382-3(a)(1).

"IRC" means the Internal Revenue Code of 1986, as amended from time to time.

"Notice Date" means the first testing date (as described in Treasury Regulation Section 1.382-2(a)(4)) on which the aggregate Percentage Stock Increases are equal to or greater than the Threshold Percentage less ten (10) percentage points.

"Percentage Stock Increase" means the increase in the Percentage Stock Ownership of Common Stock by a 5-Percent Stockholder (other than a Public Group segregated under Treasury Regulation Section 1.382-2T(j)(2)) over the lowest Percentage Stock Ownership of Common Stock by such 5-Percent Stockholder at any time since the Effective Date. For this purpose, Treasury Regulation Section 1.382-2T(g)(5)(i)(A) shall apply in determining the Percentage Stock Increase of any 5-Percent Stockholder. Notwithstanding anything to the contrary, "Percentage Stock Increase" shall not include any increase in the Percentage Stock Ownership of Common Stock by a 5-Percent Stockholder if such increase would have the effect of duplicating either a prior Percentage Stock Increase since the Effective Date or Percentage Stock Ownership that reduced the Threshold Percentage at the Effective Date.

"Percentage Stock Ownership" means percentage stock ownership of Common Stock determined in accordance with the Treasury Regulations under Section 382 of the IRC.

"Plan" means the Joint Plan of Reorganization of the Corporation and Affiliated Debtors, dated August 9, 2006.

"Prohibited Transfer" means a purported Substantial Stockholder Transfer, but only to the extent that such Transfer is null and void *ab initio* under paragraph (b) or (c) of this Section 2.

"Public Group" means a public group as defined in Treasury Regulation Section 1.382-2T(f)(13).

"Restriction Notice" means a written notice provided by the Corporation to a potential Transferee, prior to 5:00 p.m. (New York time) on the fifth Business Day following the day of receipt by the Corporation of a Transfer Notice, which written notice states that the Corporation believes that the Restriction Period either has or has not commenced and, if it has, the Termination Date has or has not occurred.

"Restriction Period" means the period:

(i) beginning on the earliest testing date (as described in Treasury Regulation Section 1.382-2(a)(4)), following the Effective Date, on which the aggregate Percentage Stock Increases of all 5-Percent Stockholders on such testing date (taking into account all pending Transfers) equals or exceeds the Threshold Percentage; and

(ii) ending on the earlier of (A) the day that is forty-five (45) days after the second anniversary of the Effective Date and (B) the earliest date on which the Board of Directors determines that (a) the consummation of the Plan did not satisfy the requirements of Section 382(1)(5) of the IRC, (b) treatment under Section 382(1)(5) of the IRC is not in the best interests of the Corporation, its affiliates and its shareholders, taking into account all relevant facts and circumstances, including, without limitation, the market and other impact of maintaining these Transfer restrictions herein, (c) an ownership change (within the meaning of Section 382 of the IRC) would not result in a substantial limitation on the ability of the Corporation (or a direct or indirect subsidiary of the Corporation) to use otherwise available Tax Benefits or (d) no significant value attributable to Tax Benefits would be preserved by continuing the Transfer restrictions herein (the earliest of the dates described in this clause (ii) being hereafter referred to as the "Termination Date").

The Board of Directors promptly shall determine, in its sole discretion, whether it is more likely than not that the consummation of the Plan will satisfy the requirements of Section 382(l)(5) of the IRC.

"Substantial Stockholder" means an individual or Entity that acquires or, if the Transfer Restrictions or Notice Restrictions are then applicable, that purports to acquire direct beneficial ownership of Common Stock in a Substantial Stockholder Transfer.

"Substantial Stockholder Transfer" means a Transfer that results in a Percentage Stock Increase or, if the Transfer Restrictions and Notice Restrictions are then applicable, that would result in a Percentage Stock Increase if it occurred and were not void *ab initio*, in each case other

3

than a Transfer that the Board of Directors has affirmatively determined shall not be a Substantial Stock Transfer.

"Tax Benefits" means net operating loss carryovers (within the meaning of Section 172 of the IRC) and net unrealized built-in loss (within the meaning of Section 382(h)(3)(A)(i) of the IRC).

"Threshold Percentage" means 35% minus the Percentage Stock Ownership on the Effective Date by 5-Percent Stockholders other than any direct public group (described in Treasury Regulation Section 1.382-2T(j)(1)(iv)(C)) of the Corporation.

"Transfer" means any direct or indirect sale, transfer, exchange, issuance, grant, redemption, repurchase, assignment, conveyance or other disposition for consideration, whether voluntary or involuntary, and whether by operation of law or otherwise, but not including an issuance, grant, redemption or repurchase of Common Stock. A Transfer also shall include the grant or transfer of an option (other than by the Corporation), but only if the option would be deemed exercised pursuant to Treasury Regulation Section 1.382-4(d)(2)(i)(A) in connection with such grant or transfer.

"Transferee" means any individual or Entity to whom direct beneficial ownership of Common Stock is Transferred and who is, or would become as a result of such Transfer, a Substantial Stockholder.

"Transfer Notice" means a written notice provided by a Substantial Stockholder to the Corporation, at least seven (7) and not more than twelve (12) Business Days prior to Completion of a potential Substantial Stockholder Transfer, which notice states (i) the name, address, facsimile number and e-mail address, and Percentage Stock Ownership of the Substantial Stockholder prior to the Substantial Stockholder Transfer, (ii) if known to the Substantial Stockholder, the name and address of the transferor, (iii) the number of shares subject to the Substantial Stockholder Transfer, and (iv) the proposed date of Completion of the Substantial Stockholder Transfer. For purposes of this definition, if a Substantial Stockholder does not exist with respect to a Substantial Stockholder Transfer, then the Transfer Notice shall be provided by the individual or Entity that purports to engage in the Transfer that will cause the Substantial Stockholder Transfer.

"Treasury Regulation" means a Treasury Regulation promulgated under the IRC.

(b) Transfer Restrictions.

A Substantial Stockholder Transfer that is Completed during the Restriction Period shall be null and void *ab initio* and shall not be effective to Transfer Common Stock, but only to the minimum extent necessary to prevent the Transfer from being a Substantial Stockholder Transfer (the "Transfer Restrictions"). The Transfer Restrictions shall not (i) apply to Transfers pursuant to a tender offer to purchase Common Stock, provided, that such tender offer results in the acquisition of beneficial ownership of Common Stock by any person or group, which, when combined with the Common Stock beneficially owned by such person or group represents more than 50% of the voting power represented by all then-outstanding Common Stock (without regard

to tenders during any subsequent offering period), or (ii) preclude the settlement of a transaction entered into through the facilities of any national securities exchange or any national securities quotation system, provided, that if the settlement of the transaction would result in a Prohibited Transfer, such Transfer shall nonetheless be a Prohibited Transfer.  With respect to a transaction entered into through the facilities of any national securities exchange or any national quotation system, the sole remedy pursuant to this paragraph (b) of Section 2 shall be recovery of the Prohibited Transfer as described in paragraph (d) of Section 2. The terms "group" and "beneficial ownership" (and terms of like effect) used in this paragraph shall have the meanings ascribed to them in Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

(c) Notice and Permitted Transfers.

No Transfer Notice is required for Transfers that occur prior to issuance by the Corporation of the Notice Date Press Release (as defined below). A Substantial Stockholder Transfer that is Completed after the Corporation issues the Notice Date Press Release shall be null and void *ab initio* unless a Transfer Notice is provided to the Corporation (the "Notice Restriction"). If the Corporation receives a Transfer Notice on a day that is not in the Restriction Period (taking into account all prior Transfers (i) for which a previous Transfer Notice was received by the Corporation, (ii) for which a Schedule 13D or Schedule 13G was theretofore filed or (iii) of which the Corporation was otherwise previously aware) and the Transfer Notice references a Substantial Stockholder Transfer that, upon Completion, would cause the Restriction Period to commence, such Transfer shall be treated as a Prohibited Transfer to the minimum extent necessary for the Restriction Period not to commence. If the Corporation receives more than one such Transfer Notice on the same day, the Transfers referenced in such Transfer Notices shall be treated as Prohibited Transfers to the minimum extent necessary for the Restriction Period not to commence, and the amount of the Common Stock referenced in each Transfer Notice that is treated as Prohibited Stock shall be in proportion to the amounts of Common Stock referenced in each such Transfer Notice. The Corporation shall provide a Restriction Notice to each Substantial Stockholder that files a Transfer Notice. The determination of whether a Transfer referenced in a Transfer Notice is a Prohibited Transfer is made on the date the Transfer Notice is received by the Corporation. From and after receipt of a Transfer Notice, until Completion of the Transfer described in the Transfer Notice (and thereafter to the extent such Transfer is Completed and is not a Prohibited Transfer), the determination of whether the Restriction Period has commenced with respect to any other Transfer (i) for which a Transfer Notice was not theretofore received by the Corporation, (ii) for which a Schedule 13D or Schedule 13G was not theretofore filed or (iii) of which the Corporation was not otherwise previously aware, shall be made by taking into account the Percentage Stock Increase referenced in such Transfer Notice (or if Completion has occurred, the Percentage Stock Increase that resulted from that part of the Transfer referenced in such Transfer Notice that was not a Prohibited Transfer).

(d) Recovery of Prohibited Transfer.

The Corporation may institute legal proceedings to force rescission of a Prohibited Transfer. Notwithstanding the preceding sentence, the sole remedy with respect to a Prohibited Transfer entered into through the facilities of any national securities exchange or any national

5

securities quotation system shall be as provided below in this paragraph (d) of Section 2. Upon written demand by the Corporation, the purported Transferee or member of a Prohibited Party Group (as defined below) with respect to a Prohibited Transfer shall deliver or cause to be delivered to an agent designated by the Board of Directors (the "Securities Transfer Agent"), all certificates and other evidences of ownership of the Common Stock that is the subject of the Prohibited Transfer (the "Prohibited Stock"), together with any dividends or other distributions that were received from the Corporation with respect to such Prohibited Stock ("Prohibited Distributions"). The Securities Transfer Agent promptly shall sell the Prohibited Securities to one or more buyers. Disposition of Prohibited Stock by the Securities Transfer Agent pursuant to this paragraph (d) of Section 2 shall be deemed to occur simultaneously with the Prohibited Transfer to which the Prohibited Stock relates. The Securities Transfer Agent shall not act or be treated as acting as an agent for or on behalf of the purported Transferee or Prohibited Party Group or for or on behalf of the Corporation and shall have no right to bind any of them, in contract or otherwise, but shall act only to carry out the ministerial functions assigned to it in these Transfer Restrictions. If a purported Transferee or member of a Prohibited Party Group has resold Prohibited Stock before receiving the Corporation's demand to surrender the Prohibited Stock to the Securities Transfer Agent, the purported Transferee or member of a Prohibited Party Group shall be deemed to have sold the Prohibited Stock on behalf of the Securities Transfer Agent and shall be required to transfer to the Securities Transfer Agent any Prohibited Distributions and the proceeds of such sale of Prohibited Stock. If a purported Transferee or member of a Prohibited Party Group fails to surrender Prohibited Stock or proceeds of a sale of Prohibited Stock to the Securities Transfer Agent, together with any Prohibited Distributions, within three (3) Business Days from the date the Corporation makes a demand for surrender of such Prohibited Stock, the Corporation may institute legal proceedings to compel such surrender. If a Prohibited Transfer occurs, but does not result from a Transfer of direct beneficial ownership of Common Stock, each individual or Entity whose ownership of Common Stock is attributed to the 5−Percent Stockholder that had a Percentage Stock Increase (collectively, the "Prohibited Party Group") shall be required to deliver, and shall be deemed to have delivered to the Securities Transfer Agent, prior to the Transfer, a sufficient number of shares of Common Stock (which Common Stock shall be so delivered in the inverse order in which it was acquired by members of the Prohibited Party Group) to cause the Transfer, following such delivery, not to be a Prohibited Transfer.

(e) Treatment of Prohibited Transfers.

No employee or agent of the Corporation shall record any Prohibited Transfer and the purported Transferee shall not be recognized as a shareholder of Prohibited Stock for any purpose whatsoever and shall not be entitled, with respect to such Prohibited Stock, to any rights of a shareholder of the Corporation, including, without limitation, the right to vote such Prohibited Stock or to receive dividend distributions, whether liquidating or otherwise, in respect thereof. Once Prohibited Stock has been acquired in a Transfer that is not a Prohibited Transfer, the Prohibited Stock shall cease to be Prohibited Stock.

(f) Proceeds of Prohibited Transfers.

The Securities Transfer Agent shall apply any proceeds of a sale by it of Prohibited Stock (or, if the purported Transferee resold the Prohibited Stock before the Securities Transfer Agent

could recover the Prohibited Stock from the Purported Transferee, the proceeds from such resale of Prohibited Stock by the Purported Transferee), as follows: (i) first, to reimburse itself for its costs and expenses in connection with its duties as Securities Transfer Agent hereunder; (ii) second, from such proceeds as well as other funds available in the Prohibited Transfers Fund, to reimburse the purported Transferee for the amounts paid by the purported Transferee for the Prohibited Stock and (iii) third, to pay any remaining balance of such proceeds into a fund (the "Prohibited Transfers Fund") that will hold all excess proceeds from sales of Prohibited Stock. The Securities Transfer Agent shall be the disbursing agent of the Prohibited Transfers Fund, and such fund shall be used to reimburse purported Transferees for the amounts paid by the purported Transferees for Prohibited Stock. At the end of the Restriction Period, any remaining amounts in the Prohibited Transfers Fund shall be paid to the U.S. Treasury Department.

(g) Amendment of Transfer Restrictions.

An affirmative vote of the holders of two-thirds of the outstanding Common Stock of the Corporation shall be required to amend this Section 2 of Article THIRD if such amendment would impose additional restrictions, burdens or requirements on any Transfer of Common Stock.

(h) Legend on Certificates.

All certificates reflecting the Common Stock of the Corporation on or after the Effective Date shall, until the end of the Restriction Period, bear a conspicuous legend in substantially the following form:

THE TRANSFER OF THE SECURITIES REPRESENTED HEREBY IS SUBJECT TO RESTRICTION PURSUANT TO ARTICLE THIRD OF THE AMENDED AND RESTATED ARTICLES OF INCORPORATION OF THE CORPORATION, AS AMENDED AND IN EFFECT FROM TIME TO TIME, A COPY OF WHICH MAY BE OBTAINED FROM THE CORPORATION UPON REQUEST.

(i) Press Releases.

By the fifth Business Day after this Section 2 of Article THIRD first becomes effective and within ten (10) Business Days after the end of each calendar year, the Corporation shall issue a press release stating the number of outstanding shares of Common Stock to be taken into account in making all calculations of Percentage Stock Ownership for purposes of this Section 2 of Article THIRD.

Within five (5) Business Days after the Corporation determines that the Notice Date has occurred, the Corporation shall issue a press release stating that fact and stating that the Transfer Notice requirements of this Section 2 of Article THIRD have therefore become operative (the "Notice Date Press Release").

Within five (5) Business Days after the Corporation determines that the Restriction Period has commenced, the Corporation shall issue a press release stating such fact.

(j) Administration of Transfer Restrictions.

The Board of Directors of the Corporation shall have the power to determine, in its sole discretion, all matters related to this Section 2 of Article THIRD, including matters necessary or desirable to administer or to determine compliance with this Section 2 of Article THIRD.

(k) Notice.

All notices and other communications provided for under this Article THIRD shall be in writing and shall be delivered by overnight courier service, faxed, or e-mailed, if to the Corporation, by overnight delivery to its address at 5050 Edgewood Court, Jacksonville, Florida 32203-0927, attention: Corporate Secretary, with a copy to Vice President, Tax, by confirmed facsimile, to facsimile number [          ] to the attention of [          ], and if to a Substantial Stockholder, by overnight delivery, confirmed facsimile or e-mail to the address, facsimile number or e-mail address set forth in its Transfer Notice.  All such notices shall be deemed given when received by the Corporation or Substantial Stockholder, as the case may be.

Section 3.  Limitation on Issuance of Non-Voting Equity Securities

Pursuant to Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Corporation will not issue non-voting equity securities (which shall not be deemed to include any warrants or options to purchase capital stock of the Corporation); provided, however, that this provision (i) will have no further force or effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such section is in effect and applicable to the Corporation or any of its wholly-owned subsidiaries and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

## FOURTH:

The amount of capital with which this Corporation will begin business shall be $1,000.00.

## FIFTH:

The Corporation is to have perpetual existence.

## SIXTH:

The registered and principal office of the Corporation shall be located at 5050 Edgewood Court, in the City of Jacksonville, County of Duval, and State of Florida.  The name of the registered agent at that address is [          ].

## SEVENTH:

The indemnification provided under this Article SEVENTH shall be subject to, and limited by, Section 7.11 below.

8

Section 7.1 <u>Obligation to Indemnify in Actions, Suits or Proceedings other than Those by or in the Right of the Corporation</u>. The Corporation shall indemnify to the fullest extent permitted by law any person who was or is a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation and was or is a party to any proceeding (other than an action by, or in the right of, the Corporation) by reason of the fact that he or she is or was a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against liability incurred in connection with such proceeding, including any appeal thereof, if he or she acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

Section 7.2 <u>Obligation to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation</u>. The Corporation shall indemnify to the fullest extent permitted by law any person who was or is a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) and was or is a party to any proceeding by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses and amounts paid in settlement not exceeding, in the judgment of the Board of Directors, the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof. Such indemnification shall be authorized if such person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation, except that no indemnification shall be made under this Section 7.2 in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable unless, and only to the extent that, the court in which such proceeding was brought, or any other court of competent jurisdiction, shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

Section 7.3 <u>Successful Defense of Proceedings</u>. To the extent that a director, officer or key employee of the Corporation has been successful on the merits or otherwise in defense of any proceeding referred to in Section 7.1 or Section 7.2, or in defense of any claim, issue, or matter therein, he or she shall be indemnified against expenses actually and reasonably incurred by him or her in connection therewith.

Section 7.4 <u>Authorization of Indemnification</u>. Any indemnification under Section 7.1 or Section 7.2, unless pursuant to a determination by a court, shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer or key employee is proper in the circumstances, because he or she has met the applicable standard of conduct set forth in Section 7.1 or Section 7.2. Such determination shall be made:

(a) By the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such proceeding;

(b) If such a quorum is not obtainable or, even if obtainable, by majority vote of a committee duly designated by the Board of Directors (in which directors who are parties may participate) consisting solely of two (2) or more directors not at the time parties to the proceeding;

(c) By independent legal counsel:

(i) Selected by the Board of Directors prescribed in paragraph (a) or the committee prescribed in paragraph (b); or

(ii) If a quorum of the directors cannot be obtained for paragraph (a) and the committee cannot be designated under paragraph (b), selected by majority vote of the full Board of Directors (in which directors who are parties may participate); or

(d) By the shareholders by a majority vote of a quorum consisting of shareholders who were not parties to such proceeding or, if no such quorum is obtainable, by a majority vote of shareholders who were not parties to such proceeding.

Section 7.5 <u>Authorization of Expenses</u>. Evaluation of the reasonableness of expenses and authorization of indemnification shall be made in the same manner as the determination that indemnification is permissible. However, if the determination of permissibility is made by independent legal counsel, persons specified by Section 7.4(c) shall evaluate the reasonableness of expenses and may authorize indemnification.

Section 7.6 <u>Expenses Payable in Advance</u>. Expenses incurred by an officer or director in defending a civil or criminal proceeding may be paid by the Corporation in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if he or she is ultimately found not to be entitled to indemnification by the Corporation pursuant to this Article SEVENTH. Expenses incurred by other employees and agents may be paid in advance upon such terms or conditions that the Board of Directors deems appropriate.

Section 7.7 <u>Nonexclusivity of Indemnification and Advancement of Expenses</u>. The indemnification and advancement of expenses provided pursuant to this section are not exclusive, and the Corporation may make any other or further indemnification or advancement of expenses of any of its directors, officers or key employees under any by-law, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his or her official capacity and as to

action in another capacity while holding such office. However, indemnification or advancement of expenses shall not be made to or on behalf of any director, officer or key employee if a judgment or other final adjudication establishes that his or her actions, or omissions to act, were material to the cause of action so adjudicated and constitute:

(a) A violation of the criminal law, unless the director, officer or key employee had reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe his or her conduct was unlawful;

(b) A transaction from which the director, officer or key employee derived an improper personal benefit;

(c) In the case of a director, a circumstance under which the liability provisions of Section 607.0834 of the Florida Business Corporation Act, are applicable; or

(d) Willful misconduct or a conscious disregard for the best interests of the Corporation in a proceeding by or in the right of the Corporation to procure a judgment in its favor or in a proceeding by or in the right of a shareholder.

Section 7.8 <u>Survival of Indemnification and Advancement of Expenses</u>. Indemnification and advancement of expenses as provided in this Article SEVENTH shall continue as, unless otherwise provided when authorized or ratified, to a person who has ceased to be a director, officer or key employee and shall inure to the benefit of the heirs, executors, and administrators of such a person, unless otherwise provided when authorized or ratified.

Section 7.9 <u>Certain Definitions</u>. For purposes of this Article, the term "corporation" includes, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger, so that any person who is or was a director, officer, employee, or agent of a constituent corporation, or is or was serving at the request of a constituent corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, is in the same position under this section with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Additionally, for purposes of this Article:

(a) The term "other enterprises" includes employee benefit plans;

(b) The term "expenses" includes counsel fees, including those for appeal;

(c) The term "liability" includes obligations to pay a judgment, settlement, penalty, fine (including an excise tax assessed with respect to any employee benefit plan), and expenses actually and reasonably incurred with respect to a proceeding;

(d) The term "proceeding" includes any threatened, pending, or completed action, suit, or other type of proceeding, whether civil, criminal, administrative, or investigative and whether

formal or informal;

(e) The term "agent" includes a volunteer;

(f) The term "serving at the request of the corporation" includes any service as a director, officer or key employee of the Corporation that imposes duties on such persons, including duties relating to an employee benefit plan and its participants or beneficiaries; and

(g) The term "not opposed to the best interest of the Corporation" describes the actions of a person who acts in good faith and in a manner he or she reasonably believes to be in the best interests of the participants and beneficiaries of an employee benefit plan.

Section 7.10 <u>Insurance</u>. The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of this Article.

Section 7.11 <u>Certain Limitations</u>. Notwithstanding any other provision of this Article SEVENTH, the Corporation shall have no obligation to indemnify any person for claims arising before February 21, 2005 or for claims resulting from gross negligence, willful misconduct, breach of fiduciary duty or intentional tort arising after February 21, 2005 but before [the Confirmation Date]. Notwithstanding any other provision of this Article SEVENTH, the Corporation shall only be required to indemnify its directors, officers or key employees (as such key employees are designated by the Chief Executive Officer and the Board of Directors) who serve in such capacity on or after February 21, 2005.

Section 7.12 <u>Director and Officer Liability</u>. To the fullest extent permitted by law, no director or officer shall be personally liable for claims for monetary damages, arising as of or after the [Effective Date], to the Corporation or any other person resulting from a breach of fiduciary duty. If the Florida Business Corporation Act is amended after the adoption of these Amended and Restated Articles of Incorporation to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by such law, as so amended. Any repeal or modification of this Article SEVENTH by the shareholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the Corporation existing at the time of such repeal or modification.

## EIGHTH:

Additional provisions for the regulation of the business and for the conduct of the affairs of the Corporation are as follows:

(a) The Board of Directors shall consist of a minimum of seven (7) and a maximum of twelve (12) members. At each Annual Meeting of Shareholders, the directors shall be elected for one (1) year terms and until their successors shall be duly elected and qualified. The number of directors shall be fixed by the Board of Directors.

The shareholders may remove one or more directors with or without cause.  If a director is elected by a voting group of shareholders, only the shareholders of that voting group may participate in the vote to remove him or her. A director may be removed only if the number of votes cast to remove the director exceeds the number of votes cast not to remove him or her. A director may be removed by the shareholders at a meeting of shareholders, provided the notice of the meeting states that the purpose, or one of the purposes, of the meeting is removal of the director.

(b) Any action required or permitted to be taken by the shareholders of the Corporation must be effected at a duly convened Annual Meeting or Special Meeting of Shareholders of the Corporation, and the ability of the shareholders to consent in writing to the taking of any action is hereby specifically denied.

(c) In furtherance and not in limitation of the powers conferred by the laws of the State of Florida, the Board of Directors is expressly authorized to make and alter the By-Laws. In the case of any inconsistencies between the Articles of Incorporation and the Bylaws, the Articles of Incorporation shall control.

(d) The Board of Directors shall determine from time to time whether, and if allowed, when and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of the shareholders. No shareholder shall have any right to inspect any book or document of the Corporation except as such right may be conferred by the laws of the State of Florida or as may be authorized by the Board of Directors.

(e) If the By-Laws so provide, the shareholders and directors shall have power to hold their meetings outside of the State of Florida at such places as may from time to time be designated by them.

(f) This Corporation may in its By-Laws confer powers additional to the foregoing upon the directors, in addition to the powers and authorities expressly conferred upon them by law.

(g) Special meetings of the shareholders may be called at any time by the Chairman of the Board, or by the Board of Directors. The Corporation shall hold a Special Meeting of Shareholders if the holders of not less than thirty percent (30%) of all votes entitled to vote on any issue proposed to be considered at the proposed special meeting shall sign, date and deliver to the Corporation's Secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held. Only business within the purpose or purposes described in the special meeting notice may be conducted at a special shareholders' meeting. Within thirty (30) days of receipt of such written demand, as provided in this Article EIGHTH, paragraph (g), the Secretary will issue notice calling for a special meeting of the shareholders to be held within thirty (30) days of such notice.

13

(h) The Corporation reserves the right to amend the Amended and Restated Articles of Incorporation of the Corporation in the manner prescribed by applicable law, provided, however, that the Board of Directors shall only be permitted to effect the amendments described in Section 607.1002 (1) through (8) of the Florida Business Corporation Act without the affirmative vote of a majority of the holders of Common Stock issued and outstanding and entitled to vote at any regular or special meeting of shareholders.

IN WITNESS WHEREOF, the undersigned has executed these Amended and Restated Articles of Incorporation this [     ] day of [          ], 2006.

**Winn-Dixie Stores, Inc.**

By _____

Name:

Title:

15

# B

# NEW WINN-DIXIE BY-LAWS

Amended and Restated
Effective [          ], 2006

AMENDED AND RESTATED BY-LAWS

OF

WINN-DIXIE STORES, INC.

* * * * * * * *

**ARTICLE I.**

**Offices**

Section 1.1 <u>Registered Office and Principal Office</u>: The registered office and principal office of the Corporation shall be located at 5050 Edgewood Court, in the City of Jacksonville, County of Duval and State of Florida, or at such place or places as the Board of Directors may from time to time designate or the business of the Corporation may require.

Section 1.2 <u>Registered Agent</u>: The registered agent of the Corporation shall be located at the registered office of the Corporation in the State of Florida and shall be designated by resolution of the Board of Directors.

Section 1.3 <u>Other Offices</u>: The Corporation may have other offices, either within or outside of the State of Florida, at such place or places as the Board of Directors may from time to time designate or the business of the Corporation may require.

**ARTICLE II.**

**Seal**

Section 2.1 <u>Seal</u>: The corporate seal shall be circular in form and shall have inscribed thereon the name of the Corporation, the year of its incorporation (1928) and the words "Corporate Seal, Florida."

