**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

**AD HOC TRADE COMMITTEE'S BRIEF IN SUPPORT OF MOTION FOR ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE SUBSTANTIVELY CONSOLIDATING DEBTORS' ESTATES**

DLA PIPER RUDNICK GRAY CARY US LLP
Thomas R. Califano
Vincent J. Roldan
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 835-6190
Facsimile: (212) 835-6001

DLA PIPER RUDNICK GRAY CARY US LLP
Mark J. Friedman
Daniel Carrigan
Janice L. Duban
6225 Smith Avenue
Baltimore, MD 21209
Telephone: (410) 580-4153
Facsimile: (410) 580-3001

DLA PIPER RUDNICK GRAY CARY US LLP
Philip V. Martino
Florida Bar Number 079189
101 East Kennedy Boulevard, Suite 2000
Tampa, FL 33602-5149
Telephone: (813) 229-2111
Facsimile: (813) 229-1447

Attorneys for Ad Hoc Trade Committee of Winn-Dixie Stores, Inc., et al.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL OVERVIEW.........................................................................................4

FACTS ..............................................................................................................7

ARGUMENT.......................................................................................................9

I. The issue of substantive consolidation should be determined prior to the filing of a disclosure statement. ..........................................................................9

II. Eleventh Circuit precedent compels Substantive Consolidation of the debtors..........................................................................................................10

(1) There is a substantial identity among the Debtors. ..................................14

(i) The Debtors have consolidated financial statements and tax returns...........................................................................................14

(ii) The Debtors operate as one unified enterprise....................................15

(iii) There is a unity of ownership among the Debtors and they have common officers. .........................................................................20

(iv) The Existence of Inter-Corporate Guarantees Supports Substantive Consolidation. ............................................................21

(a) The Indenture and related documents reflect that Noteholders did not rely on the separate credit of the Debtors. ..................................................................23

(b) Guarantees relating to leases..................................................27

(c) Bank debt guarantees ............................................................28

(v) The commingling of the Debtors' cash supports substantive consolidation. ....................................................................28

(vi) The existence of transfers of assets without formal observance of corporate formalities supports substantive consolidation. .......................................................................................30

(vii) The Debtors' commingled assets and business functions supports substantive consolidation. ..............................................32

(viii) Profitability of consolidation at a single physical location..................34

(2) Consolidation Is Necessary To Avoid Harm Or Confer Benefit. ....................34

(3) There Is A Presumption That Creditors Have Not Relied On The Credit Of Any Of The Debtors. ..............................................................36

(4) The Benefits of Consolidation Heavily Outweigh Any Harm. .......................37

III. SUBSTANTIVE CONSOLIDATION IS APPROPRIATE EVEN IF THE TEST PROMOTED BY OWENS-CORNING IS CONSIDERED MORE STRINGENT....................37

(1) Prepetition, The Debtors Disregarded Separateness So Significantly Their Creditors Relied On The Breakdown Of Entity Borders And Treated Them As One Legal Entity....................38

CONCLUSION....................41

# TABLES OF AUTHORITIES

Cases

Drabkin v. Midland – Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270 (D.C. Cir. 1987) ...... 11
Eastgroup Properties v. Southern Motel Assoc. Ltd., 935 F.2d 245 (11th Cir. 1991 ............ passim
Holywell Corp. v. Bank of N.Y. (In re Holywell Corp.), 59 B.R. 340 (S.D. Fla. 1986).. 14, 15, 21
In re Affiliated Foods, Inc., 249 B.R. 770 (Bankr. W.D. Mo. 2000)..................................... 30, 35
In re Alico Mining Inc., (Bankr. M.D. Fla. 01-18572-9PI) .................................................... 10, 13
In re American Homepatient, Inc., 301 B.R. 713 (Bankr. M.D. Tenn. 2003) ................. 15, 22, 28
In re Brentwood Golf Club, LLC, 329 B.R. 802 (Bankr. E.D. Mich. 2005) ......................... passim
In re Commercial Envelope Mfg. Co., Inc., 1977 WL 182366
(Bankr. S.D.N.Y. Aug. 22, 1977) .......................................................................................... 21
In re Donut Queen, Ltd., 41 B.R. 706 (Bankr. E.D.N.Y. 1984) .................................................. 16
In re Eagle-Picher Indus., Inc., 192 B.R. 903 (Bankr. S.D. Ohio 1996).......................... 16, 22, 28
In re F.W.D.C., Inc., 158 B.R. 523 (Bankr. S.D. Fla. 1993) ....................................................... 13
In re Food Fair, Inc., 10 B.R. 123 (Bankr. S.D.N.Y. 1981).................................................. passim
In re Gainesville P-H Properties, Inc., 106 B.R. 304 (Bankr. M.D. Fla. 1989)............... 15, 16, 21
In re Munford, Inc., 115 B.R. 390 (Bankr. N.D. Ga. 1990)......................................................... 16
In re Murray Indus., 119 B.R. 820, 820 (Bankr. M.D. Fla. 1990)........................................ passim
In re Optical Technologies, Inc., 221 B.R. 909 (Bankr. M.D. Fla. 1998) ..................................... 9
In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005)............................................................. passim
In re Palumbo Family Ltd. P'ship., 182 B.R. 447, 460 (Bankr. E.D. Va. 1995)............................ 9
In re Richton Int'l. Corp., 12 B.R. 555 (Bankr. S.D.N.Y. 1981) ................................................ 21
In re Standard Brands Paint Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993)..................................... 35
In re Stone & Webster, Inc., 286 B.R. 532, 542 (Bankr. D. Del. 2002) ........................................ 9
In re United Stairs Corp., 176 B.R. 359 (Bankr. D.N.J. 1995) ...................................................... 2
In re Vecco Constr. Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) .................................. passim
In re Worldcom, Inc., 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 21, 2003)........................ 14, 30
Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence Paperboard Corp.),
76 B.R. 866 (Bankr. D.Mass. 1987) ........................................................................................ 23
Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102 (11th Cir. 1994) ........................................... 12, 13
Soviero v. Franklin Nat. Bank of L.I. (In re Soviero), 328 F.2d 446 (2d Cir. 1964).............. 16, 29
Stone v. Eacho (In re Tip Top Tailors, Inc.), 127 F.2d 284 (4th Cir. 1942).................................. 36
Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),
860 F.2d 515 (2d Cir. 1988)................................................................................................ 10, 11

**Preliminary Statement**

The Debtors[1] are organized and function strictly as a single, integrated enterprise in the operation of supermarkets. The Debtors' combined operations are, and were intended by the Debtors to be built on multiple locations all acting and benefiting from a single identity. The Debtors have centralized management, accounting and policies and procedures which are so intensely intertwined and interdependent that any treatment of them as separate, "stand alone" entities would create the fiction of (i) disregarding the reality of the Debtors' business and (ii) artificially valuing both the Debtors and their assets. The failure to substantively consolidate the Debtors would thereby arbitrarily and unjustifiably enrich certain creditors at the expense of other creditors. Consequently, the Debtors must be substantively consolidated in order to assure equitable treatment to all creditors.

In analyzing whether or not to consolidate affiliated debtor entities, judicial circuits have articulated similar tests based on largely overlapping criteria. Whether considering the prevailing Eleventh Circuit decision, Eastgroup Properties v. Southern Motel Assoc. Ltd., 935 F.2d 245 (11th Cir. 1991), the more recent decision in In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005), cert. denied, ___ U.S. ___ (2006), 2006 WL 1131857 (U.S. May 1, 2006) or other substantive consolidation cases, courts all dictate the evaluation and consideration of:

---

[1] In addition to Winn-Dixie Stores, Inc. ("WDSI"), the following entities are Debtors in these related cases (all of whom are subsidiaries, directly or indirectly, of WDSI): Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc.("Logistics"), Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc. ("Procurement"), Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

1. The degree to which the internal operations of the entities are intertwined;

2. The degree to which the entities have been held out to third parties as an integrated enterprise or separate "stand alone" entities and the reliance on such status by third parties;

3. The degree to which it is feasible or not feasible to disentangle the entities; and

4. An examination of the economic impact of consolidation as against separateness for the subject entities.

As will become apparent from the evidence adduced to date by the Ad Hoc Trade Committee (the "Trade Committee"),[2] the affidavit of the Trade Committee's expert (M. Freddie Reiss of FTI Consulting, Inc.) and a complete evidentiary record, each of these factors weigh heavily in favor of substantive consolidation in these cases. Not only will the relevant facts in these cases demonstrate that substantive consolidation is legally and equitably warranted, but also that substantive consolidation may be the only means by which the requisite Chapter 11 plan confirmation requirements can be satisfied. The Trade Committee therefore hereby seeks the entry of an order substantively consolidating the Debtors for all reorganizational plan purposes.

