**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| In re | Chapter 11 Case |
| WINN-DIXIE STORES, INC., et al., | Case No. 05-03817-3F1 |
| Debtors. | Jointly Administered |

**AFFIDAVIT OF M. FREDDIE REISS IN SUPPORT OF MOTION FOR ORDER PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE SUBSTANTIVELY CONSOLIDATING ESTATES**

M. Freddie Reiss, being first duly sworn, deposes and says:

1. I am a Senior Managing Director in the Corporate Finance Practice of FTI Consulting, Inc. ("FTI").[1] FTI has been retained by DLA Piper Gray Cary US LLP, counsel to the Ad Hoc Committee of Trade Creditors[2] ("Trade Committee") to assist in analyzing business and financial data and other matters related to these cases, including issues related to the substantive consolidation of Winn-Dixie Stores, Inc. and its wholly owned subsidiaries (the "Debtors").[3] As indicated in Exhibit "A", I have significant experience

---

[1] FTI is the largest restructuring and reorganization advisory practice in the country. I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor. Attached hereto as Exhibit "A" is a copy of my Curriculum Vitae.

[2] The current members of the Ad Hoc Trade Committee are as follows: ASM Capital, Amroc Investments, LLC, Avenue Capital Group, LCH Opportunities, LLC, DellaCamera Capital Management, LLC, Contrarian Capital Management, LLC, Longacre Fund Management, LLC, ConAgra Foods, Inc., The Procter & Gamble Distributing Co., S.C. Johnson & Son, Inc., Conopco, Inc., Madison Capital Management, VR Capital Group, Ltd., and General Mills, Inc. The members of the Trade Committee hold approximately $70 million in unsecured claims, relating to goods sold and delivered to the Debtors, services rendered to the Debtors and rejection of leases.

[3] In addition to Winn-Dixie Stores, Inc. ("WDSI" or the "Parent"), the following entities are Debtors in these related cases (all of whom are subsidiaries, directly or indirectly, of WDSI): Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie

in restructuring and bankruptcy matters and have testified as an expert in approximately 75 proceedings.

2. I submit this affidavit in support of the motion by the Trade Committee for an order pursuant to section 105(a) of the Bankruptcy Code substantively consolidating the estates of all the Debtors.

3. Based upon my review of publicly available information, documents provided by the Debtors, discussions with the Debtors' professionals, and interviews with the Debtors' management team and other employees, the following facts and circumstances strongly support the substantive consolidation of the Debtors' estates.

**2000 Restructuring Program[4]**

4. The Debtors' current profile which is a result of a 2000 restructuring program and subsequent refinements to its operating and legal structures were intended to, and did consolidate the Debtors' financial, operational and management functions. The extent of interdependence and intermingling of their operations and finances, shows that the Debtors are truly one, unified enterprise and thus, supports a finding that these Debtors should be substantively consolidated. As part of the 2000 restructuring program, assets were transferred via inter-company accounts from one subsidiary entity to another with all stock ownership transferred by dividend to WDSI, the ultimate owner of all Debtors.

---

Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[4]Prior to 2000 the Debtors operated as 12 relatively autonomous "divisions." On April 20, 2000 the Debtors announced a major restructuring strategy to improve the efficiency and profitability of the stores of the Enterprise. One of the steps identified for restructuring was to "centralize functions to increase purchasing power and improve corporate efficiency." The restructuring included a "division realignment" described further below.

There is no indication that these transfers were or were intended to be arm's-length transactions at fair market value. WDSI restructured the prior relatively autonomous decentralized operation of its subsidiaries into a consolidated enterprise structured along retail operations with various support functions. It also transferred employees and consolidated all senior management at WDSI. The result was that the Debtors' "divisional offices" are established along regional versus corporate entity lines and are staffed by management personnel who work directly with the retail operations.

5.  The current corporate structure includes WDSI (which also operates the majority of the retail locations), two other subsidiaries which hold primarily retail operations (Winn-Dixie Montgomery, Inc. and Winn-Dixie Raleigh, Inc.) a logistics subsidiary, a procurement subsidiary, certain captive manufacturing operations, and license and asset holding subsidiaries as well as two non-debtor entities, a Bahamian retail store company and captive insurance company (collectively, the "Enterprise"). Other entities are essentially inactive or shell companies. The restructuring and realignment was intended by WDSI management to facilitate the Enterprise's increased focus on the retail operations and reduce and align the support functions, e.g., corporate management, procurement, logistics, accounting, merchandising and marketing.

