Hearing Date:    October 13, 2006

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

## MEMORANDUM OF LAW IN RESPONSE TO OBJECTIONS TO CONFIRMATION OF JOINT PLAN OF REORGANIZATION OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors" or "Winn-Dixie"), submit this memorandum of law in response to objections to confirmation of the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (as it may be further amended, supplemented, or modified, the "Plan")[2] under section 1129 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code" or the "Code").  In support thereof, the Debtors respectfully represent as follows:

---

[1]  In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

**Preliminary Statement**

On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code to restructure their businesses. To date, the Debtors' cases have been jointly administered for procedural purposes only.  After lengthy negotiations with major creditor constituencies, the Debtors are ready to seek confirmation of their consensual Plan.  The Plan represents the culmination of extraordinary efforts by the Debtors, the Creditors Committee, and other parties-in-interest to reach a fair, equitable and value-maximizing restructuring of the Debtors.  As a result of those efforts, the Debtors are in a position to confirm the Plan and emerge from Chapter 11.

Major creditor groups, including the Creditors Committee, holders of Noteholder Claim (the "Noteholders"), Landlord Claims (the "Landlords"), Vendor/Supplier Claims (the "Vendors") and Retirement Plan Claims (the "Retirees"), not only support the Plan, but also had input in the development and negotiation of the Plan.  Moreover, the Plan has received overwhelming acceptance measured in both amount and number of Claims in all voting Classes, with the exception of subclasses within Classes 10 and 11, which are being paid in full, with interest.  Despite distributing the Plan and other solicitation materials to tens of thousands of parties-in-interest, only a few creditors have filed objections to Plan confirmation.

The Debtors submit this memorandum of law in response to the objections to confirmation of the Plan.  The objections fall into roughly five categories: (1) objections to the substantive consolidation settlement; (2) objections to the limited releases; (3) objections to the interest rate to be paid to certain taxing authorities that are being paid in full; (4) objections by shareholders that are receiving no distributions under the Plan; and (5) a few miscellaneous objections, many of which are legally irrelevant or which misconstrue Plan provisions.  This

2

memorandum addresses these objections but does not, however, go through each of the

requirements for confirmation, which are outlined in the annexed confirmation order and will be

addressed at the hearing on confirmation of the Plan.  As evidenced by these materials, along with

the voting results and the relatively few objections to the Plan, the Debtors believe that the Plan is

in the best interests of creditors and clearly meets the requirements for confirmation.  Accordingly,

the Debtors respectfully request that the Court confirm the Plan and overrule the unresolved

objections to confirmation.

## Overview of the Plan

The Plan represents the culmination of extensive negotiations with various constituencies that have yielded overwhelming support for the Plan.  As indicated in the Logan Declaration, all Classes of Claims entitled to vote approved the Plan (with the exception of the subclasses that are being paid in full, with interest).  The salient features of the Plan are as follows:

- Holders of Class 1 Other Priority Claims, Class 2 MSP Death Benefit Claims, Class 3 Workers Compensation Claims, Class 4 Bond/Letter of Credit Backed Claims Class 5 Convenience Claims, and Class 6 Subsidiary General Unsecured Claims are all unimpaired under the Plan.

- Class 12 Noteholder Claims are Impaired under the Plan and will receive New Common Stock initially consisting of 62.69 shares for each $1000 of Allowed Claims.  Creditors holding 98%[3] in number and 99% in amount of Claims in this Class voted to ACCEPT the Plan.

- Class 13 Landlord Claims are Impaired under the Plan and will receive New Common Stock initially consisting of 46.26 shares for each $1000 of Allowed Claims.  In the alternative, holders of Landlord Claims can elect to have the amount of their Allowed Claim reduced to $3,000 and receive a cash payment of $2010.  Creditors holding 77% in number and 80% in amount of Claims in this Class voted to ACCEPT the Plan.

- Class 14 Vendor/Supplier Claims are Impaired under the Plan and will receive New Common Stock initially consisting of 46.26 shares for each $1000 of Allowed Claims.  In the alternative, holders of Vendor/Supplier Claims can elect to have the amount of their Allowed Claims reduced to $3000 and receive a cash payment of $2010.  Creditors holding 93% in number and 97% in amount of Claims in the Class voted to ACCEPT the Plan.

- Class 15 Retirement Plan Claims are Impaired under the Plan and will receive New Common Stock distributions initially consisting of 38.75 shares for each $1000 of Allowed Claims.  In the alternative, holders of Retirement Plan Claims can elect to have the amount of their Allowed Claim reduced to $3,000 and receive a cash payment of $2010.  Creditors holding 96% in number and 97% in amount of Claims in this Class voted to ACCEPT the Plan.

- Class 16 Other Unsecured Claims are Impaired under the Plan and will receive New Common Stock distributions initially consisting of 34.89 shares for each $1000 of Allowed Claims.  In the alternative, holders of Other Unsecured Claims can elect to have the amount of their Allowed Claim reduced to $3,000, and receive a cash payment of $2010.  Creditors holding 77% in number and 88% in amount of Claims in this Class voted to ACCEPT the

---

[3]    Numbers are rounded off to the nearest whole number.

Plan.

- Class 17 Small Claims are all Impaired under the Plan and will receive Cash distributions equal to 67% of the Allowed Claims.  Creditors holding 93% in number and 92% in amount of Claims in this Class voted to ACCEPT the Plan.

- Holders of Classes 18, 19, 20 and 21 Intercompany Claims, Subordinated Claims, Non-Compensatory Damage Claims and Winn-Dixie Interests and Subordinated Claims are Impaired and non-voting and are not entitled to receive any property or interests on account of such Interests or Claims.

- The Plan also provides for, among other things: (a) the Reorganized Debtors' entry into the Exit Facility, (b) the issuance of the New Common Stock, (c) the cancellation of all Old Securities, (d) assumption or rejection of executory contracts and unexpired leases to which any Debtor is a party based upon the Debtors' business judgment with respect to each executory contract and lease, and (e) granting limited releases to various parties who made substantial contributions in connection with the Debtors' reorganization.

## The Court Can and Should Confirm the Plan

To confirm the Plan, the Court must find that the Plan complies with each of the requirements of Bankruptcy Code section 1129(a).  The Plan  meets all of the requirements of Code section 1129(a), as is outlined in the proposed confirmation order.  Accordingly, the Plan should be confirmed, and the unresolved objections should be overruled.

## A.    The Substantive Consolidation Settlement Should Be Approved

### 1.    The Settlement is in the Best Interest of Creditors

Bankruptcy Rule 9019(a) permits a bankruptcy court to approve a compromise or settlement.  Similarly, Bankruptcy Code section 1123(b)(3)(A) permits the settlement of claims or interests belonging to the estate through a reorganization plan.  To approve a settlement, a court must find that "the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate."  See, e.g., In re Gallagher, 283 B.R. 342, 346 (Bankr. M.D. Fla. 2002) (citing

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414,

424 (1968)).

        Several landlords with guarantees have objected to the provisions of the Plan that

reflect the substantive consolidation settlement.  Relying on Third Circuit case law – but giving

short shrift to the controlling Eleventh Circuit authority – they argue that consolidation – and by

implication a settlement that incorporates any elements of a consolidation – is inappropriate here.

The landlords' objections should be overruled.

        Settlements are generally favored in bankruptcy because they minimize litigation

and expedite the administration of a bankruptcy estate.  See Munford v. Munford, Inc. (In re

Munford, Inc.), 97 F.3d 449, 455 (11th Cir. 1996) ("public policy strongly favors pretrial

settlement in all types of litigation because such cases, depending on their complexity, 'can occupy

a court's docket for years on end, depleting the resources of parties and the taxpayers while

rendering meaningful relief increasingly elusive.'  Second, litigation costs are particularly

burdensome on a bankruptcy estate given the financial instability of the estate") (citation omitted)

(quoting Wald v. Wolfson ( In re U.S. Oil & Gas Litig.),  967 F.2d 489, 493 (11th Cir. 1992)).  In

In re Justice Oaks II, Ltd., 898 F.2d 1544 (11th Cir. 1990), the Eleventh Circuit articulated a

four-part standard for courts to follow when determining if the substance of a settlement is fair and

equitable:  "(a) the probability of success in the litigation; (b) the difficulties, if any, to be

encountered in the matter of collection; (c) the complexity of the litigation involved, and the

expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the

creditors and a proper deference to their reasonable views."  Id. at 1549;  See also In re Holywell

Corp., 93 B.R. 291 (Bankr. S.D. Fla. 1988) (decision to settle is largely one of sound business

judgment and after reviewing all relevant facts should be approved unless it falls below the

"'lowest point in the range of reasonableness'") (citing <u>In re Teltronics Servs., Inc.</u>, 762 F.2d 185, 189 (2d Cir. 1985)).

Significantly, in order to approve the settlement, the Court does not have to determine the underlying litigation.  <u>See</u> <u>e.g.</u>, <u>Florida Trailer and Equip. Co. v. Deal</u>, 284 F.2d 567, 571 (5th Cir. 1960) ("the approval of a proposed settlement does not depend upon establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable."). Rather, the Court need only canvass the issues to determine whether the settlement falls within the range of reasonableness.  <u>See</u> <u>In re Vazquez</u>, 325 B.R. 30, 36 (Bankr. S.D. Fla. 2005); <u>In re Kay</u>, 223 B.R. 816, 821 (Bankr. M.D. Fla. 1998).  If the proposed settlement does not fall below the lowest point in the range of reasonableness, it should be approved.  <u>See</u> <u>In re Mrs. Weinberg's Kosher Foods, Inc.</u>, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002) ("A proposed settlement will pass muster provided it does not fall below the lowest point in the range of reasonableness.").

In <u>In re WorldCom</u>, No. 02-13533, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. 2003), creditors reached a settlement of substantive consolidation that the court approved under Bankruptcy Code section 1123(b)(3)(A) based on each party's likelihood of success, the complexity, cost, and delay of litigation, creditor support for the settlement and plan and the fact that the settlement was the product of "extensive arm's-length and good faith negotiations" between and among the debtors and creditors.  <u>See</u> <u>id</u>. at *112.  The court determined that any litigation involving consolidation would be fact sensitive, complex, intensive and protracted.  <u>See</u> <u>id</u>. at *133.  The court also noted that each objecting party would attempt to demonstrate reliance, which would undoubtedly require lengthy testimony.  <u>See</u> <u>id</u>. at *133-34.

In addition, the court also found that proof of reliance would not resolve the issue because the debtors could still argue based on unsettled law that consolidation was appropriate in

light of debtor entanglement.  See id. at *134.  Furthermore, the settlement made it more likely that

the debtors could implement a successful reorganization.  See id. at *135-36.  The court noted that

the determination of fair valuation is an inexact science, and there is no "precise formula" to

determine solvency.  Id. at *122 citing Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573,

577 (1st Cir. 1980); Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985). See also In re Drexel

Burnham Lambert Group, ("Drexel Burnham"),138 B.R. 723, 747-48 (Bankr. S.D.N.Y. 1992)

(court authorized compromise of interdebtor claims and guarantees whereby creditors of

consolidated debtors received disparate treatment even though distributions were not derived from

a precise formula; rather, they were merely the product of negotiations).

    Here, the Plan's settlement overwhelmingly has been agreed to by all the affected

classes of creditors in the requisite numbers and amounts.  The fact that there are a few creditors

who would like to derail the global compromise embodied in the Plan in order to try to enhance

their individual recoveries is irrelevant:  so long as creditors are receiving the liquidation value of

their claims, the class vote is determinative.  See 11 U.S.C. §§ 1129(a)(7) (best interests test);

1129(a)(8)(setting forth requirement for affirmative class vote to avoid cram down requirements).[4]

    In order for the Court to analyze this settlement contained in the Plan, a brief review

of the law and the facts may be helpful.  The Eleventh Circuit recognizes that a court may

authorize substantive consolidation.  See, e.g., Eastgroup Properties v. Southern Motel Assoc.,

Ltd., 935 F.2d 245 (11th Cir. 1991)(affirming order consolidating estates for purposes of

distribution).  In Eastgroup, the court held that substantive consolidation was appropriate when

---

[4]    Indeed, even without the requisite acceptance of the plan, the settlement would control so long as it is in the
best interests of the estate and creditors.  See generally In re Munford, Inc., 97 F.3d 449 (11th Cir. 1996)
(agreements settling adversary proceedings may bind non-settling parties when claims of non-settling
adversaries impact bankruptcy case, citing 11 U.S.C. § 105); See also In re Justice Oaks II, Ltd., 898 F.2d
1544 (11th Cir. 1990) (settlement approved despite objecting creditor being unable to participate in
settlement discussion and receiving no distribution under plan as a result).

"(1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit."  Eastgroup, 935 F.2d at 249.  Upon such a showing by the proponent of substantive consolidation, the burden shifts to an objecting party to show that "(1) it has [reasonably] relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation."  See id.  Finally, even if an objecting party makes such a showing, substantive consolidation is appropriate if the "benefits of consolidation 'heavily outweigh [the] harm.'"  See id. (citing In re Autotrain Corp., Inc., 810 F.2d 270, 276 (D.C. Cir. 1987)).  Many Vendors asserted that Eastgroup supported substantively consolidating the Debtors' Estates.  Indeed, an "Ad Hoc Committee of Trade Creditors" eventually filed detailed pleadings seeking consolidation.

During negotiations of the consolidation issues, many other creditor groups took the opposite position and argued that substantive consolidation was inappropriate in these cases, and that they would litigate the issue before this Court, if necessary.  Moreover, during the Debtors' bankruptcy cases, the Third Circuit Court of Appeals issued a ruling on substantive consolidation that departed from Eastgroup and which the Noteholders – who have guarantees from virtually all the Winn-Dixie companies — used to support their argument that the cases should not be consolidated.  See, e.g., In re Owens Corning, 419 F.3d 195 (3d Cir. 2005).  In rejecting the Eastgroup holding, Owens Corning held that it is a "demanding task" for a court to order substantive consolidation when doing so would eliminate credit enhancing intercompany guarantees.  Id. at 197.

