**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                             Case No.: 3:05-bk-03817-JAF

WINN-DIXIE STORES, INC., <u>et al.</u>,            Chapter 11

        Debtors.                          Jointly Administered

_____/

**MEMORANDUM OF LAW OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**(A) IN SUPPORT OF CONFIRMATION OF JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION AND (B) JOINING IN DEBTORS' RESPONSE TO**
**<u>OBJECTIONS TO CONFIRMATION OF JOINT PLAN</u>**

      The official committee of unsecured creditors (the

"<u>Committee</u>")[1] appointed in the above-captioned chapter 11 cases

of Winn-Dixie Stores, Inc. and its affiliated debtors and

debtors in possession (collectively, "<u>Winn-Dixie</u>" or the

"<u>Debtors</u>") hereby submits this (a) memorandum of law

("<u>Memorandum</u>") in support of the Debtors' Joint Plan of

Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors

(as amended, the "<u>Plan</u>"), dated August 9, 2006 and (b) joinder

in the memorandum of law the Debtors submitted in response to

objections to the confirmation of the Plan ("<u>Debtors'</u>

<u>Memorandum</u>"; Docket No. 11766), and represents as follows:

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

## PRELIMINARY STATEMENT

The Committee unanimously supports the Plan, which is the product of lengthy and arduous arms' length discussions among the Debtors, the Committee and representatives of every salient creditor constituency in the Chapter 11 Case.  The Plan has been carefully crafted and all of its provisions are interdependent. As a result, the Committee supports all of the provisions of the Plan.  Were some element of the Plan to be stricken, it could jeopardize the balance of the provisions of the Plan.  Since the Committee believes that the Plan represents the best possible outcome (i.e., one that could be realized and effectuated within a time frame most likely to preserve the maximum potential going concern value of the Estates), it urges confirmation of the Plan as it is currently drafted.  The Committee was the principal architect of the substantive consolidation compromise ("Substantive Consolidation Compromise") embodied in the Plan. It also contends that the release and exculpation provisions of the Plan, as well as those regarding the payment of fees and expenses of the professionals retained by members of the Committee to resolve the substantive consolidation dispute (section 12.3) and of the Indenture Trustee (section 12.4), are necessary and appropriate under the circumstances.

As the Debtors acknowledge in the Disclosure Statement[2], they had to initially decide whether or not to consolidate the

---

[2]    Disclosure Statement, p. 48.

Estates for voting and distribution purposes.  Without a
compromise of this threshold issue, protracted and expensive
litigation among divergent creditor groups would ensue.  The
cost, delay and uncertainty flowing from this litigation would
cause significant harm to the Debtors' rehabilitation efforts
and recoveries to creditors.  Accordingly, the Debtors believed
that the Committee was well equipped -- because it consisted of
a cross-section of the major creditor constituents in these
cases and owed a fiduciary duty to all unsecured creditors -- to
attempt to resolve the substantive consolidation issue.

As more fully explained below, the process undertaken by
the Committee successfully led to the resolution of the
substantive consolidation dispute and poised the Debtors to
emerge from chapter 11 in the near term.  Not only was the
Committee able to reach resolution among its members, it was
able to garner the support of other well organized and vocal
creditor groups in the Chapter 11 Case.  Importantly, as set
forth in the Debtors' Memorandum, all unsecured classes impacted
by the Substantive Consolidation Compromise (i.e., Landlord
Claims, Vendor/Supplier Claims, Noteholder Claims, Retirement
Plan Claims and Other Unsecured Claims) overwhelmingly voted, in
both dollar amount and number, to accept the Plan.  Under these
circumstances, the Plan should be confirmed and the objections
to it overruled.

## CASE BACKGROUND

1.      **Petition Date.**  On February 21, 2005 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").  By order dated April 13, 2005, the New York Bankruptcy Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

2.      **Committee Appointed.**  On March 1, 2005, the United States Trustee ("UST") duly appointed the Committee, which appointment was amended on August 29, 2005 and March 27, 2006.[3]  The following entities serve on the Committee and hold general unsecured claims: (a) landlord claimants, Deutsche Bank Trust Company Americas ("Deutsche Bank") and New Plan Excel Realty Trust, Inc. ("New Plan"); (b) vendor/supplier claimants, Kraft Foods Global, Inc. ("Kraft") and Pepsico & Subsidiaries ("Pepsi"); and (c) noteholder claimants or representatives,

---

[3]      On August 17, 2005, the United States Trustee filed an official notice appointing the official committee of equity security holders, which was disbanded on January 11, 2006.

