**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

**RESPONSE OF WILMINGTON TRUST COMPANY TO THE UNITED STATES TRUSTEE'S OBJECTION TO JOINT PLAN OF REORGANIZATION AND JOINDER IN MEMORANDUM OF LAW OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS (A) IN SUPPORT OF CONFIRMATION OF JOINT CHAPTER 11 PLAN AND (B) JOINING IN DEBTORS' RESPONSE TO OBJECTIONS TO CONFIRMATION OF JOINT CHAPTER 11 PLAN**

Wilmington Trust Company ("Wilmington Trust") hereby: (a) responds (the "Response") to United States Trustee's Objection (the "Objection") to Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors[1] (the "Plan"), and (b) joins (the "Joinder") in the Memorandum of Law of Official Committee of Unsecured Creditors (the "Committee") (A) in Support of Confirmation of Joint Chapter 11 Plan and (B) Joining in Debtors' Response to Objections to Confirmation of Joint Chapter 11 Plan.[2]  In support of this Response and Joinder, Wilmington Trust respectfully states as follows:

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2] To the extent the United States also objects to the payment of fees pursuant to Section 12.3 of the Plan, Wilmington Trust hereby responds to that objection as well.

3174438v2

**I.      BACKGROUND**

1.     Wilmington Trust serves as successor indenture trustee under that certain Indenture, dated as of December 26, 2000, by Winn-Dixie Stores, Inc. and the named Guarantors,[3] as has been amended and supplemented by the First Supplemental Indenture, dated as of March 29, 2001, and the Second Supplemental Indenture, dated as of January 10, 2002 (collectively, the "Indenture").  Pursuant to the Indenture, Winn-Dixie Stores, Inc. issued US$300,000,000 of those certain eight and seventh-eighths ($8^{7}/_{8}$%) Senior Notes due 2008 (the "Notes").  As of the Petition Date, not less than $310,500,000 remained due and owing on the Notes.[4]

2.     Wilmington Trust, in its capacity as Indenture Trustee, is a member of the Committee.  In addition, both in its capacity as a representative of the holders of the Notes (the "Noteholders") and as a member of the Committee, Wilmington Trust was a leading force in focusing attention upon the substantive consolidation issue, analyzing the substantive consolidation issue, and ultimately working with the creditor constituencies and the Debtors in achieving the compromise of the substantive consolidation issue embodied in the Plan which has the overwhelming and required approval of the unsecured creditor body.

3.     In the capacities described above, Wilmington Trust has earned and will earn certain fees and has incurred and will incur certain professional fees and other out-of-pocket

---

[3] Winn-Dixie Stores, Inc.'s obligations under the Indenture are guaranteed by, among others, the following Debtor entities:  Astor Products, Inc., Crackin' Good, Inc., Deep South Products, Inc., Dixie Packers, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc. and Winn-Dixie Supermarkets, Inc.

[4] Under the Plan, all Noteholder Claims shall be deemed allowed in the aggregate amount of $310,540,582.19 for all purposes of the Plan.  "Each holder of an Allowed Noteholder Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Claim: (i) on the initial Distribution Date, 62.69 shares of New Common Stock for each $1,000 of Allowed Claim; and (ii) on any applicable subsequent Distribution Date, a pro rata distribution (allocated among all holders of Allowed Unsecured Claims and all holders of remaining Disputed Unsecured Claims), based on the aggregate number of shares distributed in respect of, or held in reserve for, such Claim, immediately prior to such distribution, of any excess shares of New Common Stock in the Common Stock Reserve; *provided, however*, that the actual number of shares received shall be subject to rounding as provided in Section 8.5(a) of the Plan, and the value of such shares to be subject to dilution as set forth in Section 6.5(b) of the Plan."

3174438v2

expenses (collectively, the "Expenses"), for which it is entitled to be paid and/or reimbursed by the Debtors, pursuant to the Indenture.  In order to secure its right to receive such payments and reimbursements, Wilmington Trust, under the terms of the Indenture, holds a first priority senior security interest (the "Charging Lien") in all money or property held or collected by Wilmington Trust with respect to the Notes.  Accordingly, the Charging Lien provides Wilmington Trust with a security interest in a substantial amount of the New Common Stock (the "Stock") to be issued by the Debtors and distributed to the Noteholders.  As provided in the Plan, the Noteholders voted to approve the Plan based upon the Debtors' satisfaction of any claims of Wilmington Trust for its fees and expenses without the need for asserting its Charging Lien.  Any change to this provision for independent payment of fees and expenses by the Debtors could result in a material change to the Plan.

