# EXHIBIT A

LEASE

THIS LEASE is made as of this Nov. 25, 1997 between C. & A. Ltd., L.C., an Ohio limited liability company ("Landlord") and Winn-Dixie Stores, Inc., a Florida corporation ("Tenant") "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties. The Execution Date of this Lease shall be the last date on which Landlord and Tenant have executed this Lease, as evidenced by their respective signature blocks.

WITNESSETH:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

PREMISES

1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 206 feet in width by 278 feet in depth, with a front vestibule and rear receiving room(s), to be constructed, reconstructed, and/or renovated by or on behalf of Tenant at Tenant's expense according to plans and specifications to be approved by the parties as herein provided (collectively, the "Store"), together with exterior pads at the rear for installation of freezers and coolers, a loading dock area, and the land on which all of the same shall stand and Landlord hereby grants to Tenant a nonexclusive right and easement to use during the Term as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements shown on the Site Plan, as hereinafter defined (the "Common Areas" and together with the Store, collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on the Site Development Plan dated September 2, 1997, prepared by Kohler Engineering Group, Inc attached to this Lease as Exhibit "A", the "Site Plan"), known as Melbourne Village Plaza (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at 1270-39 Wickham Road in the City of Melbourne, County of Brevard, State of Florida The legal description of the Shopping Center is set forth on Exhibit "B".

TERM

2.    (a)    Initial Term.  The term of this Lease shall commence on the Commencement Date, as herein defined and shall terminate on January 19, 2009 (the "Initial Term").

(b)    Extension Term(s).  Tenant, at its option, shall be entitled to the privilege of 8 successive extensions of the Term of this Lease, each extension to be for a period of 5 years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease by giving to Landlord a notice in writing at least 180 days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document. If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure

(c)    Return of Premises. Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)    Holding Over. Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at 150% of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

RENT

3.    Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)    Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $396,749.00 per annum. ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $33,062.42 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Estate Taxes, (3) Shopping Center Insurance, and (4) Approved Security Expenses (collectively, "Additional Rent") Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts or other evidences of payment by Landlord (the "Payment Evidence") On or before 360 days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Tenant shall have the right, within one hundred and eighty days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within 30 days of completing its audit If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within 30 days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than 3%, Landlord shall also pay to Tenant the reasonable, out-of-pocket cost of Tenant's audit.

(1)    Common Area Maintenance Expenses. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month during the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Common Area Maintenance Expenses to

be due for the upcoming year which, for the first year, is estimated to be $17,100.00 (i.e., $1,425.00 per month). For succeeding years, the basis for a year's Common Area Maintenance Expenses shall be the amount actually paid by Tenant for the prior year.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, painting, cleaning, traffic control, inspecting, landscaping (only as shown on the Site Plan), maintaining any sprinkler and septic systems and storm water detention facilities required for operation of the Shopping Center, restriping the parking areas, lighting during the Standard Hours, as hereinafter defined, and otherwise repairing and maintaining the Common Areas.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, expenses associated with keeping the Shopping Center or the common areas safe or secure, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, holiday decorations, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or capital improvements (including repaving of asphalt parking areas or resurfacing concrete parking areas as opposed to repairing potholes or other day-to-day maintenance) unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized over the maximum allowable useful life of such capital improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses, or any single expense over 15% of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed provided, however, that on or before 10 days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once per year.

(2)    Real Estate Taxes. Tenant shall pay to Landlord, within 30 days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities, as part of a special improvement district (e.g. special assessments for sidewalks or for road

widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment. Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)     Shopping Center Insurance. Tenant shall pay, within 30 days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

(4)     Approved Security Expenses. As of the Execution Date, Landlord has determined that security services are not required in connection with the operation of the Shopping Center. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Lease to keep the Shopping Center and the Common Areas safe and secure, it shall submit a written plan for providing such services to Tenant. Tenant shall submit such plan to its security officer for review. If the plan meets with the approval of Tenant's security officer, Tenant shall advise Landlord of the same. No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment. Approved Security Expenses shall not include any expenses not based upon competitive, arms-length bids obtained less frequently than once per year. Tenant shall pay, within 30 days of receipt of Landlord's statement therefor, its Pro-rata Share of "Approved Security Expenses". Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety and security devices and personnel pre-approved by Tenant's designated security officer. Payment of Approved Security Expenses or nonpayment of unapproved security expenses by Tenant shall not be interpreted and Landlord shall not claim that such payment or nonpayment should be interpreted as assertion of control over the Common Areas by Tenant.

