# EXHIBIT A

R-1

W·O    WAYCROSS
Store No. 64

Civic Center Plaza
Winn-Dixie

## LEASE

as of

THIS LEASE, made this ___28th___ day of _____March_____, 19_95_,

between _____REGAL QUAD, INC., an Ohio corporation_____

_____

_____ (hereinafter called "Landlord"),

and _____WINN-DIXIE LOUISVILLE, INC., a Florida corporation_____

_____ (hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires,

singular or plural, and the heirs, legal representatives, successors and assigns of the respective

parties;

### WITNESSETH:

PREMISES

That the Landlord, in consideration of the rents herein reserved and of the covenants of

the Tenant, does hereby lease and demise unto the Tenant, for the term hereinafter specified,

the following described land and improvements thereon:

That certain piece, parcel or tract of land located at _Civic Center Plaza,_____

2220 Waycross Road, Forest Park Township_____

in the City of ___Forest Park_____, County of _____Hamilton_____,

State of _____Ohio_____, more particularly described as:

See Exhibit A attached hereto and made a part hereof

containing
Together with a store building, approximately _50,844_ XXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXX___square feet_____)

parking area, sidewalks, service areas and other improvements XXXXX constructed there
on. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXX.

FS-2

of the execution of th
Lease and continuing

TERM

FOR THE ...NANT TO HAVE AND TO HO. from the date ~~wharxxxhxxXXxahhk~~
~~opxxhxxaxxxxxhxhxxxnxxhxxxxxxxxxxxxxxxhxxxxxxhxxxhxxxxxxxxxhhxxxxxx~~ for an inicial term
and   1   months, terminating May 3, 2001  , unless*
of _____ 6 _____ years ~~haxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~anxxxxxxxxpphxxxhxxxxhxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxhxxhxxx~~
~~banxxxxxxxxxxhhxxxxxhxxxhxxhxprovided~~ *renewed as provided herein.

This lease is granted and accepted upon the foregoing and upon the following terms,
covenants, conditions and stipulations:

See attached page.

RENTAL

~~1. The Tenant agrees to pay to the Landlord as rental for the demised premises during the~~

~~term of this lease, and any extensions thereof, the sum of _____~~

~~_____ Dollars~~

~~($_____) per annum. The rental shall be paid in twelve (12) equal monthly~~

~~installments of _____~~

~~Dollars ($_____) per month, which installments shall be due and payable in~~
~~advance on the first day of each and every calendar month of the lease term, and any extensions~~
~~thereof. Rent for fractional years and fractional months at the beginning and end of the term~~
~~shall be prorated on the basis of the annual rate The first monthly payment of rent shall be~~
~~due on the first day of the next succeeding calendar month after the date the lease commences as~~
~~hereinafter provided, and shall include any rent due for the preceding fractional month.~~

CONSTRUCTION
OF
IMPROVEMENTS

~~2. The Landlord, at its sole cost and expense, shall diligently proceed to construct a store build-~~
~~ing, parking area, sidewalks, service area and other improvements for use and occupancy by~~
~~Tenant in conformity with the plans and specifications to be approved by both Landlord and~~
~~Tenant Said plans and specifications will be initialed by the parties hereto and when initialed~~
~~shall constitute a part of this lease Said plans and specifications shall provide for a complete~~
~~store building, commonly referred to as a "lock and key job," and shall include, but without~~
~~limitation, the following:~~

~~The Landlord, at its sole cost and expense, shall grade and pave the parking areas, together with~~
~~the sidewalks, driveways and service area, and shall provide proper and adequate water drainage~~
~~and lighting system and operations therefor.~~

CONSTRUCTION
PERIOD

~~3. The final plans and specifications for construction of Tenant's store building and other im-~~

~~provements provided for herein shall be approved by both parties on or before _____~~

~~_____ and in the event the parties shall not approve the final plans and specifications~~
~~to be evidenced by their initials thereon within said period, this lease shall be and become null~~
~~and void and of no further force and effect unless the parties hereto shall mutually agree in~~
~~writing to extend the period for approval of said plans and specifications.~~

SC-2

TERM ~~FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises~~ for the transaction of its business for an initial term of _____ years from the commencement date. The parties agree to ~~execute a supplemental~~ agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, con-~~ditions and stipulations.~~

RENTAL    1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of ___Four Hundred Thirty-five___

Thousand Six Hundred and 00/100 _____

Dollars ($_435,600.00_____) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of _Thirty Six Thousand Three Hundred and 00/100_____

Dollars ($_36,300.00_____) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which_ one and 25/100_ per cent (    1.25   %) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

*See below.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

***or sales from Ticket Master outlets;

DEFINITION    1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise
OF "GROSS    sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental
SALES"    tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

*Tenant shall also pay the sales tax which Landlord is required to collect from Tenant on all rentals to be paid hereunder by Tenant.  If any rental payment is not made when due, Tenant agrees to pay a late charge of One Percent (1%) per month on the amount of the delinquency, said late charge to continue each month as long as the delinquency exists.

