# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

WINN-DIXIE STORES, INC., et al.,

          Debtors.

_____/

Case No.:  3:05-bk-03817-JAF

Chapter 11

Jointly Administered

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court upon Winn-Dixie Stores, Inc. and Affiliated

Debtors' ("Debtors")[1] Joint Plan of Reorganization (the "Plan") and related Disclosure

Statement (the "Disclosure Statement") filed on June 29, 2006.  Debtors filed their

petitions for relief on February 21, 2005 (the "Petition Date").  On August 2, 2006,

Debtors filed a Second Proposed Disclosure Statement and Second Proposed Plan.  On

August 4, 2006, the Court entered an order approving the Disclosure Statement as

containing adequate information within the meaning of Bankruptcy Code section

1125(a).  On August 9, 2006, Debtors filed their Final Plan of Reorganization and

Disclosure Statement.

Following the hearing to approve the Disclosure Statement held on August 4,

2006 (the "Disclosure Statement Hearing"), the Court entered an order, among other

things, (i) determining the dates, procedures, and forms applicable to the solicitation

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

process, (ii) establishing tabulation procedures, and (iii) establishing the objection

deadline and scheduling the hearing to consider confirmation of the Plan (the

"Solicitation Procedures Order"). As set forth in the certifications of Kathleen M. Logan,

the President and CEO of Logan & Company, Inc. ("Logan"), Debtors' solicitation and

tabulation agent, the confirmation hearing notice, the Disclosure Statement, the Plan,

Debtors' and the Creditors Committee's approved solicitation letters, and the appropriate

ballots (or, in the case of non-voting holders of claims or non-voting Classes, the

appropriate notice) (collectively, the "Solicitation Package") were transmitted to all

holders of Claims in Classes that will receive distributions under the Plan, and holders of

Claims and Interests in Classes 18 through 21 were mailed a notice of deemed rejecting

status as required by the Solicitation Procedures Order. Debtors filed with the Court the

Plan Supplement, dated October 3, 2006, containing certain documents and other

information related to the Plan, as provided in Section 12.18 of the Plan.

On October 9, 2006, Debtors filed the declaration of Kathleen M. Logan

certifying the results of the ballot and master ballot tabulation for the Classes of Claims

voting to accept or reject the Plan, and on October 12, 2006, Debtors filed the amended

declaration of Kathleen M. Logan (the "Logan Tabulation Declaration") certifying the

results of the ballot and master ballot tabulation. On October 10, 2006, Debtors filed

their Memorandum in Response to Objections to Confirmation of Joint Plan of

Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Confirmation

Memorandum"). The objections to confirmation were voluminous, but the Court is

consolidating those objections into seven categories: 1) the Objecting Landlords'

Objections to Consolidation;[2] 2) the United States' Objections;[3] 3) the Insurance

Proceeds Proceeding;[4] 4) the Class 10 Claims' Objections;[5] 5) the Florida Tax Collectors'

Objections;[6] 6) the United States Trustee's Objections;[7] and 7) the Shareholders'

Objections.[8]  A confirmation hearing was held on October 13, 2006 (the "Confirmation

Hearing") to consider confirmation of the Plan.  Based upon the number of objections,

the Court will address each objection category in turn.  Upon the evidence presented at

the hearings, the Court makes the following Findings of Fact and Conclusions of Law.

---

[2] Objections filed by Bank of America as Trustee of Betty Holland, et. al. (Docket No. 11312), CWCapital Asset Management, LLC as successor-in-interest to CRIMMI MAE Services Limited Partnership (Docket No. 11313), Liquidity Solutions, Inc. (Docket No. 11314), Saran, Ltd. (Docket No. 11315), ORIX Capital Markets, LLC (Docket No. 11319), Knightsdale Crossing, LLC (Docket No. 11320), Daniel G. Kamin, et. al. (Docket No. 11332), and Merrill Lynch LP Holdings, Inc. (Docket No. 11431)(filed untimely) (collectively, the "Objecting Landlords").

[3] Objection to Confirmation filed by the United States of America as creditor.  (Docket No. 11302.)

[4] Objection to Confirmation filed by Creditor Bundy New Orleans Co., LLC.  (Docket No. 11303.)

[5] Objections filed by Kentucky Department of Revenue (Docket No. 11305), Mike Hogan Tax Collector for Duval County, Florida (Docket No. 11307), Forrest County, Mississippi, et. al. (Docket No. 11323), Tax Commissioner of Bulloch County, Georgia (Docket No. 11326), Harrison County, Mississippi (Docket No. 11327), and Muscogee County (Georgia) Tax Commissioner (Docket No. 11328), and the Florida Tax Collectors (collectively, the "Objecting Class 10 Claimants").

[6] Objection to Confirmation filed by Florida Tax Collectors, which consist of the tax collectors for each of the following counties within the State of Florida: Alachua, Baker, Bay, Bradford, Brevard, Broward, Charlotte, Citrus, Clay, Collier, Columbia, DeSoto, Duval, Escambia, Flagler, Gadsden, Hardee, Hendry, Hernando, Highlands, Hillsborough, Indian River, Jackson, Jefferson, Lake, Lee, Leon, Levy, Madison, Manatee, Marion, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Volusia, Wakulla, and Walton (collectively, "Florida Tax Collectors").  (Docket No. 11310.)

[7] Objection to Confirmation filed by United States Trustee – JAX.  (Docket No. 11318.)

[8] Objections filed by Ronnie Wilson (Docket No. 8988), Sarah H. Box (Docket No. 9913), Charles E. Armstrong, Jr. (Docket No. 10416), Frances A. Rogers (Docket No. 10516), Jose C. Hernandez (Docket No. 10621), Ronald G. and Carlotta W. Walsingham (Docket No. 10623), Geraldine D. Parker and William Parker (Docket No. 10634), Robert Vaughn, Jr. (Docket No. 10695), Lee Ricciardi (Docket No. 10717), Wesley E. McCall (Docket No. 10855), Matthew and Jessie M. Williams (Docket No. 10884), Sandra Jones (Docket No. 10915), Barbara L. Hart (Docket No. 11082), Cesar Garcia (Docket No. 11119), Louise Brannon (Docket No. 11262), Deborah Tindel Cheney (Docket No. 11263), Janet Bourland (Docket No. 11266), Doris Baumgardner (Docket No. 11397), Bridget Boaz (Docket No. 11399), and Joseph Tomazin

## I.      OBJECTING LANDLORDS' OBJECTIONS TO CONSOLIDATION

According to § 1129(a)(1) of the Bankruptcy Code, the Court "shall confirm a plan only if . . . [t]he plan complies with all of the provisions of" the Code. 11 U.S.C. § 1129(a)(1) (2005). The Objecting Landlords argue that the Court cannot confirm Debtors' Plan because the provisions regarding Class 13, the Landlord Class, cause the Plan to be inconsistent with § 1123(a)(4). Section 1123(a)(4) states that a plan "shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest . . . ." 11 U.S.C. § 1123(a)(4) (2005). The Court believes the argument proffered by the Objecting Landlords is a valid argument, yet the weight of the evidence adduced in the record frustrates the Court's ability to agree with the Objecting Landlords. To elucidate, the Court will address each relevant issue in turn.

### A.      Application of § 1123(a)(4) to Claims of Objecting Landlords

Following the Petition Date, Debtors began restructuring so as to cut costs and increase profitability through their "footprint process", which reduced their store footprint and generally improved their business operations. (Disclosure Statement at 41-42.) After this "footprint process" was substantially completed, Debtors attempted to formulate a consensual plan of reorganization by creating a business plan in November 2005. (Mem. of Law of Official Committee of Unsecured Creditors (A) in Support of Confirmation and (B) Joining in Debtors' Response to Objections to Confirmation at 6.) It became apparent during these negotiations that the decision whether to substantively

---

(Docket No. 11383). Sarah H. Box, however, was the only shareholder to appear and object at the Confirmation Hearing.

consolidate was a pivotal issue, one that materially divided the creditors.[9]  As a result,

Debtors requested that the Official Committee of Unsecured Creditors ("Creditors

Committee"), which includes representatives of the landlords, trade creditors, and

bondholders, settle the issue as successfully as possible with the ad hoc trade and retiree

committees.  (Disclosure Statement at 48-50.)

