# EXHIBIT "A"

*DATE:* 1-14-94

THIS LEASE AGREEMENT made as of this 5th day of November, 1993, by and between OPP PARTNERS, LTD., an Alabama limited partnership ("Landlord"), with an address of _____ and WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation qualified to transact business in the State of Alabama, ("Tenant") with an address of Post Office Box 2029, Montgomery, Alabama 36102-2029.

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1. **Demise of Premises.** Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the term or terms and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"): (i) the premises described in Exhibit "A" attached hereto and made a part hereof together with the easements, rights and appurtenances thereunto belonging or appertaining (collectively the "Land"); (ii) the buildings, structures and other improvements constructed and to be constructed on the Land (collectively, the "Improvements"); and (iii) the machinery and equipment described in Exhibit "B" attached hereto and made a part hereof and installed in and upon the Improvements, together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease (collectively, the "Equipment") (excepting Tenant's trade fixtures and equipment).

2. **Certain Definitions.**

(a) "Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining any of the Leased Premises.

(b) "Alterations" shall mean all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of and all substitutions or replacements for any of the Improvements or Equipment, both interior and exterior, structural and non-structural, and ordinary and extraordinary.

This instrument was prepared by P. Christopher Vrenn, Attorney at Law, whose address is 5050 Edgewood Court, Jacksonville, Florida 32205.

(c)   "Assignment" shall mean any Assignment of Rents and Lessor's Interest in Leases hereafter executed from Landlord to Lender.

(d)   "Basic Rent" shall mean Basic Rent as defined in Paragraph 6.

(e)   "Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 6.

(f)   "Casualty Termination Date" shall mean the Casualty Termination Date as defined in paragraph 14(g).

(g)   "Commencement Date" shall mean the Commencement Date as defined in Paragraph 3C.

(h)   "Completion Date" shall mean the Completion Date as defined in Paragraph 3B.

(i)   "Condemnation" shall mean a Taking and/or a Requisition.

(j)   "Event of Default" shall mean an Event of Default as defined in Paragraph 19(a).

(k)   "Final Payment" shall mean the final payment to Landlord of Net Proceeds, Net Award, or a Remaining Sum, as applicable.

(l)   "Final Payment Date" shall mean the first Basic Rent Payment Date occurring after the Final Payment.

(m)   "Impositions" shall mean the Impositions as defined in Paragraph 8.

(n)   "Law" shall mean any constitution, statute or rule of law.

(o)   "Legal Requirements" shall mean all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision) and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to any of the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration

repair or reconstruction of any of the Leased Premises, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Leased Premises.

(p) "Lender" shall mean an entity which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note.

(q) "Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

(r) "Mortgage" shall mean a mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

(s) "Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any expenses incurred by Landlord in collecting such award.

(t) "Net Proceeds" shall mean the entire proceeds of any insurance required under clause (i) of Paragraph 14(a), less any expenses incurred by Landlord in collecting such proceeds.

(u) "Note" shall mean a Promissory Note hereafter executed from Landlord to Lender, which Note will be secured by a Mortgage and an Assignment.

(v) "Outside Completion Date" shall mean the Outside Completion Date as defined in Paragraph 3B.

(w) "Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions and easements listed in Exhibit "C" attached hereto and made apart hereof.

(x) "Remaining Sum" shall mean the Remaining Sum a defined in Paragraph 15(b).

(y) "Replaced Equipment" shall mean the Replace Equipment as defined in Paragraph 11(d).

(z) "Requisition" shall mean any temporary requisition or confiscation of the use or occupancy of any of th Leased Premises by any governmental authority, civil or military whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition confiscation, or otherwise.

(aa) "Shopping Center" shall mean all land and improvements located on Parcel "A-1" and Parcel "A-2" as shown on the attached Site Plan.

(bb) "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(cc) "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

(dd) "Term" shall mean the Term as defined in Paragraph 5.

(ee) "Termination Date" shall mean the Termination Date as defined in Paragraph 13(b).

(ff) "Winn-Dixie Parcel" shall mean all the land located on Parcel A-1 as shown on the attached site plan.

3.    Title and Condition.

(a) The Leased Premises are demised and let subject to (i) the rights of any parties in possession of any of the Leased Premises, (ii) the existing state of title of the Leased Premises, including the Permitted Encumbrances, as of the commencement of the Term, (iii) any state of facts which an accurate survey or physical inspection of the Leased Premises might show, (iv) all Legal Requirements, including any existing violation of any thereof, and (v) the condition of the Leased Premises as of the commencement of the Term; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b) Tenant represents to Landlord that Tenant has examined the title to the Leased Premises prior to the execution and delivery of this Lease and has found the same to be satis factory for the purposes contemplated hereby and acknowledge that title is in Landlord and that Tenant has only the right o possession and use of the Leased Premises as provided in thi Lease.

-4-

(c) Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of any of the Leased Premises, including, but not limited to, any rights and remedies existing under contract or pursuant to the Uniform Commercial Code. Such assignment shall remain in effect so long as no Event of Default exists hereunder or until the termination of this Lease, whereupon Tenant shall reassign any interest so assigned hereunder to Landlord. Landlord shall also retain the right to enforce any such warranty, guaranty, or indemnity assigned in the name of Tenant. Landlord hereby agrees to execute and deliver at Tenant's expense such further documents, including powers of attorney, as Tenant may reasonably request (and which in the good faith judgment of Landlord, do not adversely affect a substantial general interest of Landlord), in order that Tenant may have the full benefit of the assignment effected or intended to be effected by this Paragraph 3(c).

(d) Landlord agrees to enter into with Tenant, at Tenant's expense, such easements, covenants or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises as requested by Tenant, subject to Landlord's approval of the form and substance thereof, not to be unreasonably withheld. It is specifically understood that Tenant shall have non-exclusive easements for pedestrian and vehicular ingress and egress over and upon all drives and accessways in the Shopping Center and that Tenant shall have a non-exclusive easement for parking, loading over and upon all areas designated for parking, loading and unloading in the Shopping Center.

3A.    Construction of Shopping Center.

Landlord, at its sole cost and expense, shall construct the Shopping Center, substantially as shown on the attached Site Plan, consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking

areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the Shopping Center and by the Shopping Center tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking areas) within the Shopping Center shall at all times during the term of this Lease, or any extensions thereof, be maintained substantially as shown on the attached Site Plan and shall not be substantially changed without the written consent of Tenant. The exteriors of all buildings in the Shopping Center shall not be materially modified without Tenant's prior written consent, subject to the provisions of the next grammatical paragraph of this Paragraph 3A. If not shown on the attached Site Plan, Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) to be constructed within the Shopping Center.

Notwithstanding the foregoing, Landlord intends initially to construct only Tenant's store building (described as "Phase I Building Construction" on the attached Site Plan), together with all the common areas on the Winn-Dixie Parcel, including without limitation, all the sidewalks, drives, entranceways, service areas and parking areas shown on the attached Site Plan. Landlord will also construct initially the paved driveway providing direct access from Perry Store Road to the rear of Tenant's store building and a paved driveway providing direct access from Perry Store Road to the front of Tenant's store building. Landlord reserves the right, but shall not be required, to construct additional buildings not to exceed the

indicated sizes within the areas described as "Phase II Construction" on the attached Site Plan, with the depth and interior dimensions to be at Landlord's discretion, provided, however, such additional buildings shall be of like structural and architectural quality as the building for Tenant. Pending construction thereon, Parcel A-2, as shown on the Site Plan, shall be maintained as paved parking area or as grassed areas and kept free of weeds and underbrush. Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the Leased Premises and all common areas during any such additional construction without unreasonable interference therewith by reason of such construction work.

Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

3B. Completion Date.

Landlord covenants and agrees that the construction of Tenant's store building and all common areas on the Winn-Dixie parcel shall begin not later than February 15, 1994, and shall be completed not later than January 15, 1995 (the "Completion Date") ; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further

the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than March 15, 1995, (the "Outside Completion Date"), this option to terminate shall not arise. "Construction of Tenant's store building" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this Lease or if Landlord fails to commence or complete construction by the above dates, Landlord agrees for a period of three (3) years after such failure or cancellation or termination that Tenant shall have the right of first refusal, on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to occupy any premises within the Shopping Center which Landlord may offer for use as a food supermarket, which right shall be exercised by Tenant in writing within sixty (60) days after receipt of written notice of the terms and conditions of the proposal from Landlord; provided, however, that if offered to Tenant within the first six (6) months the proposed lease term provisions shall be the same as provided in this Lease.

