### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

### NOTICE OF FILING

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates, as debtors and debtors in possession, give notice of filing the attached Fifth Interim Application for Allowance of Fees and Expenses for XRoads Solutions Group, LLC, for the period from May 28, 2006 through September 30, 2006.

Dated:  November 22, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By    *s/ D. J. Baker*
    D. J. Baker
    Sally McDonald Henry
    Rosalie Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY


By    *s/ Cynthia C. Jackson*
    Stephen D. Busey
    James H. Post
    Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

00550192

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | CASE NO.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et. al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

**SUMMARY OF FIFTH INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD MAY 28, 2006 TO SEPTEMBER 30, 2006**

1. Name of Applicant:  XRoads Solutions Group, LLC

2. Role of Applicant:   Financial Advisors and Operations Restructuring Consultants for the Debtors

3. Name of Certifying Professional:   Holly Felder Etlin

4. Date Case Filed:   February 21, 2005

5. Date of Application for Employment:  February 21, 2005

6. Date of Order Approving Employment:   June 2, 2005 (final Order)

7. If Debtors' counsel, date of disclosure of Compensation form:  N/A

8. Date of this Application:   November 20, 2006

9. Dates of Services Covered:  May 28, 2006 through September 30, 2006[1]

**FEES:**

10. Amount of 100% compensation sought
    as actual, reasonable and necessary:                    $1,811,021.00

**EXPENSES:**

11. Amount of 100% expense reimbursement sought
    as actual, reasonable and necessary:                    $    122,269.61

**TOTALS:**

12. Total Amount Requested for 5th Interim:              **$1,933,290.61**

13. Total of Fees and Expenses for this period paid to date:   ($1,571,086.41)

14. **Total Balance Due for 5th Interim Period:**          **$ 362,204.20**

---

[1] Time and Expenses covered in the monthly fee application of June, 2006 is for the dates of May 28, 2006 through July 1, 2006, due to XRoads' month end reporting cycle.

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **CASE NO.  05-03817-3F1** |
| | ) | |
| **WINN-DIXIE STORES, INC., et. al.,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

**FIFTH INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD MAY 28, 2006 TO SEPTEMBER 30, 2006**

XRoads Solutions Group, LLC ("XRoads" or "Applicant"), financial advisors and operations restructuring consultants to the Debtors and Debtors-in-possession in the above-captioned cases (Winn-Dixie Stores, Inc. is hereinafter sometimes referred to as the "Company", and the Debtors-in-possession are collectively referred to as the "Debtors"), hereby makes its Fifth Interim Application for Allowance and Payment of Compensation and Reimbursement of Expenses for services rendered and costs incurred in this Chapter 11 proceeding from May 28, 2006 through September 30, 2006 (the "Application")[2].  This Application is filed pursuant to 11 U.S.C § 330 and Federal Rule of Bankruptcy Procedure 2016, as well as the Court's Order Establishing Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 professionals entered on March 15, 2005.  Four previous applications have been heard and approved by this Court.  This is the Fifth interim application filed by the XRoads, financial and operations restructuring consultants for the Debtors and is not an amendment or supplement to a previous Fee Application.  The Exhibits attached to this Application, pursuant to the Guidelines are:

**Exhibit "1"** – Retention Order

**Exhibit "2"** – Application to Employ XRoads

**Exhibit "3"** – Summary of Professionals' Time

**Exhibit "4"** – Summary of Requested Reimbursement of Expenses

**Exhibit "5"** – XRoads' complete time records, in chronological order, by activity code for the time period covered in this Application.  The requested fees are itemized to the tenth of an hour.

**Exhibit "6"** – XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

In support of this Application, XRoads respectfully represents as follows:

---

[2] Time and Expenses covered in the monthly fee application of June, 2006 is for the dates of May 28, 2006 through July 1, 2006, due to XRoads' month end reporting cycle.

## GENERAL BACKROUND

1.       The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2.       The Debtors will continue in possession of their property and will operate and manage their businesses as Debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.       The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate approximately 530 stores in the United States (down from over 900 at the commencement of these cases).  Substantially all of the Debtors' store locations are leased rather than owned.

4.       The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins.  The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar super centers, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

5.       XRoads has filed four previous interim fee applications for services rendered and costs incurred in this Chapter 11 proceeding from February 21, 2005 through May 27, 2006 which included professional and non-professional services totaling $18,661,465.80.  The overall hourly rate charged during this period averaged $370 based on total gross hours incurred, both billable and non-billable.  No objections were filed and XRoads' fees were approved as presented.

6.       As authorized in the Order approving Interim Compensation Procedures for Professionals in Debtors' Case, XRoads has submitted monthly requests for payment of fees and reimbursement of expenses to the Debtors during the Application Period, with copies to the Office of the United States Trustee, counsel to the Committee of Unsecured Creditors, counsel for the Debtors and the Fee Examiner.  No objections to XRoads' monthly requests for payment have been submitted.  As such, the Company has paid XRoads 80% of its fees and 100% of its expenses incurred for the months of February through April, 2006 in the amount of $1,088,747.50.  It is anticipated that XRoads will receive payment of a portion of the September, 2006 fees and expenses pursuant to the Fee Procedure Order prior to the hearing on this Application.  All payments received will be identified and credited before the hearing.

