## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## SUMMARY OF FIFTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED (JUNE 1, 2006 THROUGH SEPTEMBER 30, 2006)

| | |
|---|---|
| Name of applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to provide professional services to: | Winn-Dixie Stores, Inc., et al., Debtors |
| Date of retention: | February 21, 2005, Petition Date |
| Period for which compensation and reimbursement are sought: | 06/01/06 – 09/30/06 |
| Amount of compensation sought as actual, reasonable, and necessary: | $4,122,040.50 |
| Amount of reimbursement sought as actual, reasonable, and necessary: | $57,007.18 |
| Amount of compensation paid/to be paid as actual, reasonable, and necessary: | $3,297,632.40 |
| Amount of reimbursement paid/to be paid as actual, reasonable, and necessary: | $57,007.18 |
| Total amount of holdback fees sought: | $824,408.10 |
| This is: | X an Interim Application    __ a Final Application |

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

Summary of monthly statements:

| DATE SUBMITTED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | FEES PAID/ TO BE PAID (80%) | EXPENSES PAID/TO BE PAID (100%) | HOLDBACK FEES TO BE SOUGHT |
|---|---|---|---|---|---|
| May 24, 2005 First Monthly 02/21/05 – 02/28/05 | $226,065.50 | $2,790.83 | $180,852.40 | $2,790.83 | $45,213.10 |
| May 23, 2005 Second Monthly 03/01/05 – 03/31/05 | $1,602,540.00[2] | $87,053.45 | $1,282,032.00 | $87,053.45 | $320,508.00 |
| June 17, 2005 Third Monthly 04/01/05 – 04/30/05 | $1,212,305.50 | $54,639.91 | $969,844.40 | $54,639.91 | $242,461.10 |
| **Interim Subtotal[3]** | **$3,012,628.00** | **$144,484.19** | **$2,410,102.40** | **$144,484.19** | **$602,525.60** |
| September 13, 2005 Fourth Monthly 05/01/05 – 05/31/05 | $1,157,668.00 | $25,844.71 | $926,134.40 | $25,844.71 | $231,533.60 |
| September 13, 2005 Fifth Monthly 06/01/05 – 06/30/05 | $1,001,608.00 | $34,312.07 | $801,286.40 | $34,312.07 | $200,321.60 |
| October 25, 2005 Sixth Monthly 07/01/05 – 07/31/05 | $658,542.50 | $40,860.71 | $526,834.00 | $40,860.71 | $131,708.50 |
| October 28, 2005 Seventh Monthly 08/01/05 – 08/31/05 | $663,027.00 | $30,805.51 | $530,421.60 | $30,805.51 | $132,605.40 |
| November 9, 2005 Eighth Monthly 09/01/05 – 09/30/05 | $677,167.00 | $13,232.82 | $541,733.60 | $13,232.82 | $135,430.40 |
| **Interim Subtotal** | **$4,158,012.50** | **$145,055.82** | **$3,326,410.00** | **$145,055.82** | **$831,599.50** |
| December 5, 2005 Ninth Monthly 10/01/05 – 10/31/05 | $445,878.00 | $7,869.83 | $356,702.40 | $7,869.83 | $89,175.60 |
| December 20, 2005 Tenth Monthly 11/01/05 – 11/30/05 | $410,747.50 | $7,023.24 | $328,598.00 | $7,023.24 | $82,149.50 |
| January 30, 2006 Eleventh Monthly 12/01/05 – 12/31/05 | $443,190.00 | $11,280.88 | $354,552.00 | $11,280.88 | $88,638.00 |
| March 1, 2006 Twelfth Monthly 01/01/06 – 01/31/06 | $603,701.00 | $13,812.23 | $482,960.80 | $13,812.23 | $120,740.20 |
| **Interim Subtotal** | **$1,903,516.50** | **$39,986.18** | **$1,522,813.20** | **$39,986.18** | **$380,703.30** |
| June 6, 2006 Thirteenth Monthly 02/01/06 – 02/28/06 | $695,695.50 | $15,893.03 | $556,556.40 | $15,893.03 | $139,139.10 |
| June 26, 2006 Fourteenth Monthly 03/01/06 – 03/31/06 | $820,266.50 | $10,640.68 | $656,213.20 | $10,640.68 | $164,053.30 |

---

[2]    Subsequently, Skadden, Arps voluntarily made a reduction in the fees requested in the amount of $28,283.00, reflecting the amount previously charged for non-working travel time.

[3]    The total takes into account the adjustment described in Note 2, above.

| DATE SUBMITTED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | FEES PAID/ TO BE PAID (80%) | EXPENSES PAID/TO BE PAID (100%) | HOLDBACK FEES TO BE SOUGHT |
|---|---|---|---|---|---|
| July 7, 2006 Fifteenth Monthly 04/01/06 – 04/30/06 | $782,708.50 | $15,186.75 | $626,166.80 | $15,186.75 | $156,541.70 |
| July 18, 2006 Sixteenth Monthly 05/01/06 – 05/31/06 | $856,190.50 | $17,597.96 | $684,952.40 | $17,597.96 | $171,238.10 |
| **Interim Subtotal** | **$3,154,861.00** | **$59,318.42** | **$2,523,888.80** | **$59,318.42** | **$630,972.20** |
| September 20, 2006 Seventeenth Monthly 06/01/06 – 06/30/06 | $1,148,763.50 | $11,894.71 | $919,010.80 | $11,894.71 | $229,752.70 |
| October 20, 2006 Eighteenth Monthly 07/01/06 – 07/31/06 | $884,712.00 | $15,870.45 | $707,769.60 | $15,870.45 | $176,942.40 |
| October 31, 2006 Nineteenth Monthly 08/01/06 – 08/31/06 | $1,037,826.50 | $15,462.79 | $830,261.20 | $15,462.79 | $207,565.30 |
| November 22, 2006 Twentieth Monthly 09/01/06 – 09/30/06 | $1,050,738.50 | $13,779.23 | $840,590.80 | $13,779.23 | $210,147.70 |
| **Interim Subtotal** | **$4,122,040.50** | **$57,007.18** | **$3,297,632.40** | **$57,007.18** | **$824,408.10** |
| **GRAND TOTALS** | **$16,351,058.50** | **$445,851.79** | **$13,080,846.80** | **$445,851.79** | **$3,270,208.70** |

Summary of interim applications:

| DATE FILED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | TOTAL FEES ALLOWED | TOTAL EXPENSES ALLOWED | TOTAL FEES/EXPENSES DISALLOWED |
|---|---|---|---|---|---|
| July 16, 2005 First Interim 02/21/05 – 04/30/05 | $3,012,628.00 | $144,484.19 | $3,012,628.00 | $144,484.19 | $0.00 |
| November 11, 2005 Second Interim 05/01/05 – 09/30/05 | $4,158,012.50 | $145,055.82 | $4,158,012.50 | $145,055.82 | $0.00 |
| March 17, 2006 Third Interim 10/01/05 – 1/31/06 | $1,903,516.50 | $39,986.18 | $1,903,516.50 | $39,986.18 | $0.00 |
| July 21, 2006 Fourth Interim 02/1/06 – 05/31/06 | $3,154,861.00 | $59,318.42 | $3,154,861.00 | $59,318.42 | $0.00 |
| November 22, 2006 Fifth Interim 06/1/06 – 09/30/06 | $4,122,040.50 | $57,007.18 | N/A | N/A | N/A |

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE TIME SUMMARY**
**(JUNE 1, 2006 THROUGH SEPTEMBER 30, 2006)**

| NAME | YEAR OF ADMISSION | RATE | HOURS | AMOUNT |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| D. J. (Jan) Baker | 1973 | $835 | 613.4 | $512,189.00 |
| Ronald C. Barusch | 1978 | 795 | 173.60 | 138,012.00 |
| Katherine M. Bristor | 1981 | 835 | 45.70 | 38,159.50 |
| Linda C. Hayman | 1982 | 820 | 0.50 | 410.00 |
| Sally McDonald Henry | 1983 | 730 | 398.40 | 290,832.00 |
| Mark A. McDermott | 1991 | 585 | 0.50 | 292.50 |
| Peter J. Neckles | 1978 | 835 | 177.20 | 147,962.00 |
| Regina Olshan | 1991 | 755 | 19.70 | 14,873.50 |
| Timothy G. Reynolds | 1981 | 770 | 1.20 | 924.00 |
| Wallace L. Schwartz | 1977 | 820 | 15.40 | 12,628.00 |
| Ronald J. Weiss | 1981 | 755 | 3.70 | 2,793.50 |
| | **TOTAL PARTNERS** | | **1,449.50** | **$1,159,076.00** |
| **COUNSEL** | | | | |
| Michael J. Balch | 1994 | $560 | 1.50 | $840.00 |
| Tiffany T. Boydell | 1995 | 560 | 149.30 | 83,608.00 |
| Linda M. Chang | 1997 | 560 | 0.70 | 392.00 |
| Stephanie R. Feld | 1982 | 560 | 371.10 | 207,816.00 |
| Rosalie W. Gray | 1982 | 560 | 783.10 | 438,536.00 |
| Joy E. Maddox | 1988 | 610 | 16.90 | 10,309.00 |
| Alexandra Margolis | 1986 | 560 | 102.70 | 57,512.00 |
| Christy L. McElhaney | 1988 | 560 | 13.90 | 7,784.00 |
| Nancy G. Rubin | 1986 | 560 | 2.40 | 1,344.00 |
| Anthony Saldana | 1995 | 560 | 193.50 | 108,360.00 |
| | **TOTAL COUNSEL** | | **1,635.10** | **$916,501.00** |
| **ASSOCIATES/LAW CLERKS** | | | | |
| Carolyn G. Aberman | 1998 | $510 | 22.30 | 11,373.00 |
| Rotem Bar-Kokhva | 1999 | 410 | 10.50 | 4,305.00 |
| Erin Brown* | n/a | 295 | 5.60 | 1,652.00 |
| Steven Eichel | 1988 | 540 | 326.00 | 176,040.00 |

| | | | | |
|---|---|---|---|---|
| Erik Elsea | 1998 | 540 | 13.90 | 7,506.00 |
| Ronald Falls, Jr.* | 2006 | 295 | 73.90 | 21,800.50 |
| Ronald Falls, Jr.* | 2006 | 335 | 171.50 | 57,452.50 |
| Carolyn B. Handler | 1989 | 540 | 7.40 | 3,996.00 |
| Kimberly Harris* | n/a | 295 | 12.70 | 3,746.50 |
| Danny J. Hart Jr. | 2005 | 335 | 60.10 | 20,133.50 |
| Denise Kaloudis | 2003 | 440 | 78.30 | 34,452.00 |
| Kelley M. Keller | 1989 | 540 | 10.20 | 5,508.00 |
| Jessica Kempf | 2005 | 375 | 110.20 | 41,325.00 |
| Suling Lam | 1998 | 540 | 1.80 | 972.00 |
| Kimberly A. LaMaina | 2001 | 465 | 334.40 | 155,496.00 |
| Jay Larry | 1992 | 375 | 55.10 | 20,662.50 |
| Jane M. Leamy | 1995 | 540 | 687.40 | 371,196.00 |
| J.R. Lederer* | n/a | 295 | 42.90 | 12,655.50 |
| Kelly Makins Baugh | 2000 | 510 | 25.00 | 12,750.00 |
| Eamonn O'Hagan | 2004 | 375 | 16.00 | 6,000.00 |
| Jessenia Paoli | 2005 | 375 | 105.50 | 39,562.50 |
| Adam S. Ravin | 1995 | 540 | 737.30 | 398,142.00 |
| Abraham A. Reshtick | 2001 | 465 | 157.50 | 73,237.50 |
| Keith Sambur | 2005 | 375 | 161.80 | 60,675.00 |
| Manan D. Shah | 2002 | 510 | 22.70 | 11,577.00 |
| Shane J. Stroud | 2002 | 465 | 16.50 | 7,672.50 |
| David M. Turetsky | 2002 | 440 | 833.50 | 366,740.00 |
| Christian P. Wenzel | 2003 | 440 | 47.30 | 20,812.00 |
| | | | | |
| | **TOTAL ASSOCIATES/LAW CLERKS** | | **4,147.30** | **$1,947,440.50** |
| | | | | |
| **SUMMER/WINTER ASSOCIATE** | | | | |
| Jennifer A. Karpe | | $170 | 32.80 | $5,576.00 |
| | | | | |
| | **TOTAL SUMMER/WINTER ASSOCIATE** | | **32.80** | **$5,576.00** |
| | | | | |
| **PARAPROFESSIONALS** | | | | |
| Michael L. Kreiner | | $210 | 21.90 | $ 4,599.00 |
| Kevin W. Lustik | | 90 | 10.70 | 963.00 |
| Maira Rivera | | 75 | 23.20 | 1,740.00 |
| Donald Rockness | | 175 | 5.50 | 962.50 |
| Joseph J. Roman | | 75 | 18.70 | 1,402.50 |
| Johannes A. Wetzel | | 175 | 250.00 | 43,750.00 |
| Ronald E. Wittman, Jr. | | 230 | 46.30 | 10,649.00 |

