1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

WINN-DIXIE STORES, INC.,        CASE NO.: 05-03817-3F1

                Debtor.
_____/


TRANSCRIPT OF PROCEEDINGS

VOLUME I of II


        Confirmation Hearing before the Honorable
Jerry A. Funk, U. S. Bankruptcy Judge, commencing at
9:00 a.m., on Friday, October 13, 2006, at the
United States Courthouse, Room 13A, 300 North Hogan
Street, Jacksonville, Florida, as reported by
Cindy Danese, a Notary Public in and for the State
of Florida at Large.


                    -   -   -

**STATEWIDE REPORTING SERVICE**
606 BLACKSTONE BUILDING
JACKSONVILLE, FLORIDA 32202
(904) 353-7706                    249-9952
EXPERTS IN MEDICAL, TECHNICAL & EXPEDITED TRANSCRIPTS

RED STAMP INDICATES
CERTIFIED
COPY

1                    A P P E A R A N C E S

2

3        STEPHEN D. BUSEY, ESQUIRE

4             Attorney for the Debtors.

5

         MARK KELLEY, ESQUIRE
6
              Attorney for various landlords.
7

8        RICHARD THAMES, ESQUIRE

9             Attorney for various tax collectors.

10

         BRIAN HANLON, ESQUIRE
11
              Attorney for Florida Tax Collectors.
12

13       RUSSELL MILLS, ESQUIRE

14            Attorney for Bundy New Orleans.

15

         NORM ROSENBAUM, ESQUIRE
16
              Attorney for Merrill Lynch LP Holdings, Inc.
17

