1      Q    Mr. Huffard, I'm Mark Kelley.  I represent

2   several landlords in this case.

3           You testified about some of the claims in

4   the landlord class?

5      A    Yes.

6      Q    Are you familiar with the landlord class?

7      A    Generally.

8      Q    What kind of distribution do the landlords

9   get in terms of shares?  46.26 shares per thousand?

10     A    I believe that's the case.  It's roughly a

11  70-some-odd percent recovery.

12     Q    You mentioned that there were different

13  types of landlord claims.  Some of the landlords had

14  claims directly against Winn-Dixie Stores and they

15  didn't have a guaranty claim?

16     A    That's correct.

17     Q    And some of the landlords had claims against

18  Winn-Dixie Raleigh or Winn-Dixie Montgomery, and they

19  would have had two claims in the landlord class, one

20  based on the lease rejection and one based on the

21  guarantee; is that correct?

22     A    I believe that's what I said.

23     Q    And the plan provides that the guaranty

24  claim will be expunged; is that correct?

25     A    As part of the settlement, that is correct.

1        Q        And the plan provides that the landlord

2    claim based on the lease, the direct claim on the

3    lease, would be the claim that got paid 46.26 shares

4    per thousand, correct?

5        A        That is correct.

6        Q        So would you agree with me that the

7    landlords' guaranty claim is treated differently than

8    the claim it has on the lease in that one is expunged

9    and one is paid?

10       A        If the landlords generally had only one

11   claim, they would be down in the other category, the

12   53-percent recovery.

13       Q        So landlords without guarantees are not in

14   the landlord class?

15       A        No.  As I said, we've classified all of the

16   landlords together.

17               Remember that we talk about landlords as if

18   any given landlord has a single claim.  Many of these

19   landlords as businesses, XYZ landlord, will have

20   claims that have both one claim, claims that have two

21   claims, they'll have claims against multiple debtors.

22   They're all over the place.

23       Q        Very simple question.  I'm not trying to be

24   too complicated.

25               The claim on the lease gets 46.26 shares per

1       thousand dollars of claim, correct?

2            A     The claim of the landlord gets that.

3       There's no distinction under the plan as to the lease

4       and the guarantee, at least to my understanding.

5       Basically, a landlord gets a single claim.

6            Q     Do you have the plan in front of you?

7            A     Yes.

8            Q     Can you look at Section 1.47 of the plan?

9            A     Do you have a page number on that?

10           Q     I don't have the page number, but it's --

11           A     Yes.

12           Q     It says that the landlord claims, it defines

13      it as any unsecured claim in an amount greater than

14      $3,000 for obligations of any of the debtors as lessee

15      or guarantor, correct?

16           A     That's what it says.

17           Q     In fact, didn't the debtor file a motion to

18      disallow the claims of the landlords that were based

19      on guarantees?

20           A     I'm not actually sure of that.

21           Q     But do you agree that the landlord's claim

22      based on a guarantee is a claim in the landlord class?

23           A     That is -- it appears that's what that says.

24           Q     So you've got a landlord claim based on a

25      guarantee and a landlord claim based on the rejection

1   of the lease, right, two claims?

2       A    My understanding from a business point of

3   view is that the settlement incorporates -- a critical

4   element of the settlement, which was negotiated,

5   frankly, by the landlord representatives on the

6   committee, was that the landlord would be entitled to

7   a single claim.

8           And I'm not trying to parse the words here.

9   I think that is the practical impact of the plan that

10  has been proposed.

11      Q    Look at Section 2.2 of the plan.  That says,

12  does it not, quote:  All claims based on prepetition

13  unsecured guarantees by one debtor in favor of any

14  other debtor shall be eliminated, and no separate

15  distributions under the plan shall be made on account

16  of claims based on such guarantees?

17          Is that what it says?

18      A    Let me just find where you're -- which

19  clause are you in?

20      Q    2.2.

21      A    Yeah.

22      Q    "Claims based on prepetition unsecured

23  guarantees by one debtor in favor of any other

24  debtors" -- and it has some other language that's not

25  relevant -- "shall be eliminated, and no separate

1    distributions under the plan shall be made on account

2    of claims based on such guarantees"; is that right?

3         A    That's what it says, yes.

4         Q    Okay.  So claims based on guarantees are

5    going to be eliminated and not receive any payment

6    under the compromise.

7         A    I believe that's correct.

8         Q    So the reason that the landlords only have

9    one claim that's paid in the landlord class is because

10   their claim based on the guarantee under this section

11   is eliminated; isn't that correct?

12        A    I think that's what I said just a little

13   while ago, was that the element of the settlement was

14   that landlords get one claim.

15        Q    Right.  So the claim that's eliminated is

16   treated differently than the claim that is allowed and

17   paid.  You would agree with that?

18        A    I'm not trying to reach a legal conclusion

19   on whether it's -- I don't know whether that claim

20   existed to begin with.  I guess it did.  But, yes.

21        Q    So the claim that's eliminated is treated

22   differently than the claim that's paid.

23        A    I guess that's right.  Just like the

24   guaranty claim for each of the bonds from each of the

25   entities is getting eliminated under the plan, too.  I

1    think that's fair to say.

2         Q    Did any of the landlords actually consent to

3    having their claim eliminated personally, or was that

4    sort of done through the committee?

5         A    I believe in essence that the landlords who

6    have voted for the plan in the majority have consented

7    to the treatment under the plan.  And if treatment

8    under the plan, as you suggest, is the elimination of

9    a guarantee, I think you're right, they have consented

10   to that.

11        Q    What about the landlords that voted against

12   the plan and objected to the plan based on the grounds

13   that their guarantee is being eliminated?  They didn't

14   consent, did they?

15        A    No, I don't know that they did.

16        Q    Now, you talked earlier about the average

17   recovery which would have been the recovery the

18   average unsecured creditor would have received if

19   there had just been a regular consolidation under the

20   plan.  Do you recall that testimony?

21        A    Yes.

22        Q    Now, you said there were 749 -- what was the

23   value of the debtor, $759 million?

24        A    $749 million of equity value, which is the

25   distributable value.

1       Q     And what was the total amount of claims that

2    will receive distributions under the plan in some

3    amount?  Do you know what that is?

4       A     Approximately $985 million.

5       Q     $985 million.  So the average distribution,

6    if it had just been a regular consolidation and

7    everybody had been treated the same, the unsecureds

8    and the retirement people got paid the same as the

9    noteholders, we would have all gotten about 76 cents

10   on the dollar, right?

11      A     I believe that's flawed, because I don't

12   believe you would have gotten to that average outcome

13   without extensive litigation, and the total enterprise

14   value would have been substantially reduced.

15      Q     But other than the litigation costs, if you

16   just divide the assets by the claims, it's about 76

17   cents on the dollar.

18      A     You can divide the assets by the claims, but

19   I believe that's flawed math.

20      Q     You mentioned earlier, and I think you

21   misspoke.  You mentioned an ad hoc landlords

22   committee, and then I think you corrected yourself.

23   There was no ad hoc landlords committee, was there?

24      A     I did correct myself, there was no ad hoc

25   landlords committee.

1          MR. KELLEY:  That's all I have.  Thank you.

2          THE COURT:  Thank you very much.

3          MR. THAMES:  Good morning, Your Honor.

4     Richard Thames on behalf of various tax collector

5     taxing jurisdictions, including the State of

6     Kentucky, Department of Revenue; Muscogee County,

7     Georgia; Bulloch County, Georgia; Harrison

8     County, Mississippi; Hinds County, Mississippi;

9     Marion County, Mississippi; Forrest County,

10     Mississippi; Yazoo City, Mississippi; Lauderdale

11     County, Mississippi; Rankin County, Mississippi;

12     Pike County, Mississippi; City of Hampton,

13     Virginia; Duval County, Florida.

14                    **CROSS-EXAMINATION**

15   BY MR. THAMES:

16       Q    Good morning, Mr. Huffard.

17       A    Good morning.  That's a lot of taxes.

18       Q    It is.

19            You painted a fairly rosy picture of the

20   company's performance.  I want to begin by asking you

21   about the cuts you've made in the administrative

22   costs.

23            How long have those costs been in effect,

24   those cost-cutting measures?

25       A    First of all, just to be clear, I haven't

1    made any cuts in the administrative costs, the

2    management team has.

3         Q    How long have those cost-cutting measures

4    been in place?

5         A    I think when you look at the chart that we

6    went through, you'll see that they started to be in

7    place in the spring of 2005, and then further costs

8    were taken out of the system in the summer of 2005.

9         Q    And approximately how much money has

10   Winn-Dixie lost on an operational basis since the

11   inception of these Chapter 11 cases?

12        A    I don't have that number right off the top

13   of my head.  It's a large number.

14        Q    Approximately how much?

15        A    I don't have that number off the top of my

16   head.

17        Q    Are you familiar with how much they lost in

18   the month of August?

19        A    Not right off the top of my head.

20        Q    The monthly reports reflect that there was a

21   $20,574,000 loss in the month of August alone.  Does

22   that sound about right?

