139

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


IN RE:


WINN-DIXIE STORES, INC.,        CASE NO.: 05-3817-3F1
et al.,

                    Debtors.
_____/


## TRANSCRIPT OF PROCEEDINGS

### VOLUME II OF II


        Confirmation Hearing before the Honorable
Jerry A. Funk, U.S. Bankruptcy Judge, to commence
at approximately 1:15 p.m., on Friday, October 13,
2006, at the United States Courthouse, Courtroom 13A,
300 North Hogan Street, Jacksonville, Florida, as
reported by Elizabeth M. Masters, RPR, and a Notary
Public in and for the State of Florida at Large.


                    -   -   -

**STATEWIDE REPORTING SERVICE**
**606 BLACKSTONE BUILDING**
**JACKSONVILLE, FLORIDA 32202**
**(904) 353-7706**                    **249-9952**
**EXPERTS IN MEDICAL, TECHNICAL & EXPEDITED TRANSCRIPTS**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


IN RE:


WINN-DIXIE STORES, INC.,          CASE NO.: 05-3817-3F1
et al.,

                    Debtors.
_____/


TRANSCRIPT OF PROCEEDINGS

VOLUME II OF II


       Confirmation Hearing before the Honorable Jerry A. Funk, U.S. Bankruptcy Judge, to commence at approximately 1:15 p.m., on Friday, October 13, 2006, at the United States Courthouse, Courtroom 13A, 300 North Hogan Street, Jacksonville, Florida, as reported by Elizabeth M. Masters, RPR, and a Notary Public in and for the State of Florida at Large.


-  -  -


RED STAMP INDICATES

CERTIFIED
COPY



1                    A P P E A R A N C E S

2

3

4        STEPHEN BUSEY, ESQUIRE
              Attorney for Debtors
5
         RICHARD THAMES, ESQUIRE
6             Attorney for Duval County Tax Collector,
              et al.
7
         BRIAN HANLON, ESQUIRE
8        BRIAN FITZGERALD, ESQUIRE
              Attorneys for Florida Tax Collectors
9
         KAREN SPECIE, ESQUIRE
10            Attorney for Terranova Corporation, et al.

11       MARY DOWD, ESQUIRE
              Attorney for F.R.O., LLC VII
12
         NORMAN ROSENBAUM, ESQUIRE
13            Attorney for Merrill Lynch LP Holdings, Inc.

14       MARK KELLEY, ESQUIRE
              Attorney for E&A, et al.
15
         BRENT PROCIDA, ESQUIRE
16            Attorney for ORIX, CW Capital, et al.

17       JOHNATHAN BOLTON, ESQUIRE
              Attorney for Saran
18
         SARAH LORBER, ESQUIRE
19            Attorney for the Daniel Kamin entities

20       ELENA KETCHUM, ESQUIRE
              Attorney for Liquidity Solutions
21
         ADAM FRISCH, ESQUIRE
22            Attorney for Knightsdale Crossing, LLC

23       DENNIS DREBSKY, ESQUIRE
              Attorney for Deutsche Bank Trust Company
24
         MATTHEW S. BARR, ESQUIRE
25            Attorney for Unsecured Creditors Committee

1                          A P P E A R A N C E S

2

3        ELENA ESCAMILLA, ESQUIRE
              Attorney for the United States Trustee
4
         THOMAS CALIFANO, ESQUIRE
5             Attorney for Ad Hoc Trade Committee

6        JERRETT McCONNELL, ESQUIRE
              Attorney for Ad Hoc Committee of
7             Winn-Dixie retirees

8        SARAH BOX
              Winn-Dixie stockholder
9
         RUSSELL MILLS, ESQUIRE
10            Attorney for Bundy New Orleans

11       DEBORAH MORRIS, ESQUIRE
              Attorney for the United States of America
12            Internal Revenue Service

13       STEVEN REISMAN, ESQUIRE
              Attorney for Wilmington Trust Company
14
         STEVEN SOLL, ESQUIRE
15            Attorney for Wachovia Bank

16       PETER NICANDRI, ESQUIRE
              Attorney for CVS EGL Overseas Marathon
17            FL, LLC

18

19                                            - - -                    o

20

21

22

23

24

25

1                    T A B L E   O F   C O N T E N T S

2

3    WITNESS                                              PAGE

4

5    **ELAINE CHRISTIAN**

6
        Direct Examination
7
            by Mr. Thames                                11
8

9
     **LAURENCE APPEL (RECALLED)**
10

11      Direct Examination

12          by Mr. Thames                                13

13

14   **PAUL HUFFARD (RECALLED)**

15
        Direct Examination
16
            by Mr. Thames                                19
17

18

19                              -  -  -

20

21

22

23

24

25

1                          E X H I B I T S

2

3    RECEIVED IN EVIDENCE                                    PAGE

4

5    Tax Collectors' 1-20                                      8

6

7
     Florida Tax Collectors' 1                                29
8

9

10   Landlords' A                                             82

11

12
     United States Trustee's 1-3                             149
13

14
                          -   -   -
15

16

17

18

19

20

21

22

23

24

25

1                A F T E R N O O N   S E S S I O N

2    October 13, 2006                           1:15 p.m.

3                              - - -

4                THE COURT:  Are we ready to continue?

5                MR. BUSEY:  Yes, Your Honor.

6                The only other two items on our exhibit list,

7        we have the -- are objections and orders for

8        confirmation in two cases in the Middle District

9        of Florida of which the United States Trustee's

10       objection to releases in exculpations were

11       overruled and the plans were confirmed.

12               We don't think that's properly an evidentiary

13       matter.  We're not putting any facts in evidence

14       that requires any authority, so we don't need to

15       put those in evidence.  We'll argue them at

16       another time.

17               And with that, we're finished with our case

18       in chief.  We have some evidence that we may use

19       for rebuttal, depending on what the objectors have

20       to say.  But we're concluded with our case in

21       chief.

22               THE COURT:  Thank you very much.

23               The Court will now listen to the objectors,

24       anybody that's filed an objection that wants to

25       present evidence.

1           I don't think this microphone is working up

2      here.

3           MR. BLEDSOE:  Your Honor, Jim Bledsoe.  We

4      couldn't hear Mr. Busey, either, so the sound

5      system must be off.

6           THE COURT:  It's working now.  Can you hear

7      me?

8           MR. BLEDSOE:  Yes.

9           THE COURT:  Mr. Thames, you're here on behalf

10     of?

11          MR. THAMES:  On behalf of the various tax

12     collectors that I identified earlier.  Do you want

13     me to go through those again?

14          THE COURT:  That's all right.

15          MR. THAMES:  Your Honor, I would like to

16     begin by way of stipulation of the introduction of

17     certain exhibits.  They will be Exhibits 1 through

18     20 on behalf of the objecting tax collectors whom

19     I represent.  And those are -- this is a

20     stipulation with debtors' counsel.

21          These are the monthly operating reports filed

22     during the pendency of the case.

23          THE COURT:  Any objection?

24          MR. BUSEY:  May I inquire, Your Honor?  Are

25     they all of the monthly operating reports filed

1        during the case?

2             MR. THAMES:  They're supposed to be, yes.

3        The month of February through August.

4             MR. BUSEY:  In reliance on Mr. Thames's

5        representation that they are, we have no

6        objection.

7             THE COURT:  Very well.  They're admitted as

8        previously numbered.

9             (Whereupon, the documents last-above referred

10       to were received in evidence as Tax Collectors'

11       Exhibits Numbers 1-20.)

12            MR. THAMES:  Thank you, Your Honor.

13            I would also like the Court to take judicial

14       notice of a few items.  The first item would be

15       the Georgia Code, Section 44-2-40, which provides

16       for an interest rate of one percent per month on

17       delinquent tax obligations.

18            The second, I would like the Court to take

19       judicial notice of the Kentucky Revised Statute,

20       Section 134.460, which provides for a tax --

21       excuse me -- an interest rate of 12 percent on

22       delinquent taxes in the state of Kentucky.

23            I would like the Court to take judicial

24       notice of the Mississippi Statute, Section

25       27-35-157, which provides for collection, as a

1    penalty, of ten percent of the amount of the

2    delinquent taxes, plus interest at the rate of six

3    percent thereafter.

4        I would like the Court to take judicial

5    notice of the Virginia Code, Section 58.1-3918,

6    which provides for a delinquency rate of 10

7    percent -- excuse me -- an interest rate of 10

8    percent on delinquent taxes within the state of

9    Virginia.

10        And I would also ask the Court to take

11    judicial notice of Florida Statute, Section

12    197.12, which provides for an interest rate on

13    delinquent real property taxes and personal

14    property taxes at the rate of 18 percent per year.

15        THE COURT:  Any objection?

16        MR. BUSEY:  Your Honor, before I answer your

17    question, I need to make the observation that the

18    statutory interest rate for a tax collector on

19    delinquent taxes is not material to the

20    confirmation of this plan because that will be

21    material to the determination of the allowed

22    amount of that claim.

23        The only thing material in this plan, to the

24    confirmation of the plan, is the rate that's going

25    to be used under Section 1129 of the code for the

1 purpose of the preferred payout of the plan to

2 cram down the tax collectors.  And that's not a

3 statutory matter.

4   Having said all of that, I have no objection

5 to Your Honor taking judicial notice of those

6 statutes.

7   THE COURT:  The Court takes judicial notice.

8   MR. THAMES:  Thank you, Your Honor.

9   Your Honor, I would like to call to the stand

10 Ms. Elaine Christian.

11   COURTROOM ADMINISTRATOR:  Ms. Christian,

12 please be seated in the witness stand.

13   MR. THAMES:  She's in the very back, Your

14 Honor.  I apologize.

15 WHEREUPON,

16        **ELAINE CHRISTIAN,**

17 having been produced and first duly sworn as a witness

18 by the courtroom administrator, was examined and

19 testified as follows:

20   COURTROOM ADMINISTRATOR:  Please state your

21 name and address, including the city and state.

22   THE WITNESS:  It's Elaine Christian, 10441

23 Sandalwood Court, Jacksonville, Florida 32218.

24   THE COURT:  Thank you.

25   You may inquire.

1          MR. THAMES:  Thank you, Your Honor.

2                    **DIRECT EXAMINATION**

3    BY MR. THAMES:

4          Q     Ms. Christian, by whom are you employed?

5          A     The tax collector, City of Jacksonville.

6          Q     And how long have you been employed by the

7    tax collector?

8          A     December 18 will be 25 years.

9          Q     And what is your position with the Tax

10   Collector's Office?

11         A     I'm a revenue collector for and I do

12   bankruptcies.

13         Q     And is it one of your job duties or

14   responsibilities to keep track of the amount of taxes

15   owed by the Chapter 11 debtors --

16         A     Yes.

17         Q     -- in this jurisdiction?

18         A     Yes, it is.

19         Q     And is Winn-Dixie included in that?

20         A     Yes.

21         Q     All right.  Are you familiar with the amount

22   of taxes that are owed by Winn-Dixie for personal

23   property and real property taxes for 2005?

24         A     Yes.

25         Q     And what are those figures, please?

1       A     For the real estate taxes, it's

2   $1,092,623.79.

3       Q     What about personal property taxes for 2005,

4   how much does Winn-Dixie owe currently?

5       A     That's $778,424.93.

6       Q     And what will be the amount of real estate

7   taxes and personal property taxes due Winn-Dixie -- due

8   by Winn-Dixie on November 1st of this year?

9       A     Based on the proposals for personal property

10  tax, it's $609,718; and for the real estate, it's

11  $2,176,645.04.

12              MR. THAMES:  Thank you, Your Honor.  I'll

13          tender the witness.

14              MR. BUSEY:  We have no questions, Your Honor.

15              THE COURT:  Does anybody else have any

16          questions of the witness?

17              Thank you very much.  You may stand down.

18              THE WITNESS:  Okay.  Thank you.

19                              (Witness excused.)

20              THE COURT:  Additional evidence, Mr. Thames?

21              MR. THAMES:  Yes.  I would like to recall to

22          the stand Mr. Laurence Appel.

23              THE COURT:  Mr. Appel, you're still under the

24          previous oath.

25              THE WITNESS:  I understand, Your Honor.

1    WHEREUPON,

2                        **LAURENCE APPEL,**

3    having been previously produced and sworn as a witness

4    by the courtroom administrator, resumed the stand and

5    testified further as follows:

6              THE COURT:   You may inquire.

7              MR. THAMES:   Thank you, Your Honor.

8                        **DIRECT EXAMINATION**

9    BY MR. THAMES:

10        Q    Mr. Appel, are you familiar with the plan

11   modifications that have been submitted by Winn-Dixie?

