1        different classes or 25 different classes or 24,

2        the number of debtors, it was simply negotiated,

3        negotiated, at five different classes, with a

4        number payout that was negotiated, not formula

5        driven.  It was negotiated as a compromise.

6        That's what this is about.

7            And the question for the Court is whether or

8        not you should approve this compromise under the

9        governing standards of the 11th Circuit, Justice

10       Oaks, as to whether or not this is reasonable and

11       whether it's in the range of reasonable likely

12       outcomes of litigation.  And as you've seen, it

13       is.

14           If you substantively consolidate this case,

15       we're going to have years of litigation, uncertain

16       result and extraordinary expense.  And we don't

17       have any idea what the outcome's going to be.  We

18       can't tell you what the payout is going to be.  We

19       can't tell you this company is going to survive

20       three years of litigation.

21           And if you do not deconsolidate it, it is

22       necessarily liquidation, because they're not

23       stand-alone.  And so in between there, you've got

24       a negotiated resolution, which is what the facts

25       of this case and the uncertainty of the law drive

1       reasonable people to do, to compromise.

2             And once 80 percent of the landlords in this

3       case -- more than that if you average all the vote

4       together -- almost 90 percent of the creditors in

5       this case vote in favor of this plan, we come to

6       Court and we're going to confirm it.

7             Are we going to have some ankle biters?  Are

8       we going to have some people looking for leverage,

9       give me a few more pennies?  Sure.  That's how

10      this game works.

11            But if we're going to guide ourselves by the

12      law, can we bring it together, can we get all the

13      constituencies in this case, almost a billion

14      dollars in claims and get them to work together in

15      remarkable efficiency in less than two years and

16      come to a compromise on one of the most difficult

17      issues in all of bankruptcydom and bring it to

18      your Court and say:  We want to compromise this,

19      and what we have proposed to you is reasonable.

20            And the only case law you'll find really

21      challenging classification under 1122, it's if

22      you're doing it for an ulterior purpose or for

23      manipulation for voting purposes.

24            And you'll see that we're not doing that

25      here.  This was a natural fallout of a natural

1          constituency that is faced with the difficult

2          issue of how to preserve value for everybody's

3          benefit.

4          I heard the landlords say:  Well, we didn't

5          have a right to vote because our plan was objected

6          to.  Your Honor knows that, in the voting

7          solicitation order, you specifically provided that

8          anybody whose claim is objected to may file a 3018

9          motion.  And that landlord didn't file a 3018

10         motion.  Everybody had the right to be heard.

11         We suggest, Your Honor, that the plan

12         classification issue is reasonable, it's brought

13         to you on a basis of reason, not manipulation.  It

14         was done by negotiation by the creditor

15         constituency themselves.

16         You should find the classification is

17         substantially similar based on the guiding

18         jurisprudence under 1122.  And if you make that

19         finding, you should find that this compromise is

20         fair and it makes sense, and particularly since it

21         has now been blessed by an affirmative vote of the

22         creditor constituency, even the landlord

23         constituency itself, at 77 percent in number and

24         82 percent in dollar value, which is a fact that

25         simply wasn't true in Owens Corning.  They did not

1    have a favorable vote on a plan proposing a

2    compromise, so it is entirely different in that

3    respect.

4         Because this is a deal bargained for by the

5    constituencies of this estate, done so in good

6    faith, driven by economic realities and the

7    necessity of compromise, you should overrule these

8    objections and confirm the plan.

9         THE COURT:  Thank you.

10        MR. DREBSKY:  Good afternoon, Your Honor.

11   I'm Dennis Drebsky, and I represent Deutsche Bank

12   Americas, a pass-through trustee for

13   two-hundred-and-some-odd million dollars worth of

14   leases that would have rejection claims of almost

15   $52 million.

16        And we were members of the creditors

17   committee and took place in the negotiations.  We

18   had both claims against the debtor directly and

19   against the various entities and we had guaranty

20   claims.

21        I want to say, as pass-through trustee, we

22   had the responsibility to all of the -- our

23   underlying holders to maximize their recoveries.

24   As members of the creditors committee, we had

25   fiduciary duties to maximize the recoveries of

1        creditors.

2            We entered into negotiations with the other

3        constituent parties, both as members of the

4        creditors committee and as representatives of the

5        landlords, along with New Plan.  And I can tell

6        you, those were long, hard, difficult

7        negotiations.  When we started those negotiations,

8        I had a lot more hair and it was a lot blacker,

9        believe me.

10           We had our own experts.  We retained experts

11       that looked at the underlying data and that tested

12       the various assumptions by Blackstone, by

13       Houlihan, by XRoads.  I didn't agree with them.

14           We negotiated very hard in lots of rooms.

15       And these were not secret negotiations going on.

16       It took over several months, several weeks,

17       several hours until this was hammered out.

18           Were we happy with the compromise?  No.  We

19       were as unhappy as the other constituencies were

20       with the compromise.  But we recognized, as Mr.

21       Busey said, that, in the absence of compromise, we

22       were facing a disaster.  We were facing possibly a

23       liquidation of this company.

24           Companies like this, in difficult economic

25       environments, with very viable competitions,

1    shouldn't be staying in bankruptcy any longer than

2    they have to.

3    And so it was with a reluctance to give up

4    our negotiating positions, to give up what we

5    believed could have been optimum recoveries, but

6    with a full realization that we had to come to a

7    reasoned compromise of whether there should be

8    total consolidation, whether it should be

9    substantive consolidation.

10    We came to this compromise, along with the

11    other constituencies, after long, hard, good-faith

12    negotiations.

13    And we support this 9019. And that's what it

14    is, it's a 9019, as correctly stated. We didn't

15    agree to extinguish the guaranty claims. What we

16    did was, those claims got, within the area of the

17    compromise, a recovery. Those claims were

18    subsumed within the recovery. It wasn't an

19    extinguishment in that sense that they were

20    disregarded.

21    Without going into all of the negotiations,

22    because I certainly wouldn't do that, it was taken

23    into account with what the ultimate figure that we

24    agreed to on behalf of the landlords and which we

25    came to the committee compromise that was

1    presented to the debtor.  And so those claims were

2    part of both the negotiations -- part and parcel

3    of the negotiations.

4         Maybe other parties may have, you know, come

5    to a different number.  I don't know.  But we did

6    it all in good faith.  And we believe that this

7    compromise certainly meets the Till standard.

8         And I'll tell you, we looked, and the other

9    constituencies looked, at literally tens and tens

10   of thousands of underlying documents and the

11   analysis.  This was not just a negotiation that

12   was, you know, started in the morning and finished

13   in the afternoon, before lunchtime.

14        And in that regard, we believe that this

15   compromise should be favorably looked upon and

16   approved.

17        Thank you.

18        THE COURT:  Thank you.

19        UNIDENTIFIED SPEAKER:  Your Honor, I object

20   to counsel testifying.  And, Your Honor, I would

21   just ask that it be clarified that all of what

22   counsel just said is not testimony, it's only by

23   way of argument, Your Honor.

24        THE COURT:  Very well.  The jury will

25   disregard that.

1          (Laughter.)

2          MR. BARR:   Thank you, Your Honor.   Matthew

3     Barr, of Milbank, Tweed, Handley & McCloy, on

4     behalf of the Official Committee of Unsecured

5     Creditors.

6          Your Honor, we thought it was important, and

7     that's why I yielded to Mr. Drebsky, that you hear

8     directly from a committee member that was heavily

9     involved in that process.

10         I do see now -- I didn't want to repeat what

11    Mr. Busey said, but now I also don't want to

12    repeat what Mr. Drebsky said, and he stole a lot

13    of the thunder that we were going to have here

14    today.

15         However, I think there are two or three

16    points that I should highlight for you, even

17    though counsel has already made some of these

18    points well.

19         Number one, as you've heard now through

20    testimony and through argument, the guaranties are

21    not being ignored, Your Honor.   They have, through

22    the process of compromise and negotiation,

23    received a benefit in the compromise.

24         In addition to the testimony, it's clear in

25    the Disclosure Statement that that was one of the

1        factors that all of these landlords and the

2        bondholders had in their coffers.  And it was one

3        of the issues that they would have litigated, some

4        would say, to the death, if they needed to

5        litigate to the death over those issues.

6              It's something that the committee as a whole

7        and each of its members took very seriously when

8        they were taking into account the compromise and

9        what made sense under all the circumstances of

10       this case to position this debtor to get them out

11       in the fastest way they can and to provide the

12       maximum recovery for all creditors of this estate

13       given their various rights and remedies and

14       litigation strengths.

15             Your Honor, in addition to the argument you

16       have heard, the landlords are saying that they've

17       just been grouped with the trade.  In fact, Your

18       Honor, that's not the case.  Again, this was a

19       weighing and balancing of the strengths and

20       weaknesses of arguments, the strengths and

21       weaknesses of two, three, ten claims, twenty-three

22       claims against various debtors.

23             In fact, the trade had very -- they would say

24       very strong arguments for sub con, or multiple

25       claims.  The bondholders would say they had very

1    weak -- the trade had very weak arguments and they

2    had great arguments for twenty-three guaranties.

3         The landlords would say they had multiple

4    claims across the board from the different various

5    debtors and then against stores.

6         So there was a weighing and balancing of all

7    these relative positions.  And it's by

8    happenstance that the distributions came out the

9    same for landlords and for trade, Your Honor.  It

10   was not that we grouped them together.

11        In addition, Your Honor, as you've heard, it

12   is a compromise.  Not only is it a compromise of

13   intercreditor and complex intercreditor issues but

14   it was also intracreditor, meaning different

15   groups had different arguments within their

16   classes.

17        For example, some landlords would have

18   argued, and they did during the process, that

19   asset allocations may have been differently from

20   what the debtors had set forth or there would be

21   litigation over where certain assets may lie,

22   therefore making a difference in distributions if

23   you had a deconsolidated class.

24        One of the elements of the compromise was to

25   deal with those issues, as we've set forth in our

1       papers that we filed with the Court.

2           The only last point I would make since

3       counsel has already made many of the points is,

4       Your Honor, by just giving the objecting landlords

5       a little tip, is what they're asking for today,

6       just, you know, less than one percent, Your Honor,

7       we would submit potentially unravels the entire

8       compromise.  It potentially has each of the

9       various groups going into their corner and gearing

10      up for litigation, which is exactly what the

11      compromise today is here to avoid.

12          We can tell you, when we put it in our

13      papers, and it's in the Disclosure Statement, that

14      they were well-organized -- and some with war

15      chests -- groups of creditors that were ready,

16      willing and able to fight their fight.

17          You had different various groups.  There was

18      the trade on one side, the bonds on the other

19      side, landlords.  And, Your Honor, the compromise

20      is to avoid that costly, time-consuming

21      litigation.  Which, in fact, it's unclear where,

22      ultimately, this case would end if we had to

23      litigate that case for weeks, for months, for

24      years.

25          It's unclear, unfortunately, if this estate

1    would be able to survive that type of fight and

2    this estate would be able to rehabilitate.

3         And for those reasons, Your Honor, we believe

4    that the objections of the landlords should be

5    overruled.

6         MR. ROSENBAUM:  May I, Your Honor?

7         THE COURT:  Come on up, Mr. Rosenbaum.

8         MR. ROSENBAUM:  I will be very brief.

9         Your Honor, the fundamental problem here and

10   what I -- the main focus of my argument before is

11   you can't have a plan premised on a deemed

12   substantive consolidation settlement with some

13   parties and not with all parties.

14        We're not disputing that everyone in this

15   courtroom that was involved in these plan

16   negotiations worked hard and long.  They're

17   friends and colleagues, and we understand the

18   efforts that we see here.

19        We just cannot simply have, under the law, a

20   substantive consolidation compromise with some

21   parties and not with all parties.

22        Thank you.

23        THE COURT:  Thank you very much.

24        MR. KELLEY:  I want to apologize to Mr. Busey

25   for biting his ankle.

