**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |

**NOTICE OF FILING**

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors in possession, give notice of filing the attached Response of XRoads Solutions Group, LLC to the Stuart, Maue, Mitchell & James, Ltd. Final Reports of the Review and Analysis of the First, Second, Third and Fourth Interim Applications of XRoads Solutions Group, LLC.

Dated: December 19, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By    *s/ D. J. Baker*
        D. J. Baker
        Sally McDonald Henry
        Rosalie Walker Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

Co-Counsel for Reorganized Debtors

SMITH HULSEY & BUSEY

By    *s/ Cynthia C. Jackson*
        Stephen D. Busey
        James H. Post
        Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-3817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., *et al.,* | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

**RESPONSE OF XROADS SOLUTIONS GROUP, LLC**
**TO THE STUART, MAUE, MITCHELL & JAMES, LTD. FINAL REPORTS OF**
**THE REVIEW AND ANALYSIS OF THE FIRST, SECOND, THIRD AND**
**FOURTH INTERIM APPLICATIONS OF**
**XROADS SOLUTIONS GROUP, LLC**

XRoads Solutions Group, LLC ("XRoads"), financial and operations restructuring

advisors for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as

debtors and debtors-in-possession in the above-captioned case (collectively, the

"Debtors"), submits this response ("Response") to the Stuart, Maue, Mitchell & James,

Ltd. ("Stuart Maue") Final Report of their review and analysis of XRoads' First Interim

Fee Application for the period from February 21, 2005, through and including May 28,

2005 (the "First Report");  Stuart Maue's Final Report of their review and analysis of

XRoads' Second Interim Fee Application for the period from May 29, 2005, through and

including October 1, 2005 (the "Second Report"); Stuart Maue's Final Report of their

review and analysis of XRoads' Third Interim Fee Application for the period from

October 2, 2005, through and including January 28, 2006 (the "Third Report"); and Stuart

Maue's Final Report of their review and analysis of XRoads' Fourth Interim Fee

1

Application for the period from January 29, 2006, through and including May 27, 2006 ("Fourth Report").[1] In support of this Response, XRoads represents as follows:

## Background

A.    Chapter 11 Cases

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed petitions under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors' cases were jointly administered for procedural purposes only.

2.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. The Debtors operated their businesses and managing their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

3.    The Debtors' bankruptcy cases were one of the 10 largest bankruptcy cases filed in 2005, with approximately $2.2 billion in assets as of the Petition Date. Turnarounds & Workouts, vol. 20, no. 1, January 15, 2006. Moreover, over 24,400 filed and scheduled claims were asserted against the Debtors in the aggregate amount of approximately $25 billion.

4.    By final order dated March 29, 2005, XRoads was authorized to provide services to the Debtors in these cases (the "XRoads Retention Order"). The XRoads Retention Order authorized XRoads to be compensated on the terms of its engagement agreement and an amendment thereto. Copies of XRoads' engagement agreement, amendment number 1 thereto and the order approving XRoads are hereto as Exhibit A.

---

[1] Stuart Maue's First Report, Second Report, Third Report and Fourth Report are hereinafter referred to collectively as the "Reports."

5.      On June 29, 2006, the Debtors filed the Disclosure Statement with Respect to Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors as well as their Joint Plan of Reorganization, which were both subsequently amended and filed on August 2, 2006. On August 4, 2006, this Court approved the Debtors' disclosure statement, as amended. The hearing to consider confirmation of the joint plan of reorganization occurred in October 2006 and on November 9, 2006 this Court confirmed the joint plan of reorganization, and the plan of reorganization became effective on November 21, 2006.

B.      Interim Payment Procedures

6.      On March 15, 2005, the Final Order Approving Interim Compensation Procedures for Professionals was entered (the "Interim Payment Order").

7.      Under the Interim Payment Order, professionals may be paid up to 80% of fees earned and 100% of expenses incurred on monthly statements after submission of fee statements to certain parties, including the Debtors and their counsel, the U.S. Trustee, counsel for the creditors' committee and counsel for the Debtors' secured lenders and after expiration of objection periods. The remaining 20% of fees are payable after court approval of interim fee applications. Interim fee applications are to be submitted approximately every four to six months.

8.      XRoads' First Interim Fee Application ("First Application") covered the period from the Petition Date through May 28, 2005, and sought $4,534,122.50 in fees and $326,995.50 in expenses. The First Application was approved by this Court on August 4, 2005. XRoads' Second Interim Fee Application ("Second Application") covered the period from May 29, 2005, through October 1, 2005, and sought $5,984,350

3

in fees and $374,713.55 in expenses. The Second Interim Fee Application was approved by this Court on December 1, 2005. XRoads' Third Interim Fee Application ("Third Application") covered the period from October 2, 2005, through January 28, 2006, and sought $4,426,882.80 in fees and $277,328.74 in expenses. The Third Application was approved by this Court on April 6, 2006. XRoads' Fourth Interim Fee Application ("Fourth Application") covered the period from January 29, 2006, through May 27, 2006, and sought $3,716,110.50 in fees and $236,989.35 in expenses. The Fourth Application was approved by this Court on August 10, 2006.[2]

9.     XRoads has received no objections to its monthly fee statements or to its Fee Applications. XRoads has received all requested amounts under XRoads' Fee Applications that have become due under the Interim Payment Order.

### Stuart Maue

10.     By order dated December 14, 2005, this Court approved the Debtors' application to employ and retain Stuart Maue as the fee examiner in these cases (the "Fee Examiner Order").

11.     In accordance with the Fee Examiner Order, Stuart Maue does not make any determinations or recommendations in its written reports as to either (a) the reasonableness or necessity of the requested fees and expenses or (b) the amount of fees and expenses to be allowed or disallowed. Fee Examiner Order ¶ 8.

### Preliminary Statement

12.     As set forth below, the issues raised by Stuart Maue do not preclude approval by this Court of the fees and expenses requested by XRoads in its Fee

---

[2]    The First Application, Second Application, Third Application and Fourth Application are hereinafter referred to collectively as the "Fee Applications."

Applications. XRoads also notes that during its engagement and in its Fee Applications, it has previously taken voluntary reductions of more than $425,000 in fees and expenses.

13.     As an initial matter, XRoads notes that the Reports have not analyzed the difficulty of these Debtors' cases, the efforts by XRoads to achieve the Debtors' goals, and the effectiveness of XRoads' work. XRoads submits that its Fee Applications should be reviewed in the overall context of these cases.

14.     Throughout the course of XRoads' engagement, the Debtors have made significant progress in these cases, resulting in a confirmed plan of reorganization. XRoads has assisted the Debtors in (a) obtaining critical financing for their cases, (b) resolving numerous reclamation claims, PACA claims and other claims, resulting in savings of millions of dollars in proceeds for the Debtors' estates, (c) assisting with the sale of various assets, resulting in millions of dollars in proceeds for the Debtors' estates, (d) assisting in re-negotiations of non-real estate contracts, (e) assisting in the preparation, negotiation and solicitation of the Debtors' joint reorganization plan, (f) restructuring the Debtors' sourcing department and procedures for procurement of non-inventory products and services resulting in millions of dollars of savings for the Debtors' estates; (g) assisting in evaluations of ongoing operations and subsequent closings of non-profitable locations resulting in millions of dollars in proceeds and savings to the Debtors' estates; and (h) assisting the Debtors with their cash management processes and controls and reporting of same to the cases' constituents. The actual services rendered by XRoads, are amply described in its Fee Applications, while no such references are made in the Reports.

15.    The standard for analyzing fee requests is whether the services rendered to the estates were reasonable and necessary, and not whether, in hindsight, some fee or expense may be questioned. Thus, although the Reports, which place weight on statistical and computer-generated analysis, are informative, the central inquiry is the reasonableness of fees and expenses incurred, in light of the services performed. On that basis alone, XRoads submits that its services rendered to the Debtors in these cases warrant no reductions in fees or expenses other than what is set forth in this Response. In support of its position that fee and expense reductions are not warranted, XRoads sets forth below its responses to the issues raised by the Reports.

16.    As indicated in the Reports, Stuart Maue utilized statistical and computer-generated reports based on its own criteria and that of the United States Trustee Guidelines (the "Guidelines"), which contain guidelines for facilitating the review of fee applications. XRoads respectfully submits that computer-generated analysis by its nature cannot determine whether sufficient information exists to determine whether fees and expenses are reasonable in light of the services rendered. The purpose of the fee application is "to enable the Court to reach an informed decision – one necessarily grounded in complete, coherent information – as to whether the requested compensation is justified." In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 845 (3d Cir. 1994). Thus, even an allegedly technically deficient entry should be approved so long as adequate information exists to permit the Court to determine the reasonableness of the activity described. XRoads submits that its time entries meet this standard.

17.    In addition, some of the time entries identified by Stuart Maue attempt to elicit more detailed information when from time to time XRoads purposely provided

entries attempting to preserve certain privileged or otherwise confidential information, including case strategy and communications with Debtors' counsel. XRoads should not be subject to fee reductions for time entries that are worded in order to protect such information.

### Reports

18.     The balance of this Response will track the substantive categories of the Reports as to both fees and expenses.

### Fees

A.     Re-computation of Fees and Expenses

19.     The First Report reflects that the amount of fees requested in the First Application was $800.00 more than the amount computed by Stuart Maue. First Report at 5. XRoads will reduce its fees by this $800.00 amount.

20.     The Fourth Report identifies the fact that XRoads requested fees that were $68,624 less than the computed amount. Stuart Maue correctly identifies the difference as "the result of a courtesy discount in the amount of $68,625 by XRoads and a computational difference of $1."

21.     The Reports reflect no other differences between the amount of fees or expenses requested by XRoads and the amount of fees and expenses computed by Stuart Maue.

B.     Potential Inadvertent Double Billing / Duplicative Entries

22.     The Reports identify various timekeepers who may have inadvertently double billed time entries. See First Report at 6; First Report Exhibit B; Second Report at 6; Second Report Exhibit C; Third Report at 6; Third Report Exhibit B  Fourth Report

at 6; Fourth Report Exhibit B. The entries in question total 296.81 hours with $120,624 in associated fees.

23.    XRoads has reviewed the entries involved and/or has contacted the respective timekeepers about the entries at issue. Most of the entries do not involve double billing or duplicative entries. However, XRoads analysis suggests that 101.4 of the hours identified by Stuart Maue's Reports may involve inadvertent duplicative entries. Therefore, out an abundance of caution, XRoads will reduce its fees by the equivalent value of the 101.4 hours identified, which amounts to $42,012.00.

C.    Missing Task Description

24.    The First Report identifies one time entry that does not contain a description. First Report at 6. As the First Report suggests, the description for services rendered on March 29, 2005, by A. Stevenson for 0.60 hours was inadvertently omitted. The following omitted description should have been inserted and is consistent with Mr. Stevenson's other time entries for work during this period: "Prepare and provided financial information to advisors for the Unsecured Creditor's Committee in response to their request."

25.    The Second Report identifies three time entries that do not contain a description. Second Report at 6; Second Report Exhibit C. First, the description for services rendered by A. Stevenson on June 7, 2005 for 0.30 hours was inadvertently omitted and should have read, "Reviewed bank plan presentation and preparation for discussion with the advisors to the Unsecured Creditor's Committee." The description for services rendered by P. Windham on September 30, 2005 for 0.40 hours was inadvertently omitted and should have read, "Revise CAPEX survey form to incorporate

8

changes from J. Veal (WD) and C. Reynolds (WD)." The description for services rendered by R. Damore on August 26, 2005 for 0.40 hours was inadvertently omitted and should have read, "Communications to XRoads' cross functional team regarding the removal of inventory at the closing GOB store by Hilco personnel."

26.    The Third Report identifies one time entry that does not contain a description. Third Report at 6; Third Report Exhibit C. As the Third Report suggests, the description for services rendered on November 29, 2005, by J. Coblentz for 1.8 hours was inadvertently omitted. The following omitted description should have been entered, and is consistent with Mr. Coblentz's other time entries for work during this period: "Creation of category assessment document."

