**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
| | ) |
| Reorganized Debtors. | ) Jointly Administered |

**NOTICE OF AGREED ORDER OF RESOLUTION OF (I) CLAIM NUMBER 8576**
**FILED BY JEFFERSON-PILOT LIFE INSURANCE COMPANY, AND (II)**
**CLAIM NUMBER 13002 FILED BY CLIFFDALE CORNER, INC.**

---

NOTICE OF OPPORTUNITY TO OBJECT AND FOR HEARING

Pursuant to Local Rule 2002-4, the Court will consider this matter without further notice or hearing unless a party in interest files an objection within 3 business days from the date of service of this paper.  If you object to the relief requested in this paper, you must (a) file your response with the Clerk of the Bankruptcy Court in accordance with the Court's electronic filing procedures or at 300 North Hogan Street, Suite 3-350, Jacksonville, Florida 32202, and (b) serve a copy by email and fax on (i) Winn-Dixie Stores, Inc. c/o Jay Castle, Esq., 5050 Edgewood Court, Jacksonville, Florida  32254, JayCastle@winn-dixie.com, (ii) James H. Post, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202, jpost@smithhulsey.com and (ii) Rosalie Gray, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, rgray@skadden.com.

If you file and serve a response within the time permitted, the Court will schedule a hearing and you will be notified.  If you do not file a response within the time permitted, the Court will consider that you do not oppose the granting of the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.

---

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates (the "Debtors"), pursuant to

Local Rule 2002-4, give notice of the proposed entry of the attached Agreed Order Resolving (i)

Claim Number 8576 filed by Jefferson-Pilot Life Insurance Company, and (ii) Claim Number

13002 filed by Cliffdale Corner, Inc.

If no objection to the proposed Agreed Order is filed and served within the time set forth above, the Court will be requested to enter the Agreed Order without further notice or hearing.

Dated: December 28, 2006

SKADDEN, ARPS, SLATE, MEAGHER          SMITH HULSEY & BUSEY
& FLOM LLP

By ____s/ D. J. Baker_____          By ____s/ James H. Post_____
     D. J. Baker                            Stephen D. Busey
     Sally McDonald Henry                   James H. Post
     Rosalie Walker Gray                    Cynthia C. Jackson,
     Adam S. Ravin                          Florida Bar Number 175460

Four Times Square                      225 Water Street, Suite 1800
New York, New York 10036               Jacksonville, Florida  32202
(212) 735-3000                         (904) 359-7700
(212) 735-2000 (facsimile)             (904) 359-7708 (facsimile)
djbaker@skadden.com                    jpost@smithhulsey.com

Co-Counsel for Reorganized Debtors     Co-Counsel for Reorganized Debtors

**<u>Certificate of Service</u>**

I certify that a copy of this document has been furnished electronically and by facsimile to the Post-Effective Date Committee, c/o Matthew Barr, Esq. and Michael Comerford, Esq., Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005, mbarr@milbank.com, mcomerford@milbank.com, this 28th day of December, 2006.



*Adam S. Ravin*
Attorney

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Reorganized Debtors.[1] | ) | Jointly Administered |

### AGREED ORDER RESOLVING (I) CLAIM NUMBER 8576 FILED BY JEFFERSON-PILOT LIFE INSURANCE COMPANY AND (II) CLAIM NUMBER 13002 FILED BY CLIFFDALE CORNER, INC.

This cause came before the Court upon the Twenty-Fourth Omnibus Objection (the "Objection") of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") to the proofs of claim listed on Exhibit A through G to the Objection.[2]  One of the proofs of claim subject to the Objection was Claim Number 8576 filed by Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"). On November 3, 2006, Jefferson-Pilot filed a response to the Objection (Docket No. 12367) in which it argued that, based upon its entitlement to the collateral securing a promissory note entered into with Cliffdale Corner, Inc. ("Cliffdale Corner"), Jefferson-Pilot held a contingent and unliquidated claim on all amounts arising under a nonresidential real property lease for property located at 690 Reily Road, Fayetteville, North Carolina (the "Lease").  Cliffdale Corner, the landlord under the Lease, also filed a claim for rejection

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2] All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Objection.

damages related to the Lease -- specifically, Claim Number 13002 in the amount of $580,012.70 (the "Cliffdale Corner Claim").  Jefferson-Pilot has acknowledged that its claim is duplicative of the Cliffdale Corner Claim.

Based upon the consent of the parties appearing below, it is

ORDERED AND ADJUDGED:

1.      Claim Number 8576 is disallowed.

2.      Claim Number 13002 is allowed as a Class 13 Landlord Claim in the amount of $580,012.70.

3.      The distribution made by the Debtors on account of Claim Number 13002 shall be paid to the Escrow Agent, Professional Mortgage, pursuant to the Loan Servicing and Escrow Agreement substantially in the form attached as Exhibit A and shall be sent to the following address:

Professional Mortgage Company, Inc.
Attn:  Shirley Staton; Loan # 94222
2 Bennett Street
Greenville, SC 29601

4.      The Court shall retain jurisdiction to resolve any disputes arising from this Agreed Order.

Dated this ____ day of _____, 2007 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge

Consent

The undersigned parties consent to the entry of the foregoing Agreed Order.

SMITH HULSEY & BUSEY

NEXSEN PRUET ADAMS KLEEMEIER, PLLC

By____*/s/ James H. Post*____
        James H. Post

By____*/s/ Christine L. Myatt*____
        Christine L. Myatt*
        Benjamin A. Kahn

Florida Bar Number 175460
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

N.C. State Bar # 10444
N.C. State Bar # 20004
Lake Point
701 Green Valley Road, Suite 100
Post Office Box 3463
Greensboro, North Carolina 27402
(336) 373-1600

-and-

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Attorneys for Jefferson-Pilot Life Insurance Company

D. J. Baker
Sally McDonald Henry
Rosalie Walker Gray
Adam S. Ravin
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

BALLARD SPAHR ANDREWS & INGERSOLL, LLP

By____*/s/ David L. Pollack*____
        David L. Pollack

Co-Counsel for Reorganized Debtors

1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
(215) 864-8325

Attorneys for Cliffdale Corner, Inc.

*Counsel have authorized their electronic signature

553407

3

## Exhibit A

## ESCROW AGREEMENT
## CONCERNING WINN-DIXIE CLAIM

THIS **ESCROW AGREEMENT CONCERNING WINN-DIXIE CLAIM** (this "Agreement") is made and entered as of this *20ᵗʰ* day of *December*, 2006 (the "**Effective Date**") by and among Cliffdale Corner, Inc., a North Carolina corporation ("**BORROWER**"), Jefferson-Pilot Life Insurance Company, a North Carolina corporation, its successors and assigns ("**LENDER**"), and Professional Mortgage Company, Inc., a South Carolina corporation ("**SERVICER**").

