# EXHIBIT "A"

08/25/99   11:07   FAX 404 237 1659     ROWE FOLTZ MARTN                    ☒004          ☒002

## CONSENT OF LENDER

AmSouth Bank, a national banking association (together with its successors, assigns, and transferees "Lender"), is the owner and holder of a certain mortgage encumbering the land subject to that certain Lease executed by LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation ("Landlord") and WINN-DIXIE CHARLOTTE, INC., a Florida corporation ("Tenant"), dated October 29, 1997, hereby consents to the terms and conditions of this Second Amendment to Lease, and agrees that any foreclosure of said mortgage or deed-in-lieu of foreclosure accepted by it shall not extinguish the Lease as amended hereby.

Catherine J Haas
Print name: _Catherine T. Haas_

AmSouth Bank

Collen Winn
Print name: _Colleen Winn_

By: _____
_James W. Davis_
Its: _Vice President_
Date: _7/17/98_

STATE OF _Florida_   )
COUNTY OF _Duval_   )

I, _Catherine T. Haas_ , a Notary Public, State and County aforesaid, do hereby certify that _James W. Davis_ personally appeared before me this day and acknowledged that he/she is _Vice President_ , of AmSouth Bank, a national banking association and that by authority duly given and as the act of the _Corporation_ , the foregoing instrument was signed in its name by its _____ , sealed with its corporate seal, and attested by her/himself as its _____

Witness my hand and official seal, this the _17th_ day of _July_ , 1998.

Catherine J Haas
Printed Name: _Catherine T. Haas_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

OFFICIAL NOTARY SEAL
CATHERINE T HAAS
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC?????
MY COMMISSION EXP. ????

C:\TRANSFER\CHARLOTT2\150\AMEND.SIT

06/25/99   11:07   FAX 404 237 1659        ROWE FOLTZ MARTN                    ☎003

STATE OF _Georgia_        )
COUNTY OF _Fulton_        )

I, _Shannon D Webb_____, a Notary Public, State and County aforesaid, do hereby certify that _Shmanee White_ personally appeared before me this day and acknowledged that he/she is Manager of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the partnership.

Witness my hand and official seal, this the _9th_ day of _June_____, 1998.

_Shannon D Webb_
Printed Name: _Shannon D Webb_
Notary Public, State and County aforesaid
My commission expires: _May 7, 2002_
(NOTARIAL SEAL)

_[seal: NOTARY PUBLIC SHANNON D. WEBB COUNTY OF PAULDING]_

STATE OF FLORIDA   )
COUNTY OF DUVAL   )

I, _Rebecca L Sawyer_____, a Notary Public, State and County aforesaid, do hereby certify that _E. Ellis Zahra, Jr_ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of WINN-DIXIE CHARLOTTE, INC., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

Witness my hand and official seal, this the _____ day of _June_____, 1998.

_Rebecca L Sawyer_
Printed Name: _Rebecca L Sawyer_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

_[seal: NOTARY PUBLIC STATE OF FLORIDA]_

REBECCA L. SAWYER
My Comm. Exp. June 2, 2002
Comm. No. CC 827310

id between WINN-
R PARTNERS,

eement dated
Carolina; and

tached to the Lease
roads known as

| no/100 Dollars
ncy of which are
lows:

t "B" to the Lease,

ty lying within the

| in full force and

IN WITNESS WHEREOF, the parties hereto have signed and sealed this First Amendment as of the day and year first above written.

**LENOIR PARTNERS, LLC**

By: _Marshall Martin_

Title: _Manager_

[COMPANY SEAL]

**WINN-DIXIE CHARLOTTE, INC.**

By: _R. P. McC__

Title: Vice President

Attest: _R.D. P___

Title: ASST. Secretary

[CORPORATE SEAL]

## CONSENT OF GUARANTOR

The undersigned Guarantor of the above described Winn-Dixie Lease does hereby consent to the foregoing First Amendment and agree that the Guaranty shall continue in full force and effect and extend to the Lease, as amended by the foregoing First Amendment.

**WINN-DIXIE STORES, INC.**

By: _R. P. McC__

Title: Vice President

Attest: _R.D. P___

Title: ASST. Secretary

[CORPORATE SEAL]



America's Supermarket

January 23, 1998

Mr. Alexander White
Lenoir Partners, LLC
1117 Perimeter Center West, Suite W211
Atlanta, GA 30338

Re:    Winn-Dixie Store #2180
       Morganton Blvd. and Fairview Drive
       Lenoir, NC

Dear Mr. White:

Reference is made to that certain Lease dated October 29, 1997 covering the referenced premises wherein you are Landlord and this Company is Tenant. This letter will serve to amend the said Lease as follows: The first two dates appearing in Article 10 of the Lease are hereby deleted and the following dates substituted in lieu thereof, respectively: "May 1, 1998" and "May 1, 1999".

Except as the said lease is herein amended, the same shall remain unamended and in full force and effect in accordance with the terms. After acknowledgment by the Landlord please return one original counterpart of this letter to Bill Nichols at the letterhead address.

Sincerely,
Winn-Dixie Charlotte, Inc

By:    B. B. Tripp
       Its President

Acknowledged and accepted this 23rd day of January 1998.

Lenoir Partners, LLC

Alexander White

jr

WINN-DIXIE CHARLOTTE        MAILING ADDRESS: P.O. BOX 411208        CHARLOTTE, NORTH CAROLINA 28241-1208        (704) 587-4000
                            STREET ADDRESS: 2401 NEVADA BOULEVARD, CHARLOTTE, NORTH CAROLINA 28273

 Printed on Recycled Paper
WD 22-10



# LEASE

### Store #2180
### Southwest corner of the intersection of Morganton Boulevard and Fairview Drive
## Lenoir, Caldwell Co., North Carolina

## TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONSTRUCTION OF SHOPPING  CENTER/SUBDIVISION OF SHOPPING CENTER . . . . . . . . . . . . . 9

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FIXTURES AND INTERIOR ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

LANDLORD'S INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

TAXES AND LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

SUBORDINATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

LENDER'S CURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TRANSFER BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

FLORIDA MANDATED PROVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

NO JOINT VENTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

NO MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

scnn5
October 7, 1997

LEASE

THIS LEASE is made this _Oct. 29_, 1997, between **LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation ("Landlord") and **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## W I T N E S S E T H:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

PREMISES
1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 220 feet in width by 200 feet in depth, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided (collectively, the "Store"), together with exterior pads at the rear for installation of freezers and coolers, a loading dock area, and the land on which all of the same shall stand and Landlord hereby grants to Tenant a nonexclusive right and easement to use during the Term as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements shown on the Site Plan, as hereinafter defined (the "Common Areas" and together with the Store, collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by Robert Johnson Architects on August 13, 1996 and last revised on March 20, 1997(the "Site Plan"), known as Lenoir Market Place (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the southwest corner of the intersection of Morganton Boulevard and Fairview Drive in the City of Lenoir , County of Caldwell, State of North Carolina. The legal description of the Shopping Center is set forth on Exhibit "B".

TERM
2.    (a)    Initial Term.  The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)    Extension Term(s).  Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the Term of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease both at the time of exercise of the extension and on the date the Extension Term commences, by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document. If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)    <u>Return of Premises.</u> Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined, which shall be removed by Tenant at its sole cost) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state, but Tenant shall be required to make any and all reasonable repairs to the Premises occasioned by Tenant's removal of its signs, equipment and Trade Fixtures. However, Tenant shall not be required to remove in-slab plumbing, electrical or refrigeration lines or facilities. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)    <u>Holding Over.</u> Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at one hundred fifty percent (150%) of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

**RENT**

3.    Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)    <u>Basic Rent.</u> Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $349,800 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $29,150.00 per month plus all applicable sales taxes or similar taxes on the Basic Rent, Percentage Rent and Additional Rent payable by Tenant, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    <u>Percentage Rent.</u> In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store by WINN-DIXIE CHARLOTTE, INC. during each fiscal year of the Term, both for cash and on credit (less bad debt expenses). Gross Sales shall not include (i) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (ii) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (iii) credits or refunds made to customers for merchandise returned or exchanged; (iv) all sales of cigarettes and tobacco; (v) all receipts from vending machines, banks, automatic teller machines and public telephones; (vi) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (vii) returns of merchandise to suppliers or manufacturers; (viii) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for

2

exchange of merchandise or other things of value; (ix) merchandise or other things of value issued as a premium in connection with any sales promotion program; and (x) gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than three percent (3%), Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.

(c)     Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (i) Common Area Maintenance Expenses, (ii) Real Estate Taxes, (iii) Shopping Center Insurance, and (iv) Approved Security Expenses (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one (1) full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts or other evidences of payment by Landlord (the "Payment Evidence"). On or before 180 days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Tenant shall have the right, within one hundred eighty (180) days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than three percent (3%), Landlord shall also pay to Tenant the reasonable, out-of-pocket cost of Tenant's audit.

3

(1)    Common Area Maintenance Expenses.    Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth (1/12) of Landlord's estimate of the amount of such Common Area Maintenance Expenses to be due for the upcoming year which, for the first year, is estimated to be $916.67 per month. For succeeding years, the basis for a year's Common Area Maintenance Expenses shall be the amount actually paid by Tenant for the prior year.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, painting, cleaning, traffic control, inspecting, landscaping (only as shown on the Site Plan or subsequently required by governmental authorities or rules and regulations), maintaining any sprinkler and septic systems and storm water detention facilities required for operation of the Shopping Center, restriping and repaving the parking areas, lighting during the Standard Hours, as hereinafter defined, and otherwise repairing and maintaining the Common Areas.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items or services benefit Tenant, expenses associated with keeping the Shopping Center or the common areas safe or secure, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, holiday decorations, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or capital improvements unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized over the maximum allowable useful life of such capital improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses, or any single expense over

4

fifteen percent (15%) of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed provided, however, that on or before ten (10) days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once every eighteen (18) months..

