# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| In re:<br><br>**WINN-DIXIE STORES, INC., <u>et al</u>.,**<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 05-03817-3F1<br><br>(Jointly Administered) |

## CERTIFICATE OF SERVICE

I, Kathleen M. Logan, hereby certify under penalty of perjury that:

1.   I am of legal age and I am not a party to this action.

2.   I am President of Logan & Company, Inc., located at 546 Valley Road, Upper Montclair, New Jersey, Claims and Noticing Agent for the above-captioned Debtors.

3.   On or about January 16, 2007 I caused copies of:

- the **Agreed Order Resolving (I) Claim Number 8639 Filed by Jefferson-Pilot Financial Insurance Company and (II)  Claim Number 12788 Filed by NMB Partners, LP**

   to be served by first class, postage pre-paid and pre-addressed envelopes and delivered to U.S. Postal Service for delivery to those persons on the Service List attached hereto as Exhibit A. A copy of the served order as listed above is attached hereto as Exhibit B.

Dated: January 18, 2007

_____
Kathleen M. Logan

---

[1]       In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

# EXHIBIT A
# SERVICE LIST

SERVICE LIST

**Agreed Order Resolving (I) Claim Number 8639 Filed
by Jefferson-Pilot Financial Insurance Company and
(II) Claim Number 12788 Filed by NMB Partners, LP**

**DEBTOR:   WINN-DIXIE STORES, INC., ET AL.**                                              **CASE:   05-03817-3F1**

| | | |
|---|---|---|
| CREDITOR ID: 410448-15 | CREDITOR ID: 410448-15 | CREDITOR ID: 417052-15 |
| JEFFERSON-PILOT LIFE INSURANCE CO | JEFFERSON-PILOT LIFE INSURANCE CO | NMB PARTNERS, LP |
| C/O NEXSEN PRUET ADAMS KLEEMEIER | ATTN DIANA R PALECEK, ESQ | C/O LEVY LAW FIRM, LLC |
| ATTN: BENJAMIN A KAHN, ESQ | CHRISTINE L MYATT, ESQ | ATTN R GEOFFREY LEVY, ESQ |
| 701 GREEN VALLEY ROAD, SUITE 100 | PO BOX 21008 | 2300 WAYNE STREET |
| GREENSBORO NC 27408 | GREENSBORO NC 27420 | COLUMBIA SC 29201 |
| | | |
| CREDITOR ID: 417052-15 | CREDITOR ID: 558341-98 | CREDITOR ID: 416243-15 |
| NMB PARTNERS, LP | PROFESSIONAL MORTGAGE OF SC, ESC AG | VILLAGE MARKETPLACE OF HAW RIVER |
| ATTN TED CHAPMAN | C/O PROFESSIONAL MORTGAGE CO, INC | C/O KENNEDY COVINGTON LOBDELL ET AL |
| ELTING L CHAPMAN III | ATTN SHIRLEY STATON, LOAN A97227 | ATTN LAWRENCE E BEHNING, ESQ |
| PO BOX 2384 | 2 BENNETT STREET | 214 N TRYON STREET, 47TH FLOOR |
| MURRELLS INLET SC 29576 | GREENVILLE SC 29601 | CHARLOTTE NC 28202 |

**Total:   6**

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
| | ) |
| Reorganized Debtors. [1] | ) Jointly Administered |
| | ) |

## AGREED ORDER RESOLVING (I) CLAIM NUMBER 8639 FILED BY JEFFERSON-PILOT FINANCIAL INSURANCE COMPANY AND (II) CLAIM NUMBER 12788 FILED BY NMB PARTNERS, LP

These causes came before the Court upon the Twenty-Fourth Omnibus Objection (the "Objection") of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") to the proofs of claim listed on Exhibit A through G to the Objection.[2]  One of the proofs of claim subject to the Objection was Claim Number 8639 filed by Jefferson-Pilot Financial Insurance Company ("Jefferson-Pilot").  On November 3, 2006, Jefferson-Pilot filed a response to the Objection (Docket No. 12366) in which it argued that, based upon its entitlement to the collateral securing a promissory note entered into between Alexander Hamilton Life Insurance Company of America (Jefferson-Pilot's predecessor-in-interest) and NMB Partners, LP ("NMB"), Jefferson-Pilot held a contingent and unliquidated claim on all amounts arising under a non-residential real property lease for property located at

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2]     All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Objection.

710 Hwy 17 South, North Myrtle Beach, South Carolina, known by the Debtors as Store 2111 (the "Lease").  NMB, the landlord under the Lease, had also filed a claim for rejection damages related to the Lease -- specifically, Claim Number 12788 in the amount of $341,000 (the "NMB Claim").

Jefferson-Pilot has acknowledged that its claim is duplicative of the NMB Claim. Based upon the consent of the parties appearing below, it is

ORDERED AND ADJUDGED:

1.      Claim Number 8639 is disallowed;

2.      Claim Number 12788 is allowed as a Class 13 Landlord Claim in the amount of $341,000;

3.      The distribution made by the Debtors on account of Claim Number 12788 shall be paid to the Escrow Agent, Professional Mortgage of South Carolina, pursuant to a Loan Servicing and Escrow Agreement substantially in the form attached as Exhibit A and shall be sent to the following address:

> Professional Mortgage Company, Inc.
> Attn:  Shirley Staton; Loan #A97227
> 2 Bennett Street
> Greenville, SC 29601

4.      The Court shall retain jurisdiction to resolve any disputes arising from this Order.

Dated this 12 day of January, 2007 in Jacksonville, Florida.


Jerry A. Funk
United States Bankruptcy Judge

2

Consent

The undersigned parties consent to the entry of the foregoing Agreed Order.


SMITH HULSEY & BUSEY

By  /s/ James H. Post
     James H. Post
     Florida Bar Number 175460


225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

-and-

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

D. J. Baker
Sally McDonald Henry
Rosalie Walker Gray
Adam S. Ravin
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

Co-Counsel for Reorganized Debtors


NEXSEN PRUET ADAMS KLEEMEIER, PLLC

By  /s/ Christine L. Myatt*
     Christine L. Myatt
     N.C. State Bar # 10444
     Benjamin A. Kahn
     N.C. State Bar # 20004
Lake Point
701 Green Valley Road, Suite 100
Post Office Box 3463
Greensboro, North Carolina 27402
(336) 373-1600

Attorneys for Jefferson-Pilot Financial Insurance
Company

LEVY LAW FIRM

By  /s/ R. Geoffrey Levy*
R. Geoffrey Levy
2300 Wayne Street
Columbia, South Carolina 29201
(803) 256-4693
(803) 799-5245

Attorneys for NMB Partners, LP


* Counsel have authorized their electronic signature.


3

Case 3:09-bk-03817-JAF    Doc 14774    Filed 01/18/07    Page 8 of 39

**Exhibit A**

## ESCROW AGREEMENT
## CONCERNING WINN-DIXIE CLAIM

THIS **ESCROW AGREEMENT CONCERNING WINN-DIXIE CLAIM** (this "**Agreement**") is made and entered as of this _14th_ day of _December_, 2006 (the "**Effective Date**") by and among NMB Partners, L. P. a South Carolina limited partnership ("**BORROWER**"), Jefferson Pilot Financial Insurance Company, a Nebraska corporation, its successors and assigns ("**LENDER**"), and Professional Mortgage Company, Inc., a South Carolina corporation ("**SERVICER**").

## WITNESSETH:

A.     BORROWER is the owner of a shopping center located at the intersection of U.S. Highway 17 and 6th Avenue, North Myrtle Beach, Horry County, South Carolina ("**Premises**"). LENDER (via Lender's predecessor, Alexander Hamilton Life Insurance Company of America) is the beneficiary under that certain Mortgage, Security Agreement and Fixture Filing dated September 18, 1997 ("**Mortgage**") securing a loan to BORROWER in the original face amount of $3,880,000.00 as has been modified from time to time ("**Loan**"). Unless otherwise defined herein, all capitalized terms shall be defined as set forth in the Mortgage.

B.     Winn-Dixie Charlotte, Inc., a Florida Corporation ("**Winn Dixie**") and BORROWER were parties to that certain Lease, dated September 16, 1996, and as amended ("**Lease**").

C.     BORROWER (via Lender's predecessor, Alexander Hamilton Life Insurance Company of America) and LENDER entered into that certain Absolute Assignment of Rents and Profits and Collateral Assignment of Leases dated September 18, 1997, a copy of which is annexed to this Agreement as _Exhibit "1"_ ("**Assignment of Leases**"). Any words or phrases defined in the Assignment of Leases shall have the same meaning and effect when used in this Agreement. This Agreement is intended to supplement the terms and conditions of the Assignment of Leases and nothing in this Agreement is intended to modify or change the substantive terms of the Assignment of Leases as between BORROWER and LENDER.

D.     Pursuant to the terms of the Lease and Joint Plan of Reorganization of Winn-Dixie Stores, Inc., and Affiliated Debtors ("**Plan**"), if approved, Winn-Dixie will deliver to SERVICER 46.26 shares of New Common Stock, as defined in the Plan, per $1,000.00 of allowed claim ("**Stock**"). The date of the approval of the Plan shall herein be referred to as the "**Effective Date.**"

E.     BORROWER may, with consent of LENDER, sell BORROWER's bankruptcy claim before distribution of the Stock. In the event, the cash proceeds from sale of the claim shall be held and administered pursuant to this Agreement, BORROWER may also receive certain cash distributions pursuant to the Plan. Any cash described in this paragraph and received by SERVICER or BORROWER shall collectively be referred to as the "**CASH PROCEEDS**".

F.    The purpose of this Agreement is to provide procedures for the Stock and the Cash Proceeds to be held and disbursed by SERVICER in accordance with the terms of this Agreement.

