UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In Re: | \| | Proceedings under Chapter 11 |
| WINN-DIXIE STORES, INC., et al. | \| | Consolidated Case No. 3:05-bk-03817-JAF |
| Debtors. | \| | Jointly Administered |
| ---------------------------------------------------- | | |

## RESPONSE TO DEBTORS' OBJECTION TO FLORIDA TAX CLAIMS AND MOTION FOR ORDER DETERMINING TAX LIABILITIES[1] OF:

Abe Skinner, as Collier County Property Appraiser
Kristina Kulpa, as Hendry County Property Appraiser
Alvin Mazourek, as Hernando County Property Appraiser
Ed Havill, as Lake County Property Appraiser
Francis Akins, as Levy County Property Appraiser
Laurel Kelly, as Martin County Property Appraiser
Miami-Dade County, Florida, a Charter County, through Marcus
Saiz de la Mora, Acting Miami-Dade County Property Appraiser
Gary Nikolits, as Palm Beach County Property Appraiser
David Johnson, as Seminole County Property Appraiser
Sharon Outland, as St.Johns County Property Appraiser
Ronnie Hawkins, as Sumter County Property Appraiser
Volusia County, Florida, a Charter County, through
Morgan Gilreath, as Volusia County Property Appraiser

## INTRODUCTION

The Motion reminds one of the proud mother, watching her Johnny parade with his regiment, who complains that the rest are all out of step with him.   What is the statistical probability that a company whose business it is to obtain reductions in taxes for a contingent fee is right, and the Property Appraisers of all sixty-seven Counties, each acting independently, are wrong in most of their assessments of Winn-Dixie's real and personal property?   Far greater than the odds against winning the Florida Lottery.   Let us therefore consider who is out of step with whom.

First, it is not at all clear whether the Order of January 19, 2007,  (Docket No. 14815, referred

---

[1]    Docket No. 10046, referred to herein as "the Motion"

1

to herein as the "Order") was intended to make the sixty-seven Property Appraisers of Florida parties

to the bankruptcy, and if so, as what.   This Court was absolutely correct in the Order, recognizing

that the Tax Collectors are not the proper officials to defend the assessments, as they have contended

since the beginning.  The Debtors should logically have commenced an adversary proceeding against

each Property Appraiser to challenge the assessments within that County.   Venue in those actions

would logically have been in the District and Division where the property is located[2].  Under Florida

law, only the circuit court in the county where the property is located has jurisdiction and venue to

hear an assessment challenge.  §194.171(1), Florida Statutes.

Second, several Property Appraisers represented by the undersigned were unaware that they

were being brought into this proceeding or risking default by not participating, by the statement on

Page 14 of the Order.   They either were not furnished a copy of the Order or failed to grasp its

substance.  The Court should not grant relief against the assessments of any Property Appraiser who

fails to respond to the invitation in the Court's Order of January 19, 2007 without such Property

Appraiser being served an appropriate Motion and a specific Notice of Hearing.

## I.  THE COURT SHOULD SUMMARILY DENY THE MOTION

### A.  The Motion fails to state a claim upon which relief can be granted under Florida law.

The Court is bound to apply the same provisions of law as is the Property Appraiser.[3]   In a

---

[2]   See, e.g., *Feltman v. Richard Crotty, as Orange County Property Appraiser (In Re Glenbeigh Hospital of Miami)*, Adversary Proceeding No. 94-1091-BKC-AJC-A, challenging the assessment of real property in Orange County in Bankruptcy Court for the Southern District of Florida.   At the request of undersigned counsel for the Orange County Property Appraiser, Hon. A. Jay Cristol applied 28 U.S.C. §1409(d) and §1412, and Fed.R.Bankr.P. 116(b)(1) and transferred the adversary proceeding to the Bankruptcy Court for the Middle District of Florida, Orlando Division, where the property, parties, witnesses and counsel were all located.  Had the Motion in this case been brought as an adversary proceeding, counsel would request a change of venue..

[3]    *Parrish v. Fayetteville Motel Enterprises, Inc., (In Re Servico*), Case 93-8461-CIV-Hurley, Order Reversing Reappraisal of Bankruptcy Court, Remanding and Closing Case, dated

judicial challenge to a Florida tax assessment, the taxpayer must allege and prove more than a mere difference of opinion as to the value of the property.  The taxpayer must allege a failure by the Property Appraiser to properly consider one of the eight criteria in §193.011, Florida Statutes.[4]  The taxpayer must prove that the Property Appraiser failed to properly consider one of those statutory factors, or it must prove the value of the property by 'clear and convincing evidence.'  §194.301, Florida Statutes.   The taxpayer may alternately allege that in valuing the subject property, the Property Appraiser's assessment is arbitrarily based on appraisal practices which are different from the appraisal practices generally applied by the property appraiser to comparable property within the same class and within the same county.   The Motion fails to allege any such delicts by any of the 67 Florida Property Appraisers.

The Motion is fatally defective because it is wholly conclusory and fails to state the data upon which ATL's conclusions are based.[5]

**B. The Motion is not based on an objective appraisal made in accordance with Florida and Federal law.**

The basis of the Motion is Exhibit "A," prepared by ATL, which suggests assessed values for real property either owned by the Debtors or in which the Debtors are a tenant, and tangible personal property of the Debtors.

Neither ATL nor its general partner, TECH Management, LLC, are registered with the Florida Secretary of State to do business in the State of Florida, which the undersigned pointed out

---

June 15, 1995.  (D.C. S.D. Florida 1995).   The Bankruptcy Judge, Hon. A. Jay Cristol, simply determined what he felt the Holiday Inn motel in Fayetteville, North Carolina was worth, without consideration of the requirements of North Carolina assessment law, e.g. requiring only octennial appraisal of property.  The Hon. Daniel T. K. Hurley, District Judge, reversed.   The undersigned counsel represented the Cumberland County, North Carolina taxing authorities in that proceeding.

[4]  *Walker v. Trump*, 549 So.2d 1098, (Fla. 4th. DCA 1989) (Yes, that Donald Trump), *Keith Investments, Inc. v. James*, 220 So.2d 695 (Fla. 4th DCA 1969)

[5]  *Walters v. State Road Department*, 239 So.2d 878 (1st DCA 1970), holding that conclusory testimony is inadmissible to prove market value of property.

to that company by letter of September 12, 2005. Despite this actual notice, ATL has such little regard for the laws of Florida that it has not bothered to qualify.  All of its activities on behalf of the Debtor, including valuing the properties, have therefore been unlawful.

No principal of ATL is registered as an appraiser with the Florida Department of Business and Professional Regulation as required by Chapter 475, Part II, Florida Statutes.  Florida law prohibits appraising real property for another and for compensation without such registration.

It is also strictly against Florida law and a crime to accept an appraisal assignment for a contingent fee. §475.624(17), Florida Statutes.  Because of this provision of Florida law, the attachments to the Motion containing ATL's suggested values of real estate are not lawful appraisals and should be disregarded by this Court.  An unlicensed person who appraises real property in Florida for another and for a compensation violates Florida law.  §475.612, F.S.

The Debtors' Motion to Employ Assessment Technologies dated February 2, 2006 (Docket No. 5608) contains a copy of the contingent-fee contract between the Debtors and ATL whereby ATL is to receive a thirty-five percent contingent fee of all taxes lowered through order of this Court. ATL is hardly an unbiased appraisal firm.

It is also significant that although Exhibit "C" to the Motion refers to work which ATL apparently farmed out to other companies, the Debtors have not submitted any appraisals which meet the Federally-mandated requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) by objective, licensed Florida appraisers in support of the Motion.[6]

Unless the Court summarily denies the Motion, there is no way that the Court can decide the case without an adversarial, evidentiary hearing relating to the property within each taxing

---

[6]    See the Federal Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 12 U.S.C. §§ 3331-3351, which mandated USPAP.   Under USPAP, if a person is acting as an advocate, he or she must so state.  An appraisal report does not comply with USPAP if it fails to disclose the data upon which the appraiser's conclusion is based.  See Standard 2 (Real Property Reporting) and Standard 8 (Personal Property Reporting).  It is also notable that the ATL report fails to contain the certifications required by USPAP.

jurisdiction.[7] If the Court finds the Motion to be facially sufficient, it should declare that the Motion is, in effect, the initial pleading in an adversary proceeding, set the normal timetable for discovery, permit motions related to venue, and set an evidentiary final hearing or hearings relative to the challenged assessments in each county.

## II. METHOD OF ASSESSMENT - TANGIBLE PERSONAL PROPERTY

The Florida Department of Revenue ("FDOR") annually prescribes present worth tables for use by Property Appraisers in establishing the value of all taxable tangible personal property within the County.   These tables are found in Chapter 12D-51 of the Florida Administrative Code. Prescriptions of the FDOR have a strong presumption of correctness.[8]  These tables are calibrated according to the industry in question.   There are two tables, one to account for inflation in the reproduction cost of the property since it was acquired, and the other to allow for losses in value from all sources (depreciation).   The Property Appraisers apply the appropriate factors from the tables to the reported historical cost of the tangible personal property.  It would be an impossibility for the Property Appraisers to value tangible personal property without the use of such tables.  An example of the useful lives and present worth tables as originally promulgated in the 1997 Rule is attached as Exhibit "B."  To use these tables, the Property Appraiser would first find the industry in which the property is used, in this instance, retail trade, find that the FDOR has prescribed a 9 year useful life for that class of property and apply the factors from the table on the first page.   The table in the 9 year life column shows a percentage to be applied to current replacement cost (from another table, not shown) of from 91% for property 1 year old to a residual of 20% for property 9 years old.

Debtors' beef is not so much with the Property Appraisers, as with the FDOR.  The FDOR is always willing to consult with representatives of industry and receive information which it uses

---

[7]    *Palm Beach Mall, Inc. v. Walker*, 585 So.2d 1149 (Fla. 4th DCA 1991).

[8]    *Havill v. Scripps-Howard Cable Co.*, 742 So.2d 210 (Fla. 1999), *Oldham v. Foremost Dairies, Inc.*, 128 So.2d 586 (Fla. 1961).

5

in prescribing the useful lives for tangible personal property.

Attached as Exhibit "A" is an excerpt of the report of a massive study performed by BCRI, Inc. for the FDOR in 2003. That study well describes the methodology which the FDOR uses in establishing the present-worth tables. See the summary page at 59 for BCRI's conclusion supporting use of the 9 year useful life for retail trade fixtures.

The undersigned presented a similar study by BCRI but specifically relating to telecommunications equipment to the Delaware Bankruptcy Court in defending the *Cable & Wireless* Florida tangible personal property assessment challenge, which the Court considered in rejecting Cable & Wireless' tax agent's opinions, based on such data as bankruptcy sales of similar property.[9]

Wal-Mart Stores, Inc. mounted a massive challenge to the use of the FDOR tables to value its store fixtures and other tangible personal property, filing suit in numerous Counties throughout the State. It contended that its values should be established by the prices of shelving on the used equipment market rather than through application of the Present Worth Tables prescribed by the FDOR. This is similar to ATL's claimed methodology in the case of the Debtors' tangible personal property. The trial Court upheld the FDOR tables and the assessments, the Fifth District Court of Appeal reversed, and the Florida Supreme Court quashed the decision of the District Court of Appeal, Fifth District, upholding application of the Present Worth Tables as the basis for assessing tangible personal property in Florida.[10]

## III. METHOD OF APPRAISAL - REAL PROPERTY

---

[9] *See, In Re Cable & Wireless USA, Inc*., Order Denying Objections to Taxing Authorities' Claims, 331 B.R. 568 (Bkrtcy. Del. 2005) in which the undersigned represented most of the same Property Appraisers as here. The taxpayer in that case challenged assessments of its tangible personal property all over the United States. The Bankruptcy Judge held an evidentiary hearing on the Objections. The tax agent in that case was also working for a contingent fee.

[10] *Mazourek v. Wal-Mart Stores, Inc.*, 831 So.2d 85 (Fla. 2002), quashing *Wal-Mart Stores, Inc. v. Mazourek*, 778 346 (Fla. 5th DCA 2000) and approving Wal-Mart Stores, Inc. v. Todora, 791 So.2d 29 (Fla. 2d DCA 2001)..

The term "just valuation" as used in the Florida Constitution is legally synonymous with market value, i.e., the amount a willing, non-necessitous buyer would pay a willing, non-necessitous seller for the property in question. Rule 12D-1.002(5), Florida Administrative Code. If the Property Appraiser makes a standard appraisal using normal techniques, he or she has necessarily considered all, and used some of the mandatory factors in §193.011, F.S.[11]

Some of the Debtors' challenges to real property involve the assessments of properties in which Winn-Dixie is only a tenant. In fact, Winn-Dixie is not the only tenant in many of the properties. In 11 U.S.C. 1123, Congress enumerated what debtors can expect from a Chapter 11 plan. This does not include relief to property owners who are not bankrupt. As to all disputed tax payments, Winn-Dixie was given the authority under Code Section 365 to accept or reject the leases, thereby acknowledging responsibility for the payment of the disputed taxes as additional rent.[12] It is up to the landlords to claim the amount of property taxes due as additional rent, and the Court is free to allow or disallow any portion of the claims of the creditor-landlord, but not to reduce the assessed value of the property as a lagniappe to the property owner. Despite the expansive language of Code Section 505, it does not extend to property taxes owed by someone other than the Debtor.

Florida law permits a tenant to maintain a tax assessment challenge only when the tenant is completely responsible for the tax (i.e., a stand alone property) and the tenant has the written consent of the landlord to commence the action. §194.181(1), F.S.[13] Winn-Dixie lacks standing to challenge the assessment of those properties in which it is a tenant absent meeting those requirements before

---

[11]    *Bystrom v. Valencia Center, Inc.*, 432 So.2d 108 (Fla. 3d DCA 1983).

[12]    See this Court's Order of May 6, 2005, extending to September 19, 2005, the time for the Debtor to assume or reject the leases of non residential property.

[13]    "(1) The plaintiff in any tax suit shall be: (a) The taxpayer or other person contesting the assessment of any tax, the payment of which he or she is responsible for under a statute or a person who is responsible for the entire tax payment pursuant to a contract and has the written consent of the property owner, or the condominium association, cooperative association, or homeowners' association as defined in s. 723.075 which operates the units subject to the assessment..."

bringing the Motion. The Motion does not identify those numerous properties where the Debtors are simply tenants and fails to attach the property owners' written authorization to challenge the assessments of those properties.[14]

Florida law requires property to be appraised at its highest and best legal use, not its present use. Thus, when property in downtown Coral Gables was zoned for high-rise office use but was subject to a long-term lease to Publix, the Court directed the Property Appraiser to ignore the factor "present use of the property" and to appraise it for tax purposes at its highest and best lawful use.[15] Unfortunately, the Debtors have failed to provide any information as to whether ATL valued its properties at highest and best or present use.

Florida law prescribes that a tax assessment must include the interests of both landlord and tenant. That is to say, Florida is a market rent rather than a contract rent state. So, where property is subject to a long-term, below market lease, the Florida property appraiser is required to ignore the fragmenting of interests and to appraise the property in fee simple as if unencumbered.[16] The Motion fails to disclose the data upon which the conclusions as to real property assessments are based, so it is not possible to tell whether ATL has capitalized contract rent rather than market rent.

## IV. THE COURT LACKS SUBJECT MATTER JURISDICTION

---

[14] Were this an adversary proceeding, it is respectfully suggested that as to non-owned real property, a Motion to Dismiss for lack of subject matter jurisdiction under FRCP 12(b)(1), incorporated into Bankruptcy Rule 7012(b), would be appropriate. *In Re Federated Department Stores*, 240 BR 711 (Bkrtcy S.D.Ohio 1999)    The legislative statements accompanying Code Section 505 make clear that the section "authorizes the bankruptcy court to rule on the merits of any tax claim involving an unpaid tax, fine, or penalty relating to a tax, or any addition to a tax, of the debtor or the estate." 124 Cong.Rec. H 11110 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards introducing the House amendment)(emphasis added), reprinted in, 1978 U.S.C.C.A.N. 5787, 6436, 6490.

[15] *Bystrom v. Valencia Center, Inc.*, supra.

[16] *Schultz v. TM Florida-Ohio Realty Ltd. Partnership*, 577 So.2d 573, (Fla. 1991)

This motion was not brought within 60 days of certification of the 2004, 2005 and 2006 tax rolls for collection. Debtors failed to attach payment for receipt the taxes admitted to be due. .Debtors have failed to comply with subsection (5) of Section 194.171, F.S.  Section 194.171, F.S., is a statute of nonclaim, not a statute of limitation [17]   The difference is that a statute of nonclaim is part of a taxpayer's cause of action and must be affirmatively pleaded, which Debtors did not.   The Court must apply Florida state law.  Section 505 of the Code is unconstitutional and unconstitutional as applied to a challenge to Florida property taxes in other than a Florida state court.

## V. SOVEREIGN IMMUNITY PRECLUDES REDUCING PROPERTY TAXES

The Property Appraisers are Constitutional officers wholly separate and apart from the Tax Collectors of Florida.  No Property Appraiser has filed a claim in this case, thereby waiving sovereign immunity, and each Property Appraiser asserts that the doctrine of sovereign immunity bars relief as to Florida ad valorem taxes.

The test of whether a claim is barred by sovereign immunity is stated in *Hufford v. Rodgers*, 912 F.2d 1338 (11th. Cir. 1990) –  First, how state law defines the entity? Second, what degree of control the state maintains over the entity? Third, where funds for the entity are derived from? Fourth, who is responsible for the judgment against the entity?

Of these factors, the fourth is of the utmost importance.  To lower property taxes directly impacts the treasury of the State of Florida.  Although the funds raised through assessment and collection of taxes within each County school district are in part the basis for funding of public schools, a portion of that funding is also derived from the State of Florida under the Florida Education Finance Program (FEFP).  (§1011.62  F.S.)  Each local School Board is required to levy a uniform millage, called the "Required Local Effort" (RLE).  Although the RLE millage is the same

---

[17]    *Ward v. Brown*, 894 So.2d 811 (Fla. 2004); holding that no matter how an action is characterized (declaratory relief, suit for refund, etc.) the 60 day statute of nonclaim is effective; *Suber v. Pultz*, 889 So.2d 947 (Fla. 2004), holding the failure to attach the receipt for taxes admitted to be due deprives the court of subject-matter jurisdiction.

in each county, the amount of money generated per full time equivalent student (FTE) differs according to the number of FTE's and assessed value in each County. To put it another way, in a property-poor, pupil-rich county, the RLE will generate fewer dollars per FTE than in a property-rich, pupil-poor county. Each year, the Legislature determines the expenditure for each FTE, which is uniform in every County. The State makes up the difference between the taxes generated by the RLE and the total expenditure per FTE.

