**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                    Case No. 3:05-bk-03817-JAF

WINN-DIXIE STORES, INC., et al.,          Chapter 11

       Debtors.                       Jointly Administered

_____/

**RESPONSE OF MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP, TO**
**FEE EXAMINER'S FINAL REPORT OF REVIEW AND ANALYSIS**
**OF FIFTH INTERIM APPLICATION OF MILBANK, TWEED,**
**HADLEY & M<sup>C</sup>CLOY LLP FOR INTERIM PERIOD JUNE 1, 2006**
**THROUGH AND INCLUDING SEPTEMBER 30, 2006**

      Milbank, Tweed, Hadley & M<sup>C</sup>Cloy LLP ("Milbank") submits this response (the "Response") to Stuart, Maue, Mitchell & James, Ltd.'s (the "Fee Examiner") final report of the review and analysis of the fifth interim application submitted by Milbank for the interim period of June 1, 2006 through and including September 30, 2006 (the "Report"), and in support thereof, respectfully represents as follows:

**BACKGROUND**

      1.   Bankruptcy Filing.  On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. and certain of its affiliated direct and indirect subsidiaries (collectively, "Winn-Dixie" or the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code")

in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").

2.    Statutory Committees.  On March 1, 2005, the United States Trustee duly appointed the Official Committee of Unsecured Creditors (the "Committee") (Docket No. 176).  On August 17, 2005, the United States Trustee appointed the Equity Security Holders' Committee (the "Equity Committee") (Docket No. 3027), which was disbanded on January 11, 2006 (Docket No. 5098).

3.    Venue Transfer.  By order dated April 13, 2005, the New York Bankruptcy Court transferred venue of these cases to the Bankruptcy Court for the Middle District of Florida (Jacksonville Division) (the "Bankruptcy Court").  The Debtors' cases are being jointly administered for procedural purposes only.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

4.    Milbank's Retention.  On April 12, 2005, pursuant to the Order Under 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002, Authorizing Retention and Employment of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP as Counsel to Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc., et al. (Docket No. 702) (the "Retention Order"), the Bankruptcy Court

authorized the Committee's retention of Milbank as its counsel in these cases effective as of March 1, 2005.[1]

     5.  <u>Fifth Interim Fee Application</u>.  On November 21, 2006, Milbank submitted the Fifth Application of Milbank, Tweed, Hadley & M<u>c</u>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, for Interim Allowance of Compensation for Services Rendered and for Reimbursement of Expenses Incurred During Period from June 1, 2006 Through and Including September 30, 2006 (the "<u>Fifth Interim Compensation Period</u>," and such interim fee application being the "<u>Fifth Interim Fee Application</u>") (Docket No. 12759).

     6.  On December 14, 2006, this Court granted the Fifth Interim Fee Application and allowed Milbank's request for $972,312.50 in fees and $74,318.99 in expenses, for a total award of $1,046,631.49 (Docket No. 13107).

     7.  <u>Fee Examiner</u>.  On August 10, 2005, the Bankruptcy Court ordered the appointment of a fee examiner, pursuant to the Order Granting Motion To Appoint Fee Examiner (Docket No. 2933). On December 14, 2005, the Bankruptcy Court entered the Order Authorizing Debtors to Employ and Retain Stuart, Maue, Mitchell & James Ltd. as Fee Examiner (Docket No. 4599) (the "<u>Fee Examiner</u>"), pursuant to which certain procedures were

---

[1]    On March 30, 2005, the New York Bankruptcy Court entered an order (Docket No. 607) approving Milbank's retention on an interim basis.

established for the Fee Examiner's review of all interim fee applications, including Milbank's Fifth Interim Fee Application.

**RESPONSE**

8.   Milbank appreciates the opportunity to address the Report and to explain and clarify items that the Fee Examiner has identified, and to supplement its Fifth Interim Fee Application.  Milbank hopes that the supplemental information in this Response and in the attached exhibits will assist the Fee Examiner and the United States Trustee in their review of the reasonableness and necessity of the fees and expenses incurred by Milbank during the Fifth Interim Compensation Period.

9.   The balance of this submission will track the substantive portions of the Report.

**A.    Recomputation Of Fees And Expenses**

10.   The recomputed amount of total fees is $429 more than the amount requested by Milbank.  (Report at 4).  This difference is the result of a variance between task hours and entry hours.  Accordingly, Milbank respectfully requests that any fees that it waives in response to the Report be offset by $429 to reflect this calculation error.

11.   The Report notes that there is no discrepancy between the amount of expenses requested for reimbursement and amounts computed by the Fee Examiner.  (Report at 4).

