## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |

## NOTICE OF FILING

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates, as reorganized debtors, give notice of filing the attached Response of Skadden, Arps, Slate, Meagher & Flom LLP to the Stuart, Maue, Mitchell & James, LTD. Final Report of the Review and Analysis of the Fifth Interim Fee Application of Skadden, Arps, Slate, Meagher & Flom LLP.

Dated:  April 20, 2007

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By    _s/ D. J. Baker_
       D. J. Baker
       Sally McDonald Henry
       Rosalie Walker Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

Co-Counsel for Reorganized Debtors

SMITH HULSEY & BUSEY

By    _s/ Cynthia C. Jackson_
       Stephen D. Busey
       James H. Post
       Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Reorganized Debtors

00554868

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

**RESPONSE OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
**TO THE STUART, MAUE, MITCHELL & JAMES, LTD. FINAL REPORT OF**
**THE REVIEW AND ANALYSIS OF FIFTH INTERIM FEE APPLICATION OF**
<u>**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**</u>

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), bankruptcy

counsel for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, while debtors

and debtors-in-possession in the above-captioned case (collectively, the "Debtors"), submits this

response ("Response") to the Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue") Final Report

of the Review and Analysis of Fifth Interim Fee Application ("Fifth Application") of Skadden,

Arps for the period June 1, 2006 through September 30, 2006 (the "Report").  In support of this

Response, Skadden, Arps represents as follows:

---

[1]   In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

**Background**

A.    Chapter 11 Cases

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed petitions under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

2.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  During these cases, the Debtors operated their business and managed their properties as debtors in possession under Bankruptcy Code sections 1107(a) and 1108.

3.    The Debtors' bankruptcy cases were one of the 10 largest bankruptcy cases filed in 2005, with approximately $2.2 billion in assets as of the Petition Date.  Turnarounds & Workouts, vol. 20, no. 1, January 15, 2006.  Moreover, over 24,400 filed and scheduled claims were asserted against the Debtors in the aggregate amount of approximately $25 billion.

4.    By final order dated March 15, 2005, Skadden, Arps was authorized to provide services to the Debtors in these cases (the "Retention Order").  The Retention Order authorized Skadden, Arps to be compensated on the terms of its retention agreement, a copy of which is attached at Exhibit A.

5.    On November 9, 2006, this Court entered an order confirming the Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (the "Plan").

6.    On November 21, 2006, the Plan went effective.

B.       Interim Payment Procedures

        7.       On March 15, 2005, the Final Order Approving Interim Compensation

Procedures for Professionals was entered (the "Interim Payment Order").

        8.       Under the Interim Payment Order, professionals may be paid up to 80% of

fees earned and 100% of expenses incurred on monthly statements after submission of fee

statements to certain parties, including the Debtors and their counsel, the U.S. Trustee, counsel

for the creditors' committee and counsel for the Debtors' secured lenders and after expiration of

objection periods.  The remaining 20% of fees are payable, after court approval of interim fee

applications.  Interim fee applications are to be submitted approximately every four to six

months.  Fees and expenses incurred after November 21, 2006, can be paid by the Debtors

without further application or approval by this Court.

        9.       The first interim fee application ("First Application") covered the period

from the Petition Date through April 30, 2005, and sought $3,012,628.00 in fees and

$144,484.19 in expenses.  The First Application was approved by this Court on August 4, 2005.

The second interim fee application ("Second Application") covered the period from May 1, 2005,

through September 30, 2005, and sought $4,158,012.50 in fees and $145,055.82 in expenses.

The Second Application was approved by this Court on December 1, 2005.  The third interim fee

application ("Third Application") covered the period from October 1, 2005, through January 31,

2006, and sought $1,903,516.50 in fees and $39,986.18 in expenses.  The Third Application was

approved by this Court on April 6, 2006.  The fourth interim fee application ("Fourth

Application") covered the period from February 1, 2006, through May 31, 2006, and sought

$3,154,861.00 in fees and $59,318.42 in expenses.  The Fourth Application was approved by this

Court on August 10, 2006.  The Fifth Application covered the period from June 1, 2006, through

September 30, 2006, and sought $4,122,040.50 in fees and $57,007.18 in expenses. The Fifth Application was approved by this Court on December 14, 2006.[2]

10.    Skadden, Arps has received no objections from any party to its monthly fee statements or to the Fee Applications. Skadden, Arps has received all requested amounts under the Fee Applications that have become due under the Interim Payment Order.

## Stuart Maue

11.    By order dated December 14, 2005, the Court approved the Debtors' application to employ and retain Stuart Maue as the fee examiner in their cases (the "Fee Examiner Order"). The Fee Examiner Order includes Stuart Maue's engagement letter and two appendices that set forth, among other things, procedures for professionals to (a) submit monthly statements and fee applications to Stuart Maue and (b) respond to Stuart Maue's written reports.

12.    In accordance with the Fee Examiner Order, Stuart Maue does not make any determinations or recommendations in its written reports as to either (a) the reasonableness or necessity of the requested fees and expenses or (b) the amount of fees and expenses to be allowed or disallowed. Fee Examiner Order ¶ 8.

13.    On March 29, 2006, Skadden, Arps received preliminary fee reports on the First Application and the Second Application. On April 28, 2006, Skadden, Arps submitted its response to those preliminary reports. On July 19, 2006, and July 20, 2006, respectively, Stuart Maue's final reports on the First Application and the Second Application were filed. On August 18, 2006, and August 21, 2006, respectively, Skadden, Arps filed its response to those final reports.

---

[2]    The First Application, Second Application, Third Application, Fourth Application and Fifth Application are referred to collectively as the "Fee Applications."

14.    On May 22, 2006, Skadden, Arps received the preliminary fee report on the Third Application.  On June 21, 2006, Skadden, Arps submitted its response to that preliminary report.  On August 30, 2006, Stuart Maue's final report on the Third Application was filed.  On September 29, 2006, Skadden, Arps filed its response to that report.

15.    On September 5, 2006, Skadden, Arps received the preliminary fee report on the Fourth Application.  On October 5, 2006, Skadden, Arps submitted its response to that preliminary report.  On October 26, 2006, Stuart Maue's final report on the Fourth Application was filed.  On November 27, 2006, Skadden, Arps filed its response to that report.

16.    On  January 25, 2007, Skadden, Arps received the preliminary fee report on the Fifth Application.  On February 26, 2007, Skadden, Arps submitted its response to that preliminary report.  On March 20, 2007, the Report was filed with this Court.  This Response addresses the Report on the Fifth Application.

## Preliminary Statement

17.    As set forth below, the issues raised by Stuart Maue do not preclude approval by this Court of the fees and expenses requested.  Skadden, Arps also notes the substantial voluntary reduction of more than $445,000.00 during the fifth interim period.

18.    As an initial matter, Skadden, Arps notes that the Report has not analyzed the difficulty of these cases, the efforts by Skadden, Arps to achieve the Debtors' goals, and the effectiveness of Skadden, Arps' representation.

19.    The Winn-Dixie cases are large and complex chapter 11 cases.  As noted above, the Debtors' bankruptcy cases were among the largest filed in the United States in 2005, with over $2 billion in assets as of the Petition Date and over 22,000 claims scheduled and filed against the Debtors for billions of dollars.  There are over 15,800 entries on the docket,

approximately 2,200 orders have been entered, and more than 62 omnibus hearings have been held.

20.    Skadden, Arps and its co-counsel, Smith Hulsey & Busey, actively represented the Debtors in these cases on a wide variety of matters.  Its representation of the Debtors required Skadden, Arps to utilize a variety of its professionals in different practice groups to deal effectively with the issues that confronted the Debtors.

21.    The efforts of Skadden, Arps and a number of other professionals assisted the Debtors in emerging from chapter 11 as a reorganized company in less than 2 years after the Petition Date.  This is a formidable accomplishment given the magnitude of the chapter 11 cases, the complex issues raised, and the litigious issues and parties involved.

22.    Skadden, Arps' services are detailed in the Fee Applications, but not referenced in the Report.  Skadden, Arps submits that the Fifth Application should be reviewed in the overall context of these cases.[3]

23.    The standard for analyzing fee requests is whether the services rendered to the estates were reasonable and necessary, not whether, in hindsight, some fee or expense may be questioned.  As one court has recognized:

> [I]t is important for a court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation.  It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

---

[3]    See First Application at 8-33, Second Application at 7-33, Third Application at 7-26, Fourth Application at 7-33, and Fifth Application at 8-36.

In re Boston & Maine Corp., 776 F.2d 2, 10 (1st Cir. 1985) (internal citations and quotations omitted).  Thus, although the Report, which places weight on statistical and computer-generated analysis, is informative, the central inquiry is the reasonableness of fees and expenses incurred, in light of the services performed.  On that basis alone, Skadden, Arps submits that, given its representation of the Debtors in these cases, no reduction in fees and expenses is warranted, other than as set forth in this Response.  In support of its position that fee and expense reductions are not warranted, Skadden, Arps sets forth below its responses to the issues raised by the Report.

24.      As indicated in the Report, Stuart Maue uses statistical and computer-generated reports based on its own criteria and the United States Trustee Guidelines (the "Guidelines"), which contain guidelines for facilitating the review of fee applications.  Skadden, Arps respectfully submits that computer-generated analysis by its nature cannot determine whether sufficient information exists to determine whether fees and expenses are reasonable in light of the services rendered.

25.      For example, Stuart Maue identifies, at times, certain entries that it states do not follow technical billing guidelines.  Skadden, Arps notes that the purpose of the fee application is "to enable the court to reach an informed decision – one necessarily grounded in complete, coherent information – as to whether the requested compensation is justified."  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 845 (3d Cir. 1994).  Thus, even an allegedly technically deficient entry should be approved so long as adequate information exists to permit the Court to determine the activity described.  Skadden, Arps submits that its time entries meet this standard.

26.      Stuart Maue submitted a preliminary report on the Fifth Application.  The initial report was similar in form and substance to the Report.  Skadden, Arps responded to the

preliminary report and believes that the information submitted to Stuart Maue, together with this Response, resolves substantially all of the issues raised in the Report.

## Report

27.     The balance of this Response will track the substantive portions of the Report as to both fees and expenses.

## Fees

A.     Recomputation of Fees and Expenses

28.     The Report reflects that the amount of fees requested in the Fifth Application was $2,554.00 less than the amount computed by Stuart Maue.  Report at 4. Skadden, Arps is not seeking compensation for the $2,554.00 identified by Stuart Maue.

29.     The Report reflects that there was no difference between the amount of expenses requested by Skadden, Arps and the amount of expenses computed by Stuart Maue.  Id.

B.     Technical Billing Discrepancies

30.     The Report identifies two timekeepers who may have inadvertently double-billed four time entries.  Report at 6.  The entries in question totaled 1.80 hours with $1,257.00 in associated fees.  Id.

31.     Skadden, Arp reviewed the entries involved.  Two entries involved an inadvertent duplication.  These two entries total 1.50 hours with $1,095.00 in associated fees. While Skadden, Arps does not believe that the remaining two entries, totaling 0.30 hours with $162.00 in associated fees, are duplicative, Skadden, Arps will nonetheless reduce its fees for the entries for a total reduction of $1,257.00.

C.    Timekeepers and Positions

32.    The Report (a) identifies 57 timekeepers for the interim period, consisting of 11 partners, 10 counsel, 24 associates, 3 law clerks, 1 summer/winter associate, and 8 paraprofessionals, and (b) indicates that Skadden, Arps billed 7,878.00 hours for the interim period.  Report at 7.  The following chart is contained in the Report:

| Position | Hours | Percentage of Total Hours | Fees | Percentage of Total Fees |
|---|---|---|---|---|
| Partner | 1,450.10 | 18% | $1,159,807.00 | 28% |
| Counsel | 1,636.30 | 21% | 917,173.00 | 22% |
| Associate | 4,088.50 | 52% | 1,930,537.50 | 47% |
| Law Clerk | 61.20 | * | $18,054.00 | * |
| Summer/Winter Associate | 32.80 | * | $5,576.00 | * |
| Paraprofessional | 609.10 | 8% | 93,447.00 | 2% |
| TOTAL | 7,878.00 | 100% | $4,124,594.50 | 100% |

* Less than 1%

Id. at 8.

33.    The Winn-Dixie cases are large, complex chapter 11 cases.  As stated in the Fifth Application, the "cases involve 24 estates, thousands of creditors, shareholders and other parties in interest, and billions of dollars in assets and claims."  Fifth Application at 34.  Skadden, Arps believes that all timekeepers for the interim period performed necessary services.

34.    Skadden, Arps submits that these cases have been, and continue to be, appropriately staffed.  As shown in the above chart, 60% of the hours recorded in the interim period were charged by associates and paraprofessionals.

35.    As explained in the Fifth Application, Skadden, Arps' services have been "substantial, necessary and of significant benefit to the Debtors and their estates."  Fifth Application at 6.  Moreover, Skadden, Arps' services during the interim period had a significant positive economic impact on the Debtors and their estates.  For example, Skadden, Arps assisted the Debtors in disallowing over 1,300 claims, which reduced potential liability of the Debtors by

9

millions of dollars. Fifth Application at 12. Further, during the interim period, Skadden, Arps

assisted the Debtors in (a) rejecting over 300 unprofitable contracts, (b) closing the sale of their

Bahamas operation, which resulted in the Debtors receiving approximately $54 million, and

(c) documenting and finalizing the Disclosure Statement and terms of the Plan. Id. at 9-10, 15-

17, 19 and 25-28.

D.      Hourly Rate Increases

        36.     Stuart Maue states that Skadden, Arps increased the hourly rates of 4

timekeepers during the fifth interim period. Report at 8.[4] The rate increases in question were

consistent with rate increases for Skadden, Arps' bankruptcy and non-bankruptcy clients.

Skadden, Arps believes them to have been reasonable and appropriate.

E.      Time Increments

        37.     Stuart Maue states that all billing entries in the Fifth Application contain a

time allotment and were billed in increments of tenths of an hour. Report at 10.

F.      Vaguely Described Conferences

        38.     The Report identifies conferences and meetings that either did not identify

the participants or did not specify the subject matter or purpose of the communication. Report at

11. Stuart Maue asserts that these entries total 4.50 hours with $2,676.00 in associated fees. Id.

        39.     While the time entries identified in the Report do not, at times, identify

both the participants and the subject matter of the conferences, this should not create an

impediment to a meaningful review of Skadden, Arps' time.

---

[4]     Skadden, Arps believes that rates increased for two, not four, timekeepers. In accordance with Skadden, Arps'
        retention, hourly rates for first year associates increase upon admission to the Bar. Mr. Falls was admitted to
        the Bar in August 2006. Mr. Falls' rate changed, accordingly, in August 2006. In September 2006,
        Mr. Woodfield's rate increased as a result of ordinary course rate changes that occur for paraprofessionals who
        are promoted.

40.     Skadden, Arps has reviewed the entries identified in Report Exhibit D-1. Attached at Exhibit D-1 are revised task descriptions with additional detail.  Revised entries were provided to Stuart Maue in response to Stuart Maue's comments on the preliminary report on the Fifth Application.  Following submission of the additional detail, the Report indicates that two entries would still be considered vague.  Skadden, Arps contacted Stuart Maue to discuss the entries in issue.  After discussion, Stuart Maue informed Skadden, Arps that the following entry by M. Shah on August 29, 2006, for 0.2 hours would be the sole remaining entry in issue:

WITHHOLDING ISSUES DISCUSSIONS (.2)

Report Exhibit D-1 at 2.  This entry is not vague.  The entry reveals that Mr. Shah engaged in discussions regarding withholding issues.  Surrounding time detail and the Fee Applications make clear that withholding issues were important considerations for the Plan.  In light of the foregoing, the entry is not vague and should be fully compensable.

