1           UNITED STATES BANKRUPTCY COURT
            MIDDLE DISTRICT OF FLORIDA
2              JACKSONVILLE DIVISION

3

4   In re:

5                           CASE NO:   05-3817-3F1
    WINN-DIXIE STORES, INC.
6

7           Debtors.
    _____/
8

9

10              TRANSCRIPT OF PROCEEDINGS

11

12           Excerpt of hearing re:  Debtors' Second Motion

13   to Compel Discovery from Visagent and Visagent's First

14   Motion to Compel, before the Honorable Jerry A. Funk,

15   U.S. Bankruptcy Judge, commencing at 1:30 p.m., on June

16   14, 2007, at the United States Courthouse, Room 4D,

17   300 North Hogan Street, Jacksonville, Florida, as

18   reported by Elizabeth M. Masters, RPR, and a Notary

19   Public in and for the State of Florida at Large.

20

21                        - - -

22

23

24           STATEWIDE REPORTING SERVICE
              606 BLACKSTONE BUILDING
25          JACKSONVILLE, FLORIDA 32202
                 (904) 353-7706

2

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5        STEPHEN D. BUSEY, ESQUIRE

 6

 7             Attorney for Debtors

 8

 9

10
         GUY RUBIN, ESQUIRE
11

12
             Attorney for Visagent
13

14

15                        - - -

16

17

18

19

20

21

22

23

24

25
```

3

1                    T A B L E   O F   C O N T E N T S

2

3

4

5   Debtors' Second Motion to Compel Discovery from     4

6   Visagent

7

8

9   Visagent's First Motion to Compel                    28

10

11

12

13                               - - -

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                 P R O C E E D I N G S
 2  June 14, 2007                          1:30 p.m.
 3                         - - -
 4  ...
 5             THE COURT:  All right.  Debtors' Second Motion
 6        to Compel Discovery from Visagent, to be followed
 7        by Visagent's Motion to Compel.
 8             MR. RUBIN:  Your Honor, from a procedural
 9        standpoint, does this Court hear the motions as
10        they're filed?  Because we requested our motion to
11        be heard.  For whatever reason, the Debtor
12        scheduled them backwards, even though their motion
13        was scheduled a day after ours.
14             I think it's actually relevant and some of the
15        argument overlaps.  I don't really care to be tit
16        for tat, but just, as a matter of procedure, we
17        requested that it be scheduled first and they
18        refused to.
19             THE COURT:  Mr. Busey.
20             MR. BUSEY:  The reason that we scheduled them
21        in the order that we did, Your Honor, is this is
22        our -- Winn-Dixie's Second Motion to Compel
23        compliance with its request for production of
24        documents and its interrogatories.
25             The Court has already heard it once and has
```

1    entered an order compelling compliance.  That

2    compliance was insufficient, and so we filed a

3    second motion.

4         Because this dispute was first in time, that's

5    the reason we scheduled it the way we did.

6         Actually, Winn-Dixie's motion here is a lot

7    more simple than Visagent's motion.  We've only got

8    three points that we're going to need to cover.

9         THE COURT:  Well, go ahead and cover your

10   points.

11        MR. BUSEY:  I have some notebooks of pleadings

12   and stuff, Your Honor, that I think would be

13   useful.  I'll hand one to the bench.

14        THE COURT:  Thank you.

15        MR. BUSEY:  Your Honor, I can cut to the chase

16   pretty quick.  Our motion is, under Tab A -- there

17   are really three things we're going to complain

18   about, two document request problems and one

19   interrogatory problem.

20        The document request problem is with regard to

21   the form of the production by the -- by Visagent.

22   In short, we've asked -- Visagent, as you know, was

23   a provider under a service contract for three years

24   of an Internet service which would provide

25   Winn-Dixie access to an Internet portal through

1        which Winn-Dixie could buy and sell goods in the

2        secondary market, that is, retail on the stores but

3        among retailers and manufacturers and wholesalers.

4             Visagent provided a service, an Internet

5        portal, in which people like Winn-Dixie could get

6        on that portal and trade in the secondary market.

7        We had a contract for three years to do that, it

8        didn't work, and Winn-Dixie stopped using it.

9             Visagent filed a suit against Winn-Dixie for

10       breach of that contract in 2004, just before the

11       bankruptcy here in Duval County.  That action was

12       stayed by reason of the bankruptcy.

13            Visagent subsequently filed this proof of

14       claim in this case for breach of contract mirroring

15       its state court action.  We objected.  Having

16       subjected itself to the jurisdiction of this Court

17       through its proof of claim which seeks

18       approximately $132 million in damages, we're now

19       here.

20            Because of the magnitude of the claim and the

21       significant factual disputes between Visagent and

22       Winn-Dixie regarding the matter, we've come to a

23       discovery dispute.

24            We've been to Your Honor before on this.

25       We've tried to resolve it consensually.  We haven't

1     been able to.

2           The first document production issue is that we

3     want to have the electronic database which Visagent

4     has and we want it produced to us in electronic

5     format.

6           And I want to show you the rule in a minute,

7     which is interesting, Rule 34 embodied in 9034, was

8     amended in 2006 to directly address the issues of

9     discovery disputes regarding electronically stored

10    information.  And we'll walk through that in just

11    a minute, but I wanted to give you an overview of

12    what the issue was.

13          We've asked for production of a lot of

14    different documents from Visagent regarding their

15    exchange, their information exchange.  It is all

16    electronically stored information.

17          And what Visagent finally gave to us, in

18    response to your last order, was 16,000 pages of

19    documents which were produced to us on a computer

20    screen in a PDF format, which means all we could do

21    was look at the page.  We couldn't get behind it

22    and we couldn't search their database.

23          And that's the whole idea of electronically

24    stored information, is being able to store -- is to

25    search the data as it's stored and maintained by

1        the person that's producing it.

2            And when we asked for the database itself, we

3        asked for it in an electronic format so that we

4        could search it, and they said no.  And all they

5        would do is give us hard copies of the 16,000

6        pages, PDF pages.

7            Let me turn first, Your Honor, to the rule.

8        If you would look under Tab C of the notebook that

9        I gave you where we have Rule 34.  And this is as

10       it was amended in 2006 for production of documents.

11           And you'll see on the first page, Rule

12       34B(i)(ii), "A party who produces documents for

13       inspection shall produce them as they're kept in

14       the usual course of business or shall organize them

15       and label them to correspond with the categories in

16       the request."

17           And (ii), "If a request does not specify the

18       form or forms for producing electronically stored

19       information, a responding party must produce the

20       information in a form or forms in which it is

21       ordinarily maintained or in a form or forms which

22       are reasonably usable."

23           And there's a comment to this rule.  If you

24       will look at the last page under Tab C, these are

25       the comments to the rule.  And I want to read to

1      you from that paragraph on page 6, in the middle of

2      the paragraph.

3          "The rule does not require a party to produce

4      electronically stored information in the form in

5      which it is ordinarily maintained as long as it is

6      produced in a reasonably usable form.  But the

7      option to produce in a reasonably usable form does

8      not mean that a responding party is free to convert

9      electronically stored information from the form in

10     which it is ordinarily maintained to a different

11     form that makes it more difficult or burdensome for

12     the requesting party to use the information

13     efficiently in the litigation.

14         "If the responding party ordinarily maintains

15     the information it is producing in a way that makes

16     it searchable by electronic means, the information

17     should not be produced in a form that removes or

18     significantly degrades this feature."

19         That's the comment directly on point to the

20     dispute that we have here.

21         If you look under Tab B, let me show you what

22     Visagent has told us about their documents.

23     Starting in February of this year, you have a

24     letter here from Mr. Rubin to a lawyer in our

25     office, David Gay, and he says, in paragraph 2, "I

1     explained to you that a creditor is in possession

2     of the data" -- data is electronically stored

3     information -- "and program that contains the

4     information pursuant to his lien rights under a

5     financing agreement with Visagent.  His name is

6     Steve Barth.  We have not been successful in

7     obtaining this information from him."

