UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 3:05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., <u>et</u> <u>al</u>., | Chapter 11 |
| Debtors. | Jointly Administered |
| _____/ | |

**FINAL RESPONSE OF MILBANK, TWEED, HADLEY & M<u>C</u>CLOY LLP, TO FEE EXAMINER'S FINAL REPORT OF REVIEW AND ANALYSIS OF SIXTH INTERIM AND FINAL APPLICATION OF MILBANK, TWEED, HADLEY & M<u>C</u>CLOY LLP FOR INTERIM PERIOD OCTOBER 1, 2006 THROUGH AND INCLUDING NOVEMBER 21, 2006 AND FINAL PERIOD MARCH 1, 2005 <u>THROUGH AND INCLUDING NOVEMBER 21, 2006</u>**

Milbank, Tweed, Hadley & M<u>C</u>Cloy LLP ("<u>Milbank</u>") submits this response (the "<u>Response</u>") to Stuart, Maue, Mitchell & James, Ltd.'s (the "<u>Fee Examiner</u>") final report of the review and analysis of the sixth interim and final application submitted by Milbank for the interim period of October 1, 2006 through and including November 21, 2006 and the final period of March 1, 2005 through and including November 21, 2006 (the "<u>Report</u>"), and in support thereof, respectfully represents as follows:

<u>BACKGROUND</u>

1. <u>Bankruptcy Filing</u>. On February 21, 2005 (the "<u>Petition Date</u>"), Winn-Dixie Stores, Inc. and certain of its affiliated direct and indirect subsidiaries (collectively,

"Winn-Dixie" or the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").

2. Statutory Committees. On March 1, 2005, the United States Trustee duly appointed the Official Committee of Unsecured Creditors (the "Committee") (Docket No. 176). On August 17, 2005, the United States Trustee appointed the Equity Security Holders' Committee (the "Equity Committee") (Docket No. 3027), which was disbanded on January 11, 2006 (Docket No. 5098).

3. Venue Transfer. By order dated April 13, 2005, the New York Bankruptcy Court transferred venue of these cases to the Bankruptcy Court for the Middle District of Florida (Jacksonville Division) (the "Bankruptcy Court"). The Debtors' cases are being jointly administered for procedural purposes only. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

4. Milbank's Retention. On April 12, 2005, pursuant to the Order Under 11 U.S.C. § 1103 and Fed. R. Bankr. P. 2014 and 5002, Authorizing Retention and Employment of Milbank,

Tweed, Hadley & M<sup>c</sup>Cloy LLP as Counsel to Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc., et al. (Docket No. 702) (the "Retention Order"), the Bankruptcy Court authorized the Committee's retention of Milbank as its counsel in these cases effective as of March 1, 2005.[1]

       5.   Milbank's Responses to Fee Examiner's Reports. Milbank submitted final responses to the Fee Examiner's review and analysis of its fees and expenses at various times during these cases.[2]

       6.   Sixth Interim and Final Fee Application. On January 22, 2007, Milbank submitted the Sixth Interim and Final Fee Application of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, for Final Allowance and Approval of Compensation for Professional Services Rendered and for Reimbursement of Expenses Incurred During Period from March 1, 2005 Through and Including November 21, 2006 (the "Sixth Fee Application") (Docket No. 14829).

---

[1] On March 30, 2005, the New York Bankruptcy Court entered an order (Docket No. 607) approving Milbank's retention on an interim basis subject to final approval, which occurred pursuant to the Retention Order.

[2] Milbank previously submitted the following responses to the various Fee Examiner reports: First Final Response on July 20, 2006 (Docket No. 9382); Second Final Response on July 20, 2006 (Docket No. 9383); Third Final Response on September 21, 2006 (Docket No. 11205); Fourth Final Response on November 27, 2006 (Docket No. 12839); and Fifth Final Response on April 19, 2007 (Docket No. 15990).

3

7.  Milbank sought interim approval of compensation and expenses incurred for the period of October 1, 2006 through and including November 21, 2006 (the "Sixth Interim Compensation Period") in the Sixth Fee Application.

8.  Fee Examiner.  On August 10, 2005, the Bankruptcy Court ordered the appointment of a fee examiner, pursuant to the Order Granting Motion To Appoint Fee Examiner (Docket No. 2933). On December 14, 2005, the Bankruptcy Court entered the Order Authorizing Debtors to Employ and Retain Stuart, Maue, Mitchell & James Ltd. as Fee Examiner (Docket No. 4599) (the "Fee Examiner"), pursuant to which certain procedures were established for the Fee Examiner's review of all interim fee applications, including Milbank's Sixth Fee Application.

