UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re                                                      Case No. 05-3817-3FI

WINN-DIXIE STORES, INC., et al.                            Chapter 11

          Reorganized Debtors.                Jointly Administered
_____/

## CARLTON FIELDS' MEMORANDUM OF LAW
## IN SUPPORT OF FINAL FEE APPLICATION
## AND RESPONSE TO STUART MAUE FINAL REPORT

Carlton Fields, P.A., special real estate litigation counsel for Winn-Dixie Stores, Inc. ("Carlton Fields") while it was a debtor and debtor in possession in the above-captioned case, submits this memorandum of law in support of its Final Fee Application and responds to the Stuart, Maue, Mitchell, & James, Ltd. ("Stuart Maue") Final Report on Carlton Fields' Final Fee Application. Except as set forth below, Carlton Field's Final Fee Application should be approved in its entirety.

**Background:**

**a.      Chapter 11 Cases**

On February 21, 2005, the Debtors filed petitions under Chapter 11 of the U.S. Bankruptcy Code. The Debtors are grocery and pharmaceutical retailers operating in the Southeastern United States. During the pendency of these cases, the Debtors operated their business and managed their properties as debtors in possession under 11 U.S.C. §1107(a) and 1108.

By order entered on May 19, 2005, Carlton Fields was approved as special real estate litigation counsel to Debtor, Winn-Dixie Stores, Inc. ("Winn-Dixie") pursuant to 11 U.S.C. §327(e), *nunc pro tunc* to February 21, 2005.

On November 19, 2006, the Court entered an order confirming the Joint Plan of Reorganization of Winn-Dixie and affiliated debtors (the "Plan"). The Plan was effective November 21, 2006.

**b.      Interim Payment Procedures.**

On March 15, 2005, the Court entered the Final Order Approving Interim Compensation Procedures for Professionals (the "Interim Payment Order").

The Interim Payment Order provided that professional may be paid up to 80% of fees earned and 100% of expenses incurred on monthly statements after submission of the fee statements to certain parties, and after the expiration of objection periods. The remaining 20% of fees are payable after Court approval of interim fee applications. Interim fee applications were to be submitted approximately every four to six months. Fees and expenses incurred after November 21, 2006 can be paid by the Debtors without further application or approval of the Court.

The Carlton Fields' first interim fee application covered the period from the Petition date through May 31, 2005. The second interim fee application covered the period from June 1, 2005 through September 30, 2005. The third interim fee application covered the period from October 1, 2005 through January 31, 2006. The fourth interim fee application covered the period from February 1, 2006 through May 31, 2006. The fifth interim fee application covered the period from June 1 2006 through September 30, 2006. Interim fee applications one through five were approved by the Court. The sixth interim and final fee application covered the period from October 1, 2006 through November 21, 2006 in addition to being a final fee application. In accordance with the Interim Payment Order, Carlton Fields has been paid 100% fees and costs

incurred during the bankruptcy period, with the exception of $29,624.50 on several matters which remains unpaid.

To date, Carlton Fields received no objections from any party to its monthly fee statements or to the fee applications.  Except as noted above, Carlton Fields has received all amounts it is due under the terms of the Interim Payment Order.

### c.    Stuart Maue Reports.

On December 14, 2005, the Court entered an order approving the retention by the Debtor of Stuart Maue as fee examiner in these cases.  In accordance with this order, Stuart Maue does not make any recommendations or determinations as to the reasonableness of the fees and expenses or the amount of the fee and expenses to be allowed or disallowed.

Carlton Fields has received Stuart Maue initial and final reports on its first, second, third, fourth, fifth and sixth fee applications.  This memorandum addresses the Stuart Maue Report on Carlton Fields' final fee application

### Preliminary Statement:

The Stuart Maue reports do not preclude approval by the Court of the fees and expenses requested and do not analyze the reasonableness of the fees, the difficulty of the numerous representations, the efforts expended by Carlton Fields, or the effectiveness of the representations.

