**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| | | |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| | | |
| Reorganized Debtors. | ) | Jointly Administered |

**NOTICE OF FILING**

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as reorganized debtors, give notice of filing the attached Response of XRoads Solutions Group, LLC to the Stuart, Maue, Mitchell & James, Ltd. Final Reports of the Review and Analysis of the Fifth and Sixth Interim Applications and Final Fee Application of XRoads Solutions Group, LLC.

Dated:  August 23, 2007

SKADDEN, ARPS, SLATE, MEAGHER                    SMITH HULSEY & BUSEY
& FLOM LLP


By ___*s/ D. J. Baker*___                              By ___*s/ Cynthia C. Jackson*___
  D. J. Baker                                          Stephen D. Busey
  Sally McDonald Henry                                 James H. Post
  Rosalie Walker Gray                                  Cynthia C. Jackson (FBN 498882)

Four Times Square                                  225 Water Street, Suite 1800
New York, New York 10036                           Jacksonville, Florida  32202
(212) 735-3000                                     (904) 359-7700
(917) 777-2150 (facsimile)                         (904) 359-7708 (facsimile)
djbaker@skadden.com                                cjackson@smithhulsey.com

Co-Counsel for Reorganized Debtors                 Co-Counsel for Reorganized Debtors

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-3817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## RESPONSE OF XROADS SOLUTIONS GROUP, LLC TO THE STUART, MAUE, MITCHELL & JAMES, LTD. FINAL REPORTS OF THE REVIEW AND ANALYSIS OF THE FIFTH AND SIXTH INTERIM APPLICATIONS AND FINAL FEE APPLICATION OF XROADS SOLUTIONS GROUP, LLC

XRoads Solutions Group, LLC ("XRoads"), financial and operations restructuring advisors for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned case (collectively, the "Debtors"), submits this response ("Second Response") to the Stuart, Maue, Mitchell & James, Ltd. ("Stuart Maue") Final Report of their review and analysis of XRoads' Fifth Interim Fee Application for the period from May 28, 2006, through and including September 30, 2006 (the "Fifth Report");  Stuart Maue's Final Report of their review and analysis of  XRoads' Sixth Interim Fee Application for the period from October 1, 2006, through and including November 21, 2006 (the "Sixth Report"). Stuart Maue's Sixth Report includes their review and analysis of XRoads' Final Fee Application for the final period from February 21, 2005, through and including November 21, 2006.[1] In support of this Second Response, XRoads represents as follows:

---

[1] Stuart Maue's Fifth Report and Sixth Report are hereinafter referred to collectively as the "Reports."  On or about December 19, 2006, XRoads filed a response to Stuart Maue's First, Second, Third and Fourth Initial Reports, which response is hereinafter referred to as the "First Response."

## Background

A.    <u>Chapter 11 Cases</u>

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed petitions under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors' cases were jointly administered for procedural purposes only.

2.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. The Debtors operated their businesses and managing their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

3.    The Debtors' bankruptcy cases were one of the 10 largest bankruptcy cases filed in 2005, with approximately $2.2 billion in assets as of the Petition Date. <u>Turnarounds & Workouts</u>, vol. 20, no. 1, January 15, 2006. Moreover, over 24,400 filed and scheduled claims were asserted against the Debtors in the aggregate amount of approximately $25 billion.

4.    By final order dated March 29, 2005, XRoads was authorized to provide services to the Debtors in these cases (the "XRoads Retention Order"). The XRoads Retention Order authorized XRoads to be compensated on the terms of its engagement agreement and an amendment thereto. Copies of XRoads' engagement agreement, amendment number 1 thereto and the order approving XRoads are attached to XRoads' First Response as Exhibit A thereto.

5.    On June 29, 2006, the Debtors filed the Disclosure Statement with Respect to Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors as well as their Joint Plan of Reorganization, which were both subsequently amended and filed

on August 2, 2006. On August 4, 2006, this Court approved the Debtors' disclosure statement, as amended. The hearing to consider confirmation of the joint plan of reorganization occurred in October 2006 and on November 9, 2006 this Court confirmed the joint plan of reorganization, and the plan of reorganization became effective on November 21, 2006.

