## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE:                                          )                    CASE NO.: 05-03817-3F1
                                                )
WINN-DIXIE STORES, INC. et al   )                    Chapter 11
                                                )
            Debtors.                        )                    Jointly Administered


### VISAGENT'S THIRD MOTION TO COMPEL, MOTION TO EXPAND TIME FOR DEPOSITION OF DEBTOR'S CORPORATE REPRESENTATIVE, MOTION TO COMPEL BETTER ANSWERS TO INTERROGATORIES, AND FOR SANCTIONS

Visagent Corporation (hereinafter "Visagent"), a claimant herein, moves the Court pursuant to Federal Rules of Civil Procedure 26 and 37 and Local Rule 7037-1, for an order compelling Winn-Dixie Stores, Inc. and twenty-three (23) of its subsidiaries and affiliates, as the Reorganized Debtors (hereinafter the "Debtors"), to produce those documents ordered to be produced and agreed to be produced, to fully respond to Visagent's discovery requests as supplemented by Debtor's corporate representative's deposition testimony, for an award of attorneys fees and sanctions, for an order expanding the time constraints to complete the deposition of Debtors' corporate representative.  In support of the motion, Visagent states:

1.      Visagent, an unsecured creditor, holds Claim No. 9953 against Debtors in the sum of $131,875,000.00. In the Amended Notice of Claim, filed herein, Visagent contends Debtors materially and substantially breached an exhaustively negotiated Service Agreement entered into between the parties on June 15, 2001, effective June 28, 2001.  Under the terms of this Agreement, Debtors were obligated for three (3) years to exclusively utilize the services of Visagent for the procurement and sale of all merchandise it acquired or sold, through internet or similar electronic means, including any means utilizing facsimile, from and through the secondary market. The secondary market is comprised of all sources (buyers and sellers) of merchandise other than direct purchases and returns from original product manufacturers. Visagent avers that Debtors breached its contractual obligation in failing to exclusively utilize Visagent's services as

1

provided for in the Service Agreement, and as a result, Visagent suffered damages amounting to 2% of all transactions in which Debtors participated in the purchase or sale of goods in the secondary market, other than those exempted by the Agreement.

Additionally, Visagent claims Debtors violated federal and state laws in connection with the theft and usurpation of trade secrets, proprietary information and business opportunities belonging to Visagent, which were provided to Debtors based on false promises by the Debtors of a continued business arrangement between the parties. Visagent relied on the unrealized inducements and promises of the Debtors to its detriment and suffered catastrophic damages as a direct consequence of Debtors' actions.

2.      Debtors objected to Visagent's claims asserting it did not breach a duty to Visagent and Visagent failed to adequately perform under the terms of the Agreement.

3.      On July 23, 2006, Visagent served upon Debtors its First Request for Production, Interrogatories and Requests for Admissions, a copy of which is attached hereto as Exhibit A.  On August 25, 2006, Debtors served their Response to Visagent Corporation's First Request for Production of Documents, attached hereto as Exhibit B, and Debtors' Response to Visagent Corporation's First Set of Interrogatories, attached hereto as Exhibit C.

4.      On April 18, 2007, Visagent Corporation served upon Debtors its Second Request for Production, a copy of which is attached hereto as Exhibit D.

5.      On May 3, 2007, Visagent served its First Motion to Compel:  Production of Documents, Better Answers to Visagent's First Set of Interrogatories and The Deposition of Debtors' Corporate Representative.  A hearing was held on June 14, 2006 and an order signed on June 21, 2007, a copy of which is attached hereto as Exhibit E.  A corrected Order was signed on July 30, 2007 a copy of which is attached hereto as Exhibit F.

6.      A Second Motion to Compel was served on May 29, 2007 and has yet to be set for hearing by the Debtors, although requested by Claimant on several occasions.

7.      In pertinent part, the Court ordered as follows:

"Visagent Corporation's motion to compel the Debtors to produce original documents responsive to Document Request Numbers 1, 2 and 3 is denied as moot because of Debtor's prior agreement to produce the originals of the copies of the documents the

Debtors have produced responsive to such Document Requests which are in Debtor's possession, custody or control."

8.    The applicable document requests are as follows:

DOCUMENT REQUEST NO. 1:  For the time period of June 28, 2001 to June 28, 2004, produce copies of all documentation regarding purchases or sales of any goods in the secondary markets in which any electronic means were utilized, including but not limited to, through the Internet, via facsimile, email or through the use of any electronic device.  This request specifically includes, but is not limited to, all invoicing, receipts, orders, order confirmations, billing, bills of lading, checks, bank drafts, wire transfer orders or confirmations or any other responsive data, whether or not actually printed on paper or retained by other data storage means.

DOCUMENT REQUEST NO. 2:    Produce copies of all correspondence between the Debtor and Visagent for the period January 1, 2000 and January 1, 2005.

DOCUMENT REQUEST NO. 3:  Produce copies of all internal communications of and between employees of the Debtor for the period January 1, 2000 and January 1, 2005, referencing in any way Visagent Corporation.

9.    The Court further ordered that "(t)he Debtors shall make a reasonable effort to locate documents regarding their communications with Dayman & Associates during the period June 28, 2001 to December 28, 2004 and to produce such documents in the Debtor's possession, custody or control." ( DOCUMENT REQUEST NO. 4:  Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and Dayman & Associates, Inc. Grocers for the period June 15, 2001 to present.)

