```
0001
 1              UNITED STATES BANKRUPTCY COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                  JACKSONVILLE DIVISION
 3
                      CASE NO.:  05-03817-3F1
 4                    Chapter 11
                      Jointly Administered
 5
    IN RE:
 6
            WINN-DIXIE STORES, INC., et al
 7
              Debtors.
 8
 9   _____
10          Videotaped deposition of THOMAS DWIGHT BARR,
11   taken pursuant to Notice of Taking Videotaped 30(B)(6)
12   Deposition, at 345 East Forsyth Street, Jacksonville,
13   Duval County, Florida, on Friday, August 24, 2007, at
14   10:40 a.m., before Terry T. Hurley, Registered
15   Professional Reporter, and Notary Public in and for the
16   State of Florida at Large.
17
18
19                       - - -
20
21
22
23
24
25
0002
 1
 2              A P P E A R A N C E S
 3
                JAMES BOLLING, ESQUIRE
 4              and DAVID L. GAY, ESQUIRE
                Smith Hulsey & Busey
 5              225 Water Street, Suite 1800
                Jacksonville, Florida  32202
 6
                Attorneys for Winn-Dixie
 7
 8              GUY BENNETT RUBIN, ESQUIRE
                Rubin & Rubin
 9              Post Office Box 395
                Stuart, Florida  34995
10
11
12   ALSO PRESENT:  Jay Castle, Esquire
                    Gladys LaForge
13                  Mark Rubin
                    Ashley Holt
14
15                       - - -
```

```
16
17
18
19
20
21
22
23
24
25
0003
 1                        I N D E X
 2
    Witness:  THOMAS DWIGHT BARR
 3
 4
                                        Page
 5
    DIRECT EXAMINATION
 6
             By Mr. Rubin----------------004
 7
 8
                   E X H I B I T S
 9
    For Identification
10
        No. 01---------------------------010
11      No. 02---------------------------029
        No. 03---------------------------096
12      No. 04---------------------------097
        No. 05---------------------------098
13      No. 06---------------------------101
        No. 07---------------------------102
14      No. 08---------------------------110
        No. 09---------------------------145
15      No. 10---------------------------146
        No. 11---------------------------150
16      No. 12---------------------------161
        No. 13---------------------------172
17      No. 14---------------------------191
        No. 15---------------------------204
18      No. 16---------------------------220
        No. 17---------------------------228
19      No. 18---------------------------234
        No. 19---------------------------245
20      No. 20---------------------------264
21
22
23
24
                        - - -
25
0004
 1          THE VIDEOGRAPHER:  This is the videotaped
 2      deposition of Tom Barr taken in the matter, In Re:
 3      Winn-Dixie Stores, Incorporated, et al, Case Number
```

```
 4        05-03817-3F1, being heard in the United States
 5        Bankruptcy Court, Middle District of Florida,
 6        Jacksonville Division.
 7             The deposition is being held at the offices of
 8        Hedquist & Associates on Friday, August 24th, at
 9        10:41 a.m.
10             Will counsel now please introduce themselves,
11        and the witness will be sworn.
12             MR. RUBIN:  Yes.  Guy Bennett Rubin for
13        Visagent Corporation.
14             MR. BOLLING:  Jim Bolling on behalf of
15        Winn-Dixie.
16             MR. GAY:  David Gay on behalf of Winn-Dixie.
17                     THOMAS DWIGHT BARR,
18   having been produced and first duly sworn as a witness,
19   testified as follows:
20                     DIRECT EXAMINATION
21   BY MR. RUBIN:
22        Q    Please state your name.
23        A    Thomas Dwight Barr.
24        Q    Mr. Barr, where do you reside?
25        A    Clay County.
0005
 1        Q    Can you tell me where, what address?
 2        A    2640 Hemlock Court, Middleburg, Florida 32068.
 3        Q    And who do you reside at that address with?
 4        A    My wife Pam.
 5        Q    How long have you been married?
 6        A    37 years.
 7        Q    Do you have any children?
 8        A    Yes.
 9        Q    How old are they?
10        A    36, 28.
11        Q    And they live outside the home?
12        A    Yes.
13        Q    You are appearing here today as a corporate
14   representative for Winn-Dixie; is that correct?
15        A    Yes.
16        Q    Have you ever given a deposition before?
17        A    Yes.
18        Q    How many times, approximately or exactly?
19        A    At least two.
20        Q    Okay.  Can you tell me what occasions you've
21   given depositions.
22        A    A slip-and-fall accident when I was a store
23   manager, and a suit on -- I'm really not sure what you
24   call it.  Winn-Dixie and I were sued.
25        Q    You were sued personally?
0006
 1        A    Yes.
 2        Q    What was the basic allegation?
 3        A    A right to work, I guess, for lack of a better
 4   word.
 5        Q    When did that occur?
 6        A    I don't recall.
 7        Q    Is it in the 2000's, the 1990's, the 1980's?
 8        A    90's.
```

```
 9      Q    In the 90's.
10            Where were you working at the time of these
11  alleged violations of some right to work?
12      A    Winn-Dixie.
13      Q    Where?
14      A    Jacksonville.
15      Q    Where in Jacksonville?
16      A    Commonwealth Avenue, our office.
17      Q    In procurement?
18      A    Yes.
19      Q    Okay.  What was the name of the person who
20  named you in a lawsuit?
21      A    I don't recall.
22      Q    A man or a woman?
23      A    Male.
24      Q    And what did he assert in the case that you did
25  personally?
0007
 1      A    That I instructed the company he worked for to
 2  not let him service a Winn-Dixie store.
 3      Q    All right.  What company did he work for?
 4      A    Premiere Beverage, I believe.
 5      Q    And you gave a deposition in that case?
 6      A    Yes.
 7      Q    Do you recall how that case was resolved?
 8      A    It was settled out of court.
 9      Q    Did you pay any money?
10      A    No, sir.
11      Q    Did Winn-Dixie pay any money?
12      A    I believe so.
13      Q    Were those the only two occasions that you've
14  ever sat for a deposition?
15      A    Yes.
16      Q    When were you a store manager for Winn-Dixie;
17  what time frame?
18      A    '71 to '89 -- '88.
19      Q    I want to make sure -- and it sounds like it's
20  been quite some time since you sat for a deposition, so
21  let me go over a couple of the ground rules that I like
22  to cover in depositions.
23            I'm going to ask you a series of questions, and
24  you're going to give a series of answers to those
25  questions.  If you don't understand any question I ask I
0008
 1  would request now that you ask me to rephrase the
 2  question or say I don't understand, or indicate somehow
 3  that you're having difficulty understanding the
 4  question.
 5            Are you willing to do that?
 6      A    Yes.
 7      Q    Okay.  If you don't ask me to restate the
 8  question or tell us somehow that you're not clear on the
 9  question and you answer it, we're going to assume that
10  you understood the question.  Okay?
11            MR. BOLLING:  Objection.
12      Q    Is that okay?
13      A    Yes, sir.
```

14      Q    Okay.  You have attorneys here representing
15  you; correct?
16      A    Yes.
17      Q    Mr. Bolling is sitting here on behalf of
18  Winn-Dixie and you're appearing on behalf of Winn-Dixie;
19  right?
20      A    Yes.
21      Q    Okay.  You're going to hear Mr. Bolling make
22  objections from time to time like he just did.
23           When you hear an objection, that's an objection
24  to place a notice on the record for the judge to make a
25  ruling at a later time, unless Mr. Bolling tells you not
0009
 1  to answer.  You understand that?
 2      A    Yes.
 3      Q    Okay.  So if you just hear objection, we should
 4  continue and let the deposition progress, and you can
 5  give the answer, and then Mr. Bolling and I may have it
 6  out with the judge deciding that issue later.
 7           If you need a break for any reason -- this is
 8  not an endurance contest, if you're uncomfortable for
 9  any reason -- is there any health issue that you might
10  have that might impact you sitting for a long period of
11  time today?
12      A    I'm a diabetic, but that should not have an
13  impact.
14      Q    Okay.  Do you need to each lunch?
15      A    Yes.
16      Q    Okay.  How long do you need for lunch?
17      A    However long it takes to eat lunch.
18      Q    Okay.  And we'll break for lunch.  If you just
19  want to let us know when you think you need to eat
20  lunch.  This is for the convenience of the witness, not
21  the lawyers, as far as I'm concerned.  So just let us
22  know.
23           Are you on any medication?
24      A    Insulin.
25      Q    Okay.  That doesn't affect your ability to
0010
 1  recall or think straight, does it?
 2      A    No, sir.
 3      Q    All right.  Many people, when they attend a
 4  deposition, say -- instead of saying yes or no they nod
 5  their head or do sounds like uh-huh, huh-uh.
 6           If you can just try and avoid that, because we
 7  have a court reporter, and it's really hard for her to
 8  take down sounds or gestures.  Just try and answer
 9  audibly whatever your answer might be.  Okay?
10      A    Yes, sir.
11      Q    Now, you're appearing as a corporate
12  representative for Winn-Dixie; correct?  I think we
13  already went over that.
14      A    Yes.
15      Q    And you've agreed to appear as a corporate
16  representative for Winn-Dixie; true?
17      A    Yes.
18      Q    I want to go over the areas of questioning that

```
19    we've noticed the corporate representative for, and I
20    want to ask you if you're prepared to answer on all of
21    these categories.  Okay?
22        A    Yes.
23        Q    So I'm going to hand you what we'll mark as
24    Exhibit Number 1 to this deposition.
25             (Exhibit No. 1 was marked for identification.)
0011
 1        Q    And would you read the caption of what that
 2    document is.  It should be underlined.
 3        A    Re-Notice of Taking Deposition, Adding Notice
 4    of Videotaping and Expanding 30(b)(6) Areas of
 5    Knowledge.
 6        Q    Okay.  And do you see a date on the last page
 7    of that document?
 8        A    (Witness looking.)
 9        Q    That looks like a fax verification.  Maybe the
10    one before that.  Or on the fax.  It doesn't matter.
11        A    It's dated April 4th, 2007.
12        Q    Okay.  So if you could turn to the first page,
13    and I believe that we'll start in the numbered
14    subparagraphs, and let's go through those one at a time.
15             Number 1 is:  Purchases and sales by debtor in
16    the secondary market during the time period of 2000
17    through 2005.
18             Are you prepared to answer questions regarding
19    that subject?
20        A    Yes.
21        Q    What have you done to prepare yourself, other
22    than the knowledge that you personally have, to prepare
23    for that category?
24        A    I have the knowledge that I have.
25        Q    Okay.  Let me cover one other thing.  There's
0012
 1    what we call an attorney/client privilege, which your
 2    lawyer might have talked to you about.
 3             Whatever I ask you, I am not asking for
 4    anything that you've communicated to your lawyers or
 5    that they've communicated to you.  Okay?  So whatever I
 6    ask you, it's going to be things that you did which do
 7    not include those communications.  Okay?
 8        A    Yes, sir.
 9        Q    All right.
10             MR. BOLLING:  Mark, may I interject?
11             MR. RUBIN:  Guy.
12             MR. BOLLING:  Guy.  Excuse me.
13             Do you have an extra copy of the version of
14    this notice that you have marked?
15             MR. RUBIN:  I -- this is not the same one; this
16    is the prior one with the same categories.  We
17    can -- you want to make a copy real quick?
18             MR. BOLLING:  Or I can just look over his
19    shoulder.
20             MR. RUBIN:  Let's make copies.
21             THE VIDEOGRAPHER:  Off record at 10:52.
22             (Off the record.)
23             THE VIDEOGRAPHER:  Back on record at 10:55.
```

```
24          MR. RUBIN:  We are on.  Okay.  Thank you.
25      Q    So I think the last question was what did you
0013
 1  do to prepare, and your comment was that it was just the
 2  knowledge that you had.
 3          Did you review any documentation in preparation
 4  for answering questions as to Item Number 1?
 5      A    Well, I -- I saw this.
 6      Q    Okay.  Did you review any particular documents
 7  to refresh your memory in preparation for this
 8  deposition?
 9          MR. BOLLING:  Objection.
10          I'm going to ask that you not answer that,
11      because what documents we selected to work with you
12      and present to you in preparation for this
13      deposition are protected by the work product
14      doctrine.
15          MR. RUBIN:  Okay.  I disagree, but we'll take
16      that up with the judge.
17      Q    Did you review any documents, other than the
18  notice of taking deposition in front of you, in
19  preparation for this deposition?
20      A    Documents that I -- my attorneys showed me.
21      Q    Right.  What was the volume of documents they
22  showed you?
23      A    I do not know.
24      Q    How -- how many?  Was it a stack this thick, or
25  a stack this thick, just a few papers, or a lot of
0014
 1  papers?
 2      A    Just a few papers for this deposition.
 3      Q    Okay.  Did you do anything else to refresh your
 4  recollection so that you'd be prepared to answer
 5  questions today?
 6      A    I met with my attorneys.
 7      Q    Okay.  Did you meet with anyone else other than
 8  your attorneys?
 9      A    No.
10      Q    Did you talk to any employees of Winn-Dixie
11  outside the presence of your attorneys to prepare for
12  the deposition?
13      A    No.
14      Q    How much time did you spend in preparation for
15  this deposition?
16      A    With my attorneys?
17      Q    With anyone.
18      A    The only person I met with was my attorneys.
19      Q    Right.  How long did you meet with your
20  attorneys?
21      A    Three or four hours, five hours maybe.
22      Q    When was that?
23      A    I actually met with them twice.  I do not
24  recall the date, but Tuesday of this week.
25      Q    Okay.  Tuesday was one of the days?
0015
 1      A    Yes.
 2      Q    And the other day you don't remember?
```

```
 3      A    I do not remember.
 4      Q    Was it within the last couple weeks?
 5      A    No, sir.
 6      Q    All right.  And on this Tuesday how much time
 7  did you spend with your attorneys?
 8      A    About four -- four or five hours.
 9      Q    All right.  And on the prior occasion how much
10  time?
11      A    Less than that.
12      Q    How much less; five minutes, five --
13      A    Three hours.  Three or four hours.  I'm really
14  not sure.
15      Q    Okay.  Let me just make clear that just because
16  I ask a question, that doesn't mean you have to give a
17  definitive answer.  Many people don't remember, can't
18  recall, time has passed, or they just -- some people
19  just don't have a good memory.  So I don't recall is a
20  perfectly acceptable answer, if you really don't recall.
21          So I'm not trying to force you into an answer
22  when I'm asking you a question.  I'm just trying to get
23  more specific answers, if I can.  Okay?
24      A    Yes.
25      Q    Let's go to Number 2:  The purchases and sales
0016
 1  of inventory by debtor with any non-manufacturer during
 2  the time frame of 2000 through 2005.
 3          Are you here prepared to answer questions on
 4  that?
 5      A    Yes.
 6      Q    And have you reviewed information in general
 7  that would give you the ability to answer questions,
 8  specific questions about that area?
 9      A    Only papers that my attorneys supplied me.
10      Q    Okay.  But you do feel like you have been
11  educated enough to answer questions today about that
12  subject?
13          MR. BOLLING:  Objection.
14      A    Yes.
15      Q    Number 3:  The purchases and sales of whole
16  truckloads in the secondary market by debtor to with --
17  I think that's a misspell -- non-manufacturers during
18  the time frame of 2000 through 2005.
19          You're prepared to answer questions regarding
20  that?
21      A    Well, you need to rephrase it so that -- I -- I
22  don't know what debtor to with non-manufacturer means.
23      A    Purchases -- purchases and sales of whole
24  truckloads in the secondary market by Winn-Dixie to or
25  with any non-manufacturer during the time frame of 2000
0017
 1  to 2005.
 2      A    I don't understand.
 3      Q    You don't understand that category?
 4      A    I don't understand to or with.
 5      Q    Okay.  Purchases and sales.  You make a
 6  purchase to and you buy from different entities;
 7  correct?
```

```
 8      A    Yes.
 9      Q    Okay.  And I think the category -- and I
10  apologize for the bad phrasing of this category, but
11  what we're interested in is information regarding
12  purchases and sales with non-manufacturers in the
13  secondary market during this time frame.
14           Is that clearer for you?
15      A    Yes.
16      Q    Okay.  Are you prepared to answer questions
17  regarding that?
18      A    Yes.
19      Q    What is LTL?
20      A    Less than truckload.
21      Q    What does that mean?
22      A    It means it's not a full truck.
23      Q    And how is that used in the procurement aspect
24  of Winn-Dixie?  How is that term utilized?
25      A    Not a full truck.
0018
 1      Q    Okay.  Can you tell -- can you tell us when an
 2  LTL would be utilized or ordered in the procurement
 3  process?
 4      A    A hundred cases could come in on an LTL truck.
 5      Q    So if I understand you correctly, LTL means
 6  anything less than a full truckload?
 7      A    Yes.
 8      Q    Okay.  And it doesn't matter how many stops it
 9  would -- it has with whatever goods are on the truck,
10  the stops are not what makes it an LTL, it's what's on
11  the truck that makes it an LTL, the quantity?
12      A    No.
13      Q    Okay.  What makes it an LTL?
14      A    The quantity that I personally am dealing with.
15      Q    Okay.  So if you're shipping or receiving goods
16  that are less than a full truckload, that's considered
17  to you LTL?
18      A    Yes.
19      Q    Do you understand Item Number 4:  Purchases and
20  sales of partial LTL or less than truckloads in the
21  secondary market by debtor with non-manufacturers during
22  the time frame 2000 through 2005?
23      A    Yes.
24      Q    Okay.  Are you prepared to answer questions
25  regarding that?
0019
 1      A    Yes.
 2      Q    Number 5:  All aspects of debtor's customs and
 3  practices in the secondary market for any goods bought
 4  or sold by debtor in these markets during the time frame
 5  2000 through 2005.
 6           Are you familiar with the debtor's customs and
 7  practices in the secondary market during that time
 8  frame?
 9      A    Yes.
10      Q    Are you prepared to answer questions?
11      A    Yes.
12      Q    Number 6:  All aspects of debtor's customs and
```

```
13   practices in dealing with diverters or alternate source
14   vendors during the time frame 2001 through 2004.
15            Is that category clear?
16       A    Yes.
17       Q    Are you prepared to answer questions about
18   that?
19       A    Yes.
20       Q    What is a diverter?
21       A    A buyer or seller of product, not from the
22   original manufacturer.
23       Q    Okay.  Is that definition one of practice, or
24   by some formal definition in some industry trade?
25       A    That's the only definition I can give you.
0020
 1       Q    Okay.  Did you learn that through on-the-job
 2   experience, or did you learn that from a book, or a
 3   seminar, or somebody telling you what it meant?
 4       A    On the job.
 5       Q    All right.  Is Winn-Dixie a diverter?
 6       A    We divert product.
 7       Q    Which would make Winn-Dixie a diverter, amongst
 8   other things that it does; correct?
 9       A    We buy and sell diverted product.
10       Q    Okay.  I think you said that anyone who buys or
11   sells diverted product is a diverter; true?
12       A    Yes, sir.
13       Q    Right.  What is an alternate source vendor?
14       A    A nicer word than diverter.
15       Q    Okay.  Does diverter have a negative
16   connotation in the procurement industry?
17       A    No.
18       Q    Why is alternate source vendor a nicer word, a
19   nicer way of --
20       A    That's for the manufacturer's benefit.
21       Q    Explain that.
22       A    Manufacturers do not like diverters.
23       Q    Why's that?
24       A    Because diverters buy their product and move it
25   across country.
0021
 1       Q    Why would the manufacturer not like that?
 2       A    You would have to ask them.
 3       Q    Well, how do you know they don't like it?
 4       A    Because I buy and sell diverted product.
 5       Q    Have you had communications with manufacturers
 6   where they have told you they don't like it?
 7       A    It's common knowledge they do not like it.
 8       Q    Okay.  Common knowledge in the procurement --
 9   grocery procurement industry?
10       A    Yes.
11       Q    So whenever we see the word diverter in a
12   document in this case, or alternate source vendor, they
13   mean the same thing; is that right?
14            MR. BOLLING:  Objection.
15       A    I would think so.
16       Q    Okay.  And I'm not asking you to -- if I ask
17   you to look at a document we'll certainly go over that,
```

18   but as far as you're concerned those are interchangeable
19   terms in the industry?
20       A    Yes.
21       Q    Number 7:  Purchases and sales through or
22   facilitated by Victory Wholesale Grocers during the time
23   period of 2000 through 2005.
24           Are you familiar with that?
25       A    Yes.
0022
 1       Q    Are you prepared to answer questions about
 2   that?
 3       A    Yes.
 4       Q    Victory is, or was during that time frame, a
 5   diverter?
 6       A    Yes.
 7       Q    Is Victory -- strike that question.
 8           What is your current job title?
 9       A    I'm a supply buyer with Winn-Dixie.
10       Q    What does a supply buyer do?
11       A    Buy supplies.
12       Q    What kind of supplies?
13       A    Meat trays, produce bags, bags for the stores.
14   I buy all of that.
15       Q    How long have you been a supply buyer?
16       A    Two years September, I believe.  Two years next
17   month.
18       Q    So since 2 -- since 9 of '05?
19       A    I think that would be correct.
20       Q    Was there any period of time during the
21   Winn-Dixie bankruptcy that you were not working for
22   Winn-Dixie?
23       A    No.
24       Q    What position did you come from when you became
25   a supply buyer in September '05?
0023
 1       A    The title was alternate source manager.
 2       Q    And how long had you been in that title?
 3       A    I -- I can't recall exactly.
 4       Q    Years, months?
 5       A    More than one year.
 6       Q    Who was the person who was the alternate source
 7   manager prior to you?
 8       A    There was not one.
 9       Q    Who was your superior or supervisor when you
10   were last the alternate source manager?
11       A    Last supervisor?
12       Q    The last supervisor you had when you were the
13   alternate source manager.
14       A    Glen Hamilton.
15       Q    What was your position before alternate source
16   manager?
17       A    For a short time, promotions coordinator.
18       Q    And before that?
19       A    I was a buyer for Winn-Dixie.
20       Q    In the diverting department?
21       A    We had no diverting department at that time.
22       Q    Has Winn-Dixie ever had a diverting department?

```
23          MR. RUBIN:  I'm sorry.  I'm just going to shut
24     this off.
25          (Mr. Rubin's phone rang.)
0024
 1     A     Have we ever had a diverting department?
 2     Q     Yes.
 3     A     Yes.
 4     Q     When?
 5     A     When we went centralized buying.
 6     Q     I'm sorry.  I didn't understand.
 7     A     When we went from operating as separate
 8     entities to one central procurement office in
 9     Jacksonville.
10     Q     When was that, approximately or particularly?
11     A     2000.  Six -- six to seven years.
12     Q     All right.  Do you know how long you were a
13     buyer at the procurement division?
14     A     1989 until we went centralized, whatever time
15     that was.
16     Q     What does centralized mean?
17     A     Corporate buying.
18     Q     What does corporate buying mean?
19     A     We used to operate as separate entities --
20     Jacksonville, Orlando, Miami -- where now everything's
21     done in Jacksonville.
22     Q     Okay.  And was that prior to Winn-Dixie going
23     into bankruptcy, or after?
24     A     Prior.
25     Q     Okay.  Do you have any idea what year that was
0025
 1     that you went to corporate or centralized buying?
 2          MR. BOLLING:  Objection.
 3     A     I think I told you 2000, or right in that area,
 4     just a minute ago.
 5     Q     Okay.  Where did you work as a buyer?
 6     A     Jacksonville.
 7     Q     What was your -- the physical address?
 8     A     5233 Commonwealth Avenue, Jacksonville.
 9     Q     Did that building have a particular name?
10     A     Winn-Dixie.
11     Q     Okay.  It was -- it wasn't called corporate
12     headquarters or procurement department?
13     A     Jacksonville Division.
14     Q     Jacksonville Division.  Is that in a different
15     building than corporate headquarters?
16     A     Yes.
17     Q     Where was corporate headquarters located?
18     A     The same place it is today.
19     Q     Do you know where that is?
20     A     Yes, sir.
21     Q     Do you know the address?
22     A     5050 Edgewood Court.
23     Q     Did Victory Wholesale Grocers have employees
24     who worked at the Jax Division on a day-to-day basis at
25     anytime since the year 2000?
0026
 1     A     No.
```

```
 2      Q    It never had people in the area where you
 3  worked and where -- where Winn-Dixie employees were
 4  buying, and they worked side-by-side with Winn-Dixie
 5  buyers?
 6      A    Not in the Jacksonville Division, no.
 7      Q    Okay.  Did Victory have any employees working
 8  at any Winn-Dixie location where they were working with
 9  Winn-Dixie employees in the -- in a buying function?
10      A    Victory had people in Winn-Dixie, yes.
11      Q    All right.  Where?  Physically what building
12  were they together?
13      A    The Deerwood office on Southside Boulevard, or
14  off of Southside Boulevard.
15      Q    Is that what people in the company called it,
16  the Deerwood office?
17      A    Yes, sir.
18      Q    Did you ever work out of that office?
19      A    Yes, sir.
20      Q    During what time frame?
21      A    From whatever date that we went centralized
22  buying until February of 2- -- this is 7.  I think we
23  all moved to Edgewood in 2006, I believe.
24      Q    So that's where you worked day in and day out,
25  was the Deerwood office, between approximately the year
0027
 1  2000 and 2006?
 2      A    Yes.
 3      Q    Or September '05?
 4           MR. BOLLING:  Objection.
 5      Q    Did you continue working as -- as a supply
 6  buyer at the Deerwood office?
 7      A    No.
 8      Q    Okay.  So in September of '05 you left the
 9  Deerwood office?
10      A    No.
11      Q    Okay.  Can you clear up -- you became a supply
12  buyer in September '05?
13      A    Yes.
14      Q    And you continued to work out of the Deerwood
15  office?
16      A    Yes.
17      Q    Okay.  Did you work in the same physical space,
18  or in a different area at the Deerwood office?
19      A    Same space.
20      Q    Okay.  During what period of time were Victory
21  employees regularly working at the Deerwood office?
22      A    Parts of 2000 through 2005 -- through parts of
23  2005.
24      Q    Okay.  Can you tell me, what were the
25  circumstances that they ceased working at the Deerwood
0028
 1  office?  They meaning the Victory employees.
 2      A    We did diverting on our own for a while with
 3  Winn-Dixie people.
 4      Q    Okay.  Is that when the Victory people left?
 5      A    Yes.
 6      Q    And when you say, we did the diverting on our
```

```
 7   own, Winn-Dixie took charge of its own diverting without
 8   the help of Victory sometime in 2005; is that correct?
 9        A    Yes.
10        Q    Were you involved in any of the contractual
11   relationships between Victory and Winn-Dixie between the
12   year 2000 and when they left in 2005?
13        A    I saw the contracts.
14        Q    Had you seen every contract?
15        A    I cannot answer that.  I do not know.
16        Q    Okay.  How many contracts did you see during
17   that time frame?
18        A    I believe I have one.
19        Q    Did you have any input or participate in any
20   way prior to the execution of that contract?
21             MR. BOLLING:  Objection.
22        A    No.
23        Q    Do you know the date of the contract you're
24   referring to which is the one and only one you have
25   knowledge of?
0029
 1             MR. BOLLING:  Objection.
 2        A    Exact date, no, sir.
 3        Q    Year?
 4        A    I would guess 2000.
 5        Q    Okay.  I'm showing you what will be marked as
 6   Exhibit Number 2.
 7             (Exhibit No. 2 was marked for identification.)
 8        Q    Is this the contract?
 9             And take your time.  Whenever I hand you an
10   exhibit, go ahead and make sure you look through the
11   pages and that you're comfortable identifying whatever
12   I'm putting in front of you.  Okay?
13        A    This appears to be it.
14             MR. RUBIN:  Okay.  And for the record this is
15   V05683 through -- through V05686 in discovery.
16        Q    When did you first see this document?
17        A    I do not know.
18        Q    When have you -- when did you last see this
19   document?
20        A    I do not know that either.
21        Q    Okay.  Have you seen this in the last six
22   months?
23        A    I do not think so.
24        Q    All right.  And I think you said that you have
25   -- you didn't have any part in input into this document
0030
 1   before it was executed?
 2        A    No.
 3        Q    All right.  We will -- we'll come back to this
 4   document.
 5             Going back to Victory employees at the Deerwood
 6   office, did any other diverter have employees at the
 7   Deerwood office on a regular basis?
 8        A    No.
 9        Q    How many Victory employees were at the Deerwood
10   office on a regular basis up until they left in 2005?
11        A    When -- when they actually left there was only
```

```
12   one left, but -- no, actually three.  I'm sorry.  Two
13   girls.  There was five at the start.
14        Q    And do you know who the five were?
15        A    Yes.
16        Q    Can you name them, please.
17        A    Bob Carlson, Bruce Malcolm, Mark Bluen, Donna
18   Shammy, and Cindy Calabatrata, and I can't spell it.
19        Q    Was there a Melissa Fowler?
20        A    Well, she took Cindy's spot when Cindy left.
21   So, yes, there was.
22        Q    Okay.  Anyone else that you can recall from
23   Victory at the Deerwood office?
24        A    I -- I do know there was a -- a temp person.  I
25   do not know the name.
0031
 1        Q    Okay.  And what did these employees of Victory
 2   do at the Deerwood office?
 3        A    Dealt with diverted product.
 4        Q    What do you mean by dealt with?
 5        A    Buy and sell product.
 6        Q    In the year 2000 how was that accomplished
 7   physically?  What -- what did they do in the office in
 8   terms of buying and selling?
 9        A    Diverters quoted us by fax, by phone.
10        Q    When you say us, do you mean Winn-Dixie or do
11   you mean Victory?
12        A    I mean Winn-Dixie, because I was part of that.
13        Q    Okay.  So in 2000 diverters quoted Winn-Dixie
14   by fax?
15        A    Yes.
16        Q    And is this before Victory was there that
17   you're talking about now?
18        A    No.
19        Q    Okay.  When Victory was there in 2000 you did
20   quotes by fax.  And then what would Victory do in the
21   buying or selling process?
22        A    The decision would be made whether to buy it or
23   not.
24        Q    Who?  Who would make that decision?
25        A    The buyers.
0032
 1        Q    And those would be Victory employees, or would
 2   those be Winn-Dixie employees?
 3        A    Winn-Dixie employees.
 4        Q    Who were the Winn-Dixie buyer employees in
 5   2000?
 6        A    20 different people.
 7        Q    Okay.  Were you one of them?
 8        A    No, sir.
 9        Q    Was there a -- a hierarchy of these Winn-Dixie
10   buyers in terms of reporting -- supervisors and -- and
11   reporting employees?
12        A    I'm not sure what you're asking me.  Do the
13   buyers have a boss?
14        A    Yeah, yeah.  Were they all the same level
15   employees.
16        A    All buyers were, yes.
```

