# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |
| | ) | |

### WINN-DIXIE'S NOTICE OF FILING LEGAL AUTHORITY IN SUPPORT OF WINN-DIXIE'S OBJECTION TO CLAIM NUMBERS 13740 AND 13741 FILED BY IRT PARTNERS, L.P. AND EQUITY ONE (HUNTER'S CREEK), INC.

Pursuant to the Court's order scheduling trial (Doc. No. 15849), Winn-Dixie Stores, Inc. and twenty-three of its reorganized debtor affiliates (collectively, "Winn-Dixie") file the attached legal authority in support of Winn-Dixie's objection to the claims of IRT Partners, L.P. and Equity One (Hunter's Creek), Inc.  Winn-Dixie reserves the right to supplement this filing if necessary.

SMITH HULSEY & BUSEY

By      */s/ Beau Bowin*
      Stephen D. Busey
      Cynthia C. Jackson
      Beau Bowin (F.B.N. 792551)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
bbowin@smithhulsey.com

Counsel for Reorganized Debtors

## **Certificate of Service**

I certify that a copy of the foregoing has been furnished by electronic mail and Federal Express to Paul J. Keenan, Jr., Esq., 1221 Brickell Avenue, Miami, FL 33131 this 17th day of December, 2007.

*/s/ Beau Bowin*
Attorney



C

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale.
In re NEW RIVER SHIPYARD, INC., Debtor.
No. 05-20958-BKC-JKO.

Dec. 8, 2006.

**Background:** Chapter 11 debtor, which formerly operated shipyard, objected to claim and post-confirmation amended claim filed by yacht owner. Debtor moved for summary judgment and order to show cause.

**Holdings:** The Bankruptcy Court, John K. Olson, J., held that:

(1) exculpatory provision in parties' ship repair contract, precluding debtor's liability for ordinary negligence, was valid;

(2) owner could not recover its post-repair costs resulting from its removal of yacht from charter business as breach-of-contract damages;

(3) owner could not recover damages for diminution in value of yacht;

(4) owner failed to mitigate damages;

(5) owner waived any right to amend its proof of claim;

(6) owner was estopped from amending its claim; and

(7) res judicata barred owner's attempt to amend claim post-confirmation.

Claim disallowed.

West Headnotes

**[1] Shipping** 76
354k76 Most Cited Cases
Under federal maritime law, parties to a maritime repair contract may agree contractually to exculpate one of the parties from ordinary negligence.

**[2] Shipping** 76
354k76 Most Cited Cases
For exculpatory provision in a maritime repair contract to be valid, (1) the contract must clearly and unequivocally indicate the parties' intention, (2) the limitation must not absolve the ship repairer of all liability and must still provide a deterrent to negligence, and (3) the parties must have equal bargaining power when creating the agreement.

**[3] Shipping** 76
354k76 Most Cited Cases
Repair contract between shipyard operator and yacht owner clearly and unequivocally absolved operator of any liability for ordinary negligence, as required for an exculpatory provision in maritime repair contract to be valid, given provision in contract stating that operator's liability under contract was limited to breach of contractual obligation to provide dockage space and repair services and that owner and vessel released operator from all liability for personal injury, loss of life, and property damage arising out of ordinary negligence of operator or its employees.

**[4] Shipping** 76
354k76 Most Cited Cases
Equal bargaining power required for exculpatory provision in maritime repair contract to be valid existed between shipyard operator and yacht owner at the time they entered into repair contract, notwithstanding owner's contention that few facilities in area had equipment capable of raising yacht out of the water, given that other facilities which could lift yacht from water were available, that there was no evidence that debtor's contractual limitation on liability was provision used throughout industry and so amounted to adhesion contract, and that owner was able to buy another vessel for $17,500,000 in cash shortly after yacht was dropped while at operator's shipyard, whereas operator was compelled to seek bankruptcy protection soon thereafter.

**[5] Shipping** 76
354k76 Most Cited Cases
As required for exculpatory provision in maritime repair contract to be valid, repair contract between shipyard operator and yacht owner did not absolve operator of all liability and provided deterrent to negligence, inasmuch as contract only excluded operator's liability for ordinary negligence, leaving operator liable for gross negligence or for wanton or willful misconduct.

**[6] Shipping** 76
354k76 Most Cited Cases
Under Florida law, economic loss rule precluded any recovery of economic damages by yacht owner against shipyard operator under ordinary negligence theory, based on incident in which yacht was dropped while it was hoisted out of water for survey, given

that parties were acting pursuant to their ship repair contract.

**[7] Torts** ⚷118
379k118 Most Cited Cases
Under Florida law, "economic loss rule" bars recovery under a tort theory when the parties are acting under a contract and economic losses are the only damages.

**[8] Negligence** ⚷1516
272k1516 Most Cited Cases
To be sufficient under Florida law, a pleading asserting gross negligence must contain sufficient allegations of ultimate fact as to make it fairly appear that defendant's course of conduct was of a gross, willful, and wanton character; allegations which might sustain a cause of action for ordinary negligence, or conclusory allegations, are insufficient.

**[9] Negligence** ⚷273
272k273 Most Cited Cases
Florida law defines "gross negligence" as an act or omission that a reasonable, prudent person would know is likely to result in injury to another.

**[10] Negligence** ⚷273
272k273 Most Cited Cases
Under Florida law, gross negligence presupposes the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than normal and usual peril, must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of, and the act of omission complained of must occur in a manner which evinces a conscious disregard of consequences, as distinguished from a careless disregard thereof, as in simple negligence, or from the more extreme willful or wanton disregard thereof, as in culpable or criminal negligence.

**[11] Damages** ⚷22
115k22 Most Cited Cases

**[11] Damages** ⚷23
115k23 Most Cited Cases
Under Florida law, damages for breach of contract are limited to those damages as would normally result from the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract as the

probable result of the breach.

**[12] Damages** ⚷23
115k23 Most Cited Cases
No reasonable person could have foreseen that owner of yacht which was dropped while hoisted from the water for survey at shipyard would take yacht entirely out of charter business, after it was fully repaired, and instead undertake highly limited sales campaign for 15-month period, during which vessel would be kept fully crewed and provisioned in readiness for new owner to emerge, and therefore, under Florida law, owner could not recover such unforeseen post-repair costs, which were not attributable to any actions by shipyard operator, as damages for alleged breach of contract by operator.

**[13] Damages** ⚷23
115k23 Most Cited Cases
Under Florida law, foreseeability of damages for breach of contract is analyzed in a two-step process, under which court first must consider whether defendant's conduct foreseeably created a "zone of risk" which poses a general threat of harm to others, then must consider whether and to what extent defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.

**[14] Damages** ⚷208(1)
115k208(1) Most Cited Cases
Under Florida law, trial court deciding question of foreseeability of damages sought under breach of contract theory has discretion to consider issue of proximate causation as a matter of law if, after the event occurred, and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that the conduct should have brought about the harm.   Restatement (Second) of Torts § 435(2).

**[15] Damages** ⚷123
115k123 Most Cited Cases
Under Florida law, owner of yacht that was dropped while hoisted from the water for survey at shipyard could not recover as damages on claim against shipyard operator for breach of contract for diminution in value of yacht, or "stigma damages," that owner allegedly suffered even though yacht was completely repaired.

**[16] Damages** ⚷120(1)
115k120(1) Most Cited Cases
Under Florida law, the purpose of money damages is to put plaintiff in as good a position as that which full

performance of the contract would have put him, which does not guarantee or mean that plaintiff is to be put in the same specific physical position.

## [17] Damages ⚷123
115k123 Most Cited Cases

When plaintiff in breach of contract action can be made whole by repairing property damage or receiving compensation equal to the cost of repair, Florida law does not generally allow additional recovery for any diminution in value which occurs beyond cost of repair.

## [18] Damages ⚷62(4)
115k62(4) Most Cited Cases

Owner of yacht that was dropped while hoisted from the water for survey at shipyard failed to take reasonable steps to mitigate its damages from shipyard operator's alleged breach of contract, and thus was barred from recovering expenses incurred after yacht was repaired, when owner pulled yacht out of charter business, even though it was completely repaired, and then kept yacht fully crewed and provisioned until its eventual sale.

## [19] Damages ⚷62(4)
115k62(4) Most Cited Cases

As a general proposition, plaintiff asserting claim for breach of contract must take all reasonable steps necessary to avoid further damages, and whether plaintiff undertook to mitigate damages is relevant to the damages calculation.

## [20] Damages ⚷62(4)
115k62(4) Most Cited Cases

Damages that plaintiff might have avoided with reasonable effort are not caused by defendant's wrong, and therefore are not to be charged against defendant in action for breach of contract.

## [21] Bankruptcy ⚷2903
51k2903 Most Cited Cases

Amendments to claims are generally allowed when the purpose is to cure a defect in the original claim, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim.

## [22] Bankruptcy ⚷2903
51k2903 Most Cited Cases

Post-bar date amendments to claims must be reviewed with careful scrutiny to ensure that there is no attempt to file a new claim under the guise of an amendment.

## [23] Bankruptcy ⚷2903
51k2903 Most Cited Cases

## [23] Bankruptcy ⚷3568(2)
51k3568(2) Most Cited Cases

Confirmation of a Chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation, and a post-confirmation amendment of a claim should only be allowed for compelling reasons.

## [24] Bankruptcy ⚷2903
51k2903 Most Cited Cases

## [24] Bankruptcy ⚷3568(2)
51k3568(2) Most Cited Cases

Yacht owner waived any right to amend its proof of claim against Chapter 11 debtor-former shipyard operator, given that owner voluntarily participated in disclosure statement approval process and plan confirmation process, voting in favor of plan, without giving debtor, court, or other creditors any indication that it intended to assert amended claim for consequential damages that were more than 10 times greater than existing claim, even though amended claim had fully matured and been fully liquidated two months before confirmation hearing, thereby allowing those involved in confirmation process to rely on estate's known maximum exposure to owner in determining plan's feasibility.

## [25] Estoppel ⚷52.10(2)
156k52.10(2) Most Cited Cases

"Waiver," generally characterized as the intentional relinquishment of a known right, requires (1) the existence at the time of waiver of a right, privilege, advantage, or benefit which may be waived, (2) the actual or constructive knowledge thereof, and (3) an intention to relinquish such right, privilege, advantage, or benefit.

## [26] Bankruptcy ⚷2829
51k2829 Most Cited Cases

## [26] Bankruptcy ⚷3544
51k3544 Most Cited Cases

A claimant with a claim to which an objection has been made is not entitled to vote on a reorganization plan unless the claimant seeks and obtains an order estimating or temporarily allowing the claim for voting purposes.

## [27] Bankruptcy ⚷3568(2)
51k3568(2) Most Cited Cases

Creditor was estopped, following confirmation of Chapter 11 debtor's plan, from amending its proof of claim to seek increased consequential damages, given reliance upon actual and implied representations made by creditor respecting nature and amount of its claim by debtor in proposing plan, by bankruptcy court in determining that plan was feasible, and by other creditors in determining whether to vote in favor of plan, and given debtor's substantial consummation of plan by, among other things, distributing initial dividends to creditors with allowed claims. 11 U.S.C.A. § 1101(2).

**[28] Bankruptcy** 🔑**3568(2)**
51k3568(2) Most Cited Cases
Creditor's treatment under confirmed plan of reorganization creates contractual relationship between debtor and creditor, in that creditor's pre-confirmation claim is subsumed in and replaced by new contract created by confirmed plan; each claimant gets a new claim, based on whatever treatment is accorded to it in plan itself.

**[29] Bankruptcy** 🔑**3568(2)**
51k3568(2) Most Cited Cases
Res judicata barred creditor's attempt to amend its proof of claim two months after confirmation of Chapter 11 debtor's plan, given that creditor had every opportunity to amend claim and litigate its entitlement to increased damages amount at or before confirmation hearing.

**[30] Judgment** 🔑**584**
228k584 Most Cited Cases

**[30] Judgment** 🔑**713(2)**
228k713(2) Most Cited Cases
Doctrine of "res judicata," as applied in bankruptcy proceedings, not only bars a court from relitigating issues that have been litigated in a cause, but also bars a court from litigating issues that may have been litigated.
***898** James H. Fierberg, Miami, FL, for Debtor.

*ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON CLAIM 27 OF MSM, INC., f/k/a*
*MSM CHARTERS, LLC, AND ORDER TO SHOW CAUSE*

JOHN K. OLSON, Bankruptcy Judge.

MSM Charters, LLC, n/k/a MSM, Inc. ("MSM") timely filed Claim 27 against the Debtor in the amount of $987,450.78, later amended after confirmation of the Debtor's chapter 11 reorganization plan to the increased amount of $1,943,804.00. The Debtor formerly operated a shipyard on the New River in Fort Lauderdale; the claim arises out of the dropping of MSM's 130-foot Hatteras motor yacht *M/Y Sacajawea* from a Syncrolift yacht hoist while the vessel was at the shipyard for survey in connection with its imminent trade-in by MSM on a larger replacement vessel, *M/Y One More Toy.*

*Sacajawea* was at the shipyard pursuant to a contract between MSM and the Debtor. That contract expressly waives claims against the Debtor arising out of ordinary negligence and similarly waives economic damages. Although the Debtor disputes that it was negligent at all in the dropping of the *Sacajawea,* it persuasively argues that MSM has failed to plead any facts which would support a finding that the Debtor was grossly negligent.

The case presents two questions: First, does the contract between the parties bar MSM's recovery of *any* damages against the Debtor? Included within this question are issues relating to the enforceability of the contract, particularly in connection with the waiver of ordinary negligence and of economic loss; whether the damages sought by MSM were reasonably foreseeable; whether MSM is entitled to damages resulting from diminution in value of *Sacajawea;* and whether MSM took appropriate steps to mitigate its damages. Second, may MSM amend its proof of claim after confirmation of the Debtor's plan? The issues arising under this question include waiver and estoppel, and generally turn on the effect of an order confirming a chapter 11 reorganization plan.

**I. Background**

In the fall of 2004, MSM entered into an agreement to trade in the *Sacajawea* on a larger vessel, *One More Toy,* f/k/a *Liquidity.* The price for *One More Toy* was $12 million cash plus the trade-in of *Sacajawea.* The deal had a very tight closing schedule, and required an immediate survey of *Sacajawea,* which in turn required that the vessel be lifted from the water. The Debtor operated a Syncrolift yacht hoist which the Debtor believed was capable of lifting the 130-foot *Sacajawea.* The parties entered into a repair contract which set forth the parties' respective rights and remedies.

While the *Sacajawea* was being lifted on November 14, 2004, the Syncrolift failed and the vessel fell,

sustaining damages. MSM contends that the Syncrolift was not rated to lift the vessel and that the Debtor was negligent in attempting to do so. The Debtor contends that it was not negligent, that MSM deliberately understated the vessel's weight (at 150 tons) in order to induce the Debtor to lift the vessel to satisfy the short closing schedule on MSM's prospective acquisition of *One More Toy,* and that the Syncrolift was incapable of lifting the (in fact, much **\*899** heavier) *Sacajawea.* In the event, the Syncrolift failed and *Sacajawea* sustained $800,000 damages when it fell.

At the time of the incident, MSM maintained an insurance policy on *Sacajawea* which established the insured value of the vessel at $4,702,500, inclusive of "the hull and material contents including fine art, engines, machinery and everything connected therewith, nothing excluded." This value was confirmed in MSM's Charter Agreement dated July 30, 2004, 3 1/2 months before the Syncrolift failure, which stated that the insured value of the vessel was $4,702,500.

As a result of the damage to *Sacajawea,* the trade-in transaction did not go forward. Instead, ***on the same day that* Sacajawea** *was dropped,* MSM entered into a cash-only contract to purchase *One More Toy* for $17.5 million. Since the prior contract called for the purchase of *One More Toy* for $12 million plus *Sacajawea,* it is clear and indisputable that the trade-in value of *Sacajawea* prior to its damage was $5.5 million. [FN1]

> FN1. MSM contends, without any documentary support, that the value of *Sacajawea* prior to the Syncrolift failure was $6.0 million. This contention, belied by all of the documentary evidence, is frivolous.

MSM sued the Debtor in state court in February 2005, alleging unspecified damages for breach of contract, negligence, gross negligence, diminution in value and bailment. The Debtor filed its voluntary chapter 11 petition three weeks later. The court established a claims bar date of July 11, 2005.

On July 8, 2005, MSM filed a proof of claim (the "Initial Claim") in the amount of $987,450.78, consisting of specific property repair damages of $802,306.78 ("Repair Damages") and loss of charter and broker commissions in the amount of $185,144.00 ("Consequential Damages"). The damage calculations were supported in a detailed spreadsheet attached to the Initial Claim.

The Debtor objected to the Initial Claim on April 27, 2006 [CP 247]; MSM responded [CP 291] on May 30, 2006, and asserted that the damages due it aggregated $987,450.78.

After the vessel was dropped, MSM caused it to be removed to the Bradford Marine ship repair yard, also located in Fort Lauderdale. Following the completion of repairs in March 2005, MSM retained *Sacajawea* until its sale for $5.3 million on May 10, 2006. Although MSM had regularly chartered the vessel prior to its damage, MSM never offered *Sacajawea* for charter thereafter. Instead, MSM continued to fully crew and provision *Sacajawea* for 15 months following the completion of repairs at the Bradford yard in March 2005 until the ultimate sale in May 2006. MSM claims to have incurred costs of $1,182, 237.00, plus attorneys' fees, in the operation and general maintenance of *Sacajawea* during this period (the "Post-Repair Costs"). These include, *inter alia,* crew wages, routine maintenance of the vessel, maintenance of water toys, restaurant and bar bills and tips, boat shoes for the crew, flowers, car rentals, and interest carrying costs. MSM has also sought to include damages to the vessel it alleges were sustained during Hurricane Wilma, which hit Fort Lauderdale on October 24, 2005, more than eleven months after the Syncrolift failure and eight months after Bradford Marine completed its repairs.

On April 28, 2006, the Debtor filed its amended chapter 11 plan [CP 279] and amended disclosure statement [CP 278]. The disclosure statement was sent to all parties in interest, including MSM, so that they could raise any objections which they **\*900** had prior to my consideration of the disclosure statement. [FN2]

> FN2. Under 11 U.S.C. § 1125, a chapter 11 reorganization plan proponent is required to provide disclosures to its creditors in connection with the proponent's attempts to solicit their votes in favor of the plan. The bankruptcy court is required to pass upon the adequacy of the disclosures made prior to such solicitation, and parties in interest are entitled to object to the information contained in the disclosure statement before the court considers it.

The disclosure statement filed by the Debtor contained the following description of the MSM damage claim:

Although the Debtor maintained insurance with

respect to the casualty, the Debtor's insurance carrier, One Beacon Insurance Company initially declined coverage. The insurer has filed an action in Federal Admiralty Court seeking a declaratory judgment that there was no coverage. The Debtor, through its special counsel Alan S. Wachs, Esq., Volpe Bajalia Wickes Rogerson Galloway and Wachs, 1301 Riverplace Blvd., Suite 1700, Jacksonville, Florida 32207-9023 ("Wachs") defended the action and sought through counterclaim a declaratory judgment that there was coverage and that the insurance company wrongfully declined coverage. The amount of the coverage that was provided for in the policy was approximately $800,000. The declination of coverage was problematic because at the same time, the owner of the vessel that was on the Syncrolift at the time of the incident, MSM Charters, filed an action in the Broward County Circuit Court to liquidate the alleged claim against the Debtor. The Debtor had valid and meritorious defenses and affirmative defenses against MSM Charters based upon, among other things, the misrepresentations made by owners of the vessel as to the gross weight of the vessel. The Debtor believes that it was this misrepresentation that caused the failure of the Syncrolift and that MSM Charters has a significant liability to the Debtor. That litigation was also being advanced by Wachs. * * * The Syncrolift litigation was recently settled. Under the settlement, the estate will receive $400,000 [for property damage]. **In addition, the subrogee of the owners vessel will receive $800,000, thereby removing substantial claim against the estate.** [Emphasis added.]

The disclosure statement also gave notice to all creditors and parties in interest as to the procedures for the treatment of disputed claims, including MSM's, as follows:

At the time of distribution to Creditors holding Ultimately Allowed Claims, including all Allowed Administrative Expenses, Allowed Priority Claims, or Allowed General Unsecured Claims, as more fully set forth in the Plan, there shall be reserved by the Debtor the amount of cash which would otherwise be distributed to the holder of such a disputed expense or Claim, as if the full amount of such expense or Claim is deemed an Allowed Claim. * * * Once a Disputed Administrative Expense, Disputed Priority Claim or Disputed General Unsecured Claim becomes an Ultimately Allowed Claim, in whole or in part, the cash reserved on account of such a disputed claim shall be distributed to such Creditor in the same

proportion as other distributions to such class of creditors. [emphasis added]
MSM did not object to either of these provisions.

As a condition precedent to confirmation of the Debtor's amended plan, the Debtor **\*901** was required to reserve the full amount of the disputed MSM claim, $987,450.78. It did so, and the full amount was escrowed prior to confirmation.

In the amended plan, the disputed MSM claim was separately classified in Class 4 of the plan. The proposed treatment of this claim was as follows:

Pursuant to the Plan, Class 4 consists of the insured Tort Claim of MSM Charters. The Class 4 Claimant holding an Allowed Claim will be satisfied by insurance proceeds to the extent of the Debtor's coverage limits. If the Allowed Class 4 Claim exceeds the amount of the available insurance proceeds, the excess Allowed Class 4 Claim will be paid *pari passu* with the Claims of Allowed Class 3 Claimants [general unsecured claims].

After it was approved, the disclosure statement and plan were circulated to the entire creditor body, including MSM. As a result, all creditors--including MSM--were on notice that the property damage component of MSM's disputed claim had already been paid by a third party, that the $802,000 property damage claim against the Debtor had been released, and that such damages were no longer a part of MSM's claims against the estate, which were therefore reduced to approximately $185,000.

The release of the $802,000 property damage component of the claim was confirmed in a Mutual Specific Release (the "Release") entered into by, among others, MSM and the Debtor prior to confirmation and by its terms "effective as of March 15, 2006, without regard to the dates of execution by the Parties." The Release provides that while MSM's claim for diminution in value and consequential damages was preserved, the Release expressly released MSM's claim for property damages. I specifically approved the Release by order entered June 19, 2006 [CP 351], and all creditors and parties in interest were therefore on notice--and entitled to rely--on the reduction of MSM's claim from $987,000 to $185,000.

At no time did MSM object to the disclosure statement or to confirmation of the plan. Although it could have done so, at no time prior to confirmation did MSM file any pleading or otherwise put the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Debtor, the creditors, or the court on notice that it sought to increase the amount of its consequential damages from $185,144 (consisting of lost charter profits and charter cancellation fees) to $987,450.78 (which now incorporates the Post-Repair Costs incurred by MSM after the Bradford yard completed the repairs) or the ultimate amount of $1,943,804 which MSM now claims.

 I conducted a confirmation hearing on the Debtor's amended plan on July 6, 2006, and entered the Confirmation Order the next day. The Confirmation Order provided for and required the escrow of $987,450.78 for MSM's Class 4 disputed claim. Although MSM's counsel  [FN3] was present at the confirmation hearing, MSM did not raise any issues with the amended plan, did not advise me, the Debtor, or other creditors of its intent to increase its claim to include Post-Repair Costs. In fact, MSM even voted in favor of the amended plan!

> FN3. MSM's counsel was actively involved in this case, represented multiple claimants in connection with it, and had full knowledge of the case.

 Two months after confirmation, and four months after it finally sold *Sacajawea* for $5.3 million, MSM filed an amended proof of claim (the "Amended Claim") in the amount of $1,943,804 on September 11, 2006. In the Amended Claim, MSM completely abandoned claims for property **\*902** damage and for lost charter fees and commissions. Instead, the Amended Claim asserts new theories of recovery based upon *Sacajawea's* operating expenses incurred during the 15 months after the vessel had been completely repaired and prior to its sale.

## II. Summary judgment standards

 Summary judgment is provided for under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in the bankruptcy courts through Federal Rule of Bankruptcy Procedure 7056 and to contested matters in bankruptcy cases (including claims objection litigation such as this matter) through Federal Rule of Bankruptcy Procedure 9014. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rice v. Branigar Org., Inc.*, 922 F.2d 788 (11th Cir.1991); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir.1987).

 In the absence of a genuine issue of material fact, a federal court should promptly adjudicate the legal questions in the case and decide them, thus avoiding the delay and expense associated with a trial. *United States v. Feinstein*, 717 F.Supp. 1552 (S.D.Fla.1989). Important as these principles are in civil litigation in the district courts, they are even more important in bankruptcy litigation, where the same policy favoring the avoidance of expense and delay generally occurs in the context of severe financial distress on the part of at least one of the parties.

 A moving party may demonstrate the absence of a genuine issue of material fact in one of two ways. First, by submitting affirmative proof that negates an essential element of the nonmoving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Second, by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* The pertinent question for me under Rule 56 is whether the evidence presented demonstrates a sufficient factual disagreement to require submission to the fact finder, or whether instead the controversy is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 Although MSM points to a number of purported factual disputes here, I conclude that even if all of those disputed facts are viewed in a manner most favorable to MSM, the inescapable conclusion is that the Debtor has no liability to MSM under the contract between the parties and as a matter of law. I also conclude that MSM is prohibited as a matter of law to amend its claim post-confirmation. For those reasons, I will grant summary judgment in favor of the Debtor and disallow any claim by MSM against the Debtor's estate.

## III. Legal analysis
### A. The parties' contract

 The repair contract between the Debtor and MSM contains an express limitation on the Debtor's liability to MSM and an express assumption of liability for loss by MSM. Paragraph 5 of the contract provides in relevant part:

> The use of the Company's facilities and services is done at the sole risk of the Owner and the Vessel, and it is expressly understood and agreed to by the Owner and the Vessel that the Company's liability under this agreement shall be limited to a breach of its contractual obligation to provide dockage space

and repair services.  * * * The Owner and the Vessel hereby release the company **\*903** and agrees to indemnify the Company and to hold the Company harmless from any and all liability for personal injury, loss of life and/or property damage arising out of the ordinary negligence of the Company or its employees * * *

Similarly, paragraph 6 of the contract provides in relevant part:

Under no circumstances shall the Company [the Debtor] be liable to the Owner [MSM] or to the Vessel [the *Sacajawea]* for economic loss (such as loss of use or charter), irrespective of its foreseeability, cause or resulting damage.

These two provisions, taken together, evidence a clear intent to relieve the Debtor from any liability for ordinary negligence and waives any claim by MSM for economic damages.  Unless these provisions were invalid or unenforceable, they operate to bar any claim by MSM for negligence or for consequential economic losses.

### 1. Waiver of negligence

[1][2] Under applicable federal maritime law, parties to a maritime contract may agree contractually to exculpate one of the parties from ordinary negligence.  The Eleventh Circuit has adopted a three-part test by which the validity of such exculpation provisions are to be measured. *Diesel Repower v. Islander Investments, Ltd.,* 271 F.3d 1318, 1324 (11th Cir.2001).  To be valid, an exculpatory provision in a maritime repair contract must provide as follows:

(a) the contract must clearly and unequivocally indicate the parties' intention;

(b) the limitation must not absolve the ship repairer of all liability and must still provide a deterrent to negligence;  and

(c) the parties must have equal bargaining power when creating the agreement.

*Id.;     Merrill Stevens Dry Dock Co. v. M/V Yeocomico II,* 329 F.3d 809  (11th Cir.2003).

[3][4]  Two of these three requirements are unquestionably present.  Paragraph 5 of the contract clearly and unequivocally absolves the Debtor of any liability.  Clearer language would be difficult to draft. I am similarly satisfied that the third requirement--equal bargaining power--is also present. MSM's argument that "there were only a few facilities in South Florida with equipment capable of raising the Vessel, a 130' Hatteras, out of the water" is insufficient to create a genuine issue of material fact on this point.  First, MSM obviously concedes that

there were other such facilities, including the Bradford Marine yard located in Fort Lauderdale, which had previously and successfully hoisted the *Sacajawea.*  A ocean-going vessel such as this is not restricted to coastal waters, and MSM could have taken it to any Gulf or South Atlantic port [FN4] if MSM had been unsatisfied with the Debtor's form of contract.  MSM has pointed to no evidence which could support a conclusion that the Debtor's contractual limitation on liability was mirrored in any other shipyard's contracts, much less in every other shipyard's contracts, such that the absolution from ordinary negligence contained here was an industry-wide contractual provision that amounted to an adhesion contract.  Finally, I note that MSM was able to purchase *One More Toy* for $17.5 million cash shortly after the incident, while the Debtor found itself compelled to seek bankruptcy protection soon thereafter.  There is no question that MSM enjoyed--at the very least--an **\*904** equality of bargaining power with the Debtor. [FN5]

> FN4.  Or, for that matter, to any port in the world.

> FN5.  If the scales tilt at all here, it is in the opposite direction:  MSM's bargaining power would appear to have been decidedly stronger.

[5]  The only remaining question regarding the enforceability of the contractual limitation on liability under the Eleventh Circuit's standards is whether the limitation absolved the Debtor of all liability or whether it still provided a deterrent to negligence.  As written, the contract only excludes liability for ordinary negligence, and the Debtor would still remain liable for gross negligence or for wanton or willful misconduct.  Exculpatory language similar to that contained in the contract here was recently upheld by the District of Columbia Court of Appeals in *Carleton v. Winter,* 901 A.2d 174 (D.C.2006). *Carleton* provides a useful review of the relevant treatises, including the *Restatement (Second) of Torts* § 496B, cmt d (1963, 1964); *Corbin on Contracts* § 85.15, 455 (2003); *Williston on Contracts* § 19.23, vol. 8, 291-97 (4th ed.1998);  and *Prosser and Keaton on Torts* § 68, 483-84 (5th ed.1984).  As the treatises uniformly suggest, contractual exculpatory clauses absolve the exculpated party only from ordinary negligence and should not be construed to include loss or damage resulting from intentional or reckless misconduct, gross negligence, or the like.  I conclude that there is nothing in the exculpation clause here that purports to exculpate the Debtor

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

from gross negligence or worse; that there is a meaningful deterrent to such negligence which survives the application of the exculpation clause in the contract; and that the contractual provisions contained in paragraph 5 of the contract fully satisfy the prerequisites for enforceability and are consistent with the holding in *Diesel Repower, supra.*

### 2. Waiver of economic loss

The unambiguous provisions of paragraph 6 of the contract bar every damage claim by MSM for economic loss, including consequential damages. "Loss of charter and loss of use" were expressly waived by MSM. Since the contract language is clear, I am restricted by that language in determining what damages may be recovered by MSM. *Merrill Stevens Dry Dock, supra,* 329 F.3d at 815. MSM has provided no legal justification to the contrary.

### B. Florida's economic loss rule

[6][7] Even if the parties had not excluded economic losses and consequential damages under their contract, the Florida economic loss rule would operate to preclude any recovery by MSM for economic damages. Succinctly stated, the economic loss rule bars recovery under a tort theory where the parties are acting under a contract and economic losses are the only damages. *Indemnity Insurance Company of North America v. American Aviation, Inc.,* 891 So.2d 532, 536 (Fla.2004). The purpose of the economic loss rule, as explained by the Florida Supreme Court, is to "protect the integrity of contract," *Id.* at 537-538, or, as Justice Cantero colorfully put it in his concurring opinion in the case, to prevent contract law and warranty law from "drown[ing] in a sea of tort." *Id.* at 544.

