1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
 2                   JACKSONVILLE DIVISION

 3                      CASE NO.:  05-03817-3F1
                       CHAPTER 11
 4                     JOINTLY ADMINISTERED

 5   In Re:

 6   WINN-DIXIE STORES, INC., et al.,       ORIGINAL

 7          Reorganized Debtors.

 8   _____

 9          Deposition of J. ADRIAN BARROW, taken on

10   behalf of Reorganized Debtors herein, pursuant to Notice

11   of Taking Deposition, at 225 Water Street, Suite 1800,

12   Jacksonville, Duval County, Florida, on Tuesday,

13   February 5, 2008, at 9:30 a.m., before Terry T. Hurley,

14   Registered Professional Reporter, and Notary Public in

15   and for the State of Florida at Large.

16

17   Appearances:

18

19   LEANNE MCKNIGHT PRENDERGAST, ESQUIRE
     Attorney for Reorganized Debtors
20
     Also present:  Jay Castle, Esquire
21
                        - - -
22

23

24

25
```

HEDQUIST & ASSOCIATES REPORTERS, INC.

1      I N D E X

2

3   Witness:  **J. ADRIAN BARROW**

4

5                                      Page

6   DIRECT EXAMINATION
       By Ms. Prendergast---------------03

7

8                   E X H I B I T S

9

10  For Identification

11     Nos. 1-8------------------------03
       No. 9---------------------------18

12

13

14

15

16                      - - -

17

18

19

20

21

22

23

24

25

1          **J. ADRIAN BARROW,**

2    having been produced and first duly sworn as a witness,

3    testified as follows:

4          THE WITNESS:  I would like to make a comment

5       before we begin, if I could.

6          MS. PRENDERGAST:  Sure.  Go ahead.

7          THE WITNESS:  I got the subpoena.  I brought

8       the items that you asked for, and those are the

9       items I'm prepared to address.  If there's anything

10      else, I have provided it to the court in writing on

11      several occasions.  I hope you have that, because

12      I'll have -- I didn't bring that information --

13         MS. PRENDERGAST:  Okay.  Great.

14         THE WITNESS:  -- is all I'm saying.

15         MS. PRENDERGAST:  Okay.  Great.

16         THE WITNESS:  So I'll have to rely on that.

17         MS. PRENDERGAST:  Very good.

18         (Exhibit Nos. 1-8 were marked for

19   identification.)

20              DIRECT EXAMINATION

21   Q    Would you please state your name.

22   A    Jeffrey Adrian Barrow.

23   Q    Would you please spell that for the record.

24   A    J-e-f-f-r-e-y, A-d-r-i-a-n, B-a-r-r-o-w.

25   Q    Thank you.  My name is Leanne Prendergast, and

1    I'll be conducting the deposition on behalf of

2    Winn-Dixie.  I'll ask you questions, and my questions

3    and your answers will be recorded.  You will need to

4    answer orally and audibly so that your answers can be

5    recorded.  The court reporter won't be able to record a

6    nod or a shake of the head.  If you don't understand my

7    questions, please ask me to clarify.  If you need to

8    take a break, please let me know.

9        A    Okay.

10       Q    Sometimes it happens that you answer a question

11   and then later, maybe five minutes later something

12   occurs to you that would help clarify your answer.  If

13   that happens to you, just let us know and we can go back

14   and get it clarified right then and there.

15       A    Okay.

16       Q    Sometimes while you're answering, a document

17   may occur to you that would help clarify your answer.

18   If that happens, please let us know and we can refer to

19   a document.

20            Are you represented in this matter, Mr. Barrow?

21       A    I am not.

22       Q    Okay.  Is there any reason that you can think

23   of that you would not be able to answer my questions

24   fully and truthfully today?  Have you taken any

25   medications?

```
 1      A    No medications.

