UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 3:05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |

## PECO PALLETS, INC.'S TRIAL MEMORANDUM

In accordance with the order scheduling trial entered in this action on August 13, 2007, claimant, PECO Pallets, Inc. ("PECO"), submits this pre-trial memorandum in support of its application for allowance and payment of an administrative expense.

1. **Statement of the claim.** This contested matter seeks the allowance and immediate payment of a Chapter 11 administrative expense pursuant to 11 U.S.C. § 503(b) for pallets lost by Winn-Dixie Stores, Inc. during the administration of the Chapter 11 case. Initial estimates placed the post-petition pallet loss at 55,225. The revised post-petition pallet loss claim is 18,887, which translates into a monetary claim of $283,305.

2. **Factual Background.** PECO is a nationwide lessor of wooden pallets which are used to transport and store consumer products sold in grocery stores and other retail outlets. A "renter" of PECO pallets is entitled by written agreement to ship its goods to customers using PECO's pallets. Such customers, referred to as "distributors," are in turn entitled by separate written agreement with PECO to receive the pallets from the product manufacturer and to use the pallets for the transportation and storage of the underlying

goods. The pallets are required to be returned to PECO or an authorized depot once the goods are removed from the pallets and placed on the shelf.

Transfers of pallets from the renters to the distributors are tracked electronically utilizing PECO's "Red Link" system, which allows the renters to input shipment information directly. The transfers are identified on the Red Link system by shipment date, purchase order, and bill of lading. Each shipment is given its own transaction number for tracking purposes. Returns from the depots are similarly tracked, with PECO paying the depot a fee based on the number of pallet returns. Distributors are not charged a fee for use of the pallet, but are nonetheless responsible for lost pallets or pallets returned to the wrong depot. PECO periodically performs audits of its renters, distributors and authorized depots to "true up" the reporting and quantify pallet losses.

On October 22, 2003, PECO and Winn-Dixie Stores, Inc. ("Winn-Dixie") entered into an Agreement for Use of PECO Pallets (the "Agreement"). Pursuant to paragraph 2 of the Agreement, Winn-Dixie is obligated to return PECO's pallets to PECO's nearest depot as soon as the goods on the pallets have been off-loaded by Winn-Dixie. Section 5 of the Agreement further provides that Winn-Dixie must pay PECO a replacement cost of $15 per for those pallets which Winn-Dixie loses or transfers to unauthorized recipients. The parties selected IFCO as their pallet servicer, and a list of authorized IFCO depots was agreed to at the inception of the relationship.

On February 21, 2005 (the "Petition Date"), Winn-Dixie and its affiliates filed voluntary petitions for reorganization with this Court.

By mere coincidence, PECO was in the midst of auditing Winn-Dixie when the Chapter 11 petition was filed. PECO was thus able to establish a baseline for tracking postpetition pallet losses at the following locations:[1]

|  | Hammond | Montgomery | Jacksonville | Baldwin | Miami | Orlando | Pompano Beach |
|---|---|---|---|---|---|---|---|
| Inventory Count | 0 | 0 | 360 | 1,162 | 1,731 | 1,340 | 1,744 |

A second audit was performed in May of 2006. Between the initial audit of February 2005 and the May 2006 audit, PECO's Red Link system showed the following pallet transfers in, transfers out and subsequent returns, meaning Winn-Dixie should have had in its possession at the time of the May 2006 audit the number of pallets listed in the "Expected Balances" row:

|  | Hammond | Montgomery | Jacksonville | Baldwin | Miami | Orlando | Pompano Beach |
|---|---|---|---|---|---|---|---|
| Starting Balance | 0 | 0 | 360 | 1,162 | 1,731 | 1,340 | 1,744 |
| Transfers In | 22,159 | 12,435 | 11,941 | 23,001 | 23,826 | 33,259 | 15,616 |
| Returns | (16,138) | (12,138) | (4,163) | (32,290) | (20,505) | (26,517) | (14,705) |
| Transfers Out | (16) | (32) | (2) | (6) | (34) | (13) | (0) |
| Expected Balances | 6,005 | 265 | 11,136 | (8,133) | 5,018 | 8,069 | 2,655 |

---

[1] There was a shortfall of pallets at the Hammond and Montgomery distribution centers at the time of the February 2005 audit, meaning the shortfall occurred prepetition. The starting balances for those locations are therefore "0" for determining post-petition losses.

