## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC. et al | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## VISAGENT'S FIFTH MOTION TO COMPEL DISCOVERY DIRECTING WINN-DIXIE TO PRODUCE RECORDS PURSUANT TO COURT ORDER DATED 12/28/2007, FOR AN ORDER DIRECTING DEBTORS' CORPORATE REPRESENTATIVE TO ANSWER DEPOSITION QUESTIONS AND FOR AN AWARD OF ATTORNEYS FEES AND SANCTIONS

Visagent Corporation (hereinafter "Visagent"), a claimant herein, moves the Court pursuant to Federal Rules of Civil Procedure 26 and 37 and Local Rule 7037-1, for an order compelling Winn-Dixie Stores, Inc. and twenty-three (23) of its subsidiaries and affiliates, as the Reorganized Debtors (hereinafter the "Debtors"), to produce those documents required BY THIS Court's order dated December 28, 2007, for an order directing the Debtors' corporate representative to answer posed deposition questions and for a continuation of the representative's deposition and for an award of attorneys fees and sanctions. In support of the motion, Visagent states:

1.      Visagent, an unsecured creditor, holds Claim No. 9953 against Debtors in the sum of $131,875,000.00. In the Amended Notice of Claim, filed herein, Visagent contends Debtors materially and substantially breached an exhaustively negotiated Service Agreement entered into between the parties on June 15, 2001, effective June 28, 2001. Under the terms of this Agreement, Debtors were obligated for three (3) years to exclusively utilize the services of Visagent for the procurement and sale of all merchandise it acquired or sold, through internet or similar electronic means, including any means utilizing facsimile, from and through the secondary market. The secondary market is comprised of all sources (buyers and sellers) of merchandise other than direct purchases and returns from original product manufacturers. Visagent avers that Debtors breached its contractual obligation in failing to exclusively utilize Visagent's services as provided for in the Service Agreement, and as a result, Visagent suffered damages

1

amounting to 2% of the value all transactions in which Debtors participated in the purchase or sale of goods in the secondary market, other than those exempted by the Agreement.

Additionally, Visagent claims Debtors violated federal and state laws in connection with the theft and usurpation of trade secrets, proprietary information and business opportunities belonging to Visagent, which were provided to Debtors based on false promises by the Debtors of a continued business arrangement between the parties. Visagent relied on the unrealized inducements and promises of the Debtors to its detriment and suffered catastrophic damages as a direct consequence of Debtors' actions.

2.      Debtors objected to Visagent's claims asserting it did not breach a duty to Visagent and Visagent failed to adequately perform under the terms of the Agreement, a claim that has been repeatedly belied by the deposition testimony of Debtors' employees.

3.      On July 23, 2006, Visagent served upon Debtors its First Request for Production, Interrogatories and Requests for Admissions. On August 25, 2006, Debtors served their Response to Visagent Corporation's First Request for Production of Documents and Debtors' Response to Visagent Corporation's First Set of Interrogatories.

4.      On April 18, 2007, Visagent Corporation served upon Debtors its Second Request for Production.

5.      On May 3, 2007, Visagent served its First Motion to Compel Production of Documents, Better Answers to Visagent's First Set of Interrogatories and the Deposition of Debtors' Corporate Representative. A hearing was held on June 14, 2006 on Debtors' Second Motion to Compel and Visagent's First Motion to Compel. The Court entered an order on June 21, 2007, which was therafter amended by a corrected order dated July 30, 2007 a copy of which is attached hereto as Exhibit A.

6.      During the course of the June 14, 2007 hearing, in response to cross-motions by Visagent for production of documents, Debtors' counsel repeatedly and vehemently represented to the Court that Debtors had produced all of the documents they had in their possession which were responsive to Visagent's discovery requests. (Hearing Transcript pages 36, 42, 44, and 53)

7.      In pertinent part, the Court ordered as follows, regarding Document Request No. 1, 2 and 3:

"Visagent Corporation's motion to compel the Debtors to produce original documents responsive to Document Request Numbers 1, 2 and 3 is denied as moot because of Debtor's prior agreement to produce the originals of the copies of the documents the Debtors have produced responsive to such Document Requests which are in Debtor's possession, custody or control."

8.      The Court further ordered that "(t)he Debtors shall make a reasonable effort to locate documents regarding their communications with Dayman & Associates during the period June 28, 2001 to December 28, 2004 and to produce such documents in the Debtor's possession, custody or control." (DOCUMENT REQUEST NO. 4) The Court further directed that "Debtors shall produce documents responsive to Document Request Numbers 5 through 9 for the period June 28, 2001 through December 28, 2004 which are in Debtor's possession, custody or control which the Debtors have not already produced."

9.      A Second Motion to Compel was served on May 29, 2007 which dealt with the refusal of Debtors' to establish a date for inspection of documents they had agreed to produce in response to Visagent's Second Request for Production.

10.     A Third Motion to Compel was filed on November 20, 2007 which sought an Order directing Debtors to produce those documents previously ordered to be produced and agreed to be produced, to fully respond to Visagent's discovery requests as supplemented by Debtor's corporate representative's deposition testimony, for an award of attorneys fees and sanctions and for an order expanding the time constraints to complete the deposition of Debtors' corporate representative. The crux of the motion was Winn-Dixie's continued refusal to produce documents responsive to Visagent's requests. Compounding Debtors' lack of compliance was the discovery during the deposition of Debtors' corporate representative that substandard efforts had been made to locate responsive documents and that the corporate representative presented as most knowledgeable was unaware of the efforts utilized to locate and produce these documents. Claimant proffered to the Court that the lack of diligence on Debtors' part in locating and retrieving responsive documents to the Requests for Production violated the June 14, 2007 Order of this Court and smacked of bad faith. Claimants had yet to discover the extent of Debtors' bad faith in obstructing the discovery process.

3

11.   A hearing was scheduled before this Court on December 13, 2007 on Visagent's Second Motion to Compel and Third Motion to Compel. The Court issued an Order dated December 28, 2007, a copy of which is attached hereto as Exhibit B. In pertinent part, the Court stated as follows:

> In regards to its Second Motion to Compel, Visagent alleges that the Debtors have failed to produce all of the documents sought in their Second Request for Production. (Tr. pg. 8). In response, Debtors' counsel adamantly maintains that the Debtors have complied in full. (Tr. pg. 10-11, 16, 34, 42-43). Specifically, Debtors' counsel stated 'We've given them all of the documents we're aware of in Winn-Dixie's possession – and we have conducted a very thorough search for those documents – and we've represented that to them. I don't know what else we can do.' (Tr. pg. 11). The Court accepts Debtors' representation that all documents they are aware of in their possession have been produced. However, the Court reserves the option to impose sanctions against the Debtors if it is discovered that they failed to produce all documents they were *aware* and in *possession* of at the time of the hearing, unless such documents are produced within thirty days of the date of this order. Additionally, if such documents are not produced within the above time frame, Debtors will be precluded from using the documents at trial."

