**TAB 4**

*Westlaw.*

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

Page 1

**C**
In re New River Shipyard, Inc.
Bkrtcy.S.D.Fla.,2006.
In re NEW RIVER SHIPYARD, INC., Debtor.
**No. 05-20958-BKC-JKO.**

Dec. 8, 2006.

**Background:** Chapter 11 debtor, which formerly operated shipyard, objected to claim and post-confirmation amended claim filed by yacht owner. Debtor moved for summary judgment and order to show cause.

**Holdings:** The Bankruptcy Court, John K. Olson, J., held that:
(1) exculpatory provision in parties' ship repair contract, precluding debtor's liability for ordinary negligence, was valid;
(2) owner could not recover its post-repair costs resulting from its removal of yacht from charter business as breach-of-contract damages;
(3) owner could not recover damages for diminution in value of yacht;
(4) owner failed to mitigate damages;
(5) owner waived any right to amend its proof of claim;
(6) owner was estopped from amending its claim; and
(7) res judicata barred owner's attempt to amend claim post-confirmation.

Claim disallowed.

West Headnotes

**[1] Shipping 354 ⚖76**

354 Shipping
     354V Liabilities of Vessels and Owners in General
          354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
Under federal maritime law, parties to a maritime repair contract may agree contractually to exculpate one of the parties from ordinary negligence.

**[2] Shipping 354 ⚖76**

354 Shipping
     354V Liabilities of Vessels and Owners in General
          354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
For exculpatory provision in a maritime repair contract to be valid, (1) the contract must clearly and unequivocally indicate the parties' intention, (2) the limitation must not absolve the ship repairer of all liability and must still provide a deterrent to negligence, and (3) the parties must have equal bargaining power when creating the agreement.

**[3] Shipping 354 ⚖76**

354 Shipping
     354V Liabilities of Vessels and Owners in General
          354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
Repair contract between shipyard operator and yacht owner clearly and unequivocally absolved operator of any liability for ordinary negligence, as required for an exculpatory provision in maritime repair contract to be valid, given provision in contract stating that operator's liability under contract was limited to breach of contractual obligation to provide dockage space and repair services and that owner and vessel released operator from all liability for personal injury, loss of life, and property damage arising out of ordinary negligence of operator or its employees.

**[4] Shipping 354 ⚖76**

354 Shipping
     354V Liabilities of Vessels and Owners in General
          354k76 k. Supplies, Repairs, and Advances. Most Cited Cases
Equal bargaining power required for exculpatory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

provision in maritime repair contract to be valid existed between shipyard operator and yacht owner at the time they entered into repair contract, notwithstanding owner's contention that few facilities in area had equipment capable of raising yacht out of the water, given that other facilities which could lift yacht from water were available, that there was no evidence that debtor's contractual limitation on liability was provision used throughout industry and so amounted to adhesion contract, and that owner was able to buy another vessel for $17,500,000 in cash shortly after yacht was dropped while at operator's shipyard, whereas operator was compelled to seek bankruptcy protection soon thereafter.

**[5] Shipping 354 ⬤➞76**

354 Shipping
   354V Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
As required for exculpatory provision in maritime repair contract to be valid, repair contract between shipyard operator and yacht owner did not absolve operator of all liability and provided deterrent to negligence, inasmuch as contract only excluded operator's liability for ordinary negligence, leaving operator liable for gross negligence or for wanton or willful misconduct.

**[6] Shipping 354 ⬤➞76**

354 Shipping
   354V Liabilities of Vessels and Owners in General
      354k76 k. Supplies, Repairs, and Advances.
Most Cited Cases
Under Florida law, economic loss rule precluded any recovery of economic damages by yacht owner against shipyard operator under ordinary negligence theory, based on incident in which yacht was dropped while it was hoisted out of water for survey, given that parties were acting pursuant to their ship repair contract.

**[7] Torts 379 ⬤➞118**

379 Torts
   379I In General
      379k116 Injury or Damage from Act
         379k118 k. Economic Loss Doctrine.
Most Cited Cases
Under Florida law, "economic loss rule" bars recovery under a tort theory when the parties are acting under a contract and economic losses are the only damages.

**[8] Negligence 272 ⬤➞1516**

272 Negligence
   272XVIII Actions
      272XVIII(B) Pleading
         272k1511 Complaint
            272k1516 k. Heightened Degrees of Negligence. Most Cited Cases
To be sufficient under Florida law, a pleading asserting gross negligence must contain sufficient allegations of ultimate fact as to make it fairly appear that defendant's course of conduct was of a gross, willful, and wanton character; allegations which might sustain a cause of action for ordinary negligence, or conclusory allegations, are insufficient.

**[9] Negligence 272 ⬤➞273**

272 Negligence
   272V Heightened Degrees of Negligence
      272k273 k. Gross Negligence. Most Cited Cases
Florida law defines "gross negligence" as an act or omission that a reasonable, prudent person would know is likely to result in injury to another.

**[10] Negligence 272 ⬤➞273**

272 Negligence
   272V Heightened Degrees of Negligence
      272k273 k. Gross Negligence. Most Cited Cases
Under Florida law, gross negligence presupposes the existence of a composite of circumstances which, together, constitute an imminent or clear and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

present danger amounting to more than normal and usual peril, must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of, and the act of omission complained of must occur in a manner which evinces a conscious disregard of consequences, as distinguished from a careless disregard thereof, as in simple negligence, or from the more extreme willful or wanton disregard thereof, as in culpable or criminal negligence.

**[11] Damages 115 ☞22**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k22 k. In General. Most Cited Cases

**Damages 115 ☞23**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k23 k. Under Circumstances Within Contemplation of Parties. Most Cited Cases
Under Florida law, damages for breach of contract are limited to those damages as would normally result from the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach.

**[12] Damages 115 ☞23**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k23 k. Under Circumstances Within Contemplation of Parties. Most Cited Cases
No reasonable person could have foreseen that owner of yacht which was dropped while hoisted from the water for survey at shipyard would take yacht entirely out of charter business, after it was fully repaired, and instead undertake highly limited sales campaign for 15-month period, during which vessel would be kept fully crewed and provisioned in readiness for new owner to emerge, and therefore, under Florida law, owner could not recover such unforeseen post-repair costs, which were not attributable to any actions by shipyard operator, as damages for alleged breach of contract by operator.

**[13] Damages 115 ☞23**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k23 k. Under Circumstances Within Contemplation of Parties. Most Cited Cases
Under Florida law, foreseeability of damages for breach of contract is analyzed in a two-step process, under which court first must consider whether defendant's conduct foreseeably created a "zone of risk" which poses a general threat of harm to others, then must consider whether and to what extent defendant's conduct foreseeably and substantially caused the specific injury that actually occurred.

**[14] Damages 115 ☞208(1)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

115 Damages
   115X Proceedings for Assessment
      115k208 Questions for Jury
         115k208(1) k. In General. Most Cited Cases
Under Florida law, trial court deciding question of foreseeability of damages sought under breach of contract theory has discretion to consider issue of proximate causation as a matter of law if, after the event occurred, and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that the conduct should have brought about the harm. Restatement (Second) of Torts § 435(2).

**[15] Damages 115 ☞123**

115 Damages
   115VI Measure of Damages
      115VI(C) Breach of Contract
         115k123 k. Defects in Performance. Most Cited Cases
Under Florida law, owner of yacht that was dropped while hoisted from the water for survey at shipyard could not recover as damages on claim against shipyard operator for breach of contract for diminution in value of yacht, or "stigma damages," that owner allegedly suffered even though yacht was completely repaired.

**[16] Damages 115 ☞120(1)**

115 Damages
   115VI Measure of Damages
      115VI(C) Breach of Contract
         115k120 Failure to Perform in General
            115k120(1) k. In General. Most Cited Cases
Under Florida law, the purpose of money damages is to put plaintiff in as good a position as that which full performance of the contract would have put him, which does not guarantee or mean that plaintiff is to be put in the same specific physical position.

**[17] Damages 115 ☞123**

115 Damages
   115VI Measure of Damages
      115VI(C) Breach of Contract
         115k123 k. Defects in Performance. Most Cited Cases
When plaintiff in breach of contract action can be made whole by repairing property damage or receiving compensation equal to the cost of repair, Florida law does not generally allow additional recovery for any diminution in value which occurs beyond cost of repair.

**[18] Damages 115 ☞62(4)**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
         115k62 Duty of Person Injured to Prevent or Reduce Damage
            115k62(4) k. Breach of Contract. Most Cited Cases
Owner of yacht that was dropped while hoisted from the water for survey at shipyard failed to take reasonable steps to mitigate its damages from shipyard operator's alleged breach of contract, and thus was barred from recovering expenses incurred after yacht was repaired, when owner pulled yacht out of charter business, even though it was completely repaired, and then kept yacht fully crewed and provisioned until its eventual sale.

**[19] Damages 115 ☞62(4)**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(B) Aggravation, Mitigation, and Reduction of Loss
         115k62 Duty of Person Injured to Prevent or Reduce Damage
            115k62(4) k. Breach of Contract. Most Cited Cases
As a general proposition, plaintiff asserting claim for breach of contract must take all reasonable steps

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

Page 5

necessary to avoid further damages, and whether plaintiff undertook to mitigate damages is relevant to the damages calculation.

**[20] Damages 115 ⟲62(4)**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(B) Aggravation, Mitigation, and Reduction of Loss
            115k62 Duty of Person Injured to Prevent or Reduce Damage
                115k62(4) k. Breach of Contract. Most Cited Cases
Damages that plaintiff might have avoided with reasonable effort are not caused by defendant's wrong, and therefore are not to be charged against defendant in action for breach of contract.

**[21] Bankruptcy 51 ⟲2903**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2903 k. Amendment or Withdrawal. Most Cited Cases
Amendments to claims are generally allowed when the purpose is to cure a defect in the original claim, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim.

**[22] Bankruptcy 51 ⟲2903**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2903 k. Amendment or Withdrawal. Most Cited Cases
Post-bar date amendments to claims must be reviewed with careful scrutiny to ensure that there is no attempt made to file a new claim under the guise of an amendment.

**[23] Bankruptcy 51 ⟲2903**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2903 k. Amendment or Withdrawal. Most Cited Cases

**Bankruptcy 51 ⟲3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3566 Confirmation; Objections
                51k3568 Effect
                    51k3568(2) k. Conclusiveness. Most Cited Cases
Confirmation of a Chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation, and a post-confirmation amendment of a claim should only be allowed for compelling reasons.

**[24] Bankruptcy 51 ⟲2903**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2903 k. Amendment or Withdrawal. Most Cited Cases

**Bankruptcy 51 ⟲3568(2)**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3566 Confirmation; Objections
                51k3568 Effect
                    51k3568(2) k. Conclusiveness. Most Cited Cases
Yacht owner waived any right to amend its proof of claim against Chapter 11 debtor-former shipyard operator, given that owner voluntarily participated in disclosure statement approval process and plan confirmation process, voting in favor of plan, without giving debtor, court, or other creditors any indication that it intended to assert amended claim for consequential damages that were more than 10 times greater than existing claim, even though

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

amended claim had fully matured and been fully li-
quidated two months before confirmation hearing,
thereby allowing those involved in confirmation
process to rely on estate's known maximum expos-
ure to owner in determining plan's feasibility.

[25] Estoppel 156 €══52.10(2)

156 Estoppel
   156III Equitable Estoppel
      156III(A) Nature and Essentials in General
         156k52.10 Waiver Distinguished
            156k52.10(2) k.  Nature and Elements
of Waiver. Most Cited Cases
"Waiver," generally characterized as the intentional
relinquishment of a known right, requires (1) the
existence at the time of waiver of a right, privilege,
advantage, or benefit which may be waived, (2) the
actual or constructive knowledge thereof, and (3)
an intention to relinquish such right, privilege, ad-
vantage, or benefit.

[26] Bankruptcy 51 €══2829

51 Bankruptcy
   51VII Claims
      51VII(A) In General
         51k2828 Contingent or Unliquidated Claims
            51k2829 k. Estimation of Value. Most
Cited Cases

Bankruptcy 51 €══3544

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3541 Acceptance
            51k3544 k. Eligibility to Vote; Impair-
ment. Most Cited Cases
A claimant with a claim to which an objection has
been made is not entitled to vote on a reorganiza-
tion plan unless the claimant seeks and obtains an
order estimating or temporarily allowing the claim
for voting purposes.

[27] Bankruptcy 51 €══3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2)  k.  Conclusiveness.
Most Cited Cases
Creditor was estopped, following confirmation of
Chapter 11 debtor's plan, from amending its proof
of claim to seek increased consequential damages,
given reliance upon actual and implied representa-
tions made by creditor respecting nature and
amount of its claim by debtor in proposing plan, by
bankruptcy court in determining that plan was feas-
ible, and by other creditors in determining whether
to vote in favor of plan, and given debtor's substan-
tial consummation of plan by, among other things,
distributing initial dividends to creditors with al-
lowed claims. 11 U.S.C.A. § 1101(2).

[28] Bankruptcy 51 €══3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2)  k.  Conclusiveness.
Most Cited Cases
Creditor's treatment under confirmed plan of reor-
ganization creates contractual relationship between
debtor and creditor, in that creditor's pre-
confirmation claim is subsumed in and replaced by
new contract created by confirmed plan; each
claimant gets a new claim, based on whatever treat-
ment is accorded to it in plan itself.

[29] Bankruptcy 51 €══3568(2)

51 Bankruptcy
   51XIV Reorganization
      51XIV(B) The Plan
         51k3566 Confirmation; Objections
            51k3568 Effect
               51k3568(2)  k.  Conclusiveness.
Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

Res judicata barred creditor's attempt to amend its proof of claim two months after confirmation of Chapter 11 debtor's plan, given that creditor had every opportunity to amend claim and litigate its entitlement to increased damages amount at or before confirmation hearing.

[30] Judgment 228 ⟶584

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
         228k584 k. Nature and Elements of Bar or Estoppel by Former Adjudication. Most Cited Cases

Judgment 228 ⟶713(2)

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(C) Matters Concluded
         228k713 Scope and Extent of Estoppel in General
            228k713(2) k. Matters Which Might Have Been Litigated. Most Cited Cases
Doctrine of "res judicata," as applied in bankruptcy proceedings, not only bars a court from relitigating issues that have been litigated in a cause, but also bars a court from litigating issues that may have been litigated.

*898 James H. Fierberg, Miami, FL, for Debtor.

**ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON CLAIM 27 OF MSM, INC., f/k/a MSM CHARTERS, LLC, AND ORDER TO SHOW CAUSE**

JOHN K. OLSON, Bankruptcy Judge.
MSM Charters, LLC, n/k/a MSM, Inc. ("MSM") timely filed Claim 27 against the Debtor in the amount of $987,450.78, later amended after confirmation of the Debtor's chapter 11 reorganization plan to the increased amount of $1,943,804.00. The Debtor formerly operated a shipyard on the New River in Fort Lauderdale; the claim arises out of the dropping of MSM's 130-foot Hatteras motor yacht *M/Y Sacajawea* from a Syncrolift yacht hoist while the vessel was at the shipyard for survey in connection with its imminent trade-in by MSM on a larger replacement vessel, *M/Y One More Toy*.

