## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 3:05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |
| _____ | ) | |

### CONSOLIDATED BISCUIT COMPANY'S TRIAL MEMORANDUM

Pursuant to the Court's October 11, 2007 Order Scheduling Trial, Claimant Consolidated Biscuit Company ("Consolidated Biscuit") submits this Trial Memorandum.

### 1.    List of all pleadings and pending motions.

(a)    Consolidated Biscuit's Proof of Claim in the amount of $623,822.68, filed on June 27, 2006 [Claim No. 13321];

(b)    Consolidated Biscuit's Amended Proof of Claim in the amount of $384,602.85, filed on July 2, 2008 [Claim No. 13830];

(c)    Consolidated Biscuit's Request for Payment of an Administrative Expense Claim in the amount of $885,975.47, filed June 30, 2006 [Docket No. 8930];

(d)    Winn-Dixie's objection to Consolidated Biscuit's Request for Payment of an Administrative Expense Claim, filed August 17, 2006 [Docket No. 10359];

(e)    Winn-Dixie's Twenty-Seventh Omnibus Objection, filed November 14, 2006 [Docket No. 12532];

(f)     Consolidated Biscuit's Response to Winn-Dixie's Twenty-Seventh Omnibus

Objection, filed November 30, 2006 [Docket No. 12878].

(g)     Consolidated Biscuit's Response to Winn-Dixie's Amended Objection to

Claim No. 13321 As Set Forth In Debtor's Twenty-Seventh Omnibus

Objection [Docket No. 17508];

(h)     Winn-Dixie's objection to Consolidated Biscuit's Amended Proof of Claim

[Docket No. 21213].

2.     **General Overview of Dispute.**

In this contested matter, the Court will be asked to decide whether Consolidated

Biscuit is entitled to recover moneys it advanced pre- and post-petition on Winn-Dixie's

behalf for packaging and ingredients necessary to supply Winn-Dixie with its private label

baked snack food inventory needs.

To resolve the dispute, the Court must first understand the industry. Consolidated

Biscuit is a "contract baker," meaning that it produces cookies and other baked snack food

products for a variety of third party customers, including national distributors and retail

grocery chains such as Winn-Dixie, utilizing the customer's recipes, brand names and

packaging. The cookies and snack foods which Consolidated Biscuit produces are not baked

on individual cookie sheets as one would expect in a "Mom and Pop" operation; rather, they

are baked in ovens often measuring as long as a football field in production runs of 500,000

or more cookies.

The large scale volume at which the baked products are produced requires that the ingredients and packaging be purchased in bulk, several weeks in advance, to accommodate the material supplier's own lead time and volume requirements.  Packaging can take even longer where artwork or labeling changes are required.  The costs of acquiring ingredient and packaging inventory are typically advanced by the contract baker (Consolidated Biscuit) and recouped through the continuing sale of products under the supply agreement with the underlying customer (Winn-Dixie).

The packaging inventory needed to fulfill a bakery supply agreement is almost always cut to the customer's specifications and typically bears trademarks, logos and nutritional information unique to the customer.  Rarely can the packaging be used by or for any other purpose or customer.  The ingredients utilized in the baking process are similarly customer specific as to grade, formulation and moisture content to meet the customer's expectations for consistency and taste.  Because the ingredients are unique and perishable, they too cannot be easily held or used for other customers.  To protect the contract baker from being "stuck" with unusable packaging and ingredient inventory, it is thus customary in the industry for the underlying supply contract to contain buy-back provisions obligating the customer to repurchase any packaging or ingredient inventory dedicated to the customer remaining at the end of the relationship.  Bakers such as Consolidated Biscuit rely on the existence and enforceability of such provisions in lending their credit to fulfill Winn-Dixie's private label inventory needs.

In the instant dispute, the Court will be asked to determine whether a "packer/contract baker" such as Consolidated Biscuit is entitled to recover as an administrative expense the

post-petition credit it extended on Winn-Dixie's behalf to purchase packaging and ingredients so that Winn-Dixie could have a steady supply of private label cookies and other baked products on its shelves. The resolution of this dispute involves a clash of two important tenets of bankruptcy law: one being the goal of preserving the limited assets of the bankruptcy estate, and the other of encouraging suppliers such as Consolidated Biscuit to extend credit to aid in the debtor's reorganization efforts.

