**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |
| _____ | ) | |

**WINN-DIXIE'S TRIAL MEMORANDUM ON ITS**
**OBJECTIONS TO CONSOLIDATED BISCUIT'S CLAIMS**

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Counsel for Winn-Dixie

# Table of Contents

Page

I.      Summary of Winn-Dixie's Objections to Consolidated's Claims ......................... 2

II.     Facts which Winn-Dixie Believes to be Uncontested ............................................ 4

III.    Contested Facts ................................................................................................. 9

IV.     Contested Legal Issues ...................................................................................... 10

V.      Winn-Dixie's Objection to Consolidated's Claims .............................................. 10

        A.      Consolidated's Administrative Claim should be denied ........................... 10

                1.      Because Consolidated's claim is based on an alleged post-petition
                        breach of a pre-petition contract, Consolidated's claim is not
                        entitled to administrative priority under 11 U.S.C. § 503 ............. 11

                        (a)     The Administrative Claim did not arise from a post-petition
                                transaction ...................................................................... 12

                        (b)     The Administrative Claim is not based on a benefit
                                Consolidated conferred on the Winn-Dixie estate ........... 13

                2.      Consolidated breached the Packaging Agreement ........................ 17

        B.      Winn-Dixie's Objection to the Amended Rejection Claim ...................... 18

                1.      Consolidated's Rejection Claim was filed after the bar date ........ 18

                2.      Consolidated does not have a claim for rejection damages .......... 19

        C.      Consolidated cannot recover damages for Winn-Dixie's failure to
                purchase the materials, ingredients or finished product ........................... 21

        D.      Consolidated's Claims are overstated ..................................................... 24

                1.      The packaging materials listed in the Administrative Claim exceed
                        a 13 week supply ....................................................................... 24

                2.      Many of the ingredients listed in Consolidated's Amended
                        Rejection Claim and Administrative Claim are not "unique" to
                        Winn-Dixie .............................................................................. 25

V.      Deposition Excerpts to be used at Trial ............................................................. 26

VI.     Legal Authority ................................................................................................ 26

VII.    Core Proceeding ............................................................................................... 28

VIII.   Settlement ........................................................................................................ 28

<u>Winn-Dixie's Trial Memorandum</u>

Winn-Dixie Stores, Inc. and affiliates (collectively the "Debtors"), submit this Trial Memorandum in accordance with the Court's orders scheduling trial (Doc. Nos. 18501 and 20501) on:

| | | |
|---|---|---|
| (i) | Consolidated Biscuit Company's Request for Administrative Expense (Doc. No. 8930; the "Administrative Claim"); |
| (ii) | Winn-Dixie's Objection to the Administrative Claim (Doc. No. 10359); |
| (iii) | Consolidated's Proof of Claim No. 13321 (the "Rejection Claim"); |
| (iv) | Winn-Dixie's Objection to Claim No. 13321 (Doc. No. 12532); |
| (v) | Consolidated's Response to Winn-Dixie's Objection to Claim No. 13321 (Doc. No. 12878); |
| (vi) | Winn-Dixie's Amended Objection to Claim No. 13321 (Doc. No. 17219); |
| (vii) | Consolidated's Response to Debtors' Amended Objection to Claim No. 13321 (Doc. No. 17508); |
| (viii) | Consolidated's Amended Proof of Claim (Doc. No. 13830; the "Amended Rejection Claim"); and |
| (ix) | Winn-Dixie's Objection to Amended Proof of Claim No. 13830 (Doc. No. 21213). |

## I.    <u>Summary of Winn-Dixie's Objections to Consolidated's Claims</u>

In its Administrative Claim Consolidated asserts that Winn-Dixie breached its obligation under a product packaging agreement to purchase from Consolidated packaging materials, ingredients and products that Consolidated acquired or produced after the Petition Date. Consolidated asserts the claim as an administrative claim because Winn-Dixie's alleged breach occurred post-petition

and Consolidated acquired or produced the materials post-petition.  As a matter of law, however, Consolidated is not entitled to an administrative claim because (i) the claim is based on an alleged post-petition breach of a pre-petition obligation and therefore it is a general unsecured claim, (ii) the claim is not based on any benefit conferred on the Winn-Dixie estate, and (iii) Consolidated breached the packaging agreement by terminating the agreement early, in a manner inconsistent with the agreement's terms, excusing Winn-Dixie from further performance.

In its Amended Rejection Claim, Consolidated asserts that Winn-Dixie breached its obligations under a pre-petition asset purchase agreement and a closing agreement to repurchase unused packaging materials and ingredients that Consolidated had acquired when it purchased a packaging plant from a Winn-Dixie subsidiary prior to the Petition Date.  Consolidated claims that those agreements were executory contracts when Winn-Dixie breached them post-petition and therefore Consolidated is entitled to a rejection damages claim.

The reason Consolidated contends that its claim is a rejection damages claim is because Consolidated filed this claim well after the general claims bar date but before the rejection damages bar date.

Consolidated's claim is not a rejection damages claim, however, because Consolidated's contracts with Winn-Dixie were not executory at the time Consolidated asserts Winn-Dixie rejected them (by operation of its Plan) and therefore the contracts were not rejected by Winn-Dixie.  Winn-Dixie had the right to move to assume or reject the agreements until the date its plan of reorganization

3

was confirmed (the "Confirmation Date").   Well before the Confirmation Date, however, Consolidated disposed of the ingredients and materials it wanted Winn-Dixie to repurchase, depriving Winn-Dixie of the ability to assume or reject the repurchase obligation.  Because there could be no performance by Consolidated, the agreement was no longer executory.  For that reason, Winn-Dixie could not and did not reject that obligation pursuant to its Plan.

