# ORIGINAL

1

```
 1           IN THE UNITED STATES BANKRUPTCY COURT

 2            FOR THE MIDDLE DISTRICT OF FLORIDA

 3                  JACKSONVILLE DIVISION

 4
     In re:                  )
 5                           )  Case No. 05-03817-3FI
                             )
 6      WINN-DIXIE STORES,INC., )  Chapter 11
        et al.,              )
 7                           )
                             )  Jointly Administered
 8            Debtors.       )

 9

10                    - - -

11

12        TELEPHONE DEPOSITION OF LARRY IVAN

13

14      DATE:      September 22, 2008 at 3:45 p.m.

15      PLACE:     Eastman & Smith, Ltd.
                   One SeaGate, 24th Floor
16                 Toledo, Ohio

17      REPORTER:  Casey G. Schreiner, RMR-RDR
                   Notary Public
18

19                    - - -

20

21

22

23

24
```


■ COLLINS REPORTING SERVICE, INC.

Inns of Court Building ▪ 405 N. Huron St. ▪ Toledo, OH 43604
Tel: 419-255-1010 ▪ Fax: 419-244-8222 ▪ collinsreporting.com

1  APPEARANCES:

2        On behalf of Winn Dixie:

3                    SMITH, HULSEY & BUSEY, L.P.A.:
                    Allan E. Wulbern (via telephone)
4                    225 Water Street, Suite 1800
                    Jacksonville, Florida 32202
5                    (904) 359-7700

6

        On behalf of Consolidated Biscuit Company:

7

                    STUTSMAN, THAMES & MARKEY, P.A.:
8                    Richard R. Thames (via telephone)
                    50 North Laura Street, Suite 600
9                    Jacksonville, Florida 32208
                    (904) 358-4000

10

                        and

11

                    EASTMAN & SMITH, LTD.:
12                    Henry N. Heuerman
                    One Seagate, 24th Floor
13                    Toledo, Ohio 43600
                    (419) 241-6000

14

15                        - - -

16

17

18

19

20

21

22

23

24

1
## I N D E X

2
### EXAMINATION

Witness Name                                        Page   Line

3  LARRY IVAN
       Examination By Mr. Wulbern ............. 4      7

4     Examination By Mr. Thames ............. 44     5
       Examination By Mr. Heuerman ........... 49     21

5     Re-Examination By Mr. Wulbern ......... 51     13
       Re-Examination By Mr. Heuerman ........ 52     8

6     Re-Examination By Mr. Wulbern ......... 53     9

7
### EXHIBITS

Exhibit      Description                         Page   Line

8  EX 1       Request of CBC for Payment of an    4      20
              Administrative Expense Claim

9  EX 2       Bakery Feeds Checks with ....... 10     16
              documentation

10  EX 3       Proof of Claim ................. 10     22

    EX 4       E-mail - Sabatino to Lauck - ... 13     20
11              7-11-06

    EX 5       Bills of Lading w/ Checks ...... 53     20

12
### OBJECTIONS

13  By                                          Page   Line
    Mr. Thames ............................. 6      10

14  Mr. Thames ............................. 29     18
    Mr. Wulbern ............................ 44     11

15

16                                - - -

17

18

19

20

21

22

23

24

```
 1                          LARRY IVAN,
 2   a Witness herein, called as if upon Examination, was
 3   by me first duly sworn, as hereinafter certified,
 4   deposed and said as follows:
 5                          MR. HEUERMAN:  The witness is
 6             sworn.
 7                          EXAMINATION
 8   BY MR. WULBERN:
 9        Q.    Okay.  Thank you.  Mr. Ivan, will you
10   please -- do you have the copies of the documents that
11   I e-mailed to Mr. Heuerman this morning?
12                          MR. HEUERMAN:  Yes, he does.
13   BY MR. WULBERN:
14        Q.    And would you pick up a copy of the
15   request for administrative expense claim?
16        A.    Got it.
17        Q.    Okay.  And while I'm thinking of it, we
18   would ask the court reporter to mark this as Exhibit 1
19   to this deposition.
20                          (Court Reporter marked
21             Deposition Exhibit 1.)
22   BY MR. WULBERN:
23        Q.    Thank you.  Mr. Ivan, would you turn to
24   Exhibit C of the administrative expense claim?
```

1          A.     I have.

2          Q.     What is Exhibit C?

3          A.     It is ingredients with a unit price,

4    ending inventory and total value.

5          Q.     Okay.  Are these ingredients that

6    Consolidated purchased after Consolidated purchased

7    the plant and which it had on hand after Consolidated

8    terminated the contract?

9          A.     Yes.

10         Q.     Did Consolidated dispose of these

11   agreements -- ingredients?

12         A.     Yes.

13         Q.     When?

14         A.     Various times.  A lot of them were in

15   June, July of 2006, the majority of them.

16         Q.     After Consolidated -- did Consolidated

17   close the Valdosta packaging plant in December of

18   2005?

19         A.     Late December, early January of 2006,

20   yes.

21         Q.     What efforts did Consolidated take to

22   protect the ingredients from spoilation?

23         A.     We stored them in the storage conditions

24   as we did while we were running, and just took general

1 care of the ingredients.

2      Q.    Did Consolidated maintain power at the

3 Valdosta plant after they closed the plant?

4      A.    I believe we did.  I don't know that for

5 sure.  I know we had security on site.

6      Q.    Did Consolidated -- did the items that

7 Consolidated had kept refrigerated prior to the

8 packaging agreement stay refrigerated after

9 Consolidated terminated the packaging agreement?

10                MR. THAMES:  Object to form.

11                THE WITNESS:  I don't know the

12           answer to that.

13 BY MR. WULBERN:

14      Q.    Are there ingredients on this list,

15 Exhibit C to the administrative expense claim, that

16 would have required refrigeration?

17      A.    I do not see any items that I know for

18 sure require refrigeration.

19      Q.    Does margarine require refrigeration?

20      A.    It can be stored at ambient, depending on

21 the type of margarine that it is.

22      Q.    Does cheese require refrigeration?

23      A.    No.

24      Q.    Do the pastry fillings require

1  refrigeration?

2          A.    No.

3          Q.    When you say "ambient" temperature, what

4  do you mean by the term "ambient"?

5          A.    The temperature of a dry-goods warehouse.

6          Q.    Does a dry-goods warehouse maintain a

7  regulated temperature?

8          A.    No.  Hotter in the summer, colder in the

9  winter.

10          Q.    Margarine can be kept in a hot warehouse?

11          A.    Depending on the type of margarine.  All

12  margarine does not require refrigeration.

13          Q.    How about butter?

14          A.    I don't know.  It may.  I don't know for

15  sure.

16          Q.    Did Consolidated make any efforts to sell

17  any of the ingredients that's on Exhibit C to

18  Consolidated's request for payment of administrative

19  expenses?

20          A.    Yes, we did sell much of that

21  ingredients.

22          Q.    To whom did you sell the ingredients?

23          A.    To Bakery Feeds, which is an animal-feed

24  processor.

1    Q.    When did Consolidated sell the
2  ingredients to Bakery Feeds?
3    A.    February of '06.
4    Q.    Prior to -- did Consolidated attempt
5  to -- make any attempts to sell the ingredients that
6  are listed on Exhibit C of the administrative expense
7  claim to any other food manufacturers?
8    A.    Not to my knowledge, no.
9    Q.    Why not?
10   A.    I can't answer that.  I don't know.
11   Q.    And do you know whether -- whether a food
12  processor would have purchased any of the ingredients
13  on Exhibit C to the administrative expense claim?
14   A.    I'm sorry, could you ask the question
15  again?
16   Q.    Do you know whether a food processor
17  would have been willing to purchase any of the
18  ingredients listed on Exhibit C to the administrative
19  expense claim?
20   A.    I don't know if they would have or would
21  not have.
22   Q.    Is that because you all didn't try to
23  sell them to a food processor?
24   A.    That's correct.

1        Q.    How much did Consolidated receive from

2  Bakery Feeds for the ingredients listed on Exhibit C

3  to the administrative expense claim?

4        A.    Approximately 3200 dollars.

5        Q.    Where are you getting that information?

6        A.    Off of -- I'm sorry.  No, that's wrong.

7  I'm getting the information from the two Bakery Feeds

8  invoices.  I didn't subtract out what the freight cost

9  was.  So one invoice was 614 dollars, the other one is

10  363 dollars, so it's more like a thousand dollars.

11        Q.    And are you looking at the documents

12  Bates stamped CBC 1335 and 1336?

13        A.    Yes.

14        Q.    Do you see the next document, CBC 1337?

15        A.    Yes.

16        Q.    And is that document another payment

17  received from Bakery Feeds?

18        A.    Yes, it is.

19        Q.    Does CBC 1337 represent proceeds from the

20  sale of the ingredients listed on Exhibit C of the

21  administrative expense claim?

22        A.    I don't believe so, no.

23        Q.    What does Exhibit C reflect?  I mean,

24  I'm -- sorry, let me restart that question.

1          What did Consolidated sell to Bakery

2    Feeds that's evidenced by the receipt Bates stamped

3    CBC 1337?

4          A.    We were still in operation; we were still

5    manufacturing product in December.  So it would have

6    been scrapped -- scrap product, the start of a

7    production run, the end of a production run.  That's a

8    normal course of the baking business.

9          Q.    What is Bakery Feeds?

10         A.    Bakery Feeds is a company that processes

11   scrap and obsolete bakery items into animal feed.

12                   MR. WULBERN:  Would you give, or

13               take, documents Bates stamped CBC 1335

14               and 1336 and have the court reporter mark

15               those two documents as Exhibit 2.

16                   (Court Reporter marked

17               Deposition Exhibit 2.)

18                   MR. WULBERN:  And would you also

19               give Mr. Ivan what is a proof of claim,

20               I'd like to have that document marked as

21               Exhibit 3.

22                   (Court Reporter marked

23               Deposition Exhibit 3.)

24                   THE WITNESS:  Okay.

1  BY MR. WULBERN:

2          Q.      If you would turn to Exhibit A1 to

3  Exhibit 3.

4          A.      Okay.

5          Q.      Is Exhibit A1 a list of the ingredients

6  that Consolidated purchased from Winn-Dixie?

7          A.      Yes.

8          Q.      Did Consolidated dispose of these

9  ingredients?

10         A.      Yes.

11         Q.      When did Consolidated dispose of the

12  ingredients that it purchased from Winn-Dixie?

13         A.      In that same February of 2006 time frame,

14  unless there was some risk of -- of infestation or

15  molding, you know, we would have -- we would have

16  disposed of it sooner than that.  But I'm not aware of

17  that being the case.

18         Q.      Can you tell from Exhibit 2 which

19  ingredients Consolidated sold under Exhibit A1 of the

20  request for -- of the proof of claim and -- as opposed

21  to the ingredients listed on Exhibit C to the request

22  for administrative expense claim?

23         A.      No, I can't distinguish between the two

24  on Exhibit 2.

1    Q.    Has Consolidated credited Winn-Dixie for

2  the proceeds from the sale of the ingredients to

3  Bakery Feeds?

4    A.    I don't -- I don't know if we've done

5  that.  It's clearly our intention to do that.

6    Q.    Well, under which claim would

7  Consolidated credit Winn-Dixie?

8    A.    I don't know.

9    Q.    Is that because you can't tell which --

10  what portion of the proceeds go to the prepetition

11  claim and what proceeds go to the administrative

12  expense claim?

13    A.    That's correct.

14    Q.    Had all the ingredients listed on Exhibit

15  C to the request for administrative expense claim

16  spoiled in February of 2006?

17    A.    I don't know if any of them spoiled or

18  not.  Some have a much longer shelf life than others.

19    Q.    Do you know if any of the ingredients

20  listed on Exhibit A1 to the proof of claim had spoiled

21  by the time -- by February of 2006?

22    A.    I don't know.

23    Q.    Does Consolidated know whether any of the

24  ingredients listed on Exhibit C to the administrative

1  expense claim or Exhibit A1 to the proof of claim had

2  spoiled by the end of February of 2006?

3          A.    I'm not aware of anyone that would have

4  that knowledge.

5                        MR. WULBERN:  Hank, at the back

6                  of the documents that I e-mailed to you

7                  with the invoices, there were some

8                  e-mails.