Section 2.2 <u>Seal Custodian</u>: The Secretary shall be the custodian of the Seal and shall affix the same to all writings and documents requiring the Seal of the Corporation as authorized by the Board of Directors.

1

# ARTICLE III.

## Meetings of Shareholders

Section 3.1 <u>Place of Meetings</u>: All meetings of the shareholders shall be held at the principal office of the Corporation in the City of Jacksonville, County of Duval and State of Florida, or at such other place, within or without the State of Florida, as may be designated by the Board of Directors and stated in the notice of meeting.

Section 3.2 <u>Annual Meetings</u>: The Annual Meeting of Shareholders shall be held at such time and on such date as the Board of Directors may determine, for the election of directors annually and for the transaction of such other business as may properly be brought before the meeting.

The directors elected at the Annual Meeting shall be elected by plurality vote of the shareholders entitled to vote and present or duly represented at such meeting.

Section 3.3 <u>Special Meetings</u>: Special meetings of the shareholders may be called at any time by the Chairman of the Board or by the Board of Directors. The Corporation shall hold a Special Meeting of Shareholders if the holders of not less than thirty percent (30%) of all votes entitled to vote on any issue proposed to be considered at the proposed Special Meeting shall sign, date and deliver to the Corporation's Secretary one or more written demands for the meeting describing the purpose or purposes for which it is to be held. Only business within the purpose or purposes described in the Special Meeting notice may be conducted at a special shareholders' meeting. Within thirty (30) days of receipt of such written demand, as provided in this Section 3.3, the Secretary will issue notice calling for a special meeting of the shareholders to be held within thirty (30) days of such notice.

Section 3.4 <u>Notice</u>: The Secretary shall notify shareholders of the date, time and place of the Annual Meeting no fewer than ten (10) or more than sixty (60) days before the meeting date, and shall send each holder of record of stock entitled to vote at such meeting, at such shareholder's address as it appears in the Corporation's current record of shareholders, a notice of such Annual Meeting, by mail with postage prepaid, or, if authorized by the shareholder, by electronic means, stating the time and place of such meeting. A similar notice shall be given by the Secretary of all Special Meetings, and in addition to the requirements for notice of Annual Meeting, the notice for Special Meetings shall include a description of the purpose or purposes for which the meeting is called.

Section 3.5 <u>Waiver of Notice</u>: A shareholder may waive notice of any meeting before or after the date and time stated in the notice. The waiver must be in writing, signed by the shareholder and delivered to the Corporation for inclusion in the minutes or filing with the corporate records. A shareholder's attendance, in person or by proxy, at a meeting (a) waives objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting or (b) waives objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the shareholder objects to considering

the matter when it is presented.

Section 3.6 <u>Quorum</u>: The holders of a majority of the issued and outstanding shares of Capital Stock of the Corporation entitled to vote at the meeting, represented in person or by proxy, shall constitute a quorum for the transaction of business at all meetings of the shareholders, except as may be otherwise provided by law or the Articles of Incorporation. The holders of a majority of shares represented, and who would be entitled to vote at a meeting if a quorum were present, where a quorum is not present, may adjourn such meeting from time to time.

Once a share is represented for any purpose at the meeting, it is deemed present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is set for the adjourned meeting.

Section 3.7 <u>Proxies</u>: A shareholder entitled to vote at any meeting of the shareholders (or another person entitled to vote on behalf of the shareholder pursuant to Section 607.0721 of the Florida Business Corporation Act or an attorney-in-fact for the shareholder) may vote the shareholder's shares in person or by proxy.  A shareholder (or another person entitled to vote on behalf of the shareholder pursuant to Section 607.0721 of the Florida Business Corporation Act or an attorney-in-fact for the shareholder) may appoint a proxy to vote or otherwise act for the shareholder by signing an appointment form or by electronic transmission. Any type of electronic transmission appearing to have been, or containing or accompanied by such information or obtained under such procedures to reasonably ensure that the electronic transmission was, transmitted by such person is a sufficient appointment, subject to any verification requested by the Corporation under Section 607.0724 of the Florida Business Corporation Act. Without limiting the manner in which such an appointment may be made, an appointment may be made by (a) signing an appointment form, with the signature affixed, by any reasonable means including, but not limited to, facsimile or electronic signature or (b) transmitting or authorizing the transmission of an electronic transmission to the person who will be appointed as the proxy or to a proxy solicitation firm, proxy support service organization, registrar, or agent authorized by the person who will be designated as the proxy to receive such transmission, provided that any electronic transmission must set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the shareholder (or another person entitled to vote on behalf of a shareholder pursuant to Section 607.0721 of the Florida Business Corporation Act or an attorney-in-fact for the shareholder).  An appointment of a proxy is valid for eleven (11) months from the date of receipt by the Secretary or the officer or agent authorized to tabulate votes, unless a longer period is expressly provided in the appointment.

Section 3.8 <u>Nature of Business at Annual Meetings of Shareholders</u>: No business may be transacted at an Annual Meeting of Shareholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors (or any duly authorized committee thereof), (b) otherwise properly brought before the Annual Meeting by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (c) otherwise properly brought before the Annual Meeting by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 3.8 and on the record date for the determination of shareholders entitled to notice of and to vote at such Annual Meeting and (ii) who complies with the notice procedures set forth in

3

this Section 3.8.

In addition to any other applicable requirements, for business to be properly brought before an Annual Meeting by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

For purposes of the 2007 Annual Meeting of Shareholders only, if the Annual Meeting is held between October 15, 2007 and November 15, 2007, then to be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation no earlier than July 15, 2007 and no later than August 15, 2007; in the event that the Annual Meeting is called for a date that is not between October 15, 2007 and November 15, 2007, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs.  Beginning with the first Annual Meeting of Shareholders after the 2007 Annual Meeting, to be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90) days prior to the anniversary date of the immediately preceding Annual Meeting of Shareholders; provided, however, that in the event that the Annual Meeting is called for a date that is not within twenty-five (25) days before or after such anniversary date, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs.

To be in proper written form, a shareholder's notice to the Secretary must set forth as to each matter such shareholder proposes to bring before the Annual Meeting (a) a brief description of the business desired to be brought before the Annual Meeting and the reasons for conducting such business at the Annual Meeting, (b) the name and record address of such shareholder, (c) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (d) a description of all arrangements or understandings between such shareholder and any other person or persons (including their names) in connection with the proposal of such business by such shareholder and any material interest of such shareholder in such business and (e) a representation that such shareholder intends to appear in person or by proxy at the Annual Meeting to bring such business before the meeting.

No business shall be conducted at the Annual Meeting of Shareholders except business brought before the Annual Meeting in accordance with the procedures set forth in this Section 3.8; provided, however, that once business has been properly brought before the Annual Meeting in accordance with such procedures, nothing in this Section 3.8 shall be deemed to preclude discussion by any shareholder of any such business.  If the Chairman of an Annual Meeting determines that business was not properly brought before the Annual Meeting in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Section 3.9 <u>Director Nominations</u>: Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation. Nominations of persons for election to the Board of Directors may be made at any Annual Meeting of Shareholders, or at any Special Meeting of Shareholders called for the purpose of electing directors, (a) by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (b) by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 3.9 and on the record date for the determination of shareholders entitled to notice of and to vote at such meeting and (ii) who complies with the notice procedures set forth in this Section 3.9.

In addition to any other applicable requirements, for a nomination to be made by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

For purposes of the 2007 Annual Meeting of Shareholders only, if the Annual Meeting is held between October 15, 2007 and November 15, 2007, then to be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation no earlier than July 15, 2007 and no later than August 15, 2007; in the event that the Annual Meeting is called for a date that is not between October 15, 2007 and November 15, 2007, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs. Beginning with the first Annual Meeting of Shareholders after the 2007 Annual Meeting, to be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation (a) in the case of an Annual Meeting, not less than sixty (60) days nor more than ninety (90) days prior to the anniversary date of the immediately preceding Annual Meeting of Shareholders; <u>provided</u>, <u>however</u>, that in the event that the Annual Meeting is called for a date that is not within twenty-five (25) days before or after such anniversary date, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs; and (b) in the case of a Special Meeting of Shareholders called for the purpose of electing directors, not later than the close of business on the tenth (10th) day following the day on which notice of the date of the Special Meeting was mailed or public disclosure of the date of the Special Meeting was made, whichever first occurs.

To be in proper written form, a shareholder's notice to the Secretary must set forth (a) as to each person whom the shareholder proposes to nominate for election as a director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by the person and (iv) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder; and (b) as to the shareholder giving the notice (i) the name

and record address of such shareholder, (ii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (iii) a description of all arrangements or understandings between such shareholder and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made by such shareholder, (iv) a representation that such shareholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (v) any other information relating to such shareholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder.  Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 3.9. If the Chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Section 3.10 <u>Voting of Shares</u>: Each outstanding share entitled to vote shall be entitled to one (1) vote on each matter submitted to a vote at a meeting of shareholders. If a quorum exists, action on a matter is approved if the votes cast by the shareholders entitled to vote favoring the action exceed the votes cast opposing the action, unless a greater vote is required by law, the Articles of Incorporation or these By-Laws. Voting shall be as permitted under applicable law.

Section 3.11 <u>Voting Lists</u>: The Secretary shall prepare, at least ten (10) days before each meeting of shareholders, an alphabetical list of the shareholders entitled to notice of the meeting, which shall show the address of and the number of shares held by each shareholder. The list shall be open for examination of any shareholder, or his or her attorney or agent, at the Corporation's principal office, at a place identified in the meeting notice in the city where the meeting will be held, or at the office of the Corporation, transfer agent or registrar ten (10) days prior to such meeting and shall be kept available for inspection, at the meeting, by any shareholder at any time during the meeting.

Any shareholder, his or her attorney or agent, on written demand as provided by statute, may inspect the list during regular business hours at his or her expense during the period that it is available for inspection. A shareholder may inspect and copy the list only if (a) the shareholder's demand is made in good faith and for a proper purpose, (b) the shareholder describes with reasonable particularity his or her purpose, (c) the list is directly connected with the shareholder's purpose, and (d) the shareholder provides at least five (5) days' prior written notice to the Corporation before any such copying commences.

## ARTICLE IV.

### Directors

Section 4.1 <u>Powers</u>: All corporate powers shall be exercised by or under the authority of,

and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors.

Section 4.2 <u>The Chairman of the Board of Directors</u>: The Chairman shall be selected annually by the Board of Directors at the first meeting of the Board after each Annual Meeting. The Chairman of the Board of Directors, if present, shall preside at all meetings of the Board of Directors and meetings of the shareholders, and shall see that all orders and resolutions of the Board of Directors are carried into effect. The Chairman shall perform such other duties as may be prescribed by the Board of Directors.

Section 4.3 <u>Number of Directors</u>: The number of directors of the Corporation shall be as from time to time fixed by, or in the manner provided in, the Articles of Incorporation of the Corporation. Directors shall be elected or appointed in the manner provided in the Articles of Incorporation of the Corporation. The original Board of Directors as of the [Effective Date] shall consist of nine (9) members.

Section 4.4 <u>Vacancies and Newly Created Directorships</u>: Each director shall serve until his or her successor is elected and qualified or until death, retirement, resignation or removal. Whenever a vacancy occurs on the Board of Directors, including a vacancy resulting from an increase in the number of directors, it may be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, or by the shareholders.

Section 4.5 <u>Resignation and Removal</u>: A director may resign at any time by delivering written notice to the Board of Directors or its Chairman or to the Corporation. A resignation is effective when the notice is delivered unless the notice specifies a later effective date. If a resignation is made effective at a later date, the Board of Directors may fill the pending vacancy before the effective date if the Board of Directors provides that the successor does not take office until the effective date.

The removal of directors of the Corporation shall be in the manner provided in the Articles of Incorporation of the Corporation.

Section 4.6 <u>Meetings</u>: The Board of Directors shall meet immediately after the Annual Meeting of Shareholders at the same place as the Annual Meeting of Shareholders. Regular meetings of the Board of Directors may be held without notice of the date, time, place or purpose of the meeting. Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors or by a majority of the directors. Notice of special meetings may be communicated in person or by mail to each director at least three (3) days in advance, or by telephone, facsimile, email or other form of electronic communication to each director at least twenty-four (24) hours in advance of the meeting. Such notice shall specify the time and place of meeting.

Section 4.7 <u>Place of Meetings</u>: Until otherwise prescribed, the regular meetings of the Board of Directors shall be held in the City of Jacksonville, Florida, at the office of the Corporation or at such other place as may be agreed upon by the Board of Directors or specified by the Chairman of the Board of Directors. The Board of Directors may hold special meetings and

may have one (1) or more offices and may keep the books of the Corporation (except such books as are required by law to be kept within the State of Florida) either within or outside of the State of Florida, at such place or places as it may from time to time determine.

Section 4.8 <u>Quorum and Voting</u>: Unless the Articles of Incorporation or these By-Laws provide otherwise, a majority of the number of directors then in office shall constitute a quorum for the transaction of business at any meeting of the Board of Directors.

If a quorum is present when a vote is taken, the affirmative vote of a majority of the directors present shall constitute an act of the Board of Directors unless the Articles of Incorporation or these By-Laws require the vote of a greater number of directors.

Section 4.9 <u>Actions of the Board by Written Consent</u>: Any action required or permitted to be taken at a meeting of the Board of Directors, or by any committee of the directors, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors or by all members of the committee, as the case may be. Any such consent shall be effective as of the date of the last signature, or at such other time as the consent shall specify, and shall have the same effect as a meeting vote and may be described as such in any document.

Section 4.10 <u>Meeting by Means of Conference Telephone</u>: Members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 4.10 shall constitute presence in person at such meeting.

Section 4.11 <u>Qualifications of Directors</u>: Directors must be natural persons who are 18 years of age or older but need not be residents of the State of Florida or shareholders of the Corporation unless the Articles of Incorporation or these By-Laws so require.

Section 4.12 <u>Compensation of Board Members</u>: The Board of Directors shall fix the compensation of directors for their service.

Section 4.13 <u>Committees of the Board of Directors</u>: The Board of Directors, by resolution adopted by a majority of the full Board of Directors, may designate from among its members an executive committee and one or more other committees each of which, to the extent provided in such resolution, shall have and may exercise all the authority of the Board of Directors, except that no such committee shall have the authority to:

(a) Approve or recommend to shareholders actions or proposals required by the Florida Business Corporation Act to be approved by shareholders;

(b) Fill vacancies on the Board of Directors or any committee thereof;

(c) Adopt, amend, or repeal the By-Laws;

(d)  Authorize or approve the reacquisition of shares unless pursuant to a general formula or method specified by the Board of Directors; and

(e)  Authorize or approve the issuance or sale or contract for the sale of shares, or determine the designation and relative rights, preferences, and limitations of a voting group except that the Board of Directors may authorize a committee (or a senior executive officer of the Corporation) to do so within limits specifically prescribed by the Board of Directors.

4.14  <u>Director Conflicts of Interest</u>: No contract or other transaction between the Corporation and one or more of its directors or any other corporation, firm, association, or entity in which one or more of its directors are directors or officers, shall be either void or voidable merely because of such relationship or interest.  Moreover, no such contract or other transaction shall be void or voidable merely because such director or directors are present at the meeting of the Board of Directors or a committee thereof that authorizes, approves, or ratifies such contract or transaction, or because his or her or their votes are counted for such purpose, if:

(a)  The fact of such relationship or interest is disclosed or known to the Board of Directors or committee that authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors;

(b)  The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or

(c)  The contract or transaction is fair and reasonable as to the Corporation at the time it is authorized by the Board of Directors, a committee or the shareholders.

A conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the Board of Directors, or on the committee, who have no relationship or interest in the transaction described above; provided, however, that a transaction may not be authorized, approved or ratified under this section by a single director. If a majority of the directors that have no such relationship or interest in the proposed transaction vote to authorize, approve or ratify same, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with such relationship or interest in the transaction does not affect the validity of any action taken under Section 4.14(a) if the transaction is otherwise authorized, approved or ratified as provided in this section.

## ARTICLE V.

### Officers

Section 5.1 <u>Election</u>: The officers of the Corporation shall be a President, a Secretary, a Treasurer and a Chief Accounting Officer. In addition, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Assistant Secretaries, Assistant Treasurers and a Controller may from time to time be elected by the Board of Directors or appointed by the President or another duly

appointed officer authorized by these By-Laws or by resolution of the Board of Directors to appoint officers. None of these officers, except the President, need be a director.

Section 5.2 <u>Multiple Offices</u>: Any officer may hold more than one (1) office, except that the President shall not be the Secretary or an Assistant Secretary of the Corporation; but no officer shall execute, acknowledge or verify any instrument in more than one (1) capacity, if such instrument be required by law or these By-Laws to be executed, acknowledged or verified by any two (2) or more officers.

Section 5.3 <u>Term of Office</u>: The officers shall hold office until they resign or are removed pursuant to the provisions of these By-Laws. Any vacancy occurring among the officers shall be filled by the Board of Directors or by an officer authorized to appoint such officer.

Section 5.4 <u>Agents</u>: The Board of Directors may appoint such agents as it may deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

Section 5.5 <u>Removal</u>: Any officer may be removed with or without cause at any time by the Board of Directors. Any officer appointed by an officer may be removed by such officer at any time with or without cause.

Section 5.6 <u>Voting Shares in Other Corporations</u>: The Corporation may vote any and all shares held by it in any other corporation by such officer, agent or proxy as the Board of Directors may appoint, or, in default of any such appointment, by the Chairman of the Board or the President.

## ARTICLE VI.

## The President

Section 6.1 <u>President</u>: The President shall be the Chief Executive Officer of the Corporation, and shall have general supervision, direction and control of the business and affairs of the Corporation. The President shall perform any and all other duties as are incident to the Office of the President or as may be required by the Board of Directors. The President shall have general supervision and direction of all the other officers, employees and agents of the Corporation. The President, in the absence of the Chairman of the Board of Directors, shall preside at all meetings of the shareholders and shall, annually, make a full report to the shareholders, at the Annual Meeting of Shareholders, of the condition of the Corporation, its resources, liabilities, loans, profits and general financial condition, which report shall be for the fiscal year ending on the last Wednesday in the month of June of each year before such Annual Meeting. The President shall, if present, preside at all meetings of the Board of Directors at which the Chairman of the Board of Directors shall not be present.

## ARTICLE VII.

### Executive Vice Presidents, Senior Vice Presidents and
### Vice Presidents

Section 7.1 <u>Executive Vice Presidents</u>: Executive Vice Presidents, if any such officers shall have been appointed or elected, shall, in the absence or disability of the President, in the order designated by the President, or failing such designation, by the Board of Directors, perform the duties and exercise the powers of the President, and shall perform such other duties as the Board of Directors shall prescribe.

Section 7.2 <u>Senior Vice Presidents</u>: Senior Vice Presidents, if any such officers shall have been appointed or elected, shall, in the absence of the President and Executive Vice Presidents, if any, in the order designated by the President, or failing such designation, by the Board of Directors, perform the duties and exercise the powers of the President. Senior Vice Presidents and other Vice Presidents shall have such powers and perform such duties as may be assigned to them from time to time by the Board of Directors or the President.

## ARTICLE VIII.

### The Treasurer

Section 8.1 <u>Custody of Funds</u>: The Treasurer shall have the custody of the corporate funds and securities, and shall keep full and accurate account of receipts and disbursements in books belonging to the Corporation. He shall deposit all moneys and other valuables in the name and to the credit of the Corporation in such depositaries as may be designated by the Board of Directors.

Section 8.2 <u>Disbursements</u>: The Treasurer shall disburse the treasury funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements. He shall render to the President and directors at the regular meetings of the Board of Directors, or whenever they may request it, an account of all his or her transactions as Treasurer and of the financial condition of the Corporation.

Section 8.3 <u>Other Duties</u>. The Treasurer shall perform such other duties as may be prescribed by the Board of Directors or the President.

## ARTICLE IX.

### The Chief Accounting Officer

Section 9.1 <u>Accounting Supervision</u>: The Chief Accounting Officer shall have general supervision of and responsibility for all accounting matters affecting the Corporation and shall perform such other duties as may be prescribed by the Board of Directors or the President.

## ARTICLE X.

## The Secretary

Section 10.1 <u>Secretary</u>: The Secretary shall attend all meetings of the Board of Directors and all meetings of the shareholders and shall record all votes and the minutes of all proceedings in a book to be kept for that purpose and shall perform like duties for the standing committees when required. He shall also have responsibility for authenticating records of the Corporation. He shall give or cause to be given notice of all meetings of the shareholders and of the Board of Directors, and he shall perform such other duties as may be prescribed by the Board of Directors, Chairman of the Board or the President.

## ARTICLE XI.

## Assistant Treasurers and Assistant Secretaries

Section 11.1 <u>Assistant Treasurer and Assistant Secretary</u>: The Assistant Treasurers and Assistant Secretaries shall perform such duties as may be prescribed hereunder or by the Board of Directors or by the President.

In the absence or disability of the Treasurer, his or her duties may be performed by any Assistant Treasurer.

In the absence or disability of the Secretary, his or her duties may be performed by any Assistant Secretary.

## ARTICLE XII.

## Delegation of Duties

Section 12.1 <u>Delegation of Duties</u>: The powers and duties of officers may be delegated to another officer to the extent permitted by a resolution of the Board of Directors or by the President.

## ARTICLE XIII.

## Indemnification

The indemnification provided under this Article XIII shall be subject to, and limited by, Section 13.11 below.

Section 13.1  <u>Obligation to Indemnify in Actions, Suits or Proceedings other than Those by or in the Right of the Corporation</u>: The Corporation shall indemnify to the fullest extent permitted by law any person who was or is a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation and was

714046.05-D.C. Server 1A                                                                          MSW - Draft October 3, 2006 - 2:33 PM

or is a party to any proceeding (other than an action by, or in the right of, the Corporation) by reason of the fact that he or she is or was a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against liability incurred in connection with such proceeding, including any appeal thereof, if he or she acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation or, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

Section 13.2 <u>Obligation to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation</u>: The Corporation shall indemnify to the fullest extent permitted by law any person who was or is a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) and was or is a party to any proceeding by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer or key employee (as such key employees are designated by the Chief Executive Officer and the Board of Directors) of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses and amounts paid in settlement not exceeding, in the judgment of the Board of Directors, the estimated expense of litigating the proceeding to conclusion, actually and reasonably incurred in connection with the defense or settlement of such proceeding, including any appeal thereof. Such indemnification shall be authorized if such person acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Corporation, except that no indemnification shall be made under this Section 13.2 in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable unless, and only to the extent that, the court in which such proceeding was brought, or any other court of competent jurisdiction, shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

Section 13.3 <u>Successful Defense of Proceedings</u>: To the extent that a director, officer or key employee of the Corporation has been successful on the merits or otherwise in defense of any proceeding referred to in Section 13.1 or Section 13.2, or in defense of any claim, issue, or matter therein, he or she shall be indemnified against expenses actually and reasonably incurred by him or her in connection therewith.

Section 13.4 <u>Authorization of Indemnification</u>: Any indemnification under Section 13.1 or Section 13.2, unless pursuant to a determination by a court, shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer or key employee is proper in the circumstances, because he or she has met the applicable standard

13

of conduct set forth in Section 13.1 or Section 13.2. Such determination shall be made:

(a) By the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such proceeding;

(b) If such a quorum is not obtainable or, even if obtainable, by majority vote of a committee duly designated by the Board of Directors (in which directors who are parties may participate) consisting solely of two (2) or more directors not at the time parties to the proceeding;

(c) By independent legal counsel:

(i) Selected by the Board of Directors prescribed in paragraph (a) or the committee prescribed in paragraph (b); or

(ii) If a quorum of the directors cannot be obtained for paragraph (a) and the committee cannot be designated under paragraph (b), selected by majority vote of the full Board of Directors (in which directors who are parties may participate); or

(d) By the shareholders by a majority vote of a quorum consisting of shareholders who were not parties to such proceeding or, if no such quorum is obtainable, by a majority vote of shareholders who were not parties to such proceeding.

Section 13.5 <u>Authorization of Expenses</u>: Evaluation of the reasonableness of expenses and authorization of indemnification shall be made in the same manner as the determination that indemnification is permissible. However, if the determination of permissibility is made by independent legal counsel, persons specified by Section 13.4(c) shall evaluate the reasonableness of expenses and may authorize indemnification.

Section 13.6 <u>Expenses Payable in Advance</u>: Expenses incurred by an officer or director in defending a civil or criminal proceeding may be paid by the Corporation in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if he or she is ultimately found not to be entitled to indemnification by the Corporation pursuant to this Article XIII. Expenses incurred by other key employees may be paid in advance upon such terms or conditions that the Board of Directors deems appropriate.

Section 13.7 <u>Nonexclusivity of Indemnification and Advancement of Expenses</u>: The indemnification and advancement of expenses provided pursuant to this section are not exclusive, and the Corporation may make any other or further indemnification or advancement of expenses of any of its directors, officers or key employees, under any by-law, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office. However, indemnification or advancement of expenses shall not be made to or on behalf of any director, officer or key employee, if a judgment or other final adjudication establishes that his or her actions, or omissions to act, were material to the cause of action so adjudicated and constitute:

(a) A violation of the criminal law, unless the director, officer or key employee had

reasonable cause to believe his or her conduct was lawful or had no reasonable cause to believe his or her conduct was unlawful;

(b) A transaction from which the director, officer or key employee derived an improper personal benefit;

(c) In the case of a director, a circumstance under which the liability provisions of Section 607.0834 of the Florida Business Corporation Act, are applicable; or

(d) Willful misconduct or a conscious disregard for the best interests of the Corporation in a proceeding by or in the right of the Corporation to procure a judgment in its favor or in a proceeding by or in the right of a shareholder.

Section 13.8 Survival of Indemnification and Advancement of Expenses: Indemnification and advancement of expenses as provided in this Article XIII shall continue as, unless otherwise provided when authorized or ratified, to a person who has ceased to be a director, officer or key employee and shall inure to the benefit of the heirs, executors, and administrators of such a person, unless otherwise provided when authorized or ratified.

Section 13.9 Certain Definitions: For purposes of this Article, the term "corporation" includes, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger, so that any person who is or was a director, officer, employee, or agent of a constituent corporation, or is or was serving at the request of a constituent corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise, is in the same position under this section with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Additionally, for purposes of this Article:

(a) The term "other enterprises" includes employee benefit plans;

(b) The term "expenses" includes counsel fees, including those for appeal;

(c) The term "liability" includes obligations to pay a judgment, settlement, penalty, fine (including an excise tax assessed with respect to any employee benefit plan), and expenses actually and reasonably incurred with respect to a proceeding;

(d) The term "proceeding" includes any threatened, pending, or completed action, suit, or other type of proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal;

(e) The term "agent" includes a volunteer;

(f) The term "serving at the request of the corporation" includes any service as a director, officer or key employee of the Corporation that imposes duties on such persons, including duties

relating to an employee benefit plan and its participants or beneficiaries; and

(g) The term "not opposed to the best interest of the Corporation" describes the actions of a person who acts in good faith and in a manner he or she reasonably believes to be in the best interests of the participants and beneficiaries of an employee benefit plan.

Section 13.10 <u>Insurance</u>: The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of this Article.

Section 13.11 <u>Certain Limitations</u>: Notwithstanding any other provision of this Article XIII, the Corporation shall have no obligation to indemnify any person for claims arising before February 21, 2005 or for claims resulting from gross negligence, willful misconduct, breach of fiduciary duty or intentional tort arising after February 21, 2005 but before [the Confirmation Date]. Notwithstanding any other provision of this Article XIII, the Corporation shall only be required to indemnify its directors, officers or key employees (as such key employees are designated by the Chief Executive Officer and the Board of Directors) who serve in such capacity on or after February 21, 2005.