The principal opponents to substantive consolidation are the holders of notes (the "Noteholders") issued pursuant to an indenture dated December 26, 2000 between WDSI, certain of its subsidiaries as guarantors, and Wilmington Trust Co. (the "Indenture Trustee"), as supplemented by first supplemental indenture dated March 29, 2001 (the "Indenture"). Pursuant

[2] The current members of the Ad Hoc Trade Committee are as follows: ASM Capital, Amroc Investments, LLC, Avenue Capital Group, LCH Opportunities, LLC, DellaCamera Capital Management, LLC, Contrarian Capital Management, LLC, Longacre Fund Management, LLC, ConAgra Foods, Inc., The Procter & Gamble Distributing Co., S.C. Johnson & Son, Inc., Conopco, Inc., Madison Capital Management, VR Capital Group, Ltd., and General Mills, Inc. The Trade Committee, the members of which hold approximately $70 million in unsecured claims, relating to goods and sold delivered to the Debtors, services rendered to the Debtors and rejection of leases, respectfully submits that it has standing to seek substantive consolidation. See In re United Stairs Corp., 176 B.R. 359, 368 (Bankr. D.N.J. 1995) (individual creditor has standing to seek substantive consolidation against non-debtor entity).

to the Indenture, WDSI issued $300 million in principal amount of senior notes (the "Notes") bearing interest at 8.875% per annum which mature by their terms in 2008. The Noteholders oppose substantive consolidation of the Debtors because they seek recovery on duplicate unsecured claims in these cases – one based on the primary Note debt and a second based on the Debtor subsidiary guaranties of that debt. The facts of these cases, however, will demonstrate that the subsidiary guaranties of the Note obligations were provided to assure the Noteholders that they held unsecured claims against the value of the assets of the entire Winn-Dixie enterprise. Providing those guaranties was no assurance to the Noteholders of any particular structure of "stand alone" Debtor entities, or of an entitlement to duplicate recovery on their claim in these cases. Instead, their entitlement, like that of other unsecured creditors, should be limited to a single claim and recovery. Only the substantive consolidation of the Debtors can ensure this result.

The Trade Committee formed to represent the interests of the overwhelming majority of unsecured creditors who would be severely prejudiced were the Noteholders to succeed in receiving duplicate claims and recoveries in these cases based upon the existence of the Debtor subsidiaries' guaranties of the Note debt. That windfall can inure to the sole benefit of Noteholders and to the sole detriment of all other unsecured creditors only if the Debtors are not substantively consolidated. Fortunately, however, as will be demonstrated, the failure to consolidate the Debtors' estates can occur only by ignoring the fundamental economic and business realities of the Debtors' operations, both pre and post petition. Substantive consolidation is necessary here to avoid forcing the Court and creditors to consider a plan which elevates form over substance and ignores the true business reality of the Debtors' operations. Such a plan would of necessity be based on artificial valuations of the separate business units and

would result in a windfall for the Noteholders that is warranted neither by the facts, nor the law, nor any right incident to the Notes.

The facts investigated by the Trade Committee as described herein show that the Debtors act as a unitary enterprise with one real "business" i.e., the operation of supermarkets.  All other functions support that business.  Any attempt to value a piece of that unitary enterprise on any basis other than on a consolidated basis would be artificial.  The Debtors are, and were run as, one single business. To proceed with a plan on any other basis would be to ignore the economic realities, would require decisions on values of separate entities and distribution to creditors that would be arbitrary and would hand the Noteholders a windfall for which they did not bargain.

## Factual Overview

The Debtors are operated along functional lines without regard to corporate identity.  In April, 2000 (significantly, prior to the issuance of the Notes), the Debtors commenced a comprehensive and intensive initiative to (i) dismantle any then-existing management and financial functions and operations at any subsidiary level and (ii) further consolidate all business operations, management and financial functions at the parent level (i.e., WDSI).  During that process, the Debtors closed headquarters offices for subsidiary entities and consolidated essentially all administrative, operational and financial functions of those subsidiary entities into the parent, WDSI.  Also during that consolidation process, WSDI formed two, new service subsidiaries ("Procurement," which served to order inventory on an enterprise basis; and "Logistics," which served to move inventory on an enterprise basis) in order to facilitate the overall consolidation by fulfilling certain operational functions on a centralized basis.  Their

initial capitalizations were assets contributed by subsidiaries which became shells. The subsidiaries that survived, did so for tax reasons.

The consolidation also involved a corporate realignment (the "Realignment") that resulted in the elimination of certain subsidiaries and the survival of others. The Realignment, however, was motivated solely by tax purposes. Since the Realignment, any remote or possible then-existing remnant of “separateness” of WDSI and its affiliated entities has entirely disappeared. Instead, the Debtors have since operated as a single, cohesive, business unit along functional and regional lines, and with total disregard to the “separateness” or “distinctness” of existing corporate identities.

Not only have the Debtors actually operated as a single business enterprise, but they have never held themselves out to the Noteholders (or any other constituency) as operating in any other manner. The Debtors themselves do not believe they are or function as "stand alone" or otherwise separate and distinct corporate entities.

The Debtors’ various retail subsidiaries are all created and function only for the benefit on the company as a whole. Their internal finances, financial policies and controls are all centralized. The subsidiaries only have depository accounts, not disbursement accounts. Accounting functions and transactions between them are evidenced solely by book entries at the parent level without the actual transfer of funds.

Furthermore, and significantly, the Indenture itself, pursuant to which the Noteholders acquired their unsecured claims, expressly permitted the consolidation of any or all of the Debtor entities – the precise relief the Trade Committee now requests. As the Trade Committee will establish, substantive consolidation, rather than prejudicing the rights of any creditors, instead

vests all of them with the benefit of their bargain and expectations in their dealings with the Debtors. That benefit extends equally to the Noteholders, who would continue to possess their unsecured claim against all enterprise assets. The Noteholders cannot justify the deprivation to other unsecured creditors of a similar recovery.

WSDI, as well as two subsidiaries, Winn-Dixie Montgomery, Inc. ("Montgomery") and Winn-Dixie Raleigh, Inc. ("Raleigh"), also operate stores in various regions. The existence of Montgomery and Raleigh was maintained after the Realignment principally for tax benefits. The actual supermarkets of the Debtors are not managed based on which entity actually owns them. Neither Montgomery nor Raleigh have corporate management functions or headquarters. Rather, the stores are managed and controlled in all ways by officers of WDSI assigned to those "divisions" (as WSDI itself refers to them).

The Realignment eliminated the separate headquarters of Montgomery and Raleigh. Nor do either of them have disbursement or other bank accounts except for depository accounts. All Montgomery and Raleigh board members (as well as those of every other WDSI subsidiary, for that matter) are WDSI officers. Montgomery and Raleigh share the same accounting, human resources, corporate management, advertising, merchandising and purchasing functions, all as part of either WDSI or one of the shared service entities (Logistics or Procurement). Accounting functions and transactions between subsidiaries are evidenced solely by book entries at the WDSI parent level, with no actual transfer of funds ever taking place.

The shared services subsidiaries, Procurement and Logistics, were designed and function to support the activity of all of the stores of WDSI, Montgomery and Raleigh. As noted,

Procurement is the Debtors' ordering entity and Logistics provides for the transportation of goods to the stores.

The Debtors have one other active subsidiary, Deep South Products, Inc. ("Deep South"), which operates primarily to bottle soda and soft drinks for the Debtors' store brands. Deep South has no bank accounts and no management above the plant manager level. For a period of time, the Deep South facility manager reported to a vice president of manufacturing at WDSI (together with the managers of certain of the Debtors' other manufacturing facilities). As part of the Realignment, however, the Debtors excised the majority of their unprofitable manufacturing businesses.

These and the host of other facts set forth herein in support of this Motion demonstrate that the Debtors functioned as a unitary enterprise with one real "business," i.e., the operation of retail supermarkets. To pretend otherwise by failing to substantively consolidate them and treat them as "separate and distinct" corporate entities for plan purposes simply ignores the business and economic realities of the Debtors' operations. Pretending otherwise would also hand the Noteholders a windfall for which they did not bargain and to which they are not entitled. The facts and circumstances of these cases compel substantive consolidation.

## FACTS

The affidavit of M. Freddie Reiss discloses (the "Reiss Affidavit"), filed in support of the Trade Committee's motion, in stark detail the pervasiveness of the consolidation and integration, and the veritable impossibility of disentangling the Debtors into "stand alone" entities. The

following is a summary of certain facts that compel a conclusion that these Debtors' estates should be substantively consolidated:

- WDSI is both the parent company of all other Debtors and the actual operator of 574 supermarkets.[3]

- The Debtors restructured in the year 2000 specifically to further consolidate their operational efficiency, cost savings and purchasing power.

- Corporate management, administrative and support functions for the Debtors' retail operations are consolidated and managed by WDSI from its corporate headquarters in Jacksonville, Florida.