6.  The consolidated corporate management, administrative and support functions for the operations of all the Debtors are managed by the Parent from its corporate headquarters in Jacksonville, Florida. The "managers" of the divisions, unless they are also employees of the Parent, have limited authority to incur obligations on behalf of their employer. All significant decisions regarding purchasing are made by officers of WDSI.

3

7. In addition to consolidating business functions, the restructuring was also implemented to effectuate tax savings including lowering payroll taxes and utilizing net operating losses.

8. WDSI management announced its intention to and did centralize the procurement, warehousing, logistics, marketing and merchandising functions of the Enterprise. All management functions for all entities were consolidated and relocated to its corporate headquarters in Jacksonville, Florida.[5] In a January 2000 press release Al Rowland, Winn-Dixie's then President and CEO, stated "[t]he centralization of procurement, marketing and merchandising will create efficiencies for better sales and profit opportunities…by eliminating redundant functions in our divisions, we will improve effectiveness in working with our suppliers. Our most talented procurement, marketing and merchandising associates will be assigned to corporate teams. This will allow division management to focus on improving retail operations" (emphasis added). The Debtors implemented this centralization by having the procurement subsidiary manage inventory received from vendors with payment coming from WDSI. Merchandising was handled by WDSI for all entities.

9. The restructuring program included a realignment of the 12 divisions effectively reducing the number of operating divisions and creating new corporations such as Winn-Dixie Procurement, Inc. ("Procurement") and Winn-Dixie Logistics, Inc. ("Logistics"). Retail stores and assets were transferred from one division to another via inter-company accounts through the parent entity WDSI.

---

[5] The Debtors' website www.winndixie.com makes no distinction among entity lines. The Jacksonville offices are described as Winn-Dixie Headquarters: "Headquarters employs over 600 associates that provide management support and service functions required of a major corporation operating in 5 states. These positions include functions such as accounting, auditing, legal, engineering, store design and human resources."

4

10. All the directors of the various subsidiaries are also officers of the Parent company. Accordingly, none of the subsidiaries has independent management or board members. Again, management of the operations is along functional and market lines without observance of the legal structure.

11. The assets associated with two of the support functions, Procurement and Logistics formed as a result of the realignment, were contributed by certain of the previously autonomous 12 divisions into the surviving or newly created corporations. Assets were transferred via inter-company accounts from one subsidiary entity to another with all stock ownership transferred by dividend to the Parent through inter-company transactions. The assets were transferred at net book value and an offsetting inter-company payable to the Parent was created as the initial capitalization of the subsidiaries. However, the resulting initial balance sheets of these entities had no equity and therefore the entities were completely dependent upon the Parent for liquidity, working capital and payment of obligations. There is no indication that these transfers were or were intended to be arm's-length transactions at fair market value.

12. WDSI management continued to restructure its operational and legal structure of the Enterprise up and through the pendency of the bankruptcy. The result of the restructuring was to continue to consolidate functions and streamline operations along market lines. Again, these changes are all booked to inter-company accounts. As indicated previously, no fair market valuations were obtained to support the transactions.

13. Nearly concurrent with the realignment, WDSI sought to improve its balance sheet by refinancing its then current credit facility. The refinancing included both revolving bank facilities and an Indenture dated December 26, 2000 among WDSI, guarantors, and

Wilmington Trust Company (the "Indenture Trustee"), as supplemented by first supplemental indenture dated March 29, 2001 (the "Indenture"). Pursuant to the Indenture, WDSI issued $300 million in principal amount of senior notes (the "Notes") bearing interest at 8.875% per annum which mature by their terms in 2008. Certain of the Debtors were obligated under the Indenture as "guarantors" in order that the Indenture Trustee would hold a claim against any entity that owned assets. However, there is no indication that the Debtors ever provided separate financial statements for the entities serving as guarantors or had any third party asset valuation reports prepared.

14. The new lenders to the Enterprise were well aware of the consolidated attributes of the Enterprise. In fact, the consolidation of the Enterprise was presented to the new lenders as evidence of the Enterprise's turnaround in all materials leading up to the financing. Consistent with this theme, all financial projections and reporting was done on a consolidated basis and the various facets of the Enterprise were presented as "divisions" not separate legal entities. The "road show" materials and prospectus for the financing presented the Enterprise as a consolidated entity with subsidiary "divisions."