As a result of creditor conflicts over the issue of substantive consolidation, the Debtors and the Creditors Committee began to analyze the facts in this case.  The analysis began with the two alternatives presumably available through litigation:  a consolidated plan or an

unconsolidated plan. The basis for a consolidated plan would be that the Winn-Dixie companies allegedly operated as one enterprise[5] and, under Eastgroup, the assets and liabilities should be pooled for the purposes of distribution for ease of administration. In the event of consolidation, every unsecured creditor would receive one distribution in the same amount, because the assets and liabilities of the companies would be pooled, and intercompany claims would be ignored.

In an unconsolidated plan, by contrast, each companies' unsecured creditors would be entitled to their pro-rata share of the assets (or stock) of each Debtor. 11 U.S.C. §§ 1129(a)(7), 1129(b)(2). In other words, each Debtor would have different owners post-emergence,[6] and the reorganized companies would not be bound to do business with each other. But in that scenario, none of the companies would be viable. Winn-Dixie Stores, Inc. ("Stores") (the Florida store owner with administrative functions that owns the Winn-Dixie trademark) could not stand alone because it has no procurement or logistical functions. Winn-Dixie Montgomery, Inc. ("Montgomery") and Winn-Dixie Raleigh, Inc. ("Raleigh") would not survive because they do not own the Winn-Dixie trademarks, have no administrative functions, have no equipment and have no procurement functions. Winn-Dixie Procurement, Inc. ("Procurement") only buys or sells goods to Winn-Dixie companies and has no way to sell its goods to the public. Winn-Dixie Logistics, Inc. ("Logistics") owns equipment and leases equipment and real estate, but has no customers outside of the Winn-Dixie corporate family. Similarly, none of the other Debtor companies have stand-alone businesses. In short, absent some compromise, an unconsolidated plan for the Winn-Dixie companies would be a liquidation plan.[7]

---

[5]   The case for consolidation has been set forth in the papers of the Ad Hoc Trade Committee. (Doc. No. 11539).

[6]   Of course, there would be some overlap; for example, the Bondholders would have substantial holdings in all the Winn-Dixie companies.

[7]   Of course, there could have been some type of compromise, such as contracts between the various companies, to preserve going concern value. This Plan is such a compromise.

In addition, there are many other thorny issues that would have to be determined before there could be distributions under unconsolidated plans. These issues include:

- What companies are liable on the trade debt? Vendors filed claims against multiple companies. The paperwork oftentimes reflected "Winn-Dixie" as the obligor. Goods sometimes were shipped to individual stores and sometimes were shipped to Procurement. Vendors oftentimes dealt with employees of Procurement (who failed to recognize, in some cases, that they worked for Procurement), who entered into promotional agreements for Stores, Montgomery, and Raleigh.

- Which of the Winn-Dixie companies should first pay the debt on which multiple Winn-Dixie companies are liable; alternatively how should the liability be allocated? Once one company paid the debt, it would only have a prepetition claim against the other companies for contribution. How could the benefits that each entity receives from the prepetition bank debt, the prepetition bond debt, and the DIP Facility be allocated? In other words, how much should Stores, Procurement, Raleigh, Logistics and Montgomery and the other Debtors each pay on the bond debt and bank debt which benefited them all.

- Should adjustments be made to intercompany balances to adjust prepetition transfer pricing or to more fairly allocate expenses and income?

- Which companies were liable for the debt owed to Retirees? Paperwork was signed by "Winn-Dixie and its affiliates."

- Which companies were liable to the various Landlords? While some landlords have clear paperwork, in other cases, the identity of their obligors is not clear.

With these parameters as background, the Debtors and the Creditors Committee eventually concluded that a settlement was in the best interests of all creditors. In reaching that

conclusion,  creditors representing diverse constituencies spent months reviewing the documents,

interviewing Winn-Dixie employees, analyzing the law and arguing about their positions.  This

process was expensive and protracted – but far less expensive and protracted than litigation would

have been.  Moreover, the eventual rough justice that was reached will, if approved, allow the

Debtors to emerge from bankruptcy promptly, get on with their business operations, and make

distributions to creditors.

        The Debtors therefore contend that the proposed settlement is fair and equitable.

The Debtors, the Creditors Committee and major creditor constituencies – including most

Noteholders, Vendors, Landlords, and Retirees – recognized that litigation would undoubtedly

require lengthy discovery and court testimony regarding creditor reliance on the separateness or

interrelatedness of the Debtors.  The parties and the Debtors also recognized, however, that

preserving the Debtors' corporate structure (i) was essential to the Debtors' success after the

Effective Date, (ii) would ultimately enhance creditor recovery, and (iii) would avoid potentially

inaccurate valuations of entities that did not have historical stand-alone values.  Finally, the Plan

received support from an overwhelming number of unsecured creditors, both in amount and in

number.

        For these reasons, and  based on the Court's knowledge of the facts of these cases,

including the potential for expensive and protracted litigation regarding substantive consolidation,

and the importance of the proposed settlement to plan formulation, the Court is in a position to

conclude that the proposed compromise and settlement is fair and equitable and in the best

interests of the Debtors' Estates.

2.    **The Settlement's Classification is Appropriate**

Certain of the objections to the substantive consolidation settlement specifically attack the Plan's classification scheme, which is a key element of the substantive consolidation settlement.  It bears emphasis that the classification scheme is the one that all negotiating parties – including Landlords – concluded was fair, appropriate and rational.

Code section 1122 provides that:"a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Although this provision prohibits the inclusion of dissimilar claims in the same class, it does not require a plan to place all similar claims in one class.  See Drexel Burnham, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

Courts have repeatedly held that plan proponents have "considerable discretion to classify claims and interests according to the facts and circumstances of the case . . ."  In re Holywell, 913 F.2d 873, 880 (11th Cir. 1990).  See also, In re Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002) (upholding separate classification of two classes for foreign tort creditors – and a lower settlement for such creditors than to domestic creditors); In re Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classifications of workers' compensation claims from surety claims; "separate classification of unsecured claims for the sole purpose of creating an impaired assenting class is not permitted.  Rather, to warrant having separate classification of similar claims, the debtor must advance a legitimate reason supported by credible proof"); In re U.S. Truck Co., 800 F.2d 581, 587 (6th Cir. 1986) (union could be classified separately from other impaired creditors; noting long-standing principle of courts having "broad discretion to determine

13

proper classification according to the factual circumstances of each individual case"); In re New Jersey Medical Center, 817 F.2d 1055, 1060-1061 (3d Cir. 1987) (upholding separate classification of physicians, medical malpractice victims, employee benefit plan participants, and trade creditors; "it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case"); See Wabash Valley Power Ass'n., Inc., 72 F.3d 1305, 1321 (7th Cir. 1996) ("Claims may be separately classified if there are 'good business reasons' to do so or if the claimants have sufficiently different interests in the plan;" upholding classification that facilitated settlement).  One check on classification is that it must not be designed to manipulate the vote.  In re Holywell, 913 F.2d at 880 (classification designed to manipulate vote unacceptable).  Of course, in this case no party has contended that the classification scheme was an attempt to manipulate class voting or violates the basic priority rights afforded by the Code.  Rather, as described above, the Debtors based the classification scheme on the proposed substantive consolidation settlement and, therefore, sufficient justification exists for having multiple classes of unsecured claims.

Indeed, this is not the first time that a classification scheme has been created to deal with the resolution of substantive consolidation issues.  In In re Orfa Corp., 129 B.R. 404 (Bankr. E.D. Pa. 1991), the court confirmed a plan that even combined the secured and unsecured claim of one creditor into the same class, because such a combination would result in a fair resolution of the substantive consolidation issues.

In re Dow Corning Corp. illustrates the propriety of classifying claimants by taking into consideration their likelihood of success in litigation.  There, Dow Corning had filed for chapter 11 relief because of the many claims it faced from having manufactured silicon breast implants.  The plan provided for a pot of money to pay such claims, and separately classified

"foreign claimants," as defined in the plan, into two classes.  One class was composed of claimants from a country that either "(1) belong[ed] to the European Union; (2) ha[d] a common law tort system, or (3) ha[d] a per capita gross domestic product of greater than 60% of the United States' per capita gross domestic product."  280 F.3d at 661.  The other class was all other foreign claimants.  Claimants in the first class would receive offers equal to 60% of the settlement offers received by United States claimants and claimants in the second class would receive settlement offers equal to 35% of the United States claimants' settlement offers.  The court upheld the classification as being rational and justified under the circumstances.

Here, the Plan classifies the Noteholder Claims, Landlord Claims, Vendor/Supplier Claims, Retirement Plan Claims and Other Unsecured Claims separately because the diverse creditor groups that examined the facts concluded this was the fairest and most rational classification.  Their separate classifications reflect the strength of each group's argument for or against substantive consolidation of the Debtors, the nature of each Claim asserted and the legal obligors of each Classes' Claims.

For example, the recovery afforded to Noteholders is different from the recovery granted to landlords because of the number of guarantees obtained pre-petition by Noteholders.  While landlords typically have only one guarantor, all operating debtors are liable to Noteholders.  Moreover, the Noteholders' large claims throughout the corporate structure might allow them to control any liquidation or contractual agreements designed to preserve going concern value if there were an unconsolidated plan.  The recovery to Vendors is the same as that for Landlords because the Vendors contended – with extrinsic evidence – that they had been doing business with "Winn-Dixie," rather than any specific debtor.  Thus, even if there were no consolidation, the Vendors contended they would have claims against multiple debtors.  Retirees were given a lesser

15

recovery because they had a weaker case for confusion than did the Vendors, although there were some ambiguities in their paperwork. By contrast, the recovery for the "Other Unsecured Creditors" is less than that for the Vendors, the Landlords and the Retirees because historically the Winn-Dixie companies had successfully maintained the corporate veil with respect to the types of claims in the Other Unsecured Claims Class. The nature of the Claims held by these Classes, in short, are "sufficiently dissimilar" to mandate separate classification. See, e.g.,  In re JRV Industries, Inc., 344 B.R. 679 (Bankr. M.D. Fla 2006) (when a legal distinction between types of unsecured claims exists, separate classification is proper).

Nor can the classification scheme be attacked on the grounds that every claim in each class is not identical:  the Code only requires that such claims be "substantially similar," 11 U.S.C. § 1122(a), not identical. See generally  Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell), 913 F.2d 873 (11th Cir. 1990)(appropriate to classify claims together even though they are not identical). Many claims – be they of Vendors, Landlords, or Retirees – have individual attributes, but the creditors themselves crafted this classification to reflect an efficient and fair resolution of litigable issues that could have devoured the estates.[8]

Thus, valid factual reasons exist for classifying the various Classes of Claims as they are classified under the Plan. The Plan therefore satisfies Bankruptcy Code section 1122, and the objections of those creditors who contend they are misclassified should be overruled, especially in light of the overwhelming acceptance of the Plan by Creditors in these Classes.

---

[8]    In this regard, Wah Hong Go has alleged that his unliquidated and contested race discrimination claim is entitled to separate classification. He provides no justification, however, for special treatment other than vague assertions that his claim is special.

3.    **The Plan has Been Proposed in Good Faith**

Certain objectors contend the Plan is not proposed in good faith.  Bankruptcy Code section 1129(a)(3) requires that a reorganization plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Although the Bankruptcy Code does not define "good faith," courts have held that a plan is proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the [Bankruptcy] Code."  See, e.g., In re McCormick, 49 F.3d 1524, 1526 (11th Cir. 1995) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied").  The court's inquiry should focus on the plan itself and the totality of circumstances surrounding the plan.  See, e.g., In re Piper Aircraft Corp., 244 F.3d 1289 (11th Cir. 2001) (good faith inquiry has little to do with pre-petition business disputes).

As will be shown at the hearing, the Debtors proposed the Plan in good faith, with the legitimate and honest purpose of reorganizing the Debtors' ongoing businesses as a means of maximizing the value of each of the Debtors and the recoveries to Claimholders.  The development of the Plan involved the active participation of, and arms' length negotiations among, the Debtors, the Creditors Committee, the Ad Hoc Trade Committee, the Ad Hoc Retirees Committee and the Exit Facility lenders (through the administrative agent); see also In re Eagle-Picher, Inc., 203 B.R. 256, 274 (S.D. Ohio 1996) (plan proposed in good faith when, among other things, it was based on extensive arms' length negotiations among plan proponents).

Moreover, the estimated recovery for Claims under the Plan is significantly greater than any value that would be distributed following a liquidation of the Debtors' assets.  This further evidences the good faith belief of the Debtors that the Plan is being proposed for the honest

purpose of reorganizing the Debtors' businesses.  Based upon all of the foregoing, the Debtors believe that the good faith requirements of Bankruptcy Code section 1129(a)(3) have been fully satisfied.

4.        **The Plan is in the Best Interests of Creditors**

The "best interests of creditors" test, set forth in Code section 1129(a)(7), requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated.  See Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re The Leslie Fay Cos., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997); see also In re Stone & Webster Inc., 286 B.R. 532, 544 (Bankr. D. Del. 2002) (best interests test in a consolidated case should be conducted on a consolidated scenario).  In considering whether a plan is in the "best interests" of creditors, a court is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all of the debtor's assets under Chapter 7 of the Bankruptcy Code.

It is clear from the Liquidation Analysis referenced in the Disclosure Statement that each holder of a Claim or Interest in an Impaired Class will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive in a Chapter 7 liquidation of the Debtors' assets, on either a consolidated or unconsolidated basis on such date.  As a result, the Plan satisfies the requirements of Code section 1129(a)(7).