Capital Research & Management Company ("CapRe"), Lonestar Partners, LP ("Lonestar") and Wilmington Trust Company ("Wilmington"), as Indenture Trustee.

3.    **Fifth Exclusivity Extension.**  By order dated April 20, 2006, the Debtors obtained a fifth extension of their exclusive periods to June 29, 2006 and August 29, 2006 (Docket No. 7348).[4]

4.    **Disclosure Statement.**  On June 29, 2006, the Debtors filed the Disclosure Statement with Respect to Joint Plan of Reorganization of the Debtors (as amended, the "Disclosure Statement") and the Plan.

5.    **Disclosure Statement Hearing.**  On August 4, 2006, the Court conducted a hearing to determine whether the Disclosure Statement contained adequate information as required under Bankruptcy Code section 1125 (the "Disclosure Statement Hearing").  The Court approved the Disclosure Statement upon conclusion of the Disclosure Statement Hearing and authorized the solicitation of votes to accept or reject the Plan.

6.    **Confirmation Hearing.**  The Plan confirmation hearing is scheduled to commence on October 13, 2006.

---

[4]    The Debtors' period in which to solicit acceptances of the Plan was subsequently extended further from August 29, 2006, to the earlier of (a) entry of an order confirming the Plan and (b) October 31, 2006 (Docket No. 10541).

## MEMORANDUM OF LAW

I. **SUBSTANTIVE CONSOLIDATION COMPROMISE**

    A. **Events Leading to Substantive Consolidation Analysis by Committee**

        7.    From and after the Petition Date, the Debtors continued the process of reducing their store footprint and improving other parts of their business operations.  Disclosure Statement, pp. 40-43.  Upon substantial completion of the "footprint process," a business plan was formulated on or around November 2005, which was an important stepping stone to negotiating a consensual plan of reorganization between the Committee and the Debtors.

        8.    However, whether or not to substantively consolidate the Estates remained a threshold issue.  Failure to resolve the substantive consolidation issue would likely lead to contentious litigation among various creditor groups.  Knowing that the Committee consisted of representatives of landlords, trade creditors, and bondholders, the Debtors requested that the Committee attempt to resolve the issue by negotiating a settlement that was acceptable to its various members and the ad hoc retiree and trade committees and in the best interest of unsecured creditors as a whole.  Disclosure Statement, p. 48.

    B. **Committee Best Positioned to Negotiate Resolution of Substantive Consolidation Issues**

        9.    The Committee undertook the task of negotiating a proposed settlement of the substantive consolidation issues.

Consistent with its statutory duties, this task is not only
appropriate, but a key component of the duties Congress set for
official committees.  See Mirant Americas Energy Marketing v.
Official Committee of Unsecured Creditors of Enron Corp., 2003
WL 22327118 *6 (S.D.N.Y. Oct. 10, 2003) ("principal purpose of
[a] creditors' committee . . . [is to] 'strike a proper balance
between the parties such that an effective and viable
reorganization of the debtor may be accomplished.'") (citation
omitted).  Second, the UST appointed a diverse body of creditors
to the Committee; thus, not only were creditors as a whole
represented, Mirant Americas Energy Mktg., 2003 WL 22327118, at
*7 ("committee represents all unsecured creditors whether or not
a member of a particular group is included in its membership"),
but the views of individual creditor groups were also expressed.
That is, the Committee has two members -- Deutsche Bank and New
Plan -- that hold Landlord Claims (each with guarantee and non-
guarantee claims); two members -- Kraft and Pepsi -- that hold
Vendor/Supplier Claims and two members -- CapRe and Lonestar --
that hold Noteholder Claims.  Furthermore, Wilmington as the
Indenture Trustee under the Indenture giving rise to the
Noteholders' Claims also serves on the Committee.

          10.    Each of the respective creditor groups on the
Committee, after reviewing the analysis prepared by the
Committee's professionals, realized that there were highly
contentious and litigable issues present and, in order to

resolve such issues in a manner fair and reasonable for all creditors, needed independent (either in-house or third-party) advice to fully appreciate the impact of these issues both on the creditors similarly situated to it and on all other creditor groups.