        4.      Section 12.3 of the Plan provides for payments of fees and expenses of professionals retained by members of the Committee in an aggregate amount not exceeding $1,410,000, to the extent those fees and expense are attributable to analyses of the issues surrounding substantive consolidation and work in reaching a compromise of the substantive consolidation issue (the "Substantive Consolidation Compromise").  This amount includes, on behalf of Wilmington Trust, fees of up to $455,000 for the legal services of Curtis, Mallet-Prevost, Colt & Mosle LLP ("CMP"), fees of up to $3,500 for the legal services of Berger Singerman, PA (local counsel for Wilmington Trust), and fees of up to $425,000 for the financial advisory services of Capstone Advisory Group LLC (financial advisor for Wilmington Trust).  These fees and expenses are not approved carte blanche; there is a review process established by the Debtors.  If the Debtors object to all or any portion of these fees and expenses, the Plan provides that they will object in writing and the Bankruptcy Court will then resolve the allowance of any disputed fees and expenses under a "reasonableness" standard.

3174438v2

5. Section 12.4 of the Plan provides for the payment of Indenture Trustee Expenses that do not relate to the Substantive Consolidation Compromise to be paid in Cash on or as soon as reasonably practicable after the Effective Date.  Again, if the Debtors object to all or any portion of these Expenses, the Plan provides that they may object in writing and the Bankruptcy Court will then resolve the allowance of any disputed Expenses under a "reasonableness" standard.

6. On or about September 25, 2006, the United States Trustee for the Middle District of Florida (the "U.S. Trustee") filed the Objection, challenging, inter alia, Sections 12.3 and 12.4 of the Plan on the basis that they purportedly circumvent the requirements of title 11 of the United States Code, as amended (the "Bankruptcy Code") by allowing for the payment of fees of professionals retained by members of the Committee absent a fee application or motion for payment of an administrative expense.

7. On or about October 10, 2006, the Debtors filed a Response to Objections to Confirmation of Joint Plan.

8. On or about October 10, 2006, the Committee filed a Memorandum of Law (A) in Support of Confirmation of Joint Chapter 11 Plan and (B) Joining in Debtors' Response to Objections to Confirmation of Joint Chapter 11 Plan.

9. Both the Debtors and the Committee support confirmation of the Plan and the payment of the fees and expenses provided pursuant to Sections 12.3 and 12.4 of the Plan -- which Plan was overwhelmingly approved by unsecured creditor classes.

10. In this Response and Joinder, Wilmington Trust requests, for the reasons set forth below, that (i) the Objection of the U.S. Trustee be overruled and (ii) that the Plan be confirmed.

3174438v2

## II. ARGUMENT

    A.    The Procedures Set Forth in the Plan for Payment
of Expenses of the Indenture Trustee Are Proper.

    11.    The U.S. Trustee improperly objects to the provisions of the Plan that provide for the payment and/or reimbursement of fees and expenses under Sections 12.3 and 12.4, implying that such payments and reimbursements are being made under Section 503(b) of the Bankruptcy Code, that Section 503(b) may not have been complied with, and that such section is the exclusive manner in which the Indenture Trustee and other Committee members can receive funds from the Debtors' estates. The U.S. Trustee is wrong on all counts.

    12.    The Plan can and does provide for the payment and/or reimbursement of fees wholly separate and apart from Section 503(b).[5] In its Objection, the U.S. Trustee has incorrectly assumed that Section 503(b) is the only manner in which certain parties (e.g., indenture trustees or committee members) can receive certain types of payments (e.g., reimbursement of fees and professional fees). However, such exclusivity is not part of the bankruptcy law. See United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 23, 2003). Section 503(b) sets out the requirements under which, when met, a creditor will have an administrative expense, which will *require* the debtor (assuming that it is not administratively insolvent) to pay such creditor on behalf of its allowed claim under that provision. It does not state that the debtor cannot otherwise arrange to pay the professional fees and expenses of committee members and indenture trustees through a settlement, through the Plan process or some other reasonable process.

---

[5] While Wilmington Trust could, if required by the Court, meet the requirements of Bankruptcy Code Section 503(b), because its Expenses were both "actual, necessary costs of preserving the estate," 11 U.S.C. § 503(b)(3)(A), and "a substantial contribution to the estate," 11 U.S.C. § 503(b)(3)(D), there is no need for it to do so. The Plan properly provides for payment of the Indenture Trustee's Expenses wholly apart from Section 503 of the Bankruptcy Code which is not an exclusive avenue for such relief.