Tenant's "Pro-rata Share" shall be the ratio of 57,500 to 195,065.

Basic Rent and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a 365 day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

TITLE

4.      Landlord is the fee simple owner of the Shopping Center, which include the Premises. On the date on which Landlord and Tenant execute this Lease (the "Execution Date") Landlord shall terminate and cause the eviction of any tenants under any other leases to the Store on or before the Commencement Date, shall deliver evidence of Landlord's status, power, and authority as required by Tenant's title insurance company, and shall execute and deliver an owners and nonforeign affidavit

SURVEY

5.      Intentionally deleted

ENVIRONMENTAL
AUDIT

6.      Intentionally deleted.

USE

7.      (a)      Permitted Use   The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

          (b)      Exclusives      Tenant shall have the exclusive right to.

                    (i) operate a supermarket, grocery, bakery, and delicatessen,

                    (ii) sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

                    (iii) operate a pharmacy or prescription drug concession,

                    (iv) operate a photo lab or film development business,

                    (v) sell beer and wine for off-premises consumption and

                    (vi) operate an automatic teller machine and banking business in the Shopping Center (each an "Exclusive Use").

          Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within 1,000 feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord).

          (c)      Prohibitions.      Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

                    (i) spa, health, sports, or exercise club;

                    (ii) lounge, bar, "teen lounge" or social encounter club;

                    (iii) bowling alley;

                    (iv) pawn shop;

                    (v) skating rink;

(vi) bingo or electronic or other game parlor;

(vii) theater (either motion or legitimate);

(viii) area or space for the sale or display of pornographic or "adult" material;

(ix) business or professional offices in excess of 10,000 square feet in the aggregate;

(x) medical offices over 10,000 square feet or abortion or HIV clinic of any size;

(xi) automobile dealership;

(xii) church;

(xiii) manufacturing or storage business;

(xiv) public auditorium or other public entertainment facility;

(xv) tag office or other government service office, except if located more than 200 feet from the Store and smaller than 5,000 square feet each and 10,000 square feet in the aggregate;

(xvi) exterior "pay" telephones, except those located more than 200 feet from the Store;

(xvii) restaurants, or

(xviii) any business requiring parking for delivery or service trucks on a routine or frequent basis

(d)    Exceptions.    Notwithstanding the foregoing, any tenant occupying the Shopping Center on the Execution Date and engaged in any exclusive or prohibited use may continue to engage in such use for the duration of the term of such tenant's lease together with any options to extend as provided in such lease. Further, any tenant may operate a restaurant in the Shopping Center provided that it is located at least 150 feet from the outer boundary of the Store.

**COMPLIANCE WITH LAWS**

8.    Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.    Tenant shall be responsible for, and Landlord hereby consents to, the reconfiguration of the parking lot as depicted on the Site Plan. The arrangement and location of all buildings and Common Areas shall be constructed and at all times during the Term be maintained as shown on the Site Plan and shall not be changed and Landlord shall not subdivide, parcel, or otherwise alter the Shopping Center without Tenant's prior written consent or create any easements in the Common Areas without the prior written consent of Tenant, which consent to easements shall not unreasonably be withheld, conditioned, or delayed  The exterior facade

of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned, or delayed.

Tenant agrees, at its sole cost and expense, to (a) complete the reconfiguration of the parking lot as shown on the Site Plan, and (b) construct, reconstruct, and/or renovate the Store (collectively, the "Improvements to the Store") in accordance with Tenant's Plans and Specifications dated September 2, 1997, which have been approved and initialed by Landlord and Tenant (collectively, "Tenant's Plans").