** any (10) rent paid by the Provident Bank ("Provident") for its "Bank Mart" or any other successor to Provident, and/or any successor to the banking operation or the Bank mart space; and (11) any sales of services or any income received by Provident, or any successor to Provident or any successor operator of a banking operation in the Bank Mart space, from the operation of the

SC-3a

**RECORD OF SALES**
1b The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**
2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses).

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

FX-3

~~The Landlord covenants and agrees that the construction of the store building, parking area~~
and other improvements shall begin within _____ after the approval of the plans and specifications by the parties hereto and shall be completed and tendered

to the Tenant ready for occupancy within _____ from such date; that failing therein, the Tenant may, at its option, cancel and terminate this lease by delivering to the Landlord a writing evidencing its election to so terminate and the Tenant shall thereupon be relieved of and from all liability hereunder, provided, however, that if the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events

~~on or before~~ _____ ~~said option to terminate shall not arise.~~

COMMENCEMENT
DATE

4. ~~The Tenant shall open its store for business within thirty (30) days following completion~~
by the Landlord of the construction of the store building, parking area and other improvements
and delivery of same to the Tenant as herein provided; and rent shall begin to accrue hereunder
upon the date that the Tenant opens its store for business, or upon the expiration of thirty (30)
days following completion by the Landlord of the construction of the improvements and delivery
of same to the Tenant, whichever date shall sooner occur No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

UTILITIES

5. Tenant agrees to pay all charges for telephone, gas, electricity, water and all other utilities
used by Tenant on the premises, and the Landlord agrees to provide access to such utilities at
all times during the term of this lease

that except for reasonable wear and tear it will

TENANT'S
REPAIRS
including the
parking area,
sidewalks and
service areas,
and including
all

6. ~~Upon the acceptance of possession of the demised premises and thereafter~~ and exterior
~~XXX~~ Tenant agrees to keep the interior of the demised premises in good condition and repair,
~~excepting~~ structural repairs and all repairs ~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ to the windows,

*See attached page

LANDLORD'S
REPAIRS

~~XXX~~The ~~Landlord~~ shall ~~XXXXXXXXX~~ and except ~~XXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~and XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~including the windows and~~ plate glass, roof, gutters,downspouts, exterior painting, masonry
walls, foundation, ~~XXXXXXXXXXXXXXXXXX~~ the plumbing (including septic tank, if any),
electrical wiring, air conditioning and heating systems, and floor surfacing of the store building
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~

Insert to Section 6

*and including all replacements; provided that Tenant shall not be obligated to make structural repairs to the Building or replace the Building roof, repave or replace the parking areas, sidewalks or service areas, or replace air conditioning, heating systems, plumbing systems or electrical systems during the first two (2) years of the initial term and Landlord shall be responsible for these repairs and replacements during this two (2) year period; and further provided that Tenant shall not be obligated to make structural repairs to the Building, replace the Building roof, repave or replace the parking areas, sidewalks or service areas, or replace air conditioning, heating systems, plumbing systems or electrical systems during the final three (3) years of occupancy by Tenant, unless these repairs or replacements become necessary because of the failure of Tenant to properly maintain the item or system, and Landlord shall be responsible for replacement of these items and systems during the final three (3) years of occupancy by Tenant. It is presumed that the final three (3) years of occupancy shall mean the fifth (5th) extension period unless Tenant notifies Landlord during the first two (2) years of any of the first four (4) extension periods that it does not intend to extend this lease beyond the then current term. If Tenant gives such a notice during the first two years of any extension period, Tenant may thereafter exercise any remaining renewals as otherwise provided for in the lease so long as Tenant agrees to reimburse Landlord for any items or systems replaced by Landlord during such period. Tenant shall, however, make repairs to such items and systems during such period. Tenant acknowledges and agrees that this Lease shall be considered a "net lease" to Landlord and that Landlord is to have no obligation with respect to repair and maintenance of the demised premises, except as specifically set forth above.

<u>Landlord's Right to Cure Default</u>. In the event of default on the part of Tenant to make any repairs or replacements to the demised premises, or in the event of default on the part of Tenant to pay and discharge any of its other obligations under this Lease, Landlord may, at its option, after thirty (30) days prior written notice to Tenant, pay and discharge such obligations and any expenditures so made by Landlord, together with interest at Twelve Percent (12%) per annum, shall be due and payable by Tenant with the next installment of rent.