Debtors' Plan provides for a settlement of issues relating to the substantive

consolidation of the Debtors' estates (the "Substantive Consolidation Compromise").  (Id.

at 51-56.)  To settle the issue of whether the estates should be consolidated, the Plan

provides for different distributions to holders of Noteholder Claims (Class 12), Landlord

Claims (Class 13), Vendor/Supplier Claims (Class 14), Retirement Plan Claims (Class

15), and Other Unsecured Claims (Class 16).  The Substantive Consolidation

Compromise was reached after extensive factual and legal analysis by the Debtors, the

Creditors Committee, the Indenture Trustee, the Ad Hoc Vendors' Committee, the Ad

Hoc Retirees' Committee, and other interested parties.

The Objecting Landlords assert that because of this compromise, they are not

receiving the same treatment as other members of Class 13 as required by § 1123(a)(4).

To support their argument, the Objecting Landlords reference In re AOV Indus., Inc., 792

F.2d 1140 (D.C. Cir. 1986).  The proposition upon which the Objecting Landlords rely in

AOV Indus. is that members of a class must not receive disparate treatment.  Specifically,

the court states that

---

[9] The Court became aware of how hotly contested the issue was when the Ad Hoc Trade Committee filed a Motion to Substantively Consolidate (Docket No. 7763) concurrently with a Motion to File Documents in Support of Its Motion to Substantively Consolidate Under Seal (Docket No. 7765) on May 11, 2006.  The Court scheduled a hearing for these motions to be held on June 1, 2006.  (Docket No. 8005.)  Various creditors filed objections to these motions, and Debtors themselves objected.  (See Resp. to and Req. to Abate the Ad Hoc Trade Committee's Mot. to Consolidate, Docket No. 8427.)  The hearing was continued

the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration – be it their claim against specific property of the debtor or some other cognizable chose in action – in exchange for the same percentage of recovery.

AOV Indus., 792 F.2d at 1152.

The facts in AOV Indus. are quite voluminous, but the pertinent events are as follows. AOV was a conglomeration of coal mining, processing, exporting and trading companies. Id. at 1142. Hawley Fuel Coalmart and Hawley Fuel Coal (collectively, "Hawley") supplied an AOV subsidiary with a considerable amount of coal on credit, thereby becoming a creditor of AOV when it filed for bankruptcy. Id. at 1141 and 1142. Hawley sued AOV in district court based upon an alleged pre-bankruptcy communication sent by Steag Handel GmbH ("Steag"), a company which acted exclusively as AOV's overseas marketing agent, which stated that Steag guaranteed payment in full to Hawley if it continued to supply coal to AOV and its subsidiaries. Id. at 1142. Hawley won a jury verdict for the full amount of its claim, but the district court granted Steag's motion for judgment notwithstanding the verdict. Id.

The plan proposed by AOV involved release provisions which required unsecured creditors to release all claims against Steag and the 50% owner of AOV, H.C. Sleigh, Ltd. ("Sleigh"), in order to receive their pro rata share. Id. at 1143. Furthermore, the plan propounded that none of the money would be made available to anyone without the releases from all save for a few select creditors, one of whom was Hawley. Id. As a

---

until June 15, 2006, when counsel for Debtors announced that the issue had been resolved and that the Ad Hoc Trade Committee would not proceed with its motions.

result, Hawley's release of its claim was not necessary for the plan to take effect, but it was necessary for Hawley to receive its pro rata share. Id. Roughly 90% of the creditors in each of the classes voted to accept the plan. Id.

These events formed the basis for the AOV Indus. court to find that Hawley was being subjected to unequal treatment in violation of § 1123(a)(4). Id. at 1152. While the court did not state that Hawley in fact had a guarantee against Steag, the court found that Hawley's release of its direct claim in order to participate in the plan was disparate treatment from the other members in its class. Id. In its rationale, the court found that two other creditors received similar communications from Steag which guaranteed their debts. Id. The disclosure statement reported that these other creditors received additional consideration for settling lawsuits the creditors had against Steag. Id. Therefore, Hawley's requisite release of its alleged guarantee against Steag in order to participate in the plan was unequal in comparison to the other creditors with similar claims. Id. at 1153. In so finding, however, the AOV Indus. court cautioned that it was not trailblazing new law. Instead, the court stated that

> we do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court's broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others. We simply find that on these facts, it is unfair to require a creditor to pay a higher price for the same benefit.

Id. at 1154.

Although the Court is not bound by this case, it finds the rationale persuasive. However, the facts before the Court differ immensely from those that were before the AOV Indus. court, and, therefore, a similar holding would be inapposite. The Creditors

Committee argues, and the Court agrees, that while the landlords without guarantees are receiving the same pro rata share that the landlords with guarantees are receiving, this is due to the Substantive Consolidation Compromise. (Joinder of Official Committee of Unsecured Creditors to Debtors' Mem. of Law in Resp. to Post Hearing Brief of Objecting Landlords at ¶ 3.) In essence, those landlords without guarantees would have generally preferred substantive consolidation so as to increase their pro rata share. Those landlords with guarantees, contrarily, would prefer to keep both of their claims so as to maximize their share. As a result, the Objecting Landlords are not receiving disparate treatment in violation of § 1123(a)(4) because both parties had to give up something in exchange for their share: the landlords without guarantees had to forego pursuit of a possible substantive consolidation, and the landlords with guarantees had to abandon their guarantee claims.[10] Given that there was only one creditor that was affected in AOV Indus., and that single creditor had to relinquish a potential guarantee claim while two similarly-situated creditors received compensation, the Court is satisfied that the persuasiveness of AOV Indus. is undercut. The Objecting Landlords are not receiving unequal treatment in violation of § 1123(a)(4).

Moreover, the Court is reticent to agree with the Objecting Landlords given the opportunity they had to review the financial documents that the Creditors Committee utilized in developing the Substantive Consolidation Compromise. At the August 4, 2006 hearing on the adequacy of the Disclosure Statement, the Objecting Landlords (among other creditors) challenged the Disclosure Statement for failure to comply with § 1125(a) in that it lacked adequate information. (See, e.g., Docket No. 9468.) To wit, the

---

[10] It is for this same reason that the Plan does not violate 11 U.S.C. § 1129(b)(1), which requires that the plan not discriminate unfairly between classes of claims or interests.

Objecting Landlords argued that they were not privy to the settlement negotiations and thus were unable to agree that the Substantive Consolidation Compromise was indeed fair to all parties. The Court, in order to avail all interested parties of the information used to create the Substantive Consolidation Compromise, forced Debtors and the Creditors Committee to comply with discovery requests in exchange for applicable confidentiality agreements. Because the Objecting Landlords never apprised the Court that such discovery requests were not fulfilled, the Court must infer that the Objecting Landlords had access to the financial information. Despite their review of such documents, however, the Objecting Landlords chose not to present any evidence to the Court that the Substantive Consolidation Compromise was in fact unfair. Furthermore, having been furnished with these models of potential recovery with or without consolidation, the Objecting Landlords did not file a Motion to Reclassify their claims. To the contrary, the Objecting Landlords candidly admitted at the Confirmation Hearing that they liked the way they were classified. (Tr. Vol. II at 248, lines 16-23.)[11] It was their burden to prove to the Court that they were receiving disparate treatment in violation of § 1123(a)(4), and the Objecting Landlords simply failed to meet that burden. As a result, the Court finds Debtors' Plan is in compliance with § 1123(a)(4).