3C. Commencement Date.

The Tenant shall open its store for business within sixty (60) days following performance of the following:

(a) Landlord's delivery of Tenant's store building and other improvements to be constructed on the premises to Tenant completed in accordance with the plans and specifications, and Landlord's delivery to Tenant, at Landlord's expense, of a Certificate of Occupancy or equivalent document for Tenant's store building;

(b) Completed construction of all of the common areas on the Winn-Dixie Parcel and of the two most easterly paved accessways from Perry Store Road to Tenant's store building, substantially as shown on the attached Site Plan;

(c) Installation and opening for use of all drives, entrances, median cuts, acceleration and deceleraton lanes and

traffic control devices benefitting the Winn-Dixie Parcel shown on the attached Site Plan in or connecting the common areas to the adjacent rights-of-way.

(d) Parcel "A-2" and Parcel "B" shall have been made subject to the use restrictions in accordance with Paragraphs 4A and 4B hereof.   Tenant shall be granted non-exclusive easements for pedestrian and vehicular ingress and egress over and upon all drives and accessways in the Shopping Center, and Tenant shall have been granted a non-exclusive easement for parking, loading and unloading over and upon all areas designated for parking, loading and unloading in the Shopping Center as shown on the attached Site Plan.   A document containing these restrictions and easements will be recorded prior to any liens and other encumbrances which could eliminate the provisions thereof through foreclosure.   Said document shall provide that it shall not be modified, amended, or cancelled without the prior written consent of Tenant.

(e) Satisfaction of all liens for labor, services or materials furnished in connection with the aforesaid construction.

In the event that all the above requirements have not been met on or prior to the Outside Completion Date, Tenant, at its sole option prior to Tenant's acceptance of possession by opening its store for business, may cancel and terminate this Lease.

Rent shall begin to accrue hereunder upon the date Tenant opens its store for business, or upon the expiration of sixty (60) days following performance of all the above requirements, whichever date shall sooner occur (the "Commencement Date").   No acceptance of possession of the demised premises, opening for business by Tenant or payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with the plans and specifications.

-9-

Notwithstanding any provision contained in this Lease, Landlord agrees that if for any reason the requirements of this Paragraph 3C are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business, and rent shall not begin to accrue until the later of February 1 of the succeeding year, or thirty (30) days after the requirements of Paragraph 3C are met, unless Tenant actually opens its store for business sooner.

4.    **Use of Leased Premises; Quiet Enjoyment.**

(a)  The Leased Premises may be used, sublet or assigned, for any legal purpose, subject to the provisions of Paragraph 17 hereof.  In no event shall the Leased Premises be used for any purpose which shall violate the provisions of any Legal Requirements or other recorded covenants, restrictions or agreements applicable to the Leased Premises or to the Shopping Center.

(b)  Tenant shall not permit any unlawful occupation, business or trade to be conducted on any of the Leased Premises or any use to be made thereof contrary to any applicable Legal Requirements. Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) violate any certificate of occupancy affecting any of the Leased Premises, (ii) make void or voidable any insurance then in force with respect to any of the Leased Premises, (iii) make it difficult or impossible to obtain fire or other insurance which Tenant is required to furnish hereunder, (iv) cause structural injury to any of the Improvements, or (v) constitute a public or private nuisance or waste.

(c)  Subject to the provisions of Paragraphs 3 and 7(b), so long as no Event of Default exists hereunder, Landlord covenants to do no act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant, provided that Landlord may enter upon and examine any of the Leased Premises at reasonable times.

**4A.   Use.**

Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theatre (either motion or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted.

Notwithstanding the foregoing, up to 1,200 square feet of building space may be used for professional or business offices or for financial institutions, provided that no such business shall have more than five (5) employees or owners using the space and that no such business shall be located within forty-five (45) feet of any exterior wall of Tenant's store building.

**4B.   Tenant's Supermarket Exclusive.**

Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the Shopping Center and any enlargement thereof.   Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the Shopping Center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such

items in not to exceed the lesser of 1,000 square feet of sales area or 10% of the square foot area of any storeroom within the Shopping Center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores and drug stores, only Tenant may sell beer and wine in the Shopping Center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the Shopping Center. Tenant shall have the non-exclusive right to operate a pharmacy or drug store in the shopping center.

Notwithstanding anything contained herein to the contrary, the 1,000 square feet of food sales area allowed above shall be increased to 1,200 square feet for a drug store tenant.

Landlord shall be permitted within the Shopping Center to lease a storeroom for use as a doughnut shop, ice cream and frozen yogurt shop, a health food store or a sandwich shop, so long as none of said shops exceeds 1,200 square feet or is located within forty (40) feet of any exterior wall of Tenant's store building.

In the event the Leased Premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the Leased Premises, and notwithstanding any provisions herein to the contrary, Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights or recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation If the holder of such first mortgage should succeed to ownership of the Leased Premises by virtue of foreclosure or transfer o

title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage.    For the purposes hereof, the term "first mortgage" shall include any first security instrument.

5.    Term.  Subject to the provisions hereof, Tenant shall have and hold the Leased Premises for an initial term (the "Term") of twenty (20) years from the Commencement Date. Provided the Lease shall not have been terminated pursuant to Paragraph 19, the Tenant shall have the option to extend the Term for the next additional extension period by giving written notice to Landlord in writing at least six (6) months prior to the expiration of the then current Term.    The initial extension period shall be for five (5) years and thereafter the Term shall be extended by up to 5 additional consecutive periods of extension of five (5) years each (for a total of six (6) 5-year extensions).  In the absence of giving of such notice to extend by Tenant to Landlord, the Term shall be automatically terminated at the end of the then current Term.    Any such extension or renewal of the Term (also referred to as the "Term") shall be subject to and continue in full force and effect all the provisions of this Lease.    In the event that Tenant does not exercise its option to extend or to further extend the Term as hereinabove provided, then Landlord shall have the right during the remainder of the Term then in effect to (i) advertise the availability of the Leased Premises for sale or for reletting and to erect upon the Leased Premises signs indicating such availability (provided that such signs do not unreasonably interfere with the use or the Leased Premises by Tenant), and (ii) show the Leased Premises to prospective purchasers or tenants at such reasonable times during normal business hours as Landlord may select.  If Tenant shall fail to timely give such notice of its irrevocable election to exercise any renewal option then Tenant's right to exercise such option and all options with regard to subsequent extensions or renewals of the Term shall expire and be null and void.

6.    Rent.

(a)    Tenant shall pay to Landlord, as annual rent for the Leased Premises during the Term, the amounts determined in accordance with the schedule set forth in Exhibit "D" attached hereto and made a part hereof ("Basic Rent"), commencing on the fifth day of the first month next following the Commencement Date and continuing on the same day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America.    Pro rata Basic Rent shall be due for the period from the Commencement Date through the fourth day of the month next following the Commencement Date and shall be paid in advance on the Commencement Date.

(b)    Tenant shall pay and discharge when the same shall become due, as additional rental, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease.    In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

7.    Net Lease; Non-Terminability.

(a)    This is a net lease and Basic Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

(b)    This Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term (except as otherwise expressly provided herein).    Tenant shall not be entitled to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent or any other sums

-14-

payable under this Lease (except as otherwise expressly provided
herein), and the obligations of Tenant under this Lease shall not
be affected by any interference with Tenant's use of any of the
Leased Premises for any reason, including the following: (i) any
damage to or destruction of any of the Leased Premises by any
cause whatsoever, (ii) any Condemnation, (iii) the prohibition,
limitation or restriction of Tenant's use of any of the Leased
Premises, (iv) any eviction by paramount title or otherwise, (v)
Tenant's acquisition of ownership of any of the Leased Premises
other than pursuant to an express provision of this Lease, (vi)
any default on the part of Landlord hereunder or under any other
agreement, (vii) any latent or other defect in, or any theft or
loss of any of the Leased Premises, (viii) the breach of any
warranty of any seller or manufacturer of any of the Equipment,
(ix) any violation of Paragraph 4(c) by Landlord, or (x) any
other cause, whether similar or dissimilar to the foregoing, any
present or future Law to the contrary notwithstanding.  It is
the intention of the parties hereto that the obligations of
Tenant hereunder shall be separate and independent covenants and
agreements, and that Basic Rent and all other sums payable by
Tenant hereunder shall continue to be payable in all events (or,
in lieu thereof, Tenant shall pay amounts equal thereto), and
that the obligations of Tenant hereunder shall continue
unaffected, unless the requirement to pay or perform the same
shall have been terminated pursuant to an express provision of
this Lease.