3

**RETENTION OF XROADS**

7.      By Final Order dated June 6, 2005 under section 327(a) of the Bankruptcy Code (the "Retention Order"), XRoads was authorized to be employed by the Debtors as Financial and Operations Restructuring Consultant in connection with the Chapter 11 cases *nunc pro tunc* to February 21, 2005.  A true and correct copy of the Retention Order is attached hereto as Exhibit "1." and true and correct copy of the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants is attached hereto as Exhibit "2." Pursuant to the Engagement Letter dated March 4, 2005, which was attached to the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants, the computation for XRoads' fees earned during this Application Period includes a base monthly rate of $200,000 for the first 400 hours of service plus $400 per hour for all hours over the 400 hour threshold.

8.       XRoads incurred a gross amount of 4,698.4 hours of professional services during this Application Period.  XRoads charged the Debtors a net amount of 3,931.8 hours (a voluntary reduction of 766.6 hours).  Pursuant to XRoads' engagement agreement, the first 1,600 hours (400 x 4 months) is capped at $800,000 ($200,000 per month).  The remaining 2,331.8 hours are billed at $400 per hour (or $931,722.5).

9.      In addition, non-professional services including database management, technical support and certain portions of the claims reconciliation process have been charged at rates of $85 to $160 per hour in accordance with XRoads' engagement agreement.  Clerical and secretarial services have been provided free of charge.  Costs incurred by the "on-client site" clerical and secretarial support while at the Debtors' location have not been charged to the Estate.  XRoads incurred a gross amount of 721.9 hours for non-professional services during this Application Period of which 645.4 were billed (or $79,298.50).

10.     Combined fees for professional and non-professional services for this Application Period total $1,933,290.61.  The overall hourly rate charged to the Debtors for this Application Period averages $460 based on net billable hours (or an average hourly rate of $385 based on total gross hours incurred).

**OVERVIEW OF XROADS' KEY ACCOMPLISHMENTS**

11.     During this Application Period, XRoads continued to lead the five major initiatives outlined below, completing the majority of the work ahead of schedule and beating our initial estimates.  Below is a detailed description of XRoads' accomplishments during this billing period, but the highlights include the following:

**Overhead Cost Reductions:**  During this time period XRoads managed several significant areas of cost reductions on behalf of the Debtors including sourcing, contract renegotiations and specific cost reduction initiatives.  The following is a brief outline of the quantifiable sourcing cost reductions that have been achieved by XRoads' Performance Improvement Group as well as the fees charged by XRoads associated with each portion of the project:

| Project | XRoads' Fees | Savings |
|---|---|---|
| Wave I of overhead cost savings targeted at: office supplies, paper, security guard services, temporary services, pallets, shrink films, lighting, temporary pharmacy services and store facility repairs. | $   800,000 | $2.4 million |
| Wave II of overhead cost savings targeted at commercial print, janitorial and store equipment purchases | $   800,000 | $20.6 million |
| Wave III of overhead cost savings. | $   800,000 | $2.5 to $5 million |
| Data Processing Center Consolidation | $   150,000 | $1.5 million |
| Winn-Dixie department savings under the direction of XRoads' Brad Boggess | $          0 | $6.5 million |
| **Total** | **$2,550,000** | **$33.5 to $36.0 million** |

XRoads is also responsible for the analysis and renegotiation of approximately three thousand executory contracts which represent potential claims totaling approximately $50 million. During this period XRoads substantially completed the analysis and renegotiation of its contracts, which will ultimately result in annual savings to the Debtors in excess of $15 million. XRoads has also assisted management in a variety of specific supplemental cost reduction initiatives during this period targeted at reducing overhead by an additional $10 million.

**Increased Liquidity:**  In prior periods, XRoads completed the majority of the work in this area enabling the Debtors to increase liquidity by approximately $170 million, although as additional vendors continue to express a desire to opt into the trade lien program, XRoads continues to manage all of the documentation and communication between the vendors and Winn-Dixie.   XRoads continued to lead Winn-Dixie's initiative for both short term and long term liquidity improvement by: (1) working to open up credit terms with trade vendors, (2) eliminate CIA prepaid inventory, (3) step up efforts for the collection of vendor deposits, and (5) focus on the collection of post-petition vendor credits from CIA vendors.

**Disposition of Excess/Unused Assets:**  Subsequent to the disposition of the 326 stores described in previous applications, during the Application Period XRoads managed the disposition of 22 stores resulting in proceeds of approximately $16 million.  In addition, during the Application Period, XRoads managed  (i) the closing on the sale on the Pompano distribution center; (ii) the sale of an owned store in Stockbridge, Georgia; (iii) the sale of owned warehouses in Harahan, Louisiana and Louisville; and (iv) the sale of three owned outparcels.  These  sales of excess owned properties generated over $20 million (exclusive of Pompano) in proceeds during this Application Period and avoidance of several million dollars in potential claims.

**Resolution of Claims:**  During this period, the Debtors substantially completed their full scale claims reconciliation process.  XRoads assisted management in managing and reporting on the ongoing process, as well as negotiating with claimants to resolve disputes in connection with those claims.  In addition, XRoads has assisted Debtors' counsel in reviewing and finalizing the numerous exhibits to the omnibus objections to claims.  The Debtors have substantially completed the reconciliation process for nearly 23,000 claims.   This process will result in the reduction of claims from in a filed amount in excess of $25 billion to an estimated allowed amount of approximately $1.1 billion.