| | | | | |
|---|---|---|---|---|
| Joseph Woodfield | | 95 | 87.50 | 8,312.50 |
| Joseph Woodfield | | 145 | 145.30 | 21,068.60 |
| | **TOTAL PARAPROFESSIONALS** | | **609.10** | **$ 93,447.00** |
| | **TOTAL** | | **7,873.60** | **$4,122,040.50** |
| | **BLENDED HOURLY RATE** | | | **$523.53** |

* Law clerks are law school graduates who are not presently admitted to practice.

**The firm adjusts its hourly rates from time to time.  Hours billed for non-working travel time represent 50% of the actual time spent traveling.

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE PROJECT CATEGORY SUMMARY**
**(JUNE 1, 2006 THROUGH SEPTEMBER 30, 2006)**

| Project Category | Total Hours | Total Fees |
|---|---:|---:|
| General Corporate Advice | 338.10 | $153,904.50 |
| Asset Disposition / General | 178.50 | $79,828.00 |
| Business Operations / Strategic Planning | 32.80 | $20,960.00 |
| Case Administration | 578.20 | $104,726.00 |
| Claims Administration / General | 868.90 | $469,647.00 |
| Claims Administration / Reclamation / Trust Funds | 85.60 | $46,224.00 |
| Creditor Meetings / Statutory Committees | 8.20 | $5,959.00 |
| Disclosure Statement / Voting Issues | 959.10 | $528,361.00 |
| Employee Matters / General | 173.30 | $105,827.00 |
| Executory Contracts / Personalty | 884.40 | $424,975.00 |
| Financing (DIP and Emergence) | 818.30 | $456,254.50 |
| Insurance | 409.20 | $215,762.50 |
| Investigations and Reviews | 20.50 | $14,108.50 |
| Lease (Real Property) | 207.50 | $111,905.50 |
| Litigation (General) | 35.70 | $16,607.50 |
| Liquidation / Feasibility | 2.90 | $1,566.00 |
| Non-Working Travel Time | 18.30 | $9,050.00 |
| Regulatory and SEC Matters | 0.20 | $112.00 |
| Reorganization Plan / Plan Sponsors | 1,616.80 | $1,035,136.00 |
| Retention / Fee Matters (SASM&F) | 133.70 | $66,188.50 |
| Retention / Fee Matters / Objections  (Others) | 76.10 | $39,532.00 |
| Tax Matters | 67.70 | $48,406.50 |
| Utilities | 90.80 | $43,105.00 |

| Project Category | Total Hours | Total Fees |
|---|---:|---:|
| Vendor Matters | 15.90 | $8,586.00 |
| Fee Examiner | 252.90 | $115,308.50 |
| **Total** | **7,873.60** | **$4,122,040.50** |

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE EXPENSE SUMMARY**
**(JUNE 1, 2006 THROUGH SEPTEMBER 30, 2006)**

| Expense Category | Total Expenses |
|---|---|
| Computer Legal Research | $22,646.41 |
| Long Distance Telephone | $2,361.67 |
| In-House Reproduction (@ $.10 per page) | $9,878.60 |
| Reproduction-Color | $29.50 |
| Outside Reproduction | $411.64 |
| Outside Research | $3,957.22 |
| Filing/Court Fees | $83.00 |
| Court Reporting | $415.00 |
| Out-Of-Town Travel | $12,590.42 |
| Business Meals | $2,178.94 |
| Courier & Express Carriers (e.g., Federal Express) | $1290.54 |
| Postage | $247.52 |
| Electronic Document Management | $74.72 |
| Other | $842.00 |
| **TOTAL** | **$57,007.18** |

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## FIFTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED (JUNE 1, 2006 THROUGH SEPTEMBER 30, 2006)

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), bankruptcy counsel for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), files this fifth interim application for allowance and payment of compensation for services rendered and reimbursement of expenses incurred (the "Fifth Application") for the period from June 1, 2006 through September 30, 2006 (the "Application Period"). In support of this Fifth Application, Skadden, Arps respectfully represents the following:

### JURISDICTION

1.     This Court has jurisdiction to consider this Fifth Application under 28 U.S.C. §§ 157 and 1334. Consideration of this Fifth Application is a core proceeding under

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

28 U.S.C. § 157(b)(2).  The relief requested may be granted in accordance with the provisions of 11 U.S.C. §§ 330 and 331.

BACKGROUND

A.  <u>The Chapter 11 Cases</u>

2.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors are operating their businesses and managing their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

4.      On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103.  On August 17, 2005, an official committee of equity holders (the "Equity Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103, but the Equity Committee was subsequently disbanded.

5.      The Debtors are filing monthly operating reports and paying their quarterly fees.  Ordinary course administrative obligations are being paid in the ordinary course of the Debtors' business, and fees and expenses incurred by professionals are or are anticipated to be paid under procedures previously established by the New York Court.

2

6.      On August 10, 2005, this Court entered an order providing for the appointment of a fee examiner in these cases.  The Debtors subsequently selected Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue") to serve as the fee examiner.  By order dated December 14, 2005, this Court authorized the retention of Stuart Maue in these cases (the "Fee Examiner Order").

7.      On November 9, 2006, this Court entered an order (the "Confirmation Order") confirming the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Plan").

8.      On November 21, 2006, the Plan went effective.

B.      Retention of Skadden, Arps

9.      On February 21, 2005, the Debtors filed the Application for Authority to Retain Skadden, Arps, Slate, Meagher & Flom LLP as Lead Restructuring and Bankruptcy Counsel to the Debtors (Docket No. 68, the "Employment Application").  A copy of the Employment Application is attached to this Fifth Application as Exhibit A.

10.      The Employment Application was supported by the Declaration of D. J. Baker and Disclosure of Compensation, a copy of which is included as part of Exhibit A.[2]

11.      On March 7, 2005, the New York Court entered an interim order approving the Employment Application.  On March 15, 2005, the New York Court entered a final order (the "Employment Order") authorizing the Debtors to retain Skadden, Arps effective as of the

---

[2]      On May 18, 2005, Skadden, Arps filed its First Supplemental Declaration of D. J. Baker.  On August 2, 2005, October 10, 2005, February 23, 2006 and June 5, 2006, Skadden, Arps filed its Second, Third, Fourth and Fifth Supplemental Declarations of D. J. Baker, respectively.  These supplemental declarations are included as part of Exhibit A.

Petition Date.  A copy of the Employment Order is attached to this Fifth Application as Exhibit B.[3]

12.    Skadden, Arps continues to hold prepetition retainer funds for application against prepetition fees and expenses, as permitted by the Employment Order.  As of the date of this Fifth Application, Skadden, Arps estimates that remaining retainer funds are in the amount of $341,350.00.

C.    <u>Interim Payment Procedures</u>

13.    The procedures governing the rights of Skadden, Arps and other professionals to obtain interim payment for services rendered and expenses incurred are set forth in the Final Order Approving Interim Compensation Procedures for Professionals (Docket No. 434, the "Interim Payment Order").

14.    Under the Interim Payment Order, professionals may be paid on a monthly basis, up to 80% of fees earned and 100% of expenses incurred, by the submission of monthly statements to the Debtors.  Such payments are subject to ratification, and the remaining 20% of fees are payable, after court approval of interim fee applications.  Interim fee applications are to be submitted approximately every four to six months.

15.    The first interim fee application (the "First Application") covered the period from the Petition Date through April 30, 2005.  The First Application was approved by the Court on August 4, 2005.

---

[3]    King & Spalding, LLP was originally to be retained as co-counsel for the Debtors to assist Skadden, Arps with a variety of matters pursuant to Bankruptcy Code section 327(a).  After Winn-Dixie filed King & Spalding's retention application, King & Spalding's role was limited.  As a result, some matters originally designated to be handled by King & Spalding were transferred to Skadden, Arps.  These matters included insurance and utilities issues.

16.    The second interim fee application (the "Second Application") covered the period from May 1, 2005 through September 30, 2005.  The Second Application was approved by the Court on December 1, 2005.

17.    The third interim fee application (the "Third Application") covered the period from October 1, 2005 through January 31, 2006.  The Third Application was approved by the Court on April 6, 2006.

18.    The fourth interim fee application (the "Fourth Application") covered the period from February 1, 2006 through May 31, 2006.  The Fourth Application was approved by the Court on August 10, 2006.

19.    This Fifth Application covers the period from June 1, 2006 through September 30, 2006.  Under the monthly statement procedures of the Interim Payment Order, for the period of June 1, 2006 through June 30, 2006, the Debtors have paid Skadden, Arps an aggregate amount of $930,905.51, representing 80% of fees ($919,010.80) and 100% of expenses ($11,894.71) for services rendered and expenses incurred.  For the period of July 1, 2006 through July 31, 2006, the Debtors have paid Skadden, Arps an aggregate amount of $723,640.05, representing 80% of fees ($707,769.60) and 100% of expenses ($15,870.45) for services rendered and expenses incurred.  For the period of August 1, 2006 through August 31, 2006, the Debtors are authorized to pay Skadden, Arps an aggregate amount of $845,723.99, representing 80% of fees ($830,261.20) and 100% of expenses ($15,462.79) for services rendered and expenses incurred. For the period of September 1, 2006 through September 30, 2006, the Debtors are authorized to pay Skadden, Arps an aggregate amount of $854,370.03, representing 80% of fees ($840,590.80)

and 100% of expenses ($13,779.23) for services rendered and expenses incurred, assuming no objections are received by Skadden, Arps by December 12, 2006.[4]

## COMPENSATION AND REIMBURSEMENT REQUESTED

20.    By this Fifth Application, Skadden, Arps requests that this Court authorize and order, on an interim basis: (a) allowance of compensation for professional services rendered by Skadden, Arps during the Application Period on behalf of the Debtors in the amount of $4,122,040.50, representing 100% of the fees earned, and payment of such fees to the extent not previously paid, and (b) allowance of actual necessary expenses incurred by Skadden, Arps during the Application Period in connection with the rendition of such professional services in the amount of $57,007.18, representing 100% of expenses incurred by Skadden, Arps during the Application Period and payment of such expenses to the extent not previously paid.