18       MARY DOWD, ATTORNEY-AT-LAW

19            Attorney for FRO, LLC VII.

20

         JOHNATHAN BOLTON, ESQUIRE
21
              Attorney for Saran, Limited.
22

23       DEBORAH MORRIS, ATTORNEY-AT-LAW

24            Attorney for Department of Justice.

25

```
 1              A P P E A R A N C E S    (Continued)

 2

 3       SARA LORBER, ATTORNEY-AT-LAW

 4              Attorney for Daniel G. Kamin entities.

 5
         ELENA ESCAMILLA, ATTORNEY-AT-LAW
 6
                Attorney for the U.S. Trustee.
 7

 8       JOHN MACDONALD, ESQUIRE
         MICHAEL COMERFORD, ESQUIRE
 9       MATTHEW BARR, ESQUIRE

10              Attorneys for Unsecured Creditors Committee.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    T A B L E   O F   C O N T E N T S

2                                                          PAGE
       **PAUL HUFFARD**
3
          Direct Examination
4             by Mr. Busey                                  11

5          Cross-Examination
              by Mr. Kelley                                 64
6
           Cross-Examination
7             by Mr. Thames                                 72

8          Cross-Examination
              by Mr. Hanlon                                 78
9
           Cross-Examination
10            by Mr. Mills                                  83

11         Cross-Examination
              by Mr. Rosenbaum                              88
12
           Cross-Examination
13            by Ms. Dowd                                   90

14         Cross-Examination
              by Mr. Bolton                                 95
15
           Cross-Examination
16            by Ms. Morris                                100

17         Cross-Examination
              by Mr. Lorber                                102
18
           Redirect Examination
19            by Mr. Busey                                 103

20
       **LARRY APPEL**
21
          Direct Examination
22            by Mr. Busey                                 109

23         Cross-Examination
              by Ms. Lorber                                127
24
           Cross-Examination
25            by Ms. Escamilla                             129

1        T A B L E    O F    C O N T E N T S (Continued)

2

3

4                        E X H I B I T S

5

6
    Debtors' Exhibit 1                                    8
7
    Debtors' Exhibit 2                                    8
8
    Debtors' Exhibit 3                                    8
9
    Debtors' Exhibit 4                                    9
10
    Debtors' Exhibit 5                                    9
11
    Debtors' Exhibit 6                                   10
12
    Debtors' Composite Exhibit 7                         64
13

14  Saran Exhibit 1                                      98

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2    October 13, 2006                              9:00 a.m.

3                          -  -  -

4              THE COURT:  Good morning.  We're here today

5         on the case of Winn-Dixie Stores, Inc.  We're

6         here on a Chapter 11 confirmation hearing.

7              Procedurally, initially the debtor will make

8         its presentation, which I assume will consist of

9         both live testimony and documentary evidence.

10             Any objectors, which we've had about 50

11        some-odd objections filed, will have an

12        opportunity to cross-examine the witnesses, and

13        I'll allow that as long as it's relevant and

14        pertinent.

15             At the conclusion of the debtors'

16        presentation, the Court then will allow any of

17        the objectors who have filed written objections

18        to come forward and make their presentation, be

19        it just argument or evidentiary, and at the

20        conclusion of each section of debtor objections

21        -- they seem to fall into certain groups -- I'll

22        allow the debtor and the creditors committee, if

23        they desire, to respond to those objections.

24             At the conclusion of all presentation, I'll

25        invite any comments of anybody that's in support

1     of or generally opposed, but not based on those

2     objections.  There's been some letters of

3     recommendation or statements in support that have

4     been filed.

5          I anticipate going to somewhere around the

6     noon hour.  We'll break for lunch, hopefully

7     around 12:00 or so, come back and stay -- I think

8     the CSOs allow us to stay here until 5:00.

9     Hopefully we'll have it finished by then.  If

10    not, we'll take a little more time if necessary.

11         Mr. Busey, are you going to be the lead

12    today?

13         MR. BUSEY:  I'll start off, Your Honor.

14         THE COURT:  Okay.  Any housekeeping matters

15    on behalf of the debtor before we get started?

16         MR. BUSEY:  No, Your Honor.  We're ready to

17    proceed.

18         THE COURT:  Then let's proceed.

19         MR. BUSEY:  Your Honor, I'd like to start by

20    putting into evidence some documents that we've

21    given to the clerk.

22         The first is the debtors' proposed plan of

23    reorganization and Disclosure Statement, which is

24    Debtors' Exhibit 1.

25         THE COURT:  Any objection?  There being no

1      objection, it's admitted as Number 1 for the

2      debtor.

3                          (Whereupon, the document

4                          previously marked as Debtors'

5                          Exhibit 1 for identification

6                          was received in evidence.)

7           MR. BUSEY:   The second is the debtors' first

8      modification to its proposed plan of

9      reorganization, which was filed with the Court on

10     October 10th.

11          THE COURT:   Any objections?   There being

12     none, it's admitted as previously numbered.

13                         (Whereupon, the document

14                       previously marked as Debtors'

15                       Exhibit 2 for identification

16                       was received in evidence.)

17          MR. BUSEY:   Third is the debtors' plan

18     supplement that was filed pursuant to Section

19     12.18 of the plan on October 3rd.

20          THE COURT:   Any objections?   It's admitted

21     as previously numbered.

22                         (Whereupon, the document

23                       previously marked as Debtors'

24                       Exhibit 3 for identification

25                       was received in evidence.)

1           MR. BUSEY:  The fourth is the debtors'
2   composite exhibit consisting of the ad hoc trade
3   committee's May 11th, 2006 motion for an order
4   substantively consolidating the debtors' estate,
5   its brief in support of the motion, and the
6   affidavit of Freddie Reiss in support of the
7   motion.
8           THE COURT:  It's admitted.
9                           (Whereupon, the document
10                          previously marked as Debtors'
11                          Exhibit 4 for identification
12                          was received in evidence.)
13          MR. BUSEY:  The fifth is the amended
14  declaration of Kate Logan reporting the voting
15  results on the plan.
16          THE COURT:  That's admitted.
17                          (Whereupon, the document
18                          previously marked as Debtors'
19                          Exhibit 5 for identification
20                          was received in evidence.)
21          MR. BUSEY:  Sixth is XRoads' liquidation
22  analysis which is referred to in the plan of
23  reorganization.
24          THE COURT:  Any objection?  That's admitted
25  as previously numbered.

1                                    (Whereupon, the document

2                                    previously marked as Debtors'

3                                    Exhibit 6 for identification

4                                    was received in evidence.)

5              MR. ROSENBAUM:  Sorry, Your Honor.  Norm

6    Rosenbaum for Merrill Lynch, the law firm of

7    Morrison & Forester.

8              What is the basis for admitting the ad hoc

9    trade committee's motion?  What is it being

10   offered for?

11             THE COURT:  You're asking me?

12             MR. ROSENBAUM:  I'm asking counsel.

13             THE COURT:  Did you object to it?

14             MR. ROSENBAUM:  I object to the admission.

15   I don't know --

16             THE COURT:  On what basis do you object?

17             MR. ROSENBAUM:  Are we going to be given an

18   opportunity to cross-examine the movant and the

19   party that submitted the declaration in support

20   of that motion?

21             MR. BUSEY:  Your Honor, we're not offering

22   it for the truth of the matter stated.  We're

23   offering it to show that there is a motion made

24   in this case to substantively consolidate which

25   tees up the dispute of substantive

1    consolidation.  It's not offered for the truth of

2    the matter stated.

3          THE COURT:  Very well.  Objection

4    overruled.

5          MR. BUSEY:  That's the conclusion of the

6    exhibits we want to put in at this time.

7          Your Honor, we'd like to call Phillip

8    Huffard to the stand.

9          COURTROOM ADMINISTRATOR:  Please be seated

10   in the witness stand.  Please raise your right

11      hand.

12   WHEREUPON,

13                     **PAUL HUFFARD**

14   was called as a witness herein, and having been first

15   duly sworn by the Courtroom Administrator, was

16   examined and testfied as follows:

17          COURTROOM ADMINISTRATOR:  Please state your

18      name and address, including the city and state.

19          THE WITNESS:  My name is Paul Huffard, I

20      live in Darien, Connecticut.

21          THE COURT:  You may inquire.

22          MR. BUSEY:  Thank you, Your Honor.

23                  **DIRECT EXAMINATION**

24   BY MR. BUSEY:

25      Q   Mr. Huffard, by whom are you employed?

1       A       I'm employed by the Blackstone Group.

2       Q       And what is the Blackstone Group?

3       A       Blackstone Group is a private investment

4   banking firm located in New York.

5       Q       Has Blackstone been employed by Winn-Dixie

6   in these cases?

7       A       We have.

8       Q       When?

9       A       Since the initiation of the bankruptcy

10   cases.  And, in fact, for some time before the

11   initiation of the bankruptcy cases.

12       Q       And what do you do for Blackstone?

13       A       I am a senior managing director at

14   Blackstone.  I'm one of the partners in our

15   restructuring advisory group.

16       Q       How long have you been with Blackstone?

17       A       I've been Blackstone since 1995.