23        A    Measured by which measure of income?  It

24   does not sound like a cash flow number.

25        Q    Whatever they say.

1          Do you know how much money they lost in

2     September?

3          A    No, I don't.  That has not been published

4     yet.

5          Q    The plan as it's currently drafted is silent

6     as to the interest rate which is proposed to be paid

7     on account of the tax collector claims.  What is the

8     interest rate that the debtor proposes?

9          A    I believe that the debtor is proposing it

10    would be seven percent.

11         Q    You believe, or do you know that to be a

12    fact?

13         A    I don't know that to be a fact.

14         Q    Did you establish that interest rate for the

15    company?

16         A    I did.

17         Q    And did you that based on the fact that you

18    believe that just solely because it has a senior lien

19    on some of the assets of the debtor, the tax

20    collectors?

21         A    I did that on the basis that I think there

22    is very, very, very low risk in the ultimate repayment

23    of that loan based on the priority of the lien that is

24    being offered to the creditors, and that I think that

25    the interest rate that has been proposed is very

1    supportable based on the fact that is in fact senior

2    to the interest rate that third-party lenders have

3    offered to the company for hundreds of millions of

4    dollars of potential loans.

5        Q    Senior to the lenders on what collateral?

6        A    Senior to lenders on the collateral that's

7    being offered to the tax agent, tax authorities.

8        Q    For example, tax collectors don't typically

9    hold liens on receivables or inventory, do they?

10       A    I can't speak to what tax collectors

11   typically do.

12       Q    Did you participate in the negotiation of

13   the exit financing?

14       A    Yes, I did.

15       Q    And did the lenders build into their loan

16   package certain financial covenants?

17       A    Yes, they did.

18       Q    And reporting requirements?

19       A    Yes, they did.

20       Q    And also other security to help ensure the

21   collection of their loans?

22       A    I don't know what you mean by "other

23   security."

24       Q    Well, how about the right of possession, is

25   that built into the loan package?

1        A       I'm exactly what sure what right you're

2    talking about.

3        Q       Tax collectors don't generally enjoy those

4    same benefits of having a loan document with monthly

5    financial reporting and the like, do they?

6        A       They do not.

7        Q       Was market competition one of the factors

8    which led Winn-Dixie to seek Chapter 11 relief?

9        A       Competition from competitors?

10       Q       Yes.

11       A       Yes, I would think so.

12       Q       Would you agree with me that the competitive

13   environment where Winn-Dixie operates today has not

14   really improved significantly in Winn-Dixie's favor?

15       A       Well, the competitive environment I think is

16   probably unchanged in the markets where it continues,

17   but I think it is important to understand that one of

18   the major initiatives that the company has undertaken

19   as part of this bankruptcy process is the focusing of

20   its operations in areas where it has an attractive

21   competitive position.

22              So when Winn-Dixie got out of the stores on

23   its northern perimeter up in the Carolinas, they were

24   doing that in part because they had an unfavorable

25   competitive position in those marketplaces.

1                So by concentrating back into the core,

2     although the competition within those markets is

3     unchanged, the average competitive position of

4     Winn-Dixie has, I think, substantially improved as a

5     result of this bankruptcy.

6          Q     But none of those competitors here locally

7     have gone away, have they?

8          A     Correct, but Winn-Dixie was not performing

9     as badly in these markets.

10         Q     You mention that the company is going to

11    have $375 million in liquidity after confirmation,

12    correct?

13         A     Correct.

14         Q     How soon after confirmation?

15         A     Simultaneous.

16         Q     All right.   And --

17         A     I'm sorry.   With confirmation?

18    Consummation.

19         Q     Consummation of the plan.

20         A     Right.

21         Q     What is Winn-Dixie's total tax liability for

22    personal property and real property taxes for 2005?

23         A     I do not know that number off the top of my

24    head.

25         Q     Does Winn-Dixie, with all that availability

1    of cash liquidity, does it have the ability to pay the

2    2005 taxes in full on the effective date of the plan?

3         A    Does it have -- I don't know what the

4    liability is of the class that you're speaking to, so

5    I can't really address that.

6         Q    So you don't know.

7         A    I don't know, I guess.  What I'm saying is,

8    I don't know the universe of claims you're talking

9    about, so I can't really speak to that.

10             MR. THAMES:  That's fair enough.  Thank

11        you.

12             THE COURT:  Thank you very much.

13             MR. HANLON:  Your Honor.

14             THE COURT:  Good morning.

15             MR. HANLON:  Brian Hanlon on behalf of the

16        Florida Tax Collectors.

17                     **CROSS-EXAMINATION**

18   BY MR. HANLON:

19        Q    Morning, sir.

20        A    Morning.

21        Q    I just have a very quick question relative

22   to the interest rate in the Class 10 creditors.  I

23   represent 55, 56 counties throughout the state of

24   Florida on Florida Tax Collectors.  And I'll try to

25   make this as quickly as possible.

1           My understanding, with your background, your

2    recommendation to the Court relative to interest rate

3    is based on what I would call a private analysis,

4    private financing analysis?

5        A    What do you mean by "private"?

6        Q    Well, I understand when we went through your

7    financial background, but your background is in

8    representing lenders, distressed debtors, and putting

9    together a financial package and coming up with the

10   appropriate interest rate for loans with distressd

11   businesses in loan situations, correct?

12       A    Correct.  But some cases are private

13   financing transactions and other cases are public

14   market financing transactions.

15       Q    In any event, it's not financed by the

16   government.  These are all private transactions.

17       A    In some cases they financed by government,

18   but the majority of the time they're not.

19       Q    With respect to the property taxes, you made

20   a recommendation to the Court of approximately seven

21   percent based on their first lien position.

22       A    Yes.

23       Q    The assumptions you used, did that include

24   an assumption that these were in fact property taxes

25   used to pay for local funding of local services to

1    Winn-Dixie?

2        A    No.    It was based on the priority and the

3    company's capital structure and what I think is an

4    efficient market price for similarly situated loans to

5    the company.

6        Q    That's how I understood your testimony.    I

7    just want to make it clear for the Court that the

8    assumptions and the recommendation to the Court is

9    based on a private financing analysis rather than an

10   analysis as taxes to be paid to fund local

11   government.

12       A    I'm not sure that there's a -- I'm not clear

13   on what the difference is you're seeking to identify,

14   but --

15       Q    Well, let's see if I can clarify it.

16   There's a statutory interest rate in the state of

17   Florida, for example, of 18 percent for delinquent

18   taxes.    Were you aware of that statute?

19       A    I'm loosely aware of that statute.

20       Q    And generally other taxing authorities

21   throughout the country, in your background expertise,

22   understand that there are statutory rates and, if the

23   taxes are not paid, then there's a delinquent tax

24   rate.

25       A    Okay.

1        Q     The point I'm trying to make, sir, is in

2   your assumptions the reason there's a higher tax rate

3   generally is because, if a tax is not paid, either a

4   service does not get funded or other people have to

5   pay the tax or sources have to be found to pay the

6   tax.

7              Were either of those considerations or

8   assumptions brought into your analysis of the rate you

9   recommended to the Court?

10       A     No, they were not.

11       Q     Thank you, sir.

12             I just have a quick question on liquidity.

13   Again, my banking background, it's been a while.  My

14   understanding of liquidity is it's a term of art used

15   relative to the cash available to a corporation.  Is

16   that generally accepted?

17       A     As I've used it here, which I think is

18   consistent with the term of art, it's the combination

19   of the cash that the company has, as well as its

20   ability to borrow under its senior secured financing

21   facility.

22       Q     I listened to your testimony this morning,

23   and there was no mention relative to the outstanding

24   liens which may encumber the cash in the liquidity of

25   Winn-Dixie.

1          My question to you is:  Are there liens that

2     encumber that cash that you were discussing this

3     morning relative to the liquidity of Winn-Dixie?

4          A    There are liens that are being offered to

5     taxing authorities under the plan that we've discussed

6     here previously.  They're senior to the exit financing

7     lenders.

8          Q    Excuse me, I didn't mean to cut you off.

9     Maybe my question wasn't clear.

10          The liquidity, the cash situation that you

11     explained to the Court this morning, and the available

12     cash -- and I believe it was in the hundreds of

13     millions of dollars -- today, not withstanding the

14     plan, proposed plan, but today, if that cash is there

15     and available, is it in fact encumbered by any

16     existing liens as we sit here this morning?

17          A    It may be.  I don't know that definitively.

18     I'm not telling you it's not, I just don't know.

19          Q    You don't know.

20          MR. HANLON:  Thank you, Your Honor.

21          THE COURT:  Thank you very much.  Good to

22     see you.

23          MR. MILLS:  Good morning, Your Honor.

24          THE COURT:  Good morning, sir.

25          MR. MILLS:  Russell Mills for Bundy New

1        Orleans.

2                        CROSS-EXAMINATION

3    BY MR. MILLS:

4        Q    Good morning, Mr. Huffard.

5        A    Good morning.

6        Q    I represent Bundy New Orleans.  There was

7    some reference earlier about Store 1417 damaged in

8    Hurricane Katrina?

9        A    Yes.

10       Q    Could you help me to understand your

11   testimony a little bit better?  You testified that you

12   expect that the debtor has or will have $375 million

13   in liquidity; is that correct?