12        A    Generally speaking, yes.

13        Q    Are you familiar with the proposed treatment

14   of the tax collector claims, that is, the Class 10

15   claimants?

16        A    Again, generally speaking, yes.

17        Q    Does Winn-Dixie intend to pay its 2006 real

18   and personal property taxes in full when they become

19   due on November 1st?

20        A    Tax -- you know, neither payables nor the tax

21   group reports through me.  I can't tell you.  I don't

22   know the answer to what our expectation of that is.

23        Q    Okay.  There was a plan modification filed

24   this week --

25        A    Right.

1       Q      -- that asserted a right of setoff.

2       A      Uh-huh.

3       Q      Can you tell me the genesis of that

4   modification or what you were trying to accomplish by

5   that modification?

6              MR. BUSEY:  Your Honor, I object to the

7         question, because the question as phrased is they

8         asserted a right to the setoff, and I don't know

9         who "they" is.

10             Why don't you show the witness the plan

11        modification you're referring to.  Well, it's in

12        front of the witness.

13  BY MR. THAMES:

14      Q      Do you have that?

15             THE COURT:  Objection sustained.

16             THE WITNESS:  What are you -- what are you --

17  BY MR. THAMES:

18      Q      The plan modification --

19      A      Sure.

20      Q      -- if you would look, with the treatment of

21  Article 10.

22             MR. THAMES:  May I approach the witness, Your

23        Honor?

24             THE COURT:  You may.

25             THE WITNESS:  What are you looking at?

1            MR. THAMES:   (Indicating on document.)

2            THE WITNESS:   Oh, okay.   Can you give me a

3        minute?

4            (Examining document.)

5            Okay.

6    BY MR. THAMES:

7        Q    Are you familiar with that section of the

8    first modification to the joint plan of

9    reorganization?   It's 4.3D(2).

10       A    I am, although I'm not -- well, yes, I am.

11       Q    What was the intention, Winn-Dixie's

12   intention, in modifying its plan there to include this

13   right of setoff?

14       A    I can't speak to -- I can't speak

15   definitively.   I do believe that the intention is to

16   the extent that a taxing authority -- to the extent

17   that we are due a refund from a taxing authority, for

18   the taxing authority to be able to offset the refund

19   and then -- against any back taxes owed, to net a

20   refund against taxes owed.

21       Q    And the refund would be as a result of

22   prepetition tax obligations?

23       A    You're -- you're going beyond my

24   understanding of this a little bit as to prepetition or

25   postpetition.   Generally speaking, to the extent that

1    we are owed a refund, we would --

2        Q    Does this have to do --

3        A    -- it would be set off.

4        Q    -- with Section 505 motions that Winn-Dixie

5    has filed against the various taxing authorities where

6    it does business?

7        A    I -- I don't know.  I'm sorry.

8        Q    Okay.  Who in this courtroom today would know

9    the purpose of the inclusion of that language besides

10   the lawyers?

11       A    I don't know the answer to that.

12            MR. THAMES:  Just a moment, Your Honor.

13   BY MR. THAMES:

14       Q    In your earlier testimony today, you referred

15   to the liquidity of the corporation.  You made some

16   reference to the company's liquidity.

17       A    Uh-huh.

18       Q    And that liquidity, how was that liquidity

19   built up during the pendency of the case?

20       A    How was the liquidity built up over the

21   pendency of the case?

22       Q    Yes.

23       A    Our liquidity -- our increase in liquidity

24   over the course of the case is primarily the result of,

25   A, operating improvements; B, asset sales; and, C,

1    improved terms on various -- you know, our

2    debtor-in-possession financing as compared to our other

3    financing.  Not --

4        Q    Well, isn't it true --

5        A    -- necessarily --

6        Q    -- to say the vast --

7        A    Not necessarily in that order.

8        Q    Okay.  But isn't it true to say the vast

9    majority of the liquidity which Winn-Dixie presently

10   enjoys is the result of asset sales and borrowing as

11   opposed to operating profits?

12       A    I don't know.  I'd have to do the math.

13   Certainly, I believe, asset sales have been the biggest

14   contribution, but there's been a meaningful positive

15   operating performance improvement.

16       Q    And whatever that performance is would be

17   reflected in the monthly financial reports which you

18   filed with the Court, correct?

19       A    To some extent.  You're asking -- not

20   really.  I mean, you're asking a cash question, right,

21   which is borrowing availability in cash.  And the

22   monthly operating statement is a GAAP financial

23   statement, which includes a lot of noncash charges.

24   You would actually have to parse through GAAP to get to

25   cash for the operating statements to be -- to be an

1  appropriate reflection for you of the improved cash

2  operating position of the business.

3      Q    The point is, you can back those items out of

4  the monthly operating expenses, such as depreciation,

5  to get the cash contributions from operations versus

6  what you're realizing through the sale of assets,

7  correct?

8      A    One certainly could.  I could not do that for

9  you sitting here right now.

10     Q    I don't expect you to, but thank you.

11     A    Sure.

12          MR. THAMES:  No further questions of this

13     witness.

14          THE COURT:  Any other questions of the

15     witness?

16          Thank you very much, sir.  You may step

17     down.

18                              (Witness excused.)

19          THE COURT:  Additional evidence?

20          MR. THAMES:  Thank you, Your Honor.  I'd like

21     to recall to the stand Mr. Huffard.

22          COURTROOM ADMINISTRATOR:  Mr. Huffard, please

23     be seated in the witness stand.

24          THE COURT:  You're still under oath.

25          THE WITNESS:  Yes.  I understand, sir.

1    WHEREUPON,

2                        **PAUL HUFFARD,**

3    having been previously produced and sworn as a witness

4    by the courtroom administrator, resumed the stand and

5    testified further as follows:

6                    **DIRECT EXAMINATION**

7    BY MR. THAMES:

8        Q    Mr. Huffard, previously, I was asking you

9    about the amount of -- the approximate amount of tax

10   claims owed by Winn-Dixie.  Do you recall that

11   testimony?

12       A    Yes.

13       Q    Do you have before you Debtors' Exhibit

14   Number 1, which is the Disclosure Statement filed in

15   this case?

16       A    Yes, I do.

17       Q    If you would please turn to page 8 of that

18   document which deals with the summary of the plan

19   treatment for Class 10.  If you would look at the

20   bottom of that page.  What is the estimated amount of

21   allowed secured tax claims in Class 10?

22       A    Twenty-five and a half million dollars.

23       Q    And was the majority of that claim the

24   Florida tax collectors' claims, the aggregate?

25       A    I don't know the composition of that total.

1    It's displayed there.

2        Q    Would the payment of statutory interest on

3    the tax collector claims jeopardize the feasibility of

4    this plan of reorganization?

5        A    No, it would not.

6        Q    Would the payment of $25.5 million in secured

7    tax claims on the plan consummation date jeopardize the

8    feasibility of Winn-Dixie's reorganization?

9        A    It would have a negative impact.  I don't

10   know that it would jeopardize it in terms of is it

11   possible to do.

12       Q    You still think you could turn the ship, to

13   use your analogy, correct?

14       A    Again, I'm not turning it, but yes.

15            MR. THAMES:  Thank you.

16            No further questions, Your Honor.

17            THE COURT:  Any other questions of this

18       witness?

19            Thank you very much.  You may step down

20                            (Witness excused.)

21            MR. THAMES:  That would conclude our

22       evidentiary showing on our objection.  Reserve the

23       right -- do you want to have the arguments at the

24       end of the day?

25            THE COURT:  One thing.  Is there anybody else

1        here, other than the Florida tax collectors, that

2        wants to be heard on the issues raised by

3        Mr. Thames?

4            I think you represent everybody that raised

5        those issues.

6            MR. THAMES:  There's some overlap with the

7        Florida tax collectors, Mr. Hanlon.

8            THE COURT:  Mr. Hanlon, do you want to appear

9        just on the interest rate portion of your

10       objection?

11           MR. HANLON:  Yes, Your Honor.  We've divided

12       up the arguments, Your Honor, between the two of

13       us.

14           THE COURT:  I'm not taking argument.  Do you

15       have any evidence you want to put on?

16           MR. HANLON:  No, Your Honor.

17           THE COURT:  I'll listen to your argument,

18       Mr. Thames, and I'll listen to Mr. Hanlon, and

19       then I will give the debtor, or whoever, an

20       opportunity to rebut those arguments, and then

21       we'll move to the next item.

22           MR. THAMES:  Yes, Your Honor.

23           Well, let me begin by saying that the tax

24       collectors we represent, including Duval County,

25       support Winn-Dixie's reorganization efforts.

1        There's been adverse press suggesting otherwise,

2        but we do support the reorganization efforts.

3        We do believe, however, that they've got to

4        follow -- you know, that they've got to do it

5        right.  And the way they're proposing to treat

6        Class 10 doesn't comply with applicable law.

7        To begin with, as we stand here now, from an

8        evidentiary point of view, there is no definitive

9        interest rate in the plan.  The plan modification

10       says it's going to be the interest rate in the

11       confirmation order.

12       Mr. Huffard testified he didn't know what

13       that number is.  So, right now, we have an open

14       item as to what the interest rate is under the

15       terms of this plan of reorganization.  They

16       haven't closed that loop.

17       This plan is also silent as to the accrual of

18       interest from the prepetition debt to the

19       confirmation date, or whenever this order goes

20       in.  The testimony is that the tax collectors are

21       oversecured.

22       Interest accrues through the effective date

23       at the statutory rate.  This plan does not provide

24       that.  It is silent at this point, and we would

25       like that to be reflected in any order confirming

1           the plan.

2                We also have a very interesting issue here as

3           to the appropriate interest rate.  Applicable law,

4           the plan has to comply with applicable law under

5           Section 1129, and applicable law says taxes accrue

6           at the statutory rate.

7                Their plan is trying to modify that, and we

8           think that's impermissible.  There's been no

9           waiver of sovereign immunity on that point by most

10          of these tax collectors who have not filed proofs

11          of claim, so I don't believe this plan can modify

12          that interest rate.

13               It is also questioned here as to whether the

14          Till factors, in the Supreme Court's decision in

15          the Till case, really come into play.  The debtor

16          didn't present -- as I said, they didn't put on

17          any evidence as to the starting point of their

18          interest rate.  They just said something to the

19          effect that it needs to be similar to what the

20          exit financing gets.

21               It didn't say what our interest rate is or

22          our treatment is, but -- which really didn't

23          trigger any obligation to address the Till

24          factors.  But there's no question in this case

25          there is -- they're not apples and oranges.  You

1       can't use the exit financing as the rate of

2       interest.

3           They've negotiated a loan document that has

4       financial covenants, net worth requirements,

5       affiliated guaranties, all of those set forth in

6       the plan.

7           The tax collectors, we have equipment to look

8       to to realize our -- the benefit -- our taxes and

9       collect our taxes.

10          If you'll look at that, there's -- you know,

11      there's been no -- there is a substantial amount

12      of risk which justifies -- even if you were to

13      apply the Till factors, justified remaining at the

14      statutory interest rate.

15          We don't have liquid collateral.  Ours is all

16      just used shelving, used refrigerator units, you

17      know, supposedly the conveyor systems on checkout

18      lanes and items of that nature.

19          So from those perspectives, we don't think --

20      we want the plan confirmed, but we don't think

21      they can confirm it with respect to Class 10,

22      because they haven't met their -- they haven't set

23      the interest rate, they haven't set it properly.

24      The statutory rate is the rate required by law,

25      and that's what needs to be applied.

1           And I'm going to defer to the Florida tax

2      collectors.  Their argument is to -- I think

3      they've honed in on the legal issues surrounding

4      the interest rate.  We'll rely on that argument as

5      well and not be duplicative.

6           Thank you.

7           THE COURT:  Thank you very much.

8           Mr. Hanlon.

9           MR. HANLON:  Good afternoon, Your Honor.

10     With me is Mr. FitzGerald, who has been working

11     with me on this case throughout the case, Your

12     Honor.

13          We're prepared to argue interest in whatever

14     time and format that the Court would like to, but

15     we --

16          THE COURT:  Well, I'm trying to handle one

17     issue at a time and let the debtor respond.  I

18     know we've taken argument on the other issues --

19          MR. HANLON:  The other issues, Your Honor.

20          THE COURT:  -- the other day, and that's

21     supposed to carry forward.  I didn't know if you

22     were rearguing the same thing.