1          I want to point out that there was a lot of

2     factual elements that were contained in these

3     arguments about the substantive consolidation

4     compromise that were stated from this podium that

5     were not stated from that witness stand and none

6     of it is evidence.

7          And I would hope the Court would bear that in

8     mind, that the record -- that the evidence in the

9     record doesn't support any of the things they

10    said, whether or not they might be correct.

11         Also, I want to point out that -- I mean, I

12    do this, too.  The other side makes an argument, I

13    don't like it, and I stand up and say:  You know,

14    the real issue, and I say something completely

15    different.

16         I said we're talking about treatment, how

17    we're treated within the class.  And Mr. Busey

18    stands up and says:  This is all about

19    classification.

20         It's not.  I thank God that we got classified

21    with these other classes in Class 13 because now

22    we're entitled to equal treatment.  I wouldn't

23    want to be anywhere else.

24         The question is treatment.  And the law is

25    clear that we're entitled to equal treatment, and

1     we didn't get it.  And in order for this plan to

2     be confirmed, no matter how much everybody that

3     has settled likes it, the claims in Class 13 have

4     to receive equal treatment.

5          And they were arguing that the -- you know,

6     the claims weren't extinguished, they were all

7     taken into account.  Well, that's -- well, I mean,

8     they technically weren't extinguished.  The plan

9     says, quote, duplicate proofs of claims --

10    duplicate proofs of claims for the same claim

11    shall be expunged.  So, technically, they were

12    expunged, they weren't extinguished.

13         But that's what happened to them.  They were

14    claims.  They put them in the landlord class.  The

15    plan expunges them, and they filed a motion to

16    disallow them because they were expunged under the

17    plan.  That's the treatment they got.

18         So, again, I repeat my prior statement that

19    you have to afford people equal treatment.  And I

20    agree with Mr. Busey, that if they actually

21    litigated this substantive consolidation issue

22    that they probably would have spent a lot of money

23    and the lawyers would make a lot of money and it

24    would take a while.

25         But, again, I point out that I think they're

1    issuing 50 million shares under the plan.  All the

2    problems of the landlords could be taken care of

3    for -- you know, if they issued an additional

4    number of shares that would be less than one

5    percent more.

6         The Court can actually confirm this plan

7    legally if they issue 50,500,000 shares rather

8    than 50,000,000.  And I think the Court knows,

9    and I know, that no matter what the argument was,

10   these people are not going to square off and have

11   a nuclear war if the Court follows the law and

12   says the landlords that objected, that little,

13   little, little group of us that actually protected

14   our rights, are entitled to receive what the law

15   says we're entitled to receive.

16        And I would ask the Court to not be

17   distracted by some argument about classification

18   that none of us made.  It's about treatment.  We

19   want equal treatment.  We're entitled to it, the

20   Court can give it to us, and it's not going to

21   derail this plan.  And for that reason, that's

22   what the Court should do.

23        MR. CALIFANO:  Your Honor, if I may.

24        THE COURT:  Certainly.

25        MR. CALIFANO:  I wasn't sure if this was the

1    time for me to speak, or later.  But I think now,

2    in light of what some of the landlords are saying,

3    now is the appropriate time.

4         THE COURT:  Who are you?

5         MR. CALIFANO:  Tom Califano, from DLA Piper.

6    I represent the ad hoc trade committee, Your

7    Honor.

8         We filed a motion for substantive

9    consolidation on May 11th.  We were involved on

10   behalf of the trade creditors, both in the ad hoc

11   group at DLA Piper and FTI, the consultants, the

12   financial consultants, that were retained by the

13   group.

14        We also assisted Kraft and Pepsi, who were

15   the trade members of the official committee, in

16   connection with the negotiations and the analysis

17   of the substantive consolidation issues.  So I

18   think that I can speak to some of the issues that

19   were addressed.

20        And one issue that I would like to take out

21   of order and speak to directly is this implication

22   that by just giving out more shares to the

23   objecting landlords that everything will be fine.

24   And it won't be, Your Honor.

25        And you cannot -- this is a deal that was

1       struck with various groups.  And part of the deal
2       was the distribution that these groups who
3       participated would get and, also, their
4       understanding as to what other groups would get.
5           And as you saw this morning, Your Honor, the
6       creditor constituencies, all the creditor
7       constituencies, voted overwhelmingly in favor of
8       this plan which embodied this compromise.
9           I believe, Your Honor, that right now we're
10      being faced with almost an extortionate threat
11      that there's a group that's going to blow up this
12      deal.  You can't give in to them.  This is an
13      agreement that was reached.
14          And I just want to explain to you some of the
15      history that we've gone through in this case.  We
16      were formed -- and we represent approximately $80
17      million in trade claims against the various
18      debtors.  We were formed to investigate the
19      substantive consolidation issue.
20          And the disparate members of our constituency
21      all agreed in the beginning that substantive --
22      that they believed that substantive consolidation
23      was the appropriate way to go through this case,
24      and that they would object to a plan that did not
25      provide for substantive consolidation of these

1    debtors.

2        We spent over a week with professionals down

3    here in Jacksonville interviewing the debtors and

4    their employees and officers.  We reviewed

5    thousands of pages of historical and financial

6    documents related to these debtors.  We researched

7    the substantive consolidation law extensively,

8    with the focus, obviously, on 11th Circuit law,

9    not 3rd Circuit law.

10       Your Honor, we also, with our financial

11   advisers, and I believe the official committee

12   will agree, found that, in the perfect case,

13   substantive consolidation would result in

14   approximately a 76-percent distribution to all

15   classes of creditors.

16       Under the plan, we're accepting 70.6 percent,

17   which reflects almost $4.8 million in difference

18   just to our group.

19       The reason why, Your Honor, is that we firmly

20   believed that even though we were serious about

21   the substantive consolidation motion, we had spent

22   money, we filed a 15-page affidavit and a 41-page

23   brief in favor of substantive consolidation, and

24   that we were ready to go forward on the issue,

25   Your Honor.

1        We believe that just for our own group that

2    $4.8 million in value, approximately $4.8 million

3    in value, would have been easily eaten up by the

4    expense of the substantive consolidation

5    litigation and the harm to this debtor and to this

6    debtors' estate.

7        So the substantive consolidation issue, Your

8    Honor, was real, and still remains to be real.

9    And I make that representation to the Court.  And

10   whether I'm testifying or arguing -- and I can go

11   on the stand -- but I can say our seriousness on

12   this issue, I think, is established by the motion

13   that we filed and the motion that the debtor has

14   circulated to the group.

15       We fully support, Your Honor, the plan and

16   the compromise that's embodied in the plan.  And

17   we were directly, as I said in both levels,

18   involved in this compromise and how this plan came

19   about.

20       But I will say this, Your Honor.  I do not

21   believe that the quick fix that's offered to you

22   by this dissident landlord group is realistic or

23   possible, and it risks blowing of the deal that

24   was negotiated over months with a real benefit to

25   the estate of tens of millions of dollars in

1    avoided fees and delay of confirmation that these

2    groups did work out.

3          As I said, we fully support the plan that is

4    before you.

5          THE COURT:   Thank you.

6          MR. McCONNELL:   Your Honor, may it please the

7    Court.   Jerrett McConnell appearing on behalf of

8    the ad hoc committee of Winn-Dixie retirees.

9          I just want to briefly say that we, by

10   reference hereto, adopt the argument just made by

11   Mr. Califano and thoroughly oppose the compromise

12   offered by Mr. Kelley.

13         Thank you.

14         THE COURT:   Thank you very much.   I'll take

15   that under advisement.

16         Let's go to the next objection.   Who wants to

17   be next?

18         Stockholders, I had a bunch of formal and

19   informal objections by stockholders.   I'll be glad

20   to hear from them at this time.

21         Yes, ma'am.   If you will come forward.   Yes,

22   ma'am.   State your name.

23         MS. BOX:   I'm Sarah Box.   You invited me back

24   today.

25         THE COURT:   I certainly did.

1          MS. BOX:  Would you like -- you have my

2     letter on file.

3          THE COURT:  I have your letter.  But I would

4     like you to articulate your feelings.

5          MS. BOX:  Oh, thank you.  I do that so well.

6          Okay, here are my objections.  I stand by the

7     ones I wrote.  I think they were in by July the

8     25th.  That was the deadline.

9          My objections to the plan of reorganization

10    are as follows:  Any plan that allows a new

11    company to operate under the name of Winn-Dixie

12    that does not offer an equitable settlement to the

13    stockholders of the company, that fails to

14    penalize the officers, directors and other

15    insiders for the sale of their personal stock of

16    Winn-Dixie prior to the filing of bankruptcy and

17    that provides any form of compensation or

18    settlement, whether in cash or in stock, to the

19    officers, directors and other insiders of

20    Winn-Dixie.

21         And this young man -- let's see -- that's in

22    charge --

23         MR. BUSEY:  You must be referring to me.  I'm

24    the only young man up here.

25         MS. BOX:  Well, I'm sorry that I didn't get

1     your name.  I was at the back.

2          But, anyway, I heard him say that everybody

3     was allowed to vote.  And I don't know about the

4     other stockholders, but I was not invited to vote

5     on any of these issues.

6          And then one of the lawyers for the

7     landowners said that -- let's see -- equal

8     treatment to all.  And I -- as a lay person, I

9     don't feel there's been equal treatment to the

10    stockholders.

11         And just in my layman's language, and from my

12    point of view, this has been discrimination at the

13    highest level.

14         And I thank you for allowing me to speak,

15    Your Honor.

16         THE COURT:  You're welcome.  And thank you.

17         MS. BOX:  And do you have any comments to me?

18         THE COURT:  I will think about what you have

19    said.  I know you sincerely believe that.

20         MS. BOX:  You know I'm sincere, right?  Thank

21    you very much.

22         THE COURT:  And I will consider that.

23         Any other stockholders that would like to

24    come forward and make a statement?

25         Thank you.

1          MR. MILLS:  Your Honor, would the Court

2     hear --

3          THE COURT:  Insurance, that's the one I'm

4     looking for.

5          MR. MILLS:  Thank you, Your Honor.

6          THE COURT:  The Louisiana insurance

7     objection.

8          MR. MILLS:  That's it, Your Honor.

9          Good afternoon, Your Honor.  Again, Russell

10    Mills.  I'm here with my co-counsel, Mr. Lange and

11    Mr. Bledsoe.

12         Your Honor, I've got a number of exhibits I

13    would like to offer into evidence first.  Your

14    Honor, I have circulated my list and, also, my

15    exhibits to opposing counsel early this week, and

16    we've spent a great deal of time negotiating over

17    them.

18         And I'm happy to announce that we have an

19    agreement, and I'd like to read that into the

20    record.

21         There is an agreement as to the admission of

22    certain documents, some for limited purposes.

23    However, there is an objection that would apply to

24    all of them.  They objected that the documents are

25    not relevant.

1          And what I think they're saying, Your Honor,

2     is that perhaps the documents are not relevant to

3     the confirmation.  This objection is not relevant

4     to confirmation.  I'll let them make their

5     argument.

6          So I would like to move -- to offer into

7     evidence the following exhibits:  Numbers 1

8     through 21, 23, 26, 29, 31, 36, 40, 42 through 44,

9     60 through 84, 87 through 94.

10         And then the documents 55, 85 and 86 are not

11    admitted for the truth of the purpose but simply

12    to show what the author's understanding of a

13    certain fact was.

14         THE COURT:  Any objection?

15         MR. BUSEY:  Yes, Your Honor.  The documents

16    that are offered are documents that we, the

17    company, Winn-Dixie, provided to Bundy New Orleans

18    in response to a discovery request by Bundy New

19    Orleans to Winn-Dixie regarding the efforts of

20    Winn-Dixie to press its insurance claims for the

21    damages Winn-Dixie suffered as a result of

22    Hurricane Katrina.

23         And Winn-Dixie has about -- this is in the

24    Disclosure Statement, which is in evidence.

25    Winn-Dixie has about $200 million in insurance

1    coverage, and it has about $150 million in

2    insurance claims for Katrina.  And we're in the

3    process of prosecuting that insurance coverage.