D.    Time Keepers and Positions

27.    Due to the size and complexity of the Winn-Dixie Chapter 11 cases, a number of XRoads personnel have been assigned to the cases. The personnel assigned have been appropriate for the scope of XRoads engagement, urgency of work required, type of work performed and expertise required by the cases. The cases involve 24 estates, thousands of creditors, shareholders and other parties in interest and billions of dollars in assets and claims. XRoads believes that all timekeepers for all interim periods have performed necessary services. Stuart Maue has calculated the blended hourly rate during the pendency of XRoads engagement as approximately $415 for its professionals, and approximately $375 as the blended hourly rate for XRoads' professionals and paraprofessionals combined First Report at 8: Second Report at 8; Third Report at 8; Fourth Report at 7.

28.    As explained in XRoads' Fee Applications, XRoads' services during these

9

interim periods have assisted the Debtors in generating millions of dollars in sale proceeds and savings.

E.    Hourly Rate Increases

29.    The First Report correctly points out that XRoads increased the hourly rates of three paraprofessionals from $100 to $160 per hour effective April 1, 2005. The explanation for this increase is that the hourly rates for the three paraprofessionals were inadvertently coded incorrectly into XRoads' system at the outset of the engagement, and were subsequently corrected. Each of the three paraprofessionals has professional experience, expertise and education justifying their $160 per hour rate. Further, the $160 hourly rate is reasonable and standard for the work provided by these paraprofessionals.

F.    Time Increments; Complete and Detailed Descriptions

30.    The Reports note that all but 22 of XRoads billing entries were in tenths of an hour increments as required by U.S. Trustee Guidelines and most of the task descriptions were sufficiently detailed and included the type of activity and subject matter involved. The Fourth Report identifies one of XRoads' timekeepers whose time was not billed in tenths of an hour increments during the Fourth Application period totaling $15,355 in associated fees. Fourth Report at 8; Fourth Report Exhibit D. This particular timekeeper inadvertently recorded his time in one hundredths of an hour increments rather than tenths of an hour increments. XRoads has recalculated those time entries and has rounded the time for each particular entry to the nearest tenth of an hour increment. Accordingly, the correct amount of time for Mr. Gutierrez on the 22 entries should have been 30.7 hours with associated fees of $12,280. Accordingly, XRoads will discount its fees by $2,200, the difference in the amount billed at tenths of an hour increments versus

10

hundredth of an hour increments after appropriate rounding.

G.    Vaguely Described Conferences

31.    The Reports state that most of XRoads' entries for conferences, telephone calls and meetings provided detailed descriptions that included the names of the participants and the subject matter. First Report at 10; Second Report at 9; Third Report at 9, Fourth Report at 9. The Reports identify some conferences and meetings that either did not identify all of the participants or did not specify the subject matter or purpose of the communication. First Report at 10; Second Report at 9-10; Third Report at 9-10; Fourth Report Exhibit E-1.

32.    In large cases, there are often days when meetings are held with large groups, such that identifying each participant in the meeting would be impracticable or impossible. For example,  Holly Etlin's time entry on April 13, 2005, reads as follows:

Meeting on Business Plan assumptions (1.9)

First Report Exhibit F-1 at 2.

This particular meeting had no less than 20 participants, including the Debtors' CFO, Controller, accounting team, Blackstone representatives, attorneys from Skadden Arps and XRoads' professionals. Some attendees attended by conference call and joined after the meeting began, and some left the meeting before it was finally concluded. Identifying each participant/attendee or describing the purpose of the meeting in more detail would not have added value or been practical for this time entry and the others like this.

33.    While not all of the time entries identified in the Reports identify both the participants and the subject matter of the conference, this should not create an

impediment to a meaningful review of XRoads' time.    In many instances, a review of a complete entry makes it clear what was done.  For example, Alex Stevenson's time entry on November 3, 2005 reads:

> Participate in Teleconference regarding: property taxes and related cash
>
> flow assumptions. (1.10)
>
> Third Report Exhibit E-1 at 2.

Mr. Stevenson's entry clearly describes the telephone call in which he participated.  This teleconference included approximately 10-15 participants including the Debtors' CFO, Blackstone representatives, attorneys from Skadden Arps and XRoads' professionals.  Identifying each and every participant would have been impracticable, and describing the subject matter for the teleconference in more detail may have had  adverse consequences to the Debtors' case strategy and management.  There would not appear to be a significant question that can be raised regarding the accuracy and information imported by this time entry and the others like this.

34.    In addition, XRoads believes its time entries are proper when viewed in the context of the matter category in which they were entered.  Specifically, to facilitate the fee review process by the Court, XRoads has employed 19 discreet matter categories for its time entries on this case.  XRoads submits that many entries are not questionable when read in the context of matter categories, as more thoroughly discussed in each of XRoads' Fee Applications.

H.    Other Vaguely Described Activities

35.    Stuart Maue asserts that some of XRoads time entries have vaguely described activities. First Report at 10-11; First Report Exhibit F-2; Third Report at 10;

Third Report Exhibit E-2, Fourth Report at 9-10; Fourth Report Exhibit E-2. XRoads has supplemented the activity descriptions for the time entries Stuart Maue considers "vague." The revised task descriptions with additional detail are attached hereto as Exhibit B.

I.    Blocked Entries

36.    The Reports identify entries that have a single time increment for more than one activity. First Report at 11; Second Report at 10; Third Report at 10-11. Stuart Maue asserts that entries of this type total 396.45 hours with $163,339.50 in associated fees. Id. Stuart Maue's Fourth Report points out that XRoads' Fourth Application has no combined or "lumped," activity descriptions. Fourth Report at 10.

37.    XRoads has reviewed the time entries from the Reports and believes that the reasonableness of substantially all of the entries identified in the Reports can be ascertained. For example, John Vander Hooven's time for February 23, 2005, reads:

> TELEPHONE CALL WITH S. HENRY (SKADDEN)
> REGARDING LIST OF PACA CLAIMANT NAMES AND
> ADDRESSES; CONTACT M. BYRUM AND J. ROY (WINN-
> DIXIE REGARDING SAME) (2.4)

First Report Exhibit G at 2. This time entry makes clear that the timekeeper engaged in a telephone call with a Skadden Arps' attorney regarding the PACA claimants and addresses, and then contacted Winn-Dixie personnel to further discuss this matter. This entry is sufficiently descriptive to determine the reasonableness of the services provided in as much as the entry describes the subject matter and nature of the timekeeper's work. Similarly, Pamela Windham's time entry for March 2, 2005 reads:

> DEVELOP INFORMATION TO CONFIRM THAT
> TERMINATING UTILITIES INCLUDING TELECOM LINES
> FOR FIRE ALARMS AT STORES WHERE LEASES WERE
> REJECTED IS PROPER; INSURE THAT NO WINN-DIXIE
> EMPLOYEES REMAIN AT THOSE LOCATIONS AND THAT
> KEYS WERE PROPERLY TURNED OVER TO LANDLORDS.
> (1.3)

First Report Exhibit G at 3. This time entry clearly shows that a continuation of activity was performed concerning continuation of utilities at store locations where the leases were rejected and that turnover of the property was properly performed. There are many other instances identified by Stuart Maue where the services rendered can be readily assessed from a review of the time entry.

38.     Further, the Reports identify as blocked entries certain tasks that by their nature can take significant time to complete and may inherently include a subtask. For example, John Vander Hooven's time for April 14, 2005, reads:

> REVIEW UPDATED DATA FILES FROM ACCOUNTS
> PAYABLE; FORMAT FILES FOR TRANSFER TO K. LOGAN
> (LOGAN & COMPANY) (3.3)

First Report Exhibit G at 9. As indicated in this time entry, XRoads' professional J. Vander Hooven reviewed data files from Winn-Dixie's accounts payable system and then formatted the files for transfer to the Debtors' claims and noticing agent Logan & Company. If Mr. Vander Hooven had merely written "Review updated data files from accounts payable" this entry would not have been flagged in Stuart Maue's report.

39. Further, several entries for continuous work should not necessitate multiple time entries. For example, John Young's time on April 4, 2005 reads:

> DEVELOPMENT OF FIVE YEAR MODEL; SPECIFICALLY PROPERTY, PLANT AND DEPRECIATION PROJECTIONS BUILT TO ROBUSTLY CAPTURE IMPACT OF FLEXIBLE STORE CLOSURE AND LIQUIDATION SCENARIOS. (2.4)

First Report at Exhibit G at 9.

J.    Intra-office Conferences

40. The Reports identify entries that describe intra-office conferences. First Report at 12-13; Second Report at 11-12; Third Report at 11-12; Fourth Report at 11-12. Stuart Maue asserts that such entries amount to 1,461.52 hours with $585,493.17 in associated fees in the First Application; 839.78 hours with $335,727.33 in associated fees in the Second Application; 958.50 hours with $381,129 in associated fees in the Third Application; and 874.68 with $354,584 in associated fees in the Fourth Application. Id. According to Stuart Maue, in total 2,761.95 hours with $1,113,785.33 in associated fees involved more than one XRoads' timekeeper billing for the conference or meeting in issue. First Report at 13; Second Report at 12; Third Report at 12; Fourth Report at 12.

41. XRoads timekeepers admittedly confer with one another in rendering services to the Debtors. It would be impossible to administer large chapter 11 cases efficiently without intra-office conferences. The Guidelines do not prohibit compensation for intra-office conferences. Instead, the Guidelines provide that conferences should identify the participants and the subject matters, which requirements have been followed by XRoads time keeping records.

42.     Bankruptcy Courts have recognized the importance of attorneys and the Debtors' professionals working together.   XRoads respectfully submits that its level of intra-office conferences was appropriate in view of the complexity and size of the cases and that, as a result, the requested compensation is reasonable.  The ability of XRoads professionals and paraprofessionals to confer internally amongst themselves, often involving professionals performing in different functional areas for the Debtors (such as strategic restructuring planning, sourcing, real estate, PACA claimants, finance, cash management and operations) has contributed to the expeditious resolution of numerous issues in these cases.   These conferences ensure that XRoads personnel are not performing duplicative work, are acting in conjunction with each other and the Debtors' personnel and professionals, and have contributed to the expeditious resolution of numerous issues in these cases.  In turn, this work process has resulted in significant benefits for the Debtors' estates and their creditors.

K.     Non-Firm Conferences, Hearings and Other Events

43.     The Reports identify instances where two or more XRoads professionals or paraprofessionals attended the same conference or other event that was also attended by non-XRoads personnel. Stuart Maue asserts that such entries total 2,392.17 hours with $974,474 in associated fees.  First Report at 10-14; Second Report at 12; Third Report at 12-13; Fourth Report at 12.  According to Stuart Maue, of this amount, 1,308.12 hours with $527,332 in associated fees involved participants other than the timekeeper who appears to Stuart Maue to the be most responsible person at the event.

44.    Cases as large and complex as these cases require the services of XRoads professionals in multidisciplinary areas, such as corporate finance, restructuring, operations, real estate, sourcing and cash management. See First Application at 12-14, Second Application at 11-13, Third Application at 13-15; Fourth Application at 12-14. XRoads professional's knowledge and experience have allowed them to address pressing matters typical of large retail cases such as these cases in an efficient manner. The Reports identify non-firm conferences and meetings that typically fall into the following categories: (a) client meetings, (b) creditor committee meetings, (c) asset disposition meetings, (d) reclamation and PACA meetings, (e) meetings with Debtors' other professionals, and (f) Board meetings. See, e.g., First Report Exhibit I; Second Report Exhibit H; Third Report Exhibit H; Fourth Report Exhibit G.

45.    XRoads believes that its Fee Applications properly discuss each of the above categories and indicate why, at times, the services of more than one XRoads professional were required at such meetings, conferences and hearings. The services performed by XRoads, and the corresponding benefits received by the Debtors, would not have been possible without team work and coordination between the various XRoads professionals assigned to these cases. Accordingly, XRoads submits that the compensation sought is reasonable and should not be denied or discounted.

46.    A few examples of entries by XRoads personnel for attendance at non-firm conferences and meetings illustrate the need for the participation of XRoads professionals at such events:

> 1205-BA/184: THE MEETING WITH M. BYRUM, J. JAMES AND J. ROY (WINN-DIXIE) TO GIVE OVERVIEW OF SCHEDULES AND

SOFA PROCESS; PRESENT SAMPLES OF DOCUMENTS AND EXPLAIN THAT R. GRAY'S (SKADDEN) INVOLVEMENT IN KEY ISSUES RELATING TO SCHEDULE'S PREPARATION. (3.3)

See First Report Exhibit I at 3

- John Vander Hooven's expertise was needed to explain to the Debtors' personnel, who were wholly unfamiliar with the bankruptcy reporting requirements, the process for filing schedules and SOFAs.