## WITNESSETH:

A.      BORROWER is the owner of a shopping center located at the intersection of Cliffdale Road and Reilly Road, Cumberland County, North Carolina ("**Premises**"). LENDER is the beneficiary under that certain Deed of Trust dated September, 26, 1994 ("**Deed of Trust**") securing a loan to BORROWER in the original face amount of $3,550,000.00 as has been modified from time to time ("**Loan**"). Unless otherwise defined herein, all capitalized terms shall be defined as set forth in the Deed of Trust.

B.      Winn-Dixie Raleigh, Inc., a Florida Corporation ("**Winn Dixie**") and BORROWER were parties to that certain Lease, dated June 30,1993, ("**Lease**").

C.      BORROWER and LENDER entered into that certain Assignment of Leases, Rents and Profits dated September 26, 1994, a copy of which is annexed to this Agreement as *Exhibit "1"* ("**Assignment of Leases**"). Any words or phrases defined in the Assignment of Leases shall have the same meaning and effect when used in this Agreement. This Agreement is intended to supplement the terms and conditions of the Assignment of Leases and nothing in this Agreement is intended to modify or change the substantive terms of the Assignment of Leases as between BORROWER and LENDER nor to alter the rights and obligations of the BORROWER and LENDER under the Loan Documents (as hereinafter defined) except as specifically set forth in this Agreement.

D.      Pursuant to the terms of the Lease and Joint Plan of Reorganization of Winn-Dixie Stores, Inc., and Affiliated Debtors ("Plan"), if approved, Winn-Dixie will deliver to SERVICER approximately 46.26 shares of New Common Stock, as defined in the Plan, per $1,000.00 of allowed claim ("Stock"), subject to adjustment as set forth in the Plan. The date of the approval of the Plan which was November 21, 2006 shall herein be referred to as the "**Effective Date.**"

E.      BORROWER may, with consent of LENDER, sell BORROWER's bankruptcy claim before distribution of the Stock. In such event, the cash proceeds from sale of the claim shall be held and administered pursuant to this Agreement. BORROWER may also receive certain cash distributions pursuant to the Plan. Any cash described in this paragraph and received by the LENDER, SERVICER or BORROWER pursuant to the Plan and related to the Premises shall collectively be referred to as the "**Cash Proceeds**".

F.    The purpose of this Agreement is to provide procedures for the Stock and the Cash Proceeds to be held and disbursed by SERVICER in accordance with the terms of this Agreement.

NOW THEREFORE, for and in consideration of good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, and the mutual agreements hereinafter set forth, BORROWER, LENDER and SERVICER hereby agree as follows:

1.    If BORROWER receives the Stock or Cash Proceeds, BORROWER shall promptly deposit the same with SERVICER. If LENDER receives the Stock or Cash Proceeds, LENDER shall promptly deposit the same with SERVICER. Any Stock or Cash Proceeds deposited by BORROWER or LENDER or received directly by SERVICER shall collectively be referred to as the "Deposit". The Deposit shall be held and released in accordance with the terms and conditions of this Agreement.

2.    BORROWER and LENDER have requested SERVICER to accept and hold the Deposit solely upon the terms and conditions set forth in this Agreement. Pursuant to the request of BORROWER and LENDER, SERVICER shall receive and accept the Deposit upon and subject solely to the remaining terms and conditions hereof.

3.    SERVICER shall hold the Deposit and all other funds held by it pursuant to this Agreement, in an account, styled "Professional Mortgage Company, Inc. as agent for Jefferson-Pilot Life Insurance Company and Cliffdale Corner, Inc., Mortgage Loan # 94222" (the "Deposit Account"). At the request of BORROWER, SERVICER shall sell some or all of the Stock and deposit the proceeds in the Deposit Account. Until disbursed in accordance with this Agreement, all interest and other income or proceeds earned thereon shall be held by SERVICER as a part of the Deposit. So long as funds remain in the Deposit Account, within twenty (20) days after the end of each month, Servicer shall provide BORROWER and LENDER a copy of the bank statement for the Deposit Account as of the previous month end, along with a copy of the account history from Servicer's system. BORROWER shall bear all risk of loss of the Deposit resulting from any cause whatsoever, including any loss of principal, except for such loss due to the bad faith, gross negligence or willful misconduct of the SERVICER or LENDER.   Neither LENDER nor SERVICER shall be liable to BORROWER or any other party for a minimum rate of interest or any other rate of return, yield or benefit accruing to the Deposit and any other funds held by SERVICER under this Agreement, provided, however, that all cash in the Deposit Account shall be deposited by SERVICER in a federally insured account bearing interest at a standard money market rate of interest and subject to immediate withdrawal of said cash in the Deposit Account as provided in this Agreement.

4.    If requested by BORROWER, SERVICER shall automatically deduct from the Deposit and make disbursements in cash from the Deposit directly to LENDER to pay regular monthly payments of principal and interest becoming due on the Loan in the amount of $29,273.00 monthly, beginning on the first day of the first calendar month following the date of delivery of the Deposit to SERVICER and on or before the first day of each calendar month thereafter ("Regular Loan Payment"), unless and until BORROWER submits supplemental written instructions to SERVICER directing the discontinuation of

2

disbursement of the Regular Loan Payment or unless or until there are insufficient Cash Proceeds in the Deposit to satisfy the Regular Loan Payment. In addition to disbursements on account for Regular Loan Payments, LENDER may from time to time submit supplemental written instructions to SERVICER directing SERVICER to make a direct disbursement(s) to LENDER of other amounts required to be paid to LENDER pursuant to the Loan ("**Other Lender Payments**"). To the extent there exists insufficient Cash Proceeds in the Deposit to pay the obligations referenced in this paragraph, Borrower shall pay such obligations as required by the Loan.

　　　　5.　　In addition to disbursements to LENDER in accordance with section 4 above, BORROWER may be or become entitled to receive disbursements from the Deposit as provided in this section and LENDER shall instruct and direct SERVICER in writing to disburse to BORROWER funds from the Deposit for the expenses set forth below and for which BORROWER has properly submitted to LENDER (with a copy to SERVICER) of a written disbursement request ("**Disbursement Request**") conforming to the following terms and conditions for each disbursement (the "**Disbursement Requirements**") as applicable to the particular Disbursement Request:

　　　　　　　　(i)　　With respect to Disbursement Requests by BORROWER for operating or repair expenses, real estate taxes relating to the Premises, insurance premiums relating to the Premises, and capital repair items relating to the Premises, BORROWER shall provide to LENDER and SERVICER a Disbursement Request at least ten (10) business days prior to the requested date of such disbursement, which Disbursement Request shall include satisfactory evidence that such items and/or conditions for which reimbursement or payment is sought have occurred, including:

　　　　　　　　　　　　(a)　　Borrower's certification to LENDER that no uncured Event of Default exists under the Note, the Deed of Trust, and the Assignment of Leases (collectively the "Loan Documents") as of the date of the Disbursement Request; and

　　　　　　　　　　　　(b)　　Commercially reasonable documentary evidence of:

　　　　　　　　　　　　　　　　(1)　　In the case of Disbursement Requests to reimburse BORROWER for funds advanced by BORROWER to make payments due LENDER under the Loan Documents, the date, amount and evidence of the applicable payments to LENDER for which the Disbursement Request is submitted; or,

　　　　　　　　　　　　　　　　(2)　　In the case of Disbursement Requests to pay, or reimburse BORROWER for payments previously made to pay operating or repair expenses for the Premises:

　　　　　　　　　　　　　　　　　　　　(aa)　　Subject to Section 5.(i)(b)(2)(cc) below, an invoice(s) and/or billing(s) from third parties for operating or repair expenses attributable to the Premises and BORROWER's written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s)

3

within ten (10) business days from the receipt of the applicable Disbursement; or

         (bb)    In the case of reimbursement requests, copies of cancelled checks or other evidence of BORROWER's prior payment of the operating expenses for which the applicable Disbursement Request is submitted.