(2)     Real Estate Taxes.  Tenant shall pay to Landlord, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center.  To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment.  Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation.  Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense.  Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)     Shopping Center Insurance.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance".  Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping Center under the terms of this Lease.  Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

(4)     Approved Security Expenses.     Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of

5

"Approved Security Expenses".  Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety and security devices and personnel pre-approved by Tenant's designated security officer. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Lease to keep the Shopping Center and the common areas safe and secure, it shall submit a written plan for providing such services to Tenant.  Tenant shall submit such plan to its security officer for review.  If the plan meets with the approval of Tenant's security officer, Tenant shall advise Landlord of the same.  No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment.  Approved Security Expenses shall not include any expenses not based upon competitive, arms-length bids obtained less frequently than once per year.  Payment of Approved Security Expenses or nonpayment of unapproved security expenses by Tenant shall not be interpreted and Landlord shall not claim that such payment or nonpayment should be interpreted as assertion of control over the common areas by Tenant.

Tenant's "Pro-rata Share" shall be the ratio of the rentable square footage of the Store as it exists from time-to-time to the total rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

**TITLE**

4.        On or before thirty (30) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment").  It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions").  Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have fifteen (15) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment.  If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice").  If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Title Objection Response").  Notwithstanding the foregoing, Landlord shall cure or cause to be removed any Exceptions that can be cured solely by the payment of money (i.e. taxes due and payable, mortgages or other encumbrances (unless all payments due under any such mortgage or encumbrance are current and Tenant obtains an SNDA as hereinafter defined), mechanics' or construction liens, etc.), shall terminate and cause the eviction of any tenants under any other leases to the Store, shall deliver evidence of Landlord's status, power, and authority as required by the Title Company, and shall execute and

6

deliver an owners and nonforeign affidavit. On or before the Commencement Date, Landlord, at Tenant's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Shopping Center and insuring Tenant's leasehold and any easements granted in connection therewith subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy").

**SURVEY**

5.      On or before ten (10) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the Store, the Common Areas, and the other buildings to be included in the Shopping Center (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, shall bear the certificate and comply with the survey protocol attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Survey Objection Response"). Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built" (the "As-Built Survey").

**ENVIRONMENTAL AUDIT**

6.      On or before fifteen (15) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition that, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation") Tenant shall notify Landlord in writing. Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure any such Environmental Violation.

**USE**

7.      (a)     <u>Permitted Use</u>. The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) including operation of a photo lab or film development business, an automatic teller machine and banking business, and for the sale of beer and wine for off-premises consumption  (the "Permitted Use").

(b)     <u>Exclusives.</u>     Tenant shall have the exclusive right to:

(1)     operate a supermarket, grocery, bakery, and delicatessen,

7

(2)     sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

(3)     operate a pharmacy or prescription drug concession.

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within one thousand (1,000) feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord). Notwithstanding the foregoing, Landlord may also lease retail space in the Shopping Center for use as an ice cream/frozen yogurt shop.

(c)    <u>Prohibitions</u>.    Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

(1)     spa, health, sports, or exercise club;

(2)     lounge, bar, "teen lounge" or social encounter club;

(3)     bowling alley;

(4)     pawn shop;

(5)     skating rink;

(6)     bingo or electronic or other game parlor;

(7)     theater (either motion or legitimate);

(8)     area or space for the sale or display of pornographic or "adult" material;

(9)     business or professional offices exceeding 3,000 square feet in the aggregate;

(10)    medical offices exceeding 5,000 square feet in the aggregate or abortion or HIV clinic;

(11)    automobile dealership;

(12)    church;

(13)    manufacturing or storage business;

(14)    public auditorium or other public entertainment facility;

(15)    tag office or other government service office;

(16)    restaurants exceeding 3,000 square feet or deriving more than 50% of their gross revenues from the sale of alcoholic beverages; or

(17)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

**COMPLIANCE WITH LAWS**

8.    Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER/ SUBDIVISION OF SHOPPING CENTER**

9.    Landlord, at its sole cost and expense, shall construct or cause to be constructed and diligently pursued to completion the Shopping Center, substantially as shown on the Site Plan, shall grade and surface as provided in Tenant's Plans, as hereinafter defined, all paved portions of the Common Areas, and shall install proper and adequate water drainage and lighting for the Shopping Center as required by final plans and specifications. All design, installation, and construction by or on behalf of Landlord shall comply in every respect with all applicable Legal Requirements, and shall be completed in a first-class manner by contractors, architects, and engineers, as required, which are licensed and may be bonded. The arrangement and location of all buildings and Common Areas shall  be constructed and at all times during the Term be maintained as shown on the Site Plan and shall not be changed and Landlord shall not subdivide, parcel, or otherwise alter the Shopping Center or create any easements in the Common Areas without the prior written consent of Tenant, which consent shall not unreasonably be withheld, conditioned, or delayed. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned, or delayed.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct or cause to be constructed the Store in accordance with guidelines submitted by Tenant to Landlord's architect to be used to create Tenant's Plans, as hereinafter defined (the "Guideplans") and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Landlord shall cause the architect to notify Tenant in writing of any discrepancies between the Guideplans and the final plans prior to Tenant's approval. Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease; Tenant's Plans shall provide for a completed Store, commonly referred to as a "turnkey" or "lock and key job". This Lease shall not be effective or enforceable against Tenant unless and until Landlord and Tenant have so approved Tenant's Plans. Tenant shall pay directly to Landlord's contractor the cost of any change to Tenant's Plans requested by Tenant (a "Change Order") and any deadlines for completion of the Store or the Shopping Center contained in this Lease shall be extended for a reasonable time for any delay caused by a Change Order.

Landlord and Tenant acknowledge and agree that the Shopping Center is to be constructed and developed initially as a single tract or parcel of land consisting of the Premises and the shop buildings outlined in red on Exhibit "A" (the "Shops"). Should Landlord deem it economically necessary or desirable to subdivide the Shopping Center into two separate tracts consisting of the Premises and the Shops, Tenant consents to such a subdivision on the condition that Landlord expressly confirms that such a subdivision does not relieve Landlord of Landlord's covenants and obligations under this Lease including, but not limited to, Landlord's covenants and obligations to:

9

(a)    maintain and repair exterior walls and structural portions of the Store and the Shopping Center, including those portions located on the Shops;

(b)    keep the Common Areas, including any common areas located on the Shops, in good condition and repair;

(c)    pay or cause to be paid all Common Area Maintenance Expenses, Real Estate Taxes, Shopping Center Insurance and Approved Security Expenses for the Shopping Center, including any such expenses attributable to the Shops or any shop parcel; further it is expressly agreed that after any subdivision, Tenant's Pro-Rata Share, as defined herein, shall remain unchanged;

(d)    repair and restore the Shopping Center, including the Shops, after casualty or condemnation as set forth herein; and

(e)    adhere to all use prohibition and restrictions regarding the Shops and the Shopping Center contained herein.

Landlord further acknowledges and agrees that, upon any conveyance of the Premises or the Shops, Landlord shall executed and record in the Caldwell County, North Carolina, records a reciprocal easement and restrictive covenant agreement substantially in the form attached hereto as Exhibit "I", which agreement shall govern the rights and obligations of the respective owners of such tracts.

LANDLORD EXPRESSLY ACKNOWLEDGES AND AGREES THAT LANDLORD'S LACK OF OWNERSHIP OR LOSS OF CONTROL OF THE SHOPS RESULTING FROM A SUBDIVISION OF THE SHOPPING CENTER SHALL NOT CONSTITUTE A VALID DEFENSE TO LANDLORD'S FAILURE TO PERFORM ANY OF ITS DUTIES HEREUNDER WITH RESPECT TO THE SHOPS.

**COMPLETION DATE**    10.    Construction of the Store and the Shopping Center shall begin not later than March 1, 1998 (the "Construction Start Date") and shall be substantially completed not later than March 1, 1999 (the "Construction Deadline"). The Construction Start Date shall be the date as of which (i) Landlord shall have obtained an building permit issued by the appropriate governmental authorities, (ii) the first concrete footings have been poured and (iii) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto.

**COMMENCEMENT DATE**    11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty ( 60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in substantial accordance with the Site Plan and Tenant's Plans, as certified by Landlord's architect (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Tenant shall have received, (i) the Title Policy, (ii) the Survey, and (iii) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store, which evidences that Landlord's contractor has completed all requirements except those which cannot be completed until Tenant has completed its needed improvements or equipment installation, shall have been issued;

10

(b)    Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    Construction of at least 7,000 sq. ft. of total building area (excluding the Store) in the Shopping Center shall have been substantially completed to at least shell finish as shown on the Site Plan;

(e)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

(f)    The Declaration and the Cross Easement as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction.

Provided that the conditions are timely fulfilled, Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or sixty (60) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

| OTHER TENANTS | 12. | INTENTIONALLY DELETED |

PARKING AND    13.    Tenant, its employees, agents, suppliers, licensees, customers, and invitees, shall have
COMMON AREAS    the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

Prior to construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 5.5 ten (10) foot wide automobile parking spaces for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

11

(b)      facilities for convenient parking of at least 309 automobiles (minimum); on the basis of arrangement as provided on the Site Plan and

After construction of the Addition, as hereinafter defined:

(a)      a minimum ratio of at least five (5)  ten (10) foot wide automobile parking spaces for each one thousand (1,000) square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)      facilities for convenient parking of at least 315 automobiles (minimum).

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

**SERVICE AREA**      14.      Landlord shall provide parking spaces for two (2) large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center. Tenant shall not use trailers for permanent merchandise storage.