**NOW THEREFORE**, for and in consideration of good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, and the mutual agreements hereinafter set forth, BORROWER, LENDER and SERVICER hereby agree as follows:

1.    If BORROWER receives the Stock or Cash Proceeds, BORROWER shall promptly deposit the same with SERVICER. If LENDER receives the Stock or Cash Proceeds, LENDER shall promptly deposit the same with SERVICER. Any Stock or Cash Proceeds deposited by BORROWER or LENDER or received directly by SERVICER shall collectively be referred to as the "**Deposit**". The Deposit shall be held and released in accordance with the terms and conditions of this Agreement.

2.    BORROWER and LENDER have requested SERVICER to accept and hold the Deposit solely upon the terms and conditions set forth in this Agreement. Pursuant to the request of BORROWER and LENDER, SERVICER shall receive and accept the Deposit upon and subject solely to the remaining terms and conditions hereof.

3.    SERVICER shall hold the Deposit and all other funds held by it pursuant to this Agreement, in an account, styled "Professional Mortgage Company, Inc. as agent for Jefferson Pilot Financial Insurance Company and NMB Partners, LP, Mortgage Loan # A97227" (the "**Deposit Account**").   At the request of BORROWER and subject to the consent of LENDER, SERVICER shall sell some or all of the Stock and deposit the proceeds in the Deposit Account. Until disbursed in accordance with this Agreement, all interest and other income or proceeds earned thereon shall be held by SERVICER as a part of the Deposit. So long as funds remain in the Deposit Account, within twenty (20) days after the end of each month, Servicer shall provide BORROWER and LENDER a copy of the bank statement for the Deposit Account as of the previous month end, along with a copy of the account history from Servicer's system. BORROWER shall bear all risk of loss of the Deposit resulting from any cause whatsoever, including any loss of principal, except for such loss due to the bad faith, gross negligence or willful misconduct of the SERVICER.   Any cash funds in the Deposit shall be put into an interest bearing account.

4.    If requested by BORROWER, SERVICER shall automatically deduct from the Deposit and make disbursements in cash from the Deposit directly to LENDER to pay regular monthly payments of principal and interest becoming due on the Loan in the amount of $37,889.17 monthly, beginning on the first day of the first calendar month following the date of delivery of the Deposit to SERVICER and on or before the first day of each calendar month thereafter ("**Regular Loan Payment**"), unless and until either BORROWER or LENDER submits supplemental written instructions to SERVICER directing the discontinuation of disbursement of the Regular Loan Payment or unless or until there are insufficient Cash Proceeds in the Deposit to satisfy the Regular Loan Payment. In addition to disbursements on account for Regular Loan Payments, LENDER may from time to time submit supplemental written instructions to SERVICER directing SERVICER to make a direct disbursement(s) to LENDER of other amounts becoming payable to LENDER on

2

account of the Loan ("**Other Lender Payments**"). To the extent there exists insufficient Cash Proceeds in the Deposit to pay the obligations referenced in this paragraph, Borrower shall pay such obligations.

5.      In addition to disbursements to LENDER in accordance with section 4 above, BORROWER may be or become entitled to receive disbursements from the Deposit as provided in this section and LENDER shall instruct and direct SERVICER in writing to disburse to BORROWER funds from the Deposit for the items for which BORROWER is entitled to use Rents and Profits pursuant to Section 7(a) of the Assignment of Leases and for which BORROWER has properly submitted to LENDER (with a copy to SERVICER) of a written disbursement request ("**Disbursement Request**") conforming to the following terms and conditions for each disbursement (the "**Disbursement Requirements**") as applicable to the particular Disbursement Request:

(i)      With respect to Disbursement Requests by BORROWER under Section 7(a) of the Assignment of Leases, BORROWER shall provide to LENDER and SERVICER a Disbursement Request at least ten (10) business days prior to the requested date of such disbursement, which Disbursement Request shall include satisfactory evidence that such items and/or conditions for which reimbursement or payment is sought have occurred, including:

(a)      Borrower's certification to LENDER that no uncured Event of Default exists under the Note, the Mortgage, the Assignment of Leases or any of the Loan Documents as of the date of the Disbursement Request; and

(b)      Commercially reasonable documentary evidence of:

(1)      In the case of Disbursement Requests to reimburse BORROWER for funds advanced by BORROWER to make payments due LENDER under the Loan Documents, the date, amount and evidence of the applicable payments to LENDER for which the Disbursement Request is submitted; or,

(2)      In the case of Disbursement Requests to pay, or reimburse BORROWER for payments previously made to pay, operating expenses for the Premises:

(aa)      Subject to Section 5.(i)(b)(2)(cc) below, an invoice(s) and/or billing(s) from third parties for operating expenses attributable to the Premises and BORROWER written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s) within ten (10) business days from the receipt of the applicable Disbursement; or

(bb)      In the case of reimbursement requests, copies of cancelled checks or other evidence of BORROWER's prior payment of the operating expenses for which the applicable Disbursement Request is submitted.

3

(cc)     Notwithstanding Section 5.(i)(b)(2)(aa) above to the contrary, in the case of invoices exceeding $10,000.00 or in the case of as valorem taxes and insurance premiums and upon BORROWER'S submission of the items set forth in Section 5.(i)(b)(2)(aa) above, LENDER reserves the right to direct SERVICER to make payment for such expenses directly to the vendor or governing body entitled to receive such payment.

(ii)     With respect to requests for Disbursement Requests by BORROWER for expenses related to modifying or upfitting the Property for any replacement tenant, BORROWER shall not be entitled to submit any Disbursement Request unless and until LENDER has approved a tenant(s) and a replacement lease(s) for the Premises in accordance with Assignment of Leases and any other applicable requirements of the Loan Documents ("**Replacement Lease(s)**").   Once a Replacement Lease(s) is approved by LENDER, BORROWER shall be entitled to submit Disbursement Requests to LENDER and SERVICER at least ten (10) business days prior to the requested date of such disbursement, which Disbursement Request shall include satisfactory evidence that such items and/or conditions for which reimbursement or payment is sought have occurred, including:

(a)     BORROWER's certification to LENDER that no uncured Event of Default exists under the Note, the Mortgage, the Assignment of Leases or any of the Loan Documents as of the date of the Disbursement Request;

(b)     if the Disbursement Request is for payment of brokerage commissions for a Replacement Lease(s), or for other costs reasonably incurred by BORROWER in reletting the Premises, the Disbursement Request shall include the invoice(s) and/or billing(s) from third parties and BORROWER's written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s) within ten (10) business days from the receipt of the applicable disbursement, provided however, LENDER reserves the right to direct SERVICER to make payment directly to the vendor or broker (as applicable);

(c)     if the Disbursement Request is for tenant improvements costs for a Replacement Lease(s) or restoration costs as described in the Assignment of Leases, then any such Disbursement Request shall comply with the provisions of preceding clause (a) and all of the following additional requirements as applicable to a particular Disbursement Request:

(1) if the Disbursement Request is for payment of the costs of government permits ("**Permit Costs**"), architectural or engineering fees for the design of such Tenant Improvement work or restoration work ("**Design Costs**") or payment of amounts due a contractor(s) performing such Tenant Improvement work or restoration work ("**Contractor Payment(s)**"), the Disbursement Request shall include the invoice(s) and/or billing(s) for such Permits Costs, Design Costs or Contractor Payments and BORROWER's written certification and warranty to LENDER that BORROWER will use the proceeds of the disbursement to pay such invoice(s) and billing(s) within ten

4

(10) business days from the receipt of the applicable disbursement; provided, however, except for a Disbursement Request for a final disbursement for Contractor Payments, which shall comply with the additional requirements set forth in subsection 5(ii)(c)(2) below, the amount allowed on account of any Contractor Payment(s) shall be limited to ninety-five percent (95%) of the applicable Disbursement Request for an interim Contractor Payment(s) with the remaining five percent (5%) held as a retention ("**Retention**") and shall otherwise be subject to the following conditions and requirements:

(aa)   The applicable Disbursement Request for a Contractor Payment(s) shall be accompanied by a conditional lien waiver covering the restoration or Tenant Improvement work for which payment is requested based on the progress of the work, which shall be certified by BORROWER in the applicable Disbursement Request; and

(bb)   If LENDER elects, LENDER shall have the right to cause an inspection of the restoration or Tenant Improvement work by a current inspection report of the Premises prepared by LENDER's inspecting architect/engineer, if applicable, at the cost of BORROWER in order to confirm BORROWER's estimate of the progress of the work and that the work for which payment is requested has been performed in a good and workmanlike manner.

(2)   in the case of a final Disbursement Request for Contractor Payment(s) following the completion of the Tenant Improvements and/or restoration work for the applicable Replacement Lease(s), BORROWER shall be entitled to submit a Disbursement Request for the final Contractor Payment(s), including the Retention and such Disbursement Request shall comply with all of the requirements and conditions in subsection 5(ii)(c)(1) above and the following additional requirements:

(aa)   The final Disbursement Request for a Contractor Payment(s) shall be accompanied by a conditional lien waiver covering the restoration and Tenant Improvements work for which the Disbursement Request is submitted;

(bb)   The final Disbursement Request for a Contractor Payment(s) shall include an original estoppel certificate executed by the tenant under any Replacement Lease(s) of the Premises or a portion thereof approved by LENDER, stating that such tenant has accepted and occupied the space set forth in the Replacement Lease, and that there are no defaults under such Replacement Lease (nor does there exist any known event or condition, which with the passage of time or the giving of notice, or both, could result in such a default); and

(cc)   The final Disbursement Request for a Contractor Payment(s) shall include a copy of any and all applicable certificates of occupancy and other governmental permits issued by applicable

5

governmental authorities, which certificates and permits allow each tenant pursuant to an Replacement Lease to occupy the Premises or the portion thereof covered by the applicable Replacement Lease; and

(dd) if LENDER elects, LENDER shall have the right to cause an inspection of the restoration or Tenant Improvement work by a current inspection report of the Premises prepared by LENDER's inspecting architect/engineer, if applicable, at the cost of BORROWER in order to confirm BORROWER's determination of the completion of such work in a good and workmanlike manner.