To put it another way, imagine sixty-seven water glasses on a counter, each representing a County. The RLE is poured into each glass. In some glasses representing pupil-rich, property-poor counties such as Glades and Bradford, the taxes generated by the required local effort will barely cover the bottom of the glass and State funds will mostly fill it. In others, such as Collier, the RLE almost fills the glass, requiring only a few drops from the State to fill it to the brim.

A judgment of a court reducing an assessment reduces the funds generated by the RLE, necessarily increasing the State funds to be paid to the School Board in that county. **Therefore, the State is responsible for the payment of a portion of any judgment which results from a reduction in the assessed value of property and the property taxes that would otherwise be payable**. Any reduction in an assessment by this Court would constitute a direct assault on the Treasury of the State of Florida, dollar for dollar for the funds represented by the Required Local Effort. This meets the fourth, and crucially important, *Hufford* test.

As to the remaining three tests, the office of Property Appraiser is created by the State Constitution. In some Charter counties, such as Miami-Dade and Volusia, the Property Appraiser is an officer under the Charter. Funds for the operation of the office are provided by the Counties, although the Property Appraiser's budget is established solely by the FDOR.

The FDOR exercises almost total control over the Property Appraiser and the performance of his or her duties. Pursuant to §195.002, Florida Statutes, the FDOR is charged with supervision of the office of the 67 Property Appraisers who assess property in Florida for ad valorem taxation. This is more than just a goal; in fact the FDOR has the power to sue any Property Appraiser to force

compliance with the requirement that the tax rolls meet the just (market) value standard and has done so from time to time.[18]

FDOR supervision includes the following:

a.  The responsibility for oversight of the duties of each property appraiser's office, including annual review of each county's tax roll, and bi-annual in-depth review of those tax rolls, both for uniformity in assessment and to ascertain compliance with the Constitutional mandate that the Property Appraiser assess all property at 100% of just value. (§§195.0012, 195.002, F.S.)

b.  The responsibility for direct aid and assistance to the Property Appraisers and Tax Collectors in the performance of their respective duties. (§195.002, F.S.)

c.  The conduct of training for Tax Collectors, Property Appraisers and their employees leading to certification necessary to the position of Property Appraiser or Tax Collector or for continuation of employment in a property appraiser's or tax collector's office.  (§195.002)

d.  The responsibility to promulgate Standard Measures of Value and a Manual of Instructions to be used by all Property Appraisers in the assessment process. (§§195.032, 195.062, F.S.)

e.  Responsibility for review of each tax roll prepared by each property appraiser and the duty to formally approve or disapprove each tax roll.  Approval or disapproval may be based on the requirement of  inter-jurisdictional and extra-jurisdictional uniformity in assessment or the requirement of assessment at just value.  No county or other taxing body has any supervisory rights or duties with respect to the tax roll.  (§§193.1142, 195.096, F.S.)

f.  The duty to propound binding rules and regulations which the property appraisers must follow in the assessment process and in the administration of their offices. (§195.027, F.S.)

g.  The responsibility to classify and sub-classify property for use in the assessment

---

[18]    Section 195.092, F.S.  See, for example, *State, Department of Revenue v. Markham*, 426 So.2d 555 (Fla. 4th DCA 1983), *Department of Revenue v. Johnston*, 442 So.2d 950 (Fla. 5th DCA 1983) *Redford v. Department of Revenue*, 478 So.2d 808 (Fla. 1985)

process and to oversee the proper classification thereof as part of the roll approval process. (§195.073, F.S.)  The list of FDOR-approved codes is found in Rule 12D-8.008 of the Florida Administrative Code for real estate and 12D-8.009 for tangible personal property.

h.  The duty to review, amend and approve each annual budget for each property appraiser and tax collector.  Even though the County Commission funds the budget of the Property Appraiser's office, the County Commission has no control over that budget. (§195.087, F.S.) Should the County disagree with the Property Appraiser's budget, its sole remedy is to appeal the approved budget to the Governor and Cabinet, sitting as the Florida Administration Commission. (§195.087, F.S.)

I.  The duty to pass upon and order (or decline to order) refunds based on changes in ad valorem assessments made by the Property Appraiser. (§197.182, F.S.)

j. the duty to prescribe all forms to be used by the Property Appraisers and tax collectors in assessing property and collecting taxes.  (§195.022, F.S.)  The Property Appraiser is precluded from using his or her own forms without Department approval.  The Department of Revenue also supplies maps and aerial photographs to the Property Appraiser's office at its costs. (§195.022, F.S.)

k.  The Governor has the duty to appoint a Performance Review Panel to review the performance of a Property Appraiser whose tax rolls are not approved for two consecutive years. This can result in the loss of the CFA designation and special qualification salary.  (§ 193.1147, F.S.)

l.  The Property Appraiser is not permitted to contract with outside vendors for assessment services or systems, who are not on the Approved Bidder's List of the FDOR. (§195.095, F.S.)  This is to insure uniformity in data processing systems throughout the State so that when tax rolls each July for approval by the Department, there will be uniformity in the systems, data and formats for each Property Appraiser's office throughout the State.  The Value Adjustment Board, an administrative agency which has the power to reduce assessments, may not hold its value hearings as to individual assessments until the Department has approved the tax roll each year.

(§194.032[1][a], F.S.)

   m.  In each case where a Property Appraiser is made a party to a lawsuit contesting an assessment, the Executive Director of Department the Department of Revenue must either be made a party (where an allegation is made that the assessment violates the Florida Constitution), or must be notified by service of the litigation in order to be given the opportunity to participate therein. (§194.181, F.S.)

   n.  The compensation of Florida's Property Appraisers and Tax Collectors is not locally determined, but is statutorily prescribed and is uniform for all Property Appraisers throughout the State, based on the population of the jurisdiction each serves.  No local jurisdiction may set the compensation. (§§145.09, 145.10)

   The *Hufford* test is therefore satisfied and the Court should decline to grant the Debtors' objections to the claims for property taxes.  None of the bankruptcy cases that have found that the Property Appraisers did not enjoy sovereign immunity followed the *Hufford* analysis.  Those Courts simply found that a waiver by the Tax Collector bound the Property Appraiser or that the assessment challenge was an in rem action which did not offend the State's sovereign immunity.

## CONCLUSION

   The Motion is facially insufficient to state a claim upon which relief may be granted to lower any of the assessments of the real or tangible personal property stated in the Motion.  The Motion should be denied.

   If the Court determines that the Motion is facially sufficient, the Court should deny the same based on the Debtors' failure to overcome the presumption of correctness which applies to a tax assessment, to consider the BCRI Report which finds the present worth factors of the Florida Department of Revenue to be reasonable.

   Should the Court feel that an evidentiary hearing is necessary, the Court should order that the procedures applicable to adversary proceedings apply to the Motion as it relates to each County, and

provide an opportunity for the Property Appraisers to conduct discovery of the Debtor and its tax reduction agent, ATL.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 15, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: D.J. Baker, Sally McDonald Henry and Rosalile Walker Gray, djbaker@skadden.com, Stephen D. Busey, James H. Post and Cynthia C. Jackson, cjackson@smithhulsey.com, to counsel for the Reorganized Debtors, James Post, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202, jpost@smithhulsey.com, to counsel for the Tax Collectors, Brian Fitzgerald, fitzgeraldb@hillsboroughcounty.org, to counsel for certain Florida Property Appraisers, the Levy Law Firm, levylawfirm@comcast.net, to counsel for other Florida Property Appraisers, Dent & Associates, jdent@dentjohnson.com, to Ronald Gunzburger, counsel for the Broward County Property Appraiser, ron@bcpa.net, to Michael Martin, counsel for the Polk County Property Appraiser mike@martinpa.com, and to Kenneth Hazouri, counsel for the Orange County Property Appraiser, khazouri@dbksmm.com.

/s/ *Gaylord A. Wood, Jr.*
Law Offices Of WOOD & STUART, P.A.
Florida Bar No. 089465
USDC MD ID No. 7287
Attorney for Property Appraisers of Collier, Hendry,
Hernando, Lake, Levy, Martin, Miami-Dade, Palm Beach,
Seminole, St. Johns, Sumter and Volusia Counties.
Post Office Box 1987
Bunnell, FL 32110-1987
Tel: (386) 437-9400
Fax: (386) 737-9414
pleadings@woodstuartpa.com

# EXHIBIT "A"

# BCRI REPORT



# Development of Depreciation Tables for the Florida Department of Revenue

**April 2003**



*Stephen L. Barreca*
*President, BCRI Inc.*

**BCRI Inc**
2800 Milan Ct, Suite 121
Birmingham, AL 35243
www.BCRI.com

# Table of Contents

INTRODUCTION .................................................................................................. 1
  BACKGROUND ................................................................................................ 1
  PURPOSE AND USE OF THIS APPRAISAL ................................................. 2
  TYPE OF APPRAISAL ...................................................................................... 2
  SUMMARY OF FACTS AND CONCLUSIONS ............................................. 2
  ASSUMPTIONS AND LIMITING CONDITIONS ......................................... 3
  PREMISE OF VALUE ....................................................................................... 4
    *Applicable Florida Statutes* ......................................................................... 4

METHODOLOGY ............................................................................................... 7
  THREE APPROACHES TO VALUE ................................................................ 7
    *Cost Approach* ............................................................................................... 7
    *Income Approach* .......................................................................................... 8
    *Sales Comparison Approach* ........................................................................ 9
  DEFINITION OF TERMS ................................................................................ 9
    *Asset Lives* ................................................................................................... 9
    *The Age-Life Concept* ............................................................................... 11
    *Depreciation Concepts* .............................................................................. 12
    *The Observed Life Table* ........................................................................... 14
  DEVELOPMENT OF DEPRECIATION TABLES AND ECONOMIC LIVES ........ 17
    *Depreciation Tables Defined* ..................................................................... 17
    *Application Of The Depreciation Tables* ................................................... 17
    *Development of the Condition Factor* ....................................................... 17
    *Life-Cycle Analysis* ................................................................................... 18
    *Physical Mortality Model* .......................................................................... 20
    *Consideration of Abnormal Functional & External Obsolescence* ........... 26
    *Total Accumulated Depreciation* ............................................................... 29

CONSIDERATION OF FLORIDA STATUTE 193.011 ............................... 31

THE OBSERVED DATA .................................................................................. 35
  DATA CLASSIFICATION ............................................................................. 35
    *North American Industry Classification System* ....................................... 35
    *Standard Equipment Classification System* .............................................. 36
    *Data Provided by the Counties* .................................................................. 38
    *Developing the Mortality Record of Experience* ...................................... 40
    *Summary of Observed Data Sample* .......................................................... 43
    *Data Validation* .......................................................................................... 45

SUMMARY OF RECOMMENDATIONS ...................................................... 48
    *Results Classifications* ............................................................................... 49

BCRI'S QUALIFICATIONS ............................................................................ 54

REFERENCES ................................................................................................... 58

# Table of Contents

## Figures

FIGURE 1 – COST APPROACH PROCESS DIAGRAM.......................................................19
FIGURE 2 – SURVIVOR CURVE SELECTION PLOT.......................................................25
FIGURE 3 – TECHNOLOGY OBSOLESCENCE MODELING.............................................27
**FIGURE 4 – COMBINING THE THREE CLASSES OF DEPRECIATION**.........................30

## Tables

TABLE 1 – *AGE-LIFE CONCEPT* ................................................................................12
TABLE 2 – OBSERVED LIFE TABLE ...........................................................................15
TABLE 3 – SUMMARY OF TAX-ROLL DATA................................................................44
TABLE 4 – SUMMARY OF LIFE & SURVIVOR CURVE RECOMMENDATIONS.................51

# Introduction

## Background

The Florida Department of Revenue ("FDOR"), in compliance with state statutes, provides general supervision and guidance to the 67 counties within the state in their efforts to assess the fair/just value of tangible personal property. To this end, the FDOR maintains and publishes a manual of standard measures of value, consistent with Florida law and commonly accepted depreciation and appraisal practice. The manual is titled *"Standard Measures of Value: Tangible Personal Property Appraisal Guidelines"* and is hereinafter referred to as "the Guidelines". The elected Property Appraisers for the various Counties throughout the state rely on the Guidelines, to varying degrees, in their assessment of tangible personal property for Ad Valorem taxation purposes. In addition to methodology and procedural guidance, the Guidelines document the FDOR's recommendations for Depreciation Tables (a.k.a., Percent Good Tables) and Economic Lives.

In accordance with accepted practice, depreciation tables and economic lives should be reviewed periodically for continued applicability. This is especially true in recent years, given the rapid pace of technological change, deregulation in many industries, and the emergence of a world economy. With shirking margins, increased competition, and other factors, taxpayer challenges to local assessments are growing rapidly across the country, and in Florida. Increasingly, the FDOR's tables and lives are issues in property tax disputes. While depreciation tables and economic lives were traditionally reviewed every few years or so, legal challenges have virtually necessitated annual review. In their efforts to maintain fair and equitable standard measures of value, the FDOR initiated an effort to develop enhanced and improved authoritative Depreciation Tables and Economic Lives to replace those currently published in Guidelines.

# Introduction

## Purpose And Use of This Appraisal

This appraisal develops Economic Life and un-trended[1] Depreciation Table recommendations for various class of property. The life and table recommendations are intended for use in a Mass Appraisal Cost Approach to value, as is typically utilized by the Property Assessors throughout the state of Florida. Specifically, the recommendations of this appraisal are ultimately intended for inclusion in the Florida Department of Revenue's tangible personal property Guidelines. Additionally, this report is intended for circulation to all stakeholders including both the property appraisers and taxpayers, giving the stakeholders opportunity to comment and provide feedback.

## Type of Appraisal

This appraisal is a *Limited Appraisal* as defined in the Uniform Standards of Professional Appraisal Practice (USPAP). The author classifies this appraisal a *Limited Appraisal*, as opposed to a *Complete Appraisal*, because it does not contain a Sales Comparison or an Income Approach to value. Given the intent of this appraisal, i.e., to support the Mass Appraisal Cost Approach, the Sales Comparison and Income approaches to value are not required. As noted earlier, the value conclusions contained in this appraisal report include Depreciation Tables and Economic Lives.

## Summary of Facts and Conclusions

| | |
|---|---|
| Property Owner: | Various property owners throughout the state of Florida |
| Client: | The Florida Department of Revenue<br>Mr. David Beggs, Program Director, Property Tax Administration |
| Scope of Appraisal: | Development of Un-trended Depreciation Tables and Economic Lives to support the Mass Appraisal Cost Approach, as typically used by the county Property Assessors in Florida for Ad Valorem taxation. |
| Function of Appraisal: | Ad Valorem Taxation |
| Effective Date of Appraisal: | January 1, 2003 |

---

[1] The Depreciation Tables presented in this report are un-trended, in that they do not incorporate original cost trend factors.

# Introduction

| | |
|---|---|
| Description of Subject Property: | Various classes of property are addressed. |
| Location of Subject Property: | Throughout the State of Florida |
| Final Estimate of Value: | This appraisal does not contain a dollar estimate of value of the subject property. The value conclusion is presented as a fraction of the cost-basis of the subject properties by effective age of plant (i.e., the Depreciation Table). Our Depreciation Table recommendations reflect our estimate of the Economic Lives and depreciation of the subject property. The recommended Depreciation Tables and Economic Lives are provided in the Appendix to this appraisal report. |

## Assumptions and Limiting Conditions

This appraisal report is subject to the assumptions and limiting conditions noted below:

1. This premise of value shall be consistent with Florida statutes applicable to the Ad Valorem taxation of tangible personal property.

2. This appraisal does not conclude a dollar estimate of value of the subject property.

3. To the fullest extent practical, the table and life recommendations shall be based on actual market observations derived directly from property tax-roll data. This requirement does not restrict the use of informed judgment and other sources of information deemed appropriate by the appraiser. While extensive validation checks were performed, the tax-roll data provided by the counties is assumed to be complete, accurate, and reliable.

4. The condition of the subject property is considered to be of average condition for its age. This assumption is inherent to mass appraisal depreciation and valuation techniques. Due to the nature of this appraisal a physical inspection of the subject property is not required nor warranted.

5. The highest and best use of the subject property is assumed to be that of in-service equipment, functioning for its intended purpose.

6. Ownership of any item contemplates certain rights, commonly referred to as the *bundle of rights*. This bundle warrants the exclusive right to possess, use and/or dispose of the owned items. This appraisal assumes that all subject

# Introduction

property is owned without liens or encumbrances; which is to say *held in fee simple ownership*.

7. The Florida Department of Revenue, the client, has expressed a preference to use Iowa Curves as the survivor curve basis for the Depreciation Tables, where deemed appropriate.

8. It is assumed that there are no hidden or unapparent conditions in regards to the subject property that materially influences its condition, depreciation or value.

9. It is assumed that the subject property is in compliance with all applicable laws regulations, zoning requirements, and the Americans with Disabilities ACT.

## Premise of Value

The analysis, findings and conclusions of this appraisal report are based on the premise of value as defined by Florida law; which is reasonably consistent with *Fair Market Value in Continued Use*, as defined by the American Society of Appraisers, applied to tangible personal property.

### *Applicable Florida Statutes*

Article XIV, Chapter 193, Section 011 of the Florida Statutes identifies certain considerations that the elected county Property Appraiser must consider when assessing the value of tangible personal property for Ad Valorem taxation. Indirectly, these criteria define the premise of value that must be used in the State of Florida for Ad Valorem taxation purposes. The 193.011 reads as follows:

**193.011 Factors to consider in deriving just valuation.**
In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:

(1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;

(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable judicial limitation, local or state land use regulation, or historic preservation ordinance, and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency

or the Governor when the moratorium or judicial limitation prohibits or restricts the development or improvement of property as otherwise authorized by applicable law. The applicable governmental body or agency or the Governor shall notify the property appraiser in writing of any executive order, ordinance, regulation, resolution, or proclamation it adopts imposing any such limitation, regulation, or moratorium;

(3) The location of said property;

(4) The quantity or size of said property;

(5) The cost of said property and the present replacement value of any improvements thereon;

(6) The condition of said property;

(7) The income from said property; and

(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing, and allowance for unconventional or atypical terms of financing arrangements. When the net proceeds of the sale of any property are utilized, directly or indirectly, in the determination of just valuation of realty of the sold parcel or any other parcel under the provisions of this section, the property appraiser, for the purposes of such determination, shall exclude any portion of such net proceeds attributable to payments for household furnishings or other items of personal property.