---

subject to final approval, which occurred pursuant to the Retention Order

B.    **<u>Technical Billing Discrepancies</u>**

12.    The Report notes that there were 1.40 hours of
potential double billing with $945 in associated fees.  (Report
at 5).  Milbank has carefully reviewed the potential double
billing entries listed on Exhibit B of the Report and determined
that the entries reflect multiple telephonic conferences
concerning similar Committee issues.

C.    **<u>Hourly Rate Increases</u>**

13.    The Report notes that hourly rates for one (1)
timekeeper increased between the Fifth Interim Compensation
Period and June of 2005 (<u>i.e.</u>, approximately, one (1) year prior
to this period and such rates increased on or around the
beginning of 2006).  (Report at 7).  The Report states that
increased hourly rates of all timekeepers resulted in $101,701
in additional fees billed during the Fifth Interim Compensation
Period.  (Report at 8).  Milbank does not believe that it would
be appropriate to deny the Firm compensation that is based on
the usual and customary hourly rates charged by the Firm to its
bankruptcy and non-bankruptcy clients.  Milbank's hourly rates
are adjusted in the normal course of the Firm's business at
least annually, usually on or around January 1 of each year, and
services rendered thereafter are billed at the new hourly rates.
The new hourly rates charged by Milbank were increased in
accordance with Milbank's established billing practices and

procedures.  Milbank submits that work done for the Committee is properly charged at the rates then in effect.

**D.    Time Increments; Complete and Detailed Descriptions**

14.   The Report notes that all billing entries were in tenths-of-an-hour increments as required by U.S. Trustee Guidelines and task descriptions were sufficiently detailed and included the type of activity and subject-matter except for 1.60 hours with $1,187.50 in associated fees.  (Report at 8-10). Milbank believes that Exhibit A attached hereto contains revised activity descriptions that are in accordance with the Fee Examiner's specifications for the identified time entries and not vaguely described activities.

**E.    Blocked Entries**

15.   The Report notes that there were no "lumped" or "blocked entries".  (Report at 10-11).

**F.    Multiple Professionals At Hearings And Conferences (Intraoffice Conferences)**

16.   The Fee Examiner has identified 251 entries describing intraoffice conferences, which represents 108.7 hours with $64,353 in associated fees and 7% of the total fees requested in the Fifth Interim Fee Application.  (Report at 11-12, Exhibit E).

17.   As the Fee Examiner notes, "[i]ntraoffice conferences are necessary and appropriate . . . ."  (Report at 11).  Additionally, there is nothing in the Bankruptcy Court's local rules or the U.S. Trustee Guidelines that mandates the

disallowance of such fees.  The Fee Examiner only requires that conferences identify the participants, the subject matter of the conference and the need for multiple attendees.  That has been done with respect to these activity description on Exhibit B attached hereto.

18.  Committee representation in cases as large and complex as those of the Debtors cannot possibly be handled by a single attorney, and clients understand and expect that a team of highly-qualified and capable attorneys are necessary to provide proper representation in complex cases.  As such, in order to maximize efficiency and cohesiveness, intra-office conferences and meetings are necessary in order to coordinate complex tasks and delegate work to ensure non-duplication. Milbank has used its best efforts to ensure intra-office conferences are employed only when necessary, as reflected by both length – most intra-office conferences were billed at .5 hours or less and all but twelve (12) entries (which were longer conferences generally relating to the review and analysis of corporate governance documents in connection with the plan of reorganization ) were billed at less than one hour -- and number -- intraoffice conferences represent only 7% of the total fees requested during the Fifth Interim Compensation Period.  As such, Milbank respectfully submits its use of intra-office conferences were limited, necessary and appropriate.  Milbank believes that Exhibit B attached hereto contains revised

activity descriptions that are in accordance with the Fee Examiner's specifications for certain of the identified time entries.

### G. Multiple Professionals At Hearings And Conferences (Non-Firm Conferences, Hearings and Events)

19.   The Fee Examiner has identified 152.8 hours, with $91,175.50 in associated fees where more than one Milbank timekeeper attended a conference, hearing or other event that was also attended by non-Firm personnel.  (Report at 13-14, Exhibit F).  Milbank has carefully reviewed the non-Firm conferences, hearings and events identified by the Fee Examiner on Exhibit F to the Report and has prepared Exhibit C attached hereto to better identify and explain the role of each timekeeper who billed for that attendance and the need for multiple attendees.  These involved meetings and hearings (not intra-office conferences) as follows:

- Court hearings
- Committee meetings
- Asset sales
- Pending motions
- Meetings regarding substantive consolidation
- Meeting with the Debtors
- Committee investigation report regarding pre-petition matters relating to the board of directors
- Claim reconciliation issues
- Plan and disclosure statement issues
- Corporate governance and corporate documents
- Taxation of common stock reserve
- Board candidacy process

Milbank believes that the level of staffing was appropriate for the tasks involved and that Milbank would not have been able competently to handle the particular meetings and hearings at issue with only one lawyer.  For example, the resolution of certain tax issues in connection with the review and analysis of corporate governance documents regarding the plan of reorganization required the participation of, among others, Michael Comerford, Matthew Barr, Dale Ponikvar and Russell Kestenbaum because of the complexity of such issues.

20.  None of the matters involving the participation of multiple professionals that have been identified by the Fee Examiner on Exhibit F to the Report were routine.  Generally, Milbank's counterparties with respect to the identified activities were also represented by multiple lawyers; multiple professionals were required because of the complexity, significance and multi-disciplinary aspects of the activities. As noted, Milbank has attached an annotated version of Exhibit C to assist the Fee Examiner in this regard.

### H.    Personnel Who Billed 10 Or Fewer Hours

21.  The Fee Examiner notes (Report at 15, Exhibit G) that five (5) timekeepers billed 10 or fewer hours during the Fifth Interim Compensation Period in an aggregate of 27.1 hours with associated fees of $6,472 and suggests a review of these timekeepers may be appropriate to allow a determination of whether they are (i) duplicating the work of others, (ii)

increasing the cost to the Debtors' estates because of
orientation or the 'getting-up-to-speed' that may be required,
or (iii) not contributing to the advancement of the cases.
Milbank has attached hereto as Exhibit D further information
regarding these individuals and the services they have performed
to assist the Fee Examiner in its review.  As Exhibit D shows,
of the five (5) timekeepers at issue, two of the timekeepers
have billed entries in excess of 10 hours during prior
application periods.  One associate assisted in the review and
analysis of corporate governance documents in connection with
the plan of reorganization.  None of these timekeepers were
rotated in and out of the engagement, and the fact that they
devoted relatively small amounts of time to the matter is not
indicative of inefficient staffing.

I.   **Long Billing Days**

22.   Lawyers in large firms like Milbank and complex
reorganization cases like those of the Debtors do not work five-
day weeks or eight-hour days.  The professional services
rendered by Milbank on behalf of the Committee have required the
continuous expenditure of substantial time and effort, under
time pressures which sometimes required the performance of
services late into the evening and, on a number of occasions,
over weekends and holidays.  The services rendered required a
high degree of professional competence and expertise in order to

be administered with skill and dispatch.  As such, on many occasions, "long billing days" cannot be avoided.

23.  The Fee Examiner has identified 5 days on which individuals billed more than 12 hours during the Fifth Interim Compensation Period.  (Report at 17, Exhibits H-1 and H-2).  The Fee Examiner further notes that these entries total 65.7 hours with $34,067.50 in associated fees.  The hours billed by individuals on these days relate to extraordinary activity levels associated with particular matters of critical importance, including (i) drafting a report in connection with the Committee's investigation of various pre-petition matters relating to the Company, (ii) traveling to and from and attending a Committee meeting in Chicago, Illinois regarding pending issues and (iii) participating in discussions and analyzing corporate governance documents in connection with the plan of reorganization.

24.  If a "12-hour rule" were imposed on counsel in these chapter 11 cases, the concern regarding inefficiencies by timekeepers who bill low hours discussed above in section H of this Response would become a significant concern.  More lawyers working fewer hours is inefficient and simply does not make sense from the client's perspective; it would not be tolerated by Milbank's non-bankruptcy clients.

### J.    Administrative/Clerical Activities

25.   The Fee Examiner has identified 295.7 hours with $45,447 in associated fees as activities describing administrative and clerical activities performed by paraprofessionals.  (Report at 19, Exhibit I).  Milbank had staff performing administrative and clerical tasks throughout the Fifth Interim Compensation Period.  In addition, Milbank submits that the administrative and clerical activities in question are activities that Milbank does not include as overhead.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  Milbank represents that it does in fact charge its non-bankruptcy clients for the items identified by the Fee Examiner.

26.   The Fee Examiner did not identify any entries describing administrative and clerical activities performed by professionals.  (Report at 19).

### K.    Legal Research

27.   The Fee Examiner had identified 37.8 hours with associated fees of $14,332.50 describing legal research time entries.  (Report at 20, Exhibit J).  The Fee Examiner did not identify any time entries that were considered vague in describing the research and its purpose.