G.     Other Vaguely Described Activities

41.     The Report identifies certain other task entries that Stuart Maue believes are vague.  Report at 12-13.  Stuart Maue asserts that the entries total 6.75 [5] hours with $3,975.00 in associated fees.  Id. at 12; Report Exhibit D-2.  Stuart Maue states the following:

> Activity descriptions for the review of documents and correspondence should identify the person or party who prepared the document or correspondence and its subject-matter.  If the documents were not recently received or were previously reviewed, the description should also state the purpose of the review.
>
> In addition, activity descriptions should sufficiently describe the preparation of work product.  A description of correspondence should identify the correspondent and the subject of the correspondence.  Similarly, a description for preparation of pleadings should identify the pleading drafted or revised.

---

[5]     Skadden, Arps is unable to find a time entry in this exhibit that is not billed in tenths of an hour.

Activity descriptions for legal research should include the issues researched and the purpose of the research. The activity description must be sufficiently detailed to allow a determination of whether the research is case-related, whether the research is presumably familiar to experienced professionals, or whether research is performed by a professional with an appropriate experience level.

Report at 12.

42.    Nothing in the entries identified in the Report prevents meaningful review of Skadden, Arps' services. The narrative descriptions set out in the Fifth Application provide a sufficient level of context for determining whether the services rendered were reasonable given the issues addressed and the amounts requested – particularly when evaluated in the context of the facts and circumstances surrounding these chapter 11 cases and other time entries.

43.    Indeed, the time entries in the Fifth Application do, in fact, reasonably describe the activity performed. The following entries, for example, are identified in the Report:

REVIEW EMAIL MESSAGES RE: EXIT FINANCING (.5), PLAN (.2) AND BANKRUPTCY RELATED MATTERS (.7)

REVIEW CORRESPONDENCE RE: TERMSHEET (.1)

CORRESPOND INTERNALLY  RE: CREDIT AGREEMENT (.2)

Report Exhibit D-2 at 2-3. These entries reasonably describe the services rendered.

44.    Notwithstanding the above, Skadden, Arps has reviewed identified entries in Report Exhibit D-2. Attached at Exhibit D-2 are revised task descriptions with additional detail. Revised entries were provided to Stuart Maue in response to Stuart Maue's comments on the preliminary report on the Fifth Application. Following submission of the additional detail, the Report indicates that two entries would still be considered vague. Report at 14. Skadden, Arps contacted Stuart Maue to discuss the entries in issue. After discussion, Stuart Maue

12

informed Skadden, Arps that the following entry by C. Wenzel on August 30, 2006, for 0.2 hours would be the sole remaining entry in issue:

CORRESPOND INTERNALLY RE:  CREDIT AGREEMENT (.2)

Report Exhibit D-2 at 3.  This entry is not vague.  A review of the entries reveals that Mr. Wenzel worked on the credit agreement and communicated with the Skadden, Arps banking team on the agreement.  In light of the foregoing, the entry is not vague and should be fully compensable.

H.    Blocked Entries

45.    The Report identifies entries that have a single time increment for more than one activity.  Report at 14-15.  Stuart Maue asserts that entries of this type total 11.80 hours with $6,574.50 in associated fees.  Id. at 14.  Skadden, Arps has reviewed the time entries and believes that the reasonableness of the entries identified in the Report can be ascertained. Further, the Report identifies as blocked entries certain tasks that go hand in hand or otherwise were done contemporaneously.  For example, D. Turetsky's time for August 3, 2006, reads:

RESEARCH AND UPDATE EXHIBIT A TO SECOND
OMNIBUS CONTRACT ASSUMPTION MOTION (3.6)

Report Exhibit E at 3.  The tasks go hand and hand and were done contemporaneously.  Further, had Mr. Turetsky written "research for assumption motion (3.6)," the entry would not have been identified as containing blocked billing.  Attorneys should not be penalized for providing the Court with more detail than required.  Otherwise, paradoxically, the more detailed the description, the less likely that the services will be compensated.  The time entries in Report Exhibit E are accurate and provide the Court with sufficient information to identify and determine the reasonableness of services provided.

46.    Skadden Arps has reviewed the entries identified in Report Exhibit E. Attached at Exhibit E are revised task descriptions with additional detail.  Revised entries were provided to Stuart Maue in response to Stuart Maue's comments on the preliminary report on the Fifth Application.  Stuart Maue provides in the Report that "[m]ost of these revisions separated the tasks and provided a separate time entry for each task."  Report at 15.  Skadden, Arps contacted Stuart Maue to discuss the entries in issue.  After discussion, Stuart Maue informed Skadden, Arps that the entry identified above by Mr. Turetsky would be omitted from the Report. Skadden, Arps submits that all but the following one entry are separated by task with allocated time:

> REVIEW OF LYNCH AGREEMENT FOR 409A ANALYSIS
> AND CALL WITH P. LYNCH COUNSEL RE:
> AGREEMENT (2.8)

Report Exhibit E at 3.  While this entry does not allocate how much time was spent analyzing Mr. Lynch's agreement and how much time was spent on a call with Mr. Lynch's counsel regarding the agreement, this entry sufficiently describes the services rendered and should be fully compensable.

I.    Intraoffice Conferences

47.    The Report identifies entries that describe intraoffice conferences.  Report at 15-16.  Intraoffice conferences are defined as conferences among professionals and paraprofessionals in the same firm.  See id.  Stuart Maue asserts that entries total 142.05 hours with $79,916.50 in associated fees.  Report at 16.  According to Stuart Maue, of this amount, 93.00 hours with $53,387.50 in associated fees involved two or more Skadden, Arps timekeepers billing for the conference or meeting in issue.  Id.

48.    Skadden, Arps timekeepers admittedly confer with one another in rendering services to the Debtors.  It would be impossible to administer chapter 11 cases

14

efficiently without intraoffice conferences.  The Guidelines do not, however, prohibit

compensation for intraoffice conferences.  Instead, the Guidelines provide that conferences

should identify the participants and the subject matters, and this was done by Skadden, Arps in

the Fifth Application, along with Exhibit D-1.

49.      Bankruptcy courts have recognized the reality that complicated issues

require the services of more than one attorney.  See, e.g., In re Boston & Maine Corp., 776 F.2d

2, 10 (1st Cir. 1985) (holding that it is appropriate to have multiple attorneys working on large,

complex tasks).

50.      Skadden, Arps' level of intraoffice conferences was appropriate in view of

the complexity of these cases and, as a result, the requested compensation is reasonable.  The

ability of professionals at Skadden, Arps to confer internally among themselves, often involving

professionals from different practice areas (such as banking, mergers and acquisitions, trusts and

estates, or insurance), has contributed to the expeditious resolution of numerous issues in these

cases.  In turn, this has resulted in significant benefits for the Debtors' estates and their creditors.

J.      Non-Firm Conferences, Hearings, and Events

51.      The Report identifies instances in which two or more Skadden, Arps

professionals or paraprofessionals appeared to attend the same hearing, meeting, or other event

that was also attended by non-firm personnel.  See Report at 17-19.  Stuart Maue asserts that

entries total 444.10 hours with $275,917.50 in associated fees.  Id. at 18.  According to Stuart

Maue, of this amount, 274.80 hours with $150,964.50 in associated fees are entries for

participants other than the timekeeper who appears most responsible at the event.  Id. at 18-19.

52.      Cases as large and complex as these cases require the services of

professionals in multidisciplinary areas, such as banking, corporate, employee, insurance,

litigation, and tax law.  Fifth Application at 29-31; see also First Application at 30, Second

Application at 30, Third Application at 24 and Fourth Application at 29-31.  Skadden, Arps'

bankruptcy and non-bankruptcy attorneys have extensive knowledge and experience that have

allowed them to address pressing matters in an efficient manner.  Fifth Application at 35.

53.    The Report identifies non-firm conferences, hearings, and meetings that

typically fall into the following categories:  (a) client meetings, (b) asset disposition/lease

meetings, (c) claims meetings, (d) financing meetings, (e) insurance meetings, (f) disclosure

statement meetings and (g) plan meetings.  See Report Exhibit G.  Time reported to plan

meetings accounts for approximately half of total time reported.  Id.

54.    Stuart Maue states that "[n]either the Application nor the activity

descriptions explained the need for multiple attendees."  Report at 18.  In support, Stuart Maue

provides four examples in the Report of instances where more than one Skadden, Arps

timekeeper billed to a meeting or teleconference.  Id.  Skadden, Arps respectfully submits that

the Fifth Application does, in fact, explain the need for multiple attendees.  See Fifth Application

at 8-33.

55.    Three of the four calls cited by Stuart Maue involved issues pertaining to

the Company's exit loan facility and financing, including real estate issues pertaining to

financing.  The Fifth Application at pages 20-21 describes in detail Skadden, Arps' financing

services and explains the necessity of more than one Skadden, Arps professional on a call or at a

meeting.  Id.  For example, the Fifth Application provides in the section designated Financing

(DIP and Emergence):

> Skadden, Arps worked with the Company on a frequent basis and
> participated in numerous external teleconferences and other
> correspondence with the Company and Blackstone (among others),
> as well as numerous internal conferences among its bankruptcy,
> banking and real estate specialists (among others).  These
> communications were necessary and essential to the services

provided because of the complexity and structure of the potential
exit financing.

Fifth Application at 20.  The Skadden, Arps professionals on the calls or meetings in issue

involved only the core members of the Skadden, Arps banking team and one professional from

Skadden, Arps real estate department.  Skadden, Arps submits that the results achieved, which

involved obtaining an exit loan facility to allow the Debtors to emerge from their chapter 11

cases, would not have been possible without the work of the Skadden, Arps professionals

involved.

   56. The fourth example cited by Stuart Maue involves a conference call on

confirmation hearing strategy and planning that was attended by five Skadden, Arps timekeepers.

Report at 18.  Skadden, Arps' Plan services (which included confirmation hearing strategy and

planning) are set forth in the Fifth Application at pages 25-28 and explain the need for, at times,

more than one Skadden, Arps professional on a call or at a meeting:

> The work performed in this matter throughout these cases
> necessarily involved the services of more than one Skadden, Arps
> professional and required numerous interoffice conferences and
> conferences with parties in interest in these cases to coordinate
> their efforts.  The ability to work in a constructive manner with
> various Skadden, Arps professionals in multi-disciplinary practices,
> as well as counsel for the Creditors Committee and financial
> advisors, enabled Skadden, Arps, on behalf of the Debtors, to
> negotiate effectively and adapt Plan provisions efficiently,
> resulting in additional preserved value of the estates and reduced
> professional fees.

Fifth Application at 28.  The Skadden, Arps professionals on the call in issue involved members

of Skadden, Arps' core bankruptcy team.  Skadden, Arps submits that the development of the

Plan would not have been possible without the coordination of the Skadden, Arps professionals

on that call.  Indeed, the Plan confirmation hearing was less than two months away from the time

of that call.

57.    Accordingly, Skadden, Arps submits that the compensation sought is reasonable and should not be denied.

K.    Personnel Who Billed 10.00 or Fewer Hours

58.    The Report identifies eleven timekeepers who billed 10.00 or fewer hours. Report at 19-20.  Stuart Maue asserts that entries total 30.80 hours with $14,578.50 in associated fees.  Id. at 20.  Stuart Maue states the following:

> A review of the fee entries of timekeepers who bill relatively few hours to a matter allows a determination of whether these timekeepers are duplicating the work of others, whether the use of these timekeepers increases the cost to the estate because of orientation or the "getting up-to-speed" that may be required, or whether the small amount of time billed contributed to the advancement of the case.

Id. at 19-20.

59.    Neither the Bankruptcy Code nor the Guidelines penalize a firm on the basis that a timekeeper has billed too few hours.  To the contrary, Skadden, Arps submits that the services performed were reasonable and necessary.  Below is a chart prepared from Report Exhibit H identifying the timekeepers and describing the work performed:

| NAME | HOURS | GENERAL DESCRIPTION OF MATTERS WORKED ON |
|------|-------|------------------------------------------|
| Balch, M | 1.50 | COUNSEL, COMPLEX MASS TORTS AND INSURANCE, INSURANCE ISSUES |
| Brown, E | 5.60 | ASSOCIATE, MERGERS AND ACQUISITIONS, GENERAL CORPORATE ADVICE |
| Chang, L | 0.70 | COUNSEL, BANKING AND INSTITUTIONAL INVESTMENT, FINANCING ISSUES |
| Handler, C | 7.40 | ASSOCIATE, TRUSTS AND ESTATES, TRUST ISSUES |
| Hayman, L | 0.50 | PARTNER, COMMERCIAL LAW, UCC ANALYSIS |
| Lam, S | 1.80 | ASSOCIATE, BANKING AND INSTITUTIONAL INVESTMENT, FINANCING ISSUES |
| McDermott, M | 0.50 | PARTNER, CORPORATE RESTRUCTURING, POTENTIAL PLAN LITIGATION ISSUES |
| Reynolds, T | 1.20 | PARTNER, INSURANCE, INSURANCE ISSUES |
| Rockness, D | 5.50 | PARAPROFESSIONAL, NON-BANKRUPTCY, RESEARCH |
| Rubin, N | 2.40 | COUNSEL, MERGERS AND ACQUISITIONS, GENERAL CORPORATE ADVICE |
| Weiss, R | 3.70 | PARTNER, TRUSTS AND ESTATES, TRUST ISSUES |

Nine of the eleven timekeepers are non-bankruptcy specialists.  These timekeepers used their specialized knowledge to assist in these bankruptcy cases without the need for any orientation time to perform their services.  One timekeeper is a corporate restructuring partner who assisted in a discrete plan litigation matter involving insurance and who had worked on the case previously in connection with litigation, and thus was already knowledgeable about the case. The final timekeeper is a non-bankruptcy paraprofessional who assisted in isolated matters and did not require knowledge of the bankruptcy cases to perform the services.

L.    Long Billing Days

60.    The Report identifies timekeepers who billed more than 12.00 hours a day during the interim period.  See Report Exhibit I-1.  Stuart Maue asserts that entries total 685.80 hours with $356,188.00 in associated fees.  Report at 21.   Stuart Maue states the following:

> Courts have generally held that billable time for professional services should include only those tasks that relate directly to work for the client.  Professionals necessarily must spend some portion of each day on personal matters, such as meals and breaks, and frequently spend time on administrative matters, such as training or supervision of others.  Professionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation.  However, such long hours are generally related to identifiable circumstances such as court deadlines, travel, or event attendance.

Id.

61.    The Guidelines do not state or suggest, however, that billing in excess of 12.00 hours a day is not compensable.  Stuart Maue acknowledges that "[p]rofessionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation."  Report at 21.  That is the case here, as evidenced by the Fifth Application Exhibits C-1 through F-1, and Report Exhibits I-1 and I-2.

62.    The hours and charges calculated by Stuart Maue include all hours on all days whenever a timekeeper exceeded 12.00 hours (including non-working travel time); Skadden, Arps submits that a more relevant calculation is the total number of hours exceeding 12.00 hours per day (without including any non-working travel time).  That calculation, shown in the chart below, is not particularly large in the context of these cases.

| TOTAL HOURS BILLED IN EXCESS OF 12.00 HOURS A DAY | TOTAL HOURS BILLED IN INTERIM PERIOD |
|---|---|
| 85.4[6] | 7,873.60[7] |

63.    The instances of timekeepers billing in excess of 12.00 hours a day are isolated in these cases, as shown by the chart below created from Report Exhibits I-1, I-2:

| Timekeeper | Hours Billed in Excess of 12.00 Hours for Interim Period |
|---|---|
| Baker, D | .4 |
| Eichel, S | 6.3 |
| Gray, R | 7.8 |
| LaMaina, K | 3.9 |
| Larry, J | 1.2 |
| Leamy, J | 1.1 |
| McDonald Henry, S | 6.4 |
| Ravin, A | 27.8 |
| Sambur, K | 2.3 |
| Turetsky, D | 28.2 |

64.    The hours billed by timekeepers in excess of 12.00 hours per day during the four-month interim period are minimal, especially given that (a) Skadden, Arps spent significant time reviewing Company information and working with various parties in interest in these cases to draft and finalize the Disclosure Statement and the Plan, including resolving Plan issues at times on an expedited basis to avoid litigation, (b) significant time was needed to review and analyze the Debtors' leases and other assets to determine their disposition in these

---

[6]    Report Exhibits I-1, I-2.