8          That was Visagent's original response to us.

9          If you will turn the page, past the green

10    page, you'll see what the secretary of state of

11    Florida says about Visagent Corporation.

12         And it shows that its registered agent is Mr.

13    Rubin, here, and that its only officer is Steve

14    Barth.  And so we have had a hard time getting past

15    that.

16         But then finally, in June, we heard again from

17    Mr. Gay, if you turn the page again -- I mean, from

18    Mr. Rubin.  He sent us an e-mail on June 11th, and

19    he says, "Please be advised that upon conferring

20    with my client, it is my understanding there is no

21    searchable database containing the documents

22    already produced to Winn-Dixie in a PDF format.  It

23    is my further understanding that Adobe documents

24    are searchable.  Accordingly, it appears that

25    Visagent has no proprietary software that would

1       provide any assistance or make searching any easier

2       than what we have already provided."

3           And so, essentially, we have -- they're saying

4       no to us.  We're not going to give it to you in

5       electronically stored information, as required by

6       the rule.

7           And if you look under Tab D -- and this is

8       just an illustration -- this is an e-mail that Mr.

9       Rubin's brother Mark sent to Winn-Dixie in 2002.

10      And it was while they were discussing the lack of

11      activity on the Internet portal.

12          And he says they're sending attached

13      spreadsheets which show Winn-Dixie posting activity

14      on the Internet and Winn-Dixie alternate source

15      vendor activity on the Internet.

16          And if you turn the page and see the

17      attachments, you'll see the document that's marked

18      WD1119.  This is what they obtained when they

19      searched in 2006 showing Winn-Dixie's postings

20      during the third quarter of 2001.  And you'll find

21      the number of postings by Winn-Dixie on their

22      software program during that quarter, which is

23      evidence that it was searchable.

24          And so what we ask -- and there's several more

25      pages of summaries that they did by searching their

1         own database.

2              And so what we ask for is the Court to enter

3         an order asking them to produce that database for

4         us as it was maintained by them, which is what the

5         rule requires, and without the ability to search it

6         in any way impaired or degraded.

7              That's our first request.

8              THE COURT:  Okay.  Do you want to respond to

9         that, Mr. Rubin?

10             MR. RUBIN:  Yes, Your Honor.

11             The most accurate status of this issue is the

12        e-mail that I did send over to Mr. Gay a few days

13        ago, which, after inquiry, we determined that the

14        documents that exist existed -- and we didn't have

15        access to them until we made phone calls and made

16        arrangements with this lienholder over the

17        information and we got him to cooperate.

18             And what he had was different types of

19        documents, some spreadsheets, some Word documents,

20        some e-mails, in different directories in a

21        computer that Windows opens each program as you

22        click on an icon.

23             It's just like -- and I'm assuming for a

24        second, but I think most of us are familiar with

25        directories.  You go to a directory, you open it

1    up.  Sometimes you see that it's a PDF, sometimes

2    you see that it's an Excel.  Whatever it is, you

3    double click and, if you have the program, the

4    computer is smart enough to use that program.

5        I've been told that what we got when we

6    requested all this information was a download of

7    all of the information that was in those

8    directories as they existed in those directories.

9        And so once we got this on some kind of a hard

10   drive from them, we then had hard documents in --

11   well, potentially hard documents in an electronic

12   data format.

13       So the question then became how would we

14   deliver those and make sure that we have a system

15   whereby we can know what document is -- has been

16   produced through Bates stamping, because we don't

17   want to be in a situation somewhere down the line

18   where there's a disagreement about what was

19   produced and what isn't produced.

20       So what we did was we printed out every

21   document in that database, we Bates stamped it, and

22   we scanned them back in and produced, ultimately, a

23   disk and gave them the disk of all of those

24   documents.

25       And the only difference between what we got

1    out of the directory database from this lienholder

2    and what we gave them is the inclusion of a Bates

3    stamp at the bottom.  It's identical.

4        We don't have any more than what we gave them.

5    We don't have software that's searchable in some

6    complex way.

7        If the Debtor wants to get more into the

8    technical details of what that is, they certainly

9    are free to engage in discovery and verify what I'm

10   saying.  This is what I'm told.  And I'm not a

11   computer wizard, but this is based on my

12   rudimentary understanding of the way computers and

13   documents work.

14       We want this case to go forward as quickly as

15   possible.  There's no interest that we have in

16   delaying.  And so if there's a more searchable

17   way, we're glad to give it, but I don't know what

18   it is.

19       MR. BUSEY:  I go back to the rule.  "If a

20   request does not specify the form for producing

21   electronically stored information" -- and ours did

22   not -- "a responding party must produce the

23   information in a form or forms in which it is

24   ordinarily maintained or in a form or forms that

25   are reasonably usable."

1          And the note says, "If the responding party

2     ordinarily maintains the information that it's

3     producing in a way that makes it searchable by

4     electronic means, the information should not be

5     produced in a form that removes or significantly

6     degrades this feature."

7          And I've showed you evidence that they

8     maintained it in a form that was searchable.

9     Obviously, they did.  Obviously, it's

10    electronically stored information.

11         Now, obviously, they didn't maintain it in the

12    ordinary course in 16,000 individual PDFs with

13    Bates stamps on it.

14         We want it as it was maintained.  We want the

15    program, we want the software, just like they had

16    it.  That's what the rule entitles us to.

17         THE COURT:  Mr. Rubin says it doesn't exist.

18         Isn't that what you're telling me or

19    representing?

20         MR. RUBIN:  Exactly.  I inquired, and the

21    response that I got was that all of these documents

22    are stored in a hard drive and in directories --

23    that's what was sent to us -- and we simply printed

24    them.

25         In order to access the information, we didn't

1    need software.

2         THE COURT:  You didn't send the same disk to

3    the Debtor that you received.  You printed that

4    disk --

5         MR. RUBIN:  Right.

6         THE COURT:  -- and then scanned them back in

7    to create another disk --

8         MR. RUBIN:  Exactly.  But it's no more --

9         THE COURT:  -- which wasn't searchable.

10        MR. RUBIN:  Well, it's no more or less

11   searchable than the disk we got from the third --

12   from the lienholder.

13        THE COURT:  But if you would let them look at

14   your disk and compare it to their disk just to make

15   sure it's the same even though -- because yours had

16   Bates stamps, so, obviously, they knew that it had

17   been dealt with in some fashion.

18        MR. RUBIN:  Certainly.  And they're free to

19   look at it.

20        MR. BUSEY:  Well, we asked for it, and they

21   told us no.

22        MR. RUBIN:  I beg to differ.  I don't think

23   that that -- I don't think that that was ever the

24   dispute.  But I don't think we have a dispute.

25   You're welcome to look at it.

1        THE COURT:  Okay.  Let's go to the next item.

2        He says they'll furnish it.  That may be part

3    of an order.  They'll furnish that, and then we'll

4    go forward --

5        MR. BUSEY:  All right.

6        THE COURT:  -- if you can prove anything

7    beyond that.

8        All right.  What's your next thing?

9        MR. BUSEY:  Your Honor, yes, we would like for

10    them to produce what he just described they didn't

11    produce.

12        THE COURT:  The original disk they got for you

13    to compare to the disk you got.

14        MR. BUSEY:  And then we'll look at that.  And

15    if we're not satisfied or we think there's

16    something amiss, then we can discover, we can have

17    discovery of their IT people and take it from there

18    and try to resolve the issue of fact.

19        THE COURT:  All right.

20        MR. BUSEY:  All right.

21        THE COURT:  If that will satisfy, subject to

22    further discovery, their duty under that issue.

23        MR. RUBIN:  Thank you, Judge.

24        MR. BUSEY:  For the time being.

25        The next item is a document request which we

1     will identify as 5, 6, 8, 9, 16, 17, 18 and 20.

2          In response to those document requests,

3     Visagent produced those 16,000 pages of PDF

4     documents.  And we saw in those documents no

5     documents responsive to the document request that I

6     just identified.

7          Now, if the truth is that they have no other

8     documents that are -- other than what they've

9     produced that are responsive to those requests,

10    sobeit.  We would just like them to tell us that so

11    we're not surprised later.