**RESPONSE**

9.  Milbank appreciates the opportunity to address the Report and to explain and clarify items that the Fee Examiner has identified, and to supplement its Sixth Fee Application. Milbank hopes that the supplemental information in this Response and in the attached exhibits will assist the Fee Examiner and the United States Trustee in their review of the reasonableness and necessity of the fees and expenses incurred by Milbank during the Sixth Interim Compensation Period.

10.  The balance of this submission will track the substantive portions of the Report.

4

### A. Recomputation Of Fees And Expenses

11.  The recomputed amount of total fees is $378.50 less than the amount requested by Milbank. (Report at 4). This difference is the result of a variance between task hours and entry hours. <u>Milbank apologizes for the error and will reduce its fee request by $378.50</u>.

12.  The Report notes that there is no discrepancy between the amount of expenses requested for reimbursement and amounts computed by the Fee Examiner. (Report at 5).

### B. Technical Billing Discrepancies

13.  The Report notes that there were no technical billing discrepancies identified (<u>e.g.</u>, double billing, wrong case billings and missing task descriptions). (Report at 6)

### C. Hourly Rate Increases

14.  The Report notes that hourly rates for timekeepers did not increase during the Sixth Interim Compensation Period. (Report at 7). The Report states that increased hourly rates of all timekeepers whose rated changed during prior interim periods resulted in $36,170.50 in additional fees billed during the Sixth Interim Compensation Period. (Report at 7-8). Milbank does not believe that it would be appropriate to deny the Firm compensation that is based on the usual and customary hourly rates charged by the Firm to its bankruptcy and non-bankruptcy clients. Milbank's hourly rates are adjusted in the normal course of the Firm's business

5

at least annually, usually on or around January 1 of each year, and services rendered thereafter are billed at the new hourly rates. The new hourly rates charged by Milbank were increased in accordance with Milbank's established billing practices and procedures. Milbank submits that work done for the Committee is properly charged at the rates then in effect.

### D.   Time Increments; Complete and Detailed Descriptions

15. The Report notes that all billing entries were in tenths-of-an-hour increments as required by U.S. Trustee Guidelines and task descriptions were sufficiently detailed and included the type of activity and subject-matter except for 10.20 hours with $6,460.50 in associated fees. (Report at 9-10). Milbank believes that Exhibit A attached hereto contains revised activity descriptions that are in accordance with the Fee Examiner's specifications for the identified time entries.

### E.   Blocked Entries

16. The Report notes that there were no "lumped" or "blocked entries". (Report at 10).

### F.   Multiple Professionals At Hearings And Conferences (Intraoffice Conferences)

17. The Fee Examiner has identified 80 entries describing intraoffice conferences, which represents 25 hours with $14,481.50 in associated fees and 5% of the total fees requested in the Sixth Fee Application. (Report at 11, Exhibit D).

18. As the Fee Examiner notes, "[i]ntraoffice conferences are necessary and appropriate . . . ." (Report at 11). Additionally, there is nothing in the Bankruptcy Court's local rules or the U.S. Trustee Guidelines that mandates the disallowance of such fees. The Fee Examiner only requires that conferences identify the participants, the subject matter of the conference and the need for multiple attendees. That has been done with respect to these activity description on Exhibit B attached hereto.

19. Committee representation in cases as large and complex as those of the Debtors cannot possibly be handled by a single attorney, and clients understand and expect that a team of highly-qualified and capable attorneys are necessary to provide proper representation in complex cases. As such, in order to maximize efficiency and cohesiveness, intra-office conferences and meetings are necessary in order to coordinate complex tasks and delegate work to ensure non-duplication. Milbank has used its best efforts to ensure intra-office conferences are employed only when necessary, as reflected by both length -- most intra-office conferences were billed at .5 hours or less and all but four (4) entries (which were longer conferences generally relating to the confirmation hearing in connection with the plan of reorganization ) were billed at less than one hour -- and number -- intraoffice conferences represent only 5% of the total fees requested during the Sixth Interim

Compensation Period. As such, Milbank respectfully submits its use of intra-office conferences were limited, necessary and appropriate. Milbank believes that Exhibit B attached hereto contains revised activity descriptions that are in accordance with the Fee Examiner's specifications for certain of the identified time entries.