The relationship between Winn-Dixie and attorney Alan Grunspan of Carlton Fields began in 1998, pre-dating the bankruptcy petition by nearly seven years.  At that time, Winn-Dixie owned or leased commercial real estate in over 700 locations throughout Florida.  Mr. Grunspan was retained by Winn-Dixie on a variety of commercial real estate related matters, such as landlord tenant disputes and hurricane damage claims.  Ultimately, a large part of Mr.

Grunspan's efforts were directed to enforcement of Winn-Dixie's exclusive right to sell groceries in Florida shopping centers.

Due to the regular customer traffic they generate, shopping center developers in Florida and elsewhere prize large supermarkets as anchor tenants.  It is common practice in shopping centers to offer tenants the exclusive right to be only such business in the center.  Tenants pay extra to be, for example, the only shoe store in the shopping center.  Winn-Dixie has included the right to be the exclusive seller of groceries in its commercial shopping center leases since at least 1957, and it is an important part of its business model.

In the late 1980's and early 1990's, large dollar store chains such as Dollar General and Family Dollar began targeting Florida shopping centers anchored by Winn-Dixie stores to take advantage of the traffic and Winn-Dixie's customer demographic.  By the late 1990's, over one hundred twenty locations in Florida were shared by a Winn-Dixie and at least one dollar store. Also in the late 1990's, in response to economic pressures, the dollar store chains changed their product mix to include more and more grocery items, eventually adding coolers for the sale of perishable groceries such as milk and produce.  This competitive activity in the same shopping centers occupied by Winn-Dixie stores directly undercut Winn-Dixie's business model and hurt the bottom line.

In 2000, Mr. Grunspan brought suit against a dollar store chain on Winn-Dixie's behalf to enforce its exclusive right to sell groceries in a shopping center in Miami-Dade County, Florida. That suit resulted in the first appellate decision in Florida broadly enforcing Winn-Dixie's grocery exclusive.  Based on this success, Winn-Dixie authorized additional lawsuits against other dollar store chains and locations throughout Florida.  Such litigation was critical to protect Winn-Dixie from unfair competition and to defend the company's basic business model.

Because the sale of groceries was profitable for them, however, the dollar store chains resisted compliance with Winn-Dixie's grocery exclusives and actively litigated.

By the time the bankruptcy petition was filed in February 2005, Carlton Fields and Mr. Grunspan had five ongoing lawsuits related to enforcement of the Winn-Dixie grocery exclusives, together with another six real estate related matters open.  During the course of bankruptcy, hurricane damage claims multiplied and the grocery exclusive litigation continued unabated at both the trial court and appellate levels.  Ultimately, Carlton Fields performed services on the following matters during the bankruptcy:

| Winn-Dixie Debtor in Possession | Florida Department of Agriculture Compliance issues | 50116 | 24201 |
|---|---|---|---|
| Winn-Dixie Stores, Inc. | Arcor U.S.A., Inc. Landlord tenant | 50116 | 23448 |
| Winn-Dixie Stores, Inc. | Bankruptcy Litigation | 49761 | 23399 |
| Winn-Dixie Stores, Inc. | Beachwalk Centre II, L.L.C. – Store No. 561 – San Destin, FL Dollar Store litigation | 50116 | 23452 |
| Winn-Dixie Stores, Inc. | Concord-Fund IV Retail, LP – Lease litigation | 50116 | 28227 |
| Winn-Dixie Stores, Inc. | Dolgencorp, Inc. – Palm Beach FL Store No. 221 Dollar Store litigation | 50116 | 23449 |
| Winn-Dixie Stores, Inc. | Dolgencorp, Inc. – Jacksonville FL Store No. 161 Dollar Store litigation | 50116 | 23453 |
| Winn-Dixie Stores, Inc. | Dollar General Investigative Dollar Store litigation | 50116 | 23462 |
| Winn-Dixie Stores, Inc. | Dollar Tree Stores, Inc., Cocoa FL Store #2324 Dollar Store litigation | 50116 | 26603 |
| Winn-Dixie Stores, Inc. | Family Dollar Stores Port St. John FL – Store 2329 Dollar Store litigation | 50116 | 26545 |
| Winn-Dixie Stores, Inc. | Family Dollar Stores of Florida/Miami Gardens – Store No. 205 Dollar Store litigation | 50116 | 23451 |
| Winn-Dixie Stores, Inc. | General Matters | 50116 | 23458 |
| Winn-Dixie Stores, Inc. | Hurricane Claims Preparation | 50116 | 23446 |