B.    Interim Payment Procedures

6.    On March 15, 2005, the Final Order Approving Interim Compensation Procedures for Professionals was entered (the "Interim Payment Order").

7.    Under the Interim Payment Order, professionals may be paid up to 80% of fees earned and 100% of expenses incurred on monthly statements after submission of fee statements to certain parties, including the Debtors and their counsel, the U.S. Trustee, counsel for the creditors' committee and counsel for the Debtors' secured lenders and after expiration of objection periods. The remaining 20% of fees are payable after court approval of interim fee applications. Interim fee applications are to be submitted approximately every four to six months.

8.    XRoads' Fifth Interim Fee Application ("Fifth Application") covered the period from May 28, 2006 through September 30, 2006, and sought $1,811,021.00 in fees and $122,269.61 in expenses. The Fifth Application was approved by this Court on December 14, 2006. XRoads' Sixth Interim Fee Application ("Sixth Application") covered the period from October 1, 2006, through November 21, 2006, and sought $736,057.50 in fees and $37,106.63 in expenses. XRoads' Final Fee Application ("Final Application") covered the period from February 21, 2005, through November 21, 2006,

and sought $21,208,544.30 in fees and $1,375,403.38 in expenses.[2] The Sixth Application and Final Fee Application are scheduled to be heard by the Court on September 6, 2007.

9.      XRoads has received no objections to its monthly fee statements or to its Fee Applications. XRoads has received all requested amounts under XRoads' Fee Applications that have become due under the Interim Payment Order.

### Stuart Maue

10.      By order dated December 14, 2005, this Court approved the Debtors' application to employ and retain Stuart Maue as the fee examiner in these cases (the "Fee Examiner Order").

11.      In accordance with the Fee Examiner Order, Stuart Maue does not make any determinations or recommendations in its written reports as to either (a) the reasonableness or necessity of the requested fees and expenses or (b) the amount of fees and expenses to be allowed or disallowed. Fee Examiner Order ¶ 8.

### Preliminary Statement

12.      As set forth below, the issues raised by Stuart Maue do not preclude approval by this Court of the fees and expenses requested by XRoads in its Fee Applications. XRoads also notes that during its engagement and in its fee applications, it has previously taken voluntary reductions of more than $495,000 in fees and expenses.

13.      As an initial matter, XRoads notes that the Reports have not analyzed the difficulty of these Debtors' cases, the efforts by XRoads to achieve the Debtors' goals,

---

[2]   The Fifth Application, Sixth Application, and Final Application are hereinafter referred to collectively as the "Fee Applications."

and the effectiveness of XRoads' work. XRoads submits that its Fee Applications should be reviewed in the overall context of these cases.

14.     Throughout the course of XRoads' engagement, the Debtors made significant progress in these cases, resulting in a confirmed plan of reorganization and a successfully reorganized operating business.   XRoads assisted the Debtors in (a) obtaining critical financing for their cases, (b) resolving numerous reclamation claims, PACA claims and other claims, resulting in savings of millions of dollars in proceeds for the Debtors' estates, (c) assisting with the sale of various assets, resulting in millions of dollars in proceeds for the Debtors' estates, (d) assisting in re-negotiations of non-real estate contracts, (e) assisting in the preparation, negotiation and solicitation of the Debtors' joint reorganization plan, (f) restructuring the Debtors' sourcing department and procedures for procurement of non-inventory products and services resulting in millions of dollars of savings for the Debtors' estates; (g) assisting in evaluations of ongoing operations and subsequent  closings of non-profitable locations resulting in millions of dollars in proceeds and savings to the Debtors' estates; and (h) assisting the Debtors with their cash management processes and controls and reporting of same to the cases' constituents. The actual services rendered by XRoads, are amply described in its Fee Applications, while no such references are made in the Reports.