10.    In its First Motion To Compel, Visagent moved to compel Debtors to respond to the following Document Requests:

DOCUMENT REQUEST NO. 5:    Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and Victory Wholesale Grocers for the period June 15, 2001 to present.

3

DOCUMENT REQUEST NO. 6: Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and C&S Wholesale Grocers for the period June 15, 2001 to present.

DOCUMENT REQUEST NO. 7:  Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and Food Marketing Group for the period June 15, 2001 to present.

DOCUMENT REQUEST NO. 8: Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and WorldWide Retail Exchange for the period June 15, 2001 to present.

DOCUMENT REQUEST NO. 9: Produce all emails, faxes, memos, correspondence or any other communications, no matter how transmitted or received, between the Debtor and intesource, Inc. for the period June 15, 2001 to present.

The Court directed that "Debtors shall produce documents responsive to Document Request Numbers 5 through 9 for the period June 28, 2001 through December 28, 2004 which are in Debtor's possession, custody or control which the Debtors have not already produced."

11. Counsel for Visagent made numerous written requests to schedule an inspection of the documents Debtors agreed to produce and those they were ordered to produce. Finally, the undersigned extracted an agreement from counsel for Debtors that he would be at their offices to inspect the documents they agreed to produce and ordered to produce as set forth in the First Request to Produce and as agreed in the Second Request to Produce at 9:00 a.m. on August 22, 2007, over two (2) months after the Court's ruling on the motion. At the appointed date and time, five (5) members of Visagent's legal team appeared to inspect documents who were shown to a room which contained documents produced by Debtor. In response to the ten (10) requests at issue, Debtor produced three (3) white three ring binders, about two to three inches in width, containing some papers. One was untitled and the others were labeled "VISAGENT" and "VISAGENT ISSUES."  Debtor also produced for review one red accordion file regarding "Daymon/FMG documents" and a loose stack of papers. The "Daymon/FMG" documents did not contain a single item pertinent to the diverting business conducted

between Debtors and Daymon. It is inconceivable that when Debtors conducted millions of dollars in business with Daymon that there would exist absolutely no documentation of same.

12.     Debtor produced no documents responsive to Requests 5 through 9.

13.     On August 23, 2007, Visagent's counsel, Ms. LaForge sent an e-mail to Counsel for Debtors, a copy of which is attached hereto as Exhibit H. requesting a response to three (3) separate inquiries.  First, whether Debtors previously produced all of the documents claimed to be a complete production, since one (1) particular document that was produced at the physical inspection, had never been produced previously.  Ms. LaForge asked that counsel for Debtor (Mr. Gay) reference another bates number in the prior production referencing this same document.   Second, Ms. LaForge requested a mechanism to correlate dates and times to the Instant Messages in the Production.  Third, Ms. LaForge requested an expansion of the hour limitation for the deposition of the corporate representative in light of the late production of documents by Debtor.
Counsel for Debtor, through Mr. Gay summarily responded to these requests stating "we will *attempt* to determine if the [identified] document has been previously produced and the dates of the instant messages."   Mr. Gay and Debtor has refused to agree to an expansion of time for the corporate representative deposition.   (A copy of Mr. Gay's response is attached hereto as Exhibit I.)

On the same date, Ms. LaForge sent another e-mail to counsel for the Debtors, a copy of which is attached hereto as Exhibit J, advising that the production was inadequate.  To date, Debtors have not fulfilled their agreement to secure the requested information and have failed to comply with the Court's July 30, 2007 Order.

14.     Moreover, during the deposition of the corporate representative, Tom Barr, it was discovered that Debtor's efforts to locate and produce those items responsive to Visagent's First and Second Request for Production were less than diligent. Mr. Barr testified that an e-mail was sent from the Debtors' legal department to current employees requesting documents in their possession responsive to the First Request for Production (Page 111)   Mr. Barr stated that he had a few binders of responsive materials that he turned over to the legal department, but there could have been documents responsive to

the requests that he did not possess. (Page 112-113) He further testified as follows commencing at page 115, line 1 of the deposition:

Q    Well, again, you're the corporate representative here, and you're supposed to know what Winn-Dixie knows about this lawsuit and about all of the categories of items in the notice.

Q     So my question to you is, what is the total world of documents and where were they when we requested them?

MR. BOLLING:  Objection.

A    I know there's like 10,000 pages of paper.

Q    Where did they come from?

A    From different sources.  But I did not read every one of those 10,000 pages.

Q    Without telling me what they said, do you know where they came from, which specific employees or departments they came from?

A    I would assume they came -- no.  They would come from the procurement department.  Who had them?  I cannot answer that question.

Q    How did they get from procurement to legal?

A    That would be something you'd have to ask somebody else.  I do not know.

Q    Well, you're the corporate representative.

A    I understand.

Q    But you don't know that?

A    No, sir.

Q    So you don't know -- as the corporate representative you don't know whether we have all of the correspondence that's requested in Document Request Number 2?

MR. GAY:  Objection.

A    No.

Q    Do you know whether we have all internal communications between employees of Winn-Dixie referencing in any way Visagent?

MR. GAY:  Objection.

A    No.

Q    Do you know whether every internal communication as requested in Number 3 was provided to your attorneys for review?

A    No.

Q    Same question for Document Request Number 2. Do you know whether every copy of every correspondence between Visagent and Winn-Dixie for that time period was

> provided to your attorneys?
> A   No.
> Q   Do you know whether the documents requested in Number 4 have all been provided to your attorneys for production in this case?
> A   No.