17      Q    Okay.  And who was their boss?
18      A    Several different people.
19      Q    Name them, please.  And if you need to say time
20 frames, go ahead.
21      A    I -- I cannot tell you who each buyer's boss
22 was.  They reported to different people.
23      Q    Okay.  How was that divided?
24      A    (No response.)
25      Q    How was it determined who they reported to?
0033
 1      A    By the category that -- that they purchased.
 2      Q    Okay.  Can you tell me what categories there
 3 were?
 4      A    Every category that covers the grocery side of
 5 a store.  People specialize in -- pet foods, buyer for
 6 that; detergent, buyer for that; so...
 7      Q    All right.  And how did -- was there any
 8 organization to the areas that reported to a specific
 9 supervisor?
10           MR. BOLLING:  Objection.
11      Q    In other words, if you had five buyers of
12 different types of frozen product, would they all be to
13 the same supervisor?
14      A    Yes.
15      Q    Okay.  And household items; if there were two
16 buyers of household items, would they be to the same
17 supervisor?
18      A    Yes.
19      Q    So there was some organization as to what was
20 being bought or sold and who they reported to?
21      A    Yes.
22      Q    But you can't describe that for us?
23           MR. BOLLING:  Objection.
24      A    I don't understand what you want me to
25 describe.
0034
 1      Q    I'd like to know if there was a hierarchical
 2 type organizational chart or model that one could look
 3 at to understand the organization of that buying
 4 function for Winn-Dixie.
 5      A    Yes.
 6      Q    Okay.  Where would one look to -- to -- to get
 7 that information?
 8      A    I -- I -- Winn-Dixie could supply that, I'm
 9 sure.
10      Q    Okay.
11      A    I don't know.  I don't -- I really don't
12 understand what you're asking.
13           Is there a chain of command?  Yes.  Buyers
14 reported to these people.  These people reported to
15 these people, and these people reported to these people.
16      Q    All right.  Were there written organizational
17 charts with peoples' names on them distributed or
18 accessible to you during this time frame of 2000 through
19 2005?
20      A    I never saw one.
21      Q    Okay.  Is there any information that was

```
22    communicated in any way which would let employees know
23    what this organizational flow was?
24        A    I can't answer that.
25        Q    Why not?
0035
 1        A    Because I don't know.
 2        Q    You've never seen any?
 3        A    Everybody knew who they reported to, and those
 4    people know who they reported to.  But if you're asking
 5    me if I've seen an all-things-considered-from-top-down,
 6    the answer is I don't think I've ever saw one.
 7             Is there one?  I don't know.
 8        Q    Okay.  Well, I thought you said a few minutes
 9    ago that you were sure that Winn-Dixie had
10    organizational charts.
11        A    I'm sure they probably do.  I have not saw one.
12             If you're asking if there is one, I don't know.
13    I would guess there would be.  There would have to be.
14        Q    All right.  To your knowledge was there a chain
15    of command amongst the Victory employees that you've
16    named?
17        A    Yes.
18        Q    What was that?
19        A    Bob was -- I think he's called -- was called
20    account manager.  Bruce Bart reported to him, and Donna,
21    Melissa, and Cindy, I think, would have handled all the
22    paperwork kind of stuff.
23        Q    So the three females were more administrative?
24        A    For the most part, yes, sir.
25        Q    Let me go back to what they actually were doing
0036
 1    in the offices and how they were doing their job.
 2             Faxes came in with offers from diverters,
 3    buyers from Winn-Dixie would make decisions.
 4             Where did Victory fit into that scheme?
 5        A    They facilitated it.
 6        Q    What did they do to facilitate it?
 7        A    On purchases they created purchase orders that
 8    enabled us to receive it.  They fielded the phone calls.
 9    They helped buyers.
10        Q    And in the year 2000, did -- did they use
11    computers to create purchase orders?  Victory I mean,
12    the Victory employees.
13        A    Yes.
14        Q    What was the NTS system?
15        A    I think the official name is Network Trading
16    System.
17        Q    Okay.
18        A    And that was a Victory-owned system.
19        Q    All right.  What was it?
20        A    It was an informational system.
21        Q    What does that mean?
22        A    We could use it to suggest items to buy.
23        Q    Was that connected to the internet?
24        A    I -- I -- I think a part of it was, but not the
25    part that we used.
0037
```

```
 1       Q    When you say we, do you mean you and Victory,
 2  or Winn-Dixie?
 3       A    Winn-Dixie.
 4       Q    Winn-Dixie actually got onto the NTS system?
 5       A    No.
 6       Q    The Winn-Dixie employees?
 7       A    No, sir.
 8       Q    When you say we used, did -- did you --
 9       A    The diverting department used.
10       Q    Right.  I'm just trying to understand.  How did
11  Winn-Dixie use the NTS system if it never operated the
12  NTS system?
13            MR. BOLLING:  Objection.
14            MR. RUBIN:  Let me rephrase.
15       Q    I thought I understood you to say that
16  Winn-Dixie employees didn't access the NTS computer, the
17  Network Trading System.  Is that correct or not?
18            MR. BOLLING:  Objection.
19       A    I could get on the NTS system.  Me.  But no,
20  sir, Winn-Dixie employees did not use the NTS trading
21  system per se.
22       Q    Okay.  Why could you get on?
23       A    To look at a report.
24       Q    So you were given access?
25       A    I could -- I could look at reports.
0038
 1       Q    My question is, were you given access by
 2  Victory?
 3       A    Limited.
 4       Q    How did they limit that?
 5       A    I do not know.
 6       Q    So why do you say it was limited?
 7       A    Because I couldn't see the same data that the
 8  Victory people could.
 9       Q    Did they provide a portal or some way to look
10  at the information to you?
11       A    I would assume so, yes, sir.
12       Q    Well, I'm not interested in assumptions.  If --
13       A    I could see limited --
14       Q    Hold on.
15       A    -- information.
16       Q    Okay.  What did you physically have to do to
17  see that?  Did you have to walk to someone else's desk?
18  Did you have a computer on your desk that you could
19  access this NTS?  Describe that for me.
20       A    I could -- I could get it off of my computer.
21       Q    Okay.  So the NTS was electronically connected
22  to your personal computer; is that correct?
23            When I say personal, I mean the one Winn-Dixie
24  gave you.
25       A    I could see it off of my --
0039
 1            MR. BOLLING:  Objection.
 2       A    -- computer.
 3       Q    All right.  So the data was streaming into your
 4  computer, the NTS data?
 5            MR. GAY:  Objection.
```

```
 6      A    I could see NTS reporting on my computer.
 7      Q    Okay.  Do you know how you were able to access
 8  that through your computer?
 9      A    With a sign-on and password.
10      Q    All right.  And what was your computer
11  connected to?
12      A    To Winn-Dixie's mainframe, I would suppose.
13      Q    You don't know?
14      A    No, sir.
15      Q    Could you on your computer at this time in 2000
16  access the internet?
17      A    Yes.
18      Q    Do you know one way or the other whether the
19  NTS came in to your computer by what's called TCIP?
20      A    No, sir.
21      Q    You don't know one way or the other?
22      A    No, sir, I don't.
23      Q    Okay.  Would it be fair to say that you cannot
24  help us with the technical aspects of how you were able
25  to access the NTS on your computer at the Deerwood
0040
 1  office?
 2           MR. BOLLING:  Objection.
 3      A    I'm -- I'm not a computer person.
 4      Q    Okay.  So would it be fair that you cannot help
 5  us with any of the technical aspects of how you were
 6  able to access the NTS on your computer at the Deerwood
 7  office?
 8           MR. BOLLING:  Objection.
 9      A    Yes.
10           THE VIDEOGRAPHER:  Excuse me.  Can I change the
11      videotape?
12           MR. RUBIN:  Yes.  Why don't we take two
13      minutes.
14           THE VIDEOGRAPHER:  Off record at 11:40.
15           (Short break.)
16           THE VIDEOGRAPHER:  And we're back on record at
17      11:48.
18           MR. RUBIN:  Okay.  Mr. Bolling, I forgot to
19      ask.  The gentleman at the end of the table, what is
20      his name and position?
21           MR. BOLLING:  Jay Castle.  He's within -- he's
22      assistant general counsel for Winn-Dixie.
23           MR. RUBIN:  Okay.  Jay Castle?
24           MR. BOLLING:  (Nods head.)
25      Q    I think you said you needed a password to get
0041
 1  onto the NTS; is that right?
 2      A    Yes.
 3      Q    Who gave you that password?
 4      A    Victory.
 5      Q    Do you know who at Victory?
 6      A    No, sir.
 7      Q    When you sat down at your computer -- and again
 8  we're talking about in the year 2000.
 9           When you sat down at your computer did you have
10  an icon on your screen that you would just double click
```

```
11  to get into the NTS?
12      A    Yes.
13      Q    Did you have e-mails in the year 2000 on your
14  computer?
15      A    Yes.
16      Q    Did you have instant messaging on your computer
17  in the year 2000?
18      A    No.
19      Q    Did you receive spreadsheets in the year 2000
20  over the e-mail system?
21      A    Yes.
22      Q    And the spreadsheets would contain what kind of
23  materials?
24      A    It could be ads; could be several things.
25      Q    Like?  Such as what?
0042
 1      A    Copies of our ads that we were going to --
 2      Q    Okay.  Could it be lists -- spreadsheets of
 3  availables?
 4           MR. BOLLING:  Objection.
 5      Q    Do you know what availables are?
 6      A    In the diverting world?
 7      Q    Yes.
 8      A    Yes, sir.
 9      Q    What's an available?
10      A    Something that's for sale.
11      Q    Okay.  Would the spreadsheets include
12  availables?
13      A    In 2000?
14      Q    Yes.
15      A    I do not think so.
16      Q    Okay.  Was there some point in time after 2000
17  that spreadsheets contained availables that were
18  accessed on the computer -- on your computer?
19      A    I do not recall ever getting a spreadsheet with
20  availables on my computer.
21      Q    Okay.  Do you recall getting spreadsheets from
22  any source with availables at any time?
23      A    I do not recall ever getting availables by a
24  spreadsheet on my computer.
25      Q    Right.  My question is, I -- you already said
0043
 1  that.  My next question is, did you receive any
 2  spreadsheets from any source with availables?
 3      A    Availables were faxed in from -- from
 4  diverters, yes.
 5      Q    Okay.
 6      A    If you call that a spreadsheet, I don't know.
 7      Q    Okay.  During what time frame were they faxed
 8  in?
 9      A    For the entire time frame.
10      Q    Okay.  What kinds of things did you get through
11  the e-mail system?
12      A    (No response.)
13      Q    You said advertisements.  That's one type of
14  thing.
15           Did you ever receive e-mails from diverters?
```

```
16      A    In what year?
17      Q    In any year.
18      A    Yes.
19      Q    Okay.  What years did you receive e-mails from
20 diverters?
21      A    2000, 2001, 2002, 2003, 2004.
22      Q    Okay.  So the whole time that we're talking
23 about you were receiving e-mails from diverters?
24           MR. BOLLING:  Objection.
25      Q    Is that correct?
0044
 1      A    I received e-mails from diverters, yes.
 2      Q    During the whole time 2000 through 2005?
 3      A    Up until I was no longer the alternate source
 4 manager I received e-mails from diverters.
 5      Q    Right.  And those e-mails contained information
 6 regarding availables, didn't they?
 7      A    Well, that was not the question you asked.  You
 8 asked --
 9      Q    This is a new question.
10      A    I do not recall receiving e-mails with
11 availables on them, no.
12      Q    Okay.  Not a single e-mail where product was
13 offered to Winn-Dixie through an e-mail; is that your
14 testimony?
15      A    I do not recall me personally receiving e-mails
16 with availables on them.
17      Q    All right.  Do you recall receiving any e-mail,
18 excluding the word available, with any information
19 regarding product either to buy or to sell from
20 diverters?
21      A    A specific e-mail, no.
22      Q    I'm not asking about a specific e-mail.  I'm
23 talking about, generally did e-mails contain information
24 at anytime regarding product that was available to buy
25 or available to sell to diverters?
0045
 1           MR. BOLLING:  Objection.
 2      A    I do not recall them communicating me -- with
 3 me via e-mail for availables.
 4      Q    Okay.  So how did they communicate with you
 5 during the time frame of 2000 through 2005, when you
 6 left?  Name all the modes of communication.
 7      A    Phone.
 8      Q    Right.
 9      A    Fax.
10      Q    Right.
11      A    E-mail.
12      Q    Right.
13      A    That would be it.
14      Q    Okay.  Instant message?
15      A    Only one -- I only -- I only communicated with
16 -- yes.  The answer is yes.
17      Q    Okay.  Who did you communicate via instant
18 message with during this time frame?
19      A    Visagent, Purity.  I -- I don't think Victory
20 had it until -- until 2005, but I'm not sure of that.
```

```
21      Q    Did anyone else, any of the other buyers?  You
22  said there were 20 or more buyers; is that right?
23      A    Yes.
24      Q    Did any of the buyers have computers in the
25  year 2000?
0046
 1      A    Yes.
 2      Q    Did all of them or just some of them?
 3      A    All buyers had computers.
 4      Q    Okay.  Did all buyers have access to the
 5  internet in 2000?
 6           MR. BOLLING:  Objection.
 7      A    I do not know.
 8      Q    Who would know?
 9      A    An IT person.  That's who I would go to.
10      Q    Okay.  Who's the head of IT who was around back
11  then?
12      A    He's no longer there.
13      Q    Okay.  Who was the head of IT?
14      A    I think the name would be Mike Nixon.
15      Q    And when I say IT, I mean specifically IT for
16  the procurement, for the Deerwood facility.
17           Is that the person?  Nixon?
18      A    That's who I would guess.  I do not know if
19  there was a person assigned to the Deerwood office.
20      Q    Okay.
21      A    I do not know that.
22      Q    Right.  Who would you call when you had
23  computer gliches?  And everybody's got them.
24      A    The help desk.
25      Q    Okay.  And who was head of the help desk?
0047
 1      A    It's a 1-800 number, and it could be anywhere.
 2      Q    But as far as you know Mike Nixon was the head
 3  of IT?
 4      A    Yes.
 5      Q    And you don't know of any employee at the
 6  Deerwood office who was familiar with the computer setup
 7  during any part of this time?
 8           MR. BOLLING:  Objection.
 9      Q    When did Mike Nixon leave the company?
10      A    I do not know.
11      Q    Did you know him personally?
12      A    No, sir.
13      Q    About how many e-mails would you get on a daily
14  basis --
15           MR. BOLLING:  Objection.
16      Q    -- during this time frame of 2000 through 2006?
17      A    I do not know.
18      Q    More than a few?
19           MR. BOLLING:  Objection.
20      A    10, 15.  I do not know.
21      Q    What kind of information were you IM'ing back
22  and forth with Purity?
23      A    General information.  If you're asking for
24  specifics, I don't know.
25      Q    No, just gen- -- I'm asking generally what --
```

```
0048
 1     A     How you doing?  How's your day going?
 2     Q     That's all?
 3     A     Pretty much.
 4     Q     Well, what else?
 5     A     Well, I don't know.
 6     Q     Okay.  Let me see if I can refresh your
 7   recollection.
 8           Were any deal details conveyed by IM with
 9   Purity?
10     A     Not that I recall.
11     Q     Were any deal details discussed with any of the
12   Visagent people?
13     A     Yes.
14     Q     Over IM, instant messaging?
15     A     Yes.
16     Q     Was this at the same time you also had instant
17   messaging with Purity?
18     A     Yes.
19     Q     Okay.  So do you remember what instant
20   messaging service you were using; like AOL?
21     A     AOL instant messenger.
22     Q     And was it Visagent who brought AOL to you and
23   suggested that?
24     A     They suggested that, yes.
25     Q     Before Visagent's relationship with Winn-Dixie
0049
 1   there was no instant messaging at all; correct?
 2     A     That's correct.
 3     Q     And you remember that there was deal
 4   information being instant messaged with Visagent
 5   employees; correct?
 6     A     Yes.
 7     Q     But you don't remember if you were doing the
 8   same kind of instant messaging with Purity.
 9           MR. BOLLING:  Objection.
10     Q     Is that correct?
11     A     That's correct.
12     Q     Can you say as you sit here today that you did
13   not convey any deal information to Purity or Purity to
14   you through instant messaging?
15     A     No.
16     Q     Okay.  You just don't know one way or the
17   other, do you?
18     A     I do not recall doing deal information with
19   Purity.
20     Q     All right.  What were all the ways that you
21   could receive quotes when -- in the year 2000?
22     A     2000.  Phone, fax -- could or did?
23     Q     Could.
24     A     Could by e-mail.  I suppose they could mail you
25   a letter if they wanted to.
0050
 1           That would be it.
 2     Q     All right.  And I think it's already your
 3   testimony that no one ever e-mailed a quote to you of
 4   any kind in the year 2000.
```

```
 5      A    I think I said I did not recall anybody.
 6      Q    Okay.  So it might have happened; you just
 7   don't have a memory one way or the other?
 8           MR. BOLLING:  Objection.
 9      A    I do not recall people e-mailing me quotes.
10      Q    Well, you don't recall them not doing it
11   either; right?
12      A    I do not recall them e-mailing me quotes.
13      Q    Right.  Well, but you can't say that they
14   didn't.
15           MR. BOLLING:  Objection.
16      Q    Can you?
17      A    No, sir.
18      Q    And I think you said that you don't know what
19   any of the other computers for the buyers had access to
20   on their computers; is that correct?
21      A    I -- I think you asked me did all the buyers
22   have access to the internet.
23      Q    Right.
24      A    And I said I did not know that.
25      Q    Right.  And you don't -- do you know whether at
0051
 1   anytime they had access to instant messaging?
 2      A    I think I was the only person in the building
 3   that did.
 4      Q    For the entire time through 2005?
 5      A    I'm the only person in the procurement
 6   department that had instant messenger on their computer.
 7      Q    Through 2005?
 8      A    Yes, in procurement.
 9           MR. BOLLING:  Before you ask the next question.
10           How much more time do we have on the tape?
11           THE VIDEOGRAPHER:  45 minutes.
12           MR. BOLLING:  Should we wait 45 minutes to go
13   to lunch?
14           THE WITNESS:  That's fine with me.
15           MR. BOLLING:  Okay.
16   BY MR. RUBIN:
17      Q    Okay.  Number 9 on the list on the notice is:
18   Purchases and sales through or facilitated by Dayman &
19   Associates during the time period 2000 through 2005.
20           Are you prepared to talk about that
21   relationship?
22      A    Yes.
23      Q    What is Dayman & Associates?
24      A    They're a private-label broker.
25      Q    Okay.  Do they do any diverting?
0052
 1      A    I do not think Dayman did, but a sister company
 2   did.
 3      Q    What was the sister company called?
 4      A    Food Marketing Group.
 5      Q    Okay.  And they're also known as FMG?
 6      A    Yes.
 7      Q    And we have that as Number 12 on the same list.
 8           So did you come prepared to talk about FMG's
 9   relationship with Winn-Dixie?
```

```
10      A    Yes.
11      Q    How did FMG communicate offers to Winn-Dixie
12  for availables to either buy or sell during the time
13  frame 2001 through the time you left procurement?
14           MR. BOLLING:  Objection.
15      A    It would've had to have been by fax or phone.
16      Q    Why would it have to be that way?
17      A    Because they have a -- a network that we were
18  not a participant in.
19      Q    Okay.  So they -- were they prevented from
20  sending e-mails?
21      A    No, sir.
22      Q    Why couldn't they have sent availables through
23  e-mail?
24      A    They could have.
25      Q    Okay.  Well, I think you said they couldn't
0053
1   have done it any other way other than phone or fax.
2       A    No.  I just -- I just said phone or fax.
3            You asked how they would communicate with us,
4   and I said by phone or fax.
5       Q    And you said it must have been by phone or fax?
6       A    By phone or fax.
7       Q    Okay.  And you can say with certainty that they
8   never communicated any deal information other than by
9   phone or fax during the entire time that Winn-Dixie did
10  business with FMG?
11      A    No.
12      Q    You can't say that?
13      A    No.
14      Q    Okay.  Why not?
15      A    Because I do not know.
16      Q    Why don't you know?
17      A    I do not know if they sent an e-mail or not.
18      Q    What did you do to find out whether or not they
19  did?  You were the -- let me just give you a preface to
20  that question.  I'll re-ask that question.
21           You have appeared as the corporate
22  representative for Winn-Dixie; correct?
23      A    Yes.
24      Q    You have agreed to be responsible to talk about
25  any purchases or sales through or facilitated by Food
0054
1   Marketing Group during the period of 2000-2005; correct?
2       A    Yes.
3       Q    What did you do to find out how offers were
4   communicated to Winn-Dixie by FMG?
5       A    I can't answer that question.
6       Q    Why?
7       A    Because I don't -- I do not -- we were not a
8   trading partner of FMG.  They had a network of trading
9   partners.  Our business with FMG would have been little
10  to none during this time frame because we were not on
11  their trading partner list.  We were not a member of
12  their trading partner list.
13           So you asked could they have sent us a quote.
14  Yes, but that would have been out of the ordinary for us
```

```
15    to do business with FMG.
16        Q    Okay.  So your testimony is that Winn-Dixie did
17    little to no -- little to none buying or selling in the
18    surplus goods market during this entire time frame of
19    2000 through 2005; correct?
20        A    A little.
21            MR. BOLLING:  Objection.
22        Q    A little?
23        A    Little.
24        Q    What does that mean?
25        A    Well, it may not mean none.
0055
 1        Q    What does little mean?
 2        A    Small.
 3        Q    In dollar amounts what does little or small
 4    mean?
 5        A    I can't answer that.
 6        Q    Why not?
 7        A    Because I do not know in dollars.
 8        Q    Didn't you have a responsibility by agreeing to
 9    be here as the corporate representative to find out what
10    the trading volumes were with FMG, which is specifically
11    identified?
12            MR. BOLLING:  Objection.
13        A    I do not know the dollar amount.
14        Q    My question to you is, do you agree that you
15    had a responsibility to find out what information
16    existed to the areas that I told through your attorneys
17    we were going to be discussing today?
18            MR. BOLLING:  Objection.  Calls for a legal
19    conclusion.
20        A    I -- I cannot answer that.
21        Q    Did you take any steps whatsoever to learn any
22    of the detailed information about trading with FMG
23    during this time frame prior to sitting for this
24    deposition?
25        A    No.
0056
 1        Q    Did you understand prior to sitting down for
 2    the deposition that you had a responsibility to learn
 3    the information, if you didn't know it?
 4            MR. BOLLING:  Objection.
 5        A    I was not aware I needed to know specific
 6    dollars.
 7        Q    Did you read this list before today?
 8        A    Yes.
 9        Q    Well, what does it mean to you:  Purchases and
10    sales through or facilitated by Food Marketing Group --
11    this is Number 11 -- FMG during the time period of 2000
12    and 2005?
13        A    Did you have purchases and sales with FMG?
14    Yes.
15        Q    And --
16        A    That would have been my answer.
17        Q    That's all you thought that you were
18    responsible to do, was to answer that one question about
19    whether or not you had sales or purchases?
```

```
20      A    I have no idea what you were going to ask.
21      Q    I don't want to know what you discussed with
22  your attorneys, but did they, in general, tell you what
23  your responsibilities were with regard to being a
24  corporate representative?
25           MR. BOLLING:  Objection.
0057
 1           And I'd ask you not to divulge anything that we
 2      talked about, pursuant to the attorney/client
 3      privilege and work product doctrine.
 4      Q    Nobody told you that you needed to obtain
 5  information before -- that wasn't resident in your head
 6  before sitting for this deposition?
 7           MR. BOLLING:  Same objection.
 8           And ask you not to answer.
 9      Q    Well, the question is, outside of your
10  attorneys no one told you that -- what -- that you
11  needed to be prepared to answer questions about these
12  subjects?
13      A    I saw the questions.  I was not aware that I
14  needed to be prepared to talk specific dollars by person
15  or company.
16      Q    Okay.  Well, you haven't been able to answer
17  specific dollars, and you also haven't been able to
18  answer whether or not there were e-mail communications
19  on offers either.  You couldn't say one way or the other
20  with any certainty; true?
21           MR. BOLLING:  Objection.
22      A    I -- I cannot tell -- I can tell you I do not
23  recall getting offers via e-mail, but --
24      Q    What did you do --
25           MR. BOLLING:  Let him finish his answer.
0058
 1      Q    Go ahead.
 2      A    As far as dollars per specific supplier I'm not
 3  prepared to give you that we did $102 with a specific
 4  company.
 5      Q    Right.  Did you look back at all of your
 6  e-mails with FMG for this time frame in preparation for
 7  this deposition?
 8      A    No.
 9      Q    Did you ask any employee in sales, all those 20
10  people, whether they did -- had any e-mail
11  communications with FMG during this time frame?
12      A    No.
13      Q    You could have, couldn't you?
14      A    Yes.
15      Q    Same question with regard to Victory.
16           Did you look at your e-mail -- your back
17  e-mails for this time frame, 2000 through 2005, to
18  determine one way or the other whether you communicated
19  deal information by e-mail with Victory at any time?
20      A    I did not look at e-mails.
21      Q    You did not look at your old e-mails?
22      A    No.
23      Q    Did you look at anyone else's e-mails from the
24  sales department?
```

```
25      A    No.
0059
 1      Q    Did you ask any of the sales employees whether
 2 they remember doing business through e-mails with
 3 Victory?
 4      A    No.
 5      Q    Are any of those salespeople still working for
 6 Winn-Dixie?
 7      A    Buyers?
 8      Q    Buyers, yes.
 9      A    Yes.
10      Q    Okay.  So you could have asked those questions.
11 You could have gone around and asked those questions;
12 correct?
13      A    Yes.
14      Q    But you didn't think that that was necessary
15 for this deposition?
16      A    No.
17      Q    Number 13 is:  Purchases and sales through or
18 facilitated by Worldwide Retail Exchange, WWRE, during
19 the time period 2000 through 2005.
20           Did you do anything to determine or become
21 familiar with purchases and sales with WWRE?
22      A    No.
23      Q    Were there any purchases and sales with WWRE?
24      A    No.
25      Q    How do you know that?
0060
 1      A    Because that's not an organization that was a,
 2 quote, diverting organization.
 3      Q    Well, isn't WWRE one of the excluded entities
 4 from the service agreement, which is the critical
 5 document in this case?
 6      A    Yes.
 7      Q    Okay.  Do you know why they were excluded?
 8      A    No.
 9      Q    Do you know if they facilitated any
10 transactions through any other diverters?
11           MR. BOLLING:  Objection.
12      A    I would not know that, so, no.
13      Q    Okay.  You would not personally know that.  Is
14 there anybody else in Winn-Dixie who would know that?
15      A    No.
16      Q    How do you know?
17      A    Because WWRE was not a facilitator of diverted
18 product.  That's what not they were -- that's not what
19 they were built, or what they do today.
20      Q    Who was the WWRE contact at Winn-Dixie --
21           MR. BOLLING:  Objection.
22      Q    -- during this time frame?
23           MR. BOLLING:  Objection.
24      A    I would -- I would guess Daryl Mills.
25      Q    Okay.  Did you talk to Daryl Mills about the
0061
 1 WWRE in preparation for this deposition?
 2      A    Mr. Mills is no longer with Winn-Dixie.
 3      Q    Did you call Mr. Mills?  Is he alive?
```

```
 4      A    Yes.
 5      Q    Have you spoken to him?
 6      A    I have spoken to him.
 7      Q    When have you last spoken with him?
 8      A    I spoke with him yesterday.
 9      Q    Yesterday?
10      A    Yes, sir.
11      Q    What did you speak to him about?
12      A    General stuff.  Nothing about this deposition.
13      Q    When was the last time before yesterday you
14 spoke to him?
15      A    I had lunch with him a month ago.
16      Q    All right.  And did you talk about the Visagent
17 case at all?
18      A    No, sir.
19      Q    And prior to a month ago how long was it before
20 you -- since you last spoke to him?
21      A    I have lunch with Mr. Mills once ever(sic) five
22 or six weeks.
23      Q    Okay.  So you're friends?
24      A    I used to work for Mr. Mills.
25      Q    Would you consider yourself a friend?
0062
 1      A    I -- I would consider him a friend.  I don't
 2 know whether he considers the same thing.
 3      Q    Okay.  Well, how do you get together with him
 4 for lunch; does he call you or do you call him?
 5      A    Usually I call him.
 6      Q    Is there a business purpose to the lunches?
 7      A    No, sir.
 8      Q    Strictly social?
 9      A    Yes, sir.
10      Q    And in all the conversations you've had in
11 these lunches every five weeks has Visagent ever come
12 up?
13      A    I'm sure it has, yes, sir.
14      Q    Tell me what you've talked to him about with
15 regard to Visagent.
16      A    Mr. Mills is aware there's a lawsuit.
17      Q    Right.
18      A    I have never discussed specifics with him.  He
19 knows there's a lawsuit.  He knows Mark.  Never discuss
20 specifics of the lawsuit.
21      Q    Well, in what context did Visagent come up in
22 these conversations?
23      A    How's the Visagent lawsuit going.
24      Q    Does he know what the -- did you explain what
25 the issues are?
0063
 1      A    No.
 2      Q    Okay.  Does he know what the issues are?
 3      A    I do not know.
 4      Q    Has this lunch just been you and he one-on-one?
 5      A    We've had lunch one-on-one; we've had lunch
 6 with other people.
 7      Q    Okay.  What other people have had lunch with
 8 you and Mr. Mills?
```

```
 9      A    Les Wulfert.
10      Q    When was that?
11      A    We may have had lunch in the last six weeks.  I
12 cannot give you a specific date.
13      Q    Was anybody else at that lunch with you,
14 Mr. Mills, and Mr. Wulfert?
15      A    Mark Talton may have been there.
16      Q    Can you spell the last name?
17      A    T-a-l-t-o-n.
18      Q    Is he with Winn-Dixie?
19      A    Yes.
20      Q    What position?
21      A    He's a buyer.
22      Q    Did Visagent come up in any way at that lunch
23 with Mr. Talton and Mr. Wulfert and Mr. Mills?
24      A    Not that I recall.
25      Q    Anybody else who's gone to lunch with you and
0064
 1 Mr. Mills?
 2      A    Not that I recall.
 3      Q    And I think you said that you didn't discuss
 4 with Mr. Mills, when you have had lunches with him,
 5 anything about the WWRE; correct?
 6      A    No, sir.
 7      Q    Did you talk about anything on this list of
 8 1 through 21?
 9      A    No, sir.
10      Q    Where did you meet yesterday with Mr. Mills?
11      A    I did not meet him.
12      Q    I'm sorry.  On the phone?
13      A    Yes, sir.
14      Q    Okay.  How long was the telephone call?
15      A    Two or three minutes, four minutes.
16      Q    What was discussed?
17      A    That I was coming to a deposition today, that
18 he had a conversation with Mark, that he totaled his
19 truck, what kind did I suggest that he buy, or what
20 would I buy.  I think I told him if I had his money I'd
21 buy a big 'un.  That's about it.
22      Q    Did he tell you what he talked to Mark about?
23      A    He just said he had a conversation with Mark.
24      Q    Okay.  Did he make any comment to you about
25 this deposition?
0065
 1      A    Good luck.
 2      Q    Did he suggest to you in any way what might be
 3 asked?
 4      A    No.
 5      Q    Did he suggest to you in any way what to say
 6 about any -- any question?
 7      A    No.
 8      Q    Did you call Mr. Mills yesterday or did he call
 9 you?
10      A    He called me.
11      Q    What is the entity Intesource?
12      A    It's a reverse auction site.
13      Q    And can you explain what that is?
```