Accordingly, even if the contract did not expressly exclude liability for ordinary negligence, no tort claims could be recovered by MSM because such claims are specifically barred by the Florida economic loss rule's prohibition on the recovery of such claims by parties who are in privity.

### C. Failure to state a claim for gross negligence

[8] Prior to the filing of its Claim 27 here, MSM had sued the Debtor in state *905 court. Under Florida procedural rules (which are substantially similar on this point to Fed.R.Civ.P. 8), a pleading asserting gross negligence must contain a short and plain statement of the ultimate facts showing that the plaintiff is entitled to relief. *Summerlin v. Tramill,* 290 So.2d 53 (Fla.1973) (citing *Tramill v. Summerlin,* 276 So.2d 173 (Fla.App. 3rd DCA 1973) (overturned on other grounds). Such a complaint

must contain sufficient allegations of ultimate fact as to make it fairly appear that the defendant's course of conduct was of a gross, willful, and wanton character. *Id.* Allegations which might sustain a cause of action for ordinary negligence, or conclusory allegations, are insufficient. *Id.*

MSM's state court complaint is insufficient to state a cause of action for gross negligence under the foregoing standards and under Fla.R.Civ.P. 1.110(b)(2). There is no short and plain statement of the ultimate facts which would support a claim that the Debtor was grossly negligent, nor are any facts alleged from which one might reasonably conclude that the Debtor's conduct was intentional, willful, or wanton.

[9][10] Nor are there any pleadings or discovery materials in the record in the claims litigation here which support any contention that the Debtor was grossly negligent in its maintenance or operation of the Syncrolift. Florida substantive law defines gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Eller v. Shova,* 630 So.2d 537, 540 n. 3 (Fla.1994). As put in *Tran v. Waste Management, Inc.,* 290 F.Supp.2d 1286, 1294 (M.D.Fla.2003), a showing of gross negligence under Florida law requires the following elements:

a. Gross negligence presupposes the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than normal and ... usual ... peril;

b. Secondly, gross negligence must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of; [a]nd

c. [T]he act of omission complained of must occur in a manner which evinces a conscious disregard of consequences, as distinguished from a careless disregard thereof (as in simple negligence) or from the more extreme willful or wanton disregard thereof (as in culpable or criminal negligence).

There is simply nothing in the record here which would support a finding that the Debtor was grossly negligent or worse.

### D. MSM's damage claims were not foreseeable

[11][12] Damages for breach of contract are limited to those "damages as would normally result from the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to

have been in the contemplation of the parties at the time they made the contract as the probable result of the breach." *Poinsettia Dairy Products, Inc. v. Wessel Co.,* 123 Fla. 120, 166 So. 306, 310 (1936). Thus, even if one were to ignore the fact that the parties contemplated and agreed in paragraph 6 of their contract that the Debtor would not be liable for any economic damages, the damages now sought by MSM could not possibly have been contemplated at the time of contracting. No reasonable person could have foreseen that MSM would take *Sacajawea* out of the charter business entirely and would instead undertake a highly limited sales campaign for fifteen months in which the vessel would be kept fully **\*906** crewed and provisioned, in readiness for a new owner to emerge. Perhaps MSM thought that it might as well try this uneconomic and apparently irrational course since it intended to stick the Debtor with the bill. [FN6] Regardless, the charges which MSM seeks recover from the Debtor for Post-Repair Costs are wholly unforeseeable and are therefore not recoverable under applicable Florida law.

> FN6. Nothing in the record directly supports my speculation on this point, but then, nothing in the record supports any other rational explanation for MSM's behavior in this regard.

[13][14] Under Florida law, foreseeability is analyzed in a two-step process. *McCain v. Florida Power Corporation,* 593 So.2d 500 (Fla.1992). First, the court must consider whether a defendant's conduct foreseeably created a "zone of risk" which poses a general threat of harm to others. Second, the court must consider "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id.* at 502. *McCain* treats the question of the "zone of risk" as a threshold legal requirement, and treats the causation element as a question of fact with the focus on whether "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* at 502-3. Under this test, as the likelihood of risk grows greater, so does the duty to limit and protect against the risk. However, the trial court has the discretion to consider the issue of proximate causation as a matter of law if after the event occurred and "looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." *Id.* at 504, quoting from *Restatement (Second) of Torts* § 435(2) (1965).

MSM cannot get past *McCain's* first step. The Debtor's actions did not create a larger zone of risk that posed a general threat to MSM's trade-in of *Sacajawea.* Although MSM suggests in its brief that the lifting of vessels is inherently risky, its actions (including the decision by the Master of *Sacajawea* to leave the vessel at the shipyard and fly to Europe) and the fact that vessels are regularly hoisted for survey and repair purposes belie that contention. [FN7] More significantly here, however, no rational person could reasonably anticipate (a) that *Sacajawea* would not continue to serve as a trade-in for MSM's purchase of *One More Toy* after it was repaired; (b) that MSM would instead enter into a contract *on the same day as the accident* to purchase *One More Toy* in an all-cash $17.5 million deal; (c) that MSM would fully crew and provision *Sacajawea* for 15 months after its complete repair while it sought to sell the vessel; or (d) that MSM would take *Sacajawea* out of charter in the interim. *Sacajawea* was fully repaired 3 1/2 months after it was damaged. The delay in its sale, and the costs associated with the sale method chosen by MSM, cannot be attributable to any actions by the Debtor.

> FN7. To the extent that MSM is suggesting a *per se* or strict liability standard be applied to the hoisting of vessels, I see no legitimate basis for such a position.

### E. MSM cannot recover damages for diminution in value, or "stigma damages"

As discussed in the text at footnote 1 above, the value of *Sacajawea* immediately prior to its damage was $5.5 million. The vessel was sold 15 months after repairs were completed for $5.3 million. Given normal depreciation and wear and tear, and given MSM's acknowledgment that there is great fluctuation in the market **\*907** value of luxury yachts, there is no competent evidence in the record which would support a factual determination which could be made after trial that *Sacajawea* actually experienced any diminution in value after it was damaged.

[15][16][17] Even if such evidence existed, and MSM could establish that the value of *Sacajawea* actually declined after its damage and repair, applicable Florida law bars recovery for either the deficiency between the trade-in value and the eventual sales price or stigma damages as part of consequential damages. *Orkin Exterminating Company, Inc. v. DelGuidice,* 790 So.2d 1158 (Fla. 5th DCA 2001). The purpose of money damages is to put the injured party in as good a position as that

which full performance of the contract would have put him. *Grossman Holdings Ltd. v. Hourihan*, 414 So.2d 1037 (Fla.1982). This does not guarantee or mean that the plaintiff "is to be put in the same specific physical position," *Id. at 1039.* When a plaintiff can be made whole by repairing the damage or receiving compensation equal to the cost of repair, the law does not generally allow an additional recovery for any diminution in value which occurs beyond the cost of repair. *Id.*

MSM has acknowledged that *Sacajawea* was fully repaired. It nonetheless contends that the damages to the vessel created a "stigma" which resulted in the refusal by the owner of *One More Toy* to accept *Sacajawea* as a trade-in, [FN8] which in turn caused MSM to incur the extraordinary and unforeseeable expenses it now seeks to recover from the Debtor. This type of damage cannot be recovered under Florida law

> FN8. This assertion is of somewhat dubious validity, given that MSM agreed to a $17.5 million all cash deal on the same day that the damage occurred.

### F. MSM failed to mitigate its damages

[18][19][20] As a general proposition, a plaintiff must take all reasonable steps necessary to avoid further damages, and whether the plaintiff undertook to mitigate damages is relevant to the damage calculation. "[D]amages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him." 2 *Williston on Contracts* § 1353 at 274 (1962). MSM failed to take reasonable steps to mitigate its damages. From the completion of repairs in February 2005 through the sale of *Sacajawea* in May 2006, MSM made no attempt to charter the vessel, other than one four-night charter in October 2005. That charter generated $16,850 in revenue. During that same period, MSM generated $4.5 million in charter revenue from its operation of *One More Toy*. Despite MSM's conscious decision to use *One More Toy* to generate very substantial revenues while holding *Sacajawea* back from the charter business, MSM wants to Debtor to pay all of its expenses associated with keeping *Sacajawea* fully crewed and provisioned, including both ordinary and extraordinary expenses-- none of which relate in any way to the Syncrolift failure and the damage to the vessel, but all of which could have been offset by the continued use of *Sacajawea* as a charter vessel until its sale. MSM's decision to pull *Sacajawea* out of the charter business

and its decision to keep the vessel fully crewed and provisioned constituted a flagrant failure to mitigate its damages. As a consequence, even if such damages were not contractually barred, and not barred as a matter of law because they were unforeseeable, **908** they are barred because MSM failed to mitigate.

### G. MSM would not be permitted to amend its proof of claim had it sought to do so pre-confirmation

MSM's original proof of claim was filed in the amount of $987,450.78, and consisted of approximately $ 802,000 in property damages and $185,000 in consequential damages. The property damage claim for $802,000 was released by MSM after the insurance companies paid for the repairs to *Sacajawea*. As noted in the background discussion above, the record was full of references to the nature and extent of MSM's claim. In the run up to confirmation of the Debtor's chapter 11 plan, the record--as set forth in the claim itself, the release of the property damage claim, the disclosure statement, and the plan-- was clear that the only real, live claim against the Debtor from MSM was the disputed $185,000 consequential damage claim arising entirely from lost charter income and commissions [FN9] (although, to be sure, the Debtor reserved and escrowed cash to satisfy the entire $987,000 claim as filed). MSM did absolutely nothing to disabuse the Debtor, the other creditors, or the court from the reasonable conclusion that the only real fight left in the case was the Debtor's objection to MSM's $185,000 consequential damage claim. Instead, MSM sat quietly by, did not object to the disclosure statement or plan, and even voted for the plan.

> FN9. These categories of damages have been entirely abandoned in MSM's Amended Claim which seeks recovery for the carrying costs discussed above.

It is particularly noteworthy that MSM sold *Sacajawea* in early May 2006, about two months prior to the confirmation hearing. Although its accounting may not have been complete, [FN10] MSM most certainly knew prior to approval of the disclosure statement and prior to confirmation that the claim for consequential damages it intended to assert was far greater than the $185,000 it had included in its filed claim. In fact, MSM's ultimate consequential damage claim is *more than ten times* the consequential damages it let the Debtor, the creditors, and the court know about prior to confirmation, and arises from entirely different

categories of expenses than those asserted in the (now abandoned) $185,000 claim for lost charter fees and commissions.

> FN10. Organizing all of the invoices for rental cars, boat shoes, flowers, bar bills and the like is, after all, time consuming.

On September 11, 2006, four months after the sale of *Sacajawea* and two months after confirmation, MSM filed its Amended Claim in the amount of $1,943,804. All of that claim constitutes consequential damages, and fills up both the $802,000 in property damages included in the Initial Claim and another $956,000 besides.

If the Amended Claim had been filed before confirmation, even though a year or so after the bar date, [FN11] at least the Debtor, creditors, and the court would have had some inkling that MSM intended to assert a consequential damage claim 1000% greater than anything it had previously asserted. The information was clearly and uniquely in MSM's possession. MSM's failure to disclose its new claim operated to the severe prejudice and detriment of the Debtor and of other creditors.

> FN11. As noted above, the bar date for the filing of claims was fixed by order at July 11, 2005.

[21][22] Amendments to claims are generally allowed where the purpose is to cure a defect in the original claim, to describe **\*909** the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. *In re International Horizons, Inc.,* 751 F.2d 1213, 1216 (11th Cir.1985); *In re Integrated Resources, Inc.,* 157 B.R. 66, 70 (S.D.N.Y.1993). Post-bar date amendments must be reviewed with careful scrutiny to assure that there is no attempt made to file a new claim under the guise of an amendment. *In re Enron Corp.,* 419 F.3d 115 (2nd Cir.2005). Here, MSM's post-bar date, post-confirmation amendment did not arise out of the same "conduct, transaction, or occurrence" as set forth in the original claim. Rather, it includes a whole panoply of damages arising out of it unilateral decisions to pull *Sacajawea* out of the charter fleet but to keep the vessel fully stocked and provisioned nonetheless.

In *Enron,* the Second Circuit explained the process and analysis which a bankruptcy court should employ in determining whether an amendment to a proof of claim should be allowed, as follows:

Courts considering amendments to claims typically engage in a two-step inquiry: First, they examine "'whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.' " *Id.* (quoting *In re Black & Geddes, Inc.,* 58 B.R. 547, 553 (S.D.N.Y.1983)). An amendment will meet this threshold of it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." *In re McLean Indus., Inc.,* 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990)(citing *In re G.L. Miller & Co.,* 45 F.2d 115, 116 (2d Cir.1930)). Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will "examine each fact within the case and determine if it would be equitable to allow the amendment." *In re Integrated Res., Inc.,* 157 B.R. at 70. Multiple factors play a role in the analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would "receive a windfall" from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified. *See, id.; see also In re McLean Indus., Inc.,* 121 B.R. at 708. Of these, however, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *In re Integrated Res., Inc.,* 157 B.R. at 70.
*Id.* at 133.

The *Enron* analysis provides detailed and generally accepted instruction on how the bankruptcy court should view post-bar date amendments filed **before** confirmation of a chapter 11 plan. Under the *Enron* standard, MSM would not have been allowed to amend its Claim even prior to confirmation. Case law mandates a significantly higher degree of scrutiny when a claimant seeks to amend its claim **after** confirmation.

## H. Post-confirmation amendment of MSM's proof of claim patently improper

[23] Confirmation of a chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation, and a post-confirmation amendment of a claim should only be allowed for compelling reasons. *In re Chappell,* 984 F.2d 775 (7th Cir.1993); *Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1354 (7th Cir.1990). It would be inequitable and highly prejudicial to the Debtor and its legitimate creditors if MSM were allowed to revise or amend its proof of claim in an attempt to

increase the amount and type of its damages.  **\*910** _Holstein v. Brill,_ 987 F.2d 1268 (7th Cir.1993).

### 1. Waiver

 [24][25] First, MSM has waived any right to amend its claim.  Waiver, generally characterized as "the intentional relinquishment of a known right," _Dooley v. Weil,_ 672 F.2d 1340 (11th Cir.1982), requires (1) the existence at the time of waiver of a right, privilege, advantage or benefit which may be waived;  (2) the actual or constructive knowledge thereof;  and (3) an intention to relinquish such right, privilege, advantage or benefit.  _Id._ at 1347.

 [26] Here, MSM voluntarily participated in the disclosure statement approval process and the plan confirmation process--and voted in favor of the plan--without once mentioning that it intended to assert an amended claim which had fully matured and been fully liquidated upon the sale of _Sacajawea_ two months before the confirmation hearing.  Until it filed its amended claim in September 2006, MSM gave no inkling to creditors or the court  [FN12] that its claim was anything more than $802,000 in property damage, the entire amount of which had been paid by insurance, and $185,000 in consequential damages.  MSM never sought to amend its claim, never sought amendment of the Debtor's disclosure statement, never sought to stay confirmation, and never objected to its treatment under the plan.  Here is what MSM did do:

> FN12.  MSM did give the Debtor's counsel a copy of its "Damage book" in August, a month after confirmation and a month before it filed the Amended Claim.

(1) On May 10, 2006, MSM closed on the sale of _Sacajawea_ for $5.3 million.
(2) On May 30, 2006, MSM filed its response [CP 291] to the Debtor's objection to MSM's original claim.  In the response, MSM represented to the court that it "timely filed a claim in the amount of $987,450.78 together with a summary outlining the different components of the claim amount.... The amounts due to Claimant arise from prepetition damages sustained to the vessel '_M/V Sacajawea_ ' as a result of the collapse of the Syncrolift and lost charter fees and commissions  [FN13] which had to be paid despite the fact that the vessel was not able to meet its charter obligations due to the accident."

> FN13.  As noted above, MSM's Amended Claim entirely abandons charter fees and commissions as elements of its damage

calculation.

(3) On May 31, 2006, MSM filed a motion [CP 298] which sought the estimation or temporary allowance of its Claim 27   [FN14] under Fed.R.Bankr.P. 3018(a) for purposes of voting on the Debtor's chapter 11 plan, objecting to the plan, and determining whether the plan is feasible.  [FN15]  The motion notes that the claim was timely filed in the amount of $987,450.78.

> FN14.  A claim to which an objection has been made is not entitled to vote on the reorganization plan unless the claimant seeks and obtains an order estimating or temporarily allowing the claim for voting purposes.  The purpose of the rule is to prevent either specious claims or specious objections from interfering with honest creditor democracy in the plan voting process.

> FN15.  Under 11 U.S.C. § 1129(a)(11), the bankruptcy court must find before it confirms a chapter 11 plan that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  This requirement is generally referred to as the "feasibility test."

**\*911** (4) On June 14, 2006, MSM filed its Ballot [CP 328] accepting the Debtor's plan, and indicated on the ballot that MSM held a Class 3 general unsecured claim in the amount of $987,450.78, "subject to Court's ruling on Motion for Estimation" [CP 298].   On June 28, 2006, following a hearing on June 26th, and without objection from MSM, I entered an order [CP371] denying as moot MSM's motion for estimation [CP 298].

 In none of these pleadings filed in anticipation of the confirmation hearing on July 6th did MSM give any hint that it intended to assert its huge Amended Claim made up from entirely new categories of damages.  MSM's waiver of its right to do so two months later is implied from its actual conduct.  _Dooley, supra,_ 672 F.2d at 1347.  The acts, conduct and circumstances surrounding MSM's Claim were relied upon by creditors of the estate and by me in concluding that the Debtor's plan was feasible under § 1129(a)(11).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

All parties in the courtroom--and I--knew that MSM had released the $802,000 property damage component of its Claim after the settlement was approved and the insurance proceeds paid. MSM had expressly released the Debtor from any property damage claim. MSM had sold *Sacajawea* two months before the confirmation hearing, and surely knew then--but kept hidden from creditors and me--that it intended to assert a consequential damage claim **more than ten times greater** than the $185,000 consequential damage claim that the Debtor, all other creditors, and I knew was still out there. The Debtor, its creditors, and the court were entitled to rely on MSM's silence during the confirmation process to conclude that the maximum exposure which the estate had to MSM was $185,000. MSM's failure to timely amend its claim after the sale of *Sacajawea* and its failure to object to the disclosure statement and to confirmation of the plan constitute as a matter of law a knowing waiver by MSM of its right to amend its proof of claim at a later date.

### 2. Estoppel

[27] In addition to being barred from claim amendment by its waiver, MSM is also estopped from amending its claim. The Debtor and its creditors, and I, relied upon MSM's actual and implied representations as to the nature and amount of its claim. All of the rest of us present in the courtroom at the confirmation hearing "knew" that MSM's $987,000 claim had been reduced as a result of MSM's release of the entire $802,000 property damage portion of that claim. We all knew that MSM's total remaining damage claim was no greater than $185,144, arising solely from lost charter revenues and charter cancellation fees. The Debtor relied upon this knowledge in proposing the plan; other creditors relied upon it in determining whether to vote in favor of the plan; and I relied upon it in determining that the plan was feasible.

Subsequent to confirmation, and again in reliance on the knowledge described above, the Debtor substantially consummated the plan pursuant to § 1101(2) by, among other things, distributing initial dividends to creditors holding allowed claims. *See Holstein, supra, 987 F.2d 1268.* Now, with the specter of MSM's Amended Claim hanging over the case, the Debtor would have to seek the return of plan distributions from the legitimate creditors who have been paid in order to have enough money to make a *pro rata* distribution to MSM on its $1,943,804 Amended Claim. This exercise would be highly prejudicial to those legitimate creditors, would multiply litigation enormously, and would call into question fundamental issues of fairness and due process.

**\*912** The absurd spectacle which would result from the allowance of MSM's late-filed Amended Claim could have been entirely avoided had MSM properly and timely amended its claim instead of waiting four months after the sale of *Sacajawea* and two months after confirmation to do so. MSM most surely knew well before it sold *Sacajawea* in May 2006 that it had accumulated huge consequential damages during the fifteen months since the repairs had been completed in February 2005. Instead of letting the Debtor, creditors, and the court know that these huge new claims existed, MSM lulled all of us into assuming that the plan would pay legitimate creditors what it said it would pay them, and that the plan was feasible. The creditors, the Debtor, and I relied on the representations implicit in MSM's silence. MSM is estopped now to disavow those representations through the assertion of its Amended Claim.

### 3. Res judicata

[28][29] A creditor's treatment under a confirmed plan of reorganization creates a contractual relationship between the debtor and the creditor. The creditor's pre-confirmation claim is subsumed in and replaced by the new contract created by the confirmed plan; "each claimant gets a 'new' claim, based on whatever treatment is accorded to it in the plan itself." *Holstein, supra,* 987 F.2d at 1270; *In re Benjamin Coal Co.,* 978 F.2d 823, 827 (3rd Cir.1992). The initial claim filed by the creditor during the pendency of the case is dead, replaced by the new contractual obligation created by the creditor's treatment under the confirmed plan.

[30] The doctrine of *res judicata* in bankruptcy proceedings "not only bars a court from relitigating issues that have been litigated in a cause but also bars a court from litigating issues that *may have been litigated.*" *In re Westbrook,* 246 B.R. 412, 416 (Bankr.S.D.Ala.1999). MSM had every opportunity to amend its claim and litigate its entitlement to the new consequential damages it seeks at or before the confirmation hearing. *In re Justice Oaks II, Ltd.,* 898 F.2d 1544 (11th Cir.1990). It did not do so, and its attempt to amend its claim two months after confirmation is barred by *res judicata.* Pursuant to MSM's release of the $802,000 property damage claim, MSM's maximum claim is limited by the *res judicata* effect of the confirmation order to $185,144, the balance of its original claim.

### IV. Conclusion

 MSM is barred from amending its Claim post-confirmation under principles of waiver, estoppel, and *res judicata*. Since MSM released the $802,306.78 property damage component of its initial claim of $987,450.78, only the balance of its Initial Claim, $185,144, is properly before me for consideration. The parties' ship repair contract, entered into between parties of equal bargaining power, expressly bars the types of damages sought by MSM in the $185,144 portion of its initial claim (and also bars in their entirety the $1,943,804 in new categories of consequential damages sought in the Amended Claim). The contract clearly and unequivocally waives the claims asserted by MSM but does not absolve the Debtor of liability for gross negligence, willful misconduct, or the like, and the contract is thus enforceable under maritime law. "Loss of charter and loss of use" damages were expressly waived by MSM, and would in any event be barred under the economic loss rule provided for in applicable Florida law. MSM failed to state a cause of action in its state court complaint, and has failed to state a claim here, for gross negligence. Moreover, its damage claims were not reasonably foreseeable by the parties at the time of contracting. **\*913** Losses for diminution in value, or "stigma damages," are unavailable as a matter of law. Finally, MSM failed utterly to mitigate its damages as it was obliged to do.

 There is no genuine issue of material fact present in this case, the Debtor is entitled to judgment as a matter of law, and the Initial Claim and the Amended Claim filed by MSM, Inc., f/k/a MSM Charters, LLC, are hereby DISALLOWED in their entirety.

### V. Attorneys' fees and costs
 The ship repair contract between the Debtor and MSM provides for the award of attorneys' fees under certain circumstances. The Debtor is hereby authorized to file a motion seeking the allowance of attorneys' fees and costs associated with its objection to MSM's claim within twenty days of the date of this order. That motion, and any timely objection filed by MSM, will be considered at a hearing to be held on **January 24, 2007,** at **1:30 p.m.**

### VI. Order to show cause
 Pursuant to the provisions of Federal Rule of Bankruptcy Procedure 9011(b), MSM and its counsel have represented to the court that the claims and other legal contentions made in its Amended Claim and in the pleadings and briefs filed in connection therewith are warranted by existing law or by a nonfrivolous argument for the extension,

modification, or reversal of existing law or the establishment of new law. MSM's assertion and prosecution of its Amended Claim subsequent to confirmation of the Debtor's plan and in the context of MSM's own pre-confirmation behavior appears to be (a) wholly frivolous and abusive under existing law, and (b) barred under clear and well-established doctrines of waiver, estoppel and *res judicata* which are, or should be, entirely familiar to experienced bankruptcy practitioners such as MSM's counsel. Accordingly, and pursuant to Rule 9011(c)(1)(B), MSM's counsel Robert D. McIntosh and Mariaelena Gayo-Guitian, and the law firm of Adorno & Yoss LLP, are hereby ORDERED to show cause why they have not violated Rule 9011(b) with respect to the post-confirmation filing and prosecution of MSM's Amended Claim, in a hearing to be held in Courtroom 308, United States Courthouse, 299 E. Broward Boulevard, Fort Lauderdale, FL 33301 on **January 24, 2007 at 1:30 p.m.**

 355 B.R. 894, 20 Fla. L. Weekly Fed. B 221

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



United States Court of Appeals,
Seventh Circuit.
Thomas HOLSTEIN, Plaintiff-Appellant,
v.
Kevin BRILL, Defendant-Appellee.
No. 92-1670.

Argued Jan. 6, 1993.
Decided Feb. 18, 1993.
Rehearing and Rehearing En Banc
Denied March 16, 1993.

 Former employee moved to amend wage claim asserted against Chapter 11 debtor. The Bankruptcy Court, Erwin I. Katz, J., allowed amendment, and appeal was taken.  The United States District Court for the Northern District of Illinois, Suzanne B. Conlon, J., affirmed, and further appeal was taken. The Court of Appeals, Easterbrook, Circuit Judge, held that former employee was improperly allowed to increase wage claim four years after confirmation of substantially consummated reorganization plan.

 Affirmed in part and reversed in part.

 Ripple, Circuit Judge, dissented and filed opinion.

West Headnotes

**[1] Bankruptcy** 🔑**2674**
51k2674 Most Cited Cases
Money owed former employee for wages could not be set off against former employee's debt to employer for postemployment legal work in bankruptcy case commenced by the employer;  debts were not mutual, that is, contemporaneous, and thus could not be cancelled in bankruptcy.

**[2] Bankruptcy** 🔑**2903**
51k2903 Most Cited Cases
Former employee was improperly allowed to increase wage claim, nearly tripling original amount, four years after confirmation of substantially consummated reorganization plan;  even if amendment related back to original pleading, there was no showing of reason for delay in seeking amendment.

**[3] Bankruptcy** 🔑**2903**

51k2903 Most Cited Cases

**[3] Bankruptcy** 🔑**3784**
51k3784 Most Cited Cases
Bankruptcy judge may allow or forbid claim amendments following claims bar date in exercise of reasoned discretion;  in either case, appellate review is deferential.

**[4] Bankruptcy** 🔑**2903**
51k2903 Most Cited Cases

**[4] Bankruptcy** 🔑**3569**
51k3569 Most Cited Cases
Postconfirmation claim amendments should be allowed in Chapter 11 cases only for compelling reasons;  modification of confirmed and substantially consummated plan is forbidden except to limited extent permitted by statute. Bankr.Code, 11 U.S.C.A. § 1127.
**\*1269** Thomas O. Holstein (argued), Chicago, IL, for plaintiff-appellant.

 David A. Mucklow (argued), Norman B. Newman, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, IL, for defendant-appellee.

 Before EASTERBROOK and RIPPLE, Circuit Judges, and MILLER, District Judge. [FN*]

        FN* Hon. Robert L. Miller, Jr., of the Northern District of Indiana, sitting by designation.

 EASTERBROOK, Circuit Judge.

 Two bankruptcy lawyers have landed in bankruptcy themselves, owing each other money.    Thomas Holstein owes Kevin Brill more than $11,000 as wages for services performed while Brill was his employee;  Brill owes Holstein more than $7,000 in fees for cases referred after the employment ended.

 On March 30, 1984, Holstein filed a petition under Chapter 13 of the Bankruptcy Code.   Creditors had until August 2, 1984, to make claims.   One day late, Brill filed a proof of claim for $11,475 in unpaid wages.   On August 9 the bankruptcy court converted Holstein's case to Chapter 11 of the Code and set a new bar date of February 15, 1985.   Brill did not file an additional or amended claim, although on August

30, 1984, Brill's employment with Holstein had ended, and the debt for wages should have been clear then or shortly thereafter.   Everyone treated his earlier claim as timely--for Holstein's schedules had listed him as a creditor in roughly this amount--but the parties disputed its priority.   Brill sought a high priority, while the trustee contended, and Bankruptcy Judge Hertz ultimately decided, that Brill was an "insider" whose debt belongs in the eighth position. The trustee prepared, and Judge Hertz approved, a disclosure statement specifying that Brill was entitled to $11,318.   On November 3, 1986, Judge Hertz confirmed Holstein's plan of reorganization.   Brill did not object to the disclosure statement or the plan.

 Come 1990 Brill, who had not been paid, asked Bankruptcy Judge Katz, to whom the case had been reassigned, to convert the reorganization to a Chapter 7 liquidation.   Holstein opposed this, observing that he had paid more than $340,000 to his creditors and was about to begin paying the lowest-priority debts. After Holstein demanded that Brill fork over the more than $7,000 to which he was clinging, Brill replied on September 4, 1990, by increasing his own claim.   Unpaid wages actually exceed $28,000, according to Brill's revised calculation.   Judge Katz declined to convert the case to Chapter 7, refused to give Holstein any additional time to pay, ordered Brill to turn the $7,000 over to the estate, granted Brill's request to increase his claim to $28,000, and rejected Holstein's request to offset his accounts with Brill.   1991 WL 236871, 1991 Bankr. LEXIS 1606. The district court affirmed.   1992 WL 55488, 1992 U.S.Dist. LEXIS 2506.   Bankruptcy **1270** Judge Wedoff, presiding in Brill's separate bankruptcy (commenced in 1988 without notice to Holstein), has concluded that the $7,000 covered by Judge Katz's turnover order is not dischargeable.

 [1] Setoff is not available.   Holstein owes Brill money for wages preceding August 30, 1984;   Brill owes Holstein money for legal work done after Brill was in practice on his own.   These are not "mutual" (that is, contemporaneous) debts and accordingly may not be canceled in bankruptcy. *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 U.S. 562 (7th Cir.1986); cf. *In re Iowa R.R.,* 840 F.2d 535, 543-44 (7th Cir.1988).   Holstein must pay Brill in full under his Chapter 11 plan, and Brill must pay Holstein in full under both Judge Katz's turnover order and Judge Wedoff's order.   As both apparently have the means to do so, it all comes to the same thing as setoff, provided these lawyers live up to their obligations.

 [2] Increasing Brill's claim 4 years after the

confirmation of Holstein's plan, and 5 1/2 years after the bar date in the Chapter 11 case, is another matter entirely.   Because the plan of reorganization does not specify the sum Holstein must pay Brill, an increase would not "modify" the plan in a way that 11 U.S.C. § 1127(b) forbids.   Still, that statute implies that after confirmation and "substantial consummation" of a plan, changes that verge on modification must be rare.   Neither Judge Katz nor the district judge discussed the significance of the confirmation of the plan and Holstein's substantial performance of his obligations.   Both relied, instead, on the relation back principle of Fed.R.Civ.P. 15(c), applied to adversary proceedings in bankruptcy by Fed.R.Bankr.P. 7015 and to amended claims by *In re Unroe,* 937 F.2d 346 (7th Cir.1991), and *In re Stavriotis,* 977 F.2d 1202 (7th Cir.1992).   We may assume, in the language of Rule 15(c)(2), that the "claim ... asserted in [Brill's] amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading".   That an amendment would relate back to the original pleading does not make it appropriate for the court to permit the amendment.