 2      Q    Any substances --

 3      A    No substances.

 4      Q    -- that may impair your ability to answer --

 5      A    No substances.

 6      Q    -- truthfully and fully?

 7           Okay.  What is your current address,

 8  Mr. Barrow?

 9      A    P.O. Box 350423, Jacksonville, Florida,

10  32235-0423.

11      Q    32235?

12      A    Correct.

13      Q    Okay.  And has that been your address since

14  February 21st, 2005?

15      A    Yes.

16      Q    You mentioned that you did bring the documents

17  that you were subpoenaed to bring today?

18      A    Yes.

19      Q    You brought all the documents that were

20  responsive to the subpoena?

21      A    Yes.

22      Q    May I see those, please?

23      A    Yes.  These are the documents that I have that

24  were originals from Wachovia.  I did make a copy of them

25  for you.
```

1    Q    Okay.  Great.  Thank you.

2    A    And I also called Wachovia's office yesterday

3 and asked them to fax everything.  So you can have all

4 of it.  It should be the same information.

5    Q    Okay.  Mr. Barrow, I'm going to show you

6 documents that have been marked as Exhibits 1 to 4.

7 These are the proofs of claims that you filed against

8 Winn-Dixie.

9    A    Uh-huh.  Yes.

10    Q    These are the only claims that you have

11 asserted against Winn-Dixie; is that correct?

12    A    Yes.

13    Q    And are these in fact the only claims that you

14 have against Winn-Dixie for any cause of action

15 whatsoever?

16    A    At this time, yes.

17    Q    At this time for anything from the beginning of

18 time?

19    A    I don't know.  It depends on what turns up

20 here.

21    Q    Okay.  But we're talking about -- okay.  From

22 today backward to the beginning of time, do you have any

23 other claims against Winn-Dixie?

24    A    Not at this time.

25    Q    Okay.  And these are based on amounts you

1    allege are due to you under the MSP, Winn-Dixie's

2    management security plan, and the SRP, Winn-Dixie's

3    supplemental retirement plan?

4        A    Yes.

5        Q    Okay.  And two of the proofs of claims, 5743

6    and 5795, have been disallowed as amended, leaving 7739

7    and 7349.

8        A    I don't know the numbers, but it would be the

9    last ones I filed.

10       Q    Right.  They're numbered sequentially, so

11   that's correct.

12       A    Okay.  Good.

13       Q    Turning to your January 5, 2004 release

14   agreement with Winn-Dixie, I'm going to call that the

15   release for purposes of this deposition.

16       A    Okay.  For simplification.  Okay.  Release.

17       Q    In your objection to the debtor's motion for

18   order authorizing rejection of employment --

19   employment-related executory contract you refer to your

20   claims as being secured.

21       A    Yes.

22       Q    What did you mean by that?

23       A    I meant I was due not to have any negative

24   impact financially.

25       Q    That the SRP and MSP accounts were due not to

1   have any --

2       A    Negative impact to me financially, and they

3   were to be delivered to me as agreed upon in the

4   release.

5       Q    Okay.  So --

6       A    To simplify the answer, I believe it would just

7   be to ensure that I was made whole for those accounts.

8       Q    So you're referring to the part of the release

9   that said they were to -- the MSP and SRP accounts were

10  to be excluded from business dealings that might

11  negatively impact them?

12      A    That's correct.

13      Q    So you're not using the term secured in this

14  context to mean collateralized?

15      A    No.  It would be to make me whole.

16      Q    Okay.  So you're not saying that you were given

17  collateral to secure the accounts?

18      A    I was given letters through the release,

19  through that agreement, and through a letter sent back

20  to me by Dedra Dogan ensuring the accounts were secured.

21  So her letter and the company's agreement would be the

22  collateral.

23      Q    But you weren't given any kind of property or

24  letter of credit --

25      A    No.

1    Q    -- or any other thing of value?

2    A    No.

3    Q    Okay.  Just those two pieces of paper?

4    A    Yes.

5    Q    Okay.  Are you aware of any other fact or

6    evidence to support the argument that the MSP or SRP