The May 2006 audit counts, however, revealed shortfalls at Winn-Dixie's Hammond, Montgomery, Jacksonville, Miami, Orlando and Pompano Beach facilities, and a surplus at Winn-Dixie's Baldwin distribution center:

|  | Hammond | Montgomery | Jacksonville | Baldwin | Miami | Orlando | Pompano Beach |
|---|---|---|---|---|---|---|---|
| **Expected Balances** | 6,005 | 265 | 11,136 | (8,133) | 5,018 | 8,069 | 2,655 |
| **Inventory Count** | 704 | 56 | 388 | 611 | 1,135 | 3,245 | 689 |
| **Actual Loss for Period** | (5,301) | (209) | (7,748) | 8,744 | (3,883) | (4,824) | (1,966) |

The net shortfall between the Petition Date and May of 2006 for these locations was 15,187 pallets. Notably, those losses are occurring at a time when Winn-Dixie was closing a multitude of stores and distribution centers. The higher than normal loss of pallets may also be attributable in part to Hurricane Katrina. Though the distribution facilities suffered no direct hits from the storm, Winn-Dixie apparently provided bottled water and other necessities to victims and aid workers without tracking or recovering the pallets used to provide such relief.

At the time PECO's administrative expense application was filed, it did not have the benefit of a third audit, meaning that PECO had to estimate the losses utilizing Winn-Dixie's historical loss rate. That estimate proved to be overstated. A May 2007 audit, however, established the actual losses occurring between May of 2006 and May of 2007 which, by location, were as follows:

| Hammond | Montgomery | Jacksonville | Baldwin | Miami | Orlando | Pompano Beach |
|---|---|---|---|---|---|---|
| 2,061 | 1,018 | 580 | 3,877 | 9,472 | 3,223 | (7,289) |

By counting the number of days between the May 2006 and May 2007 audits, the average daily loss rate for each location was determined and then multiplied by the number of days between the audits and the administrative cutoff to fairly apportion the loss between the pre-November 21, 2006 administrative cutoff and the post-November 21 period. The resulting pallet loss during that period was an even 3,700, meaning Winn-Dixie lost a total of 18,887 pallets during the administrative period.

Eleven U.S.C. § 503(b) provides that, "after notice and a hearing, there *shall* be allowed, administrative expenses, . . . including - - (1)(A) the actual, necessary costs and expenses of preserving the estate. . . ." (emphasis added). PECO operates in a competitive environment. It generally obtains renters by being the low cost provider of pallets. The savings realized by PECO's renters (typically $2 per pallet) are in turn generally passed through to Winn-Dixie, thus improving its margins. Conversely, if Winn-Dixie were not an a member of the PECO distribution network, the renters delivering products to Winn-Dixie would be assessed an unauthorized transfer fee of up to $15 to $20 for each PECO pallet delivered to Winn-Dixie (such fees are intended to offset the higher costs of recovering pallets from the unauthorized locations and to compensate PECO for the higher losses associated with non-approved distributors). Since over 201,000 PECO pallets were delivered to Winn-Dixie during the administrative period, Winn-Dixie received benefits of anywhere from $402,000 on the low side to over $3,020,734 on the high side by participating in the PECO distribution system. On a more basic level, Winn-Dixie's post-petition use of PECO's

pallets allowed it to receive, ship, store and move products within and among its distribution network. Any associated expense associated with the use of PECO's pallets while in Winn-Dixie's custody and control is therefore an actual and necessary expense of preserving the estate.

At the time of contracting, the parties determined that $15 per lost pallet was appropriate compensation under the Agreement (the current fee is $20 per pallet). Winn-Dixie therefore owes PECO as an administrative expense the sum of $283,305 ($15 per pallet x 18,887).

### 3. **Statement of uncontested facts.**

(a) PECO is a nationwide lessor of wooden pallets.

(b) On October 22, 2003, PECO and Winn-Dixie entered into an Agreement for Use of PECO Pallets.

(c) Pursuant to paragraph 2 of the Agreement, Winn-Dixie is obligated to return PECO's pallets to PECO's nearest depot as soon as the goods on the pallets have been off-loaded.

(d) Section 5 of the Agreement provides that Winn-Dixie must pay PECO a replacement cost of $15 per for those pallets which Winn-Dixie loses or transfers to unauthorized recipients.

(e) Winn-Dixie continued to receive pallets from PECO's renters post-petition.

(f) Winn-Dixie did not track its pallet returns to the authorized depots.

(g) Winn-Dixie did not assume the Agreement in connection with its Chapter 11 reorganization.

4. **Statement of contested facts.**

(a) The number or amount of pallets actually lost by Winn-Dixie.

(b) The benefits relating to its participation in the PECO distribution system.

(c) The amount Winn-Dixie is indebted to PECO for replacement of the lost and improperly transferred pallets as a cost of doing business.

(d) Who bears responsibility for tracking pallet returns to the authorized depots (Winn-Dixie contends that IFCO was PECO's agent and was responsible for tracking returns. Though the point is debatable, Winn-Dixie is unable to identify a single instance where IFCO failed to report the return of a PECO pallet from Winn-Dixie. This is a red herring issue. Winn-Dixie's failure to actually track such returns or provide PECO with bills of lading or other documents substantiating its pallet returns precludes it from a practical matter from proving that IFCO failed to properly report returns or that Winn-Dixie is entitled to any credit for misidentified pallet returns within the Winn-Dixie service area).