In a footnote, the Court reiterated that the Order of July 30, 2007 remains effective, to wit: if the Debtors discover responsive documents other than those which the Debtors have already produced, Debtors shall produce such documents to Visagent no later than 30 days prior to the beginning date of any trial on this matter, failing which, the Debtors will be precluded from using such documents at trial."

12.   The Court also noted that Debtor agreed to produce a corporate representative other than Mr. Barr for deposition on the following area:

> All efforts taken by Winn-Dixie to locate and produce documents responsive to Visagent's requests for production of documents to Winn-Dixie referenced in Mr. David Gay's correspondence to Mr. Guy Rubin dated October 1, 2007.

13.   On January 28, 2008, counsel for Debtors forwarded a letter to the undersigned, a copy of which is attached hereto as Exhibit C. After denying the existence of additional information responsive to Claimant's Request for Production since June 14, 2007, Mr. Gay wrote:

"Additionally, by way of disclosure of Winn-Dixie's efforts to locate and produce documents responsive to Visagent's discovery requests, Winn-Dixie has recently

4

identified two potential sources of electronic documents which, due to undue burden and cost, Winn-Dixie has not reviewed for responsive information.

First, Winn-Dixie discovered that a system-wide backup of Winn-Dixie's electronic mail system was created in 2005. However, because Winn-Dixie has subsequently changed its electronic mail infrastructure, this backup information is no longer readable or searchable by Winn-Dixie without undue burden and cost. Therefore, pursuant to Federal Civil Procedure Rule 26 (b)(2)(B), Winn-Dixie has not reviewed this information for responsive documents.

Second, Winn-Dixie, through a document management vendor, maintains archives comprised of imaged documents. Winn-Dixie has determined that these archives may contain warehouse receiving and bills of lading documents regarding Winn-Dixie's purchases and sales of goods in the secondary market for the period 2001 through 2004. However, such documents are stored within a massive archive system which cannot be searched for documents specifically related to such purchases and sales without undue burden and cost...."

14.    On February 13, 2008, Debtors produced Matthew Larsen of Deloitte Financial Advisory Services, a senior manager working in the area of electronic discovery, who testified that the sources referred to in Mr. Gay's letter were the Metafile data (Transcript p. 96-97) and the system wide backup of the e-mail system in 2005. (Transcript p. 99) Upon further inquiry, it was revealed that Debtors had changed their backup system **AFTER** commencement of litigation in this case. However, Mr. Larsen indicated that he saw no impediment to having the data base replicated on to a hard drive and provided to Claimants. (Transcript p. 103-104)

15.    On April 17, 2008, Claimants filed their Fourth Motion to Compel seeking an order directing Debtors to produce those documents responsive to Visagent's First and Second Requests for Production, those documents ordered to be produced and agreed to be produced pursuant to Court Order and/or stipulation by searching recently discovered data bases and for an award of attorneys fees and sanctions. Since the first appearance on Visagent's First Motion to Compel through the hearing on the Third Motion to Compel, this court has listened to Debtors' unyielding and repeated protestations that they have produced everything they have that is responsive to Visagent's Request for Production. The Court made particular note of these protestations in its last decision. Yet, two additional sources of potentially responsive materials to Claimant's discovery requests "recently" appeared.

16.    Moreover, Debtors have **YET** to comply with initial requests for production at the most elementary basic level. Based on a thorough review of the documents produced by Debtors to Claimants, there have been no documents produced responsive to Document Requests Numbers 4, 6, 7 and 8 of Visagent's Second Request for Production.  For the Court's ease of reference, the requests objections and responses are set forth below:

**DOCUMENT REQUEST NO. 4**:   Personnel files of all Winn Dixie employees assigned to secondary market department, alternate source department, or any other employee who was assigned or has knowledge of relationship or contract between Winn Dixie and Visagent, including but not limited to the personnel files of:

> Tom Barr
> Darryl Mills
> Phil Payment
> Melissa Fowler
> Kevin Gates
> Seth Gaynor
> Glenn Hamilton
> Dick Judd
> Dan LeFever
> Ed Mieskoski
> David Mulcoch
> Justin Struther
> Les Wulfert

OBJECTION TO DOCUMENT REQUEST NO. 4:        Debtors object to this request because it is overly broad and burdensome and will not lead to the discovery of admissible evidence.  The Debtors also object to this requests to the extent it seeks assess to information protected by the named individuals' rights to privacy under the Florida Constitution.

RESPONSE TO DOCUMENT REQUEST NO. 4:   Subject to their objections and the Protective Order regarding Confidential Information, Debtors will produce the personal files of the Winn-Dixie employees having knowledge of the relationship or contract between Winn-Dixie and Visagent to the extent such files relate to Visagent and to the extent such documents are in Debtors' possession, custody or control.

6

**DOCUMENT REQUEST NO. 6**:   Any and all communications between Victory and Winn Dixie regarding Winn Dixie's access to and use of the "NTS" between 7/10/02 and 1/31/05.

OBJECTION TO DOCUMENT NO. 6:      Debtors object to this request because it is overly broad as to the time frame identified.

RESPONSE TO DOCUMENT REQUEST NO. 6:   Subject to their objections, Debtors will produce any such documents in their possession, custody or control which Debtors have not already produced, for the period July 10, 2002 to June 28, 2004.

**DOCUMENT REQUEST NO. 7**:   Copies of all documents reflecting Winn Dixie's access to "NTS" and Victory's maintenance and customization of "NTS" on behalf of Winn Dixie from 7/10/02 until 1/31/05.

OBJECTION TO DOCUMENT REQUEST NO. 7: Debtors object to this request because it is overly broad as to the time frame identified.

RESPONSE TO DOCUMENT REQUEST NO. 7:   Subject to their general objections, Debtors will produce any such documents in their possession, custody or control which Debtors have not already produced, for the period July 10, 2002 to June 28, 2004.

**DOCUMENT REQUEST NO. 8**:   Any and all documents reflecting communications from Winn Dixie to Alternate Source Vendors from 6/15/01 to 1/01/05 including, but not limited to, correspondence, emails, facsimiles, and instant messages

OBJECTION TO DOCUMENT REQUEST NO. 8: Debtors object to this request because (1) it is overly broad and burdensome, (ii) it will not lead to the discovery of admissible evidence, and (iii) it is vague due to the undefined term "Alternative Source Vendor."