*Sacajawea* was at the shipyard pursuant to a contract between MSM and the Debtor. That contract expressly waives claims against the Debtor arising out of ordinary negligence and similarly waives economic damages. Although the Debtor disputes that it was negligent at all in the dropping of the *Sacajawea*, it persuasively argues that MSM has failed to plead any facts which would support a finding that the Debtor was grossly negligent.

The case presents two questions: First, does the contract between the parties bar MSM's recovery of *any* damages against the Debtor? Included within this question are issues relating to the enforceability of the contract, particularly in connection with the waiver of ordinary negligence and of economic loss; whether the damages sought by MSM were reasonably foreseeable; whether MSM is entitled to damages resulting from diminution in value of *Sacajawea*; and whether MSM took appropriate steps to mitigate its damages. Second, may MSM amend its proof of claim after confirmation of the Debtor's plan? The issues arising under this question include waiver and estoppel, and generally turn on the effect of an order confirming a chapter 11 reorganization plan.

**I. Background**

In the fall of 2004, MSM entered into an agreement to trade in the *Sacajawea* on a larger vessel, *One More Toy*, f/k/a *Liquidity*. The price for *One More Toy* was $12 million cash plus the trade-in of *Sacajawea*. The deal had a very tight closing schedule, and required an immediate survey of *Sacajawea*, which in turn required that the vessel be lifted from the water. The Debtor operated a Syncrolift yacht hoist which the Debtor believed was capable of lift-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

ing the 130-foot *Sacajawea.* The parties entered into a repair contract which set forth the parties' respective rights and remedies.

While the *Sacajawea* was being lifted on November 14, 2004, the Syncrolift failed and the vessel fell, sustaining damages. MSM contends that the Syncrolift was not rated to lift the vessel and that the Debtor was negligent in attempting to do so. The Debtor contends that it was not negligent, that MSM deliberately understated the vessel's weight (at 150 tons) in order to induce the Debtor to lift the vessel to satisfy the short closing schedule on MSM's prospective acquisition of *One More Toy,* and that the Syncrolift was incapable of lifting the (in fact, much *899 heavier) *Sacajawea.* In the event, the Syncrolift failed and *Sacajawea* sustained $800,000 damages when it fell.

At the time of the incident, MSM maintained an insurance policy on *Sacajawea* which established the insured value of the vessel at $4,702,500, inclusive of "the hull and material contents including fine art, engines, machinery and everything connected therewith, nothing excluded." This value was confirmed in MSM's Charter Agreement dated July 30, 2004, 3 1/2 months before the Syncrolift failure, which stated that the insured value of the vessel was $4,702,500.

As a result of the damage to *Sacajawea,* the trade-in transaction did not go forward. Instead, **on the same day that Sacajawea was dropped,** MSM entered into a cash-only contract to purchase *One More Toy* for $17.5 million. Since the prior contract called for the purchase of *One More Toy* for $12 million plus *Sacajawea,* it is clear and indisputable that the trade-in value of *Sacajawea* prior to its damage was $5.5 million.[FN1]

> FN1. MSM contends, without any documentary support, that the value of *Sacajawea* prior to the Syncrolift failure was $6.0 million. This contention, belied by all of the documentary evidence, is frivolous.

MSM sued the Debtor in state court in February 2005, alleging unspecified damages for breach of contract, negligence, gross negligence, diminution in value and bailment. The Debtor filed its voluntary chapter 11 petition three weeks later. The court established a claims bar date of July 11, 2005.

On July 8, 2005, MSM filed a proof of claim (the "Initial Claim") in the amount of $987,450.78, consisting of specific property repair damages of $802,306.78 ("Repair Damages") and loss of charter and broker commissions in the amount of $185,144.00 ("Consequential Damages"). The damage calculations were supported in a detailed spreadsheet attached to the Initial Claim.

The Debtor objected to the Initial Claim on April 27, 2006 [CP 247]; MSM responded [CP 291] on May 30, 2006, and asserted that the damages due it aggregated $987,450.78.

After the vessel was dropped, MSM caused it to be removed to the Bradford Marine ship repair yard, also located in Fort Lauderdale. Following the completion of repairs in March 2005, MSM retained *Sacajawea* until its sale for $5.3 million on May 10, 2006. Although MSM had regularly chartered the vessel prior to its damage, MSM never offered *Sacajawea* for charter thereafter. Instead, MSM continued to fully crew and provision *Sacajawea* for 15 months following the completion of repairs at the Bradford yard in March 2005 until the ultimate sale in May 2006. MSM claims to have incurred costs of $1,182, 237.00, plus attorneys' fees, in the operation and general maintenance of *Sacajawea* during this period (the "Post-Repair Costs"). These include, *inter alia,* crew wages, routine maintenance of the vessel, maintenance of water toys, restaurant and bar bills and tips, boat shoes for the crew, flowers, car rentals, and interest carrying costs. MSM has also sought to include damages to the vessel it alleges were sustained during Hurricane Wilma, which hit Fort Lauderdale on October 24, 2005, more than eleven months after the Syncrolift failure and eight months after Bradford Marine completed its repairs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

Page 9

On April 28, 2006, the Debtor filed its amended chapter 11 plan [CP 279] and amended disclosure statement [CP 278]. The disclosure statement was sent to all parties in interest, including MSM, so that they could raise any objections which they *900 had prior to my consideration of the disclosure statement.[FN2]

> FN2. Under 11 U.S.C. § 1125, a chapter 11 reorganization plan proponent is required to provide disclosures to its creditors in connection with the proponent's attempts to solicit their votes in favor of the plan. The bankruptcy court is required to pass upon the adequacy of the disclosures made prior to such solicitation, and parties in interest are entitled to object to the information contained in the disclosure statement before the court considers it.

The disclosure statement filed by the Debtor contained the following description of the MSM damage claim:

Although the Debtor maintained insurance with respect to the casualty, the Debtor's insurance carrier, One Beacon Insurance Company initially declined coverage. The insurer has filed an action in Federal Admiralty Court seeking a declaratory judgment that there was no coverage. The Debtor, through its special counsel Alan S. Wachs, Esq., Volpe Bajalia Wickes Rogerson Galloway and Wachs, 1301 Riverplace Blvd., Suite 1700, Jacksonville, Florida 32207-9023 ("Wachs") defended the action and sought through counterclaim a declaratory judgment that there was coverage and that the insurance company wrongfully declined coverage. The amount of the coverage that was provided for in the policy was approximately $800,000. The declination of coverage was problematic because at the same time, the owner of the vessel that was on the Syncrolift at the time of the incident, MSM Charters, filed an action in the Broward County Circuit Court to liquidate the alleged claim against the Debtor. The Debtor had valid and meritorious defenses and affirmative defenses against MSM

Charters based upon, among other things, the misrepresentations made by owners of the vessel as to the gross weight of the vessel. The Debtor believes that it was this misrepresentation that caused the failure of the Syncrolift and that MSM Charters has a significant liability to the Debtor. That litigation was also being advanced by Wachs. * * * The Syncrolift litigation was recently settled. Under the settlement, the estate will receive $400,000 [for property damage]. **In addition, the subrogee of the owners vessel will receive $800,000, thereby removing substantial claim against the estate.** [Emphasis added.]

The disclosure statement also gave notice to all creditors and parties in interest as to the procedures for the treatment of disputed claims, including MSM's, as follows:

At the time of distribution to Creditors holding Ultimately Allowed Claims, including all Allowed Administrative Expenses, Allowed Priority Claims, or Allowed General Unsecured Claims, as more fully set forth in the Plan, there shall be reserved by the Debtor the amount of cash which would otherwise be distributed to the holder of such a disputed expense or Claim, as if the full amount of such expense or Claim is deemed an Allowed Claim. * * * Once a Disputed Administrative Expense, Disputed Priority Claim or Disputed General Unsecured Claim becomes an Ultimately Allowed Claim, in whole or in part, the cash reserved on account of such a disputed claim shall be distributed to such Creditor in the same proportion as other distributions to such class of creditors. [emphasis added]

MSM did not object to either of these provisions.

As a condition precedent to confirmation of the Debtor's amended plan, the Debtor *901 was required to reserve the full amount of the disputed MSM claim, $987,450.78. It did so, and the full amount was escrowed prior to confirmation.

In the amended plan, the disputed MSM claim was separately classified in Class 4 of the plan. The pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

posed treatment of this claim was as follows:

Pursuant to the Plan, Class 4 consists of the insured Tort Claim of MSM Charters. The Class 4 Claimant holding an Allowed Claim will be satisfied by insurance proceeds to the extent of the Debtor's coverage limits. If the Allowed Class 4 Claim exceeds the amount of the available insurance proceeds, the excess Allowed Class 4 Claim will be paid *pari passu* with the Claims of Allowed Class 3 Claimants [general unsecured claims].

After it was approved, the disclosure statement and plan were circulated to the entire creditor body, including MSM. As a result, all creditors-including MSM-were on notice that the property damage component of MSM's disputed claim had already been paid by a third party, that the $802,000 property damage claim against the Debtor had been released, and that such damages were no longer a part of MSM's claims against the estate, which were therefore reduced to approximately $185,000.

The release of the $802,000 property damage component of the claim was confirmed in a Mutual Specific Release (the "Release") entered into by, among others, MSM and the Debtor prior to confirmation and by its terms "effective as of March 15, 2006, without regard to the dates of execution by the Parties." The Release provides that while MSM's claim for diminution in value and consequential damages was preserved, the Release expressly released MSM's claim for property damages. I specifically approved the Release by order entered June 19, 2006 [CP 351], and all creditors and parties in interest were therefore on notice-and entitled to rely-on the reduction of MSM's claim from $987,000 to $185,000.

At no time did MSM object to the disclosure statement or to confirmation of the plan. Although it could have done so, at no time prior to confirmation did MSM file any pleading or otherwise put the Debtor, the creditors, or the court on notice that it sought to increase the amount of its consequential damages from $185,144 (consisting of lost charter

profits and charter cancellation fees) to $987,450.78 (which now incorporates the Post-Repair Costs incurred by MSM after the Bradford yard completed the repairs) or the ultimate amount of $1,943,804 which MSM now claims.

I conducted a confirmation hearing on the Debtor's amended plan on July 6, 2006, and entered the Confirmation Order the next day. The Confirmation Order provided for and required the escrow of $987,450.78 for MSM's Class 4 disputed claim. Although MSM's counsel [FN3] was present at the confirmation hearing, MSM did not raise any issues with the amended plan, did not advise me, the Debtor, or other creditors of its intent to increase its claim to include Post-Repair Costs. In fact, MSM even voted in favor of the amended plan!

> FN3. MSM's counsel was actively involved in this case, represented multiple claimants in connection with it, and had full knowledge of the case.

Two months after confirmation, and four months after it finally sold *Sacajawea* for $5.3 million, MSM filed an amended proof of claim (the "Amended Claim") in the amount of $1,943,804 on September 11, 2006. In the Amended Claim, MSM completely abandoned claims for property *902 damage and for lost charter fees and commissions. Instead, the Amended Claim asserts new theories of recovery based upon *Sacajawea's* operating expenses incurred during the 15 months after the vessel had been completely repaired and prior to its sale.

## II. Summary judgment standards

Summary judgment is provided for under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in the bankruptcy courts through Federal Rule of Bankruptcy Procedure 7056 and to contested matters in bankruptcy cases (including claims objection litigation such as this matter) through Federal Rule of Bankruptcy Pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cedure 9014. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rice v. Branigar Org., Inc.,* 922 F.2d 788 (11th Cir.1991); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525 (11th Cir.1987).

In the absence of a genuine issue of material fact, a federal court should promptly adjudicate the legal questions in the case and decide them, thus avoiding the delay and expense associated with a trial. *United States v. Feinstein,* 717 F.Supp. 1552 (S.D.Fla.1989). Important as these principles are in civil litigation in the district courts, they are even more important in bankruptcy litigation, where the same policy favoring the avoidance of expense and delay generally occurs in the context of severe financial distress on the part of at least one of the parties.

A moving party may demonstrate the absence of a genuine issue of material fact in one of two ways. First, by submitting affirmative proof that negates an essential element of the nonmoving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Second, by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* The pertinent question for me under Rule 56 is whether the evidence presented demonstrates a sufficient factual disagreement to require submission to the fact finder, or whether instead the controversy is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although MSM points to a number of purported factual disputes here, I conclude that even if all of those disputed facts are viewed in a manner most favorable to MSM, the inescapable conclusion is that the Debtor has no liability to MSM under the contract between the parties and as a matter of law.

I also conclude that MSM is prohibited as a matter of law to amend its claim post-confirmation. For those reasons, I will grant summary judgment in favor of the Debtor and disallow any claim by MSM against the Debtor's estate.

### III. Legal analysis

#### A. The parties' contract

The repair contract between the Debtor and MSM contains an express limitation on the Debtor's liability to MSM and an express assumption of liability for loss by MSM. Paragraph 5 of the contract provides in relevant part:

The use of the Company's facilities and services is done at the sole risk of the Owner and the Vessel, and it is expressly understood and agreed to by the Owner and the Vessel that the Company's liability under this agreement shall be limited to a breach of its contractual obligation to provide dockage space and repair services. * * * The Owner and the Vessel hereby release the company *903 and agrees to indemnify the Company and to hold the Company harmless from any and all liability for personal injury, loss of life and/or property damage arising out of the ordinary negligence of the Company or its employees * * *

Similarly, paragraph 6 of the contract provides in relevant part:
Under no circumstances shall the Company [the Debtor] be liable to the Owner [MSM] or to the Vessel [the *Sacajawea*] for economic loss (such as loss of use or charter), irrespective of its foreseeability, cause or resulting damage.

These two provisions, taken together, evidence a clear intent to relieve the Debtor from any liability for ordinary negligence and waives any claim by MSM for economic damages. Unless these provisions were invalid or unenforceable, they operate to bar any claim by MSM for negligence or for con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

sequential economic losses.

### 1. Waiver of negligence

[1][2] Under applicable federal maritime law, parties to a maritime contract may agree contractually to exculpate one of the parties from ordinary negligence. The Eleventh Circuit has adopted a three-part test by which the validity of such exculpation provisions are to be measured. *Diesel Repower v. Islander Investments, Ltd.,* 271 F.3d 1318, 1324 (11th Cir.2001). To be valid, an exculpatory provision in a maritime repair contract must provide as follows:

(a) the contract must clearly and unequivocally indicate the parties' intention;

(b) the limitation must not absolve the ship repairer of all liability and must still provide a deterrent to negligence; and

(c) the parties must have equal bargaining power when creating the agreement.

*Id.; Merrill Stevens Dry Dock Co. v. M/V Yeocomico II,* 329 F.3d 809 (11th Cir.2003).