With respect to the administrative expense claim, the Court should always be mindful that it was Winn-Dixie which sought the benefit of the relationship with Consolidated Biscuit by continuing to place orders with Consolidated Biscuit post-petition, at all times knowing that Consolidated Biscuit was advancing costs for Winn-Dixie to fill such orders. A ruling adverse to Consolidated Biscuit will result in a windfall to Winn-Dixie and will likely have a chilling effect on suppliers' willingness to extend credit to Chapter 11 debtors.

### 3.    Brief statement of the theory of each claim.

Performance under the supply agreement and other contracts between Winn-Dixie and Consolidated Biscuit straddled the Petition Date. The present disputes thus involves claims for packaging and inventory purchased both pre- and post-petition to fulfill Winn-Dixie's ongoing orders. The claims and disputes are outlined below:

(a)    Consolidated Biscuit's Proof of Claim. Claim No. 13321 for $623,822.68 represents sums due Consolidated Biscuit for packaging and ingredient inventory purchased by Consolidated Biscuit in connection with its acquisition of the Valdosta bakery facilities

which remained in inventory as of August 2005.  Winn-Dixie was and is obligated to repurchase this inventory under the express terms of an Asset Purchase Agreement dated November 2004 and a Closing Agreement dated January 18, 2005.  Claim No. 13321 was subsequently amended by Claim No. 13830, which reduced the original claim by approximately $239,000 to $384,602.85 to account for packaging and ingredient inventory utilized after the August, 2005 inventory was taken.[1]

Winn-Dixie contends that Claim No. 13321, and consequently the amended Claim No. 13830, are untimely because they were filed after the general Claims Bar Date. Consolidated Biscuit obviously disputes this contention because Winn-Dixie's repurchase obligations did not arise or become "ripe" until at least 90 days after closing, and were therefore executory on the Petition Date.[2]  The contracts under which Winn-Dixie was obligated to repurchase the pre-petition inventory were never assumed and were therefore deemed rejected under the "catch all" contract rejection provisions of Winn-Dixie's confirmed plan of reorganization, which gave any party affected by such rejection 30 days from the contract rejection within which to file their proofs of claim for any resulting damages.  Consolidated Biscuit's proof of claim, filed after the Claims Bar Date but before confirmation, is not therefore subject to being disallowed as untimely.

---

[1] Claim No. 13321 was also amended to correct an overstatement of the claim due to a coding error and to attach the correct contractual documents to the claim.

[2] Consolidated Biscuit was not obligated to invoice Winn-Dixie on day 90, but was instead entitled to continue using the pre-petition packaging and ingredients until such time as the inventory was no longer usable, at which time the invoice could be generated and submitted to Winn-Dixie for immediate payment.

(b)    <u>Consolidated Biscuit's Administrative Expense Claim</u>.  Winn-Dixie continued to order and purchase cookies and other baked products from Consolidated Biscuit post-petition.  Consolidated Biscuit was therefore required to replenish its supply of the ingredient and packaging needed to perform its obligations to Winn-Dixie under the January 18, 2005 Contract Packaging Agreement.  It made those outlays in reliance on the fact that Winn-Dixie had committed to repurchase any unused inventory remaining after the termination of the parties' relationship, as was constantly communicated to Winn-Dixie throughout the relationship.  The legal authority for this claim is 11 U.S.C. § 503(b).

Winn-Dixie disputes the administrative expense claim questioning the "benefit to the estate" of the unused packaging and ingredients.  According to Winn-Dixie, there is no benefit afforded to the estate from unused flour or other ingredients.  Such focus is, however, entirely misplaced.  It is the credit which Consolidated Biscuit extended on Winn-Dixie's behalf in order to provide Winn-Dixie with needed or desired inventory which is the proper focus of the inquiry.  Without ingredients and packaging to produce the baked products, there would be no inventory of private label baked products for Winn-Dixie's shelves, and hence no *desired* finished product to sell.  Absent Consolidated Biscuit's extension of such credit, Winn-Dixie would have had to advance on an "up front basis" the cash needed to produce the products *it* desired for its shelves, further straining its liquidity.  Consolidated Biscuit's claim is therefore properly allowable as an administrative expense.