Even if Consolidated were entitled to either an administrative expense claim or a rejection claim for breach of Winn-Dixie's obligations to purchase materials from Consolidated, Consolidated is barred by applicable provisions of the Uniform Commercial Code from recovering damages from Winn-Dixie for that breach because Consolidated disposed of the materials and ingredients without notice to Winn-Dixie.[1]

## II.    Facts which Winn-Dixie Believes to be Uncontested

1.      For many years, Crackin' Good, Inc. ("Crackin' Good"), a subsidiary of Winn-Dixie, owned and operated a bakery facility in Valdosta, Georgia (the "Plant").

2.      On November 24, 2004, Crackin' Good, Winn-Dixie and Consolidated entered into an Asset Purchase Agreement (the "APA"), pursuant to which Consolidated agreed to purchase the Plant together with its inventories of packaging materials and ingredients.

---

[1]   Winn-Dixie also contends that Consolidated has vastly overstated the amounts of its Administrative Claim, but believes the Court need not reach this issue because of the dispositive issues identified above.

3.       Under the terms of the APA, Winn-Dixie agreed to repurchase any of those packaging materials and ingredients that Consolidated did not consume within ninety days after buying the Plant.

4.       On January 17, 2005, Consolidated and Crackin' Good closed on the purchase and sale of the Plant pursuant to the APA.

5.       On January 18, 2005, Consolidated, Crackin' Good and Winn-Dixie entered into a Closing Agreement.  In the Closing Agreement, Winn-Dixie granted a license to Consolidated to use Winn-Dixie's "Oven Gem" trademark for 180 days.[2]  Winn-Dixie also agreed to repurchase any remaining Oven Gem packaging materials at the price Consolidated paid Crackin' Good if the parties did not agree to renew that license before the expiration of the 180 day term.

6.       On January 18, 2005, as contemplated by the APA, Winn-Dixie and Consolidated also entered into a contract packaging agreement (the "Packaging Agreement") pursuant to which (i) Winn-Dixie agreed to purchase the bakery products described in the Packaging Agreement exclusively from Consolidated for 180 days (the "Products") and (ii) Consolidated agreed to manufacture and sell the Products to Winn-Dixie at the prices set forth in the Packaging Agreement for 180 days.[3]

---

[2]  Prior to selling the plant, Winn-Dixie allowed Crackin' Good to manufacture and sell product to third parties under the "Oven Gem" trademark.

[3]  Consolidated initially requested that Winn-Dixie continue to purchase products from Consolidated for 90 days.  It was Winn-Dixie which wanted Consolidated to supply products to Winn-Dixie for at least 180 days.

7.      The Packaging Agreement allowed the parties to amend the list of products covered by the agreement if both parties agreed to the amendment.

8.      The Packaging Agreement provided that either party could terminate the agreement after 180 days by providing 120 days written notice.

9.      Winn-Dixie agreed that if either party terminated the Packaging Agreement, Winn-Dixie would repurchase from Consolidated (i) up to "a 13 week supply" of "any packaging materials dedicated to [Winn-Dixie]", and (ii) any ingredients which were "unique to the [Winn-Dixie] Products."

10.     Consolidated hoped that the six-month Packaging Agreement would grow into a long term relationship with Winn-Dixie, but Consolidated accepted the risk that it may not.

11.     On February 21, 2005 (the "Petition Date"), the Debtors (including Crackin' Good) filed voluntary petitions for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

12.     Consolidated purchased the majority of the materials and ingredients listed in its Administrative Claim in March, April and May of 2005.  At that time, Consolidated relied on Winn-Dixie's *pre-petition* purchasing history from Crackin' Good to estimate the volume of materials and ingredients Consolidated would need to fill future orders from Winn-Dixie.

13.    By Order dated April 28, 2005 (the "Claims Bar Date Order"), this Court set August 1, 2005 as the last date for all parties to assert pre-petition claims against one or more of the debtors to file a proof of claim (the "Bar Date").

14.    Consolidated did not file any proof of claim by the Bar Date regarding any of Winn-Dixie's liabilities under the APA, the Closing Agreement or the Packaging Agreement.

15.    On August 1, 2006, Winn-Dixie gave Consolidated 90 days notice that Winn-Dixie would no longer purchase "extruded and corn based salty snacks" from Consolidated, effectively amending the list of products covered by the Packaging Agreement.  Consolidated consented to that amendment.

16.    On August 16, 2005, Consolidated sent Winn-Dixie an invoice for $421,559.99 for packaging materials and ingredients that Consolidated had purchased from Winn-Dixie, but which Consolidated had not used (the "August 16 Invoice").

17.    Winn-Dixie did not pay the August 16 Invoice.

18.    On September 16, 2005, Consolidated gave Winn-Dixie notice that Consolidated was terminating the Packaging Agreement in 60 days (rather than the 120 day notice required by the Agreement).

19.    Winn-Dixie objected to the 60 day notice of termination, but offered to allow Consolidated to terminate the Packaging Agreement in 90 days (which would have been December 16, 2005), on the condition that Consolidated agree to release all claims against Winn-Dixie based on the Packaging Agreement.

7

20.     Consolidated did not agree to release those claims, and Winn-Dixie therefore did not agree to waive the required 120 day notice to terminate the Packaging Agreement.