9                        MR. HEUERMAN:  Yes.

10                       MR. WULBERN:  Will you pull

11                 those out?

12                       MR. HEUERMAN:  Pages 1370

13                 through 1372?

14                       MR. WULBERN:  Yes.

15                       MR. HEUERMAN:  Okay.

16                       MR. WULBERN:  And will you give

17                 them to the court reporter to mark as

18                 Exhibit 4 to the deposition?

19                       MR. HEUERMAN:  Okay.

20                       (Court Reporter marked

21                 Deposition Exhibit 4.)

22                       THE WITNESS:  Okay.

23  BY MR. WULBERN:

24          Q.    Mr. Ivan, have you seen the e-mails that

1  are Bates stamped as 1370 through 1372?  I should say

2  have you ever seen these e-mails?

3       A.    Yes.

4       Q.    Can you tell me what the purpose of these

5  e-mails were?

6       A.    The purpose of the e-mails was to

7  determine what the value of the packaging material

8  was.

9       Q.    And what did Consolidated do to determine

10  what the value of the packaging materials was?

11       A.    Made a request to a supplier to tell us

12  what they would pay us for it.

13       Q.    Who was that supplier?

14       A.    Smurfit.

15       Q.    What is Smurfit Supply?

16       A.    Smurfit-Stone, they're a packaging

17  supplier, corrugated, film.

18       Q.    What would Smurfit do with the packaging

19  materials?

20       A.    I think it was intended that this would

21  be the scrap value, the recycled value.

22       Q.    So Smurfit would recycle the packaging

23  materials?

24       A.    Correct.

1       Q.    Who else did Consolidated consult with
2  about the value of the packaging materials?
3       A.    I don't know.
4       Q.    Did Consolidated consult with anyone else
5  other than Smurfit about the value of the packaging
6  materials?
7       A.    I don't know that.  I don't know.
8       Q.    Before Consolidated sold the ingredients
9  to Bakery Feeds, did Consolidated give notice to
10  Winn-Dixie that Consolidated was going to sell those
11  ingredients to Bakery Feeds?
12       A.    I'm not aware that we did give notice.  I
13  don't know that we didn't, but I'm not aware that we
14  did.
15       Q.    Would anyone at Consolidated know that?
16       A.    I don't know.
17       Q.    Turn to Exhibit C of Consolidated's
18  request for administrative -- no, Exhibit B, I'm
19  sorry.  Please turn to Exhibit B of Consolidated's
20  request for administrative expense claim.
21       A.    Okay.
22       Q.    Now, is this a list of the packaging
23  material that Consolidated purchased after Winn-Dixie
24  filed for bankruptcy?

1        A.    Yes.

2        Q.    Did Consolidated dispose of these

3    packaging materials?

4        A.    Yes.

5        Q.    How did Consolidated dispose of the

6    packaging materials listed on Exhibit B to the

7    administrative expense claim?

8        A.    To Smurfit-Stone and Georgia-Pacific.

9        Q.    When did Consolidated -- you told me

10   about Smurfit-Stone.  What materials did Consolidated

11   send to Georgia-Pacific?

12       A.    Corrugated -- old corrugated boxes.

13       Q.    Can you tell from Exhibit B to the

14   administrative expense claim which of these items

15   would be corrugated boxes?

16       A.    Yes.  It would be preceded with a

17   C-O-N --

18       Q.    Okay.

19       A.    -- for "container."

20       Q.    All right.  Other than the containers

21   listed on Exhibit B to the administrative expense

22   claim, did Consolidated sell everything else on this

23   list to Smurfit?

24       A.    Yes.

1      Q.    So none of the items listed on Exhibit B

2  to the administrative expense claim went to a

3  landfill, then?

4      A.    No.

5      Q.    Were you aware of that fact when I took

6  the deposition of Mr. Varney up in Ohio a couple weeks

7  ago?

8                    MR. HEUERMAN:   Which fact?

9                    THE WITNESS:   I don't understand

10            the question.

11  BY MR. WULBERN:

12      Q.    Were you aware that none of the materials

13  listed on Exhibit B of the administrative expense

14  claim were ever delivered to a landfill by

15  Consolidated?

16      A.    Yes, I was aware of that.

17      Q.    Do you recall in Mr. Varney's deposition,

18  he said that -- Mr. Varney said that he believed that

19  the packaging materials had been taken to a landfill?

20      A.    I don't remember that, no.

21      Q.    Okay.  And we have the last set of

22  documents for the last exhibit, would be the documents

23  Bates stamped Exhibits 1338 through 1369.

24      A.    Okay.

1          Q.     Would you look through these documents

2    and tell me if any of the documents that are listed in

3    Exhibit 5 do not relate to the disposition of

4    Winn-Dixie's -- of packaging materials that were

5    dedicated to Winn-Dixie?

6          A.     On the document marked CBC 1349 --

7          Q.     Yes, sir?

8          A.     -- there were some items on there that

9    did not belong to Winn-Dixie.

10         Q.     And which items on CBC -- what is CBC

11   1349?

12         A.     It's a bill of lading for a shipment to

13   Smurfit-Stone in Jacksonville, Florida.

14         Q.     And is this for a shipment of

15   food-packaging materials or finished product?

16         A.     Food-packaging materials.

17         Q.     Which of the food-packaging materials

18   listed on CBC 1349 were not Winn-Dixie's packaging

19   materials?

20         A.     The item -- excuse me.  The items marked

21   NP Frosted Blueberry, NP Frosted Apple, Purity Apple

22   TP, and Purity Strawberry TP, those were not

23   Winn-Dixie product, packaging.

24         Q.     How much did Smurfit pay Consolidated for

1   the Winn-Dixie packaging materials on CBC 1349?

2       A.    Well, we would have to do some

3   calculations to determine that.  We have the price per

4   ton and we have the weight of the packaging material,

5   so we could determine what portion of it was for

6   Winn-Dixie packaging and which portion was not.

7       Q.    At the end of the deposition, I would

8   like to go ahead and get on the record which are

9   Winn-Dixie and which are not, so we can all be on the

10  same page.

11       Okay.  Keep on going, and tell me if

12  there are any other bills of lading that are documents

13  in Exhibit 5 that are not -- or include packaging

14  materials that are not Winn-Dixie's.  When I say

15  "Winn-Dixie's," I meant dedicated to Winn-Dixie.

16       A.    Okay.  Document CBC 1350.

17       Q.    And what is CBC 1350?

18       A.    Bill of lading for shipment to

19  Smurfit-Stone, Jacksonville, Florida.

20       Q.    Of what?

21       A.    Of food-packaging material.

22       Q.    Which of the food-packaging materials

23  listed on CBC 1350 were not dedicated to Winn-Dixie?

24       A.    The FS Vanilla Wafers.  And then

…

1    document -- shall I go on?

2        Q.    Yes.

3        A.    Document CBC 1351, Fireside Vanilla

4    Wafers.

5        Q.    And 1351 is another bill of lading to

6    Smurfit-Stone?

7        A.    Of packaging material, yes.

8        Q.    Packaging material, okay.  Is that the

9    only material on CBC 1351 that was not dedicated to

10   Winn-Dixie or was not an Oven Gem material?

11       A.    I believe the Thrifty Maid was also a

12   Winn-Dixie label --

13       Q.    Okay.

14       A.    -- which is on that document, CBC 1351.

15       Q.    Okay.  So Fireside is the only -- the

16   only material that's not dedicated to Winn-Dixie?

17       A.    On that bill of lading, yes.

18       Q.    Okay.  Keep on going.

19       A.    CBC 1352, Snappy Cinnamon Graham, the

20   Honey Graham Snappy, and the BB Frosted Cinnamon TP

21   and the BB Frosted Fudge TP.

22             I don't know about the other items, the

23   two Fastco items and the Centrella.  I'm not familiar

24   with those labels.

1    Q.    Let's stop here.  And would you take a

2  pen and strike through the items of CBC 1352 that were

3  not dedicated to Winn-Dixie.

4    A.    Okay.  The ones I know for sure are not

5  dedicated to Winn-Dixie would be the Honey Graham

6  Snappy, the Snappy Cinnamon Graham, and the last two

7  items, BB Cinnamon Toaster Pastry and BB Frosted Fudge

8  Toaster Pastry.  I don't know about the other three.

9    Q.    So have you struck through those four?

10    A.    Yes.

11    Q.    Let's go back to CBC 1351 and will you

12  strike through the Fireside Vanilla Wafers?

13    A.    Yes, I did.

14    Q.    Okay.  On 1350, there is another FS

15  Vanilla Wafers that needs to come out.

16    A.    Yes.

17    Q.    And then on CBC 1349, the last four

18  items, let's strike those out, and confirm that those

19  are not Winn-Dixie packaging materials.

20    A.    (Witness complies with request.) Yes, I

21  do confirm that, and I struck them out.

22    Q.    Super.  Okay.  We left off at 1352.  Are

23  there any other non-Winn-Dixie packaging materials on

24  any of the remainder of Exhibit 5?

22

1          A.     On document CBC 1353, the Snappy

2    Saltines.

3          Q.     Please strike through Snappy Saltines.

4          A.     I have.  I'm not familiar with the name

5    Pure Maid or Family Choice, so I'm not sure whether

6    those are Winn-Dixie packaging or not.

7          Q.     Okay.  Will you look at CBC 1354, please.

8          A.     Okay.

9          Q.     Are there any non-Winn-Dixie materials on

10   CBC 1354?

11         A.     Both items are not Winn-Dixie on CBC

12   1354.

13         Q.     Are there any Winn-Dixie items on CBC

14   1355?

15         A.     Snappy Unsalted cartons.

16         Q.     Are there any non-Winn-Dixie items on CBC

17   1356?

18         A.     I believe those are all Winn-Dixie.

19         Q.     Are there any non-Winn-Dixie items on CBC

20   1357?

21         A.     The first two items on CBC 1357 are not

22   Winn-Dixie.  I'm not familiar with the Fastco name,

23   the last item.

24         Q.     Are there any non-Winn-Dixie packaging

1   materials on CBC 1358?

2        A.    The two items marked Snappy Saltines and

3   Snappy Unsalted are not Winn-Dixie items.

4        Q.    CBC 1359 says bales of cardboard.

5        A.    Right.

6        Q.    Are these -- is this packaging materials

7   that was dedicated to Winn-Dixie?

8        A.    I don't know that.  I can't tell from

9   this.

10       Q.    If you look at CBC 1360, can you tell

11   whether the items on this bill of lading are dedicated

12   to Winn-Dixie?

13       A.    I can't tell that from this information.

14       Q.    Would you look at CBC 1361 and tell me

15   whether the items listed on this bill of lading are

16   packaging materials dedicated to Winn-Dixie?

17       A.    This is a tough one to answer.  I -- I

18   can't tell, but the information is there to give us

19   the answer.  I just don't know whether this is

20   dedicated to Winn-Dixie or not.  Because this has --

21   this item -- or document CBC 1361 has item numbers

22   next to the trays, and we could track, for example,

23   S-778 and determine what product that tray is, what

24   product it goes to.

1          Q.     What would it take to track that
2     information?
3          A.     We would have to go back into our system
4     and see if we could identify what that tray was used
5     for.
6          Q.     But without going to your system, you
7     can't identify whether the items on Exhibit 1361 were
8     dedicated to Winn-Dixie, then?
9          A.     That's correct.
10         Q.     Would you look at Exhibit 1362 and tell
11    me whether any of the items on this bill of lading are
12    dedicated to Winn-Dixie?
13         A.     They're both dedicated to Winn-Dixie.
14         Q.     Would you look at the bill of lading
15    Bates stamped CBC 1363 and tell me whether any of
16    these item are dedicated to Winn-Dixie?
17         A.     I cannot tell.
18         Q.     Would you look at the document Bates
19    stamped CBC 1364 and tell me whether any of these
20    items were dedicated to Winn-Dixie?
21         A.     Again, the information is there to make
22    the determination.  I just don't -- I just don't have
23    that knowledge right here.
24         Q.     Is that because there are codes there --

1          A.      Correct.

2          Q.      -- that would allow you to make that

3    determination if you had access to Consolidated's

4    computer system?