Section 13.12 <u>Director and Officer Liability</u>: To the fullest extent permitted by law, no director or officer shall be personally liable for claims for monetary damages to the Corporation or any other person resulting from a breach of their fiduciary duty. If the Florida Business Corporation Act is amended after the adoption of these Amended and Restated By-Laws to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation, in addition to the limitation on personal liability provided herein, shall be limited to the fullest extent permitted by such law, as so amended. Any repeal or modification of this Article XIII by the shareholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the Corporation existing at the time of such repeal or modification.

## ARTICLE XIV.

### Certificates of Stock

The Certificates of stock of the Corporation shall be numbered and shall be entered in the books of the Corporation as they are issued. They shall exhibit the holder's name and certify the number of shares owned by the holder and shall be signed by the President or a Vice President and by the Secretary or an Assistant Secretary or an Assistant Treasurer of the Corporation and sealed with the Seal of the Corporation.

Any or all of the signatures on a certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate

shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue. The certificates shall identify the series, if any, of the stock and the variation in rights, preferences and limitations determined for each such series of stock. The certificates shall likewise indicate that the Corporation is incorporated under the laws of the State of Florida.

## ARTICLE XV.

### Transfers of Stock

The shares of stock shall be transferable on the books of the Corporation by the person named in the Certificate or his or her by attorney, lawfully constituted in writing, upon surrender of the certificate thereof.

Subject to these By-Laws and the Articles of Incorporation, the Board of Directors shall have power and authority to make all such rules and regulations as it shall deem expedient concerning the issue, transfer and registration of certificates for shares of stock of the Corporation or scrip certificates for such stock. Any such restrictions are valid and enforceable against the holder or the transferee of the holder if the restriction is authorized and its existence is conspicuously noted on the front or back of the certificate.

The Board of Directors may appoint and remove transfer agents and registrars of transfers, and may require all stock certificates and/or scrip certificates to bear the signature of any such transfer agent and/or of any such registrar of the transfers.

## ARTICLE XVI.

### Record Date

The Board of Directors may fix a future date as the record date for determining the shareholders entitled to notice of a shareholders' meeting, to demand a Special Meeting, to vote or to take any other action. Such record date may not be more than seventy (70) days before the meeting or action requiring a determination of shareholders. A determination of shareholders entitled to notice of or to vote at a shareholders' meeting is effective for any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting, which it must do if the meeting is adjourned to a date more than one hundred twenty (120) days after the date fixed for the original meeting.

If no record date is fixed by the Board of directors for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, the close of business on the day before the first notice of the meeting is delivered to shareholders shall be the record date for such determination of shareholders.

The Board of Directors may fix a date as the record date for determining shareholders entitled to a distribution or share dividend. If no record date is fixed by the Board of Directors for such determination, it is the date the Board of Directors authorizes the distribution or share dividend.

## ARTICLE XVII.

### Registered Shareholders

The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as expressly provided by the laws of the State of Florida.

## ARTICLE XVIII.

### Lost Certificates

Any person claiming a certificate of stock to be lost or destroyed shall make an affidavit or affirmation of that fact and verify the same in such manner as the Board of Directors may require, and shall if the Board of Directors so requires, give the Corporation, its transfer agents, registrars and/or other agents a bond of indemnity in form and with one or more sureties satisfactory to the Board of Directors before a new certificate may be issued of the same tenor and for the same number of shares as the one alleged to have been lost or destroyed.

## ARTICLE XIX.

### Inspection of Books

The Board of Directors shall determine from time to time whether, and if allowed, when and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall be open to the inspection of the shareholders. No shareholder shall have any right to inspect any book or document of the Corporation except as such right may be conferred by the laws of the State of Florida or as may be authorized by the Board of Directors or the shareholders.

## ARTICLE XX.

### Checks, Etc.

All checks, drafts, acceptances, notes and other orders, demands or instruments in respect of the payment of money shall be signed or endorsed in behalf of the Corporation by such officer or officers or by such agent or agents as the Board of Directors may from time to time designate.

714046.05-D.C. Server 1A                                                                MSW - Draft October 3, 2006 - 2:33 PM

## ARTICLE XXI.

### Fiscal Year

The fiscal year of the Corporation shall end on the last Wednesday in the month of June of each year.

## ARTICLE XXII.

### Dividends

Dividends upon the capital stock of the Corporation may be declared at the discretion of the Board of Directors, at any regular or special meeting, subject to the provisions of the Articles of Incorporation and the laws of the State of Florida.

## ARTICLE XXIII.

### Notices

Section 23.1 <u>How Given</u>: Notice required to be given by the Articles of Incorporation or these By-Laws is effective when mailed postage prepaid, or, if authorized by the shareholder, officer or director, when transmitted by electronic means, and correctly addressed to the mailing or electronic address of the shareholder, officer or director, as the case may be, at such address as appears on the current records of the Corporation.

Section 23.2 <u>Waiver of Notice</u>: Notice of a meeting of the Board of Directors need not be given to any director who signs a waiver of notice either before or after the meeting. Attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except when the director states at the beginning of the meeting or promptly upon arrival, any objection to the transaction of business because the meeting is not lawfully called or convened.

## ARTICLE XXIV.

### Amendments

Except as otherwise provided in the Articles of Incorporation, these By-Laws may be altered, amended or repealed by the affirmative vote of a majority of the holders of Stock issued and outstanding and entitled to vote at any regular or special meeting of the shareholders, or by the affirmative vote of a majority of the Board of Directors at any regular or special meeting, if notice of the proposed alteration, amendment or repeal be contained in the notice of the meeting. In the case of any conflict between the Articles of Incorporation and these By-Laws, the Articles of Incorporation shall control.

C

# REGISTRATION RIGHTS AGREEMENT

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**WINN-DIXIE STORES, INC.**

**and**

**THE HOLDERS NAMED HEREIN**

Dated as of October [  ], 2006

# Table of Contents

**Page**

1.      Definitions ................................................................................................................ 1
2.      Securities Act Registration on Request. ................................................................ 4
3.      Piggyback Registration. .......................................................................................... 5
4.      Expenses. ................................................................................................................. 6
5.      General. .................................................................................................................... 7
        (a)     Registration of Other Securities. ............................................................. 7
        (b)     Registration Statement Form. ................................................................... 7
        (c)     Effective Registration Statement. ............................................................ 7
        (d)     Selection of Underwriters. ....................................................................... 8
        (e)     Priority in Requested Registration. ......................................................... 8
        (f)     Registration Procedures. .......................................................................... 8
6.      Underwritten Offerings. ........................................................................................ 13
        (a)     Requested Underwritten Offerings ........................................................ 13
        (b)     Piggyback Underwritten Offerings: Priority. ........................................ 13
        (c)     Selling Holders to be Parties to Underwriting Agreement. ................... 15
        (d)     Holdback Agreements. ........................................................................... 15
7.      Preparation: Reasonable Investigation. ................................................................ 16
        (a)     Registration Statements. ........................................................................ 16
        (b)     Confidentiality. ...................................................................................... 17
8.      Postponements and Suspensions. .......................................................................... 17
        (a)     Postponements and Suspensions. .......................................................... 17
        (b)     Withdrawal Right; Expenses ................................................................. 18
        (c)     Certain Exceptions. ................................................................................ 18
        (d)     Limitation. .............................................................................................. 18
9.      Indemnification. .................................................................................................... 18
        (a)     Indemnification by the Company. .......................................................... 18
        (b)     Indemnification by the Offerors and Sellers. ........................................ 19
        (c)     Notices of Losses, etc. ........................................................................... 20
        (d)     Contribution. .......................................................................................... 20
        (e)     Indemnification Payments. ..................................................................... 21
        (f)     Other Indemnification. ........................................................................... 21
        (g)     Survival. ................................................................................................. 21
10.     Registration Rights to Others. .............................................................................. 21
11.     Rule 144. ............................................................................................................... 22
12.     Amendments and Waivers. .................................................................................... 22
13.     Nominees for Beneficial Owners. ......................................................................... 22
14.     Assignment. ........................................................................................................... 22
15.     Calculation of Percentage or Number of Shares of Registrable Common Stock. ............ 23
16.     Notice of Registrable Common Stock Holdings. ................................................... 23
17.     Termination of Registration Rights. ...................................................................... 23
18.     Applicability of Charter and By-laws. ................................................................... 24
19.     Miscellaneous. ....................................................................................................... 24
        (a)     Further Assurances ................................................................................ 24

i

**Page**

(b)     Headings..................................................................................................24
(c)     Remedies.................................................................................................24
(d)     Submission to Jurisdiction. ....................................................................24
(e)     Waiver of Jury Trial...............................................................................25
(f)     Service of Process...................................................................................25
(g)     Entire Agreement....................................................................................25
(h)     Notices. ..................................................................................................26
(i)     Governing Law. ......................................................................................26
(j)     Severability.............................................................................................26
(k)     Counterparts. ..........................................................................................26

714047.04-D.C. Server 1A     MSW - Draft October 3, 2006 - 2:35 PM

SCHEDULES:

SCHEDULE A – HOLDERS OF REGISTRABLE COMMON STOCK
SCHEDULE B – NOTICES

REGISTRATION RIGHTS AGREEMENT

REGISTRATION RIGHTS AGREEMENT, dated as of October [•], 2006 (this "Agreement"), by and among Winn-Dixie Stores, Inc., a Florida corporation (the "Company"), and the holders of Registrable Common Stock (as hereinafter defined) who are listed on Schedule A to this Agreement and who execute a counterpart of this Agreement not later than [_____], 2006 (the "Original Holders") and such other Persons who may become a party hereto pursuant to Section 14 hereof (together with the Original Holders, the "Holders").

This Agreement is being entered into in connection with the acquisition of Common Stock (as hereinafter defined) by the "Original Holders" pursuant to the Plan (as hereinafter defined). Upon the issuance of the Common Stock pursuant to the Plan, each Original Holder will own the number of shares of Common Stock specified with respect to such Original Holder in Schedule A hereto.

As provided for in the Plan, the Company is herewith agreeing to register Registrable Common Stock (as hereinafter defined) under the Securities Act (as hereinafter defined) and to take certain other actions with respect to the Registrable Common Stock, subject to the terms and conditions of this Agreement.

In consideration of the premises and the mutual agreements set forth herein, the parties hereto hereby agree as follows:

1.    Definitions.  Unless otherwise defined herein, capitalized terms used herein and in the recitals above shall have the following meanings:

"Affiliate" of a Person means any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such other Person.  For purposes of this definition, "control" means the ability of one Person to direct the management and policies of another Person, directly or indirectly through one or more intermediaries whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereto.

"Automatic Shelf Registration Statement" shall mean a registration statement filed by a Well-Known Seasoned Issuer which shall become effective upon filing thereof pursuant to General Instruction I.D for Form S-3.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to be closed.

"Commission" means the U.S. Securities and Exchange Commission.

"Common Stock" means the shares of common stock, par value $0.001, of the Company, as adjusted to reflect any merger, consolidation, recapitalization, reclassification, split-up, stock dividend, rights offering or reverse stock split made, declared or effected with respect to the Common Stock.

"<u>Company</u>" has the meaning set forth in the preamble hereto.

"<u>Company Indemnitee</u>" has the meaning set forth in Section 9(a) hereof.

"<u>Effective Date</u>" means the effective date of the Plan pursuant to the terms thereof.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"<u>Expenses</u>" means all expenses incident to the Company's performance of or compliance with its obligations under this Agreement, including, without limitation, (i) all registration, filing, listing, stock exchange and NASD fees and expenses (including, without limitation, all fees and expenses of any "qualified independent underwriter" required by the rules of the NASD), (ii) all fees and expenses of complying with state securities or blue sky laws (including the reasonable fees, disbursements and other charges of counsel for the underwriters in connection with blue sky filings), (iii) all word processing, duplicating and printing expenses, messenger, telephone and delivery expenses, (iv) all rating agency fees, (v) the fees, disbursements and other charges of counsel for the Company and of its independent public accountants, including the expenses incurred in connection with "cold comfort" letters required by or incident to such performance and compliance, (vi) the reasonable fees, disbursements and other charges of one firm of counsel and one firm of accountants to the Holders selling shares of Registrable Common Stock under such registration statement pursuant to Section 2 or Section 3 hereof (selected by the Holders holding a majority of the shares of Registrable Common Stock covered by such registration), (vii) premiums and other costs of policies of insurance against liabilities arising out of a Public Offering of the Registrable Common Stock being registered, and (viii) any fees and expenses of any special experts retained by the Company in connection with such registration, and the fees and expenses of other persons retained by the Company, including any fees and disbursements of underwriters customarily paid by issuers or sellers of securities, but excluding in all events underwriting discounts and commissions and applicable transfer taxes in respect of shares of Registrable Common Stock covered by such registration, if any, which fees, discounts, commissions and transfer taxes shall be borne by the Selling Holder or Selling Holders of Registrable Common Stock in all cases; <u>provided</u>, <u>however</u>, that in no event shall the Company have the obligation to pay Expenses in excess of $50,000 in the aggregate per registration statement for the matters contained in clauses (vi) and (vii) above.

"<u>Holders</u>" has the meaning set forth in the preamble hereto.

"<u>Holder Indemnitee</u>" has the meaning set forth in Section 9(b) hereof.

"<u>Initiating Request</u>" has the meaning set forth in Section 2 hereof.

"<u>Loss</u>" and "<u>Losses</u>" have the meanings set forth in Section 9(a) hereof.

"<u>NASD</u>" means the National Association of Securities Dealers, Inc.

"<u>Offering Documents</u>" has the meaning set forth in Section 9(a) hereof.

"Original Holders" has the meaning set forth in the preamble hereto.

"Permitted Securities" means Common Stock or other capital stock of the Company issued after the Effective Date in connection with equity investments in the Company or its subsidiaries or acquisitions for which the Company's board of directors has approved the granting of registration rights.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental or regulatory body or subdivision thereof or other entity.

"Piggyback Requesting Holder" has the meaning set forth in Section 3 hereof.

"Plan" means the Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for the Company and certain of its domestic subsidiaries, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof.

"Public Offering" means a public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act.

"Registrable Common Stock" means any shares of the Common Stock issued pursuant to the Plan and owned by the Holders from time to time, including shares of Common Stock acquired by a Holder in privately negotiated transactions subsequent to the Effective Date, but excluding shares of Common Stock acquired by a Holder subsequent to the Effective Date in transactions effected on a national securities exchange or in the over-the-counter market, provided, however, that a share of Common Stock will cease to be Registrable Common Stock if (a) a registration statement covering such share of Common Stock has been declared effective by the Commission and such share of Common Stock has been sold or disposed of pursuant to such effective registration statement, (b) such share of Common Stock has been sold or disposed of pursuant to Rule 144 (or any successor rule) under the Securities Act, (c) such share of Common Stock is eligible for resale pursuant to Rule 144 and the Holder thereof does not then beneficially own more than 1% of such class of securities, (d) such share of Common Stock has been Transferred to a Person who is not (and does not become as a result of such Transfer) a Holder, (e) such share of Common Stock is held by the Company or any of its subsidiaries, or (f) such share of Common Stock ceases to be outstanding.

"Requesting Holder" means one or more Holders which, together with their Affiliates, collectively beneficially own Registrable Common Stock representing at least 5% of the shares of Common Stock issued pursuant to the Plan.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"Selling Holders" means the Holders of that have requested that some or all of their shares of Registrable Common Stock be registered pursuant hereto.

"Transfer" means any transfer, sale, assignment, pledge, hypothecation or other disposition of any interest. "Transferor" and "Transferee" have correlative meanings.

3

"Well-Known Seasoned Issuer" shall have the meaning set forth in Rule 405 under the Act.

2.    Securities Act Registration on Request.

At any time and from time to time, a Requesting Holder may make a written request (the "Initiating Request") to the Company for the registration with the Commission under the Securities Act of all or part of such Requesting Holder's Registrable Common Stock, which Initiating Request shall specify the number of shares to be disposed of by such Requesting Holder and the proposed plan of distribution therefor.  Upon the receipt of any Initiating Request for registration pursuant to this Section 2, the Company promptly (and in any event within three Business Days after receipt of such request) shall notify in writing all other Holders of the receipt of such Initiating Request and will, subject to the terms hereof, file a registration statement on or before the date that is 90 days after the date that the initial Initiating Request is received by the Company, and 60 days after any subsequent Initiating Request is received by the Company and otherwise use its best efforts to effect, at the earliest practicable date, such registration under the Securities Act of (x) the Registrable Common Stock which the Company has been so requested to register by such Requesting Holder, and (y) all other Registrable Common Stock which the Company has been requested to register by any other Holders by written request given to the Company within 30 days after the giving of written notice by the Company to such other Holders of the Initiating Request, all to the extent necessary to permit the disposition (in accordance with Section 5(c) hereof) of the Registrable Common Stock so to be registered; provided, that:

(A)    the Company shall not be required to effect more than a total of three registrations pursuant to this Section 2,

(B)    if the Company shall have previously effected a registration pursuant to this Section 2 or shall have previously effected a registration of which notice has been given to the Holders pursuant to Section 3 hereof following the effectuation of a registration pursuant to this Section 2, the Company shall not be required to effect any registration or file a registration statement pursuant to this Section 2 until a period of 180 days shall have elapsed from the effective date of such previous registration,

(C)    any Holder whose Registrable Common Stock was to be included in any such registration pursuant to this Section 2, by written notice to the Company, may withdraw such request and, on receipt of such notice of the withdrawal of such request from Holders holding a percentage of Registrable Common Stock, such that the Holders that have not elected to withdraw do not hold, in the aggregate, the requisite percentage of the Registrable Common Stock to initiate a request under this Section 2, the Company shall not effect such registration, and

(D)    the Company shall not be required to effect any registration pursuant to this Section 2 unless at least 5% of the shares of Common Stock issued pursuant to the Plan are to be included in such registration.

3.      Piggyback Registration.

If the Company proposes to file a registration statement under the Securities Act (other than a registration statement (x) on Form S-4 or S-8 or any substitute form that may be adopted for Form S-4 or S-8 by the Commission or (y) in connection with an exchange offer or offering of securities solely to the Company's existing securityholders) with respect to an offering by the Company of equity securities of the Company or securities convertible or exchangeable into equity securities of the Company for its own account or for the account of a holder of any such security, it shall give prompt written notice to all of the Holders of the Registrable Common Stock of its intention to do so and of such Holders' rights (if any) under this Section 3, which notice, shall be given at least 15 days prior to such proposed registration. Upon the written request of any Holder of Registrable Common Stock receiving notice of such proposed registration (a "Piggyback Requesting Holder") made within 7 days after the receipt of any such notice which request shall specify the Registrable Common Stock intended to be disposed of by such Piggyback Requesting Holder (which may be all or any portion of such Holder's Registrable Common Stock) and, in the case of an underwritten offering the minimum offering price per share at which such Piggyback Requesting Holder is willing to sell its Registrable Common Stock, the Company shall, subject to Section 6(b) hereof, effect the registration under the Securities Act of all Registrable Common Stock which the Company has been so requested to register by the Piggyback Requesting Holders thereof; provided, that:

(A)      prior to the effective date of the registration statement filed in connection with such registration pursuant to this Section 3, promptly (and in any event within 2 Business Days) following receipt of notification, if any, by the Company from the managing underwriter (if an underwritten offering) of the price or range of prices at which such securities are proposed to be sold, the Company shall so advise each Piggyback Requesting Holder of such price;

(B)      any Piggyback Requesting Holder may withdraw all of its Registrable Common Stock requested by such Piggyback Requesting Holder to be included in such registration statement at any time prior to the earlier of (x) the execution and delivery of any underwriting agreement with respect to the applicable offering or (y) the date of effectiveness of the registration statement in respect of such registration, by delivery of written notice of such withdrawal to the Company as promptly as practicable, without prejudice to the rights of any Holder or Holders to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 3 or to cause such registration to be effected as a registration under Section 2 hereof, as the case may be;

(C)      if at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of all of such securities, the Company may, at its election, give written notice of such determination to each Piggyback Requesting Holder and (i) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Common Stock in connection with such registration (but not from any obligation of the Company to

5

pay the Expenses in connection therewith), without prejudice, however, to the rights of any Holder to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 3 or to cause such registration to be effected as a registration under Section 2 hereof, as the case may be, and (ii) in the case of a determination to delay registering, shall be permitted to delay registering any Registrable Common Stock, for the same period as the delay in registering such other securities; and

(D)     if such registration was initiated by the Company for its own account and involves an underwritten offering, each Piggyback Requesting Holder that does not withdraw its request as provided in Section 3(B) shall sell its Registrable Common Stock on the same terms and conditions as those that apply to the Company, and the underwriters of such underwritten offering (including the Registrable Common Stock sold by each Piggyback Requesting Holder) shall be an underwriter (or underwriters) selected by the Company in its sole and absolute discretion.

No registration effected under this Section 3 shall relieve the Company of its obligation to effect any registration upon request under Section 2 hereof and no registration effected pursuant to this Section 3 shall be deemed to have been effected pursuant to Section 2 hereof.

Notwithstanding anything in this Agreement to the contrary, the Company shall have no obligation under this Section 3 to make any offering of its securities, or to complete an offering of its securities that it proposes to make, and shall incur no liability to any Holder for its failure to do so, except for any liability to pay Expenses.

4.     Expenses.

(a)     Subject to Section 4(c), the Company shall pay all Expenses in connection with any registration initiated pursuant to Section 2 or 3 hereof, whether or not such registration shall become effective and whether or not all or any portion of the Registrable Common Stock originally requested to be included in such registration is ultimately included in such registration.

(b)     Notwithstanding anything in subsection (a) to the contrary, the Company shall not be required to pay for any Expenses of any registration proceeding begun pursuant to Section 2 if the registration request is subsequently withdrawn at the request of Holders of a majority of the Registrable Common Stock to be registered (in which case all participating Holders shall bear such expenses pro rata based upon the number of shares of Registrable Common Stock that were to be requested in the withdrawn registration), unless the Holders of a majority of the Registrable Common Stock agree to forfeit their right to one demand registration pursuant to Section 2 or a registration request is withdrawn pursuant to Section 8(a) hereof.

(c)     Notwithstanding anything else in this Agreement to the contrary, in no event shall the Company have the obligation to pay Expenses in excess of $50,000 in the aggregate per registration statement for the matters contained in clauses (vi) and (vii) of the definition of Expenses in Section 1 above.

5.    <u>General</u>.

(a) <u>Registration of Other Securities</u>.  Whenever the Company shall effect a registration pursuant to Section 2 hereof, no securities other than (i) Registrable Common Stock, (ii) subject to Section 5(e), Common Stock to be sold by the Company for its own account and (iii) Permitted Securities shall be included among the securities covered by any such registration pursuant to Section 2 unless the Selling Holders holding not less than a majority of the shares of Registrable Common Stock to be covered by such registration shall have consented in writing to the inclusion of such other securities, which consent shall not be unreasonably withheld.  If any securityholders of the Company (other than the Holders of Registrable Common Stock in such capacity) register securities of the Company in a registration statement to be filed pursuant to Section 2, such securityholders shall pay the fees and expenses of their counsel and their pro rata share, on the basis of the respective amounts of the securities included in such registration on behalf of each such securityholder, of the Expenses for such registration if such Expenses are not paid by the Company for any reason.

(b) <u>Registration Statement Form</u>.  Registrations under Section 2 hereof shall be on such appropriate registration form prescribed by the Commission under the Securities Act as shall be selected by the Company and as shall permit the disposition of the Registrable Common Stock pursuant to an underwritten offering.  The Company agrees to use its reasonable best efforts to include in any such registration statement filed pursuant to Section 2 or 3 hereof all information which Selling Holders holding a majority of shares of the Registrable Common Stock covered by such registration statement effected pursuant hereto, upon advice of counsel, shall reasonably request.  The Company may, if permitted by law, effect any registration requested under Section 2 by the filing of a registration statement on Form S-3 (or any successor or similar short form registration statement), including an Automatic Shelf Registration Statement.

(c) <u>Effective Registration Statement</u>.  A registration requested pursuant to Section 2 hereof shall not be deemed to have been effected

(i)    unless a registration statement with respect thereto has been declared effective by the Commission (or, in the case of an Automatic Shelf Registration Statement, has become effective) and remains effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock has been disposed of in accordance with the method of disposition set forth in such registration statement or there shall cease to be any Registrable Common Stock, <u>provided</u>, that such period need not exceed 180 days,

(ii)    if, after it has become effective, such registration is interfered with by any stop order, injunction, notice or other order or requirement of the Commission or other governmental or regulatory agency or court for any reason other than a violation of applicable law or regulation solely by any Selling Holder and has not thereafter become effective or

(iii)    if, in the case of an underwritten offering pursuant to a registration statement requested under Section 2 hereof, the conditions to closing specified in an underwriting agreement to which the Company is a party (other than conditions to the underwriters' obligations relating expressly to Selling Holders that are not typical in underwritten offerings) are not satisfied or waived other than by reason of any breach or failure by any Selling Holder, or are not otherwise waived.

The Holders of Registrable Common Stock to be included in a registration statement may at any time terminate a request for registration made pursuant to Section 2 in accordance with Section 2(c).

(d)  Selection of Underwriters.  The underwriter or underwriters of each underwritten offering, if any, of the Registrable Common Stock pursuant to a registration statement effected under Section 2 hereof shall be an investment banking firm of national standing selected by the Company with the consent of Selling Holders holding a majority of the shares of Registrable Common Stock to be included in such underwritten offering, which consent shall not be unreasonably withheld, delayed or conditioned.

(e)  Priority in Requested Registration.  If a registration under Section 2 hereof involves an underwritten Public Offering and the managing underwriter of such underwritten offering shall advise the Company in writing (in which case, the Company shall advise the Selling Holders in writing) that if all of the securities requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which would be sold in such offering within a price range acceptable to the Company and the Selling Holders owning at least a majority of the shares of Registrable Common Stock covered by such registration, the Company shall include in such underwritten offering, to the extent of the number and type of securities which the Company is advised can be sold in such offering, (i) first, all Registrable Common Stock requested to be included, pro rata among the Selling Holders requested to be included in such underwritten offering on the basis of the number of shares of Registrable Common Stock requested to be included by all such Selling Holders, (ii) second, Permitted Securities requested to be registered by the holders of Permitted Securities pro rata among the holders of Permitted Securities on the basis of the number of Permitted Securities requested to be registered by the holders of all such Permitted Securities and (iii) third, securities that the Company proposes to issue and sell for its own account (unless the holders of a majority of the Permitted Securities requested to be registered by holders of Permitted Securities consent to the inclusion of the Company's securities on a pro rata basis with the Permitted Securities requested to be registered by the holders of Permitted Securities).