- The Debtors' accounting functions are consolidated to one location and involve a consolidated cash management system which commingled the cash from the various Debtor entities.

- The Debtors have common officers and directors. In fact, every director of the Debtors' subsidiaries is an officer of WDSI.

- WSDI essentially finances its subsidiaries. It holds all of the cash and pays all of the expenses.

- Creditors of the Debtors conducted business with the Debtors as though they were one enterprise.

- The Debtors entered into intercompany transactions that were not arms-length transactions. Assets were transferred without consideration and employees were moved at will. The intercompany accounts maintained by WDSI are not maintained on a subsidiary to subsidiary basis.

- The Debtors public statements on its website and otherwise depicted the Debtors as one business.

- The Debtors' credit facilities were based upon the Debtors' consolidated financial metrics.

- WDSI is the primary obligor under the Notes, which were marketed based on consolidated financials. Although certain of WDSI's subsidiaries are guarantors to the Indenture, Noteholders were not assured of separate "stand alone" entities.

---

[3] Based on the Debtors' Form 10-Q as of January 11, 2006.

- Only consolidated financial statements are provided to creditors.
- The Debtors' file public statements with the SEC under the name of the parent company, WDSI. All of WDSI's SEC filings are based upon consolidated financial statements for all Debtors.
- An accounting of decades worth of intercompany transactions would be cost-prohibitive and be subject to significant error due to the Debtors' accounting and the absence of certain records.

See generally Reiss Affidavit.

## ARGUMENT

### I. THE ISSUE OF SUBSTANTIVE CONSOLIDATION SHOULD BE DETERMINED PRIOR TO THE FILING OF A DISCLOSURE STATEMENT.

Whether to consolidate or separate the Debtors must be resolved before any consolidation of a reorganization plan. The issue of substantive consolidation impacts the adequacy of disclosure to creditors, the voting and distribution schemes of any proposed plan, and alters creditor recoveries. Thus, it is appropriate that the issue be determined prior to the consideration of a plan. In re Optical Technologies, Inc., 221 B.R. 909, 911 (Bankr. M.D. Fla. 1998) (scheduling evidentiary hearing on motion to substantive consolidate certain debtors despite the fact the some of the entities to be consolidated "did not file their Petitions for Relief until approximately two months ago and may not file their own disclosure statements"); In re Palumbo Family Ltd. P'ship., 182 B.R. 447, 460 (Bankr. E.D. Va. 1995) (considering separate issue, noted that motion for substantive consideration was considered and approved prior to debtors' submission of joint disclosure statement); In re Stone & Webster, Inc., 286 B.R. 532, 542 (Bankr. D. Del. 2002) ("it is not at all unusual for a plan proponent, or plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan."). Indeed, a motion seeking substantive consolidation may be filed

NEWY1:7991456.v12

prior to the filing of a plan and prior to the termination of the Debtors' exclusivity. See In re Alico Mining Inc., (Bankr. M.D. Fla. 01-18572-9PI) (motion to substantively consolidate a debtor and nondebtor filed by a creditors' committee nearly two months prior to proposed plan of reorganization and prior to the termination of the debtor's exclusivity). In the present case, the Debtors have obtained an extension of exclusivity so that the various parties herein can consider the substantive consolidation of these estates. As set forth below, the Court should consider at this time whether these cases should be substantively consolidated, notwithstanding the fact that the Debtors have not yet filed their plan.

## II. ELEVENTH CIRCUIT PRECEDENT COMPELS SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Substantive consolidation results in, inter alia, pooling the assets of, and claims against, the entities to be consolidated; satisfying liabilities from the resulting common fund; eliminating inter-company claims; and combining the creditors of the companies for purposes of voting on a plan of reorganization. See Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988). The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors. Id. Though some courts have stated that substantive consolidation should be used sparingly,[4] taking into account the realities of current interrelated corporate structures, the Eleventh Circuit Court of Appeals in Eastgroup

[4] See In re Owens Corning, 419 F.3d 195 (3d Cir. 2005). However, it is submitted that even if a court were to apply the standard set forth in Owens Corning, substantive consolidation would be warranted here. The Trade Committee submits that Owens Corning does not so much restrict "substantive consolidation" as to guard against its application where entities are sufficiently "stand alone" not to be regarded as an integrated enterprise.

Properties recognizes a "modern" or "liberal" trend toward allowing substantive consolidation as follows:

> There is . . . a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes.

Eastgroup Properties v. Southern Motel Assoc. Ltd., 935 F.2d 245, 248-49 (11th Cir. 1991) (citing In re Murray Indus., 119 B.R. 820, 828-29 (Bankr. M.D. Fla. 1990)). The Trade Committee submits that the significance of Eastgroup Properties is less a relaxed "substantive consolidation" standard and more a refusal of the Eleventh Circuit "to stick its head in the sand" and fail to recognize that legal remedies must respond to changing business realities. Entities cannot selectively pick and choose when company separateness shall apply. Entities that function essentially as an integrated enterprise cannot be viewed as "stand alone" to the prejudice of its creditors generally or to prefer one class of creditors over others.

Bankruptcy courts are authorized to order substantive consolidation by virtue of their general equitable powers. See Eastgroup Properties, 935 F.2d at 248 (citing Augie/Restivo Baking Co., 860 F.2d at 518 n.1 and Drabkin v. Midland – Ross Corp. (In re Auto-Train Corp.), 810 F.2d 270, 276 (D.C. Cir. 1987)). The Eleventh Circuit in Eastgroup Properties stated, "the basic criteria by which to evaluate a proposed substantive consolidation is whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation." Eastgroup Properties, 935 F.2d at 249 (citations omitted). "In other words, a court 'must conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties'." Id. (citing Auto-Train, 810 F.2d at 276).

In Eastgroup Properties, the Eleventh Circuit adopted the standard for substantive consolidation set forth by the D.C. Circuit in Auto-Train:

> [T]he proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made the prima facie case for consolidation the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated;[5] and (2) it will be prejudiced by substantive consolidation. Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."

Eastgroup Properties, 935 F.2d at 249; Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1108 (11th Cir. 1994) (adopting Eastgroup in the spousal context). Thus, in the present case, the Trade Committee will establish that, (1) there is a substantial identity between the Debtors, and (2) consolidation is necessary to avoid some harm or realize some benefit. See Eastgroup Properties, 935 F.2d at 249.

Eastgroup Properties sets forth seven factors which a court should consider when determining whether grounds for substantive consolidation exist:

> (1) The presence or absence of consolidated financial statements.
>
> (2) The unity of interests and ownership between various corporate entities.
>
> (3) The existence of parent and inter-corporate guarantees on loans.

---

[5] Eastgroup Properties notes that creditors may be estopped from asserting that they relied on the credit of one of the entities where a "reasonable creditor in a similar situation would not have relied on the separate credit of one of the entities to be consolidated" or, stated another way, "where such a claim would be unreasonable in light of all the facts." Eastgroup Properties, 935 F.2d at 249 n. 11 (citations omitted)

    (4) The degree of difficulty in segregating and ascertaining individual assets and liabilities.

(5) The existence of transfers of assets without formal observance of corporate formalities.

(6) The commingling of assets and business functions.

(7) The profitability of consolidation at a single physical location.

Eastgroup Properties, 935 F.2d at 249 (citations omitted); Murray Indus., 119 B.R. at 830.[6] These factors are only examples of information useful to the court in analyzing substantive consolidation issues; no single factor is likely to be determinative in the court's inquiry. See id. at 2500. In Reider, the Eleventh Circuit noted that because a substantive consolidation analysis requires a balancing of the prejudices to creditors, such analysis is "to great degree sui generis," requiring the court to determine what equity requires in each case. Reider, 31 F.3d at 1108. Similarly, the court in Murray Indus. recognized that "the formula developed to analyze these cases has always been tailored to the unique fact pattern of the case involved." Murray Indus., 119 B.R. at 830.

Since the decision in Eastgroup Properties, other courts within the Eleventh Circuit have consistently applied the Auto-Train test when determining substantive consolidation. See In re F.W.D.C., Inc., 158 B.R. 523, 525 (Bankr. S.D. Fla. 1993); see also Alico Mining, 278 B.R. at 588-89 (determining that a debtor can be substantively consolidated with a non-debtor, and

[6] The Eastgroup Properties court listed additional factors that could be presented in some cases: (1) the parent owning the majority of the subsidiary's stock; (2) the entities having common officers or directors; (3) the subsidiary being grossly undercapitalized; (4) the subsidiary transacting business solely with the parent; and (5) both entities disregarding the legal requirements of the subsidiary as a separate organization. Eastgroup Properties, 935 F.2d at 250. Of course, all those factors, present here, weigh in favor of substantive consolidation of these Debtors.

scheduling an evidentiary hearing to determine whether substantive consolidation was appropriate under the Auto-Train test).

As set forth below, consideration of each of the factors referenced in the Eastgroup Properties case compels substantive consolidation.