15. Additional important elements for substantive consolidation consideration in this case include issues related to financial and operational entanglement, reliance of third parties and avoidance of harm to creditors.

**Financial Entanglement**

16. The extent to which the Debtors are financially entangled includes: (i) the consolidation of the Debtors' accounting functions at the Parent; (ii) maintenance of one general ledger; (iii) the filing of consolidated financial statements for the entire Enterprise; (iv) the

setting of debt covenants on consolidated financial results; (v) the fact that only consolidated financial statements are provided to creditors; (vi) the commingling of cash; (vii) failure to evidence inter-company borrowings; (viii) lack of arm's length dealings between subsidiary and parent and between subsidiaries; (ix) the fact that various subsidiaries and business segments are incidental to the store operations and therefore are not disclosed in segment reporting requirements; and (x) WDSI employees actually contracted for and incurred obligations on behalf of subsidiaries.

17. The consolidated accounting functions are managed by the Parent at the corporate offices in Jacksonville, Florida. The accounting department maintains a single general ledger for all the entities. For external reporting purposes, the Debtors produce consolidated financial statements and all debt covenants are based upon consolidated financial metrics. Financial statements for the various legal entities are used primarily for tax purposes and not in the operations and management of the business.

18. Another example of the Debtors' financial entanglement is the Debtors' cash management system, i.e., flow of funds between and among the parent and subsidiaries. The Debtors have maintained a consolidated cash management system which commingled the various Debtors' cash since prior to the 2000 restructuring and continued to do so up to and through the pendency of the bankruptcy cases. Activity between subsidiaries was and was intended to be recorded as inter-company entries as between the subsidiaries and the Parent but not as between the actual entities doing business with each other.

19. The Debtor maintains a cash management system which includes depository accounts in the name of WDSI and certain subsidiaries. These depository accounts are swept on a

daily basis into a principal concentration account at WDSI. WDSI also maintains the various controlled disbursement accounts for the Debtors. WDSI utilizes the funds in the principal concentration account to make investments, its disbursements and those of its subsidiaries, as the subsidiaries do not have disbursement accounts of their own.

20. Both prior to and after the Debtors' Chapter 11 filings, the proceeds of asset sales of subsidiaries were deposited in a centralized WDSI account, and used to pay secured debt without regard to obligations which may be asserted against that particular entity. In addition, regardless of which entity a reclamation claim was made against, all reclamation payments came from WDSI.

21. The transfers of cash among the entities are accounted for through a series of inter-company accounts. These inter-company accounts are maintained between WDSI and its subsidiaries but are not maintained on a subsidiary to subsidiary basis.

22. The Debtors do not evidence these corporate borrowings with any formal documents, e.g., inter-company notes. The borrowings do not have any due dates, interest rates or any other debt attributes.

23. The lack of documentation is consistent with the individual subsidiaries' lack of substance apart from WDSI in so far as: (i) Procurement and Logistics were established to be breakeven entities; (ii) transfer pricing between the divisions is effectively ignored; and (iii) the manufacturing subsidiaries historically had no or de minimus third party sales and were dependent on sales to the Enterprise.

24. The Procurement and Logistics divisions were established and are operated as break-even, in other words, they were not intended to be stand-alone entities.[6] Transfers between entities included nominal mark-ups, arbitrarily established and then rebated back to the retail locations after collection of vendor discounts and allowances, effectively eliminating the mark-ups. Therefore, these transfers can not be considered arms-length and in fact highlight the lack of separateness of Procurement and Logistics from the entities performing as retailers. Moreover, at the end of each year every subsidiary eliminates its profit or loss for the year through an inter-company entry with the Parent. Accordingly no financial statement for any subsidiary reflects its true financial condition in accordance with Generally Accepted Accounting Principles ("GAAP"). Clearly, none of the books and records of any subsidiary is in accordance with GAAP. Only the consolidated financial statements issued in accordance with SEC requirements reflect GAAP.

25. Logistics gained significant assets as a result of the 2000 realignment; however, the transfers to it were done through inter-company accounts. Again, there is no indication that these transfers were or were intended to be arm's length transactions at fair market value. In addition, pricing for services provided by Procurement and Logistics are not at market rates.