5.     **The Provisions for Payments under Plan Sections 12.3 and 12.4 Comply with Section 1129(a)(4)**

The United States Trustee and the United States also object to the provisions in Plan section 12.3 for payments to professionals who helped forge the substantive consolidation settlement and argue that the payments should be subject to the fee application process.

Nothing in the Code, however, requires that the fees of professionals retained by members of the Creditors Committee – rather than the committee itself – be subject to the fee application process. Similarly, nothing in the Code requires that those professionals' fees be subject to that process. Rather, all the Code requires is that the fees be approved by the court as reasonable. 11 U.S.C. § 1129(a)(4).[9] Here, the Court will be able to reach such a conclusion: the testimony will show that a tremendous amount of work was done that was beneficial to the Estates and that the fees to be paid are, in fact, reasonable. Moreover, it bears emphasis that the fees are subject to review by the Debtors and, if the Debtors object to the fees, ultimately are subject to the Court's review under the "reasonableness" standard. Plan §§ 12.3, 12.4.

Similarly, the United States Trustee suggests, without providing any authority on point, that there is no legal justification for payment of these fees. In fact, however, Code section 503(b)(4) specifically provides for the payment of fees for counsel to committee members.[10] Moreover, Code section 503(b)(3)(D)[11] and Code section 503(b)(4), read together, allow

---

[9]     Code section 1129(a)(4) provides: "Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

[10]    First Merchs. Acceptance Corp. v. J.C. Bradford & Co., 198 F.3d 394 (3d Cir. 1999).

[11]    Allowing "reasonable compensation for professional services rendered by an attorney as an accountant of an entity whose expense is allowable under paragraph (3)." 11 U.S.C. § 503(b)(4).

compensation for entities that make a substantial contribution to the estate.[12]  Here, the payments proposed to be made to the professionals are a component of the substantive consolidation compromise, as stated in Plan Section 2.3 and should be approved as part of the compromise under Rule 9019.  The cap on fees provided for in the Plan reflects a settlement of the substantial contribution applications that were anticipated to be filed and the Debtors believe that the proposed process to pay and review these fees is more efficient and less costly under the circumstances.

The provisions regarding payment of the fees of the Indenture Trustee set forth in Plan section 12.4 have become typical in the reorganization plans of ongoing companies with public debt.  This is because – as is typical with public debt – the Indenture here provides for the payment of the fees and expenses of the Indenture Trustee.  Moreover, the Indenture provides for the imposition of a charging lien on any distributions made to bondholders.  Thus, rather than foregoing an indenture trustee attempt to implement a cumbersome charging lien process, it has become relatively common for debtors to agree to pay such fees.[13]  See, e.g., In re Global Crossing, (Bankr. S.D.N.Y. Dec. 26, 2002 Case No. 02-40188 (REG) (providing for expenses of indenture trustee to be compensated without a separate application to the court); In re ATA Holdings Corp. (Bankr. S.D. Indiana June 12, 2006 Case No. 04-19866 (BHL)) (same).

Importantly, too, in voting to approve the Plan, the Noteholders did so under a Plan that provided that the expenses of the Indenture Trustee would be paid by the Debtors, rather than from the Noteholders' recovery pursuant to the Indentured Trustee's charging lien.  It was an

---

[12]    Allowing "compensation for a creditor… in making a substantial contribution in a case under chapter 11 of this title."

[13]    The I.R.S. cites a dated Sixth Circuit case, Wright v. City Nat'l. Bank & Trust Co. of Battle Creek, 104 F.2d 285 (6th Cir. 1939), to support its objection.  The case addressed a different statute and addressed official committee fees.

integral part of the substantive consolidation compromise that the Indentured Trustee's fees, as well as the fees of the professionals involved in reaching that compromise, be paid by the Debtors' estates. In voting to approve the Plan, all the creditors voted on the understanding that such fees were being paid by the Debtors' estates. It would be unreasonable to upset those expectations after Plan voting has been completed.

In sum, the payment of fees under Plan sections 12.3 and 12.4 meets the "reasonableness" criteria, because they provide compensation to professionals who made a contribution to the Debtors' estates by foregoing the substantive consolidation compromise and avoiding the enforcement of the Indentured Trustee's charging lien against the distribution to the Noteholders.

## B.    The Plan's Limited Releases Should Be Approved

### 1.    The Plan's Releases

Article XII of the Plan includes several provisions that release or otherwise define the liabilities of various non-Debtors in connection with actions taken or liabilities arising before the Effective Date. These provisions are the subject of an objection to confirmation asserted by the United States Trustee, but not by any entity affected by the releases. Winn-Dixie believes that this objection lacks merit. Among other reasons, it appears to be premised on a misunderstanding of the actual terms of Article XII, or to apply an incorrect legal standard to its terms. Moreover, it totally ignores the detailed and careful Creditors Committee investigation of certain potential claims the Estates might have against the Debtors' officers and directors.

As an initial matter, different tests for the approval of non-debtor releases have been applied, depending on the nature of the claims released, the identity of the parties affected by

the release, and whether the release is consensual.  The principal forms of releases proposed in chapter 11 plans are:

> (i)      the "Debtor Release": provisions for the release of estate causes of action against non-debtor parties, that do not affect the non-derivative claims held by parties other than the estate;
>
> (ii)     the "Voluntary Creditor Release": provisions for the voluntary release of direct claims against non-debtors by creditors who affirmatively consent to such release; and
>
> (iii)    the "Involuntary Creditor Release": provisions for the release of claims against nondebtors that are binding on all creditors without regard to whether they affirmatively consent to the release.

In addition, chapter 11 plans also commonly contain exculpation clauses ("Exculpations") that limit the liability of parties participating in the chapter 11 process except in instances of willful misconduct or gross negligence. See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (describing exculpation clauses as "commonplace").  As one circuit court has noted, however, such clauses are not true releases, because they "se[t] forth the appropriate standard for liability." Id. at 246.

Here, Plan section 12.12(a) contains a Debtor Release of claims against certain persons who have contributed significantly to the Debtors' reorganization.  Section 12.12(b) of the Plan sets forth a Voluntary Creditor Release of certain persons by holders of Claims who vote to accept the Plan.  Plan section 12.15 sets forth an Exculpation limiting the liability of certain persons who have participated in the formulation of the Plan.  The Plan does not include any Involuntary Creditor Release provisions.

Different legal standards have emerged for each of the releases and exculpations identified because each type of release raises different concerns.  For example, Code section 524(e) has sometimes been held to preclude approval of Involuntary Creditor Releases, see cases cited in In re Transit Group, 286 B.R. 811 (Bankr. M.D. Fla. 2002) (disagreeing with those cases), but is

inapplicable by its own terms to a Debtor Release.[14]  See In re WCI Cable, Inc., 282 B.R. 457,

468-69 (Bankr. D. Or. 2002) (holding Code section 524(e) inapplicable to settlement of estate

claims).  Similarly, Voluntary Creditor Releases are generally regarded as contractual in nature,

and thus typically receive less scrutiny than either Debtor Releases or Involuntary Creditor

Releases.  See In re Resorts Int'l, Inc., 145 B.R. 412, 468 (Bankr. D.N.J. 1990) (approving

voluntary release and noting that voluntary release was "purely contractual between the parties to

the release").

2.      **Section 12.12(a) Debtor Release**

Here, the Section 12.12(a) Debtor Release is a settlement of claims by the Debtors

against: (i) each other Debtor and  the Non-Debtor affiliates; (ii) present and former Debtors'

officers, directors and employees (the "Officers"); (iii) any professionals of the Debtors;   (iv)

Wachovia and its advisors; and  (v) the Creditors Committee, its members and their advisors.  This

release by the Debtors follows from the exhaustive investigation undertaken by the Creditors

Committee.

The Debtor Release is in the best interests of the Debtors' estates and arises from an

appropriate exercise of the Debtors' authority under Section 1123(b)(3) to include in the Plan "the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  See, e.g.,

In re Pacific Gas & Elec. Co., 304 B.R. 395 (Bankr. N.D. Cal. 2004) (court approved release and

settlement of debtor's claims pursuant to section 1123(b)(3)); In re Best Products Co., 168 B.R. 35

(Bankr. S.D.N.Y. 1994) (same); In re General Homes Corp., FGMC, Inc., 134 B.R. 853, 861

(Bankr. S.D. Tex. 1991) (in considering confirmation of plan that contained releases of bank group

---

[14]      Of course, the argument that Code section 524(e) prohibits involuntary releases has been rejected in this
district.  In re Transit Group, 286 B.R. 811, 818.

and each of its members by the debtor, the court held that "[t]o the extent that the language contained in the plan purports to release any causes of action against the Bank Group which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the Code requiring that the plan be… proposed in good faith").  The standard applied for approval of this kind of release by the Debtors should be the same standard as is applied to the approval of any release by the Debtors – the standard for approval of settlements under Bankruptcy Rule 9019.[15]  The Debtor Release clearly satisfies that standard.

The Debtors do not believe that they possess any valid claims against any of the beneficiaries of the Debtor Release.  Indeed, following its own independent investigation, the Creditors Committee concluded that the Debtors likely had no viable causes of action against any of the Debtors' current or former officers or directors that had a reasonable probability of success in producing a benefit to these estates.  These facts underscore that any attempt to litigate the claims that are being released by the Debtors would be highly speculative and enjoy a low likelihood of success.  Furthermore, such litigation would likely be highly complex and would involve enormous costs to the Debtors, including legal expenses and the distraction of the Debtors' key personnel from the demands of the Debtors' ongoing businesses.  Moreover, the beneficiaries of the Debtor Release have made significant contributions to the Debtors' businesses and/or reorganization efforts and have, thereby, earned the benefit of the Debtor Release.  Further supporting the propriety of the releases is the fact that no party other than the U.S. Trustee has filed an objection to the Debtor Release (or any other release contained in the Plan) and the high degree of support that the Plan enjoys among creditors.  In light of all of these considerations, the Debtor

---

[15]    For further discussion of this standard, see discussion of the substantive consolidation compromise.

Release is clearly reasonable, in the best interests of the Debtors, these estates, and creditors, and

should be approved.[16]

---

16    The United States Trustee has suggested, without authority, that a different test – the "Factors" – should be
applied.  These factors were first articulated by the court in In re Master Mortgage Inv. Fund, Inc., 168 B.R.
930 (Bankr. W.D. Mo. 1994).  The Debtor Release is also justified under the Factors.  Under this test, a
Debtor Release should be approved to the extent the proponent shows:

(a)      an identity of interest between the debtor and the third party such that a suit against the
non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

(b)      the non-debtor has contributed substantial assets to the reorganization;

(c)      the injunction is essential to the reorganization;

(d)      a substantial majority of the creditors agree to such injunction, the impacted class has
overwhelmingly voted to accept the proposed plan treatment; and

(e)      the plan provides a mechanism for the payment of all, or substantially all, of the claims of
the class or classes affected by the injunction.

Even if this more stringent test is applied, however, the Debtors submit that they have satisfied the test, as
follows:

Identity of Interest.  Winn-Dixie has an identity of interest with each of the parties affected by the Debtor
Release, because each of these parties shares an interest with the Debtors in the success of the Plan and the
rehabilitation of the Debtors' business.    See In re Zenith, 241 B.R. at 110.

Substantial Contribution.  The current Officers released each continued to serve the Debtors through the
difficult process of the Chapter 11 Case, and their continued efforts have been responsible for the successful
stabilization of the Debtors' businesses.  In addition, many of the Officers have aided the Debtors'
reorganization by, among other things, designing and implementing the restructuring of the Debtors, and
have also participated in the negotiations that led to the formulation of the Plan.  See In re Zenith, 241 B.R. at
111 (debtor's officers and directors had made "substantial contribution" to reorganization by designing,
implementing and negotiating financial restructuring). Wachovia, the Creditors Committee and the Indenture
Trustee each contributed to the Debtors' reorganization by, among other things, participating in the
negotiation of the compromise.

Necessity to Reorganization. The releases in Plan section 12.12(a) were necessary to the formulation of the
Debtors' reorganization.  Absent the Debtors' willingness to release Wachovia, the Indenture Trustee and the
Creditors Committee, for example, it is unlikely that these parties would have participated in the Plan
negotiation process or agreed to the concessions that underlie the compromise.  Moreover, releases of the
Debtors' current Officers are necessary to the Debtors' successful emergence from the Chapter 11 Cases
because such persons would be distracted in their duties, or unwilling to continue their service to the Debtors,
if they believed that there was a danger they could be the targets of legal action by the Debtors for their
pre-Effective Date activities.

Approval by Creditors.  The releases form part of a Plan that has been accepted by  all affected Classes
entitled to vote on the Plan.  Thus, the release set forth in Section 12.12(a) of the Plan has been
overwhelmingly approved by the creditors most affected by it.

Provision for Payment of Claims.  The Plan provides for a distribution to all non-subordinated,
non-intercompany unsecured Claims.  As such, all unsecured Claimholders are being compensated through
the receipt of Plan distributions that would likely be unavailable absent the Compromise and the releases.
See, e.g., In re Zenith, 241 B.R. at 110-11 (approving release in case in which affected unsecured creditors
received partial, but not 100% distribution on their claims).

3.      __Section 12.12(b) Voluntary Creditor Release__

The Section 12.12(b) Voluntary Creditor Release provides a voluntary release of claims held by Claimholders who voted to accept the Plan.  The entities being released under the Section 12.12(b) Voluntary Creditor Release is similar to the class of releases under the Section 12.12(a) Debtor Release.  It bears emphasis that no creditor has objected to this release, which was bold and conspicuous on the ballots.