11.     Accordingly, near the end of calendar year 2005, the Committee -- whose membership reflects a cross-section of the Debtors' general unsecured creditors -- began its analysis with the dual goals of resolving the substantive consolidation issue and maximizing the value of the Estates for the benefit of all unsecured creditors.

### C.   Committee's Substantive Consolidation Analysis

#### 1.   Legal and Factual Analysis

12.     The Committee undertook a diligence process that began with the preparation of a questionnaire designed to elicit from the Debtors information in many factual categories that would be relevant to the substantive consolidation analysis. After the questionnaires were completed, the Committee worked closely with the Debtors to locate and gather documentary responses to such questionnaires.  The Committee then undertook to review and consider the responsive information including, without limitation, the Debtors' books and records, public filings, key contracts, invoices and numerous other documents -- in the aggregate, thousands of pages of documents were reviewed for the Committee's factual analysis.  Additionally, the

Committee conducted interviews of current and former Winn-Dixie employees and analyzed the relevant legal standards for substantive consolidation in the Eleventh Circuit and other influential circuits.  Through this extensive and significant legal and factual analysis, the Committee concluded that many criteria in the substantive consolidation analysis are subject to dispute, either as to their factual underpinnings or as to the relative weight a court should ascribe to any particular factor.  Furthermore, it became increasingly clear that divergent creditor groups were organizing on multiple sides of the issues preparing to aggressively litigate unless a fair and reasonable compromise was reached.

### 2.    Financial Analysis

13.    Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"), the Committee's financial advisor, prepared financial analyses to assist the Committee in reviewing the impact of substantive consolidation versus non-substantive consolidation under multiple scenarios employing various assumptions.  However, the members of the Committee did not agree on a single set of assumptions to be used in Houlihan's presentations and analyses and did not negotiate a settlement based on one set of assumptions.  Instead, Houlihan prepared a multitude of presentations and analyses utilizing various assumptions for the Committee's members and their respective in-house or third party advisors in connection with their

respective analysis of the substantive consolidation issue. Furthermore, many of the iterations of the presentations and analyses that were prepared for the Committee were done at the request of specific members, which, in some instances, reflected their specific views and position within the Debtors' capital structure.

14.    Importantly, at no time was it possible to craft one set of assumptions, agreed upon by all of the various groups of creditors, that would establish a baseline to negotiate a resolution of the substantive consolidation issues.  The underlying assumptions and contested issues for the many iterations of models and analyses that were prepared included, without limitation:

- Value allocation among the Debtors;

- Value allocation of fixed owned assets;

- Value allocation of owned equipment;

- Value allocation of dairy operations among certain Debtors;

- Value allocation of operating store assets;

- Appropriate obligors and guarantors for particular Classes of Claims;

- Allocation of Claims, including allocation of secured and administrative expense Claims;

- The amount, validity and enforceability of postpetition intercompany claims and prepetition intercompany claims;

- Methodologies for allocation of value of postpetition intercompany claims and prepetition intercompany claims; and

- Entities to be consolidated and entities not to be included in substantive consolidation.

**D.    Committee Compromises Substantive
       Consolidation Issues**

15.    After completing its extensive legal, factual and financial analysis, the Committee had numerous telephonic and in-person meetings to foster further discussions and initiate negotiations regarding the substantive consolidation issue amongst its members in an effort to consensually resolve the issues in such a manner that they could form the basis for inclusion in a plan of reorganization.  Eventually, after the members of the Committee and their individual advisors engaged in extensive back and forth negotiations over a several month period and requested further analysis from the Committee's advisors, the negotiations process came to a close.  The Committee -- composed of two landlords (each with guarantee and non-guarantee claims), two vendors and two noteholders plus the Indenture Trustee for the notes issued by Winn-Dixie -- agreed at the end of May 2006, subject to discussions with the Debtors and the ad hoc committees, upon a reasonable compromise of the highly complex substantive consolidation issues.  The Committee believed that the proposed compromise was fair and reasonable to all creditors and would avoid time consuming and costly litigation, including litigation of each of the many assumptions that one must make in order to successfully litigate these issues and that were utilized and/or reviewed by the Committee in settlement discussions.