–5–

13. On the contrary, the Plan can provide Wilmington Trust with its reimbursement rights completely apart from Section 503(b). The Indenture Trustee's reimbursement rights can be viewed as payment on its claim, and as such, must comply with Section 1129 of the Bankruptcy Code, and not with Section 503(b). Viewed as such, the reimbursement rights are simply the equivalent of the collateral for the Charging Lien held by Wilmington Trust.

14. Similarly, Wilmington Trust's reimbursement rights, and the fees and expenses of the Committee members in reaching the Substantive Consolidation Compromise, should be viewed as an essential part of the settlement which forms the Plan. Under Bankruptcy Rule 9019, as part of a settlement, the Debtors' decision to pay such fees must meet only a business judgment test. Here, the payment of the Section 12.3 and 12.4 fees and expenses is reasonable, and meets the business judgment test.

15. Indeed, Sections 12.3 and 12.4 provide safeguards to ensure that only the reasonable expenses of Wilmington Trust and its professionals will be compensated. Sections 12.3 and 12.4 require service of documents on the Debtors that substantiate the Expenses. In the event of a dispute with respect to compensation sought, this Court remains the final arbiter of reasonableness.

16. Additionally, Section 12.4 of the Plan is reasonable because under the terms of the Indenture, the Indenture Trustee is entitled to have the Indenture Trustee Expenses paid through the exercise of the Charging Lien. Thus, the reimbursement rights provided in Section 12.4 of the Plan are essentially a means of satisfying the Charging Lien without having the lien actually exercised. The exercise of the lien would be a cumbersome process, the elimination of which saves money, time, and effort, thereby benefiting the holders of claims against the Debtors. Moreover, because the Plan provides for disbursements to Noteholders to

be in the form of shares of Stock, the exercise of the Charging Lien would require a liquidation of Stock that would be costly, time-consuming, and have the potential to disrupt the newly-formed markets for the Stock.[6]

17.     Importantly, too, in voting to approve the Plan, the Noteholders did so under a Plan that provided that the Expenses of the Indenture Trustee would be paid by the Debtors, rather than from the Noteholders' recovery pursuant to the Charging Lien.  That understanding was an integral part of the Substantive Consolidation Compromise and the Plan on which the Noteholders overwhelmingly voted to accept.  Elimination of the payment of these fees at this time would be a material modification of the settlement, requiring re-solicitation and a new round of voting on a modified Plan.

18.     Based upon our experience in Chapter 11 cases and our review of several cases where public bonds/notes were compromised under a plan of reorganization, provisions such as Section 12.4 are not uncommon and have been approved by multiple Bankruptcy Courts throughout the country including within this Circuit.  See, e.g., In re Silicon Graphics, Inc., (Bankr. S.D.N.Y. Case No. 06-10977 (BRL)) (plan confirmed providing for fees and expenses of indenture trustee and professionals to be paid by debtors without separate application to the court); In re ATA Holdings Corp., (Bankr. S.D. Indiana Case No. 04-19866 (BHL)) (same); In re Atlas Air Worldwide Holdings, (Bankr. S.D. Fla. 04-10792-BKC-RAM through 04-10796-BKC-RAM) (same); In re Dan River, (Bankr. S.D. Ga. 04-10990 (WHD)) (same); In re Fibermark, Inc., (Bankr. D. Vt. 04-10463 (CAB)) (same); In re Haynes Int'l, Inc., (Bankr. S.D. Ind. 04-05364 (AJM)) (same); In re Int'l Wire Group, Inc., (Bankr. S.D.N.Y. 04-11991 (BRL)) (same); In re Northwestern Corp., (Bankr. D. Del. 03-12872 (CGC)) (same); In re Ormet Corp., (Bankr.

---

[6] Indeed, it would have been a simple matter to have just increased the dividend to the Noteholder Class to represent the load that the Indenture Trustee would exact.  However, even there, some of the Stock would still have to be sold to realize the cash to pay the Trustee's expenses.  This inefficiency is obviated by the simple expedient of the Plan methodology.

S.D. Ohio 04-51255) (same); In re DDI Corp., (Bankr. S.D.N.Y. 03-15261 (SMB)) (same); In re Loral Space & Comm. Ltd., (Bankr. S.D.N.Y. 03-41710 (RDD)) (same); In re Texas Petrochemicals, L.P., (Bankr. S.D. Tex. 03-40258-H3-1) (same); In re Exide Techs., (Bankr. D. Del 02-11125 (KJC)) (same); In re Global Crossing Ltd., (Bankr. S.D.N.Y. Case No. 02-40188 (REG)) (same); In re Worldcom, Inc., (Bankr. S.D.N.Y. Case No. 02-13533 (AJG)) (same); In re Enron Corp., (Bankr. S.D.N.Y. Case No. 01-16036 (AJG)) (same); In re Armstrong World Indus., Inc., (Bankr. D. Del. 00-44771 (JKF)) (same); In re Loewen Group Int'l, Inc., (Bankr. D. Del. 99-1244 (PJW)) (same).[7]

19. Wilmington Trust respectfully submits that no prejudice will result from the Plan's procedures set forth in Sections 12.3 and 12.4, and that to require otherwise simply increases the administrative and economic burden on the Debtors, the Committee members and their professionals, and this Court, for no discernible benefit.