COMPLETION DATE    **10.**    Landlord shall deliver the Store to Tenant on or before 10 days after the Execution Date (the "Turnover Date"). Construction, reconstruction, and/or renovation of the Store in accordance with Tenant's Plans shall begin not later than on or before 120 days after the Turnover Date (the "Construction Start Date") and shall be completed not later than 365 days after the Turnover Date. Tenant shall make a diligent and good faith effort to complete its construction by such date, but shall not be in default if it is delayed past the anticipated completion date.

COMMENCEMENT    **11.**    The Commencement Date, as defined and utilized in this Lease, shall be January 1,
DATE                1998.

CONDITION OF        **12.**    Landlord makes no representation or warranty except as otherwise expressly stated
SHOPPING CENTER    in this Lease with respect to the condition or composition of the Store, the Common Areas, or the Shopping Center.

PARKING AND        **13.**    Tenant, its employees, agents, suppliers, licensees, customers, and invitees, shall
COMMON AREAS    have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide a minimum ratio of at least 4.85 10 foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center, and facilities for convenient parking of at least 620 automobiles (minimum) as provided on the Site Plan. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

SERVICE AREA    **14.**    Landlord has provided parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center. Tenant shall not use trailers for permanent merchandise storage.

UTILITIES

**15.    Tenant's Utilities.** Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall be responsible for environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility.

Common Areas. All of the Common Areas (including parking area) shall be adequately lighted during the hours of ½ hour before dusk until midnight (the "Standard Hours") Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan. Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

TENANT'S
MAINTENANCE

16    Tenant shall keep the interior of the Store in reasonably neat and orderly, good condition and shall repair or replace as needed the windows and plate glass, automatic doors, air conditioning and heating systems and floor surfacing of the Store, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and interior wiring to the main disconnect or main electrical panel and plumbing, from, but not including, the water meter, excluding structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

LANDLORD'S
MAINTENANCE

17.    (a)    Store. Landlord shall, at its cost and expense and not as part of Common Area Maintenance Expenses, keep and maintain in good condition and repair, and replace as necessary the facade of the Store, the exterior walls and structural portions of the Store (including painting of the exterior walls as needed), roof, gutter, downspouts, masonry walls, foundation and structural members of the Store, the exterior plumbing (including and from the water meter for the Store and including septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store. Provided, however, that if the concrete loading dock for the Store is in need of repair, Landlord will cause such repairs to be made (i) upon receipt of the written request therefor from Tenant, or (ii) if initiated by Landlord, after obtaining the written consent of Tenant. In either event, Tenant shall pay the cost of such repairs, provided the amount is preapproved by Tenant.

(b)    Common Areas Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store). Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding or other security services, cleaning and sweeping as needed but at least three (3) times weekly, lighting during the Standard Hours in accordance with Tenant's Plans and this Lease and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas Landlord shall keep all exterior surfaces of

buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Premises.

SIGNS

18.     Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs, antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

        Landlord shall maintain, at its cost, the electrically illuminated pylon sign(s) and monument sign(s) in the locations marked on the Site Plan. The pylon sign(s) shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panel(s) in the uppermost spaces on such pylon sign(s) and may connect the sign panel(s) to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel(s) if billed as a portion of Additional Rent

FIXTURES AND
INTERIOR
ALTERATIONS

19.     Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. If Landlord does not respond to Tenant within 30 days from receipt of Tenant's request for approval of Tenant's modifications then Tenant may terminate this Lease. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term

        Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications

1

**INDEMNIFICATION**     20.     Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**     21.     If the Store or the Shopping Center is totally destroyed or damaged by fire or other casualty to the extent of 50% or more of the value thereof based upon replacement costs is damaged or destroyed (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

(a)     If a Major Casualty occurs during the first 5 years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Landlord shall proceed promptly (but in any event within 180 days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date a certificate of occupancy is issued for the repaired or restored Store Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)     If a Major Casualty occurs during the last 3 years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within 30 days of the date of the Major Casualty to terminate this Lease;

(i) If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within 15 days of receipt of Landlord's termination notice, to extend the Lease for the next successive 3 Extension Terms. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(ii) If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic and Additional shall be pro-rated as of such date;

(iii) If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Landlord shall to proceed promptly (but in any event within 180 days of destruction or damage) and without expense to Tenant to repair

the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

(iv) If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Landlord would be obligated to repair the Store, then Landlord shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

**LANDLORD'S INSURANCE**

22. (a) *Landlord*. Landlord shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to *Tenant's* interests.