FS-A (Rev)

If in order to protect the Tenant's property in the demised premises it shall be necessary to make emergency repairs to any portion of the demised premises which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice in writing as above provided fails or neglects to make with all due diligence other repairs which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or incurred by it in making such repairs. Landlord further covenants that the demised premises will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules, or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

**FIXTURES AND ALTERATIONS**

8.  The Tenant, at its own expense, may from time to time during the term of this lease make any alterations, additions and improvements in, on and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install on and in said premises any and all signs, racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which signs, racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

**INDEMNIFICATION**

9.  The Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of accident or damage to any person or property happening on or about the demised premises, except in case of accident or damage caused by the fault or negligence of Landlord, its servants, agents or employees.

Further, Tenant will, at all times during the term of this Lease, comply with all applicable laws, rules, statutes, regulations and the like pertaining to the protection of the environment. Tenant shall indemnify and save Landlord harmless from any voilations by the Tenant of the foregoing that result in any release of hazardous materials or any contamination of the demised premises, occurring after the commencement date of this Lease. Notwithstanding the foregoing, Landlord shall, at Landlord's cost and expense, take necessary action required to remediate any and all contamination of the demised premises existing prior to the commencement date of this Lease. Landlord shall indemnify and save Tenant harmless from any violation of any applicable law, rule, statute, regulation and the like pertaining to the protection of the environment or any release of hazardous material and any contamination of the demised premises

**FIRE**

in any lease of the demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then either party may elect within thirty (30) days after such damage to terminate this lease by giving to the other a written

prior to the commencement date of this Lease

FI-5

Landlord

notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If the demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if neither party has elected to terminate as aforesaid, then the Tenant ~~Landlord~~ agrees to proceed promptly and without expense to the ~~Tenant~~ to repair the damage or restore the improvements ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
to substantially the same condition that existed prior to the occurrence, and there shall be no abatement of rental during reconstruction.

Tenant                    Landlord

/ ~~Landlord~~ agrees to carry fire and extended coverage insurance on the demised premises in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all rights against the ~~Tenant~~ for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the ~~Tenant~~, its agents, servants or employees.                                                              Landlord

**QUIET ENJOYMENT**

11. The Landlord covenants, warrants, and represents that upon commencement of the lease term, the demised premises will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.                                                              materially

The Landlord warrant the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business, including parking in conjunction therewith, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting the Tenant from conducting a general mercantile business, including parking in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES AND LIENS**

/ Tenant

12. All taxes, assessments, and charges on land or improvements ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ~~xxxxxxxxxxxxx~~ upon the premises shall be promptly paid by ~~xxxxxxxx~~ when due.*The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at ~~six~~ twelve per cent ~~(6%)~~ per annum.
(12%)

*All such taxes and assessments shall be prorated between Landlord and Tenant at the commencement and termination of this Lease to reflect equitably the period of Tenant's occupancy. Landlord will promptly pay all obligations secured by mortgage and other liens.

**CONDEMNATION**

13. If any part of the store building located on the demised premises be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, or in the event that any portion in excess of ___twenty___ per cent ( 20 %) of the overall parking area constructed for Tenant's use on the demised premises be so taken, or in the event that any portion of the demised premises (including parking area) be so taken so as to interfere materially or substantially with the conduct of Tenant's business in the demised premises, then in any such event, the Tenant shall be entitled to termination of this

FS-6

lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as above provided, or in the event of any taking which does not permit a termination by the Tenant, the Landlord shall promptly restore the premises to a condition comparable to the condition at the time of taking, and the lease shall continue, but Tenant shall be entitled to such ~~equitable~~ abatement of rent and other adjustments as shall be just and equitable under all circumstances. Tenant shall not be entitled to any part of any award made on account of such taking or appropriation. Tenant may make a separate claim for property owned by Tenant in the demised premises and for removal and relocation expenses.

**DEFAULT**   14. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable,* or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated from the Landlord ~~conspicuously~~ to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but the Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

*and the continuance of said default for a period of seven (7) days after Tenant shall have received written notice by certified or registered mail to pay such rent,

**BANKRUPTCY**   15. The Tenant further covenants and agrees that if, at any time, the Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease at an end and shall forthwith be entitled to immediate possession of the premises.