**B.**     **Effect of Settlement on Objecting Landlords' Claims**

The Substantive Consolidation Compromise was a settlement that was reached between the various unsecured creditors and Debtors. In bolstering their assertion that

---

[11] It is for precisely this reason that the Court will not address the Objecting Landlords' argument that the Plan's classification of the Class 13 claims is impermissible. The Objecting Landlords argue that Debtors do not provide a rational basis for classifying the landlords with guarantee claims with the landlords without guarantee claims. (Joint Objection of [Objecting Landlords] to the Debtors' Plan of Reorganization at 11-12.) The Objecting Landlords never filed a motion for reclassification and, as aforementioned, candidly admitted they preferred this classification scheme. They cannot now argue that the classification scheme is impermissible.

the Creditors Committee and Debtors cannot settle away their rights, the Objecting

Landlords rely on U.S. ex. rel. Rahman v. Oncology Assocs., P.C., 269 B.R. 139 (D. Md.

2001). Rahman involved a False Claims Act brought by the United States against some

physicians specializing in radiation oncology and the more than 80 healthcare entities

they owned, operated or controlled. Id. at 143. Allegedly, the physicians and their

service providers engaged in fraudulent billing schemes, thereby depriving the

government's Medicare and Champus programs of over $12 million in revenues. Id. at

144. As a result, the United States was seeking over $86 million in penalties and treble

damages against the defendants. Thereafter, certain creditors filed an involuntary petition

for relief under Chapter 7 with respect to one of the service provider defendants,

EquiMed, Inc. ("EquiMed"). Id. Pending in that bankruptcy case was an action brought

by EquiMed, one of the physician defendants, Dr. Douglas Colkitt ("Colkitt"), Id. at 143,

and others seeking coverage from two insurance providers ("Coverage Action"). Id. at

146-47. At some point the trustee entered into a settlement with the two insurance

providers and moved the court for approval of the settlement ("Insurance Settlement").

Id. at 147. The reference was withdrawn as to that approval, yet the insurance providers

urged the court to grant the motion for approval of the settlement. Id. at 158.

　　　In denying the motion for approval of the settlement, the Rahman court noted that

the Insurance Settlement conflicted with a separate major settlement involving

approximately fourteen parties, one of whom was Colkitt, who participated in the other

settlement but did not participate in the Insurance Settlement. Id. at 158, 145. As a

result, the Rahman court could only approve one of the two settlements, as to grant the

motion to approve the Insurance Settlement would inherently cause denial of the other.

Id. at 159.  The basis of the Coverage Action was that the insurance providers afforded

liability coverage to directors and officers of the service providers.  Id.  The major

dispute in the Coverage Action was that the insurance providers denied coverage to

Colkitt and also sought to rescind the policies extended to EquiMed because of alleged

material misrepresentations in the applications for coverage.  Id.  The Insurance

Settlement resulted in $1.3 million to the bankruptcy estate in exchange for the

extinguishment of the claim of Colkitt and other officers and directors.  Id.  The trustee

sought to withdraw from the Insurance Settlement based upon his belief that the other

settlement was more beneficial to the estate.  Id.

  In considering the validity of the Insurance Settlement, the Rahman court stated

that a court "cannot uphold 'an impairment of rights accomplished in violation of

applicable legal rules.'"  Id. at 160 (quoting In re Joint E. & S. Dist. Asbestos Litig., 982

F.2d 721, 750 (2d Cir. 1992)).  The Rahman court held that the policies provided by the

insurance providers to shield the officers and directors from liability belonged to the

officers and directors themselves, not to the bankruptcy estate.  Id.  "Since rights under

the policies may belong to the officers and directors and not to EquiMed, the Trustee was

not entitled to bargain away those rights in return for a payment to the estate from the

insurers."  Id.  Furthermore, the Rahman court stated that "Colkitt and the other officers

and directors were not parties to the Insurance Settlement and were not compensated in

any way for the extinguishment of their rights . . . ."  Id.

  The Rahman case is not binding precedent, but the Court indulged in the above

synopsis to demonstrate the inapplicability of the Rahman holding to the facts before the

Court.  Whether the Objecting Landlords agree with the Substantive Consolidation

Compromise or not, their interests <u>were</u> represented during the exhaustive negotiations between the various unsecured creditors. There were two landlord representatives on the Creditors Committee, one with a guarantee claim and one without. As a result, the Objecting Landlords' interests were taken into account during the negotiations.[12] With respect to the <u>Rahman</u> decision, the officers and directors were third parties who had no voice during the negotiations between the trustee and the insurance providers. In addition, Colkitt had interests that were not only adverse to the insurance providers, but were also surely antagonistic to the best interests of the bankruptcy estate. These two factors alone differentiate the holding in <u>Rahman</u> from the case currently before the Court. The Creditors Committee negotiated on behalf of <u>all</u> unsecured creditors within the defined classes.[13] While the Objecting Landlords do not agree with that compromise, they cannot now claim that their rights were settled away without their consent, especially considering that they had the opportunity to view the models and financial documents utilized in procuring the settlement agreement.

Consequently, Eleventh Circuit precedent dictates that every affected creditor need not consent to a settlement for it to be binding on all creditors. The Eleventh Circuit merely lists several factors that a bankruptcy court must take into account in determining whether to approve a settlement. In <u>Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II,</u>

---

[12] <u>See</u> <u>Mirant Americas Energy Marketing, L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.</u>, No. 02 Civ. 6274 (GBD), 2003 WL 22327118, at *7, 2003 U.S. Dist. LEXIS 18149, at *22-24 (S.D.N.Y. October 10, 2003) ("[C]reditors committees often contain creditors having a variety of viewpoints. . . . Such conflicts are not unusual in reorganization. Indeed, they are inherent in all bankruptcy cases, and inevitable in complex cases . . . . Yet, despite the likely conflicts, and in recognition of the greater efficiencies achieved, jointly administered cases with a single creditors' committee is commonplace. Often single committees represent what can be characterized as different 'classes' of unsecured creditors. Bankruptcy Courts have recognized that – at least prior to submission of a reorganization plan – creditors possessing claims with significantly different characteristics nonetheless continue to possess greater commonality as unsecured creditors.") (internal quotations and citations omitted).
[13] "It is well settled that a creditors' committee owes a fiduciary obligation to its constituency." <u>Mirant Americas</u>, 2003 WL 22327118, at *4, 2003 U.S. Dist. LEXIS 18149, at *15 (citations omitted).

Ltd.), 898 F.2d 1544 (11th Cir. 1990), cert. denied, 498 U.S. 959 (1990), the Eleventh

Circuit stated that a court must consider four factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Id. at 1549 (citations omitted).  As a result, "[w]hile the desires of the creditors are not

binding, a court should carefully consider the wishes of the majority of the creditors."

Romagosa v. Thomas, No. 06-cv-301-Orl-19JGG, 2006 U.S. Dist. LEXIS 50629, at *19,

2006 WL 2085461, slip op. at *5 (M.D. Fla. July 25, 2006) (citation omitted).

     The Court notes that of 421 holders of landlord claims, 324 holders accepted the

Plan while 97 holders rejected it.  (Debtors' Ex. 5 at 5.)  That means roughly 23% of

landlords rejected the Plan, while approximately 77% (~ 76.96%) in that class voted to

accept the Plan.  (Id. at 6.)  Those accepting constituted $180,965,273.11 of the amount

held by the landlord class (Id. at 5), or 82.46% of the amount held.  (Id. at 6.)

Furthermore, only 12 landlords with guarantee claims filed formal objections to

confirmation of the Plan.  As a result, the majority of the landlord class voted to accept

the Plan.  The Court opines that the paramount interests of the creditors, even within the

subset of landlords, is that the Substantive Consolidation Compromise is a better

alternative than forcing impending litigation.

     If this case were to proceed to litigation, witnesses testified that the protracted

litigation could wipe out the estate.  Therefore, the probability of success would be next

to nil, from either perspective.  If the Court denied the settlement and the parties filed a

motion for substantive consolidation which the Court then decided to grant, the estate

would be reduced to going-concern value plus whatever is left in the estate after paying attorney's fees and other expenses consonant with litigation. If the Court denied the settlement and the parties filed a motion for substantive consolidation which the Court then denied, the estate would still be decimated due to litigation costs and fees. Therefore, there would be little probability of success if this case continued to litigation.