     (c) Tenant agrees that it shall remain obligated
under this Lease in accordance with its provisions and that,
except as otherwise expressly provided herein, it shall not take
any action to terminate, rescind or avoid this Lease,
notwithstanding (i) the bankruptcy, insolvency, reorganization,
composition, readjustment, liquidation, dissolution, winding-up
or other proceeding affecting Landlord, (ii) the exercise of any
remedy, including foreclosure, under the Mortgage, or (iii) any
action with respect to this Lease (including the disaffirmance
hereof) which may be taken by Landlord under the Federal

Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise.

(d)  Tenant waives all rights which may now or here-after be conferred by law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, and (ii) to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent or any other sums payable under this Lease, except as otherwise expressly provided herein.

8.    Payment of Impositions; Compliance with Law.

(a)  Subject to the provisions of Paragraph 18 hereof relating to contests, Tenant shall, before interest or penalties are due thereon, pay and discharge all taxes of every kind and nature (including real and personal property income, franchise, withholding, profits and gross receipts taxes), all charges for any easement or agreement maintained for the benefit of any of the Leased Premises, all general and special assessments, levies, permits, inspection and license fees, all water and sewer rents and other utility charges, all ground rents, and all other public charges whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the acquisition, occupancy, leasing, use or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent (including without limitation, any gross income tax, sales tax or excise tax levied by any governmental body on or with   respect   to   such   Basic   Rent)   (collectively   the "Impositions").

Nothing herein shall obligate Tenant to pay Federal, State or local (i) franchise, capital stock or similar taxes, if any, of Landlord, (ii) income, excess profits or other taxes, if any, of Landlord, determined on the basis of its net income, or (iii) any estate, inheritance, succession, gift, capital levy or similar tax unless the taxes referred to in clauses (i) and (ii) above are in lieu of or a substitute for any other tax or

assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect at the commencement of the term, would be payable by Tenant. In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments which become due and payable during the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions. Tenant shall deliver to Landlord, within twenty days of receipt thereof, copies of all settlements and notices pertaining to the Impositions which may be issued by any governmental authority and receipts for payments of all Impositions made during each calendar year of the Term, within ninety days after payment.

(b)    Tenant shall promptly comply with and conform to all of the Legal Requirements, subject to the provisions of Paragraph 18 hereof.

9.    Liens; Recording and Title.

(a)    Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on any of the Leased Premises or Basic Rent or any other sums payable by Tenant under this Lease, other than the Mortgage, the Assignment, the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING ANY OF THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANIC'S OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN AND TO ANY OF THE LEASED PREMISES.

(b)    Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future Law in order to evidence the respective interest of Landlord and Tenant in any of the Leased

-17-

Premises, and shall cause a memorandum of this Lease, and any
supplement hereto or to such other instrument, if any, as may be
appropriate, to be recorded, filed or registered and re-recorded,
refiled or re-registered in such manner and in such places as may
be required by any present or future Law in order to give public
notice and protect the validity of this Lease.

(c) Nothing in this Lease and no action or inaction
by Landlord shall be deemed or construed to mean that Landlord
has granted to Tenant any right, power or permission to do any
act or to make any agreement which may create, give rise to, or
be the foundation for, any right, title, interest or lien in or
upon the estate of Landlord in any of the Leased Premises.

10.    Indemnification.    Tenant agrees to pay, protect,
indemnify, save and hold harmless Landlord from and against any
and all liabilities, losses, damages, penalties, costs, expenses
(including reasonable attorneys' fees and expenses), causes of
action, suits, claims, demands or judgments of any nature
whatsoever, howsoever caused, arising from (i) any of the Leased
Premises or Adjoining Property or the use, non-use, occupancy,
condition,    design,    construction,    maintenance,    repair    or
rebuilding of any of the Leased Premises or Adjoining Property,
and any injury to or death of any person or any loss of or damage
to any property in any manner arising therefrom connected
therewith or occurring thereon, whether or not Landlord has or
should have knowledge or notice of the defect or conditions, if
any, causing or contributing to said injury, death, loss, damage
or other claim, provided, however, that Tenant shall not be
responsible for any such liabilities, losses, etc., arising from
Landlord's construction of the Shopping Center as described in
Paragraph 3A, (ii) any violation by Tenant of any provision of
this Lease, of any contract or agreement to which Tenant is a
party, or of any Legal Requirement or Permitted Encumbrance, or
(iii) any cause other than the negligence or wilful misconduct of
Landlord or its employees. In case any action or proceeding is
brought against Landlord by reason of any such claim, Tenant
covenants upon notice from Landlord to resist or defend Landlord

-18-

in such action, with the expenses of such defense paid by Tenant,
and Landlord will cooperate and assist in the defense of such
action or proceeding if reasonably requested so to do by Tenant.

The obligations of Tenant under this Paragraph 10
shall survive any termination of this Lease.

11.    Maintenance and Repair.

(a) Tenant shall at all times, including any
Requisition period, maintain the Leased Premises, including,
without limitation, the roof, landscaping, walls and structural
components of the Leased Premises, and the Adjoining Property
in good repair and appearance and, in the case of the Equipment,
in good mechanical condition, except for ordinary wear and tear,
and shall promptly make all Alterations (substantially equivalent
in quality and workmanship to the original work) of every kind
and nature, whether foreseen or unforeseen, which may be required
to be made upon or in connection with any of the Leased Premises
in order to keep and maintain the Land, Improvements and
Equipment in as good repair and appearance as they were
originally, except for ordinary wear and tear. Tenant shall do
or cause others to do all shoring of the Leased Premises or
Adjoining Property or of foundations and walls of the
Improvements and every other act necessary or appropriate for
preservation and safety thereof, by reason of or in connection
with any excavation or other building operation upon any of the
Leased Premises or Adjoining Property, whether or not Landlord
shall, by any Legal Requirements, be required to take such action
or be liable for failure to do so. Landlord shall not be required
to make any Alteration, whether foreseen or unforeseen, or to
maintain any of the Leased Premises or Adjoining Property in any
way, and Tenant hereby expressly waives the right to make
Alterations at the expense of Landlord, which right may be
provided for in any Law now or hereafter in effect. Tenant shall
make all repairs and Alterations for which it is responsible
hereunder promptly upon written notice from Landlord, and all
such work shall be in a good, proper and workmanlike manner.

-19-

(b)  Landlord shall have the right, upon notice to Tenant (or without notice in case of emergency), to enter upon any of the Leased Premises for the purpose of making any Alterations which may be necessary by reason of Tenant's failure to comply with the provisions of subparagraph (a) of this Paragraph 11.  Except in case of emergency, the right of entry shall be exercised at reasonable times and at reasonable hours. Tenant shall pay the cost of all such Alterations to Landlord within twenty (20) days from the time of demand for payment by Landlord to Tenant and upon submission of evidence of Landlord's payment of such costs.

(c)  Tenant shall from time to time replace with other operational equipment or parts (the "Replacement Equipment") any of the Equipment (the "Replaced Equipment") which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation as provided in Paragraph 13(d), or been lost, stolen, damaged or destroyed as provided in Paragraph 14.  Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of Replaced Equipment or other personal property of Tenant or the installation of Replacement Equipment.  All Replacement Equipment shall become the property of Landlord, shall be free and clear of all liens and rights of others and shall become a part of the Equipment to the same extent as the Replaced Equipment was.

11A.  Signs.  Tenant may place, erect and maintain any signs on the roof, walls, and any other places on or about its store building, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the Leased Premises resulting from the installation or removal of such signs.