**Plan of Reorganization Activities:**  During this period, XRoads, in conjunction with Blackstone and Debtors' counsel, performed substantial analysis in connection with the finalization of the Debtors' Disclosure Statement and Plan of Reorganization.  This analysis included the preparation of the liquidation analysis in connection with the formulation of the Plan, the estimation of allowed claims for the various classes in the Plan, and the analysis of the Debtors' business practices, accounting records and other evidence associated with the assessment of the Debtors' potential substantive consolidation.  In addition, XRoads assisted the Debtors with analysis of their pre and post exit liquidity and the associated implications on the Debtors' exit financing structure.

12.     The major initiatives led by XRoads include:  (1) non-merchandise cost reductions and outsourcing, (2) disposition of excess/unused assets, (3) real estate and occupancy cost reductions, and (4) claims settlement negotiations.

  a.     **Non-Merchandise Cost Reductions and Outsourcing:**

    i.     XRoads strategic sourcing group identified alternative sourcing opportunities in 3 major phases (Wave 1, Wave 2, and Wave 3) resulting in the identification of approximately $29 million of savings.  In order to track sourcing savings and the soft

benefits, XRoads designed a scorecard system and trained Winn-Dixie's staff in the use of these tools.  XRoads then transitioned the resulting contracts from this first phase of cost reductions to the Winn-Dixie personnel.  In order to effectuate a sustainable program, XRoads developed a standard set of tools and templates to facilitate industry analysis, supplier research, RFP creation, negotiation execution, and savings tracking.

ii.    XRoads completed work with Winn-Dixie IT to evaluate outsourcing opportunities for shelf tags and related Data Processing responsibilities.  The recommendation associated with this work has identified an additional $1.5 million savings for the Company.

iii.    In addition to achieving the results outlined above, XRoads has developed a standard set of tools and templates to facilitate industry analysis, supplier research, RFP creation, negotiation execution, and savings tracking and has trained Winn-Dixie's staff in these methodologies in order to effectuate a sustainable program.

b.    **Disposition of Excess/Unused Assets:**  In addition to closing 326 stores in prior periods and all of the related negotiations with each of the landlords and computation of rejection damages, XRoads continued to manage the asset disposition process, including;

i.    The sale of 22 store leases, resulting in proceeds of approximately $16 million.

ii.    The sale of an owned store in Stockbridge, Georgia, resulting in proceeds of approximately $2 million.

iii.    The sale of owned warehouses in Harahan, Louisiana, and Louisville resulting in proceeds of approximately $10.4 million.

iv.    The sale of three excess owned properties, resulting proceeds of approximately $8.3 million.

v.    The closing on the sale of the Pompano distribution center, resulting in proceeds of approximately $51 million.

c.    **Real Estate and Occupancy Cost Reductions:**  To date, over 470 real estate leases have been rejected (with creditor committee and court approval), resulting in the reduction of the monthly lease payments by approximately $19.3 million and reduction of total lease liabilities by approximately $1.8 billion.  In addition, XRoads managed the lease disposition process, including negotiations with landlords, equipment sales, the orderly closure of stores and the GOB process.  XRoads' real estate team completed the elimination of sandwich leases with rent

subsidies. Through its efforts since the petition date, XRoads eliminated approximately 47 negative subsidy "sandwich" leases , which had cost the company approximately $6 million per year.  In addition, XRoads continued negotiations with all landlords on the go-forward stores to resolve claims and potential cure payments for lease assumptions expected with the Plan of Reorganization.

    d.    **Claims Settlement:**  XRoads completed the analysis and reconciliation of over 4,300 claims. The $2.2 billion filed amount of these claims was reduced to an estimated allowed amount of $414.5 million, a reduction of more than $1.8 billion. XRoads completed the majority of the reconciliation of reclamation claims by December 2005, although several additional vendors expressed a desire to opt into the Trade Lien Program during the Application Period.  XRoads continued to be responsible for generating the documents (term memos, reconciliation worksheets and addendums to stipulations) for each vendor opting into the Trade Lien Program. XRoads is also the primary liaison between the vendors and Winn-Dixie's merchandising group to effectuate the changes in terms as vendors opt into the Trade Lien Program.  XRoads manages the teams associated with reclamation, real estate, and contract claims. In addition, XRoads is responsible for monitoring and reporting to management the progress in the claims reconciliation process, estimating the ultimate claims amount and preparing reporting for management and the constituencies on the process. The Debtors substantially completed the reconciliation process for over 23,000 claims by the end of September, 2006.