21.    All legal services performed by Skadden, Arps were performed for and on behalf of the Debtors and not for or on behalf of any other individual or entity.  These services were rendered in discharge of Skadden, Arps' professional responsibilities as bankruptcy counsel for the Debtors in these cases.  Skadden, Arps' services have been substantial, necessary and of significant benefit to the Debtors and their estates.

22.    No agreement or understanding exists between Skadden, Arps and any other entity for the sharing of compensation to be received for services rendered in connection with these cases.  See Exhibit A.

23.    Skadden, Arps spent a total of 7,873.60 hours during the Application Period, resulting in an average billing rate of $523.53 per hour.  The rates charged by Skadden, Arps are

---

[4]    After submission of its monthly fee statements, Skadden, Arps discovered discrepancies in its time records that in total reflect that Skadden, Arps underbilled for its services in an approximate amount of $2,800.00. Skadden, Arps is not seeking compensation for such services.

the normal hourly bundled billing rates that were in effect during the Application Period. The summary preceding this Fifth Application contains a list of the attorneys and paraprofessionals who have performed services on behalf of the Debtors during the Application Period, as well as a breakdown of the hours, hourly rates and fees attributable to those individuals. Also included is a summary of total hours and fees by project category.

24.     Skadden, Arps maintains written records of the time spent by attorneys and paraprofessionals in the rendition of professional services to the Debtors. Such time records are made substantially contemporaneously with the rendition of services by the person rendering such services. Skadden, Arps' daily time records for each monthly segment of the Application Period, allocated by matter, listing the name of the attorney or paraprofessional, the date on which the services were performed, and the amount of time spent in performing the services, are attached to this Fifth Application as Exhibit C-1 for the period of June 1, 2006 through June 30, 2006, Exhibit D-1 for the period of July 1, 2006 through July 31, 2006, Exhibit E-1 for the period of August 1, 2006 through August 31, 2006, and Exhibit F-1 for the period of September 1, 2006 through September 30, 2006.

25.     Skadden, Arps also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with its rendition of services on behalf of the Debtors. The summary preceding this Fifth Application includes a breakdown of expenses incurred during the Application Period. The detail for such expenses is attached to this Fifth Application as Exhibit C-2 for the period of June 1, 2006 through June 30, 2006, Exhibit D-2 for the period of July 1, 2006 through July 31, 2006, Exhibit E-2 for the period of August 1, 2006 through August 31, 2006, and Exhibit F-2 for the period of September 1, 2006 through September 30, 2006. Skadden, Arps has included in this Fifth Application all compensation for fees and

7

disbursements processed by its accounting department for the Application Period.  Skadden, Arps reserves the right to seek additional compensation for services rendered and reimbursement for additional expenses that may have been incurred during these cases.

SUMMARY OF SERVICES RENDERED

26.     Throughout the Application Period, Skadden, Arps has worked closely with the Debtors and their advisors to administer these estates and maximize the return for estate creditors and has acted at all times in the best interests of creditors and other parties in interest in these cases.  Skadden, Arps' services have been directed toward a myriad of tasks necessary to achieve this result.  To meet the Debtors' needs, Skadden, Arps provided multi-disciplinary services on a daily basis, often working nights and weekends.  Throughout this process, certain of the principal Skadden, Arps' professionals working on the cases were required to devote the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of the efforts of the Debtors, Skadden, Arps, and the Debtors' other professionals, the Debtors' Plan became effective on November 21, 2006.

27.     The daily time records attached as Exhibits C-1, D-1, E-1 and F-1 provide a detailed description of the services rendered by Skadden, Arps during the Application Period. For the convenience of the Court, the following summary[5] identifies the areas to which Skadden, Arps devoted substantial time and attention during the Application Period:[6]

---

[5]     The summary is presented in matter number order, consistent with the order in which the time records are organized.

[6]     The summary necessarily does not include a description or discussion of all Skadden, Arps' services during the Application Period.  To the extent the following summary does not encompass a particular Skadden, Arps service, the service is contained in the corresponding time detail at Exhibits C-1, D-1, E-1 and F-1. Skadden, Arps seeks compensation for all of its services in these cases as detailed in exhibits submitted with its interim fee applications.

(a)      General Corporate Advice

During the Application Period, Skadden, Arps prepared for and attended board of directors meetings and governance meetings with the Debtors. Skadden, Arps assisted the Debtors with reviewing board materials and advising on board of directors' issues.

Skadden, Arps further assisted the Debtors on a wide variety of general corporate bankruptcy issues, including, without limitation, the fiduciary duties of the Debtors and their management, issues implicating the Debtors' corporate structure and matters of corporate governance.

In particular, in connection with the Plan, Skadden, Arps (i) analyzed and researched securities issues, (ii) drafted corporate documents and language for the Plan, (iii) advised the Company on the Company's stock issues, including the processes of relisting stock and registering stock reserves, (iv) negotiated and prepared a form registration rights agreement, (v) initiated, researched and prepared documentation for communication with the staff of the Securities and Exchange Commission ("SEC") regarding Bankruptcy Code section 1145, (vi) advised the compensation committee of the Debtors, (vii) drafted the Management Incentive Plan, (viii) analyzed the appropriate level and duration of D&O tail insurance, and (ix) worked with the Board of Directors and others to negotiate the retention contract of Peter L. Lynch, President and Chief Executive Officer ("Mr. Lynch").

Skadden, Arps further advised the Company on governance matters relevant to emergence from chapter 11. In this regard, Skadden, Arps advised on charter documents and by-laws for the reorganized Debtors.

In addition, Skadden, Arps advised the Company on matters pertaining to several sale transactions that have been important for creditors in these cases. Sale transactions in these cases have resulted in millions of dollars for the estates, and, correspondingly, for the Company's creditors.

Finally, Skadden, Arps prepared, reviewed and commented upon the Debtors' filings with the SEC, reviewed the Debtors' quarterly financial statements and reviewed and commented on press releases.

During the Application Period, Skadden, Arps professionals devoted a total of 338.10 hours to this category, for which compensation is sought in the aggregate amount of $153,904.50.

(b)      Asset Dispositions / General

During the Application Period, Skadden, Arps assisted the Debtors on numerous issues relating to the closing on the sale of their Bahamas operations. After the Debtors determined that their Bahamas operations were not necessary for their reorganization

efforts and that it was in the best interest of the estates to sell these assets, Skadden, Arps assisted the Debtors in obtaining maximum value for these assets.

In the prior interim period, Skadden, Arps (i) prepared a motion allowing the Debtors to sell their Bahamas operations to BK Foods, Ltd., subject to higher and better offers, (ii) reviewed issues pertaining to the transition of services under the transition services agreement and prepared the accompanying transition services agreement, (iii) drafted the non-competition agreement, (iv) assisted in the preparation of the underlying sale documents, (v) assisted the Debtors in avoiding negative tax implications that could have arisen in connection with the sale, (vi) conducted the auction with The Blackstone Group, L.P. ("Blackstone"), (vii) assisted the Debtors in determining the "highest and best" offer for the assets, and (viii) prepared an order that was entered by this Court authorizing the sale.

During the Application Period, Skadden, Arps performed necessary services for a successful closing on the sale that occurred in August 2006. In this regard, Skadden, Arps prepared and finalized closing documentation for the sale, facilitated resolution of the conditions precedent to closing and assisted the Debtors in arranging for the orderly transfer of the Bahamas operations.

As a result of Skadden, Arps' work, in conjunction with Blackstone, the Debtors received approximately $54 million for the sale of their Bahamas operations.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. For example, it was necessary for Skadden, Arps to hold (i) conferences with the Company and counsel for the Creditors Committee and other professionals to review closing issues and (ii) intraoffice conferences to coordinate work among professionals working on various aspects of the sale from different departments within Skadden, Arps, which were needed to address non-bankruptcy issues. By coordinating the work among the professionals, Skadden, Arps effectively resolved issues that arose, such as banking, corporate and tax, in a cost-effective manner.

During the Application Period, Skadden, Arps professionals devoted a total of 178.50 hours to this category, for which compensation is sought in the aggregate amount of $79,828.00.

(c)    Business Operations / Strategic Planning

During the Application Period, Skadden, Arps reviewed and advised on legal issues relating to the Debtors' business operations and the restructuring of their operations.

Skadden, Arps also engaged in weekly conference calls with the Debtors' management and advisors to strategize regarding upcoming matters and business issues,

including emergence, employee, insurance and public relations issues.  These weekly calls necessarily involved more than one Skadden, Arps professional to address the numerous issues raised (on which different Skadden, Arps lawyers were working) and to ensure that strategy issues and client concerns were communicated to the appropriate attorneys.

Moreover, Skadden, Arps assisted the Debtors' management in addressing legal issues relating to the Debtors' Plan for emergence from these chapter 11 cases.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. Specifically, it was necessary for Skadden, Arps to speak with the Debtors' management regarding business operations and strategic planning and to communicate, where necessary and appropriate, with other Skadden, Arps' professionals.

During the Application Period, Skadden, Arps professionals devoted a total of 32.80 hours to this category, for which compensation is sought in the aggregate amount of $20,960.00.

(d)    <u>Case Administration</u>

During the Application Period, Skadden, Arps spent time performing administrative matters typical for any large chapter 11 case, including matters relating to (i) general communications with creditors and other parties in interest, (ii) general case administration, including duties pertaining to staffing, service of process, and pleading and file maintenance, (iii) preparation for, and attendance at, court hearings, (iv) general advice with respect to the prosecution of the cases and (v) general advice with respect to the rights and duties of debtors-in-possession in the administration of the cases.

Given the size and complexity of these chapter 11 cases, the Debtors and Skadden, Arps were presented with a unique set of challenges in managing the process, tracking motions filed by others, responding to inquiries from parties in interest, and maintaining organization and control over these cases.

Skadden, Arps maintained various files to enable Skadden, Arps and others to address promptly issues that arose during the Application Period.  Skadden, Arps reviewed pleadings and ensured that those primarily responsible for the cases were kept informed of significant events and filed documents.  The efficient management of administrative matters in a paper-intensive case of this size is a significant task.  Each week, the Debtors and Skadden, Arps are inundated with numerous items of correspondence, documents, requests, pleadings and other papers.  As of the end of the Application Period, the main docket contained over 11,531 entries.  Indeed, during the Application Period alone, nearly 3,400 pleadings were filed, resulting in over 28 filings on average per day.  There are numerous other docketed entries, due to the over 14 adversary proceedings in these cases.

To handle this volume of activity, Skadden, Arps continued in its adherence to various procedures implemented to create efficiencies in the management of the cases and to avoid unnecessary duplication of effort between its own professionals and its advisors.  For instance, Skadden, Arps maintained detailed calendars of future events in the cases and maintained other planning tools to track and meet deadlines.

Skadden, Arps also spent time on necessary services designed to promote efficiency in these cases, including preparing for and attending meetings on significant case events and reviewing recent events outside of filed pleadings to ensure that issues affecting these cases were handled promptly.  Skadden, Arps also spent time coordinating appropriate staffing to avoid duplicative or unnecessary services.

Due to the size and complexity of these cases, Skadden, Arps professionals necessarily communicated internally in order to coordinate case responsibilities and to ensure efficient administration of these cases.  Furthermore, to ensure efficient administration of the estates, Skadden, Arps communicated frequently with Smith Hulsey & Busey ("SH&B") on upcoming hearing matters and other events in this matter category.

During the Application Period, Skadden, Arps professionals devoted a total of 578.20 hours to this category, for which compensation is sought in the aggregate amount of $104,726.00.

(e)     Claims Administration / General

During the Application Period, Skadden, Arps continued to assist the Debtors with numerous issues relating to chapter 11 claims and claims-related processes and procedures.