18       Q       And what is the nature of Blackstone's

19   services to Winn-Dixie in this case?

20       A       We are Winn-Dixie's investment banker, so

21   we've assisted them with financial advice in many

22   aspects of this bankruptcy case.

23           We've been intimately involved in their

24   business plan development, in the valuation of the

25   business and the negotiation of the plan of

1    reorganization that's in front of the Court today.
2    We've assisted them on the various assets sales that
3    they've undertaken during the last year and a half.
4        Q    What generally is the structure of the
5    plan?  Will you describe the plan, please?
6        A    The plan contemplates a substantial
7    deleveraging of the company.
8             It divides the creditors into 20 classes of
9    different creditors.
10            It provides for the payment in full of the
11   secured and administrative creditors.
12            It provides for the conversion of the
13   prepetition unsecured creditors into the reorganized
14   common stock of Winn-Dixie.
15       Q    And with regard to the liens of the secured
16   creditors, are those affected adversely by the plan?
17       A    They are not.
18       Q    How is the former equity of the company
19   treated?
20       A    The former equity of the company receives no
21   distribution under the plan.
22       Q    What is your understanding of the term
23   "substantive consolidation" in the context of
24   bankruptcy?
25       A    Substantive consolidation, my understanding

1    is that that is a concept under the Bankruptcy Code

2    whereby creditors of different business entities

3    within a consolidated operating group are all treated

4    similarly.  They're treated as if they were a creditor

5    of a consolidated group rather than being treated as

6    if they were creditors of each of the different

7    subsidiaries of a company.

8        Q    What is your understanding of the factors

9    that should be considered in determining whether

10   affiliated debtors should be substantively

11   consolidated?

12       A    The factors -- my understanding of the

13   factors that should be considered basically revolve

14   around:  Was the debtor doing business as separate

15   individual businesses, in which case that would weigh

16   against consolidation, substantive consolidation.

17            Or, on the other hand, were the business

18   activities of the different debtors so commingled that

19   nobody on the outside really understood that they were

20   doing business as different entities, rather they

21   simply thought they were doing business as a whole.

22       Q    Was the issue of substantive consolidation

23   present in Winn-Dixie's case?

24       A    Yes, it was.

25       Q    And why was that?

1          A       There are many debtors that are part of

2      these proceedings, and there are creditors who have

3      direct claims against many of the debtors.  Some of

4      the creditors have claims against all of the debtors.

5              The effect of having multiple claims against

6      multiple debtors is basically to multiply or magnify

7      the recovery that you get under a deconsolidated

8      plan.

9              So it's a very important economic

10     consequence how the issue of substantive consolidation

11     gets resolved.

12             In this case, it is such a significant issue

13     that it will ultimately have potentially tens of

14     millions of dollars of difference in the recovery the

15     different creditor groups get.

16         Q     Can you list some of the issues that you

17     consider in determining whether to substantively

18     consolidate a case or not to substantively consolidate

19     a case?

20         A     Sure.

21         Q     That were present in this case.

22         A     Yes.  In this case, there were a number of

23     factors that, I think, from the outside, from a

24     layman's point of view, indicated, at least to me,

25     that these were companies basically operating as all

1    one group.

2              For instance, none of the individual legal

3    entities that exist within Winn-Dixie's corporate

4    structure are stand-alone businesses.  None of them

5    actually can run their own business, none of them can

6    be pulled away from the part.  They all operate just a

7    part of the value chain within the supermarket

8    business.

9              For instance, some of the entities own

10   stores.  Some of the entities do the corporate

11   administration.  Some of the entities do the

12   purchasing of product.  Some of the entities do the

13   distribution of product to the stores.

14             If you pull any of those pieces away, it

15   destroys the value of the piece you pulled away as

16   well as the piece that remains.

17             There are, furthermore, when you look at

18   Winn-Dixie's corporate structure from a financial

19   point of view, there are not independent banking and

20   credit relationships that these different legal

21   entities had.

22             In essence, the top-level legal entity,

23   Winn-Dixie, Stores, Inc., served as the bank of

24   Winn-Dixie.  That was the entity that borrowed all the

25   money and that provided for all the cash flow that

1      needed to go down among the different entities.

2             So there was no separate, you know, credit

3      arrangements that any of these legal entities had.

4      And, furthermore, there were never any financial

5      statements for the different legal entities that were

6      publicly distributed, even though they did exist on an

7      internal basis.

8             So it's hard to believe that any third party

9      on the outside made an independent credit decision as

10     to advancing credit to the lower-level legal

11     entities.  They never had any information about what

12     the creditworthiness of those entities were.

13            So those are all the type of factors that I

14     think argue towards consolidating these companies for

15     bankruptcy plan purposes.

16            On the other hand, there are factors that

17     point the other direction.

18            For instance, in the Winn-Dixie note

19     indenture, there are very clear guarantees from each

20     of the lower-level subsidiaries.  And I have heard

21     many times in my discussions with the noteholders that

22     those were guarantees that were specifically

23     negotiated for, they were important parts of their

24     credit advancement division.

25            So those tend to say people did look at the

1    cooperate structure and did think it was important

2    that the different entities are treated distinctly.

3            In addition, Winn-Dixie does account for the

4    financial flows between the different legal entities.

5    It's not the case, as it is in some companies, that

6    there's really no bookkeeping of the intercompany

7    transactions.   There are relatively complete records

8    that I think comply with general accounting standards

9    so you can go back and look at kind of a historical

10   record of the intercompany transactions.

11           So those are some of the factors that I

12   think would say, no, these really were stand-alone

13   businesses and they should not be consolidated.

14       Q    What did Blackstone do to determine whether

15   these cases should or should not be substantively

16   consolidated?

17       A    Well, we were part of an extensive effort

18   that was undertaken by both the debtors' professionals

19   as well as the creditors committees' professionals to

20   look at the various detailed factors that would weigh

21   both in support of consolidation as well as in support

22   of deconsolidation.

23           There were literally thousands and thousands

24   of pages of documents that were reviewed, historical

25   financial data, contracts, invoices.   There were

1    interviews, extensive interviews, with company

2    personnel both at the corporate office as well as out

3    in the field so that you were understanding how people

4    out in the stores thought they were being operated

5    from a legal entity point of view.

6              This diligence process took probably three

7    or four months of concerted effort by many people.

8              So there was a very extensive effort to

9    focus on the information, weighing both for and

10   against consolidation.

11       Q    And who participated in that diligence

12   process?

13       A    Well, it was the debtors and their

14   professionals, it was the creditors committee and

15   their professionals.

16             And then, as the course of these in

17   negotiations and settlement efforts developed, in

18   addition there were ad hoc committees of creditors

19   that developed in an effort to make sure that each of

20   the different major constituencies in the case that

21   had a different interest in this issue were adequately

22   represented.

23             So there was an ad hoc committee of the

24   noteholders, there was an ad hoc committee of the

25   landlords -- I'm sorry -- of the trade vendors, and

1    there was an ad hoc committee of the retirees that
2    were ultimately formed.

3          So it was extensively analyzed.

4          Q    Give us an example of a creditor who would
5    be economically motivated to argue in favor of
6    substantive consolidation.

7          A    Well, in fact, the trade vendor community,
8    as an example, is a constituency that would argue in
9    favor of substantive consolidation.  In fact, as you
10   mentioned earlier when you were admitting documents
11   into evidence, they went so far as to file a motion
12   seeking a ruling to consolidate the cases.

13         They are a group of creditors who have -- to
14   hear them talk in their interviews and then to look at
15   the underlying data, many of them thought they were
16   dealing with Winn-Dixie Stores, Inc. just as a single
17   business entity when they did business with
18   Winn-Dixie.

19         I think there's a fair amount of confusion
20   about who their actual customers were.  In many cases,
21   we saw invoices that were sent to companies that did
22   not actually exist.  And, nonetheless, over many years
23   there was a course of business that happened and their
24   bills got paid, and they just assumed that they were
25   sending their goods to Winn-Dixie Stores.

1        They are motivated from a plan point of view

2   to pursue consolidation because that gives -- that

3   would give them an average recovery, and that would

4   give them an average recovery, it would give the note-