14       A    Correct.

15       Q    And then you say that the plan contemplated

16   $150 million, is that correct, $150 million in

17   payments under the plan?

18       A    Correct.  It had been made prior to the

19   resulting availability of 375, so those are already

20   funded by the time you get to the 375.

21       Q    So you have $375 million to pay

22   administrative claims.

23       A    No.  I'm sorry, I'm not being clear.

24            After we pay all of the administrative

25   claims of approximately $150 million, we will have

```
 1    $375-plus million available after we pay them.

 2         Q    But my point is, if there are other

 3    administrative claims beyond those you've

 4    contemplated --

 5         A    Oh, I'm sorry.

 6         Q    -- those would go to pay -- be paid out of

 7    $375 million?

 8         A    Correct.

 9         Q    Have you accounted for any administrative

10    claims that might arise out of damages in Hurricane

11    Katrina?

12         A    Those damages are largely insured under the

13    company's insurance policies.

14              MR. MILLS:  Object as nonresponsive.

15    BY MR. MILLS:

16         Q    Have you accounted in your estimation of

17    administrative claims for the possibility that there

18    may be administrative claims arising from Hurricane

19    Katrina?

20         A    Yes, we have.

21         Q    And how much are those?

22         A    I believe they're zero.

23         Q    So you've accounted for zero claims?

24         A    We don't believe there are any claims.

25         Q    Why is it that you believe there are no
```

1    claims?

2         A    Because the company has insurance policies

3    against those sort of claims.

4         Q    Do you know that it has enough insurance

5    coverage to cover all those claims?

6         A    I believe that it does based on the

7    discussions I've had with the management team, but I

8    -- that's what I've heard.

9         Q    Do you know how much those claims are?

10        A    I do not.

11        Q    Would that affect your opinion, you think,

12   if you knew those things about whether or not this

13   debtor had sufficient ability to pay?

14             MR. BUSEY:  Your Honor, object to the form

15        of the question.  When he says "that," I don't

16        know what he's referring to.

17             THE COURT:  Sustained.  Restate the

18        question.

19             MR. MILLS:  Certainly, sir.

20   BY MR. MILLS:

21        Q    You said that you don't know how much the

22   claims are out there arising from Hurricane Katrina,

23   correct?

24        A    That is correct.

25        Q    You said you don't know how much the

1    insurance proceeds there are out there to pay for

2    these claims, correct?

3         A    I do -- that is correct, I don't know the

4    exact policy.  I do understand that there's sufficient

5    insurance to cover the claims.

6         Q    Could it be that there are not sufficient

7    monies to pay these administrative claims?

8         A    I don't believe so.

9         Q    Suppose there's no insurance.

10         A    I don't understand why that scenario would

11    play out.

12         Q    I understand that, but suppose there's no

13    insurance.

14              MR. BUSEY:  Your Honor, I object.  That's a

15         hypothetical question.  The witness has already

16         testified it's his understanding there is

17         insurance.

18              THE COURT:  Objection sustained.

19    BY MR. MILLS:

20         Q    Let me ask you this question, Mr. Huffard:

21    How much monies in insurance proceeds has the debtor

22    received arising from Hurricane Katrina, if you know?

23         A    I don't know that number off the top my

24    head.

25         Q    I'll represent to you that the Disclosure

1     Statement says it's $50 million.

2          A     Okay.

3          Q     And I've heard others say that it's as much

4     as $75 million.  Okay?

5          A     Okay.

6          Q     Are those monies included in this $375

7     million in liquidity?

8          A     Yes.  Those have been incorporated into the

9     company's cash balances.  Assuming that those are the

10    right numbers, to the extent that the company has

11    received the monies, they would either have paid it to

12    the person that they should pay it to, or they would

13    have used it in their operations.

14         Q     So do you know if any money has been set

15    aside out of that $75 million or $50 million?

16         A     I don't believe any has.  I don't believe

17    that any of that should have been set aside.  I don't

18    believe that any of it was owed to anybody other than

19    the company.

20               MR. MILLS:  I'll object as nonresponsive.

21    BY MR. MILLS:

22         Q     The question was:  Have any monies been set

23    aside?

24         A     I think if you look at my answer, I did

25    respond.  I said no.

1        Q    Okay.  Now, does the plan reserve any

2    monies, any of these insurance monies, for payment to

3    others?  Let me be more clear.  That's a bad

4    question.  I'm sorry, I'll withdraw it.

5            Does the plan reserve monies for payment to

6    any affected landlords, let's say?

7        A    There's no separate reserves established

8    under the plan.

9            MR. MILLS:  Thank you.  I have no further

10           questions.

11           THE COURT:  Thank you very much.

12           MR. ROSENBAUM:  Good morning.  Norm

13       Rosenbaum, Morrison & Foerster for Merrill Lynch

14       LP Holdings, Inc.

15                    CROSS-EXAMINATION

16   BY MR. ROSENBAUM:

17       Q    You testified earlier that New Plan Realty

18   is a member of the committee; is that correct?

19       A    I didn't, I think, testify to that, but I

20   believe that's factually correct.

21       Q    They are a member of the committee.  And

22   they're also holder of landlord claims?

23       A    Yes, they are.

24       Q    Do you know what type of landlords claims

25   they hold?

1        A      Are you talking about rejection damage

2    claims?

3        Q      You testified earlier that there's two types

4    of landlords:   landlords holding rejection damage

5    claims, and an additional guaranty claim is a

6    guarantee of the underlying lease.

7               Do you know what type of claims New Plan

8    Realty holds of those two types?

9        A      I believe -- again, my question to you:   Is

10   it with respect to ongoing leases and any claims they

11   might have under ongoing leases?   Or are you talking

12   about claims that they might have with respect to

13   leases that have been rejected where there's a

14   rejection damage claim?

15       Q      Do you know what type of rejection damage

16   claims New Plan Realty holds?

17       A      I believe I do.

18       Q      Could you describe them?

19       A      I believe they are all of the type where

20   they would have both a primary obligor and a

21   guarantor.

22       Q      So it's your testimony here today that New

23   Plan Realty has filed a claim on its lease for a lease

24   rejection claim and a separate claim for a guarantee?

25       A      I did not say that.   What I said is, my

1    understanding is that the nature of the leases that

2    New Plan has that have been rejected is that they

3    would have both a primary obligor as one of the lower-

4    level subsidiaries, as well as the guarantor of

5    Winn-Dixie Stores.

6              I can't tell you directly what claims New

7    Plan may or may not have filed in respect to those

8    leases.

9         Q    Is there anything in the record today that

10   would indicate what type of claims New Plan has filed

11   against these debtors?

12        A    I'm not aware of anything in the record.

13             MR. ROSENBAUM:   Thank you.

14             MS. DOWD:   Good morning, Your Honor.   Mary

15        Dowd representing an objecting landlord, FRO, LLC

16        VII.

17                     **CROSS-EXAMINATION**

18   BY MS. DOWD:

19        Q    Good morning, Mr. Huffard.

20        A    Morning, Mary.

21        Q    Mr. Huffard, you testified fairly

22   extensively about the 3rd Circuit's decision in Owens

23   Corning, did you not?

24        A    I don't think I testified extensively about

25   the decision.   I testified about my understanding of

1    the process that it went through and the net impact of

2    the decisions.

3        Q    Have you read the 3rd Circuit's opinion?

4        A    No, I have not.

5        Q    Were you involved professionally in the

6    Owens Corning case?

7        A    I was not.  Everything I'm aware of is based

8    on information that's publicly available.

9        Q    Did you review the transcripts from the

10   District Court hearings on substantive consolidation

11   settlements?

12       A    I did not.

13       Q    Did you attend any of those hearings?

14       A    No, I did not.

15       Q    Mr. Huffard, I'm going to, with the Court's

16   permission, hand you a copy of the 3rd Circuit's

17   opinion from the Owens Corning case.

18           THE COURT:  Hand it to him.

19           THE WITNESS:  I guess I get to practice law

20       now, right?

21   BY MS. DOWD:

22       Q    Mr. Huffard, could you turn to Page 20 as

23   noted in the upper right-hand corner of the opinion?

24       A    Okay.

25       Q    I'm going to ask you to go down to the

```
 1    bottom paragraph on that page.  And starting with the
 2    fifth line after the parenthetical, could you read
 3    that for the Court?
 4         A    I'm sorry.  Tell me again where you'd like
 5    me to go?
 6              THE COURT:  You may approach.
 7              MS. DOWD:  (Indicating.)
 8              Thank you, Your Honor.  I'll go back on the
 9         record so everyone's in the same place.
10    BY MS. DOWD:
11         Q    Mr. Huffard, I'm asking you to read from the
12    3rd Circuit's decision in Owens Corning, beginning on
13    the bottom of the page I pointed out to you, after the
14    parenthetical starting out where the Court says, "As
15    we have explained."
16              Could you read that next sentence?
17         A    Sure.
18              "As we have explained, commingling justifies
19    consolidation only when separately accounting for the
20    assets and liabilities of the distinct entities will
21    reduce the recovery of every creditor.  That is, when
22    every creditor will benefit from the consolidation."
23         Q    Thank you.  Could you also turn to the last
24    page of the opinion.
25              Have you heard of the phrase "deemed
```

1    consolidation"?