23          MR. HANLON:  I would, Your Honor, If

24     Mr. FitzGerald is prepared to argue directly on

25     interest.

1          I have an interest aspect of the overall

2     jurisdictional argument that I was prepared to

3     argue, I think, later on in the hearing.

4          THE COURT:  Well, we'll take that in due

5     course.  Let's just take the interest rate if you

6     have the argument on that.

7          MR. HANLON:  Thank you, Judge.

8          MR. FITZGERALD:  Thank you, Your Honor.

9     Brian FitzGerald for the Florida tax collectors.

10    I will limit this argument just to the interest

11    issue.

12         I have some other reasons stated in our

13    objection to confirmation, but that's been saved

14    to the appropriate time.

15         One preliminary matter.  We have requested

16    judicial notice of certain judicatory facts.  That

17    would be the outstanding taxes owed to the Florida

18    tax collectors, which are 55 tax collectors in the

19    state, exclusive of Duval County, which Mr. Thames

20    already proved up the amount owed to that county

21    with testimony.

22         We had filed a request for judicial notice

23    and attached a summary of the taxes, the total

24    taxes, owed for 2004, both real estate and

25    tangible personal property.  We've provided the

1        summary with counsel and we have provided a copy

2        to the Court.

3            Today we have submitted affidavits from each

4        of the individual tax collectors attached to the

5        summary; that the summary reflects an accurate

6        representation of the amounts of taxes unpaid and

7        owed in their respective counties.

8            It's got both cumulative total amounts and a

9        breakdown by individual county by individual folio

10       number, real estate address, tangible personal

11       property account number.

12           We've submitted that.  We have made a request

13       for judicial notice and submitted it.  I ask that

14       the Court admit that into evidence as reflecting

15       what is owed to the Florida tax collectors.

16           THE COURT:  Any objection?

17           MR. BUSEY:  Yes, Your Honor.  It's hearsay.

18           THE COURT:  What's the purpose of it being

19       offered?

20           MR. FITZGERALD:  It's being offered just to

21       have a record.  We filed a proof of claim back in

22       November of 2005 before the taxes were paid.  That

23       proof of claim was filed subject to amendment as

24       taxes were paid so that we would have an actual

25       amount when the issue came up as to the Florida

1      taxes at the time of confirmation and what was
2      actually outstanding.

3           And that's the purpose of admitting it, is to
4      show what is actually owed to the Florida tax
5      collectors.

6           MR. BUSEY:  Your Honor, the proof of claim
7      was for $68 million.  And, in subsequent
8      correspondence with the Florida tax collectors,
9      they have told us now that they believe the amount
10     outstanding and unpaid by the debtors to date is
11     approximately $10 million.

12          We don't agree with the number.  We think
13     that the amount of the tax we owe is less than
14     that.   That's why we can't stipulate with them on
15     these facts.

16          But for the purpose of the record today, if
17     what Mr. Fitzgerald wants to do is to show that
18     the Florida tax collectors' claim in this case for
19     2004 and 2005 is approximately $10 million, we
20     understand that's so.

21          But there's a lot more than that in that
22     document, and that's why we object to it.

23          THE COURT:  Very well.  The Court will allow
24     it for the purpose of stating what you feel your
25     claim is without proving it up.

 1            (Whereupon, the document last-above referred

 2    to was received in evidence as Florida Tax

 3    Collectors' Exhibit Number 1.)

 4            MR. BUSEY:  Did I say the right amount?

 5            MR. FITZGERALD:  No.  It's actually less than

 6    that.  And the summary that's attached has been

 7    provided.

 8            The delinquent 2005 unpaid tangible property

 9    taxes are in the cumulative amount of

10    $5,804,650.46.  The delinquent 2005 real estate

11    taxes are in the amount of $1,830,179.05.

12            And bear in mind that these figures do not

13    include the Duval County taxes owed.  Again, those

14    -- Mr. Thames put on evidence as to what that

15    amount is.

16            And there are also 2004 tangible property

17    taxes of $59,799.30, and 2004 real estate unpaid

18    taxes in the amount of $98,910.28.  And that was

19    on three separate Florida counties.

20            MR. BUSEY:  We'll stand on the Court's

21    ruling.

22            THE COURT:  Thank you.

23            MR. FITZGERALD:  Your Honor, in relation

24    to the interest, the plan as set forth in the

25    modification that was just filed this week does

1          attempt to reduce the statutory rate of interest.

2              Originally, the plan provided for six

3          percent, now it's -- it provides for interest

4          rates established in the confirmation order.

5          There was testimony that Winn-Dixie's

6          representative felt that seven percent was an

7          appropriate amount.

8              The tax collectors submit that the attempt to

9          reduce the statutory interest rate of 18 percent,

10         as required by Florida Statute 197.122, takes the

11         plan out of compliance with Section 1129(a)(2).

12         The taxes are fully secured by statutory first

13         lien pursuant to 197.122(1).

14             The calculation for delinquent tax interest,

15         including the statutory reference as well as

16         12D13.004 of the Florida Administrative Code, the

17         rules promulgated by the Department of Revenue for

18         the calculation of delinquent tax interest.

19             We've cited a number of cases in our

20         objection.  These cases are also cited in

21         memorandum with regard to the 505 motion which the

22         debtors have filed in reference to the Florida tax

23         collectors' claims.  Similar filings have been

24         made to the tax claims of the various other

25         states.

1          And I would cite, first of all, the case of

2     Cone Constructors, In Re Cone Constructors, at 304

3     B.R. 513, which is a Middle District of Florida

4     case, which notes, "The taxing authority, as an

5     oversecured creditor, is entitled to the statutory

6     18 percent interest rate on property tax

7     obligations."

8          Despite an argument by the debtors in that

9     case, it was a punitive measure.

10         The Court found that an 18 percent statutory

11    rate is not wholly disproportionate to market

12    rates, and there was no evidence that that

13    interest rate was passed by the Florida

14    legislature to penalize delinquent taxpayers.

15         There are a number of cases in the Middle

16    District of Florida, bankruptcy cases, which again

17    provide that 18 percent, the statutory rate on

18    delinquent taxes, is not a penalty but, rather, is

19    an appropriate interest rate to be applied for

20    oversecured tax creditors for delinquent tax

21    claims.

22         Another one is In Re Luizzo, which is at 204

23    B.R. 235.   In this case -- this is a Northern

24    District of Florida case.   A nonconsensual

25    oversecured tax creditor was found to receive

1        postpetition interest on claims at the statutory

2        rate -- and that was upheld by the Court -- unless

3        the rate was a penalty or would lead to an

4        unconscionable result.

5            The statutory 18 percent rate on delinquent

6        real estate taxes was specifically held not to be

7        a penalty.  In the absence of some specific

8        inequity in the facts of that case, it would be

9        upheld by the Court.

10           In this particular case, the debtors could

11       have paid these taxes back in November 2005, when

12       the bills were sent.  If they had paid them at

13       that time, they would have been entitled to a four

14       percent statutory discount on the taxes, and that

15       would have been in an amount of somewhere in the

16       nature of $450,000.

17           In addition, it would have included -- or it

18       would have precluded any claim for any interest at

19       this point.  The taxes could have been challenged

20       once they were paid, in accordance with Florida

21       law, as Florida law requires.

22           But the problem in this case of the interest

23       and the debtors' attempts to impose a new

24       nonstatutory interest rate on the Florida tax

25       collectors are totally self-created.

1          Again, they could have paid the taxes, gotten

2      the statutory discount, saved that money, and then

3      not had the interest accruing at the rate that it

4      has been all this time.  The interest would not

5      have even been an issue.

6          Another Middle District case I would cite is

7      In Re Mulberry Corporation, in which the Court --

8      again, the Middle District of Florida, Judge

9      Paskay, specifically found that the statutory 18

10     percent interest rate on delinquent taxes is not a

11     penalty, and that the taxing authority has the

12     responsibility to meet the obligations and costs

13     of operating the government.

14         The debtors in this case have certainly

15     availed themselves of all the services provided by

16     the taxing authorities in the various counties:

17     fire, police, schools.

18         And as stated in Mulberry Corporation, that

19     is another factor to help show that the 18 percent

20     statutory rate is not a penalty.  Again, there's

21     been no evidence presented in this case today that

22     the 18 percent statutory rate constitutes a

23     penalty.

24         I would also cite the Middle District case

25     that this Court ruled on in In Re Haskell, at 252

1          B.R. 236, in which it was held that the statutory

2          rate of 18 percent on delinquent taxes was

3          appropriate and agreed with the Luizzo holding

4          that it was not a penalty.

5              The debtors have cited several cases for the

6          proposition that market rates or other factors

7          should be taken into account in determining an

8          interest rate on delinquent ad valorem taxes

9          and thereby imposing a rate other than the

10         statutorily required rate on the Florida tax

11         collectors.

12             One of these is the Southern States case that

13         they discuss in detail in their memorandum in

14         support of confirmation.

15             The Southern States case actually deals with

16         IRS tax claims and it deals with unsecured

17         priority tax claims under 507(a)(7) and not --

18         does not deal with secured tax claims.

19             And the statute involved in Southern States,

20         the federal statute, specifically provided for an

21         adjustment, a year-to-year adjustment, of the

22         interest rate based on fluctuations in the prime

23         lending rate.

24             And that case, we would submit, is not

25         relevant whatsoever to the issues before this

1      Court when there's a secured claim, not an

2      unsecured priority claim, it's an oversecured tax

3      claimant, and there's a statutory requirement for

4      18-percent interest that's been held repeatedly in

5      this district not to be a penalty.

6           Again, the Till case, which was cited by the

7      debtors, a Florida Supreme Court case, deals with

8      a situation of private lenders.  It was a fact

9      that was considered in coming up with an interest

10     rate to protect the unsecured creditors for

11     private loans made to the debtor.

12          The Florida tax collectors are not a bank,

13     we're not a lender, we're not a private entity.

14     We're arms of the state and we're carrying out

15     our statutory duties to collect taxes at the full

16     amount and at the full statutory rate of

17     interest.

18          And there's no reason and no cases cited by

19     the debtors to go against that, to provide for a

20     lesser rate of interest in the plan or in the

21     subsequent 505 motion for the Florida tax

22     collectors for delinquent taxes other than the

23     statutory 18 percent.

24          It's just simply not a market-rate issue in

25     this case.  And we would submit that the testimony

1           as to market rate and other factors that were

2           taken into account in coming up with a proposed

3           seven-percent rate are completely irrelevant.

4           It's a legal issue for determination by the Court

5           in this situation.

6                There's been no evidence that paying the

7           statutory rate of interest on delinquent tax

8           claims would impact the feasibility or the

9           consummation of the plan.

10               And, Your Honor, we're simply seeking to have

11          the tax collectors treated fairly as secured tax

12          claimants under Class 10.  And we submit that a

13          reduction of the interest rate would simply not do

14          that.  It would be singling the tax collectors out

15          for inequitable treatment under the code.

16               And for that reason we file our objection,

17          among other grounds, but specifically right now

18          for the attempted reduction in interest rate in

19          the proposed plan as amended.

20               THE COURT:  Thank you very much.

21               Response?

22               MR. BUSEY:  Thank you, Your Honor.

23               And, first, let me thank Mr. Thames for

24          noting for the Court that the Duval County Tax

25          Collector, our home tax collector, supports the

1          plan and supports the feasibility of Winn-Dixie's

2          plan, contrary to prior reports.  We're pleased to

3          hear that.

4               The issue before the Court now is the proper

5          interest rate that the Court should put in its

6          order confirming this plan in providing for

7          deferred payments under the Bankruptcy Code to the

8          tax collectors, who are Class 10, in order to

9          confirm the plan over the objection of the tax

10         collectors, which are subclasses in Class 10,

11         under 1129(b)(2)(a)(2).

12              And the issue before the Court in doing that

13         is what is the proper interest rate to impose for

14         extended payouts over six years if the debtor

15         chooses to do that under the plan?  That's an

16         option available to the debtor, to pay taxing

17         authorities over six years.