4        So far, Winn-Dixie has presented to the

5    insurers about $90 million in loss documentation

6    for inventory and equipment, and it has received

7    about $75 million from the insurers.  And that's a

8    process that's ongoing.

9        The objection that's been filed by Bundy

10   argues that, among the $75 million that has been

11   received by the debtor to date, some portion of it

12   should be theirs because Bundy is a landlord whose

13   store was in New Orleans and it was destroyed and

14   under a contract with Winn-Dixie by its lease and

15   Winn-Dixie is obligated to pay the landlord for

16   the damages.

17       And Winn-Dixie is insured for that.  And, in

18   fact, Bundy is a named insured under Winn-Dixie's

19   policy.

20       But the fact of the matter is that Winn-Dixie

21   has not submitted a proof of loss yet for that

22   store and has not been indemnified by its insurers

23   yet for the property damage to that store.

24       Mr. Mills believes that Winn-Dixie has.

25   There's a disputed fact about that, as to whether

1     Winn-Dixie has received from the insurers that

2     $6.7 million or not.  And that's what this

3     evidence is about.

4          And if you put in these hundred exhibits,

5     then we're going to have to call rebuttal evidence

6     to show that we have not been reimbursed for that

7     $6.7 million.

8          That is an issue of fact that is ultimately

9     going to be determined when -- we filed a motion

10    to reject this lease.  It hasn't been heard yet.

11    It will be heard in the near future.  And when the

12    Court approves the rejection of the lease, it will

13    set a bar date for filing a rejection damage

14    claim.  And when Mr. Mills files a rejection

15    damage claim, then we can talk about how much is

16    owed to Mr. Mills by the company.

17         And these are all issues of fact that relate

18    to that, but they don't relate to the confirmation

19    of this plan.  The only thing that's material to

20    the confirmation of this plan is if we ultimately

21    end up losing that dispute to Bundy New Orleans,

22    and Winn-Dixie has, in fact, received $6.7 million

23    in insurance coverage, which it hasn't received,

24    and owes that money to Bundy New Orleans, does

25    that present a confirmation issue?

1          And the evidence is, from Mr. Huffard, that

2     it doesn't present a confirmation issue.  There's

3     plenty of liquidity.  Winn-Dixie, if it were

4     adjudicated to owe that money, could pay it.

5          So because of that, we don't think whether

6     or not we've gotten this money or not gotten the

7     money from the insurance companies is a relevant

8     issue of fact to the confirmation proceeding and

9     we should not burden the confirmation proceeding

10    with the hours of taking evidence on that issue of

11    fact which is not material to the confirmation.

12         MR. MILLS:  So we're clear, Your Honor, I

13    certainly don't anticipate taking hours.

14         Mr. -- counsel says that Winn-Dixie is

15    insured --

16         THE COURT:  How does this relate to

17    confirmation, 1129?

18         MR. MILLS:  It relates directly to

19    feasibility, for example.  Counsel here this

20    morning asked his expert, is this plan feasible,

21    even if you have to pay the Bundy claim?  Counsel

22    said yes.  So he solicited that information

23    himself.

24         So what I have to show to you today, Your

25    Honor, is that there is not necessarily enough

1    money here to pay all of these claims.  They said

2    my claim is $6 million.  That's correct.  I have

3    evidence to show that the claims will be well over

4    $100 million.  It bears on feasibility.

5         Secondly, I have evidence to show that

6    perhaps the limits -- Mr. Busey said that the

7    limits were $200 million.  Well, that's not

8    necessarily true for all events.  It's $100

9    million for some other events.  Perhaps they're

10   already over their limits.

11        The point being is that it bears on

12   feasibility how they're treating these claims in

13   particular.

14        Secondly, I think it also bears on good

15   faith, fair and equitable.  In this situation, if

16   it's true, as I contend, that they submitted

17   claims to the insurer and they did it on the basis

18   of for both personal and real property.  That's

19   what the claims say.

20        And then the insurers paid unallocated, that

21   is to say, they paid both on real property and

22   personal property, then my client has an interest

23   in those monies.  That's true under Florida law

24   and it's true under this lease.

25        The lease says, if they get monies, then they

1    have to hold it for me.  They have to pay it to a
2    trustee and hold it to rebuild this property.  So
3    if I can prove, then, that they have done that,
4    then I have an interest in those monies.

5         And, basically, they're using those monies.
6    As the expert said this morning, they put those
7    monies, that $75 million they got, and they
8    haven't given it to any real property lessor but
9    have put it in their own funds.  They are now
10   proposing to pay it out to other creditors and to
11   use it in their operations.

12        So, Your Honor, that's bad faith.  That's
13   leaving me unprotected.

14        You can analogize it as though I were a
15   secured claimant almost.  I mean, it's unusual, I
16   grant you, that an administrative claimant would
17   show up at a confirmation hearing.  Of course, the
18   code says that administrative claimants must be
19   paid in full, they must, or else the plan can't be
20   confirmed.

21        My situation, though, is this, Your Honor.
22   It's that I have monies out there that are used,
23   or should have been used, to secure my debt, the
24   insurance proceeds, and they weren't.  They're
25   being used for some other purpose.

1       In effect, I've become an involuntary lender

2   to this debtor.  They've taken these monies, of

3   which I think I have an interest, and they now

4   have committed them to pay to others or else use

5   them in their operations.  That leaves me with no

6   protection.  That's a confirmation issue, Your

7   Honor.

8       THE COURT:  You didn't file an adversary

9   proceeding to establish a trust or something?

10   This has been going on now for over a year, I'm

11   sure.

12       MR. MILLS:  No, actually not, Your Honor.  We

13   only learned about this in the past month or so.

14       THE COURT:  You learned about --

15       MR. MILLS:  We learned about the fact that

16   the monies, that the insurance monies, had

17   actually been paid to the debtors.  I have

18   correspondence in here where the -- my client had

19   corresponded with the debtors' real estate

20   counsel.  The real estate counsel advised him, and

21   we filed a claim.

22       There was never any disclosure that monies

23   had been paid.  In fact, what happened was, they

24   filed a motion to assume our lease.  They filed it

25   very late, probably in late July.  They filed a

1    motion to assume our lease.  And the cure they

2    offered was the prepetition arrearage.

3        And I called them, and I said to them:  Well,

4    that's not good enough.  You have these other

5    nonmonetary cures.  You have to restore the

6    property, for example.

7        And at that point, they said:  No, we're not

8    going to assume your property.

9        And I asked them:  Have any insurance monies

10    come in?

11        And they said:  Yes, finally.

12        So, Your Honor, I think it is an

13    administrative issue.  And, further, it has

14    bearing upon my small, little $6-million claim.

15    And the Court realizes, of course, that I'm not

16    the only real property lessor who has suffered

17    Katrina damage.

18        THE COURT:  I understand.  But the lease has

19    now been rejected; is that right?

20        MR. MILLS:  No, Your Honor, the lease has not

21    been rejected.  I actually opposed the rejection.

22    They recently filed a motion to reject.  And while

23    I understand that a debtor has virtually

24    unfettered discretion to reject a lease -- at

25    least that's true in the 5th Circuit, where I

1   practice, and I'm sure it is here, too -- while

2   they have that discretion, it didn't seem fair to

3   me here for them to take the property, keep the

4   property for a year, get the monies in, use the

5   monies, and then throw away the lease.

6       So if there was to be a rejection, it seemed

7   to me that it should be conditioned upon them, if

8   they've gotten any monies, to give me those

9   monies, or at least -- or at least to set up some

10   sort of reserve.

11       I'm not here arguing --

12       THE COURT:   Let me hear from Mr. Busey.

13       MR. BUSEY:   The motion to reject is set for

14   hearing on October 25.

15       MR. MILLS:   Your Honor, I'm not here arguing

16   that I should have an administrative claim or what

17   the amount of the administrative claim is.   I just

18   want to make sure that when I get that

19   administrative claim that there are monies there

20   to pay that claim.   And given the state of this

21   insurance, that is not at all true, nor the

22   uncertainty about the amount of the claims.

23       MR. BUSEY:   Your Honor, the documents that

24   Mr. Mills proposed to put in evidence are the

25   insurance policies and their correspondence -- and

1    their proofs of claim and their correspondence

2    back and forth between the company and its outside

3    professionals and the claims agents and the claims

4    agents for the insurance companies regarding what

5    has and has not been paid by the insurance

6    companies to Winn-Dixie to date.

7        We don't believe any of that is relevant to

8    confirmation.

9        THE COURT:  I think what I'm going to do is

10   defer this matter until the motion to reject.

11   We're talking about 12 days from now.  It's going

12   to take me a while before I rule on this

13   confirmation.

14       So I don't find it a confirmation matter.  At

15   this point, I find that, based on previous

16   testimony, there appears to be ample money,

17   notwithstanding the insurance, to pay the claim if

18   they have to.  They have $350 million, he says, in

19   liquidity.  Plus, if it gets out of here, he has

20   got the exit money.

21       And, again, I'm not sure what the outcome of

22   that litigation would be if they reject your

23   lease.  But I don't think it would be -- I don't

24   think that the objection to confirmation -- it's

25   not a confirmation issue at this point because

1     it's not an administrative claim at this point.

2          MR. MILLS:  Could I have one moment, please,

3     sir?

4          THE COURT:  Yes.

5          MR. BUSEY:  Your Honor, could we take a short

6     break?

7          THE COURT:  All right.  Take about five

8     minutes.

9          THE MARSHAL:  All rise.

10          (Short break.)

11          MR. MILLS:  Thank you, Your Honor, for the

12     break.

13          THE COURT:  Have you worked anything out?

14          MR. MILLS:  Well, just so that I understand

15     the Court's ruling, you're saying that these

16     issues that I've raised today, then, would be

17     deferred over to the hearing on the motion to

18     reject, which I believe is October 25th.

19          THE COURT:  Right.  And if you can't work

20     anything out, I'll go ahead and plan on hearing it

21     that day, if time permits, and we'll deal with it

22     to the extent applicable and determine whatever

23     you're seeking for me to determine.

24          MR. MILLS:  Okay.  Thank you, Your Honor.

25          THE COURT:  And you'll keep your exhibits

1    until that time.

2         MR. MILLS:  I will do that.

3         THE COURT:  Does the United States of America

4    have an objection?  Do you want to articulate

5    that, or are you withdrawing it?

6         MS. MORRIS:  A little of both.

7         Good afternoon now.  Deborah Morris again on

8    behalf of the United States.

9         Your Honor, we've raised objections on six

10   points in our original objection.  I'll go through

11   each one and either notify the Court of the status

12   or argue it if we're still pursuing it.

13        Our first objection related to Section 12.14

14   of the plan which we thought appeared to cut off

15   the setoff or recoupment rights of the United

16   States.  The debtors have modified Section 12.14

17   to the satisfaction of the United States and,

18   accordingly, we are withdrawing our objection to

19   that provision.

20        Our second objection related to whether the

21   plan met the cramdown requirements with respect to

22   our secured tax claim because Section 4.3 of the

23   plan did not provide for the payment of any

24   secured tax claims via setoff.  We were concerned

25   with that that provision, along with 12.14,

1    combined to essentially strip the United States of

2    its secured status.

3        There have been modifications made to that.

4    We're generally satisfied with that, but we do

5    have a reservation.  And in order to understand

6    it, I'm going to have to give you a little bit of

7    background on what's going on with the IRS claim,

8    so if you will just bear with me.

9        The language added to Section 4.3(d) of the

10   plan allows for setoff of an allowed -- as to

11   allowed secured tax claims, which is a defined

12   term under the plan.

13       Now, the IRS has filed proofs of claim

14   against the debtors primarily for income taxes for

15   the years 2000, 2001, 2002 and 2003.  And as

16   originally filed, those proofs of claim asserted a

17   secured claim in the amount of about $3 million

18   via setoff, with the remainder of our claims being

19   either priority or general unsecured.