180501/167: MET WITH P. LYNCH AND B. NUSSBAUM (BOTH WINN-DIXIE) AND C. BOUCHER (XROADS) TO DISCUSS PROGRESS AND RESULTS OF SOURCING INITIATIVE. (1.60)

See Second Report Exhibit H at 46.

- Lisa McCarty met with the Debtors' CEO and CFO and a senior member of the XRoads team to review the results of the Debtors' Sourcing Initiative, an initiative that (as discussed in XRoads' Fee Applications) has resulted in millions of dollars of savings for the Debtors.

11205-BA/406: MEETING WITH J. JAMES (WINN-DIXIE) AND J. YOUNG (XROADS) TO DISCUSS STATUS OF CONTRACT REVIEW PROJECT AND TO GO OVER THE ONE-PAGE ANALYSIS FORMS (.30)

See Third Report Exhibit H at 29.

- Elaine Lane met with an in-house lawyer for the Debtors and a member of XRoads regarding the Debtors' contract review project and an analysis form which form and project enabled the Debtors to leverage their internal resources to

conduct a review project (as detailed in the Fee Applications) resulting in millions of dollars of savings for the Debtors.

L.    Personnel Who Billed 10.00 or Fewer Hours

47.    The Reports identify seven timekeepers who billed 10.00 or fewer hours during the three Fee Application periods. Stuart Maue estimates that such entries total 78.50 hours with $19,444.50 in associated fees. First Report at 14; Second Report at 13; Third Report at 13; Fourth Report at 13.

48.    Neither the Bankruptcy Code nor the Guidelines penalize a firm on the basis that a timekeeper has billed too few hours. To the contrary, XRoads submits that the services performed by each of the identified timekeepers were reasonable and necessary. The identified timekeepers include XRoads' General Counsel who was involved in these cases on a limited as needed basis; a paraprofessional billing specialist who left XRoads employ; and research paraprofessionals who only billed time when appropriate research projects were assigned to them.

M.    Long Billing Days

49.    The Reports identify timekeepers who billed more than 12.00 hours a day during the relevant periods. First Report Exhibit K-1; Second Report Exhibit J-1; Third Report Exhibit J-1; Fourth Report at Exhibit I-1. Stuart Maue asserts that these entries total 9,858.10 hours with $3,902,128.50 in associated fees. First Report at 15; Second Report at 13-14; Third Report at 14; Fourth Report at 14.

Stuart Maue states:

> Courts have generally held that billable time for professional services should include only those tasks that relate directly to work for the client. Professionals necessarily must spend some portion of each day on

19

personal matters, (such as meals and breaks) and frequently spend time on administrative matters, such as training or supervision of others. Professionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation. However, such long hours are generally related to identifiable circumstances such as court deadlines, travel, or event attendance. Id.

50.    The Guidelines do not state or suggest, however, that billing in excess of 12.00 hours a day is not compensable. Stuart Maue acknowledges that "[p]rofessionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation." Id. That is the case here, as evidenced by the time detail in XRoads' Fee Applications.

51.    The hours and charges calculated by Stuart Maue include all hours on all days whenever a timekeeper exceeded 12.00 hours (including a non-working travel time entry). XRoads submits that a more relevant calculation is the total number of hours exceeding 12.00 hours per day (without including any non-working travel time). That calculation shown by the chart below is not particularly large in the context of these cases.

|  | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Period | % of Total |
|---|---|---|---|
| Fee App 1 | 410.10 | 10,466.40 | 3.9% |
| Fee App 2 | 398.60 | 13,968.10 | 2.9% |
| Fee App 3 | 114.80 | 10,016.10 | 1.1% |
| Fee App 4 | 110.70 | 8,597.70 | 1.3% |
| Total | 1,034.20 | 43,028.30 | 2.4% |

52.    Likewise, the instances in which timekeepers billed in excess of 12.00 hours a day are relatively few as shown by the charts attached hereto as Exhibits C, D, E and F created using data from First Report Exhibits K-1 and K-2; Second Report Exhibits J-1 and J-2; Third Report Exhibits J-1 and J-2; and Fourth Report Exhibits I-1 and I-2.

53.    The hours billed by timekeepers in excess of 12.00 hours per day during the four interim periods are minimal given that (a) XRoads was retained approximately one week before the commencement of these cases, (b) there were numerous dispositions of assets, often on an expedited basis, (c) many objections were filed with respect to the reclamation and PACA motions, and (d) XRoads personnel lived in the Jacksonville, Florida area during the week to provide their services at Winn-Dixie's corporate offices and therefore spent long hours on site at those offices.

54.    XRoads believes that its Fee Applications reflect time spent appropriately by XRoads personnel to meet the needs of its client. Notwithstanding the preceding, in the Second Report Stuart Maue identifies a time entry on August 18, 2005 by Senior Consultant, M. Salem for 20.60 hours and on June 8, 2005 by Director, J. Young for 24.0 hours. XRoads has researched these particular entries. Mr. Salem did work 20.6 hours on August 18, 2005; there is no correction needed for this entry. Mr. Young's entry of 24.7 hours on June 8, 2005 is incorrect. Entries for Mr. Young's work on June 8, 9 and 10, 2005 were inadvertently included on his entry for June 8, 2005. In actuality, Mr. Young worked 12.2 hours on June 8, 2005, 12.6 hours on June 9, 2005 and 6 hours on June 10, 2005. In other words, 6.5 hours of Mr. Young's time on June 8, 2005 should have been coded to work performed on June 9, 2005 and 6.0 hours coded on June 8, 2005 should have been coded to work performed on June 10, 2005.

55.    In the Third Report, Stuart Maue identifies a billing entry on November 27, 2005 by B. Gutierrez for 24.00 hours. XRoads has researched this entry. The explanation for the entry is as follows: In November 2005, a software problem occurred in XRoads' time entry system whereby Mr. Gutierrez's billing entries for three Mondays

21

in November 2005 were not properly captured. The specific days involved were Mondays, November 7, 2005, November 14, 2005 and November 21, 2005. When the problem was discovered, all of Mr. Gutierrez's time entries for those particular days were re-entered on November 27, 2005. However, each of the November 27, 2005 time entries properly identifies the original date on which the work was performed. For example, one of the entries on November 27, 2005 reads as follows:

> DEVELOPED QUESTIONNAIRE FOR IT INTERVIEWS
>
> (11/7-NOT CAPTURED IN PRIOR MONTH'S STATEMENT)
>
> (2.9)

The total hours billed on the three Mondays in November 2005 were as follows: November 7, 2005 - 6.9 hours; November 14, 2005 - 9.1 hours; and November 21, 2005 - 8.0 hours. Accordingly, the entries on November 27, 2005 added up to 24 hours, but were in fact the time entries for the three days discussed above and were identified as such.

N.    Administrative/Clerical Activities

56.    The Reports identify activities considered by Stuart Maue to be administrative or clerical in nature. First Report at 15-16; Second Report at 14-15; Third Report at 15-16; Fourth Report at 14-15.

57.    The administrative and clerical activities identified by Stuart Maue include staffing matters, modifications to work product, project instruction and billing matters. XRoads has reviewed the activities contained in the First Report Exhibit L, Second Report Exhibit K; and, Third Report Exhibit K , and Fourth Report Exhibit J and responds below.

58.    The Reports identify certain time entries of paraprofessionals as relating to administrative/clerical activities. Stuart Maue asserts that such entries total 937.43 hours with $85,355.33 in associated fees. First Report at 16; Second Report at 15; Third Report at 16; Fourth Report at 15. Items identified in the exhibits to the Reports include services that properly should be rendered by a paraprofessional, including the following: (a) billing coordination, (b) conflicts checks, and (c) preparation of case communication lists and documents. In addition, because XRoads personnel lived on-site in Jacksonville, Florida during the pendency of these cases, numerous IT issues were encountered and resolved by XRoads paraprofessional personnel. Usage of these personnel for this purpose provided value to the Debtors' estate by increasing the productivity of XRoads professionals and unburdening the Debtors' personnel from the set-up and maintenance of XRoads connectivity with the Debtors' systems. Each of these services was necessary and appropriate for the administration of the Chapter 11 cases.

59.    Paraprofessionals are trained to provide the above-listed services. Such services required specialized skills of paraprofessionals and, accordingly, were appropriately assigned to those paraprofessionals. Accordingly, XRoads respectfully submits that these services are compensable.

60.    The Reports further identify certain time entries of professionals as administrative/clerical activities. First Report at 16: Second Report at 15; Third Report at 16; Fourth Report at 15. Stuart Maue asserts these activities total 143.86 hours with $60,710.00 in associated fees. Id.

61.    XRoads acknowledges that a limited number of its professionals' time entries describe administrative activities. However, most of the entries concern

23

professional services appropriate to that professional. For example, E. Gordon time entry on March 1, 2005 for 0.20 hours reads: "Prepared and circulated list of affiliated debtors and case numbers." Ms. Gordon was a Managing Director in XRoads' Case Management Services group, hence the twelve minutes spent performing the abovementioned task was appropriate to her duties and necessary to the efficient management of the Debtors' cases. Further, over a year after the entries have been made, it has not possible to identify the exigencies of situations that might explain the necessity of the professional performing the particular task at the time. The small percentage such entries identified by Stuart Maue supports the fact that XRoads uses clerical and paraprofessional staff whenever possible and appropriate to the task.

O.     Travel

62.     The Reports identify 194.60 hours with $22,680 in associated fees for travel time. First Report at 17; Second Report at 16; Third Report at 16; Fourth Report at 16.

63.     XRoads engagement agreement provides that "the Company shall not pay XRoads for the travel time spent by XRoads personnel while traveling to and from the Company's designated workplace ('Travel Time'). Travel Time will be non-working commuting time measured from the time XRoads personnel leave the location from which he or she departs until arrival at the Company designated workplace, including commuting time while XRoads personnel are temporarily living near the Company's designated workplace."

64.     The entries identified by Stuart Maue as travel time should not have billed and were inadvertently included in XRoads' Fee Applications for which the Reports

24

relate. Accordingly, XRoads will be reducing its fees by the sum of $22,680 for these entries.

P.      Fleming / Kmart / Spiegel Bankruptcy Fee Analysis

65.     The First Report identifies time spent by paraprofessionals R. Janda and J. Cain in analyzing and researching professional fees in other bankruptcy proceedings identified as "Fleming," "Kmart," and "Spiegel." Time spent by these paraprofessionals on these matters was to, as Stuart Maue correctly quotes, "minimize and manage [XRoads] professional fee costs on the Winn-Dixie case." The total hours identified by Stuart Maue for this work is 243.50 with $35,425 in associated fees.

66.     XRoads submits that the research performed on these related bankruptcy matters was necessary and beneficial for the estates and that the corresponding compensation, in light of the services performed for these functions and its resultant effect on XRoads' billings is reasonable.

Q.      Summary of Projects

67.     The Reports confirm that XRoads categorized its services into 15 to 19 billing projects for the benefit of the estate, including categories for Retention and Compensation matters for XRoads ("XRoads Retention") and Retention/Compensation matters for others ("Others Retention"). First Report at 18; Second Report at 16-17; Third Report at 17-18; Fourth Report at 16-17.

68.     Stuart Maue states that some billing entries in categories other than XRoads Retention and Others Retention appear to be related to these categories and, as a result, Stuart Maue reassigned some billing entries to the XRoads' Retention or the Others' Retention categories. XRoads has endeavored to record time performed for work

in the appropriate matter category. Because of the size of this case, and the thousands of entries were recorded by various XRoads timekeepers, XRoads recognizes that there may be entries recorded in categories that may be appropriately recorded in another category. XRoads believes that its services performed are identifiable and compensable in these cases, including services performed in the specifically mentioned categories, XRoads Retention and Others Retention.

69.    Regarding the XRoads Retention category, XRoads understands that the Debtors counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("SASM&F") has provided to Stuart Maue a memorandum that discusses compensation for services rendered in connection with professionals' fee applications and retention applications. XRoads respectfully submits that these types of services and work are compensable in accordance with the facts of these cases, the Bankruptcy Code and the Guidelines themselves and as discussed in SASM&F's memorandum.