         (cc)    Notwithstanding Section 5.(i)(b)(2)(aa) above to the contrary, in the case of invoices exceeding $10,000.00 or in the case of ad valorem taxes and insurance premiums and upon BORROWER'S submission of the items set forth in Section 5.(i)(b)(2)(aa) above, LENDER reserves the right to direct SERVICER to make payment for such expenses directly to the vendor or governing body entitled to receive such payment.

        (ii)    With respect to requests for Disbursement Requests by BORROWER for expenses related to modifying or upfitting the Property for marketing the Premises to prospective tenants or for any replacement tenant under a replacement lease approved by the Lender for the Premises in accordance with the Assignment of Leases and any other applicable requirements of the Loan Documents (**Replacement Lease(s)**), such modifications and upfit expenses being referred to as **"Tenant Improvement Work,"** BORROWER shall be entitled to submit Disbursement Requests to LENDER and SERVICER at least ten (10) business days prior to the requested date of such disbursement, which Disbursement Request shall include satisfactory evidence that such items and/or conditions for which reimbursement or payment is sought have occurred, including:

        (a)    BORROWER's certification to LENDER that no uncured Event of Default exists under the Note, the Deed of Trust, the Assignment of Leases or any of the Loan Documents as of the date of the Disbursement Request;

        (b)    if the Disbursement Request is for payment of brokerage commissions for a Replacement Lease(s), or for other costs reasonably incurred by BORROWER in reletting the Premises, the Disbursement Request shall include the invoice(s) and/or billing(s) from third parties and BORROWER's written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s) within ten (10) business days from the receipt of the applicable disbursement, provided however, LENDER reserves the right to direct SERVICER to make payment directly to the vendor or broker (as applicable);

        (c)    if the Disbursement Request is for Tenant Improvement Work for a Replacement Lease(s), then any such Disbursement Request shall comply with the provisions of preceding clause (a) and all of the following additional requirements as applicable to a particular Disbursement Request:

        (1) if the Disbursement Request is for payment of the costs of government permits ("**Permit Costs**"), architectural or engineering fees for the

design of such Tenant Improvement Work ("**Design Costs**") or payment of amounts due a contractor(s) performing such Tenant Improvement Work ("**Contractor Payment(s)**"), the Disbursement Request shall include the invoice(s) and/or billing(s) for such Permits Costs, Design Costs or Contractor Payments and BORROWER's written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s) within ten (10) business days from the receipt of the applicable disbursement; provided, however, except for a Disbursement Request for a final disbursement for Contractor Payments, which shall comply with the additional requirements set forth in subsection 5(ii)(c)(2) below, the amount allowed on account of any Contractor Payment(s) shall be limited to ninety-five percent (95%) of the applicable Disbursement Request for an interim Contractor Payment(s) with the remaining five percent (5%) held as a retention ("**Retention**") and shall otherwise be subject to the following conditions and requirements:

(aa)    The applicable Disbursement Request for a Contractor Payment(s) shall be accompanied by a conditional lien waiver covering the restoration or Tenant Improvement Work for which payment is requested based on the progress of the work, which shall be certified by BORROWER in the applicable Disbursement Request; and

(bb)    If LENDER elects, LENDER shall have the right to cause an inspection of the restoration or Tenant Improvement Work by a current inspection report of the Premises prepared by LENDER's inspecting architect/engineer, if applicable, at the cost of BORROWER in order to confirm BORROWER's estimate of the progress of the work and that the work for which payment is requested has been performed in a good and workmanlike manner, such cost to BORROWER not to exceed $500.00 per site visit by such inspecting architect/engineer.

(2)    in the case of a final Disbursement Request for Contractor Payment(s) following the completion of the Tenant Improvement Work BORROWER shall be entitled to submit a Disbursement Request for the final Contractor Payment(s), including the Retention and such Disbursement Request shall comply with all of the requirements and conditions in subsection 5(ii)(c)(1) above and the following additional requirements:

(aa)    The final Disbursement Request for a Contractor Payment(s) shall be accompanied by a conditional lien waiver covering the restoration and Tenant Improvement Work for which the Disbursement Request is submitted;

(bb)    The final Disbursement Request for a Contractor Payment(s) shall include an original estoppel certificate executed by the tenant under any Replacement Lease(s) of the Premises or a portion

5

thereof approved by LENDER, if applicable, stating that such tenant has accepted and occupied the space set forth in the Replacement Lease and that there are no defaults under such Replacement Lease (nor does there exist any known event or condition, which with the passage of time or the giving of notice, or both, could result in such a default); and

(cc) The final Disbursement Request for a Contractor Payment(s) shall include a copy of any and all applicable certificates of occupancy and other governmental permits issued by applicable governmental authorities, which certificates and permits allow each tenant pursuant to an Replacement Lease to occupy the Premises or the portion thereof covered by the applicable Replacement Lease, if applicable; and

(dd) if LENDER elects, LENDER shall have the right to cause an inspection of the Tenant Improvement Work by a current inspection report of the Premises prepared by LENDER's inspecting architect/engineer, if applicable, at the cost of BORROWER in order to confirm BORROWER's determination of the completion of such work in a good and workmanlike manner, such cost to BORROWER not exceed $500.00 per site visit by such inspecting architect/engineer.

(3)     Notwithstanding anything in this Section 5(ii)(c) to the contrary, in the case of a Disbursement Request pursuant to this Section 5(ii)(c) for an invoice greater than $10,000.00, the LENDER reserves the right to direct SERVICER to make payment directly to the vendor entitled to receive such payment.

(d)     In the event BORROWER has previously paid the expense for which a Disbursement Request is submitted, then BORROWER shall be entitled to reimbursement from the Deposit upon presentation of a Disbursement Request complying with the applicable requirements of this subsection 5(ii) and, in addition, such Disbursement Request shall include copies of cancelled checks or other evidence reasonably satisfactory to LENDER of BORROWER's prior payment of the expenses for which reimbursement is requested.