**UTILITIES**      15.      Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted during the hours of ½ hour before dusk until midnight (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan. Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

**TENANT'S MAINTENANCE**      16.      Tenant shall keep the roof, gutters and downspouts, and the interior of the Store in reasonably neat and orderly, good condition and shall repair or replace as needed the windows and plate glass, automatic doors, air conditioning and heating systems, roof,  and floor surfacing of the Store, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and interior wiring to the main disconnect or main electrical panel and plumbing, from, but not including, the water meter, excluding structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an

12

unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

**LANDLORD'S MAINTENANCE**

17.    (a)    <u>Store</u>. Landlord shall, at its cost and expense and <u>not</u> as part of Common Area Maintenance Expenses, keep and maintain in good condition and repair, and replace as necessary the facade of the Store, the exterior walls and structural portions of the Store (including painting of the exterior walls as needed) other than the roof,  masonry walls, foundation and structural members of the Store, the exterior plumbing (including and from the water meter for the Store and including septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store.

(b)    <u>Common Areas</u>. Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store). Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, necessary safety and security devices and personnel pre-approved by Tenant's designated security officer, cleaning and sweeping as needed but at least three (3) times weekly, lighting during the Standard Hours in accordance with Tenant's Plans and this Lease and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance (including  replacement, when necessary) of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the negligence or wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Premises.

**SIGNS**

18.    Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Landlord shall construct, install, and maintain, at its cost, electrically illuminated pylon sign(s) in the locations marked on the Site Plan. The pylon sign(s) shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panel(s) in the uppermost spaces on such pylon sign(s) and may connect the sign panel(s) to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel(s) if billed as a portion of Additional Rent.

13

**FIXTURES AND
INTERIOR
ALTERATIONS**

19.    Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof.  Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before ten (10) days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant.  Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications.  Tenant shall indemnify Landlord from and against all mechanics', materialmen's, subcontractors' and similar liens arising by reason of construction or emplacement of Tenant's Trade Fixtures.

**INDEMNIFICATION**

20.    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees.  Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**

21.    If (i) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent (50%) or more of the value thereof based upon replacement costs or to an extent that renders the Store untenantable in Tenant's reasonable judgment, or (ii) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

14

(a)     if a Major Casualty occurs during the first seventeen (17) years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Landlord shall proceed promptly (but in any event within one hundred eighty (180) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored.  Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)     if a Major Casualty occurs during the last three (3 ) years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within thirty (30) days of the date of the Major Casualty to terminate this Lease;

(1)     If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within fifteen (15) days of receipt of Landlord's termination notice, to extend the Lease for the next successive Extension Term.  Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(2)     If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic Additional, and Percentage Rent shall be pro-rated as of such date;

(3)     If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Landlord shall to proceed promptly (but in any event within one hundred fifty (150) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.  Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

15

(4)    If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Landlord would be obligated to repair the Store, then Landlord shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

**LANDLORD'S INSURANCE**

22.    (a)    *Landlord.* Landlord shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(1)    Liability Insurance. Landlord shall carry comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00, it being understood that Tenant shall not be responsible for any portion of premiums for insurance exceeding such limits. Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(2)    Casualty Insurance. Landlord shall carry or cause to be carried all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)    *Tenant.* Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any such Mortgagee.

(1)     Liability Insurance.  Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00.  Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(2)     Casualty Insurance.  Tenant shall carry or cause to be carried all-risk commercial property insurance on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom.  As to casualty losses, Tenant shall pay the replacement cost thereof.  Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

QUIET ENJOYMENT  23.     Landlord covenants, warrants and represents that:

(a)     the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created (other than those accepted by Tenant in its leasehold title policy), unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)     As of the Execution Date Landlord is a duly organized, validly existing limited liability corporation, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary limited liability corporation action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Shopping Center or any portion thereof is bound;

(c)     no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

17

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyways appertaining thereto, during the Term subject to the Permitted Exceptions and matters revealed by the Survey or the Audit and approved or waived in writing by Tenant;

(e)    As of the Execution Date, there is no zoning, comprehensive plan, or other restriction or Legal Requirement preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes;

(f)    As of the Execution Date, Landlord has not previously, either directly or indirectly, leased any portion of the Shopping Center, sold any portion of the Shopping Center, or otherwise permitted any portion of the Shopping Center or any other property owned or controlled by Landlord to be used in a manner as would be prohibited by or violate this Lease.

**TAXES AND LIENS**    24.    Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center which are or could be superior to Tenant's leasehold (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

**CONDEMNATION**    25.    If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within sixty (60) days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Landlord shall promptly upon receipt of and to the extent of the condemnation award, commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue.

If any portion of the Common Areas or any drive, entrance, median cut, access point, route or mode of access thereto depicted on the Site Plan, is obstructed for longer than one hundred eighty (180) days or appropriate governmental authorities notify Tenant that the same will be obstructed for one hundred eighty (180) days or longer or taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or prevent its use of or access to or through the Common Areas, or any drive, entrance, median cut, access point whether or not the same is compensable under applicable Legal Requirements or so as to reduce the required parking area by an amount in excess of ten percent (10%), Tenant may, at its option, terminate this Lease within sixty (60) days of the obstruction, taking, or purchase and shall be liable for Basic, Additional, and Percentage Rent only up to the time of such obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Lease, however, Tenant shall notify Landlord and Landlord shall have fifteen (15) days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Lease shall continue. If the alternative parking area

does not meet with Tenant's reasonable approval, Tenant may terminate this Lease as above provided.

If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for a supermarket or its use of or access to the Common Areas (collectively, a "Zoning Change"), then any such Zoning Change may be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease within 180 days of the event giving rise to Tenant's right to terminate.

Except with respect to the Addition, as hereinafter defined, if constructed and financed by Tenant, any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

**DEFAULT**      26.      Tenant:

(a)      Tenant shall be in default under this Lease if:

(1)      Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

(2)      Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(i)      Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic, Additional, or Percentage Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs

19

to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary brokerage commissions paid in connection with re-letting the Premises.

(ii)    Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past ,due and unpaid Basic, Additional, or Percentage Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(iii)    Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

(b)    Landlord:  Landlord shall be in default under this Lease if:

(1)    Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within ten (10) days after receipt of a written statement from Tenant (a "Repayment Default"); or

(2)    Landlord fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(i)    In the case of a Repayment Default, Tenant, Tenant shall be entitled to offset such amount against all Basic, Additional, and Percentage Rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.

If Landlord fails, following notice as outlined above, to:

(ii)    timely commence or complete construction of the Store or the Shopping Center or reconstruction of the Store or the Shopping Center (following a casualty or condemnation if obligated to do so under this Lease), Tenant may either (i) extend to Landlord such additional time to complete such construction or reconstruction, as Tenant deems reasonable, in its reasonable discretion, (ii) cause the same to be completed, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the

same until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset or (iii) terminate this Lease by written notice to Landlord without waiving Tenant's rights to damages against Landlord.

(iii)    timely provide the Commitment or the Title Policy or cure to the defects properly objected to by Tenant, Tenant shall notify Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Commitment or the Title Policy, as the case may be, Tenant may either (i) extend to Landlord such additional time to deliver the Commitment or the Title Policy as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease or (iii) obtain the Commitment or the Title Policy from another source, in which case Tenant shall be entitled to offset the cost of the Commitment and/or the Title Policy against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the Commitment and/or the Title Policy and the cost of curing defects until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(iv)    timely provide the Survey or to timely cure survey defects or to timely provide the As-Built-Survey as required under this Lease, Tenant shall notify Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Survey or if Landlord still has not cured survey defects, as the case may be, Tenant may either (i) extend to Landlord such additional time to so deliver or cure as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease; or (iii) obtain the Survey or the As-built Survey from another source or undertake the cure of the survey defects, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(v)    timely provide the Audit or to cure Environmental Violations revealed thereby to Tenant's reasonable satisfaction, as required by this Lease, Tenant may (i) extend to Landlord such additional time to obtain the Audit or to cure such Environmental Violations as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Lease (iii) obtain the Audit from another source or undertake the cure of the Environmental Violations, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(vi)    If Tenant is prevented or prohibited from constructing or enjoying the Addition by any acts or omissions of Landlord (including any prior or successor landlord), or by reason of a breach of any covenant, representation, or warranty made or given by Landlord in this Lease or failure of any condition to be performed by Landlord under this Lease, then Tenant may terminate this Lease.

21

(xii)   If any representation or warranty made by Landlord in paragraph 23(a), 23(d), 23(f) or 41(a) of this Lease is determined during the Term to be false, or if any other representation or warranty made by Landlord in this Lease is determined to have been false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the material adverse effects to Tenant's reasonable satisfaction within thirty (30) days of written notice from Tenant, Tenant at its option may terminate this Lease by written notice to Landlord.  Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

(xiii)  Tenant shall have the termination rights provided for in the paragraphs of this Lease relating to Casualty and Condemnation.

(ix)    If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store, the Shopping Center, or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse Tenant for the reasonable out-of-pocket cost therefor within ten (10) days of receipt of a written statement therefore, shall constitute a Repayment Default.

(x)     If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, or employees, which release or environmental condition materially impairs  Tenant's ability to use the Premises for the Permitted Use and, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation"), Tenant may abate all rent due under this Lease for so long as such material impairment persists (the "Impairment Period") and, if the Impairment Period lasts for more than 180 days, Tenant may terminate this Lease by written notice to Landlord at any time following such 180 days.

(xi)    Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

22

In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

**CONSTRUCTION RISKS**

27.    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen's, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans.  Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen's, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof. Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined.

**NOTICES**

28.     All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below.  All rent payments shall be sent to Landlord at the address below.  Each communication shall be deemed duly given and received: (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :        LENOIR PARTNERS, L.L.C.
                  1117 Perimeter Center West, Suite W211
                  Atlanta, Georgia  30338

or such other address as Landlord may direct from time to time.