(3)       Notwithstanding anything in this Section 5(ii)(c) to the contrary, in the case of a Disbursement Request pursuant to this Section 5(ii)(c) for an invoice greater than $10,000.00, the LENDER reserves the right to direct SERVICER to make payment directly to the vendor entitled to receive such payment.

(d)       In the event BORROWER has previously paid the expense for which a Disbursement Request is submitted, then BORROWER shall be entitled to reimbursement from the Deposit upon presentation of a Disbursement Request complying with the applicable requirements of this subsection 5(ii) and, in addition, such Disbursement Request shall include copies of cancelled checks or other evidence reasonably satisfactory to LENDER of BORROWER's prior payment of the expenses for which reimbursement is requested.

6.       If not sooner disbursed in accordance with sections 3, 4 and/or 5 above, LENDER shall instruct and authorize SERVICER in writing to disburse the Deposit to BORROWER upon the date on which the Note has been repaid in full, all obligations of BORROWER secured by this Agreement have been performed in full and the Mortgage has been reconveyed to BORROWER.

7.       If the Deposit Account contains insufficient Cash Proceeds to fulfill a Disbursement Request approved by the LENDER, then the SERVICER shall, at the option of the BORROWER, and if approved by LENDER, sell sufficient Stock to satisfy the Disbursement Request and distribute the proceeds to the BORROWER.

8.       This Agreement shall be irrevocable, and BORROWER and LENDER hereby waive all rights and powers to alter, amend, revoke or terminate this Agreement, except as otherwise specifically set forth elsewhere in this Agreement. This Agreement shall terminate when all compensation owed to SERVICER in connection with the administration of this Agreement shall have been paid in full and the Deposit has been fully disbursed in accordance with the terms hereof.

9.       BORROWER hereby acknowledges that, pursuant to the Assignment of Leases, LENDER has a first prior lien and security interest in and to the (a) the Deposit Account and all rights relating thereto and proceeds therefrom and thereof; (b) all books and records relating to the types and items of property described in the foregoing clause (i) under BORROWER's control; and (c) all proceeds (whether cash or non-cash, and including without

6

limitation insurance proceeds) and products of the property described in the foregoing clause (a) and all replacements and substitutions therefor and all additions and accessions thereto, subject to any amounts owed to SERVICER, as security for payment of all indebtedness and sums due under the Loan Documents and this Agreement. The parties hereto agree that this Agreement constitutes a security agreement, and that BORROWER shall consent to such financing statements and execute such other documents as LENDER shall deem reasonably necessary or desirable to continue the perfection of LENDER's interest in the Deposit.

10.    An **"Event of Default"** shall occur hereunder upon: (a) the failure of BORROWER to properly apply any disbursements to pay any third party invoices or billings within the time periods required in subsections 5(i)(b)(2)(aa), 5(ii)(b) or 5(ii)(c) above and BORROWER shall not be entitled to any prior notice or grace period in the event of such a default, (b) the failure of BORROWER to make any payment to or deposit any sum of money with LENDER or SERVICER as and when due under this Agreement within ten (10) days from delivery of written notice to BORRWER, (b) a breach by BORROWER of any other provision of this Agreement where BORROWER fails to fully cure such breach within ten (10) days from delivery of written notice to BORRWER, or (c) the occurrence of an Event of Default by BORROWER under any of the Loan Documents.

11.    Upon the occurrence of an Event of Default under this Agreement and while such Event of Default is continuing, and subject to the terms of the Assignment of Leases: (a) LENDER shall not be obligated to cause SERVICER to disburse the Deposit to BORROWER; (b) LENDER shall be entitled to pursue all of its right and remedies under the Loan Documents, and the remedies to which it is entitled at law and in equity, including, without limitation, all remedies of a secured party under the South Carolina Uniform Commercial Code; and (c) SERVICER shall, upon written notice of an Event of Default from LENDER, pay over to LENDER upon LENDER's request the Deposit (less any Costs and Expenses owed to SERVICER, and LENDER shall be entitled immediately to apply such sum in the following order and priority: first, to SERVICER's Costs and Expenses (as defined in Paragraph 15 herein); second, to reimburse LENDER for LENDER's reasonable out-of-pocket expenses incurred in connection with this Agreement or the Loan; third, to discharge any delinquent payments of BORROWER and accrued and unpaid interest thereon; and fourth, to pay accrued interest currently due and owing under the Loan. The rights of LENDER hereunder are in addition to and without limitation of any other rights and remedies that LENDER may have under this Agreement, the Loan Documents or applicable law.

12.    Notwithstanding the existence of any other liens or security interests in the Deposit, upon the occurrence of an Event of Default under this Agreement and while such Event of Default is continuing, and subject to the terms of the Assignment of Leases, LENDER shall have the right to determine the order in which any or all of the Deposit, or the Property shall be subjected to the remedies provided herein and in the Mortgage. LENDER shall have the right to determine the order in which the indebtedness secured hereby is satisfied from the proceeds realized upon the exercise of the remedies provided herein and in the Mortgage. BORROWER, and any party who now or hereafter acquires a lien or security interest in the Deposit or the Property and who has actual or constructive notice of this Agreement or the Mortgage hereby expressly waives and relinquishes any and all rights to demand or require the marshaling of liens or the marshaling of assets by LENDER in

7

connection with the exercise of any of the remedies provided herein or in the Mortgage or permitted by applicable law.

13.     LENDER and SERVICER shall not in any way be responsible for failure to do any or all of the things for which rights, interest, powers and authorities are herein granted. LENDER and SERVICER shall be responsible only for the application of such cash, documents or other property as it actually receives under the terms hereof; provided, however, that the failure of SERVICER or LENDER to do any of the things or exercise any of the rights, interests, powers and authorities hereunder shall not be construed to be a waiver of any such rights, interests, powers and authorities.

14.     SERVICER joins in the execution of this Agreement for the express purposes of agreeing to be bound solely by the provisions set forth in this Agreement with respect to the administration and disbursement of the Deposit that the Deposit may be disbursed according to the provisions of this Agreement.  BORROWER hereby acknowledges that pursuant to the Assignment of Leases, BORROWER released all power of dominion and control over the Deposit and BORROWER shall not, by entering into this Agreement, have any power of dominion or control of the Deposit and acknowledges that it shall not have access to the Deposit except as specifically provided herein.

15.     BORROWER agrees that SERVICER shall incur no costs or expenses whatsoever in connection with the preparation of this Agreement, the holding of the Deposit or the administration of this Agreement, and BORROWER agrees that all costs and expenses shall be borne and paid by BORROWER; provided, however, such costs and expenses shall be deducted and paid directly from the Deposit to the extent of available Cash Proceeds. BORROWER agrees that SERVICER will be entitled to receive: (i) an annual fee of $800.00, (ii) an amount of $100.00 for each Disbursement Requested processed by SERVICER and (iii) any amounts payable to SERVICER pursuant to section 16 below (collectively the **"Costs and Expenses"**).  SERVICER shall have the right to withdraw such Costs and Expenses which are due and owing from the Deposit prior to any disbursement.  To the extent insufficient Cash Proceeds exist in the Deposit to pay such Costs and Expenses, BORROWER shall pay such Costs and Expenses within seven (7) days from receipt of an invoice from SERVICER.

16.     Nothing contained in this Agreement shall constitute LENDER and/or SERVICER as a joint venturer, partner or agent of BORROWER, or LENDER and/or SERVICER liable for any debts, obligations, acts, omissions, representation, or contracts of BORROWER or LENDER.

17.     BORROWER shall indemnify and hold harmless SERVICER and its directors, officers, employees, attorneys, successors and assigns from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations, liabilities and costs and expenses (including litigation costs, accounting fees, and reasonable attorneys' fees and expenses) arising from or in any way connected in any manner whatsoever with:  (a) the holding of the Deposit in accordance with the provisions of this Agreement; (b) the acts, errors or omissions of BORROWER, LENDER or the agent of either; and (c) SERVICER's acting in accordance with the provisions of this Agreement, excepting only liability occasioned solely by SERVICER's bad faith, gross negligence or willful misconduct, and, in

8

no other event shall SERVICER be liable for any incidental, consequential, special or punitive damages. Furthermore, BORROWER agrees to release and hold harmless SERVICER and its directors, officers, employees, attorneys, successors and assigns, from and against any and all loss, liability, cost, damages and expenses incurred by BORROWER or LENDER, including, without limitation, legal and account fees and expenses arising in any manner whatsoever out of SERVICER's acting in accordance with the provisions of this Agreement. The provisions of this paragraph shall survive the termination of this Agreement and any deposit provided for by this Agreement.

18. Except for Expedited Notices (as defined herein), all other notices, demands, documents, requests, or other communications which are required or permitted to be given or served hereunder shall be in writing and shall be effective when received either (a) personally, (b) by Federal Express or similar overnight courier, (c) by mail, postage prepaid, registered or certified mail, return receipt requested, or (d) except in the case of any notice of default, by first class mail, addressed as follows:

|  |  |
|---|---|
| BORROWER: | NMB Partners, L.P.<br>c/o Elting L. Chapman II<br>P O Box 2384<br>Murrells Inlet, SC 29516 |
| LENDER: | Jefferson Pilot Financial Insurance Company<br>c/o Delaware Investment Advisers<br>1300 South Clinton Street<br>Fort Wayne, IN 46802<br>Attn: Loan Servicing, Loan #A97227 |
| SERVICER: | Professional Mortgage Company, Inc.<br>Attn: Shirley Staton; Loan #A97227<br>2 Bennett Street<br>Greenville, SC 29601<br>Phone: (864) 242-0079<br>Fax: (864) 242-1877<br>Email: Shirley@pmcsc.com |

Such addresses may be changed from time to time by any party serving notice as above provided.