The Appraisal Foundation, Uniform Standards of Appraisal Practice, defines Market Value as:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> 1. The buyer and seller are typically motivated;
>
> 2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

In consideration of Florida statute 193.011, specifically in regards to the consideration of location, highest and best use, and income from use, the added condition of usage must be considered. In the opinion of this author, as well as many other appraisers practicing in the state of Florida, statute 193.011 is reasonably consistent with the commonly accepted premise: *Fair Market Value in Continued Use*. The American Society of Appraisers' textbook, Valuing Machinery and Equipment, defines this premise of value as:

> *Fair Market Value in Continued Use* is the estimated amount, expressed in terms of money, that may reasonably be expected for a property in an exchange between a willing buyer and a willing seller, with equity to both, neither under any compulsion to buy or sell, and both fully aware of all relevant facts, including installation, as of a specific date and assuming that the business earnings support the value reported. This amount includes all normal direct and indirect costs, such as installation and other assemblage cost to make the property fully operational.

The value conclusions presented in this appraisal report are consistent with all applicable Florida Statutes, and the requirements and/or appraisal concepts put forth by USPAP, the ASA and the Appraisal Foundation. A more detail description of the consideration to state statute 193.011 is provided at the end of the Methodology section.

# Methodology

Generally, an appraisal considers all three approaches to value: the *Cost Approach*, the *Income Approach*, and the *Sales Comparison Approach*. No one approach is generally superior to the other approach. The choice of which approach the appraiser gives the most weight is up to the discretion of the appraiser. Typically the appraiser considers many factors including the nature, scope and purpose of the appraisal, the availability of reliable data, adequate comparable sales, intangibles, and other considerations beyond the scope of this report.

Accepted appraisal practice calls for all approaches to be considered. While all three approaches should generally be considered, this requirement does not mandate that all three approaches be fully developed. It is not always possible, practical, or warranted to implement a particular approach to value. For example, in jurisdictions where only tangible assets are taxed, as in Florida, the sales comparison and income approach may not be desirable because of the difficulty of removing the contribution to value attributable to intangibles. Conversely, the Cost Approach may not be suitable in an appraisal intended to yield a business going concern value because the Cost Approach inherently excludes intangibles. In such cases, the Cost Approach may establish a floor (or ceiling) value, providing insight in evaluating the results of the other approaches to value.

## Three Approaches to Value

### *Cost Approach*

The Cost Approach is based, in part, on the *principle of substitution*, which holds that a willing buyer would not pay more for a property than it would cost today to duplicate the functionally of the subject property. The starting point for the Cost

## Methodology

Approach, therefore, is an estimate of the Replacement Cost New (RCN) of the subject property. The RCN is, by definition, the current cost to replace the subject property, using the most economical equipment that achieves the same or similar functionality.

The estimate of the RCN is then reduced to reflect all forms of depreciation; namely: Physical Depreciation, Functional Obsolescence, and External Obsolescence taking into account the age and condition of the property. The result yields an estimate of the value of the subject property. This process is typically referred to as the Replacement Cost New Less Depreciation (RCNLD) method.

### Mass Appraisal Cost Approach

The term *Mass Appraisal* in the context of property valuation implies the use of Depreciation Tables and/or average Economic Lives. The term *Mass Appraisal Cost Approach* implies the use of Depreciation Tables and average Economic Lives in the context of the Cost Approach to value.

The use of mass appraisal techniques and parameters in an appraisal is quite common, especially in the application of the Cost and Income approaches to value. For instance, typically the estimate of the Economic Lives is the result of a mass appraisal analysis, in that the Economic Lives reflect the average or mean life from a sample of observed lives for similar equipment.

County Property Appraisers must assess the fair market value of the tangible personal property of thousands of businesses each year. It is not logistically possible to undertake a fee-appraisal for each taxpayer. The Property Appraiser must rely on Mass Appraisal techniques to accomplish his constitutional requirements.

The Mass Appraisal Cost Approach can be just as accurate and reliable as a fee-appraisal Cost Approach, and in many instances it is the preferred approach of fee-appraisers. For instance, many fee-appraisals submitted to Property Appraisers by taxpayers rely upon Mass Appraisal techniques to some extent.

### *Income Approach*

The Income Approach is predicated on the economic principle that the value of a property is the present worth of its future net benefits. For an income producing property, the Income Approach is generally achieved using a Discounted Cash Flow (DCF) model to compute the present value of future cash flows. An alternative to the DCF model is to use an overall Capitalization rate and the first year's estimate of net operating income.

# Methodology

## Sales Comparison Approach

The Sales Comparison Approach relies on prior sales of comparable properties as the basis for the value estimate. To the extent that the prior sales are not exactly comparable to the subject properties, they must be discarded or adjusted to reflect the differences. In addition to adjusting for tangible factors, such as age, condition, location, etc., intangible considerations must also be considered. Intangible considerations may include, but are not limited to: the motivation of the buyer and seller, and synergies that may be specific to the purchaser but not generally applicable to other potential purchasers. The difficulty associated with these and other comparability adjustments plus the general difficulty of identifying sales along with details surrounding the condition of the sale often make the Sales Comparison Approach impractical.

## Definition of Terms

Before we delve into the methodologies of developing Depreciation Tables, we need to define some of the terms that we will be using.

## Asset Lives

Asset lives take various forms. The various forms of lives, while all related, are different and are intended to support a particular computation or connotation. The most commonly used asset lives and those having particular interest in property valuations are briefly defined below. These definitions are in the context of property valuation and may have different connotations in other disciplines.

Except for those lives that reflect observed past experience, such as the *Realized Life*, most lives are forward-looking in that they identify the future life expectancy. If should be noted that all forward-looking lives represent the statistically most probable future life. Thus, all forward-looking lives represent an average or mean life expectancy. Some property will live longer than the average and some will live less then the average.

*Age* – is the number of years that have elapsed since a property was originally built or placed in service. Also called Chronological Age. By convention, at the end of the year all assets placed in service during the year are considered to be 0.5 years old. This is consistent with the assumption that the assets were either place evenly throughout the year or all placed on July 1.

*Effective Age* – is the apparent age of a property; that is, it is the chronological age adjusted for condition. If the subject property is in average condition for its age then the effective age is equal to the chronological age. The term *Effective Age* is also used to denote an average or weighted average age of several properties of differing ages.

# Methodology

*Vintage* – is synonymous with the y*ear of placement* or *year of acquisition* of the subject property.

*Remaining Life* – is the effective period of time that a property or group of properties is expected to continue to provide service to the owner. It represents the most statistically probable future life expectancy. The Remaining Life concept is applicable to other life types. These include the *Remaining Economic Life*, the *Remaining Physical Life*, the *Remaining Useful Life*, and others.

*Physical Life* – The effective period of time that a **new** (age=0.0) property or group of properties can be expected to provide service <u>given that only physical causes are influencing the life of the property.</u> The Physical Life is the most probable life absent consideration of functional or external obsolescence. Computers, for example, may have a Physical Life of 10 years, however, because of functional obsolescence most computers are replaced long before reaching their potential Physical Life. The Physical Life, therefore, establishes an upper limit to the life of the subject property.

*Useful Life, Normal Useful Life or Economic Useful Life* – The effective period of time that a **new** (age=0.0) property or group of properties is expected to provide service to the owner. The Useful Life takes into account all factors that affect the period of time that the asset is providing service to the owner. These factors include Physical Depreciation, and Functional and External Obsolescence. It should be noted, that when there is no obsolescence, the Useful Life is equal to the Physical Life. The Useful Life relates to how long a property is likely to be used.

*Economic Life* – is the effective period of time that a **_new_** (age = 0.0) property or group of properties is used <u>profitably</u>. The Economic Life is a theoretical concept in that it could be less than the Useful Life. The Useful Life relates to how long the property is actually used, whereas the Economic Life relates to how long the property can be used profitably. The Economic Life is equal to the Remaining Economic Life at age 0.0. Note that the Economic Life, by definition, represents the best estimate of the future life expectancy of newly placed plant; the overall life expectancy for aged plant is greater then the Economic Life of new plant and is equal to the age plus the Remaining Economic Life.

*Probable Life* – is the Useful Life expectancy for a property or group of properties of a given age or vintage. Thus, the Probable Life is equal to the age of the property plus the Remaining Useful Life of the property.

*Vintage Average Service Lives (VASL)* – The VASL is a common depreciation analyst's term that denotes the average useful life a single vintage of property, including <u>all</u> of the property placed in the vintage year. This would include not only the equipment still existing, but also the equipment that has <u>previously retired</u>. The VASL is a weighted average of (1) the age at retirement of equipment that has been retired, (2) the age of equipment still in service, and (3) the Remaining Useful Life of

# Methodology

the equipment still in service. In other words, the VASL reflects a weighting of the past, present and future life. The *Average Service Life (ASL)* is the weighted average of the VASLs.

It should be noted that the ASL and VASL have little, if any, application in property valuation. For appraisal purposes, we are only concerned with the life of surviving property. The life of retired property is only of interest to the extent that it may provide insight into the future life of the surviving property.

### The Age-Life Concept

Simply stated, the age-life concept holds that the most probable life of a property or group of properties increases as the property ages. This concept is best understood with an example:

> Consider that on January 1, 1990 a business purchased 10 widgets; and at the end of each year they retired one of the widgets. In this simple example, we easily note that the average Economic Life, on 1/1/1990, is 5 years.

> Now lets step forward three years to January 1, 1993. At this point in time three widgets have been retired and 7 widgets are remaining. The best estimate of the Remaining Economic Life is now 3.5 years. Note that the Economic Life of just the surviving widgets on 1/1/1993 is 6.5 years, the age plus the remaining life (3 + 3.5).

> Now lets step forward to year 8, 1/1/1998. We are now 3 years past the Economic Life (of new property). We now have only two widgets left, which are 8 years old. The average remaining life is 1-year. Thus, the Economic Life of just the two 8-year-old widgets is 9 years (8 years old + 1 year remaining on average). The table below illustrates this example.

# Methodology

### Table 1 – *Age-Life Concept*

| Date | Year | Units in Service | Age | Average Remaining Life | Economic Life |
|---|---|---|---|---|---|
| 1/1/1990 | 0 | 10 | 0 | 5.0 | 5.0 |
| 1/1/1991 | 1 | 9 | 1 | 4.5 | 5.5 |
| 1/1/1992 | 2 | 8 | 2 | 4.0 | 6.0 |
| 1/1/1993 | 3 | 7 | 3 | 3.5 | 6.5 |
| 1/1/1994 | 4 | 6 | 4 | 3.0 | 7.0 |
| 1/1/1995 | 5 | 5 | 5 | 2.5 | 7.5 |
| 1/1/1996 | 6 | 4 | 6 | 2.0 | 8.0 |
| 1/1/1997 | 7 | 3 | 7 | 2.5 | 8.5 |
| 1/1/1998 | 8 | 2 | 8 | 1.0 | 9.0 |
| 1/1/1999 | 9 | 1 | 9 | 0.5 | 9.5 |
| 1/1/2000 | 10 | 0 | 10 | 0.0 | 10.0 |

While this example is somewhat simplistic, it does illustrate the age-life concept and demonstrates the accepted fact that a property's probable life increases as the property ages.

## Depreciation Concepts

Depreciation is the loss in value of a property over time. The accumulated depreciation of a property is the difference between the original value of the property and the remaining value of the property. There are many causes of depreciation, however, they are typically classified into three broad categories: Physical Depreciation, Functional Obsolescence and External Obsolescence.

*Physical Depreciation* – is the loss in value of an asset due to exposure to the elements. The causes of Physical Depreciation include wear and tear with usage, deterioration with age, and accidental or chance destruction. Physical depreciation is best modeled using traditional physical mortality techniques. These techniques are rooted in actuarial theory, and were established by Messrs. Gompertz and Makeham in the 19th century.

*Functional Obsolescence* – is the loss in value (i.e., depreciation) resulting from a flaw or deficiency in the property that inhibits its ability to function for its intended purpose, relative to current market expectations. Functional requirements of equipment are subject to change over time due to changing consumer expectations. For example, increasing consumer expectations may promote new functionality that older equipment cannot accommodate, thus resulting in additional depreciation (loss in value) of the subject property. Similarly, technological enhancements in newer models may offer increased economic efficiency, thereby decreasing the efficiency of

the older model relative to that of the newer one. The relative loss in functionally reduces the value of the subject property.

*External Obsolescence or Economic Obsolescence* – is the loss in value resulting from causes external to the control of the property owner and not inherent to the property itself. The classic example is the construction of a major new roadway that diverts traffic away from the gas station. The gas station's profitability is reduced, resulting in an overall loss in value of the business. This loss in value is called External or Economic Obsolescence.

As you may have summarized, the definitions sometimes overlap. Accidental destruction, for example, is generally considered Physical Depreciation, yet is does meet the definition of External Obsolescence. In modeling depreciation and estimating value, its not critical how the appraiser classifies each form of depreciation. What is important is that the appraiser accounts for all forms depreciation impacting the subject property, and does so only once. For example: if the appraiser were to reduce the Useful Life below that of the Physical Life based on the owner's modernization plans, and then apply a functional obsolescence adjustment due to rapid technology change; it is very likely that the appraiser double counted functional obsolescence.

*Abnormal versus Ordinary Obsolescence* – Because some forms of obsolescence exhibits depreciation patterns different from other causes of depreciation it is necessary is necessary to draw a distinction between *Abnormal* and *Ordinary* obsolescence.

> *Ordinary Obsolescence* – ongoing obsolescence that has achieved and a state of equilibrium such that anticipated future patterns of depreciation are generally consistent with recently observed experience. In other words, past depreciation patterns are a reliable indicator of future depreciation patterns. The depreciation impacts resulting from ordinary obsolescence are readily captured in physical mortality models.

> *Abnormal Obsolescence* – is obsolescence that is expected to result in significantly higher levels of depreciation over recently observed experience. Abnormal obsolescence cannot be reliably predicted from traditional mortality models. When abnormal obsolescence is present, the appraiser may have to separately model and quantify the resulting impacts to depreciation.

Abnormal functional obsolescence is often associated with the substitution of one technology for another, such as fiber cable substituting for metallic cable. During the first roughly 50 to 70 percent of a technology substitution the rate of substitution steadily increases. While traditional mortality models will capture recently experienced obsolescence, they may not adequately reflect the future levels depreciation if the expected increase is significant. Technology substitution models, however, have proven to reliably depict future levels of depreciation resulting from various sources of abnormal obsolescence.

*The history of metallic cable provides a good illustration of the difference between ordinary and abnormal functional obsolescence. Throughout the 1960s and 1970s drastically improved new generations of buried metallic cable technology were introduced. During this period, five major generations of metallic cable were introduced.[2] Each new generation represented a significant improvement over prior generations. While the impact to depreciation was significant, it did not cause the wholesale replacement of prior generations. Rather, the remaining life of older cables fell slightly as the economics of replacing older cables incrementally improved. The increased depreciation resulting from this technological (functional) obsolescence was readily captured in traditional mortality studies and models. Hence, the introduction of successive generations of metallic technology resulted in* **ordinary** *functional obsolescence.*

*In stark contrast, the introduction of fiber optic cables in the late 1970's resulted in abnormal functional obsolescence. Unlike successive generations of metallic cable, fiber cable resulted in the wholesale substitution of metallic cable, although the substitution period is quite long (its still underway today). Today, all long-distance and nearly all interoffice metallic cable has been replaced with fiber; and roughly, 35 to 45% of all feeder-network cable is fiber. The substitution of fiber for metallic cable in the distribution network has began, however fiber penetration is less than 1%. The introduction of fiber cable resulted in* **abnormal** *functional obsolescence of metallic cable.*

### The Observed Life Table

Development of the Observed Life Table (OLT) and analysis of the OLT are a critical component of developing the depreciation tables and economic lives. The OLT represents a summary of the mortality experience from which the survivor curve and

---

[2] Air-core, paper insulated, lead-sheath cable gave way to air-core, plastic insulated, plastic-sheath cables. Early plastic technology eventually gave way to air-core polypropylene insulated conductors and sheath (PIC) cables; followed by dual-expanded PIC cables (DPIC). Air-core DPIC cables quickly gave way to petroleum-jelly-filled DPIC cables; the standard for todays buried metallic cable applications.

# Methodology

remaining life, by age of plant, are determined. This information is then used to develop the depreciation table. The observed life table for Display Furnishings & Fixtures is provided, in part, in the table below.