28.    With respect to the 37.8 hours with $14,332.50 in associated fees of legal research, the Fee Examiner does not suggest any abuses or non-compensable time for legal research.

The question is whether such charges were reasonable and appropriate.  This is an area where there is no substitute for the Bankruptcy Court's and the United States Trustee's experience with the conduct of bankruptcy cases generally and their respective knowledge of the issues raised in these reorganization cases in particular.  To help them in this analysis, Milbank notes that the hours expended for legal research approximate 1% of the total hours and 1% of the total fees.  Milbank submits that such amounts are reasonable and that the research was necessary to the administration of the cases.

L.    **Travel**

29.    The Fee Examiner has identified 1 task describing working travel and 7 tasks describing non-working travel. Collectively, this represents an aggregate of 4.5 hours with $3,037.50 in associated fees for working travel and 39.40 hours with $24,670 in associated fees for non-working travel.  (Report at 20).  Milbank notes that the time billed for travel was for necessary trips by Milbank attorneys for Bankruptcy Court hearings, meetings with the Debtors' employees and representatives and store auctions.  The hours expended for non-working travel time approximate 1% of the total hours and 2% of the total fees.  Milbank submits that such amounts are reasonable and that the travel was necessary to the administration of the cases.  Milbank attorneys traveled several times to Jacksonville, Florida to attend hearings related to

13

ongoing matters in these cases, as well as a trip to Chicago, in connection with a meeting to discuss substantive consolidation issues.

**M.    <u>Travel Expenses</u>**

30.    The Fee Examiner identifies (Report at 26 and Exhibit M to the Report) out-of-town travel expenses totaling $15,674.03.  The Fee Examiner notes that $7,894.08 of the out-of-town travel expenses are described only as "travel" and "did not include a separate itemization for airfare, hotel accommodations, or other travel-related expenses."  Milbank has reviewed all of the entries identified by the Fee Examiner as out-of-town travel and attaches as Exhibit E hereto revised travel expense descriptions that identify the nature of the expenses.

31.    The Fee Examiner notes that $6,381.16 of the out-of-town travel expenses are for a conference room in connection with a Winn-Dixie meeting.  This charge relates to an in-person meeting of approximately twenty-five (25) people held in Chicago and the charges were reasonable and necessary expenses.  The meeting included members of the Committee and the Committee's advisors and resulted in a settlement of substantive consolidation issues that formed the cornerstone of the Debtors' plan of reorganization.  As such, Milbank respectfully submits it should be reimbursed for the expenses in the amount of $6,381.16.  See Exhibit E attached hereto.

32.  In addressing the Fee Examiner's review of travel expenses, Milbank will voluntarily waive its request for reimbursement of $2,412.60, which was inadvertently billed.

**N.     Local Travel**

33.  The Fee Examiner has indicated that Milbank sought reimbursement for local travel expenses in the amount of $4,652.98.  (Report at 32, Exhibit P-1).  The Fee Examiner contends that "[w]hile the Firm may reimburse its employees for commuting expenses [when working after regular business hours], this type of expenses is generally considered part of Firm overhead."  (Report at 31).

34.  Milbank submits that overtime transportation expenses incurred in connection with legitimate client business may be charged to the client.  Milbank provides transportation assistance to personnel who arrive at or leave work during off-peak hours.  "Off-peak travel" is defined as beginning or ending work during the period from 8:30 p.m. to 6:00 a.m., Monday through Friday, or at any time on a Saturday, Sunday or Firm-observed holiday.  Persons who start and end work during off-peak hours are entitled to transportation assistance for one-way travel only.  When a person who is eligible for transportation reimbursement elects to travel by private automobile or public transportation, as of July 25, 2006, Milbank provides fixed reimbursement of $20.00 to persons residing within the five

boroughs of New York City and $30.00 to persons residing outside
of New York City.

35.  In light of the number of long billing days
during the Fifth Interim Compensation Period, Milbank submits
that reimbursement for local travel expenses are reasonable and
reflect the exercise of sound billing judgment by Milbank
personnel.  Such overtime expenses are charged by Milbank to its
non-bankruptcy clients.  Milbank submits that it is market
practice for firms like Milbank to charge for such expenses.

36.  In an effort to address the Fee Examiner's
concerns noted on page 38 of the Report, Milbank will
voluntarily waive its request for reimbursement of $12, which
was inadvertently billed.

O.  **Overtime and Local Meals**

37.  The Fee Examiner has identified $1,223.25 in
overtime meal expenses (Report at 33-34 and Exhibit P-2 to the
Report) and suggests that "[w]hile the Firm may reimburse its
employees for [overtime] meal expenses, this type of expense is
generally considered part of Firm overhead."  (Report at 33).