[7]    Fifth Application at vi.

cases, (c) significant time was needed to address a structure for exit financing for the Company,

and (d) significant time was needed to review employee-related issues for implementing the

Debtors' reorganization plan.  In light of these factors, the number of hours in question is not

large.

M.    Administrative/Clerical Activities

        65.    The Report identifies activities considered by Stuart Maue to be

administrative or clerical in nature.  Report at 22-23.  Stuart Maue states the following:

> Clerical activities include tasks that may be effectively
> performed by administrative assistants, secretaries, or support
> personnel.  The performance of clerical or secretarial tasks by
> attorneys, accountants, paralegals, and other paraprofessionals
> generally constitutes nonbillable time and should be delegated to
> nonbilling staff members.  Courts have held that time spent
> performing administrative or clerical activities such as filing,
> organizing and updating files, retrieving and distributing
> documents, checking the docket, calendaring events, photocopying,
> scanning documents, training and assignment of tasks to staff
> members, or "supervising" any of the foregoing is not compensable.

Id.

*Administrative/Clerical Activities by Paraprofessionals*

        66.    The Report identifies certain time entries of paraprofessionals as

administrative/clerical activities.  Report at 23; Report Exhibit J-1.  Stuart Maue asserts that

entries total 417.20 hours with $63,873.00 in associated fees.  Id.

        67.    Items identified in Report Exhibit J-1 include services that should be

rendered by a paraprofessional, including the following:  (a) research/retrieval of case documents,

including pleadings from the docket, (b) preparation of case communication lists and documents,

(c) revision of case calendar and working group lists, (d) research and preparation of documents

for filing, (e) preparation and distribution of media updates and other documents, and

(f) assembling/preparing service documents.  These services are necessary in the administration

of chapter 11 cases.  It is more efficient and economical for a paraprofessional, rather than an attorney, to perform the needed services, and Skadden, Arps respectfully submits that the services are compensable.

68.    Paraprofessionals are trained to provide the above-listed services.  Such services require specialized skills of paraprofessionals and, accordingly, were appropriately assigned to paraprofessionals.  Especially since the advent of electronic case filing, docket searches and filings require specialized training, for which secretaries and clerical staff are not trained.  The majority of entries identified by Stuart Maue resulted from services of the primary paraprofessional on these cases.  The delegation of these services primarily to one paraprofessional confirms an effort to utilize efficient case management practices.

*Administrative/Clerical Activities by Professionals*

69.    The Report identifies certain time entries of professionals as administrative/clerical activities.  Report at 23; Report Exhibit J-2.  Stuart Maue asserts that entries total 6.50 hours with $3,280.50 in associated fees.  Report at 23.  Of the twenty-one entries in issue, Stuart Maue has noted eighteen entries using the description "coordinate," "distribute," "distribution" or "circulate."  Stuart Maue indicates that these verbs describe activities which should be "delegated to nonbilling staff members."  Report at 22.

70.    Skadden, Arps respectfully submits that the time entries in issue describe activities that are properly performed by professionals.  It is necessary for professionals to ensure that proper documents and information are assembled and distributed to case parties.  The information and documents distributed were necessary to promote communication among the appropriate parties in interest.  The distribution is often to the client, opposing parties, or other persons in interest, and is more akin to correspondence.  Often, documents distributed are

22

attached in e-mail and enclosed with a memorandum seeking information or informing or advising of case issues.  In any event, the distribution is necessary to promote communications on the issue at hand.

71.     Documents coordinated and circulated internally are no less necessary or compensable.  These cases involve complex issues, and it is necessary for Skadden, Arps professionals to communicate with each other to resolve the issues.  It would be inefficient to have professionals' assistants involved in the coordination and distribution of information that more often than not is distributed in e-mail form and needs to be addressed promptly.

72.     Revised entries for the three entries that do not concern distribution or circulation of documents are attached at Exhibit J-2.  Revised entries were provided to Stuart Maue in response to Stuart Maue's comments on the preliminary report on the Fifth Application.  Following submission of the additional detail, the Report indicates that all but one of the revised entries would still be classified as administrative/clerical.  Report at 24.  Exhibit J-2 contains additional information that Skadden, Arps believes resolves any outstanding issues on this matter.

N.    Legal Research

73.     Stuart Maue identifies activities describing legal research so that a determination may be made of whether the issues researched should be familiar to experienced attorneys, whether the research is performed by attorneys with the appropriate level of experience, and whether the fees billed for research are otherwise reasonable, necessary, and relevant.  Report at 25.  Stuart Maue asserts that such entries total 590.70 hours with $262,563.50 in associated fees.  Id.

74.     The matter categories identified on Report Exhibit K as having the most research-related hours — General Corporate Advice, Executory Contracts (Personalty), Insurance, and Reorganization Plan/Plan Sponsors (this latter category accounting for 30% of the

23

total hours charged) — contain billings for the heavily litigated matters.  The Fifth Application

discusses these matters in detail as well as the necessity of legal research for the interim period

and cases in general.  Fifth Application at 9-10, 18-19, 21-23, 25-28.

        75.     Further, Skadden, Arps utilized forty-one discrete matter categories in

these cases.  Legal research services recorded in specific categories render the services

identifiable.  This, plus the fact that the Fifth Application discusses the services performed,

allows a court to determine the reasonableness of the services provided.

        76.     The legal research services performed were necessary and beneficial for

the estates, creditors, and other parties in interest in these cases, and the corresponding

compensation, in light of the services performed, is reasonable.

O.     Travel

        77.     The Report reflects 7 travel entries that total 18.30 hours with associated

fees of $9,050.00.  Report at 26; Report Exhibit L.  The Report acknowledges that each travel

entry was only billed at one-half the actual travel time.  Id. at 26.

        78.     As stated in the Second Application, "Skadden, Arps did not charge for

non-working travel time through July 2005 . . . .  As of August 2005, hours billed for non-

working travel time represent 50% of the actual time spent traveling."  Second Application at v.

Further, the Fifth Application provides that "[h]ours billed for non-working travel time represent

50% of the actual time spent traveling."  Fifth Application at vi.

P.     Summary of Projects

        79.     The Report confirms that Skadden, Arps categorized its services into

twenty-five billing projects (out of the 41 possible categories) in the interim period, including

Retention/Fee Matters (SASM&F) ("SASM&F"), Retention/Fees/Objections (Others) ("Others")

and "Fee Examiner."  Report at 26-27.

80.      Regarding the SASM&F category, attached as Appendix 1 is a brief memorandum provided to Stuart Maue that discusses compensation for services rendered in connection with fee applications and retention applications.  These services are compensable in accordance with the facts of these cases, the Bankruptcy Code and the Guidelines themselves.

81.      Regarding the Others category, chapter 11 cases, especially large, complex chapter 11 cases, often require the efforts of multiple firms.  The Others category involves Skadden, Arps' services in connection with assisting the Debtors in retaining other firms and working with other firms to manage these cases effectively.  These services are described in detail in the Fifth Application at 29-30 and are compensable because of their necessity for the Debtors' cases.

82.      The Guidelines suggest that the services rendered in the SASM&F category and the Others category are compensable.  For example, the Guidelines include the following as suggested project categories for bankruptcy cases:

> Fee/Employment Applicants:  Preparation of employment and fee applications for self or others; motions to establish interim procedures.
>
> Fee/Employment Objections:  Review of and objections to the employment and fee applications of others.

Guidelines Exhibit A.  These categories and services are included in the SASM&F category and in the Others category in the Fifth Application.

83.      Regarding the Fee Examiner category, the services performed were necessary to comply with the Fee Examiner Order.

84.      The services performed during the interim period for all categories of services were necessary, and the requested compensation, in light of the services provided, is reasonable.

## Expenses

A.    Billing Discrepancies

85.    Stuart Maue reviewed the expense items for apparent irregularities, such as double billing, wrong case billing, or missing expense descriptions.  Report at 31.  "No technical billing discrepancies were identified in the Application."  Id.

B.    Airfare

86.    The Report identifies air travel charges of $6,542.88.  Report at 32.  Stuart Maue states that the descriptions of these expenses do not indicate the type of travel, the fare class, or the origination or destination.  Id.

87.    Skadden, Arps provided additional information to Stuart Maue regarding the travel charges in response to Stuart Maue's comments on the preliminary report on the Fifth Application, as stated in the Report.  See Report Exhibit N-1; Report at 32.  Additional information included the "timekeeper name, the origination and destination of the travel, and the fare class."  Report at 32.

88.    The submitted information resolved any outstanding issues on this matter.

C.    Meals

89.    The Report identifies meal charges of $271.88.  Report at 33.  Stuart Maue states that Skadden, Arps does not provide the location of the meals or the number of attendees. Id.

90.    Skadden, Arps provided additional information to Stuart Maue regarding the meal charges in response to Stuart Maue's comments on the preliminary report on the Fifth Application, as stated in the Report.  See Exhibit N-2; Report at 33.  Additional information included "the timekeeper name, the location of the meal, the dates of the trip, and the number of attendees."  Report at 33.

91.     The submitted information resolved any outstanding issues on this matter.

D.     Other Travel Expenses

92.     The Report identifies "Out-of-Town Travel" charges of $6,047.54.  Report at 34.  Stuart Maue states that Skadden, Arps does not identify the nature of the expenses but provided a date, an amount and a timekeeper name.  Id.

93.     The "Out-of-Town Travel" expense category encompasses business-related travel and lodging expenses, which are reimbursable under the terms of Skadden, Arps' retention.  Skadden, Arps provided additional information to Stuart Maue regarding "Out-of-Town Travel" in response to Stuart Maue's comments on the preliminary report on the Fifth Application, as stated in the Report.  See Exhibit N-3; Report at 34.  Additional information included the "timekeeper name, origination and destination of travel, and the dates of travel."  Report at 34.  Skadden, Arps believes that the submitted information resolves any outstanding issues on this matter.

E.     Photocopies

94.     The Report identifies photocopy charges of $9,878.60.  Report at 35.  Stuart Maue asserts that "[t]he Application stated that the requested rate for these internal photocopies was $0.10 per page."  Id.  Consistent with its retention agreement and as indicated in the Fifth Application at 37, Skadden, Arps billed for photocopies at the rate of $0.10 per page.  Additional detail on the photocopy charges was provided to Stuart Maue and is attached at Exhibit N-4.  The submitted information resolved any outstanding issues on this matter.

95.     The Report also identifies electronic document management charges of $74.72.  Report at 35.  Stuart Maue states that the charges include "printing to paper from TIF."  Id.  Under the terms of Skadden, Arps' retention, Skadden, Arps is entitled to reimbursement for electronic document management.  Electronic document management includes scanning, OCR

27

processing, printing from scanned files, and conversions.  Skadden, Arps bills in-house services

at rates comparable to those charged by outside vendors.  This request is consistent with Skadden,

Arps' retention agreement.  Additional detail on the electronic document management charges

was provided to Stuart Maue and is attached at Exhibit N-4.  The submitted information resolved

any outstanding issues on this matter.

       96.    Further, the Report identifies outside reproduction charges of $411.64.

Report at 35.  Outside reproduction is used when photocopy reproductions are either too large or

Skadden, Arps' internal copy center is unable to process the job because of the constraints of the

job.  When Skadden, Arps is unable to process the work internally, it uses the services of outside

vendors.  Additional detail on the outside reproduction charges was provided to Stuart Maue and

is attached at Exhibit N-4.  The submitted information resolved any outstanding issues on this

matter.

       97.    Lastly, the Report identifies color photocopying charges of $29.50.

Report at 35.  Under the terms of Skadden, Arps' retention, Skadden, Arps is entitled to

reimbursement for color photocopying, and Skadden, Arps charges $0.50 per page for color

copies.  This request is consistent with Skadden, Arps' retention agreement.  Additional detail on

the color photocopying charges was provided to Stuart Maue and is attached at Exhibit N-4.  The

submitted information resolved any outstanding issues on this matter.

F.    <u>Computer-Assisted Legal Research</u>

       98.    The Report identifies Westlaw and LEXIS/NEXIS charges of $22,314.77.

Report at 35. Stuart Maue asserts that "[t]he Application stated that charges for on-line

computerized research are billed at the actual amounts charged by vendors, which have been

reduced by discounts the firm receives from vendors." <u>Id.</u> at 35-36.  As discussed in the Fifth

28

Application and Skadden, Arps' retention agreement, computerized research is billed at provider

cost.  Fifth Application at 37.

G.    Local Meals

99.    The Report identifies a charge as potential overhead titled "Contracted

Catering-NY" of $1,907.06.  Report at 36-37.  Skadden, Arps does not, however, charge for

overhead, and this charge is not related to overhead.  Under the terms of Skadden, Arps' retention,

Skadden, Arps recharges clients for the costs of furnishing meal services during meetings.  See

Exhibit A.  Here, the expenses were business-related and at Skadden, Arps' cost.

100.    Stuart Maue states that Skadden, Arps does not include the purpose, the

location or the number of attendees for the charges.  Report at 36.  Skadden, Arps provided

additional information to Stuart Maue in response to Stuart Maue's comments on the preliminary

report on the Fifth Application, as stated in the Report.  See Exhibit P; Report at 36-37.

Additional information included "the timekeeper name, the number of attendees, and the type of

meal (delivery or buffet lunch)."  Report at 37.  As indicated above, the expenses were all

business-related.  The submitted information resolved any outstanding issues on this matter.

H.    Postage

101.    The Report identifies postage charges of $247.52.  Report at 37.  Under

the terms of Skadden, Arps' retention, Skadden, Arps is entitled to reimbursement for postage.

I.    Telephone Charges

102.    The Report identifies "Telephone Expense" charges of $881.32.  Report at

38.  Stuart Maue states the following:

>Stuart Maue is unable to determine if those charges are local
>telephone charges or cellular telephone charges, which are both,
>according to the U.S. Trustee Guidelines, considered to be part of
>the firm's overhead expenses.

Id.  The Fifth Application contains no cellular charges; all of the charges in question are long

distance charges.  Skadden, Arps does not bill its clients for local telephone calls.

     103.     Skadden, Arps believes there are no outstanding issues on this matter.

## Conclusion

     104.     Skadden, Arps has performed substantial and necessary services in these

cases.  Skadden, Arps believes that the fees and expenses billed to the Debtors were reasonable

and necessary, subject to the reductions agreed to in this Response.

     105.     Skadden, Arps believes that its time entries and the Fee Applications will

allow the Court to determine the necessity and benefit of Skadden, Arps' services.

DATED:  April 20, 2007

                SKADDEN, ARPS, SLATE, MEAGHER
                & FLOM LLP


                */s/  Sally McDonald Henry*
                D. J. Baker
                Sally McDonald Henry
                Rosalie Walker Gray
                Four Times Square
                New York, New York 10036
                (212) 735-3000
                (212) 735-2000 (facsimile)


                Attorneys for the Reorganized Debtors

**EXHIBIT A**

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

DIRECT DIAL
(212) 735-2150
DIRECT FAX
(917) 777-2150
EMAIL ADDRESS
DJBAKER@SKADDEN.COM

FOUR TIMES SQUARE

NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

February 7, 2005

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

Laurence B. Appel, Esq.
Senior Vice President and General Counsel
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699

RE:    Engagement Agreement with Skadden

Dear Larry:

We are pleased that Winn-Dixie Stores, Inc., for itself and each of its subsidiaries for which there is no disqualifying conflict and which Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden" or the "Firm") has agreed to represent (collectively, the "Company"), has decided to engage Skadden as special counsel in connection with the matters described below in the "Scope of Engagement" section of this Engagement Agreement and such other matters as are assigned to us in the future and that we agree to undertake (the "Engagement"). Accordingly, the Engagement is limited to those specific matters enumerated in and/or contemplated by this Engagement Agreement.