12         But as it is, their document response says we

13    will produce them, and we got none in the stuff

14    they produced.

15         And so we want to -- we want to put a fence

16    around that and have them tell us specifically

17    that, with regard to those requests that I

18    identified, they have nothing else other than what

19    they've already produced.

20         THE COURT:  Mr. Rubin.

21         MR. RUBIN:  Yes, Your Honor.

22         THE COURT:  That sounds fair.

23         MR. RUBIN:  We don't have any problem with

24    that.  The reason that we don't normally add the

25    nomenclature that they're requesting, we don't have

1       any other documents other than what we've produced.

2             We understand that we're under a continuing

3       obligation.  And should we come across additional

4       documents, we will produce them.  But we don't want

5       to be caught again into a gotcha situation where we

6       have a corporate representative or someone else

7       having to defend an interrogatory or a production

8       answer that says we don't have any documents.  But

9       it may have been true at a particular time.

10            THE COURT:  Right.  The order says that they

11      don't have any documents other than what's been

12      produced.  However, if they discover it, they will

13      furnish it to you at least 15 days prior to trial

14      or they will be prohibited from producing it.

15            MR. BUSEY:  All right, Your Honor.

16            THE COURT:  That takes care of that one.

17            MR. BUSEY:  Can we say 30 days?

18            THE COURT:  30 days.

19            MR. BUSEY:  All right.  And, finally, this is

20      regarding interrogatory answers 5, 9, 10, 11, 15

21      and 17.  And in response to those interrogatories,

22      I think it would be good if you would look under

23      Tab A in our motion -- at our motion.  I'll give

24      you an example.

25            If you will look at page 11.  The request is

1        at the bottom of page 10 and it goes over to the

2        top of page 11.

3            Their initial response is quoted.  Then you

4        enter an order requiring an additional and better

5        response.  And their supplemental responses are

6        then quoted.

7            And then they go on to say, "Furthermore, some

8        aspects of the information requested by this

9        interrogatory may be derived or ascertained from

10       documents Visagent will produce pursuant to

11       Visagent's supplemental response, and the burden of

12       deriving or ascertaining the answer is

13       substantially the same for the Debtors as it is for

14       Visagent."

15           And they make that same response, if you turn

16       the pages, in response to each of the

17       interrogatories that I have talked about, that

18       they're going to produce another 16,000 pages.  And

19       it's just as easy for you to see the answer to the

20       interrogatory in those 16,000 pages as it is for

21       Visagent.  And they rely on Rule 33.

22           Let's look at Rule 33 for a minute.  It's

23       under Tab I.  And you'll see that in Rule 33 it

24       has, under subparagraph D, the option to produce

25       business records, and it gives somebody in

1      Visagent's position the option to do that.  But it
2      says that they have to specify the documents from
3      which the answers can be ascertained.
4           And in the last sentence, "The specification
5      shall be in sufficient detail to permit the
6      interrogating party to locate and identify as
7      readily as the party served the records from which
8      the answer may be ascertained."  That's the rule.
9           And if you look back at what I pointed you to
10     in their answers, they said:  We're going to give
11     you some more documents in the future, and you can
12     tell yourself the answers to these interrogatories
13     from those.
14          And what they gave us in the future, after
15     they gave us this response, was the 16,000 PDF
16     imagines.  And there's no reasonable specification.
17     We have no way of knowing where in those 16,000
18     documents to find the answers to those
19     interrogatories I identified.
20          THE COURT:  Mr. Rubin.
21          MR. RUBIN:  Yes, Your Honor.
22          We had a hearing that, unfortunately, I could
23     not attend.  Mr. Harden attended on behalf of
24     Visagent.  And, admittedly, Mr. Harden was not as
25     familiar with the day-to-day and the back and forth

1      and the documents and information as I am.

2          But he reported, I trust very accurately, Your

3      Honor's order from the last hearing in terms of the

4      obligations of the claimant, and for each one of

5      these interrogatories that a better answer was

6      required.

7          We did our level best.  And if you take a look

8      at all of the interrogatories, we not only set

9      forth the specific grounds where we had previously

10     objected, but we also identified documents where we

11     knew documents existed.

12         One of the reasons that we objected initially

13     was because these requests are extraordinarily

14     brought, requests such as the one pointed out to

15     Your Honor, number 11 -- from page 11, rather --

16     "State all facts, events, circumstances and

17     identify all documents which support your

18     allegations in the complaint" --

19         MR. BUSEY:  Keep reading.

20         MR. RUBIN:  Okay.

21         -- "that you filed in the circuit court action

22     that Winn-Dixie breached its contractual obligation

23     to exclusively utilize Visagent's services for

24     e-commerce."

25         And so in our response, which if you -- did

1    you include the response there?

2         MR. BUSEY:  Yes.

3         MR. RUBIN:  If you turn the page, our

4    supplemental responses 1, 2, 3, pretty significant

5    paragraphs giving detail of what we're complaining

6    about in the case.

7         THE COURT:  We're here on number 5.  Isn't

8    that what --

9         MR. RUBIN:  Well, this was an example that he

10   gave.

11        THE COURT:  Okay.

12        MR. RUBIN:  But I think number 5 was one of

13   many that they were complaining about with this

14   same complaint.

15        THE COURT:  All right.  And the one you just

16   read was number 9.

17        MR. RUBIN:  Yes, Your Honor.

18        THE COURT:  Okay.

19        MR. RUBIN:  So we did our best to state

20   specifically enough to give them notice of what

21   we're complaining about with detail.

22        And we identified the two documents that were

23   the basis, which were the service agreement and the

24   user agreement.

25        And then we added language to that, again, as

1       a protection, which is, because the interrogatories

2       are worded so broadly, we don't want to be in a

3       position where some document -- it may be obscure

4       now but its relevance becomes known later.

5            Particularly in the situation, Your Honor,

6       where we have a claim, and they've objected to the

7       claim.  We don't know what their defenses are.  We

8       don't know anything about Winn-Dixie's position in

9       this case because we don't have pleadings like a

10      normal case would have in federal court.

11           We don't -- we don't have a scheduling order,

12      we don't have the mandatory disclosure

13      requirements, and so we don't really know what

14      their positions are.

15           So this is a failsafe paragraph which says

16      that this is all -- all of the documents we know

17      apply to what you're asking about are specifically

18      identified, but there may be documents within the

19      universe of what we have that may be relevant

20      because your question is:  Tell us everything that

21      supports.

22           So, you know, technically, I could have a

23      personnel file from an employee which shows what

24      that employee was paid in a given week.  That may

25      be an element of damages.

1            When you ask a broad question, you're going to

2       get a broad answer.  And everything might have some

3       connection.

4            THE COURT:  Okay.  Can't we do the same kind

5       of order saying that -- obviously, they've got to

6       get ready for trial somewhere down the road.  And

7       if they come across one of those orders that

8       they've given you and they didn't specifically

9       point out the answer, they've got to furnish it to

10      you 30 days prior to the trial.

11           MR. BUSEY:  I'm sorry, Your Honor, I didn't

12      understand what you just said.

13           THE COURT:  I did.

14           MR. BUSEY:  What's the language?

15           THE COURT:  Similar.  It's just that they

16      furnish it in compliance.  However, they have a

17      duty to furnish specifically -- because he's

18      indicated that particular interrogatory that they

19      did say these two agreements, but there may be

20      something else in the 16,000 documents.

21           Well, they need to point that out to you

22      30 days prior to trial or they can't use it.

23           MR. BUSEY:  I see.

24           MR. RUBIN:  And that normally comes in the

25      form of an exhibit list.

1           THE COURT:  Well, it may or may not.

2           MR. RUBIN:  Right.

3           MR. BUSEY:  If Your Honor --

4           THE COURT:  If you pull it out in trial and

5     they haven't been furnished, you can't use it.

6           MR. RUBIN:  Well, we understand the

7     surprise --

8           MR. BUSEY:  And it may have been in the 16,

9     but we didn't know that was responsive.