G.  **Multiple Professionals At Hearings And Conferences (Non-Firm Conferences, Hearings and Events)**

20. The Fee Examiner has identified 92.70 hours, with $56,091 in associated fees where more than one Milbank timekeeper attended a conference, hearing or other event that was also attended by non-Firm personnel. (Report at 13-14, Exhibit E). Milbank has carefully reviewed the non-Firm conferences, hearings and events identified by the Fee Examiner on Exhibit E to the Report and has prepared Exhibit C attached hereto to better identify and explain the role of each timekeeper who billed for that attendance and the need for multiple attendees. These involved meetings and hearings (not intra-office conferences) as follows:

- Confirmation hearing
- Committee meetings
- Meetings with the Debtors
- Claim reconciliation issues
- Plan and confirmation issues
- Corporate governance and corporate documents
- Tax issues
- Board candidacy process

Milbank believes that the level of staffing was appropriate for the tasks involved and that Milbank would not have been able competently to handle the particular meetings and hearings at issue with only one lawyer. For example, the resolution of corporate governance issues in connection with consummating the confirmed plan of reorganization required the participation of, among others, Matthew Barr, Alex Kaye, Michael Comerford and Scott McClelland because of the complexity and breadth of such issues.

21. None of the matters involving the participation of multiple professionals that have been identified by the Fee Examiner on Exhibit E to the Report were routine. Generally, Milbank's counterparties with respect to the identified activities were also represented by multiple lawyers; multiple professionals were required because of the complexity, significance and multi-disciplinary aspects of the activities. As noted, Milbank has attached an annotated version of Exhibit C to assist the Fee Examiner in this regard.

### H. Personnel Who Billed 10 Or Fewer Hours

22. The Fee Examiner notes (Report at 15-16, Exhibit F) that four (4) timekeepers billed 10 or fewer hours during the Sixth Interim Compensation Period in an aggregate of 24 hours with associated fees of $9,945 and suggests a review of these timekeepers may be appropriate to allow a determination of whether they are (i) duplicating the work of others, (ii)

9

increasing the cost to the Debtors' estates because of orientation or the 'getting-up-to-speed' that may be required, or (iii) not contributing to the advancement of the cases. Milbank has attached hereto as Exhibit D further information regarding these individuals and the services they have performed to assist the Fee Examiner in its review.  As Exhibit D shows, of the four (4) timekeepers at issue, three (3) of the timekeepers have billed entries in excess of 10 hours during a prior application period.  Two associates assisted in the review and analysis of corporate governance and exit facility documents in connection with confirmation of the plan of reorganization. None of these timekeepers were rotated in and out of the engagement, and the fact that they devoted relatively small amounts of time to the matter is not indicative of inefficient staffing.

**I.     Long Billing Days**

23.    Lawyers in large firms like Milbank and complex reorganization cases like those of the Debtors do not work five-day weeks or eight-hour days.  The professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to

be administered with skill and dispatch.  As such, on many occasions, "long billing days" cannot be avoided.

24.  The Fee Examiner has identified three (3) days on which individuals billed more than 12 hours during the Sixth Interim Compensation Period.  (Report at 16-17, Exhibits G-1 and G-2).  The Fee Examiner further notes that these entries total 43.80 hours with $26,505 in associated fees.  The hours billed by individuals on these days relate to extraordinary activity levels associated with particular matters of critical importance, including (i) preparing for and attending the confirmation hearing in Jacksonville, Florida and (ii) traveling to and from Jacksonville to attend the confirmation hearing.

25.  If a "12-hour rule" were imposed on counsel in these chapter 11 cases, the concern regarding inefficiencies by timekeepers who bill low hours discussed above in section H of this Response would become a significant concern.  More lawyers working fewer hours is inefficient and simply does not make sense from the client's perspective; it would not be tolerated by Milbank's non-bankruptcy clients.

**J.**   **Administrative/Clerical Activities**

26.  The Fee Examiner has identified 72.8 hours with $10,399 in associated fees as activities describing administrative and clerical activities performed by paraprofessionals.  (Report at 18-19, Exhibit H).  Milbank had staff performing administrative and clerical tasks throughout

the Sixth Interim Compensation Period.  In addition, Milbank submits that the administrative and clerical activities in question are activities that Milbank does not include as overhead.  Milbank submits that it is market practice for firms like Milbank to charge for such expenses.  Milbank represents that it does in fact charge its non-bankruptcy clients for the items identified by the Fee Examiner.