| Winn-Dixie Stores, Inc. | Dolgencorp Jensen Beach FL – Store No. 308 Dollar Store litigation | 50116 | 23459 |
|---|---|---|---|
| Winn-Dixie Stores, Inc. | Metro 2 Go, Inc. – Landlord/tenant | 50116 | 23461 |
| Winn-Dixie Stores, Inc. | Dolgencorp Kissimmee FL Noble Management Company – Store No. 2260 Dollar Store litigation | 50116 | 23463 |
| Winn-Dixie Stores, Inc. | Northway/Elysee – Landlord Tenant | 50116 | 23445 |
| Winn-Dixie Stores, Inc. | Pharmacy matter | 50116 | 23450 |
| Winn-Dixie Stores, Inc. | Dolgencorp, Hillsborough FL – Store No. 734 Dollar Store litigation | 50116 | 23456 |
| Winn-Dixie Stores, Inc. | Sarria Holdings II, Inc. – Store No. 330 Landlord Tenant and Dollar Store | 50116 | 23460 |
| Winn-Dixie Stores, Inc. | Family Dollar Hialeah FL Store No. 242 – Dollar Store litigation | 50116 | 25029 |
| Winn-Dixie Stores, Inc. | Family Dollar Sumar Palm Beach FL Store No. 295 Dollar Store litigation | 50116 | 23457 |
| Winn-Dixie Stores, Inc. | The Ben Tobin Companies, Ltd. Landlord Tenant | 50116 | 23447 |
| Winn-Dixie Stores, Inc. | WD Cordova, LLC Landlord Tenant | 50116 | 31749 |
| Winn-Dixie Stores, Inc. | Family Dollar YDB Ft. Lauderdale FL – Store No. 210 Dollar Store litigation | 50116 | 23455 |

Carlton Fields services during the bankruptcy continued to be necessary and benefit the Debtor. Landlord disputes, pursuit of several hundred hurricane damage claims across the state, and enforcement of the grocery exclusive in key shopping centers were the firm's primary activities. The appeals in the grocery exclusive cases raised real property issues important to Winn-Dixie and commercial lessees in Florida generally, and have attracted multiple *amicus* briefs. Several commercial real estate matters and grocery exclusive related actions and appeals remain pending after confirmation.

## Legal Services Rendered by Carlton Fields

Carlton Fields seeks allowance and payment of fees for services provided to Winn Dixie in the following areas of representation: (i) preparing and making claims on landlords to pay for damages to multiple stores from the 2004 and 2005 hurricanes; (ii) protecting Winn Dixie's exclusive use rights in shopping centers through enforcement of its right to be free of competition in selling groceries in particular centers; (iii) general assistance on questions regarding leases, landlord negotiations, real estate, and related matters; and (iv) obtaining retention as special counsel, preparation of fee applications, and matters in connection with same.

Carlton Fields' representation has produced important results for Winn-Dixie.  The appeal of a grocery exclusive case in Florida's Fourth District Court of Appeal (begun and primarily briefed during the bankruptcy period) has resulted in an opinion that upholds Winn-Dixie's grocery exclusive as a real property covenant running with the land.  This allows Win-Dixie to enforce the exclusive directly against the violating dollar store or other tenants.  The opinion also determined that large sophisticated dollar store chains such as Dollar General have implied actual notice of Winn-Dixie grocery exclusives, and a corresponding duty to search the public record or inquire after the existence of such an exclusive.  The recent opinion swept aside the primary defenses of the dollar stores as group against enforcement of the grocery exclusive. The opinion will serve to protect Winn-Dixie across the State of Florida from unfair competition in the shopping centers it occupies.  The opinion is attached hereto as Exhibit A.