15.     The standard for analyzing fee requests is whether the services rendered to the estates were reasonable and necessary, and not whether, in hindsight, some fee or expense may be questioned. Thus, although the Reports, which place weight on statistical and computer-generated analysis, are informative, the central inquiry is the reasonableness of fees and expenses incurred, in light of the services performed. On that

basis alone, XRoads submits that its services rendered to the Debtors in these cases warrant no reductions in fees or expenses other than what is set forth in this Second Response and XRoads' previously filed First Response. In support of its position that fee and expense reductions are not warranted, XRoads sets forth below its responses to the issues raised by the Reports.

16.     As indicated in the Reports, Stuart Maue utilized statistical and computer-generated reports based on its own criteria and that of the United States Trustee Guidelines (the "Guidelines"), which contain guidelines for facilitating the review of fee applications.  XRoads respectfully submits that computer-generated analysis by its nature cannot determine whether sufficient information exists to determine whether fees and expenses are reasonable in light of the services rendered.  The purpose of the fee application is "to enable the Court to reach an informed decision – one necessarily grounded in complete, coherent information – as to whether the requested compensation is justified."  In re Busy Beaver Bldg. Ctrs, Inc., 19 F.3d 833, 845 (3d Cir. 1994).  Thus, even an allegedly technically deficient entry should be approved so long as adequate information exists to permit the Court to determine the reasonableness of the activity described. XRoads submits that its time entries meet this standard.

17.     In addition, some of the time entries identified by Stuart Maue attempt to elicit more detailed information when from time to time XRoads purposely provided entries attempting to preserve certain privileged or otherwise confidential information, including case strategy and communications with Debtors' counsel.  XRoads should not be subject to fee reductions for time entries that are worded in order to protect such information.

**Reports**

18.    The balance of this Second Response will track the substantive categories of the Reports as to both fees and expenses.

**Fees**

A.    Re-computation of Fees and Expenses

19.    The Fifth Report identifies the fact that XRoads' requested fees were $3,277.50 less than the computed amount. Stuart Maue correctly identifies the difference as the "result of the credit in the amount of $3,277.50 for D. Simon."

20.    The Sixth Report identifies the fact that in XRoads Final Application, the re-computation of fees for the final period shows that the total requested amount is $79,515.70 less than the computed amount and $6,870 less than the computed amount for expenses. Sixth Report at 26.  These variances are due to voluntary reductions taken by XRoads in its interim fee applications and its First Response.

21.    The Reports reflect no other differences between the amount of fees or expenses requested by XRoads and the amount of fees and expenses computed by Stuart Maue.

B.    Potential Inadvertent Double Billing / Duplicative Entries

22.    The Reports identify various timekeepers who may have inadvertently double billed time entries.  See Fifth Report at 6; Fifth Report Exhibit B; Sixth Report at 7; Sixth Report Exhibit B-1.  The entries in question total 5.0 hours with $2,036 in associated fees.

23.    XRoads has reviewed the entries involved and/or has contacted the respective timekeepers about the entries at issue.  XRoads' analysis reveals that the 5.0

7

hours identified by Stuart Maue's Reports do involve inadvertent duplicative entries. Therefore, XRoads will reduce its fees by the equivalent value of the 5.0 hours identified, which amounts to $2,036.

C.      Potential Wrong Case Billing.

24.     The Sixth Report identifies one time entry that appears to have billed to the wrong case matter.  XRoads analysis agrees with Stuart Maue's Sixth Report. Therefore, XRoads will reduce its fees by the value of the time identified (0.60 hours), which amounts to $60.

D.      Time Keepers and Positions

25.     Due to the size and complexity of the Winn-Dixie Chapter 11 cases, a number of XRoads personnel have been assigned to the cases.  The personnel assigned have been appropriate for the scope of XRoads engagement, urgency of work required, type of work performed and expertise required by the cases.  The cases involved 24 estates, thousands of creditors, shareholders and other parties in interest and billions of dollars in assets and claims.  XRoads believes that all timekeepers for all interim periods performed necessary services.  Stuart Maue has calculated the blended hourly rate during the Sixth Application period of XRoads engagement as approximately $443 for its professionals, and approximately $379 as the blended hourly rate for XRoads' professionals and paraprofessionals combined. Sixth Report at 9.  These rates were and are reasonable and appropriate for the professional services delivered by XRoads.