Continued questioning of Mr. Barr revealed that he was not involved in collecting documents responsive to Request No. 4 (p. 117) and could not testify whether the information requested was provided by Debtors to Visagent. (p. 117)

15.    The following questions were posed and answers given regarding Document Requests No. 5. (Page 117):

> Q   Request Number 5.  We've asked for all communications between Winn-Dixie and Victory.
> Did you do anything -- did you have any personal involvement to collect any such documents?
> A   No.
> Q   Do you know where they would have been stored for that time period, 2001 to, let's say, the end of 2004?
> A   No.
> Q   Were you -- as corporate representative were you made aware of what efforts any other Winn-Dixie employee made to collect the documents requested in Number 5?
> A   No.
> Q   And as we sit here today, as the corporate representative you don't know whether all of these documents have been provided by Winn-Dixie to your attorneys in the context of this case?
> A   No.

16.    The same questions were posed to Mr. Barr regarding other Document Requests (6 through 9) and he gave the same answers.  He was not involved in locating documents responsive to the Requests, he did know anyone at Winn Dixie who had personal involvement in locating documents, he did not know what documents were produced and he did not know if all of the responsive documents were, in fact, produced. (Page 118-119) He further indicated that he did not speak with anyone about locating responsive documents and he did not personally undertake to locate such documents. (Page 120)  Typical of the questions and answers is the following (Page 118):

> Q   Were you -- as corporate representative were

you made aware of what efforts any other Winn-Dixie
employee made to collect the documents requested in
Number 5?

A   No.

Q   And as we sit here today, as the corporate
representative you don't know whether all of these
documents have been provided by Winn-Dixie to your
attorneys in the context of this case?

A   No.

Q   Same for Document Request Number 6.  Did you
have any personal involvement in trying to find
CNS-related documents?

A   No.

Q   Do you know of anyone else who did at
Winn-Dixie?

A   No.

Q   Do you know whether Winn-Dixie has provided any
documents, or all of the documents rather, requested in
Number 6 to your litigation attorneys?

A   No.

Q   Document Request Number 7:  All communications
between Winn-Dixie and Food Marketing Group.

Did you have any involvement in trying to put
together those documents?

A   No.

Q   Do you know who did?

A   No.

Q   Do you know if anybody did?

A   No.

Q   Do you know if any documents or -- do you know
if all the documents responsive to 7 have been given to
litigation counsel for Winn-Dixie?

A   No.

Q   Number 11 requested business transaction
reports between the debtor and Victory.

Did you make any attempt to collect business
transaction reports?

A   No.

Q   Do such documents exist, to your knowledge?

A   I'm not real sure what business -- what -- what
the scope of that is.

Q   Transaction reporting.

You know what transaction reporting is, don't
you?

A   Yes.

Q   Okay.  Do you know if there are transaction

8

reports that are done on -- that were done during this particular time frame which show the business between Winn-Dixie and Victory?

A    All reports that I have have been turned over to legal.

Q    Right.  My question to you:  As the corporate representative are you aware of any other types of reports other than what you had that show business transactions, either individual or aggregated, like annual or quarterly reporting, showing the business between Victory and Winn-Dixie?

A    No.

Q    In preparation for this deposition have you spoken to anyone about whether or not such documents might exist?

A    No.

Q    Have you attempted to locate the documents that were not in your area, your box?

A    No.

17.    Another disturbing theme to Mr. Barr's testimony was the complete lack of effort by Debtors' to secure any responsive documents from any former employees either by interviewing them or searching their files or archived files.  (P. 122) Illustrative of this line of questioning is the following (Page 122):

Q    Did you ever ask Mr. Mills whether he had any communications to or from Victory?

A    No.

Q    So you wouldn't know if he had any communications in the files that he had left when he retired, would you?

MR. BOLLING:  Objection.

A    No.

Q    So there may be documents there; right?

A    I -- I do not think so.

Q    You're guessing that there aren't.  You don't know one way or the other, do you?

MR. BOLLING:  Objection.

A    I don't know that there are.

Q    Okay.  Same thing for documents that may have come to or from Mr. Payment?

MR. BOLLING:  Objection.

A    Yes.

Q    And that would be the similar answer with regard to CNS communications?

MR. BOLLING:  Objection.

A    Yes.

Q    Same answer with regard to Purity communications?

MR. BOLLING:  Objection.

A    Yes.

Q    Same answer with regard to FMG communications?

MR. BOLLING:  Objection.

A    Yes.

Further, Mr. Barr never researched the e-mail or instant message files of former employees who had intimate knowledge of the relationship between Visagent and the Debtors (p. 146) and he did not know if anyone at Winn Dixie had done so (p. 158):

Q    Did you check the e-mail files of Mr. Payment, or Mr. Mills, or Mr. Sheehan to determine whether this document was there in their e-mails?

A    No, sir.

Q    As the corporate representative, for this deposition could you have gained access to their e-mails to look at all of the e-mails that they may have had with Visagent?

MR. BOLLING:  Objection.

A    None of these people are with Winn-Dixie.

Q    Their accounts are still somewhere on servers of Winn-Dixie, aren't they?  E-mail accounts.

MR. BOLLING:  Objection.

A    I do not know that.

Q    You don't know?  You don't know whether there are archived e-mail files?

A    I -- I do not know that.

Q    Did you ask anyone whether archived e-mail files exist?

A    I did not.

Q    You have not?