14       A    We used them when we were -- to have several,
15   quote, suppliers, slash, manufacturers quote on any
16   given item.  It could have been chickens, it could have
17   been shrimp.  And that's exactly what it is, a reverse
18   auction, where you're lowering the cost of the product.
19            It was a tool.  We did not use it to buy or
20   sell.  It was a tool to -- to drive your costs down.
21            They -- they did -- they were not involved in
22   the actual purchase of product.  Nothing was ever sold
23   on it, but they were not involved in the purchase of the
24   product.
25       Q    Okay.  I think what you're saying is Winn-Dixie
0066
 1   never did any business with Intesource?
 2       A    Well, as the tool, as it was provided, yes.
 3       Q    And so let me make sure that I understand.
 4   Excuse my ignorance, because I'm not -- reverse auctions
 5   are not my bailiwick.
 6            Winn-Dixie would list something on some kind of
 7   a portal of Intesource, and then there would be bidding
 8   where it bids the price down from what you originally
 9   ask?
10            MR. BOLLING:  Objection.
11       Q    Or you buy things that way?
12            MR. BOLLING:  Objection.
13       A    We did not buy or sell.  If we wanted to run a
14   promotion on shrimp, you could invite suppliers to
15   participate in a reverse auction, and have a starting
16   price, whatever it may be, and a supplier could decide
17   whether they wanted to go lower or not lower.
18       Q    Well, ultimately the only way it helps you is
19   if you buy something though at a low price; right?
20       A    That is correct, but it was not bought through
21   the Intesource system.  That was done in entirely
22   different --
23       Q    Right.  But it's facilitated with Intesource?
24       A    Well --
25       Q    Isn't it?
0067
 1            MR. BOLLING:  Objection.
 2       A    Their -- their system was a tool to -- to see
 3   where the pricing would end up.
 4            Facilitated, I don't --
 5       Q    Well, without that tool you wouldn't have a
 6   reverse auction, would you?
 7       A    No.
 8       Q    So they actually brought buyers -- actually,
 9   sellers to you of product?
10       A    No, we -- we would tell them who we wanted them
11   to invite.
12       Q    Okay.
13       A    But then we used their tool.
14       Q    I see.  Okay.  It'd be fair to say they
15   facilitated the sale, would it not?
16            MR. BOLLING:  Objection.
17       A    The information from that tool was what -- was
18   how we decided on who we were going to purchase product

```
19   from.
20        Q    Right.  So their tool facilitated the sale; is
21   that not correct?
22             MR. BOLLING:  Objection.  He's -- that's asked
23        and answered, and he said he didn't know what you
24        meant by facilitate.
25        Q    You don't understand the word facilitate?
0068
 1        A    I understand that we used their system to lower
 2   the cost of our -- potentially lower the cost of an item
 3   we wanted to sell.
 4        Q    That's what Visagent's system did too; right?
 5        A    No.
 6        Q    Visagent's system wasn't a tool?
 7        A    Yes.
 8        Q    It was a tool?
 9        A    Yes.
10        Q    Visagent actually didn't buy or sell to
11   Winn-Dixie, did they?
12        A    No.
13        Q    So they were similar in that they were a tool
14   like Intesource is a tool; right?
15             MR. BOLLING:  Objection.
16        A    They're both tools, but different systems.
17        Q    Okay.  Did Intesource work through the
18   internet?
19        A    Yes.
20        Q    And how much business was done with Intesource
21   through this --
22        A    I do not --
23        Q    -- reverse auction?
24        A    I do not know.
25        Q    Well, weren't you notified that -- again on
0069
 1   this notice -- that we were going to be asking questions
 2   about Intesource?
 3        A    Yes.
 4        Q    What did you do to find information and make
 5   yourself educated about the relationship and the
 6   dealings between Winn-Dixie and Intesource?
 7        A    We had no purchases or sales using the
 8   Intesource system.
 9        Q    I'm totally confused.  Let me just ask a
10   different question then.
11             Did you ever -- was the Intesource tool ever
12   used in connection with Winn-Dixie buying product?
13        A    The information from it was used to buy
14   product.
15        Q    Right.  How much product?
16        A    I cannot answer that question.
17        Q    Why?
18        A    I do not know.
19        Q    Okay.  Well, did -- let me just go to the
20   specific heading on the notice of taking deposition:
21   All aspects of the relationship and dealings between
22   debtor and Intesource during the time period of 2000
23   through the present.
```

```
24          Okay.  This is not asking for sales with
25     Intesource or purchases from Intesource; correct?
0070
 1     A     Correct.
 2     Q     This is just asking about all aspects of the
 3     relationship and all dealings with Intesource.
 4          So let me go back to my last question, which
 5     was:  What did you do in preparation for sitting as the
 6     corporate representative to make yourself familiar with
 7     all aspects of the relationship and dealings between
 8     Winn-Dixie and Intesource?
 9     A     I did not have any communication with anyone on
10     dealings with Intesource and Winn-Dixie.  I know what I
11     know about Intesource.
12     Q     All right.  So you didn't do anything to
13     prepare on this subject, did you?
14     A     No, sir.
15     Q     And you didn't talk to anybody?
16     A     No, sir.
17     Q     And you didn't review any documents?
18     A     No, sir.
19     Q     Was there an Intesource contact with Winn-Dixie
20     that you know of?
21     A     I -- I am sure there was.  I do not know that
22     person's name.
23     Q     Okay.  Had you researched prior to this
24     deposition you'd know that name, wouldn't you?
25          MR. BOLLING:  Objection.
0071
 1     A     I do not know if I would or not.
 2     Q     Well, is this --
 3     A     I may --
 4     Q     -- a secret?
 5     A     I may have found the name.
 6     Q     Is it a secret within Winn-Dixie who was the
 7     contact person with Intesource?
 8     A     No, sir.
 9     Q     Would you know if -- if -- if someone -- if a
10     judge were to ask you or direct you to use whatever
11     resources in Winn-Dixie there are today to find out who
12     was the contact person between Winn-Dixie and Intesource
13     you'd be able to do that, wouldn't you?
14          MR. BOLLING:  Objection.
15     A     I would try, yes.
16     Q     Is there any doubt in your mind that you'd be
17     able to look through files and find out who the main
18     person at Winn-Dixie was to deal with Intesource?
19     A     I do not know that there's files out there.  I
20     -- I -- I do not know.
21          Could I find a contact?  Yes.
22     Q     All right.  We're going to get into the files
23     in a little bit.  Let me just make it through this --
24     this list, and then we'll talk about documents and
25     files.
0072
 1          All aspects of the relationship -- this is
 2     number 17 -- and dealings between debtor and CNS
```

```
 3   Wholesale Grocers for the time period 2000 through the
 4   present.
 5           What did you do to make yourself educated about
 6   this subject?
 7       A   I know about the subject.  I did not go do any
 8   research.
 9       Q   Okay.  Is there anyone who knows more about CNS
10   than you do in terms of the relationship with
11   Winn-Dixie?
12       A   Not that I know of.
13       Q   Is there anyone who knows anything about CNS
14   and Winn-Dixie's relationship other than you?
15       A   Not that I know of.
16       Q   What files did you look at so that you'd be
17   prepared to testify about the specifics of relationships
18   and dealings between Winn-Dixie and CNS?
19       A   None.
20       Q   Okay.  And you spoke to no -- nobody about the
21   relationship?
22       A   No, sir.
23       Q   Has there been any business between Winn-Dixie
24   and CNS during this time frame?
25       A   Not that I'm aware of.
0073
 1       Q   But you haven't looked?
 2           MR. BOLLING:  Objection.
 3       A   I don't know where you would look.
 4       Q   You didn't talk to any buyers?
 5       A   No buyer would have any dealings with CNS.
 6       Q   How do you know that?
 7       A   Because CNS is not somebody they would deal
 8   with.
 9       Q   Tell me why you -- you believe that.
10       A   It's not that I believe it; it's that I know
11   that.
12       Q   Right.  How do you know that?
13       A   Because CNS is a wholesaler of product, and our
14   first and our only relationship with them was brought on
15   by Visagent.
16       Q   Okay.  And when the Visagent relationship ended
17   there was no further contact, to your knowledge, with
18   CNS?
19       A   No, sir.
20       Q   And you understand that when you're answering
21   these questions you're answering all of the questions
22   that we're talking about on behalf of Winn-Dixie, not on
23   behalf of yourself personally?  You understand that?
24       A   Yes, sir.
25       Q   Okay.  Number 18:  All aspects of the outside
0074
 1   sales program in connection with Visagent or any other
 2   entity during the time period of 2001 through the
 3   present.
 4           What did -- what did you do to familiarize
 5   yourself with the outside sales program?
 6       A   I -- I know about it.
 7       Q   Did you read any documents?
```

```
 8      A    No, sir.
 9      Q    Describe exactly what the outside sales program
10  was.
11      A    Exactly?
12      Q    Yes.
13      A    It was devised by -- the idea was devised by
14  Visagent to have two people transmit files that would
15  match up potential sales and purchases on both sides in
16  a way of creating business for both parties.
17      Q    Okay.  And was Winn-Dixie interested in that
18  program?
19      A    I know that we did a test file.
20      Q    How do you know that?
21      A    The person that was working with Mark told me
22  that.
23      Q    Who was that?
24      A    Les Wulfert.
25      Q    Have you had any conversations with Les Wulfert
0075
 1  about the outside sales program?
 2      A    Not since he left Winn-Dixie.
 3      Q    When did he leave?
 4      A    Our last reorg.  We've reorg'd so many times.
 5  16 months, 14 months.  I'm not sure of the exact date of
 6  our last reorganization.
 7      Q    Did you ever have any conversations with
 8  Mr. Wulfert in the context of this litigation?
 9      A    He knows there's a lawsuit.
10      Q    Right.  But my question is, did you talk about
11  the outside sales program at a time when you both knew
12  that there was a lawsuit?
13      A    I -- I -- I don't recall.  I'm not sure.  You
14  know, I've had conversations with Les, but I'm not sure
15  that we talked about the outside sales catalog.
16      Q    Okay.  Has Winn-Dixie matched any information,
17  the way that you described the concept, with any other
18  entity?
19      A    Not that I'm aware of.
20      Q    Well, who have you asked?
21      A    Well, it -- they have not.
22      Q    How do you know?
23      A    Because it would have come through me up in
24  this time frame, and I didn't do anything.
25      Q    Well, this time frame is through the present,
0076
 1  and you haven't been involved in procurement for a
 2  couple years; is that correct?
 3      A    That's correct, but we haven't had an outside
 4  sales catalog since before I was out of diverting.
 5      Q    Right.  Well, how do you know that there isn't
 6  a program now?
 7      A    I do not know there isn't.
 8      Q    Did you ask anybody?
 9      A    No, sir.
10      Q    You didn't think that you had the
11  responsibility to ask anybody if there's an outside
12  sales program, in preparation for this deposition?
```

```
13        A    No, sir.
14        Q    Well, what did you think that Category 18
15   meant?
16        A    The outside sales program was a Visagent
17   program.
18        Q    Right.  I think you said that they're the ones
19   that came up with the idea.
20        A    The outside sales program was a Visagent
21   program, and to the best of my knowledge that's the only
22   time we've ever discussed matching files with anybody.
23        Q    Okay.  And your knowledge only goes up through
24   September of 2005 with regard to procurement.
25             MR. BOLLING:  Objection.
0077
 1        Q    Is that correct?
 2        A    Well, I'm in procurement now.
 3        Q    Alternate source vending.
 4        A    I -- I'm involved in alternate source supplying
 5   now.
 6        Q    In what aspect?
 7        A    I just sort of like help them when they need
 8   help.
 9        Q    Okay.  Are you a consultant?
10        A    No, sir.  I work for Winn-Dixie.
11        Q    Right.  Is it part of your job description to
12   help the alternate source --
13        A    Not in writing no, sir.
14        Q    -- people?
15             When was the last time they asked for your
16   help?
17        A    Yesterday.
18        Q    What did they ask you?
19        A    A deduction.
20        Q    But you have no direct responsibility in that
21   department?
22        A    No, sir.
23        Q    You don't know what goes on day-to-day in the
24   alternate source department, do you?
25        A    No, sir.
0078
 1        Q    They ask questions of you on an as-needed
 2   basis, kind of like a troubleshooter.  Would that be
 3   fair?
 4        A    They ask questions for when they need help.
 5        Q    Right.
 6        A    I won't say a troubleshooter.
 7        Q    Okay.  Helper?
 8        A    I help when I can.
 9        Q    All right.  Number 19 is:  The administration
10   of the service agreement between Visagent and Winn-Dixie
11   which is the subject of this litigation, including all
12   transactions by Winn-Dixie made pursuant to said
13   agreement.
14             What documents -- did you review any documents
15   in preparation for answering questions as to Number 19?
16        A    I've seen the user agreement.
17        Q    Other than the user agreement.
```

```
18        A    No, sir.
19        Q    What individuals have you spoken to in
20   preparation for answering questions as to Number 19?
21        A    No one.
22        Q    And you say you did not speak with Mr. Mills
23   specifically about this category in your conversations
24   with him at lunches or any other social gathering?
25        A    Mr. Mills was aware there was a lawsuit, and
0079
 1   specifically I do not recall ever asking or talking
 2   about something specific.
 3        Q    Right.  Were you involved in the negotiations
 4   for the service agreement?
 5        A    I was in attendance.
 6        Q    In attendance at what?
 7        A    At several meetings.
 8        Q    At meetings.  Were you in attendance in every
 9   meeting?
10        A    I can't say that I was.
11        Q    All right.  In order to answer questions
12   completely about Category Number 19 you'd need to speak
13   to someone who was in each of the meetings, wouldn't
14   you?
15             MR. BOLLING:  Objection.
16        A    I do not know that -- that everybody was at
17   every meeting.
18        Q    No, I'm -- that's exactly what I'm saying.  If
19   different people are at different meetings, then you'd
20   need to speak to at least one person at every meeting to
21   have a complete picture of the negotiations, wouldn't
22   you?
23        A    I do not think so.
24        Q    Well, how would you know what happened in a
25   particular meeting that you didn't attend and you
0080
 1   haven't spoken to anybody about?
 2        A    You wouldn't.
 3        Q    So you are assuming that some meetings were
 4   inconsequential to Category Number 19?
 5        A    I'm sure no meeting is inconsequential.
 6        Q    Well, then how would you answer questions about
 7   a meeting that you have not obtained any information
 8   about?
 9        A    You asked did I attend every meeting.  I do not
10   -- I may have attended every meeting, and I may not
11   have.  I don't know.  I don't know that anybody attended
12   every meeting.  You don't know that.
13        Q    Right.
14        A    If there was five meetings, maybe I was at all
15   five, or maybe I wasn't.  I do not know how many
16   meetings there were.
17        Q    Okay.  You're the corporate representative;
18   right?
19        A    Yes, sir.
20        Q    Corporate representative is supposed to know --
21   is speaking on behalf of Winn-Dixie; right?
22        A    Yes.
```

```
23      Q    So Winn-Dixie as an entity has employees
24 working for it; right?
25      A    Yes.
0081
 1      Q    And, hypothetically, if there's a meeting on
 2 Tuesday, Thursday, and Saturday of any given week, and
 3 there's a Winn-Dixie employee at every meeting,
 4 Winn-Dixie has done something on Tuesday, Thursday, and
 5 Saturday; correct?
 6      A    Yes.
 7      Q    All right.  Now, how would you as the corporate
 8 representative know what happened on Thursday if you
 9 haven't established whether there was even a meeting on
10 Thursday?
11           MR. BOLLING:  Objection.
12      A    I can't answer that.
13      Q    So you don't know when all the meetings took
14 place, do you?
15      A    No.
16      Q    Okay.  You haven't made a list of what all the
17 meetings were, all the meetings or negotiations up to
18 the point of the execution of the service agreement;
19 correct?
20      A    Yes.
21      Q    Okay.  So you don't know how many there were;
22 true?
23      A    Yes.
24      Q    You don't know who attended any particular
25 meeting; correct?
0082
 1      A    Yes.
 2      Q    You don't know what was discussed at any
 3 particular meeting?
 4      A    Yes.
 5      Q    And you're sitting here as the corporate
 6 representative to tell us Winn-Dixie's position on the
 7 service agreement; true?
 8      A    Yes.
 9           MR. RUBIN:  Maybe this is a good breaking
10      point.  Are you ready for lunch?
11           THE WITNESS:  Whenever.
12           MR. RUBIN:  Are we close?  Thank you.
13           THE VIDEOGRAPHER:  Off record at 12:45.
14           (Lunch break.)
15           THE VIDEOGRAPHER:  Back on record at 1:42.
16 BY MR. RUBIN:
17      Q    We covered Number 19 on this list, and I
18 believe that your answers probably will apply also to
19 Number 20.  I don't want to spend too much more time on
20 this list, but would you read Number 20:  All
21 correspondence, communications, internal or external,
22 conferences, meetings, representations, and any other
23 aspect of the relationship between Visagent and debtor
24 from 2000 to the present.
25           We talked about for Number 19 the meetings and
0083
 1 negotiations leading up to the service agreement's
```

```
 2   execution, and I don't want to rehash what your answers
 3   were, but would it be correct to say that you have not
 4   done anything to prepare for this deposition with regard
 5   to the items in Number 20 in terms of reading documents
 6   or talking to people to get further educated about
 7   Number 20 so you'd be prepared as the corporate
 8   representative?
 9           MR. BOLLING:  Objection.
10      A    I have not read any documents.  There's really
11   nobody for me to talk to, because there's not very many
12   people left at Winn-Dixie.
13      Q    Right.  Well, why would the person have to be
14   at Winn-Dixie for you to talk to them?
15      A    They would not have to be.
16      Q    Right.  So it wouldn't have prevented you from
17   talking to Mr. Mills about why he signed the service
18   agreement, or what he meant by the wording that was used
19   in the service agreement; right?
20      A    Yes.
21      Q    But you didn't talk to him about that, did you?
22      A    No, sir.
23      Q    And there were many Visagent employees who
24   worked hand-in-hand with many Winn-Dixie employees
25   during the entire time of the relationship between the
0084
 1   two companies up until late 2004; correct?
 2           MR. BOLLING:  Objection.
 3      A    There was many Visagent people that worked with
 4   many Winn-Dixie people?  Depends on what you call many.
 5      Q    Several from each company working together
 6   toward a common goal.
 7      A    I -- I would not say several.
 8      Q    Okay.  How -- let me not put words in your
 9   mouth.
10           How would you describe --
11      A    Bob would talk to me.  Bob would talk to me,
12   Simon would talk to me, Mark would talk to somebody
13   higher than me.  So two people, three people, maybe.
14           The Visagent people did not have a full reign
15   of talking to everybody in our building.
16      Q    Okay.  Were there any other Visagent people who
17   came to Winn-Dixie for training sessions?
18      A    I think generally it was Bob, Simon, and maybe
19   Mark.
20           Could there have been somebody else?  Tom Bixby
21   maybe.  He was, I think, their IT person at the time.
22      Q    Right.  But this is my point:  You don't know
23   who talked to whom during the course of this
24   relationship, because you haven't done anything to find
25   out before answering questions on behalf of Winn-Dixie,
0085
 1   have you?
 2           MR. BOLLING:  Objection.
 3      A    I know more about our relationship with
 4   Visagent than anybody I could talk to.
 5      Q    But you don't have all the information of all
 6   the employees because you weren't at every place at
```

```
 7    every time, were you, that there was communication
 8    between the two companies?
 9              MR. BOLLING:  Objection.
10         A    No.
11         Q    And you haven't made any attempts to gain
12    additional information other than what's inside your
13    head as Tom Barr who was a buyer for Winn-Dixie;
14    correct?
15         A    I was the alternate source manager for
16    Winn-Dixie.
17         Q    Alternate source manager for Winn-Dixie.
18              Other than your specific role as alternate
19    source manager, you didn't seek out any other people to
20    find out what they did in their relationships with the
21    Visagent entity or the Visagent employees; correct?
22         A    If -- if the Visagent people had a meeting with
23    somebody in that building, not me, I'm relatively sure
24    that I would have heard about it in just discussion
25    about Visagent, because I was Visagent's contact in that
0086
 1    building.
 2         Q    Right.
 3         A    But if you're asking me if yesterday I called
 4    everybody and asked them, no, I did not.
 5         Q    I'm asking you have you talked to anyone at
 6    all.  Let me give you an example.
 7              Patricia Mitchell, as an example, right, had
 8    communications with Mark Rubin.  Are you aware of that?
 9         A    Yes.
10         Q    Okay.  Have you reviewed the communications
11    between Ms. Mitchell and Mr. Rubin?
12         A    Recently?
13         Q    Recently.
14         A    No.
15         Q    Okay.  Have you talked to Ms. Mitchell about
16    her conversations with Mark Rubin or anybody else at
17    Visagent?
18         A    No.
19         Q    So how would -- how would you as the corporate
20    representative of Winn-Dixie know about the relationship
21    between the two companies as it pertains to those
22    conversations?
23         A    I would not.
24         Q    Was there anything preventing you from talking
25    to Patricia Mitchell?
0087
 1         A    I don't know where she's at.
 2         Q    Well, assuming that you could find her, is
 3    there any -- but you didn't try and find her, did you?
 4         A    No, sir, I did not.
 5         Q    And that's just one example.  I mean, there
 6    were many, many people within the Winn-Dixie
 7    organization who had contacts with different levels of
 8    Visagent's organization.
 9              MR. BOLLING:  Objection.
10         Q    Isn't that true?
11         A    Not many.
```

```
12      Q    How do you know unless you -- you looked?
13      A    I -- I know who the Visagent people talked to
14 at Winn-Dixie.  They talked to me and my superiors.
15      Q    Did you speak to Ron Peterson about this
16 category, Number 20?
17      A    No, sir.
18      Q    Did you speak to Chris Wilson?
19      A    No, sir.
20      Q    They had interaction with Visagent employees,
21 didn't they?
22      A    I do not know.
23      Q    Okay.  And you don't know because you never
24 asked?
25      A    I did not ask.
0088
 1      Q    I want to make sure that I understood a
 2 particular answer that you gave earlier about Excel
 3 spreadsheets.  And when I say Excel, I mean, there's
 4 probably a few programs that have spreadsheets.  I use
 5 Excel.  So forget Excel.  Any kind of a spreadsheet
 6 program.
 7           Do you understand what a spreadsheet is?
 8      A    Yes, sir.
 9      Q    Okay.  Did you testify earlier that you never
10 sent out Excel spreadsheets with offerings to diverters
11 over the internet?
12      A    No, sir, I didn't.
13      Q    Okay.  Or by e-mail?
14      A    Did I ever send -- I thought the question was
15 did diverters send us offerings via spreadsheet via
16 e-mail.
17      Q    That might have been, and that's why I'm asking
18 the question, because I want to make sure that I'm
19 covering both directions.
20           They never sent you by e-mail any spreadsheets
21 with availables, buying or selling.  You testified to
22 that earlier; right?
23      A    I think I said I don't recall anybody
24 sending --
25      Q    Okay.  So you don't know one way or the other?
0089
 1           MR. BOLLING:  Objection.
 2      Q    Right?
 3      A    I don't recall anybody sending me spreadsheets
 4 with offerings.
 5      Q    And I don't want to rehash it.  That answer
 6 indicates that you can't be sure that nobody did; true?
 7           MR. BOLLING:  Objection.
 8      A    I don't recall anybody sending me a
 9 spreadsheet.
10      Q    Do you recall you sending spreadsheets to
11 diverters?
12      A    I sent them to Visagent.  Offerings or a
13 spreadsheet?
14      Q    Tell me what the difference is.
15      A    Well, I could have sent somebody a spreadsheet
16 with some deals that we had on stuff, but it wouldn't
```

```
17   necessarily have been an offering.
18        Q    Why would you send a spreadsheet?
19        A    So they could peruse it, see if there's
20   anything they might be interested in.
21        Q    Well, isn't that offering something?
22        A    Well, no.  I -- I consider an offering a select
23   group of items that I have for sale.
24        Q    And the other thing --
25        A    May not be.
0090
 1        Q    -- is just a list of what you have that you're
 2   not selling?
 3        A    That could potentially be a sale.
 4        Q    Potentially.  So you're just identifying
 5   surplus, but you're not offering it at a price or a
 6   quantity?
 7        A    That's correct.
 8        Q    All right.  You'd agree that that's
 9   communicating over the internet the possible sale of
10   surplus goods?
11             MR. BOLLING:  Objection.
12        A    It was sent over the e-mail.
13        Q    Right.  And you're communicating for the
14   purpose of enticing sales.  That's your job; right?
15        A    Yes.
16        Q    Okay.  You'd agree that e-mails is the
17   internet; true?
18             MR. BOLLING:  Objection.
19        A    Yes.
20        Q    Now, did you send out these spreadsheets with
21   either -- you said offerings.  And the other word was?
22        A    A list of deal items.
23        Q    Deal items.  Offerings or deal items.  You sent
24   those out during the three years of the service
25   agreement?
0091
 1        A    I would think so, yes.
 2        Q    Well, that's an equivocal answer.
 3             Do you remember one way or another whether you
 4   sent them out during the course of this service
 5   agreement?
 6             MR. BOLLING:  Objection.
 7        A    I do not recall the exact date, but I would say
 8   yes.
 9        Q    Okay.  That happened on a fairly regular basis,
10   didn't it?
11        A    It depends on what you call regular.
12        Q    Weekly.
13        A    Not every week, no.
14        Q    When did you start doing that?
15        A    I do not recall.
16        Q    And you said you sent them to Visagent and who
17   else?
18        A    I'm sure I sent them to American Foods, I would
19   guess.  And towards -- when our business got real, real
20   bad I may have sent it to others.  I do not recall.
21        Q    Okay.  What was your understanding of -- when
```

```
22    you sent these spreadsheets out what was your
23    understanding of the service agreement with Visagent in
24    terms of whether they should be listed on the exchange
25    or not?
0092
 1            MR. BOLLING:  Objection.
 2       Q    Let me ask a predicate question before we get
 3    to that.
 4            Is what you were sending out for these possible
 5    deals or the offerings items that were already on the
 6    exchange?
 7       A    I can't tell you that.  The exchange was for
 8    full truckloads of products.  Full truckload.  What we
 9    sent out was probably for LTL loads -- LTL quantities.
10       Q    Okay.  So because it was LTL you didn't feel
11    like you needed -- you were obligated under the service
12    agreement to list it on the exchange?
13       A    The service agreement says full truckload
14    quantities.
15       Q    That's not my question.  My question is, is
16    that the reason that you sent out the spreadsheets, that
17    you felt like you didn't need to list LTL quantities on
18    the exchange?
19       A    And my answer is LTL quantities were not
20    governed by the Visagent user agreement.
21       Q    Okay.  The user agreement or the service
22    agreement?
23       A    Service agreement.  Whatever we call that
24    thing.
25       Q    Well, there's a user agreement and then there's
0093
 1    a service agreement.  They're different documents, so I
 2    want to make sure that we're clear.
 3       A    Okay.
 4       Q    When did you first get a copy of the service
 5    agreement?
 6       A    I cannot answer that.  I do not know.
 7       Q    Did you receive it contemporaneously within a
 8    few days of when it was executed?
 9       A    I cannot answer that question.  I do not know.
10       Q    You don't know if you had it weeks, months, or
11    years after June of 2001?
12       A    I would say probably weeks, but I do not know
13    the date.
14       Q    It could have been months?
15       A    I wouldn't think so.
16       Q    I'm not -- when you say I wouldn't think so, is
17    that your best guess, and that's all it is, is a guess?
18            MR. BOLLING:  Objection.
19       A    I do not know when the agreement was handed to
20    me.  No, sir, I do not know.
21       Q    Did you ask anyone to interpret the service
22    agreement for you at any time before this litigation?
23       A    No, sir.
24       Q    So how do you know what the contract meant
25    legally when you read it?
0094
```

```
 1       A    We were obligated to use Visagent for all, what
 2  we call, internet-based trading, which we did.
 3       Q    For all internet-based trading.  What does that
 4  mean, internet-based trading?
 5       A    That means a program that was set up over the
 6  internet for that purpose, which is what the Visagent
 7  system was.
 8       Q    All right.  And you were required to place all
 9  full truckloads for sale on that system?
10            MR. BOLLING:  Objection.
11       A    Only full truckloads.  I never said all
12  truckloads.  Only truckloads.
13       Q    Okay.  So if you had a full truckload of
14  something to sell, that service agreement did not
15  obligate Winn-Dixie to put it on their system; is that
16  correct?
17       A    That is correct.
18       Q    So it was discretionary?
19       A    The -- the system was for all full truckloads
20  of product sold through an internet-based system would
21  be listed on -- we would only use their system.  And
22  that's the only system we used.
23       Q    So, again, under that interpretation -- I
24  understand what you're saying -- Winn-Dixie didn't have
25  to use the system at all if it wasn't using the
0095
 1  internet; is that right?
 2            If it elected not to use the internet it didn't
 3  have to list even one item on the exchange, full
 4  truckload or LTL?
 5       A    Well, it was never LTL, it was only full
 6  truckload.
 7       Q    Okay.  Only full truckloads.
 8            So if Winn-Dixie had a full truckload of
 9  Charmin toilet paper that it wanted to sell, there
10  was -- what you're saying -- your interpretation -- let
11  me rephrase this question.
12            I'm going to ask you, so that we're clear, what
13  Winn-Dixie's official corporate representative position
14  is on this issue.  We can talk in a little bit about
15  what you actually did, okay, as an individual employee,
16  as the surplus goods manager.
17            But from the corporate representative position
18  on this case you're saying that Winn-Dixie never
19  believed that it was obligated by the service agreement
20  to put full truckload sales on the Visagent system?
21       A    Our obligation was to try and help make the
22  Visagent system work, and that's what we did.
23       Q    So is it true that the corporation's
24  interpretation, Winn-Dixie's interpretation, was that
25  this service agreement did not obligate Winn-Dixie to
0096
 1  use the system?
 2       A    If we were going to use an internet-based
 3  system, we were going to use Visagent.
 4       Q    And if Winn-Dixie elected not to use an
 5  internet-based system then the service agreement didn't
```

```
 6   obligate Winn-Dixie to do anything?
 7   A    (No response.)
 8   Q    True?
 9   A    I -- I don't agree with that.
10   Q    Well, I'm just trying to understand what you're
11   telling me.
12        You're saying your interpretation is if a full
13   truckload was going to be sold or bought through the
14   internet that we had to use Visagent.  But if a full
15   truckload -- if we decided that a full truckload wasn't
16   going to be sold through an internet-based system, then
17   we didn't have to use Visagent.  Right?
18   A    Our obligation to Visagent was to try and make
19   their system work, which that's what we tried to do.
20        MR. RUBIN:  We're going to get into the service
21        agreement, but let me just have these marked and get
22        this out of the way.  This is Exhibit Number 3.
23        (Exhibit No. 3 was marked for identification.)
24   Q    Just tell me when you're done.
25   A    Okay.
0097
 1   Q    This document is an e-mail from you; correct?
 2   A    Yes, sir.
 3   Q    And it's sent on August 7, 2003, to maybe 20 or
 4   30 people?
 5   A    Yes, sir.
 6   Q    And you're including with it some Excel
 7   spreadsheets; right?
 8   A    Yes, sir.
 9   Q    And I think you've already said that this was
10   transmitted through the internet; right?
11   A    Yes, sir.
12   Q    And you say here:  Attached are items that we
13   may be able to offer to you in truckload or LTL.  Right?
14   A    Yes, sir.
15   Q    You wrote that?
16   A    Yes, sir.
17   Q    I'm handing you what's going to be marked as
18   Exhibit Number 4.
19        (Exhibit No. 4 was marked for identification.)
20   Q    More spreadsheets from you on September 2 to a
21   whole number of people enclosing spreadsheets of items
22   that quantities may be limited?
23   A    Yes.
24   Q    Right.  This is sent over the internet?
25   A    Yes.
0098
 1        MR. BOLLING:  Objection.
 2        (Exhibit No. 5 was marked for identification.)
 3   Q    Exhibit Number 5.  October 13, '03, from you to
 4   a number of people.  And can you go through this list of
 5   people and identify who they are?
 6        You've got the person -- you've got Simon
 7   Garwood who's a Visagent employee; right?  That's the
 8   first person.
 9   A    Some of them I do not remember who they were
10   with.
```

```
11      Q    Well, just tell me -- let's go through it and
12  tell me which ones you do know.
13      A    Cathy I do not, Chris I do not, Cliff I do not,
14  Craig I do not, Dan I do not, Donna Story I do not.
15      Q    Deluxe Distributors.  What is that?
16      A    That's a -- that's an HVC diverter.
17      Q    That's a diverter.  Okay?
18      A    Eric Wieda is with Newport Wholesale.
19      Q    What do they do?
20      A    They're a diverter.
21           Harriet Cohen I do not, Jeff Sizemore is with
22  Purity Wholesale.
23      Q    Diverter?
24      A    Yes.
25           John Cannistra, American Foods, a diverter.
0099
1  John Garretson I do not know, or do not recall.  John
2  Mansfield I do not, Kevin Smith I do not, Kirk Walker,
3  Purity Wholesale, Laurel Catton I do not, Premier is a
4  diverter, Prestige is a diverter, Rick Quillman was with
5  Wholesale Exchange, who is a diverter.  Rob Post, I do
6  not remember who he's with.  Robert Horick is with
7  Purity Wholesale.
8      Q    Purity is a diverter?
9      A    Purity is a diverter.
10          Ross Cord I do not recall, Scott Cummings I do
11  not recall, Scott Olsen I do not recall, Shaun Moore I
12  do not recall, Sherry Nelson I do not recall, Stephanie
13  Brokamp I do not recall, Steve Lewis I do not recall,
14  Sue Parks I do not recall.  TDM12 is a diverter.  Tom
15  Schisler I do not.  Victory Bocca is a diverter, and
16  Westin Trading is a diverter.
17      Q    Okay.  And these were not offered through the
18  Visagent exchange; correct?
19      A    I do not know that.
20      Q    Well, if you offered them through the Visagent
21  exchange that would defeat the purpose of the exchange,
22  because the exchange is supposed to be anonymous, right?
23      A    The exchange is supposed to be anonymous, that
24  is correct.
25      Q    So it wouldn't make any sense to send these and
0100
1  also be on the exchange, would it?
2      A    Sure it would.  I do not know who is on the
3  Visagent exchange.  Nobody.  It's an anonymous exchange.
4  One of these people or none of these people could be on
5  the exchange.
6      Q    All right.  And you're offering it to these
7  people to sell it outside of the exchange if they
8  respond to your e-mail; correct?
9      A    Yes.
10      Q    This is a way to avoid doing business through
11  the exchange; correct?
12      A    No.
13      Q    Why would you write this e-mail?
14      A    To sell product.
15      Q    Outside of the exchange; right?
```

```
16        A    Yes.
17        Q    All right.  And that would be true for all of
18   these e-mails that I'm going through with the
19   spreadsheets attached, so far Exhibits 3, 4, 5, and I've
20   got a couple more; that would be true for all of these?
21        A    True as?
22        Q    That the reason you sent these was to sell
23   product outside of the exchange?
24             MR. BOLLING:  Objection.
25        A    I was not obligated to only use the exchange.
0101
 1        Q    That's not the question.  The question was,
 2   these e-mails were sent for the purpose of selling
 3   product outside of the exchange; true?
 4             MR. BOLLING:  Objection.
 5        A    Yes.
 6             (Exhibit No. 6 was marked for identification.)
 7        Q    Exhibit 6.  This is your e-mail on October 27,
 8   2003?
 9        A    Yes.
10        Q    And again your goal is to sell product in full
11   truckload quantities outside the exchange; right?
12        A    No, sir.
13        Q    No.  What's your goal?
14        A    Could be available.  May be available.  It
15   doesn't say anything about just full.  It could be LTL.
16        Q    Okay.  Well, full would be better than LTL,
17   wouldn't it?
18        A    It's easier.
19        Q    Right.  And more profitable?
20        A    For the most part, yes, sir.
21        Q    Right.  So the goal is to sell full truckload
22   outside the exchange through this internet
23   communication; right?
24             MR. BOLLING:  Objection.
25        A    The object was to sell product.
0102
 1        Q    Right.  And the way that this e-mail would
 2   accomplish that would be to go outside the exchange;
 3   right?
 4        A    Would be outside the exchange.
 5        Q    And this was communicated through the internet?
 6        A    Yes.
 7             (Exhibit No. 7 was marked for identification.)
 8        Q    Exhibit Number 7, another e-mail, December 8th,
 9   to mostly diverters?
10        A    Yes.
11        Q    Sending spreadsheets for product that was
12   available in truckload quantities?
13        A    May be available.
14        Q    Right.  You are advertising to these people
15   that these may be available in truckload quantities,
16   which would be your goal, to sell truckloads?
17        A    May have been my goal, but it doesn't usually
18   happen that way.
19        Q    Right.  And this was communicated over the
20   internet; right?
```

```
21      A    Yes, sir.
22      Q    Purity was one of the biggest diverters; right?
23      A    Yes.
24      Q    And they sent offerings to Winn-Dixie on a very
25 large scale basis, I mean thousands of product offerings
0103
 1 weekly; right?
 2      A    They sent a -- we got fax offers from them
 3 probably daily, but they had a download system that
 4 actually went to Victory, then sent to Winn-Dixie.
 5      Q    Right.  And so the download from Purity was by
 6 -- that's electronic; correct?
 7      A    I do not know that.
 8      Q    Okay.  Whatever download means.
 9      A    Okay.
10      Q    You don't know what it means, do you?
11      A    I know it's transmission of a file.
12      Q    Data transmission; right?
13      A    I would suppose.
14      Q    It's done over computer lines, isn't it, to the
15 best of your knowledge?
16      A    Yes.
17      Q    Okay.  And it's transmitted over some kind of a
18 network; right?
19      A    Yes.
20      Q    And you don't know whether that's the internet
21 or not.  I understand that.
22      A    That's correct.
23      Q    Okay.  Did you ever inquire of anyone at any
24 time whether the transmission of data through these
25 networks were being done through the internet or not?
0104
 1      A    No.
 2      Q    Would it have made any difference based upon
 3 your interpretation of the service agreement?
 4      A    I -- I do not think so.
 5      Q    Well, what is Winn-Dixie's position; that it
 6 makes no difference whether that was through the
 7 internet, because you didn't have an obligation to sell
 8 anything through the internet; right, or buy anything
 9 through the internet?
10           MR. BOLLING:  Objection.
11      A    Our obligation was to make the Visagent system
12 work, and it was the only web-based program that we
13 used.
14      Q    Okay.  Was there any other obligation of
15 Winn-Dixie in the service agreement other than what
16 you've already stated?
17           MR. BOLLING:  Objection.
18      A    I'm sure there's several things in there.  I
19 would have to look at it.
20      Q    All right.  Very good.  And we'll get to that
21 document very shortly.
22           But following through on -- on the Purity line.
23 They had data transmissions to Victory, and Victory
24 accepted those data transmissions which were intended to
25 get to Winn-Dixie; right?
```

```
0105
 1          MR. BOLLING:  Objection.
 2     A    End result would be.
 3     Q    Right.  Okay.  And Victory acted as an agent in
 4  that capacity; in other words, they were just the
 5  middleman in getting the electronic data from Purity,
 6  and then somehow making that a usable format and giving
 7  it to your buyers to review; right?
 8     A    That is correct.
 9     Q    And then your buyers would say yes or no to
10  whatever products were there and get that information
11  back to the agent, Victory, and they would communicate
12  the yes or no to Purity; right?
13     A    That is correct.
14     Q    And how did they communicate the yes or no back
15  to Purity?
16     A    By fax.
17     Q    All right.  Only?  Exclusively by fax?
18     A    As far as I know, yes.
19     Q    Okay.  When you say as far as you know, who did
20  you talk to in preparation for this deposition that was
21  in a position to know one way or the other?
22     A    It was done by fax.
23     Q    Well, how do you know that?
24     A    Because that's normal procedure.
25     Q    How do you know it wasn't done by electronic
0106
 1  transmission at some point up until Victory left the
 2  premises?
 3     A    A piece of paper was created, given to a buyer,
 4  buyer says yes/no.  That piece of paper with yes/no is
 5  faxed to Purity to see if that product was still
 6  available, then Purity would take that piece of paper,
 7  put yes/no on it, send it back to us.
 8     Q    By fax?
 9     A    Yes.
10     Q    No other way?
11     A    I do not think so.
12     Q    Do you know one way or the other?
13     A    I'm -- I'm -- without a doubt it was done by
14  fax.
15     Q    Okay.  And it was never done any other way?
16     A    I don't think that it was able to be done
17  another way.
18     Q    All right.  There was a change in the NTS
19  system, was there not, when -- at the end of 2002; there
20  was an extension of their contract?
21          MR. BOLLING:  Objection.
22     Q    Are you familiar with that?
23     A    A change in the NTS system.  We changed it all
24  the time.  I would ask them to upgrade different things
25  for me.
0107
 1          You need to be more specific than what you're
 2  saying.
 3     Q    Okay.  Let me just make sure I understand.  The
 4  system that you just described with Victory and the
```

```
 5   taking the data transmissions and then going through,
 6   taking it to your buyers in paper form and then sending
 7   it back over the fax if it's a yes, that was for buying
 8   and for selling?
 9   A    For buying.
10   Q    Just for buying.  What about for selling?
11   A    All of our offers were sent this a-way(sic) or
12   by phone.
13   Q    Okay.  All of them were sent by either I --
14   e-mail or by phone?
15   A    Bob.  Any offer he made was done by phone.  I
16   was the one that sent these.  Bob never sent these.
17   Q    Okay.  Bob who?
18   A    Bob Carlson.  He was the account manager for
19   Victory.
20   Q    And was this process that you've described
21   going through Victory the same process for all
22   diverters, not just Purity?
23   A    Yes.
24   Q    So all the diverters had downloads that were
25   captured by Victory?
0108
 1   A    All inventory diverters, yes.
 2   Q    Okay.  What are the other kinds of diverters
 3   other than inventory?
 4   A    A flip diverter.
 5   Q    Okay.  What is a flip transaction?
 6   A    The diverter never takes possession of it.  He
 7   buys it from whomever, never brings it into his
 8   possession.  It goes from that person to the end user
 9   all in one scoop.
10   Q    All right.  And were flip transactions -- were
11   flip transactions included one way or the other in the
12   service agreement?
13   A    Flip transactions.
14   Q    Was there any obligation to put flip
15   transactions through the Visagent exchange?
16        MR. BOLLING:  Objection.
17   Q    According to the -- to Winn-Dixie's
18   interpretation of the service agreement.
19   A    We bought flip delivered product.  We did not
20   have the capability, with the exception of maybe
21   twice -- our product that we sold was brought into our
22   warehouse first and then sent out from there.
23   Q    Okay.  I'm not sure how that relates to my
24   question.  My question was, were flip transactions
25   required under the service agreement, according to
0109
 1   Winn-Dixie's interpretation of that document, to go
 2   through the exchange or not?
 3        MR. BOLLING:  Objection.
 4   A    The answer is no.
 5   Q    All right.  Did Winn-Dixie ever tell any
 6   diverter that flip transactions had to go through the
 7   exchange?
 8   A    We asked all diverters to use the exchange,
 9   when it was announced.
```

```
10      Q    Asked or instructed that all flip transactions
11   must go through the exchange?
12      A    We asked that all diverters sign up and use the
13   exchange.
14      Q    Wasn't that a requirement of the diverter to do
15   business with Winn-Dixie?
16      A    For internet-based trading, yes.
17      Q    So did you tell the diverters that that was
18   only for internet-based training?
19      A    I did not put out the letter.
20      Q    Did Winn-Dixie -- I'm not asking you
21   individually.
22           Did Winn-Dixie advise the diverters that got
23   the announcement letter that flip transactions that went
24   through the internet had to go through the exchange, but
25   flip transactions that weren't going through the
0110
 1   internet can be done the old-fashioned way?
 2      A    I need to look over the -- the letter that was
 3   put out.
 4      Q    Well, to your knowledge as the corporate
 5   representative, other -- outside of that letter was
 6   there any other communication that was made to diverters
 7   describing that option to go outside the system?
 8      A    I asked diverters to use the exchange.
 9      Q    Again, I don't want to get caught into a
10   problem.  I'm not asking you individually what you did.
11   I'm asking what Winn-Dixie communicated.
12      A    As a representative of Winn-Dixie, I asked the
13   diverters to use the exchange.
14      Q    I'm still asking a different question.
15           Did Winn-Dixie ever communicate to diverters
16   that flip transactions could be done either through the
17   Visagent exchange or through the traditional model that
18   they had been doing business previous, prior to the
19   execution of the service agreement?
20      A    No.
21           (Exhibit No. 8 was marked for identification.)
22           MR. RUBIN:  We're done with those.  So maybe we
23      can put them in a stack in order in case we need to
24      go back to them.
25      Q    What we have marked as Exhibit 8 is our first
0111
 1   request to produce to Winn-Dixie.
 2           Have you ever seen this document before?
 3      A    Yes.
 4      Q    Can you tell us what you did specifically to
 5   locate documents that were potentially responsive to
 6   these requests?
 7      A    An e-mail was sent.
 8      Q    I don't want to know what they said in an
 9   e-mail.
10           MR. BOLLING:  Let me make an objection that
11      you can go ahead and answer this to the extent it
12      doesn't divulge what you and either the Winn-Dixie
13      in-house attorneys or us talked to you about.
14      Q    All right.  I don't want to know what anybody
```

```
15    said to you.  I just want to know what you did or what
16    you know about locating documents.  Okay?
17        A    All documents that I know of was turned over to
18    our legal department.
19        Q    Right.  And my question is, number one, did
20    anybody help you at Winn-Dixie to retrieve documents?
21        A    An e-mail was sent by our legal department
22    asking --
23            MR. BOLLING:  Let me make an objection that you
24        not disclose your communications with the legal
25        department.
0112
 1        A    An e-mail was sent by somebody.
 2            MR. BOLLING:  If it was the legal department
 3        then you shouldn't say --
 4            THE WITNESS:  I'm sorry.
 5            MR. BOLLING:  -- what was in it.
 6        Q    All I want to know is what you did or who
 7    helped you locate documents that are responsive
 8    potentially to these requests.
 9            So you got this document; right?
10        A    Yes.
11        Q    You read it?
12        A    Yes.
13        Q    It asks for documents from certain categories
14    and certain time frames; right?
15        A    Yes.
16        Q    And did you have anyone -- were you the person
17    who was in charge of collecting these documents?
18        A    The documents I had possession of, yes.
19        Q    All right.  Which categories of documents did
20    you have possession of?  And when you say possession,
21    what do you mean by that?
22        A    I mean, I had a couple of binders full of
23    Visagent-related material.
24        Q    Okay.  Where were those being stored?
25        A    In my place of -- where I work.
0113
 1        Q    Were those in your own file cabinet?
 2        A    My possession.
 3        Q    Okay.  Did someone ask you to keep those in a
 4    special place at the end of the Visagent contract so
 5    that you could easily get to them?
 6        A    No, sir.
 7        Q    So what other documents are kept where you got
 8    these from?
 9        A    What other documents.
10        Q    I mean, is it a file room, a file cabinet, one
11    particular drawer?
12        A    The documents that I had were in two binders in
13    my cube in a file cabinet.
14        Q    In your cube.  How big is your cube?
15        A    Not very big.  We're packed like sardines.
16        Q    Okay.  Would you say it's 10 x 10?
17        A    Try 6 x 6.
18        Q    6 x 6.  Did you -- why were these documents
19    with you in your cube?
```