 [3] Leave to amend should be freely granted early in a case, *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), but passing milestones in the litigation make amendment less appropriate.   One milestone of particular significance in bankruptcy is the bar date.   By then creditors must submit their proofs of claim.   Once the claims are in, the parties may concentrate on determining their validity and providing for payment.   How they will proceed depends on who claims how much.   Some enlargement later by amendment may be appropriate, and the debtor may himself submit claims within a limited period after the bar date.   See 11 U.S.C. § 501(c); Fed.R.Bankr.P. 3004; *In re Danielson,* 981 F.2d 296 (7th Cir.1992).   Bankruptcy judges may decide to allow (see *Unroe*), or forbid (see *Stavriotis*), such changes in the exercise of reasoned discretion;   in either case appellate review is deferential.

 [4] Confirmation of the plan of reorganization is a second milestone, equivalent to final judgment in ordinary civil litigation.   *Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1354 (7th Cir.1990).   Once that milestone has been reached, further changes should be allowed only for compelling reasons.   *In re Chappell,* 984 F.2d 775, 782 (7th Cir.1993).   Cf. Fed.R.Civ.P. 60(b). Confirmation automatically discharges all debts other than those provided for in the plan, 11 U.S.C. §

1141(d)(1)(A), and "each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself."  *In re Benjamin Coal Co., 978 F.2d 823, 827 (3d Cir.1992).*  Modification of a confirmed and substantially consummated plan is forbidden except to the limited extent 11 U.S.C. § 1127 permits.  Post-confirmation amendments make an end run around these provisions and may throw monkey wrenches into the proceedings, making the plan infeasible or altering the distributions to remaining creditors.  Small claims may be conceded, while larger ones may be contested (by other creditors, if not by the *1271 debtor).  And whether or not late-breaking claims affect third parties' entitlements, they assuredly disrupt the orderly process of adjudication.  To every thing there is a season, and the season for stating the amount of a debt is before the confirmation of a plan of reorganization.

What explains Brill's delay?  A high hurdle for a litigant does not imply searching appellate review.  Still, we must ensure that the bankruptcy and district judges applied the right standard.  Neither judge, however, identified *any* appropriate reason for Brill's six-year delay in making a claim for $28,000.  Brill's brief in this court is equally silent.  He does not contend, for example, that essential documents became available only recently, or that Holstein hindered his efforts to compute unpaid wages accurately.  His latest claim invokes an oral contract; he does not rely on documents.  Brill received notice of the proceedings and of the two bar dates (one in Chapter 13 and another in Chapter 11).  He made a claim for a little more than $11,000 without suggesting that the computation was tentative.  Brill did not object to the disclosure statement or the plan of reorganization; he did not ask for discovery so that he could compute the back pay obligation using Holstein's records.   There is nothing but the equivalent of:  "Whoops, my mistake." Perhaps there is more:  Brill asserts that after Holstein renewed his claim to the $7,000 and demanded an accounting, he was "forced to reanalyze the situation."   In other words, he retaliated for Holstein's demand by increasing his own demands.  A litigant's inattention, laziness, error, or desire to lash back at an adversary is not good cause by any standard.  *Danielson, 981 F.2d at 298;  United States v. Dumont, 936 F.2d 292, 295 (7th Cir.1991);  Redfed v. Continental Casualty Corp., 818 F.2d 596, 602 (7th Cir.1987).* Having kept his silence while the trustee was toting up Holstein's obligations, Brill cannot surface 5 1/2 years later with a demand almost three times the original amount.

We asked the parties whether any other court ever

had allowed a claim to be increased, for *any* reason, after confirmation of a plan of reorganization.  Neither side could find such a decision under the 1978 Code, or for that matter under the 1898 Act during its final 50 years.   Our search was equally fruitless.   Without excluding the possibility of a post-confirmation amendment of a claim for cogent reason, we conclude that a creditor's inattention to the case or careless error in calculation does not suffice.  As Brill has not provided any other explanation for the delay, a remand is unnecessary.

The judgment is affirmed to the extent it precludes a setoff of the debts and reversed to the extent it directs Holstein to pay Brill more than $11,318.

RIPPLE, Circuit Judge, dissenting.

I agree with the majority that there are limits on the authority of a bankruptcy court to allow an amendment under Federal Rule of Civil Procedure 15 [FN1] to a proof of claim.  *See In re Roberts Farms, Inc., 980 F.2d 1248, 1251 (9th Cir.1992)* (stating that Rule 15 liberally permits amendment of proof of claim;  however, a court should inquire whether opposing party would be unduly prejudiced by such amendment);  *In re Unioil, Inc., 962 F.2d 988, 992-93 (10th Cir.1992)* (stating same);  *In re Wilson, 96 B.R. 257, 262 (Bankr. 9th Cir.1988)* (noting that in determining prejudicial effect of amendment to proof of claim, court should look to bad faith, unreasonable delay in filing, impact on other claimants, reliance by debtor or other claimants, and change of debtor's position).  I also agree that Rule 15's concept of "relatedness" is not the only criteria, especially after the plan of reorganization has been confirmed.  At that point in the litigation, an amendment to a proof of claim ought to be allowed rarely and only after careful evaluation by the bankruptcy court.   That evaluation must take into consideration the reasons for the delay on the part of the creditor and *1272 the possibility of prejudice to others involved in the bankruptcy.

> FN1.  Bankruptcy Rule 7015 states that Federal Rule of Civil Procedure 15 applies in adversary proceedings.

However, it is still important to remember that the matter of amendment is committed to the sound discretion of the bankruptcy judge.  *In the Matter of Stavriotis, 977 F.2d 1202, 1204 (7th Cir.1992).*   The bankruptcy court, especially in a Chapter 11 proceeding, is engaged in the delicate, complex, and sophisticated task of attempting to breathe life back

into the bankrupt entity.    The bankruptcy court is therefore in a unique position to appreciate the motivations of the creditors and the impact on the bankrupt estate from an amendment.

This is one of many cases to arrive in this court recently where a matter controlled by the abuse of discretion standard comes to us either unexplained or vaguely explained.    This lack of explanation may be due in large measure to the pressures on courts of first instance, including bankruptcy courts, to deal with a great number of cases.    However, this failure to communicate adequately with reviewing courts does provide, understandably, a significant unease on the part of appellate courts.    It also provides a temptation for appellate courts to micromanage bankruptcy matters.

While prolonging bankruptcy proceedings is indeed regrettable, I believe the appropriate course in a case such as this is to remand the case to the bankruptcy court in order to allow that court to provide us with a more elaborate explanation of its reasons for permitting the amendment.    The bankruptcy court did note that Mr. Brill was unable to compute the full amount of his claim when he filed the original proof of claim but left us in the dark as to when such information did become reasonably available to Mr. Brill.    The bankruptcy court is also in a far superior position than we to determine the impact of such an amendment on the debtor and on any other remaining creditors.

I believe that remanding this case to the bankruptcy court is far more appropriate than engaging in factual assumptions at the appellate level.    The majority concludes that Mr. Brill should have known the total of his legal fees long in advance of his amended filing.    The majority also attributes to Mr. Brill a retaliatory motive for filing the amended proof of claim.    This sort of fact-finding ought to be done on remand in the bankruptcy court rather than here.

Because I believe the bankruptcy court should have an opportunity to set forth in greater detail the basis of its decision to permit an amendment of Mr. Brill's proof of claim, I would remand this matter to the bankruptcy court for a more detailed elaboration.

987 F.2d 1268, 24 Fed.R.Serv.3d 1352, Bankr. L. Rep.  P 75,142

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.
In re Donald E. SMITH, Debtor.
Donald E. Smith, Plaintiff,
v.
Fairbanks Capital Corporation, Defendant.
**Bankruptcy No. 02-41629-JDW.
Adversary No. 03-4015.**

Aug. 15, 2003.

 Chapter 13 debtor brought action against creditor alleging improper assessment and collection of attorney fees. On motion to dismiss, the Bankruptcy Court, James D. Walker, Jr., J., held that: (1) debtor had pecuniary interest in his claims; (2) debtor was party in interest; and (3) creditor's notation of accruing attorney fees did not by itself violate the automatic stay.

 Motion granted.

West Headnotes

**[1] Bankruptcy** 🗝️**2159.1**
51k2159.1 Most Cited Cases
On question of standing, Chapter 13 debtor had pecuniary interest in his claims alleging improper assessment and collection of attorney fees, on allegations that creditor violated his rights under Bankruptcy Code with respect to certain attorney fees; it was creditor's conduct of collecting money from debtor that violated debtor's rights, and if debtor prevailed, creditor would have to return money collected and refrain from collecting further amounts.

**[2] Bankruptcy** 🗝️**2159.1**
51k2159.1 Most Cited Cases
On question of standing, Chapter 13 debtor was party in interest to bring claims alleging improper assessment and collection of attorney fees, since payments to creditor were made outside the plan from debtor's own funds.

**[3] Bankruptcy** 🗝️**2897.1**
51k2897.1 Most Cited Cases

**[3] Bankruptcy** 🗝️**3715(10)**
51k3715(10) Most Cited Cases

Court could not entertain postconfirmation claim objection raised by Chapter 13 debtor based on amount of creditor's claim.

**[4] Bankruptcy** 🗝️**2933**
51k2933 Most Cited Cases
Standard under rule governing relief from judgment should apply to motions to reconsider claim only when the court has actually entered an order allowing or disallowing the claim subsequent to a challenge to that claim; when there has been no previous litigation on the claim, the court should consider the extent and reasonableness of the delay, the prejudice to any party in interest, the effect on efficient court administration, and the moving party's good faith. Bankr.Code, 11 U.S.C.A. § 502(j); Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

**[5] Bankruptcy** 🗝️**2394.1**
51k2394.1 Most Cited Cases
A creditor's notation of accruing attorney fees does not by itself violate the automatic stay. Bankr.Code, 11 U.S.C.A. § 362(a)(3), (a)(5).
 **\*688** Judson C. Hill, Timothy D. Roberts, Savannah, GA, for Debtor.

 Mary Grace Diehl, Thomas R. Walker, Atlanta, GA, for Fairbanks.

**MEMORANDUM OPINION**

 JAMES D. WALKER, Jr., Bankruptcy Judge.

 This matter comes before the Court on Fairbanks Capital Corporation's motion to dismiss Debtor Donald E. Smith's class action complaint, which alleges improper assessment and collection of attorney fees by Fairbanks. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(B) and (O). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**
 Debtor, Donald E. Smith, filed a Chapter 13 petition on May 24, 2002. His plan was confirmed on October 6, 2002. Fairbanks Capital Corporation filed a proof of claim in Debtor's case that set forth a secured claim of $27,848.85, including a $10

299 B.R. 687
299 B.R. 687
(Cite as: 299 B.R. 687)

arrearage. The claim did not disclose that Fairbanks would seek payment of attorney fees incurred between the date of filing and the date of confirmation. Fairbanks did not make an application pursuant to Rule 2016 for such attorney fees. Debtor alleges that Fairbanks has posted such attorney fees to Debtor's account and has collected those fees directly from Debtor because Fairbanks' claim is being paid outside the plan.

Debtor filed this class action complaint on January 30, 2003, stating five counts: (1) claims objection; (2) request for sanctions; (3) declaratory and equitable relief; (4) claim disallowance; and (5) violation of the automatic stay. Fairbanks responded by filing the motion to dismiss at issue here.

### Conclusions of Law

Debtor has filed its complaint as a class action. Federal Rule of Civil Procedure ("FRCP") 23(c)(1) requires that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." The Eleventh Circuit Court of Appeals has said that "the [class] certification decision itself should come early in the litigation." *Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1389 (11th Cir.1998) (superseded by Fed.R.Civ.P. 23(f) on other grounds). An early consideration of class certification does not harm the parties because, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Forehand v. Florida State Hosp.,* 89 F.3d 1562, 1566 (11th Cir.1996). Nevertheless, in *Telfair v. First Union Mortgage Corp.,* 216 F.3d 1333 (11th Cir.2000), the court said, "It was within the [bankruptcy] court's discretion to consider the merits of the claims before their amenability to class certification. With no meritorious claims, certification of those claims as a class action is moot." *Id.* at 1343 (internal citations omitted). Likewise, in this case, if **689** the complaint cannot survive Fairbanks' motion to dismiss, the class action is moot. As a result, the Court will consider dismissal before addressing the issue of class certification.

I. *Motion to Dismiss*

A. *Rule 12(b)(1): lack of standing*

Fairbanks first challenges the Court's subject matter jurisdiction pursuant to FRCP 12(b)(1) on the ground that Debtor lacks constitutional standing to bring this suit. Article III of the Constitution provides that

federal courts may only hear cases or controversies. [FN1] "[S]tanding is an essential and unchanging part of the case-or-controversy requirement ...." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). In *Lujan,* the Court set forth a three-part test for standing:

> FN1. "The judicial Power shall extend to all Cases ... [and] to Controversies ...." U.S. Const. Art. III, sec. 2, cl. 1. Although bankruptcy courts are Article I courts rather than Article III courts, their jurisdiction is derived from the district courts. Because the jurisdiction of district courts is limited by the case or controversy requirement, so is the jurisdiction of the bankruptcy courts. *U.S. v. Amoskeag Bank Shares, Inc. (In re Amoskeag Bank Shares, Inc.),* 239 B.R. 653, 657 n. 3 (D.N.H.1998); *In re Interpictures, Inc.,* 86 B.R. 24, 28- 29 (Bankr.E.D.N.Y.1988).

First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61, 112 S.Ct. at 2136 (internal citations and quotation marks omitted).

Fairbanks has argued that standing in bankruptcy is narrower than Article III standing and that it is limited to those who have a pecuniary interest in the outcome. However, the cases cited by Fairbanks deal with the issue of standing to object to or to appeal a bankruptcy order, not standing to pursue an adversary proceeding. *Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.),* 151 F.3d 605, 607 (7th Cir.1998); *Fidelity Bank, N.A. v. M.M. Group, Inc.,* 77 F.3d 880, 882 (6th Cir.1996); *Willemain v. Kivitz,* 764 F.2d 1019, 1022 (4th Cir.1985). The court in *Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir.1988), distinguished between Article III standing and standing to appeal a bankruptcy order, noting that the "pecuniary interest" or "person aggrieved" standard for appeals "is more exacting than the constitutional case or controversy

requirement imposed by Article III, for under the constitutional 'injury in fact' test, *the injury need not be financial.*"  *Id.* at 642 n. 2 (emphasis added).  *See also Westwood Community Two Ass'n, Inc. v. Barbee (In re Westwood Community Two Ass'n. Inc.),* 293 F.3d 1332, 1337 (11th Cir.2002) (noting that the right to be heard in a Chapter 7 or Chapter 11 case is based on the "party in interest" standard, while the right to appeal a bankruptcy order is based on the more stringent "person aggrieved" standard, which requires a direct financial stake).

[1] Regardless of whether constitutional standing in bankruptcy requires a pecuniary interest, Debtor satisfies those requirements.  First, he has alleged an injury **690** in fact:  Fairbanks has violated his rights under the Bankruptcy Code with respect to certain attorney fees.  Second, a causal connection exists:  it is Fairbanks action of collecting money from Debtor that violates Debtor's rights.  Third, redressability is satisfied:  if Debtor prevails, Fairbanks will have to return money collected and refrain from collecting further amounts.

[2] In some situations, such as objecting to a proof of claim or seeking reconsideration of the allowance of a claim, the Bankruptcy Code and Rules limit who may act to parties in interest. [FN2]  The term "party in interest" has been defined "to include anyone whose financial interest may be affected by the outcome of a bankruptcy case."  *In re Barnes,* 275 B.R. 889, 893 (Bankr.E.D.Cal.2002).  To the extent Debtor must be a party in interest to bring his claims, he satisfies this standard because payments to Fairbanks are made outside the plan from Debtor's own funds.  *Telfair,* 216 F.3d at 1340.

> FN2. "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, *unless a party in interest ... objects.*"  11 U.S.C.A. § 502(a) (West 1993) (emphasis added).  "A *party in interest* may move for reconsideration of an order allowing or disallowing a claim against the estate."  Fed. R. Bankr.P. 3008 (emphasis added).

B. *Rule 12(b)(6):  failure to state a claim upon which relief can be granted*

Fairbanks has asserted that Debtor's complaint fails to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6).  In evaluating such a motion, "a court must accept the allegations in the complaint as true, construing them in the light most

favorable to the plaintiffs."  *White v. Lemacks,* 183 F.3d 1253, 1255 (11th Cir.1999).  The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Plaintiff's complaint alleges that Fairbanks posted postpetition, preconfirmation attorney fees to his account and collected those fees directly from Debtor.  As will become evident, the allegation that Fairbanks collected the fees is central to all of Debtor's claims.  While the Court is obligated to accept Debtor's allegations of fact as true, the allegation regarding collection of attorney fees is not so much a fact as a conclusion bereft of any supporting facts.  As long as Fairbanks has not demanded and has not been paid more than the amount listed in its proof of claim, any allegation of improperly collecting attorney fees is anticipatory.  Debtor does not dispute that Fairbanks is entitled to the amount listed on its proof of claim, nor does Debtor allege that Fairbanks has actually received more than that amount.  Thus, Debtor's allegation relates only to the manner in which Fairbanks has allocated payments received, which is a matter of Fairbanks' internal record keeping, not an actual collection of attorney fees.

Plaintiff's complaint asserts a challenge to Fairbanks' proof of claim, asserts a violation of the automatic stay, and asserts an abuse of the bankruptcy process.  As remedies, Debtor seeks claim disallowance, actual and punitive damages, and declaratory and injunctive relief.

1. Challenge to Claim

**Objection to claim:**  Debtor has presented an objection to Fairbanks' proof of claim on the ground that it fails to disclose Fairbanks' intent to seek postpetition, preconfirmation attorney fees.  However, Fairbanks' failure to disclose its intentions **691** is not a valid basis for objecting to a proof of claim.  Debtor's objection actually goes to the booking of certain attorney fees by Fairbanks and the allocation of money paid to those fees.  Such an objection has nothing to do with the proof of claim itself.

[3] Even if Debtor had made out a proper objection with respect to the amount of the proof of claim, it would be untimely.  Neither the Bankruptcy Code nor the Bankruptcy Rules provide any deadline for

objecting to claims, but courts have determined claims objections to be untimely when they are made postconfirmation. In *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544 (11th Cir.1990), the court held that when an objection to a proof of claim "is based on an argument that the plan *misclassified* the objectionable claim, the objection must be made prior to confirmation of the plan." *Id.* at 1553 (emphasis added). More recently, the Eleventh Circuit has refused to allow a postconfirmation objection contesting the *amount* of the claim. *Universal Amer. Mortg. Co. v. Bateman (In re Bateman),* 331 F.3d 821, 828 (11th Cir.2003). In light of *Bateman,* the Court cannot entertain a postconfirmation claim objection raised by Debtor based on the amount of Fairbanks' claim.

 **Reconsideration of claim:** Debtor has also characterized his cause of action with respect to the proof of claim as one for reconsideration of the allowance of Fairbanks' claim. Pursuant to Section 502(j), "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case." 11 U.S.C.A. § 502(j) (West 1993). In *Colley v. National Bank of Texas (In re Colley),* 814 F.2d 1008 (5th Cir.1987) the court concluded that reconsideration for cause of a claim that "has in fact been litigated between parties to a bankruptcy proceeding" should be done pursuant to Federal Rule of Civil Procedure 60(b), which provides the standards for relief from a judgment or an order. [FN3] *Id.* at 1010.

> FN3. Rule 60(b) provides for relief from judgment in the event of
> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
> Fed.R.Civ.P. 60(b).

 [4] The proof of claim in this case was allowed without actual litigation because there was no timely objection to it. In other words, it was deemed allowed rather than allowed by court order. This Court has previously considered the application of Rule 60(b) as the standard for cause to reconsider a claim that had not been challenged. *In re Clark,* 172 B.R. 701, 704-05 (Bankr.S.D.Ga.1994) (Walker, J.); *but see Layne v. Firstar Bank, N.A. (In re Layne),* No. 98-13017, Adv. No. 99-1078A, 2000 WL 33943200, at *4 n.4 (Bankr.S.D.Ga.2000) (questioning *Clark*'s application of Rule 60(b) to reconsideration of claims not previously litigated); *In re Gomez,* 250 B.R. 397, 401 (Bankr.M.D.Fla.1999) (rejecting the Rule 60(b) standard for reconsideration of claims that had been deemed allowed). The Court concludes that the Rule 60(b) standard should only apply when the Court has actually entered an order allowing or disallowing the claim subsequent to a challenge to that claim. **\*692** When there has been no previous litigation on the claim, the Court should consider "(1) the extent and reasonableness of the delay, (2) the prejudice to any party in interest, (3) the effect on efficient court administration, and (4) the moving party's good faith." *Gomez,* 250 B.R. at 401.

 Debtor has argued that Fairbank's assessment and collection of postpetition, preconfirmation attorney fees against Debtor was not discovered until well after confirmation. Because they were not disclosed, Debtor had no reason to object to the proof of claim on the grounds that Fairbanks was not oversecured or that Fairbanks was not entitled to attorney fees under the mortgage. However, even assuming Debtor can prove that Fairbanks is not entitled to attorney fees under bankruptcy law, Debtor still has no basis for challenging the claim. As explained above, until Fairbanks has collected or attempted to collect more than the amount listed on its proof of claim-which consists of principal, interest, and arrearages-its actions are not objectionable. Without any basis for challenging the proof of claim, Debtor has no grounds to request reconsideration of an allowed claim.

 **Disallowance of claim pursuant to § 502(d):** Debtor has also argued that Fairbanks' claim should be disallowed in its entirety pursuant to Section 502(d) because its receipt of payments for postpetition, preconfirmation attorney fees is an avoidable transfer pursuant to Section 549(a). [FN4] In other words, Debtor is seeking reconsideration of the allowance of the claim. As explained above, Debtor does not have any ground for seeking reconsideration. Because Debtor has failed to state a

claim for reconsideration, the Court need not consider the merits of the Section 502(d) argument.

> FN4. "[T]he trustee may avoid a transfer of property of the estate(1) that occurs after the commencement of the case;  and ... that is not authorized under this title or by the court."  11 U.S.C.A. § 549(a) (West 1993).

 Because an objection to Fairbanks' claim is untimely and because Debtor has no basis for either objecting to the claim or seeking reconsideration of the claim, Debtor's challenge to the proof of claim will be dismissed.

 2. Violation of Automatic Stay

 Debtor has alleged that Fairbanks violated Sections 362(a)(3) and (a)(5)  [FN5] of the automatic stay by assessing and collecting unauthorized attorney fees. However, as explained in detail above, Debtor's complaint in this case is only sufficient to allege that Fairbanks has included accrued fees on Debtor's account as part of its internal record keeping procedures.

> FN5. Section 362(a) provides in relevant part as follows:
> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of-
> ...
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;  [and]
> ...
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title[.]
> 11 U.S.C.A. § § 362(a)(2) & (a)(5) (West 1993 & Supp.2003).

 [5] A creditor's notation of accruing attorney fees does not by itself violate the automatic stay. Because one purpose of the automatic stay is to prevent "disorderly, piecemeal dismemberment of the debtor's estate [,] .... postpetition bookkeeping entries by [the creditor] did not implicate Bankruptcy Code § 362(a)(3)." **693 Mann v. Chase Manhattan Mortg. Corp., 316 F.3d 1, 3 (1st Cir.2003). The court in Mann explained that violation of that section requires

an overt act. Id. at 4. Debtor argues that Fairbanks notified him that he was under an obligation to pay the attorney fees in question and that interest would accrue on those fees until paid. However, until Fairbanks demands from Debtor more than it is entitled to under its allowed proof of claim, it cannot be said to have taken any overt act to collect those fees. Debtor has not alleged that Fairbanks has attempted to actually collect more than $27,848.85.

 Similarly, with respect to Section 362(a)(5), Fairbanks' internal record keeping does not serve to expand the existing lien or create a new one absent some effort to obtain more than was owed at the time of filing. As noted in Mann, Debtor has not alleged that Fairbanks "has undertaken any action to modify its original record lien." Id. (emphasis added).

 Because Debtor has not alleged that Fairbanks has actually attempted to collect an amount in excess of its proof of claim, it has not stated a claim under Section 362. Therefore, all counts arising from such a claim will be dismissed.

 3. Abuse of Bankruptcy Process

 Finally, Debtor has alleged that Fairbanks' actions constitute an abuse of the bankruptcy process. Debtor has essentially asserted a claim for contempt under Section 105(a)  [FN6] based on Fairbanks' failure to comply with Section 506(b).  [FN7] However, it does not appear the alleged conduct of Fairbanks violates any provision of bankruptcy law. Section 506(b) provides for the accrual of attorney fees and interest for oversecured creditors and cannot be "violated." If a creditor were to collect fees to which it were not entitled under Section 506(b), the debtor's recourse would be to a nonbankruptcy law claim such as breach of contract or conversion, not a claim under Section 506(b), which does not provide a cause of action.

> FN6. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C.A. § 105(a) (West 1993).

> FN7. Section 506(b) provides:
> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim,

299 B.R. 687
**(Cite as: 299 B.R. 687)**

and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C.A. § 506(b) (West 1993).

The Court can find no violation of bankruptcy law in Fairbanks' conduct and therefore cannot theorize any actionable claim that could be asserted under Section 105(a) based on these facts. [FN8] Thus, the Court finds that Debtor has failed to state a claim for abuse of the bankruptcy process.

> FN8. While the Court is unaware, at this time, of any facts that would state such a claim, it hesitates to declare that no set of facts could ever state a claim. Section 105(a) does not define a right of action; however an order under Section 105(a) may be deemed to be relief granted pursuant to a court created right of action. Following that construct, it could be argued that any request under Section 105(a) should survive at motion to dismiss for failure to state a claim because the movant could contend the court always has the right to recognize a claim that fits the movant's specifications. Thus, it must be held that claims purportedly stated under Section 105(a) will be narrowly construed.

## II. *Class Certification*

Having determined that Debtor's complaint must be dismissed in its entirety for failure to state a claim upon which relief **\*694** can be granted, the Court need not consider the question of class certification.

## III. *Conclusion*

The Court finds that Debtor has standing to bring his complaint. The Court further finds that Debtor has failed to state a claim upon which relief may be granted with respect to challenging Fairbanks' proof of claim, alleging a violation of the automatic stay, and alleging abuse of the bankruptcy process. As a result, those claims must be dismissed.

An Order in accordance with this Opinion will be entered on this date.

299 B.R. 687

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



United States Court of Appeals,
Fifth Circuit.
In the Matter of Joe Ben COLLEY, Debtor.
Joe Ben COLLEY, Plaintiff-Appellant
v.
NATIONAL BANK OF TEXAS, Defendant-
Appellee.
Joe Ben COLLEY, Plaintiff-Appellant,
v.
WEST TEXAS WHOLESALE SUPPLY, Defendant-
Appellee.
**Nos. 86-1625, 86-1626.**

April 17, 1987.
Rehearing and Rehearing En Banc Denied June 8,
1987.

 Chapter 13 debtor sought review of a bankruptcy court order refusing to reconsider allowance of creditors' proofs of claim.  The United States District Court for the Western District of Texas, James R. Nowlin, J., affirmed, and debtor appealed.    The Court of Appeals, Edith H. Jones, Circuit Judge, held that refusal of bankruptcy court to reconsider its allowance of creditors' proofs of claim was not an abuse of discretion, where debtor's "Motions for Reconsideration" were almost entirely a rehash of his original objections to the claims, debtor did not explicitly or implicitly assert fraud, newly discovered evidence, mistake, inexcusable neglect, or any of the other matters pertinent to a motion for relief from a judgment, and debtor did not even generally assert "cause" for reconsideration.

 Affirmed.

 Opinion on rehearing, 5th Cir., 818 F.2d 443.

West Headnotes

**[1] Bankruptcy** 3765
51k3765 Most Cited Cases
            (Formerly 51k1113)
Court of Appeals had jurisdiction to consider federal district court's affirmance of bankruptcy court order refusing to reconsider allowance of creditors' proofs of claim in debtor's Chapter 13 case.  Bankr.Code, 11 U.S.C.A. § § 502(j), 1301 et seq.; 28 U.S.C.A. § 158(d).

**[2] Bankruptcy** 3784
51k3784 Most Cited Cases
            (Formerly 51k1113)
Refusal of bankruptcy court to reconsider its allowance of creditors' proofs of claim in debtor's Chapter 13 case was reviewed under an abuse of discretion standard.  Bankr.Code, 11 U.S.C.A. § § 502(j), 1301 et seq.; 28 U.S.C.A. § 158(d).

**[3] Bankruptcy** 2932
51k2932 Most Cited Cases
            (Formerly 51k342)
Broad discretion of bankruptcy court to reconsider allowance or disallowance of proof of claim should not encourage parties to avoid usual rules for finality of contested matters.  Rules Bankr.Proc.Rules 3008, 3008 note, 11 U.S.C.A.;  Bankr.Code, 11 U.S.C.A. § 502(j).

**[4] Bankruptcy** 2932
51k2932 Most Cited Cases
            (Formerly 51k342)
When proof of claim has in fact been litigated between parties to bankruptcy proceeding, litigants must seek reconsideration of bankruptcy court's determination pursuant to standards of rule governing relief from judgement or order if litigants elect not to pursue timely appeal of original order allowing or disallowing the claim. Rules Bankr.Proc.Rules 3008, 9024, 11 U.S.C.A.;  Fed.Rules Civ.Proc.Rule 60, 28 U.S.C.A.;  Bankr.Code, 11 U.S.C.A. § 502(j).

**[5] Bankruptcy** 2933
51k2933 Most Cited Cases
            (Formerly 51k1108)
Refusal of bankruptcy court to reconsider its allowance of creditors' proofs of claim in debtor's Chapter 13 case was not an abuse of discretion, where debtor's "Motions for Reconsideration" were almost entirely a rehash of his original objections to the claims, debtor did not explicitly or implicitly assert fraud, newly discovered evidence, mistake, inexcusable neglect, or any of the other matters pertinent to a motion for relief from a judgment, and debtor did not even generally assert "cause" for reconsideration.  Rules Bankr.Proc.Rules 3008, 9024, 11 U.S.C.A.;  Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.;  Bankr.Code, 11 U.S.C.A. § § 502(j), 1301 et seq.
 **\*1009** Eric R. Borsheim, Austin, Tex., for plaintiff-appellant.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

 Baker & Price, Mark S. Summers, Coffee, Goldston & Ponder, Douglas J. Powell and B. Weldon Ponder, Austin, Tex., for defendant-appellee.

 Appeals From the United States District Court for the Western District of Texas.

 Before GEE, REAVLEY, and JONES, Circuit Judges.

 EDITH H. JONES, Circuit Judge:

 These appeals filed by the Chapter 13 debtor challenge the district court's affirmance of a bankruptcy court order refusing to reconsider its allowance of appellees' proofs of claim in Colley's bankruptcy.  The issues being identical, and the facts similar, we dispose of them together and AFFIRM.

 Although old bankruptcy cases, like old soldiers, never die, we shall endeavor to put this one at rest.  The disputes between these creditors and Colley originated in 1980 in a state court action against Colley and a co-debtor Cynthia McBee d/b/a Oak Hills Gun Shop to collect debts owed by them.  McBee almost immediately filed a Chapter 11 bankruptcy proceeding.   The creditors succeeded in winning state court judgments and orders of attachment covering real property owned by Colley on the **\*1010** basis that he had obtained their money under false pretenses.  Tex.Civ.Prac. & Rem.Code § 61.002(9) (Vernon 1986).  Colley thereupon filed for Chapter 13 relief in 1982.  Appellees litigated their respective lien positions on the gun shop inventory, in the McBee bankruptcy, up to the Fifth Circuit.  *In re McBee,* 714 F.2d 1316 (1983).  After eventually resolving this portion of their claims in the *McBee* proceeding, the creditors returned to Colley's bankruptcy and asserted that the remainder of their claims were fully secured by virtue of their attachment liens.  Colley objected to their proofs of claim, questioning the calculations of principal, interest and attorneys' fees asserted by each of the creditors, as well as their rights under the writs of attachment.  On May 16, 1985, following a trial on the merits, the bankruptcy judge rejected Colley's position and allowed the claims of National Bank of Texas and West Texas Wholesale Supply in full.