7    accounts were collateralized or secured?

8    A    Not at this time.

9    Q    Are you aware of any other document or paper to

10   support the argument that the MSP or SRP accounts were

11   secured?

12   A    Other than those two documents.  Those are the

13   ones that I rely on.

14   Q    Okay.  What obligations or duties did you have

15   to Winn-Dixie after you signed the release?

16   A    It's outlined in the agreement, I believe.  I

17   didn't read the entire thing, other than I wasn't to go

18   after any employees for employment, was one.  I wasn't

19   to file any discrimination or any other claims, was two.

20   That's all I can think of right off.

21   Q    Okay.  What obligations or duties, if any, were

22   owed to you by Winn-Dixie under the release after

23   Winn-Dixie signed the release?

24   A    To fulfill the release agreement, in specific,

25   addressing the MSP and SRP accounts.

1    Q    Meaning --

2    A    Meaning to make me whole and not impact me

3    negatively financially.

4    Q    Okay.  I'm going to show you a document marked

5    as Exhibit 5.  Exhibit 5 is a notice of the debtors

6    objection to and motion to adjust and confirm accounts

7    -- amounts -- excuse me -- of management security plan

8    claims and supplemental retirement plan claims

9    consistent with the joint plan of reorganization.

10         This document notified you that the debtors had

11    filed an objection and motion to reduce your MSP claim

12    and reclassify it to unsecured.  This document was

13    served upon you at the P.O. Box address that you've

14    identified at this deposition.

15         Can you confirm that you received this

16    document?

17    A    I can't confirm it today without going back to

18    my records.

19    Q    Could you please look it over?

20    A    Sure.  What would you like me to do?  I see it.

21    Q    Okay.  If you had received a document like this

22    would you have reviewed it?

23    A    More than likely.

24    Q    And would you have understood it?

25    A    Yes.

1    Q    Assuming that you received and understood this

2 document, would you have disagreed with what Winn-Dixie

3 was proposing to do with your MSP account?

4    A    Yes.

5    Q    So did you file an objection?

6    A    Yes.

7    Q    You filed an objection to this document?

8    A    I filed an objection to the prepetition

9 contract that was listed that the court had put out.

10    Q    Okay.  But I'm talking about to this document.

11 Did you file an objection to this document?

12    A    I don't know if it was specifically to this

13 document.

14    Q    Okay.  I'm showing you a document marked as

15 Exhibit 6.  This is also a notice of debtors' omnibus

16 objection to and motion to adjust and confirm amounts

17 of, A, management security plan claims, and, B,

18 supplemental retirement plan claims, consistent with the

19 joint plan of reorganization.

20    This document notified you that the debtors --

21 the debtors had filed a motion to reduce your SRP claim

22 and reclassify it to unsecured.  This document was

23 served upon you at the Post Office Box you identified

24 today.

25    Can you confirm that you received this

1    document?

2    A    It would be the same answer as the other I

3    responded to.

4    Q    We served two documents on you, and you're not

5    sure you received either one?

6    A    More than likely I have received them.

7    Q    And if you received it would you have reviewed

8    it?

9    A    Yes.

10    Q    And understood it?

11    A    Yes.

12    Q    And would you have agreed with this treatment

13    of your SRP claim?

14    A    No.

15    Q    And did you file a motion objecting to this

16    treatment of your SRP claim?

17    A    I filed a motion or objection I know to the

18    prepetition contract that was put forth and put out

19    originally by the courts.  I think it was either the

20    Logan Company through the courts, or the courts.

21    Q    Okay.  I understand that you did that.  But

22    what about to this motion?

23    A    I don't -- I don't recall.

24    Q    Okay.  Both of these notices also provided you

25    with notice of a hearing date upon which the debtors

1    held a hearing for the motions where they were going to