(e) Whether Winn-Dixie is entitled to credit for an unspecified number of pallets returned to other IFCO pallet depots or to other distributors within Winn-Dixie's prepetition service area.

5. **Statement of contested legal issues.** The following legal issues appear to be in dispute:

(a) Whether Winn-Dixie's participation in the PECO distribution system and subsequent post-petition use of PECO's pallets conferred substantial benefits on Winn-Dixie.

(b) Whether any expense associated with the loss of such pallets while in the custody and control of Winn-Dixie is an actual and necessary expense of preserving the estate.

(c) Whether Winn-Dixie's deemed rejection of the PECO agreement has any impact on PECO's administrative expense claim where Winn-Dixie continued to receive and accept the benefits of the contract throughout the entire administrative period.

(d) Whether the loss suffered by PECO as a result of its post-petition supply of pallets differ from the damages (if any) suffered as a result of the deemed rejection of the pre-petition contract.

6. **Depositions.** PECO does not anticipate use of any deposition transcript at trial at this time. PECO reserves the right to utilize the deposition transcript of Ronnie Calloway, Winn-Dixie's corporate representative, in its entirety.

7. **Legal Authority.**

(a) To implement the rehabilitative provisions of Title 11, Congress encourages creditors to continue conducting business with a debtor by promising then an administrative expense priority for all post-petition claims arising out of such transactions. *In re Baldwin Rental Centers, Inc.*, 228 B.R. 504, 511 (Bankr. S.D. Ga. 1998) ("The purpose of granting administrative expenses a priority is to encourage creditors to cooperate with a debtor's reorganization efforts so that the debtor can effectively reorganize and continue its business . . ."); and *In re Mammoth Mart, Inc.*, 536 F. 2d 950, 954 (1st Cir. 1976) ("[W]hen third parties are induced to supply goods or services to the debtor-in-possession . . . the purposes of [§ 503] plainly require that their claims be afforded priority").

(b) Costs incidental to the continued operation of a business are entitled to administrative expense priority even though the expenditure in and of itself confers no "benefit" to the estate. *Reading Co. v. Brown*, 391 U.S. 471, 483-84, 88 S. Ct. 1759, 1766 (1968) ("[A]ctual and necessary costs should include costs ordinarily incident to operation

of a business, and not be limited to costs without which rehabilitation would be impossible"). Even post-petition tort claims are entitled to administrative expense priority in payment even though the estate clearly does not benefit from the underlying injury. *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. Del. 2006). *See also, In re N.P. Mining Co., Inc.*, 963 F. 2d 1449 (11th Cir. 1992) (Penalties for environmental infractions entitled to administrative expense priority).

(c)     A prima facie case under § 503(b) is established where the claimant establishes that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession business to function as a going concern. *In re Transamerican Natural Gas Corp.*, 978 F. 2d 1409, 1416 (5th Cir. 1992).

(d)     Some courts have imposed an "inducement" element with respect to administrative claims; that is, the continued provision of services or goods pursuant to a pre-petition contract must have been "induced" or "accepted" by the debtor in possession in order for any resulting expense to receive administrative expense treatment. *See e.g. In re Jartran, Inc.*, 732 F. 2d 584 (7th Cir. 1984). The inducement element is, however, intended solely to filter out improper administrative claims where the products or services were requested by the pre-petition debtor and were unwanted or unused by the post-petition debtor. *See e.g. In re Adelphia Business Solutions, Inc.*, 296 B.R. 656, 665 (Bankr. S.D. N.Y. 2003) ("The 'inducement' requirement is very much a requirement in the law but it must be construed in accordance with common sense - - to filter out, as in *Jartran*, claims for administrative expense treatment where the post-petition benefit is requested pre-petition and/or unwanted by the post-petition debtor-in-possession, *but to require administrative expense treatment*

*where the post-petition benefit is knowingly accepted and desired, post-petition, by the post-petition debtor-in-possession*") (emphasis added).

(e)     The date of contracting is not the focal point of the *Jartran* inquiry; rather, it is the date where the services or products are provided which determines whether a claim is entitled to administrative expense priority. *In re National Steel Corp.*, 316 B.R. 287, 301 (Bankr. N.D. Ill. 2004).