RESPONSE TO DOCUMENT REQUEST NO. 8:   Subject to their objections, Debtors will produce any such documents in their possession, custody or control which Debtors have not already produced, for the period June 28, 2001 to June 28, 2004.

17.    Debtors have failed to produce the requested personnel files (as opposed to "personal files" referenced in Debtors response). In fact, although Debtors agreed to produce these records, none have been produced. At the deposition of Matthew Larsen, the designated corporate representative, he testified as follows:

93:12  Q    With regard to Exhibit 3, which is Visagent's
93:13  second request for production, in Item Number 4 we had
93:14  requested personnel files of employees who were involved
93:15  in this relationship between Winn-Dixie and Visagent.
93:16        What efforts has Winn-Dixie taken to produce
93:17  these files?
93:18    A   The files were pulled for review, and reviewed
93:19  by counsel.
93:20    Q   And what documents were produced from these
93:21  files?
93:22    A   I don't believe that any documents have been
93:23  produced from these files.

These records are material and relevant to the instant claim. From the time that Visagent began presenting their program to Debtors through the execution of and duration of the subject contract, the personnel involved in executive and policy making decisions, management, technical operation and day to day operation concerning the Visagent project changed so often that Claimants required a score card to know who held what positions. The only constant in the Winn-Dixie employees interacting with Claimants was Tom Barr, a middle manager in the procurement department. During the three-year contract period, there were four different executives acting as the liaison between Debtors and Claimant. Several of these individuals were terminated or "retired" for reasons unknown to Claimants. Depositions of Debtors' employees have heretofore yielded no concrete facts regarding these employee terminations/separations. For example, during the April 14, 2008 deposition of Philip H. Payment, Jr., a former Vice President of Winn-Dixie, Mr. Payment was questioned about the job performance of Daryl Mills, a former Winn-Dixie employee who was intimately involved in the negotiation of the contract with Visagent, and who "retired" less than four (4) months after the contract was executed by Mr. Payment. The following exchange occurred:

94:23   Q   All right. Let's move on. Can you give us

8

94:24  your assessment of Daryl Mills as a report to you?
94:25        MR. GAY: Objection to form.
95:1   A   Can I or will I?
95:2   Q   Can you?
95:3   A   I don't know.
95:4   Q   Okay. Will you?
95:5   A   I don't understand the relevance.
95:6   Q   That's not for you to determine. You're a
95:7   witness in a federal case, and you need to answer the
95:8   questions that are posed unless there's a privilege
95:9   involved, and I don't think there is one. You've got an
95:10  attorney who can assert a privilege.
95:11        I would like for you to tell us how you assess
95:12  Daryl Mills' performance as a manager reporting directly
95:13  to you.
95:14  A   I would have to see the human resource files
95:15  where I did his year-end evaluation.
95:16  Q   Well, your attorney and his firm have refused
95:17  to give us those files, so I can only rely upon asking
95:18  you from your memory.
95:19        MR. GAY: Objection. I don't think there's
95:20   even a question pending.
95:21        MR. RUBIN: Then what are you objecting to?
95:22        MR. GAY: The semblance of any sort of perhaps
95:23   maybe question.
95:24  Q   So please give me what you can recall of
95:25  Mr. Mills' performance, without the benefit of those
96:1   documents which I don't have.

Mr. Payment thereafter proffered his opinion without the relevant personnel records, and
Visagent's counsel did not have the benefit of having the records to cross examine the
witness. Mr. Payment additionally testified to Mr. Mills' strengths and his weaknesses:

97:4   Q   Okay. What areas didn't he do such a good job
97:5   in?
97:6   A   He was -- lacked strength in management of
97:7   people, management of a lot of people.
97:8   Q   What are some of the specific skills that he
97:9   lacked in that aspect?
97:10  A   Keeping people on deadlines.
97:11  Q   So he would allow things to slide?
97:12  A   Some.
97:13  Q   Anything else?
97:14  A   I can't think of any.

Mr. Payment also testified that Mr. Mills was separated from Winn-Dixie, but he could

not recall the events surrounding the terminations, who was involved and the reasons

therefore:

97:22  Q   What was the reason for his separation from
97:23  Winn-Dixie?
97:24     A   I don't recall.
97:25     Q   Did you participate in his separation?
98:1     A   Yes.
98:2     Q   And you don't have any idea what the reasons
98:3  were?
98:4         You're a friend of his now, social friend;
98:5  right?
98:6     A   Yes.
98:7     Q   And you don't remember what the reasons were
98:8  that he left the company after working under you for how
98:9  many years?
98:10     A   He worked for me for about three or four.
98:11     Q   Is that something that you tend to remember, is
98:12  the circumstances that your friend left?
98:13     A   There were many circumstances.
98:14     Q   Can you name some of them?  Was it your
98:15  decision or someone else's decision?
98:16     A   It was joint.
98:17     Q   Okay.  Yours and who else joined you in that
98:18  decision-making process?
98:19     A   I don't know.
98:20     Q   Well, who related to you -- who was
98:21  communicating with you on the subject?
98:22     A   I'm not sure.
98:23     Q   You're not sure because you don't remember, or
98:24  you're not sure why?
98:25     A   I don't -- I'm not sure who it was.
99:1     Q   Well, who else could -- who else had the
99:2  authority to impact Mr. Mills' employment?
99:3     A   Either Dan LaFever or Dick Judd.  I don't
99:4  recall the timing.  I don't know who was the manager in
99:5  charge at the time.
99:6     Q   Okay.  And one of those individuals contacted
99:7  you and had concerns about Mr. Mills?
99:8         MR. GAY:  Objection to form.
99:9     A   It might have been HR.  It might not have been
99:10  either one of those individuals.
99:11     Q   Okay.

10

99:12   A   It might have been human resources.

99:13   Q   What was the concern that was brought to your
99:14 attention?

99:15   A   I'm drawing a blank.

99:16   Q   Well, was it a personal thing or was it a work
99:17 trait, a work-related issue?

99:18   A   It definitely would have been work-related.

99:19   Q   Well, if it came from HR it would hardly be a
99:20 performance issue, would it, because they don't judge
99:21 performance, I assume?

99:22   A   I don't know how to answer that question or
99:23 statement.

99:24   Q   Well, I'm just trying to find out something
99:25 that I think is fairly clear that you should remember,
100:1 which is the reason why he was let go. And, you know,
100:2 in all candor, for you to be here under oath, and being
100:3 a friend of his and not tell us, I think, you know,
100:4 calls into question whether you're being really truthful
100:5 and complete in your answers.