[3][4] Two of these three requirements are unquestionably present. Paragraph 5 of the contract clearly and unequivocally absolves the Debtor of any liability. Clearer language would be difficult to draft. I am similarly satisfied that the third requirement-equal bargaining power-is also present. MSM's argument that "there were only a few facilities in South Florida with equipment capable of raising the Vessel, a 130' Hatteras, out of the water" is insufficient to create a genuine issue of material fact on this point. First, MSM obviously concedes that there were other such facilities, including the Bradford Marine yard located in Fort Lauderdale, which had previously and successfully hoisted the *Sacajawea.* A ocean-going vessel such as this is not restricted to coastal waters, and MSM could have taken it to any Gulf or South Atlantic port [FN4] if MSM had been unsatisfied with the Debtor's form

of contract. MSM has pointed to no evidence which could support a conclusion that the Debtor's contractual limitation on liability was mirrored in any other shipyard's contracts, much less in every other shipyard's contracts, such that the absolution from ordinary negligence contained here was an industry-wide contractual provision that amounted to an adhesion contract. Finally, I note that MSM was able to purchase *One More Toy* for $17.5 million cash shortly after the incident, while the Debtor found itself compelled to seek bankruptcy protection soon thereafter. There is no question that MSM enjoyed-at the very least-an **\*904** equality of bargaining power with the Debtor.[FN5]

> FN4. Or, for that matter, to any port in the world.

> FN5. If the scales tilt at all here, it is in the opposite direction: MSM's bargaining power would appear to have been decidedly stronger.

[5] The only remaining question regarding the enforceability of the contractual limitation on liability under the Eleventh Circuit's standards is whether the limitation absolved the Debtor of all liability or whether it still provided a deterrent to negligence. As written, the contract only excludes liability for ordinary negligence, and the Debtor would still remain liable for gross negligence or for wanton or willful misconduct. Exculpatory language similar to that contained in the contract here was recently upheld by the District of Columbia Court of Appeals in *Carleton v. Winter,* 901 A.2d 174 (D.C.2006). *Carleton* provides a useful review of the relevant treatises, including the *Restatement (Second) of Torts* § 496B, cmt d (1963, 1964); *Corbin on Contracts* § 85.15, 455 (2003); *Williston on Contracts* § 19.23, vol. 8, 291-97 (4th ed.1998); and *Prosser and Keaton on Torts* § 68, 483-84 (5th ed.1984). As the treatises uniformly suggest, contractual exculpatory clauses absolve the exculpated party only from ordinary negligence and should not be construed to include loss or damage resulting from intentional or reckless misconduct, gross negligence,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

or the like. I conclude that there is nothing in the exculpation clause here that purports to exculpate the Debtor from gross negligence or worse; that there is a meaningful deterrent to such negligence which survives the application of the exculpation clause in the contract; and that the contractual provisions contained in paragraph 5 of the contract fully satisfy the prerequisites for enforceability and are consistent with the holding in *Diesel Repower, supra.*

### 2. Waiver of economic loss

The unambiguous provisions of paragraph 6 of the contract bar every damage claim by MSM for economic loss, including consequential damages. "Loss of charter and loss of use" were expressly waived by MSM. Since the contract language is clear, I am restricted by that language in determining what damages may be recovered by MSM. *Merrill Stevens Dry Dock, supra,* 329 F.3d at 815. MSM has provided no legal justification to the contrary.

### B. Florida's economic loss rule

[6][7] Even if the parties had not excluded economic losses and consequential damages under their contract, the Florida economic loss rule would operate to preclude any recovery by MSM for economic damages. Succinctly stated, the economic loss rule bars recovery under a tort theory where the parties are acting under a contract and economic losses are the only damages. *Indemnity Insurance Company of North America v. American Aviation, Inc.,* 891 So.2d 532, 536 (Fla.2004). The purpose of the economic loss rule, as explained by the Florida Supreme Court, is to "protect the integrity of contract," *Id.* at 537-538, or, as Justice Cantero colorfully put it in his concurring opinion in the case, to prevent contract law and warranty law from "drown[ing] in a sea of tort." *Id.* at 544.

Accordingly, even if the contract did not expressly exclude liability for ordinary negligence, no tort

claims could be recovered by MSM because such claims are specifically barred by the Florida economic loss rule's prohibition on the recovery of such claims by parties who are in privity.

### C. Failure to state a claim for gross negligence

[8] Prior to the filing of its Claim 27 here, MSM had sued the Debtor in state *905 court. Under Florida procedural rules (which are substantially similar on this point to Fed.R.Civ.P. 8), a pleading asserting gross negligence must contain a short and plain statement of the ultimate facts showing that the plaintiff is entitled to relief. *Summerlin v. Tramill,* 290 So.2d 53 (Fla.1973)*(citing Tramill v. Summerlin,* 276 So.2d 173 (Fla.App. 3rd DCA 1973) (overturned on other grounds). Such a complaint must contain sufficient allegations of ultimate fact as to make it fairly appear that the defendant's course of conduct was of a gross, willful, and wanton character. *Id.* Allegations which might sustain a cause of action for ordinary negligence, or conclusory allegations, are insufficient. *Id.*

MSM's state court complaint is insufficient to state a cause of action for gross negligence under the foregoing standards and under Fla.R.Civ.P. 1.110(b)(2). There is no short and plain statement of the ultimate facts which would support a claim that the Debtor was grossly negligent, nor are any facts alleged from which one might reasonably conclude that the Debtor's conduct was intentional, willful, or wanton.

[9][10] Nor are there any pleadings or discovery materials in the record in the claims litigation here which support any contention that the Debtor was grossly negligent in its maintenance or operation of the Syncrolift. Florida substantive law defines gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another." *Eller v. Shova,* 630 So.2d 537, 540 n. 3 (Fla.1994). As put in *Tran v. Waste Management, Inc.,* 290 F.Supp.2d 1286, 1294 (M.D.Fla.2003), a showing of gross negligence un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

der Florida law requires the following elements:

a. Gross negligence presupposes the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than normal and ... usual ... peril;

b. Secondly, gross negligence must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of; [a]nd

c. [T]he act of omission complained of must occur in a manner which evinces a conscious disregard of consequences, as distinguished from a careless disregard thereof (as in simple negligence) or from the more extreme willful or wanton disregard thereof (as in culpable or criminal negligence).

There is simply nothing in the record here which would support a finding that the Debtor was grossly negligent or worse.

**D. MSM's damage claims were not foreseeable**

[11][12] Damages for breach of contract are limited to those "damages as would normally result from the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach." *Poinsettia Dairy Products, Inc. v. Wessel Co.,* 123 Fla. 120, 166 So. 306, 310 (1936). Thus, even if one were to ignore the fact that the parties contemplated and agreed in paragraph 6 of their contract that the Debtor would not be liable for any economic damages, the damages now sought by MSM could not possibly have been contemplated at the time of contracting. No reasonable person could have foreseen that MSM would take *Sacajawea* out of the charter business entirely and would instead undertake a highly limited sales campaign for fifteen months in which the vessel would be kept fully *906 crewed and provisioned, in readiness for a new owner to emerge. Perhaps

MSM thought that it might as well try this uneconomic and apparently irrational course since it intended to stick the Debtor with the bill.[FN6] Regardless, the charges which MSM seeks recover from the Debtor for Post-Repair Costs are wholly unforeseeable and are therefore not recoverable under applicable Florida law.

> FN6. Nothing in the record directly supports my speculation on this point, but then, nothing in the record supports any other rational explanation for MSM's behavior in this regard.

[13][14] Under Florida law, foreseeability is analyzed in a two-step process. *McCain v. Florida Power Corporation,* 593 So.2d 500 (Fla.1992). First, the court must consider whether a defendant's conduct foreseeably created a "zone of risk" which poses a general threat of harm to others. Second, the court must consider "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id.* at 502.*McCain* treats the question of the "zone of risk" as a threshold legal requirement, and treats the causation element as a question of fact with the focus on whether "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *Id.* at 502-3. Under this test, as the likelihood of risk grows greater, so does the duty to limit and protect against the risk. However, the trial court has the discretion to consider the issue of proximate causation as a matter of law if after the event occurred and "looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." *Id.* at 504, quoting from *Restatement (Second) of Torts* § 435(2) (1965).

MSM cannot get past *McCain's* first step. The Debtor's actions did not create a larger zone of risk that posed a general threat to MSM's trade-in of *Sacajawea.* Although MSM suggests in its brief that the lifting of vessels is inherently risky, its ac-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tions (including the decision by the Master of *Sacajawea* to leave the vessel at the shipyard and fly to Europe) and the fact that vessels are regularly hoisted for survey and repair purposes belie that contention.[FN7] More significantly here, however, no rational person could reasonably anticipate (a) that *Sacajawea* would not continue to serve as a trade-in for MSM's purchase of *One More Toy* after it was repaired; (b) that MSM would instead enter into a contract *on the same day as the accident* to purchase *One More Toy* in an all-cash $17.5 million deal; (c) that MSM would fully crew and provision *Sacajawea* for 15 months after its complete repair while it sought to sell the vessel; or (d) that MSM would take *Sacajawea* out of charter in the interim. *Sacajawea* was fully repaired 3 1/2 months after it was damaged. The delay in its sale, and the costs associated with the sale method chosen by MSM, cannot be attributable to any actions by the Debtor.

> FN7. To the extent that MSM is suggesting a *per se* or strict liability standard be applied to the hoisting of vessels, I see no legitimate basis for such a position.

### E. MSM cannot recover damages for diminution in value, or "stigma damages"

As discussed in the text at footnote 1 above, the value of *Sacajawea* immediately prior to its damage was $5.5 million. The vessel was sold 15 months after repairs were completed for $5.3 million. Given normal depreciation and wear and tear, and given MSM's acknowledgment that there is great fluctuation in the market *907 value of luxury yachts, there is no competent evidence in the record which would support a factual determination which could be made after trial that *Sacajawea* actually experienced any diminution in value after it was dam- aged.

[15][16][17] Even if such evidence existed, and MSM could establish that the value of *Sacajawea* actually declined after its damage and repair, applicable Florida law bars recovery for either the deficiency between the trade-in value and the eventual

sales price or stigma damages as part of consequential damages. *Orkin Exterminating Company, Inc. v. DelGuidice,* 790 So.2d 1158 (Fla. 5th DCA 2001). The purpose of money damages is to put the injured party in as good a position as that which full performance of the contract would have put him. *Grossman Holdings Ltd. v. Hourihan,* 414 So.2d 1037 (Fla.1982). This does not guarantee or mean that the plaintiff "is to be put in the same specific physical position,"*Id.* at 1039. When a plaintiff can be made whole by repairing the damage or receiving compensation equal to the cost of repair, the law does not generally allow an additional recovery for any diminution in value which occurs beyond the cost of repair. *Id.*

MSM has acknowledged that *Sacajawea* was fully repaired. It nonetheless contends that the damages to the vessel created a "stigma" which resulted in the refusal by the owner of *One More Toy* to accept *Sacajawea* as a trade-in, [FN8] which in turn caused MSM to incur the extraordinary and unforeseeable expenses it now seeks to recover from the Debtor. This type of damage cannot be recovered under Florida law

> FN8. This assertion is of somewhat dubious validity, given that MSM agreed to a $17.5 million all cash deal on the same day that the damage occurred.

### F. MSM failed to mitigate its damages

[18][19][20] As a general proposition, a plaintiff must take all reasonable steps necessary to avoid further damages, and whether the plaintiff undertook to mitigate damages is relevant to the damage calculation. "[D]amages which the plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and, therefore, are not to be charged against him." 2 *Williston on Contracts* § 1353 at 274 (1962). MSM failed to take reasonable steps to mitigate its damages. From the completion of repairs in February 2005 through the sale of *Sacajawea* in May 2006, MSM made no attempt to charter the vessel, other than one four-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

night charter in October 2005. That charter generated $16,850 in revenue. During that same period, MSM generated $4.5 million in charter revenue from its operation of *One More Toy*.Despite MSM's conscious decision to use *One More Toy* to generate very substantial revenues while holding *Sacajawea* back from the charter business, MSM wants to Debtor to pay all of its expenses associated with keeping *Sacajawea* fully crewed and provisioned, including both ordinary and extraordinary expenses-none of which relate in any way to the Syncrolift failure and the damage to the vessel, but all of which could have been offset by the continued use of *Sacajawea* as a charter vessel until its sale. MSM's decision to pull *Sacajawea* out of the charter business and its decision to keep the vessel fully crewed and provisioned constituted a flagrant failure to mitigate its damages. As a consequence, even if such damages were not contractually barred, and not barred as a matter of law because they were unforeseeable,*908 they are barred because MSM failed to mitigate.

### G. MSM would not be permitted to amend its proof of claim had it sought to do so pre-confirmation

MSM's original proof of claim was filed in the amount of $987,450.78, and consisted of approximately $ 802,000 in property damages and $185,000 in consequential damages. The property damage claim for $802,000 was released by MSM after the insurance companies paid for the repairs to *Sacajawea*. As noted in the background discussion above, the record was full of references to the nature and extent of MSM's claim. In the run up to confirmation of the Debtor's chapter 11 plan, the record-as set forth in the claim itself, the release of the property damage claim, the disclosure statement, and the plan-was clear that the only real, live claim against the Debtor from MSM was the disputed $185,000 consequential damage claim arising entirely from lost charter income and commissions FN9 (although, to be sure, the Debtor reserved and escrowed cash to satisfy the entire $987,000 claim

as filed). MSM did absolutely nothing to disabuse the Debtor, the other creditors, or the court from the reasonable conclusion that the only real fight left in the case was the Debtor's objection to MSM's $185,000 consequential damage claim. Instead, MSM sat quietly by, did not object to the disclosure statement or plan, and even voted for the plan.

> FN9. These categories of damages have been entirely abandoned in MSM's Amended Claim which seeks recovery for the carrying costs discussed above.

It is particularly noteworthy that MSM sold *Sacajawea* in early May 2006, about two months prior to the confirmation hearing.FN10 MSM most certainly knew prior to approval of the disclosure statement and prior to confirmation that the claim for consequential damages it intended to assert was far greater than the $185,000 it had included in its filed claim. In fact, MSM's ultimate consequential damage claim is *more than ten times* the consequential damages it let the Debtor, the creditors, and the court know about prior to confirmation, and arises from entirely different categories of expenses than those asserted in the (now abandoned) $185,000 claim for lost charter fees and commissions.

> FN10. Organizing all of the invoices for rental cars, boat shoes, flowers, bar bills and the like is, after all, time consuming.

On September 11, 2006, four months after the sale of *Sacajawea* and two months after confirmation, MSM filed its Amended Claim in the amount of $1,943,804. All of that claim constitutes consequential damages, and fills up both the $802,000 in property damages included in the Initial Claim and another $956,000 besides.

If the Amended Claim had been filed before confirmation, even though a year or so after the bar date,FN11 at least the Debtor, creditors, and the court would have had some inkling that MSM in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

tended to assert a consequential damage claim 1000% greater than anything it had previously asserted. The information was clearly and uniquely in MSM's possession. MSM's failure to disclose its new claim operated to the severe prejudice and detriment of the Debtor and of other creditors.

> FN11. As noted above, the bar date for the filing of claims was fixed by order at July 11, 2005.