There are two sub-issues present with respect to the administrative expense claim: Winn-Dixie's repurchase obligation with respect to packaging purchased under the Contract Packaging Agreement is limited to no more than a 13 week supply in the absence of Winn-

Dixie's prior authorization (an industry standard provision).  Winn-Dixie's repurchase obligations for ingredients purchased under the Contract Packaging Agreement is similarly limited to ingredients which are "unique to the products" produced by Consolidated Biscuit for Winn-Dixie.  The instant disputes thus involves a determination of whether the packaging inventory at issues is more than a 13 week supply, or whether the administrative expense claim includes ingredients which are not unique to Winn-Dixie's products.[3]

Winn-Dixie also contends that Consolidated Biscuit's administrative expense claims are barred under the UCC because Consolidated Biscuit does not presently hold the ingredients and packaging inventory at issue.  The is a red-herring issue.  The ingredients inventory was perishable and already exceeded its usable shelf-life at the time the invoices were submitted.  The packaging inventory was similarly unusable because the labeling did not comply with FDA disclosure regulations concerning Trans Fat content which went into effect on January 1, 2006.  Thus, Winn-Dixie could not utilize the ingredients or packaging inventory for itself (and in fact made no attempt to retrieve such items), nor could any other customer of Consolidated Biscuit utilize such products.

4.      **Brief summary of contentions of fact in support of Claimant's legal theories and evidence relied upon to establish such facts.**

On or about November 24, 2004, Consolidated Biscuit contracted to purchase Winn-Dixie's Crackin' Good Bakery in Valdosta, Georgia for $10,000,000.  The bakery was owned

---

[3]      By logical deduction, Consolidated Biscuit is at a minimum entitled to reimbursement for packaging inventory purchases of up to a 13-week supply.

by Crackin' Good, Inc., a wholly owned subsidiary of Winn-Dixie.  Consolidated Biscuit's

offer for the bakery was $2,000,000 higher than that submitted by the next highest suitor, but

was expressly conditioned on the parties entering into a long-term supply contract for Winn-

Dixie's private label baking needs.  Winn-Dixie needed a supplier for its private label baked

product needs and readily agreed to those terms.  The parties' agreements are expressed in

three principal contracts:

> (1)    Asset Purchase Agreement between Consolidated Biscuit and Crackin' Good, Inc. dated as of November 18, 2004;
>
> (2)    Contract Packaging Agreement between Winn-Dixie dated January 18, 2005; and
>
> (3)    Closing Agreement dated January 18, 2005.

The transaction with Winn-Dixie closed on January 18, 2005.  At closing,

Consolidated Biscuit paid Winn-Dixie an additional $1,802,645 for the existing packaging

and ingredient inventory located at the baking facility on the condition that Winn-Dixie

repurchase any inventory which was not consumed within the first 90 days of the supply

relationship.  Consolidated Biscuit thereafter began providing product to Winn-Dixie as its

exclusive private label baked snack food provider.

On or about February 21, 2005 - - a mere month after the purchase and sale of the

Valdosta facility - - Winn-Dixie filed its Chapter 11 Petition.[4]

---

[4]   Between the acquisition closing date of January 18, 2005 and the Petition Date, Consolidated Biscuit produced $929,994.46 in finished goods for Winn-Dixie for which it was not paid [Claim No. 9559].  Claim No. 9559 is not at issue in this contested proceeding.

Winn-Dixie continued to order and purchase cookies and other baked products from Consolidated Biscuit post-petition at its historical rates. Consolidated Biscuit therefore continued to purchase ingredient and packaging inventory in sufficient quantities to fulfill such volume.  Consolidated Biscuit's packaging purchasing decisions were based on the historical movement of products from the Valdosta bakery to Winn-Dixie, the experience of the former Winn-Dixie employees acquired with the bakery facility, and the forecasts of future needs provided by Winn-Dixie.  The inventory purchases did not exceed Consolidated Biscuit's estimates of a 13 week supply at the time of purchasing.

On June 23, 2005, Winn-Dixie announced the closure of approximately 250 stores. Winn-Dixie's purchases from Consolidated Biscuit abruptly fell from approximately $1,600,000 per month to just over $600,000 shortly after the announcement was made. Some 346 stores were actually closed by August 2005.