21.     On December 16, 2005, Consolidated terminated the Packaging Agreement over Winn-Dixie's objection, thus breaching the Agreement.

22.     Consolidated closed the Plant in December 2005.

23.     On December 30, 2005, Consolidated sent an invoice in the amount of $1,086,292.67 to Winn-Dixie for Consolidated's inventory of ingredients, materials and finished product that Consolidated claimed to have acquired or produced after Consolidated purchased the Plant pursuant to the Packaging Agreement (the "December 30 Invoice").

24.     Winn-Dixie did not pay the December 30 Invoice.

25.     Winn-Dixie paid Consolidated for all of the products that Winn-Dixie ordered from Consolidated and Consolidated delivered to Winn-Dixie after the Petition Date.

26.     On June 27, 2006, Consolidated filed its Rejection Claim (Claim No. 13321) in the amount of $623,822, asserting that Winn-Dixie breached its obligation under the Packaging Agreement to repurchase ingredients and packaging materials that Consolidated purchased from Crackin' Good with the Plant (the "Pre-petition Inventory").

27.     On June 30, 2006, Consolidated filed the Administrative Claim in the amount of $885,975.47 (Doc. No. 8930), asserting that Winn-Dixie breached

its obligation under the Packaging Agreement to purchase from Consolidated (i) ingredients and packaging materials that Consolidated purchased *after the Petition Date* and (ii) finished products which Winn-Dixie had not ordered but which Consolidated had on hand after Consolidated terminated the Packaging Agreement (the "Post-petition Inventory").

28.    In July 2006, Consolidated sold the Plant to a third party and disposed of the packaging materials, ingredients and products that are the subject of Consolidated's claims by either selling them for scrap or delivering them to a landfill.

29.    On November 9, 2006, this Court entered its Order Confirming Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors (Doc. No. 12440), and setting December 9, 2006 as the bar date for filing claims based on rejection of contracts pursuant to the Plan (the "Rejection Bar Date").

30.    On July 2, 2008, Consolidated filed its Amended Rejection Claim reducing the amount of the Rejection Claim and substituting the Asset Purchase Agreement and the Closing Agreement as the basis for the claim instead of the Packaging Agreement.

## III.   **Contested Facts**

Winn-Dixie disputes that it has any obligation to purchase the ingredients, packaging materials and finished goods described in either the Administrative Claim or the Amended Rejection Claim.

IV.    **Contested Legal Issues**

1.    Whether Consolidated is entitled to an administrative expense claim under 11 U.S.C. § 503.

2.    Whether Consolidated's early termination of the Packaging Agreement excused Winn-Dixie from its repurchase obligations under the Packaging Agreement.

3.    Whether Winn-Dixie rejected the Repurchase Obligations.

4.    Whether Consolidated is entitled under the Uniform Commercial Code to recover any damages.

V.    **Winn-Dixie's Objection to Consolidated's Claims**

A.    Consolidated's Administrative Claim should be denied.[4]

Consolidated's Administrative Claim is based on Winn-Dixie's pre-petition obligation in the Packaging Agreement to purchase from Consolidated (i) packaging materials Consolidated purchased post-petition to package Winn-Dixie products, and (ii) ingredients Consolidated purchased post-petition that are unique to Winn-Dixie's products.    Consolidated's Administrative Claim also seeks payment of finished product Consolidated had on hand at the termination of the agreement, but which Winn-Dixie had not ordered.[5]    The Administrative Claim

---

[4]  Consolidated has the burden to prove (i) that Winn-Dixie has an obligation to purchase the ingredients, materials and finished products described in its Administrative Claim, *and* (ii) that Consolidated's claim is entitled to administrative priority.  *See In re Fulwood Enterprises, Inc.*, 149 B.R. 712, 715 (Bankr. M.D. Fla. 1993) (emphasis added; Paskay, J.).

[5]  Winn-Dixie never ordered the $77,869.45 in finished goods listed on Exhibit D to Consolidated's Administrative Claim and there is no contractual basis for requiring Winn-Dixie to pay for those goods.

should be denied because (i) the claim is based on a post-petition breach of a pre-petition contract and therefore is an untimely pre-petition unsecured claim, and (ii) Consolidated breached the Packaging Agreement by terminating the agreement early, excusing Winn-Dixie from further performance.

> 1.      *Because Consolidated's claim is based on an alleged post-petition breach of a pre-petition contract, Consolidated's claim is not entitled to administrative priority under 11 U.S.C. § 503.*

To establish its right to an administrative claim, the claimant must show (i) that its claim arises from a transaction with the debtor-in-possession (*i.e.* post-petition) *and* (ii) the debt must be beneficial to the estate:

> In order to qualify for a Section 503(b)(1)(A) administrative priority claim, the claim must satisfy the following test: the debt must both (1) arise from a transaction with the debtor-in-possession and (2) be beneficial to the debtor-in-possession in the operation of its business.
>
> > *In re OES Environmental, Inc.*, 319 B.R. 266, 268 (Bankr. M.D. Fla. 2004) (citing *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984); and *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976) emphasis added; Paskay, J.).

11

(a)    The Administrative Claim did not arise from a post-petition transaction.