5          A.      That's correct, yes.

6          Q.      Will you look at CBC 1365 and tell me

7    whether any of these items on this bill of lading are

8    items that are dedicated to Winn-Dixie?

9          A.      The Big Sixty Trays are, and the Old

10   Fashion Trays are, I'm familiar with those names.

11   Again, I don't have the knowledge to know whether

12   T-484 is specific to Winn-Dixie or not.

13         Q.      If we look at the bill of lading Bates

14   stamped CBC 1366, tell me whether any of these items

15   are dedicated to Winn-Dixie.

16         A.      I can't tell by looking at this

17   information, this bill of lading.

18         Q.      Please look at the bill of lading Bates

19   stamped CBC 1367 and tell me if any of these items are

20   dedicated to Winn-Dixie.

21         A.      I know the first two items are not

22   dedicated to Winn-Dixie.  I'm not sure about the

23   Fastco item.  Do you want me to strike those out?

24         Q.      Yes, please.

1      A.      (Witness complies with request.)

2      Q.      Please look at CBC 1368 and tell me

3  whether any of the items listed on this bill of lading

4  were dedicated to Winn-Dixie.

5      A.      I believe the items that were not

6  dedicated to Winn-Dixie are the Jumbo Chocolate Royal

7  Pies and the Royal Cake Chocolate Pie and Royal Cake

8  Jumbo Banana Pie.

9              I need to -- I need to qualify that

10  answer.  We may have purchased this packaging material

11  from Winn-Dixie at the time we made the acquisition,

12  so I'm not sure -- I'm not sure where that falls into

13  the category of being dedicated or not dedicated.

14      Q.      Why do you believe that these packaging

15  materials might have been purchased from Winn-Dixie?

16      A.      Because these are for items that we did

17  not have the capability to make at any of out other

18  plants.  So it seems to me that these may have --

19  these may have come with the acquisition of the plant.

20  But we don't have the ability to make pies, these --

21  these type pies in any of our other plants so --

22      Q.      But you don't know whether they were --

23  whether Winn-Dixie or Crackin' Good sold these

24  materials to Consolidated or not, do you?

1    A.    I don't know whether they did or not, but

2  it seems logical to me that maybe they did.

3    Q.    Were any of the materials that we went

4  through earlier and scratched out, were any of those

5  materials that Consolidated purchased from Crackin'

6  Good or Winn-Dixie?

7    A.    I don't believe so, but I can't say with

8  complete certainty.

9    Q.    Okay.  Please turn to CBC 1369 and tell

10  me whether any of the items listed on this bill of

11  lading were either not dedicated to Winn-Dixie or not

12  purchased from Crackin' Good/Winn-Dixie?

13    A.    Snappy Unsalted.  That's the only item on

14  there that I don't -- I don't believe belonged to

15  Winn-Dixie.

16    Q.    How much did Smurfit pay Consolidated for

17  the packaging materials listed on Exhibit B to the

18  administrative expense claim?

19    A.    Ask the question again, please.

20    Q.    How much did Smurfit pay Consolidated for

21  the packaging materials listed on Exhibit B to the

22  administrative expense claim?  Let me restate the

23  question.

24    A.    Yeah.  I'm not sure I can answer the

1    question.

2         Q.    Okay.  Did Smurfit buy any of the

3    packaging materials listed on Exhibit B to the

4    administrative expense claim?

5         A.    I believe they -- yes.

6         Q.    Which ones?

7         A.    I believe they bought -- paid for

8    everything, bought everything that's on Exhibit B,

9    with the -- with the exception of possibly some of the

10   containers that were sold to Georgia-Pacific.

11        Q.    Okay.  How much did Smurfit pay

12   Consolidated for the items on Exhibit B that Smurfit

13   purchased from Consolidated?

14        A.    I don't -- I don't know that.  I can't

15   answer that question.

16        Q.    Why not?

17        A.    Because I just don't have the knowledge.

18   I just don't know what -- what they paid for Exhibit B

19   and what they paid for for those items that I deleted

20   off the bills of lading.

21        Q.    Can you -- did Smurfit buy any of the

22   items on Exhibit A2 to Consolidated's amended proof of

23   claim?

24                    MR. HEUERMAN:  Did you say

1           Exhibit A?

2                   MR. WULBERN:   Exhibit A2 of

3           Consolidated's amended proof of claim.

4                   THE WITNESS:   Okay.   I have A2

5           now.   Please ask the question again.

6                   MR. WULBERN:   Will the court

7           reporter read the question back, please.

8                   (Court Reporter read back the

9           following:

10                  "Question:   Did Smurfit buy any

11          of the items on Exhibit A2 to

12          Consolidated's amended proof of claim?")

13   BY MR. WULBERN:

14          Q.   Let me ask the question over again.

15               Did Smurfit buy any of the materials

16   listed on Exhibit A2 of Consolidated's amended proof

17   of claim?

18                  MR. THAMES:   Object.

19                  THE WITNESS:   Yes.

20   BY MR. WULBERN:

21          Q.   Which ones?

22          A.   Again, I cannot answer that.   I don't

23   know.

24          Q.   Does Consolidated intend to credit

1    Winn-Dixie for the amounts Consolidated received on

2    the sale of the items listed on Exhibit A2 of

3    Consolidated's amended proof of claim?

4        A.    Yes.

5        Q.    How much is Consolidated going to credit

6    Winn-Dixie for the items listed on Exhibit A2 of

7    Consolidated's amended proof of claim?

8        A.    I don't know.

9        Q.    How is Consolidated going to credit

10   Winn-Dixie for the proceeds from the sale of the items

11   on Exhibit A2 of Consolidated's amended proof of

12   claim?

13       A.    I guess we would err on the side of

14   caution and make sure that there was a fair credit

15   issued.  We're not talking about large sums of money

16   here, relatively speaking.

17       Q.    How much money are we talking about?

18       A.    As it relates to Smurfit-Stone?

19       Q.    As it relates to any of the proceeds, all

20   of the proceeds that Consolidated received from the

21   sale of the items on Exhibit A2 of Consolidated's

22   amended proof of claim?

23       A.    Well, we have a check from Smurfit-Stone

24   for CBC Exhibit 1348, 2,800 dollars -- no, I'm sorry.

```
 1   Where is the Smurfit check at?
 2              Okay.  We have a Smurfit -- CBC 1343,
 3   which is a check in the amount of 3,039 dollars.
 4        Q.    Are those the only proceeds from the
 5   sale -- the sale of the items listed on Exhibit A2 of
 6   Consolidated's administrative expense?  I mean, of
 7   Consolidated's amended proof of claim.
 8        A.    At this point just CBC 1343, and then
 9   also CBC 1344.
10        Q.    How much was that check for?
11        A.    18,302 dollars.  Still looking here.
12   That looks like the only two.
13        Q.    Well, are there any other checks that are
14   in -- let's look at the first check.  It's a check
15   from Georgia-Pacific.  It's Bates stamped CBC 1338 in
16   the amount of 912 dollars.
17        A.    Let me find that.
18        Q.    It should be on the front of Exhibit --
19        A.    Okay.
20        Q.    What is this?  What is CBC 1338?
21        A.    It's a check from Georgia-Pacific for
22   scrap corrugated.
23        Q.    What scrap corrugated did Georgia-Pacific
24   pay Consolidated for?
```

1           A.      For scrap corrugated that we disposed of.

2           Q.      Was any of that scrap corrugated included

3    in the items listed on Exhibit A2 of Consolidated's

4    amended proof of claim?

5           A.      I'm sure it was.

6           Q.      How much?

7           A.      I don't know.

8           Q.      Are any of the proceeds from the 912

9    dollar check from Georgia-Pacific proceeds from the

10   sale of corrugated listed on Exhibit B to

11   Consolidated's administrative expense claim?

12          A.      I can't determine that.

13          Q.      Why not?

14          A.      Because it's not broken out in the --

15   it's not identified in enough detail on the -- on the

16   checks, and I don't see corresponding bills of lading

17   to go with those.

18          Q.      Okay.   What about CBC 1339?   This is a

19   1,050 dollar check from Georgia-Pacific to

20   Consolidated.   Why did Georgia-Pacific give

21   Consolidated a check for 1,050 on September 15th,

22   2006?

23          A.      For scrap corrugated that they picked up.

24          Q.      Did Consolidated -- I'm sorry, did

1    Georgia-Pacific buy any of the scrap corrugated -- did

2    this check that is CBC 1339 pay for any of the scrap

3    corrugated listed on Exhibit A2 of Consolidated's

4    amended proof of claim?

5         A.    Well, again, I -- that's my assumption,

6    but it doesn't tell me that specifically on this -- on

7    document CBC 1339.

8         Q.    Do you assume that it also paid for some

9    of the corrugated materials on Exhibit B of

10   Consolidated's administrative expense claim?

11        A.    I assume it could have, yes.

12        Q.    But you don't know?

13        A.    I do not know.

14        Q.    Let's look at the document Bates stamped

15   CBC 1340.

16        A.    Okay.

17        Q.    And this is a check from Georgia-Pacific

18   dated September 12th, 2006, and the amount of -- in

19   the amount of $2,568.50.  Is this another check for

20   corrugated materials that Consolidated sold to

21   Georgia-Pacific?

22        A.    Yes.

23        Q.    And is this corrugated -- are these

24   corrugated materials listed on Exhibit A2 of

1    Consolidated's administrative -- let me start over

2    again.

3                    Does the check listed on -- shown on CBC

4    1340 pay for any of the corrugated materials

5    identified on Exhibit A2 of Consolidated's amended

6    proof of claim?

7            A.    It could.  I can't say for sure.

8            Q.    Could it pay for some of the corrugated

9    materials on Exhibit B to Consolidated's

10   administrative expense claim?

11           A.    Yes, it could.

12           Q.    If you look at CBC 1341, that is a check

13   for $1,125.50 from Georgia-Pacific to Consolidated.

14   Is this check for payment of any of the corrugated

15   materials on Exhibit B to Consolidated's

16   administrative expense claim?

17           A.    Could be.

18           Q.    Could it also be for payment of

19   corrugated materials on Exhibit A2 of Consolidated's

20   administrative expense claim?

21           A.    Could.

22           Q.    And, I'm sorry, Exhibit A2 of

23   Consolidated's amended proof of claim.

24           A.    It could.

1          Q.     But you just don't know, do you?

2          A.     Correct.  I do know that we scrapped all

3     of the corrugated rather than take it to a landfill,

4     so it certainly seems reasonable to me that this was

5     that packaging that was disposed of, recycled.

6          Q.     Is that true for the check that is Bates

7     stamped CBC 1342 in the amount of 948 dollars?

8          A.     Yes, that's true.

9          Q.     So this 948 dollar check could have paid

10    for corrugated materials on Exhibit B to the amended

11    proof of claim or Exhibit A2 of the -- I'm sorry.  Let

12    me start over again.

13               The 948 dollar check on document Bates

14    stamped CBC 1342 could have paid for materials listed

15    on Exhibit B to the administrative expense claim or

16    Exhibit A2 of Consolidated's amended proof of claim?

17         A.     Yes, it certainly could.

18         Q.     And again, you just don't know, though,

19    do you?

20         A.     No.

21         Q.     I don't know if we've talked about CBC

22    1343.  CBC 1343 is a November 10th, 2006, check in the

23    amount of -- let me start over again.

24               CBC 1343 is a November 10, 2006, check

1  from Smurfit-Stone to Consolidated Biscuit in the
2  amount of $3,039.42.
3              Is this check in payment of materials
4  listed on Exhibit B to Consolidated's administrative
5  expense claim?
6         A.    It could be, yes.
7         Q.    Could it also be in payment of materials
8  listed on Exhibit A2 in Consolidated's amended proof
9  of claim?
10        A.    It could, yes.
11        Q.    And the next check is CBC 1344 in the
12 amount of $18,302.06 from Smurfit-Stone to
13 Consolidated Biscuit.  Is this check in payment of
14 materials listed on Exhibit B to Consolidated's
15 administrative expense claim?
16        A.    Could be.
17        Q.    Could it also be in payment of materials
18 listed on Exhibit A2 of Consolidated's amended proof
19 of claim?
20        A.    Could be, yes.
21        Q.    Did we already discuss CBC 1346?
22        A.    I don't know if we have or not.
23        Q.    Okay.  Well, CBC 1346 is a check in the
24 amount of 925 dollars from Smurfit-Stone to

1    Consolidated Biscuit.  Is this check in payment of

2    some of the materials listed on Exhibit B to

3    Consolidated's administrative expense claim?

4             A.    Could be.

5             Q.    Could it also be in payment of some of

6    the materials listed on Exhibit A2 of Consolidated's

7    amended proof of claim?