(f)  Registration Procedures.  If and whenever the Company is required to effect any registration under the Securities Act as provided in Sections 2 and 3 hereof, the Company shall, as expeditiously as possible:

(i)    prepare and file with the Commission (promptly and, in the case of any registration pursuant to Section 2, in any event on or before the date that is (A) 90 days after the date the initial Initiating Request is received by the Company, and 60 days after any subsequent Initiating Request is received by the Company or (B) if, as of such

ninetieth or sixtieth day, as appropriate, the Company does not have any audited financial statements required to be included in the registration statement, 30 days after the receipt by the Company from its independent public accountants of such audited financial statements, which the Company shall use its reasonable best efforts to obtain as promptly as practicable) the requisite registration statement to effect such registration and thereafter use its best efforts to cause such registration statement to become (in the case of registration statements other than Automatic Shelf Registration Statements, which shall be automatically effective) and remain effective; provided, however, that the Company may discontinue any registration of its securities that are not shares of Registrable Common Stock (and, under the circumstances specified in Sections 3 and 8(b) hereof, its securities that are shares of Registrable Common Stock) at any time prior to the effective date of the registration statement relating thereto;

(ii)     prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock has been disposed of in accordance with the method of disposition set forth in such registration statement; provided, that such period need not extend beyond 180 days after the effective date of the registration statement;

(iii)     furnish to each Selling Holder covered by such registration statement and their representatives designated pursuant to Section 7(a), if any, and each underwriter, if any, such number of copies of such drafts and final conformed versions of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference), such number of copies of such drafts and final versions of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holder or any underwriter may reasonably request in writing;

(iv)     use its best efforts (a) to register or qualify all Registrable Common Stock and other securities, if any, covered by such registration statement under such other securities or blue sky laws of such jurisdictions as each Selling Holder or other securityholder covered by such registration statement shall reasonably request in writing, (b) to keep such registration or qualification in effect for so long as such registration statement remains in effect and (c) to take any other action that may be necessary or reasonably advisable to enable such Selling Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Selling Holders or other securityholders as applicable, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this Section 5(f)(iv) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

9

(v)     use its best efforts to cause all Registrable Common Stock and other securities, if any, covered by such registration statement to be registered with or approved by such other federal or state governmental agencies or authorities as may be necessary in the opinion of counsel to the Company or counsel to the Selling Holder or Selling Holders covered by such registration statement to enable such Holder or Holders to consummate the disposition of such Registrable Common Stock;

(vi)    use its reasonable best efforts to obtain and, if obtained, furnish to each Selling Holder, and each underwriter a signed copy, addressed to each such underwriter, of:

(A) an opinion or opinions of counsel to the Company dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement) reasonably satisfactory in form and substance to such Selling Holder, and

(B) a comfort letter or comfort letters, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement), signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement,

in each case covering substantially the same matters with respect to such registration statement (and the prospectus included therein) and, in the case of the accountants' letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' letters delivered to the underwriters in underwritten Public Offerings of securities and, in the case of the accountants' letter, such other financial matters, as such Selling Holder (or the underwriters, if any) may reasonably request;

(vii)   notify each Selling Holder and holder of other securities covered by such registration statement, if any, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, and, at the written request of any such Selling Holder or holder of other securities covered by such registration statement, promptly (and in any event no later than 10 days following notice of the occurrence of such event to such Selling Holders) prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to

10

make the statements therein not misleading in the light of the circumstances under which they were made;

(viii)    promptly notify each Selling Holder (A) of any notification to the Company by the Commission of any stop order issued or threatened to be issued suspending the effectiveness of such registration statement and (B) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Common Stock for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose and the Company agrees to use its best efforts to (x) prevent the issuance of any such stop order, and in the event of such issuance, obtain the withdrawal of any order suspending the effectiveness of a registration statement relating to the Registrable Common Stock at the earliest possible moment and (y) obtain the withdrawal of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Common Stock included in such registration statement for sale in any jurisdiction at the earliest possible moment;

(ix)    otherwise use its best efforts to comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of 12 months beginning after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder;

(x)    furnish to each Selling Holder and to the managing underwriter, if any, as promptly as practicable prior to the filing thereof a copy of any amendment or supplement to such registration statement or prospectus;

(xi)    use its reasonable best efforts to cause all Registrable Common Stock covered by a registration statement to be listed on a national securities exchange, or, if necessary or required, on an interdealer quotation system, on which similar securities issued by the Company are then listed;

(xii)    provide a transfer agent, registrar and CUSIP number for the Registrable Common Stock covered by a registration statement no later than the effective date thereof;

(xiii)    promptly notify each Selling Holder covered by such registration statement and the underwriter or underwriters, if any:

(A) when such registration statement or any prospectus used in connection therewith, or any amendment or supplement thereto, has been filed and, with respect to such registration statement or any post-effective amendment thereto, when the same has become effective; and

(B) of any comments (whether oral or written) from the Commission or the blue sky or securities commission or regulator of any state

11

with respect to any filing referred to in clause (i) and of any written request by the Commission for amendments or supplements to such registration statement or prospectus;

(xiv)    enter into such agreements (including, in any underwritten offering, an underwriting agreement in customary form) and take such other actions as the Holders holding a majority of the shares of Registrable Common Stock covered by such registration statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Common Stock, including customary indemnification;

(xv)    if requested by the managing underwriter(s) or Selling Holders holding a majority of the shares of Registrable Common Stock being sold in connection with an underwritten offering, subject to applicable law, promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter(s) and Selling Holders holding a majority of shares of Registrable Common Stock being sold agree should be included therein relating to the plan of distribution with respect to such Registrable Common Stock, including without limitation, information with respect to the number of shares of Registrable Common Stock being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Common Stock to be sold in such offering; and make all required filings of such prospectus supplement or post-effective amendment as soon as notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(xvi)    if requested by Selling Holders holding a majority of the shares of Registrable Common Stock being sold, reasonably cooperate with the Selling Holders and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Common Stock to be sold and not bearing any restrictive legends (except as may be provided in the Company's articles of incorporation, as amended); and enable such Registrable Common Stock to be in such share amounts and registered in such names as the managing underwriter(s) or, if none, Selling Holders holding a majority of the shares of Registrable Common Stock being sold, may request at least two Business Days prior to any sale of Registrable Common Stock to the underwriters; and

(xvii)    use its best efforts to take all other actions necessary to effect the registration of the Registrable Common Stock contemplated hereby.

As a condition to the obligations of the Company to complete any registration pursuant to this Agreement with respect to the Registrable Common Stock of a Selling Holder, such Selling Holder must furnish to the Company in writing such information regarding itself, the Registrable Common Stock held by it and the intended methods of disposition of the Registrable Common Stock held by it as is necessary to effect the registration of such Selling Holders' Registrable Common Stock and is requested in writing by the Company. At least 20 days prior to the first anticipated filing date of a registration statement for any registration under this Agreement, the Company will notify in writing each Selling Holder of the information referred to in the preceding sentence which the Company is requesting from that Selling Holder

whether or not such Selling Holder has elected to have any of its Registrable Common Stock included in the registration statement.  If, within 3 days prior to the filing date, the Company has not received the requested information from a Selling Holder, then the Company may file the registration statement without including Registrable Common Stock of that Selling Holder, if, in the opinion of the Company's counsel, such information is required to be included in such registration statement.

Each Selling Holder agrees that as of the date that a final prospectus is made available to it for distribution to prospective purchasers of Registrable Common Stock it shall cease to distribute copies of any preliminary prospectus prepared in connection with the offer and sale of such Registrable Common Stock.  Each Selling Holder further agrees that, upon receipt of any written notice from the Company of the happening of any event of the kind described in Section 5(f)(vii), such Selling Holder shall forthwith discontinue such Selling Holder's disposition of Registrable Common Stock pursuant to the registration statement relating to such Registrable Common Stock until such Selling Holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 5(f)(vii) and, if so directed by the Company, shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Selling Holder's possession of the prospectus relating to such Registrable Common Stock current at the time of receipt of such notice.  If any event of the kind described in Section 5(f)(vii) occurs and such event is the fault solely of a Selling Holder (or Selling Holders), such Selling Holder (or Selling Holders) shall pay all Expenses attributable to the preparation, filing and delivery of any supplement or amendment of such prospectus contemplated by Section 5(f)(vii).

6.    Underwritten Offerings.

(a) Requested Underwritten Offerings  If requested by the underwriters in connection with an underwritten Public Offering pursuant to a registration under Section 2 hereof, the Company shall enter into a underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company and a majority of the Selling Holders whose Registered Common Stock is included in such offering and the underwriters and to contain such representations and warranties by the Company and the Selling Holders and such other terms as are customary in agreements of that type, including, without limitation, indemnification and contribution to the effect and to the extent provided in Section 9 hereof.

(b) Piggyback Underwritten Offerings: Priority.

(i)    If the Company proposes to register any of its securities under the Securities Act for its own account as contemplated by Section 3 hereof and such securities are to be distributed by or through one or more underwriters, and if the managing underwriter of such underwritten offering shall advise the Company (in which case, the Company shall advise the Piggyback Requesting Holders) that if all of the securities requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would

exceed the number and type of securities which could be sold in such offering within a price range acceptable to the Company, then the Company shall include in such registration pursuant to Section 3, to the extent of the number and type of securities which the Company is so advised can be sold in such offering, (i) first, all of the securities that the Company proposes to issue and sell for its own account, (ii) second, Permitted Securities requested to be registered by holders of Permitted Securities and Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof, pro rata among the holders of Permitted Securities and Piggyback Requesting Holders on the basis of the number of Permitted Securities and shares of Registrable Common Stock requested to be registered by all such holders of Permitted Securities and Piggyback Requesting Holders and (iii) third, other securities (other than Permitted Securities or Registrable Common Stock), if any.

(ii)     If the Company proposes to register any Permitted Securities pursuant to a demand registration of the holders of Permitted Securities as contemplated by Section 3 hereof involving an underwritten offering, if the managing underwriter of such underwritten offering shall advise the Company (in which case, the Company shall use reasonable efforts to advise the Piggyback Requesting Holders) that if all of the securities requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which would be sold in such offering within a price range acceptable to the Company, then the Company shall include in such registration pursuant to Section 3, to the extent of the number and type of securities which the Company is so advised can be sold in such offering, (i) first, Permitted Securities requested to be registered by the holders of Permitted Securities, pro rata among the holders of Permitted Securities on the basis of the number of Permitted Securities requested to be registered by all such holders of Permitted Securities, (ii) second, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders, and (iii) third, securities that the Company proposes to issue and sell for its own account (unless the Holders of a majority of the shares of Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof consent to the inclusion of the Company's securities on a pro rata basis with the Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof), and (iv) fourth, other securities (other than Permitted Securities or Registrable Common Stock), if any.

(iii)     In the case of any other registration contemplated by Section 3 involving an underwritten offering, if the managing underwriter of such underwritten offering shall advise the Company (in which case, the Company shall use reasonable efforts to advise the Piggyback Requesting Holders) that if all of the securities requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which would be sold in such offering within a price range acceptable to the Company, then the Company shall include in such registration pursuant to Section

3, to the extent of the number and type of securities which the Company is so advised can be sold in such offering, (i) first, Permitted Securities requested to be registered by holders of Permitted Securities and Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof, pro rata among the holders of Permitted Securities and Piggyback Requesting Holders on the basis of the number of Permitted Securities and shares of Registrable Common Stock requested to be registered by all such holders of Permitted Securities and Piggyback Requesting Holders (ii) second, securities that the Company proposes to issue and sell for its own account (unless the holders of a majority of the Permitted Securities requested to be registered by holders of Permitted Securities and the Holders of a majority of the shares of Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof consent to the inclusion of the Company's securities on a pro rata basis with the Permitted Securities requested to be registered by the holders of Permitted Securities and Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 3 hereof), and (iii) third, other securities (other than Permitted Securities or Registrable Common Stock), if any.

In addition to the withdrawal rights specified in Section 3(B) hereof, any Piggyback Requesting Holder may withdraw its request to have all or any portion of its Registrable Common Stock included in any such offering by notice to the Company within 5 Business Days after receipt of a copy of a notice from the managing underwriter pursuant to this Section 6(b).

(c) <u>Selling Holders to be Parties to Underwriting Agreement</u>.  The Selling Holders holding shares of Registrable Common Stock to be distributed by underwriters in an underwritten offering contemplated by Section 6(a) or (b) shall be parties to the underwriting agreement between the Company and such underwriters and any such Selling Holder, at its option, may reasonably require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Selling Holders and that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement be conditions precedent to the obligations of such Selling Holders.  No Selling Holder may participate in any underwritten registration hereunder unless such Selling Holder (i) agrees to sell such Selling Holder's Registrable Common Stock on the basis provided in any such underwriting arrangements and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents, each in the form approved by Selling Holders holding a majority of the shares of Registrable Common Stock to which such registration relates. No such Selling Holder shall be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Selling Holder, such Selling Holder's Registrable Common Stock and such Selling Holder's intended method of distribution.

(d) <u>Holdback Agreements</u>.  Each Selling Holder agrees, unless otherwise agreed to by the managing underwriter for any underwritten offering pursuant to this Agreement, to the extent permitted by law not to effect any sale or distribution of any equity securities of the Company or securities convertible into or exchangeable or exercisable for equity securities of the

Company, including any sale under Rule 144 under the Securities Act and any other market sale, during the 10 days prior to the date on which an underwritten registration of Registrable Common Stock pursuant to Section 2 or 3 hereof has become effective and until 90 days after the effective date of such underwritten registration, except (i) as part of such underwritten registration, (ii) for transfers to Affiliates of such Selling Holders who agree to be bound by this Agreement, (iii) for distributions by limited partnerships or limited liability companies to their limited partners or members who agree to be bound by this Agreement, or (iv) to the extent that such Selling Holder is prohibited by applicable law from agreeing to withhold securities from sale or is acting in its capacity as a fiduciary or an investment adviser. Without limiting the scope of the term "fiduciary," a Selling Holder shall be deemed to be acting as a fiduciary or an investment adviser if its actions or the securities proposed to be sold are subject to the Employee Retirement Income Security Act of 1974, as amended, the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or if such securities are held in a separate account under applicable insurance law or regulation.

The Company agrees (i) unless otherwise agreed to by the managing underwriter for any underwritten offering pursuant to this Agreement, not to effect any Public Offering or distribution of any equity securities of the Company, or securities convertible into or exchangeable or exercisable for equity securities of the Company, during the 10 days prior to the date on which any underwritten registration pursuant to Section 2 or 3 hereof has become effective and until 90 days after the effective date of such underwritten registration, except as part of such underwritten registration and except for distributions pursuant to any employment, option or benefit plan or agreement of the Company, and (ii) to cause each holder of any equity securities, or securities convertible into or exchangeable or exercisable for equity securities, in each case, acquired from the Company at any time after the date of this Agreement (other than in a Public Offering or a transaction effected pursuant to Rule 144A under the Securities Act), to agree not to effect any Public Offering or distribution of such securities, during such period.

7.    Preparation: Reasonable Investigation.

(a) Registration Statements. In connection with the preparation and filing of each registration statement under the Securities Act pursuant to this Agreement, the Company shall (i) give each Selling Holder and its representatives (designated to the Company in writing and who execute a confidentiality agreement as described below) (each, an "Inspector") of each Selling Holder or group of Selling Holders holding at least 25% of the shares of Registrable Common Stock registered under such registration statement, the underwriters, if any, and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of all underwriters and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of Selling Holders holding a majority of the shares of Registrable Common Stock covered by such registration statement, the reasonable opportunity to participate in the preparation of such registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, including, without limitation, the opportunity to review, comment or object to any information pertaining solely to such Selling Holder that is contained in drafts of all documents proposed to be filed, including exhibits (and the Company will make the corrections reasonably requested by such Selling Holder with respect to such information prior to filing any such registration statement or amendment) (ii) upon reasonable advance notice to the Company, give each Inspector such reasonable access to all

16

financial and other records, corporate documents and properties of the Company and its subsidiaries, as shall be necessary, in the reasonable opinion of such Selling Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act, and (iii) upon reasonable advance notice to the Company, provide each Inspector reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of such Selling Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act, provided, however, that with respect to (i), (ii) and (iii) above, all persons conducting due diligence on behalf of Selling Holders shall cooperate to the extent reasonably practicable to minimize any disruption to the Company's operation of its business.

(b) <u>Confidentiality</u>.  Each Selling Holder (i) shall maintain, and shall cause its agents referred to in Section 7(a) to maintain, the confidentiality of any confidential information received from or otherwise made available by the Company to such Selling Holder, including drafts of registration statements, and (ii) shall use, and shall cause its agents referred to in Section 7(a) to use, all confidential information only to exercise the Selling Holders' due diligence responsibility.  Information that (i) is or becomes available to a Holder of Registrable Common Stock from a public source other than as a result of a disclosure by such Holder or any of its Affiliates, (ii) is disclosed to a Holder of Registrable Common Stock by a third-party source who the Holder of Registrable Common Stock reasonably believes is not bound by an obligation of confidentiality to the Company or (iii) is or becomes required to be disclosed by a Holder of Registrable Common Stock by law, including by court order, shall not be deemed to be confidential information for purposes of this Agreement.  The Holders of Registrable Common Stock shall only grant access, and the Company shall only be required to grant access, to information under this Section 7 to legal counsel and to such other Person(s) who agree in writing in form and substance reasonably satisfactory to the Company whereby the Person executing such writing shall maintain the confidentiality of any confidential information received from or otherwise made available to it by the Company or the holders of Registrable Common Stock under this Agreement.  Each Holder shall be bound by this Section 7(b) and shall remain bound until the confidential information received by such Holder ceases to be confidential information.

8.     <u>Postponements and Suspensions</u>.

(a) <u>Postponements and Suspensions</u>.

The Company may (x) delay making a filing of any registration statement or any amendment or supplement to a registration statement requested pursuant to Section 2 or (y) suspend any Selling Holder's rights to make sales pursuant to any effective registration statement, if in each case prior to such delay or suspension the Company delivers a written certificate signed by the Chief Executive Officer and the Chief Financial Officer of the Company to the Selling Holders stating that its board of directors has determined in good faith that the filing thereof at the time requested, or the offering of securities pursuant thereto, would materially and adversely affect a pending or proposed Public Offering of the Company's securities, including, without limitation, a material financing, or a material acquisition, merger, recapitalization, consolidation, reorganization or similar transaction, or negotiations, discussions

17

or pending proposals with respect thereto or would require the disclosure of material non-public information that, in the good faith judgment of the board of directors, individually or in the aggregate, would have a material adverse effect on (i) the Company and its subsidiaries taken as a whole or (ii) any material business line of the Company (a "Postponement Certificate").  If the Company suspends the Selling Holders' rights to make sales pursuant hereto, the applicable registration period shall be extended by the same number of days of such suspension.

(b)  Withdrawal Right; Expenses

If the Company shall fail to file or delay filing any registration statement to be filed pursuant to a request for registration under Section 2 hereof (whether or not pursuant to Section 8(a)) the Selling Holders requesting such registration shall have the right to withdraw the request for registration.  The Company shall pay all Expenses incurred in connection with a request for registration withdrawn pursuant to this paragraph and shall not be relieved of any liability it might otherwise have under Section 19(c) hereof.

(c)  Certain Exceptions.

Notwithstanding anything to the contrary contained in this Section 8, during any period in which the Company is not eligible to use Form S-3 (or comparable successor form), the Company may suspend any Selling Holder's rights to make sales pursuant to any effective registration statement, in order to file a post-effective amendment to a registration statement (i) to include and update the Company's financial statements for each quarter and annual period, which post-effective amendment will be filed with the Commission not later than 3 Business Days following the date the Company files its Quarterly Reports on Form 10-Q or Form 10-K for each such quarter or annual period, as applicable, with the Commission or (ii) as necessary in the judgment of the Company's counsel to otherwise comply with Commission rules and interpretations requiring the Company to file post-effective amendments to report any event which constitutes a material change.  In connection with such filing, the Company will use its best efforts to obtain effectiveness of such post-effective amendment at the earliest practicable time.

(d)  Limitation.

The filing of a registration statement or any amendment or supplement thereto by the Company cannot be deferred, and the Selling Holders' rights to make sales pursuant to an effective registration statement cannot be suspended, pursuant to the provisions of this Section for more than ninety (90) days in the aggregate per 365-day period

9.    Indemnification.

(a)  Indemnification by the Company.  In connection with any registration statement filed by the Company pursuant to Section 2 or 3 hereof, to the fullest extent permitted by law the Company shall, and hereby agrees to, indemnify and hold harmless, each Selling Holder of any Registrable Common Stock covered by such registration statement and each other Person, if any, who controls (within the meaning of the Exchange Act) such Selling Holder, and their respective stockholders, directors, officers, employees, partners, agents and Affiliates (each, a "Company Indemnitee" for purposes of this Section 9(a)), against any losses, claims, damages,

18

liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof and whether or not such Company Indemnitee is a party thereto), joint or several, and expenses, including, without limitation, the reasonable fees, disbursements and other charges of legal counsel and reasonable costs of investigation, to which such Company Indemnitee may become subject under the Securities Act or otherwise (collectively, a "Loss" or "Losses"), insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such securities were registered or otherwise offered or sold under the Securities Act or otherwise, any preliminary prospectus, final prospectus or summary prospectus related thereto, or any amendment or supplement thereto or any document incorporated by reference, if used during the period in which the Company is required to keep the registration statement to which such prospectus relates current (collectively, "Offering Documents"), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances in which they were made not misleading (with respect to the final prospectus or summary prospectus related thereto, or any amendment or supplement thereto, if used during the period in which the Company is required to keep the registration statement to which such prospectus relates current), or any violation by the Company or any of its Affiliates of any federal or state law, rule or regulation applicable to the Company or any of its Affiliates and relating to action required of or inaction by the Company or any of its Affiliates in connection with any such registration; provided, that the Company shall not be liable in any such case to the extent that any such Loss arises out of or is based upon an untrue statement or omission made in such Offering Documents in reliance upon and in conformity with information furnished to the Company in writing by any Company Indemnitee, or on its behalf, specifically stating that it is for inclusion therein; and provided, further, that the Company shall not be liable to any Person who participates as an underwriter in the offering or sale of Registrable Common Stock or any other person, if any, who controls (within the meaning of the Exchange Act) such underwriter, in any such case to the extent that any such Loss arises out of such Person's failure to send or give a copy of the final prospectus (including any documents incorporated by reference therein), as the same may be then supplemented or amended, to the Person asserting an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of Registrable Common Stock to such Person if such statement or omission was corrected in such final prospectus. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Company Indemnitee and shall survive the transfer of such securities by such Company Indemnitee.

(b) Indemnification by the Offerors and Sellers. In connection with any registration statement filed by the Company pursuant to Section 2 or 3 hereof in which a Selling Holder has registered for sale shares of Registrable Common Stock, each such Selling Holder shall, and hereby agrees to, indemnify and hold harmless to the fullest extent permitted by law the Company and each of its directors, officers, employees, agents, partners, stockholders, Affiliates and each other Person, if any, who controls (within the meaning of the Exchange Act) the Company and each other seller under such registration statement and such seller's employees, directors, officers, stockholders, partners, agents and Affiliates (each, a "Holder Indemnitee" for purposes of this Section 9(b)), against all Losses insofar as such Losses arise out of or are based upon any untrue statement of a material fact contained in any Offering Documents (or any document incorporated by reference therein) or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the

light of circumstances in which they were made not misleading, if such untrue statement or omission was made in reliance upon and in conformity with information furnished to the Company in writing by such Holder of Registrable Common Stock, or on its behalf, specifically stating that it is for inclusion therein; provided, however, that the liability of such indemnifying party under this Section 9(b) shall be several, and not joint and several, among such indemnifying parties on the basis of the number of securities included in such registration statement and shall be limited to the amount of the net proceeds received by such indemnifying party in the sale of Registrable Common Stock giving rise to such liability.  Such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of a Holder Indemnitee and shall survive the transfer of such securities by such indemnifying party.

(c) Notices of Losses, etc.  Promptly after receipt by an indemnified party of written notice of the commencement of any action or proceeding involving a Loss referred to in Section 9(a) or (b), such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; provided, however, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under Section 9(a) or (b), except to the extent that the indemnifying party is materially and actually prejudiced by such failure to give notice.  In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and, unless in such indemnified party's reasonable judgment, after consultation with its separate counsel, a conflict of interest between such indemnified and indemnifying parties may exist in respect of such Loss, to assume and control the defense thereof, in each case at its own expense, jointly with any other indemnifying party similarly notified, to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after its assumption of the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation, unless in such indemnified party's reasonable judgment, after consultation with its separate counsel, a conflict of interest between such indemnified and indemnifying parties arises in respect of such claim after the assumption of the defense thereof, in which event the indemnifying party shall be liable for the reasonable legal expenses of one counsel (plus local counsel) representing all indemnified parties.  No indemnifying party shall be liable for any settlement of any such action or proceeding effected without its written consent, which shall not be unreasonably withheld.  No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such Loss or which requires action on the part of such indemnified party or otherwise subjects the indemnified party to any obligation or restriction to which it would not otherwise be subject.

(d) Contribution.  If the indemnification provided for in this Section 9 shall for any reason be unavailable to an indemnified party under Section 9(a) or (b) in respect of any Loss, then, in lieu of the amount paid or payable under Section 9(a) or (b), the indemnified party and the indemnifying party under Section 9(a) or (b) shall contribute to the aggregate Losses (including legal or other expenses reasonably incurred in connection with investigating the same) (i) in such proportion as is appropriate to reflect the relative fault of the Company and the prospective sellers of Registrable Common Stock covered by the registration statement which

resulted in such Loss or action in respect thereof, with respect to the statements, omissions or action which resulted in such Loss or action in respect thereof, as well as any other relevant equitable considerations, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of Registrable Common Stock; provided that for purposes of this clause (ii), the relative benefits received by the prospective sellers shall be deemed not to exceed the amount received by such sellers in the sale of their Registrable Common Stock. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The obligations, if any, of the selling holders of Registrable Common Stock to contribute as provided in this Section 9(d) are several in proportion to the relative value of their respective Registrable Common Stock covered by such registration statement and not joint. In addition, no Person shall be obligated to contribute hereunder any amounts in payment for any settlement of any action or Loss effected without such Person's consent.

(e) <u>Indemnification Payments</u>. The indemnification and contribution required by this Section 9 shall be made by prompt periodic payments of the amount thereof during the course of any investigation or defense, as and when invoices therefor are delivered to the indemnifying party in respect of any particular Loss as incurred.

(f) <u>Other Indemnification</u>.

Indemnification similar to that specified in the preceding paragraphs of this Section 9 (with appropriate modifications) shall be given by the indemnifying parties set forth in Sections 9(a) and (b) with respect to any required registration or other qualification of securities under any federal or state law or regulation of any governmental authority other than the Securities Act. The provisions of this Section 9 shall be in addition to any other rights to indemnification or contribution which any Company Indemnitee or Holder Indemnitee, as the case may be, may have pursuant to law, equity, contract or otherwise.

(g) <u>Survival.</u>

Unless otherwise superseded by an underwriting agreement entered into in connection with an underwritten public offering, the obligations of the Company and Selling Holders under this Section 9 shall survive the completion of any offering of Registrable Common Stock pursuant to a registration statement under this Section 9, and shall survive the termination of this Agreement.

10.     <u>Registration Rights to Others</u>.

The Company's board of directors is expressly permitted to enter into agreements which provide to any holder of newly issued securities of the Company rights which are *pari passu* to (but not senior to) rights provided to the holders of Registrable Common Stock in this Agreement, provided, however, that the performance of the obligations of the Company pursuant to any such agreement shall not violate or directly conflict with the rights provided to the holders of Registrable Common Stock in this Agreement.