(1) There is a substantial identity among the Debtors.

The first prong of Eastgroup Properties requires the moving party to show that there is a substantial identity among the Debtors. In the present case, all of the facts reflect that there is indeed a substantial identity: (i) the Debtors filed consolidated financial statements and tax returns; (ii) their operations are run as a unified enterprise; (iii) the Debtors consist of one parent company and its direct and indirect subsidiaries, with overlapping officers; (iv) there are inter-company guarantees; (v) the Debtors commingled cash; (vi) the Debtors transferred assets among themselves without formal observance of corporate formalities; (vii) the Debtors commingled assets and business functions; and (viii) all the Debtors' accounting is performed in one location by the same personnel. These facts are described in greater detail below.

(i) The Debtors have consolidated financial statements and tax returns.

The presence of consolidated financial statements supports substantive consolidation. See, e.g., Holywell Corp. v. Bank of N.Y. (In re Holywell Corp.), 59 B.R. 340, 347-48 (S.D. Fla. 1986) (court considered "the presence of consolidated financial statements" as one of several factors); Murray Indus., 119 B.R. at 831 (court considered that "the debtors published one single consolidated financial statement for each of their operating years" and that "all audits performed by outside services were done on a consolidated basis" as factors in support of substantive consolidation); In re Worldcom, Inc., 2003 WL 23861928 *37 (Bankr. S.D.N.Y. Oct. 21, 2003)

("public financial reporting on a consolidated basis" cited as one of several factors in support of substantive consolidation); In re Brentwood Golf Club, LLC, 329 B.R. 802, 814 (Bankr. E.D. Mich. 2005) (court cited the consolidated business records and financial records of the debtor and its subsidiary as weighing in favor of substantive consolidation); In re Food Fair, Inc., 10 B.R. 123, 126 (Bankr. S.D.N.Y. 1981) (fact that the debtors issued consolidated financial statements for a number of years weighed in favor of substantive consolidation).

In the present case, the Debtors' published documents financial statements were prepared on a consolidated basis. See Reiss Affidavit ¶ 38. Similarly, their audits were on a consolidated basis and they filed operating reports on a consolidated basis. There is no indication that any creditor ever received a financial statement other than a consolidated statement. See Reiss Affidavit ¶ 37, 38.

The Debtors filed consolidated federal tax returns. See In re American Homepatient, Inc., 301 B.R. 713, 719 (Bankr. M.D. Tenn. 2003) (court noted testimony that "financial tax statements and tax returns are done on a consolidated basis" as a factor in support of substantive consolidation). State tax returns for Florida and South Carolina were also prepared on a consolidated basis.

(ii)     The Debtors operate as one unified enterprise.

The existence of a unity of interests between the various corporate entities supports substantive consolidation. In re Gainesville P-H Properties, Inc., 106 B.R. 304, 306 (Bankr. M.D. Fla. 1989) aff'd sub nom Eastgroup Properties, 938 F.3d 245 (citing common ownership of the two entities as one factor in support of substantive consolidation); Holywell, 59 B.R. at 347-48 (court considered "the unity of interests and ownership between the various corporate

entities" as one of several factors); Murray Indus., 119 B.R. at 830 (court considered that "there was total unity of ownership wherein the parent owned and controlled all the subsidiaries" in support of substantive consolidation).

Courts have found "unity of interests and ownership between various entities" where the entities had common ownership, conducted the same business and were "operated as a cohesive and cooperative economic and business unit." In re Vecco Constr. Indus., Inc., 4 B.R. 407, 411 (Bankr. E.D. Va. 1980); see also In re Donut Queen, Ltd., 41 B.R. 706, 708 (Bankr. E.D.N.Y. 1984). The debtor's entry into contracts with suppliers that did not clearly differentiate between the entities and were based on the buying power of the group, thus "providing benefits to [the entities] that they would not have been available to either company alone" is evidence of the interrelationship of the entities when conducting a substantive consolidation analysis. See In re Munford, Inc., 115 B.R. 390, 392-93 (Bankr. N.D. Ga. 1990).[7]

Similarly, the fact that a debtor may refer to its corporate subsidiaries as "divisions" is a factor in support of substantive consolidation. In re Eagle-Picher Indus., Inc., 192 B.R. 903, 906 (Bankr. S.D. Ohio 1996) (court noted that parent referred to subsidiary corporations as divisions as a factor in support of substantive consolidation); Soviero v. Franklin Nat. Bank of L.I. (In re

---

[7] The unity of interest among debtors may also be manifested as the sharing of the same facilities and management. See Gainesville P-H Properties, 106 B.R. at 306 (court considered "same physical facilities" as one of several factors); Food Fair, 10 B.R. at 126 (court cited the recent consolidation of corporate offices for greater profitability and sharing of officers among entities as weighing in favor of substantive consolidation); Vecco,4 B.R. at 411 (parent and subsidiaries all operate from the same business locations and share "[o]verhead, management, accounting and other related expenses"); Munford, 115 B.R. at 393 (citing the finding that "business decisions were made by the executive officers to maximize the joint operational efficiencies and economies of scales of [the debtors] rather than to determine what was best for them as separate entities" as one of the factors supporting substantive consolidation).

Soviero), 328 F.2d 446, 448 (2d Cir. 1964) (court noted "bankrupt's stationery and advertising referred to the affiliates as branches" as a factor in support of substantive consolidation).

As stated previously, the Debtors demonstrate an intent to and actually operate as one unitary cohesive business, i.e. the operation of Winn-Dixie supermarkets. The Debtors' 2000 restructuring program and subsequent refinements to its operating and legal structures supports substantive consolidation. See Reiss Affidavit ¶ 4. As part of the 2000 restructuring program, assets were transferred via inter-company accounts from one subsidiary entity to another with all stock ownership transferred by dividend to WDSI, the ultimate owner of all Debtors. Id. There is no indication that these transfers were or were intended to be arm's-length transactions at fair market value. Id. WDSI restructured the prior relatively autonomous decentralized operation of its subsidiaries into a consolidated enterprise structured along retail operations with various support functions. Id. It also transferred employees and consolidated all senior management at WDSI. Id.

The current corporate structure includes WDSI (which also operates the majority of the retail locations), two other subsidiaries which hold primarily retail operations (Winn-Dixie Montgomery, Inc. and Winn-Dixie Raleigh, Inc.) a logistics subsidiary, a procurement subsidiary, certain captive manufacturing operations, and license and asset holding subsidiaries as well as two non-debtor entities, a Bahamian retail store company and captive insurance company. See Reiss Affidavit ¶ 5. Other entities are essentially inactive or shell companies. Id. The Debtors' manufacturing operations do not have their own corporate identities and some of them are in nominal corporate entities such as Deep South. See Reiss Affidavit ¶ 26. Others are nominally held by the retail subsidiaries. Id. These operations have an immaterial level of third party sales which indicates that without WDSI and the other retail divisions they would not be a

going concerns or a stand alone businesses. Id. The manufacturers sell through Procurement to the retail stores. In addition, the manufacturers do not have their own cash management rather they use the centralized cash management of WDSI. Id.

The Debtors' "divisional offices" are established along regional versus corporate entity lines and are staffed by management personnel who work directly with the retail operations. Id. The restructuring and realignment was intended to facilitate the Debtors' increased focus on the retail operations and reduce and align the support functions, e.g., corporate management, procurement, logistics, accounting, merchandising and marketing. Id.

The consolidated corporate management, administrative and support functions for the operations of all the Debtors are managed by WDSI from its corporate headquarters in Jacksonville, Florida. See Reiss Affidavit ¶ 6. The "managers" of the subsidiaries, unless they are also employees of WDSI, have limited authority to incur obligations on behalf of their employer. Id. All significant decisions regarding purchasing are made by officers of WDSI. Id.

In addition to consolidating business functions, the restructuring was also implemented to effectuate tax savings including lowering payroll taxes and utilizing net operating losses. See Reiss Affidavit ¶ 7. The Debtors announced the intention to and did centralize the procurement, warehousing, logistics, marketing and merchandising functions. See Reiss Affidavit ¶ 8. All management functions for all entities were consolidated and relocated to its corporate headquarters in Jacksonville, Florida. Id.

In a January 2000 press release Al Rowland, WDSI's then President and CEO, stated that "The centralization of procurement, marketing and merchandising will create efficiencies for better sales and profit opportunities…by eliminating redundant functions in our divisions, we

will improve effectiveness in working with our suppliers. Our most talented procurement, marketing and merchandising associates will be assigned to corporate teams. This will allow division management to focus on improving retail operations." See Reiss Affidavit at ¶ 8. (emphasis added). The Debtors implemented this by having the procurement subsidiary manage inventory received from vendors even though payment came from WDSI.[8] Merchandising was handled by WDSI for all entities. Id.