---

[6] In fact, the Debtors' 2005 Form 10-K admits that Procurement and Logistics did not operate on a stand alone basis and their expenses may or may not be higher were it not for inter-company transfer pricing and the centralized headquarter functions and allocations related thereto.

26. The Debtors' manufacturing operations[7] do not have their own corporate identities and some of them are in nominal corporate entities such as Deep South Products, Inc. ("Deep South"). Others are nominally held by the retail subsidiaries. These operations have an immaterial level of third party sales which indicates that without WDSI and the other retail divisions they would not be going concerns or stand alone businesses. The manufacturers sell through Procurement to the retail stores. In addition, the manufacturers do not have their own cash management, rather they use the centralized cash management of the Parent. Furthermore, the manufacturers have been managed, at various times, by and through Logistics.

27. The trademark for Deep South's primary product "Chek" beverages is actually owned by WDSI.

28. The various functions of the subsidiaries are an incident to the retail operations and their financial results are below the threshold required by GAAP to be shown as segments, i.e., they are not significant enough to meet the accounting and regulatory requirements for separate disclosure.

29. Notwithstanding the issues noted above, the manner in which the Debtors historically accounted for the inter-company transactions results in the financial records of the Debtors being hopelessly entangled. The Debtors report that an attempt to correct or re-state for decades worth of transactions would be cost prohibitive and would necessarily

---

[7] The description of these activities on the Debtors' website supports substantive consolidation: "Winn-Dixie owns and operates manufacturing plants throughout the Southeast, including: Jacksonville, FL; Valdosta, GA; Fitzgerald, GA; Madison, FL; Taylors, SC; New Orleans, LA; Plant City, FL; High Point, NC; and Montgomery, AL. These plant facilities specialize in producing and processing packaged meats, a full line of dairy products, coffee, tea spices, crackers, cookies, jams, jellies, peanut butter, condiments, beverage, and pizza....Winn-Dixie's manufacturing plants continue to produce for all of Winn-Dixie's retail stores."

be subject to significant error due to: (i) the Debtors record "millions of transactions per month" through the inter-company accounts which include numerous estimates and allocations which are not priced at arm's-length and for which new estimates would need to be created; (ii) detailed records only exist since 2001 when the Enterprise implemented its current accounting system; therefore, the accounting prior to 2001 could not be adjusted and the beginning balances can not be adequately evaluated due to the lack of detailed records.

**Operational Entanglement**

30. The Debtors were and are so completely operationally intertwined as to require substantive consolidation. This is true for the Debtors as it relates to internal operations and external operations with both customers and creditors.

31. Relative to internal operations it is clear that all corporate functions are consolidated at WDSI and managed by WDSI employees. The subsidiaries have no autonomy and no executive or senior level management in their individual operations. In fact, all employees carry Winn-Dixie business cards notwithstanding the nominal business entity by which they are employed. Thus, the employees of the Debtors hold themselves out to the world as employees of the Enterprise not a particular subsidiary.

32. The Debtors' internal reporting follows its management structure which is on an operational and market basis, e.g., designated market area ("DMA") which in turn rolls up to divisions and then regions. This management and reporting structure does not align with the legal entities since operations cross legal entities lines. Effectively other than for certain state tax returns the Enterprise does not function or report on a legal entity basis.

33. The crossover between divisional and legal structure lines is exemplified by the reporting lines of Deep South. Deep South bottles carbonated drinks for sale in the retail stores. Although Deep South is a separate legal entity the highest level of employee is the plant manager who currently reports to a newly hired Vice President of Manufacturing employed by Logistics.

34. While employees may technically be assigned to a legal entity for tax purposes, it was evident through employee interviews conducted by FTI that employees do not differentiate between the various entities other than using the "division" terminology. In addition, certain employees of Procurement did not understand that it was a separate legal entity.

35. Furthermore, the Debtors routinely transferred employees between entities as well as commingled various employees in the same location.

36. This transparency is consistent with how the Debtors interact with customers, i.e., as the brand "Winn-Dixie" versus a particular legal entity. In fact, the customer awards program is maintained by the parent WDSI even though customers do business with individual retail stores.

**Reliance**

37. The extent to which various creditors did not rely on the separateness of the Debtors supports substantive consolidation. Based on my work to date, I have concluded that financial data was issued only on a consolidated basis when parent and subsidiary guarantees were given.