Here, the Section 12.12(b) Voluntary Creditor Release is clearly permissible because it was fully disclosed – in bold and conspicuous lettering on the ballots – and is consensual. Indeed, such releases have routinely been upheld by courts.  See In re Specialty Equip. Cos., 3 F.3d 1043 (7th Cir. 1993) (noting that consensual releases are not objectionable); In re Conseco, Inc., 301 B.R. 525 (Bankr. N.D. Ill. 2003); see also In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005) (holding that nondebtor releases should ordinarily only be granted under exceptional circumstances but that "[n]ondebtor releases may also be tolerated if the affected creditors consent"); In re Zenith, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving releases of claims against non-debtor parties under the debtor's reorganization plan as to creditors who voted to accept the debtor's plan); In re Resorts Int'l, 145 B.R. at 468.  Indeed, the Eleventh Circuit has held that under Code section 105(a) bankruptcy courts may grant involuntary releases and issue permanent injunctions where such relief plays an important role in the success of a workable reorganization plan.  See In re Munford, Inc., 97 F.3d 449 (11th Cir. 1996).

The releases in Plan section 12.12(b) are mutual releases by creditors who affirmatively vote in favor of the Plan and the Debtors' present or former officers, directors, and employees for pre-Effective Date claims relating to the Debtors.  Although these releases are releases of claims held by non-debtor parties against other non-debtor parties, the standard applied

to non-voluntary releases should not apply because these releases are <u>consensual</u>.  That is, creditors only grant the release to the extent that they affirmatively vote in favor of the Plan.  The releases do not bind creditors who vote against the Plan.  Courts have held that where, as here, non-debtor third party releases are consensual, such releases are permissible without being subject to heightened <u>Transit</u>-type scrutiny.

The United States Trustee's arguments appear to confuse the standards for approval of a Voluntary Creditor Release.  In the first place, cases such as <u>Transit Group</u> are irrelevant to Section 12.12(b) because those cases involved Involuntary Creditor Releases, rather than Voluntary Creditor Releases, and as such the "unusual circumstances" test adopted by that case is inapplicable.

Moreover, the United States Trustee's contention that consideration must be demonstrated for each Voluntary Creditor Release appears to ignore the voluntary and contractual nature of such releases.  It is well established under contract law that valid consideration for a release does not necessarily need to come from the party that is being released, but may be provided by a third party.  <u>See</u> <u>Palmer v. Davis</u>, 808 P.2d 128 (Utah Ct. App. 1991) (holding that releasee could enforce release as third party beneficiary, even though all consideration for release had been provided by releasee's employer); <u>see</u> <u>also</u> Restatement (Second) of Contract § 302 (1981).  The beneficiaries of the releases are effectively third party beneficiaries of the voluntary agreement between the Debtors and those creditors that have voted for the Plan.  As such, there is no reason for the Court to disapprove the Section 12.12(b) release.

Indeed, authority from the Middle District of Florida supports releases when an appropriate record has been made to support the release.  In <u>Transit Group</u>, Judge Jenneman surveyed the law relating to third party releases and concluded that, although there was no

controlling authority in the Eleventh Circuit, third party releases are appropriate when an appropriate evidentiary record has been made.  In <u>Transit Group</u>, however, there were only a sparse three paragraphs in the confirmation affidavit supporting the releases, and, indeed, with respect to some of the releases, absolutely no evidentiary support.  Moreover, the releases at issue in <u>Transit Group</u> were <u>involuntary</u> third-party releases.  With respect to those involuntary releases, however, the court emphasized that even they were allowed in unusual cases when a proper evidentiary record has been made.  286 B.R. at 815.  For that reason, Judge Jennemann allowed the release of GECC, which had significantly aided the plan process, even though GECC was obviously acting in it own self-interest,  <u>id</u>. at 818-19, but would not approve the involuntary releases for which there was little or no evidentiary support.

In <u>Transit Group</u> the court indicated that a number of factors can justify third party releases and injunctions.  According to the <u>Transit Group</u> court, specific factors are whether the: (i) debtor and the third party share an identity of interest, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (ii) non-debtor has contributed substantial assets to the reorganization; (iii) impacted class, or classes, has overwhelmingly voted to accept the plan; (iv) plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction and (v) bankruptcy court made a record of specific factual findings that support its conclusions.  286 B.R. at 817.

The releases, injunctions, and related relief contained in Article XII of the Plan are an important part of the restructuring of the Debtors.  For example, if the releases were not included in the Plan, then the directors, officers, and employees of the Debtors might well have objected to the release of their indemnification claims against the Debtors.  A claim against the directors, officers, and employees of the Debtors therefore would have been, in effect, a claim

directly against the Debtors, unless the Debtors could have proven it to be a pre-petition claim not subject to allowance. See In re Banco Latino Int'l, No. 94-10202, 2003 Bankr. LEXIS 2139 (S.D. Fla. 2003) (emphasizing importance of officer indemnification under Florida law in allowing claims for indemnification). This is an example of the "identity of interest" between debtors and non-debtors that Courts have held warrant injunctions against the filing of claims against non-debtors. See, e.g., In re Zenith Electronics Corp., 241 B.R. 92 (Bankr. D. Del. 1999) (identity of interests between debtor and released party exists where suit against released party is in essence a suit against the debtor's estate); see also Class Five Nev. Claimants v. Dow Corning Corp., (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002), cert. denied, 537 U.S. 816 (2002); In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994).

The releases, injunctions, and related relief also are warranted here in light of the overwhelming acceptance of the Plan by Class 12 Noteholder Claims, Class 13 Landlord Claims, Class 14 Vendor/Supplier Claims, Class 15 Retirement Plan Claims and Class 16 Other Unsecured Claims, who are all receiving significant distributions under the Plan. This is clearly the sort of overwhelming acceptance by the class affected by the releases that courts have considered significant in approving third-party releases. See, e.g., In re Dow Corning, 280 F.3d at 648; In re Zenith Electronics Corp., 241 B.R. at 111; In re Master Mortgage Inv. Fund, Inc., 168 B.R. at 930.

The releases are also justified because the beneficiaries of the releases have contributed substantially to the Debtors' reorganization. Indeed, much of the value to be distributed under the Plan will be the result of their efforts to date. It has required untold hours of hard work by all parties to the releases to reach the point of confirmation of the Debtors' Plan. Many of the Debtors' officers and employees will continue to dedicate their efforts to ensuring the

success of the Debtors' Plan.  These efforts constitute additional consideration to all constituencies in support of the releases.

### 4.      Section 12.15 Exculpation

Under Plan section 12.15, the liability of the Debtors, the Reorganized Debtors or their respective subsidiaries, the Creditors Committee, Wachovia, the Indenture Trustee, or any of their respective present or former members, officers, directors, employees, advisors, professionals and agents (collectively the "Exculpated Parties") for matters related to the Chapter 11 Case or the Plan process is limited to gross negligence or willful misconduct, and the Exculpated Parties are released from claims beyond that limitation.  As one court noted in upholding a similar exculpation provision, such provisions are "commonplace ... in Chapter 11 plans."  In re PWS Holding, 228 F.3d at 245.  Such provisions also are consistent with public policy and Bankruptcy Code section 1125(e), under which there is no liability for good faith actions in connection with plan solicitation or issuance of securities under the Plan.  See 11 U.S.C. § 1125(e).

Like Plan section 12.15,  the exculpation provision approved in PWS Holding "release[d] ... claims brought in connection with work on the bankruptcy reorganization plan" by holders of claims or interests against the debtors, the reorganized debtors, the creditors committee and "their respective members, officers, directors, employees, advisors, professionals or agents, [except for] willful misconduct or gross negligence . . . ." In re PWS Holding, 228 F.3d at 235, 246. Because such provisions do not "affect the liability of [the exculpated] parties, but rather [state] the standard of liability under the [Bankruptcy] Code," they do not "come within the meaning of § 524(e)."  In re PWS Holding, 228 F.3d at 245.

The differences between the exculpation clause in Plan section 12.15 and the exculpation clause in PWS Holding are not material.  In Plan section 12.15, Wachovia and the

Indenture Trustee also are exculpated, while the provision in <u>PWS Holding</u> did not include such

parties.  However, it is not uncommon for courts to confirm plans that grant exculpation to key

third parties including a debtor's lenders.  <u>See</u>, <u>e.g.</u>, reorganization plans and confirmation orders

in <u>In re FiberMark, Inc.</u>, Case No. 04-10463  (Bankr. D. Vt. Dec. 5, 2005); <u>In re RCN Corporation</u>,

Case No. 04-13638 (RDD) (Bankr. S.D.N.Y. Dec 8., 2004); <u>In re Kmart Corporation</u>, Case No.

02-02474 (Bankr. N.D. Ill. Apr. 23, 2003); <u>In re Sterling Chemicals Holdings, Inc.</u>, Case No.

01-37805-H4-11 (Bankr. S.D. Tex. Nov. 20, 2002).

        Exculpations of this kind are standard in complex cases such as the Debtors'.  The

exculpations are appropriately limited in scope, applying only to acts and omissions occurring

after the Petition Date and in connection with the Chapter 11 Case or the Plan and conferring only

a qualified immunity by excluding acts or omissions which are the result of fraud, gross negligence

or willful misconduct.  Moreover, these exculpations have been earned.  The beneficiaries of the

exculpations have made significant contributions to the Debtors' reorganization, which

contributions have allowed for the formulation of the Plan that resolves many complicated issues

among the Debtors and other interested parties (including the substantive consolidation dispute)

and which, in the Debtors' view, positioned the Debtors to seek confirmation of the Plan at this

time and provides for the best possible recoveries for Claims against the Debtors.  In the Debtors'

view, the beneficiaries of the exculpations would not have contributed as they did without the

prospect of the limited immunity reflected in the exculpations.  The Debtors are also unaware of

any valid causes of action against any of the beneficiaries of the exculpations.  In view of the

foregoing, the exculpations are appropriate and in the best interests of the Debtors' estates.  <u>See</u>

<u>Enron</u> Tr. 99-101, 143, 145 (Bankr. S.D.N.Y. Jul. 15, 2004).

## C.    **The Plan is Feasible**

Certain of the Taxing Authorities have suggested that the Plan is not feasible, but have provided no basis for this inflammatory charge.  Their allegation appears to be based upon a misunderstanding of how to read financial reports that leads them to confuse accounting charges with decreases in cash.  Granted, a court may confirm a reorganization plan only if confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." See 11 U.S.C. § 1129(a)(11).  This section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." 7 Collier, Bankruptcy ¶ 1129.03[11], at 1129-69 (15th rev. ed. 2006); see also In re Rivers End Apts., Ltd., 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994).  All the evidence will show that Winn-Dixie meets this standard.

Section 1129(a)(11) does not require a guarantee of the plan's success.  Rather, the proper standard is whether the plan offers a "reasonable assurance" of success.  See Kane, 843 F.2d at 649 (a plan may be feasible although its success is not guaranteed); In re Texaco, Inc., 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability."); In re Prudential Energy Co., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11)").

The Debtors believe that the Plan is feasible and that confirmation of the Plan is not likely to be followed by the liquidation or further financial reorganization of the Reorganized Debtors.  The Debtors base this conclusion upon the Projections attached to the Disclosure Statement as Exhibit B.  The Projections contain significant detail concerning the efforts

underlying preparation of the Debtors' go-forward business plan, including the Projections, and the

Debtors' reasons for concluding that the Plan is feasible and not likely to be followed by another

financial restructuring.

The Debtors emphasize that (i) the Plan will eliminate almost one billion dollars in

unsecured claims, thereby significantly reducing the Reorganized Debtors' related obligations;

(ii) the Debtors will have ample cash resources, to the extent necessary, to pay all sums required to

be paid in Cash under the Plan as well as projected operating and capital expenditures through the

projection period; and (iii) the individuals managing the Reorganized Debtors are well qualified to

lead them in achieving the estimated financial results set forth in the Projections because they

possess many years of experience in the retail grocery industry.

Based on the foregoing, the Debtors submit that (a) the Plan provides a feasible

means of completing a reorganization of the Debtors' businesses and (b) subject to the risks

described in the Disclosure Statement, there is reasonable assurance that the Debtors will be able

to satisfy all of their obligations under the Plan.  As a result, the Plan satisfies the requirements of

Bankruptcy Code section 1129(a)(11).

### D. Because Unsecured Creditors Are Not Being Paid in Full, Equity Can Receive No Distribution

A number of Winn-Dixie shareholders have objected to the Plan on the grounds

that shareholders are not receiving a distribution under the Plan.  Unfortunately, because the

absolute priority rule of the Bankruptcy Code does not allow for a distribution to shareholders

when unsecured claim-holders are not being paid in full (unless the creditors, as a class, consent to

such a gift), no distribution is possible to shareholders.

Here, the testimony will show that the value of the stock to be distributed to

creditors is less than the amount of the claims.  Accordingly, absent creditor consent — and such

consent has not been granted — Code section 1129(b)(2) does not allow for a distribution to shareholders.

Section 1129(b) provides, in part, that the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the fact that classes have rejected the plan if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. See 11 U.S.C. § 1129(b)(1).

The Plan does not "discriminate unfairly" among Classes 18, 19, 20 and 21. Rather holders of Claims or Interests in these Classes are not receiving a distribution because, as this Court recognized, Winn-Dixie Stores, Inc. is unable to pay its creditors in full. Moreover, the Plan is "fair and equitable" because it satisfies the absolute priority rule of Code section 1129(b)(2). Specifically, no class or interests junior to Classes 18, 19, 20 and 21 will receive any property on account of their claims or interest. Accordingly, the Shareholder Objections should be overruled.

**E.**     **The Market Rate for the Proposed Taxing Authorities is Appropriate**

Several taxing authorities (the "Secured Taxing Authorities") have objected to the Plan on the basis that the 6% interest rate for Secured Tax Claims originally provided for in the Plan is inadequate. To address this objection, the Plan will be amended to provide for a rate as determined by the Court.