### E.   Debtors and Ad Hoc Committees Support Substantive Consolidation Compromise

16.     Shortly after reaching the Substantive Consolidation Compromise, the Committee met with the Debtors to explain the proposed compromise and immediately gained the Debtors' support and agreement to embody it in the Plan. Furthermore, in recognition of the extraordinary amount of time and effort that each member of the Committee and its independent advisors devoted to resolving the most important issue remaining in the case that formed the cornerstone of the Plan -- the substantive consolidation issue -- the Debtors agreed to pay the reasonable fees and expenses of professionals individually retained by members of the Committee in an aggregate amount not exceeding $1,400,000.  The members of the Committee believed that retention of these professionals was a necessary element of successfully negotiating the compromise as views diverged during discussions and negotiations.  The payment of such fees was an integral part of the Substantive Consolidation Compromise.

17.     Immediately thereafter, the Committee met with the ad hoc retirees' committee ("Retirees' Committee").  After numerous discussions and negotiations, and some minor adjustments to the proposed compromise, including, an increase in the percentage of recoveries for the retirees' claims, reimbursement of fees and expenses up to an aggregate amount of $50,000, and providing a discount coupon Winn-Dixie card to each member of the class, the Retirees' Committee agreed to support

the Substantive Consolidation Compromise as fair and reasonable.
The Retirees' Committee, as evidenced by the statement that it
filed in support of the Plan (docket no. 11256), fully supports
the Substantive Consolidation Compromise and confirmation of the
Plan.

18.    The Committee also met with the ad hoc trade
committee ("Trade Committee").  After extensive discussions and
negotiations, the Committee agreed to certain small changes
including, ensuring that no creditor class recovery was more
than 100% as of the Confirmation Date -- and if a creditor class
exceeds a 100% recovery, the excess amount will be redistributed
on a pro-rata basis to other creditors -- and to support
reimbursement of fees and expenses for the Trade Committee of up
to an aggregate amount of $1,300,000, in connection with their
efforts to analyze and settle issues relating to substantive
consolidation.[5]  In turn, the Trade Committee agreed that the
Substantive Consolidation Compromise was fair and reasonable and
supports it and confirmation of the Plan.

**F.    Substantive Consolidation Compromise has
        Broad Based Support Among All Unsecured
        Creditor Constituencies**

19.    As discussed above, the Substantive Consolidation
Compromise was agreed to by a broad range of unsecured
creditors, therefore avoiding the substantial cost and delay

---

[5]    It is important to note that, similar to the Retirees' Committee, the
reimbursement of fees of its professionals was an important aspect of the
negotiation process.  Indeed, if these individuals were required to go out-of-
pocket to reimburse their professionals it is unclear whether a compromise
could have been reached with this key group.

that would be incurred if the complex legal and factual issues associated with substantive consolidation were litigated to conclusion.  Furthermore, as evidenced by voting on the Plan, all classes of unsecured claims have voiced their support of the Substantive Consolidation Compromise by overwhelmingly voting affirmatively to accept the Plan.  In summary, the Debtors and the Committee believe that the Substantive Consolidation Compromise is a reasonable compromise of complex issues and avoids the substantial delay and cost associated with the uncertainties of litigation.

## II.  **Release and Exculpation Provisions**

20.    As demonstrated in the Debtors' Memorandum, the UST's argument that section 524(e) of the Bankruptcy Code contains a <u>per</u> <u>se</u> prohibition on releases of non-debtors is unavailing.  All that section 524(e) does is confirm that, in and of itself, the bankruptcy discharge of the debtor does not provide an automatic discharge to any non-debtor party. Accordingly, the majority of courts that have examined this issue agree that, non-debtor release and exculpation provisions in a plan of reorganization are permissible under appropriate circumstances. <u>See</u> <u>e.g.</u>, <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 245 (3d Cir. 2000) (describing exculpation clauses as "commonplace" in chapter 11 plans).  Furthermore, the Committee submits that when the issue before a court is the appropriateness of the release and exculpation of the members of

a statutory committee appointed under section 1102(a) of the
Bankruptcy Code and such committee's professionals retained
under section 1103(a) of the Bankruptcy Code (collectively, the
"Committee Releasees"), there are additional considerations that
a court should consider, which are discussed below and in the
Debtors' Memorandum.