B. The Payment of Wilmington Trust's and Its Professionals' Fees Is Reasonable and Should Be Allowed.

20. The legal fees incurred by CMP and Berger Singerman, PA, and the financial advisory fees of Capstone Advisory Group LLC ("Capstone"), for services provided to Wilmington Trust in connection with the Substantive Consolidation Compromise are reasonable, and should be allowed as set forth in Sections 12.3 and 12.4 of the Plan.

21. Wilmington Trust recognized that substantive consolidation was a major issue and potential stumbling block to a successful reorganization at an early stage of the Debtors' proceedings. It was clear that the recoveries of the different creditor constituencies could be affected significantly by a substantive consolidation of the Debtors' estates-- a position

---

[7] Because so many cases involving large public debt are filed in New York and Delaware, it is not surprising that most of the cases cited above are from those venues. Nevertheless, the rationale is sound and is accepted whenever the circumstances, as here, warrant it. Indeed, such a plan provision was confirmed in the Southern District of Florida in In re Atlas Air Worldwide Holdings, (Bankr. S.D. Fla. 04-10792-BKC-RAM through 04-10796-BKC-RAM).

which Wilmington Trust would not support absent Court approval of the Plan. It was also clear that litigation over substantive consolidation could prolong the Debtors' bankruptcy cases by months, if not years, and consume a significant amount of economic resources as well as risk the reorganization of these estates.

22. Accordingly, Wilmington Trust became independently involved in analyzing the appropriateness of substantive consolidation in early February 2006 and took a leading role in bringing the issue to the fore and enabling a negotiated resolution. Between February 2006 and July 2006, Wilmington Trust, with the assistance and counsel of CMP, engaged Capstone to provide advice from a financial perspective to Noteholders, investigated the corporate and financial structure of the Debtors, reviewed and analyzed the relevant case law with respect to substantive consolidation, and performed an analysis of the claims against the Debtors and the effect that substantive consolidation would have on the various creditor constituencies. In performing these tasks, Wilmington Trust, CMP, and Capstone cooperated and shared thoughts and analysis with other members of the Committee, the Debtors, and their respective counsel. The work of Wilmington Trust and its advisors substantially aided in months of negotiation within the Committee, and ultimately led to the Substantive Consolidation Compromise amongst creditor constituencies.

23. The services of Wilmington Trust with respect to the Substantive Consolidation Compromise were necessary and integral to the formation of a consensual Plan of Reorganization. The Substantive Consolidation Compromise is an essential element of the Plan and facilitated the Debtors' filing of a Plan that was supported unanimously by the Committee and which Plan has the overwhelming support of the unsecured creditors. The Compromise benefits all parties in interest because it avoids costly and time-consuming litigation that could hamper the restructuring effort of the Debtors and allows them to move expeditiously to

confirmation of the Plan and emergence from bankruptcy. Accordingly, Wilmington Trust's fees in connection with the Substantive Consolidation Compromise should be allowed under Section 12.3 as reasonable.

24. Further, Wilmington Trust participated in these Chapter 11 cases in several ways other than in connection with the Substantive Consolidation Compromise, including serving as an active member of the Committee, dissemination of information to the Noteholders, acting as representative of the interests of the Noteholders, acting as liaison between the Noteholders and other constituencies, and participating in development and negotiations in connection with the Plan on behalf of the Noteholders.

25. An indenture trustee provides integral, statutorily mandated service to a public company debtor, whether in or out of Chapter 11. Under the Trust Indenture Act, an issuer of public debt must have a qualified indenture for which there is a qualified trustee. A debtor's obligation to pay for this benefit is created under the debtor's contractual undertaking set forth in the applicable indenture. Wilmington Trust's fulfillment of this statutory role provided significant benefit to the Debtors' estates.

26. Moreover the Bankruptcy Code encourages consensual restructurings, and is equally concerned with insuring that a contemplated consensual distribution scheme be honored. The Debtors' creditor constituencies intensively negotiated the Plan that provided for specific distributions to each creditor class. Integral to that scheme was that the Debtors pay the indenture trustees' expenses as part of the treatment of the Noteholders. That arrangement should be confirmed here. Accordingly Wilmington Trust's fees should be allowed under Section 12.4 as reasonable.