(i) Liability Insurance. Landlord shall carry comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than nor more than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00. Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(ii) Casualty Insurance. Landlord shall carry or cause to be carried all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b) *Tenant*. Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee

as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests Notwithstanding the foregoing, so long as Tenant (or Winn Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any such Mortgagee If Tenant ceases to be a publicly traded company, Tenant shall provide Landlord with annual financial statements, certified by its Chief Financial Officer, reflecting Tenant's net worth

(i)      Liability Insurance,      Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000 00 and deductibles of not more than $250,000 00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(ii)     Casualty Insurance,  Tenant shall carry or cause to be carried all-risk commercial property insurance on the interior nonstructural portions of the Store (that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000 00, and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom.  As to casualty losses, Tenant shall pay the replacement cost thereof.  Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease

QUIET ENJOYMENT      23.      Landlord covenants, warrants and represents that:

(a)      the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)      As of the Execution Date Landlord is a duly organized, validly existing limited liability company, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary company action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall

not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Shopping Center or any portion thereof is bound;

    (c)    Except for the Mortgagee and Scotty's, as herein provided, no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

    (d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the Term subject to the Permitted Exceptions and matters revealed by the Survey or the Audit and approved or waived in writing by Tenant;

    (e)    As of the Execution Date, there is no zoning, comprehensive plan, or other restriction or Legal Requirement preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes;

    (f)    As of the Execution Date, Landlord has not previously, either directly or indirectly, leased any portion of the Shopping Center, sold any portion of the Shopping Center, or otherwise permitted any portion of the Shopping Center or any other property owned or controlled by Landlord to be used as a grocery store

TAXES AND LIENS    24.    Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon  the Shopping Center (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures

CONDEMNATION    25.    If any part of the Store or more than fifty percent (50%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within 60 days of such taking or purchase, and any unearned Basic Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant  If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue

If any portion of the Common Areas or any drive, entrance, median cut, access point, route or mode of access thereto depicted on the Site Plan, is obstructed for longer than 180 days or appropriate governmental authorities notify Tenant that the same will be obstructed for 180 days or longer or taken for any public or quasi-public use, under any  Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or  prevent its use of or access to or through the Common Areas, or any drive, entrance, median cut, access point whether or not the same is compensable under applicable Legal Requirements or so as to reduce the required parking area by an amount in excess of 10%, Tenant may, at its option, terminate this Lease within 60 days of the obstruction, taking, or purchase and shall be liable for Basic and

Additional Rent only up to the time of such obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Lease, however, Tenant shall notify Landlord and Landlord shall have 15 days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Lease shall continue. If the alternative parking area does not meet with Tenant's reasonable approval, Tenant may terminate this Lease as above provided.

Except for any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

DEFAULT

26.    Tenant

(A)  Tenant shall be in default under this Lease if

(a)    Tenant fails to pay any Basic Rent or Additional Rent due under this Lease within 10 days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

(b)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner)

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(1)    Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic or Additional Rent as and when due less any sums received from reletting the Premises; (ii) the actual out-of-pocket costs to make repairs to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iii) reasonable and customary brokerage commissions paid in connection with re-letting the Premises

(2)    Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic or Additional Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(3)     Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant

(B)   Landlord   Landlord shall be in default under this Lease if:

(a)     Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within 10 days after receipt of a written statement from Tenant (a "Repayment Default"); or

(b)     Landlord fails to perform any other of its material obligations under this Lease within 30 days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(1)     In the case of a Repayment Default, Tenant shall be entitled to offset such amount against all Basic and Additional Rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset

(2)     If Landlord fails, following notice as outlined above, to timely commence or complete reconstruction of the Store or the Shopping Center (following a casualty or condemnation if obligated to do so under this Lease), Tenant may either (i) extend to Landlord such additional time to complete such construction or reconstruction, as Tenant deems reasonable, in its reasonable discretion, (ii) cause the same to be completed, in which case Tenant shall be entitled to offset the cost of the same against all rent due under this Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the same until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset or (iii) terminate this Lease by written notice to Landlord without waiving Tenant's rights to damages against Landlord

(3)     If any representation or warranty made by Landlord in paragraph 23(a), 23(d), 23(f) or 41(a) of this Lease is determined during the Term to be false, or if any other representation or warranty made by Landlord in this Lease is determined to have been false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the material adverse effects to Tenant's reasonable satisfaction within 30 days of written notice from Tenant, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

(4)     Tenant shall have the termination rights provided for in the paragraphs of this Lease relating to Casualty and Condemnation.

(5)    If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs required of it hereunder to the Store, the Shopping Center, or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse Tenant for the reasonable out-of-pocket cost therefor within 10 days of receipt of a written statement therefore, shall constitute a Repayment Default.

(6)    If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, or employees, which release or environmental condition materially impairs for more than thirty (30) days after written notice of same to Landlord Tenant's ability to use the Premises for the Permitted Use (the "Impairment Period") and, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation"), Tenant may (1) abate all rent due under this Lease during the Impairment Period and/or (2) terminate this Lease by written notice to Landlord on or before thirty (30) days after the end of the Impairment Period.

(7)    Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset

In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled (in addition to whatever other damages or remedies such party is entitled) to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

CONSTRUCTION RISKS

27.    Tenant shall indemnify Landlord and save Landlord harmless from and against all mechanics', materialmen's, sub-contractors' and similar liens, all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Tenant, Tenant's contractors, sub-contractors, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store, or from any faulty construction thereof.

NOTICES

28.    All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

JK2 96582 5 80130 00555
9/10/97 4 24 pm

16

Landlord :        C. & A. Ltd., L.C.
                  4440 Lake Forest Drive
                  Suite 110
                  Cincinnati, Ohio  45242
                  Telecopy:  (513) 554-1110

or such other address as Landlord may notify Tenant from time to time.

Tenant            Winn-Dixie Stores, Inc.  Re: Store #2317
                  3015 Coastline Drive
                  Orlando, FL  32808
                  Telecopy  (407) 294-4241

With a copy to:  Winn-Dixie Stores, Inc.  Re: Store #2317
                 Attn: General Counsel
                 5050 Edgewood Court
                 P O  Box B
                 Jacksonville, FL 32203-0297
                 Telecopy: (904) 783-5138

or to such other address as Tenant may notify Landlord from time to time

**ASSIGNMENT AND**
**SUBLEASING**

29.      Tenant may, without the consent of Landlord, vacate the Store or assign this Lease,
or sublease the Store in whole or in part to any corporation or entity which is the parent of or
subsidiary to or affiliated with Tenant, or to any corporation or entity with which Tenant merges
or consolidates or to which it sells all or substantially all of its business in the state where the
Store is located.

         Otherwise, Tenant may only with the consent of Landlord (which consent shall not be
unreasonably withheld, conditioned, or delayed) assign this Lease or sublease the Store in
whole or in part to an assignee or a sublessee whose intended use is (a) a Permitted Use, and
(b) does not violate any then existing exclusive use granted to some other tenant in the
Shopping Center of which Tenant has received prior written notice  If Tenant desires to so
assign or sublease, it shall give written notice to Landlord of its intention to do so and shall
reveal the identity of the intended assignee or sublessee and the intended use, in which case
Landlord shall within thirty (30) days of such notice advise Tenant in writing of its approval or
disapproval of such intended assignment or subleasing  If Tenant receives notice of Landlord's
approval within such period or should Landlord fail to give Tenant notice of its approval or
disapproval (in which event an approval is to be presumed), Tenant may proceed in due
course.  If the proposed assignee or subtenant meets the criteria set forth in this paragraph and
Landlord disapproves the intended assignment or subleasing, this Lease shall, at Tenant's
option exercisable by written notice to Landlord, be terminated and cancelled without the
execution of any other or further document, and both parties hereto shall be released of and
from further liability hereunder as of the date of Landlord's disapproval, except as otherwise
expressly provided in this Lease.