~~CONSTRUCTION~~   ~~16. It is understood and agreed that nothing herein contained shall constitute the Landlord as~~
**RISKS**   ~~the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the premises for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their subcontractors, employees, agents or servants by reason of Landlord constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify and save Tenant harmless from and against all claims and suits for damages to persons or property from defects in material or from the use of unskilled labor or from any negligence caused by Landlord, Landlord's contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements, or from any faulty construction thereof.~~

**EXCLUSIVE**   17. The Landlord agrees that, if it owns or controls any property located within five hundred
**SUPERMARKET**   (500) feet of the demised premises, it will not, without the written permission of the Tenant,

FS-7

directly or indirectly, lease or rent such property to any person, firm or corporation to be used for or occupied by any business dealing in or which shall keep in stock or sell any staple or fancy groceries, meats, fish, fruits, vegetables, dairy products, bakery goods, or frozen foods; nor will the Landlord permit any tenant of any such property to sublet in any manner, directly or indirectly, any such property to any person, firm or corporation to be used for or occupied by any business dealing in or which shall keep in stock or sell any of the above listed items.

**NUISANCES**   18  The Tenant agrees that the leased demised premises or any portion thereof shall not be used for any illegal or unlawful purpose, and that the Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon.

**DISCLAIMER OF LIABILITY**   Landlord shall not be liable for, and Tenant's obligations hereunder shall not be diminished because of, any loss to the person or property of Tenant by reason of its use and occupancy of the demised premises, and arising or caused by water leakage, plumbing defects, gas, electric wiring or snow and ice on the demised premises.

**EXTENSIONS**   19.  It is further agreed that Tenant, at its option, shall be entitled to the privilege of

_____Five_____ ( 5 ) successive extensions of this lease, each extension to be for a period of

_____Five_____ ( 5 ) years and on the same terms and conditions~~xxxxxxxxxxxxxxx~~

__ as applicable to the initial term. _____

_____

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in

writing at least _____six months_____ before the expiration of the initial term,

and if extended, at least _____six months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

**NOTICES**   20. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at, __4901 Hunt Road,_____

Cincinnati, Ohio  45242 _____._____

_____
or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by certified or registered mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to

the Tenant at __Post Office Box 17121, Louisville, Kentucky  40217-0121_____

__ or 720 Locust Lane, Louisville, Kentucky  40213-3604_____

or to such other address as Tenant may from time to time direct by written notice forwarded to Landlord by registered or certified mail.

FS-8

**END OF TENANCY**

21. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. With respect to alterations, additions or improvements made by Tenant to the demised premises, if the Landlord directs the removal of said additions, alterations or improvements, Tenant agrees to restore the demised premises to substantially the same condition as existed immediately prior to the making of said additions, alterations, or improvements, reasonable wear and tear excepted.

**ARBITRATION**

22. In the event there should arise any misunderstanding between the parties hereto as to the compliance with the terms and conditions of this lease upon the part of either of the parties hereto, or as to whether the premises tendered by the Landlord have been improved in substantial conformity with the plans and specifications approved by the parties, or as to whether either party has ground hereunder entitling it to terminate this lease, it is mutually agreed that such differences, if they cannot be satisfactorily adjusted between the parties hereto *within thirty* (30) days, shall be submitted to a single arbitrator, if the parties hereto agree upon one; otherwise, to a board of three arbitrators, of whom one shall be selected by each party within ten (10) days after such 30 day period, and a third person shall be selected by these two; and the decision and award of such single arbitrator if only one is used, or any two of such board, if three are used, as the case may be, shall be final and binding upon the said parties and their successors and assigns respectively, and shall have the same force and effect as though such decision had been handed down by a court of final jurisdiction Each of the parties hereto covenants to abide by any such arbitration decision.

**ASSIGNMENT**

23 The Tenant may without the consent of the Landlord assign or sublease or vacate the demised premises in whole or in part, provided, the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease

**SUBORDINATE**

24 The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument as may be required to effectuate such subordination: provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**BENEFIT**

25. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties.

FS-9

**SHORT FORM LEASE**  26. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**  27. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**  28. This written lease contains the complete agreement of the parties with reference to the leasing of said property, except plans and specifications of said building and improvements to be approved formally by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered in the presence of:

LANDLORD:

REGAL QUAD, INC., an Ohio corporation

BY: _____
    Print Name: _WALTER G DOTZ_
    Title: _V.P._

TENANT:

WINN-DIXIE LOUISVILLE, INC., a Florida corporation

By: _____
    Print Name: _R.P. McCook_
    Title: _V.P._

STATE OF OHIO )
: SS:
COUNTY OF HAMILTON )

BEFORE ME, the Subscriber, a Notary Public in and for said County and State, personally appeared Walter G. Dietz, Vice President of REGAL QUAD, INC., the corporation which executed the foregoing instrument, who acknowledged he did sign said instrument as such officer on behalf of said corporation, and by authority of its Board of Directors, and that the execution of said instrument is his free and voluntary act and deed individually and as such officer, and the free and voluntary act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunder subscribed my name and affixed my Notarial Seal this 25th day of March , 1995.