Next, if the Court denied confirmation based upon the Substantive Consolidation Compromise, the creditors would be faced with the Sisyphean task of attempting to collect any percentage of their claims. After fees and costs, the going-concern value of the estate may cover all of the administrative claims and secured claims the Debtors would be required to pay. It may not. In the Court's reasonable judgment, it is most apparent that the unsecured creditors, namely, the Objecting Landlords, would face much difficulty in their collection efforts.

With respect to the complexity of the litigation, if the Court were forced to decide substantive consolidation, the Court would have to consider much testimony from the individual creditors to determine whether they obtained their guarantees from the subsidiaries or the parent company, and if the parent company, which one. After days, possibly weeks, of testimony and other evidence, the Court would also have to consider the possibility that the Debtors' operations may be so hopelessly intermingled that substantive consolidation would be the only choice. Again, this would have to be proven with extensive evidence.[14] As a result, due to the complexity of the case, the expense,

---

[14] See, e.g., In re Worldcom, No. 02-12533, 2003 Bankr. LEXIS 1401, at *133, 2003 WL 23861928, at *45 (Bankr. S.D.N.Y. October 31, 2003) ("Litigation of the issues resolved by the [substantive consolidation settlement] would be highly fact-intensive, complex and protracted, involving expert analyses and detailed testimony regarding the extent of the [debtors'] accounting and operational entanglement, including complex issues attendant to [many] . . . intercompany claims . . . , as well as evidence of the extent to which each holder of [a claim] that opposes substantive consolidation relied upon the separate legal identity of [the debtor] when it extended credit . . . .") (internal citations omitted).

inconvenience and delay to the estate and the creditors, the litigation would be so inhibitive as to make the Substantive Consolidation Compromise a vastly more appropriate option.

Thus, the Justice Oaks factors lead the Court to conclude that the Substantive Consolidation Compromise should be approved. Bankruptcy Rule 9019(a) allows the Court to approve a compromise or settlement, Fed. R. Bankr. P. 9019(a) (2005), and § 1123(b)(3)(A) of the Code permits a plan to incorporate a settlement. 11 U.S.C. § 1123(b)(3)(A) (2005). Besides utilizing the Justice Oaks factors as guidance, a court must also ensure that "the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate." In re Gallagher, 283 B.R. 342, 346 (Bankr. M.D. Fla. 2002) (citation omitted). The Objecting Landlords had sufficient representation during the negotiations for the Substantive Consolidation Compromise, so their rights were not settled away. They may not consent to the compromise, but all parties had to participate in the give-and-take accordant with settlement. The result may not be just in their opinion, but the Court concludes that the Substantive Consolidation Compromise embodied in Debtors' Plan is fair and equitable and in the best interests of Debtors' estate.

## C.    Application of Owens Corning and "Deemed" Consolidation

The Objecting Landlords' final argument states that Debtors' Plan incorporates a "deemed" consolidation. Advancing the recent Third Circuit decision In re Owens Corning, 419 F.3d 195 (3d Cir. 2005), the Objecting Landlords contend that the consolidation is inequitable and therefore cannot be approved. In Owens Corning, a syndicate of banks extended $2 billion in unsecured loans to Owens Corning, a Delaware

corporation, and a few of its subsidiaries. Id. at 199. In extending such financing, the

banks included direct guarantee claims against the guarantors in the event of default. Id.

at 201. These guarantees were "credit enhancements" to protect the banks' interests in

their $2 billion loan. Id. Subsumed within the loan agreement was specific language

limiting Owens Corning's operations with its subsidiaries. Namely, the subsidiaries were

directed to remain separate entities from Owens Corning. Id.

Although Owens Corning attempted to regain footing as a result of this loan,

inevitably it had to file for reorganization under Chapter 11. Id. at 201-02. The plan it

submitted to the bankruptcy court was a "deemed" consolidation, wherein for purposes of

valuing and satisfying creditor claims the subsidiaries were to be considered

consolidated. Id. at 202. For all other purposes, however, Owens Corning and its

subsidiaries would not merge nor commingle their assets. In addition, all guarantees

would be eliminated, thereby extinguishing the guarantees obtained by the banks when

they extended their financing. Id. In anticipation of submitting the plan, the plan

proponents filed a motion for consolidation to be ruled upon by the bankruptcy court. Id.

at 202 n.6.

While the Third Circuit found many reasons that the bankruptcy court and district

court erred in granting the motion for consolidation, the court stated that

> the flaw most fatal to the Plan Proponents' proposal is that
> the consolidation sought was "deemed" (i.e., a pretend
> consolidation for all but the Banks). If Debtors' corporate
> and financial structure was such a sham before the filing of
> the motion to consolidation, then how is it that post the
> Plan's effective date this structure stays largely
> undisturbed, with the Debtors reaping all the liability-
> limiting, tax and regulatory benefits achieved by forming
> subsidiaries in the first place? In effect, the Plan
> Proponents seek to remake substantive consolidation not as

> a remedy, but rather a stratagem to "deem" separate resources reallocated to [Owens Corning] to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

Id. at 216. Essentially, the plan proposed by Owens Corning would undo the bargain the banks had that other creditors of Owens Corning did not have. Id. at 212. The Third Circuit articulated that

> [n]o principled, or even plausible, reason exists to undo [Owens Corning's] and the Banks' arms-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit – a $ 2 billion loan unsecured by [Owens Corning] and guaranteed by others only in part. To overturn this bargain, set in place by [Owens Corning's] own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

Id. at 216.

The Court is impressed by the Third Circuit's decision and finds its exposition very persuasive. However, the issue presented in Owens Corning is not currently before the Court. First, Debtors have not sought "deemed" consolidation or even substantive consolidation, unlike the case in Owens Corning.[15] What is before the Court is a Plan wherein certain provisions regarding the unsecured creditors incorporate a settlement which touches on events consistent with consolidation. Normally unsecured creditors are not divided into separate classes, but the creditors divided themselves up due to their varying interests, not for the purpose of gerrymandering of votes. As aforementioned, the Ad Hoc Committee of Trade Creditors had filed a motion for substantive consolidation.

---

[15] The Court is in no way ruling on the propriety of "deemed" consolidation. It is the opinion of the Court that such "deemed" consolidation can be equated with a company being slightly liquidated, or a person being somewhat bankrupt. Similarly, consolidation is an either-or scenario. There is no middle ground.

But based upon the overwhelming agreement of the parties, they determined that substantive consolidation would not be prudent and reached a compromise.[16]

Thus, what is before the Court is an agreement reached between the parties. As the Court has already noted, this compromise is fair and equitable and in the best interests of the estate. The Objecting Landlords had adequate representation with the Creditors Committee. This was a compromise that entailed bargaining for specific benefits while giving away certain rights. The landlords with guarantees thought it was fair to give up their guarantee claims in exchange for 70.6% of their unsecured claims. The landlords without guarantees thought it was fair to forego seeking substantive consolidation, as did the vendors and suppliers, in exchange for 70.6% of their unsecured claims.

The Objecting Landlords had access to all financial documents and models utilized by the Creditors Committee. Armed with that information, the Objecting Landlords failed in their burden to show to the Court that they would have received a higher percentage without the Substantive Consolidation Compromise. They did not present any evidence that the settlement was unfair. In fact, the Objecting Landlords did not prove anything, but merely proffered evidence that giving them more shares would scarcely dilute the percentages of the other unsecured creditors yet significantly improve the percentage share of the Objecting Landlords. While the Court is pleased with the Objecting Landlords' ingenuity, unfortunately, the Court cannot modify the Plan without evidence of an inequity. As a result, the Court duly notes the Objecting Landlords' well-

---

[16] Assuming, arguendo, that the Court were faced with a motion for consolidation, the facts from Owens Corning are not directly on point as the facts in this case. It is significant that the loan in Owens Corning was for $2 billion. It would be unfathomable and beyond all coherence to permit those few creditors to be pooled into a category of other unsecured creditors and have their guarantees wiped out. In mentioning this key fact, the Court does not wish to disparage the claims of the Objecting Landlords. But $2 billion is an overwhelming amount of money, and the Court is certain this was a highly compelling fact to the Third

placed arguments, but based upon the record as a whole, the Court cannot agree with their assertions. Therefore, the Objecting Landlords' objections are overruled.