Landlord agrees to construct a shopping center pylon sign adjacent to U.S. Highway #331 as shown on the Site Plan marked "Pylon Sign", and Tenant shall be permitted to affix thereon its electrically illuminated sign panels advertising its

business in the demised premises, to be installed by Tenant, but connected to power outlets to be installed by Landlord, with suitable underground conduit and wiring extending to the pylon from Tenant's store building. Tenant shall be responsible for maintaining its sign panel located on the pylon sign. Additionally, Tenant may, at its cost, erect a sign advertising its business on a site to be determined by it, but within one of the shopping center buffer areas adjacent to the Perry Store Road right-of-way.

12. **Alterations.** Except as otherwise provided in Paragraphs 11, 28 and this Paragraph, Tenant shall not (i) make any Alterations, (ii) construct upon the Land any additional Improvements, (iii) install equipment in the Improvements or accessions to the Equipment, or (iv) do any other act which would tend to impair the value of the Lease Premises, without Landlord's written consent, not to be unreasonably withheld. Notwithstanding the above, Tenant may make non-structural Alterations without the prior written consent of the Landlord. In the event that Landlord gives its prior written consent to any of the actions enumerated in clauses (i), (ii) and (iii) above or if such consent is not required, Tenant agrees that (i) the market value of the Leased Premises shall not be lessened by any such Alteration, construction or installation, or its usefulness or structural integrity impaired, (ii) all such Alterations, construction and installations shall be performed in a good and workmanlike manner, (iii) all such Alterations, construction and installations shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with any such Alteration, construction or installation shall comply with the requirements of any insurance policy required to be maintained by Tenant hereunder, (v) Tenant shall promptly pay all costs and expenses of any such Alteration, construction or installation and shall discharge all liens filed against any of the Leased Premises arising out of the same, (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, construction or installation, and

(vii) all such Alterations, construction and installations shall be the property of Landlord and shall be subject to this Lease.

13.    Condemnation.

(a)    Tenant, immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding at Tenant's expense.  Landlord immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof. Subject to the provisions of this Paragraph 13 and Paragraph 15, Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant is or may be entitled by reason of any Condemnation, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise, but nothing in this Lease shall be deemed to (a) assign to Landlord any award or payment on account of Tenant's trade fixtures, equipment or other tangible property, moving expenses, loss of business and similar claims, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor or (b) impair Tenant's right to any such award or payment so long as such claim is not based upon the value of Tenant's leasehold interest.

(b)    If (i) the entire Leased Premises or (ii) any substantial portion of the Leased Premises, the loss of which even after restoration would be substantially and materially adverse to the business operations of Tenant, shall be subject of Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than sixty days after Landlord gives Tenant notice that Landlord has received a notice of a Taking or Tenant receives notice of a Taking, give notice to Landlord of its intention to terminate this Lease on any Basic Rent Payment Date specified in such notice, which date (the "Termination Date") shall be the latter of the first Basic Rent Payment Date after the actual date of the Taking or the effective date of the Taking under the law of the State.  In such event, the condemnation proceeds shall be retained by Landlord, and the

term of the Lease shall end as of the Termination Date, with Tenant paying all sums and charges otherwise due hereunder through the Termination Date whether or not the Leased Premises are usable in part.

(c) In the event of any other Condemnation of any of the Land or Improvements which does not result in a termination of this Lease, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent or any other sums payable by Tenant hereunder, except as specifically provided in this subparagraph (c). Subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be retained by Landlord and, promptly after such Condemnation Tenant, as provided in Paragraphs 11(a) and 15, shall commence and diligently continue to restore the Land and Improvements as nearly as possible to their value, condition and character immediately prior to such Condemnation, in accordance with the provisions of Paragraph 15.

Upon the final payment to Landlord of the Net Award of a Taking which falls within the provisions of this subparagraph (c), then Landlord shall make the Net Award available to Tenant for restoration, in accordance with the provisions of Paragraph 15.

In the event of a Requisition of any of the Land or Improvements, Landlord shall apply the Net Award of such Requisition, to the extent available, to the installments of Basic Rent or other sums payable by Tenant hereunder thereafter payable and Tenant shall pay any balance remaining thereafter. Upon the expiration of the Term, any portion of such Net Award which shall not have been previously credited to Tenant on account of the Basic Rent shall be retained by Landlord.

(d) If any of the Equipment shall be taken by a Condemnation other than a Condemnation which falls within the provisions of Paragraph 13(b), the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent or any other sums payable by Tenant hereunder. Tenant shall, whether or not the Net Award is sufficient for the

-23-

purpose, promptly replace the Equipment so taken, in accordance with the provisions of Paragraphs 11(d) and 15 and the Net Award of such a Condemnation shall thereupon be payable to Tenant.

(e) Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Paragraph 13(a), no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other.

14. Insurance.

(a) Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i) Insurance against loss or damage to the Improvements and Equipment by fire and other risks from time to time included under standard extended and additional extended coverage vandalism, malicious mischief and flood policies, in amounts not less than the actual replacement value of the Improvements and Equipment, excluding footings and foundations and other parts of the Improvements which are not insurable. Such policies shall contain replacement cost endorsements and not more than a $ 100,000.00 deductible.

(ii) General public liability insurance against claims for bodily injury, death or property damage occurring on, in or about any of the Leased Premises or the Adjoining Property, in an amount not less than $1,000,000 for bodily injury or death to any one person, not less than $5,000,000 for any one accident, and not less than $1,000,000 for property damage. Policies for such insurance shall be for the mutual benefit of Landlord, Tenant and any Lender.

(iii) Worker's compensation insurance covering all persons employed in connection with any work done on or about any of the Leased Premises for which claims for death or bodily injury could be asserted against Landlord Tenant or any of the Leased Premises, or in lieu of such worker's compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State.

-24-

(b)  The insurance required by Paragraph 14(a) shall be written by companies of recognized financial standing which are approved by Landlord and are authorized to do an insurance business in the State.  Notwithstanding the above so long as Tenant is not in default hereunder and its stockholders' equity exceeds $100,000,000, it may self-insure each of the coverages described in Paragraph 14(a) if such self-insurance does not violate any Legal Requirements.  Sums due from Tenant in lieu of insurance proceeds because of such self-insurance shall be treated as insurance proceeds for all purposes under this Lease. The insurance policies (i) shall be for a term of not less than six months, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the worker's compensation insurance referred to in Paragraph 14(a)(iii) hereof) name Landlord, Tenant and any Lender as insured parties, as their respective interests may appear.  If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, or if for any other reasonable cause said insurance shall become unsatisfactory to Landlord, Tenant shall immediately obtain new or additional insurance satisfactory to Landlord.

(c)  Each insurance policy referred to in clauses (i) and (ii) of Paragraph 14(a) shall contain standard non-contributory mortgagee clauses in favor of any Lender.  Each policy shall provide that it may not be cancelled except after 30 days prior notice to Landlord and any Lender.  Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of

an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises.

(d) Tenant shall pay as they become due all premiums for the insurance required by this Paragraph, shall renew or replace each policy, and shall deliver to Landlord such renewal or replacement policy and evidence of the payment of the full premium therefor at least twenty days prior to the expiration date of each policy. In the event of Tenant's failure to comply with any of the foregoing requirements, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be repaid by Tenant within thirty (30) days after written demand therefor by Landlord.

(e) Anything in this Paragraph 14 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 14(a) may be the subject of self-insurance as described in Paragraph 14(b) or be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 14.

(f) In the event of any casualty loss, Tenant shall give Landlord immediate notice thereof. Landlord is hereby authorized to adjust, collect and compromise, in its name or in Tenant's name, all claims under any of the insurance policies required by this Paragraph 14 (except the public liability and worker's compensation insurance) and to execute and deliver on behalf of Tenant all necessary proofs of loss, receipts, vouchers and releases required by the insurers. Tenant agrees to sign, upon request of Landlord, all such proofs of loss, receipts, vouchers and releases. However, if Landlord so elects, Tenant shall adjust, collect and compromise any and all such claims, and Landlord shall have the right to join with Tenant therein. Any adjustment, settlement or compromise of any such claim shall be subject to the prior written approval of Landlord and any Lender, and Landlord and any Lender shall have the right to prosecute or contest, or to require Tenant to prosecute or contest, any such

-26-

claim, adjustment, settlement or compromise. All proceeds of any insurance required under clauses (i) and (ii) of Paragraph 14(a) shall be payable to a trustee selected by Landlord and Tenant and reasonably satisfactory to Lender.   Each insurer is hereby authorized and directed to make payment under said policies, including return of unearned premiums, directly to such trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such trustee as Tenant's attorney-in-fact to endorse any draft therefor.