### ROLES AND RESPONSIBILITIES OF THE CROSS-FUNCTIONAL TEAMS

16.    XRoads established cross-functional teams to oversee and manage the initiatives outlined above.  XRoads' teams include: (1) real estate planning and management, (2) treasury and finance, which covers vendor management, cash management and financial reporting and lender communications, (3) strategic advisory, (4) procurement/strategic sourcing, and (5) claims management services and (6) contract management.  These activities of the cross-functional teams and initiatives are discussed in more detail below.

    a.    **Real Estate Management:**  XRoads was tasked with reducing occupancy costs and cash outflows and maximizing asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization.  In addition, XRoads managed the lease disposition process, including negotiations with landlords, equipment

sales, the orderly closure of stores and the GOB process. In addition, with the assistance of outside counsel and company personnel XRoads continued to manage the process of negotiating and resolving assumption and cure cost objections filed by Landlords in response to omnibus lease assumption motions, as well as the analysis and reconciliation of approximately 2,000 real estate claims filed in the Debtors' cases. These efforts are on-going and will continue beyond the effective date of the Plan.

b.   **Treasury and Finance:**   XRoads continued to service in a liaison role working with the DIP bank agent and the financial advisors to the UCC regarding information requests, cash reporting, variance analysis requirements and updated business plan development. XRoads finance team continued to evaluate Winn-Dixie key supply contracts to determine if they should be assumed, rejected or renegotiated. The process included the evaluation of existing contract terms and assessing the need for potential rejection, assumption or renegotiation in order to address inequities in the contracts due to the company's new footprint and related vendor claims and cure cost. While continuing the role of leading Winn-Dixie's effort to expand vendor liquidity opportunities, XRoads Treasury and Finance team continued evaluating short and long term vendor credit opportunities. This involved working with the merchandising and finance groups to identify targeted post emergence vendor liquidity improvement objectives by vendor based on current credit line deficiencies. XRoads continues to serve as the liason between several cross functional WD departments and WD accounting. XRoads assists WD accounting obtain timely, accurate information related to significant asset dispositions, relevant claim matters and other transactions that impact the company's financial reporting both ordinary course period to period, quarterly and year end financial reporting.

**Strategy and Advisory:** This XRoads team integrates the information provided by other XRoads groups and the Company to develop strategic alternatives and recommendations. Specifically, XRoads has also been responsible for the production of documents and responses to questions from the UCC regarding substantive consolidation, as well as questions from the Ad Hoc Trade Committee. In support of the substantive consolidation issue, XRoads' spent considerable time in collecting and analyzing information requested by the UCC professionals, particularly questions regarding how the Company's intercompany accounting works and what is transacted through the

accounts.  XRoads also continued to utilize its integrated valuation analysis created in May 2006 to sensitize the business plan for various recovery scenarios for the Plan of Reorganization.  Together with company personnel and other outside professionals, XRoads facilitated an accurate count on plan votes.  Further, in certain contested and classes at risk of an unfavorable vote, XRoads together with these other outside professionals actively sought (and received) favorable votes through discussions with creditors and their representatives (e.g., Class 13 Landlords) who were otherwise undecided or potentially adverse to the Plan.  These votes helped ensure acceptance of the Plan by a majority of every voting class.

c.    **Procurement/Strategic Sourcing:**  As outlined above, XRoads continued to manage the Corporate Sourcing and Procurement function.  Working with the Debtors, XRoads continued the analysis of the indirect spend to establish categories for sourcing opportunities and began a reset of the spend information from Fiscal Year 2006. This analysis will serve as the basis for future sourcing strategy for the Debtors and will reflect the spending patterns associated with the new footprint of the Debtors' business.

d.    **Claims Management Services:**  In addition to the work previously completed on the PACA claims and reclamation demands, the Case Management team focused on four major projects: (1) working with Winn-Dixie to oversee the claims reconciliation teams, (2) preparation of reports for management to reflect the progress of each reconciliation team and also to estimate the dollar amount of claims in each major category for the purposes of drafting the plan of reorganization, (3) reconciliation of the general unsecured portion of the reclamation claims, reconciliation of claims involving executory contracts, including real estate 502(b)(6) rejection damages, as well as rejection damages and cure payments for non-real estate executory contracts  and (4) contract and real estate claims management including extensive renegotiation.

e.    **Contract Management and Analysis:**  XRoads has been responsible for reviewing and analyzing approximately 3,000 additional executory contracts for Winn-Dixie.  In connection with the Debtors' Plan of Reorganization, the Debtor filed numerous motions to assume and reject non-real estate executory contracts and unexpired leases.  The XRoads Contracts Team reviewed approximately 3,000 contracts and identified agreements that the Debtors are rejecting, assuming, or terminating.  Additionally, the Contracts Team identified and assisted

in the renegotiation of several hundred contracts with the creditors, which will result in substantial cost-savings to the debtor. In addition, the Contracts Team has reconciled approximately $140 million in claims filed by creditors for rejection damages, reducing the allowed amount to approximately $23 million.

## THE FIFTH INTERIM APPLICATION

17.     For the Fifth Interim Application Period beginning May 28, 2006 and ending September 30, 2006, XRoads incurred professional and non-professional fees of $1,811,021.00 and expenses of $122,269.61 for a total of $1,933,290.61.  XRoads has received payment in the amount of $1,448,816.80 for professional fees (approximately 80% fees) and $122,269.61 for expenses (100% expenses) for a total of $1,571,086.41 for the period of May 28, 2006 through September 30, 2006.  It is anticipated that XRoads will receive payment of 80% fees and 100% expenses for September, 2006 in the amount of $482,338.91 pursuant to the Fee Procedure Order prior to the hearing on this Application.  All payments received will be identified and credited before the hearing.  Accordingly, XRoads requests an interim allowance of compensation for professional services XRoads rendered to the Debtors for the period May 28, 2006 to September 30, 2006 in the amount of $1,933,290.61 and payment for the balance of the 20% holdback for May 28, 2006 through September 30, 2006, totaling $362,204.20