Skadden, Arps worked extensively with the Company, XRoads Solution Group LLC ("XRoads") and Logan & Company, Inc. (the claims agent) ("Logan") in reviewing and analyzing filed claims.  Skadden, Arps monitored updated claims reports prepared by Logan, reflecting new proof of claim filings, and analyzed certain significant claims appearing on the reports.  The review of claims necessarily required Skadden, Arps to spend considerable time analyzing and performing legal research on numerous issues associated with the claims, including claim classification, priority status and other issues.

During the Application Period, Skadden, Arps drafted and filed seven omnibus claim objections.  The claim objections resulted in the disallowance, or other resolution, of over 1,300 claims.  This, in turn, reduced the estates' potential liability by millions of dollars.  Skadden, Arps also began work on several omnibus claim objections that were filed subsequent to the Application Period.

In connection with this process, Skadden, Arps responded to numerous filed responses and other inquiries from creditors generated by the claim objections.  Skadden, Arps spent considerable time working with various parties in interest and counsel for the

12

claimants to resolve claim objections that were filed in the Application Period and that were filed prior to the Application Period, but not yet resolved.

As the plan confirmation hearing approached, Skadden, Arps worked with the Debtors to analyze claims that could be potential impediments to confirmation, and on claims-related deadlines that would be imposed pursuant to the Plan. These issues required giving attention to claims alleging administrative, priority or secured status. Skadden, Arps assisted the Debtors in reviewing, analyzing and developing strategies for the handling of such claims.

In addition to the above, Skadden, Arps performed work begun in the prior interim period with respect to analyzing methods to obtain money owed to the estate from various claimants, including preparing demand letters.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases. The sheer amount of claims alone filed in these cases (over 13,600) explains the necessity for, at times, more than one Skadden, Arps professional and the coordination and work of many parties in interest in these cases.

During the Application Period, Skadden, Arps professionals devoted a total of 868.90 hours to this category, for which compensation is sought in the aggregate amount of $469,647.00.

(f)    Claims Administration / Reclamation / Trust Funds

In the ordinary course of the Debtors' business, the Debtors purchase materials, supplies, goods, products and other related items (collectively, the "Goods") from various vendors for use and sale in their stores. Before and after the Petition Date, the Debtors received demands from their vendors asserting a right to reclaim their Goods under Section 2-720(2) of the Uniform Commercial Code and Bankruptcy Code section 546(c). The deadline to assert a reclamation demand was March 14, 2005 (the "Reclamation Demand Deadline"). The Debtors received approximately 480 reclamation demands asserting aggregate claims of approximately $125 million on or before the Reclamation Demand Deadline.

To maintain normal business operations and prevent the vendors from reclaiming their Goods, as well as costly and distracting litigation relating to the reclamation claims, which would have negatively affected the Debtors' business, the Debtors sought to consensually resolve their vendors' reclamation claims. In this regard, Skadden, Arps negotiated with several of the Debtors' reclamation vendors and reached a resolution of reclamation procedures to be applied in these cases, which is reflected in the final reclamation order, dated April 4, 2005 (the "Final Reclamation Order").

Under the Final Reclamation Order, as modified by order dated May 19, 2005, extending the Debtors' time to file statements of reclamation until June 30, 2005, Skadden, Arps assisted XRoads and the Debtors in reviewing, analyzing and reconciling, from the Debtors' perspective, each vendor's reclamation claim (including asserting appropriate defenses with respect to each reclamation claim) and subsequently served approximately 480 statements of reclamation upon the reclamation vendors.

To facilitate a global resolution of the reclamation issues that would provide the Debtors with additional trade credit, Skadden, Arps, on behalf of the Debtors, and certain reclamation trade vendors entered into discussions which resulted in an agreement for, among other things, (i) the establishment of a trade vendor lien program and (ii) procedures for the calculation and treatment of trade vendors' reclamation claims (the "Reclamation/Trade Lien Program").  By order dated August 5, 2005 (the "Reclamation/Trade Lien Order"), this Court granted the motion approving the Reclamation/Trade Lien Program, which benefited the Debtors by (i) virtually eliminating reclamation litigation, except for two omnibus reclamation motions filed since the Court entered the Reclamation/Trade Lien Order, (ii) significantly increasing the amount of trade credit available to the Debtors from those vendors who opted into the Reclamation Trade/Lien Program and (iii) fostering good vendor relations.

During the Application Period, Skadden, Arps assisted XRoads in resolving reclamation claims remaining against the Debtors.  In connection therewith, Skadden, Arps (a) analyzed issues relating to the outstanding reclamation claims, (b) drafted an objection seeking to resolve the remaining outstanding reclamation claims and their corresponding unsecured non-priority claims (the "Reclamation Objection"), (c) reviewed and revised XRoads' vendor reclamation analysis and reconciliations in connection with drafting the Reclamation Objection, and (d) continually communicated with (i) XRoads regarding the Reclamation Objection and reconciliation of the vendors' reclamation claims, and (ii) the reclamation vendors regarding the reconciliation of their respective claims.  As a result of the overall efforts of Skadden, Arps and XRoads, more than 99% of the reclamation claims have been resolved to date and approximately two-thirds of those reclamation vendors opted into the Reclamation/Trade Lien Program.

During the Application Period, Skadden, Arps professionals devoted a total of 85.60 hours to this category, for which compensation is sought in the aggregate amount of $46,224.00.

(g)    Creditor Meetings / Statutory Committee

During the Application Period, Skadden, Arps provided a variety of services relating to the Creditors Committee.

Skadden, Arps has assisted the Debtors and their other advisors in working with the Creditors Committee and its professionals on continuing information and related requests.  In addition, Skadden, Arps has communicated frequently with counsel for the Creditors Committee regarding the progress and status of the cases.  Skadden, Arps has

provided substantial information to counsel for the Creditors Committee on motions before filing in an effort to resolve objections or issues on requested relief to ensure the smooth progress of these cases. Skadden, Arps believes that these efforts to keep the Creditors Committee informed have created a constructive working relationship. As a result, many issues are addressed and resolved out of court without the need for unnecessary litigation between the Debtors and the Creditors Committee.

Skadden, Arps also spent time analyzing fee issues relating to the Creditors Committee and other constituencies. This work was necessary to gauge administrative liability for Plan formulation.

The large part of Skadden, Arps' services relating to this matter category is detailed in more relevant specific matter categories.

During the Application Period, Skadden, Arps professionals devoted a total of 8.20 hours to this category, for which compensation is sought in the aggregate amount of $5,959.00.

(h)    Disclosure Statement / Voting Issues

During the Application Period, Skadden, Arps moved forward with the preparation of a detailed disclosure statement (the "Disclosure Statement") containing information about the Debtors' history, business operations, management structure, debt structure and chapter 11 cases, as well as a summary of the Plan and information concerning the voting and confirmation processes, securities and tax issues, and risk factors.

The preparation of the Disclosure Statement involved significant review of the Debtors' historical financial information, securities filings and other background materials necessary to the drafting of the Disclosure Statement, as well as coordination with the Debtors and various professionals on Plan information.

Applicable information pulled from these materials was then summarized by Skadden, Arps and incorporated into the Disclosure Statement. Additionally, in an effort to be able to accurately describe the numerous important events that had taken place during the pendency of the chapter 11 cases, Skadden, Arps spent significant time during the Application Period reviewing and analyzing previously filed pleadings and then drafting descriptions for insertion into the Disclosure Statement. In other instances, Skadden, Arps worked directly with the Debtors and their other advisors to obtain information necessary for completion of the Disclosure Statement.

Skadden, Arps further spent time revising the Disclosure Statement in accordance with comments from the Creditors Committee and other parties in interest. Also, due to evolving Plan negotiations, Skadden, Arps spent considerable time revising the Disclosure Statement to accurately portray the Plan's most recent developments.

Extraordinary efforts were needed and made by the Debtors and many professionals to complete the Disclosure Statement.

The aforementioned efforts led to the filing of the Disclosure Statement on June 29, 2006. The Disclosure Statement itself was over 100 single-spaced pages. Following the filing of the Disclosure Statement, Skadden, Arps spent time addressing numerous questions and issues on the Disclosure Statement from parties in interest in an effort to ensure a confirmable reorganization plan.

In this regard, Skadden, Arps spent time reviewing the twenty objections filed against the Disclosure Statement. In an effort to efficiently handle the objections, each objection was lodged and addressed by a carefully coordinated team of Skadden, Arps professionals. Skadden, Arps researched each objection, negotiated with numerous parties and, depending on the issue involved, revised the Disclosure Statement to resolve the objection. Significant efforts were spent to address each and every objection.

Approximately two days before the hearing on the Disclosure Statement, Skadden, Arps filed an amended Disclosure Statement with this Court. The revisions were aimed primarily at resolving objections. Due to the nature of certain objections to the Disclosure Statement, not all objections were resolved. Skadden, Arps thereafter spent significant time preparing for the contested hearing on the Disclosure Statement on August 4, 2006. Following the hearing, this Court entered an order approving the Disclosure Statement.

Contemporaneously while preparing the Disclosure Statement, Skadden, Arps spent significant and necessary time on the Plan solicitation process. Skadden, Arps worked closely with the Debtors and their professionals in devising a solicitation process in the best interests of the Debtors, their estates and creditors. Skadden, Arps thereafter prepared proposed procedures, drafted the applicable motion (the "Solicitation Motion") and further drafted several ballots for secured classes, unsecured classes, and for other voting classes. Skadden, Arps also prepared several different notices for holders of unimpaired classes receiving full payment, impaired classes receiving no distribution, parties to contracts and leases, and holders of contingent, unliquidated and disputed claims, along with notices for hearings on the Disclosure Statement and confirmation of the Plan. The Solicitation Motion was filed on July 14, 2006 and approved by order of this Court dated August 4, 2006.

Following approval of the Solicitation Motion, Skadden, Arps spent significant time coordinating with Logan on the mailings of the Disclosure Statement and Plan to approximately 20,000 parties in interest. Skadden, Arps also worked with the Debtors and Logan in analyzing voting reports as they came in and addressing numerous voting issues as they surfaced typical in any large chapter 11 case.

In addition, Skadden, Arps spent considerable time addressing issues and responding to inquiries from various constituencies, including shareholders and landlords, on the Disclosure Statement, the Plan and voting processes. Skadden, Arps

drafted and sent letters to creditors on behalf of the Debtors and engaged in numerous teleconferences in an effort to address all inquiries.  To handle the numerous inquiries and often duplicate inquiries most efficiently, Skadden, Arps worked with the Debtors to craft template responses to common issues.  Skadden, Arps further worked on issues pertaining to Bankruptcy Rule 3018.

As a result of Plan solicitation efforts by the Debtors, Skadden, Arps, the Debtors' other professionals and the Creditors Committee and its professionals, the Plan received overwhelming acceptance in all cases of claims, except two classes involving claims that were to be paid in full.

During the Application Period, Skadden, Arps professionals devoted a total of 959.10 hours to this category, for which compensation is sought in the aggregate amount of $528,361.00.

(i)      Employee Matters / General

During the Application Period, Skadden, Arps provided a variety of services relating to employee matters.

Skadden, Arps assisted the Debtors in their efforts to ensure the continued service of Mr. Lynch.  In this regard, Skadden, Arps, together with certain of the Debtors' other professionals, advised the Debtors in making progress toward a new employment agreement with Mr. Lynch (a "New Employment Agreement").  Skadden, Arps provided the Debtors with legal advice regarding appropriate terms for a New Employment Agreement and assisted the Debtors in negotiating the terms for such an agreement with both (i) Mr. Lynch and his legal counsel and (ii) the Creditors Committee and its advisors.  As a result, following the Application Period, the Debtors, Mr. Lynch, and the Creditors Committee were able to reach agreement on the terms of a New Employment Agreement.