5   holders an average recovery, and it would give all of

6   the other creditors, all the other unsecured

7   creditors, an average recovery.

8        If you contrast that to a deconsolidated

9   case, there are going to be creditors who get good

10  recoveries, and there are going to be creditors who

11  get bad or relatively lower recoveries.

12       In this particular instance, we have a large

13  group of creditors, the noteholders, who have clear

14  contractual guarantees from each of the debtor

15  entities.  And that lets them get a recovery from this

16  company and lets them get a recovery from that

17  company.  And when you add up those multiple bites at

18  the apple, it really has a significant impact in

19  magnifying their recovery.

20       So, for instance, if you just compare the

21  noteholders with the trade creditors, the trade

22  creditors don't have such a clear advantage in terms

23  of those multiple bites at the apple, and from a

24  negotiating point of view, they want to bring the

25  noteholders down to their level and have everybody get

1    an average recovery, which would be higher for the

2    trade creditors than if there had not been that sort

3    of consolidation.

4        Q     And how much debt is represented by the

5    noteholders constituency that you just spoke of?

6        A     The noteholders' claims are approximately

7    $310 million.

8        Q     Are you familiar with the Owens Corning case

9    which is in bankruptcy?

10       A     I'm generally familiar with it.

11       Q     And was there a substantive consolidation

12   issue in that case?

13       A     There was a big substantive consolidation

14   issue.

15       Q     And tell us procedurally what happened in

16   that case.

17       A     My understanding of what happened in the

18   Owens Corning case is that there was a motion made to

19   substantively consolidate that case.  After weeks of

20   litigation, the judge took it under consideration.

21       Q     After weeks of trial?

22       A     I'm sorry.  After weeks of trial took it

23   under consideration, and ultimately ruled on the

24   matter almost a year after the initial litigation.

25             That ruling, which did approve the

1    consolidation, was subsequently challenged.  And,

2    after further litigation, again over more than a one-

3    year period, that ruling was overturned.

4        Q    By the 3rd Circuit Court of Appeal?

5        A    I believe that's correct.

6             So now Owens Corning has found itself where

7    it has to go back to square one and reformulate a plan

8    that complies with the reverse ruling, and it's

9    basically still trying the figure out how it gets out

10   of bankruptcy.

11       Q    And the ruling of the 3rd Circuit Court of

12   Appeals in Owens Corning was that substantive

13   consolidation should not happen in that case because

14   of the noteholders --

15            THE COURT:  You are?

16            MR. BOLTON:  Your Honor, my name is

17       Johnathan Bolton from Fulbright & Jaworski.

18            Your Honor, he's leading the witness.  I

19       object.

20            THE COURT:  Sustained.  Try not to lead the

21       witness, Mr. Busey.

22            MR. BUSEY:  Thank you, Your Honor.

23   BY MR. BUSEY:

24       Q    Is it your understanding that the holding of

25   the 3rd Circuit in the Owens Corning case was because

1    the noteholders had relied on individual credit --

2              MR. KELLEY:  Your Honor, I object.  He's

3         still leading the witness.  Mark Kelley.

4              MR. BOLTON:  Your Honor, he's still leading

5         the witness.

6    BY MR. BUSEY:

7         Q    -- of the affiliated debtors?

8              THE COURT:  Sustained.

9    BY MR. BUSEY:

10        Q    What was your understanding of the ruling of

11   the 3rd Circuit and why they ruled the way they did?

12             MR. KELLEY:  Your Honor, I object to that.

13        The opinion speaks for itself.

14             THE COURT:  Overruled.

15             THE WITNESS:  My understanding was that the

16        ruling effectuated the deconsolidation of those

17        cases because the noteholders had advanced money

18        to the debtors in reliance upon their guarantees

19        from each of the individual debtors.

20   BY MR. BUSEY:

21        Q    Do you believe that the outcome in Owens

22   Corning would be reliable to predict what would happen

23   if substantive consolidation were litigated in this

24   case?

25             MS. DOWD:  Objection, Your Honor.  There's

1    no foundation for him to testify about that.

2        MR. KELLEY:  Unless he's a lawyer, he's not

3    competent.

4        COURT REPORTER:  Y'all have to state your

5    names before you speak, please.

6        MS. DOWD:  Mary Dowd, D-o-w-d.

7        MR. KELLEY:  Mark Kelley.

8        MS. DOWD:  Your Honor, there's been no

9    foundation laid whatsoever for Mr. Huffard to

10   testify as to what the 3rd Circuit is ruling and

11   why.

12       MR. KELLEY:  I object.  There's no

13   foundation that he's competent to give an opinion

14   about what a decision in the 3rd Circuit means.

15       MR. BUSEY:  Your Honor, I'm not asking the

16   witness to give an opinion.  I'm asking if he was

17   familiar with the case, and these are predicate

18   questions to ask if the ruling in that case

19   played a role in the considerations and

20   negotiations of substantive consolidation in this

21   case.

22       THE COURT:  I'll overrule the objections.

23       THE WITNESS:  I'm sorry, could you restate

24   the question?

25       MR. BUSEY:  I don't remember it.

1          THE WITNESS:  I'm not competent, I guess, so

2     I forgot.

3          MR. BUSEY:  I'll restate the question.

4     BY MR. BUSEY:

5     Q    Based on your understanding of the ruling of

6     the 3rd Circuit in the Owens Corning case, do you

7     believe that's a reliable predictor of what would

8     happen if substantive consolidation were litigated in

9     this case?

10    A    Not speaking from a legal point of view, I

11    do believe there's substantially different facts on

12    the ground here.

13    Q    And what are those facts?

14    A    The facts are that, as I've mentioned

15    earlier, Winn-Dixie really -- the different debtor

16    entities within the Winn-Dixie family of companies

17    really are kind of inextricably intertwined in terms

18    of their business operations.

19         Whereas, at Owens Corning, that was a group

20    of truly stand-alone companies, and I think it would

21    be fairly easy to split those off and identify their

22    value, for instance, as individual entities.

23         It's much more complex here.  That's not the

24    way Winn-Dixie operates its business.

25    Q    And so what advice did Blackstone give

1    Winn-Dixie regarding whether or not litigation of

2    substantive consolidation in this case, the result

3    could be reliably predicted?

4         A    Our advice was that there were factors both

5    for and against consolidation in this case, and that

6    if a litigation path was pursued, that there would be

7    an answer down the road at some point, that nobody

8    could predict what that answer was, and that it would

9    take a very long time and tremendous amount of money

10   to get to that answer.

11        Q    And what would be the impact on the debtors,

12   in your judgment, if that protracted litigation

13   occurred in this case?

14        A    I think that would be very negative on the

15   debtors' ongoing restructuring efforts.  And I think

16   ongoing litigation, just staying in bankruptcy for a

17   longer period of time continues sort of the cloud

18   that's over any company that's in bankruptcy.

19             Obviously there are professional fees that

20   run at a tremendous rate.

21             And I think that sort of uncertainty would

22   really dampen their ability to continue their

23   restructuring efforts.

24        Q    If the litigation ultimately related in a

25   determination in this case that the cases could not be

1    substantively consolidated, do you believe the

2    formulation of separate plans for the 24 debtors would

3    be practical?

4         A    If you actually had to deconsolidate these

5    businesses, you could do it.  It would entail a

6    tremendous destruction of value.

7              I think it would basically lead to

8    formulating liquidating plans for each of the

9    entities.  You could not pull them apart and continue

10   their operations as going concerns.

11             Obviously, the alternative to that from a

12   practical point of view is that the creditors of each

13   of the debtor entities would work together to kind of

14   stitch back together contractual relationships between

15   the entities to allow for their ongoing operations.

16             That is, in essence, what has happened in

17   terms of the substantive consolidation compromise that

18   we've reached here.

19        Q    In light of these considerations and

20   uncertainties, what conclusion did you reach regarding

21   the best resolution for these estates of the

22   substantive consolidation issue?

23        A    Our conclusion and our recommendation to the

24   debtors was that, if there could be a settlement of

25   the substantive consolidation issue that was supported

1    broadly by the different creditor constituencies, that

2    would be a far better outcome than any of the possible

3    litigated scenarios.

4         Q    And how did the compromise described in the

5    plan of the issue of substantive consolidation come

6    about?

7         A    It came about as a result of a lengthy,

8    contentious at times, fully advised negotiation

9    process.

10             There were -- as we went through the process

11   -- at the start, the debtors came to view this issue

12   as primarily an intercreditor issue.

13             This doesn't -- the issue of substantive

14   consolidation doesn't, at the end of the day, change

15   the overall business -- the overall value of the

16   company's business, but what it does do is it affects

17   how big a slice of the pie each of the different

18   creditor groups get.

19             So the debtors' view was that the creditors

20   committee would be in an ideal position to spearhead

21   trying to reach a consensual arrangement between the

22   different types of creditors within the company's

23   capital structure.

24             The debtors did undertake in parallel, as

25   I've mentioned earlier, a due diligence process and an

1    analysis process, and we were in fact prepared to