2        A    Yes, I've heard of it.

3        Q    Are you aware that it's different than

4    substantive consolidation?

5        A    I'm not exactly sure what its technical

6    meaning is.

7        Q    I'll ask you to read again for the courtroom

8    from the 3rd Circuit's opinion, starting with

9    (indicating).   Thank you.   If you could read that.

10       A    Do you want to tell everybody where we're

11   at?

12            MS. DOWD:   Your Honor, we're reading from

13       the 3rd Circuit's conclusion, immediately before

14       their final conclusion, as they discuss

15       substantive consolidation, then move on to

16       discuss deemed consolidation.

17            THE WITNESS:   "But perhaps the flaw most

18       fatal to the plan proponent's proposal is that

19       the consolidation sought was deemed, i.e., a

20       pretend consolidation for all but the banks.

21            "If the debtor's corporate and financial

22       structure was such a sham before the filing of

23       the motion to consolidate, then how is it that

24       the post plan's effective date structure stays

25       largely undisturbed, with the debtors reaping all

1        of the liability limiting, tax and regulatory

2        benefits achieved by the forming subsidiaries in

3        the first place?

4            "In effect, the plan proponents seek to

5        remake substantive consolidation not as a remedy,

6        but rather a stratagem to deem separate resources

7        reallocated to OCD to strip the banks of rights

8        under the Bankruptcy Code, favor other creditors,

9        and yet trump such possible plan objections by

10       the banks."

11       Q    Thank you.

12            Did I understand your testimony earlier that

13       there were differences -- that you were

14       distinguishing the Owens Corning fact pattern

15       from the Winn-Dixie fact pattern?

16       A    I was distinguishing that, at least based on

17       my understanding.

18       Q    And your understanding was based on what you

19       testified to earlier, that you hadn't actually

20       reviewed any of the underlying testimony or

21       documentation in the Owens Corning case; is that

22       correct?

23       A    That is correct.

24            MS. DOWD:   Thank you.

25            THE COURT:   Thank you very much.

1                        CROSS-EXAMINATION

2     BY MR. BOLTON:

3         Q     Good morning, Mr. Huffard.  My name is

4     Johnathan Bolton, and I represent Saran, Limited, one

5     of the smaller landlord objectors from Texas.

6               Sir, in your substantive consolidation

7     analysis, you looked at documents starting from which

8     date?

9         A     I think the earliest documents we would have

10    looked at went back to the mid '90s.

11        Q     Isn't it true that the debtors' accounting

12    system was actually changed in 1990?

13        A     What do you mean, "accounting system"?

14        Q     Well, the Disclosure Statement, I represent

15    to you, states that the debtors' accounting system was

16    changed in 1990.  Do you recall that?

17        A     You mean the software they used for

18    accounting?

19        Q     Correct.

20        A     I'm not familiar with that specific element.

21        Q     Did you look at documents from the debtors

22    regarding your substantive consolidation analysis

23    before 1990?

24        A     I believe several of the financial figures

25    may have come from before that, but the majority were

1    after.

2         Q    Do you recall which ones?

3         A    No.

4         Q    Isn't it correct that, in doing a

5    substantive consolidation analysis and the factors,

6    that you have to look at the debtor-creditor

7    relationship at the time that the creditors did

8    business with the debtor?

9         A    I don't know.

10        Q    You stated that the noteholders have a 96

11   percent recovery in this plan, and that was due to the

12   fact that, quote, they have quite clear direct

13   guarantees from each of the debtor entities.

14             Do you recall that testimony?

15        A    Yes.

16             MR. BOLTON:  Your Honor, may I approach the

17        witness?

18             THE COURT:  You may.

19             MR. BOLTON:  Thank you.

20   BY MR. BOLTON:

21        Q    Sir, I've handed you what's been marked as

22   Saran Exhibit 1.  Can you identify that document,

23   please?

24        A    It appears to be some sort of guarantee

25   agreement.

1          Q     And who is it between?

2          A     Ellison Pittman, a Texas corporation, and

3     Winn-Dixie Texas, Inc., a Florida corporation.

4          Q     I represent to you, sir, that Ellison

5     Pittman, Inc. is the successor in interest to my

6     client, Saran, Limited.

7               MR. BOLTON:  Your Honor, I move to admit

8          Exhibit 1 into evidence.

9               THE COURT:  Any objection?

10              MR. BUSEY:  Yes, Your Honor.  I've never

11         seen it before, and there's no foundation laid

12         for it.  It's hearsay.

13              THE COURT:  Sustained.

14              MR. BOLTON:  Your Honor, if I can respond.

15         This is a self-authenticating document, Your

16         Honor.  Under Federal Rule of Evidence 9028, it's

17         acknowledged.  It's got a Notary signature on

18         it.  And to get around his hearsay objection,

19         it's an admission of a party opponent.  It's

20         signed by Winn-Dixie Stores, Inc.

21              It's admissible, Your Honor, and I move

22         again to readmit Saran Exhibit 1.

23              THE COURT:  Did you attach a copy of your

24         Proof of Claim?

25              MR. BOLTON:  Yes, Your Honor.

1                  THE COURT:   I'll admit it.

2                              (Whereupon, the document

3                              previously marked as Saran

4                              Exhibit 1 for identification

5                              was received in evidence.)

6     BY MR. BOLTON:

7         Q     Sir, if you look at that guarantee -- I'll

8     just give you a minute to take a look at it, if you

9     would, and just tell me when you've read it.

10        A     (Examining document.)   Okay.

11        Q     Sir, do you believe that this type of

12    separate written agreement constitutes a, to use your

13    words, quite clear direct guarantee?

14        A     Yes, I think that's -- I think that's

15    correct.

16        Q     But you would agree that Saran's claim,

17    although it also has a quite clear direct guarantee,

18    is treated different from a claim of the noteholders;

19    is that correct?

20        A     Well, unfortunately for Saran, it only has

21    one guarantee.   The noteholders have many, many

22    guarantees.   Each of the individual debtors guarantees

23    their claim.

24        Q     So is it the fact that the noteholders have

25    more than one guarantee is why they get 96 percent as

1    opposed to why Saran gets 70.1 percent?

2        A    Exactly.

3        Q    But the trade creditors don't have

4    guarantees, do they?

5        A    They do not have -- I don't want to speak

6    categorically across the class.  Most of the trade

7    creditors do not have guarantees.

8        Q    But under this plan they'll receive the same

9    percentage of recovery as landlords like my client

10   that you agreed have a separate written guarantee; is

11   that correct, sir?

12       A    Some of the trade creditors have alleged

13   guarantees.  I've not seen any written forms of

14   those.  But the issue with the trade creditors is

15   different.  It's not in the form of a guarantee.  It's

16   a vagueness about who the obligor actually was.

17       Q    So is it your testimony, sir, because of

18   this vagueness, they get the same recovery as someone

19   with a separate written guarantee?

20       A    Vagueness and confusion about where their

21   claim is, yes.  And I think that that vagueness was, I

22   think, in people's minds, potentially giving them the

23   ability to assert multiple claims without necessarily

24   a guarantee.

25       Q    Sir, do you have the underlying data with

1    you upon which you relied to form your opinion that

2    the substantive consolidation compromise is fair and

3    equitable so I can cross-examine you about it?

4        A    I do not have underlying data with me.

5        Q    What does the phrase "fair and equitable"

6    that you use, where does that come from?

7        A    I believe it is a term under the Bankruptcy

8    Code, but I'm not certain of that.

9        Q    Is that used in 1129(b), in fact, of the

10   Bankruptcy Code?

11       A    I don't know.

12       Q    You're not qualified to make a legal

13   conclusion as to whether a settlement is fair and

14   equitable under the Bankruptcy Code, are you, sir?

15       A    I guess I'm not qualified and I'm not

16   competent.   But, no, I'm not trying to give any legal

17   conclusions here.

18                MR. BOLTON:   Thank you, sir.

19                Pass the witness, Your Honor.

20                THE COURT:   Thank you very much.

21                MS. MORRIS:   Good morning.   Deborah Morris

22            from the Department of Justice on behalf of the

23            United States.

24                        CROSS-EXAMINATION

25   BY MS. MORRIS:

1        Q      I'd like to go back to your discussion of

2    the substantive consolidation for just a moment, and I

3    believe you testified that the recovery ranges from

4    approximately 53 percent to 96 percent for general

5    unsecured creditors, correct?