18              What's the appropriate interest rate to put

19         in that would assure that the payment of those

20         claims over that time period would have a value as

21         of the effective date of the full allowed amount

22         of that claim?  That is, what it would take to

23         cause the deferred tax payments to have a present

24         value at the effective date.  And that's all

25         that's before the Court, is that issue.

1          The statutory rate for delinquent taxes is

2    not relevant to the determination of that issue.

3    The statutory rate for delinquent taxes is

4    relevant only to the Court's determination of the

5    allowed amount of the claim.

6          The claim has been made.  The claims have

7    been objected to by the debtors, both the Florida

8    tax collectors and all of the taxing authorities

9    represented by Mr. Thames.

10          And those objections, those claims and the

11   objections to the claims, will be heard at another

12   day.  And at that time, when you determine the

13   allowed amount of the claim, you will determine

14   the appropriate statutory interest rate for

15   delinquency as a part of determining that claim.

16          And if the statutory interest rate is

17   reasonable, you may use it.  And the statutory

18   rate, if you determine it to be a penalty, then it

19   will be up to the Court to determine the proper

20   statutory rate.

21          In the Mulberry case, which was cited by

22   counsel, Judge Paskay held that an 18 percent

23   interest rate was a penalty and imposed a nine

24   percent interest rate for determining the allowed

25   amount of the claim.

1           In the case cited for you, which was cited by

2      counsel, the Haskell case, you determined that an

3      18 percent interest rate in that context was not a

4      penalty, you expressly stated, because of the

5      evidence before you, or the lack of evidence

6      before you, on the record in that case.

7           And you said that, in that decision, that

8      that would not necessarily be true in any other

9      cases; it would depend on the record that was

10     before you.  And that's absolutely right.

11          But that's not the issue before you today.

12     The allowed amount of the claim will be determined

13     at another date, and the proper rate to be used

14     for determining the delinquency as a part of that

15     claim will be heard another day.

16          The only issue before you today is what's the

17     rate you're going to put in the confirmation order

18     which will assure those tax collectors that they

19     get a present value of the full allowed amount of

20     their claim as of the effective date.  And that

21     was the reason we offered Mr. Huffard's

22     testimony.

23          Now, what's the law on that?  Is the law that

24     you pay a statutory rate or is the law that you

25     pay a market rate?  The law is that you pay a

1    market rate.

2         And as Mr. Thames is aware, because he cited

3    the case, the United States Supreme Court has

4    spoken to this in the decision of Lee M. Till.

5    And that was a Chapter 13 case.

6         And the Court said that the issue before it

7    is to -- this fact helps to explain why there's no

8    readily apparent Chapter 13 cramdown market rate

9    of interest, because every cramdown loan is

10   imposed by a Court over the objection of the

11   secured creditor, and there's no free market of

12   willing cramdown lenders.

13        Interesting, the Supreme Court said in

14   footnote 14, "The same is not true in a Chapter 11

15   context, as numerous lenders advertise financing

16   for Chapter 11 debtors-in-possession.  Thus, when

17   picking a cramdown rate in a Chapter 11 case, it

18   might make sense to ask what an efficient market

19   would produce."

20        That's what the Supreme Court said in a

21   Chapter 13 case in a footnote observing what you

22   would do in a Chapter 11 case.

23        And subsequent to the Supreme Court's

24   decision in Till, which is a 2004 decision, the

25   6th Circuit Court of Appeal addressed this very

1       issue in In Re American Home Patient, Inc., which

2       is a Chapter 11 case that was decided in July of

3       '05 -- and this is in our brief -- at 420 F.3d

4       559.

5       And it discussed the Till case.  It discussed

6       the fact that it was a Chapter 13 case.  And then

7       it said, "In determining the market rate of

8       interest to use to cram down a secured tax

9       creditor in this case."

10      The 6th Circuit said, in its pre-Till

11      assessment, that the bankruptcy court relied on

12      several 6th Circuit cases calling for the

13      application of a coerced loan theory in

14      determining cramdown interest rates.

15      Under the coerced loan theory, the Courts

16      treat any deferred payment of an obligation under

17      a plan as a coerced loan, and the rate of return

18      with respect to such a loan must correspond to the

19      rate of return that would be charged or obtained

20      by the creditor making a loan to a third party

21      with similar terms, duration and collateral.  The

22      Courts, therefore, must use the market rate of

23      interest used for similar loans in the region.

24      And the Court went on to say, in discussing

25      footnote 14 out of the Till decision, "We opt to

1          take our cue from footnote 14 of the opinion,

2          which offered that the guiding principal, when

3          picking a cramdown rate of interest in a Chapter

4          11 case, it might make sense to ask what rate an

5          efficient market would produce."

6                This means that the market rate should be

7          applied in Chapter 11 cases where there exists an

8          efficient market.   But where no efficient market

9          exists for Chapter 11, then the bankruptcy court

10         should employ the formula approach used in Till.

11               So what's the evidence before you?   The

12         evidence before you is that the debtors went out

13         in an efficient market and shopped postpetition

14         financing, $720 million secured by all of the

15         assets of this debtor, including the collateral,

16         which is the statutory collateral of the tax

17         collectors.

18               And, that is, those lenders knew, and the

19         Wachovia financing facility provides that its loan

20         would be junior to the collateral which

21         constitutes the statutory collateral of the tax

22         collectors.

23               And in bargaining for that financing among 14

24         competing lending institutions, the debtor was

25         able to bargain for LIBOR plus one and a half,

1           or seven percent rate of interest.   That was the

2           rate of interest that the efficient market

3           produced for a lender junior in position to these

4           statutory tax collectors.

5                And so we asked Mr. Huffard what would be an

6           appropriate market rate to ensure -- I asked him

7           the question -- market value for the tax

8           collectors for their deferred payments under the

9           Chapter 11 plan.   He said it would be not more

10          than seven percent.

11               That's the only evidence before you, Your

12          Honor, of a market rate of interest for this

13          collateral in this case, and we ask you to use

14          that number in a confirmation order for the

15          deferred payouts under Class 10.

16               THE COURT:   Thank you very much.

17               MR. FITZGERALD:   If I may respond briefly.

18               Your Honor, again, as we stated, there's been

19          no testimony or evidence that the 18-percent rate

20          would be a penalty.   There's nothing before the

21          Court today in that regard.

22               And the Till case again deals with private

23          lenders in a private lending situation, which the

24          tax collectors are not.   There has been evidence

25          and testimony that the exit lenders would have

```
 1          other factors and other protections built in that
 2          the tax collectors do not.
 3              They cannot go and sell certificates on
 4          property that's being used in the reorganization,
 5          they can't go and issue warrants and levy on the
 6          tangible property, they can only get paid.  And
 7          for that reason, again, the 18 percent is not --
 8          is not a penalty but is an appropriate statutory
 9          rate to employ, as has been upheld in this
10          jurisdiction.
11              I would also briefly like to clarify whether
12          or not the Florida tax collectors' exhibit has
13          been admitted.
14              Basically, it shows liquidated amounts
15          reflecting credits from what was originally shown
16          on the tax collectors' proof of claim which was
17          filed.  And it is a business record exception to
18          hearsay in that it -- the tax collectors have
19          filed affidavits that these are the amounts shown
20          in their records unpaid based on their review of
21          the records and the tax rolls for which they have
22          custody of and are in charge of under Florida
23          law.
24              And so I just wanted to clarify the admission
25          of that exhibit.
```

1           THE COURT:   They're admitted into evidence

2      for this hearing.

3           MR. FITZGERALD:   Yes.

4           THE COURT:   That's not your proof of claim.

5      You need to file an amended proof of claim --

6           MR. FITZGERALD:   Right.

7           THE COURT: -- and you can attach all that to

8      it, and then the debtor has their opportunity to

9      object and deal with that accordingly.

10           But it's admitted for evidentiary purposes

11      for this hearing.

12           MR. FITZGERALD:   All right.

13           MR. BUSEY:   For the reason you stated, to

14      show the amount that's being claimed by the tax

15      collectors.

16           THE COURT:   Correct.

17           Briefly.

18           MR. THAMES:   Thank you, Your Honor.

19           Mr. Busey suggests that the statutory rates

20      of interest have no relevance going forward from

21      confirmation.

22           It is true that he has filed an objection to

23      the claims asserted by the various taxing

24      authorities and is seeking a reduction of the

25      interest rate based on the prepetition claim.

1           But I submit that it's kind of missing the

2      point, Your Honor.  The point is, under this plan,

3      it has to comply -- to be proposed in good faith

4      and in accordance with law.  That's Section

5      1129(a)(3).

6           According to law, they are obligated -- the

7      law, they are obligated to pay statutory interest

8      on delinquent -- on delinquent taxes.

9           And that is the point.  If you go -- the Till

10     analysis is very -- it works when you have the

11     private lender who's bargained for loan covenants,

12     financial reporting, coverage ratios.  It doesn't

13     work when you're dealing with tax collectors.  We

14     have used equipment.

15          And the evidence -- what is the evidence

16     before you? as Mr. Busey says.  The evidence

17     before you is that we have a debtor that, no

18     matter how you look at it, has been performing

19     badly.  I mean, its operating results have not

20     turned the corner yet.  It's not expected to turn

21     the corner for a while.

22          Depreciation -- although there's a lot of

23     talk about GAAP, depreciation is very relevant to

24     the tax collectors because it is real -- it's an

25     accounting adjustment for real life losses in

1       value of the collateral.

2              And what collateral is that?  It's the used

3       equipment.  We don't have cash assets, as I said

4       before.  So it's an interesting -- if you're going

5       to buy in to the Till argument, the tax collectors

6       -- I mean, you've either got the statutory rates

7       or something using the Till factor analysis.

8              But the debtor didn't make justifications for

9       risk.  You've got the secured lender who has all

10      the protections in the world.  That's their

11      interest rate.  They have cash assets, they have

12      more collateral, they have rights of equipment to

13      -- of possession and all those things.  We don't

14      have those rights.

15             We have a debtor entity who has been losing

16      money.  We hope they turn the corner.  You know,

17      we trust they will.  But there's just simply --

18      it's just simply not fair and equitable under

19      Section 1129(b) to treat us over -- to pay us this

20      lower -- try to lower the interest rate, which is

21      not in compliance with law, and pay it over a

22      six-year period.

23             We just don't think the debtor has met their

24      evidentiary burden by simply saying it should be

25      -- it should be at least -- you know, it should be

1       no more than what these guys -- what the secured

2       lenders are getting.

3               That's not evidence of the starting point,

4       which is the threshold for triggering the Till

5       analysis.  They didn't put on any evidence of the

6       base rate, no evidence of prime rate, no evidence

7       of anything.

8               So you're left with an uncertain interest

9       rate proposed by the debtor and a statutory rate

10      proposed by the tax collectors.  And that's the

11      only valid interest rate that's before the Court

12      on the evidence presented.

13              Thank you.

14              THE COURT:  Thank you very much.

15              MR. BUSEY:  Your Honor, may I just briefly.

16              The issue before the Court on 1129 cramdown

17      of Class 10 is, what rate of interest will produce

18      a present value?  That's the issue before the

19      Court on 1129 cramdown.

20              The only evidence before you as to what rate

21      of interest should be used to produce present

22      value under 1129(b)(2)(a)(2) is seven percent.

23              THE COURT:  Thank you very much.

24              The Court will take that under advisement.

25              The next is -- well, while we've got the tax

```
 1        collectors on the carpet, they have a sovereign

 2        immunity objection.

 3              Mr. Hanlon, do you or Mr. FitzGerald want to

 4        be heard briefly on that?  I've already heard this

 5        argument.

 6              MR. BUSEY:  Your Honor, our understanding

 7        from our hearing last week was that you're not

 8        going to hear argument on that issue again.

 9              THE COURT:  I just want him to confirm it for

10        the record.

11              MR. BUSEY:  Okay.

12              THE COURT:  And they're submitting additional

13        -- or I gave them time to submit, I believe.

14              MR. HANLON:  Yes, Your Honor.

15              Your Honor, incident to that time you gave

16        us, we have until Monday.  The debtor then filed

17        another 75-page brief in support of confirmation.

18        Could we have until Wednesday?

19              THE COURT:  Yes, you can have until

20        Wednesday.

21              MR. HANLON:  All right.  I can get something

22        done Monday, but it would be in better format

23        Wednesday.

24              THE COURT:  All right.

25              MR. BUSEY:  I didn't hear the period of time
```

1      he asked for, Your Honor.