20       The debtors and the IRS have continued to

21   negotiate the amounts of the debtors' liabilities

22   because those were years that they were just

23   coming out of audits and they were still going

24   through the administrative process.

25       So for the years 2000 through 2002, the

1    debtors and the IRS have reached tentative

2    agreements on the adjustments proposed by the IRS

3    for those years coming out of the audits.

4        Now, those agreements have not been finalized

5    and we don't have final numbers yet.  And, in

6    addition, we don't have any agreement yet for the

7    2003 year.

8        Now, several months after we filed the proofs

9    of claim, the debtors filed several amended tax

10   returns related to prepetition tax years.  They're

11   now claiming refunds for certain years, generally

12   relating to net operating loss carrybacks that

13   have come about in more recent years as the

14   debtors have experienced financial difficulties.

15       The debtors submitted these claims for refund

16   in late June of this year, and they've just, on

17   September 22nd, filed amended forms with respect

18   to these refunds.

19       And all of this I'm just telling you to give

20   you some background into the idea that the claims

21   of the IRS are far from determined as of this

22   date.  And we expect the total amount of the IRS

23   claims to eventually come down.  But because of

24   these refunds the debtor is claiming, we expect

25   our secured portion of our claim to actually go

1     up.

2          So to the extent they're entitled to refunds

3     for certain years, we're entitled, our position

4     is, to set off any other liabilities against

5     those, and so we expect there to be some movement

6     in the proofs of claim.

7          Now, the IRS is amending, and, I believe, may

8     have done so today even, their proofs of claim to

9     attempt to try to better reflect what's going on

10    currently in terms of what we assert our status to

11    be.

12         But as I said before, everything is still

13    ongoing.  And so there may come a time in the

14    future when the proofs of claim get amended again

15    to change -- probably to come down, as I said, in

16    total amount, and there could be a change in the

17    amount or the particular period to which we're

18    asserting a secured claim via the setoff.

19         Our concern with the modification with

20    reference to the term "secured tax claim" is

21    simply that we don't want the plan to be construed

22    that our setoff is limited to a secured claim as

23    asserted in a particular proof of claim, whether

24    it be the one filed on the claims bar date or one

25    that was in effect today or the day the

1    confirmation order is entered.  We just simply

2    want to make sure that there's nothing in the plan

3    that's going to affect our setoff rights.

4         We're not arguing that the debtors are giving

5    up any of their rights to object to setoff on

6    whatever grounds they, you know, think is

7    appropriate other than we just don't want the plan

8    itself to affect the setoff rights.

9         We are just trying to maintain the status quo

10   with the plan not having an effect on that, and

11   that is what was done in Section 12.14.  And we

12   just want to make it clear that the same applies

13   to the modifications to Section 4.3.

14        THE COURT:  Okay.  Mr. Busey, do you

15   understand that?

16        MR. BUSEY:  No.  We have had discussions with

17   the IRS and we have, by reason of those

18   discussions, inserted language in the plan

19   supplement, or, I mean -- excuse me -- the first

20   modification of the plan, which is in evidence as

21   Exhibit 2, and it's black-lined.  And you can see

22   that we put a paragraph in there, 4.3(d)(2), to

23   clarify the rights of setoff.

24        And our intent and our purpose was to make

25   clear by that addition in the plan modification to

1      satisfy the United States that they're not giving

2      that up, and that's what that language is in there

3      for.

4           MS. MORRIS:  That's fine, Your Honor.  We

5      just wanted to make that clear for the record.

6           THE COURT:  Very well.

7           MR. BUSEY:  And we had these discussions, and

8      that's why we did the amendment.  I don't

9      understand why we just had that discussion.

10          THE COURT:  Okay.

11          MS. MORRIS:  We had subsequent discussions.

12     But I just wanted to have that on the record

13     that --

14          THE COURT:  Okay, you've got it.

15          MS. MORRIS:  -- that's our understanding.

16          Our third objection related to our priority

17     tax claims, particularly the manner of payment or

18     the lack -- the plan did not specify the manner of

19     payment or the interest rate to be paid on

20     priority tax claims should the debtors choose a

21     deferred cash payment.

22          The debtors have also modified that provision

23     of the plan, Section 4.1.  And we are satisfied by

24     those modifications and withdraw our objection to

25     that provision.

1          THE COURT:  Very well.

2          MS. MORRIS:  The remaining objections that we

3     have, we have raised an objection to the treatment

4     of our general unsecured claim.  As I just stated,

5     because of the changing nature of the IRS claim,

6     we may eventually end up that we don't have a

7     general unsecured claim.

8          But I can't stand here today and say we're

9     not going to, so we're reserving our objections

10    with respect to our general unsecured claim in the

11    event that we eventually end up with a general

12    unsecured claim.

13         Particularly, our objection related to the

14    treatment of our noncompensatory damages claim,

15    which was put in Class 20, and receives no

16    distribution under the plan.

17         We think that the plan does not -- it's

18    essentially effectively subordinating the penalty

19    claims, which, if we were in a Chapter 7 case, we

20    would take our place at the back of the line and

21    wait and see whether or not we got any

22    distribution when everyone else was paid.

23         But that's not provided for in a Chapter 11,

24    and we don't think there's any justification for

25    putting us at the bottom and giving us zero when

1    other -- some other general unsecured creditors,

2    as we've heard extensively today, are getting as

3    much as 96 percent of their claims recovered.

4         You know, we have a joint and several claim

5    against 23 of the debtors and, you know, we have

6    been put at the bottom with no recovery on those

7    claims at all.

8         And, further, our treatment of the general

9    unsecured claim, the penalty portion, fails to

10   meet the best interest of creditors test because,

11   as we heard testimony this morning, the

12   liquidation analysis did not include any analysis

13   of whether the IRS would receive any payment on

14   its general unsecured claim, so they have not

15   established that we're receiving as much under the

16   plan as we would under a liquidation with respect

17   to that claim.

18        Our fifth point was concern about the lack of

19   definitiveness of an effective date of the plan.

20   Section 10.12 sets forth a number of conditions

21   that have to be met before the plan becomes

22   effective.

23        And our concern is that this is -- it seems

24   to be solely within the discretion of the debtors,

25   creditors committee and Wachovia.  And it's just a

1    little bit too uncertain for our comfort level.

2        We would prefer to have a deadline in there.

3    You know, if the debtors could tell us how much

4    time they think they need.  If they need 20 days

5    after the plan becomes -- the order confirming the

6    plan becomes final, that's fine.  We would just

7    like to have some kind of deadline.

8        I think deadlines, in my experience,

9    certainly make things happen.  And in my practice,

10   I've routinely seen plans have some type of

11   effective date.  You know, they can choose a date

12   certain if they want, but, typically, I've seen

13   them ten days after the confirmation order becomes

14   final or something along those lines.

15       It just makes things move along a little bit

16   more quickly, I think, and, you know, keeps people

17   moving toward getting the plan consummated.

18       Our final objection related to the payment of

19   attorney fees as part of the substantive

20   consolidation, particularly the payment of

21   professional fees, I should say, without a fee

22   application being filed with the Court.

23       The purpose of our objection is not to say

24   that, you know, this professional or that is not

25   entitled to payment under the plan or is not

1    entitled to payment under the code, our only

2    complaint is that we would like the Court to

3    review fee applications from these individuals.

4        We think the Bankruptcy Code has specific

5    provisions that relate to payments of fees of

6    professionals, including Section 330 and Section

7    503, both of which require notice and hearing.  I

8    mean, there are applications that have to be filed

9    or requests for payment of administrative

10   expenses.

11       In their written responses, the debtors argue

12   that Section 1129(a)(4) only requires the Court

13   approve fees as reasonable.  But I don't think the

14   statute says that.  I mean, reasonableness is a

15   requirement, but it's not the only requirement for

16   payment of monies from an estate.

17       In no way does Section 1129(a)(4) supercede

18   Section 330 or 503.  And, in fact, 1129(a)(1), of

19   course, requires that all provisions of the

20   Bankruptcy Code be complied with.  And so I think

21   that the debtors' response to that is not

22   well-taken in that nothing in 1129(a)(4) relieves

23   the requirements, the statutory requirements, for

24   showing entitlement to fees by professionals.

25       In their responses, both the creditors

1    committee and ad hoc committees seem to make the

2    argument that the fees can be approved as part of

3    the settlement under 9019 and, you know, that they

4    don't have to go through this ordinary process.

5        I don't think there's any basis for this idea

6    of contracting around Bankruptcy Code provisions

7    when you have objecting parties.  I mean, perhaps

8    if everyone were in agreement, then that might be

9    a different issue.  But where we have parties

10   objecting to these provisions, I think that it's

11   inappropriate to say we can agree to not follow

12   Bankruptcy Code provisions.

13       They're essentially, I think, usurping this

14   Court's authority and substituting the debtors'

15   judgment for the normal notice and hearing

16   procedures that are required by the Bankruptcy

17   Code.  And so, accordingly, we object to that

18   provision.

19       And that concludes our objections.

20       THE COURT:  Thank you very much.

21       Any response, Mr. Busey?

22       MR. BUSEY:  Yes, Your Honor.

23       I'll respond to the last two points made by

24   the United States.  One is as to the effective

25   date.

1           The conditions as to the effective date are
2     spelled out in Article 10 of the plan, appearing
3     on page 36 of the plan, 10.2.  There are seven
4     conditions articulated.  They're remarkably simple
5     for a case of this magnitude.

6           Principal among them is that you have to
7     enter an order confirming the plan, and the other
8     principal among them is after the exit financing
9     is closed.  Both of those have to take place.

10          We can't predict the dates when those things
11    are going to happen.  We wish we could dictate the
12    date that you're going to enter an order.  But we
13    don't know.  There's naturally an economic
14    pressure among all the constituencies to cause
15    this to happen.  We think the effective date is
16    adequately defined, and the Court should overrule
17    that objection.

18          The other objection we'll speak to is the
19    objection of the United States to the payment of
20    professional fees.  That's the professional fees
21    in 2.3 of the plan that were incurred by
22    constituencies participating in the substantive
23    consolidation negotiation.

24          You've heard it referred to in the evidence
25    in this case as a total of $2.7 million to a

1    number of different constituencies and a number of

2    different professionals, including lawyers and

3    investment bankers.  They're identified on page 55

4    of the Disclosure Statement in amounts that are

5    capped.

6         But what you heard Mr. Appel say, he thought

7    that if they were approved up and to that amount,

8    it would be reasonable.  But he wanted to have the

9    opportunity to look at their underlying

10   documentation and the reasonableness of the fees

11   in the event that he wants to think there's a

12   number below $2.7 which would be appropriate.

13        The evidence you heard from Mr. Huffard is

14   that, if this estate had to pay $2.7 million in

15   order to get this plan confirmed and to get a

16   compromise, it was worth it many times over.

17        So you have evidence of reasonableness on its

18   face.  You have further evidence that the company

19   is going to look at it and further look at the

20   underlying documentation and challenge it.  And if

21   there is, in the company's judgment, a challenge

22   to be made, then bring it to the Court.

23        There is no requirement under the Bankruptcy

24   Code that you approve by fee application all fees

25   paid by the estate.  It's only in 330 that you

1    approve by fee application professionals employed

2    by the estate or by the committee.   These are not

3    professionals employed by the estate or the

4    committee.   These are simply other parties' fees

5    that the company agreed to pay as a part of the

6    substantive consolidation compromise.   It's a part

7    of the 9019 compromise.

8          And for all of those reasons, including

9    the fact that you have evidence that they're

10   more than justified by the value of the

11   compromise, you should overrule the objection and

12   confirm the plan.

13         THE COURT:   Thank you.

14         Mr. Barr.

15         MR. BARR:   Thank you, Your Honor.

16         Again, Matthew Barr of Milbank, Tweed.   I'll

17   be very brief and try not to repeat anything that

18   Mr. Busey said.

19         I will add, Your Honor, as Mr. Busey said,

20   the effective date has conditions to the effective

21   date.   It's the committee's position that we want

22   to go effective as soon as possible.