70.    Regarding the Others Retention category, chapter 11 cases, especially large, complex chapter 11 cases, often require the efforts of multiple firms. The Others Retention category involves XRoads' services in connection with assisting the Debtors in retaining other firms and working with those other firms to establish chapter 11 case procedures, including interim compensation arrangements.

71.    The Guidelines suggest that the services rendered in the XRoads Retention category and the Others Retention categories are compensable. For example, the Guidelines include the following as suggested project categories for bankruptcy cases:

> Fee/Employment Applicants: Preparation of employment and fee applications for self or others; motions to establish interim procedures.
>
> Fee/Employment Objections: Review of and

objections to the employment and fee applications
of Others.

Guidelines Exhibit A. These categories and services are included in the XRoads
Retention category and in the Others Retention category in XRoads' Fee Applications.

72.    XRoads believes its services performed during the four interim periods for
all categories of services were necessary, and XRoads believes that the compensation
requested, in light of the services provided, is reasonable.

### Expenses

A.    Potential Double-Billed Expenses

73.    The First and Second Reports identify hotel expenses charged by the same
professional for apparent overlapping hotel stays.  First Report at 22-23; Second Report
at 20.  Third Report 20.  XRoads has reviewed the entries in question and has determined
that two of the entries for Ellen Gordon were inadvertent duplicate entries.  Accordingly,
XRoads will be reducing its charges by the sum of $727.72 for these two entries.  Two
remaining entries for Elaine Lane and Marwan Salem in the First Application and one
entry for Christopher Wright in the Second Application were not double-billed.  Rather,
incorrect dates were entered for the second billing slip in each instance.  Attached hereto
as Exhibit G is a corrected listing of the particular entries.

74.    The Third Report identifies two airfare expenses by B. Gutierrez each in
the amount of $508.90 and indicating travel dates of November 7, 2005 to November 10,
2005.  XRoads has reviewed these entries and has determined that the entries are
inadvertent duplicates.  Accordingly, the amount of $508.90 will be deducted from
XRoads next fee application.  XRoads has further reviewed the taxi charges identified in
the Third Report as possibly duplicative.  Third Report at 20; Third Report Exhibit N.

XRoads has determined that $195 of the amounts identified were inadvertent duplications, and XRoads will reduce its fees by the $195 amount.

75.    The Fourth Report identifies taxi charges totaling $96.20 that appear to be duplicative.    Fourth Report at 20.    XRoads has reviewed these expenses and has determined the amount identified was an inadvertent duplication.    Accordingly, XRoads will reduce its fees by the $96.20 amount.

B.    Airfare

76.    The Reports state that XRoads has complied with the requirement that airfare be billed at coach fares and that XRoads' applications all stated that XRoads professionals flew coach fare and booked flights in advance whenever necessary and possible to reduce cost to the Debtors. First Report at 24; Second Report at 21-22; Third Report at 21; Fourth Report at 21.    Stuart Maue states that most of the descriptions for airfare did not include the location of the origin or destination of the travel. Id.

77.    XRoads' professionals use detailed descriptions for their airfare expenses in their expense reimbursement entries.    Stuart Maue is correct in its assumption that the vast majority of travel on this case was to and from Jacksonville, Florida, and therefore XRoads personnel did not generally include such destinations and departure information. If it is determined to be critical to the analysis of XRoads' airfare expense data that the origin and final destination of each travel expense entry be supplied, XRoads will research the additional detail required, however such research will require significant time to perform.    It should be further noted that a few of the senior XRoads personnel performing services for the Debtors on this case traveled from California, therefore airfare charges exceeding $1,000 for coach class fare for such transcontinental travel was

reasonable and unavoidable.

78.    The Second Report identifies airfare charges for J. Young that ranged in price between $1,013.90 and $1,033. 90. These charges were for coach class tickets, the price for which increased in part due to rising fuel costs. The Second Report at page 23 identifies Director, A. Shah as requesting reimbursement for airfare charges in the amount of $1,016.90 for each of nine round trip flights between Newark, New Jersey and Jacksonville, Florida.   Mr. Shah's airfare charges exceeded $1,000 due to similar circumstances -- i.e. unpredictable and changing scheduling needs and rising fuel prices.

79.    The Third Report at pages 22 -- 23 identifies Senior Consultant, M. Salem's airfare charges for each of the fifteen flights during the third interim period as costing between $589.60 and $1,036.11, with twelve of the charges exceeding $1,000. Many of Mr. Salem's airfare charges during the third interim period were in excess of $1,000 due to booking dates -- the Debtors' needs for Mr. Salems's services ranged from week to week which made advance bookings problematic or impracticable. For similar reasons, Director, A. Shah's airfare charges for each of his five round trip flights between Newark, New Jersey and Jacksonville, Florida were in excess of $1,000.

80.    The Fourth Report at pages 22 -- 23 identifies two airfare charges requested in the Fourth Application that appear to be at least partially duplicative of entries requested in the Third Application.   XRoads has researched these particular charges and has determined there are inadvertent duplicate entries. Accordingly, XRoads will reduce its fees by $964.39. Further, the Fourth Report makes an assumption that Senior Consultant, M. Salem only purchased full fare coach tickets during the Fourth interim period.   During the Fourth Application period, Mr. Salem's air travel was

29

purchased at discounted coach fare tickets when possible however due to increases in fuel prices, and scheduling needs and the associated increase in airfare, airfare during this period did increase for some of XRoads personnel.

C.      Lodging / Apartment Rentals

81.      In the First Report, Second Report and Fourth Report, Stuart Maue concludes that after comparing XRoads' apartment rentals with the potential hotel charges XRoads could have incurred, the use of the apartments resulted in a cost savings to the Debtors.  First Report at 25-26; Second Report at 23-25; Third Report at 23-25; Fourth Report at 23-24.

82.      XRoads rented nine apartments in April 2005 and nine additional apartments in May 2005 to house the various XRoads personnel performing services for the Debtors.  XRoads was required by the apartment's landlord to lease the apartments to individual tenants, not XRoads.  However, when a named individual was not using their particular assigned apartment, other XRoads personnel would utilize the apartment. Therefore, during the period from April 28, 2005 through May 27, 2005, although Mr. Myers and Mr. Young only billed 11.20 hours on the Winn-Dixie matter, their apartment was utilized by other XRoads personnel.  Accordingly, the cost savings achieved through apartment rentals was not compromised.

83.      In the First Report at page 26, Stuart Maue notes, that on ten occasions a timekeeper with an apartment rented in their name also incurred hotel charges.  As noted above, apartments were rented in individual's names but were often utilized by other XRoads personnel.  Therefore, if an apartment rented in a particular individual's name was being utilized prior to that individual's arrival in Jacksonville, Florida, the later

arriving individual stayed in a hotel.

84.     In the Third Report, Stuart Maue determined that the apartment rentals resulted in a cost savings to the Debtors in all but eight instances during a four month period. Third Report at 24. However, as noted above, when a lease rented in a particular individual's name was not being utilized by that individual, other XRoads personnel would utilize the apartment. XRoads does not believe the aggregate cost savings of the apartment rentals was ever compromised.

D.     Lodging / Hotel

85.     The Reports note that the name of the hotel at which XRoads personnel stayed is not included in XRoads' descriptions. First Report at 27; Second Report at 25-26; Third Report at 25-26; Fourth Report at 24-25. The Jacksonville, Florida hotels primarily utilized by XRoads personnel were the Jacksonville Hyatt and the Omni Hotel Jacksonville. XRoads negotiated discounted rates at both hotels, which rates on average were approximately $130.00 per night.

86.     In the Third Report at page 26, Stuart Maue notes that XRoads Third Application included two hotel charges for Managing Director, E. Gordon, each for the dates of October 4 through October 7, 2005 in the same amount of $523.80. XRoads has reviewed those records and discovered an inadvertent data entry was recorded. The second charge should be $369.51 for Ms. Gordon's hotel stay from October 24-25, 2005. for the period. Accordingly, XRoads will reduce its fees by the $154.29 difference.

E.     Other Travel Expenses

87.     The Reports identify that XRoads incurred meal charges of $173,883.19 during the four interim periods, however only $10,442.37of this total cost was billed to

the estate. First Report at 28; Second Report at 26; Third Report at 26; Fourth Report at 25. XRoads did not bill for meals unless XRoads personnel were participating during the meal in a necessary meeting respecting the case.

D.    Ground Transportation / Rental Cars

88.    The Reports identify that XRoads personnel shared rental cars whenever possible and that XRoads voluntarily discounted the cost for car rental expenses to lower the car usage per professional to a ration of 1:3. First Report at 28-29; Second Report at 26-27; Third Report 27; Fourth Report at 25-26.

89.    The First Report notes instances where two timekeepers rented vehicles for the same period when those timekeepers were staying in the same apartment in Jacksonville, Florida. First Report at 29. The fact that two timekeepers were staying in the same apartment did not necessarily mean that those timekeepers arrived and departed from Jacksonville on the same dates, worked the same hours, or otherwise would have made a shared car convenient. Again, XRoads voluntarily discounted the rental car cost to insure a 1:3 car to professional ration for the benefit of the estate.

90.    The First Report at pages 29 – 30 identifies rental car charges and gasoline charges for Senior Consultant, M. Perreault, including instances where gasoline charges were incurred on the same dates as the first day of the rental period and again on or near the last day of the rental period. Mr. Perreault commuted from Destin, Florida to Winn—Dixie's Jacksonville, Florida offices in a rental car and therefore required a full tank of gasoline on the first day of the rental and would generally purchase gas on the last day of a weekly rental period. By XRoads analysis, Mr. Perreault saved the estate by renting a car to travel to and from the Jacksonville, Florida offices, versus the applicable mileage

reimbursement that would have been paid, or the applicable airfare.

E.  Transportation / Taxi and Train Fares

91.     The Reports correctly note that XRoads voluntarily discounted the cost of transportation to/from each timekeeper's residence to the airport and travel from the hotel to the client location by capping the rates for these services at $35 and $40 respectively. First Report at 30; Second Report at 27; Third Report at 27-28; Fourth Report at 26.

92.     The Reports further correctly identify instances where XRoads inadvertently did not cap these transportation rates.  Id.  XRoads analysis indicates that a total of $1,255.76 in charges exceeding the caps was made in the Fee Applications. XRoads will reduce its charges by this $1,255.76 amount.

F.  Mileage, Parking and Tolls

93.     The Reports identify the amounts requested for reimbursement of XRoads' mileage, parking charges and tolls.  First Report at 31-32; Second Report at 28; Third Report at 28-29; Fourth Report at 27.

94.     The Reports state that XRoads' mileage requests were itemized and included the date, timekeeper's name, amount charged, number of miles, rate per mile and the origin and destination of travel.   Accordingly, XRoads has complied with applicable Guidelines and Bankruptcy rules.

95.     Likewise, parking charges were itemized and included the date, timekeeper name, amount charged, and whether the charge was incurred at a hotel or airport.

G.   Photocopies

96.     The Reports identify photocopy charges of $1,353.15, which were charged

33

at a rate of $0.15 per page. First Report at 32; Second Report at 29; Third Report at 29 Fourth Report at 27. Outside photocopy charges, which were a direct pass-through charge to the Debtors, totaled $20,224.03. XRoads utilizes outside photocopying services when the size of the photocopying job is too large for XRoads' equipment and overall cost savings can be achieved.

97.     A total of $1,651.76 was charged for outside services to scan and create PDF documents and CDs. Again these charges were a direct pass-through of third party vendor's charges.

H.     Overhead Expenses / Telephone Charges

The Reports identify certain telephone charges as potential overhead that should not be charged in accordance with U.S. Trustee Guidelines. First Report at 33-34; Second Report at 30; Third Report at 30-31. The total amount of telephone charge reimbursement requested was $4,966.35. The charges in question are all long distance charges. XRoads does not bill its clients for local telephone calls. Any cellular telephone charges included in the noted charges reflect business telephone usage, rather than either personal use or incidental costs associated with maintaining a cellular telephone.

## Conclusion

98.     XRoads has performed substantial and necessary services in these cases. XRoads believes that the fees and expenses billed to the Debtors were reasonable and necessary, subject to the reductions noted to in this Response and summarized on Exhibit H attached hereto.

99.    XRoads believes that its time entries and its Fee Applications have and will sufficiently allow the Court to determine the necessity and benefit of XRoads' services.