6.     If not sooner disbursed in accordance with sections 4 and/or 5 above, LENDER shall instruct and authorize SERVICER in writing to disburse the Deposit to BORROWER upon the date on which the Note has been repaid in full, all obligations of BORROWER secured by this Agreement have been performed in full and the Deed of Trust has been reconveyed to BORROWER. In addition, LENDER shall instruct and authorize SERVICER in writing to disburse the Deposit to BORROWER upon the date on which any Replacement Lease becomes effective, provided however, that BORROWER shall have certified to LENDER that no uncured Event of Default exists under the Loan Documents.

7.     If the Deposit Account contains insufficient Cash Proceeds to fulfill a Disbursement Request approved by the LENDER, then the SERVICER shall, at the option of

the BORROWER, sell sufficient Stock to satisfy the Disbursement Request and distribute the proceeds to the BORROWER.

8. This Agreement shall be irrevocable, and BORROWER and LENDER hereby waive all rights and powers to alter, amend, revoke or terminate this Agreement, except as otherwise specifically set forth elsewhere in this Agreement. This Agreement shall terminate when all compensation owed to SERVICER in connection with the administration of this Agreement shall have been paid in full and the Deposit has been fully disbursed in accordance with the terms hereof.

9. BORROWER hereby acknowledges that, pursuant to the Assignment of Leases, LENDER has a first prior lien and security interest in and to the (a) the Deposit Account and all rights relating thereto and proceeds therefrom and thereof; (b) all books and records relating to the types and items of property described in the foregoing clause (a) under BORROWER's control; and (c) all proceeds (whether cash or non-cash, and including without limitation insurance proceeds) and products of the property described in the foregoing clause (a) and all replacements and substitutions therefor and all additions and accessions thereto, subject to any amounts owed to SERVICER, as security for payment of all indebtedness and sums due under the Loan Documents and this Agreement. The parties hereto agree that this Agreement constitutes a security agreement, and that BORROWER shall consent to such financing statements and execute such other documents as LENDER shall deem reasonably necessary or desirable to continue the perfection of LENDER's interest in the Deposit.

10. An **"Event of Default"** shall occur hereunder upon: (a) the failure of BORROWER to properly apply any disbursements to pay any third party invoices or billings within the time periods required in subsections 5(i)(b)(2)(aa), 5(ii)(b) or 5(ii)(c) above within fifteen (15) days from delivery of written notice to BORROWER of said failure to pay, (b) the failure of BORROWER to make any payment to or deposit any sum of money with LENDER or SERVICER as and when due under this Agreement within fifteen (15) days from delivery of written notice to BORRWER of said failure to pay, (c) a breach by BORROWER of any other provision of this Agreement where BORROWER fails to fully cure such breach within fifteen (15) days from delivery of written notice to BORRWER to cure, or (d) the occurrence of an Event of Default by BORROWER under any of the Loan Documents.

11. Upon the occurrence of an Event of Default under this Agreement and while such Event of Default is continuing and subject to the terms of the Assignment of Leases; (a) LENDER shall not be obligated to cause SERVICER to disburse the Deposit to BORROWER; (b) LENDER shall be entitled to pursue all of its right and remedies under the Loan Documents, and the remedies to which it is entitled at law and in equity, including, without limitation, all remedies of a secured party under the North Carolina Uniform Commercial Code; and (c) SERVICER shall, upon written notice of an Event of Default from LENDER, pay over to LENDER upon LENDER's request the Deposit (less any Costs and Expenses owed to SERVICER, and LENDER shall be entitled immediately to apply such sum in the following order and priority: first, to reimburse LENDER for LENDER's reasonable out-of-pocket expenses, if applicable, under the Loan Documents; and second, to any amounts due and owing under the terms of the Loan Documents in the manner set forth in the Loan Documents. The rights of LENDER hereunder are in addition to and without limitation of any other rights and remedies that LENDER may have, if any, under this Agreement.

7

**Notwithstanding anything to the contrary stated herein, nothing in this Agreement shall modify, abridge or abrogate LENDER's agreement not to seek a deficiency judgment against BORROWER, its successors and assigns, as set forth in the Loan Documents.**

12. Notwithstanding the existence of any other liens or security interests in the Deposit, upon the occurrence of an Event of Default under this Agreement and while such Event of Default is continuing and subject to the terms of the Assignment of Leases, LENDER shall have the right to determine the order in which any or all of the Deposit, or the Property shall be subjected to the remedies provided herein and in the Deed of Trust. LENDER shall have the right to determine the order in which the indebtedness secured hereby is satisfied from the proceeds realized upon the exercise of the remedies provided herein and in the Deed of Trust, subject, however, to the provisions of Paragraph 11. BORROWER, and any party who now or hereafter acquires a lien or security interest in the Deposit or the Property and who has actual or constructive notice of this Agreement or the Deed of Trust hereby expressly waives and relinquishes any and all rights to demand or require the marshaling of liens or the marshaling of assets by LENDER in connection with the exercise of any of the remedies provided herein or in the Deed of Trust.

13. SERVICER joins in the execution of this Agreement for the express purposes of agreeing to be bound solely by the provisions set forth in this Agreement with respect to the administration and disbursement of the Deposit and hereby acknowledges that the Deposit shall be disbursed according to the provisions of this Agreement. BORROWER hereby acknowledges that pursuant to the Assignment of Leases, BORROWER released all power of dominion and control over the Deposit, except as specifically provided herein, and BORROWER shall not, by entering into this Agreement, have any power of dominion or control of the Deposit nor access to the Deposit, except as specifically provided herein.

14. BORROWER agrees that SERVICER shall incur no costs or expenses whatsoever in connection with the preparation of this Agreement, the holding of the Deposit or the administration of this Agreement, and BORROWER agrees that all such costs and expenses of SERVICER shall be borne and paid by BORROWER; provided, however, such costs and expenses shall be deducted and paid directly from the Deposit to the extent of available Cash Proceeds. BORROWER agrees that SERVICER will be entitled to receive: (i) an annual fee of $1,500.00, (ii) an amount of $100.00 for each Disbursement Request processed by SERVICER and (iii) any amounts payable to SERVICER pursuant to section 16 below (collectively the **"Costs and Expenses"**), provided, however, that SERVICER may reduce or waive such Costs and Expenses, in the discretion of SERVICER. SERVICER shall have the right to withdraw such Costs and Expenses which are due and owing from the Deposit prior to any disbursement. To the extent insufficient Cash Proceeds exist in the Deposit to pay such Costs and Expenses, BORROWER shall pay such Costs and Expenses within seven (7) days from receipt of an invoice from SERVICER. LENDER and BORROWER agree that each party shall bear and pay for their respective costs and expenses arising out of the preparation of this Agreement. LENDER and BORROWER agree that LENDER and BORROWER, respectively, shall bear and pay for their respective costs and expenses arising out of or in any manner connected to the Deposit and the administration of this Agreement, except as otherwise provided herein or in the Loan Documents.