Tenant:           WINN-DIXIE CHARLOTTE, INC.  Re: Store 2180
                  2401 Nevada Boulevard
                  Charlotte, North Carolina  28273

With a copy to:   Winn-Dixie Stores, Inc.
Attn: General Counsel
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297
Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

29.    Tenant may vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

Tenant, without the consent of Landlord, may assign this Lease or sublease the Premises at any time for use as a supermarket, and, subject to the stipulations hereinafter set forth in the next paragraph hereof, Tenant may also, without the consent of Landlord, assign this Lease or sublease the Premises for use other than as a supermarket, subject to the provisions of Article 7 of this Lease.

In the event Tenant desires to assign this Lease or to sublease the Premises for the conduct of a business other than a supermarket, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to terminate this Lease by giving written notice to Tenant of such election. In the event Landlord elects to terminate this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the Premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such ninety (90) days in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the Premises. Upon surrender of possession of the Premises by Tenant, this Lease shall be deemed terminated without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease the Premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to terminate this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to terminate this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for performance of all obligations of Tenant under this Lease notwithstanding Tenant's assignment or sublease pursuant to this Article 29.

**SUBORDINATE**

30.    Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord

24

hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord.  Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice.  Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease.  Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice.  Tenant shall be entitled to full credit under this Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord.   No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications.  Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL CERTIFICATE**

31.    Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate").  Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

32.    Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord.  The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder.  Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto.  Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

34.    If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require.  Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease.  The Transfer

Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to <u>temporarily</u> withhold rent in trust pending receipt of Transfer Requirements.

**SHORT FORM LEASE**

35.    Landlord shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its recording in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL TITLES**

36.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

37.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date and supersedes any prior agreement with respect to the subject matter hereof.  No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

38.    Landlord shall have recorded in the public records of Caldwell County, North Carolina , declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration") and cross easement agreement(s) (collectively, the "Cross Easement"), as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that no portion of the Shopping Center shall be used for any of the activities or uses prohibited by this Lease.

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| Exhibit "A" | - | Site Plan |
|---|---|---|
| Exhibit "B" | - | **Legal Description of Shopping Center** |
| Exhibit "C" | - | **SNDA** |
| Exhibit "D" | - | **Surveyor's Certificate** |
| Exhibit "E" | - | **Estoppel Certificate** |
| Exhibit "F" | - | **Zoning Letter** |
| Exhibit "G" | - | **Short Form Lease** |
| Exhibit "H" | - | **"Coming Soon" Sign Specifications** |
| Exhibit "I" | - | **Declaration** |
| Exhibit "J" | - | **Supplemental Lease Agreement** |

**FORCE MAJEURE**

40.    If there shall occur, during the Term, (i) strike(s), lockout(s), or labor dispute(s); (ii) the inability to obtain labor or materials or reasonable substitutes therefor; (iii) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay

26

money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL CONDITION**

41.    (a)    <u>Landlord</u>. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)    <u>Tenant.</u> Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, subtenants or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification

27

includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents, subtenants, or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder.

NO BROKERS    42.    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

FLORIDA MANDATED PROVISION    43.    The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

EXPANSION    44.    As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option) of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the south side of the Store measuring approximately 60 feet in width by 200 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the south wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall

28

supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice 180 days prior to the expiration of the fifth year from the Commencement Date or 180 days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").

On or before ten (10) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost. The Amendment shall include, among other things, the following:

(a)    If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease. Upon completion of the Addition and commencement of business therein by Tenant, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to ten percent (10%) of the cost of the Addition, or an amount equal to $7.95 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of twelve percent (12%), plus the prime rate, as published in the _Wall Street Journal_, or similar public source, at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. Tenant shall obtain, at its cost and expense, such information or investigations concerning the status of the title, environmental condition, and boundaries of the land upon which the Addition shall be constructed as it shall desire, and it shall be a condition of Tenant's obligation to pay Basic Rent with respect to the Addition that it be satisfied with such information and investigations; or

(b)    If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant , as its sole remedy, shall have the right but not the obligation to construct the Addition at its sole cost and expense. If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby. Landlord shall provide, in consideration of Tenant's constructing the Addition, an endorsement to the Title Policy, the Survey, and the Audit. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect

of the Addition for the remainder of the Term and the base for calculation of Percentage Rent shall be increased by an amount equal to ten (10) times the total cost of the Addition; and

        (c)      Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not such date remain at least ten (10) years of the Initial Term, Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

| | |
|---|---|
| **TAKE OVER AND RELEASE** | **45.**    If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for 180 continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this Lease by written notice to Tenant within 360 days following the Store Closing, and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease. |
| **GOVERNING LAW** | **47.**    This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located. |
| **NO JOINT VENTURE** | **48.**    This is a Lease between a landlord and a Tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other. |
| **TIME** | **49.**    Time is of the essence of this Lease. |
| **NO MERGER** | **50.**    In the event that Tenant becomes the owner of fee title to the Store or the Shopping Center, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates. |

        **IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease the day and year indicated

below.

Witnesses:

Print name: J M Martin

Print name: Donna W. Pottorff

LANDLORD:

**LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation

By: _____

Its: Manager

Date: _____

Print name: Rebecca L Sawyer

Print name: Cynthia N. Crossland

TENANT:

WINN-DIXIE CHARLOTTE, INC.

By: R. P. McCook

R. P. McCook

Its: Vice President

Date: 10-__-97

Attest: _____

Mallory Gayle Holm

Its: Assistant Secretary

31

STATE OF_____ )
COUNTY OF_____ )

I, _Stephanie A. Ziankoski_, a Notary Public, State and County aforesaid, do hereby certify that _Alexander White_ personally appeared before me this day and acknowledged that he/she is _manager_ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _12th_ day of _October_, 1997.

_Stephanie A. Zian[...]_
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

STATE OF FLORIDA   )
COUNTY OF DUVAL   )

I, _Rebecca L. Sawyer_, a Notary Public, State and County aforesaid, do hereby certify that _Mallory Gayle Holm_ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Charlotte, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

Witness my hand and official seal, this the _29_ day of _October_, 1997.

_Rebecca L. Sawyer_
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

O:\TRANSFER\CHARLOTT\2180\SCNNS.LSE

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310

32

## CORPORATE GUARANTY OF LEASE OBLIGATIONS

**THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS** ("Guaranty") is given as of the date indicated below by **WINN-DIXIE STORES, INC.**, a Florida corporation ("Guarantor") to and in favor of **LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation, ("Landlord") on behalf and for the account of **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation ("Tenant").

## R E C I T A L S :

1.      Landlord and Tenant intend to be parties to that certain lease dated *October 29, 1997*, 1997, (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Caldwell County, North Carolina, as more particularly described in the Lease (the "Premises").

2.      Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.      Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

**NOW THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.      The foregoing recitals are true and correct and incorporated herein.

2.      If Tenant fails, after notice and an opportunity to cure as provided in the Lease, to timely perform its obligations under the Lease, then Guarantor shall:

(a)      With respect to monetary defaults, following ten (10) days written notice from Landlord, cure such monetary default(s) of Tenant to the extent that Tenant does not have a right, under the Lease, to offset any amount due to Landlord because of any default by Landlord under the Lease;

(b)      With respect to nonmonetary defaults, following thirty (30) days written notice from Landlord, cure such nonmonetary default(s) of Tenant, provided, however, that if the nature of such nonmonetary default is such that the default is not capable of a cure within thirty (30) days, then Guarantor's obligation under this Guaranty shall be to commence a cure and diligently prosecute the same to completion within a reasonable time after receipt of Landlord's notice.

3.      No amendment, modification, or extension of the Lease which has the effect of increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

4.      All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time to time. Each communication shall be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :     LENOIR PARTNERS, L.L.C.
               1117 Perimeter Center West, Suite W211
               Atlanta, Georgia  30338

               or at such other address as Landlord may direct from time to time.

Guarantor:     Winn-Dixie Stores, Inc.
               Attn: P. Christopher Wrenn, Esquire
               5050 Edgewood Court
               P.O. Box B
               Jacksonville, FL 32203-0297
               Telecopy: (904) 783-5138

               or to such other address as Guarantor may direct from time to time.

5.     This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the date indicated below.

**WINN-DIXIE STORES, INC.**

By: _R. P. McCook_____
    R. P. McCook
Its: _Vice President_____
Date: _10/29-97_____

C:\TRANSFER\CHARLOTT\2180\GUARANTY.WPD

Parking Lot Details

VICINITY MAP
NOT TO SCALE

EXHIBIT "A"

PROPOSED
WINN-DIXIE
ILLUSTRATIVE
SITE PLAN

EXHIBIT "B"

This is a description of a survey made for Property Concepts, Inc., being that property belonging to Miller Brothers Ready Mix Concrete Company, a deed of which is recorded at Deed Book 820 at Page 620 in the Caldwell County Registry of Deeds, being in the City of Lenoir, Lenoir Township, Caldwell County, North Carolina and being more particularly described as follows:

BEGINNING on a new 1/2 inch iron pipe on the south right of way of Morganton Boulevard (N.C. Highway #18 and U.S. Highway #64), said BEGINNING POINT being located South 69 degrees 04 minutes 54 seconds West 734.73 feet from the N.C.G.S. Station "Yale", and said BEGINNING POINT having the North Carolina Grid Coordinates of North 790,824.73 feet, East 1,241,017.38 feet, said BEGINNING POINT being in a line with that property belonging to Taylor Brothers Construction, a deed of which is recorded at Deed Book 1003 at Page 125 in the Caldwell County Registry of Deeds; thence from the POINT OF BEGINNING and with the Taylor Brothers property North 14 degrees 23 minutes 01 seconds West 75.00 feet to a point in the center of Morganton Boulevard; thence with the center of Morganton Boulevard North 78 degrees 05 minutes 41 seconds East 780.50 feet to a point in the center of Morganton Boulevard at the intersection of Fairview Drive; thence South 04 degrees 04 minutes 23 seconds East 160.27 feet to a P.K. Nail set in Fairview Drive; thence South 01 degrees 17 minutes 39 seconds West 222.37 feet to a new 1/2 inch iron pipe on the west side of Fairview Drive; thence South 03 degrees 43 minutes 39 seconds West, passing a new 1/2 inch iron pipe on line at 103.55 feet, and continuing on the same bearing 60.00 feet for a total distance along this bearing of 163.55 feet to a point in the center of Lower Creek at the west right of way of Fairview Drive; thence with the center of the creek for six calls: South 87 degrees 20 minutes 07 seconds West 170.19 feet; South 76 degrees 45 minutes 10 seconds West 57.85 feet; South 59 degrees 51 minutes 13 seconds West 81.38 feet; South 44 degrees 55 minutes 05 seconds West 79.99 feet; South 33 degrees 47 minutes 50 seconds West 118.27 feet; South 52 degrees 23 minutes 09 seconds West 196.35 feet to a point in the center of the creek, a corner with the Taylor Brothers Construction property; thence leaving the creek and with the Taylor Brothers Construction property North 14 degrees 23 minutes 01 seconds West, passing an existing 3/4 inch iron pipe on the north bank of the creek at 76.17 feet, and continuing on the same bearing 593.34 feet to the POINT OF BEGINNING containing 9.580 acres gross by coordinates.