19. In the event the BORROWER seeks LENDER'S consent for a sale of the Stock under paragraphs 3 or 7 hereof, BORROWER may elect to invoke the following procedure for expedited notice ("Expedited Notice") in which event the Lender must respond to BORROWER'S request within three (3) business days of LENDER'S receipt of the request or LENDER'S consent shall be deemed given to the request. In order for a notice to be an Expedited Notice, BORROWER shall deliver written notice which includes a statement, in capitalized letters, substantially as follows: "PURSUANT TO PARAGRAPH 19 OF THE LOAN SERVICING AND ESCROW AGREEMENT CONCERNING WINN DIXIE CLAIM, LENDER HAS THREE (3) BUSINESS DAYS FROM RECEIPT OF THIS

9

LETTER TO APPROVE OR DISAPPROVE BORROWER'S REQUEST TO SELL ITS WINN-DIXIE STOCK, OR SUCH APPROVAL WILL BE DEEMED TO BE GIVEN." BORROWER shall include with the written notice an explanation, and any available back-up data, of the reason for the request and the valuation of the stock. This written notice must be sent simultaneously to **each of the following persons by both** (a) federal express or other nationally recognized overnight courier, **and** (b) electronic mail, addressed as follows:

> Jefferson Pilot Financial Insurance Company
> c/o Delaware Investment Advisers
> 1300 South Clinton Street
> Fort Wayne, IN 46802
> Attn: Robert F. Larkin, Second VP
>      Loan # A97227
> Email: rflarkin@delinvest.com
> (Office phone): 260-455-5475

> and

> Jefferson Pilot Financial Insurance Company
> c/o Delaware Investment Advisers
> 1300 South Clinton Street
> Fort Wayne, IN 46802
> Attn: Sherrie R. Davis, Second VP
>      Loan # A97227
> Email: srdavis@delinvest.com
> (Office phone): 260-455-1397

> and

> Professional Mortgage Company, Inc.
> Attn: Shirley Staton; Loan #A97227
> 2 Bennett Street
> Greenville, SC 29601
> Phone: (864) 242-0079
> Fax: (864) 242-1877
> Email:Shirley@pmcsc.com

In addition to the written notice set forth above, BORROWER shall call one or both of the persons listed above on the day the written notice is sent to advise that person that the notice has been sent and the deadline for response.

20.     BORROWER may not assign, pledge or otherwise transfer or encumber this Agreement or any right hereunder separate and apart from the Loan Documents.  This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of BORROWER, LENDER and SERVICER.

21.     This Agreement and the Assignment of Leases embody the entire agreement among BORROWER, LENDER and SERVICER relating to the subject matter hereof, and

10

supersedes all prior agreements and understandings upon BORROWER, LENDER and SERVICER relating to such subject matter. No implied covenants or obligations shall be read into this Agreement against SERVICER. This Agreement may be changed, waived or terminated only by an instrument in writing signed by the party against who enforcement of such change, waiver or termination is sought.

22. If any provision of this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

23. LENDER shall have all of the rights and remedies granted in this Agreement, the Note, the Mortgage, the Assignment of Leases and other Loan Documents and available at law and in equity, and these same rights and remedies shall be cumulative and may be pursued separately, successively or concurrently against BORROWER, or any property covered under the Mortgage or the Assignment of Leases or the Loan Documents at the sole discretion of LENDER. The exercise or failure to exercise any of the same shall not constitute a waiver or release thereof or of any other right or remedy, and the same shall be non-exclusive.

24. This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina and the laws of the United States applicable to transactions undertaken within the State of South Carolina.

25. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed one and the same document.

26. The federal tax identification number of the BORROWER is 57-1052619.

27. In the event at any time (a) of a dispute regarding the Deposit, (b) of a dispute regarding the performance by LENDER or BORROWER under this Agreement or the other Loan Documents, (c) of a dispute regarding the performance by any party under this Agreement, or (d) SERVICER shall receive conflicting demands or instructions under this Agreement, all parties hereto agree that at the sole option of SERVICER either (i) the Deposit then held in escrow by SERVICER shall remain in escrow until written confirmation of the resolution of the dispute, or (ii) SERVICER shall be entitled to deposit the funds contained in the Deposit into a court of general jurisdiction in the State of South Carolina and to interplead the parties hereto in connection therewith, and the parties hereto hereby consent to the jurisdiction of such court in connection with any such dispute.

28. SERVICER may resign from its obligations under this Agreement at any time after thirty (30) days' prior written notice to the other parties hereto. LENDER shall designate, in its sole discretion, a substitute SERVICER promptly after receipt of notice of resignation by SERVICER and shall take all reasonable actions necessary to cause such designated successor to promptly assume the obligations of SERVICER hereunder. SERVICER hereby agrees that it shall take all actions reasonably necessary and shall cooperate with LENDER, at no expense to LENDER, to facilitate any transfer of

SERVICER's obligations, duties and rights hereunder. From and after the effective date of resignation and the delivery of the Deposit to the replacement servicer designated by LENDER, SERVICER shall have no further obligation or liability under this Agreement.

29. SERVICER may rely on any written instruction received from LENDER without further inquiry. SERVICER may rely and shall be protected in acting or refraining from acting upon any written notice from LENDER (including but not limited to electronically confirmed facsimiles of such notice) believed by it to be genuine and to have been signed or presented by a duly authorized person acting on behalf of LENDER.

30. SERVICER is not chargeable with knowledge, and has no duties with respect to, any other agreements between BORROWER and LENDER, including, without limitation, the Loan Documents. SERVICER shall not be liable for any claims, suits, actions, costs, damages, liabilities or expenses or for any interruption of services in connection with the subject matter of this Agreement other than liabilities caused by bad faith, gross negligence or willful misconduct on the part of SERVICER. SERVICER shall not have any duty to manage the value of the Stock and shall have no liability for any deterioration in value of the Stock over the term of this Agreement. In no event shall SERVICER be liable for any incidental, consequential, special or punitive damages.

31. LENDER and BORROWER acknowledge and agree that: (a) SERVICER makes no representations or warranties, express or implied, concerning the validity, effectiveness, perfection or priority of LENDER's security interest in the Deposit Account or any funds in connection therewith; (b) this Agreement applies only to the Deposit referenced herein, but not to any other deposit account which BORROWER may now or hereafter maintain.

32. LENDER and BORROWER consent to the administration of the funds associated with the Deposit by the National Bank of South Carolina.

33. In the event BORROWER becomes subject to voluntary or involuntary proceedings under the U.S. Bankruptcy Code, or if SERVICER is served with legal process which SERVICER in good faith believes affects the Deposit or the Deposit Account, SERVICER shall have the right to place a hold on such Deposit until such time as SERVICER receives an appropriate court order or other assurances satisfactory to SERVICER establishing that the Deposit or the Deposit Account may be disbursed according to the provisions of this Agreement.

34. Business Day shall mean any day, except Saturday, Sunday or a day which banks in the State of South Carolina are not required to be open for business.

(The remainder of this page is intentionally left blank.)

12

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

**NMB Partners, L.P.**
By: Chapman Properties of Florence, Inc., a
South Carolina corporation, its sole general
partner

By: _____
Name: _____
Title: _____


LENDER:

**Jefferson Pilot Financial Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact

*Robert F. Larkin*
By: Robert F. Larkin, Second Vice President


SERVICER:

**Professional Mortgage Company, Inc.**


By: _____
Name: _____
Title: _____

13

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

**NMB Partners, L.P.**
By: Chapman Properties of Florence, Inc., a
South Carolina corporation, its sole general
partner

By: _Elling L. Chapman III_
Name: _ELTING D. CHAPMAN III_
Title: _PRESIDENT_

LENDER:

**Jefferson Pilot Financial Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact

_____

By: Robert F. Larkin, Second Vice President

SERVICER:

**Professional Mortgage Company, Inc.**

By: _____
Name: _____
Title: _____

13

IN WITNESS WHEREOF, LENDER, BORROWER and SERVICER have executed this Agreement as of the day and year first above written.

BORROWER:

**NMB Partners, L.P.**
By: Chapman Properties of Florence, Inc., a
South Carolina corporation, its sole general
partner

By: _____
Name: _____
Title: _____

LENDER:

**Jefferson Pilot Financial Insurance Company**
By: Delaware Investment Advisers,
a series of Delaware Management Business Trust,
as attorney-in-fact

By: _____
By: Robert F. Larkin, Second Vice President

SERVICER:

**Professional Mortgage Company, Inc.**

By: _____
Name: Shirley H. Staton
Title: Vice President

13

**Exhibit "1"**
**Assignment of Leases**

FILED
HORRY COUNTY, S.C.
97 SEP 18 PM 3:39
R.M.C.

267804

# ABSOLUTE ASSIGNMENT OF RENTS AND PROFITS AND COLLATERAL ASSIGNMENT OF LEASES

THIS ABSOLUTE ASSIGNMENT OF RENTS AND PROFITS AND COLLATERAL ASSIGNMENT OF LEASES (this "Assignment") is dated as of ___September 18___, 1997, and is by and between __NMB PARTNERS, L.P._____, a South Carolina __limited partnership_____ ("Assignor") and ALEXANDER HAMILTON LIFE INSURANCE COMPANY OF AMERICA, a Michigan corporation ("Assignee").