### Table 2 – Observed Life Table

| Placement Band: 1922 - 2001 | | Total Exposures: $ 1,844,359,673 | | |
|---|---|---|---|---|
| Experience Band: 1998 - 2002 | | Total Retirements: $  179,195,425 | | |
| | | Sum of Observed Life Table: 9.43 | | |
| Display Furnishings & Fixtures | | | | |
| Age | Exposures | Retirements | Retirement Rate | Survival Rate | Percent Surviving |
| 0.5 | $   225,754,520 | $   8,816,771 | 0.039055 | 0.960945 | 0.990236 |
| 1.5 | $   216,452,585 | $   9,051,371 | 0.041817 | 0.958183 | 0.951563 |
| 2.5 | $   233,004,926 | $  18,542,329 | 0.079579 | 0.920421 | 0.911772 |
| 3.5 | $   193,121,570 | $  13,625,558 | 0.070554 | 0.929446 | 0.839214 |
| 4.5 | $   171,037,339 | $  17,686,147 | 0.103405 | 0.896595 | 0.780003 |
| 5.5 | $   152,198,136 | $  18,241,674 | 0.119855 | 0.880145 | 0.699347 |
| 6.5 | $   128,711,342 | $  16,662,442 | 0.129456 | 0.870544 | 0.615527 |
| 7.5 | $    93,647,123 | $  11,235,197 | 0.119974 | 0.880026 | 0.535843 |
| 8.5 | $    83,575,423 | $  10,475,768 | 0.125345 | 0.874655 | 0.471556 |
| 9.5 | $    86,042,828 | $  10,517,663 | 0.122238 | 0.877762 | 0.412449 |
| 10.5 | $    58,909,207 | $   8,686,803 | 0.147461 | 0.852539 | 0.362032 |
| 11.5 | $    41,607,725 | $   6,067,677 | 0.145831 | 0.854169 | 0.308647 |
| 12.5 | $    36,348,169 | $   5,538,674 | 0.152378 | 0.847622 | 0.263637 |
| 13.5 | $    31,648,491 | $   4,941,551 | 0.156139 | 0.843861 | 0.223464 |
| 14.5 | $    19,581,902 | $   2,541,702 | 0.129799 | 0.870201 | 0.188573 |
| 15.5 | $    20,462,891 | $   1,719,823 | 0.084046 | 0.915954 | 0.164096 |
| 16.5 | $    19,013,620 | $  10,422,223 | 0.548145 | 0.451855 | 0.150305 |
| 17.5 | $     7,702,853 | $     989,129 | 0.128411 | 0.871589 | 0.067916 |
| 18.5 | $     4,774,668 | $     423,905 | 0.088782 | 0.911218 | 0.059195 |
| 19.5 | $     5,054,534 | $     854,616 | 0.169079 | 0.830921 | 0.053939 |
| 20.5 | $     5,277,274 | $     365,528 | 0.069265 | 0.930735 | 0.044819 |
| 21.5 | $     3,369,794 | $     861,360 | 0.255612 | 0.744388 | 0.041715 |
| 22.5 | $     1,880,098 | $     498,325 | 0.265053 | 0.734947 | 0.031052 |
| 23.5 | $       935,300 | $      40,803 | 0.043626 | 0.956374 | 0.022822 |
| 24.5 | $       815,740 | $      90,810 | 0.111322 | 0.888678 | 0.021826 |
| 25.5 | $       684,377 | $      78,075 | 0.114082 | 0.885918 | 0.019396 |
| 26.5 | $       585,244 | $      97,025 | 0.165786 | 0.834214 | 0.017184 |
| 27.5 | $       549,018 | $      17,663 | 0.032172 | 0.967828 | 0.014335 |
| 28.5 | $       489,644 | $      13,166 | 0.026889 | 0.973111 | 0.013874 |
| 29.5 | $       274,904 | $      53,676 | 0.195254 | 0.804746 | 0.013501 |
| 30.5 | $       133,842 | $       8,021 | 0.059929 | 0.940071 | 0.010865 |

Note: Table stopped at age 30.5. See Appendix for full table.

The observed life table includes various aged mortality data. The primary components of which are described below.

**Placement Band** – The placement band identifies the years of placement for the property included in our sample of mortality experience. In our analysis, all years of placements are included. The placement band therefore reflects the full range of placement years for the property included in the sample.

**Experience Band** – The experience band defines the activity years for which mortality experience is included in the sample. In our analysis, all activity years are included. The sample data used in our analysis includes observed market experience

# Methodology

going back 5 years; therefore, the experience band included mortality experience observed in years 1998 to 2002.

**Age** – In the observed life table, mortality experience is group by the age of the property at the start of the year in which the experience is observed. The average age assumes that the property is placed uniformly throughout the year of placement. Property placed in calendar year 2000 would therefore have an average age of 1.5 years at the beginning of 2002. Similarly, property placed in 1998 would also have an average age of 1.5 years at the beginning of year 2000.

**Exposures** – The exposures represent the owner's initial investment in the property (i.e., its original cost) that is exposed to retirement at the beginning of the activity year in which the mortality activity is observed.

**Retirements** – The retirements that occurred in the activity year following the base year for the state age. In other words, the observed retirements occurring during the age-interval equal to the age and one plus the age. For instance the OLT above show roughly $8.8M of retirement for age 0.5. This represent the observed retirements during the activity year in which the subject property aged from 0.5 years at the start of the activity year, to 1.5 years at the end of the activity year.

**Retirement Rate** – The ratio of the plant retired to the plant exposed to retirement. In terms of anticipating the future mortality of the subject property, the retirement rate represents the statistical probability of retirement of similar aged property.

**Survival Rate** – The survival rate equals one minus the retirement rate. It therefore represents the statistical probability of survival for similar aged property.

**Percent Surviving** – Reflects the survival patterns of a hypothetical group of property subject to the same mortality patterns identified in the observed life table. The percent surviving begins at 100% at age 0.0. This reflects 100% of the plant initially placed in service. As the property ages, the observed probability of survival is applied to the surviving base to yield the percent surviving at each observed age. In this analysis, the mortality experience is not available for age-interval 0.0-0.5; therefore it is assumed that the annual probability of survival is one half the first observed interval.

**Sum of Observed Life Table** – The sum of the observed life table is the sum of the Percent Surviving for all ages. It provides a rough estimate of the observed average life of property expected to realize the mortality patterns reflected in the observed life table.

# Methodology

### Development of Depreciation Tables and Economic Lives

#### Depreciation Tables Defined

Depreciation Tables may take many forms depending context of the application. For the remainder of this report, Depreciation Tables will be addressed in the context of an assessment of value.

In its simplest form, the Depreciation Table identifies the *Condition Factor* by age of plant. The Condition Factor is a number which when multiplied to the cost-basis, yields an estimate of the remaining value of the subject property. The Condition Factor is often referred to as the Percent Good or Percent Remaining Value. These terms are interchangeable.

In its expanded form, the Depreciation Table may also contain the Remaining Economic Life, the Percent Surviving, the Annual Depreciation Rate, and other related parameters. In this report, the term Depreciation Table refers to the Condition Factor and the Remaining Economic Life by age of plant.

#### Application Of The Depreciation Tables

The Depreciation Table is commonly used in the Cost Approach to value. Here, the RCN is multiplied by the Condition Factor yield the Replacement Cost New Less Depreciation (RCNLD). If the Condition Factor reflects all causes of depreciation, then the resulting RCNLD provides an estimate of the remaining value of the property. The Condition Factors concluded in this report reflect all Physical depreciation and all ordinary Functional and External Obsolescence that is typical present in the subject property.

In addition to the Cost Approach, which directly utilizes the Condition Factor, the Remaining Economic Lives may be used in other approaches to value. In an Income Approach, for example, the appraiser is concerned with the remaining future income producing potential of the subject property. An accurate assessment of the Remaining Economic Life of the subject property is, therefore, essential.

There are many uses of Depreciation Tables besides property valuation. For instance, budgeting and long-range business planning are two areas where depreciation and economic lives play a major role. In capital-intensive industries, such as communications, depreciation and economic lives are critical to strategic planning and competitive analysis.

#### Development of the Condition Factor

The Condition Factor is the primary depreciation parameter necessary to support an assessment of value. There are several depreciation techniques for estimating the Condition Factor. The most commonly accepted technique is the use of the classic

*Age-life* ratio. As the name implies, the Age-life ratio is the ratio of the age to the life of the subject property. The Age-life ratio provides the best estimate of the accumulated depreciation of the property. One less the Age-life ratio yields an estimate of the un-depreciated portion of the property, i.e., the Remaining Value of the property. The age-life formula for the Condition Factor is as follows:

$$Condition.Factor = 1 - \frac{Age}{Age + Remaining.Life}$$

or

$$Condition.Factor = \frac{Remaining.Life}{Age + Remaining.Life}$$

In the above formula, it should be noted that the life in the Age-life ratio is the Probable Life, <u>not the Economic Life</u>. By definition, the Economic Life is the estimated life expectancy for <u>new</u> plant only. This is an important point as many inexperienced appraisers mistakenly use the Economic Life in the denominator. The Economic Life is simply the average life expectancy (i.e., the most likely or statistically probable life).

The Condition factor is dependent on only two parameters, the age and the Remaining Economic Life; and the age is known[3]. The Remaining Life, therefore, is the only parameter that needs to be determined to estimate the Condition Factor. A combination of various depreciation techniques, collectively referred to as Life-Cycle Analysis in this report, are used to determine the most probable Remaining Economic Life, by age of plant, for the subject property.

## Life-Cycle Analysis

The fundamental process involves assessing the individual impacts of all relevant influences to value (i.e., all causes of depreciation); and then combining the impacts to yield the net accumulated depreciation and the resulting remaining value. The causes of depreciation are: Physical Depreciation, Functional Obsolescence, and External Obsolescence. Because of the differences in the nature of the three classes of depreciation, each must be modeled using techniques appropriate for the class.

Physical depreciation is best modeled using traditional mortality (actuarial) techniques. Functional obsolescence is modeled using an extension of technology substitution analysis. External Obsolescence can occur in a variety of forms; therefore the approach taken is case specific. Ultimately, the impact of depreciation for each

---

[3] Technically, the *Effective Age* is the age that should be used in the age-life ratio; however, in the context of Depreciation Tables, the *chronological age* equals the *Effective Age*. The Depreciation Table is developed from a large sample of market observations. The observed condition by chronological age defines the average condition by age. In the application of the resulting Condition Factors, if the subject property's condition is significantly different from the average condition for its age, then the appraiser may choose to adjust the age accordingly. The adjusted age is the Effective Age.

# Methodology

class is formatted in terms of the forward-looking probabilities of lost value (herein called depreciation probabilities or rates). In this form, the influences from any number of causes of depreciation are readily combined and the net depreciation determined. This approach to value is modeled in Figure 1.



**Figure 1 – Cost Approach Process Diagram**

The FDOR's current depreciation tables utilize a mortality survivor curve (e.g., an Iowa curve) to represent the combined impact of all forces of depreciation. While this approach has enjoyed widespread application, mortality models, when used this way, will curtail the longevity of the depreciation tables when abnormal obsolescence is present. The reason for this is inherent in the way actuarial-models model depreciation. While actuarial models have proven to be very stable when modeling physical mortality forces and ordinary obsolescence, they are not necessarily suited for modeling significant abnormal obsolescence.

To better assess the different depreciation characteristics of the three causes of depreciation, and to significantly increase the longevity of the depreciation tables, BCRI models each of the classes of depreciation using models that are specifically applicable to each class. The resulting composite depreciation tables represent the statistical combination of the probabilities of depreciation from each of the individual models associated with each class of depreciation.

The following sections describe objective and proven techniques that BCRI employs for each of the three classes of depreciation: Physical Depreciation, Abnormal Functional Obsolescence and Abnormal External Obsolescence.

# Methodology

### Physical Mortality Model

The physical mortality process uses market observations, specifically mortality history, to establish a mortality survivor curve that reflects past and anticipated depreciation patterns. The survivor curve is expressed using either the fundamental form of the Gompertz-Makeham actuarial model, or the survivor curve may be selected from a number of standard survivor curve families. The two most popular families of survivor curves are Iowa Curves and Bell Curves. Each of the various survivor curve models, Gompertz-Makeham, Iowa, Bell, and others, can approximate the others, therefore, the choice of which type of survivor curve is one of preference.

### Determination of the Physical Mortality Survivor Curve

The survivor curves are derived from observed mortality patterns documented in the Observed Life Table. Our physical mortality model uses both Gompertz-Makeham and Iowa survivor curves. Initially, the best-fit Gompertz-Makeham curve is determined for the observed experience. Because Gompertz-Makeham curves use a closed formula, sophisticated computerized fit-criteria has evolved over time allowing a better match to the observed mortality patters. Once the best-fit Gompertz-Makeham curve is found, the best-fit Iowa curve is derived.

While it is not necessary at this point to use Iowa curves, many people are more comfortable with Iowa curves. As noted in the Assumptions and Limiting Conditions section, it is preferable to use Iowa curves. The primary reasons are that they are better known and more easily understood.

The determination of the best-fit Iowa curve to the observed life table is a two-step process [4]. First, the observed average life is determined from the observed life table. Then the best-fit Iowa curve is determined. In the first step, the observed average life is determined. This is accomplished by *arbitrarily* choosing an Iowa curve and adjusting its average life until the observed realized life equals the realized life of the Iowa curve through the oldest age of the sample or to the *Tcut* (see the definition of Tcut below).

Next, each Iowa curve is scaled to the average observed life derived in step 1. The least sum of squares error (SSE) of the Percent Surviving, or other metric, is then computed for each Iowa curve to get a preliminary and objective ranking of the best-fit curve. The analyst then examines the results (typically graphically) and makes a determination of which Iowa curve best reflects the observed experience and is the best indicator of future performance.

Step one is the most challenging and has the most significant impact on the resulting depreciation table. Generally the mortality experience is insufficient for the observed percent surviving to go all the way to zero. With an incomplete life table, the

---

[4] *Depreciation Systems*, Frank K. Wolf & W. Chester Fitch, Iowa State University Press, 1994

# Methodology

observed life cannot be objectively determined. The analyst, in selecting an *arbitrary* Iowa curve, has made an arbitrary assumption regarding the future mortality patterns necessary to complete the life table. The analyst should exercise experience and informed judgment in selecting the initial Iowa curve.

Our modeling process uses a variation of the above process, which improves the results of step one, and therefore, improves the overall selection of the survivor curve. Instead of using an arbitrary survivor curve in first step, we find the best-fit Gompertz-Makeham curve to the observed life table. The resulting observed average life is then computed and used in step two to find the best-fit Iowa curve.

### Determining the Best-Fit Gompertz-Makeham Curve

The process of identifying the observed mortality patterns and deriving the most appropriate Gompertz-Makeham survivor curve is called the *Graduation*[5]. The Graduation is a complex statistical process whereby the best-fit survivor curve is determined form the observed life table by solving the Gompertz-Makeham formula. The Gompertz-Makeham formula is given below.

$$P(x) = s^x \cdot g^{c^x - 1}$$

Where:    $P(x)$ is the percent surviving at age $x$.
$c$, $g$, & $s$ are parameters of the curve that define its shape.

The solution to solving the Gompertz-Makeham formula equates the area under the observed survivor curve (*realized life*) to that of the theoretical curve; and equates the first moment of the observed survivor curve (probability of depreciation) to that of the theoretical curve. These two equations are solved simultaneously such that parameters $s$ and $g$ are expressed in terms of $c$. Thus, with two equations, three unknowns, and the observed life table, a trial an error algorithm along with goodness of fit metrics can be used to find the best value of $c$.

Selection of the appropriate survivor curve is as much an art as a science. It requires considerable understanding of actuarial theory and experience. And, while not necessary, it is helpful to have specific knowledge of the subject property. The final selection of the best-fit survivor curve to the observed life table is always done visually, however, several statistical fit criteria have evolved over the last 70 years or more that aid in the selection process. Generally, goodness of fit metrics is used to narrow the candidates that the analyst then reviews.

Because survivor curves are non-linear, they do not lend themselves to traditional statistical measures of fit, such as the standard deviation, mean, $R^2$, variance, etc. For example, these measures of fit would only be meaningful by individual age of plant.

---

[5] A comprehensive description of the Graduation proves is beyond the scope of this report. See the references at the end of the report for further reading.

# Methodology

Thus, a unique mean and standard deviation would exist for each age of plant. Considering that most of the classes of plant have observations in 40 or more different ages, it clear that such measures of fit are not helpful in determining the survivor curve.

Accepted depreciation practice for performing Graduations includes a mechanism for ignoring older unstable or unreliable mortality activity. This mechanism is called a *Tcut*. The Tcut defines the age by which all mortality observations equal to or older than the Tcut will be excluded from the analysis. Tcuts are a valuable tool to the analysis, because older observations often become erratic and typically represent a mere fraction of the total experience. In regards to the use of Tcuts, the National Association of Regulatory Utility Commissioners (NARUC) states in its manual, *Public Utility Depreciation Practices*:

> A Tcut is a truncation of the observed life table values and is generally used in a mathematical fitting of the curve to the observed values. A Tcut is used to mathematically perform a function that is automatic in visual fitting (i.e., setting a point beyond which the observed data are considered irrelevant or unreliable and are, therefore ignored).

> Careful selection of a Tcut can greatly enhance the reliability of the resulting analysis. Conversely, since the use of a Tcut involves truncating the observed data, careless selection can impair the reliability of subsequent work.

The NARUC depreciation manual goes on to caution:

> The use of a Tcut can also have an adverse effect on the reliability by creating a stub curve. The observed survivor curve at the early ages fits a large number of curves. This is particularly true where the mode of the retirement frequency curve is greater than the average life (i.e., the majority of retirements occur at later ages).

> Both of the problems mentioned above are exacerbated when the Tcut occurs near [or before] the mode of the retirement frequency curve, i.e., the steepest portion of the survivor curve. Therefore, Tcuts near or at the mode [or before the mode] of the frequency curve should be avoided.

# Methodology

While statistical measures of the goodness of fit may be very helpful to the analyst, they are by no means definitive. It is universally accepted that manual review and final selection of the survivor curve be conducted by an experienced depreciation analyst. Some of the standard measures of goodness of fit are described below:

**SSE** – Sum of the Squared Error: Traditionally, this statistic is utilized in the Grad method and applied to the percent surviving.

**WRMSE** – Weighted Root Mean Squared Error: The square root of the weighted mean squared error in retirements. The WRMSE is the same as the traditional RMSE only the error is weighted to the total plant exposed to retirement (i.e., "exposures").

**LARDTot** – Least Absolute Retirement Difference To Total retirements: This metric computes the absolute value of the error between the observed retirements and that derived from the survivor curve by age over all observed ages divided by the total observed retirements.

**LARDTCut** – Least Absolute Retirement Difference To Tcut: Same as the LARDTot, only the metric is computed for ages younger than the Tcut.

**LNRDTot** – Least Net Retirement Difference To Total retirements: Same as LARDTot, only the absolute value of the error is not used. Thus, plus and minus errors are somewhat offsetting.

**LNRDTCut** – Least Net Retirement Difference To Tcut. Same as LNRDTot, only the metric is computed for ages younger then the Tcut.

### Physical Life And Service Life Determination

The graduation process captures the depreciation influences of all causes of depreciation reflected in the mortality data sample. These influences are predominately *physical depreciation* in nature; however, the modeling process also captures *ordinary* functional and economic obsolescence.

The lives derived from the graduation process are commonly referred to as physical lives, even though they do not reflect a pure physical life. To avoid confusion regarding the various forms of asset lives, we define the asset lives captured by the graduation process as the *Service Life*.

> *Service Life* – is defined in this appraisal report as the most probable life of the subject property, taking into account physical depreciation and ordinary functional and external obsolescence. The service life is therefore

the life directly determined from the results of the graduation process.

The service life is equal to the age of the property plus the remaining service life of the property. When no ordinary obsolescence exists, then the service life equals the physical life. When ordinary obsolescence is materially present, the service life will be less than the physical life. Similarly, if no abnormal obsolescence is present, then the service life is equal to the useful life and the economic life of the property.