38.  Milbank's written policy regarding this category
of expense provides that personnel who work past 8:00 p.m. on a
client matter (not including time spent at dinner) can be
reimbursed for dinner expenses up to $25 in New York and
California.  All such overtime meal expenses are charged by
Milbank to its non-bankruptcy clients.  Milbank submits that it

is market practice for firms like Milbank to charge for such expenses.

39.   The Fee Examiner also indicates (Report at 34 and Exhibit P-2 to the Report) that Milbank sought reimbursement for potentially duplicative local meals in the amounts of $17.00 and $25.00, both dated September 19, 2006.  Milbank submits that the meals were not duplicative, but they were processed internally on the same day.  The actual dates in connection with the local meals were September 19, 2006 and September 20, 2006.

40.   The Fee Examiner also indicates (Report at 33-34 and Exhibit P-3 to the Report) that Milbank sought reimbursement for a local meal in the amount of $1,219.22.  Milbank submits that the meals, as indicated on Exhibit P-3 to the Report, relating to an in-person Committee meeting held at Milbank's New York office, were reasonable and necessary expenses.  As such, Milbank respectfully submits it should be reimbursed for the expenses in the amount of $1,219.22.

**P.   Document Processing/Overtime**

41.   The Fee Examiner identifies (Report at 35-36 and Exhibit P-4 to the Report) a total of $19,914.12 in charges for secretarial and support staff overtime.  These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  As the Third Circuit held in Busy Beaver, not all clerical services are

17

necessarily overhead.  19 F.3d at 848.  These expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well.  That is the market practice.  In considering the propriety of a professional's charges under section 330 for so-called "overhead expenses," the bankruptcy court should seek to determine if nonbankruptcy professionals charge their clients for these particular services.  Busy Beaver, 19 F.3d at 849.  Milbank represents that it does in fact charge its nonbankruptcy clients for the items identified by the Fee Examiner.

**Q.    Expenses Associated With Multiple Attendance**

42.  The Fee Examiner identifies (Report at 37, Exhibit Q) expenses associated with some conferences, hearings or other events for which multiple Milbank timekeepers billed $1,205.26.  As addressed above in section G of this Response, Milbank submits that attendance by Milbank timekeepers was appropriate and similarly submits that reimbursement of each timekeepers' expenses is also reasonable.

**R.    Courier Services; Photocopies; Facsimiles; Binding**

43.  The Fee Examiner identifies (Report at 28-30 and 36) charges for courier services, photocopies, facsimiles and binding.  These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients.  Milbank submits that these expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank

but by its peer firms as well.  That is the market practice.
Milbank represents that it does in fact charge its non-
bankruptcy clients for the items listed above and identified by
the Fee Examiner.

   **S.    Computer-Assisted Legal Research**

   44.   The Fee Examiner identified computer database
research totaling $14,342.13 and indicated that the application
does not disclose the method used to calculate such amounts or
whether the amount requested is at actual cost or a discounted
rate.  For database services provided by entities such as Lexis
and Westlaw (the "Providers"), Milbank pays the Providers for
access to such databases pursuant to flat rate subscription
agreements.  For a specific Lexis or Westlaw search run on
behalf of a client, Milbank charges the client for the cost of
the search at a rate assigned by the Provider.  On an annualized
basis, the expenses incurred by Milbank that it attributes to
computer-assisted legal research are greater than the
disbursements related to such research for which Milbank seeks
reimbursement from its clients.

   **CONCLUSION**

   45.   Milbank has supplemented its fee application to
address the asserted deficiencies noted by the Fee Examiner.
Milbank appreciates the considerable efforts of the Fee Examiner
and has itself made considerable effort to address the issues
raised in the Report.  Milbank hopes that the supplemental

materials submitted herewith will enable the Fee Examiner to evaluate the reasonableness and necessity of the fees and expenses incurred during the Fifth Interim Compensation Period, in connection with the Fee Examiner's final report that was submitted to the Bankruptcy Court.

Dated:  New York, New York
       April 19, 2007

                **MILBANK, TWEED, HADLEY & M$^C$CLOY LLP**

      By:    /s/ Michael E. Comerford
           Matthew S. Barr (MB 9170)
           Michael E. Comerford (MC 7049)
           1 Chase Manhattan Plaza
           New York, New York 10005
           (212) 530-5000

           Co-counsel for Official Committee of
           Unsecured Creditors of Winn-Dixie
           Stores, Inc., et al.