This letter sets forth the terms of our engagement arrangements for all matters (whether pending or prospective), including staffing, fees and waivers, the scope of our engagement, the basis on which the Firm will present its bills for fees, related charges and disbursements, and certain limitations on the Firm's services arising from potential conflicts of interest. Our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

## Scope of Engagement

We have agreed to represent the Company as special counsel in the Company's efforts to work out its present financial circumstances, which may include restructuring its financial affairs and capital structure, in addition to ongoing and future representation of the Company on matters for which Skadden is or in the future may be engaged by the Company not related to the Company's efforts to work out its present financial circumstances. The services to be provided by Skadden in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement which the Firm is requested and is able to provide and which are consistent with its ethical obligations. As legal counsel, we are not in a position to, and the

Company has not retained us to, provide financial advice. With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services to be rendered by us and the scope of our engagement.

In addition to certain matters with respect to which we are providing legal services to the Company, in connection with the Company's restructuring activities (whether outside of court or in connection with the preparation for, commencement and prosecution of chapter 11 reorganization cases), the Engagement may involve advice as to corporate transactions and corporate governance, negotiations, out-of-court agreements with creditors, equity holders, prospective acquirers and investors, review of documents, preparation of agreements, review and preparation of pleadings, court appearances and such other actions as both of us deem necessary and desirable. The Engagement also will include advice to, and representation of the Company, as debtors and debtors-in-possession, should the Company seek relief pursuant to the provisions of the Bankruptcy Code subject to the approval of our retention by the Bankruptcy Court.

If the Company determines that reorganization cases under chapter 11 of the Bankruptcy Code are appropriate, we will prepare for the filing of the chapter 11 petitions, including review of documents and preparation of the petitions with supporting schedules and statements, subject to appropriate coordination with King & Spalding LLP, which has commenced such preparations, to avoid duplication of effort and expense. During the cases and subject to our ethical obligations discussed above, we will advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11; prepare such administrative and procedural applications and motions as may be required for the sound conduct of the cases; prosecute and defend litigation that may arise during the course of the cases; consult with you concerning and participate in the formulation, negotiation, preparation and filing of a plan or plans of reorganization and disclosure statement(s) to accompany the plan(s); review and object to claims; analyze, recommend, prepare, and bring any causes of action created under the Bankruptcy Code; take all steps necessary and appropriate to bring the cases to a conclusion; and perform the full range of services normally associated with matters such as this which the Firm is in a position to provide. With respect to the foregoing, we will allocate appropriate responsibilities to King & Spalding LLP in consultation with the Company, but in all such matters it is our understanding that the Company intends for us to act as the Company's principal bankruptcy counsel.

In the event that chapter 11 cases are commenced and our retention is authorized, our representation will include, as noted above, serving as principal bankruptcy counsel to the debtors-in-possession under a general retainer, subject to court approval. Such representation also will encompass all out-of-court planning and negotiations attendant to these tasks. Although it is hoped that litigation can be avoided, subject to ethical constraints regarding conflicts of interest, we also will be available to serve the Company in any litigation capacities that become necessary to the extent that any required court approval is obtained.

## Case Management and Coordination of Outside Counsel

The Company is presently using more than one law firm for representation of its interests on substantive matters. It is likely that more than one law firm may be needed for such representation, particularly to represent the Company in connection with the numerous labor-intensive day-to-day tasks associated with potential chapter 11 cases. Other than the general

representation of the Company by Skadden as principal restructuring counsel and in the cases (if filed) pursuant to this Engagement Agreement, the Company will continue to have discretion to assign specific tasks to co-counsel, adjunct counsel, or special counsel (collectively, "Other Counsel"), as the case may be. If, as outlined below, we are unable to obtain court approval for all matters in potential chapter 11 cases that you wish us (and we agree) to undertake, our representation would include as many of those matters as are approved. We are committed to working with the Company and in full cooperation with Other Counsel to manage the Engagement on a cost-efficient and productive basis. To the extent possible, given the nature and magnitude of the Engagement, steps have been taken and should continue to be taken by the Company to coordinate tasks and, when practical, to divide these tasks to avoid unnecessary duplication of effort between us and Other Counsel.

## Engagement Personnel

I will coordinate all Engagement matters on behalf of Skadden Arps. Additional lawyers, including those in other practice areas, will be added to the Engagement on an as needed basis.

## Fees, Charges and Disbursements

Our fees will be based primarily on the time involved in the Engagement and our bundled hourly time charges. A list of our current bundled hourly time charges using the Firm's bundled rate structure as of January 1, 2005 is attached as Exhibit A. As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised.

Our final fee statement to the Company normally would reflect a variety of factors. These factors include bundled hourly time charges, the significance of the Firm's role, the importance of the Firm's expertise, the complexity of the matter, the outcome of the matter, the Firm's contribution to the results obtained, the size and significance of the matter, the intensity and duration of the Firm's efforts, the amount of fees we have received in other comparable matters, and the views of our client. As to the latter factor, we consider it very important and would not submit a final statement for services rendered without having discussed our fee in advance with the Company based on the factors mentioned above and obtaining your concurrence.

As to billing, we will submit to the Company for payment a statement with respect to all matters for which we are responsible on not less than a monthly basis. At each matter's conclusion, we will submit a final statement for services rendered that will be based upon our bundled hourly time charges and, if appropriate, the factors outlined above, and that would credit all prior payments. Each statement submitted would be accompanied by a summary of attorney time showing the time worked by each lawyer working on an Engagement matter and the guideline hourly rate for each lawyer. In addition, our billing statements will include charges and disbursements incurred by us in the course of performing legal services in accordance with our standard practice as described in the summary attached as Exhibit B, which may be periodically updated.

From time to time, the Company may request a fee range estimate for a particular Engagement matter. Any such estimate would be premised upon certain assumptions, including, but not limited to, completion of the matter by a particular target date, no unusual issues or problems arising, no litigation, counsel for the other parties sufficiently experienced and competent to perform such counsel's normal functions in this type of matter and so forth. In such situations, we will respond promptly to the Company's request in writing although it is agreed that such estimates shall not constitute a fee cap or amendment of this Engagement Agreement and all such discussions and written estimates would be handled through the undersigned in respect of the overall Engagement on behalf of the Firm.

## Fee Structure and Retainers

It is customary in matters of this nature for us to receive a reasonable retainer/on account payment and to be paid promptly for services rendered and charges and disbursements incurred on behalf of the Company, including payment for the services rendered and charges and disbursements incurred prior to the date hereof. Given the size and complexity of the Company's affairs, we have requested a payment in the amount of $500,000.00, representing a retainer/on account payment for professional services rendered and to be rendered and charges and disbursements incurred by us to the Company's account in connection with our representation of the Company including with respect to any consensual non-judicial restructuring as well as any initial preparation that you authorize for cases under chapter 11 of the Bankruptcy Code that may be filed by or against the Company (the "Initial Retainer"). We would appreciate your sending the Initial Retainer by wire transfer to:

CITIBANK, N.A.
460 West 33rd Street
NEW YORK, NEW YORK

ABA #021-000089
FOR CREDIT TO:
ACCOUNT # 3006-0143 of Skadden, Arps, Slate, Meagher & Flom LLP

The Company agrees to supplement the Initial Retainer from time to time during the course of the Engagement in such amounts as we mutually shall agree are reasonably necessary to maintain the Initial Retainer at a level that will be sufficient to fund Engagement fees, charges and disbursements to be incurred for time periods to be covered by the Initial Retainer. Should the Company subsequently decide to seek chapter 11 relief, we may also require an additional retainer/on account payment to supplement the Initial Retainer in order to cover Engagement fees, charges and disbursements to be incurred during the initial phase of the reorganization cases (the "Filing Retainer"). We will determine and discuss the amount of the Filing Retainer with you prior to the initiation of any chapter 11 case or at such earlier time as either we or the Company deems appropriate or desirable. Of course, the reasonableness of the Filing Retainer remains subject to review by the court in any ensuing cases.

In the future, we will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above. Each invoice constitutes a request for an interim payment against the reasonable fee to be determined

at the conclusion of our representation. Upon transmittal of the invoice, the Firm shall draw upon the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) in the amount of the invoice. The Company agrees upon submission of each such invoice, if so requested by the Firm, to wire the invoice amount to us as replenishment of the Initial Retainer (together with any supplemental amount to which the Firm reasonably requests), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice, up to the remaining balance, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

In the event that the Company subsequently determines to seek bankruptcy court protection and subject to the terms of any professional compensation order entered in the Company's chapter 11 cases, the issuance of our periodic invoice shall constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of the representation. Although the Company may pay us from time to time for services rendered in our capacity as special counsel for various matters, some fees, charges, and disbursements incurred before the filing of bankruptcy petitions (voluntary or involuntary) may remain unpaid as of the date of the bankruptcy filings. Any portion of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) not otherwise properly applied will be held by us for the payment of any such unpaid fees, charges and disbursements (whether or not billed).

If the Company determines to commence a chapter 11 case, the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) will be applied to any unpaid prepetition invoices and unbilled fees, charges and disbursements, although any requisite court permission will be obtained in advance. Postpetition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court, it being agreed and understood that the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) shall be held by us and applied against the final fee application filed and approved by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nonetheless remain liable for payment of court approved postpetition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503 (b)(1).

If a dispute develops about our fees, you may be entitled under Part 137 of the Rules of the Chief Administrator of the New York Courts to arbitration of that dispute if it involves more than one thousand and less than fifty thousand dollars.

## Confidentiality and Related Matters

Confidential communications between a client and counsel are ordinarily privileged, but the commencement of a bankruptcy case may severely limit this attorney-client privilege. Specifically, if a trustee is appointed in any case concerning a corporate debtor or partnership, the trustee will be able to obtain from us or other counsel and disclose to others information communicated by the Company to counsel. Some courts also have held that an examiner may invade the attorney-client privilege.

Because of the nature of the Firm's practice (involving more than 1,600 lawyers throughout the United States and in various international offices), from time to time we concurrently may represent one client in a particular matter and the adversary of that client in an unrelated matter. Thus, for example, while representing the Company, we may represent a third party who is adverse to the Company in a matter unrelated to the matters covered by this Engagement Agreement. In addition, while representing the Company, we may represent an account debtor of the Company as a debtor in a reorganization case or in connection with out-of-court negotiations with such entity's creditors concerning that entity's ability to pay its debts generally.

Despite any such concurrent representation, we strictly preserve all client confidences and zealously pursue the interests of each of our clients. The mutual understanding reflected in this Engagement Agreement, including the waivers set forth below, are, of course, premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit.

With respect to third parties and based on our initial discussions concerning the Company's capital structure and given the Company's business relationships, we have identified certain entities involved with the Company as our clients, or as affiliates of our clients, on matters unrelated to the Company including, but not limited to, bank group members Amsouth Bank, Bank One, The CIT Group/Business Credit, Inc., Congress Financial Corporation (Florida), Fleet Retail Group, Inc., General Electric Capital Corporation, GMAC Commercial Finance LLC, Merrill Lynch Capital, PNC Business Credit, Suntrust Bank, UBS AG, Wachovia Bank, National Association, Wachovia Capital Markets, LLC, and Wells Fargo Foothill, LLC, as well as other entities that are providing financial accommodations and services to the Company or have other material relationships. (In the event that chapter 11 cases are commenced, we will prepare a disclosure summary that will be publicly disclosed and will be updated periodically thereafter in connection with the filing of interim fee applications and as otherwise required.) Accordingly, while for purposes of this Engagement Agreement, the Company should assume that we represent a substantial number of the Company's creditors and stakeholders on matters unrelated to the Company, we will, at the Company's request, furnish you with a list of relevant clients when we receive updated information from the Company from time to time regarding its creditors and other stakeholders.

We do not provide certain kinds of opinion letters in connection with restructuring and bankruptcy reorganization cases to clients or to others who may wish to rely upon such letters. We do not alter this policy except under very unusual circumstances and then only upon further written agreement, as approved by a special committee of the Firm.

## Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present

Laurence B. Appel
February 7, 2005
Page 7

or future parties on matters other than those for which it had been or then is engaged by the Company, whether or not on a basis adverse to the Company or any of its affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Other Representation." In furtherance of this mutual agreement, the Company agrees that it will not for itself or any other party assert the Firm's representation of the Company, either previously, in its then existing representation in the Engagement, or in any other matter in which the Company retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Other Representation and agrees that any Permitted Other Representation does not constitute a breach of duty. Permitted Other Representation would include, without limitation, representing a client over which the Company might be seeking to acquire influence or control, or from which the Company may wish to buy assets, or representing a client regarding its interest at the time in acquiring influence or control over an entity in which the Company then has a similar interest. Notwithstanding the foregoing waivers, the Firm agrees that, during the pendency of any chapter 11 reorganization cases involving the Company in which the Firm is acting as bankruptcy and restructuring counsel pursuant to a general retainer pursuant to 11 U.S.C. § 327 (a), the Firm will not represent present or future clients of the Firm on matters adverse to the Company in such chapter 11 reorganization cases.

Our representation of the Company is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Company's consent. Provided that the Firm acts in the manner set forth in this paragraph, the Company would not for itself or any other party assert that the Firm's possession of such information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter, (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Company or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm.

With respect to parties affiliated with the Company generally, including parties owned by the Company and parties that hold direct or indirect interests in the Company, it is our understanding that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated party or person in their individual capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so. Finally, it is our understanding that if the Firm acts as counsel for any other party as to which the Company then owns completely, directly or indirectly, all of the common stock or similar voting interest (other than directors' qualifying shares, if any), the mutual agreement reflected in this letter, including the waivers, would apply to that party as well.

*    *    *

The provisions of this letter will continue in effect, including if the Firm's representation of the Company was ended at your election (which, of course, the Company would be free to do at any time) or by the Firm for Good Cause (which would be subject to ethical requirements). Good Cause includes the Company's breach of this agreement (including any material change in our engagement responsibilities without our consent or the failure to pay any payment when due under this Engagement Agreement), the Company's refusal or failure to cooperate with us or provide us with continuing access to the Board of Directors and senior management officers of the Company as appropriate, any fact or circumstance that would render our continuing representation unlawful or unethical, or, in our reasonable judgment, resignation of the engagement becomes

Laurence B. Appel
February 7, 2005
Page 8

necessary or appropriate. Any unused portion of the retainers we have received will be applied to our outstanding fees, charges and disbursements and the Company will promptly pay to us the remaining balance owed to us, if any. To the extent that the remaining amount of the retainers exceeds the amount of such fees, charges and disbursements, we will pay such amount to the Company. In addition, the provisions of this Engagement Letter will apply to future engagements of the Firm by the Company unless we mutually agree otherwise.

The Company agrees to make appropriate employees available to us to assist in factual inquiries and factual determinations, court hearings and appearances, transactions and dealings in relation to the subject matter with regard to which we have been retained.

This agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its conflicts of laws principles. For purposes of this letter, references to Skadden or the Firm include our affiliated law practice entities. There are no representations or promises other than as expressly set forth herein.

If the foregoing terms of our representation meet with your approval and accurately represent your understanding of the Company's retention agreement with us, we would appreciate your signing one copy of this Engagement Agreement and returning it to us.

Again, we very much appreciate the opportunity to work with Winn-Dixie Stores, Inc. and look forward to doing so.