10          THE COURT:  I understand.  I understand

11    exactly what you're saying.  And that's always a

12    problem.

13          MR. BUSEY:  And you see the request in our

14    interrogatory number 5, which is on page 10, and

15    it's very specific.  It's right out of the

16    contract.  It's the total dollar volume of full or

17    truckload quantities.  That's contractual language.

18          And their answer includes that broad language:

19    Go look at our 16,000 documents.

20          THE COURT:  If that's what they say, and then

21    they try to produce something, even though it was

22    in that 16,000 documents, without telling you

23    30 days ahead of time, then it's not coming in.

24          MR. BUSEY:  Got it.  We can draft that order.

25          MR. RUBIN:  Right.  And just so --

1        THE COURT:  And you haven't gone through the

2    16,000 documents yet to see what that figure is.

3        MR. RUBIN:  Well, here's the problem, Your

4    Honor.

5        THE COURT:  Or have you?

6        MR. RUBIN:  Here's the problem.  The primary

7    answer was Visagent never categorized the dollar

8    figures the way they're asking for them.  That's

9    what we responded.

10        The catchall was:  But there's a way to go

11    through the documents and try and piece that

12    together from a lot of different documents.  No one

13    document says that.  And you can do it just as

14    easily as we can.

15        That's what -- that's what the response was

16    for that particular --

17        THE COURT:  Well, ultimately, you've got the

18    burden of proving how much is owed you, and so

19    you've got to be able to do that.

20        MR. RUBIN:  And those will be on our exhibit

21    list.

22        MR. BUSEY:  And this is a good discussion,

23    Your Honor, because I think Mr. Rubin said it

24    right.  In the first part of his answer, he says:

25    Well, we don't keep the stuff that way, so we don't

1      have it.  But then he goes on and says:  But you

2      might find it in those 16,000 documents.  And

3      that's just not fair to us.

4          If he doesn't have it, he doesn't have it, and

5      I want to be able to rely on that.

6          THE COURT:  Well, I've told you how we'll deal

7      with it.

8          MR. BUSEY:  All right.

9          THE COURT:  And your final -- is that it?

10         MR. BUSEY:  That's it.

11         THE COURT:  Okay, good.

12         Now, Mr. Rubin.

13         MR. RUBIN:  Okay.  If I could just have a

14     30-second composure break so I can get my documents

15     together.

16         THE COURT:  We can handle that.

17         And it appears to me, Mr. Rubin, that most of

18     your objections are very similar to the Debtors'

19     objections.

20         MR. RUBIN:  Well, there are some, and then I

21     think there are other ones that are not.

22         And let me just start with the basic problem

23     that we're having.  Our intention is to move this

24     case forward as federal courts all around the

25     country like to see their dockets moved and

1          discovery engaged upon in good faith.

2               We have been trying to get a corporate

3          representative deposition since November of last

4          year, and, unfortunately, the Defendant,

5          Winn-Dixie, refuses to present a corporate

6          representative despite requests.

7               They have their reasons why -- and we'll go

8          over that -- which I don't think are valid.  And

9          we'll argue about that.

10              But now it appears that there's somewhat of a

11         pattern of delay taking place.  And we want the

12         Court's intervention so that we can move this case

13         along and we can have some visibility to the end,

14         because, at the pace that we're going, we're going

15         to be around in 2010 and beyond.

16              So let me just start with the scheduling of

17         the corporate representative.

18              THE COURT:  All right.  Well, I entered an

19         order --

20              MR. RUBIN:  Right.

21              THE COURT:  -- that said you can't take their

22         depositions until you've completed the discovery.

23              MR. RUBIN:  Right.  And the order said --

24         and --

25              THE COURT:  Okay.

1        MR. RUBIN:  Okay, I know what you're talking

2    about.

3        THE COURT:  And they're saying you haven't

4    completed it.  And so we've got a little match

5    there.

6        MR. RUBIN:  Right.

7        THE COURT:  But that's over now.  See, I just

8    said that you've completed it.

9        MR. RUBIN:  Very good.

10        THE COURT:  So now you can start scheduling

11    depositions.  And now, if you have a problem,

12    you'll need to bring it to my attention.

13        MR. RUBIN:  Very good.

14        THE COURT:  And I'm not telling you a

15    schedule.  You've got to cooperate like normal

16    professionals do and get a convenient date and

17    time.

18        But I think, according to Mr. Busey,

19    everything is done, but you've still got some

20    duties down the road.

21        MR. RUBIN:  Right.

22        THE COURT:  Mr. Busey, do you disagree with

23    that?  Obviously, you do.

24        MR. BUSEY:  I would like to bring some

25    precision to it, Your Honor.

1              THE COURT:  Okay.

2              MR. BUSEY:  I'm going to read from a paragraph

3      of the Court's order of February the 8th.

4              "Visagent will not depose the reorganized

5      Debtors' witnesses until the Court rules on the

6      Motion to Compel."

7              And you had not at that point.

8              THE COURT:  Right.

9              MR. BUSEY:  "And in the event the Court orders

10     Visagent to produce additional discovery, not until

11     20 days after Visagent complies with the Court

12     order."

13             And what we just argued was the fact they

14     haven't complied yet, and you just granted us

15     relief on it.  And so we want that stuff before he

16     takes our witness' deposition.

17             THE COURT:  I thought I ruled that you already

18     have it but they couldn't produce anything

19     different.  Is there still --

20             MR. BUSEY:  No.  You were --

21             THE COURT:  -- something they have to produce?

22             MR. BUSEY:  No.

23             THE COURT:  Oh, the disk.

24             MR. BUSEY:  Yes, the disk.

25             MR. RUBIN:  Right.  But that -- but that was

1      --

2           MR. BUSEY:  That was the core dispute.

3           THE COURT:  Okay.  All right.

4           MR. RUBIN:  That's only --

5           THE COURT:  You've got the disk in your back

6      pocket.

7           MR. RUBIN:  I wish I had it.

8           So let me understand if we have an agreement,

9      which is great.  I'm going to be away for the next

10     two weeks, anyway.  So we'll get them the disk.

11     And within ten days after they receive the disk,

12     we'll be able to coordinate a deposition to take

13     place in the next 30 days after that.  I mean, is

14     that reasonable?

15          THE COURT:  That depends on everybody's

16     schedule.

17          MR. RUBIN:  Okay.

18          THE COURT:  The discovery will be complete

19     when you deliver the disk, the correct disk.

20          MR. BUSEY:  The correct disk, not a Superman

21     comic book.

22          MR. RUBIN:  Right.

23          THE COURT:  They're not going to do that.

24          MR. RUBIN:  What I don't want to get into,

25     Your Honor, is we produce a disk and they say this

1       is not the correct disk.

2           I'm going to -- as an officer of the court,

3       I'm going to give them what our client is telling

4       us.  And, as Mr. Busey said, that's subject to them

5       taking further discovery and then they can

6       determine whether the client is being truthful or

7       not.

8           THE COURT:  Okay.

9           MR. RUBIN:  Okay.

10          THE COURT:  Now, what's next?

11          MR. RUBIN:  With regard to the specific

12      issues, we need to go to our -- I did not provide a

13      book because we had already filed the motion.

14          Page 3 of our motion, we requested purchases

15      and sales in secondary markets where electronic

16      means were utilized.  That language is some of the

17      defining language as to whether the contract

18      applies to certain purchases by the Debtor or not.

19          There was an objection to the request because

20      electronic means, they said, was overly broad.

21      They responded by delivering to us 10,000 documents

22      in boxes.  Actually, they didn't deliver them.

23      They said:  Come to our office and you can inspect

24      it.

25          This is a specific request.  And the documents

1      were neither identified -- and I'm glad that Mr.

2      Busey identified the rule of procedure, which we

3      agree one hundred percent with.

4           There's two ways that a responding party can

5      comply with the rule.  They can either deliver the

6      documents as they were originally kept or they can

7      mark and identify which ones are responsive to the

8      request itself.