27.  The Fee Examiner did not identify any entries describing administrative and clerical activities performed by professionals.  (Report at 19).

**K.**  **Legal Research**

28.  The Fee Examiner had identified 14.3 hours with associated fees of $5,817.50 describing legal research time entries.  (Report at 19, Exhibit I).  The Fee Examiner did not identify any time entries that were considered vague in describing the research and its purpose.

29.  With respect to the 14.3 hours with $5,817.50 in associated fees of legal research, the Fee Examiner does not suggest any abuses or non-compensable time for legal research.  The question is whether such charges were reasonable and appropriate.  This is an area where there is no substitute for the Bankruptcy Court's and the United States Trustee's experience with the conduct of bankruptcy cases generally and their respective knowledge of the issues raised in these reorganization cases in particular.  To help them in this

12

analysis, Milbank notes that the hours expended for legal research approximate 2% of the total hours and 1% of the total fees. Milbank submits that such amounts are reasonable and that the research was necessary to the administration of the cases.

**L.    Travel**

30.    The Fee Examiner has identified eight (8) tasks describing non-working travel.  This represents an aggregate of 42.50 hours with $25,445 in associated fees for non-working travel.  (Report at 20).  Milbank notes that the time billed for travel was for necessary trips by Milbank attorneys for Bankruptcy Court hearings, meetings with the Debtors' and their advisors.  The hours expended for non-working travel time approximate 6% of the total hours and 8% of the total fees. Milbank submits that such amounts are reasonable and that the travel was necessary to the administration of the cases. Milbank attorneys traveled several times to Jacksonville, Florida to attend hearings related to ongoing matters in these cases, including the confirmation hearing.

**M.    Travel Expenses**

31.    The Fee Examiner identifies (Report at 24-25 and Exhibit L to the Report) out-of-town travel expenses totaling $8,090.56.  The Fee Examiner notes that $5,668.57 of the out-of-town travel expenses are described only as "travel" and "did not include a separate itemization for airfare, hotel accommodations, or other travel-related expenses."  Milbank has

13

reviewed all of the entries identified by the Fee Examiner as out-of-town travel and attaches as Exhibit E hereto revised travel expense descriptions that identify the nature of the expenses.

33. The Fee Examiner notes that $740.50 of the out-of-town travel expenses are for a meal charge incurred on October 12, 2006. This charge relates to a dinner with certain of the Committee members and the Committee's professionals in connection with the confirmation hearing in Jacksonville, Florida. Milbank submits this charge was a reasonable and necessary expense. As such, Milbank respectfully submits it should be reimbursed for the expenses in the amount of $740.50. See Exhibit E attached hereto.

33. <u>In addressing the Fee Examiner's concerns regarding charges for certain cab fares and first class airfare, Milbank will voluntarily waive its request for reimbursement of $2,730.22, which was inadvertently billed</u>.

**N.  Local Travel**

34. The Fee Examiner has indicated that Milbank sought reimbursement for local travel expenses in the amount of $721.76. (Report at 29, Exhibit N-1). The Fee Examiner contends that "[w]hile the Firm may reimburse its employees for commuting expenses [when working after regular business hours], this type of expenses is generally considered part of Firm overhead." (Report at 29).

14

35. Milbank submits that overtime transportation expenses incurred in connection with legitimate client business may be charged to the client. Milbank provides transportation assistance to personnel who arrive at or leave work during off-peak hours. "Off-peak travel" is defined as beginning or ending work during the period from 8:30 p.m. to 6:00 a.m., Monday through Friday, or at any time on a Saturday, Sunday or Firm-observed holiday. Persons who start and end work during off-peak hours are entitled to transportation assistance for one-way travel only. When a person who is eligible for transportation reimbursement elects to travel by private automobile or public transportation, as of July 25, 2006, Milbank provides fixed reimbursement of $20.00 to persons residing within the five boroughs of New York City and $30.00 to persons residing outside of New York City.

36. In light of the number of long billing days during the Sixth Interim Compensation Period, Milbank submits that reimbursement for local travel expenses are reasonable and reflect the exercise of sound billing judgment by Milbank personnel. Such overtime expenses are charged by Milbank to its non-bankruptcy clients. Milbank submits that it is market practice for firms like Milbank to charge for such expenses.