## Application of Legal Standards to the Services of Carlton Fields

In considering the criteria of *In the Matter of First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), for the determination of a reasonable attorney's fee, the following considerations support the allowance of the fees requested:

a.      The Time and Labor Required.   As set forth above, Carlton Fields provided legal services on behalf of, and for the benefit of Winn Dixie in the twenty-five (25) matters enumerated above.   During the entire case period, Carlton Fields devoted 6,308.20 hours of attorney time, and 1,175.10 hours of legal assistant time to the representation of Winn Dixie. The daily time detail for the numerous matters on which professionals of Carlton Fields spent time during the entire case period, as well as detail of the expenses incurred during the entire case period, were attached to each of the previously filed interim fee applications.[1]  Moreover, Carlton Fields described in each of its prior interim fee applications the services rendered during each application period and has described herein the services rendered during the sixth interim period.   All of the detail and descriptions for the prior interim application periods are incorporated herein by reference and, together with the detail and descriptions contained herein for the sixth interim period, are offered in support of the Carlton Fields' Final Application.

b.      Carlton Fields has made substantial effort to (i) restrict the number of attorneys involved in the Winn Dixie matters so as to maximize familiarity with the issues involved and avoid wasted time, and (ii) assign the performance of all tasks to the least senior attorney capable of performing such tasks.

c.      The Novelty and the Difficulty of the Questions.   Although Carlton Fields would not consider all of its work to be exceptionally novel or difficult, the issues of the enforceability of Winn Dixie's exclusive use rights in shopping centers have involved some very novel and difficult questions under Florida law, among others, whether real property restrictive covenants in commercial leases were barred by § 542.335, Fla. Stat.   This was an issue of first

---

[1] All of Carlton Fields Bills were attached to the interim fee applications and submitted to Stuart Maue for review. Due to privilege considerations in the several actions pending in Florida, the copies of the bills attached to the interim fee applications were redacted to remove attorney-client privileged or work product protected entries.  The bills reviewed by Winn-Dixie and Stuart Maue were not redacted.

impression in Florida.  Because of the importance of this question to commercial lessor and lessees generally, several amicus briefs were filed.  The result was an appellate opinion that swept away the primary defenses of the dollar stores to enforcement of Winn-Dixie's grocery exclusive.

        d.    <u>The Customary Fee</u>.  The requested fees for the attorneys working on these matters reflects discounts from Carlton Fields' customary billing rates for matters of this kind.  Due to its long term relationship with Mr. Grunspan and the firm, Winn-Dixie enjoyed favored client status at Carlton Fields.  The firm charged Winn-Dixie at rates substantially reduced from its standard rates.  The reductions, negotiated prior to the bankruptcy, resulted in substantial savings to Winn-Dixie.  Over the twenty-one month course of the Winn-Dixie bankruptcy, Carlton Fields billed $1,885,043.15 in fees at reduced rates on the twenty-one matters described above.  The cost savings to Winn-Dixie when compared to the firm's standard rates was substantial.  In addition, the firm billed $126,333.24 in costs, the majority of these necessary outside expenses passed along to the client at cost.

        e.    <u>The Skills Requisite to Perform the Legal Services Properly</u>.  Alan Grunspan is the attorney in charge of Carlton Fields' legal work for Winn Dixie. Mr. Grunspan has been representing Winn Dixie on many Florida real estate and lease related issues, including litigation in these areas, since 1997. Since Mr. Grunspan joined Carlton Fields in December 2004, Carlton Fields has provided extensive legal services to Winn Dixie, much of it relating to litigation involving the protection of the Debtors' exclusive use rights in shopping centers. Mr. Grunspan has been practicing law for over twenty (20) years and has extensive experience in these areas. Carlton Fields has performed the work set forth in this Application with its customary skill and diligence.

      f.      <u>The Experience, Reputation and Ability of the Attorneys</u>.  Carlton Fields has practiced law in Florida continuously for more than a century and has grown to be one of the largest law firms in the State of Florida, specializing in all phases of commercial practice, including litigation, real estate, leasing, bankruptcy, and land use, condominium, and zoning law. Carlton Fields' experience and reputation are well known.