26.     As explained in XRoads' Fee Applications, XRoads' services during these interim periods have assisted the Debtors in generating millions of dollars in sale proceeds and savings, and ultimately resulted in a successfully restructured and ongoing

business operation.

E.      Hourly Rate Increases

27.     The Fifth and Sixth Reports correctly point out that XRoads took no hourly rate increases during the interim periods covered thereby.  XRoads increased the hourly rates of three paraprofessionals prior to the periods covered by the Fifth and Sixth Applications, which increases were discussed in XRoads' First Response.

F.      Time Increments; Complete and Detailed Descriptions

28.     The Reports note that all of XRoads billing entries were in tenths of an hour increments as required by U.S. Trustee Guidelines and most of the task descriptions were sufficiently detailed and included the type of activity and subject matter involved. The Fifth Report identifies 5.40 hours of vaguely described activities with $810.00 in associated fees.  XRoads will voluntarily reduce its fees by this amount rather than re-enter those time entries.

G.      Blocked Entries

29.     The Fifth Report identifies entries that have a single time increment for more than one activity.  Fifth Report at 9; Fifth Report Exhibit E. Stuart Maue asserts that the entries of this type total 8.20 hours with $3,680.00 in associated fees.  Id.  Stuart Maue's Sixth Report points out that XRoads' Sixth Application has no combined or "lumped," activity descriptions.  Sixth Report at 11.

30.     XRoads has reviewed the time entries from the Fifth Report and believes that the reasonableness of all the identified time entries in the Fifth Report can be ascertained.   Therefore, XRoads does not believe any fee adjustment is warranted or necessary.

H.    Intra-office Conferences

31.    The Reports identify entries that describe intra-office conferences. Fifth Report at 10; Sixth Report at 11-12. Stuart Maue asserts that such entries amount to 418.35 hours with $174,525 in associated fees.  According to Stuart Maue's Reports, in total 319.60 hours with $134,630 in associated fees involved more than one XRoads' timekeeper billing for the conference or meeting in issue. Id.

32.    XRoads timekeepers admittedly confer with one another in rendering services to the Debtors. It would be impossible to administer large chapter 11 cases efficiently without intra-office conferences. The Guidelines do not prohibit compensation for intra-office conferences. Instead, the Guidelines provide that conferences should identify the participants and the subject matters, which requirements have been followed by XRoads time keeping records.

33.    Bankruptcy Courts have recognized the importance of attorneys and the Debtors' professionals working together.   XRoads respectfully submits that its level of intra-office conferences was appropriate in view of the complexity and size of the cases and that, as a result, the requested compensation is reasonable.  The ability of XRoads professionals and paraprofessionals to confer internally amongst themselves, often involving professionals performing in different functional areas for the Debtors (such as strategic restructuring planning, sourcing, real estate, PACA claimants, finance, cash management and operations) contributed to the expeditious resolution of numerous issues in these cases.  These conferences ensure that XRoads personnel are not performing duplicative work, are acting in conjunction with each other and the Debtors' personnel and professionals, and have contributed to the expeditious resolution of numerous issues

10

in these cases.  In turn, this work process has resulted in significant benefits for the Debtors' estates and their creditors.

I.    Non-Firm Conferences, Hearings and Other Events

34.    The Reports identify instances where two or more XRoads professionals or paraprofessionals attended the same conference or other event that was also attended by non-XRoads personnel. Stuart Maue asserts that such entries total 260.65 hours with $111,599 in associated fees.  Fifth Report at 10-11; Sixth Report at 12-13.  According to Stuart Maue, of this amount, 137.55 hours with $57,991 in associated fees involved participants other than the timekeeper who appears to Stuart Maue to the be most responsible person at the event. Id.