A    I have not.

Q    Well, as the corporate representative and a person who was involved in collecting documents -- strike that.

I think the first question on the request to produce was produce all communications between the parties; right?  We went over that.

A   Yes.

Q   Okay.  This is a communication between the parties, is it not?

A   It appears to be, yes.

Q   Okay.  And Winn-Dixie did not go into all of the archived files to produce all of the e-mails between it and Visagent --

MR. BOLLING:  Objection.

Q   -- in this case?

A   As far as I know, every piece of paper has been given to legal that we had available to us.

Q   Who gave all of the e-mails from every person who had an e-mail account that had anything to do with Visagent to the lawyers for Winn-Dixie?

A   I do not know that.

Q   You don't know if that even exists -- you don't even know that that happened, do you?

A   As far as I know, everything that we had available to us was given to our legal attorneys.

Q   What facts do you base that on?

A   Just the knowledge I have of this.

Q   Right.  What facts are you aware of that indicate to you that someone went in to the e-mail archives, looked for communications between Winn-Dixie and Visagent, and then produced them to your litigation lawyers?

A   I do not know that.

18.    The lack of diligence on Debtors' part in locating and retrieving responsive documents to the Requests for Production violates the June 14, 2007 Order of this Court and smacks of bad faith thus warranting the imposition of attorneys' fees and sanctions. It is now more than five (5) months since the Court's hearing on Visagent's First Motion to Compel and Debtors have not produced the documents agreed to and ordered by the Court.  There is still pending a Second Motion to Compel, which Debtors initially refused to schedule. Under FRCP 37, the Court has the inherent powers to impose sanctions to achieve the orderly and expeditious disposition of cases where a party's conduct disrupts or impairs the judicial process.   The Court's attention is respectfully directed to the matter of <u>Action Marine, Inc. v. Continental Carbon, Inc.</u>, WL 2301897 (M.D. Ala., 2007).  The Court found that monetary sanctions, including attorney fees and expenses, were warranted for defendant's failure to disclose documents in

response to properly promulgated discovery requests and prior orders of the Court where the requested documents went directly to the key issues in the case, and the defendant willfully, openly and in bad faith refused to comply with direct orders from the Court. Visagent moves this Court for an order, compelling within thirty (30) days, the production of all previously requested and ordered documents identified in this Motion, together with appropriate sanctions sufficient to put Debtor on notice that discovery misconduct will not be tolerated by this Court.

**Motion To Compel Further Deposition of Debtor's Corporate Representative and For Court's Instruction and Admonition to Comply With Requirements Of Federal Rules of Civil Procedure**

19.    Mr. Barr appeared at the deposition as the duly appointed corporate representative of Debtors.  (Deposition Transcript at page 5, Line 13)  Marked as Exhibit 1 was the Re-Notice of Taking Deposition Adding Notice of Videotaping and Expanding 30(b)(6) Areas of Knowledge dated April 4, 2007. Attached hereto as Exhibit K is a copy of this Notice.  Mr. Barr was questioned as to his preparedness to answer questions pertaining to the subparagraphs describing a particular area of expertise. He indicated that he held the requisite knowledge to answer questions regarding subparagraphs 1 through 7, 9, 12 and 17 and had prepared by meeting with his counsel and reviewing "just a few papers" for the deposition. (Deposition Transcript pages 13 through 19, 29, 51, 52, 72) He readily admitted he did nothing else to prepare for the deposition.

20.    As the corporate representative, Mr. Barr was unable to field questions relating to the areas of knowledge listed in the Notice.  He could not answer inquiries directed to the technical aspects of the parties' relationships.   By way of example, see page 39-40 and page 46 of the transcript:

>    Q   Do you know one way or the other whether the
> NTS came in to your computer by what's called TCIP?
>    A   No, sir.
>    Q   You don't know one way or the other?
>    A   No, sir, I don't.
>    Q   Okay.  Would it be fair to say that you cannot
> help us with the technical aspects of how you were able

to access the NTS on your computer at the Deerwood
office?

    MR. BOLLING:  Objection.

A  I'm -- I'm not a computer person.

Q  Okay.  So would it be fair that you cannot help
us with any of the technical aspects of how you were
able to access the NTS on your computer at the Deerwood
office?

    MR. BOLLING:  Objection.

A  Yes.

Page 46

Q  Okay.  Did all buyers have access to the
internet in 2000?

    MR. BOLLING:  Objection.

A  I do not know.

Q  Who would know?

A  An IT person.  That's who I would go to.

He was also unable to answer inquiries about the negotiation of the Service Agreement
and the intentions of those who negotiated on the part of the Debtors:

Q  Thank you.  Now, did you have any involvement
in the negotiation of the service agreement itself?

A  No.

Q  Okay.  So when I ask you questions about the
service agreement, from the Winn-Dixie standpoint how
are you going to answer what Mr. Mills, for instance,
intended in signing the con- -- Mr. Payment intended in
signing the contract, if you haven't talked to
Mr. Payment?

    MR. BOLLING:  Objection.

A  I'm -- I'm the best person available to talk
about the service agreement today.

Q  Today.  Okay.  Well, did you know what
Mr. Payment intended the service agreement to mean when
he signed it?

A  No.

Q  Okay.

21.    In the Notice served upon Debtors, the corporate representative to be
produced was to have knowledge of:

"11.    Purchases and sales through or facilitated by Food Marketing Group (FMG)
during the time period of 2000 through 2005; 12. All aspects of the relationship and
dealings between Debtor and FMG during the time period of 2001 through present."