20      A      Because I did business with Visagent.
21      Q      Okay.  Were there other files that related to
22  Visagent or any of these other requests that were not in
23  your cube?
24      A      Could have been.
25      Q      What did you do?
0114
 1      A      An e-mail was sent asking for people to provide
 2  those documents.
 3      Q      Okay.  So the legal department sent out a
 4  message to retrieve documents?
 5      A      An e-mail was sent asking us to go through our
 6  files and provide the documents that we had.
 7      Q      Who is we; you and who else?
 8      A      Anybody that happened to have anything that had
 9  Visagent on it.
10      Q      All right.  Did you have a correspondence file
11  with Visagent?
12      A      I had an e-mail file.
13      Q      All right.  What about letters or
14  presentations, or all the materials that had gone --
15      A      I had presentations from them.
16      Q      Okay.  One, or more than one?
17      A      At least one.
18      Q      Okay.  And you had the original presentation
19  materials?
20      A      I do not know if it's original or a copy.
21      Q      What did the other employees -- and what did
22  any other employees have that were responsive to these
23  requests?
24      A      I did not personally look over everything they
25  had.  They were sent on their own to somebody.
0115
 1      Q      Well, again, you're the corporate
 2  representative here, and you're supposed to know what
 3  Winn-Dixie knows about this lawsuit and about all of the
 4  categories of items in the notice.
 5             So my question to you is, what is the total
 6  world of documents and where were they when we requested
 7  them?
 8             MR. BOLLING:  Objection.
 9      A      I know there's like 10,000 pages of paper.
10      Q      Where did they come from?
11      A      From different sources.  But I did not read
12  every one of those 10,000 pages.
13      Q      Without telling me what they said, do you know
14  where they came from, which specific employees or
15  departments they came from?
16      A      I would assume they came -- no.  They would
17  come from the procurement department.  Who had them?  I
18  cannot answer that question.
19      Q      Okay.  And did you ever put your hands on the
20  documents that came from other people in the procurement
21  department?
22      A      I may or may not have.  I did not take --
23  physically take documents and hand them to somebody, no.
24      Q      How did they get from procurement to legal?

```
25      A    That would be something you'd have to ask
0116
 1   somebody else.  I do not know.
 2      Q    Well, you're the corporate representative.
 3      A    I understand.
 4      Q    But you don't know that?
 5      A    No, sir.
 6      Q    So you don't know -- as the corporate
 7   representative you don't know whether we have all of the
 8   correspondence that's requested in Document Request
 9   Number 2?
10           MR. GAY:  Objection.
11      A    No.
12      Q    Do you know whether we have all internal
13   communications between employees of Winn-Dixie
14   referencing in any way Visagent?
15           MR. GAY:  Objection.
16      A    No.
17      Q    Do you know whether every internal
18   communication as requested in Number 3 was provided to
19   your attorneys for review?
20      A    No.
21      Q    Same question for Document Request Number 2.
22   Do you know whether every copy of every correspondence
23   between Visagent and Winn-Dixie for that time period was
24   provided to your attorneys?
25      A    No.
0117
 1      Q    Do you know whether the documents requested in
 2   Number 4 have all been provided to your attorneys for
 3   production in this case?
 4      A    No.
 5      Q    Have you had any involvement at all in
 6   collecting documents, including correspondence, e-mails,
 7   or any type of communication between Visagent and Dayman
 8   & Associates?  You've been involved in that task.
 9      A    Explain it to me one -- how you said it again.
10   I'm sorry.
11      Q    In Number 4 we requested all different kinds of
12   correspondence between Winn-Dixie and Dayman; correct?
13      A    Yes.
14      Q    And that's a sister company to FMG; right?
15      A    Was.
16           MR. BOLLING:  Objection.
17      Q    Was.  Were you involved in collecting what's
18   requested in Request Number 4?
19      A    No.
20      Q    Okay.  You can't tell us then whether that
21   information has been provided by Winn-Dixie to its
22   attorneys in this case, have you?
23      A    No.
24      Q    Request Number 5.  We've asked for all
25   communications between Winn-Dixie and Victory.
0118
 1           Did you do anything -- did you have any
 2   personal involvement to collect any such documents?
 3      A    No.
```

```
 4      Q    Do you know where they would have been stored
 5  for that time period, 2001 to, let's say, the end of
 6  2004?
 7      A    No.
 8      Q    Were you -- as corporate representative were
 9  you made aware of what efforts any other Winn-Dixie
10  employee made to collect the documents requested in
11  Number 5?
12      A    No.
13      Q    And as we sit here today, as the corporate
14  representative you don't know whether all of these
15  documents have been provided by Winn-Dixie to your
16  attorneys in the context of this case?
17      A    No.
18      Q    Same for Document Request Number 6.  Did you
19  have any personal involvement in trying to find
20  CNS-related documents?
21      A    No.
22      Q    Do you know of anyone else who did at
23  Winn-Dixie?
24      A    No.
25      Q    Do you know whether Winn-Dixie has provided any
0119
 1  documents, or all of the documents rather, requested in
 2  Number 6 to your litigation attorneys?
 3      A    No.
 4      Q    Document Request Number 7:  All communications
 5  between Winn-Dixie and Food Marketing Group.
 6           Did you have any involvement in trying to put
 7  together those documents?
 8      A    No.
 9      Q    Do you know who did?
10      A    No.
11      Q    Do you know if anybody did?
12      A    No.
13      Q    Do you know if any documents or -- do you know
14  if all the documents responsive to 7 have been given to
15  litigation counsel for Winn-Dixie?
16      A    No.
17      Q    Number 11 requested business transaction
18  reports between the debtor and Victory.
19           Did you make any attempt to collect business
20  transaction reports?
21      A    No.
22      Q    Do such documents exist, to your knowledge?
23      A    I'm not real sure what business -- what -- what
24  the scope of that is.
25      Q    Transaction reporting.
0120
 1           You know what transaction reporting is, don't
 2  you?
 3      A    Yes.
 4      Q    Okay.  Do you know if there are transaction
 5  reports that are done on -- that were done during this
 6  particular time frame which show the business between
 7  Winn-Dixie and Victory?
 8      A    All reports that I have have been turned over
```

```
 9   to legal.
10        Q    Right.  My question to you:  As the corporate
11   representative are you aware of any other types of
12   reports other than what you had that show business
13   transactions, either individual or aggregated, like
14   annual or quarterly reporting, showing the business
15   between Victory and Winn-Dixie?
16        A    No.
17        Q    In preparation for this deposition have you
18   spoken to anyone about whether or not such documents
19   might exist?
20        A    No.
21        Q    Have you attempted to locate the documents that
22   were not in your area, your box?
23        A    No.
24             THE VIDEOGRAPHER:  Excuse me.  Can I change
25        videotape?
0121
 1             Off record at 2:42.
 2             MR. RUBIN:  Let's break for five.
 3             (Short break.)
 4             THE VIDEOGRAPHER:  Back on record at 2:56.
 5   MR. RUBIN:
 6        Q    With regard to the document production for all
 7   of these items that were requested, the e-mail that came
 8   out asking for employees to collect documents, was that
 9   attaching the request so everyone knew what was being
10   requested?  This -- was this attached to that?
11        A    No.
12        Q    What did the e-mail request people collect?
13        A    Any communication files, e-mails written with
14   Visagent or Dayman.
15        Q    Okay.  What about Victory; was there a separate
16   e-mail asking for --
17        A    No.
18        Q    -- Victory and Winn-Dixie communications?
19        A    No.
20        Q    Well, how were those collected?
21        A    I do not know that.
22        Q    Have they been collected?
23        A    I think all documents that pertain to this have
24   been turned over to legal.
25        Q    What do -- what do you base that on?
0122
 1        A    To the best of my knowledge.
 2        Q    What knowledge are you basing that on?
 3        A    To the best of my knowledge all the documents
 4   that -- that pertain to this have been turned over to
 5   legal.
 6        Q    Who turned over documents regarding
 7   communications between Victory and Winn-Dixie?
 8        A    That would have been documents that I had.
 9        Q    Okay.  And were there any documents at any
10   other levels?  You were a manager, but there may have
11   been documents at a higher level with people at a higher
12   level than you; right?
13        A    Not that I know of.
```

```
14        Q    You mean Victory never had any communications
15   with, say, Phil Payment?
16        A    Not that I'm aware of, but they could have.
17        Q    Right.  What did you do to find out whether
18   there were documents between Victory and any managerial
19   level higher than you?
20        A    I did -- I did not.
21        Q    So there may exist documents out there and you
22   just don't know about them?
23        A    I think all documents have been turned over
24   that -- that -- that Winn-Dixie has.
25        Q    Did you ever ask Mr. Mills whether he had any
0123
 1   communications to or from Victory?
 2        A    No.
 3        Q    So you wouldn't know if he had any
 4   communications in the files that he had left when he
 5   retired, would you?
 6             MR. BOLLING:  Objection.
 7        A    No.
 8        Q    So there may be documents there; right?
 9        A    I -- I do not think so.
10        Q    You're guessing that there aren't.  You don't
11   know one way or the other, do you?
12             MR. BOLLING:  Objection.
13        A    I don't know that there are.
14        Q    You don't know that there are and you don't
15   know that there are not; correct?
16        A    Yes.
17        Q    Okay.  Same thing for documents that may have
18   come to or from Mr. Payment?
19             MR. BOLLING:  Objection.
20        A    Yes.
21        Q    And that would be the similar answer with
22   regard to CNS communications?
23             MR. BOLLING:  Objection.
24        A    Yes.
25        Q    Same answer with regard to Purity
0124
 1   communications?
 2             MR. BOLLING:  Objection.
 3        A    Yes.
 4        Q    Same answer with regard to FMG communications?
 5             MR. BOLLING:  Objection.
 6        A    Yes.
 7        Q    Tell us what the chain of command was in late
 8   2000, early 2001 within the procurement department.  Who
 9   was at the top?
10        A    Just procurement?  Phil Payment.
11        Q    And who was his boss?
12        A    That may come to me.  I do not remember the
13   gentleman's name.
14        Q    Okay.  Who reported directly to Phil Payment?
15        A    Several people.  Daryl Mills.  Several business
16   development -- development managers reported direct to
17   Payment.
18        Q    What was Mr. Payment's title?
```

```
19      A    VP of procurement, I believe.
20      Q    And what was Mr. Mills' title?
21      A    Director of strategy and business.
22      Q    Do you know anybody else who directly reported
23 to Mr. Payment?
24      A    Pat Rice was director of grocery.  I think
25 there was one other person.  I'm sorry, I don't remember
0125
 1 who it was.
 2      Q    All right.  So we have some business
 3 development managers, Mr. Mills, Pat Rice.  Is that a
 4 man or a woman?
 5      A    It's a man.  And actually the business managers
 6 reported to Pat, who reported to Payment.
 7      Q    Okay.
 8      A    I'm sorry.
 9      Q    Okay.  Those are down here.  And you don't know
10 who they are?
11      A    I know some of them.  I don't know that I could
12 tell you every one of them.
13      Q    Well, just the ones you know.
14      A    At that time it was Dwayne Rabin, Eddie Martin,
15 Don Plese.
16      Q    How do you spell that name?
17      A    P-l-e-s-e.  Joe Goode, Tim McNamara, John
18 Foley.  And there's one other that I do not remember his
19 name.
20      Q    To your knowledge are any of these gentlemen
21 still working with Winn-Dixie?
22      A    Tim McNamara, Joe Goode.
23           Want to tell me the other names?
24      Q    Rabin?
25      A    Dwayne is still with Winn-Dixie, yes.
0126
 1      Q    Martin?
 2      A    No.
 3      Q    Plese?
 4      A    No.
 5      Q    Foley?
 6      A    Oh, excuse me.  Plese is.  He's -- he's in
 7 Tampa, Florida.
 8      Q    Foley?
 9      A    No.
10      Q    Mr. Rice?
11      A    No.
12      Q    And who reported to Mr. Mills?
13      A    Myself, Kevin Gates and his group.
14      Q    What was his group?
15      A    Business systems manager, or business systems.
16           Gary Regina and his group was reclaim.
17      Q    What is reclaim?
18      A    It's returns to the manufacturer.  That's us.
19 That was the three of us that reported straight to
20 Mr. Mills.
21      Q    Okay.  And then who reported to you?
22      A    The Victory people.
23      Q    Anybody else?
```

```
24      A    No, sir.
25      Q    And we've already talked about the Victory
0127
 1  people.
 2           You haven't remembered anybody else who was
 3  there?
 4      A    No, sir.
 5      Q    Bob Carlson was one of the Victory people?
 6      A    Yes, sir.
 7      Q    Did he write letters or announcements on behalf
 8  of Winn-Dixie?
 9      A    Not -- not that I -- I -- not that I recall.  I
10  won't say he didn't send out an e-mail to somebody, but
11  the only announcement I know that we made was the
12  Visagent announcement.  I think Daryl Mills wrote that.
13      Q    Okay.  Did Mr. Carlson ever consider himself a
14  Winn-Dixie employee?
15      A    No, sir.
16      Q    Okay.  Do you know if he was permitted to use
17  Winn-Dixie letterhead?
18      A    Not that I know of.
19      Q    Do you know who Nicole Stephanof is?
20      A    Yes.  She was a Victory person.  That's one
21  that I didn't remember.
22      Q    Okay.
23      A    Didn't recall.
24      Q    Okay.  Of the people that worked for Victory
25  that were working alongside of the Winn-Dixie
0128
 1  procurement department that we've talked about, did they
 2  do business for themselves, or did they do business
 3  exclusively for Winn-Dixie?
 4           MR. BOLLING:  Objection.
 5      Q    If you know.
 6      A    Did they do business for themselves.
 7      Q    What I mean is did they have -- was the
 8  arrangement that -- that allowed them to be there and
 9  have office space -- it was on the same floor with you?
10      A    Yes.
11      Q    What was the arrangement?
12      A    They would assist us with our sales and
13  purchases of diverted product.
14      Q    Okay.  Was that their only job?
15      A    As far as I know, yes.
16      Q    Okay.  Do you know one way or the other what
17  the inner workings of that organization were -- was for
18  the group of people who worked there in-house at
19  Winn-Dixie?
20           MR. BOLLING:  Objection.
21      A    I'm not sure what you're asking me.
22      Q    What I mean is do you know if those people only
23  worked on Winn-Dixie business when they were doing their
24  business there at the Winn-Dixie on the Winn-Dixie
25  property?
0129
 1      A    That should be all they were doing.
 2      Q    Why was that all they should be doing?
```

```
 3      A    Because they were assigned to Winn-Dixie.
 4      Q    And how do you know that?
 5      A    Because Victory put them there to assist
 6  Winn-Dixie.
 7      Q    Okay.  Did someone explain to you from a
 8  business standpoint, a contractual standpoint, what the
 9  arrangement was between Victory and Winn-Dixie in 2000,
10  early 2001?
11      A    I know we had an agreement with Victory.
12      Q    Right.  Do you know what that specific
13  agreement was?  I know that you said you saw a contract
14  at some point.
15      A    Well, we give them office space, we furnished
16  their phones.  They furnished their own equip- -- well,
17  we furnished their computers, they furnished their own
18  fax.  And they were to aid us with buying and selling of
19  diverted product.
20      Q    But no one ever explained that to you; that's
21  kind of what the assumption was?  How did you come by
22  that information?
23      A    Because I was there when we put Victory in to
24  do that.
25      Q    Okay.  And at the time that you put Victory in
0130
 1  and you were there was there someone who explained to
 2  you this is a new organization that's going to be doing
 3  this, and this is what the contract provides for, and
 4  then you know exactly what the parameters of their
 5  business is?  Did anything like that happen?
 6      A    Nobody sat me down and went over a contract,
 7  no.
 8      Q    Anybody explain anything about what they were
 9  supposed to be doing?
10      A    No.
11      Q    Did you have meetings before they came in where
12  that was discussed?
13      A    I was not in a meeting where that was
14  discussed.
15      Q    So would it be accurate to say that you don't
16  know whether there was any limitations on what Victory
17  was doing there at the procurement office?
18      A    Are you asking me were they able to do other
19  things besides Winn-Dixie business?
20      Q    I'm asking you whether you're aware from any
21  source whether there were any limitations on what
22  Victory could be doing on Winn-Dixie's property there on
23  the same floor as the procurement department?
24      A    They were there to do Winn-Dixie's business.
25      Q    Did they work independently, or did you
0131
 1  instruct them what to do?
 2      A    They knew what to do, but I supervised them.
 3      Q    So you could give instructions to any
 4  particular person on what to do?
 5      A    Yes.
 6      Q    Could you fire someone?
 7      A    No.
```

```
 8       Q    Could you hire someone for Victory to put them
 9   into that position?
10       A    No, sir.
11       Q    Could you change their terms of employment in
12   any way?
13       A    They did not work for Winn-Dixie.  No, sir.
14       Q    Okay.  So when you say you gave them
15   instructions, it was guidance?
16       A    Guidance.
17       Q    Not binding though?
18       A    If I had an issue I would go to Bob.  Bob would
19   handle the issue.
20       Q    Okay.  So you didn't have any direct authority
21   over any of the Victory employees.  That would be
22   accurate?
23       A    The Victory people did not work for me.
24       Q    Would it be accurate that you had no direct
25   authority over them?
0132
 1       A    That would be accurate.
 2       Q    Was there any entity that came in and did what
 3   Victory did for Winn-Dixie while they were at the
 4   procurement department after Victory left?
 5       A    Was there an entity that came in and did --
 6       Q    You earlier told us that -- I think you said
 7   that you took it all in-house.
 8       A    That's correct.
 9       Q    Previously you were using Victory from 2000 all
10   the way through, I think you said 2005 they left.
11       A    Okay.
12       Q    Okay.  Was there anyone there in between them
13   leaving and Winn-Dixie doing it in-house that was
14   assisting in any aspect of diverting?
15       A    No.
16       Q    At one point there was an analysis of what
17   company to bring in between, I believe it was FMG,
18   Purity, and Victory?
19       A    I did an analysis, yes.
20       Q    Right.  Why did you do that analysis?
21       A    Because we were just exploring our options.
22       Q    Okay.  So you were looking for, at that time,
23   what the best method to assist the diverting process
24   would be?
25       A    Yes.
0133
 1       Q    Any other reasons why you did that analysis?
 2       A    No, sir.
 3       Q    Did Winn-Dixie develop its own system to
 4   replace NTS?
 5       A    No, sir.
 6       Q    How did Winn-Dixie, from a technology
 7   standpoint, become independent from Victory?
 8       A    We actually used their system without their
 9   people.
10       Q    Did you buy the NTS system?
11       A    No, sir.
12       Q    Was it still the NTS system?
```

```
13      A    Yes, sir.
14      Q    How did you get that system?
15      A    Donna and Melissa stayed in the building, they
16  were the only two Victory people, but I did the
17  diverting in and out, and we still used their system for
18  the download, the daily download.
19      Q    So two Victory employees stayed on?
20      A    As admins.
21      Q    Did they stay on under the employment of
22  Victory, or did they become Winn-Dixie?
23      A    Victory.
24      Q    Okay.  So you had two Victory administrative
25  assistants.  And did you pay to use the NTS system?
0134
 1      A    No, sir.
 2      Q    Well, do you know what the contractual
 3  relationship was that allowed you to use -- I think that
 4  NTS was proprietary software, wasn't it?
 5      A    Yes, sir.
 6      Q    Was there any contractual agreement between
 7  Victory and Winn-Dixie to allow Winn-Dixie to continue
 8  to use it?
 9      A    No, sir.
10      Q    What about the hardware; did they leave the
11  hardware too; computers, servers?
12      A    There were no servers that I'm aware of, but
13  the system remained.
14      Q    Can you describe what the system consisted of?
15      A    A download.  Go to their website and print
16  orders, or the suggested orders.
17      Q    How long had that system been in place?
18      A    From the time Victory was there.
19      Q    From 2000?
20      A    Yes.
21      Q    And you had to go to their website?
22      A    I guess it's a website.  I do not know.
23      Q    So would that be done on your computer then?
24  Once they left you would just access it directly -- the
25  NTS directly from your computer, which I know you did
0135
 1  before, but without any restrictions?
 2      A    Actually Donna did it.  I didn't do it.
 3      Q    Okay.  And do you know if there was any
 4  agreement between Victory and Winn-Dixie with regard to
 5  these employees and using the system?
 6      A    No, sir.  No agreement, no contract.
 7      Q    You know for sure there was no contract?
 8      A    I know there was no contract.
 9      Q    Why did they let Winn-Dixie use their system?
10  Were they being paid?
11      A    No, sir.
12      Q    Why did they let Winn-Dixie use their system?
13      A    The same reason any diverter would let you use
14  their system, if you would let them have access to your
15  deal information.
16      Q    So this was a handshake agreement; we can use
17  your system as long -- and you can use our information?
```

```
18        A    There was no hand -- there was no agreement.
19        Q    How did it come about that they left,
20   physically left the premises?
21        A    Because I told them I wanted to move to doing
22   the purchases and sales myself with Winn-Dixie people.
23        Q    Okay.  Did you -- who approved that within your
24   Winn-Dixie hierarchy?
25        A    It would have been Glen Hamilton.  I'm sure it
0136
 1   was approved above him, but, I mean, that's who would
 2   have -- I would have went to.
 3        Q    Was he your immediate boss at that time?
 4        A    Yes.
 5        Q    When you took that on did you get a raise?
 6        A    No.
 7        Q    You took on additional responsibility?
 8        A    I did not call it additional responsibility.
 9        Q    Okay.  Did you personally get a raise at any
10   time between 2003 and 2005?
11        A    I have a yearly review.
12        Q    Okay.  And so you got a regular raise that was
13   at the review, but nothing extraordinary?
14        A    No, sir.
15        Q    Okay.  What is the regular range of raises?
16        A    Anywhere from 2 to 3 1/2 percent.
17        Q    And were your raises, within that time frame,
18   within that 2 to 3 1/2 percent?
19        A    Yes.
20        Q    Will you define the term secondary market.
21        A    Anything that's dealt not coming direct from a
22   manufacturer or authorized broker.
23        Q    Would it be fair to say that diverting exists
24   in the secondary market?
25        A    Yes.
0137
 1        Q    That's where the world of diverting happens?
 2        A    Yes.
 3        Q    What about the term surplus, what does that
 4   mean within the industry?
 5        A    Excess inventory.
 6        Q    What about the term truckload?
 7             MR. BOLLING:  Objection.
 8        A    Truckload?
 9        Q    Is that a term of art within the industry?
10        A    Yes, sir.
11        Q    What does a truckload mean?
12             MR. BOLLING:  Objection.
13        A    A full truck.
14        Q    What size truck is a full truck?
15        A    43-foot.
16        Q    And is that industry standard that full truck
17   means a full 43-foot truck, or can it mean any size full
18   truck?
19        A    I would guess it could mean any size full
20   truck.
21        Q    Without guessing, is that the way it's used in
22   the industry, that there are different size trucks, and
```