 Rather than appeal the May 16 orders, Colley filed motions for reconsideration in July, 1985, which were heard by the bankruptcy court in November of that year.  Colley's grounds for reconsideration were not materially different from those contained in his

original objection to the creditors' proofs of claim, [FN1] and the bankruptcy court denied reconsideration.  This appeal followed.

> FN1. The only entirely new issue he raised questioned the interest calculation by NBT, and this information was available from the outset of his objection.

 [1][2] We have jurisdiction to consider the district court's order denying reconsideration pursuant to 28 U.S.C. §  158(d).  See *In re W.F. Hurley, Inc.,* 612 F.2d 392 (8th Cir.1980).  We review the bankruptcy court's ruling on the motion to reconsider under the abuse of discretion standard. *Id.*

 The bankruptcy court has power to reconsider the allowance or disallowance of proofs of claim "for cause".  11 U.S.C. §  502(j);  Bankruptcy Rule 3008.  As the Advisory Committee Note to Bankruptcy Rule 3008 evidences, the bankruptcy court's discretion in deciding whether to reconsider a claim is virtually plenary, as the court may decline to reconsider without a hearing or notice to the parties involved.  If reconsideration is granted, the court may readjust the claim in any fashion "according to the equities of the case." 11 U.S.C. §  502(j).

 [3][4] The court's broad discretion should not, however, encourage parties to avoid the usual rules for finality of contested matters.  Bankruptcy Rule 9024 incorporates Federal Rule of Civil Procedure 60 into all matters governed by the Bankruptcy Rules *except,* inter alia, "the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(b)...."   We interpret Rule 9024 to provide that, when a proof of claim has in fact been litigated between parties to a bankruptcy proceeding, the litigants must seek reconsideration of the bankruptcy court's determination pursuant to the usual Rule 60 standards if they elect not to pursue a timely appeal of the original order allowing or disallowing the claim.  The elaboration of Section 502(j)'s requirement of "cause" for reconsideration by the Rule 60 criteria substantially eliminates the "tension with the right of an appeal from an erroneous final order."  3 Collier on Bankruptcy (15th ed.) ¶  502.10 at 502-107.   See also *In re W.F. Hurley, Inc., supra.*

 [5] In this case, whether the bankruptcy court applied the test embodied in Rule 60(b) in ruling on reconsideration of appellees' claims is not clear.  It is obvious that Colley did not feel himself so bound and

814 F.2d 1008                                                                          Page 3
814 F.2d 1008, Bankr. L. Rep.  P 71,756
**(Cite as: 814 F.2d 1008)**

his "Motions for Reconsideration", as noted, are almost entirely a rehash of his original objections to the claims.   He did not explicitly or implicitly assert fraud, newly discovered evidence, mistake, inexcusable neglect, or any of the other matters pertinent to a Rule 60(b) motion.   He did not even generally assert "cause" for reconsideration under § 502(j).   As Colley did not even get his foot in the door for purposes of **\*1011** reconsideration, the district court was well within its discretion to deny that relief. [FN2]

> FN2. Colley argues in a supplemental brief that the judgments of the bankruptcy court allowing the claims of appellees were not embodied in a separate document as required by Federal Rule of Civil Procedure 58, and Bankruptcy Rule 9021.  He therefore urges us to consider his contest of the claims on the merits.   We do not agree with this contention.   See *InterFirst Bank Dallas v. Federal Deposit Insurance Corp.,* 808 F.2d 1105 (5th Cir.1987).

AFFIRMED.

814 F.2d 1008, Bankr. L. Rep.  P 71,756

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



United States Court of Appeals,
Eleventh Circuit.
In re INTERNATIONAL HORIZONS, INC., et al.,
Debtors,
UNITED STATES of America, Plaintiff-Appellant,
v.
INTERNATIONAL HORIZONS, INC., et al.,
Defendants-Appellees.
No. 84-8068.

Jan. 31, 1985.

 After the United States Bankruptcy Court for the
Northern District of Georgia held the Government's
amended proofs of claim for certain federal corporate
income taxes untimely, the United States District
Court for the Northern District of Georgia, Orinda D.
Evans, J., affirmed, and the Government appealed.
The Court of Appeals, Nichols, Senior Circuit Judge,
sitting by designation, held that:  (1) Government's
amended claim for corporate income taxes was
actually its assertion of a new claim, and thus postbar
date amendment was properly disallowed;  (2) there
was no prior and timely filing of an informal proof of
claim, and thus Government's untimely filing of
amended claim was not excused on that basis;  and
(3) equitable considerations did not support
amendment.

 Affirmed.

West Headnotes

[1] Bankruptcy ⚖2903
51k2903 Most Cited Cases
(Formerly 51k336)
In a bankruptcy case, amendment to a claim is freely
allowed where purpose is to cure defect in claim as
originally filed, to describe claim with greater
particularity or to plead new theory of recovery on
facts set forth in original claim;  however, court must
subject postbar date amendments to careful scrutiny
to assure that there was no attempt to file a new claim
under the guise of amendment.

[2] Bankruptcy ⚖2903
51k2903 Most Cited Cases
(Formerly 51k336)
Government's postbar date amended claim for

corporate income taxes, following original timely
claim for withholding taxes and Federal
Unemployment Tax Act taxes, was actually an
assertion of a new claim, and thus amendment was
properly disallowed. 26 U.S.C.A. § 3301 et seq.

[3] Bankruptcy ⚖2902
51k2902 Most Cited Cases
(Formerly 51k328)
Mere notice of a claim alone is not to be called an
informal proof of claim and does not excuse absence
of proper timely proof.

[4] Bankruptcy ⚖2902
51k2902 Most Cited Cases
(Formerly 51k328)
An informal claim may be asserted, if at all, only
when it is apparent that
creditor intends to seek recovery from estate and
when informal proof of claim is "filed" prior to bar
date.

[5] Bankruptcy ⚖2900(1)
51k2900(1) Most Cited Cases
(Formerly 51k328)
Government's untimely filing of amended claim for
corporate income taxes was not excused on basis that
it had previously and timely filed an informal proof
of claim, where, notwithstanding that Internal
Revenue Service had met with one debtor to discuss
alleged tax liabilities months prior to debtors' filing
for bankruptcy, no mention of potential liability was
made again until notice of deficiency was sent
months past bar date, nothing in record indicated that
debtors or creditors knew that Government intended
to assert corporate income tax claim prior to bar date,
and nothing indicated that interested parties were
aware of claims prior to bar date, the date by which
claims were to be filed.

[6] Bankruptcy ⚖2900(1)
51k2900(1) Most Cited Cases
(Formerly 51k328)
Government was estopped from asserting that a
windfall would befall creditors absent allowance of
its untimely amended claim for corporate income
taxes, notwithstanding that debtors and creditors were
aware of income tax liabilities and acted, at least in
part, based on that knowledge, where Government
had multiple opportunities to assert its claim timely

751 F.2d 1213                                                                                                    Page 2
751 F.2d 1213, 55 A.F.T.R.2d 85-1038, 85-1 USTC  P 9212, 12 Collier Bankr.Cas.2d 91, 12 Bankr.Ct.Dec. 1022,
Bankr. L. Rep.  P 70,245
(Cite as: 751 F.2d 1213)

but did not, it had an opportunity to object to disclosure statement which did not schedule corporate income taxes but did not, and it was aware that reorganization plan described payment only of actual tax liabilities and that plan would be unviable should Government reach and prevail on merits of its tax claim but did not object to plan either in writing or at confirmation hearing.

[7] **Bankruptcy** 🔑2923
51k2923 Most Cited Cases
(Formerly 51k678)
That Chapter 11 reorganization plan provided for litigation of corporate tax claims in Bankruptcy Court did not bar debtors' objections to Government's amended claim for corporate income taxes on grounds of timeliness. Bankr.Code, 11 U.S.C.A. § 1101 et seq.

[8] **Bankruptcy** 🔑2924
51k2924 Most Cited Cases
(Formerly 51k328)
Debtors, by waiting for three months, did not waive their right to object to Government's amended claim for corporate income taxes on grounds of timeliness where Government, through unjustified negligence, had waited 20 months to assert its late claim.
 *1214 Glenn L. Archer, Asst. Atty. Gen., Michael L. Paup, Wynette J. Hewett, Gayle P. Miller, Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

 David G. Bisbee, Robert A. Parker, Jr., Atlanta, Ga., for defendants-appellees.

 Appeal from the United States District Court for the Northern District of Georgia.

 Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS, [FN*] Senior Circuit Judge.

            FN* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

 NICHOLS, Senior Circuit Judge:

 This is an appeal from the judgment of the United States District Court for the Northern District of Georgia affirming the decision of the United States Bankruptcy Court for the Northern District of Georgia which held untimely the United States' amended proofs of claim for certain federal corporate

income taxes.  This court has jurisdiction under 28 U.S.C. § 1293(b).  Appellant contends that the bankruptcy court abused its discretion in holding that the amended claims for corporate income taxes were untimely under the circumstances which shall be presented below.  Finding there was no abuse of discretion, we *affirm*.

Facts

 Appellees International Horizons, Inc. (IHI); International Horizons (Curacao), N.V.;  North American Exports, Inc. (NAE);  and International Horizons, N.V., on March 20, 1981, filed petitions for reorganization pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq.  World of English, N.V. and Communication and Studies International, Ltd., affiliates of the above-mentioned debtors, filed similarly on June 17, 1981, as did Financial Resources, K.K., on February 1, 1982. The proceedings involving these debtors were handled in consolidated form, with the debtors continuing to operate the businesses as debtors-in-possession.

 On June 17, 1981, the bankruptcy court set a bar date by order, filed pursuant to Rule 3001(b)(2)(B) of the Interim Bankruptcy Rules (adopted by the bankruptcy court and the District Court for the Northern District of Georgia as applicable to cases under Chapter 11 of 11 U.S.C.) and notwithstanding the provisions of § § 502 and 1111(a) of Title 11, in which it ordered that creditors desiring to assert claims against debtors were to file proofs of claim on or before August 31, 1981.  It is undisputed that the United States Internal Revenue Service (Service) was sent timely notice of the bar date order.

 On May 18, 1981, and June 29, 1981, the Service filed proofs of claim against NAE asserting claims for withholding taxes and Federal Unemployment Tax Act (FUTA) taxes for three quarterly tax periods of 1980 and 1981 in the amount of approximately $33,000.  On May 18, 1981, the Service also filed a proof of claim against IHI asserting claims for withholding taxes for two quarterly tax periods of 1980 and 1981 for approximately $36,000.

 *1215 Subsequent to the bar date, on December 28, 1981, the Service served upon NAE a notice of deficiency for corporate income taxes in the amounts of $385,539 and $14,886,908 for the 1974 and 1975 tax years respectively.  Prior to the bar date, indeed prior to debtors filing their petitions, the Service and NAE had discussed whether taxpayer NAE's tax

returns were correct at a closing conference for an audit on October 15, 1980.  There was no resolution of the controversy at this October 15 meeting, and NAE was not contacted about the Service's concerns again until the notice of deficiency, more than a year after the closing conference and four months after the bar date.  No corresponding proof of claim for corporate income taxes was filed, nor was an extension for time to file ever requested.

 Following receipt of the notice of deficiency, on January 22, 1983, debtors filed a disclosure statement indicating that they had received a notice of deficiency and intended to "vigorously" contest.  The disclosure statement also described the plan's provision that unfiled claims be cancelled without any payment whatsoever.  Payment of corporate income taxes was never scheduled in the reorganization plan, as the only listing of payment to the government was in the amount of $71,360, the aggregate of the FUTA and withholding taxes.

 November 5 was set by the bankruptcy court as the deadline for filing objections to the disclosure statement;  ballots and objections to confirmation of the reorganization plan were to be filed by December 6, 1982.  The government filed no objections.  Rather, on November 2, prior to the deadline for objections to the disclosure statement and the plan, the Service filed an amended proof of claim asserting a claim against NAE for the withholding and FUTA taxes (stated in the original proof of claim) and a claim for corporate income taxes in the amount of $385,539 and $14,886,908 and interest in the amount of $160,019 and $5,074,124 for the tax years 1974 and 1975 respectively.  On November 18, 1982, the Service filed an amended proof of claim against IHI, asserting the previous claims against IHI and a claim for corporate income tax of $1,719,649 and interest of $81,412 for 1980.  Taken together, the two amended proofs asserted claims of well over $20,000,000, amended on to the original $70,000 claimed.

 Finally, ending the long saga of reorganization negotiations, a hearing on confirmation was held on December 15, 1982.  During this hearing an exchange occurred among the judge, debtors' counsel, and the Service's counsel concerning tax claims.  Of course, appellant and appellees each interpret the meaning of this exchange differently.  The record does show, however, at least that debtors' counsel indicated that the plan would allow for payment of *actual* tax liability as found by the

bankruptcy court, and that the government, which had not actively participated in the almost incessant hearings and conferences which occurred in the 21 months of negotiations leading to the confirmation hearing, was aware that debtors felt they would have to pay no corporate income taxes and that it was unlikely that the debtors could pay those tax claims and other creditors' claims as well.  Still, the government stated that the plan should be confirmed, as it ultimately was.  The debtors filed an objection to the government corporate income tax claims and moved for summary judgment in March 1983;  the government filed a cross-motion.  The bankruptcy court granted debtors' motion in June 1983.

Dispositions Below

 We consider briefly the bankruptcy court's decision here so that we may provide an ample foundation for consideration of any abuse of discretion.

 The bankruptcy court determined that Rule 715 of the Rules of Bankruptcy Procedure, which incorporate Rule 15 of the Federal Rules of Civil Procedure, controls consideration of allowance of pleading amendment, and noted that while amendments should be freely allowed, they are not to be used to assert an entirely new claim.

 ***1216** The court first considered amendment under the traditional view that amendment was allowed only where a new claim was not being asserted and an original timely proof of claim had been filed.  Distinguishing the case principally relied upon by the Service, *Menick v. Hoffman*, 205 F.2d 365 (9th Cir.1953), as of precedential value only in its factual setting in which notice to the individual's business of a claim for withholding taxes also constituted notice to the individual of his income tax liability, the court found that:

> [T]he Service's amendment asserts a new claim-- i.e. a claim not arising out of the same occurrence or transaction as the timely filed proofs of claims filed by the Service in these cases.  To the extent that the Court could find [the Service's prebankruptcy tax actions] constituted notice to the debtors of the Service's claims for corporate income taxes, the Court would hold that notice of the existence of a claim is not sufficient to establish that claim in a bankruptcy proceeding and that a creditor has an affirmative duty to [file] timely a proof of claim.

 The court then undertook a detailed analysis of equitable factors following the analysis of *In re Miss*

751 F.2d 1213, 55 A.F.T.R.2d 85-1038, 85-1 USTC P 9212, 12 Collier Bankr.Cas.2d 91, 12 Bankr.Ct.Dec. 1022, Bankr. L. Rep. P 70,245
**(Cite as: 751 F.2d 1213)**

_Glamour Coat Co.,_ 80-2 U.S.T.C. ¶ 9737 (S.D.N.Y. Oct. 8, 1980), and held that--

> This Court [refuses] to allow the Service to amend its proof of claim. While the debtor and its creditors acted with knowledge of the potential of the IRS's asserting a claim for corporate income taxes in these cases, when balanced against the Service's behaviour, it would not be appropriate to grant the Service leave to amend. The Service has disregarded its internal procedures concerning the filing of proofs of claim for unliquidated or disputed claims and has offered no justification for its failure to act timely. While amendments are to be freely allowed where justice so requires, * * * the Service's unexplained negligence does not present an instance under which justice or fairness requires the allowance of an amendment.

The district court, after a _de novo_ review of the record, adopted in full and affirmed the findings of fact and conclusions of law set forth by the bankruptcy court.

### Discussion

This court reviews the decision of the district court and the bankruptcy court and will reverse only upon finding an abuse of discretion. _Carnegia v. Georgia Higher Education Assistance Corp.,_ 691 F.2d 482, 483 (11th Cir.1982). (Since the district court adopted the decision of the bankruptcy court, we will address ourselves only to the bankruptcy court decision.) Appellant asserts the court's decision below disallowing amendment constitutes an abuse of discretion because the debtors and creditors were aware of the tax liabilities, the amended proof of claim was filed prior to plan confirmation, the plan arguably provided for tax claim litigation on the merits, and because the debtors waited for three months after plan confirmation before objecting to the late claim. We find appellant's contentions uncompelling.

[1] It is well accepted that the bankruptcy court is guided by the principles of equity, and that the court will act to assure that "fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." _Pepper v. Litton,_ 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Thus in a bankruptcy case, amendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim.

_See Szatkowski v. Meade Tool & Die Co.,_ 164 F.2d 228, 230 (6th Cir.1947); _In re G.L. Miller & Co.,_ 45 F.2d 115 (2d Cir.1930). Still, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment. _In the_ _Matter of Commonwealth Corp.,_ 617 F.2d 415, 420 (5th Cir.1980). _See_ *1217_Wheeling Valley Coal Corp. v. Mead,_ 171 F.2d 916, 920 (4th Cir.1949).

Under the traditional view on the appropriateness of amendment that the bankruptcy and district courts first considered, and which was developed interpreting the statutory 6-month bar provision of § 57n of the Bankruptcy Act, 11 U.S.C. § 93(n), amendment is permitted only where the original claim provided notice to the court of the existence, nature, and amount of the claim and that it was the creditors' intent to hold the estate liable. _See Walsh v. Lockhart Associates,_ 339 F.2d 417, 418 (5th Cir.1964). _See also Sun Basin Lumber Co. v. United States,_ 432 F.2d 48, 49 (9th Cir.1970); _Lacoe v. DeLong,_ 65 F.2d 82, 83 (9th Cir.1933). Appellant contends that the court below abused its discretion in applying the facts of this case to the above-mentioned principles, and relies on _Menick v. Hoffman,_ 205 F.2d 365 (9th Cir.1953), a case where the Service was allowed amendment of a withholding tax claim to include an income tax claim.

[2] The court below has considered _Menick_ and we think properly found it confined to its facts. In _Menick,_ a case decided by the ninth circuit and not controlling in this circuit, the bankrupt was an individual, rather than a corporation, and the withholding taxes as to the bankrupt's business had a dual identity of being also income taxes as to the bankrupt individually. In the present case the original claim also was for withholding and FUTA taxes; however the amendment sought to introduce claims based upon nonrecognition of a transaction under 26 U.S.C. § 351, controversy over business deductions, and disqualification of NAE as a domestic international sales corporation (DISC). In _Menick_ the ninth circuit considered that the amendment merely particularized a claim to include taxes of a same generic origin. The bankruptcy court here determined that the amended claims, relating to nonrecognition of a transaction and adjustments premised upon the complex DISC tax provisions, simply did not relate to basic withholding and FUTA taxes. We can find no abuse of discretion in the court's determination that the amended claim was actually an assertion of a new claim. (This court

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

751 F.2d 1213                                                                                                        Page 5
751 F.2d 1213, 55 A.F.T.R.2d 85-1038, 85-1 USTC  P 9212, 12 Collier Bankr.Cas.2d 91, 12 Bankr.Ct.Dec. 1022,
Bankr. L. Rep.  P 70,245
**(Cite as: 751 F.2d 1213)**

neither endorses nor rejects the Ninth Circuit's reasoning in *Menick*, as the facts of that case are not before us.)

Appellant suggests, however, that the circumstances of this case are analogous to those in which the courts have deemed amendment merely a method of perfecting a prior informal proof of claim. Appellant asserts that the debtors, as debtors-in-possession and thus standing in the shoes of a trustee under 11 U.S.C. § 1107, were well aware of the government's claims since they had discussed these tax issues with the Service in 1980. Furthermore, asserts the Service, the disclosure statements noted the Service's notice of deficiency against debtors and the plan called for litigation of tax claims. The bankruptcy court found that the debtors and creditors knew of the potential of the Services' asserting a claim for corporate income taxes against the debtors.

[3][4] The bankruptcy court rightly found that mere notice of a claim alone is not to be called an informal proof of claim and does not excuse the absence of a proper timely proof as the law requires. An informal claim may be asserted, if it can be at all, only when it is apparent that the creditor intends to seek recovery from the estate and when the informal proof of claim is "filed" prior to the bar date. *See Wilkens v. Simon Brothers, Inc., 731 F.2d 462, 465 (7th Cir.1984)* ("The general rule is that a claim arises where the creditor evidences an intent to assert its claim against the debtor. Mere knowledge of the existence of the claim by the debtor, trustee or bankruptcy court is insufficient").

[5] Here the Service met with NAE to discuss alleged tax liabilities months prior to debtors filing for bankruptcy. No mention of the potential liability was made again until a notice of deficiency was sent months past the bar date. Nothing in the record indicates that the debtors or creditors knew that the government intended to assert a corporate income tax claim prior to **\*1218** the bar date. While it is true that the creditors and debtors were aware of the Service's claims prior to plan confirmation, nothing in the record indicates that the interested parties were aware of the claims prior to the bar date, the date by which claims were to be filed.

The informal proof of claim as a minimum must furnish the information that a formal claim would give. This includes the fact the claimant has what it believes to be legal claim for money owing. In the tax context, after audit of income tax returns, such

notice is given in a notice of deficiency. We may suppose, *arguendo,* that a notice of deficiency, known to the trustee, before the cut-off date, would have some claim to be regarded as an informal proof of claim in the bankruptcy. Here there was no notice of deficiency until too late. After an audit, and after discussions of tax liability by the taxpayer with the auditor and perhaps other Treasury officials, but before notice of deficiency, Treasury is sending an ambiguous message. Its silence may say that on review it has failed to find the right to collect taxes so obvious and clear as the auditor said. It may say the matter is still under study. It does not say taxpayer is exonerated. It does not say taxpayer is liable and owes money in all events.

Such an ambiguous message would to the ordinary mind become a little less ambiguous as a greater length of time passed in silence. The message is strengthened that Treasury's right to collect a deficiency is found not as clear as originally supposed. The message is weakened that Treasury is just perfecting the details of its claims. It is clear that until notice, or until limitations run, taxpayer is not justified in disregarding any possible contingent tax liability in determining its financial condition. None of this adds up to an informal proof of claim. Thus, the Service has not shown sufficient facts from which we may conclude that the court abused its discretion in finding that no informal proof of claim was filed. *Cf. Evanston Motor Co. v. First National Bank of Lincolnwood, 735 F.2d 1029 (7th Cir.1984)* (cases accepting that an assertion of a claim against a trustee is equivalent to filing with the court, and is thus an informal proof of claim, are based on law superseded by Bankruptcy Rule 509(c) and Interim Bankruptcy Rule 3001 and are no longer applicable).

Finally, appellant asserts that the court abused its discretion when balancing the factors enunciated in *Miss Glamour Coats supra,* which held in a case of similar circumstances that the court should consider (1) whether the debtors and creditors relied upon the Service's earlier proofs of claim or whether they had reason to know that subsequent proofs of claim would be filed pending the completion of an audit; (2) whether other creditors would receive a windfall by the court's refusing to allow amendment; (3) whether the Service intentionally or negligently delayed in filing its proof of claim stating the amount of corporate tax due; (4) the justification for failure of the Service to file for a timely extension to the bar date; and (5) whether equity requires consideration of any other factors. The Service concedes that it

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

751 F.2d 1213, 55 A.F.T.R.2d 85-1038, 85-1 USTC  P 9212, 12 Collier Bankr.Cas.2d 91, 12 Bankr.Ct.Dec. 1022, Bankr. L. Rep.  P 70,245
**(Cite as: 751 F.2d 1213)**

was negligence not to request an extension for its time to file a proof of claim, as indeed its regulations require.   The Service proffers no justification. Yet the government suggests that other equitable factors exist which strongly support amendment.

[6]  The bankruptcy court considered the *Miss Glamour Coat* factors in detail.   It found that the debtors and creditors were aware of the income tax liabilities and acted, at least in part, based on that knowledge.   Still the court found that the creditors would not receive a windfall if the tax claim was barred.   The government had multiple opportunities to assert its claim timely;  it did not.     It had opportunity to object to the disclosure statement which did not schedule corporate income taxes;  it did not.   It was aware that the reorganization plan described payment only of *actual* tax liabilities and that the plan would be unviable should the government reach and prevail on the merits of its tax claim.     Yet it did not object to the plan either in writing **\*1219** or at the confirmation hearing.   The bankruptcy court held that given the above behavior, the Service was estopped from asserting that a windfall would befall creditors absent the tax claims. We can find no abuse of discretion in the court's equitable    consideration    of    the    Service's reorganization posture.

[7][8] Finally, the government claims as an equitable factor that the plan provided for litigation of the tax claims in bankruptcy court, that the plan binds the debtors, and that debtors waived the right to object to the claim by allowing the plan to go through confirmation.    We find that the plan provision allowing for litigation of tax claims did not bar objections to claims on the grounds of timeliness. The plan discloses payments only of timely claims and the discussion of the plan given by appellees' counsel at the confirmation hearing was a mere summary not intended to give detailed analysis of specific claims.     The government's somewhat paradoxical argument that appellees have waived their right to object by waiting for three months, when appellant, through unjustified negligence, waited 20 months to assert its late claim, is singularly unappealing.

Conclusion
 The court below provided a detailed analysis of the facts and correctly related them to the applicable law. The government concedes that it is to receive no special consideration in determination of its late claims.    Here the Service acted negligently and

without justification.   It was given every chance to assert its rights, yet failed to until the eve of confirmation. Aware that debtors plan was unviable should its claims prevail, the Service still argued that the plan be confirmed.   The weighing of equities is within the province of the courts below and their judgment is to be reversed only when an abuse of discretion occurred.   Having considered appellant's arguments, the record, and the decisions below, we find no abuse of discretion.

 AFFIRMED.

 751 F.2d 1213, 55 A.F.T.R.2d 85-1038, 85-1 USTC P  9212,  12  Collier  Bankr.Cas.2d  91,  12 Bankr.Ct.Dec. 1022, Bankr. L. Rep.  P 70,245

END OF DOCUMENT



▷
United States Bankruptcy Court, M.D. Florida,
Jacksonville Division.
In re NORRIS GRAIN COMPANY, Detroit HC,
Inc., and Olympia Stadium Corporation,
Debtors.
NORRIS GRAIN COMPANY, Detroit HC, Inc., and
Olympia Stadium Corporation,
Plaintiffs,
v.
UNITED STATES of America, Defendant.
**Nos. 85-218-BK-J-GP, 85-231-BK-J-GP and 85-
232-BK-J-GP.
Adv. No. 86-314.**

Dec. 3, 1987.

 Chapter 11 debtors filed complaint against IRS to determine debtors' federal tax liability and to obtain adjudication of objections to IRS's proofs of claim. The Bankruptcy Court, George L. Proctor, J., held that:  (1) IRS's amended claim for $1,690,026 in unpaid 1984 taxes, a claim which was filed after claim bar date, did not arise out of same transaction as original, timely filed claim for $365.75 for interest based upon late payment of 1984 taxes, and amended claim would accordingly not be allowed;  (2) amendment would not be allowed under balancing of equities test;  but (3) IRS was entitled to extension of time with respect to filing claim for 1985 taxes.

 Claims allowed in part and disallowed in part.

West Headnotes

**[1] Bankruptcy** ☞2899
51k2899 Most Cited Cases
Bar date for filing proofs of claim in Chapter 11 cases is mechanism intended by Congress to provide debtor and its creditors with finality.  Bankr.Code, 11 U.S.C.A. § 1101 et seq.

**[2] Bankruptcy** ☞2900(1)
51k2900(1) Most Cited Cases
Congressional goal of finality precludes bankruptcy courts from finding exceptions to claim bar dates in supposed interest of equity.

**[3] Bankruptcy** ☞2899
51k2899 Most Cited Cases
IRS's amended claim of $1,690,026 for unpaid 1984

income taxes, a claim which was filed after claim bar date set in Chapter 11 case, did not arise out of same transaction as original, timely filed IRS claim for $365.75 for interest based upon late payment of 1984 taxes, and amendment of claim accordingly would not be permitted.  Bankr.Code, 11 U.S.C.A. § 1101 et seq.

**[4] Bankruptcy** ☞2903
51k2903 Most Cited Cases
Balancing of the equities test to determine whether postbar date amendment of claim should be allowed would not warrant permitting IRS amendment of proof of claim for $1,690,026 for unpaid 1984 tax liability, filed after claim bar date, to expand original IRS claim of $365.75 for interest based upon late payment of 1984 taxes;  original, timely filed interest claim did not provide notice that subsequent claim for unpaid taxes would be forthcoming, amended claim was not reasonably within amount of original claim, evidence indicated breakdown in IRS's internal procedures, rather than insufficiency of time, was reason for late filing of amended claim, and IRS failed to timely move for extension of time in which to file amended claim.

**[5] Bankruptcy** ☞2902
51k2902 Most Cited Cases
Informal proof of claim doctrine did not warrant permitting IRS to assert claim for $1,690,026 for unpaid 1984 taxes, a claim which was filed after claim bar date, where IRS had not filed any paper before bar date indicating intention to hold debtor liable for unpaid 1984 taxes.

**[6] Bankruptcy** ☞2903
51k2903 Most Cited Cases
Whether creditors would receive windfall to which they were not entitled if amendment to IRS proof of claim that was filed after claim bar date was not allowed was inappropriate factor to consider in deciding whether to permit untimely amendment.

**[7] Bankruptcy** ☞2903
51k2903 Most Cited Cases
IRS was not entitled to extension of time in which to file amended claim under doctrine of excusable neglect, where failure of IRS to file timely claim was due to its own internal problems.

**[8] Bankruptcy** ☞2900(1)

81 B.R. 103                                                                                          Page 2
81 B.R. 103
**(Cite as: 81 B.R. 103)**

51k2900(1) Most Cited Cases
Extension of time for filing proofs of claim cannot be
granted unless creditor can show excusable neglect.

**[9] Bankruptcy ⚖️2900(1)**
51k2900(1) Most Cited Cases
IRS was entitled to extension of time for filing claim
for 1985 taxes; debtors filed application in 1985 for
extension of time in which to file 1985 tax return and
indicated tentative tax due of zero, and IRS relied
upon debtors' assertion that no tax would be due for
1985 in failing to file claim for 1985 taxes, so failure
of IRS to file timely claim for 1985 taxes was result
of excusable neglect, and claim for 1985 taxes filed
after claim bar date would be deemed timely filed.

   **\*105** James H. Post, Jacksonville, Fla., for plaintiffs.

  Richard F. Mitchell, Washington, D.C., for
defendant.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW

  GEORGE L. PROCTOR, Bankruptcy Judge.

  On September 25, 1986, the debtors filed a
complaint against the Internal Revenue Service of the
United States of America (the "IRS") to determine
the debtors' federal tax liability and for adjudication
of objections to defendant's proofs of claims.   On
April 9, 1987, the IRS filed a motion for an
enlargement of time in which to file a claim for 1985
income taxes. Pursuant to an order of this Court, the
IRS motion was consolidated with this adversary
proceeding for purposes of discovery and trial.    A
trial was held on October 7, 1987, and the Court
having considered the evidence and the arguments,
finds as follows:

Findings of Fact
 1. On November 5, 1984, the debtors filed a
consolidated income tax return for the year ending
February, 1984, showing a total tax due of $391,533,
which was paid by the debtors.