2    ask the judge to enter orders reclassifying, reducing

3    your MSP claim and your SRP claim.

4           Did you attend the hearing?

5       A   No, I did not attend the hearing.

6       Q   Why didn't you attend the hearing?

7       A   I don't -- I don't really recall.  I don't

8    know.

9       Q   Okay.  I'm going to show you a document that we

10   have marked as Exhibit 7.  It's a notice of entry of an

11   order reducing, adjusting or disallowing as applicable

12   and confirming allowed amounts of, A, management

13   security plan claim, and, B, supplemental retirement

14   plan claim, and notifies you that the bankruptcy court

15   did enter the order reducing and reclassifying your MSP

16   claim to unsecured, and as a result you now have an MSP

17   claim allowed in the total amount of $148,000.  This

18   notice was served to you at your Post Office Box that

19   you identified today.

20          Can you confirm that you received a copy of

21   this document?

22      A   Not without going back and looking at my

23   records.

24      Q   If you received it would you have reviewed it?

25      A   Yes.

HEDQUIST & ASSOCIATES REPORTERS, INC.

1    Q    And would you have understood it?

2    A    Yes.

3    Q    Do you understand that under this order you

4    have a death benefit under the MSP claim of $59,304?

5    A    Yes.

6    Q    Payable in cash --

7    A    At my death.

8    Q    -- in the event of your death?

9    A    Yes.

10   Q    I'm going to show you a document marked as

11   Exhibit 8.  It's also a notice of entry of order

12   reducing, adjusting, or disallowing if applicable and

13   confirming allowed amounts of, A, management security

14   plan claims, and, B, supplemental retirement plan

15   claims.  It notifies you that the bankruptcy court

16   entered an order reducing and reclassifying your SRP

17   claim, and as a result you now have an SRP claim allowed

18   in the amount of $173,306.53, and that the claim was

19   allowed as an unsecured claim.

20        The notice was served upon you at the P.O. Box

21   you've identified today.

22        Can you confirm that you received this

23   document?

24   A    I can't confirm it without looking at my

25   records, but if I would have read it I would have

1  understood it.  Same answer as a while ago, but I would

2  not have agreed with it.

3      Q    Okay.  You didn't file an appeal of the judge's

4  orders that these notices put you on notice that were

5  entered, did you?

6      A    I don't know.  I don't think so.

7      Q    Okay.  Did you understand that the orders --

8  that the order was dispositive of the claims that you

9  filed?

10      A    Apparently not, if I didn't file an appeal.

11      Q    Did you seek or obtain legal advice from anyone

12  regarding the order?

13      A    No.

14      Q    Why not?

15      A    I just felt that what I had in writing would

16  substantiate my claim.

17      Q    Okay.  Well, the time for filing an appeal has

18  passed, and we would submit to you that these are final

19  orders and that your claims have been finally

20  adjudicated by final order of the bankruptcy judge, and

21  that you're not going to be able to go back and

22  relitigate them at this point in time.

23           After the order was entered you received a

24  distribution of stock --

25      A    I did.

1    Q    -- on the claims?

2    A    I did, yes.

3    Q    And when did that occur?

4    A    I believe it's on that document.  Sometime in

5  December of 2006.  I assume that's when Winn-Dixie

6  deposited it into the Wachovia account that they set up

7  for these.

8    Q    Okay.  And Wachovia is your broker?

9    A    I believe that Winn-Dixie had an arrangement

10  and agreement to deposit everything into the Wachovia

11  accounts, or set it up for people.  Is that correct?

12    Q    Okay.

13    A    So everybody got -- whoever got claims or got

14  stock issued, the company worked through Wachovia to set

15  up the accounts --

16    Q    Okay.  Great.

17    A    -- and deposited it.  Of course, again, these

18  are the originals.  I made copies.

19    Q    Thank you.

20    A    And I also got another copy from -- faxed to me

21  yesterday from Wachovia just to make sure everybody was

22  covered there.

23    Q    Thank you.  And what did you do with your