(f)     Winn-Dixie's post-petition participation in the PECO distribution network pursuant to the terms of the contract allowed it to continue in business, ship goods via pallet, and receive the indirect benefit of the lower pricing being charged by PECO to its suppliers. The loss of pallets incidental to such continued operations therefore benefitted the estate. *See e.g. In re United Tracking Service, Inc.*, 851 F. 2d 159 (6th Cir. 1988). *See also In re J.A.V. AG., Inc.*, 154 B.R. 923, 929-30 (Bankr. W.D. Tex. 1993) ("The primary purpose of the benefit analysis under 11 U.S.C. § 503(b) is to prevent unjust enrichment to the estate . . . . To allow the estate to benefit from the use and possession of the trucks without requiring it to pay the costs associated with their usage would be to unjustly enrich the estate").

(g)     Though an administrative expense claimant must establish a concrete benefit to the estate from the parties' relationship, the benefits conferred on the estate need not be measured in precise dollars and cents. *In re Transamerica Natural Gas Corp.*, 978 F. 2d 1409, 1420 (5th Cir. 1992), *cert. dismissed*, 507 U.S. 1048 (1993) ("Although the amount to be allowed as an administrative expense must be measured in dollars and cents . . . the question whether the estate has benefitted cannot be so narrowly confined . . . . Although the estate receives a benefit that often can be measured by the actual cost of necessary goods or

services supplied, the estate also receives other less readily calculable benefits, such as the ability to continue to conduct business as usual").

(h)     Winn-Dixie did not specifically assume or reject its executory contract with PECO; rather, the contract was deemed rejected under the terms of Winn-Dixie's plan of reorganization. The deemed rejection of the PECO contract has no impact on PECO's entitlement to an administrative expense priority for its claim. *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F. 2d 119, 124 (2nd Cir. 1960) (Even if a contract is rejected, the creditor has an equitable right to payment for benefits received by the debtor "during the interval between the filing of the debtor's petition and the rejection of the contract"); *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D. N.Y. 2003) ("Pending the decision to reject, the non-debtor entity to the contract is entitled to payment as an administrative expense for goods and services provided during the period of time before the debtor assumes or rejects the contract"); *In re Patient Education Materials, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998) (Where "a debtor in possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services"). This common sense notion is grounded in the fact that the non-debtor party to the contract cannot as a matter of law unilaterally cease performance under an executory contract prior to its assumption or rejection. *See e.g. In re Pittsburgh-Canfield Corp.*, 283 B.R. 231, 238 (Bankr. N.D. Ohio 2002).

(i)     The damages suffered by PECO as a result of the loss of pallets supplied post-petition to Winn-Dixie are independent of any damages flowing from the deemed rejection of its contract. They are not therefore pre-petition claims and are entitled to receive

-11-

administrative expense priority in payment if all other factors needed to establish such claim are proven. *In re Globe Metallurgical, Inc.*, 312 B.R. 34, 39 (Bankr. S.D.N.Y. 2004) ("Although the right of assumption or rejection exists, when a debtor makes use of the subject of the executory contract prior to its rejection, the parties to the executory contract may be entitled to an administrative claim pursuant to 11 U.S.C. § 503); and *In re Palace Quality Services Ind., Inc.*, 283 B.R. 868, 887 (Bankr. E.D. Mich. 2002) (In a lease context, "[A] rejection claim is distinct from other post-petition claims a lessor may have against the estate. . . . A rejection claim is prospective only"). *See also In re Davidson & McKirdy Co., Inc.*, 70 B.R. 38 (Bankr. Conn. 1987).

(j)     The $15 charge for lost or misdelivered pallets set forth in the parties' contract is the best measure of the cost to Winn-Dixie of preserving its estate. *In re Beverage Canners Int'l. Corp.*, 255 B.R. 89, 93 (Bankr. S.D. Fla. 2000) ("[T]he value of consideration received under an executory contract is the amount set forth in such contract. . . . The basis for the presumption is that the parties are in the best position to negotiate the terms and value of the consideration").

PECO reserves the right to supplement its statement of legal authorities in connection with any post-trial briefing.

**8.     Statement as to "core" nature of proceeding.** This is a "core" proceeding within the meaning of 28 U.S.C. § 157(a) and claimant consents to the entry of the final orders or judgments by this Court.

9. **Statement of settlement conferences.** The parties to this litigation have discussed settlement on numerous occasions. The parties were unsuccessful in resolving this claim.

                                 **STUTSMAN THAMES & MARKEY, P.A.**

                                 */s/ Richard R. Thames*
By_____
                                 Richard R. Thames
                                 Robert A. Heekin, Jr.

Florida Bar Number 0718459
Florida Bar Number 0652083
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@stmlaw.net
rheekin@stmlaw.net

Attorneys for PECO Pallets, Inc.

## Certificate of Service

I certify that on May 5, 2008 a copy of the foregoing was transmitted to the Court for uploading to the Case Management/Electronic Case Files ("CM/ECF") System, which will send a notice of electronic filing to all parties who have consented to receiving electronic notifications in this case.

/s/ Richard R. Thames
_____
Attorney

66094