100:6      MR. GAY: Objection to form.

100:7   Q   So I'm asking you to -- you know, whatever
100:8 reservations you have, if you want, you know,
100:9 confidentiality on it we can probably arrange it if it's
100:10 something sensitive, but we need to know, because this
100:11 is a very serious case and Mr. Mills was a key player
100:12 in, you know, the facts of this case. So I really need,
100:13 you know, you to be forthcoming on this issue.

100:14   A   I cannot remember the exact, without seeing the
100:15 document, documents that transpired, what -- I don't
100:16 have the recall right now to tell you what the reason
100:17 Daryl left the company, because he ended up with a --
100:18 working for us subsequent to that.

100:19      So it wasn't a -- put it this way. If we
100:20 didn't want him around, he wouldn't be around. We saw
100:21 value, so we kept him around.

100:22   Q   Did he voluntarily retire, or was he asked to
100:23 voluntarily retire?

100:24      MR. GAY: Objection to form.

100:25   A   I can't remember exactly what happened.

101:1   Q   Okay.

101:2   A   I believe that he -- it was a mutual decision,
101:3 and that he voluntarily retired.

     18.     At his deposition two months earlier (February 11, 2008), Mr. Mills

testified as follows:

19:24  Q   In other words, was it your idea to retire when
19:25  you retired, or was it Mr. Payment's idea for you to
20:1   retire at that point?
20:2     A   I had been thinking about it.  One day Philip
20:3   asked if I had considered retiring, my answer was yes.
20:4     Q   So it was completely voluntary?
20:5     A   As I understood it.
20:6     Q   You were perfectly fine with your -- would it
20:7   be fair to say that you were terminated, or would it
20:8   more accurate to say that you voluntarily retired and
20:9   you picked the time and the place for your retirement?
20:10       MR. GAY:  Object to form.
20:11    A   I picked the time and the place.
20:12    Q   Okay.  Did you receive a severance package?
20:13    A   No.

Obviously there is a discrepancy between the recollections of Mr. Mills and his former

boss, Mr. Payment.  Visagent is entitled to obtain the personnel records of Mr. Mills to

determine the real reasons for his separation from the Debtor and whether it has any

relation to the issues in this case, or directly to his participation in the relationship

between Debtor and Visagent Corporation.

19.      After Mr. Mills "retired," he was replaced by Ed Mieskoski, who became

the Visagent "point man" at Winn-Dixie.  Mr. Payment testified as follows regarding Mr.

Mieskoski's termination:

101:13  Q   Why was he terminated?
101:14      MR. GAY:  Objection.  Assumes facts not in
101:15  evidence.
101:16    A   (No response.)
101:17    Q   Was he terminated?  I'll rephrase the question,
101:18  and we can get to the whys afterwards.
101:19    A   Ed was terminated.
101:20    Q   Can you give us the reason for his termination?
101:21    A   I don't think that I did the termination.
101:22    Q   Okay.  Fine.  You had knowledge of the reason
101:23  though.  He was your direct report; right?
101:24      MR. GAY:  Objection to the form.
101:25    A   Ed was a direct report of mine, yes.
102:1     Q   Right.  And regardless of who made the

102:2  decision, you had to know the reason, didn't you?
102:3     A   Ed's termination was not my decision.
102:4     Q   I understand.  What was the reason?
102:5     A   I don't recall the reason for Ed's termination.

    20.    Edmund Mieskoski was deposed March 20, 2008.  Mr. Mieskoski testified

as follows:

143:25  Q.  All right.  Were you terminated, or did you
144:1  retire from your position?
144:2     A.  I was asked to resign.
144:3     Q.  Okay.  By whom?
144:4     A.  Dan Lafever.
144:5     Q.  Okay.  Why?
144:6     A.  And Phil Payment.
144:7     Q.  Why?
144:8     A.  No reason given.
144:9     Q.  Were the numbers just not being met?
144:10    A.  Oh, no.  They were being met overall.
144:11  Diverting number wasn't quite, I don't think.
144:12        MR. GAY:  What?  I didn't --
144:13        THE WITNESS:  Diverting number, I think
144:14  was -- the performance was actually very high.  Had a
144:15  very good review.
144:16    Q.  (By Mr. Rubin)  Did they give you a
144:17  recommendation to go get another job?
144:18    A.  I never received a recommendation letter.
144:19        MR. GAY:  I did?
144:20        THE WITNESS:  I did not.  No, I did
144:21  not.
144:22    Q.  (By Mr. Rubin)  And they never told you any
144:23  reason?
144:24    A.  No.
144:25    Q.  How did that make you feel?
145:1     A.  Well, it's standard SOP.  I've had to
145:2  terminate people as well.  And the less said, the
145:3  better.  You know, there's the implications there.
145:4  That's probably directive from HR and Legal.  So I
145:5  wasn't surprised.

    21.    The continual shifting of Winn-Dixie management assigned to administer

the Visagent contract had serious ramifications on the consistency of purpose, continuity

and level of commitment by Winn-Dixie staff to utilize Visagent's services as required

under the Service Agreement. Additionally, with the loss of each manager, came a period where the new manager had to be "brought up to speed" on the dynamics, scale, capabilities and value propositions of Visagent's services. Also, with each learning curve, there was a loss of critical historical perspective as to the rationale for the project. The personnel records are imperative to these issues. Debtors agreed to produce them, but have failed to do so.

22.    Document Requests 6 and 7 ask for information concerning the NTS system. This information had not been produced at all, although promised by Debtors. Document Request 8 requests communications between Debtors and Alternate Source Vendors for a stated time period. Debtors agreed to produce same and have failed miserably to do so. Claimants know there are communications because some have been discovered via third party discovery.

23.    On August 24, 2007, Debtors produced Tom Barr as their corporate representative for deposition. In the course of the deposition, it was learned that Mr. Barr did not have the requisite knowledge concerning the harvesting of information responsive to Claimants discovery requests. Consequently, Claimants moved the Court for relief in their Third Motion to Compel and Debtors agreed to produce a corporate representative other than Mr. Barr for deposition on the following area:

All efforts taken by Winn-Dixie to locate and produce documents responsive to Visagent's requests for production of documents to Winn-Dixie referenced in Mr. David Gay's correspondence to Mr. Guy Rubin dated October 1, 2007.