[21][22] Amendments to claims are generally allowed where the purpose is to cure a defect in the original claim, to describe*909 the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. *In re International Horizons, Inc.,* 751 F.2d 1213, 1216 (11th Cir.1985); *In re Integrated Resources, Inc.,* 157 B.R. 66, 70 (S.D.N.Y.1993). Post-bar date amendments must be reviewed with careful scrutiny to assure that there is no attempt made to file a new claim under the guise of an amendment. *In re Enron Corp.,* 419 F.3d 115 (2nd Cir.2005). Here, MSM's post-bar date, post-confirmation amendment did not arise out of the same "conduct, transaction, or occurrence" as set forth in the original claim. Rather, it includes a whole panoply of damages arising out of it unilateral decisions to pull *Sacajawea* out of the charter fleet but to keep the vessel fully stocked and provisioned nonetheless.

In *Enron,* the Second Circuit explained the process and analysis which a bankruptcy court should employ in determining whether an amendment to a proof of claim should be allowed, as follows:

Courts considering amendments to claims typically engage in a two-step inquiry: First, they examine " 'whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.' "*Id.* (quoting *In re Black & Geddes, Inc.,* 58 B.R. 547, 553 (S.D.N.Y.1983)). An amendment will meet this threshold of it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the

facts set forth in the original claim." *In re McLean Indus., Inc.,* 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990)(citing *In re G.L. Miller & Co.,* 45 F.2d 115, 116 (2d Cir.1930)). Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will "examine each fact within the case and determine if it would be equitable to allow the amendment." *In re Integrated Res., Inc.,* 157 B.R. at 70. Multiple factors play a role in the analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would "receive a windfall" from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified. *See, id.; see also In re McLean Indus., Inc.,* 121 B.R. at 708. Of these, however, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *In re Integrated Res., Inc.,* 157 B.R. at 70.

*Id.* at 133.

The *Enron* analysis provides detailed and generally accepted instruction on how the bankruptcy court should view post-bar date amendments filed *before* confirmation of a chapter 11 plan. Under the *Enron* standard, MSM would not have been allowed to amend its Claim even prior to confirmation. Case law mandates a significantly higher degree of scrutiny when a claimant seeks to amend its claim *after* confirmation.

### H. Post-confirmation amendment of MSM's proof of claim patently improper

[23] Confirmation of a chapter 11 plan is the equivalent of a final judgment in ordinary civil litigation, and a post-confirmation amendment of a claim should only be allowed for compelling reasons. *In re Chappell,* 984 F.2d 775 (7th Cir.1993); *Kham & Nate's Shoes No. 2 v. First Bank of Whiting,* 908 F.2d 1351, 1354 (7th Cir.1990). It would be inequitable and highly prejudicial to the Debtor and its legitimate creditors if MSM were allowed to re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

Page 18

vise or amend its proof of claim in an attempt to increase the amount and type of its damages.*910 *Holstein v. Brill,* 987 F.2d 1268 (7th Cir.1993).

### 1. Waiver

[24][25] First, MSM has waived any right to amend its claim. Waiver, generally characterized as "the intentional relinquishment of a known right,"*Dooley v. Weil,* 672 F.2d 1340 (11th Cir.1982), requires (1) the existence at the time of waiver of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit. *Id.* at 1347.

[26] Here, MSM voluntarily participated in the disclosure statement approval process and the plan confirmation process-and voted in favor of the plan-without once mentioning that it intended to assert an amended claim which had fully matured and been fully liquidated upon the sale of *Sacajawea* two months before the confirmation hearing. Until it filed its amended claim in September 2006, MSM gave no inkling to creditors or the court [FN12] that its claim was anything more than $802,000 in property damage, the entire amount of which had been paid by insurance, and $185,000 in consequential damages. MSM never sought to amend its claim, never sought amendment of the Debtor's disclosure statement, never sought to stay confirmation, and never objected to its treatment under the plan. Here is what MSM did do:

> FN12. MSM did give the Debtor's counsel a copy of its "Damage book" in August, a month after confirmation and a month before it filed the Amended Claim.

(1) On May 10, 2006, MSM closed on the sale of *Sacajawea* for $5.3 million.

(2) On May 30, 2006, MSM filed its response [CP 291] to the Debtor's objection to MSM's original claim. In the response, MSM represented to the court that it "timely filed a claim in the amount of $987,450.78 together with a summary outlining the different components of the claim amount.... The amounts due to Claimant arise from prepetition damages sustained to the vessel '*M/V Sacajawea* ' as a result of the collapse of the Syncrolift and lost charter fees and commissions [FN13] which had to be paid despite the fact that the vessel was not able to meet its charter obligations due to the accident."

> FN13. As noted above, MSM's Amended Claim entirely abandons charter fees and commissions as elements of its damage calculation.

(3) On May 31, 2006, MSM filed a motion [CP 298] which sought the estimation or temporary allowance of its Claim 27 [FN14] under Fed.R.Bankr.P. 3018(a) for purposes of voting on the Debtor's chapter 11 plan, objecting to the plan, and determining whether the plan is feasible.[FN15] The motion notes that the claim was timely filed in the amount of $987,450.78.

> FN14. A claim to which an objection has been made is not entitled to vote on the reorganization plan unless the claimant seeks and obtains an order estimating or temporarily allowing the claim for voting purposes. The purpose of the rule is to prevent either specious claims or specious objections from interfering with honest creditor democracy in the plan voting process.

> FN15. Under 11 U.S.C. § 1129(a)(11), the bankruptcy court must find before it confirms a chapter 11 plan that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This requirement is generally referred to as the "feasibility test."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
(Cite as: 355 B.R. 894)

**\*911** (4) On June 14, 2006, MSM filed its Ballot [CP 328] accepting the Debtor's plan, and indicated on the ballot that MSM held a Class 3 general unsecured claim in the amount of $987,450.78, "subject to Court's ruling on Motion for Estimation" [CP 298]. On June 28, 2006, following a hearing on June 26th, and without objection from MSM, I entered an order [CP371] denying as moot MSM's motion for estimation [CP 298].

In none of these pleadings filed in anticipation of the confirmation hearing on July 6th did MSM give any hint that it intended to assert its huge Amended Claim made up from entirely new categories of damages. MSM's waiver of its right to do so two months later is implied from its actual conduct. *Dooley, supra,* 672 F.2d at 1347. The acts, conduct and circumstances surrounding MSM's Claim were relied upon by creditors of the estate and by me in concluding that the Debtor's plan was feasible under § 1129(a)(11). All parties in the courtroom-and I-knew that MSM had released the $802,000 property damage component of its Claim after the settlement was approved and the insurance proceeds paid. MSM had expressly released the Debtor from any property damage claim. MSM had sold *Sacajawea* two months before the confirmation hearing, and surely knew then-but kept hidden from creditors and me-that it intended to assert a consequential damage claim *more than ten times greater* than the $185,000 consequential damage claim that the Debtor, all other creditors, and I knew was still out there. The Debtor, its creditors, and the court were entitled to rely on MSM's silence during the confirmation process to conclude that the maximum exposure which the estate had to MSM was $185,000. MSM's failure to timely amend its claim after the sale of *Sacajawea* and its failure to object to the disclosure statement and to confirmation of the plan constitute as a matter of law a knowing waiver by MSM of its right to amend its proof of claim at a later date.

**2. Estoppel**

[27] In addition to being barred from claim amendment by its waiver, MSM is also estopped from amending its claim. The Debtor and its creditors, and I, relied upon MSM's actual and implied representations as to the nature and amount of its claim. All of the rest of us present in the courtroom at the confirmation hearing "knew" that MSM's $987,000 claim had been reduced as a result of MSM's release of the entire $802,000 property damage portion of that claim. We all knew that MSM's total remaining damage claim was no greater than $185,144, arising solely from lost charter revenues and charter cancellation fees. The Debtor relied upon this knowledge in proposing the plan; other creditors relied upon it in determining whether to vote in favor of the plan; and I relied upon it in determining that the plan was feasible.

Subsequent to confirmation, and again in reliance on the knowledge described above, the Debtor substantially consummated the plan pursuant to § 1101(2) by, among other things, distributing initial dividends to creditors holding allowed claims. *See Holstein, supra,* 987 F.2d 1268. Now, with the specter of MSM's Amended Claim hanging over the case, the Debtor would have to seek the return of plan distributions from the legitimate creditors who have been paid in order to have enough money to make a *pro rata* distribution to MSM on its $1,943,804 Amended Claim. This exercise would be highly prejudicial to those legitimate creditors, would multiply litigation enormously, and would call into question fundamental issues of fairness and due process.

**\*912** The absurd spectacle which would result from the allowance of MSM's late-filed Amended Claim could have been entirely avoided had MSM properly and timely amended its claim instead of waiting four months after the sale of *Sacajawea* and two months after confirmation to do so. MSM most surely knew well before it sold *Sacajawea* in May 2006 that it had accumulated huge consequential damages during the fifteen months since the repairs had been completed in February 2005. Instead of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

letting the Debtor, creditors, and the court know that these huge new claims existed, MSM lulled all of us into assuming that the plan would pay legitimate creditors what it said it would pay them, and that the plan was feasible. The creditors, the Debtor, and I relied on the representations implicit in MSM's silence. MSM is estopped now to change those representations through the assertion of its Amended Claim.

### 3. Res judicata

[28][29] A creditor's treatment under a confirmed plan of reorganization creates a contractual relationship between the debtor and the creditor. The creditor's pre-confirmation claim is subsumed in and replaced by the new contract created by the confirmed plan; "each claimant gets a 'new' claim, based on whatever treatment is accorded to it in the plan itself." *Holstein, supra,* 987 F.2d at 1270; *In re Benjamin Coal Co.,* 978 F.2d 823, 827 (3rd Cir.1992). The initial claim filed by the creditor during the pendency of the case is dead, replaced by the new contractual obligation created by the creditor's treatment under the confirmed plan.

[30] The doctrine of *res judicata* in bankruptcy proceedings "not only bars a court from relitigating issues that have been litigated in a cause but also bars a court from litigating issues that *may have been litigated.*" *In re Westbrook,* 246 B.R. 412, 416 (Bankr.S.D.Ala.1999). MSM had every opportunity to amend its claim and litigate its entitlement to the new consequential damages it seeks at or before the confirmation hearing. *In re Justice Oaks II, Ltd.,* 898 F.2d 1544 (11th Cir.1990). It did not do so, and its attempt to amend its claim two months after confirmation is barred by *res judicata.* Pursuant to MSM's release of the $802,000 property damage claim, MSM's maximum claim is limited by the *res judicata* effect of the confirmation order to $185,144, the balance of its original claim.

### IV. Conclusion

MSM is barred from amending its Claim post-confirmation under principles of waiver, estoppel, and *res judicata.* Since MSM released the $802,306.78 property damage component of its initial claim of $987,450.78, only the balance of its Initial Claim, $185,144, is properly before me for consideration. The parties' ship repair contract, entered into between parties of equal bargaining power, expressly bars the types of damages sought by MSM in the $185,144 portion of its initial claim (and also bars in their entirety the $1,943,804 in new categories of consequential damages sought in the Amended Claim). The contract clearly and unequivocally waives the claims asserted by MSM but does not absolve the Debtor of liability for gross negligence, willful misconduct, or the like, and the contract is thus enforceable under maritime law. "Loss of charter and loss of use" damages were expressly waived by MSM, and would in any event be barred under the economic loss rule provided for in applicable Florida law. MSM failed to state a cause of action in its state court complaint, and has failed to state a claim here, for gross negligence. Moreover, its damage claims were not reasonably foreseeable by the parties at the time of contracting.*913 Losses for diminution in value, or "stigma damages," are unavailable as a matter of law. Finally, MSM failed utterly to mitigate its damages as it was obliged to do.

There is no genuine issue of material fact present in this case, the Debtor is entitled to judgment as a matter of law, and the Initial Claim and the Amended Claim filed by MSM, Inc., f/k/a MSM Charters, LLC, are hereby DISALLOWED in their entirety.

### V. Attorneys' fees and costs

The ship repair contract between the Debtor and MSM provides for the award of attorneys' fees under certain circumstances. The Debtor is hereby authorized to file a motion seeking the allowance of attorneys' fees and costs associated with its objection to MSM's claim within twenty days of the date

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

355 B.R. 894
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221
**(Cite as: 355 B.R. 894)**

of this order. That motion, and any timely objection filed by MSM, will be considered at a hearing to be held on **January 24, 2007**, at **1:30 p.m.**

### VI. Order to show cause

Pursuant to the provisions of Federal Rule of Bankruptcy Procedure 9011(b), MSM and its counsel have represented to the court that the claims and other legal contentions made in its Amended Claim and in the pleadings and briefs filed in connection therewith are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. MSM's assertion and prosecution of its Amended Claim subsequent to confirmation of the Debtor's plan and in the context of MSM's own pre-confirmation behavior appears to be (a) wholly frivolous and abusive under existing law, and (b) barred under clear and well-established doctrines of waiver, estoppel and *res judicata* which are, or should be, entirely familiar to experienced bankruptcy practitioners such as MSM's counsel. Accordingly, and pursuant to Rule 9011(c)(1)(B), MSM's counsel Robert D. McIntosh and Mariaelena Gayo-Guitian, and the law firm of Adorno & Yoss LLP, are hereby ORDERED to show cause why they have not violated Rule 9011(b) with respect to the post-confirmation filing and prosecution of MSM's Amended Claim, in a hearing to be held in Courtroom 308, United States Courthouse, 299 E. Broward Boulevard, Fort Lauderdale, FL 33301 on **January 24, 2007 at 1:30 p.m.**

Bkrtcy.S.D.Fla.,2006.
In re New River Shipyard, Inc.
355 B.R. 894, 20 Fla. L. Weekly Fed. B 221

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 5**



278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Page 1

▷
In re Powe
Bkrtcy.S.D.Ala.,2002.

United States Bankruptcy Court,S.D. Alabama.
In re Michael F. POWE, Debtor.
Michael F. Powe, Plaintiff,
Theresa Moore Ballard, Intervenor,
v.
Chrysler Financial Corporation, L.L.C., Defendant.
**Bankruptcy Nos. 98-10935-MAM-13,
98-13377-WSS-13.
Adversary No. 99-1121.**

May 10, 2002.

Chapter 13 debtors, as named representatives of class, sued to recover for automobile finance company's alleged failure to properly disclose flat postpetition attorney's fee that it added to its proof of claim in any case where it was oversecured, and also challenged reasonableness of this flat fee. The Bankruptcy Court, Margaret A. Mahoney, Chief Judge, held that: (1) class claims were "in personam" claims, over which bankruptcy court could exercise "core" jurisdiction, even as to class members whose bankruptcy cases were pending in other districts; (2) automobile finance company adequately disclosed this flat postpetition fee; (3) determination as to reasonableness of fee had to be made on district by district basis, and class had to be decertified except as to class members in Southern District of Alabama; and (4) flat $225 fee claimed by finance company, as cradle-to-the-grave fee for any services that its attorneys provided post-petition, was not unreasonable.