On or about August 5, 2005, Winn-Dixie provided notice of termination of the "current supply agreement of extruded and corn-based, salty snacks" under the Contract Packaging Agreement.  In roughly that same time frame, Winn-Dixie unilaterally began dropping individual products from the list of items approved for purchase by its purchasing agents without providing Consolidated Biscuit with sufficient opportunity to "run off" the packaging and ingredients which it had already purchased to supply such products for Winn-Dixie.  In other instances, Winn-Dixie would not authorize new packaging or inventory purchases, leading to further reductions in the amount of products being supplied under the Contract Packaging Agreement.  By September of 2005, Winn-Dixie's purchases from Consolidated Biscuit were only 38% of the purchase volume for March, April and May.

Faced with continuing and substantial losses occasioned by Winn-Dixie's downsizing and reduced purchasing, Consolidated Biscuit had no choice but to give notice of termination of the Contract Packaging Agreement by letter dated September 16, 2005.[5]  By agreement of the parties, performance under the Contract Packaging Agreement ceased on December 16, 2005, though Winn-Dixie never placed an order with Consolidated Biscuit after November 2, 2005.

Following termination of the relationship, Consolidated Biscuit invoiced Winn-Dixie for the ingredients and packaging inventory which it purchased post-petition on Winn-Dixie's behalf.  Following receipt of the invoice, Winn-Dixie made no attempt to retrieve the leftover ingredients or packaging materials.  Consolidated Biscuit eventually sold the leftover inventory for scrap.

On June 29, 2006, Consolidated Biscuit filed a Proof of Claim in the amount $623,822.68 [Claim No. 13321] for the packaging and ingredients inventory which was not consumed within 90 days of the closing of the purchase and sale of the Valdosta facility.  The figures contained in Claim No. 13321 were derived from inventory figures taken in August of 2005.

On June 30, 2006, Consolidated filed its Request for Payment of Administrative Expense Claim in the amount of $885,975.47, which includes a claim for $344,617.95 in packaging materials, $463,488.07 for ingredients inventory, and $77,869.45 for finished goods.  The majority of the packaging and ingredient inventory at issue was purchased in the

---

[5]  Winn-Dixie was for all practical purposes the only customer purchasing products from Consolidated Biscuit's Valdosta facility.

March/April/May time frame, before Winn-Dixie announced its restructuring plans. Ingredients inventory which could be used at other Consolidated Biscuit plants has been accounted for and excluded from the administrative expense claim. The finished goods inventory represents the surplus inventory produced and held for Winn-Dixie.

On August 17, 2006, Winn-Dixie filed its objection to Consolidated Biscuit's administrative expense claim on the grounds: (1) they had no obligation to pay for claimed charges under the Agreement; (2) any obligation under the Agreement is a prepetition obligation not actual and necessary to preservation of the estates; and (3) Consolidated violated the automatic stay by terminating the Agreement and should thereby be barred from recovering its claim.

On November 9, 2006, Winn-Dixie's Chapter 11 Plan was confirmed.

Claim No. 13321 was amended and superceded by Claim No. 13830 for $384,602.85 filed on July 2, 2008. Claim No. 13830 lowers the amount sought as contract rejection damages by some $239,000 to account for a coding error in the original invoice and for inventory utilized after August 2005. The correct contract documents, executed in connection with the same transaction, were also affixed to the amended claim.

5.     **Statement of all admitted or uncontested facts.**

(a)     On November 24, 2004, Consolidated Biscuit purchased Winn-Dixie's Valdosta Crackin' Good Bakery and the inventory located therein for $12,128,012.85. Finished goods inventory located at the plant was excluded

from the sale, as were Winn-Dixie's private label recipes, logos and trademarks.

(b)     On January 18, 2005, Winn-Dixie and Consolidated Biscuit entered into a Contract Packaging Agreement for Consolidated Biscuit to process and package certain Winn-Dixie brand bakery and snack foods.

(c)     On February 21, 2005, Winn-Dixie filed its Chapter 11 Petition.

(d)     Winn-Dixie continued to purchase products from Consolidated Biscuit post-petition.

(e)     The general Claims Bar Date in Winn-Dixie's Chapter 11 case was August 1, 2005.