In *In re Murray Industries, Inc.*, 110 B.R. 585 (Bankr. M.D. Fla. 1990), Judge Paskay recognized that under bankruptcy law when a claim is based on a liability that was created *pre-petition*, the claim is not transformed into an administrative claim merely because the events that give rise to the liability occur *post-petition*:

> Considering first whether the claim asserted by the Plaintiff qualifies for a cost of administration priority treatment under § 503, one must determine *when* the claim arose. This is so because if these claims are pre-petition claims, of course, they would not qualify to be treated as cost of administration under § 503 of the Code.
>
> ***
>
> In this instance, *the fact that the vacation pay may not have become payable under the terms of the collective bargaining agreement until an event occurred postpetition, does not alter the priority scheme*. It is now well established that the accrual of a claim for bankruptcy purposes must be determined with reference to bankruptcy law and not state law, and if the right to payment, which is an indispensable element of a claim under § 101(4)(A) of the Bankruptcy Code, matured and became vested prior to the commencement of a case, *the fact that the time of payment is triggered by an event which occurred postpetition does not render such a claim a postpetition claim and is not entitled to be treated as a cost of administration under § 503 of the Bankruptcy Code and in turn treated as a first priority pursuant to § 507(a)(1) of the Bankruptcy Code*.
>
> > *In re Murray Industries, Inc.* at 588-89 (emphasis added; reversed as moot).

12

Winn-Dixie's obligation to repurchase materials and ingredients from Consolidated arose under the *pre-petition* Packaging Agreement.  The fact that Consolidated Winn-Dixie's repayment obligation—if it has one—was triggered *post-petition*, does not convert Consolidated's pre-petition claim into a post-petition administrative expense claim.[6]

Moreover, Consolidated cannot show that, *post-petition*, Winn-Dixie induced Consolidated to purchase any of the packaging materials and ingredients listed on its Administrative Claim.  Consolidated acknowledges that it relied on Winn-Dixie's *pre-petition* purchasing history with Crackin' Good when it purchased the majority of those materials and ingredients.

> (b)    The Administrative Claim is not based on a benefit
>        Consolidated conferred on the Winn-Dixie estate.

Pursuant to § 503 of the Bankruptcy Code, only those expenses which are actual and necessary to the administration of the debtor's estate are allowed as an administrative expense.  Section 503 states in relevant part:

---

[6] Consolidated may argue that the case *In re The Grand Union Co.*, 266 B.R. 621 (Bankr. D.N.J. 2001) supports its claim for an administrative expense for materials and ingredients Consolidated purchased after the Petition Date.  *Grand Union* actually stands for the proposition that Winn-Dixie's obligation to purchase the unused materials and ingredients is a *pre-petition claim*.  *See id.* at 627 ("This Court agrees with Grand Union that both the Repurchase Obligation and the Shortfall are part of CSI's rejection damages and are only entitled to be treated as pre-petition unsecured claims. … In the matter at hand, CSI's right to payment of the Repurchase Obligation and the Shortfall were established by the Agreement, which was executed *pre-petition*.").  Although the Court in *Grand Union* did award an administrative expense claim to the creditor, that claim was based on a *post-petition* representation that induced the creditor to purchase additional product to fill the debtors' needs, *i.e.*, a post-petition transaction.  *See id.* at 625-26. Consolidated admits that it made its *post-petition* purchases based on *pre-petition* information, therefore, *Grand Union* is inapplicable to Consolidated's administrative expense claim.

(b) After notice and a hearing, there shall be allowed administrative expenses, ... including-

(1)(A) the *actual*, *necessary* costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case….

11 U.S.C. § 503(b)(1)(A).

The Eleventh Circuit has held that administrative expenses under § 503 are to "be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors." *Varsity Carpet Services, Inc. v. Richardson (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1377 (11th Cir. 1994).

In *Colortex,* the Eleventh Circuit explained that the purpose of giving some creditors administrative expense priority is to prevent unjust enrichment of the debtor, *not to compensate the creditor for its loss*:

> [t]he threshold requirement for an administrative expense is that it be actual and necessary to the preservation of the estate; *the benefit must run to the debtor* and be fundamental to the conduct of its business. *In re Continental Airlines*, 146 B.R. 520, 526 (Bankr. D. Del.1992).  Administrative expense priority prevents unjust enrichment from this benefit:
>
>> The principal purpose of according administrative priority to claims for benefit to the estate is to prevent unjust enrichment of the debtor's estate, *rather than simply to compensate the claimant.*
>>
>> *In re Colortex Indus. at 1383* (emphasis added; quoting *In re Coal-X "76"*, 60 B.R. 907, 912 (Bankr. D. Utah 1986)).

14

In *In re Continental Airlines*, cited above in *Colortex*, an aircraft lessor sought an administrative expense claim against Continental based on the lessor's cost to bring the aircraft into compliance with provisions in the aircraft lease regarding the return of the aircraft to the lessor.  The Delaware bankruptcy court *denied* the lessor's administrative expense claim because it would not benefit Continental's bankruptcy estate to bring the aircraft into compliance with the lease provisions:

> *Movants must show that the failure to return the aircraft in compliance with the Lease return conditions resulted in a benefit to the estate.*
>
> *  *  *
>
> Movants have not borne their burden of proof on entitlement to an administrative expense claim for the breach of the lease return conditions. *There was no showing that failure to bring engine 666317 into compliance with the lease return conditions resulted in a benefit to the estate. Similarly, there was no showing that the failure to paint out the Continental logo on the airframe resulted in a benefit to the estate.*
>
> *In re Continental Airlines* at 528 (emphasis added).[7]