8             A.    Could be.

9             Q.    It could also be a payment of some

10   materials that weren't dedicated to Winn-Dixie, could

11   it have been?

12            A.    That's true.

13            Q.    Look at the document Bates stamped CBC

14   1347.

15            A.    Yes.

16            Q.    This is a check in the amount of

17   $1,881.90, dated November 10th, 2005, from

18   Smurfit-Stone to Consolidated Biscuit Company.

19            A.    Yes.

20            Q.    Is this check in payment of some of the

21   materials listed on Exhibit B to Consolidated's

22   administrative expense claim?

23            A.    No.

24            Q.    What is this check in payment for?

1        A.    This check is in payment for --

2   Smurfit-Stone was -- had a baler, kind of a

3   compactor/baler that we would recycle old corrugated

4   from ingredients and plastic trays that come in

5   corrugated boxes.  So they would -- we would bale that

6   up and then sell it to Smurfit-Stone through the

7   normal course -- just the normal course of business,

8   to prevent from taking it to the landfill.

9        Q.    Was this check in payment of old

10  corrugated that Consolidated shipped from the Valdosta

11  plant?

12       A.    No, it would have been old corrugated for

13  packaging and ingredients that came into the Valdosta

14  plant.

15       Q.    From where?

16       A.    From various suppliers, from carton

17  suppliers, from shortening suppliers, from whatever

18  suppliers would package their materials or ingredients

19  in corrugated boxes, and then as we would use the

20  ingredients or the packaging, we would recycle the

21  corrugated box that the packaging came in --

22       Q.    Okay.

23       A.    -- or the ingredients came in.

24       Q.    Will you look at the document Bates

1    stamped CBC 1348.

2         A.    Okay.

3         Q.    Is that also for old corrugated packaging

4    material from ingredients and supplies that were sent

5    to the Valdosta plant by third parties?

6         A.    Yes.

7         Q.    This is not related to Winn-Dixie's

8    packaging materials?

9         A.    Correct, it is not.

10        Q.    Is Consolidated going to credit -- let me

11   start over again.

12             Is Consolidated going to credit its

13   administrative expense claim for proceeds Consolidated

14   received on the sale of materials and ingredients?

15                       MR. THAMES:  Let me answer that,

16              Larry.

17                       We are going to give a credit to

18              Winn-Dixie.  We're going to make an

19              attempt at an allocation between the

20              prepetition claim and the post-petition

21              claim, but I think there's an

22              acknowledgement and awareness that some

23              sort of credit is due.  We just need to

24              crunch the numbers.

1          MR. WULBERN:  Well, when do I --

2     do I get to depose Mr. Ivan again and ask

3     him how he came up with the numbers?

4          MR. THAMES:  I'll lay it out for

5     you.  How's that?

6          MR. WULBERN:  It isn't going to

7     be good enough.

8          MR. THAMES:  It sure will.

9          MR. WULBERN:  It's a little

10    late.

11         MR. THAMES:  He's got to check,

12    Allan.  It's obviously a subset of the

13    checks for the disposition of ingredients

14    and packaging.  You can look at the bill

15    of lading, call out some of the items,

16    and you can come up with what is fairly

17    attributable to Winn-Dixie.

18         You can then -- then what we

19    will probably do is go through and look

20    at the value or amount of packaging and

21    ingredients listed on the proof of claim,

22    compare that to our -- the volume and

23    amount that's in our administrative

24    expense claim and come up with some sort

1    of fair allocation.

2              Or we might just say you can

3    have everything on these checks.  We'll

4    figure that out.  This is an

5    insignificant amount.

6              THE WITNESS:  That's what I was

7    alluding to.  Other than CBC 1347 and

8    1348, we might just be willing to give

9    the total credit.  When I said "err on

10   the side of caution," that's what I was

11   implying, was if -- if we can't make the

12   determination, then we'll just give them

13   credit for everything.

14             MR. WULBERN:  On both claims?

15             MR. THAMES:  Yes.

16             THE WITNESS:  Yes, on both

17   claims.

18             MR. THAMES:  And you'll know as

19   quickly as we make a determination, and

20   that will be before Thursday.

21             MR. WULBERN:  Okay.  We're going

22   to take a break, and I may be finished.

23   I just have to think about it.

24             THE WITNESS:  Okay.

```
 1                    (Pause.)
 2                    MR. WULBERN:  I have two
 3               questions left.  They may open up to a
 4               few more, but two basic questions.
 5     BY MR. WULBERN:
 6          Q.    Did Consolidated notify Winn-Dixie before
 7     Consolidated sold the materials listed on Exhibit A2
 8     of the amended proof of claim or Exhibit B to the
 9     administrative expense claim?
10          A.    I'm not aware of any notification.  They
11     were clearly aware that the material was there, but
12     I'm not aware of any notification.
13          Q.    Why did Consolidated Biscuit sell the
14     ingredients that's on Exhibit A1 to the amended proof
15     of claim and Exhibit C of the administrative expense
16     claim to Bakery Feeds?
17          A.    For two reasons:  One, to mitigate
18     Winn-Dixie's exposure; and secondly, it keeps it out
19     of the landfill.
20          Q.    So Consolidated mitigated Winn-Dixie's
21     exposure for what side of the claim for ingredients?
22     We have the administrative expense claim is for
23     463,488 dollars and the amended proof of claim is for
24     22,239 dollars --
```

1              MR. THAMES:  For ingredients.
2    BY MR. WULBERN:
3         Q.    -- for ingredients.  So that's 485,000
4    dollars that Consolidated wants to charge Winn-Dixie
5    for ingredients.
6              How much did Consolidated receive in
7    payment for 485,000 dollars' worth of ingredients?
8         A.    Well, I can't find the Bakery Feeds
9    checks.  There we go, maybe.
10        Q.    Exhibit 2.
11                  MR. HEUERMAN:  I think they got
12                  moved a little bit here in all the
13                  papers.
14                  THE WITNESS:  Okay.  Exhibit 2.
15                  About a thousand dollars.
16   BY MR. WULBERN:
17        Q.    Consolidated mitigated its damages by
18   selling 485,000 dollars in ingredients for a thousand
19   dollars.
20        A.    And we also avoided the expense of taking
21   it to the landfill.  So the answer is yes.
22                  MR. WULBERN:  I don't have any
23                  other questions.
24                  MR. THAMES:  I have a few,

1           because I'm not sure how that's going to

2           leave it.  I know what you intended, but

3           I just want to make sure it's clear.

4                    - - -

5                 EXAMINATION

6   BY MR. THAMES:

7        Q.    Mr. Ivan, Consolidated Biscuit has

8   produced all of the checks pertaining to the

9   disposition of leftover ingredients and packaging at

10  the Valdosta bakery facility, correct?

11                MR. WULBERN:   Object.

12                THE WITNESS:   Yes.

13  BY MR. WULBERN:

14       Q.    And those checks are the checks

15  identified as CBC 1335 through 134 -- 46, correct?

16  That included the two checks at 1347 and 1348, which

17  were for the old corrugated?

18       A.    Mine are all in disarray, but I believe

19  that to be true.

20                MR. WULBERN:   Hold on.  I want

21           to hear the question back again, because

22           I think you said "ingredients," and those

23           checks we just went through talked about

24           materials.

1                    MR. THAMES:  Ingredients and

2              packaging is what I intended to say.

3                    MR. WULBERN:  Okay.

4                    MR. THAMES:  But anyway let me

5              reask it, just in case.

6  BY MR. THAMES:

7        Q.    You produced all the checks for the

8  disposition of ingredients and packaging inventory

9  which remained at the Valdosta plant at the time of

10 this closure, correct?

11       A.    Yes.

12       Q.    And those are represented by check -- the

13 documents which were Bates stamped as CBC 1345 and

14 1346, correct?  1347 and 1348 relate to corrugated,

15 old corrugated cardboard?

16       A.    Well, I don't see a 1346.

17       Q.    That is the check for $975.79 for

18 boxboard cuttings.

19       A.    Okay.  I have a copy of that now, yes.

20 You're correct, yes.

21       Q.    And some of these checks are attributable

22 to packaging or ingredients not attributable to

23 Winn-Dixie, correct?

24       A.    Correct, yes.

1          Q.     And so the amount of credit which

2     Winn-Dixie would be entitled to for the disposition of

3     the ingredients and packaging is some sort of subset

4     of the checks we've identified as CBC 1335 through CBC

5     1346, correct?

6          A.     Correct.

7          Q.     And can you go back to the bill of lading

8     and perhaps carve out some of those payments to find

9     out how much of these checks are attributable to

10    Winn-Dixie and how much are to other customers?

11         A.     Yes.

12         Q.     All right.  When was Winn-Dixie invoiced

13    for the leftover ingredients and packaging?  Was that

14    the December 2005 time frame?

15         A.     I was not involved in that.  I don't

16    know.

17         Q.     Okay.

18         A.     I don't know that date for sure.

19         Q.     To your knowledge, all these ingredients

20    and packaging was available for Winn-Dixie to come

21    pick up, correct?

22         A.     That's correct.

23         Q.     And at any time prior to the disposition,

24    did Winn-Dixie make an offer or any attempt to come

1    pick up this packaging or ingredient inventory?

2         A.    I'm not aware of them making an attempt

3    to pick it up, inspect it, or do anything.

4         Q.    All right.  Is Consolidated Biscuit a

5    dealer of ingredients?

6         A.    No.

7         Q.    And does Consolidated Biscuit typically

8    sell ingredients to other food processors?

9         A.    No.

10        Q.    Does Consolidated Biscuit typically

11   purchase ingredients from other food processors?

12        A.    No.

13        Q.    Are chain of custody and sanitation

14   issues, are they implicated in the sale of ingredients

15   from one baker or food processor to another?

16        A.    Yes.  You have to be careful to make sure

17   that it's handled properly, and it's a -- that becomes

18   a very difficult task.  And then there's --

19        Q.    Is it good business practice for a baker

20   or food processor to buy sort of used ingredients from

21   other manufacturers?

22        A.    Not in my opinion.  We certainly don't do

23   it.

24        Q.    To your knowledge, is there even an

1  established market for used ingredients?

2        A.      Only to go into animal feed is the only

3  market I'm aware of.

4        Q.      Is the sale of ingredients between bakers

5  customary in the industry?

6        A.      No.  Not with Consolidated, for sure.

7        Q.      Did Consolidated Biscuit attempt to

8  utilize any of the leftover ingredients at any of its

9  other facilities?

10       A.      Yes.

11       Q.      And those are not included in the

12  administrative expense claim, correct?

13       A.      That's correct.

14       Q.      Were the leftover ingredients and

15  packaging materials good for anything other than scrap

16  at the time of the disposition?

17       A.      No.

18       Q.      Do the ingredients have a shelf life?

19       A.      Yes.

20       Q.      And might there be documents contained

21  within the documents that have been exchanged within

22  this litigation that would show the shelf life of some

23  of the ingredients?

24       A.      I don't know.  Very well could be.

1          Q.    All right.  Are you going to be able to

2    determine whether the power was left on at the

3    Valdosta plant through the sale -- to the point in

4    time when Consolidated Biscuit sold the plant?

5          A.    Yes, I can determine that.

6                     MR. THAMES:   Okay.  I don't have

7                any questions.  I may have opened the

8                door for Allan to follow up.

9                     MR. HEUERMAN:   I have a couple,

10               if I could ask Larry, since I'm not down

11               there to consult with Tim, do you

12               object --

13                     MR. THAMES:   Rick.

14                     THE WITNESS:   Rick.

15                     MR. HEUERMAN:   Excuse me.

16                     MR. THAMES:   Is that okay with

17               you, Allan?