11.  Rule 144.

The Company shall, at its own expense, take all actions reasonably necessary to enable Holders to sell Registrable Common Stock without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any similar rules or regulations hereafter adopted by the Commission, including, without limiting the generality of the foregoing, filing on a timely basis all reports required to be filed under the Exchange Act.  Upon the written request of any Holder, the Company shall deliver to such Holder a written statement as to whether it has complied with such requirements.  If at any time the Company is not required to file reports in compliance with either Section 13 or Section 15(d) of the Exchange Act, the Company at its expense will, forthwith upon the written request of any Holder, make available adequate current public information with respect to the Company within the meaning of paragraph (c)(2) of Rule 144.

12.  Amendments and Waivers.  Any provision of this Agreement may be amended, modified or waived if, but only if, the written consent to such amendment, modification or waiver has been obtained from (i) except as provided in clause (ii) below, the Holder or Holders of at least a majority of the shares of Registrable Common Stock then outstanding and (ii) in the case of any amendment, modification or waiver of the definition of "Expenses", any provision of Section 4, 8 or 9, any increase in the 180-day time period specified in Section 6(d) or any provisions or related definitions as to the number of requests for registration to which Holders are entitled under Section 2 or 3 hereof, or this Section 12, the written consent of each Holder so affected.

13.  Nominees for Beneficial Owners.

Except as provided otherwise below, a person or entity is deemed to be a Holder whenever such person or entity owns of record such Registrable Common Stock.  If any Registrable Common Stock is held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its election in writing delivered to the Company, be treated as the Holder of such Registrable Common Stock for purposes of any request or other action by any Holder or Holders pursuant to this Agreement or any determination of the number or percentage of shares of Registrable Common Stock held by any Holder or Holders contemplated by this Agreement. The Company may require assurances reasonably satisfactory to it of such owner's beneficial ownership of such Registrable Common Stock.  If the Company receives conflicting instructions, notices or elections from two or more persons or entities with respect to the same Registrable Common Stock, the Company will act upon the basis of instructions, notice or election received from the registered owner of such Registrable Common Stock.

14.  Assignment.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Any Holder may assign to any permitted Transferee (as permitted under applicable law) of its Registrable Common Stock all but not less than all of its rights and obligations under this Agreement, provided, that after giving effect to such Transfer, such Transferee shall hold 5% or more of the

22

outstanding shares of Common Stock; and, provided, further, that such Transferee shall agree in writing with the parties hereto prior to the assignment to be bound by this Agreement as if it were an original party hereto, whereupon such assignee shall for all purposes be deemed to be a Holder under this Agreement and the transferring Holder shall cease to have any rights under this Agreement.  Except as provided above or otherwise permitted by this Agreement, neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any Holder without the prior written consent of the other parties hereto. The Company may not assign this Agreement or any right, remedy, obligation or liability arising hereunder or by reason hereof.

15.    Calculation of Percentage or Number of Shares of Registrable Common Stock.

For purposes of this Agreement, all references to a percentage or number of shares of Registrable Common Stock or Common Stock shall be calculated based upon the number of shares of Registrable Common Stock or Common Stock, as the case may be, issued pursuant to the Plan and shall exclude any Registrable Common Stock or Common Stock, as the case may be, owned by the Company or any subsidiary of the Company.  For the purposes of calculating any percentage or number of shares of Registrable Common Stock or Common Stock as contemplated by the previous sentence, the terms "Holder" and "Original Holder" shall include all Affiliates thereof owning any shares of Registrable Common Stock or Common Stock.

16.    Notice of Registrable Common Stock Holdings.

From time to time, upon reasonable written request by the Company, each Holder will promptly advise the Company of the number of shares of Registrable Common Stock then held by it.

17.    Termination of Registration Rights.

714047.04-D.C. Server 1A                                                                                    MSW - Draft October 3, 2006 - 2:35 PM

The Company's obligations under Sections 2 and 3 hereof to register Common Stock for sale under the Securities Act shall commence on the Effective Date and terminate on the earlier to occur of (i) the first date on which no shares of Registrable Common Stock are held by any Original Holder or their permitted Transferees or (ii) the second anniversary of the Effective Date (such period, the "Term"); provided, however, that if at the end of the Term any Original Holder or its permitted Transferee shall hold at least 5% of the Registrable Common Stock, the Term shall be extended by the aggregate number of days that the Company postponed or suspended the use of any registration statement pursuant to Section 8 hereof.

18.    Applicability of Charter and By-laws.

Notwithstanding anything to the contrary herein, all applicable provisions of the Company's Amended and Restated Articles of Incorporation and Amended and Restated By-laws shall apply to this agreement and any actions taken hereunder as if set forth herein.

19.    Miscellaneous.

(a) Further Assurances  Each of the parties hereto shall execute such documents and other papers and perform such further acts as may be reasonably required or advisable to carry out the provisions of this Agreement and the transactions contemplated hereby.

(b) Headings.  The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

(c) Remedies.  Except as otherwise expressly provided for herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.  The election of any one or more remedies by any party hereto shall not constitute a waiver by any such party of the right to pursue any other available remedies.

Damages in the event of breach of this Agreement by a party hereto would be difficult, if not impossible, to ascertain, and it is therefore agreed that each such Person, in addition to and without limiting any other remedy or right it may have, will have the right to an injunction or other equitable relief in any court of competent jurisdiction, enjoining any such breach, and enforcing specifically the terms and provisions hereof and the Company and Holder, by its acquisition of Registrable Common Stock, hereby waives any and all defenses it may have on the ground of lack of jurisdiction or competence of the court to grant such an injunction or other equitable relief.  The existence of this right will not preclude any such Person from pursuing any other rights and remedies at law or in equity which such Person may have.

(d) Submission to Jurisdiction.

Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought in any federal court located in the State of New York or any New York state court, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably

24

waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such action, suit or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, service of process on such party as provided in Section 19(d) shall be deemed effective service of process on such party.

   (e)  Waiver of Jury Trial.

     EACH PARTY ACKNOWLEDGES THAT ANY DISPUTE THAT MAY ARISE OUT OF OR RELATING TO THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE SUCH PARTY HEREBY EXPRESSLY WAIVES ITS RIGHT TO JURY TRIAL OF ANY DISPUTE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER AGREEMENTS RELATING HERETO OR ANY DEALINGS AMONG THEM RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO ENCOMPASS ANY AND ALL ACTIONS, SUITS AND PROCEEDINGS THAT RELATE TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY REPRESENTS THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PARTY UNDERSTANDS AND WITH THE ADVICE OF COUNSEL HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND REPRESENTATIONS IN THIS SECTION 19(e).

   (f)  Service of Process.

     By the execution and delivery of this Agreement, the Company hereby appoints [  ] as its authorized agent upon which process may be served in any legal action or proceeding which may be instituted in any federal or state court in the Borough of Manhattan, The City of New York, arising out of or relating to this Agreement.  Service of process upon such agent at the office of such agent at [   ], and written notice of said service to the Company at its address set forth in Section 19(h) hereof, shall be deemed in every respect effective service of process upon the Company in any such legal action or proceeding.  Such appointment shall be irrevocable so long as the Holders shall have any rights pursuant to the terms thereof or of this Agreement until the appointment of a successor by the Company and such successor's acceptance of such appointment.  The Company further agrees to take any and all actions, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of such agent or successor

   (g)  Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and there are no

25

restrictions, promises, representations, warranties, covenants or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings among the parties hereto with respect to the subject matter hereof.

(h)  <u>Notices</u>.  Any notices or other communications to be given hereunder by any party to another party shall be in writing, shall be delivered personally, by facsimile, by certified or registered mail, postage prepaid, return receipt requested, or by Federal Express or other comparable delivery service, to the address of the party set forth on Schedule B hereto or to such other address as the party to whom notice is to be given may provide in a written notice to the other parties hereto, a copy of which shall be on file with the Secretary of the Company.  Notice shall be effective when delivered if given personally, when receipt is acknowledged if telecopied, three days after mailing if given by registered or certified mail as described above, and one business day after deposit if given by Federal Express or comparable delivery service.

(i)  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(j)  <u>Severability</u>.  Notwithstanding any other provision of this Agreement, neither the Company nor any other party hereto shall be required to take any action which would be in violation of any applicable Federal or state securities law.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(k)  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**WINN-DIXIE STORES, INC.**

By: _____

Name:

Title:

**[ORIGINAL HOLDERS]**

By: _____

Name:

Title:

27

SCHEDULE A

### HOLDERS OF REGISTRABLE COMMON STOCK

Original Holder

Number of
Shares Owned

SCHEDULE B

<u>NOTICES</u>

If to the Company, to:

Winn-Dixie Stores, Inc.
Attention:
[Address]

Tel:
Fax:

with a copy to:

[_____]


Tel:
Fax:

If to the Holders, to:

such Holder, at such Holder's address or to such Holder's telephone or telecopy number reflected in the Company's books and records

with a copy to:

[_____]

Tel:
Fax:

# D

# NEW EQUITY INCENTIVE PLAN

## WINN-DIXIE STORES, INC.

## EQUITY INCENTIVE PLAN

1.     <u>Purpose; Types of Awards; Construction.</u>

The purpose of the WINN-DIXIE STORES, INC. Equity Incentive Plan (the "Plan") is to promote the interests of the Company and its Subsidiaries and the stockholders of the Company by providing officers, employees, non-employee directors, consultants, and independent contractors of the Company and its Subsidiaries with appropriate incentives and rewards to encourage them to enter into and continue in the employ or service of the Company or its Subsidiaries, to acquire a proprietary interest in the long-term success of the Company and to reward the performance of individuals in fulfilling their personal responsibilities for long-range and annual achievements.  The Plan provides for the grant, in the sole discretion of the Committee, of options (including "incentive stock options" and "nonqualified stock options"), stock appreciation rights, restricted stock, restricted stock units, stock- or cash-based performance awards, and other stock-based awards.  The Plan is designed so that Awards granted hereunder which are intended to comply with the requirements for "performance-based compensation" under Section 162(m) of the Code may comply with such requirements, and the Plan and Awards shall be interpreted in a manner consistent with such requirements. Notwithstanding any provision of the Plan, to the extent that any Awards would be subject to Section 409A of the Code, this Plan and Awards shall be interpreted in a manner consistent with Section 409A of the Code and any regulations or guidance promulgated thereunder.

2.     <u>Definitions.</u>

For purposes of the Plan, the following terms shall be defined as set forth below:

(a)     "Award" means any Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Performance Awards, or Other Stock-Based Award granted under the Plan.

(b)     "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award.

(c)     "Board" means the Board of Directors of the Company.

(d)     "Cause" means, unless otherwise specified in the particular employment agreement applicable to the Grantee or the Award Agreement, that the Grantee has (a) continually failed to substantially perform, or been grossly negligent in the discharge of, his or her duties to the Company or any of its subsidiaries (in any case, other than by reason of a disability, physical or mental illness); (b) committed or engaged in an act of theft, embezzlement or fraud, (c) been convicted of or plead guilty or nolo contendere to a felony or a misdemeanor with respect to which fraud or dishonesty is a material element, (d) materially violated any material policy of the Company or any of its

Subsidiaries, or (e) intentionally engaged in any other action or inaction that the Committee determines was not taken in good faith for the best interests of the Company. Determination of Cause shall be made by the Committee in its sole discretion.

(e)        A "Change in Control" shall be deemed to have occurred if, after the Effective Date, the event set forth in any one of the following paragraphs shall have occurred:

(1)        any Person becomes after the six month anniversary of the Effective Date the "Beneficial Owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company (not including in the securities Beneficially Owned by such Person any securities acquired directly from the Company) representing 51% or more of the combined voting power of the Company's then outstanding securities, excluding any Person who becomes such a Beneficial Owner in connection with a transaction described in clause (i) of paragraph (3) below and excluding any Person who becomes such a Beneficial Owner solely by reason of the repurchase of shares by the Company; or

(2)        the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, on the Effective Date, constitute the Board of Directors and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Company) whose appointment or election by the Board of Directors or nomination for election by the Company's stockholders was approved or recommended by a vote of at least 51% of the directors then still in office who either were directors on the Effective Date or whose appointment, election or nomination for election was previously so approved or recommended; or

(3)        there is consummated a merger or consolidation of the Company or any Subsidiary with any other corporation, other than (i) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) at least 50% of the combined voting power of the voting securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (ii) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company (not including in the securities Beneficially Owned by such Person any securities acquired directly from the Company) representing 51% or more of the combined voting power of the Company's then outstanding securities; or

(4)        the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially

2

all of the Company's assets to an entity, at least 50% of the combined voting power of the voting securities of which are owned by Persons in substantially the same proportions as their ownership of the Company immediately prior to such sale.

Notwithstanding the foregoing, (1) a "Change in Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the holders of the common stock of the Company immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in an entity which owns all or substantially all of the assets of the Company immediately following such transaction or series of transactions, (2) a "Change in Control" shall not occur for purposes of the Plan as result of any primary or secondary offering of Company common stock to the general public through a registration statement filed with the Securities and Exchange Commission, (3) a "Change in Control" shall not be deemed to have occurred by virtue of the consummation of the Joint Plan of Reorganization of the Company and (4) for purposes of Awards subject to Section 409A of the Code, a "Change in Control" shall have occurred only if such Change in Control is also a "a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the Company's assets," within the meaning of Code Section 409A.

(f)     "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(g)     "Committee" shall mean the Compensation Committee of the Board, which shall consist of two or more persons, each of whom, unless otherwise determined by the Board, is an "outside director" within the meaning of Section 162(m) of the Code, a "nonemployee director" within the meaning of Rule 16b-3, and an "independent" director within the meaning of the listing requirements of the New York Stock Exchange or any other national securities exchange on which the Stock is principally traded.

(h)     "Company" means Winn-Dixie Stores, Inc., a corporation organized under the laws of the State of Florida, or any successor corporation.

(i)     "Covered Employee" shall have the meaning set forth in Section 162(m)(3) of the Code.

(j)     "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and as now or hereafter construed, interpreted and applied by regulations, rulings and cases.

(k)     "Fair Market Value" means, with respect to Stock or other property, the fair market value of such Stock or other property determined by such methods or procedures as shall be established from time to time by the Committee. Unless otherwise determined by the Committee in good faith, the per share Fair Market Value of Stock as of a particular date shall mean (i) the closing price per share of Stock on the national securities exchange on which the Stock is principally traded for such

3

particular date, or (ii) if the shares of Stock are then traded in an over-the-counter market, the average of the closing bid and asked prices for the shares of Stock in such over-the-counter market for such particular date, or (iii) if the shares of Stock are not then listed on a national securities exchange or traded in an over-the-counter market, such value as the Committee, in its sole discretion, shall determine.

(l)     "Grantee" means an officer, employee, non-employee director, consultant, or independent contractor of the Company or any Subsidiary of the Company that has been granted an Award under the Plan.

(m)     "Harmful Conduct" means, unless otherwise specified in the Award Agreement, (i) a breach in any material respect of an agreement to not reveal confidential information regarding the business operations of the Company or any Affiliate or an agreement to refrain from solicitation of the customers, suppliers or employees of the Company or any Affiliate, or (ii) a violation of any of the restrictive covenants contained in the Grantee's employment, severance or other agreement with the Company, or any of its Affiliates.

(n)     "ISO" means any Option intended to be and designated as an incentive stock option within the meaning of Section 422 of the Code.

(o)     "NQSO" means any Option that is not designated as an ISO.

(p)     "Option" means a right, granted to a Grantee under Section 6(b)(i) of the Plan, to purchase shares of Stock.  An Option may be either an ISO or an NQSO.

(q)     "Other Stock-Based Award" means a right or other interest granted to a Grantee under Section 6(b)(vi) of the Plan that may be denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock.

(r)     "Performance Award" means a right or other interest granted to a Grantee under Section 6(b)(v) of the Plan that may be payable in cash or may be denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock and which is awarded upon the attainment of Performance Goals.

(s)     "Performance Goals" means performance goals pre-established by the Committee in its sole discretion, based on one or more of the following criteria (as determined in accordance with generally accepted accounting principles): revenue growth, earnings (including earnings before taxes, earnings before interest and taxes, or earnings before interest, taxes, depreciation and amortization), operating income, pre- or after-tax income, cash flow (before or after dividends), earnings per share, return on capital, return on equity, return on capital (including return on total capital or return on invested capital), cash flow return on investment, return on assets, market share or penetration, business expansion, share price performance, total shareholder return, improvement in or attainment of expense levels or expense ratios, employee and/or customer satisfaction,

4

customer retention, and any combination of, or a specified increase in, any of the foregoing. The performance goals may be based upon the attainment of specified levels of performance by the Company, or a business unit, division, Subsidiary, or business segment of the Company.  In addition, the performance goals may be based upon the attainment of specified levels of performance under one or more of the measures described above relative to the performance of other entities. To the extent permitted under Section 162(m) of the Code (including, without limitation, compliance with any requirements for stockholder approval), the Committee in its sole discretion may designate additional business criteria on which the performance goals may be based or adjust, modify or amend the aforementioned business criteria, including without limitation, performance goals based on the Grantee's individual performance. Performance Goals may include a threshold level of performance below which no Award will be earned, a level of performance at which the target amount of an Award will be earned and a level of performance at which the maximum amount of the Award will be earned.  Measurement of performance relative to Performance Goals shall exclude the impact of losses or charges in connection with restructurings or discontinued operations. In addition, the Committee in its sole discretion shall have the authority to make equitable adjustments to the Performance Goals in recognition of unusual or non-recurring events affecting the Company or any Subsidiary of the Company or the financial statements of the Company or any Subsidiary of the Company, in response to changes in applicable laws or regulations, including changes in generally accepted accounting principles or practices, or to account for items of gain, loss or expense determined to be extraordinary or unusual in nature or infrequent in occurrence or related to the disposal of a segment of a business or related to a change in accounting principles, as applicable.

(t)       "Person" shall have the meaning set forth in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (1) the Company or any Subsidiary, (2) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any Subsidiary, (3) an underwriter temporarily holding securities pursuant to an offering of such securities, or (4) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(u)       "Plan" means this Winn-Dixie Stores, Inc. Equity Incentive Plan, as amended from time to time.

(v)       "Repricing" shall have the meaning set forth in Section 3 of the Plan.

(w)       "Restricted Stock" means an Award of shares of Stock to a Grantee under Section 6(b)(iii) of the Plan that may be subject to certain restrictions and to a risk of forfeiture.

(x)       "Restricted Stock Unit" means a right granted to a Grantee under Section 6(b)(iv) of the Plan to receive Stock or cash at the end of a specified

5

deferral period, which right may be conditioned on the satisfaction of specified performance or other criteria.

(y)      "Rule 16b-3" means Rule 16b-3, as from time to time in effect promulgated by the Securities and Exchange Commission under Section 16 of the Exchange Act, including any successor to such Rule.

(z)      "Stock" means shares of the common stock, par value $.01 per share, of the Company.

(aa)     "Stock Appreciation Right" or "SAR" means the right, granted to a Grantee under Section 6(b)(ii) of the Plan, to be paid an amount measured by the appreciation in the Fair Market Value of Stock from the date of grant to the date of exercise of the right.

(bb)     "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

(cc)     "Total Authorized Shares" shall have the meaning set forth in Section 5 of the Plan.

(dd)     "Substitute Awards" means Awards granted or shares of Stock issued by the Company in assumption of, or in substitution or exchange for, awards previously granted by a company acquired by the Company or any Subsidiary or with which the Company or any Subsidiary combines.

3.      Administration.

The Plan shall be administered by the Committee.  The Committee shall have the authority in its sole discretion, subject to and not inconsistent with the express provisions of the Plan, to administer the Plan and to exercise all the powers and authorities either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan, including, without limitation, the authority to grant Awards; to determine the persons to whom and the time or times at which Awards shall be granted; to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate and the terms, conditions, restrictions and performance criteria relating to any Award or the issuance of Stock pursuant to any Award; to determine Performance Goals no later than such time as required to ensure that an underlying Award which is intended to comply with the requirements of Section 162(m) of the Code so complies; and to determine whether, to what extent, and under what circumstances an Award may be settled, cancelled, forfeited, exchanged, or surrendered; to make adjustments in the terms and conditions of, and the Performance Goals (if any) included in, Awards; to construe and interpret the Plan and any Award; to prescribe, amend and rescind rules and regulations relating to the Plan; to determine the terms and provisions of the Award Agreements (which need not be identical for each Grantee); and to make all other determinations deemed necessary or advisable for the administration of the Plan. Notwithstanding the foregoing, neither the Board, the Committee nor their respective delegates shall have the authority without first obtaining the approval of the

6

Company's stockholders to reprice (or cancel and regrant) any Option or SAR or, if applicable, other Award at a lower exercise, base or purchase price, to cancel any Option or SAR in exchange for cash or another Award if such cancellation has the same effect as lowering the exercise, base or purchase price of such Option or SAR, or to take any other action with respect to an Award that would be treated as a repricing under the rules and regulations of the principal securities market on which the Stock is traded (any such actions, a "Repricing").

All determinations of the Committee shall be made by a majority of its members either present in person or participating via video conference or other electronic means, at a meeting, or by written consent.  The Committee may delegate to one or more of its members or to one or more executive officers or other agents such administrative duties as it may deem advisable (including the authority to grant Awards to non-officers), and the Committee or any person to whom it has delegated duties as aforesaid may employ one or more persons to render advice with respect to any responsibility the Committee or such person may have under the Plan.  All decisions, determinations and interpretations of the Committee shall be final and binding on all persons, including but not limited to the Company, any Subsidiary of the Company, or Grantee (or any person claiming any rights under the Plan from or through any Grantee) and any stockholder.

No member of the Board or Committee shall be liable for any action taken or determination made in good faith with respect to the Plan or any Award granted hereunder.

4.    Eligibility.

Awards may be granted to officers, employees, non-employee directors, consultants, or independent contractors of the Company or its Subsidiaries.  In determining the persons to whom Awards shall be granted and the number of shares to be covered by each Award, the Committee may take into account the duties of the respective persons, their present and potential contributions to the success of the Company or its Subsidiaries and such other factors as the Committee shall deem relevant in connection with accomplishing the purposes of the Plan.

5.    Stock Subject to the Plan.

(a)    The maximum number of shares of Stock reserved for the grant of Awards under the Plan shall be [INSERT NUMBER THAT IS 10% OF OUTSTANDING AS OF DISTRIBUTION DATE] shares of Stock, subject to adjustment as provided herein ("Total Authorized Shares").  Subject to adjustment as provided herein, no more than [forty percent (40%)] of the Total Authorized Shares may be awarded under the Plan in the aggregate in respect of Awards other than Options and SARs.  If any shares of Stock subject to an Award are forfeited, cancelled, exchanged, surrendered, or if an Award terminates or expires without a distribution of shares to the Grantee, the applicable number of shares of Stock with respect to such Award (determined in a manner consistent with the immediately preceding sentence) shall, to the extent of any such forfeiture, cancellation or exchange, again be available for Awards

under the Plan.  Upon the exercise of any Award granted in tandem with any Awards such related Awards shall be cancelled to the extent of the number of shares of Stock as to which the Award is exercised and, notwithstanding the foregoing, such number of shares shall no longer be available for Awards under the Plan.  Substitute Awards shall not reduce the shares of Stock reserved for the grant of Awards under the Plan or authorized for Awards granted to an individual.

(b)     Subject to adjustment as provided herein, (i) no more than [     ][1] shares of Stock may be made subject to Awards of Options and SARs granted to an individual in any consecutive twelve month period, (ii) no more than [     ][2] shares of Stock may be made subject to Awards other than Awards of Options and SARs granted to an individual in any consecutive twelve month period and (iii) no [     ][3] shares of stock may be issued pursuant to exercise of ISOs.   Determinations made in respect of the limitations set forth in the immediately preceding sentence shall be made in a manner consistent with Section 162(m) of the Code.

(c)     Shares of Stock may, in whole or in part, be authorized but unissued shares or shares of Stock that shall have been or may be reacquired by the Company in the open market, in private transactions or otherwise.

(d)     In the event that any dividend or other distribution (whether in the form of cash, Stock, or other property), recapitalization, Stock split, reverse split, reorganization, merger, consolidation, spin-off, combination, repurchase, or share exchange, or other similar corporate transaction or event, affects the Stock such that an adjustment is appropriate in order to prevent dilution or enlargement of the rights of Grantees under the Plan, then the Committee shall make such equitable changes or adjustments to any or all of the following in order to prevent such dilution or enlargement of rights: (i) the maximum number and kind of shares of Stock or other property (including cash) that may be issued hereunder in connection with Awards, (ii) the maximum number of shares of Stock that may be made subject to Awards to any individual, (iii) the number and kind of shares of Stock or other property (including cash) issued or issuable in respect of outstanding Awards, (iv) the exercise price, grant price, or purchase price relating to any Award; provided, that, with respect to ISOs, such adjustment shall be made in accordance with Section 424(h) of the Code; and (v) the Performance Goals applicable to outstanding Awards.

6.     Specific Terms of Awards.

---

[1]   40% of Total Authorized.

[2]   40% of Total Authorized.

[3]   50% of Total Authorized.

(a)    General.  The term of each Award shall be for such period as may be determined by the Committee.  Subject to the terms of the Plan and any applicable Award Agreement, payments to be made by the Company or any Subsidiary of the Company upon the grant, maturation, or exercise of an Award shall be made in such forms as the Committee shall determine at the date of grant or thereafter, including, without limitation, cash, Stock, or other property, and on such other terms and conditions set forth in the Award Agreement (to the extent consistent with the Plan).  The Committee may make rules relating to any permitted installment or deferred payments with respect to Awards, including the rate of interest to be credited with respect to such payments.

(b)    Types of Awards.  The Committee is authorized to grant the Awards described in this Section 6(b), under such terms and conditions as deemed by the Committee to be consistent with the purposes of the Plan.  Such Awards may be granted with value and payment contingent upon the achievement of Performance Goals.  Unless otherwise determined by the Committee, each Award shall be evidenced by an Award Agreement containing such terms and conditions applicable to such Award as the Committee shall determine at the date of grant or thereafter.

(i)    Options.  The Committee is authorized to grant Options to Grantees on the following terms and conditions:

(A)    Type of Award.  The Award Agreement evidencing the grant of an Option under the Plan shall designate the Option as an ISO or an NQSO.

(B)    Exercise Price.  The exercise price per share of Stock purchasable under an Option shall be determined by the Committee, but, except for outstanding awards assumed, converted or replaced in connection with a corporate transaction, in no event shall the exercise price of any Option be less than the Fair Market Value of a share of Stock on the date of grant of such Option.  The exercise price for Stock subject to an Option may be paid in cash or by an exchange of Stock previously owned by the Grantee, through a "broker cashless exercise" procedure approved by the Committee, a combination of the above, or any other method approved the Committee, in any case in an amount having a combined value equal to such exercise price.

(C)    Term and Exercisability of Options.  Unless the Committee determines otherwise, the date on which the Committee adopts a resolution expressly granting an Option shall be considered the day on which such Option is granted.  Options shall be exercisable over the exercise period (which shall not exceed seven years from the date of grant), at such times and upon such conditions as the Committee may determine, as reflected in the Award Agreement.  An Option may be exercised to the extent

9

of any or all full shares of Stock as to which the Option has become exercisable, by giving written notice of such exercise to the Committee or its designated agent.

(D)    Other Provisions.  Options may be subject to such other conditions including, but not limited to, restrictions on transferability of the shares of Stock acquired upon exercise of such Options, as the Committee may prescribe in its discretion or as may be required by applicable law.

(ii)    SARs.  The Committee is authorized to grant SARs to Grantees on the following terms and conditions:

(A)    In General.  SARs may be granted independently or in tandem with an Option at the time of grant of the related Option.  An SAR granted in tandem with an Option shall be exercisable only to the extent the underlying Option is exercisable.  Payment of an SAR may be made in cash, Stock, property, or a combination of the foregoing, as specified in the Award Agreement or determined in the sole discretion of the Committee.