Indeed, the Debtors are financially entangled for many reasons, including (i) the consolidation of the Debtors' accounting functions at WDSI; (ii) maintenance of one general ledger; (iii) the filing of consolidated financial statements for the Debtors despite the fact that WDSI can and does produce financial statements by legal entity; (iv) the setting of debt covenants on consolidated financial results; (v) the fact that only consolidated financial statements are provided to creditors; (vi) the commingling of cash; (vii) failure to evidence inter-company borrowings; (viii) lack of arm's length dealings between subsidiary and parent and between subsidiaries; (ix) the fact that various subsidiaries and business segments are incidental to the store operations and therefore are not disclosed in segment reporting requirements; and, (x) WDSI employees actually contracted for and incurred obligations on behalf of subsidiaries. See Reiss Affidavit ¶ 16.

The Debtors' supermarkets were managed along geographical location. The Debtors' active non-retail subsidiaries, Logistics, Procurement and Deep South, have been since the 2000 realignment run as support for the operation of the supermarkets. Thus, these subsidiaries have

---

[8] The Trade Committee notes that, with many supply contracts, WDSI, not Procurement, is the party to the agreement. See Reiss Affidavit ¶ 42.

only one existence as retail supermarkets. Internally, the Debtors paid little attention to the distinction between the various corporate entities. For example, the authority to make expenditures was done along business function lines. Thus, employees in the procurement function had authority to purchase for Montgomery, that Montgomery employees did not have.

The Debtors' website, www.winndixie.com, does not distinguish between Debtor entities. The website reflects there is one corporate headquarters and several "division" headquarters. There are various Winn-Dixie product brands that do not use the names of any individual subsidiaries. The Debtors' manufacturing and distribution facilities are organized by region. Furthermore, entities are described along functional, not entity lines. Thus, the website itself supports the proposition that vendors do not distinguish among the individual Debtor entities.

Thus, the Debtors have been at all times since their April 19, 2000 restructuring, a single, integrated enterprise with a clear unity of interest.

(iii) There is a unity of ownership among the Debtors and they have common officers.

The unity of ownership among entities supports consolidation. See Eastgroup Properties, 935 F.2d at 249-50. In the present case, there is no dispute as to the ownership of interest among the Debtors. All the Debtors consist of one parent company and twenty-three of its direct and indirect subsidiaries. The directors of the various subsidiaries are also officers of WDSI. See Reiss Affidavit ¶ 10. Accordingly, none of the subsidiaries has independent management or board members. Id. Tthe fact that every director of each subsidiary is also an officer of WDSI supports consolidation.

(iv) The Existence of Inter-Corporate Guarantees Supports Substantive Consolidation.

In the vast majority of cases, the existence of inter-company guarantees is considered to be a factor in support of substantive consolidation.[9] See Holywell, 59 B.R. at 347-48 (court considered "the existence of cross-claims of guarantees on loans to other debtors" as one of several factors supporting substantive consolidation); Murray Indus., 119 B.R. at 830-31 (court considered that "the entire operation of all entities was financed by two secured loans … guaranteed by most all, if not all, the subsidiaries" to illustrate that the Debtors functioned as a single economic entity "for the purpose in institutional borrowings"); Brentwood Golf Club, 329 B.R. at 814 (court cited existence of at least one inter-corporate guarantee, the subsidiary's guarantee of the bank's loan to the debtor, as a factor weighing in favor of substantive consolidation); Food Fair, 10 B.R. at 126 (court cited extensive cross-corporate guarantees between the parent and at least one subsidiary as a factor in support of substantive consolidation); In re Commercial Envelope Mfg. Co., Inc., 1977 WL 182366, *4-*6, (Bankr. S.D.N.Y. Aug. 22, 1977) (court cited the fact certain "lenders received cross-corporate guarantees from each of the four companies so that in effect all the assets of the debtors so that in effect all the assets of the debtors stand as security for the total indebtedness due." Further the court noted that the creditor objecting to consolidation had made no showing that it dealt solely with one of the subsidiaries, noting "[o]n the contrary, it received an inter-corporate guarantee from the parent corporation."); In re Richton Int'l. Corp., 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981) (court cited the existence of extensive cross corporate guarantees of both trade and bank

[9] Similarly, the payment by one entity of another's debts supports substantive consolidation. See Gainesville P-H Properties, 106 B.R. at 306 (court considered "one entity [paying] unsecured debts of the other" as one of several factors in support of substantive consolidation).

obligations as a factor in support of substantive consolidation); Eagle-Picher, 192 B.R. at 906 (court noted that the debtors' lenders required that the account receivables of all divisions be pledged to support a credit facility in support of its finding there was substantial identity between the entities to be consolidated); American Homepatient, 301 B.R. at 719 (court noted testimony that "the senior secured debt holders named only the parent company as obligor on the credit facility (with subsidiaries as guarantors)" and "the senior secured debt holders required only consolidated reporting in the past" as factors in support of substantive consolidation); Vecco, 4 B.R. at 411 (citing intercorporate guarantees of the major secured obligation of the parent debtor as a factor in support of the unity of interest of the debtors and substantive consolidation).

In the present case, the Debtors' Notes, structured lease financing, senior secured prepetition financing, and DIP financing involved parent-subsidiary guarantees. Similarly, the majority of the Debtors' landlords also required guarantees.

The WDSI Board of Directors meeting minutes dated October 6, 1999, generally put forth the motivation for WDSI to compel its subsidiaries to execute the guarantees. At that meeting, the Debtors' Chairman stated, "it is from time to time expedient that the parent company act in the capacity of guarantor or surety or co-maker or endorser of the contractual obligations of such subsidiary corporations […] including, without limitation, promissory notes, bonds, and other evidences of indebtedness, and leases, agreements for leases, mortgages, deeds of trust and contracts". These minutes also note that "the businesses of such subsidiary companies are so connected and related as to make the businesses of such subsidiary companies substantially an incident to the businesses of the parent company." (emphasis added). Thus, the Debtors' board recognized the fact that these Debtors were so interrelated (even before the 2000 realignment) that guarantees were appropriate.

(a) The Indenture and related documents reflect that Noteholders did not rely on the separate credit of the Debtors.

As set forth above, certain of the Debtors are parties to the Indenture. The Notes are "upstream" guaranteed by certain of WDSI subsidiaries. Courts recognize that subsidiaries can benefit from their "upstream" guarantees of their parent's debt in the form of (i) funds flowing from parent to guarantor, or (2) the maintaining of the parent's financial strength. See Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence Paperboard Corp.), 76 B.R. 866, 874 (Bankr. D. Mass. 1987) (analyzing fair consideration in context of upstream guarantee).[10] Here, however it is difficult to measure the benefit that any Debtor other than WDSI received from the sale of the Notes since the Debtors did not track the use of funds on an entity by entity basis.

Because Noteholders have direct claims against WDSI and guarantee claims against certain WDSI subsidiaries, they likely will argue that they relied upon the separateness of the entities. Noteholders, however, were well aware of the consolidated attributes of the Debtors. See Reiss Affidavit ¶ 14. In fact, the consolidation of the Debtors was presented to the Noteholders as evidence of the Debtors' turnaround in all materials leading up to the financing. Id. Consistent with this theme, all financial projections and reporting was done on a consolidated basis and the various facets of the Debtors were presented as "divisions" not separate legal entities. Id. The "road show" materials and prospectus for the financing presented the Debtors as a consolidated entity with subsidiary "divisions." Id.

[10] Of course, this benefit must still be quantified should an upstream guarantee be scrutinized as a fraudulent conveyance. See Lawrence Paperboard, 76 B.R. at 874 ("clearly, such a quantification is necessary because without it the Court cannot compare the consideration by [lender] and ostensibly based through [parent] to [subsidiary guarantor] with the value of guarantees by [guarantor]").

The Noteholders were primarily concerned with having recourse to all the Debtors' assets, rather than to the separateness of the various entities. Even a cursory inspection of the Indenture and related documents reflects that the Noteholders could not have reasonably relied upon the separateness of the Debtors when extending credit. When lenders or noteholders rely on the financials and creditworthiness of a company and its subsidiaries taken as a whole, they typically will provide in the affirmative and negative covenants that the company must ensure that its subsidiaries also abide by certain covenants.

For example, in section 1005 of the Indenture, it is up to WDSI to maintain the corporate existence, licenses and franchises of each of its subsidiaries unless the board of directors of WDSI determines that "the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries taken as a whole...." Indenture section 1005 (emphasis added).

Similarly in sections 1006, 1007, 1008 and 1014 (all covenants), WDSI is required to take all actions necessary to ensure that every "Restricted Subsidiary," whether or not such subsidiary is a guarantor, adheres to the same such covenants regarding the limitation on liens, limitation on sale and leaseback transactions, maintenance of properties and limitation on indebtedness, to which the Company must abide.