38. The only published financial statements were on a consolidated basis.[8] The Debtors' website does not differentiate the various legal entities and there does not appear to be any evidence that vendors received separate financial statements. Although Procurement was established to facilitate the procurement of inventory for the various retail locations, certain contractual documents I read blur the distinction between Procurement and the retail operations referring to them interchangeably.

39. I understand that the claims scheduled in the Debtors' bankruptcy schedules reflect the books and records of the Debtors at the time of filing but have not been reconciled on a legal entity basis. This fact indicates that even the Debtors are unsure whether the creditor claims scheduled in their bankruptcy schedules are appropriately reflective of the relative legal entity.

40. In addition, the credit facilities are based upon consolidated financial metrics. Furthermore, the indentures were marketed based upon the consolidated financials.

41. WDSI is the primary obligor under the indenture and certain subsidiaries are guarantors. All reporting and projections done in connection with the Indenture were done on a consolidated basis. The Debtors were presented to the holders of the Notes as a unitary Enterprise. The Indenture and the prospectus recognized that the Debtors may consolidate further including between guarantor and non-guarantor entities, and explicitly allowed for consolidation of the various entities. Furthermore, there is no indication that bondholders were ever given any information pertaining to the separate financial statements of each legal entity. Therefore, the holders of the Notes could not have relied on the separate credit of the various Debtors or on the assets held by such entities.

---

[8] Footnote disclosure exists as to parent and combined guarantor subsidiary financial statements; however, no information is presented on a separate legal entity basis.

42. With respect to how the Enterprise presented itself to certain trade creditors, I have reviewed numerous supply agreements where WDSI, not Procurement, is a party to the agreement.

43. The overwhelming number of landlords received guarantees of the lease obligations from the parent WDSI. I understand that all leasing transactions were handled by in-house WDSI attorneys.

**Harm to be avoided to creditors**

44. It is clear that substantially all of the trade creditors believed they were dealing with one entity, "Winn-Dixie." Information was not provided to trade creditors that significant assets existed at legal entities outside of their relationship with "Winn-Dixie" and that they would be deprived from realizing value from certain entities, absent substantive consolidation.

45. The holders of the Notes intend to realize value from certain entities by asserting their claims separately even though they apparently did not rely on separate financial statements from these entities. In addition, it appears that assets transferred to separate legal entities, which became guarantors, appear to have been transferred without fair consideration.

46. Absent substantive consolidation, the Noteholders by asserting duplicative claims against each estate will receive a distribution which is far in excess of the distribution to all other unsecured creditors despite the fact that as the management of the Debtors has stated: "[t]he Senior Notes are unsecured obligations that are pari passu with most of the Debtors' other unsecured obligations, which generally consist of trade debt, contract and

lease obligations (including possible rejection damages), employee obligations and litigation claims."[9]

47. In addition, any plan of reorganization that allocates value to different classes of unsecured creditors would necessitate the valuation of entities on an arbitrary basis. The result would be an unfair treatment of the creditors as the allocation would not reflect the true value available to the creditors as a whole.

48. Furthermore, absent substantive consolidation it would be necessary to propose and confirm different plans for each Debtor with overlapping creditor constituencies and inconsistent distributions despite the fact that all creditors are of equal priority.

**Conclusion**

49. The analysis of substantive consolidation is not a checklist issue, but rather revolves around a thorough exposition of the Debtors, their accounting and operational functions and their course of dealings with and among themselves, creditors and other third parties as an integrated enterprise or a group of stand alone entities.

50. My investigation is continuing but the facts discovered to date in this matter strongly support substantive consolidation.

51. During the course of work on this matter, staff working at my direction and I reviewed and analyzed documents provided by management for the Debtors and its advisors. However, not all documents requested have been provided to me or my staff as of this date. I understand that the Debtors and its advisors are working towards providing this information as soon possible.

---

[9] Motion for Authority (A) to Maintain Existing Bank Accounts and Cash Management System, (B) to Continue Use and Existing Checks and (C) to Continue Use of Current Investment Policy dated February 21, 2005, para. 11, p. 4.

_____
M. Freddie Reiss

Sworn to and subscribed before me

this 11th day of May, 2006.

_____
Notary

My Commission Expires: 25. July. 06

DONNA M. FIGUEROA
Commission # 1366214
Notary Public - California
Los Angeles County
My Comm. Expires Jul 25, 2006