In determining this rate, the first step is to analyze Code section 1129(b)(2). Code section 1129(b)(2) requires that holders of secured claims in classes that have voted against the plan receive the present value of their claims. In other words, they must receive a payment, over

time, that is equal to the payment they would receive on the Plan's effective date. The way in which the appropriate interest rate is to be set, however, is not specified in the Code.[17]

The Eleventh Circuit, however, has made it clear that to determine the appropriate interest rate, one must look at the market rate. In In re Southern States Motors Inns, Inc., 709 F.2d 647 (11th Cir. 1983), the court explained that the appropriate rate for taxes was not necessarily the statutory rate, but rather the market rate. Since Southern States was decided, the Supreme Court has addressed the appropriate interest rate in a chapter 13 case, but has not decided the issue in a Chapter 11 case.[18]

Here, the Debtors will establish the appropriate market rate for these Claims in the hearing, and thus these objections should be overruled.

## F.      The Miscellaneous Objections Should Be Overruled

In addition to the objections set forth above, there are several other objections that either misconstrue the Plan or are irrelevant to confirmation.

- The IRS contends that its setoff and recoupment rights have been abrogated; however, the Plan does not affect such rights. In any event, the Debtors have clarified the Plan's language.

- The IRS objects to the Plan on the grounds that the Effective Date is uncertain. In fact, the conditions to Effectiveness are routine and the IRS authority is not on point. The

---

[17]    The Secured Taxing Authorities also complain that the Bankruptcy Code has been amended to provide for interest at the statutory rate. That argument, however, is irrelevant to the determination that this Court is to make.

[18]    Till vs. SCS Credit Corp. (In re Till), 541 U.S. 465, 477 (2004) (distinguishing Chapter 11 cases from Chapter 13 cases, and noting that the competitive rates reflected in debtor-in-possession binding can help the court determine "what rate an efficient market would produce"); Bank of Montreal v. Official Committee of Unsecured Creditors (In re American Homepatient, Inc.), 420 F.3d 559 (6th Cir. 2005) (court should use rate efficient market would produce for chapter 11 cramdown rate).

case law on which the IRS relies were all cases in which an "Effective Date" was subject to conditions that were not likely to be met.

- Bundy New Orleans Co., LLC alleges that the Debtors have absconded with its insurance proceeds. The evidence will show that the Debtors have received no such proceeds.

- Several landlords contend that the assignment of the leases to a special purpose entity is improper because it allows the Debtors to substitute a weaker company as the obligor on the leases. This ignores the fact that the original tenant and Winn-Dixie Stores, Inc. (if different) will remain liable on the leases.

- One taxing authority claims that the Court's jurisdiction over tax claims is unconstitutional. Art. 8, Cl. 3 of the Constitution, however, clearly gives this Court the requisite power.

## Plan Modifications

The Debtors intend to make a few, non-material modifications to the Plan designed to take into account settlements resolving certain objections and to clarify other aspects of the Plan. Bankruptcy Code section 1127 and Bankruptcy Rule 3019 together allow plan proponents to make modifications to a plan after solicitation that bind all creditors if the modifications do not adversely affect creditors or interest holders. In accordance with this authority, courts have allowed plan proponents to make non-material changes without any special procedures or vote resolicitation. See, e.g., In re Am. Solar King Corp., 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("if a modification does not 'materially' impact a claimant's treatment, the change is not adverse") (citation omitted); In re Mount Vernon Plaza Comm. Urban Redevelopment Corp., 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted plan as modified

because "[n]one of the changes negatively affected the repayment of creditors, length of plan, or protected property interests of parties in interest").

### Conclusion

For all of the forgoing reasons, the Plan fully satisfies all applicable requirements of the Bankruptcy Code, and the Plan should be confirmed.

Dated: October 10, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ____*s/ D. J. Baker*____
    D. J. Baker
    Sally McDonald Henry
    Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for the Debtors

SMITH HULSEY & BUSEY

By ____*s/ Cynthia C. Jackson*____
    Stephen D. Busey
    James H. Post
    Cynthia C. Jackson,
    Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for the Debtors

**Exhibit A**

**Exhibit A**

| Company[*] | Function | Creditors[**] |
|---|---|---|
| Winn-Dixie Store, Inc. ("Stores") (direct or indirect parent) | administrative<br>owns operating stores<br>guarantor of leases<br>owns key trademarks | bank<br>bonds<br>trade<br>landlords (directly, and as guarantor)<br>letters of credit<br>MSP/SRP |
| Winn-Dixie Montgomery, Inc. ("Montgomery") | owns operating stores | bank<br>bonds<br>trade<br>landlords |
| Winn-Dixie Raleigh, Inc. ("Raleigh") | owns operating stores | bank<br>bonds<br>trade<br>landlords |
| Winn-Dixie Logistics, Inc. ("Logistics") | owns trucks, owns and leases equipment, rents property | bank<br>bonds<br>landlords |
| Winn-Dixie Procurement, Inc. ("Procurement") | purchases inventory; sells inventory to Montgomery Stores, Raleigh; contracts promotions for all the stores | bank<br>bonds<br>trade |
| Deep South Products, Inc. | operates jam, jelly, peanut butter and condiment plants in Georgia | bank<br>bonds |
| Crackin' Good, Inc. | operated Crackin' Good Crackers and cookies and spice plants | bank<br>bonds |

---

[*]   In addition to the above Winn-Dixie companies, the following Debtors have limited or no operations: Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc.

[**]   Reflects largest claims.  Does not include intercompany claims and many miscellaneous claims.

| **Company** | **Function** | **Creditors** |
|---|---|---|
| Astor Products, Inc. | coffee, tea and spice plants | bank<br>bonds |
| Dixie Packers, Inc. | operated<br>sold meat packing plant | bank<br>bonds |
| Dixie Spirits, Inc. | operates liquor stores in Mississippi | bank<br>bonds |
| Winn-Dixie Supermarkets, Inc. | operates retail liquor stores in Florida | bank<br>bonds |

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

### ORDER CONFIRMING JOINT PLAN OF REORGANIZATION
### OF WINN-DIXIE STORES, INC. AND AFFILIATED DEBTORS

<u>RECITALS</u>

      A.      On June 29, 2006, the Debtors filed the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (as subsequently amended, modified, or supplemented, the "Plan") and a related disclosure statement (the "Disclosure Statement").[2]

      B.      On August 4, 2006, this Court entered an order approving the Disclosure Statement as containing adequate information within the meaning of Bankruptcy Code section 1125(a).

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2]    Unless otherwise defined, capitalized terms used in this order (the "Order") shall have the meanings ascribed to them in the Plan.  In addition, in accordance with the Introduction to the Plan, any term used in the Plan or this Order that is not defined in the Plan or this Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.      Following the hearing to approve the Disclosure Statement held on August 4, 2006 (the "Disclosure Statement Hearing"), the Court entered an order, among other things, (i) determining the dates, procedures, and forms applicable to the solicitation process, (ii) establishing tabulation procedures, and (iii) establishing the objection deadline and scheduling the hearing to consider confirmation of the Plan (the "Solicitation Procedures Order").

D.      As set forth in the certifications of Kathleen M. Logan (the "Logan Solicitation Certifications"), the President and CEO of Logan & Company, Inc. ("Logan"), the Debtors' solicitation and tabulation agent, the confirmation hearing notice, the Disclosure Statement, the Plan, the Debtors' and the Creditors Committee's approved solicitation letters, and the appropriate ballots (or, in the case of non-voting holders of claims or non-voting Classes, the appropriate notice) (collectively, the "Solicitation Package") were transmitted to all holders of Claims in Classes that will receive distributions under the Plan, and holders of Claims and Interests in Classes 18 through 21 were mailed a notice of deemed rejecting status as required by the Solicitation Procedures Order.

E.      On or about August 11, 2006, the confirmation hearing notice was published in 18 newspapers, as set forth in the Publication Notice filed.

F.      The Debtors filed with the Court the Plan Supplement, dated October 3, 2006, containing certain documents and other information related to the Plan, as provided in Section 12.18 of the Plan.

G.      On October 10, 2006, the Debtors filed the declaration of Kathleen M. Logan (the "Logan Tabulation Declaration"), certifying the results of the ballot and master ballot tabulation for the Classes of Claims voting to accept or reject the Plan.

H.      On October 9, 2006, the Debtors filed the declaration of Kathleen M. Logan (the "Logan Tabulation Declaration") certifying the results of the ballot and master ballot tabulation for the Classes of Claims voting to accept or reject the Plan.

I.      On October 10, 2006, the Debtors filed their Memorandum in Response to Objections to Confirmation of Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Confirmation Memorandum").

J.      The Court held a hearing on October 13, 2006 (the "Confirmation Hearing") to consider confirmation of the Plan.

NOW, THEREFORE, based upon the Court's review of, among other things, the Plan, the Plan Supplement, the Disclosure Statement, the Solicitation Procedures Order, the Logan Certification, the Supporting Declarations, the Confirmation Memorandum, all of the evidence proffered or adduced at, the objections filed in connection with, and the arguments of counsel made at, the Confirmation Hearing; and upon the record of the Disclosure Statement Hearing, the Confirmation Hearing and all prior proceedings in this Chapter 11 Case; and after due deliberation thereon; and good cause appearing therefor:

FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT[3]

1.      Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)).  This Court has jurisdiction over the Chapter 11 Case under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2.      Judicial Notice.  This Court takes judicial notice of the docket of the Chapter 11 Case maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, and all orders entered during the pendency of the Chapter 11 Case.

3.      Outline of Plan.  In addition to Administrative Claims and Priority Tax Claims, which need not be classified, the Plan designates twenty-one Classes of Claims and Interests.  Under the Plan:

- Holders of Other Priority Claims (Class 1), MSP Death Benefit Claims (Class 2), Workers Compensation Claims (Class 3), Bond/Letter of Credit Backed Claims (Class 4), Convenience Claims (Class 5), and Subsidiary Interests (Class 6) are Unimpaired, and thus are deemed to have accepted the Plan under Bankruptcy Code section 1126(f);

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

- Holders of Intercompany Claims (Class 18), Subordinated Claims (Class 19), Non-Compensatory Damages Claims (Class 20), and Winn-Dixie Interests (Class 21) are Impaired and are not entitled to receive any distribution under the Plan on account of their Claims or Interests, and thus are deemed to have rejected the Plan under Bankruptcy Code section 1126(g); and

- Holders of the AmSouth Bank Collateralized Letter of Credit Claim (Class 7), Thrivent/Lutherans Leasehold Mortgage Claim (Class 8), NCR Purchase Money Security Interest Claim (Class 9), Secured Tax Claims (Class 10), Other Secured Claims (Class 11), Noteholder Claims (Class 12), Landlord Claims (Class 13), Vendor/Supplier Claims (Class 14), Retirement Plan Claims (Class 15), Other Unsecured Claims (Class 16) and Small Claims (Class 17) are Impaired and will receive distributions under the Plan, and thus had the right to vote to accept or reject the Plan.

4.    <u>Transmittal and Mailing of Materials; Notice</u>.  The Solicitation Package was transmitted and served upon all interested parties in compliance with the Solicitation Procedures Order and in compliance with the Bankruptcy Rules, and such transmittal and service was adequate and sufficient.  Notice of the Confirmation Hearing and all deadlines in the Solicitation Procedures Order was given in compliance with the Bankruptcy Rules and the Solicitation Procedures Order and was good and sufficient notice in accordance with Bankruptcy Rules 2002(b) and 3020(b)(2), and no other or further notice is required.  Votes for acceptance or rejection of the Plan were solicited in good faith, after transmittal of a disclosure statement containing adequate information, and otherwise in compliance with Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3017 and 3018.

5.    <u>Receipt and Tabulation of Votes</u>.  The procedures used by Logan to receive and tabulate ballots from the holders of Claims in the voting Classes, as set forth in the Logan Tabulation Declaration, were proper and appropriate and in compliance with the

Solicitation Procedures Order.  As described in the Logan Tabulation Declaration, the Plan was accepted by ten of the eleven Impaired Classes entitled to vote.  The holders of certain subclasses of Secured Tax Claims (Class 10) and one subclass of Other Secured Claims (Class 11), rejected the Plan.  The Debtors therefore obtained the requisite acceptances both in number and amount for confirmation of the Plan.

6.     Burden of Proof.  The Debtors have met their burden of proving each of the elements of Bankruptcy Code section 1129 by a preponderance of the evidence, which is the applicable standard.

7.     Identification of Plan Proponents (Fed. R. Bankr. P. 3016(a)).  As required by Fed. R. Bankr. P. 3016(a), the Plan is dated and identifies the Plan proponents.

8.     Good Faith Solicitation; Good Faith Issuance of Securities (11 U.S.C. § 1125(e)).  The Debtors, the Creditors Committee and each of their respective agents, directors, officers, employees, investment bankers, financial advisors, attorneys, and other professionals, through their participation in the negotiation and preparation of the Plan and the Disclosure Statement and their efforts to confirm the Plan, have solicited acceptances of the Plan in good faith and in compliance with applicable provisions of the Bankruptcy Code.  The Debtors, the Creditors Committee and the holders of Claims receiving any of the New Common Stock, and their respective agents, representatives, attorneys, and other advisors, have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, sale, issuance or purchase of the New Common Stock and are entitled to the protections afforded by Bankruptcy Code section 1125(e) and the exculpation and limitation of liability provisions set forth in Section 12.15 of the Plan.

9.      Plan Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(1)).  The

Plan complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules,

thereby satisfying Bankruptcy Code section 1129(a)(1).