### A.   Exculpation

21.   "The Bankruptcy Code 'contemplates a significant
and central role for committees in the scheme of a business
reorganization'." In re Drexel Burnham Lambert Group, Inc., 138
B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (citation omitted) aff'd
140 B.R. 347 (S.D.N.Y. 1992).  To allow committees to perform
this central role, the Bankruptcy Code provides committees and
their members with both a fiduciary duty to their constituents
and a limited immunity with respect to the acts performed within
the scope of their statutory authority.  Id.  The qualified
immunity provided by section 1103 of the Bankruptcy Code
"corresponds to and is intended to further, the Committee's
statutory duties and powers." Pan Am Corp. v. Delta Air Lines,
Inc., 175 B.R. 438, 514 (S.D.N.Y. 1994).[6]  "This immunity
applies to conduct within the scope of the authority conferred
on the committee either by statute or by court . . . . To
overcome this immunity, [one] must prove that the committee
engaged in willful misconduct or 'ultra vires' activity."

---

[6]   The grant of limited immunity also applies to committee's
professionals.  See, e.g., In re PWS Holding Corp., 228 F.3d at 245-47;
Drexel Burnham, 138 B.R. at 722.

<u>Vasconi & Assocs., Inc. v. Credit Manager Ass'n of California</u>, 1997 WL 383170 at *4 (N.D. Cal. July 1, 1997).  <u>See</u> <u>also</u> <u>Philip v. L.F. Rothschild Holdings, Inc., (In re L.F. Rothschild Holdings, Inc.)</u>, 163 B.R. 45, 49 (S.D.N.Y. 1994).

22.    Accordingly, as explained in <u>In re PWS Holding Corp.</u>, 228 F.3d at 245-47, as long as the exculpation provided to the Committee Releasees by a plan of reorganization is no broader than the qualified immunity they already enjoy by virtue of the statute, such exculpation is perfectly legitimate.  <u>See also</u> <u>In re Genesis Health Ventures, Inc.</u>, 266 B.R. 591, 606 (Bankr. D. Del. 2001) ("to the extent [plan exculpation provisions] set forth the applicable standards of liability for persons associated with and providing services towards the reorganization of the debtors, the provisions may be approved"); <u>Vasconi</u>, 1997 WL 383170 at *4 (same).

23.    As in the cases cited above, the exculpation granted to the Committee Releasees, pursuant to section 12.15 of the Plan, carves out "acts or omissions which are the result of fraud, gross negligence or willful misconduct."  Accordingly, rather than impermissibly "altering" (<u>i.e.</u>, further limiting) the Committee Releasees' limited statutory responsibility, which was the expressed concern of this Court in <u>In re Transit Group, Inc.</u>, 286 B.R. 811, 819 (Bankr. M.D. Fla. 2002),[7] the Plan merely

---

[7]    The other case decided by this Court that the UST has cited, <u>In re Optical Techs., Inc.</u>, 216 B.R. 989 (Bankr. M.D. Fla. 1997), does not involve the release/exculpation of parties similarly situated to the Committee Releasees.

correctly states the standard for the limited immunity the Committee Releasees already enjoy and should be approved.[8]

### B.  Non-Debtor Releases

24.    The non-debtor releases in section 12.12(a) of the Plan as applicable to the Committee, its members and advisors is a settlement of claims and should be approved under the same standard for approval of settlements under Bankruptcy Rule 9019.  See e.g., In re Pac. Gas & Elec. Co., 304 B.R. 395 (Bankr. N.D. Cal. 2004).[9]  Furthermore, as discussed in the Debtors' Memorandum, the UST's proposed "factors" test, although inapplicable, is also satisfied.  Debtors' Memorandum, p. 24, n.

---

[8]    In order for creditors to volunteer to expend time and resources to serve on committees, the courts should make sure that such creditors are protected to the fullest extent possible from any liability that may accrue to them from such service.  The leading national bankruptcy treatise states so unequivocally:

"Actions against committee members in their capacity as such should be discouraged.  If members of committees can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.  An active and involved committee is an important part of a chapter 11 case and if a committee can be intimidated by the threat of legal action seeking personal liability of its members, it will not be able to play its role in the case.

Lawrence P. King, Collier on Bankruptcy, ¶ 1103.05[4][b], 1103-32 (15th ed. rev. 2006).

[9]    Finally, the UST separately objects to the exculpation provision as it applies to attorneys hired by various constituencies in these cases based on the alleged violation of the ethical standards expressed in Rule 1.8(h) of the ABA Model Rules of professional Conduct, which prohibits attorneys from prospectively limiting their potential liability to their clients.  However, the only client of the Committee's attorneys in these cases is the Committee, which will cease to exist, in its current form, as of the effective date of the Plan. Accordingly, the Committee's attorneys will never be in a position where the exculpation provision will limit their potential liability to its client, but only with respect to third parties.