27. It is important to note that the Motion for Substantive Consolidation filed by the self-entitled "Ad Hoc Trade Committee," and the Affidavit of M. Freddie Reiss filed in

support thereof, present only one view of the issue of whether the Debtors' estates should be substantively consolidated and does so in an argumentative fashion. Had the Substantive Consolidation Compromise not been reached, Wilmington Trust would have filed extensive opposition to the Motion for Substantive Consolidation to present the view as to why the Debtors' estates were not properly subject to substantive consolidation.[8] Some of the reasons that the substantive consolidation issue is not so clear-cut as the papers filed by the Ad Hoc Trade Committee may make it appear include the following:

        (i)    Creditors could argue that substantive consolidation is a drastic remedy that should be used only sparingly where any creditor objects to its use.

        (ii)    Creditors could argue that there is no commingling of assets that would make it prohibitively expensive for the estates to be disentangled.

        (iii)    Creditors could argue that the factors that support substantive consolidation in this case are the less significant factors that exist quite properly and regularly with almost every modern corporate family, such as common officers and directors, parent ownership of subsidiaries, and consolidated financial statements. In contrast, creditors could argue that the factors that weigh against substantive consolidation, are the ones that are truly significant, such as the degree of difficulty in segregating assets and liabilities, the observance of corporate formalities in asset transfers, and the commingling of assets.

        (iv)    Creditors could argue that consolidation should not be permitted if holders of unsecured claims reasonably relied on the fact that the related debtors were distinct entities at the time credit was extended. It is obvious here that the Noteholders *did* rely on the

---

[8] Indeed, should the Plan or the Substantive Consolidation Compromise fail to be confirmed, Wilmington Trust expressly reserves its right to oppose a substantive consolidation of the Debtors' estates.

–11–

3174438v2

fact that the subsidiaries were distinct – otherwise, the guarantees would have been meaningless from day one.

28. Comparing these arguments to the arguments for substantive consolidation put forth in the Ad Hoc Trade Committee's Motion for Substantive Consolidation shows that the substantive consolidation issue is highly fact intensive, time-consuming and a substantial risk to all parties to litigate. Compensating the efforts of Wilmington Trust and its professionals toward reaching the Substantive Consolidation Compromise is thus reasonable and proper pursuant to Bankruptcy Rule 9019 and Section 1129 of the Bankruptcy Code.

### III. JOINDER IN MEMORANDUM

29. Wilmington Trust hereby joins in the Committee's Memorandum of Law (A) in Support of Confirmation of Joint Chapter 11 Plan and (B) Joining in Debtors' Response to Objections to Confirmation of Joint Chapter 11 Plan. Wilmington Trust reserves all rights to be heard before the Bankruptcy Court with respect to the Committee's Memorandum, this Response and Joinder, and confirmation of the Plan.

3174438v2

WHEREFORE, for the reasons set forth above, Wilmington Trust respectfully requests that this Court (i) deny the relief sought in the Objection, (ii) confirm the Plan, and (iii) grant Wilmington Trust such other and further relief as this Court deems is just and proper. Wilmington Trust reserves the right to supplement this Response to the extent that the U.S. Trustee supplements the Objection or raises additional or different arguments at the hearing.

Dated: October 11, 2006

Respectfully submitted by counsel:

By /s/ Brian G. Rich
Brian G. Rich 038229
BERGER SINGERMAN, PA
315 South Calhoun Street, Suite 712
Tallahassee, Florida 32301
Tel: (850) 561-3010
Fax: (850) 561-3013
E-Mail: BRich@bergersingerman.com

-and-

Paul Steven Singerman 378860
BERGER SINGERMAN, PA
200 South Biscayne Blvd., Suite 1000
Miami, Florida 33131
Tel: (305) 755-9500
Fax: (305) 714-4340
E-Mail: singerman@bergersingerman.com

-and-

Arthur J. Spector 620777
BERGER SINGERMAN, PA
350 E. Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301
Tel: (954) 713-7511
Fax: (954) 523-2871
Email: aspector@bergersingerman.com

-and-

3174438v2

Steven J. Reisman
Theresa Foudy
CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP
101 Park Avenue
New York, New York  10178-0061
Tel:  (212) 696-6000
Fax:  (212) 697-1559
E-Mail:  sreisman@cm-p.com (SR-4906)
            tfoudy@cm-p.com (TF-6268)