         In the event of vacating or of any assignment or subleasing as herein permitted, until
cancellation or expiration of this Lease, Tenant shall continue to remain liable and responsible
for the payment of rent and the due performance of all other terms, covenants, and conditions
of this Lease.

Notwithstanding the foregoing, Tenant may sublease a portion or department of the Store without Landlord's consent to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the Store.

**SUBORDINATE**

30.    Provided that, with respect to any first priority or primary mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic and/or Additional Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Lease for any and all Basic and/or Additional Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL CERTIFICATE**

31.    Within a reasonable time, but no less than 10 business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate") Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than 2 Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500 00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

32.    Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises

**TRANSFER BY LANDLORD**

34.    If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require  Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease.  The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

**SHORT FORM LEASE**

35.    Landlord  shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its  recording in the public records of the county or parish in which the Premises are located   Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL TITLES**

36.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

37.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises and supersedes any prior agreement with respect to the subject matter hereof.  No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

38.    Landlord shall have recorded in the public records of Volusia County, Florida, declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration") as a primary encumbrance and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that no portion of the Shopping Center nor any portion of the tracts of land designated on the Site Plan as Outparcels or Retail Stores shall be used for any of the activities or uses prohibited by this Lease.

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Intentionally Deleted |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Intentionally Deleted |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Intentionally Deleted |

**FORCE MAJEURE**

40    If there shall occur, during the Term, (1)strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor, (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually

performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL CONDITION**

41.    (a)    Landlord. Landlord represents and warrants to Tenant that except as revealed by the Audit, it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof knowingly cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the

{                                                    {

Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on  or under  the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder

NO BROKERS

42.　　Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

FLORIDA MANDATED PROVISION

43.　　The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time  Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida  Additional information regarding radon and radon testing may be obtained from your county public health unit.

EXPANSION

44.　　[omitted]

TAKE OVER AND RELEASE

45.　　If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for 90 continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this Lease by written notice to Tenant within 90 days of such Store Closing  and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease

GOVERNING LAW

46.  This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located.

NO JOINT VENTURE

47. This is a Lease between a landlord and a Tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

TIME                48.     Time is of the essence of this Lease.

NO MERGER           49.     In the event that Tenant becomes the owner of fee title to the Store or the Shopping
                    Center, the fee title and the leasehold granted hereunder shall not merge but shall remain
                    separate and distinct interests and estates.

            IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease the day and year
indicated below.

Witnesses:                                      LANDLORD:

_J. Mark Addy_                                  C. & A. Ltd., L.C., an Ohio Limited Liability Company
Print name: R. Mark Addy

_Barbara Hood_                                  By: PECO HOLDINGS III LTD., an Ohio Limited Liability
Print name: BARBARA HOOD                            Company, Its Managing Member

                                                    By: _____
                                                        Michael C. Phillips
                                                        Its Managing Member
                                                        Date: October 3, 1997

_Brenda J. Babcock_                             TENANT:
Print name: BRENDA J. BABCOCK
                                                Winn Dixie Stores, Inc.
_Laura L. Andrews_
Print name: LAURA L. ANDREWS                    By: R. P. McCook
                                                    R. P. McCook
                                                    Its: VICE PRESIDENT
                                                    Date: 11-24-97


STATE OF _OHIO_              )
                            )
COUNTY OF _HAMILTON_        )

        The foregoing instrument was acknowledged before me this _October 3_, 199 7, by
Michael C. Phillips, as Managing Member of PECO HOLDINGS III LTD., an Ohio Limited Liability Company,
Managing Member of C. & A. Ltd., L.C., a limited liability company, on behalf of the company, [PLEASE
CHECK ONE]  ✓  who is personally known to me or _____ who has produced
_____ as identification.