(Seal)

Notary Public
Name: RICHARD G VAUGHAN
Commission Number: Notary Public, State of Ohio
Commission Expiration Date: 1995

Personally Known ☐    OR    Produced Identification ☐

Type of Identification Produced _____


STATE OF FLORIDA )
: SS:
COUNTY OF DUVAL )

BEFORE ME, the Subscriber, a Notary Public in and for said County and State, personally appeared B.P. McCook, Vice President of WINN-DIXIE LOUISVILLE, INC., the corporation which executed the foregoing instrument, who acknowledged he did sign said instrument as such officer on behalf of said corporation, and by authority of its Board of Directors, and that the execution of said instrument is his free and voluntary act and deed individually and as such officer, and the free and voluntary act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunder subscribed my name and affixed my Notarial Seal this 22nd day of March , 1995.

(Seal)

JO ELLEN VAN CAMP
MY COMMISSION # CC 472700
EXPIRES. February 25, 1999
Bonded Thru Notary Public Underwriters

Notary Public
Name: _____
Commission Number: _____
Commission Expiration Date: _____

Personally Known ☒    OR    Produced Identification ☐

Type of Identification Produced _____

JAX-147113



The legal description for the demised premises is set forth on page 2 of Exhibit A.

Exhibit "A" - Page 1

EXHIBIT "A"

| | |
|---|---|
| Situated in | the City of Forest Park<br>Section 36, Town 3, Entire Range 1<br>Township of Forest Park<br>County of Hamilton<br>State of Ohio |
| Being a | part of the Grantors' 16.544 acre tract<br>as conveyed by the Forest Park Development<br>Corporation, |
| | and more particularly described as follows: |
| Beginning at | a point in the north right-of-way of<br>Waycross Road in the Grantors' southeast<br>corner common with the southeast corner of<br>Lot No. 49 in Part 2 of the Crossways<br>Industrial Park as recorded in Plat Book<br>224, Page 5, in the offices of the Hamilton<br>County Recorder, |
| Thence with | the Grantors' east line,<br>N 19° 46' 47" W, 507.00, feet to a point, |
| Thence thru | and across the Grantors' lots and lands, |
| | The following (6) courses and distances: |
| | (1)   S 70° 13' 13" W, 140.00 feet to a point,<br>(2)   S 19° 46' 47" E, 113.00 feet to a point,<br>(3)   S 70° 13' 13" W, 125.00 feet to a point,<br>(4)   N 19° 46' 47" W, 113.00 feet to a point,<br>(5)   S 70° 13' 13" W, 335.00 feet to a point,<br>(6)   S 15° 15' 23" E, 474.91 feet to a point<br>   in the north right-of-way of said<br>   Waycross Road, |
| Thence with | said right-of-way<br>N 74° 44' 37" E, 237.96 feet to a point in<br>said right-of-way tangent to a curve, |
| Thence | continuing in said right-of-way 395.52 feet<br>with the arc of said curve deflecting north<br>eastwardly at a radius of 5,010 feet, the<br>chord across which bears |
| | N 72° 28' 55" E, 395.42 feet to the place of<br>beginning in the Grantors' southeast corner; |
| Thus | enclosing 6.653 acres of land in the<br>Grantors' southeastern portion of the 16.544<br>acre tract. |

WAYCROSS    FIREPROOF

8-11-
102.Q

## DECLARATION OF RESTRICTIONS

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, the undersigned, REGAL QUAD, INC. an Ohio corporation, is the Owner of certain pieces, parcels and tracts of land located in the City of Forest Park, County of Hamilton and State of Ohio, said pieces, parcels or tracts of land being more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof (hereinafter called "Shopping Center"), within which there are two (2) proposed out parcels as shown on Exhibit B attached hereto and by this reference made a part hereof (hereinafter called "Out Parcels").

WHEREAS, the said Regal Quad, Inc (hereinafter called "Declarant") has entered into a lease with WINN-DIXIE LOUISVILLE, INC., a Florida corporation qualified to do business in the State of Ohio (hereinafter called "Winn-Dixie"), dated as of March 28, 1995, and under such lease the Declarant demised to Winn-Dixie a certain store building located on a parcel of land lying immediately adjacent and contiguous to the boundaries of the parcels of land hereinabove described, the legal description of which is attached hereto as Exhibit C and made a part hereof (hereinafter called the "Winn-Dixie Parcel"); and

WHEREAS, the remainder of the Shopping Center, exclusive of the Out Parcels and the Winn-Dixie Parcel will be developed by Declarant as part of its over-all development of the Shopping Center; and

WHEREAS, it is one of the principal inducements to Winn-Dixie to enter into said lease, and it is an essential part of the consideration of Winn-Dixie for the rentals to be paid under said lease that the parcels of land hereinabove described be restricted to only certain uses in order not to permit competition with the businesses to be carried on in the parcel of land on which the said Winn-Dixie store building is located.