## II.    THE UNITED STATES' OBJECTIONS

The United States had numerous objections to Debtors' Plan, but through the various modifications of the Plan the United States has either withdrawn or settled such objections with Debtors with respect to all but three objections. These objections are: 1) the Plan does not justify differing treatment of general unsecured claims; 2) the effective date is not definite; and 3) the proposal to pay professional fees without the filing of a fee application contravenes the Bankruptcy Code. This final objection was also made by the United States Trustee and is discussed in that section of this opinion. Thus, this section will only address the first two objections of the United States.

### A.    Differing treatment of general unsecured claims

The United States objects to the treatment of its general unsecured claim, specifically, its non-compensatory damages claim, which was placed in Class 20 and receives no distribution under the Plan. (See Joint Plan of Reorganization at 20.) Section 1122(a) of the Bankruptcy Code states that a "plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a) (2005). The Eleventh Circuit has articulated that a plan proponent has considerable discretion in delineating claims into classes, but such discretion is curtailed if the plan "unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights." Olympia & York Florida Equity

---

Circuit. The Third Circuit itself noted that to allow "deemed" consolidation in Owens Corning would cause the case to become the "Banquo's ghost of bankruptcy." 419 F.3d at 216.

Corp. v. Bank of New York (In re Holywell Corp.), 913 F.2d 873, 880 (11th Cir. 1990) (citations omitted).  Debtors' Plan provides for nine separate classes of general unsecured claims.  The United States contends that Debtors do not provide adequate justification for such disparate treatment.

The Court finds that Debtors have provided adequate justification for the allegedly disparate treatment.  As discussed in the Objecting Landlords' Objections to Consolidation section of this opinion, the treatment of the various classes of claims reflects a compromise based upon what each representative of such claims deemed appropriate for its class.  Notwithstanding the fact that the United States did not take part in the Substantive Consolidation Compromise, the Court finds that the classifications were not intended to gerrymander the vote, that the number of classes is appropriate, and the classification scheme does not violate any basic priority rights.  See Holywell, 913 F.2d at 880.  In addition, in a Chapter 7 liquidation the United States would probably receive the same distribution in Class 20, given the going-concern value of Debtors.  As a result, the Court overrules the United States' objection to the differing treatment of general unsecured claims.

### B.    Effective date

According to Debtors' Plan, the "effective date" is the day upon which seven conditions must be satisfied, as listed in Section 10.2 of the Plan.  (See Joint Plan of Reorganization at 36-37.)  The Court finds that the conditions listed are adequately definite, and many of them have already been completed.  As a result, the Court overrules the United States' objection as to the effective date.  However, in order to assuage the United States' fears that the effective date is too tenuous and capable of manipulation by

the parties, the Court reserves jurisdiction to impose an effective date. Thus, the United States or any other party in interest may file an appropriate motion to impose the effective date if the parties dawdle.

## III.   INSURANCE PROCEEDS PROCEEDING

Bundy New Orleans Co., LLC ("Bundy") is the lessor under a lease (the "Lease") with Winn-Dixie Louisiana, Inc. ("WD Louisiana") in New Orleans, Louisiana. The Lease required WD Louisiana to maintain insurance covering any losses to the property. The property suffered significant damage as a result of the devastation from Hurricane Katrina. As a result, WD Louisiana or Winn-Dixie Montgomery, Inc. ("WD Montgomery") (collectively, the "Lessee") filed an insurance claim relating to such damage. Without delving into the specific facts of this proceeding, Bundy claims that the Lessee, and, by default, Debtors, have absconded with the insurance proceeds relating to the insurance claim.

Bundy is the holder of a Class 13 Landlord claim and also has an administrative claim. Objecting under numerous theories, Bundy essentially claims that Debtors use of the allegedly absconded insurance proceeds is in violation of § 1129(a)(1) and (a)(2) because neither the Plan nor Debtors, the Plan proponent, complies with the applicable provisions of the Bankruptcy Code. Specifically, Bundy claims that the Plan violates § 1129(a)(3) because the Plan is not proposed in good faith and is forbidden by law. In addition, Bundy claims that the Plan does not comply with § 1129(a)(7) in that it fails to meet the best interests of creditors test because Debtors have not proposed to pay Bundy the insurance proceeds or Bundy's administrative claim. Furthermore, Bundy claims that the Plan does not comply with § 1129(a)(11) because the Plan does not take into account

several administrative claims not covered by insurance proceeds.  Lastly, Bundy asserts

that Debtors have not complied with § 1129(b)(2) because, among other things, the Plan

proposes to pay creditors with the allegedly absconded insurance proceeds.

Bundy also objects on other grounds, but these are immaterial because the Court

overrules Bundy's objections.  Without deciding the merits of the underlying adversary

proceeding, the Court finds that there is ample liquidity to pay Bundy without affecting

feasibility.  Because of such liquidity, if Bundy is victorious in the underlying adversary

proceeding, it will be in a position to receive all of its allegedly absconded insurance

proceeds from Debtors.  Therefore, all of Bundy's objections are inapposite and

accordingly overruled.

### IV.    CLASS 10 CLAIMS' OBJECTIONS

Although the Plan is silent as to the interest rate for Class 10 secured tax claims,

the Debtors propose to pay 7% interest on the claims.  Debtors base the proposed rate on

the approximate amount they will pay their exit financing lender.  The Objecting Class 10

Claimants assert that their claims should be paid at their respective statutory rates and

that Debtors' proposal to pay anything less violates § 1129(b)(2).  Section 1129(b)(2)

requires that holders of secured claims in classes that have voted against the Plan receive

the present value of their claims.  In other words, they must receive a payment over time

that is equal to the payment they would receive on the Plan's effective date.  The manner

in which the appropriate interest rate is to be set, however, is not specified in the Code.

The following evidence was adduced at the Confirmation Hearing.  Debtors'

search for exit financing resulted in fourteen proposals.  (Tr. Vol. I at 57, lines 22-25.)

The interest rate Debtors obtained under the approximate $720 million exit financing

facility varies according to the amount of unused liquidity available to Debtors and ranges from LIBOR[17] plus 125 basis points to LIBOR plus 225 basis points. (Tr. Vol. I at 60, lines 21-22.) Debtors expect the exit financing interest rate to be LIBOR plus 150 basis points, currently equivalent to a 7% interest rate. (Tr. Vol. I at 61, lines 1-2.) Because of their statutory liens, allowed Class 10 Claimants are senior to the exit lenders. (Tr. Vol. I at 61, lines 16-21.) Other than requesting that the Court take judicial notice of the respective statutory rates ranging from 10-18%, the Objecting Class 10 Claimants presented no evidence as to an appropriate interest rate.

Paul Huffard (" Mr. Huffard") is a senior managing director and a restructuring advisory partner at Blackstone Group, a private investment banking firm which has assisted Debtors in these cases by helping develop a business plan, valuing Debtors, and negotiating the Plan. Mr. Huffard testified that based upon the Class 10 Claimants' senior lien position and the consequent low risk of non-payment, the appropriate market interest rate for Class 10 tax claims should be no higher than LIBOR plus 150 points.

The appropriate interest rate under § 1129(a)(9)(C) is the prevailing market rate for a loan of a term equal to the payout period, taking into account the quality of the security and the risk of default. In re Southern States Motor Inns, Inc., 709 F.2d 647, 651 (11th Cir. 1983). In a case dealing with the appropriate rate of cram down interest in a Chapter 13 case, the Supreme Court noted that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what an efficient market would produce." Till v. SCS Credit Corp., 541 U.S. 465, 477 n.14 (2004). "Tak[ing] [its] cue" from

---

[17] London Interbank Offered Rate ("LIBOR") is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds to other banks in the London wholesale (or "interbank") money market. Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/LIBOR (last visited November 14, 2006).