In the event of any casualty (whether or not insured against) resulting in damage to any of the Leased Premises, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent or any other sums payable by Tenant hereunder, except as hereinafter in this subparagraph (f) specifically provided. The Net Proceeds of such casualty shall be retained by the above-mentioned trustee and, promptly after such casualty, Tenant, as required in Paragraph 11(a), shall commence and diligently continue to restore the Land and Improvements as nearly as possible to their value condition and character immediately prior to such damage, in accordance with the provisions of clauses (i) through (iv) of Paragraph 15(a). Upon the final payment to the trustee of such Net Proceeds, then the trustee shall make the Net Proceeds available to Tenant for restoration, in accordance with the provisions of Paragraph 15(a). In the event of any loss of any of the Equipment which does not fall within the provisions of the immediately preceding paragraph, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent or any other sums payable by Tenant hereunder.  Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace such Equipment, in accordance with the provisions of Paragraph 11(a), and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.

(g) If the Leased Premises are damaged to the extent of 50% or more of the value thereof within such time as less than

three (3) years remains in any Term, Tenant shall have no obligation to restore the Leased Premises if it shall give notice Landlord of its intent not to so restore not later than ninety (90) days after such casualty, but all Net Proceeds payable in connection with such casualty shall be delivered to Landlord, and the Term of this Lease shall terminate upon such payment and payment of all sums otherwise due and payable by Tenant hereunder through the Basic Rent Payment Date stated in Tenant's notice (the "Casualty Termination Date").

Notwithstanding anything to the contrary herein above contained, if, prior to the Casualty Termination Date, Landlord or the trustee shall not have received the full amount of the Net Proceeds payable by reason of the Casualty, the Casualty Termination Date shall automatically be extended to the first Basic Rent Payment Date after receipt by Landlord of the full amount of the Net Proceeds. Such extension shall occur regardless of the reason for the trustee's failure to receive the full amount of the Net Proceeds prior to the originally stated Casualty Termination Date and Landlord shall have the right to contest the amount of any Net Proceeds.

15.    Restoration.

(a)  In the event that Net Proceeds or a Net Award are made available by Landlord for the restoration of any of the Land or Improvements, the trustee shall disburse such proceeds or award only in accordance with the following conditions:

(i)    Prior to commencement of restoration, the architects, contracts, contractors, plans and specifications for the restoration shall have been approved by Landlord, which approval shall not be unreasonably withheld;

(ii)   at the time of any disbursement, no Event or Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged;

(iii)  disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of

the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) waivers of liens, (3) contractors' and subcontractors' sworn statements, (4) a satisfactory bring down of title insurance, and (5) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed, in place and free and clear of mechanics' lien claims;

(iv)    each request for disbursement shall be accompanied by a certificate of Tenant, signed by the President or any Vice President of Tenant, describing the work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease;

(v)    Landlord may retain ten percent of the restoration fund until the restoration is fully completed;

(vi)    the restoration fund shall be kept in a separate interest-bearing account by the trustee; and

(vii)    at all times the undisbursed balance of the restoration fund held by Landlord shall be not less than the cost of completing the restoration work free and clear of all liens.

In addition, prior to commencement of restoration and at any time during restoration, if the estimated cost of restoration, as reasonably determined by Landlord, exceeds the amount of the Net Proceeds or the Net Award available for such restoration, the amount of such excess shall be paid by Tenant the trustee to be added to the restoration fund.    Any sum in the restoration fund added by Tenant which remains in the restoration fund upon the completion of restoration shall be returned to Tenant.    For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of restoration, the Net Proceeds or the Net Award shall be deemed to be disbursed prior to any amount added by Tenant.

-29-

(b) In the event that there are funds not added by Tenant remaining undisbursed upon completion of restoration and full payment therefor (the "Remaining Sum") then such sum shall be credited to Basic Rent subsequently accruing hereunder.

16.   Subordination to Financing.   Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination, provided, however, as a condition to this subordination, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as Tenant fully performs all of its obligations hereunder.   Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law.

Tenant agrees that it will give notice to any holder of a first mortgage encumbering the Leased Premises, provided that Tenant has been notified in writing of the name and address of such mortgage holder, of any defaults of the Landlord or other circumstances which would entitle Tenant to terminate this Lease or abate the rental payable hereunder, specifying the nature of the default by Landlord, and thereupon the holder of the Mortgage shall have the right, but not the obligation, to cure any such default by Landlord, and Tenant will not terminate this Lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days after such notice to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot be reasonably cured within such 30-day

period. No such Lender shall, upon assuming title to the Leased Premises, be liable for any act or omission of any prior landlord (including Landlord), be subject to any offsets or defenses which Tenant may have against any prior landlord, be bound by any rent or additional rent paid for more than the then current period to any prior landlord, or be bound by any agreement or modification of this Lease made without such Lender's consent after Tenant has been given written notice of such Lender's interest, in such a way as to reduce rent, accelerate rent payments, shorten the original term or change any renewal option. Nothing herein shall be construed to be in conflict with the provisions of paragraph 7 hereof.

17.    Assignment, Subleasing and Vacating.  The        Leased Premises may be vacated or may be used by Tenant, or may be assigned or sublet in whole or in part for use as a retail food store, commonly referred to as a supermarket, or for the conduct of any business not in violation of the provisions of any recorded covenants, restrictions or agreements applicable to the Leased Premises or to the shopping center of which the Leased Premises are a part, or of any Legal Requirements. In the event of any vacating, assignment or subleasing as herein permitted, Tenant shall continue to remain liable and responsible for the payment of the Basic Rent and the performance of all its other obligations under this Lease, including but not limited to its obligations under Paragraph 11 hereof with respect to repairs and maintenance.

In the event that Tenant vacates the entire premises or ceases selling merchandise therein for a period of six (6) consecutive months while the premises may be used for the operation of a general mercantile business (excluding temporary cessations caused by events beyond Tenant's control), Landlord shall have the continuing option thereafter, while the premises remain vacant, to terminate and cancel this Lease upon thirty (30) days written notice to Tenant of its election to do so. The exercise of such option shall not be effective if Tenant promptly advises Landlord that it has committed to assign this lease or to

sublet the demised premises to a third party for occupancy within two (2) months or that Tenant is in the process of reopening the premises for business within two (2) months and the premises are used for a business within such two (2) month period.

Each sublease of any of the Leased Premises shall be subject and subordinate to the provisions of this Lease. No assignment or sublease made as permitted by this Paragraph shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. No assignment or sublease shall impose any obligations on Landlord under this Lease. Tenant shall, within ten days after the execution and delivery of any such assignment, deliver a duplicate original copy thereof in recordable form to Landlord, and within ten days after the execution and delivery of any such sublease, Tenant shall deliver a duplicate original copy thereof to Landlord.

Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default. Tenant shall not mortgage or pledge this Lease, and any such mortgage or pledge made in violation of this Paragraph shall be void.

18.    Permitted Contests. Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any lien referred to in Paragraphs 9 or 12, or (iv) take any action with respect to any encroachment, violation, hindrance, obstruction or impairment referred to in Paragraph 11(b) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to

prevent (i) the collection of, or other realization upon, the Imposition or lien so contested, (ii) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such encroachment, violation, hindrance, obstruction or impairment, (iii) any interference with the use or occupancy of any of the Leased Premises, (iv) any interference with the payment of any Basic Rent, and (v) the cancellation of any fire or other insurance policy. Tenant shall provide Landlord security satisfactory in the sole opinion of Landlord assuring the payment, compliance, discharge, removal or other action, including all costs, attorneys' fees, interest and penalties, in the event that the contest is unsuccessful. While any such proceedings are pending and the required security is held by Landlord, Landlord shall not have the right to pay, remove or cause to be discharged the Imposition or lien thereby being contested. Tenant further agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as the conditions of the first sentence of this Paragraph are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Landlord harmless against any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof. No such contest shall subject Landlord to the risk of any civil or criminal liability.