18.     XRoads seeks approval of the fees and expenses incurred during the Application Period in the amounts as summarized in the following table:

| Monthly Statements | Capped Fees to 400 hours | Fees over 400 Hours @ $400 per hr | Admin Fees | Total Fees | Expenses | Total Fees & Expenses | Payments 80% Fees – 100% Exp |
|---|---|---|---|---|---|---|---|
| June, 2006 | $200,000.00 | $ 359,682.50 | $ 40,075.00 | $ 599,757.50 | $ 53,455.14 | $653,212.64 | $533,261.14 |
| July, 2006 | $200,000.00 | $ 86,080.00 | $ 19,996.00 | $ 306,076.00 | $ 17,043.88 | $323,119.88 | $ 261,904.68 |
| August, 2006 | $200,000.00 | $ 140,440.00 | $ 5,430.50 | $ 345,870.50 | $ 16,885.28 | $362,755.78 | $ 293,581.68 |
| September, 2006 | $200,000.00 | $ 345,520.00 | $ 13,797.00 | $ 559,317.00 | $ 34,885.31 | $594,202.31 | $ 482,338.91 |
| Totals | $800,000.00 | $ 931,722.50 | $ 79,298.50 | $1,811,021.00 | $122,269.61 | $1,933,290.61 | $1,571,086.41 |
| Amount Due for 5th[h] Interim Period | | | | | | | $ 362,204.20 |

19.     The professional services and related expenses for which XRoads requests an interim allowance of compensation and reimbursement of expenses were rendered and incurred in connection with this case in the discharge of XRoads' professional responsibilities as financial and operations restructuring

consultants for the Debtors in these Chapter 11 cases.  XRoads' services have been substantial, necessary and beneficial to the Debtors and their estates, creditors and other parties-in-interest.

20.    XRoads has maintained written records of the time expended by its professionals and staff in this case as required in the Middle District of Florida.  Time records are maintained contemporaneously with the rendering of services by each of XRoads' professionals and staff in the ordinary course of business.  Such records set forth in detail the services rendered on behalf of the Debtors, the dates upon which services were rendered, the nature of the services, the time spent and the identity of the professional or staff who performed such services during the Fifth Interim Application Period, and are annexed hereto as Exhibits 3 to 5.  A schedule setting forth the number of hours expended by the individual professional and staff personnel during the Fifth Interim Application Period are annexed hereto as Exhibit 3.

## SUMMARY OF SERVICES RENDERED

21.    During the Fifth Interim Application Period, XRoads provided extensive services to the Debtors in furtherance of XRoads' professional responsibilities as financial and operations restructuring consultants.  Moreover, the number of hours expended by XRoads' professionals and staff were actual, necessary and beneficial to the Debtors.  XRoads encountered numerous complex financial advisory, restructuring and case management issues during the Application Period.  XRoads was called upon to respond, often upon very short notice, to a host of issues and demands.  XRoads professionals have rendered advice in all of these areas with skill and great dispatch.  The single most important factor this Court should consider when determining Applicant's allowance in these proceedings is the value of XRoads' services as measured by the results obtained.  XRoads can show that the work it is performing in these bankruptcy cases is beneficial to the Debtors. The full breadth of XRoads services are described in detail in the attached XRoads time records, and annexed hereto as Exhibit "5".

22.    The following summary of services rendered during the Application Period is not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are more fully available by reviewing Exhibit "5".  Rather, it is merely an attempt to highlight certain of those areas in which services were rendered to the Debtors, as well as to identify some of the issues that XRoads was required to address.  XRoads has attempted to place the services it has provided to the Debtor in the particular category that best relates to such services.  However, because certain services may relate to one or more categories, services pertaining to one category may be included in another category.

A.  **ACCOUNTING (12.00 hours):**  This billing category includes time spent assisting the Debtors with requests from the Debtors' auditors.  This category also includes assisting the Debtors in reconciliation of their books and records in connection with fresh start accounting.

B.  **ASSET SALES (111.30 hours):**  This billing category includes time spent on the sale of on-going store operations and overseeing the closing of all of the sales approved by the Court.  This category also includes, among other things, the following:  (i) the sale of three owned outparcels, which resulted in gross proceeds to the Debtors' estates of approximately $8.3 million; (ii) the sale of an owned store in Stockbridge, Georgia, which resulted in gross proceeds to the Debtors' estates of approximately $2 million; (iii) the sale of owned warehouses in Harahan, Louisiana and Louisville, which resulted in gross proceeds to the Debtors' estates of approximately $10.4 million; and (iv) the disposition of "targeted" stores, which resulted in aggregate aggregated proceeds in excess of $16 million.

C.  **BUSINESS ANALYSIS (1757.00 hours):**  This is the largest billing category and includes work done by all of the cross-functional teams described above, including:  modeling and cash flow analyses done by the treasury and finance team, analysis of real property leases done by the real estate group, and analysis of non-real estate executory contracts and vendor agreements done by the procurement group.  During this period, this category includes substantial hours on, among other itesm, the following:  (i) preparing and finalizing the liquidation analysis for the Debtors' plan of reorganization; (ii) analyzing and renegotiating non-real estate executory contracts and related cure amounts; (iii) analyzing real estate leases for assumption or rejection; and (iv) assisting in the analysis of the Debtors' business practices, accounting records and other evidence associated with the Debtors and Committee's assessment of substantitive consolidation.