Skadden, Arps also continued to advise the Debtors with respect to numerous employment-related contracts.  In this regard, Skadden, Arps assisted the Debtors by (i) reviewing numerous employment-related contracts, (ii) identifying potential issues related to such contracts, (iii) advising the Debtors with respect to their assumption/rejection decisions in connection with such contracts, (iv) drafting and arranging for the filing, on August 4, 2006, of both the Debtors' Motion for Order Authorizing Assumption of Employment-Related Executory Contracts and Fixing Cure Amounts (the "Employment Contract Assumption Motion") and the Debtors' Motion for Order Authorizing Rejection of Employment-Related Executory Contracts (the "Employment Contract Rejection Motion"), and (v) assisting in the development of communications materials related to the Employment Contract Assumption Motion and the Employment Contract Rejection Motion.  Due in large measure to Skadden, Arps' efforts, on August 24, 2006, the Court entered separate orders approving the Employment Contract Assumption Motion and the Employment Contract Rejection Motion, and the

17

Debtors succeeded in appropriately disposing (either by assumption or rejection) of the relevant contracts in a manner that promoted the best interests of these estates.

In addition to the foregoing, Skadden, Arps assisted the Debtors in analyzing a variety of employee-related issues.  Skadden, Arps advised the Debtors regarding issues related to the Management Security Plan and the Supplemental Retirement Plan (together, the "Non-Qualified Plans").  In this regard, Skadden, Arps (i) continued to analyze the impact of the chapter 11 filings upon the Non-Qualified Plans, (ii) addressed inquiries from employees and retirees concerning the Non-Qualified Plans, (iii) advised the Debtors with respect to information materials to be sent to participants in the Non-Qualified Plans, and (iv) analyzed and advised the Debtors regarding issues related to the treatment of claims under the Non-Qualified Plans under the plan of reorganization.

Skadden, Arps further advised the Debtors, together with certain of the Debtors' other professionals, regarding the development and drafting of a management incentive plan and equity incentive plan and advised the Debtors with respect to the impact of the chapter 11 filings on employee benefits and in analyzing resulting employee claims.

As a result of Skadden, Arps' efforts, the Debtors were able to make significant progress, and in many instances come to closure, with respect to difficult employee issues during the Application Period.

During the Application Period, Skadden, Arps professionals devoted a total of 173.30 hours to this category, for which compensation is sought in the aggregate amount of $105,827.00.

(j)      Executory Contracts / Personalty

The Debtors estimate that, as of the Petition Date, they were parties to at least 2,800 executory contracts and leases of personal property (some of which have expired or terminated during the pendency of these cases).  The contracts pertain to almost all aspects of the Debtors' business, including supply contracts with vendors for thousands of different products sold in the Debtors' stores and contracts with independent contractors that provide numerous services to the Debtors.  The personal property leases include leases of several different types of computer equipment, customer check-out equipment, security equipment and other items.  In certain instances, the Debtors lease hundreds of pieces of equipment under these leases.

During the Application Period, Skadden, Arps assisted the Debtors with various executory contract and personal property lease issues, including providing information as to their rights and obligations under the Bankruptcy Code, the ability to assume or reject and the consequences of either course of action, the treatment of prepetition arrearages in the event of assumption or rejection, and related matters.

Skadden, Arps worked closely with the Debtors and XRoads in (i) evaluating multiple contracts and leases for assumption or rejection, (ii) analyzing contract-related

claims, (iii) drafting language for proposed contract amendments, (iv) drafting agreements to assume contracts on negotiated and/or amended terms and (v) drafting agreements to reject contracts on negotiated terms.  Skadden, Arps also responded to inquiries from certain contract and lease parties and coordinated with the Debtors to resolve issues raised by such parties.

During the Application Period, Skadden, Arps drafted and filed six motions (two omnibus motions and four motions, respectively, addressing individual contracts with The Libman Company, Sanderson Farms, Inc., Lifetime Loan Corporation, and Rexall Sundown, Inc.) to reject approximately 15 unnecessary or unprofitable executory contracts and unexpired leases and dispose of related claims on negotiated terms.  The Court entered orders approving these motions on June 29, 2006, July 13, 2006, and October 12, 2006.  In addition, Skadden, Arps drafted and filed three omnibus motions to reject approximately 321 unnecessary or unprofitable executory contracts and unexpired leases on non-negotiated terms.  The Court entered orders approving these motions on June 29, 2006, September 21, 2006, and October 5, 2006.

Furthermore, during the Application Period, Skadden, Arps drafted and filed six motions (four omnibus motions and two motions, respectively, addressing contracts with IBM Corporation and related entities and Cardtronics, LP) to assume approximately 101 executory contracts and unexpired leases on negotiated terms.  The Court entered orders approving these motions on September 14, 2006, October 5, 2006, and October 12, 2006.  Moreover, Skadden, Arps drafted and filed five omnibus motions to assume over 600 executory contracts and unexpired leases on non-negotiated terms.  The Court entered orders approving these motions on August 24, 2006, September 14, 2006, October 5, 2006, and October 12, 2006.

As a result of efforts by the Debtors, XRoads and Skadden, Arps, the Debtors successfully rejected over 330 unprofitable contracts and leases, thereby achieving significant savings for these estates.  Skadden, Arps' legal efforts also allowed the Debtors to assume over 700 beneficial executory contracts and unexpired leases, often at significant cost savings to the Debtors, their estates, and creditors.

The complexity of the work performed in this matter throughout these cases required the services of more than one Skadden, Arps professional.  The work performed on this matter also necessarily involved non-firm conferences with parties in interest in these cases.  Due to the complexity of the number of executory contracts reviewed by Skadden, Arps professionals, during the Application Period, it became necessary for a Skadden, Arps attorney to be on-site at the Debtors' corporate headquarters for approximately two weeks to coordinate and assist in the review process.

During the Application Period, Skadden, Arps professionals devoted a total of 884.40 hours to this category, for which compensation is sought in the aggregate amount of $424,975.00.

(k)    Financing (DIP and Emergence)

During the Application Period, Skadden, Arps worked with the Debtors on obtaining an exit financing facility, a cornerstone for the Debtors' emergence from chapter 11.  Indeed, the Plan contemplates that the Debtors will obtain exit financing in an amount sufficient to (i) satisfy the postpetition secured lender's claim, (ii) support other payments required to be made under the Plan, (iii) pay transaction costs and (iv) fund working capital and general corporate purposes of the reorganized Debtors, following the effective date of the Plan.

During the Application Period, Skadden, Arps advised the Company regarding a structure for exit financing.  As part of the advisory process, Skadden, Arps worked with the Company on a frequent basis and participated in numerous external teleconferences and other correspondence with the Company and Blackstone (among others), as well as numerous internal conferences among its bankruptcy, banking and real estate specialists (among others).  These communications were necessary and essential to the services provided because of the complexity and structure of the potential exit financing.  Additionally, Skadden, Arps analyzed various issues related to the exit financing, including issues related to the potential real estate and general exit financing collateral packages, as well as other security matters.  These matters required significant due diligence and legal research by Skadden, Arps.

The Company received exit financing proposals from approximately 14 potential lenders.  Skadden, Arps reviewed and analyzed each proposal and communicated its analysis to the Company and Blackstone and assisted the Company and Blackstone in the Company's selection of an exit financing lender and securing exit financing.

After considerable review and negotiation, the Debtors chose financing with the Debtors' prepetition secured lender, Wachovia ("Wachovia" or the "Agent").  The proposed financing ("Exit Facility") with Wachovia is $725 million upon consummation of a reorganization plan and requires the Debtors to pay related expenses in accordance with the commitment letter (the "Commitment Letter").  After the Company chose Wachovia, Skadden, Arps worked closely with the Company to prepare all documentation for the Exit Facility.  Skadden, Arps, together with the Debtors, reviewed and commented extensively on various drafts of the Commitment Letter and other documents relating to the Exit Facility to ensure that all terms were in the best interests of the Debtors, their estates and creditors, and engaged in significant due diligence to ensure that all terms that would be required by the Agent could be satisfied.

Importantly, in this regard, Skadden, Arps spent considerable time analyzing the Agent's collateral.  The Company's fee-owned properties and leasehold interests comprise a large portion of the collateral for the financing.  In light of the importance of the real estate collateral, Skadden, Arps, on behalf of the Debtors, reviewed more than five hundred (500) leases to ascertain the extent of their collateral.  To facilitate the review, Skadden, Arps worked closely with Smith, Gambrell & Russell LLP ("Smith Gambrell"), the Company's long-time real estate counsel.  Together, Skadden, Arps and Smith

Gambrell worked efficiently and prepared a form of lease abstract that could be used to determine which leases were suitable to use as collateral and which are subject to restrictions on mortgaging or assigning that make them unsuitable for use as collateral. Relying on years of experience in managing and overseeing large-scale diligence projects for major financings, Skadden, Arps worked with Smith Gambrell in creating the diligence summaries to ensure the accuracy of the diligence results.

In addition to working on the lease diligence process, Skadden, Arps worked with Smith Gambrell and counsel for Wachovia to refine the closing checklist and establish suitable deadlines for the completion of various real estate deliverables, including, but not limited to, appraisals, title, survey, UCC searches, mortgage modifications, and assignment and assumption agreements. Skadden, Arps also assisted in devising the corporate structure of the real estate subsidiaries that will ultimately hold the Company's leases and fee-owned properties. Skadden, Arps prepared first drafts of the corporate formation documents and operating agreements for these real estate subsidiaries, and worked with Smith Gambrell and Blackstone in fine-tuning these documents.

During the Application Period, as a result of the significant efforts above, Skadden, Arps, on behalf of the Debtors, filed a motion for authorization to enter into the Commitment Letter for the Exit Facility, which was approved by this Court on July 27, 2006. Following approval of the motion, Skadden, Arps drafted and coordinated the delivery of various closing deliverables related to the Exit Facility, and worked with the Company and the Agent to fulfill various conditions related to the closing of the Exit Facility. As a result of the numerous services provided by Skadden, Arps, together with Smith Gambrell and counsel for the Agent, the Debtors have obtained the financing necessary to emerge from their chapter 11 bankruptcy cases.

Additionally, during the Application Period in this category, Skadden, Arps spent time coordinating efforts for the Company's entry into a postpetition premium finance agreement with AFCO Premium Credit LLC ("AFCO") relating to the renewal of the Company's casualty insurance policies. Specifically, Skadden, Arps devoted time during the Application Period to (i) corresponding with AFCO and the Debtors' insurance brokers regarding the terms of the premium finance agreement, and (ii) seeking the required consent (from the U.S. Trustee, the Creditors Committee and the Agent) to enter into the premium finance agreement. As a result of Skadden, Arps' efforts, the Debtors obtained the necessary consents and thereafter entered into a premium finance agreement with AFCO to finance the renewal of its casualty insurance policies.

During the Application Period, Skadden, Arps professionals devoted a total of 818.30 hours to this category, for which compensation is sought in the aggregate amount of $456,254.50.

(l)    <u>Insurance</u>

During the Application Period, Skadden, Arps assisted the Debtors with numerous insurance issues affecting their business and in connection with the Plan.

In connection with the Debtors' business, to comply with various federal and state laws and regulations (as well as various utility provider requirements), the Debtors must post, or have a surety post, bonds or other forms of security, including, by way of example, bonds (i) to comply with workers' compensation insurance regulations, (ii) to comply with government licensing, tax and other regulations, and (iii) to maintain or establish water, waste, telephone and electric utility accounts.