2    propose our own settlement if the creditors were
3    unable to reach a settlement among themselves, but our
4    strong hope and desire was that the creditors would be
5    able to figure out how to resolve this issue
6    consensually among themselves.
7          As I mentioned earlier, a number of ad hoc
8    committees were created to further supplement the
9    diversity of creditors that are represented on the
10   creditors committee.
11         The creditors committee itself does include
12   representatives of the noteholder constituency,
13   representatives of the landlord constituency and
14   representatives of the trade vendor constituency, and
15   I think they have a pretty good cross-section of the
16   different creditors of the company within their own
17   committee structure.
18         That being said, there were ad hoc
19   committees that formed to further represent the
20   interests of the different creditor groups.  As I
21   mentioned earlier, the noteholders had an ad hoc
22   committee, the trade vendors had an ad hoc committee,
23   and the employees, the retirees, had an ad hoc
24   committee.  They were not directly represented by a
25   member on the creditors committee.

1          Q      But they participated as an ad hoc

2     committee?

3          A      They actively participated as an ad hoc

4     committee.

5          Q      And did the committee come to the debtors

6     with a proposed compromise?

7          A      The committee did.

8          Q      And what was that compromise?

9          A      The proposed compromise treated different

10    creditors differently according to a sense of their

11    litigation strength --

12         Q      Are you referring to unsecured creditors?

13         A      I'm sorry.  This is only an issue among

14    unsecured creditors, so whenever I'm talking here

15    about creditors, it's unsecured creditors.

16                The compromise breaks the unsecured

17    creditors into five different groups.  They are the

18    noteholders, the landlords, trade vendors, the

19    retirees, and then other unsecured creditors.

20                And that splitting up of the unsecured

21    creditor pool is not something that the debtors ever

22    mandated.  That was sort of a natural partitioning

23    that occurred, really led by the interests of the

24    individual creditor groups, and that the debtors

25    supported because we think that that is a logical

1   clustering of the different creditor interests in our

2   capital structure.

3        Q    What are the varying distributions proposed

4   to those five different unsecured creditor classes?

5        A    Well, first of all, they're all getting

6   reorganized common stock of Winn-Dixie as their

7   distribution.  They get it in different percentages in

8   terms of the recovery versus their claim, and again

9   those percentages are based ultimately upon perceived

10  differences in litigation strength as it related to

11  the substantive consolidation issue and these multiple

12  debtor claims that different constituencies have.

13             So the estimated recoveries under this plan,

14  based on the reorganization value that's set forth in

15  the disclosure statement of $759 million, range from,

16  in round numbers, 53 percent on the low side to 96

17  percent on the high side.

18        Q    And the high side being the bondholders?

19        A    The high side being the bondholders.

20        Q    Let's look at each of those five different

21  groups and the considerations that were present that

22  would justify disparate distributions to the five

23  groups.

24             What was the recovery level for the bond-

25  holders?

1        A      Approximately 96 percent.

2        Q      And why are the bondholders on the top of

3    the heap?

4        A      The bondholders are on the top of the heap

5    because in a deconsolidated world they have quite

6    clear direct guarantees from each of the debtor

7    entities, so they are able to get a recovery from

8    every single one of the debtor entities within the

9    Winn-Dixie family.

10              As I said earlier, that has a tremendous

11   magnifier effect in terms of the economic return that

12   you would get as a creditor.

13       Q      And what was the next class?

14       A      The next class would be the trade vendors.

15       Q      And what was their recovery?

16       A      Their recovery is approximately 70 percent,

17   I think.

18       Q      70.6 percent.

19       A      Yeah.

20       Q      It's in the plan.

21       A      Correct.

22       Q      And the bondholders was the same, wasn't it?

23       A      No.

24       Q      Excuse me.  The landlords.

25       A      The landlord recovery is the same.

1       Q      What were the considerations for the
2    landlords and the vendors to get them to 70.6 percent?
3       A      Well, the landlords are -- landlords
4    obviously have leases in many cases that are spread
5    throughout the different debtor entities of the
6    Winn-Dixie family.  And they fall into one of --
7    generally fall into one of two types.
8              If they are landlords of stores that are at
9    the upper-level entity, Winn-Dixie Stores, Inc., they
10   have a direct claim against Winn-Dixie Stores and
11   that's all they have.
12             If they are landlords of any of the lower-
13   level subsidiaries, they have a direct claim against
14   the tenant, whatever the entity is that's the tenant
15   on the lease, and they will also have a guarantee from
16   Winn-Dixie Stores, Inc.
17             So, again, they have the potential to have
18   this two times magnifier effect, whereas the bond-
19   holders have a much higher magnifier effect.
20             Now, I speak of landlords as if -- you know,
21   that's sort of you're either one place or the other.
22   I think it's important to understand that the
23   landlords are spread all over this company's capital
24   structure, and many of the landlords have leases at
25   all of the different entities, so they all have sort

1    of a hodgepodge of different interests and exposure

2    within a given landlord.

3         Q    And what were the considerations for the

4    vendors to receive the same distribution as the

5    landlords?

6         A    Unlike the noteholders and the landlords who

7    have fairly clear contractual relationships, the

8    vendors have much less clear contractual

9    relationships.  Many of them do business just on the

10   basis of purchase orders.  Many of them, as I said

11   earlier, seemingly are doing business with Winn-Dixie

12   entities that don't exist.  They'll use the name of a

13   warehouse, for instance, on their purchase order.

14              And the landlord -- I'm sorry.  The vendors

15   have told us repeatedly that they have thought that

16   they were doing business with Winn-Dixie Stores, Inc.

17   The company accounts for them at a different entity.

18   Many of them are not even aware of the entity at which

19   the company shows their claims residing.

20              It's very fuzzy as to where the landlord

21   claims actually exist, and they have asserted in many

22   cases the ability to have a claim against multiple

23   debtor entities because of that confusion.

24         Q    And what about the employee retirement

25   claims that was 59.1 percent?

1        A     The employee retiree claims, similarly there

2    are contracts that give rise to those claims.   There

3    is similar confusion, although I think to be fair, a

4    slightly lower degree of confusion about where their

5    claims exist.

6              Those claims are treated at the company as

7    if they are all claims of the top-level entity,

8    Winn-Dixie Stores, Inc., and yet many of those

9    employees actually work for other debtor entities, and

10   there has never been any intercompany accounting for

11   the fact that the parent might be paying for the

12   employees of the lower-level entities and they've

13   never been charged for that.

14             Furthermore, in the documentation and in the

15   conversations that many of these employees had over

16   the course of their careers, I think it's fair to say

17   that there was a large degree of confusion about who

18   would actually be the legal obligor under their

19   retirement claims.

20        Q     And then how did those four groups compare

21   to what was characterized as the other class?

22        A     The other class --

23        Q     The other class is getting 53.2 percent.

24        A     Right.   The other class is getting the

25   lowest recovery, and the reason for that is they

1    generally have fairly clear claims against a single
2    entity.
3              There's really little in the way of argument
4    about how they could either have been confused about
5    the entity they were doing business with or why they
6    would have thought it would be a multi-debtor type of
7    claim.
8              So, again, one of the things that really is
9    driving, I think, the differentiation in the
10   recoveries here is the issue of multi-debtor claims
11   and the magnifier effect that that would give you.
12             The creditors in the other class really
13   don't have the ability, I think in a realistic way, to
14   assert that claim.
15       Q    And this was the compromise that was
16   submitted to the debtors by the creditors committee?
17       A    That is correct.
18       Q    And what was the debtors' reaction to the
19   proposed compromise?
20       A    Well, the debtors' reaction was enthusiastic
21   that there had been a compromise, because we do think
22   that this is the right outcome for this case.
23             I will say that historically there were
24   different steps in the compromise process where
25   certain groups of creditors had reached compromise and

1    other groups had not reached compromise.

2              We, on behalf of the debtors, encouraged the

3    committee to continue negotiations in an effort to

4    bring all creditors groups in.  And I think the

5    success has been proven in the voting record for this

6    plan where all of the different creditor groups have

7    in fact voted for this plan.

8         Q    Does the substantive consolidation

9    settlement include paying approximately $2.7 million

10   in professional fees for the constituencies

11   participating in the negotiations?

12        A    Yes, it does.

13        Q    If you look at Page 55 of the Disclosure

14   Statement which is in front of you as Exhibit 1 --

15        A    Yes.

16        Q    -- that $2.7 million in fees, does it show

17   on Page 55 of the Disclosure Statement the