6        A      That's correct.

7        Q      But there are other general unsecured

8    creditors in this case that are receiving zero,

9    correct, specifically the Class 20 noncompensatory

10   damages claim?

11       A      Those are the -- yeah, I don't know that

12   those are unsecured creditors.  I guess I'm not clear

13   on exactly how you would describe them.

14       Q      But there is a class, Class 20, of

15   noncompensatory damages claims.  You're aware of that?

16       A      Which I believe are called subordinated

17   claims.

18       Q      That's actually Class 19.

19       A      19, okay.

20       Q      So Class 20 is one of the groups that has

21   been deemed to reject the plan because it's receiving

22   no payment; is that your understanding?

23       A      Yes.

24       Q      So when you made the statement that all

25   unsecured creditors groups had approved the

1    substantive compromise, were you including Class 20 in

2    that statement?

3         A    I was not meaning to include them in that.

4         Q    On a related note, on the liquidation

5    analysis, if we could go back to that for a moment --

6    and I'm looking at the liquidation analysis as set

7    forth in the Disclosure Statement, I believe it's Page

8    116 -- that analysis estimated recoveries for

9    noteholders, landlords, vendors, retirement plans and

10   other unsecured creditors, correct?

11        A    You're saying as contrasted to these

12   noncompensatory damage claims?

13        Q    Correct.  My question was going to be

14   whether these noncompensatory damages claim were

15   included in the liquidation analysis.

16        A    I don't -- I don't know the answer to that

17   question.  We did not actually do this part of the

18   analysis.

19             MS. MORRIS:  That's all I have.  Thank you,

20        Your Honor.

21             THE COURT:  Thank you.

22             MS. LORBER:  Sara Lorber on behalf of the

23        Daniel G. Kamin entities.

24                      CROSS-EXAMINATION

25   BY MS. LORBER:

1      Q     Have you done any analysis to determine

2    whether the landlord guarantees are legally

3    enforceable?

4      A     No.   That's not my area of expertise.

5      Q     Do you know whether the debtor has performed

6    any such analysis?

7      A     I believe that the debtors' attorneys and

8    the creditors committee's attorneys have looked at

9    representative forms of guarantee, and I don't know

10   what the conclusion was.

11     Q     Do you have any reason to believe that the

12   guarantees of the landlords who are objecting to

13   confirmation of the plan are not, in your words, quite

14   clear direct guarantees?

15     A     No.

16           MS. LORBER:   Thank you, Your Honor.   That's

17     it.

18           THE COURT:   Redirect from the debtor?

19           MR. BUSEY:   Yes, Your Honor.

20                    **REDIRECT EXAMINATION**

21   BY MR. BUSEY:

22     Q     Mr. Huffard, when Mr. Thames was asking you

23   about the loss of the debtors for their operations for

24   the period ending in August, he used a $20-million

25   number.   That's approximately the number that was

1    shown on the monthly operating report for the period

2    ending in August on a GAAP basis.

3              Does that represent a cash loss?

4         A    No.    If that number is the so-called

5    operating profit or loss, no, that does not represent

6    a cash loss.

7              There are significant amounts of

8    depreciation and amortization that would be included

9    in that number which are noncash.    There are also

10   various other accounting charges that run through

11   there.

12        Q    When Mr. Kelley asked you about the

13   elimination of guaranty claims, landlords only get to

14   vote one claim instead of two claims, in the

15   compromise, the substantive consolidation compromise,

16   was there a value subscribed to the landlords for the

17   fact that they were going to have one claim instead of

18   two claims?

19        A    Yes.    The difference in their recovery from

20   70 point whatever percent it was to down to the 53-

21   percent recovery that the other class gets, that's in

22   essence the premium given to the landlords in respect

23   of their guaranty claim.

24        Q    And that's part of the compromise that the

25   landlords voted to approve as a part of the balloting?

1        A    That is.

2             MR. BOLTON:  Objection, Your Honor,

3        misstates facts not in evidence.  The landlords

4        never consented or approved that, Your Honor.

5             MR. BUSEY:  Your Honor, the balloting is in

6        evidence.

7             THE COURT:  So noted.

8             Was that Mr. Bolton who said that?

9             MR. BOLTON:  Yes, sir.

10            MR. BUSEY:  Debtors' Exhibit 5, Your Honor.

11       That's where the balloting is.

12            THE COURT:  Very well.

13  BY MR. BUSEY:

14       Q    In fact, let's look at that.  Mr. Huffard,

15  what is the percentage by which the landlords have

16  approved the plan in number of claims?

17       A    Including insiders or excluding insiders?

18       Q    This is excluding insiders.

19       A    Excluding -- excluding insiders, the

20  percentage would be nearly 77 percent of the number of

21  holders who vote, and nearly 80 -- slightly in excess

22  of 82 percent of the amount of claims that were

23  voted.

24       Q    Thank you.

25            MR. BUSEY:  Your Honor, we have no further

1     questions.

2          THE COURT:   Thank you.

3          Let me just get things clear for myself.

4     Landlords with no guarantees that have rejection

5     damage claims or other lease claims are with the

6     general unsecured creditors.

7          THE WITNESS:   No.   All landlords are grouped

8     together.   As I mentioned, the landlord universe

9     is actually a fairly heterogeneous universe.

10    There are single landlords which may have leases

11    that have both types of claims.   There are

12    landlords down at each of the lower-level

13    operating subsidiaries.

14         Part of the compromise structure here was

15    that all of the landlords get the same treatment,

16    and that was just one of sort of the natural

17    breaks in the creditor groups.

18         Landlords all have kind of similar interests

19    and similar relationship with the company, so all

20    landlords are treated similarly.

21         THE COURT:   Thank you very much.

22         Anything further of the witness?

23         MR. BUSEY:   Yes, Your Honor.   I'd like to

24    ask a follow-up question to that question.

25 BY MR. BUSEY:

1      Q      How is it that the landlords with guarantees

2  and without guarantees came to settle in the same

3  class based upon the negotiations as you understood

4  them?

5          MR. ROSENBAUM:  Objection, Your Honor,

6      assumes facts not in evidence.  There's no

7      landlords in part of that settlement agreement,

8      that class treatment.

9          THE COURT:  Overrule the objection.

10          THE WITNESS:  My understanding is that that

11      was a demand of the landlord group that that be

12      an element of the compromise.

13          MS. LORBER:  Objection, Your Honor.  Sara

14  Lorber.

15          I believe this is hearsay.  I don't believe

16      there has been any evidence that the witness has

17      participated personally in the negotiation.

18          THE COURT:  Mr. Busey, restate the question.

19          MR. BUSEY:  I beg your pardon?

20          THE COURT:  Restate the question.

21          MR. BUSEY:  We'll withdraw the question.

22          No further questions.

23          THE COURT:  Thank you very much, sir.  You

24      may step down.

25                          (Witness excused.)

1           THE COURT:  Continue.

2           MR. BUSEY:  Your Honor, could we take a

3       short break before we put our next witness on?

4           THE COURT:  Very well.  We'll take a break

5       for, let's say, 10 minutes.  Come back at 11:20

6           (Brief break.)

7           THE COURT:  Are you ready to proceed?

8           MR. BUSEY:  Yes, Your Honor.  We call Larry

9       Appel to the stand.

10          COURTROOM ADMINISTRATOR:  Please be seated

11      in the witness stand.  Please raise your right

12      hand.

13  WHEREUPON,

14                      **LARRY APPEL**

15  was called as a witness herein, and having been first

16  duly sworn by the Courtroom Administrator, was

17  examined and testfied as follows:

18          COURTROOM ADMINISTRATOR:  Please state your

19      name and address, including the city and state.

20          THE WITNESS:  Larry Appel, 5050 Edgewood

21      Avenue, Jacksonville, Florida.

22          THE COURT:  Thank you.

23          You may inquire.

24          MR. BUSEY:  Thank you.

25                  **DIRECT EXAMINATION**

```
 1    BY MR. BUSEY:

 2         Q    Mr. Appel, by whom are you employed?

 3         A    Winn-Dixie Stores.

 4         Q    And when did you join Winn-Dixie?

 5         A    In September of 2002.

 6         Q    And what are your responsibilities at

 7    Winn-Dixie?

 8         A    I am senior vice-president.  I'm responsible

 9    for the legal function.  I'm also responsible for the

10    company's compliance programs.  I serve as corporate

11    secretary, so I'm responsible for liaison with the

12    board and corporate govenance activities, government

13    relations, assets protection and, for the last six

14    months, HR.

15         Q    What is the nature of the business conducted

16    by Winn-Dixie?

17         A    We are in the retail food and drug business.

18         Q    And what is Winn-Dixie's general business

19    structure?

20         A    Our general business structure?  We have a

21    Winn-Dixie Stores holding company and we operate

22    stores through several subsidiaries.

23         Q    What led to Winn-Dixie's Chapter 11 filings

24    in February of 2005?

25         A    Several things, many of which Mr. Huffard
```

1    referred to, but combining them, over several years

2    leading up to the filing we experienced negative

3    sales, declining sales and profitability, declining

4    market share.