2           THE COURT:  Three days, or two more days.

3           MR. BUSEY:  That's just outrageous.

4           (Laughter.)

5           THE COURT:  Certainly.

6           MR. HANLON:  Thank you, Your Honor.

7           THE COURT:  And we don't need to repeat the

8      argument since you're going to submit; is that

9      right?

10          MR. HANLON:  I just bring to the Court's

11     attention, I disagree with the -- with the

12     assertion that the interest issue before the Court

13     is simply a matter of the interest rate.

14          I believe the issue is -- the other elements

15     of 1129 include whether or not the Court is going

16     to follow state law.

17          Now, the plan --

18          THE COURT:  We've already finished that

19     issue.

20          MR. HANLON:  Pardon?

21          THE COURT:  I'm through with that issue.

22          MR. HANLON:  I understand, Judge.  So --

23          THE COURT:  I appreciate it and thank you

24     very much.  And I look forward to your submission.

25          MR. HANLON:  Okay, fine, Judge.

1           Now, with respect to the -- to the sovereign

2       immunity and the additional arguments I have.

3       Just briefly, Your Honor, this is a court of

4       equity.  It's a forum.  The debtor must prove what

5       entitlements they have under state or federal

6       law.

7           So again, without getting into all the

8       arguments again, we rely on state law.  We

9       reiterate state law.  Not only the interest rate

10      but the application and the ability to contest

11      taxes must be done in accordance with state law.

12          The debtor has admitted in their pleadings

13      and submitted with their affidavits that the time

14      limits under Florida law have expired.  They,

15      therefore, are not able to come to this Court as a

16      Court of original jurisdiction to determine

17      property taxes.  To that extent, we believe the

18      plan fails.

19          The Supreme Court has indicated that the

20      Court must not consider aspects in the

21      neighborhood or on the consent of hypothetical

22      jurisdiction.

23          The Court -- as Your Honor is well aware, the

24      first issue the Court must look at, regardless of

25      arguments of counsel or what the plan in fact

1           says, is whether the Court has jurisdiction.

2                With respect to the estate issues relative to

3           state tax law, I believe the Court does not.

4           Notwithstanding the fact the Court has in rim

5           jurisdiction over property of the estate, I don't

6           think that extends the Court's subject matter

7           jurisdiction over property taxes.  And that's the

8           distinction.

9                There's a tendency to say, well, this is a

10          claim, and a claim is a core matter and, therefore

11          -- you must therefore decide the core matter of a

12          claim determination.  But that skips the issue of

13          ultimate subject matter jurisdiction over property

14          taxes when the time has expired under state law.

15               505 of the Code specifically provides for

16          that, that the debtor must first go to state court

17          and request a refund, which it --

18               THE COURT:  Mr. Hanlon, didn't you tell me

19          all this last week or the week before?

20               MR. HANLON:  Yes, Your Honor.

21               THE COURT:  Okay.  Mr. Hanlon, I'm not ruling

22          on your objection.

23               MR. HANLON:  I understand, Your Honor.

24               To the extent the debtor is taking that

25          position, we believe it fails to comply with the

```
 1          1129 provisions of compliance with law.

 2                  THE COURT:  I understand.

 3                  MR. HANLON:  Okay.

 4                  THE COURT:  And you've put that in writing,

 5          and you're going to put it in writing again by

 6          next Wednesday.

 7                  MR. HANLON:  Okay, Judge.

 8                  THE COURT:  That's fine.

 9                  MR. HANLON:  We've said that over and we've

10          got it all in writing in our -- in our objections,

11          Your Honor.  I won't reiterate them for the -- in

12          order for the Court to get through with this

13          hearing today.  And I will then submit the rest by

14          brief.  It is a legal argument, Your Honor.

15                  THE COURT:  Thank you very much.

16                  MR. HANLON:  Thank you very much.

17                  THE COURT:  I guess we ought to just take the

18          landlords.  I think that's going to be the -- I

19          don't care who goes first just as long as we get

20          all of them together so that the debtor can

21          respond to all of the landlords at one time.

22                  MS. SPECIE:  May it please the Court, Your

23          Honor.  Karen Specie on behalf of landlords

24          Westfork Tower, LLC; Concord Fund IV Retail, LP;

25          TA Cresthaven, LLC; Flagler Retail Associates,
```

1       Limited; and Elston/Leetsdale, LLC by and through

2       their property manager Terranova Corporation.

3            Your Honor, as much as I enjoy being here in

4       Jacksonville, I have an uncontested matter at this

5       point, and so I will pronounce what that is, and

6       then I may take my leave and I will leave the

7       floor to others whose matters are more hotly

8       contested.

9            THE COURT:   Thank you.

10           MS. SPECIE:   Your Honor, we filed a limited

11      objection to confirmation.   This deals with a

12      different type of issue on landlords.   And that

13      being the difference between landlords whose

14      leases are being assumed under a Court order, or

15      pursuant to a separate motion -- that includes my

16      clients -- as opposed to landlords or parties to

17      executory contracts that are being assumed under

18      the terms of the actual Chapter 11 plan.

19           The plan has a provision in it, in Section

20      7.4, that states that certain leases and executory

21      contracts are being assumed under the plan.   And

22      then there's another portion of that paragraph

23      that says, "Provided, however, that any executory

24      contracts that are assumed, the debtor can later

25      decide postconfirmation to reject those contracts

1        if it doesn't like the cure amount that the Court

2        says is due."

3              We have -- the debtor has agreed to put

4        clarification language into the plan that makes it

5        clear and states that "Section 7.4 of the plan

6        applies only to assumptions of executory contracts

7        and unexpired leases that will occur pursuant to

8        the provisions of the plan and does not apply to

9        assumptions of executory contracts and unexpired

10       leases that will occur, or have occurred, pursuant

11       to separate motions."

12             With that language in the confirmation order,

13       Your Honor, Terranova will withdraw its objection

14       to confirmation.

15             THE COURT:   Thank you.

16             MS. SPECIE:   Thank you very much.

17             THE COURT:   Mr. Busey, that's your agreement?

18             MR. BUSEY:   Yes, Your Honor.

19             THE COURT:   Very well.   Thank you very much.

20             MS. SPECIE:   Thank you, Your Honor.

21             THE COURT:   It's always a pleasure.

22             MS. DOWD:   Good afternoon, Your Honor.   Mary

23       Dowd on behalf of F.R.O., LLC VII, an objecting

24       landlord.

25             Also, Your Honor, to kind of give some

1      pathway to the Court, with your permission, of how

2      we intend to proceed, there are a number of

3      objecting landlords who have filed objections to

4      confirmation who are present in the courtroom.

5          With your permission, we've agreed that we

6      will divide up our arguments so as not to keep

7      repeating one another and then just adopt one

8      another's arguments.

9          THE COURT:   That sounds good to me.

10         MS. DOWD:   Thank you.

11         There will be three principal arguments that

12     the landlord group is making.   One, that the plan

13     cannot be confirmed because it's fundamentally

14     premised on deemed substantive consolidation.

15         Two, that the compromise consolidation cannot

16     be approved as a matter of law.

17         And, three, that the plan does not comply

18     with 1123(a)(4) because it doesn't treat claims in

19     the same class the same.

20         I'll address the first argument.

21         Winn-Dixie's plan is fundamentally flawed

22     because, at its core, it's premised on a deemed

23     consolidation.

24         Under the Winn-Dixie plan, credit enhancing

25     guaranties of creditors are expunged for purposes

1           of voting and distribution under the plan only,

2           but the Winn-Dixie entities will be maintained and

3           will emerge as reorganized debtors intact, with

4           the same corporate structure and corporate

5           observances that they've had through the case and

6           before the bankruptcy.

7                The 3rd Circuit, in an opinion that's been

8           spoken about quite a bit today, the Owens Corning

9           decision from October 2005, 419 F.3d 195, squarely

10          addressed deemed consolidation in a factual

11          context that was very similar to the Winn-Dixie

12          situation.

13               In Owens Corning, bank lenders made a loan to

14          the Owens Corning parent and the subsidiaries

15          guarantied that loan.

16               The debtor and the official committees in

17          Owens Corning and some ad hoc committees proposed

18          a plan whereby they would expunge the guaranties

19          of the bank.  The bank objected.

20               The district court, sitting as the bankruptcy

21          court in the Owens Corning matter, held extensive

22          evidentiary hearings that lasted over at least 13

23          days of trial time, and the district court allowed

24          and approved the deemed consolidation.

25               The bank appealed to the 3rd Circuit.  The

1       3rd Circuit held, "The most fatal flaw to the plan
2       proposal is that the consolidation sought was
3       deemed, i.e., a pretend consolidation for all but
4       the banks.  If debtor's corporate and financial
5       structure was such a sham before the filing of the
6       motion to consolidate, then how is it that post
7       the plan's effective date this structure stays
8       largely undisturbed, with the debtors reaping all
9       of the liability-limiting, tax and regulatory
10      benefits achieved by forming subsidiaries in the
11      first place?
12          "In effect, the plan proponents seek to
13      remake substantive consolidation not as a remedy
14      but, rather, a stratagem to 'deem' separate
15      resources reallocated and to strip the banks of
16      rights under the Bankruptcy Code, favor other
17      creditors and yet trump possible plan objections
18      by the banks.  Such deemed schemes we deem not
19      Hoyle."
20          The 3rd Circuit went on to say, in commenting
21      on how unusual and extraordinary a remedy
22      substantive consolidation is, that deemed
23      consolidation is not the same thing as substantive
24      consolidation.  And that even when you have a
25      "perfect storm" of factors that would allow a

        1          Court to approve substantive consolidation, you

        2          can't ever do a deemed consolidation.

        3               Finally, the concluding line of the Owens

        4          Corning decision points out emphatically that you

        5          cannot use consolidation of any type.  Substantive

        6          consolidation, the actual consolidation, deemed

        7          consolidation, you cannot use it as a tactic or a

        8          sword; it's supposed to be a shield.

        9               The problem with the Winn-Dixie plan is that

       10          it's doing exactly what the Owens Corning court

       11          disapproved.

       12               There's been evidence and in discussion at

       13          length today that the objecting landlord creditors

       14          have claims, have two claims, a direct claim and a

       15          guaranty claim, and yet the plan is ignoring the

       16          guaranty claim.

       17               We would request that the Court, as it did

       18          earlier today, take judicial notice of the claims

       19          register which will show, in the case of F.R.O.,

       20          LLC VII, that two claims were filed and were

       21          docketed in timely under the claims register, one

       22          against Winn-Dixie Raleigh and one against

       23          Winn-Dixie Stores; and that the other objecting

       24          landlord creditors similarly filed timely proofs

       25          of claims on the register.

1              Secondly, we would ask the Court to take

2       judicial notice of the docket in the case in the

3       motion by Winn-Dixie whereby they sought to

4       disallow duplicate claims of landlords.

5              They filed a motion referred to as the

6       Twentieth Omnibus Objection, and within the last

7       week an order was entered granting that motion and

8       continuing the objection with respect to the

9       objecting landlords and disallowing it with

10      respect to those creditors who didn't respond.

11             There's evidence in the record that shows

12      that Winn-Dixie has acknowledged that the

13      objecting landlords have two claims.

14             In fact, the Winn-Dixie situation is much

15      more egregious than the situation that the Court

16      declined to approve in Owens Corning.

17             In Owens Corning, guaranties were wiped out

18      and unsecured creditors were all treated in a

19      certain way.  In this situation, there's blatant

20      gerrymandering, where different creditors are

21      treated differently, depending on whether or not

22      they had a seat at the table or not.

23             Here, the Court should also note that

24      Winn-Dixie is a bystander.  It has testified that,

25      really, the proposal was made by the committee and

1    the debtor is a neutral party to it.  What's being

2    divided is shares of stock in a reorganized

3    entity.

4        In conclusion, Your Honor, the Owens Corning

5    decision is on point in the sense that the

6    proposal that's before the Court, insofar as it's

7    a deemed consolidation, cannot be approved.

8    There's simply no authority for it.

9        THE COURT:  Thank you very much.

10       MS. DOWD:  Your Honor, Mr. Rosenbaum will

11   make the next argument.  And I would like

12   permission to adopt the arguments of the other

13   landlord objecting creditors.