23         So just so the Court understands it and is

24   assured, the committee is going to do everything

25   and everything it can to get that effective date

1    in a position to be as quickly as possible

2    because we want to get distributions to creditors

3    in these cases to them as quickly as possible.  So

4    having the effective date conditions met sooner

5    means creditors will get paid sooner.

6        In addition, Your Honor, I'll just add, as

7    the ad hoc committee of trade vendors put in their

8    motion, Your Honor has previously approved, in the

9    context of a settlement, the payment of fees

10   without fee applications.

11       You may recall in a reclamation lien

12   settlement before this Court, one of the

13   conditions to the settlement was the payment of

14   the fees of then the ad hoc lien trade committee

15   which negotiated the reclamation lien program with

16   the debtors and the committee.

17       In the context of that 9019 settlement, Your

18   Honor, you did approve the payment of the fees of

19   that ad hoc committee with just the review for

20   reasonableness by the debtors without fee

21   applications, Your Honor.  We would just bring

22   that to your attention as well.

23       We believe that the same procedures in this

24   context is absolutely appropriate.

25       Thank you.

1          THE COURT:   Thank you.

2          MS. ESCAMILLA:   Your Honor, we have an

3     objection to that paragraph, also.   I just wanted

4     to make sure the Court was aware of it.

5          THE COURT:   Well, let me hear all your

6     objections now, Ms. Escamilla.

7          I'll hear from the U.S. Trustee at this

8     point.

9          MS. ESCAMILLA:   Your Honor, first of all, the

10    United States Trustee is not attempting to

11    preclude confirmation of the plan of Winn-Dixie.

12    What we want to do is to ensure that the

13    Bankruptcy Code is complied with, that the Court's

14    authority to review fees is not usurped and --

15         Do you want me to go into the other areas

16    where I filed objections, Your Honor?

17         THE COURT:   Yes.   It's your turn.

18         MS. ESCAMILLA:   -- and to obtain direction

19    from the Court as to what this Court deems

20    acceptable as to releases in a Chapter 11 plan.

21         The provisions that the United States Trustee

22    has objected to can be removed from the plan or

23    modified.

24         For example, 12.3, which is the provision

25    that we've just heard discussed regarding the fees

1    in the substantive consolidation compromise, they

2    could be modified to require the professionals to

3    file fee applications.  That would allow the Court

4    to review the fees for reasonableness.  That does

5    not place an undue burden on these professionals.

6         Regarding the objection regarding leases, the

7    United States Trustee has no ability at this time

8    to determine what this Court's position is.  There

9    is no controlling law in the 11th Circuit

10   regarding releases, and this Court has never

11   addressed the issue.  So our objection is trying

12   to attempt to get direction from the Court as to

13   what is acceptable to this Court, whether this is

14   an extraordinary circumstance in this case and

15   what factors this Court should consider.

16        We have three exhibits, Your Honor.  They

17   relate to our last objection.  So Exhibit Number 1

18   is just the portions of the debtors' joint plan

19   that we're objecting to, which is 12.3, 12.4,

20   12.12(a), (b) and 12.15.

21        Exhibit Number 2 are The Florida Bar rules

22   regarding limiting malpractice.  And it's Florida

23   Bar Rule 4-1.8(h).

24        And Exhibit Number 3 is The New York State

25   Bankruptcy -- I'm sorry -- The Bar Association

1       Code of Professional Responsibility EC 6-6.

2              If I could offer those into evidence, Your

3       Honor.

4              THE COURT:   Any objection?

5              MR. BUSEY:   No, Your Honor.

6              THE COURT:   They're admitted as previously

7       numbered.

8              (Whereupon, the documents last-above referred

9       to were received in evidence as United States

10      Trustee's Exhibits Numbers 1, 2 and 3,

11      respectively.)

12             MS. ESCAMILLA:   Going back now to 12.3 and

13      12.4.

14             As I stated earlier, we believe that it

15      circumvents the requirement of the Bankruptcy Code

16      that requires Court review of fees either under

17      Section 330 or 503.

18             Mr. Busey stated that the fees in question

19      under the substantive consolidation compromise are

20      approximately $2.7 million.   They are $2,760,000.

21             There are caps on those.   It's $1.4 --

22      $1,410,000 for the professionals that were

23      retained by members of the creditors committee.

24             Then there's the committee of trade vendors,

25      the ad hoc committee of trade vendors, and their

1    cap is $1.3 million.

2        And then the members of the ad hoc committee

3    of retirees, the cap on that is $50,000.

4        The testimony and the plan provisions that

5    you have before you say that the debtor is going

6    to make the call as to reasonableness up to that

7    cap.  It totally takes the Court out of the

8    context of whether or not the fees are

9    reasonable.

10        The debtor, as stated in their memorandum,

11    they say that it only requires -- 1129(a)(4) only

12    requires that the fees and expenses that are going

13    to be paid by the proponent are approved by or are

14    subject to the approval of the Court as being

15    reasonable.

16        Well, if the Court does not have a fee

17    application before it, there is no way for it to

18    make a determination as to reasonableness.

19        There are factors under Section 330 that the

20    Court has to look at to determine if the fees are

21    reasonable.  Likewise, there are factors under 503

22    for substantial contribution for the Court to

23    determine whether those fees are reasonable.

24        All we have is the testimony of the expert

25    basically saying that he thinks the fees that

1       would have been incurred if this would have been

2       litigated would have been much more.  That is what

3       the debtor wants you to make a determination as to

4       reasonableness.  That is not sufficient.

5           As stated by Mr. Barr, there was a provision

6       that was pointed out in their objection in the

7       reclamation compromise before the Court where, in

8       paragraph 542, there is a provision that says that

9       their fees in the amount of $300,000 for

10      professionals were being approved as part of the

11      compromise.

12          I don't believe that was brought to the

13      Court's attention.  And had it been brought to the

14      Court's attention, I believe that you would have

15      been usurping your ability to independently review

16      the fees.  And it was something that, had we

17      brought it, we would be objecting to it.  It's

18      something that escaped the United States Trustee's

19      office in that compromise.

20          I do recognize that it was approved by the

21      Court, but I do not know whether that was done

22      consciously.

23          THE COURT:  I was asleep.

24          MS. ESCAMILLA:  Well, I'll admit, too, that

25      the United States Trustee did not see that

1    provision, also, Your Honor.

2         Regarding the indenture trustee fees.  12.4

3    of the plan hasn't been objected to by anybody.

4    12.4 of the plan provides that all pre and

5    postpetition fees of the indenture trustee will be

6    paid without any Court review.

7         There has been no testimony as to what amount

8    we're talking about.  Is it $20 million, is it $10

9    million?  I can tell you that the creditors

10   committee counsels' fees up to this time have been

11   -- are approximately $9 million, and that went up

12   to May 31st.  I have no idea what type of fees are

13   involved in 12.4.

14        The indenture trustee's argument is that

15   there is a review process by the debtors.  Well,

16   that's not the review process contemplated under

17   the Bankruptcy Code.  The review process is that

18   an application is filed, there's a notice of

19   hearing, the Court reviews it and makes a

20   determination as to reasonableness.

21        The only time any of these fees will get to

22   the Court, either under 12.3 or 12.4, is if the

23   debtor says:  You know, we don't think that

24   portion of your fee request is reasonable.  Then

25   the other side has the ability, at their option,

1    to bring it to your attention.  So what the Court

2    may ultimately look at is minuscule.  And probably

3    it won't be, because they don't want the Court to

4    look at it.

5         The other argument by the indenture trustee

6    is that the fees that they're requesting under

7    12.4 are reimbursement rights under the plan and

8    it can be viewed as a payment of their claim.

9         The third argument is that the payments of

10   fees are part of the compromise of the plan under

11   9019, and that the debtor only needs to meet the

12   business judgment test.  And it allows the

13   satisfaction of a charging lien without having the

14   lien satisfied.

15        They claim that other courts have commonly

16   done this and so, therefore, this Court should do

17   it.

18        And, lastly, they say that the noteholders

19   voted to accept this provision and, therefore,

20   they expect the debtors to pay their fees.  And,

21   therefore, if the Court disallows this and they

22   have to do the charging lien, that that would be a

23   modification of the plan.

24        Well, the United States Trustee's argument in

25   response to -- that that would be a modification

1        is simply incorrect.

2                Paragraph 4.3(f) of the plan specifically

3        states that -- and I'll read it -- "All

4        distributions to holders of allowed noteholders

5        shall be subject to and the allocations made

6        herein shall be reduced on a prorata basis by the

7        indenture trustee changing lien to the extent of

8        any unpaid indenture trustee expenses that are not

9        paid pursuant to Section 12.4 of the plan."

10               So no modification of the plan would be

11       required to disallow that provision completely.

12               The United States Trustee is not saying that

13       those provisions should be disallowed in its

14       entirety.  We are saying that if the Court -- the

15       Court should modify those provisions in 12.3 and

16       12.4 and require fee applications to be filed so

17       that the Court can review the fees as to

18       reasonableness.

19               We don't believe that the filing of fee

20       applications changes the nature of the

21       compromise.  All it does is put a requirement that

22       they comply with the Bankruptcy Code and file fee

23       applications.

24               Moving on to the releases.  The testimony

25       today was that there are three types of releases

1       in the plan.   12.12(a) are debtor releases to

2       nondebtors.   The 12.12(b) are nondebtor releases

3       by claimants.   And that is consensual.

4              And the third is a nonconsensual release, and

5       that's included in what everyone has been labeling

6       exculpation language, 12.15.

7              It's stated in our brief -- and there's been

8       many issues brought to the Court's attention -- is

9       whether Section 524 precludes any of these

10      releases.

11             I don't know the Court's position on that.

12      There is a split of authority.   There's no

13      controlling in the 11th Circuit.

14             If the Court determines that 524 would

15      preclude any of those releases, all of those

16      provisions should be stricken.

17             If the Court is inclined to allow the

18      releases, the United States requests findings of

19      fact from the Court as to the extraordinary

20      circumstances that exist in this particular case;

21      and as to each party that is being released, what

22      factors the Court has looked at and believes that

23      the debtors meet in order to get those releases.

24             12.12(a) is one of the releases by the

25      debtor.   As mentioned in testimony earlier today,

1    it releases -- the debtor releases nondebtor

2    entities.

3         We believe that's too broad.  There's no

4    reason to include that.  They're releasing present

5    and former directors, officers and employees of

6    the debtor and nondebtor subsidiaries.

7         Again, they're putting everything and the

8    kitchen sink in here.  Everything they could do,

9    they've got it in here.  They've included

10   professionals of the debtor, Wachovia and its

11   advisers, the creditors committee and its members

12   and its advisers.  And the advisers are defined as

13   -- or at least the testimony was today that it

14   includes all their professionals, for the

15   creditors committee and Wachovia.

16        The debtors argue that the four-part test

17   enunciated in Justice Oaks should be looked at to

18   determine whether the releases in this provision,

19   12.12(a), are fair and equitable.

20        Debtor argues that 1123(b)(3) allows the

21   debtors to settle claims.  There are cases which

22   basically say that you can look at those factors.

23   1123 allows debtor to settle claims.

24        The debtors' memorandum also says that the

25   Court does -- that Courts do not look at any other

1     factors.

2          And there is case law that specifically says

3     that the factors that I put in my brief that were

4     used in Transit, that have been used in Exide,

5     they've been used in Continental, those factors

6     are in one case that I found.  It's not used

7     much.  But there aren't too many releases

8     specifically that are written opinions that deal

9     with debtor releases.

10         Exide Technologies, at 300 B.R. 48, took the

11    factors that were first enunciated in Master

12    Mortgage and reviewing releases by a debtor of a

13    nondebtor third party.