DATED: December 19, 2006

**XROADS SOLUTIONS GROUP, LLC**

_____
Holly Felder Etlin
Principal

(212) 610-5600
(212) 610-5601 (facsimile)

**EXHIBIT A**



400 Madison Avenue, 3rd Floor
New York, NY 10017
main  212.610.5600
fax   212.610.5601
www.xroadsllc.com

February 16, 2004

H. Jay Skelton
Chairman of the Board
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254

Re:    Winn-Dixie Stores, Inc.  / XRoads Solutions Group, LLC

Dear Mr. Skelton:

This letter agreement ("Agreement") sets forth the services to be provided by XRoads Solutions Group, LLC and its affiliates (collectively, "XRoads") to Winn-Dixie Stores, Inc. and its affiliates and subsidiaries (collectively, the "Company") and the terms and conditions under which such services will be performed (the "Engagement"). All references in this Agreement to XRoads shall include officers, agents, and employees of XRoads.

1.  **Scope of Services and Fees: Pre-Petition**.

a.  Pre-Petition Services.  From February 15, 2005 through February 21, 2005 (the "Pre-Petition Period"), the Company shall employ XRoads to assist the Company and its bankruptcy counsel in preparations for a possible filing of a petition for protection under the United States Bankruptcy Code, which assistance shall include without limitation, assisting in the preparation of schedules of assets and statements of financial affairs, financial and cash flow forecasting, review of contracts (including executory contracts), review of accounts payable, coordination with investor and public relations professionals, analysis of the Company's largest unsecured creditors, real estate analysis, business plan review, and assistance in arranging for Debtor-in-Possession ("DIP") financing, as may be requested.

b.  Pre-Petition Fees.  The Company shall pay XRoads a fixed flat fee of $300,000 ("Pre-Petition Fee") for XRoads' pre-petition services during the Pre-Petition Period, which Pre-Petition Fee shall include payment for all of XRoads personnel's time spent performing the services set forth in Section 1.a. above during the Pre-Petition period and all of XRoads' anticipated out-of-pocket expenses for travel, meals and living expenses incurred during the Pre-Petition Period.  The Company shall pay the Pre-Petition Fee to XRoads on or before 12:00 noon EST on February 18, 2005.

_____ Initial
_____ Here



Winn-Dixie Stores, Inc.
February 16, 2005
Page 2 of 12

2. **Scope of Services: Post-Petition**.

    a. Within three (3) days after the Company has filed its petition for bankruptcy protection under the United States Bankruptcy Code, the Company shall seek bankruptcy court approval of XRoads' Engagement as provided for in this Agreement, pursuant to 11 U.S.C. § 328 or such other appropriate code section as determined by the parties and the Company's counsel. During the Company's bankruptcy ("Post-Petition Period"), XRoads shall be engaged to advise the Company in connection with various debtor, financial and operations restructuring advisory matters, including but not limited to:

    i.  **Real Estate Planning and Management**

- Assessments of marketability versus holding costs of excess real estate

- Assisting the Company in its selection and management of third parties to evaluate, market and sell leases associated with stores and facilities to be closed

- Assisting the Company in the valuation of potential lease reductions for continuing stores and facilities

- Assist with renegotiation of existing real estate leases

- Assist with disposition of non-essential real estate

    ii.  **Vendor Management**

- Assisting the Company in its communications, negotiations with, and presentations to vendors, trade creditors and holders of such debt

    iii.  **Cash Management and Financial Reporting**

- Analyzing and redesigning the Company's cash management and all related activities

- Advising the Company on its cash forecasting process, including reviewing cash flow projection models previously prepared by the Company, and redesigning the Company's cash forecasting processes

- Assisting the Company in redesigning and implementation of new effective management and financial reporting methodologies for the Company's business

- Assisting the Company in the development of a reliable long-term liquidity forecast

_____ Initial

_____ Here



- Assisting the Company in developing a more detailed financial reporting package with commentary, including an analysis of monthly performance, an outlook to the next period based on current trends and backlogs, and a comparison to budget so that deviations therefrom, if any, can be tracked and explained along with providing a view toward any changes to the budget model which may become necessary

iv. **Lender Management**

- Communication

- Validate reports

v. **Strategic Advisory**

- Evaluating and advising the Company on its Company's strategic alternatives

- Evaluating the Company's business plan, including the level of execution of said plans, plans for business closings, shut downs or other improvements or changes, and advising on same; assisting the Company in the integration of same into the Company's reorganization and restructuring plans

vi. **Case Management Services**

- XRoads understands that the Company has retained Logan & Company, Inc. to provide the Company with bankruptcy management and analysis work in connection with claims filed by the Company's creditors, including analysis of claims, reconciliations, litigation / objection support functions, and exhibit preparation. XRoads shall not duplicate such services but may provide supplementary services if requested to do so by the Company and its bankruptcy counsel. XRoads shall provide the Company with such other selected bankruptcy support services and bankruptcy administrative services as the Company in consultation with its bankruptcy counsel elects from the list of such services set forth on Schedule A attached hereto, which Schedule A is incorporated herein by this reference, all at the rates set forth on Schedule A attached hereto (the "BK Admin Charges"). BK Admin Charges shall be paid in accordance with the payment procedures approved by the Bankruptcy Court overseeing the Company's bankruptcy case.

b. <u>Expansion of Services</u>. The scope of XRoads' post-petition services may be expanded from time to time, provided that XRoads and the Company mutually agree in writing to any such expansion and any corresponding increase in fees.

_____ Initial
_____ Here



  c. <u>Post-Petition Monthly Fees & Hourly Fees</u>. XRoads will charge the Company a fixed minimum fee of $200,000 per month during the Post-Petition Period (the "Monthly Fees") for XRoads services set forth in Sections 2.a. and b. above, provided that if XRoads' personnel's time spent "performing the Services" (as defined below) total more than 400 hours in any calendar month during the Post-Petition Period, then the Company shall pay XRoads for such additional hours at the rate of rate of $400 per hour ("Hourly Fees"). The Company shall pay XRoads the Monthly Fees in advance on the first day of each month, subject to the bankruptcy court's authorized procedures for payments to professionals. The Monthly Fee for February 2005 and the final month of this Engagement shall be prorated, as will the 400 hour threshold provided for above. "Performing the Services" shall include time spent by XRoads professional personnel performing the services provided for in Sections 2.a. and b. above, and shall exclude non-working time spent traveling to, from and for the Company to perform such services.

  d. <u>Payment of Hourly and Admin Fees</u>. XRoads will submit monthly invoices for any Hourly Fees hereunder, which invoices shall be due and payable in accordance with the bankruptcy court's payment procedures for the Company's bankruptcy case. XRoads' administrative non-professional services performed in connection with this Engagement shall be charged at rates of $85 - $160 per hour ("Admin Fees") and such administrative services shall not be applied towards the 400 hour threshold provided for above. Administrative services includes paralegal, technical support and document management services. Administrative services do not include clerical or secretarial services. Admin Fees shall be included in XRoads monthly invoices for Hourly Fees and shall be payable therewith.

  e. <u>Travel Time</u>. The Company shall not pay XRoads for the travel time spent by XRoads personnel while traveling to and from the Company's designated workplace ("Travel Time"). Travel Time will be non-working commuting time measured from the time XRoads personnel leave the location from which he or she departs until arrival at the Company designated workplace, including commuting time while XRoads personnel are temporarily living near the Company's designated workplace.

  f. <u>Expenses</u>. XRoads shall be entitled to reimbursement of its expenses reasonably incurred in connection with this Engagement (e.g., actual out of pocket expenses such as communications, travel, meals and living expenses incurred in connection with the Engagement). The Company shall only be charged for coach class airline travel during this Engagement. XRoads will submit periodic invoices for these expenses, which invoices shall be due and payable in accordance with the bankruptcy court's payment procedures for the Company's bankruptcy case.

  g. <u>Retainer</u>. The Company shall pay to XRoads $500,000 as a retainer due on or before 12:00 noon EST on February 18, 2005. The retainer is a "security retainer" to secure payment to XRoads for services to be rendered and expenses to be incurred by XRoads



during the Pre-Petition Period and Post-Petition Period. The retainer is not to be applied or credited to amounts due from the Company as they come due, but will be returned to the Company once all amounts due hereunder are paid in full. The Company hereby grants a security interest in the retainer to XRoads to secure payment of all amounts due hereunder and expressly authorizes XRoads to pay itself any amounts past due from the retainer. The Company acknowledges and agrees that this security interest is perfected by virtue of XRoads' possession of the retainer. Interest earned on the retainer is the property of the Company and shall be periodically delivered to the Company.

h. <u>Performance Fee</u>. In addition to the Monthly Fees and Hourly Fees provided for above, XRoads shall be entitled to a performance fee for this Engagement in the amount of $1,250,000 (the "Performance Fee"), which shall be paid by the Company to XRoads upon the consummation of a Qualifying Transaction. "Qualifying Transaction" shall mean the earlier of (i) the sale or monetization of all or substantially all of the assets or equity of the Company in one or more transactions; (ii) the merger or consolidation of the Company with or into any other entity in one or more transactions; (iii) the substantial consummation of a plan of reorganization for the Company; or (iv) the liquidation of the Company. At the sole discretion of the Board of Directors of the Company, the Performance Fee payable to XRoads may be increased, provided that the maximum Performance Fee payable hereunder shall not exceed $5,000,000. Any increase in the Performance Fee over the $1,250,000 amount shall be subject to the approval of the bankruptcy court after due notice and opportunity for hearing given to the U.S. Trustee, the unsecured creditors committee and any secured lenders of the Company.

k. <u>Wire Transfer</u>. All payments required hereunder shall be paid by wire transfer unless otherwise permitted by XRoads. Set forth below are XRoads' wire transfer instructions:

      Bank Name:  Comerica Bank
      Bank Address:  611 Anton Blvd; Costa Mesa, CA  92626
      Bank Phone:  Phone (800) 888-3595
      ABA Routing:  ABA: 121137522
      Account Name:  XRoads Solutions Group, LLC
      Account No:  189-262-1549
      Contact Person:  J.Simon / E.Lyons

Payments made by mail should be sent to XRoads Solutions Group, LLC, Attention: Edward Lyons, Controller, 9 Executive Circle, Suite 190, Irvine, California 92614.

l. <u>Right to Terminate Services</u>. Failure of the Company to promptly pay amounts due for services rendered or for reimbursement of expenses shall constitute justification for XRoads to terminate this Agreement upon three (3) days written notice and XRoads shall have the right to recover from the Company (i) all unpaid amounts owed, (ii) the $1,250,000 minimum amount Performance Fee, and (iii) any Performance Fee amount in excess of

_____ Initial
_____ Here



**X Roads**
SOLUTIONS GROUP

Winn-Dixie Stores, Inc.
February 16, 2005
Page 6 of 12

$ 1,250,000

$2,000,000 as determined appropriate by the Company's Board of Directors or the bankruptcy court overseeing the Company's bankruptcy, as applicable, based on XRoads services performed.

3. **Term of Engagement**.

The term of the Engagement shall commence as of February 15, 2005. Either the Company or XRoads may terminate this Agreement upon thirty (30) days' advance written notice, with payment due to XRoads for fees through the termination date (including Monthly Fees, Hourly Fees, Admin Fees and the minimum Performance Fee) and expenses incurred through the termination date. Notwithstanding the preceding, in the event the Company terminates this Agreement for good cause, the Company shall not be obligated to pay XRoads the Performance Fee, provided that XRoads shall have the right to have any such termination for cause ruled upon by the bankruptcy court overseeing the Company's bankruptcy case. XRoads may withdraw for good cause without the Company's consent. Good cause includes a party's breach of this Agreement (including the Company's failure to pay any appropriate invoice when due), the Company's or XRoads' failure or refusal to cooperate with the other, or any fact or circumstance that would render XRoads' continuing representation unlawful or unethical. In such withdrawal event, the Company shall pay to XRoads all fees through the withdrawal date (including Monthly Fees, Hourly Fees, Admin Fees and the minimum Performance Fee) and expenses incurred through the withdrawal date.

4. **Work Performed**.

XRoads work for the Company will be performed on a "level-of-effort" basis; that is, the depth of our analyses and extent of our authentication of the information on which our advice to the Company will be predicated, may be limited in some respects due to the extent and sufficiency of available information, time constraints dictated by the circumstances of our engagement, and other factors. Moreover, we do not contemplate examining any such information in accordance with generally accepted auditing or attestation standards. Rather, it is understood that, in general, we are to rely on information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of its accuracy and validity.