15.    Nothing contained in this Agreement shall constitute LENDER and/or SERVICER as a joint venturer, partner or agent of BORROWER, or LENDER and/or SERVICER liable for any debts, obligations, acts, omissions, representation, or contracts of BORROWER.

16.    BORROWER shall indemnify and hold harmless SERVICER and its directors, officers, employees, attorneys, successors and assigns from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, liabilities and costs and expenses (including reasonable litigation costs, reasonable accounting fees, and reasonable attorneys' fees and expenses) arising from or in any way connected in any manner whatsoever with: (a) the holding of the Deposit in accordance with the provisions of this Agreement; (b) the acts, errors or omissions of BORROWER; and (c) SERVICER's acting in accordance with the provisions of this Agreement, excepting only liability occasioned by SERVICER's or LENDER's bad faith, gross negligence or willful misconduct, and, in no other event shall SERVICER be liable for any incidental, consequential, special or punitive damages. Furthermore, BORROWER agrees to release and hold harmless SERVICER and its directors, officers, employees, attorneys, successors and assigns, from and against any and all loss, liability, cost, damages and expenses incurred by BORROWER, including, without limitation, legal and account fees and expenses arising in any manner whatsoever out of SERVICER's acting in accordance with the provisions of this Agreement. The provisions of this paragraph shall survive the termination of this Agreement and any deposit provided for by this Agreement.

17.    All notices, demands, documents, requests, or other communications which are required or permitted to be given or served hereunder shall be in writing and shall be effective when received either (a) personally, (b) by Federal Express or similar overnight courier, (c) by mail, postage prepaid, registered or certified mail, return receipt requested, or (d) except in the case of any notice of default, by first class mail, addressed as follows:

| | |
|---|---|
| BORROWER: | Cliffdale Corner, Inc.<br>Attn: Mr. Butch Dunlap<br>238 N. McPherson Church Road<br>Fayetteville, NC 28303<br>Phone: (910) 864-3232 |
| LENDER: | Jefferson-Pilot Life Insurance Company<br>c/o Delaware Investment Advisers<br>1300 South Clinton Street<br>Fort Wayne, IN 46802<br>Attn: Loan Servicing, Loan #94222 |
| SERVICER: | Professional Mortgage Company, Inc.<br>Attn: Shirley Staton; Loan #94222<br>2 Bennett Street<br>Greenville, SC 29601<br>Phone: (864) 242-0079<br>Fax: (864) 242-1877 |

9

Email: Shirley@pmcsc.com

Such addresses and the persons to whom notice shall be directed may be changed from time to time by any party serving notice as above provided.

18.    BORROWER may not assign, pledge or otherwise transfer or encumber this Agreement or any right hereunder separate and apart from the Loan Documents. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of BORROWER, LENDER and SERVICER.

19.    This Agreement and the Assignment of Leases embody the entire agreement among BORROWER, LENDER and SERVICER relating to the Deposit Account, and supersedes all prior agreements and understandings upon BORROWER, LENDER and SERVICER relating to such Deposit Account. No implied covenants or obligations shall be read into this Agreement against SERVICER. This Agreement may be changed, waived or terminated only by an instrument in writing signed by the party against who enforcement of such change, waiver or termination is sought.

20.    If any provision of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

21.    Subject to the provisions of paragraph 11 of this Agreement, LENDER shall have all of the rights and remedies granted in this Agreement, the Note, the Deed of Trust, the Assignment of Leases, and these same rights and remedies shall be cumulative and may be pursued separately, successively or concurrently against BORROWER, or any property covered under the Deed of Trust or the Assignment of Leases or the Loan Documents at the sole discretion of LENDER. The exercise or failure to exercise any of the same shall not constitute a waiver or release thereof or of any other right or remedy, and the same shall be non-exclusive.

22.    This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina and the laws of the United States applicable to transactions undertaken within the State of North Carolina.

23.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed one and the same document.

24.    The federal tax identification number of the BORROWER is 56-1837292.

25.    In the event at any time (a) of a dispute regarding the Deposit, (b) of a dispute regarding the performance by LENDER or BORROWER under this Agreement or the other Loan Documents, (c) of a dispute regarding the performance by any party under this Agreement, or (d) SERVICER shall receive conflicting demands or instructions under this Agreement, all parties hereto agree that at the sole option of SERVICER either (i) the Deposit then held in escrow by SERVICER shall remain in escrow until written confirmation of the

resolution of the dispute, or (ii) SERVICER shall be entitled to deposit the funds contained in the Deposit into a court of general jurisdiction in the State of North Carolina and to interplead the parties hereto in connection therewith, and the parties hereto hereby consent to the jurisdiction of such court in connection with any such dispute.

26.     SERVICER may resign from its obligations under this Agreement at any time after thirty (30) days' prior written notice to the other parties hereto.  LENDER shall designate, in its sole discretion, a substitute SERVICER promptly after receipt of notice of resignation by SERVICER and shall take all reasonable actions necessary to cause such designated successor to promptly assume the obligations of SERVICER hereunder. SERVICER hereby agrees that it shall take all actions reasonably necessary and shall cooperate with LENDER, at no expense to LENDER, to facilitate any transfer of SERVICER's obligations, duties and rights hereunder.  From and after the effective date of resignation and the delivery of the Deposit to the replacement servicer designated by LENDER, SERVICER shall have no further obligation or liability under this Agreement, except for liability arising from SERVICER'S bad faith, gross negligence, willful misconduct or as otherwise specifically set forth in this Agreement occurring prior to the replacement servicer's receipt of the Deposit.

27.     SERVICER may rely on any written instruction received from LENDER without further inquiry.  SERVICER may rely and shall be protected in acting or refraining from acting upon any written notice from LENDER (including but not limited to electronically confirmed facsimiles of such notice) believed by it to be genuine and to have been signed or presented by a duly authorized person acting on behalf of LENDER.

28.     SERVICER is not chargeable with knowledge, and has no duties with respect to, any other agreements between BORROWER and LENDER, including, without limitation, the Loan Documents.  SERVICER shall not be liable for any claims, suits, actions, costs, damages, liabilities or expenses or for any interruption of services in connection with the subject matter of this Agreement other than liabilities caused by bad faith, gross negligence or willful misconduct on the part of SERVICER. SERVICER shall not have any duty to manage the value of the Stock and shall have no liability for any deterioration in value of the Stock over the term of this Agreement, except for liability arising from SERVICER'S bad faith, gross negligence, willful misconduct or as otherwise specifically set forth in this Agreement. In no event shall SERVICER be liable for any incidental, consequential, special or punitive damages.

29.     LENDER and BORROWER acknowledge and agree that:  (a) SERVICER makes no representations or warranties, express or implied, concerning the validity, effectiveness, perfection or priority of LENDER's security interest in the Deposit Account or any funds in connection therewith; (b) this Agreement applies only to the Deposit referenced herein, but not to any other deposit account which BORROWER may now or hereafter maintain.

30.     LENDER and BORROWER consent to the administration of the funds associated with the Deposit by the National Bank of South Carolina, a FDIC insured bank.