As surveyed by Western Carolina Surveyors, PA; TYRONE RICHARD BISHOP, RLS, this the 5th day of March, 1997 and being JOB #2882-97.

I, TYRONE RICHARD BISHOP, RLS, certify that this description was prepared by me from a survey made under my supervision this the 5th day of March, 1997.

TYRONE RICHARD BISHOP, RLS (L-2427)

FILE NAME: 2882-97



EXHIBIT "B"

EXHIBIT "C"

SUBORDINATION, NONDISTURBANCE,
AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this _____, between _____, a _____ _____, whose address is _____ (together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation, whose address is 2401 Nevada Boulevard, Charlotte, North Carolina 28273 (together with its successors and assigns, "Winn-Dixie");

R E C I T A L S :

1.      Lender has made or is about to make a loan to LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Caldwell County, North Carolina (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Lenoir Market Place" shopping center at the southwest corner of the intersection of Morganton Boulevard and Fairview Drive, in Lenoir, Caldwell County, North Carolina, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.      By Lease dated _____ (as amended by _____and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.      Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

NOW THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.      Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)      The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)      Winn-Dixie shall not be named as a party defendant unless required by law.

35

(c)    The Lease shall not be terminated or affected by any Foreclosure Event.

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender.  Notwithstanding the foregoing, Lender shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease.  Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto.  However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.    -Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any.  Any such purported action without such consent shall be void as against Lender.

7.    Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.    If Lender, or its assignee, obtains Landlord's interest in the Shopping Center or enforces it right to collect rent under this Lease, Lender agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require.  Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease.  The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to <u>temporarily</u> withhold rent in trust pending receipt of Transfer Requirements.

9.    If Lender notifies Winn-Dixie in writing that it should pay the rent and other payments due from Winn-Dixie under the Lease to Lender, Winn-Dixie shall thereafter pay such payments as and when they become due and payable to Lender or as Lender directs.  <u>[IF NO INDEMNITY/WAIVER FROM LANDLORD FOR THIS IN LEASE, ADD ONE HERE]</u>

IN WITNESS WHEREOF, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

Print name:_____

Print name:_____          By:_____
                                              Its:_____
                                              Date:_____

37

_____    **WINN-DIXIE CHARLOTTE, INC.**
Print name:_____

_____    By:_____
Print name:_____    Its:_____
                                                                                          Date:_____

STATE OF_____    )
COUNTY OF_____    )

        I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____personally appeared before me this day and acknowledged that he/she is _____ Secretary of _____, a _____ corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

        Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

        I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Charlotte, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

        Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

EXHIBIT "D"

## WINN-DIXIE SURVEY PROTOCOL AND ORDER FORM
(Form SP-1)

This protocol presents the minimum scope of work Winn-Dixie Stores, Inc. or its subsidiaries or affiliates require for its boundary and improvements surveys. The following protocol has been developed to assist the surveyor in the preparation of the survey. The survey should include the following:

1.    A Surveyor's Certificate in the form attached hereto should be included on the face of the map.  No other certifications should appear on the face of the map which deal with the same issues that are contained within the Surveyor's Certificate, except those otherwise required by this protocol.

2.    The survey must be certified to the persons or entities checked below or as otherwise requested by Winn-Dixie:

| | |
|---|---|
| _____ | Winn-Dixie _____, Inc. |
| _____ | National Westminster Bank, Plc, as agent |
| _____ | Sunbelt-Dix, Inc. |
| _____ | _____ (Title Company) |
| _____ | _____ (Legal Counsel) |
| _____ | _____ (Lender's Counsel) |
| _____ | _____ (Other) |

3.    The Surveyor's Certificate should refer to the title commitment, a copy of which (together with copies of the exceptions listed therein) will be provided to the surveyor as soon as possible.

4.    The legal description should refer to County, range, township, section and/or lot, and should match the legal description contained in the title commitment. If the legal description in the title commitment is not a metes and bounds description, the legal description on the map should also include the metes and bounds description, including a point of beginning and all of the calls therefor, together with a certification that both descriptions describe one and the same property. The metes and bounds calls should be labeled on the boundary lines and the metes and bounds description should be printed separately on the survey.  The survey should show interior lot lines, if any.  If the property is made up of several different parcels or lots, the following will be required: (a) separate descriptions for each parcel or lot, (b) a legal description that tracks around the outer boundary of the overall parcel, and (c) a surveyor's certification that they are one and the same property and that the parcels or lots are contiguous. If the record legal description and the actual measurements differ, both should be labeled as to each call and should be separately printed on the map, together with a certification that both descriptions describe one and the same property.

5.    The legal description should include a statement of acreage.

6.    The map should show the size (including gross square footage), location, and type of all existing buildings and the distance of such buildings from each boundary line, and show all "permanent" and significant improvements other than buildings, such as signs, parking areas or structures, etc. If there are existing improvements on the subject property, the map should indicate the number of existing and required handicapped, motorcycle, regular, and other parking spaces.  A note should be added indicating the number of parking spaces required by applicable zoning regulations.

7.    The map should indicate the location of water/gas/sewer mains or telephone/electric/utility lines or irrigation lines serving the subject property as evidenced by on-site observation by showing manholes, catch basins, crossing wires or cables, valve vaults and other surface indications.

8.    The map should show fences or walls and their dimensions and nature of use.

9.    The map should indicate any encroachments onto the subject property from any exterior source or onto adjacent property from the subject property and should indicate any visible easements or rights-of-way (other than those of record)

10.   The map should show the widths of all streets and identify all streets as being either public or private rights of way and include arrows from all rights of way up to the edge of the property line to indicate that there are no gaps. The map should show points of access (curb cuts) from public rights of way (street or road) into the subject property.  The map should contain a vicinity map showing the property surveyed in reference to nearby highway(s) or major street

intersection(s).  If the property is not abutted by a public roadway, the survey should show the location of the nearest public roadway and its distance from the property.

11.  The map should identify and show setback, height and bulk restrictions of record or disclosed by applicable zoning or building codes (in addition to those recorded in subdivision maps) (and should note the source of same).  If none, the map should so state.

12.  The map should show all easements of record, including those that benefit the property, and identify same with the applicable recording information (Official Records Book and Page number).  If an easement or other recorded document listed in the title commitment does not affect the subject property, is blanket in nature, or is not locatable, this should be noted.

13.  Monuments must be placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

14.  The map should show any retention or detention ponds or drainage structures or facilities.

15.  The map should indicate names of all adjoining property owners on all sides of the subject property.

16.  The map should indicate the flood zone designation for the subject property (with proper annotation based on Federal Flood Insurance Rate Maps or the state or local equivalent, by scaled map location and graphic plotting only).

17.  The map should state the street address of the subject property or state that no street address has been assigned.

18.  Significant observations not otherwise required to be disclosed should be noted on the map.

19.  If checked below, a separate topographical survey should be completed.

Topographical Required:  _____ yes _____ no

20.  If the property is unimproved at the time the survey is prepared, in an effort to assist Winn-Dixie in correctly locating the property improvements, the surveyor should contact Winn-Dixie's Store Design Department.  Upon the surveyor's receipt of information from either Winn-Dixie's Store Design Department or their architect, the surveyor should prepare, in addition to the survey, a separate map showing the following:

(a)  The projection of the location of the footprint of the contemplated improvements;

(b)  If the contemplated improvements are used as a **[check one]** _____ supermarket; _____ warehouse; or _____ manufacturing facility, the following applies with respect to parking spaces:

| | Existing Parking Spaces | Required (by applicable building and zoning coded) |
|---|---|---|
| Regular (10') | | |
| Handicapped | | |
| Motorcycle | | |

21.  The survey should note and the separate map (if any is prepared) should note any encroachments of existing (or proposed) improvements onto the subject property, onto adjacent property or over establishing building setback lines or easement areas.

22.  In addition to the above, the surveyor should furnish a copy of the declaration page of the surveyor's professional liability insurance policy.