## RECITALS

Assignor is the owner in fee simple of that certain parcel of real property and all improvements thereon situated in Horry County, S.C. more particularly described in Exhibit A attached hereto and by this reference incorporated herein (said land together with all rights and appurtenances thereto and all improvements presently located or hereafter constructed thereon being collectively referred to as the "Property").

Simultaneously with the execution and delivery of this Assignment, Assignee has loaned to Assignor the principal sum of Three Million Eight Hundred Eighty Thousand Dollars ("Loan"), which loan is evidenced by that certain promissory note of even date herewith, executed by Assignor in favor of Assignee (said note and any and all renewals, replacements, modifications and extensions thereof are collectively referred to as the "Note").

Simultaneously with the execution and delivery of this Assignment, Assignor has executed and delivered a ____Mortgage_____, Security Agreement and Fixture Filing of even date herewith ("Indenture") as security for the debt as evidenced by the Note (the Note and Indenture being hereinafter sometimes collectively referred to, together with this Assignment, as the "Loan Documents").

Assignor has entered into certain leases reflected in the rent roll attached hereto as Exhibit B and by this reference incorporated herein.

In order to induce Assignee to make the Loan, Assignor desires to absolutely assign to Assignee all rents and income from the Property and to collaterally assign all present and future leases covering all or any part of the Property.

NOW, THEREFORE, in consideration of the above stated premises and of        Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Assignor, Assignor hereby covenants and agrees with Assignee as follows:

IV-179                                    -1-                     BOOK 1975 PAGE 224

2-24

1.    <u>Absolute Assignment of Rents and Profits</u>.  Assignor hereby absolutely, presently and unconditionally grants, assigns, transfers and sets over unto Assignee, and not as additional security for the Note, subject to all of the terms, covenants and conditions set forth herein, all of Assignor's right, title and interest in and to the following, whether arising under the Leases (as hereinafter defined), by statute, at law, in equity, or in any other way:

All of the rents, income, profits, revenue, judgments, condemnation awards, insurance proceeds, unearned insurance premiums and any other fees or sums payable to Assignor or any other person as landlord and other benefits and rights of the Property arising from the use, occupancy, operation or management of all or any portion thereof or from all the Leases and any proceeds, deposits or security deposits (subject to the rights, if any, of tenants) relating thereto, including, without limitation, any award to Assignor made hereafter in any court involving any of the tenants under the Leases in any bankruptcy, insolvency, or reorganization proceeding in any state or federal court, and Assignor's right to appear in any action and/or to collect any such award or payment, and all payments by any tenant in lieu of rent (collectively, "Rents and Profits").

The assignment of Rents and Profits set forth herein shall be an absolute, present and unconditional assignment and shall, immediately upon execution, give Assignee the right to collect all Rents and Profits without the necessity of instituting legal proceedings of any kind whatsoever to enforce the provisions of this Assignment.  Assignor hereby irrevocably appoints Assignee its true and lawful attorney, such appointment being coupled with an interest, to act on behalf of Assignor, should Assignee so elect, to, at any time, demand, receive and enforce payment, give receipts, releases and satisfactions, and sue, either in the name of Assignor or in the name of Assignee, for all such Rents and Profits and apply the same to the indebtedness evidenced by the Loan.

2.    <u>Collateral Assignment of Leases</u>.  Assignor hereby absolutely, presently and unconditionally grants, assigns, transfers and sets over unto Assignee, as additional security for the Note, subject to all of the terms, covenants and conditions set forth herein, all of Assignor's right, title and interest in and to the following, whether arising under the Leases, by statute, at law, in equity, or in any other way:

(a)    All of the leases of the Property which are in effect on the date hereof, and entered into or in effect from time to time after the date hereof, including, without limitation, all amendments, extensions, replacements, modifications and renewals thereof and all subleases, concession agreements, any ground leases or ground subleases and all other agreements affecting the same and all guaranties thereunder (the "Leases"); and

(b)    All contracts, agreements, management, operating and maintenance agreements, warranties, licenses, permits, guaranties and sales contracts relating to the Property, entered into by or inuring to the benefit of Assignor (the "Contracts").

IV-179

-2-

BOOK 1975 PAGE 225

225

3.  <u>Purpose of Collateral Assignment of Leases</u>.  Assignor hereby agrees that this Assignment is given by Assignor to Assignee to secure the following in such order of priority as Assignee may elect:

(a)  The repayment of the indebtedness evidenced by the Note, the terms of which are incorporated herein by this reference, of even date herewith, payable to the order of Assignee, in the principal sum of <u>Three Million</u> <u>Eight Hundred*</u> and 00/100 Dollars with interest thereon, as provided therein, and all late charges, prepayment premiums and fees required under the Note and all extensions, renewals, modifications, amendments and replacements thereof;        *Eighty Thousand

(b)  The payment of all other sums which may be advanced by or otherwise be due to Assignee under any provision of the Note, the Indenture or under any other instrument or document referred to in clause (c) below, with interest thereon at the rate provided herein or therein;

(c)  The performance of each and every of the covenants and agreements of Assignor contained (i) in the Note, the Indenture, or (ii) in any and all pledges or other security agreements, loan agreements, supplemental agreements, assignments, affidavits and all instruments of indebtedness or security now or hereafter executed by Assignor, or any of the parties constituting Assignor, or any general partners of such parties, in connection with any indebtedness referred to in clauses (a) or (d) of this paragraph or for the purpose of supplementing or amending the Indenture or any instrument secured hereby (but specifically excluding from all of the foregoing the Environmental Indemnity Agreement) (all of the foregoing in this clause (ii) as the same may be amended, modified or supplemented from time to time, collectively referred to as "Related Agreements"); and

(d)  The repayment of any other loans or advances, with interest thereon, hereafter made to Assignor (or any successor in interest to Assignor as the owner of the Property or any part thereof), by Assignee when the promissory note evidencing the loan or advance specifically states that said Note is secured by the Indenture, together with all extensions, renewals, modifications, amendments and replacements thereof.

4.  <u>Representations, Warranties and Agreements</u>.  Assignor hereby represents, warrants and agrees that:

(a)  Assignor has the right, power and capacity to make this Assignment and that no person, firm or corporation or other entity other than Assignor has or will have any right, title or interest in or to the Leases or the Rents and Profits.

(b)  Assignor has made no assignment other than this Assignment of any of Assignor's rights in any of the Rents and Profits or the Leases;

IV-179

- 3 -

(c)     The rent roll attached hereto as <u>Exhibit B</u> is a true, accurate and complete list of all Leases now in full force and effect.

(d)     With respect to each Lease in effect at the date hereof: (i) the Lease is in full force and effect and is valid, binding and enforceable in accordance with its terms; (ii) the Lease has not been modified or amended in any respect, nor has any provision thereof been waived; (iii) neither the tenant nor lessor thereunder is in default under the terms of the Lease; (iv) no rent has been prepaid under the Lease for more than one month in advance; and (v) the tenant thereunder has no deduction, claim, counterclaim, set-off, or defense against the lessor thereunder or against the rents or other sums payable or to be payable thereunder.

5.     <u>Covenants</u>.

(a)     Assignor shall not, without the prior written consent of Assignee, which consent shall not be unreasonably withheld or delayed, (i) enter into, or consent to or permit the assignment or subletting of, any Leases; (ii) modify, extend, cancel, consent to any surrender, or in any way alter the terms of the Leases previously approved by Assignee, or take any action under or with respect to any such Leases which would materially decrease either the obligation of the tenant thereunder or the rights or remedies of the landlord or otherwise fail to perform the landlord's obligations under the Leases; (iii) alter, modify, change or terminate the terms of any guaranties of the Leases; (iv) create or permit any lien or encumbrance which, upon foreclosure, would be superior to any such Leases or in any other manner impair Assignee's right, title and interest in the Rents and Profits; (v) pledge, transfer, mortgage or otherwise encumber or assign the Leases or the Contracts or attempt to pledge, transfer, mortgage or otherwise encumber or assign the Rents and Profits; or (vi) collect rents more than thirty (30) days prior to their due date.

(b)     Assignor shall, at its sole cost and expense, perform and discharge all of the obligations and undertakings of the landlord under the Leases. Assignor shall use reasonable efforts to enforce the performance of each obligation of the tenants under the Leases and will appear in and prosecute or defend any action connected with the Leases or the obligations of the tenants thereunder. Assignee shall have the right, but not the obligation, to cure any default of Assignor under any of the Leases and all amounts disbursed in connection with said cure shall be deemed to be indebtedness secured by the Indenture.

(c)     Assignor shall not take any action which will cause or permit the estate of any tenant under the Leases to merge with Assignor's interest in the Property.

(d)     Assignor agrees, from time to time, to execute and deliver, upon demand, all assignments and any and all other writings as Assignee may reasonably deem necessary or desirable to carry out the purpose and intent hereof, or to enable Assignee to enforce any right or rights hereunder.

IV-179

- 4 -

6.    <u>Events of Default</u>.    The term "Event of Default" as used herein shall mean the occurrence of any one of the following:

      (a)     If a default by failure to pay or otherwise shall occur under the Note, the Indenture or any other instrument evidencing or securing the Loan and shall not be cured within any applicable curative period stated therein;

      (b)     If Assignor shall fail to comply with any of the covenants, duties or obligations of Assignor herein and such default shall continue for thirty (30) days or more after written notice to Assignor from Assignee specifying the nature of such default; provided, however, that if such default is of a nature that it cannot be cured within the thirty (30) day period, then Assignor shall not be in default if it commences good faith efforts to cure the default within the thirty (30) day period, demonstrates continuous diligent efforts to cure the default in a manner satisfactory to Assignee and, within a reasonable period, not to exceed ninety (90) days after the date of the original written notice of such default, completes the cure of such default; or

      (c)     If at any time any representation, warranty, statement, certificate, schedule and/or report to Assignee in or pursuant to this Assignment, the Indenture or any Related Agreement is false or misleading in any material respect as of the date made or furnished.