The remaining service life for any age of plant is computed directly from the best-fit survivor curve. The most probable remaining service life at any age $x$ is the remaining area under the survivor curve, starting at age $x$, divided by the value of the survivor curve at age $x$. The remaining service life at age x, $RL(x)$, is given by the following formulas.

$$RL(x) = \frac{\int_x^\infty PS(x)}{PS(0)}$$

Which can be approximated by :

$$RL(x) \approx \frac{\sum_x^\infty PS_x}{PS_0 \cdot I} - \frac{I}{2}$$

Where:

$PS(x)$ is the formula for the Percent Surviving from the Survivor Curve at age x.

$PS_x$ is the Percent Surviving at age x.

$I$ is the sampling interval, usually equal to 1.

It should be noted that the remaining service life at age zero is simply the most probable life expectancy of newly placed plant. The most probable life of aged plant is the age plus the remaining service life. When the survivor curve captures all anticipated depreciation, then the service life is equal to the economic life.

Figure 2 shows the graphical results of the graduation of the observed data summarized in Table 2 earlier. In this case, eight distinct survivor curves were selected for consideration. The solid red line represents the survivor curve that was ultimately selected. Because the observed mortality data very well behaved, the various survivor curves considered are very similar to the selected curve and barely discernable on the graphic.

The graduation model utilized by BCRI considers roughly 1,000 distinct survivor curves for each Tcut used in the analysis. The model automatically selects 4 Tcuts: one for each age where the accumulated exposures equals 100%, 95%, 90%, and 85%

# Methodology

of the total exposures in the observed life table. Typically 4,000 distinct survivor curves are automatically fitted to the observed data.

The graduation model then computes the various fit metrics, discussed earlier, and automatically selects those curves having the best fit for each metric and for each Tcut. After eliminating duplicates, cases where two or more fit-metrics yielded the same survivor curve, the automatically selected curves are retained for subsequent review. Typically, the graduation program retains four to eight survivor curves for each Tcut. In addition to the automatically selected Tcuts, the analyst will typically specify additional Tcuts during the review and final selection of the survivor curve.



**Figure 2 – Survivor Curve Selection Plot**

Once the survivor curve is determined the next step in the development of the depreciation tables is to compute the remaining service lives by age of plant. Using the formulas given above, the remaining service lives are readily determined. From the remaining service lives, the annual probability of depreciation by age of plant, *pd(age)*, are computed using the age-life concept.

$$pd(age) = \frac{age}{age + RL(age)}$$

In this form, the depreciation reflected in the observed life table is readily combined with other sources of depreciation such as abnormal obsolescence.

# Methodology

## *Consideration of Abnormal Functional & External Obsolescence*

As noted earlier, the observed life tables reflects physical depreciation and ordinary functional and external obsolescence. To the extent that future *abnormal* obsolescence is expected to be significant, it should be added to the depreciation documented in the observed life table. This section outlines the modeling process used by BCRI to model abnormal functional and external obsolescence.

### Abnormal Functional Obsolescence

The influence to value resulting from abnormal functional obsolescence is not constant by age of plant; it typically increases with the passage of time. This fact is the prime reason that traditional actuarial approaches, while capturing past abnormal obsolescence, are ineffective at capturing future increases in abnormal obsolescence. Future obsolescence directly and significantly influences today's remaining life and value.

To deal with the different characteristics, abnormal functional obsolescence is modeled separately using models uniquely suited to the characteristics of functional obsolescence. This section descries the functional obsolescence modeling process. Because abnormal functional obsolescence is modeled separately, the analyst must take precautions so as not to double count past obsolescence. Typically, this is accomplished during the actuarial analysis by utilizing mortality data that predates significant influence from abnormal obsolescence.

There can be many causes of abnormal functional obsolescence. When it is occurring, regardless of the cause, the usage of the subject property relative to that of newer and more functional property declines. Today, abnormal functional obsolescence is typically the result of changes in technology. For example, a new technology is developed that is far superior to the old technology; and over time, the new technology replaces the old technology.

The replacement of older technology by newer technology is called *technology substitution*. When the pace of the technology substitution results in premature retirement of the older technology, abnormal functional obsolescence results. As noted earlier, incremental improvements in an existing technology does not generally results in abnormal obsolescence; rather, the resulting depreciation impacts are readily reflected in the service lives developed in the graduation of the observed life table.

Technology substitution follows predictable patterns and can be objectively modeled and projected. From the substitution model, the future obsolescence of the older technology can be objectively quantified. Figure 3 depicts a typical substitution of a new technology for an old technology, along with the projected obsolescence of the old technology. The curve labeled 'Obsolescence' reflects the percentage of the current value remaining, as a direct result of abnormal functional obsolescence.

## Methodology



**Figure 3 – Technology Obsolescence Modeling**

Once the Functional Obsolescence pattern is established, the annual impacts of obsolescence may be calculated in terms of the annual rates of obsolescence. These rates reflect the probabilities of depreciation (or displaced value) directly resulting from the abnormal functional obsolescence.

This approach allows the appraiser to <u>objectively</u> quantify the net impact of Functional Obsolescence. The resulting impacts to value are readily documented in terms of the annual probability of depreciation, and easily combined with the impacts from physical depreciation and other economic losses. Recent case studies demonstrate the accuracy of using this approach to assess functional obsolescence.

From **Error! Reference source not found.** We observe that the obsolescence pattern mimics the decline in the adoption pattern of the older technology, which equals one minus the adoption pattern of the new technology. Thus, given the adoption pattern of either the old or new technologies, with minimal judgment, the resulting obsolescence is readily determined.

Determining the adoption pattern of competing technologies, unfortunately, is a highly specialized skill requiring sophisticated computer modeling. BCRI specializes in technology forecasting and assessing the resulting depreciation impacts. BCRI has over 18 years experience in this area, and has developed computer-modeling tool to support such analysis. Universities, industries and government entities use BCRI's flagship technology forecasting software, called "tf. Innovate".

# Methodology

A variation of the classical technology substitution model called "Multi-Generational Substitution Analysis" or MSA[6]. This technique requires only general understanding of technology substitution theory and general knowledge of the marketplace where the technology substitution(s) are occurring. MSA was developed by BCRI several years ago to deal with the complexities of many successive and overlapping technologies, all with short economic lives.

Because of the short life cycle and intergeneration period (i.e., the period of time between the introduction of major new generations of competing technologies), traditional and multi-substitution models are extremely difficult to implement. BCRI's MSA model solves this problem by computer simulation of the life cycles of each of the past and anticipated generations of technology. While MGS is not a replacement for detailed technology-substitution assessment, experience has shown that MSA produces reliable and accurate results with minimal data. Like the traditional substitution model, the depreciation results of the MSA are similarly formatted in terms of the annual probability of depreciation.

Once a technology substitution trend is established, there is a high probability that the substitution will continue, and do so consistent with the established trends. While the resulting depreciation is ever changing, the obsolescence pattern remains reasonably stable over time. Thus, like physical depreciation, when separately modeled, functional obsolescence patterns are reasonably stable over time.

## Abnormal External Obsolescence

Abnormal external obsolescence may take a variety of forms. The form of the loss dictates the approach one must take to assessing its contribution to depreciation. Regardless of the form that external obsolescence takes, the approach to quantifying its influence is to equate the loss in terms of annual probabilities of deprecation. In this form the loss in value is readily combined with that of physical depreciation and functional obsolescence.

The depreciation impact of external obsolescence that is applicable to an industry or to a particular class of property will be reflected in the mortality activity data and therefore reflected in the physical mortality analysis. Such obsolescence is referred to an ordinary obsolescence. Experience suggests that instances of abnormal external obsolescence are generally applicable to a specific company. External obsolescence, specific to a particular business, are should not be incorporated into the depreciation tables.

When a business is experiencing taxable abnormal external obsolescence, the appraiser should quantify the depreciation impact and add it to the depreciation

---

[6] While MSA is described here for completeness, none of the classes of plant studied, required the application of this modeling technique.

resulting from the application of the depreciation tables recommended in this appraisal report.

**Residual Value**

Generally, most equipment, regardless of its age, has some salvage value. Discarded and defective copper cable has some value to a copper junk dealer. Likewise, discarded circuit packs may be refurbished and resold, and when they cannot be resold, they may contain precious metals such as gold and silver that has value to the owner. Traditionally, the depreciation impact of the residual value is accounted for by not allowing the depreciation condition factors to go below the residual value. The observed mortality data gives little insight into the residual value of the various classes of plant.

The un-trended depreciation tables concluded in this appraisal report, are not adjusted to capture the impact of the residual value. Because, these tables are continuous and are not arbitrarily stopped at the average economic life, as many depreciation tables are, for all practical purposes the residual value impact is minimized and often eliminated.

## *Total Accumulated Depreciation*

Once all causes of depreciation have been quantified and documented, the next step in the process is to determine the accumulated depreciation as of the lien date, and generate the resulting composite depreciation table.

The first step in determining the accumulated depreciation is to combine the impacts from the various causes of depreciation. This must be done at the vintage level to facilitate valuation by age of plant. For each class of depreciation, the resulting depreciation was expressed in terms of the annual probability of loss in value (i.e., depreciation) by age of plant. In this form, the various forms of depreciation are statistically combined. The formula for combining these mutually exclusive probabilities of depreciation is given below.

$$\rho_T = \rho_1 + (1 - \rho_1) \cdot \rho_2$$

Where: $p_T$ is the combined loss due to $p_1$ and $p_2$.

Figure 4 illustrates the effect of combining multiple probabilities of loss in value. In this figure, the individual probabilities of depreciation from the three classes of depreciation, physical, functional and external, are plotted separately along with the combined probability of depreciation.

# Methodology



**Figure 4 – Combining The Three Classes of Depreciation**

The resulting composite annual probabilities of loss in value due to all causes of depreciation are then directly used to determine the forward-looking life cycle for the subject property. From this composite life cycle, the net remaining useful lives by age of plant are determined. The remaining useful lives are computed using the same formulas used to compute the service lives.

Once the useful remaining lives are determined, the condition factors, by age of plant, are computed using the same the age-life formulas used earlier. These condition factors constitute the Un-Trended Depreciation Table and reflect the combination of all forms of depreciation[7].

---

[7] Except abnormal external obsolescence that is applicable to a specific company or business.

# Consideration of Florida Statute 193.011

Value and the Cost Approach[9] to value is an accepted method of estimating Fair Market Value.

The Cost Approach begins with an estimate of the most economic replacement cost of the subject property as of the effective date of the appraisal. The replacement cost is then depreciated down to reflect physical deterioration, condition, and functional and external obsolescence. The resulting value provides an estimate of present cash value of the property. The Depreciation Tables and Economic Life recommendations in this appraisal report reflect all forms of depreciation and are specifically intended for use in a Cost Approach to Value.

**Criterion-2** requires the consideration of the highest and best use of the subject property, as well as the present use of the subject property. For the purposes of depreciation and life analysis, all property was classified by equipment type and industry type. The highest and best use of the property was assumed to be that for which the property was intended. For example, a desk's highest and best use was assumed to that of a desk; and a PC's highest and best use was assumed to be that of a PC.

In a property-conducted appraisal, the appraiser is required by statute 193.011 to appraise the subject property at its highest and best use. Thus, if the property owner is utilizing a PC as a doorstop, the appraiser must consider the PC's higher use, which is that for which it was intended – a PC functioning as a PC. This requirement is consistent with our assumptions regarding highest and best use.

**Criterion-3** requires the consideration of the location of the subject property. The market observation data (i.e., the tax-roll data) utilized in this appraisal is specific to Florida. Additionally, the mortality data derived from the tax-roll data inherently reflects the location and environment where the subject property is located. Thus, the depreciation tables and live developed in this appraisal report, appropriately consider the location of the property.

**Criterion-4** requires the consideration of the quantity and size of the property. It is common depreciation practice to consider the quantity of a group of similar property in terms of its investment for the purposes of developing the economic lives and depreciation tables. The resulting value indicators therefore directly reflect the decline in the dollar value of the property. The size of the property is accounted for in the classification of the property by equipment type. For instance, separate classifications were implemented for Personal Computers, Mid-Range Servers, and Mainframe Computers.

---

[9] The Mass Appraisal Cost Approach is an accepted methodology within the Cost Approach. It should be noted, that the Florida Supreme Court in a recent ruling [see Wal-Mart v. Mazourek] identified to the Property Appraiser's methodology as the Mass Appraisal Cost Approach and ruled that resulting appraisal met all requirements of 193.011.

# Consideration of Florida Statute 193.011

In the application of the economic lives and depreciation tables recommended in this appraisal report, the appraiser should apply the appropriate depreciation tables to the subject property, taking into consideration the size and classification of the subject property. Additionally, the depreciation tables are directly applied to the replacement cost of the subject property, which inherently considers the quantity of the subject property.

**Criterion-5** requires the consideration of the cost of said property and its present replacement value. As noted earlier in this appraisal report, the depreciation tables developed in this report are un-trended depreciation tables, in that they are applied to the cost-basis of the subject property. Un-trended depreciation tables, therefore, are independent of the cost-basis of the property; however, the cost does factor into the analysis. The appraiser directly considers the cost and replacement value of the subject property by estimating the replacement cost new and than applying the depreciation table to the result to yield an estimate of value.

**Criterion-6** requires the consideration of the condition of the subject property. The value indicators provided in the depreciation table are commonly called the *condition factors*. This is because they represent the remaining condition of the subject property. They are developed based on the remaining useful life of the property, which defines the property's ability to continue providing value to the owner. The depreciation table's condition factors are the best estimate of the condition of the subject property.

The depreciation tables are developed based on average condition for age. In other words, if the subject property were in average condition for its age, then the property appraiser would use the factors directly from the appropriate depreciation table. If the subject property's condition was not average for its age, then the property appraiser is required to estimate the effective age, base on the specific condition of the subject property, and than apply the appropriate depreciation table.

**Criterion-7** requires the consideration of the income potential of the subject property. The depreciation tables developed in this appraisal directly consider the remaining income producing potential of the property. This is accomplished by considering the remaining service life relative to the overall service life. For example, if a laser printer is 2 years old and our life studies tell us that the most probable remaining life is 3 more years. Then the printer will, in all likelihood, continue contributing to the net income of the business for 3 years. In this case the condition factor would be estimated as 3/(2 + 3) or 60%. The printer has consumed 40% (2/5) of its income producing value (i.e. 40% of its useful service life), leaving 60% of its income producing value remaining.

**Criterion-8** requires the consideration of the net proceeds of the sale of the property. The depreciation tables developed in this appraisal report were not derived from a

# Consideration of Florida Statute 193.011

sales comparison approach to value. The appropriate use of these depreciation tables will result in a fair estimate of the net proceeds of a sale of the subject property.

# The Observed Data

The analysis, conclusions and recommendations of this appraisal report are dependent in part on the quality of the market observations supporting the analysis. The market/mortality observations are directly derived from historical tax roll data provided by various counties throughout the state of Florida. These data were reported to the county assessors office by the taxpayers under penalty of law if improperly reported. The county assessor uses this data to assess the fair market value of the subject property for Ad Valorem taxation. This chapter describes the observed data, and how it is classified, and how it is interpreted for life analysis purposes.

## Data Classification

The first step in the data collection process was to establish a common classification system such that similar property from all participating counties is classified the same. For several reasons, it is desirable to not only classify the specific type of equipment, but also the industry type of the business that owns the equipment. Some taxpayers, usually small business, often lump various types of equipment together. In those instances where the county assessor allows some property to be reported in this manner, it is helpful to have depreciation tables that are generally applicable to a particular industry. Also, there are instances where a particular type of property may have different life and depreciation characteristics depending on the type of industry where it is being used.

### *North American Industry Classification System*

The Florida Department of Revenue has, for several years, recommended that the Counties use the U.S. Bureau of Labor & Statistics (BLS) North American Industry Classification System (NAICS) to identify the type of industry for each taxpayer.

# The Observed Data

After review, it was decided that the NAICS coding scheme was sufficient for our purposes. All counties providing tax-roll data were required to implement the NAICS system and assign the appropriate NAICS code each taxpayer. A complete listing of the BLS NAICS codes is available for download from the BLS web site.

In addition to the standard NAICS codes published by the BLS, Florida has several unique industry types for which there are no NAICS codes. To deal with these exceptions, the standard NAICS code was extended from 6 characters to 8 characters, with the additional characters being used to identify local classifications. The Florida specific classifications are listed below.

| NAICS.Ext | Description |
|---|---|
| 111300.07 | Citrus Brokers |
| 445100.13 | Other Supermarkets and Grocery |
| 482100.19 | Railroads (Non-Operating Property) |
| 722200.14 | Franchise Limited Service Restaurants - Bar-B-Q |
| 722200.15 | Franchise Limited Service Restaurants - Hamburger |
| 722200.16 | Franchise Limited Service Restaurants - Pizza |
| 722200.17 | Franchise Limited Service Restaurants - Chicken/Fish |
| 722200.18 | Franchise Limited Service Restaurants - Mexican |
| 722200.19 | Franchise Limited Service Restaurants - All Others |
| 814100.08 | Mobile Home Owners |
| 814100.09 | Mobile Home Attachments |

## Standard Equipment Classification System

In addition to the NAICS codes, the Florida Department of Revenue historically recommended the use of *Use Codes*; which consisted of a set of codes useful in identifying the specific equipment type of an item of property. After review, it was determined that the *Use Codes* did not provide the level of aggregation necessary to support development of new depreciation table. Additionally, our research showed that there doesn't exist a common classification system that uniquely identifies a particular type of property. There are some exceptions for certain industries, primarily utilities, but these are not applicable outside the specific industry for which they are intended.

In order to uniquely identify the specific type of equipment within an industry, it was decided that a new classification system would be developed. The new system is called the Standard Equipment Classification System (SECS). The SECS system compliments the NAICS system and allows the each property item to be classified by equipment type.

There are two types of SECS codes, specific codes and generic codes. Specific SECS codes are assigned to equipment types that are common to many industries or of particular interest. Office Furniture is one such example. Additionally, because, the

Federal Communication Commission (FCC) has standard equipment codes for communication industries, we include a corresponding SECS code for compatibility and reporting purposes. The Federal Energy Regulatory Commission (FERC) has issued similar equipment codes for Electric Utilities. We anticipate incorporating the FERC codes for electric utility plant items into the SECS system in a subsequent release.

The volume of SECS codes was kept to a minimum by providing a series generic codes that, when combined with the NAICS code, provide a reasonable indication of the equipment type.

> For example, there is no SECS code for a washing machine used in a Laundromat. The washing machine should be classified as Primary Production Equipment, SECS code "30.10.00.00". When taken in combination with the NAICS code for a Laundromat, clearly the subject property is either a commercial washing machine or dryer.