With best regards,

Yours very truly,

D. J. Baker

Attachments

AGREED AND ACKNOWLEDGED:

Winn-Dixie Stores, Inc., for itself
and its subsidiaries

By: _____
Laurence B. Appel
Senior Vice President and General Counsel

Effective as of February 2, 2005

**CONFIDENTIAL**

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

### STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE[*]

#### January 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL**: | $540 - $825 |
| **COUNSEL/SPECIAL COUNSEL**: | $535 - $640 |
| **ASSOCIATES**: | |
| Level | |
| 9 | $495 |
| 8 | 495 |
| 7 | 480 |
| 6 | 460 |
| 5 | 430 |
| 4 | 395 |
| 3 | 375 |
| 2 | 335 |
| 1 | 265[**] |
| **LEGAL ASSISTANTS**: | $90 - $195 |

---

[*]    These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., **secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances). In-house reproduction under the bundled rate structure is charged at $0.10 per page. Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.**

[**]    First year associates will move to $295/hr. at the later of April 1st, 2005 or the date of passing bar exam.

**SKADDEN ARPS, SLATE, MEAGHER& FLOM LLP AND AFFILIATES**
*Policy Statement Concerning Charges and Disbursements*
*Under Standard Bundled Rate Structure*
*Effective 9/1/03*

*Skadden Arps bills for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for external charges at the actual cost billed by the vendor except in a few cases noted below; charges for internal support services are billed at rates derived from internal cost analyses or at rates set at or below comparable outside vendor charges.*

---

**I. Research Services.** *Charges for on-line computerized research (LexisNexis, Westlaw and financial services) and use of outside research services and materials are billed at the actual amounts charged by vendors, which have been reduced by discounts the Firm receives from vendors.*

*SEC filings retrieved using the Disclosure system in our library are charged based on standard vendor rates derived from an internal cost analysis.*

*The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.*

**II. Travel-Related Expenses.** *Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous items associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:*

- *Air Travel. Coach travel is used for all U.S. domestic flights unless upgrades are available at little additional cost or prior client approval is obtained for a different class. For international flights from the United States, business class is used. Travel by attorneys based outside the United States is consistent with these policies.*

- *Lodging. Overnight accommodations are generally booked with hotels with which the Firm has a corporate rate or, when this is not possible, with hotels suggested by the client.*

*Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:*

- *Fares for commercial transportation (e.g., car service, taxi or rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.*

- *Round-trip transportation to the office is not charged separately for attorneys who work weekends or holidays, nor is transportation home on business days when an attorney works past a certain hour (typically 8:30 p.m.).*

- *Local travel for support staff is not charged when a staff member works after 8:00 p.m. specifically for the client.*

**III. Word Processing and Secretarial and other Special Task-Related Services.** *Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. There is no separate charge for word processing and secretarial services associated with preparing legal documents.*

*Multi-function personnel, such as qualified secretaries and word processors, may also perform other specialized tasks (such as EDGAR filings or legal assistant services). Such work is recorded in the appropriate billing category (for example, legal assistant services are recorded as fee in "Legal Assistant Support" on bills).*

**IV. Reproduction and Electronic Document Management.** *Photocopying services (including copying, collating, tabbing and velo binding) performed in-house is charged at 10 cents per page, which represents the average internal cost per page. Color photocopies are charged at 50 cents per page (based on outside vendor rates). Photocopying projects performed by outside vendors are billed at the actual invoice amount. Special arrangements can be made for unusually large projects.*

*Electronic Data Management services (e.g., scanning, OCR processing, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.*

**V. Electronic Communications:** *Clients are charged for communications services as follows:*

- *Telephone Charges. There is no charge for local telephone calls or facsimile services. Long distance telephone calls made from the Firm are charged based on applicable rates in tariff tables and are allocated*

*within a client based on the hours worked by attorneys on various matters for that client. Collect, credit card and third party calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.*

• *Facsimile Charges. There is no charge for outgoing or incoming facsimiles.*

*VI. Postage and Courier Services. Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm. Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers; a standard rate is charged for their time.*

*VII . UCC Filing and Searches. Charges for filings and searches, in most instances, are based on standard amounts determined by the vendor. Unusual filings and searches will be charged based on vendor invoice.*

*VIII. Meals. Business meals with a client are charged at actual cost. Luncheon and dinner meetings with the client at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances. Overtime meals are not charged separately to clients.*

*IX. Direct Payment by Clients of Other Disbursements. Other major disbursements incurred in connection with an engagement will be paid directly by the client. (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount.) Examples of such major disbursements that clients will pay directly include:*

• *Professional Fees (including disbursements for outside professional services such as local counsel, accountants, witness and other professional fees).*

• *Filing/Court Fees (including disbursements for agency fees for filing documents, standard witness fees, juror fees).*

• *Transcription Fees (including disbursements for outside transcribing agencies and courtroom stenographer transcripts).*

• *Other Disbursements (including any other required out-of-pocket expenses incurred for the successful completion of a matter).*

\* \* \* \* \*

2

# EXHIBIT D-1
## VAGUELY DESCRIBED CONFERENCES
### (FIFTH INTERIM FEE APPLICATION)

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | REVISED DESCRIPTION |
|---|---|---|---|---|
| 06/13/06 | Rubin, N | 0.20 | DISCUSSION WITH R. BARUSCH AND R. OLIVER | DISCUSSION WITH R. BARUSCH AND R. OLIVER RE: RISK FACTOR DISCLOSURES/PLAN |
| 06/14/06 | Rubin, N | 0.20 | DISCUSSION WITH R. OLIVER | DISCUSSION WITH R. OLIVER RE: RISK FACTOR DISCLOSURES/PLAN |
| 06/14/06 | Rubin, N | 0.20 | DISCUSSION WITH R. BARUSCH | DISCUSSION WITH R. BARUSCH RE: RISK FACTOR DISCLOSURES/PLAN |
| 06/23/06 | O'Hagan, E | 0.10 | STATUS CONFERENCE RE: POTENTIAL CLAIMS OF SURETY BOND ISSUERS | STATUS CONFERENCE WITH S. FELD RE: POTENTIAL CLAIMS OF SURETY BOND ISSUERS |
| 08/15/06 | Reynolds, T | 1.20 | BRIEFLY REVIEW POLICIES AND DISCUSS | BRIEFLY REVIEW POLICIES AND DISCUSS ISSUE WITH M. BALCH |
| 08/22/06 | Feld, S | 0.70 | CONFERENCE TO REVIEW CLAIMS REPORT | CONTINUE TO REVIEW CLAIMS REPORT |
| 08/29/06 | Shah, M | 0.20 | WITHHOLDING ISSUES DISCUSSIONS | CORRESPONDENCE WITH SKADDEN ARPS TEAM ON MSP WITHHOLDING ISSUES IN PLAN |
| 09/01/06 | Gray, R | 0.20 | EMAILS/TELECONFERENCES RE: LOGISTICS FOR EFFECTIVE DATE CLOSING | EMAILS/TELECONFERENCES WITH CONFER. ROOM SERVICE PERSONNEL RE: LOGISTICS FOR CLOSING EFFECTIVE DATE |
| 09/06/06 | Barusch, R | 0.30 | INHOUSE CONFERENCE RE: SAME | INHOUSE CONFERENCE WITH A. SALDANA RE: 10-K |
| 09/14/06 | Wenzel, C | 0.20 | INTERNAL CONFERENCE AND CALLS WITH CLIENT TO DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.7) | INTERNAL CONFERENCE WITH T. BOYDELL TO DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.2); CALLS WITH CLIENT TO DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.5) |
| 09/20/06 | Wenzel, C | 0.40 | INTERNAL CONFERENCE AND CONFERENCE WITH OSHR TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.8) | INTERNAL CONFERENCE WITH T. BOYDELL TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.4); CONFERENCE WITH OSHR TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.4) |
| 09/25/06 | Wenzel, C | 0.40 | INTERNAL CONFERENCE TO DISCUSS SECURITY AGREEMENT AND GUARANTEE AGREEMENT | INTERNAL CONFERENCE WITH T. BOYDELL TO DISCUSS SECURITY AGREEMENT AND GUARANTEE AGREEMENT |

**EXHIBIT D-2**
**OTHER VAGUELY DESCRIBED ACTIVITIES**
**(FIFTH INTERIM FEE APPLICATION)**

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | REVISED DESCRIPTION |
|---|---|---|---|---|
| 06/13/06 | Rubin, N | 0.30 | REVIEW MATERIALS | REVIEW PLAN, RISK FACTOR DISCLOSURES |
| 06/15/06 | Tran Boydell, T | 0.10 | REVIEW EMAIL RE: SAME | REVIEW EMAIL FROM P. NECKLES/A. MARGOLIS ET AL. RE: EXIT FINANCING MOTION |
| 06/15/06 | Tran Boydell, T | 0.30 | REVIEW EMAIL MESSAGES RE: EXIT FINANCING | REVIEW EMAIL MESSAGES FROM P. NECKLES/A. MARGOLIS ET AL. RE: EXIT FINANCING |
| 06/15/06 | Tran Boydell, T | 0.20 | AND BANKRUPTCY ISSUES | REVIEW EMAIL MESSAGES FROM P. NECKLES/A. MARGOLIS ET AL. RE: BANKRUPTCY ISSUES ON EXIT FINANCING |
| 06/16/06 | Bristor, K | 0.50 | EMAIL CORRESPONDENCE RE APPLICATION [SIC] OF 382L5 | EMAIL CORRESPONDENCE WITH R. BARUSCH RE: APPLICATION OF 382L5/TAX ISSUES |
| 06/21/06 | Tran Boydell, T | 0.10 | REVIEW EMAIL RE: BANKRUPTCY MATTERS | REVIEW EMAIL FROM SKADDEN TEAM RE: BANKRUPTCY MATTERS PERTAINING TO EXIT FINANCING |
| 06/27/06 | Olshan, R | 0.70 | OPTION ISSUES | CALL WITH S. REISNER RELATING TO STOCK OPTIONS PREVIOUSLY GRANTED |
| 06/27/06 | Tran Boydell, T | 0.50 | REVIEW EMAIL MESSAGES RE: EXIT FINANCING | REVIEW EMAIL MESSAGES FROM P. NECKLES AND SKADDEN TEAM RE: EXIT FINANCING |
| 06/27/06 | Tran Boydell, T | 0.20 | PLAN | REVIEW EMAIL MESSAGES FROM P. NECKLES AND SKADDEN TEAM RE: PLAN |
| 06/27/06 | Tran Boydell, T | 0.70 | AND BANKRUPTCY RELATED MATTERS | REVIEW EMAIL MESSAGES FROM P. NECKLES AND SKADDEN TEAM RE: BANKRUPTCY MATTERS PERTAINING TO EXIT FINANCING |
| 06/29/06 | Tran Boydell, T | 1.30 | REVIEW AND RESPOND TO EMAIL MESSAGES RE: EXIT FINANCING MATTERS | REVIEW EMAIL MESSAGES FROM P. NECKLES AND A. MARGOLIS RE: EXIT FINANCING |

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | REVISED DESCRIPTION |
|---|---|---|---|---|
| 07/06/06 | McDonald Henry, S | 0.10 | REVIEW CORRESPONDENCE RE: TERMSHEET | REVIEW CORRESPONDENCE FROM LIBERTY MUTUAL RE: SURETY FACILITY TERMSHEET |
| 7/26/06 | Neckles, P | 0.70 | PREPARE E-MAILS RE: ANALYSIS OF AMENDMENT FOR K. HARDEE | NO FURTHER INFORMATION |
| 08/30/06 | Wenzel, C | 0.20 | CORRESPOND INTERNALLY RE: CREDIT AGREEMENT | CORRESPOND INTERNALLY WITH SKADDEN, ARPS BANKING TEAM RE: CREDIT AGREEMENT |
| 08/31/06 | Wenzel, C | 0.40 | CORRESPOND INTERNALLY RE: CREDIT AGREEMENT | CORRESPOND INTERNALLY WITH T. BOYDELL RE: CREDIT AGREEMENT COMMENTS |
| 09/07/06 | Leamy, J | 1.20 | EMAILS, 22ND | EMAIL S. WILLIAMS RE: OHIO CASUALTY AND 5TH OMNIBUS (.1); EMAIL D. STERN RE: PHARMACARE HEALTH SERVICE CLAIM (.1); RESEARCH AND RESPOND TO K. FAGERSTROM EMAIL RE: TIP LEASE (.3); EMAIL W. BANKS RE: OBJECTION TO STATE OF GA. CLAIM (.2); EMAIL K. FAGERSTROM RE: XEROX (.1); EMAIL S. EICHEL RE: CFSAUER AND 22ND CLAIM OBJECTION (.1); EMAILS A. RAVIN RE: WOOLBRIGHT, FRANKFORD DALLAS AND 22ND CLAIM OBJECTION (.1); EMAIL H. FOLEY RE: CWCAPITAL ASSET MANAGEMENT (.1); EMAIL A. BARRAGE RE: MERRILL LYNCH CLAIMS (.1) |

2

**EXHIBIT E**
**BLOCKED ACTIVITIES**
**(FIFTH INTERIM FEE APPLICATION)**

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | REVISED DESCRIPTION |
|---|---|---|---|---|
| 06/29/06 | Neckles, P | 2.70 | DRAFT E-MAILS AND CONFERENCE CALLS WITH J. O'CONNELL AND F. HUFFARD REGARDING COMMUNICATION OF COMMITMENT LETTER AND FEE LETTER TO CREDITORS COMMITTEE (2.70) | EMAILS TO J. O'CONNELL AND F. HUBBARD REGARDING COMMUNICATION OF COMMITMENT LETTER AND FEE LETTER TO CREDITORS COMMITTEE (1.7); CONFERENCE CALLS WITH J. O'CONNELL AND F. HUBBARD REGARDING COMMUNICATION OF COMMITMENT LETTER AND FEE LETTER TO CREDITORS COMMITTEE (1.0) |
| 07/13/06 | Ravin, A | 0.80 | REVIEW CORRESPONDENCE FROM AND DRAFT CORRESPONDENCE  TO C. IBOLD AND UNDERLYING ASSIGNMENT AGREEMENTS RE: GUARANTEE ISSUE SURROUNDING ASSIGNMENT AGREEMENTS, DRAFT CORRESPONDENCE TO AND REVIEW CORRESPONDENCE FROM L. MCDOWELL RE: SAME (.8) | REVIEW CORRESPONDENCE FROM AND DRAFT CORRESPONDENCE TO C. IBOLD RE: GUARANTEE ISSUE SURROUNDING ASSIGNMENT AGREEMENTS (.1); REVIEW ASSIGNMENT AGREEMENTS RE: GUARANTEE ISSUES (.2); DRAFT CORRESPONDENCE TO AND REVIEW CORRESPONDENCE FROM L. MCDOWELL RE: SAME (.5) |
| 07/20/06 | Ravin, A | 0.80 | REVIEW MEMORANDA FROM R. GRAY AND K. BRISTOR RE: TRANSFER RESTRICTIONS, OBTAIN COPIES OF FORM TRANSFER RESTRICTION LANGUAGE, REVIEW SAME, DRAFT MEMORANDUM TO R. GRAY AND K. BRISTOR RE: SAME (.8) | REVIEW MEMORANDA FROM AND DRAFT MEMORANDUM TO R. GRAY AND K. BRISTOR RE: TRANSFER RESTRICTIONS (.2); OBTAIN COPIES OF FORM TRANSFER RESTRICTION LANGUAGE AND REVIEW SAME (.4), DRAFT MEMORANDUM TO R. GRAY AND K. BRISTOR RE: SAME (.2) |
| 08/03/06 | Turetsky, D | 3.60 | RESEARCH AND UPDATE EXHIBIT A TO SECOND OMNIBUS CONTRACT ASSUMPTION MOTION (3.6) | RESEARCH IN CONNECTION WITH UPDATING EXHIBIT A TO SECOND OMNIBUS CONTRACT ASSUMPTION MOTION ( CONTEMPORANEOUS RESEARCH AND UPDATING) (3.6) |
| 09/13/06 | Shah, M | 2.80 | REVIEW OF LYNCH AGREEMENT FOR 409A ANALYSIS AND CALL WITH P. LYNCH COUNSEL RE: AGREEMENT (2.8) | NO LONGER WITH THE FIRM |