9           My staff was placed in a room with boxes of

10     documents that were Bates stamped.  There were no

11     file jackets.  There was no original

12     correspondence.  It was all copies in boxes and,

13     you know, in huge volumes.

14          And so, essentially, they, I would say, gave

15     us a document dump and said:  Find it within those

16     documents.

17          It's really the same thing that they're

18     complaining about, except our request was very

19     specific.  And I believe that they need to give us

20     the files the way that they were organized

21     originally so that we can look through them and

22     understand what methods the Debtor used to organize

23     its files.

24          That alone has some value, Your Honor, when we

25     get an expert involved and we can talk about what

1    their filing systems were and how they account for

2    things.

3        But just to throw us into a room with 10,000

4    documents, it doesn't comply with the rule.

5        THE COURT:  Mr. Busey.

6        MR. BUSEY:  Yes, Your Honor.

7        We have a notebook that contains our answer to

8    this, and I'll point you to it.

9        Your Honor, we have provided documents

10   responsive to Visagent's request in two formats.

11   One, electronically, for stuff that was maintained

12   electronically, and one in hard copy for stuff that

13   was maintained in hard copy.

14       And when Mr. Rubin picked up on our request

15   that things that are stored electronically should

16   be produced electronically, in a searchable form,

17   he requested it of us and we gave him the disk just

18   like we maintain it.

19       And we gave him the hard copies in the manner

20   that he described, and he said to us in response to

21   that:  Well, that's not as originally kept, because

22   I don't see file jackets on it, even though we gave

23   him exact copies of what we had.

24       So if you look in the notebook that I just

25   gave you, under Tab F, when we received that last

1    request from Mr. Rubin, as we continued to have a

2    dialog after he filed his Motion to Compel, Mr. Gay

3    wrote this letter to Mr. Rubin on June 13th, and he

4    said, with regard -- first of all, we said, in the

5    first paragraph, we've already given you everything

6    we've got.

7         And, secondly, with regard to the complaint he

8    just made, we will -- we did agree, however, to

9    produce the original of those documents to the

10    extent they are still in our possession.  The

11    Debtors will make those documents available for

12    inspection during the week of June 25 at our

13    offices.

14         The same documents that we already gave him

15    copies of, he just wants to see the originals.  And

16    we wrote him on June 13th and said:  We'll show you

17    the originals.

18         MR. RUBIN:  Well, I'm glad.  This is the first

19    I've seen of this document.  We're only one day

20    after that, and I've been in transit, so that's

21    wonderful.

22         THE COURT:  Okay.

23         MR. BUSEY:  And this is a problem that we had

24    with the failure of the certification on this

25    motion.  We just did not have an adequate dialog

1    between us, and I'm embarrassed that we're before

2    the Court on it.

3        THE COURT:  Okay, good.  That resolves that,

4    subject to your further objection.

5        MR. RUBIN:  Okay.

6        THE COURT:  You know, hopefully, this will

7    take care of it.

8        MR. RUBIN:  I hope so.

9        THE COURT:  Okay.  The Court denies your

10   request, subject to Winn-Dixie following through in

11   their letter of June 13th.

12       MR. RUBIN:  Thank you.

13       THE COURT:  That's what we're saying.

14       MR. RUBIN:  That's fine, Judge.

15       THE COURT:  Your next objection.

16       MR. RUBIN:  I think that if they're going to

17   give us original documents, then that would apply

18   to request number 2 on page 4.

19       That would apply -- well, let me just take

20   them one by one.  I think it applies, also, to some

21   of the other ones, but let me just stay in order.

22       THE COURT:  Give me each one and let me hear

23   what Mr. Busey has to say so we can stay on the

24   same page.

25       MR. RUBIN:  All right.  Request number 4, we

1     asked for all e-mails, faxes, memos, correspondence

2     or any other communications, no matter how

3     transmitted or received, between the Debtor and

4     Damon & Associates, grocers, for the period of

5     June 15, 2001 to the present.

6          To set this up for Your Honor, Damon is a

7     diverter.  A diverter does -- is essentially a

8     middleman that does business between grocery

9     stores, in this case, and other grocery stores

10    where that diverter finds out a need on the part of

11    one grocery store and a surplus on the part of the

12    other grocery store and essentially provides a

13    solution by arranging a buy and sell or actually

14    buying it themselves and selling it and that's how

15    they make a profit.

16         Well, the contract at question in this case is

17    a solution that Visagent developed at great expense

18    to do away with diverters in the way that it's

19    always been done before, to create essentially a

20    NASDAQ or an eBay-type platform where grocery

21    stores could deal with each other and be more

22    efficient because they don't have to deal with the

23    middleman, the time that it takes to deal with the

24    middleman.  And it would be an honest transaction

25    because it's all blind.  And there's competition,

 1    because the buyers of surplus all will compete

 2    against each other and the sellers as well.

 3         Well, the contract in question excluded every

 4    diverter from business with the Debtor using any

 5    electronic means.  And we can fight over what

 6    electronic means is another today.

 7         But there was an exclusion within that scope

 8    of the contract for one company for one year.  The

 9    contract was a three-year contract.

10         A one-year exclusion was for a company called

11    Victory.  And Victory was an in-house diverter for

12    Winn-Dixie, meaning that they actually had their

13    offices inside the headquarters and they were doing

14    this same function within the physical space of the

15    administrative offices of the Debtor.

16         So at the time that this contract was signed,

17    for a period of three years, a company like Damon,

18    doing business with Winn-Dixie by electronic means,

19    was prohibited and it would be a violation of the

20    contract if they did it.

21         And we know they did it, because we already

22    have production showing that the diverters

23    essentially were kicked out for a little while, and

24    then they all came back in.  Again, the reasons and

25    the defenses, we'll leave that for another day.

1          But on discovery, we're certainly permitted to

2     look at what e-mails and correspondence and dialog

3     was going on between Damon, a diverter, and the

4     Debtor during the time that our contract was valid.

5     Even they haven't asserted any defense that, for

6     some period of time, they were to have abided by

7     the contract.

8          And, essentially, they responded and said:

9     We'll give you the agreements we have with Damon,

10    but we're not going to give you anything else.  And

11    they haven't.  In fact, they said they would give

12    us the agreements, and they didn't even give us the

13    agreements.

14         THE COURT:  Mr. Busey.

15         MR. BUSEY:  Your Honor, if you would look at

16    their request, number 4, about Damon, on page 5 of

17    their motion, and look at their argument at the

18    bottom, you will see they say at the bottom, "Damon

19    & Associates (also known as FMG.)"

20         FMG is Food Marketing Group, and it was the

21    subject of their document request number 7.  If you

22    turn to number 7, which you'll see is Food

23    Marketing Group.

24         And their -- the fuss we have with number 7 --

25    and we'll get to that -- is the time period.  But

1        it's the same organization.  And we responded and

2        we gave them the stuff we had.

3            And you'll see -- if you'll look under Tab J,

4        you'll see our response in full.  And look at page

5        4 regarding number 7, Food Marketing Group --

6            THE COURT:  Wait a minute.  Which page?

7            MR. BUSEY:  Tab J, number 4, page number 4.

8        It's our objection to their request number 7 about

9        Food Marketing Group.  The document request number

10       7 is in the middle of the page.

11           THE COURT:  I've got it.

12           MR. BUSEY:  And our response, at the bottom of

13       the page, is, "Subject to the general objections,

14       Debtors will produce such documents in their

15       possession, custody or control for the contract

16       period."  And we did.

17           Damon, which is a part of Food Marketing

18       Group, also does stuff other than diverting.  And

19       the reason we did the objection to which Mr. Rubin

20       just referred to is to the extent we had business

21       dealings with Damon other than regarding the

22       diverting business, it wasn't relevant and it

23       wouldn't lead to the discovery of admissible

24       evidence, so we didn't do that.

25           But to the extent that it dealt with the

1    diverting business, which is the Food Marketing

2    Group aspect of it, which was the subject of number

3    7, we have produced everything that he's asked for,

4    subject only to the fuss we're going to have about

5    the time period.  We only produced this for the

6    contract period.