**O.   Overtime and Local Meals**

37. The Fee Examiner has identified $119.02 in overtime meal expenses (Report at 31 and Exhibit N-2 to the

Report) and suggests that "[w]hile the Firm may reimburse its employees for [overtime] meal expenses, this type of expense is generally considered part of Firm overhead." Report at 31).

38. Milbank's written policy regarding this category of expense provides that personnel who work past 8:00 p.m. on a client matter (not including time spent at dinner) can be reimbursed for dinner expenses up to $25 in New York and California. All such overtime meal expenses are charged by Milbank to its non-bankruptcy clients. Milbank submits that it is market practice for firms like Milbank to charge for such expenses.

    **P.**    **Document Processing/Overtime**

39. The Fee Examiner identifies (Report at 32 and Exhibit N-3 to the Report) a total of $6,181.50 in charges for secretarial and support staff overtime. These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients. Milbank submits that it is market practice for firms like Milbank to charge for such expenses. As the Third Circuit held in Busy Beaver, not all clerical services are necessarily overhead. 19 F.3d at 848. These expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well. That is the market practice. In considering the propriety of a professional's charges under section 330 for so-called "overhead expenses," the bankruptcy court should seek to determine if

nonbankruptcy professionals charge their clients for these particular services. <u>Busy Beaver</u>, 19 F.3d at 849. Milbank represents that it does in fact charge its nonbankruptcy clients for the items identified by the Fee Examiner.

**Q.   Expenses Associated With Multiple Attendance**

40.   The Fee Examiner identifies (Report at 33-34, Exhibit O) expenses associated with some conferences, hearings or other events for which multiple Milbank timekeepers billed $3,426.80. As addressed above in section G of this Response, Milbank submits that attendance by Milbank timekeepers was appropriate and similarly submits that reimbursement of each timekeepers' expenses is also reasonable.

**R.   Photocopies; Binding**

41.   The Fee Examiner identifies (Report at 27 and 33) charges for photocopies and binding. These are items that Milbank does not include as overhead in its charges to its non-bankruptcy clients. Milbank submits that these expenses are routinely charged and compensated in the non-bankruptcy context, not only by Milbank but by its peer firms as well. That is the market practice. Milbank represents that it does in fact charge its non-bankruptcy clients for the items listed above and identified by the Fee Examiner.

**S.   Computer-Assisted Legal Research**

42.   The Fee Examiner identified computer database research totaling $4,670.77 and indicated that the application

17

does not disclose the method used to calculate such amounts or whether the amount requested is at actual cost or a discounted rate. For database services provided by entities such as Lexis and Westlaw (the "Providers"), Milbank pays the Providers for access to such databases pursuant to flat rate subscription agreements. For a specific Lexis or Westlaw search run on behalf of a client, Milbank charges the client for the cost of the search at a rate assigned by the Provider. On an annualized basis, the expenses incurred by Milbank that it attributes to computer-assisted legal research are greater than the disbursements related to such research for which Milbank seeks reimbursement from its clients.

### T. Summary of Findings for Final Period

43. The Fee Examiner has prepared a Summary of Findings for the final period that displays the fees and expenses requested for each interim period and the total for the final period. The Fee Examiner notes that Milbank has voluntarily reduced its Sixth Fee Application by $17,956.28, and Milbank is making a further voluntary reduction of $3,108.72 in connection with this Report. Additionally, the Fee Examiner notes that the re-computation of fees for the final period shows that the aggregate requested amount for the final period is $2,099 less than the computed amount. Milbank respectfully requests that any further fees or expenses that it waives in

18

<u>response to the various reports prepared by the Fee Examiner or otherwise be offset by $2,099 to reflect this calculation error</u>.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

44. Milbank has supplemented its fee application to address the asserted deficiencies noted by the Fee Examiner. Milbank appreciates the considerable efforts of the Fee Examiner and has itself made considerable effort to address the issues raised in the Report. Milbank hopes that the supplemental materials submitted herewith will enable the Fee Examiner to evaluate the reasonableness and necessity of the fees and expenses incurred during the Sixth Interim Compensation Period, in connection with the Fee Examiner's final report that was submitted to the Bankruptcy Court.

Dated:  New York, New York
        August 10, 2007

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:   /s/ Matthew S. Barr
      Matthew S. Barr (MB 9170)
      Michael E. Comerford (MC 7049)
      1 Chase Manhattan Plaza
      New York, New York 10005
      (212) 530-5000

      Co-counsel for Official Committee of
      Unsecured Creditors of Winn-Dixie
      Stores, Inc., et al.