      g.      <u>The "Undesirability" of the Case</u>.  Representing Winn Dixie is by no means undesirable and Carlton Fields is proud to have the privilege of serving as special counsel for Winn Dixie in the various matters covered in the final application.

      h.      <u>The Nature and Length of Professional Relationship with Client</u>.  Prior to this proceeding, Mr. Grunspan has been representing Winn Dixie since 1997.  Carlton Fields has been representing Winn Dixie since Mr. Grunspan joined the firm in December 2004.

      i.      <u>Awards in Similar Cases</u>.  The compensation prayed for by Carlton Fields is commensurate with allowances in similar cases for work of this caliber. The fees sought as interim compensation are entirely reasonable in that the services rendered were of high quality and compensation requested is based on hourly rates which in many instances are below the rates Carlton Fields customarily charges commercial clients for services of the same kind and quality.

      j.      <u>Whether the Fee is Fixed or Contingent</u>.  The fees requested are based upon fixed hourly rates and are not contingent.

      k.      <u>Time Limitations Imposed by Client or Other Circumstances</u>.  There have been no extreme time limitations imposed by the client thus far.

      l.      <u>The Preclusion of Other Employment by Counsel Due to Acceptance of this Case</u>.  Carlton Fields is aware of no other employment which has been precluded by virtue of having accepted representation as special counsel for Winn Dixie.

m.    As further support for the fees requested, Carlton Fields respectfully requests that the Court take into account that Carlton Fields maintains a large suite of offices in a prime commercial location with library facilities; sophisticated office equipment, including word processing equipment; subscriptions to computerized research services; and a large support staff, including secretaries, clerks, paraprofessionals, and other support personnel. A firm with resources of this nature and level is necessary to adequately represent the interests of Winn Dixie in the various matters being handled by Carlton Fields. Consequently, a substantial portion of whatever hourly compensation may be allowed by this Court will merely defray substantial overhead charges which have already been incurred and paid in cash during the time which has elapsed since Carlton Fields was appointed to serve as special counsel for Winn Dixie these proceedings.

n.    Carlton Fields has made no arrangement regarding the sharing of compensation for services rendered in connection with this Chapter 11 case.

## Compensation and Reimbursement Requested for the Entire Case Period

By its Final Application, Carlton Fields requests that this Court authorize and order, with respect to the entire case period, (a) final allowance and payment, to the extent not already paid, of compensation equal to $1,870,513.40 in fees, for professional services rendered by Carlton Fields as counsel to Debtors, representing 100% of the fees earned less $14,529.75 in technical billing discrepancies as described below, and (b) final allowance and reimbursement, to the extent not already reimbursed, of $126,044.51, representing 100% of the actual and necessary out-of-pocket disbursements made and charged incurred by Carlton Fields as counsel to Debtors, less $288.73 in technical billing discrepancies as described below.

Carlton Fields submits that the aggregate fees sought in the Final Application represent "reasonable compensation for actual, necessary services rendered" in accordance with section

330(a)(1)(A) of the Bankruptcy Code.  In addition, Carlton Fields submits that the aggregate expenses for which reimbursement is sought in the Final Application represent "actual, necessary expenses" under section 330(a)(1)(B) of the Bankruptcy Code.

## Response to Stuart Maue Report on Final Fee Application.

The standard for analyzing fee requests is whether the services rendered to the estates were reasonable and necessary, not whether, in hindsight, some fee or expense may be questioned. As one court has recognized:

> [I]t is important for a court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation. It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner. On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

*In re Boston & Maine Corp.*, 776 F.2d 2, 10 (1st Cir. 1985) (internal citations and quotations omitted). Thus, although the Report, which places weight on statistical and computer-generated analysis, is informative, the central inquiry is the reasonableness of fees and expenses incurred, in light of the services performed. On that basis alone, Carlton Fields submits that, given its representation of the Debtors in these cases, no reduction in fees and expenses is warranted, other than as set forth in this Response. In support of its position that fee and expense reductions are not warranted, Carlton Fields sets forth below its responses to the issues raised by the report.