35.    Cases as large and complex as these cases require the services of XRoads professionals in multidisciplinary areas, such as corporate finance, restructuring, operations, real estate, sourcing and cash management.  See Fifth Application at 13-15, Sixth Application at 16-17. XRoads professionals' knowledge and experience have allowed them to address pressing matters typical of large retail cases such as these cases in an efficient manner. The Reports identify non-firm conferences and meetings that typically fall into the following categories: (a) client meetings, (b) creditor committee meetings, (c) asset disposition meetings, (d) reclamation and PACA meetings, (e) meetings with Debtors' other professionals, and (f) Board meetings. See, e.g., Fifth Report Exhibit G; Sixth Report Exhibit E.

36.    XRoads believes that its Fee Applications properly discuss each of the above categories and indicate why, at times, the services of more than one XRoads professional were required at such meetings, conferences and hearings. The services

performed by XRoads, and the corresponding benefits received by the Debtors, would not have been possible without team work and coordination between the various XRoads professionals assigned to these cases.

37.    XRoads personnel in attendance at non-firm conferences and meetings were present to bring their particular area of expertise or case responsibility to bear at the meeting or conference, and by doing so added value to the group and assisted in the efficient administration of these cases. Accordingly, XRoads submits that the compensation sought is reasonable and should not be denied or discounted.

J.    <u>Personnel Who Billed 10.00 or Fewer Hours</u>

38.    The Reports identify a few timekeepers who billed 10.00 or fewer hours during the Fifth and Sixth Fee Application periods. Stuart Maue estimates that such entries total 15.10 hours with $4,162 in associated fees. Fifth Report at 11-12; Sixth Report at 13-14.

39.    Neither the Bankruptcy Code nor the Guidelines penalize a firm on the basis that a timekeeper has billed too few hours. To the contrary, XRoads submits that the services performed by each of the identified timekeepers were reasonable and necessary. The identified timekeepers include professionals who provided specialized isolated tasks on an as needed basis, and a paraprofessional billing specialist who left XRoads employ.

K.    <u>Long Billing Days</u>

40.    The Reports identify timekeepers who billed more than 12.00 hours a day during the relevant periods. Fifth Report Exhibit I-1; Sixth Report Exhibit G-1 and G-2. Stuart Maue asserts that these entries total 487.20 hours with $208,198 in associated fees. Fifth Report at 12-13; Sixth Report at 14.

Stuart Maue states:

> Courts have generally held that billable time for professional services should include only those tasks that relate directly to work for the client. Professionals necessarily must spend some portion of each day on personal matters, (such as meals and breaks) and frequently spend time on administrative matters, such as training or supervision of others. Professionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation. However, such long hours are generally related to identifiable circumstances such as court deadlines, travel, or event attendance. Id.

41.     The Guidelines do not state or suggest, however, that billing in excess of 12.00 hours a day is not compensable. Stuart Maue acknowledges that "[p]rofessionals may periodically work extraordinarily long hours without many breaks because of the demands of the representation." Id. That is the case here, as evidenced by the time detail in XRoads' Fee Applications.

42.     The hours and charges calculated by Stuart Maue include all hours on all days whenever a timekeeper exceeded 12.00 hours (including a non-working travel time entry).  XRoads submits that a more relevant calculation is the total number of hours exceeding 12.00 hours per day (without including any non-working travel time).  That calculation shown by the chart below is not particularly large in the context of these cases.

| | Total Hours Billed in Excess of 12 Hours Per Day | Total Hours Billed in Interim Period | % of Total |
|---|---|---|---|
| Fee App 5 | 374.80 | 4,698.40 | 7.98% |
| Fee App 6 | 112.40 | 1,736.60 | 6.47% |
| Final App (1-6) | 1,521.40 | 49,483.30 | 3.07% |

43.     The hours billed by timekeepers in excess of 12.00 hours per day during

the two interim periods are minimal given that (a) there were numerous dispositions of assets, often on an expedited basis, (b) many objections were filed with respect to the reclamation and PACA motions, and (c) XRoads personnel lived in the Jacksonville, Florida area during the week to provide their services at Winn-Dixie's corporate offices and therefore spent long hours on site at those offices.  Further, during these two interim periods as the case wound down, less personnel were assigned to the case such that each person took on more tasks in a more concentrated period before the confirmation deadline.