Not only was Mr. Barr unable to answer inquiries into these areas, he took no actions prior to the deposition to become informed as to these areas as the designated corporate representative.  Illustrative of this is the following excerpt at page 46:

> Q    Okay.  And you can say with certainty that they never communicated any deal information other than by phone or fax during the entire time that Winn-Dixie did business with FMG?
>
> A    No.
>
> Q    You can't say that?
>
> A    No.
>
> Q    Okay.  Why not?
>
> A    Because I do not know.
>
> Q    Why don't you know?
>
> A    I do not know if they sent an e-mail or not.
>
> Q    What did you do to find out whether or not they did?  You were the -- let me just give you a preface to that question.  I'll re-ask that question.
>
> You have appeared as the corporate representative for Winn-Dixie; correct?
>
> A    Yes.
>
> Q    You have agreed to be responsible to talk about any purchases or sales through or facilitated by Food Marketing Group during the period of 2000-2005; correct?
>
> A    Yes.
>
> Q    What did you do to find out how offers were communicated to Winn-Dixie by FMG?
>
> A    I can't answer that question.
>
> Q    Why?
>
> A    Because I don't -- I do not -- we were not a trading partner of FMG.  They had a network of trading partners.  Our business with FMG would have been little to none during this time frame because we were not on their trading partner list.  We were not a member of their trading partner list.
>
> So you asked could they have sent us a quote.  Yes, but that would have been out of the ordinary for us to do business with FMG.
>
> Q    Okay.  So your testimony is that Winn-Dixie did little to no -- little to none buying or selling in the surplus goods market during this entire time frame of 2000 through 2005; correct?
>
> A    A little.
>
> MR. BOLLING:  Objection.
>
> Q    A little?
>
> A    Little.

Q    What does that mean?

A    Well, it may not mean none.

Q    What does little mean?

A    Small.

Q    In dollar amounts what does little or small mean?

A    I can't answer that.

Q    Why not?

A    Because I do not know in dollars.

Q    Didn't you have a responsibility by agreeing to be here as the corporate representative to find out what the trading volumes were with FMG, which is specifically identified?

MR. BOLLING:  Objection.

A    I do not know the dollar amount.

Q    My question to you is, do you agree that you had a responsibility to find out what information existed to the areas that I told through your attorneys we were going to be discussing today?

MR. BOLLING:  Objection.  Calls for a legal conclusion.

A    I -- I cannot answer that.

Q    Did you take any steps whatsoever to learn any of the detailed information about trading with FMG during this time frame prior to sitting for this deposition?

A    No.

The exchange continued at page 56:

Q    Did you understand prior to sitting down for the deposition that you had a responsibility to learn the information, if you didn't know it?

MR. BOLLING:  Objection.

A    I was not aware I needed to know specific dollars.

Q    Did you read this list before today?

A    Yes.

Q    Well, what does it mean to you:  Purchases and sales through or facilitated by Food Marketing Group -- this is Number 11 -- FMG during the time period of 2000 and 2005?

A    Did you have purchases and sales with FMG? Yes.

Q    And --

A    That would have been my answer.

Q   That's all you thought that you were responsible to do, was to answer that one question about whether or not you had sales or purchases?

A   I have no idea what you were going to ask.

Q   I don't want to know what you discussed with your attorneys, but did they, in general, tell you what your responsibilities were with regard to being a corporate representative?

MR. BOLLING:  Objection.

And I'd ask you not to divulge anything that we talked about, pursuant to the attorney/client privilege and work product doctrine.

Q   Nobody told you that you needed to obtain information before -- that wasn't resident in your head before sitting for this deposition?

MR. BOLLING:  Same objection.

And ask you not to answer.

Q   Well, the question is, outside of your attorneys no one told you that -- what -- that you needed to be prepared to answer questions about these subjects?

A   I saw the questions.  I was not aware that I needed to be prepared to talk specific dollars by person or company.

Q   Okay.  Well, you haven't been able to answer specific dollars, and you also haven't been able to answer whether or not there were e-mail communications on offers either.  You couldn't say one way or the other with any certainty; true?

MR. BOLLING:  Objection.

A   I -- I cannot tell -- I can tell you I do not recall getting offers via e-mail, but --

Q   What did you do --

MR. BOLLING:  Let him finish his answer.

Q   Go ahead.

A   As far as dollars per specific supplier I'm not prepared to give you that we did $102 with a specific company.

Q   Right.  Did you look back at all of your e-mails with FMG for this time frame in preparation for this deposition?

A   No.

Q   Did you ask any employee in sales, all those 20 people, whether they did -- had any e-mail communications with FMG during this time frame?

A   No.

Q    You could have, couldn't you?

A    Yes.

22.    The same questions were posed to Mr. Barr with regard to Victory (Areas 7 and 8 of the Notice) at page 58 of the deposition:

> Did you look at your e-mail -- your back e-mails for this time frame, 2000 through 2005, to determine one way or the other whether you communicated deal information by e-mail with Victory at any time?
>
> A    I did not look at e-mails.
>
> Q    You did not look at your old e-mails?
>
> A    No.
>
> Q    Did you look at anyone else's e-mails from the sales department?
>
> A    No.
>
> Q    Did you ask any of the sales employees whether they remember doing business through e-mails with Victory?
>
> A    No.
>
> Q    Are any of those salespeople still working for Winn-Dixie?
>
> A    Buyers?
>
> Q    Buyers, yes.
>
> A    Yes.
>
> Q    Okay.  So you could have asked those questions. You could have gone around and asked those questions; correct?
>
> A    Yes.
>
> Q    But you didn't think that that was necessary for this deposition?
>
> A    No.