23   as long as it's full it's called a truckload?
24       A    In the secondary market industry a full truck
25   is normally a 43-foot trailer.  You can put 1680 cases
0138
 1   of one thing on it.
 2       Q    Right.  Are there different size trucks that
 3   are used in the secondary market?
 4       A    I can't answer that.  I do not know.
 5       Q    You don't know?
 6       A    No.
 7       Q    Okay.  What is a split truck?
 8       A    More than one product on it.  It can be a full
 9   truck, but a split truck.
10       Q    So that can be a truckload?
11       A    Yes.
12       Q    What is EDI?
13       A    Electronic data transfer.
14       Q    Do you know what the I stands for?
15       A    Information, I think.
16       Q    Did -- has Winn-Dixie -- in the time frame of
17   2000 to 2005 when you left procurement did Winn-Dixie
18   get EDI from any source?
19       A    From manufacturers.
20       Q    Any other source?
21       A    I don't know who else they would have got them
22   from besides the manufacturer.
23       Q    Did they get EDI from any diverters?
24       A    No, sir, not that I know of.
25       Q    Did Winn-Dixie get any electronic transmissions
0139
 1   from the inventories of wholesalers during that time
 2   frame we're talking about?
 3       A    Those went to Victory.
 4       Q    Okay.  So Winn-Dixie didn't get any?
 5       A    Not that I'm aware of.
 6       Q    What's an ACH transfer?
 7       A    It's like an electronic check.
 8       Q    Was -- in the year 2000, was all -- and all
 9   means every dollar -- of the diverting business done
10   through Victory?
11       A    Well, I'm not sure when Victory signed their
12   contract.
13       Q    From the time they signed their contract.
14       A    As far as I know, yes.
15       Q    Did Victory conduct its business in what would
16   be considered the traditional method of doing business
17   in diverting?
18       A    Yes.
19       Q    Okay.  Were there any diverters who were not
20   using traditional means for conducting business in
21   diverting?
22       A    That we did business with?
23       Q    Yes.
24       A    Not that I'm aware.
25       Q    What is E-commerce?
0140
 1            MR. BOLLING:  Objection.

```
  2      A    I'm familiar with the term, but I -- I do not
  3  know.
  4      Q    What does it -- what does it mean to you?
  5  What's your familiarity?  When have you heard it used?
  6      A    Well, it's a buzz word amongst consultants.
  7  I'm sure it's something to do with electronic commerce.
  8  That's what it would mean to me.
  9      Q    Okay.  As the corporate representative of
 10  Winn-Dixie you do not know what the definition of
 11  E-commerce is?
 12      A    It would be electronic commerce, I'm sure.
 13      Q    When was the first time you heard about
 14  Visagent, or its predecessor Tradepoint?
 15      A    Well, I didn't know until after we did business
 16  that it was Tradepoint.  I think Mark might have told me
 17  that.
 18      Q    And when you mention Mark, that's Mark Rubin?
 19      A    Yes.  I'm sorry.
 20      Q    I just want to make sure it's on the record.
 21      A    I do not know the exact date.  I know that we
 22  were told we were going to go over and see a
 23  presentation at Visagent's headquarters.
 24      Q    Where were they located?
 25      A    Hendricks.
0141
  1      Q    In San Marco?
  2      A    Yes, sir.  I know where it's at.  Yeah,
  3  Hendricks.
  4      Q    Okay.  And where were they located within the
  5  building?
  6      A    Second floor, I think.
  7      Q    All right.  Was there a sign on the building?
  8      A    I do not recall.
  9      Q    Okay.  When you went up to the second floor was
 10  there a lobby area?
 11      A    There was a waiting area, yes.
 12      Q    Okay.  And was there a marquis with the name of
 13  the company there?
 14      A    I do not recall.
 15      Q    Who -- and we're talking about the first time
 16  you ever met with the Visagent people?
 17      A    I believe it was the first time.
 18      Q    Okay.  Who was at that meeting?
 19      A    Kevin Gates, Daryl Mills, myself, Mark Rubin,
 20  Bob Warren, I'm not sure if Simon was there or not, I
 21  think Tom Bixby, and a couple of developers.  They were
 22  either -- the developers were either at the first one or
 23  the second one.  I'm not sure.
 24      Q    And at the first meeting were you walked around
 25  the corporate offices?
0142
  1      A    Not that I recall.  I think we were just shown
  2  to a conference room.
  3      Q    At any time -- how many times total were you at
  4  the Visagent corporate offices?
  5      A    Four, five.
  6      Q    Okay.  Were you ever walked around the offices
```

```
 7   and introduced to employees?
 8        A    Not that I recall.
 9        Q    What had you heard the purpose was for going to
10   meet with Visagent on that first occasion?
11        A    To look at an internet-based trading program.
12        Q    Had you received any materials on it?
13        A    I had not until we went to the meeting.
14        Q    Did anyone who was with you on the Winn-Dixie
15   side receive any materials?
16        A    I do not know.
17        Q    Who did you have a discussion about -- who did
18   you discuss what the meeting was going to be about on
19   the Winn-Dixie side?  In other words, who told you about
20   this internet-based --
21        A    That would have been Daryl Mills, I'm sure.
22        Q    Okay.  And do you remember anything other than
23   what you've already told us?
24             MR. BOLLING:  Objection.
25        A    Just that we were going to look at a system.
0143
 1        Q    All right.  And what was discussed at this
 2   meeting in the conference room?
 3        A    We looked at flip charts of what the system was
 4   supposed to be, what it was supposed to do, how great it
 5   was going to be.
 6        Q    Okay.  And were any materials given to you at
 7   that meeting?
 8        A    I'm sure there was a Power Point presentation.
 9        Q    In hard copy?
10        A    Yes.
11        Q    Okay.  And that Power Point presentation was
12   given to each one of the Winn-Dixie people?
13        A    I would think so, yes.
14        Q    Do you know one way or the other?
15        A    I think we each had a copy of it.
16        Q    Okay.  Was that contained in the materials that
17   you turned in in the discovery process that we talked
18   about earlier?
19        A    Yes, I think so.
20        Q    Well --
21        A    Yes, should have been.
22        Q    What did you learn at that meeting about the
23   Visagent proposal that was differing from the
24   traditional method of procurement?
25        A    This was going to be a one-stop shop.
0144
 1        Q    What do you mean?
 2        A    One-stop shop.  Find it, click it, buy it,
 3   done.
 4        Q    Can you explain that?  I'm not sure I
 5   understand.
 6        A    I was supposed to be able to sign on to a
 7   website, there would be thousands and thousands of items
 8   for me to look at, when I saw one I wanted I just click
 9   it, bought it, and you're done.
10        Q    Okay.  And was it represented that that's what
11   existed, or that's what would exist?
```

```
12      A    That's what would exist.
13      Q    Okay.  Would exist at what particular time?
14      A    Would exist at what particular time?
15      Q    I mean, what --
16      A    They were writing it as -- as we were meeting
17 with them.
18      Q    Okay.  So the program didn't exist at that
19 time?
20      A    Not as far as I know.  Not at the first
21 meeting.
22      Q    Okay.  Do you know when that first meeting was?
23      A    No, sir.
24           MR. BOLLING:  How close are we to the end of
25      the tape?
0145
 1           THE VIDEOGRAPHER:  (Indicating by hand.)
 2           (Exhibit No. 9 was marked for identification.)
 3      Q    Hand you Exhibit Number 9.  Have you seen this
 4 document before?
 5      A    No, sir.
 6      Q    Would that refresh your recollection at all in
 7 terms of the date that that first meeting might have
 8 been?
 9      A    No, sir.
10      Q    Do you know who John Sheehan was?
11      A    That was the name I couldn't remember to tell
12 you a while ago.  That's who Payment would have reported
13 to.
14      Q    Okay.  Was Mr. Sheehan at this meeting?
15      A    At the Visagent office?
16      Q    At the meeting that you just described.
17      A    No, sir.
18      Q    Do you know one way or the other whether August
19 29th would have been the date you were at a meeting at
20 the Visagent offices?
21      A    No, sir.
22      Q    Okay.  Actually before we go on, as the
23 corporate representative did you review the files of
24 Mr. Sheehan?
25      A    No.
0146
 1      Q    Wouldn't it have been important for you as the
 2 corporate representative to know for this deposition
 3 what started the relationship between Visagent and
 4 Winn-Dixie?
 5           MR. BOLLING:  Objection.
 6      A    To this minute I never knew John Sheehan had a
 7 meeting with the Visagent people.
 8      Q    Did you ever ask anyone in Winn-Dixie who was
 9 involved at the point of initial contact?
10      A    No, sir.
11           (Exhibit No. 10 was marked for identification.)
12      Q    Hand you Exhibit Number 10.  Have you ever seen
13 that e-mail?
14      A    No, sir.
15      Q    Did you check the e-mail files of Mr. Payment,
16 or Mr. Mills, or Mr. Sheehan to determine whether this
```

```
17   document was there in their e-mails?
18        A    No, sir.
19        Q    As the corporate representative, for this
20   deposition could you have gained access to their e-mails
21   to look at all of the e-mails that they may have had
22   with Visagent?
23             MR. BOLLING:  Objection.
24        A    None of these people are with Winn-Dixie.
25        Q    Their accounts are still somewhere on servers
0147
 1   of Winn-Dixie, aren't they?  E-mail accounts.
 2             MR. BOLLING:  Objection.
 3        A    I do not know that.
 4        Q    You don't know?  You don't know whether there
 5   are archived e-mail files?
 6        A    I -- I do not know that.
 7        Q    Did you ask anyone whether archived e-mail
 8   files exist?
 9        A    I did not.
10        Q    You have not?
11        A    I have not.
12        Q    Well, as the corporate representative and a
13   person who was involved in collecting documents --
14   strike that.
15             I think the first question on the request to
16   produce was produce all communications between the
17   parties; right?  We went over that.
18        A    Yes.
19        Q    Okay.  This is a communication between the
20   parties, is it not?
21        A    It appears to be, yes.
22        Q    Okay.  And Winn-Dixie did not go into all of
23   the archived files to produce all of the e-mails between
24   it and Visagent --
25             MR. BOLLING:  Objection.
0148
 1        Q    -- in this case?
 2        A    As far as I know, every piece of paper has been
 3   given to legal that we had available to us.
 4        Q    Who gave all of the e-mails from every person
 5   who had an e-mail account that had anything to do with
 6   Visagent to the lawyers for Winn-Dixie?
 7        A    I do not know that.
 8        Q    You don't know if that even exists -- you don't
 9   even know that that happened, do you?
10        A    As far as I know, everything that we had
11   available to us was given to our legal attorneys.
12        Q    What facts do you base that on?
13        A    Just the knowledge I have of this.
14        Q    Right.  What facts are you aware of that
15   indicate to you that someone went in to the e-mail
16   archives, looked for communications between Winn-Dixie
17   and Visagent, and then produced them to your litigation
18   lawyers?
19        A    I do not know that.
20        Q    You have no facts to support that, do you?
21        A    No.
```

```
22      Q     Were you at the global exchange summit?
23      A     Global?
24      Q     Reference this, the first line of this
25   document.
0149
 1      A     Oh, no, no, no.  No, sir, I was not.
 2      Q     Have you ever heard of the global exchange
 3   summit?
 4      A     No, sir, I have not.
 5      Q     You wouldn't know what this e-mail references?
 6      A     I'm not sure what you're asking me.  It appears
 7   to me it's just a request for a meeting.
 8      Q     Okay.  Did you become aware at any time of this
 9   request for a meeting?
10      A     I knew that later, not before.  I knew that
11   Mark had met, I actually thought it was Al Roland, the
12   president of the company, at some meeting.  I didn't
13   know it was John Sheehan.  But -- but that was -- that
14   was later on, and I think one of the Visagent people
15   told me that.
16      Q     Okay.  To your knowledge did anyone have the
17   task of gathering e-mails in connection with our request
18   to produce?
19            MR. BOLLING:  Objection.
20      A     An e-mail was sent asking us to go through our
21   files, and anything that had anything to do with Dayman,
22   Visagent, get them to the boss.
23      Q     Okay.  That e-mail that you received would not
24   have hit any of the people who are no longer employees
25   of Winn-Dixie; correct?
0150
 1      A     Yes.
 2      Q     And you got that e-mail sometime in late 2006
 3   or early 2007?
 4      A     Yes.
 5      Q     And many of the people who we're talking about
 6   are no longer there; right?
 7      A     Yes.
 8      Q     So they wouldn't be able to have collected
 9   information that were in those e-mail accounts that are
10   no longer active, but have some body of information that
11   are archived; right?
12      A     I know those people are no longer here.
13      Q     So how were those archived files mined for
14   information responsive to the request from the legal
15   department?
16            MR. BOLLING:  Objection.
17      A     I do not know that they were.
18            (Exhibit No. 11 was marked for identification.)
19      Q     Hand you Exhibit 11.  Not referencing the top
20   part, but the original message part from Kevin Gates to
21   Daryl Mills, Phil Payment, Mike Nixon, Gordon Goodyear
22   regarding a meeting, have you ever -- have you ever seen
23   this document?
24      A     Actually I think I have.  Kevin sat right
25   behind me, so I may have seen this, yes.
0151
```

```
 1        Q    Okay.  Do you know one way or the other?  Can
 2  you be sure?
 3        A    No, sir.
 4        Q    Okay.  Who is Gordon Goodyear?
 5        A    He's an IT person.
 6        Q    Okay.  With Winn-Dixie?
 7        A    Yes.
 8        Q    Is he still there?
 9        A    Yes.
10        Q    Okay.  Did he work from time to time in the
11  procurement area?
12        A    No, sir.
13        Q    I mean, doing his IT work did he assist in
14  technology within the procurement department?
15        A    I do not think so.
16        Q    Okay.  It would be Mr. Nixon, I think you said,
17  that would know what the configurations are, or were?
18        A    And Gordon may know that too.
19        Q    Okay.  Does this refresh your recollection at
20  all as to the first meeting that you participated in --
21        A    No, sir.
22        Q    -- that we talked about?  No.
23             Were you involved at all in any of the testing
24  of any of the first versions of the Visagent exchange?
25        A    Yes.
0152
 1        Q    Tell us about what your involvement was.
 2        A    Well, the first versions was installed on my
 3  computer and on one of the Victory peoples' computer,
 4  and -- and actually it was a test system to start with,
 5  and we actually give them feedback on what we wanted to
 6  see from the system.
 7        Q    And what did you think of the system?
 8        A    I think it was a great idea.
 9        Q    And what kind of feedback did you give?
10        A    Oh, geez, I -- I don't know.  I can't tell you
11  that.  I know we had back and forth conversations
12  several times.
13        Q    Do you know what that version was called, the
14  first version?
15        A    1, I think.
16        Q    Okay.  And do you know how many versions there
17  were?
18        A    No, sir.
19        Q    Hand you Exhibit Number 12.
20             MR. RUBIN:  Give that back to me, and we'll
21        just destroy this one, and make Exhibit Number 12
22        the next one, which is -- it's slightly different,
23        but there's no value to it.  Just make the next
24        document, whatever it is, Number 12.
25        Q    What other involvement did you have prior to
0153
 1  the service agreement being executed?
 2             MR. BOLLING:  Objection.
 3        A    We -- we attended the meetings at Visagent, we
 4  talked with their programmers, for lack of a better
 5  word, I guess whoever helped write the program, they
```

```
 6    were from the Bahamas, or somewhere like that, what we
 7    wanted to see, how we wanted to see them.
 8         Q    And did they take those suggestions and make
 9    changes based upon them?
10         A    Yes.
11         Q    And you say that there were a series of
12    meetings, four or five?
13         A    At least three or four, yes.  Could have been
14    five.
15         Q    At the Visagent offices?
16         A    I don't think they were all at Visagent.  I
17    know we had three or four meetings there.
18         Q    Okay.  Did you have any meetings anywhere else?
19         A    Bob and Mark was in our offices on more than
20    one occasion.
21         Q    This is all prior to the service agreement?
22         A    Well, I can't answer truthfully to that.  I do
23    not know the exact dates.
24         Q    All right.  Well, I'm trying to focus on what
25    was happening before the service agreement was executed.
0154
 1              So were you involved in testing that software
 2    and getting it to a point where Winn-Dixie felt
 3    comfortable with what it could do?  Was that one of your
 4    roles?
 5         A    I don't think the exchange was 100 percent when
 6    we signed the user agreement.
 7         Q    I'm not there yet.
 8         A    Okay.
 9         Q    I'm trying to find out what your role was, and
10    then I'm going to ask you about some of the other people
11    at Winn-Dixie.
12              What was your role in the lead-up to the
13    service agreement being signed?  What were you doing?
14    What was your task in connection with Visagent?
15         A    I -- I attended the same meetings that
16    Mr. Mills and Kevin did.
17         Q    Okay.  Did Kevin and Mr. Mills also give
18    feedback on the version of software?
19         A    No.
20         Q    What did Kevin do?
21         A    He was our business system.  His job was to
22    coordinate the integration of it, transmission of our
23    files to Visagent.
24         Q    Which files?
25         A    Our deal file, our item file.
0155
 1         Q    Okay.  And that's a technical issue?
 2         A    Yes.
 3         Q    And you weren't involved in the technical
 4    issues?
 5         A    No, sir.
 6         Q    You were involved in the functionality?
 7         A    Of Visagent.
 8         Q    Of the exchange?
 9         A    Yes.
10         Q    And so you looked at Version 1?
```

```
11      A    Yes.
12      Q    And then were you shown a subsequent version?
13      A    I'm sure we were, yes.
14      Q    Okay.  Do you remember being shown subsequent
15 versions?
16      A    I -- I -- I remember being shown that the
17 system had been updated.  I don't know that they called
18 it Number 2 or not, but I do know it was upgraded.
19      Q    Okay.  When you went back and looked at the
20 upgraded system, were you looking for some of the things
21 that were your suggestions from the first version?
22           MR. BOLLING:  Objection.
23      A    I can't answer that question.  I'm sure we
24 were.  I do not know that they did them.  I do not know
25 they didn't do them either.
0156
 1      Q    Okay.  What was the purpose of you looking at
 2 the subsequent versions?
 3      A    To see how the system worked.
 4      Q    Would it be accurate to say that you were
 5 looking at subsequent versions to look at the
 6 advancements that they were making in enhancements?
 7      A    Yes.
 8      Q    Okay.  And that was to facilitate the business
 9 of Winn-Dixie; correct?
10      A    Yes.
11      Q    Were there any drawbacks to the system that
12 were pointed out that you were privy to, whether you
13 made them, or anyone else?
14      A    During the whole time frame or -- or --
15      Q    As you went through the versions before the
16 service agreement was executed.
17      A    I can't tell you that.  I do not know.
18      Q    You don't recall ever making any comments about
19 limitations on the system?
20      A    I'm sure I did, but I do not know they were
21 corrected before the user agreement.
22      Q    I haven't gotten there.  I haven't asked you
23 that question.  I'm just trying to find out if you ever
24 made comments to anyone at Winn-Dixie or anyone at
25 Visagent pointing out deficiencies in the exchange.
0157
 1           MR. BOLLING:  Objection.
 2      A    I'm sure we did.
 3      Q    Okay.
 4      A    I'm sure I did.
 5      Q    Okay.  What deficiencies?
 6      A    Time supply.  It needed to show a time supply.
 7 It did not to start with.
 8      Q    Was that ever corrected before the service
 9 agreement was executed?
10      A    You just told me we wasn't talking about it, so
11 I do not know if it was corrected before then or not.
12      Q    That's fine.  Now I've asked you the question.
13           Were there any other deficiencies that you
14 pointed out at any time prior to the service agreement?
15      A    I don't know.  Other things were pointed out,
```

16    but I do not know if they were pointed out prior to
17    that.
18        Q    Okay.  Tell me what things were pointed out.
19             So you don't know of anything other than time
20    supply that was pointed out as a fix item prior to
21    execution of the service agreement?
22             MR. BOLLING:  Objection.
23        Q    Would that be accurate?
24             MR. BOLLING:  Objection.
25        A    Not that I recall.
0158
1         Q    Who else would know about items that were
2    addressed as problematic or deficient prior to the
3    execution of the service agreement?
4         A    The Visagent people.
5         Q    Okay.  Nobody from the Winn-Dixie side?
6         A    I do not think there's anybody there.
7         Q    Whether they're there or not, anybody that
8    might know?
9         A    Well, Bob Carlson with Victory may know.
10        Q    Okay.  Did he attend meetings?
11        A    I know he was at at least one.
12        Q    Do you know what date?
13        A    No, sir.
14        Q    Do you know where it occurred?
15        A    Visagent headquarters.
16             THE VIDEOGRAPHER:  Excuse me.  Can I change
17    video?
18             MR. RUBIN:  Yes.
19             THE VIDEOGRAPHER:  Off record at 3:55.
20             (Short break.)
21             THE VIDEOGRAPHER:  Back on record at 4:06.
22    BY MR. RUBIN:
23        Q    Let me back go back on the discovery issue and
24    revisit one point with you.
25             You testified that you don't know if anybody
0159
1    checked the archive accounts for all of those people who
2    are no longer employees of Winn-Dixie to look for their
3    e-mails; right?
4         A    Yes.
5         Q    Okay.  Do you have access yourself to all of
6    your archived e-mails going all the way back to 2000?
7         A    No.
8         Q    Okay.  Who checked your archives?
9         A    I do not know they were checked.
10        Q    Okay.  What about instant messaging; how were
11    those retrieved?
12        A    I saved every instant message I had to a
13    computer disk.
14        Q    Okay.  And what about -- do you know whether
15    Winn-Dixie's system, computer system, archives those
16    also?
17        A    I do not know.
18        Q    Do you know if anyone else's -- if any other
19    employee had instant message that might contain
20    communications with Visagent?

21      A    The only person that had instant messenger was
22  me.
23      Q    In procurement.  Are you sure about
24  company-wide?
25      A    We had --
0160
 1          MR. BOLLING: Objection.
 2      A    We had to get special permission for me to get
 3  it.  I do not think anybody else had it.
 4      Q    But you don't know?
 5      A    No, sir.
 6      Q    And I think we covered this, but just to be
 7  sure.  All the people who are no longer employees of
 8  Winn-Dixie who might have had correspondence in files
 9  that were archived somewhere, you don't know if those
10  were searched?
11      A    No.
12      Q    I'm talking about hard files now.
13      A    No.
14      Q    Thank you.  Now, did you have any involvement
15  in the negotiation of the service agreement itself?
16      A    No.
17      Q    Okay.  So when I ask you questions about the
18  service agreement, from the Winn-Dixie standpoint how
19  are you going to answer what Mr. Mills, for instance,
20  intended in signing the con- -- Mr. Payment intended in
21  signing the contract, if you haven't talked to
22  Mr. Payment?
23          MR. BOLLING:  Objection.
24      A    I'm -- I'm the best person available to talk
25  about the service agreement today.
0161
 1      Q    Today.  Okay.  Well, did you know what
 2  Mr. Payment intended the service agreement to mean when
 3  he signed it?
 4      A    No.
 5      Q    Okay.
 6          (Exhibit No. 12 was marked for identification.)
 7      Q    Exhibit Number 12.  I think you testified
 8  earlier that you saw this at some point after it was
 9  executed; correct?
10      A    I believe that's right.  Yes, sir.
11      Q    Never saw any drafts of it?
12      A    Actually, yes, I did.
13      Q    When did you see a draft?
14      A    I'm -- I saw a fax copy that was sent to
15  Patricia with some of it marked through, I guess
16  corrections being made, or whatever you call that stuff.
17      Q    Did you read the corrections?
18      A    No, sir.
19      Q    So you may have seen something, but you don't
20  know what the difference was between the one that was a
21  draft and the one that became final?
22      A    That's correct.  Yes, sir.
23      Q    All right.  I'd like for you to look at this
24  document.  I assume that you've become familiar with it
25  as the corporate representative; correct?

```
0162
 1     A    I think so, yes, sir.
 2     Q    You've studied it pretty good?
 3     A    I've looked at it, yes, sir, several times.
 4     Q    What if anything does this contract obligate
 5  Winn-Dixie to do?
 6     A    My interpretation is, any --
 7     Q    I'm asking for Winn-Dixie's interpretation.
 8     A    Winn-Dixie's interpretation is any full
 9  truckload business that's done over the internet we
10  would use this system.
11     Q    Any other obligations that Winn-Dixie agreed to
12  in executing this contract?
13     A    The fees.
14     Q    The fees contained on Page 2?
15     A    I don't know where they're at.
16          Yes, sir, the fees.  We agreed to the 2 percent
17  fees.
18     Q    Okay.  Anything else?
19     A    Well, we agreed to the confidentiality of the
20  system.
21     Q    Okay.  Anything else?
22     A    We knew there was -- they had a dispute
23  resolution, a third-party arbitration thing.  I'm not
24  sure they had it then, but Mark said they had one
25  coming.
0163
 1     Q    All right.  I think we covered earlier that
 2  Winn-Dixie's position being what it is, Winn-Dixie was
 3  not obligated to run any business through the internet
 4  and therefore generate any commissions by signing this
 5  agreement; correct?
 6     A    My charge -- Winn-Dixie's charge was to help
 7  the Visagent system be successful.  And we did that.
 8     Q    Okay.  Why would you need a contract if
 9  Winn-Dixie wasn't required to commit any business to the
10  Visagent exchange?
11     A    Mark wanted this contract.
12     Q    Right.  Why would Winn-Dixie agree to it if it
13  wasn't obligating itself to use the exchange?
14     A    I do not know.
15     Q    Well, who would know on behalf of Winn-Dixie
16  other than the corporate representative?
17     A    This contract was because Mark Rubin wanted a
18  contract.
19     Q    And Winn-Dixie signs contracts because vendors
20  want them signed?
21     A    This contract was signed because Mark was
22  trying to create a business, Winn-Dixie was trying to
23  support that business, and we signed this contract.
24     Q    Did Visagent put pressure on Winn-Dixie to sign
25  this contract?
0164
 1     A    Not that I know of.
 2     Q    Did they coerce Winn-Dixie in any way?
 3     A    Not that I know of.
 4     Q    Did Winn-Dixie enter into it voluntarily?
```

```
 5        A    Yes.
 6        Q    Do you assume that Mr. Payment understood all
 7   the terms when he signed it?
 8        A    Yes.
 9        Q    Okay.  This was reviewed by the legal
10   department before Mr. Payment signed it; correct?
11        A    Yes.
12        Q    And, in fact, we know that there were changes
13   made to it; right?
14        A    Yes.
15        Q    Let's go over the scope of the agreement.
16             Is the scope of the agreement what the contract
17   covers?
18             MR. BOLLING:  Objection.
19        A    It appears to.
20        Q    All right.  Well, tell me where you -- you said
21   that this contract covers only full truckloads over the
22   internet, if we use the internet; right?
23        A    That is correct.
24        Q    All right.  Where is the language in this
25   document that creates that interpretation?  What are you
0165
 1   relying upon, what language, for your -- for
 2   Winn-Dixie's interpretation of the obligation?
 3        A    This agreement is intended to cover all of
 4   user's business transactions for full or truckload
 5   quantities of consumer packaged goods purchased or
 6   resold through the internet.  And I -- we interpret
 7   similar electronic means to be another website that
 8   would be like this one, be in competition with that.
 9        Q    Okay.  Were there any in existence at this
10   time?
11        A    Yes.
12        Q    Which ones?
13        A    Purity Wholesale had a system.  I'm not going
14   to tell you it was identical to this, but they had a
15   web-based system.  TriBorough Wholesale I believe had a
16   web-based system.  I think Dayman had a web-based
17   system.
18        Q    What about Victory?
19        A    I do not think they had one at the time.
20        Q    Did they ever have one?
21        A    I think they had some kind of system, but not a
22   procurement sales system.  I don't think.  I'm not sure,
23   so I don't know.
24        Q    Do you know of any web-based system similar to
25   Visagent's that Victory had at this time?
0166
 1        A    No, sir.
 2        Q    So internet or similar electronic means, as far
 3   as Winn-Dixie is concerned in this case, means only
 4   through the internet; right?
 5             MR. BOLLING:  Objection.
 6        A    A web-based program like Visagent's.
 7        Q    Okay.  What is the web?
 8        A    The internet.
 9        Q    All right.  So --
```

```
10      A    An internet-based program like Visagent's.
11      Q    Okay.  Where does it say internet system like
12   Visagent's?
13      A    It does not.
14      Q    Okay.  Does through the internet mean
15   transmitted through the internet?
16      A    I -- I do not know what it means here.
17      Q    Okay.  Well, I'm asking, what is Winn-Dixie's
18   position on the phrase purchased or resold through the
19   internet or similar electronic means in a wholesale
20   format?
21      A    It means an internet-based program like
22   Visagent's, we would use theirs, we would not use
23   another one similar to theirs.
24      Q    Okay.  Would a reasonable interpretation of
25   this same language mean data transmissions that are sent
0167
 1   through the internet?
 2      A    I don't interpret this -- this contract, I
 3   don't interpret that to be, no.
 4      Q    And you haven't spoken to Mr. Payment?
 5      A    No.
 6      Q    Okay.  So this is your interpretation.  When
 7   did you develop this interpretation?
 8      A    This was everybody's interpretation.
 9      Q    When did you first discuss this interpretation
10   with anyone?
11      A    Before we -- I can't give you an exact date.
12      Q    Was it before the contract was signed?
13      A    I can't tell you that.
14      Q    Was it after there was already a lawsuit?
15      A    No, it was before the lawsuit.
16      Q    Was it in 2001?
17      A    I cannot give you an exact date.
18      Q    Who did you speak to about this interpretation?
19      A    (No response.)
20      Q    When you say, we had this interpretation before
21   the lawsuit, who's we?
22      A    I know I talked with Daryl Mills.
23      Q    And he gave you that interpretation?
24      A    No.  I may have gave him that interpretation.
25      Q    And he said, yes, that's what I intended?
0168
 1      A    I cannot tell you what he said.  I do not
 2   recall.
 3      Q    When did you have a conversation with Daryl
 4   Mills?
 5      A    I do not recall the day.
 6      Q    Or year?
 7      A    Sir?
 8      Q    Do you know the year?
 9      A    It was -- it was probably when we signed this
10   thing, but I cannot give you the date.
11      Q    Okay.  Isn't it true that there was a meeting
12   that took place at Winn-Dixie's office a day or two
13   before this contract was executed in which the length of
14   the contract was discussed that you attended?
```

```
15       A    I believe so.
16       Q    And isn't it true that Mr. Mills was at that
17   meeting?
18       A    I believe so.
19       Q    And isn't it true that Mr. Mills asked Mark
20   Rubin, what's the length of the contract that you're
21   proposing, and Mark Rubin said three years?  Do you
22   recall that?
23       A    I -- I recall there was a conversation about
24   length of the contract.
25       Q    Right.
0169
 1       A    I do not know that Mark said it, but --
 2       Q    Okay.  And do you recall who you were with?
 3       A    Kevin Gates.
 4       Q    And do you recall Mr. Gates saying to -- after
 5   he heard three years, saying to Mr. Mills, that's too
 6   long, it should only be one year?
 7       A    Yes.
 8       Q    And do you remember you nodding your head yes,
 9   you agreeing with Mr. Gates that it should only be for a
10   year?
11       A    Yes.
12       Q    And do you recall Mr. Mills saying, well, we
13   need to give Visagent enough time to ramp this up, to
14   get it going and to get Victory out of here, standing in
15   the building of Winn-Dixie?  Do you recall that
16   statement?
17       A    No, sir.
18       Q    Do you recall something else?
19       A    I do not recall Mr. Mills saying that we need
20   to get Victory out of here.
21       Q    Do you recall him saying that we need to give
22   Visagent three years to get this program ramped up?
23       A    Mr. Mills wanted to do three years.  That is
24   correct.
25       Q    Do you remember him saying those words?
0170
 1       A    Not those exact words, but --
 2       Q    What do you recall?
 3            MR. BOLLING:  Wait.  Let him finish his answer.
 4       Q    Go ahead.
 5       A    I do know Mr. Mills wanted three years.
 6       Q    You don't recall the specific words in the
 7   conversation?
 8       A    No, sir.
 9       Q    Do you recall Victory's name being raised at
10   all in that conversation?
11       A    No, sir.
12       Q    Do you deny that Victory was brought up in that
13   conversation and that it was a goal of Winn-Dixie to get
14   them out of the diverting posture that they had at
15   Winn-Dixie?
16       A    I do not think that's true, no.
17       Q    Okay.  Did this contract anticipate the service
18   agreement, anticipate Victory being weaned off or out of
19   Winn-Dixie in the same position that they had been,
```

```
20  in-house diverting?
21          MR. BOLLING:  Objection.
22      Q   Do you understand the question?
23      A   Yes, sir.  I think from Visagent's standpoint
24  it would, but from ours, we had no idea, because we
25  didn't know how the system was going to work.
0171
 1      Q   My question is, from Winn-Dixie's standpoint
 2  was this contract anticipating eliminating Victory from
 3  being an in-house diverter at sometime during the course
 4  of the contract?
 5      A   No.
 6      Q   What is the purpose of the exclusion for
 7  Victory for one year?
 8      A   I do not know.
 9      Q   You can't explain that, can you?
10      A   No, sir.
11          MR. BOLLING:  Objection.
12      Q   And Winn-Dixie has no position on that
13  exclusion?
14          MR. BOLLING:  Objection.
15      Q   And doesn't know any reason why that term is
16  there?
17          MR. BOLLING:  Objection.
18      A   No, sir.
19      Q   You said that E-commerce is a very broad term
20  earlier; correct?
21      A   Yes, sir.
22      Q   E-commerce is used in this agreement, isn't it?
23      A   Yes.
24      Q   It says:  User will not employ or contract for
25  the services of an entity other than provider, Visagent,
0172
 1  for its E-commerce transactions covered under the scope
 2  of this agreement.  Right?
 3      A   Yes.
 4      Q   Are you aware that another contract was
 5  executed to provide E-commerce services with Victory?
 6      A   Another contract was executed.
 7      Q   Yes, with Victory.
 8      A   We extended the contract that we had.
 9      Q   Okay.  Well, let's look at that for a moment.
10          (Exhibit No. 13 was marked for identification.)
11      Q   I'm handing you Exhibit Number 13.  When you've
12  reviewed that just let me know, and I've got some
13  questions for you.
14      A   I've -- I've seen this, yes, sir.
15      Q   Okay.  Well, earlier you said that you were
16  only aware of one contract between Winn-Dixie and
17  Victory.
18          This is a second one, is it not?
19      A   Yes.
20          MR. BOLLING:  Objection.
21      Q   Before we talk about this contract dated June
22  14, 2002, Exhibit 12 to this deposition -- 13, sorry --
23  was Victory aware of the service agreement between
24  Winn-Dixie and Visagent?
```

```
25      A    I'm sure they were, yes.
0173
 1      Q    Did they have a copy of it?
 2      A    I do not think so, no.
 3      Q    Did anyone ever tell them the restrictions, any
 4  restrictions or obligations that Winn-Dixie made by
 5  signing the service agreement?
 6      A    I do not know if anybody ever sat Victory down.
 7  Victory was well aware that an internet-based trading
 8  platform such as Visagent was the only one we could use.
 9      Q    Okay.  And you keep on saying internet-based
10  platform.  That's an interpretation of the contract.
11  There's nowhere in the contract itself that says that
12  the scope of the contract is limited to an
13  internet-based platform; correct?
14           MR. BOLLING:  Objection.
15      Q    Just so we're clear.
16      A    Our understanding, my understanding, this was
17  going to be the only internet-based trading platform
18  that we used.
19      Q    Did Victory know the term -- the three-year
20  term of the service agreement, to the best of your
21  knowledge?
22      A    Yes.
23      Q    Did you have discussions with anyone from
24  Victory about that?
25      A    I'm sure that we talked about it, because one
0174
 1  of the Victory people used the Visagent system.
 2      Q    Well, how does that lead to an understanding of
 3  how long the contract would last?
 4      A    Well, they knew it was a three-year contract,
 5  yes.
 6      Q    Did you have conversations with Mr. Carlson
 7  where you discussed that?
 8      A    I'm sure I told Bob we had a three-year
 9  contract.
10      Q    Right.  You didn't agree with a three-year
11  contract; correct?
12      A    I wish we had not done a three-year contract.
13      Q    At the time that Mr. Mills said I want to give
14  Visagent three years you didn't agree with that;
15  correct?
16      A    No, sir.
17      Q    You didn't speak up and object verbally though,
18  did you?
19      A    Kevin and I both did.
20      Q    Okay.  What did you say?
21      A    It needs to be one year.  Visagent needs to
22  prove their-self to us.
23      Q    And Mr. Mills overruled you?
24      A    He was the boss.
25      Q    Right.  And you didn't go to anyone else before
0175
 1  Mr. Payment signed the contract, did you?
 2      A    No, sir.
 3      Q    Okay.  Why would it matter whether it's one
```

```
 4  year or three years if Winn-Dixie wasn't obligated to do
 5  anything in that contract?
 6          MR. BOLLING:  Objection.
 7      A    It needed to be one year because Visagent
 8  needed to prove their platform to us.
 9      Q    Right.
10      A    Instead of us proving it for them.
11      Q    Do you agree that the contract as you've
12  interpreted it as the corporate representative, the
13  service agreement does not obligate Winn-Dixie to run
14  any business through the -- through any Visagent
15  exchange, because all Winn-Dixie has to do is avoid an
16  internet-based system, whatever that means?
17      A    I guess it could be interpreted that way, but
18  that's not the intentions of it, and it was not our
19  intention.
20      Q    What was your intention?
21      A    To make the Visagent system work.
22      Q    You would agree though that Winn-Dixie was not
23  obligated to run any business through the system; right?
24      A    I can't answer that question.
25      Q    Well, you're the corporate representative.
0176
 1  You're the only person I can ask, who represents
 2  Winn-Dixie, that question.
 3          MR. BOLLING:  Objection.
 4      Q    Did Winn-Dixie believe that it was obligated to
 5  run any of its business through the exchange, the
 6  Visagent exchange?
 7          MR. BOLLING:  Objection.
 8      A    We tried to make the Visagent exchange work.
 9      Q    I have to insist that I get an answer one way
10  or the other.  You're not answering my question.
11          My question is, did Winn-Dixie believe that it
12  was obligated to run any of its business through a
13  Visagent exchange when it signed the service agreement?
14          MR. BOLLING:  Objection.
15      A    I'll repeat it.  We tried to make the Visagent
16  exchange work.
17      Q    Okay.  I'm not here to waste my time and your
18  time.  You're refusing to answer my direct question; is
19  that right?
20          MR. BOLLING:  Objection.
21      A    I'm answering it the best I can.
22      Q    Right.  I'm asking you as the corporate
23  representative what the corporation believes it was
24  obligated to do in terms of putting secondary market
25  goods onto a Visagent exchange.
0177
 1          Did the service agreement obligate Winn-Dixie
 2  to put any of its goods on the exchange?
 3          MR. BOLLING:  Objection.
 4      Q    Yes or no.  That's a very simple question.
 5          MR. BOLLING:  Objection.
 6      A    Anything that we put on an internet-based
 7  platform was going to be put on the Visagent grocery
 8  exchange.
```

```
 9      Q    Had to be?
10      A    And it was.
11      Q    Had to be on Visagent if it was going through
12 the internet?
13      A    An internet-based platform similar to Visagent.
14 Visagent or similar.
15      Q    What is an internet-based platform?
16      A    I don't know.  It's a program like Visagent.
17      Q    What is a program like Visagent?  How do you
18 define that?
19      A    Any trading tool that was similar to
20 Visagent's.  It could have been Purity's, could have
21 been TriBorough's.  If we were going to sell product on
22 a platform like that we were obligated to use
23 Visagent's, and we did.
24      Q    Okay.  Tell me what similarities would qualify
25 to be like Visagent's and which ones would not, so we
0178
 1 can determine what Winn-Dixie was obligated to do.
 2           MR. BOLLING:  Objection.
 3      A    I do not know what you're asking me.
 4      Q    You're saying similar to Visagent's web-based
 5 platform.
 6      A    A program.
 7      Q    Right.  Tell me what material characteristics
 8 of Visagent's system would qualify for similar to.
 9      A    I can't answer your question.
10      Q    Do you understand the question?
11      A    No, I do not.
12      Q    Your testimony is, we were only obligated to
13 put merchandise on Visagent's exchange if we wanted to
14 put merchandise on an internet-based platform similar to
15 Visagent's; right?  That's your testimony?
16      A    Or a platform similar to Visagent's.
17      Q    Right.
18      A    Okay.
19      Q    So your interpretation is you couldn't have put
20 any goods on another system like Visagent's; that's what
21 Winn-Dixie was obligating itself to do.  That if there
22 were multiple systems that were just like Visagent's, it
23 had to go through Visagent; right?
24      A    Yes.
25      Q    Okay.  And I'm asking you, what were the
0179
 1 characteristics of Visagent's system that formed the
 2 criteria of that decision?
 3      A    The user agreement.
 4      Q    What aspects of this web-based platform would
 5 make another system similar to Visagent's?
 6           MR. BOLLING:  Objection.
 7      A    I can't answer that.  We did not look at other
 8 systems.
 9      Q    Then how would you know if you're violating the
10 contract if you don't know what the important aspects of
11 the web-based platform were?
12           MR. BOLLING:  Objection.
13      A    I can't answer that.
```

```
14      Q    Okay.  Let me start from a different angle then
15 since you don't understand what I'm saying.
16           You're saying that any -- any business through
17 the internet was okay as long as it didn't go through a
18 system that was similar to Visagent's; correct?
19           MR. BOLLING:  Objection.
20      A    No, I don't think I'm saying that.
21      Q    Okay.  Well, I'm just trying to understand you.
22 You've testified that you made offerings yourself by
23 sending spreadsheets through the internet; right?
24      A    That is correct.
25      Q    But you're saying that that does not violate
0180
 1 the contract terms through the internet or similar
 2 means; right?
 3      A    I do not feel that we violated anything by
 4 sending an e-mail with a spreadsheet attached.
 5      Q    Right.  What would violate the contract?
 6      A    Another company, Purity.  Here.  Use our
 7 system.  Try it.  It's better than Visagent's.
 8      Q    Tell me what that system would look like in
 9 order to violate the contract.
10      A    It would be a web-based program just like
11 Visagent's.
12      Q    What is a web-based program?
13      A    The same thing Visagent's is.
14      Q    Describe what Visagent's is.  The court
15 reporter doesn't know, a jury may not know, I don't
16 know.  You tell me what Visagent's system is.
17           MR. BOLLING:  Objection.  Asked and answered.
18      A    A marketplace, a web-based marketplace where
19 several suppliers can sign up and buy or sell goods
20 through.
21      Q    Okay.  Is that as simple as you want to leave
22 it?  That's what your -- that's what you believe
23 Visagent had to offer; right, a web-based marketplace
24 where buyers and sellers could meet?
25      A    That's basically what it was.  I mean, there's
0181
 1 more technical stuff to it.
 2      Q    Right.  But at its basics that's how to
 3 describe Visagent's system; right?
 4      A    Yes.
 5      Q    Okay.  Why wasn't that put into the contract?
 6      A    I do not know.
 7      Q    Could it have been?
 8      A    I'm sure it could.  I actually think Mark wrote
 9 the contract.
10      Q    Right.  Well, whether he did or he didn't,
11 you -- Winn-Dixie had a legal department, and you said
12 that you saw versions where certain corrections had been
13 made; right?
14      A    That's correct.  Yes, sir.
15      Q    And if the interpretation that Winn-Dixie
16 through you is putting on this contract is what they
17 believed at the time, there was nothing preventing
18 Winn-Dixie from adding language to clearly express that
```

```
19   limitation; correct?
20        A    That would be correct.
21             MR. BOLLING:  Objection.
22        Q    This contract wasn't drawn up overnight and --
23   and rushed through, was it?
24        A    I'm not aware that it was, no, sir.
25        Q    Right.  And in your experience Winn-Dixie
0182
 1   doesn't do things in a rushed manner, they do things in
 2   a deliberate manner; correct?
 3        A    Yes.
 4        Q    They think about things; correct?
 5        A    Yes.
 6        Q    They talk them through; correct?
 7        A    Yes.
 8        Q    They do their due diligence; correct?
 9        A    Yes.
10        Q    They take it to legal; true?
11        A    Yes.
12        Q    And then they discuss it some more before they
13   make an obligation; correct?
14        A    Yes.
15        Q    And at none of those places in the contract
16   process was it ever suggested that the interpretation
17   that you were giving this contract be put into plain
18   English and be included in the contract; correct?
19             MR. BOLLING:  Objection.
20        A    Yes.
21             MR. BOLLING:  Can we take a break for a minute?
22             MR. RUBIN:  Sure.
23             THE VIDEOGRAPHER:  Off record at 4:43.
24             (Short break.)
25             THE VIDEOGRAPHER:  Back on record at 4:52.
0183
 1   BY MR. RUBIN:
 2        Q    I think we've already given you Exhibit Number
 3   13, which is the Victory/Winn-Dixie June 4, 2002
 4   contract; right?
 5        A    Yes.
 6        Q    Would you please -- you agree that this is a
 7   contract, a binding agreement; right?
 8        A    It appears to be, yes.
 9        Q    Would you go to the third full paragraph on the
10   first page.  Actually the last paragraph may be easier.
11   The one that starts with, in addition.
12             Would you read aloud the -- that whole
13   paragraph, please.
14        A    In addition, Victory, in conjunction with its
15   outsourcing program, will provide an NTS non-exclusive
16   license to any Winn-Dixie associate who has an internet-
17   connected PC.  This will allow Winn-Dixie associates to
18   evaluate nationwide manufacturer deal information,
19   monitor nationwide diverter pricing, analyze
20   manufacturer of non-divert programs, and will permit
21   Winn-Dixie to independently evaluate corporate diversion
22   activity by using the NTS reporting module.  Victory
23   will assist with the training of any Winn-Dixie
```