 2. On March 25, 1985, Norris Grain Company
("NGC") filed a petition for reorganization under
Chapter 11 of Title 11 of the United States Code.

 3. On March 27, 1985, Detroit HC, Inc. ("Detroit
HC") and Olympia Stadium Corporation ("Olympia")
filed petitions for reorganization under Chapter 11.

 4. On March 28, 1985, the debtors sent a notice of
their Chapter 11 filings to the attention of the Special

Procedures Unit of the IRS in Jacksonville, Florida.
The Special Procedures Unit is a department of the
IRS responsible for filing proofs of claim on behalf
of the IRS in these Chapter 11 cases.

 5. On April 3, 1985, this Court established July 23,
1985, as the bar date for filing claims against NGC
and July 25, 1985, as the bar date for filing claims
against Detroit HC and Olympia.

 6. In April, 1985, the IRS received notice of the bar
dates.

 7. On May 1, 1985, the debtors filed an application
for an extension of time until November 15, 1985, for
filing their consolidated income tax return for the
year ending February 1985.   In the application, the
debtors listed the tentative amount of tax due as zero.
In reliance upon the application, the IRS did not file a
claim prior to the bar date with respect to the debtors'
1985 income taxes.

 8. On May 14, 1985, the debtors, after having their
1984 income tax return reviewed by their tax
attorneys, filed an amended 1984 income tax return
with the IRS Service Center in Atlanta, Georgia.
The amended 1984 return indicated an unpaid tax
liability in the amount of $1,690,026.   The debtors
also forwarded a copy of the amended 1984 return to
the Special Procedures Unit in Jacksonville, Florida.

 9. On May 31, 1985, the IRS filed Claim No. 2 in the
case of NGC, Case No. 85-218-BK-J-GP, in the
amount of $365.75 for interest which arose upon the
debtors' failure to timely pay the 1984 income taxes
reported in its original 1984 return.   The IRS did not
conduct any further examinations prior to the bar
date regarding the need to file additional proofs of claim
in the NGC case.

 10. On July 12, 1985, the IRS filed Claim No. 8A in
the estimated amount of $1,155.63 in the case of
Olympia, Case No. 85-232-BK-J-GP.    This claim
was later withdrawn by the IRS.

 11. On July 29, 1985, the IRS filed Claim No. 2 in
the estimated amount of  $165,732.49 in the case of
Detroit HC, Case No. 85-231-BK-J-GP.   The same
claim was also docketed as Claim No. 14 in the case
of NGC, Case No. 85- 218BK-J-GP.   The IRS stated
at trial that both of these claims had been withdrawn.

 12. On November 14, 1985, the debtors filed their
consolidated income tax return for the year ending
February, 1985, showing a total tax due of $573,038.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**\*106** 13. On November 26, 1985, the IRS, relying upon the debtors' 1985 income tax return, filed Claim No. 18 in the case of NGC, Case No. 85-218- BK-J-GP, asserting a claim in the amount of $573,038 for 1985 income taxes.

14. On December 19, 1985, six months after the bar date, the IRS, relying upon the debtors' 1984 amended income tax return, filed Claim No. 20 in the case of NGC, Case No. 85-218-BK-J-GP, asserting a claim in the amount of $1,690,026 for unpaid 1984 income taxes.   This claim, which was based upon the debtors' 1984 amended income tax return filed over seven months earlier, was the first in which the IRS asserted a claim for 1984 income taxes.

15. On January 15, 1986, the debtors filed a second amended 1984 income tax return which reduced its tax liability to $1,673,458.    The debtors mailed a copy of the second amended 1984 return to the Special Procedures Unit in Jacksonville, Florida.

16. On July 16, 1986, the debtors' Second Amended Consolidated Plan of Reorganization (the "Plan") was confirmed.   The Plan provided for the full payment of all allowed claims.    The debtors have paid all allowed claims in full except those creditors, such as retirees, who were to be paid over an extended period of time.

17. On August 15, 1986, the debtors filed objections to the proofs of claim filed by the IRS.

18. On September 25, 1986, the debtors filed a complaint to determine their federal tax liability and their objections to the IRS claims on the grounds that the claims were untimely.

19. On April 19, 1987, the IRS filed a motion for an enlargement of time in which to file a claim for 1985 income taxes.

Conclusions of Law

[1] 1. The bar date for filing proofs of claim in Chapter 11 cases is a mechanism intended by Congress to provide the debtor and its creditors with "finality."   *See e.g.,* *In re Chicago Rock Island and Pacific RR Co.,* 788 F.2d 1280 (7th Cir.1986);   and *Hoos & Co. v. Dynamics Corp. of America,* 570 F.2d 433, 439 (2d Cir.1978).   For this reason, courts look upon the bar date as being:

[in] the nature of a statute of limitations [which] must be strictly observed.

*In re Kay Homes Inc.,* 57 B.R. 967, 971 (Bkrtcy.S.D.Tex.1986).

[2] The congressional goal of finality precludes the Bankruptcy Courts from "finding exceptions to these rules in the supposed interest of equity."   *Hoos & Co.,* 570 F.2d at 439;   *See also,* *In re Pigott,* 684 F.2d 239, 243 (3rd Cir.1982);   *In re Evanston Motor Co., Inc.,* 26 B.R. 998, 1005 (N.D.Ill.1983), *aff'd,* 735 F.2d 1029 (7th Cir.1984).   Thus, although aware that a bar date, like other limitation periods, would inevitably cause hardship on those who failed to act timely, Congress decided that the goal of finality is of greater benefit to the public than any benefit derived from allowing individual exceptions to the bar date. *Hoos & Co.,* 570 F.2d at 439;   *In re Stern,* 70 B.R. 472, 476 (Bkrtcy.E.D.Pa.1987).

[3] 2. Nevertheless, amendment to a claim is often allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim. *See,* *Szatkowski v. Meade Toole & Die Co.,* 164 F.2d 228, 230 (6th Cir.1947);   *In re G.L. Miller & Co.,* 45 F.2d 115 (2d Cir.1930).   However, the courts must still subject such amendments to a careful inspection. Says the Eleventh Circuit:

[C]ourt[s] must subject post bar date amendments to careful scrutiny to assure that there [is] no attempt to file a new claim under the guise of amendment.

*In re International Horizons,* 751 F.2d 1213 (11th Cir.1985).

3. Under the traditional analysis, the factor most often considered is whether the "amended" claim arose out of the same transaction or occurrence set forth in the original timely filed claim.    *See,* *In re AM International, Inc.,* 67 B.R. 79,82 (N.D.Ill.1986); *In re Hunt,* 59 B.R. 718 (Bkrtcy.D.Me.1986);   **\*107***In re Sapienza,* 27 B.R. 526 (Bkrtcy.W.D.N.Y.1983); and *In re Overly Hautz Co.,* 57 B.R. 932, 936 (Bkrtcy.N.D.Ohio 1986).     Other courts have expanded this notion and have allowed amendments to tax claims where the tax claims were of the "same genre" as the original claims or where the original and amended claims were both "within the matrix of an indebtedness due the federal government in their revenue collection function."    *See,* *Menick v. Hoffman,* 205 F.2d 365 (9th Cir.1953);   *In re Emerald Green Corp.,* 2 B.C.D. 938 (Bkrtcy.E.D.N.Y.1976);    *In re Midwest Teleproductions Co., Inc.,* 69 B.R. 675 (Bkrtcy.N.D.Ohio 1987).

4. Applying the traditional test to the case at bar, it is quite clear that the amended claim for $1,690,026 in income taxes is substantially different than the $365.75 claim for interest based upon the debtors' late payment of $391,533 of 1984 income taxes. One claim is for accrued interest while the other asserts a claim for unpaid corporate income taxes. Indeed, it is also worth noting that a taxpayer's liability for interest on late payment of income taxes and a taxpayer's liability for unpaid taxes arise out of separate statutory provisions of the Internal Revenue Code. [FN1] Upon this premise, the Court finds that the amended claim does not arise out of the same transaction as the original claim and is in fact an assertion of a new claim.

> FN1. Income taxes imposed upon corporations arise under I.R.C. § 11 (Supp.1987), whereas interest for the late payment of taxes is derived I.R.C. § 6601 (Supp.1987).

[4] 5. The government has argued that this Court ought to apply the more liberal standard espoused in cases such as *In re Miss Glamour Coat Co.,* 80-2 USTC ¶ 9737 (S.D.N.Y.1980), where the court suggested that a "balancing of the equities test" ought to be applied to allow a post-bar date amendment. Under that test, the factors which the Court would look to are:

(1) whether the debtor and creditors relied upon the IRS's earlier proofs of claim or whether they had reason to know that subsequent proofs of claim would follow;

(2) whether the other creditors would receive a windfall to which they are not entitled on the merits by the Court not allowing this amendment to the IRS proof of claim;

(3) whether the IRS intentionally or negligently delayed in filing the proof of claim stating the amount of corporate taxes due;

(4) the justification, if any, for the failure of the IRS to file for a time extension for the submission of further proofs of claim; and

(5) whether or not there are any other considerations which should be taken into account in assuring a just and equitable result.

Without deciding that the "balancing of the equities test" is the appropriate standard to be applied, the Court will indulge in argument and will discuss these factors as they relate to the amended claim filed by the IRS.

6. Applying the first factor, the Court finds that the

original $365.75 interest claim did not provide notice to the Court or any interested party that a subsequent claim for unpaid income taxes would be forthcoming. In fact, the original claim affirmatively states that the "Tax Due" from the debtors for their 1984 income taxes was "None." This provides little, if any, notice of a possible amendment.

Another factor often considered in determining whether there was notice of a possible amendment is whether the amendment is reasonably related to the amount stated in the original claim.

> Ordinarily, to be within the scope of a permissible amendment, the second claim should not only be of the same nature as the first *but also within the amount to which the first claim provides Notice.*

*In re AM International, Inc.,* 67 B.R. 78, 82 (N.D.Ill.1986). On this issue, the Court finds that the $1,690,026 IRS amendment is not reasonably within the amount of the original $365.75 claim. In fact, the "amended" claim of $1,690,026 seeks an increase of some 6,188 percent.

**\*108** [5] As an alternative to this argument, the IRS asserts that the amendment ought to be allowed under the "informal proof of claim doctrine." Under this doctrine, the Bankruptcy Court may accept an informal, amendable claim, if that informal claim apprises the Court of the creditor's intention to hold the debtor liable. Here, the creditor has not filed any such paper prior to the bar date which evidences an intention to hold the debtor liable for unpaid income taxes. Accordingly, the Court cannot allow an amendment to the IRS proof of claim under this doctrine.

[6] 7. The second factor announced in *Miss Glamour Coat* is whether the other creditors would receive a windfall to which they are not entitled as a result of the Court not allowing this amendment to the IRS proof of claim. The Court finds this factor to be inappropriate in deciding whether to permit the untimely amendment, for not only does such an analysis involve undue speculation, it also does nothing to promote the legislative goal of finality.

8. The third and fourth factors concern whether the creditor itself is at fault in failing to file a timely claim. As reflected in *Miss Glamour Coat,* courts have generally refused to grant relief where the creditor's own internal procedures are the cause of its failure to file timely proofs of claim. As the Eleventh Circuit stated in a related case:

> This Court [refuses] to allow the Service to amend its proof of claim.... While amendments are to be

freely allowed where justice so requires ... the Service's unexplained negligence does not present an instance under which justice or fairness require the allowance of an amendment.
*International Horizons,* 751 F.2d at 1216.

In this case, the IRS could have filed a timely claim with respect to the 1984 income taxes because it had received the debtors' amended tax return over two months prior to the bar date.  Moreover, not only did the debtors file their amended income tax return with the Service Center in Atlanta, they also mailed a copy of it directly to the IRS Special Procedures Unit in Jacksonville, which was the department responsible for filing proofs of claim.  Under these circumstances, it is difficult to find justification for the IRS having failed to file a claim in a timely fashion.  Had this been a private claimant, most courts would find two months a sufficient time in which to file a claim.

The excuse offered by the IRS for its failure to file a timely claim was that the IRS Service Center in Atlanta was unable to timely "process" the amended tax return within the two months before the bar date because it is overwhelmed with an immense workload.  In addition, the IRS argues that the Special Procedures Division did not receive, or at least has no record of receiving, a copy of the amended tax return.  For the reasons discussed, the Court finds these excuses insufficient both factually and legally.

First, it has long been held that where a litigant's own internal procedures are the cause of the failure to comply with proper legal procedures, courts should generally refuse to grant relief from the consequences of the lack of compliance.  *In re Saltzmann,* 25 B.R. 125, 128 (Bkrtcy.E.D.Wis.1982).  In this regard, the IRS "is to receive no special consideration in determination of its late claims."  *In re International Horizons, Inc., supra* at 1219.  In this case, all the evidence tends to point to a breakdown in the IRS' internal procedures rather than an insufficiency of time.  To permit the IRS to now file an amended claim would be inequitable. [FN2]

> FN2. It should also be noted that, although the IRS contends that two months was an insufficient amount of time to have filed a claim in response to the debtors' amended return for 1984, the same amount of time was apparently sufficient for the IRS to review the debtors' application for extension to file its 1985 income taxes and decide that

a claim for the 1985 taxes need not be filed prior to the bar date.

[7] The Court also finds as influential the fact that the IRS failed to timely move for an extension of time in which to file an amended claim.  The only request for such **109** an extension was made at trial and, for the same reasons that the amendment was denied, the Court will deny the IRS's request for an extension of time.

[8] An extension of time for the filing of proofs of claim cannot be granted unless a creditor can show "excusable neglect."  "Excusable neglect" requires a showing that the creditor's failure to timely file a proof of claim was due to circumstances beyond its reasonable control.  *In re South Atlantic Financial Corp.,* 767 F.2d 814 (11th Cir.1985).

> The Army bases its claim of excusable neglect on its own cumbersome internal procedures.  Delay resulting from a breakdown in a creditor's internal procedures, however, does not constitute excusable neglect within the meaning of Rule 9006(b)(2).
> *In re Century Brass Products,* 72 B.R. 68, 10 (Bkrtcy.D.Conn.1987).

Thus, because the failure of the IRS to file a timely claim was due to its own internal problems, it is not entitled to an extension of time to file its claim for 1984 taxes under the doctrine of "excusable neglect."

As for the second reason offered, the Court finds the testimony of the IRS representative is insufficient.  Specifically, the testimony that the IRS Special Procedures Division had no record of having received the debtors' amended tax return was negated by the admission that the amended tax return could have been simply lost or mishandled.  Thus, the Court finds no reason to justify the allowance of an amended claim on these grounds.

Finally, the Court in *Miss Glamour Coat* suggest a consideration of other factors which may justify the allowance of an untimely amendment to a proof of claim.  Having found none, the Court will stand by its decision disallowing the IRS amendment to its proof of claim.

[9] Separate from its claim for unpaid 1984 income taxes, the IRS has also moved for an extension of time with regard to filing a claim for 1985 taxes.  Here, the Court finds that the underlying facts warrant such an extension. This is based upon the testimony which revealed that the debtors filed an application in 1985 for an extension of time in which

81 B.R. 103
**(Cite as: 81 B.R. 103)**

to file its 1985 tax return and indicated a tentative tax due of zero.   The IRS, in failing to file a claim for 1985 income taxes, relied upon the debtors' assertion that no tax would be due for 1985.   Accordingly, the Court finds the failure of the IRS to file a timely claim for the 1985 income taxes was the result of excusable neglect and the IRS claim for $573,038 for 1985 income taxes is deemed to have been timely filed.

 The Court will enter a final judgment in accordance with these Findings of Fact and Conclusions of Law.

 81 B.R. 103

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



▷

United States Bankruptcy Court, E.D. Missouri,
Eastern Division.
In the Matter of INTERCO INCORPORATED, et al.,
Debtors.
In re INTERCO INCORPORATED, Sky City Stores,
Inc.
**Bankruptcy Nos. 91-40441-172, 91-40470-172.**

Jan. 27, 1993.

Chapter 11 debtors objected to proofs of claim filed by lessors and guarantors of nonresidential real property leases rejected by debtors.  The Bankruptcy Court, James J. Barta, J., held that:  (1) late filed claims by lessors under leases rejected by Chapter 11 debtors for rejection damages could not be construed as amendments to timely filed proofs of claim for rent or taxes and maintenance;  (2) copies of guarantees attached by lessors to proofs of claim they filed against debtor-lessee served as "informal proofs of claim," which were capable of amendment, against debtor-guarantor, in jointly administered cases;  (3) those lessors which did not attach copy of guarantees by debtor guarantor did not file "informal proofs of claim" against debtor guarantor; and (4) Bankruptcy Code's cap on damages for claims resulting from termination of lease also applies to guarantors of leases.

Objections sustained in part and overruled in part.

See also 143 B.R. 707.

West Headnotes

**[1] Bankruptcy** 🔑2903
51k2903 Most Cited Cases
Late filed claims by lessors for rejection damages under leases rejected by Chapter 11 debtors, asserting damages under different sections of Bankruptcy Code and alleging much greater damages, could not be construed as amendments to timely filed proofs of claim for rent or taxes and maintenance. Bankr.Code,
11 U.S.C.A. § § 501, 502, 502(b)(6), 503(b)(1)(A),
507(a)(1).

**[2] Bankruptcy** 🔑2903
51k2903 Most Cited Cases
In certain circumstances it is appropriate to allow late

filed claims as amendments to timely filed claims.

**[3] Bankruptcy** 🔑2902
51k2902 Most Cited Cases
Copies of guarantees attached by lessors to proofs of claim filed against Chapter 11 debtor-lessee served as "informal proofs of claim," which were capable of amendment, against Chapter 11 debtor-guarantor, in jointly administered cases;  guarantees clearly showed that debtor-guarantor was guarantor of leases in question, debtors admittedly mailed preprinted proof of claim forms only for debtor-lessee's case and did not include proof of claim forms for case of debtor-guarantor, and both debtors were represented by counsel from same law firm.

**[4] Bankruptcy** 🔑2903
51k2903 Most Cited Cases
Before bankruptcy court may allow amendment of proof of claim, record must show that within statutory period claim had either formally or informally disclosed facts showing assertion of claim against estate and intention by claimant to share in its assets.

**[5] Bankruptcy** 🔑2902
51k2902 Most Cited Cases
Lessors, which made a number of attachments to claims relating to rejection of lease filed in case of Chapter 11 debtor-lessee, but which did not attach copy of guarantees by Chapter 11 debtor-guarantor, did not file "informal proofs of claim" against debtor-guarantor, in jointly administered cases;  none of attachments indicated that they had claims against debtor-guarantor or intended to assert claims against debtor-guarantor.

**[6] Bankruptcy** 🔑2834
51k2834 Most Cited Cases
Bankruptcy Code provision limiting claims by lessors for damages resulting from termination of lease also cap damages recoverable by lessor from debtor-guarantor of lease, rather than applying only to damages against debtor-
lessee. Bankr.Code, 11 U.S.C.A. § 502(b)(6).
 ***935** Bryan, Cave, McPheeters & McRoberts, Gregory D. Willard, Lloyd A. Palans, John C. Boyle, Carl J. Spector, St. Louis, MO, for debtors-in-possession.

Jean Winborne Boyles, Raleigh, NC, for Claimants

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

CASA MADRE Partnership, Ltd.

Randall F. Scherck, Lashly & Baer, P.C., St. Louis, MO, for claimant.

MEMORANDUM

JAMES J. BARTA, Bankruptcy Judge.

At Saint Louis, in this District, this 27th day of January, 1993.

This Memorandum addresses the Objection to Proofs of Claim filed by Interco Incorporated and Sky City Stores, Inc., objecting to claims asserted by Mullins Shopping Center Partnership Ltd., CASA Madre Partnership Ltd., Center Associates, Saluda Square and Edisto Village Partners-83 (Claim Objection # 99). This Memorandum also addresses the Motion to Allow Amended Claim filed by Claimant Saluda Square (Motion Z-146).

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § § 157 and 1334, 11 U.S.C. § § 105 and 502, Rule 3007 of the Federal Rules of Bankruptcy Procedure and Local District Court Rule 29. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

I. *Background*

Certain facts and circumstances are pertinent to all of the claims and claimants, and certain facts are different with respect to each claimant. The following facts apply to each of the claims and claimants.

On January 24, 1991, Interco Incorporated ("Interco") and thirty affiliated entities, including Sky City Stores, Inc. ("Sky City") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code. On January 25, 1991, this Court entered an "Order Authorizing Joint Administration" in which this Court ordered that the Chapter 11 cases of the thirty-one entities "shall be jointly administered and are hereby consolidated for procedural purposes only." The Court further ordered that "[n]othing herein contained shall constitute or be deemed to constitute the substantive consolidation of Debtors' estates." *Order Authorizing Joint Administration,* January 25, 1991, p. 2. Throughout these proceedings, all the Debtor entities have been represented by the same law firm. See *Stipulation of Facts,* filed July 20, 1992, p. 1.

Debtors have continued in possession of their property and operated and managed their businesses as debtors-in-possession, pursuant to 11 U.S.C. § § 1107 and 1108. On June 26, 1992, this Court confirmed the Debtors' Amended Joint Plan of Reorganization (the "Plan").

On April 18, 1991, this Court entered Standing Order # 3, which, among other things, set the last day on which claims could be filed, and established claims processing and objection procedures. Pursuant to Standing Order # 3, July 1, 1991 was "fixed as the last day (the "Bar Date") by which all creditors of the Debtors" must file proofs of claim. *Standing Order # 3,* April 18, 1991, p. 2. Standing Order # 3 also provided that "[a]ny creditor whose claim arises out of the rejection by the Debtor of an executory contract or unexpired lease must file its claim by the later of (i) July 1, 1991; or (ii) within 30 days after the entry of an order approving the rejection." *Id.* at 5.

On and prior to January 24, 1991, (the "Petition Date"), Sky City leased certain real property from each of the Claimants. *Stipulation of Facts,* filed July 20, 1992, p. 2. On March 1, 1991, Debtors Sky City, Interco and Converse, Inc. filed a Motion to Reject Nonresidential Real Property Leases. The Debtors requested this Court to approve the rejection of numerous leases, including all the various leases relevant to this claim objection. *See Motion to Reject Nonresidential Real Property Leases, Revised Exhibit A,* filed March 19, 1991, p. 2. [FN1] **\*936** On March 28, 1991, this Court entered an Order Authorizing Rejection of Nonresidential Real Property Leases.

> FN1. Exhibit A, which was attached to the Motion to Reject, listed T. Cooper James and Associates as the landlord for the Chester Lease. Saluda Square, the Claimant here, is apparently the successor to T. Cooper James and Associates.

Debtors sent a copy of the Order Authorizing Rejection to each of the Claimants, along with preprinted proof of claim forms only for the Sky City estate. The parties' counsel and counsel for Debtors have stated that Debtors did not include preprinted proof of claim forms for the Interco estate with the copies of the Order authorizing rejection.

On June 2, 1992, Debtors filed Claim Objection # 99, objecting to certain claims filed by the Claimants. Debtors asserted that the claims arose from the

March 28, 1991 rejection of certain real property leases by Sky City Stores, Inc, and, because the claims were filed late, they should be not allowed. *Objection to Proofs of Claim # 99,* filed June 2, 1992, p. 2.

The Claimants filed the following responses to Claim Objection # 99: (1) Saluda Square filed a "Response to Debtor's Objection to Claim and Motion to Allow Amended Claim" (Motion Z-146) on June 24, 1992 and "Saluda Square's Memorandum in Opposition to Debtor's Objection to Claim and in Support of Saluda Square's Motion to Allow Amended Claim" on July 27, 1992; (2) Center Associates and Edisto Village Partners-83 filed a "Response" on June 26, 1992 and a "Brief" on July 27, 1992; and (3) CASA Madre Partnership Ltd. and Mullins Shopping Center Partnership Ltd. filed a "Response" on June 26, 1992 and a "Brief" on July 27, 1992.

Debtors filed a Memorandum of Law on July 27, 1992. The parties entered into a Stipulation of Facts, which included fifteen exhibits. On July 30, 1992, this Court heard oral argument from counsel for Debtors, counsel for Saluda Square, counsel for Center Associates and Edisto Village Partners-83, and counsel for CASA Madre Partnership, Ltd. and Mullins Shopping Center Partnership, Ltd. [FN2]

> FN2. One attorney, Jean Winborne Boyles, represents four Claimants: CASA Madre, Mullins, Center Associates and Edisto Village. Saluda Square is represented by a separate attorney: Randall F. Scherck.

The claims of each Claimant in this matter fall into one of three fact patterns. One group of Claimants filed timely proofs of claim against Sky City and subsequently filed late proofs of claim purporting to amend the original timely proofs of claim against Sky City. A second group of Claimants filed timely proofs of claim against the Sky City estate, and included in the exhibits and attachments to the Sky City claims copies of guarantees of leases executed between the various claimants and Interco. This second group of Claimants then filed late claims against Interco. A third group of Claimants filed timely claims against the Sky City estate, but did not include copies of the guarantees of leases among the attachments and exhibits. The third group of Claimants also filed late proofs of claim against Interco. The Court will address these three groups of Claimants separately.

II. *Group One, Late Claims Against Sky City*

A. Center Associates--Raeford, South Carolina
On June 24, 1991, Center Associates filed Proof of Claim No. 3740 against the Sky City estate in the amount of $7,447.91. *Stipulation of Facts,* Exhibit E. Claimant asserted that this claim was for "rent for 2/91" pursuant to "[11 U.S.C.] § 507(a)(1) and § 503(b)(1)(A)."

On September 19, 1991, after the last day to file claims, Center Associates filed Proof of Claim No. 5719 against the Sky City estate. *Stipulation of Facts,* Exhibit H. Claimant asserted that this second proof of claim was filed as an amendment to the previously filed proof of claim. According to Exhibit A to Proof of Claim No. 5719, Center Associates filed the second proof of claim for "STATUTORY REJECTION DAMAGES pursuant to 11 U.S.C. § 502(b)(6)" in the amount of $164,339.48.

*937 B. Center Associates--Clinton, South Carolina
On June 24, 1991, Center Associates filed Proof of Claim No. 3744 against Sky City in the amount of $10,925.39. *Stipulation of Facts,* Exhibit F. Claimant asserted Proof of Claim No. 3744 was for "rent for 2/91" pursuant to "[11 U.S.C.] § 507(a)(1) and § 503(b)(1)(A)." Claimant submitted several attachments, including a copy of the lease.

On September 19, 1991, Center Associates filed Proof of Claim No. 5720 against Sky City and designated Claim No. 5720 as an amendment to a previously filed claim. *Stipulation of Facts,* Exhibit I. Claimant asserted the amount owed by Sky City was $1374.42 plus the amount calculated on Exhibit A to Claim No. 5720: $223,549.05 for "STATUTORY REJECTION DAMAGES pursuant to 11 U.S.C. § 502(b)(6)."

C. Edisto Village Partners-83
On June 24, 1991, Edisto Village Partners-83 ("Edisto Village") filed Proof of Claim No. 3756 against Sky City, together with several attachments including the lease and other amendments and addenda. *Stipulation of Facts,* Exhibit D. Claimant asserted that this claim was for "taxes/maintenance prior to 2/91" pursuant to "[11 U.S.C.] § 507(a)(1) and § 503(b)(1)(A)" in the total amount of $15,152.60. *Stipulation of Facts,* Exhibit D.

On September 19, 1991, Edisto Village filed Proof of Claim No. 5718 against Sky City. *Stipulation of Facts,* Exhibit G. Claimant designated this proof of claim as an amendment to the first timely filed Proof

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

of Claim and asserted the amount owed by Sky City was $14,746.08 plus "attached Exhibit 'A'." In Exhibit A to Proof of Claim No. 5718 Claimant request "STATUTORY REJECTION DAMAGES pursuant to 11 U.S.C. § 502(b)(6)" in the amount of $93,404.52.

### III. *Allowance of Amendments of Claims*

[1][2] The Eighth Circuit has stated that:

"[t]he limitation of time within which proofs of claim should be made must necessarily be observed. Such disposition of bankruptcy cases that creditors may expeditiously realize what they may is important and necessary ..."

*Matter of Donovan Wire & Iron Co.,* 822 F.2d 38, 39 (8th Cir.1987) (quoting *In re Faulkner,* 161 F. 900, 903 (8th Cir.1908)). However, this Circuit has also recognized that in certain circumstances it is appropriate to allow late filed claims as amendments to timely filed claims. *See Id.* and *In re Haugen Const. Services, Inc.,* 876 F.2d 681 (8th Cir.1989).

As a general rule, "amendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim."

*In re Fischer,* 109 B.R. 384, 387 (Bankr.E.D.Mo.1989) (quoting *Int'l Horizons, Inc.,* 751 F.2d 1213, 1216 (11th Cir.1985)), *aff'd,* 131 B.R. 137 (E.D.Mo.1990). "However, many courts have cautioned that post bar date amendments must be scrutinized 'to assure that there [is] no attempt to file a new claim under the guise of an amendment.' " *Id.*

The timely proofs of claim filed by Center Associates and Edisto Village requested allowance under 11 U.S.C. § 507(a)(1) and 503(b)(1)(A) for "rent for 2/91" or "taxes/maintenance prior to 2/91." [FN3] In this matter, the Debtors have not objected to these timely filed proofs of claim. A claim filed under Section 501 is deemed allowed **938 under Section 502 unless a party in interest objects.

FN3. Section 507 provides:
(a) The following expenses and claims have priority in the following order:
(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.
Section 503 provides:
(b) After notice and a hearing, there shall be allowed administrative expenses, other than

claims allowed under section 502(f) of this title, including--
(1)(A) the actual, necessary costs and expenses preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case ...

The second set of proofs of claim filed against Sky City by these Claimants after the last day to file claims, purports to assert claims for rejection of lease damages pursuant to 11 U.S.C. § 502(b)(6). These late proofs of claim are distinctly different from those timely filed claims for rent, maintenance and taxes. The late proofs of claim assert damages under different sections of the Bankruptcy Code and allege much greater damage amounts. Accordingly, this Court must find that the late filed claims cannot be construed as amendments to the timely filed proofs of claim against Sky City.

### IV. *Group Two, Late Claims--Copies of Guarantees as Informal Proofs of Claim*

#### A. Saluda Square

On June 26, 1991, Saluda Square filed Proof of Claim No. 3946 against Sky City. *Stipulation of Facts,* Exhibit A. This claim was in the amount of $165,575.48 and the basis for the claim was described as "Rejection of Lease." Claimant attached an exhibit to the proof of claim which included a "computation of damages," a copy of the guarantee of the lease and a copy of the lease. *Id.* The parties agree Claim No. 3946 was timely filed. *Stipulation of Facts,* p. 3. [FN4]

FN4. Debtor objected to Claim No. 3946, and the parties subsequently stipulated to allowance of the claim in the general, unsecured amount of $70,366.68, which reflected application of the limitations of 11 U.S.C. § 502(b)(6). *See Stipulation of Facts, Exhibit B.*

On April 13, 1992, Saluda Square filed Proof of Claim No. 6005, in the amount of $70,366.68 against Interco. *See Stipulation of Facts, Exhibit C.* Saluda Square alleged the basis for the second proof of claim was Interco's guarantee of the rejected (Chester) lease. Saluda Square indicated this second proof of claim amended and supplemented a claim dated June 25, 1991 (the first proof of claim filed against Sky City). The first proof of claim was attached as an exhibit to the second proof of claim, together with the attachments submitted with the first proof of claim:

the computation of damages, the guarantee of lease, and the lease.