24  stock?

25    A    I sold it.  And I believe here -- it should be

1  in there.

2      Q    Okay.

3      A    Here it is, if you'll flip back to the first

4  page.

5           I believe it was Wachovia.  They took that

6  first amount, 39,000 -- what is it, 31.13?  They took

7  that automatically to pay for the taxes on the

8  distribution.

9      Q    Okay.

10     A    So that's the way it was.  So that was, I

11  believe -- well, it's the number of shares reflected in

12  here for that amount.  That must be it.  That's what it

13  is.  3000-and-what?

14     Q    3036 shares.

15     A    3036.  That's what they sold for the taxes.

16     Q    Okay.

17     A    And then it came to that amount.

18     Q    Okay.

19     A    And they, I guess, just showed that as an

20  adjustment there.

21     Q    Okay.

22     A    Now, the balance of the stock, I sold.  And

23  here's the -- and it should be here too.  Everything

24  should be the same.  If it's not, you let me know, but

25  I'm pretty sure.

1        The balance of the stock was sold on 2/2/07.

2    Settlement date was 2/7/2007, and --

3        Q    And that's what this page shows?

4        A    Well, good.  I'm glad you got it.

5        Q    2 of '07.  Okay.

6        A    Do you want to confirm that?  I wanted to make

7    sure I made the copies the same.  So they should look

8    the same.

9        Q    What consideration did you receive when you

10   sold the stock?

11       A    Whatever the amount is right here listed for

12   this.

13       Q    50,000?

14       A    Looks like it sold in two lots.  Yeah,

15   50,433.49 then 52,442.

16       Q    Okay.

17       A    Yeah.  There's commissions and fees deducted

18   out of that apparently.

19            MS. PRENDERGAST:  Can we have this marked

20       Composite 9, please.

21            (Plaintiff's Exhibit No. 9 was marked for

22   identification.)

23       Q    Is this your only copy?

24       A    It is.  I think she was having a little trouble

25   with my fax machine.

1    Q    We'll make a copy during the break.

2    A    That will be great.  If you want the original

3    here to make a copy, you're welcome.

4    Q    Oh, no.  We'll take a break in a minute.  Let's

5    flip through and make sure they match up, make sure you

6    didn't miss a page or anything.

7    A    Okay.

8    Q    Did you do anything to try to reject the

9    distribution from Winn-Dixie, or attempt to return it?

10    A    No, I did not.

11    Q    Did you attempt to communicate to Winn-Dixie

12    that you would not accept the distribution from

13    Winn-Dixie?

14    A    I did not.

15    Q    Are you familiar with Winn-Dixie's Chapter 11

16    plan provision that says that all consideration

17    distributed under the plan shall be in exchange for and

18    in complete satisfaction and discharge and release of

19    all claims under the plan?

20    A    I -- I see this.  I was under the impression

21    that a release had to be signed to do that.

22    Q    Not under the plan.

23    A    Okay.

24    Q    And after receiving the distribution of stock

25    you filed your application for cure, claim cure?

1    A    For the balance.

2    Q    Okay.  And in your application for claim cure

3    you requested full restitution.

4         What amount do you assert that should be?

5    A    I don't have that document with me.  I'm sure

6    y'all have a letter on that.

7    Q    Do you assert that that total is the same as

8    what you wrote in your letter?  Sitting here today do

9    you assert the total is the same as the letter you wrote

10   to the judge?

11   A    Yes.

12   Q    Okay.  So that total would be $191,201.46?

13   A    Yes.

14   Q    Okay.  And how did you calculate that total?

15   A    I took what I received and then I used my MSP

16   payout letter that I received from the vice president of

17   performance and rewards, and I put it into a program on

18   the computer for net present value to give me what the

19   amount would be when I turned 65 that I needed to have

20   in my account -- I believe I wrote that in here -- if I

21   was paid out at 65 what would need to be in there for

22   the 10-year payout to occur, what that value would be.

23   Q    What was the date on that letter from the

24   president?

25   A    I'm sorry?