24.    On February 13, 2008, Debtors produced Matthew Larsen, a senior manager at Deloitte Financial Advisory Services, LLP, who performed electronic discovery services for Debtors. During the deposition, Claimants' counsel met

with obstructionist objections from Debtors' counsel concerning the measures
taken to secure information responsive to the discovery requests and directions to
the witness not to respond to the posed inquiries alleging attorney-client privilege.
When Claimant's counsel asked for the instructions given to the witness in
gathering responsive information, the following exchanges occurred:

10:12 Q   And what happened at that first meeting or
10:13 first contact?
10:14    A   I believe the general first contact was they
10:15 were looking for electronic discovery systems. At that
10:16 point I didn't know it was Visagent.
10:17    Q   And what assignment were you given?
10:18       MR. GAY: You can answer that question to the
10:19    extent it does not involve your direct
10:20    communications with Jay Castle.
10:21       MR. RUBIN: Are you claiming attorney/client
10:22    privilege on the directions that he got to perform
10:23    discovery?
10:24       MR. GAY: The specific communication he had
10:25    with in-house counsel at Winn-Dixie, yes.
11:1       MR. RUBIN: Okay. That's what was offered as
11:2    an accommodation to us going forward on our motion
11:3    to compel, was to produce the person who was most
11:4    knowledgeable about what efforts were taken. And if
11:5    he got his instructions from someone, I mean, that's
11:6    part of the discovery.
11:7       MR. GAY: I believe what you noticed by way of
11:8    deposition was a 30(b)6 corporate representative
11:9    deposition regarding efforts taken by Winn-Dixie to
11:10   locate and produce documents responsive to
11:11   Visagent's request for production.
11:12      MR. RUBIN: Right.
11:13      MR. GAY: Specifically.
11:14      MR. RUBIN: Yes, that's exactly right.
11:15      MR. GAY: And that's what he's prepared to
11:16   testify to today.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

14:19 Q   And what kind of information -- or what kind of
14:20 information was exchanged, or communications did you
14:21 have with Mr. Gay in connection with Visagent?
14:22      MR. GAY: Don't answer that question. That's
14:23   privileged communication.

14:24      MR. RUBIN: Okay. You're instructing him not
14:25   to answer?
15:1       MR. GAY: (No response.)

     25.    During the course of the deposition, counsel for Debtors voiced several objections to questions on the purported grounds of attorney client privilege or work product and directed the witness not to answer the inquiry. The questions and objections are listed below:

33:8  Q   And electronic transmissions I guess, according
33:9  to the definition that you just gave us, which is data
33:10 transferred over transmission lines, would be your
33:11 common understanding of how electronic data moves from
33:12 one party to another party?
33:13      MR. GAY: Again, is there a question?
33:14      MR. RUBIN: Yes. I'm asking what his
33:15 understanding is.
33:16      MR. GAY: Can you read the question back,
33:17 please.
33:18      MR. RUBIN: Go ahead. If he doesn't understand
33:19 it, I think he can tell me he doesn't understand it.
33:20      MR. GAY: I didn't hear the question. I would
33:21 like to hear it so I can assert an appropriate
33:22 objection.
33:23      MR. RUBIN: Sure.
33:24      (The question was read back.)
33:25      MR. GAY: I don't see a question pending, but
34:1  to the extent there is one, object to form and
34:2  object to mischaracterization of prior testimony.
34:3      To the extent you can, you can answer it.
34:4      MR. RUBIN: Let me just -- before you do.
34:5      That's a speaking objection. You can object to
34:6  form. I have no problem with that. But when you
34:7  look at your client and you tell him, you can answer
34:8  it if you can, that's an improper speaking
34:9  objection, and I would ask you to please refrain
34:10   from doing that. Okay. Thank you.


***************

39:9   Q   Okay. I'm not understanding. You said you
39:10 spoke to somebody. I thought you said -- and correct me
39:11 if I'm wrong. I mean, I'm not trying to play games. I
39:12 thought you said that someone told you that individuals
39:13 were contacted and they were told to turn in their hard

39:14 copy files on anything dealing with Visagent.
39:15       Is that what you said?
39:16    A   I don't know that I said someone told me, but I
39:17 did have those conversations with counsel, and I also
39:18 reviewed e-mails related to those requests.
39:19    Q   Okay. So conversations with counsel and review
39:20 of e-mails.
39:21       Let's talk about the conversations with counsel
39:22 first. What did your -- what did counsel tell you was
39:23 done to notify employees or former employees to gather
39:24 their documents and turn them in somewhere?
39:25       MR. GAY: Don't answer that question.
40:1       Object on attorney/client privilege basis.
40:2       MR. RUBIN: That's exactly what we're here to
40:3   find out, what efforts were taken. And if it was
40:4   done by an attorney that doesn't shield the
40:5   information.
40:6       MR. GAY: You just asked the question starting
40:7   with what did counsel tell you.
40:8       He's here to testify to what you requested in
40:9   your deposition notice.
40:10      MR. RUBIN: Right. And the information that he
40:11  has came from an attorney. Right?
40:12      MR. GAY: We can go off the record and have
40:13  this conversation, but I'm not going to have a full
40:14  conversation about what the extent of privileged
40:15  communications were.
40:16      MR. RUBIN: I'm glad to go off the record. I
40:17  mean, we may need to go back on the record, but
40:18  let's go off.

49:25  Q  All right. So let's go through, and I'd like
50:1  for you to tell me -- well, I'll ask you specifics and
50:2  you can tell me what the backup is for each one.
50:3       Starting with 8/22/04. Chris Wilson e-mail to
50:4  Sharon Lane, Dick Judd, Doug Flick, Hal Hopkins, Tom
50:5  Barr, Les Wilfert, Seth Gaynor, Glen Hamilton, and Larry
50:6  Appel regarding all correspondence and legal documents
50:7  relating to Visagent and any communications regarding
50:8  Visagent.
50:9       Is this just a single e-mail?
50:10    A   Yes.
50:11    Q   Is that the backup?
50:12    A   Correct. Well, it's the e-mail that went out
50:13  and the responses from these individuals.
50:14    Q   Right. Is Chris Wilson still with Winn-Dixie?

17

50:15   A   He is not.

50:16   Q   Okay. Did you have any conversations with
50:17 Chris Wilson?

50:18   A   I did not.

50:19   Q   So you don't know what his thinking was in
50:20 terms of how he got on an addressee list for this
50:21 e-mail?

50:22   A   No.

50:23   Q   All right. Is this essentially a paraphrase of
50:24 the contents of the e-mail? It says e-mail regarding
50:25 all correspondence. Was it requesting all

51:1 correspondence?

51:2   A   Yes, requesting.

51:3   Q   Okay. What were they asked to do specifically?

51:4       MR. GAY: I'm going to object. The specific
51:5   request is protected by work product privilege.

51:6       MR. RUBIN: How is that different than what you
51:7   have written?