So ordered.

West Headnotes

**[1] Federal Courts 170B ⬅️➡️13**

170B Federal Courts
   170BI Jurisdiction and Powers in General

    170BI(A) In General
      170Bk12 Case or Controversy Requirement
        170Bk13 k. Particular Cases or Questions, Justiciable Controversy. Most Cited Cases
Class claims asserted by Chapter 13 debtors on behalf of themselves and other similarly situated bankruptcy debtors, challenging automobile finance company's practice of including, in proof of claim filed in any case in which it was oversecured, a flat fee for postpetition services provided by its attorney, did not have to be dismissed, even assuming that, as result of finance company's repossession of car or of debtor's completion of plan payments, the named representatives' claims had become moot; any such mootness occurred only after class had been certified and resulted from length of time that it took to resolve claims.

**[2] Federal Courts 170B ⬅️➡️13**

170B Federal Courts
   170BI Jurisdiction and Powers in General

    170BI(A) In General
      170Bk12 Case or Controversy Requirement
        170Bk13 k. Particular Cases or Questions, Justiciable Controversy. Most Cited Cases
Claim asserted by Chapter 13 debtor, challenging automobile finance company's practice of including, in proof of claim filed in any case in which it was oversecured, a flat fee for postpetition services provided by its attorney, did not become moot merely because debtor, about the time of her marriage, had completed plan payments; if court found in debtor's favor on her claim, she would be entitled to refund from finance company.

**[3] Bankruptcy 51 ⬅️➡️2057**

51 Bankruptcy
   51I In General
    51I(C) Jurisdiction
      51k2057 k. Effect of Dismissal or Closing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Page 2

of Case. Most Cited Cases
Mere fact that her Chapter 13 case had been closed did not extinguish bankruptcy court's jurisdiction to decide class claim filed by debtor.

**[4] Bankruptcy 51 ☞2127.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(A) In General
            51k2127 Procedure
                51k2127.1 k. In General. Most Cited Cases
Motion in limine could be used only to resolve evidentiary issues, and not to limit debtors' remedy upon their class claims against automobile finance company, by excluding punitive damages from consideration.

**[5] Bankruptcy 51 ☞2060.1**

51 Bankruptcy
    51I In General
        51I(C) Jurisdiction
            51k2060 Exclusive, Conflicting, or Concurrent Jurisdiction
                51k2060.1 k. In General. Most Cited Cases
Federal statute which provides that "home court" for bankruptcy case, i.e., the court in which bankruptcy case is commenced or is pending, shall have exclusive jurisdiction over property of debtor and of estate grants the "home court" exclusive jurisdiction only over in rem matters; statute does not make "home court" the exclusive forum to hear in personam matters. 28 U.S.C.A. § 1334(e).

**[6] Bankruptcy 51 ☞2048.2**

51 Bankruptcy
    51I In General
        51I(C) Jurisdiction
            51k2048 Actions or Proceedings by Trustee or Debtor
                51k2048.2 k. Core or Related Proceedings. Most Cited Cases

**Bankruptcy 51 ☞2060.1**

51 Bankruptcy
    51I In General
        51I(C) Jurisdiction
            51k2060 Exclusive, Conflicting, or Concurrent Jurisdiction
                51k2060.1 k. In General. Most Cited Cases
Class claims which were brought by Chapter 13 debtors, as named representatives of class, to recover for automobile finance company's alleged failure to properly disclose flat postpetition attorney's fee that it added to its proof of claim in any case where it was oversecured, and which also challenged reasonableness of this flat fee, were in personam claims, over which United States Bankruptcy Court for the Southern District of Alabama could exercise "core" jurisdiction, and which did not have to be pursued separately in "home courts" of each debtor that was member of this nationwide class. 28 U.S.C.A. § 1334(e).

**[7] Bankruptcy 51 ☞2853.20(1)**

51 Bankruptcy
    51VII Claims
        51VII(B) Secured Claims
            51k2853 Oversecurity
                51k2853.20 Fees, Costs or Charges; Attorneys' Fees
                    51k2853.20(1) k. In General. Most Cited Cases
Oversecured creditor that desires to recover postpetition/preconfirmation attorney's fee as addition to its claim must make some disclosure of fee. Bankr.Code, 11 U.S.C.A. § 506(b).

**[8] Bankruptcy 51 ☞2901.1**

51 Bankruptcy
    51VII Claims
        51VII(D) Proof; Filing
            51k2901 Sufficiency of Filing
                51k2901.1 k. In General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Page 3

Automobile finance company adequately disclosed flat postpetition attorney's fee that it added to its proof of claim in any case in which it was oversecured, though its separate itemization of fee in proof of claim may not always have clearly indicated whether fee was for pre- or postpetition services; it was enough that finance company disclosed that attorney's fee was claimed, because court's review of fee would be the same whether it was pre-or postpetition. Bankr.Code, 11 U.S.C.A. § 506(b).

**[9] Bankruptcy 51 ☞2159.1**

51 Bankruptcy
   51II Courts; Proceedings in General
      51II(B) Actions and Proceedings in General
         51k2159 Parties
            51k2159.1 k. In General. Most Cited Cases
Following determination, in adversary proceeding brought by Chapter 13 debtors as named representatives of nationwide class, that automobile finance company had properly disclosed flat postpetition attorney's fee that it added to its proof of claim in any case in which it was oversecured, any determination of reasonableness of fee had to be made on district by district basis; class had to be decertified, except as to class members in Southern District of Alabama, based on lack of commonality.

**[10] Bankruptcy 51 ☞2853.20(4)**

51 Bankruptcy
   51VII Claims
      51VII(B) Secured Claims
         51k2853 Oversecurity
            51k2853.20 Fees, Costs or Charges; Attorneys' Fees
               51k2853.20(4) k. Amount; Reasonableness Thereof. Most Cited Cases
Flat $225 fee claimed by automobile finance company as addition to its oversecured claim, as cradle-to-the-grave fee for any services that its attorneys provided postpetition, was not unreasonable, though in some cases attorneys' only involvement

in case might consist of filing proof of claim. Bankr.Code, 11 U.S.C.A. § 506(b).

**[11] Bankruptcy 51 ☞2891**

51 Bankruptcy
   51VII Claims
      51VII(D) Proof; Filing
         51k2891 k. In General. Most Cited Cases
Act of filing proof of claim is not always a ministerial act, but may require consideration of various legal issues, such as whether creditor is under- or oversecured or whether there is co-debtor, and in most situations, creditor may use attorney to file proof of claim if reasonable fee is charged.

**[12] Bankruptcy 51 ☞2933**

51 Bankruptcy
   51VII Claims
      51VII(E) Determination
         51k2933 k. Reconsideration. Most Cited Cases
Claim may be reconsidered for cause, and the reconsidered claim may be allowed or disallowed according to equities of case. Bankr.Code, 11 U.S.C.A. § 502(j).

**[13] Bankruptcy 51 ☞3715(10)**

51 Bankruptcy
   51XVIII Individual Debt Adjustment
      51k3704 Plan
         51k3715 Acceptance and Confirmation
            51k3715(9) Effect
               51k3715(10) k. Conclusiveness; Res Judicata; Collateral Estoppel. Most Cited Cases

**Judgment 228 ☞542**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
         228k541 Courts or Other Tribunals Rendering Judgment
            228k542 k. In General. Most Cited

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Page 4

Cases
Orders allowing claims and orders confirming plans should be accorded res judicata effect.

**[14] Bankruptcy 51 ☜2933**

51 Bankruptcy
   51VII Claims
      51VII(E) Determination
         51k2933 k. Reconsideration. Most Cited Cases
No cause existed for bankruptcy court to reconsider automobile finance company's claims, where court had not disallowed flat $225 fee charged by finance company, as addition to its proof of claim, in cases within district where it was oversecured. Bankr.Code, 11 U.S.C.A. § 502(j).

*541 Steve Olen,Steven L. Nicholas, Donald J. Stewart, Mobile, Alabama, for Plaintiffs.
C. Lee Reeves, E. Barry Johnson, Birmingham, Alabama, Rhonda L. Nelson, San Francisco, California, for Chrysler Financial Corp, LLC.

### ORDER GRANTING JUDGMENT TO CHRYSLER FINANCIAL CORPORATION

MARGARET A. MAHONEY, Chief Judge.
This matter came before the Court for trial the week of December 10, 2001. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court has the authority to enter a final order. For the reasons indicated below, the Court is granting a judgment in favor of the defendant, Chrysler Financial Corporation, L.L.C.

### FACTS

Michael Powe filed a chapter 13 bankruptcy case on March 12, 1998. He had a 1994 Plymouth Grand Voyager vehicle secured by a loan to Chrysler Financial Corporation ("CFC."). CFC was listed as a creditor of Powe in his schedules. Powe *542 valued his vehicle at $15,000 and listed CFC's claim at

$14,000. On April 14, 1998, CFC filed a proof of claim listing a total debt owed by Powe of $11,878.13. There was a handwritten notation at Box 5 of the claim that read "Includes $225.00 Atty fees." Powe was in default on his loan prepetition. Also on April 14, 1998, Chrysler filed an objection to the debtor's plan which stated "As an over-secured creditor, Chrysler's proof of claim includes $225.00 in reasonable attorney fees to which Chrysler is entitled both under the terms of the Loan Documents and the Bankruptcy Code."The objection to confirmation was settled and Chrysler withdrew its objection to the plan. Chrysler and Powe agreed Chrysler would be paid $14,580 over the life of the plan at $250 per month in full satisfaction of all amounts due.

Irvin Grodsky, the debtor's attorney, stated that attorney fees were never discussed with the attorney for Chrysler. Powe and Grodsky were only concerned about the affordability of the monthly payment.

This adversary case was filed on July 1, 1999. In July 2000, Powe defaulted for the first time postpetition on his plan payments. The Court held a hearing on August 2, 2000, at which time Chrysler and Powe settled the matter. The Court indicated that Chrysler was entitled to an attorneys fee and costs. Chrysler stated that it struggled with how to word the order in regard to the settlement because it usually did not assess additional fees against a debtor for a relief from stay motion. Powe's counsel was unaware of Chrysler's position. The order presented to the Court requested a $225.00 attorneys fee and disclosed that it was the same fee included in Chrysler's proof of claim as part of the $14,580. The Court entered the order on August 15, 2000. On December 6, 2001, Powe surrendered the car to Chrysler after again becoming delinquent.

Mr. Powe is employed by the Mobile Public Schools and has a master's degree in business. He attended part of the trial in this suit, although not all of it. He has not read any of the pleadings or discovery in the case other than his own deposition.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
**(Cite as: 278 B.R. 539)**

He has a very general understanding of the case.

Theresa Moore Ballard was Theresa Moore throughout most of her case.[FN1] She filed her chapter 13 case on September 18, 1998. She had a loan to Chrysler Financial Corporation secured by a 1994 Plymouth Voyager van. She listed her debt to Chrysler in her schedules at $7,600. Chrysler filed a proof of claim for $8,220 which stated that it "includes attorney's fees of $225 and precomputted (sic) interest of 8.75." The claim form was signed and filed by a paralegal in the office of Dreher, Langer & Tomkies of New Orleans, Louisiana.

> FN1. Ms. Moore married about the time she paid off her chapter 13 case. Since her file is labeled Theresa Moore, the Court will call her that in this opinion.

Chrysler did not object to Moore's plan and it was confirmed on March 22, 1999. Chrysler subsequently filed a motion for relief from stay that indicated Moore had failed to provide information about insurance on the vehicle. The motion was denied based upon Moore maintaining insurance. A second relief from stay motion was filed by Chrysler when Moore fell behind in her plan payments. Moore caught up the payments and Chrysler dismissed the motion. On January 18, 2001, Moore paid off her chapter 13 plan and subsequently received a discharge. This payoff occurred after a meeting on the same day with her bankruptcy counsel and class action counsel about the possibility of *543 Moore joining this suit. At payoff, she was aware she was paying Chrysler's attorneys fees as well. However, in order to obtain a discharge, Moore had to pay off the entire balance owed to the chapter 13 trustee. On January 19, 2001, Moore moved to intervene in the suit.

Chrysler paid the Dreher law firm a flat fee of $275 for all of its services in the Moore bankruptcy case. Local counsel was paid $300 for two appearances at relief from stay hearings. The Dreher firm, not Chrysler, paid those fees.

Moore attended part of the trial, but not all of it. She has not read any of the pleadings in the case. She understands the nature of the lawsuit in very general terms only.

*CHRYSLER PRACTICES*

Chrysler has had an ever increasing number of chapter 13 cases filed by debtors who claim Chrysler as one of their creditors. In 1996, about 5,000 chapter 13 cases nationwide involved Chrysler. In 2001, 12,000 cases involved Chrysler. Since 1994, an average 5,000 cases per year involving Chrysler debt have been filed (or 40,000 cases). Chrysler estimates that about 20% of chapter 13 debtors completed their plans and got a discharge (or 9,000 cases) since 1994.

Since at least 1994, Chrysler has hired an ever decreasing number of law firms to handle its bankruptcy cases nationwide. In 1996, there were 134 firms used by Chrysler. In 1996, that number had contracted to 24. As of January 1, 2002, there were 19 firms. Firms submit bids for the work and, at this time, firms that are chosen work on flat fees-one charge for all work required in a case. That fee varies depending upon the part of the country served. Flat fees have lowered Chrysler's costs of handling bankruptcy matters and have lowered the fees charged to debtors overall.

The attorneys must follow the Bankruptcy Performance Standards established by Chrysler. However, the standards do not state whether or when counsel may or should request attorneys fees or costs in chapter 13 cases. The standards do not require that disclosure of fees (if requested) be made in any particular form. In fact, Chrysler's designated corporate representative, Richard Engel, did not know before the commencement of this suit that outside counsel were adding postpetition fees to some claims despite his extensive bankruptcy experience at Chrysler.

Chrysler did not receive copies of proofs of claim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
**(Cite as: 278 B.R. 539)**

Page 6

from counsel. The company kept track of each debtor's debt based upon its own internal numbers. If money was received from a debtor in excess of what Chrysler's records showed was owed, Chrysler credited the funds to an interest income category. There is no way that Chrysler knows if this money is an attorneys fee or interest income. Attorneys fees claimed in a proof of claim are paid if the chapter 13 case is paid in full.

*CHRYSLER'S OUTSIDE COUNSEL PRACTICES*

Because the Bankruptcy Performance Standards did not address the issue of attorneys fees, outside counsel for Chrysler have taken varied approaches to disclosure of their postpetition flat fees. In some cases, the fee was included with a notation on the claim form such as "includes attorneys fees of $225, [FN2]*544 $290,[FN3] $325,[FN4] $410,[FN5] $315-350 and other sums."[FN6] [FN7] In still other cases, fees were disclosed as postpetition attorneys fees.[FN8] In others, attorneys fees were only included in a claim after a court order was entered specifically approving the fees.[FN9] In other cases, where Chrysler was unsecured or undersecured, no attorneys fee was added.[FN10] In some cases, no fees were disclosed and Chrysler indicated it was fully secured.[FN11, FN12]

> FN2. Plaintiffs' Exhibits 91-95, 108, 106, Tab 1, 104, Tab 5, proofs of claim of Dreher, Langer & Tomkies, L.L.P. and Draper & Culpepper (at least one proof of claim stated no amount. It just stated it included "Attorneys Fees"; Exhibit 104, all tabs disclose that attorneys fees are assessed and most state amounts.