(f)     The Contract Packaging Agreement was still executory on the August 1, 2005 Claims Bar Date.

(g)     On or about August 5, 2005, Winn-Dixie provided notice of its termination of the current supply agreement of extruded and corn-based salty snacks.

(h)     On September 16, 2005, Consolidated Biscuit notified Winn-Dixie of its intent to terminate the Contract Packaging Agreement.

(i)     On December 16, 2005, the parties ceased performing under the Contract Packaging Agreement.

(j)     On June 29, 2006, Consolidated Biscuit filed a Proof of Claim in the amount of $623,822.68 for packaging and ingredients subject to repurchase by Winn-Dixie pursuant to the Contract Packaging Agreement.

(k)     On June 30, 2006, Consolidated Biscuit filed its Request for Payment of Administrative Expense Claim in the amount of $885,975.47.

(l)     On November 9, 2006, Winn-Dixie's Chapter 11 Plan was confirmed.

(m)    Winn-Dixie never assumed any of the contracts at issue during the pendency of its Chapter 11 case.

(n)    On July 2, 2008, Consolidated Biscuit filed its amended proof of claim, reducing its pre-petition claim from $623,822.68 to $384,602.85.

## 6.     Brief statement of contested facts.

The contested facts include, but are not limited to, the following:

(a)     Whether Consolidated Biscuit's post-petition purchases of packaging and ingredient inventories on Winn-Dixie's behalf benefitted the estate.

(b)     Whether Consolidated Biscuit's post-petition purchases of ingredients and packaging inventory for Winn-Dixie were induced by Winn-Dixie's continued placement of orders with Consolidated Biscuit.

(c)     Whether the packaging inventory subject to repurchase by Winn-Dixie pursuant to the Contract Packaging Agreement exceeded a 13 week supply.

(d)     Whether the 13 week supply limitation on Winn-Dixie's packaging repurchase obligations is to be measured at the time the packaging was ordered, or at the conclusion of the relationship.

(e)     Whether the ingredients inventory subject to repurchase by Winn-Dixie pursuant to the Contract Packaging Agreement were unique to the products being produced for Winn-Dixie.

(f)     Whether the inventory and packaging inventory at issue was obsolete.

(g)     Whether Winn-Dixie made any effort to retrieve or utilize the packaging or ingredient inventory at issue following receipt of Consolidated Biscuit's invoicing for same.

**7.     Statement of contested legal issues.**

The contested legal issues include, but are not limited to:

(a)     Whether Consolidated Biscuit's Administrative Expense Claim should be allowed upon the authority of *Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759, 20 L.Ed.2d 751 (1968), and its progeny;

(b)     Whether Winn-Dixie's repurchase obligations under the various agreements are pre-petition obligations;

(c)     Whether Consolidated Biscuit's proofs of claim for contract rejection damages are timely;

(d)     Whether Consolidated Biscuit violated the automatic stay when it issued its notice of termination of the Contract Packaging Agreement;

(e)     Whether Consolidated Biscuit was required to hold obsolete and spoiled inventory indefinitely as a condition for recovering its administrative expense;

-14-

(f)      Whether Winn-Dixie was unjustly enriched at the expense of Consolidated Biscuit.

## 8.      __Legal authority__.

(1)      To implement the rehabilitative provisions of Title 11, Congress encourages creditors to continue conducting business with a debtor by promising them an administrative expense priority for all post-petition claims arising out of such transactions. *In re Baldwin Rental Centers, Inc.*, 228 B.R. 504, 511 (Bankr. S.D. Ga. 1998) ("The purpose of granting administrative expenses a priority  is to encourage creditors to cooperate with a debtor's reorganization efforts so that the debtor can effectively reorganize and continue its business . . ."); and *In re Mammoth Mart, Inc.*, 536 F. 2d 950, 954 (1st Cir. 1976) ("[W]hen third parties are induced to supply goods or services to the debtor-in-possession . . . the purposes of [§ 503] plainly require that their claims be afforded priority").

(2)      A prima facie case under § 503(b) is established where the claimant establishes that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the transaction enhanced the ability of the debtor-in-possession business to function as a going concern. *In re Transamerican Natural Gas Corp.*, 978 F. 2d 1409, 1416 (5th Cir. 1992).