---

[7]  *See also*, *In re Harloff*, 247 B.R. 523, 529 (Bankr. M.D. Fla. 2000) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience by virtue of the debtor's possession of its property*.") (emphasis in original); *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606 (Bankr. N.D. Ga. 1985) ("the administrative expense scheme *does not focus in the first instance on whether the creditor sustained a loss* … but rather whether the estate has received a benefit.") (emphasis added); *In re Ram Manufacturing, Inc.*, 38 B.R. 252, 254 (E.D. Pa. 1984) ("the administrative claim is *limited to the amount by which the estate benefits* rather than the *amount of harm or forbearance suffered by the lessor*.") (emphasis added) and *In re Mid Region Petroleum, Inc.*, 111 B.R. 968, 971-72 (Bankr. N.D. Okla. 1990) (GATX claims administrative expense priority on the basis of *loss to GATX* not on the basis of *benefit to the bankruptcy estate*.  But nothing in the Bankruptcy Code warrants administrative expense priority *on the sole basis of creditor loss*.") (emphasis added).

Because Winn-Dixie indeed paid Consolidated for *all* of the product that Winn-Dixie ordered from Consolidated and Consolidated delivered to Winn-Dixie after the Petition Date, Consolidated has no claim that Winn-Dixie has been unjustly enriched by Consolidated. Consolidated does not, and cannot, allege that paying Consolidated for materials, ingredients and product that Consolidated did not deliver to Winn-Dixie, and that Consolidated no longer possesses, would result in any benefit to Winn-Dixie's estate.

Consolidated instead asks the Court to grant Consolidated administrative priority status to compensate *Consolidated* for its loss on the materials and ingredients that Winn-Dixie did not purchase or use.

Consolidated argues that having a supply of materials and ingredients on hand allowed Consolidated to produce products that Winn-Dixie could sell at a profit, therefore, Winn-Dixie should be required to pay for the Post-petition Inventory as administrative expense. As this Court explained in *In re Right Time Foods, Inc.*, 262 B.R. 882 (Bankr. M.D. Fla. 2001), that Consolidated spent money on materials and ingredients so that Winn-Dixie had the potential to make a product is not enough to confer administrative expense priority on the cost of those items:

> [a] postpetition expense may only qualify as an actual necessary expense of preserving the estate to the extent that *the incurring of such expense conferred some concrete benefit upon the estate*. It is not enough that the incurring of an expense secured a *potential benefit* or maintains a right to obtain a future benefit for an

estate.  In order for a claim on a post-petition expense to be allowed as an administrative priority claim, *an estate must actually make beneficial use of any value received in exchange for the incurring of the expense.*

> *See In re Right Time, Inc.* at 884-85 (Funk, J.; emphasis added; (citing *Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta)*, 789 F.2d 1530 (11th Cir. 1986) and *In re Colortex Industries, Inc.*, 19 F.3d 1371 (11th Cir. 1994)).[8]

### 2.    *Consolidated breached the Packaging Agreement*.

Consolidated's Administrative Claim also should be denied because Consolidated breached the Packaging Agreement by terminating the agreement on less than 120 days notice.

The Packaging Agreement required either party to give 120 days notice prior to terminating the agreement.  On December 16, 2005, Consolidated unilaterally terminated the Packaging Agreement—over Winn-Dixie's objection—on 90 days notice, which was a breach of the Agreement.[9]  When Winn-Dixie entered into the Packaging Agreement, Winn-Dixie bargained for the 120 notice period with the understanding that Consolidated would consume a 13 week supply

---

[8]  *See also In re Subscription Television of Greater Atlanta* at 1532 ("That which is thought to have some potential benefit, in that it makes a business more likely salable, may be a benefit but is too *speculative* to be allowed as an 'actual, necessary cost and expense of preserving the estate.'") (emphasis added).

[9]  By terminating the Packaging Agreement over Winn-Dixie's objection, Consolidated violated the automatic stay.  *See In re Edwards Mobile Homes Sales, Inc.*, 119 B.R. 857, 860 (Bankr. M.D. Fla. 1990) ("Ohio Casualty by virtue of its 'cancellation notice' of Debtor's surety bond violated the automatic stay.") (Baynes, J.)

(90 days) of materials within the 120 day notice period (otherwise Winn-Dixie would have to purchase that 13 week supply from Consolidated). By terminating on 90 days notice, Consolidated deprived Winn-Dixie of the notice it bargained for. Consolidated's wrongful termination constituted a material breach that excused Winn-Dixie from further performance of the Agreement.[10] *See U.S. Hone Corp. v. Suncoast Utilities, Inc.,* 454 So. 2d 601, 604 (Fla. 2d DCA 1984) (holding that unilateral termination of a contract by one party excused the other party from further performance.)

B.    Winn-Dixie's Objection to the Amended Rejection Claim.

1.    *Consolidated's Rejection Claim was filed after the bar date.*

Consolidated did not file its purported Rejection Claim until June 29, 2006, *eleven months after the Bar Date.* By failing to file a proof of claim before the Bar Date, Consolidated waived its right to assert any claim for any liability arising out of the APA or the Closing Agreement (collectively, the "Sale Agreements"), unless the claim is a rejection damage claim (for which the Confirmation Order established a December 9, 2006 bar date). *See In re South Atlantic Financial Corp.*, 767 F.2d 814, 817 (11th Cir. 1985).