18                     MR. WULBERN:   That's fine.  Just

19               don't tag-team me at trial.

20                          -  -  -

21                     EXAMINATION

22    BY MR. HEUERMAN:

23          Q.    Mr. Ivan, is rodent infestation and other

24    types of infestation a problem at commercial bakeries?

1          A.     Yes.   We -- especially the farther south

2     you go, the bigger the issue is.

3          Q.     What about mold, is that also a problem?

4          A.     Yes.

5          Q.     And does it become even a greater problem

6     when a bakery is -- if those products, those

7     ingredients, are left in a bakery that's -- that's not

8     occupied on a full-time basis?

9          A.     Yes.   That's an issue if it's not -- if

10    the plant is vacant, as that plant was vacant, there

11    would be no pest control, no regular pest control

12    going on, specifically checking mousetraps for

13    activity and glue strips for various kinds of insects.

14    None of that was taking place in the bakery -- in that

15    empty bakery at that time.

16         Q.     Did Consolidated have hopes of selling

17    that bakery to another baker?

18         A.     Yes, high hopes.

19         Q.     If there was either mold or infestation

20    of either rodents or other pests, would that

21    discourage a prospective buyer for that bakery?

22         A.     I believe it would.

23         Q.     Was that one of the reasons that

24    Consolidated sold the materials in February to Bakery

1    Feeds, the dry materials, to Bakery Feeds?

2         A.    Was to get it out of the building as

3    quickly as we could.  We didn't know how long the

4    building was going to -- it was going to be there

5    before we sold it, so we needed to get that material

6    out of the building to avoid -- to avoid rodent

7    activity and infestation.

8                        MR. HEUERMAN:  That's all I

9             have.

10                       MR. WULBERN:  I have two more

11            questions.

12                             - - -

13                       RE-EXAMINATION

14   BY MR. WULBERN:

15        Q.    In February of 2006, had the shelf life

16   of all of the ingredients expired?

17        A.    I don't think so.  I don't know for sure,

18   but I doubt it.

19        Q.    Were any of the ingredients that

20   Consolidated sold to Bakery Feeds still in their

21   original packing -- packaging?  Let me state that over

22   again.

23                  Were any of the ingredients that

24   Consolidated sold to Bakery Feeds in February 2006

1    still in their original packaging?

2         A.    I'm sure that it was.  I didn't see it

3    personally, but that's how we dispose of it.

4                    MR. WULBERN:  I don't have any

5               other questions.

6                    MR. HEUERMAN:  I just have one.

7                         - - -

8                    RE-EXAMINATION

9    BY MR. HEUERMAN:

10        Q.    Does Consolidated have a policy with

11   respect to an ingredient's shelf life as to when it

12   can use those ingredients to produce products?

13        A.    If I understand your question correctly,

14   CBC has a policy that the ingredient must have 50

15   percent of its original shelf life left before it can

16   be included into a batch to make cookies or crackers.

17        Q.    Okay.  And is that a fairly common

18   practice in the industry?

19        A.    In fact, I called -- it is a CBC policy,

20   but that's mandated to us by many of our contract

21   customers.  So the answer is yes.

22        Q.    So from CBC's standpoint, and probably

23   other bakers' standpoint, even though an ingredient

24   still had a shelf life left, if it was less than 50

1   percent of that shelf life, it would be of no good to

2   either CBC or any other baker?

3            A.      That's correct.

4                         MR. HEUERMAN:   That's all I

5            have.

6                         MR. WULBERN:   You keep on doing

7            this to me.

8                              -  -  -

9                         RE-EXAMINATION

10  BY MR. WULBERN:

11           Q.      Was there less than a 50 percent shelf

12  life on all of the ingredients that Consolidated sold

13  to Bakery Feeds?

14           A.      I don't know the answer to that.

15                        MR. WULBERN:   No more questions.

16                        MR. THAMES:   We'll read.

17                        (Discussion had off the record.)

18                        (Court Reporter marked

19           Deposition Exhibit 5.)

20                        (Deposition concluded and

21           witness excused at 5:17 p.m.)

22                        (Signature reserved.)

23                              -  -  -

24

54

```
 1                    SIGNATURE PAGE

 2
     Date of Deposition:  September 22, 2008
 3
     Correction page(s) enclosed?  Yes____    No____
 4
     How many correction pages?_____
 5

 6                _____

 7                    LARRY IVAN      Date

 8                         - - -

 9

10

11

12

13

14

15

16

17  Please return this signed signature page along with
                 correction page(s) to:
18
                 COLLINS REPORTING SERVICE, INC.
19                   405 North Huron Street
                     Toledo, Ohio  43604
20                    (419) 255-1010

21

22

23  Worksheet No. CS08-3438

24
```

```
 1                C E R T I F I C A T E

 2

 3           I, Casey G. Schreiner, a Notary Public in

 4    and for the State of Ohio, duly commissioned and

 5    qualified, do hereby certify that the within-named

 6    witness was by me first duly sworn to tell the truth,

 7    the whole truth, and nothing but the truth in the

 8    cause aforesaid; that the testimony then given was by

 9    me reduced to stenotype in the presence of said

10    witness and afterwards transcribed; that the foregoing

11    is a true and correct transcription of the testimony

12    so given as aforesaid.

13           I do further certify that this deposition was

14    taken at the time and place in the foregoing caption

15    specified.

16           I do further certify that I am not a

17    relative, employee of or attorney for any of the

18    parties in this action; that I am not a relative or

19    employee of an attorney of any of the parties in this

20    action; that I am not financially interested in this

21    action, nor am I or the court reporting firm with

22    which I am affiliated under a contract as defined in

23    the applicable civil rule.

24
```

1          IN WITNESS WHEREOF, I have hereunto set my

2   hand and affixed my seal of office at Toledo, Ohio on

3   this ____23rd____ day of ____September____, 2008.

4

5                                  _____

6                                  CASEY G. TSCHREINER
                                      Notary Public
7                              in and for the State of Ohio

8
    My Commission expires December 8, 2011.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Concordance Report**

Unique Words: **737**

Total Occurrences:
**2,937**

Total Words In File:
**7,947**

- - -
Single File Concordance
- - -
Case Insensitive
- - -
Cover Pages = 3
- - -
Includes  ALL  Text
Occurrences
- - -
Dates  ON
- - -
Includes Pure Numbers
- - -
Possessive Forms  ON
- - -

- - $ - -

**$1,125.50** [1] 34:13
**$1,881.90** [1] 37:17
**$18,302.06** [1] 36:12
**$2,568.50** [1] 33:19
**$3,039.42** [1] 36:2
**$975.79** [1] 45:17

- - 0 - -

**06** [1] 8:3

- - 1 - -

**1** [2] 4:18, 21
**1,050** [2] 32:19, 21
**10** [1] 35:24
**10th** [2] 35:22; 37:17
**12th** [1] 33:18
**1335** [4] 9:12; 10:13;
44:15; 46:4
**1336** [2] 9:12; 10:14
**1337** [3] 9:14, 19; 10:3
**1338** [3] 17:23; 31:15,
20
**1339** [3] 32:18; 33:2, 7
**134** [1] 44:15
**1340** [2] 33:15; 34:4
**1341** [1] 34:12
**1342** [2] 35:7, 14
**1343** [5] 31:2, 8; 35:22,
24
**1344** [2] 31:9; 36:11
**1345** [1] 45:13
**1346** [5] 36:21, 23;
45:14, 16; 46:5
**1347** [4] 37:14; 41:7;
44:16; 45:14
**1348** [5] 30:24; 39:1;
41:8; 44:16; 45:14
**1349** [5] 18:6, 11, 18;
19:1; 21:17
**1350** [4] 19:16, 17, 23;
21:14

**1351** [5] 20:3, 5, 9, 14;
21:11
**1352** [3] 20:19; 21:2, 22
**1353** [1] 22:1
**1354** [3] 22:7, 10, 12
**1355** [1] 22:14
**1356** [1] 22:17
**1357** [2] 22:20, 21
**1358** [1] 23:1
**1359** [1] 23:4
**1360** [1] 23:10
**1361** [3] 23:14, 21; 24:7
**1362** [1] 24:10
**1363** [1] 24:15
**1364** [1] 24:19
**1365** [1] 25:6
**1366** [1] 25:14
**1367** [1] 25:19
**1368** [1] 26:2
**1369** [2] 17:23; 27:9
**1370** [2] 13:12; 14:1
**1372** [2] 13:13; 14:1
**15th** [1] 32:21
**18,302** [1] 31:11

- - 2 - -

**2** [6] 10:15, 17; 11:18,
24; 43:10, 14
**2,800** [1] 30:24
**2005** [3] 5:18; 37:17;
46:14
**2006** [12] 5:15, 19;
11:13; 12:16, 21; 13:2;
32:22; 33:18; 35:22, 24;
51:15, 24
**2008** [2] 54:2; 56:3
**2011** [1] 56:8
**22** [1] 54:2
**22,239** [1] 42:24
**23rd** [1] 56:3
**255-1010** [1] 54:20

- - 3 - -

**3** [3] 10:21, 23; 11:3
**3,039** [1] 31:3
**3200** [1] 9:4
**363** [1] 9:10

- - 4 - -

**4** [2] 13:18, 21
**405** [1] 54:19
**419** [1] 54:20
**43604** [1] 54:19
**46** [1] 44:15
**463,488** [1] 42:23
**485,000** [1] 43:3, 7, 18

- - 5 - -

**5** [4] 18:3; 19:13; 21:24;
53:19
**50** [3] 52:14, 24; 53:11
**5:17** [1] 53:21

- - 6 - -

**614** [1] 9:9

- - 8 - -

**8** [1] 56:8

- - 9 - -

**912** [2] 31:16; 32:8
**925** [1] 36:24
**948** [3] 35:7, 9, 13

- - A - -

**a1** [6] 11:2, 5, 19;
12:20; 13:1; 42:14
**a2** [22] 28:22; 29:2, 4,
11, 16; 30:2, 6, 11, 21;
31:5; 32:3; 33:3, 24;
34:5, 19, 22; 35:11, 16;
36:8, 18; 37:6; 42:7
**ability** [1] 26:20
**able** [1] 49:1
**access** [1] 25:3
**acknowledgement** [1]
39:22
**acquisition** [2] 26:11,
19
**action** [3] 55:18, 20, 21
**activity** [2] 50:13; 51:7
**administrative** [41]
4:15, 24; 6:15; 7:18; 8:6,
13, 18; 9:3, 21; 11:22;
12:11, 15, 24; 15:18, 20;
16:7, 14, 21; 17:2, 13;
27:18, 22; 28:4; 31:6;
32:11; 33:10; 34:1, 10,
16, 20; 35:15; 36:4, 15;
37:3, 22; 39:13; 40:23;
42:9, 15, 22; 48:12
**affiliated** [1] 55:22
**affixed** [1] 56:2
**aforesaid** [2] 55:8, 12
**afterwards** [1] 55:10
**agreement** [2] 6:8, 9
**agreements** [1] 5:11
**allan** [3] 40:12; 49:8, 17
**allocation** [2] 39:19;
41:1
**allow** [1] 25:2
**alluding** [1] 41:7
**ambient** [3] 6:20; 7:3, 4
**amended** [21] 28:22;
29:3, 12, 16; 30:3, 7, 11,
22; 31:7; 32:4; 33:4;
34:5, 23; 35:10, 16; 36:8,
18; 37:7; 42:8, 14, 23
**amount** [14] 31:3, 16;
33:18, 19; 35:7, 23; 36:2,
12, 24; 37:16; 40:20, 23;
41:5; 46:1
**amounts** [1] 30:1
**animal** [2] 10:11; 48:2
**animal-feed** [1] 7:23

**answer** [12] 6:12; 8:10;
23:17, 19; 26:10; 27:24;
28:15; 29:22; 39:15;
43:21; 52:21; 53:14
**anyway** [1] 45:4
**apple** [2] 18:21
**applicable** [1] 55:23
**approximately** [1] 9:4
**assume** [2] 33:8, 11
**assumption** [1] 33:5
**attempt** [5] 8:4; 39:19;
46:24; 47:2; 48:7
**attempts** [1] 8:5
**attorney** [2] 55:17, 19
**attributable** [4] 40:17;
45:21, 22; 46:9
**available** [1] 46:20
**avoid** [2] 51:6
**avoided** [1] 43:20
**aware** [12] 11:16; 13:3;
15:12, 13; 17:5, 12, 16;
42:10, 11, 12; 47:2; 48:3
**awareness** [1] 39:22