(B)    Term and Exercisability of SARs.  Unless the Committee determines otherwise, the date on which the Committee adopts a resolution expressly granting an SAR shall be considered the day on which such SAR is granted.  SARs shall be exercisable over the exercise period (which shall not exceed ten years from the date of grant), at such times and upon such conditions as the Committee may determine, as reflected in the Award Agreement; provided, that (i) subject to clause (ii) below, no SAR granted to an employee of the Company or a Subsidiary (other than Substitute Awards) shall vest prior to the first anniversary of the date on which the SAR is granted and (ii) the Committee shall have the authority to accelerate the exercisability of any outstanding SAR at such time and under such circumstances as it, in its sole discretion, deems appropriate.

(C)    Payment.  An SAR shall confer on the Grantee a right to receive an amount with respect to each share of Stock subject thereto, upon exercise thereof, equal to the excess of (1) the Fair Market Value of one share of Stock on the date of exercise over (2) the grant price of the SAR (which in the case of an SAR granted in tandem with an Option shall be equal to the exercise price of the underlying Option, and which in the case of any other SAR shall be such price as the Committee may determine but in no event shall be less than the Fair Market Value of a share of Stock on the date of grant of such SAR).  A SAR may

10

be exercised by giving written notice of such exercise to the Committee or its designated agent.

(iii)    Restricted Stock.  The Committee is authorized to grant Restricted Stock to Grantees on the following terms and conditions:

(A)    Issuance and Restrictions.  Restricted Stock shall be subject to such restrictions on transferability and other restrictions, if any, as the Committee may impose at the date of grant or thereafter, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Committee may determine.  The Committee shall have the authority to accelerate the exercisability of any outstanding award of Restricted Stock at such time and under such circumstances as it, in its sole discretion, deems appropriate. Except to the extent restricted under the Award Agreement relating to the Restricted Stock, a Grantee granted Restricted Stock shall have all of the rights of a stockholder including, without limitation, the right to vote Restricted Stock and the right to receive dividends thereon.

(B)    Certificates for Stock.  Restricted Stock granted under the Plan may be evidenced in such manner as the Committee shall determine.  If certificates representing Restricted Stock are registered in the name of the Grantee, such certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, and the Company shall retain physical possession of the certificate.

(C)    Dividends.  Except to the extent restricted under the applicable Award Agreement, dividends paid on Restricted Stock shall be paid at the dividend payment date in cash or in shares of unrestricted Stock having a Fair Market Value equal to the amount of such dividends.  Stock distributed in connection with a stock split or stock dividend, and other property distributed as a dividend, shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Stock with respect to which such Stock or other property has been distributed.

(iv)    Restricted Stock Units.  The Committee is authorized to grant Restricted Stock Units to Grantees, subject to the following terms and conditions:

(A)    Conditions to Vesting.  At the time of the grant of Restricted Stock Units, the Committee may impose such restrictions or conditions to the vesting of such Awards as it, in its

11

discretion, deems appropriate, including, but not limited to, the achievement of Performance Goals.  The Committee shall have the authority to accelerate the settlement of any outstanding award of Restricted Stock Units at such time and under such circumstances as it, in its sole discretion, deems appropriate.

(B)    <u>Delivery of Shares</u>.  Unless otherwise provided in an Award Agreement or except as otherwise provided in the Plan, upon the vesting of a Restricted Stock Unit there shall be delivered to the Grantee, within 30 days of the date on which such Award (or any portion thereof) vests, that number of shares of Stock equal to the number of Restricted Stock Units becoming so vested.

(C)    <u>Dividend Equivalents</u>.  Subject to the requirements of Section 409A of the Code, an Award of Restricted Stock Units may provide the Grantee with the right to receive dividend equivalent payments with respect to Stock subject to the Award (both before and after the Stock subject to the Award is earned or vested), which payments may be either made currently or credited to an account for the Participant, and may be settled in cash or Stock, as determined by the Committee.  Any such settlements and any such crediting of dividend equivalents may be subject to such conditions, restrictions and contingencies as the Committee shall establish, including the reinvestment of such credited amounts in Stock equivalents.

(D)    <u>Deferrals</u>.  The Committee may require or permit Grantees to elect to defer the delivery of shares of Stock that would otherwise be due by virtue of the vesting of the Restricted Stock Units under such rules and procedures as the Committee shall establish; provided, however, to the extent that such deferral is subject to Section 409A of the Code, the rules and procedures established by the Committee shall comply with Section 409A of the Code.

(v)    <u>Performance Awards</u>.  The Committee is authorized to grant Performance Awards to Grantees, which may be denominated in cash or shares of Stock and payable either in shares of Stock, in cash, or in a combination of both.  Such Performance Awards shall be granted with value and payment contingent upon the achievement of Performance Goals and such goals shall relate to periods of performance of not less than one calendar year.  The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter.  The maximum amount that any Grantee may receive with respect to cash-based Performance Awards pursuant to this Section 6(b)(v)

12

whether payable in cash or in shares of Stock in respect of any performance period is $5,000,000. Payments earned hereunder may be decreased or, with respect to any Grantee who is not a Covered Employee, increased in the sole discretion of the Committee based on such factors as it deems appropriate and no Grantee shall have any right to any particular payment or distribution unless and until the Committee certifies that the applicable Performance Goals have been achieved and the Committee has determined the final amount of such payment or distribution. No payment shall be made to a Covered Employee prior to the certification by the Committee that the Performance Goals have been attained. The Committee may establish such other rules applicable to the Performance-Based Awards to the extent not inconsistent with Section 162(m) of the Code.

(vi)     Other Stock-Based Awards. The Committee is authorized to grant Awards to Grantees in the form of Other Stock-Based Awards, as deemed by the Committee to be consistent with the purposes of the Plan. The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter (including, in the discretion of the Committee, the right to receive dividend equivalent payments with respect to Stock subject to the Award).

(c)     Termination of Service. Except as otherwise set forth in the Award Agreement, (1) upon the Grantee's termination of service with the Company or any of its Subsidiaries, the Grantee shall have 90 days following the date of such termination of service to exercise any portion of an Option or SAR that the Grantee could have exercised on the date of such termination of service; provided, however, that such exercise must be accomplished prior to the expiration of the Award term; (2) if the Grantee 's termination of service is due to total and permanent disability (as defined in any agreement between the Grantee and the Company or, if no such agreement is in effect, as determined by the Committee in its good faith discretion) or death, the Grantee, or the representative of the estate of the Grantee, as the case may be, may exercise any portion of the Option or SAR which the Grantee could have exercised on the date of such termination for a period of one year thereafter, regardless of the otherwise scheduled expiration of the Award term; and (3) in the event of a termination of the Grantee's service with the Company or any of its Subsidiaries for Cause, the unexercised portion of the Option or SAR shall terminate immediately and the Grantee shall have no right thereafter to exercise any part of the Award.

(d)     Forfeiture/ Repayment of Awards. In addition to the forfeiture of Awards as provided in Section 6(c), if the Grantee engages in Harmful Conduct, prior to or following termination of employment, the Grantee shall forfeit any then outstanding Award, and shall return to the Company, without consideration, any shares of Stock owned by the Grantee that were previously subject to an Award and any cash amounts previously paid to a Grantee in respect of an Award. To the extent the

shares of Stock subject to this Section 6(d) have been previously sold or otherwise disposed of by the Grantee during the twelve-month period preceding the Grantee engaging in Harmful Conduct, the Grantee shall repay to the Company the aggregate Fair Market Value of such shares of Stock on the date of such sale or disposition, less any amounts paid to the Company for such shares.  In addition, to the extent set forth in the Award Agreement, if the Company is required to restate its financial statements, the Company may require that a Grantee repay to the Company the aggregate Fair Market Value of any Award (regardless of whether such Award was payable in shares of Stock or cash) that vested upon the attainment of Performance Goals to the extent such Performance Goals would not have been achieved had such restatement not been required.

> 7.    Change in Control Provisions.

(a)    Unless otherwise determined in an Award Agreement, in the event of a Change of Control, (i) all Awards shall become fully vested and exercisable, (ii) the restrictions, payment conditions, and forfeiture conditions applicable to any such Award granted shall lapse, and (iii) and any performance conditions imposed with respect to Awards shall be deemed to be fully achieved and with respect to each outstanding Award that is assumed or substituted in connection with a Change in Control, such Award shall remain subject to the same terms and conditions that were applicable to the Award immediately prior to the Change in Control except that the Award shall confer the right to purchase or receive, for each share subject to the Option, SAR, award of Restricted Stock, award of Restricted Stock Units, Performance Award, or Other Stock-Based Award the consideration (whether stock, cash or other securities or property) received in the Change in Control by holders of shares of Stock for each share of Stock held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the greatest number of holders of the outstanding shares).  Notwithstanding any other provision of the Plan, in the event of a Change in Control in which the consideration paid to the holders of shares of Stock is solely cash, the Committee may, in its discretion, provide that each Award shall, upon the occurrence of a Change in Control, be cancelled in exchange for a payment in an amount equal to (i) the excess of the consideration paid per share of Stock in the Change in Control over the exercise or purchase price (if any) per share of Stock subject to the Award multiplied by (ii) the number of Shares granted under the Option or SAR.  In the event of any Change in Control or any other merger, consolidation or other reorganization in which the Company participates or that affects shares of Stock, all of the Company's obligations regarding any Awards that were granted hereunder and that are outstanding on the date of such event shall, on such terms as may be approved by the Committee prior to such event, be assumed by the surviving or continuing corporation or canceled in exchange for property (including cash) in an amount determined by the Committee in its sole discretion to be appropriate.

> 8.    General Provisions.

(a)    Nontransferability.  Unless otherwise determined by the Committee, Awards shall not be transferable by a Grantee except by will or the laws of

descent and distribution and shall be exercisable during the lifetime of a Grantee only by such Grantee or his guardian or legal representative.

(b)    No Right to Continued Employment, etc.  Nothing in the Plan or in any Award, any Award Agreement or other agreement entered into pursuant hereto shall confer upon any Grantee the right to continue in the employ or service of the Company or Subsidiary of the Company or to be entitled to any remuneration or benefits not set forth in the Plan or such Award Agreement or other agreement or to interfere with or limit in any way the right of the Company or any such Subsidiary to terminate such Grantee's employment or independent contractor relationship.

(c)    Taxes.  Prior to the settlement of any Award, the Grantee shall be required to pay to the Company in cash all federal, state and local taxes required to be withheld in respect of such settlement.  The Committee may provide in the Award Agreement that in the event that a Grantee is required to pay any amount to be withheld in connection with the issuance of shares of Stock in settlement or exercise of an Award, such withholding and other taxes shall be satisfied with shares of Stock to be received upon settlement or exercise of such Award equal to the minimum amount required to be withheld.  Notwithstanding the foregoing, the Company is authorized to take such action as the Committee deems advisable to enable the Company and Grantees to satisfy obligations for the payment of withholding taxes and other tax obligations relating to any Award.

(d)    Stockholder Approval; Amendment and Termination.

(i)    The Plan shall take effect upon the effective date of the Joint Plan of Reorganization of the Company (the "Effective Date").

(ii)    The Board may at any time and from time to time alter, amend, suspend, or terminate the Plan in whole or in part; provided, however, that unless otherwise determined by the Board, an amendment that results in a Repricing and an amendment that requires stockholder approval in order for the Plan to continue to comply with Section 162(m) or any other law, regulation or stock exchange requirement shall not be effective unless approved by the requisite vote of stockholders.  Notwithstanding the foregoing, no amendment to or termination of the Plan shall affect adversely any of the rights of any Grantee, without such Grantee's consent, under any Award theretofore granted under the Plan.

(e)    Expiration of Plan.  Unless earlier terminated by the Board pursuant to the provisions of the Plan, the Plan shall expire on the tenth anniversary of the date of the Plan's adoption by the Board.  No Awards shall be granted under the Plan after such expiration date.  The expiration of the Plan shall not affect adversely any of the rights of any Grantee, without such Grantee's consent, under any Award theretofore granted.

15

(f)     <u>No Rights to Awards; No Stockholder Rights</u>.  No Grantee shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Grantees.   Except as provided specifically herein, a Grantee or a transferee of an Award shall have no rights as a stockholder with respect to any shares of Stock covered by the Award until the date of the issuance of a Stock certificate to him for such shares or the issuance of shares to him in book-entry form.

(g)     <u>Unfunded Status of Awards</u>.  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any payments not yet made to a Grantee pursuant to an Award, nothing contained in the Plan or any Award shall give any such Grantee any rights that are greater than those of a general creditor of the Company.

(h)     <u>No Fractional Shares</u>.  No fractional shares of Stock shall be required to be issued or delivered pursuant to the Plan or any Award.  The Committee shall determine whether cash, other Awards, or other property shall be issued or paid in lieu of such fractional shares of Stock or whether such fractional shares or any rights thereto shall be forfeited or otherwise eliminated.

(i)     <u>Regulations and Other Approvals</u>.

(i)     The obligation of the Company to sell or deliver Stock with respect to any Award granted under the Plan shall be subject to all applicable laws, rules and regulations, including all applicable federal and state securities laws, and the obtaining of all such approvals by governmental agencies as may be deemed necessary or appropriate by the Committee.

(ii)     Each Award is subject to the requirement that, if at any time the Committee determines, in its absolute discretion, that the listing, registration or qualification of Stock issuable pursuant to the Plan is required by any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body is necessary or desirable as a condition of, or in connection with, the grant of an Award or the issuance of Stock, no such Award shall be granted or payment made or Stock issued, in whole or in part, unless listing, registration, qualification, consent or approval has been effected or obtained free of any conditions not acceptable to the Committee.

(iii)     In the event that the disposition of Stock acquired pursuant to the Plan is not covered by a then current registration statement under the Securities Act and is not otherwise exempt from such registration, such Stock shall be restricted against transfer to the extent required by the Securities Act or regulations thereunder, and the Committee may require a Grantee receiving Stock pursuant to the Plan, as a condition precedent to receipt of

16

such Stock, to represent to the Company in writing that the Stock acquired by such Grantee is acquired for investment only and not with a view to distribution.

(j)    Governing Law.  The Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Florida without giving effect to the conflict of laws principles thereof.

(k)    Foreign Employees.  Awards may be granted to employees who are foreign nationals or employed outside the United States, or both, on such terms and conditions different from those applicable to Awards to employees employed in the United States as may, in the judgment of the Committee, be necessary or desirable in order to recognize differences in local law or tax policy.  The Committee also may impose conditions on the exercise or vesting of Awards in order to minimize the Company's obligation with respect to tax equalization for employees on assignments outside their home country.

# E

# DESIGNATION OF DIRECTORS

**DESIGNATION OF DIRECTORS PURSUANT TO SECTION 6.7(a) OF
JOINT PLAN OF REORGANIZATION OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS**

Pursuant to Section 6.7(a) of the Plan, the New Board of Reorganized Winn-Dixie will be comprised of nine (9) directors, which will include the Debtors' Chief Executive Officer, one (1) individual reasonably acceptable to the Creditors Committee, and seven (7) individuals selected by the Creditors Committee.  Accordingly, subject to confirmation of the Plan and the occurrence of the Effective Date, the following individuals have been designated to serve on the New Board:

- *Peter L. Lynch:*  Mr. Lynch has served as President and CEO of Winn-Dixie since December 2004.  Mr. Lynch was a private investor from July 2003 to December 2004. From March 2000 to July 2003, he served as the President and Chief Operating Officer of Albertson's, Inc.  From June 1999 to March 2000, Mr. Lynch served as Executive Vice President of Operations at Albertson's, Inc.  Mr. Lynch holds a B.S. in Finance from Nichols College.

- *Ronald E. Elmquist*:  Mr. Elmquist has served as President and CEO of Qualserve Corporation since 2005. He has served as a director of RadioShack Corporation since 1997. Mr. Elmquist was formerly President and CEO of Submitorder, Inc.; Chairman, President and CEO of Keystone Automotive Operations, Inc.; President of  Global Food Services and Corporate Vice President at Campbell Soup Company, Inc.; and Chairman, President and CEO of W.S. Holdings Corporation and White Swan, Inc. He has also held senior positions at Fleming Companies, Inc., PYA Monarch, Inc., and Sysco Corporation.  Mr. Elmquist graduated from the University of Illinois in 1970 with a B.B.A. in Business Administration.

- *Evelyn V. Follit*:  Ms. Follit has served in various positions at RadioShack Corporation from 1997 to 2005 including:  Senior Vice President, Chief Organizational Enabling Services Officer and Chief Information Officer. Ms. Follit is currently a director of Catalina Marketing Corporation and GetConnected, Inc. She has previously held senior positions at A.C. Nielsen Corporation, D&B Corporation, ITT Industries and IBM Corporation.  Ms. Follit graduated from City University of New York in 1970 with a B.A. She also obtained an M.B.A. in Finance and Information Systems from Pace University in 1977.

- *Charles P. Garcia*:  Mr. Garcia currently serves as President of the Sterling Hispanic Capital Markets Group at vFinance, Inc. Mr. Garcia was founder, CEO and Chairman of Sterling Financial Investment Group, Inc. A graduate of the U.S. Air Force Academy, he served as a White House Fellow in 1988 and former intelligence officer for the U.S. Department of State from 1988 to 1992.  Mr. Garcia is a director of several not-for-profit organizations, including the U.S. Air Force Academy, the American Bar Association, and Read On! Foundation.  Mr. Garcia graduated from the United States Air Force Academy with a B.S. in 1983.  Mr. Garcia also graduated from the University of Oklahoma in 1987 with an M.A. in Public Administration and received a J.D. from Columbia University Law School in 1994.

- *Jeffrey C. Girard*:  Mr. Girard has served as Vice Chairman, Finance and Administration at Shopko Stores, Inc. from 2002 to 2004. Earlier in his career he served in senior management roles at Supervalu, Inc., Supermarkets General Corporation, Pathmark Stores, Inc., and Standard Brands, Inc. Mr. Girard received a B.A. in Economics from Michigan State University in 1968.  He graduated from Columbia University Graduate School of Business in 1973 with an M.B.A.

- *Yvonne R. Jackson*:  Ms. Jackson is the founder and President of BeecherJackson.  Between 1993 and 2005, Ms. Jackson served as Senior Vice President, Human Resources for Pfizer, Inc., Compaq Computer Corporation, and Burger King Corporation. From 1979 to 1993 she served in a number of human resources positions at Avon Products, Inc., including Vice President, Human Resources for the U.S. division. She began her career as a personnel manager at Sears, Roebuck & Co. Ms. Jackson graduated from Spelman College in 1970 with a B.A. in Liberal Arts.

- *Gregory P. Josefowicz*:  Mr. Josefowicz is the former Chairman, President and CEO of Borders Group, Inc. and is currently a director of PetSmart, Inc. and Ryerson, Inc. Mr. Josefowicz joined Borders as President and CEO in 1999 after having served as President of the Midwest Region of Albertson's, Inc. He also held several senior positions at Jewel Food Stores and served as a director of Spartan Stores, Inc.  Mr.

Josefowicz graduated from Michigan State University in 1974 with a B.A. in Marketing and from the J.L. Kellogg Graduate School of Management (Northwestern University) in 1976 with an M.A. in Management.

- *Terry Peets*:  Mr. Peets is a senior advisor to J.P. Morgan Partners and serves as a director of Berry Plastics, Inc., Pinnacle Foods Group, Inc., Ruiz Foods, Inc., and WKI Holding Company, Inc. Mr. Peets has served as Chairman of Bruno's Supermarkets, Inc.; President, CEO and a director of Pia Merchandising Company, Inc.; Executive Vice President of Vons Companies, Inc.; and Executive Vice President of Ralph's Grocery Company.  Mr. Peets graduated from Pepperdine University in 1983 with an M.B.A. in Business Management.

- *Richard E. Rivera*:  Mr. Rivera is the President and CEO of Rubicon Enterprises, LLC and currently serves as a director of the National Restaurant Association.  Mr. Rivera has served as Vice Chairman, President and Chief Operating Officer at Darden Restaurants, Inc. and as President of Darden's Red Lobster chain. He has also served as President and CEO of Chart House Enterprises, Inc., Rare Hospitality International, Inc., and TGI Friday's, Inc. (a division of Carlson Companies, Inc.).  He has also held senior positions at W.R. Grace & Company (President of Del Taco Corporation); Annheuser-Busch Companies, Inc. (President of El Chico Corporation); and Grand Metropolitan plc (various positions, including Executive Vice President at Steak & Ale Restaurants of America).  Mr. Rivera graduated from Washington and Lee University in 1968 with a B.A. in Liberal Arts.

In the event that any of the foregoing determine before the Effective Date that they are unable to serve, and so notify the Debtors and the Creditors Committee, a replacement will be designated in an amended designation of directors to be filed with the Bankruptcy Court.

# F

# CLAIM SETTLEMENT PROTOCOLS

## CLAIM SETTLEMENT PROTOCOLS PURSUANT TO SECTION 12.20 OF
## JOINT PLAN OF REORGANIZATION OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS

1.    The Reorganized Debtors shall not settle or compromise any Landlord Claim, Vendor/Supplier Claim or Other Unsecured Claim in excess of an Allowed amount of $250,000 without either the approval of the Post-Effective Date Committee (which shall act by majority vote) or an order of the Bankruptcy Court.  Subject to the approval of the Post-Effective Date Committee, the Reorganized Debtors may settle or compromise any Landlord Claim, Vendor/Supplier Claim or Other Unsecured Claim at an Allowed amount that exceeds $250,000 without an order of the Bankruptcy Court.  The Reorganized Debtors may settle or compromise any Landlord Claim, Vendor/Supplier Claim or Other Unsecured Claim at an Allowed amount of $250,000 or less without an order of the Bankruptcy Court and without the approval of the Post-Effective Date Committee.

2.    With respect to any compromise or settlement that is subject to approval by the Post-Effective Date Committee as provided in paragraph 1 above, (a) the Reorganized Debtors shall seek such approval by delivering a written request to the Post-Effective Date Committee's counsel (c/o Matthew Barr and Michael Comerford) by email and fax; (b) the Post-Effective Date Committee shall have a period of three (3) business days (or such other period of time agreed to among the Reorganized Debtors and Post-Effective Date Committee) from the time of such delivery to review, and if necessary object to, the proposed compromise or settlement; (c) any objection by the Post-Effective Date Committee to any such request shall be delivered in writing to the Reorganized Debtors' counsel (c/o Jay Castle and James Post) by email and fax; (d) in the event of any objection by the Post-Effective Date Committee, the proposed compromise or settlement shall not be consummated by the Reorganized Debtors until and unless such objection is resolved by agreement of the Reorganized Debtors and the Post-Effective Date Committee, or the Bankruptcy Court otherwise enters an order approving such settlement or compromise on motion of the Reorganized Debtors, upon notice to counsel to the Post-Effective Date Committee; and (e) any written request delivered to the Post-Effective Date Committee in accordance with this that is not objected to by the Post-Effective Date Committee within three (3) business days (or such other period of time agreed to among the Reorganized Debtors and Post-Effective Date Committee) from the time of delivery shall be deemed approved by the Post-Effective Date Committee and the Reorganized Debtors may immediately consummate the compromise or settlement.

3.    The monthly written reports required by Section 12.20(c) of the Plan shall be delivered by the Reorganized Debtors to the Post-Effective Date Committee within 15 days after the end of each month that is the subject of the reports.

4.    The procedures for administration and mediation of Claims pursuant to the Claims Resolution Procedure, as amended (Docket Nos. 3326 and 7353), which requires mediation as a prerequisite to the filing of motions for relief from stay or motions to modify the permanent injunction of Section 524 of the Bankruptcy Code, in order to liquidate litigation claims in other forums, shall continue to be followed and shall remain in full force and effect after the Effective Date.

G

COMMITMENT LETTER FOR EXIT FACILITY



**WACHOVIA
SECURITIES**

<u>CONFIDENTIAL</u>

**WACHOVIA BANK, NATIONAL ASSOCIATION
WACHOVIA CAPITAL MARKETS, LLC**
*One Wachovia Center
301 South College Street
Charlotte, North Carolina 28288*

June 28, 2006

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attention:  Bennett L. Nussbaum
       Senior Vice President & Chief Financial Officer

**$725,000,000 Credit Facility
Commitment Letter**

Ladies and Gentlemen:

Wachovia Bank, National Association ("Bank") is pleased to confirm the commitment of Bank to provide, and Wachovia Capital Markets, LLC ("WCM", and together with Bank, "Wachovia"), is pleased to confirm the commitment of WCM to structure, arrange and syndicate, a senior secured revolving loan and letter of credit facility in the amount of $725,000,000 (the "Credit Facility") based upon and subject to the terms and conditions set forth in this letter and the Summary of Principal Terms and Conditions attached as Exhibit A hereto (the "Term Sheet", and together with Exhibit B hereto and this letter, collectively, the "Commitment Letter") and in the fee letter of even date herewith (the "Fee Letter"), in each case upon the effective date of a plan of reorganization (the "Plan") in the jointly-administered bankruptcy case filed by Winn-Dixie Stores, Inc. (the "Company") and certain of its subsidiaries under Chapter 11 of the United States Bankruptcy Code currently pending in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Chapter 11 Case").

The Company hereby appoints WCM and WCM hereby agrees, acting alone or through or with affiliates selected by it, to act as the sole lead arranger and the sole bookrunner for the Credit Facility in connection with arranging a syndicate of banks and financial institutions (collectively, the "Lenders") acceptable to WCM in good faith in consultation with the Company to provide all or a portion of the Credit Facility.  Bank will act as lead lender as well as administrative and collateral agent for the Credit Facility (in such capacity, "Agent").

695023.9

In connection with the efforts of WCM to form a syndicate of financial institutions to become Lenders under the Credit Facility, the Company and its subsidiaries agree to use their commercially reasonable efforts to actively assist in achieving a syndication that is satisfactory to WCM in good faith. It is understood and agreed that WCM will manage, in consultation with the Company, all aspects of the syndication, including, without limitation, decisions as to the final allocation of the commitments, when commitments will be accepted, the selection of proposed Lenders and titles among the Lenders. WCM may use its affiliates to assist in the syndication of the Credit Facility and may allocate fees payable to it and such affiliates in such manner as it and its affiliates may agree. WCM may share with any of its affiliates and advisors any information related to the Company, its subsidiaries and the transactions contemplated under this Commitment Letter on a confidential basis. Subject to the approval of the Bankruptcy Court (as defined in the Term Sheet), the Company (for itself and its subsidiaries) agrees that the arrangements with WCM will be on an exclusive basis and that the Company and its subsidiaries will not negotiate with, engage, solicit, confer with or otherwise consult with any other financial institution or entity regarding the Credit Facility or any other proposed senior first lien or second lien credit facility for the Company and its subsidiaries in connection with the financing of the Plan. Except as otherwise agreed to in writing by Wachovia, no other agents, co-agents, arrangers, bookrunners or book managers will be appointed or used by the Company or its subsidiaries in connection with the financing pursuant to a senior credit facility.

The Company agrees, and agrees to cause its subsidiaries, (i) to cooperate with and assist Wachovia in its efforts, both prior and subsequent to closing to syndicate the Credit Facility to Lenders, and, in connection therewith, to make the management of the Company reasonably available for due diligence meetings with prospective Lenders and (ii) to provide, and use its commercially reasonable efforts to cause the agents, accountants, investment bankers and other advisors of the Company and its subsidiaries to provide all information, including financial projections, as may be reasonably deemed necessary by Wachovia to prepare materials with information for submission to potential Lenders, including an information memorandum to be used in connection with the syndication of the Credit Facility.