A breach of these covenants by a Restricted Subsidiary, therefore, even a restricted subsidiary which is not a guarantor under the Indenture, would be considered a failure of WDSI to fulfill its obligations under the Indenture and trigger a default. This makes clear that the Noteholders relied on information regarding the assets and operations of any subsidiary of WDSI as material to the ability of WDSI to meet its obligations under the Indenture, whether or not

such subsidiary is a guarantor. But for WDSI and its subsidiaries abiding by these covenants as a whole, the credit would not have been provided to WDSI.

There is an abundance of evidence elsewhere in the Indenture that the assets and operations of WDSI were, and continue to be, evaluated by the Noteholders together with its subsidiaries on a consolidated basis, including the following:

- Section 801 prohibits WDSI from merging with any person, or sell, assign, transfer, or lease or otherwise convey all its properties and assets to any person, or pursuant to any of its Restricted Subsidiaries from entering into such transactions, if such transactions, in the aggregate, would result in a sale, assignment, conveyance, lease or disposition of all or substantially all of the properties and assets of WDSI and its Restricted Subsidiaries <u>on a consolidated basis</u> to any <u>other</u> person, unless, <u>inter alia</u>, WDSI is the continuing person (in the case of a merger) or the surviving entity expressly assumes outstanding notes under the Indenture. Sections 801(2) and 802 of the Indenture expressly contemplates that the guarantors may merge with WDSI. "Each Guarantor, if any, will not, and the Company will not permit a Guarantor to, in a single transaction or through a series of related transactions, consolidate or merge with or into any other Person (<u>other than [WDSI] or any Guarantor…</u>") Indenture section 801(2) (emphasis added). This provision would thus permit WDSI, Montgomery, Raleigh, Logistics, Procurement and Deep South to merge and form one entity.

- Section 1006(6) permits the Debtors to grant cross-company liens.

- Section 1007 restricts the Debtors' entry into sale/leaseback transactions involving "Principal Property." "Principal Property" is defined as, generally, the business assets of the Debtors, except for such assets that are "not of material importance to the business conducted by [WDSI] and [WDSI' subsidiaries] <u>taken as an entirety</u>. Indenture section 1007 (emphasis added) Section 1007(3) also permits inter-company sale/leaseback transactions. <u>See</u> Indenture Section 1007(3).

- Section 1008 requires WDSI to maintain its properties, but does not require such property to be segregated from that of any subsidiary.

- Section 1014 makes reference to a "consolidated fixed change coverage ratio".

- Section 1016 authorizes WDSI to enter into transactions with its "Restricted Subsidiaries" that are not at arms length.

- Section 1022 requires WDSI to provide copies of its SEC filings, but does not require separate financial statements of the guarantors (unless the guarantor's financial statements would be required by the SEC).

- Section 1602 limits the obligations of each guarantor to a maximum aggregate amount equal to the greatest amount that would not render such guarantor's obligations subject to avoidance as a fraudulent transfers, showing that each guarantor's obligations are not incurred in exchange for any specific consideration.

These provisions reflect that the Debtors obtained credit based on the value of their entire enterprise without reliance on the separate credit of any guarantor. Moreover, there are no covenants requiring that WDSI's assets remain separate from its subsidiaries, nor are there any covenants requiring the Debtors to maintain separate books and records or other indicia of separateness.

Further, prepetition the Debtors did merge guarantor entities into WDSI. If at any time WDSI could merge all or some of the guarantor subsidiaries, the Noteholders could not reasonably rely on the separateness of these entities.

The prospectus for the Notes (the "Prospectus"), the primary communication to Noteholders, supports this analysis. The prospectus is based on the consolidated financial statements of all the Winn-Dixie entities, and sets forth their consolidated capitalization. There is nothing in the prospectus that indicates that Noteholders had any information relating to the individual assets or debt of individual guarantors. In addition, the prospectus states that:

- "Payments on the notes will be effectively subordinate to the obligations of any non-Guarantor Subsidiaries" and "[u]nder the Indenture, we may transfer assets to non-Guarantor Subsidiaries". Prospectus at S-42.

- That each guarantor may merge with WDSI or another guarantor. Prospectus at S-61.

- That subsidiaries may enter into transactions with affiliates of the company that are not arms-length, good faith transactions. Prospectus at S-52.

- The guarantees themselves may be invalidated by a court as fraudulent conveyances for lack of fair consideration. Prospectus at S-14.

- There are no legal opinions that analyze the separateness of the subsidiaries.

WDSI and certain of the Debtors are parties to that certain purchase agreement dated March 22, 2001 with underwriters to the Notes (the "Purchase Agreement"). The provisions of the Purchase Agreement further reflect that underwriters to the Notes did not rely on the separateness or credit of the individual Debtors.

- The Purchase Agreement contains a warranty that "(A) there has been no material adverse change in the condition, financial or otherwise, or in the earnings, business affairs, or business prospect of the Company and the subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business...[and] (B) there has been no transactions entered into by the Company or any of its subsidiaries, other than the ordinary course of business, which was material to the Company and its subsidiaries considered as one enterprise."

- There is a warranty that all leases and subleases material to the business of [WDSI and its subsidiaries], considered as one enterprise, and under which the company or any of its subsidiaries holds properties described in the prospectus, are in full force and effect.

These provisions conclusively establish that Noteholders did not rely on the separate credit of the subsidiaries.

(b) Guarantees relating to leases

The Debtors are parties to a pass-through trust agreement (the "Pass-Through Trust Agreement"), pursuant to which over $400 million in certificates were offered. The Debtors entered into leases of non-residential real property, which leases were assigned to the trustee of the Pass-Through Trust Agreement. WDSI has guaranteed all obligations of its subsidiaries as lessees. WDSI also routinely granted guarantees of individual store leases of Montgomery and Raleigh.

      (c) Bank debt guarantees

The Debtors' primary secured obligations arose under a Second Amended and Restated Credit Agreement dated June 29, 2004 with various banks (the "Pre-Petition Credit Agreement"). The Pre-Petition Credit Agreement provided for revolving loans and the issuance of letters of credit. It was secured by substantially all of the personal property and owned real property of the Debtors that were parties thereto.

After the petition date, the Debtors obtained an $800 million DIP credit facility (the "DIP Credit Facility"). The primary obligors are WDSI, Montgomery, Procurement, Raleigh, and Winn-Dixie Supermarkets, Inc. The obligations under the DIP Credit Facility were guaranteed by all of the Debtors and were secured by a lien on assets of the Debtors.

(v) The commingling of the Debtors' cash supports substantive consolidation.

The commingling of cash supports substantive consolidation. See Brentwood Golf Club, 329 B.R. at 814 (court cited sharing of a bank account by the debtor and subsidiary for over one year as weighing in favor of substantive consolidation); Eagle-Picher, 192 B.R. at 906 (court noted that all cash received from account receivables by the subsidiary entities was swept into a central fund by the parent corporation and the parent corporation controlled this common fund, dispersing cash back to the division as necessary for operations as a factor in support of substantive consolidation); American Homepatient, 301 B.R. at 719 (court noted testimony that "all of the company's cash is concentrated on the parent level which in turn pays all amounts due to the company's creditors" as a factor in favor of substantive consolidation); Vecco, 4 B.R. at 411-12 (court noted that the debtors had single operating account in which the receipts of the parent and the subsidiaries were deposited in the parent's name as a factor in support

consolidation); Soviero, 328 F.2d at 448 (court noted "although each Affiliate maintained a bank account from which it paid local obligations, such as rent and utilities, the proceeds of their [] sales were turned over to the bankrupt for deposit in its account" as a factor in support of substantive consolidation).

In the present case, the Debtors utilize a centralized cash management system that effectively commingles the cash of each entity. The Debtors have maintained a consolidated cash management system which commingled the various Debtors' cash since prior to the 2000 restructuring and continued to do so up to and through the pendency of the bankruptcy cases. See Reiss Affidavit ¶ 18. Activity between subsidiaries were and were intended to be recorded as inter-company entries as between the subsidiaries and WDSI but not as between the actual entities doing business with each other. Id.

The Debtors maintain a cash management system which includes depository accounts in the name of WDSI and certain subsidiaries. See Reiss Affidavit ¶ 19. These depository accounts are swept on a daily basis into a principal concentration account at WDSI. Id. WDSI also maintains the various controlled disbursement accounts for the Debtors. Id. WDSI utilizes the funds in the principal concentration account to make investments, its disbursements and those of its subsidiaries, as the subsidiaries do not have disbursement accounts of their own. Id.

Both prior to and after the Debtors' Chapter 11 filings, the proceeds of asset sales of subsidiaries were deposited in a centralized WDSI account, and used to pay secured debt without regard to obligations which may be asserted against that particular entity. See Reiss Affidavit ¶ 20. In addition, regardless of which entity a reclamation claim was made against, all reclamation payments came from WDSI. Id.