(i)      Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).
In addition to Administrative Claims and Priority Tax Claims, which need not be
classified, the Plan designates twenty-one Classes of Claims and Interests.  The
Claims and Interests placed in each Class are substantially similar to other Claims or
Interests, as the case may be, in each such Class, and such classification is therefore
consistent with Bankruptcy Code section 1122.  Valid factual and legal reasons exist
for the various Classes of Claims and Interests created under the Plan, and the Plan
does not unfairly discriminate between or among holders of Claims or Interests in
such Classes.  Specifically, valid factual and legal reasons exist for the separate
classification of Claims in Classes and Interests 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,
14, 15, 16, 17, 18, 19 and 20 and for the separate classification of Interests in Class
21.  The Plan thus satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

(ii)      Specification of Unimpaired Classes (11 U.S.C. §
1123(a)(2)).  The Plan specifies that Classes 1, 2, 3, 4, 5 and 6 are Unimpaired
under the Plan, thereby satisfying Bankruptcy Code section 1123(a)(2).

(iii)      Specified Treatment of Impaired Classes (11 U.S.C. §
1123(a)(3)).  Article IV of the Plan specifies the treatment of Impaired Classes 7, 8,
9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21,   thereby satisfying Bankruptcy
Code section 1123(a)(3).

(iv)      No Discrimination (11 U.S.C. § 1123(a)(4)).  The
Plan provides for the same treatment for each Claim or Interest in each respective
Class unless the holder of a particular Claim or Interest has agreed to a less
favorable treatment of such Claim or Interest, thereby satisfying Bankruptcy Code
section 1123(a)(4).

(v)      Implementation of the Plan (11 U.S.C. § 1123(a)(5)).
Article VI of the Plan provides adequate and proper means for implementation of
the Plan, thereby satisfying Bankruptcy Code section 1123(a)(5).  Among other
things, Article VI includes provisions relating to (i) entry by Reorganized Winn-
Dixie into the Exit Facility, (ii) the continued corporate existence of the
Reorganized Debtors, (iii) the execution and delivery of the corporate documents
that will govern the Reorganized Debtors, including, but not limited to, the New
Winn-Dixie Charter and New Winn-Dixie By-Laws, (iv) the cancellation of the Old
Securities and related agreements, (v) the authorization and issuance of New
Common Stock and the Registration Rights Agreement, (vi) the revesting in the
Reorganized Debtors, on the Effective Date, of the property of the Debtors' Estates
not disposed of under the Plan, and (vii) the selection of the initial directors and

officers for Reorganized Winn-Dixie and each of the other Reorganized Debtors. Other Articles of the Plan also set forth adequate means for the implementation of the Plan:  Article VIII includes provisions regarding distributions under the Plan; Article IX provides the procedures for resolving disputed, contingent, and unliquidated Claims; Article XI provides for the retention of jurisdiction by the Court over certain matters; and Article XII provides for, among other things, the discharge of, and certain releases by and of, the Debtors and other parties-in-interest. Further, the Debtors will have sufficient Cash to make all payments required to be made on the Effective Date under the Plan.

(vi)    Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6)). Under Article VI of the Plan, and subject to such future amendment as is permitted by applicable law, the New Winn-Dixie Charter and New Winn-Dixie By-laws filed with the Court as part of the Debtors' Plan Supplement prohibit the issuance of nonvoting equity securities, thereby satisfying Bankruptcy Code section 1123(a)(6).

(vii)    Designation of Officers And Directors (11 U.S.C. § 1123(a)(7)).  The provisions of the Plan and the New Winn-Dixie Charter and New Winn-Dixie By-laws regarding the manner of selection of officers and directors of the Debtors are consistent with the interests of Claim and Interest holders and with public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).  Specifically, Article VI of the Plan provides that the initial board of directors of Reorganized Winn-Dixie will consist of nine members, including the Debtors' Chief Executive Officer, one individual reasonably acceptable to the Creditors Committee, and seven individuals selected by the Creditors Committee.  The Debtors and the Creditors Committee identified, in the Plan Supplement filed before the Confirmation Hearing, the members of the initial board of directors of Reorganized Winn-Dixie.  The members of the initial board of directors will serve until the expiration of their terms or their earlier resignation or removal in accordance with the New Winn-Dixie Charter and New Winn-Dixie By-laws, as each may be amended from time to time in accordance with applicable law.

(viii)    Impairment of Classes (11 U.S.C. § 1123(b)(1)).  In accordance with Bankruptcy Code section 1123(b)(1), Articles III and IV of the Plan impair and leave unimpaired, as the case may be, each Class of Claims and Interests under the Plan.

(ix)    Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).  In accordance with Bankruptcy Code section 1123(b)(2), Article VII of the Plan provides that, except as otherwise provided therein or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have rejected each pre-petition executory contract and unexpired lease to which it is a party, unless such contract or lease (a) was previously assumed or rejected by a Final Order, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of any pending motion to assume, to assume on modified terms, to reject or to make any other disposition

8

filed by the Debtor on or before the Confirmation Date.  The Debtors' decision regarding the assumption or rejection of their executory contracts is based on, and is within, the sound business judgment of the Debtors, and is in the best interests of the Debtors, their Estates, and their Claim and Interest holders.

(x)     Retention, Enforcement, and Settlement of Claims Held by the Debtors (11 U.S.C. § 1123(b)(3)).  In accordance with Bankruptcy Code section 1123(b)(3), Section 6.13 of the Plan provides that, except as otherwise provided in the Plan or this Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, the Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all claims, right or causes of action, suits, and proceedings, whether in law or equity, whether known or unknown, that the Debtors or their Estates may hold against any Person or entity.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights or causes of action, suits, or other proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(xi)     Other Provisions Not Inconsistent With Title 11 (11 U.S.C. § 1123(b)(6)).  In accordance with Bankruptcy Code section 1123(b)(6), the Plan includes additional appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code.

(xii)     Cure of Defaults.  (11 U.S.C. § 1123(d)).  Section 7.4 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with Bankruptcy Code section 365 (b)(2).  All cure amounts will be determined in accordance with the underlying agreements and applicable bankruptcy and non-bankruptcy law.  Thus, the Plan complies with Bankruptcy Code section 1123(d).

10.     Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2).  Specifically:

(i)     Each of the Debtors filed a Chapter 11 petition under Bankruptcy Code section 301.  Each of the Debtors is a proper debtor under Bankruptcy Code section 109.

(ii)     The Debtors are proper proponents of the Plan under Bankruptcy Code section 1121(a).

(iii)     The Debtors complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures

Order in transmitting the Solicitation Package and related documents and notices, and in soliciting and tabulating votes on the Plan.

(iv)    The Debtors, and each of their respective affiliates, agents, directors, officers, employees, investment bankers, financial advisors, attorneys, and other professionals have participated in "good faith" and in compliance with all applicable provisions of the Bankruptcy Code.

11.    <u>Substantive Consolidation Settlement (11 U.S.C. § 1123(b)(3))</u>.  The Plan provides for a settlement of issues relating to the substantive consolidation of the Debtors' estates (the "Substantive Consolidation Compromise").  To settle the issue of whether the estates should be consolidated, the Plan provides for different distributions to holders of  Noteholder Claims (Class 12), Landlord Claims (Class 13), Vendor/Supplier Claims (Class 14), Retirement Plan Claims (Class 15), and Other Unsecured Claims (Class 16). This Substantive Consolidation Compromise was reached after extensive factual and legal analysis by the Debtors, the Creditors Committee, the Indenture Trustee, the Ad Hoc Vendors' Committee, the Ad Hoc Retirees' Committee, and other interested parties.  It is the result of arm's length negotiations among interested parties and will avoid potentially expensive and time-consuming litigation. The distributions to Creditors under the Substantive Consolidation Compromise are within the range of the distributions that could be anticipated if the issues were litigated.

12.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Plan, including all documents necessary to effectuate the Plan, including but not limited to those contained in the Plan Supplement, in good faith and not by any means forbidden by law, thereby satisfying Bankruptcy Code section 1129(a)(3).  The Court has examined the totality of the circumstances surrounding the formulation of the Plan.  Based on the evidence presented at, or in declarations filed in connection with, the Confirmation Hearing, the Plan has been proposed with the legitimate and honest purpose of reorganizing the business affairs of the

Debtors and maximizing the returns available to Claim holders.  Consistent with the overriding

purpose of Chapter 11, the Plan is designed to allow the Debtors to reorganize by providing the

Reorganized Debtors with capital structures that will allow them sufficient liquidity and capital

resources to satisfy their obligations, to fund necessary capital expenditures, and to otherwise

conduct their businesses.  Further, the Plan itself and the arms' length negotiations among the

Debtors, the Creditors Committee, and the Debtors' other constituencies, and their respective

legal and financial advisors, leading to the Plan's formulation, as well as the  support of holders

of Claims entitled or authorized to vote, provide independent evidence of the Debtors' and the

Creditors Committee's good faith in proposing the Plan.  Further the indemnification,

exculpation, release and injunction provisions of the Plan have been negotiated in good faith and

at arms length with, among others, the Debtors and the Creditors Committee and their respective

advisors and are consistent with Bankruptcy Code sections 105, 524(e), 1122, 1123(b)(3)(A),

1123(b)(6), 1129 and 1142, and are each necessary to the Debtors' successful emergence from

chapter 11.

13.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.

Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring

property under the Plan, for services or for costs and expenses in or in connection with the

Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, including

the payments provided for in Sections 12.3 and 12.4 of the Plan, have been approved by, or is

subject to the approval of, the Court as reasonable, thereby satisfying Bankruptcy Code section

1129(a)(4).

14.    <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>.  The Debtors

have complied with Bankruptcy Code section 1129(a)(5).  Specifically:

(i)    The Debtors have disclosed the identity and affiliations of the individuals proposed to serve, on and after the Effective Date of the Plan, as directors or officers of Reorganized Winn-Dixie.  The appointment or continuance of the proposed directors and officers is consistent with the interests of holders of Claims and Interests and public policy.

(ii)    The Debtors have disclosed the identity of all insiders who will be employed or retained by Reorganized Winn-Dixie, and the nature of such persons' compensation.

15.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>.  The  Plan does not provide for any rate change that requires regulatory approval.  Thus, Bankruptcy Code section 1129(a)(6) is not applicable to this Chapter 11 Case.

16.    <u>Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7))</u>.  The Plan satisfies Bankruptcy Code section 1129(a)(7).  Specifically:

(i)    The summary of the Liquidation Analysis contained in the Disclosure Statement and the other evidence related thereto that was presented at the Confirmation Hearing have not been controverted by other evidence. The methodology used and assumptions made in the Liquidation Analysis, as supplemented by the evidence proffered or adduced at the Confirmation Hearing, are reasonable.

(ii)    Each holder of a Claim or Interest in each Impaired Class either has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.  No Class has made an election under Bankruptcy Code section 1111(b)(2).

17.    <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  Classes 1, 2, 3, 4, 5 and 6 are Classes of Unimpaired Claims and Interests that are conclusively presumed to have accepted the Plan under Bankruptcy Code section 1126(f).  Classes 7, 8, 9, 11, 12, 13, 14 ,15, 16 and 17 are Classes of Claims that have voted to accept the Plan in accordance with the Plan and Bankruptcy Code section 1126(c).  Class 10 contains subclasses of Claims that have voted to reject the Plan, and one subclass in Class 11 has voted to reject the Plan (the "Rejecting

Subclasses"),  although the claim represented by the subclass in Class 11 that has voted to reject

the Plan has been disallowed by order of the Court to the extent it alleges secured status, and

such vote should be disregarded for that reason.  Classes 18 through 21 are not entitled to receive

or retain any property or interests under the Plan on account of their Claims or Interests and,

accordingly, are deemed to have rejected the Plan under Bankruptcy Code section 1126(g).  The

Debtors have thus requested that the Court confirm the Plan even though the requirements of

Bankruptcy Code section 1129(a)(8) have not been satisfied as to the Rejecting Subclasses and

Classes 18, 19, 20 and 21 in light of their deemed rejection of the Plan.

18.     Treatment of Administrative and Priority Claims (11 U.S.C. § 1129(a)(9)).

The treatment of Administrative Claims under Section 4.1(a) of the Plan satisfies the

requirements of Bankruptcy Code section 1129(a)(9)(A), the treatment of Other Priority Claims

under Plan Section 4.2(a) satisfies the requirements of Bankruptcy Code section 1129(a)(9)(B),

and the treatment of Priority Tax Claims under Section 4.1(b) of the Plan satisfies the

requirements of Bankruptcy Code section 1129(a)(9)(C).

19.     Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)).  As set forth

in the Logan Tabulation Declaration and as reflected in the record of the Confirmation Hearing,

at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined

without including any acceptance of the Plan by any insider of the Debtors holding a Claim in

such Class, thereby satisfying Bankruptcy Code section 1129(a)(10).

20.     Feasibility (11 U.S.C. § 1129(a)(11)).  Based upon the information in the

Disclosure Statement and the testimony given at the Confirmation Hearing, confirmation of the

Plan is not likely to be followed by the liquidation or the need for further financial reorganization

of the Reorganized Debtors or any successor to the Debtors, thereby satisfying Bankruptcy Code section 1129(a)(11).

21.     Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under 28 U.S.C. § 1930 have been paid or will be paid as Administrative Claims on or before the Effective Date under Section 12.5 of the Plan and will continue to be paid thereafter as required, thereby satisfying Bankruptcy Code section 1129(a)(12).

22.     Continuation of Retiree Benefits (11 U.S.C. § 1129 (a)(13).  Plan Section 7.9(a) provides for the payment of all benefits subject to Bankruptcy Code sections 1114 and 1129(a)(13).  Accordingly, Bankruptcy Code section 1129(a)(13), which requires, among other things, continuation of any such benefits, is satisfied.