15.

**III. Payment of Professionals Retained by Members of Committee to Resolve Substantive Consolidation Dispute Is Reasonable and Proper**

25.     Contrary to the UST's objection, nothing in the Bankruptcy Code requires that the fees of professionals retained by members of the Committee to analyze and resolve the substantive consolidation issue be subject to a fee application process.  Rather, such fees can be approved as part of a settlement under Bankruptcy Rule 9019.

26.     As explained above, the various Committee members dedicated a significant amount of time, effort, and funds to analyzing the substantive consolidation issue and negotiating a compromise.  While that work clearly made a substantial contribution to the Estates by resolving what threatened to be a lengthy and expensive litigation, there is nothing that requires separate court approval of the fees and expenses.  To create the burden of an additional application process would result in additional expenses to the parties and the Court.

27.     To the extent there are individual issues as to the reasonableness of specific fees, the Debtors can object and the Court will resolve the issue.  The Bankruptcy Code requires no more.  The Substantive Consolidation Compromise encompassed the payment of these fees, without which there is no guarantee the parties would have agreed to the settlement.

**IV.  Payment of Indenture Trustee's Fees Under Section 12.4
     Essential to Compromise and Common Provision
     in Chapter 11 Plans of Reorganization**

28.    The payment of fees incurred by the Indenture
Trustee in connection with the Plan is a common mechanism that
is routinely approved by bankruptcy courts.  See, e.g., In re
Worldcom (Bankr. S.D.N.Y. Case No. 02-13533 (AJG)) (plan
confirmed providing for expenses of indenture trustee to be
compensated without a separate application to the court); In re
Global Crossing (Bankr. S.D.N.Y. Case No. 02-40188 (REG))
(same).

29.    Under the terms of the Indenture, as is common,
the Indenture Trustee is entitled to have its fees and expenses
paid through a "charging lien" against the recovery of the
noteholders.  Where, as here, that recovery will consist of the
New Common Stock, leaving the Indenture Trustee to exercise its
charging lien will not only result in a lower distribution to
noteholders but also a liquidation of some of the New Common
Stock that could potentially disrupt the newly-formed market for
such stock.  For these reasons, it is not uncommon for plans to
provide for payment of the fees and expenses of the Indenture
Trustee.

30.    Moreover, of great concern is the confusion that
may arise between the Debtors and the noteholders if the payment
of such fees is not approved in connection with the Plan and not

paid by the Debtors.  In that circumstance, proposed distributions made to noteholders would not be what the noteholders expected when they voted and approved the Substantive Consolidation Compromise.  For these reasons, the payment of the fees and expenses of the Indenture Trustee is reasonable and should be approved.

## V.    **Joinder in Memorandum**

31.    The Committee hereby joins in the Debtors' Memorandum and agrees with the statement of facts, the legal arguments, and the assertions set forth by the Debtors in the Debtors' Memorandum.  The Committee reserves all rights to be heard before the Bankruptcy Court with respect to any issues in connection with the Debtors' Memorandum, this Memorandum and confirmation of the Plan.

## CONCLUSION

For the foregoing reasons, including the statement of facts, legal arguments and assertions set forth in the Debtors' Memorandum, the Committee requests that the Court enter an order confirming the Plan, and granting such other relief as it deems just and proper.

Dated:  October 10, 2006

AKERMAN SENTERFITT

By: /s/  *Patrick P. Patangan*
John B. Macdonald
Florida Bar No. 230340
E-mail:john.macdonald@akerman.com
Patrick P. Patangan
Florida Bar No. 348340
E-mail: patrick.patangan@akerman.com
50 North Laura Street, Suite 2500
Jacksonville, Florida  32202
Telephone: (904) 798-3700
Facsimile: (904) 798-3730

Co-counsel for the Official
Committee of Unsecured Creditors of
Winn-Dixie Stores, Inc., et al.

And

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne (DD 7543)
Matthew S. Barr (MB 9170)
Michael E. Comerford (MC 7049)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

Co-counsel for the Official
Committee of Unsecured Creditors of
Winn-Dixie Stores, Inc., et al.