_Barbara Hood_
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

                                                BARBARA HOOD
                                                Notary Public, State of Ohio
                                                My Commission Expires Aug. 2, 1998

STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _Nov.   24_ , 199_7_ , by
_____ R. ʋ. McCook ___ , as __Vice__ President of Winn-Dixie Stores, Inc., a Florida corporation,
on behalf of the corporation, who is personally known to me.

_Brenda J. Babcock_
Printed Name. __BRENDA J. BABCOCK__
Notary Public, State and County aforesaid
My Commission Expires: __11-20-99__
Notary ID No _____

(NOTARIAL SEAL)

Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp Nov. 20, 1999
Comm. No. CC 511004



EXHIBIT B

PARCEL 1

The West 485 feet of the East 660 feet of the North 330 feet of Section 24, Township 27
South, Range 36 East, said lands situated, lying and being in Brevard County, Florida;
LESS the right-of-way of Montreal Avenue (State Road 518).

PARCEL 2

The East 10 feet of the West 495 feet of the East 660 feet of the North 330 feet of
Section 24, Township 27 South, Range 36 East, Brevard County, Florida (Parcel A); and
from the Northeast corner of Section 24, Township 27 South, Range 36 East, Brevard
County, Florida; run South 00 degrees 01 minutes 07 seconds East along the East line of
said Section 24, a distance of 217.07 feet; thence run South 87 degrees 33 minutes 03
seconds West parallel with the North line of said Section 24, a distance of 40.04 feet to
a point on the West right-of-way line of Wickham Road, said point being the POINT OF
BEGINNING; thence continue South 87 degrees 33 minutes 03 seconds West along said line
125 feet; thence run South 00 degrees 01 minutes 07 seconds East parallel with the East
line of said Section 24, a distance of 112.93 feet; thence run North 87 degrees 33
minutes 03 seconds East parallel with the North line of said Section 24, a distance of
125 feet to the West right-of-way line of Wickham Road; thence run North 00 degrees 01
minutes 07 seconds West along the West right-of-way line of Wickham Road, 112.93 feet to
the POINT OF BEGINNING (Parcel B); LESS that property taken for road right-of-way for
Wickham Road by condemnation.

PARCEL 3

From the Northeast corner of Section 24, Township 27 South, Range 36 East, Brevard
County, Florida; run South 87 degrees 33 minutes 03 seconds West along the North line of
said Section 24, a distance of 40.04 feet; thence run South 00 degrees 01 minutes 07
seconds East parallel with the East line of said Section 24, 197.07 feet to the POINT OF
BEGINNING; thence continue South 00 degrees 01 minutes 07 seconds East along said line, a
distance of 20 feet; thence run South 87 degrees 33 minutes 03 seconds West parallel with
the North line of said Section 24, a distance of 125 feet; thence run North 00 degrees 01
minutes 07 seconds West parallel with the East line of said Section 24, a distance of 20
feet; thence run North 87 degrees 33 minutes 03 seconds East along a line parallel with
the North line of said Section 24, a distance of 125 feet to the POINT OF BEGINNING; LESS
that property taken for road right-of-way for Wickham Road by condemnation. Together with
all of the right, title and interest of the lessor in and to the North 330 feet of the
East 660 feet of Section 24, Township 27 South, Range 36 East, Brevard County, Florida.

PARCEL 4

That property as described in Official Records Book 1519, Page 707, located in Section
24, Township 27 South, Range 36 East, Brevard County, Florida, and being more
particularly described as follows:
Continued