NOW, THEREFORE, in consideration of the premises and the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable considerations, paid to Declarant by Winn-Dixie, the receipt and sufficiency of which is hereby acknowledged, Declarant, for itself and its successors and assigns, does hereby place the following restrictive covenants upon the said parcels of the land hereinabove described to run with the title to said land

1.    Any buildings which may be constructed on the Out Parcels shall not be allowed to exceed one story nor 22 feet in height nor shall exceed in building square footage 25% of the square footage of the respective parcels. Pending construction on the Out Parcels, the land shall be maintained as paved, or as grassed or landscaped area and kept free of weeds and debris. All other portions of the Out Parcels (hereinafter called "Out Parcel Common Facilities") shall be reserved only for use as a paved parking area with accompanying sidewalks, drives, entrances, and exits, together with any necessary appurtenances for such use, including, without limitation, paving, light standards, curbings, directional signs, utilities and drainage facilities and the like.

2.    Declarant does hereby establish and create for Winn-Dixie, its successors and assigns, and its employees, agents, suppliers, customers and invitees, a mutual, reciprocal and non-exclusive easement, right, license and privilege of passage and use, both pedestrian and automobile, and for utilities and drainage over, across and upon any and all portions of the Out Parcel Common Facilities and the Shopping Center Common Areas (later defined), for the purpose of ingress and/or egress, and the location, installation, construction, maintenance and repair of utility and drainage facilities; and all Out Parcel Common Facilities and Shopping Center Common Areas from time to time existing upon the Out Parcels and Shopping Center are hereby expressly reserved and set apart for such purpose or purposes. Nothing herein is intended to nor shall be construed to create any rights whatsoever for the benefit of the general public in the Out Parcels or the Shopping Center

3.    Declarant does hereby reserve, establish and create for the benefit of the Out Parcels and the Shopping Center, and the owners, tenants and occupants thereof, and their respective successors, assigns, employees, agents, suppliers, customers and invitees, a mutual,

HAMILTON COUNTY RECORDER'S OFFICE
Doc B:95 - 38042 Type: MT
Filed:03/28/1995 3:30:54 PM    $   38.00
Off.Rec.: 6718 1463 F  K22        B    394

reciprocal and non-exclusive easement, right, license and privilege of passage and use, both pedestrian and automobile, and for utilities and drainage over, across and upon any and all portions of the Winn-Dixie Parcel, excluding the area on which the store building is located, for the purpose of ingress and/or egress, and the location, installation, construction, maintenance and repair of utility and drainage facilities. Nothing herein is intended to nor shall be construed to create any rights whatsoever for the benefit of the general public in the Winn-Dixie Parcel.

4.    Declarant will construct the Shopping Center with additional building area, substantially as shown on Exhibit "B", consisting of all the buildings shown thereon, together with required ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "Shopping Center Common Areas." The arrangement and location of all driveways and parking areas within the Shopping Center shall at all times during the time of the lease, or any extension thereof, be maintained as shown on Exhibit B and shall not be changed without the written consent of Winn-Dixie. Notwithstanding the foregoing, Declarant shall, prior to developing the Out Parcels, provide to Winn-Dixie a proposed survey, plat and site plan for the Out Parcel showing all proposed improvements to be located thereon, together with a description of the proposed use of the Out Parcel. Winn-Dixie shall review the materials provided by Declarant within thirty (30) days after receipt and determine whether the proposed development and use of the Out Parcel is in compliance with this Declaration which determination and approval shall not be unreasonably withheld.

5.    Declarant hereby dedicates and grants to Winn-Dixie, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of the lease, or any extensions thereof, all the Shopping Center Common Areas as shown on Exhibit "B", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking, utilities, drainage and for ingress and egress between the demised premises and all other portions of the Shopping Center and the adjoining streets, alleys and sidewalks. Declarant hereby reserves for itself, its tenants and their respective employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of the lease, or any extensions thereof, all the Shopping Center Common Areas which are located on the Winn-Dixie Parcel, for parking, utilities, drainage, and for ingress and egress between all other portions of the Shopping Center and the Winn-Dixie Parcel and the adjoining streets, alleys and sidewalks.