Footnote 14 of Till, the Sixth Circuit Court of Appeals held that where there is an efficient market in a Chapter 11 case, the market rate should be applied. American Homepatient, Inc., 420 F.3d 559, 567 (6th Cir. 2006). The court held that where no efficient market exists for a chapter 11 debtor, the bankruptcy court should employ the formula approach. Id. The Court agrees with the holding of American Homepatient and holds that in an efficient market rate in a Chapter 11 case, the market rate should be applied.

The only evidence before the Court is that Debtors went out into an efficient market and shopped $720 million in post-petition financing, which is secured by all of Debtors' assets, including the collateral, which is the collateral of the Objecting Class 10 Claimants. Debtors' search resulted in fourteen proposals among competing lending institutions for a loan that would be junior to the Class 10 Claimants' liens. The result of that search was an interest rate of LIBOR plus 150 points. The Court finds that the process leading to the exit facility was an efficient test of the market. The existence of an efficient market in this case coupled with the Class 10 Claimants' senior lien position and the consequent low risk of non-payment, leads the Court to conclude that the appropriate interest rate in providing for deferred payments to the Class 10 Claimants is 7%.

## V.    FLORIDA TAX COLLECTORS' OBJECTIONS

The Florida Tax Collectors ("FTC") object to Debtors' Plan on numerous constitutional grounds, including sovereign immunity defenses, subject matter jurisdiction pursuant to the Tenth Amendment, violations of the Full Faith and Credit Clause, as well as state law arguments. The Court finds that these objections are relevant to FTC's Motion for Leave to File Their Proof of Claim without Prejudice, FTC's Motion

to Abstain, and FTC's Motion to Dismiss, but are not relevant to confirmation of the Plan. The Court has taken these constitutional issues under advisement, and the Court will separately enter findings of fact and conclusions of law in due course.

FTC also objects to confirmation under §§ 1129(a)(9)(A) and 1129(a)(1), asserting that the 2006 post-petition ad valorem property taxes must be treated as an administrative expense and paid in cash on the effective date of the Plan. This issue was neither addressed at the Confirmation Hearing nor in Debtor's Reply to Florida Tax Collector's Supplemental Memorandum of Law. FTC also raises other objections based on various provisions of § 1129 of the Code. With respect to FTC's objections to the Plan being confirmed, all objections save the issue of whether the 2006 ad valorem property taxes must be classified as an administrative expense are overruled. It is axiomatic that all post-petition taxes are administrative expenses. To the extent that the issue of whether the 2006 ad valorem property taxes must be classified as an administrative expense remains pending, that objection is sustained. With respect to its remaining objections, FTC is being treated in accordance with the provisions of the Bankruptcy Code.

### VI.    UNITED STATES TRUSTEE'S OBJECTIONS

The United States Trustee objects to the following: 1) section 12.3 of the Plan, which provides for the payment by Debtors of certain professional fees and expenses of the members of the Creditors Committee, the members of the ad hoc committee of trade vendors, and the members of the ad hoc committee of retirees; 2) section 12.4 of the Plan which provides for the payment by Debtors of certain professional fees and expenses of

the Indentured Trustee; and 3) sections 12.12(a), 12.12(b), and 12.15 of the Plan, which provide for non-debtor releases.

**A.**     **Section 12.3 – Debtors' payment of Substantive Consolidation Compromise Professional Fees**

By all accounts, the parties involved in analyzing and negotiating the substantive consolidation issue and ultimately forging the Substantive Consolidation Compromise dedicated significant time and effort to the process. As part of the Substantive Consolidation Compromise, Section 12.3 of the Plan provides for Debtors to pay, without necessity of the filing of a fee application, certain fees and expenses of professionals retained by the following creditors in the following amounts in an aggregate amount not to exceed $2,760,000: a) the members of the Creditors Committee – an amount not to exceed $1,410,000; b) the members of the ad hoc committee of trade vendors – an amount not to exceed $1,300,000; and c) the members of the ad hoc committee of retirees – an amount not to exceed $50,000. Specifically, Section 12.3 provides that the parties seeking fees and expenses shall not be required to file fee applications or comply with the guidelines and rules applicable to fee applications, and shall not be subject to § 330 or § 503 of the Bankruptcy Code. The Plan provides for court review of the reasonableness of the fees in the event Debtors object thereto.

Mr. Huffard testified that Debtors' agreement to pay the professional fees set forth in 12.3

> was an integral part of the settlement that was reached by the creditors, so you really can't pick and choose. . . .
> That being said, even if it hadn't been part of the deal, I think this would be an excellent use of the company's assets. By paying these fees and getting to this

settlement, we will have saved multiples of this in avoided
legal fees from litigation down the road.

(Tr. Vol. I at 39, lines 1-11.)  The United States Trustee suggests that the Court require

that the parties who seek fees pursuant to 12.3 of the Plan file a fee application so the

Court can determine whether the fees are reasonable.

The Court finds, based upon the testimony at the confirmation hearing, that the

professionals involved made a substantial contribution to Debtors' Chapter 11 case.  The

testimony reflected that the various Creditors Committee members devoted a significant

amount of time, effort, and funds to analyzing the substantive consolidation issue and

negotiating a compromise.  Given that the professionals made a substantial contribution

to the cases, the Court finds that the allowance of fees as set forth in section 12.3 is

appropriate.  However, the Court will require the professionals who seek fees and

expenses pursuant to 12.3 of the Plan to file fee applications and serve a copy upon the

Creditors Committee, the United States Trustee, Debtors, and any other party that

requests a copy.  The Court will schedule a hearing to determine the reasonableness of

the fees.  Any objections as to reasonableness must be filed at least 7 days prior to the

hearing, and must be specifically detailed objections.

**B.** **Section 12.4 - Debtors' payment of Indentured Trustee Fees**

Wilmington Trust Company serves as Indenture Trustee.  Under the terms of the

Indenture, the Indenture Trustee is entitled to have its fees and expenses paid by Debtors.

In order to secure its right to receive such payments, the Indenture Trustee holds a

charging lien in all money held or collected by the Indenture Trustee with respect to the

Notes.  Accordingly, the charging lien provides the Indenture Trustee a security interest

in a portion of the New Common Stock (the "Stock") to be issued by Debtors and distributed to the Noteholders.

Section 12.4 of the Plan provides for the payment of the Indenture Trustee expenses (the "Expenses"), which do not relate to the Substantive Consolidation Compromise,[18] to be paid by Debtors rather than require the Indenture Trustee pursue the recovery of its Expenses by enforcing its charging lien.  It also requires that "on or before the Confirmation Date, the Indenture Trustee shall serve on the Debtors reasonably substantiating documents in support of the Indenture Trustee Expenses incurred to such date by the Indenture Trustee, whether incurred prior to or subsequent to the Petition Date, together with a detailed, reasonable estimate of any fees and expenses to be incurred through the Effective Date." (See Joint Plan of Reorganization at 40.)  If Debtors object to all or any portion of the Expenses, the Plan provides that they may object in writing and the Court will then resolve the allowance of any disputed Expenses under a reasonable standard.

The United States Trustee objects to section 12.4, asserting that the Court should require a fee application to be filed in order to determine whether the fees sought are reasonable.[19]  Debtors, the Creditors Committee, and the Indenture Trustee filed responses to the United States Trustee's Objection, citing a number of (unpublished) confirmation orders in which bankruptcy courts have approved similar provisions without

---

[18] Debtors asserted at the Confirmation Hearing that the Indenture Trustee Expenses were part of the Substantive Consolidation Compromise.  A review of the Plan, however, evidences that the fees set forth in Section 12.4 do not relate to and were not part of the Substantive Consolidation Compromise.