19.    Conditional Limitations; Default Provision.

(a) The occurrence of any one or more of the following shall constitute an Event of Default under this Lease:

(i) a failure by Tenant to make (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity or before any administrative tribunal, which had or might have the effect of preventing Tenant from complying with the provisions of this Lease) any payment of Basic Rent or other sum herein required to be paid by Tenant; (ii) a failure by Tenant to duly perform and observe, or a violation or breach of any other provision hereof; (iii) any representation or warranty made by Tenant herein proves to be incorrect, now or hereafter, in any material respect; (iv) Tenant shall (a) voluntarily be adjudicated a bankrupt or insolvent, (b) seek or consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (c) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, (d) make a general assignment for the benefit of creditors, or (e) be unable to pay its debts as they mature; (v) a court shall enter an order, judgment or decree appointing, with the consent of Tenant, a receiver or trustee for it or for any of the Leased Premises or approving a petition  filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, sixty days after it is entered; (vi) subject to the provisions of Paragraph 17, the Leased Premises shall have been vacated or abandoned; (vii) Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution; or (vii) the estate or interest of Tenant in any of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty days after such levy or attachment.

(b)  If an Event of Default shall have occurred, Land-lord shall have the right at its option, then or at any time thereafter, to do any one or more of the following without demand upon or notice to Tenant:

(1)    Landlord  may  give  Tenant  notice  of  Landlord's intention to terminate this Lease on a date specified in such notice. Upon the date therein specified, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date hereinbefore fixed for the expiration of the Term, but Tenant shall remain liable for all its obligations hereunder through such date, including its liability for Rent as hereinafter provided.

(2)    Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (1) above, (a) give Tenant notice to surrender any of the Leased Premises to Landlord immediately or on a date specified in such notice, at which time Tenant shall surrender and deliver possession of the Leased Premises to Landlord or (b) reenter and repossess any of the Leased Premises by force, summary proceedings, ejectment or any other means or procedure. Upon or at any time after taking possession of any of the Leased Premises, Landlord may remove any persons or property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal. No such entry or repossession shall be construed as an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (1) above.

(3)    After repossession of any of the Leased Premises pursuant to clause (2) above, whether or not this Lease shall have been terminated pursuant to clause (1) above, Landlord shall have the right (but shall be under no obligation) to relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would  otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its absolute discretion, may determine; and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall have no duty to mitigate damages and shall not be responsible or liable for any failure to relet the Leased Premises or any part

thereof or for any failure to collect any rent due upon any such reletting. Landlord may make such Alterations as Landlord in its sole discretion may deem advisable. Tenant agrees to pay Landlord, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting any of the Leased Premises, including fees and commissions of attorneys, architects, agents and brokers.

(4) Landlord may exercise any other right or remedy now or hereafter existing by Law or in equity.

(c) No expiration or termination of this Lease pursuant to Paragraph 19(b)(1) or any other provision of this Lease, by operation of law, repossession of the Leased Premises pursuant to Paragraph 19(b)(2) or otherwise, or reletting of any of the Leased Premises pursuant to Paragraph (19)(b)(3), shall relieve Tenant of any of its liabilities and obligations hereunder, including the liability for Basic Rent, all of which shall survive such expiration, termination, repossession or reletting.

(d) In the event of any expiration or termination of this Lease or repossession of any of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall pay to Landlord Basic Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages (i) Basic Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to Paragraph 19(b)(3), after deducting from such proceeds all of Landlord's expenses in connection with such reletting (including all repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alterations and expenses of preparation for

-36-

reletting).  Tenant hereby agrees to be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages. Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(e)  Before an Event of Default shall exist under this Paragraph 19 or any other Paragraph hereof by reason of an Event of Default under subparagraph (a) of this Paragraph 19, Landlord shall have given Tenant notice thereof and Tenant shall have failed to cure the Default within the applicable grace period stated below.  If the cure consists of payment of money or furnishing of insurance coverages required in Paragraph 14, the applicable grace period shall be 5 days from the date on which the notice is received.  If the cure consists of something other than payment of money (except the failure to provide insurance), the applicable grace period shall be thirty days from the date on which the notice is given, or such longer time as reasonably necessary to cure the default, provided that Tenant shall commence to cure the default within said thirty day period and actively, diligently and in good faith proceed with continued curing of the default until it shall be fully cured.

20.    Additional Rights of Landlord.

(a)  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease.  No delay or failure by Landlord to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.  In addition to the other remedies provided in this Lease, Landlord shall be entitled, to the extent permitted by applicable Law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

-37-

(b)  Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future Law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future Law which exempts property from liability for debt or for distress for rent.

(c)  Tenant shall pay to Landlord all the expenses incurred by Landlord in connection with any Event of Default or the exercise of any remedy by reason of an Event of Default, including attorneys' fees and expenses.  If Landlord shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or any of the Leased Premises, at the option of Landlord, Tenant, at its expense, shall provide Landlord with counsel approved by Landlord and shall pay all costs incurred or paid by Landlord in connection with such litigation.

21.  Notices.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease shall be in writing and shall be deemed to have been given for all purposes when delivered in person or when deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address stated above.  For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

22.  Estoppel Certificate.  Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by a President, Vice President or authorized general partner certifying (i) that this Lease is unmodified and in full effect (or,

if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent and all other sums payable hereunder have been paid, (iii) that to the knowledge of the signer of such certificate no default by either Landlord or Tenant exists hereunder or specifying each such default of which the signer may have knowledge; and (iv) with respect to a certificate signed on behalf of Tenant, that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant, or if any such proceedings are pending or threatened to said signer's knowledge, specifying and describing the same. It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective purchaser of the Leased Premises.

23. **Surrender and Holding Over.** Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except for any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear. Tenant shall remove from the Land and Improvements on or prior to such expiration or earlier termination all property situated thereon which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property

-39-

and repairing any damage to any of the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination. Tenant shall not commit waste of the Leased Premises.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof shall operate and be construed as a tenancy from month to month only, at the Basic Rent and Percentage Rent (as defined in Exhibit "D") reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over shall entitle Landlord, in addition to collecting rentals, to exercise all rights and remedies provided by law or in equity, including the remedies of paragraph 19(b).

24. **Risk of Loss.** The risk of loss or of decrease in the enjoyment and beneficial use of any of the Leased Premises in consequence of the damage or destruction thereof by fire, the elements, casualties, thefts, riots, wars or otherwise, or in consequence of foreclosure, attachments, levies or executions (other than by Landlord and those claiming from through or under Landlord) is assumed by Tenant, and Landlord shall in no event be answerable or accountable therefor. Except as otherwise specifically provided in this Lease, none of the events mentioned in this Paragraph shall entitle Tenant to any abatement of Basic Rent.

25. **No Merger of Title.** There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly; (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (b) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership. No such merger shall

-40-

occur unless and until all persons, corporations, firms and other entities having any interest in (i) this Lease or the leasehold estate created by this Lease and (ii) the fee estate in or owner-ship of the Leased Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

26. **Non-Recourse.** Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Leased Premises and not against any other assets, properties or funds of Landlord or any director, officer, general partner, limited partner, employee or agent of Landlord or any legal representative, heir, estate, successor or assign of any thereof.

27. **Security Agreement/Uniform Commercial Code.**

With respect to the personal property located on the Leased Premises and owned by the Tenant, including heating, air conditioning and ventilating equipment and other equipment necessary for the operation of the Improvements as shown in the plans and specifications for the Improvements (but excluding Tenant's trade fixtures and equipment), Tenant hereby grants to Landlord a security interest in and to such property as security for its obligations under this Lease. This Lease constitutes a Security Agreement as defined in the Uniform Commercial Code of the State. If requested by Landlord, Tenant agrees to execute and deliver to Landlord financing statements which upon filing will give notice to third parties of such security interest.

28. **Expansion.** Tenant is hereby granted the option and privilege at any time during the term of this Lease or any extensions thereof, of enlarging its store building by incorporating the area on its southerly side with an addition not exceeding sixty (60) feet in width by one hundred seventy-five (175) feet in depth. This option may be exercised at any time. Upon at least three (3) months notice to Landlord by Tenant, Landlord agrees to construct such addition for occupancy by Tenant, in accordance with plans and specifications to be

approved by the parties, with all due diligence following the
vacation of the necessary area by other tenant.  The addition
shall be of like quality of construction as Tenant's original
building.  In order to facilitate the expansion of Tenant's store
building, Landlord agrees that any adjacent building or buildings
within the expansion area shall be of like structural quality and
in architectural harmony with Tenant's store building, shall
front on the line which is the interior sidewalk line of Tenant's
store building, and shall have a finish floor level, and roof and
ceiling heights which shall be at the same elevations as the
finish floor level, roof and ceiling heights of Tenant's store
building.  Further, Landlord agrees that the wall of Tenant's
store building adjoining the expansion areas shall be constructed
with steel column equivalently spaced to the nearest row of steel
column supports within the open area of Tenant's demised store
building, and such wall supports shall be of sufficient load
bearing capacity to carry the roof support system across the full
span of the original and of the expanded building width.