D.  **BUSINESS OPERATIONS (409.50 hours):**  This billing category includes XRoads involvement in the management of on-going day-to-day operations of the Debtors' business.  A large portion of the time in this category has been incurred by the strategic sourcing group, which managed the on-going day-to-day operations of the sourcing and purchasing groups.  This also includes work being done by the treasury group in the collection of accounts

receivable and the strategic planning group in areas such as merchandising and vendor negotiations.

**E.   CASE ADMINISTRATION (27.60 hours):**  This billing category includes communications between the cross-functional teams to ensure that critical tasks are identified and coordinated as the reorganization initiatives are implemented, including reviewing the Debtors' case docket regularly to ensure that transferred claims are properly categorized for contract cure and reclamation claim payments.

**F.   CLAIMS (1291.40 hours):**  This billing category includes all of the work previously described above on the Reclamation Claims and the Debtors' general claims reconcilation process.  This billing category also includes all of the time spent by XRoads negotiating with trade vendors and exchanging documents to complete the process of opting into the Trade Lien Program and reconciling claims. Primary activities in this category during the Application Period includes:  (i) ongoing management of the Debtors' general claims reconciliation process; (ii) assisting in the preparation of the Debtors' omnibus objection to claims through review of numerous exhibits thereto for accuracy and completeness; (iii) negotiating with creditors to resolve responses to omnibus objections to claims; and (iv) preparing claim reserve analyses in connection with the Debtors' plan of reorganization.

**G.   CORPORATE FINANCE (2.70 hours):**  This billing category captures the time incurred by XRoads in reviewing the financing proposals received by the Debtors in connection with its exit financing.

**H.   CREDITOR MEETING (3.70 hours):**  This billing category not only includes the time spent at meetings with creditors, but the preparation for those meetings including the presentations for the Unsecured Creditor's Committee and the Bank Group.  It also includes meetings with the ad hoc committee representing the Reclamation Claimants.

**I.   FEE APPLICATION (52.60 hours):**  This billing category includes the preparation of the Fourth Interim Fee Application, the narrative sections of the monthly fee statements as well as a portion of the accounting work done by Xroads' billing department to prepare and file the monthly fee statements.

**J.** **OPERATIONS IMPROVEMENT (35.80 hours):** This category captures the time incurred by XRoads strategic sourcing (vendor management) team to identify and effectuate overhead cost savings.

**K.** **PLAN (161.80 hours):** This billing category includes time spent by XRoads assisting the Debtors and their other advisors on finalizing the Plan of Reorganization and Disclosure Statement, including preparation of Plan class reserves and estimated allowed claims.

**L.** **TAX (72.10 hours):** This billing category includes time incurred by XRoads in connection with the analysis of the Company's tax liabilities and identification of strategies for reducing the tax liabilities through reassessment as well as footprint reductions.

### SUMMARY OF EXPENSES REQUESTED

23.    Applicant seeks reimbursement for actual, necessary expenses (the "Expenses") incurred in rendering services during the Fifth Fee Application Period. The total amount of the Expenses is $122,269.61.

24.    Section 330 of the Bankruptcy Code authorizes "reimbursement for actual, necessary expenses" incurred by a professional person employed by the Debtors.  Attached hereto as Exhibit "6" are XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

25.    The following is a brief cost summary as to the different types of expenses for which XRoads is seeking reimbursement:

A.    Airfare:  All of XRoads professionals flew coach fare and booked flights in advance, whenever necessary and possible, to reduce costs for the Debtors. In this case, XRoads incurred airfare charges of $64,197.91 during the Application Period on behalf of the Debtors.

B.    Ground:  XRoads incurred the sum of $18,498.78 in ground transportation charges including car rentals, gas, taxi, mileage, parking and tolls.  XRoads' policy for car rentals is that whenever possible, XRoads' professionals share rental cars to lower the cost of car per person.  For the period May 28, 2006, through September, 2006, the number of professionals decreased considerably during the months of July through September resulting in the necessity for each professional to purchase their own rental cars due to the different times the professionals were at the client site and the different tasks they needed to complete. XRoads voluntarily discounted the cost for the rental car expense for the month of June in the amount of $3,535.25 to lower the car usage per professional to a ratio of 1:3.  In addition, XRoads' continued to voluntarily discounted transportation to/from residence to the airport

15

(capped at $35.00) and travel from the hotel to the Company's office (capped at $40.00) for ground transportation costs.

C.   Lodging:   XRoads entered into several short term apartment lease agreements during the majority of this case to offset the cost of hotel charges to the estate. XRoads incurred apartment costs in the amount of $7,772.98 for the month of June. As of July, 2006, XRoads terminated the leases due to the decrease of professionals working on the case. Whenever possible, XRoads negotiated corporate rates to reduce the cost of lodging, however, hotel rates do fluctuate based on availability at the time of reservation. XRoads incurred total hotel expenses in the amount of $24,019.20 for the period May 28, 2006 through September 30, 2006.  This amount is for 148 night stays or a daily average lodging cost of $162.29.  The total amount of lodging expenses incurred for the period May 28, 2006 through September 30, 2006 is $31,792.18.