Before the Petition Date, Liberty Mutual Insurance Company ("Liberty") provided a surety facility ("Surety Facility") for the posting of bonds for the Debtors. As of the Petition Date, bonds in the approximate aggregate amount of $41 million remained outstanding.

Earlier in the cases, the Debtors were unable to reach an acceptable agreement with Liberty to post new surety bonds and, therefore, entered into an agreement with another company, detailed in the Fourth Application. During the Application Period, the Debtors and Liberty engaged in extensive good faith negotiations and reached an agreement on a facility more favorable for the Debtors.

To consummate a deal on the Surety Facility, Skadden, Arps, on behalf of the Debtors, (i) analyzed numerous bonds, (ii) reviewed and negotiated terms and term sheets for the Surety Facility, (iii) researched issues pertaining to the Surety Facility, (iv) engaged in numerous conferences with the Debtors and parties in interest to ensure that the Surety Facility was in the best interests of the Debtors, their estates and creditors and (v) prepared the applicable motion (the "Surety Motion") for authority to execute the Surety Facility.

Following the filing of the Surety Motion, Skadden, Arps prepared for the August 10, 2006 hearing, where this Court approved the Surety Motion. The Surety Facility is for 18 months, has a credit limit of $50 million and has proven to be necessary for the Debtors' business.

During the Application Period, Skadden, Arps also spent time working to ensure that necessary insurance policies were renewed by the Debtors. In this regard, Skadden, Arps spent time reviewing applicable entered orders and procedures in these cases governing renewal. Thereafter, Skadden, Arps worked with the Debtors in obtaining consents on renewal pursuant to required procedures in these cases, requiring drafting of certificates and negotiations with the Agent, counsel for the Creditors Committee and other parties in interest. During the Application Period, the Debtors successfully renewed many insurance policies necessary for continuing business.

In connection with the Plan, Skadden, Arps performed numerous insurance-related services. Skadden, Arps (i) spent substantial time reviewing and researching various issues relating to the Debtors' insurance policies, including outstanding liability, both prospective and retrospective, and indemnification, (ii) researched and analyzed numerous issues pertaining to the Debtors' policies and whether certain policies were executory, (iii) reviewed potential cure costs on assumed policies, (iv) reviewed

insurance-related claims to assess validity and liability and (v) strategized on how to handle the Debtors' numerous policies and claims under the Plan.

During the Application Period, Skadden, Arps also spent considerable time reviewing workers' compensation claims. Skadden, Arps worked with the Debtors in determining liability and continuing payment under orders entered in these cases.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases. Specifically, intraoffice conferences were necessary in order to coordinate the efforts being taken by Skadden, Arps professionals in analyzing the treatment of insurance policies and insurance claims.

During the Application Period, Skadden, Arps professionals devoted a total of 409.20 hours to this category, for which compensation is sought in the aggregate amount of $215,762.50.

(m)    Investigations and Reviews

During the Application Period, Skadden, Arps continued to provide services to the Debtors in connection with the Committee Investigation (as defined below).

As more fully described in the Fourth Application, the Creditors Committee commenced a broad investigation (the "Committee Investigation") into events or circumstances giving rise to the Debtors' chapter 11 filings, as typical in large chapter 11 cases. The purpose of the Committee Investigation was to determine any viable causes of action for the estates. The Debtors cooperated fully with the Creditors Committee in the Committee Investigation.

During the Application Period, Skadden, Arps continued to facilitate and monitor the Committee Investigation. On June 29, 2006, the Creditors Committee filed its report (the "Report") summarizing the Committee Investigation and, importantly, the findings. The Report concluded that there were likely no viable causes of action available to the Debtors' estates against any current or former officers or directors of the Company that had a reasonable probability of success in producing a benefit for the Debtors' estates. Report at 61.

Following the filing of the Report, Skadden, Arps spent time reviewing the Report and communicating and summarizing Report findings to the Company.

During the Application Period, Skadden, Arps professionals devoted a total of 20.50 hours to this category, for which compensation is sought in the aggregate amount of $14,108.50.

(n)    Lease (Real Property)

During the Application Period, Skadden, Arps advised the Debtors with respect to various real property lease issues and their rights and obligations under the Bankruptcy Code with respect to such leases.

For example, Skadden, Arps assisted the Debtors by preparing and filing three motions (the "Assigned Lease Rejection Motions") seeking to reject approximately 80 leases that were assigned prepetition in order to ensure that any continuing obligations that would result from the default of an assignee of such leases would be treated as prepetition obligations.  Several formal and informal objections to the Assigned Lease Rejection Motions were asserted by landlords and assignees alike, including formal objections filed by 1997 Properties, Inc., Fiesta Mart, Inc., and Brookshires Grocery Company.  Skadden, Arps worked with counsel to the objecting parties to resolve the issues raised in the objections and, ultimately, was successful in resolving such issues through modifications to the proposed forms of orders.  On July 13, 2006, this Court entered three orders approving the Assigned Lease Rejection Motions.  On July 24, 2006, W.T.V.A., Ltd., a landlord party to one of the rejected leases, filed a motion for reconsideration of one of the three orders approving the Assigned Lease Rejection Motions.  Skadden, Arps worked with the landlord's counsel and was, ultimately, able to resolve the landlord's concerns through the submission of a modified proposed order.  As a result of such efforts, on September 15, 2006, W.T.V.A. withdrew its motion for reconsideration.

During the Application Period, Skadden, Arps also handled and responded to daily inquiries by landlords regarding their respective leases and assisted the Debtors in resolving disputes with various parties relating to leased properties, including disputes pertaining to postpetition rent, taxes and common area maintenance charges.  In this regard, during the Application Period, Skadden, Arps devoted time to the analysis of (and discussion with counsel to the Creditors Committee regarding) various applications and motions filed by the landlords seeking administrative expense treatment for certain claims arising under their respective leases.  In many instances, it was necessary for Skadden, Arps to communicate with counsel for those landlords and explain the legal and factual basis upon which the Debtors had determined that all or a portion of the claim was not entitled to administrative status.  Skadden, Arps was successful during the Application Period in facilitating the resolution of several administrative expense applications, either by negotiating the outright withdrawal of such application or by negotiating an agreed order resolving such application in a manner favorable to the Debtors.  Where a resolution did not seem possible, Skadden, Arps drafted and filed several objections during the Application Period which challenged the relief sought in several administrative expense applications.  Through all of the aforementioned efforts, Skadden, Arps helped the Debtors to minimize their administrative claim liability.

Additionally, during the Application Period, Skadden, Arps negotiated and prepared a stipulation settling claims arising under various real property leases for which

Deutsche Bank Trust Company Americas served as Pass-Through Trustee (the "Deutsche Bank Stipulation").  Through the Deutsche Bank Stipulation, Skadden, Arps was not only able to assist the Debtors in reaching agreement to fix Deutsche Bank's claims in the amount of $51.5 million, but was also able to obtain Deutsche Bank's agreement to withdraw its objection to the Second Omnibus Motion for Authority to (i) Assume Non-Residential Real Property Leases, (ii) Fix Cure Amounts and (iii) Grant Related Relief (Docket No. 8941).  During the Application Period, the Debtors also prepared a motion seeking approval of the Deutsche Bank Stipulation (which motion was ultimately filed shortly after the end of the Application Period).

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and non-firm conferences with parties in interest in these cases.

During the Application Period, Skadden, Arps professionals devoted a total of 207.50 hours to this category, for which compensation is sought in the aggregate amount of $111,905.50.

(o)      Litigation (General)

During the Application Period, Skadden, Arps represented the Debtors in pursuing a $374,849.79 claim against Able Laboratories, Inc. ("Able") in Able's bankruptcy case, which is pending in the United States Bankruptcy Court for the District of New Jersey.  In this regard, Skadden, Arps researched issues relevant to the claim and drafted and filed a response to an objection to the claim filed by Able.  As of the date of this Application, the disposition of the Debtors' claim against Able remains open.

During the Application Period, Skadden, Arps professionals devoted a total of 35.70 hours to this category, for which compensation is sought in the aggregate amount of $16,607.50.

(p)      Reorganization Plan / Plan Sponsors

During the Application Period, Skadden, Arps' resources continued to be primarily focused on developing a global and confirmable chapter 11 plan reorganization plan.  Skadden, Arps was instrumental in negotiating with relevant claimholders to resolve the issues present in the cases involving hundreds of millions of dollars in assets and claims.  As a result of significant efforts by the Debtors, Skadden, Arps, the Debtors' other professionals, professionals for the Creditors Committee and other constituencies in these cases, the Plan was confirmed and has become effective.

Skadden, Arps spent necessary time (a) researching different approaches to a chapter 11 plan for these complex cases and developing related strategies, (b) researching plan issues typical of large chapter 11 cases and specific to these complex cases, and (c) negotiating, reviewing and preparing plan terms and term sheets with parties in interest.

Skadden, Arps spent considerable time reviewing and analyzing the Substantive Consolidation Compromise (that is defined and more fully described in the Plan and the Fourth Application) and its effect on plan issues with parties in interest.

In addition to work spent during the Application Period on the Substantive Consolidation Compromise, Skadden, Arps spent considerable time working on other matters pertaining to the Plan, such as drafting provisions of the Plan and circulating the Plan to parties in interest for comment and review to promote consensual resolution of these cases. Skadden, Arps spent time reviewing parties' comments and continued to work and advise on Plan issues. As a result of extraordinary efforts by the Debtors, Skadden, Arps and many professionals and parties in interest in these cases, the Debtors filed their first Plan on June 29, 2006 and an amended and revised Plan on August 9, 2006.

Skadden, Arps also spent significant time and effort reviewing, negotiating, and responding to objections that were filed against the Plan. In this regard, Skadden, Arps drafted and circulated letters and other communications to shareholders who voiced opposition to their treatment under the Plan. Shareholders objected to the Plan because they were not receiving a distribution under the Plan. Skadden, Arps corresponded with shareholders to explain that because the absolute priority rule of the Bankruptcy Code does not allow for a distribution to shareholders when unsecured claimholders are not being paid in full (unless the creditors, as a class, consent to such a gift), no distribution was possible to shareholders. Many of these objecting shareholders did not lodge formal objections to confirmation of the Plan after receiving these letters from Skadden, Arps, despite having objected at the Disclosure Statement stage of the chapter 11 proceedings. The objections that were filed were overruled by the Confirmation Order.

Skadden, Arps also negotiated with various landlords in an attempt to reach a consensual disposition of their objections to the Plan. The majority of objections that were filed to the confirmation of the Plan, however, were those filed by landlords who had leased space to Winn-Dixie or any of its subsidiaries. Many of the landlords objected to the fact that, under Plan section 7.4, the Debtors had discretion to reject an unexpired lease that was subject to a then pending assumption motion. Skadden, Arps spent substantial time communicating and negotiating with these landlords to explain that the section applied only to unexpired leases assumed pursuant to the Plan. All of the leases that were the subject of these landlords' objections were being assumed by the Debtors via separate motions. In an attempt to reach a consensual Plan and resolution of this discrepancy, Skadden, Arps added clarifying language to the proposed Confirmation Order, which was accepted by this Court.

Skadden, Arps also spent time analyzing, reviewing and responding to objections that attacked the Plan's classification scheme. Certain parties objected to the Plan arguing that the Plan was not confirmable under Bankruptcy Code section 1123(a)(4). These parties, mostly landlords, argued that the Plan could not be confirmed because it provided different treatment of claimholders in the same class. Skadden, Arps devoted

considerable time and resources to illustrate that no such disparate treatment existed and that valid factual reasons existed for the Plan's classification of claims, namely, the Substantive Consolidation Compromise.  The Substantive Consolidation Compromise, which is necessary for the resolution of these cases, was a settlement that negotiating parties, including landlords, concluded was fair, appropriate and rational.