18   professionals that are proposed to be paid and the

19   amounts that are proposed to be paid?

20        A    Yes, it does.

21        Q    And why did the debtor agree to the payment

22   of those fees, capped in those amounts, to those

23   professionals for the creditors who participated in

24   the substantive consolidation negotiations?

25        A    Well, that was -- the payment of these

1    professional fees was an integral part of the

2    settlement that was reached by the different

3    creditors, so you can't really pick and choose.  This

4    was part of the deal, and I think the debtor supports

5    the deal.

6         That being said, even if it hadn't been part

7    of the deal, I think this would be an excellent use of

8    the company's assets.  By paying these fees and

9    getting to this settlement, we will have saved

10   multiples of this in avoided legal fees from

11   litigation down the road.

12        Q    What did Blackstone do to evaluate the

13   compromise that was presented to the debtors by the

14   creditors committee?

15        A    We have run many analyses, as I talked about

16   earlier, looking at the impact of substantive

17   consolidation and deconsolidation, looking at the

18   types of issues that are raised in the analysis of

19   this issue, and running different permutations of key

20   driving assumptions through those analyses.

21        We've run a lot of analyses on them, we've

22   looked at the recoveries that are embodied in this

23   compromise, and I think, when we compare those to the

24   range of outcomes we see under different scenarios,

25   this seems like a fair compromise.

1        Q     Can you tell me whether or not Blackstone

2   reached a conclusion that the compromise was fair and

3   equitable for the creditor constituency?

4        A     Yes, we did.

5        Q     And what was that conclusion?

6        A     That it was fair and equitable.

7        Q     Are the claims in each of the five classes

8   substantially similar to the other claims in the

9   class?

10       A     Within each of the classes, yes, I believe

11   they are.

12       Q     Are you familiar with the best-interest test

13   and liquidation analysis that's described on Pages 115

14   and 116 of the Disclosure Statement?

15       A     I am.

16       Q     What does the liquidation analysis show

17   regarding -- liquidation analysis is in evidence --

18   what does it show regarding the recoveries that would

19   be available to creditors of the debtors in a

20   liquidation under Chapter 7?

21       A     It shows that the recoveries are very much

22   lower than are being offered under this plan, in the

23   single-digit-percent-on-the-dollar range than the

24   numbers that are in the Disclosure Statement.

25       Q     Did Winn-Dixie ask Blackstone to perform a

1    valuation of Winn-Dixie's enterprise value in

2    connection with the reorganization plan?

3         A    Yes, they did.

4         Q    Why did Blackstone undertake to do a

5    valuation of Winn-Dixie?  What was the purpose of it?

6         A    The purpose of it was to allow ultimately

7    creditors to determine what sort of recoveries they

8    might be offered under a plan of reorganization.

9         Q    If they were to receive common stock?

10        A    That's correct.

11        Q    And what was the reorganization value of

12   Winn-Dixie that was determined by Blackstone?

13        A    It was a range of values ranging from $625

14   million to $890 million, but has a midpoint of $759

15   million.

16        Q    And that determination of value of $759

17   million of Winn-Dixie, was that based upon

18   Blackstone's analysis of Winn-Dixie's restructuring as

19   a part of the bankruptcy process?

20        A    Yes, it was.

21        Q    Do you see the exhibit book in front of you?

22        A    Yes.

23        Q    Look at what is marked as Exhibit 7, which

24   is a series of charts.  Do you recognize those?

25        A    Yes, I do.

1      Q      I want to show you the first one.   Were
2    these prepared by Blackstone?

3      A      Yes, they were.

4      Q      (Displaying chart.)   This first chart, which
5    is entitled "ID Period Sales Trend," what does that
6    show?

7      A      This is a chart showing the relative sales
8    performance of the company's 520 continuing stores.
9    Those are the stores that are part of their go-forward
10   footprint.   The phrase "ID" means identical store.

11            And what this is is a measure of using a
12   comparable number of stores, 520, in each measuring
13   period.   It looks at the sales performance during the
14   current year's period versus the sales performance
15   during the prior year's period.   So it's really just a
16   measure of sales growth.

17     Q      And approximately how many stores is
18   represented here?

19     A      520.

20     Q      And what is the beginning date on the chart?

21     A      January of 2005.

22     Q      So that's the sales of those 500 core stores
23   compared to the year before, January '04.

24     A      Correct, January '04 compared to January of
25   '05.   And you'll see that that is down four and a half

1    percent.

2         Q    Off of the year before?

3         A    Compared to the year before.

4              And that was a fairly typical result in the

5    period leading up to the bankruptcy.  In the year and

6    more leading up to the bankruptcy, the company was

7    typically experiencing sales declines in the four- to

8    six-percent range relative to the prior years.

9         Q    That is, each year their sales were going

10   down.

11        A    Correct.

12        Q    So follow this chart through, please, and

13   describe for us what this chart shows in terms of the

14   store sales for Winn-Dixie's 500 core stores during

15   the course of the bankruptcy.

16        A    Well, what this shows is -- and obviously

17   the company filed for Chapter 11 in February of 2005,

18   right there at the 4.6 percent down.

19             What this shows is that, after a period of a

20   number of most of volatility, frankly, following the

21   bankruptcy filing, that the new initiatives that the

22   management team had started to put into place to try

23   to drive the company's top line performance started to

24   take hold.

25             And during the early -- during the fall of

1    2005, really for the first time in many years, the
2    company started to experience actually sales growth
3    instead of sales decline.

4         And that sales growth went up into the high
5    single-digit range -- you see eight and a half
6    percent in November of '05 -- and has stayed
7    remarkably consistent since that time, in the high
8    single-digit percentage.

9         The reason that this chart to me is so
10   important is, in a retail company like Winn-Dixie, one
11   of the things that has really hurt their operations
12   historically is the sales declines.

13        This is a fixed-cost business.  You have a
14   certain number of stores.  You have rent which is
15   fixed at each of those stores.  You have labor out in
16   the stores and you have labor at the corporate.  The
17   labor has a small variable component, but a large part
18   of it is also fixed.

19        So when you generate sales in the stores and
20   those in turn generate gross margin, that gross margin
21   goes to cover these fixed costs.

22        And when you have sales declines
23   sequentially for a number of years in a row, any
24   retailer will find themselves in a position where the
25   gross margin they're generating out in the stores is

1    not enough to cover the fixed costs of operating their

2    business.  And that really was the spiral that

3    Winn-Dixie fell into.

4            And what has happened in the company's turn-

5    around efforts here is that spiral has been broken,

6    and they are now experiencing sales increases on a

7    consistent basis which will start to push them back up

8    in terms of the sales per store that they're

9    generating and it starts to frankly reverse that same

10   downward spiral, which is you're now being able to

11   sell more product, realize more gross margin, and your

12   costs actually don't go up that much as you do that.

13           So these sort of fixed-cost structure

14   instances, there's a very powerful effect on the down-

15   side as your sales volume declines.  There's an

16   equally powerful effect on the upside as the sales

17   volume recovers.

18       Q    And what's the last period shown on that

19   chart?

20       A    August of 2006.

21       Q    That was the last monthly operating report

22   that's been filed by Winn-Dixie?

23       A    That is correct.

24       Q    How does the sales growth at Winn-Dixie

25   Stores reflected by this chart compare to the

1    industry?

2        A     Well, this is quite favorable compared to

3    many industry participants and quite favorable

4    compared to the average industry participant.

5             If you think about food retailing, people

6    don't eat more food from year to year, they eat the

7    same number, so the overall demand for food is

8    basically growing at a population growth type rate,

9    which is in the low single digits.

10            So when you're seeing growth significantly

11   above population growth, what that means is that

12   you're taking a share away from other food retailers.

13       Q     (Displaying chart.)  And this next chart

14   called "Liquidity," did Blackstone prepare this?

15       A     Yes, we did.

16       Q     And what does it show?

17       A     This shows Winn-Dixie's liquidity under its

18   DIP facility as well as its cash balances.  And you

19   see a steady increase in liquidity as you move from

20   last summer, July of last summer, where it was at $125

21   million, to August of this year.

22       Q     This right here (indicating) is July last

23   year?

24       A     Right.

25       Q     Go ahead.

1          A        Compared to August of this year, where it

2     was $324 million.

3                   And I think that steady increase in

4     liquidity is a combination of multiple factors.

5                   Obviously, the company has been very focused

6     on building its liquidity as part of preparing itself

7     to emerge from Chapter 11.

8                   I think, as everybody knows, there have been

9     a number of assets sales, market closures, which have

10    yielded good liquidity for the company to be able to

11    reinvest in growing its business.

12                  The company has also been able to get back