5            In the period immediately leading up to the

6    bankruptcy filing, which would be the fiscal -- our

7    second fiscal quarter, which is the holiday seasons,

8    typically grocers such as ourselves build up inventory

9    in anticipation of high holiday sales.  So we built up

10   inventory, we didn't achieve the sales levels that we

11   expected, and that reduced liquidity.

12           When we announced our results in liquidity

13   in February of 2005, we experienced a dramatic decline

14   in vendor financing, which was shown on a chart that

15   was up a little while ago, a fairly direct drop right

16   in

17   -- a lot of which was between February 10th when we

18   announced our earnings and February 20th, and as a

19   result we thought it in the best interest of the

20   company and its stakeholders to file for bankruptcy.

21      Q    Approximately how many people did Winn-Dixie

22   employ as of the petition date?

23      A    Approximately 90,000.

24      Q    And approximately how many people does

25   Winn-Dixie employ now?

1          A      Approximately 55,000.

2          Q      And how many stores did the company operate,

3    approximately, as of the petition date?

4          A      Around 920.

5          Q      And approximately how many stores does it

6    operate now?

7          A      520.

8          Q      Have there been other facility reductions

9    that have taken place during the pendency of the case,

10   either through rejection or sales?

11         A      Yes, there have.

12         Q      What are those?

13         A      Well, in our distribution centers, we've

14   essentially eliminated three and a half distribution

15   centers, and we've eliminated or exited several

16   manufacturing facilities.

17              We've also consolidated our corporate

18   offices here in Jacksonville.  We've exited three

19   buildings and substantially consolidated most of our

20   corporate leadership team in one building.

21         Q      And what market area were you in at the time

22   of the petition, and what market area are you in now?

23         A      At the time of the petition, we were in

24   Florida, all of Georgia, Alabama, Mississippi,

25   Louisiana, I think we even had a store in Tennessee,

1    North Carolina and South Carolina.

2        Q    And where are you now?

3        A    We're now in Florida, and really then

4    running South Georgia, Alabama, Mississippi,

5    Louisiana, running along the I-10 corridor for the

6    most part to New Orleans.  We're completely out of

7    most of North Georgia, including Atlanta, as well as

8    North and South Carolina.

9        Q    Has the bankruptcy process facilitated that

10   restructuring?

11       A    Made it possible.

12       Q    Since the petition date, has Winn-Dixie

13   reduced its corporate overhead?

14       A    Yes.

15       Q    By approximately how much per year?

16       A    The annual run rate is, I think, slightly in

17   excess of $100 million a year.

18       Q    In addition to right-sizing its operations

19   and its expense reduction, can you describe other

20   initiatives undertaken by Winn-Dixie during the last

21   18 months that have improved the company's operations

22   and earnings?

23       A    Sure.  In addition to putting ourselves in

24   the right store footprint and reducing our

25   administrative structure to a level that is

1    appropriate for that store footprint, we had a number
2    of -- have had and continue to have a number of
3    business initiatives that are designed to increase our
4    operating performance.
5            One of the most important was in the field.
6    We restructured our entire field organization to
7    provide field support for every 20 stores or so with
8    groups of specialists that could help more efficiently
9    implement the programs that we needed to implement in
10   our stores.
11           And then we used -- we leveraged that field
12   organization to drive a number of initiatives through
13   our stores.  We had a major produce campaign and
14   changed the way we go to market with our perishables;
15   meat campaign; deli bakery.  We've seen those sales go
16   up as a result of our deli bakery campaign.
17           A number of service initiatives.  We changed
18   out registers and other things on the front end to try
19   to have a better customer experience to deliver better
20   service and faster checkout.
21           So we really touched every area of the
22   business, including shrink reduction programs to
23   increase profitability, and other things.
24       Q   Were you involved in the formulation of the
25   reorganization plan which we seek to confirm today?

1          A    Yes.

2          Q    What role did the official committee

3     representing unsecured creditors play in that plan

4     formulation process?

5          A    We worked very closely and consensually with

6     the creditors committee on all aspects of the case.

7     We worked with them to negotiate all aspects of the

8     plan.  In particular, they played a leadership role in

9     the settlement of the substantive consolidation

10    matter.

11         Q    Is Winn-Dixie proposing the plan in good

12    faith?

13         A    Yes.

14         Q    What does the plan provide in respect to a

15    postconfirmation board of directors?

16         A    The plan provides that there will be nine

17    members of the board of directors.

18         Q    And are those proposed directors identified

19    in the plan supplement that we filed last week?

20         A    Yes, they are.

21         Q    What does the plan provide with respect to

22    the existing senior officers of Winn-Dixie?

23         A    They'll continue to serve at the discretion

24    of the board.

25         Q    Are those officers and directors proposed by

1    Winn-Dixie qualified to assist in the reorganized

2    debtors in implementing and performing their

3    obligations under the plan?

4         A    I believe they are.

5         Q    Has Winn-Dixie publicly disclosed the

6    compensation of its five most highly compensated

7    executives?

8         A    Yes, we have.

9         Q    Section 6.6(a) of the plan provides that the

10   new board will establish a new equity incentive plan.

11            Is this new equity incentive plan contained

12   in one of the documents that was filed with the plan

13   supplement?

14        A    Yes, it is.

15        Q    What is the purpose of the new equity

16   incentive plan?

17        A    The equity incentive plan, which is fairly

18   typical of many public company compensation programs,

19   is designed to ensure that there's an equity

20   component, a long-term incentive component, to

21   management compensation, which serves to align

22   management interests with shareholder and stockholder

23   interest.

24        Q    And what are the essential terms of the new

25   equity incentive plan?

1       A       The equity incentive plan provides for up to

2   10 percent of the fully diluted equity of the company

3   on the initial distribution date to be available for

4   the compensation committee of the board to issue to

5   members of management.

6       Q       To your knowledge, have all professional

7   fees paid by Winn-Dixie in these Chapter 11 cases been

8   subject to Court approval?

9       A       Yes.

10      Q       To your knowledge, have the debtors paid or

11  will have paid by the effective date all fees required

12  by law in connection with these proceedings?

13      A       Yes.

14      Q       Are you familiar with Section 2.3 and 12.3

15  of the plan regarding the payment of professional fees

16  of creditors who participated in the substantive

17  consolidation compromise negotiations?

18      A       Yes, I am.

19      Q       Would you look at Page 55 of the Disclosure

20  Statement in front of you, please?

21      A       Okay.

22      Q       Are the professionals for the creditors who

23  participated in the negotiations of substantive

24  consolidation and the amounts to be paid to them, that

25  is, the cap of the amounts to be paid by them,

1    identified on Page 55 of the Disclosure Statement?

2         A    Yes, they are.

3         Q    Was the original request to the company

4    regarding these fees for a sum certain in fee

5    reimbursement to each of these creditor

6    constituencies?

7         A    Yes, it was.

8         Q    What was your response to that question?

9         A    We indicated that we understood the

10   contribution that these entities had -- professionals

11   had made, but that paying a sum certain wasn't

12   appropriate, and that we needed the opportunity to see

13   detailed billing statements to understand the

14   reasonableness of the fees and to review them before

15   we could pay a specific amount.

16        Q    And is that what the plan now provides for?

17        A    That's exactly what the plan provides for.

18        Q    What does the plan provide in the event

19   there is a dispute, that is, you can't agree with the

20   requesting professional regarding the reasonableness

21   of the fee?

22        A    I believe that, if there's a dispute between

23   us, then the Court has the authority to decide that

24   dispute.

25        Q    Are you going to make sure that the fees

1    paid pursuant to Section 2.3 and 12.3 are indeed

2    reasonable and supported?

3        A    It's all on our mind.  Yes, we'll review

4    everything and make sure that it's reasonable and

5    appropriate.

6        Q    Does the plan provide for the continued

7    retiree benefits that are protected under Section 114

8    of the Bankruptcy Code?

9        A    Yes, it does.

10       Q    Are you generally familiar with the release

11   and exculpation provisions contained in 12.12 and

12   12.15 of the plan?

13       A    Yes, I am.

14       Q    Would you turn, please, to section 12.12 of

15   the plan?

16       A    Give me a moment.  Okay.

17       Q    Section 12.12(a) of the plan is entitled

18   "Releases by Debtors."  Who is granting the releases

19   described in Section 12.12(a)?

20       A    The debtor companies, Winn-Dixie and its

21   debtor affiliates.

22       Q    And who is receiving those releases?

23       A    Those releases run to the benefit of the

24   other debtors; to the benefit of officers, directors

25   and employees of the debtors; members of the creditor

1    committee; advisors to the creditor committee;

2    Wachovia Bank, our exit facility lender, and its

3    professionals.

4         Q    What claims are being released by that

5    section?

6         A    That constitutes a release of claims that

7    could be brought in the name of the company for the

8    period from emergence backwards.

9         Q    Why are the debtors proposing in the plan to

10   provide those releases to those parties?

11        A    Well, the debtor believes that those

12   releases are in the best interest of the debtor.