14       THE COURT:  Very well.

15       MS. DOWD:  Thank you.

16       MR. ROSENBAUM:  Your Honor, did you accept --

17   did you judicially notice that documents that

18   Ms. Dowd requested?

19       THE COURT:  Yes.  If I haven't, I will.

20       MS. DOWD:  Thank you.

21       THE COURT:  It's noticed.

22       MS. DOWD:  Thank you.

23       THE COURT:  Normally, if somebody doesn't

24   prosecute an objection, I deem that it's been

25   abandoned, you know.

```
 1              But in this case, as to the landlords, I

 2     don't need every landlord to come up.  I will deal

 3     with those on their merits based on the arguments

 4     of the spokesman for the landlords.

 5              MS. DOWD:  Thank you, Your Honor.

 6              THE COURT:  Or spokespersons.

 7              MR. ROSENBAUM:  Good afternoon, Your Honor.

 8     Norman Rosenbaum again, with Morrison & Foerster.

 9     And with me today is my co-counsel, Alexandra

10     Steinberg Barrage.  We represent Merrill Lynch

11     Holdings -- Merrill Lynch LP Holdings, Inc.

12              Your Honor, I would like to introduce as

13     exhibits, as one exhibit, 32 separate proofs of

14     claim filed by New Plan Realty Trust, Inc.

15              Each of these claims -- Your Honor, we

16     downloaded each of these claims from the Logan and

17     Co. Web site.  Each claim bears the stamp of Logan

18     on date received.  And each of the claims was

19     filed against, and I quote, Winn-Dixie Stores,

20     Inc., et al.

21              THE COURT:  Any objection?

22              MR. BUSEY:  May I see it, Your Honor?

23              THE COURT:  Certainly.

24              MR. ROSENBAUM:  (Tenders document to Mr.

25     Busey.)
```

1              MR. BUSEY:  Thank you.  (Examining document.)

2              THE COURT:  You may continue while he's

3         looking at that.

4              MR. ROSENBAUM:  Thank you, Your Honor.

5              Your Honor, not to be repetitive, but my

6         client does adopt the arguments that you've heard

7         from Ms. Dowd and will hear from Mr. Kelley.

8              Your Honor, as proposed, this plan cannot be

9         confirmed.  The plan proponents and the debtor,

10        under the guise of a deemed consolidation

11        settlement, cannot deprive landlords who hold

12        valid guaranty claims of their contractual

13        guaranties over their objection.

14             The debtors here really have two options.

15        They can move for a real substantive

16        consolidation, with all the findings of fact and

17        opportunity to object, an extensive hearing much

18        like was discussed today in the Owens Corning

19        case.  If the result of that is approved, every

20        creditor is treated the same.

21             The other option the plan proponents and the

22        debtors have here today is to obtain the consent

23        of all the parties who have objected to their

24        deemed substantive consolidation settlement,

25        obtain their consent and approval to the

1      treatment.

2          In fact, Your Honor, we've reached out to the

3      debtors and the committee to suggest that, and our

4      overtures were not accepted.

5          But, clearly, this plan cannot be confirmed

6      under the guise of a deemed consolidation

7      settlement under Bankruptcy Rule 9019.

8          As you've heard from Ms. Dowd, there is

9      absolutely no authority for such a settlement

10     under a plan.  And it's precisely what the 3rd

11     Circuit, in Owens, says you cannot do.  As

12     Ms. Dowd quoted, "You cannot use deemed

13     substantive consolidation as a sword."

14         In fact, as was pointed out, the situation

15     proposed by the debtors is worse than what you had

16     in Owens.  In Owens, you had the quality of

17     treatment under a deemed substantive

18     consolidation.

19         Here, you have trade creditors receiving a

20     projected distribution of 70.6 percent; the

21     landlords with guaranty claims receiving a

22     distribution of 70.6 percent; landlords without

23     guaranty claims receiving a distribution of 70.6

24     percent; and noteholders with guaranty claims

25     receiving a distribution, a projected

1          distribution, of 95.6 percent.

2              The effect of proposing a deemed substantive

3          consolidation settlement as the basis of their

4          plan of reorganization has the effect of

5          eviscerating other provisions of the Bankruptcy

6          Code, namely, 1122 and 1123(a)(4).  You're going

7          to hear more from Mr. Kelley about 1123(a)(4).

8              What I would like to add is, Your Honor,

9          landlords with guaranty claims never had the

10         opportunity to vote on this plan.  Those claims

11         were provisionally disallowed by the Twentieth

12         Omnibus Objection.  We never had the right to

13         vote.

14             Your Honor, I believe the debtors, in their

15         brief in support of confirmation filed earlier

16         this week and in response to the objections, cite

17         to Worldcom.  It's 2003 Bankruptcy LEXIS 1401.

18             I think that's an instructive case, Your

19         Honor, because, in Worldcom, what you had was a

20         real substantive consolidation.  I think there

21         were nine or ten days of hearings.  The opinion

22         has seven pages of findings of fact on substantive

23         consolidation going through all the standards

24         under the various cases.  You also have the

25         conclusions of law.

1           What you also have in Worldcom is, with

2       respect to one substantive consolidation issue,

3       you have a settlement with a class of creditors.

4       Nowhere in that opinion does it say that any of

5       those classes of creditors objected to the plan.

6       What you had was a consensual resolution of a plan

7       issue with a group of claimants.

8           Your Honor, we can address the fact that the

9       settlement is unfair and the process that went

10      into achieving the settlement, but, frankly, Your

11      Honor, I think that's beside the point.  The fact

12      of the matter is, they can't approve this plan on

13      the basis of the settlement.

14          I would add, though, there's many things that

15      did strike us as particularly unfair about the

16      settlement.

17          First, in the Disclosure Statement and in

18      various pleadings filed, in letters that were

19      submitted to all claimants, there's a

20      representation that New Plan Realty somehow was

21      representative of the interests of the landlords.

22          And from the exhibit we introduced -- sorry.

23      I want to make sure where my exhibit is.

24          MR. BAKER:  We're still reviewing it.

25          MR. BUSEY:  We're not ready yet, Your Honor.

1              THE COURT:  Okay.

2          MR. ROSENBAUM:  Well, the exhibit I have

3     introduced shows that New Plan filed one claim on

4     the basis of their leases.  They did not file an

5     underlying claim on their lease with their lessee

6     and a separate guaranty claim, so how they were

7     representative of landlord interests with

8     guaranties escapes me.

9          Similarly, Deutsche Bank, while they may have

10    filed guaranty claims, it seems to me to be in a

11    separate class.  They've had leases that were

12    assumed, they had leases that weren't covered by

13    guaranty claims.

14         And the latest on Deutsche Bank is the

15    debtors have achieved a settlement with them of a

16    claim for $52 million.

17         I would ask the Court to take judicial notice

18    of the motion and stipulation that have been filed

19    with the Court.

20         Neither in the motion nor the stipulation is

21    there any basis for explaining the settlement.  It

22    is that Deutsche Bank asserted that these are

23    their claims, and the debtors are allowing those

24    claims.

25         Your Honor, what we -- in addressing the

1        settlement a little further -- and I'll be brief

2        -- what I thought we heard in testimony this

3        morning from the debtors' financial advisor,

4        Blackstone, is that part of the basis for treating

5        landlords with guaranty claims and trade vendors

6        the same is because -- and I'm quoting -- "The

7        trade vendors hold vague claims."  And they have

8        alleged, merely alleged, that they have multiple

9        claims.

10        But the uncontroverted evidence you've heard

11        today, and there appears to be no dispute, the

12        landlords objecting today have valid guaranty

13        claims.  That's without dispute.  So I don't

14        really see that as an explanation for treating

15        landlords with guaranty claims and trade vendors

16        the same.

17        Your Honor, in conclusion, our modus here

18        today are to have a fair treatment under a plan

19        that's confirmable, and I think you're going to

20        hear from Mr. Kelley that there's a way to do

21        this.

22        We don't have to, for lack of a better word,

23        destroy this plan today.  There's a resolution

24        that could be achieved, and I think Your Honor can

25        approve that.

1                Thank you very much.

2                THE COURT:  The exhibit, is this just being

3        filed to show that you filed multiple claims?

4        You're not agreeing to the amounts?  I mean, the

5        debtor is not bound by those amounts, they're

6        bound by the proof of claim actually on record

7        that they could or could not object to?

8                MR. ROSENBAUM:  Yes.  That's correct, Your

9        Honor.

10               THE COURT:  With that understanding, any

11       objection?

12               MR. BUSEY:  Beg your pardon?

13               THE COURT:  With that understanding, is there

14       an objection to those being admitted into

15       evidence?

16               MR. BUSEY:  May I have just a moment, Your

17       Honor?

18               THE COURT:  Certainly.

19               (Mr. Busey conferring with counsel.)

20               MR. BUSEY:  Your Honor, so that we can be

21       clear, the document that is offered is not Merrill

22       Lynch's claims, they're the claims of New Plan,

23       which was a member of the committee.  And it was

24       represented, when they were offering it into

25       evidence, that this was all of their claims, and

1         we're looking at that now and checking to see if

2         this is true.

3              THE COURT:  I understand.

4              MR. ROSENBAUM:  That's correct, Your Honor.

5              MR. BUSEY:  And we haven't finished that

6         examination.

7              THE COURT:  All right.  I'll keep that under

8         advisement until they make their decision.  You

9         get to come back up one more time, Mr. Rosenbaum.

10             MR. ROSENBAUM:  Thank you, Your Honor.

11             THE COURT:  And Mr. Kelley.

12             MR. KELLEY:  Good afternoon, Your Honor.  I

13        represent various, what I would call, Eden & Avant

14        entities.  I won't name them all.  In addition to

15        that, I represent Villa Rica -- there's about

16        eight of those -- Villa Rica Properties, LLC; West

17        Ridge, LLC; and Bank of America, as trustee for

18        Betty Holland.

19             As the case with the other landlords, all of

20        my clients filed two claims on each lease, one

21        against the lessee, one against the guarantors.

22             As with my co-counsel, I adopt the arguments

23        of the other landlord lawyers.  But I'm here today

24        to address a specific deficiency with the plan.

25             As the Court knows, one of the things the

1        Court must do in order to confirm a plan is enter

2        a finding that the plan complies with the law,

3        with the Bankruptcy Code in particular.

4               In fact, the order that's been tendered to

5        Your Honor, the proposed confirmation order, has a

6        specific finding that the plan complies with

7        Section 1123(a)(4).

8               And based on the evidence before the Court

9        today, it absolutely does not.  And unless that

10       problem can be rectified, the plan can't be

11       confirmed.  Fortunately, it probably can be

12       rectified.

13              Here's what 1123(a)(4) says, "Notwithstanding

14       any otherwise applicable nonbankruptcy law, a plan

15       shall provide the same treatment for each claim or

16       interest in a particular class unless the holder

17       of a particular claim or interest agrees to less

18       favorable treatment of such particular claim or

19       interest."

20              The evidence you've heard today was that, in

21       the landlord class, several landlords, not all of

22       them but several landlords, have two claims.  They

23       have one claim based on the lease rejection and

24       they have one claim based on the guaranty of the

25       lease, which is also a lease rejection claim.

1           One claim in the landlord class will be paid

2      46.26 shares per thousand.  The plan provides that

3      the other claim in the same class will be

4      expunged.  The witness admitted that that's

5      different treatment.

6           I asked the witness:  Did my clients consent

7      to that?

8           He said:  Everybody that voted for the plan

9      consented.

10          So what about those of us that didn't vote

11     for the plan, that objected to the plan, and

12     objected to having their claims expunged?

13          He said:  Well, they probably didn't

14     consent.

15          That proves that they haven't complied with

16     that code section, because they didn't give the

17     same treatment to every claim.

18          Now, I want to point out that the code

19     section talks in terms of claims, not creditors.

20     It's not that every landlord in the class got

21     treated the same.  Every claim has to be treated

22     the same.

23          In fact, the legislative history -- and I

24     cite House Report Number 95-595, 95th Congress,

25     First Section, page 406, this is 1977, "Paragraph

1       4 applies to claims, not creditors."

2           Collier says, "Section 1123(a)(4) restates a

3       cardinal principle of bankruptcy law, namely that

4       creditors of the same class have a right to

5       equality of treatment, thus, a plan cannot

6       discriminate against substantially similar claims

7       unless, one, the holder of the claim agrees to

8       less favorable treatment, or, two, the claim is

9       part of a separate class."

10          Now, as Your Honor knows, debtors write plans

11      and creditors committees talk to them.  We have

12      had nothing to do with the drafting of this plan.