14         The factors are whether there are an identity

15    of interest between the debtor and the third

16    party, whether there's an indemnification

17    agreement.  And the one that's most important is

18    whether the nondebtor which is getting the

19    releases has contributed substantial assets to the

20    reorganization.

21         None of these parties have provided financial

22    contribution in the form of money or assets to the

23    reorganization.  They may have put in sweat and

24    they may have negotiated compromises.  They've

25    worked harder.  But we have no testimony as to the

1    nondebtor subsidiaries and what they did to obtain

2    these releases.

3        Likewise, the debtor is releasing its

4    professionals.  Now, the Court will have to go

5    back a little bit into when we employed the

6    investment bankers and other professionals, not

7    the attorneys but the investment bankers and some

8    of those other parties.

9        In those applications, those parties wanted

10   to get indemnification rights.  And we negotiated

11   it down.  However, this releases them of anything.

12   In the applications to be employed, their

13   liability was limited to gross negligence and

14   willful misconduct.

15       However, the attorneys don't have that.  Only

16   the financial advisers received some of those

17   releases.  So, in this instance, the debtors are

18   releasing any malpractice claims they could have

19   against the attorneys in this case.

20       In Exide, the debtor's releases of officers,

21   directors and professionals were not allowed.

22   That case did not have the vote of the unsecured

23   creditors.  And the facts are not similar to this

24   one.

25       In that case, the directors' and officers'

1      contributions were not sufficient, and there was

2      no evidence that the release was necessary to the

3      success of the reorganization.

4          If the Courts utilize the factors that were

5      utilized in Exide, the releases that are in

6      12.12(a) are too broad, and specifically as they

7      relate to past officers, nondebtor subsidiaries,

8      all employees of the debtors and the

9      professionals.

10         12.12(b) is the second provision that we

11     objected to, and that's a little bit -- it's a

12     much more limited release.  In that provision, the

13     debtor is getting claimants to release any claims

14     against any present or former directors, officers,

15     employees of any of the debtors.

16         When we were objecting to the Disclosure

17     Statement, and even prior to that, we made sure

18     that -- we knew this provision was going to be in

19     there.  And based on negotiations and discussions,

20     it was prominently displayed on the ballot.  It

21     was -- although it wasn't bolded in the plan that

22     went out to creditors, it's clearly marked so.

23         So what we are asking is if in fact does --

24     is the Court going to utilize a different standard

25     for consensual releases?  And we just don't know

1        what factors this Court is going to utilize.

2             There are Courts that have said that if it is

3        a consensual release, we don't give it any

4        scrutiny.  If the creditors voted for it, let it

5        go.  And what we're asking is for guidance from

6        the Court as to what it believes is appropriate.

7             The third provision is the 12.15 provision.

8        And in some of the memorandums filed, they're

9        arguing that it is not a release.  It is -- the

10       United States Trustee argues that it is a

11       nonconsensual release.  It's limiting liability of

12       numerous claimants, and it also precludes any

13       causes of action from any claimants.  So it is a

14       release.  It is nonconsensual.  There were no

15       banners or anything anywhere regarding this

16       provision.

17            And so, again, we ask the Court to provide us

18       with what factors it's going to utilize as to

19       determine whether these releases are appropriate.

20            Again, it includes professionals, it includes

21       attorneys.  It does limit their conduct, the

22       releases, which are the result of fraud, gross

23       negligence or willful misconduct.

24            There is case law that says that 1103 allows

25       a creditors committee to obtain -- that is the

1    liability that exists that's spelled out there.

2    That the statutory liability that exists for

3    members of the creditors committee is what is in

4    the plan.

5         There is a case from the 3rd Circuit which is

6    cited PWS, which basically says that professionals

7    can be released.

8         The United States Trustee disagrees with

9    PWS.  We believe that professionals should not be

10   released in exculpation provisions; that it's not

11   proper.

12        What I've provided the Court, in Exhibit

13   Number 2 and in Exhibit 3, are specific sections

14   of the Professional Responsibility Code of New

15   York and Florida, because we have -- most of the

16   attorneys are from both those jurisdictions.

17        And what the professional -- what the

18   attorneys are doing are basically limiting their

19   malpractice liability.  There has been no

20   testimony as to whether the parties -- the debtor

21   had an independent attorney to determine whether

22   that was appropriate.

23        There has been no testimony whether the

24   creditors committee has obtained separate counsel

25   to determine whether the request of limitation of

1       liability by the attorneys was acceptable.

2            We believe that the provisions regarding

3       exculpation and limitation of liability of

4       attorneys that is listed in 12.15 is a violation

5       of ethical standards and should be removed from

6       the plan.

7            So, in conclusion, we believe that this plan

8       can be confirmed.  We believe that the provisions

9       that we have objected to can be modified to comply

10      with the Bankruptcy Code.

11           We believe that the releases are overly

12      broad as they currently exist, and we ask the

13      Court for specific findings regarding the proper

14      test of factors to be utilized when allowing

15      releases.

16           THE COURT:  Thank you very much.

17           Response from Mr. Busey?

18           MR. BUSEY:  Yes, Your Honor.

19           Your Honor, let me deal first in response

20      with the last point that the U.S. Trustee made,

21      and that is the rules of professional conduct.

22           The rule of professional conduct in Florida

23      that the U.S. Trustee has brought the Court's

24      attention to is Rule 4-1.8, which is a rule in

25      conflict of interest, and it's entitled

1   "Prohibitive Transactions."   And this is

2   transactions in which a lawyer cannot engage,

3   generally with a client.

4       Subpart (h) of that is an agreement limiting

5   malpractice.   And it reads, "A lawyer shall not

6   make an agreement respectively limiting the

7   lawyer's liability to a client unless the client

8   is represented by counsel."

9       The U.S. Trustee severely misperceives what

10  is in 12.12(a) and (b) and 12.15.   There is no

11  agreement being offered to the Court here among

12  any of the professionals -- that's between any of

13  the professionals in this case and the debtor.

14  There is no agreement between either professionals

15  in the case and the debtor.

16      This is an agreement among the constituencies

17  of this case that was made pursuant to an act of

18  Congress, the United States Bankruptcy Code, for

19  approval by this Court.

20      The lawyers in the case, the professionals in

21  the case, are not a party to the agreement, so

22  this rule is wholly inapplicable.   But let's put

23  that aside.

24      Start with 12.3 of the plan, and that is the

25  fees for substantive consolidation.   Again, I'll

1     say, as I did in response to the IRS, that the

2     evidence is that those fees totaling $2.7 million

3     were fees incurred by neither the committee nor

4     the debtor but by individual members of the

5     committee and by other ad hoc constituencies who

6     played substantial roles in forging the

7     substantive consolidation compromise.

8            There's nothing in the code that prevents

9     payment of those fees by the debtors as a part of

10    a deal, as a part of a compromise.

11           The only requirement in the code is in 1129,

12    which says that any professional fees to be paid

13    out of an estate during the course of a bankruptcy

14    have to be reasonable.

15           Mr. Huffard said that those fees, which are

16    capped, they may be less than $2.7 but they won't

17    be more than $2.7, brought real value to the

18    estate and saved the estate millions of dollars.

19           And it's not, as Ms. Escamilla said, just in

20    saving the cost of litigation, it was saving the

21    constituencies in this case the potential loss of

22    value of the estate if a compromise were not

23    achieved.

24           He said that that was an investment that was

25    worth many, many times its value in order to get

1    the substantive consolidation done.

2          It was done as a part of the agreement.   It

3    is an integral part of the agreement that the

4    debtor seeks the Court to approve under Rule

5    9019.  And, moreover, it has been blessed by the

6    people who have a real economic interest in this

7    case, and that's the creditors, by over 80 percent

8    of them, by an affirmative vote across all

9    unsecured classes.

10         For the U.S. Trustee to come into this Court

11   without any kind of interest in the outcome of

12   this case and say take that part of the compromise

13   and just pull it out without regard to the risk to

14   the entire compromise simply is inappropriate.

15         The people who have an economic interest in

16   this case have spoken.  They want those fees

17   paid.  They are reasonable, according to

18   Mr. Huffard.

19         And, moreover, you have the safety net of

20   Mr. Appel saying:  I'm going to look at the

21   document and I'm going to make sure they're

22   reasonable in my judgment as well, that is, the

23   debtor.

24         I think there's an adequate record here for

25   you to show and make the finding you need to make

1    under 1129 that they are reasonable and are a part

2    of a compromise and should be approved.

3         The same thing is true for the indenture

4    trustee's fees under 12.4.  The payment of those

5    fees was a part of the compromise.

6         You'll see in the indenture trustee response

7    that the indenture trustee has filed with the

8    Court that they've cited, I think, fifty cases

9    where indenture trustee fees are paid as a part of

10   a compromise.  Because if you didn't do that, they

11   would be paid out the distribution that goes to

12   the indenture trustee and then to the $300 million

13   in bondholders, and the bondholders will receive

14   less in a recovery.

15        The bondholders bargained, as a part of this

16   compromise, to get the 70 cents that they're going

17   to get as a part of the deal and have the debtor

18   pay their fees.  That was a part of the

19   compromise, part of the substantive consolidation,

20   part of the Rule 9019.

21        And the Court has authority under Rule 9019

22   to approve this compromise and authorize it.

23        That gets us to Section 12.12 of the plan and

24   12.15.

25        And, most pertinently, there's nothing in the

1      Bankruptcy Code that prevents this Court from

2      approving a plan that has these releases in it,

3      nothing.

4          524(e), if you read it, does not bar releases

5      as a part of a confirmation of a plan.  And as

6      Ms. Escamilla said, there's no controlling 11th

7      Circuit authority on this issue.

8          So the only question to you as the Court

9      considering the confirmation of this plan, is

10     there some good reason why you should tell the

11     billion-dollar creditor constituency in this case

12     why they shouldn't be able to agree to the

13     releases as they have as a part of this plan?  Is

14     there some good reason?

15         There's nothing as a matter of law, there's

16     nothing in the Bankruptcy Code, there's nothing in

17     the 11th Circuit.  So why should you reach out and

18     say no to the creditors that have spoken in this

19     case?

20         Ms. Escamilla didn't argue today, but she did

21     point out in her brief, that there is a case in

22     the Middle District of Florida, In Re Transit, in

23     which Judge Jenneman in Orlando, upon the

24     objection of the U. S. Trustee's Office in the

25     confirmation of that case, denied the approval of

1      these fees.  That is, sustained the objection and

2      denied confirmation of the plan because of

3      provisions like releases in here.

4           And if you read the Transit decision

5      carefully, you'll see that there was not the

6      record in that case that we have made in this case

7      showing the consideration for and the value of

8      these releases to the estate, because, frankly,

9      you'll see that the debtor in that case simply did

10     not put on a record.  There's only a confirmation

11     affidavit.

12          Moreover, the third-party releases under

13     12.12(b) in that case were not voluntary, they

14     were involuntary, and that particularly stuck in

15     the craw of Judge Jenneman.

16          And the exculpation provisions which Judge

17     Jenneman didn't allow in that case are the same

18     kind of exculpation provisions that had been

19     approved by the 6th Circuit Court of Appeals in

20     PWS and a number of other courts around the

21     country.

22          So there's nothing, as a matter of law, that

23     prevents you from approving this, and there's a

24     lot of good reasons why you should.

25          One more thing I want to say, though.  We had

1    marked in our exhibit book that we would offer to

2    the Court two additional exhibits.  Which I didn't

3    put in any exhibits, as I told the Court, because

4    they're not really proof of the facts, they're

5    persuasive authority on law.  But they were marked

6    for identification as Exhibits 8 and 9.

7         Exhibit 8 were pleadings filed in the case of

8    the Middle District of Florida, Francis Gothier.

9    It was in Tampa, in the Tampa division.  It was

10   Case Number, in Tampa, 04-07239.  It was Judge

11   Williamson.  The exhibit contains the United

12   States Trustee's objection to confirmation, a

13   certified copy of the confirmation order and the

14   transcript of the confirmation hearing.