5. **Reports**.

XRoads will submit oral and/or written reports, at the request of the Company, summarizing our evaluations and analyses based on our work pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objective of our Engagement. However, because of the time and scope limitations implicit in our Engagement and the related limitations on the depth of our analyses and the extent of our verification of information, we may not discover all such matters or perceive their significance. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the information used in our analyses and on which our findings and advice to the Company may be based. In addition, we

Initial
Here



Winn-Dixie Stores, Inc.
February 16, 2005
Page 7 of 12

have no obligation to and will not update our reports or extend our activities beyond the scope set forth herein unless the Company requests and we agree to do so.

6. **Disclosures**.

XRoads has represented, and will in the future represent, many different clients with various business interests in numerous industries. These clients are often referred to XRoads by intermediaries such as lawyers, investment bankers, lenders and accountants ("Referral Sources"). In undertaking the Engagement on behalf of the Company, XRoads' objective is to provide services for the Company to the best of its ability, but without precluding XRoads from representation of other clients or from accepting referrals from or making referrals to Referral Sources. We have undertaken a reasonable review of our records to determine XRoads' professional relationships with the persons or entities the Company has identified. We are not aware of any conflicts of interest or relationships that would preclude us from performing the above work for the Company. XRoads agrees to update its disclosure information from time to time if and when additional parties with an interest in or a relationship with the Company are identified by the Company, in writing, to XRoads.

7. **Entire Agreement, Waiver, Modification, and Notices**.

This Agreement, including any Exhibits, constitutes the final and complete expression of the parties with respect to its subject matter and supersedes and replaces any other written or oral agreement or understanding between the parties. This Agreement may be amended, modified, supplemented or waived only by a written instrument signed by both parties. No waiver of a breach hereof shall be deemed to constitute a waiver of a future breach, whether of a similar or a dissimilar nature. All notices, demands or other communications which are required or are permitted to be given in this Agreement shall be in writing and shall be deemed to have been sufficiently given (i) upon personal delivery, (ii) the third business day following due deposit in the United States mail, postage prepaid, and sent certified mail, return receipt requested, correctly addressed or (iii) when receipt is acknowledged if sent via facsimile transmission. Notices to you shall be sent to the address set forth on page one of this Agreement. Notices to XRoads shall be sent to the address set forth below:

XRoads Solutions Group, LLC
Attn: General Counsel
9 Executive Circle, Suite 190
Irvine, CA 92614
Fax (949) 567-1702

Either party may give written notice of a change of address by certified mail, return receipt requested, and after notice of such change has been received, any notice shall be given to such party in the manner above described at such new address.



_____ Initial

_____ Here



Winn-Dixie Stores, Inc.
February 16, 2005
Page 8 of 12

### 8. Authority.

The Company has all requisite corporate power and authority to enter into this Agreement. The Company and XRoads have fully reviewed this Agreement, have obtained counsel on its terms, and have participated in the drafting of this Agreement such that it shall not be construed against any one party. This Agreement has been duly and validly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.

### 9. Expiration of Offer.

If this Agreement is not executed within seven days from its issue date, XRoads reserves the right to amend or revoke the terms after such date.

**THE ADDITIONAL TERMS AND CONDITIONS ATTACHED TO THIS AGREEMENT ARE HEREBY MADE PART OF THIS AGREEMENT AS THOUGH FULLY SET FORTH HEREIN.**

If you agree to the terms and conditions set forth above, please indicate your acceptance and approval by signing this letter in the space provided below and on the duplicate copy attached. Please return one fully executed original to the undersigned for our files.

XRoads looks forward to serving you in this important matter.

Very truly yours,

**XRoads Solutions Group, LLC**

Dennis I. Simon
Managing Principal

**AGREED AND ACCEPTED:**

**Winn-Dixie Stores, Inc.**

By:_____          Date:_____

H. Jay Skelton
Chairman of the Board

_____ Initial
_____ Here



## ADDITIONAL TERMS AND CONDITIONS

**Amounts Not Paid**. All amounts not paid when due will bear interest at an annual rate of 12% or the maximum rate allowed by law, whichever is greater.

**Agreement Not to Employ**. XRoads' business is in part centered on its ability to identify and secure the services of talented personnel for its client companies. Absent an agreement with XRoads providing it fair compensation, XRoads would suffer serious economic harm were its client companies to hire directly or through other companies XRoads' employees. The Company agrees that during the term of this Agreement and for twelve months thereafter it shall not, directly or indirectly, knowingly solicit, offer employment to or hire any employee or independent contractor of XRoads with whom the Company has had contact as a result of this Engagement. If the Company and XRoads agree that the Company may hire a XRoads' employee or independent contractor, notwithstanding the prohibition in the immediately preceding sentence, and such hiring occurs within twelve months after the termination of this Agreement, the Company shall pay XRoads an amount equal to the particular individual's standard hourly rate at XRoads multiplied by an assumed annual billing of 2,000 hours as liquidated damages. Any such payment shall be made on the date the XRoads' employee or independent contractor begins work for the Company. This paragraph shall not preclude the Company from making general employment solicitations not specifically aimed at XRoads' employees or independent contractors.

**Warranties and Indemnification**. XRoads neither expresses nor implies any warranties of its work nor predicts results of the Engagement. XRoads has not offered any assurances that the efforts to resolve the financial, structural or management issues facing the Company can or will be successful.

XRoads shall not be subject to any liability to the Company for any act or omission relating to, in connection with or arising out of services rendered hereunder, unless XRoads' acts or omissions constitute willful malfeasance, gross negligence or the reckless disregard of XRoads' obligations or duties hereunder. In furtherance of the foregoing, the Company agrees and covenants that it will not initiate any legal or administrative proceedings whatsoever against XRoads relating to, in connection with or arising from the services rendered hereunder seeking more than the amount of the fees actually paid to XRoads for the Engagement. The Company acknowledges and agrees that the allocation of risk provided by this paragraph is fair and reasonable.

The Company releases, indemnifies and holds XRoads harmless from and against any losses, claims, damages or liabilities ("Losses") to which XRoads may become subject and shall promptly reimburse XRoads for any legal or other expenses (including the cost of any investigations and the hiring of any accountant or other experts) reasonably incurred by XRoads relating to, in connection with or arising from the services rendered hereunder, whether or not resulting in any liability, unless such Losses resulted from XRoads' willful malfeasance, gross negligence or the reckless disregard of its obligations or duties hereunder.

In the event of a bankruptcy involving the Company, XRoads understands that the foregoing provisions may be modified by the order of the bankruptcy court approving the engagement of XRoads.

_____ Initial
_____ Here



Winn-Dixie Stores, Inc.
February 16, 2005
Page 10 of 12

**Legal Proceedings**. If after the termination of the Engagement XRoads is requested and agrees or is required to participate in any manner in legal or administrative proceedings regarding the Company, compensation shall be paid to XRoads for time spent in preparation, travel, attendance at and work related thereto, all at XRoads' then current hourly rates for the relevant personnel involved, unless XRoads is a party litigant. XRoads shall be further entitled to such compensation in the event XRoads is required to participate in any manner in legal or administrative proceedings concerning the Company during the Engagement, if such participation requires work outside the scope of services to be performed under this Engagement. For individuals no longer employed by XRoads, at the time of such participation, payment shall be made to such individuals directly or to their employers, as applicable.

**Accuracy of Information**. The Company will use reasonable efforts to assure that all information, financial or otherwise, provided by or on behalf of the Company with respect to the Engagement (the "Information") to XRoads will, as of its respective dates, be accurate and complete in all its material respects. The Company understands that XRoads will not be responsible for independently verifying the accuracy of the Information. The Company assumes full responsibility for inaccuracies in any Information provided by or on behalf of the Company to XRoads or any third party. The Company will reasonably cooperate with XRoads in all phases of XRoads' services under the Engagement. Specifically, without limiting the generality of the foregoing, if at any time during the Engagement, the Company discovers that any of the Information is inaccurate in any material respect it will immediately notify XRoads.

**Work Output**. XRoads' work processes used, prepared or assembled by XRoads during the Engagement, including XRoads' proprietary methodology, know-how and computer models ("Work Processes") shall be the exclusive property of XRoads. The Company shall not be entitled to the Work Processes. XRoads shall retain copies of the Work Processes pursuant to its document retention policy as in effect from time to time. Upon the conclusion of the Engagement, XRoads shall deliver to the Company any data, reports, or runs assembled or prepared by XRoads for the Engagement specifically and for the benefit of the Company. The data, reports and runs shall be the property of the Company.

**Future Engagements**. XRoads has offices throughout the United States. XRoads is or expects to be engaged by other clients from time to time and cannot assure that, following the Engagement, an engagement will not be accepted elsewhere for an interested party.

**Independent Contractor**. The Company acknowledges that XRoads is being retained as an independent contractor to the Company and no employment relationship, partnership, joint venture or other association shall be deemed created by this Agreement.

**Confidentiality**. During the term of the Engagement and thereafter, XRoads shall keep secret and retain in strictest confidence, any and all confidential information relating to the Company or which XRoads shall obtain knowledge of by reason of the Engagement, including, without limitation, trade secrets, customer lists, financial plans or projections, pricing policies, marketing plans or strategies, business acquisition or divestiture plans, new personnel acquisition plans, technical processes and other research projects. XRoads shall not, except in connection with the performance of its duties hereunder, disclose any such information to anyone outside the Company, other than to XRoads' legal counsel, as required by applicable law (provided prior written notice thereof is given by XRoads to the Company) or with the

Initial
Here


**X Roads**
SOLUTIONS GROUP

Company's prior written consent, which shall not be unreasonably withheld or delayed. The obligations of XRoads in this paragraph shall not apply to information which is (i) known generally to the public; (ii) known to XRoads prior to the date of this Agreement; (iii) lawfully disclosed to XRoads by a third party; (iv) generally known in the industry in which the Company is engaged; or (v) required by law to be disclosed by XRoads, in which event XRoads shall provide the Company with prompt notice thereof.

The Company shall not, except as required in the conduct of its business, disclose any Work Processes to any third party other than the Company's lenders, attorneys and advisors or as otherwise required by law, without the prior written consent of XRoads, which consent shall not be unreasonably withheld or delayed.

**Engagement of Legal Counsel.** XRoads will have the right to retain independent legal counsel to obtain advice with respect to its services under the Engagement. The Company will reimburse XRoads upon demand for the reasonable fees and expenses of such independent legal counsel incurred as an expense by XRoads on behalf of the Company up to $37,500 per calendar quarter, on a cumulative basis. Nothing in this Section limits the rights of XRoads to employ counsel and to pay legal expenses, and any obligation of the Company or any other party to indemnify XRoads for such expenses, in the event any claim is asserted against XRoads or any litigation is commenced in connection with the Engagement.

**Agreement to Mediate/Arbitrate:**

a.    **Mediation.**  The parties shall mediate all disputes and claims between them arising out of or related to the Engagement or any resulting transaction (a "Dispute") before resorting to arbitration.  Selection of a mediator shall occur within ten days of a demand for mediation.  If the parties cannot agree on the selection of a mediator within ten days, either or both party shall request the American Arbitration Association (AAA) to appoint one for them within fifteen days.  The mediation shall take place within ten days of the date of the selection or appointment of the mediator and shall take place in New York City, New York.  Mediation fees, if any, shall be divided equally among the parties involved and prepaid.  If any party commences an arbitration based on a Dispute without first attempting to resolve the matter through mediation or initiates an unauthorized court action, then that party shall be required to pay the other party's attorneys' fees, expert costs and other expenses in connection with the arbitration or unauthorized court action.  The parties agree that any Dispute which is not settled through mediation shall be decided by neutral, binding arbitration and not by court action, except as provided by law for judicial review and enforcement of arbitration proceedings and awards and as provided in subsection c. below.

b.    **Arbitration.**  The arbitration shall be conducted in accordance with AAA's Expedited Procedures for arbitration (unless the parties agree in writing to use AAA's Commercial Arbitration Rules) and shall be conducted in New York City, New York. The parties have no right to discovery and the arbitrator(s) shall have no power to allow discovery unless the parties agree in writing to modify this limitation.  Except as provided above, each party shall be responsible for its own attorneys' fees and costs. The arbitrator shall apply New York law as the applicable state law governing the Dispute, without reference to choice of law principles, applying New York rules of

_____ Initial
_____ Here



evidence as applicable in a court of law. The award of the arbitrator shall be final and binding upon the parties without right of appeal or judicial review. Application may be had by any party to any court of general jurisdiction for entry and enforcement of judgment based on said award. Such judgment shall be binding, final and nonappealable.