31.    In the event BORROWER becomes subject to voluntary or involuntary proceedings under the U.S. Bankruptcy Code, or if SERVICER is served with legal process which SERVICER in good faith believes affects the Deposit or the Deposit Account, SERVICER shall have the right to place a hold on such Deposit until such time as SERVICER receives an appropriate court order or other assurances satisfactory to SERVICER establishing that the Deposit or the Deposit Account may be disbursed according to the provisions of this Agreement.

32.    Business Day shall mean any day, except Saturday, Sunday or a day which banks in the State of North Carolina are not required to be open for business.

(The remainder of this page is intentionally left blank.)

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

Cliffdale Corner, Inc.

Name: Sharlene R. Williams
Title: President


LENDER:

**Jefferson-Pilot Life Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact


By: Robert F. Larkin, Second Vice President


SERVICER:

**Professional Mortgage Company, Inc.**


By: _____
Name: _____
Title: _____

13

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

**Cliffdale Corner, Inc.**

By: _____
Name: _____
Title: _____

LENDER:

**Jefferson-Pilot Life Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact

*Robert F. Larkin*

By: Robert F. Larkin, Second Vice President

SERVICER:

**Professional Mortgage Company, Inc.**

By: _____
Name: _____
Title: _____

13

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

**Cliffdale Corner, Inc.**

By: _____
Name: _____
Title: _____

LENDER:

**Jefferson-Pilot Life Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact

_____
By: Robert F. Larkin, Second Vice President

SERVICER:

**Professional Mortgage Company, Inc.**

By: _____
Name: Shirley M. Staton
Title: Vice President

13

BK4221PG0765

48530

048248

RECEIVED

94 SEP 26 PM 4: 24

GEORGE E. TATUM
REGISTER OF DEEDS
CUMBERLAND CO., N.C.

**EXHIBIT 1**

Please return to: L. Stacy Weaver, Jr, McCOY, WEAVER, WIGGINS, CLEVELAND & RAPER
222 Maiden Lane, Fayetteville, NC 28301

IV-179

STATE OF __NORTH CAROLINA__

COUNTY OF __CUMBERLAND__

# ASSIGNMENT OF LEASES, RENTS AND PROFITS

THIS ASSIGNMENT, Made this _26th_ day of __September__, 19 _94_, by
and between __CLIFFDALE CORNER, INC., a North Carolina Corporation__
___XXI___, _____, his wife (whether one or more persons), party of the
first part, to JEFFERSON-PILOT LIFE INSURANCE COMPANY, of Greensboro, North Carolina, party of the
second part,

WITNESSETH: For value received and as additional security for the indebtedness hereinafter mentioned, the
party of the first part hereby assigns, sets over, transfers and conveys unto the party of the second part all the
right, title and interest of the party of the first part in and to the rents, issues, profits, revenues, royalties, rights
and benefits, hereinafter referred to as "rents", from the following described property:
(Insert below description of real estate appearing in Deed of Trust or Mortgage.)

> SEVENTY FIRST TOWNSHIP, CUMBERLAND COUNTY,
> NORTH CAROLINA
>
> See Attached Exhibit "A".

The term of this Assignment shall be until that certain Note and Deed of Trust or Mortgage (or any extension
or renewal thereof), dated _September 26th, 1994_, made, executed and delivered by the party of
the first part to JEFFERSON-PILOT LIFE INSURANCE COMPANY, covering the above described premises for
the sum of _Three Million Five Hundred Fifty Thousand_($ 3,550,000.) Dollars shall have been fully
paid and satisfied, or until the expiration of the period of redemption, if any, at which time this Assignment is to
be fully satisfied, cancelled and released, and the releasing of said Deed of Trust or Mortgage shall constitute a
release hereof.

And to that end the party of the first part hereby further assigns, sets over, transfers and conveys unto the
said JEFFERSON-PILOT LIFE INSURANCE COMPANY all leases of said premises now made, executed or de-
livered, whether written or verbal, or to be hereafter made, be the same written or verbal, including specifically,
without limiting the generality hereof, the following leases:
(Insert below description of each lease, including names of parties, term, date, amendments and recording
data.)

That certain lease by and between Cliffdale Corner, Inc. (Landlord) and
Winn-Dixie Raleigh, Inc. (Tenant) dated June 30, 1993 and having lease period
from September 1, 1994 to August 31, 2014. See Short Form Lease recorded in
Book _3991_, Page _895_, Cumberland County Registry.

22.

BK4221PG0766

And the party of the first part does hereby authorize and empower the said JEFFERSON-PILOT LIFE IN-SURANCE COMPANY to collect the rents payable under all of said leases above referred to as they shall become due, and does hereby direct each and all of the tenants of the aforesaid premises to pay such rents as may now be due or shall hereafter become due to the said JEFFERSON-PILOT LIFE INSURANCE COMPANY upon demand for payment thereof by said Company. It is understood and agreed, however, that no such demand shall be made unless and until there has been a default in the payment of the indebtedness secured by the Deed of Trust or Mortgage herein mentioned, or default in the payment of any other sums secured by said Deed of Trust or Mort-gage, or default in the performance of any of the covenants set forth in said Note or said Mortgage or Deed of Trust or Assignment of Leases, Rents and Profits; and, until such demand is made, the party of the first part is author-ized to collect, or continue collecting, said rents, but such privilege to collect, or continue collecting, as aforesaid by the party of the first part shall not operate to permit the collection by the said party of the first part, his heirs, executors, administrators or assigns, of (and the party of the first part hereby covenants and agrees with the party of the second part that the party of the first part will not collect, demand or receive) any installment of rent in advance of the date prescribed in said lease or leases for the payment thereof.

The authority and power of JEFFERSON-PILOT LIFE INSURANCE COMPANY to collect said rents from said property, as set forth herein, may be exercised and said rents collected with or without the taking of possession of said real property, or any part thereof, and without the necessity of (but nothing herein contained shall be con-strued to prohibit) JEFFERSON-PILOT LIFE INSURANCE COMPANY instituting foreclosure of its Mortgage, Deed of Trust or lien, and an action upon its Note or an action upon this Assignment directly against the tenants under the leases assigned herewith.

And in furtherance of this Assignment, the party of the first part does hereby additionally authorize and empower the JEFFERSON-PILOT LIFE INSURANCE COMPANY, by its employees, agents, or representatives, at the option of JEFFERSON-PILOT LIFE INSURANCE COMPANY, upon the occurrence of any default, as aforesaid, to enter upon the aforesaid premises and to collect, in the name of the party of the first part or in its own name as assignee, the rents accrued but unpaid and in arrears at the date of such default, as well as the rents thereafter accruing and becoming payable during the period this Assignment is operative; and to this end, the party of the first part further agrees to cooperate and to assist the JEFFERSON-PILOT LIFE INSURANCE COMPANY, its employees, agents or representatives, in all reasonable ways with collection of said rents;

The party of the first part does hereby authorize (but nothing herein shall be deemed to require or obligate) the JEFFERSON-PILOT LIFE INSURANCE COMPANY, upon such entry, to take over and assume the manage-ment, operation and maintenance of the said premises and to perform all acts necessary and proper in its sole discretion and to expend such sums as may be necessary in connection therewith, including the authority to effect new leases, to cancel or surrender existing leases, to alter or amend the terms of existing leases, to renew existing leases, or to make concessions to tenants; the party of the first part hereby releasing all claims against the JEF-FERSON-PILOT LIFE INSURANCE COMPANY arising out of such management, operation and maintenance, excepting the liability of the JEFFERSON-PILOT LIFE INSURANCE COMPANY to account as hereinafter set forth.