## EXHIBIT "D"

### SURVEYOR'S CERTIFICATE

Certified to: _____

RE:    File #_____ Drawing No. _____ Title:_____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that:

1.      This survey was prepared from an actual on-the-ground survey of the real property shown hereon (the "Property") and was conducted by the Surveyor or under the Surveyor's supervision;

2.      Monuments have been duly located or placed and actually exist at all major corners of the boundaries of the Property and such monuments are located, are of the size, and consist of the materials, as shown on this Survey;

3.      The survey and the legal description of the Property, including the point of beginning and all calls, is true, correct, and accurate, is identical to the legal description contained in _____ Title Insurance Company's commitment for title insurance No. _____, dated _____(the "Commitment") and there are no visible discrepancies, conflicts, shortages in area, boundary line conflicts, visible encroachments onto or protruding from the Property, or visible easements or rights-of-way (other than those which exist pursuant to recorded instruments) except as noted hereon;

4.      All recorded easements or other instruments or exceptions noted in the Commitment ("Exceptions") and capable of being located have been correctly located hereon and are indicated by official recording information [book and page], and those Exceptions which cannot be located or do not affect the Property are noted hereon either as "blanket" Exceptions that affect the entire Property or as not affecting the Property;

5.      The following, if they exist on the Property, have been located on this Survey:

(a)     buildings (labeled as to type, dimensions and gross square footage, and distance from each boundary line;

(b)     significant other improvements other than buildings, such as signs, parking areas, or other structures such as fences or walls (labeled as to dimensions and nature of use);

(c)     water/gas/sewer mains and telephone/electric/utility lines (as determined by on site surface observation only);

(d)     water retention or detention ponds;

(e)     high water marks, if the Property is located on or contains a body of water;

(f)     interior lot lines; and

(g)     any natural or constructed objects affecting the Property.

6.      Lines indicating all setback restrictions of record or disclosed by applicable building or zoning codes are drawn hereon and any height or bulk restrictions of record or disclosed by applicable building or zoning codes, if any, are noted hereon and the source for either type of restriction is indicated on this Survey. If no such restrictions affect or apply to the Property, a note has been placed hereon to so indicate;

7.      If a street address has been assigned for the Property, it is noted on this Survey;

8.      A vicinity map is contained on this Survey and such vicinity map shows the Property in reference to nearby public rights-of-way and major street intersections.  This Survey shows the names and widths of all rights-of-way bounding the Property and indicates (a) whether such rights-of-way are public or private; (b) by use of arrows drawn to the Property boundary line that there are no gaps between the Property boundaries and the borders of such rights-of-way; (c) existing curb cut access points to any such rights-of-way which are public; and (d) that the Property has access to and from a public roadway as shown on the Survey.  This Survey shows the distance to and location of the nearest intersecting public street or road (if access is by easement or private right of way);

9.      Based upon a review of Federal Flood Insurance Rate Maps (or the state or local equivalent if no federal map exists), the Surveyor has determined by scaled map location and graphic plotting only that the Property is not located in a 100 year Flood Plain or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated;

41

10.    The  Property  contains  approximately  _____  acres  and  currently  is  zoned

11.    The name of the owners of the properties adjoining the Property are indicated on this Survey;

12.    This Survey meets or exceeds the minimum technical standards established pursuant to the laws of the state in which the Property is located and meets the requirements set forth in the Winn-Dixie Survey Protocol (Form SP-1).

13.    This is to certify that this map or plat and the survey on which it is based were made (i) in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM in 1992, and includes items 1, 2, 3, 4, 6, 7, 8, and 10 of the Table A thereof, and (ii) pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of a(n) _____ [insert "Urban", "Suburban, " "Rural," or "Mountain/Marshland" here] Survey.

Signature:_____ Registered Land Surveyor No._____

Address:_____

Phone:_____ Fax:_____

**EXHIBIT "E"**

**ESTOPPEL CERTIFICATE**

WINN-DIXIE STORE #2180

Lenoir Market Place

Lenoir, North Carolina

The undersigned officer of WINN-DIXIE CHARLOTTE, INC., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.      That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Lenoir Market Place (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

| | |
|---|---|
| (a) | Short Form Lease dated _____, recorded in Official Records Volume _____, page ___ of the public records of Caldwell. North Carolina; |
| (b) | Letter Agreement(s) dated _____; |
| (c) | Supplemental Lease Agreement dated _____; |
| (d) | First Amendment to Lease dated _____; |
| (e) | Second Amendment to Lease dated _____. |

2.      That the term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.      That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.      That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

| | |
|---|---|
| (a) | _____ |
| (b) | _____ |
| (c) | _____ |
| (d) | _____ |

5.      That the Lease contains no provision for purchase of the Premises by Tenant.

6.      Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____.

7.      Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

43

8.      Notwithstanding anything to the contrary herein:

(a)     No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)     Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.      The address for notices to Tenant is 2401 Nevada Boulevard, Charlotte, North Carolina 28273, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.     This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

WINN-DIXIE CHARLOTTE, INC.

By:_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge.  Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

LENOIR PARTNERS, L.L.C.
By:_____

Its:_____

44

## EXHIBIT "F"

### (ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re: _____, Caldwell County, State of North Carolina

To Whom It May Concern:

    This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Caldwell, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Caldwell, relating to uses permitted in the _____ District.  The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above.  The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

    As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations.  Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

    Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

45

**EXHIBIT "G"**

**SHORT FORM LEASE**

**THIS SHORT FORM LEASE** is hereby executed this _____, 19____, by and between **LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation, whose mailing address is 1117 Perimeter Center West, Suite W211, Atlanta, Georgia 30338 ("Landlord") and **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation, whose mailing address is 2401 Nevada Boulevard, Charlotte, North Carolina 28273 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**W I T N E S S E T H:**

**WHEREAS**, Landlord and Tenant did enter into a Lease, dated _____, 19____ (the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

46

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LENOIR PARTNERS, L.L.C.**

_____
Print Name:_____

_____          By:_____
Print Name:_____          Its:_____
     As to Landlord

**WINN-DIXIE CHARLOTTE, INC.**

_____
Print Name:_____

_____          By:_____
Print Name:_____          Its:_____
     As to Tenant

STATE OF_____ )
COUNTY OF_____ )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____personally appeared before me this day and acknowledged that he/she is _____ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

STATE OF FLORIDA   )
COUNTY OF DUVAL   )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Charlotte, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

48

EXHIBIT "A"

EXHIBIT "B"

This is a description of a survey made for Property Concepts, Inc., being that property belonging to Miller Brothers Ready Mix Concrete Company, a deed of which is recorded at Deed Book 820 at Page 620 in the Caldwell County Registry of Deeds, being in the City of Lenoir, Lenoir Township, Caldwell County, North Carolina and being more particularly described as follows:

BEGINNING on a new 1/2 inch iron pipe on the south right of way of Morganton Boulevard (N.C. Highway #18 and U.S. Highway #64), said BEGINNING POINT being located South 69 degrees 04 minutes 54 seconds West 734.73 feet from the N.C.G.S. Station "Yale", and said BEGINNING POINT having the North Carolina Grid Coordinates of North 790,824.73 feet, East 1,241,017.38 feet, said BEGINNING POINT being in a line with that property belonging to Taylor Brothers Construction, a deed of which is recorded at Deed Book 1003 at Page 125 in the Caldwell County Registry of Deeds; thence from the POINT OF BEGINNING and with the Taylor Brothers property North 14 degrees 23 minutes 01 seconds West 75.00 feet to a point in the center of Morganton Boulevard; thence with the center of Morganton Boulevard North 78 degrees 05 minutes 41 seconds East 780.50 feet to a point in the center of Morganton Boulevard at the intersection of Fairview Drive; thence South 04 degrees 04 minutes 23 seconds East 160.27 feet to a P.K. Nail set in Fairview Drive; thence South 01 degrees 17 minutes 39 seconds West 222.37 feet to a new 1/2 inch iron pipe on the west side of Fairview Drive; thence South 03 degrees 43 minutes 39 seconds West, passing a new 1/2 inch iron pipe on line at 103.55 feet, and continuing on the same bearing 60.00 feet for a total distance along this bearing of 163.55 feet to a point in the center of Lower Creek at the west right of way of Fairview Drive; thence with the center of the creek for six calls: South 87 degrees 20 minutes 07 seconds West 170.19 feet; South 76 degrees 45 minutes 10 seconds West 57.85 feet; South 59 degrees 51 minutes 13 seconds West 81.38 feet; South 44 degrees 55 minutes 05 seconds West 79.99 feet; South 33 degrees 47 minutes 50 seconds West 118.27 feet; South 52 degrees 23 minutes 09 seconds West 196.35 feet to a point in the center of the creek, a corner with the Taylor Brothers Construction property; thence leaving the creek and with the Taylor Brothers Construction property North 14 degrees 23 minutes 01 seconds West, passing an existing 3/4 inch iron pipe on the north bank of the creek at 76.17 feet, and continuing on the same bearing 593.34 feet to the POINT OF BEGINNING containing 9.580 acres gross by coordinates.

As surveyed by Western Carolina Surveyors, PA; TYRONE RICHARD BISHOP, RLS, this the 5th day of March, 1997 and being JOB #2882-97.

I, TYRONE RICHARD BISHOP, RLS, certify that this description was prepared by me from a survey made under my supervision this the 5th day of March, 1997.

TYRONE RICHARD BISHOP, RLS (L-2427)

FILE NAME: 2882-97



<u>**EXHIBIT "H"**</u>

Coming Soon Sign Specifications

**Text of** Sign: Coming Soon —
Winn-Dixie
Marketplace

**Size:**  Maximum size permitted by applicable law and
restrictions of record and otherwise reasonably
acceptable to Landlord and Tenant

50

**EXHIBIT "I"**

**DECLARATION OF RESTRICTIVE COVENANTS**

   **THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 199__ by **LENOIR PARTNERS, L.L.C.,** a Georgia limited liability corporation (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

**R E C I T A L S**

   1.  Owner is the owner of that certain real property located in the County of Caldwell, State of North Carolina as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), is or may become the owner of certain other real property located within one thousand (1,000) feet of any boundary of the Shopping Center ("Owner's Remaining Land".