7.    <u>Revocable License to Collect Rents and Profits</u>.

      (a)     Notwithstanding any provision to the contrary contained elsewhere herein, so long as no Event of Default has occurred hereunder, Assignor shall have a license ("License") to manage the Property, to collect, receive and use all Rents and Profits in accordance with the terms of the Leases; to let the Property and to take all actions which a reasonable and prudent landlord would take in enforcing the provisions of the Leases and Contracts; provided, however, that all amounts so collected shall be applied toward operating expenses, real estate taxes and insurance relating to the Property, capital repair items necessary to the operation of the Property, and the payment of sums due and owing under the Note, the Indenture and this Assignment prior to any other expenditure or distribution by Assignor. From and after the occurrence of an Event of Default (whether or not Assignee shall have exercised Assignee's option to declare the Note immediately due and payable), the License shall be automatically revoked without any notice to Assignor or any other action by Assignee. Assignor hereby irrevocably authorizes and directs (i) each of the tenants under the Leases, upon receipt of a written notice from Assignee so demanding, to pay all Rents and Profits due or which becomes due under its Lease directly to Assignee, and (ii) each property manager of any part of the Property, upon receipt of a written notice from Assignor so demanding, to pay all Rents and Profits thereafter received by such property manager directly and promptly to Assignee.

BOOK 1975 PAGE 228

(b)    Any amounts received by Assignor or its agents in the performance of any acts prohibited by the terms of this Assignment, including, but not limited to, any amounts received in connection with any cancellation, modification or amendment of any of the Leases prohibited by the terms of this Assignment and any amounts received as rents, income, issues or profits from the Property in Assignor's or its agents' possession from and after the occurrence of an Event of Default under this Assignment, shall be held by Assignor in trust as trustee for Assignee and all such amounts shall be accounted for to Assignee and shall not be commingled with other funds of the Assignor. Any person acquiring or receiving all or any portion of such trust funds shall acquire or receive the same in trust for Assignee as if such person had actual or constructive notice that such funds were impressed with a trust in accordance herewith.

8.    <u>Remedies of Assignee</u>.    Notwithstanding and in addition to the Assignee's absolute right to the Rents and Profits, upon the occurrence of any Event of Default, Assignee in person or by agent or by court-appointed receiver (and Assignee shall have the right to the immediate appointment of such a receiver without regard to the adequacy of the security, and Assignor hereby irrevocably consents to such appointment and waives notice of any application therefor) may, at its option, without any action on its part being required, without in any way waiving such default, with or without the appointment of a receiver, or an application therefor:

(a)    take possession of the Property and have, hold, conduct tests of, manage or hire a manager to manage, lease and operate the Property, on such terms and for such period of time as Assignee may deem proper, with full power to make, from time to time, all alterations, renovations, repairs or replacements thereto as may seem proper to Assignee;

(b)    with or without taking possession of the Property, collect and receive all Rents and Profits, notify tenants under the Leases, or any other parties in possession of the Property, to pay Rents and Profits directly to Assignee, its agent or a court-appointed receiver and apply such Rents and Profits as Assignee sees fit in Assignee's sole discretion, which may include to the payment of:

(i)    all costs and expenses incident to: taking and retaining possession of the Property; management and operation of the Property; keeping the Property properly insured; all alterations, renovations, repairs and replacements to the Property, including, without limitation, reasonable compensation for all of Assignee's employees and other agents working in connection with the Property; reasonable and actual attorneys' fees; and management and rental commissions;

(ii)    all taxes, charges, claims, assessments, and any other liens which may be prior in lien or payment to the Loan, and premiums for insurance for the Property, with interest on all such items; and

IV-179

         (iii)    the indebtedness evidenced by the Loan, together with all costs and attorneys' fees in such order or priority as to any of such items as Assignee in its sole discretion may determine, any statute, law, custom or use to the contrary notwithstanding.

         (c)    exclude Assignor, its agents and servants wholly from the Property;

         (d)    have joint access with Assignor to the books, papers and accounts of Assignor relating to the Property at the expense of Assignor;

         (e)    commence, appear in and/or defend any action or proceedings purporting to affect the interests, rights, powers and/or duties of Assignee hereunder, whether brought by or against Assignor or Assignee;

         (f)    pay, purchase, contest or compromise any claim, debt, lien, charge or encumbrance which in the judgment of Assignee may affect or reasonably appear to affect the interest of Assignee or the rights, power and/or duties of Assignee hereunder;

         (g)    perform as landlord under the Leases and as a party under the Contracts, but Assignee shall not have the obligation to do so;

         (h)    demand, receive and enforce payment, give receipts, releases and satisfactions, and sue, either in the name of Assignor or in the name of Assignee, for all such Rents and Profits and apply the same to the indebtedness evidenced by the Loan;

         (i)    take whatever measures Assignee from time to time deems necessary or desirable to exercise, enforce, perform or protect Assignee's rights, titles or interests in any or all of the Loan Documents and Related Agreements; and

         (j)    exercise any other remedies permitted to Assignee under applicable law.

    Assignee owns the Rents and Profits and the collections, and the receipt by Assignee of any Rents and Profits pursuant to this Assignment after the institution of foreclosure proceedings under the Indenture shall not cure any such Event of Default or affect such proceedings or any sale pursuant thereto. This Assignment is an absolute assignment of the Rents and Profits, and the election by Assignee to exercise one or more or none of its remedies shall not diminish such absolute assignment or Assignee's ownership of the Rents and Profits.

    9.    <u>Application of Proceeds</u>.    Any proceeds collected by Assignee hereunder shall be applied by Assignee to pay, in such order as Assignee shall elect, the following: (i) all costs and expenses of controlling, managing and operating the Property, including, but not limited to, debt service on the Note, Assignor's obligations under the Indenture, the Loan Documents and the Related Agreements, and attorneys' fees, including any fees in the

representation of Assignee in any proceeding under Title 11, United States Code; (ii) satisfying the requirements of the Leases, including, but not limited to, all costs and expenses for maintenance, repairs, replacements and alterations; (iii) special assessments, taxes, insurance, all amounts evidenced, secured, permitted or required to be spent, escrowed or reimbursed pursuant to any of the Note, Indenture, Loan Documents or the Related Agreements; (iv) fees of representatives designated by Assignee to manage and operate the Property; and (v) all other expenses pertaining to any part or all of the Property and the Leases.

      10.    <u>Indemnity and Assignee's Disclaimer.</u>

      (a)    Assignee shall not be obligated to perform or discharge nor does it hereby undertake to perform or discharge any obligation, duty or liability under the Leases or under or by reason of this Assignment. Assignor shall and does hereby agree to indemnify Assignee for and to defend and hold Assignee harmless from any and all obligations, liabilities, losses, costs, expenses, civil fines, penalties or damages (including attorneys' fees) which Assignee may incur under the Leases or under or by reason of this Assignment, and from any claims whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in the Leases, [excluding claims arising out of Assignee's sole gross negligence and intentional misconduct]. Should Assignee incur any such obligation, liability, loss, cost, expense, civil fine, penalty or damage under the Leases or under or by reason of this Assignment, or in the defense of any of such claims or demands, the amount thereof, including costs, expenses and attorneys' fees, shall be secured hereby; and Assignor shall reimburse Assignee therefor immediately upon demand and upon failure of Assignor to do so, Assignee may declare all sums so secured to be immediately due and payable. The foregoing indemnity shall not be applicable to any such claim, liability, loss, cost, expense or damage arising solely from Assignee's gross negligence or willful misconduct in exercising its remedies hereunder. In the event Assignee acquires title to the Property, the foregoing indemnity shall not be applicable to claims, liability, loss, cost, expense or damage arising from Assignee's actions taken thereafter under the Leases.

      (b)    This Assignment shall not be deemed or construed to constitute Assignee as mortgagee-in-possession of the Property or to obligate Assignee to take any action hereunder, to incur expenses or to perform or discharge any obligation, duty or liability hereunder or under the Leases, and Assignee is not required to take possession of the Property as a condition to the assignment contained herein.

      11.    <u>Waiver and Discretion.</u>    The failure of Assignee to enforce any of the terms, covenants or conditions hereof shall not be construed or deemed to be a waiver of any rights or remedies hereunder. Assignee shall have the full right, power and authority to enforce this Assignment, or any of the terms, covenants or conditions hereof, at any time or times that Assignee shall deem fit.

IV-179

                 - 8 -

12.   <u>Notices</u>.      All notices expressly provided hereunder to be given by Assignee to Assignor and all notices and demands of any kind or nature whatever which Assignor may be required or may desire to give to or serve on Assignee shall be served in the manner set forth in the Indenture, reference to which is made for all purposes.

13.   <u>Performance and Release</u>.      The full repayment of the indebtedness evidenced by the Note and the performance of all of the obligations set forth in the Indenture and the duly recorded release thereof or reconveyance of the Property described therein shall constitute a reassignment of the Leases hereby assigned to Assignee.

14.   <u>Binding Effect</u>.      This Assignment applies to and binds the parties hereto and their respective heirs, administrators, executors, successors and assigns (including any trustee or debtor-in-possession appointed in any proceeding under Title 11, United States Code), as well as any subsequent owner of the Property (or any portion thereof), and any agreement creating rights in Assignee other than those created herein shall be deemed incorporated herein by reference and made a part hereof for all purposes.