## SECS Features

The SECS coding scheme is hierarchical; which allows for parent categories, which can have dependent categories, which in turn can have dependent categories. This type of structure provides great flexibility and order to the coding scheme.

The SECS code consists of four hierarchical levels. Each level is two numeric characters each, for a total of eight characters. Assuming we maintain the current use of numeric digits only, then there can be 99 unique dependents to each parent level. This should be more than adequate, and it avoids the problem the NAICS system ran into with only one digit assigned to some of its hierarchical levels.

The SECS codes are left justified and zero filled. This facilitates classification and aggregation of property, and provides a consistent coding scheme for reporting either specific property items or aggregate groups of property. Additionally, by zero filling the code, others are free to extend the SECS to include additional levels should their local needs require it. For example, a County could easily implement a 9 or 10-digit SECS scheme that provides a fifth level that would allow them to track property at a much lower level and still be consistent with the standard 8 character SECS and consistent with the overall coding scheme.

Each unique level of SECS classifications also contains a classification called "*Other*". *Other* always carries the code 99. This provides a specific code to use when none of the codes at the specific level are applicable to the subject property.

# The Observed Data

### SECS Classification Rules

Equipment should always be classified at the lowest level possible. The lower the level the more detailed the classification. In this and subsequent analysis, one can always aggregate to a higher level, whereas it is not possible to allocate data to a lower level with out additional information.

The *Other* classification (code 99) should not be used when the property can be reasonably classified to one of the specific codes at the current or lower levels.

Do not arbitrarily classify property to a parent category, when the property can be classified to a dependent of the parent. (For example, don't classify a business' desks and chairs to Furniture (code 10.10.00.00) when it can be classified more succinctly as Office Furniture (code 10.10.10.00) which is a dependent of Furniture.

A parent category should only be used when the subject property consists of a mixture of the dependent categories and desegregation is not practical. In other words, if the property item consists of multiple types of property that includes more than one dependent category then classification to the parent level is appropriate and consistent. Additionally, if the property line-item consists predominately of one type of property (at least 75%), with a few relatively minor items thrown in; then the line-item should be classified to the predominate category and not the parent category.

### Data Provided by the Counties

The tax-roll data provided by the counties included a single line item for each item of property reported by the taxpayer. The specific data provided includes the following:

> **State Code**:  The U.S. Postal Service's two-character abbreviation for the State ("FL").

> **County Code**:  A four-character code, which uniquely identifies the County within the State. The FDOR's standard two digit County code should be reported.

> **Tax-Year**:  The tax year to which the reported data apply; synonymous with Roll Year (e.g., 2001).

> **SECS**:  Standard Equipment Classification System code appropriate for the subject property reported in this line item. A listing of the SECS codes is provided in Appendix-SECS.

> **NAICS**:  North American Industry Classification System code assigned to the taxpayer.  A given taxpayer account can have only one NAICS code assigned.

# The Observed Data

**Taxpayer Account Number**:   The unique account code assigned to the taxpayer by the county.

**Vintage**:  The 4-digit calendar year in which the property item was initially placed in service.  The vintage year equals the year-acquired minus the age of the equipment at time of acquisition. (For property acquired new, the vintage equals the year acquired, for used property, the vintage will be less than the year acquired).

**Quantity**:  The number of units included in the assessment for a given line item. Only numeric characters, representing positive integers, may appear in this field. This field is right justified and padded on the left with spaces or zeros. The Quantity field is optional.

**Original Cost**:  The total cost of all units of property reported on the line item. (Do not report the unit cost. For example, if a taxpayer line-item includes 4 tables each costing $100 dollars, then the ORIGCOST field for this line-item should contain 400).

**Description**: The text description of the property item as reported by the taxpayer or assigned by the County.

## Other Instructions Regarding the Reporting of Data

In addition to the above described classification instructions, the counties were given additional instructions regarding the reporting of their tax-roll data. These additional instructions are listed below.

- The County shall report all taxpayers and all taxpayer data unless otherwise directed by BCRI or the Florida Department of Revenue. This includes instances where the county may believe some data to be in error or erroneous.

- If for any reason, the County cannot provide all of the requested data for all taxpayers, the county shall advise BCRI of the circumstances. Note: it is not necessary that we have data for all taxpayers, however, it is crucial that we understand what is not being provided and in what tax-years, so that the missing data can be property handled for analysis purposes.

- If the county suspects that a situation exists concerning a taxpayer's data that they feel may inappropriately influence the analysis, the county should so advise BCRI. We will review any potential problems and process the data accordingly.

# The Observed Data

- We encourage Counties to correct any errors found in the tax-roll data, but we recognize that this is not always practical. Counties do not have to correct all errors, however, please be advised that a single relatively minor error will cause the entire taxpayer to be omitted from the analysis.

## Developing the Mortality Record of Experience

The purpose of the above-described data is to develop the *Observed Life Table*, described earlier in this appraisal report. This is accomplished by combining the aged mortality experience for the various taxpayers. Specifically, we need to combine the Exposures and Retirements by age of plant. From these data, the remaining parameters of the Observed Life Table are readily computed. The track record of the mortality (e.g. exposures, retirements, etc.) for a group of similar property is commonly called the *Mortality Record of Experience (MORE)*. Our initial data-objective is to develop the MORE for each taxpayer.

The plant exposed to retirement, Exposures, during the tax year is simply the reported original cost. In Florida, the taxpayer is required to report the plant in service as of the beginning of the tax year. Thus, this plant is exposed to mortality forces throughout the tax year.

The retirements occurring during the tax year can be estimated by comparing successive tax-roll data reported by the taxpayer. Specifically, the retirements are estimated by taking the difference between the original costs reported in successive tax years. This calculation is done separately for each taxpayer, class of plant (SECS code) and vintage.

The average age of the plant exposed to retirement at the start of the tax year is equal to the tax year less the vintage less 0.5 years. For example, if the taxpayer reported $10,000 of furniture in vintage 2002 on their 2003 tax return, then the average age of the furniture is estimated to be 0.5 years (i.e. 2003 – 2002 – 0.5). The average age assumes that the subject property was purchased uniformly through the year of placement. This common practice is referred to as the half-year convention.

## Retirement Considerations

It is common practice to exclude certain retirements from the analysis of the life[10]. Such exclusions typically include retirements that are not indicative of the life of the subject property or retirements resulting from unusual circumstances. Some of the specific retirement exclusions and their impact on this analysis are discussed below.

---

[10] A discussion of retirement exclusions can be found in *Depreciation Systems* by Wolf and Fitch, Chapter 2, and in *Public Utility Depreciation Practices* by the National Association of Regulatory Utility Commissioners, Chapter II.

# The Observed Data

**Sales** – A retirement caused by a sale is defined as a retirement in which the property is not retired from service, but continues in service under new ownership. Because such retirements do not provide an indication of the useful service life of the property, they are generally excluded from the life analysis. Because of the nature of the data being provided, it is not possible to distinguish between ordinary retirements and retirements resulting from sales. In subsequent data validation analysis, however, some sales-retirements will be excluded due to validation checks identifying excessive *infant mortality*. Excessive infant mortality is discussed in the Data Validation section of the report.

The extent of sales-retirements is typically very small relative to total observed retirements. For example, the owner of a Laundromat may decide that they have one too many washers; and sell one to another Laundromat. The washer has not reached the end of its service life, however, this transaction will show up as a retirement in the taxpayers mortality record of experience. The original owner is not in the business of selling washing machines; however, on rare occasions such sales will be made.

While small, to the extent that sales-retirements exist, they will have a downward impact on the computed service life, and a corresponding decrease in the resulting indications of value. The bottom line is that the assessed value may be lower than warranted, thus, favoring the taxpayer for Ad Valorem taxation purposes.

**Reimbursed Retirements** – A reimbursed retirement is a premature retirement for which the taxpayer is compensated at the time of retirement. Compensation may be from insurance, from the party that damaged the property, or other reasons. Generally, reimbursed retirements should not be included in the life analysis, as they may inappropriately lower the observed life. Due to the nature of the observed mortality data, reimbursed retirements cannot be discerned from ordinary retirements. While such retirements are expected to be rare, relative to the total observed retirements, to the extent that they exist, the life and resulting value indictors will be lower. Again, the impact will favor the taxpayer for Ad Valorem taxation purposes.

**Outlier Retirements** – Outlier retirements are retirements resulting from unusual circumstances; and are not indicative of the normal service life of the subject property. As such, outliers should be excluded from the life analysis. Due to the nature of the observed mortality data, the circumstances surrounding given retirement cannot be discerned, leaving only statistical analysis techniques to identify outliers.

Using statistical analysis techniques to excluded outlier retirements would be extremely burdensome, not practical except under some circumstances, and

would expose the potential for excluding ordinary retirements. For a typical taxpayer, retirements for a given class of property are generally not uniformly spread over time. For instance, a taxpayer may decide that his employees' PCs need to be upgraded. Over a short period of time, the owner may replace all but the newest PCs. Replacement patterns like this are common and will result in a spike in the retirement patters. Such retirements are ordinary and should be included in the life analysis. Statistically, however, they may likely show up as outliers.

An exception can be made for infant mortality. For our purposes, infant mortality is defined as retirements occurring in the first two years of placement. Retirement of newly placed plant is generally the result of unusual circumstances; and clearly, excessive infant mortality is an indication of outlier retirements. Statistical identification of excessive outlier-retirements in the first couple of years of placement is practical and warranted. Our infant mortality analysis is discussed in the Data Validation section later in this report.

Outlier retirements tend to show up as erratic behavior in the Observed Life Table, and may, at the discretion of the analyst, be given consideration in the final selection of the survivor curve. As noted earlier, selection of the survivor curve is as much an art as it is a science. Blindly accepting the statistical best fit is not considered good practice. The analyst must exercise judgment and make the final call. In the final selection of the best-fit survivor curve, it is not uncommon for the analyst to give less weight to excessive outliers.

To the extent that outlier retirements exists and not excluded during the data validation stages, they may result in a somewhat lower service life than is warranted. Again the bottom line is slightly lower value indicators, which favor the taxpayer for Ad Valorem taxation purposes.

**Asset Transfers** – An asset transfer referrers to the transferring of property from one location to another. When the transfer is between taxing jurisdictions, or from one corporate entity to another it may result in a false retirement; otherwise the transfer will not show up at all. A transfer is an accounting transaction not a retirement – the property remains in service after the transfer.

In our model, we cannot discern between an ordinary retirement and a retirement resulting from a transfer. While retirements due to transfer are small relative to the total observed retirements, they may influence the observed life. To appreciate the impact of transfers we must consider transfers-out separately from transfers-in.

# The Observed Data

A transfer-out shows up as a false retirement in the mortality record of experience. Since transfers are not age dependent, many will show up as excessive infant mortality, and be appropriately excluded during the data validation processing.

Each transfer-out at one location has a corresponding transfer-in at the receiving location. The transfer-in will show up as additional exposures on the mortality record of experience at the receiving location. The additional exposures at the receiving location lower the retirement rate, offsetting the increased retirement rate at the transferring location. When the observed retirements at the receiving location for the same class of property and for the same vintage of property is equal to or exceeds that of the transfer then the transfer-in will offset the transfer-out[11]. If the observed retirements are less, then the transfer-in will offset that portion of the transfer-out retirements equal to the observed retirements at the receiving location.

The impact of transfers is small and favors the taxpayer. First, many transfers will not show up as retirements at all. Second, a portion, if not all, transfer-out retirements will be offset by increased exposures at the receiving locations. Only the remaining transfer-out retirements, to the extent they are significant, may cause a slight lowering of the observed life. Again, the bottom line impact favors the taxpayer for Ad Valorem taxation purposes.

In summary, the above discussion identifies several concerns regarding retirements. Although in all cases the result favors the taxpayer, they are concerns nonetheless. It should be noted that such concerns are not unique to this effort. They are typically encountered in actuarial analysis of physical property, as well as any statistical analysis of a large sample of data. While the above discussion puts a spotlight on these retirement exceptions, we should not loose sight that these exceptions are rare relative to the very large volume of ordinary retirements in the our data sample.

It is the opinion of this author, based on examination and analysis of the observed data and based on experience and informed judgment, that the retirement concerns address above are in fact minor and do not adversely affect the reasonableness of the value conclusions reached in this appraisal report.

## Summary of Observed Data Sample

All 67 counties in Florida were offered the opportunity to participate in this project. More then 20 agreed to participate, however, in many cases, the data required could not be supported by the county's management software without significant programming effort. Seven counties provided historical tax-roll data for this effort. The participating counties included:

---

[11] Assuming both the transferring location and the receiving location are included in our data sample.

# The Observed Data

- Alachua
- Charlotte
- Hernando
- Hillsborough
- Lake
- Lee
- Pasco
- Pinellas

Pinellas County could only provide data for the latest tax year (2002). Pasco County did not get their data to us in time to be included in the analysis. A summary of the data received, by county is provided in Table 3.

### Table 3 – Summary of Tax-Roll Data

| County | Tax Year | Total Taxpayers | Total Original Cost | Total Observations | Unique NAICS Codes | Unique SECS Codes | Earliest Vintage |
|--------|----------|-----------------|---------------------|--------------------|--------------------|-------------------|------------------|
| **Alachua** | | | | | | | |
| | 2001 | 12,698 | $ 3,472,021,155 | 230,167 | 451 | 56 | 1900 |
| | 1998 | 11,860 | $ 1,305,103,797 | 198,147 | 427 | 52 | 1871 |
| | 1999 | 12,386 | $ 1,461,137,380 | 209,960 | 433 | 51 | 1882 |
| | 2000 | 12,631 | $ 1,262,465,844 | 219,702 | 443 | 54 | 1885 |
| **Charlotte** | | | | | | | |
| | 1999 | 17,745 | $ 1,103,315,497 | 228,423 | 599 | 28 | 1907 |
| | 2000 | 17,493 | $ 1,139,748,299 | 237,323 | 632 | 31 | 1899 |
| | 2001 | 17,425 | $ 1,215,629,188 | 247,710 | 655 | 31 | 1899 |
| **Hernando** | | | | | | | |
| | 2001 | 5,249 | $ 2,251,648,784 | 85,672 | 483 | 82 | 1946 |
| **Hillsborough** | | | | | | | |
| | 1999 | 34,702 | $ 8,261,809,681 | 346,299 | 264 | 50 | 1901 |
| | 2000 | 36,789 | $ 9,519,297,874 | 353,669 | 263 | 50 | 1888 |
| | 2001 | 37,901 | $ 10,805,003,070 | 353,997 | 263 | 50 | 1886 |
| **Lake** | | | | | | | |
| | 2000 | 7,041 | $ 570,595,990 | 49,273 | 421 | 34 | 1924 |
| | 2001 | 7,576 | $ 581,402,036 | 50,485 | 425 | 28 | 1880 |
| **Lee** | | | | | | | |
| | 1999 | 29,576 | $ 1,882,329,791 | 402,984 | 408 | 88 | 1921 |
| | 2000 | 31,921 | $ 2,035,625,034 | 427,855 | 414 | 94 | 1921 |
| | 2001 | 33,551 | $ 2,378,625,557 | 453,356 | 415 | 94 | 1930 |
| **Pasco** | | | | | | | |
| | 2000 | 17,255 | $ 1,987,884,068 | 134,700 | 664 | 90 | 1933 |
| | 2001 | 21,128 | $ 2,359,559,099 | 153,883 | 697 | 92 | 1933 |

# The Observed Data

### Data Validation

Validation of the tax-roll data was performed at several levels. The validation checks included both automated error checking and manual review. Naturally, due to the large volume of data in our data sample, manual review of each taxpayer's data is not logistically possible, nor required. Manual reviews were conducted when the mechanized validation indicated a potential exception. The validation checks performed are described below.

### Initial Field & Format Validations

The counties optionally performed the first round of validation prior to submitting their data. Some counties elected to utilize a program, DevPro, developed by BCRI to aid the counties in preparing their data. DevPro provided the following functionality:

1. Basic field and format verification,
2. Translation of local County classification codes to the standard NAICS and SECS codes,
3. Ability to edit exceptions,
4. Output of the required data transmission file.

Use of the DevPro program was optional. Counties that had access to a programming staff could readily perform the DevPro functionality without the extra step. Most counties elected not to use DevPro.

The second round of data validation occurred upon receipt of the counties tax-roll data. A manual review of a subset of the data provided was conducted to ensure format compliance. Next mechanized field and format verifications were conducted on the entire sample. It should be noted that BCRI did not make any changes to the sample data. When exceptions were encounter, the line item was flagged and appropriate action taken. Almost exclusively, data flagged to be in error resulted in the exclusion of all data for the particular taxpayer for the affected mortality activity years.

The purpose of the field and format checks is to ensure that the data was reported property. All fields critical to the analysis were independently verified for conformance with known characteristics appropriate for the field. For example, if the tax year is 2001, then the latest valid vintage is year 2000. The fields verified included:

- State ID
- County ID
- NAICS Code
- SECS Code
- Tax Year
- Vintage

# The Observed Data

- Original Cost

## Trend and Pattern Validation

At each stage of processing, BCRI reviewed the composite data and results for reasonableness. Where, in our opinion, the results appeared to be outside the expected range of reasonableness, further review of the underlying data was performed; and where warranted, corrective action taken. Analysis of infant mortality trends was the primary area where corrective action was warranted.

Infant Mortality

In addition to specific field validations, certain data patterns or trends found in the data may suggest that the resulting observed mortality pattern is false in that it represents an exception or perhaps the results of circumstances specific only to a particular taxpayer and therefore should be excluded from the analysis. Excessive *Infant Mortality* is one such pattern.

Infant mortality, as defined earlier, is the retirement of relatively new plant. When a large sample of property is considered, a small percentage of property is expected to be replaced in the first year or two following placement. For example, each year a very small percentage of utility poles are damaged by automobiles and replaced. The probability of a pole being struck by an automobile in a given year is the same for a new pole as it is for older poles. Thus, low levels of infant mortality are expected and represent normal depreciation considerations.

Excessive infant mortality, however, is an indication of Outlier Retirements that may results in false mortality indications. As noted earlier in this appraisal report, Outlier Retirements, as well as other influences that result in false mortality inductions should be excluded from the life analysis.

In our investigation of infant mortality, we discovered that excessive infant mortality was often associated with various special circumstances that warrant the data to be excluded from the life analysis. Some of the more frequent causes of excessive infant mortality encountered are discussed below.