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | REVISED DESCRIPTION |
|---|---|---|---|---|
| 09/14/06 | Wenzel, C | 0.70 | INTERNAL CONFERENCE AND CALLS WITH CLIENT TO DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.7) | INTERNAL CONFERENCE WITH T. BOYDELL TO DISCUSS DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.2); CALLS WITH CLIENT TO DISCUSS INSURANCE AND CREDIT PROCESSOR CLOSING CONDITIONS (.5) |
| 09/20/06 | Wenzel, C | 0.80 | INTERNAL CONFERENCE AND CONFERENCE WITH OSHR TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.8) | INTERNAL CONFERENCE WITH T. BOYDELL TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.4); CONFERENCE WITH OSHR TO DISCUSS CLOSING CHECKLIST AND OUTSTANDING ITEMS (.4) |

2

**EXHIBIT J-2**
**ADMINISTRATION/CLERICAL ACTIVITIES BY PROFESSIONALS**
**(FIFTH INTERIM FEE APPLICATION)**

| DATE | NAME | TASK HOURS | ORIGINAL DESCRIPTION | NECESSITY OF SERVICE |
|------|------|-----------|----------------------|----------------------|
| 07/14/06 | Hart Jr., D | 0.40 | MULTIPLE COMMUNICATION WITH SKADDEN ACCOUNTING RE: MAY BILL | CORRESPONDENCE WITH SKADDEN ACCOUNTING ON MAY BILL TO ENSURE COMPLIANCE WITH COURT ORDER ON PROFESSIONAL SERVICES |
| 08/14/06 | Feld, S | 1.40 | REVIEW FILES FOR ADDRESSES FOR SOLICITATION | REVIEW WINN-DIXIE PARTIES/VOTING PARTIES TO ENSURE APPROPRIATE SERVICE/SOLICITATION UNDER BANKRUPTCY RULES |
| 09/21/06 | Kempf, J | 0.60 | ORGANIZING AND MANAGING DRAFTS OF REAL ESTATE DELIVERABLE AND OTHER PERTINENT DOCUMENTS | MAINTAINING CLOSING DOCUMENTS OF THE CREDIT AGREEMENT AND REVIEWING CONTEMPORANEOUSLY THE DOCUMENTS TO ENSURE ALL NECESSARY DOCUMENTS ARE PRESENT AND COMPLETE TO FACILITATE THE CLOSING |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-1**

| TRAN DATE | TIMEKEEPER NAME | BILLED AMOUNT | BILL NUMBER | NARRATIVE |
|---|---|---|---|---|
| 6/21/2006 | Baker DJ | $ - | 1113475 | AGENCY: NAVIGANT TRAVEL. FROM: EWR NEWARK NJ TO: JAX JACKSONVILLE FL-INTL CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 6/21/2006 | Baker DJ | $ - | 1113475 | AGENCY: NAVIGANT TRAVEL.. NAME: BAKER, DAVID JANSING. |
| 6/21/2006 | Baker DJ | $ - | 1113475 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 6/21/2006 | Baker DJ | $ - | 1113475 | AGENCY: NAVIGANT TRAVEL.. NAME: BAKER, DAVID JANSING. |
| 6/21/2006 | Baker DJ | $ 174.30 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER063006 DATE: 6/30/2006    DEPARTING AIRPORT OR STATION: JFK; ARRIVAL AIRPORT OR STATION: JACKSONVILLE; CARRIER: JETBLUE; CLASS OF SERVICE: ECONOMY; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 06/21/06; TO: JACKSONVILLE; RETURN DATE: 06/22/06 *** |
| 6/22/2006 | Baker DJ | $ 363.30 | 1113475 | AGENCY: NAVIGANT TRAVEL. FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: A COACH. NAME: BAKER, DAVID JANSING. |
| 7/30/2006 | Baker DJ | $ 963.00 | 1122978 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: LGA NEW YORK NY-LA GUARDIA CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER,DAVID JANSING. |
| 7/30/2006 | Baker DJ | $ - | 1122978 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: LGA NEW YORK NY-LA GUARDIA CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER,DAVID JANSING. |
| 7/30/2006 | Baker DJ | $ - | 1122978 | AGENCY: NAVIGANT TRAVEL.. NAME: BAKER, DAVID JANSING. |
| 8/1/2006 | Baker DJ | $ 709.30 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: JAX JACKSONVILLE FL-INTL TO: LGA NEW YORK NY-LA GUARDIA CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 8/2/2006 | Ravin AS | $ 1,463.59 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: LGA NEW YORK NY-LA GUARDIA CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: RAVIN,ADAM S. |
| 8/2/2006 | Ravin AS | $ (709.30) | 1124484 | AGENCY: NAVIGANT TRAVEL.. NAME: RAVIN, ADAM S. |
| 8/3/2006 | Baker DJ | $ 1,463.59 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: LGA NEW YORK NY-LA GUARDIA CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER,DAVID JANSING. |
| 8/3/2006 | Baker DJ | $ (709.30) | 1124484 | AGENCY: NAVIGANT TRAVEL. NAME: BAKER, DAVID JANSING. CREDIT TICKET #: 0067605623868 |
| 8/4/2006 | Baker DJ | $ 309.30 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 8/4/2006 | Ravin AS | $ 309.30 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH. NAME: RAVIN, ADAM S. |
| 8/21/2006 | Turetsky DM | $ 378.60 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: JFK NEW YORK NY-KENNEDY TO: JAX JACKSONVILLE FL-INTL UNK=B6 CLASS: B COACH; FROM: JAX JACKSONVILLE FL-INTL TO: JFK NEW YORK NY-KENNEDY UNK=B6 CLASS: B COACH. NAME: TURETSKY, DAVID M. |
| 8/30/2006 | Baker DJ | $ 663.60 | 1124484 | AGENCY: NAVIGANT TRAVEL. FROM: EWR NEWARK NJ TO: JAX JACKSONVILLE FL-INTL CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 8/30/2006 | Baker DJ | $ (618.60) | 1124484 | AGENCY: NAVIGANT TRAVEL.. NAME: BAKER, DAVID JANSING. |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-1**

| 9/26/2006 | Henry S | $ 663.60 | 1124506 | AGENCY: NAVIGANT TRAVEL. FROM: EWR NEWARK NJ TO: JAX JACKSONVILLE FL-INTL CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH; FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: Y COACH. NAME: HENRY, SALLY M. |
| --- | --- | --- | --- | --- |
| 9/26/2006 | Baker DJ | $ 759.30 | 1124506 | AGENCY: NAVIGANT TRAVEL. FROM: LGA NEW YORK NY-LA GUARDIA TO: JAX JACKSONVILLE FL-INTL CARRIER: DL DELTA AIR LINES CLASS: Y COACH. NAME: BAKER, DAVID JANSING. |
| 9/28/2006 | Baker DJ | $ 359.30 | 1124506 | AGENCY: NAVIGANT TRAVEL. FROM: JAX JACKSONVILLE FL-INTL TO: EWR NEWARK NJ CARRIER: CO CONTINENTAL AIRLINES CLASS: A COACH. NAME: BAKER, DAVID JANSING. |
| **TOTAL** | | **$ 6,542.88** | | |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-2**

| TRAN DATE | TIMEKEEPER NAME | BILLED AMOUNT | BILL NUMBER | NARRATIVE |
|---|---|---|---|---|
| 5/24/2006 | Baker DJ | $18.52 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER052606 DATE: 5/26/2006   PLACE: TRELLISIS; ATTENDEES: 1; NAME: D. J. (JAN) BAKER; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 05/23/06; TO: JACKSONVILLE; RETURN DATE: |
| 6/21/2006 | Baker DJ | $32.82 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER063006 DATE: 6/30/2006   PLACE: JULIETTE'S RESTAURANT; ATTENDEES: 1; NAME: D. J. (JAN) BAKER; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 06/21/06; TO: JACKSONVILLE; RETURN DATE: 06/22/06 *** |
| 8/2/2006 | Baker DJ | $93.87 | 1124484 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006   PLACE: OMNI HOTEL; ATTENDEES: 1; NAME: D. J. (JAN) BAKER; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 08/01/06; TO: JACKSONVILLE; RETURN DATE: |
| 8/2/2006 | Baker DJ | $59.64 | 1124484 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006   PLACE: OMNI HOTEL; ATTENDEES: 1; NAME: D. J. (JAN) BAKER; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 08/01/06; TO: JACKSONVILLE; RETURN DATE: |
| 9/26/2006 | Baker DJ | $15.30 | 1124506 | VENDOR: BAKER DJ INVOICE#: ER100606 DATE: 10/6/2006   PLACE: OMNI JACKSONVILLE HOTEL; ATTENDEES: 1; NAME: D. J. (JAN) BAKER; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE; RETURN DATE: 09/28/06 *** |
| 9/26/2006 | Henry S | $51.73 | 1124506 | VENDOR: HENRY S INVOICE#: ER092906 DATE: 9/29/2006   PLACE: JULIETTE'S RESTAURANT; ATTENDEES: 1; NAME: SALLY MCDONALD HENRY; TITLE: PARTNER; COMPANY: SKADDEN; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE, FL; RETURN DATE: 09/28/06 *** |
| TOTAL | | $271.88 | | |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-3**

| TRAN DATE | TIMEKEEPER NAME | BILLED AMOUNT | BILL NUMBER | NARRATIVE |
|---|---|---|---|---|
| 5/24/2006 | Baker DJ | $ 253.56 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER052606 DATE: 5/26/2006   LODGING: HYATT REGENCY; NUMBER OF NIGHTS: 1; START DATE: 05/23/06; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 05/23/06; TO: JACKSONVILLE; RETURN DATE: 05/24/06 *** |
| 5/24/2006 | Baker DJ | $ 71.07 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER052606 DATE: 5/26/2006 BUSINESS TRAVEL CAR RENTAL; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 05/23/06; TO: JACKSONVILLE; RETURN DATE: 05/24/06 *** |
| 5/24/2006 | Baker DJ | $ 10.00 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER052606 DATE: 5/26/2006 BUSINESS TRAVEL PARKING; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 05/23/06; TO: JACKSONVILLE; RETURN DATE: 05/24/06 *** |
| 6/21/2006 | Baker DJ | $ 236.17 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER063006 DATE: 6/30/2006   LODGING: OMNI JACKSONVILLE HOTEL; NUMBER OF NIGHTS: 1; START DATE: 06/21/06; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 06/21/06; TO: JACKSONVILLE; RETURN DATE: 06/22/06 *** |
| 7/30/2006 | Baker DJ | $ 370.20 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006   LODGING: OMNI HOTEL; NUMBER OF NIGHTS: 2; START DATE: 07/30/06; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 07/30/06; TO: JACKSONVILLE; RETURN DATE: 08/01/06 *** |
| 7/30/2006 | Baker DJ | $ 35.00 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006 BUSINESS TAXI; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 07/30/06; TO: JACKSONVILLE; RETURN DATE: 08/01/06 *** |
| 7/30/2006 | Baker DJ | $ 177.05 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006 BUSINESS TRAVEL CAR RENTAL; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 07/30/06; TO: JACKSONVILLE; RETURN DATE: 08/01/06 *** |
| 7/30/2006 | Baker DJ | $ 262.23 | 1122978 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006. LODGING; OMNI HOTEL;   *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 07/30/06; TO: JACKSONVILLE; RETURN DATE: 08/01/06 *** |
| 8/2/2006 | Baker DJ | $ 96.78 | 1124484 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006 BUSINESS MEALS;   *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 08/02/06; TO: JACKSONVILLE; RETURN DATE: 08/04/06 *** |
| 8/2/2006 | Baker DJ | $ 124.77 | 1124484 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006 BUSINESS TRAVEL CAR RENTAL; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 07/30/06; TO: JACKSONVILLE; RETURN DATE: 08/01/06 *** |
| 8/2/2006 | Baker DJ | $ 535.18 | 1124484 | VENDOR: BAKER DJ INVOICE#: ER080406 DATE: 8/4/2006   LODGING: OMNI JACKSONVILLE HOTEL; NUMBER OF NIGHTS: 2; START DATE: 08/02/06; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 08/02/06; TO: JACKSONVILLE; RETURN DATE: 08/04/06 *** |
| 8/4/2006 | Ravin AS | $ 623.63 | 1124484 | VENDOR: RAVIN AS INVOICE#: ER081106 DATE: 8/11/2006   LODGING: OMNI HOTEL; NUMBER OF NIGHTS: 2; START DATE: 08/02/06; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 08/02/06; TO: JACKSONVILLE; RETURN DATE: 08/04/06 *** |
| 8/4/2006 | Ravin AS | $ 8.00 | 1124484 | VENDOR: RAVIN AS INVOICE#: ER081106 DATE: 8/11/2006 BUSINESS MEAL; *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 08/02/06; TO: JACKSONVILLE; RETURN DATE: 08/04/06 *** |
| 8/21/2006 | Turetsky DM | $ 59.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/22/2006 | Turetsky DM | $ 28.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006, BUSINESS TRAVEL TAXI; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/22/2006 | Turetsky DM | $ 17.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006, BUSINESS TRAVEL TAXI;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/23/2006 | Turetsky DM | $ 28.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/24/2006 | Turetsky DM | $ 28.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/25/2006 | Turetsky DM | $ 52.33 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS MEALS; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-3**

| | | | | |
|---|---|---|---|---|
| 8/25/2006 | Turetsky DM | $ 39.80 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 WIRELESS ACCESS;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/25/2006 | Turetsky DM | $ 850.20 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006   LODGING: OMNI HOTEL, JACKSONVILLE, FL; NUMBER OF NIGHTS: 4; START DATE: 08/21/06; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/25/2006 | Turetsky DM | $ 49.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI;  *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/25/2006 | Turetsky DM | $ 21.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI;  *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/21/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/25/06 *** |
| 8/28/2006 | Turetsky DM | $ 73.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/29/2006 | Turetsky DM | $ 28.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/30/2006 | Turetsky DM | $ 25.63 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS MEAL; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/30/2006 | Turetsky DM | $ 35.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS TRAVEL TAXI;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/30/2006 | Turetsky DM | $ 30.00 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006, BUSINESS TRAVEL TAXI;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/30/2006 | Turetsky DM | $ 15.70 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006 BUSINESS PHONE CHARGES;   *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 8/30/2006 | Turetsky DM | $ 517.54 | 1124484 | VENDOR: TURETSKY DM INVOICE#: ER090806 DATE: 9/8/2006   LODGING: OMNI HOTEL, JACKSONVILLE, FL; NUMBER OF NIGHTS: 2; START DATE: 08/28/06; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 08/28/06; TO: JACKSONVILLE, FL; RETURN DATE: 08/30/06 *** |
| 9/26/2006 | Baker DJ | $ 509.94 | 1124506 | VENDOR: BAKER DJ INVOICE#: ER100606 DATE: 10/6/2006   LODGING: OMNI JACKSONVILLE HOTEL; NUMBER OF NIGHTS: 2; START DATE: 09/26/06; *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE; RETURN DATE: 09/28/06 *** |
| 9/26/2006 | Henry S | $ 562.74 | 1124506 | VENDOR: HENRY S INVOICE#: ER092906 DATE: 9/29/2006   LODGING: OMNI JACKSONVILLE HOTEL; NUMBER OF NIGHTS: 2; START DATE: 09/26/06; *** RELATING TO TRIP FROM: NEW YORK, NY; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE, FL; RETURN DATE: 09/28/06 *** |
| 9/26/2006 | Henry S | $ 30.00 | 1124506 | VENDOR: HENRY S INVOICE#: ER092906 DATE: 9/29/2006, BUSINESS TRAVEL PARKING;   *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE, FL; RETURN DATE: 09/28/06 *** |
| 9/26/2006 | Henry S | $ 105.43 | 1124506 | VENDOR: HENRY S INVOICE#: ER092906 DATE: 9/29/2006, BUSINESS TRAVEL CAR RENTAL;   *** RELATING TO TRIP FROM: NEW YORK; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE, FL; RETURN DATE: 09/28/06 *** |
| 9/27/2006 | Baker DJ | $ 138.59 | 1124506 | VENDOR: BAKER DJ INVOICE#: ER100606 DATE: 10/6/2006, BUSINESS TRAVEL CAR RENTAL;   *** RELATING TO TRIP FROM: NYC; DEPARTURE DATE: 09/26/06; TO: JACKSONVILLE; RETURN DATE: 09/28/06 *** |
| **Total** | | **$ 6,047.54** | | |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit N-4**