7         MR. RUBIN:  Your Honor, number one, the

8    response on the Damon request, which is what we're

9    talking about, is that we'll produce agreements.

10        They didn't say that this is the same

11   organization.  In fact, it's my understanding that

12   Damon at some point merged with or was bought by

13   FMG.

14        But the point is, Your Honor, that this is

15   discovery.  This is not what is relevant at a

16   trial.  We want all of the correspondence between

17   Damon, whether it was diverting or not, because we

18   know that they were a diverter.  And there may be

19   information there that -- we all know that letters

20   are not written in a vacuum.  Sometimes they

21   contain two or more subjects.  There's no reason

22   why not to give it to us.

23        I believe we already have confidentiality.  If

24   that's their concern, we can certainly have a

25   confidentiality order.

1          But I don't think it's appropriate for the

2     Debtor to be the arbiter of what is discoverable

3     and what isn't discoverable or might lead to

4     discoverable evidence when we have shown the Court

5     that Damon was a diverter -- there's no argument

6     about that -- and that they did business during the

7     time that the contract was breached.

8          And now we're in discovery.  We're looking for

9     who in Damon was corresponding with who in

10    Winn-Dixie and we take it from there.  What was the

11    subject matter of what they were talking about?

12    Maybe they were saying things about Visagent in

13    those documents.  Maybe they were saying things

14    about the entire world of diverting.  We don't

15    know.

16         But we know one thing, Damon is going to be a

17    potential material witness.  And we have a right to

18    know who at Damon was communicating with who and

19    what they were saying with the Debtor.  And if we

20    want to take depositions, then we'll be prepared.

21         MR. BUSEY:  I think I can make this simple,

22    Your Honor.  Damon has business dealings with

23    Winn-Dixie far broader and different from the

24    diverting business.  And there's no reason for

25    Winn-Dixie to have to go through all of its records

1    for all of these years regarding all of its

2    divisions regarding any correspondence with Damon

3    that didn't have anything to do with the diverting

4    business.

5         We can represent, and do represent, that we

6    have produced everything that we have in our

7    possession regarding the diverting business for the

8    contract period with this company.

9         THE COURT:  That doesn't do it.  You've got to

10   furnish all of the correspondence with Damon during

11   the period, the contract period, whether it's

12   diverting business or otherwise.

13        If you want to take the time to go through it

14   and redact things out of it that you think are

15   inflammatory, you know, or something or if you want

16   me to review them in camera first, we can do it.  I

17   don't know how much time that's going to take.

18        But I think you need to give them -- it may

19   lead to something discoverable.  And I think the

20   rules require you to furnish that, at least for

21   that period of time.

22        MR. BUSEY:  Well, I'm at a --

23        THE COURT:  It may be 16-million documents in

24   a room somewhere.

25        MR. BUSEY:  Or there could be one document in

1        16-million rooms.

2            THE COURT:  However you want to spread it out.

3            MR. BUSEY:  But what I'm addressing is the

4        degree of effort that Winn-Dixie should go to to

5        try to find such correspondence in whatever

6        division --

7            THE COURT:  Make a reasonable effort to put it

8        all together.

9            MR. BUSEY:  We'll make a reasonable effort.

10            THE COURT:  And then if they're not happy or

11        they find that they've got a copy of something that

12        you should have furnished, we'll deal with that.

13            MR. RUBIN:  Your Honor, this is probably a

14        good time to talk about the time frame as well,

15        because this is going to spill over to other

16        objections.

17            The time frame, being the contract period,

18        would be a reasonable restriction if the only claim

19        in this case were the breach of contract; it's not.

20            The other claim, and the more substantial

21        claim in this case, is one involving the violation

22        and theft of trade secrets of Visagent after the

23        contract was over and up until the time that the

24        bankruptcy petition was filed.  So we're going

25        beyond the end date of that contract.

1          We want to see in not only the Damon materials

2     but the other ones that we've requested -- and

3     we're specific.  We're not asking for, you know,

4     the materials of every diverter that they have --

5     and there are 20 or 30 of them -- we've chosen

6     specific ones.  We're trying to be surgical with

7     this.  We're trying not to be overbearing.

8          But we believe that there are certain

9     nondisclosures that were violated, confidentiality

10    agreements that were violated.  And that the

11    methods, the proprietary methods, of Visagent were

12    stolen and used after the end of that contract

13    period.

14         And, again, this is discovery.  I think that

15    we have every right to look at what was going on

16    between the Debtor and these companies for the time

17    frame between the middle of 2004 and at least the

18    filing of the petition.

19         MR. BUSEY:  Your Honor, look at page 6 of his

20    motion.  Document request number 5, for example.

21    He asks for the production of any communication

22    whatsoever between Winn-Dixie and Victory Wholesale

23    Grocers from 2001 to present.  That's for six,

24    seven years.

25         Victory is somebody with whom Winn-Dixie does

1       an awful lot of business on a lot of subjects, and

2       there are other companies in here like that.

3       There's nothing surgical about that request.

4           On the speculation that he may find something

5       regarding the violation of a trade secret, he's

6       asked for all of our communications for seven years

7       with a bunch of companies no matter what the

8       subject matter.

9           That's not a reasonable balance between his

10      entitlement to discovery on a specific issue versus

11      the burden on Winn-Dixie of complying with it.

12          And the Court's job, in looking at a request

13      like this upon an objection like this, is to weigh

14      the precision with which he's asked for something,

15      the showing that he's made of his need for it and

16      that it justifies the burden and expense to

17      Winn-Dixie to produce it.

18          And I don't believe that Visagent has made

19      that showing on these requests.

20          MR. RUBIN:  If I might respond, Your Honor.

21          As I explained earlier, Victory was really the

22      hub of all diverting for Winn-Dixie.  They're the

23      people who had computers in the corporate offices

24      of the Debtor.

25          We have information and reason to believe that

1        the computers were being even shared by employees

2        of the Debtor and its diverting company, Victory,

3        in violation of the contract and beyond.

4              And, again, I don't know why it would be so

5        burdensome when Victory is strictly a diverting

6        company.  The solution was a diverting solution.

7        And, if nothing else, this may lead to the

8        discovery of damages information, because the

9        damages wouldn't stop at the end of the contract

10       period, they would continue into the future if

11       there was a theft of trade secrets.

12             THE COURT:  The contract period and six months

13       thereafter.

14             MR. BUSEY:  Yes, sir.

15             THE COURT:  Then when you find something that

16       you feel you need to trace further and you can

17       surgically pick it out, the Court will consider it

18       or you can make another request at that point,

19       maybe more specifically.

20             But I think that that's the way you should go.

21             MR. RUBIN:  Okay.  Can we have that ruling

22       apply to all of the requests that we've set forth

23       that they've objected to and open-ended to the

24       present requests?

25             THE COURT:  Just make it all the same.

1        MR. RUBIN:   Thank you.

2        On page 8 and request number 6, that would be

3    taken care of by that ruling, Your Honor.

4        Number 7 would be taken care of by that

5    ruling.

6        Number 8 would be taken care of by that

7    ruling.

8        Number 9 as well.

9        Number 10 is a little bit different.  We're

10   going back to the contract claim with this one,

11   Your Honor, and we're looking for financial reports

12   for the years 2001 through 2004 that show the

13   actual sales and purchases by the Debtor in the

14   secondary market.

15       This is a directly relevant document which

16   would be an estimation of damages that we'd want

17   our expert to look at to calculate what Visagent's

18   damages are should we prevail.

19       And I think that we asked for, coincidentally,

20   the same six months that Your Honor has already

21   given to us.

22       But the subject matter is a little bit

23   different.  It's not discovery of communications

24   with third parties, it's internal documents with

25   that extra six-month period.

1          THE COURT:   Number 10 requests financial

2     reports.

3          Your response is that the Debtors produced

4     documents --

5          MR. BUSEY:   And we have, and we have.

6          THE COURT:   -- that you asked for.   And now

7     you want to expand the time?