As indicated in the Report, Stuart Maue uses statistical and computer-generated reports based on its own criteria and the United States Trustee Guidelines (the "Guidelines"), which contain guidelines for facilitating the review of fee applications. Carlton Fields respectfully submits that computer-generated analysis by its nature cannot determine whether sufficient information exists to determine whether fees and expenses are reasonable in light of the services rendered.

###### a.      Fees.

Carlton Fields will now directly address the comments of auditor Stuart Maue as they relate to the final fee application as to all Carlton Fields' bills and applications.   Stuart Maue groups its comments under three headings: Technical Billing Discrepancies, Billing Guidelines, and Necessity, Relevance, and Reasonableness.  Carlton Fields will address each in turn.

Technical Billing Discrepancies:  In the first instance, Stuart Maue points out several of what they describe as "Technical Billing Discrepancies" relating to less than 1% of the total bill. Carlton Fields has reviewed its records regarding these items as reflected on Stuart Maue's Summary of Findings for Final Period, page 24 of the Sixth Interim and Final Fee Application. After review, it was determined that all of these items resulted from inadvertent billing and typographical errors over the twenty-one month bankruptcy period.  Carlton Fields agrees the following amounts should be removed from the fee applications:

| | |
|---|---|
| Potential Double Billing: | $3,475.75 |
| Post-Confirmation Billing: | $3,192.00 |
| Duplicative Entries – Third and Fourth Application: | $962.00 |
| Potential Billing Error (single "20 hour" entry): | $6,900.00 |
| Total Adjustment: | $14,529.75 |

Billing Guidelines:  Information regarding firm staffing, rates, and time increments are accurately reflected in the Stuart Maue reports.  Staffing requirements were dictated by the activity in one or more of up to twelve active lawsuits, two appeals, and the numerous landlord disputes handled by the firm during the bankruptcy period.  In addition, the firm handled and coordinated an emergency, system-wide effort to make hundreds of claims for hurricane damage

and repair against a large number of landlords and their insurance companies. Firm staffing was reasonable and appropriate.

Next, Stuart Maue identifies what it describes as "Vaguely Described Conferences" and "Other Vaguely Described Activities." Respectfully, Carlton Fields stands by its time entries as compliant with U.S. Trustee Guideline (b)(4)(v). Carlton Fields notes that the purpose of the fee application is "to enable the court to reach an informed decision - one necessarily grounded in complete, coherent information - as to whether the requested compensation is justified." *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 845 (3d Cir. 1994). Thus, even an allegedly technically deficient entry should be approved so long as adequate information exists to permit the Court to determine the activity described. The time entries here are sufficient to reasonably identify the conferences and activities involved. On occasion, a time entry reviewed in isolation may simply reflect "instructions" or "confer with" or "work on." However, when the entry is reviewed in the context of bill, obviously related time entries above or below it make clear what the conference or work was about. See Composite Exhibit B attached hereto, addressing these categories on all bills. As can be seen from the attached, the most of the entries are not vague but clear when simply considered in the context of the bills. *See, e.g., In re Prime Foods of St. Croix, Inc.*, 80 B.R. 758, 763 (Bankr. D. Virgin Islands 1987) (entries sufficiently detailed when viewed in context of bill).

Stuart Maue next identifies time entries as lumped or "block billing." These entries comprise approximately 4% of the total bill. Often an entry identified as "blocked" is a straightforward entry which simply has two related tasks in it. Carlton Fields submits that the entries identified by Stuart Maue as "blocked" are still sufficiently specific to allow an assessment of the reasonableness of the services performed, which is the purpose of the fee

application.  It would elevate form over substance to penalize the firm for format issues with otherwise sufficient entries.  Nonetheless, Carlton Fields' professionals have reviewed the time entries labeled as "blocked billing" by Stuart Maue on all six fee applications, and have clarified many of them, breaking down specific tasks by time spent.  See Composite Exhibit C. Accordingly, Carlton Fields submits that it should be approved in full for this time.