44.    XRoads believes that its Fee Applications reflect time spent appropriately by XRoads personnel to meet the needs of its client, and no adjustments should be made to XRoads fees associated with this category.

L.    <u>Administrative/Clerical Activities</u>

45.    The Reports identify activities considered by Stuart Maue to be administrative or clerical in nature. Fifth Report at 13-14; Sixth Report at 15-16.

46.    The administrative and clerical activities identified by Stuart Maue include staffing matters, modifications to work product, project instruction and billing matters. XRoads has reviewed the activities contained in the Fifth Report Exhibit J-1, Sixth Report Exhibit H, and responds below.

47.    The Reports identify certain time entries of paraprofessionals as relating to administrative/clerical activities. Items identified in the exhibits to the Reports include services that properly should be rendered by a paraprofessional, in particular billing coordination and fee application preparation.

48.    Such services required specialized skills of paraprofessionals and,

accordingly, were appropriately assigned to those paraprofessionals.  Accordingly, XRoads respectfully submits that these services are compensable.

49.     The Fifth Report further identifies certain time entries of professionals as administrative/clerical activities.   Fifth Report at 14. Stuart Maue asserts these activities total 23.20 hours with $10,130 in associated fees. Id.

50.     XRoads acknowledges that a limited number of its professionals' time entries describe some administrative activities.   However, most of the entries concern professional services appropriate to that professional in relation to fee application matters and ensuring accurate billing to the client. The small percentage of such entries identified by Stuart Maue supports the fact that XRoads uses clerical and paraprofessional staff whenever possible and appropriate to the task.

M.      Summary of Projects

51.     The Reports confirm that XRoads categorized its services into 7 to 12 billing projects for the benefit of the estate, including categories for Retention and Compensation matters for XRoads ("XRoads Retention") and Response to Fee Examiner's Reports ("Fee Auditor Response").   Fifth Report at 14-15; Sixth Report at 16-17.

52.     Stuart Maue states that some billing entries in categories other than XRoads Retention appear to be related to this category and, as a result, Stuart Maue reassigned some billing entries to the XRoads' Retention.   XRoads has endeavored to record time performed for work in the appropriate matter category. Because of the size of this case, and the thousands of entries were recorded by various XRoads timekeepers, XRoads recognizes that there may be entries recorded in categories that may be

15

appropriately recorded in another category.  XRoads believes that its services performed are identifiable and compensable in these cases, including services performed in the specifically mentioned category.

53.     Regarding the XRoads Retention category, XRoads understands that the Debtors counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("SASM&F") has provided to Stuart Maue a memorandum that discusses compensation for services rendered in connection with professionals' fee applications and retention applications. XRoads respectfully submits that these types of services and work are compensable in accordance with the facts of these cases, the Bankruptcy Code and the Guidelines themselves and as discussed in SASM&F's memorandum.

54.     Regarding the Fee Auditor Response category, XRoads notes that its time should be compensable in the same manner as preparing for and defending any fee application, and should be allowed to the full extent that other professionals received compensation for such activity.

55.     The Guidelines suggest that the services rendered in the XRoads Retention category are compensable. For example, the Guidelines include the following as suggested project categories for bankruptcy cases:

> Fee/Employment Applicants: Preparation of employment and fee applications for self or others; motions to establish interim procedures.
>
> Fee/Employment Objections: Review of and objections to the employment and fee applications of Others.

Guidelines Exhibit A. XRoads understands these categories and services are included in the XRoads Retention category and in the Fee Auditor Response category in XRoads' Fee Applications.

56.     XRoads believes its services performed during the two interim periods for all categories of services were necessary, and XRoads believes that the compensation requested, in light of the services provided, is reasonable.