23.    In response to inquiries regarding Areas 13 and 14 of the Notice, Mr. Barr gave similar answers, advising that he did not undertake any efforts to educate himself on the relationship between Debtors and the WWRE (Page 68) and was therefore unable to answer questions regarding same.   Regarding Areas 15 and 16 concerning debtors relationship with Intesource, the following exchange occurred at page 69 of the transcript:

> Q   Did you ever -- was the Intesource tool ever used in connection with Winn-Dixie buying product?
>
> A    The information from it was used to buy product.
>
> Q    Right.  How much product?

A    I cannot answer that question.

Q    Why?

A    I do not know.

Q    Okay.  Well, did -- let me just go to the specific heading on the notice of taking deposition: All aspects of the relationship and dealings between debtor and Intesource during the time period of 2000 through the present.

Okay.  This is not asking for sales with Intesource or purchases from Intesource; correct?

A    Correct.

Q    This is just asking about all aspects of the relationship and all dealings with Intesource.

So let me go back to my last question, which was:  What did you do in preparation for sitting as the corporate representative to make yourself familiar with all aspects of the relationship and dealings between Winn-Dixie and Intesource?

A    I did not have any communication with anyone on dealings with Intesource and Winn-Dixie.  I know what I know about Intesource.

Q    All right.  So you didn't do anything to prepare on this subject, did you?

A    No, sir.

Q    And you didn't talk to anybody?

A    No, sir.

Q    And you didn't review any documents?

A    No, sir.

Q    Was there an Intesource contact with Winn-Dixie that you know of?

A    I -- I am sure there was.  I do not know that person's name.

Q    Okay.  Had you researched prior to this deposition you'd know that name, wouldn't you?

MR. BOLLING:  Objection.

A    I do not know if I would or not.

Q    Well, is this --

A    I may --

Q    -- a secret?

A    I may have found the name.

Q    Is it a secret within Winn-Dixie who was the contact person with Intesource?

Q    Would you know if -- if -- if someone -- if a judge were to ask you or direct you to use whatever resources in Winn-Dixie there are today to find out who was the contact person between Winn-Dixie and Intesource

you'd be able to do that, wouldn't you?

MR. BOLLING:  Objection.

A    I would try, yes.

Q    Is there any doubt in your mind that you'd be able to look through files and find out who the main person at Winn-Dixie was to deal with Intesource?

A    I do not know that there's files out there.  I -- I -- I do not know.

Could I find a contact?  Yes.

24.    Further inquiry of Mr. Barr regarding Area 18 and 19 of the Notice produced the following testimony commencing at page 73:

Q    Okay.  Number 18: All aspects of the outside sales program in connection with Visagent or any other entity during the time period of 2001 through the present.

What did -- what did you do to familiarize yourself with the outside sales program?

A    I -- I know about it.

Q    Did you read any documents?

A    No, sir.

25.    The testimony continued at page 78:

Q    All right.  Number 19 is:  The administration of the service agreement between Visagent and Winn-Dixie which is the subject of this litigation, including all transactions by Winn-Dixie made pursuant to said agreement.

What documents -- did you review any documents in preparation for answering questions as to Number 19?

A    I've seen the user agreement.

Q    Other than the user agreement.

A    No, sir.

Q    What individuals have you spoken to in preparation for answering questions as to Number 19?

A    No one.

Q    And you say you did not speak with Mr. Mills specifically about this category in your conversations with him at lunches or any other social gathering?

A    Mr. Mills was aware there was a lawsuit, and specifically I do not recall ever asking or talking about something specific.

Right.  Were you involved in the negotiations for the service agreement?

A    I was in attendance.

Q    In attendance at what?

A    At several meetings.

Q    At meetings.  Were you in attendance in every meeting?

A    I can't say that I was.

Q    All right.  In order to answer questions completely about Category Number 19 you'd need to speak to someone who was in each of the meetings, wouldn't you?

      MR. BOLLING:  Objection.

A    I do not know that -- that everybody was at every meeting.

Q    No, I'm -- that's exactly what I'm saying.  If different people are at different meetings, then you'd need to speak to at least one person at every meeting to have a complete picture of the negotiations, wouldn't you?

A    I do not think so.

Q    Well, how would you know what happened in a particular meeting that you didn't attend and you haven't spoken to anybody about?

A    You wouldn't.

Q    So you are assuming that some meetings were inconsequential to Category Number 19?

A    I'm sure no meeting is inconsequential.

Q    Well, then how would you answer questions about a meeting that you have not obtained any information about?

A    You asked did I attend every meeting.  I do not -- I may have attended every meeting, and I may not have.  I don't know.  I don't know that anybody attended every meeting.  You don't know that.

Q    Right.

A    If there was five meetings, maybe I was at all five, or maybe I wasn't.  I do not know how many meetings there were.

Q    Okay.  You're the corporate representative; right?

A    Yes, sir.

Q    Corporate representative is supposed to know -- is speaking on behalf of Winn-Dixie; right?

A    Yes.

Q    So Winn-Dixie as an entity has employees working for it; right?

A    Yes.