24    personnel who wishes to use the NTS.
25         Q    All right.  Now, given this paragraph, it's
0184
 1    clear that business will be done between Victory and
 2    Winn-Dixie under this contract using the internet;
 3    correct?
 4         A    No, sir.
 5         Q    No?  What does this will allow Winn-Dixie
 6    associates to evaluate nationwide manufacturer deal
 7    information mean, following the paragraph that says
 8    Victory will provide licenses to Winn-Dixie associates
 9    who have internet-connected PC's?
10         A    That's correct.
11         Q    Why would you need an internet-connected PC
12    unless you're doing something with the internet?
13         A    You asked -- all this enabled our people to do
14    was to go on to a program and look at pricing in the
15    market.  There was no buying or selling through this.
16         Q    Right.  It would allow Winn-Dixie associates
17    through the internet to analyze nationwide manufacturer
18    deal information; right?
19         A    Correct.
20         Q    And Visagent's system allowed the analysis of
21    nationwide deal information, but on an anonymous level;
22    right?
23         A    No.
24         Q    The Visagent system didn't allow Winn-Dixie to
25    go in and analyze deal information that was being
0185
 1    offered?
 2         A    It allowed you to go in and look at pricing
 3    being offered in the market.
 4         Q    Right.  That's deal information.
 5         A    No, that's not.  That's cost information.
 6         Q    What's deal information?
 7         A    Deal is Proctor & Gamble has a $5 deal on Tide
 8    detergent.  With the NTS inquiry module you could go out
 9    and see -- you couldn't see customer-specific, but you
10    could see in the midwest a $5 deal was being offered on
11    Tide.
12         Q    By the manufacturer.
13         A    By the manufacturer.
14         Q    So this was to buy direct from the
15    manufacturer?
16         A    No buying or selling was done with this.  None.
17         Q    What would be the relevance to Winn-Dixie if
18    you couldn't buy or sell using this information?
19         A    When you had the Proctor & Gamble people come
20    in and they said, listen, we got you a $3 deal; this is
21    the best deal in the world.  You could say, don't think
22    so.  We know that you're offering a $5 deal somewhere in
23    the midwest.
24         Q    Okay.  Well, let's go to the last part of this
25    sentence:  Permitting Winn-Dixie to independently
0186
 1    evaluate corporate diversion activity by using NTS
 2    reporting modules.

```
 3      A    Same thing.
 4      Q    Isn't that -- what does diversion mean?
 5      A    Diversion means when you actually buy and sell
 6  product.
 7      Q    To and from diverters?
 8      A    Correct.
 9      Q    Right.  So that's not manufacturer trades;
10  correct?
11      A    That's correct.
12      Q    All right.  So this system would allow
13  Winn-Dixie employees to use the internet to look at
14  diverting information; correct?
15      A    No, sir.
16      Q    Tell me then -- tell me what that means then.
17      A    It would -- it would -- they could use that $5
18  deal information to sit a supplier down and say, listen,
19  you've got a $5 deal, you're giving me a $3 deal.
20           If they gave us a $5 deal because we told them
21  that, then that would enable us to divert that product
22  if we wanted to.  But this was not a buying or selling
23  tool.
24      Q    Okay.  Well, let's go up to the first paragraph
25  on that same point where the NTS system is described,
0187
 1  and it says:  Victory will provide Winn-Dixie's
 2  diverting department with licenses and access to the
 3  NTS.
 4           Do you see that?
 5      A    Yes, sir.
 6      Q    Okay.  And the NTS system will include computer
 7  hardware necessary to run it and any data connections
 8  necessary to connect our on-site associates with
 9  Victory's central office location; right?
10      A    Yes, sir.
11      Q    Okay.  Would you agree that that is a data
12  connection through the internet?
13      A    Yes, sir.
14      Q    All right.  And the NTS would, it says provides
15  -- provided Winn-Dixie will include full item comparison
16  functionality.
17           That's items available; right?
18      A    I think so, yes, sir.
19      Q    And auto-buy processing.  What is that?
20      A    It's what generated items that we give the
21  buyers every morning to look at.
22      Q    All right.  So you're providing information to
23  buyers?
24      A    Yes.
25      Q    Through the internet?
0188
 1      A    Through the Victory NTS system.
 2      Q    Right.  Well that's an internet-based system,
 3  isn't it?
 4      A    It's -- it's a data file system.
 5      Q    I know what your posi- -- what Winn-Dixie's
 6  position is on it's got to be a similar platform as
 7  Visagent's.  My only question is:  To your knowledge is
```

```
 8    the NTS system where you're pushing items for buyers to
 9    look at, is that an internet-based data system?
10         A    I do not think so.
11         Q    What is it then?
12         A    Well, unless -- unless data files transmitted
13    is done over the -- I don't know that it's done over the
14    internet.
15         Q    But you don't know that it's not either.
16         A    No, sir, I do not.
17         Q    What are the different ways it can be
18    transmitted if it's not over the internet?
19         A    I can't answer that.  I'm not an IT person.
20         Q    All right.  And Victory says it will maintain
21    and customize the NTS to fit Winn-Dixie's specific and
22    changing needs; right?
23         A    Yes.
24         Q    And that's what Visagent was doing for
25    Winn-Dixie as well?
0189
 1              MR. BOLLING:  Objection.
 2         A    Basically.
 3         Q    This includes tuning and customizing software
 4    to implement specific programs, such as the creation of
 5    an inter-divisional diverting program.
 6              Well, Visagent was tuning and customizing its
 7    software to implement specific programs for Winn-Dixie
 8    before and after the service agreement was signed;
 9    correct?
10         A    Before and after, yes.
11         Q    And spent hundreds of thousands, if not
12    millions, of dollars doing that?
13         A    I have no idea what they spent.
14         Q    You know it's expensive to do programming of
15    this nature that has to take into account the kinds of
16    data that Winn-Dixie had to make the process functional;
17    correct?
18         A    I have no idea how expensive that is.
19         Q    All right.  You have no reason to doubt that
20    hundreds of thousands, or millions of dollars were spent
21    customizing Winn-Dixie's requested software upgrades?
22         A    I have no idea how expensive that would be.
23         Q    Right.  And you wouldn't doubt it if you heard
24    a number like that, would you?
25         A    I have no idea how expensive that would be or
0190
 1    should be.
 2         Q    It says:  Victory will provide Winn-Dixie's
 3    corporate diverting department with miscellaneous office
 4    equipment.
 5              Did it?
 6         A    They furnished their own copiers, fax machines.
 7         Q    It says this -- that Victory will provide
 8    Winn-Dixie's corporate diverting department with
 9    equipment.
10              Did it?
11         A    Their own people.
12         Q    So it didn't provide Winn-Dixie with any
```

13    equipment?
14        A    No, sir.
15        A    They were our corporate diverting department,
16    so they provided it to their-self.
17        Q    Did you have any involvement in the negotiation
18    or execution of this June 14, 2002 agreement between
19    Winn-Dixie and Victory?
20        A    No, sir.
21        Q    Do you know if it was passed by legal?
22        A    No, sir, I do not know.
23        Q    Do you know if there was any consideration
24    given to whether or not this contract violated the terms
25    of the service agreement between Visagent and
0191
 1    Winn-Dixie?
 2        A    No, sir, I do not.
 3        Q    Are you aware that a request was made by
 4    Winn-Dixie to Visagent to let them out of the
 5    exclusivity provisions of the contract?
 6        A    No, sir, I'm not.
 7        Q    Let me show you what we'll mark as Number 14.
 8            (Exhibit No. 14 was marked for identification.)
 9        Q    You've seen this letter before; correct?
10        A    Yes, sir, I've seen this.
11            MR. RUBIN:  For the record, we're looking at
12    V05558 and V05559.
13        Q    This is a letter dated June 20, 2001, signed by
14    Daryl Mills to all alternate source vendors; is that
15    correct?
16        A    Yes, sir.
17        Q    And that was sent out five days after the
18    service agreement was signed; right?
19        A    If you say so, yes.  I'm not exactly sure of
20    the date.  I would have to look at it, but if you say it
21    was five days, it was five days.
22        Q    Well, that service -- I want you to be sure of
23    what you're testifying to, so the service agreement I
24    think is Exhibit 12.
25        A    Yes, five days.  Right.
0192
 1        Q    Did you have anything to do with this being
 2    sent out?
 3        A    No, sir.
 4        Q    Did you know it was sent out -- it was being
 5    sent out before it was sent out?
 6        A    Yes, sir.
 7        Q    How did you find out about that?
 8        A    Mr. Mills told me.
 9        Q    Tell me about that conversation.
10        A    He told me he was going to send out an e-mail
11    to all -- I mean, a letter to all diverters announcing
12    the Visagent program.
13        Q    All right.  Did he give you a draft of it to
14    read before it was sent out?
15        A    He may have.
16        Q    You don't know one way or the other?
17        A    No, sir.

18      Q    Okay.  Did you check your files to see if you
19  had a draft?
20      A    I think there was one in there.
21      Q    Okay.  So if you had an unsigned version, it's
22  safe to say you saw this before it went out?
23      A    Yes, sir.
24      Q    Okay.  This -- what was the purpose of this
25  document?
0193
 1      A    To instigate interest in the Visagent exchange.
 2      Q    Interest?
 3      A    Absolutely.
 4      Q    Was it to convey a message to the diverting
 5  community?
 6      A    We wanted them to try to use the Visagent
 7  exchange.
 8      Q    All right.  Read the first two paragraphs,
 9  please.
10      A    As part of Winn-Dixie's continuing effort to
11  streamline operations and to better manage the alternate
12  source vendors, we have taken direct responsibility for
13  the secondary market procurement process.  Winn-Dixie
14  has retained the Visagent corporation, an independent
15  technological solutions provider based in Jacksonville,
16  to facilitate the end-to-end procurement of all flip
17  goods that are purchased or sold on the secondary
18  market.
19      Q    Okay.  This is Mr. Mills talking about the
20  contract that was just signed five days ago; right?
21      A    I would guess so, yes.
22      Q    All right.  And he says at that time that
23  Visagent was retained to facilitate end-to-end
24  procurement on all flip goods purchased or sold in the
25  secondary market for Winn-Dixie; correct?
0194
 1      A    That's what it says, yes, sir.
 2      Q    All right.  It also says that Winn-Dixie is
 3  taking direct responsibility for the secondary market
 4  procurement process; right?
 5      A    That's correct, yes, sir.
 6      Q    Now, at this time Victory was still operating
 7  under the terms of their one-year agreement, the first
 8  agreement, which is Exhibit Number 2 to this deposition;
 9  right?
10      A    Let me look.
11      Q    Yes.
12      A    I think this is a 24-month agreement.  As a
13  matter of fact, it says it's a 24-month agreement.
14  Page 3, the first --
15      Q    I stand corrected.  It started in 2000 --
16      A    Oh, okay.
17      Q    -- and it was ending in 2002.
18          But at the time that the Winn-Dixie
19  announcement came out and at the time that the service
20  agreement was signed, one whole year, approximately, had
21  passed of the two-year Victory original agreement;
22  right?

```
23      A    Correct.
24      Q    So there was one year left on this agreement?
25      A    Correct.
0195
 1      Q    And signing a contract with Visagent in order
 2  for this contract, Exhibit Number 2, not to be breached
 3  there had to be an exclusion for this contract for a
 4  period of one year until it ended; right?
 5           MR. BOLLING:  Objection.
 6      A    I would guess.
 7      Q    Right.
 8      A    Yes.
 9      Q    Otherwise, Visagent and Victory would have a
10  contract covering the same thing at the same time, and
11  that would be a breach, wouldn't it?
12           MR. BOLLING:  Objection.
13      A    The Visagent contract was for full truckloads.
14  This letter reads flip goods.  Entirely different thing.
15      Q    All right.  Well, this letter doesn't say
16  anything about web-based platform only; right?
17      A    That's correct.
18      Q    Okay.  Tell us how flip goods purchased and
19  sold on the secondary market were done before the
20  service agreement was signed.
21      A    Via phone call.
22      Q    Right.  And this document, the Winn-Dixie --
23  the announcement on June 20th, Exhibit Number 13 --
24  no -- 15 --
25           MR. RUBIN: I'm sorry.  I'm all messed up.  The
0196
 1  one he's got.
 2           THE WITNESS:  14.
 3      Q    -- 14 says in the third paragraph, which we
 4  haven't gotten to yet:  Effective June 29, 2001, all
 5  Winn-Dixie flip transactions will be facilitated through
 6  the anonymous internet-based platform known as the
 7  Visagent grocery exchange.
 8           It says will be facilitated; right?
 9      A    Yes.
10      Q    That's a -- that's a definitive term.  It's
11  not, you have the option to do it this way, or you have
12  the option of doing it the old way; right?
13      A    It says will be facilitated.
14      Q    Right.  This was telling diverters that we're
15  changing the way we're doing business in nine days.
16  This is your notice.  If you want to continue to do
17  business with us you've got to go through the exchange .
18  Right?
19      A    All flip transactions.
20      Q    That's all I'm talking about right now.
21      A    Yes.
22      Q    Okay?
23      A    Yes.
24      Q    And define a flip transaction again.
25           MR. BOLLING:  Objection.
0197
 1      A    A transaction that the diverter never takes
```

```
 2   possession of the product.
 3       Q    All right.  And what companies did the most
 4   flip transactions from 2000 to 2005?
 5            MR. BOLLING:  Objection.
 6       A    I would guess Purity Wholesale would be the
 7   biggest one.
 8       Q    All right.  How much volume would they do
 9   yearly --
10       A    I have no idea.
11       Q    -- in flip?
12       A    I have no idea.
13       Q    Okay.  We've got the documents, and we can get
14   into that.
15            Did Purity do all their flip transactions
16   through the exchange for the three years of the
17   contract?
18       A    I have no idea.
19       Q    You never looked at that issue?
20       A    I -- I'm sure Purity did business with -- with
21   hundreds of different customers.  I don't know that they
22   did them all through the exchange or not.
23       Q    I'm sorry.  Bad question.
24            In every transaction with Winn-Dixie.  Do you
25   know if Purity did flip transactions with Winn-Dixie?
0198
 1       A    I'm sure they did, and I know they used the
 2   grocery exchange, at least sometime.
 3       Q    Okay.  Did they use the -- did they use the
 4   exchange for all of their flip transactions from the
 5   time the service agreement was signed to the end of the
 6   service agreement?
 7       A    I -- I can't answer that question.
 8       Q    You don't know?
 9       A    I do not know.
10       Q    Again, you're the corporate representative, and
11   you're supposed to know what the diverters used and
12   didn't use.  That's the -- what this case is about,
13   whether they used the Visagent system or not.
14            MR. BOLLING:  Is there a question pending?
15       Q    Do you understand that that's what you are here
16   to talk about?
17       A    Yes.
18            MR. BOLLING:  Objection.
19       Q    One of the things?
20       A    (Nods head.)
21       Q    Yes?
22       A    Yes.
23       Q    And you didn't take any steps to learn whether
24   Purity was working with Winn-Dixie outside the Visagent
25   exchange or inside the exchange?
0199
 1       A    I know they worked outside the exchange, but
 2   you're talking about flip stuff, not downloads and that
 3   kind of thing.
 4            Flip loads.  I do not know how many we bought
 5   from Purity.  I don't know if every single one that
 6   Purity ever had was put on the exchange.  I know they
```

```
 7   put product on the exchange.  I know we purchased
 8   product on the exchange.  I don't know if I bought it
 9   from Purity, because it's an anonymous exchange.
10        Q    Okay.
11             THE VIDEOGRAPHER:  Excuse me.  Can I change
12        videotapes?
13             MR. RUBIN:  Yeah.  Sure.
14             THE VIDEOGRAPHER:  Off record at 5:15.
15             (Off the record.)
16             THE VIDEOGRAPHER:  Back on record at 5:15.
17        Q    You were the alternate source manager?
18        A    Yes.
19        Q    Right.  All the salespeople reported to you?
20             MR. BOLLING:  Objection.
21        Q    They reported to different, like, managers?
22        A    I don't know who you mean by salespeople.
23        Q    The buyers.
24        A    The buyers did not report to me.
25        Q    Right.  Did their report report to you?
0200
 1        A    No, sir.
 2        Q    Okay.  Did you have any authority over the
 3   buyers?
 4        A    No.
 5        Q    Did you communicate information to them?
 6        A    I talked to all of them.
 7        Q    Okay.  What was your role vis-a-vis the buyers?
 8        A    I went to them just like, listen, I've got this
 9   offer, are you interested.
10        Q    Right.
11        A    We've got a deal on corn flakes; you interested
12   in selling it.
13        Q    So you were kind of like an equal with them?
14        A    They did not answer to me.
15        Q    All right.  Question to the corporate
16   representative of Winn-Dixie:  Did Winn-Dixie notify all
17   of its buyers that on June 29, 2001, they were not to do
18   business for the next three years directly with any
19   diverter on flip transactions?
20        A    No.
21        Q    That kind of a message would have been
22   consistent with this announcement; correct?
23        A    No.
24        Q    No?
25        A    No.
0201
 1        Q    Well, doesn't this say that all transactions
 2   must be go through the exchange?
 3        A    Our buyers did not deal with diverters, did not
 4   deal direct with diverters.
 5        Q    Who did?  Who worked with diverters?
 6        A    The diverters and me.  Bob Carlson, the
 7   diverting group, and myself worked with the diverters.
 8        Q    Okay.  Did you instruct Bob Carlson and his
 9   group that consistent with this document that no trades
10   on flip transactions should be made directly with any
11   diverters, that they all have to go through the
```

12  anonymous exchange?
13      A    No, I did not.
14      Q    That would have been consistent with this
15  announcement; correct, that kind of an order or
16  instruction?
17      A    I do not think so.
18      Q    Why not?
19      A    I just do not.
20      Q    For what reason would it be inconsistent?
21      A    Victory was in-house and we -- their business
22  was in a separate entity.
23      Q    The Victory business?
24      A    Yes.
25      Q    Okay.  Well, after the one-year exclusion under
0202
 1  the service agreement did you still consider Victory's
 2  business to be separate and not have any impact on the
 3  service agreement with Visagent?
 4      A    I -- I -- I think at the end of that it was
 5  extended a year, was it not?
 6      Q    My question is, at the end of that one-year
 7  exclusion under the service agreement anything that
 8  Victory brought in in terms of flip transactions would
 9  have fallen under this directive, wouldn't it?  Talking
10  about Exhibit 14.
11      A    Anything that Victory -- rephrase it again.
12  I'm -- I think I know what you're saying, but I'm not
13  sure what you're saying.
14      Q    What I'm saying is, the service agreement has
15  an exclusion for Victory for one year.
16      A    Okay.
17      Q    It's true that that exclusion is in there
18  because that is timed exactly to be the end of the
19  existing June 14th -- I'm sorry -- July 24th, 2000
20  two-year contract; right?
21      A    Yes.
22      Q    Right.  So on July the 23rd, 2002, it was
23  anticipated that Victory would no longer be doing the
24  in-house diverting under the July 24th, 2000 contract.
25      A    Okay.
0203
 1      Q    At the time the service agreement was executed.
 2  Correct?
 3      A    I'd have to agree.
 4      Q    Okay.  So when this letter went out, the June
 5  20, 2001 letter, this was telling any diverter who
 6  wanted to bring flip transactions to Winn-Dixie that
 7  they needed to be done through the exchange or not at
 8  all; correct?
 9      A    That's what it reads.
10      Q    Right.  And Victory would be treated just like
11  any other diverter at the end of its contract period.
12           That was the intent, wasn't it?
13      A    I do not know what the intent was.
14      Q    Let's go to the second page of Exhibit 14.
15           You see there are two bolded paragraphs; the
16  first one starts with the word based, and the next one

```
17   is please?
18        A    Yes.
19        Q    Okay.  Read the second one, please.
20        A    Please do not phone, fax, or e-mail Winn-Dixie,
21   since the fundamental principle of the exchange is
22   anonymity.
23        Q    What does that mean?
24        A    It means please do not phone, fax, or e-mail
25   Winn-Dixie.
0204
 1        Q    Right.  This is telling every diverter, we do
 2   not want you to contact us by phone or by fax or by
 3   e-mail.  You must use the exchange to do business with
 4   us.  Correct?
 5        A    That's what it appears to say.
 6        Q    The next paragraph, go ahead and read that.
 7        A    Winn-Dixie's goal is to transact much more
 8   truckload business buying and selling on the secondary
 9   market.  This initiative will also provide you with an
10   opportunity to increase your business activity with
11   Winn-Dixie.
12        Q    Is that accurate?
13        A    That would be accurate, yes.
14        Q    And as far as Winn-Dixie is concerned today,
15   the -- the deal with Visagent was to transact more
16   truckload business, both buying and selling, in the
17   secondary market using the exchange?
18        A    That would be correct.
19             MR. RUBIN:  Can you make two more copies of
20        that real quick?  We can go off for a minute.
21             THE VIDEOGRAPHER:  Off record at 5:23.
22             (Short break.)
23             THE VIDEOGRAPHER:  Back on record at 5:26.
24             (Exhibit No. 15 was marked for identification.)
25        Q    Mr. Barr, you had mentioned that you had a
0205
 1   contact at Purity that you were IM'ing with?
 2        A    Yes, sir.
 3        Q    Was that Mr. Horick that you were IM'ing with?
 4        A    Yes, sir.
 5        Q    He's a diverting buyer; a buyer for a diverter?
 6        A    And a seller.
 7        Q    Okay.  He does buying and selling for Purity?
 8        A    He did.
 9        Q    At this time, in this time frame of 2001
10   through 2004?
11        A    Yes, sir.
12        Q    And the whole Visagent model, as it was
13   explained to Winn-Dixie, was to eliminate the diverter
14   from taking so much profit from Winn-Dixie; right?
15        A    I -- I don't know that it was ever discussed
16   that way.
17        Q    It wasn't discussed that by going to a more
18   competitive anonymous model of trading that Winn-Dixie's
19   bottom line would be increased because the margins would
20   -- of the middleman would greatly disappear?
21        A    Okay.  Well, that's not what you said.
```

```
22      Q    I'm sorry.
23      A    Okay.
24      Q    Is it true that what I just said, that was one
25  of the moving forces behind the Visagent system?
0206
 1           MR. BOLLING:  Objection.
 2      A    The selling point of the Visagent system was
 3  see it, click, I'm done.  One-stop shop.
 4      Q    Right.  And diverters wouldn't have the ability
 5  to have one-on-one negotiations with individual buyers
 6  of Winn-Dixie where favoritism might come into play, or
 7  relationships might come into play; right?
 8           MR. BOLLING:  Objection.
 9      A    Diverters did not deal with our buyers per se.
10      Q    How about dealing with you; did they deal with
11  you?
12      A    Yes.
13      Q    Did you have personal relationships with
14  diverters?
15      A    What do you mean by personal?
16      Q    I mean, did you do social things with
17  diverters?
18      A    Went out to dinner with Mark.  Well, Mark
19  wasn't a diverter.  I attended a race with one one time.
20      Q    NASCAR races; right?
21      A    Yes.
22      Q    You're a big NASCAR guy?
23      A    I'm a NASCAR fan, yes, sir.
24      Q    In fact, your password for the Visagent test
25  system was NASCAR, wasn't it?
0207
 1      A    That's correct.
 2      Q    And so diverters took you to NASCAR races
 3  where?
 4      A    Never took me.  Ever.
 5      Q    What did they do?
 6      A    I met Robert at Miami/Homestead.  I gave him
 7  his ticket.  They never gave me anything.
 8      Q    Okay.  So you gave a diverter something?
 9      A    A ticket, yes.
10      Q    All right.  Do you belong to a golf course, a
11  golf club?
12      A    Do I?
13      Q    Yes.
14      A    No.
15      Q    Do you play golf?
16      A    Yes.
17      Q    Have you ever been to a golf club with a
18  diverter?
19      A    Yes.
20      Q    Have they ever treated you to a round of golf?
21  Ever?
22      A    Take out the Victory people, the answer would
23  be no.
24      Q    How about the Victory people?
25      A    Yes.
0208
```

```
 1      Q    They're diverters, aren't they?
 2      A    Yes.
 3      Q    All right.  How often did they take you to
 4 their golf club?
 5      A    Not often.  I played golf with Robert Horick
 6 one time in Boca.  I paid my own way.  Other than that,
 7 I never played golf.
 8           I played in the Winn-Dixie charity golf
 9 tournament with the Victory people, but Robert was in
10 that tournament, American Foods was in that tournament,
11 but I did not play golf with them.
12      Q    Victory did -- somebody at Victory had a golf
13 membership?
14      A    Yes.
15      Q    At what club?
16      A    Fleming Island.
17      Q    And how many times have you played there?
18      A    I paid Robert when I played golf there.
19      Q    Each and every time?
20      A    Well, I won't say I never missed a time, but I
21 made a point to pay Robert when I played golf.
22      Q    Robert who now?
23      A    Bob Carlson.
24      Q    Bob Carlson.
25      A    I call him Robert sometimes.
0209
 1      Q    All right.  Did you advise your supervisors at
 2 Winn-Dixie that you were doing that?
 3      A    I worked for Daryl Mills.  Yes, he knew that.
 4      Q    Daryl knew that you were playing golf with the
 5 Victory people?
 6      A    Yes, I'm sure he did.
 7      Q    Did he know that you were being treated from
 8 time to time by the Victory people?
 9           MR. BOLLING:  Objection.
10      A    I don't think the Victory people treated me
11 from time to time.  I said they -- I may have not paid
12 him, and I may have paid him every time, but I -- but I
13 won't tell you that I missed a time.  That would be sort
14 of --
15      Q    Winn-Dixie has a code of ethics, don't they?
16      A    Yes, they do.
17      Q    You're not supposed to socialize and fraternize
18 with vendors and give the appearance of a relationship
19 with someone you're doing business with, don't they?
20      A    You can socialize with somebody if your bosses
21 approve it.
22      Q    And Mr. Mills approved each and every time you
23 went?
24      A    I cannot honestly say yes.
25      Q    So the answer is no?
0210
 1      A    Well, he played with us a time or two, so I
 2 can't tell you without a doubt, unequivocally, yes.
 3      Q    Now, once the diverters found out through
 4 announcements and industry news that they could no
 5 longer do business directly with Winn-Dixie, that they
```

```
 6  had to go through the exchange, they were upset, weren't
 7  they, a lot of them?
 8       A    I would imagine they probably were.
 9       Q    Well, without imaging, they called you and they
10  told you they were upset, several of them?
11       A    Yes.
12       Q    And Mr. Horick was one of them; correct?
13       A    Yes.
14       Q    And Mr. Horick provided you with what has been
15  marked as Exhibit Number 15, which is a Dun & Bradstreet
16  report and a Florida corporate officers and directors
17  search for Global Food Resources; correct?
18       A    I do not know that Robert sent this to me.
19       Q    Okay.  He sent it to Winn-Dixie; right?
20       A    Well, it -- I don't know.  I don't recognize --
21  I guess it's possible.  I don't know.  I've never seen
22  this before that I know of.
23       Q    Well, do you see the Bates stamp number on the
24  bottom?
25       A    Yes.
0211
 1       Q    It starts with a V?
 2       A    Right.
 3       Q    And it's 05549 through 55 -- 05553?
 4       A    Yes.
 5       Q    Okay.  That means they're documents that we
 6  received from Winn-Dixie in discovery in this case.
 7       A    Yes, sir.
 8       Q    Okay.  That means that you supplied them to us.
 9  All right?
10       A    Yes, sir.
11       Q    Assuming that's true for the purposes of this
12  line of questioning, Mr. Horick, in the first week of
13  July 2001, is sending Winn-Dixie information on Global
14  Food Resources; right?
15       A    Yes.
16       Q    Do you know what the relevance of this
17  information is?
18       A    Global Food Resources is a diverting house.
19       Q    Okay.  How do you know that?
20       A    Because they quoted -- I've got, or I had where
21  they sent out look-fors, offers to sell product.  Same
22  as a diverter.
23       Q    All right.  And is there any problem with Mark
24  Rubin being the president of Global Food Resources and
25  an executive at Visagent?
0212
 1       A    Would be to me if I was a diverter.
 2       Q    Okay.  But what about you -- what about
 3  Winn-Dixie; was there a problem with that?
 4       A    There was with me.
 5       Q    I'm not talking about you personally now.  I'm
 6  talking about Winn-Dixie as a corporation.
 7            Did Winn-Dixie as a corporation have a problem
 8  with that?
 9       A    I don't think they knew that.
10       Q    Okay.  Well, they knew it the first week of
```

```
11    July; right?
12         A    Yes.  Well, somebody did, yes, sir.
13         Q    Right.  And they didn't complain about that, to
14    your knowledge, to Mr. Rubin, did they?
15         A    Not to my knowledge.
16         Q    They didn't call any kind of a breach of
17    contract on the service agreement, did they?
18         A    Not to my knowledge.
19         Q    Did anybody at Winn-Dixie have any
20    conversations with Mr. Rubin, or anyone else at
21    Visagent, bringing up this issue?
22         A    Not to my knowledge.
23         Q    Okay.  Do you know that in the service
24    agreement there are provisions which say that if you
25    think there's a breach of this contract that you should
0213
 1    bring it to the attention of the other side and give
 2    them notice to cure?
 3              MR. BOLLING:  Objection.
 4         A    At some point, whether it was before the
 5    agreement was signed or after the agreement was signed,
 6    Mark said he had no affiliation with Global Food
 7    Resources.  Separate company.  Had nothing to do with
 8    it.
 9         Q    Okay.
10         A    That might have been good enough for
11    Winn-Dixie.
12         Q    All right.  Well, you're talking for Winn-Dixie
13    right now.
14         A    Okay.
15              MR. BOLLING:  Objection.
16         Q    Do you know one way or the other whether
17    Winn-Dixie thought that that was any kind of an issue
18    that would prevent the service agreement from going
19    forward?
20         A    No.
21         Q    Okay.  And the contract continued between
22    Winn-Dixie and Visagent, the service agreement, for the
23    entire three years.  It was never declared terminated
24    prematurely by Winn-Dixie; correct?
25         A    Correct.
0214
 1         Q    It terminated because of the expiration of the
 2    three-year term; correct?
 3         A    Correct.
 4         Q    So this could not have been a big deal to
 5    Winn-Dixie; true?
 6         A    True.
 7         Q    Now, Mr. Horick is the guy that was IM'ing you,
 8    and you claim that -- and you went golfing with him, so
 9    you're more than just business affiliates; correct?
10              MR. BOLLING:  Objection.
11         A    Golf and a race from 1990 to 2007, I would say
12    is not, you know, we're the best of buddies.
13         Q    How many people were you instant messaging with
14    in 2001?
15         A    Mark, Simon, Robert Horick.  I won't say I
```