B. CASA Madre Partnership LTD

On June 3, 1991, CASA Madre Partnership LTD ("CASA Madre") filed Proof of Claim No. 2500 against Sky City in the amount of $679,863.52. *Stipulation of Facts,* Exhibit M. CASA Madre attached to the Proof of Claim form a summary of lease rejection damages, a copy of the lease and a copy of the guarantee of lease. [FN5]

> FN5. According to Debtors, Claim No. 2500 is subject to a pending settlement in the amount of $99,401.73.

On November 4, 1991, CASA Madre filed Proof of Claim No. 5796 against Interco in the amount of $679,863.52. *Stipulation of Facts,* Exhibit N. CASA Madre submitted several attachments to Claim No. 5796 including: (1) a summary of the lease rejection damages, (2) an "explanation" (3) copies of letters between counsel for CASA Madre and Interco's legal department and (4) a copy of Proof of Claim No. 2500, together with the attachments originally submitted with that first proof of claim against Sky City.

C. Center Associates--Raeford, South Carolina

As noted above, on June 24, 1991, Center Associates filed Proof of Claim No. 3740 against the Sky City estate in the amount of $7,447.91. *Stipulation of Facts,* Exhibit E. Claimant asserted that this claim was for "rent for 2/91" pursuant to "[11 U.S.C.] § 507(a)(1) and § 503(b)(1)(A)." Center Associates submitted several attachments to Claim No. 3740 including copies of the lease and the guarantee of lease.

On April 2, 1992, Center Associates filed Proof of Claim No. 5996 against the Interco estate in the amount of $1,095,596.52. *Stipulation of Facts,* Exhibit J. Claimant submitted several attachments to Proof of Claim No. 5996 including: (1) a summary of damages (2) a copy of the guarantee of lease and (3) a copy of the lease. Claimant **939** did not include a copy of Proof of Claim No. 3740 (the first proof of claim), nor did Claimant indicate on the proof of claim form that Proof of Claim No. 5996 was intended to be an amendment to Proof of Claim No. 3740. Center Associates did indicate that its claim against Interco was "[s]ubject to credit for any payment on Sky City claim of [$]164,339.47."

V. *Amendment of Claims/Informal Proofs of Claim*

[3][4] The Eighth Circuit has espoused a liberal policy in permitting amendments to proofs of claim in bankruptcy proceedings. *See In re Haugen Construction Services, Inc.,* 876 F.2d 681, 682 (8th Cir.1989) and *Matter of Donovan Wire & Iron Co.,* 822 F.2d 38, 39 (8th Cir.1987). The Court of Appeals for the Eighth Circuit has stated:

"Great liberality in permitting amendments of claims in bankruptcy proceedings is proper, but the statute requiring that a proof of claim in writing be filed is clear, positive and unambiguous and it must not be nullified in the name of equity."

*Matter of Donovan,* 822 F.2d at 39 (quoting *Tarbell v. Crex Carpet Co.,* 90 F.2d 683, 685-86 (8th Cir.1937)). Thus, before this Court can allow an amendment, the record must show that "within the statutory period" the Claimant either formally or informally "disclosed facts showing an assertion of a claim against the estate and an intention by the claimant to share in its assets ..." *Id.* [FN6]

> FN6. Some courts have followed a three-prong test to determine whether a document constitutes an informal proof of claim. Under this three-prong test, the "document must state an explicit demand showing (1) the nature of the claim, (2) the amount of the claim against the estate and (3) must evidence an intent to hold debtor liable." *In re Nucorp Energy, Inc.,* 52 B.R. 843, 845 (Bankr.S.D.Calif.1985).

Saluda Square, CASA Madre and Center Associates assert that the copies of the guarantees they attached to the proofs of claim against Sky City should serve as informal proofs of claim against Interco. By applying the determinations described below to the standard established by the Eighth Circuit, this Court finds that the copies of the "Guarantee of Lease" filed by Saluda Square, CASA Madre and Center Associates constitute timely filed informal proofs of claim which are capable of amendment.

First the Court has determined that the guarantees submitted by these claimants disclose the existence of claims against Interco, because the guarantees clearly show that Interco is the guarantor of the leases between Sky City and each of these Claimants. Next, this Court must determine whether the copy of the Guarantee of Lease which was attached as an exhibit to a proof of claim filed against *Sky City* evidences an intention by each of these Claimants to share in *Interco's* assets. In making this determination, this Court has followed the principle

149 B.R. 934                                                                                           Page 6
149 B.R. 934
(Cite as: 149 B.R. 934)

enunciated by the Eighth Circuit:

> Bankruptcy proceedings are equitable in their nature, and should be as far as possible conducted on broad lines to accomplish the ultimate purpose of distributing the assets of a bankrupt pro rata among his creditors.

*Matter of Donovan Wire,* 822 F.2d at 39.

Here, Debtors admit they mailed to each of these Claimants preprinted proof of claim forms *only* for the Sky City case and did not include proof of claim forms for the Interco case. Sky City and Interco are represented by legal counsel from one law firm, and these cases have been jointly administered. This Court finds and concludes that under these circumstances, the copies of the guarantees submitted by these Claimants adequately evidence "an intention by the claimant[s] to share in [Interco's] assets ..." *Id.* As noted above, the Bankruptcy Court has the equitable power to "allow an amendment to an informal document so that these documents may be deemed to have been filed in a timely fashion as a proof of claim." *In re Toys Plus, Inc.,* 98 B.R. 475, 476 (Bankr.E.D.Mo.1989) (citing *Matter of Donovan,* 822 F.2d 38). Having found that Saluda Square, CASA Madre and Center Associates filed timely informal claims, this Court **\*940** finds it is appropriate to allow the untimely formal proofs of claim as amendments to the informal proofs of claim.

## VI. *Group Three, Copies of Guarantees Not Filed*

A. Center Associates--Clinton, South Carolina
As noted above, on June 24, 1991, Center Associates filed Proof of Claim No. 3744 against Sky City in the amount of $10,925.39. *Stipulation of Facts,* Exhibit F. Claimant asserted Claim No. 3744 was for "rent for 2/91" pursuant to "[11 U.S.C.] § 507(a)(1) and § 503(b)(1)(A)." Claimant submitted several attachments, including a copy of the lease. However, Claimant did not include a copy of a guarantee of lease.

On April 2, 1992, Center Associates filed Proof of Claim No. 5997 against Interco in the amount of $1,490,327.28. *Stipulation of Facts,* Exhibit K. Claimant asserted the basis for this claim was "contract--guaranty of lease."

B. Mullins Shopping Center Partnership LTD
On June 3, 1991, Mullins Shopping Center Partnership LTD ("Mullins") filed Proof of Claim No. 2503 against Sky City in the amount of $607,266.73. *Stipulation of Facts,* Exhibit L. Claimant submitted attachments including a summary

of damages and a copy of the lease. However, Claimant did not include a copy of a guarantee of lease.

On November 4, 1991, Mullins filed Proof of Claim No. 5795 against Interco in the amount of $607,266.73. *Stipulation of Facts,* Exhibit N. Claimant asserted the basis for this claim was "contract--guaranty of lease."

## VII. *Informal Proofs of Claim*

[5] As noted above, before an amendment to a proof of claim is to be allowed, the record must show that "within the statutory period" the Claimant either formally or informally "disclosed facts showing an assertion of a claim against the estate and an intention by the claimant to share in its assets ..." *Matter of Donovan,* 822 F.2d at 39 (quoting *Tarbell v. Crex Carpet Co.,* 90 F.2d 683, 685-686 (8th Cir.1937)).

These Claimants did not attach copies of the guarantees, nor did they attach to the timely claims anything which indicates these Claimants have claims against Interco or intend to assert claims against Interco. *See Matter of Donovan,* 822 F.2d at 39. Accordingly, this Court cannot construe Claim No. 3744 filed by Center Associates and Claim No. 2503 filed by Mullins as informal proofs of claim in the Interco estate. Further this Court cannot construe the late filed claims as amendments, because there is nothing to amend in the Interco case.

## VIII. *Application of Section 502(b)(6)*

[6] Section 502(b)(6) of the Bankruptcy Code states:
> (b) Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that--

>      .   .   .   .   .

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--
> (A) the rent reserved by such lease without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--
> (i) the date of the filing of the petition; and
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

149 B.R. 934
149 B.R. 934
**(Cite as: 149 B.R. 934)**

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

.    .    .    .    .

Debtor Interco argues that the limitation of Section 502(b)(6) clearly applies to guarantors of leases. Claimants CASA Madre and Center Associates argue that the plain **\*941** language of Section 502(b)(6) caps a lessor's damages against a tenant only, and not against a guarantor.    Claimant Saluda Square concedes that Section 502(b)(6) applies to its guarantee.

This Court determined in *In re Interco,* 137 B.R. 1003, that

Section 502(b)(6) applies a cap to damages resulting from the termination of lease of real property;  and that read literally, it applies to cap the damages of a lessor when the guarantor of the lease is a debtor under Title 11.    Neither the legislative history nor the applicable case law demonstrates that this literal application would thwart Congress' purpose.
*Id.* at 1007.

This Court has reviewed the evidence and the applicable law and finds that the amount of damages that may be recovered by these Claimants as lessors, against these Debtors as guarantors under the rejected executory contracts referred to in these pleadings is limited by the terms of 11 U.S.C. § 502(b)(6).

### ORDER
At Saint Louis, in this District, this 27th day of January, 1993.

On consideration of the record as a whole and consistent with the Memorandum entered in this matter,

IT IS ORDERED that this hearing is concluded;  and that Debtors' Objection to Proof of Claim No. 5719 filed by Center Associates, Proof of Claim No. 5720 filed by Center Associates and Proof of Claim No. 5718 filed by Edisto Village Partners-83 is SUSTAINED and those claims are NOT ALLOWED, as having been filed out of time;  and

That Debtors' Objection to Proof of Claim No. 6005 filed by Saluda Square, Proof of Claim No. 5796 filed by CASA Madre Partnership, Ltd., and Proof of Claim No. 5996 filed by Center Associates is OVERRULED, and those claims are allowed as amendments to timely-filed informal proofs of claim;  and that the Motion to Allow Amended Claim filed

by Saluda Square (Motion Z-146) is DENIED as moot;  and

That Debtors' Objection to Proof of Claim No. 5997 filed by Center Associates and Proof of Claim No. 5795 filed by Mullins Shopping Center Partnership, Ltd. is SUSTAINED and those claims are NOT ALLOWED, as having been filed out of time;  and that claimants' request to allow these claims as amendments to timely-filed proofs of claim is DENIED;  and

That with respect to Proofs of Claim No. 6005, No. 5796 and No. 5996, the amount of damages that may be recovered by the claimants as lessors, against the Debtor, Interco, Inc., as guarantor under the rejected executory contracts referred to in these pleadings is limited by the terms of 11 U.S.C. § 502(b)(6).

149 B.R. 934

END OF DOCUMENT



H

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.
In re LEE WAY HOLDING COMPANY, Debtor.
**Bankruptcy No. 2-85-00661.**

Feb. 22, 1995.

 Chapter 11 debtor's computer equipment lessor moved to file claim for lease rejection damages eight years after it had filed earlier claim for rent and maintenance charges under the leases.    Trustee objected to claim.   The Bankruptcy Court, Donald E. Calhoun, Jr., J., held that:   (1) subsequent claim was not amendment to original claim;   (2) subsequent claim was not amendment of informal proof of claim stemming from motion to assume or reject leases;  and (3) delay in filing late claim was not due to excusable neglect.

 So ordered.

West Headnotes

**[1] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
Determining whether to permit amendment to timely proof of claim is within discretion of bankruptcy court.

**[2] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
Courts have developed two-part test in determining whether to permit amendment to timely proof of claim:  (1) court must determine whether amendment reasonably relates to timely filed claim or whether it is merely attempt to file new claim;  and (2) court must determine whether allowing amendment would be equitable under circumstances of case.

**[3] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
With respect to first part of test to determine whether to permit amendment to timely proof of claim, amendment should be allowed if it cures defect in original claim, describes claim with greater particularity, or pleads new theory of recovery based on facts of original claim.

**[4] Bankruptcy ⟨⟩2903**

**[5] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
Post bar date amendments to claims must be scrutinized to assure that there is no attempt to file new claim under guise of amendment.

**[5] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
Under second part of test to determine whether to allow amendment to timely filed proof of claim, court must perform equitable analysis considering such factors as whether there is undue prejudice to opposing party, whether other claimants might be harmed or prejudiced, whether there is justification for inability to file amended claim at time original claim was filed, whether there is bad faith or dilatory behavior on part of claimant, and whether other creditors would receive windfall if amendment was not allowed.

**[6] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
To allow late claim as amendment to timely filed claim, second claim should not only be of same nature as first, but also within amount to which first claim provided notice.

**[7] Bankruptcy ⟨⟩2903**
51k2903 Most Cited Cases
Amendment to claim by Chapter 11 debtor's computer equipment lessor would not be allowed where first claim was based on rent and maintenance charges under equipment leases while second was based on lease rejection damages, second claim was substantially greater than first claim, dramatic increase in amount of second claim would have material effect on dividend paid to unsecured creditors, and second claim was filed more than eight years after first.

**[8] Bankruptcy ⟨⟩2125**
51k2125 Most Cited Cases

**[8] Bankruptcy ⟨⟩2902**
51k2902 Most Cited Cases
Informal proofs of claim are recognized in bankruptcy;  bankruptcy courts are courts of equity, and must assure that substance does not give way to form and that technical considerations do not prevent substantial justice from being done.

**[9] Bankruptcy ⟨⟩2902**

178 B.R. 976                                                                                                    Page 2
178 B.R. 976
**(Cite as: 178 B.R. 976)**

51k2902  Most Cited Cases

Informal claim must apprise court of existence, nature, and amount of claim, if it is ascertainable, and make clear claimant's intention to hold debtor liable for claim.

**[10]** Bankruptcy ⚷2902
51k2902  Most Cited Cases

Informal proof of claim must, at minimum, furnish same information as contained in formal claim; this includes fact that claimant has what it believes to be legal claim for money owing.

**[11]** Bankruptcy ⚷2902
51k2902  Most Cited Cases

Motion to assume or reject computer equipment leases, which was made by Chapter 11 debtor's equipment lessor, was not informal proof of claim, and, thus, lessor's late claim for lease rejection damages could not be allowed as amendment to informal proof of claim, where motion did not include demand on estate or express intent to hold debtor liable for rejection damages, and did not give notice of existence, nature, or amount of alleged lease rejection claim.

**[12]** Bankruptcy ⚷2900(1)
51k2900(1)  Most Cited Cases

Nearly two months, which was time between dates that computer equipment leases were deemed rejected and amended bar date, was sufficient amount of time for Chapter 11 debtor's equipment lessor to file lease rejection claims, and, thus, bankruptcy court would not fix later bar date for lessor to file the claim.  Fed.Rules Bankr.Proc.Rule 3002(c)(4), 11 U.S.C.A.

**[13]** Bankruptcy ⚷2900(1)
51k2900(1)  Most Cited Cases

Late claim for computer equipment lease rejection damages made by Chapter 11 debtor's lessor could not be allowed under excusable neglect standards where claim was approximately eight years late, and lessor failed to set forth any reason for delay, despite fact that filing timely amendment to original timely filed claim was clearly within its control.  Fed.Rules Bankr.Proc.Rule 9006(b)(1), 11 U.S.C.A.

**[14]** Bankruptcy ⚷2892.1
51k2892.1  Most Cited Cases

**[14]** Bankruptcy ⚷2900(1)
51k2900(1)  Most Cited Cases

Creditor who fails to file timely claim or make

request for extension of time to file claim may not file late claim and participate in distribution from the estate.

**[15]** Bankruptcy ⚷2892.1
51k2892.1  Most Cited Cases

Late filed claims in Chapter 13 cases may be disallowed.

**[16]** Bankruptcy ⚷2900(1)
51k2900(1)  Most Cited Cases

Chapter 11 debtor's computer equipment lessor was estopped from asserting late claim for lease rejection damages due to extraordinary eight-year delay in filing claim where trustee and creditors had relied on claims bar date to estimate size of dividend to be paid in case, and delay in filing claim showed lessor's unreasonable lack of diligence.

**[17]** Bankruptcy ⚷2967.5
51k2967.5  Most Cited Cases

Whether to subordinate untimely filed claim, thereby entitling claim to participate in any surplus of estate, is at discretion of court;  equitable consideration should be examined by court to determine whether late filed claim should be paid from surplus of estate.

**[18]** Bankruptcy ⚷3443
51k3443  Most Cited Cases

Untimely filed claim in Chapter 7 case may be paid if all other claims have been paid.  Bankr.Code, 11 U.S.C.A. § 726(a).

 **\*977**  Frederick M. Luper, Chapter 11 Trustee, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, OH.

 Robert J. Sidman, Vorys, Sater, Seymour & Pease, Columbus, OH, for Official Unsecured Creditors' Committee.

 Gordon W. Johnston, Bricker & Eckler, Columbus, OH, for Unisys Corp.

***OPINION AND DECISION ON MOTIONS FOR SUMMARY JUDGMENT***

 DONALD E. CALHOUN, Jr., Bankruptcy Judge.

 This matter is before the Court on the Motions for Summary Judgment filed by **\*978** Unisys Corporation, fka Sperry Univac Division of Sperry Corp. ("Unisys") and Frederick M. Luper, Chapter 11 Trustee of the Lee Way Holding Company bankruptcy estate ("Trustee"), concerning the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Trustee's objection to claim number 5951 filed by Unisys.

This Court is vested with jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### I. *Findings of Fact*

On May 27, 1994, the parties filed Stipulations of Fact ("Stip. of Facts") with respect to the Trustee's objection to Unisys' claim. The Court, by this reference, adopts those facts as stipulated by the parties. Prior to the filing of this Chapter 11 proceeding, Lee Way Holding Company ("Debtor"), and Unisys entered into a number of Lease and Service Agreements. Two relevant Lease and Service Agreements were still in effect on March 7, 1985, the date of Debtor's bankruptcy filing ("the Leases"). Pursuant to the terms of the Leases, Unisys leased computer equipment to Debtor, and Unisys agreed to perform maintenance services for the leased equipment (Stip. of Facts ¶¶ 1-5).

Debtor used the leased computer equipment after approximately eight and one-half months after the Chapter 11 filing. Debtor made payments to Unisys totaling $204,704.85 in partial consideration of Debtor's continued use of the leased equipment. On August 16, 1985, Unisys filed a Motion for Order Directing Debtor to Assume or Reject Unexpired Leases and to Provide Adequate Protection ("Motion to Assume or Reject"). An Agreed Order resolving the Motion to Assume or Reject was entered by the Bankruptcy Court on September 27, 1985, providing that the Leases would be deemed rejected unless assumed on or before October 17, 1985. Debtor failed to assume the Leases by October 17, 1985, and the Leases were thereby deemed rejected. Debtor continued to use the leased equipment after October 17, 1985, and continued to make payments in partial consideration of such continued use, until November 20, 1985, when it surrendered the equipment. Unisys filed an administrative claim for Debtor's post-petition use of the leased equipment. On December 19, 1986, the Bankruptcy Court entered an Order allowing Unisys an administrative claim for $288,678.29 (Stip. of Facts ¶¶ 6-14).

By Order entered March 13, 1985, the Court appointed an Official Creditors' Committee. The Committee included Sperry Corporation, one of Debtor's scheduled creditors (Stip. of Facts ¶ 19).

Unisys is the resulting entity of a merger between Sperry Corporation and Burroughs Corporation (Stip. of Facts ¶ 3). Unisys formally accepted the appointment to the Creditors' Committee in this case on March 28, 1985 (Stip. of Facts ¶ 18). The Bankruptcy Court entered an Order ("Initial Bar Date Order") on April 24, 1985, that established August 15, 1985 as the last date for filing proofs of claim in this Chapter 11 case ("Initial Bar Date") (Stip. of Facts ¶ 20). On August 14, 1985, Unisys filed an unsecured non-priority pre-petition claim in the sum of $272,861.11 ("Original Claim"). The Original Claim, comprised of several hundred pages, arose from Debtor's failure to pay rent, maintenance charges and taxes under the terms of the Leases (Stip. of Facts ¶ 21). On August 15, 1985, the Official Creditors' Committee filed a Motion for Extension of Bar Date, which was granted, and the Initial Bar Date was extended to December 15, 1985 ("Amended Bar Date") (Stip. of Facts ¶ 22). Unisys was extremely active during the course of this Chapter 11 proceeding (see, e.g., Stip. of Facts ¶¶ 8, 12, 15, 18, 21 and 26). On September 13, 1993, nearly eight years after the Amended Bar Date, Unisys filed an unsecured non-priority claim in the sum of $3,505,559.11 ("Subsequent Claim") based primarily on alleged lease rejection damages (Stip. of Facts ¶ 26).

Debtor's First Amended Chapter 11 Plan was filed on July 13, 1993 and confirmed by the Bankruptcy Court by an Order entered October 20, 1993. By Order entered January 11, 1994, the Bankruptcy Court approved Debtor's Motion For Authority to Pay Partial Distribution to Unsecured Creditors, resulting in a distribution totalling $2,794,984.92 (Stip. of Facts ¶¶ 28-30). Unisys contends that the Subsequent Claim is an **\*979** amendment of the Original Claim. The Trustee argues that the Subsequent Claim is a new claim filed after the bar date, and should be disallowed as untimely.

### II. *Conclusions of Law*

Federal Rule of Bankruptcy Procedure 7056, adopts Rule 56 of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

In its Motion for Summary Judgment, Unisys contends that the Court should allow the Subsequent Claim either as an amendment to the Original Claim, or an amendment to an informal proof of claim. Unisys also argues that if the Subsequent Claim is ruled to be a new claim, it is not subject to an established bar date. The Trustee asserts that the Subsequent Claim is an untimely new claim. The Trustee also argues that if the Subsequent Claim is considered an amendment, Unisys should be estopped from asserting the claim.

The Stipulation of Facts submitted by the parties provides the Court with sufficient undisputed facts to allow for a ruling under Fed.R.Bankr.P. 7056.

**A.  Unisys' Subsequent Claim Is Not An Amendment To The Original Claim**

[1][2] Initially, the Court notes that Unisys should have obtained leave of Court to amend its claim. *In re Outdoor Sports Headquarters, Inc.,* 161 B.R. 414, 421 (Bankr.S.D.Ohio 1993). Despite the failure of Unisys to seek leave to amend its Original Claim, the Court will not elevate form over substance, and will address the merits of whether the Subsequent Claim should be allowed as an amendment. *Outdoor Sports,* 161 B.R. at 421. Determining whether to permit an amendment to a timely proof of claim is within the discretion of the Court. Courts have developed a two-part test in making this determination:  (1) the Court must determine whether the amendment reasonably relates to a timely filed claim or whether it is merely an attempt to file a new claim;  and (2) the Court must determine whether allowing an amendment would be equitable under the circumstances of the case. *Outdoor Sports,* 161 B.R. at 421.

[3][4] With respect to the first prong of the test, an amendment to a proof of claim should be allowed if it cures a defect in the original claim, describes a claim with greater particularity, or pleads a new theory of recovery based on the facts of the original claim. *In re Pyramid Building Co.,* 87 B.R. 38, 40 (Bankr.N.D.Ohio 1988) [citing *United States v. International Horizons, Inc.,* 751 F.2d 1213, 1216 (11th Cir.1985) ]; *In re Chavis,* 160 B.R. 804 (Bankr.S.D.Ohio 1993). Post bar date amendments

to claims "must be scrutinized to assure that there [is] no attempt to file a new claim under the guise of an amendment." *International Horizons,* 751 F.2d at 1216; *Chavis,* 160 B.R. at 805; *In re First Truck Lines,* 141 B.R. 621, 629 (Bankr.S.D.Ohio 1992), *aff'd,* No. C-3-92-304 (S.D.Ohio Sept. 21, 1993); *In re Parsons,* 135 B.R. 283, 284 (Bankr.S.D.Ohio 1991). "Amendment is not permitted as a guise for filing untimely claims." *Pyramid Building,* 87 B.R. at 40.

[5] Under the second prong of the test for permitting an amendment to a timely-filed proof of claim, the Court must perform an equitable analysis, considering factors such as:
(1) whether there is undue prejudice to an opposing party;
(2) whether other claimants might be harmed or prejudiced;
**\*980** (3) whether there is justification for the inability to file the amended claim at the time the original claim is filed;
(4) whether there is bad faith or dilatory behavior on the part of the claimant;  and
(5) whether other creditors would receive a windfall if the amendment was not allowed.

*First Truck Lines,* 141 B.R. at 629-30; *Parsons,* 135 B.R. at 285; and *Outdoor Sports,* 161 B.R. at 421.

This Court finds that the Subsequent Claim neither cures a defect in the Original Claim, nor describes the Original Claim with greater particularity. A review of the Original Claim clearly shows that claim to be complete, and there is no defect to be cured. The Original Claim specifically relates to actual default under the Leases, and the resulting claim for rent, maintenance charges and taxes. The Original Claim represented the actual and liquidated default of Lee Way under the Leases during the time that Lee Way was in possession of the leased equipment. There was certainly the opportunity for Unisys to fully or partially mitigate any potential lease rejection damages. As such, the Original Claim as filed was not "defective." Similarly, the Original Claim was not improperly described. Indeed, as stated herein, the Claim was fully and accurately documented. This is not a case where the creditor was required to add detail to the claim to avoid the possibility that the claim would be denied as being insufficiently documented.

The only remaining question is whether the Subsequent Claim asserts a new theory of recovery based on the facts of the Original Claim, or if Unisys

is attempting to file a new claim under the guise of an amendment to the Original Claim. The Court in *Matter of Interco, Inc.,* 149 B.R. 934 (Bankr.E.D.Mo.1993), held that "claims for rejection of lease damages pursuant to 11 U.S.C. § 502(b)(6) ... are distinctly different from those timely filed claims for rent, maintenance and taxes. The late proofs of claim assert damages under different sections of the Bankruptcy Code and allege much greater damage amounts." *Interco,* 149 B.R. at 938. As such, the *Interco* court refused to permit late filed claims for lease rejection damages to be construed as amendments to timely filed claims for rent, taxes and maintenance. *Interco,* 149 B.R. at 938.

While a new theory of recovery is asserted in the Subsequent Claim, it is not based on the facts underlying the Original Claim. The Original Claim was based on rent, maintenance charges and taxes due under the terms of the Leases (Stip. of Fact ¶ 21). The Subsequent Claim was based on Debtor's rejection of the Leases, and allegations of resulting damage for the period of time remaining under the Leases during which Debtor was no longer in possession of the leased equipment (Stip. of Fact ¶ 26). Unisys filed the Original Claim for $272,861.11, while the Subsequent Claim was filed for $3,505,559.11. Unisys does not plead a new theory of recovery based on the same facts of the Original Claim, and does not allege similar damage amounts in the Subsequent Claim.

[6][7] An analysis of the tests set forth above, and the legal analysis in *Interco* weigh heavily against Unisys' argument that the Subsequent Claim is an amendment. This is a fact intensive inquiry for the Court. "Disposition of a motion to amend a proof of claim falls within the sound discretion of the bankruptcy court." *Stavriotis v. U.S. (In re Stavriotis),* 977 F.2d 1202, 1204 (7th Cir.1992). To allow an amendment, "the second claim should not only be of the same nature as the first, but also within the amount to which the first claim provided notice." *In re AM International, Inc.,* 67 B.R. 79, 82 (N.D.Ill.1986); *Chavis,* 160 B.R. at 805; *International Horizons,* 751 F.2d at 1217-18; *Stavriotis,* 977 F.2d at 1205.

The creditor in *Stavriotis* (the IRS) attempted to amend its proof of claim five months after the bar date had lapsed, to increase the amount of its claim from $11,132.93 to $2,435,078.39. The debtor objected to the IRS' amended claim on procedural and substantive grounds. The bankruptcy court refused to permit the amendment on the grounds that

the claims "were dissimilar in kind and amount." *Stavriotis,* 977 F.2d at 1203. The Appellate Court held that it was not an abuse of discretion to disallow the *981 amendment due to the "dramatic increase in the claim amount which came as an unfair surprise to other creditors and perhaps the debtor." *Stavriotis,* 977 F.2d at 1204. The *Stavriotis* Court noted other factors that persuaded it to deny the IRS' attempt to amend its proof of claim, including the fact that the IRS' amendment would prejudice other creditors who were unaware that the IRS had an ongoing audit that could result in an increased claim amount. Further, the IRS offered no excuse or justification for the delay in amending its claim. *Stavriotis,* 977 F.2d at 1205-06.

The factors relied on by the *Stavriotis* Court are applicable here. The Original Claim, filed on August 14, 1985, was for $272,861.11. On September 13, 1993, Unisys filed an amendment to the Original Claim in the amount of $3,505,559.11. Clearly, Unisys' Subsequent claim is not within an amount for which the Original Claim provided notice. This dramatic increase comes as an unfair surprise to the Trustee and creditors in this case, and would have a material effect on the dividend paid to unsecured creditors under the plan of reorganization. Unisys provided no excuse or justification for its eight year delay. Therefore, consistent with the analysis in *Stavriotis,* the Subsequent Claim will not be considered an amendment to the Original Claim because of the substantial disparity between the two claims, the prejudicial effect on the Trustee and other creditors, and the lack of justification for Unisys' delay.

"Leave to amend [claims] should be freely granted early in a case, but passing milestones in the litigation make amendment less appropriate. One milestone of particular significance in bankruptcy is the bar date ... Confirmation of the plan of reorganization is a second milestone ... Once that milestone has been reached, further changes should be allowed only for compelling reasons." *Holstein v. Brill,* 987 F.2d 1268, 1270 (7th Cir.1993). Post confirmation claims amendments could jeopardize feasibility of the plan, altering the distributions to remaining creditors, and disrupting the orderly process of adjudication. *Holstein,* 987 F.2d at 1270-71. All of these factors weigh against allowing the Subsequent Claim as an amendment to the Original Claim.

Bankruptcy Rule 7015 incorporates Fed.R.Civ.P. 15 in adversary proceedings. Bankruptcy Rule 9014

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

permits the court, in its discretion, to extend Rule 7015 to contested matters such as claims objections. *Stavriotis, 977 F.2d at 1204. Fed.R.Civ.P. 15(a)* indicates that a court should freely grant leave to amend a party's pleading when justice so requires. Here, the interest of justice weighs against allowing Unisys to amend the Original Claim. "The season for stating the amount of a debt is before the confirmation of the plan of reorganization." *Holstein, 987 F.2d at 1271.* Allowing a creditor to file a claim after confirmation of the plan would be inequitable. *In re Decko Products, Inc., 73 B.R. 275, 276 (Bankr.N.D.Ohio 1987)* (allowing a creditor to file a proof of claim after confirmation of the plan and 23 months after receiving notice of the bankruptcy, reducing the amount available to other creditors, would be inequitable). The Subsequent Claim was filed nearly eight years after the Amended Bar Date, two months after the plan was proposed, and on the eve of the confirmation hearing. Not only have priority and administrative claims been paid by the Trustee, but a substantial distribution has already been paid. The Court finds that allowing Unisys' Subsequent Claim as an amendment would result in unfair surprise and would be inequitable to unsecured creditors that filed timely claims. Simply put, Unisys missed the season to amend its claim.