```
 1     Q     You said you took a total from a letter from
 2  the president.
 3     A     No, no, no, no.  I went on the internet for a
 4  little net present value calculator.
 5           Oh, oh, the letter from the vice president of
 6  performance and rewards?
 7     Q     Right.
 8     A     Oh, I'm sorry.  You got it.  I don't recall the
 9  date.
10     Q     October 31, 2003?
11     A     That would be it.
12     Q     So you took that?
13     A     Yeah.
14     Q     So you -- and then you used a net value --
15     A     Net present value calculator.
16     Q     Calculator?
17     A     It's a formula I found on the internet.
18     Q     Okay.
19     A     Now, that would be for what my --
20     Q     But you didn't stop as of the petition date
21  2/21/05; you took it right up until the date on this
22  letter?
23     A     No, I -- I looked out like upon reaching age
24  65 --
25     Q     Okay.
```

1      A      -- what I would have needed to have in monies

2    value-wise to receive my payouts as originally intended

3    under that letter.

4      Q      Oh, okay.

5      A      And the other one was my supplemental

6    retirement.  I simply found my statement from 6/30, I

7    see here, '06 on T. Rowe Price.  That's the last

8    statement I recall seeing at T. Rowe Price, and that was

9    the balance in my account at that time.

10           The supplemental retirement plan was the plan

11   where you were allowed to set aside your income and have

12   it payroll deducted over a period of time.  So I had it

13   payroll deducted automatically and put into the mutual

14   funds that the company had set up over the course of a

15   number of years.

16           I believe though I did make a mistake here.

17   I'm incorrect.  It wasn't ten years.  It might have been

18   six or seven years that I had the monies deducted out of

19   my paycheck.

20      Q      Oh, okay.

21      A      So that would have given me the value.  They

22   showed what the value was I had at the time for my SRP.

23   Then I explained how I arrived at my MSP.

24      Q      Okay.

25      A      Then I just simply said, here's what I got from

1 the company, here's the total of the two together, and I

2 just subtracted it and came up with the difference.

3     Q    Okay.  Are you aware of any other facts or

4 evidence to support the claim cure?

5     A    Not that I haven't provided you, that I can

6 recall.

7     Q    Okay.  Did you read the disclosure statement

8 and Chapter 11 plan distributed to the creditors in this

9 case?

10     A    Not entirely, no.  It was very voluminous.

11     Q    Did you understand what you read?

12     A    Parts of it.

13     Q    Did you seek legal counsel with respect to the

14 provisions of the Chapter 11 plan disclosure statement?

15     A    I don't recall.

16     MS. PRENDERGAST:  Why don't we take a short

17     break.

18     THE WITNESS:  Okay.

19     (Short break.)

20     THE WITNESS:  I recall something that I need to

21     share with you.

22     MS. PRENDERGAST:  Okay.  Please do.

23     THE WITNESS:  You asked had I sought legal

24     counsel.

25     MS. PRENDERGAST:  Yes.

1          THE WITNESS:  There was a group that had a

2      lawyer handling the MSP and SRP.  All I know is his

3      name is Jared.  I can't recall anything else at this

4      point.  I forwarded my e-mail, one of the ones that

5      you have in letter format, to him, but I never got

6      to talk directly to him, and nothing ever came of

7      that.

8      Q    Okay.  Did you receive a response to your

9  e-mail?

10     A    I don't recall.  I don't recall if there was a

11  response.  I received -- there was a gentleman by the

12  name of Rich Ester, called me back and said he didn't

13  understand what I was wanting.  So I just let it drop.

14     Q    Okay.  Thank you.

15     A    All right.

16     Q    What's your understanding, Mr. Barrow, of the

17  purpose for the MSP and SRP?

18     A    It was ways that the company provided you an

19  opportunity to have a better retirement program.

20     Q    And do you understand that those plans were

21  deemed to be nonqualified under ERISA?