51:8       MR. GAY: Because it would reveal the mental
51:9   impressions of the attorney requesting the
51:10   information. That's why we have provided it in
51:11   summary form.

51:12       MR. RUBIN: Are you asserting that this is some
51:13   kind of a privilege log?

51:14       MR. GAY: No.


68:1   Q   Right. So the next question is -- and I
68:2 understand what you're saying is that since there was a
68:3 request for all electronic documents that's inclusive of
68:4 every corporation and everybody who did business with
68:5 Winn-Dixie; right?

68:6   A   Correct.

68:7   Q   And you got a response from one person, a
68:8 written response?

68:9   A   The response came --

68:10   Q   Or a response came to Valerie Profitt --

68:11       MR. GAY: Objection to form.

68:12   Q   -- from one person?

68:13       MR. GAY: Objection to form.

68:14   A   Gary Klingerman was the IT person tasked with
68:15 looking for all electronic documents regarding these
68:16 individuals.

68:17   Q   And what did he come up with?

68:18       MR. GAY: Objection.

68:19   Q   What was his response?

68:20       MR. GAY: Objection. That's -- that's

68:21    protected by work product as well.  We're asserting
68:22    work product privilege as to the actual content of
68:23    the individual response.

75:7   Q   How many documents were withheld based on
75:8   relevance?
75:9      A   I don't know the amount.
75:10     Q    Who made the decision?
75:11     A    I know of the relevance discussion because
75:12  there was an initial --
75:13        MR. GAY:  I'm going to interject to the extent
75:14    this involves communications with in-house counsel
75:15    at Winn-Dixie, or me, or anybody at my law firm.
75:16        You can't -- you can't reveal the specifics of
75:17    that conversation.
75:18     A    Okay.  So what was the question?
75:19     Q    The question was, do you know who made the
75:20  decision to withhold documents based upon relevance
75:21  decisions?
75:22     A   I know at least one person was David Gay.
75:23     Q    And do you know what criteria was used?
75:24        MR. GAY:  Objection.
75:25        I'm going to tell you not to answer that.
76:1    That's -- that's work product.

80:4   Q    And were word searches conducted in those
80:5   databases that you just referred to?
80:6     A   Yes.
80:7     Q    What word searches were conducted, and by whom?
80:8        MR. GAY:  Again I'm going to instruct you not
80:9    to answer to the extent it involves communications
80:10    you had directly with Winn-Dixie in-house counsel or
80:11    anyone at my law firm.
80:12     Q   Did you perform any word searches?
80:13     A   I did not.
80:14     Q    Were the word searches, to your knowledge,
80:15  without telling me which ones were done, were they done
80:16  to comply with discovery requests?
80:17     A   Yes.
80:18     Q   Okay.
80:19        MR. RUBIN:  And you're not letting him answer
80:20    that?
80:21        MR. GAY:  I don't know what answer that means.
80:22        MR. MARK RUBIN:  Ask another question.
80:23        MR. GAY:  I don't think he gets to participate.
80:24        MR. RUBIN:  He can talk to me.

80:25      I'm not sure what your position is.  He can't

81:1    tell me what word searches were performed in the

81:2    process of trying to find documents responsive to

81:3    our request?

81:4        MR. GAY:  If you want to have a full discussion

81:5    of the privilege then the best way to go about that

81:6    is to go off the record and we can talk about that.

81:7        MR. RUBIN:  Okay.  Go off the record.

81:8        (Discussion off the record.)

81:9        MR. RUBIN:  Just go ahead, and you can make

81:10    your objections, and we'll have to do what we have

81:11    to do.

81:12  Q   It's your understanding that specific word

81:13  searches were made in connection with document requests

81:14  to locate documents that may be responsive; correct?

81:15    A   Correct.

81:16        MR. GAY:  Objection to form.

81:17    Q   And who actually performed the word searches?

81:18    A   Counsel for Winn-Dixie.

81:19    Q   Who?

81:20    A   David Gay.

81:21    Q   Beginning when?

81:22        MR. GAY:  I'm going to instruct you not to

81:23    answer that.

81:24        MR. RUBIN:  That's a time.  No, no.  Beginning

81:25    when.  When did he do his first word searches?

82:1    That's not a communication.

82:2        MR. GAY:  I didn't say it was a communication.

82:3    I said it reveals mental impressions.

82:4        MR. RUBIN:  When you did it?

82:5        MR. GAY:  Potentially.

82:6        MR. RUBIN:  Well, it's obviously sometime after

82:7    you got the document request.  How does that reveal

82:8    anything --

82:9        MR. GAY:  It may or may not have been done

82:10    before the document was received.

82:11        MR. RUBIN:  I'm just going to make it very

82:12    clear that I don't believe that is any kind of

82:13    protected privileged information.  I will be asking

82:14    for sanctions if you instruct him not to answer that

82:15    question.

82:16        Do you insist on instructing him not to answer

82:17    that question?

82:18        MR. GAY:  My position has not changed.

82:19    Q   Okay.  So you're refusing to answer that

82:20  question, when the word searches were made?

82:21      MR. GAY: No. I've instructed him not to
82:22  answer the question.
82:23      MR. RUBIN: Good. And he's taking your
82:24  instruction. I understand.
82:25      MR. GAY: Are you advising him not to?
83:1       MR. RUBIN: He's not my client. I can't tell
83:2   him what to do.
83:3       MR. GAY: I just want to make sure we keep that
83:4   in mind.

26.    In the course of questioning Mr. Larsen, it was revealed that he maintained a case file in connection with his work for Winn-Dixie, where he maintained notes that would assist in answering the questions posed to him. (Transcript page 15-15, 19) He did not bring the file to the deposition, having left it at Mr. Gay's office. (Transcript page 45) Mr. Larsen indicated that he could not respond to certain questions without his case file. (Transcript page 45, 96) When Visagent's counsel requested a short recess to retrieve the file, Debtors counsel refused claiming that it was "unnecessary." (Transcript page 45)   As the deposition continued, it became increasingly apparent that the witness required his case file to answer questions:

90:14  Q  And you don't know what Bates stamp range that
90:15  was offhand, I'm assuming; right?
90:16  A  I do not.
90:17      MR. RUBIN: I'm going to make a request, since
90:18  he can't answer the questions that I have, that we
90:19  take a 15-minute break and you get your file, come
90:20  back, and we make an attempt so that you can give me
90:21  answers to my questions about documents that were
90:22  purportedly produced regarding specific requests to
90:23  produce and what was done on each one. That's why
90:24  we're here.
90:25      Are you willing to do that?
91:1       MR. GAY: He's not going to produce his file.
91:2   What is in his file that you're talking about is
91:3   attorney/client privileged or work product.
91:4       MR. RUBIN: I'm not asking him to produce the
91:5   file.
91:6       MR. GAY: You're asking him to show up with the
91:7   file and read from it during the deposition.
91:8       MR. RUBIN: You handed him a document to
91:9   refresh his memory because he couldn't remember