> FN3. Plaintiffs' Exhibit 114, Tab 3, Proof of claim of Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance PLLC. (Ark., E.D.N.C., M.D.N.C.), Plaintiffs' Exhibit 104, Tab 2, Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance PLLC. (lists fees as "attorneys fees") (Ark., Miss., Va.,

N.C. and S.C.) Tab 3, Porter & Hedges (S.D.Tex.) (all state attorneys fees charged, some claims state amount.); Plaintiffs' Exhibit 114, Tabs 5-8, (W.D.N.C., S.C., E.D.Tenn., E.D.Va., W.D.Va.) (states amount and "attorney fees"); Tabs 9-10, Riezman Berger PC (states amount and "attorneys fees") (Ill.); Tab 11, 12, 13 & 14, Mapother & Mapother (Ky., Ind.) (includes amount and "attorney fees"); Tab 15, Kim Wilson (Utah) (includes amount and "legal fees"); Tab 16 & 17, Lyons, Doughty & Veldhuis (N.J., Del.) (no amount but states "attorney fees"); Tab 18-21, Dreher, Langer & Tomkies, L.L.P. (Miss., La.) (includes amount and "ATTY FEES" or "attorney fees"); Tab 22, P. Michael Richardson (N.D.Tenn.) (includes amount and "attorney's fee"); Tab 23, David E. Drexler (W.D.Tenn.) (includes amount and "attorney fee").

> FN4. Plaintiffs' Exhibit 104, Tab 4, Shermeta, Chemko & Adams (E.D.Mich.).

> FN5. Plaintiffs' Exhibit 104, Tab 3, Porter & Hedges (S.D.Tex.).

> FN6. Plaintiffs' Exhibit 104, Tab 7, Engel, Hairson & Johanson, P.C. (N.D.Ala.) (no amount but states "attorney fees" included); Tab 8, Kim Wilson (Utah) (no amount but states "includes legal fees"); Tab 9, Lyons, Doughtry & Veldhuis (N.J. and Pa.) (no amount but states includes "attys fees"); Tab 10, Holland & Knight (N.D.Ga.) ("$275 attorney fees"); Tab 11, Riezman & Blitz, P.C. (Ill.) ($300 "atty. fees" or "attorney fee" or "atty's fee" or "attorney's fees"); Tab 12, Steven D. Lipsey (E.D.Tenn.) ($250 "Atty fee"); Tab 13, Stiles & Harbison (W.D.Ky.) ($190-200 "attorney fees") (S.D. Ill. and E.D. Ky.) (no amount but states "attorney's fees" or "atty fees"); Tab 15, George Rigely (W.D.Tex.) ($150 "atty. fee"); Tab 17, Mi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

chael L. Loyd & Assoc. (E.D. Okla. and W.D. Okla.) ($200-350 "attorney fees"); Tab 18, Carlton Fields (S.D.Fla.) (no amount but states "attorneys' fees").

FN7. Plaintiffs' Exhibit 104, Tab 6, Mapother & Mapother (Ind., Ky., Ohio).

FN8. Exhibit 106, Tab 3, Michael L. Loyd & Associates (W.D.Okla.); Debtor's Exhibit 106, Tab 2 and Exhibit 116, Tab 7 proof of claim of M. Michael Richardson (M.D.Tenn.); Exhibit 106, Tab 4, Dysart Taylor Lay Cotter McMonigle, P.C. (E.D.Mo.); Exhibit 106, Tab 3, Michael L. Loyd & Associates (W.D.Okla.).

FN9. All of Efremsky & Nagel fees (E.D.Ca.) per Roger Efremsky testimony. Plaintiffs' Exhibit 104, Tab 1.

FN10. Plaintiffs' Exhibit 105, Tab 1, Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance PLLC. (Districts in Ark., S.C., Tenn., and Va.); Exhibit 105, Tab 2, Porter & Hedges (S.D.Tex.); Tab 3, Shermeta, Chimko & Adams, P.C. (E.D.Mich.); Tab 4, Dreher, Langer & Tomkies (W.D.La.); Tab 5, Stone & Hinds, P.C. (M.D.Tenn.).

FN11. Plaintiffs' Exhibit 113, Tabs 1-10, Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance PLLC. (Ark., Miss., N.C., S.C.); Plaintiffs' Exhibit 103, Tab 1, Cooksey, Howard, Martin & Toolen (C.D.Calif.); Tab 2, Efremsky & Nagel (E.D.Calif.); Tab 3, Hale, Headrick, Dewey, Wolf, Golwen, Thornton & Chance PLLC. (Ark., Miss., N.C., S.C.); Tab 4, Porter & Hedges (S.D.Tex.); Tab 5, Shermeta, Chemko & Adams, P.C. (E.D. Mich. and W.D. Mich.); Tab 8, Engel, Hairston & Johanson, P.C. (N.D.Ala.); Tab 9, Snow, Christensen & Martineau (Utah); Tab 11, Stone & Hinds, P.C. (E.D.Tenn.); Tab 12, George Rigeley (W.D.Tex.); Tab

13, Michael Richardson; Tab 14, Michael Loyd & Assoc.

FN12. Some proofs of claim were not clear about fees charged. Plaintiffs' Exhibit 103, Tab 6, Dreher, Langer & Tomkies, L.L.P. (claim lists $225 on line for "amount of arrearage and other charges at time case filed"); Tab 7, Mapother & Mapother (claim lists $640.68 on line for "amount of arrearage and other charges at time case filed"); Tab 10, Reizman & Blitz, P.C. (Ill.) (claim lists $225 or $300 on line for "amount of arrearage and other charges at time case filed").

*545 Chrysler called a number of witnesses to describe each firm's particular practice in regard to attorneys fee claims in proofs of claim. The practices are briefly catalogued below.

*Oklahoma*-According to Ms. Patsy Brown, an attorney with Michael L. Loyd and Associates, her firm put an attorneys fee of $100-400 in proofs of claim when Chrysler was oversecured or there was a co-debtor, depending upon services provided. Loyd & Associates represented Chrysler from 1985 or 1987 through February 10, 1997. On some claim forms, there was a line item for "amount of attorneys fees for representation in bankruptcy." She used that line to disclose fees in the Western District of Oklahoma where the trustee required use of that form. Otherwise she includes the fees in item 4 on the official form as "attorneys fees." [FN13] She generally had a conversation with attorneys in the Eastern and Northern Districts of Oklahoma about her fees.FN14 Debtors*546 should know "attorneys fees" on claims filed were postpetition fees if item 5 is checked.

FN13. Plaintiffs' Exhibit 104, Tab 17.

FN14. When the Court prevented certain testimony of Chrysler attorneys, Chrysler made an offer of proof with each Chrysler attorney witness about conversations each

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Chrysler attorney had with debtors' counsel in their jurisdictions. The proof offered was that debtors' counsel acknowledged to Chrysler's counsel that they understood Chrysler was charging an attorneys fee and that Chrysler's attorneys fee was a postpetition fee. The Court concluded that the testimony was hearsay. Chrysler stated that they only wanted to introduce the statements to show acknowledgments of the postpetition nature of fees were made by debtors' counsel, not that the fees were postpetition fees or not. The acknowledgments were out of court statements by nonparties (debtors' counsel). Although Chrysler alleged that the testimony was not made to prove the truth of the statements, the Court sees no other purpose for which it could be relevant. It was important to Chrysler to prove that debtors or their attorneys knew of Chrysler fees and knew that the fees were postpetition and, knowing that, that the debtors did not object to Chrysler's claims. Chrysler did not need to prove the state of mind or motives of its own attorneys. Using the acknowledgments of debtors' counsel to show Chrysler attorneys thought debtors' counsel understood the fees would have been proper for this purpose. But using the statements to prove debtors had knowledge of Chrysler's fees is a different matter. The parties who made the acknowledgment must testify so the meaning of their statements can be plumbed. Chrysler cited two cases to the Court that are relevant. *U.S. v. Lynn,* 608 F.2d 132 (5th Cir.1979) held that the out of court statements of a defendant used to show the reason for a victim's state of mind-fear-were admissible for that purpose. As stated in this case, the defendant's knowledge was not relevant to the notice and adequate disclosure issue. In *U.S. v. Parry,* 649 F.2d 292 (5th Cir.1981), out of court statements the defendant made to his mother were admissible to show defendant's knowledge. Again, that is the opposite of the use of the statements of debtors' counsel by Chrysler. *See Weaver v. Tech Data Corp.,* 66 F.Supp.2d 1258 (M.D.Fla.1999). If the Court were to admit the evidence to show that Chrysler's attorneys thought debtor's counsel knew of Chrysler's fees and the fees' postpetition nature, the Court would consider that fact irrelevant. The test of adequate notice is what the debtors and their counsel *in fact* knew or should have known. E.g., *Christopher v. Kendavis Holding Co. (In re Kendavis Holding Co.),* 249 F.3d 383, 386 (5th Cir.2001) (" 'an elementary and fundamental requirement of due process ... is notice reasonably calculated ... to apprise interested parties of the pendency of the action'... a potential litigant who knows about a legal proceeding usually has adequate notice.") (quoting from *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) *supra* ); *In re Marino,* 195 B.R. 886, 893 (Bankr.N.D.Ill.1996) ("a creditor who knows of the proceeding but has not received formal notice should be prevented from standing back and allowing the bankruptcy action to proceed."). 249 Fed.R.Evid. 803(3).

*New Jersey, Pennsylvania and Delaware-* According to Mr. David Lyons, his firm, Lyons, Doughty & Veldhuis, P.C., represented Chrysler on and off for the last 25 years. His firm's representation ceased in August 2001. His firm was paid $320 as a flat fee for all services ("cradle to grave") in each chapter 13 case. At one point, the proofs of claim he filed for Chrysler stated "contractual attorneys fees" or "fees" were charged.[FN15] Later when he used the official form, he included attorneys fees by stating "atty fees." Mr. Lyons only requested attorneys fees when he filed an objection to confirmation. He indicated he was charging attorneys fees

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

in the objection to the plan.[FN16] In some cases in which an objection was filed, the attorneys fee was eliminated as part of an agreement as to the value of the vehicle. That agreement was memorialized by a consent order or an announcement on the record. It is possible some proofs of claim filed by Lyons contained a postpetition attorneys fee but did not disclose it.[FN17] In fact, some of the proofs of claim included attorney's fees based on the Chrysler contract that allowed fees to be charged as a percent of the unpaid balance. He was never paid more than $320, however; he used the number merely as a negotiating tool.

FN15. Plaintiffs' Exhibit 105, Tab 9.

FN16. Plaintiffs' Exhibit 37.

FN17. Plaintiffs' Exhibit 113, Tab 14, claims 2 and 4.

*Michigan*-Darrell Chimko of Shermeta, Chimko & Adams represented Chrysler for the last eight years in the Eastern and Western Districts of Michigan. His firm receives a $250 flat fee for cradle to grave services in each case.[FN18] In the Eastern District of Michigan-Detroit, the trustee directs that the total amount of the claim be placed in Box 4. The creditor then attaches a sheet that includes only the amount of the claim without attorneys fees. He requests attorneys fees only in a situation where Chrysler is oversecured. Sometimes he lists "attorneys fees" on the face of the proof of claim.FN19 However, he tries to do whatever the trustee requires. According to Chimko, any Michigan attorney knows "attorneys fees" claimed on a proof of claim form are postpetition fees.

FN18. This fee has decreased from $350 to $325 to $250 over the years.

FN19. Plaintiff's Exhibit 104, vol. 4 and 5.

*Kentucky and Indiana*-Allen Morris of Stites and Harbison represented Chrysler personally from 1993 or 1994 to 1996 and his firm represented it before that. He handled Chrysler work on a flat fee

basis of $190-210 in the Southern District of Indiana (New Albany) and the Western District of Kentucky (Louisville). In all other divisions and districts, the fee was higher due to travel. His flat fee only covered work up to confirmation of a plan. The attorneys fee is included in the proof of claim as "plus attorneys fee and interest." The fee is added to all claims in which Chrysler believes it is oversecured. A debtor would know the fee is a postpetition fee because the box in item 5 is not checked on the proof of claim and the attachment that his firm did for proofs of claim showed it.[FN20] Some claims did not list the attorneys fee on the face of the claim, *547 only in the attachment.FN21

FN20. Plaintiff's Exhibit 104, vol. 8, Tab 13, # 103360, 103354, 103383.

FN21. Plaintiff's Exhibit 104, vol. 8, tab 13, # 103357.

*Illinois*-James S. Cole of the Riezman & Blitz firm has represented Chrysler in all three districts in Illinois from 1993 to present and since mid-2001 also in Missouri, Iowa, Kansas, Nebraska, Minnesota, Wisconsin, North Dakota and South Dakota. He charges a flat fee of $300 for cradle to grave services in Illinois cases and $288 for Missouri cases. His firm files proofs of claim requesting attorneys fees if Chrysler is oversecured or there is a co-debtor. His firm also includes fees when a debtor files bankruptcy very shortly after purchasing a car. For many years, Cole indicated attorneys fees were added only in an attachment to the proof of claim. Now his firm states "attorneys fees" on the face of the claim too.[FN22] Since his firm cannot be in each location, they hire local counsel for individual appearances and pay them per appearance.

FN22. Plaintiff's Exhibit 104, vol. 7, tab 11.

*Alabama, Mississippi and Louisiana*-Ms. Deidre Cherry and Ms. Robin DeLeo testified about the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Dreher, Langer & Tomkies firm's representation of Chrysler in Alabama, Mississippi and Louisiana. Ms. DeLeo at the Dreher firm and at her previous firm represented Chrysler from June 1996 to June 2001. Ms. Cherry, of counsel to the Dreher firm, assisted in that work. Their policy was to charge postpetition attorneys fees to the debtor if Chrysler was oversecured. The claim was placed on the proof of claim form in box 5 [FN23] as "includes $225 of attys fees" or "includes attys fees of $225." [FN24] At some point after the commencement of this suit, the Dreher firm started placing "includes $225 of *postpetition* attys fees" (emphasis added) on the form in the Southern District of Alabama only. Each claim form had a Chrysler computer screen attached which showed the prepetition balance owed on the account (until 1998) or, after that, a form that stated what principal, interest, and attorneys fees were owed. Ms. Cherry, as required by Ms. DeLeo, sent letters to debtors' counsel when Chrysler's treatment in a plan was inadequate. The letters always made reference to the $225 attorneys fee. Ms. Cherry generally had a follow up call with each debtor's attorney in which she mentioned the fee.

> FN23. It was placed in Box 5 at least from 1998 to 2001.

> FN24. The flat fee that the Dreher, Langer firm was paid for Alabama cases was $275, but for consistency sake, the firm only requested a $225 fee in proofs of claim.