(3)      The continued provision of services or goods pursuant to a pre-petition contract entitles the provider to an administrative expense if the continued performance was "induced" or "accepted" by the debtor in possession. *See e.g. In re Jartran, Inc.*, 732 F. 2d 584 (7th Cir. 1984). *See also In re Grand Union Co*., 266 B.R. 621, 625-626 (Bankr. D. N.J.

2001) ("[W]hen third parties are induces to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, their claims must be afforded priority"); and *In re Collins Aikman Corp.*, 384 B.R. 751, 763 (Bankr. S.D. Mich. 2008) ("Where a debtor-in-possession induces a creditor to continue performing under an unassumed pre-petition executory contract, pending the decision to assume or reject, the creditor is entitled to administrative priority to the extent that the goods or services supporting the claim were provided post-petition and were beneficial to the estate").

      (4)     The inducement test is intended solely to filter out improper administrative claims where the products or services were requested by the pre-petition debtor and were unwanted or unused by the post-petition debtor. *See e.g. In re Adelphia Business Solutions, Inc.*, 296 B.R. 656, 665 (Bankr. S.D. N.Y. 2003) ("The 'inducement' requirement is very much a requirement in the law but it must be construed in accordance with common sense -- to filter out, as in *Jartran*, claims for administrative expense treatment where the post-petition benefit is requested pre-petition and/or unwanted by the post-petition debtor-in-possession, *but to require administrative expense treatment where the post-petition benefit is knowingly accepted and desired, post-petition, by the post-petition debtor-in-possession*") (emphasis added).

      (5)     The date of contracting is not the focal point of the *Jartran* inquiry; rather, it is the date where the services or products are provided which determines whether a claim is entitled to administrative expense priority. *In re National Steel Corp.*, 316 B.R. 287, 301 (Bankr. N.D. Ill. 2004).

(6)    Winn-Dixie's receipt of finished goods from Consolidated, pursuant to the terms of the parties' contracts, allowed it to continue in business by providing desired inventory for Winn-Dixie to sell to its customers.  The receipt of such products, obviously critical to a grocer such as Winn-Dixie, therefore benefitted the estate.  *See e.g. In re The Grand Union Co*., 266 B.R. 621, 626 (Bankr. D. N.J. 2001) (Claim for inventory supplied to grocer entitled to administrative expense priority, even though a substantial portion of such inventory was never used - - "Plainly, Grand Union believed that the inventory was necessary for optimally meeting its ongoing operational needs.  The fact that the actual use of inventory did not match Grand Union's projected needs does not mean that the warehousing of the inventory was not beneficial.  After all, Grand Union was able to make decisions about individual store operations based in the certitude that it had a sufficient quantity and type of inventory on hand").

(7)    Though an administrative expense claimant must establish a concrete benefit to the estate from the parties' relationship, the benefits conferred on the estate need not be measured in precise dollars and cents.  *In re Transamerica Natural Gas Corp.,* 978 F. 2d 1409, 1420 (5th Cir. 1992), *cert. dismissed*, 507 U.S. 1048 (1993) ("Although the amount to be allowed as an administrative expense must be measured in dollars and cents . . . the question whether the estate has benefitted cannot be so narrowly confined . . . . Although the estate receives a benefit that often can be measured by the actual cost of necessary goods or services supplied, the estate also receives other less readily calculable benefits, such as the ability to continue to conduct business as usual").  "Profit" is not the measure of benefit to the estate.  *In re Patient Education Media, Inc.*, 221 B.R. 97, 103 (Bankr. S.D. N.Y. 1998)

("Just as the debtor in possession must still pay a trade vendor who provides inventory that cannot be sold, the debtor in possession must pay for the use of a nondebtor's property, even where the use turns out to be unprofitable. . . . Linking the creditor's priority entitlement to the profitable use of his credit will chill the creditor's willingness to extend credit, and ultimately, frustrate the goal of rehabilitation").