---

[10]    Consolidated may argue that Consolidated could not have continued to package products for Winn-Dixie without purchasing more labeling because of FDA changes to package labeling requirements that went into effect at the end of 2005 and therefore Consolidated should be excused from the 120 day notice requirement. That it may have been expensive for Consolidated to perform under the Packaging Agreement in 2006 does not excuse Consolidated from giving Winn-Dixie 120 days' notice before terminating the Packaging Agreement. *See Marshall Const. Ltd. v. Coastal Sheet Metal & Roofing, Inc.,* 569 So. 2d 845, 848 (Fla. 1st DCA 1990) ("It is a well-settled contract principle that unexpected difficulty, expense or hardship does not excuse a party from performance of its obligations under a contract.").

2.    *Consolidated does not have a claim for rejection damages.*

Consolidated's Amended Rejection Claim is based on Winn-Dixie's obligation under the Sale Agreements to repurchase materials and ingredients that Winn-Dixie sold to Consolidated, and Consolidated's reciprocal obligation to deliver those ingredients and materials to Winn-Dixie (the "Repurchase Obligations").   Consolidated asserts that Winn-Dixie rejected the Repurchase Obligations upon confirmation of its plan of reorganization (the Plan deemed any remaining executory contracts to be rejected), and that the claim was not late because Consolidated filed the claim before the December 9, 2006 deadline for filing a rejection claim.

This Court has held that for a contract to be an executory contract, there must be substantial performance due from *both* the debtor and the claimant:

> In determining whether a contract is executory, this jurisdiction has followed the Countryman approach, which states that an executory contract is a "contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."
>
> *In re Surfside Resort and Suites, Inc.*, 344 B.R. 179, 186 (Bankr. M.D. Fla. 2006) (Funk, J.; citations omitted).

Although the Repurchase Obligations may have been executory on the Petition Date, the Confirmation Date is the critical date for determining whether

Winn-Dixie rejected the Sale Agreements.  The Eleventh Circuit has held that the determination as to whether a contract is executory is based upon the "benefits that assumption or rejection would produce for the estate." *Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 84 F.3d 1364, 1375 (11th Cir. 1996).

In *In re Government Securities Corp.*, 101 B.R. 343 (Bankr. S.D. Fla. 1989), *aff'd*, 972 F.2d 328 (11th Cir. 1992), Judge Cristol found that where an executory contract had terminated *after* the petition date but before the last day to assume or reject the contract, the contract was *no longer* executory:

> *The critical date for determining the executory nature of a contract is the date on which the bankruptcy court considers the debtor's application to assume or reject the contract.*  Although a contract may be executory on the date the bankruptcy petition is filed, circumstances may arise which render the contract no longer executory. For example, if the agreement expires of its own terms before the bankruptcy court considers the application to assume or reject the contract, the application becomes moot as there is no longer anything to assume or reject.
>
> *Thus, if the bond in this case were executory at the time of the commencement of the bankruptcy proceedings, but expired of its own terms (i.e., the expiration/renewal date was reached) a few days later, there would have been nothing for the trustee to assume or reject on the sixtieth day and any motion for assumption or rejection would have been deemed moot.*
>
> *Id.*  at 349 (emphasis added).

Winn-Dixie had the exclusive right to decide whether to move to assume or reject the Sale Agreements through the Confirmation Date. When Consolidated destroyed the ingredients and materials in July, 2006, three months before the Confirmation Date, Consolidated effectively terminated Winn-Dixie's right to choose whether to assume or reject the Sale Agreements ("robbing the estate of an important choice conferred by the Bankruptcy Code on [the debtor] for the benefit of the estate's creditor body." *In re El Paso Refinery, L.P.*, 220 B.R. 37, 40, n. 6, Bankr. W.D. Tex. 1998).

As of the Confirmation Date, there was no executory contract, and Winn-Dixie could not and never did reject *any* of the Consolidated agreements. Consolidated therefore does not have a rejection damage claim.

C.      Consolidated cannot recover damages for Winn-Dixie's failure to purchase the materials, ingredients or finished product.

Even if Consolidated were entitled to an administrative expense claim, or a claim for rejection damages, Consolidated is barred by the Uniform Commercial Code from recovering the damages claimed in its Administrative Claim and the Amended Rejection Claim. Because Consolidated's claims are for the breach of a contract to purchase goods, Consolidated's claims are governed by the Uniform Commercial Code. *See In re Dana Corp.*, 2007 WL 4105714 (Bankr. S.D. N.Y. 2007) (an objection to a proof of claim based on an agreement for the sale of goods is governed by the UCC).

Consolidated's Amended Rejection Claim and Administrative Claim seek to recover the contractually-agreed to price of the Pre-petition Inventory and the Post-petition Inventory. Under § 2-709 of the Uniform Commercial Code, for a seller to recover the price of goods, the seller must be in possession of the goods:

> (1)    When the buyer files to pay the price as it becomes due the seller may recover … the price:
>
> (a) Of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; and
>
> (b) Of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.
>
> (2) Where the seller sues for the price she or he *must hold for the buyer any goods which have been identified to the contract* and are still in her or his control except that if resale becomes possible the seller may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer *and payment of the judgment entitles her or him to any goods not resold.*
>
> § 672.709, Fla. Stat. (2007) (emphasis added).