- - B - -

**baker** [4] 47:15, 19;
50:17; 53:2
**bakeries** [1] 49:24
**bakers** [2] 48:4; 52:23
**bakery** [26] 7:23; 8:2;
9:2, 7, 17; 10:1, 9, 10,
11; 12:3; 15:9, 11; 42:16;
43:8; 44:10; 50:6, 7, 14,
15, 17, 21, 24; 51:1, 20,
24; 53:13
**baking** [1] 10:8
**bale** [1] 38:5
**baler** [2] 38:2, 3
**bales** [1] 23:4
**banana** [1] 26:8
**bankruptcy** [1] 15:24
**basic** [1] 42:4
**basis** [1] 50:8
**batch** [1] 52:16
**bates** [16] 9:12; 10:2,
13; 14:1; 17:23; 24:15,
18; 25:13, 18; 31:15;
33:14; 35:6, 13; 37:13;
38:24; 45:13
**bb** [4] 20:20, 21; 21:7
**becomes** [1] 47:17
**believe** [12] 6:4; 9:22;
20:11; 22:18; 26:5, 14;
27:7, 14; 28:5, 7; 44:18;
50:22
**believed** [1] 17:18
**belong** [1] 18:9
**belonged** [1] 27:14
**bigger** [1] 50:2
**bill** [16] 18:12; 19:18;
20:5, 17; 23:11, 15;
24:11, 14; 25:7, 13, 17,
18; 26:3; 27:10; 40:14;
46:7

**bills** [3] 19:12; 28:20;
32:16
**biscuit** [11] 36:1, 13;
37:1, 18; 42:13; 44:7;
47:4, 7, 10; 48:7; 49:4
**bit** [1] 43:12
**blueberry** [1] 18:21
**bought** [2] 28:7, 8
**box** [1] 38:21
**boxboard** [1] 45:18
**boxes** [4] 16:12, 15;
38:5, 19
**break** [1] 41:22
**broken** [1] 32:14
**building** [3] 51:2, 4, 6
**business** [3] 10:8; 38:7;
47:19
**butter** [1] 7:13
**buy** [6] 28:2, 21; 29:10,
15; 33:1; 47:20
**buyer** [1] 50:21

- - C - -

**c-o-n** [1] 16:17
**cake** [2] 26:7
**calculations** [1] 19:3
**call** [1] 40:15
**capability** [1] 26:17
**caption** [1] 55:14
**cardboard** [2] 23:4;
45:15
**care** [1] 6:1
**careful** [1] 47:16
**carton** [1] 38:16
**cartons** [1] 22:15
**carve** [1] 46:8
**case** [2] 11:17; 45:5
**casey** [2] 55:3; 56:6
**category** [1] 26:13
**caution** [2] 30:14;
41:10
**cbc** [70] 9:12, 14, 19;
10:3, 13; 18:6, 10, 18;
19:1, 16, 17, 23; 20:3, 9,
14, 19; 21:2, 11, 17;
22:1, 7, 10, 11, 13, 16,
19, 21; 23:1, 4, 10, 14,
21; 24:15, 19; 25:6, 14,
19; 26:2; 27:9; 30:24;
31:2, 8, 9, 15, 20; 32:18;
33:2, 7, 15; 34:3, 12;
35:7, 14, 21, 22, 24;
36:11, 21, 23; 37:13;
39:1; 41:7; 44:15; 45:13;
46:4; 52:14, 19; 53:2
**cbc's** [1] 52:22
**centrella** [1] 20:23
**certainty** [1] 27:8
**certified** [1] 4:3
**certify** [3] 55:5, 13, 16
**chain** [1] 47:13
**charge** [1] 43:4
**check** [34] 30:23; 31:1,
3, 10, 14, 21; 32:9, 19,

From $1,125.50 to check

21; 33:2, 17, 19; 34:3,
12, 14; 35:6, 9, 13, 22,
24; 36:3, 11, 13, 23;
37:1, 16, 20, 24; 38:1, 9;
40:11; 45:12, 17
**checking** [1] 50:12
**checks** [14] 31:13;
32:16; 40:13; 41:3; 43:9;
44:8, 14, 16, 23; 45:7,
21; 46:4, 9
**cheese** [1] 6:22
**chocolate** [2] 26:6, 7
**choice** [1] 22:5
**cinnamon** [2] 20:19,
20; 21:6, 7
**civil** [1] 55:23
**claim** [68] 4:15, 24;
6:15; 8:7, 13, 19; 9:3, 21;
10:19; 11:20, 22; 12:6,
11, 12, 15, 20; 13:1;
15:20; 16:7, 14, 22; 17:2,
14; 27:18, 22; 28:4, 23;
29:3, 12, 17; 30:3, 7, 12,
22; 31:7; 32:4, 11; 33:4,
10; 34:6, 10, 16, 20, 23;
35:11, 15, 16; 36:5, 9,
15, 19; 37:3, 7, 22;
39:13, 20, 21; 40:21, 24;
42:8, 9, 15, 16, 21, 22,
23; 48:12
**claims** [2] 41:14, 17
**clear** [1] 44:3
**closed** [1] 6:3
**closure** [1] 45:10
**codes** [1] 24:24
**colder** [1] 7:8
**collins** [1] 54:18
**commercial** [1] 49:24
**commission** [1] 56:8
**commissioned** [1] 55:4
**common** [1] 52:17
**compactor** [1] 38:3
**company** [2] 10:10;
37:18
**compare** [1] 40:22
**complete** [1] 27:8
**complies** [2] 21:20;
26:1
**computer** [1] 25:4
**concluded** [1] 53:20
**conditions** [1] 5:23
**confirm** [2] 21:18, 21
**consolidated** [83] 5:6,
7, 10, 16, 21; 6:2, 6, 7, 9;
7:16; 8:1, 4; 9:1; 10:1;
11:6, 8, 11, 19; 12:1, 7,
23; 14:9; 15:1, 4, 8, 9,
10, 15, 23; 16:2, 5, 9, 10,
22; 17:15; 18:24; 26:24;
27:5, 16, 20; 28:12, 13;
29:24; 30:1, 5, 9, 20;
31:24; 32:20, 21, 24;
33:20; 34:13; 36:1, 13;
37:1, 18; 38:10; 39:10,
12, 13; 42:6, 7, 13, 20;

43:4, 6, 17; 44:7; 47:4, 7,
10; 48:6, 7; 49:4; 50:16,
24; 51:20, 24; 52:10;
53:12
**consolidated's** [32]
7:18; 15:17, 19; 25:3;
28:22; 29:3, 12, 16; 30:3,
7, 11, 21; 31:6, 7; 32:3,
11; 33:3, 10; 34:1, 5, 9,
15, 19, 23; 35:16; 36:4,
8, 14, 18; 37:3, 6, 21
**consult** [3] 15:1, 4;
49:11
**contained** [1] 48:20
**container** [1] 16:19
**containers** [2] 16:20;
28:10
**contract** [3] 5:8; 52:20;
55:22
**control** [2] 50:11
**cookies** [1] 52:16
**copies** [1] 4:10
**copy** [2] 4:14; 45:19
**correction** [2] 54:3, 4,
17
**correctly** [1] 52:13
**corresponding** [1]
32:16
**corrugated** [32] 14:17;
16:12, 15; 31:22, 23;
32:1, 2, 10, 23; 33:1, 3,
9, 20, 23, 24; 34:4, 8, 14,
19; 35:3, 10; 38:3, 5, 10,
12, 19, 21; 39:3; 44:17;
45:14, 15
**cost** [1] 9:8
**couple** [2] 17:6; 49:9
**course** [3] 10:8; 38:7
**court** [11] 4:18, 20;
10:14, 16, 22; 13:17, 20;
29:6, 8; 53:18; 55:21
**crackers** [1] 52:16
**crackin** [3] 26:23; 27:5,
12
**credit** [12] 12:7; 29:24;
30:5, 9, 14; 39:10, 12,
17, 23; 41:9, 13; 46:1
**credited** [1] 12:1
**crunch** [1] 39:24
**cs08-3438** [1] 54:23
**custody** [1] 47:13
**customary** [1] 48:5
**customers** [2] 46:10;
52:21
**cuttings** [1] 45:18

— D —

**damages** [1] 43:17
**date** [3] 46:18; 54:2, 6
**dated** [2] 33:18; 37:17
**day** [1] 56:3
**dealer** [1] 47:5
**december** [5] 5:17, 19;
10:5; 46:14; 56:8

**dedicated** [26] 18:5;
19:15, 23; 20:9, 16; 21:3,
5; 23:7, 11, 16, 20; 24:8,
12, 13, 16, 20; 25:8, 15,
20, 22; 26:4, 6, 13;
27:11; 37:10
**defined** [1] 55:22
**deleted** [1] 28:19
**delivered** [1] 17:14
**depending** [2] 6:20;
7:11
**depose** [1] 40:2
**deposed** [1] 4:4
**deposition** [13] 4:19,
21; 10:17, 23; 13:18, 21;
17:6, 17; 19:7; 53:19, 20;
54:2; 55:13
**detail** [1] 32:15
**determination** [4]
24:22; 25:3; 41:12, 19
**determine** [8] 14:7, 9;
19:3, 5; 23:23; 32:12;
49:2, 5
**difficult** [1] 47:18
**disarray** [1] 44:18
**discourage** [1] 50:21
**discuss** [1] 36:21
**discussion** [1] 53:17
**dispose** [6] 5:10; 11:8,
11; 16:2, 5; 52:3
**disposed** [3] 11:16;
32:1; 35:5
**disposition** [7] 18:3;
40:13; 44:9; 45:8; 46:2,
23; 48:16
**distinguish** [1] 11:23
**document** [9] 9:14,
16; 10:20; 18:6; 19:16;
20:1, 3, 14; 22:1; 23:21;
24:18; 33:7, 14; 35:13;
37:13; 38:24
**documents** [13] 4:10;
9:11; 10:13, 15; 13:6;
17:22; 18:1, 2; 19:12;
45:13; 48:20, 21
**doesn't** [1] 33:6
**dollar** [4] 32:9, 19;
35:9, 13
**dollars** [17] 9:4, 9, 10;
30:24; 31:3, 11, 16; 35:7;
36:24; 42:23, 24; 43:4, 7,
15, 18, 19
**door** [1] 49:8
**doubt** [1] 51:18
**dry** [1] 51:1
**dry-goods** [2] 7:5, 6
**due** [1] 39:23
**duly** [3] 4:3; 55:4, 6

— E —

**e-mailed** [2] 4:11; 13:6
**e-mails** [5] 13:8, 24;
14:2, 5, 6
**early** [1] 5:19

**efforts** [2] 5:21; 7:16
**employee** [2] 55:17, 19
**empty** [1] 50:15
**enclosed** [1] 54:3
**end** [3] 10:7; 13:2; 19:7
**ending** [1] 5:4
**entitled** [1] 46:2
**err** [2] 30:13; 41:9
**established** [1] 48:1
**evidenced** [1] 10:2
**examination** [4] 4:2, 7;
44:5; 49:21
**example** [1] 23:22
**exception** [1] 28:9
**exchanged** [1] 48:21
**excuse** [2] 18:20; 49:15
**excused** [1] 53:21
**exhibit** [89] 4:18, 21,
24; 5:2; 6:15; 7:17; 8:6,
13, 18; 9:2, 20, 23;
10:15, 17, 21, 23; 11:2,
3, 5, 18, 19, 21, 24;
12:14, 20, 24; 13:1, 18,
21; 15:17, 18, 19; 16:6,
13, 21; 17:1, 13, 22;
18:3; 19:13; 21:24; 24:7,
10; 27:17, 21; 28:3, 8,
12, 18, 22; 29:1, 2, 11,
16; 30:2, 6, 11, 21, 24;
31:5, 18; 32:3, 10; 33:3,
9, 24; 34:5, 9, 15, 19, 22;
35:10, 11, 15, 16; 36:4,
8, 14, 18; 37:2, 6, 21;
42:7, 8, 14, 15; 43:10,
14; 53:19
**exhibits** [1] 17:23
**expense** [39] 4:15, 24;
6:15; 8:6, 13, 19; 9:3, 21;
11:22; 12:12, 15; 13:1;
15:20; 16:7, 14, 21; 17:2,
13; 27:18, 22; 28:4; 31:6;
32:11; 33:10; 34:10, 16,
20; 35:15; 36:5, 15; 37:3,
22; 39:13; 40:24; 42:9,
15, 22; 43:20; 48:12
**expenses** [1] 7:19
**expired** [1] 51:16
**expires** [1] 56:8
**exposure** [2] 42:18, 21