The Company hereby represents, warrants and covenants that (i) all information, other than Projections (as defined below), which has been or is hereafter made available to Wachovia or any prospective Lender by or on behalf of the Company or any of its representatives in connection with the business of the Company and its subsidiaries and the Plan ("Information") is and will be complete and correct in all material respects as of the date made available to Wachovia or such prospective Lender and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to Wachovia or prospective Lenders by the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to Wachovia such Information and Projections as Wachovia may reasonably request and to supplement the Information and the Projections from time to time until the closing date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is correct on the closing date of the Credit Facility. In arranging and syndicating the Credit Facility, Wachovia will be using and relying on the Information and the Projections without responsibility for independent verification thereof.

The Credit Facility will be available pursuant to the terms and conditions of an amendment and restatement of the Existing Credit Agreement (as defined in the Term Sheet) or a new credit agreement (as Agent shall determine in consultation with the Company) and other definitive loan documentation incorporating provisions that are customary in similar financings by the Bank or otherwise determined by the Bank in good faith to be appropriate in the context of the contemplated transactions or consistent with the terms of the existing arrangements of the Company in its current working capital financing for which Wachovia is the agent. Certain of those terms and conditions are specified in the Term Sheet.

The Company will promptly reimburse Wachovia for all reasonable costs and expenses incurred by Wachovia in connection with its continuing review of the transaction and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), and the loan documentation and the syndication of the Credit Facility, including reasonable attorneys' fees and legal expenses, appraisal and similar fees, environmental assessments, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus reasonable and documented out-of-pocket expenses for the field examiners of Wachovia in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses) and including all CUSIP fees for registration with the Standard & Poor's CUSIP Service Bureau (the "CUSIP Bureau"), in each case whether or not the Credit Facility closes. As of the date hereof, based on the appraisals and field examinations previously conducted by Wachovia, Wachovia estimates that the costs and expenses to be incurred by Wachovia in connection with the third party appraisals with respect to inventory and pharmacy scripts of the Company and its subsidiaries related to the Credit Facility for the period from the date hereof through the closing date should not be more than $60,000 and the costs and expenses to be incurred by Wachovia in connection with an updated field examination of the Company and its subsidiaries related to the Credit Facility for the period from the date hereof through the closing date should not be more than $60,000.

All such charges and expenses are to be paid to Wachovia upon demand, together with such advance funds on account of such charges and expenses as Wachovia may from time to time request in good faith or Wachovia may require that the Company pay such charges directly, including as to appraisals and leasehold reports. Wachovia has the right to apply to such charges and expenses any sums received from or on behalf of the Company or any of its subsidiaries or at its option to charge the existing loan account of the Company or its subsidiaries maintained by Bank as agent under the existing credit facility of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation.

The Company and its subsidiaries agree to jointly and severally indemnify and hold harmless Wachovia, and each director, officer, employee, attorney, advisor, agent and affiliate of Wachovia (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any losses (other than lost profits), claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, relate to, or result from, this Commitment Letter,

695023.9                                    3

the Fee Letter, the Credit Facility or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss (other than lost profits), claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. The obligations of the Company set forth in this paragraph and the immediately preceding two paragraphs are subject to the approval of the Bankruptcy Court.

This Commitment Letter is addressed solely to the Company and is not intended to confer any obligations to or on, or benefits to or on, any third party. No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except to the extent such damages are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Person. In addition, neither the Company nor any Indemnified Person shall be responsible or liable for special, indirect, consequential, incidental or punitive damages which may be alleged as a result of this Commitment Letter or the Fee Letter.

Except as set forth below, this Commitment Letter and the Fee Letter and the contents of such documents shall not be disclosed by the Company or its subsidiaries to any third party without the prior written consent of Wachovia. Notwithstanding the foregoing, (a) this Commitment Letter (but not the Fee Letter) may be filed with the Bankruptcy Court in connection with a motion of the Company to seek approval of this Commitment Letter or the Credit Facility, (b) the Fee Letter may be disclosed on a confidential and "need to know" basis to the Company's attorneys, financial advisors and accountants, and to the Official Creditors' Committee appointed in the Chapter 11 Case (the "Committee"), provided, that, to the extent such documents and information is disclosed to the Committee, the Company and the Committee shall enter into a confidentiality agreement with Wachovia, which shall be in form and substance satisfactory to Wachovia in good faith, and (c) the Fee Letter may be disclosed on a confidential and "need to know" basis to the United States Trustee subject to such confidentiality arrangements as Wachovia and the Company require. In no event shall any third party be entitled to rely upon this Commitment Letter or the Fee Letter.

The Company acknowledges and agrees that Wachovia may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries. The Company further acknowledges and agrees to the disclosure by Wachovia of information relating to the Credit Facility (i) to Gold Sheets and other publications, with such information to consist of deal terms and other information customarily found in such publications and that Wachovia may otherwise use the corporate name and logo of the Company in "tombstones" or other advertisements or public statements and (ii) in connection with obtaining a published CUSIP from the CUSIP Bureau.

695023.9

4

This Commitment Letter will be of no force and effect unless a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by Wachovia by 5:00 p.m. in New York City on June 29, 2006, together with the Fee Letter as duly authorized, executed and delivered by the Company. The commitment of Wachovia under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earliest of (i) effectiveness of the Plan, (ii) the agreement to undertake or acceptance of a commitment by the Company or any of its subsidiaries for any debt or equity financing in lieu of all or any portion of the Credit Facility in any transaction other than a transaction led or arranged by Wachovia or any of its affiliates, or as otherwise agreed to in writing by Wachovia, (iii) the occurrence of a Material Adverse Change (as defined in Exhibit B hereto) or a material adverse effect on the feasibility of the Plan or the transactions contemplated hereby, and (iv) as of the close of business on December 31, 2006, if the initial borrowings under the Credit Facility have not occurred on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall be joint and several and shall survive the termination of this Commitment Letter or the commitment of Wachovia hereunder, unless and until provisions relating to such indemnities and obligations are superseded and replaced by corresponding provisions that are contained in the definitive loan documentation governing the Credit Facility that shall have been executed by the parties thereto. Following any termination hereof, the Credit Facility will require reapproval by the credit committee of Wachovia even if Wachovia and its agents and counsel and other advisors continue to work on the transaction. Such reapproval, if obtained, may result in different terms or conditions, or the determination not to consummate the transaction.

This Commitment Letter contains the entire commitment of Wachovia for this transaction and, upon acceptance by the Company, supersedes all prior proposals, commitment letter, negotiations, discussions and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by Wachovia to make any oral or written statements inconsistent with this Commitment Letter.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter may not be assigned by the Company without the prior written consent of Wachovia and may not be assigned by Wachovia without the prior written consent of the Company; provided, that, no such consent of the Company shall be required in connection with an assignment by Wachovia to an affiliate of Wachovia. This Commitment Letter may not be amended, waived or modified, except in writing signed by Wachovia and the Company. This Commitment Letter is governed by and construed in accordance with the laws of the State of New York, but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York.

WACHOVIA AND THE COMPANY EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

695023.9                                              5

All of the reimbursement, indemnification and confidentiality obligations of the parties set forth in this Commitment Letter shall survive the expiration or termination of this Commitment Letter and shall remain in full force and effect regardless of whether the Credit Facility closes, unless and until provisions relating to such reimbursement, indemnification and confidentiality obligations are superseded and replaced by corresponding provisions that are contained in the definitive loan documentation governing the Credit Facility that shall have been executed by the parties thereto.

All references to the term "good faith" used herein (including the Term Sheet) when applicable to Agent shall mean, notwithstanding anything to the contrary contained herein, honesty-in-fact in the conduct or transaction concerned and observance of reasonable commercial standards of fair dealing based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

If the Company accepts and agrees to the foregoing, please so indicate by executing and returning the enclosed copy of this Commitment Letter for itself and its subsidiaries to Wachovia, together with the Fee Letter.

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

WACHOVIA BANK,
NATIONAL ASSOCIATION

Kimberley A. Quinn
Senior Vice President

WACHOVIA CAPITAL MARKETS, LLC

Kimberley A. Quinn
Managing Director

ACCEPTED on this ____ day
of June, 2006:

WINN-DIXIE STORES, INC.,
for itself and its subsidiaries.

By:_____

Title:_____

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

WACHOVIA BANK,
NATIONAL ASSOCIATION

WACHOVIA CAPITAL MARKETS, LLC

Kimberley A. Quinn
Senior Vice President

Kimberley A. Quinn
Managing Director

ACCEPTED on this 28th day
of June, 2006:

WINN-DIXIE STORES, INC.,
for itself and its subsidiaries.

By: _____

Title: SVP and CFO

# EXHIBIT A

## Winn-Dixie, Inc.

### $725,000,000  Senior Secured Revolving Credit Facility (the "Credit Facility")

### Summary of Principal Terms and Conditions

### June 28, 2006

Capitalized terms used below have the meaning assigned to such terms in the Credit Agreement, dated February 23, 2005, by and among Wachovia Bank, National Association, as agent, certain other agents parties thereto, the lenders parties thereto, Borrowers and certain of their subsidiaries (the "Existing Credit Agreement"), except as otherwise provided herein.

| | |
|---|---|
| **Borrowers:** | Winn-Dixie Stores, Inc. ("Administrative Borrower"), its subsidiaries that are Borrowers under the Existing Credit Agreement and one or more new special purpose subsidiaries of Administrative Borrower (collectively, the "SPE") to be formed to own the real property of Borrowers and Guarantors (whether owned or leased). |
| **Guarantors:** | The direct or indirect U.S. subsidiaries of Administrative Borrower (other than the Insurance Captive) that are not Borrowers. |
| **Sole Lead Arranger and Sole Bookrunner:** | Wachovia Capital Markets, LLC ("WCM"). |
| **Administrative and Collateral Agent:** | Wachovia Bank, National Association ("Agent"). |
| **Lenders:** | Wachovia and such other financial institutions that may become parties to the financing arrangements as Lenders as WCM may determine in good faith in consultation with the Company.  It is anticipated that WCM will first seek to have those institutions that are lenders under the Existing Credit Agreement become Lenders under the Credit Facility and will otherwise review with the Company any other institutions that it may solicit to be Lenders. |
| **Letter of Credit Issuer:** | Wachovia Bank, National Association. |
| **Credit Facility:** | $725,000,000 ("Maximum Credit") consisting of revolving loans ("Revolving Loans") subject to the Borrowing Base and other terms described below, with a portion of the Credit Facility available for letters of credit arranged for by Agent ("LCs") with a sublimit on LCs outstanding at any |

A-1

time of $300,000,000.

At its option, Administrative Borrower may, not less than thirty (30) days prior to the closing of the Credit Facility, upon notice to and after consultation with Agent, elect to reduce the amount of the Maximum Credit but in no event to an amount less than $600,000,000.

Revolving Loans may be drawn, repaid and reborrowed.

Each voluntary prepayment of Revolving Loans shall be without premium or penalty, subject to funding losses set forth in the Existing Credit Agreement.

**Accordion Feature:**    Borrowers shall have the option (to be exercised no more than three (3) times during the term of the Credit Facility) to increase the Maximum Credit by up to $100,000,000 in increments of not less than $25,000,000, subject to additional commitments from existing and/or new Lenders and subject to other terms and conditions to be agreed.

**Borrowing Base:**    Revolving Loans and LCs to Borrowers based on:

Upon its execution of the Commitment Letter, Administrative Borrower will specify to WCM in writing which of the following Borrowing Base alternatives should be included in the Loan Documents:

Option 1:

(a) the lesser of (i) 70% multiplied by the value of Eligible Inventory consisting of finished goods (other than Perishable Inventory) or (ii) 90% of the Net Recovery Percentage of such Eligible Inventory multiplied by the value thereof; plus

(b) the lesser of (i) 70% multiplied by the value of Eligible Inventory consisting of Perishable Inventory, (ii) 90% of the Net Recovery Percentage of such Perishable Inventory multiplied by the value thereof, or (iii) $85,000,000, plus

(c) the lesser of: (i) the sum of (A) 90% of the Net Amount of Eligible Pharmacy Receivables (other than Medicare/Medicaid Pharmacy Receivables) and (B) 90% of the Net Amount of Eligible Credit Card Receivables or (ii) $35,000,000; plus

(d) the lesser of: (i) 80% of the Net Amount of Eligible Pharmacy Receivables consisting of Medicare/ Medicaid Pharmacy Receivables or (ii) $10,000,000; plus

(e) the lesser of (i) 90% multiplied by the Net Recovery Percentage of the Eligible Pharmacy Scripts or (ii) $70,000,000, subject to adjustment as provided in the Existing Credit Agreement; plus

(f) the Leasehold Availability; plus

(g) the Real Property Availability; minus

(h) applicable reserves.

or

Option 2:

(a) the lesser of (i) 70% multiplied by the value of Eligible Inventory consisting of finished goods (other than Perishable Inventory) or (ii) 90% of the Net Recovery Percentage of such Eligible Inventory multiplied by the value thereof; plus

(b) the lesser of (i) 70% multiplied by the value of Eligible Inventory consisting of Perishable Inventory, (ii) 90% of the Net Recovery Percentage of such Perishable Inventory multiplied by the value thereof, or (iii) $85,000,000, plus

(c) the lesser of: (i) the sum of (A) 90% of the Net Amount of Eligible Pharmacy Receivables (other than Medicare/Medicaid Pharmacy Receivables) and (B) 90% of the Net Amount of Eligible Credit Card Receivables or (ii) $35,000,000; plus

(d) the lesser of: (i) 80% of the Net Amount of Eligible Pharmacy Receivables consisting of Medicare/ Medicaid Pharmacy Receivables or (ii) $10,000,000; plus

(e) the lesser of (i) 90% multiplied by the Net Recovery Percentage of the Eligible Pharmacy Scripts or (ii) $70,000,000, subject to adjustment as provided in the Existing Credit Agreement; plus

(f) the Leasehold Availability; plus

(g) the Real Property Availability; plus

(h) the lesser of the following (the "FILO Availability"):
(i) the sum of (A) the lesser of (1) 10% multiplied by
the value of Eligible Inventory consisting of finished
goods (other than Perishable Inventory) or (2) 10% of
the Net Recovery Percentage of such Eligible
Inventory multiplied by the value thereof, which
percentages may be adjusted to a lesser amount after
the receipt of the inventory appraisals referred to
below, plus (B) the lesser of (1) 10% multiplied by the
value of Eligible Inventory consisting of Perishable
Inventory, or (2) 10% of the Net Recovery Percentage
of such Perishable Inventory multiplied by the value
thereof, which percentages may be adjusted to a lesser
amount after the receipt of the inventory appraisals
referred to below, or (ii) $50,000,000; minus

(i) applicable reserves.

Revolving Loans based on the FILO Availability ("FILO
Revolving Loans") shall be deemed to be the first
Revolving Loans made and shall be the last Revolving
Loans repaid, such that the FILO Revolving Loans are
"first-in-last-out".

The amount of the "Net Recovery Percentage" is
determined based on the projected recovery of the
applicable category of Eligible Inventory and Eligible
Pharmacy Scripts, in the case of inventory on a "going out
of business sale" basis and in the case of pharmacy scripts
on a "net orderly liquidation value" basis, in each case net
of estimated liquidation expenses, all as set forth in the
most recent appraisal of such inventory or pharmacy
scripts, as the case may be, in form and containing
assumptions and appraisal methods satisfactory to Agent in
good faith by an appraiser acceptable to Agent, on which
Agent and Lenders are expressly permitted to rely.

The term "Medicare/Medicaid Pharmacy Receivables"
means Pharmacy Receivables arising pursuant to goods
sold by Borrowers to eligible Medicare or Medicaid
beneficiaries to be paid by a satisfactory fiscal
intermediary or by another governmental authority under

Medicare or Medicaid.

The term "Leasehold Availability" means the lesser of $100,000,000 or an amount equal to 60% of the "estimated gross leasehold value" of the Eligible Leasehold Property as set forth in the most recent Leasehold Report of the leasehold properties in form and containing assumptions and valuation methods satisfactory to Agent in good faith by DJM Asset Management, LLC or such other valuation firm acceptable to Agent, on which Agent and Lenders are expressly permitted to rely, received prior to the date hereof; provided, that, the Leasehold Availability shall be recalculated and adjusted annually based upon the then most recent acceptable Leasehold Report received by Agent to an amount equal to the lesser of $100,000,000 or the amount equal to 60% of the "estimated gross leasehold value" of the Eligible Leasehold Property as set out in such Leasehold Report.

For purposes of the definition of the term "Leasehold Availability", the term "estimated gross leasehold value" is as determined pursuant to the applicable Financial Modeling of Values of Leasehold Interests prepared by DJM Asset Management, LLC (each, a "Leasehold Report").

The term "Real Property Availability" means the lesser of $65,000,000 or an amount equal to 65% of the fair market value of the Eligible Real Property as set forth in the most recent appraisal of such real property in form and containing assumptions and appraisal methods satisfactory to Agent in good faith by an appraiser acceptable to Agent, on which Agent and Lenders are expressly permitted to rely, received by Agent prior to the date hereof, provided, that, the Real Property Availability shall be recalculated and adjusted annually based upon the then most recent acceptable appraisal received by Agent to an amount equal to the lesser of $65,000,000 or the amount equal to 65% of the fair market value of the Eligible Real Property as set out in such appraisal.

**Eligibility:**    Eligible Inventory consists of finished goods held for resale in the ordinary course of the business of a Borrower, in each case which are acceptable to the Agent in good faith based on the criteria to be set forth in the Loan Documents (which shall be consistent with the criteria set forth in the Existing Credit Agreement).  In general,

Eligible Inventory does not include (i) raw materials; (ii) inventory at premises other than those owned and controlled by any Borrower (except subject to certain conditions set forth in the Loan Documents); (iii) inventory subject to a security interest or lien in favor of any person other than the Agent except specified liens and other permitted liens that are subject to an intercreditor agreement in form and substance satisfactory to the Agent in good faith between the holder of such security interest or lien and the Agent; (iv) obsolete or slow moving inventory; (v) inventory which is not subject to the first priority, valid and perfected security interest of the Agent; (vi) returned, damaged and/or defective inventory; (vii) inventory purchased or sold on consignment, (viii) pharmaceuticals, tobacco and alcohol which such Borrower is not duly licensed to sell or with respect to which such Borrower is not complying with any duly issued license, and (ix) other criteria to be set out in the Loan Documents consistent with the criteria set forth in the Existing Credit Agreement.

Eligible Pharmacy Receivables means pharmacy receivables owed to any Borrower, in each case that are acceptable to the Agent in good faith based on the criteria to be set forth in the Loan Documents (which shall be consistent with the criteria set forth in the Existing Credit Agreement). In general, pharmacy receivables shall be Eligible Pharmacy Receivables if (i) such pharmacy receivables arise from the actual and bona fide sale and delivery of prescription drugs by such Borrower in the ordinary course of its business which transactions are completed in accordance with the terms and provisions contained in any documents related thereto; (ii) such pharmacy receivables are not unpaid more than thirty (30) days after the original invoice; (iii) such pharmacy receivables do not arise from sales on consignment, guaranteed sale, sale and return, sale on approval, or other terms under which payment by the account debtor may be conditional or contingent; (iv) the chief executive office of the account debtor with respect to such pharmacy receivables is located in the United States of America or Canada; (v) there are no facts, events or occurrences known to any Borrower or the Agent which would impair the validity, enforceability or collectability of such pharmacy receivables; (vi) such pharmacy receivables are subject to the first priority, valid and perfected security interest of the Agent; and (vii) other criteria to be set out in the Loan Documents consistent with the criteria set forth in

the Existing Credit Agreement.  The eligibility of Medicare/Medicaid Pharmacy Receivables will be determined by the Agent in good faith pursuant to criteria to be set forth in the Loan Documents (which shall be consistent with Agent's customary criteria for the eligibility of Medicare and Medicaid receivables) following the completion of Agent's updated field examination and due diligence with respect to Medicare/Medicaid Pharmacy Receivables.

Eligible Credit Card Receivables and the net amounts thereof will be determined by the Agent in good faith pursuant to criteria to be set forth in the Loan Documents (which shall be consistent with Agent's customary criteria for the eligibility of credit card receivables).  In general, credit card receivables shall not be Eligible Credit Card Receivables if (i) such receivables are unpaid more than 10 days after the original transaction giving rise to such receivables, (ii) such receivables are owed by a credit card processor or credit card issuer where there is a default under the terms of the arrangements of a Borrower with such credit card processor or issuer, as the case may be, or where there is a default or other event or circumstance where such credit card processor or issuer has the right to suspend or terminate payments to a Borrower or to establish reserves against amounts otherwise payable to a Borrower, (iii) receivables owing by a credit card processor or issuer where such processor or issuer has not entered into an agreement with Agent acknowledging Agent's security interest in such receivables and agreeing to follow the instructions of Agent with respect to payments (except as to American Express, Agent shall only require a letter from Borrowers and Guarantors to American Express in form and substance satisfactory to Agent in good faith), (iv) receivables that are not subject to the first priority, valid and perfected security interest of the Agent, and (v) those other credit card receivables that do not constitute collateral acceptable to Agent in good faith for lending purposes pursuant to criteria established by Agent in good faith and set forth in the Loan Documents (which shall be consistent with Agent's customary criteria for the eligibility of credit card receivables).

Eligible Pharmacy Scripts means pharmacy scripts owned by any Borrower, in each case which are acceptable to the Agent in good faith based on the criteria to be set forth in the Loan Documents (which shall be consistent with the

criteria set forth in the Existing Credit Agreement). In general, Eligible Pharmacy Scripts will not include (i) pharmacy scripts for which the Borrowers' pharmacy store computer and phone systems, in the Agent's determination, (A) are inadequate to facilitate the sale of prescriptions to a potential purchaser and (B) do not facilitate the transfer of pharmacy prescriptions files to a potential purchaser; (ii) pharmacy scripts subject to a security interest or lien in favor of any person other than the Agent except certain specified liens permitted in the Loan Documents or that are subject to an intercreditor agreement in form and substance satisfactory to the Agent in good faith between the holder of such security interest or lien and the Agent; (iii) pharmacy scripts that are not in a form that may be sold or otherwise transferred or are subject to regulatory restrictions on the transfer thereof that are not acceptable to the Agent in good faith and (iv) other criteria to be set out in the Loan Documents consistent with the criteria set forth in the Existing Credit Agreement.

Eligible Leasehold Property will be determined by Agent in good faith pursuant to general criteria that will be set forth in the Loan Documents (which shall be consistent with the criteria set forth in the Existing Credit Agreement). In general, Eligible Leasehold Property will include a real property leasehold: (i) that is leased by the SPE; (ii) that is not subject to a security interest, lien or mortgage in favor of any person other than the Agent except designated permitted liens and other liens permitted in the Loan Documents that are subject to an intercreditor agreement in form and substance satisfactory to Agent in good faith between the holder of such security interest, lien or mortgage and Agent; (iii) that does not prohibit a mortgage or other encumbrance on the leasehold interest of the SPE; (iv) for which Agent shall have received the following items, each in form and substance satisfactory to the Agent in good faith, if so requested by Agent in good faith, (A) a valid and perfected first priority leasehold mortgage in favor of Agent upon such leasehold property (subject to designated permitted liens); (B) if required in the jurisdiction where the leased premises are located, evidence that fixture filings naming Agent, as secured party, and the SPE, as debtor, have been filed with respect to such leasehold property; (C) leasehold title insurance policies in favor of Agent with endorsements as required by Agent (as to leaseholds having an aggregate appraised value of approximately $100,000,000 as set forth in the

April 2006 Leasehold Report); and (D) that satisfies such other conditions as the parties agree.

Eligible Real Property will be determined by Agent in good faith pursuant to general criteria that will be set forth in the Loan Documents (which shall be consistent with the criteria set forth in the Existing Credit Agreement). In general, Eligible Real Property will include real property: (i) that is owned in fee simple by the SPE; (ii) that is not subject to a security interest, lien or mortgage in favor of any person other than the Agent except designated permitted liens and other liens permitted in the Loan Documents that are subject to an intercreditor agreement in form and substance satisfactory to Agent in good faith between the holder of such security interest, lien or mortgage and Agent; (iii) for which Agent shall have received the following items, each in form and substance satisfactory to the Agent in good faith, if so requested by Agent, (A) a valid and perfected first priority mortgage in favor of Agent upon such real property (subject to designated permitted liens); (B) if required in the jurisdiction where the leased premises are located, evidence that fixture filings naming Agent, as secured party, and the SPE, as debtor, have been filed with respect to such real property; (C) mortgagee title insurance policies with endorsements required by Agent; (D) an ALTA survey; and (E) that satisfies such other conditions as the parties agree.

**Reserves:**    Such amounts as Agent may from time to time establish and revise in good faith, without duplication, reducing the amount of Revolving Loans, and LCs that would otherwise be available to the Borrowers under the lending formula(s) provided for herein: (i) to reflect events, conditions, contingencies or risks which, as determined by the Agent in good faith, adversely affect, or would have a reasonable likelihood of adversely affecting, (A) the eligible borrowing base assets or any other property which is security for the obligations or its value, (B) the assets, business or financial condition of any Borrower or Guarantor or (C) the security interests and other rights of the Agent or any Lender in the eligible borrowing base assets or any other property which is security for the obligations (including the enforceability, perfection and priority thereof), (ii) to reflect the Agent's good faith belief (whether based on the receipt or discovery of new information, any change, occurrence or development with

respect to previously furnished information, or otherwise) that any collateral report or financial information furnished by or on behalf of any Borrower or Guarantor to the Agent is, has become or may have been incomplete, inaccurate or misleading in any material respect, (iii) to fully reflect LCs (to the extent that the Agent has not received cash collateral in respect thereof on terms and conditions satisfactory to Agent in good faith), (iv) to reflect (A) past due payables which are outstanding more than sixty (60) days past the invoice date as of such time, (B) past due accruals which are outstanding more than sixty (60) days past the receipt of inventory related to such accrual as of such time, in excess of $10,000,000, (C) past due rent payments which are outstanding more than thirty (30) days past due as of such time, and (D) real estate taxes which are past due and delinquent, and (v) to reflect any claims due and payable on the effective date of the Plan or as soon as practicable thereafter but in any event within twenty (20) days thereafter and that are not paid on the effective date of the Plan and $1,000,000 (or such lesser amount as may be required) to fund the "Claim Reduction Fund" set forth in the Plan, such aggregate amount to be reduced from time to time to reflect payments in respect of such claims referred to above in this clause (v). In addition, without limiting any other rights of Agent and Lenders, reserves may be established at Agent's option in good faith to reflect a reduction in the value of the Eligible Leasehold Property and/or the Eligible Real Property either as the result of the sale or other disposition thereof, as a result of the actual or projected diminution in the value of the Eligible Leasehold Property and/or Eligible Real Property set forth in the most recent Leasehold Report or appraisal thereof, as applicable, from the immediately preceding Leasehold Report or appraisal thereof, as applicable, but in any event, with respect to a reserve established against Leasehold Availability or Real Property Availability, only to the extent that such reduction has not been reflected in a reduction in the Leasehold Availability or Real Property Availability, as applicable, pursuant to a Leasehold Report or appraisal, as applicable, following the closing date. To the extent that the Agent (a) has reflected in the lending formulas used to establish the Borrowing Base any circumstance, condition, event or contingency in a manner satisfactory to the Agent in good faith or (b) may revise the lending formulas used to determine the Borrowing Base or establish new criteria or revise existing criteria for any of

the eligible Borrowing Base assets so as to address any circumstances, condition, event or contingency in a manner satisfactory to the Agent in good faith, in each case the Agent shall not establish a Reserve for the same purpose.