WDSI acts as a "bank" for the Debtors' operations. All intercompany balances are between the subsidiaries and WDSI.[11] Negative cash flow entities are financed by positive cash flow (through WDSI) and through external financing obtained by WDSI.

(vi) The existence of transfers of assets without formal observance of corporate formalities supports substantive consolidation.

The existence of transfers of assets without formal observance of corporate formalities supports substantive consolidation. See Murray Indus., 119 B.R. at 831 (court considered that "there was no precise allocation of the liability resulting from the [secured] borrowing between the individual Debtors" and numerous intercompany exchanges of funds and properties between the subsidiaries with no reconciliation or payment on account of the transfers as factors in support of substantive consolidation); Worldcom, 2003 WL 23861928 *37 ("financial entanglement resulting from internal financial management being conducted on a business line and functional basis, rather than legal entity basis" and "inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls" as two of several factors in support of substantive consolidation); Brentwood Golf Club, 329 B.R. at 814 (court cited a lack of corporate formalities and many inter-corporate transfers and loans "with no appropriate documentation or observance of any corporate or other legal formalities" as weighing in favor of substantive consolidation); In re Affiliated Foods, Inc., 249 B.R. 770, 779-80 (Bankr. W.D. Mo. 2000) (citing the transfer of money between entities

[11] With the exception of three notes totaling $2.7 million payable from WDM to Win General Insurance, Inc.

without corporate formalities and proper accounting as one factor in support of substantive consolidation).

In the present case, there is significant evidence that the Debtors transferred assets among themselves without observance of corporate formalities.

- There was no allocation of borrowings under pre-petition bank debt or debt under the DIP Credit Facility among the Debtors.

- Transfers between entities included nominal mark-ups, arbitrarily established and then rebated back to the retail locations after collection of vendor discounts and allowances, effectively eliminating the mark-ups. Therefore, these transfers can not be considered arms-length and in fact highlight the lack of separateness of Procurement and Logistics from the entities performing as retailers. Moreover, at the end of each year every subsidiary eliminates its profit or loss for the year through an inter-company entry with WDSI. Accordingly no financial statement for any subsidiary reflects its true financial condition in accordance with Generally Accepted Accounting Principles ("GAAP"). Clearly none of the books and records of any subsidiary is in accordance with GAAP. See Reiss Affidavit ¶ 24.

- The Debtors do not evidence these corporate borrowings with any formal documents, e.g., inter-company notes. The borrowings do not have any due dates, interest rates or any other debt attributes. See Reiss Affidavit ¶ 22.[12]

- The assets associated with two of the support functions, Procurement and Logistics formed as a result of the realignment, were contributed by certain of the previously autonomous 12 divisions into the surviving or newly created corporations. Assets were transferred via inter-company accounts from one subsidiary entity to another with all stock ownership transferred by dividend to WDSI through inter-company transactions and/or by non cash dividends to WDSI. The assets were transferred at net book value and an offsetting inter-company payable to WDSI was created as the initial capitalization of the subsidiaries. However, the resulting initial balance sheets of these entities had no equity and therefore the entities were completely dependent upon WDSI

[12] The lack of documentation however is consistent with the individual subsidiaries' lack of substance apart from WDSI in so far as: (i) Procurement and Logistics were established to be breakeven entities; (ii) transfer pricing between the divisions is effectively ignored; and (iii) the manufacturing subsidiaries historically had no or de minimus third party sales and were dependent on sales with the other entities. See Reiss Affidavit ¶ 24.

for liquidity, working capital and payment of obligations. There is no indication that these transfers were or were intended to be arm's-length transactions at fair market value. See Reiss Affidavit ¶ 11.

- The Debtors continued to restructure their operational and legal structure up and through the pendency of the bankruptcy. The result of the restructuring was to continue to consolidate functions and streamline operations along market lines. Again, these changes are all booked to inter-company accounts, whether as asset transfers or dividends. As indicated previously, no fair market valuations were obtained to support the transactions. See Reiss Affidavit ¶ 12.

- Logistics gained significant assets as a result of the 2000 realignment but the transfers to it were done through inter-company accounts. Again, there is no indication that these transfers were or were intended to be arm's length transactions at fair market value. Also pricing for services provided by Procurement and Logistics are not at market rates. See Reiss Affidavit ¶ 25.

- The Debtors assigned lease obligations among themselves without documenting the transactions.

- The retained earnings of any entity at any year end are dividended to WDSI and thus these entities do not have equity of their own.

Thus, the Debtors routinely transacted with each other without observance of corporate formalities.

(vii) The Debtors' commingled assets and business functions supports substantive consolidation.

The commingling of assets and business functions supports substantive consolidation. Eastgroup Properties, 935 F.2d at 249. In the present case, it is clear that all corporate functions are consolidated at WDSI and managed by WDSI employees. See Reiss Affidavit ¶ 31. The subsidiaries have no autonomy and no executive or senior level management in their individual operations. Id. In fact, all employees carry Winn-Dixie business cards notwithstanding the nominal business entity by which they are employed. Id. Thus, the employees of the Debtors hold themselves out to the world as employees of the Debtors, not a particular subsidiary. Id.

The Debtors' internal reporting follows its management structure which is on operational and market basis, e.g., designated market area ("DMA") which in turn roll up to regions and divisions. See Reiss Affidavit ¶ 33.  This management and reporting structure does not align with the legal entities since operations cross legal entities lines. Id.  Effectively, other than for certain state tax returns, Debtors do not function or report on a legal entity basis. Id.

The crossover between divisional and legal structure lines is exemplified by the reporting lines of Deep South. Deep South bottles carbonated drinks for the Debtors. See Reiss Affidavit ¶ 33. Although Deep South is a separate legal entity the highest level of employee is the plant manager who currently reports to a newly hired Vice President of Manufacturing employed by Logistics. Id.

While employees may technically be assigned to a legal entity for tax purposes, it was evident through employee interviews that employees do not differentiate between the various entities other than using the "division" terminology. See Reiss Affidavit ¶ 34.  Furthermore, the Debtors routinely transferred employees between Debtor entities as well as commingled various debtor employees in the same location. See Reiss Affidavit ¶ 35.  The Debtors announced their intention to and did centralize the procurement, warehousing, logistics, marketing and merchandising functions. See Reiss Affidavit ¶ 8.  All management functions for all entities were consolidated and relocated to its corporate headquarters in Jacksonville, Florida. Id.

The manner in which the Debtors historically accounted for the inter-company transactions results in the financial records of the Debtors being hopelessly entangled. See Reiss Affidavit ¶ 29.  The Debtors report that an attempt to correct or re-state decades worth of transactions would be cost prohibitive and would necessarily be subject to significant error due

to: (i) the Debtors record "millions of transactions per month" through the inter-company accounts which include numerous estimates and allocations which are not priced at arms-length and for which new estimates would need to be created; (ii) detailed records only exists since 2001 when the Company implemented its current accounting system; therefore, the accounting prior to 2001 could not be adjusted and the beginning balances can not be adequately evaluated due to this lack of detailed records. Id.

(viii) Profitability of consolidation at a single physical location

The profitability of consolidating entities at a single location supports substantive consolidation. This factor is satisfied if there is sufficient and necessary synergy between the entities such that the entities are dependant on one another to be profitable. See Brentwood Golf Club, 329 B.R. at 815 (finding the profitability of consolidation factor was satisfied where the debtors "are only profitable if they exist at a single location"). Substantive consolidation may enhance multiple debtors' ability to minimize expenses by sharing overhead, management and accounting costs. See Vecco, 4 B.R. at 411 (noting that requiring the debtors to segregate their business functions and operations would require physically separating the entities, resulting in substantial increases in expenses). The Debtors recognized that fact in the 2000 realignment when executive functions were consolidated in Jacksonville, Florida specifically for efficiency reasons.

(2) Consolidation Is Necessary To Avoid Harm Or Confer Benefit.

As the foregoing analysis reflects, the movant has established that there is a substantial identity among the Debtors. Substantive consolidation here also provides significant benefits to these Debtors. See Eastgroup Properties, 935 F.2d at 249. Here, one clear benefit of

NEWY1:7991456.v12

consolidation is that it avoids the inequitable result that would result from an attempt to treat what in essence are the various support functions of this business enterprise as truly separate entities, ascribing arbitrary values to them and the using that as a basis for distribution to creditors.  Substantive consolidation will confer benefit upon these estates as follows:

- All creditors will be treated fairly so that they realize the full benefit of their bargains.  See Eastgroup Properties, 935 F.2d at 251.  The Debtors' noteholders will receive an unjust windfall absent substantive consolidation because they did not reasonably rely on the separate credit of the Debtors.

- There will be one plan of reorganization rather than a plan for all twenty-four (24) debtor entities.  See Murray Indus., 119 B.R. at 832.