23.     No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).  The Plan may be confirmed notwithstanding the rejections by the Rejecting Subclasses and the deemed rejections of the Plan by Classes 18, 19, 20 and 21, because the Plan complies with 11 U.S.C. § 1129(b) by satisfying the requirements of sections 1129(b)(1) and 1129(b)(2) of the Bankruptcy Code with respect to the deemed rejecting classes.

24.     Principal Purpose of Plan (11 U.S.C. § 1129(d)).  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

25.     Exit Facility.  The Plan contemplates that the Debtors will obtain the Exit Facility from third party lenders under the terms of loan documents, including revolving credit and letters of credit, as determined necessary to satisfy the DIP Facility Claim, support other

payments required to be made under the Plan, pay transaction costs, and fund working capital

and general corporate purposes of the Reorganized Debtors following the Effective Date.  The

Debtors have received a commitment from Wachovia Bank, National Association (the "Exit

Lender") to provide exit financing upon the terms set forth in a commitment letter, dated June 28,

2006, among Winn-Dixie Stores, Inc., Exit Lender and Wachovia Capital Markets, LLC (the

"Exit Financing Commitment"), which was approved by this Court in an order entered on July 27,

2006 (the "Exit Financing Order") and filed with the Plan Supplement.  The Debtors and the Exit

Lender have been negotiating the terms of a credit agreement and related documents consistent

with the terms of the Exit Financing Commitment.  The decision to accept the Exit Financing

Commitment is the result of an extensive effort by the Debtors and their financial advisors to

market the proposed financing to potential lenders.  The evidence reflects that the Debtors, in

consultation with their advisors, selected the Exit Financing Commitment as the most favorable

exit financing option in light of all the circumstances.  The Debtors' entry into the loan

documents (which documents amend and restate the loan documents governing the DIP Facility)

upon the terms and conditions of the Exit Financing Commitment, and the granting of security

interests, liens and mortgages to Exit Lender pursuant thereto, is in the best interests of the

Debtors' estates and creditors and is necessary to the consummation of the Plan.

26.    <u>Modifications</u>.  Before or at the Confirmation Hearing, in

accordance with Bankruptcy Code section 1127 and Fed. R. Bankr. P. 3019, the Debtors

proposed certain modifications to the Plan (collectively, the "Plan Modifications").  The

Debtors' form and manner of notice of the Plan Modifications was good and sufficient

under the particular circumstances and no other or further notice of the Plan

Modifications is or shall be required.  The Plan Modifications do not (a) adversely affect

the classification or treatment of holders of Claims and Interests, (b) constitute material

modifications of the Plan under Bankruptcy Code section 1127, (c) cause the Plan to fail

to satisfy the requirements of Bankruptcy Code sections 1122, 1123, and 1129, or (d)

require the resolicitation of acceptances or rejections of the Plan from any party or

require that any party be afforded an opportunity to change its previously cast acceptance

or rejection of the Plan.

27.     No Liquidation.  Because the Plan does not provide for the liquidation of

all or substantially all of the property of the Debtors and the Reorganized Debtors will engage in

business following consummation of the Plan, Bankruptcy Code section 1141(d)(3) is not

applicable.

28.     Condition To Confirmation.  The conditions to Confirmation of the Plan

set forth in Section 10.1 of the Plan have been satisfied before the Confirmation Date.

DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED THAT,

29.     Objections.  All objections that have not been withdrawn, resolved,

waived, or settled are overruled on the merits.  To the extent, if any, that pleadings or letters filed

by individuals or entities constitute objections to Confirmation of the Plan, they are also

overruled.

30.     Confirmation.  The Plan is hereby confirmed under Bankruptcy Code

section 1129 and all parties-in-interest are authorized and empowered, or enjoined, as the case

may be, to act in accordance with its terms.  All acceptances and rejections previously cast for or

16

against the Plan are hereby deemed to constitute acceptances or rejections of the Plan as modified hereby.

31.    <u>Incorporation of all Plan Provisions</u>.  The terms of the Plan and the exhibits thereto, including, without limitation, the exhibits contained in the Plan Supplement (including any non-material amendments, modifications, or supplements thereof at any time before the Effective Date as may be agreed upon by the Debtors and the Creditors Committee), are incorporated by reference into and are an integral part of the Plan and this Order.  Each term, as it may have been altered or interpreted in accordance with this Order, is valid and enforceable pursuant to its terms.

32.    <u>Substantive Consolidation Compromise</u>.  The Substantive Consolidation Compromise, and the distributions to Creditors reflected in this Plan in accordance with the Substantive Consolidation Compromise, are fair and reasonable and are in the best interests of the estate and creditors.

33.    <u>Binding Effect</u>.  (a) Under Bankruptcy Code section 1141, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and except as expressly provided in the Plan or this Order, the provisions of the Plan (including the exhibits to, and all documents and agreements executed under the Plan) and this Order shall be binding on (i) the Debtors, (ii) the Reorganized Debtors, (iii) all holders of Claims against and Interests in any of the Debtors, whether or not such holders of Claims or Interests filed proofs of claim in the chapter 11 case, whether or not such Claims or Interests are Impaired under the Plan, and whether or not, if Impaired, such holders accepted, rejected, or are deemed to have accepted or rejected the Plan, (iv) each Person acquiring property under the Plan, (v) all non-Debtor parties

17

to executory contracts and unexpired leases with any of the Debtors, (vi) all entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein,  (vii) every other party in interest in the Chapter 11 Cases, and (viii) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, attorneys, agents, representatives, beneficiaries, or guardians, if any.

34.    <u>Discharge</u>.  Except as otherwise expressly provided in the Plan or this Order and subject only to the occurrence of the Effective Date, the Debtors are hereby discharged and released from all Claims against, Liens on, and Interests in each of the Debtors, their assets, and their properties, arising at any time before the entry of this Order, regardless of whether a proof of Claim or proof of Interest therefor was filed, whether the Claim or Interest is Allowed, or whether the holder thereof voted to accept the Plan or is entitled to receive a distribution thereunder.  Subject to the occurrence of the Effective Date, any holder of such a discharged Claim, Lien, or Interest shall be precluded and enjoined from asserting against the Debtors or Reorganized Debtors or any of their assets or properties, any other or further Claim or Interest based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the date of this Order.

35.    <u>Provisions of Plan Enforceable</u>.  Each term and provision of the Plan is valid and enforceable pursuant to its terms.

36.    <u>Cancellation of Evidences of Indebtedness</u>.  As provided in Section 6.4 of the Plan, except as otherwise provided in the Plan or this Order, or under the terms of the documents evidencing and orders approving the DIP Facility and/or the Exit Facility, on the

Effective Date, (a) the Old Securities (including the Winn-Dixie Notes and the Winn-Dixie Interests) and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor shall be deemed extinguished, cancelled, and of no further force and effect, and (b) the obligations of the Debtors (and Reorganized Debtors) under any agreements, indentures, or certificates of designations governing the Old Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor, as the case may be, shall be discharged in each case without further act or action under any applicable agreement, law, regulation, order or rule and without any action on the part of the Bankruptcy Court or any Person; provided, however, that the Winn-Dixie Notes and the Indenture shall continue in effect solely for the purpose of (i) allowing the holders of the Winn-Dixie Notes to receive the distributions provided for Noteholder Claims hereunder, (ii) allowing the Disbursing Agent or the Indenture Trustee, as the case may be, to make distributions on account of the Noteholder Claims, and (iii) preserving the rights of the Indenture Trustee with respect to the Indenture Trustee Expenses to the extent not paid pursuant to Section 12.4 of the Plan, including, without limitation, the Indenture Trustee Charging Lien and any indemnification rights provided by the Indenture.

37.   <u>Good Faith Solicitation and Distribution</u>.  The Debtors, the Creditors Committee, and its members in their capacity as such, and each of their respective affiliates, agents, directors, officers, employees, investment bankers, financial advisors, attorneys and other professionals, have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  In addition, the Debtors, each member of the Creditors Committee, and each of their respective affiliates, agents, directors, officers, employees, investment bankers, financial

advisors, attorneys and other professionals, have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the distribution of the New Common Stock under the Plan, and, accordingly, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

38.    Executory Contracts.  As of the Effective Date, all executory contracts or unexpired leases assumed by the Debtors during this Chapter 11 Case or under the Plan shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Reorganized Debtors or the Real Estate Subsidiaries (as defined below), as the case may be, notwithstanding any provision in such contract or lease (including those described in Bankruptcy Code sections 365(b)(2) and (f)) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease.

39.    Approval of Assumption or Rejection of Contracts and Leases.  Under Bankruptcy Code section 365, unless otherwise provided in an order of  the Court specifically dealing with a contract or lease, (a) the assumption of each executory contract or unexpired lease that is subject to assumption pursuant to Article VII of the Plan, is hereby approved as proposed therein; and (b) the rejection of each executory contract or unexpired lease that is subject to rejection pursuant to Article VII of the Plan, is hereby approved as proposed in such sections of the Plan.  Section 7.4 of the Plan applies only to assumptions of executory contracts and unexpired leases that will occur under the provisions of the Plan and does not apply to assumptions of executory contracts and unexpired leases that will occur pursuant to separate motions.

40.  <u>Rejection Damages Bar Date</u>.  Any Claim arising from the rejection of an executory contract or unexpired lease under Article VII of the Plan or otherwise  shall be forever barred (to the extent such Claim is not already barred) and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the claims against and served upon counsel to the Reorganized Debtors within 30 days of the entry of this Order or as otherwise provided in prior orders of this Court.

41.  <u>Injunctions; Stays</u>.  (a)  Except as provided in the Plan or this Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged under the Plan, or an Interest or other right of an equity security holder that is terminated under the Plan, are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person, that does not comply with or is inconsistent with the provisions of the Plan.

(b)  As of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, or an Interest that is terminated, pursuant to Sections 12.11, 12.12, or 12.13 of the Plan are permanently enjoined from taking any of the following actions on account

of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes

of action, or liabilities, or such terminated Interests: (i) commencing or continuing, in any

manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or

recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or

enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or

obligation due to any released Person; or (v) commencing or continuing any action, in any

manner, in any place, or against any Peron that does not comply with or is inconsistent with the

provisions of the Plan.

(c)     In accordance with Section 12.16 of the Plan, unless otherwise

provided in the Plan or in this Order, all injunctions or stays in effect in the Chapter 11 Case

under Bankruptcy Code sections 105 or 362 or any order of this Court, and extant on the

Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order), shall

remain in full force and effect until the Effective Date.  From and after the Effective Date, all

injunctions or stays contained in the Plan or this Order shall remain in full force and effect in

accordance with their terms.

42.     <u>Debtor Releases, Voluntary Creditor Releases and Exculpations</u>.  The

releases proposed to be made by the Debtors in favor of third parties under section 12.12(a) of

the Plan are appropriate and should be approved.  The Creditors Committee conducted an

extensive investigation of certain potential claims against the proposed released parties and

determined that these are likely no viable causes of action by the Debtors' estates against them

that have a reasonable probability of success in producing a benefit for the Debtors' estates.  The

proposed released parties have made a substantial contribution to the Debtors' reorganization, the

releases are necessary to the success of the Debtors' rehabilitation under the Plan, and the Plan

has been accepted by substantial majorities in all Classes of Creditors voting, with the exception

os the Rejecting Subclasses, which are being paid in full.  Moreover, the voluntary creditor

releases provided for in Plan Section 12.12(b) are appropriate and should be approved.  These

releases were fully disclosed and are consensual agreements by creditors who voted to accept the

Plan.  In addition the exculpation provisions in Section 12.15 of the Plan are appropriate and

should be approved.

      43.    Nothing in this Order or the Plan, including Sections 12.12, 12.13, or

12.14, shall release, discharge, or enjoin any claims arising before the Petition Date brought by

any creditor under the Employee Retirement Income Security Act of 1974 ("ERISA") against

any entity or person who is not one of the Debtors, except to the extent provided for in Plan

section 12.12(b).

      44.    <u>Revesting of Property</u>.  In accordance with Section 6.11 of the Plan, and

except as otherwise expressly provided in the Plan, including, but not limited to, Article VI

thereof, or this Order, the property of each Debtor's Estate, together with any property of each

Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the

Plan, shall revest in the applicable Reorganized Debtor on the Effective Date.  No property of the

Debtors' Estate is being, or should be deemed to be, abandoned pursuant to Bankruptcy Code

section 554 or otherwise.  Thereafter, the Reorganized Debtors may operate their businesses and

may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the

Bankruptcy Rules, and this Court.  As of the Effective Date, all property of the Reorganized

Debtors shall be free and clear of all Claims, encumbrances, Interests, charges, and Liens except

as specifically provided in the Plan or this Order.

45.     <u>Approval of Initial Officers, Directors</u>.  (a)  Under Bankruptcy Code section 1129(a)(5)(A)(ii), the Court approves, as consistent with the interests of holders of Claims and Interests and with public policy, the selection, election, and/or continuance, as the case may be, of the individuals designated as officers or directors of Reorganized Winn-Dixie; provided, however, that nothing set forth herein shall prevent any of the foregoing individuals from resigning as an officer or director without further order of the Court.

(b)     Without further event or action by any Person (other than the occurrence of the Effective Date), each of the individuals referred to in paragraph 44(a) above may become or continue as a director of Reorganized Winn-Dixie.  On the Effective Date, (i) the terms of the current members of the board of directors of Winn-Dixie shall expire and the members thereof who are not continuing as directors of Reorganized Winn-Dixie shall cease to serve in such capacity and (ii) the operation of Reorganized Winn-Dixie shall become the general responsibility of the board of directors of Reorganized Winn-Dixie, subject to, and in accordance with, the New Winn-Dixie Charters and New Winn-Dixie By-Laws, which are hereby approved.