SCHEDULE A-PAGE 2
COMMITMENT NO. REVISED

Case No. 40a-147126

LEGAL DESCRIPTION CONTINUED

From the Northeast corner of aforesaid Section 24, Township 27 South, Range ·36 East, Brevard County, Florida, run South 87 degrees 33 minutes 03 seconds West along the North line of said Section 24, a distance of 165.04 feet; thence run South 00 degrees 01 minutes 07 seconds East, parallel with the East line of said Section 24, a distance of 78.07 feet to the South right-of-way line of State Road 518 and the POINT OF BEGINNING of the herein described parcel; thence run North 87 degrees 33 minutes 03 seconds East along said right-of-way line, a distance of 88.45 feet to the point of curvature of a curve to the right, having a radius of 30 feet and a central angle of 92 degrees 25 minutes 50 seconds; thence run Southeasterly along said curve, an arc distance of 48.40 feet to the point of tangency of said curve; thence run South 01 degrees 01 minutes 07 seconds East along the West right-of-way line of Wickham Road, a distance of 87.70 feet to the South line of property described in Official Records Book 848, Page 245; thence run South 87 degrees 33 minutes 03 seconds West along said South line, a distance of 119.75 feet; thence run North 00 degrees 01 minutes 07 seconds West along the West line of Official Records Book 848, Page 245, a distance of 119 feet to the POINT OF BEGINNING.

PARCEL 5

A tract of land in the Northeast One-Quarter of Section 24, Township 27 South, Range 36 East, being more particularly described as follows: From the Northeast corner of said Northeast quarter, Section 24, Township 27 South, Range 36 East, run South 00 degrees 07 minutes 45 seconds East along the East line of said Section 24 and the centerline of Wickham Road, for a distance of 1,158.87 feet; thence run South 89 degrees 52 minutes 15 seconds West for a distance of 50.00 feet to a point on the Westerly right-of-way line of said Wickham Road, said last mentioned point being the POINT OF BEGINNING of the parcel to be hereinafter described; thence run South 87 degrees 26 minutes 19 seconds West, for a distance of 884.00 feet; thence run North 00 degrees 07 minutes 45 seconds West for a distance of 1,082.10 feet to a point on the Southerly right-of-way line of Montreal Avenue; thence run North 87 degrees 26 minutes 19 seconds East along said last mentioned Southerly right-of-way line for a distance of 274.05 feet; thence run South 00 degrees 07 minutes 45 seconds East for a distance of 255.45 feet; thence run North 87 degrees 26 minutes 19 seconds East for a distance of 609.95 feet to said Westerly right-of-way line of said Wickham Road; thence run South 00 degrees 07 minutes 45 seconds East along the said last mentioned Westerly right-of-way line, for a distance of 826.65 feet to the POINT OF BEGINNING.

PARCEL 6

A tract of land in the Northeast One-Quarter of Section 24, Township 27 South, Range 36 East, being more particularly described as follows: From the Northeast corner of said Northeast One-Quarter of Section 24, Township 27 South, Range 36

Continued

Case No. 40a-147126

## LEGAL DESCRIPTION CONTINUED

East, run South 87 degrees 26 minutes 19 seconds West along the North line of the Northeast One-Quarter of said Section 24 and the centerline of Montreal Avenue (State Road 518), for a distance of 1,062.21 feet; thence run South 00 degrees 07 minutes 45 seconds East for a distance of 74.58 feet to a point on the Southerly right-of-way line of said Montreal Avenue, said last mentioned point being the POINT OF BEGINNING of the parcel to be hereinafter described. From said POINT OF BEGINNING, run South 00 degrees 07 minutes 45 seconds East for a distance of 652.00 feet; thence run North 87 degrees 26 minutes 19 seconds East for a distance of 125.00 feet; thence run North 00 degrees 07 minutes 45 seconds West for a distance of 652.00 feet to a said Southerly right-of-way line of said Montreal Avenue; thence run South 87 degrees 26 minutes 19 seconds West along said last mentioned Southerly line for a distance of 125.00 feet to the POINT OF BEGINNING.

LESS AND EXCEPT from the above described parcels that certain parcel conveyed by virtue of that Special Warranty Deed recorded September 14, 1987, in Official Records Book 2839, Page 277, of the Public Records of Brevard County, Florida, and by reference hereby made to same for a more particular description therein; and LESS and EXCEPT that parcel as conveyed to Apple Restaurants of Central Florida by deed recorded July 18, 1995, in Official Records Book 3490, Page 4100