6.    Declarant agrees to indemnify and save harmless Winn-Dixie from any claim or loss by reason of any accident or damage to any person or property happening on or about the Shopping Center Common Areas or Out Parcel Common Facilities, and Declarant further agrees to carry, at its expense, public liability insurance coverage on all such Shopping Center Common Areas and Out Parcel Common Facilities, with a contractual liability endorsement on the policy, issued by a company qualified to transact business in Ohio, stipulating limits of not less than $500,000 for an accident affecting any one person, and not less than $1,000,000 for an accident affecting more than one person, and $100,000 property damage.

7.    Declarant agrees that in its use of the Shopping Center parcel or the Out Parcels by way of an enlargement of the Shopping Center and in conjunction with the construction of any buildings or common areas thereon, it will maintain a ratio of at least 5.0 automobile parking spaces per 1,000 square feet of gross building area (including additional floor levels, but excluding mezzanines and double-deck store room and machine room areas) in the entire Shopping Center. Such parking areas as may be built on the Shopping Center shall be available for the non-exclusive, free of charge use of Winn-Dixie, its employees, agents, suppliers, customers and invitees.

8.    Declarant further covenants and agrees that it will not directly or indirectly sell, lease or rent any property located within the above-described parcels or within 1,000 feet of any exterior boundary thereof (except to Winn-Dixie) for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will Declarant permit any tenant or occupant of such property except Winn-Dixie to sublet in any manner, directly or indirectly, any part thereof to

2

any person, firm or corporation engaged in any such business without the prior written consent of Winn-Dixie; and Declarant also covenants and agrees not to permit or suffer any of such property (except that leased to Winn-Dixie) to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods or frozen foods without the prior written consent of Winn-Dixie, provided that if the sale of such products does not exceed ten percent (10%) of the total annual gross sales of any such business, then such a business operation will not be considered in violation of this covenant, unless such use is for a combination gasoline station - convenience store which use shall be prohibited.  Notwithstanding the foregoing, the sale by a drugstore located on said parcels of incidental food items for off-premises consumption in any area up to a maximum of 1,200 square feet of floor space shall not be a violation hereof.

or drive through or carry out sales of prepared foods by a restaurant Also, only retail and service shops and business and professional offices shall be allowed to operate on the Out Parcels and Shopping Center, it being intended that no spa, bowling alley, skating rink, bingo parlor, theater (either motion picture or legitimate) or health and recreational or entertainment-type activities shall be permitted thereon.

9.    These covenants and restrictions shall become effective on the date hereof and shall continue in effect for and during the term of said lease to Winn-Dixie and any extensions or renewals thereof, and said covenants and restrictions shall run with the title to the parcels of land hereinabove described and shall bind the successors and assigns of the Declarant.

10.    Said covenants and restrictions are declared to be expressly for the benefit of said Winn-Dixie, its successors and assigns, and Declarant, its successors and assigns, and all mortgagees of the premises demised to Winn-Dixie and shall be enforceable by any of them, as well as by Declarant, its successors and assigns, and shall not in anywise be released, terminated, cancelled or extended or otherwise changed, modified or amended without the express written consent of Winn-Dixie, its successors or assigns, and Declarant, its successors and assigns, but subject to such consent, Declarant expressly reserves the right to release, terminate, cancel, extend or otherwise change, modify, or amend said covenants and restrictions, and the exercise of such right shall be conclusively effected by the recordation of an instrument in writing duly executed by the appropriate parties in interest in the appropriate public records of Hamilton County, Ohio.

IN WITNESS WHEREOF, the Declarant has executed these presents this 27th day of March, 1995.

Signed, sealed and delivered
in the presence of:

_____

_Thomas E. Frum_____
As to Declarant

This instrument prepared by
Kenneth P Kreider

KEATING, MUETHING & KLEKAMP
1800 PROVIDENT TOWER
ONE EAST FOURTH STREET
CINCINNATI, OHIO 45202

REGAL QUAD, INC., an Ohio corporation

By: _Walter G. Dietz_____
Walter G. Dietz
Vice President

DECLARANT

3

STATE OF OHIO ) : SS:
COUNTY OF HAMILTON )

BEFORE ME, the Subscriber, a Notary Public in and for said County and State, personally appeared Walter G. Dietz, Vice President of REGAL QUAD, INC., the corporation which executed the foregoing instrument, who acknowledged he did sign said instrument as such officer on behalf of said corporation, and by authority of its Board of Directors, and that the execution of said instrument is his free and voluntary act and deed individually and as such officer, and the free and voluntary act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunder subscribed my name and affixed my Notarial Seal this 27ᵗʰ day of March, 1995.