[19] The United States Trustee's written objection appears to object both to the payment by Debtors of the Indentured Trustee Expenses and to the procedure by which the Expenses will be paid.  The Court finds that by not prosecuting the former at the Confirmation Hearing, the United States Trustee abandoned that objection.

confirmation orders in which bankruptcy courts have approved similar provisions without the necessity of the filing of a fee application. However, none of the memoranda indicate whether these provisions were permitted in the presence of an objection.

      Upon review of the memoranda and the arguments of the parties at the Confirmation Hearing, the Court finds it appropriate to sustain the United States Trustee's Objection to section 12.4 of the Plan. Despite the requirement in the Plan that the Indenture Trustee provide the Debtors with a "detailed, reasonable estimate of any fees and expenses to be incurred through the Effective Date" (see Joint Plan of Reorganization at 40), neither Debtors nor the Indenture Trustee provided the Court with an estimate of the fees sought. The Court recognizes that when the Noteholders voted on the Plan they expected the Indentured Trustee Expenses to be paid by Debtors without the necessity of the filing of a fee application. Despite those expectations, the Court finds it ill-advised and is unwilling to sign a blank check for the Indenture Trustee Expenses.[21] Accordingly, the Court will sustain the United States Trustee's objection to section 12.4 of the Plan. The Court will require the Indenture Trustee to file an Expense application and serve a copy upon the Creditors Committee, the United States Trustee, Debtors, and any other party that requests a copy. The Court will schedule a hearing to determine the reasonableness of the Expenses. Any objections as to reasonableness must be filed at least 7 days prior to the hearing, and must be specifically detailed objections.

---

[21] The Noteholders were on notice that their distribution would be reduced in the event the Court did not approve section 12.4 because paragraph f of section 4.3 of the Plan provides that "[n]otwithstanding the foregoing, all distributions to holders of Allowed Noteholder Claims shall be subject to, and the allocations herein shall be reduced on a Pro Rata basis by the Indenture Trustee Charging Lien to the extent of any

## C.    Releases

The United States Trustee objects to the release provisions in sections 12.12(a),

12.12(b), and 12.15 of the Plan.  The United States Trustee objects to the release

provisions, contending that they are inconsistent with 11 U.S.C. § 524 and therefore

violate the requirements of § 1129(a)(1).  Section 524(e) provides that "except as

provided in subsection (a)(3) of this section, discharge of a debt of a debtor does not

affect the liability of any other entity on, or the property of any other entity for, such

debt." 11 U.S.C. § 524 (2005).  The Eleventh Circuit has not addressed the propriety of

non-debtor releases in a plan of reorganization.  The circuit courts which have addressed

the issue are split on whether § 524(e) proscribes non-debtor releases in a Chapter 11

reorganization plan.  The Fifth, Ninth, and Tenth Circuits have concluded that § 524(e)

conflicts with an interpretation of § 105[22] of the Bankruptcy Code that would permit non-

debtor releases.  In re Lowenschuss, 67 F.3d 1394 (9th Cir. 1995); In re Zale Corp., 62

F.3d 746 (5th Cir. 1995); In re W. Real Estate Fund, Inc., 922 F.2d 592 (10th Cir. 1990).

Other circuit courts have found no conflict between sections 105(a) and 524(e).  In re

Dow Corning Corp., 280 F.3d 648 (6th Cir. 2002); In re Continental Airlines, 203 F.3d

203 (3rd Cir. 2000); In re Specialty Equip. Cos., Inc., 3 F.3d 1043 (7th Cir. 1993); In re

Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2nd Cir. 1992); In re A.H. Robins

Co., Inc., 880 F.2d 694 (4th Cir. 1989).  The Court agrees with those courts, which hold

---

unpaid Indenture Trustee Expenses that are not paid pursuant to Section 12.4 of the Plan." (See Joint Plan
of Reorganization at 40.)

[22] Section 105 of the Bankruptcy Code grants a court broad equitable power to "issue any order, process or
judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. §
105 (2005).  However, "whatever equitable powers remain in the bankruptcy courts must and can only be
exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S.
197, 206 (1988).

that bankruptcy courts have the power under § 105 to issue permanent injunctions or third party releases under certain factual circumstances.

### 1.    Section 12.12(a) - Releases by Debtors

Section 12.12(a) of the Plan provides for the release by Debtors of estate causes of action against the following non-debtor parties: 1) Debtors' non-debtor subsidiaries; 2) the present or former directors, officers, and employees of any of Debtors or any of Debtors' non-debtor subsidiaries; 3) professionals of Debtors; 4) Wachovia and its advisors; 5) the Creditors Committee, its members, and its and their advisors (but not its members in their individual capacities).  Section 12.12(a) releases all claims that could be brought in the name of Debtors from the period of emergence from Chapter 11 backwards.  (Tr. Vol. I at 119, lines 6-8.)

Larry Appel ("Mr. Appel"), Winn Dixie Stores' senior vice-president, testified to the following.  Debtors and the Creditor's Committee conducted a substantial review of the potential existence of claims that could be brought on behalf of Debtors and concluded that there were no valid claims.  (Tr. Vol. I at 119, lines 13-19.)  The beneficiaries of the section 12.12(a) release "put a tremendous amount of time, effort, and attention into this business."  (Tr. Vol. I at 120, lines 7-8.)  Debtors believe it is in their best interests to issue the release rather than face the specter of pursuing the claims and expending time, energy, effort, and management attention on an exercise in futility.  (Tr. Vol. I at 119, lines 20-24.)  The 12.12(a) release provision will permit Debtors to eliminate pre-petition indemnification obligations to their officers, directors, and employees.  (Tr. Vol. I at 121, lines 20-25 through 122, lines 1-10.)

As the Court previously noted, Bankruptcy Rule 9019(a) permits a bankruptcy court to approve a compromise or settlement. Similarly, § 1123(b)(3)(A) of the Bankruptcy Code permits the settlement of claims or interests belonging to a bankruptcy estate through a reorganization plan. Besides utilizing the Justice Oaks factors as guidance, a court must find that "the proposed compromise is fair and equitable and in the best interests of the bankruptcy estate." In re Gallagher, 238 B.R. 342, 346 (Bankr. M. D. Fla. 2002). Taking into account Mr. Appel's testimony and the entire record of this case, the Justice Oaks factors weigh heavily in favor of approving the release provision set forth in Section 12.12(a) of the Plan. In addition, the Court finds that the releases set forth in section 12.12(a) of the plan are fair and equitable and in the best interests of Debtors' estates. Therefore, the Court overrules the United States Trustee's Objection to Section 12.12(a) of the Plan.

### 2.    Section 12.12(b) - Consensual Release

The releases set forth in 12.12(b) relate to the present or former directors, officers, or employees of the Debtors in connection with or related to Debtors, the conduct of Debtors' business, the Chapter 11 Case, or the Plan. The 12.12(b) releases were disclosed in bold and conspicuous lettering on the ballot and provide a voluntary release of claims by Claimholders who voted to accept the Plan. The 12.12(b) releases do not apply to Claimholders who did not vote or who voted against the Plan notwithstanding their membership in a class, which voted in favor of the Plan.

Consensual releases have been routinely upheld by courts. See In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142 (2d Cir. 2005) (holding that nondebtor releases should ordinarily only be granted under unique circumstances but that "[n]ondebtor

releases may also be tolerated if the affected creditors consent.") (citing In re Specialty Equip. Cos., 3 F.3d 1043, 1047 (7th Cir. 1993)); Specialty Equip., 3 F.3d at 1047 (noting that § 524(e) "does not purport to limit or restrain the power of the bankruptcy court to otherwise grant a release to a third party" as long as such releases are "consensual and non-coercive"); In re Zenith Elecs. Corp., 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving releases of claims against non-debtor parties as to creditors who voted to accept the plan). As the Court has noted on several previous occasions, it is here to adjudicate disputes. In view of the fact that only Claimholders who vote to accept the Plan are effected by the releases, the Court finds it inappropriate to interject itself into the process and invalidate the releases. Accordingly, the Court will overrule the United States Trustee's Objection to section 12.12(b) of the Plan.