If, at the date of completion of any such building addition,
fewer than ten (10) years of the term of this Lease remain, the
term of this Lease shall be extended for the period of time
necessary to provide a full ten (10) years from that date.
Thereafter, for the balance of the term, including extensions,
the Basic Rent component of Basic Rent as described on Exhibit
"D" (and the base for computation of the Percentage Rent
component of Basic Rent) shall be increased by the greater of: an
amount equal to twelve percent (12%) of the cost of the addition,
or an amount equal to $5.75 per square foot of the enlarged area,
or an amount equal to a computed percentage multiplied by the
cost of such addition, such percentage being equal to four
percent (4%) plus the current prime interest rate (as published
by the Federal Reserve or in the Wall Street Journal or similar
public source) at the time of Tenant's notice to Landlord.  At
Tenant's request, the construction cost shall be established by
bids obtained by Landlord from at least three (3) reputable
contractors acceptable by Tenant.  The final cost of the addition

upon completion shall be certified by the general contractor performing the work.  If the term of this Lease is extended to provide a full ten (10) year term, the provisions of the Lease shall remain in effect, and the option periods, if any, shall follow upon the end of the extended term.    Basic Rent, as adjusted by reason of the addition, shall continue.    Upon completion, the addition shall be a part of the Leased Premises, and all references to the Leased Premises contained in this Lease shall be construed to include both Tenant's store building and the addition.

Causing any addition to be constructed is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.    However, nothing contained in this Lease shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the Leased Premises, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Paragraph 28.    Additionally, Landlord's obligation shall not limit Tenant's right to undertake and complete the addition at its own cost, as described later in this Paragraph 28.

If Landlord, for any reason, fails or refuses to construct the building addition contemplated after Tenant has properly exercised its option, Tenant, as its sole remedy and at its option, and at its own expense, shall have the right to construct the building addition of the size and quality set forth above. If Tenant constructs the addition, Tenant agrees to cause any mechanics' liens incurred by and in connection with such addition to be promptly discharged, Tenant further agrees to indemnify and hold Landlord harmless from any expense occasioned by mechanics' liens.  If, upon completion and occupancy of a building addition by Tenant, fewer than ten (10) years of the term of this Lease remain, the lease term shall be extended for a period of time necessary to provide a full ten (10) year term. There shall be no increase in the Basic Rent component of Basic Rent by reason of Tenant's expansion and, for ten (10) years following the date of

completion of the addition, the base for calculation of the Percentage Rent component of Basic Rent, if any, shall be increased by an amount equal to the greatest of the three (3) factors set forth in the second paragraph of this Paragraph 28. Upon expiration of ten (10) years following the date of completion of the addition, the base for calculation of the Percentage Rent component of Basic Rent shall revert to the Basic Rent component of Basic Rent set forth in Exhibit "D."

29.    **Right of First Refusal.** Tenant shall have the right of first refusal of the Leased Premises as hereinafter set forth. If at any time during the Term Landlord shall receive a bona fide offer (other than at public auction) from a third person (except in lieu of exercise of the power of eminent domain) for the purchase of the Leased Premises, which offer Landlord shall desire to accept, Landlord shall promptly deliver to Tenant a copy of such offer, and Tenant may within 15 days thereafter elect to purchase the Leased Premises on the same terms and conditions as those set forth in such offer. If Tenant shall not accept such offer within the time herein specified the aforesaid right of first refusal shall terminate but the Term of this Lease shall otherwise continue.

The right of first refusal in this paragraph shall be inapplicable to a transfer by way of sale, gift, or devise, including a trust, to or for a party related to Landlord, or to any transfer from one such related party to another, but shall apply to any subsequent transfer to a third person.    For the purpose of this paragraph, if the then owner of the Leased Premises shall be an individual, a related party shall include a spouse, lineal descendant or spouse of such descendant, ancestor or sibling (whether by the whole or half blood), partnership of which such owner is a member, a joint ownership or ownership in common which includes the then owner of the Leased Premises, or a corporation the majority of whose securities is owned by the owner of the Leased Premises, or any one or more of the foregoing parties.    If the then owner of the Leased Premises shall be a corporation, a related party shall include an affiliate,

-44-

subsidiary or parent corporation, a successor by merger or consolidation or the holder or holders of the majority of the securities of such corporation. If the then owner of the Leased Premises shall be a partnership, a related party shall include an affiliate as that term is defined in the prospectus of Landlord as the same may be amended from time to time.

30. Miscellaneous. The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease the singular shall include the plural as the context requires, and the following words and phrases shall have the following meanings: (a) "including" shall mean "including but not limited to"; (b) "provisions" shall mean "provisions terms, agreements, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (d) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition"; (e) "any of the Leased Premises" shall mean "the Leased Premises or any part thereof or interest therein"; (f) "any of the Land" shall mean "the Land or any part thereof or interest therein"; (g) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein"; (h) "any of the Equipment" shall mean "the Equipment or any part thereof or interest therein"; and (i) "any of the Adjoining Property" shall mean "the Adjoining Property or any part thereof or interest therein". Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord. Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. Each appointment of Landlord as attorney-in-fact for Tenant under this Lease is irrevocable and coupled with an interest. Landlord has the right to refuse to grant its consent whenever such consent is required under this Lease. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by

-45-

the party against whom enforcement of any such modification, amendment, discharge or waiver is sought. The covenants of this Lease shall run with the land and bind Tenant, the heirs, distributees, personal representatives, successors and assigns of Tenant and all present and subsequent encumbrancers and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several. In the event any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Lease will be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes stamped or marked "Counterpart Number 1" shall constitute "chattel paper" or other "collateral" within the meaning of the Uniform Commercial Code in effect in any jurisdiction. This Lease shall be governed by and construed according to the Laws of the State.

IN WITNESS WHEREOF, Landlord and Tenant have caused this

instrument to be executed as of the day and year first above written.

Signed sealed and delivered
in the presence of:

OPP PARTNERS, LTD., an
Alabama Limited Partnership

BY: CORPORATE GENERAL, INC.,
an Alabama corporation

_Alise Atcheson_

_Jeanette Seavers_
As to Landlord

By: _Thomas W. Orm_
    Its                    President

Attest: _Hugh H. Minor_
        Its                Secretary

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE MONTGOMERY, INC., a
Kentucky corporation

_P. Wiley_

_Rebecca L. Sawyer_
As to Tenant

By: _____
    Its          Vice President

Attest: _____
        Its              Secretary

(CORPORATE SEAL)

TENANT



TITLE

## LEASE PLAN

SCALE

1" = 40'

DATE

JUNE 8,1993

FIELD BOOK

DESIGNED BY

DRAWN BY

CHECKED BY

APPROVED BY

RON BELL

REVISIONS

SEPT. 10, 1993

OCT. 5, 1993

ALABAMA
PROFESSIONAL ENGINEER AND
REGISTERED
NO. 10689
LAND SURVEYOR
RONALD L. BELL

EXHIBIT A
PLOT PLAN

DATE
APPROVED BY:

INITIAL

APPROVED
TO FORM

SHEET NO.

## LP

SEQUENCE NO.

1 OF 1

G U A R A N T Y

In consideration of the sum of Ten Dollars ($10.00) paid

OPP PARTNERS, LTD., an Alabama limited partnership

_____

_____

_____

hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida co:
ation with its principal office at 5050 Edgewood Court, Jacksonville,
Florida 32205, hereinafter called "Guarantor", the receipt and suffi-
ciency whereof are hereby acknowledged, Guarantor does hereby guarante
unto Landlord, its heirs, legal representatives, successors and assign
the due performance and observance by  WINN-DIXIE MONTGOMERY, INC.,

a Kentucky corporation qualified to do business in the State of Ala

_____

hereinafter called "Tenant", of all the terms, covenants and condition
on the part of Tenant to be performed and observed including, without
limitation, payment of rentals under the attached and foregoing lease
agreement dated   November 5, 1993            , covering certain prem
located   at the southeast corner of Perry Store Road and US 331 in the
City of Opp, County of Covington, State of Alabama

_____

_____

IN WITNESS WHEREOF, Guarantor has caused this Guaranty t
executed in its corporate name and its corporate seal to be hereunto
affixed and attested by its officers thereunto duly authorized this
5th   day of   November            , 19  93  .