D.   Meals:  XRoads incurred the sum of $20,899.77 in meal charges while traveling to and from and working at Company's offices, however, these meal charges were not billed to the Debtors.  Pursuant to the Bankruptcy Guidelines, XRoads did not charge the Debtors for breakfast, lunch or dinner unless XRoads was participating, during the meal, in a necessary meeting respecting the case.  XRoads has only billed the sum of $3,999.63 in accordance with the Bankruptcy Guidelines.

E.   Telephone:  XRoads incurred the sum of $2,639.90 in conference charges related to this case.   XRoads did not charge cell phone or long distance calls during this Application Period.

F.   Federal Express:  XRoads incurred the sum of $964.16 in Federal Express charges directly related to this case and required by the circumstances.

G.   Photocopy and Scanning Charges:   XRoads incurred the sum of $127.05 in photocopy charges directly related to this case.

H.   Miscellaneous Charges:  XRoads incurred the sum of $50.00 in One-day airport club pass needed for time sensitive information transfer to Skadden Arps regarding Winn-Dixie contract assumptions

26.   Applicant maintains the following policies with respect to Expenses:

a.   No amortization of the cost of any investment, equipment, or capital outlay is included in the Expenses.

b.   Applicant uses FedEx or similar express mail delivery only for emergency or exigent circumstances (i.e., when next-day response from the recipient was necessary) and when less costly than other available alternatives in light of the time constraints involved.

c.   In-house photocopying by Applicant is charged at $.15 per page.  To the extent practicable, Applicant generally uses and will continue to use less expensive, outside copying services.

d.   All expenses for which Applicant seeks reimbursement are of the kind, and at the least expensive rate, Applicant customarily charges nonbankruptcy/insolvency clients.

e.   All amounts paid to third party providers of goods and services are billed by Applicant at actual cost, without enhancements for handling or other administrative charges.

f.   No portion of the expenses represents secretarial time, secretarial overtime, word processing time, charges for after-hour and/or weekend air conditioning and other utilities, cost of meals or transportation provided to professionals and staff who work late or on weekends or other office overhead.

g.   Any and all automotive travel expenses are billed in accordance with the amount allowed by the Internal Revenue Service pursuant to IRC §274(d) and the current applicable I.R.B. Announcement.

## LEGAL ARGUMENT

27.   XRoads believes that the requested fee amount of $1,811,021.00 for 4,698.40 hours worked, is reasonable considering the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), made applicable to bankruptcy proceedings by In re *First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), as follows:

## TIME AND LABOR REQUIRED

28.   Applicant's professionals rendered a total of 4,698.40 hours of services on behalf of the Debtors during the Applicable Period.  The time expended and expenses incurred were necessary, reasonable and appropriate under the circumstances of these cases based on the complex and time sensitive matters addressed.

## THE NOVELTY AND DIFFICULTY OF THE SERVICE

29.   Applicant represents and would demonstrate to this Court that its role as financial and operations restructuring consultants to the Debtors' in these cases has involved significant sophistication and expertise.

## THE SKILL REQUISITE TO PERFORM THE SERVICES PROPERLY

30.   Due to the nature of the financial and operating issues presented in these cases, a relatively high degree of skill is required by Applicant in its representation of the Debtors.  Applicant's experience and expertise is facilitating and expediting the results being achieved in these cases, without incurring the extra time and expense had less experienced financial advisors handled these matters.

31.     Admittedly, the criterion of "the skill requisite to perform the services properly" is a subjective standard.  XRoads submits that the paramount factor that the Court should consider in applying this standard, however, is whether the results being achieved by Applicant are beneficial to the estates.  Applicant believes that the answer to such a query justifies allowance of the fees and costs requested in this Application.

## THE PRECLUSION OF OTHER EMPLOYMENT BY THE PROFESSIONAL DUE TO THE ACCEPTANCE OF THE CASE

32.     Due to the expedited manner in which these cases are being handled, work on other clients and matters were often deferred or delayed as a result.

## THE CUSTOMARY FEE

33.     Applicant represents and would demonstrate that the rates charged by Applicant for the services performed herein are competitive and customary for the degree of skill and expertise required in the performance of similar services rendered by other experienced financial advisors in bankruptcy matters and in the Middle District of Florida.

## WHETHER THE FEE IS FIXED OR CONTINGENT

34.     Applicant's fee is neither fixed nor contingent (other than the contingency of court-allowance and available assets to pay professionals).  It is based primarily upon the actual total number of hours worked, plus the actual costs incurred.

## TIME LIMITATIONS IMPOSED BY THE CLIENT OR OTHER CIRCUMSTANCES

35.     Throughout these bankruptcy cases and XRoads' involvement herein, there were many issues arising that needed immediate attention.  Because of the size and complexity of these cases, in many instances, XRoads has assisted the Debtors and Debtors' counsel in preparing for meetings and hearings covering a wide range of issues and impacting many constituencies.  These matters often placed increased time constraints on Applicant to effectively represent the Debtors' interests.

## EXPERIENCE, REPUTATION AND ABILITY OF APPLICANT

36.     The professionals who provided services on behalf of Applicant in this case are thoroughly experienced in all matters of bankruptcy, insolvency, and reorganization.  The ability of XRoads' professionals who have assisted the Debtors should be considered by this Court in measuring the results obtained.