Skadden, Arps conducted extensive case law research and reviewed numerous confirmed plans to show that courts repeatedly give plan proponents considerable discretion to classify claims and interests according to the circumstances of the case.

In addition, Skadden, Arps spent time briefing responses to classification objections in the Confirmation Brief (defined below).  Despite the fact that all Plan classes (except 2 classes discussed above) overwhelmingly approved the Plan, Skadden, Arps' services were necessary to ensure confirmation of the Plan.  The objections were overruled by the Confirmation Order.

Skadden, Arps also spent time addressing objections filed by certain taxing authorities (the "Tax Objectors").  The Tax Objectors objected to the Plan on the basis that the 6% interest rate for secured tax claims originally provided for in the Plan was inadequate.  Skadden, Arps and SH&B spent time working with the taxing authorities in an attempt to reach an amicable resolution.  After making this initial (but unsuccessful) effort to settle the matter globally with respect to the Tax Objectors, Skadden, Arps and SH&B spent time researching case law and precedent to determine the appropriate or applicable interest rates.  Ultimately, the Court resolved the issues.

Moreover, Skadden, Arps spent considerable time responding to an objection to the Plan's release provisions.  Article XII of the Plan included several provisions that released or otherwise defined the liabilities of various non-Debtors in connection with actions taken or liabilities arising before the Plan's effective date.  These provisions were the subject of an objection to confirmation asserted by the United States Trustee (but not by any entity affected by the releases).  The United States Trustee argued that non-debtor releases are inconsistent with the Bankruptcy Code.  Skadden, Arps devoted considerable resources to expressing Winn-Dixie's belief that this objection lacked merit.  Skadden, Arps communicated with the United States Trustee and her office to reiterate the fact that the releases were drafted only after the careful and detailed Committee Investigation, the Creditors Committee's investigation of certain potential claims of the Debtors.  The objections were overruled by the Confirmation Order.

To facilitate approval of the Plan and resolve the above-referenced objections and other filed objections, Skadden, Arps addressed and set forth many of the Plan's objections and the Debtors' proposed resolution in a confirmation brief ("Confirmation Brief").  The Confirmation Brief was filed shortly before the Plan confirmation hearing.  While the Confirmation Brief was filed outside the Application Period, significant efforts by Skadden, Arps to develop the brief occurred during the Application Period.

The culmination of the above efforts enabled Skadden, Arps to adequately prepare for and attend the Plan confirmation hearing to prosecute, with SH&B, the Plan.

Moreover, Skadden, Arps drafted, negotiated and revised the proposed Confirmation Order.

On November 9, 2006, this Court entered an order confirming the Plan.

In addition to the foregoing, Skadden, Arps extensively advised the Debtors on Plan-related corporate governance issues relating both to ongoing management of the Debtors' business as a debtor-in-possession, but also those present upon emergence from chapter 11. For example, Skadden, Arps (i) advised the compensation committee of the Debtors, (ii) drafted the Management Incentive Plan, (iii) reviewed and advised on the term sheet and tax consequences stemming from transfer restrictions, (iv) drafted the Registration Rights Agreement, (v) advised on the appropriate level and duration of director and officer insurance, (vi) worked with the Board of Directors and others on employee retention issues, and (vii) provided advice in conjunction with various NASDAQ listing issues. Some, or all, of these services are more fully described in the specific matter categories.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and required numerous interoffice conferences and conferences with parties in interest in these cases to coordinate their efforts. The ability to work in a constructive manner with various Skadden, Arps professionals in multi-disciplinary practices, as well as counsel for the Creditors Committee and financial advisors, enabled Skadden, Arps, on behalf of the Debtors, to negotiate effectively and adapt Plan provisions efficiently, resulting in additional preserved value of the estates and reduced professional fees.

During the Application Period, Skadden, Arps professionals devoted a total of 1,616.80 hours to this category, for which compensation is sought in the aggregate amount of $1,035,136.00.

(q)    Retention / Fee Matters / Skadden, Arps

During the Application Period, Skadden, Arps performed services associated with the firm's compliance with the Bankruptcy Code's retention and compensation requirements. Skadden, Arps continued reviewing disclosure parties to ensure compliance with rules and procedures relating to its retention in these cases. In connection therewith, Skadden, Arps prepared and filed a supplemental declaration disclosing connections with parties in interest and other necessary information.

In addition, under an administrative order governing payment of professionals, Skadden, Arps prepared monthly statements that contain detailed records of services rendered and expenses incurred. Preparation of monthly statements is time-consuming, as it requires a review of all time and expense entries to ensure that they are properly

charged to the Debtors, that they are recorded in the proper category and that they do not reveal privileged information. Preparation of monthly statements was particularly time-consuming in these cases due to the appointment of Stuart Maue. Skadden, Arps reviewed its records for compliance with Stuart Maue's billing guidelines.

Through the fee review process, Skadden, Arps refines its bills and voluntarily makes reductions in charges. For example, total voluntary reductions made with respect to the months covered by the Application Period for fees and expenses were approximately $445,000.00.

Skadden, Arps further spent time preparing the Fourth Application (consisting of hundreds of pages and multiple exhibits) in accordance with established procedures in these cases. Thereafter, Skadden, Arps spent necessary time preparing for a hearing on the Fourth Application, where this Court approved Skadden, Arps' requested fees and expenses.

To render the services provided in this category necessarily required the services of more than one Skadden, Arps professional because lawyers from various areas that had generated fees needed to assist in the fee application, statement and review process.

During the Application Period, Skadden, Arps professionals devoted a total of 133.70 hours to this category, for which compensation is sought in the aggregate amount of $66,188.50.

(r)    <u>Retention / Fee Matters / Objections (Others)</u>

During the Application Period, Skadden, Arps performed services associated with retention and compensation issues involving professionals other than Skadden, Arps, including other professionals retained by the Debtors.

Skadden, Arps assisted the Debtors with a variety of issues relating to the application to retain Deloitte Tax LLP ("Deloitte"). The Debtors sought to retain Deloitte to provide fresh-start tax services in connection with implementation of the Plan and emergence from chapter 11 (the "Deloitte Application"). In connection with the Deloitte Application, Skadden, Arps assisted the Debtors in reviewing and revising engagement terms, negotiating the retention with counsel for the Creditors Committee, and preparing and filing the retention application, proposed order and other retention papers (collectively, the "Deloitte Retention"). On June 29, 2006, an order was entered by this Court approving the Deloitte Retention.

During the Application Period, Skadden, Arps further provided services to the Debtors' estates in accordance with the Order Authorizing Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Business, entered by the New York Court on March 4, 2005) (the "Ordinary Course Professional Order"). Skadden, Arps provided notice to ordinary course professionals of the entered order and of the retention and compensation requirements. Skadden, Arps further (i) communicated with

many professionals on proposed retentions, (ii) responded to questions in connection with completing retention declarations and (iii) coordinated the return and filing of necessary papers to allow the retention of ordinary course professionals. Skadden, Arps prepared supplements listing professionals in accordance with the Ordinary Course Professional Order, which were filed with this Court during the Application Period on July 7, 2006 (fifteenth supplement), July 27, 2006 (sixteenth supplement) and September 22, 2006 (seventeenth supplement). As a result of Skadden, Arps' efforts, the Debtors retained three additional necessary ordinary course professionals.

Skadden, Arps further assisted the Debtors in complying with the quarterly reporting requirements under the Ordinary Course Professional Order. Under the Ordinary Course Professional Order, the Debtors are required to report on payments made to ordinary course professionals. Skadden, Arps assisted in the preparation of the required report that was filed with this Court on July 20, 2006.

Finally, Skadden, Arps spent time communicating with professionals in these cases regarding compliance with established procedures for fee applications. Skadden, Arps worked with SH&B and coordinated the timely notice and filing of such fee applications.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and required intraoffice conferences and conferences with parties in interest in these cases. For example, Skadden, Arps had to hold conferences with the Debtors' outside professionals and intraoffice conferences to coordinate fee retention matters among the Debtors' other professionals to ensure that the Debtors' other professionals were complying with applicable Court orders.

During the Application Period, Skadden, Arps professionals devoted a total of 76.10 hours to this category, for which compensation is sought in the aggregate amount of $39,532.00.

(s)     <u>Tax Matters</u>

During the Application Period, Skadden, Arps assisted the Debtors in analyzing claims of federal and state taxing authorities.

In this regard, Skadden, Arps monitored and analyzed discussions that the Debtors' tax advisors had with taxing authorities, such as the IRS. This analysis required Skadden, Arps to assess the validity of such claims, including any related penalties, and the priority such claims would receive under a reorganization plan.

Similarly, Skadden, Arps worked with the Debtors and their tax advisors on tax planning initiatives and the implications of the chapter 11 filings on certain tax treatment matters.

Further, during the Application Period, Skadden, Arps assisted the Debtors in handling tax disputes with landlords.

The work performed in this matter throughout these cases necessarily involved the services of more than one Skadden, Arps professional and necessarily required intraoffice conferences and conferences with parties in interest in these cases.  In addition to discussing tax matters with the Debtors' other professionals, Skadden, Arps professionals held intraoffice conferences to efficiently assess and analyze issues impacting the Debtors' tax liability.

During the Application Period, Skadden, Arps professionals devoted a total of 67.70 hours to this category, for which compensation is sought in the aggregate amount of $48,406.50.

(t)    Utilities

During the Application Period, Skadden, Arps continued to assist the Debtors in pursuing resolutions with approximately twenty-one (21) utility companies that provide, or had provided as of the Petition Date, utility services to the Debtors with respect to such utility companies' requests for adequate assurance or demands on surety bonds which backed payment of prepetition utility services to the Debtors (the "Bond Demands").

To reach a successful resolution with these utility companies, Skadden, Arps drafted, negotiated, revised, and finalized stipulations setting forth the terms of proposed settlements.  In connection therewith, Skadden, Arps coordinated with the Debtors to obtain the relevant information from the Debtors' records to verify and analyze the information obtained from such utility companies.  In accordance with an order, dated May 19, 2005, granting the Debtors authority to settle disputes with certain utility companies without further court order, Skadden, Arps prepared and furnished notice of each resolution to the parties specified in such order.  Following the passing of the applicable objection period, Skadden, Arps worked with the Debtors and the applicable utility company to consummate the terms of the settlement resolution.

Skadden, Arps also continued to update reports concerning the status of the resolutions of Bond Demands respecting bonds issued by Liberty and periodically presented those reports to Liberty.

In addition, Skadden, Arps facilitated the resolutions of various issues regarding utility services, including misapplication payments and noncompliance with the order, dated March 10, 2005, prohibiting utility companies from altering or refusing service to the Debtors.

During the Application Period, Skadden, Arps professionals devoted a total of 90.80 hours to this category, for which compensation is sought in the aggregate amount of $43,105.00.

31

(u)    Vendor Matters

During the Application Period, Skadden, Arps continued to assist the Debtors with various matters involving their vendor relationships and the impact of the chapter 11 filings on such relationships.

Skadden, Arps assisted the Debtors in resolving vendor claims, including claims asserted by Russell Stover Candies ("Russell Stover") and Southeast-Atlantic Beverage Company ("Seabev").