13    onto trade terms with its trade vendors as part of the

14    negotiation we've undertaken with the trade vendors

15    over time.

16                  So I think this is a very positive chart for

17    Winn-Dixie.  I think this positions it well to emerge

18    from bankruptcy and have liquidity to drive its

19    business forward.

20         Q        Explain the significance of a company like

21    Winn-Dixie emerging from bankruptcy and having $324

22    million in liquidity.

23         A        Well, liquidity, from a finance point of

24    view, is really cushion.  It is the ability to spend

25    cash to support your business, if you choose to.  Now,

1    part of the goal is not to burn cash.

2         But this is a large amount of liquidity.

3    $324 million is, I think by almost anybody's measure,

4    a lot of money.  And I think what this does is provide

5    Winn-Dixie a lot of cushion as it continues to

6    implement its restructuring plans going forward and

7    try to drive its business.

8         Q    Does Winn-Dixie's business plan have a

9    capital improvement program?

10        A    Yes, it does.

11        Q    And what is that program?

12        A    It has a program to spend meaningful amounts

13   of capital in its stores to upgrade and remodel its

14   stores, and then also in the later years to actually

15   start to build new stores, open new stores.

16        Q    And will that capital spending be funded by

17   this liquidity?

18        A    Yes, in part.

19        Q    (Displaying chart.)  And the next chart, did

20   your group prepare this chart?

21        A    Yes, we did.

22        Q    What does it show?

23        A    This is a -- this chart shows a measure of

24   the support that the company is getting from its trade

25   vendors, and the measure that's showed here is what's

1   called days payable outstanding.  It basically is a
2   shorthand for how quickly do your vendors make you pay
3   them once they ship you goods.
4          So you can see that right before the company
5   filed for Chapter 11, back in February of 2005, on
6   average the company had 29 days payable, which meant
7   that on average the vendors were asking to get paid
8   for their product within 29 days.
9          Now, it's important to understand this is an
10  average, which there are vendors who are much shorter,
11  there are vendors which are much longer.  This is the
12  average measure.
13         Then what happened upon the company filing
14  for Chapter 11 in mid February of '05, you see what is
15  quite predictable, which is a dramatic drop in the
16  trade terms that the company's vendors were offering
17  it.
18         And you can see that that bounced back
19  slightly, but basically was pretty low for a number of
20  months afterwards.
21         The Court may remember that we were
22  negotiating with the trade vendors during the spring
23  and summer of last year a reclamation motion to settle
24  their reclamation claims.  And as part of that, we
25  were able to reach a settlement with the trade vendors

1    and get them to put us back on more normal trade

2    terms.

3         And you can see the improvement in the trade

4    credit that has been offered to the company during the

5    fall of last year, and that has stayed roughly

6    constant since that time.

7         I think this is important as, among other

8    things, a measure of confidence that the trade vendors

9    have in terms of where the company is headed.  This

10   shows, I think, pretty good trade support.

11        It is important to understand, however, that

12   even at 15 or 16 days, that is still far short of what

13   the company hopes to achieve once it emerges from

14   Chapter 11.  Trade vendors typically don't open a

15   company up all the way to normal terms until it

16   actually gets out of Chapter 11.

17        And there is a significant opportunity for

18   the company to further increase its liquidity by

19   getting back onto normal trade terms once it emerges

20   from bankruptcy.

21        That's really one of the many driving

22   factors to say let's get this company out of

23   bankruptcy sooner rather than later so that we can get

24   back on normal terms with our vendors.

25        Q    Let's look at the next chart.  (Displaying

1    chart.)   What does that show?

2        A    This chart shows the quarterly amount of the

3    company's administrative expense.  This is basically

4    what you could call their overhead.

5            And I think it's been widely reported, one

6    of the key initiatives that the management team has

7    focused on is reducing their overhead so that they

8    will be a more profitable business.  And you can see

9    here a steady progression of declining quarterly

10   overhead cost rates.

11           So going from $84 million in the second

12   quarter of 2005.  Now, I should add these are fiscal

13   quarters, so this is the quarter ending in January of

14   2005.  And it has steadily declined into the low $50

15   million per quarter.

16           So that's in excess of $30 million per

17   quarter or $120 million per year of cost that the

18   management team has taken out of their overhead cost

19   structure.

20       Q    And what is the collusion you reached from

21   the data shown by these four charts?

22       A    The conclusion I reach is that the company

23   is very much on track to continue its operating turn-

24   around.  This is a large company, and, like an

25   aircraft carrier, it takes a long time to turn

1    around.

2           But as we look at the measures of what the

3    company has said that they could do and would do, we

4    see a steady record here of the company executing on

5    what they promised.

6           So I think, although the company still has

7    obviously a long way to continue to go to get its

8    operations to where they ultimately hope it will go,

9    we believe they're on track and that the financial

10   performance shows that.

11        Q    Did Blackstone's valuation of Winn-Dixie at

12   $759 million rely on the financial projections that

13   are enclosed with the Appendix B to the Disclosure

14   Statement?

15        A    Yes, they did.

16        Q    (Displaying document.)   Can you see that?

17        A    Yes, I can.

18        Q    Is that the income statement from those

19   financial statements?

20        A    That is correct.

21        Q    What does that exhibit show as the projected

22   earnings of the company over the next five years, net

23   income?

24        A    This exhibit shows that on a net income

25   basis -- that's the line you've highlighted here --

1  that the company is actually projected to continue to

2  lose money on a net income basis during fiscal year

3  2007, but that that will turn into a net income

4  positive income statement in 2008, and continue to

5  grow into the forecast period, reaching ultimately

6  $137 million of net income in 2011.

7       Q    And do the financial statements include a

8  balance sheet?

9       A    They do, which I doubt anybody can see.

10      Q    What's the projection on total assets?

11      A    I'm not sure I can see myself.

12      Q    Let me do that again.

13      A    The total assets is approximately $1.4

14  billion for the fiscal year that we're currently in,

15  and that would be as of June of next summer.  And then

16  that would grow to approximately $1.8 billion by the

17  end of fiscal 2011.

18      Q    There's also in those financial statements a

19  cash flow statement?

20      A    There is.

21      Q    And what does the cash flow statement tell

22  you?

23      A    This cash flow statement shows two things.

24  One, a growth -- let me see which line you've

25  highlighted here.  Shows an increase in the cash

1    balance of the company over the projection period.

2              And what you see when you look at the actual
3    components of that is a significant growth in the cash
4    profitability of the business itself, then for many
5    years offset by the capital expenditure program that
6    Mr. Busey referred to earlier.

7              So they will be reinvesting much of the cash
8    flow that they generate for the next couple years.
9    And then, when you get out into the 2010-2011 time
10   frame, they will actually start to be generating a
11   meaninful amount of cash flow from their operations.

12      Q    (Displaying chart.)  And this next chart,
13   what does that show?

14      A    This is a graphical summary of some of the
15   component analyses that Blackstone undertook as part
16   of their overall valuation analysis.

17      Q    What are the different methods of valuation
18   that you used in doing this?

19      A    Well, we've used, I think, three commonly
20   accepted valuation methodologies, being a market
21   multiple approach, looking at how comparable companies
22   trade in the public markets.

23              We've used precedent transaction approach,
24   which is to examine MMA transactions for similarly
25   situated companies, other grocery store chains.

1          And we've used the discounted cash flow

2     approach, which is what's down at the bottom as "DCF."

3     And that examines the projections and the cash flows

4     that are projected to be generated by the business and

5     discounts those back to the present.

6          Q    And what conclusion did you reach from

7     looking at those three different methodologies?

8          A    The conclusion that we reached was that

9     obviously there is a wide range in the different

10    conclusions that those methodologies would suggest.

11         We examined those.  We debated internally

12    which we thought was the most relevant to the

13    valuation here.

14         I think overall we felt that the discounted

15    cash flow approach most accurately reflected the

16    potential future improvement in the company's

17    operations, and we've determined this range of $625-

18    to $893 million that I referred to earlier, which

19    again has the midpoint value of $759 million.

20         Q    And this valuation is based upon those

21    projections that we just looked at for five years?

22         A    That is correct.

23         Q    And what is Blackstone's conclusion

24    regarding the reasonableness of those projections?

25         A    Our conclusion is that those are reasonable

1    projections.

2        Q    What is the proposed capital structure of
3    the reorganized debtors?

4        A    As I mentioned earlier, this plan of
5    reorganization in front of the Court today entails a
6    substantial deleveraging of Winn-Dixie's capital