13             There's been a substantial review, both by

14   the debtors as well as by the creditor committee, of

15   the potential existence of claims that could be

16   brought on behalf of the debtor.

17             Based on everything that we've been made

18   aware of and based on the report of the creditor

19   committee, there are no such valid claims, and we

20   believe it's in the best interest of the debtor to

21   issue the release rather than have the possibility of

22   having to pursue those claims and expend time, energy,

23   effort, management attention and focus on something

24   that wouldn't be productive.

25        Q    Do you believe that the proposed releases

1   under Section 12.12(a) have made a substantial

2   contribution to the company?

3        A    They absolutely have.

4        Q    And what is that contribution?

5        A    Well, the work of restructuring, as I've

6   come to understand, is not an easy one.  People have

7   put a tremendous amount of time, effort and attention

8   into this business.  And the people that we've

9   mentioned as being covered by the releases in 12(a)

10  are among the people who have done a large majority of

11  the heaviest part of the lifting.

12       Q    By the plan of reorganization, is the

13  company rejecting its prepetition indemnification

14  obligation to those officers and directors?

15       A    Yes, it is.

16       Q    Are the provisions in the plan in Section

17  12.12(a) for releases proposed by the company in part

18  in exchange for rejection of its indemnification

19  obligations?

20       A    They absolutely are.  In fact, the release

21  provisions, the exculpation provisions and the

22  indemnity provisions are sort of inextricably

23  intertwined.

24            The company proposed a plan which eliminated

25  its prepetition indemnification obligation in large

1    part because of those release and exculpation
2    provisions.

3           Otherwise, just as it is very standard for
4    companies to maintain indemnities so that officers and
5    directors and employees can go about about their
6    business and know that, as they're acting in good
7    faith, that the company will stand behind them, we
8    wouldn't have agreed to eliminate the indemnity for
9    for the same reason that we'll have that indemnity
10   going forward.

11        Q    Did the directors and officers of Winn-Dixie
12   continue to serve during the Chapter 11 proceedings
13   with an expectation that the confirmation of the plan
14   would include releases and exculpation provisions?

15        A    Yes, they did.

16        Q    Was there an increase in the directors' and
17   officers' workload during the course of the
18   proceedings?

19        A    A dramatic increase.  Just as an example, in
20   the prior two or three fiscal years, we were averaging
21   four or five regular and telephonic meetings of our
22   board, and that went over 15 each of the last two
23   years.

24        Q    Are you aware of any actionable claim the
25   company has against the company's directors and

1    officers?

2          A    No.

3          Q    Or there any of the other released parties

4    under 12.12(a)?

5          A    No, I'm not.

6          Q    Did the creditors committee conduct an

7    investigation during these proceedings regarding

8    whether the debtors had viable claims against its

9    officers and directors?

10         A    Yes, they did.

11         Q    What was the purpose of that investigation?

12   Look at Page 47 of the Disclosure Statement.

13         A    The Disclosure Statement lists a number of

14   very specific purposes for the investigation, and a

15   number of allegations had been made, in particular by

16   the former equity committee in this case.

17               In general, what the creditor committee

18   sought to do was to examine all the facts and

19   circumstances leading up to Winn-Dixie's prior

20   business leading up the bankruptcy and determine

21   whether there were any valid claims that could be

22   brought in the name of the company against any party.

23         Q    And did the committee issue a report of its

24   findings?

25         A    Yes, it did.

1      Q      And what did that report conclude regarding

2    the existence of any such claims?

3      A      Found that there was no reasonable basis to

4    believe that there were valid claims that could be

5    brought.

6      Q      Do you believe that the releases that the

7    debtors are giving in 12.12(a) are necessary and

8    appropriate for the debtors' reorganization?

9      A      Yes, and they're important elements of the

10   plan.

11     Q      Section 12.12(b) of the plan is entitled

12   "Releases by Holders of Claims."

13            Who is granting the releases in that

14   section?

15     A      Those would be third parties who are

16   creditors and who have voted in favor of our plan of

17   reorganization.

18     Q      Are the releases provided for in 12.12(b)

19   therefore involuntary, or voluntary and consensual?

20     A      They're voluntary and consensual.

21     Q      Who is receiving the releases?

22     A      Officers, directors and employees of the

23   debtors.

24     Q      And how was this proposed release presented

25   to the creditors?

1       A     Very, very clearly and prominently in the

2   plan of reorganization, the Disclosure Statement and

3   the actual balloting in bold letters.

4       Q     Are you also familiar with the exculpation

5   provisions in Section 12.15 of the plan?

6       A     Yes, I am.

7       Q     What is your understanding of the purpose of

8   the exculpation provisions?

9       A     The exculpation provisions apply during the

10  period that is between the filing date and the

11  emergence date, and they essentially eliminate

12  liability for claims other than fraud, gross

13  negligence, willful misconduct for the same parties

14  that are covered under the 12(a) company release that

15  we discussed before.

16      Q     And I think you just referred to it, but is

17  the exculpation limited in any way?

18      A     Yes.  The exculpation does not eliminate

19  liability or limit liability in any way if the claims

20  are based on fraud, gross negligence or willful

21  misconduct.

22      Q     And what's the consideration received by the

23  company for the exculpation?

24      A     Well, it's all the -- it's the same, I

25  believe, as for the 12(a) releases, which is

1     substantial work that's been done in part with the

2     expectation -- well, not in part -- with the

3     understanding and in reliance upon the expectation of

4     the release and exculpation being provided, as well as

5     the substantial benefit that all those parties have

6     provided to the estate during the course of the

7     bankruptcy.

8          Q     Can you tell me whether or not the parties

9     to the plan of reorganization and the creditors who

10    vote on it bargained for those release and exculpation

11    provisions?

12         A     Absolutely.

13         Q     Do you think it's the right thing to do?

14         A     I do.

15         Q     Why?

16         A     I think it's the right thing to do for the

17    company.  Because, as I said before, the company has

18    the right to be able to emerge from bankruptcy and

19    look forward and focus its efforts on what it needs to

20    do to continue this turnaround and be successful in

21    the marketplace, not to be looking backwards and

22    distracted by claims.

23               And I think it's the right thing for the

24    individuals.  These are folks -- by and large, these

25    are good people who have worked hard to try to effect

1     a good outcome for Winn-Dixie and its stakeholders.

2     They've done that with the expectation and

3     understanding that these provisions would be available

4     to them.   They were specifically discussed, they were

5     specifically incorporated into the plan, they were key

6     elements of the plan, and to pull them out and pretend

7     that the plan still represents an appropriate answer

8     for the company or for any of these individuals is not

9     fair.

10              The right thing to do is exactly what's in

11    there.

12         Q    And have the creditors voted for them?

13         A    Yes, they have.

14         Q    Have the plan's provisions for releases and

15    exculpation been advocated to and considered by the

16    company's officers and directors and insurers in their

17    underwriting and pricing of the company's directors'

18    and officers' insurance coverage upon emergence?

19         A    Absolutely that is the case.

20         Q    And why is that?

21         A    Because when the insurers went in particular

22    to underwrite the run-off policy, the policy for

23    periods -- excuse me -- the insurance policy, DNL

24    policy look backwards, they needed to understand the

25    risks that they were underwriting, and they reviewed

1    all aspects of the plan of reorganization.

2           Along with our CFO, Ben Nussbaum, I had a

3    number of telephone calls with them over the past 12

4    or 18 months, and every time they have asked very

5    specifically about those provisions and factored them

6    into their coverage and the pricing.

7        Q    With the plan, has the company achieved its

8    objectives in filing for Chapter 11?

9        A    I'm happy to say, yes, we have.

10          MR. BUSEY:  No further questions, Your

11       Honor.

12          THE COURT:  Cross-examination?

13          (No response.)

14          THE COURT:  Thank you very much, sir.  You

15       may step down.

16          I'm sorry.  You've got to stand up quick

17       here.

18                    **CROSS-EXAMINATION**

19   BY MS. LORBER:

20       Q    Earlier you testified --

21          THE COURT:  Excuse me.  You need to --

22          MS. LORBER:  I'm sorry.  Sarah Lorber -- I

23       apologize -- on behalf of the Daniel Kamin

24       entities.

25   BY MS. LORBER:

1       Q       Earlier you testified as to the professional

2    fees of the committee members being paid as part of

3    the plan; is that correct?

4       A       Yes.

5       Q       And is it correct that approximately $1.4

6    million will be paid to members of the unsecured

7    creditors committee?

8       A       I'd have to refresh my memory to the

9    numbers.

10      Q       Can I direct you to Section 12.3 of the

11   plan?

12      A       (Examining documents.)   To the professionals

13   retained by the members of the committee, yes, that's

14   right.

15      Q       Do you know what percentage of that amount

16   is expected to be paid to the professionals hired by

17   the two landlords on the committee?

18      A       I do not know the answer to that.

19      Q       Have you seen any preliminary fee statements

20   from these committee members?

21      A       I have not personally reviewed preliminary

22   statements from any of them yet, so I have not seen

23   them.

24              MS. LORBER:   That's it, Your Honor.   Thank

25       you.

```
 1                   THE COURT:   Thank you.

 2                   Ms.  Escamilla.

 3                   MS.  ESCAMILLA:   Elena Escamilla on behalf of

 4           the United States Trustee.

 5                          CROSS-EXAMINATION

 6      BY MS.  ESCAMILLA:

 7           Q     Good morning, Mr. Appel.

 8           A     Morning.   How are you?

 9           Q     Fine, thank you.

10                 The provision 12.12, you stated, was the

11      debtors' releases, is that correct, 12.12(a)?

12           A     12.12(a) is, yes.

13           Q     And under that release, is the debtor

14      releasing nondebtor subsidiaries?

15           A     I believe that is the case, yes.

16           Q     And what consideration have the nondebtor

17      subsidiaries provided?

18           A     Nondebtor subsidiaries have participated in

19      the case and performed activities associated with the

20      bankruptcy case.

21           Q     Which nondebtor subsidiaries are we talking

22      about?

23           A     I'm sorry.   Nondebtor subsidiaries?

24           Q     Yes.

25           A     Would be, I think, Winn General and
```

1    Winn-Dixie Bahamas.

2        Q    And Winn-Dixie Bahamas has been sold.

3        A    The assets of Winn-Dixie Bahamas have been

4    sold.  The subsidiary still exists and is owned by the

5    company.

6        Q    And Winn General does what?

7        A    Winn General is a part of our insurance

8    program.

9        Q    And have they provided any financial

10   contributions to the debtors?

11       A    Winn General in specific assists in all of

12   the insurance programs, which have been vital to the

13   activities that we've been conducting.

14       Q    That's their function; is that correct?

15       A    Yes.

16       Q    Have they provided any financial

17   contribution for these releases?

18       A    Have they provided any financial

19   contribution for these releases?  Not that I'm aware

20   of.

21       Q    Have any of the former directors and

22   officers provided any type of compensation to the

23   debtor for these releases?

24       A    The officers and directors have performed

25   substantial service for the debtors.

1      Q     Have they provided any compensation?

2      A     You're asking whether they paid money in

3   return for the releases?

4      Q     That's correct.

5      A     To the best of my knowledge, the answer to

6   that is no.

7      Q     Your release relates to present or former

8   directors.  What time period are we talking about?

9      A     Well, the release covers all periods prior

10  to the bankruptcy -- to the emergence.

11     Q     So from the date of filing to the emergence?

12     A     Which release provision are you asking

13  about?

14     Q     12.12(a).

15     A     12.12(a).

16     Q     That's correct.

17     A     I believe covers periods prefiling as well.

18     Q     And do we know who these officers are that

19  you plan on releasing?

20     A     Sure.

21     Q     Are they disclosed in the Disclosure

22  Statement in any place?

23     A     I don't believe that they're disclosed in

24  the Disclosure Statement.

25     Q     And you're also releasing all employees of

1    any debtor or nondebtor subsidiaries in 12.12(a)?

2         A    With certain exceptions, I believe, yes,

3    that's correct.

4         Q    And what is the purpose of releasing non or

5    just plain employees of the debtors?

6         A    It's the same thing that I said before,

7    there have been substantial both company and creditor

8    committee reviews of potential claims that could be

9    brought in the name of the debtor against any of these

10   individuals.  No one's found any valid claim.

11             The release ensures that the company will

12   not be diverted into pursuing claims that ultimately

13   end up being an inefficient use of time and a lot of

14   money, but allow the company instead to move forward.

15             So there's substantial benefit to the

16   company.

17        Q    Did the professionals that you hired request

18   that the debtor release them of any potential claim?

19        A    Did the professionals that we hired?

20        Q    Yes.

21        A    By that you mean?

22        Q    You're releasing any professionals that were

23   hired by Winn-Dixie.

24        A    So you're asking me whether Smith Hulsey,

25   Skadden Arps --

1       Q     Exactly.

2       A     -- Blackstone -- I mean, I'm just trying --

3   did they specifically ask?  I don't know that I ever

4   had a specific conversation with them in which they

5   asked.  They obviously were part of the plan

6   discussions and negotiations and were aware of those

7   provision.

8             I would more describe the releases as

9   resulting from negotiations with the company and the

10  creditor committee than negotiations between the

11  company and any particular professional.

12      Q     Let me move on to 12.12(b).  You stated

13  earlier that those are third-party releases; is that

14  correct?

15      A     Yes.

16      Q     And you stated that that was a consensual

17  release.

18      A     Yes.

19      Q     Does that release only apply to those

20  claimants that are voting to accept the plan?

21      A     That's my understanding.

22      Q     It does not include the class if in fact it

23  accepts -- if that potential class accepts the plan?

24      A     I didn't understand that question.  I'm

25  sorry.

1    Q    Does the release extend to the entire class?

2    A    My understanding is that either creditors

3  who do not vote or who voted against are not releasing

4  parties regardless of what the overall class that they

5  happen to be in voted.  I think that's what you're

6  asking me.

7    Q    The exculpation clause, moving onto 12.15 --

8    A    Yes.

9    Q    -- I believe your testimony was that that is

10  also consensual?

11    A    I don't believe I did testify that that was

12  consensual.  If I did, I may have misspoken.

13    Q    Why was that provision not prominently

14  displayed on the ballot and spelled out regarding the

15  releases?

16    A    Well, because it's a part of the overall

17  plan as opposed to an individual release that would

18  only be given consensually if you vote yes.

19    Q    So it's a nonconsensual release?

20    A    If nonconsensual means that, if the plan is

21  approved, individuals who didn't vote in favor of the

22  plan would be bound by the exculpation provisions,

23  then that's a nonconsensual exculpation, yes.

24    Q    The exculpation clause in 12.15 limits

25  liability, correct?

1        A       It does limit liability.

2        Q       And does it also extinguish any causes of

3    action?

4        A       That aren't based on gross negligence,

5    willful misconduct or fraud?  Only for periods from

6    the filing date to the emergence date.  So basically

7    for conduct during the bankruptcy.

8        Q       It relates to professionals, does it not

9    also, of the creditors committee, the debtors and

10   Wachovia?

11       A       Yes.  It's the same individuals that we

12   talked about with the company release in 12(a).

13       Q       And is malpractice released, any type of

14   malpractice by those professionals?

15       A       I guess it would depend on whether

16   malpractice -- I mean, I'm not an expert on

17   malpractice law as to whether that's a negligence,

18   gross negligence.  It depends on, I guess, the

19   standard that you would apply as to whether that's

20   released.

21       Q       And you're not aware of that standard?

22       A       The malpractice standard?

23       Q       Yes.

24       A       I do not believe I am.

25       Q       Did the professionals of the creditors

 1   committee request that specific provision?

 2       A    No, other than the fact that when we were

 3   negotiating with the professionals of the creditor

 4   committee and they were representing to us the

 5   interests of their constituent, of their client, they

 6   indicated that all those provisions, not just the

 7   exculpation provision, but the release, consensual

 8   release, company release and exculpation, were

 9   important parts of the plan.  And it was part of the

10   overall bargain of the plan.

11       Q    Was it important to them specifically, or

12   important to the plan itself?

13       A    I'm not sure how to distinguish between

14   those.

15       Q    Did they have self-interest in --

16       A    No, I don't believe they did.

17            MS. ESCAMILLA:  I have nothing further at

18       this time, Your Honor.

19            THE COURT:  Thank you very much.

20            Redirect?

21            MR. BUSEY:  No, Your Honor.

22            THE COURT:  Thank you very much, sir.  You

23       may step down.

24                            (Witness excused.)

25            MR. BUSEY:  Good time to take a lunch break,

```
 1          Your Honor?

 2                THE COURT:   Sounds good to me.   How long do

 3          you think everybody needs to get back, about

 4          1:15, an hour and 15 minutes?

 5                MR. BUSEY:   1:15.

 6                THE COURT:   Sounds good to me.

 7                (Whereupon, at 12:00 p.m., a lunch break was

 8          taken, and the hearing was resumed at 1:15 p.m.)

 9                               -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

138

1                        C E R T I F I C A T E

2       STATE OF FLORIDA )

3       COUNTY OF DUVAL  )

4              I, Cindy Danese, Notary Public, State of

5       Florida at Large, do hereby certify that the attached

6       represents the proceedings before the United States

7       Bankruptcy Court, Middle District of Florida,

8       Jacksonville Division, before the Honorable Jerry A.

9       Funk, Bankruptcy Judge, in the matter of In Re:

10      Winn-Dixie Stores, Inc.; such transcript is an

11      accurate recordation of the proceedings which took

12      place.  A transcript of this proceeding has been

13      produced on October 25, 2006.

14

15

16

17                              STATEWIDE REPORTING SERVICE

18

19

20      _____

21                              CINDY DANESE

22

23                              **Cindy Danese**
                                Commission # DD379429
24                              Expires December 14, 2008
                                Bonded Troy Fain  Insurance, Inc. 800-385-7019

25