13          And the way that they drafted it -- and I'm

14      sure with the amount of lawyering that went into

15      that plan, there's a detailed reason for

16      everything -- they put these claims in the same

17      class.  And having undertaken that decision,

18      having put those claims in the landlord class,

19      they must, as a matter of law, treat them the same

20      unless the landlords consent to inferior

21      treatment.

22          Now, some landlords, arguably, did consent.

23      There are a whole group of landlords that either

24      voted for the plan, they didn't object to the

25      plan, they didn't file a response when there was a

1  motion to eliminate their claim.  That's the vast

2  majority of the landlords that have probably

3  consented one way or the other.

4   But the group that sits out here today did

5  not.  They have done everything they could legally

6  do to voice their opposition to having their

7  guaranty claims expunged, to oppose it and to

8  object to it.

9   And I would submit that there's absolutely no

10  evidence on the record of consent, yet there seems

11  to be an argument for consent.  I think what they

12  argued this morning was that, well, there was

13  consent because your class voted for it.  It's an

14  overwhelming vote of the class, so you consented.

15   Well, that makes no sense.  First of all, the

16  statute says the consent must come from the holder

17  of the particular claim.  There's no vicarious

18  consent.  You can't vote this in.

19   In fact, why would this code section even be

20  in the code?  Why would it say the plan shall have

21  this if you could not include it if people voted

22  for it?  I mean, the requirements of 1129(a)(1),

23  which is that the plan complies with the code,

24  sets certain provisions which you just have to

25  comply with.

1        You can't put people in a class and not let
2   them vote and then vote their claims away and say,
3   well, you know, we all voted for it.  Which is
4   exactly what they've done here.  Because as Your
5   Honor recalls, we even objected to not being able
6   to vote.  But we were allowed to vote.

7        And the claims that are being expunged in
8   this class were not given the right to vote, which
9   is another way that they were not -- did not
10  receive equality of treatment.

11       The debtor argues that somehow that the
12  members of the committee had similar interests
13  and, because they entered into the settlement,
14  that we're somehow bound by it.

15       Well, I'm offended by that.  They didn't call
16  my clients.  My clients never agreed to it.  We
17  didn't agree to have a secret agent go to meetings
18  we knew nothing about and reach an agreement that
19  was against our interests.

20       As these documents will point out, when you
21  see them, the landlords on the committee had the
22  opposite interest of my client.  My client and
23  these landlords filed two claims, one on the lease
24  and one on the guaranty.  In order to get our
25  payment in Class 13, he had to lose a claim.

1        New Plan, the landlord on the committee, had

2    one claim.  They didn't even file duplicate

3    claims.  In fact, if you look at the debtors'

4    motion to expunge duplicate claims, they're not on

5    it.  If you look at the order, they're not on it.

6    Because they don't have a duplicate claim.  In

7    fact, because they had no duplicate claim, they

8    actually helped themselves in this settlement.

9        As the Court asked the question this morning,

10   which I think was perceptive, you said, well, the

11   landlords that didn't have guaranties, are they

12   down there in the other unsecured class that got

13   50-something percent?

14       Well, no, they're not.  They got all elevated

15   to the landlord class because some of us had

16   guaranties.  And New Plan was on the committee

17   that negotiated this.  They negotiated themselves

18   up to be treated as if they had a guaranty when

19   they didn't have one.

20       And it's offensive to me that the committee

21   would enter into a settlement and say I'm bound by

22   it when they're serving their own interests and

23   they're sacrificing my clients' interests.

24       These guarantied landlords were not asked to

25   come, they did not participate, they didn't

1    consent, and they object.

2         And the other reason that they can't consent

3    on our behalf is the code section itself.

4    1123(a)(4) says the only person that can consent

5    is the holder of the claim.

6         So this plan and the language that they put

7    in the confirmation order tendered to your Court

8    cannot be confirmed because they can't have a

9    settlement that does that.

10        They can say, well, you know, the settlement

11   is good for the estate, so we should confirm it

12   even over these objections.  Even if it violates

13   1123(a)(4), it's just so good for everybody else

14   that, you know, we ought to confirm it anyway.

15        There's a very interesting case that we cited

16   in our materials.  It's In Re -- it's U.S. ex rel.

17   Rahman versus Oncology Associates.  And in that

18   case, there was a bankruptcy case where there was

19   an insurance policy that insured officers and

20   directors.

21        And there was a dispute.  The insurance

22   company claimed, you know, we don't think that

23   policy is applicable.  Something is wrong with

24   it.  We want it thrown out.

25        And so they reached an agreement with the

1       debtor that they would pay a bunch of money to the

2       debtor and the debtor would agree that the

3       insurance policy was void ab initio.

4           Now, of course, the insureds, the officers

5       and directors, weren't too happy about that, and

6       they objected.  And they said:  Wait a minute.

7       You can't settle the claim, because you're wiping

8       out our interest and we're not part of the

9       settlement.  And the bankruptcy court refused to

10      confirm the settlement, even though it was good

11      for the estate.

12          And this is a quote that I like.  "The trustee

13      was not entitled to bargain away those rights of

14      third parties in return for a payment to the

15      estate from the insurance.  The third parties were

16      not compensated in any way for the extinguishment

17      of their rights which are the result from court

18      approval of the settlement."

19          My client is in exactly the same situation

20      today.  The ad hoc committee wants more money.

21      The noteholders want to give up nothing.  They

22      only get 95.6 percent plus $1.4 million, so I'm

23      not sure how much they gave up in this.

24          And, lo and behold, the only person that

25      wasn't at the -- at these negotiations lost all

1          their guaranties.  The noteholders technically

2          lost their guaranties, but they got paid so much

3          money.  They got paid 25 percent more than we did

4          in an alleged consolidation of the plan.

5                  Everybody got what they wanted, and they

6          basically got it at our expense.  And that is not

7          fair.  And the Court should not confirm a plan

8          that has that language in it.

9                  There is another case very similar to this,

10         AOV Industries.  It's a D. C. Circuit case, 792

11         F.2d 1140.  In that case, some creditors were

12         required -- all the unsecured creditors got paid,

13         but some creditors were required to give up their

14         guaranties.  The plan was affirmed.  It was

15         appealed.  It was District Court affirmed.

16                 And it went to the D.C. Circuit, and they

17         said:  You know, we're going to confirm the plan,

18         but we're reversing this thing about equal

19         treatment.  That's not equal treatment.  We're

20         going to send it back down for a remedy that's

21         appropriate.

22                 And that's really what my clients want

23         today.  Everything about this plan could be

24         confirmed if they would just comply with this code

25         section.  And this is what they have to do.

1            As to the objecting landlords, who I -- we

2    had dinner last night, and we figured we had about

3    $25 million in claims.  If our claims were allowed

4    and treated like -- given equal treatment, first

5    of all, they would be reduced by the 70.6 percent

6    that we receive on the main claim, because the

7    guaranty claim is only for the amount that's left

8    over after the creditor, the main creditor, pays.

9            So their claims would be 29.4 percent of the

10   original claim because of the payment to the main

11   creditor.

12           Well, if you take 29.4 percent of the 46.26

13   shares that they're passing out, if they gave 13.6

14   shares to these guarantied landlords on their

15   guaranties, they would solve the problem.  And I

16   can do the math if I can submit it to the Court in

17   writing.  That would be a dilution of the other

18   creditors' interest of less than one percent.

19           It has no effect on the debtor.  The debtor

20   doesn't care.  The debtor is issuing stock that's

21   all of the equity in its company.  They've said

22   today, this is strictly a dispute on how they're

23   going to divide up that stock.

24           The only people that could be harmed by

25   giving the landlords their statutory right to

1      equal treatment would be the other creditors who

2      would have to be diluted.

3           But I would ask the Court to consider whether

4      that's fair.  And, of course, it's not unfair.

5      It's not unfair for other people to get what

6      they're entitled to and then for my clients and

7      the objecting landlords to receive equality of

8      treatment that they're absolutely guaranteed under

9      the law.

10          And we would ask that the Court condition

11     confirmation upon a requirement that, as to this

12     group that's here today, their guaranty claims are

13     given equality of treatment.

14          Thank you.

15          THE COURT:  As to the exhibit, Mr. Busey?

16          MR. BUSEY:  Your Honor, these are claims that

17     were filed in the case by New Plan Excel Realty

18     Trust.  They're represented to be all of the

19     claims that were filed.  Actually, it's 28 or 29.

20          We have no objection for these being filed

21     into evidence as proofs of -- as 28 proofs of

22     claim of New Plan Realty.

23          THE COURT:  They're admitted as Landlords' 1,

24     or however you've marked it.  How did you mark it,

25     Mr. Rosenbaum?

1         MR. ROSENBAUM:  Landlords' Exhibit A.

2         THE COURT:  Sounds good.  It's as long as we

3    don't have any other Landlords' Exhibit A.

4         Mr. Reddick, we don't, do we?

5         COURTROOM ADMINISTRATOR:  No, sir.

6         THE COURT:  Good.

7         (Whereupon, the document last-above referred

8    to was received in evidence as Landlords' Exhibit

9    A.)

10        MR. ROSENBAUM:  Your Honor, I do believe the

11   count was 32, but --

12        THE COURT:  That's fine.  I get the message.

13        Yes, sir.

14        MR. PROCIDA:  Good afternoon, Your Honor.

15   I'm Brent Procida from Venable.

16        I'm here on behalf of a variety of landlord

17   and landlord-related clients, CW Capital Asset

18   Management, ORIX Capital Markets and Allied

19   Capital Corp.

20        I just have one housekeeping matter.  As to

21   CW Capital and ORIX, we have filed objections on

22   two basic premises.  One is -- the first premise

23   is consistent with everything you've heard from

24   the other landlords today.

25        The second premise has to do with the

1       provisions regarding the assumption of leases

2       provided for in this plan.

3           The third client I'm here on behalf of,

4       Allied Capital Corp., their objection was

5       exclusively on that second point, concerning the

6       assumption of leases.

7           Based on language that the debtor has

8       included in the order of confirmation that has

9       been brought to the Court today, we are

10      withdrawing the objection in its entirety on

11      behalf of Allied Capital Corp. and withdrawing the

12      portion of the objections filed on behalf of CW

13      Capital and ORIX that relate to the assumption of

14      the leases.  So those have been taken care of.

15          I have one short point to add to what my

16      landlord comrades have said, and that is, I would

17      just like to bring to the Court's attention that

18      it seems that one of the rationales we've heard

19      here today for treating the noteholder claims more

20      favorably than the landlord claims is that, well,

21      in a deconsolidated environment, those noteholders

22      would collect more because they have guaranties

23      against all of the subsidiaries.

24          And I don't know what evidence the Court has

25      before it to substantiate that other than the

1      liquidation analysis that the debtor has provided,

2      I think, as Exhibit 6 today.

3           And if you'll look at the liquidation

4      analysis, at least in terms of the noteholders'

5      recovery relative to the recovery of the other

6      classes, that's borne out.  So if that's their

7      logic, I don't know that I agree with it or take a

8      position on it.

9           But if that is it, at least vis-a-vis the

10     landlords, that is an argument to be made.

11     However, if that's the argument they're making, it

12     cannot support paying the landlords the same

13     amount as the vendors, because the very same

14     liquidation analysis shows that, in a

15     deconsolidated environment, the landlords would be

16     recovering more than the vendors.

17          And as a result, it's -- Your Honor, the plan

18     tries to have it both ways here.  If we're going

19     to look at the value of these claims in a

20     deconsolidated environment and adjust the

21     recoveries based on those relative values, you

22     know, that's one way to look at it.

23          But we can't have it that way and justify a

24     lower recovery for the landlords vis-a-vis the

25     noteholders based on that argument and not have

1           the landlords recover more than the vendors.

2                 That's all I have to add, Your Honor.

3                 THE COURT:   Thank you.

4                 MR. BOLTON:   Good afternoon, Your Honor.

5           Johnathan Bolton, Fulbright & Jaworski, on behalf

6           of Saran, Limited.

7                 Your Honor, I would just add a few points.   I

8           would ask the Court to focus on the evidence that

9           was presented to you today.   We don't believe the

10          debtors have met their burden to prove substantive

11          -- a deemed substantive consolidation is proper.

12                Specifically, Judge, there's no evidence in

13          the record that the proposed substantive

14          consolidation is fair and equitable, and there's

15          no evidence in the record that the proposed

16          settlement is in the best interests of creditors.

17                Your Honor, we, the landlord class, do want

18          Winn-Dixie to emerge from bankruptcy successfully,

19          we just simply want -- because we're going to be

20          the owners of this new company, we're going to be

21          part of the owners of the company.   We simply want

22          full recovery of our guaranty claims, Your Honor.

23                And I join in the objections argued by the

24          other landlords.

25                Thank you, Your Honor.

1          THE COURT:  Do you join in Mr. Kelley's

2    nuance of what he thinks will make this fair?

3          MR. BOLTON:  I join in all of that, Your

4    Honor.

5          Thank you.

6          MS. LORBER:  Good afternoon, Your Honor.

7    Sarah Lorber again on behalf of the Daniel Kamin

8    entities.

9          I know that you do not want a lot of people

10   joining in, but we just felt that it would be

11   better if we put on the record -- there are not

12   too many additional landlords who we represent --

13   that we are joining in and adopting the arguments

14   made by the previous counsel for the landlords.

15         THE COURT:  Thank you very much.

16         MS. KETCHUM:  Good afternoon, Your Honor.

17   Elena Paris Ketchum, from Stichter, Riedel, Blaine

18   & Prosser, in Tampa, Florida.  We represent

19   Liquidity Solutions.

20         We adopt the arguments made by counsel.

21         THE COURT:  Thank you.

22         MS. KETCHUM:  Thank you, Your Honor.

23         MR. FRISCH:  Good afternoon, Your Honor.

24   Adam Frisch on behalf of Knightsdale Crossing,

25   LLC.

1           And as previous counsel spoke, we join in the

2      objection with the previous landlords.

3           THE COURT:   Thank you very much.

4           Response.

5           MR. BUSEY:   Your Honor, I think the starting

6      point for response is that you have to back off

7      and get the big picture of what is being proposed

8      here.

9           The debtors have proposed in their plan, in

10     the context of exclusivity, a compromise, a 9019

11     compromise, of a dispute regarding the issue of

12     substantive consolidation.

13          The debtors are not proposing to

14     substantively consolidate the cases, we're not

15     proposing separate plans.   We're proposing to

16     treat all the creditors of these 24 estates in a

17     single plan, with varying payouts, and in

18     accordance with the compromise of the issue of

19     substantive consolidation.

20          As you have heard testimony and argument

21     today, the Owens Corning case is really a good

22     example of what this estate is facing.   We have

23     the choice of coming to the Court and asking to

24     substantively consolidate the case, as did the

25     debtor in Owens Corning.

1           And there would be people who would be in

2      favor of that and supportive of it, like the

3      vendors, and there would be people who would be

4      opposed to it, like the bondholders and probably

5      the landlords.  And, therefore, because of the

6      absence of agreement, that dispute would have to

7      be litigated.

8           That would require a trial of several weeks

9      long before Your Honor, adjudicating -- trying to

10      adjudicate who had what claims against which

11      entities, how to deal with the intercompany

12      accounts, which assets were which, and a variety

13      of issues throughout the whole thing.

14           If you are a landlord, you're a landlord of

15      what entity?  If you had a guaranty, you had a

16      guaranty at what entity?  What are the assets of

17      those separate entities?  And there are different

18      tenants and landlords and there are different

19      guarantors, and you would have to sort through all

20      that and decide whether or not you're going to

21      substantively consolidate this thing or not.

22           And you heard what happened in Owens

23      Corning.  That was on a motion.  And the District

24      Court, who had withdrawn the reference, had the

25      trial for two weeks and took it under advisement

1         for a year -- and you can imagine the dilemma Your

2         Honor would have in trying to sort through those

3         issues and come to a decision -- and granted the

4         motion, granted the motion to substantively

5         consolidate the case.  And then that went up to

6         the 3rd Circuit.

7              And then after another year, as the matter

8         was briefed and pending before the 3rd Circuit,

9         the 3rd Circuit said:  No, you're really

10        disadvantaging the bondholders who had guaranties

11        at different entities who were entitled to recover

12        more than anybody else.  That's prejudicial to

13        them, it's not fair and equitable to them, and

14        sent it back down.

15             But that doesn't reliably predict what would

16        happen in this case in litigation.  Because as you

17        heard from Mr. Huffard, in Owens Corning, their

18        subsidiaries there were independently viable.

19        They were separate businesses, and stand-alone

20        plans were conceivable in that case.

21             But the evidence you've heard is that

22        stand-alone plans would not be feasible in this

23        case, because these entities do not stand alone.

24        They don't have headquarters functions, they don't

25        have finance functions, they don't have accounting

1       functions, they don't have human resources

2       functions, they don't exist independently and

3       they're dependent upon each other.

4           And in the absence of an agreement among the

5       constituencies of the estate, separate plans for

6       the 24 affiliates would necessarily mean

7       liquidation and recoveries in one-digit

8       percentages.  So that's the dilemma facing the

9       estate.

10          And as the debtors looked at this, what, do

11      we move forward with substantive consolidation and

12      litigate this for three years and embroil these

13      estates in litigation?

14          And the business, the business we're trying

15      to rehabilitate, and to have it embroiled and have

16      its management's attention directed to litigation

17      and have the entire public wonder whether or not

18      it was going to be viable or not just didn't make

19      sense.

20          And the Owens Corning case was in the 3rd

21      Circuit.  It disagreed in approach with the East

22      Group case, which was a binding 11th Circuit

23      authority here which has a much more liberal

24      attitude about substantive consolidation.

25          And so as we as professional advisers to this

1          estate looked to the precedent facing us in terms

2          of the outcome of substantive consolidation

3          litigation, what do we see?  We see that it's

4          simply not predictable.

5              So not only do you have the delay of

6          litigation, three years, as evidenced by Owens

7          Corning, the extraordinary expense of litigation,

8          the millions of dollars a month in professional

9          fees to this estate for three years, you don't

10         even know how it's going to come out because it's

11         just simply determined on the basis of the

12         uncertainty of the facts and the uncertainty of

13         the law.

14             So what does this estate do when it's faced

15         with that dilemma?  Compromise, it calls out for

16         compromise, it cries out for compromise.

17             So we went to the creditors committee, the

18         official committee appointed by the U.S. Trustee

19         and this Court to represent as a fiduciary the

20         interests of all the creditors in this case, and

21         said:  What do we do?

22             And they raised their hand, as Mr. Huffard

23         testified, and said:  Let's take a crack at trying

24         to hammer out a compromise.

25             And it took months, it took months, of

1        shuttle diplomacy among all these creditor
2        constituencies and the ad hoc groups that
3        appeared, including the two landlord members on
4        the committee.
5             And contrary to the representations to you,
6        those landlords on the committee have leases and
7        they have guaranties.  They have both leases with
8        guaranties and leases without guaranties.
9             New Plan, the proofs that are in evidence
10       now, claims if you look at the proof of claim,
11       it's against Winn-Dixie, et al.  It's a claim
12       against 24 estates.
13            And if we didn't do a compromise, as we
14       brought to the Court, it would be up to the
15       debtors to sort through each of those claims
16       against the 24 estates and try to figure out where
17       the lease claims should be and where the guaranty
18       claims should be.
19            But, thankfully, we're not going to have to
20       go through that with that one landlord with its 32
21       claims against 24 debtors because we have the
22       benefit of this compromise.
23            And the debtor can bring to the Court -- and
24       there's lots of precedence for bringing it to the
25       Court -- a compromise of disputed and contested

1       issues in the form of a Rule 9019 compromise in

2       the form of a plan of reorganization.

3              And the one interesting thing that you should

4       note about the Owens Corning case is that it

5       wasn't a plan compromise, it was a motion.  There

6       was no plan before the Court, nothing confirmed.

7       There was no compromise.  It was a motion by the

8       debtor to substantively consolidate an objection

9       by the bank and it was litigated.

10             We don't have that.  We have a compromise.

11      We have a compromise that's proposed pursuant to

12      the mechanisms of the Bankruptcy Code, put out for

13      a ballot to the creditors and voted on

14      overwhelmingly by the creditors of this case to

15      support the compromise, voted upon in each of the

16      five classes of unsecured creditors that are

17      proposed as part of the compromise.

18             Now, let's look at those classes, because the

19      real issue before you, argued by these objectors,

20      is that the classification is inappropriate.  You

21      should deny this claim only because the

22      classification of Class 13, the landlords, is

23      inappropriate under 1122.  That's the objection

24      you've heard.

25             And so let's focus on that objection for a

1       minute.  Because should you torpedo this entire

2       compromise, this entire effort of all these cases

3       -- and 80 percent of the land- -- 80 percent of

4       the landlords voted in favor of this compromise --

5       because of these few objectors, these 25 million

6       out of 285 million rejection damages claims for

7       landlords.  They are less than 10 percent of the

8       landlord rejection damages claims in the case.

9           So 10 percent are objections, 80 percent

10      voted in favor of it.  And it's a classification

11      issue.  And they said:  Why?

12          Well, you've got landlords with and without

13      guaranties in Class 13, and they're not similar,

14      and, therefore, you should sustain the objection

15      and deny confirmation.  That's what the objection

16      is.

17          Is that what this Court should do?  No.

18      Why?  Let's look at the law of 1122.  And what

19      does it say about what you can and can't do?  It

20      says that you have to put substantially similar

21      claims in the same class.  That's what it is,

22      substantially similar.

23          And if you look at the case law to determine

24      what substantially similar means in the context of

25      1122, it's all over the map.

1        Typically, what do you do in a Chapter 11

2    case with unsecured creditors?  You put them in a

3    single class.  Whether they're slip-and-falls or

4    whether they're noteholders or whether they're

5    landlords or vendors or whatever, you put the

6    unsecured creditors in a class because they're

7    similar.  Why are they similar?  Because they're

8    unsecured creditors.  That's what you typically

9    do.

10       And then you get in the cases where they have

11   divided unsecured creditors in more than one class

12   and then you get case law on:  Can you do that?

13   Are they similar or are they dissimilar?

14       In the Dow Corning case, not the Owens

15   Corning case but the Dow Corning case, which is

16   cited in our brief, which is a 6th Circuit

17   decision, they had to -- they had litigation

18   claimants making tort claims against the debtor.

19       They divided the class up, their unsecured

20   claimant class up, into domestic and foreign

21   claims.  And, actually, there was more than one

22   subset of foreign claims.  It was as to whether or

23   not you're from Canada or Europe or East Europe or

24   the United States.  And they give them different

25   levels of payout, the tort claimants.

1           Why?   Because they said tort claimants in the
2     United States get higher verdicts, so they should
3     get more.   And they got a higher payout.

4           And each of the other types of where they're
5     coming from geographically, depending on what the
6     litigation results typically are in those
7     jurisdictions, got lesser payouts.

8           And so there was a substantial justification
9     for the way it sort of sorted out in the classes
10    that they negotiated and compromised in Dow
11    Corning.

12          And the Court approved that over a
13    classification objection, even though they were
14    both similar in many respects because they were
15    tort claims and they were dissimilar because they
16    covered different geographic areas and they had
17    likely different litigation results.

18          And that's a good precedent for the guidance
19    of you here.   We could have put these unsecured
20    claims in 16,000 different subclasses if you
21    wanted to have each one be exactly like itself.

22          And so the question is:   What is the rule of
23    reason here?   What is a reasonable way these can
24    naturally sort out?

25          And what the unsecured creditors committee

1           brought to us was:  Basically what we've got is

2           five groups here based upon the fact that they've

3           got some leverage in the litigation, and they

4           negotiated.

5                The payout wasn't a measurement of precisely

6           how that leverage was, because there's no way to

7           empirically measure that, it was simply a

8           negotiation of a compromise.

9                And everybody ultimately -- the

10          constituencies who were participating in those

11          negotiations agreed to it, and that constituency

12          included landlords with guaranties and without

13          guaranties.  And what they agreed to was a plan

14          that simply had a landlord class.

15               And the people in the landlord class were

16          similar.  Why?  Because they're unsecured

17          creditors.  Why?  Because they're landlords.

18               They may be landlords at Montgomery, they may

19          be landlords at Raleigh, they may be landlords at

20          Winn-Dixie Stores, they may have guaranties at

21          Winn-Dixie Stores, they may have guaranties

22          someplace else.  They're different in a lot of

23          respects.  But they're landlords, and they

24          negotiated together as landlords.

25               And so that's how, rather than 16,000