15        And Exhibit 9 is the pleadings filed in

16   Anchor Glass Container Corp., which was a case in

17   Tampa, in the Middle District.  It's Case Number

18   5-15606, which is Judge Paskay's decision.  Again,

19   the exhibit consists of the United States

20   Trustee's objection to confirmation and an order

21   confirming -- a certified copy of the order

22   confirming the plan of reorganization.

23        In both of those cases -- and both of them

24   are this year, the Gothier case, the confirmation

25   order was signed in June of 2006, and, in the

1           Anchor Glass case, the confirmation order was

2           signed in April of 2006.  In both of those cases,

3           the plans provided for releases in exculpations,

4           just like are provided in this plan, or more

5           onerous.

6               In both of those cases, the United States

7           Trustee's Office, just like they did in Transit,

8           made the objection that the United States Trustee

9           doesn't think they should be in a plan.  In both

10          of those cases, the Court considered Judge

11          Jenneman's decision in Transit and rejected it.

12              And Judge Paskay, in Anchor, and Judge

13          Williamson, in Gothier, overruled the United

14          States Trustee's objection and approved the

15          releases as a part of the plan.

16              What that shows you, once again, is that

17          there is at best a split of authority within the

18          Middle District, which is persuasion only, not

19          binding on you.  And there's no authority that's

20          binding on you that tells you that you shouldn't

21          or can't do it.

22              And as in those two cases which I showed you

23          that came out of Tampa, and unlike the Transit

24          case, we have a record in this case.  There's no

25          record in the Transit case.

1           And the record shows in this case that, in

2      the debtors' judgment, the parties being released

3      under 12.12(a) have made a substantial

4      contribution to this case with the -- with what

5      you have seen.  And you've taken -- you will, in

6      the confirmation order, I hope, take judicial

7      notice of the entire record of this case.

8           This case has been -- for a case of this

9      magnitude, which is a national case, with

10     professionals from all over the country

11     participating in very difficult issues, including

12     the evidence you've heard today on substantive

13     consolidation, a remarkably consensual case.

14          It has been well-led and well-advised by

15     outside professionals, both lawyers and investment

16     bankers.

17          The parties have behaved reasonably and

18     responsibly.  They have brought an extraordinary

19     economic tempest and brought it to a consensual

20     resolution in a reasonable period of time.

21          And by this plan and because of these

22     releases want to bring closure, want to bring

23     closure to this process, with all of the contests

24     that are going on.  And it's because it's a

25     consensual plan, it's because it's a compromise,

1    it's because there's substantial contribution
2    brought because of the give-up by the debtor, the
3    rejection of its prepetition and indemnity
4    obligations to officers and directors which was
5    bargained for in exchange for the releases that
6    are in the plan.
7         That's again a substantial consideration.
8    It's record evidence not present in Transit.
9    There is substantial consideration being given for
10   these releases.
11        There's nothing in the code or the case law
12   binding on this Court that bars them.  The parties
13   in interest want them.  The parties in interest
14   have, by 80 percent vote of approval, approved
15   them, and the person here objecting to it is
16   someone who has no economic interest in the case.
17        Under those circumstances, we think that you
18   should overrule the objection and approve the
19   release bargained for by the parties in the case.
20        THE COURT:  Thank you very much.
21        UNIDENTIFIED SPEAKER:  Thank you, Your
22   Honor.  Again, I'll be brief and not to repeat
23   anything that Mr. Busey has said.
24        I guess I'll answer for the New York lawyers
25   under the New York Code of Professional

 1        Responsibility.  Similarly, the New York Code

 2        provides that this is to limit prospectively the

 3        lawyer's liability for malpractice or anything

 4        else.

 5            Your Honor, with respect to the professionals

 6        for the committee and, particularly, the attorneys

 7        covered by this, as you know, the committee will

 8        cease to exist in its current form upon

 9        confirmation and upon the effective date of this

10        plan of reorganization.

11            So, in fact, the committee and its attorneys

12        won't be in a position where we have a committee

13        prospectively waiving any potential malpractice

14        claims that it may have against the attorneys that

15        no longer exist or are no longer its attorneys in

16        connection with the Chapter 11 case.  So,

17        likewise, the New York law, we believe, is

18        inapplicable in these cases.

19            Not to repeat anything that we've said before

20        with respect to the fees, I would just note, you

21        know, as you've heard, if there is a dispute with

22        respect to the reasonableness of the fees -- and

23        you heard Mr. Appel on the stand say that it's the

24        company's money and he's taking that very

25        seriously -- if the parties still have a dispute,

1    meaning they can't consensually resolve the
2    reasonableness, it will be brought in front of
3    Your Honor.
4         I can tell you if I was the attorney asking
5    for the fees or the debtors were objecting to the
6    fees that that fee statement would be in front of
7    Your Honor to make a determination of whether or
8    not the fees are reasonable.
9         So the U.S. Trustee's argument that you
10   may not see the fees, Your Honor, I think falls
11   flat, because, if there is a dispute, those fees
12   will be sitting in front of you to make that
13   determination.
14        Your Honor, we've already spoken about why
15   it's important and all the efforts that the
16   individual members of the committee and their
17   professionals have made in this case.  You've
18   heard testimony about it, you've heard argument
19   about it.  I'm not going to belabor the point.
20        But, obviously, all the parties involved in
21   the negotiation of this plan, as well as the
22   80-plus percent of creditors that have accepted
23   this plan, do not object to that particular
24   point.
25        They believe that there is substantial

1     consideration given by those parties, and that, as

2     part of one of the elements of the settlement,

3     it's absolutely appropriate for the reasonable

4     fees of those professionals to be paid by the

5     estate.

6         Shortly, with respect to the indenture

7     trustees, Your Honor, I didn't want to stand up

8     here and say that it's common, because that's not

9     something that we would argue.  But we can cite,

10    and we have cited in our papers as well as the

11    indenture trustee has cited, a number of cases of

12    just -- only a few of the many cases that provide

13    for similar treatment.

14        And it's important to certain of the

15    creditors, and particularly here the noteholders,

16    because it's a direct impact on their distribution

17    if for some reason the estate, which has agreed in

18    this context as many estates have, do not pay

19    those reasonable fees of the indenture trustee.

20        There is -- the indenture provides for a

21    charging lien.  And if that creditor -- indenture

22    trustee is not paid, that indenture trustee would

23    get a distribution on account of all those

24    creditors.  In this case, common stock.  Would

25    have to liquidate that common stock to pay its

1      fees, which, number one, would reduce a

2      distribution to the noteholders; and, number two,

3      would have to start to create a market in those --

4      in that stock which may or may not have an impact

5      on the ultimate amount of the -- of the trading

6      ability and what the stock would trade.

7           So, Your Honor, I'm -- I understand from a

8      number of the noteholder constituencies in this

9      case that this would be a concern of theirs.

10          And, in fact, it would not be inconceivable

11     for some of them to argue, although there is some

12     language, as Ms. Escamilla said, in the plan that

13     this was not what they expected under the plan;

14     that they expected those fees to be paid.

15          Again, with respect to the releases, not to

16     repeat what Mr. Busey has said, you've heard

17     testimony about the substantial contributions that

18     the parties who are the beneficiaries of the

19     debtors' release have provided in these cases.

20     For example, the creditors committee's releases

21     and releasees.

22          The cornerstone of this plan is a substantive

23     consolidation compromise, Your Honor.  As you

24     heard in this testimony in the record about the

25     arduous arm's-length negotiations, how the

1       creditors committee, with its fiduciary duties to

2       all at the same time as having their individual

3       viewpoints as being a cross-section of this

4       committee, took months upon months of analysis,

5       negotiations, et cetera, to try to resolve the

6       cornerstone of the plan, the last gating item to

7       get this restructuring done and the company out of

8       Chapter 11, and believe that the creditors

9       committee and its members have provided

10      significant consideration.

11          With respect to exculpation, we've cited a

12      number of cases in our pleading that we filed,

13      Your Honor, that provides that exculpation is

14      absolutely appropriate under the circumstances for

15      a creditors committee.

16          In fact, there are cases that we've cited

17      that provide that exculpation should be provided

18      as long as it is no broader than what the law

19      provides.

20          We submit, and our papers provide, that what

21      is being asked for here is exactly what the law

22      provides and, therefore, is appropriate under the

23      circumstances and should be approved and the

24      objections of the U.S. Trustee should be

25      overruled.

1          THE COURT:  Thank you.

2          MR. REISMAN:  Good afternoon, Your Honor.  My

3     name is Steven Reisman, and I'm with the law firm

4     of Curtis, Mallet-Prevost, Colt & Mosle.  We are

5     counsel for Wilmington Trust Company, as indenture

6     trustee.

7          Given the hour, the late hour, and the

8     arguments of learned, bright, articulate counsel,

9     Mr. Busey and Mr. Barr, I won't belabor or I won't

10    go on with many arguments here.  But I just want

11    to have the record clear on a couple of points.

12         One is that we support the releases that are

13    provided for under the plan.  We believe that

14    there was a substantial give-up by the directors

15    and officers.

16         Wilmington Trust Company is both a member of

17    the creditors committee as a creditor in this case

18    and as a representative of the noteholders here,

19    $310 million of noteholders, and was very much

20    involved in the process of negotiating many points

21    of the plan.

22         One of the key provisions of the plan are

23    the releases that go to the directors, the

24    officers, the professionals, and we fully support

25    that.

1        The noteholders fully support that in the

2    fact that 98 percent in number and 99 percent in

3    amount of the class voted to approve this plan on

4    the noteholders, irrespective of the overall

5    80-percent approval that this plan achieved,

6    which, I believe, is remarkable given the size of

7    the case, the complexity, the issues.

8        With respect to the fees of the indenture

9    trustee and the fees of the members of the various

10   committees, the ad hoc committee, the creditors

11   committee, there is self-interest clearly on the

12   part of Wilmington Trust, clearly on the part of

13   the professionals involved in having that

14   approved.

15       That was very much a part of the settlement,

16   right, so that the recoveries of the noteholders

17   and of all the creditors would not be impacted; it

18   would be paid directly by the debtor.

19       There is a mechanism here -- and I have no

20   doubt that Mr. Appel, who testified and is general

21   counsel and who is very much on top of this case,

22   is reviewing our fee statements as he has them

23   and will question us on any issues that he has, as

24   well as all the other professionals before him.

25       It's his fiduciary duty to maximize the

1    recovery for the creditors of this estate and to

2    look after the reorganized debtor when this

3    company emerges from bankruptcy.

4         Your Honor, the last comment, and that is

5    that, you know, the bankruptcy process in this

6    case worked.  It didn't please everybody.  The

7    noteholders here could have received in excess of

8    a hundred cents on the dollar had these cases not

9    have been deemed substantive consolidation or the

10   compromise not have been reached under 9019.

11        This is -- this is a case which worked

12   remarkably well.  No one is particularly pleased.

13   But we are all satisfied, or most of us are

14   satisfied, with the -- with the outcome that this

15   case has achieved.

16        The settlement that is embodied in the plan

17   provides for the payment of the fees, provides for

18   the releases.

19        We would respectfully request, Your Honor,

20   that you overrule the objection of the U.S.

21   Trustee.

22        Thank you.

23        THE COURT:  Thank you, sir.

24        MR. McCONNELL:  May it please the Court,

25   Jerrett McConnell appearing on behalf of the ad

1     hoc committee of Winn-Dixie retirees.

2          Your Honor, I just wanted to address the

3     professional fees issue. I won't get into the

4     releases or exculpation provisions.

5          But, Your Honor, attorneys with much larger

6     reputations and hourly rates, to be quite honest,

7     than I have already submitted briefs on this issue

8     and argued the legalities of the provisions, this

9     provision of the proposed plan, and there's really

10    no reason for me to rehash those arguments.

11         However, Your Honor, I would like to say

12    this. In negotiating the substantive

13    consolidation issues, the professionals for the

14    creditors committee, the ad hoc trade committee

15    and the ad hoc retirees committee did not save

16    this estate millions of dollars. I firmly believe

17    that they actually did save this estate. I have

18    no doubt in my mind that this estate could not

19    have survived the litigation of the substantive

20    consolidation issue.

21         In agreeing to the substantive consolidation

22    compromise, the retirees withdrew certain legal

23    theories and arguments that could have garnered

24    them a better return on their claims. But because

25    they felt that litigating those issues would have

1        a detrimental impact to the estate, thereby

2        jeopardizing their return as well as those of all

3        of the unsecured creditors, they agreed to the

4        compromise outlined in the plan.

5            And the part of the compromise that convinced

6        them that this was the best option that, so to

7        speak, sealed the deal for the retirees was the

8        inclusion of the provision to reimburse the

9        retirees for their professional fees.

10            To pull that provision out of the substantial

11        consolidation compromise is to unwind the whole

12        settlement in the eyes of the retirees committee.

13            Your Honor, the men and women of this

14        committee aren't multi-billion-dollar

15        corporations.  They're not millionaire land

16        developers that can take back their shopping

17        center from Winn-Dixie and market it to someone

18        else to recoup their losses.

19            Many of them are on fixed incomes and many of

20        them will lose a large portion of that monthly

21        income when the MSP checks stop this month.  Yet,

22        a group of them felt that it was important enough

23        that all MSP and SRP participants be represented

24        in these proceedings and, therefore, they pooled

25        their resources to hire an attorney.

1           The debtor recognized the importance of their

2      participation in this reorganization and, in

3      recognition of their substantial contribution,

4      agreed to pay their professional fees as part of

5      the substantial consolidation compromise.

6           The debtor knows this is the right thing to

7      do.   The creditors, the overwhelming majority of

8      whom voted to approve this plan, know that it's

9      the right thing to do.   I just for the life of me

10     cannot understand why the U.S. Trustee can't see

11     that it's the right thing to do, both legally and

12     ethically.

13          Your Honor, the decisions of the U.S. Trustee

14     in this case have cost this estate and, therefore,

15     the creditors millions of dollars.   The decisions

16     of the U.S. Trustee mainly to appoint an equity

17     committee cost this Court countless hours of

18     courtroom time, and now the U.S. Trustee is

19     seeking to derail a compromise that the creditors

20     overwhelmingly support.

21          I ask the Court today to tell Ms. Escamilla

22     the same thing that you told me so many months

23     ago, that this is a complicated case and that

24     people are going to get paid.

25          I ask that you confirm this case and overrule

1      the U.S. Trustee's objection.

2           Thank you.

3           THE COURT:   Number one, I didn't have an

4      ex-parte communication with Mr. McConnell and told

5      him he was going to get paid; and, number two,

6      Ms. Escamilla, you're doing your job.

7           Yes, sir.

8           MR. SOLL:   Good afternoon, Your Honor.

9      Steven Soll from Otterbourg, Steindler, Houston &

10     Rosen.   We're counsel for Wachovia Bank.   I'm here

11     to address and respond to the U.S. Trustee's

12     objection relating to the releases.

13          We have filed a written response in

14     connection with that objection.   I will not

15     repeat, although I support, the comments made by

16     Mr. Busey and Mr. Barr.

17          I would ask the Court to take judicial notice

18     of the DIP financing order in this case, which is

19     docket number 501.   And I would ask the Court to

20     take judicial notice of the order approving the

21     exit financing commitment letter that was entered

22     in this case, and that's docket number 9266.

23          The DIP financing order, Your Honor, in

24     Section 15(e), provided the creditors committee

25     with an opportunity to investigate matters

1       pertaining to Wachovia's liens and claims.

2           They had a challenge time period.  And the

3       order provided that, at the end of that time

4       period, if an adversary proceeding was not

5       commenced, Wachovia would have releases for all

6       matters relating to prepetition activities.

7           The challenge period expired, the

8       investigation was done, and no claims were

9       asserted against Wachovia.  So Wachovia, in

10      essence, has releases with respect to all matters

11      leading up to the petition date.

12          The DIP financing order also approved the DIP

13      agreement.  The DIP agreement had the credit

14      agreement.  The credit agreement had broad

15      indemnification language in it.  That language is

16      set forth as an attachment to the response that we

17      filed.  And that indemnifies Wachovia for all

18      matters relating to their actions during the

19      Chapter 11 case, excepting gross fraud, willful

20      misconduct, et cetera.

21          Later in the case, when we got to the stage

22      of the exit financing, the commitment letter

23      provides both that a plan be filed that's

24      acceptable to Wachovia, and we bargained for the

25      releases that are in the plan.

1                   And that commitment letter also contained

2          indemnification provisions regarding Wachovia's

3          conduct in connection with the exit financing and

4          that facility and the commitment letter.  So we

5          have different indemnifications and releases for

6          different stages already.

7                   The result from that is that were claims to

8          be asserted against us should these provisions not

9          be approved, we would have indemnification rights

10         against the debtor.  And that's one of the

11         elements that is considered in the Transit case as

12         it pertains to identity of interest of parties.

13                  As it pertains to substantial contribution, I

14         think Mr. Huffard and Mr. Appel's testimony was

15         pretty clear that they believe that all the

16         parties that were included in the release

17         provisions were making substantial contributions.

18                  To be specific about Wachovia's

19         contributions, we have funded an $800 million DIP

20         facility.  We will be prepared to fund a $720

21         million exit financing facility.  I think the

22         testimony is clear that the exit facility is

23         critical and necessary to the reorganization.

24         Nobody challenges that.

25                  In addition, we obviously are agreeing to the

 1          payments that are being made in this case.   And

 2          Mr. Huffard's testimony was that $150 million of

 3          payments would be made to parties in interest

 4          under the plan.

 5              As the holder of first lien on substantially

 6          all of the assets, that represents an

 7          accommodation and a concession on Wachovia's part

 8          that's consistent with providing the exit

 9          financing facility.  So we've made substantial

10          contributions in several ways.

11              Those matters in which we've made a

12          contribution are almost identical to the

13          contributions that were made in the Transit case

14          by General Electric Capital Corporation, which,

15          even under that restrictive standard in that case,

16          GECC was, in fact, granted the types of releases

17          that are requested in this proceeding for

18          Wachovia.

19              So we believe that, both factually as well as

20          under the law, the releases and indemnification

21          provisions are appropriate and they're clearly

22          necessary and we think, at this juncture, we're

23          entitled to them.

24              Thank you.

25              THE COURT:   Thank you.

1          Are there any other parties here who has

2    filed a written objection that hasn't been heard?

3          MR. NICANDRI:  Yes, Your Honor.  This will be

4    quick, though, because I believe we've got a

5    resolution.

6          THE COURT:  You are?

7          MR. NICANDRI:  Peter Nicandri for CVS EGL

8    Overseas Marathon FL, LLC.

9          This entity, our client, is a tenant of

10   Winn-Dixie.  Winn-Dixie being the landlord at a

11   property located in the Keys.

12         Our objection is very limited.  It has to do

13   with the revesting provisions of the confirmation

14   order, proposed confirmation order, as well as the

15   plan.

16         In particular, our lease has not been assumed

17   or rejected as of this date.  And the fear with

18   the language in the plan and the proposed order

19   was that the revesting would -- the way the

20   revesting language is written, the debtors would

21   retain their property -- the reorganized debtors

22   would retain their -- or regain their property

23   free and clear of encumbrances on the property as

24   well as they could dispose of the property without

25   the restrictions of the Bankruptcy Code.

1           There has been a motion for assumption of

2      this lease filed but it has not been heard yet.

3      And the fear for CVS is that the revesting

4      language could be construed pretty readily, in our

5      view, to hurt our lease rights.

6           Essentially, we like the store, we want to

7      keep the store.  We're pleased that they want to

8      assume it.  But, at the same time, the revesting

9      language created some issues for us.

10           But a few minutes ago we did -- I think

11      we resolved this issue.  Winn-Dixie has agreed

12      to insert some language in Chapter 4- -- or

13      Section 44, I believe, of the proposed

14      confirmation order that specifically references

15      Section 365(h) that would make it clear that any

16      revesting is not intended to affect our rights

17      under that section.

18           THE COURT:  Mr. Busey, is that your

19      agreement?

20           MR. BUSEY:  Yes, Your Honor.

21           THE COURT:  Very well.  It's on the record.

22           MR. NICANDRI:  Thank you.

23           MR. FITZGERALD:  Your Honor, Brian FitzGerald

24      for the Florida tax collectors.  I just have a

25      brief follow-up.

1          We did discuss this morning the issues in

2     regard to interest and constitutional

3     jurisdictional issues which are raised in the

4     Florida tax collectors' objection.  Those were the

5     only ones dealt with in the debtors' brief in

6     support of confirmation.

7          There were a few other bases set forth in the

8     Florida tax collectors' objection, some of which

9     deal with positions taken in regard to the 505

10    motions.

11         I could either address those briefly for the

12    record, or, as an alternative, in the interest of

13    time and the late hour, if we could include those

14    in the supplemental memo, memorandum, that the

15    Florida tax collectors will be filing by this

16    Wednesday.

17         THE COURT:  That's what I anticipated at the

18    time.  And you weren't able to make the last

19    hearing, so I thought I would give you some time

20    to insert some input into the thing.

21         MR. FITZGERALD:  Okay.

22         THE COURT:  So that's fine.

23         MR. FITZGERALD:  Very well.  Thank you.

24         THE COURT:  Are there any other creditors

25    that have filed an objection that want to be

1      heard?

2           Any objection that hasn't been articulated,

3      other than landlord objections that I said I will

4      consider on the merits that relate to the deemed

5      substantive consolidation, are overruled for

6      failure to prosecute.

7           Ms. Dowd.

8           MS. DOWD:  Your Honor, this is more in the

9      nature of a housekeeping point, but I wanted to

10     make this on the record.

11          Attached to the debtors' memorandum in

12     support of confirmation is a proposed confirmation

13     order, which I realize is not actually in front of

14     you right now.  But there is an offensive

15     provision in it that I wanted to call the Court's

16     attention to, which is paragraph 68.

17          It's not directed at landlords, it's directed

18     generally at the effect of the order.  And it

19     requests the Court to waive Bankruptcy Rule

20     3020(e).  Which the rule provides that anytime a

21     confirmation order is entered, it can't become

22     effective for at least ten days.  Along with

23     certain other types of provisions in the

24     Bankruptcy Code, there's always a ten-day waiting

25     period.

1          And the debtors are requesting, as I read the

2     proposed order, or they will be requesting, that

3     the Court waive that rule, and we object to that.

4          THE COURT:    Thank you.

5          Does anybody else have any objections?

6          Mr. Busey, do you need to respond to anything

7     at this point?

8          MR. BUSEY:    Well, without getting into what

9     is really offensive in this courtroom, Your Honor,

10    we have agreed to take out that paragraph that

11    Ms. Dowd just spoke to.

12         THE COURT:    Thank you.

13         There being nothing further, the hearing is

14    concluded.    Thank you very much.

15         THE MARSHAL:    All rise.

16         (Whereupon, the proceedings were concluded at

17    5:05 p.m.)

18                         -  -  -

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2    STATE OF FLORIDA )

3    COUNTY OF DUVAL  )

4           I, Elizabeth M. Masters, RPR, and Notary

5    Public, State of Florida at Large, do hereby certify

6    that the attached material represents the proceedings

7    before the United States Bankruptcy Court, Middle

8    District of Florida, Jacksonville Division, before the

9    Honorable Jerry A. Funk, Bankruptcy Judge, in the

10   matter of In Re: Winn-Dixie Stores, Inc., et al.; such

11   transcript is an accurate recordation of the

12   proceedings which took place.  A transcript of this

13   proceeding has been produced on October 24, 2006.

14

15

16

17

18

19                         STATEWIDE REPORTING SERVICE

20

21

22

23                         ELIZABETH M. MASTERS, RPR

24

25