**c.** **Provisional Remedies**. Notwithstanding the above, either party may, without waiving any remedy under this Agreement, seek from any court having jurisdiction, any interim or provisional relief available under applicable law that is necessary to protect the rights, property or remedies of that party, pending the outcome of the mediation and/or arbitration, including but not limited to, applications for injunctive relief, writs of attachment or possession.

**d.** **Bankruptcy Court**. Notwithstanding the foregoing, in the event of a bankruptcy filing by the Company, the Company shall have the right to seek a determination of any Disputes by the bankruptcy court having jurisdiction over the Company's case.

**Use of Name**. The Company agrees that XRoads shall have the right to use the Company's name and logo in a description of the services provided by XRoads under the Agreement.

**Applicable Law; Headings**. The Agreement shall be governed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws. The paragraph headings in the Agreement and the Additional Terms and Conditions are for informational purposes only.

END OF DOCUMENT



## UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
|  | ) |  |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

### FINAL ORDER AUTHORIZING DEBTORS TO EMPLOY XROADS SOLUTIONS GROUP, LLC AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS

These cases came before the Court for hearing on June 2, 2005, upon the application filed on February 21, 2005 by Winn-Dixie Stores, Inc. and its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for entry of an order pursuant to Sections 327(a) and 328 of the Bankruptcy Code authorizing the Debtors to employ XRoads Solutions Group, LLC ("XRoads") as financial and operations restructuring consultants (the "Application").[1] The Court has reviewed the Application, the letter agreement attached to the Application (the "Agreement"), the initial declaration and first and second supplemental declarations of Dennis I. Simon (the "Simon Declarations"); the interim order authorizing such retention entered on March 29, 2005 by the United States Bankruptcy Court for the Southern District of New York, and Amendment #1 to the Agreement attached hereto as Exhibit A (the "Amendment," and the Agreement as modified by the Simon Declarations and the Amendment, the "Amended Agreement"); and the Court has considered the evidence and heard the argument of counsel. The Court has determined that the terms of compensation being sought by XRoads as described in the Amended Agreement are

---

[1]     All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Application.

reasonable. After due deliberation and finding proper notice has been given, the Court determines that good cause exists to grant the relief and that granting the relief is in the best interest of these estates and creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Application is granted as set forth in this Order.

2.      The Debtors are authorized to retain XRoads as their financial and operations restructuring consultants on a final basis, pursuant to Sections 327(a) and 328 of the Bankruptcy Code, as of February 21, 2005 (the "Petition Date"), on the terms set forth in the Application and the Amended Agreement; provided, however, that in the event of any inconsistency between this Order and the Application or the Amended Agreement, this Order shall govern.

3.      If any supplemental declarations are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental declarations, XRoads' employment shall continue as authorized pursuant to this Order.

4.      The terms of compensation and reimbursement of expenses to be paid to XRoads as set forth in the Application, the Amended Agreement and this Order are "reasonable" as such term is used in Section 328(a) of the Bankruptcy Code, and XRoads shall be compensated and reimbursed in accordance with the terms of the Application, the Amended Agreement and this Order, but such compensation and reimbursement shall be subject to prior approval of this Court in accordance with the standards of and requirements under Section 328(a) of the Bankruptcy Code and any order of this Court establishing procedures for monthly compensation and reimbursement of expenses; provided that, notwithstanding the preceding

-2-

clause, only the United States Trustee retains the right to object to XRoads' interim and final fee applications (including expense reimbursement) on all grounds, including but not limited to the reasonableness standard provided for in Section 330 of the Bankruptcy Code.

     5.    XRoads shall provide forty-five (45) days' notice of any application for deferred fees and/or performance fees based upon the consummation of one or more Qualifying Transaction (as defined in the Agreement, which is defined in the Application), which notice shall be provided to the United States Trustee, counsel for the official committee of unsecured creditors, counsel for the Debtors' secured lenders, and the parties named on the master service list maintained in these cases.

     6.    XRoads' application for any performance fee in excess of $1,500,000 shall be permitted upon the Debtors' Board of Director's determination that such additional amount is warranted based on XRoads performance for the Debtors, including but not limited to an analysis of the over-all contribution to the reorganization process made by XRoads and the respective recoveries achieved by the various constituencies in the case. Notwithstanding paragraph 4 above, all parties in interest retain the right to object to XRoads' application for any performance fee in excess of $1,500,000 on all grounds, including but not limited to the reasonableness standard provided for in Section 330 of the Bankruptcy Code.

     7.    XRoads shall contemporaneously maintain time entries in six-minute increments for each individual working on the engagement.

     8.    In the event XRoads seeks reimbursement for attorneys' fees from the debtors pursuant to the Amended Agreement, the invoices and supporting time records from such attorneys shall be included in XRoads' own applications (both interim and final), and such invoices and time records shall be subject to the United States Trustee's guidelines for

-3-

compensation and reimbursement of expenses and the approval of the Bankruptcy Court under

the standards of Sections 330 and 331 of the Bankruptcy Code without regard to whether such

attorney has been retained under Section 327 of the Bankruptcy Code and without regard to

whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

Notwithstanding the foregoing, XRoads shall not seek reimbursement from the Debtors of any

legal fees or expenses related to XRoads' employment pursuant to the Application or Amended

Agreement.

        9.      To the extent that any pre-petition retainer received by XRoads from the

Debtors remains after application to pre-petition fees, charges, costs, or expenses, XRoads is

authorized to hold such remaining retainer for application to allowed amounts owed pursuant to

XRoads' final application in these cases; provided, however, that XRoads shall hold the retainer

in a segregated account as funds clearly designated for the account of the Debtors and make

periodic interest payments to the Debtors; and provided, further, however, that any party in

interest may at any time challenge the use and application of the retainer by XRoads; and

provided further, however, that to the extent the pre-prepetition retainer is insufficient to satisfy

all pre-petition fees, charges, costs, or expenses, XRoads shall waive any unpaid pre-petition

fees, charges, costs, or expenses.

        10.     The Court shall retain jurisdiction to hear and determine all matters arising

from the implementation of this Order.

        11.     XRoads shall serve upon all creditors of the Debtors a notice in a form

approved by the United States Trustee that discloses the material terms of XRoads' approved

retention under Section 328 of the Bankruptcy Code and provides a thirty (30) day period within

which any objections to such retention must be filed with the Court and served upon XRoads;

provided, however, that parties in interest who previously received notice of the Application and an opportunity to object and who failed to file an objection by the previously applicable objection deadline (the "Previously Noticed Creditors") shall not be entitled to file and serve objections or to have their objections heard. The Court shall consider any objections (other than objections filed by Previously Noticed Creditors, which shall be denied) at the omnibus hearing next following the expiration of such thirty (30) day period. This Order shall be final as to all creditors who do not file a timely objection and to all Previously Noticed Creditors.

Dated June 3, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties included
on the Master Service List.

**EXHIBIT A**



**XRoads**
SOLUTIONS GROUP

400 Madison Avenue, 3rd Floor
New York, NY 10017

main  212.610.5600
fax    212.610.5601
www.xroadsllc.com

H. Jay Skelton
Chairman of the Board
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254

Re:    Winn-Dixie Stores, Inc.
        Amendment #1 to XRoads Engagement Agreement dated February 16, 2004

Dear Mr. Skelton:

This Amendment #1 shall amend that certain engagement letter agreement dated February 16, 2004 (the "Agreement") between Winn-Dixie Stores, Inc. and its affiliates and subsidiaries (collectively, the "Company") and XRoads Solutions Group, LLC and its affiliates (collectively, "XRoads"). This Amendment #1 shall be effective as of May 31, 2005.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, XRoads and the Company hereby agree that the Agreement shall be amended as follows:

1. **Section 2.c. of the Agreement entitled "Post-Petition Monthly Fees & Hourly Fees", is hereby amended to add the following language thereto:**

   "In XRoads final fee application, XRoads shall waive recovery of ten percent (10%) of its Hourly Fees up to a maximum of $1.5 million ("Fee Waiver"), provided however in the event any objections to XRoads' fee application are filed and granted, any reductions to XRoads fees or expenses shall be first offset against XRoads Fee Waiver."

2. **Section 2.h. of the Agreement entitled "Performance Fee", is hereby deleted in its entirety and replaced with the following language:**

   "h.   <u>Performance Fee</u>. In addition to the Monthly Fees and Hourly Fees provided for above, XRoads shall be entitled to a performance fee for this Engagement in the amount of $1,500,000 (the "Performance Fee"), which shall be paid by the Company to XRoads upon  the consummation of a Qualifying Transaction.  "Qualifying Transaction" shall mean the earlier of one of the following events providing a 100% claim recovery to the Company's secured and approved unsecured creditors, plus a recovery to the Company's equity holders: (i) the sale or monetization of all or substantially all of the assets or equity of the Company in one or more transactions; (ii) the merger or consolidation of the Company with or into any other entity in one or more

_____ Initial
_____ Here

H. Jay Skelton
Winn-Dixie Stores, Inc.
May 31, 2005
Page 2



transactions; (iii) the substantial consummation of a plan of reorganization for the Company; or (iv) the liquidation of the Company. At the sole discretion of the Board of Directors of the Company, the Performance Fee payable to XRoads may be increased, provided that the maximum Performance Fee payable hereunder shall not exceed $5,000,000.  Any increase in the Performance Fee over the $1,500,000 amount shall be subject to the approval of the bankruptcy court after due notice and opportunity for hearing given to the U.S. Trustee, the unsecured creditors committee and any secured lenders of the Company. Notwithstanding the preceding, in the event the Performance Fee awarded to XRoads is $3,000,000 or more, XRoads shall be paid the Performance Fee in the following manner: (i) 50% in cash upon the consummation of a Qualifying Transaction, and (ii) 50% payable over five years with fully amortized quarterly payments bearing interest at the applicable 5 year treasury rate."

3. **Entire Agreement/Conflicts**: This Amendment #1 incorporates by reference all of the terms and conditions contained in the Agreement, which shall remain unchanged and in full force and effect, except as amended by this Amendment #1. In the event of any conflict between the terms of the Agreement and the terms of this Amendment #1, the terms of this Amendment #1 will be deemed to have superseded those of the Agreement and exclusively will govern the matter in question.

If you agree to the terms and conditions set forth above, please indicate your acceptance and approval by signing this letter in the space provided below and on the duplicate copy enclosed. Please return one fully executed original to the undersigned for our files.

**AGREED AND ACCEPTED:**

Very truly yours,

**XRoads Solutions Group, LLC**

**Winn-Dixie Stores, Inc.**

By:_____

Dennis I. Simon
Managing Principal

H. Jay Skelton
Chairman of the Board

Date: _____

_____ Initial
_____ Here

**Exhbit B**
**Revised Task Descriptions of Vague Entries**

| Date | Time Keeper's Name | Entry Hours | Original Time Description | Updated Time Description |
|------|--------------------|-------------|--------------------------|--------------------------|
| **1ST INTERIM FEE AUDITOR REPORT** | | | | |
| 03/15/05 | Karol, S | 1.60 | Responding to External Data Requests | Responding to data requests regarding real estate from professionals for constituencies and landlords |
| 04/05/05 | Vander Hooven, J | 3.10 | Research Issues for Bennett and report back with findings | Discussion with Bennett Nussbaum regarding asset allocation on Schedules for each filed entity and assignment of fair market values for property listed. |
| 04/21/05 | Doyle, T | 0.40 | Monthly invoice statement follow-up with recipients | Monthly invoice statement follow-up with recipients to address questions raised about XRoads' invoice |
| 05/02/05 | Salem, M | 0.80 | Engagement administration | Set up office space for XRoads team due to office space realignment at the WD Corporate Headquarters. |
| 05/08/05 | Simon, D | 1.40 | Work time on flight to Jacksonville | regarding sensitivity analysis of erroneous factors. |
| 05/12/05 | Salem, M | 0.90 | Engagement administration | Arranged and packed XRoads files due to office space realignment at the WD Corporate Headquarters. |
| 05/13/05 | Salem, M | 0.60 | Engagement administration | Packed XRoads files and shipped to New York as part of completion of responsibilities on site. |
| | | | | |
| **2ND INTERIM FEE AUDITOR REPORT** | | | | |
| None | | | | |
| | | | | |
| **3RD INTERIM FEE AUDITOR REPORT** | | | | |
| 11/11/05 | Rosolanko, M | 2.50 | Winn-Dixie Corrections | Winn-Dixie fee statement corrections for compliance with the Bankruptcy guidelines |
| 11/14/05 | Rosolanko, M | 2.00 | Ellen's corrections | Make corrections to time entries for compliance with the Bankruptcy guidelines. |
| 01/26/06 | Young, B | 2.20 | Worked on GUCS | Worked on reconciling General Unsecured Claims provided by vendors and Logan's website. |
| | | | | |
| **4TH INTERIM FEE AUDITOR REPORT** | | | | |
| 01/30/06 | Gutierrez, B | 1.10 | Collected change management intellectual capital | Collected change management intellectual capital from engagement management, internet research, and pas case history |
| 02/17/06 | Kwon, O | 2.90 | Worked on final business case document | Worked on Commercial Print final business case and savings presentation document |
| 02/23/06 | Kwon, O | 2.90 | Worked on project wrap-up | Finalized all deliverable documents, detailing transition areas for project wrap-up. |
| 02/27/06 | Goetz, L | 4.00 | Travel time | Travel time from NYC to Jacksonville, FL for Winn-Dixie |

## Exhibits C, D, E & F
## 12.0 Hour Days - Summary

|  | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Periods | % of Total |
|---|---|---|---|
| Fee App 1 | 410.10 | 10,446.40 | 3.9% |
| Fee App 2 | 398.60 | 13,968.10 | 2.9% |
| Fee App 3 | 114.80 | 10,016.10 | 1.1% |
| Fee App 4 | 110.70 | 8,597.70 | 1.3% |
| Total | 1,034.20 | 43,028.30 | 2.4% |

**Exhibit C**
**12.0 Hour Days - First Application**

| Time Keeper | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Periods | % of Total |
|---|---|---|---|
| Bailey, J. | 19.90 | 253.10 | 7.9% |
| Boucher, C. | 11.00 | 376.10 | 2.9% |
| Claflin, K. | - | 49.30 | 0.0% |
| Damore, R. | 39.80 | 651.70 | 6.1% |
| Dinoff, J. | 47.40 | 747.20 | 6.3% |
| Doyle, T | - | 23.40 | 0.0% |
| Eckerman, A. | 7.60 | 259.30 | 2.9% |
| Etlin, H. | - | 391.30 | 0.0% |
| Gaston, B. | 6.10 | 394.40 | 1.5% |
| Gordon, E. | 6.10 | 496.60 | 1.2% |
| Gura, J. | 1.80 | 219.50 | 0.8% |
| Karol, S. | 68.50 | 692.10 | 9.9% |
| Lane, E. | 12.10 | 451.20 | 2.7% |
| McCarty, L. | - | 96.10 | 0.0% |
| Myers, G. | 7.60 | 214.50 | 3.5% |
| Nguyen, K | - | 89.60 | 0.0% |
| Perreault, M. | 26.50 | 703.10 | 3.8% |
| Salem, M. | 30.80 | 288.50 | 10.7% |
| Shah, A. | 2.30 | 131.30 | 1.8% |
| Simon, D. | 11.90 | 435.90 | 2.7% |
| Simon, J. | - | 1.20 | 0.0% |
| Spencer, J. | 0.30 | 81.00 | 0.4% |
| Stevenson, A. | 0.10 | 459.90 | 0.0% |
| Vander Hooven | 14.00 | 472.10 | 3.0% |
| Windham, P | 19.90 | 637.70 | 3.1% |
| Wong, J. | 10.40 | 309.60 | 3.4% |
| Wright, C. | - | 156.90 | 0.0% |
| Wuertz, T. | 21.30 | 496.30 | 4.3% |
| Young, J. | 30.00 | 411.30 | 7.3% |
| Yuan, K. | 14.70 | 456.20 | 3.2% |
| | 410.10 | 10,446.40 | 3.9% |

## Exhibit D
## 12.0 Hour Days - Second Application

| Time Keeper | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Periods | % of Total |
|---|---|---|---|
| Bailey, J. | 2.80 | 54.20 | 5.2% |
| Boggess, B. | - | 110.90 | 0.0% |
| Boucher, C. | 11.40 | 621.70 | 1.8% |
| Cassidy, K. | - | 470.00 | 0.0% |
| Claflin, K. | - | 5.50 | 0.0% |
| Damore, R. | 35.70 | 816.60 | 4.4% |
| Dinoff, J. | 44.80 | 801.20 | 5.6% |
| Doyle, T | - | 1.90 | 0.0% |
| Dussinger, M. | 7.70 | 162.80 | 4.7% |
| Eckerman, A. | 24.20 | 459.20 | 5.3% |
| Etlin, H. | 1.20 | 505.00 | 0.2% |
| Gaston, B. | 5.30 | 774.80 | 0.7% |
| Gordon, E. | 2.60 | 496.30 | 0.5% |
| Gura, J. | - | 95.40 | 0.0% |
| Karol, S. | 72.20 | 963.30 | 7.5% |
| Kwon, O. | 9.20 | 769.40 | 1.2% |
| Lane, E. | 12.20 | 567.90 | 2.1% |
| Lapson, G. | - | 30.30 | 0.0% |
| McCarty, L. | - | 279.70 | 0.0% |
| Nguyen, K | - | 59.70 | 0.0% |
| Perreault, M. | 14.20 | 210.60 | 6.7% |
| Salem, M. | 76.50 | 980.70 | 7.8% |
| Schmieder, S. | 2.40 | 283.70 | 0.8% |
| Shah, A. | 5.30 | 364.30 | 1.5% |
| Simon, D. | - | 165.50 | 0.0% |
| Song, V. | 10.90 | 524.30 | 2.1% |
| Stevenson, A. | 3.80 | 550.10 | 0.7% |
| Vander Hooven | - | 254.00 | 0.0% |
| Windham, P | 5.80 | 815.50 | |
| Wright, C. | - | 19.50 | |
| Wuertz, T. | 27.40 | 904.30 | 3.0% |
| Young, J. | 23.00 | 849.80 | 2.7% |
| | 398.60 | 13,968.10 | 2.9% |

**Exhibit E**
**12.0 Hour Days - Third Application**

| Time Keeper | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Periods | % of Total |
|---|---|---|---|
| Boggess, B. | 1.80 | 605.50 | 0.3% |
| Boucher, C. | 3.50 | 208.80 | 1.7% |
| Cassidy, K. | - | 18.00 | 0.0% |
| Claflin, K. | - | 9.70 | 0.0% |
| Coblentz, J. | 0.80 | 484.90 | 0.2% |
| Damore, R. | 22.30 | 543.50 | 4.1% |
| Doyle, T | - | 1.50 | 0.0% |
| Dussinger, M. | 28.50 | 726.20 | 3.9% |
| Etlin, H. | - | 291.10 | 0.0% |
| Fagerstrom, K. | - | 101.00 | 0.0% |
| Gaston, B. | 2.00 | 672.50 | 0.3% |
| Gordon, E. | - | 437.90 | 0.0% |
| Gutierrez, B. | 17.90 | 390.90 | 4.6% |
| Hunt, K. | 1.90 | 511.30 | 0.4% |
| Karol, S. | 5.70 | 584.90 | 1.0% |
| Kwon, O. | - | 715.40 | 0.0% |
| Lane, E. | 10.70 | 632.70 | 1.7% |
| McCarty, L. | - | 55.20 | 0.0% |
| Nguyen, K | 2.00 | 265.00 | 0.8% |
| Salem, M. | 5.30 | 712.30 | 0.7% |
| Shah, A. | 1.70 | 238.70 | 0.7% |
| Simon, D. | - | 32.60 | 0.0% |
| Song, V. | 3.20 | 98.70 | 3.2% |
| Stevenson, A. | - | 205.40 | 0.0% |
| Vander Hooven | - | 46.60 | 0.0% |
| Windham, P | 1.30 | 337.20 | 0.4% |
| Wuertz, T. | 3.80 | 541.90 | 0.7% |
| Young, J. | 2.40 | 546.70 | 0.4% |
| | 114.80 | 10,016.10 | 1.1% |

**Exhibit F**
## 12.0 Hour Days - Fourth Application

| Time Keeper | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Periods | % of Total |
|---|---|---|---|
| Boggess, B. | 0.60 | 465.40 | 0.1% |
| Boucher, C. | - | 20.80 | 0.0% |
| Cassidy, K. | - | 268.00 | 0.0% |
| Claflin, K. | - | 1.00 | 0.0% |
| Coblentz, J. | - | 91.20 | 0.0% |
| Damore, R. | 6.10 | 415.90 | 1.5% |
| Doyle, T | - | 0.80 | 0.0% |
| Dussinger, M. | 18.10 | 837.50 | 2.2% |
| Edmonson, J. | - | 209.00 | 0.0% |
| Etlin, H. | - | 263.70 | 0.0% |
| Fagerstrom, K. | 0.10 | 622.40 | 0.0% |
| Gaston, B. | 8.80 | 765.20 | 1.2% |
| Goetz, L. | 3.60 | 260.40 | 1.4% |
| Gordon, E. | 8.50 | 401.10 | 2.1% |
| Gutierrez, B. | - | 294.50 | 0.0% |
| Hunt, K. | - | 283.00 | 0.0% |
| Karol, S. | 9.20 | 616.50 | 1.5% |
| Kwon, O. | - | 197.20 | 0.0% |
| Lane, E. | 34.50 | 804.90 | 4.3% |
| McCarty, L. | - | 14.10 | 0.0% |
| Nguyen, K | 2.30 | 136.10 | 1.7% |
| Salem, M. | 7.60 | 815.60 | 0.9% |
| Simon, D. | - | 12.10 | 0.0% |
| Stevenson, A. | - | 1.50 | 0.0% |
| Vander Hooven | - | 18.60 | 0.0% |
| Wuertz, T. | - | 199.00 | 0.0% |
| Young, J. | 11.30 | 582.20 | 1.9% |
| | **110.70** | **8,597.70** | **1.3%** |

# EXHIBIT G

## Corrected Hotel Listing Dates

|  |  | 1st charge | 2nd charge | Comments |
|---|---|---|---|---|
| 4/29/2005 | Lane: Lodging 4/25 - 4/29/05 | 492.68 |  |  |
| 5/6/2005 | Lane: Lodging 5/2 - 5/5/05 |  | 492.68 | Corrected lodging dates |
| 4/29/2005 | Salem: Lodging 4/25 - 4/29/05 | 521.08 |  |  |
| 5/6/2005 | Salem: Lodging 5/2 - 5/6/05 |  | 492.68 | Corrected lodging dates |
| 6/16/2005 | Wright: Lodging 6/13 - 6/16/05 | 369.51 |  |  |
| 6/23/2005 | Wright: Lodging 6/20 - 6/23/05 |  | 369.51 | Corrected lodging dates |

# Exhibit H

## Summary of additional Voluntary Reductions by XRoads Solutions Group

| | | |
|---|---|---:|
| 1. | Computation error in First Application (See ¶ 19 in XRoads' Response) | $ 800.00 |
| 2. | Duplicate billing entries (See ¶ 23 in XRoads' Response) | 42,012.00 |
| 3. | Tenth of hour rounding errors (See ¶ 30 in XRoads' Response) | 2,200.00 |
| 4. | Travel Time (See ¶ 64 in XRoads' Response) | 22,680.00 |
| 5. | Duplicate coding charges (See ¶ 73 in XRoads' Response) | 727.72 |
| 6. | Duplicate taxi charges (See ¶ 74 in XRoads' Response) | 195.00 |
| 7. | Duplicate taxi charges (See ¶ 75 in XRoads' Response) | 96.20 |
| 8. | Duplicate airfare charge (See ¶ 80 in XRoads' Response) | 964.39 |
| 9. | Incorrect Hotel charge (See ¶ 86 in XRoads' Response) | 154.29 |
| 10. | Transportation charges in excess of cap (See ¶ 92 in XRoads' Response) | 1,255.76 |
| | Total: | $ 71,085.36 |