This Assignment is given as additional security for the performance of each and all of the obligations and covenants of the Note and Deed of Trust or Mortgage above described (or any extension or renewal thereof).

The JEFFERSON-PILOT LIFE INSURANCE COMPANY shall, after payment of all proper charges and ex-penses, including reasonable compensation to such agents, employees or representatives as shall be selected or employed, and after the accumulation of a reasonable reserve to meet taxes, assessments, utility rents, and fire and liability insurance in requisite amounts, credit the net amount of income received by it from the premises by virtue of this Assignment to any amounts due and owing to it by the party of the first part under the terms of said Note and Mortgage or Deed of Trust, but the manner of the application of such net income and what items shall be credited, shall be determined in the sole discretion of the JEFFERSON-PILOT LIFE INSURANCE COM-PANY.

The undersigned party of the first part, assignor, expressly covenants and agrees with the party of the second part that at the time of the execution and delivery of this Assignment there has been no anticipation or prepay-ment of any rents by any of the tenants occupying the above described property or by any of the lessees in any of the above described leases.

It is further convenanted and agreed that the party of the first part, assignor, and his successors or assigns, shall have no right, power or authority to (and the party of the first part covenants and agrees with the party of the second part that the party of the first part shall not) alter, modify or amend the terms, or any of them, of any of the leases above described in any particular whatsoever without first obtaining the consent in writing of JEF-FERSON-PILOT LIFE INSURANCE COMPANY to such alteration, modification or amendment.

The provisions of this instrument shall be binding upon and shall inure to the benefit of the party of the first part and his or its legal representatives, successors or assigns and upon the JEFFERSON-PILOT LIFE INSUR-ANCE COMPANY, its successors and assigns.

Nothing herein contained shall be construed as making the JEFFERSON-PILOT LIFE INSURANCE COM-PANY a mortgagee in possession, nor shall said Company be liable for laches, or failure to collect said rents, issues, profits, revenues, royalties, rights and benefits, and it is understood that said Company is to account only for such sums as are actually collected.

BK4221PG0767

The party of the first part covenants and agrees with the party of the second part that no tenant need determine whether or not a default has occurred making this Assignment operative, but shall pay over the rent to JEFFERSON-PILOT LIFE INSURANCE COMPANY upon notice from it to do so and upon so doing shall be relieved from liability therefor to owner in all respects.

It is further covenanted and agreed that the party of the first part, assignor, will keep, observe and perform all of the covenants on the part of the lessor to be kept, observed and performed in any lease affecting any portion of the mortgaged premises. If the party of the first part fails to keep, observe and perform any covenant of any such lease, JEFFERSON-PILOT LIFE INSURANCE COMPANY shall have the right, at its option, to keep, observe and perform such covenant on behalf of the party of the first part or to declare, with or without notice, all sums secured by the Mortgage or Deed of Trust referred to herein to be immediately due and payable and avail itself of any and all remedies provided for in said Mortgage or Deed of Trust in the event of default. In the event JEFFERSON-PILOT LIFE INSURANCE COMPANY should exercise its option to keep, observe or perform any of the lessor's obligations under any lease affecting the premises, it shall be entitled to recover from the party of the first part immediately upon demand any expenses incurred or amounts advanced in performing such covenants, together with interest at the highest lawful rate per annum now permitted by written contract under the laws of this State from the date of such advance. Should the party of the first part fail to repay JEFFERSON-PILOT LIFE INSURANCE COMPANY any such expenses or advances as herein provided, JEFFERSON-PILOT LIFE INSURANCE COMPANY may at its option, with or without notice, declare all sums secured by said Mortgage or Deed of Trust to be immediately due and payable and avail itself of any and all remedies provided for therein in the event of default.

IT IS UNDERSTOOD AND AGREED that neither the existence of this Assignment nor the exercise of its privilege to collect said rents, issues, profits, revenues, royalties, rights and benefits hereunder, shall be construed as a waiver by the party of the second part, or its successors and assigns, of the right to enforce payment of the debt hereinabove mentioned, in strict accordance with the terms and provisions of the Deed of Trust or Mortgage and Note _____ for which this Assignment is given as additional security.

IN WITNESS WHEREOF, the part _____ of the first part has s _____ ~~hereunto set xxxxxxxxxxhand xxxx and seal xxxxxx the day and year first above written~~ caused this instrument to be signed in its

WITNESS:        corporate name by its duly authorized officers and its seal to be hereunto fixed by authority of its Board of Directors, the day and year first above written.


CLIFFDALE CORNER, INC. _____    _____ (SEAL)

By: _Joseph P. Riddle III_____    _____ (SEAL)
Joseph P. Riddle, III, President

ATTEST:        _____ (SEAL)

By: _Sharlene R. Williams_____    _____ (SEAL)
Sharlene R. Williams, Secretary

        _____ (SEAL)

        _____ (SEAL)

        _____ (SEAL)

        _____ (SEAL)

        _____ (SEAL)

        _____ (SEAL)


STATE OF   NORTH CAROLINA
                                    } ss.    (Acknowledge below in form generally used in State where this instrument is executed.)
COUNTY OF   CUMBERLAND

I, _Susanne Almon_____, a Notary Public for said County and State, do hereby certify that Sharlene R. Williams, personally appeared before me this day, and stated that she is Secretary of Cliffdale Corner, Inc. and acknowledged on behalf of Cliffdale Corner, Inc., the due execution of the foregoing instrument.

Witness my hand and official seal this 26th day of September ,1994.

My commission expires:12-4-96    signed: _Susanne Almon_

                        Notary Public

BK4221PG0768

The foregoing Certificate(s) of _____ _Susan Alman_ _____

is/are certified to be correct. This instrument and this certificate are duly registered at the date and time and in the Book and Page shown on the first page hereof.

GEORGE E. TATUM          REGISTER OF DEEDS FOR _____ CUMBERLAND _____ COUNTY,

By _____ Deputy/Assistant - Register of Deeds

BY _____
          Assistant Treasurer

**Assignments of Leases, Rents and Profits**

FROM

TO

JEFFERSON-PILOT LIFE
INSURANCE COMPANY

Filed for record in the office of _____

of the County of _____

State of _____

at _____ o'clock _____ M., and

recorded on _____

record. No. _____ Page _____

and the record verified.

EXHIBIT "A"
## LEGAL DESCRIPTION

### SHOPPING CENTER TRACT

BEGINNING at a point, said point being the northernmost boundary corner of a tract owned by THE PANTRY, INC. recorded in Deed Book 2795, Page 297; Cumberland County Registry;

THENCE North 08 degrees 46 minutes 40 seconds West for a distance of 140.41 feet to a point;

THENCE along a curve to the right having a radius of 60.00 feet and an arc length of 47.12 feet, being subtended by a chord of South 86 degrees 53 minutes 54 seconds West for a distance of 45.92 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 191.01 feet to a point;

THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 54.63 feet, being subtended by a chord of South 64 degrees 41 minutes 12 seconds West for a distance of 49.25 feet to a point;

THENCE along a curve to the right having a radius of 505.46 feet and an arc length of 77.09 feet, being subtended by a chord of South 24 degrees 20 minutes 39 seconds West for a distance of 77.02 feet to a point in the northern margin of a proposed right of way of Cliffdale Road (right of way varies);

THENCE North 61 degrees 17 minutes 11 seconds West for a distance of 53.00 feet along said right of way margin to a point;

THENCE along a curve to the left having a radius of 452.46 feet and an arc length of 67.67 feet, being subtended by a chord of North 24 degrees 25 minutes 45 seconds East for a distance of 67.60 feet to a point;

THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 55.43 feet, being subtended by a chord of North 25 degrees 13 minutes 42 seconds West for a distance of 49.82 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 138.83 feet to a point;

THENCE North 19 degrees 23 minutes 53 seconds East for a distance of 187.87 feet to a point;

THENCE North 40 degrees 36 minutes 07 seconds West for a distance of 149.11 feet to a point;

THENCE North 19 degrees 23 minutes 53 seconds East for a distance of 346.57 feet to a point;

THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 647.99 feet to a point;

THENCE South 18 degrees 04 minutes 54 seconds West for a distance of 21.00 feet to a point;

THENCE South 19 degrees 31 minutes 18 seconds West for a distance of 84.82 feet to a point;

THENCE South 19 degrees 21 minutes 39 seconds West for a distance of 85.00 feet to a point;

THENCE North 72 degrees 42 minutes 32 seconds West for a distance of 6.36 feet to a point;

THENCE South 19 degrees 23 minutes 56 seconds West for a distance of 111.45 feet to a point;

THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of South 25 degrees 36 minutes 05 seconds East for a distance of 49.50 feet to a point;

THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 166.52 feet to a point;

THENCE along a curve to the left having a radius of 60.00 feet and an arc length of 47.26 feet, being subtended by a chord of North 86 degrees 49 minutes 52 seconds East for a distance of 46.05 feet to a point in the western margin of a proposed right of way margin of Reilly Road (right of way varies);

THENCE South 22 degrees 18 minutes 00 seconds West for a distance of 69.95 feet along said western right of way margin to a point;

THENCE along a curve to the left having a radius of 60.00 feet and an arc length of 53.34 feet, being subtended by a chord of North 45 degrees 07 minutes 59 seconds West for a distance of 51.60 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 158.91 feet to a point;

THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of South 64 degrees 23 minutes 55 seconds West for a distance of 49.50 feet to a point;

THENCE South 19 degrees 23 minutes 56 seconds West for a distance of 146.50 feet to a point;

THENCE South 64 degrees 29 minutes 32 seconds East for a distance of 227.07 feet to a point in said western right of way margin;

THENCE South 27 degrees 10 minutes 42 seconds West for a distance of 132.68 feet along said western right of way margin to a point;

THENCE South 28 degrees 19 minutes 28 seconds West for a distance of 38.27 feet along said western right of way margin to a point;

THENCE North 60 degrees 31 minutes 10 seconds West for a distance of 155.56 feet to the point and place of BEGINNING;

Together with and subject to covenants, easements, and restrictions of record.

Said property contains 9.428 acres more or less.

This description prepared by Larry King & Associates, R.L.S., P.A. on this 17th day of February, 1994.
☐

# LEGAL DESCRIPTION

## MAIN ENTRANCE TRACT

BEGINNING at a point, said point being North 26 degrees 55 minutes 17 seconds East 900.64 feet from the northwestern boundary corner of a tract owned by THE PANTRY, INC. recorded in Deed Book 2795, Page 297, Cumberland County Registry; said beginning point also being in the western margin of a proposed right of way of Reilly Road (right of way varies);

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 131.64 feet to a point;

THENCE along a curve to the left  having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of South 64 degrees 23 minutes 53 seconds West for a distance of 49.50 feet to a point;

THENCE South 19 degrees 23 minutes 53 seconds West for a distance of 142.69 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 27.92 feet to a point;

THENCE along a curve to the left  having a radius of 35.00 feet and an arc length of 14.40 feet, being subtended by a chord of North 31 degrees 11 minutes 14 seconds East for a distance of 14.30 feet to a point;

THENCE North 19 degrees 23 minutes 53 seconds East for a distance of 155.69 feet to a point;

THENCE along a curve to the left  having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of North 25 degrees 36 minutes 07 seconds West for a distance of 49.50 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a  distance of 184.99 feet to a point;

THENCE along a curve to the left  having a radius of 50.00  feet and an arc length of 78.54 feet, being subtended by a chord of South 64 degrees 23 minutes 53 seconds West for a distance of  70.71 feet to a point;

THENCE South 19 degrees 23 minutes 53 seconds West for a distance of 154.69 feet to a point;

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 37.92 feet to a point;

THENCE along a curve to the left  having a radius of 35.00 feet and an arc length of 14.40 feet, being subtended by a chord of North 31 degrees 11 minutes 14 seconds East for a distance of  14.30 feet to a point;

THENCE North 19 degrees 23 minutes 53 seconds East for a  distance of 140.69 feet to a point;

THENCE along a curve to the right  having a radius of 85.00 feet and an arc length of 133.52 feet, being subtended by a chord of North 64 degrees 23 minutes 53 seconds East for

page 3 of 4

a distance of 120.21 feet to a point;

THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 81.12 feet to a point;

THENCE along a curve to the left having a radius of 662.90 feet and an arc length of 99.81 feet, being subtended by a chord of South 74 degrees 54 minutes 55 seconds East for a distance of 99.72 feet to a point;

THENCE along a curve to the right having a radius of 662.90 feet and an arc length of 99.81 feet, being subtended by a chord of South 74 degrees 54 minutes 55 seconds East for a distance of 99.72 feet to a point;

THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 124.44 feet to a point in said western margin of said proposed right of way of Reilly Road;

THENCE South 14 degrees 03 minutes 37 seconds West for a distance of 77.34 feet along said right of way to the point and place of BEGINNING;

Said property contains 0.8469 acres more or less.

This description prepared by Larry King & Associates, R.L.S., P.A. on this 21st day of April, 1993.

page 4 of 4