   2.  Owner is the landlord under that certain lease dated _____, 19___, between Owner and WINN-DIXIE CHARLOTTE, INC., a Florida corporation (together with its successors and assigns, "Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

   3.  Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

   **NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center and Owner's Remaining Land shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

I.
**RESTRICTIONS**

   1.1  Restrictions on Use.  The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) including operation of a photo lab or film development business, an automatic teller machine and banking business, and for the sale of beer and wine for off-premises consumption  (the "Permitted Use").

   (b)  Exclusives.  Tenant shall have the exclusive right to:

     (1)  operate a supermarket, grocery, bakery, and delicatessen,

     (2)  sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

     (3)  operate a pharmacy or prescription drug concession.

51

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within one thousand (1,000) feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord). Notwithstanding the foregoing, Landlord may also lease retail space in the Shopping Center for use as an ice cream shop.

    (c)    <u>Prohibitions</u>.    Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

(1)    spa, health, sports, or exercise club;

(2)    lounge, bar, "teen lounge" or social encounter club;

(3)    bowling alley;

(4)    pawn shop;

(5)    skating rink;

(6)    bingo or electronic or other game parlor;

(7)    theater (either motion or legitimate);

(8)    area or space for the sale or display of pornographic or "adult" material;

(9)    business or professional offices exceeding 3,000 square feet in the aggregate;

(10)    medical offices exceeding 5,000 square feet in the aggregate or abortion or HIV clinic;

(11)    automobile dealership;

(12)    church;

(13)    manufacturing or storage business;

(14)    public auditorium or other public entertainment facility;

(15)    tag office or other government service office;

(16)    restaurants exceeding 3,000 square feet or deriving more than 50% of their gross revenues from the sale of alcoholic beverages; or

(17)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

    1.2    <u>Restrictions on Building Height</u>.  No structure, other than the Store erected in the Shopping Center shall exceed a maximum vertical building height of twenty-five (25) feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (i) seventy-five (75) years after the date hereof, or (ii) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center, which modification or amendment shall become effective upon (i) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (ii) filing same in the real property records of Caldwell County, North Carolina.

## IV.
## EASEMENTS

4.1    Ingress and Egress.
(a)    Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas as shown on the Site Plan.

(b)    Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(c)    Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

## V.
## GENERAL PROVISIONS

5.1    Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, and Owner's Remaining Land and shall inure to the benefit of Tenant.

5.2   _Severability_.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3   _Pronouns_.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4   _Captions_.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5   _Governing Law_.  This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of North Carolina.

5.6   _No Presumption_.  This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7   _Exhibits._  The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit"A" -   Site Plan
Exhibit "B" -   Legal Description of the Shopping Center

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses: _____

Owner:
**LENOIR PARTNERS, L.L.C.**

Print name:_____

_____

By:_____

Print name:_____

Its:_____
Date:_____

STATE OF_____ )
COUNTY OF_____ )

   I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____personally appeared before me this day and acknowledged that he/she is _____ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

   Witness my hand and official seal, this the _____ day of _____, 1997.

_____

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)



EXHIBIT "A"

This is a description of a survey made for Property Concepts, Inc., being that property belonging to Miller Brothers Ready Mix Concrete Company, a deed of which is recorded at Deed Book 820 at Page 620 in the Caldwell County Registry of Deeds, being in the City of Lenoir, Lenoir Township, Caldwell County, North Carolina and being more particularly described as follows:

BEGINNING on a new 1/2 inch iron pipe on the south right of way of Morganton Boulevard (N.C. Highway #18 and U.S. Highway #64), said BEGINNING POINT being located South 69 degrees 04 minutes 54 seconds West 734.73 feet from the N.C.G.S. Station "Yale", and said BEGINNING POINT having the North Carolina Grid Coordinates of North 790,824.73 feet, East 1,241,017.38 feet, said BEGINNING POINT being in a line with that property belonging to Taylor Brothers Construction, a deed of which is recorded at Deed Book 1003 at Page 125 in the Caldwell County Registry of Deeds; thence from the POINT OF BEGINNING and with the Taylor Brothers property North 14 degrees 23 minutes 01 seconds West 75.00 feet to a point in the center of Morganton Boulevard; thence with the center of Morganton Boulevard North 78 degrees 05 minutes 41 seconds East 780.50 feet to a point in the center of Morganton Boulevard at the intersection of Fairview Drive; thence South 04 degrees 04 minutes 23 seconds East 160.27 feet to a P.K. Nail set in Fairview Drive; thence South 01 degrees 17 minutes 39 seconds West 222.37 feet to a new 1/2 inch iron pipe on the west side of Fairview Drive; thence South 03 degrees 43 minutes 39 seconds West, passing a new 1/2 inch iron pipe on line at 103.55 feet, and continuing on the same bearing 60.00 feet for a total distance along this bearing of 163.55 feet to a point in the center of Lower Creek at the west right of way of Fairview Drive; thence with the center of the creek for six calls: South 87 degrees 20 minutes 07 seconds West 170.19 feet; South 76 degrees 45 minutes 10 seconds West 57.85 feet; South 59 degrees 51 minutes 13 seconds West 81.38 feet; South 44 degrees 55 minutes 05 seconds West 79.99 feet; South 33 degrees 47 minutes 50 seconds West 118.27 feet; South 52 degrees 23 minutes 09 seconds West 196.35 feet to a point in the center of the creek, a corner with the Taylor Brothers Construction property; thence leaving the creek and with the Taylor Brothers Construction property North 14 degrees 23 minutes 01 seconds West, passing an existing 3/4 inch iron pipe on the north bank of the creek at 76.17 feet, and continuing on the same bearing 593.34 feet to the POINT OF BEGINNING containing 9.580 acres gross by coordinates.

As surveyed by Western Carolina Surveyors, PA; TYRONE RICHARD BISHOP, RLS, this the 5th day of March, 1997 and being JOB #2882-97.

I, TYRONE RICHARD BISHOP, RLS, certify that this description was prepared by me from a survey made under my supervision this the 5th day of March, 1997.

*Tyrone Richard Bishop*

TYRONE RICHARD BISHOP, RLS (L-2427)

FILE NAME: 2882-97



<u>EXHIBIT "J"</u>

<u>SUPPLEMENTAL LEASE AGREEMENT</u>

THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _____, 199___, between **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation, (the "Tenant") and **LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated _____, recorded in Volume ____, page ____ of the public records of Caldwell County, North Carolina; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

NOW, THEREFORE, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____.

2.    The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:                                    TENANT:

_____        **WINN-DIXIE CHARLOTTE, INC.**
Print name:_____


_____        By:_____
Print name:_____        _____
                                                        Its:_____
                                                        Date:_____

LANDLORD:

_____    **LENOIR PARTNERS, L.L.C.**
Print name:_____


_____    By:_____
Print name:_____
                                    Its:_____
                                    Date:_____

STATE OF_____ )
COUNTY OF_____ )

     I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is _____ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

     Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)


STATE OF FLORIDA   )
COUNTY OF DUVAL   )

     I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Charlotte, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

     Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

59

## CONSENT

_____, a _____ _____ the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

Its:_____

Date:_____

STATE OF_____ )

COUNTY OF_____ )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____personally appeared before me this day and acknowledged that he/she is _____ Secretary of _____, a _____ corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____, 1997.

_____

Printed Name:_____

Notary Public, State and County aforesaid

My commission expires:

(NOTARIAL SEAL)

This Instrument was prepared by
P. Christopher Wrenn, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

(Reserved for Clerk)

## DECLARATION OF RESTRICTIVE COVENANTS

**THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 199__ by **LENOIR PARTNERS, L.L.C.,** a Georgia limited liability corporation (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

### R E C I T A L S

1.      Owner is the owner of that certain real property located in the County of Caldwell, State of North Carolina as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), is or may become the owner of certain other real property located within one thousand (1,000) feet of any boundary of the Shopping Center ("Owner's Remaining Land".

2.      Owner is the landlord under that certain lease dated _____, 19___, between Owner and WINN-DIXIE CHARLOTTE, INC., a Florida corporation (together with its successors and assigns, "Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center and Owner's Remaining Land shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

I.
### RESTRICTIONS

1.1      <u>Restrictions on Use</u>.      The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) including operation of a photo lab or film development business, an automatic teller machine and banking business, and for the sale of beer and

O:\transfer\charlott\dec.res.2180
10-07-97                                                                                                    1

wine for off-premises consumption  (the "Permitted Use").

(b)    <u>Exclusives.</u>    Tenant shall have the exclusive right to:

      (1)    operate a supermarket, grocery, bakery, and delicatessen,

      (2)    sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods,

      (3)    operate a pharmacy or prescription drug concession.

        Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within one thousand (1,000) feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord). Notwithstanding the foregoing, Landlord may also lease retail space in the Shopping Center for use as an ice cream shop.

(c)    <u>Prohibitions</u>.    Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following:

      (1)    spa, health, sports, or exercise club;

      (2)    lounge, bar, "teen lounge" or social encounter club;

      (3)    bowling alley;

      (4)    pawn shop;

      (5)    skating rink;

      (6)    bingo or electronic or other game parlor;

      (7)    theater (either motion or legitimate);

      (8)    area or space for the sale or display of pornographic or "adult" material;

      (9)    business or professional offices exceeding 3,000 square feet in the aggregate;

      (10)    medical offices exceeding 5,000 square feet in the aggregate or abortion or HIV clinic;

      (11)    automobile dealership;

      (12)    church;

      (13)    manufacturing or storage business;

      (14)    public auditorium or other public entertainment facility;

2

(15)    tag office or other government service office;

(16)    restaurants exceeding 3,000 square feet or deriving more than 50% of their gross revenues from the sale of alcoholic beverages; or

(17)    any business requiring parking for delivery or service trucks on a routine or frequent basis.

1.2    <u>Restrictions on Building Height</u>.  No structure, other than the Store erected in the Shopping Center shall exceed a maximum vertical building height of twenty-five  (25) feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (i) seventy-five (75) years after the date hereof, or (ii) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center, which modification or amendment shall become effective upon (i) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (ii) filing same in the real property records of Caldwell County, North Carolina.

## IV.
## EASEMENTS

4.1    <u>Ingress and Egress</u>.

(a)    Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas as shown on the Site Plan.

(b)    Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(c)    Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (i) such closure does not exceed the minimum time period required pursuant to applicable

law to prevent such prescriptive rights, and (ii) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

## V.
## GENERAL PROVISIONS

5.1     Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, and Owner's Remaining Land and shall inure to the benefit of Tenant.

5.2     Severability.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     Pronouns.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4     Captions.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5     Governing Law.  This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of North Carolina.

5.6     No Presumption.  This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7     Exhibits.  The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit "A" -     Site Plan
Exhibit "B" -     Legal Description of the Shopping Center

IN WITNESS WHEREOF, this Declaration has been executed as of the date first above written.

Witnesses:                                    Owner:
                                              LENOIR PARTNERS, L.L.C.
_____
Print name:_____

_____       By:_____
Print name:_____           _____
                                          Its:_____
                                          Date:_____

4

STATE OF_____ )
COUNTY OF_____ )

        I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____personally appeared before me this day and acknowledged that he/she is _____ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

        Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

5

VICINITY MAP
NOT TO SCALE

EXHIBIT "A"

PROPOSED
WINN-DIXIE

ROBERT
JOHNSON
architect

EXHIBIT "B"

This is a description of a survey made for Property Concepts, Inc., being that property belonging to Miller Brothers Ready Mix Concrete Company, a deed of which is recorded at Deed Book 820 at Page 620 in the Caldwell County Registry of Deeds, being in the City of Lenoir, Lenoir Township, Caldwell County, North Carolina and being more particularly described as follows:

BEGINNING on a new 1/2 inch iron pipe on the south right of way of Morganton Boulevard (N.C. Highway #18 and U.S. Highway #64), said BEGINNING POINT being located South 69 degrees 04 minutes 54 seconds West 734.73 feet from the N.C.G.S. Station "Yale", and said BEGINNING POINT having the North Carolina Grid Coordinates of North 790,824.73 feet, East 1,241,017.38 feet, said BEGINNING POINT being in a line with that property belonging to Taylor Brothers Construction, a deed of which is recorded at Deed Book 1003 at Page 125 in the Caldwell County Registry of Deeds; thence from the POINT OF BEGINNING and with the Taylor Brothers property North 14 degrees 23 minutes 01 seconds West 75.00 feet to a point in the center of Morganton Boulevard; thence with the center of Morganton Boulevard North 78 degrees 05 minutes 41 seconds East 780.50 feet to a point in the center of Morganton Boulevard at the intersection of Fairview Drive; thence South 04 degrees 04 minutes 23 seconds East 160.27 feet to a P.K. Nail set in Fairview Drive; thence South 01 degrees 17 minutes 39 seconds West 222.37 feet to a new 1/2 inch iron pipe on the west side of Fairview Drive; thence South 03 degrees 43 minutes 39 seconds West, passing a new 1/2 inch iron pipe on line at 103.55 feet, and continuing on the same bearing 60.00 feet for a total distance along this bearing of 163.55 feet to a point in the center of Lower Creek at the west right of way of Fairview Drive; thence with the center of the creek for six calls: South 87 degrees 20 minutes 07 seconds West 170.19 feet; South 76 degrees 45 minutes 10 seconds West 57.85 feet; South 59 degrees 51 minutes 13 seconds West 81.38 feet; South 44 degrees 55 minutes 05 seconds West 79.99 feet; South 33 degrees 47 minutes 50 seconds West 118.27 feet; South 52 degrees 23 minutes 09 seconds West 196.35 feet to a point in the center of the creek, a corner with the Taylor Brothers Construction property; thence leaving the creek and with the Taylor Brothers Construction property North 14 degrees 23 minutes 01 seconds West, passing an existing 3/4 inch iron pipe on the north bank of the creek at 76.17 feet, and continuing on the same bearing 593.34 feet to the POINT OF BEGINNING containing 9.580 acres gross by coordinates.

As surveyed by Western Carolina Surveyors, PA; TYRONE RICHARD BISHOP, RLS, this the 5th day of March, 1997 and being JOB #2882-97.

I, TYRONE RICHARD BISHOP, RLS, certify that this description was prepared by me from a survey made under my supervision this the 5th day of March, 1997.

TYRONE RICHARD BISHOP, RLS (L-2427)

FILE NAME: 2882-97



EXHIBIT "B"

This Instrument was prepared by
P. Christopher Wrenn,  Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

(Reserved for Clerk)

## SHORT FORM LEASE

**THIS SHORT FORM LEASE** is hereby executed this _October 29_, 19 _97_, by and between **LENOIR PARTNERS, L.L.C.**, a Georgia limited liability corporation, whose mailing address is 1117 Perimeter Center West, Suite W211, Atlanta, Georgia  30338 ("Landlord") and **WINN-DIXIE CHARLOTTE, INC.**, a Florida corporation, whose mailing address is 2401 Nevada Boulevard, Charlotte, North Carolina  28273 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

**WHEREAS**, Landlord and Tenant did enter into a Lease, dated _October 29_ 19 _97_ (the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter.  Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease.  Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each.  Tenant has no option to purchase the Premises under the Lease.

o:\transfer\charlotte\2180\sfl.wpd
10-07-97                                                                                                1

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name: J M Martin

Print Name: Donna W. Pottorff

As to Landlord

Print Name: Rebecca L. Sawyer

Print Name: Cynthia N. Crossland

As to Tenant

**LENOIR PARTNERS, L.L.C.**

By: _____
Alexander White
Its: Manager

**WINN-DIXIE CHARLOTTE, INC.**

By: _____
R. P. McCook
Its: Vice President

Attest: _____
Mallory Gayle Holm
Its: Assistant Secretary

2

STATE OF _GEORGIA_ )
COUNTY OF _FULTON_ )

I, _Stephanie A Ziankoski_, a Notary Public, State and County aforesaid, do hereby certify that _Alexander White_ personally appeared before me this day and acknowledged that he/she is ~~manager~~ Secretary of LENOIR PARTNERS, L.L.C., a Georgia limited liability corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _13th_ day of _September_ , 1997.

_Stephanie A. Ziankoski_
Printed Name: _Stephanie_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

I, _Rebecca L. Sawyer_, a Notary Public, State and County aforesaid, do hereby certify that _Mallory Gayle Holm_ personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Charlotte, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

Witness my hand and official seal, this the _29_ day of _October_ , 1997.

_Rebecca L. Sawyer_
Printed Name: _Rebecca L. Sawyer_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 572310

3

EXHIBIT "A"

EXHIBIT "B"

This is a description of a survey made for Property Concepts, Inc., being that property belonging to Miller Brothers Ready Mix Concrete Company, a deed of which is recorded at Deed Book 820 at Page 620 in the Caldwell County Registry of Deeds, being in the City of Lenoir, Lenoir Township, Caldwell County, North Carolina and being more particularly described as follows:

BEGINNING on a new 1/2 inch iron pipe on the south right of way of Morganton Boulevard (N.C. Highway #18 and U.S. Highway #64), said BEGINNING POINT being located South 69 degrees 04 minutes 54 seconds West 734.73 feet from the N.C.G.S. Station "Yale", and said BEGINNING POINT having the North Carolina Grid Coordinates of North 790,824.73 feet, East 1,241,017.38 feet, said BEGINNING POINT being in a line with that property belonging to Taylor Brothers Construction, a deed of which is recorded at Deed Book 1003 at Page 125 in the Caldwell County Registry of Deeds; thence from the POINT OF BEGINNING and with the Taylor Brothers property North 14 degrees 23 minutes 01 seconds West 75.00 feet to a point in the center of Morganton Boulevard; thence with the center of Morganton Boulevard North 78 degrees 05 minutes 41 seconds East 780.50 feet to a point in the center of Morganton Boulevard at the intersection of Fairview Drive; thence South 04 degrees 04 minutes 23 seconds East 160.27 feet to a P.K. Nail set in Fairview Drive; thence South 01 degrees 17 minutes 39 seconds West 222.37 feet to a new 1/2 inch iron pipe on the west side of Fairview Drive; thence South 03 degrees 43 minutes 39 seconds West, passing a new 1/2 inch iron pipe on line at 103.55 feet, and continuing on the same bearing 60.00 feet for a total distance along this bearing of 163.55 feet to a point in the center of Lower Creek at the west right of way of Fairview Drive; thence with the center of the creek for six calls: South 87 degrees 20 minutes 07 seconds West 170.19 feet; South 76 degrees 45 minutes 10 seconds West 57.85 feet; South 59 degrees 51 minutes 13 seconds West 81.38 feet; South 44 degrees 55 minutes 05 seconds West 79.99 feet; South 33 degrees 47 minutes 50 seconds West 118.27 feet; South 52 degrees 23 minutes 09 seconds West 196.35 feet to a point in the center of the creek, a corner with the Taylor Brothers Construction property; thence leaving the creek and with the Taylor Brothers Construction property North 14 degrees 23 minutes 01 seconds West, passing an existing 3/4 inch iron pipe on the north bank of the creek at 76.17 feet, and continuing on the same bearing 593.34 feet to the POINT OF BEGINNING containing 9.580 acres gross by coordinates.

As surveyed by Western Carolina Surveyors, PA; TYRONE RICHARD BISHOP, RLS, this the 5th day of March, 1997 and being JOB #2882-97.

I, TYRONE RICHARD BISHOP, RLS, certify that this description was prepared by me from a survey made under my supervision this the 5th day of March, 1997.

*Tyrone Richard Bishop*

TYRONE RICHARD BISHOP, RLS (L-2427)

FILE NAME: 2882-97