15.   <u>Actions by Assignee.</u>   Assignee may take or release any security, may release any party primarily or secondarily liable for any indebtedness evidenced by the Loan, may grant extensions, renewals or indulgences with respect to such indebtedness, and may apply any security therefor held by it to the satisfaction of such indebtedness, without prejudice to any of its rights hereunder.

16.   <u>No Election of Remedies</u>.   Nothing herein contained and no act done or omitted by Assignee pursuant to the powers and rights granted it herein shall be deemed to be a waiver by Assignee of its rights and remedies under the Note and Indenture, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof.  The right of Assignee to collect said indebtedness and to enforce any security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.  It is the intent of both Assignor and Assignee that this Assignment be supplementary to, and not in substitution or derogation of, any provision contained in the Indenture giving Assignee (as beneficiary thereunder) any interest in or rights with respect to the Property.  Accordingly, this Assignment shall not be construed in any way to impair or limit any rights or interests which Assignee would otherwise have with respect to the Property by reason of the Indenture.

17.   <u>Construction of Terms</u>.  In this Assignment, whenever the context so requires, the masculine gender includes the feminine or neuter, and the singular number includes the plural.

18.   <u>No Merger</u>.  Neither this Assignment nor pursuit of any remedy hereunder by Assignee shall cause or constitute a merger of the interests of the lessee and the lessor under

IV-179

- 9 -

BOOK 1975 PAGE 232

any of the Leases such that any of the Leases hereby assigned are no longer valid and binding legal obligations of the parties executing the same.

19.   Governing Law.  THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  IN ANY LITIGATION IN CONNECTION WITH OR TO ENFORCE THIS ASSIGNMENT, THE ASSIGNOR HEREBY IRREVOCABLY CONSENTS AND CONFERS PERSONAL JURISDICTION ON THE STATE COURTS OF THE COUNTY IN WHICH THE PROPERTY IS LOCATED, OR ON THE UNITED STATES DISTRICT COURT OR THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT IN WHICH THE PROPERTY IS LOCATED.  ASSIGNOR EXPRESSLY WAIVES ANY OBJECTIONS AS TO VENUE IN ANY SUCH COURTS AND AGREES THAT SERVICE OF PROCESS MAY BE MADE ON THE ASSIGNOR BY MAILING A COPY OF THE SUMMONS AND COMPLAINT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ASSIGNOR'S ADDRESS.  NOTHING CONTAINED HEREIN SHALL, HOWEVER, PREVENT THE ASSIGNEE FROM BRINGING ANY ACTION OR EXERCISING ANY RIGHTS WITHIN ANY OTHER STATE OR JURISIDCTION OR FROM OBTAINING PERSONAL JURISDICTION BY ANY OTHER MEANS AVAILABLE BY APPLICABLE LAW.

20.   Waiver of Jury Trial.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE ASSIGNOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING THAT RELATES TO OR ARISES OUT OF THIS ASSIGNMENT OR THE ACTS OR FAILURE TO ACT OF OR BY ASSIGNEE IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS ASSIGNMENT.

21.   Material Inducements.  ALL WAIVERS SET FORTH IN THIS ASSGINMENT ARE MATERIAL INDUCEMENTS FOR THE ASSIGNEE TO ACCEPT THIS ASSIGNMENT.

22.   Severability.   In the event any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision hereof, and this Assignment shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, but only to the extent that is invalid, illegal or unenforceable.

23.   Modification.  This Assignment may not be amended or modified orally, but only by an agreement in writing signed by the party against whom enforcement of any amendment or modification is sought.

IV-179

BOOK 1975 PAGE 233

24.    <u>Not Mortgagee-in-Possession</u>.  Neither the assignment of Rents and Profits, Leases and Contracts to Assignee nor the exercise by Assignee of any of its rights or remedies hereunder shall be deemed to make Assignee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property, unless and until Assignee, in person or by agent, assumes actual possession thereof; nor shall appointment of a receiver for the Property by any court at the request of Assignee or by agreement with Assignor, or the entering into possession of the Property by such receiver, be deemed to make Assignee a "mortgagee-in-possession" or otherwise liable in any manner with respect to the Property.

25.    <u>Captions</u>.  The captions of this Agreement are inserted only for the purpose of convenience, and in no way define, limit or prescribe the scope or extent of this Assignment or any part hereof.

IN WITNESS WHEREOF, Assignor has caused this instrument to be duly executed under seal as of the date first above written.

NMB PARTNERS, L.P., a South Carolina limited partnership

BY:    CHAPMAN   PROPERTIES   OF
FLORENCE, INC., a South Carolina corporation, its sole general partner

BY: _____
ELTING L. CHAPMAN III,
President

_____
Witness

_____
Witness

STATE OF SOUTH CAROLINA

COUNTY OF ___HORRY___

Personally appeared before me _Clay D. Brittain,_ III made oath that (s)he saw the within named NMB Partners, L.P., a South Carolina limited partnership, by Chapman Properties of Florence, Inc., a South Carolina corporation, its sole general partner, by Elting L. Chapman III, its President, sign, seal and deliver the within instrument, and that Deponent together with _Patricia V. Lewis_ witnessed the execution thereof.

Sworn to and subscribed before
me this 18th day of September,
1997

_____
Notary Public

[NOTARIAL SEAL]

Commission Expiration Date:

_10-11-98_

BOOK 1975 PAGE 234

Exhibit A

**PARCEL "A-1"**

ALL AND SINGULAR, all that certain piece or tract of land, lying and being situate in North Myrtle Beach, Little River Township, Horry County, South Carolina and being more particularly described as follows:

Beginning at a half inch rebar (found), this being the common corner of this property and the A.F. McLean, Jr., et al. property to which reference is made to Plat Book 109, Page 164, RMC office for Horry County, located a distance of 390.19 feet Southwest of the intersection of 6th Avenue South (State Road S-26-358) and the Western right-of-way of U.S. Highway 17; thence from said beginning runs with the Western right-of-way of said U.S. Highway 17, S48° 07'22"W 126.93 feet to a PK nail (set).  Said point being the Southeast corner of a (1.09 Acres±) parcel referenced as Parcel "B-2" on a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell Associates of NMB, Inc.; thence leaves the right-of-way of said U.S. Highway 17 and runs with said (1.09 Acres±) parcel the following six calls, N41° 52'38"W 3.49 feet to a scribe mark in concrete (set), a curve with a deflection to the left having a radius of 39.50 feet and a chord, bearing and distance of N19°52'16"E 37.27 feet to a half inch rebar (set), N41°52'38"W 44.27 feet to a half inch rebar (set), N22°40'08"W 39.82 feet to a half inch rebar (set), N41°52'38"W 97.00 feet to a PK nail (set), S48°07'22"W 245.00 feet to a half inch rebar (set).  Said point being the Northeast corner of a (0.89 acre±) parcel referenced as Parcel "B-1" on a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell and Associates of NMB, Inc.; thence runs with said (0.89 acre±) parcel S48°07'22"W 150.29 feet to a scribe mark on concrete (set).  Said point being situate in the Eastern right-of-way of access easement for Grant Drive;  thence runs with said access easement N18°03'57W 47.13 feet to a half inch rebar (set).  Said point being situate at the intersection of and in the Eastern right-of-way of access easement for Grant Drive and Grant Drive thence runs with said Grant Drive N18°03'57"W 372.58 feet to a half inch rebar (set).  Said point being the Southeastern corner of the Mildred C. Holmes property to which reference is made to Deed Book 467, page 832 and Plat Book 9, page 171, RMC Office for Horry

1

County; thence runs with the said Holmes property N18°05'24"W 318.45 feet to a half inch rebar (found). Said point being the Southern corner of NMB Partners, L.P. Parcel "2" to which reference is made to Plat Book 140, page 35, RMC Office for Horry County; thence runs with said Parcel "2" the following two calls, N72°03'41"E 140.00 feet to a half inch rebar (found), N56°44'41"E 248.60 feet to a PK nail (set), said point being situate in the Southern right-of-way of 6th Avenue South (State Road S-26-358); thence runs with said Southern right-of-way of 6th Avenue South the following three calls, S56° 32'41"E 133.44 feet to a half inch rebar (set), S59°32'28"E 20.23 feet to a half inch rebar (set), a curve with a deflection to the left, having a radius of 193.50 feet and a chord, bearing and distance of S71°34'25"E 60.78 feet to a half inch rebar (set). Said point being the Northwest corner of Grand Strand Lodge No. 392 Property to which reference is made to Plat Book 143, page 51, RMC Office for Horry County; thence leaves the Southern right-of-way of 6th Avenue South (State Road S-26-358) and runs with the Grand Strand Lodge Property the following two calls, S30°44'12"W 58.99 feet to a half inch rebar (set), S21°28'59"E 188.88 feet to a half inch rebar (found). Said point being the Northwest corner of the said A.F. McLean Jr., et al. property; thence runs with the McLean property S21°29'15"E 411.25 feet to the POINT AND PLACE OF BEGINNING containing 7.87 acres± and being shown on the survey.

The plat referenced herein is entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97, last revised 9-9-97, by Powell Associates of NMB, Inc., recorded 9-11-97 in Plat Book 150 at page 26, records of the Horry County RMC.

**Derivation:** This being a portion of the property acquired by Mortgagor by deed of Ruth Barnwell Tallant, et al. recorded in Deed Book 1900 at page 63 and by deed of Sally Barnwell Chapman, et al. Recorded in Deed Book 1900 at page 66, and being all the property acquired by Mortgagor by deed of the Grand Lodge of Masons recorded in Deed Book 1900 at page 69, records of the Horry County RMC.

## PARCEL "B-2"

ALL AND SINGULAR, all that certain piece or tract of land, lying and being situate in North Myrtle Beach, Little River Township, Horry County, South Carolina and Being more particularly described as follows:

Said point of beginning at a PK Nail (Set) this being the common

2

corner of this property and a (0.89 acres±) Parcel referenced as Parcel "B-1" on a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell Associates of NMB, Inc., located southwest 716.19 feet, as measured along the western right-of-way of U.S. Highway 17 from the intersection of the southwest right-of-way of 6th Avenue South (State Road S-26-358) and said right-of-way of U.S. Highway 17, thence from said beginning leaves the Western right-of-way of US Highway 17 and runs with the said (0.89 acres±) Parcel, N 41°52'38" W 200.00 feet to a half inch rebar (set), said point being the Northeast corner of said (0.89 Acres±) Parcel and situate on the Southern property line of a 7.83 acres±) Parcel, referenced as Parcel "A-1" of a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell Associates of NMB, Inc.  Thence runs with said (7.83 acres±) Parcel the following six calls, N 48°07'22" E 245.00 Feet to a PK Nail (Set), S 41°52'38" E 97.00 feet to a half inch rebar (Set), S 22°40'08" E 39.82 feet to a half inch rebar (Set) S 41°52'38" E 44.27 Feet to a half inch rebar (Set). a curve with a deflection to the right, having a radius of 39.50 feet and a chord, bearing and distance of S19°52'16" W37.27 feet to a scribe mark in conc. (Set), s 41°52'38" E 3.49 Feet to a PK Nail (Set), said point being situate in the Western right-of-way of US Highway 17, thence runs with the Western right-of-way of US Highway 17 S 48°07'22" West 199.07 feet to the POINT AND PLACE OF BEGINNING containing 1.09 acres± and being shown on the survey.

The plat referenced herein is entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97, last revised 9-9-97, by Powell Associates of NMB, Inc., recorded 9-11-97 in Plat Book 150 at page 26, records of the Horry County RMC.

**Derivation:** This being a portion of the property acquired by Mortgagor by deed of Ruth Barnwell Tallant, et al. recorded in Deed Book 1900 at page 63 and by deed of Sally Barnwell Chapman, et al. Recorded in Deed Book 1900 at page 66, records of the Horry County RMC.

### EASEMENT PARCEL (Storm Water Retention)

A perpetual, non-exclusive easement (appurtenant to Parcel A-1 above) over, under, and across the following described premises for the retention of storm water drainage and for the construction, maintenance, and repair of improvements designed to receive and retain storm water drainage:

3

ALL AND SINGULAR, all that certain piece, parcel or strip of land, situated, lying and being in North Myrtle Beach, Little River Township, Horry County, South Carolina and being more particularly described as follows:

Beginning at a PK Nail (Set) this being the southeast corner of NMB Partners, L.P., Parcel "2" to which referenced is made to Plat Book 140, Page 35, RMC Office for Horry County, also being the Northeast corner of a (7.83 acres±) parcel, referenced as Parcel "A-1" of a plat entitled "North Strand Marketplace" ALTA/ACSM Land Survey dated 7-25-97 by Powell Associates of NMB, Inc., located southeast 330.34 feet, as measured along the Southwest right-of-way of 6th Avenue South (State Road S-26-358), from the intersection of the Southern right-of-way of Ashland Avenue and said right-of-way of 6th Avenue South, thence from said beginning leaves said right-of-way of 6th Avenue South and runs with said (7.83 acres±) parcel the following two calls:  S 56°44'41" W 248.60 feet to a half inch rebar (found), S 72°03'41" W 140.00 feet to a half inch rebar (found).  Said point being the Northwest corner of said (7.83 acres±) parcel and situate on the Southeast property line of the Mildred C. Holmes property to which reference is made to Deed Book 467, Page 832 and Plat Book 9, Page 171, RMC Office for Horry County, thence runs with the said Holmes property N 18°05'24" W 43.00' to a point, thence runs across said parcel "2" the following two calls:  N 72°03'41" E 134.34 feet to a point, thence N 56°44'41" E 226.59 feet to a point, said point being situate on the said right-of-way of 6th Avenue South, thence runs with said right-of-way of 6th Avenue South S 53°55'31" E 45.96 feet to the POINT AND PLACE OF BEGINNING containing 0.37 Acres±.

The plat referenced herein is entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97, last revised 9-9-97, by Powell Associates of NMB, Inc., recorded 9-11-97 in Plat Book 150 at page 26, records of the Horry County RMC.

**Derivation:** This being a portion of the property acquired by Mortgagor by deed of Ruth Barnwell Tallant, et al. recorded in Deed Book 1900 at page 63 and by deed of Sally Barnwell Chapman, et al. recorded in Deed Book 1900 at page 66, records of the Horry County RMC.

4

## ACCESS EASEMENT PARCEL (Ingress and Egress)

A perpetual, non-exclusive, divisible easement for ingress and egress (appurtenant to Parcel A-1 and Parcel B-2 described above) over the following described two parcels:

ALL AND SINGULAR, all that certain piece, parcel or strip of land, situated, lying and being in North Myrtle Beach, Little River Township, Horry County, South Carolina and being more particularly described as follows:

Beginning at a scribe mark in conc. (set) this being the Southern corner of a (0.89 acres±) parcel referenced as Parcel "B-1" on a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell Associates of NMB, Inc., located Southwest 954.73 feet, as measured along the Western right-of-way of U. S. Highway 17, from the intersection of the Southwest right-of-way of 6th Avenue South (State Road S-26-358) and said right-of-way of U. S. Highway 17, thence from said beginning runs with said right-of-way of U. S. Highway 17 S 48°07'22" W 43.72 feet to a half inch rebar (found). Said point being the Southeast corner of the Mildred C. Holmes property to which reference is made to Plat Book 57, Page 34, RMC Office for Horry County, thence leaves said right-of-way of U.S. Highway 17 and runs with said Holmes property a distance then continues with the property of Edens North Port Partners, to which reference is made to TMS 144-09-06-095 and TMS 144-09-06-075, N 18°03'57" W 283.38 feet to a point, said point being situate in the Western right-of-way of Grant Drive, thence N 71°54'57" E 40.00 feet to a half inch rebar (Set), said point being situate in the Eastern right-of way of Grant Drive and the Western property line of a (7.83 acres±) parcel referenced as parcel "A-1" of a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97 by Powell Associates of NMB, Inc., thence runs with said (7.83 acres±) parcel S 18°03'57" E 47.13' to a scribe mark in conc. (Set), said point being the Northwest corner of said (0.89 acres±) parcel, thence runs with said (0.89 acres±) parcel S 18°03'57" E 218.61 feet to the POINT AND PLACE OF BEGINNING containing 0.28 acres±.

**Derivation:** This being the easement acquired by Mortgagor from Edens North Port Partners by Easement recorded November 7, 1996 in Deed Book 1900 at page 74, office of the Horry County RMC.

5

BOOK 1975 PAGE 239

ALL AND SINGULAR, all that certain piece, parcel or strip of land, situated lying and being in North Myrtle Beach, Little River Township, Horry County, South Carolina and being more particularly described as follows:

BEGINNING at a scribe mark in conc. (set) this being the Southern corner of a (0.89 acres±) parcel of which this additional access easement is a part thereof, referenced as parcel "B-1" on a plat entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7/25/97 by Powell Associates of NMB, Inc., also being the intersection of the Western right-of-way of U. S. Highway 17 with the Eastern right-of-way of access easement for Grant Drive, thence from said beginning leaves the said right-of-way of U.S. Highway 17 and runs with the said right-of-way of access easement for Grant Drive and the Western property line of said (0.89 acres±) parcel N 18°03'57" W 85.57 feet to a point, thence leaves said right-of-way of access easement for Grant Drive and runs through said (0.89 acres±) parcel the following three calls, S 41°52'38" E 62.27 feet to a point, a curve with a deflection to the left, having a radius of 34.50 feet and a chord, bearing and distance of N 73°29'45" E 29.62 feet to a point, S 41°52'38" E 3.32 feet to a point, said point being situate in said right-of-way of U. S. Highway 17, thence runs with said right-of-way of U. S. Highway 17 S 48°07'22" W 61.31 feet to the point and place of beginning containing 0.03 acres±.

**Derivation:** This being a portion of the property acquired by Mortgagor by deed of Ruth Barnwell Tallant, et al. recorded in Deed Book 1900 at page 63 and by deed of Sally Barnwell Chapman, et al. Recorded in Deed Book 1900 at page 66, records of the Horry County RMC.

The plat referenced herein is entitled "North Strand Marketplace" ALTA/ACSM Land Title Survey dated 7-25-97, last revised 9-9-97, by Powell Associates of NMB, Inc., recorded 9-11-97 in Plat Book 150 at page 26, records of the Horry County RMC.

6

## EXHIBIT "B"
## RENT ROLL
## NORTH STRAND MARKETPLACE SHOPPING CENTER
## NORTH MYRTLE BEACH, SOUTH CAROLINA

| Tenant | Business Type | SF | Term | Commencement |
|--------|---------------|-----|------|--------------|
| Winn-Dixie Charlotte, Inc. | Grocery Store | 44,000 | 20 years | 8/14/97 |
| S&L Enterprises, Inc. (Seaside Fish & Chips) | Restaurant | 1,200 | 7 years | 8/14/97 |
| VPI of NMB, Inc. (Movie Max) | Video Rental | 4,800 | 7 years | 8/18/97 |
| Specials, Inc. (Marketplace ABC) | Package Store | 1,200 | 5 years | 7/16/97 |
| Branch Banking & Trust Company of South Carolina | Bank Site | Outparcel | 20 years | 9/1/97 |

30834.0034.9*C:\DMS\R_BERRY\0060287.01
Rev. September 15, 1997

BOOK 1975 PAGE 241

241