**County Accounting Changes** – Counties occasionally, for various reasons, change the account number of the taxpayer. Often account number changes are the result of changes to the taxing jurisdiction within the county, and sometimes account numbers were changes due to internal procedures within the county. Changes in the taxpayer's account number from one tax year to the next, will give false retirement indications. The derived retirements are not actual retirements and should be excluded from the life analysis.

**Taxpayer Accounting Changes** – For various reasons, a company may reclassify equipment from one class of plant to another, or from one taxing jurisdiction to

# The Observed Data

another. Additionally, we have seen cases where the company implemented a new continuing property record systems, or changes to the existing system, which caused assets to be reclassified. The resulting retirement indications do not reflect actual retirements and should be excluded from the life analysis.

**Leased Equipment** – We encountered several instances where a taxpayer, usually a construction company, leases a large volume of equipment for one to three years. As the lease expired, the equipment was returned. While the tax-burden of such equipment often remains with the leasing company, in several instances the construction company reported the equipment on its tax-rolls and assumed the tax-burden. This situation resulted in high false retirements of new equipment. These false retirements should be excluded for the life analysis.

**Partial Business Sales** – Instances where a business sold part of its operation, but not the entire operation, resulted in a portion of the selling company's assets being assigned to a new taxpayer account number. These transactions resulted in false retirement indications for the selling company. These transactions are not actual retirements and should be excluded from the life analysis.

All of the reasons above, as well as others, resulted in excessively high infant mortality and give false retirement indications. While it was not practical to manually investigate all instances of high infant mortality, we did investigate many instances. In all of the cases of excessive infant mortality that we investigated, we found the derived retirements to be false. As a result of our investigation and experience, instances of excessive infant mortality were excluded from the subsequent depreciation and life analysis.

# Summary of Recommendations

This chapter summarizes the results of our analysis and presents our economic life and survivor curve conclusions. Additionally we give our recommendations to the Florida Department of Revenue concerning the various asset accounts that the department addresses in their Guidelines. Our economic life and survivor curve conclusions and recommendations are provided in Table 4 below. The various depreciation tables referenced in Table 4 are provided in Appendix DEPR, attached to this appraisal report.

Overall the sample of observed data was broad and strong, however, the number of counties participating in the project was lower than expected. As a result of the limited number of counties participating, for some classes of plant there was insufficient mortality activity to support rigorous analysis. For Amusement & Theme-Parks, for instance, there was approximately $135 Million dollars of total exposures in the experience band; however, there were only 677 mortality observations. These results suggest that there could be only one or two theme parks in our sample. Obviously, the counties containing the majority of Florida's theme parks were not among the participating counties. While the theme park data was sufficient to provide some indication of the survivor curve and life, R2\11-years, our recommendation is to keep the current life of 10-years, pending further study and review.

Nonetheless, for many of the asset accounts, there were more than ample mortality observations to support the analysis. A summary of the total data received is provided below.

# Summary of Recommendations

Total Taxpayers – all years .....................................364,927
Total Original Cost ................................. $ 53,593,202,144
Total Observations.............................................4,383,605
Number of counties participating ...................................... 7
Tax Years Reported ........................................ 1998 – 2002
Range of Vintages........................................... 1871 – 2001

## *Results Classifications*

To facilitate the development of the depreciation tables consistent with the analysis that can be supported by the observed data, our recommendations and conclusions can be classified into three categories.

1. Sufficient Data To Support Full Analysis
2. Sufficient Data To Support Partial Analysis
3. Insufficient Data To Support Analysis

Table 4, below, summarizes our findings, conclusions, and recommendations. The table lists the asset category, the best-fit survivor curve, the economic life, an action code and any pertinent comments. The action code corresponds to the three classifications listed above, plus a forth code, "Drop". For several classes of plant, we recommend that the asset category be dropped due to its close similarity with another asset category.

Over half of the 92 asset categories considered had adequate data to support either full or partial analysis. For 38 of the 92 categories, the data was strong and more than adequate to support the development of the economic life and depreciation table.

For 14 asset categories, there was marginally sufficient data to support the analysis, however, for various reasons we recommended a partial change to the economic life. Two of the more common reasons for a partial change to the economic life are given below.

First: In some cases, the observed life table did not go sufficient close to zero, so as to yield a stub-curve as discussed in the methodology section. In these instances, we generally can soundly conclude a minimal value for the economic life; recognizing that in all probability the life is somewhat higher. In these instances, we recommended that the estimated minimum life be used, pending further study. While in such cases, our life recommendation has a high probability of being lower than the true economic life; the lower life recommendation favors the taxpayer. Additionally, in all such instances, our recommendation is a marked improvement over the currently recommended life.

# Summary of Recommendations

Second: In other instances, the life indications were significantly greater than previous recommended by the Florida department of revenue. While there was generally sufficient data to support a reasonable life estimate, the observed data was not overly abundant. In these instances, we recommended a partial increase to the life, pending further study. In all such instances, our recommendation is an improvement over that currently recommended.

For 40 of the asset accounts considered, there were insufficient mortality observations to support the analysis. For these accounts, BCRI did not make an economic life recommendation, however, we did recommend a change to the depreciation table. The depreciation tables currently recommended by the Florida Department of Revenue are loosely based on the Iowa R3 survivor curve; we recommend that depreciation tables based on the Iowa R2 curve be used for these assets.

The Iowa R3 curve rarely shows up as the best-fit survivor curve for personal property. Generally, we will only see the R3, R4, or R5 curves for large major structures and heavy industrial type property. Major structures, may include a telecom switching center, a power generating plant, and metal utility poles. These types of facilities, along with some heavy industrial equipment, generally have very few retirements until the age nears or exceeds the average service life; thus resulting in a strong right-modal retirement pattern. The overwhelmingly majority of personal property types do not follow such a pattern – typically, the retirements are more gradual and spread out. As evidence of this, in the over 200 mortality graduations conducted as part of this assignment, not once was the best-fit Iowa curve an R3, R4, or R5.

In addition to limited applicability of the R3 curve, the particular implementation of the R3 curve underlying the Florida Department of Revenue's depreciation table is inconsistent with accepted depreciation and valuation practice. Specifically, the survivor curves are arbitrarily truncated at the age equal to the remaining life of new equipment (i.e. the average service life). While the tables correctly rely on the age-life concept for the early ages, truncating the table at the average life is inconsistent with the age-life concept, and inconsistent with commonly accepted depreciation and valuation theory and practice.

Because there is insufficient data for these 40 asset types, we cannot conclude the most appropriate survivor curve(s). Nonetheless, we can conclude a significant improvement to the depreciation tables currently recommended. The most appropriate improvement we can make to the depreciation tables is to recommend the use of depreciation tables based on the Iowa R2 curve. As noted above, the R3 (and above) is rarely observed in practice, whereas the R2 is often observed. Additionally, the R2 is likely to have the least impact to the taxpayer compared to other typically observed curves.

# Summary of Recommendations

## Table 4 – Summary of Life & Survivor Curve Recommendations

| Line # | Name of Plant Classification | Iowa Curve | Life | Action Code | Comment |
|---|---|---|---|---|---|
| 1 | Aerospace industry | L1 | 10 | New | |
| 2 | Agriculture | O2 | 9 | New | |
| 3 | Agriculture: Animal Production | O2 | 15 | New | |
| 4 | Agriculture: Crop production | O2 | 8 | New | Use Forestry & Logging pending further study |
| 5 | Agriculture: Fishing, Hunting Trapping | O2 | 15 | New | |
| 6 | Agriculture: Forestry and Logging | O2 | 15 | PD | Long life indications, 21yrs. |
| 7 | Agriculture: Grain & Oilseed Production | O2 | 15 | PD | Long life indications, 24yrs. |
| 8 | Amusement and theme parks | R2 | 10 | NC | |
| 9 | Automotive parts manufacturing | L1 | 18 | New | |
| 10 | Automotive Repair and Maintenance | O2 | 13 | PD | Life indications 12-15 yrs |
| 11 | Bakeries and confectionery production | O2 | 14 | PD | Life indications > 14yrs. |
| 12 | Banking | O2 | 11 | New | |
| 13 | Barber and Beauty Shops | O2 | 15 | PD | Life indication > 20yrs |
| 14 | Billboards | R2 | 20 | NC | |
| 15 | Brewery equipment | L1 | 12 | NC | |
| 16 | Canneries and frozen food production (Fruit, Vegetable Preserving; Specialty Food Mfg.) | O2 | 12 | NC | |
| 17 | Cement and Concrete Product Manufacturing | L1 | 12 | NC | |
| 18 | Chemical Manufacturing | L1 | 17 | NC | |
| 19 | Clay Product and Refractory Manufacturing | L1 | 25 | PD | Long life indications. |
| 20 | Cold storage and ice-making equipment | L1 | 18 | NC | |
| 21 | Computers: General Purpose | L1 | 7 | New | |
| 22 | Computers: Mainframe | L1 | 6 | New | |
| 23 | Computers: Peripherals | L1 | 6 | New | |
| 24 | Computers: Personal computers | Special | 4 | New | |
| 25 | Computers: Special Purpose | L1 | 7 | New | |
| 26 | Construction: General | O2 | 12 | New | |
| 27 | Construction: Heavy | O2 | 8 | New | |
| 28 | Construction: Marine | R2 | 12 | PD | Long life indications, 14-16yrs. |
| 29 | Dry-cleaning and Laundry Services | O2 | 15 | New | |
| 30 | Fast Food Restaurants | O2 | 12 | PD | Long life indications. |
| 31 | Food and beverage production | L1 | 10 | New | |
| 32 | Food Services and Drinking Places (Excludes Fast Food Restaurants) | O2 | 12 | New | |
| 33 | Foundries: Primary & Nonferrous Metals Production | R2 | 12 | New | |
| 34 | Glass and glass products | O2 | 14 | NC | |
| 35 | Gypsum Product Manufacturing | R2 | 15 | NC | |
| 36 | Hand Tools | O2 | 18 | New | |
| 37 | Hospital furnishings | O2 | 10 | Drop | |
| 38 | Hotel and motel furnishings and equip | O2 | 10 | New | |
| 39 | Jewelry products and pens | R2 | 12 | NC | |
| 40 | Machinery Manufacturing | L1 | 16 | New | |
| 41 | Manufacturing: Computers/Electronics | L1 | 6 | NC | |
| 42 | Manufacturing: Electrical Equip/Appliance/Components | L1 | 10 | NC | |
| 43 | Manufacturing: Fabricated Metal Products | L1 | 16 | PD | Use Machinery Manufacturing pending further study |
| 44 | Meatpacking (Animal Slaughtering and Processing) | R2 | 12 | NC | |
| 45 | Medical Equipment | O2 | 15 | New | |
| 46 | Medical Equipment & Supplies Manufacturing | R2 | 8 | New | |
| 47 | Metalworking machinery manufacturing | R2 | 10 | NC | |
| 48 | Mining and quarrying | O2 | 13 | New | |
| 49 | Motion Picture and Video Production | R2 | 12 | NC | |
| 50 | Office Furniture | O2 | 15 | New | |
| 51 | Office Furniture & Support Equipment | O2 | 10 | New | |
| 52 | Office Support Eq. | O2 | 7 | New | |
| 53 | Office Support Eq.: Telephone Sets & Devices | R2 | 6 | NC | |
| 54 | Office Support Eq.: Cellular Telephones | R2 | 5 | NC | |
| 55 | Optical Instrument and Lens Manufacturing | R2 | 10 | NC | |
| 56 | Paints & Varnishes Manufacturing | L1 | 17 | PD | |

# Summary of Recommendations

## Table 4 – Summary of Life & Survivor Curve Recommendations

| Line # | Name of Plant Classification | Iowa Curve | Life | Action Code | Comment |
|---|---|---|---|---|---|
| 57 | Paper and pulp manufacturing | L1 | 18 | New | |
| 58 | Plastics Product Manufacturing | R2 | 11 | NC | |
| 59 | Point Of Sale Equipment | L1 | 8 | New | |
| 60 | Primary Metal Production (nonferrous) | R2 | 12 | Drop | Combined with Foundries |
| 61 | Printing & Publishing | O2 | 15 | New | |
| 62 | Professional and scientific instruments | R2 | 10 | NC | |
| 63 | Radio and Television Broadcasting | L1 | 6 | New | |
| 64 | Radio and TV Broadcasting and Equip. Manufacturing | L1 | 10 | NC | |
| 65 | Railroad Rolling Stock Manufacturing | R2 | 12 | NC | |
| 66 | Retail Trade Fixtures | L1 | 9 | New | |
| 67 | Sawmills and Wood Preservation | R2 | 10 | NC | |
| 68 | Signs (Excluding Billboards) | O2 | 10 | New | |
| 69 | Signs: Display Advertising | R2 | 20 | Drop | |
| 70 | Soft Drink Manufacturing | R2 | 10 | New | |
| 71 | Steam and Air-Conditioning Supply | R2 | 28 | NC | |
| 72 | Sugar and Confectionery Product Manufacturing | R2 | 18 | NC | |
| 73 | Telecom/CATV Switching & Head-End Eq. | R2 | 8 | NC | |
| 74 | Telecom/CATV Antennas | R2 | 10 | NC | |
| 75 | Telecom/CATV COE & Circuit/Radio Transmission Eq. | R2 | 8 | NC | |
| 76 | Telecom/CATV Conduit | R2 | 20 | NC | |
| 77 | Telecom/CATV Fiber Cable & Drops | R2 | 20 | NC | |
| 78 | Telecom/CATV Metallic Cable & Drops | R2 | 12 | NC | |
| 79 | Telecom/CATV Poles & Towers | R2 | 20 | NC | |
| 80 | Telecom/CATV Power Eq. | R2 | 12 | NC | |
| 81 | Telecom/CATV Station & Connection Eq. | R2 | 10 | NC | |
| 82 | Telecom/CATV All Other Eq. | R2 | 8 | NC | |
| 83 | Textile mills, products, and apparel manufacturing | R2 | 12 | New | |
| 84 | Theater equipment | R2 | 10 | NC | |
| 85 | Tobacco Manufacturing | R2 | 15 | NC | |
| 86 | Vegetable oil products (Starch, Vegetable, Fats & Oils Mfg.) | R2 | 18 | NC | |
| 87 | Waste Management and Remediation Services | L1 | 10 | New | |
| 88 | Water transportation | R2 | 20 | NC | |
| 89 | Water utilities (Water Supply and Irrigation Systems) | R2 | 50 | NC | |
| 90 | Wharves, docks and piers | R2 | 20 | NC | |
| 91 | Wholesale trade fixtures and equipment | O2 | 12 | New | |
| 92 | Wood products and furniture manufacturing | O2 | 12 | New | |

| Action Code Legend | |
|---|---|
| New | New Depreciation Table & Economic Life Determined. |
| NC | No Change to Economic Life. |
| PD | Partial Change pending additional study |
| Drop | This category was dropped, typically because it was combined with another category. |

## Certification

# *Certificate Of Appraisal*

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions; and they represent my personal, impartial, unbiased professional analysis, opinions and conclusions.

- I have no present or prospective interest or bias in the properties that are the subject of this report, and I have no personal interest or bias with respect to the parities involved.

- I was commissioned by the Florida Department of Revenue to conduct an unbiased and independent assessment.

- My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice (USPAP)* and accepted depreciation practice by the *Society of Depreciation Professionals (SDP)*.

- I did not make a physical inspection of the subject property. The opinions of value concluded in this report are the Condition Percent and Remaining Economic Lives contained in the recommended Depreciation Tables. As such, average condition for age is inherently assumed, and a physical inspection of the subject property is not warranted.

- The American Society of Appraisers and the Society of Depreciation Professionals have a mandatory re-accreditation program, I am in compliance with these programs.

- No persons, other than myself, provided significant professional assistance in developing this report.

**Stephen L. Barreca, CDP, PE**
Certified Depreciation of Professional – Society of Depreciation Professionals
Licensed Professional Engineer – State of Alabama
Candidate Member – American Society of Appraisers
President – BCRI Inc.

# BCRI's Qualifications

BCRI is specifically and uniquely qualified for this assignment. Successful completion of this project requires extensive experience and knowledge in four major areas of study: Depreciation Theory, Technology Forecasting, Valuation Theory, and Software Development. BCRI and its employees have extensive experience in all four areas.

Over the past 18 years, BCRI's owner, Steve Barreca, has developed hundreds of depreciation tables reflecting the combined impact of all causes of depreciation. The net value of the numerous property assessments he has undertaken exceeds $250 Billion dollars. Mr. Barreca is a licensed professional engineer and a Certified Depreciation Professional by the Society of Depreciation Professionals. Mr. Barreca is past president of the Society of Depreciation Professionals, and considered an expert in depreciation theory and practice by his peers.

## Qualifications of Stephen L. Barreca

Stephen L. Barreca is founder and president of BCRI Inc. Mr. Barreca founded BCRI in 1998. Mr. Barreca has extensive experience in the areas of depreciation and valuation theory and practice. He has conducted or managed valuation and economic life studies of various type of personal property with an aggregate value in excess of $350 Billion dollars. Mr. Barreca's clients include some of the largest corporations in the world as well as state governments and local taxing authorities in both the US and Canada.

Mr. Barreca has been accepted as a legal expert in the areas of personal property valuation, economic life studies, assessment of functional obsolescence, depreciation

# BCRI's Qualifications

theory and practice, depreciation table development, technology forecasting, and telecommunications network engineering and construction practice. He has successfully testified in utility rate cases involving many billions of dollars of revenue, and numerous property tax administration hearings and civil litigation.

Before forming BCRI Inc., Mr. Barreca was Vice President – Communication Technology Strategies for Technology Futures Inc. (TFI) responsible for overseeing and/or conducting TFI's telecommunication research studies. These studies included assessments of technological change, functional obsolescence of machinery and equipment, economic life studies, as well as depreciation and valuation assessments. Mr. Barreca's duties also included teaching training seminars and providing executive briefings to clients. Prior to joining TFI, Mr. Barreca spent 20 years at BellSouth in various engineering, strategic planning, and regulatory capacities. Mr. Barreca's extensive experience and expertise includes:

- Conducting or managing asset obsolescence & valuation studies involving over half a Trillion dollars in capitalized assets, including Telecommunication Network equipment, Computers and other high-tech equipment, Office Furniture & Equipment, Retail Fixtures & Equipment, Point of Sale equipment, and others.
- Assessing Functional & Technological Obsolescence of various types of property.
- Group depreciation and accounting practice, including the development of vintage retirement unit costs.
- Mass Appraisal techniques for personal property.
- Determining the economic and useful life expectancies of various types of equipment.
- Development of Depreciation and Percent Good Tables.
- Assessing the impact of traditional depreciation forces (i.e., wear and tear, deterioration, chance loss, etc.)
- Development and/or selection of mortality survivor curves (e.g., Iowa and Gompertz-Makeham).
- Technology Forecasting and qualifying the Marketing, Strategic and other business implications of technological change.
- Residual Value and Salvage Studies.
- Assessing the evolution and business implications of new and emerging technologies.
- Telecommunications Outside Plant Engineering

Mr. Barreca has presented at numerous industry forums including the International Association of Appraising Officers (IAAO), the annual Wichita Tax Conference, the USTA (United States Telephone Association) Network Planning Conference, the USTA Capital Recovery Conference, the IBC (International Business Communication) Asia Workshop, the International Engineering Consortium's World Forum, the Society of Depreciation Professionals, the American Society of

Appraisers, and others. Mr. Barreca has taught training seminars on depreciation, valuation and function obsolescence at industry association conferences, professional society conferences, and public training courses. Additionally, his studies have been published in numerous trade magazines and professional journals. Mr. Barreca has presented to the FCC, State Public Service Commissions, and before the Florida Senate Subcommittee on Telecommunications Reform.

Mr. Barreca is Secretary and past President of the Alabama Chapter of the American Society of Appraisers (ASA), past President of the Society of Depreciation Professionals (SDP) and a member of several industry associations including the International Association of Appraising Officers, the Institute of Electrical and Electronic Engineers, the ASA (Candidate Member), the Society of Depreciation Professionals. Mr. Barreca is a registered Professional Engineer (PE) and a Certified Depreciation Professional (CDP) from the Society of Depreciation Professionals. He received his BSEE degree from the University of New Orleans.

Mr. Barreca experience in assessing technological change and its impacts to the life cycles of personal property are internationally recognized. Mr. Barreca has given seminars on this subject worldwide, taught public courses on the subject, and supports a client list that includes many Fortune-500 companies.

BCRI specializes in the Mass Appraisal Cost Approach to value. As noted above, Mr. Barreca has undertaken numerous such assessments over the last 18 years involving the development of depreciation tables; for both industry and government taxing authorities, both in the U.S. and Canada. Additionally, Mr. Barreca has testified as an expert witness in legal proceedings involving depreciation, valuation, and economic lives on numerous occasions since 1990.

Mr. Barreca is a member of the IAAO and a candidate member of the ASA. Mr. Barreca currently chairs the Alabama chapter of the ASA's Board of Examiners, responsible for approving the accreditation of its members. Additionally, Mr. Barreca is as past president of the Society of Depreciation Professionals, and is currently nominated for election to president of the ASA – Alabama Chapter.

In addition to his Depreciation, Valuation and Technology Forecasting experience, Mr. Barreca has considerable experience in developing computer applications in these areas. While employed in the Old Bell System in the mid 1980s, Mr. Barreca chaired the AT&T system-wide effort to design and implement a new PC-network computer system to replace the mainframe-based depreciation system developed in the 1970s and used by all 21 Bell Operating companies. Following that assignment, Mr. Barreca led BellSouth's effort to design and implement a comprehensive depreciation system for BellSouth's internal use. That system was implemented in 1986, and was not materially changed until 1999 to make ready for Y2K. Additionally, as noted in the

# BCRI's Qualifications

previous section, BCRI developed and successfully markets a commercial technology forecasting software application.

Mr. Barreca will personally manage this project and will be the primary analyst. Mr. Rick Nord, Senior Analyst, will be assistant project manager. Mr. Nord's depreciation experience is on a par with that of Mr. Barreca. Additionally, Mr. Nord has a strong background (over 35 years) in finance, accounting, and an equally strong background in PC software development.

# References

W. C. Fitch and F. K. Wolf, *Depreciation Systems*, Iowa State Regulatory Conference, 1994.

W. C. Fitch and F. K. Wolf, *Conceptual Framework for Forecasting the Useful Life of Industrial Property*, Iowa State Regulatory Conference, 1984.

K. A. Kateregga, *Technological Forecasting Models and Their Applications in Capital Recovery*, Department of Industrial Engineering, Iowa State University.

*Public Utility Depreciation Practices*, National Association of Regulatory Utility Commissioners (NARUC), 1996

J. C. Fisher and R. H. Pry, *A Simple Substitution Model of Technological Change, Technological Forecasting and Social Change*, 1971.

R. C. Lenz and L. K. Vanston, *Comparisons of Technology Substitutions in Telecommunications and Other Industries*, Technology Futures, Inc., 1986.

S. L. Barreca, *Telecommunications Infrastructure Valuation Study*, Technology Futures Inc, 1998.

S. L. Barreca, *Comparison of Economic Life Techniques*, Technology Futures Inc, 1999.

S. L. Barreca, *Technological Obsolescence – Assessing the Loss in Value on Utility Property*, Journal of the Society of Depreciation Professionals, 1998.

# Appendix

S. L. Barreca, *Assessing Functional Obsolescence in a Rapidly Changing Marketplace, A Cost-Based Approach,* Journal of the Society of Depreciation Professionals, 1999.

*Valuing Machinery & Equipment,* American Society of Appraisers, 2000

*Uniform Standards of Professional Appraisal Practice (USPAP),* the Appraisal Foundation, 2003

*End of Report Text*

## UNTRENDED DEPRECIATION SCHEDULE
### (FOR USE ON REPLACEMENT COST NEW)

| Effective Age in Years | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 | Effective Age in Years |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 83% | 85% | 87% | 89% | 90% | 91% | 92% | 93% | 94% | 94% | 95% | 95% | 96% | 96% | 96% | 97% | 97% | 98% | 98% | 1 |
| 2 | 65% | 69% | 73% | 76% | 79% | 82% | 84% | 86% | 87% | 88% | 89% | 90% | 91% | 91% | 92% | 93% | 93% | 95% | 97% | 2 |
| 3 | 43% | 52% | 57% | 62% | 67% | 72% | 76% | 78% | 80% | 82% | 84% | 85% | 86% | 87% | 88% | 89% | 90% | 93% | 95% | 3 |
| 4 | 24% | 34% | 41% | 48% | 54% | 61% | 67% | 70% | 73% | 75% | 77% | 79% | 81% | 82% | 83% | 85% | 86% | 90% | 93% | 4 |
| 5 | 18% | 23% | 30% | 37% | 43% | 51% | 58% | 62% | 66% | 69% | 71% | 73% | 75% | 77% | 79% | 81% | 82% | 87% | 91% | 5 |
| 6 | | 18% | 23% | 28% | 33% | 41% | 49% | 54% | 58% | 62% | 65% | 68% | 71% | 73% | 75% | 77% | 78% | 84% | 89% | 6 |
| 7 | | | 19% | 23% | 26% | 33% | 39% | 45% | 50% | 54% | 58% | 62% | 65% | 68% | 70% | 72% | 74% | 81% | 86% | 7 |
| 8 | | | | 20% | 22% | 26% | 30% | 37% | 43% | 47% | 51% | 55% | 58% | 62% | 65% | 68% | 70% | 78% | 84% | 8 |
| 9 | | | | | 20% | 22% | 24% | 30% | 36% | 41% | 45% | 49% | 53% | 57% | 60% | 63% | 65% | 75% | 82% | 9 |
| 10 | | | | | | 20% | 21% | 25% | 29% | 34% | 39% | 43% | 47% | 51% | 54% | 57% | 60% | 71% | 79% | 10 |
| 11 | | | | | | | 20% | 22% | 24% | 29% | 33% | 37% | 42% | 46% | 49% | 52% | 55% | 68% | 76% | 11 |
| 12 | | | | | | | | 20% | 22% | 25% | 28% | 31% | 36% | 40% | 44% | 47% | 50% | 64% | 74% | 12 |
| 13 | | | | | | | | | 20% | 22% | 24% | 26% | 31% | 35% | 39% | 42% | 45% | 60% | 71% | 13 |
| 14 | | | | | | | | | | 20% | 22% | 23% | 27% | 31% | 34% | 37% | 40% | 56% | 68% | 14 |
| 15 | | | | | | | | | | | 20% | 21% | 24% | 28% | 31% | 33% | 35% | 52% | 65% | 15 |
| 16 | | | | | | | | | | | | 20% | 22% | 25% | 27% | 29% | 31% | 48% | 61% | 16 |
| 17 | | | | | | | | | | | | | 20% | 22% | 23% | 25% | 27% | 44% | 58% | 17 |
| 18 | | | | | | | | | | | | | | 20% | 22% | 23% | 24% | 39% | 54% | 18 |
| 19 | | | | | | | | | | | | | | | 20% | 21% | 22% | 34% | 51% | 19 |
| 20 | | | | | | | | | | | | | | | | 20% | 21% | 30% | 47% | 20 |
| 22 | | | | | | | | | | | | | | | | | 20% | 26% | 40% | 22 |
| 24 | | | | | | | | | | | | | | | | | | 23% | 34% | 24 |
| 26 | | | | | | | | | | | | | | | | | | 21% | 28% | 26 |
| 28 | | | | | | | | | | | | | | | | | | | 23% | 28 |
| 30 | | | | | | | | | | | | | | | | | | | 21% | 30 |
| 32 | | | | | | | | | | | | | | | | | | | 20% | 32 |

These percentages should be applied to historical cost after it has been factored upward (trended) to the current year's Replacement Cost New (RCN). Trending of historical cost may not be appropriate when assets' replacement costs are decreasing due to emerging technologies. See section VIII.G., for discussion.

Factors indicate the remaining percentage of economic life.

This table is based on equipment in average condition.

If the county property appraiser determines that the application of another comparable table, designed specifically for ad valorem tax purposes more accurately reflects the just value of the personal property within the county they may utilize such table, on a county-wide basis, in lieu of the table above.

Source: 1997 Florida Department of Revenue, Property Tax Administration (Based on Marshall Valuation Service, Depreciation-Fixtures & Equipment", Normal Depreciation, Sec. 97, p. 18, January 1996)

EXHIBIT B

ATTACHMENT C

# Florida Department of Revenue
## LIFE EXPECTANCY GUIDELINES

The asset life recommendations have been derived from various sources: Marshall Valuation Service, Florida Public Service Commission, and industry depreciation studies. As relevant information becomes available, the Department will update the tables.

| INDUSTRY GROUP | ASSET LIFE IN YEARS |
|---|---|
| Aerospace industry | 10 |
| Agriculture, machinery and equipment | 10 |
| cotton ginning | 12 |
| Aircraft and all helicopters | |
| except commercial aircraft | 6 |
| commercial aircraft | 12 |
| Amusement and theme parks | 10 |
| Apparel and fabricated textile manufacturing | 9 |
| Automobile repair shops | 10 |
| Bakeries and confectionery production | 12 |
| Barber and beauty shops | 10 |
| Billboards | 20 |
| Brewery equipment | 12 |
| Cable television, headend facilities | 11 |
| microwave systems | 9.5 |
| program origination | 9 |
| service and test | 8.5 |
| subscriber connection and distribution | 10 |
| Canneries and frozen food production | 12 |
| Cement manufacture | 20 |
| Chemical and allied production | 9.5 |
| Clay products manufacturing | 15 |
| Clocks and watches, manufacturing | 10 |
| electronic instrumentation | 6 |
| Cold storage and ice-making equipment | 18 |
| Cold storage warehouse equipment | 10 |
| Computers, 'personal computers' ('PC') | 4 |
| mainframe | 6 |
| Peripherals | 6 |
| Condiments, manufacturing and processing | 10 |
| Construction equipment, general construction | 6 |
| marine construction | 6 |
| Dairy products manufacturing | 12 |
| Data handling equipment, except computers | 6 |
| Distilling | 12 |
| Electrical equipment manufacturing | 10 |
| Electric companies, steam production | 25-34 |
| other production, combined cycle | 16-21 |
| gas tubines | 26-29 |
| nuclear production | 26-28 |

| INDUSTRY GROUP | ASSET LIFE IN YEARS |
|---|---|
| transmission | 39-41 |
| distribution | 29-33 |
| Electronic equipment manufacturing | 6 |
| Fabricated metal products | 12 |
| special tools | 3 |
| Fishing equipment, excluding boats and barges | 4 |
| Food and beverage production | 12 |
| special handling devices | 4 |
| Fur processing | 9 |
| Gas distribution, total distribution equipment | 35-40 |
| Optional - for equipment by category: | |
| mains and services, plastic | 36-40 |
| mains and services, steel | 37-44 |
| meters, regulators, installations | 25-30 |
| other distribution equipment | 30-35 |
| Glass and glass products | 14 |
| special tools | 2.5 |
| Grain and grain mill products manufacture | 17 |
| Gypsum products | 15 |
| Hand tools | 5 |
| Hospital furnishings and equipment | 10 |
| Hotel and motel furnishings and equipment | 10 |
| Jewelry products and pens | 12 |
| Knitwear and knit products | 7.5 |
| Laundry equipment | 10 |
| Leather and leather products | 11 |
| Logging, timber cutting | 6 |
| Machinery manufacturing, except as otherwise listed | 10 |
| Meatpacking | 12 |
| Medical and dental supply production | 9 |
| Metalworking machinery manufacturing | 10 |
| Mining and quarrying | 10 |
| Motion picture and television production | 12 |
| Motor vehicle and parts manufacturing | 12 |
| special tools | 3 |
| Office furniture and equipment | 10 |
| Optical lenses and instrument manufacturing | 10 |
| Paints and varnishes | 9.5 |
| Paper and pulp manufacturing | 13 |
| converted paper, paperboard and pulp | 10 |

# Florida Department of Revenue
## LIFE EXPECTANCY GUIDELINES

The asset life recommendations have been derived from various sources: Marshall Valuation Service, Florida Public Service Commission, and industry depreciation studies. As relevant information becomes available, the Department will update the tables.

| INDUSTRY GROUP | ASSET LIFE IN YEARS |
|---|---|
| Petroleum and natural gas, drilling, onshore | 6 |
| drilling, offshore | 7.5 |
| exploration and production | 14 |
| marketing | 9 |
| petroleum refining | 16 |
| pipeline transportation | 22 |
| Plastics manufacturing | 9.5 |
| Plastic products manufacturing | 11 |
| special tools | 3.5 |
| Primary metals production, nonferrous and foundry products | 14 |
| special tools | 6.5 |
| Primary steel mill products | 15 |
| Printing and publishing | 11 |
| Professional and scientific instruments | 10 |
| Radio and television, broadcasting | 6 |
| manufacturing | 10 |
| Railroad transportation equipment manufacturing | 12 |
| locomotive manufacturing | 11.5 |
| Recreation and amusement | 10 |
| Retail trades, fixtures and equipment | 9 |
| Residential furniture | 10 |
| Restaurant and bar equipment | 10 |
| Restaurant equipment, fast foods | 7 |
| Rubber products manufacturing | 14 |
| special tools | 4 |
| Sawmills, permanent | 10 |
| portable | 6 |
| Service establishments | 9 |
| Ship and boat building machinery and equipment | 12 |
| special tools | 6.5 |
| Soft drink manufacture and bottling | 12 |
| Steam production and distribution | 28 |
| Stone products manufacturing | 15 |
| Sugar and sugar products manufacturing | 18 |
| Telecommunications, local exchange | |
| analog switching | 8 |
| digital switching | 8 |
| circuit, digital | 8 |
| circuit, analog | 8 |

| INDUSTRY GROUP | ASSET LIFE IN YEARS |
|---|---|
| circuit, optic | 8 |
| other central office equipment | 8 |
| information/origination equipment | 8 |
| smart phones | 6 |
| metallic cable | 12 |
| fiber cable | 20 |
| poles | 20 |
| conduit | 20 |
| Telecommunications, interstate interexchange | |
| analog switching | 8 |
| digital switching | 8 |
| metallic cable | 12 |
| fiber cable | 20 |
| poles | 20 |
| conduit | 20 |
| all other equipment | 8 |
| Telecommunications, cellular | |
| analog switching | 8 |
| digital switching | 8 |
| radio frequency channel and control | 8 |
| power equipment | 12 |
| antennae | 10 |
| towers | 20 |
| transmission equipment | 8 |
| cellular phones | 5 |
| Textile products, including finishing and dyeing | 9 |
| manufacture of nonwoven fabrics | 10 |
| manufacture of yarn, thread and woven fabrics | 11 |
| manufacture of textured yarns | 8 |
| Theater equipment | 10 |
| Tobacco and tobacco products | 15 |
| Vegetable oil products | 18 |
| Waste reduction and resource recovery | 10 |
| Water transportation | 20 |
| vessels, barges and tugs | 18 |
| Water utilities | 50 |
| Wharves, docks and piers | 20 |
| Wholesale trade fixtures and equipment | 9 |
| Wood products and furniture manufacturing | 10 |

ATTACHMENT E

SAMPLE PROPERTY WORKSHEET

Card _____ of _____

| Co. # | Account Number | Class Code | Alternate Key |
|---|---|---|---|

Taxpayer Name

Actual Physical Location

City

Mailing Address

City

State or Country | Sequence Number

Business Name

Primary Class of Property
- ☐ Retail
- ☐ Wholesale
- ☐ Manufacturing
- ☐ Leasing/Rental
- ☐ Service
- ☐ Special

Total Area

Sales Area

Fixture Cost per Sq. Ft.

| PROPERTY APPRAISER'S VALUES | D.O.R. VALUES |
|---|---|
| F.F. & E. Just Value | F.F. & E. Just Value |
| Leasehold Impr. Just Value | Leasehold Impr. Just Value |
| Pollution Control Just Value | Pollution Control Just Value |
| Pollution Control Salvage | Pollution Control Salvage |
| TOTAL JUST VALUE | TOTAL JUST VALUE |
| Exemption Value | Exemption Value |
| TOTAL TAXABLE VALUE | TOTAL TAXABLE VALUE |
| Exemption Type | Penalty Rate % | Taxpayer's Estimate of Value |

Furniture, Fixtures, Machinery, Equipment, Leasehold Improvements, Materials and Supplies

| Quantity | Description or Item | Age | Year Purchased | Condition | Original Cost | Index Factor | Replacement Cost New | Depreciation Factor (P.W.T.) | Just Value |
|---|---|---|---|---|---|---|---|---|---|

Source of Data:  ☐ Field   ☐ Tax Return

Evaluator

Date

61