| TRAN DATE | NAME | DISBURSEMENT TYPE | BILLED AMOUNT | QUANTITY | PER PAGE CHARGE | BILL NUMBER | NARRATIVE |
|---|---|---|---|---|---|---|---|
| 6/2/2006 | Copy Center, D | In-house Reproduction | $ 1.00 | 10 | $ 0.10 | 1113475 | |
| 6/2/2006 | Copy Center, D | In-house Reproduction | $ 435.10 | 4351 | $ 0.10 | 1113475 | |
| 6/2/2006 | Copy Center, D | In-house Reproduction | $ 2.20 | 22 | $ 0.10 | 1113475 | |
| 6/2/2006 | Copy Center, D | In-house Reproduction | $ 127.30 | 1273 | $ 0.10 | 1113475 | |
| 6/2/2006 | Copy Center, D | In-house Reproduction | $ 188.80 | 1888 | $ 0.10 | 1113475 | |
| 6/6/2006 | Copy Center, D | In-house Reproduction | $ 0.50 | 5 | $ 0.10 | 1113475 | |
| 6/6/2006 | Copy Center, D | In-house Reproduction | $ 8.80 | 88 | $ 0.10 | 1113475 | |
| 6/6/2006 | Copy Center, D | In-house Reproduction | $ 0.60 | 6 | $ 0.10 | 1113475 | |
| 6/6/2006 | Copy Center, D | In-house Reproduction | $ 2.00 | 20 | $ 0.10 | 1113475 | |
| 6/6/2006 | Copy Center, D | In-house Reproduction | $ 122.60 | 1226 | $ 0.10 | 1113475 | |
| 6/9/2006 | Copy Center, D | In-house Reproduction | $ 0.10 | 1 | $ 0.10 | 1113475 | |
| 6/9/2006 | Copy Center, D | In-house Reproduction | $ 63.60 | 636 | $ 0.10 | 1113475 | |
| 6/9/2006 | Copy Center, D | In-house Reproduction | $ 16.40 | 164 | $ 0.10 | 1113475 | |
| 6/9/2006 | Copy Center, D | In-house Reproduction | $ 8.20 | 82 | $ 0.10 | 1113475 | |
| 6/13/2006 | Copy Center, D | In-house Reproduction | $ 91.00 | 910 | $ 0.10 | 1113475 | |
| 6/13/2006 | Copy Center, D | In-house Reproduction | $ 1.20 | 12 | $ 0.10 | 1113475 | |
| 6/13/2006 | Copy Center, D | In-house Reproduction | $ 0.30 | 3 | $ 0.10 | 1113475 | |
| 6/13/2006 | Copy Center, D | In-house Reproduction | $ 0.20 | 2 | $ 0.10 | 1113475 | |
| 6/16/2006 | Copy Center, D | In-house Reproduction | $ 0.70 | 7 | $ 0.10 | 1113475 | |
| 6/16/2006 | Copy Center, D | In-house Reproduction | $ 0.30 | 3 | $ 0.10 | 1113475 | |
| 6/16/2006 | Copy Center, D | In-house Reproduction | $ 3.90 | 39 | $ 0.10 | 1113475 | |
| 6/20/2006 | Copy Center, D | In-house Reproduction | $ 31.50 | 315 | $ 0.10 | 1113475 | |
| 6/20/2006 | Copy Center, D | In-house Reproduction | $ 6.30 | 63 | $ 0.10 | 1113475 | |
| 6/20/2006 | Copy Center, D | In-house Reproduction | $ 3.60 | 36 | $ 0.10 | 1113475 | |
| 6/20/2006 | Copy Center, D | In-house Reproduction | $ 31.20 | 312 | $ 0.10 | 1113475 | |
| 6/23/2006 | Copy Center, D | In-house Reproduction | $ 7.00 | 70 | $ 0.10 | 1113475 | |
| 6/23/2006 | Copy Center, D | In-house Reproduction | $ 0.70 | 7 | $ 0.10 | 1113475 | |
| 6/23/2006 | Copy Center, D | In-house Reproduction | $ 0.90 | 9 | $ 0.10 | 1113475 | |
| 6/23/2006 | Copy Center, D | In-house Reproduction | $ 156.60 | 1566 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 311.20 | 3112 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 0.30 | 3 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 0.80 | 8 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 12.30 | 123 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 42.90 | 429 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 0.80 | 8 | $ 0.10 | 1113475 | |
| 6/27/2006 | Copy Center, D | In-house Reproduction | $ 1.80 | 18 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 10.20 | 102 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 1.70 | 17 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 4.20 | 42 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 4.70 | 47 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 168.50 | 1685 | $ 0.10 | 1113475 | |
| 6/30/2006 | Copy Center, D | In-house Reproduction | $ 143.30 | 1433 | $ 0.10 | 1113475 | |
| 7/4/2006 | Copy Center, D | In-house Reproduction | $ 0.40 | 4 | $ 0.10 | 1122978 | |
| 7/4/2006 | Copy Center, D | In-house Reproduction | $ 18.70 | 187 | $ 0.10 | 1122978 | |
| 7/7/2006 | Copy Center, D | In-house Reproduction | $ 28.50 | 285 | $ 0.10 | 1122978 | |
| 7/7/2006 | Copy Center, D | In-house Reproduction | $ 3.90 | 39 | $ 0.10 | 1122978 | |
| 7/7/2006 | Copy Center, D | In-house Reproduction | $ 0.90 | 9 | $ 0.10 | 1122978 | |
| 7/7/2006 | Copy Center, D | In-house Reproduction | $ 17.90 | 179 | $ 0.10 | 1122978 | |
| 7/11/2006 | Copy Center, D | In-house Reproduction | $ 18.70 | 187 | $ 0.10 | 1122978 | |
| 7/11/2006 | Copy Center, D | In-house Reproduction | $ 6.00 | 60 | $ 0.10 | 1122978 | |
| 7/11/2006 | Copy Center, D | In-house Reproduction | $ 142.60 | 1426 | $ 0.10 | 1122978 | |
| 7/14/2006 | Copy Center, D | In-house Reproduction | $ 1.00 | 10 | $ 0.10 | 1122978 | |
| 7/14/2006 | Copy Center, D | In-house Reproduction | $ 3.40 | 34 | $ 0.10 | 1122978 | |
| 7/14/2006 | Copy Center, D | In-house Reproduction | $ 0.60 | 6 | $ 0.10 | 1122978 | |
| 7/18/2006 | Copy Center, D | In-house Reproduction | $ 126.90 | 1269 | $ 0.10 | 1122978 | |
| 7/18/2006 | Copy Center, D | In-house Reproduction | $ 4.00 | 40 | $ 0.10 | 1122978 | |
| 7/18/2006 | Copy Center, D | In-house Reproduction | $ 0.20 | 2 | $ 0.10 | 1122978 | |
| 7/18/2006 | Copy Center, D | In-house Reproduction | $ 0.10 | 1 | $ 0.10 | 1122978 | |
| 7/21/2006 | Copy Center, D | In-house Reproduction | $ 17.80 | 178 | $ 0.10 | 1122978 | |
| 7/21/2006 | Copy Center, D | In-house Reproduction | $ 2.00 | 20 | $ 0.10 | 1122978 | |
| 7/21/2006 | Copy Center, D | In-house Reproduction | $ 1.00 | 10 | $ 0.10 | 1122978 | |
| 7/21/2006 | Copy Center, D | In-house Reproduction | $ 14.70 | 147 | $ 0.10 | 1122978 | |
| 7/25/2006 | Copy Center, D | In-house Reproduction | $ 2.70 | 27 | $ 0.10 | 1122978 | |
| 7/25/2006 | Copy Center, D | In-house Reproduction | $ 181.70 | 1817 | $ 0.10 | 1122978 | |
| 7/25/2006 | Copy Center, D | In-house Reproduction | $ 75.60 | 756 | $ 0.10 | 1122978 | |
| 7/25/2006 | Copy Center, D | In-house Reproduction | $ 1,183.90 | 11839 | $ 0.10 | 1122978 | |
| 7/25/2006 | Copy Center, D | In-house Reproduction | $ 4.80 | 48 | $ 0.10 | 1122978 | |
| 7/28/2006 | Copy Center, D | In-house Reproduction | $ 4.00 | 40 | $ 0.10 | 1122978 | |
| 7/28/2006 | Copy Center, D | In-house Reproduction | $ 170.20 | 1702 | $ 0.10 | 1122978 | |
| 7/28/2006 | Copy Center, D | In-house Reproduction | $ 4.00 | 40 | $ 0.10 | 1122978 | |
| 7/28/2006 | Copy Center, D | In-house Reproduction | $ 33.60 | 336 | $ 0.10 | 1122978 | |
| 7/28/2006 | Copy Center, D | In-house Reproduction | $ 64.70 | 647 | $ 0.10 | 1122978 | |
| 8/1/2006 | Copy Center, D | In-house Reproduction | $ 122.40 | 1224 | $ 0.10 | 1124484 | |
| 8/1/2006 | Copy Center, D | In-house Reproduction | $ 61.90 | 619 | $ 0.10 | 1124484 | |
| 8/1/2006 | Copy Center, D | In-house Reproduction | $ 2.10 | 21 | $ 0.10 | 1124484 | |
| 8/1/2006 | Copy Center, D | In-house Reproduction | $ 10.80 | 108 | $ 0.10 | 1124484 | |
| 8/3/2006 | Copy Center, D | In-house Reproduction | $ 42.80 | 428 | $ 0.10 | 1124484 | |
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 10.40 | 104 | $ 0.10 | 1124484 | |
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 156.80 | 1568 | $ 0.10 | 1124484 | |

Skadden, Arps, Slate, Meagher Flom LLP
Fifth Interim Response
Exhibit N-4

| Date | Dept | Description | Amount | Qty | Rate | Code | Notes |
|---|---|---|---|---|---|---|---|
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 182.10 | 1821 | $ 0.10 | 1124484 | |
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 141.40 | 1414 | $ 0.10 | 1124484 | |
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 76.80 | 768 | $ 0.10 | 1124484 | |
| 8/4/2006 | Copy Center, D | In-house Reproduction | $ 5.60 | 56 | $ 0.10 | 1124484 | |
| 8/8/2006 | Copy Center, D | In-house Reproduction | $ 282.10 | 2821 | $ 0.10 | 1124484 | |
| 8/8/2006 | Copy Center, D | In-house Reproduction | $ 1.30 | 13 | $ 0.10 | 1124484 | |
| 8/8/2006 | Copy Center, D | In-house Reproduction | $ 1.40 | 14 | $ 0.10 | 1124484 | |
| 8/8/2006 | Copy Center, D | In-house Reproduction | $ 0.90 | 9 | $ 0.10 | 1124484 | |
| 8/8/2006 | Copy Center, D | In-house Reproduction | $ 0.60 | 6 | $ 0.10 | 1124484 | |
| 8/11/2006 | Copy Center, D | In-house Reproduction | $ 71.90 | 719 | $ 0.10 | 1124484 | |
| 8/11/2006 | Copy Center, D | In-house Reproduction | $ 0.90 | 9 | $ 0.10 | 1124484 | |
| 8/11/2006 | Copy Center, D | In-house Reproduction | $ 0.70 | 7 | $ 0.10 | 1124484 | |
| 8/11/2006 | Copy Center, D | In-house Reproduction | $ 88.30 | 883 | $ 0.10 | 1124484 | |
| 8/11/2006 | Copy Center, D | In-house Reproduction | $ 0.40 | 4 | $ 0.10 | 1124484 | |
| 8/15/2006 | Copy Center, D | In-house Reproduction | $ 43.90 | 439 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 7.10 | 71 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 7.50 | 75 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 1.40 | 14 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 1.30 | 13 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 1,267.10 | 12671 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 3.70 | 37 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 18.60 | 186 | $ 0.10 | 1124484 | |
| 8/18/2006 | Copy Center, D | In-house Reproduction | $ 30.90 | 309 | $ 0.10 | 1124484 | |
| 8/22/2006 | Copy Center, D | In-house Reproduction | $ 26.30 | 263 | $ 0.10 | 1124484 | |
| 8/22/2006 | Copy Center, D | In-house Reproduction | $ 2.00 | 20 | $ 0.10 | 1124484 | |
| 8/22/2006 | Copy Center, D | In-house Reproduction | $ 2.70 | 27 | $ 0.10 | 1124484 | |
| 8/22/2006 | Copy Center, D | In-house Reproduction | $ 48.50 | 485 | $ 0.10 | 1124484 | |
| 8/25/2006 | Copy Center, D | In-house Reproduction | $ 261.00 | 2610 | $ 0.10 | 1124484 | |
| 8/25/2006 | Copy Center, D | In-house Reproduction | $ 3.90 | 39 | $ 0.10 | 1124484 | |
| 8/25/2006 | Copy Center, D | In-house Reproduction | $ 1.30 | 13 | $ 0.10 | 1124484 | |
| 8/25/2006 | Copy Center, D | In-house Reproduction | $ 107.50 | 1075 | $ 0.10 | 1124484 | |
| 8/25/2006 | Copy Center, D | In-house Reproduction | $ 0.20 | 2 | $ 0.10 | 1124484 | |
| 8/29/2006 | Copy Center, D | In-house Reproduction | $ 0.30 | 3 | $ 0.10 | 1124484 | |
| 8/29/2006 | Copy Center, D | In-house Reproduction | $ 2.80 | 28 | $ 0.10 | 1124484 | |
| 8/29/2006 | Copy Center, D | In-house Reproduction | $ 6.80 | 68 | $ 0.10 | 1124484 | |
| 9/1/2006 | Copy Center, D | In-house Reproduction | $ 9.00 | 90 | $ 0.10 | 1124506 | |
| 9/1/2006 | Copy Center, D | In-house Reproduction | $ 34.30 | 343 | $ 0.10 | 1124506 | |
| 9/1/2006 | Copy Center, D | In-house Reproduction | $ 0.90 | 9 | $ 0.10 | 1124506 | |
| 9/5/2006 | Copy Center, D | In-house Reproduction | $ 0.20 | 2 | $ 0.10 | 1124506 | |
| 9/8/2006 | Copy Center, D | In-house Reproduction | $ 5.10 | 51 | $ 0.10 | 1124506 | |
| 9/8/2006 | Copy Center, D | In-house Reproduction | $ 1,210.30 | 12103 | $ 0.10 | 1124506 | |
| 9/8/2006 | Copy Center, D | In-house Reproduction | $ 202.80 | 2028 | $ 0.10 | 1124506 | |
| 9/12/2006 | Copy Center, D | In-house Reproduction | $ 22.00 | 220 | $ 0.10 | 1124506 | |
| 9/12/2006 | Copy Center, D | In-house Reproduction | $ 3.30 | 33 | $ 0.10 | 1124506 | |
| 9/12/2006 | Copy Center, D | In-house Reproduction | $ 1.00 | 10 | $ 0.10 | 1124506 | |
| 9/15/2006 | Copy Center, D | In-house Reproduction | $ 6.00 | 60 | $ 0.10 | 1124506 | |
| 9/15/2006 | Copy Center, D | In-house Reproduction | $ 1.10 | 11 | $ 0.10 | 1124506 | |
| 9/15/2006 | Copy Center, D | In-house Reproduction | $ 0.50 | 5 | $ 0.10 | 1124506 | |
| 9/19/2006 | Copy Center, D | In-house Reproduction | $ 0.40 | 4 | $ 0.10 | 1124506 | |
| 9/19/2006 | Copy Center, D | In-house Reproduction | $ 8.00 | 80 | $ 0.10 | 1124506 | |
| 9/19/2006 | Copy Center, D | In-house Reproduction | $ 0.20 | 2 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 60.20 | 602 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 20.70 | 207 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 3.20 | 32 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 328.80 | 3288 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 50.20 | 502 | $ 0.10 | 1124506 | |
| 9/22/2006 | Copy Center, D | In-house Reproduction | $ 257.60 | 2576 | $ 0.10 | 1124506 | |
| 9/25/2006 | Copy Center, D | In-house Reproduction | $ 179.00 | 1790 | $ 0.10 | 1124506 | |
| 9/26/2006 | Copy Center, D | In-house Reproduction | $ 46.00 | 460 | $ 0.10 | 1124506 | |
| 9/26/2006 | Copy Center, D | In-house Reproduction | $ 12.80 | 128 | $ 0.10 | 1124506 | |
| 9/26/2006 | Copy Center, D | In-house Reproduction | $ 11.70 | 117 | $ 0.10 | 1124506 | |
| 9/29/2006 | Copy Center, D | In-house Reproduction | $ 5.70 | 57 | $ 0.10 | 1124506 | |
| 9/29/2006 | Copy Center, D | In-house Reproduction | $ 77.10 | 771 | $ 0.10 | 1124506 | |
| 9/29/2006 | Copy Center, D | In-house Reproduction | $ 64.20 | 642 | $ 0.10 | 1124506 | |
| 9/29/2006 | Copy Center, D | In-house Reproduction | $ 0.10 | 1 | $ 0.10 | 1124506 | |
| **TOTAL IN-HOUSE REPRODUCTION** | | | **$ 9,878.60** | **98,786** | | | |
| 6/6/2006 | Copy Center, D | Reproduction - Color | $ 20.00 | 40 | $ 0.50 | 1113475 | |
| 7/27/2006 | Copy Center, D | Reproduction - Color | $ 9.50 | 19 | $ 0.50 | 1122978 | |
| **TOTAL REPRODUCTION-COLOR** | | | **$ 29.50** | **59** | | | |
| 4/28/2006 | Litigation-General, D | Outside Reproduction and E | $ 338.54 | 0 | | 1113475 | VENDOR: RLS LEGAL SOLUTIONS LLC; INVOICE#: 11-361509; DATE: 4/28/2006 - OUTSIDE COPY SERVICE PER K. KELLER |
| 5/9/2006 | Copy Center, D | Outside Reproduction and E | $ 73.10 | 1 | | 1113475 | VENDOR: WORLD COPY INC.; INVOICE#: 41877; DATE: 5/9/2006 - AUTHORIZATION #NY005867, BATES STAMP COPIES AND 8-1/2X11 COPIES |
| **TOTAL OUTSIDE REPRODUCTION AND BINDING** | | | **$ 411.64** | **1** | | | |
| 6/29/2006 | Copy Center, D | Printing to paper from TIF | $ 14.72 | 184 | $ 0.08 | 1113475 | |
| 8/31/2006 | Copy Center, D | Printing to paper from TIF | $ 60.00 | 750 | $ 0.08 | 1124484 | |
| **TOTAL ELECTRONIC DOCUMENT MANAGEMENT** | | | **$ 74.72** | **934** | | | |
| **GRAND TOTAL** | | | **$ 10,394.46** | | | | |

**Skadden, Arps, Slate, Meagher Flom LLP**
**Fifth Interim Response**
**Exhibit P**

| TRAN DATE | NAME | BILLED AMOUNT | BILL NUMBER | NARRATIVE |
|---|---|---|---|---|
| 5/24/2006 | Gray RW | $ 31.08 | 1113475 | ROOM:OFFSITE NO SECTION 12:00 PM - 02:00 PM; COLD LUNCH FOR 4 ATTENDEES $31.08;  TOTAL:$31.08 |
| 6/2/2006 | Baker DJ | $ 236.95 | 1122978 | ROOM:38-226 12:30 PM - 11:00 PM; BUFFET LUNCH FOR 8 ATTENDEES $236.95;  TOTAL:$236.95 |
| 6/12/2006 | Baker DJ | $ 118.48 | 1122978 | ROOM:38-202C 12:30 PM - 03:00 PM; BUFFET LUNCH FOR 4 ATTENDEES $118.48;  TOTAL:$118.48 |
| 6/12/2006 | Baker DJ | $ 12.22 | 1122978 | ROOM:38-404 10:00 AM - 12:30 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $12.22;  TOTAL:$12.22 |
| 6/21/2006 | Baker DJ | $ 414.66 | 1122978 | ROOM:38-416 12:30 PM - 02:00 PM; BUFFET LUNCH FOR 14 ATTENDEES $414.66;  TOTAL:$414.66 |
| 6/28/2006 | Neckles PJ | $ 261.23 | 1113475 | ROOM:38-226 10:00 AM - 01:30 PM; AM/PM DELIVERIES FOR 8 ATTENDEES $24.28;  BUFFET LUNCH FOR 8 ATTENDEES $236.95;  TOTAL:$261.23 |
| 7/18/2006 | Baker DJ | $ 14.57 | 1122978 | ROOM:38-306 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 7/24/2006 | Baker DJ | $ 24.45 | 1122978 | ROOM:38-404 10:30 AM - 11:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $12.22;  AM/PM DELIVERIES FOR 6 ATTENDEES $12.22;  TOTAL:$24.45 |
| 7/25/2006 | Baker DJ | $ 14.57 | 1122978 | ROOM:38-404 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 7/25/2006 | Baker DJ | $ 12.14 | 1122978 | ROOM:38-426C 03:30 PM - 05:00 PM; AM/PM DELIVERIES FOR 5 ATTENDEES $12.14;  TOTAL:$12.14 |
| 7/28/2006 | Baker DJ | $ 30.44 | 1122978 | ROOM:38-218 09:00 AM - 12:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $18.14;  AM/PM DELIVERIES FOR 6 ATTENDEES $12.30;  TOTAL:$30.44 |
| 8/1/2006 | Baker DJ | $ 14.57 | 1124484 | ROOM:37-132 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 8/7/2006 | Baker DJ | $ 12.22 | 1124484 | ROOM:38-308 03:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $12.22;  TOTAL:$12.22 |
| 8/8/2006 | Baker DJ | $ 14.57 | 1124484 | ROOM:38-212 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 8/9/2006 | Baker DJ | $ 75.15 | 1124484 | ROOM:38-220 11:00 AM - 01:30 PM; AM/PM DELIVERIES FOR 8 ATTENDEES $16.30;  BUFFET LUNCH FOR 2 ATTENDEES $58.85;  TOTAL:$75.15 |
| 8/14/2006 | Baker DJ | $ 176.54 | 1124484 | ROOM:38-404 01:00 PM - 05:00 PM; BUFFET LUNCH FOR 6 ATTENDEES $176.54;  TOTAL:$176.54 |
| 8/15/2006 | Baker DJ | $ 14.57 | 1124484 | ROOM:38-404 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 8/16/2006 | Baker DJ | $ 117.70 | 1124484 | ROOM:38-426C 12:30 PM - 02:00 PM; BUFFET LUNCH FOR 4 ATTENDEES $117.70;  TOTAL:$117.70 |
| 8/17/2006 | Baker DJ | $ 10.19 | 1124484 | ROOM:38-328C 10:00 AM - 12:00 PM; AM/PM DELIVERIES FOR 5 ATTENDEES $10.19;  TOTAL:$10.19 |
| 8/21/2006 | Gray RW | $ 89.84 | 1124484 | ROOM:38-218 11:00 AM - 03:00 PM; BUFFET LUNCH FOR 3 ATTENDEES $89.84;  TOTAL:$89.84 |
| 8/22/2006 | Baker DJ | $ 14.57 | 1124484 | ROOM:37-132 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 8/23/2006 | Baker DJ | $ 117.70 | 1124484 | ROOM:38-218 01:00 PM - 02:00 PM; BUFFET LUNCH FOR 4 ATTENDEES $117.70;  TOTAL:$117.70 |
| 8/25/2006 | Baker DJ | $ 12.22 | 1124484 | ROOM:38-404 03:00 PM - 05:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $12.22;  TOTAL:$12.22 |
| 8/29/2006 | Baker DJ | $ 14.57 | 1124484 | ROOM:37-134 05:00 PM - 06:30 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 9/5/2006 | Baker DJ | $ 14.57 | 1124506 | ROOM:38-404 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 9/13/2006 | Feld SR | $ 8.15 | 1124506 | ROOM:38-414 11:00 AM - 01:00 PM; AM/PM DELIVERIES FOR 4 ATTENDEES $8.15;  TOTAL:$8.15 |
| 9/14/2006 | Baker DJ | $ 14.57 | 1124506 | ROOM:38-318 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| 9/19/2006 | Baker DJ | $ 14.57 | 1124506 | ROOM:38-404 04:00 PM - 06:00 PM; AM/PM DELIVERIES FOR 6 ATTENDEES $14.57;  TOTAL:$14.57 |
| TOTAL | | $ 1,907.06 | | |

**APPENDIX 1**

<u>M</u> <u>E</u> <u>M</u> <u>O</u> <u>R</u> <u>A</u> <u>N</u> <u>D</u> <u>U</u> <u>M</u>


TO:        Stuart, Maue, Mitchell & James, Ltd.

FROM:    Skadden, Arps, Slate, Meagher & Flom LLP

            RE:    Winn-Dixie Bankruptcy Cases and Compensation for
                    Preparation, Filing and Defending Retention and Fee
                    <u>Applications and Bankruptcy Rule 2014 Investigations</u>


## <u>Questions Presented</u>

        1.  Can a bankruptcy court award a debtor's attorney its reasonable fees for preparing, filing and defending its fee application?

        2.  Can a bankruptcy court award a debtor's attorney its reasonable fees for preparing, filing, performing ongoing investigations associated with and defending its retention application?


## <u>Brief Answers</u>

        1.  Yes.  The Bankruptcy Code authorizes bankruptcy courts to award a debtor's attorney its reasonable fees for preparing, filing and defending its fee application.

        2.  Yes.  The Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorize courts to award a debtor's attorney its reasonable fees for preparing, filing, performing ongoing investigations associated with and defending its retention application.


## <u>Compensation for Preparing, Filing, and Defending Fee Applications</u>

        Bankruptcy Code section 330(a)(6) specifically provides that a court may award compensation to a debtor's properly retained attorney for the preparation of a fee application after notice and a hearing.  The court should award compensation based on the level and skill reasonably required to complete the fee application.  Section 330(a)(6) codified an extensive body of case law holding that it was inequitable to require professionals to file fee applications without awarding the professional reasonable compensation for the task.  <u>In re Nucorp Energy, Inc.</u>, 764 F.2d 655, 659 (9th Cir. 1985) (allowing compensation for time spent preparing fee applications because it is "fundamentally inequitable to impose substantial

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

requirements on bankruptcy counsel as prerequisites to their obtaining compensation while simultaneously denying compensation for the efforts necessary to comply with those requirements"); In re Braswell Motor Freight Lines, 630 F.2d 348, 351 (5th Cir. 1980) ("It was an abuse of discretion to deny a reasonable fee for preparation of the fee application."); In re Waczewski, No. 6:06-bk-00620-KSJ, 2006 Bankr. LEXIS 3206, at *3 (M.D. Fla. 2006) ("Section 330(a)(6) explicitly contemplates that the preparation of fee applications is compensable, and a majority of courts routinely allow such compensation where reasonable.").

Pursuant to Bankruptcy Code section 330(a)(3)(C), a court may compensate attorneys for necessary case administration services.  Arguably, by enacting the more specific section 330(a)(6), Congress recognized that fee applications by their very nature were necessary to the administration of the case and removed fee applications from the section 330(a)(3) rubric.  Nevertheless, fee applications are necessary to case administration and the court may award reasonable compensation for preparation of the fee application.

In addition, due to the public nature of bankruptcy fee applications, attorneys must carefully review time records to ensure that confidential information and other sensitive information is not publicized.  Therefore, it takes a significant amount of time and skill to prepare a fee application and Skadden, Arps, Slate, Meagher and Flom LLP ("Skadden, Arps") prepares its fee applications with a great deal of professionalism.

As indicated above, bankruptcy courts may award compensation for fee applications only after notice and a hearing.  Bankruptcy Code section 102(1) defines "after notice and a hearing" to include contested matters before the bankruptcy court.  Since Congress contemplated awarding reasonable compensation for fee applications only after parties in interest and the United States Trustee receive notice of the application and have an opportunity to object, it is logical to conclude that professionals can receive compensation for filing and defending fee applications.

Since bankruptcy courts may award reasonable compensation for the preparation of a fee application only after notice and a hearing, Skadden Arps may receive compensation for preparing, filing and defending its fee applications.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

## Compensation for Preparing, Filing and Defending Retention Applications

Under Bankruptcy Code section 327, a court may authorize a debtor to employ an attorney so long as the attorney is "disinterested" and does not "hold or represent an interest adverse to the estate." Furthermore, under Bankruptcy Rule 2014, an attorney's application for employment under Bankruptcy Code section 327 must set forth and explain all of the attorney's "previous connections with a creditor, any party in interest, . . . their accountants" and any person employed by the United States Trustee. Because parties in interest and creditors change throughout the course of a case, attorneys must periodically review their records to ensure no improper relationship inadvertently arises. Finally, after internally verifying that the Bankruptcy Code permits the retention, attorneys must prepare a report of any relationships and file these reports with the bankruptcy court. Undoubtedly, these Bankruptcy Code section 327 and Bankruptcy Rule 2014 investigations are more exhaustive and time consuming than any conflicts check that ethical rules require outside of bankruptcy.[1]

As indicated above, Bankruptcy Code section 330(a)(3) states that a court may award professionals compensation for necessary case administration services. The retention of professionals, such as attorneys, is an essential and necessary part of case administration. Moreover, the Office of the United States Trustee's fee guidelines for fee applications indicate that professionals may receive compensation for preparing retention applications. See 11 U.S.C. § 330 (28 C.F.R. Pt. 58, App. A).

Similarly, because Bankruptcy Rule 2014 requires attorneys to review and disclose initially and periodically their relationships with creditors and other parties to remain employed by a debtor, compensation for these investigations is also appropriate. See In re Sterling Chemicals Holdings, Inc., 293 B.R. 701, 704 (Bankr. S.D. Tex. 2003) (court held that it will "allow compensation for all reasonable and necessary efforts to comply with the disclosure requirements of Fed. R. Bankr. P. 2014(a)").

In addition, failure to comply strictly with Bankruptcy Rule 2014 may result in severe consequences to the estate, such as disqualification of the professional. Disqualification could have a severe impact on a debtor because of the delay and disruption of having to obtain and integrate new professionals. Therefore, it is in the estate's best interest for its professionals to review carefully their records to ensure that any proposed and continued employment is appropriate under the Bankruptcy Code and Bankruptcy Rules.

---

[1]    See, e.g., American Bar Association Model Rules of Professional Conduct, Model Rule 1.7(a) (an attorney "shall not represent a client if the representation of that client will be directly adverse to another client unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and each client consents after consultation") (internal subsection references omitted).

3

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

   Finally, as noted above, bankruptcy courts may award compensation for professionals only after notice and a hearing.  Because Congress requires professionals to provide notice and a hearing before receiving compensation on retention applications, it logically follows that professionals should receive reasonable compensation for filing and defending their retention applications.

   The Bankruptcy Code and Bankruptcy Rules required Skadden, Arps to prepare a retention application and to perform a diligent and time consuming search of its records for any connections it may have to the debtors, creditors and other parties in interest.  Furthermore, Skadden, Arps had to update these searches during the cases so that it could continue to provide necessary services to the estates.  Therefore, this Court should award Skadden, Arps its reasonable fees for preparing, filing and defending its retention application and Bankruptcy Rule 2014 investigation, as applicable.

4