8          MR. RUBIN:   For the entire 2004 year.

9          THE COURT:   I assume they didn't question it.

10    The answer says 2001 to June 2004.   That's what you

11    asked for, wasn't it?   Well, you just asked for the

12    calendar year 2004.

13         MR. RUBIN:   The response was:  We'll give it

14    to you basically to the end date of the contract,

15    and we were looking for it for the end of 2004.   I

16    think that's consistent with Your Honor's previous

17    ruling.

18         THE COURT:   Okay.

19         MR. BUSEY:   The reason for the difference,

20    Your Honor, is this financial report showing actual

21    purchase and sales is solely designed to get damage

22    information, and that's why it should be limited to

23    the contract period.

24         THE COURT:   That makes sense.

25         MR. RUBIN:   Well, we have claims, as I've

1      explained, that go beyond the contract period.  And

2      if they were engaged in the theft of trade

3      secrets --

4          THE COURT:  That has nothing to do with what

5      they sold.

6          MR. BUSEY:  What we actually purchased or

7      sold.

8          MR. RUBIN:  I think if they were using our

9      trade secrets that they obtained improperly, what

10     business they did in the secondary market is a

11     relevant calculation.  And we actually may come

12     back to the Court --

13         THE COURT:  Well, you'll come back.

14         MR. RUBIN:  Okay.

15         THE COURT:  That's June 28th, '04.  That's how

16     it stands.

17         MR. RUBIN:  Thank you, Judge.

18         THE COURT:  That's about it, right?

19         MR. RUBIN:  I think that the next one would be

20     number 19 on page 13 of the motion.  There was an

21     objection to the entire request.

22         THE COURT:  Number 19?

23         MR. RUBIN:  Yes, Your Honor.

24         We asked for all electronic data transmissions

25     from any wholesaler that provided detailed in-stock

1    product availability during the period of

2    January 1st, 2000 through January 1st, 2005.

3         Leaving aside the scope for a moment, the

4    reason we asked for this information, Your Honor,

5    using this language is that, again, there was an

6    exclusion written into the contract which is at

7    issue in the breach of contract part of the case

8    where that language was used, so we need to know

9    what in-stock listing from wholesalers they had in

10   order to determine what damages can be redacted

11   from our damage calculations.

12        If we just have gross numbers of transactions,

13   it would be overly inclusive.  If there are some

14   wholesalers that provided this information, these

15   transmissions, and there was business conducted as

16   a result of that type of transmission, it shouldn't

17   be a damage.

18        But how can we ever know what would be an

19   appropriate damage and what wouldn't?  And

20   certainly Winn-Dixie would want to exclude damages

21   in this case unless we have this information.

22        MR. BUSEY:  Your Honor, if you're looking at

23   page 13 of their motion --

24        THE COURT:  Yes.

25        MR. BUSEY:  -- and you see their

1    characterization of our objection and response that

2    says, "Debtors object to this because it will not

3    lead to the discovery of admissible evidence"?

4         THE COURT:  Yes.

5         MR. BUSEY:  If you will turn under -- that

6    misstates our response.  If you will turn under Tab

7    J.

8         MR. RUBIN:  If it does, I apologize.

9         MR. BUSEY:  Tab J is our response.

10       THE COURT:  To number -- what was that, 19?

11       MR. BUSEY:  Yes.  It's on page 9.

12       THE COURT:  It says they'll produce it.

13       MR. BUSEY:  And we did.

14       MR. RUBIN:  Well, and this is one of the

15    problems with not responding -- and I -- I

16    apologize for that being included in the motion.

17    It probably shouldn't have except for the fact that

18    we've been through all the documents that have been

19    produced to us.  I have a staff of a couple people

20    who are just doing this.  And we have not found

21    that -- if they could point by Bates stamp range

22    where they are, then we won't have any dispute

23    about it.

24       But I don't think it's been produced.  If Mr.

25    Busey is saying he knows for sure that they exist

1       and they've been provided, then we'll take that

2       representation.

3            Or if Mr. Busey is willing to say that there

4       are no detailed transmissions of listings this way,

5       then it will never be a reduction of damages, and

6       we're fine with that, also.

7            But we can't find them.

8            THE COURT:  Mr. Busey, are you going to look

9       for them and see if you sent them?

10           MR. BUSEY:  Well, what we'll do, Your Honor --

11           THE COURT:  Do you have a receipt?

12           MR. BUSEY:  -- we'll use the same language you

13      suggested earlier.  And they've got them.  And if

14      we find them later and we haven't produced them,

15      we've got to produce them 30 days before trial.

16           THE COURT:  Fair enough.

17           MR. RUBIN:  Well, I don't --

18           THE COURT:  Fair enough.

19           MR. RUBIN:  -- have an objection to that, with

20      one proviso, Your Honor, though.  To the extent

21      that Your Honor imposes expert deadlines for

22      reports and we only get these 30 days before, there

23      would have to be an amendment exclusion for any

24      expert reports.

25           MR. BUSEY:  That's the first time he's raised

1    a question about the 30 days, Your Honor.  Do you

2    want to agree to 120 days?

3         MR. RUBIN:  I don't know when we're trying the

4    case.  I mean, it could be in 60 days.

5         MR. BUSEY:  I don't think --

6         THE COURT:  We're not going to try it in

7    60 days.

8         MR. RUBIN:  I hope not.

9         I mean, this might be a good time to at least

10   ask the Court, how would you like to schedule it?

11        THE COURT:  I have no idea.  You haven't even

12   finished discovery yet.  You haven't started

13   depositions yet.  You haven't been through

14   mediation yet.  You haven't even selected a

15   mediator yet.  So you've got to do all that before

16   we'll think about trying this case.

17        MR. RUBIN:  Yes, Your Honor.

18        THE COURT:  Well, not all of it.  But I want

19   to get that done first.

20        Let's finish this.

21        MR. RUBIN:  Okay.

22        THE COURT:  30 days.

23        Next.

24        MR. RUBIN:  We have now interrogatories.  And

25   we don't have -- I don't think we have quite so

1       many on the interrogatory side.

2            We asked for, specifically, the total dollar

3       amounts of full or truckload quantities of consumer

4       packaged goods purchased or resold on a

5       wholesale --

6            MR. BUSEY:  What number are you talking about?

7            MR. RUBIN:  I'm sorry.  It's number 6.  This

8       is the first interrogatory, page 14.

9            THE COURT:  Page 14?

10           MR. RUBIN:  It's at the end of the document

11      requests.

12           THE COURT:  Okay.

13           MR. RUBIN:  The reason we asked for this with

14      the specific --

15           THE COURT:  I'm sorry.  Which interrogatory

16      are we dealing with?

17           MR. RUBIN:  I'm sorry.  It's interrogatory

18      number 6, and it happens to be number 6.

19           THE COURT:  I've got it.

20           MR. RUBIN:  Okay.  The contract in question

21      uses the language "full or truckload quantities of

22      consumer packaged goods."

23           And, again, I think that there's likely to be

24      some dispute about what's covered under the

25      contract and what isn't covered under the contract.

1        The same way as I had mentioned earlier that

2        electronic means, we have a difference of opinion

3        as to what that might mean.

4            Well, also, what needs to be carried and how

5        it's carried is another potential excluding or

6        limiting factor in the damages.

7            So we asked them to tell us the dollar amounts

8        that Winn-Dixie conducted for using the same

9        language as the contract, full or truckload

10        quantities of consumer packaged goods in the

11        secondary market that's diverting.

12            For each of the time frames A through D -- A

13        through C is for the contract period.  And then

14        after that, because we -- again, we believe that

15        damages will continue even after the contract

16        period based upon the tort claims that are pending.

17            And the answer was:  You can get the same

18        information out of the 10,000 documents that we've

19        given you as easily as we can get it.

20            And that's not true, Your Honor, because we

21        can't characterize for them what the Debtor

22        believes is a full or truckload quantity.  I need

23        them to tell us what they believe is a full or

24        truckload quantity.

25            The documents that we received show total

1        quantities year by year.  We want to know what they

2        think is a full or truckload quantity.  It's in the

3        contract.  This is an interpretation or the intent

4        of a particular term.

5            If they think that nothing is covered, let

6        them say that there was no quantity that was full

7        or truckload.  If they think that it's some part of

8        the total, let them tell us that.  But just by

9        looking at the documents, we can't make that

10       representation.

11           This is an interrogatory.  We're asking them

12       to give us the information of what they believe.

13       It has a legal impact on this case.  It needs to be

14       sworn.  It needs to be such that we can rely upon

15       it to move forward.

16           THE COURT:  Mr. Busey.

17           MR. BUSEY:  Your Honor, we gave a proper

18       response to this.  We have the right, under Rule

19       33, to refer to documents and say that they can get

20       it out of the documents as easily as we can.

21           In this instance, we did it more better than

22       they did it, because after we responded and said:

23       You can get it out of the documents as well as we

24       can, there was a dialog between Mr. Gay and Mr.

25       Rubin, where Mr. Rubin said:  But we want to see

1    your documents in an electronic format, we want to

2    have it in a searchable format, just like you want

3    it from us.

4        And we did that.  If you look under Tab D, you

5    will see a May 3 letter from Mr. Gay to Mr. Rubin.

6    And in response to Mr. Rubin's specific request, we

7    said we gave to them our entire database in

8    electronic format.  And we said:  Enclosed is a

9    computer disk containing electronically stored

10   information in usable form responsive to Visagent's

11   request.  This electronic stored information

12   relates to the purchase and sale of consumer

13   packaged goods in the secondary market for 2001

14   through 2004.

15       And it was searchable, it's searchable, so it

16   complies with 33 and 34.  And they can get the

17   information as well as we can.  That's exactly what

18   we would have to go through to do it.

19       Mr. Rubin said one other thing that's not in

20   this interrogatory.  He asked for us to tell him

21   what we think a full truckload is.

22       He didn't ask us that question.  If he wants

23   to propound that interrogatory, he can.  There may

24   be a disagreement among us as to how you describe

25   what is a full or less than full truckload.

1      But that's not among the interrogatories he

2    asked us or the subject of this objection.

3        MR. RUBIN:  Unless I made a mistake, I'm

4    reading the interrogatory in my motion, and it says

5    -- I apologize for jumping in.  May I speak, Your

6    Honor?

7        THE COURT:  Certainly.

8        MR. RUBIN:  And it says, "State the total

9    dollar amount of Winn-Dixie purchases of full or

10    truckload quantities."

11        MR. BUSEY:  And those dollar amounts are in

12    the information we gave you.

13        MR. RUBIN:  It misses the point completely,

14    Your Honor.

15        THE COURT:  Well, you didn't say each,

16    purchase of each full and truckload quantities, you

17    just said -- like I read it, I thought full and

18    truckload means the same thing.  It's full or a

19    truckload, a full load and a truckload.  Maybe I'm

20    wrong.

21        I mean, I'm not making a ruling here of what

22    it means.  I'm saying, why didn't you ask him:

23    What is your definition of full and truckload, and

24    then you would know if you're on the same page.

25        MR. BUSEY:  That was the issue he described

1    earlier.  And he didn't ask us that question.

2         MR. RUBIN:  Well, we can propound an

3    interrogatory, Your Honor.

4         Let me make an ore tenus motion to exceed --

5         THE COURT:  I'm not going to rule on what is

6    full or a truckload.

7         MR. RUBIN:  No, just to exceed 25.  Because

8    we've had an objection and we've had to back off of

9    interrogatories because they've objected to more

10    than 25.

11         THE COURT:  Yes.

12         MR. RUBIN:  Would Your Honor give us 25 more

13    interrogatories?

14         THE COURT:  I'm not giving you anything.  I'm

15    right here.

16         MR. RUBIN:  Okay.

17         THE COURT:  Just let's finish these.  Let's

18    get through these --

19         MR. RUBIN:  All right.

20         THE COURT:  -- get them answered, and then

21    we'll worry about more interrogatories.

22         MR. RUBIN:  Okay.  But just to be clear,

23    you're denying this one?

24         THE COURT:  I'm denying it without prejudice

25    to define your terms.

1           MR. RUBIN:  Okay.

2           THE COURT:  Or ask them to define their terms,

3     however you want to do it.

4           MR. RUBIN:  Okay.  I think that would also

5     apply to the next one, number 7.

6           THE COURT:  Yes.

7           MR. RUBIN:  And 8 as well.

8           THE COURT:  Yes.

9           MR. RUBIN:  And 9.

10          THE COURT:  Yes.

11          MR. RUBIN:  And 12.

12          THE COURT:  What about 10?

13          MR. RUBIN:  Well, 10 is not part of this

14    motion.

15          THE COURT:  Okay.

16          MR. RUBIN:  And 13.

17          THE COURT:  Okay.

18          MR. RUBIN:  Number 14 is, we're just looking

19    for the names of the lists -- the names of the

20    wholesalers that provided electronic data

21    transmission.  We talked about electronic data

22    transmissions.

23          We may have to do third-party discovery.  All

24    we want to know is, who provided you electronic

25    data transmissions?

1          THE COURT:  And we're talking about number --

2          MR. RUBIN:  Number 14 on page 17 --

3          THE COURT:  14.

4          MR. RUBIN:  -- (g).

5          THE COURT:  Mr. Busey.

6          MR. BUSEY:  Again, this is a part of the

7      failure of the attorneys to comply with their

8      obligations to meet and confer, Your Honor.

9          If you would turn to Tab E, it's the second

10     paragraph of that letter.

11         MR. RUBIN:  We'll withdraw it.

12         THE COURT:  Very well.

13         MR. RUBIN:  And I think that is all of our

14     problems, Your Honor.

15         THE COURT:  Good.

16         MR. RUBIN:  I appreciate the patience of the

17     Court.

18         THE COURT:  No, no, no.  This is always fun.

19     You never get reversed on ruling on discovery.  You

20     just try to get it right.

21         I think you need -- this thing, obviously, if

22     it gets to a trial, it's going to be a long trial.

23     You're going to have thousands of documents.

24         You need to start thinking at some point how

25     long it's going to take you to try the case.  And

1      then once -- if you can get together and then we

2      can get a status conference to try to reach out and

3      look toward a trial date so I can reserve those

4      dates.

5           I really think -- I think mediation helps.  If

6      both of you say there's no way we can mediate this,

7      but I would think it may be beneficial.  And,

8      again, we don't have mandatory mediation, but I'm

9      suggesting that if you can agree on a mediator once

10     you get most of your discovery done so you can

11     resolve it.

12          MR. BUSEY:  We will, Your Honor.  Right now I

13     don't think it would be fruitful because the

14     parties have such vast differences of opinion about

15     the case.  But perhaps, after we have some

16     discovery, it will make more sense.

17          THE COURT:  That's what I figured.

18          MR. RUBIN:  Agreed.

19          THE COURT:  Okay.  So is there anything else

20     now?

21          MR. RUBIN:  No, Judge.

22          THE COURT:  Hearing is concluded.

23          MR. BUSEY:  Thank you, Your Honor.

24          MR. RUBIN:  Thank you, Your Honor.

25          COURTROOM ADMINISTRATOR:  Court is adjourned.

1          (Whereupon, the hearing was concluded at 3:05

2    p.m.)

3                      - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2  STATE OF FLORIDA  )

3  COUNTY OF DUVAL    )

4           I, Elizabeth M. Masters, Registered

5  Professional Reporter and a Notary Public, State of

6  Florida at Large, do hereby certify that the attached

7  represents an excerpt of the proceedings before the

8  United States Bankruptcy Court, Middle District of

9  Florida, Jacksonville Division, before the Honorable

10  Jerry A. Funk, Bankruptcy Judge, in the matter of In

11  Re:  Winn-Dixie Stores, Inc.; such transcript is an

12  accurate recordation of the proceedings which took

13  place.  A transcript of this proceeding has been

14  produced on June 28, 2007.

15

16

17                      STATEWIDE REPORTING SERVICE

18

19                      _____

                        ELIZABETH M. MASTERS, RPR
20

21

22

23

24

25