Stuart Maue's next comments involve the appearance of more than one professional at intra-office conferences or non-firm conferences, hearings, or depositions.  This was not a representation on a single matter. This representation involved multiple active litigations, landlord disputes and hurricane damage claims  A number of the cases, such as the grocery exclusive cases and the hurricane claims, had interrelated issues and, as a result, the litigation had to be coordinated among the various professionals working on the different cases.  A position or discovery response taken in one case could not be contradicted in another.  Intra-office conferences to communicate and coordinate among multiple matters is compensable. *In re Frontier Airlines, Inc.,* 74 B.R. 973, 977-978 (Bankr. D. Colo. 1987).  Intra-office conferences were necessary here to coordinate the on-going efforts of the professionals involved.

Likewise, the presence of an associate at a hearing or deposition together with a partner also sometimes necessary.  The senior partner handled the appearance, while a associate with first-hand knowledge of the related cases assisted to insure that  positions were not taken inconsistent with those taken in the other matters.  For example, partner Charles Rosenberg and associate Jason Alderman traveled to and attended the deposition of a key Dollar General employee for this reason.  This deposition was taken in one case but relevant to several pending cases with Dollar General.  Mr. Alderman was familiar with the issues in all cases and assisted Mr. Rosenberg in obtaining the maximum across- the-board benefit from the single deposition.

The Guidelines do not prohibit compensation for intra-office conferences. Instead, the Guidelines provide that conferences should identify the participants and the subject matters, and this was done by Carlton Fields. Bankruptcy courts have recognized the reality that complicated issues require the services of more than one attorney. *See, e.g., In re Boston & Maine Corp.,* 776 F.2d 2, 10 (1st Cir. 1985) (holding that it is appropriate to have multiple attorneys working on large, complex tasks); *see also Frontier Airlines, supra*.  Carlton Field's level of intra-office conferences was appropriate in view of the complexity of these cases and, as a result, the requested compensation is reasonable. The ability of professionals at Carlton Fields to confer internally among themselves, often involving professionals from different practice areas, has contributed to the expeditious resolution of numerous issues in these cases.  In turn, this has resulted in significant benefits for the Debtor's estate.  Carlton Fields respectfully submits that, given the nature of its representation, its regular intra-office conferences and its staffing at hearings and depositions was reasonable, necessary, and appropriate.

Necessity, Relevance, and Reasonableness:  Information regarding personnel who billed 10.00 or fewer hours and long billing days are accurately reflected in the Stuart Maue reports. With regard to personnel who billed fewer that 10.00 hours, Carlton Fields respectfully reiterates that its staffing was reasonable and appropriate.  The simultaneous pursuit of multiple on-going lawsuits and hurricane damage claims sometimes involved pulling in extra personnel for a short time to cover specific tasks or required the assistance of professionals with specialized knowledge so that the particular task could be more efficiently and effectively handled.

During the course of the twenty-one month bankruptcy, there were very few instances of a Carlton Fields attorney billing more than 12.0 hours in a single day.  The Guidelines do not state or suggest that billing in excess of 12.00 hours a day is not compensable.   The very few

instances of long (twelve hour plus) billing days involved travel to necessary hearings or depositions both in and outside Florida.  Travel time to necessary hearings or depositions is compensable.  *See, Frontier Airlines, supra*, 74 B.R. at 978-979.

Stuart Maue identifies administrative activities by paraprofessionals and professionals. Carlton Fields respectfully submits that, given the context of this representation, its staffing was appropriate.  The task performed required at least the services of a trained paraprofessional.  It is more efficient and economical for a paraprofessional, rather than an attorney to perform the needed services, and Carlton Fields respectfully submits that the services are compensable. Paraprofessionals are trained to provide these services. Such services require specialized skills of paraprofessionals and, accordingly, were appropriately assigned to paraprofessionals. Especially since the advent of electronic case filing, docket searches and filings require specialized knowledge, for which secretaries and clerical staff are not trained.  The delegation of these services to paraprofessionals confirms an effort to utilize efficient case management practices.

The Report identifies certain time entries of professionals as administrative/clerical activities, descriptions such as "coordinate," "distribute," or "circulate." Carlton Fields respectfully submits that the time entries at issue describe activities that are properly performed by professionals. It is necessary for professionals to ensure that proper documents and information are assembled and distributed to case parties.  Documents coordinated and circulated internally are no less necessary or compensable. These cases involve complex and sometimes interrelated issues, and it is necessary for Carlton Fields professionals to communicate with each other to appropriately address the issues. It would be inefficient to have professionals' assistants involved in the coordination and distribution of information that more often than not is distributed in e-mail form and needs to be addressed promptly.

Stuart Maue next identifies legal research as a category. Carlton Fields respectfully submits that these charges are reasonable and necessary in the circumstances of this representation. Many issues that arose in the course of the twelve lawsuits, two appeals, and the numerous landlord disputes handled by the firm during the bankruptcy period required legal research, with some raising important and novel issues that needed to be addressed in order to effectively represent the Debtor. Indeed, the grocery exclusive litigation presented a legal issue regarding restrictive covenants important to commercial real property in Florida, such that multiple amicus briefs were filed on either side of the issue. The result was an appellate opinion making law on real property issues important to Winn-Dixie's continued operation and also to commercial tenants throughout Florida. In addition, the hurricane claims process involved insurance law issues, and at least two of the landlord tenant disputes involved a bankruptcy issue on which the courts are split, stemming from a dispute on the affect on Winn-Dixie subleases from the bankruptcy of the primary lessee.

Stuart Maue next identified working and non-working travel, each category totaling less than 1% of the total bill. The travel time was reasonable and necessary as the litigation took place in various parts of Florida and depositions of dollar store chain personnel took place out of state. Travel time to necessary hearings or depositions is compensable. *See, Frontier Airlines, supra*, 74 B.R. at 978-979.

Finally, fees attributable to hourly rate increases amounted to less than .001% of the bill. Carlton Fields submits that this was reasonable over the course of twenty-one months.

b.      **Expenses.**

Information regarding expenses is accurately reflected in the Stuart Maue reports. In the first instance, Stuart Maue points out several of what they describe as "Technical Billing

Discrepancies" regarding expenses.  Carlton Fields has reviewed its records regarding these items as reflected on Stuart Maue's Summary of Findings for Final Period, page 26 of the Sixth Interim and Final Fee Application.  After review, it was determined that these items resulted from inadvertent billing and typographical errors over the twenty-one month bankruptcy period. Carlton Fields agrees the following amounts should be removed from the fee applications:

| | |
|---|---|
| Potential Double Billed Expenses: | $88.82 |
| Duplicative Entries – Third and Fourth Application: | $14.19 |
| Travel Expenses Associated w/no fees: | $96.90 |
| Total Expense Adjustment: | $288.73 |

The remainder of Carlton Fields' expenses is reasonable and necessary in the circumstances of the representation.  *See, e.g., In re Hillsborough Holdings Corp.,* 127 F.3d 1398, 1403-1404 (11th Cir. 1997)*;  In re Mulberry Phosphates, Inc.*, 151 B.R. 948 (Bankr. M.D. Fla. 1992).  Carlton Fields utilizes a case specific billing system that allocates expenses to particular cases.  The large majority of the expenses sought were incurred in the course of the suits and simply passed through at cost to the client.

**Conclusion.**

Carlton Fields respectfully submits that, with the exception of the fee and expense technical billing discrepancies as set forth above, that its final fee application are compliant with all guidelines and the fees and expenses set forth were reasonably and necessarily incurred for the benefit of the Debtor.  Accordingly, the Court should approve Carlton Fields' application in full for fees in the amount of $1,870,513.40, and expenses in the amount of $126,044.51, as set forth herein.

Dated: August 22, 2007

Respectfully submitted,

CARLTON FIELDS, P.A.
Special Counsel for Debtors
100 SE 2nd Street, Suite 4000
Miami, Florida 33131
Telephone:      (305) 530-0050
Facsimile:      (305) 530-0055
**dsmith@carltonfields.com**

By:____/s David James Smith_____
        DAVID JAMES SMITH
        Florida Bar Number 876119
        HYWEL LEONARD
        Fla. Bar Number 296376