**Expenses**

A.     <u>Potential Double-Billed Expenses</u>

57.     The Fifth Report identifies two airfare charges that appear potentially duplicative of other entries.  Fifth Report at 19.  XRoads has reviewed the entries in question and has determined that the June 26, 2006 expense for B. Boggess titled "round trip airfare to client 6/28/2006 and 6/29/2006" was inadvertently inaccurately described. That description should have stated "One Way Coach Airfare."  The return airfare is noted in the Fifth Report at page 19.  Accordingly, this expense was not duplicated and should be reimbursed.

58.     The other identified airfare charge that appears duplicative was in fact an increase in airfare which increase was caused by changes in travel plans and departure and arrival cities.  Fifth Report at 19-20.  Accordingly, this expense also was not duplicative and should be reimbursed.

59.     The Fifth Report at page 20 identifies one additional charge that may be duplicative of an airfare charge requested in the Third Interim Fee Application.  XRoads has reviewed the charge in the amount of $883.40 and has determined that this charge was inadvertently included in the Fifth Application.  Accordingly, XRoads will reduce its charges by this $883.40 amount.

B.     <u>Airfare</u>

60.     The Reports state that XRoads has complied with the requirement that

airfare be billed at coach fares and that XRoads' applications all stated that XRoads professionals flew coach fare and booked flights in advance whenever necessary and possible to reduce cost to the Debtors.  Fifth Report at18-19; Sixth Report at 20.   Stuart Maue states that most of the descriptions for airfare did not include the location of the origin or destination of the travel. Id.

61.    XRoads' professionals use detailed descriptions for their airfare expenses in their expense reimbursement entries.  Stuart Maue is correct in its assumption that the vast majority of travel on this case was to and from Jacksonville, Florida, and therefore XRoads  personnel did not generally include such destinations and departure information.  If it is ultimately determined to be critical to the analysis of XRoads' airfare expense data that the origin and final destination of each travel expense entry be supplied, XRoads will research the additional detail required, however such research will require significant time to perform.  It should be further noted that some of the senior XRoads personnel performing services for the Debtors on this case traveled from California and New York, therefore airfare charges exceeding $1,000 for coach class fare for such travel was reasonable and periodically unavoidable.

62.    The Sixth Report identifies three charges for airfare totaling $1,917.99 which were for travel after November 21, 206.  Sixth Report at 18-19.  Stuart Maue does not address the fact that this airfare was purchased prior to November 21, 2006. XRoads professionals continued to provide services to the Debtor after November 21, 2006, for which this travel was required.  If the Court deems an adjustment to this travel expense is required, XRoads will make appropriate adjustments, and invoice Winn-Dixie for such charges.

C.      Lodging / Hotel

63.      The Fifth Report notes that XRoads daily average lodging cost was $116.01.    Fifth Report at 22.    The Sixth Report fails to note XRoads daily average lodging cost, however XRoads calculates such daily average lodging cost for the Sixth Application period as $153.    These daily average lodging costs were necessary, reasonable and appropriate amounts for the stays required.    The fact that on a couple occasions the nightly charge was in excess of the average is due to high occupancy periods during the relevant application periods.    XRoads submits that no adjustments are required.

D.      Other Travel Expenses

64.      The Reports identify that XRoads incurred meal charges of $25,175.43 during the two interim periods, however only $5,440.70 of this total cost was billed to the estate.    Fifth Report at 23; Sixth Report at 22.    XRoads did not bill for meals unless XRoads personnel were participating during the meal in a necessary meeting respecting the case.

E.      Ground Transportation / Rental Cars

65.      The Reports identify that XRoads personnel shared rental cars whenever possible and that XRoads voluntarily discounted the cost for car rental expenses to lower the car usage per professional to a ration of 1:3.    Fifth Report at 23-24; Sixth Report at 22-23.    No issues were identified in the Reports with respect to rental car charges.

66.      The Reports did not identify any issues with XRoads' other ground transportation charges.

F.      Transportation / Taxi and Train Fares

67.     The Reports correctly identifies a duplicate taxi chare in the amount of $40.50.  Fifth Report at 25-25.  XRoads will reduce its charges by this $40.50 amount.

G.      Mileage, Parking and Tolls

68.     The Reports identify the amounts requested for reimbursement of XRoads' mileage, parking charges and tolls.  Fifth Report at 26-27; Sixth Report at 24. The Fifth Report identifies a potentially duplicative parking charge in the amount of $12.00.  Fifth Report at 26-27.  XRoads will reduce its charges by this $12.00 amount.

69.     The Reports state that XRoads' mileage requests were itemized and included the date, timekeeper's name, amount charged, number of miles, rate per mile and the origin and destination of travel.  Accordingly, XRoads has complied with applicable Guidelines and Bankruptcy rules.

70.     Likewise, parking charges were itemized and included the date, timekeeper name, amount charged, and whether the charge was incurred at a hotel or airport.

H.      Photocopies

71.     The Reports identify photocopy charges of $103.05, which were charged at a rate of $0.15 per page.  Fifth Report at 27; Sixth Report at 24.

I.      One Day Airport Club Pass

72.     The Fifth Report identifies a reimbursement charge in the amount of $50.00 for a one day airport club pass required to transfer time sensitive information to Debtor's counsel, Skadden Arps. Fifth Report at 27.  XRoads will voluntarily reduce its charges by the $50.00 amount.

J.      Final Period

73.      In these cases, XRoads has taken voluntary fee and expense reductions totaling approximately $500,000.  The Sixth Report notes that when comparing XRoads interim fee applications to the final fee application, no difference between the amount requested for the final period and the total amounts requested in the interim applications after adjustment for reductions is being sought.  Stuart Maue's comparison of the interim applications revealed that XRoads is seeking $79,515.70 less than the computed amount of fees and $6,870 less than the computed amount for expenses. Sixth Report at 26.

**Conclusion**

74.      XRoads performed substantial and necessary services in these cases. XRoads believes that all of its fees and expenses billed to the Debtors were reasonable and necessary, subject to the reductions noted to in this Second Response and XRoads' First Response.  The total amount of XRoads voluntary reductions as set forth in the First Response and this Second Response are summarized on Exhibit A attached hereto.

75.   XRoads believes that its time entries and its Fee Applications have and will sufficiently allow the Court to determine the necessity and benefit of XRoads' services.

DATED: August 23, 2007

**XROADS SOLUTIONS GROUP, LLC**

Kipp Fagerstrom
Managing Director

(212) 610-5600
(212) 610-5601 (facsimile)

22

**Exhibit A**

**Summary of Voluntary Reductions
by XRoads Solutions Group**

|  | Description | First Response | Second Response | Totals |
|---|---|---|---|---|
| 1. | Computation Error | $        800.00 | $              - | $        800.00 |
| 2. | Duplicate Billing Entries | 42,012.00 | 2,036.00 | 44,048.00 |
| 3. | Tenth of the Hour Rounding Errors | 2,200.00 | - | 2,200.00 |
| 4. | Travel Time | 22,680.00 | - | 22,680.00 |
| 5. | Time Billed to the Wrong Case | - | 60.00 | 60.00 |
| 6. | Duplicate Coding Charges | 727.72 | - | 727.72 |
| 7. | Vague Time Entries |  | 810.00 | 810.00 |
| 8. | Duplicate Ground Transportation Charges | 291.20 | 52.50 | 343.70 |
| 9. | Duplicate Airfare Charges | 964.39 | 883.40 | 1,847.79 |
| 10. | Incorrect Hotel Charge | 154.29 | - | 154.29 |
| 11. | Reversal of Club Pass Expense | - | 50.00 | 50.00 |
| 12. | Transportation Charges in Excess of Cap | 1,255.76 | - | 1,255.76 |
|  | Totals | $     71,085.36 | $      3,891.90 | $     74,977.26 |