Q    And, hypothetically, if there's a meeting on Tuesday, Thursday, and Saturday of any given week, and

there's a Winn-Dixie employee at every meeting,
Winn-Dixie has done something on Tuesday, Thursday, and
Saturday; correct?

A    Yes.

Q    All right.  Now, how would you as the corporate
representative know what happened on Thursday if you
haven't established whether there was even a meeting on
Thursday?

MR. BOLLING:  Objection.

A    I can't answer that.

Q    So you don't know when all the meetings took
place, do you?

A    No.

26..    Similar testimony was adduced regarding Areas 20
(Page 82):

…….. and I don't want to rehash what your answers
were, but would it be correct to say that you have not
done anything to prepare for this deposition with regard
to the items in Number 20 in terms of reading documents
or talking to people to get further educated about
Number 20 so you'd be prepared as the corporate
representative?

MR. BOLLING:  Objection.

A    I have not read any documents.  There's really
nobody for me to talk to, because there's not very many
people left at Winn-Dixie.

Q    Right.  Well, why would the person have to be
at Winn-Dixie for you to talk to them?

A    They would not have to be.

Q    Right.  So it wouldn't have prevented you from
talking to Mr. Mills about why he signed the service
agreement, or what he meant by the wording that was used
in the service agreement; right?

A    Yes.

Q    But you didn't talk to him about that, did you?

A    No, sir.

Page 87:

Q    Did you speak to Ron Peterson about this
category, Number 20?

A    No, sir.

Q    Did you speak to Chris Wilson?

A    No, sir.

Q    They had interaction with Visagent employees,
didn't they?

A    I do not know.

Q    Okay.  And you don't know because you never

asked?
A    I did not ask.

27.    Federal Rule of Civil Procedure 30 requires that when a corporation is to be deposed the corporation is required to produce and prepare one or more persons with requisite knowledge as corporate representatives to testify as to the subject matters upon which the opposing party planned to inquire pursuant to the notice of deposition. Quantochrome Corp. v. Micromeritics Instrument Corp., 189 FRD 697 (S.D. Fla., 1999) The party seeking discovery may simply name the corporation as the deponent.  It is then the duty of the corporation to name one or more persons who consent to testify on its behalf and theses persons must testify as to matters known or reasonably available to the corporation.  Not only must the corporation designate a witness, but it is responsible also to prepare the witness to answer questions on the topics identified and present the corporations knowledge on those topics. Geico Casualty Co. v. Beauford, WL 1192446 (M.D. Fla., 2007) When producing a corporate representative for deposition, a corporation's duty extends beyond the mere act of producing a human body to speak on the corporation's behalf.  Quantochrome, supra.  In analyzing Rule 30 (b)(6), the Court in New World Network, Ltd. v. M/V Norwegian Sea, WL 1068124 (S.D. Fla., 2007), stated that if a designated deponent cannot answer those questions regarding the subject matter listed in the notice, then the corporation has failed to comply with its obligations and may be subject to sanctions.

28.    A clear reading of the above illustrative excerpts form the deposition testimony of Tom Barr  indicates that the Debtors failed to comply with their Rule 30 (b)(6) obligations in that Mr. Barr was not prepared to answer questions in many of the areas of inquiry listed in the Notice.  Debtors never objected to the Notice and listed subject matters as irrelevant to the claims and defenses in this matter and have never offered to produce additional representatives to address those areas to which Mr. Barr could not respond.

29.    Prior to commencing the deposition of the corporate representative, this affiant sought to extend the presumptive time limitation of seven (7) hours by agreement between the parties.  Debtors were unwilling to extend the time.  Absent an agreement

between the parties, a court order is necessary.  Claimants seek an additional one day of seven (1) hours to continue the deposition of the corporate representative.

30.     As can be seen from the excerpts of testimony provided in this motion, an inordinate amount of time was expended merely questioning Mr. Barr as to the extent of his knowledge regarding the listed subject areas and the efforts made by the Debtors to comply with the discovery requests and Court order.  There are numerous areas of inquiry to be addressed and hundreds of documents.  The relevant time period is in excess of 4 1/2 years in duration.  One day of seven hours was not sufficient to complete the deposition because of the volume of material to be covered and additional time is needed for a fair examination.  Debtors refusal to stipulate to this additional time is indicative of their  entirely obstructionist posture regarding the discovery process.

31.     In its First Motion to Compel, Visagent Corporation sought to compel Debtors to answer the following Interrogatories:

INTERROGATORY NO. 6: State the total dollar amount of Winn-Dixie purchases of full or truckload quantities of consumer packaged goods purchased or resold in a wholesale format in the secondary market:

    a.  For the period June 28, 2001 through June 27, 2002.
    b.  For the period June 28, 2002 through June 27, 2003.
    c.  For the period June 28, 2003 through June 27, 2004.
    d.  For the period June 27, 2004 through February 21, 2005.
    e.  For the period February 21, 2005 through present.
    f.  For each of the time periods in a through e of this interrogatory, state the total secondary market transactions by purchases, by sales for full or truckload quantities and by less than full or truckload quantities.

INTERROGATORY NO. 7: State the total dollar amount of Winn-Dixie sales of full or truckload quantities of consumer packaged goods purchased or resold in a wholesale format in the secondary market:

    a.  For the period June 28, 2001 through June 27, 2002.
    b.  For the period June 28, 2002 through June 27, 2003.
    c.  For the period June 28, 2003 through June 27, 2004.
    d.  For the period June 27, 2004 through February 21, 2005.
    e.  For the period February 21, 2005 through present.
    f.  For each of the time periods in a through e of this interrogatory, state the total secondary market transactions by purchases, by sales for full or truckload quantities and by less than full or truckload quantities.

INTERRROGATORY NO. 8: State the total dollar amount of Winn-Dixie purchases of full or truckload quantities of consumer packaged goods purchased or resold through the services of Victory Wholesale Grocers between June 28, 2001 and July 1, 2002.

INTERRROGATORY NO. 9: State the total dollar amount of Winn-Dixie sales of full or truckload quantities of consumer packaged goods purchased or resold through the services of Victory Wholesale Grocers between June 28, 2001 and July 1, 2002.

INTERROGATORY NO. 12: State the total dollar amount of Winn-Dixie purchases of full or truckload quantities of consumer packaged goods purchased or resold through the services of intesource, Inc. between June 28, 2001 and June 27, 2004.

INTERROGATORY 13: State the total dollar amount of Winn-Dixie sales of full or truckload quantities of consumer packaged goods purchased or resold through the services of intesource, Inc. between June 28, 2001 and June 27, 2004.

INTERROGATORY 14: List all wholesalers that provided electronic data transmissions detailing "in stock" product availability during the period January 1, 2000 though January 1, 2005.  Include the date that any listed entity or individual began such transmissions and the gross value of purchases and sales, by month, for each.


32.    The Court denied Visagent Corporation's motion to compel regarding Interrogatory Numbers 6 through 9 and 12 through 14 without prejudice. In actuality, Visagent withdrew its application to compel a response to Interrogatory 14.  However, in making its ruling the Court remarked:

THE COURT:  Well, you didn't say each purchase of each full and truckload quantities, you just said -- like I read it, I thought full and truckload means the same thing. It's full or a  truckload, a full load and a truckload.  Maybe I'm wrong.  I mean, I'm not making a ruling here of what it means.  I'm saying, why didn't you ask him:  What is your definition of full and truckload, and then you would know if you're on the same page…….. I'm denying it without prejudice to define your terms.

33.    On August 24, 2007, the deposition of Debtors' corporate representative, Tom Barr, was commenced.   Mr. Barr testified as follows commencing at page 17-18:

Q    What is LTL?

A    Less than truckload.

Q    What does that mean?

A    It means it's not a full truck.

Q    And how is that used in the procurement aspect of Winn-Dixie?  How is that term utilized?

A    Not a full truck.

Q    Okay.  Can you tell -- can you tell us when an LTL would be utilized or ordered in the procurement process?

A    A hundred cases could come in on an LTL truck.

Q    So if I understand you correctly, LTL means anything less than a full truckload?

A    Yes.

Q    Okay.  And it doesn't matter how many stops it would -- it has with whatever goods are on the truck, the stops are not what makes it an LTL, it's what's on the truck that makes it an LTL, the quantity?

A    No.

Q    Okay.  What makes it an LTL?

A    The quantity that I personally am dealing with.

Q    Okay.  So if you're shipping or receiving goods that are less than a full truckload, that's considered to you LTL?

A    Yes.

Mr. Barr confirmed this definition at Page 137:

Q    What about the term truckload?

        MR. BOLLING:  Objection.

A    Truckload?

Q    Is that a term of art within the industry?

A    Yes, sir.

Q    What does a truckload mean?

        MR. BOLLING:  Objection.

A    A full truck.

Q    What size truck is a full truck?

A    43-foot.

Q    And is that industry standard that full truck means a full 43-foot truck, or can it mean any size full truck?

A    I would guess it could mean any size full truck.

Q    Without guessing, is that the way it's used in the industry, that there are different size trucks, and as long as it's full it's called a truckload?

A    In the secondary market industry a full truck

is normally a 43-foot trailer.  You can put 1680 cases
of one thing on it.

Based on the definition provided by the corporate representative, which Visagent accepts for the purpose of answering Interrogatories 6 through 9, 12 and 13, Debtors are in a position to provide answers to Interrogatories 6 through 9, 12 and 13. Visagent hereby moves this Court for an Order instructing Debtor to fully answer these interrogatories based upon the terms it has now self-defined.

WHEREFORE, Visagent requests the relief identified within be granted in its entirety, together with sanctions including attorneys fees and costs as appropriately determined by the Court, and for such other and further relief as the Court deems just and proper.

## CERTIFICATE OF GOOD FAITH

I HEREBY CERTIFY that I personally made a good faith effort to resolve the issues set forth by way of this Motion prior to filing same. As outlined in the Memorandum, the issues raised could not be resolved.

_____
Guy Bennett Rubin, Esq. (FBN 691305)
Attorneys for Plaintiffs
**RUBIN & RUBIN**
P.O. Box 395
Stuart, Florida  34995
Telephone:     (772) 283-2004
Facsimile:     (772) 283-2009

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the original of this Motion has been electronically filed via ECF and that a true and correct copy of the foregoing has been furnished by US regular Mail to: David L. Gay, Smith, Hulsey & Busey, 225v Water Street, Suite 1800, Jacksonville, Florida 32202 on the 20th day of November 2007.

_____
Guy Bennett Rubin, Esq. (FBN 691305)
Attorneys for Plaintiffs
**RUBIN & RUBIN**
P.O. Box 395
Stuart, Florida  34995
Telephone:     (772) 283-2004
Facsimile:     (772) 283-2009