16    never got one from somebody else, but that would be the
17    bulk of it, and the bulk of it was Simon and Bob Horick.
18         Q    Right.  And that was strictly business; right?
19         A    Oh, you know, somebody -- someone might have
20    asked me how my Steelers did.
21         Q    Right.
22         A    Basically business.
23         Q    But the IM was put into place to facilitate the
24    business relationship between the procurement department
25    of Winn-Dixie and Visagent; correct?
0215
 1         A    Yes.
 2         Q    So that you could communicate faster and make
 3    working with the system easier; right?
 4         A    Well, I don't -- I can't answer that, because
 5    actually there was suppose -- there really shouldn't be
 6    any communication.  I was supposed to just go on their
 7    system, look, click, buy, and done.
 8         Q    Well, they weren't telling you who was on the
 9    other side of the transactions, were they?
10         A    No.
11         Q    Right.
12         A    But the system was designed for them not to
13    call me, not to fax me, not to e-mail me, not to instant
14    message me.
15         Q    For Visagent not to?
16         A    Yeah.  Why would they have any -- why would
17    they be any different?
18         Q    Well, why -- why did you participate in instant
19    messaging with Visagent?
20         A    Because Mark Rubin asked us to.
21         Q    Okay.  And that was for what purpose?
22         A    So we could talk quicker if we needed to.  If I
23    was on the phone, they could get to me.
24         Q    And that was to help Winn-Dixie with its
25    business; right?
0216
 1         A    I'm sure it was, in Mark's view, that.
 2         Q    Well, what was it in your view, engaging in the
 3    instant messaging?
 4         A    It was more work for me.
 5         Q    And you said earlier that you IM'd with
 6    Mr. Horick, but you didn't do offerings and trades with
 7    him, you would just do the occasional hello, how you
 8    doing.
 9         A    That's a true statement.
10         Q    So the instant messaging with Mr. Horick was
11    personal, not business?
12         A    That would be correct, yes, sir.
13         Q    Right.  So you had a personal relationship with
14    Mr. Horick; right?
15         A    If you call sending an instant message a
16    personal relationship.  I talk to people every day on
17    the phone, but I don't call it personal relationships.
18         Q    Well, if you talk to someone on the phone every
19    day and you don't talk about business, I would call that
20    a personal relationship.

```
21        A    I did not --
22             MR. BOLLING:  Objection.
23        A    -- instant message Robert every day.
24        Q    And it's a coincidence that this Dun &
25   Bradstreet came from Mr. Horick.  And he never mentioned
0217
 1   anything in an IM to you about Global Food Resources.
 2   Is that your claim?
 3             MR. BOLLING:  Objection.
 4        A    I do not recall him ever instant messaging me
 5   saying something about Global Food Resources.
 6        Q    Were you his primary contact at Winn-Dixie?
 7        A    No.
 8        Q    Who was the primary contact?
 9        A    Bob Carlson.
10        Q    Bob Carlson was not a Winn-Dixie employee, was
11   he?
12        A    No, sir.
13        Q    Okay.  So who was Winn-Dixie's primary contact
14   with Mr. Horick?
15        A    It would be me.
16        Q    And if he was upset with Global Food Resources
17   having some common ownership with Visagent, don't you
18   think he would have brought it up with you, as his
19   primary contact?
20        A    I did have a conversation with him.
21        Q    About Global Food Resources?
22        A    Yes.
23        Q    When?
24        A    I do not know.
25        Q    Around the time of this Dun & Bradstreet?
0218
 1        A    I can't tell you that; do not know.
 2        Q    Might have been?
 3        A    Do not know, but Robert faxed to me an offer
 4   from Global Food Resources had faxed to them, and said
 5   something -- and called me and said something to the
 6   effect, see, they're a diverting house just like we are.
 7        Q    In addition to Purity and Mr. Horick being very
 8   upset, other -- I think you already said other diverters
 9   were upset that Visagent was going to become an
10   intermediary between them and Winn-Dixie; right?
11        A    I'm sure there was other people out there.
12        Q    And as a result of that upset in the diverting
13   community, they were calling and writing and faxing you
14   and other people in the procurement department
15   concerning their displeasure; right?
16        A    I -- I do not know who all they may have called
17   or faxed.  I know they were not real happy.
18        Q    Well, it got so bad you had to have a meeting,
19   didn't you?
20        A    You're going to have to help me with that one.
21        Q    Well, isn't it true that you had a meeting at
22   the Winn-Dixie -- at -- is there a cafeteria in the
23   building where you worked?
24        A    No, sir.
25        Q    Is there a cafeteria at any Winn-Dixie
```

0219
1   building?
2       A    Edgewood Court there is.
3       Q    Okay.  Do you remember a meeting in the
4   cafeteria with Bob Warren, Daryl Mills, and you?
5       A    No, sir.
6       Q    Okay.  Do you remember any meeting anywhere
7   where you advised Daryl Mills in front of Bob Warren
8   that there was a very negative reaction in the diverting
9   community?
10      A    I do not recall making that statement, no.
11      Q    I'm not saying -- oh, okay.  Ever to Mr. Mills?
12      A    I don't recall making that statement, no.
13      Q    Okay.  Do you recall any conversation where
14  this subject was brought up, Mr. Mills was there, you
15  were there, Bob Warren was there, and Mr. Warren said
16  something to the effect of, well, this is like a
17  divorce, and the diverters are just going through the
18  four stages of divorce; anger, resentment, denial, and
19  acceptance, and they'll come around.
20           Does that sound at all familiar to you?
21      A    No.
22      Q    No.  And you don't remember Mr. Mills agreeing
23  and saying, we just need to stick with it?
24      A    I do not recall that.
25      Q    Okay.  Are you saying that it didn't happen?
0220
1       A    No, I'm not saying that.
2       Q    All right.  Let me show you what we'll mark as
3   Number 16.
4            (Exhibit No. 16 was marked for identification.)
5       Q    If you could look at that and then let me know
6   when you're done.
7       A    Okay, sir.
8       Q    This was copied to you; right?
9       A    Yes, sir.
10      Q    Did you ask Mr. Carlson to write this?
11      A    No, sir.
12      Q    Did Mr. Mills ask Mr. Carlson to write this?
13      A    I do not know that.
14      Q    You're the corporate representative.  How did
15  this letter come to be?
16      A    Because we were trying to convince the
17  diverters to use the exchange.
18      Q    What happened prior to this letter that caused
19  the letter to be written?
20      A    I would -- I would have to assume that they
21  were getting covered up with faxes or phone calls.  I
22  might have told Bob there was nothing on the exchange.
23           Because I worked it every single morning
24  myself, I would have to say that's what it is.
25      Q    And you have no idea how Robert Carlson used
0221
1   Winn-Dixie stationery and represented himself to be a
2   Winn-Dixie employee essentially by signing over the
3   Winn-Dixie name?  You have no idea how that came to be?
4       A    It says Winn-Dixie diverting.

```
 5        Q     Right.
 6        A     Every single diverter we did business with knew
 7   Bob was a Victory associate, not a Winn-Dixie associate.
 8   Every one of them.
 9        Q     So it was clear that this was coming from
10   Victory, even though the letterhead is Winn-Dixie?
11        A     No, it was clear it was coming from Bob Carlson
12   at Winn-Dixie.
13        Q     Okay.  Did you see this at the time that it was
14   sent out?
15        A     I'm sure I did.
16        Q     Did you see a draft before it was sent out?
17        A     I'm sure I did.
18        Q     And you approved it?
19        A     I didn't initial it, but I would say yes.
20        Q     All right.  And this doesn't narrow anything to
21   flip transactions.  This says -- correct me if I'm
22   wrong -- recently Winn-Dixie asked all diverters to
23   participate with other diverters and retailers using
24   Visagent as a tool to offer and trade goods via the
25   internet.  This process is to replace the former method
0222
 1   of faxes and numerous phone calls.  Where most diverting
 2   companies have honored this request, a few have
 3   attempted to circumvent or disregard it.  This neglect
 4   of procedures is not acceptable.  We will have no choice
 5   but to completely stop doing business with your company
 6   if you are currently conducting business in the
 7   following fashion:  Not posting with Visagent, and
 8   instead calling to buy or sell product.  Calling to
 9   check on postings, either to inform us of your posting
10   or inquire if a posting belongs to Winn-Dixie.  Calling
11   frequently to chat or harass our assistants in hopes of
12   communicating with us directly.
13             All of that was approved by you?
14        A     I would have to say so.
15        Q     All right.  This was meant to convey that there
16   was no other way for diverters to do business with
17   Winn-Dixie, other than using the exchange, otherwise
18   they were going to be cut out of business all together.
19   True?
20        A     This was an implied threat to get them to use
21   the exchange.
22        Q     Was it implied or direct?
23        A     We wanted diverters to use the Visagent grocery
24   exchange.  We tried to make them use the exchange.
25        Q     Did Daryl Mills see this before it went out?
0223
 1        A     I do not know.
 2        Q     Regarding the service agreement -- and let's
 3   get it in front of you, because I've got some additional
 4   questions.  I think it was Exhibit 12.
 5             Is Winn-Dixie's position that Mr. Payment was
 6   authorized to sign the document?
 7        A     Yes, sir.
 8        Q     Okay.  And that he was authorized to bind
 9   Winn-Dixie to whatever obligations were contained in the
```

```
10   service agreement?
11      A    Yes, sir.
12      Q    Did anyone at Winn-Dixie have conversations
13   with members of the WWRE regarding the effect or the
14   scope of the service agreement?
15      A    Not that I'm aware of.
16      Q    Did you ever have any conversation with Steve
17   Carr regarding the service agreement or any aspect of
18   the agreement between Visagent and Winn-Dixie?
19      A    Not that I recall.  When we were trying to
20   develop the surplus goods exchange, which was an
21   offshoot of this, Steve Carr, myself, somebody from
22   Safeway, I believe, interviewed different companies, and
23   during that time when they wrote the surplus goods
24   agreement there may have been specifically nothing with
25   Steve Carr that I'm aware of.
0224
 1      Q    You don't recall, but you might have had
 2   conversations with him?
 3      A    Well, I'm sure I had conversations with him.  I
 4   can't imagine why I would have conversations with him
 5   about our service agreement for the grocery exchange.  I
 6   mean, it was no business of theirs, so --
 7      Q    Well, I mean, Winn-Dixie was a member of the
 8   WWRE, wasn't it?
 9      A    Sure it was, but it has nothing to do with
10   this.
11      Q    Winn-Dixie -- I'm sorry.  The WWRE had a
12   competitive bid for the endorsement of the WWRE as the
13   preferred exchange provider for all WWRE members;
14   correct?
15           MR. BOLLING:  Objection.
16      A    You lost me.
17      Q    Was there a competition amongst Visagent,
18   DEXSI -- and there's one other?
19      A    It would have been Dayman.
20      Q    Dayman.  Was there a competition at any point
21   between those three companies?
22      A    Yes, and I said that.  Safeway, myself, and
23   Steve interviewed DEXSI in Miami, I believe, Visagent
24   here, and Dayman in Connecticut, to be the provider,
25   developer of the surplus goods exchange that was
0225
 1   affiliated with the WWRE.  That is correct.
 2      Q    Right.
 3      A    But I still don't think that I would've had a
 4   conversation with Steve Carr about my grocery exchange
 5   agreement, or why I would have.  I mean, he had nothing
 6   to do with that.
 7      Q    Well, if you were looking -- tell us about the
 8   process of this selection.  This is a selection
 9   committee; you, and I think it was Mr. Rice from
10   Safeway?
11      A    I do not remember his name, but it was a
12   Safeway representative.
13      Q    Okay.  And Mr. Carr?
14      A    That's correct.
```

```
15      Q    And what were you three doing?
16      A    WWRE was trying to develop a -- well, actually
17 I think Mark pitched it to the WWRE first, and then they
18 decided, well, we need to interview more than one
19 company.
20      Q    And you were on a committee?
21      A    I was on a group of three.
22      Q    Right.  And what was the group of three
23 supposed to do?
24      A    Go out and visit these three companies, see who
25 we thought would be the best person, best company for
0226
 1 the WWRE to partner with to develop this surplus goods
 2 exchange.
 3      Q    Okay.  And a recommendation after the visits
 4 was made?
 5      A    We did it on a point system, and Visagent won
 6 that.
 7      Q    Okay.  Were there three separate votes, or did
 8 all three of you vote -- contribute to the points
 9 separately or all together?
10      A    We all did points separately, and then totaled
11 them, and the one with the most points got it.
12      Q    Okay.  Did Visagent have the most points on
13 each one of the three evaluations?
14      A    No.
15      Q    What was yours?
16      A    They were second on mine.
17      Q    Who was the top?
18      A    Dayman.
19      Q    And was this after the service agreement was
20 signed?
21      A    Oh, I'm sure it was, yes, sir.
22      Q    Okay.  So they -- Visagent was second on your
23 list, even though you already had a service agreement
24 and contract with them; right?
25      A    Yes.
0227
 1      Q    All right.  And you don't think that it would
 2 be a relevant conversation to talk with Mr. Carr during
 3 that selection committee process about what agreement
 4 Winn-Dixie already has with Visagent?
 5      A    Absolutely not.  No bearing.
 6      Q    Did you or anyone else at Winn-Dixie have
 7 conversations with diverters about the Visagent proposal
 8 before the service agreement was signed?
 9      A    I would not think so.
10      Q    Do you know one way or the other?
11      A    I did not have any conversations with any
12 diverters that I'm aware of, and I would have probably
13 been the only one.
14      Q    What were the projected volumes?  And again
15 this may not be your personal knowledge, but I'm asking
16 you as the corporate representative, were there any
17 conversations about the commission related to the
18 expected volumes to be done -- transacted through the
19 exchange, prior to the service agreement being executed?
```

```
20      A    I never gave anybody volume estimates, but I
21  understood there was -- Mark said there was some given.
22  I never gave any.
23          MR. RUBIN:  I've only got one, but it's pretty
24      simple.
25          MR. BOLLING:  Can I get a copy of this?
0228
 1          (Short break.)
 2          THE VIDEOGRAPHER:  Off record at 5:57.
 3          (Off the record.)
 4          THE VIDEOGRAPHER:  We're back on the record at
 5      6:06.
 6          (Exhibit No. 17 was marked for identification.)
 7  BY MR. RUBIN:
 8      Q    You have Exhibit Number 17 in front of you.
 9  Have you ever seen that document?
10      A    Yes, sir.
11      Q    This was copied to you, according to this
12  document, on May 14, 2001?
13      A    Yes, sir.
14      Q    You don't recall that far back getting it?
15      A    I remember this document.
16      Q    Oh, you do remember it?
17      A    Yes, sir.
18      Q    Did you have any discussion with anyone
19  regarding this fee matrix?
20      A    No, sir.
21      Q    Do you know who had conversations with Visagent
22  regarding this issue?
23      A    This appears to me -- and this is what it is.
24  This is something a finance person sent to Mark as a
25  suggestion.
0229
 1      Q    Right.  And this was after some conversation
 2  about potential volumes for the business; correct?
 3      A    I have no idea where Matthew got the volumes
 4  from.
 5      Q    Right.  Did you make any attempt to talk to
 6  Mr. Laney before this deposition to find out what he was
 7  trying to suggest, or what conversations he might have
 8  had with anyone else?
 9      A    No, sir.
10      Q    So you have no idea what this document means?
11      A    It was a suggestion on what the fees were going
12  to be.  I knew the fees were going to be 2 percent
13  regardless.
14      Q    How did you know that?
15      A    I come acrossed it in a conversation somehow or
16  another.
17      Q    You don't know with who?
18      A    No, sir.
19      Q    Well, why would someone have a conversation
20  about what the fees would be if the fees had already
21  been established?
22      A    I'm sure this is a finance person sending this
23  to Mark.
24      Q    And what would be the purpose for this?
```

```
25      A    The fees would change based on volume.
0230
 1      Q    So somehow Mr. Laney got the impression that
 2  the volumes could go over a hundred million dollars;
 3  correct?
 4      A    That's what he says, yes.
 5      Q    All right.  Do you -- were you involved in any
 6  volume projections --
 7      A    No.
 8      Q    -- before the service agreement was signed?
 9      A    No.
10      Q    Have you learned since the service agreement
11  was signed, up until today, what the projections for
12  volumes were?
13      A    I -- I do not know that any projection -- I
14  never gave anybody any projections to Visagent.  I do
15  not know of anybody giving projections to Visagent, but
16  it is my understanding that Mark or Bob, one, says
17  projections were given to them.
18      Q    Okay.  But you don't know what they were?
19      A    I don't know what they were, and I don't know
20  who gave them to them.
21      Q    All right.  I think you made a comment earlier
22  that Mark Rubin drafted the service agreement.
23      A    I think that's where it come from.
24      Q    What is that based on?
25      A    I -- I can't tell you that.  I don't know.  I
0231
 1  just took it to understand that Mark wrote the agreement
 2  and then our people looked at the agreement, and
 3  everybody made changes.
 4      Q    All right.  But you have no facts to base that
 5  assumption on, that he drafted it?
 6      A    No, sir.
 7      Q    Do you know who actually negotiated the terms
 8  on behalf of Winn-Dixie?
 9      A    No, sir.
10      Q    Did you do anything before this deposition to
11  find out who negotiated the terms?
12      A    No, sir.
13      Q    Why not?
14      A    Just did not.
15      Q    In the service agreement -- let's get that in
16  front of you again -- Exhibit Number 12, there is a
17  clause regarding the services on Page 1 going over to
18  Page 2.
19           The services that were -- that are described
20  here, which run from the bold services heading all the
21  way to the beginning of scope of the agreement -- right?
22      A    Yes, sir.
23      Q    Is there any part of those services that
24  Visagent failed to perform during the three years of the
25  service agreement?
0232
 1      A    The answer is no.
 2      Q    Okay.  And Winn-Dixie's official position
 3  today, the services were satisfactory?
```

```
 4            MR. BOLLING:  And let him read the whole thing.
 5            Have you read the whole thing?
 6     A    The mechanics of the service was satisfactory.
 7     Q    Okay.  Was there any guarantee as to volume in
 8  this contract?
 9     A    No.
10     Q    Was there any guarantee of how many people
11  would participate in the system?
12     A    No.
13     Q    How many diverters?
14     A    No.
15     Q    How many users?
16     A    No.
17     Q    In the user agreement clause immediately above
18  the services it says that if Winn-Dixie as the user
19  determines that there are amendments to the user
20  agreement that are unacceptable that you can give ten
21  days notice that they're unacceptable.
22            Was any change of the user agreement made that
23  you're aware of that was unacceptable to Winn-Dixie?
24     A    No.
25     Q    No breach of the user agreement clause by
0233
 1  Visagent?
 2     A    No.
 3     Q    In the fees paragraph at the bottom of Page 2
 4  over to Page 3, was there any fee that was overcharged
 5  by Visagent that would constitute a breach of this
 6  clause?
 7     A    No.
 8     Q    The service level section.  There was a minimum
 9  service level warranted.
10            Did the service level of the exchange ever
11  become unsatisfactory to Winn-Dixie?
12     A    No.
13     Q    Was the system that was delivered to Winn-Dixie
14  sufficiently similar to the version of the system that
15  had been tested and approved by Winn-Dixie?
16            MR. BOLLING:  Objection.
17     Q    Do you understand the question?  I can re --
18     A    Would you mind?
19     Q    No.  Yeah, no problem.
20            The services paragraph -- you know what?
21  Retract the question.
22            On Page 2 under the exclusions within the scope
23  of the agreement -- do you see what I'm talking about?
24     A    Yes, sir.
25     Q    And the last item is direct user transactions
0234
 1  with the following entities.  And we've already spoken
 2  about Victory Wholesale Grocers.
 3            Were there any direct user transactions between
 4  Winn-Dixie and Worldwide Retail Exchange during the term
 5  of this three-year contract?
 6     A    No, sir.
 7     Q    Were there any direct user transactions with
 8  Intesource?
```

```
 9       A    No, sir.
10       Q    So those exclusions would have no application
11  in any analysis of fees that are due to Visagent;
12  correct?
13            MR. BOLLING:  Objection.
14       A    I would not think so.
15       Q    I'd like to talk about -- with you about --
16            (Exhibit No. 18 was marked for identification.)
17       Q    Let me just make sure I gave you the right
18  thing.  Yeah.
19            On Page 2 we've asked in the second set of
20  interrogatories to Winn-Dixie to describe the breaches
21  that it -- if any, that are claimed that were committed
22  by Visagent in connection with the service agreement.
23            Did you provide the information for this answer
24  to the interrogatory?
25       A    I have the -- the faxes that Global Food
0235
 1  Resources sent out.
 2       Q    My question is only -- we'll get to that.
 3       A    Okay.  Yes.
 4       Q    My question to you is, did you supply the
 5  information that's contained in the answer to
 6  Interrogatory Number 1?
 7       A    Yes.
 8       Q    All right.  And on Page 8 is this your
 9  signature?
10       A    Yes.
11       Q    And you're swearing to the truth of the answers
12  when you signed that with a notary public; right?
13       A    Best I can, yes, sir.
14       Q    Okay.  The question is:  Set forth each and
15  every breach of Visagent to the service agreement, and
16  for each breach identify the date and time of each
17  breach, all documents referencing or supporting such
18  breach, and every witness to each breach.
19            The answer is, subject to objections:  Visagent
20  did not perform under the service agreement because
21  Visagent's grocery exchange failed to provide a platform
22  for the sale or purchase of sufficient volumes of
23  diverted grocery products.
24            Now, I'm trying to understand what you mean by
25  that.  What do you mean by failed to provide a platform
0236
 1  with sufficient volumes?
 2       A    Not enough users, not enough products.
 3       Q    Okay.  Where is the obligation in the service
 4  agreement for Visagent to provide sufficient numbers of
 5  users in the exchange?
 6       A    There's not.
 7       Q    So how could Visagent breach something that it
 8  didn't promise?
 9       A    I can't answer that question.
10       Q    Okay.  There is no breach there, is there?
11       A    I don't think Visagent lived up to their
12  promises.
13       Q    Okay.  Tell me which promises, and identify it
```

```
14    in the service --
15        A    It's not in the user agreement.
16        Q    Okay.  It's not in -- I'm talking about the
17    service agreement.
18        A    It's not in the service agreement.
19        Q    Okay.  Let me ask you to take a look at the
20    service agreement, please, and go to Page 4 under
21    miscellaneous.  And doesn't it say -- are you with me?
22    Page 4, miscellaneous.
23        A    Yes.
24        Q    This agreement, including the other agreements
25    and documents referenced herein, constitutes the entire
0237
 1    understanding and agreement of provider and user with
 2    respect to the subject matter of this agreement, and
 3    contains all of the covenants and agreements of provider
 4    and user with respect to this agreement.
 5             Does it say what I've read so far?
 6        A    Yes, sir.
 7        Q    Provider and user each acknowledge that no
 8    representations, inducements, promises, or agreements,
 9    oral or written, have been made by provider or user, or
10    anyone acting on behalf of provider or user, which are
11    not referenced or contained in this agreement, and any
12    prior agreements, promises, negotiations, or
13    representations with respect to the subject matter of
14    this agreement, whether written or oral, not expressly
15    set forth in this agreement, are of no force or effect.
16             Did I read that right?
17        A    Yes, sir.
18        Q    Okay.  And you say that there were promises
19    that were made by Visagent that aren't in this agreement
20    that you claim are -- that Winn-Dixie claims is a breach
21    of the service agreement; is that correct?
22        A    Visagent did not live up to its billing.  Not
23    in the user agreement.  Visagent did not -- did not
24    perform to what they -- we expected them to.
25        Q    All right.  Was there a performance
0238
 1    guarantee --
 2        A    No.
 3        Q    -- in the service agreement?
 4        A    No, sir.
 5        Q    All right.  So you were disappointed with the
 6    results of the contract; is that right?
 7        A    Yes.
 8             THE VIDEOGRAPHER:  Excuse me.  Can I change
 9    tapes?
10             MR. RUBIN:  Yes.
11             THE VIDEOGRAPHER:  Off record at 6:25.
12             (Off the record.)
13             THE VIDEOGRAPHER:  Back on record at 6:25.
14        Q    So would you agree on behalf of Winn-Dixie that
15    the first breach that you've claimed is excluded by the
16    provisions of the miscellaneous clause on Page 4?
17             MR. BOLLING:  Objection.
18        A    In your interpretation, yes.
```

19      Q    Well, how do you -- I'm looking for
20  Winn-Dixie's interpretation.
21           How is it a breach of an expectation that
22  Visagent didn't meet its billing when it says here in
23  the miscellaneous clause that there are no
24  representations that can be counted on as a term of this
25  contract unless it's stated in the contract?
0239
1            MR. BOLLING:  Objection.  It doesn't state
2       that.
3       A    I've answered the best I can.
4       Q    Okay.  To your knowledge, did Visagent say
5   anything, make any representations to Winn-Dixie that
6   were false?
7       A    Yes.
8       Q    What did Visagent say to Winn-Dixie that was
9   false?
10      A    That they had no affiliation with a diverting
11  house.
12      Q    All right.  When did they say that to
13  Winn-Dixie?
14      A    More than once.
15      Q    Tell me when.
16      A    I cannot give you dates.
17      Q    Who said it?
18      A    Mark.
19      Q    Okay.
20      A    Mark -- Mark has no affiliation with Global
21  Food Resources, separate entity.  The service agreement
22  says Visagent acts as an independent neutral third
23  party.
24           You can't act as an independent neutral third
25  party when you've got a diverting house as your
0240
1   next-door neighbor that you own.
2       Q    All right.  And Mark told you this?
3       A    No, no.  Mark just said he had no affiliation
4   with any diverting house.
5       Q    All right.
6       A    They were not a diverter, they had nothing to
7   do with a diverter, and were not affiliated with a
8   diverter.
9       Q    Okay.  He was talking about Visagent; right?
10      A    He was talking about Visagent.  That is
11  correct.
12      Q    Did anyone else say anything that you believe
13  was a false representation, other than what you just
14  quoted Mark Rubin saying?  And he didn't say it to you;
15  he said it to someone else?
16      A    It was said to --
17      Q    To who?
18      A    It was said to me.
19      Q    Okay.  Do you know if it was said to anyone
20  else?
21      A    I do not know.
22      Q    Okay.  Is there anything else that Mark Rubin
23  said to you?

```
24      A    Not that I recall right offhand.
25      Q    Well, this is my opportunity to ask you, so --
0241
 1      A    I understand.
 2      Q    -- have you thought about it?
 3      A    I've thought about it.
 4      Q    Okay.  Nothing else?
 5      A    No.
 6      Q    Okay.  Was there anyone else, any other
 7  representative of Visagent that made a false statement
 8  to Winn-Dixie?
 9      A    Not that I'm aware.
10      Q    Okay.  And we've already gone through that
11  Winn-Dixie within two weeks of this service agreement
12  being executed was aware that there was information
13  indicating that Mark Rubin may have been an executive at
14  Global Food Resources; right?
15      A    I believe, yes, sir.
16      Q    Okay.  Which you now say is a diverting house;
17  right?
18      A    It is a diverting house.
19      Q    All right.  And Winn-Dixie didn't think it was
20  serious enough to have any communications with Visagent
21  about the effect on this service agreement for the
22  remaining 2 years, 11 months, and 2 weeks of the
23  contract; right?
24      A    Yes.
25      Q    So it must not have been that important;
0242
 1  correct?
 2           MR. BOLLING:  Objection.
 3      A    It was important to me.
 4      Q    Right.  But not to Winn-Dixie?
 5      A    Apparently not.
 6      Q    Okay.  The second item in your breaches,
 7  Visagent -- I guess we've already covered the second
 8  one.
 9           Is there any other aspect of Interrogatory
10  Number 1 -- I'm sorry -- the second paragraph of
11  Interrogatory Number 1 that we haven't covered?
12      A    No, sir.
13      Q    Okay.  We asked you in the interrogatory to
14  provide the date and time of each breach.  And as we sit
15  here you can't say when Mark Rubin made the statement
16  that you claim was false; right?
17      A    The exact date, no.
18      Q    Even a rough date?
19      A    No, sir.
20      Q    And are there any documents which reference or
21  support the false statements?
22           MR. BOLLING:  Objection.
23      A    No.
24      Q    Was that no?
25      A    No.
0243
 1      Q    And is there any witness other than you who
 2  could testify to false statements by Mr. Rubin?
```

```
 3      A    I am relatively sure that Daryl Mills and Kevin
 4  Gates were present when Mark said, I have nothing to do
 5  with a diverting house.
 6      Q    Okay.  Well, did he say I, or did he say
 7  Visagent has nothing to do with a diverting house?
 8      A    Visagent.
 9      Q    Okay.  Let's go to Paragraph 3.  Have we
10  covered all of your personal knowledge of the two
11  breaches that you claim?
12      A    Yes.
13      Q    Are there -- you haven't identified any
14  specific documents.  It says that documents showing
15  goods purchased and sold on the grocery exchange, the
16  documents reflected Visagent's representations that it
17  was affiliated with diverter organizations, and the
18  documents that Visagent was affiliated with Global Food
19  Resources,  Inc., evidence these breaches.
20           What documents are you talking about here?
21      A    There -- there is faxes from Global Food
22  Resources quoting product.
23      Q    Right.  And we -- we asked you to set forth and
24  identify each and every such document, and there's
25  nothing in this answer.
0244
 1           So what -- can you point to any specific
 2  document now which is referred to in this answer?
 3           MR. BOLLING:  Objection.
 4      A    I cannot put my hand on it.  There is a
 5  document that shows --
 6      Q    Right.  Why didn't you identify --
 7           MR. BOLLING:  Let him finish his answer.
 8      Q    I'm sorry.  Go ahead.
 9      A    There is -- there is documents that show Global
10  Food Resources diverting product.  Why it's not attached
11  to here, I don't know.
12      Q    Did you give it to your attorneys?
13      A    It's in the paperwork that was given to
14  attorneys.
15      Q    Okay.  Well, why doesn't your answer
16  specifically identify the document by Bates stamp
17  number, or date, or any means which is asked in the
18  question?
19      A    I do not know.
20      Q    Would you agree that it's incomplete, the
21  answer?
22      A    If it's supposed to have a Bates stamped
23  document, yes.
24      Q    I'm just asking you to read Interrogatory
25  Number 1.  And it says:  Set forth each and every
0245
 1  breach, and for each breach identify the date and time
 2  of each breach, all documents referencing and supporting
 3  such breach.
 4           Okay.  So we're asking you to identify the
 5  documents.  And that's not done, is it?
 6      A    There's not a document attached, no.
 7      Q    Right.  And it's not referenced in the answer,
```

```
 8  or identified, is it?
 9            MR. BOLLING:  Objection.
10      A    No.
11      Q    Okay.  So this answer is incomplete, because
12  you say there are documents, but they're not identified.
13            MR. BOLLING:  Objection.
14      Q    Correct?
15      A    That is correct.
16      Q    Did you consult with anyone other than your
17  attorneys in responding to these interrogatories?
18      A    No.
19      Q    Did you refer to any documentation specifically
20  when you came up with the language for these
21  interrogatories?
22      A    No.
23            (Exhibit No. 19 was marked for identification.)
24      Q    I'm handing you Exhibit 19, which is
25  Winn-Dixie's response to our second request for
0246
 1  production of documents.
 2            Did you have anything -- any -- have you seen
 3  this document request before, first?
 4      A    (No response.)
 5      Q    And I'd ask -- go ahead and look through the
 6  request, and before you answer I want to make sure that
 7  you've seen this before.  If you haven't, and it only
 8  went to your lawyers, you can let us know that as well.
 9      A    I have seen this.
10      Q    Okay.
11      A    Yes.
12      Q    All right.  Well, let's go to Exhibit --
13  Document Request Number 2.  Did you do any -- did anyone
14  at Winn-Dixie do anything to locate what was requested
15  in Request Number 2?
16      A    An e-mail was sent by Paul Taberio, who was a
17  senior VP, to all procurement staff, anything pertaining
18  to Visagent to be sent to him, and that would be turned
19  over to legal.
20      Q    Okay.  And that -- this request was -- was made
21  just a few months ago.  Let me get the date.  In April
22  of this year.
23            So do you know when the e-mail went out?
24      A    No, sir.
25      Q    As we discussed before, an e-mail would only --
0247
 1  could only have been received by current employees;
 2  right?
 3      A    That is correct.
 4      Q    There are many employees who are no longer
 5  working for Winn-Dixie who would have knowledge of where
 6  these documents might be; right?  The ones contained in
 7  Exhibit Number -- in Request Number 2?
 8      A    That is possible, yes.
 9      Q    Right.  So what was done to try to search for
10  documents that may exist in the files of someone who's
11  no longer working for Winn-Dixie?
12            MR. BOLLING:  Objection.
```

```
13      A    Nothing that I know of.
14      Q    Request Number 4 asks for personnel files of
15 the people who are listed here, and the response was
16 that:  Winn-Dixie will produce the personnel files of
17 Winn-Dixie employees having knowledge of the
18 relationship or contract between Winn-Dixie and Visagent
19 to the extent such files relate to Visagent, and to the
20 extent such documents are in debtor's possession,
21 custody, or control.
22           As the corporate representative of Winn-Dixie,
23 has anyone gone through all the personnel files to look
24 at them and determine whether or not there's any
25 responsive information?
0248
 1      A    I know of nobody going through all of these
 2 peoples' personnel files.
 3      Q    Okay.  So Winn-Dixie right now doesn't know
 4 whether or not the personnel files have any information
 5 that might be relevant?
 6           MR. BOLLING:  Objection.
 7      Q    Is that correct?
 8           MR. BOLLING:  Objection.
 9      A    This says as files relate to Visagent.
10           I can't imagine a Visagent file being in a
11 personnel file.  Is it personnel or is it personal?
12      Q    The question is has -- I think you've already
13 said to your knowledge no one's even looked at the
14 personnel files; right?
15           MR. BOLLING:  Objection.
16      A    To my knowledge, no.
17      Q    Okay.  Item 5:  Copies of all licenses, or any
18 other form of permission given to Winn-Dixie by Victory
19 for access to its NTS from 7/10/02 through 1/31/05.
20           Did anyone look for any licensing or
21 permissions?
22      A    We -- we do not have that, and it says that.
23      Q    Well, I understand it says that.
24      A    We don't have any licenses.
25      Q    Did you look personally?
0249
 1      A    There was never a copy of a license given to us
 2 by Victory.
 3      Q    How do you know?
 4      A    (No response.)
 5      Q    Were you the only one dealing with Victory?
 6      A    No, sir.
 7      Q    Then how do you know there wasn't a license, or
 8 an agreement, or a note, or a letter?
 9      A    I don't.
10      Q    So you don't know whether Winn-Dixie has any of
11 those documents in its possession or not; right?
12      A    No.
13      Q    Request Number 6:  Any and all communications
14 between Victory and Winn-Dixie regarding Winn-Dixie's
15 access into and use of the NTS between 7/10/02 and
16 1/31/05.
17           The response was:  Debtors will produce any
```

```
18   such documents in their possession, custody, or control
19   which debtors have not already produced for the period
20   of 7/10/02 to July 28, '04.
21          Has Winn-Dixie looked for any such documents?
22     A    An e-mail was sent to all people on staff to
23   look for any documents that may pertain to Visagent, and
24   send them in.
25     Q    This is -- this has nothing to do with
0250
 1   Visagent.
 2     A    I understand.
 3     Q    This is Victory and Winn-Dixie.
 4     A    Their -- they -- there is nothing been sent out
 5   besides what's already been turned into the legal staff
 6   that I know of.
 7     Q    Right.  My question is, first of all, you
 8   testified earlier that an e-mail was sent out with
 9   regard to -- to all employees search for and turn in any
10   documents that deal with Visagent.
11          Was there a similar e-mail sent out:  Please
12   look for all documents regarding any communications
13   between Victory and Winn-Dixie?
14     A    No, there was not.
15     Q    So how would Winn-Dixie know whether there are
16   documents responsive to Request Number 6?
17     A    I can't answer that.
18     Q    It doesn't know because it hasn't looked;
19   correct?
20          MR. BOLLING:  Objection.
21     A    I guess the answer is yes.
22     Q    Request Number 7, similar to Number 6, except
23   this is asking for documents reflective of Winn-Dixie's
24   access to the NTS, and Victory's maintenance and
25   customization of the NTS on behalf of Winn-Dixie.
0251
 1          Would the same answers to 7 apply as you just
 2   gave to 6, that no one has even looked for them in
 3   Winn-Dixie's organization, to your knowledge?
 4          MR. BOLLING:  Objection.
 5     A    To my knowledge, all documents that we have
 6   concerning Victory has been sent to the legal
 7   department.
 8     Q    Okay.  Tell me who sent and who searched and
 9   what they found.
10     A    I cannot tell you that.
11     Q    Why not?
12     A    Because I do not know that.
13     Q    Well, how do you know anyone searched?
14     A    Because all my files were sent to them.
15     Q    All right.  How do you know who else looked for
16   files?
17     A    I do not know that.
18     Q    Okay.  And you don't know whether the files of
19   any former employees have been looked at; correct?
20     A    That is correct.
21     Q    So what has been turned in, to your knowledge,
22   is only the documents that were kept and maintained by
```

23   you in your 6 x 6 box; right?
24        A    That would be me, yes.
25        Q    Nothing else in the entire procurement
0252
 1   department, to your knowledge, has been turned in?
 2        A    I do not know.
 3        Q    Item Number 8 -- Request Number 8:  All
 4   documents reflecting communications from Winn-Dixie to
 5   alternative source vendors from 6/15/01 to 1/1/05,
 6   including correspondence, e-mails, facsimiles, and IM's.
 7             And the answer was:  Subject to objections,
 8   debtors will produce any such documents in their
 9   possession, custody, or control which debtors have not
10   already produced from June 28, '01 to June 24, '04 --
11   June 28, '04.
12             Other than what you gave to legal from your
13   6 x 6 box, do you know of any other files that have been
14   searched to determine whether there are responsive
15   documents to Request Number 8?
16        A    No.
17        Q    Are there any other former employees or current
18   employees who had the capability to have communications
19   with alternative source vendors by correspondence,
20   e-mail, facsimile, or instant message, other than you?
21        A    Instant message, no.  I cannot speak if
22   somebody didn't e-mail or fax a supplier on their own.
23        Q    Right.  Or write letters.
24        A    Or write a letter.
25        Q    Right.  So would you agree that it's unknown
0253
 1   whether any such documents may exist outside of what
 2   you've supplied?
 3        A    Yes.
 4             MR. RUBIN:  Let's take just 3 or 4 minutes, and
 5        I think this will be my last break.  I just want to
 6        make sure that before we break today I'm not missing
 7        anything that I'd like to ask today.
 8             THE VIDEOGRAPHER:  Off record at 6:48.
 9             (Short break.)
10             THE VIDEOGRAPHER:  Back on record at 6:56.
11             (Mark Rubin is now in the room.)
12   BY MR. RUBIN:
13        Q    Mr. Barr, you testified that as of September, I
14   think it was 21st, when that Carlson letter went out to
15   the diverters trying to get the diverters in line and
16   everyone use the exchange, that you were fully
17   supportive of the concept of the exchange; correct?
18        A    I wanted -- we wanted the exchange to work,
19   yes.
20        Q    Right.  And I know that that is from a
21   corporate standpoint.  Let me just shift over and ask
22   you specifically personally.  Were you also personally
23   in favor of that?
24        A    I would've liked for the exchange to work.
25        Q    Okay.  And what was the internal thought in
0254
 1   Winn-Dixie about how long would be a reasonable period

```
 2   of time to ramp up to get some results on the exchange?
 3        A    I don't think there was a timetable.
 4        Q    Okay.  So nobody -- nobody had any kind of
 5   expectations that by x-date we'll have either so many
 6   people registered as users on the exchange that we can
 7   trade with, or by x-date we'll see so many listings on
 8   the exchange, or by x-date we'll have transacted so much
 9   business on the exchange?  Any of those thoughts?
10        A    We -- we do not know how many users was on the
11   exchange.  That wasn't given to us.
12        Q    Did you ask?
13        A    Oh, yeah.
14        Q    Okay.
15        A    Yeah.  That's confidential.
16        Q    All right.
17        A    I asked every Friday how many users signed up
18   that week for the exchange.
19        Q    Okay.
20        A    Did that by e-mail, I believe.
21             We never put a dollar amount on the exchange,
22   because it was new, and we -- we tried to support the
23   exchange.
24        Q    All right.  And so in September you were --
25   you wanted to see the exchange work, and you were
0255
 1   supporting it by word and action; right?
 2        A    I think so.
 3        Q    All right.  And then you were in the process of
 4   working with the WWRE in that same time frame in
 5   developing and promoting the surplus goods exchange
 6   after there was a vote that Visagent would go forward on
 7   the surplus goods exchange; right?
 8        A    I don't think that I -- that Winn-Dixie was
 9   expected to support and promote the surplus goods
10   exchange.  That was a program affiliated with the WWRE
11   that -- that we had access to.
12        Q    Okay.  And you were a member of the WWRE;
13   right?
14        A    At that time, yes.
15        Q    And all members of the WWRE were supporting the
16   initiatives of the WWRE, which its members actually paid
17   for the establishment and the maintenance of the WWRE
18   entity; right?
19             MR. BOLLING:  Objection.
20        A    I believe that's correct.
21        Q    So Winn-Dixie, like all the members, had an
22   interest in supporting a successful rollout of this
23   technology, the surplus goods exchange; right?
24             MR. BOLLING:  Objection.
25        A    I can't speak for the other people.  Winn-Dixie
0256
 1   supported the surplus goods exchange as part of the
 2   WWRE.
 3        Q    Okay.  How did it support the surplus goods
 4   exchange?  What actions did it take to support?
 5        A    We -- we posted some items on the surplus goods
 6   exchange.  I think we bought an item or two for our
```

```
 7   Atlanta Sav-Rites off of the surplus goods exchange.
 8            I believe it was surplus goods.  I could be
 9   wrong, but I think it was.
10            There was not a lot of -- stuff that was listed
11   on the surplus goods exchange didn't match up a whole
12   lot with our UPC list, meaning it was stuff that we
13   didn't carry.
14       Q    Okay.  At what point in time did Winn-Dixie --
15   I'm talking about the corporate, and I'll ask you
16   personally as well.  But from a corporate standpoint, at
17   what point did Winn-Dixie become disenchanted with the
18   Visagent exchange and the service agreement, if that
19   ever happened?
20            I think you were saying that it didn't live up
21   to its billing, or something like that; right?
22       A    It did not, in my opinion, live up to its
23   billing.
24       Q    Was that Winn-Dixie's opinion as well, or just
25   yours?
0257
 1       A    I would -- I would have to say it would be
 2   Winn-Dixie's opinion.
 3       Q    Okay.  And when did Winn-Dixie start believing
 4   that this exchange was not living up to its billing?
 5       A    When we didn't make purchases off of it because
 6   there was not availables to purchase.
 7       Q    When was that?
 8       A    I cannot give you a date.
 9       Q    Can you give me a year?
10       A    Safe to say between 2001 and 2004.
11       Q    Well, that's the whole contract term.  So
12   that's --
13       A    You're asking me something that -- we tried to
14   make the system work.  We -- we asked the Visagent
15   people all the time how they were coming on signing up
16   new members.  There was not a lot of available offers on
17   the exchange three months after we signed the agreement,
18   six months after we signed the agreement, or a year
19   after we signed the agreement.
20       Q    In order to achieve a critical mass there need
21   to be high-volume users on an exchange like that; right?
22       A    Yes.
23       Q    Okay.  Was Winn-Dixie a high-volume user on the
24   exchange?
25       A    We were a user on the exchange.
0258
 1       Q    Right.  My question is, as a percentage of all
 2   of Winn-Dixie's diverting business, what percentage of
 3   its business was being run through the exchange under
 4   the service agreement?
 5       A    A small part.
 6       Q    Right.  A fraction?
 7       A    A small part.
 8       Q    1 or 2 percent?
 9       A    (No response.)
10       Q    Less maybe?
11       A    A small part.
```

```
12      Q    You don't know?
13      A    I do not know the percentage, no.
14      Q    Well, we've asked for this deposition that you
15 be prepared to answer questions, whoever the corporate
16 representative was, whether it be you or anyone else, to
17 talk about the usage of the exchange.
18           And did you do anything to review any
19 documentation so that you would be familiar with what
20 part of surplus secondary market diverting transactions
21 were run through the exchange?
22           MR. BOLLING:  Objection.
23      A    No.
24      Q    Why was such a small part of Winn-Dixie's
25 surplus business being committed to the exchange at a
0259
 1 time when you knew that high-volume was the only way to
 2 get critical mass?
 3      A    It was as much Visagent's responsibility to
 4 build their mass as it was Winn-Dixie's.
 5      Q    Right.  But Visagent couldn't post anything on
 6 the exchange; right, itself?
 7      A    Theoretically, yes.
 8      Q    Right.  Winn-Dixie though could post any part
 9 of or all of its secondary market buys and sells on the
10 exchange; right?
11      A    Could.
12      Q    Right.  And Winn-Dixie expected there to be a
13 lot of buyers of its offerings through the exchange.
14 That was the plan.  Right?
15      A    Yes.
16      Q    And so what was -- was there any organization
17 to a building up of the offerings in the exchange so
18 that other users could get on the system and see that
19 there was product and be encouraged to buy and sell
20 themselves?
21      A    We posted product on the exchange.
22      Q    Right.  Minimal.  Small, in your words.
23           MR. BOLLING:  Objection.
24      Q    Right?
25           MR. BOLLING:  Misstates his testimony.
0260
 1      A    I don't know that I said we posted small.  I
 2 may have, but if I did, I did.  We posted product
 3 availables on the Visagent grocery exchange.
 4      Q    Right.  I understand that you participated to
 5 some extent.
 6           Whatever goods that Winn-Dixie wanted to sell
 7 -- and you've already said that they could have posted
 8 everything on the exchange.  They also could have posted
 9 on the exchange and offered it -- under your
10 interpretation of the agreement, of the service
11 agreement, they could have used both systems
12 simultaneously; right, the traditional system that it
13 had been using through Victory, and it could have posted
14 the same things on the exchange; right?
15      A    That is correct.
16      Q    Okay.  But it didn't do that, did it?
```

17      A    That is incorrect.  We did post items on the
18 exchange that we -- that we posted -- sent out to
19 regular diverters.
20      Q    I'm not talking about some, I'm talking about
21 all.
22      A    I cannot tell you we posted every single item
23 on the Visagent grocery exchange, no.
24      Q    Well, I -- I think you've already testified
25 that it was a very small part of the business, of the
0261
 1 diverting business went through the exchange; right?
 2           MR. BOLLING:  Objection.
 3      Q    Over these three years.
 4      A    I do not know the dollar amount.  I did not do
 5 all my business with the Visagent grocery exchange.
 6      Q    Mr. Barr, the amount of business that was done
 7 through Victory was in the -- and I've got the
 8 documents, and we're going to go through this --
 9 actually, let's go through some of it now.
10           In the many, many, many millions of dollars for
11 Victory, and Purity, FMG -- the top -- the top ten
12 diverters that you were doing business with, you were
13 doing business of somewhere in the range of 200 million
14 dollars a year; isn't that right?
15           MR. BOLLING:  Objection.
16      A    We did a lot of business.
17      Q    Right.  Well, it would be well over 100 million
18 dollars; right?
19      A    Yes.
20      Q    Right.  What percentage of that went into the
21 exchange as offers to buy or sell?
22      A    Buys, probably not a whole lot, because that
23 system wasn't -- there was not enough items on there to
24 buy.  Sales, I -- I posted a lot of items on the
25 Visagent exchange that did not sell, that sold through
0262
 1 traditional diverting methods.
 2      Q    Were you posting Kraft product on the exchange?
 3      A    No.
 4      Q    You --
 5      A    Well, I should -- let me rephrase.  I don't
 6 think we ever posted a Kraft product on the exchange.
 7      Q    Right.  But you sold Kraft product through the
 8 traditional methods of diverting, didn't you?
 9      A    Yes.
10      Q    And you told Visagent employees on more than
11 one occasion that you were not allowed to divert Kraft
12 because of the manufacturer restrictions.  True?
13      A    That is a correct statement.
14      Q    So why were you allowed to do it with
15 diverters, but you weren't allowed to do it on the
16 exchange?
17      A    Didn't do it with a bunch of diverters.  Sold
18 some Kraft product that was short-dated per the Kraft
19 people.
20      Q    Can you explain that?  I don't understand what
21 you just said.

```
22      A    Short-dated product.  Product going to go out
23  of date; got 45 days shelf life.  And I'm not sure
24  that's what it was.
25      Q    So you talked to the people at Kraft?
0263
 1      A    No, I did not.
 2      Q    Who did?
 3      A    I would -- I would guess a category manager
 4  did, or somebody, and we were asked to get rid of it.
 5  And we sold it.
 6      Q    Why didn't you put it out and post it on the
 7  exchange?
 8      A    Because nobody -- it had to have man -- it had
 9  to have -- I -- I -- it had to have -- the dating
10  wouldn't work on the exchange.
11           I'm not sure what the dating model was on the
12  exchange, but the person we sold it to was, this is
13  short-dated product.  I think it had to have
14  manufacturers' six-month date, a year date.
15           I'm not sure what -- I'm not sure what the
16  exchange said, but you couldn't put short-dated product
17  on the exchange, because the end user wouldn't accept
18  it.
19      Q    Is it your testimony that the only Kraft
20  product that was ever sold to diverters and not put on
21  the exchange was short-dated Kraft?
22      A    No, it's not.  Listen, I'm not -- I cannot say
23  that with certainty.  I can say that the only item I
24  remember selling was Kraft mayonnaise.
25           Did we sell something else?  That could very
0264
 1  well have happened.
 2      Q    Well, you told the people at Visagent you
 3  couldn't; right?
 4      A    Listen, that was our policy.
 5      Q    Right.  So you might have broken your policy
 6  and sold it through traditional diverters in the
 7  traditional method; right?
 8      A    If it was done, it would be because I was asked
 9  to.  We had a non-divert agreement with Kraft.
10           What I told the Visagent people was a true
11  statement.
12           (Exhibit No. 20 was marked for identification.)
13      Q    I'm handing you Exhibit Number 20.  Does this
14  look like a familiar report?
15      A    Yes.
16      Q    Referring specifically to V05064, this shows
17  sales history by vendor.  This is what was sold for the
18  period of 6/27/2002 to 6/25/2003?
19      A    Yes.
20      Q    So this does not include any purchases;
21  correct?
22      A    That is correct.  Yes, sir.
23      Q    And during this time -- particular time frame,
24  which was the second year of the Visagent contract;
25  right --
0265
```

```
 1      A    Yes.
 2      Q    -- Victory -- Victory sales -- hold on a
 3 second.  I think the columns are a little bit mixed up,
 4 but it looks like there were $22,272,987 of sales?
 5      A    Yes, sir.
 6      Q    And it looks like the total amount of sales was
 7 39,382,729 for all diverters?
 8      A    That's what it says.
 9      Q    Or for all vendors.
10      A    That's what it says, yes, sir.
11      Q    Right.  Is every one of the names on this list
12 a diverter except for Visagent?
13           MR. BOLLING:  I'm sorry.  I didn't hear the
14      question.
15      Q    Is every one -- is every name on this list a
16 diverter except for Visagent?
17      A    Yes, sir.
18      Q    Do you know what -- and Visagent's sales were
19 980,646 in this time frame; right?
20      A    Yes, sir.
21      Q    Do you know what a -- what percentage of the
22 total that comes to?
23           MR. BOLLING:  I'm sorry.  Did you say -- was
24      the question whether Visagent's sales were --
25           MR. RUBIN:  980,646.
0266
 1      A    I do not know what that percentage is of
 2 39,000,000.
 3      Q    It's about 2.5 percent, isn't it?  Doing
 4 rough -- roughly if there was $40 million of sales, and
 5 if Visagent were a million, it would be 2.5 percent;
 6 right?
 7      A    Okay.  I agree.
 8      Q    Okay.  And of the approximately $40 million in
 9 sales there had to be -- have been posted somewhere for
10 buyers to buy them; right?
11      A    (No response.)
12      Q    They had to be offered by these diverters;
13 right?
14           MR. BOLLING:  Objection.
15      Q    They were offered by Winn-Dixie to these
16 diverters?
17      A    Probably for the most part, yes.
18      Q    Right.  So Winn-Dixie had to post these
19 offerings somewhere during this year?
20      A    Or we just called and -- cold called, they
21 called us.
22      Q    Right.  Do -- which ones of these diverters
23 worked through Victory, the NTS system?  Or maybe all of
24 them did.
25      A    No, all of them didn't.
0267
 1           Newport downloaded to us, Purity downloaded,
 2 Quality King downloaded, River City Trading downloaded,
 3 Supreme downloaded, of course Victory downloaded.  And
 4 I'm -- I'm not sure.  I think that's all that's on this
 5 list.
```

```
 6      Q    Okay.  Did you say American?
 7      A    Yes.
 8      Q    Okay.  So I have American, Purity, Quality,
 9  River City, Supreme, and Victory?
10      A    And I would have to go back and look to --
11      Q    All right.
12      A    -- to see if I missed somebody.
13      Q    When you say download, what do you mean by
14  that?
15      A    They sent a file to Victory.  Those are
16  inventory diverters.  They physically have product in
17  inventory to sell.
18      Q    All right.  Did any of that -- none of them
19  sent downloads to Winn-Dixie directly?
20      A    No, sir.
21      Q    And how did Grapevine sell, if you know, over
22  $3 million of product; was it all by faxes and phone
23  calls?
24           MR. BOLLING:  Objection.
25      A    Yes.
0268
 1      Q    You know that for a fact?
 2      A    I don't think Grapevine -- unless I'm mistaken
 3  and they downloaded some product, but I don't think they
 4  were an inventory house.  So if they weren't an
 5  inventory house they had to do it by phone and fax.
 6      Q    Okay.
 7           MR. BOLLING:  The question you asked was how
 8      much this entity sold, and then you read from this
 9      sheet, which misstates what this sheet says.  This
10      is sales by Winn-Dixie.
11           MR. RUBIN:  What did I say?
12           MR. BOLLING:  You asked the question, well, how
13      did this entity sell this amount?
14           MR. RUBIN:  I'm sorry.
15           MR. BOLLING:  That entity didn't sell that
16      amount.
17      Q    How did Winn-Dixie sell that amount to
18  Grapevine, is what I meant.
19      A    It would have to be by phone and fax, unless
20  they downloaded product to us, and I don't think they
21  did.  I could be wrong.  I would have to look.
22      Q    When you say downloaded product --
23      A    That would be a file that went to Victory.
24      Q    -- that would be purchasing, Winn-Dixie
25  purchasing; right?
0269
 1      A    Oh, that is correct.  I'm sorry.
 2      Q    That's where I got kind of --
 3      A    But it still would've had to been phone or fax.
 4      Q    Right.  So Winn-Dixie -- did Winn-Dixie have
 5  sellers outside of Victory?
 6      A    No.
 7      Q    So Victory would have sent the offerings to all
 8  these companies?
 9      A    Or they would've contacted us with look-fors.
10      Q    And you would have put them in touch with
```

```
11  Victory?
12       A    Well, if they called me I would tell them, but
13  if they called Bob, he would tell them.
14       Q    How would these offerings from Winn-Dixie's
15  inventories be communicated by Victory to these
16  diverters?
17       A    Could have been phone, could have been fax.
18       Q    Or it could have been downloads?
19       A    No, sir.
20       Q    The stream would never go that way?
21       A    No, sir.
22       Q    So if I understand what you're saying, the
23  internet was in no way involved with any sales of
24  Victory, or any other name on this list, other than
25  Visagent; is that correct?
0270
 1       A    In my opinion, no.
 2       Q    Okay.  Where am I wrong?
 3       A    Well, I -- I think you construe e-mail as using
 4  the internet to do business.  I do not, because no
 5  business is done by e-mail.
 6            You may send them something, but no transaction
 7  is completed because of that e-mail, or through that
 8  e-mail, or by that e-mail.
 9       Q    What is the e-mail used for?
10       A    Well, you -- I suppose you could send somebody
11  an e-mail and tell them you want to sell some Tide
12  detergent.
13       Q    Or you can send spreadsheets.
14       A    Or you can send a spreadsheet.  But that does
15  not constitute a sale, even if they send it back and
16  say, I'll take some.
17       Q    Okay.  And you think that the spirit of the
18  service agreement was that the actual sale had to be
19  consummated over the internet in order to have been
20  required to be run through the Visagent exchange?
21            MR. BOLLING:  Objection.
22       A    The Visagent exchange was designed to be a
23  one-stop shop:  See it, punch it, buy it, done.
24       Q    Well, the scope says the agreement is intended
25  to cover all of user's business transactions for full or
0271
 1  truckload quantities of consumer packaged goods
 2  purchased or resold through the internet or similar
 3  electronic means in a wholesale format, excluding
 4  purchases by user from the original manufacturer or its
 5  authorized representatives.
 6            So Winn-Dixie's interpretation of goods
 7  purchased or resold means that the money has to actually
 8  change hands over the internet?
 9            I'm just trying to understand what Winn-Dixie's
10  position is on this.
11       A    That -- I don't think that's what I said.
12       Q    Okay.  What part of the transaction would have
13  to be over the internet in order for that clause to
14  apply?
15       A    I cannot answer that.  No purchase or sale is
```

16    done because or by an e-mail.  It's just not.
17         Q    Well, if I were to send you an e-mail and say,
18    I have a truck for sale, and you respond and say, I'll
19    take it, it's sold, we have a contract, we don't -- we
20    haven't done business over the internet?
21         A    I don't think so.
22         Q    Okay.  At what point in time is the business
23    transacted if not when the agreement is made for the buy
24    and sale of goods?
25         A    When it -- when -- when a diverter pays for the
0272
 1    product, or when I receive the product into my
 2    warehouse.
 3         Q    Well, that wouldn't happen in the Visagent
 4    exchange for any product, would it?
 5         A    That would not happen on the Visagent exchange
 6    for any product.
 7              I do not know what you're asking me.
 8         Q    All I'm saying is, if your definition of the
 9    actual transaction being completed is to receive the
10    money or the goods, depending upon whether you're buying
11    or selling, that never happens in cyberspace, that
12    happens in reality; right?
13         A    And the only place we used that reality was the
14    Visagent system.
15         Q    The Visagent system was a cyberspace location,
16    was it not?
17         A    It was an internet-based platform, yes.
18         Q    Right.  I'm not trying to talk over your head.
19              Do you know what cyberspace means?
20         A    No, sir.
21         Q    It means in the electronic transmission in an
22    artificial environment.
23         A    Okay.
24         Q    Through E-commerce.
25         A    Okay.
0273
 1         Q    Okay.  So when you get goods in your warehouse,
 2    that can't happen in cyberspace because actual goods
 3    can't fit in a computer, they have to go on a loading
 4    dock somewhere and be transported.  That's physical
 5    goods; right?
 6         A    Correct.
 7         Q    So that could never happen that the Visagent
 8    platform could have a transaction completed under your
 9    definition where Winn-Dixie is buying goods; true?
10         A    You're going to have to rephrase it.  I'm
11    sorry.
12              MR. RUBIN:  Can you read that?  I could never
13    restate it.
14              (Question read back by the Reporter.)
15         A    In the -- in the Visagent world that could not
16    happen.
17         Q    Right.  So no purchases by Winn-Dixie can be
18    completed using the internet, under your definition of
19    the completion of a transaction?
20         A    No.  I think we talked about -- we were talking

```
21    about e-mail, and an e-mail is not a contract.
22         Q     Okay.
23         A     And you asked --
24         Q     Well, let me go back --
25               MR. BOLLING:  Let him finish his answer.
0274
 1         Q     Well --
 2         A     You asked, okay, so when is it a contract, and
 3    I said when the product is paid for or when it's
 4    delivered.
 5         Q     Okay.  Let me re-ask the question, because I
 6    don't think I said when do you have a contract.
 7         A     Okay.  I'm sorry.
 8         Q     I think I said when are packaged -- consumer
 9    packaged goods purchased or resold -- okay.  What is the
10    point in time when they're -- when the transaction is
11    completed.  And I used the example of, you want to buy
12    my truck, and you respond and say, yeah, I'll buy your
13    truck.
14               I believe that this is a transaction being
15    completed.  You disagree; correct?
16         A     That is correct.
17         Q     Okay.  You said the transaction is completed
18    when either I get the truck, if I'm buying the truck, or
19    when I get the money, if I'm selling the truck; right?
20         A     Yes.
21         Q     Okay.  So using that -- and I'm not trying to
22    put words in your mouth, I'm just trying to find out
23    what Winn-Dixie thinks is a transaction.
24               You understand?
25         A     I think so.
0275
 1         Q     Okay.  So I'm asking you, if that's the
 2    definition of a transaction, the receipt of money or the
 3    receipt of the goods, then a transaction can never occur
 4    for anything that Winn-Dixie buys through the Visagent
 5    exchange, because you don't receive goods through the
 6    actual exchange, you receive them on a loading dock.
 7               Is that correct?
 8         A     With the Visagent exchange you're committed,
 9    and you knew that going in, that when you buy something
10    you commit to buy it, when you sold something you commit
11    to sell it.  If you sell it and then can't fulfill it,
12    there was some kind of penalty phase, clause, or
13    something.  But we knew that with the Visagent system.
14               So, yes, you could finalize a contract with the
15    Visagent system without exchange of goods.
16         Q     Okay.  Would that be the completion of a
17    transaction?
18         A     (No response.)
19         Q     When you say the finalization of a contract, is
20    that the same thing as completing a transaction?
21         A     Well, no, because the product still has to be
22    delivered, the product still has to be picked up.  If
23    it's short, money has to be paid back.
24         Q     Let me rephrase that question then.
25               Is that what occurs, that you said, the buying
```

0276
1  and selling on the exchange with all those
2  ramifications, is that purchasing or reselling?
3      A    You're going to have to help me.
4      Q    The term in the contract is consumer packaged
5  goods purchased or resold.  That's what this contract
6  covers; right?
7      A    Yes.
8      Q    Okay.  Are products purchased and resold on the
9  Visagent exchange?
10     A    Yes.
11     Q    Okay.  Are products purchased and resold in the
12  example that I gave you with the truck and an e-mail
13  correspondence?  Would that be either a purchase or a
14  resale, if I bought it from someone else and I resold it
15  to you?
16     A    I'm sorry.  I do not understand the question.
17     Q    Would that be a purchase if I offered you my
18  truck and you responded in an e-mail, yes, I'll buy your
19  truck?  Is that a purchase?
20     A    I -- I do not think so.
21         MR. RUBIN:  All right.  I'm going to stop here.
22     I have many hours left on this deposition.  I've got
23     literally hundreds of documents to go through, which
24     are reports that have been provided to us that I
25     want to go over with you, along with many other
0277
1  areas of questioning.
2         So we're going to seek leave of the court.
3     We're not terminating and completing this
4     deposition.  I know that you disagree with that.
5     You're not agreeing to continue it, but we're going
6     to seek leave of court to do that.  I do appreciate
7     you staying late to let us complete today.
8         And, Mr. Barr, I appreciate your sitting here
9     and dealing with my questions, which aren't the
10    easiest to understand or to respond to.
11         THE VIDEOGRAPHER:  That's the end of the
12    deposition for today at 7:33.
13         MR. BOLLING:  He'll read.
14         (Witness excused.)
15         (The deposition concluded at 7:33 p.m.)
16
17
18                         - - -
19
20
21
22
23
24
25
0278
1                    CERTIFICATE OF OATH
2
3  STATE OF FLORIDA)
                   )

```
 4   COUNTY OF DUVAL )
 5
 6            I, the undersigned authority, certify that
 7   THOMAS DWIGHT BARR personally appeared before me and was
 8   duly sworn.
 9
10            WITNESS my hand and official seal this 30th day
11   of August 2007.
12
13
14                        _____
                                   Terry T. Hurley, RPR
15
16
17
18
19
20
21
22
23
24
25
0279
 1            REPORTER'S DEPOSITION CERTIFICATE
 2
 3   STATE OF FLORIDA)
                     )
 4   COUNTY OF DUVAL )
 5
 6            I, Terry T. Hurley, Registered Professional
     Reporter, certify that I was authorized to and did
     stenographically report the deposition of THOMAS DWIGHT
 7   BARR; that a review of the transcript was requested; and
     that the transcript is a true and complete record of my
 8   stenographic notes.
 9            I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties,
10   nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
11   financially interested in the action.
12            DATED this 30th day of August 2007.
13
14
15                        _____
                                   Terry T. Hurley, RPR
16
17
18
19
20
21
22
23
24
25
0280
```

```
 1                    ERRATA SHEET
 2      DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES HERE
 3   In re:  Winn-Dixie Stores
             Date of deposition:  August 24, 2007
 4
 5   PAGE NO.  LINE NO.      CHANGE          REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22   Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct, subject
23   to any changes in form or substance entered here.
24   _____            _____
     DATE                  THOMAS DWIGHT BARR
25   (th)
```