Unisys relies on *Outdoor Sports,* where the court allowed a creditor to amend its claim ten months after the bar date and after confirmation of the plan. The amended proof of claim added a prepayment penalty not included in the original proof of claim. "The Prepayment Amount is grounded in the same right to payment as the [original claim]. Therefore, the Amended Proof of Claim merely increases the amount of the claim grounded in the right to payment set forth in the Original Proof of Claim and does not assert a new claim." *Outdoor Sports, 161 B.R. at 421-22.* The amended proof of claim in *Outdoor Sports* was filed less than one year after the original claim, and shortly **\*982** after the creditor learned of facts which made the amendment necessary. The court found that the creditor "was not dilatory in filing the Amended Proof of Claim", and equitable considerations did not preclude allowing the amendment. *Outdoor Sports, 161 B.R. at 423.*

*Outdoor Sports* is distinguishable for several reasons. Here, Unisys waited almost eight years before filing its "amendment". Unisys' actions were dilatory and unjustifiable. If unsure as to the amount of alleged lease rejection damages, Unisys should have filed a claim in an unliquidated amount, pending a determination of the actual rejection damages, if

any. Unisys could have had its rejection damage claim estimated for voting on Debtor's plan of reorganization. *11 U.S.C. § 502(c).* Failing to file the Subsequent Claim until eight years after the Amended Bar Date compels this court to deny the attempted amendment on equitable grounds. Surely, the Trustee and other creditors were entitled to rely on an eight year silence as evidence that no lease rejection claim would be filed. Other claimants would be harmed by the late-filed amendment due to its substantial nature, and the distributions for timely filed claimants would be significantly reduced (see Affidavit of Harold Slaughter attached to Trustee's Motion for Summary Judgment). The dilatory conduct of Unisys has delayed the administration and distribution of this estate, and has hampered the Trustee's efforts to close this case. Due to the equitable considerations in the present case, Unisys' reliance on *Outdoor Sports* is not persuasive.

The court in *Estate of Verkamp v. KDI Corp. (In re KDI Corp.), 119 B.R. 594, 599 (Bankr.S.D.Ohio 1990),* held that "[w]hile mere passage of time need not result in a denial of leave to amend pleadings, delay itself becomes fatal at some point in time." *See also Tenneco Resins, Inc. v. Reeves Bros. Inc., 752 F.2d 630 (Fed.Cir.1985)* (Court denied motion to amend reply to a counterclaim where the movant did not act for five years, having foregone numerous opportunities to assert relevant issues); *Troxel Manufacturing Co. v. Schwinn Bicycle Co., 489 F.2d 968 (6th Cir.1973), cert. den., 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974)* (Court denied motion to amend pleadings to set forth an alternative theory of recovery where the case had been pending for two and one-half years); *Carter v. Super Markets General Corporation, 684 F.2d 187 (1st Cir.1982)* (Court denied motion to amend after six year delay attributable to inadvertence and clerical error); *see also* Fed.R.Civ.P. 41(b); and Fed.R.Bankr.P. 7041(b). At some point, a claimant "by sleeping on its rights ... should be precluded by the passage of time from amending its claim." *KDI, 119 B.R. at 600.*

In the present case the Amended Bar Date was December 15, 1985. Unisys filed the Original Claim for rent, maintenance charges and taxes on August 14, 1985. More than eight years later, on September 13, 1993, Unisys filed a new proof of claim as an amendment to the Original Claim. Factors such as Unisys' activity in this case, its position on the creditors committee, the length of the delay, the size of the Subsequent Claim, and the resulting prejudice dissuade this Court from considering the Subsequent

Claim to be an amendment to the Original Claim. In arriving at this conclusion, the Court has performed an equitable analysis of the facts at issue. As set forth above, the Court has determined that allowing the amendment would cause undue prejudice to the Trustee in his administration of the estate, as well as to creditors filing timely claims. There has been absolutely no justification shown for the inability of Unisys to file the Amended Claim at the time the Original Claim was filed, even in an unliquidated amount. There is no question that Unisys was dilatory in its prosecution of the Subsequent Claim. Based on the foregoing analysis, the Court has concluded that the amendment does not reasonably relate to the timely filed Original Claim, but is merely an attempt to file a new claim after the bar date. Under the circumstances of this case, it would not be equitable to allow the amendment. The Subsequent Claim is therefore a new claim filed after the bar date, and will be disallowed.

**B. *The Subsequent Claim Is Not An Amendment Of An Informal Proof Of Claim***

[8] Unisys alternatively argues that the Subsequent Claim is an amendment to an **\*983** informal proof of claim, citing *In re Dietz,* 136 B.R. 459 (Bankr.E.D.Mich.1992). Informal proofs of claim are recognized because bankruptcy courts are courts of equity, and must assure that substance does not give way to form, and that technical considerations do not prevent substantial justice from being done. *Grubb v. Pittsburgh Nat'l Bank (In re Grubb),* 169 B.R. 341, 348 (Bankr.W.D.Pa.1994); *In re Harper,* 138 B.R. 229, 237 (Bankr.N.D.Ind.1991) [citing *Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) ]. In *Dietz,* a creditor filed a proof of claim six days after the bar date. The creditor argued that its late filing amended an informal proof of claim filed with the court prior to the claims bar date. The "informal proof of claim" was a letter mailed to the trustee and the bankruptcy court clerk, in which the creditor stated that it was owed over $20,000. *Dietz,* 136 B.R. at 461. The court adopted a five-part test addressing the elements of an informal proof of claim:

1) the proof of claim must be in writing;

2) the writing must contain a demand by the creditor on the debtor's estate;

3) the writing must express an intent to hold the debtor liable for the debt;

4) the proof of claim must be filed with the Bankruptcy Court; and

5) based on the facts of the case, it would be equitable to allow the amendment.

*Dietz,* 136 B.R. at 463 (citations omitted).

[9][10] Unisys alleges that its Motion to Assume or Reject Leases satisfies the requirements of an informal proof of claim. "A written document filed with the bankruptcy court which contains a demand on the estate or otherwise expresses an intent to hold the debtor liable for an alleged debt will serve as an informal proof of claim." *Dietz,* 136 B.R. at 464. The informal claim must "apprise the court of the existence, nature and amount of the claim (if ascertainable) and make clear the claimant's intention to hold the debtor liable for the claim." *In re Charter Co.,* 876 F.2d 861, 863 (11th Cir.1989). An informal proof of claim must, at a minimum, furnish the same information as contained in a formal claim. "This includes the fact that claimant has what it believes to be a legal claim for money owing." *International Horizons,* 751 F.2d at 1218.

[11] Unisys' Motion to Assume or Reject set forth neither the nature nor amount of the Subsequent Claim, but merely requested assumption of the Leases by a date certain. The Motion to Assume or Reject did not include a demand on the estate or express an intent to hold the Debtor liable for rejection damages as required by *Dietz* and *International Horizons,* and did not give notice of the existence, nature or amount of the alleged lease rejection claim, as required by *Charter. See also First Interstate Bank of Denver, N.A. v. Connolly (In re Anchor Resources, Inc.),* 139 B.R. 954 (D.Colo.1992). In addition, that motion was filed more than eight years before the Subsequent Claim. Unisys argues that the Trustee had some duty to analyze claims to determine if additional amounts might be owing. This is an impossible burden to place on the Trustee, whose duty is to the estate, not to the negligent creditor. Unisys' claim was hundreds of pages long and related to seven leases, only two of which are now relevant. Putting such a burden on the Trustee would invariably result in tremendous additional costs of administration at the expense of the estate as a whole, but without any resulting benefit to the estate.

Finally, the speculative nature of Unisys' rejection damages weighs against the Motion to Assume or Reject being deemed an informal claim. Unisys may have fully or partially mitigated any lease rejection damages by re-leasing or selling the equipment, thereby reducing or eliminating its rejection damages. The Motion to Assume or Reject is not an informal claim under the requirements set forth in *Charter* and *Dietz.* The equities here do not support recognizing

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

an informal proof of claim.  *AM International, 67 B.R. at 82* (Before allowing a late filed "informal claim" the party seeking equity should be without fault as to the late filing.)    As such, the Subsequent Claim cannot be considered an amendment to an informal proof of claim.

**\*984 C. The Subsequent Claim Is Subject To The Established Bar Date**

 [12] Even if the Subsequent Claim is deemed a new claim, Unisys argues that it is not subject to an established bar date.    Fed.R.Bankr.P.  3003(c)(3) provides:

> *Time for Filing.*  The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.   Notwithstanding the expiration of such time, a proof of claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2), (c)(3), and (c)(4).

Under Fed.R.Bankr.P. 3002(c)(4):

> A claim arising from the rejection of an executory contract or unexpired lease of the debtor may be filed within such time as the court may direct.

Unisys argues that absent a specific bar date for lease rejection damage claims, the Subsequent Claim cannot be untimely.   The Advisory Committee Note to Rule 3002 contradicts this argument:

> Paragraph (4) is derived from former chapter rules ... In light of the reduced time it is necessary that a party with a claim arising from the rejection of an executory contract have sufficient time to file that claim. This clause allows the court to fix an appropriate time.

 Rule 3002(c)(4) was intended to provide creditors sufficient time to file lease rejection claims.  If there is insufficient time to file the claim prior to the regular bar date, the court may fix a later date.   In many cases, the relevant lease may not be rejected until after the regular bar date has expired.   Here, Unisys had ample time to file its lease rejection damage claim prior to the Amended Bar Date.   Unisys never requested the Court to set a deadline for filing lease rejection damage claims, or to otherwise extend the deadline for filing claims, thereby risking that the Court would not permit a claim asserted after the bar date.    *See 8 Collier on Bankruptcy,* ¶ 3002.05[5], p. 3002-18 (15th ed. 1990).

 On August 15, 1985 the Official Creditors' Committee filed the Motion for Extension of Bar Date.   The Court granted the motion and the bar date was moved to December 15, 1985.    On August 16, 1985 Unisys filed the Motion to Assume or Reject.  On September 27, 1985 the Agreed Order was

entered requiring Debtor to assume the Leases on or before October 17, 1985, or the Leases would be deemed rejected.    Unisys had almost two months between the date the Leases were deemed rejected and the Amended Bar Date to file an appropriate lease rejection claim.    Rule 3002(c)(4) does not require, and the Court finds it inappropriate to fix a later bar date in this case.

 **D. The Subsequent Claim Is Untimely And Will Be Disallowed**

 The Court has determined that the Subsequent Claim is a new claim filed after the Amended Bar Date.   The Subsequent Claim did not bear a reasonable relationship to the Original Claim, but constituted an attempt to file a new claim under the guise of an amendment;  and under the equities of this case, the Court will not recognize the Subsequent Claim as an amendment.    *Outdoor Sports,* 161 B.R. at 421. Although the issue was not adequately raised by Unisys, the question remains as to whether the untimely Subsequent Claim can be allowed based on excusable neglect.

 In *In re Wm. B. Wilson Mfg. Co.,* 59 B.R. 535 (Bankr.W.D.Tex.1986), the court allowed a creditor to file a proof of claim as an amendment to a timely "informal proof of claim" based on "excusable neglect."    The court in *Wilson Mfg.* stated that excusable neglect may exist if the failure to timely perform a duty, such as compliance with the bar date, was due to circumstances beyond the party's reasonable control (excusable neglect existed when the creditor did not receive notice of the claims bar date).   *Wilson Mfg.,* 59 B.R. at 537, 538.

 In *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court broadened the definition of excusable neglect.     In *Pioneer,* the court noted that the "excusable neglect" standard of Fed.R.Bankr.P. 9006(b)(1) governs late filings of proofs of claim in Chapter 11 cases, but not in Chapter 7 cases based on the different policies of the **\*985** two chapters. "Whereas the aim of a Chapter 7 liquidation is the prompt closure and distribution of the debtor's estate, Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors."    *Pioneer,* 113 S.Ct. at 1495. Bankruptcy courts have broad equity powers to balance the interests of the relevant parties, guided by the goal of ensuring successful reorganization in Chapter 11 proceedings.  "This context suggests that

Rule 9006's allowance for late filings due to 'excusable neglect' entails a correspondingly equitable inquiry." *Pioneer,* 113 S.Ct. at 1495. The *Pioneer* Court concluded that "enlargement of prescribed time periods under the 'excusable neglect' standard of Rule 9006(b)(1) is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer." *Pioneer,* 113 S.Ct. at 1496. The determination of whether a party's neglect is excusable is "an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer,* 113 S.Ct. at 1498.

[13] "The burden of proving 'excusable neglect' is on the party seeking to be relieved of the time bar." *In re Nutri*Bevco, Inc.,* 117 B.R. 771, 785 (Bankr.S.D.N.Y.1990). Considering all of the relevant circumstances here, the Subsequent Claim will not be allowed based on excusable neglect. Unisys' unreasonable eight-year delay in filing the Subsequent Claim, the prejudicial effect of the claim, the substantial impact on the administration and distribution of the estate, and Unisys' failure to adequately explain the delay support the Court's ruling. Unisys has provided no justification for its failure to file a timely amendment. The Trustee and creditors are entitled to a level of certainty as to the potential claims pool to allow for case administration and plan projections. If allowed, the Subsequent Claim would significantly reduce the dividend to timely filed claims. Under the circumstances of this case, Unisys has not met its burden of proving "excusable neglect". The length of the delay was outside the parameters for "excusable neglect", and has delayed and hampered the Trustee's administration of this estate, including the distribution to creditors. Unisys has failed to set forth any reason for the delay, despite the fact that filing a timely amendment was clearly within its control.

Unisys had many opportunities to file its lease rejection claim, but failed to do so within a reasonable period of time. Based on all of the circumstances of this case, the Court cannot conclude that Unisys acted in good faith in filing the Subsequent Claim after an eight-year delay and on the eve of plan confirmation. Whether the failure to properly file this claim was caused by Unisys or its

counsel is irrelevant. The Supreme Court has noted that clients may be held accountable for the acts and omissions of their attorneys. *See Pioneer,* 507 U.S. at ----, 113 S.Ct. at 1499. The fact that this is a liquidating Chapter 11 proceeding under the supervision of the Chapter 11 Trustee also supports the Court's conclusion. Although this is technically a Chapter 11 proceeding, the aim of the "reorganization" was an orderly and expeditious liquidation and distribution of the Debtor's estate. In weighing the equities of the case, and based on the differing policies of an actual reorganization and a liquidation under the supervision of a Chapter 11 Trustee, the Court finds that Unisys has failed to meet its burden of proving "excusable neglect." *See Pioneer,* 113 S.Ct. at 1495.

[14] Since the Subsequent Claim is subject to the established bar date, the claim was untimely, and will be disallowed. The Leases were deemed rejected on October 17, 1985. If Unisys was unsure as to the amount of its claim for lease rejection damages, it should have taken advantage of § 502(c) of the Bankruptcy Code, which provides for the filing of estimated claims. A creditor who fails to file a timely claim or make a request for an extension of time to file a claim may not file a late claim and participate in distribution from the estate. **986*Internal Revenue Service v. Kolstad (In re Kolstad),* 928 F.2d 171, 173 (5th Cir.1991), *cert. den.,* 502 U.S. 958, 112 S.Ct. 419, 116 L.Ed.2d 439 (1991).

Unisys does not argue that it failed to receive notice of the bankruptcy filing or bar date. Unisys even received the Court's Notice of Order Establishing Deadline for Filing of Administrative Claims dated September 28, 1987. Again, Unisys failed to take action to preserve or assert its lease rejection damage claim. Accordingly, *U.S. v. Cardinal Mines Supply, Inc.,* 916 F.2d 1087 (6th Cir.1990) and *Internal Revenue Service v. Century Boat Company (In re Century Boat Company),* 986 F.2d 154 (6th Cir.1993) are distinguishable. *Chavis,* 160 B.R. at 806. The court in *Internal Revenue Service v. Messics (In re Messics),* 159 B.R. 803 (Bankr.N.D.Ohio 1993), stated that "both the opinion and dissent in *Pioneer* take for granted that untimely claims will be barred in chapter 11 [absent] excusable neglect ... It seems unlikely that the [Supreme] Court would have struggled so to determine whether the late filing at issue was due to excusable neglect if late filing were not perceived a bar to allowance." *Messics,* 159 B.R. at 809-10.

[15] Several courts have disallowed claims filed after the bar date in chapter 13 cases.   In *In re Zimmerman, 156 B.R. 192 (Bankr.W.D.Mich.1993)* the court rejected the *Hausladen* [FN1] court's controversial interpretation of 11 U.S.C. § 502 and held that late filed claims in chapter 13 cases may be disallowed. *Zimmerman*, 156 B.R. at 195. *See also Messics, supra; Grubb, supra; Chavis, supra; In re Friesenhahn,* 169 B.R. 615 (Bankr.W.D.Texas 1994); *In re Stoiber,* 160 B.R. 307 (Bankr.N.D.Ohio 1993); *In re Bailey,* 151 B.R. 28 (Bankr.N.D.N.Y.1993). The *Zimmerman* court came to its conclusion by analyzing the interrelation of 11 U.S.C. §§ 501, 502 and Fed.R.Bankr.P. 3002.   The court stated that "a prerequisite [for a claim] being 'deemed allowed' under § 502 is filing under § 501 ... The merits of a claim will be analyzed under § 502 only if the claim meets § 501's requirements." *Zimmerman*, 156 B.R. at 195.   While § 501 is silent as to the time limit for filing claims, that void is filled by Fed.R.Bankr.P. 3002. *Zimmerman*, 156 B.R. at 196. Fed.R.Bankr.P. 3002 makes timely filing a prerequisite to allowance. *Zimmerman*, 156 B.R. at 198.   Therefore, under a thorough legal analysis of 11 U.S.C. §§ 501, 502 and Fed.R.Bankr.P. 3002, if a creditor fails to timely file its claim under § 501, the claim will not be allowed pursuant to § 502. *Zimmerman*, 156 B.R. at 198; *Stoiber*, 160 B.R. at 310; *Bailey*, 151 B.R. at 32.

FN1. *In re Hausladen, 146 B.R. 557 (Bankr.D.Minn.1992)* (en banc) (The court held that filing a claim after the bar date does not result in disallowance, but relates only to the claim's priority.)

Disallowance of a claim due to untimely filing was codified in 1994 by new sub-section (b)(9) to 11 U.S.C. § 502, thereby overruling *Hausladen* and its progeny.   Section 502(b)(9) states that a claim shall not be allowed if "proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2) or (3) of § 726(a) ..."   The Court believes that the addition of § 502(b)(9) codified the proper construction of the law in existence prior to the 1994 amendments.   Even though § 502(b)(9) is not retroactively applicable, the Court believes it consistent with the interplay between the relevant statutory sections, as articulated in *Zimmerman*, and adopts the reasoning of the court in *Zimmerman* in this regard.

**E. Unisys Is Estopped From Asserting The Subsequent Claim**

[16] The Court finds that Unisys is estopped from asserting the Subsequent Claim due to the extraordinary delay in filing that claim.   The Trustee and creditors of the estate relied on the claims bar date to estimate the size of the dividend to be paid in this case (see Affidavit of Harold Slaughter attached to Trustee's Motion for Summary Judgment).   Unisys' unexplained eight year silence enforced this reliance.   Parties filing timely claims should be rewarded for the Trustee's diligence in claims litigation.   Such litigation was, in effect, funded from estate assets, and those assets would otherwise have been available for distribution to creditors.   The risk of losing claims litigation is significant.   Creditors filing timely claims are entitled to enjoy an increased dividend, **987 not settle for a lower dividend based on Unisys suddenly springing to action.   The Court questions whether Unisys would have filed the Subsequent Claim if the Trustee had been less successful in administration of this case.

Unisys previously asserted the doctrine of estoppel in this case.   In Adversary Proceeding 2-87-0089, in which the Trustee sought to recover a post-petition transfer pursuant to § 549 of the Bankruptcy Code, Unisys declared (at p. 19 of its Motion for Summary Judgment):

This Court should apply the doctrine of estoppel under the broad concept of equity and declare that the Trustee's challenge to Debtor's prior actions and commitments upon which Unisys has clearly relied is inappropriate at this late stage of the proceedings.

The Court finds that filing the Subsequent Claim is similarly inappropriate at this late stage of the proceedings.

The Trustee raises the doctrine of laches in his estoppel argument.   Black's Law Dictionary, Sixth Edition, defines "laches" as based upon the maxim that equity aids the vigilant and not those who slumber on their rights.   Many courts have applied the doctrine of laches to bar untimely proofs of claim in Chapter 11 cases.   "Laches" is "an equitable measure traditionally employed by courts to prevent one party from being unfairly prejudiced by another's delay, to bar untimely proofs of claim in Chapter 11 cases." *In re Wilson*, 96 B.R. 257, 263 (9th Cir. BAP 1988) (citations omitted).

In *Decko Products,* the court in a Chapter 11 proceeding held that a creditor who waited almost two years after receiving notice of the bankruptcy to file its claim was barred by laches. *Decko Products,* 73 B.R. at 276. In *In re Cmehil,* 43 B.R. 404

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

(Bankr.N.D.Ohio 1984) the court held that a creditor who waited more than two years before asserting a claim against the estate was similarly barred from asserting its claim. "Equity aids the vigilant and diligent, not those who sleep on their rights." Cmehil, 43 B.R. at 408. In *Walters v. Hunt (In re Hunt)*, 146 B.R. 178 (Bankr.N.D.Tex.1992) the court in a Chapter 11 proceeding denied the claimant's request to file a late proof of claim based on the doctrine of laches when the claimant waited two and one-half years after learning of the bankruptcy to seek leave of court to file a proof of claim. "This court may apply the equitable doctrine of laches to prevent the late filing of a proof of claim if Plaintiff's delay was unreasonable." *Hunt*, 146 B.R. at 184 [citing *Morgan v. Barsky (In re Barsky)*, 85 B.R. 550, 554 (C.D.Cal.1988), *aff'd*., 933 F.2d 1013 (9th Cir.1991) ]. Here, Unisys' delay was clearly unreasonable, and laches will bar the assertion of the Subsequent Claim.

In *Barsky*, the doctrine of laches prevented a creditor in a Chapter 13 proceeding from making a claim more than two years after confirmation of a plan. The creditor did not receive notice of the meeting of creditors due to an error by the court clerk. Prior to confirmation of the plan, the debtor called the creditor to give notice of the pending proceedings. The creditor even received a copy of the plan, which did not provide for her claim. The court described laches as:

> an equitable doctrine applied at the discretion of the court ... to protect a party against whom a claim has been asserted, from any prejudice which may result from the unreasonable delay of the party asserting the claim. To establish laches, the party asserting the defense must show (1) an unreasonable lack of diligence, and (2) prejudice resulting from that lack of diligence.

*Barsky*, 85 B.R. at 554 (citation omitted).

The Court must decide "whether a finding of unreasonable delay is consistent with the requirements of due process under the circumstances, and whether there has been an adequate showing of prejudice." *Barsky*, 85 B.R. at 554. The *Barsky* court denied the claim because of "the unreasonableness of [the creditor's] dilatory conduct in bringing the claim", noting that a determination that a creditor's delay was unreasonable is reviewed under the abuse of discretion standard. *Barsky*, 85 B.R. at 555. The eight year lapse before Unisys asserted its lease rejection damage claim is strong evidence of an "unreasonable lack of diligence," especially for a **\*988** creditor as active in the

bankruptcy proceeding as Unisys. Unisys had ample time prior to the bar date to file its lease rejection claim, and waiting eight years to do so was unreasonable. Filing the lease rejection claim, even in an unliquidated amount, would have provided notice of potential rejection damages to the Trustee and other creditors, and would have avoided the prejudice that now exists.

To satisfy the second prong of the *Barsky* test, there must be prejudice resulting from Unisys' unreasonable lack of diligence. The prejudice resulting from Unisys' delay has been detailed above. The Trustee states that in the First Amended Disclosure Statement, a distribution rate of forty-seven percent (47%) was estimated as the amount payable to general unsecured creditors, not including the Subsequent Claim. The Trustee successfully objected to certain claims after the First Amended Disclosure Statement was filed, and as of December 13, 1993, the estimated distribution rate to unsecured creditors was fifty-six percent (56%). In its Memorandum in Opposition to the Trustee's Motion for Summary Judgment, Unisys argues that the Plan in this case was confirmed based on a projected distribution rate to unsecured creditors of 47%, and a reduction in funds available to other unsecured creditors due to the Subsequent Claim is not prejudicial. Even if this contention were true, the Court is not precluded from finding, and does so find that the inaction of Unisys was prejudicial: "Allowing a dilatory creditor to wait out the proceedings before asserting her rights would significantly prejudice all involved by robbing them of the significant benefit of finality." *Barsky*, 85 B.R. at 555. Preclusion of the untimely Subsequent Claim at this late stage is clearly justified in the discretion of the Court due to the unreasonable delay, and prejudice to the Trustee and other creditors.

**F. *Subordination Of Late Filed Claims***

[17] Subordination of a late filed claim is another option available to the Court. Whether to subordinate an untimely filed claim, thereby entitling the claim to participate in any surplus of the estate is at the discretion of the court. *Wilson*, 96 B.R. at 263 (holder of late filed claim denied request to participate in distributions from surplus of the estate after payment of other claims). Equitable considerations should be examined by the court to determine whether the late filed claim should be paid from the surplus of the estate. *Wilson*, 96 B.R. at 263.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

[18] Under 11 U.S.C. § 726(a) an untimely filed claim in a Chapter 7 case may be paid if all other claims have been paid.  *Wilson,* 96 B.R. at 262. However, no statutory authority exists for allowing untimely filed claims to be paid from the surplus of the estate in Chapter 11.   The case law supporting subordination of claims relies on § 726(a), allowing a tardily filed claim to participate in distribution of the estate, although with junior priority to timely claims.   If the Court allowed the Subsequent Claim as an amendment, it would be inclined to subordinate that claim to timely filed claims on equitable grounds.   However, regardless of the Court's ruling on subordination, there is no surplus in this estate, so subordination of the Subsequent Claim would have the same effect as disallowance.

**III.** *Conclusion*

 The Trustee's Motion for Summary Judgment is well taken.   The Subsequent Claim is not an amendment of a timely filed claim (either formal or informal), and should have been filed prior to the bar date. Nearly eight years passed from the bar date to the filing of the Subsequent Claim.     The Court concludes that the Subsequent Claim is untimely, and due to its unreasonable lack of diligence and the prejudice caused thereby, Unisys is estopped from asserting the Subsequent Claim.

 Based on the foregoing, it is hereby

 ORDERED THAT Unisys' Motion for Summary Judgment is DENIED;  and it is further

 ORDERED THAT the Trustee's Motion for Summary Judgment is GRANTED.

 IT IS SO ORDERED.

 178 B.R. 976

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.
In re MARINELAND OCEAN RESORTS, INC.,
Debtor.
**Bankruptcy No. 97-08346-3P1.**

Dec. 16, 1999.

Chapter 11 debtor-former franchisee objected to two claims filed by creditor-hotel franchisor, the first to recover unpaid prepetition royalties and associated charges allegedly due under the franchise agreement and the second, filed after the claims bar date, seeking royalties, liquidated and treble damages, damages for debtor's alleged unauthorized use of trademarks, or, in the alternative, quantum meruit damages. Creditor filed motion for leave to file an amended proof of claim, with respect to the second claim. The Bankruptcy Court, George L. Proctor, Chief Judge, held that: (1) second claim was not an amendment to the first claim but, instead, was an assertion of a new claim; (2) consideration of the *Miss Glamour Coat* equitable balancing test weighed in favor of disallowing the amendment and, thus, debtor's objection to second claim was sustained; (3) creditor's failure to comply with the bar date was not the result of "excusable neglect," and so second claim was disallowed as a late-filed claim; (4) franchise agreement and related documents were validly assigned from resort's former owner-operator to debtor; and (5) as a result of debtor's continued operation of the subject hotels pursuant to the franchise agreement, it was bound to pay creditor the sums at issue in creditor's first claim.

Motion for leave to file amended claim denied, objection to first claim overruled, and objection to second claim sustained.

West Headnotes

**[1] Bankruptcy** 2899
51k2899 Most Cited Cases
Bar date for filing proofs of claim in Chapter 11 cases is a mechanism intended by Congress to provide the debtor and its creditors with "finality."

**[2] Bankruptcy** 2897.1
51k2897.1 Most Cited Cases
Post-bar date claims disrupt the orderly discharge of a debtor and, for this reason, late-filed claims are generally disallowed.

**[3] Bankruptcy** 2903
51k2903 Most Cited Cases
In the Eleventh Circuit, courts must carefully scrutinize post-bar date amendments to ensure that the amendment is genuine rather than an assertion of an entirely new claim.

**[4] Bankruptcy** 2903
51k2903 Most Cited Cases
Bankruptcy courts liberally allow claim amendments when the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim.

**[5] Bankruptcy** 2903
51k2903 Most Cited Cases
Claim amendments are freely permitted so long as the initial claim provides adequate notice of the existence and nature of the claim, as well as the creditor's intent to hold the estate liable.

**[6] Bankruptcy** 2903
51k2903 Most Cited Cases
To be within the scope of a permissible amendment, an amended claim should not only be of the same nature as the original, but also reasonably within the amount to which the original claim provided notice.

**[7] Bankruptcy** 2903
51k2903 Most Cited Cases
If an initial proof of claim does not give fair notice of the conduct, transaction, or occurrence that forms the basis of the claim asserted in an amendment, then the amendment asserts a new claim and will not be allowed.

**[8] Bankruptcy** 2903
51k2903 Most Cited Cases
Post-bar date claim asserted by creditor-hotel franchisor against Chapter 11 debtor-former franchisee was not an amendment to creditor's first claim but, instead, was an assertion of a new claim; although both claims arose from an identical transaction, the franchise agreement, first claim was based solely on monthly fees and associated charges under the agreement, while second claim alleged

242 B.R. 748, 35 Bankr.Ct.Dec. 101, 13 Fla. L. Weekly Fed. B 70
**(Cite as: 242 B.R. 748)**

independent claims for liquidated and treble damages based on debtor's alleged use of creditor's trademarks, second claim's request for recovery in quantum meruit also arose from separate facts than those upon which first claim was based, and first claim only gave fair notice of a claim for $27,560.98, while second claim potentially involved recovery in excess of $119,000.

**[9] Bankruptcy** ☞2903
51k2903 Most Cited Cases
Equitable balancing test enumerated in *Miss Glamour Coat* for determining whether a post-bar date claim is an amendment to an earlier claim or a new claim, traditionally construed as focusing on bad faith, prejudice, and delay, involves consideration of: (1) whether debtor and creditors relied upon the earlier proof of claim or had reason to know that a subsequent proof of claim would be filed, (2) whether other creditors would receive a windfall if the court refused to allow amendment, (3) whether claimant intentionally or negligently delayed in filing the amendment, (4) justification for the failure to file for an extension to the bar date, and (5) whether other equitable considerations exist which compel amendment.

**[10] Bankruptcy** ☞2903
51k2903 Most Cited Cases
Consideration of the *Miss Glamour Coat* equitable factors weighed in favor of disallowing a post-bar date claim asserted by creditor-franchisor against Chapter 11 debtor-former franchisee as an amendment to an earlier claim; original claim in the amount of $27,560.98 did not provide notice to the court or any interested party that a subsequent claim for treble damages, liquidated damages, or quantum meruit for an amount, at minimum, of $119,000 would be forthcoming, 51 of debtor's creditors who filed claims settled them in reliance on debtor's maximum exposure to creditor-franchisor being no more than $27,560.98 and to allow second claim would potentially dilute the distribution to those creditors, creditors would not receive a windfall if amendment were disallowed, and creditor-franchisor was at fault for not timely filing its second claim.

**[11] Bankruptcy** ☞2900(1)
51k2900(1) Most Cited Cases
Although a post-bar date claim relates back to the original claim and is deemed timely filed if allowed as an amendment in accordance with the Eleventh Circuit's traditional or equitable analysis, a "new" post-bar date claim will only be allowed if the

claimant can demonstrate that its failure to file in a timely manner was the result of "excusable neglect." Fed.Rules Bankr.Proc.Rules 3003(c)(3), 9006(b)(1), 11 U.S.C.A.

**[12] Bankruptcy** ☞2900(1)
51k2900(1) Most Cited Cases
Creditor-franchisor's failure to comply with the bar date was not the result of "excusable neglect," and so its post-bar date claim against Chapter 11 debtor-former franchisee was disallowed as a late-filed claim, where creditor failed to offer any legitimate reason beyond its reasonable control to justify its failure to comply with the bar date. Fed.Rules Bankr.Proc.Rules 3003(c)(3), 9006(b)(1), 11 U.S.C.A.

**[13] Bankruptcy** ☞2928
51k2928 Most Cited Cases
Proper proof of claim is presumed valid, and is prima facie evidence of the validity of both the claim and its amount.

**[14] Bankruptcy** ☞2926
51k2926 Most Cited Cases
Objecting party has the burden of coming forward with sufficient evidence to rebut the prima facie validity of a proper proof of claim.

**[15] Bankruptcy** ☞2926
51k2926 Most Cited Cases
Once an objecting party meets its burden of coming forward with sufficient evidence to rebut the prima facie validity of a proper proof of claim, the claimant has the ultimate burden of proving the validity and amount of the claim.

**[16] Assignments** ☞109
38k109 Most Cited Cases
Acceptance by assignee of an assignment of assignor's rights and a delegation of performance of assignor's duties constitutes a promise by him or her to perform those duties, enforceable by either the assignor or the other party to the original contract.

**[17] Novation** ☞1
278k1 Most Cited Cases
"Novation" is a mutual agreement between the parties concerned for the discharge of a valid existing obligation by the substitution of a valid new contract.

**[18] Assignments** ☞58
38k58 Most Cited Cases
Provision, holding that franchisee could not assign

242 B.R. 748, 35 Bankr.Ct.Dec. 101, 13 Fla. L. Weekly Fed. B 70
**(Cite as: 242 B.R. 748)**

the franchise agreement without franchisor's prior written consent, could be waived where such provision was inserted into the agreement for the benefit of franchisor.

**[19] Contracts** ☞227
95k227 Most Cited Cases

Doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted.

**[20] Assignments** ☞58
38k58 Most Cited Cases

Acts and conduct of a party to a contract, with knowledge of the fact that the contract has been assigned, may warrant the conclusion that a provision requiring written consent to an assignment has been waived.

**[21] Assignments** ☞58
38k58 Most Cited Cases

Hotel franchisor accepted assignee of franchisee as the entity with whom it would deal under the franchise agreement and, through parties' subsequent course of dealing, established a waiver of the provision requiring prior written consent to an assignment; assignee expressly agreed to "perform and carry out all of the terms, covenants and conditions" of the agreement pursuant to its terms, thus satisfying the agreement's conditions for assignment, and franchisor elected not to reject the assignment, but continued to do business with assignee pursuant to the agreement and subsequently honored assignee's request to terminate the agreement.

**[22] Bankruptcy** ☞2927
51k2927 Most Cited Cases

Chapter 11 debtor-corporation, which continued to operate the subject hotels using creditor-franchisor's trade names, trademarks, and system pursuant to a franchise agreement after the original franchisee's assignment of the agreement to debtor, failed to come forth with sufficient evidence to rebut the prima facie validity of creditor's proof of claim and, thus, was liable for charges reflected on creditor's account statement, which were properly assessed in accordance with the parties' contractual relationships.
**\*751** John B. MacDonald, Jacksonville, FL, for Marineland Ocean Resorts, Inc.

Richard R. Thames, Jacksonville, FL, for Choice Hotel International, Inc.

***FINDINGS OF FACT AND CONCLUSIONS OF***

*LAW*

GEORGE L. PROCTOR, Chief Judge.

This case came before the Court upon the objections of Marineland Ocean Resorts, Inc. ("Debtor") to Claims 62 and 116 filed by Choice Hotel International, Inc. ("Choice"), and upon Motion for Leave to File Amended Proof of Claim brought by Choice. The objections to claims and motion for leave were consolidated and heard at trial on August 26, 1999. Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

***FINDINGS OF FACT***

1. Marineland, Inc. is the former owner and operator of the Marineland oceanfront theme park and resort in Flagler County, Florida. The facilities included a marine animal attraction, a restaurant, a campground, a marina and two hotels located at 9507 Ocean Shore Boulevard, Marineland, Florida (the "Property"). (Aug. 26, 1999 Tr. at 11-12.)

2. During 1995 and continuing through April, 1996, Debtor negotiated with Marineland, Inc. for the purchase of the Property. Debtor ultimately closed on the Property on or about April 15, 1996. (*Id.* at 11-13.) At the time of the closing, the hotels on the Property were operating subject to a Quality Inn Franchise Agreement dated May 20, 1974, between Marineland, **\*752** Inc. and Quality Inns International, Inc. [FN1] (the "Franchise Agreement.") (*Id.* at 14; Choice Ex. 2.)

> FN1. Choice is the successor to Quality Inns International, Inc. and the owner of the Quality Inns Trade names and service marks. (August 16, 1999 Tr. at 106.) References to "Choice" include reference to Quality Inns International, Inc.

3. In connection with the closing, Debtor and Marineland, Inc. entered into an Assignment and Undertaking Agreement dated March, 1, 1996, with its effective date being the date of closing of April 15, 1996 (the "Agreement"). (Aug. 26, 1999 Tr. at 15; Debtor Ex. 1.) The Agreement provided that Debtor would assume and indemnify on behalf of Marineland, Inc. the various contracts listed on Schedule 1.05, including the Franchise Agreement. (Debtor Ex. 1 at Schedule 1.05.)

4. Debtor began operating the hotels on or about April 10, 1996. (Aug. 26, 1999 Tr. at 46-53.) Based

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

upon the review of the Property's records and the actual benefits derived from the licenses with Choice, Debtor determined not to continue with the franchise relationship with Choice. (*Id.* at 28.) By letter dated May 3, 1996, the president of Debtor, Jack Coovert, gave notice to Choice of Debtor's intent to "cancel our franchise agreement with Choice Hotels International effective May 31, 1996 or as soon as possible." (Choice Ex. 14.)

5. The Franchise Agreement between Debtor and Choice permitted the licensee to terminate the Franchise Agreement (after 20 years) on any anniversary of the commencement date, provided it gave Choice no less than three months written notice of its intent to terminate. (Choice Ex. 2.) Although Debtor had missed the deadline for notifying Choice of its desire to terminate the Franchise Agreement on the 1996 anniversary date, Choice honored the request and, by letter dated May 16, 1996, permitted Debtor to terminate the Franchise Agreement effective August 1, 1996. (Choice Ex. 15.) However, by letter dated May 24, 1996, Choice advised Marineland, Inc. that it remained liable on the Franchise Agreement and that as a result of the sale of the Property to Debtor, Marineland, Inc. was in default. [FN2] (Debtor Ex. 16.) On May 24, 1996, Choice sent a re-licensing package to Debtor for its consideration. (Choice Ex. 16.)

FN2. *See infra* note 5, and accompanying text.

6. Sometime after May 31, 1996, on its own initiative, Debtor began to take steps to de-identify the Property as a Choice franchise. (Aug. 26, 1999 Tr. at 30.) The de-identification included the substitution of all brochures and advertisements designating the hotels as being affiliated with Choice. (Debtor Exs. 9, 10.) Furthermore, no paraphernalia such as towels, soap, and other room accouterments with Choice's logo were displayed at the hotels. (Aug. 26, 1999 Tr. at 32-33.) However, Debtor admitted that the hotels continued to use after-market receipts with the Choice logo and that exterior signage on the roadway and over the hotel office door continued to display the Choice designation of "Quality Inn". (*Id.* at 46-47; Choice Exs. 13, 20.)

7. On October 30, 1997, Debtor filed a Chapter 11 petition with this Court. (Doc. 1.) An order establishing a claims bar date of July 22, 1998 was entered on April 23, 1998. (Doc. 114.)

8. Choice filed its original proof of claim (Claim 62)

on May 19, 1998. (Choice Ex. 23.) Claim 62 sought to recover $27,560.98 in unpaid pre-petition royalties and other sums due under the Franchise Agreement through the August 1, 1996 termination date. (*Id.*) Debtor's plan of reorganization was confirmed on July 8, 1998. (Doc. 215.)

9. Debtor timely filed an objection to Claim 62 on August 21, 1998. The objection was later amended solely to delete the Unsecured Creditors' Committee as a movant thereunder. (Doc. 309.) On June 15, 1999, Choice filed Claim 116 in the **\*753** amount of $119, 372.40. (Choice Ex. 24.) Claim 116 includes damages for the alleged unauthorized use of Choice trademarks through March 1, 1997. Claim 116 also seeks, in the alternative, quantum meruit damages of $148,139, which allegedly represents the value of the reservations placed through Choice's reservation system for the period of May 1, 1996 through July 31, 1996. Debtor filed an objection to Claim 116 on June 16, 1999, upon which Choice filed a response. (Docs. 512, 514.) Thereafter, on June 22, 1999, Choice filed Motion for Leave to File Amended Proof of Claim. (Doc. 515.)

### CONCLUSIONS OF LAW

Choice contends that Debtor expressly assumed the Franchise Agreement, therefore, Debtor is responsible for royalty charges and other fees related to the continued operation of the Property under the trade name Quality Inn for the several months following the assignment. (Choice Post-trial Mem. at 9- 12.) Additionally, Choice argues that even in the absence of an express assumption of the contract, it is entitled to quantum meruit recovery because Debtor knowingly accepted the benefits of the Franchise Agreement. (*Id.* at 12-17.) Moreover, Choice contends that Claim 116 arises out of the same transactions as Claim 62, therefore, it is properly allowable as an amended claim. (*Id.* at 21-28.) Choice therefore alleges that it is entitled to liquidated damages based on Debtor's unauthorized use of Choice marks through June 16, 1997. (*Id.* at 18-21.)

Debtor objects to the merits of Claims 62 and 116 based on, among other things, that it did not assume the Franchise agreement. (Debtor Mem. at 16- 24.) Moreover, Debtor contends that Claim 116 is not an amendment to Claim 62, therefore, it is time barred. (*Id.* at 7-13.) Alternatively, Debtor argues that even if Claim 116 amends Claim 62, equitable factors bar the amendment. (*Id.* at 13-16.) The Court will first decide whether Claim 116 amends Claim 62 or whether it asserts a new claim.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

### I. Amendment or Assertion of New Claim?

[1][2][3] As this Court has previously noted, "[t]he bar date for filing proofs of claim in Chapter 11 cases is a mechanism intended by Congress to provide the debtor and its creditors with 'finality.'" *Norris Grain Co. v. United States (In re Norris Grain Co.),* 81 B.R. 103, 105 (Bankr.M.D.Fla.1987), *aff'd,* 131 B.R. 747 (M.D.Fla.1990), *aff'd,* 969 F.2d 1047 (11th Cir.1992) (citations omitted). *See Hoos & Co. v. Dynamics Corp. of Am.,* 570 F.2d 433, 439 (2d Cir.1978) (noting Congress decided goal of finality is of greater benefit to public than benefit derived from allowing individual exceptions to bar date). Post-bar date claims disrupt the orderly discharge of a debtor and, for this reason, late-filed claims are generally disallowed. *See Biscayne 21 Condominium Ass'n. Inc. v. South Atl. Fin. Corp. (In re South Atl. Fin. Corp.),* 767 F.2d 814, 817-18 (11th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *see also Security Sav. and Loan Ass'n of Dickinson, Tex. v. Kay Homes, Inc. (In re Kay Homes, Inc.),* 57 B.R. 967, 971 (Bankr.S.D.Tex.1986) (viewing claims bar date in nature of statute of limitations; to be strictly observed). Accordingly, the Eleventh Circuit has mandated that courts carefully scrutinize post-bar date amendments to ensure that the amendment is genuine rather than an assertion of an entirely new claim. *See United States v. Int'l Horizons, Inc. (In re Int'l Horizons, Inc.),* 751 F.2d 1213, 1216 (11th Cir.1985) (citing *First Nat'l Bank of Mobile v. Everhart (In re Commonwealth Corp.),* 617 F.2d 415, 420 (5th Cir.1980)).

### A. Traditional Analysis

[4][5][6][7] Nevertheless, courts liberally allow claim amendments when the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater **\*754** particularity or to plead a new theory of recovery on the facts set forth in the original claim. *See Int'l Horizons, Inc.,* 751 F.2d at 1216 (citations omitted). *See also Norris Grain,* 81 B.R. at 106 (noting amendment traditionally permitted if it arises out of same transaction or occurrence underlying original timely filed claim). Similarly, amendment is freely permitted so long as the initial claim provides adequate notice of the existence and nature of the claim, as well as the creditor's intent to hold the estate liable. *See Unioil v. H.E. Elledge (In re Unioil, Inc.),* 962 F.2d 988, 992 (10th Cir.1992). Likewise, to be within the scope of a permissible amendment, the amended claim should

not only be of the same nature as the original, but also reasonably within the amount to which the original claim provided notice. *See In re AM Int'l, Inc.,* 67 B.R. 79, 82 (N.D.Ill.1986) (citing *Int'l Horizons, Inc.,* 751 F.2d at 1216). However, if the initial proof of claim does not "give fair notice of the conduct, transaction or occurrence that forms the basis of the claim asserted in the amendment", then the amendment asserts a new claim and will not be allowed. *Pepperland, Inc. v. Westgate-Cal. Corp. (In re Westgate-Cal. Corp.),* 621 F.2d 983, 984 (9th Cir.1980).

The Court initially notes that Choice does not assert that Claim 116 cures any defect in Claim 62, therefore, the Court will determine whether Claim 116 describes Claim 62 with greater particularity or pleads a new theory of recovery on the facts set forth in the original claim. Claim 62 asserts an unsecured, non-priority claim in the amount of $27,560.98 arising from charges calculated under the Franchise Agreement and other contracts for services allegedly provided by Choice through July 31, 1996. (Choice Ex. 23.) Claim 116 includes the original charges of $27,560.98, but adds separate and distinct claims for: (1) royalties for June, 1996; (2) royalties for July, 1996; (3) liquidated damages as calculated under the Franchise Agreement for alleged unauthorized use of Choice marks; (4) treble damages for unauthorized use of Choice marks under the Franchise Agreement; and (5) a footnote in which Choice alleges that it has a right to quantum meruit damages for reservations placed through its system from March through August, 1996, in the amount of $148,139.00, plus actual and treble damages in an unknown amount for the unauthorized use of Choice marks. (Choice Ex. 24.)

[8] It is without dispute that the proposed amendment arose from the identical transaction as the original claim: the Franchise Agreement. However, the royalties for June and July, 1996, are already included in the total of $27,560.98 as compiled in Claim 62 and thus, simply compound the elements of Choice's claim as originally filed. Further, the liquidated and treble damages alleged in Claim 116 are not based upon the same facts asserted in Claim 62, which is based solely on monthly fees and associated charges under the Franchise Agreement. The liquidated and treble damages are independent claims based upon an alleged extended and unauthorized use of Choice marks; not on the standardized monthly royalty fees and associated charges set forth in Claim 62. Thus, the facts allegedly demonstrating the extended and

unauthorized use of Choice marks did not form the basis for Claim 62. Likewise, Choice's claim of quantum meruit in footnote 1 of Claim 116 is not based upon the standardized monthly royalty fees found in Claim 62, but instead is based solely on additional facts allegedly demonstrating actual benefits derived by Debtor from services provided by Choice.  Moreover, Claim 62 only gave fair notice of the standardized monthly fees and associated charges under the Franchise Agreement in the amount of $27,560.98.   The transactions which gave rise to Claim 62 did not give fair notice of a claim for quantum meruit, or treble and liquidated damages associated with the unauthorized use of Choice marks in an amount potentially exceeding $119,000.  *See AM Int'l, Inc., 67 B.R. at 82;  \*755Pepperland, Inc., 621 F.2d at 984*.   The new theories of recovery asserted by Choice in Claim 116 are simply not based upon the same set of facts as set forth in the original claim.   Therefore, the Court finds that such an amendment is in fact an assertion of a new claim. *See In re Nat'l Merchandise, Co., Inc., 206 B.R. 993, 1000 (Bankr.M.D.Fla.1997)* (amendment seeking to change status of claim from unsecured to secured is assertion of new claim);  *see also In re Jones, 219 B.R. 631, 634 (Bankr.M.D.Fla.1998)* (amendment seeking to change status of claim from priority to unsecured is assertion of new claim;  although both claims arose from identical occurrence).

### B. Equitable Considerations

 [9]  Notwithstanding the fact that the claims are distinct, Claim 116 may be allowed as an amendment based on the equitable balancing test as enumerated in *In re Miss Glamour Coat Co., Inc., 79 Civ. 2605, 1980 WL 1668, at *5 (S.D.N.Y. Oct. 8, 1980)*.   The *Miss Glamour Coat* factors have traditionally been construed as focusing on bad faith, prejudice and delay, and involve a consideration of the following:
   (1) whether the debtor and creditors relied upon the earlier proof of claim or had reason to know that a subsequent proof of claim would be filed;
   (2) whether other creditors would receive a windfall if the court refused to allow amendment;
   (3) whether claimant intentionally or negligently delayed in filing the amendment;
   (4) the justification for the failure to file for an extension to the bar date;
   (5) whether other equitable considerations exist which compel amendment.

 *See Int'l Horizons, Inc., 751 F.2d at 1218-19; Jones, 219 B.R. at 634*.

 [10]  With regard to the first factor, the Court finds

that the original claim in the amount of $27,560.98 did not provide notice to the Court or any interested party that a subsequent claim for treble damages, liquidated damages or quantum meruit for an amount, at minimum, of $119,000 would be forthcoming.   Moreover, fifty-one of Debtor's creditors whom filed claims settled them in reliance on Debtor's maximum exposure to Choice being no more than $27,560.98.   To allow Claim 116 in an amount of no less than $119,000 would potentially dilute the distribution to these creditors, whom may not have settled their claims had they known their distribution may be diluted by a claim potentially exceeding five-times Choice's original timely filed claim.   Therefore, the equities favor Debtor and the creditors who had no notice of the second claim and relied on its absence.

 The second factor announced in *Miss Glamour Coat* addresses whether the other creditors would receive a windfall were the Court to disallow the amendment.   [FN3]   Since all other creditors expected Debtor's maximum liability to Choice to be $27,560.98 pursuant to Claim 62, disallowing the amendment would put them in the position they anticipated when they settled their claims.   To the contrary, allowing the amendment would potentially dilute all other creditors' claims.   Therefore, the Court finds that the creditors would not receive a windfall if the amendment is disallowed.

> FN3.  Neither Debtor nor Choice addresses this factor in their post-trial briefs.   Choice notes that the Court has previously found this factor inappropriate in deciding whether to permit a post-bar date amendment to a claim.   (Choice Post-trial Mem. at 25) (citing *Norris Grain, 81 B.R. at 108;  In re Haack, 165 B.R. 501, 504 (Bankr.M.D.Fla.1994)*).   However, the Court has subsequently considered this factor in allowing a post-bar date amendment.  *See Jones, 219 B.R. at 635* (finding creditors would receive windfall were Court to disallow amendment).

 The third and fourth *Miss Glamour Coat* factors address whether or not the creditor was at fault in failing to timely file the claim.  *See \*756Norris Grain, 81 B.R. at 108*.   Choice points out that it requested leave to amend Claim 62 in its initial response filed shortly after the bar date. (Choice Post-trial Mem. at 26.)   Also, Choice contends that any delay in filing Claim 116 was caused by Debtor's failure to produce requested documents, not by the neglect or intentional design of Choice.  (*Id.* at 25-

27.) However, although Choice asserts that it did not learn of Debtor's position with regard to the Franchise Agreement until after the bar date, such information was discernible from Debtor's objection to Claim 62 filed on August 16, 1996. Nonetheless, Choice waited some ten months after Debtor's objection before filing Claim 116. Furthermore, Choice did not file a motion to extend the time for filing claims which could have been done prior to the bar date in order to give it time to wait for the requested information.

 In its Motion for Leave to File Amended Claim, Choice contends that it could not amend its claim until after the bar date because it did not learn of the unauthorized use of Choice marks until June 17, 1999. However, Claim 116 was filed on June 15, 1999, thus, the information obtained on June 17 could not have been included in the claim. Furthermore, Choice was apprised of information regarding the alleged unauthorized use of Choice marks some four months earlier through the deposition testimony of Jack Coovert, former president of Debtor, in which he stated that he believed the Choice signage was not removed until March of 1997. (Choice Ex. 8 at p. 14.) Therefore, Choice's arguments for allowing it to amend its claim are untenable. Clearly, Choice was at fault for not timely filing its claim.

 [11][12] The final element of the equitable balancing test requires the Court to consider any other equitable factors in order to assure a just and equitable result. See *Miss Glamour Coat,* 1980 WL 1668, *5. Choice argues that it would be inequitable to allow Debtor to retain the benefits of Choice's trademarks and signage without adequately compensating Choice for their use. (Choice Post-trial Memo. at 28-29.) However, Choice's argument is unappealing. A much greater inequity would result if the Court were to allow Claim 116. Claim 116 was filed approximately 13 months after Choice's original claim and some 10 months after Debtor's initial objection to Claim 62. Moreover, Claim 62 did not give Debtor notice of the nature or amount of Claim 116, both of which have changed considerably. Based on the foregoing analysis, the Court concludes that the equities weigh in favor of disallowing the amendment. Accordingly, the Court will sustain Debtor's objection to Claim 116 and deny Choice's Motion for Leave to File Amended Proof of Claim. [FN4] The Court **\*757** turns then to Debtor's objection to Claim 62.

             FN4. Debtor argues that Choice's failure to timely file Claim 116 was not the result of

"excusable neglect". (Debtor Mem. at 11-12.) However, Choice does not specifically address "excusable neglect" in its brief or Motion for Leave to File Amended Proof of Claim, although its arguments for allowing the amended claim are similar to those involved in an "excusable neglect" situation. (*See generally* Choice Post-trial Mem.; Doc. 515.) Choice's arguments for allowing Claim 116 rely on it being construed as an "amendment" to Claim 62, which was timely filed. (*Id.*) A post-bar date claim relates back to the original claim and is deemed timely filed if allowed as an amendment in accordance with the traditional or equitable analysis as set forth by the Eleventh Circuit. *See* discussion *supra* Part I.A-B. On the other hand, a "new" post-bar date claim will only be allowed if the claimant can demonstrate that its failure to file in a timely manner was the result of "excusable neglect". *See South Atl. Fin. Corp.,* 767 F.2d at 817-20; *see also* Fed. R. Bankr. P. 3003(C)(3), 9006(b)(1). In this case, Choice seeks to file an amended claim, not an untimely claim. Nevertheless, even if the Court construes Choice's Motion For Leave to File Amended Proof of Claim as a request to file an untimely proof of claim, Choice failed to offer any legitimate reason beyond its reasonable control to justify its failure to comply with the bar date. *See* discussion *supra* Part I.B. *See also South Atl. Fin. Corp.,* 767 F.2d at 818-20 (finding no "excusable neglect" when failure to file timely claim was not the result of circumstances beyond creditor's reasonable control). Accordingly, the Court holds that Choice's failure to comply with the bar date was not the result of "excusable neglect" and therefore, Claim 116 is disallowed as a late filed claim.

 **II. Merits of Claim 62**

 [13][14][15] A proper proof of claim is presumed valid, and is prima facie evidence of the validity of both the claim and its amount. *See In re St. Augustine Gun Works,* 75 B.R. 495 (Bankr.M.D.Fla.1987). Consequently, the objecting party has the burden of coming forward with sufficient evidence to rebut the prima facie validity of the claim. *See In re Haack,* 165 B.R. 501, 503 (Bankr.M.D.Fla.1994) (citing *St. Augustine Gun Works,* 75 B.R. at 496). Once the objecting party

meets this burden, the claimant has the ultimate burden of proving the validity and amount of the claim. *Id.*

[16][17] Choice contends that the sums asserted in Claim 62 are due and owing because Debtor expressly assumed the Franchise Agreement. (Choice Post-trial Mem. at 7.) Moreover, Choice argues that Debtor knowingly accepted the benefits of the Franchise Agreement, therefore, it cannot credibly argue that it has no financial obligation to Choice. (*Id.* at 12.) Conversely, Debtor argues that it has no obligation to Choice because there was no novation [FN5] between the parties, and Choice did not expressly approve, in writing, of the assignment of the Franchise Agreement from Marineland, Inc. to Debtor. (Debtor Mem. at 16-21.) In addition, Debtor contends that it did not derive any benefit from the Franchise Agreement, therefore, it does not owe Choice for the services assessed under the Re-licensing Guidelines. (*Id.* at 21-23.)

> FN5. The Court does not find it necessary to determine whether or not a novation has occurred. Debtor mistakenly contends that a novation is necessary in order for it to be an obligor under the Franchise Agreement. However, the General Assignment of Contracts and Assumption of Liabilities is an assignment of the rights and a delegation of performance of the duties of the assignor, and its acceptance by the assignee constitutes a promise by him or her to perform those duties. (*See* Choice Ex. 1.) This promise is enforceable by either the assignor or the other party to the original contract. On the other hand, "[a] novation is a mutual agreement between the parties concerned for the discharge of a valid existing obligation by the substitution of a valid new contract ...." *Miami Nat'l Bank v. Forecast Constr. Corp.,* 366 So.2d 1201, 1204 (Fla.App.3d DCA 1979). A novation is only necessary to completely release the original contracting party from its obligations under the Franchise Agreement. *See Estate of Johnston v. TPE Hotels, Inc.,* 719 So.2d 22, 25 (Fla.App.5th DCA 1998), *reh'g denied,* (1998) *review denied,* 727 So.2d 904 (Fla.1999). Because the issue of whether Marineland, Inc. continues to remain liable to Choice on the Franchise Agreement is not before the Court, the Court need not address whether or not a novation has occurred.

[18][19][20] Initially, Choice and Debtor dispute whether or not Choice had to provide express written approval of an assignment of the Franchise Agreement from Marineland, Inc. to Debtor. After a thorough reading of the Franchise Agreement, the Court concludes that Marineland, Inc. could not assign the agreement without the prior written consent of Choice. (*See* Choice Ex. 2, ¶ 12.) However, the Court also recognizes that such a provision may be waived. *See Charlotte Harbor & N. Ry. Co. v. Burwell,* 56 Fla. 217, 48 So. 213 (1908). The doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted. *See Gilman v. Butzloff,* 155 Fla. 888, 22 So.2d 263 (1945). The Court concludes that the covenant not to assign without the prior written consent of Choice was inserted into the Franchise Agreement for the benefit of Choice. Therefore, pursuant to the doctrine of waiver, Choice may waive the written consent requirement in the Franchise Agreement. *See American Ideal Management, Inc. v. Dale Village Inc.,* 567 So.2d 497, 501 (Fla.Dist.Ct.App.1990). The acts and conduct of a party to a contract, with knowledge of the fact that the contract has been assigned, may warrant the conclusion **\*758** that a provision requiring written consent to an assignment has been waived. *See Orlando Orange Groves Co. v. Hale,* 119 Fla. 159, 174, 161 So. 284 (1935); *see also Holman v. Halford,* 518 So.2d 442, 443 (Fla.Dist.Ct.App.1988) (noting lessor may waive provision requiring written consent to subletting either by accepting benefits of sublease or through subsequent course of conduct).

[21] Paragraph 13(a) of the Franchise Agreement states that the franchised motel will not be sold or assigned unless the buyer or transferee "shall, in writing, accept title thereto subject to all the conditions and covenants hereof for and during the unexpired term hereof, as fully and with the same effect as though said buyer, assignee or transferee were an original party and signatory hereto." (Choice Ex. 2, ¶ 13(a).) In this case, Debtor expressly agreed to "perform and carry out all of the terms, covenants and conditions" of the Franchise Agreement pursuant to the terms of the Assignment and Undertaking Agreement dated March 1, 1996. [FN6] (Choice Ex. 1.) Therefore, notwithstanding the prior written consent provision, the conditions for assignment pursuant to paragraph 13(a) of the Franchise Agreement were met. The assignment, however, was subject to Choice's right to reject the assignment or transferee within 60 days after notification of the transfer. (*See* Choice Ex. 2, ¶ 13(d).) Notice of the

242 B.R. 748, 35 Bankr.Ct.Dec. 101, 13 Fla. L. Weekly Fed. B 70
**(Cite as: 242 B.R. 748)**

assignment was given to Choice by at least May 3, 1996, giving Choice until July 3, 1996, to reject the assignment and terminate the Franchise Agreement. (*See* Choice Exs. 14, 17.) Choice did not elect to do so. Instead, Choice continued to do business with Debtor pursuant to the Franchise Agreement. Moreover, Choice subsequently honored Debtor's request to terminate the Franchise Agreement effective August 1, 1996. (Choice Ex. 15.)

FN6. *See supra* note 5, and accompanying text.

 The Court finds that the evidence shows that Choice accepted Debtor as the entity with whom it would deal under the Franchise Agreement and, through the subsequent course of dealing between the parties, established a waiver of the provision that requires prior written consent to an assignment. *See Vitra-Spray of Fla., Inc. v. Gumenick,* 144 So.2d 533 (Fla.Dist.Ct.App.1962). Based on the foregoing, the actions of Choice and Debtor point inescapably to the conclusion that the Franchise Agreement and related documents were validly assigned from Marineland, Inc. to Debtor. *See Orlando Orange Groves Co.,* 119 Fla. at 174, 161 So. 284.

 [22] Debtor continued to operate the Property using Choice's trade names, trademarks and system and, for a period of at least two months thereafter, continued to submit monthly sales reports to Choice. Choice's account statement reflects the sums due for the period of May, 1996, through July 31, 1996, plus service and guest refund charges which accrued after the August 1, 1996 termination date. (*See* Choice Ex. 7.) It does not include post-termination damage claims relating to the unauthorized use of Choice's marks after the termination date. Thus, all of the charges reflected on the account statement were properly assessed in accordance with the contractual relationships between the parties. (*See* Choice Exs. 2-7, 12.) The Court finds Debtor's remaining arguments regarding a lack of any benefit derived from the Franchise Agreement similarly unappealing. Thus, Debtor has failed to come forth with sufficient evidence to rebut the prima facie validity of Claim 62. Hence, as a result of Debtor's continued operation of the Property pursuant to the Franchise Agreement and related documents, Debtor is bound to pay Choice the sums at issue in Claim 62.

### CONCLUSION
 Based on the foregoing, Debtor's objection to Claim 116 is sustained and Choice's Motion for Leave to File Amended Claim is denied. Moreover, upon the

evidence **\*759** presented, Debtor's objection to Claim 62 is overruled, and the claim is allowed as filed as a general unsecured claim in the amount of $27,560.98. A separate order will be entered in accordance with these Findings of Fact and Conclusions of Law.

 242 B.R. 748, 35 Bankr.Ct.Dec. 101, 13 Fla. L. Weekly Fed. B 70

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.