22     A    I had heard about the SRP being nonqualified,

23  but not the MSP.  I recall a meeting, and this is very

24  vague, this was in the early 80's in the Charlotte

25  division, I don't even remember the name of the company,

1  came up and made a presentation to us on MSP.  The one

2  thing that sticks out that I recall was that to

3  participate in this plan you had to have 500 shares of

4  Winn-Dixie stock.

5         At that time I did not have 500 shares of

6  Winn-Dixie stock.  I was subsequently after that meeting

7  promoted into headquarters, and my boss at that time

8  encouraged me to get onto that plan, buy the stock and

9  participate, which I did.  And that's really -- that's

10  the way it occurred.

11     Q    And what do the plans being non-risk qualified

12  mean to you?

13     A    I'd have to read the ERISA act to find out.

14     Q    Okay.  Fair enough.  I'm looking at the

15  release.  Isn't it true that you drafted this language?

16     A    I believe it's real close to what I drafted.

17     Q    About if Winn-Dixie becomes engaged --

18     A    Subsequently becomes engaged in -- yes, I did.

19     Q    Okay.  And what did you have in mind when you

20  drafted this?

21     A    To protect my retirement.

22     Q    In the event that what?

23     A    That anything occurred.

24     Q    Did you have bankruptcy in mind when you did

25  this?

1      A      That could have been one of the things in mind.

2      Q      So why didn't you use the word bankruptcy?

3      A      I didn't see a need.  I was looking for any

4  business event that might occur.

5      Q      You were really thinking about mergers or

6  reorganizations?

7      A      I did not know what could have occurred.

8             MS. PRENDERGAST:  I think we're finished.  I

9         don't have any further questions for you,

10        Mr. Barrow.  Thank you for your time.

11             THE WITNESS:  All right.  Do I get a copy of

12        this?

13             MS. PRENDERGAST:  You can if you want.  You

14        have the right to read your deposition and to make

15        corrections if you want to.

16             Would you like to do that?

17             THE WITNESS:  Yes, please.

18             (Witness excused.)

19             (The deposition concluded at 11:05 a.m.)

20                         - - -

21

22

23

24

25

1          **CERTIFICATE OF OATH**

2

3    STATE OF FLORIDA)
                     )
4    COUNTY OF DUVAL )

5

6          I, the undersigned authority, certify that J.

7    ADRIAN BARROW personally appeared before me and was duly

8    sworn.

9

10         WITNESS my hand and official seal this 21st day

11   of February 2008.

12

13

14   _____
     Terry T. Hurley, RPR
15

16

17

18

19

20

21

22

23

24

25

1      ## REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA)
                    )
4   COUNTY OF DUVAL )

5

6          I, Terry T. Hurley, Registered Professional
    Reporter, certify that I was authorized to and did
    stenographically report the deposition of J. ADRIAN
7   BARROW; that a review of the transcript was requested;
    and that the transcript is a true and complete record of
8   my stenographic notes.

9          I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties,
10  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
11  financially interested in the action.

12         DATED this 21st day of February 2008.

13

14

15                                        _____
                                          Terry T. Hurley, RPR
16

17

18

19

20

21

22

23

24

25

1          **ERRATA SHEET**

2     **DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE**

3   In re:  WINN-DIXIE STORES, INC., et al.
          Date of deposition:  February 5, 2008

4

5   PAGE NO.  LINE NO.      CHANGE          REASON

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21

22  Under penalties of perjury, I declare that I have read
    my deposition and that it is true and correct, subject
23  to any changes in form or substance entered here.

24  _____           _____
    DATE                J. ADRIAN BARROW
25  (th)

HEDQUIST & ASSOCIATES REPORTERS, INC.