91:10   certain things. All I'm asking him to do is the
91:11   same thing, unless you have something in your bag
91:12   that you can pull out right now that helps him
91:13   answer these questions, which is the purpose why
91:14   we're here.
91:15       He says he has the information, he doesn't
91:16   remember, and he's got it a few blocks away from
91:17   here. If you're not willing to cooperate on that
91:18   we'll suspend the deposition, we'll take it to the
91:19   judge, and we'll come back at another date. That's
91:20   fine with me. He's the one that lives in Atlanta.
91:21       MR. GAY: It's not going to help for him to go
91:22   get his file because the document that he's
91:23   referencing is straight out of our files and work
91:24   product. It's not in his file.
91:25       MR. RUBIN: He just testi- --
92:1       MR. GAY: It's at our office.
92:2       MR. RUBIN: He just testified it was in his
92:3   file.
92:4       MR. GAY: Well, we can have an argument about
92:5   that. But it's -- regardless, it's protected by
92:6   attorney/client privilege and work product
92:7   privilege, and he's not going to discuss the
92:8   particular contents.
92:9       To the extent he brings it in this room and it
92:10   becomes discoverable, we're not doing that.
92:11       MR. RUBIN: So it's your position that even
92:12   though he just testified that he personally reviewed
92:13   a Bates stamp range, and I'm asking what that Bates
92:14   stamp range is so I can verify that we have been
92:15   produced the Victory e-mails, you're not going to
92:16   let him go and get that information for us?
92:17       MR. GAY: Do you want to continue this
92:18   conversation on the record?
92:19       MR. RUBIN: Yeah, I do.
92:20       MR. GAY: I think it's appropriate to go off
92:21   the record.
92:22       MR. RUBIN: I don't think it's appropriate to
92:23   go off the record.
92:24       MR. GAY: I'm not sure what the answer to your
92:25   question -- I don't know what your question was, but
93:1   I can tell you that what you requested in your
93:2   deposition notice was a corporate representative to
93:3   testify to the efforts that Winn-Dixie took to
93:4   locate and produce documents responsive to
93:5   Visagent's request for production.

93:6      MR. RUBIN: Right.
93:7      MR. GAY: That is who we have produced. He's
93:8    prepared to talk about those things on behalf of the
93:9    corporation.

      27.    Based on counsel's misplaced objections and directives to the witness not to answer questions and the refusal to take a short recess to get the witness' case file so he could answer questions, Visagent's counsel suspended the deposition to seek judicial intervention as to these issues:

104:9  MR. RUBIN: We are suspending this deposition
104:10    pending going to the court for relief at this time
104:11    based upon the advice of counsel not to answer
104:12    questions and the refusal to take a break to obtain
104:13    the information that would allow you to reference
104:14    information that would allow you to answer questions
104:15    that you're not able to answer off of recall.
104:16      So we'll take it up with the court, and we will
104:17    reconvene once we have a court ruling.
104:18      MR. GAY: For the record, I disagree with
104:19    counsel's recitation of the facts. We oppose
104:20    continuing the deposition. We have done what you
104:21    have requested that we do, and that's make an
104:22    individual of the corporation available to answer
104:23    questions regarding Winn-Dixie's efforts to locate
104:24    and produce documents responsive to Visagent's
104:25    request for production.
105:1      We have done that today, and therefore oppose
105:2    continuing the deposition.
105:3      MR. RUBIN: We're done.
105:4      Want to advise him to read or waive?
105:5      MR. GAY: We'll read.
105:6      (Witness excused.)
105:7      (The deposition concluded at 2:36 p.m.)

      28.    The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential.  Bogle v. McClure, 332 F.3d 1347, 1358 (11th Cir., 2003); Palmer v. Westfield Insurance Company, 2006 WL 2612168 (M.D.Fla., 2006). This privilege is narrowly construed and communications are only protected if at the time they were made, they were intended to remain confidential and, under the circumstances, were reasonably

23

expected and understood to be confidential.  Palmer, supra.  The privilege can be
extended to third parties who are agents of the attorney provided that:

> (1)    the third party must be an agent of the attorney;
>
> (2)    the third party must facilitate the communication between the attorney and
the client for legal advice;
>
> (3)    the communication with the third party must be kept confidential; and
>
> (4)    the privilege must not be waived.  United States v. Kovel, 296 F.2d 918,
921 (2d Cir., 1961); In re Tri-State Media Group, Inc., supra at 360.

Here, Debtor has exhibited no basis or foundation for its counsel's instructions to Mr.
Larson not to answer the questions posed to him regarding **factual** information regarding
searches Debtor made in attempting to respond to Visagent's discovery requests.
Specifically, Visagent is entitled to the following non-protected factual information:

> Who conducted the searches?
>
> When were they conducted?
>
> What were the search criteria?
>
> What are the Bates ranges of documents responsive to particular requests by
>
> Visagent? (i.e. emails, correspondence, instant messages, etc.)

Mr. Gay's blanket objections of work-product privilege to protect the mental impressions
of counsel in the physical acts of what measures were taken to respond to discovery
requests is unfounded and presents a clear example of continuing discovery obstruction
by Debtor.

> 29.    Under federal law, it is well established that the attorney-client privilege
attaches to corporations as well as to individuals.  Upjohn Co. v. United States, 449 U.S.
383, 101 S.Ct. 677, 66 L.Ed. 584 (1981).  The attorney-client privilege applies only if:

1.)    the asserted holder of the privilege is or sought to become a client;

2.)    the person to whom the communication was made

> a.)    is a member of the bar of a court, or his subordinate and
>
> b.)    in connection with this communication is acting as a lawyer;

3.)    the communication relates to a fact of which the attorney was informed

> a.)    by his client
>
> b.)    without the presence of strangers

    c.)    for the purpose of securing primarily either

            i.)    an opinion on law or

            ii.)    legal services or

            iii.)    assistance in some legal proceeding, and not

    d.)    for the purpose of committing a crime or tort; and

4.)    the privilege has been

    a.)    claimed and

    b.)    not waived by the client.

AARP v. Kramer Lead Marketing Group, 2005 WL 1785199 (M.D.Fla., 2005); Lockheed Martin Corporation v. L-3 Communications Corporation, 2007 WL 2209250 (M.D.Fla., 2007);    Universal City Development Partners, Ltd. v. Ride & Show Engineering, Inc., 230 F.R.D. 688, 68 Fed. R. Evid. Serv. 396 (M.D.Fla., 2005)   When a corporation is a client, communications between any corporate employee, acting within the scope of his corporate duties, and an attorney for the corporation through which the corporation may obtain legal advice may be privileged. Upjohn Co. v. United States, 449 U.S. 383, 394, 101 S.Ct. 677, 661 L.Ed.2d 584 (1981); Lockheed Martin Corporation v. L-3 Communications Corporation, supra.   The privilege only protects communications for the purpose of seeking legal advice between client and an attorney acting in his capacity as legal adviser. Thus, where an attorney is functioning as a business agent or as an accountant, rather than as a legal adviser, the communications will not be protected by the privilege. U.S. v. Davis, 636 F2d 1028 (5th Cir., 1981; Ray v. Cutter Laboratories, Div. of Miles, Inc., 746 F. Supp. 86, (M.D.Fla., 1990).

      30.    However, not all communications between an attorney and client are per se privileged.   Communication of factual information is not protected by the attorney-client privilege, as well as retainer agreements. Universal City Dev. Partners, Ltd. v. Ride & Show Eng'g., 230 F.R.D. 688, 690-691 (M.D.Fla., 2005). In Lockheed, supra, (Page 4 of the opinion) the Court offered this analysis:  "The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication with his attorney." In addition, where information is communicated to a lawyer with the intent that the information be publicly

disclosed, courts have found that the communications are not intended to be confidential. In re Hillborough Holdings Corp., 118 B.R. 866, 869-70 (M.D.Fla, 1990). A client may also waive the privilege "if he injects into the case an issue that in fairness requires an examination of otherwise protected communications," Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386 (11th Cir., 1994), modified 30 F.3d 1347 (11th Cir., 1994), cert. den. 513 U.S. 110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995) or if the client testifies concerning portions of the attorney-client communication of fails to assert the privilege. Third Party Verification v. SignatureLink, Inc., No. 6:06-cv-415-Orl-22DAB, 2007 WL 1288361 (M.D.Fla., 2007). Here Debtor has indeed injected the substance of claimed privileged information into the case that in fairness requires responses. Debtor affirmatively offered Visagent an opportunity to depose a corporate representative on the nature of the efforts Debtor made to respond to Visagent's discovery requests. The offer was made to counsel in open court and was approved by this Court. The offer came is response to complaints by Visagent regarding the lack of responsiveness and preparedness of Tom Barr, who was initially tendered as Debtor's corporate representative most knowledgeable with all areas of inquiry by Visagent.

31. Like the attorney-client privilege, the party asserting the work-product privilege has the burden of proving that the document is work-product. AARP v. Kramer Lead Mktg. Group, 2005 WL 1785199 (M.D.Fla., 2005); Palmer v. Westfield Insurance Company, 2006 WL 2612168 (M.D.Fla., 2006). This privilege typically applies only to documents prepared principally or exclusively to assist in anticipated or ongoing litigation. Documents which do not refer to work product prepared by an attorney or other agent of a party to aid in forthcoming litigation, and which were generated in the ordinary course of business, are discoverable. AARP v. Kramer Lead Marketing Group, 2005 WL 1785199 (M.D.Fla., 2005); Cutrale Citrus Juices USA, Inc. v. Zurich American Insurance Group, 2004 WL 5215191 (M.D.Fla., 2004) "In limiting work product to materials prepared 'in anticipation of litigation,' the drafters of Rule 26(b)(3) excluded form the rule's protection '(m)aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes'." Rule 26(b)(3), Fed.R.Civ.P., Advisory Committee Note. The party asserting

that a document or information is protected by work product has the burden of establishing that the document was prepared both:

> (1)    in anticipation of litigation and

> (2)    by the party or by a representative of the party. Federal Deposit Ins. Corp. v. Cherry, Bekaert & Holland, 131 F.R.D 596, 600 (M.D.Fla., 1990)

32.    Rule 30 is clear on the type of objections counsel may make and when counsel may instruct a deponent not to answer a question. Fed.R.Civ.P. 30(d) (4). Counsel may instruct a deponent not to answer only under the following circumstances: (1) when necessary to preserve a privilege, (2) to enforce a limitation on evidence directed by the court, or (3) to protect a witness from an examination being conducted in bad faith or in such a manner as to unreasonably annoy, embarrass or oppress the deponent. Gober v. City of Leesburg, 197 F.R.D. 519, 520 (M.D.Fla., 2000); Geico Casualty Company v. Beauford, 2006 WL 2789013 (M.D.Fla., 2006).

Again, the information for which privileges were asserted by Mr. Gay for Debtor are not opinions or true work product mental impressions related to litigation strategy, but rather relate to factual information which is appropriate for disclosure under the procedural and substantive circumstances in this case.

Federal Rule of Civil Procedure 37(a) (4) (A) provides for the award of expenses and sanctions when a party must bring a motion to compel. In pertinent part, the Rule provides that if a motion to compel is granted, or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the Court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court, action, or that the opposing party's nondisclosure, response or objection was substantially justified, or that other circumstances make an award of expenses unjust. A motion is considered to be "substantially justified" if it raises an issue about which there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action. Pierce v. Underwood, 487 U.S. 552, 556, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

Visagent has expended considerable resources in compelling discovery from Debtor. It is appropriate for this court to award compensation to Visagent in the form of sanctions against Debtor for these repeated obstructionist litigation tactics and repeated violations of this Court's orders as well as Debtor's responsibility of conducting itself in this litigation in good faith, as demonstrated in this Fifth Motion to Compel and prior motions to compel.

WHEREFORE, Visagent requests the relief identified within be granted in its entirety, together with sanctions including attorneys fees and costs as appropriately determined by the Court, and for such other and further relief as the Court deems proper.

## CERTIFICATE OF GOOD FAITH

I HEREBY CERTIFY that I personally made a good faith effort to resolve the issues set forth by way of this Motion prior to filing same. As outlined in the Memorandum, the issues raised could not be resolved.

Guy Bennett Rubin, Esq. (FBN 691305)
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original of this Motion has been electronically filed via ECF and that a true and correct copy of the foregoing has been furnished by US regular Mail to: David L. Gay, Smith, Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 on the 16th day of May, 2008.

Guy Bennett Rubin, Esq. (FBN 691305)
Attorneys for Plaintiffs
**RUBIN & RUBIN**
P.O. Box 395
Stuart, Florida 34995
Telephone:    (772) 283-2004
Facsimile:    (772) 283-2009