Generally, paralegals in the firm signed the proofs of claim with Ms. DeLeo's signature after 1998. Before that, paralegals signed the proofs of claim in their own names. The change occurred because questions about claims were always directed to the signer of the form and Ms. DeLeo wanted all questions to come to her. In the relief from stay order in Powe that reiterated that a $225 attorneys fee was charged for all services in a case, including the motion for relief from stay, the order was drafted as it was to insure that it was clear the only attorneys fee being charged to Powe was $225. Local counsel

were paid by the Dreher firm itself, not Chrysler, if local counsel was necessary.

*California*-Roger Efremsky, an attorney at Efremsky & Nagel in California, has represented Chrysler since February or March 1996 in the Northern and Eastern Districts of California as second tier counsel under the Cooksey & Cooksey firm. He has a direct relationship with *548 Chrysler but his fees are paid through the Cooksey firm. The present cradle to grave fee he charges is $400. His policy is to include attorneys fees in proofs of claim if Chrysler is oversecured and he has to file an objection to the plan, a motion for relief from stay or a motion to assume (if the debtor has a lease). In all cases, any fees Efremsky includes are specifically approved in a court order of some type. He has only included an attorneys fee in a proof of claim in 63 of approximately 780 chapter 13 cases he has handled since 1996.

### CHRYSLER ATTORNEY PRACTICES FROM VIEWPOINT OF DEBTORS' COUNSEL AND CHAPTER 13 TRUSTEE

Four chapter 13 debtor lawyers testified in this case, Eric Schwab of Sacramento, California, and Irvin Grodsky, Melissa Wetzel and Larson Edge of Mobile, Alabama, Schwab reviews all secured and priority proofs of claim filed in his cases. He is aware that Richard Efremsky sometimes charges postpetition attorneys fees when Chrysler is oversecured. The fees are approved in court orders. He believes a flat fee charge by attorneys for creditors like Chrysler is fair and cheaper than "a la carte" fees. His own fee is a set amount as well that can be subject to increase.

Irvin Grodsky, Larson Edge and Melissa Wetzel do not review all proofs of claim. They do not have the time due to the size of their practices. It has never been the standard procedure in this district. Grodsky does not object to the concept of a flat fee as long as there is disclosure. If the chapter 13 office alerted Grodsky that a claim might be defective, he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would look at it carefully. He also relies on his knowledge of how attorneys in this court practice and what they typically do. Once he did examine Chrysler's proof of claim in the Powe case, he would never have thought it included an attorneys fee. Edge does not usually review proofs of claim when they are received. Wetzel handles the mail and reviews any claims received. As far as the claim in Moore's case, he cannot tell if the fee included is pre- or postpetition and he did not have a practice of calling creditors' counsel about such fees before this suit. He does now. Edge believes $225 is a reasonable fee for this case in light of the relief from stay motion filed. He thought that the fee was for prepetition work. Wetzel does not recall seeing the Chrysler proof of claim in the Moore case, but if she did, she would have assumed it was a prepetition fee.

The chapter 13 trustee from Sacramento, California and Reno, Nevada testified. He assumes that fees shown in a proof of claim are prepetition fees if not otherwise specified due to the timing of filing of the petition and proof of claim. He does not find flat fees to be unreasonable per se, and in fact believes they can be beneficial to debtors since hourly charges are usually higher. Mr. Johnson believes fee disclosures can be made other than in a proof of claim such as in letters and a stipulation between counsel. However, bankruptcy judges are more interested in reviewing postpetition fees than prepetition. Johnson also would object to a flat fee charged by a creditor that included a fee for filing a relief from stay motion if the fee request was made before the motion was filed.

*LAW*

There are six motions pending in this case that require a ruling in conjunction with this final judgment. They are:

1. Chrysler's motion to dismiss, as moot, the claims of plaintiff Michael F. Powe and to dismiss the class claims for injunctive relief (docket

entry no. 181).

**\*549** 2. Chrysler's motion in limine (docket entry no. 182)-(denied orally on record with findings and conclusions to follow).

3. Chrysler's motion for judgment to be entered in favor of defendant and against plaintiffs and class members after the conclusion of the plaintiffs' evidence (docket entry no. 186).

4. Chrysler's motion for judgment to be entered in favor of defendant and against plaintiffs and class members after the conclusion of all evidence, or in the alternative, should this Court rule in favor of plaintiffs and class members and against CFC, motion to allow CFC to amend its proofs of claim (docket entry no. 187).

5. Chrysler's motion for decertification of class, or in the alternative, for amendment of the Court's class action order to limit the class to this district (docket entry no. 188).

6. Chrysler's motion to require plaintiff to propose a plan for class notice (docket entry no. 177).

There are several other issues pending: the Court's ruling on Chrysler's objections to plaintiffs' exhibits 110 and 111 and Chrysler's oral motion at trial to narrow class to exclude closed cases, cases outside two-year statute of limitations and cases with arbitration clauses. The Court will address each of these matters.

A.

*Chrysler's Motion to Dismiss, as Moot, the Claims of Michael F. Powe and to Dismiss the Class Claims for Injunctive Relief*

[1] Chrysler moves for dismissal of Powe's claims because his vehicle was repossessed on December 6, 2001, and he will never pay the $225 attorneys

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fee included in Chrysler's proof of claim. Powe therefore has no standing to sue Chrysler. The motion also alleges that Moore voluntarily paid its claim, including the $225 attorneys fee and her case is closed. Moore therefore has no standing to sue. Since both class representatives at the time of trial lacked standing, the case should be dismissed.

Powe and Moore assert that even if their claims are moot, the mootness occurred after certification and should not dictate that the case be dismissed. The mootness of their claims resulted from the length of time this case has taken to resolve.

The Court concludes that Powe and Moore's situation is similar to the situation of Claude and Terry Nolerto in their class action case against Nations-Banc Mortgage Corporation. The Nolettos' case was converted to chapter 7 after the case was filed and NationsBanc Mortgage Corporation argued that the case should be dismissed due to mootness. The Court concluded that dismissal was not appropriate.

> [M]ootness should not bar a case when the Court has taken a long period of time to determine whether class certification is appropriate. *Graves v. Walton County Bd. of Education,* 686 F.2d 1135 (5th Cir.1982); *Comer v. Cisneros,* 37 F.3d 775 (2d Cir.1994). In this [the Noletto] case, at the time was case was filed, the Nolettos were in chapter 13 and were proper plaintiffs ... The Court delayed the certification hearing to deal with jurisdictional issues and to allow discovery. Other cases focus on whether the plaintiff's claim was a viable one when the plaintiff moved for class certification. *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124 (3d Cir.2000). The Nolettos moved for class certification at the filing of this case. Their claim was a viable one then \*550 and was only mooted later. Other cases discuss mootness which may occur when the harm dissipates during the normal time required for resolution of the controversy, i.e., trial and appeals. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)... The U.S. Supreme Court has held that a plaintiff whose claim

> is mooted "due to an occurrence other than a judgment on the merits [ ]"... does not lose his right to press the class certification claim. *U.S. Parole Commission v. Geraghty,* 445 U.S. 388, 402, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

*Noletto v. NationsBanc Mortgage Corp.,* Case No. 98-13813-MAM-13,Adv. No. 99-1120, order granting class certification motion (Bankr.S.D.Ala. Dec. 29, 2000).

[2] Powe and Moore's claims are like Noletto's claim. They became moot after the filing of the case and after class certification. Therefore, the case remains viable. As to Powe individually, his claim became moot involuntarily. His auto was repossessed when he could not make payments. Moore's claim is not moot. She paid the attorneys fee at issue. She is due a refund of the fee if the Court grants judgment to plaintiffs. Her payment was involuntary in the sense that she had no choice but to pay to receive her discharge. This action remains pending as her request for consideration of allowance of Chrysler's claim.

[3] The fact that a case was closed does not extinguish bankruptcy court jurisdiction. The Court incorporates its rulings in *Slick v. Norwest Mortgage, Inc. (In re Slick)* and *Dean v. First Union Mortgage Corp. (In re Dean)* on this issue. *Slick v. Norwest Mortgage, Inc. (In re Slick),* Order Awarding Judgment to Plaintiffs, Adv. No. 99-1136,Case No. 98-14378 (Bankr.S.D.Ala. May 10, 2002); *Dean v. First Union Mortgage Corporation (In re Dean),* Order Awarding Judgment to Plaintiffs, Adv. No 99-1144,Case No 00-11321-MAM-13 (Bankr.S.D.Ala. May 10, 2002).

Finally, to the extent either or both of Powe's and Moore's cases are moot, the Court would grant plaintiff's leave to appoint another class representative. There are other appropriate members of the class.

B.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Chrysler's Motion in Limine*

[4] The Court has already denied this motion orally on the record. Chrysler asserted that the Court should exclude from the record any evidence of the unreasonableness of Chrysler's attorneys fees for the reasons listed in its motion and any evidence as to punitive damages. The plaintiffs asserted that the Court had indicated that the unreasonableness of fees would be at issue in its June 1 and July 27, 2001 orders. Plaintiffs argue that a remedy-punitive damages-cannot be excluded from consideration by a motion in limine. Such a motion's purpose is to limit evidence only.

The Court concluded that the motion was due to be denied because the issue of the reasonableness of the fees had been raised by the plaintiffs and the Court had indicated on its rulings of June 1 and July 27, 2001 that evidence of the propriety of any specific fee could be addressed at trial. The Court concluded that preclusion of a remedy was not properly addressed in a motion in limine. Only evidentiary issues can be covered. *E.g., Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,* 2001 WL 1673258 (C.D.Cal.2001) *(dicta).* There are cases that do preclude remedies through a motion in limine however. *The \*551Cayuga Indian Nation of New York, The Seneca-Cayuga Tribe of Oklahoma v. Cuomo,* 1999 WL 509442 (N.D.N.Y.1999); *Dalton v. Wal-Mart Stores, Inc.,* 1996 WL 435146 (D.N.H.1996). This Court recognizes the existence of this case law but disagrees with it. In any event, the Court concluded that the reasonableness of fees was a proper issue for the Court.

C.

*Chrysler's Motion for Judgment to be Entered in Favor of Defendant and Against Plaintiffs and Class Members After the Conclusion of Plaintiffs' Evidence*

Chrysler alleges that plaintiffs' evidence does not sustain their burden of proving there is a class to whom relief should be granted. Resolution of this motion necessarily entails the Court's review of the evidence in plaintiffs' case and the application of the law to it. The Court's reasoning as to this motion is below. For the reasons stated below, this motion is denied.

D.

*Chrysler's Motion for Judgment at the Conclusion of All Evidence*

Chrysler alleges that plaintiffs did not sustain their burden of proof when the evidence is viewed after completion of trial. Resolution of this motion necessarily entails the Court's review of all of the evidence and the application of the law to it. For the reasons stated in the subparts below, this motion is granted.

E.

*Chrysler's Motion for Decertification of the Class, or in the Alternative, For Amendment of the Court's Class Action Order to Limit the Class to This District*

Chrysler asserts that the class certified by this Court on July 27, 2001 should be decertified because this Court has no jurisdiction over the case; there is no commonality or typicality among class members; this is not properly a Rule 23(b)(2) case; many of the class members have arbitration agreements in their contracts; and no notice has been given to class members. Resolution of this motion necessarily entails the Court's review of the evidence and the application of the law to it. For the reasons stated below, the motion is granted to the extent of limiting the class to debtors in the Southern District of Alabama as to the reasonableness of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
**(Cite as: 278 B.R. 539)**

a specific fee.

F.

*Chrysler's Motion to Require Plaintiff (sic) to Propose a Plan for Class Notice*

Chrysler asserts that the plaintiffs should be required to give notice to class members in this case. First, Chrysler asserts, although the class was certified as a Rule 23(b)(2) class, it is really a Rule 23(b)(3) class and therefore notice is required. Second, notice is necessary when the class representatives' interests are different than the other class members. Since Powe and Moore have claims in which injunctive relief is not appropriate and, as to Powe, no damages are appropriate, many other class members' claims are distinct from the class representatives' claims. Third, proposed amendments to Rule 23(b)(2) would require notice to class members. Fourth, Chrysler wants notice given to insure that all class members are bound by the judgment due to res judicata. Plaintiffs assert that the Rule 23(b)(2) classification is proper as explained in this Court's prior rulings. The main relief sought is injunctive.

The Court is not inclined to revisit its certification issue now. Since the trial was *552 held, the issue is essentially moot anyway. Also, the Court concludes, upon review of its earlier opinions, that Rule 23(b)(2) certification was proper for the reasons stated in the opinions which are incorporated by reference. *In re Noletto,* Case No. 98-13813,Adv. No. 99-1120, order granting class certification motion (Bankr.S.D.Ala. December 29, 2000); *In re Sheffield,* Case No. 97-10511,Adv. No. 99-1124, order granting class certification motion (Bankr.S.D.Ala. December 29, 2000); *In re Slick,* Case No. 98-14378,Adv. No. 99-1136, order granting class certification motion (Bankr.S.D.Ala. December 29, 2000); *In re Miller,* Case No. 97-12807,Adv. No. 99-1137, order granting class certification motion (Bankr.S.D.Ala. December 29,

2000); *In re Powe,* Case No. 98-10935,Adv. No. 99-1121, order granting class certification motion (Bankr.S.D. Ala. June 1, 2001).

G.

*Trial Issues*

There were numerous issues raised in the trial of this case. Chrysler's relationship to its debtors varied from that of the mortgage lender creditors' relationship to their debtors described in two other opinions that the Court is issuing contemporaneously with this one. *Slick v. Norwest Mortgage, Inc. (In re Slick),* Adv. No. 99-1136,Case No. 98-14378-MAM-13, Order Awarding Judgment to Plaintiffs (Bankr.S.D.Ala. May 10, 2000); *Dean v. First Union Mortgage Corp. (In re Dean),* Adv. No. 99-1144,Case No. 96-14029-MAM-13, Order Awarding Judgment to Plaintiffs (Bankr.S.D.Ala. May 10, 2000). In those cases the Court is awarding judgment for the classes. Chrysler's situation differs in several important respects. First, Chrysler's entire claim is being paid through the chapter 13 plan or is being discharged.[FN25] Second, Chrysler's attorneys disclosed that attorneys fees are being charged by indicating that fact on the proofs of claim.

> FN25. In several cases in 2002 not involving Chrysler, the Court has seen auto loans of six or seven years. These loans are like mortgage loans in that they survive the life of the plan and are paid directly to the creditor, except for arrearages.

Two evidentiary objections were taken under advisement by the Court in conjunction with the trial of this case. Chrysler objected to admission of plaintiffs' Exhibits 110 and 111. Exhibit 110 was a draft of the expert witness report of Jan Johnson, the Chapter 13 trustee from the Eastern District of California. Exhibit 111 was a draft of the report of Alex Gray, an attorney that represented Chrysler in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

Mobile in the Powe case. The Court concludes the documents are relevant and they are admitted. Even if the Court excludes them from evidence, the outcome of the case remains the same.

There are ten issues that need to be addressed in this ruling. They are:

1. Jurisdiction

2. Adequacy of disclosure

3. Reasonableness of fees

4. Reconsideration of claims

5. Amendment of claims

6. Standing of Powe and Moore

7. Private rights of action under § 105

8. Class decertification

9. Arbitration clauses

10. Incentive fees

1.

*Jurisdiction*

[5][6] Chrysler asserts that this Court does not have jurisdiction to hear this case. For the reasons stated in *In re Noletto*, 244 B.R. 845 (Bankr.S.D.Ala.2000), the Court concludes that it does have jurisdiction. The U.S. District Court of the *553 Northern District of Alabama has recently issued a thoughtful opinion concluding that its bankruptcy court also has jurisdiction to consider a class action suit. *Bank United v. Manley (In re Manley)*, 273 B.R. 229 (N.D.Ala.), opinion dated November 29, 2001. This Court adopts its reasoning as well. This Court concludes that there is clearly no obstacle to this Court ruling on issues involving debtors in this district. The defendant does

not dispute this exercise. It is debtors' cases beyond this district as to which a question has been raised. As to those cases, the District Court certainly has jurisdiction if this Court does not. If this Court is held to be without jurisdiction over this case, the Court reports and recommends to the District Court that it adopt these findings and conclusions pursuant to Fed. R. Bankr.P. 9033.

2.

*Adequacy of Disclosure*

Bankruptcy Code Section 506(b) states:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The plaintiffs assert that secured creditors must file applications seeking approval of any fees sought under this section. Otherwise, without such an application and a court order specifically approving the fees, the fees cannot be charged to the debtor. Chrysler asserts no application and no specific disclosure is necessary.

[7] The Court has ruled in other cases that some disclosure of a postpetition/preconfirmation fee is required. *Slick v. Norwest Mortgage, Inc. (In re Slick)*, Order Awarding Judgment to Plaintiffs, Case No. 98-14378,Adv. No. 99-1136 (Bankr.S.D.Ala. May 10, 2002); *Dean v. First Union Mortgage Corp. (In re Dean)*, Order Awarding Judgment to Plaintiffs, Case No. 00-11321 and 96-14029,Adv. No. 99-1144 (Bankr.S.D.Ala. May 10, 2002). In prior rulings in similar cases, the Court has ruled that postpetition/preconfirmation attorneys fees must be included in a creditor's proof

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539                                                                    Page 16
278 B.R. 539
(Cite as: 278 B.R. 539)

of claim or an application for compensation or the fees cannot be collected from a debtor and are discharged. *Id.*

[8] This case is different from the *Slick* and *Dean* cases cited above. In those cases, the creditor, a mortgage lender, did not disclose a fee at all. In *Slick,* the fees were not even added to the mortgage balance reflected in the proof of claim. In *Dean,* the Court believes that the fees were added to the balance owed but in no manner separately itemized. In this case, Chrysler's attorneys did disclose the attorneys fees charged in varying ways. What manner of disclosure is adequate?

As stated in other opinions incorporated in this one by reference, the reason postpetition/preconfirmation fees need to be disclosed and added to the proof of claim is that debtors have a right to cure all preconfirmation arrearages, costs and fees through payments in their chapter 13 plans. *See Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993); *Telfair v. First Union Mortgage Corp.,* 216 F.3d 1333 (11th Cir.2000); *Slick v. Norwest Mortgage, Inc. (In re Slick),* Order Awarding Judgment to Plaintiffs, Case No. 98-14378,Adv. No. 99-1136 (Bankr.S.D.Ala. May 10, 2002); *Dean v. First Union Mortgage Corp. (In re Dean),* Order Awarding Judgment to Plaintiffs, Case No. 00-11321 and 96-14029,Adv. No. 99-1144 (Bankr.S.D.Ala. May 10, 2002). *554 Debtors should be able to fully pay all costs during the bankruptcy so that, postdischarge, they are completely current on their obligations or have fully paid debts to be satisfied during the bankruptcy case.

Fees to be charged to debtors as part of a secured creditor's claim in a case are to be "reasonable." 11 U.S.C. § 506(b). A debtor needs to be able to discern if the fees he is paying are reasonable. Unless a debtor has notice of the fees, he cannot make that determination.

When this case was commenced, the Court believed that the reasonableness standard for judging pre-

and postpetition attorneys fees might be different. Prepetition fees were "reasonable" for § 506(b) purposes if reasonable under state law and/or allowed by the parties' contract. Bankruptcy court scrutiny of those fees was more limited. *See, e.g., In re Carey,* 8 B.R. 1000 (Bankr.S.D.Cal.1981); *In re Schriock Constr., Inc.,* 176 B.R. 176 (Bankr.D.N.D.1994), *rev'd*104 F.3d 200 (8th Cir.1997). On December 17, 2001, the Eleventh Circuit Court of Appeals issued an en banc decision that held that the reasonableness standard for pre- and postpetition fees is the same. *Welzel v. Advocate Realty Investments, Inc. (In re Welzel),* 275 F.3d 1308 (11th Cir.2001). Pre-*Welzel,* a disclosure that a fee was pre- or postpetition made a difference in the scrutiny a debtor and his attorney might apply to that fee. *Welzel* leveled the standard in this circuit and concluded that four other circuits had ruled similarly. *First W. Bank & Trust v. Drewes (In re Schriock Constr., Inc.),* 104 F.3d 200 (8th Cir.1997); *Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc. (In re Hudson Shipbuilders, Inc.),* 794 F.2d 1051 (5th Cir.1986); *In re 268 Ltd.,* 789 F.2d 674 (9th Cir.1986); *Unsecured Creditors' Comm. 82-00261C-11A v. Walter E. Heller & Co. S.E., Inc. (In re K.H. Stephenson Supply Co.),* 768 F.2d 580 (4th Cir.1985).

Therefore, whereas Powe and his counsel might have objected to hourly rates or types of service rendered or time expended when the fee was postpetition, but not prepetition, that dichotomy has been ruled baseless in *Welzel.* Therefore, if a creditor discloses that an attorneys fee has been charged regardless of whether Chrysler discloses the fee is prepetition or postpetition, that disclosure is sufficient because the review will be the same. Therefore, the Court's concern is that there is sufficient notice and description of all fees to put a debtor and all other interested parties on notice that a fee has been charged and a review may be warranted.

Chrysler's attorneys, to the extent the Court could determine from the evidence, always stated at least that an "attorneys fee" was being charged if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
**(Cite as: 278 B.R. 539)**

Chrysler was oversecured or otherwise entitled to a fee. The attorney may not have indicated clearly that the fee was pre- or postpetition but the fact that a fee was disclosed is sufficient according to *Welzel.* There may have been instances where a fee was charged to a debtor but not disclosed. However, the plaintiffs bore the burden of proving that was the case and the Court has no concrete evidence of nondisclosure. The attorneys who testified all indicated that a fee was only charged when Chrysler was oversecured or there was a co-debtor. No proof of claim indicated otherwise. At most, from the Court's review of the evidence, nondisclosure is a very infrequent event, if it happened at all.

3.

*Reasonableness of Fees*

[9] If the fees were adequately disclosed as the Court is ruling they were, the only way the fees would not be payable is if they are unreasonable per *55511 U.S.C. § 506(D) or are postconfirmation fees. *Telfair v. First Union Mortgage Corp.,* 224 B.R. 243 (Bankr.S.D.Ga.)*aff'd,*216 F.3d 1333 (11th Cir.), *cert. denied,*531 U.S. 1073, 121 S.Ct. 765, 148 L.Ed.2d 666 (2001). Plaintiffs assert that the fees are unreasonable on several grounds. Attorneys are not necessary to file proofs of claim at all and there should be no attorneys fee for ministerial services. The flat fees charged may overcompensate Chrysler in some cases. Flat fees are per se unreasonable. Also, the flat fee includes charges for postconfirmation work. Chrysler asserts that the reasonableness of the fees is not one of the issues certified for class status. Furthermore, the fees are reasonable. Chrysler also asserts that reasonability is a determination each bankruptcy court should make itself based upon the particular facts of each case in question. Once a reasonableness determination is necessary all commonality of the class certified in this case is gone and no class ruling is appropriate

except for debtors in this district.

The Court concludes that all of the issues plaintiffs raise about Chrysler's fees do raise issues personal to each case or district that make a blanket ruling by one court impossible. Once the nondisclosure hurdle is jumped, one court cannot deal with the variations among courts and regions. Unlike the cases in which there was no disclosure of fees to debtors, this case raises issues of prevailing local rates charged by attorneys, work required by chapter 13 trustees preconfirmation, breakdown of flat fees between pre- and postconfirmation work, allowance of additional fees for relief from stay, and motions and other local legal culture issues. As Chrysler evidence showed, courts have unique ways of processing chapter 13 cases that are geared to the particular district. Size of district and docket, number of trustees, computer systems and prior judicial ruling all influence how chapter 13 claims are handled. This Court cannot impose a cookie cutter fee structure on all districts for this reason. Upon hearing the evidence, the Court concludes that there is insufficient commonality to maintain a class as to what is an appropriate fee except as to debtors in this district.

[10] As to fees in this district, the Southern District of Alabama, the evidence presented showed that a $225 flat fee is charged for all work done on Chrysler's behalf in a chapter 13 case in this district. The charge is imposed at the filing of the case. In some cases, Chrysler may need to do no more than file a proof of claim. In other cases, an objection to confirmation and/or a motion for relief from stay will be needed. Charging a flat fee of $225-275 is not inappropriate or unfair. *See In re Geraci,* 138 F.3d 314 (7th Cir.1998) (debtors' attorneys fees set at a presumptively reasonable flat fee); *Schueler v. Roman Asphalt Corp.,* 827 F.Supp. 247 (S.D.N.Y.1993); *In re Haskew,* 2001 WL 589043 (Bankr.D.Idaho 2001); *In re McMullen,* 273 B.R. 558 (Bankr.C.D.Ill.2001). In fact, several witnesses opined that overall the flat fee resulted in reduced cost to debtors as evidenced by the falling fees over

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
(Cite as: 278 B.R. 539)

the past five years or more charged by Chrysler's outside counsel. When the fee is charged for all work, not just filing of a proof of claim, there is no question that it is a reasonable fee. In Powe and Moore's cases, relief from stay was necessary. A fee of $225-275 is reasonable for the stay motion alone. This Court allows a $350 fee in cases where there is no flat fee arrangement. The Court concludes the fees as charged in this district are reasonable.

[11] As this case has proved, preparing and filing a proof of claim is not a simple task. In many instances legal issues need *556 to be considered at that time. Is the creditor oversecured? Is there a co-debtor? What is the district's policy on the proper manner to file a proof of claim? Are there prepetition fees or costs and, if so, should some or all of them be added to the claim? The act of filing a proof of claim is not always a ministerial act. If a creditor does not intend to ever claim any fees or costs and wishes to only claim the prepetition principal balance and accrued interest, the preparation and filing of the claim might be as ministerial and no counsel needed. In most situations, however, any attorney may properly be used to file a proof of claim if a reasonable fee is charged.

4.

*Reconsideration of Claims*

[12][13][14] Plaintiffs (and the Court) have termed this adversary as a request for reconsideration of claims pursuant to 11 U.S.C. § 502(j) as to those class members whose claims have been allowed or dealt with in a confirmed chapter 13 plan. *In re Powe,* Case No. 98-10935,Adv. No. 99-1121, order denying debtor's motion to strike Chrysler's amended motion to strike, denying defendant's motion for summary judgment and granting debtor's motion for class certification (Bankr.S.D. Ala. June 1, 2001). Section 502(j) allows a claim to be reconsidered "for cause." *Id.* The reconsidered claim

"may be allowed or disallowed according to the equities of the case." *Id.* Chrysler asserts that reconsideration is a remedy that should not be freely allowed, particularly if the reconsideration will prejudice Chrysler. Orders allowing claims and orders confirming plans should be accorded res judicata effect. *In re Justice Oaks II, Ltd.,* 898 F.2d 1544 (11th Cir.1990). Since the Court is not disallowing any fee of Chrysler in this district to the extent it is a flat fee of $275 or less for all work in each chapter 13 case, there is no need for the Court to reconsider the claims and the plaintiffs' request for reconsideration is denied.

5.

*Amendment to Claims*

Chrysler asserts that if there is a deficiency in the proofs of claim it filed, it should be allowed to amend the claims. Since the Court is concluding that Chrysler's proofs of claim were appropriate as filed, there is no need to address this issue.

6.

*Standing of Powe and Moore*

This issue was addressed in Part A above. If Powe is not a party with standing due to his voluntary surrender of his vehicle without payment of any fee, the Court concludes that a substitute plaintiff as class representative should be allowed. The length of time this case pended before trial caused the mootness of his claim. Moore also was a proper class representative at the time of certification. Her claim was mooted by payment of her entire chapter 13 plan debt in full. This debt included Chrysler's secured claim and fees. As with Powe, the length of time this case has lasted caused this situation. In order to obtain a discharge, Moore had to pay all of her plan debt. Her claim is not mooted by this pay-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

278 B.R. 539
278 B.R. 539
**(Cite as: 278 B.R. 539)**

ment. She would still be owed a return of the fee if the Court had found the fee, or any part of it, to be disallowable.

### 7.

*Private Right of Action Under Section 105*

This Court has already ruled that a private right of action does exist under 11 U.S.C. § 105. *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir.2000); *In re Tate,* 253 B.R. 653 (Bankr.W.D.N.C.2000)

*\*557 8.*

*Class Decertification*

Chrysler asks the Court to decertify the class it constituted on July 27, 2001. It asserts that Rule 23(b)(2) certification is improper, multidistrict certification is improper, the Rule 23(a) standards are not met, and there are other limitations on the class even if it was appropriately certified.

Based upon the evidence, the Court agrees that the multi-district class is inappropriate for the issue remaining after the *Welzel* decision-the reasonableness of fees charged. Since that is the sole remaining issue, the class lacks commonality. The amounts of the fees vary; the proof of claim forms vary; the confirmation process varies; the creditor's attorneys' practice vary. Commonality requires that "there are questions of law or fact common to the class." Fed. R. Bankr.P. 7023(a)(2). Other than as to proofs of claim filed in this district, there is no commonality among the class members. As to debtors in the Southern District of Alabama, the class requirements are met. The Court still concludes that a Rule 23(b)(2) class was appropriate. Although no relief is being accorded debtors in this district because the Court has concluded the fees are reason-

able, the class will be bound by the result.

### 9.

*Arbitration Clauses*

Chrysler asserts that many of the loan agreements of debtors who are a part of the class of debtors in the Southern District of Alabama and nationwide were precluded from being members of any class due to arbitration agreements in their contracts. The Court does not need to reach this issue.

### 10.

*Incentive Fees to Class Representatives*

This issue is moot since there is no recovery for the class.

IT IS ORDERED that defendant, Chrysler Financial Corporation, L.L.C. is awarded a judgment with this Order. Chrysler is instructed to submit a judgment for the Court's signature within 30 days of this order.

Bkrtcy.S.D.Ala.,2002.
In re Powe
278 B.R. 539

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.