(8)    The "benefit to the estate" inquiry is subjective, to be made on a case by case basis. *In re Right Time Foods, Inc.*, 262 B.R. 882, 884 (Bankr. M.D. Fla. 2001). The "benefit" is not to be determined after-the-fact. *In re Atlantic Retail, Inc.*, 287 B.R. 849, 860 (Bankr. N.D. Ga. 2002)("For this court to accept the Debtor's argument that the promotion did not provide benefit to the Debtor's estate simply because after the fact, it suggested that the promotion provided difficult to measure, intangible benefits, would effectively discourage parties from dealing with a Chapter 11 debtor without a guarantee of first priority payment").

(9)    Though rehabilitation of a distressed business is a laudable goal, a debtor's reorganization is to be financed by the debtor and its pre-petition creditors, not post-petition suppliers. The goal of preserving the limited assets of the estate must therefore give way to the more important policy of encouraging third parties to continue conducting business with the estate. *In re Colortex Ind., Inc. (Varsity Carpet Services, Inc. v. Richardson)*, 19 F.3d 1371, 1377-83 (11th Cir. 1994) ("[A] balance must be struck between the goal of maximizing the estate and the goal of encouraging on-going business with third parties to facilitate the continued operations of the business, and thus the reorganization. . . . That balance may never be struck to denigrate the clear intent of Section 503(b)(1)(A) which is to satisfy the actual

and necessary costs of preserving the estate. . . . 'Although the fundamental goal of Chapter 11 is the ultimate rehabilitation of the debtor, the treatment of administrative expenses as debts entitled to first priority status suggests an overriding policy that a debtor's efforts to reorganize shall be financed by the debtor, not the debtor's post-petition creditors").

(10)    The damages suffered by Consolidated Biscuit as a result of its post-petition purchase of ingredients and packaging materials utilized to ensure a constant flow of finished goods for sale by Winn-Dixie, are independent of any damages flowing from the deemed rejection of its contract.  They are not therefore pre-petition claims and are entitled to receive administrative expense priority in payment if all other factors needed to establish such claim are proven.  *In re Globe Metallurgical, Inc.*, 312 B.R. 34, 39 (Bankr. S.D.N.Y. 2004) ("Although the right of assumption or rejection exists, when a debtor makes use of the subject of the executory contract prior to its rejection, the parties to the executory contract may be entitled to an administrative claim pursuant to 11 U.S.C. § 503); and *In re Palace Quality Services Ind., Inc.*, 283 B.R. 868, 887 (Bankr. E.D. Mich. 2002) (In a lease context, "[A] rejection claim is distinct from other post-petition claims a lessor may have against the estate. . . . A rejection claim is prospective only").  *See also In re Davidson & McKirdy Co., Inc.*, 70 B.R. 38 (Bankr. Conn. 1987).

(11)    One of the predominant policies behind § 503(b) is to facilitate the reorganization of insolvent businesses by encouraging creditors to supply the debtor with goods and services necessary to conduct its business.  *Alabama Surface Mining Comm'n v. N.P. Mining Co.* (*In re N.P. Mining Co.*), 963 F.2d 1449, 1453 (11th Cir. 1992) ("Obviously,

without a guaranty of first priority payment, third parties would not deal with a business in a Chapter 11 reorganization and the goal of rehabilitation could not be achieved").

(12)    As to the timeliness of Consolidated Biscuit's proofs of claim, a party to an executory contract is not required to file a proof of claim until its contract is rejected.  To hold otherwise "would result in a deluge of potentially pointless preemptive proofs of claims is inconsistent with the Bankruptcy Code's more prudent approach, which is to simply permit those non-debtor's whose contracts or leases were rejected to react to the debtor's decision." *In re National Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2002).  It is the breach of the contract which gives rise to the "claim."  Until the contract is rejected, there is no "breach."  *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983)("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim . . . ")*.  See also* 11 U.S.C. § 365(g).

(13)    Consolidated Biscuit's sale of the obsolete packaging and perishable ingredients inventory does not bar its administrative expense claim.  Pursuant to § 672.703, Florida Statutes, a seller may, upon the buyer's failure to make a payment due on or before delivery, (i) resell any obsolete or unsalable inventory for "scrap or salvage" under § 672.704; (ii) resell and recover damages under § 672.706; or (iii) recover damages for nonacceptance under § 672.709.[6]  Pursuant to § 672.709, Florida Statutes, a seller may recover from a buyer who fails to pay for the goods "the price" of the goods identified to the contract if the seller is unable after reasonable efforts to resell them at a reasonable price or

---

[6] Consolidated Biscuit does not concede that this dispute is governed by Article 2 of the Uniform Commercial Code.

the circumstances readily indicate that such an effort will be unavailing.  Consolidated Biscuit is not a dealer of "ingredients."  The packaging inventory was proprietary to Winn-Dixie and could not be sold to anyone else, and was in any event outdated as of January 1, 2006 due to new FDA packaging regulations.  The ingredients inventory was similarly stale or growing stale.  A sale for anything other than scrap would have been unavailing.  *FMI, Inc. v. RMAX, Inc.*, 286 S.C. 343, 333 S.E.2d 360 (1985)(circumstances reasonably indicating that any effort to resell goods would be unavailing is all that is necessary to support a claim under § 2-709 of the UCC); *Precision Mirror & Glass v. Nelms*, 8 Misc.3d 339, 797 N.Y.S.2d 720, 57 UCC Rep.Serv.2d. 258 (2005)(Absence of any market for custom made product excused seller from having to mitigate damages through attempted sale to third-party); and *In re S.N.A. Nut Co.*, 247 B.R. 7, 20 (Bankr. N.D. Ill. 2000)(Nuts manufactured for ice cream distributor were specially-manufactured goods with no market). Similarly, a supplier need not maintain obsolete or custom made inventory in order to recover damages flowing from a buyer's repudiation of a contract.  *See e.g. Traycor, Inc. v. Austin Supply & Drywall Co., Inc.*, 484 S.W.2d 446 (Tex. Ct. App. 1972).

Consolidated reserves the right to supplement its statement of legal authorities in connection with any post-trial briefing.

## 9.     List of depositions Claimant may use at trial.

Consolidated anticipates utilizing the following depositions and transcripts at trial:

(i)     Deposition of Kenneth Kirschner;
(ii)    Deposition of Joseph Ragase;

      (iii)     Deposition of Glenda Rhyder; and

      (iv)     Deposition of Bennett L. Nussbaum.

The depositions are currently being transcribed and submitted to the deponents for potential corrections. The transcripts are not therefore available for page and line designations at this time.

## 10.    **Exhibit List.**

Attached as **Exhibit A** is Consolidated Biscuit's proposed Exhibit List as of September 22, 2008. Consolidated Biscuit reserves the right to amend its Exhibit List through trial. The parties are believed to have exchanged all relevant documents. Consolidated Biscuit also reserves the right to utilize any exhibit identified or utilized by Winn-Dixie in connection with the trial of this matter.

## 11.    **Witnesses.**

Consolidated Biscuit anticipates calling the following witnesses:

    Larry Ivan
    Vice-President of Consolidated Biscuit

    Bill Varney
    CFO of Consolidated Biscuit

    Jeffrey Snavely
    Counsel for Consolidate Biscuit at the time the transaction documents were negotiated

    Kenneth Kirschner
    Counsel for Winn-Dixie at the time the transaction documents were negotiated

Bennett L. Nussbaum
CFO of Winn-Dixie

12.      **Statement as to "core" nature of proceeding.**

This is a "core" proceeding within the meaning of 28 U.S.C. § 157(a) and Consolidated Biscuit consents to the entry of the final orders or judgments by the bankruptcy judge of this court.

13.      **Statement requiring settlement conferences.**

The undersigned certifies that the parties have thoroughly explored settlement of the foregoing disputes and that a settlement still remains possible.  As of this date, however, there is no settlement.

**STUTSMAN THAMES & MARKEY, P.A.**

*/s/ Richard R. Thames*

By_____
        Richard R. Thames
        Robert A. Heekin, Jr.

Florida Bar Number 0718459
Florida Bar Number 0652083
50 North Laura Street, Suite 1600
Jacksonville, Florida  32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@stmlaw.net
rah@stmlaw.net

Attorneys for Consolidated Biscuit Company

-23-

**<u>Certificate of Service</u>**

I certify that, on September 22, 2008, the foregoing was filed electronically with the Court's CM/ECF electronic filing system which will in turn generate a notice of filing to all parties who have consented to receiving notices in this case.

*/s/ Richard R. Thames*

_____
Attorney

69622