If a seller does not have the goods that are the subject of its claim, the seller *cannot* recover the price of the goods from the buyer. In *Adsit Co., Inc. v. Gustin*, 874 N.E.2d 1018 (Ind. Ct. App. 2007), the Gustins (the buyers) wrongfully rejected goods and returned them to the agent for Adsit (the seller). The agent, however, lost the goods. Adsit subsequently brought an action against the Gustins

for the price of the goods pursuant to Indiana Code § 26-1-2-709, which is identical to § 672.709.  The Indiana Court of Appeals found that because Adsit's agent had lost the goods, § 26-1-2-709(2) precluded Adsit from recovering the price of the goods from Gustin:

> Under these circumstances, we find that when German Auto Tops—Adsit's agent—had actual possession of the returned goods, Adsit, in turn, had constructive possession thereof.  At that time, the risk of loss shifted back to Adsit.  *Given that Adsit bore the risk of loss and that it was otherwise required to resell the goods and credit the Gustins for the value of the resale, see I.C. § 26-1-2-709(2), we find that the trial court properly concluded that Adsit is not entitled to damages stemming from the Gustins' wrongful rejection of the seat covers.*
>
> *Adsit* at 1027 (emphasis added).

Because Consolidated disposed of the Pre-petition and Post-petition Inventories, Consolidated has no right to recover on either its Administrative Claim or Amended Rejection Claim.[11]

---

[11]  Although not evident from the face of its claims, Consolidated may assert that it only seeks to recover the difference between Consolidated's invoice price of the materials and ingredients and the scrap price that Consolidated ultimately recovered when it sold those goods.  As a condition precedent to recovering resale damages under 2-706, Consolidated was required to give Winn-Dixie notice of the sale prior to the sale. *See* § 672.706, Fla. Stat. (2007).  Because Consolidated disposed of the Pre-petition and Post-petition Inventories without giving Winn-Dixie prior notice of the sale, Consolidated has no right to recover on either its Administrative Claim or its Amended Rejection Claim.

D.    Consolidated's Claims are overstated.

1.    *The packaging materials listed in the Administrative Claim exceed a 13 week supply.*

Under its terms if either party terminated the Packaging Agreement on 120 days notice, Winn-Dixie agreed to purchase any packaging materials which were dedicated to Winn-Dixie but which had not been consumed in the production of Products during the term of the Agreement. Winn-Dixie was not obligated, however, to purchase more than a 13 week supply of any packaging materials:

> After six months from the beginning of the initial term, either party may terminate this Agreement, with or without cause, upon 120 days written notice to the other party…. Customer agrees to repurchase from Packer any packaging inventory *dedicated to Customer* that was not consumed in the production of Products during the term of this Agreement; *provided, however, Customer shall not be obligated to purchase more than 13 weeks supply of packaging materials …* unless Customer has authorized Packer in writing to purchase quantities of packaging materials in excess of a 13 week supply.
>
> Packaging Agreement, paragraph 5 (emphasis added).

Consolidated contends that when it purchased packaging materials in March, April and May, 2005, Consolidated never purchased more than a 13 week supply of packaging materials as measured by Winn-Dixie's historical purchases from Crackin' Good. Therefore, according to Consolidated, none of the quantities of materials listed on the Administrative Claim exceed 13 week supply.

When Winn-Dixie entered into the Packaging Agreement, however, Winn-Dixie bargained for a 120 day notice of termination on the assumption that Consolidated would utilize a 13 week (90 day) supply of materials over the 120 notice period.[12]  For this reason, a "13 week supply" should be measured on the date notice of termination is given by either party.  Based on that measurement, the evidence at trial will show that Consolidated overstated its Administrative Claim for packaging materials by approximately $111,000.

2.    *Many of the ingredients listed in Consolidated's Amended Rejection Claim and Administrative Claim are not "unique" to Winn-Dixie.*

The Packaging Agreement also provided that Winn-Dixie would purchase from Consolidated any ingredients that Consolidated had on hand on the date of termination that were unique to the Products:

*Any* ingredients inventory that Packer has on hand on the date of termination that is *unique to the Products* shall be sold to Customer at Packer's cost plus transportation costs.

Packaging Agreement, paragraph 5 (emphasis added).

Consolidated contends that *all* of the ingredients are unique because Consolidated purchased them to manufacture products for Winn-Dixie.   Under

---

[12]   That Winn-Dixie bargained for 120 notice period so that it would limit its liability to repurchase unused materials evidences the materiality of Consolidated's breach when it unilaterally terminated the Packaging Agreement on 90 days notice.

Consolidated's definition of the word, ingredients such as pure vegetable oil, cheddar cheese, and shortening are "unique" to Winn-Dixie's products.

"Unique," however, means ingredients which are truly unique to Winn-Dixie's products, as opposed to anybody else's products, such as specially formulated jams and other ingredients which are not commonly found in bakery or snack products. Using the correct definition of "unique," the evidence will show that Consolidated overstated its Administrative Claim for unique ingredients by approximately $250,000.

## V.   Deposition Excerpts to be used at Trial

See Exhibit A.

## VI.   Legal Authority

The following is the legal authority upon which Winn-Dixie may rely. Winn-Dixie may rely upon additional authority at trial or in post-trial briefing:

1.   11 U.S.C. § 503

2.   §§ 672.703, .706, .708, .709 and .723, Fla. Stat. (2007)

3.   *In re Fulwood Enterprises, Inc.,* 149 B.R. 712 (Bankr. M.D. Fla. 1993)

4.   *In re Midway Airlines, Inc.*, 221 B.R. 411 (Bankr. N.D. Ill. 1998)

5.   *Varsity Carpet, Inc. v. Richardson (In re Colortex Indus.)*, 19 F.3d 1371 (11th Cir. 1994)

6.   *In re Continental Airlines*, 146 B.R. 520 (Bankr. D. Del. 1992)

7.   *In re Coal-X "76"*, 60 B.R. 907 (Bankr. D. Utah 1986)

8.      *In re Harloff*, 247 B.R. 523 (Bankr. M.D. Fla. 2000)

9.      *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. 606 (Bankr. N.D. Ga. 1985)

10.     *In re Ram Manufacturing, Inc.*, 38 B.R. 252 (E.D. Pa. 1984)

11.     *In re Mid Region Petroleum, Inc.*, 111 B.R. 968 (Bankr. N.D. Okla 1990)

12.     *In re OES Environmental, Inc.*, 319 B.R. 266 (Bankr. M.D. Fla. 2004)

13.     *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984)

14.     *GATX Leasing Corp v. Airlift Int'l, Inc. (In re Airlift Int'l., Inc.)*, 761 F.2d 1503 (11th Cir. 1985)

15.     *In re Murray Industries, Inc.*, 110 B.R. 585 (Bankr. M.D. Fla. 1990)

16.     *In re The Grand Union Co.*, 266 B.R. 621 (Bankr. N.J. 2001)

17.     *In re Right Time Foods, Inc.*, 262 B.R. 882 (Bankr. M.D. Fla. 2001)

18.     *Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta)*, 789 F.2d 1530 (11th Cir. 1986)

19.     *In re Edwards Mobile Homes Sales, Inc.* 119 B.R. 857 (Bankr. M.D. Fla. 1990)

20.     *In re Surfside Resort and Suites, Inc.*, 344 B.R. 179 (Bankr. M.D. Fla. 2006)

21.     *Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.)*, 84 F.3d 1364 (11th Cir. 1996)

22.     *In re Martin Brothers Toolmakers, Inc.*, 796 F.2d 1435, 1439 (11th Cir. 1986)

23.     *In re Government Securities Corp.*, 101 B.R. 343 (Bankr. S.D. Fla 1989)

24.     *In re El Paso Refinery, L.P.*, 220 B.R. 37 (Bankr. W.D. Tex. 1998)

25. *In re Dana Corp.*, 2007 WL 4105714 (Bankr. S.D. N.Y. 2007)

26. *U.S. Home Corp. v. Suncoast Utilities, Inc.*, 454 So. 2d 601, 604 (Fla. 2d DCA 1984)

27. *Marshall Const. Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So. 2d 845, 848 (Fla. 1st DCA 1990)

28. *Adsit Co., Inc. v. Gustin*, 874 N.E. 2d 1018 (Ind. Ct. Ap. 2007)

## VII.   <u>Core Proceeding</u>

This is a core proceeding and Winn-Dixie consents to the jurisdiction of the Court and the entry of final orders or judgments by the Court.

## VIII.   <u>Settlement</u>

The parties have made a good faith endeavor to settle the matter and have been unable to do so.

SMITH HULSEY & BUSEY

By    <u>/s/ *Allan E. Wulbern*    </u>
       Stephen D. Busey
       Allan E. Wulbern

Florida Bar Number 175511
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Counsel for Winn-Dixie

## <u>EXHIBIT A</u>

Page and Line Designations from
<u>August 28, 2008 Deposition of William Varney</u>

Page 5, Lines 7-16
Page 9, Line 20 – Page 15, Line 16
Page 16, Line 19 – Page 19, Line 8
Page 46, Lines 9-16
Page 53, Lines 5-20
Page 54, Lines 7-15
Page 56, Lines 12-19
Page 60, Lines 10-18
Page 63, Lines 14-20
Page 64, Line 21 – Page 65, Line 2
Page 69, Lines 4-11
Page 88, Lines 11-23
Page 100, Lines 5-11
Page 113, Line 19 – Page 115, Line 5
Page 120, Lines 10-15
Page 122, Line 20 – Page 124, Line 14
Page 127, Lines 5-11
Page 127, Line 19 – Page 128, Line 5
Page 129, Lines 16-24
Page 131, Lines 12-19
Page 132, Line 22 – Page 133, Line 8

Page and Line Designations from
<u>August 28, 2008 Deposition of Lawrence Ivan</u>

Page 4, Lines 7-19
Page 5, Line 17 – Page 8, Line 5
Page 8, Lines 15-22
Page 8, Line 24 – Page 9, Line 17
Page 14, Line 17 – Page 17, Line 5
Page 21, Line 16 – Page 22, Line 18
Page 23, Line 21 – Page 24, Line 1
Page 24, Line 7 – Page 25, Line 8
Page 29, Line 19 – Page 30, Line 21
Page 34, Lines 8-19
Page 37, Line 21 – Page 42, Line 22
Page 51, Line 22 – Page 55, Line 5
Page 57, Line 15 – Page 58, Line 1
Page 66, Lines 4-8

Page 67, Line 17 – Page 70, Line 20
Page 71, Line 8 – Page 72, Line 2
Page 72, Line 12 – Page 73, Line 12
Page 76, Lines 11-21
Page 81, Lines 12-16


September 18, 2008 Deposition
of Bennett Nussbaum
(All)

## **Certificate of Service**

I certify that a copy of the foregoing has been furnished by CM/ECF notification to Richard R. Thames, Esq., Stutsman Thames & Markey, 50 North Laura Street, Suite 1600, Jacksonville, Florida 32202 on this 22nd day of September, 2008.


                    /s/ *Allan E. Wulbern*
                         Attorney

618893.3