— F —

**facilities** [1] 48:9
**facility** [1] 44:10
**fact** [3] 17:5, 8; 52:19
**fair** [2] 30:14; 41:1
**fairly** [2] 40:16; 52:17
**falls** [1] 26:12
**familiar** [4] 20:23; 22:4,
22; 25:10
**family** [1] 22:5
**fashion** [1] 25:10
**fastco** [3] 20:23; 22:22;
25:23
**february** [8] 8:3; 11:13;

12:16, 21; 13:2; 50:24;
51:15, 24
**feed** [2] 10:11; 48:2
**feeds** [18] 7:23; 8:2;
9:2, 7, 17; 10:2, 9, 10;
12:3; 15:9, 11; 42:16;
43:8; 51:1, 20, 24; 53:13
**figure** [1] 41:4
**filed** [1] 15:24
**fillings** [1] 6:24
**film** [1] 14:17
**financially** [1] 55:20
**find** [3] 31:17; 43:8;
46:8
**fine** [1] 49:18
**finished** [2] 18:15;
41:22
**fireside** [3] 20:3, 15;
21:12
**firm** [1] 55:21
**first** [5] 4:3; 22:21;
25:21; 31:14; 55:6
**florida** [2] 18:13; 19:19
**follow** [1] 49:8
**following** [1] 29:9
**follows** [1] 4:4
**food** [8] 8:7, 11, 16, 23;
47:8, 11, 15, 20
**food-packaging** [5]
18:15, 16, 17; 19:21, 22
**foregoing** [2] 55:10, 14
**form** [1] 6:10
**four** [2] 21:9, 17
**frame** [2] 11:13; 46:14
**freight** [1] 9:8
**front** [1] 31:18
**frosted** [5] 18:21;
20:20, 21; 21:7
**fs** [2] 19:24; 21:14
**fudge** [2] 20:21; 21:7
**full-time** [1] 50:8

— G —

**gem** [1] 20:10
**georgia-pacific** [13]
16:8, 11; 28:10; 31:15,
21, 23; 32:9, 19, 20;
33:1, 17, 21; 34:13
**give** [10] 10:12, 19;
13:16; 15:9, 12; 23:18;
32:20; 39:17; 41:8, 12
**given** [2] 55:8, 12
**glue** [1] 50:13
**goes** [1] 23:24
**graham** [4] 20:19, 20;
21:5, 6
**greater** [1] 50:5
**guess** [1] 30:13

— H —

**hand** [2] 5:7; 56:2
**handled** [1] 47:17
**hank** [1] 13:5
**he's** [1] 40:11

hear [1] 44:21
hereby [1] 55:5
herein [1] 4:2
hereinafter [1] 4:3
hereunto [1] 56:1
heuerman [17] 4:5, 11, 12; 13:9, 12, 15, 19; 17:8; 28:24; 43:11; 49:9, 15, 22; 51:8; 52:6, 9; 53:4
high [1] 50:18
hold [1] 44:20
honey [2] 20:20; 21:5
hopes [2] 50:16, 18
hot [1] 7:10
hotter [1] 7:8
how's [1] 40:5
huron [1] 54:19

- - I - -

i'd [1] 10:20
identified [4] 32:15; 34:5; 44:15; 46:4
identify [2] 24:4, 7
implicated [1] 47:14
implying [1] 41:11
inc [1] 54:18
include [1] 19:13
included [4] 32:2; 44:16; 48:11; 52:16
industry [2] 48:5; 52:18
infestation [5] 11:14; 49:23, 24; 50:19; 51:7
information [7] 9:5, 7; 23:13, 18; 24:2, 21; 25:17
ingredient [3] 47:1; 52:14, 23
ingredient's [1] 52:11
ingredients [67] 5:3, 5, 11, 22; 6:1, 14; 7:17, 21, 22; 8:2, 5, 12, 18; 9:2, 20; 11:5, 9, 12, 19, 21; 12:2, 14, 19, 24; 15:8, 11; 38:4, 13, 18, 20, 23; 39:4, 14; 40:13, 21; 42:14, 21; 43:1, 3, 5, 7, 18; 44:9, 22; 45:1, 8, 22; 46:3, 13, 19; 47:5, 8, 11, 14, 20; 48:1, 4, 8, 14, 18, 23; 50:7; 51:16, 19, 23; 52:12; 53:12
insects [1] 50:13
insignificant [1] 41:5
inspect [1] 47:3
intend [1] 29:24
intended [3] 14:20; 44:2; 45:2
intention [1] 12:5
interested [1] 55:20
inventory [3] 5:4; 45:8; 47:1
invoice [1] 9:9
invoiced [1] 46:12

invoices [2] 9:8; 13:7
involved [1] 46:15
issue [2] 50:2, 9
issued [1] 30:15
issues [1] 47:14
item [7] 18:20; 22:23; 23:21; 24:16; 25:23; 27:13
items [45] 6:6, 17; 10:11; 16:14; 17:1; 18:8, 10, 20; 20:22, 23; 21:2, 7, 18; 22:11, 13, 16, 19, 21; 23:2, 3, 11, 15; 24:7, 11, 20; 25:7, 8, 14, 19, 21; 26:3, 5, 16; 27:10; 28:12, 19, 22; 29:11; 30:2, 6, 10, 21; 31:5; 32:3; 40:15
ivan [9] 4:1, 9, 23; 10:19; 13:24; 40:2; 44:7; 49:23; 54:6

- - J - -

jacksonville [2] 18:13; 19:19
january [2] 5:19; 56:3
july [1] 5:15
jumbo [2] 26:6, 8
june [1] 5:15

- - K - -

keep [3] 19:11; 20:18; 53:6
keeps [1] 42:18
kept [2] 6:7; 7:10
kinds [1] 50:13
knowledge [7] 8:8; 13:4; 24:23; 25:11; 28:17; 46:19; 47:24

- - L - -

label [1] 20:12
labels [1] 20:24
lading [19] 18:12; 19:12, 18; 20:5, 17; 23:11, 15; 24:11, 14; 25:7, 13, 17, 18; 26:3; 27:11; 28:20; 32:16; 40:15; 46:7
landfill [7] 17:3, 14, 19; 35:3; 38:8; 42:19; 43:21
large [1] 30:15
larry [4] 4:1; 39:16; 49:10; 54:6
last [5] 17:21, 22; 21:6, 17; 22:23
late [2] 5:19; 40:10
lay [1] 40:4
leave [1] 44:2
leftover [4] 44:9; 46:13; 48:8, 14
let's [5] 21:1, 11, 18; 31:14; 33:14

life [9] 12:18; 48:18, 22; 51:15; 52:11, 15, 24; 53:1, 12
list [4] 6:14; 11:5; 15:22; 16:23
listed [40] 8:6, 18; 9:2, 20; 11:21; 12:14, 20, 24; 16:6, 21; 17:1, 13; 18:2, 18; 19:23; 23:15; 26:3; 27:10, 17, 21; 28:3; 29:16; 30:2, 6; 31:5; 32:3, 10; 33:3, 24; 34:3; 35:14; 36:4, 8, 14, 18; 37:2, 6, 21; 40:21; 42:7
litigation [1] 48:22
logical [1] 27:2
looks [1] 31:12
lot [1] 5:14

- - M - -

maid [2] 20:11; 22:5
maintain [2] 6:2; 7:6
majority [1] 5:15
mandated [1] 52:20
manufacturers [2] 8:7; 47:21
manufacturing [1] 10:5
margarine [5] 6:19, 21; 7:10, 11, 12
mark [4] 4:18; 10:14; 13:17
marked [9] 4:20; 10:16, 20, 22; 13:20; 18:6, 20; 23:2; 53:18
market [2] 48:1, 3
material [13] 14:7; 15:23; 19:4, 21; 20:7, 8, 9, 10, 16; 26:10; 39:4; 42:11; 51:5
materials [57] 14:10, 19, 23; 15:2, 6; 16:3, 6, 10; 17:12, 19; 18:4, 15, 16, 17, 19; 19:1, 14, 22; 21:19, 23; 22:9; 23:1, 6, 16; 26:15, 24; 27:3, 5, 17, 21; 28:3; 29:15; 33:9, 20, 24; 34:4, 9, 15, 19; 35:10, 14; 36:3, 7, 14, 17; 37:2, 6, 10, 21; 38:18; 39:8, 14; 42:7; 44:24; 48:15; 50:24; 51:1
mean [3] 7:4; 9:23; 31:6
meant [1] 19:15
mine [1] 44:18
mitigate [1] 42:17
mitigated [2] 42:20; 43:17
mold [2] 50:3, 19
molding [1] 11:15
money [2] 30:15, 17
morning [1] 4:11
mousetraps [1] 50:12
moved [1] 43:12
mr [83] 4:5, 8, 9, 11, 12,

13, 22, 23; 6:10, 13; 10:12, 18, 19; 11:1; 13:5, 9, 10, 12, 14, 15, 16, 19, 23, 24; 17:6, 8, 11, 17, 18; 28:24; 29:2, 6, 13, 18, 20; 39:15; 40:1, 2, 4, 6, 8, 9, 11; 41:14, 15, 18, 21; 42:2, 5; 43:1, 2, 11, 16, 22, 24; 44:6, 7, 11, 13, 20; 45:1, 3, 4, 6; 49:6, 9, 13, 15, 16, 18, 22, 23; 51:8, 10, 14; 52:4, 6, 9; 53:4, 6, 10, 15, 16

- - N - -

name [2] 22:4, 22
names [1] 25:10
needs [1] 21:15
non-winn-dixie [5] 21:23; 22:9, 16, 19, 24
normal [1] 10:8; 38:7
north [1] 54:19
notary [1] 55:3; 56:6
notice [2] 15:9, 12
notification [2] 42:10, 12
notify [1] 42:6
november [3] 35:22, 24; 37:17
np [2] 18:21
numbers [3] 23:21; 39:24; 40:3

- - O - -

object [4] 6:10; 29:18; 44:11; 49:12
obsolete [1] 10:11
obviously [1] 40:12
occupied [1] 50:8
offer [1] 46:24
office [1] 56:2
ohio [5] 17:6; 54:19; 55:4; 56:2, 7
okay [43] 4:9, 17; 5:5; 10:24; 11:4; 13:15, 19, 22; 15:21; 16:18; 17:21, 24; 19:11, 16; 20:8, 13, 15, 18; 21:4, 14, 22; 22:7, 8; 27:9; 28:2, 11; 29:4; 31:2, 19; 32:18; 33:16; 36:23; 38:22; 39:2; 41:21, 24; 43:14; 45:3, 19; 46:17; 49:6, 16; 52:17
old [8] 16:12; 25:9; 38:3, 9, 12; 39:3; 44:17; 45:15
ones [3] 21:4; 28:6; 29:21
open [1] 42:3
opened [1] 49:7
operation [1] 10:4
opinion [1] 47:22

opposed [1] 11:20
original [3] 51:21; 52:1, 15
oven [1] 20:10

- - P - -

p.m. [1] 53:21
package [1] 38:18
packaging [53] 5:17; 6:8, 9; 14:7, 10, 16, 18, 22; 15:2, 5, 22; 16:3, 6; 17:19; 18:4, 18, 23; 19:1, 4, 6, 13; 20:7, 8; 21:19, 23; 22:6, 24; 23:6, 16; 26:10, 14; 27:17, 21; 39:3, 8; 40:14, 20; 44:9; 45:2, 8, 22; 46:3, 13, 20; 47:1; 48:15; 51:21; 52:1
packing [1] 51:21
page [5] 19:10; 54:1, 3, 17
pages [2] 13:12; 54:4
paid [6] 28:7, 18, 19; 33:8; 35:9, 14
papers [1] 43:13
parties [3] 39:5; 55:18, 19
pastry [1] 6:24; 21:7, 8
pause [1] 42:1
pay [9] 14:12; 18:24; 27:16, 20; 28:11; 31:24; 33:2; 34:4, 8
payment [16] 7:18; 9:16; 34:14, 18; 36:3, 7, 13, 17; 37:1, 5, 9, 20, 24; 38:1, 9; 43:7
payments [1] 46:8
pen [1] 21:2
percent [2] 52:15; 53:1, 11
personally [1] 52:3
pertaining [1] 44:8
pest [2] 50:11
pests [1] 50:20
pick [4] 4:14; 46:21; 47:1, 3
picked [1] 32:23
pie [2] 26:7, 8
pies [3] 26:7, 20, 21
place [2] 50:14; 55:14
plant [13] 5:7, 17; 6:3; 26:19; 38:11, 14; 39:5; 45:9; 49:3, 4; 50:10
plants [2] 26:18, 21
plastic [1] 38:4
please [4] 4:10; 15:19; 22:3, 7; 25:18, 24; 26:2; 27:9, 19; 29:5, 7; 54:17
point [2] 31:8; 49:3
policy [3] 52:10, 14, 19
portion [1] 12:10; 19:5, 6
post-petition [1] 39:20

BSA                                     IN RE: WINN-DIXIE STORES                                     XMAX(4/14)

power [2]  6:2; 49:2
practice [2]  47:19;
52:18
preceded [1]  16:16
prepetition [2]  12:10;
39:20
presence [1]  55:9
prevent [1]  38:8
price [2]  5:3; 19:3
prior [3]  6:7; 8:4; 46:23
problem [3]  49:24;
50:3, 5
proceeds [11]  9:19;
12:2, 10, 11; 30:10, 19,
20; 31:4; 32:8, 9; 39:13
processes [1]  10:10
processor [6]  7:24;
8:12, 16, 23; 47:15, 20
processors [2]  47:8, 11
produce [1]  52:12
produced [2]  44:8; 45:7
product [6]  10:5, 6;
18:15, 23; 23:23, 24
production [1]  10:7
products [2]  50:6;
52:12
proof [26]  10:19; 11:20;
12:20; 13:1; 28:22; 29:3,
12, 16; 30:3, 7, 11, 22;
31:7; 32:4; 33:4; 34:6,
23; 35:11, 16; 36:8, 18;
37:7; 40:21; 42:8, 14, 23
properly [1]  47:17
prospective [1]  50:21
protect [1]  5:22
public [2]  55:3; 56:6
pull [1]  13:10
purchase [2]  8:17;
47:11
purchased [11]  5:6;
8:12; 11:6, 12; 15:23;
26:10, 15; 27:5, 12;
28:13
pure [1]  22:5
purity [2]  18:21, 22
purpose [2]  14:4, 6

-- Q --

qualified [1]  55:5
qualify [1]  26:9
question [13]  8:14;
9:24; 17:10; 27:19, 23;
28:1, 15; 29:5, 7, 10, 14;
44:21; 52:13
questions [7]  42:3, 4;
43:23; 49:7; 51:11; 52:5;
53:15
quickly [2]  41:19; 51:3

-- R --

re-examination [3]
51:13; 52:8; 53:9
read [3]  29:7, 8; 53:16
reask [1]  45:5

reasonable [1]  35:4
reasons [2]  42:17;
50:23
recall [1]  17:17
receipt [1]  10:2
receive [2]  9:1; 43:6
received [4]  9:17; 30:1,
20; 39:14
record [2]  19:8; 53:17
recorded [2]  14:21; 35:5
recycle [3]  14:22; 38:3,
20
recycled [2]  14:21; 35:5
reduced [1]  55:9
reflect [1]  9:23
refrigerated [2]  6:7, 8
refrigeration [6]  6:16,
18, 19, 22; 7:1, 12
regular [1]  50:11
regulated [1]  7:7
relate [2]  18:3; 45:14
related [1]  39:7
relates [2]  30:18, 19
relative [2]  55:17, 18
relatively [1]  30:16
remainder [1]  21:24
remained [1]  45:9
remember [1]  17:20
reporter [10]  4:18, 20;
10:14, 16, 22; 13:17, 20;
29:7, 8; 53:18
reporting [2]  54:18;
55:21
represent [1]  9:19
represented [1]  45:12
request [10]  4:15; 7:18;
11:20, 21; 12:15; 14:11;
15:18, 20; 21:20; 26:1
require [5]  6:18, 19, 22,
24; 7:12
required [1]  6:16
reserved [1]  53:22
respect [1]  52:11
restart [1]  9:24
restate [1]  27:22
return [1]  54:17
rick [2]  49:13, 14
right [6]  16:20; 23:5;
24:23; 46:12; 47:4; 49:1
risk [1]  11:14
rodent [2]  49:23; 51:6
rodents [1]  50:20
royal [3]  8:14;
rule [1]  55:23
run [2]  10:7
running [1]  5:24

-- S --

s-778 [1]  23:23
sale [12]  9:20; 12:2;
30:2, 10, 21; 31:5; 32:10;
39:14; 47:14; 48:4; 49:3
saltines [3]  22:2, 3;
23:2
sanitation [1]  47:13

schreiner [2]  55:3; 56:6
scrap [11]  10:6, 11;
14:21; 31:22, 23; 32:1, 2,
23; 33:1, 2; 48:15
scrapped [2]  10:6; 35:2
scratched [1]  27:4
seal [1]  56:2
secondly [1]  42:18
security [1]  6:5
sell [12]  7:16, 20, 22;
8:1, 5, 23; 10:1; 15:10;
16:22; 38:6; 42:13; 47:8
selling [2]  43:18; 50:16
send [1]  16:11
september [3]  32:21;
33:18; 54:2
service [1]  54:18
shelf [9]  12:18; 48:18,
22; 51:15; 52:11, 15, 24;
53:1, 11
shipment [3]  18:12, 14;
19:18
shipped [1]  38:10
shortening [1]  38:17
show [1]  48:22
signature [3]  53:22;
54:1, 17
signed [1]  54:17
sir [1]  18:7
site [1]  6:5
sixty [1]  25:9
smurfit [17]  14:14, 15,
18, 22; 15:5; 16:23;
18:24; 27:16, 20; 28:2,
11, 12, 21; 29:10, 15;
31:1, 2
smurfit-stone [14]
14:16; 16:8, 10; 18:13;
19:19; 20:6; 30:18, 23;
36:1, 12, 24; 37:18; 38:2,
6
snappy [10]  20:19, 20;
21:6; 22:1, 3, 15; 23:2, 3;
27:13
sold [12]  11:19; 15:8;
26:23; 28:10; 33:20;
42:7; 49:4; 50:24; 51:5,
20, 24; 53:12
sooner [1]  11:16
sorry [6]  8:14; 9:6, 24;
15:19; 30:24; 32:24;
34:22; 35:11
sort [4]  39:23; 40:24;
46:3; 47:20
south [1]  50:1
speaking [1]  30:16
specific [1]  25:12
specifically [2]  33:6;
50:12
specified [1]  55:15
spoilation [1]  5:22
spoiled [4]  12:16, 17,
20; 13:2
stamped [16]  9:12;
10:2, 13; 14:1; 17:23;

24:15, 19; 25:14, 19;
31:15; 33:14; 35:7, 14;
37:13; 39:1; 45:13
standpoint [2]  52:22,
23
start [5]  10:6; 34:1;
35:12, 23; 39:11
state [3]  51:21; 55:4;
56:7
stay [1]  6:8
stenotype [1]  55:9
stop [1]  21:1
storage [1]  5:23
stored [2]  5:23; 6:20
strawberry [1]  18:22
street [1]  54:18
strike [5]  21:2, 12, 18;
22:3; 25:23
strips [1]  50:13
struck [2]  21:9, 21
subset [2]  40:12; 46:3
subtract [1]  9:8
summer [1]  7:8
sums [1]  30:15
super [1]  21:22
supplier [3]  14:11, 13,
17
suppliers [4]  38:16, 17,
18
supplies [1]  39:4
supply [1]  14:15
sworn [3]  4:3, 6; 55:6
system [3]  24:3, 6; 25:4

-- T --

t-484 [1]  25:12
tag-team [1]  49:19
talked [2]  35:21; 44:23
talking [2]  30:15, 17
task [1]  47:18
temperature [3]  7:3, 5,
7
term [1]  7:4
terminated [2]  5:8; 6:9
testimony [2]  55:8, 11
thames [18]  6:10;
29:18; 39:15; 40:4, 8, 11;
41:15, 18; 43:1, 24; 44:6;
45:1, 4, 6; 49:6, 13, 16;
53:16
thank [2]  4:9, 23
there's [1]  39:21; 47:18
they're [2]  14:16; 24:13
thinking [1]  4:17
third [1]  39:5
thousand [2]  9:10;
43:15, 18
three [1]  21:8
thrifty [1]  20:11
thursday [1]  41:20
tim [1]  49:11
times [1]  5:14
toaster [1]  21:7, 8
toledo [2]  54:19; 56:2

ton [1]  19:4
total [2]  5:4; 41:9
tough [1]  23:17
tp [4]  18:22; 20:20, 21
track [2]  23:22; 24:1
transcribed [1]  55:10
transcription [1]  55:11
tray [3]  23:23; 24:4
trays [4]  23:22; 25:9,
10; 38:4
trial [1]  49:19
true [5]  35:6, 8; 37:12;
44:19; 55:11
truth [3]  55:6, 7
type [3]  6:21; 7:11;
26:21
types [1]  49:24
typically [2]  47:7, 10

-- U --

understand [2]  17:9;
52:13
unit [1]  5:3
unsalted [3]  22:15;
23:3; 27:13
utilize [1]  48:8

-- V --

vacant [2]  50:10
valdosta [8]  5:17; 6:3;
38:10, 13; 39:5; 44:10;
45:9; 49:3
value [5]  5:4; 14:7, 10,
21; 15:2, 5; 40:20
vanilla [4]  19:24; 20:3;
21:12, 15
varney [2]  17:6, 18
varney's [1]  17:17
volume [1]  40:22

-- W --

wafers [4]  19:24; 20:4;
21:12, 15
wants [1]  43:4
warehouse [3]  7:5, 6,
10
we'll [3]  41:3, 12; 53:16
we're [3]  30:15; 39:18;
41:21
we've [3]  12:4; 35:21;
46:4
weeks [1]  17:6
weight [1]  19:4
weren't [1]  37:10
whereof [1]  56:1
willing [2]  8:17; 41:8
winn-dixie [63]  11:6,
12; 12:1, 7; 15:10, 23;
18:5, 9, 23; 19:1, 6, 9,
15, 23; 20:10, 12, 16;
20; 24:8, 12, 13, 16, 20;

25:8, 12, 15, 20, 22;
26:4, 6, 11, 15, 23; 27:6,
11, 12, 15; 30:1, 6, 10;
37:10; 39:18; 40:17;
42:6; 43:4; 45:23; 46:2,
10, 12, 20, 24
**winn-dixie's** [7]  18:4,
18; 19:14, 15; 39:7;
42:18, 20
**winter** [1]  7:9
**within-named** [1]  55:5
**witness** [20]  4:2, 5;
6:11; 10:24; 13:22; 17:9;
21:20; 26:1; 29:4, 19;
41:6, 16, 24; 43:14;
44:12; 49:14; 53:21;
55:6, 10; 56:1
**worksheet** [1]  54:23
**worth** [1]  43:7
**wrong** [1]  9:6
**wulbern** [38]  4:8, 13,
22; 6:13; 10:12, 18; 11:1;
13:5, 10, 14, 16, 23;
17:11; 29:2, 6, 13, 20;
40:1, 6, 9; 41:14, 21;
42:2, 5; 43:2, 16, 22;
44:11, 13, 20; 45:3;
49:18; 51:10, 14; 52:4;
53:6, 10, 15

- - Y - -

**yeah** [1]  27:24
**you'll** [1]  41:18