**Collateral:**

To secure all obligations of Borrowers and Guarantors to Agent and Lenders, Agent shall have first priority, perfected security interests in and liens upon the Collateral, but as to priority, subject to such liens as are permitted under the Loan Documents (which shall be consistent with the liens permitted under the Existing Credit Agreement) that have priority over the security interests and liens of Agent under applicable law. The term "Collateral" shall mean all of each Borrower's and Guarantor's present and future accounts, contract rights, general intangibles (including, without limitation, all trademarks, patents and other intellectual property, tax refunds, choses in action, franchises, licenses and other rights and agreements), deposit accounts, letters of credit, letter-of-credit rights, supporting obligations, chattel paper, documents, instruments (including any notes receivable and stock and other equity interests in all subsidiaries (including, without limitation, the newly formed subsidiary referred to above), except as to the stock or other equity interests of controlled foreign corporations as determined under the Internal Revenue Code for the stock or other equity interests of such corporations in excess of 65% thereof), investment property, inventory, equipment, fixtures and other goods, real property (owned and leased) and all products and proceeds of any of the foregoing.

**Use of Proceeds:**

The proceeds of the Revolving Loans under the Credit Facility will be used by Borrowers to pay allowed administrative expenses and allowed claims in accordance with the Plan, costs, expenses and fees in connection with the Credit Facility and for working capital and general corporate purposes of Borrowers.

**Term:**

5 years from date of closing ("Maturity Date").

**Interest Rates:**

Borrowers may elect that all or portions of the Revolving Loans bear interest at:

(a)     the Applicable Margin plus the ABR; or

(b)     the Applicable Margin plus the Adjusted Eurodollar

Rate.

Revolving Loans for which interest is calculated using the ABR are referred to herein as "Base Rate Loans" and for which interest is calculated using the Adjusted Eurodollar Rate are referred to herein as "Eurodollar Rate Loans".

The Applicable Margin is determined based on Quarterly Average Excess Availability as set forth on Schedule 1 to this Exhibit A. Except as otherwise provided in Schedule 1 hereto, the Applicable Margin will be calculated and established each fiscal quarter and remain in effect until adjusted thereafter after the end of the next fiscal quarter.

"ABR" means the higher of (i) the rate of interest publicly announced by Wachovia Bank, National Association as its "prime rate", subject to each increase or decrease in such prime rate, effective as of the date of any such change or (ii) the federal funds effective rate from time to time plus .50%.

"Adjusted Eurodollar Rate" means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in US Dollars for a term comparable to the applicable period of one, two, three or six months as selected by Borrowers (but if more than one rate is specific on such Telerate page, the rate will be an arithmetic average of all such rates), and in each case subject to the reserve percentage prescribed by governmental authorities; provided, that, (i) no more than six (6) interest periods may be in effect at any one time, (ii) no more than two (2) interest periods of six months may be in effect at any one time, and (iii) in no event will the aggregate amount of Eurodollar Rate Loans with an interest period of six months exceed 50% of the total amount of Eurodollar Rate Loans.

All interest will be computed on basis of actual days elapsed over a 360 day year (or 365/366 days, in the case of Loans for which the ABR is used), payable monthly in arrears and may be charged by Agent to any Borrower's loan account. Default rates are as set forth on Schedule 1 hereto.

**Unused Line Fee:**

.25% per annum on the amount by which the Maximum Credit exceeds the average monthly balance of Revolving Loans and LCs outstanding, payable monthly in arrears, computed on the actual number of days elapsed over a 360 day year.

**Letter of Credit Fees**

1.00% on the daily outstanding balance of commercial LCs and the applicable percentage of the Applicable Margin for Eurodollar Rate Loans (as adjusted from time to time as set forth above) on the daily outstanding balance of standby LCs, in each case payable monthly in arrears, computed on the actual number of days elapsed over a 360 day year. Applicable bank fees, opening charges and arranging fees (which shall be in amounts consistent with those payable pursuant to the Existing Credit Agreement) are in addition to such fees and may be charged to the loan account of Borrowers maintained by Agent.

**Loan Documentation:**

Definitive loan documentation (collectively, the "Loan Documents"), including, without limitation, a loan and security agreement, supplemental security agreements, pledge agreements, mortgages, guarantees, control agreements, intercreditor and subordination agreements, UCC financing statements, opinion letters of counsel to Borrowers and Guarantors, and related documents, each in form and substance satisfactory to Agent in good faith.

All of the Loan Documents will be prepared or approved by Agent and counsel to Agent and incorporate Agent's customary terms and provisions, including, without limitation, the absence of any default as a condition to all Revolving Loans and LCs, the right to establish reserves against loan availability (consistent with such right set forth in the Existing Credit Agreement) and such other provisions as may be required by Agent in good faith in the context of the transactions contemplated hereby.

**Representations and Warranties:**

To include, but not be limited to (with exceptions, materiality thresholds and cure periods to be agreed upon by the parties): representations and warranties concerning: the Collateral; corporate existence and good standing (or as to Florida, active status), power and authority; accuracy of financial information; absence of material adverse changes as of the date of closing; locations of jurisdiction of incorporation, chief executive office and Collateral; priority of Agent's security interests; ownership of

properties, and absence of other liens (except as specifically agreed to by Agent); filing of tax returns and payment of taxes; absence of material litigation or investigations; compliance with other agreements and applicable law, regulation, etc.; identification of bank accounts; environmental matters; employee benefit matters; accuracy and completeness of information furnished to Agent; and survival and continuing nature of representations and warranties (which shall be deemed made as of the date of each credit extension).

**Affirmative Covenants:**    To include, but not be limited to (with exceptions, materiality thresholds and cure periods to be agreed upon by the parties): maintenance of corporate existence and rights; requirements for new locations; compliance with laws; performance of obligations; maintenance of properties in good repair; maintenance of appropriate and adequate insurance; Agent's rights to inspect books and properties (but without any limitation on the number of field examinations if an Event of Default exists or the dollar amount for which Borrowers are liable on the field examination charges); payment of taxes and claims; delivery of financial statements, financial projections and other information; collateral reporting, notices, appraisal and leasehold reporting requirements, including (i) the right to obtain appraisals of the inventory and pharmacy scripts up to two times in any twelve month period (or more frequently if Excess Availability is less than $125,000,000 or upon an Event of Default) and (ii) to obtain Leasehold Reports of the leaseholds and appraisals of the owned real property one time in any twelve month period (or more frequently if Excess Availability is less than $125,000,000 or upon an Event of Default); the requirement that Borrowers and Guarantors maintain Excess Availability at all times of not less than $50,000,000; the transfer to the SPE of all Leasehold Property (other than the Leasehold Property that has value as set forth in the April 2006 Leasehold Report which shall have been transferred as provided in clause (d) of Exhibit B hereto) within sixty (60) days after the closing date; and the granting of leasehold mortgages on the Leasehold Property not subject to leasehold mortgages at closing within sixty (60) days after the closing date (other than the seventeen (17) of the Leasehold Property as referred to in clause (e) of Exhibit B).

Collateral reporting will include, so long as Excess Availability is not less than $125,000,000 and no Event of Default exists, a monthly borrowing base report, in form satisfactory to Agent in good faith, which shall include, among other things, summaries as to accounts and inventory and reports of new purchases of inventory consisting of produce, dairy, meat and seafood or other categories or departments of inventory specified by Agent, with more frequent reporting and in such form as Agent may specify if Excess Availability is less than $125,000,000 or if an Event of Default exists.

With respect to collections and the transfer thereof to Agent pursuant to control agreements with the banks at which such accounts are maintained, which shall be in form and substance acceptable to Agent in good faith, so long as there is no Event of Default and Excess Availability is greater than $125,000,000, Agent will instruct such banks to remit amounts deposited in the blocked accounts to the operating accounts of Borrowers.

In addition, Borrowers shall not be required to prefund ACH transfers up to the amount of $50,000,000 outstanding at any time; provided, that, (i) there shall be no Event of Default, (ii) Excess Availability shall not be less than $125,000,000 for more than five (5) consecutive business days; (iii) Excess Availability shall not have been less than $125,000,000 on more than three (3) separate occasions during the term of the Credit Facility; and (iv) Excess Availability shall not be less than $120,000,000.

**Negative Covenants:**

To include, but not be limited to (with exceptions, materiality thresholds and cure periods to be agreed upon by the parties): limitations on: dividends, redemptions and repurchases of capital stock; incurrence of debt (including capital leases) and guarantees; repurchases or prepayment of debt; creation or suffering of liens; loans, investments and acquisitions; affiliate transactions; changes in business conducted; asset sales, mergers and consolidations; capital expenditures; restrictions affecting subsidiaries; opening new bank accounts.

**Financial Covenants:**

Minimum EBITDA in amounts and for periods to be agreed upon by the parties, which shall be tested quarterly based on the four (4) immediately preceding fiscal quarters for which Agent has received financial statements, except that the first four (4) quarters following the closing date

shall be tested based upon Minimum EBITDA less capital expenditures in amounts to be agreed upon by the parties for such period, provided, that, compliance with such financial covenants shall not be required so long as Excess Availability is greater than $75,000,000.

**Events of Default:**    To include (with grace and cure periods to be agreed upon by the parties), but not be limited to, payment and performance defaults under any of the Loan Documents; cross-defaults to other indebtedness in excess of an amount to be agreed to by the parties and documents; breach of representations and warranties; insolvency, voluntary and involuntary bankruptcy; the failure of Borrowers or Guarantors to comply in any material respect with the Confirmation Order or any other applicable bankruptcy order or stipulation; the Confirmation Order is revoked, remanded, vacated, reversed, stayed, rescinded, modified, or amended on appeal; judgments and attachments; revocation of any guaranty; dissolution (subject to certain exceptions to be agreed upon by the parties); change in control; material adverse change in the assets or business of Borrowers and Guarantors taken as a whole.

**Conditions Precedent:**    Those conditions precedent customarily required by Agent in similar financings and any additional conditions precedent deemed appropriate by Agent in good faith in the context of this transaction, including, without limitation, those set forth on Exhibit B to the Commitment Letter.

**Expenses and Indemnity:**    Borrowers will, from and after closing, and upon Agent's demand, pay all of the reasonable and documented out-of-pocket expenses and customary administrative charges related to the Credit Facility incurred by Agent, including, without limitation, reasonable collateral appraisal and reasonable leasehold reporting fees, legal costs and expenses, filing and search charges, recording taxes and field examination charges and expenses (including a charge at the then standard rate of Agent per person per day for the examiners of Agent in the field and in the office, plus other reasonable and documented out-of-pocket expenses).

Waivers to include, but not be limited to, waivers by Agent, Lenders and each Borrower and Guarantor of its rights to jury trial and claims for special, indirect or consequential damages in respect any breach or alleged

breach by any Agent, any Lender, any Borrower or Guarantor of any of the loan documentation.

Borrowers and Guarantors shall indemnify and hold harmless Agent and Lenders and their respective directors, officers, agents, representatives and employees from and against all losses, claims, damages, expenses, or liabilities including, but not limited to, reasonable legal or other expenses incurred in connection with investigating, preparing to defend, or defending any such loss, claim, damage,  expenses or liability, incurred in respect of the Credit Facility, except as to any such indemnitee as a result of the gross negligence or willful misconduct of such indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction.

**Governing Law:**              New York (excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York).

**USA PATRIOT Act:**            Each Lender subject to the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act") hereby notifies Borrowers and Guarantors that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and Guarantors and other information that will allow such Lender to identify such person in accordance with the Act. Borrowers and Guarantors are hereby advised that this commitment is subject to satisfactory results of such verification.

Each term used but not defined in this Exhibit A shall have the meaning assigned to such term in the letter, dated of even date herewith, from Wachovia Bank, National Association to Winn-Dixie Stores, Inc. to which this Exhibit A is attached.

This Summary of Principal Terms and Conditions for the Credit Facility is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the documentation.  Rather, it is intended only to outline certain principal terms to be included in the Loan Documents.

695023.9                                    A-17

SCHEDULE 1
TO
EXHIBIT A TO COMMITMENT LETTER

1. The Applicable Margin for the interest rate and the percentages for the letter of credit fee for standby LCs shall be the applicable percentage calculated based on the percentage set forth in Tier 3 of the chart below until the last day of the second (2nd) full fiscal quarter after closing. The Applicable Margin will be calculated and established effective as of the first day of the next fiscal quarter based on the Quarterly Average Excess Availability for the fiscal quarter most recently ended prior thereto as set forth on the chart below and will be adjusted as of the first day of each fiscal quarter thereafter based on the Quarterly Average Excess Availability for the fiscal quarter most recently ended prior thereto as set forth on the chart below.

2. The term "Applicable Margin" as used in the Term Sheet means, at any time (subject to paragraph 1 above), except for Revolving Loans based on FILO Availability (determined as provided in paragraph 3 below), for all Revolving Loans for which interest is calculated based on the ABR, the Applicable ABR Rate Margin, for all Revolving Loans for which interest is calculated based on the Adjusted Eurodollar Rate, the Applicable Eurodollar Rate Margin, and for Standby LCs, the Applicable Standby LC Margin, in each case determined if the Quarterly Average Excess Availability for the immediately preceding fiscal quarter is at or within the amounts indicated for such percentage as of the last day of the immediately preceding fiscal quarter as follows:

| Tier | Quarterly Average Excess Availability | Applicable Eurodollar Rate Margin | Applicable ABR Rate Margin | Applicable Standby LC Margin |
|------|--------------------------------------|-----------------------------------|----------------------------|------------------------------|
| 1 | Equal to or greater than $400,000,000 | 1.25% | 0% | 1.25% |
| 2 | Less than $400,000,000 and equal to or greater than $300,000,000 | 1.50% | 0% | 1.50% |
| 3 | Less than $300,000,000 and equal to or greater than $200,000,000 | 1.75% | 0% | 1.75% |
| 4 | Less than $200,000,000 and equal to or greater than $125,000,000 | 2.00% | .25% | 2.00% |
| 5 | Less than $125,000,000 | 2.25% | .50% | 2.25% |

3. The Applicable Margin for Revolving Loans based on FILO Availability shall be 3.75% as to such Revolving Loans for which interest is calculated based on the Adjusted Eurodollar Rate and 2.00% as to such Revolving Loans for which interest is calculated based on the ABR.

695023.9

A-18

4. The term "Quarterly Average Excess Availability" shall mean, at any time, the average of the aggregate amount of the Excess Availability plus the average of the aggregate amount of Qualified Cash of Borrowers for the immediately preceding fiscal quarter as calculated by Agent (absent manifest error). As used herein, the term "Qualified Cash" shall mean the amount of unrestricted cash of Borrowers that is (a) subject to the valid, enforceable and first priority perfected security interest of Agent, (b) not subject to any other security interest, pledge, lien, encumbrance or claim, (c) available to be used without condition, restriction or limitation and (d) maintained in an investment account at Wachovia pursuant to a deposit account control agreement or an investment property control agreement, as the case may be, in form and substance satisfactory to Agent in good faith, which provides that, among other things, no amounts may be withdrawn or disbursed from such account to any person without the prior written consent of Agent.

5. After an Event of Default under the Loan Documents, the applicable rates of interest and rate for LC fees shall be increased by 2.00% per annum above the then applicable pre-default rates. Such increased rate shall also be applicable to Revolving Loans and LCs outstanding in excess of the loan availability or any applicable limits, whether or not such excess(es) are permitted by Agent or any Lender at any time. Such increased rates shall also apply to any obligations owing to Agent and Lenders that are due and remain unpaid after the termination of the Loan Documents.

**EXHIBIT B**

**Winn-Dixie, Inc.**

**$725,000,000  Senior Secured Credit Facility (the "Credit Facility")**

**Conditions Precedent to Credit Facility**

June 28, 2006

All capitalized terms used in this Exhibit B have the meaning assigned to such terms in the Commitment Letter and the Term Sheet.

Those conditions precedent customarily required by Agent in similar financings and any additional conditions precedent deemed appropriate by Agent in good faith in the context of this transaction, including, without limitation, the following:

(a)    Receipt by Agent of all financial information, projections, budgets, business plans, cash flows and such other information as Agent shall request from time to time, including (i) projected monthly balance sheets, income statements, statements of cash flows and availability of Borrowers for the 2006 and 2007 fiscal years of Borrowers, (ii) projected annual balance sheets, income statements, statements of cash flows and availability of Borrowers and Guarantors through the end of the 2011 fiscal year of Borrowers, in each case as to projections described in clauses (i) and (ii), with the results and assumptions set forth in all of such projections in form and substance satisfactory to Agent in good faith, and an opening pro forma balance sheet for Borrowers and Guarantors in form and substance satisfactory to Agent in good faith, (iii) any updates or modifications requested by Agent to the projected financial statements of Borrowers and Guarantors previously received by Agent, in each case in form and substance satisfactory to Agent in good faith, and (iv) pro forma financial statements of Borrowers for the fiscal years ending 2004, 2005 and year to date for 2006 (and on a monthly basis for 2005 and 2006) which, among other things, shall demonstrate pro forma EBITDA in amounts to be agreed upon for the most recently ended twelve month periods.  Agent acknowledges receipt of the documents and information described in clauses (i), (ii) and (iv) of this paragraph and that as of the date hereof such documents and information are satisfactory to it.

(b)    Agent's completion of its due diligence, with results satisfactory to Agent in good faith, including (i) receipt and review of third party appraisals with respect to inventory and pharmacy scripts, in each case in form and containing assumptions and appraisal methods satisfactory to Agent in good faith by appraisers acceptable to Agent, addressed to Agent and on which Agent and Lenders are expressly permitted to rely, (ii) receipt and review of third party appraisals with respect to owned real estate and leasehold reports with respect to leaseholds, in each case, in form and containing assumptions and appraisal and valuation methods satisfactory to Agent in good faith by appraisers and valuation firms acceptable to Agent, addressed to Agent and on which Agent and Lenders are expressly permitted to

rely, (iii) an updated and current field examination of the business and collateral of Borrowers and Guarantors in accordance with Agent's customary procedures and practices and as otherwise required by the nature and circumstances of the businesses of Borrowers and Guarantors and (iv) environmental audits of the owned real estate of Borrowers and Guarantors conducted by an independent environmental engineering firm acceptable to Agent, and in form, scope and methodology satisfactory to Agent in good faith. Agent acknowledges receipt of the documents and information described in clauses (ii) and (iv) of this paragraph and that as of the date hereof such documents and information are satisfactory to it. Agent shall be satisfied in good faith with the corporate and capital structure of Borrowers and Guarantors and with all legal, tax, accounting, business and other matters relating to Borrowers after giving effect to the Plan and the Credit Facility and Agent and its counsel will have had the opportunity to conduct customary legal due diligence (the results of which shall be satisfactory to Agent and its counsel in good faith).

(c)  No Material Adverse Change shall have occurred since May 31, 2006, provided, that, commencing as of the date that is ten (10) business days after the receipt by Agent of the 2006 10-K, instead of May 31, 2006, such date shall be June 28, 2006, so long as (i) within such ten (10) business day period, Agent shall not have notified Administrative Borrower that Agent has determined in good faith that a Material Adverse Change shall have occurred during the period commencing on May 31, 2006 and ending on the date of the filing of the 2006 10-K with the SEC, and (ii) no Material Adverse Change shall have occurred since May 31, 2006 that is not disclosed in the 2006 10-K. As used in the Commitment Letter and this Exhibit B, (A) the term "Material Adverse Change" shall mean a material adverse change in the business, operations, assets or financial condition of Administrative Borrower and its subsidiaries (taken as a whole) since May 31, 2006, or June 28, 2006 as described in the 2006 10-K, as applicable, other than any material adverse change relating to or resulting from any of the following, so long as such change does not have a material adverse affect on the ability of Borrowers and Guarantors to fulfill the obligations of Borrowers and Guarantors to Agent and Lenders or the ability of Agent and Lenders to enforce the obligations of Administrative Borrower and its subsidiaries to Agent and Lenders or the ability of Agent and Lenders to enforce their respective rights and remedies with respect to the Collateral: (1) changes in general economic conditions or securities markets in general, (2) events, circumstances, changes or effects that affect the retail food industry (except if Administrative Borrower and its subsidiaries (taken as a whole) are disproportionately affected thereby), (3) catastrophes, including hurricanes, earthquakes, hailstorms, severe winter weather, floods, fires, tornadoes and other natural or man-made disasters, (4) any changes after the date hereof in any and all domestic (federal, state or local) or foreign laws, rules, regulations, orders, judgments or decrees promulgated by any governmental authority, including those relating to the protection of the environment, natural resources, and human health and safety applicable to Administrative Borrower and its subsidiaries (taken as a whole) or any of their respective properties or assets (except if Administrative Borrower and its subsidiaries (taken as a whole) are disproportionately affected

thereby), (5) any outbreak or escalation of hostilities or war or any act of terrorism, or (6) compliance with the Plan and the transactions contemplated thereby, and (B) the term "2006 10-K" shall mean the annual report of Administrative Borrower on Form 10-K for the fiscal year ended June 28, 2006 as filed with the SEC. No defaults or events of default on the closing date under any of the Loan Documents or on any other material debt or any material contract of Borrowers or Guarantors shall exist. There shall be no material misstatements in or omissions from the materials previously furnished to Agent by Borrowers and Guarantors. Agent must be satisfied in good faith that any financial statements delivered to it fairly present the business and financial conditions of Borrowers and Guarantors.

(d)     Administrative Borrower shall have formed the SPE in accordance with applicable law and shall have executed and delivered to Agent or its designee all agreements, documents and instruments, in form and substance satisfactory to Agent in good faith, necessary or desirable to transfer and cause its subsidiaries to transfer title to all of the owned Real Property and all of the Eligible Leasehold Property of Administrative Borrower and its subsidiaries to the SPE.

(e)     Execution and delivery of the Loan Documents by all parties thereto other than Agent, and including all consents, waivers, acknowledgments and other agreements from third persons that Agent may in good faith deem necessary or desirable (which shall include the consents, waivers, acknowledgments and other agreements from third persons required pursuant to the Existing Credit Agreement), in form and substance satisfactory to Agent in good faith, and including delivery to Agent of each of the following, each in form and substance satisfactory to Agent in good faith, (i) all agreements, documents and instruments, necessary or desirable to grant to Agent a valid and perfected first priority mortgage (subject to designated permitted liens) in favor of Agent upon the Real Property (whether pursuant to a modification agreement as to Real Property currently subject to a mortgage in favor of Agent under the existing credit facility or a new mortgage as to Real Property not currently subject to a mortgage in favor of Agent under the existing credit facility) and a valid and perfected first priority leasehold mortgage (subject to designated permitted liens) in favor of Agent upon each Leasehold Property (whether pursuant to a modification agreement as to Leasehold Property currently subject to a leasehold mortgage in favor of Agent under the existing credit facility or a new leasehold mortgage as to Leasehold Property not currently subject to a leasehold mortgage in favor of Agent under the existing credit facility), other than (A) seventeen (17) of the Leasehold Property selected by Agent for which such leasehold mortgage will not be required at closing or as a post-closing requirement, (B) those leaseholds that have valid and enforceable prohibitions on the granting of leasehold mortgages by the lessee, and (C) such of the Leasehold Property to which no value has been given under the April 2006 Leasehold Report, which are to be delivered within sixty (60) days after the closing date as set forth in the Affirmative Covenants in Exhibit A hereto, (ii) evidence of insurance coverage, (iii) a lender's loss payee endorsement in favor of Agent as to casualty and business interruption insurance, (iv) mortgagee's

title insurance by a company and agent acceptable to Agent insuring (A) as to Real Property, the priority, amount and sufficiency of each mortgage, deed of trust or deed to secure debt, insuring against matters that would be disclosed by surveys, and containing any endorsements, assurances or affirmative coverage requested by Agent in good faith in accordance with its customary practices for protection of its interests and (B) as to Leasehold Property, the priority, amount and sufficiency of each mortgage, deed of trust or deed to secure debt for such Leasehold Property having an aggregate appraised value of approximately $100,000,000 as set forth in the April 2006 Leasehold Report, insuring against matters that would be disclosed by surveys to the extent that such surveys exist as of the closing date, and containing any endorsements, assurances or affirmative coverage requested by Agent in good faith in accordance with its customary practices for protection of its interests.

(f)    Agent, for the benefit of itself and Lenders, shall hold perfected, first priority security interests in and liens upon the Collateral, but as to priority, subject to such liens as are permitted under the Loan Documents (which shall be consistent with the liens permitted under the Existing Credit Agreement) that have priority over the security interests and liens of Agent under applicable law

(g)    The Excess Availability at closing as determined by Agent after the application of proceeds of the initial Revolving Loans and after provision for payment of all fees and expenses of the transactions contemplated hereby, shall be not less than the amount equal to $200,000,000.

(h)    Agent shall have received evidence, in form and substance satisfactory to Agent in good faith, that Borrowers and Guarantors have obtained all necessary consents and approvals to the Credit Facility.

(i)    Agent shall have received a certified copy of the final order confirming the Plan in the Chapter 11 Case (the "Confirmation Order"), which order shall be in form and substance satisfactory to Agent in good faith, entered by the United States Bankruptcy Court having exclusive jurisdiction over the Chapter 11 Case (the "Bankruptcy Court") after due notice to all creditors and other parties-in-interest and as entered on the docket of the Clerk of the Bankruptcy Court. The Confirmation Order shall authorize the financing under the Credit Facility for Borrowers and shall contain such other terms and provisions as Agent and its counsel shall in good faith require. The Confirmation Order shall be in full force and effect and shall not have been modified, reversed, stayed or vacated.

(j)    The Plan and any amendments thereto shall be in form and substance satisfactory to Agent and its counsel in good faith. Agent acknowledges that the June 27, 2006 draft of the Plan provided to Agent is satisfactory to it, provided, however, that any amendments or supplements to the Plan will need to be in form and substance satisfactory to Agent in good faith. The Plan shall be consummated and effective and all agreements and undertakings of the parties thereunder to be performed by such time shall have been satisfied and performed. The Confirmation Order shall be final, valid, subsisting and continuing and all conditions precedent to the

effectiveness of the Plan shall have been fulfilled (or waived in accordance with the terms of the Plan), including, without limitation, the execution, delivery and performance of all terms and conditions thereof. Agent shall have received evidence, in form and substance satisfactory to Agent in good faith, that all consents, approvals or withholding of objections, appropriate or necessary to consummate the Plan and the Credit Facility have been obtained.

(k)     No motion, action or proceeding shall be pending against a Borrower or Guarantor by any creditor or other party-in-interest in the Bankruptcy Court or any other court of competent jurisdiction which adversely affects or may reasonably be expected to adversely affect the Plan in any material respect, the post-consummation business of Borrowers in any material respect or the Credit Facility in any material respect.

(l)     Borrowers and Guarantors shall comply in full with the notice and other requirements of the U.S. Bankruptcy Code in a manner acceptable to Agent and its counsel in good faith.

(m)     The Confirmation Order shall have been entered by no later than November 30, 2006 and the satisfaction of the each of the conditions to the Credit Facility, and the closing of the Credit Facility, shall have occurred by no later than December 31, 2006.

Any actions set forth in this Exhibit B required to be taken on the effective date of the Plan shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.