- Substantive consolidation will avoid time-consuming and costly litigation that would be required to untangle the Debtors' affairs, which would be necessary if the Debtors have to file separate plans.  See Murray Indus., 119 B.R. at 831.

- Substantive consolidation will moot fraudulent transfer litigation regarding the guarantees on the Notes, and based on transactions between Debtors.  See Affiliated Foods, 249 B.R. at 781-82.

- Substantive consolidation will eliminate the problem of classification and voting with respect to separate plans of reorganization.  See In re Standard Brands Paint Co., 154 B.R. 563, 571 (Bankr. C.D. Cal. 1993).

It would not be possible to achieve these benefits without consolidation.  These benefits, combined with the substantial identity among the Debtors set forth above, reflects that these cases should be substantively consolidated.

The alternative to substantive consolidation is to proceed with a plan of reorganization that ignores the economic reality that these Debtors function as one consolidated business unit. In contrast, absent substantive consolidation, the Debtors' unsecured creditors will be harmed, whereas the Noteholders will reap an undeserved windfall.  As the court recognized in Food Fair, "only by ignoring the separate corporate entity of the subsidiaries and consolidating the proceeding with those of the parent corporation can all creditors receive the equality of treatment

which it is the purpose of the bankruptcy act to afford." See Food Fair, 10 B.R. at 127 (citing Stone v. Eacho (In re Tip Top Tailors, Inc.), 127 F.2d 284, 288 (4th Cir. 1942)). In the present case, the Debtors' trade creditors and Noteholders share identical priority as unsecured creditors. If these Debtors are not consolidated, any plan of reorganization that allocates value to different classes of unsecured creditors would necessitate the valuation of entities on an arbitrary basis. See Reiss Affidavit ¶ 47. The result would be an unfair treatment of the creditors as the allocation would not reflect the true value available to the creditors as a whole. Id. Substantively consolidating all of the assets of the Debtors will create a common fund for the equitable, pro-rata treatment of all claims.

(3) There Is A Presumption That Creditors Have Not Relied On The Credit Of Any Of The Debtors.

Under Eastgroup Properties, once the movant has made a prima facie case for consolidation, there is a presumption that creditors have not relied on the credit of one of the entities involved. Eastgroup Properties, 935 F.2d at 249. After the moving party makes this showing, the burden shifts to an objecting creditor to show (1) it has relied on the separate credit of one of the entities to be consolidated, and (2) it will be prejudiced by substantive consolidation. The evidence, however, reflects that creditors did not reasonably rely on the separate credit of the Debtors.

The Trade Committee anticipates that the Debtors' Noteholders will object to substantive consolidation. The facts, however, reveal that the Noteholders could not have reasonably relied on the separate credit of particular Debtors based upon the information provided them in the prospectus. Rather, it is clear that the Noteholders purchased the Notes as though they were issued by one merged entity. See discussion of Indenture, infra. In addition, the Noteholders

will not be harmed by substantive consolidation notwithstanding the pooling of the Debtors' assets, because the Noteholders would merely be obtaining the benefit of their bargain – a claim against a merged entity, an action which is wholly consistent with the terms of the Indenture.

(4) The Benefits of Consolidation Heavily Outweigh Any Harm.

Even if a creditor carries its burden to object to substantive consolidation, the Trade Committee respectively submits that the benefits of consolidation will heavily outweigh the harm. Absent consolidation, any plan filed will be fundamentally flawed and unfair.

## III. SUBSTANTIVE CONSOLIDATION IS APPROPRIATE EVEN IF THE TEST PROMOTED BY OWENS-CORNING IS CONSIDERED MORE STRINGENT

The Third Circuit Court of Appeals in Owens Corning questioned the "substantive consolidation" standard applied in Eastgroup Properties and other cases that adopted the Auto-Train standard, to the extent that standard might be applied to permit substantive consolidation over an objecting creditor's showing that it relied on the separateness of the entities. See Owens Corning, 419 F.3d at 210 ("If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-à-vis the claims of that creditor."). The Owens Corning court suggested that substantive consolidation requires a showing that: "(i) prepetition they [the Debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. at 211. The court elaborated on the first rationale:

NEWY1:7991456.v12

> A prima facie case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity. Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Creditor opponents of consolidation can nonetheless defeat a prima facie showing under the first rationale if they can prove they are adversely affected and actually relied on the debtors' separate existence.

Id. at 212.

Though the decision in Owens Corning is not binding, the decision is applied below. The facts of the present case would support substantive consolidation even under the more strict standard of Owens Corning.

(1) Prepetition, The Debtors Disregarded Separateness So Significantly Their Creditors Relied On The Breakdown Of Entity Borders And Treated Them As One Legal Entity.

The Debtors disregarded separateness so significantly that their creditors treated them as one entity. Trade creditors treated the Debtors as one entity. In addition, and more importantly, the Noteholders treated the Debtors as though they are one entity. See infra.

In Owens Corning, the court denied substantive consolidation on facts that readily are distinguishable. There, a syndicate of banks provided a loan to Owens Corning ("OCD"), the parent corporation, which was guaranteed by all of OCD's domestic subsidiaries with a book value in excess of $30 million. See Owens Corning, 419 F.3d at 201. The plan of reorganization proposed by OCD and seventeen of its subsidiaries provided for the "deemed" substantive consolidation of the debtors and three non-debtor subsidiaries. The court, however, found that

the credit agreement in that case had very specific provisions regarding the separateness of the entities:

> CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with its subsidiaries. For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there would be no effect on the guarantees' value.

Id. at 201.

Thus, the court found that the debtors and the banks specifically negotiated the lending transaction in reliance upon the separateness of all debtor entities. Id. In particular, the court noted that OCD negotiated the credit agreement based on the separateness of OCD's subsidiaries and the representation that such subsidiaries would not merge or consolidate in any way that would diminish the value of the guarantees. Id. at 213. The court supported its finding by citing to testimony from professionals involved in the negotiations, that the value of the guarantees were derived from the separateness of the entities, and that the guarantees were intended to provide 'structural seniority' to the lenders. Id. Even though the banks did not review unconsolidated financial statements, the court found they knew a "great deal about the subsidiaries assets and liabilities." See id. at 213.

As set forth above, none of the covenants existed in Owens Corning exist in the present case. In fact, in many ways, the opposite exists:

- The Indenture authorizes and contemplates that guarantors may merge with WDSI;
- There are no separateness covenants in the Indenture; and
- There is no evidence that the Debtors noteholders knew anything about the guarantors' assets and liabilities. In fact, two guarantors, Logistics and Procurement, are "break even" entities.

The business operations of the debtors in Owens Corning are also readily distinguishable from the Debtors' business operations. There, the debtors were discrete entities, who served a different purpose. See Owens Corning, 419 F.3d at 200. The parent company required its subsidiaries to provide a "credit enhancement" because its credit rating was hindered by growing asbestos liability. See id. at 201. The guarantor subsidiaries had little or no debt, and one subsidiary had no asbestos liability, no debt, and had assets of approximately $700 million. See id.

Here, as set forth above, the extent of interdependence and intermingling of their operations and finances, shows that the Debtors are truly one, unified enterprise and thus, supports a finding that these Debtors should be substantively consolidated. See Reiss Affidavit ¶ 4. Their operations were restructured to centralize corporate functions mainly for tax benefits, not for any business purpose. The Debtors entered into the Indenture to retire previous debt. See Prospectus at S-15. The Debtors' own board minutes reflect that it obtained guarantees because "the business of each subsidiary companies are so connected and related as to make [their businesses] substantially an incident to the business of [WDSI]." See infra. Thus, the facts in Owens Corning are distinguishable, and the Debtors should be substantively consolidated even if Owens Corning were to govern.

## CONCLUSION

For the reasons stated herein, the movant Trade Committee respectfully requests that the Court grant its motion for an order substantively consolidating the Debtors' estates. These Debtors have at all times since 2000 operated as a single business. All creditors did business with them on that basis. Any attempt to try and treat these entities on a separate basis is just an attempt by Noteholders to advantage themselves in a manner for which they did not bargain.

Dated: New York, New York
May 11, 2006

DLA PIPER RUDNICK GRAY CARY US LLP

By: /s/ Thomas R. Califano
Thomas R. Califano
Vincent J. Roldan
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 835-6190
Facsimile: (212) 835-6001

- and -

By: /s/ Mark J. Friedman
Mark J. Friedman
Daniel Carrigan
Janice L. Duban
6225 Smith Avenue
Baltimore, MD 21209
Telephone: (410) 580-4153
Facsimile: (410) 580-3001

- and -

By: /s/ Philip V. Martino
Philip V. Martino
Florida Bar Number 079189
101 East Kennedy Boulevard, Suite 2000
Tampa, FL 33602-5149
Telephone: (813) 229-2111
Facsimile: (813) 229-1447

Attorneys for Ad Hoc Trade Committee of Winn-Dixie Stores, Inc., et al.