46.     <u>Insurance</u>.  The Debtors are authorized and directed to purchase and maintain directors and officers insurance coverage, for a tail period of six (6) years, for those Persons covered by any such policies in effect during the pendency of the Chapter 11 Case, continuing after the Effective Date,  based upon any act or omission related to such Person's service with, for, or on behalf of  the Debtors (whether occurring before or after the Petition Date).  Such policy shall be fully paid and non-cancellable, and the Debtors are authorized and directed to expend $8.2 million to purchase such policy.

47.   <u>Plan Modifications</u>.  At the request of the Debtors, the Plan is hereby modified pursuant to 11 U.S.C. § 1127(a).

48.   <u>Exit Facility</u>.  The Exit Facility is approved, and the Debtors or Reorganized Debtors, as applicable, are authorized to execute, deliver and perform their obligations under the amended and restated revolving credit agreement, mortgages, security agreements and other documents with the Exit Lender, which documents amend and restate the loan documents governing the DIP Facility (collectively, the "Exit Financing Documents") upon terms and conditions substantially consistent with those contained in the Exit Financing Commitment, with such changes as may be agreed between the Debtors or Reorganized Debtors, as applicable, and the lenders thereunder, as necessary or appropriate to effect the Exit Facility in accordance with the Plan.  The Exit Financing Documents are approved and shall constitute legal, valid, binding and authorized obligations of the Debtors or Reorganized Debtors, as applicable, enforceable in accordance with their terms.  Exit Lender is hereby authorized to file at any time and from time to time such financing statements indicating as the collateral all now existing or hereafter arising or acquired property and assets of the Reorganized Debtors that are Borrowers and Guarantors under the Exit Facility naming Exit Lender, as secured party, and each Borrower and Guarantor, as debtor, as Exit Lender may require, together with any amendments or continuations with respect thereto.

49.   <u>DIP Facility</u>.  Notwithstanding anything to the contrary contained in this Order or the Plan, Wachovia's claims, liens, interests, rights, priorities, protections and remedies arising under or in connection with the Final Financing Order and the DIP Facility shall extend and continue in full force and effect during the period commencing

on the date of this Order through the Effective Date (the "Post Confirmation Period").

Any loans, advances, letter of credit accommodations or other financial or credit

accommodations made or provided by Wachovia to the Debtors at any time during the

Post Confirmation Period shall be fully protected and entitled to all of the rights, claim

priorities, liens, remedies and protections afforded under the DIP Facility and the Final

Financing Order.  As of and after the Effective Date, any and all loans, advances,

financial accommodations, borrowings and obligations outstanding under the DIP

Facility shall continue in effect and constitute legal, valid, and binding and enforceable

obligations on and after the Effective Date and be assumed by certain Reorganized

Debtors in their capacities as borrowers under the Exit Financing Documents.  The

security interests and liens in favor of Wachovia Bank, National Association, in its

capacity as administrative agent and collateral agent under the DIP Facility ("Wachovia"),

granted by the Final Financing Order and the loan documents governing the DIP Facility

(as amended and restated by the Exit Financing Documents) shall continue in full force

and effect in favor of Wachovia as administrative agent and collateral agent under the

Exit Facility and shall not be discharged, released, terminated or otherwise impaired in

any way as a result of, among other things, the entry of this Order, the occurrence of the

Confirmation Date or the occurrence of the Effective Date.

   50. <u>Exit Financing Documents</u>.  The Borrowers and Guarantors (as

each such term is defined in the Exit Financing Documents) are authorized to enter into

the Exit Financing Documents and perform all of their obligations under the Exit

Financing Documents.  On the Effective Date, the Reorganized Debtors that are

Borrowers or Guarantors under the Exit Facility (the "Reorganized Debtor Borrowers")

shall enter into the Exit Financing Documents.  Pursuant to Bankruptcy Code section 1142(b), and without further action by the Bankruptcy Court or by the shareholders and directors of the Reorganized Debtor Borrowers, the Reorganized Debtor Borrowers shall be authorized to (1) enter into the Exit Financing Documents, (2) ratify, amend and restate the DIP Facility in accordance with the Exit Financing Documents, (3) perform all of their obligations under the DIP Facility, as amended and restated by the Exit Financing Documents, and (4) execute and deliver all documents, agreements and instruments necessary or appropriate to enter into and perform all obligations under the Exit Financing Documents, and to take all other actions and execute, deliver, record and file all such other agreements, documents, instruments, financing statements, releases, applications, registration statements, reports and any changes, additions and modifications thereto in connection with the consummation of the transactions contemplated by the Exit Financing Documents, including, without limitation, the making of such filings or the recording of such liens and security interests, as may be required by the Exit Financing Documents and/or as the Exit Lender may determine or require in its discretion.

51.    <u>Real Estate Transfers in Connection with Exit Facility</u>.   The Debtors or the Reorganized Debtors are authorized to take all actions necessary to create Winn-Dixie Properties, LLC, Winn-Dixie Stores Leasing, LLC, Winn-Dixie Raleigh Leasing, LLC, Winn-Dixie Montgomery Leasing, LLC, and Winn-Dixie Warehouse Leasing, LLC (collectively, the "Real Estate Subsidiaries"), and to transfer into the Real Estate Subsidiaries all real property interests owned or leased by the Debtors.  In furtherance of and without limiting the foregoing, the Debtors or the Reorganized Debtors are authorized, without limitation, to (i) terminate The

27

Dixon Realty Trust 1999-1, a Utah trust, and contemporaneously therewith, to cause the conveyance of all real property interests in fee simple held in the name of Winn-Dixie Stores, Inc., as owner-trustee of The Dixon Realty Trust 1999-1, to Winn-Dixie Properties, LLC, (ii) assign their assumed real property leases to Winn-Dixie Stores Leasing, LLC, Winn-Dixie Raleigh Leasing, LLC, Winn-Dixie Montgomery Leasing, LLC, and Winn-Dixie Warehouse Leasing, LLC as provided for in Section 7.5 of the Plan, (iii) enter into with the Real Estate Subsidiaries such operating agreements and other agreements and documents deemed reasonable and appropriate by the Debtors or the Reorganized Debtors in connection with the transfers of such owned or leased real property, and (iv) take all actions necessary to cause the Real Estate Subsidiaries to convey to the lenders pursuant to the Exit  Financing Documents security interests, liens and mortgages in such owned or leased real property interests.

52.    Additional Modifications.  Without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the Debtors shall be authorized and empowered to make non-material modifications to the documents filed with the Court, including the documents included in the Plan Supplement (subject to the rights specified in section    of the Plan)or forming part of the evidentiary record at the Confirmation Hearing, in their reasonable business judgment as may be necessary.  Further, following entry of this Order, the Debtors shall be authorized upon further order of the Bankruptcy Court, to alter, amend, or modify the Plan in accordance with Bankruptcy Code section 1127(b), or to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

53.    General Authorizations.  Under Bankruptcy Code section 1142(b) and the terms of the Plan, each of the Debtors and the Reorganized Debtors, as the case may be, and any

officer thereof, are authorized without the need for further shareholder or Court approval to execute and deliver, and take such action as is necessary to effectuate the terms of, implement, or further evidence, the contracts, instruments, securities, and other agreements and documents contemplated by the Plan and the terms and conditions of the Plan.  Without limiting the foregoing, the Debtors are authorized to make any State Law filings necessary to terminate the existence of inactive subsidiaries that the Debtors have determined to terminate as of the Effective Date.

54.    <u>Governmental Approvals Not Required</u>.  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

55.    <u>Creditors Committee</u>.  On the Effective Date, the Creditors Committee shall be dissolved and members thereof shall be released and discharged of and from all further authority, duties, responsibility and obligations related to and arising from and in connection with the Chapter 11 Case, and the retention of employment of the Creditors Committee's attorneys and other advisors shall terminate other than as provided in Plan Section 12.20.

56.    <u>Exemption from Stamp Taxes</u>.  Under Bankruptcy Code section 1146(c), (a) the issuance, transfer or exchange of any securities, instruments, or documents; (b) the creation of any other lien, mortgage, deed or trust, or other security interest; or (c) the making or

assignment of any lease or sublease, or the making, delivery, filing, or recording of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with the Plan, shall not be taxed under any law imposing a stamp tax, documentary tax, real estate transfer tax, sales or use tax, intangible tax, recording or filing fee, privilege tax, or other similar tax or fee.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the New Winn-Dixie Charter, the New Winn-Dixie By-laws, the Exit Facility (and the providing of security therefor), the transfer of owned and leased real property interests to the Real Estate Subsidiaries as provided in Plan Section 6.12(c) (including, without limitation, the conveyance of real property from The Dixon Realty Trust 1999-1 to the Real Estate Subsidiaries,  the assignment to and pledge of real property leases by the Real Estate Subsidiaries, and any transfers of owned or leased real property among the Real Estate Subsidiaries, whether by merger or otherwise), and the maintenance or creation of security therein as contemplated by the Exit Facility, including the recordation of mortgages, deeds to secure debt, modifications to mortgages, modifications of deeds to secure debt and fixture filings.

57.    Exemption from Securities Laws and Registration and Related Matters (11 U.S.C. § 1145(a)).  The issuance and distribution of the New Common Stock has been duly authorized, and when issued as provided in the Plan, will be validly issued, fully paid, and nonassessable.  The offer and sale of the New Common Stock is in exchange for Claims against the Debtors, within the meaning of Bankruptcy Code section 1145(a)(1).  In addition, under Bankruptcy Code section 1145, to the extent, if any, that the New Common Stock constitutes "securities," (a) the offering of such New Common Stock is exempt, and the issuance and

distribution of such New Common Stock will be exempt, from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities, and (b) New Common Stock will be freely tradeable by the recipients thereof, subject to (i) the provisions of Bankruptcy Code section 1145(b)(1) relating to the definition of an underwriter in Section 2(11) of the Securities Act, and compliance with any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments, and (ii) the restrictions, if any, on the transfer as set forth in such securities and instruments.

58.   <u>Transfers of Property</u>.  The revesting, on the Effective Date, of all of the property of the Debtors' Estates in the Reorganized Debtors (a) is a legal, valid, and effective transfer of property, (b) vests the Reorganized Debtors with good title to such property free and clear of all Claims and Interests, except as expressly provided in the Plan or this Order, (c) does not constitute an avoidable transfer under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) does not and shall not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law.

59.   <u>Payment of United States Trustee Fees</u>.  All fees payable by the Debtors under 28 U.S.C. § 1930 shall be paid on or before the Effective Date.

60.   <u>Failure to Consummate Plan</u>.  In accordance with Section 12.17 of the Plan, if consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount of any Claim or Class of Claims), assumption or rejection of executory contracts or

leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (ii) prejudice in any manner the rights of any Debtor, the Creditors Committee, or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor, the Creditors Committee, or any other Person.

61.    <u>Retention of Jurisdiction</u>.  Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding the entry of this Order or the occurrence of the Effective Date, this Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction over those items and matters set forth in Article XI of the Plan.

62.    <u>References to Plan Provisions</u>.  The failure specifically to include or reference any particular provision of the Plan in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

63.    <u>Inconsistency</u>.  In the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern unless otherwise expressly provided for in such agreement, instrument, or document.  In the event of any inconsistency between the Plan or any agreement, instrument, or document intended to

32

implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

        64.   <u>Notice of Entry of Confirmation Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), within ten business days of the date after the Effective Date, the Reorganized Debtors (or their agents) shall give notice of the entry of this Order after the Effective Date and the deadline for filing Administrative Claims set forth in section 12.1 of the Plan, in substantially the form of Exhibit B annexed hereto (the "Confirmation Notice"), by United States first class mail postage prepaid, by hand, or by overnight courier service, to all parties served with the Confirmation Hearing Notice and any other parties identified by the Debtors; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any person to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved - left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such person of that person's new address.  To supplement the notice described in the preceding sentence, within fifteen days after the Effective Date, the Debtors shall publish the Confirmation Notice in The Wall Street Journal, The New York Times, the Sun-Sentinel, the Florida Times-Union, the Orlando Sentinel, the Miami Herald, the Palm Beach Post, The Tampa Tribune, the St. Petersburg Times, the News & Observer, the Albany Herald, the Ledger-Inquirer, the Savannah Morning News, The Courier Herald, The Times-Picayune, the Press-Register, the Birmingham News, The Meridian Star and the Sun Herald.  Mailing and publication of the Confirmation Notice in the time and manner set forth in the preceding paragraph are good and sufficient under the particular circumstances and in accordance with the requirements of Fed. R. Bankr. P. 2002 and 3020(c).

65.    <u>Notice of Effective Date</u>.  Within three business days following the occurrence of the Effective Date, the Reorganized Debtors shall file notice of the Effective Date with the Bankruptcy Court.

66.    <u>Authorization to Consummate</u>.  The Debtors are authorized to consummate the Plan at any time after entry of this Order subject to the satisfaction or waiver of the conditions precedent to Effective Date set forth in Section 10.2 of the Plan.  More specifically, the Debtors (i) are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and (ii) are authorized to issue the New Common Stock.

67.    <u>Reversal</u>.  If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of the Court or any other court, in the absence of a stay of the Confirmation Order, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken in good faith under or in connection with the Plan prior to the Debtors' receipt of written notice of any such order. Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, in the absence of a stay of the Confirmation Order, any such act or obligation incurred or undertaken in good faith pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

68.    <u>Order Immediately Effective</u>.  For good cause shown, as set forth on the record of the Confirmation Hearing, and notwithstanding Bankruptcy  Rule 3020(e), this

Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan.

69.    <u>Substantial Consummation.</u>  On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127.

70.    <u>Retention of Jurisdiction</u>.  The Court will retain jurisdiction over the matters set forth in Article XI of the Plan.

Dated: Jacksonville, Florida
       October   , 2006


                                                        /s/_____
                                                        United States Bankruptcy Judge