(Seal)

Notary Public

Name: _____ KENNETH P. KREDEL, Attorney at Law
Notary Public, State of Ohio
Commission Number: _____ My Commission Has No Expiration Date
Commission Expiration Date: _____ Section 147.03

Personally Known ☒   OR   Produced Identification ☐

Type of Identification Produced _____

6718■1455

EXHIBIT A

Parcel 2:

Situated in    the City of Forest Park
               Section 36, Town 3, Entire Range 1
               Forest Park Township
               County of Hamilton
               State of Ohio

Beginning at   a point in the northwest corner of
               Lot No. 38 in Part 2 of the Crossways
               Industrial Park as recorded in Plat
               Book 224, Page 5, in the offices of
               the Hamilton County Recorder,

               said point being a westerly extension
               of the centerline of Schappelle Drive,
               a dedicated public right-of-way in said
               Industrial Park and recorded in Plat
               Book 223, Page 99, in the offices of
               said Recorder,

Thence with    the west lines of Lots 38 & 39, S 2° 43' 35"
               W, 479.38 feet to a point which is the place of
               beginning of the herein described tract;

               from this place of beginning,

Thence with    the west lines of Lots 39 & 49 in said Indus-
               trial Park the following two (2) courses and
               distances:

               1)  S 2° 43' 35" W, 60.00 feet to a point;

               2)  S 19° 46' 47" E, 529.65 feet to a point
                   in the north right-of-way of Waycross
                   Road as now improved, part of which is
                   described in Deed Book 3661, Page 622, in
                   the offices of said County Recorder,

Thence with    the north right-of-way of said Waycross Road
               the following two (2) courses and distances:

               1)  395.52 feet with the arc of a curve de-
                   flecting southwesterly at a radius of
                   5,010.00 feet, the chord across which
                   bears

- 2 -

S 72° 28' 55" W, 395.42 feet to a point
tangent to said curve,

2)  S 74° 44' 37" W, 411.50 feet to a point,

Thence thru    and across the Grantor's Lots and Lands the
following five (5) courses and distances:

1)  N 24° 15' 00" W, 120.00 feet to a point,

2)  S 65° 45' 00" W, 40.00 feet to a point,

3)  N 24° 15' 00" W, 103.33 feet to a point,

4)  N 60° 21' 00" W, 83.62 feet to a point,

5)  S 82° 59' 00" W, 189.00 feet to a point
in the east right-of-way line of
Hamilton Avenue (US 127)

Thence with    said right-of-way the following two (2) courses
and distances:

1)  24.08 feet with the arc of a curve deflect-
ing northeasterly at a radius of 908.75 feet,
the chord which bears

N 02° 05' 05" E, 24.08 feet to a point
tangent to said curve,

2)  N 02° 50' 37" E, 604.29 feet to a point,

Thence at    right angles thru and across the Grantor's Lots
and Lands

S 87° 09' 23" E, 956.49 feet to the place of
beginning in the west line of Lot 39 in the
Crossways Industrial Park;

Thus    enclosing 16.544 acres of land,

subject to, and together with, drainage and
utility easements and covenants of record.

EXHIBIT "C"

Situated in
the City of Forest Park
Section 36, Town 3, Entire Range 1
Township of Forest Park
County of Hamilton
State of Ohio

Being a
part of the Grantors' 16.544 acre tract
as conveyed by the Forest Park Development
Corporation,

and more particularly described as follows:

Beginning at
a point in the north right-of-way of
Waycross Road in the Grantors' southeast
corner common with the southeast corner of
Lot No. 49 in Part 2 of the Crossways
Industrial Park as recorded in Plat Book
224, Page 5, in the offices of the Hamilton
County Recorder,

Thence with
the Grantors' east line,
N 19° 46' 47" W, 507.00, feet to a point,

Thence thru
and across the Grantors' lots and lands,

The following (6) courses and distances:

(1)  S 70° 13' 13" W, 140.00 feet to a point,
(2)  S 19° 46' 47" E, 113.00 feet to a point,
(3)  S 70° 13' 13" W, 125.00 feet to a point,
(4)  N 19° 46' 47" W, 113.00 feet to a point,
(5)  S 70° 13' 13" W, 335.00 feet to a point,
(6)  S 15° 15' 23" E, 474.91 feet to a point
     in the north right-of-way of said
     Waycross Road,

Thence with
said right-of-way
N 74° 44' 37" E, 237.96 feet to a point in
said right-of-way tangent to a curve,

Thence
continuing in said right-of-way 395.52 feet
with the arc of said curve deflecting north
eastwardly at a radius of 5,010 feet, the
chord across which bears

N 72° 28' 55" E, 395.42 feet to the place of
beginning in the Grantors' southeast corner;

Thus
enclosing 6.653 acres of land in the
Grantors' southeastern portion of the 16.544
acre tract.

67188.1470