### 3.    Sections 12.15(a) and (b) - Exculpation and Limitation of Liability

Section 12.15 limits liability and provides for an injunction of any right of action against Debtors, the Reorganized Debtors, their respective subsidiaries, the Creditors Committee, Wachovia, the Indenture Trustee, or any of their respective present or former members, officers, directors, employees, advisors, professionals, and agents for any matters related to the Chapter 11 Case or the Plan process except for acts and omissions which are the result of fraud, gross negligence, or willful misconduct. Section 12.15 applies to the period between the filing date and the emergence date.

The United States Trustee objects to section 12.15 as it relates to Wachovia and to the professionals, specifically the attorneys, on the basis that it goes beyond a mere request for immunity for official acts normally included in an exculpation clause. Additionally, the United States Trustee asserts that 12.15's application to the attorneys

hired by Debtors, the Reorganized Debtors, the Creditor's Committee, and Wachovia conflicts with the ethical standards set forth in Florida Bar Rule 4-1.8 and Disciplinary Rule 6-102 of the New York Code of Professional Responsibility because it limits the attorneys' liability to acts or omissions, which are the result of fraud, gross negligence, or willful misconduct.

Mr. Appel testified that the beneficiaries of section 12.15 performed substantial work in these cases with the understanding and the expectation that the exculpation provision would be included in the Plan. (Tr. Vol. I at 125, lines 1-4.) Moreover, the parties to the Plan and the creditors who voted on the Plan bargained for the exculpation provision. (Tr. Vol. I at 125, lines 8-12.) The release and exculpation provisions "were specifically discussed, they were specifically incorporated into the plan, they were key elements of the plan, and to pull them out and pretend that the plan still represents an appropriate answer for the company or any of these individuals is not fair." (Tr. Vol. I at 126, lines 4-9.) In light of the significant contributions made to this case by the beneficiaries of the exculpation clause, the beneficiaries' expectation that the exculpation would be included in the Plan in exchange for their participation in the case, the fact that the exculpation was the result of negotiation by all parties, and the overwhelming acceptance of the Plan, the Court finds that the exculpation provision is appropriate.[23] See In re Enron Corp., 326 B.R. 497, 500 (S.D.N.Y. 2005) (affirming bankruptcy court confirmation order which found that a similar exculpation provision was "reasonable and customary and in the best interests of the estates" and without which negotiation of the plan would have been impossible).

---

[23] The Court notes that its finding is based specifically on the record of and circumstances in this case.

Finally, the Court notes that the United States Trustee misconstrues the application of Florida Bar Rule 4-1.8 and Disciplinary Rule 6-102 of the New York Code of Professional Responsibility.  Those provisions prohibit a lawyer from prospectively limiting liability to a client for malpractice, and also prohibit an attorney from settling a claim for liability without first advising the client that independent representation is appropriate.  First, the parties involved with this provision are not limited from suing the professionals for malpractice _prospectively_, but rather are _retroactively_ waiving any claims they might have for the window of time up until confirmation.  This does not violate the ethical rules.  In addition, Debtors and the parties involved with this provision are not _settling_ any claim with their professionals.  What is before the Court with this provision is the exculpation of _any_ party involved with the creation of the Plan – Debtors, their employees, their professionals, et. al. – from being sued by any _other_ party, namely, holders of claims, for any cause of action save fraud, gross negligence, or willful misconduct.  Debtors are not settling with their professionals a cause of action for malpractice.  The Court trusts based upon the integrity of counsel in this case that they would not settle away their clients' rights without first advising them to seek independent representation.  Neither scenario is currently before the Court, and therefore these applications to the ethical rules are inapposite.  Accordingly, the Trustee's objections to this provision of the Plan are overruled.

### VII.   SHAREHOLDERS' OBJECTIONS

A number of Debtors' shareholders have objected to the Plan on the grounds that the shareholders are not receiving a distribution under the Plan.  Unfortunately, because the absolute priority rule of the Bankruptcy Code does not allow for a distribution to

shareholders when unsecured claim-holders are not being paid in full (unless the creditors, as a class, consent to such a gift), no distribution is possible to the shareholders.

The testimony at the Confirmation Hearing revealed that the value of the stock to be distributed to creditors is less than the amount of the claims. Accordingly, absent creditor consent – and such consent has not been granted – § 1129(b)(2) does not allow for a distribution to the shareholders. Section 1129(b) provides, in part, that the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the fact that classes have rejected the plan if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. See 11 U.S.C. § 1129(b)(1) (2005).

The Court finds that the Plan does not discriminate unfairly among Classes 18, 19, 20 and 21. Rather, holders of claims or interests in these Classes are not receiving distribution because Debtors are unable to pay their creditors in full. The Court has no authority to permit the owners of a company to reap the benefits of payment when the company's creditors are not receiving payment in full of their claims. Moreover, the Plan is fair and equitable because it satisfies the absolute priority rule of § 1129(b)(2). Specifically, no class or interests junior to Classes 18, 19, 20 and 21 will receive any property on account of their claims or interests. Accordingly, the Shareholders' objections are overruled.

## CONCLUSION

Based upon the record taken as a whole, the Court overrules the objections by the Objecting Landlords' because Debtors' Plan is in compliance with § 1123(a)(4), the Substantive Consolidation Compromise embodied in Debtors' Plan is fair and equitable

and in the best interests of Debtors' estate, and Debtors are not seeking approval of a

"deemed" consolidation from the Court.   The Court overrules the objections of the

United States because there is no differing treatment of the general unsecured claims, and

the parameters set forth for the effective date are adequate.  The Court overrules the

objections pertaining to the Insurance Proceeds Proceeding because there is ample

liquidity to pay Bundy without affecting the feasibility of the Plan.  The Court overrules

the objections by the Class 10 Claimants because the appropriate interest rate in

providing for deferred payments to the Class 10 Claimants is 7%.  The Court sustains in

part and overrules in part the objections by the Florida Tax Collectors.  The Court has

taken FTC's constitutional issues under advisement, and the Court will separately enter

findings of fact and conclusions of law in due course.  With respect to FTC's objections

to the Plan being confirmed, all objections save the issue of whether the 2006 ad valorem

property taxes must be classified as an administrative expense are overruled.  To the

extent that the issue of whether the 2006 ad valorem property taxes must be classified as

an administrative expense remains pending, that objection is sustained.  The Court

sustains in part and overrules in part the objections by the United States Trustee.  The

Court sustains the United States Trustee's objections to sections 12.3 and 12.4 of the Plan

and will require the parties who seek fees and Expenses pursuant to those sections to file

fee and Expense applications and serve a copy upon the Creditors Committee, the United

States Trustee, Debtors, and any other party that requests a copy.  The Court will conduct

a hearing as to reasonableness.  The Court overrules the objections by the United States

Trustee to sections 12.12(a), 12.12(b), and 12.15 of the Plan, which provide for non-

debtor releases because: 1) the releases set forth in section 12.12(a) of the plan are fair

and equitable and in the best interests of the Debtors' estates; 2) the releases set forth in

section 12.12(b) are consensual; and 3) the exculpation clause set forth in section 12.15 is

appropriate in light of the significant contributions made to this case by the beneficiaries

of the exculpation clause, the beneficiaries' expectation that the exculpation clause would

be included in the Plan in exchange for their participation in the case, the fact that the

exculpation clause was the result of negotiation by all parties, and the overwhelming

acceptance of the Plan.  In addition, the Unites States Trustee's applications to the ethical

rules are inapposite.  Lastly, the Court overrules the objections by the Shareholders

because of the absolute priority rule, the Plan does not discriminate unfairly among

Classes 18, 19, 20 and 21, and no class or interests junior to Classes 18, 19, 20 and 21

will receive any property on account of their claims or interests.  In the event that these

Findings of Fact and Conclusions of law conflict with the Confirmation Order, these

Findings of Fact and Conclusions of Law control.

DATED this 16 day of November, 2006 in Jacksonville, Florida.

**JERRY A. FUNK**
United States Bankruptcy Judge