Signed, sealed and delivered
in the presence of:

WINN-DIXIE STORES, INC.

By _____
Its                   President

Attest: _____
Its              Secretary

(CORPORATE SEAL)

GUARANTOR

STATE OF        )
                 )
COUNTY OF      )

       I,     Rebecca L. Sawyer    , a Notary Public in and for said County,     in     said     State,     hereby     certify     that James Kufeldt              , whose name as President of WINN-DIXIE STORES, INC., a Florida corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such President and with full authority, executed the same voluntarily on the day the same bears date.

       Given under my hand and official seal this _5th_ day of _November_ , 1993.

                                _Rebecca L. Sawyer_
                                Notary Public, State and County aforesaid.

                                My Commission Expires 6-9-94

(NOTARIAL SEAL)

NOTARY PUBLIC
STATE OF FLORIDA

REBECCA L. SAWYER
My Comm. Exp. June 9, 1994
Comm. No. CC 012880

EXHIBIT A

LEGAL DESCRIPTION

STATE OF ALABAMA
COVINGTON COUNTY

WINN-DIXIE PARCEL (PARCEL A-1)

A PARCEL OF LAND LYING IN AND BEING A PART OF THE SOUTH ½ OF
THE SOUTHEAST QUARTER OF SECTION 28, AND THE NORTHEAST
QUARTER OF THE NORTHEAST QUARTER OF SECTION 33, ALL IN
TOWNSHIP 4 NORTH, RANGE 18 EAST AND BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF
THE SOUTHEAST QUARTER OF SECTION 28, TOWNSHIP 4 NORTH, RANGE
18 EAST AND RUN THENCE NORTH 89° 54' 25" WEST ALONG THE SOUTH
LINE OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF
SECTION 28 FOR A DISTANCE OF 163.64 FEET TO A POINT ON THE
EAST RIGHT-OF-WAY LINE OF U.S. HIGHWAY 331; THENCE NORTH 16°
19' 15" WEST ALONG SAID EAST RIGHT-OF-WAY LINE FOR A DISTANCE
OF 55.86 FEET; THENCE CONTINUE ALONG SAID EAST RIGHT-OF-WAY
LINE A CURVE TO THE LEFT (HAVING A RADIUS OF 1103.62 FEET, A
CHORD BEARING OF NORTH 21° 25' 45" WEST, A CHORD DISTANCE OF
196.54 FEET) AN ARC DISTANCE OF 196.80 FEET; THENCE LEAVING
SAID EAST RIGHT-OF-WAY LINE NORTH 64° 29' 45" EAST A DISTANCE
OF 32.31 FEET; THENCE NORTH 00° 09' 54" EAST A DISTANCE OF
59.18 FEET; THENCE SOUTH 89° 50' 06" EAST A DISTANCE OF
236.70 FEET; THENCE SOUTH 00° 09' 54" WEST A DISTANCE OF
61.28 FEET; THENCE SOUTH 89° 50' 06" EAST A DISTANCE OF
206.00 FEET; THENCE NORTH 00° 09' 54" EAST A DISTANCE OF
203.85 FEET; TO A POINT LYING ON THE SOUTH RIGHT-OF-WAY LINE
OF COUNTY HIGHWAY 22 (OPP-ALBERTON ROAD); THENCE ALONG SAID
SOUTH RIGHT-OF-WAY LINE SOUTH 84° 55' 00" EAST A DISTANCE OF
129.19 FEET; THENCE LEAVING SAID SOUTH RIGHT-OF-WAY SOUTH 00°
13' 55" WEST A DISTANCE OF 447.77 FEET; THENCE NORTH 89° 50'
06" WEST A DISTANCE OF 348.19 FEET; THENCE NORTH 00° 09' 54"
EAST A DISTANCE OF 7.00 FEET TO THE POINT-OF-BEGINNING SAID
WINN-DIXIE PARCEL CONTAINING 4.12 ACRES, MORE OR LESS.

EXHIBIT "B"

MACHINERY AND EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements but excluding trade fixtures, inventory, furniture and other personalty belonging to Tenant not shown on the plans and specifications for the building.

EXHIBIT "C"

PERMITTED ENCUMBRANCES

EXHIBIT "D"

BASIC RENT PAYMENTS

1.  **Basic Rent.** Subject to the adjustment provided for in Paragraph 2, Basic Rent shall be $176,093.75 per annum, payable monthly in advance on the fifth day of each month in equal installments of $14,674.48 each, except that if the Commencement Date shall not occur on the fifth day of a calendar month, the installment of Basic Rent due on the first Basic Rent Payment Date shall be equal to the product of (a) the monthly rent installment and (b) the fraction whose numerator is the number of days from (and including) the Commencement Date through (and including) the fifth day of the calendar month next following the first Basic Rent Payment Date and whose denominator is thirty.

2.  **Gross Sales Adjustments to Basic Rent.** In addition to Basic Rent, Tenant shall pay the amount, if any, by which one percent (1%) of the Gross Sales (as hereinafter defined) exceeds the Basic Rent for any of Tenant's fiscal years ending on or about June 30. (Such sum is hereafter called the "Percentage Rent").

"Gross Sales" as used herein shall mean the aggregate gross sales of all merchandise sold, and gross charges for all services rendered in or from the Leased Premises both for cash and on credit; provided however such terms shall not include (1) any rental tax, or any sales tax, gross receipts tax or similar tax by whatever name called, the amount of which is determined by the amount of sales made and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the Leased Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines; (6) accommodation check cashing fees and accommodation sales such as sales of postage stamps, lottery tickets, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the Leased Premises.

Tenant shall submit to Landlord on or before the sixtieth day following the end of each of Tenant's fiscal years for accounting purposes a statement signed by Tenant demonstrating in reasonable detail the amount of Gross Sales for the preceding fiscal year as set forth in Tenant's regularly maintained books and records. Any Percentage Rent due for that fiscal year shall be immediately payable within 60 days of the end of Tenant's fiscal year.

Tenant shall keep at all times during the Term of this Lease, at the Leased Premises or at the principal office of Tenant, full, complete and accurate books of account and records in accordance with accepted accounting practices with respect to all operations of the business conducted in or from the Leased Premises for at least one year from the end of the fiscal year to which they are applicable, or, if any audit is required or a controversy should arise between the parties hereto regarding the Percentage Rent payable hereunder, until such audit or controversy is terminated. Such books and records shall at all reasonable times be open to the inspection of the Landlord or its duly authorized representatives, who shall have full and free access to such books and records, the right to audit such books and records, and the right to require of Tenant, its agents and

employees, such information or explanation with respect to such books and records as may be necessary for a proper examination and/or audit thereof.

If the examination and/or audit referred to in the immediately preceding paragraph shall disclose a liability for payment of Percentage Rent to the extent of three percent or more in excess of the Percentage Rent theretofore computed and paid by Tenant for the period being examined, Tenant shall pay to Landlord the cost of such examination and/or audit in addition to the deficiency of Percentage Rent.

EXHIBIT D - Page 2



TITLE
# LEASE PLAN

SCALE: 1" = 40'
DATE JUNE 8, 1993
FIELD BOOK
DESIGNED BY:
DRAWN BY:
CHECKED BY:
APPROVED BY: RON BELL
REVISIONS
SEPT. 10, 1993
OCT. 5, 1993
NOV. 16, 93
JUNE 21, 1994
SEPT. 30, 1994

ALABAMA
PROFESSIONAL ENGINEER AND
REGISTERED
NO. 10689
LAND SURVEYOR
RONALD L. BELL

SHEET NO.
LP
SEQUENCE NO.
1 OF 1

APPROVED AS TO FORM
Division Manager
Legal Dept.
Winn-Dixie Stores, Inc.

PLOT PLAN
DATE 12/29/94
APPROVED BY:
LANDLORD
TENANT

EXHIBIT B-1