## THE UNDESIRABILITY OF THE CASE

37.     The uncertainty of success or payment for services rendered, or for reimbursement of out-of-pocket expenses incurred in this case, could cause this case to be considered undesirable.  Notwithstanding the difficulties imposed by the uncertainty of payment, Applicant was nevertheless willing to undertake these risks.

## THE NATURE AND LENGTH OF THE PROFESSIONAL
## RELATIONSHIP WITH THE CLIENT

38.     Applicant has been employed by the Debtors since the Court's entry of its Employment Order, effective February 21, 2005.  None of the members of the Debtors are members of Applicant, and Applicant has not agreed to share any fees received in the Bankruptcy Case with anyone other than members of Applicant.

## AWARDS IN SIMILAR CASES

39.     Applicant represents and would demonstrate that the compensation sought in connection with the services rendered and expenses incurred in these cases is not excessive and is commensurate with the compensation sought or awarded in similar cases under the Bankruptcy Code.  The amounts sought in this Application are based in part on the usual and customary hourly rates which Applicant charges other clients in similar matters.  Applicant routinely scrutinizes its bills to ensure that its fees are in compliance with the customary rates in this District and voluntarily writes off certain fees and all overhead expenses, including its use of counsel, secretarial overtime, after-hour utilities, tabs and binders, etc.  Moreover, Applicant believes its billing rates are equivalent to or may even be less than those charged by other nationally recognized financial advisors in the bankruptcy community.  Therefore, taking into consideration the time and labor spent, the nature and extent of the representation and the nature of this proceeding, Applicant believes the allowance prayed for herein is reasonable and just.

## REASONABLENESS OF XROADS' FEES

40.     The general areas of focus in this stage of the case as described earlier in this Application are certainly not exhaustive of the variety or number of issues and problems encountered in connection with its role as financial and operations restructuring consultants herein.  XRoads has been asked to assist, and represent the Debtors throughout these cases on time-consuming and difficult tasks.  Many of the issues have

arisen under exigent circumstances and have required XRoads to dedicate significant resources exclusively to these cases within a very compressed period of time.

41.    XRoads represents and would demonstrate that the fees and expenses requested herein are not excessive and are, in its opinion, fair and reasonable in connection with the services provided by XRoads on behalf of the Debtors.

42.    XRoads would show that the work it has performed during the Application Period has been beneficial to the Debtors and its constituency as set forth above and in the Fee Statements attached hereto. Taking into consideration the time and labor spent, the nature and extent of the representation and the nature of these proceedings, XRoads believes the allowance prayed for herein is reasonable and just.

<u>CONCLUSION</u>

43.    For the foregoing reasons, XRoads requests approval and allowance of the interim compensation requested herein in connection with its representation of the Debtors during the Application Period, representing all fees in the amount of $1,811,021.00 (100%) and actual and necessary out-of-pocket expenses in the amount of $122,269.61 (100%), for a total of $1,933,290.61 incurred during the time period beginning May 28, 2006 through September 30, 2006.

WHEREFORE, PREMISES CONSIDERED, XRoads respectfully requests that, after appropriate notice and a hearing, this Court approve and allow the interim compensation and reimbursement of expenses incurred on behalf of the Debtors during the Application Period, as more particularly set forth above, authorize and direct the Debtors to remit payment of such allowed fees and reimbursement of costs to XRoads as approved by the Court, and grant such other and further relief to which it may show itself to be justly entitled.

Dated: November 21, 2006                                   Respectfully submitted:

By:_____
Holly Felder Etlin
XRoads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, CA   92614

Financial Advisors and Operations
Restructuring Consultants for the Debtors

**CERTIFICATION**

1.      I have been designated by Xroads Solutions Group, LLC (the "Applicant") as the professional with responsibility in this case for compliance with the "Guidelines for Fee Applications for Professionals in the Middle District of Florida in Bankruptcy Cases" (the Guidelines").

2.      I have read the Applicant's Application  for Compensation and Reimbursement of Expenses (the "Application").  The Application complies with the Guidelines, and the fees and expenses sought fall within the guidelines, except as specifically noted in this Certification and described in the Application.

3.      The fees and expenses sought are billed at rates and in accordance with practices customarily employed by the Applicant and generally accepted by the Applicant's clients.

4.      In seeking reimbursement for the expenditures described on Exhibit "2", the Applicant is seeking reimbursement only for the actual expenditure and has not marked-up the actual cost to provide a profit or to recover the amortized cost of invstment in staff time or equiptment or capital outlay (except to the extent that the Applicant has elected to charge for in-house photocopies and outgoing facsimily transmissions at the maximum rates permitted by the Guidelines).

5.      In seeking reimbursement for any service provided by a third party, the Applicant is seeking reimbursement only for the amount actually paid by the Application to third party.

6.      The following are the variances with the provisions of the Guidelines, the date of each Court Order approving the variance, and the justification for the variance: <u>NONE</u>

XRoads Solutions Group, LLC


_____
Holly Felder Etlin
XRoads Solutions Group, LLC
1821 East Dyer Road
Suite 225
Santa Ana, CA 92705

FINANCIAL ADVISORS AND OPERATIONS
RESTRUCTURING CONSULTANTS FOR THE
DEBTORS