The Debtors and Russell Stover disputed the amount of Russell Stover's claim, including the treatment of certain unsold candy purchased prior to the Petition Date. During the Application Period, Skadden, Arps analyzed the issues relating to the dispute, and communicated with the Debtors and XRoads regarding (i) the dispute, including reconciliation of Russell Stover's claims, payment of Russell Stover's reclamation claim, trade credit to be provided by Russell Stover, and strategy with respect to obtaining credit for the unsold Russell Stover candy, and (ii) the proposed global settlement with Russell Stover.  Skadden, Arps also conferred with Russell Stover's counsel regarding (x) the dispute, including the treatment of the Russell Stover claims and the unsold candy, (y) the proposed settlement and (z) payment of Russell Stover's reclamation claim.  As a result of Skadden, Arps' efforts, the Debtors reached a favorable resolution of the Russell Stover dispute.

Skadden, Arps also assisted the Debtors with respect to resolving the claim of Seabev.  In connection therewith, Skadden, Arps (i) communicated with the Debtors with respect to the Seabev claim, (ii) analyzed issues with respect to resolving the Seabev claim, (iii) reviewed and revised the proposed stipulation resolving the claim, and (iv) communicated with Seabev's counsel regarding the proposed stipulation resolving the claim, and the accompanying motion and order.  As a result of Skadden, Arps' efforts, the Seabev claim was consensually resolved.

Skadden, Arps also assisted the Debtors in resolving issues relating to other vendor disputes.

During the Application Period, Skadden, Arps professionals devoted a total of 15.90 hours to this category, for which compensation is sought in the aggregate amount of $8,586.00.

(v)    Fee Examiner

During the Application Period, Skadden, Arps spent necessary time working on matters pertaining to the Court-appointed fee examiner, Stuart Maue, and the Fee Examiner Order.

Skadden, Arps spent significant time reviewing Stuart Maue's reports, consisting of many thousands of pages.  During the Application Period, Skadden, Arps drafted

responses to Stuart Maue's preliminary reports on the Third Application and the Fourth Application and drafted responses to Stuart Maue's final reports on the First Application and the Second Application.

Responding to Stuart Maue in accordance with the Fee Examiner Order required considerable work by Skadden, Arps. The reports, themselves, were voluminous, raising numerous issues. Skadden, Arps spent considerable time (i) reviewing the four reports, (ii) strategizing and developing an efficient work plan to handle responses to each report, (iii) researching legal issues raised in the reports, (iv) producing additional documentation to Stuart Maue, (v) preparing lengthy and detailed response briefs for each report and (vi) otherwise complying with Stuart Maue's guidelines under the Fee Examiner Order.

Following submission of responses, Skadden, Arps spent time addressing outstanding issues in the reports and otherwise working with Stuart Maue in accordance with the Fee Examiner Order.

The work performed in this matter necessarily involved the services of multiple Skadden, Arps professionals and required Skadden, Arps professionals to hold intraoffice conferences.

During the Application Period, Skadden, Arps professionals devoted a total of 252.90 hours to this category, for which compensation is sought in the aggregate amount of $115,308.50.

## SUPPORT FOR ALLOWANCE OF COMPENSATION

28.     Bankruptcy Code section 330 authorizes the Court to award "reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ." 11 U.S.C. § 330(a)(1)(A). In order to evaluate services rendered by a professional person, a court must determine whether such services were necessary and reasonable.

29.     Skadden, Arps respectfully submits that the fees requested in this Fifth Application are allowable pursuant to the factors generally considered by courts in awarding compensation in chapter 11 cases. Those factors and the applicability of each factor to the services performed by Skadden, Arps in these cases are set forth below:

(a)    Time and Labor Required

During the Application Period, Skadden, Arps expended an aggregate of 7,873.60 hours in the representation of the Debtors at a blended rate of approximately $523.53 per hour.  A detailed description of the services rendered during the Application Period is set forth fully in Exhibits C-1, D-1, E-1 and F-1.  All of the services rendered were necessary to enable the Debtors to perform their statutory duties, fulfill their fiduciary obligations and progress through reorganization.

(b)    Nature and Complexity of the Cases

As should be evident from the summary of Skadden, Arps' services, as described above in this Application and previous applications, the Debtors' chapter 11 cases present a particularly unique set of circumstances and are unquestionably large and complex cases.  The chapter 11 cases require work in a broad range of fields, involving a vast array of legal issues.  These cases involve 24 estates, thousands of creditors, shareholders and other parties in interest, and billions of dollars in assets and claims.

The nature and complexity of these cases have required Skadden, Arps to develop case management and staffing solutions at every stage of the proceedings.  These tasks have been particularly daunting in light of the size and complexity of the Company's operations.  Skadden, Arps, nonetheless, has assisted the Company by employing streamlined case management procedures and has assigned various professionals to discrete tasks, where possible, to avoid the performance of duplicative or unnecessary work.

Given the size of this case and the number of matters that continually need to be addressed, there have been occasions when a number of Skadden, Arps professionals must be present and participate in the discussions and negotiations.  This is particularly true of the weekly business calls, case management meetings and other meetings involving cash collateral, sale of assets and lease issues, claims, litigation and plan-related issues.  Skadden, Arps believes that, as evidenced by the summaries contained in this Application and the time entries attached hereto, it has demonstrated reasons for attendance by more than one Skadden, Arps professional.

During the Application Period, Skadden, Arps professionals researched a number of complex legal issues.  The time spent on legal research was necessary and appropriate to resolve the issues to be addressed by Skadden, Arps professionals.  For example, Skadden, Arps researched a number of issues relating to the Substantive Consolidation Compromise.  One significant issue was the effect of intercorporate guarantees on arguments for and against substantive consolidation.  Moreover, in order to determine the appropriateness of eliminating intercorporate guarantees through substantive consolidation, Skadden, Arps professionals researched the law in other jurisdictions because there was no case law in the Eleventh Circuit on point.  Similarly, substantive consolidation and the proposed compromise of substantive consolidation raised a host of complicated issues, including under what circumstances a court could approve a

34

settlement as part of a plan. Furthermore, Skadden, Arps prepared a response to the Consolidation Motion (as discussed in the Fourth Application), which raised important procedural issues that required research.

In addition, Skadden, Arps professionals researched other complex matters. For example, with respect to the Plan, Skadden, Arps researched (i) classifications of claims, (ii) payments on claims and collection of money owed to the Debtors, (iii) applicable interest rates on claims, (iv) release and exculpation provisions, (v) emergence issues, such as stock listing issues, board structures, by-laws and company operating agreements,(vi) setoff issues on claims, (vii) issues involving the Exit Facility, (viii) the standards for approving settlements, (ix) numerous 11 U.S.C. §1129(a) claims, and (x) insurance renewals and executory contract issues. Skadden, Arps did not undertake research on routine issues because the Skadden, Arps team included a number of lawyers with years of restructuring experience.

(c)     Skill Requisite to Perform Legal Services

Skadden, Arps respectfully submits that it has the specialized skill necessary to perform the legal services required by the Debtors. In order to address the issues presented during the Application Period, Skadden, Arps utilized its skills and expertise in bankruptcy, banking, corporate, employee, insurance, litigation and tax law.

Skadden, Arps is among the largest law firms, with one of the largest restructuring groups, in the world. Skadden, Arps restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude of fast-paced issues that arise in chapter 11 cases. Accordingly, Skadden, Arps' depth of experience in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly.

(d)     Preclusion from Other Employment

Skadden, Arps was not precluded from other employment during the Application Period, although it has been necessary to reduce other client commitments of certain attorneys on the team to ensure proper coverage of issues on behalf of the Debtors.

(e)     Customary Fee

The hourly rates at which Skadden, Arps' fees have been charged by each professional are set forth in the summary preceding this Fifth Application. The rates are those customarily charged by Skadden, Arps to its clients in bankruptcy-related matters according to its bundled rate structure, as increased from time to time. These hourly rates compare favorably with rates charged by other national law firms for similar legal services.

(f)      Whether the Fee is Fixed or Contingent

Skadden, Arps has agreed to be compensated, and has calculated its fee, on the basis of a fixed hourly rate for the services performed.  Skadden, Arps' fees are contingent only to the extent that they are subject to this Court's approval and an administratively solvent estate.

(g)      Time Limitations Imposed by Client or Circumstances

In general, the circumstances of these cases have at times imposed significant time constraints on Skadden, Arps' services.  Certain Skadden, Arps attorneys have committed almost all of their available time to providing services to the Debtors.

(h)      Amounts Involved and Results Obtained

Exhibits C-1, D-1, E-1 and F-1 set forth detailed descriptions of the services rendered by Skadden, Arps and the charges associated with such services.  Skadden, Arps respectfully submits that the services provided were necessary to enable the Debtors to operate as debtors-in-possession, fulfill their fiduciary obligations and begin the process of restructuring their debts.

(i)      Experience, Reputation and Ability of Attorneys

Skadden, Arps respectfully submits that it and its attorneys are experienced, capable and have an excellent reputation in the national restructuring industry.  Skadden, Arps has extensive experience representing debtors in bankruptcy cases throughout the country.

(j)      Undesirability of Case

Skadden, Arps believes that this factor is not applicable to its representation of the Debtors in the current cases.

(k)      Nature and Length of Relationship with Client

On February 7, 2005, the Debtors retained Skadden, Arps for the specific purpose of assisting them with their reorganization efforts.  By order dated March 15, 2005, Skadden, Arps' retention in these cases was effective as of the Petition Date.

(l)      Awards in Similar Cases

Skadden, Arps submits that the fees requested in this Fifth Application are comparable to fees requested and awarded in other chapter 11 bankruptcy cases of this size, nature and complexity.

<u>SUPPORT FOR EXPENSE REIMBURSEMENT</u>

30.     Bankruptcy Code section 330(a)(1)(B) provides for reimbursement to approved professionals for all "actual, necessary expenses."  11 U.S.C. § 330(a)(1)(B).  According to the engagement agreement entered into between Skadden, Arps and the Debtors (the "Engagement Agreement"),[7] Skadden, Arps and the Debtors have agreed that Skadden, Arps' bundled rate structure will apply to these cases.  Therefore, Skadden, Arps is not seeking to be compensated separately for certain staff, clerical and resource charges.  Moreover, under the bundled rate structure applicable to the Debtors, copying costs are charged at $0.10 per page, computerized research and telephone calls are billed at provider cost without reference to Skadden, Arps' internal capital costs or overhead, and document production (including secretarial and word processing time), facsimile services, proofreading, overtime meals and overtime travel allowances are not charged for separately on an incurrence basis.

31.     Consistent with the firm's policy with respect to its other clients, Skadden, Arps is seeking compensation for other charges and disbursements incurred as out-of-pocket expenses in the rendition of necessary services to the Debtors and their estates.  These charges and disbursements include costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage and, when applicable, witness fees and other fees related to trials and hearings.

32.     A complete description of each disbursement is included in Exhibits C-2, D-2, E-2 and F-2.  Skadden, Arps' policy requires all attorneys to retain and submit for review receipts and/or invoices for all disbursements incurred through outside vendors.  Skadden, Arps

---

[7]     The Engagement Agreement is Exhibit A to the Employment Application, which is attached as Exhibit A to this Fifth Application.

maintains all receipts and/or invoices related to each client's disbursement account in a central storage facility, and such records can be produced upon request.

<u>NOTICE OF FIFTH APPLICATION</u>

33.     Notice of this Fifth Application has been provided in accordance with the Interim Payment Order.

WHEREFORE, Skadden, Arps requests that the Court (i) approve Skadden, Arps' fees in the amount of $4,122,040.50, and expenses in the amount of $57,007.18, for the period of June 1, 2006 through September 30, 2006, (ii) authorize payment of the foregoing amounts in full and (iii) grant Skadden, Arps such other and further relief as the Court deems just and proper.

Dated:  November 22, 2006

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

/s/  *D. J. Baker*
D. J. Baker
Sally McDonald Henry
Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

Attorneys for the Debtors

38