7    structure.

8            And, frankly, I think it's a very positive
9    vote of confidence that the unsecured creditors have
10   taken in the management team's efforts to turn the
11   company around that they have agreed to convert all of
12   their unsecured claims into equity.  It's not uncommon
13   for unsecured creditors to want to retain some portion
14   of their claims in the form of debt securities.

15           But I think everybody's goal is the same,
16   which is to give Winn-Dixie every opportunity for
17   success here, and so we have negotiated a capital
18   structure that substantially de-levers the company.

19           Really, the only debt instruments that the
20   company will have outstanding after the plan of
21   reorganization is consummated, they will have very
22   small number of capital leases for equipment and then
23   they will have the senior secured exit facility, the
24   Wachovia facility that we've been in front of the
25   Court before to get approval for the commitment letter

1    on.

2              That facility itself will have no funded

3    borrowings day one.  Will have approximately $240

4    million of letters of credit outstanding, but will

5    have no funded borrowings, and the company will be, I

6    think, even better off than it currently is.

7              Although $324 million is a lot of liquidity

8    for the company to currently have, we currently

9    estimate that post emergence the company will have in

10   excess of $375 million of liquidity available to it.

11        Q    Let's talk about that exit facility for a

12   minute.

13             Would you describe, please, the process by

14   which Winn-Dixie came to terms with Wachovia as the

15   lead lender on that $725 million exit facility.

16        A    Sure.  Beginning in January of this year, as

17   the company was undertaking efforts to work with the

18   committee to structure a compromise of the substantive

19   consolidation issues, we simultaneously began a

20   process of trying to identify some potential sources

21   of exit financing.

22             We went to a very broad universe of

23   potential exit financing lenders, and ultimately

24   received 14 different proposals to provide exit

25   financing.

1            We went through a process of analyzing each

2     of those, ranking them, discussing the different

3     proposals that we got with the creditors committee.

4            In March, I think the determination was made

5     to put the exit financing process on hold for just a

6     moment to let the company update its business plan to

7     incorporate both the positive trends in its operating

8     performance that it was seeing, as well as to update

9     what were frankly less positive trends in the cost of

10    insurance, of hurricane insurance, that I think many

11    of the Southeast-based companies have experienced.

12           So we determined that it would be better to

13    let the company refresh its projections and give those

14    new projections out to the exit lenders and ask them

15    to resubmit their proposals with that updated

16    information so that we could more thoroughly rely on

17    the proposals that we got back from them.  So we did

18    do that.

19           By the beginning of May, we had recirculated

20    a business plan and asked the lenders to update their

21    proposals.

22      Q    Is that business plan the same business plan

23    essentially that's in the Disclosure Statement?

24      A    Essentially.  It's slightly modified, but

25    it's essentially the same.

1    And we have -- we got again proposals back

2    from this large group of potential lenders.

3    Those proposals in and of themselves were

4    significantly better than we had received in the first

5    round, I think again reflecting the lender market's

6    confidence in the sense of direction that they were

7    getting on the turnaround that the management team was

8    working on.

9    We analyzed the different proposals that we

10   got.  We negotiated the terms with the group of

11   lenders.  We had discussions with the creditors

12   committee.

13   And the company ultimately determined that

14   Wachovia had in fact submitted the most favorable

15   proposal.  And we then moved into the finalization of

16   a commitment letter with them, and that commitment

17   letter has been put before the Court for approval and

18   was approved mid summer.  I can't remember the exact

19   date.

20   Q    And when will the exit facility

21   documentation be finalized?

22   A    The exit facility documentation is virtually

23   finalized right now.  In fact, I was commenting with

24   some of the lawyers we're farther ahead of the game

25   than we are normally on most deals.

1        Q      And the proposed effective date under the

2    plan of reorganization is contingent upon the closing

3    of the exit facility?

4        A      That is correct.

5        Q      Can you tell me whether or not you believe

6    the process leading to the exit facility was an

7    efficient testing of the market?

8        A      I think it was a very efficient testing of

9    the market.  Whenever you have 14 lenders aggressively

10   competing for a loan, you get a good -- you get a good

11   result for the company.

12       Q      And what's the collateral under the exit

13   facility supporting the $725 million borrowing?

14       A      The collateral is substantially all of the

15   company's assets.

16       Q      And what's the interest rate under the

17   facility?

18       A      The interest rate under the facility is set

19   according to a pricing grid, so it varies according to

20   how much unused liquidity availability the company

21   has.  And the pricing ranges from LIBOR plus 125 basis

22   points to LIBOR plus 225 basis points.

23              Based on the projections that we have, our

24   expectation is that it will, in a normal course, be at

25   an interest of LIBOR plus 175 basis points -- I'm

1    sorry -- 150 basis points, LIBOR plus 150, which is

2    about seven percent right now.

3        Q    Are you familiar with Class 10 of the

4    proposed plan, secured tax claims?

5        A    I am.

6        Q    Does the plan contemplate payment in full of

7    allowed Class 10 claims?

8        A    Yes, it does.

9        Q    If the company elects to defer the payment

10   of those claims over the period of time allowed by the

11   Bankruptcy Code, what in your judgment is the right

12   market rate of interest that would provide for those

13   deferred payments to have a present value as of the

14   time of the effective date of the amount of the

15   allowed claim?

16       A    Well, those claims will enjoy the benefit of

17   a lien that it will actually put them in a position

18   senior to the exit lenders in the company's capital

19   structure.

20       Q    Because of their statutory liens?

21       A    That is correct.

22            And because of that seniority, I think the

23   interest rate should certainly be no higher than the

24   interest rate under the exit facility.

25            Usually senior creditors have lower interest

1    rates than junior creditors.

2         As such, I think it should be no higher than

3    LIBOR plus 150, which again would be seven percent.

4         Q    Thank you.

5         Will the debtors have sufficient sources of

6    cash available to satisfy their obligations on the

7    effective date of the plan?

8         A    Yes, they will.

9         Q    And why is that?

10        A    Well, as I mentioned earlier, we expect to

11   have in excess of $375 million of liquidity available

12   to the company after -- after satisfying the

13   approximately $150 million of payments that need to be

14   made as part of the emergence process.

15        So I think that provides substantial cushion

16   against the payments that are contemplated under the

17   plan.

18        Q    Will the company's assets and its

19   contemplated exit facility provide the debtors with

20   sufficient capital to meet their financial projections

21   under the plan?

22        A    Yes, I believe they will.

23        Q    And do you believe there will be a need for

24   further reorganization by the debtors under the

25   Bankruptcy Code?

1       A    I do not.

2       Q    There's been an objection filed to the plan

3   of reorganization by a creditor known as Bundy New

4   Orleans.  Have you read that objection?

5       A    Yes, I have.

6       Q    The objection states that Bundy New Orleans

7   is a creditor as a landlord, Bundy's store was

8   destroyed in Hurricane Katrina, and that the debtors

9   have an obligation under their lease to Bundy to pay

10  the landlord for the cost of rebuilding that store,

11  approximately $6.7 million.

12           The objection also alleges that Winn-Dixie

13  has received that money from its insurers and has not

14  paid it to the landlord.  The objection alleges that

15  Winn-Dixie has absconded with that $6.7 million.

16           Assuming that all those allegations are

17  true, does this plan have the ability to permit

18  Winn-Dixie to pay Bundy $6.7 million if it's

19  ultimately adjudicated that it owes it to Bundy?

20      A    Yes.  I think the exit facility and the

21  liquidity provided under the exit facility are quite

22  sufficient to handle a $5-million to $10-million

23  payment.

24           That is exactly the point of having as much

25  liquidity as we've put together here, which is not to

1   pay money that we've absconded with, obviously,

2   because I don't think that's the factual pattern, but

3   we have quite a bit of flexibility to handle

4   unexpected bumps in the road here.

5            So that's, I think, one of the very positive

6   things about the capital structure that we've been

7   able to put in place.

8            MR. BUSEY:  Your Honor, we'd like to offer

9        into evidence Debtors' Exhibit Number 7, which

10       are the graphs that Mr. Huffard referred to in

11       his testimony.

12           THE COURT:  Any objection?  They're admitted

13       as Composite 7, I believe.

14                         (Whereupon, the documents

15                         previously marked as Debtors'

16                         Composite Exhibit 7 for

17                         identification were received

18                         in evidence.)

19           MR. BUSEY:  We have no further questions of

20       Mr. Huffard.

21           THE COURT:  Cross-examination?

22           If you'll come right up to the front here,

23       Mr. Kelley.

24                    **CROSS-EXAMINATION**

25   BY MR. KELLEY: