IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC. *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## REQUEST OF CONSOLIDATED BISCUIT COMPANY
## FOR PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM

Consolidated Biscuit Company ("Consolidated") hereby requests the Court to issue

an order requiring payment of its administrative expense claim pursuant to 11 U.S.C. §503(b) by

debtor Winn-Dixie Stores, Inc. ("Debtor") and in support of its request herein states as follows:

1.    Debtor and its affiliates filed voluntary petitions for reorganization under

Chapter 11 on February 21, 2005 (the "Commencement Date").

2.    Consolidated and Debtor entered into a Contract Packaging Agreement dated

as of January 18, 2005, as amended (the "Agreement"). A true copy of the Agreement is attached

hereto and incorporated herein as Exhibit A. The Agreement was finally terminated by the parties

as of December 16, 2005 (the "Termination Date").

3.    Pursuant to the Agreement, Consolidated agreed to process and package

certain designated food products (the "Products") and supply them to Debtor. During the initial six-

month term of the Agreement, Consolidated was designated as the Debtor's exclusive supplier of

the Products.



*1*
9-21-08
COLLINS REPORTING

4.      To enable Consolidated to perform its obligations under the Agreement, Consolidated was required to maintain an inventory of ingredients and packaging materials unique to the Products, which materials could not be resold by Consolidated or otherwise used by Consolidated in its business operations.  Because the unique nature of these inventory items, the Agreement obligated the Debtor to repurchase this inventory from Consolidated upon termination of the Agreement.

5.      With respect to packaging inventory, the Agreement provided in Section 5 that:

> [Debtor] agrees to repurchase from [Consolidated]
> any packaging inventory dedicated to [Debtor] that
> was not consumed in the production of Products
> during the term of this Agreement…

6.      On the Termination Date, Consolidated had on hand, and invoiced Debtor for, $344,617.95 of packaging materials designed specifically for the Products and purchased by Consolidated following the Commencement Date.  A summary of Consolidated's packaging material invoices is set forth on Exhibit B attached hereto.

7.      With respect to ingredients inventory, the Agreement in Section 5 provided that:

> Any ingredients inventory that [Consolidated] has on
> hand on the date of termination that is unique to the
> Products shall be sold to [Debtor] at [Consolidated's]
> costs plus transportation costs.

8.      On the Termination Date, Consolidated had on hand, and invoiced Debtor for, $463,488.07 of ingredients purchased by Consolidated after the Commencement Date to enable it to manufacture the Products.  A summary of Consolidated's ingredients invoices is set forth on Exhibit C attached hereto.

9.    All of the packaging material and ingredients represented by the invoices summarized on Exhibits B and C for which claim is made hereby were purchased by Consolidated subsequent to the Commencement Date, to replenish inventory used to produce Products post-petition pursuant to Debtor's purchase orders and solely to enable Consolidated to perform its post-petition obligations to the Debtor under the Agreement. None of this material and ingredients was used or usable by Consolidated for any other purpose.

10.    To permit it to process Products in an efficient and cost-effective manner, Consolidated was required to establish certain minimum production runs on the several items of Product and maintain an inventory of certain items to fulfill Debtor's needs.

11.    On the Termination Date, Consolidated had on hand, and invoiced Debtor for, $77,869.45 of Products manufactured by Consolidated for Debtor following the Commencement Date. A summary of Consolidated's finished goods inventory of Products is set forth on Exhibit D hereto.

12    Consolidated prays for allowance under 11 U.S.C. §503(b) of its claims in the amounts of $344,617.95, $463,488.07 and $77,869.45 with respect to this inventory.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]**

WHEREFORE, Consolidated Biscuit Company prays that this Court grant its request and order the Debtor to forthwith pay Consolidated's claims in the amount of $344,617.95, $463,488.07 and $77,869.45 and for such other and further relief as may be just and warranted in the premises.

Respectfully submitted,

Dated: June 30, 2006

EASTMAN & SMITH LTD.

/s/ Kenneth C. Baker
Henry N. Heuerman (0017962)
hnheuerman@eastmansmith.com
Kenneth C. Baker (0011853)
kcbaker@eastmansmith.com
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio 43699-0032
Telephone: (419) 241-6000
Facsimile: (419) 247-1777

Attorneys for Consolidated Biscuit Company

H:\HOME\ADCramer\Other\KCB\Consolidated Biscuit\Winn Dixie Stores Inc\Request for Payment of an Adm Exp Claim 06292006 FNL.rtf

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing **Request of Consolidated Biscuit for Payment of an Administrative Expense Claim** was served this 30th day of June, 2006, via the Court's electronic noticing system upon all those participating therein, and via ordinary U.S. Mail, postage prepaid, to the following parties:  Winn-Dixie Stores, Inc., 5050 Edgewood Court, Jacksonville, FL 32254-3699, Debtor; to Kenneth C. Meeker, Esq. and Elena L. Escamilla, Esq., Office of the United States Trustee, 135 West Central Boulevard, Room 620, Orlando, FL 32801; to Adam Ravin, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square, New York, NY  10036, an attorney for Debtors; to Cynthia C. Jackson, Esq., James H. Post, Esq., Stephen D. Busey, Esq. and Leanne McKnight Prendergast, Esq., Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, FL 32201, attorneys for Debtors; to Dennis F. Dunne, Esq., Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, NY 10005, an attorney to the Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc.; and to John B. MacDonald, Esq. and Patrick P. Patangan, Esq., Akerman Senterfitt, 50 North Laura Street, Suite 2500, Jacksonville, FL  32202, attorneys to the Official Committee of Unsecured Creditors of Winn-Dixie Stores, Inc.

/s/ Kenneth C. Baker
An Attorney for Consolidated Biscuit Co.

EXHIBIT A

## CONTRACT PACKAGING AGREEMENT

This Agreement executed as of this 18th day of January, 2005, by and between Winn-Dixie Stores, Inc., 5050 Edgewood Court, Jacksonville, Florida 32254 ("Customer") and Consolidated Biscuit Co., 312 Rader Road, McComb, Ohio 45858 ("Packer").

1.    **Products and Description of Services**.    Packer will process and package the food products listed on Schedule A (the "Products") attached hereto and made a part hereof.  Said Schedule A may be amended from time to time upon the mutual agreement of Customer and Packer.  During the initial six-month term hereof, Packer will be Customer's exclusive supplier of the Products.

2.    **Price**.    Upon orders by Customer, Packer will process and pack the ordered quantity of the Products.  The price to be paid Packer by Customer for the Products is set forth on Schedule A attached hereto and part hereof (the "Price").  The "Transfer Prices" set forth on Schedule A shall remain in effect for three months from the date hereof and the "Market Prices" set forth on Schedule A shall remain in effect for the subsequent three months from the date hereof, and may thereafter be changed by Packer upon 30 days written notice (which notice may be given before the end of such six-month period but shall not be effective during such six-month period) if Packer's material and/or processing costs increase.

3.    **Terms of Payment and Delivery**.    The terms of payment are net within 21 days from the date of delivery. All Products processed and packaged hereunder are processed and packaged F.O.B. Packer's plant, located at 701 North Forest Street, Valdosta, Georgia 31601.  Packer shall ship the Products to destinations designated by Customer, but all costs of transportation shall be borne by Customer, and all risk of loss shall pass to Customer when the Product is delivered to the carrier (the date of delivery).  A late charge of 1% per month will be charged on all invoiced amounts which are not paid within 30 days from the date of delivery.

4.    **Services, Equipment and Ingredients**.    The Price to be paid to Packer shall be for all processing, packaging and other services necessary to process and package the Product and shall include all raw materials, labor, packaging materials, supplies and ingredients necessary to produce the Products.

5.    **Term and Termination**.    This Agreement shall be in effect for a term of six months and, unless either party has notified the other party in writing 90 days before the expiration of the initial six-month term, this Agreement will continue indefinitely until terminated by one or both parties pursuant to the terms set forth herein.  After six months from the beginning of the initial term, either party may terminate this Agreement for any reason, with or without cause, upon 120 days written notice to the other party. Upon termination, Customer agrees to pay all outstanding invoices for Products within 30 days of the date of termination. Any invoice issued after the date of termination for Products delivered under this Agreement shall be paid within 30 days from the date of

the invoice. Upon termination, Customer agrees to repurchase from Packer any packaging inventory that had been purchased by Packer from Customer that was not consumed in the production of Products during the term of this Agreement. In addition, Customer agrees to repurchase from Packer any packaging inventory dedicated to Customer that was not consumed in the production of Products during the term of this Agreement; provided, however, Customer shall not be obligated to purchase more than 13 weeks supply of packaging materials (including packaging materials purchased pursuant to the previous sentence) unless Customer has authorized Packer in writing to purchase quantities of packaging materials in excess of a 13 week supply. Prior to, and as a condition to Customer's obligation to make, such purchases, Customer shall have the right to inspect the packaging inventory and to decline to repurchase any such inventory that is not usable due to damage, neglect or prior use. Packer shall destroy and provide Customer proof of destruction of all such rejected packaging materials. Packer agrees to return all such packaging materials to Customer upon Packer's receipt of payment therefore. Customer shall bear all delivery and transportation costs for the return of packaging materials. Any ingredients inventory that Packer has on hand on the date of termination that is unique to the Products shall be sold to Customer at Packer's cost plus transportation costs.

6.   **Packer's Warranty**. Packer warrants that:

(a)   The Products will be produced and packaged according to and meet the recipes and specifications referenced in Customer's quality manual, ingredients computer files and process procedures manuals to be provided to Packer by Customer in writing or electronically with respect prior to the first order of Products in the case of those manuals and files that relate to all Products and prior to Customer's ordering a particular Product in the case of those manuals and files that relate to such Product (the "Specifications");

(b)   All raw materials, supplies, and ingredients supplied by Packer hereunder shall be merchantable, of good quality and fit for the purpose for which intended;

(c)   None of the Products sold hereunder will be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act and will not be an article which may not be introduced into interstate commerce pursuant to Section 404 of the Act.

(d)   Packer shall not to sell or release any Product or any packaging materials containing Customer's trademarks or trade names to anyone other than Customer, without Customer's written permission.

7.   **Customer's Warranty**.  Customer warrants that:

(a)   The labels and packaging materials approved by or supplied by Customer to be used for the Products, and the Products, if produced in accordance with the Specifications, will not violate any laws or regulations in effect in any jurisdiction in which the Products are manufactured, shipped or sold;

(b)   All raw materials, supplies, packaging materials and ingredients supplied by Customer hereunder shall be merchantable, of good quality and fit for the purpose for which intended; and

(c)   The labels, packaging materials, specifications and procedures supplied by or approved by Customer hereunder will not infringe on any valid United States patent, trademark or copyright owned by or licensed to any person not a party to this Agreement.

8.   **Packer's Indemnification**.  Packer shall indemnify customer against all damages, liability, losses and expenses (including attorney fees) incurred as a result of claims asserted by third-parties and which arise from (i) any breach by Packer of any of its warranties contained in this Agreement; or (ii) from any negligent act or omission of Packer, its agents or employees; however, this indemnification does not include claims for lost profits, incidental or consequential damages or punitive damages, and does not include claims, losses, damages, liability, costs or expenses which are caused by the negligent acts or omissions or the willful misconduct of Customer, its agents or employees.

9.   **Customer's Indemnification**.  Customer shall indemnify Packer against all damages, liability, losses and expenses (including attorney fees) incurred as a result of claims asserted by third-parties and which arise from (i) any breach by Customer of any of its warranties contained in this Agreement; or (ii) from any negligent act or omission or willful misconduct of Customer, its agents or employees; however, this indemnification does not include claims for lost profits, incidental or consequential damages or punitive damages, and does not include claims, losses, damages, liability, costs or expenses which are caused by the negligent acts or omissions or willful misconduct of Packer, its agents or employees.

10.   **Insurance**.  Packer agrees to at all times maintain and keep in force and effect insurance which names Customer as an additional insured, and Customer agrees to at all times maintain and keep in force and effect insurance which names Packer as an additional insured.   Packer and Customer each agree to maintain the following coverages: general comprehensive public liability insurance, which provides coverage on an occurrence basis in the amount of $5,000,000 (with up to $2,000,000 of self-insurance/deductibles), with product liability and recall endorsements.   Packer and Customer also agree to maintain workers' compensation insurance as required by law for all their employees who perform any services in connection with this Agreement and further agree to provide, upon request, certificates of insurance from their respective insurance carriers indicating that the required insurance with the limits and

endorsements specified is in effect. These certificates of insurance shall also provide that the insurance cannot be amended or canceled without 30 days' written notice to the other party.

11.    <u>Confidential Information</u>. Packer and its representatives will maintain as secret and confidential and not disclose to third parties without prior written permission from Customer any trade secrets and other confidential information gained from discussions, or in any other way, including, but not limited to, descriptions, specifications and procedures furnished by Customer.    Upon termination of this Agreement, Packer will return to Customer all confidential information that was supplied by Customer to Packer.  For purposes of this paragraph, the terms "trade secrets and other confidential information" shall include and be limited to information disclosed by Customer to Packer that was not (i) known to Packer at the time of such disclosure; (ii) at the time of disclosure or thereafter known to or available to the public through sources entitled to disclose such information; and (iii) disclosed to Packer in good faith by another party having the right to disclose such information.

Customer and its representatives will maintain as secret and confidential and not use for its own use or disclose to any third party any trade secrets or confidential information gained from discussions, observations or in any other manner including, but not limited to, Customer's formulas, descriptions, processing, and specifications learned from Packer.  For the purposes of this paragraph, the terms "trade secrets and other confidential information" shall include and be limited to the information disclosed by Packer to Customer that was not (i) known to Customer at the time of such disclosure; (ii) at the time of disclosure or thereafter known to or available to the public through sources entitled to disclose such information; and (iii) disclosed to Customer in good faith by another party having the right to disclose such information.

12.    <u>Relationship of the Parties</u>. This Agreement shall not make or constitute either party an agent or representative for the other for any purpose whatsoever. Neither party shall have the power or authority, except as specifically authorized herein, to act in the other's behalf or in the other's name, or bind the other, either directly or indirectly, in any manner whatsoever.  Neither party shall have the authority to employ any person on behalf of the other.  Each party shall have, as between the parties, the exclusive right to select, engage, fix the compensation of and discharge or otherwise manage, supervise and control the persons hired by it and shall, with respect to all such persons, perform all obligations and discharge all liabilities imposed upon employers under labor, wage hour, workers' compensation, unemployment compensation or insurance, social security, and other federal, state and municipal laws and regulations.

13.    <u>Assignment</u>. This Agreement shall not be assigned in whole or in part by either party hereto without the written consent of the other party.

14.    <u>Force Majeure</u>. In the event of strikes, labor unrest, riot, war, rebellion, fire, earthquake, interruption of utilities, act of governmental authorities, act of God or causes beyond the control of the parties hereto which shall prevent either party from performing its obligations hereunder, no liability for non-compliance caused thereby during the continuance thereof shall exist or arise.  The party who seeks to be excused

from performance on account of any of the aforementioned events, shall give prompt notice to the other party of its inability to perform hereunder.

15.    **Notices**.  Except as otherwise specifically provided herein, all notices or communications provided for herein shall be in writing and sent by certified mail, return receipt requested or by private mail that provides for evidence of the date of delivery and addressed as follows :

| If to Customer: | Winn-Dixie Stores, Inc.<br>5050 Edgewood Court<br>Jacksonville, FL 32254<br>Attn: Legal Department |
|---|---|
| with a copy to: | Kirschner & Legler, P.A.<br>300A Wharfside Way<br>Jacksonville, Florida 32207<br>Attn: Kenneth M. Kirschner |
| If to Packer: | Consolidated Biscuit Co.<br>312 Rader Road<br>McComb, OH 45858<br>Attn: _____ |
| With a copy to: | Eastman & Smith Ltd.<br>One SeaGate, 24th Floor<br>P.O. Box 10032<br>Toledo, OH 43699-0032<br>Attn: Henry N. Heuerman |

16.    **Successors and Assigns**.  Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the respective parties hereto.

17.    **Entire Agreement**.  This Agreement, together with any schedules or exhibits attached hereto, exclusively and completely states the rights, obligations and agreements of the parties hereto, and supersedes all preprinted terms and conditions on Customer's and Packer's present and future purchase orders, invoices, confirmations, and other terms and conditions of other agreements, oral or written, between the parties.  No modification of this Agreement shall be valid or binding unless in writing and duly executed by the authorized representatives of both parties hereto.

18. **General Provisions**.

(a)    This Agreement shall be governed and construed in accordance with the laws of the State of Georgia.

(b)    The failure of any party to this Agreement to exercise any right or privilege granted under this Agreement shall not be deemed as a waiver of any subsequent rights or privileges.

(c)    In the event any term, condition, provision or clause of this Agreement is adjudged invalid or unenforceable, by a court of competent jurisdiction, such event shall not affect other terms, conditions, provisions or clauses of this Agreement which can be given effect and enforced without the invalid or unenforceable provision.

## [SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives effective on the date first written above.

"CUSTOMER":

**WINN-DIXIE STORES, INC.**, a Florida corporation

By: _____
                     Bennett L. Nussbaum
Title: _____Senior Vice-President_____

"PACKER":

**CONSOLIDATED BISCUIT CO.**, an Ohio corporation

By: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives effective on the date first written above.

**"CUSTOMER":**

**WINN-DIXIE STORES, INC.,** a Florida corporation

By: _____

Title: _____


**"PACKER":**

**CONSOLIDATED BISCUIT CO.,** an Ohio corporation

By: _William H. Noyes_

Title: _Vice President_

## SCHEDULE A

### LIST OF BAKERY PRODUCTS AND PRICES

| NUMBER | WD CODE | UPC | DESCRIPTION | PACK | SIZE | Current Transfer Price | Market Price |
|---|---|---|---|---|---|---|---|
| 1 | 102 | 14608 | WD LOW SODIUM CRACKERS | 24 | 16 OZ | $24.00 | $ 15.90 |
| 2 | 101 | 14610 | WD SALTINES | 24 | 16 OZ | $24.00 | $ 15.90 |
| 3 | 96 | 14641 | WD FAT FREE SALTINE CRACKERS | 24 | 15 OZ | $27.40 | $ 15.90 |
| 4 | 103 | 14662 | WD UNSALTED SALTINE CRACKERS | 24 | 16 OZ | $24.00 | $ 15.90 |
| 5 | 119 | 14335 | WD ORLEANS CRACKERS | 12 | 16 OZ | $13.50 | $ 9.52 |
| 6 | 1940 | 14340 | WD SOUP & CHILI CRAX | 12 | 12 OZ | $10.50 | $ 6.60 |
| 7 | 104 | 14615 | TM GEORGIA CRACKERS | 18 | 16 OZ | $22.05 | $ 15.22 |
| 8 | 153 | 14664 | TM GEORGIA CRACKERS | 18 | 12 OZ | $18.50 | $ 13.56 |
| 9 | 217 | 14256 | CG CHEEZE BITS | 12 | 15 OZ | $13.95 | $ 14.04 |
| 10 | 170 | 14480 | CG CHEEZE BITS | 12 | 9 OZ | $11.25 | $ 9.09 |
| 11 | 2029 | 14300 | WD FRST APPLE TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 12 | 2051 | 14301 | WD FRST BRN SGR CINN TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 13 | 2048 | 14302 | WD FROSTED BLUEBERRY TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 14 | 2041 | 14303 | WD FROSTED CHERRY TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 15 | 2049 | 14304 | WD FROSTED FUDGE TOASTER PASTRIES | 12 | 10.5 OZ | $10.75 | $ 8.14 |
| 16 | 2036 | 14305 | WD FROSTED GRAPE TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 17 | 2042 | 14306 | WD FROSTED STRAWBERRY TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 18 | 2030 | 14307 | WD FRST STRWBRY/BANA TOASTER PASTRIES | 12 | 11 OZ | $10.75 | $ 8.14 |
| 19 | 2037 | 14308 | WD BLUEBERRY TOASTER PASTRIES | 12 | 10 OZ | $10.75 | $ 8.14 |
| 20 | 20445 | 14309 | WD CHERRY TOASTER PASTRIES | 12 | 10 OZ | $10.75 | $ 8.14 |
| 21 | 2039 | 14311 | WD STRAWBERRY TOASTER PASTRIES | 12 | 10 OZ | $10.75 | $ 8.14 |
| 22 | 23 | 14266 | WD CHOCOLATE MARSHMALLOW PIES | 12 | 11 OZ | $10.00 | $ 6.78 |
| 23 | 24 | 14267 | WD COCONUT MARSHMALLOW PIES | 12 | 11 OZ | $10.00 | $ 6.78 |
| 24 | 26 | 14268 | WD BANANA MARSHMALLOW PIES | 12 | 11 OZ | $10.00 | $ 6.78 |
| 25 | 32 | 14272 | WD BUTTER PECAN MARSHMALLOW PIES | 12 | 11 OZ | $10.00 | $ 6.78 |
| 26 | 30 | 14274 | WD OATMEAL SNACK CAKE | 12 | 9.5 OZ | $10.00 | $ 6.78 |
| 27 | 140 | 15010 | CG BIG 60 DUPLEX SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 28 | 152 | 15012 | CG BIG 60 OAT PNUT BUTTER SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 29 | 139 | 15014 | CG BIG 60 PEANUT BUTTER SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |

| 30 | 143 | 15016 | CG BIG 60 VANILLA CRÈME SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
|---|---|---|---|---|---|---|---|
| 31 | 137 | 15018 | CG BIG 60 PNT BTR GRAHAM SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 32 | 148 | 15020 | CG BIG 60 VANILLA FUDGE SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 33 | 142 | 15030 | CG BIG 60 ASSORTED SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 34 | 144 | 15040 | CG BIG 60 LEMON SANDWICH COOKIES | 12 | 24 OZ | $14.20 | $ 11.63 |
| 35 | 238 | 15000 | CG CHOCOLATE KREMOS SANDWICH COOKIES | 12 | 16 OZ | $13.80 | $ 11.49 |
| 36 | 113 | 14250 | WD VANILLA WAFERS  (BOX) | 12 | 12 OZ | $13.20 | $ 7.84 |
| 37 | 5361 | 14265 | TM VANILLA WAFERS | 12 | 8 OZ | $8.04 | $ 7.66 |
| 38 | 156 | 14206 | CG OLD FASH OATMEAL COOKIES | 12 | 12 OZ | $9.10 | $ 8.40 |
| 39 | 168 | 14207 | CG OLD FASH CHOCOLATE CHIP COOKIES | 12 | 12 OZ | $9.10 | $ 8.40 |
| 40 | 151 | 14208 | CG OLD FASH ICED OTMEAL COOKIES | 12 | 12 OZ | $9.10 | $ 8.40 |
| 41 | 169 | 14210 | CG OLD FASH BUTTER COOKIES | 12 | 12 OZ | $9.10 | $ 8.40 |
| 42 | 145 | 15724 | CG REALLY PECAN JOY COOKIES | 12 | 12 OZ | $14.30 | $ 14.30 |
| 43 | 178 | 15730 | CG REALLY CHOCOLATE  CHIP COOKIES | 12 | 18 OZ | $17.90 | $ 17.90 |
| 44 | 189 | 15731 | CG REALLY CHEWY CHOC/CHP COOKIES | 12 | 16 OZ | $17.90 | $ 17.90 |
| 45 | 197 | 15732 | CG REALLY CHUNKY CHOCOLATE CHIP COOKIES | 12 | 15 OZ | $17.90 | $ 17.90 |
| 46 | 87 | 14193 | WD CINNAMON  GRAHAM CRACKERS | 12 | 16 OZ | $13.20 | $ 9.52 |
| 47 | 86 | 14320 | WD SUGAR HONEY GRAHAM CRACKER | 12 | 14.4 OZ | $13.20 | $ 9.52 |
| 48 | 2156 | 14280 | WD BUTTER FLAVOR PIE CURST | 12 | 6 OZ | $11.45 | $ 8.42 |
| 49 | 2152 | 15280 | WD GRAHAM PIE CRUST | 12 | 6 OZ | $11.45 | $ 7.32 |
| 50 | 2155 | 15282 | WD CHOCOLATE FLAVOR PIE CRUST | 12 | 6 OZ | $11.45 | $ 9.51 |
| 51 | 200 | 14295 | WD GINGER SNAPS (box) | 12 | 12 OZ | $13.20 | $ 13.20 |

## LIST OF SNACK PRODUCTS AND PRICES

| No. | WD Code | UPC | Snacks | Pack | Size | Transfer Price | Market Price |
|---|---|---|---|---|---|---|---|
| 1 | 299 | 15121 | WD Super size rest tortilla chips | 6 | 20oz | $8.50 | $ 6.00 |
| 2 | 262 | 15128 | WD Rest style tortilla chips | 12 | 10oz | $8.90 | $ 6.70 |
| 3 | 196 | 15137 | WD Cool garden tortilla chips | 12 | 9oz | $8.90 | $ 6.70 |
| 4 | 188 | 15138 | WD Triangle nacho tortilla chips | 12 | 9oz | $8.90 | $ 6.70 |
| 5 | 187 | 15140 | WD Triangle natural tortilla chips | 12 | 9oz | $8.90 | $ 6.70 |
| 6 | 195 | 15142 | WD Triangle salsa tortilla chips | 12 | 9oz | $8.90 | $ 6.70 |
| 7 | 20192 | 15205 | WD Bite size nacho tortilla chips | 12 | 9.5oz | $8.90 | $ 6.70 |
| 8 | 287 | 15206 | WD bite size natural tortilla chips | 12 | 9.5oz | $8.90 | $ 6.70 |
| 9 | 199 | 15130 | WD Regular corn chips | 12 | 10oz | $8.90 | $ 6.70 |
| 10 | 201 | 15131 | WD BBQ corn chips | 12 | 10oz | $8.90 | $ 6.70 |
| 11 | 202 | 15133 | WD Chili cheese corn chips | 12 | 10oz | $8.90 | $ 6.70 |
| 12 | 6869 | 15145 | WD 3-pk MW natural popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 13 | 6870 | 15146 | WD 3-pk MW butter popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 14 | 6864 | 15147 | WD 3-pk MW butter no salt popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 15 | 6877 | 15157 | WD Microwave kettle popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 16 | 6848 | 15218 | WD Double butter MW popcorn | 6 | 21oz | $9.05 | $ 6.48 |
| 17 | 6947 | 15219 | WD Butter lite MW popcorn | 6 | 21oz | $9.05 | $ 6.48 |
| 18 | 6946 | 15222 | WD 6-pk MW double butter popcorn | 12 | 21oz | $18.05 | $ 12.96 |
| 19 | 6865 | 15225 | WD 3-pk NW double butter popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 20 | 6956 | 15226 | WD 3-pk NW light butter popcorn | 12 | 10.5oz | $11.25 | $ 6.48 |
| 21 | 218 | 15120 | WD White cheese popcorn | 12 | 4.75oz | $8.90 | $ 6.36 |
| 22 | 1230 | 15115 | WD Puff cheese curls | 12 | 7oz | $8.90 | $ 5.52 |
| 23 | 204 | 15124 | Baked cheese balls | 12 | 6.5oz | $8.90 | $ 5.52 |
| 24 | 206 | 15126 | WD Crunchy cheese curls | 12 | 9.5oz | $8.90 | $ 5.52 |
| 25 | 248 | 15127 | WD Super size puff cheese | 12 | 14oz | $16.32 | $ 11.40 |
| 26 | 221 | 15202 | WD Baked crunchy cheese curls | 12 | 7 oz | $8.90 | $ 5.52 |

## AMENDMENT TO CONTRACT PACKAGING AGREEMENT

THIS AMENDMENT TO CONTRACT PACKAGING AGREEMENT (the "Amendment") is made as of this __4__ day of February, 2005, by and between WINN-DIXIE STORES, INC. ("Customer") and CONSOLIDATED BISCUIT CO. ("Packer").

WHEREAS, Packer and Customer are parties to a certain Contract Packaging Agreement dated January 17, 2005 (the "Agreement"); and,

WHEREAS, the parties wish to amend the Agreement as set forth herein.

NOW THEREFORE, the parties agree as follows:

1.  Paragraph 3 of the Agreement is hereby amended to read, in its entirety, as follows:

> 3.  **Terms of Payment and Delivery.**  The terms of payment are net within 21 days from the date of delivery.  All Products processed and packaged hereunder are processed and packaged F.O.B. Packer's plant, located at 701 North Forest Street, Valdosta, Georgia 31601.  Packer shall ship the Products to destinations designated by Customer.  For Products shipped during the first 3 months from the date hereof, all costs of transportation shall be borne by Packer, and, thereafter, all costs of transportation shall be borne by Customer.  Irrespective of who bears the cost of transportation, all risk of loss shall pass to Customer when the Product is delivered to the Carrier (the date of delivery).  A late charge of 1% per month will be charged on all invoiced amounts which are not paid within 30 days from the date of delivery.

2.  To the extent not modified hereby, the Agreement shall remain in full force and effect.  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date set forth above.

WINN-DIXIE STORES, INC.

By: _____
Its: _____


CONSOLIDATED BISCUIT CO.

By: _William H. Norm_
Its: _Vice President_

## AMENDMENT TO CONTRACT PACKAGING AGREEMENT

THIS AMENDMENT TO CONTRACT PACKAGING AGREEMENT (the "Amendment") is made as of this ____ day of February, 2005, by and between WINN-DIXIE STORES, INC. ("Customer") and CONSOLIDATED BISCUIT CO. ("Packer").

WHEREAS, Packer and Customer are parties to a certain Contract Packaging Agreement dated January 17, 2005 (the "Agreement"); and,

WHEREAS, the parties wish to amend the Agreement as set forth herein.

NOW THEREFORE, the parties agree as follows:

1.    Paragraph 3 of the Agreement is hereby amended to read, in its entirety, as follows:

3.    <u>Terms of Payment and Delivery</u>.  The terms of payment are net within 21 days from the date of delivery.  All Products processed and packaged hereunder are processed and packaged F.O.B. Packer's plant, located at 701 North Forest Street, Valdosta, Georgia 31601.  Packer shall ship the Products to destinations designated by Customer.  For Products shipped during the first 3 months from the date hereof, all costs of transportation shall be borne by Packer, and, thereafter, all costs of transportation shall be borne by Customer.  Irrespective of who bears the cost of transportation, all risk of loss shall pass to Customer when the Product is delivered to the Carrier (the date of delivery).  A late charge of 1% per month will be charged on all invoiced amounts which are not paid within 30 days from the date of delivery.

2.    To the extent not modified hereby, the Agreement shall remain in full force and effect.  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date set forth above.

WINN-DIXIE STORES, INC.

By: _____

Its: _____

CONSOLIDATED BISCUIT CO.

By: _____

Its: _____

H:\HOME\DSnavely\ConBisCo\Winn-Dixie\AMENDMENT TO CONTRACT PACKAGING AGREEMENT v2.doc

## EXHIBIT B

| Resource | Description | Unit Price | End Inventory Purchased | Total $ to be Invoiced |
|---|---|---|---|---|
| 304325 | ROL REG CORN CHIP | 0.066475149 | 625 | 41.55 |
| 309518 | CTN FROST CHERRY TP | 0.0775 | 1000 | 77.50 |
| 309514 | CTN FROST FUDGE TP | 0.0775 | 3346 | 259.32 |
| 309546 | DIV PIE CRUST W-02 | 0.047 | 5799 | 272.55 |
| 309355 | CTN 16 OZ WX GA CRK | 0.0956 | 3300 | 315.48 |
| 309471 | DIV 12 OZ REALLY PAD W-11 | 0.077000162 | 4349 | 334.87 |
| 304350 | ROL TRI NACHO TORTILLA | 0.090379918 | 3734 | 337.48 |
| 304330 | ROL BBQ CORN CHIP | 0.065379168 | 5625 | 367.76 |
| 304332 | ROL CHILI CHEESE CORN CHI | 0.066299947 | 8125 | 538.69 |
| 309084 | ROL BIG 60 DUPLEX | 0.046466498 | 15000 | 697.00 |
| 304497 | CON #80 R CARDBOARD | 0.262 | 2718 | 712.12 |
| 304466 | CTN 3-PK MW KETTLE BTR | 0.083657319 | 8830 | 738.69 |
| 304356 | ROL SALSA TORTILLA CHIP | 0.090379918 | 8536 | 771.48 |
| 304496 | CON #10 PLAIN WHITE KO | 0.65 | 1270 | 825.50 |
| 309542 | TRA ALUM PIE CRUST PAN | 0.138975 | 6000 | 833.85 |
| 309543 | TRA PIE CRUST LID | 0.098115385 | 9300 | 912.47 |
| 309470 | CON 12 OZ REALLY W-11 | 0.335000358 | 2725 | 912.88 |
| 309316 | CTN UNSALTED WD | 0.095621187 | 10175 | 972.95 |
| 304463 | CTN 3-PK MW BTR LIGHT | 0.083489998 | 13620 | 1,137.13 |
| 309275 | CON ORLEAN WAF W-4 | 0.3008305 | 3800 | 1,143.16 |
| 309083 | ROL BIG 60 OATMEAL P.B. | 0.043857159 | 28000 | 1,228.00 |
| 309087 | ROL BIG 60 VAN CREME | 0.042490519 | 30500 | 1,295.96 |
| 309082 | ROL BIG 60 ASSORTED FILM | 0.065397992 | 20500 | 1,340.66 |
| 309496 | CON W-13 CHUNKY | 0.624000803 | 2250 | 1,404.00 |
| 309074 | CON W-20 CHEESE BITS | 0.34 | 4188 | 1,423.92 |
| 304465 | CTN 3-PK MW NOSALT | 0.08133 | 17790 | 1,446.86 |
| 309085 | ROL BIG 60 PRT BTR GRAHM | 0.0445 | 34000 | 1,513.00 |
| 309151 | CON 14.4 OZ GRAHM W-63 WD | 0.355 | 4300 | 1,526.50 |
| 309124 | TRA 20 OZ KREMO S638 | 0.075899802 | 20160 | 1,530.14 |
| 309212 | CTN OATMEAL PIE | 0.077267081 | 20121 | 1,554.69 |
| 331040 | CTN TOASTERZ STRAWBERRY | 0.06195 | 25200 | 1,561.14 |
| 304475 | OVERWRAP | 1.10082326 | 1487 | 1,636.92 |
| 304470 | CTN 3-PK MW NATURAL | 0.082094616 | 20400 | 1,674.73 |
| 309545 | CON W-2 PIE CRUST | 0.249000768 | 6761 | 1,683.49 |
| 309898 | TRA CHEWY S389 OV | 0.036 | 49600 | 1,785.60 |
| 309512 | CTN FROST BRN SGR CIN TP | 0.077500117 | 26600 | 2,061.50 |
| 304460 | CTN 3-PK MW BUTTER | 0.081756349 | 26100 | 2,133.84 |
| 304484 | CON 50# | 0.312000045 | 6860 | 2,140.32 |
| 331126 | CG PALLET CAP - FIRST CHO | 0.12 | 18123 | 2,174.76 |
| 309086 | ROL BIG 60 LEMON | 0.042694109 | 52000 | 2,220.09 |
| 309476 | ROL REALLY PECAN JOY | 0.192 | 11637 | 2,234.30 |
| 309522 | CON W-6 TP | 0.265000033 | 8584.74 | 2,274.96 |
| 309223 | CON W-18 PIE | 0.3 | 8050 | 2,415.00 |
| 309357 | CON 18/16 GA CRK W52 | 0.516 | 5080 | 2,621.28 |
| 304499 | CON #20 PLAIN WHITE KO | 0.465 | 6044 | 2,810.46 |
| 309121 | CON 12/16 OZ KREMO W-35 | 0.35 | 8050 | 2,817.50 |
| 309231 | TRA CHOC MINIPIE (ENG) | 0.12984 | 22500 | 2,921.40 |
| 309114 | TRA KREMO S733 | 0.041125694 | 71100 | 2,924.04 |
| 309072 | CON W-31/12 12 OZ | 0.31502384 | 9530 | 3,002.18 |

| | | | | |
|---|---|---|---|---|
| 304485 | CON #70 | 0.903 | 3587 | 3,239.06 |
| 309490 | CON W-10 18 OZ REALLY | 0.594458505 | 5796 | 3,445.48 |
| 309055 | CON W-30 12 | 0.268 | 13380 | 3,585.84 |
| 309472 | TRA REALLY/DELUX S542 | 0.047552671 | 76014 | 3,614.67 |
| 304461 | CTN 3-PK MW DOUBLE BTR | 0.082076628 | 45100 | 3,701.66 |
| 309126 | CON 12 OZ FP TRAY CKY W-5 | 0.613001183 | 6764 | 4,146.34 |
| 309306 | XX HOT-MELT GLUE | 1.104929252 | 4025 | 4,447.34 |
| 309234 | ROL MINI PIE OVERWRAP (BO | 1.440000122 | 3274.34 | 4,715.05 |
| 37935 | ROL 15.75" 2.5MIL HDPE/TI | 0.018739635 | 257178.5 | 4,819.43 |
| 309091 | CON BIG 60 W-28 | 0.423247172 | 12020 | 5,087.43 |
| 309325 | CON 18/12 GA CRK W-42 | 0.421000081 | 13103 | 5,516.36 |
| 309315 | CON 12/16 OZ SALTINE W-57 | 0.43 | 13670 | 5,878.10 |
| 309061 | ROL 16" COEX | 1.119831468 | 5301 | 5,936.23 |
| 309491 | TRA 18 OZ CHOC S499 | 0.079569519 | 78645 | 6,257.74 |
| 309314 | CON 24/16 OZ SALTINE W-27 | 0.565000415 | 11801 | 6,667.57 |
| 334004 | ROL 3.67 OZ ICE BLUE (22 | 0.013999997 | 490050 | 6,860.70 |
| 309236 | ROL MINI PIE BANANA | 0.003 | 2505800 | 7,517.40 |
| 309098 | CON 18 OZ CHEWY W60 OF | 0.517 | 14765 | 7,633.51 |
| 462343 | TRAY 13 OZ CREME S-778IVE | 0.025860475 | 325980 | 8,430.00 |
| 309276 | ROL 10 1/2" GRHM K160HB23 | 2.890758675 | 2939.73 | 8,498.05 |
| 309319 | ROL 7 1/4" COEX | 1.12213212 | 7584 | 8,510.25 |
| 309206 | CTN CHOC PIE | 0.095546097 | 93900 | 8,971.78 |
| 334002 | ROL 3.67 OZ ICE CHERRY(22 | 0.014000002 | 653400 | 9,147.60 |
| 304478 | BAG GENERIC MW POPCORN | 0.04 | 249250 | 9,970.00 |
| 309081 | TRA BIG 60 S538 | 0.05056999 | 216384 | 10,942.54 |
| 37987 | ROL 17" B2150 LINER | 0.019152542 | 737647.5 | 14,127.83 |
| 309310 | ROL 9 1/16" CO-EX SALTINE | 1.13052476 | 15743 | 17,797.85 |
| 309202 | ROL 8 3/4 PIES | 1.336890241 | 13558 | 18,125.56 |
| 309312 | CTN SALTINE WD | 0.096922482 | 210650 | 20,416.72 |
| 309327 | CTN 12 OZ TM GA CRK | 0.0956 | 222375 | 21,259.05 |
| 334003 | ROL 3.67 OZ ICE STRAW(22 | 0.014000001 | 1842225 | 25,791.15 |
| | | **Total pkg CBC Purchased** | | **344,617.95** |
| | | | | |
| | | | | |
| | Updated 6/27/06 WD total | | | |
| | pkg CBC Purchased. | | | |

## EXHIBIT C

| Resource | Description | Unit Price | End Inventory Purchased | Total $ to be Invoiced |
|---|---|---|---|---|
| 113204 | CL PROTEOLYTIC ENZYME TAB | 0.094228856 | 125.4 | 11.82 |
| 123378 | CO GOLDEN MEADOW VEG SHAD | 1.650118203 | 33.84 | 55.84 |
| 153345 | FV N&A BUTTER PECAN 0392 | 2.02 | 42 | 84.84 |
| 153300 | FV ART BLACK CHERRY 202-0 | 2.638072855 | 34.04 | 89.80 |
| 173202 | SP CHILI POWDER | 2 | 50 | 100.00 |
| 123330 | CO LEMON YELLOW SHADE 402 | 1.393851508 | 77 | 107.33 |
| 153315 | FV ART LEMON OIL 7136 | 3.529745042 | 33 | 116.48 |
| 123348 | CO MARSHMALO ROSE SHAD 40 | 3.491196451 | 41 | 143.14 |
| 153361 | FV ART CREAMY VANILLA 488 | 4.790415704 | 34.64 | 165.94 |
| 123375 | CO BANANA YELLOW SHADE 40 | 2.109543011 | 81 | 170.87 |
| 153312 | FV COCONUT 0371 | 3.828831948 | 48 | 183.78 |
| 153336 | FV ORANGE OIL 002056 | 2 | 115 | 230.00 |
| 153331 | FV N&A CINNAMON OIL 0741 | 5.199937811 | 47 | 244.40 |
| 153279 | FV ART BANANA OIL 202-013 | 3.97852349 | 63 | 250.65 |
| 15103 | FV LEMON SUPREME | 2.089 | 133.4 | 278.67 |
| 18940 | SW NULOMALINE - SURE SWEE | 0.8419 | 400 | 336.76 |
| 14026 | FL SOFT WHEAT BULK FLOUR | 0.117855273 | 3150 | 371.24 |
| 153314 | FV N&A GRAHAM CRKR 5435 - | 7.048139535 | 53 | 373.55 |
| 153288 | FV N&A CINNAMON | 1.495197232 | 255 | 381.28 |
| 153285 | FV ART CARAMEL 209-0313 | 2.780068729 | 139.68 | 388.32 |
| 153281 | FV ART BUTTERSCOTCH 0328 | 2.708420612 | 155 | 419.81 |
| 113198 | CL SODIUM PROPIONATE | 0.874 | 500 | 437.00 |
| 18067 | SW SORBITOL | 0.45 | 1100 | 495.00 |
| 153373 | FV PWD N&A VANILLIN REPLA | 4.306666667 | 121 | 521.11 |
| 153306 | FV ART CHOCOLATE 0705 | 3.198014927 | 186 | 594.83 |
| 153372 | FV VANILLA SUGAR 3060 | 12.58 | 50 | 629.00 |
| 113172 | CL PYROXIDINE  HCL VITAMI | 14.7845805 | 44.1 | 652.00 |
| 153362 | FV VANILLA CRYSTAL (16-1) | 1.69 | 400 | 676.00 |
| 110960 | CL PULVERIZED SALT (EXTRA | 0.154687179 | 4500 | 696.09 |
| 153365 | FV VANILLA WAFER TYPE D87 | 3.82 | 200 | 764.00 |
| 153363 | FV SPECIAL ART VANILLA 01 | 2.392055567 | 350 | 837.22 |
| 153368 | FV POWD VANILLA 2981 | 16.7952 | 50 | 839.76 |
| 183032 | SW GRAPE SPRINKLE 22265 | 2.16 | 400 | 864.00 |
| 11227 | CL FUMERIC ACID | 1 | 880 | 880.00 |
| 18911 | SW SUGAR SANDING SUGAR | 0.3526 | 2500 | 881.50 |
| 153297 | FV NATURAL CHEESE 1176 | 9.466666667 | 100 | 946.67 |
| 12265 | CO BLUE LIQUID PC616 | 6.5 | 150 | 975.00 |
| 11312 | CL MIRA-SPERSE | 0.5 | 2100 | 1,050.00 |
| 153370 | FV VANILLIN 001249 | 9.845266742 | 110.125 | 1,084.21 |
| 183029 | SW GREEN SPRINKLE 22217 | 1.41 | 850 | 1,198.50 |
| 153308 | FV N&A CHOCOLATE D160 | 2.24 | 550 | 1,232.00 |
| 113450 | CL POTASSIUM CHLORIDE USP | 0.529 | 2450 | 1,296.05 |
| 16103 | SH MARGARINE | 0.577675 | 2300 | 1,328.65 |
| 150920 | FV N&A BUTTER WL29015 812 | 6.85 | 200 | 1,370.00 |
| 173227 | SP CINAMON SUGAR | 0.646718519 | 2212 | 1,430.54 |
| 163402 | SH BUNGE COTTNSEED FLAK 1 | 0.862883333 | 1700 | 1,466.90 |
| 19270 | TN PECAN HALVES | 5.147515528 | 300 | 1,544.25 |
| 113211 | CL SODIUM METABISULPHITE | 0.503412698 | 3121.0625 | 1,571.18 |
| 18232 | SW SUGAR SANDING RED | 0.694526923 | 2500 | 1,736.32 |
| 133400 | CG STRAWB BANANA TOASTER/ | 0.81 | 2200 | 1,782.00 |
| 153293 | FV CHEESE 1035 | 10.84924851 | 165 | 1,790.13 |
| 153282 | FV ART CUSTARD 0620 | 3.623909637 | 511 | 1,851.82 |
| 153360 | FV N&A VANILLA CREME 2967 | 2.756639055 | 673 | 1,855.22 |
| 183098 | SW SUGAR EFG CANE BULK | 0.259735343 | 7740.4375 | 2,010.47 |
| 163294 | SH NATURAL LARD 2017235 | 4.092135004 | 492 | 2,013.33 |

| Code | Description | | | |
|---|---|---|---|---|
| 118113 | SW INVERT SUGAR LIQUID | 0.337741111 | 6000 | 2,026.45 |
| 113420 | CL MR CHIP ICING STABIL F | 0.75462 | 2765 | 2,086.52 |
| 153353 | FV ART BUTTER 6136 | 2.613886245 | 840.4 | 2,196.71 |
| 18513 | SW SYR COR HI.FRUCTO-BULK | 0.100388629 | 24800 | 2,489.64 |
| 11699 | CL LOW TEMP 588 STARCH | 0.5 | 5150 | 2,575.00 |
| 153369 | FV PURE VANILLA & SPICE | 8 | 324 | 2,592.00 |
| 183028 | SW WHITE COLOR SPRINKLE 2 | 1.937777778 | 1350 | 2,616.00 |
| 11478 | CL BINOSAL 15–MODIFIED S | 0.5 | 5550 | 2,775.00 |
| 123416 | DE EGG YOLK SOLIDS | 1.55 | 1800 | 2,790.00 |
| E2793 | VERSA WHIP 600K | 8.142380952 | 350 | 2,849.83 |
| 123305 | CO CARAMEL COLOR 602 | 0.83 | 3450 | 2,863.50 |
| 143399 | FL UNSWEET MED DESICCAT C | 0.606338028 | 4765 | 2,889.20 |
| 113201 | CL SODIUM ALGINATE KELTON | 12.21712 | 238 | 2,907.67 |
| 15628 | FV BLUEBERRY FLAVOUR FN-1 | 5.355 | 555.66 | 2,975.56 |
| 25429 | CL KOSHER GELATIN | 11 | 300 | 3,300.00 |
| 103393 | LIQUOR CHOCOLATE | 2.284958333 | 1760 | 4,021.53 |
| 153163 | FV STO-MAR | 6.660743902 | 614 | 4,089.70 |
| 118114 | SW CORN SYRUP SOLID STARD | 0.25 | 16575 | 4,143.75 |
| 15235 | FV STRAWBERRY NAT FN-2004 | 7.694006309 | 546 | 4,200.93 |
| 123443 | DE DELACTOSED WHEY | 0.681818182 | 6200 | 4,227.27 |
| 123414 | DE POWDERED WHOLE EGGS | 1.53 | 2955 | 4,521.15 |
| 13888 | FI PASTE RAISIN | 1.103717949 | 4100 | 4,525.24 |
| 18507 | SW SYRUP CORN-BULK    4 | 0.117106943 | 39298 | 4,602.07 |
| 133408 | CG GRAPE TOASTR PASTR 119 | 0.748 | 7000 | 5,236.00 |
| 133295 | FI UNFLAVOR BAKERY 2347 | 0.876568627 | 6000 | 5,259.41 |
| 160821 | SH SOYBEAN OIL TK2 523MDP | 0.321626559 | 17595 | 5,659.02 |
| 163156 | SH SHORTENING OLYMPIC 200 | 0.354739623 | 16701 | 5,924.51 |
| 160815 | SH SOYBEAN OIL 574 MDP 38 | 0.342113393 | 17381 | 5,946.27 |
| 14623 | COCONUT MACAROON BAKER'S | 0.605714286 | 9975 | 6,042.00 |
| 103413 | CH SEMI SWEET CHOC DROPS | 1.1013375 | 5800 | 6,387.76 |
| 123387 | DE CHEDLONG F009510 | 2.604125 | 2700 | 7,031.14 |
| G3560 | CL SODIUM ALUMINUM PHOSPH | 1.215357143 | 6300 | 7,656.75 |
| 123384 | DE CHEDDAR CHEESE | 3.650331871 | 2202.66 | 8,040.44 |
| 103001 | CH NATURAL COCOA POWDER L | 0.6143525 | 13475 | 8,278.40 |
| 153354 | FV BUTTER-VAN FLAVOR | 6.596940299 | 1365 | 9,004.82 |
| 11338 | CL PANODAN-SDK-EMULSIFER | 2.23 | 4149.5 | 9,253.39 |
| 183177 | SW MALT SYRUP PREMOSE OS- | 0.245 | 39600 | 9,702.00 |
| 103003 | CH BLACK B&C COCOA BAG | 0.956666667 | 10550 | 10,092.83 |
| 163126 | SH PURE VEGATABLE OIL | 0.315386959 | 35767 | 11,280.45 |
| 16834 | SH COCONUT SPRAY OIL 76 D | 0.421252651 | 46935 | 19,771.49 |
| 133405 | CG BRN SGR CIN TP 119408 | 0.66 | 30800 | 20,328.00 |
| 133404 | CG BLUEB TOASTER PASTRY 1 | 0.83 | 28600 | 23,738.00 |
| 133407 | CG CHIOC FUDG TP 119420 | 0.7 | 41250 | 28,875.00 |
| 133403 | CG APPLE TOASTER PASTRY 1 | 0.7 | 56100 | 39,270.00 |
| 133406 | CG CHERRY TOASTER PASTRY | 0.76 | 54450 | 41,382.00 |
| 133401 | CG STRAWB TOAST PASTR 10T | 0.789806094 | 64900 | 51,258.42 |
| | **Total Ingredients purchased after acquisition** | | | **463,488.07** |

## EXHIBIT D

| Resource | Description | Unit Price | Ending Inventory Qty | Total $ to Invoice |
|---|---|---|---|---|
| 714307 | WX 12/11 OZ FRST STRAWB/B | 8.17 | 430.00 | 3,511.38 |
| 714309 | WX 12/10 OZ CHERRY | 7.41 | 274.00 | 2,031.44 |
| 814253 | WX 12/12 OZ GINGER SNAP B | 13.09 | 95.00 | 1,243.83 |
| 814257 | TD 12/8 OZ CHOCOLATE CHIP | 6.54 | 12.00 | 78.51 |
| 814261 | TD 12/8 OZ LEMON SUGAR | 5.54 | 562.00 | 3,116.06 |
| 814262 | TD 12/8 OZ OATMAL CHOC CH | 8.11 | 213.00 | 1,726.96 |
| 814269 | WX 12/11 OZ WILD CHERRY P | 8.74 | 1,941.00 | 16,965.22 |
| 814270 | WX 12/11 OZ DEVIL FOOD PI | 9.18 | 391.00 | 3,589.78 |
| 814272 | WX 12/11 OZ BUTTER PECAN | 8.42 | 25.00 | 210.39 |
| 814275 | WX 12/11 OZ VANILLA PIE | 8.47 | 541.00 | 4,583.97 |
| 814292 | WX 12/12 OZ ANIMAL COOKIE | 8.02 | 468.00 | 3,754.43 |
| 814316 | TD 12/8 OZ OATMEAL CKY | 5.81 | 296.00 | 1,718.50 |
| 814317 | TD 12/8 OZ MIXED | 6.86 | - | 0.00 |
| 814610 | WX 24/16 OZ SALTINE STAK- | 15.07 | 21.00 | 316.47 |
| 814641 | WX 24/15 OZ FAT FREE CRAC | 15.22 | 5.00 | 76.12 |
| 814851 | CG 12/12 OZ OATMEAL TRAY | 8.58 | 217.00 | 1,862.36 |
| 815012 | CG 12/24 OZ OATMEAL PNUT | 10.76 | 509.00 | 5,474.97 |
| 815014 | CG 12/24 OZ PEANUT BUTTER | 12.35 | 1,548.00 | 19,112.03 |
| 815020 | CG 12/24 OZ VAN FUDGE BIG | 10.00 | 361.00 | 3,611.25 |
| 815040 | CG 12/24 OZ LEMON | 9.15 | 40.00 | 365.89 |
| 815621 | CG 12/14 OZ COCONUT KREMO | 13.99 | 250.00 | 3,496.89 |
| 815724 | CG 12/12 OZ REALLY PECAN | 17.10 | 55.00 | 940.49 |
| 815732 | CG 12/15 OZ REALLY CHUNKY | 16.50 | 5.00 | 82.50 |
| | | | Total Finished Goods | 77,869.45 |
| | | | | |
| | | | | |
| | Updated 6/27/06 chart for WD Finished Goods | | | |

PNC Bank, Nation... ...tion
Jeanette, PA
RAW MATERIAL ACCOUNT

**Bakery Feeds**
A Division of Griffin Industries, Inc.
CENTRE, AL

60-152
433

No. 136713

**FIFTH THIRD BANK**

DATE  3/06/06

CHECK AMOUNT

Name:   CONSOLIDAT

Box:    631073

PAY          Six Hundred Fourteen Dollars and 27 Cents      *****614.27

Date:   03/24/2006

TO THE
ORDER OF:    CONSOLIDATED BISCUIT COMPANY
             701 N. FOREST ST.                      By:
             VALDOSTA
             GA,  31601-0000

Batch:  501

Item:   6

Amt:    614.27

John M. Griffin
AUTHORIZED SIGNATURE

⑈136713⑈ ⑆043301627⑆ 101729782⑈

4291.3080

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Bakery Feeds** | | | VENDOR NO.<br>44026000 | | CHECK DATE<br>3/06/06 | No.   136713 | |
| Invoice Date | Quantity | Unit of Measure | Product Code | Description | Trailer # | Price | Amount |
| 2/28/06 | 1.00 | EA | | FUEL SURCHARGE | | 124.74 | 124.74- |
| 2/16/06 | 16.40 | TN | | BAKERY WASTE | K-2229 | 43.00 | 705.20 |
| 2/22/06 | 17.71 | TN | | BAKERY WASTE | K-2501 | 43.00 | 761.53 |
| 2/25/06 | 17.96 | TN | | BAKERY WASTE | K-2229 | 43.00 | 772.28 |
| 2/28/06 | | EA | | FREIGHT | | 500.00 | 1500.00- |

| | | | |
|---|---|---|---|
| Bakery Feeds | 4221 Alexandria Pike | Cold Spring, KY 41076 | Phone: 859-781-2010 |

614.27


COLLINS REPORTING

CBC 1335

PNC Bank, National Association
Jeannette, PA
RAW MATERIAL ACCOUNT

**Bakery Feeds** 60-162/433
A Division of Griffin Industries, Inc.
HAMPTON TRANSFER

No. 136874

DATE 3/06/06

CHECK AMOUNT
******363.44

PAY
Three Hundred Sixty Three Dollars and 44 Cents

TO THE
ORDER OF:
CONSOLIDATED BISCUIT
ATTN: PARKER
701 N. FOREST STREET
VALDOSTA
GA, 31601-0000

By:

_John M. Griffin_
AUTHORIZED SIGNATURE

⑈136874⑈ ⑆043301627⑆ 1017297829⑈

FIFTH THIRD BANK

Name: CONSOLIDAT
Box: 631073
Date: 03/24/2006
Batch: 501
Item: 7
Amt: 363.44

4291.3080

## Bakery Feeds

| | VENDOR NO. 48326000 | | | CHECK DATE 3/06/06 | | No. | 136874 | |
|---|---|---|---|---|---|---|---|---|

| Invoice Date | Quantity | Unit of Measure | Product Code | Description | Trailer # | Price | Amount |
|---|---|---|---|---|---|---|---|
| 2/28/06 | 1.00 | EA | | FUEL SURCHARGE | | 40.26 | 40.26- |
| 2/07/06 | 21.46 | TN | | BAKERY WASTE | 2229 | 45.00 | 965.70 |
| 2/28/06 | | EA | | FREIGHT | | 500.00 | 500.00- |
| 2/07/06 | 1.00 | EA | | CITATIONS | | 62.00 | 62.00- |
| | | | | | | | 363.44 |

Bakery Feeds        4221 Alexandria Pike        Cold Spring, KY 41076        Phone: 859-781-2010

CBC 1336

B10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT    Middle District of Florida  Jacksonville Division | PROOF OF CLAIM |

| Name of Debtor.<br>**Winn-Dixie Stores, Inc.** | Case Number<br>**05-03817-3F1** |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property).
**Consolidated Biscuit Company**
Name and address where notices should be sent.
c/o Stutsman Thames & Markey, P.A.
Attn: Richard R. Thames, Esq.
50 N. Laura Street, Suite 1600
Jacksonville, Florida 32202

Telephone number    (904) 358-4000

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: **13321**
(If known)

Filed on:  June 29, 2006

*558559*

Name and address where payment should be sent (if different from above):
**Consolidated Biscuit Company**
Attn:  William H. Varney
312 Rader Road
McComb, Ohio 45858

Telephone number.    **(419) 293-2911**

DEBTOR: WINN-DIXIE STORES, INC.
U.S. BANKRUPTCY COURT  M.D.-FLORIDA
JOINTLY ADMINISTERED UNDER
CASE: 05-03817 (3F1)
CHAPTER 11
**CLAIM NO.: 13830-**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**    $   384,602.85

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim Attach itemized statement of interest or charges.

**2. Basis for Claim:  Contract Rejection Damages**
(See instruction #2 on reverse side )

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
**Nature of property or right of setoff:**  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

Value of Property:$_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim,
if any: $ _____    Basis for perfection: _____

Amount of Secured Claim: $ _____    Amount of Unsecured: $ _____

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U S C §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U S C  §507 (a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7)

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507(a)(8)

☐ Other – Specify applicable paragraph of 11 U S C §507 (a)()

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements You may also attach a summary Attach redacted copies of documents providing evidence of perfection of a security interest You may also attach a summary (See definition of "redacted" on reverse side )
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING**
If the documents are not available, please explain

Amount entitled to priority

$ _____

| Date:<br>**7/1/08** | Signature: The person filing this claim must sign it  Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above  Attach copy of power of attorney, if any<br><br>Attorney<br>Richard R. Thames | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim  Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U S C §§ 152 and 3571*

3
9-21-08
COLLINS REPORTING

# EXHIBIT "A"

## REVISED EXHIBIT A TO PROOF
## OF CLAIM  OF CONSOLIDATED BISCUIT CO.

### CALCULATION OF AMOUNT OF CLAIM

Ingredients subject to repurchase by
Winn-Dixie, per Exhibit A-1............................................................$22,239.98

Packaging materials subject to repurchase by
Winn-Dixie, per Exhibit A-2..........................................................$362,362.87

**TOTAL**      <u>**$384,602.85**</u>

This proof of claim supercedes and reduces Claim No. 13321 filed by Henry N. Heuerman, Esq. on behalf of Consolidated Biscuit Co. on or about June 29, 2006.

68959

EXHIBIT A-1

| Resource | Description | Unit Price | Ending Inv Qty from Acquisition | Total $ to be Invoiced |
|---|---|---|---|---|
| 123378 | CO GOLDEN MEADOW VEG SHAD | 1.6667 | 5.16 | 8.60 |
| 18940 | SW NULOMALINE - SURE SWEE | 0.8695 | 50.00 | 43.47 |
| 123377 | CO WAFER YELLOW SHADE 409 | 1.1795 | 39.00 | 46.00 |
| 113198 | CL SODIUM PROPIONATE | 0.6387 | 100.00 | 63.87 |
| 153300 | FV ART BLACK CHERRY 202-0 | 3.0500 | 23.96 | 73.08 |
| 153285 | FV ART CARAMEL 209-0313 | 2.7846 | 28.32 | 78.86 |
| 173202 | SP CHILI POWDER | 2.0000 | 50.00 | 100.00 |
| 21920 | PEANUT BUTTER DROPS #2 | 0.9150 | 120.00 | 109.80 |
| 113172 | CL PYROXIDINE HCL VITAMI | 19.3636 | 6.90 | 133.61 |
| 113450 | CL POTASSIUM CHLORIDE USP | 0.5904 | 250.00 | 147.59 |
| 153361 | FV ART CREAMY VANILLA 488 | 2.9167 | 36.00 | 105.00 |
| 153362 | FV VANILLA CRYSTAL (16-1) | 1.6907 | 120.00 | 202.88 |
| 153368 | FV POWD VANILLA 2981 | 16.1600 | 13.00 | 210.08 |
| 173261 | SP WHOLE GROUND NUTMEG | 4.1000 | 60.00 | 246.00 |
| 153370 | FV VANILLIN 001249 | 7.6506 | 33.88 | 259.16 |
| 123329 | CO CHEDDAR SHADE 0148 | 6.2000 | 45.00 | 279.00 |
| 173257 | SP CRUSHED GROUND RED PEP | 1.5000 | 50.00 | 75.00 |
| 18911 | SW SUGAR SANDING SUGAR | 0.3527 | 1,400.00 | 493.75 |
| 193437 | PN DRY ROASTED PEANUT | 0.9598 | 960.00 | 921.42 |
| 153353 | FV ART BUTTER 6136 | 2.6143 | 424.60 | 1,110.03 |
| 183033 | SW STRAWB/BANANA BLEND 22 | 2.1600 | 600.00 | 1,296.00 |
| 113171 | CL VITAMIN A PALMITATE | 45.0976 | 37.00 | 1,668.61 |
| 11482 | CL GUAR GUM 8/24 (TIC) | 1.6800 | 1,050.00 | 1,764.00 |
| 123416 | DE EGG YOLK SOLIDS | 1.8000 | 1,000.00 | 1,800.00 |
| 113426 | CL GELOGEN GIT 04 AGAR GE | 5.9564 | 550.00 | 3,276.02 |
| 123384 | DE CHEDDAR CHEESE | 3.1766 | 1,161.00 | 3,688.00 |
| 113424 | CL INSTANT CLEARJEL | 1.0861 | 3,720.00 | 4,040.18 |
| | Total Ingredients purchased from WD | | | 22,239.98 |

EXHIBIT A-2

| Resource | Description | Unit Price | Ending Inv Qty from Acquisition | Total $ to be Invoiced |
|---|---|---|---|---|
| 309538 | STK BUTTER FLA PIE CR | 0.015196429 | 150 | 2.28 |
| 309245 | CTN SUNRISE BANAN PIE | 0.00173075 | 16000 | 27.69 |
| 309123 | ROL 20 OZ CHOC KREMO | 0.064 | 1406 | 89.98 |
| 309303 | DIV WAFER PAD W-24B | 0.05 | 1700 | 85.00 |
| 309474 | ROL REALLY CHOC CHIP | 0.16 | 600 | 96.00 |
| 309304 | XX COLD MELT GLUE (ELMER) | 1.461111111 | 80 | 116.89 |
| 309236 | ROL MINI PIE BANANA | 0.003 | 69000 | 207.00 |
| 309225 | CTN BISHOP DEVILFD PI | 0.062971429 | 3700 | 232.99 |
| 309028 | PAD W-07DOZ | 0.090740741 | 2700 | 245.00 |
| 309540 | STK GRAHAM PIE | 0.015205882 | 17500 | 266.10 |
| 304464 | CTN 6-PK MW BUTTER | 0.094806492 | 2850 | 270.20 |
| 304449 | ROL BACON & CHEDDAR | 0.050895221 | 5625 | 286.29 |
| 309074 | CON W-20 CHEESE BITS | 0.315873016 | 987 | 311.77 |
| 304495 | CON #90 PLAIN BROWN | 0.2752 | 625 | 172.00 |
| 309302 | DIV WAFER PAD W-24A | 0.1 | 3000 | 300.00 |
| 304472 | CTN.6-PK MW NATURAL | 0.07 | 5625 | 393.75 |
| 309298 | CON W-24 WAFER | 0.32 | 1631 | 521.92 |
| 309901 | ROL 18 OZ CHOC CHIP OV | 0.044038462 | 12000 | 528.46 |
| 309073 | CTN 15 OZ CHEESE BIT | 0.30878177 | 1750 | 540.37 |
| 309244 | DIV PIE PAD W-61 20 CT | 0.12 | 2600 | 312.00 |
| 309847 | CTN 12 OZ VAN WAFER OV | 0.093505535 | 6300 | 589.08 |
| 309358 | CON 16 OZ OV CRACKER W52 | 0.443116883 | 1400 | 620.36 |
| 309510 | CTN FROST BLUEBERRY TP | 0.047201566 | 13650 | 644.30 |
| 309231 | TRA CHOC MINIPIE (ENG) | 0.129846154 | 5500 | 714.15 |
| 309229 | CTN BISHOP BTR PECAN | 0.059542857 | 8683 | 521.00 |
| 309125 | CON 20 OZ KREMO W-34 | 0.375128205 | 2050 | 769.01 |
| 309898 | TRA CHEWY S389 OV | 0.029354167 | 27200 | 798.43 |
| 309459 | CON 12 SNAPPY GRHAM | 0.33 | 2700 | 891.00 |
| 309319 | ROL 7 1/4" COEX | 1.074952562 | 904 | 971.76 |
| 309234 | ROL MINI PIE OVERWRAP (BO | 1.390355913 | 701.66 | 975.56 |
| 309159 | CON GRAHAM W37 OV | 0.328 | 3000 | 984.00 |
| 309228 | CTN BISHOP ROYALSTRIP | 0.06 | 16400 | 984.00 |
| 309502 | CTN BLUEBERRY TP | 0.047206723 | 21100 | 996.06 |
| 309097 | CON 12 OZ W-59 OF | 0.290074074 | 3555 | 1,031.21 |
| 309900 | ROL 18 OZ ICED OATMEAL OV | 0.066055556 | 16000 | 1,056.89 |
| 304471 | CTN 6-PK MW BTR LIGHT | 0.070004968 | 17150 | 1,200.59 |
| 309221 | CTN VANILLA PIE | 0.055912888 | 23300 | 1,302.77 |
| 309239 | ROL ROYAL TRT 20 CT | 0.0048 | 273187 | 1,311.30 |
| 309067 | CTN 12 OZ GINGER SNAP | 0.087201507 | 15123 | 1,318.75 |
| 309831 | ROL 10 OZ SOUP/CHILI OV | 0.046609351 | 28985 | 1,350.97 |
| 309026 | BAG W-7 | 0.749090909 | 1932 | 1,447.24 |
| 309224 | CTN BISHOP BANANA PIE 9 1 | 0.06 | 25000 | 1,500.00 |
| 309243 | CON W-61 20 CT PIE | 0.365028571 | 4375 | 1,597.00 |
| 309240 | TRA ROYALTRT 20 CT | 0.17 | 6000 | 1,020.00 |
| 309088 | ROL BIG 60 VAN FUDGE | 0.042012195 | 40000 | 1,680.49 |
| 309246 | CTN SUNRISE CHOC PIE | 0.059493878 | 31325 | 1,863.65 |
| 304399 | ROL 1 OZ PUFF CHEZ | 0.044794079 | 42210 | 1,890.76 |
| 309858 | CTN BANANA PIE OV | 0.165828571 | 8752 | 1,451.00 |
| 309902 | ROL 18 OZ SUGAR OV | 0.044057692 | 50000 | 2,202.88 |
| 309838 | CTN 16 OZ SNACK OV | 0.099583333 | 23546 | 2,344.79 |
| 309238 | CON W-56 30 CT PIE | 0.465066667 | 5100 | 2,371.84 |
| 309118 | ROLVANILLA KREMO | 0.0575742 | 41782 | 2,405 57 |
| 309278 | CTN 12 OZ SOUP/CHILI | 0.113246753 | 21575 | 2,443.30 |
| 309867 | ROL 24 OV DUPLEX CREME | 0.047236111 | 54000 | 2,550.75 |
| 309233 | TRA BANANA MINI PIE ARAB | 0.082293402 | 31927 | 2,618.00 |
| 304467 | CTN 6-PK MW DOUBLE BTR | 0.094800469 | 30225 | 2,865.34 |

| 309833 | ROL 12 OZ VAN WAFER OV | 0.040057143 | 70100 | 2,804.00 |
|--------|------------------------|-------------|-------|----------|
| 309237 | DIV W-56 30-CT PIE PAD | 0.154 | 18912 | 2,912.45 |
| 309235 | ROL MINI PIE CHOC | 0.003 | 792000 | 2,376.00 |
| 309860 | TRA CHOC MINI PIE OV 30CT | 0.151288136 | 20903 | 3,162.38 |
| 309040 | CTN 9 OZ CHEESE BITS | 0.070127226 | 45451 | 3,187.35 |
| 309868 | ROL 24 OZ VAN CREME OV | 0.047223684 | 68000 | 3,211.21 |
| 309870 | ROL 24 OZ LEMON CREME OV | 0.047232558 | 68000 | 3,211.81 |
| 309869 | ROL 24 OZ ASST CREME OV | 0.047230769 | 70000 | 3,306.15 |
| 309520 | CTN GRAPE TP | 0.047200997 | 71750 | 3,386.67 |
| 309214 | CTN ROYAL STRIPE | 0.0595 | 59100 | 3,516.45 |
| 309899 | ROL 18 OZ OATMEAL OV | 0.14 | 26000 | 3,640.00 |
| 309210 | CTN DEVIL FOOD PIE | 0.0595 | 61600 | 3,665.20 |
| 309830 | ROL 12/18 GINGERSNAP OV | 0.089302885 | 41601 | 3,715.00 |
| 309848 | CTN 9 OZ OV CHEESE BITS | 0.100011662 | 39375 | 3,937.96 |
| 309859 | CTN CHOC PIE OV | 0.165790476 | 26000 | 4,310.55 |
| 309113 | ROL KREMO DELUX CHOC | 0.051377709 | 85000 | 4,367.11 |
| 309068 | CTN 12 OZ ANIMAL D | 0.087197581 | 53175 | 4,636.73 |
| 309837 | CTN FSTCO UNSALTED 1# | 0.125 | 39425 | 4,928.13 |
| 309836 | CTN 16 OZ SUGAR HON GRAHA | 0.113494687 | 44700 | 5,073.21 |
| 309216 | CTN WILD CHERRY PIE | 0.06 | 95600 | 5,736.00 |
| 309111 | ROL KREMO DLX COCONUT | 0.051377331 | 115200 | 5,918.67 |
| 309834 | CTN 16 OZ ORLEAN WAFER OV | 0.130243902 | 46900 | 6,108.44 |
| 309857 | CTN OATMEAL PIE  OV | 0.069964706 | 84957 | 5,947.00 |
| 309939 | CTN 1# PM UNSALTED | 0.129008219 | 45625 | 5,886.00 |
| 309112 | ROL KREMO DLX LEMON | 0.051382353 | 133450 | 6,856.98 |
| 309274 | CTN ORLEAN WAFER WD | 0.128754316 | 54525 | 7,020.33 |
| 309127 | ROL 12 OZ OATMEAL COOKIE | 0.039559829 | 186500 | 7,377.91 |
| 309835 | CTN 16 OZ CINN GRAHAM OV | 0.088996997 | 83247 | 7,409.00 |
| 309521 | CTN FROST STRAWB/BANANA T | 0.047197894 | 160450 | 7,572.90 |
| 309242 | TRA CHOC 20 CT | 0.09980452 | 81854 | 8,169.00 |
| 309276 | ROL 10 1/2" GRHM K160HB23 | 2.890148831 | 2822 | 8,156.00 |
| 309911 | CTN OV FRST BWNSG | 0.049397078 | 172830 | 8,537.30 |
| 309840 | CTN 16 OZ SALTINE  OV | 0.144998314 | 63350 | 9,185.64 |
| 309851 | CTN 8.5 OZ ANIMAL  OV | 0.063800963 | 155700 | 9,933.81 |
| 309241 | TRA BANANA 20 CT | 0.099804089 | 116775 | 11,654.62 |
| | | | | |
| 309849 | CTN 8.5 OZ COCONUT BAR OV | 0.063798857 | 218750 | 13,956.00 |
| 309853 | CTN 8.5 OZ ICED FRUIT | 0.063798266 | 221625 | 14,139.29 |
| 309938 | CTN PM SALTINE | 0 128997792 | 113000 | 14,576.75 |
| 309850 | CTN 8.5 OZ BUTTER | 0.063801723 | 234500 | 14,961.50 |
| 309852 | CTN 8.5 OZ CHOC CHIP | 0.06380117 | 239400 | 15,274.00 |
| | | | | |
| 309232 | TRA BANANA MINIPIE (ENG) | 0.082299458 | 225687 | 18,574.00 |
| | | | | |
| 309861 | TRA BANANA MINI PIE OV 30 | 0.086568496 | 274625 | 23,773.87 |
| | | **Total pkg purchased from WD** | | 362,362.87 |

# EXHIBIT "B"

## ASSET PURCHASE AGREEMENT
### [Crackin' Good Bakery - Valdosta, Georgia]

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made effective as of November 24, 2004 (the "Effective Date"), by and between:

CRACKIN' GOOD, INC., a Florida corporation ("Seller"), and

CONSOLIDATED BISCUIT CO., an Ohio corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### RECITALS:

A.    Seller is the owner and holder of fee simple title in the Crackin' Good Bakery facility located at 701 North Forest Street, Valdosta, Georgia 31601 (the "Facility"). The Facility occupies the real property described on Exhibit A to this Agreement (the "Land"). The Facility and the Land together are referred to as the "Premises."

B.    Seller desires to assign and sell to Buyer, and Buyer desires to assume and purchase, Seller's interest in the Premises and certain other assets relating to the Premises, subject to the terms and conditions contained in this Agreement.

IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.0    **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

    1.1    "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

    1.2    "Assets" will have the meaning assigned in paragraph 2.1 of this Agreement.

1

1.3   "Bill of Sale" will mean the bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at Closing that portion of the Assets constituting Equipment, Inventory and other tangible and intangible personal property.

1.4   "Broker" will mean the real estate broker(s) identified in paragraph 13.0 of this Agreement as the broker for the transaction contemplated hereunder.

1.5   "Business Day" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Jacksonville, Florida.

1.6   "Buyer Indemnitee" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.7   "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's Counsel relating to the subject transaction; (b) recording fees for recording of the Conveyance Instrument in the appropriate public records; (c) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations and any physical inspection of the Assets; (d) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (not to exceed $8,500 for the owner's policy); (e) the cost of the Survey (not to exceed $9,500); (f) the cost of the Phase I Assessment (not to exceed $6,000) and the cost of any Phase II Assessment requested by Buyer pursuant to paragraph 4.2.2; (f) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees and documentary taxes; and (g) one-half of Escrow Agent's and Closing Agent's fee.

1.8   "Buyer's Counsel" will mean the law firm or firms engaged by Buyer as its legal counsel (including local counsel) in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transaction.

1.9   "Closing" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14.0 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.10  "Closing Agent" will mean Title Insurer, acting in its capacity as closing agent for the transactions contemplated hereunder.

2

1.11   "Closing Date" will have the meaning assigned in paragraph 14.1 of this Agreement.

1.12   "Closing Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.13   "Commonly Controlled Entity" will have the meaning assigned in paragraph 5.11.4 of this Agreement.

1.14   "Closing Statement" will mean the statement substantially in the form of Exhibit C to this Agreement reflecting the net amount due from Buyer to Seller at Closing for the Assets, after making the adjustments as provided in this Agreement.

1.15   "COBRA" will mean the provisions of Code section 4980B and Part 6 of Subtitle B of Title I of ERISA.

1.16   "Code" will mean the Internal Revenue Code of 1986, as amended from time to time.

1.17   "Consent" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any Contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Facility are governed or bound.

1.18   "Contract Assignment" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.19   "Contracts" will mean the contracts, agreements, licenses, permits, guaranties and warranties to which Seller is a party (other than orders by Seller for the purchase of Inventory) relating to the operation, maintenance and repair of the Facility that are identified on Exhibit D to this Agreement.

1.20   "Conveyance Instrument" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.21   "Co-Pack Agreement" will have the meaning assigned in paragraph 14.3 of this Agreement.

3

1.22    "Customer List" will mean the list of Seller's customers for the last 3 years with respect to the products manufactured at the Facility, as identified on the Disclosure Schedule.

1.23    "Damages" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.24    "Delivery Deadline" will mean 5:00 p.m., Eastern Time, 30 Business Days after the Effective Date, constituting the deadline for Seller's delivery of certain documents and materials to Buyer pursuant to paragraph 4.2.5 of this Agreement.

1.25    "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.26    "Disclosure Schedule" will mean the schedule of certain factual disclosures, relating to the Assets or this transaction, set forth on Exhibit E to this Agreement, which, for each disclosure made thereon, refer to the paragraph of this Agreement to which such disclosure relates.

1.27    "Effective Date" will have the meaning assigned in the first paragraph of this Agreement.

1.28    "Employee Benefit Plans" will mean all benefit plans, programs and policies, whether written or oral, that Seller has provided to the Facility Employees within 5 years of Closing including, but not limited to, those defined as "employee benefit plans" in Section 3 (3) of ERISA, those defined as an "employee pension benefit plan" in Section 3 (2) of ERISA and, including, without limitation, any employment, consulting or deferred compensation agreement, executive compensation, bonus incentive, pension, profit-sharing, savings, retirement, stock option, stock purchase or severance pay plan, any life, health, disability or accident insurance plan or any holiday or vacation practice, as to which Seller has or in the future could have any direct or indirect, actual or contingent liability.

1.29    "Environmental Laws" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning the protection or safety of the environment, the ecosystem, natural resources, and human health; discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into air, water, ground water, land or man-made structures; or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including,

4

without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, the Occupational Safety and Healthy Act, as amended, and any other similar federal, state or local law.

1.30    "Environmental Permits" will mean all Consents required under any Environmental Law.

1.31    "ERISA" will mean the Employee Retirement Income Security Act of 1974, as amended.

1.32    "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.33    "Escrow Agent" will mean Title Insurer, acting in its capacity as escrow agent for the transactions contemplated hereunder.

1.34    "Excluded Personal Property" will mean (i) Seller's rights in respect of items of Equipment leased, or other items used by Seller, under a Contract that Buyer has not elected to assume pursuant to paragraph 4.2.7 of this Agreement or for which any necessary Consent to assignment has not been obtained; (ii) items of furniture, fixtures and equipment, whether movable or affixed to the Premises, described on Exhibit F to this Agreement; (iii) trademarks, trade names, logos or designs of Seller or Winn-Dixie or any of their Affiliates; (iv) all inventory excluded from the definition of "Inventory"; (v) all building signs and panels incorporating Seller's business name as presently conducted at the Facility; (vi) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (vii) all accounts receivable, cash and cash equivalents; (viii) all formulae, recipes, processes, procedures and know-how of or related to the operation of and products produced at the Facility to the extent that such formulae, recipes, processes, procedures and know-how are proprietary to Seller's customers including Winn-Dixie; and (ix) all intellectual property relating to any of the foregoing..

1.35    "Facility" will have the meaning assigned in Recital A of this Agreement.

5

1.36  "Facility Employee" will mean any employee of Seller or any of Seller's Affiliates who works at the Facility, as identified on Exhibit G to this Agreement.

1.37  "Facility Purchase Price" will have the meaning assigned in paragraph 3.1 of this Agreement.

1.38  "Governmental Authority" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.39  "Hazardous Material" will mean any (i) hazardous substance, extremely hazardous substance, toxic substance, hazardous waste, contaminant, or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, extremely hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.40  "Hired Employees" will have the meaning assigned in paragraph 11.4.1 of this Agreement.

1.41  "Indemnified Person" will have the meaning assigned in paragraph 16.3.1 of this Agreement.

1.42  "Indemnifying Person" will have the meaning assigned in paragraph 16.3.1 of this Agreement.

1.43  "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.44  "Inventories" will mean raw and finished products (other than finished products bearing Seller's or Winn-Dixie's or Affiliate's private label, trademark, trade name, logo or design), operating supplies, ingredients, work in process and packaging materials (other than packaging materials

6

bearing Seller's or Winn-Dixie's or Affiliate's private label, trademark, trade names, logos or designs that are associated with products that are not listed on Item 11.5 of Exhibit E to this Agreement), whether on hand, in transit to the Premises or ordered but not yet in transit or received.

1.45    "Inventories Count" will have the meaning assigned in paragraph 3.4 of this Agreement.

1.46    "Inventories Price" will mean Seller's actual cost for the Inventories at Closing, as determined by the Inventory Count, excluding any obsolete, spoilated or unusable Inventory.

1.47    "Investigation Period" will have the meaning assigned in paragraph 4.2.1 of this Agreement.

1.48    "Knowledge" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the officers of Seller and Winn-Dixie and the plant manager of the Facility, and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers and manager.

1.49    "Land" will have the meaning assigned in Recital A of this Agreement.

1.50    "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

1.51    "Legal Description" will have the meaning assigned in paragraph 4.5 of this Agreement.

1.52    "Lien" will mean any lien, mortgage, deed of trust, chattel mortgage, pledge, option, right of first refusal, preemptive right, charge, security interest or other matter causing a defect or imperfection in title.

1.53    "Material Adverse Effect" will mean (i) an event that would prevent or materially delay the performance by Seller of its obligations under this Agreement or would materially interfere with the ability of the parties hereto to consummate the transactions contemplated hereby, or (ii) an effect on the Assets or the operation of the Facility or an event that would otherwise materially adversely affect the use of the Assets or operations of the Facility by Buyer as currently utilized by Seller.

1.54    "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to

7

the extent such assessments can be cured by the payment of money; (iii) construction liens that have attached to and become a lien against Seller's interest in the Premises; (iv) judgments that have attached to and become a lien against Seller's interest in the Assets; and (v) any other lien against or defect of title on Seller's interest in the Assets that can be satisfied with the payment of money.

1.55 "Non-Hired Employees" will have the meaning assigned in paragraph 11.4.5 of this Agreement.

1.56 "Permitted Encumbrances" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.57 "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.58 "Phase I Assessment" will have the meaning assigned in paragraph 4.6 of this Agreement.

1.59 "Phase I Objection Notice" will have the meaning assigned in paragraph 4.6 of this Agreement.

1.60 "Phase I Objection Response" will have the meaning assigned in paragraph 4.6 of this Agreement.

1.61 "Phase II Work" will have the meaning assigned in paragraph 4.2.2 of this Agreement.

1.62 "Premises" will have the meaning assigned in Recital A of this Agreement.

1.63 "Purchase Price" will mean the Facility Purchase Price and the Inventories Price, collectively.

1.64 "Review Deadline" will mean 5:00 p.m., Eastern Time, 15 Business Days following the later of the Delivery Deadline or the actual delivery of all of the documents and information required to be delivered by the Delivery Deadline.

1.65 "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.66 "Seller Indemnitee" will have the meaning assigned in paragraph 16.2 of this Agreement.

8

1.67  "Seller's Closing Costs" will mean: (a) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy, to the extent such costs exceed $8,500; (b) documentary transfer taxes, if any; (c) fees and costs of Seller's Counsel relating to the subject transaction; (d) the cost of the Survey, to the extent such costs exceed $9,500; (e) the cost of the Phase I Assessment, to the extent such costs exceed $6,000; (f) the commission payable to Broker and (f) one-half of Escrow Agent's and Closing Agent's fee.

1.68  "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.69  "Survey" will have the meaning assigned in paragraph 4.5 of this Agreement.

1.70  "Survey Objection Notice" will have the meaning assigned in paragraph 4.5 of this Agreement.

1.71  "Survey Objection Response" will have the meaning assigned in paragraph 4.5 of this Agreement.

1.72  "Title Commitment" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.73  "Title Insurer" will mean Lawyer's Title Insurance Corp.

1.74  "Title Objection Notice" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.75  "Title Objection Response" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.76  "Title Policy" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.77  "Winn-Dixie" will mean Winn-Dixie Stores, Inc., a Florida corporation.

2.0  **Assets and Liabilities.**

2.1  Seller agrees to assign, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the following real and personal property interests (collectively, the "Assets"):

9

2.1.1 Seller's fee simple title interest in the Premises;

2.1.2 Seller's interest in all furniture, fixtures, tools and equipment owned by Seller and located on the Premises or otherwise currently or historically (within the past thirty-six (36) months) used in the operation of the Facility, including, but not limited to, heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, and flooring located on the Premises including, but not limited to, those assets (with any omissions not material) set forth in the Disclosure Schedule (the "Equipment"), which term specifically does not include the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller;

2.1.3 Inventories;

2.1.4 Seller's interest in the Contracts that Buyer elects to assume pursuant to paragraph 4.2.7 of this Agreement, provided any necessary Consents have been obtained;

2.1.5 All assignable deposits and other similar Assets related to or made in connection with any of the Assets, to the extent credited to Seller and added to the Purchase Price at Closing;

2.1.6 The express or implied warranties and guarantees relating to any of the Assets, to the extent such expressed or implied warranties are assignable;

2.1.7 All formulae, recipes, processes, procedures and know-how of or related to the operation of and products produced at the Facility, except and to the extent that any such formulae, recipes, processes, procedures and know-how are proprietary to Seller's customers including Winn-Dixie.

2.1.8 All prepayments or deposits received by the Seller from customers for any products of the business to the extent allocable to liabilities assumed by Buyer with respect to performance after Closing under Contracts assumed by Buyer at Closing, all of which deposits and pre-payments are set forth in the Disclosure Schedule (collectively, the "Business Products Prepayments") and all of which will be transferred to Buyer by credit against the Purchase Price at Closing; and,

10

2.1.9 All franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and other similar permits and rights obtained from any government or similar type entity with respect to the operations of the Facility, and all pending applications therefore, to the extent the foregoing are in effect at Closing and by their terms or by law assignable.

2.2 Except as explicitly set forth in this Agreement or in any instrument or document executed by Buyer at Closing or otherwise in connection with this Agreement, Buyer assumes no liabilities of Seller (the "Excluded Liabilities") including, but not limited to, all tax liabilities, all liabilities arising out of or related to the transactions contemplated hereby, all liabilities arising out of or related to the use or handling of Hazardous Material and the Environmental Laws, and all liabilities, obligations, and responsibilities arising out of ERISA. Seller shall perform, pay and discharge, in the normal course of business, consistent with past practices, the Excluded Liabilities.

## 3.0  Purchase Price; Payment.

3.1 Purchase Price.  Buyer agrees to pay Seller a purchase price of $10,000,000.00 for the Assets other than Inventories (the "Facility Purchase Price") and the Inventories Price for the Inventories, payable to Seller on the Closing Date.

3.2 Deposit.

3.2.1 An earnest money deposit of $150,000 (the "Initial Deposit") will be due and payable to Escrow Agent within 3 Business Days following the date on which this Agreement is fully executed by all of the parties hereto and delivered to all such parties.

3.2.2 An additional earnest money deposit of $250,000 (the "Second Deposit") will be due and payable to Escrow Agent within 3 Business Days following expiration of the Investigation Period.

3.2.3 The Initial Deposit and the Second Deposit together are referred to as the "Deposit," which amounts Escrow Agent will place in an interest-bearing account. Any reference in this Agreement to the Initial Deposit, the Second Deposit or the Deposit will be deemed to include any interest accrued thereon. Interest accrued on the Deposit will be attributed to Buyer and Seller in proportion to how

11

the Deposit is paid, and the parties will be responsible for payment of state and federal income taxes, if any, associated therewith.

3.2.4   Except as otherwise set forth in this Agreement, the Deposit will be deemed nonrefundable to Buyer. At the Closing, the Deposit will be released to Seller and credited against the Purchase Price.

3.3   <u>Payment of Purchase Price</u>. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "<u>Closing Deposit</u>") with Escrow Agent. Escrow Agent will deposit the Closing Deposit into a federally insured interest-bearing account and will disburse or apply the Closing Deposit as provided in this Agreement. Escrow Agent will credit interest earned on the Closing Deposit through the Closing to Buyer. At Closing, the Purchase Price will be credited and disbursed to Seller or for its benefit as Seller may direct.

3.4   <u>Inventory Count</u>.   Beginning immediately following the close of business of the Facility on the day immediately preceding the Closing Date, the parties shall conduct a physical count of the Inventories on hand at the Premises (the "<u>Inventory Count</u>"). Prior to the Inventory Count Buyer and Seller shall identify, each acting in good faith, all items of inventory that are Excluded Personal Property and Seller shall remove such items prior to the Closing. Buyer and Seller each shall have representatives present during the Inventory Count who shall acknowledge in writing all computations before leaving. Inventory in open containers shall be inventoried at one-half of the full container cost; unopened containers shall be inventoried at the full cost of the container.

The parties agree to be cooperative and reasonable in connection with the Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity that may arise during the Inventory Count. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax.

Prior to Closing, Seller will provide Buyer with reasonable evidence of the identity, amounts and costs of Inventories that have been ordered but not received.

12

**4.0**    **Condition of Assets; Buyer's Due Diligence.**

4.1    Condition of Assets.  Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets with all faults, and without representations or warranties except as expressly provided in this Agreement and in the Conveyance Instrument delivered at Closing.

4.2    Investigation Period.

4.2.1    Investigation Period.  Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m., Eastern Time, on the Review Deadline in which to investigate and inspect the Assets and all matters relating thereto, to determine whether or not the same are satisfactory to Buyer in Buyer's sole discretion (the "Investigation Period").

4.2.2    Access to Premises.    At all reasonable times during the Investigation Period, Seller will permit Buyer access to the Premises as needed to inspect, examine, survey and otherwise undertake those actions that Buyer deems necessary or desirable to determine the feasibility of acquiring the Assets, provided that: (i) Buyer has given Seller at least 24 hours prior notice of Buyer's proposed entry onto the Premises; (ii) Buyer's notice includes the names of its agents or contractors who will be performing any evaluation, testing or inspection of the Premises and the qualifications of such agents or contractors; (iii) such entry will be conducted during normal business hours; (iv) such entry will be coordinated with Seller, and Buyer will be accompanied by Seller's representative during such entry; (v) during such entry, Buyer will exercise reasonable efforts to avoid disruption of the business operations of Seller; and (vi) Buyer's entry will not include any invasive testing or measurements except as expressly provided herein to the contrary.  Buyer's physical inspection of the Premises may include superficial samplings of building materials and soil, water and air quality conditions, provided that the samples are shared immediately with Seller and that, with reasonable promptness following such sampling, Buyer will repair and restore the area affected by such sampling.    If Buyer reasonably determines from the results of the Phase I Assessment or superficial sampling that invasive testing and inspection ("Phase II Work") will be necessary to further evaluate the nature and extent of a suspected condition, then Buyer will notify Seller of such

13

proposed testing, including a description of results of the Phase I Assessment, superficial samplings or inspections giving rise to such further testing and the suspected condition to be further evaluated. Buyer may not proceed with the proposed Phase II Work without Seller's consent, which consent may be granted, conditioned or withheld in Seller's discretion, and without Seller and Buyer having agreed in writing upon the conditions, procedures and time periods under and during which Buyer may make objections to the environmental condition of the Premises as established by the Phase II Work, Seller may elect to cure or decline to cure the objections and Buyer may terminate this Agreement; provided, however, that Seller's refusal to grant testing under the terms proposed by Buyer shall be grounds for Buyer's terminating the acquisition of the Assets under paragraph 4.2.6 of this Agreement and the Deposit shall be refunded and paid to Buyer immediately after such termination. The costs for completing all such investigations, tests, verifications, copies and examinations, including all such Phase II Work, will be paid by Buyer.

4.2.3    Reporting of Investigations. If Buyer discovers any condition that affects any of the Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, will not contact or report to such agencies with respect to such condition without Seller's prior written consent. Following Buyer's written notification to Seller of such condition, Seller agrees to report the same to the applicable governmental agencies to the extent required by law and to provide a copy of said notification(s) to the Buyer.

4.2.4    Indemnification. Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against all claims or liens against Seller or the Premises filed by contractors, materialmen or laborers performing work and tests for Buyer related to these investigations. If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will, at its cost, restore the Premises, including any excavation, as nearly as reasonably possible to its original condition prior to such termination; provided, however, that Buyer will not be responsible for any remediation, removal or migration of any Hazardous Material on the Premises. The foregoing indemnification provisions will survive the expiration or termination of this Agreement and/or the Closing and not be merged therein.

14

4.2.5  <u>Seller's Deliveries</u>.  Prior to the Effective Date, Seller has delivered to Buyer the following materials, to the extent such items are in Seller's active possession and control:

(a)    a list and copies of all leases of Equipment (other than Excluded Personal Property) used at the Premises;

(b)    copies of all warranties (roof, mechanical, electrical, etc.) in effect for the benefit of Seller with respect to any of the Assets; and

(f)    all other deliveries required pursuant to this Article 4, including the Title Commitment, Survey, Phase I Assessment, and the Exhibits and Schedules;

it being understood that such materials are being provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise (other than representations and warranties made by Seller in other provisions of this Agreement or in the Conveyance Instrument).  Buyer will deliver or return to Seller all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials within 5 Business Days following termination of this Agreement prior to Closing for any reason except Seller's default or breach hereunder.  Seller agrees to cooperate with Buyer, without expense to Seller except as otherwise set forth herein, in updating and re-certifying any such materials.

4.2.6  <u>Election to Proceed</u>.  If Buyer determines that it does not wish to proceed with the acquisition of the Assets for any reason, in Buyer's sole discretion, then Buyer may elect to terminate this Agreement by delivering written notice of such election to Seller within three (3) Business Days following the expiration of the Investigation Period or at any time in the event that Buyer does not obtain financing in accordance with <u>paragraph 9.9</u> of this Agreement and Seller and the Escrow Agent will promptly refund to Buyer any Deposit.  If Buyer timely elects to terminate this Agreement, then thereupon the parties will have no further obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination.  If Buyer fails to terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Assets, and thereupon, the Second Deposit will be due and payable and the

15

Deposit will be nonrefundable to Buyer except as otherwise expressly provided in this Agreement.

4.2.7 <u>Election to Assume Contracts.</u>  Buyer will notify Seller in writing prior to the Review Deadline of Buyer's election whether to assume at Closing any or all of the Contracts.  If Buyer timely elects to assume any such Contracts, then at Closing, Seller will assign such Contracts to Buyer, subject to any necessary Consents being obtained. If Buyer timely elects not to assume any Contracts, or if Buyer fails to make a timely election, then such Contracts will not be assigned to, or assumed by Buyer at Closing, and Seller, at its sole cost and expense, will arrange for the proper termination of same, as applicable, on or before the Closing Date.

4.3    <u>Title.</u>  At Closing, Seller will convey and assign to Buyer, and Buyer will accept and assume, all of Seller's right, title and interest in the Assets, subject only to those matters listed on <u>Exhibit H</u> to this Agreement and to any other matters approved or waived by Buyer as provided in this Agreement (collectively, the "<u>Permitted Encumbrances</u>").  Evidence of the delivery of marketable and insurable fee simple marketable title to the Premises will be pursuant to Title Insurer's issuance of a policy of title insurance for the Premises (in the form of a marked Title Commitment evidencing the Title Insurer's binding obligation to issue its title policy), insuring the interest of Buyer in the Premises as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for specific references reflecting matters disclosed on the Survey) and subject only to the Permitted Encumbrances, using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Premises is located, in the amount of the Facility Purchase Price (the "<u>Title Policy</u>").

4.4    <u>Title Insurance Commitment.</u>  Seller will order from Title Insurer and, not later than the Delivery Deadline, deliver to Buyer a title insurance commitment (the "<u>Title Commitment</u>") naming Buyer as the proposed insured for the Premises, committing to insure Buyer's interest in the Premises as acquired from Seller in the amount of the Facility Purchase Price, and stating all exceptions and conditions to such title, including, without limitation, all easements, restrictions, covenants, reservations and other encumbrances affecting title to the Premises.  Seller will cause the Title Commitment and legible copies of the matters affecting the title or otherwise listed therein to be delivered to Buyer not later than the Delivery Deadline.  Buyer will have until the Review Deadline to examine the Title Commitment and related instruments.    It is a condition of Buyer's obligation to close and to pay the Purchase Price to Seller that title to

16

Seller's fee simple interest in the Premises is good and marketable at Closing, and insurable subject only to the Permitted Encumbrances. Based on the foregoing, if title is found to be objectionable to Buyer, Buyer will notify Seller in writing on or before the Review Deadline as to those matters (other than Permitted Encumbrances) to which Buyer objects (the "Title Objection Notice"). If Buyer does not timely provide the Title Objection Notice to Seller, any objections Buyer may have to any title matters disclosed by the Title Commitment (other than Monetary Objections, all of which will be released at or prior to Closing) thereafter will be deemed waived. If Buyer timely delivers the Title Objection Notice to Seller, then Seller will have 5 Business Days after the date of receipt of the Title Objection Notice to notify Buyer in writing whether Seller is willing and/or able, in its reasonable judgment, to cure the objections before the Closing (the "Title Objection Response"). If Seller states in the Title Objection Response that it is unable or unwilling to cure objections stated in the Title Objection Notice (other than the Monetary Objections) before the Closing, or Seller fails to timely provide the Title Objection Response, then Buyer will have until the later of expiration of the Investigation Period or 5 days after the Title Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unsatisfied objections and complete the purchase of the Assets subject to the title objections, or (ii) terminate this Agreement. If Seller states in the Title Objection Response that Seller is willing to cure the objections stated in the Title Objection Notice, then Seller will use reasonable, diligent and good faith efforts to cure such objections on or before the Closing Date. If Seller is unable to cure such objections despite reasonable, diligent and good faith efforts to do so, and the parties have not mutually agreed to extend the Closing Date, then Buyer may, at its sole option, either (i) waive its objections and proceed to Closing subject to the title objections, or (ii) terminate this Agreement. In the event of termination of this Agreement under this paragraph, none of the parties thereafter will have any further rights or obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination and the Deposit shall be refunded and paid to Buyer.

4.5    Survey. Not later than the Delivery Deadline, Seller will deliver to Buyer and Title Insurer two prints of a current boundary survey of the Land (the "Survey") (i) prepared by a registered land surveyor licensed in the state in which the Premises is located and prepared in accordance with ALTA-ACSM - 1999 minimum standard detail requirements, (ii) showing how the matters identified in the Title Commitment affect the Premises (including but not limited to the plotting of all easements that are not blanket in nature), (iii) showing the location of the Facility and all other improvements located thereon and applicable "set-back" lines, (iv) showing a metes and

17

bounds legal description of the Land as described on <u>Exhibit A</u> to this Agreement and any easements benefiting the Land (the "<u>Legal Description</u>"), (v) showing all Table A items identified on Exhibit A attached hereto; and (vi) certified to Buyer, Buyer's lender, Seller and Title Insurer. Buyer will have until the Review Deadline to review the Survey and to deliver written objections to the accuracy or completeness of the Legal Description as set forth in the Survey or its consistency with that set forth in the Title Commitment and to any other objectionable items revealed by the Survey other than Permitted Encumbrances, describing in each appropriate case the cure or cures that would be acceptable to Buyer (the "<u>Survey Objection Notice</u>"). If Buyer does not timely provide the Survey Objection Notice to Seller, any objections Buyer may have to any survey matters thereafter will be deemed waived. If Buyer timely sends the Survey Objection Notice, then Seller will have 5 Business Days after receipt of the Survey Objection Notice to notify Buyer in writing whether Seller is willing and/or able, in its reasonable judgment, to cure the objections before the Closing in a manner reasonably satisfactory to Buyer (the "<u>Survey Objection Response</u>"). If Seller states in the Survey Objection Response that it is unable or unwilling to cure such objections before the Closing, or Seller fails to timely provide the Survey Objection Response, then Buyer will have until the later of expiration of the Investigation Period or 5 days after the Survey Objection Response or the deadline for giving same, to elect whether to (i) waive the unsatisfied objections and complete the purchase of the Assets subject to the Survey objections; or (ii) terminate this Agreement. If Seller states in the Survey Objection Response that Seller is willing to cure the objections stated in the Survey Objection Notice, then Seller will use its reasonable, diligent and good faith efforts to cure such objections on or before the Closing Date. If Seller is unable to cure such objections despite reasonable, diligent and good faith efforts to do so, and the parties have not mutually agreed to extend the Closing Date, then Buyer may, at its sole option, either (i) waive its objections and proceed to Closing subject to the Survey objections, or (ii) terminate this Agreement. In the event of termination of this Agreement under this paragraph none of the parties thereafter will have any further rights or obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination and the Deposit shall be refunded and paid to Buyer.

4.6     <u>Environmental Site Assessment</u>.  Not later than the Delivery Deadline, Seller will deliver to Buyer a Phase I environmental site assessment covering the Premises, prepared by a licensed environmental engineer (the "<u>Phase I Assessment</u>"), and certified to Buyer, Buyer's lender(s), and Seller. The Phase I Assessment will investigate, analyze and report with respect to those matters that current ASTM or other applicable industry

18

accepted guidelines recommend should be included.   Buyer will have until the Review Deadline to review the Phase I Assessment, to deliver written objections to any of the material items, including, without limitation, "recognized environmental conditions", disclosed in the Phase I Assessment and or request Phase II Work pursuant to paragraph 4.2.2 of this Agreement (the "Phase I Objection Notice").  If Buyer does not timely provide the Phase I Objection Notice to Seller, any objections Buyer may have to any Phase I Assessment matters and Buyer's right to request Phase II Work thereafter will be deemed waived.  If Buyer timely sends the Phase I Objection Notice, then Seller will have 5 Business Days after receipt of the Phase I Objection Notice to notify Buyer in writing whether Seller is willing to cure the objections and/or to permit Phase II Work before the Closing (the "Phase I Objection Response").  If Seller states in the Phase I Objection Response that it is unwilling to cure such objections before the Closing or to permit Phase II Work, then Buyer will have until the later of expiration of the Investigation Period or 5 Business Days after the Phase I Objection Response or the deadline for giving same, to elect whether to (i) waive the unsatisfied objections and/or Phase II Work and complete the purchase of the Assets subject to the Phase I Assessment objections, or (ii) terminate this Agreement.  If Seller states in the Phase I Objection response that it is willing to permit Phase II Work, the parties shall proceed according to the agreements between them regarding Phase II Work reached as contemplated by paragraph 4.2.2 of this Agreement.  If Seller states in the Phase I Objection Response that Seller is willing to cure the objections stated in the Phase I Objection Notice, then Seller will use its reasonable, diligent and good faith efforts to cure such objections on or before the Closing Date.  If Seller is unable to cure such objections despite reasonable, diligent and good faith efforts to do so, and the parties have not mutually agreed to extend the Closing Date, then Buyer may, at its sole option, either (i) waive its objections and proceed to Closing subject to the Phase I Assessment objections, or (ii) terminate this Agreement.   In the event of any termination of this Agreement under this paragraph none of the parties thereafter will have any further rights or obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination and the Deposit shall be refunded and paid to Buyer.

4.7     The rights of Buyer set forth in paragraphs 4.2.2, 4.2.6, 4.4, 4.5 and 4.6 will constitute Buyer's sole remedies for an objectionable condition identified by Buyer as a result of Buyer's evaluation of the result of Buyer's due diligence investigations, the Title Commitment, the Survey, the Phase I Assessment or Phase II Work and reported to Seller as part of the applicable objection process set forth in those paragraphs; provided, however, that nothing contained in this Article 4 shall in any way negate

19

any representation, warranty or covenant of the Seller hereunder, or the Buyer's right to rely on the same.

5.0    **Seller's Representations and Warranties.**    In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer as follows:

5.1    Organization.    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and has full power and authority to own, operate and lease the Facility and to conduct its business as it is presently being conducted thereon and to enter into and to perform its obligations under or otherwise relating to this Agreement. Seller is duly qualified and licensed as a foreign corporation to conduct the business conducted by it and is in good standing in each jurisdiction in which such qualification or licensing is necessary under applicable Law and where the failure to be so qualified or otherwise authorized would, individually or in the aggregate, have a Material Adverse Effect.

5.2    Authorization.    The execution, delivery and performance of this Agreement, all agreements and instruments attached hereto, and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on Seller's part, and no other corporate proceedings on Seller's part is necessary to authorize this Agreement, all agreements and instruments attached hereto, and the transactions contemplated hereby. This Agreement, and all agreements and instruments attached hereto, have been duly executed and delivered by Seller and Winn-Dixie and, assuming the due execution by the other parties hereto, constitute or will constitute the legal, valid and binding obligation of Seller, enforceable against each of them in accordance with their respective terms.

5.3    Conflict or Violation.    Neither the execution or delivery of this Agreement, the agreements and instruments attached hereto, nor the consummation of the transactions contemplated hereby by Seller will result in (a) a violation of or a conflict with any provision of Seller's organizational documents, (b) a breach of, or default under, any term or condition of, or otherwise cause any impairment of, any material contract or agreement, indebtedness, franchise, Consent, authorization or concession to which Seller is a party or is subject or by which any of its assets is bound, (c) a violation by Seller of any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction, decree or award applicable to such companies, or (d) the imposition of any Encumbrance or other restriction on any of the Assets.

20

5.4    Consents and Approvals.  Except as set forth in the Disclosure Schedule, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Seller on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement, the agreements and instruments attached hereto or the consummation of the transactions contemplated hereby.

5.5    Facility.  The Legal Description is an accurate description of the Land on which the Facility is located.  Except as set forth in the Disclosure Schedule, Seller owns a fee simple interest in the Facility free and clear of any Lien, except for the Permitted Encumbrances.  With respect to the Facility:

5.5.1    There are no pending or, to the Knowledge of Seller, threatened condemnation proceedings, lawsuits, or administrative actions;

5.5.2    There are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party or parties the right of use or occupancy of any portion of the Facility other than as may be provided in the Contracts;

5.5.3    There are no outstanding purchase contracts, options or rights of first refusal to purchase the Facility, or any portion thereof or interest therein.

5.6    Title to and Condition of Assets.

5.6.1    Except as set forth in the Disclosure Schedule, Seller has and will convey to Buyer good and marketable title to all of the Assets that are personal property, free and clear of any Lien.  The Conveyance Instrument is sufficient to transfer insurable title to the Premises to Buyer and any warranties contained in the Conveyance Instrument are incorporated herein by reference.

5.6.2    To the Knowledge of Seller, there are no material latent defects in the Assets except as set forth in the Disclosure Schedule.  To the Knowledge of Seller, the Facility is structurally sound, subject to normal wear and tear, and is adequate for the use to which it is being put, and none of the Assets are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost, individually or in the aggregate.  Excepting the use of the Excluded Personal Property and any leased equipment described in the Disclosure Schedule, the Assets

21

are sufficient for the continued conduct of Seller's business with respect to the Facility after the Closing Date in substantially the same manner as conducted prior to the Closing Date. Seller has not sold, assigned, moved or disposed of any assets used in the Facility in contemplation of the transactions contemplated herein, other than the Excluded Personal Property.

5.7    Litigation. The Disclosure Schedule contains a true, complete and correct list, caption and description of each pending lawsuit, claim, administrative proceeding, arbitration, labor dispute or governmental investigation or inspection to which Seller is a party and which involve or materially affect the Assets or operations of the Facility. Except as set forth in the Disclosure Schedule, to the Knowledge of Seller, there are no material (individually or in the aggregate) claims, legal actions or investigations threatened or contemplated against Seller relating to the Assets or operations at the Facility. The Disclosure Schedule describes all product liability claims received by Seller during the past 5 years in connection with goods produced at the Facility. There are no orders, decrees, judgments or written agreements with any court or governmental authority to which Seller is a party and that relates to the Assets or operations at the Facility or by which the Assets or Facility are bound.

5.8    Compliance with Laws; Consents.

5.8.1    Seller owns and operates the Assets, and, has manufactured, stored, processed and sold the Facility's inventories and products, and otherwise carried on and conducted operations at the Facility in compliance with all Laws. The Disclosure Schedule sets forth for the past 3 years all governmental investigations, inspections or citations under any health, environmental, safety, labor, employment or other applicable Laws and the results thereof together with a brief description of all corrective or other action taken with respect thereto. There are no pending, or to the Knowledge of Seller, threatened governmental citations which relate to the Assets or operations of the Facility. To the Knowledge of Seller, there are no pending governmental investigations which relate to the Assets or operations of the Facility. The Assets are being used and occupied, and are located, constructed and operated in compliance with, and conform to all applicable Laws.

5.8.2    Seller holds all Consents required for the ownership and conduct of its business conducted at the Facility, and such Consents are in full force and effect. There is no pending or threatened lawsuit, claim, administrative    proceeding,    arbitration,    labor    dispute    or

22

governmental investigation with respect to revocation, cancellation, suspension or non-renewal of any such Consent, and there has occurred no event that (whether with notice or lapse of time or both) will result in such a revocation, cancellation, suspension or non-renewal thereof. No Consent held by Seller in connection with the Facility has been subject to any revocation, cancellation, suspension or non-renewal within the past 3 years.

5.9    <u>Conduct of Business</u>. Since the Effective Date:

5.9.1    The business and affairs of the Facility have been and will thereafter be conducted and carried on only in the ordinary course consistent with Seller's past practices;

5.9.2    Except for personal property purchased, sold or leased in the ordinary course of business consistent with its past practices, and for items of Excluded Personal Property, Seller has not purchased, sold, leased, mortgaged, pledged or otherwise acquired or disposed of any material properties or assets used in the Facility;

5.9.3    There has been no material increase or other change made in the rate or nature of the compensation, including wages, salaries, bonuses and benefits under any Employee Benefit Plans which has been paid, or will be paid or payable, by Seller to any Facility Employee; and

5.9.4    Seller has not sustained or incurred any loss or damage (whether or not insured against) on account of fire, flood, accident or other calamity which has interfered or affected, or may interfere with or affect the Assets or the Facility of which Seller has not provided notice to Buyer.

5.10    <u>Labor Matters</u>.    Seller is not now, or ever has been, a party to any collective bargaining agreement with respect to the Facility or any of the Facility Employees.    To the Knowledge of Seller, there are no organizational efforts pending or threatened by any labor union with respect to the Facility Employees.    There are no material controversies pending or, to the Knowledge of Seller, threatened between Seller and any of the Facility Employees.    Seller has not, with respect to the Facility or the Facility Employees, committed, or engaged in, any material (individually or in the aggregate) unfair labor practices.    Seller has, with respect to the Facility, complied with all Laws relating to employment, wages, hours, working conditions, collective bargaining and the payment of social security, unemployment and similar taxes, and is not liable for

23

any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing; and, to the Knowledge of Seller, there are no proceedings, investigations or citations pending before any court, governmental agency or instrumentality or arbitrator relating to any failure so to comply thereto. Exhibit G of this Agreement sets forth the name of each employee of Seller or any of Seller's Affiliates who works at the Facility and sets forth with respect to each Facility Employee (including any employee who is on a leave of absence or on layoff status) the following information in effect with respect to such Facility Employee as of November 18, 2004, with respect to services performed in the business conducted at the Facility: (i) title; (ii) hire date; (iii) salary and/or wage rate; and (iv) with respect to hourly Facility Employees, earned and unused vacation and sick time.

5.11    Employee Benefit Plans.

5.11.1 The Disclosure Schedule sets forth a complete list of all Employee Benefit Plans affecting Facility Employees. Each Employee Benefit Plan is in compliance with all Laws and has been administered and operated in all material respects in accordance with its terms. True and complete copies of the plan documents, summary plan descriptions and the most recent annual report (IRS Form 5500) have been made available to Buyer.

5.11.2 Each Employee Benefit Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code, has received a favorable determination letter from the IRS and no event has occurred and no condition exists that could reasonably be expected to result in the revocation of any such determination. No Employee Benefit Plan is subject to Title IV of ERISA and none of the Assets are subject to any lien under ERISA or the Code. All payments for contributions, premiums or benefits required under the terms of the Employee Benefit Plans, insurance policies, trust agreements or applicable law that are due or relate to the period prior to the Closing Date have been made or accrued on the appropriate balance sheet.

5.11.3 No reportable event(s) (within the meaning of ERISA) or prohibited transaction(s) (within the meaning of the Code), have occurred in respect of any of the Employee Benefit Plans that would result in any material liability to Seller or the Assets. Other than claims for benefits in the ordinary course, there are not pending or, to Seller's Knowledge, threatened any claims relating to the Employee Benefit Plans by any Facility Employee or beneficiary or former Facility

24

Employee or beneficiary, alleging a breach or breaches of fiduciary duties or violations of other applicable state or federal law which could result in liability on the part of Seller or any of the Employee Benefit Plans under ERISA, the Code or any other law that would have a material adverse effect on Seller or the Assets. None of the Employee Benefit Plans has been audited, investigated or been subject to any correction procedure involving either the Internal Revenue Service, the Department of Labor or the Pension Benefit Guaranty Corporation within the last 5 years, and there are no outstanding issues with reference to any of the Employee Benefit Plans pending before such governmental agencies.

5.11.4 Neither Seller, nor any corporation, trade, business or entity under common control with Seller within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (a "Commonly Controlled Entity") contributes to or has an obligation to contribute to any multiemployer plan within the meaning of Section 3(37) of ERISA. Neither Seller nor any Commonly Controlled Entity has incurred any liability under Title IV of ERISA arising in connection with the termination of or complete or partial withdrawal from any plan covered or previously covered by Title IV of ERISA that could become, after the Closing Date, an obligation of Buyer or its affiliates.

5.11.5 All obligations of Seller and each Commonly Controlled Entity with respect to Facility Employees, whether arising by operation of law or by contract, required to be performed under Section 4980B of the Code or Part 6 of Title I of ERISA (or similar state law), including, without limitation, such obligations that may arise by virtue of the transaction contemplated by this Agreement, have been or will be timely performed.

5.11.6 No Facility Employee will become entitled to any severance benefit or enhanced benefit solely as a result of the transaction contemplated by this Agreement.

5.12    **Absence of Certain Changes Regarding Employees.** Except as set forth in the Disclosure Schedule, since November 18, 2004, Seller has not and will not have thereafter on or prior to the Closing Date:

5.12.1 entered into, adopted, modified or amended in any material respect any time off, vacation pay, sick pay, severance, or other Employee Benefit Plan providing for benefits to any of the Facility Employees;

25

5.12.2 made any material wage or salary increase or bonus, or increase in any other direct or indirect compensation, for or to any of the Facility Employees;

5.12.3 entered into any Contract to do any of the foregoing; or

5.12.4 entered into or amended or modified any employment agreement or collective bargaining agreement.

5.13    Environmental Matters.

5.13.1 Except as set forth in the Disclosure Schedule, (a) the Premises is free from any and all Hazardous Materials that require remediation or clean-up under Environmental Laws because of any action or actions by Seller and, to the Knowledge of Seller, because of any action of any other Person; (b) except as expressly authorized by an effective permit or by applicable Laws, there have been no releases, discharges or emissions, or any threats of releases, discharges or emissions of any Hazardous Material, or any other harmful substance, into, onto, under or from the Premises caused by Seller or, to the Knowledge of Seller, caused by any other Person; and (c) no wastes of any kind have at any time been disposed of in any amount on, at or under the Premises by Seller or, to the Knowledge of Seller, by any other Person except in accordance with Environmental Laws.

5.13.2 Except as set forth in the Disclosure Schedule, Seller is in compliance with all Environmental Laws, including, without limitation, all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land, ground water or man-made structures; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; (iv) the health and safety of workers and other frequenters of the Premises; (v) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters; and (vi) to the Knowledge of Seller, no underground storage tanks are, or have been, located at the Premises since its inception.

5.13.3 To the Knowledge of Seller, there is no pending or threatened lawsuit, claim, action or proceeding by any governmental entity or third party arising under Environmental Laws in respect to the

26

Facility or the Assets, nor to the Knowledge of Seller, does any valid basis exist for such a lawsuit, claim, action or proceeding.

5.14    Insurance. The Disclosure Schedule sets forth a description of all pending claims relating to the Assets of which the Seller has notice and a summary of material claims made under any policies of insurance maintained by Seller for the Assets during the past 3 years. Seller has not, with respect to the Assets, during the past 3 years, been denied or had revoked or rescinded by a carrier any policy of insurance. The Disclosure Schedule sets forth all outstanding requirements or recommendations of which Seller has Knowledge that were received by Seller from any insurance company that wrote the policies or by any Board of Fire Underwriters or similar body exercising similar functions or by any Governmental Authority which requires or recommends changes in the conduct of the business, or repairs or other work to be done or with respect to the Assets or operations of the Facility or requiring any equipment or facilities to be installed on or in connection with the Assets or operations of the Facility.

5.15    Contracts. The exhibits to this Agreement, or the Disclosure Schedule, as applicable, identifies as of the Effective Date all existing material written Contracts, including, without limitation, the following:

5.15.1 any agreement (or group of related agreements) for the lease of personal property to or from any Person;

5.15.2 any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services;

5.15.3 any agreement concerning a partnership, joint venture or other profit sharing arrangement;

5.15.4 any agreement pursuant to which a lien is created with respect to any of the Assets;

5.15.5 any agreement concerning confidentiality or noncompetition;

5.15.6 any collective bargaining agreement;

5.15.7 any agreement under which Seller has advanced or loaned funds or other property to any Facility Employee;

5.15.8 any requirements, "take or pay" or similar agreement relating to the Facility;

27

5.15.9 any agreement or arrangement establishing, creating or relating to any rebate, promotion, advertising coupon or other allowance relating to the Facility;

5.15.10 any brokerage or distributor agreements relating to the Facility;

5.15.11 any agreement under which the consequences of a default or termination could have a Material Adverse Effect on the business, financial condition, operations, results of operations, or future prospects of the Facility or the Assets;

provided, however, the above does not include purchase orders issued in the ordinary course of business or Contracts calling for consideration to be paid by Seller with respect to the Facility less than $10,000. Except as set forth in the Disclosure Schedule, no material Contract (as described above) of Seller has been terminated within 180 days prior to the Effective Date. Except as set forth in the Disclosure Schedule, there are no existing material contracts or commitments (whether written or oral) to which Seller is a party with respect to the Facility, or to which any of the Assets are subject or bound.

5.16   <u>Compliance With Contracts</u>.   Neither Seller nor, to the Knowledge of Seller, any other Person is in material breach of, or in material default under, any Contract.   To the Knowledge of Seller, no state of facts exists or event has occurred, is pending or is threatened or contemplated, which, after the giving of notice, or the lapse of time, is reasonably likely to constitute or result in a material breach or a material default by Seller, or any other Person of any such Contract.

5.17   <u>Relationship With Suppliers and Customers</u>.   To the Knowledge of Seller, the relationships of Seller with the material suppliers and customers of the Facility is satisfactory and Seller has not received notice of any intention to terminate or materially modify any of such relationships.   The Disclosure Schedule sets forth a list of the five largest customers of Seller with respect to the Facility for the 2001, 2002 and 2003 fiscal years, determined on the basis of the total dollar amount of net sales to such customers.   The Disclosure Schedule further sets forth a list of the five largest vendors to Seller for the same periods, determined on the basis of the total dollar amount of purchases from such vendors.

5.18   <u>Product and Service Warranties</u>.   The Disclosure Schedule contains a true and complete description of Seller's standard terms and conditions of sale (containing applicable warranty provisions) for all products manufactured,

28

assembled or sold by Seller that have been in effect at any time over the past 3 years, except for warranties imposed by law. Except as provided in the Disclosure Schedule: (i) all products manufactured at the Facility and sold by Seller (and the delivery thereof) prior to the Closing Date have been in conformity with all applicable Laws, contractual commitments and all expressed or implied warranties; and (ii) to the Knowledge of Seller, no liability for any warranty claims exists for the replacement thereof or other damages in connection with such sales and deliveries. No product heretofore manufactured or sold by Seller at the Facility is now subject to any guaranty, warranty or claim for indemnity other than those sold or delivered in accordance with Seller's standard terms and conditions of sale.

5.19   Product Information.   The Disclosure Schedule sets forth a list of all products currently manufactured and/or sold by Seller with respect to the Facility and a description of all products which are under development for manufacture or sale or both thereby.

5.20   Full Disclosure.   Seller has no Knowledge of any fact or other information related to the Assets, operations at the Facility or the transactions contemplated pursuant to this Agreement which has not been disclosed to Buyer in writing, and which is expected to have a Material Adverse Effect on the Assets, operations at the Facility or the transactions contemplated by this Agreement. No representation or warranty made by Seller in this Agreement, any of the related documents delivered pursuant to this Agreement or in the Disclosure Schedule, contains, or will contain, any untrue statement of a material fact, or omits or will omit any material fact.

5.21   Taxes.   With respect to the business conducted at the Facility and the Assets, Seller has timely filed all tax returns that are, or were required to be, filed and all such tax returns are correct and complete. Seller has paid on a timely basis all taxes, whether federal, state or local, relating in anyway to the Facility or the Assets, whether or not shown as due on such tax returns. There is no pending or threatened tax audit of any tax return involving the business conducted at the Facility or Assets.

5.22   Inventories.   The Facility has been maintained in a clean and sanitary condition in accordance with accepted industry standards and practices. All products and inventories have been maintained and manufactured in accordance with all applicable Good Manufacturing Practices requirements promulgated by the Federal Food and Drug Administration and/or other federal, state or local regulatory authority. All Inventories of Seller purchased hereunder are not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act as amended or

29

within the meaning of any applicable state or local laws that regulate the manufacturer, packaging and/or distribution of food.    All products and Inventories are wholesome and fit for human consumption.  All products and Inventories delivered hereunder comply in all respects with any applicable specifications thereof.

5.23    <u>Financial Statements</u>.   Set forth in the Disclosure Schedules are the financial statements of Seller related to the Facility for the periods ended June 26, 2002, June 25, 2003, and June 30, 2004.  Except as set forth in the Disclosure Schedules, such financial statements have been compiled in accordance with sound accounting principles, consistently applied with past periods, and fairly depict, to the extent presented, the financial condition of the Facility and its business on and as of the date thereof.

6.0    <u>Buyer's Representations and Warranties</u>.  Buyer represents and warrants to Seller and Winn-Dixie as follows:

6.1    <u>Organization</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio and has or will have at Closing full power and authority to own, operate and lease the Facility and to enter into and to perform its obligations under or otherwise relating to this Agreement.   Buyer is or will be at Closing duly qualified and licensed as a foreign corporation to conduct the business to be conducted by it in the State of Georgia.

6.2    <u>Authorization</u>.    The execution, delivery and performance of this Agreement, all agreements and instruments attached hereto, and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on Buyer's part, and no other corporate proceedings on Buyer's part is necessary to authorize this Agreement, all agreements and instruments attached hereto, and the transactions contemplated hereby.  This Agreement, and all agreements and instruments attached hereto, have been duly executed and delivered by Buyer and, assuming the due execution by the other parties hereto, constitute or will constitute the legal, valid and binding obligation of Buyer, enforceable against it in accordance with their respective terms.

6.3    <u>Conflict or Violation</u>.  Neither the execution or delivery of this Agreement, the agreements and instruments attached hereto, nor the consummation of the transactions contemplated hereby by Buyer will result in (a) a violation of or a conflict with any provision of Buyer's organizational documents, (b) a breach of, or default under, any term or condition of, or otherwise cause any impairment of, any material contract or agreement,

30

indebtedness, franchise, Consent, authorization or concession to which Buyer is a party or is subject or by which any of its assets is bound, or (c) a violation by Buyer of any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction, decree or award applicable to it.

6.4 <u>Consents and Approvals</u>. Except as set forth in the Disclosure Schedule, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority or any other Person is required to be made or obtained by Buyer on or prior to the Closing Date in connection with the execution, delivery and performance of this Agreement, the agreements and instruments attached hereto or the consummation of the transactions contemplated hereby.

7.0 <u>Seller's Covenants</u>. Seller hereby covenants for the benefit of Buyer as follows:

7.1 Seller will use commercially reasonable efforts to obtain all Consents required to perform the obligations of Seller under this Agreement and each of the closing documents to which either is or is to become a party and to attain the fulfillment of the conditions set forth in <u>paragraph 9.0</u> of this Agreement.

7.2 Seller will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and issuance of the Title Policy.

7.3 Seller will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

7.4 At any time and from time to time after the Closing, at the Buyer's request and without further consideration, the Seller shall execute and deliver such further documents, and perform such further acts, as may be reasonably necessary in order to effectively transfer and convey the Assets to the Buyer, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transactions contemplated hereby.

7.5 Buyer and Seller hereby waive compliance by the Seller with provisions of any bulk transfer laws applicable to the transactions contemplated by this Agreement. Except for liabilities assumed hereunder, the Seller agrees promptly and diligently to pay and discharge when due or to contest or

31

litigate all claims of creditors that are asserted against the Buyer by reason of any non-compliance with such laws.

7.6    Seller shall be responsible for customer claims relating to services rendered by Seller prior to Closing and customer claims relating to or returns of products of the Seller which were sold or manufactured by Seller prior to the closing.  If, after Closing, a customer makes such a claim or seeks a return and in the reasonable judgment of Seller the claim or return is proper in accordance with the terms of the Seller's agreement with such customer and Seller so informs Buyer, Buyer shall replace or repair as the case may be the services rendered or product purchased at the Buyer's then generally prevailing prices and labor rates.  Such repairs or returns shall be for the account of the Seller and Seller shall promptly reimburse Buyer for the amounts thereof.

7.7    Except as otherwise set forth herein from the date hereof through the Closing, Seller agrees that it shall conduct its business in the ordinary course consistent with past practices and, in a manner such that the conditions set forth herein will be satisfied on and as of the closing and it will not enter into any new contract or agreement or customer or potential customer of Seller outside the ordinary course consistent with past practice.  Seller shall give Buyer proper notice of any event, condition, or circumstance occurring from the date hereof through the Closing that will constitute a violation or breach of any representation or warranty contained herein.

7.8    Seller hereby agrees that since December 31, 2002, neither Seller nor any of its agents, representatives or affiliates have removed from the Facility any tangible property, unless such removal occurred in order to replace such property or otherwise was in the ordinary course of business, consistent with past practice.  From the date hereof through Closing, neither Seller nor any of its agents, representatives, or affiliates will remove from the Facility any Assets without the consent of Buyer, which consent will not be unreasonably withheld, except for the removal of any piece of property that has a fair market value at the time of such removal of less than $5,000 provided that in no event shall property with a fair market value in excess of $25,000 in the aggregate be removed from the Facility pursuant to such exception.

8.0    **Buyer's Covenants.**  Buyer for itself hereby covenants for the benefit of Seller as follows:

8.1    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and issuance of the Title Policy.

32

8.2    Buyer will use commercially reasonable efforts to obtain all Consents required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in <u>paragraph 10.0</u> of this Agreement.

8.3    Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.0    <u>Conditions Precedent to Buyer's Obligations</u>.  The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

9.1    Seller will have performed all of its covenants contained in this Agreement, and all of Seller's representations and warranties contained in this Agreement will be true and accurate in all material respects on the Effective Date and as of the Closing Date.  Seller shall have delivered to Buyer a certificate dated the date of Closing and signed by an officer of Seller, to the forgoing effect.

9.2    The Review Deadline will have occurred without the termination of this Agreement.

9.3    No material adverse change in the facts on which Buyer's approval of the Title Commitment, Survey, Phase I Assessment, Phase II Work, and Exhibits and Schedules in accordance with <u>paragraphs 4.2.2, 4.3, 4.4, 4.5, 4.6 and 4.7</u> is based will have occurred prior to Closing.

9.4    There will not have occurred any Material Adverse Effect.

9.5    Title Insurer will have issued the Title Policy or will be irrevocably and unconditionally committed to issue the Title Policy effective as of the date the Closing occurs.

9.6    All material Consents required to be obtained prior to the Closing Date in connection with the consummation of the transaction contemplated hereby will have been obtained (without any materially adverse terms, limitations or conditions), except to the extent the failure to obtain any such Consent

33

could not individually or in the aggregate have a material adverse effect on the ability of any of the parties to perform any of its obligations hereunder or under any closing documents to which such party is or is to become a party, and such Consents will be in full force and effect.

9.7    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

9.8    Seller shall have executed and delivered to Buyer all of the documents reasonably necessary or convenient to consummate the transactions contemplated hereunder as Buyer may reasonably request including, but not limited to, the Bill of Sale, the Contract Assignment, the Conveyance Instrument and a Closing Statement.

9.9    Buyer shall have obtained financing, on terms, subject to conditions, and in amounts, satisfactory to it, in its sole discretion, for the transactions contemplated hereby, which financing may include, but shall not be limited to, the issuance of industrial revenue bonds.

10.0   **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

10.1   Buyer will have performed all of its covenants contained in this Agreement, and all of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects on the Effective Date and as of the Closing Date. Buyer shall have delivered to Seller a certificate dated the date of Closing and signed by an officer of Buyer, to the forgoing effect.

10.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3   All material Consents required to be obtained prior to the Closing Date in connection with the consummation of the transactions contemplated hereby will have been obtained (without any materially adverse terms, limitations or conditions), except to the extent the failure to obtain any such Consent would not individually or in the aggregate have a material

34

adverse effect on the ability of any of the parties to perform any of its obligations under this Agreement or any of the closing documents to which such party is or is to become a party, and such Consents will be in full force and effect.

10.4   Buyer shall have executed and delivered to Seller all of the documents reasonably necessary or convenient to consummate the transactions contemplated hereunder as Seller may reasonably request including, but not limited to, the Contract Assignment and a Closing Statement.

## 11.0   Special Operating Covenants.

11.1   Operations Prior to Closing.   Seller will continue its operations at the Facility in the ordinary course of business, and will maintain the Assets until Closing in the same condition as on the Effective Date, ordinary wear and tear, condemnation and casualty excepted.   Seller will not- sell, dispose of, abandon or remove from the Premises any of the Assets or agree to do so except in the ordinary course of business. Seller will not be obligated to retain any particular Facility Employees, notwithstanding the provisions of paragraph 11.4 below.

11.2   Pre-Closing Operations Consultation.   During the Investigation Period, Seller agrees to cooperate with Buyer in providing reasonable Facility operational training and consultation to Buyer's selected managers and foremen, for the purpose of training Buyer's Hired Employees in the proper operation of the Facility.   Seller will make available to Buyer any applicable Facility mechanical operating records and manuals in its possession.

11.3   Turnover of Operations.   On the Closing Date, Seller will turn over operating responsibility to Buyer, and thereupon Seller will have no further obligations with respect to the Facility operations.   Seller will remove all Excluded Personal Property by the Closing Date. To the extent practicable, the parties will notify the gas, water, telephone and electric utility companies serving the Facility that Buyer will be responsible for the payment of all obligations incurred therefore on and after the Closing Date.   Seller will request such gas, water and electric utility companies to cause meters to be read as of the day preceding the Closing Date, and Seller will be responsible for the payment of all charges for such services through such date.   Seller will cause the telephone company to render a bill for telephone service for the Facility through the date preceding the Closing Date, and Seller will be responsible for the payment of such bill. To the extent Seller cannot obtain the utility meter readings on the Closing Date, the parties will adjust the foregoing based upon estimates and final

35

meter readings (as of the Closing Date) after the Closing. The foregoing provisions will survive the Closing for a period of 1 year.

11.4    Employees.

11.4.1 Buyer Offers.  Prior to expiration of the Investigation Period, Buyer may designate by written notice to Seller which of those Facility Employees to whom Buyer wishes to offer employment at the Facility following Closing; provided, however, that Seller may offer any such Facility Employees continuing employment with Seller in another business location. At Closing, Buyer will offer to employ those Facility Employees so designated who, on the Closing Date, are actively employed by Seller at the Facility. Such offers of employment will be on terms and conditions determined by Buyer, consistent with its normal practices. Any such Facility Employees who are offered employment with Buyer and who accept such employment are referred to as "Hired Employees." Unless and until a designated Facility employee accepts employment with Buyer, such Facility employee will be considered a Non-Hired Employee.

11.4.2 Hired Employees.  Hired Employees will be removed from Seller's payroll and will cease to be employed by Seller as of the Closing Date, on the same basis as Seller intends to cease employment of Non-Hired Employees. Seller will pay to such Hired Employees all salary and wages for services performed prior to the Closing Date in accordance with applicable law. Seller will terminate effective as of the Closing Date the active participation of all of the Hired Employees in all of Seller's benefit plans, and will cause each benefit plan to comply with its terms and all applicable laws.

11.4.3 COBRA.  Seller will be responsible for satisfying obligations under Section 601 et seq. of ERISA and Section 4980B of the Code, to provide continuation coverage to, or with respect to, any Hired Employee in accordance with law with respect to any "qualifying event" occurring on or before the Closing Date or resulting from the transactions contemplated herein, including provision of all required notices.

11.4.4 Severance.  Seller will be responsible for any severance or similar obligations payable to any Hired Employee resulting from events occurring on or prior to the Closing Date, or resulting from the transactions contemplated herein.

36

11.4.5 <u>Non-Hired Employees</u>. Buyer will have no obligation or liability with respect to any Facility Employee to whom Buyer has elected not to extend an offer of employment, or to whom an offer of employment with Buyer has been extended but not accepted (referred to as "Non-Hired Employees"), and Seller will be responsible for any and all liabilities and obligations with respect to the Non-Hired Employees, including compliance with any notice requirements of the Worker Adjustment and Retaining Notification Act (WARN Act) with respect to the cessation of Seller's operations on the Premises and the termination of employment of Non-Hired Employees by Seller.

11.4.6 <u>Vacation; Sick Pay; Bonuses</u>. Seller will be responsible for any obligations payable to any (i) hourly Hired Employee or Non-Hired Employee for earned and unused vacation and sick time as of the Closing Date; and (ii) Hired Employee or Non-Hired Employee for bonus, incentive pay or "gainsharing" earned on or prior to the Closing Date.

11.4.7 <u>Payroll</u>. Following the Closing Date in accordance with its normal procedures, Seller will process its payroll for the week preceding the Closing Date, including cutting paychecks, short term disability payments, withholding all required income and employment taxes and timely depositing all required income and employment tax withholdings and payments with governmental authorities, accompanied by the required forms. Seller will be responsible for all wage information reports (W-2 Reports) for wages paid by Seller to the Hired Employees.

11.5   <u>Co-Pack Agreement</u>. For a period of not less than 180 days following Closing, Winn-Dixie shall purchase exclusively from Buyer, and Buyer shall sell to Winn-Dixie and its Affiliates, Winn-Dixie's and its Affiliates' requirements of certain products and goods historically purchased from Seller on the terms and as otherwise provided in the Co-Pack Agreement.

11.6   <u>Repurchase of Inventory</u>. If and to the extent that any Inventory relates to the sale or production of any goods or products for Winn Dixie and/or its Affiliates and such Inventory has not been consumed within ninety (90) days of Closing, Winn-Dixie will immediately, at the election of Buyer, repurchase any such Inventory, in cash or immediately available funds, and Buyer will deliver to Winn-Dixie any such unused Inventory.

12.0   <u>Loss by Fire or Other Casualty; Condemnation</u>. In the event that, prior to Closing, the Assets, or any material part thereof, are destroyed or materially

37

damaged, or if condemnation proceedings are commenced against any material part of the Premises, either party will have the right, exercisable by giving notice of such decision to the other within 15 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, Seller will instruct the Escrow Agent to refund and pay to Buyer the Deposit and thereafter none of the parties will have any further rights or obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination and the Deposit shall be refunded and paid to Buyer. If neither party exercises its right of termination, and Buyer acquires the Assets subject to such loss or condemnation, then as Buyer's sole remedy, at Closing Seller will assign to Buyer any rights Seller may have, and is entitled to assign, to recover all insurance proceeds or to receive all condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0  **Brokers; Commissions.**  The parties agree that there is no brokerage commission due in connection with the transaction contemplated by this Agreement other than that due to The Blackstone Group ("Broker"), whose fees and expenses will be paid by Seller. Except for Broker, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement. Seller and Buyer hereby agree to defend and indemnify and agree to hold harmless each other from and against any claims by any other person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closing of this transaction or earlier termination of this Agreement.

14.0  **Closing.**

14.1  The Closing hereunder will occur on a date, falling after the Review Deadline and on or before January 17, 2005, mutually designated by Seller and Buyer (the "Closing Date"). The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2  Possession of the Assets will be delivered to Buyer on the Closing Date free and clear of all liens and rights of third parties whatsoever, subject only to the Permitted Encumbrances.

38

14.3   At the Closing, Seller will deliver to Buyer the following:

(i)     An appropriate instrument of assignment and conveyance of the Premises, in the form of a special warranty deed, substantially as set forth on <u>Exhibit I</u> to this Agreement (the "<u>Conveyance Instrument</u>"), as required by Title Insurer to properly insure title to Buyer's interest in the Premises as assigned and conveyed by Seller;

(ii)    The Bill of Sale;

(vi)   An assignment and assumption of the Contracts that Buyer has elected to assume pursuant to <u>paragraph 4.2.7</u> of this Agreement, provided any necessary Consent has been obtained, substantially in the form of Contract Assignment set forth on <u>Exhibit J</u> to this Agreement (the "<u>Contract Assignment</u>");

(vii)   A product supply agreement substantially in the form of Co-Pack Agreement set forth on <u>Exhibit K</u> to this Agreement (the "<u>Co-Pack Agreement</u>");

(viii)  The Closing Statement;

(ix)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered;

(x)    a certificate of Seller's corporate secretary certifying that the transactions contemplated hereby have been duly authorized and certifying to the authorization and the signatures of those officers authorized to execute and deliver documents on behalf of Seller pursuant hereto; and

(xi)   Any other documentation required of Seller by Law.

Buyer may waive compliance by Seller as to any of the foregoing items by an instrument in writing.

14.4   At the Closing, Buyer will execute and deliver to Seller the following:

(i)     The Conveyance Instrument, to the extent that Buyer is required to join in the execution and delivery of same;

(ii)    The Contract Assignment;

(iii)   The Co-Pack Agreement;

(iv)   The Closing Statement;

(v)    Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered;

(vi)   a certificate of Buyer's corporate secretary certifying that the transactions contemplated hereby have been duly authorized and certifying to the authorization and the signatures of those officers authorized to execute and deliver documents on behalf of Buyer pursuant hereto; and

(vii)  Any other documentation required of Buyer by Law.

Seller may waive compliance by Buyer as to any of the foregoing items by an instrument in writing.

14.5   On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer to consummate the conveyance and acquisition of Seller's interest in the Premises to Buyer in accordance with the terms hereof.

14.6   All taxes (including real and personal property taxes), utilities and other payments regarding the Premises and the Equipment will be prorated between the parties as of midnight of the date preceding the Closing Date in accordance with the tax proration method employed by custom in the area in which the Premises is located as determined by the Title Insurer, and will be a credit or debit, as the case may be, against the Purchase Price at Closing. Buyer and Seller agree to prorate as of the Closing Date any taxes assessed against the Property by a supplemental bill levied by reason of an event occurring prior to the Closing. Seller will pay all assessments levied against the Premises and the Equipment on or before the Closing Date. Buyer will pay all assessments levied against the Premises and the Equipment after the Closing Date. Any amounts not determinable as of the Closing Date will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer agrees to notify the taxing authority promptly after Closing of the transfer and assignment of Seller's interest in the Assets to Buyer for purposes of proper tax

40

assessment notifications. This provision will survive Closing for a period of 1 year.

14.7 Any matter specified in paragraph 14.6 above that cannot reasonably be determined and apportioned between Seller and Buyer on the Closing Date will be specified by Buyer and Seller in writing at Closing, and will be subject to settlement at such time as such matter is finally determined (but in no event later than 1 year after the Closing Date). Additionally, any apportionments, prorations or adjustments that are miscalculated (through mathematical error) at Closing will be subject to recalculation and final settlement at such time as such miscalculation is discovered (but in no event later than 1 year after the Closing Date). Such apportionments will be effective as of the Closing Date. This provision will survive the Closing for a period of 1 year.

14.8 At Closing, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

14.9 At any time and from time-to-time after Closing, at either party's reasonable request and without further consideration, the other party shall execute and deliver such further documents, and perform such further acts, as may be necessary in order to effectively transfer and convey the Assets to Seller on the terms contained herein and to otherwise comply with the terms of the agreement and consummate the transactions contemplated hereby.

15.0 **Default; Remedies.**

15.1 Seller's Default. If Seller fails to materially comply with or perform any of the covenants, agreements or obligations to be performed by Seller under this Agreement, then Buyer will be entitled to terminate this Agreement by written notice to Seller and, in addition to the return of the Deposit, to recover from Seller Buyer's actual (but not consequential) damages incurred as a result of such default (which recoverable damages in no event shall exceed the amount of the Deposit), or to seek an order of specific performance. Upon such termination, without any other action being necessary, Escrow Agent will return the Deposit to Buyer. Buyer waives all other remedies it may have at law or in equity.

15.2 Buyer's Default. If Buyer fails to materially comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under this Agreement, then Seller may elect to terminate this Agreement by written notice to Buyer and thereupon Escrow Agent will deliver the Deposit to Seller as Seller's agreed liquidated final damages, and not as a

41

penalty, it being understood that Seller's actual damages in the event of such default may be difficult or impossible to ascertain. Seller waives all other remedies it may have at law or in equity.

15.3 The foregoing remedies in Sections 15.1 and 15.2 are the sole remedies afforded to either of the parties in the event of a default hereunder not followed by Closing or termination hereof after a default hereunder.

16.0 **Indemnification.**

16.1 <u>Indemnification by Seller</u>. Seller will defend and indemnify Buyer and its Affiliates (each, a "<u>Buyer Indemnitee</u>") against, and hold each Buyer Indemnitee harmless from:

16.1.1 Any claims asserted by a third party with respect to any debts, liabilities and obligations of Seller of any nature, whether accrued, absolute, contingent, or known or unknown on the date hereof, existing or arising on or resulting from events which actually or allegedly occurred or failed to occur before the Closing Date, except post-Closing liabilities under any Contracts assumed by Buyer;

16.1.2 Any liability incurred by Buyer due to the waiver of compliance with any applicable bulk sales act;

16.1.3 Any and all debts, liabilities, obligations, costs and expenses of Seller or any Affiliate arising out of any defect in any product manufactured or sold by Seller prior to the Closing Date;

16.1.4 Any liability, loss, claim, damage or deficiency resulting directly or indirectly from any misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Seller under this Agreement;

16.1.5 Any liability, loss, claims, damages or deficiency arising out of or related to the ownership and/or operation of the Facility or the Assets, on or prior to Closing.

16.1.6 Any liability, loss, claim or damage arising out of or related to the Excluded Liabilities.; .

16.1.7 All other actions, suits, proceedings, demands, assessments, adjustments, costs and expenses incident to the enforcement or defense of any claim related to the foregoing, including, without

42

limitation, interest, penalties and reasonable attorneys' fees and other out-of-pocket expenses (collectively "Damages").

16.2    Indemnification by Buyer.  Buyer will defend and indemnify Seller and its Affiliates (each, a "Seller Indemnitee") against, and hold each Seller Indemnitee harmless from:

16.2.1 Any claims asserted by a third party with respect to any debts, liabilities and obligations of Buyer of any nature, whether accrued, absolute, contingent, or known or unknown on the date hereof, existing or arising on or resulting from events which actually or allegedly occurred or failed to occur on or after the Closing Date, except liabilities under any Contracts not assumed by Buyer;

16.2.2 Any and all debts, liabilities, obligations, costs and expenses of Buyer or any Affiliate arising out of any defect in any product manufactured or sold by Buyer on or after the Closing Date;

16.2.3 Any liability, loss, claims, damages or deficiency arising out of or related to the ownership and/or operation of the Facility or the Assets, after Closing except for Excluded Liabilities.

16.2.4 Any liability, loss, claim, damage or deficiency resulting directly or indirectly from any material misrepresentation, breach of warranty or nonfulfillment of any agreement on the part of Buyer under this Agreement; and

16.2.5 All other Damages.

16.3    Indemnification Procedures.

16.3.1 Upon any Person entitled to be indemnified under this paragraph 16.0 (the "Indemnified Person") becoming aware of a fact, condition or event for which indemnification is provided under this paragraph 16.0, the Indemnified Person will with reasonable promptness notify the Person from whom indemnification is sought (the "Indemnifying Person") in writing of such fact, condition or event; provided that the failure to provide such notice will not prejudice the Indemnified Person's right to indemnification hereunder except to the extent that the Indemnifying Person is actually prejudiced thereby.  If such fact, condition or event is the assertion of a claim by a third party, the Indemnifying Person will be entitled to participate in or take charge of the defense against such claim; provided, that the Indemnifying Person and its counsel will proceed with diligence and in good faith

43

with respect thereto and such counsel must be reasonably acceptable to the Indemnified Party. Notwithstanding the Indemnifying Person's election to assume the defense or investigation of such claim, the Indemnified Person will have the right to employ separate counsel and to participate in the defense or investigation of such claim, action or proceeding, provided the Indemnified Person will bear the expense of such separate counsel unless the Indemnifying Person will not have employed counsel to represent the Indemnified Person within a reasonable time after notice of the assertion of any such claim or institution of any such action or proceeding in which case the Indemnifying Person will bear the expense of such counsel.

16.3.2 Neither the Indemnified Person nor the Indemnifying Person will make any settlement of any claim that would give rise to liability on the part of the Indemnifying Person or Indemnified Person under this paragraph 16.0 without the prior written consent of the other, which consent will not be unreasonably withheld, provided that an Indemnified Person will not be required to consent to any settlement involving the imposition of equitable remedies which do not have a material affect on the business, operations or prospects of the Indemnified Person other than financial obligations for which such Indemnified Person will, subject to paragraph 16.6, be indemnified hereunder. No Indemnifying Person will be required to consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Person of a release from all liability in respect to such claim or litigation. Whenever the Indemnified Person or the Indemnifying Person receives a firm offer to settle a claim for which indemnification is sought under this paragraph 16.0, it will promptly notify the other of such offer. If the Indemnifying Person refuses to accept such offer within 20 Business Days after receipt of such offer (or of notice thereof), such claim will continue to be contested and, if such claim is within the scope of the Indemnifying Person's indemnity contained in this paragraph 16.0, the Indemnified Person will be indemnified pursuant to the terms hereof. If the Indemnifying Person notifies the Indemnified Person in writing that the Indemnifying Person desires to accept such offer, but the Indemnified Person refuses to accept such offer within 20 Business Days after receipt of such notice, the Indemnified Person may continue to contest such claim and, in such event, the total maximum liability of the Indemnifying Person to indemnify or otherwise reimburse the Indemnified Person hereunder with respect to such claim will be limited to and will not

44

exceed the amount of such offer plus reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) to the date of notice that the Indemnifying Person desires to accept such offer, provided that this sentence will not apply to any settlement of any claim involving the imposition of equitable remedies or to any settlement imposing any material obligations on such Indemnified Person other than financial obligations for which such Indemnified Person will, subject to paragraph 16.6, be indemnified hereunder.

16.4    Exclusive Remedy. This paragraph 16.0 will provide the sole and exclusive remedy for any and all Damages sustained or incurred by any Indemnified Person with respect to the representations, warranties and covenants of this Agreement after Closing, it being understood that the parties will be limited to their respective remedies as provided in paragraph 15.0 for Damages sustained or incurred by an Indemnified Person following a breach of a party's obligations under this Agreement that results in a claim or termination of this Agreement prior to Closing.

16.5    Time Limitations.    The Indemnifying Person will have no Liability to the Indemnified Persons under or in connection with the inaccuracy or breach of any of the representations or warranties made by the Indemnifying Person, or any covenant to be performed on or before the Closing Date by the Indemnifying Person, contained in this Agreement unless written notice of an indemnification claim based thereon is given to the Indemnifying Person within the survival periods described in paragraph 17.7. Failure to promptly provide such notice will in no way negate the right to indemnification unless such failure materially prejudices the Indemnifying Party's ability to defend any such claim.

16.6    Limitations as to Amount. The Indemnifying Person will have no Liability with respect to the matters described in paragraphs 16.1 and 16.2 until the total of all Damages with respect thereto exceeds $100,000, and then will have Liability only with respect to Damages to the extent in the aggregate such Damages exceed such amount; provided, however, the $100,000 threshold contained in this paragraph 16.6 will not apply to any Damages related to or arising from any claim sustained or incurred by an Indemnified Person as a result of an act(s) of fraud by the Indemnifying Person nor will it apply to the representations, warranties and covenants contained in paragraphs 5.1, 5.2, 5.3, 5.4, 5.6.1, 5.9.1, 5.9.2, 5.9.3, 5.9.4, 5.11, 5.13, 5.21, 6.1, 6.2, 6.3, 6.4 and 11.4 of this Agreement. In no event will the aggregate Liability of the Indemnifying Person under paragraph 16.1 or 16.2 of this Agreement exceed $5,000,000; provided, however, the $5,000,000 limit contained in this paragraph 16.6 will not apply to any

45

Damages related to or arising from any claim sustained or incurred by an Indemnified Person as a result of an act(s) of fraud by the Indemnifying Person nor will it apply to the representations, warranties and covenants contained in <u>paragraphs 5.1, 5.2, 5.3 or 5.6.1</u> of this Agreement.

16.7    <u>Subrogation</u>. Upon payment in full of any indemnification claim, or the payment of any judgment or settlement with respect to a third party claim, the Indemnifying Persons will be subrogated to the extent of such payment to the rights of the Indemnified Person against any Person with respect to the subject matter of such indemnification claim or third party claim; provided, however, that in no event will any Indemnifying Person be subrogated as to rights to proceed against any insurance coverage of Buyer.

## 17.0    **Miscellaneous**

17.1    <u>Termination</u>.

17.1.1 This Agreement may be terminated on or prior to the Closing Date only as follows:

(i)    by written consent of Seller and Buyer;

(ii)    at the election of either Buyer or Seller, if the Closing shall not have occurred on or before January 17, 2005, provided that no party will be entitled to terminate this Agreement pursuant to this clause (ii) if such failure to close is a result of such party's default under this Agreement, and, upon a termination pursuant to this clause (ii), so long as the failure to close is not due to the default of Buyer hereunder, Seller shall instruct the Escrow Agent to refund and pay the Deposit to Buyer upon such termination;

(iii)    at the election of Buyer as provided in <u>paragraphs 4.2.2, 4.2.6, 4.4, 4.5, 4.6, 4.7, 11.0 and 12.0</u> of this Agreement;

(iv)    at the election of Seller as provided in <u>paragraph 12.0</u> of this Agreement.

17.1.2 Upon termination of this Agreement pursuant to <u>clause (ii)</u> above, each party will retain its remedies as may be provided against the other party pursuant to <u>paragraph 15.0</u> of this Agreement.

17.2    <u>Attorneys' Fees</u>. If either party commences an action against the other to

46

enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the substantially non-prevailing party will pay to the substantially prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.

17.3    Notices.  All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will be in writing and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Crackin' Good, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  President
Telefax No. 904 370 6748

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651

and

Kirschner & Legler, P.A.
300A Wharfside Way
Jacksonville, Florida 32207
Attn: Kenneth M. Kirschner
Telefax No. 904 346 3299

47

If to Buyer:

> Consolidated Biscuit Co.
> 312 Rader Road    -
> P. O. Box 847
> McComb, OH  43588
> Telefax No. ▓▓▓▓▓▓▓▓▓▓

With a Copy to:

> Eastman & Smith Ltd.
> One SeaGate, 24th Floor
> P.O. Box 10032
> Toledo, OH  43699-0032
> Attn: Henry N. Heuerman
> Telexfax No. 419 247 1777

or such other address as either party may from time to time specify by notice to the other.

17.4 <u>Successors and Assigns</u>.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5 <u>Assignment</u>.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other; provided, however, that Buyer may assign this Agreement to an Affiliate of Buyer, or to any governmental agency in order to obtain financing for the transactions contemplated hereby, without the consent of Seller as long as (i) Buyer gives prompt written notice to Seller of such assignment, and (ii) Buyer confirms in writing that it will remain liable for the obligations of "Buyer" hereunder.

17.6 <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer.

17.7 <u>Survival of Certain Provisions</u>.    The respective representations and warranties of Seller and Buyer as set forth in <u>paragraphs 5.0 and 6.0</u> of this Agreement will survive Closing for a period of 12 months, except as otherwise made inaccurate as a result of the conveyance and assignment of the Assets by Seller to Buyer, and will not be deemed merged into the

48

Conveyance Instrument, provided, however, that the representations and warranties contained in Sections 5.1, 5.2, 5.3, 5.4, 5.6.1, 5.11, 5.13 5.21, 6.1, 6.2, 6.3 and 6.4 shall survive indefinitely.

17.8 <u>Governing Law.</u>  This Agreement will be governed by and construed in accordance with the laws of the state in which the Premises is located.

17.9 <u>Merger of Prior Agreements.</u>  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof other than the Confidentiality Agreement signed by Buyer on April 23, 2004, and, together with the Confidentiality Agreement, constitutes the entire agreement of the parties with respect to the matters contained herein.

17.10 <u>Time is of the Essence.</u>  Time is of the essence of this Agreement.

17.11 <u>No Recordation.</u>  This Agreement will not be recorded in any public office or court, except that upon default it may be presented to a court of competent jurisdiction.

17.12 <u>Dates in this Agreement.</u>  Any date contained in this Agreement that falls on a Saturday, Sunday or federal holiday generally observed in Jacksonville, Florida will be deemed to fall on the next Business Day.

17.13 <u>Waiver Of Trial By Jury.</u>  Buyer and Seller each agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or the Assets undesirable. Accordingly, Buyer and Seller each specifically waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the Assets.  The foregoing waiver is made knowingly, voluntarily and intentionally by both Buyer and Seller.

18.0 <u>Confidentiality and Publicity.</u>

18.1 Each party agrees to notify the other prior to issuing any press release or making any public statement regarding the transactions contemplated hereby, and will attempt to obtain the reasonable approval of the other party prior to making such release or statement, except where such release or statement is required by applicable law or pursuant to any listing agreement with, or the rules or regulations of, any securities exchange or any other regulatory requirement, in which case the disclosing party will endeavor to provide the other party with as much prior notice of the content of such release or statement as is reasonably practicable under the circumstances.

49

18.2    Between the Effective Date and the Closing Date, Seller and Buyer will maintain in confidence, and will cause their respective directors, officers, employees, agents, and advisors to maintain in confidence, any written, oral, or other information obtained from any other party in connection with this Agreement or the transactions contemplated hereby, unless such information becomes publicly available through no fault of such party, the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transactions contemplated herein, or the furnishing or use of such information is required by legal proceedings or otherwise by Law.

18.3    During the three year period beginning on the Closing Date, Seller agrees not to divulge, communicate, use to the detriment of Buyer or any of its affiliates, for either Seller's or any of its affiliates' benefit or the benefit of any other person, firm, corporation, association or other entity, or misuse in any way, in whole or in part, any proprietary or confidential information or trade secrets related to the business conducted at the Facility or the Assets, as they may exist from time to time. Seller acknowledges that the list of the customers of the business as it may exist from time to time, and the business' proprietary information, including its trade secrets, are valuable, special and unique assets of the business and are "confidential information".

19.0    **Escrow Agent**.

19.1    Duties.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Escrow Agent agrees to promptly deposit the Initial Deposit and the Second Deposit, upon receipt thereof, in an interest bearing account, to hold the same in escrow, and disburse the same in accordance with this Agreement.  Although interest accrued on the Deposit will be payable to the party entitled to the Deposit at such time as the Deposit it paid, interest accrual will be deemed to belong to Buyer for federal and state income tax purposes.    Escrow Agent will release the Deposit only as expressly provided in this Agreement.

19.2    Indemnity.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in

50

connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.

19.3    <u>Dispute.</u>  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal).

[Signature page follows]

51

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

SELLER:

**CRACKIN' GOOD, INC.,** a Florida corporation

By:_____
Name:Frank Lazaran
Title: President

BUYER:

**CONSOLIDATED BISCUIT CO.,** an Ohio corporation

By: *William H Varney*
Name:William H. Varney
Title: Vice President

52

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**CRACKIN' GOOD, INC.,** a Florida corporation

By: _Frank Lazaran_ _____
Name: Frank Lazaran
Title: President

**BUYER:**

**CONSOLIDATED BISCUIT CO.,** an Ohio corporation

By: _____
Name: William H. Varney
Title: Vice President

52

The undersigned, Winn-Dixie Stores, Inc. does hereby guaranty the timely performance and payment by Seller of each of its obligations under and in respect of the foregoing Agreement.

WINN-DIXIE    STORES,    INC.,    a    Florida corporation

By: *Frank Lazaran*

Name: Frank Lazaran
Title: President


Acknowledged this ___ day of _____, 2004:

**ESCROW AGENT:**

**LAWYER'S TITLE INSURANCE CORP.**


By: _____
Name: _____
Title: _____

53

The undersigned, Winn-Dixie Stores, Inc. does hereby guaranty the timely performance and payment by Seller of each of its obligations under and in respect of the foregoing Agreement.

WINN-DIXIE STORES, INC., a Florida corporation

By:_____
Name: Frank Lazaran
Title: President

Acknowledged this ___ day of November, 2004:

ESCROW AGENT:

LAWYERS TITLE INSURANCE CORP.

By: _____
Name: _____
Title: _____

55

**EXHIBITS TO ASSET PURCHASE AGREEMENT**
**ARE VOLUMINOUS AND ARE NOT ATTACHED FOR THAT REASON**


Copies of the exhibits may be obtained from Richard R. Thames, Esq., 50 North Laura Street, Suite 1600, Jacksonville, Florida 32202, (904) 358-4000.

**Tony Sabatino**
07/11/06 10:38 AM

To: Kevin Lauck/McComb/CBC@CBC
cc: Bill Varney/McComb/CBC@CBC
Subject: RE: Cases

Kevin,

This is the information we spoke about on recycle of packaging materials ,Wayne will send all load

information to your attention for billing per attached.
—— Forwarded by Tony Sabatino/McComb/CBC on 07/11/2006 10:36 AM ——

**Wayne Jarvis**
06/27/2006 06:20 AM

To: Tony Sabatino/McComb/CBC@CBC
cc:
Subject: RE: Cases

—— Forwarded by Wayne Jarvis/Valdosta/CBC on 06/27/2006 06:20 AM ——



**"Matson - Clayburg, Jeanne "**
**<JCLAYBUR@SMURFI T.COM>**
06/26/2006 04:27 PM

To: <Wayne.Jarvis@cbcbakery.com>
cc:
Subject: RE: Cases

```
Wayne,
Here's what I can do on some of your grades.  We can spot a trailer at
your facility and most likely the carrier will only do one load a day.

1.  Clear PP with print film (Butter Cookies) $100/ton.
2.  Natural HDPE film with bar code on it $180/ton.
3.  Natural HDPE film (no print) $450/ton.
4.  Natural LDPE film (no print) $450/ton.
5.  Clear PS trays $230/ton
6.  Foil film $0/ton.
7.  Baled OCC $95.00 per ton.
8.  Palletized Banded OCC - $5.00/ton.
9.  Chipboard Banded - $5.00/ton.

These prices are based upon getting at least 20-25 loads. Please let me
know what you think.  Thanks.
Jeanne
Smurfit-Stone.


-----Original Message-----
From: Wayne.Jarvis@cbcbakery.com [mailto:Wayne.Jarvis@cbcbakery.com]
Sent: Friday, June 23, 2006 6:12 AM
To: Matson - Clayburg, Jeanne
Subject: RE: Cases


Correct, all material is new.
```

4
9-21-08
COLLINS REPORTING

"Matson -

Clayburg, Jeanne                    To:
<Wayne.Jarvis@cbcbakery.com>
"                                   cc:

<JCLAYBUR@SMURFIT                    Subject:  RE: Cases
.COM>


06/22/2006 03:02

PM


But the film on the rolls haven't been used before right?

-----Original Message-----
From: Wayne.Jarvis@cbcbakery.com [mailto:Wayne.Jarvis@cbcbakery.com]
Sent: Thursday, June 22, 2006 1:53 PM
To: Matson - Clayburg, Jeanne
Subject: RE: Cases

Film was used to wrap cookies.


"Matson -

Clayburg, Jeanne                    To:
<Wayne.Jarvis@cbcbakery.com>
"                                   cc:

<JCLAYBUR@SMURFIT                    Subject:  RE: Cases
.COM>


06/22/2006 11:58

AM


CBC 1371

Wayne,  The film I looked at what is it mainly used for?  Example to
wrap boxes and pallets?  It's not used to package food is it?  I'm
trying to find out if it is a Pure PP grade or a PE grade.
Thanks
Jeanne

-----Original Message-----
From: Wayne.Jarvis@cbcbakery.com [mailto:Wayne.Jarvis@cbcbakery.com]
Sent: Wednesday, June 21, 2006 10:53 AM
To: Matson - Clayburg, Jeanne
Subject: Cases

Jeanne,

I received your phone message about the baled cardboard bringing $95.
per ton. Thanks for getting back so soon.
Let me know the prices on the other items we spoke about .

Thanks,

Wayne Jarvis
229-671-7027

CBC 1372

THIS DOCUMENT CONTAINS VOID PANTOGRAPH, MICROPRINT BORDER, THERMOCHROMIC INK AND ARTIFICIAL WATERMARK.

**Georgia-Pacific Corporation**
PO BOX 45067
JACKSONVILLE, FL 32232-5067

CHASE BANK USA N.A.
WILMINGTON, DELAWARE
02-26
311    4945-09

CHECK #: **0906588045**

DATE:    9/18/06

SIBC

PAY EXACTLY    $*******912.00

PAY    Nine Hundred Twelve and 00/100

TO THE
ORDER OF    CONSOLIDATED BISCUIT CO
312 RADER RD
MC COMB OH 45858-9751

Tyler L. Worha

⑈0906588045⑈ ⑉031100267⑉ 6301446450 509⑈

| | |
|---|---|
| Name: | CONSOLIDAT |
| Box: | 631073 |
| Date: | 09/29/2006 |
| Batch: | 655 |
| Item: | 4 |
| Amt: | 912.00 |

FIFTH THIRD BANK

4291.3080

**Georgia-Pacific Corporation**
PO BOX 45067
JACKSONVILLE, FL 32232-5067

| | VENDOR NUMBER | DATE | CHECK NUMBER |
|---|---|---|---|
| | 382913 | 9/18/06 | 906588045 |

| DATE | INVOICE # | GROSS AMOUNT | DISCOUNT | NET AMOUNT | PHONE CONTACT |
|---|---|---|---|---|---|
| 8/14/06 | 62609112 | 509.50 | .00 | 509.50 | 866-203-5947 |
| 62609112 | | | | | |
| 8/14/06 | 62609113 | 402.50 | .00 | 402.50 | 866-203-5947 |
| 62609113 | | | | | |

| | TOTALS | | 912.00 | .00 | 912.00 |
|---|---|---|---|---|---|

5

G-21-08

COLLINS REPORTING

CBC 1338



FIFTH THIRD BANK

| Name: | CONSOLIDAT |
|---|---|
| Box: | 631073 |
| Date: | 09/29/2006 |
| Batch: | 655 |
| Item: | 3 |
| Amt: | 1050.50 |

4291.3080    p

## Georgia-Pacific Corporation
PO BOX 45067
JACKSONVILLE, FL 32232-5067

| | | VENDOR NUMBER | DATE | CHECK NUMBER |
|---|---|---|---|---|
| | | 382913 | 9/15/06 | 906587702 |

| DATE | INVOICE # | GROSS AMOUNT | DISCOUNT | NET AMOUNT | PHONE CONTACT |
|---|---|---|---|---|---|
| 8/11/06 62609110 | 62609110 | 505.00 | .00 | 505.00 | 866-203-5947 |
| 8/11/06 62609111 | 62609111 | 545.50 | .00 | 545.50 | 866-203-5947 |

CBC 1339



FIFTH THIRD BANK

| | |
|---|---|
| Name: | CONSOLIDAT |
| Box: | 631073 |
| Date: | 09/26/2006 |
| Batch: | 652 |
| Item: | 19 |
| Amt: | 2568.50 |

Idosta
su ILL

Tina    Harmon Associates –
                subsidiary        516-997-3400
                                    Ect 406
                             Recycled Paper

4291. 3080

## Georgia-Pacific Corporation

PO BOX 45067
JACKSONVILLE, FL 32232-5067

VENDOR NUMBER 382913    DATE 9/12/06    CHECK NUMBER 906581313

| DATE | INVOICE # | GROSS AMOUNT | DISCOUNT | NET AMOUNT | PHONE CONTACT |
|---|---|---|---|---|---|
| 8/04/06 | 6260911 | 556.00 | .00 | 556.00 | 866-203-5947 |
| 6260911 | | | | | |
| 8/07/06 | 6260912 | 533.00 | .00 | 533.00 | 866-203-5947 |
| 6260912 | | | | | |
| 8/07/06 | 6260913 | 493.00 | .00 | 493.00 | 866-203-5947 |
| 6260913 | | | | | |
| 8/08/06 | 6260914 | 490.50 | .00 | 490.50 | 866-203-5947 |
| 6260914 | | | | | |
| 8/08/06 | 6260915 | 496.00 | .00 | 496.00 | 866-203-5947 |
| 6260915 | | | | | |

CBC 1340



FIFTH THIRD BANK

Name:    CONSOLIDAT
Box:     631073
Date:    09/26/2006
Batch:   652
Item:    18
Amt:     1125.50

4291.3080

Valdosta

Recycled Paper

**Georgia-Pacific Corporation**
PO BOX 45067
JACKSONVILLE, FL 32232-5067

| DATE | INVOICE # | GROSS AMOUNT | DISCOUNT | NET AMOUNT | PHONE CONTACT |
|------|-----------|--------------|----------|------------|---------------|
| 8/10/06 | 6260918 | 479.50 | .00 | 479.50 | 866-203-5947 |
| 6260918 | | | | | |
| 8/10/06 | 6260919 | 646.00 | .00 | 646.00 | 866-203-5947 |
| 6260919 | | | | | |

VENDOR NUMBER 382913
DATE 9/14/06
CHECK NUMBER 906583098

CBC 1341



THIS DOCUMENT CONTAINS VOID PANTOGRAPH, MICROPRINT BORDER, THERMOCHROMIC INK AND ARTIFICIAL WATERMARK.

**Georgia-Pacific Corporation**
O BOX 45067
ACKSONVILLE, FL 32232-5067

CHASE BANK USA N.A.
WILMINGTON, DELAWARE
62-26 4645-09
311

CHECK #: **0906582843**

DATE: 9/13/06

PAY EXACTLY $********948.00

"Press or rub with finger,
if the blue colored symbol disappears,
this document is authentic."

PAY     Nine Hundred Forty-Eight and 00/100

TO THE
ORDER OF    CONSOLIDATED BISCUIT CO
312 RADER RD
MC COMB OH 45858-9751

Tyke L. Worte

⑈0906582843⑈ ⑆031100267⑆ 6301446450 509⑈

FIFTH THIRD BANK

| | |
|---|---|
| Name: | CONSOLIDAT |
| Box: | 631073 |
| Date: | 10/10/2006 |
| Batch: | 662 |
| Item: | 4 |
| Amt: | 948.00 |

4291.3080

**Georgia-Pacific Corporation**
PO BOX 45067
JACKSONVILLE, FL 32232-5067

| | | VENDOR NUMBER | DATE | CHECK NUMBER |
|---|---|---|---|---|
| | | 382913 | 9/13/06 | 906582843 |

| DATE | INVOICE # | GROSS AMOUNT | DISCOUNT | NET AMOUNT | PHONE CONTACT |
|---|---|---|---|---|---|
| 8/09/06 | 6260916 | 483.50 | .00 | 483.50 | 866-203-5947 |
| 6260916 | | | | | |
| 8/09/06 | 6260917 | 464.50 | .00 | 464.50 | 866-203-5947 |
| 6260917 | | | | | |

CBC 1342



FIFTH THIRD BANK

Name:    CONSOLIDAT
Box:     631073
Date:    12/05/2006
Batch:   708
Item:    22
Amt:     3039.42

4291.3080

| TICKET# | DATE | DESCRIPTION | WEIGHT | $/TON | AMOUNT |
|---------|------|-------------|--------|-------|--------|
| 6213609 | 08/16 | HDPE FILM-ROLLS | 13484 | 450.00 | 3,033.90 |
| 6213609 | 08/16 | FILM - OTHER - ROLLS | 9316 | .00 | .00 |
| 6213609 | 08/16 | POLYSTYRENE - MISC L | 48 | 230.00 | 5.52 |

928700892

Smurfit-Stone Container Enterprises, Inc

SMURFIT-STONE

Smurfit-Stone Container Enterprises, Inc
401 Alton Street, P.O. Box 276 • Alton, Illinois 62002-2276

CORPORATE    Chase Manhattan Bank Delaware
IMPREST      1201 Market Street
CHECK 7287008758    Wilmington, DE 19801

62-28  3064-09
311

[9287008758]

**FIFTH THIRD BANK**

| | |
|---|---|
| Name: | CONSOLIDAT |
| Box: | 631073 |
| Date: | 11/09/2006 |
| Batch: | 690 |
| Item: | 11 |
| Amt: | 18302.06 |

Date: 10/20/06    Amount ***18,302.06***

EIGHTEEN THOUSAND THREE HUNDRED TWO AND 06/100 ****************************************

To the order of    Signover

CONSOLIDATED BISCUIT COMPANY    SIBC
701 NORTH FORREST STREET

VALDOSTA        GA    31602
31602CD99

Imprest Account
2nd Signature Required
If Over $5000.00

THIS CHECK NOT VALID UNLESS PRESENTED FOR
PAYMENT WITHIN 180 DAYS FROM DATE OF ISSUE

1ST SIGNATURE

2ND SIGNATURE

⑆9287008758⑈ ⑆031100267⑈ 6301535849509⑆

4291.3080

REMITTANCE ADVICE

PAGE 1

31602CD99    CONSOLIDATED BISCUIT COMPANY
701 NORTH FORREST STREET

VALDOSTA        GA  31602

CHECK NUMBER  9287008758

CHECK DATE    10/20/06

CHECK AMOUNT   $18,302.06

| TICKET# | DATE | DESCRIPTION | WEIGHT | $/TON | NET AMOUNT |
|---------|------|-------------|--------|-------|------------|
| 0600966 S064793 | 07/20 | OLD CORRUGATED | 26960 | 95.00 | 1,280.60 |
| MA61071916 S064794 | 07/20 | OLD CORRUGATED | 26100 | 95.00 | 1,239.75 |
| MA61071916 S064794 | 07/20 | UNASSIGNED | 0 | .00 | .00 |
| MA61071916 S064794 | 07/20 | FREIGHT CHARGEBACK | 0 | .00 | 175.14- |
| 6211769 | 07/19 | POLYSTYRENE - MISC L | 10420 | 230.00 | 1,198.30 |
| 6211779 | 07/19 | BOXBOARD CUTTINGS - | 40000 | 5.00 | 100.00 |
| 6211785 | 07/26 | HDPE FILM-ROLLS | 28146 | 450.00 | 6,332.85 |
| 6211785 | 07/26 | HDPE MISC-ROLLS | 5414 | 180.00 | 487.26 |
| 6211895 | 07/26 | POLYSTYRENE - MISC L | 10380 | 230.00 | 1,193.70 |
| 6211977 | 07/26 | FILM - OTHER - ROLLS | 24040 | .00 | .00 |
| 6211977 | 07/26 | FILM - OTHER - ROLLS | 22890 | .00 | .00 |
| 6211977 | 07/26 | FILM - OTHER - ROLLS | 24040- | .00 | .00 |
| 6212005 | 07/26 | POLYSTYRENE - MISC L | 10080 | 230.00 | 1,159.20 |
| 6212011 | 07/26 | POLYSTYRENE - MISC L | 8340 | 230.00 | 959.10 |
| 6212078 | 07/26 | FILM - OTHER - ROLLS | 27680 | .00 | .00 |
| 6212078 | 07/26 | FILM - OTHER - ROLLS | 27480 | .00 | .00 |
| 6212078 | 07/26 | FILM - OTHER - ROLLS | 27680- | .00 | .00 |
| 6212078 | 07/26 | POLYPROPYLENE ROLLS | 27480 | 100.00 | 1,374.00 |
| 6212078 | 07/26 | FILM - OTHER - ROLLS | 27480- | .00 | .00 |
| 6212152 | 07/25 | BOXBOARD CUTTINGS - | 39150 | 5.00 | 97.88 |
| 6212172 | 07/25 | BOXBOARD CUTTINGS - | 34150 | 5.00 | 85.38 |
| 6212176 | 07/26 | BOXBOARD CUTTINGS - | 36540 | 5.00 | 91.35 |
| 6212266 | 07/25 | BOXBOARD CUTTINGS - | 29610 | 5.00 | 74.03 |
| 6212294 | 07/26 | BOXBOARD CUTTINGS - | 34140 | 5.00 | 85.35 |
| 6212298 | 07/26 | BOXBOARD CUTTINGS - | 30750 | 5.00 | 76.88 |
| 6212344 | 07/26 | BOXBOARD CUTTINGS - | 34950 | 5.00 | 87.38 |
| 6212402 | 07/26 | BOXBOARD CUTTINGS - | 34280 | 5.00 | 85.70 |
| 6212414 | 07/26 | BOXBOARD CUTTINGS - | 36720 | 5.00 | 91.80 |
| 6212433 | 07/26 | BOXBOARD CUTTINGS - | 36670 | 5.00 | 91.68 |
| 6212458 | 07/28 | BOXBOARD CUTTINGS - | 34330 | 5.00 | 85.83 |
| 6212498 | 07/28 | BOXBOARD CUTTINGS - | 30540 | 5.00 | 76.35 |
| 6212523 | 07/28 | BOXBOARD CUTTINGS - | 32700 | 5.00 | 81.75 |
| 6212530 | 07/28 | BOXBOARD CUTTINGS - | 36380 | 5.00 | 90.95 |
| 6212610 | 07/31 | BOXBOARD CUTTINGS - | 29680 | 5.00 | 74.20 |
| 6212629 | 07/31 | BOXBOARD CUTTINGS - | 36690 | 5.00 | 91.73 |
| 6212678 | 08/03 | POLYPROPYLENE ROLLS | 31600 | 100.00 | 1,580.00 |
| 6212684 | 08/03 | BOXBOARD CUTTINGS - | 27700 | 5.00 | 69.25 |
| 6212775 | 08/03 | BOXBOARD CUTTINGS - | 25300 | 5.00 | 63.25 |
| 6212777 | 08/03 | BOXBOARD CUTTINGS - | 28680 | 5.00 | 71.70 |

**SMURFIT-STONE**

Smurfit-Stone Container Enterprises, Inc

401 Alton Street, P.O. Box 276 • Alton, Illinois 62002-2276

CORPORATE
IMPREST
CHECK 9287008404

Chase Manhattan Bank Delaware
1201 Market Street
Wilmington, DE 19801

9287008404

| | |
|---|---|
| Name: | CONSOLIDAT |
| Box: | 631073 |
| Date: | 10/10/2006 |
| Batch: | 662 |
| Item: | 3 |
| Amt: | 975.79 |

Date: 9/21/06    Amount: ******975.79**

NINE HUNDRED SEVENTY FIVE AND 79/100 ******************************************

To the order of

CONSOLIDATED BISCUIT COMPANY
701 NORTH FORREST STREET

VALDOSTA        GA  31602
31602CD99

⑈9287008404⑈ ⑆031100267⑆ 6301535849509⑈

4291, 3080

Smurfit-Stone Container Enterprises, Inc

928700840

| TICKET# | DATE | DESCRIPTION | WEIGHT | $/TON | AMOUNT |
|---|---|---|---|---|---|
| 6211127 | 07/17 | BOXBOARD CUTTINGS — | 39040 | 5.00 | 97.60 |
| 6211200 | 07/17 | BOXBOARD CUTTINGS — | 29820 | 5.00 | 74.55 |
| 6211240 | 07/17 | BOXBOARD CUTTINGS — | 35800 | 5.00 | 89.50 |
| 6211314 | 07/17 | BOXBOARD CUTTINGS — | 35700 | 5.00 | 89.25 |
| 6211465 | 07/17 | BOXBOARD CUTTINGS — | 35120 | 5.00 | 87.80 |
| 6211476 | 07/17 | BOXBOARD CUTTINGS — | 31460 | 5.00 | 78.65 |
| 6211527 | 07/17 | BOXBOARD CUTTINGS — | 38030 | 5.00 | 95.08 |
| 6211566 | 07/17 | BOXBOARD CUTTINGS — | 38860 | 5.00 | 97.15 |
| 6211605 | 07/17 | BOXBOARD CUTTINGS — | 34010 | 5.00 | 85.03 |
| 6211629 | 07/17 | BOXBOARD CUTTINGS — | 35500 | 5.00 | 88.75 |
| 6211730 | 07/18 | BOXBOARD CUTTINGS — | 36970 | 5.00 | 92.43 |

CBC 1346

**Smurfit-Stone**

Smurfit-Stone Container Enterprises, Inc.
401 Alton Street, P.O. Box 278 • Alton, Illinois 62002-2276

CORPORATE IMPREST
CHECK 9287005025

Chase Manhattan Bank Delaware
1201 Market Street
Wilmington, DE 19801

9287005025

1,881.90

Date 11/10/05    Amount ****1,881.90**

ONE THOUSAND EIGHT HUNDRED EIGHTY ONE AND 90/100 *******************************

To the order of

CONSOLIDATED BISCUIT COMPANY
701 NORTH FORREST STREET
VALDOSTA        GA   31602
31602CD99

Imprest Account
2nd Signature Required
If Over $5000.00

THIS CHECK NOT VALID UNLESS PRESENTED FOR PAYMENT WITHIN 180 DAYS FROM DATE OF ISSUE

1ST SIGNATURE

2ND SIGNATURE

⑆9287005025⑆ ⑈031100267⑈ 6301535849509⑆

**FIFTH THIRD BANK**

Name:   CONSOLIDA

Box:    631073

Date:   01/10/2006

Batch:  438

Item:   18

Amt:    1881.90

4291.3080

| | TICKET# | DATE | DESCRIPTION | WEIGHT | $/TON | AMOUNT |
|---|---|---|---|---|---|---|
| MA61082310 | S052014 | 08/26 | OLD CORRUGATED | 41820 | 90.00 | 1,881.9 |

Smurfit-Stone Container Enterprises, Inc.        92870050



4291.3080

| | TICKET# | DATE | DESCRIPTION | WEIGHT | $/TON | AMOUNT |
|---|---|---|---|---|---|---|
| 1086019 | S056019 | 12/13 | OLD CORRUGATED | 46180 | 55.00 | 1,269.95 |
| 98112 | S056020 | 12/14 | OLD CORRUGATED | 33420 | 55.00 | 919.05 |
| 98113 | S056021 | 12/15 | OLD CORRUGATED | 25200 | 55.00 | 693.00 |

Smurfit-Stone Container Enterprises, Inc.    9287006076

HIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. VB00329
Shipper's Bill of Lading No. 0600954
Consignee's Reference/PO No. VB00329

Name of Carrier JBHT Carrier's Code
(SCAC)

From **Consolidated Biscuit Co.**

14:36:34    July   14 2006

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable.

④

The property described below, is apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

To **SMURFIT-STONE**
1580 WEST BEAVER STREET

JACKSONVILLE          FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier JBHT    JB HUNT TRUCKING

Order No. VB00329    P.O. No. VB00329    Car or Vehicle Initials No. 3039076

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 54 | CTN OG CINN GRANAMIALS 18,900 | 1782 | |
| 53 | CTN OG HONEY GRAHAMS 18,550 | 1749 | |
| 108 | CTN WD ORLEANS WAFERS 40,500 | 4104 | |
| 105 | CTN NP FROSTED BLUEBERRY 42,000 | 3710 | |
| 57 | CTN NP FROSTED APPLE 22,800 | 1710 | |
| 760 | CTN PURITY APPLE TP 266,000 | 17664 | |
| 240 | CTN PURITY STRAWBERRY TP 84000 | 84000 | |

CHIPBOARD

TOTAL PALLETS  33 AT  50.0 LBS EACH
PALLETS IN/OUT  1650 /33

SEAL NOS.    781

| 1377 | ◄ TOTAL PIECES | TOTAL WEIGHT | 116369 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____    Date _____

NOTE—Where the rate is dependant on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. **Consolidated Biscuit Co.**
Signature of Consignor

Shipper, Per _____    Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company  McComb, OH 45858

FILE COPY

CBC 1349

HIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. VB00328
0600953
Shipper's Bill of Lading No.
Consignee's Reference/PO No. VB00328

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

From
Consolidated Biscuit Co.
13:51:18     July 14 2006     ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to its destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

To
SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE     FL     32209

Delivering Carrier  JBHT   JB HUNT TRUCKING

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.
CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Order No. VB00328     P.O. No. VB00328     Car or Vehicle Initials No. 575203

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 48 | CTN BLUEBIRD FROSTED FUDGE TP 16,800 | 1152 | |
| 108 | CTN TM MIXED CKY 40,500 | 3564 | |
| 36 | CTN TM OAT. CHOC. CHIP 13,500 | 1188 | |
| 108 | CTN WD 12OZ ANIMAL 40,500 | 4428 | |
| 252 | TM PARTY CKY 94,500 | 8316 | |
| 108 | CG 9OZ CHEEZE BITS 40,500 | 3564 | |
| 120 | CTN OG CINN GRANIMALS 42,000 | 3720 | |
| 245 | ~~CTN FS VANILLA WAFERS~~ 73,500 | 8575 | |
| 36 | CTN WD 12 OZ SOUP & CHILI 375 | 1512 | |

CHIPBOARD

PALLETS IN/OUT     / 30
TOTAL PALLETS  30 AT  50.0 LBS EACH     1500

**SEAL NOS.**

| 1061 | ◀ TOTAL PIECES | TOTAL WEIGHT | 37519 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____     Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor

**Consolidated Biscuit Co.**

Shipper, Per _____     FILE COPY     Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH  45858

CBC 1350

THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00326
Shipper's Bill of Lading No. 0600951
Consignee's Reference/PO No. VB00322
Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

**From** Consolidated Biscuit Co.

9:00:19    July 14 2006

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.* The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

④

To
SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE          FL     32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT   JB HUNT TRUCKING

Order No. VB00326        P.O. No. VB00322-        Car or Vehicle Initials No. 49758

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 105 | CTN OVEN GEM 9OZ CHEEZE BITS | 3465 | |
| 420 | CTN FIRESIDE VANILLA WAFERS | 14700 | |
| 313 | CTN THRIFTY MAID 8OZ CHOC CHIP | 10329 | |
| 160 | CTN THRIFTY MAID 8OZ LEMON SUGAR | 5280 | |
| 124 | CTN THRIFTY MAID OATMEAL CKYS | 4092 | |
| 37 | CTN THRIFY MAID 8OZ PATRY CKY | 1221 | |

CHIPBOARD

PALLETS IN/OUT        / 35
TOTAL PALLETS  35 AT  50.0 LBS EACH     1750

**SEAL NOS.**

| 1159 | ◀ TOTAL PIECES | TOTAL WEIGHT | 40837 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____        Date _____

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____        FILE COPY        Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company    McComb, OH 45858

CBC 1351

HIS MEMORANDUM  Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

At  Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00327
Shipper's Bill of Lading No. _____ 0600952
Consignee's Reference/PO No. VB00322
Name of Carrier _____ \JBHT_____ Carrier's Code
(SCAC) _____

**From**
Consolidated Biscuit Co.

10:48:59    July  14 2006

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable,
The property described below, in apparent good order, except as noted (contents and condition of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to
deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby
agreed to by the shipper and accepted for himself and his assigns.

④

SMURFIT-STONE
1580 WESR BEAVER STREET

JACKSONVILLE                    FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO
BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID
unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00327          P.O. No. VB00322          Car or Vehicle Initials No. 42595

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 96 | CTN FASTCO 16OZ CINN GRAHAM | 3072 | |
| 177 | CTN FASTCO HONEY GRAHAM | 5664 | |
| 184 | CTN HONEY GRAHAM SNAPPY | 5888 | |
| 96 | CTN SNAPPY CINN GRAHAM | 3072 | |
| 71 | CTN CENTRELLA HONEY GRAHAM | 2272 | |
| 432 | CTN BB PRODT. CINN TP | 10368 | |
| 384 | CTN BB FROST. FUDGE TP | 9216 | |

CHIPBOARD

PALLETS IN/OUT      / 30
TOTAL PALLETS  30 AT  50.0 LBS EACH    1500

SEAL NOS.    779

| 1440 | ◀ TOTAL PIECES | | TOTAL WEIGHT | 41052 |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.      Per _____    Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.  Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____                    Agent, Per _____

Permanent post office address of shipper        FILE COPY
Consolidated Biscuit Company  McComb, OH 45858

CBC 1352



THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00321
Shipper's Bill of Lading No. 0600946
Consignee's Reference/PO No. VB00321

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

**From**
Consolidated Biscuit Co.

17:49:30   July 12 2006

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request."

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.



**To**
SMURFIT-STONE
1580 WEST BEAVER STREET
JACKSONVILLE          FL     32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT   JB HUNT TRUCKING

Order No. VB00321       P.O. No. VB00321          Car or Vehicle Initials No.  564184

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 183 | 309939 PURE MAID UNSALTED (45,625) | 6973 | |
| 62 | 309938 PURE MAID SALTINES (15,500) | 2356 | |
| 254 | 309840 OVEN GEM SALTINES (63,350) | 9629 | |
| 369 | SNAPPY GEORGIA CRACKER (110,457) | 12519 | |
| 2 | 309951 FAMILY CHOICE UNSALTED (400) | 62 | |
| 3 | 309950 FAMILY CHOICE SALTINES (750) | 116 | |
| 7 | CRRACKIN GOOD 16 OZ GEORGIA CRACKER (2,475) | 315 | |
| 16 | ~~SNAPPY SALTINES~~ (4,400) | 608 | |
| 1 | OVENGEM UNSALTED CRACKERS (15,000) | 2182 | |
| | | | |
| | CHIPBOARD | | |
| | | PALLETS IN/OUT    / 30 | |
| | TOTAL PALLETS  30 AT  50.0 LBS EACH | 1500 | |
| | SEAL NOS.   773 | | |
| 897 | ◀ TOTAL PIECES | TOTAL WEIGHT   36260 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____        Date _____

NOTE—When the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.        Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____          FILE COPY          Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858

CBC 1353

THIS MEMORANDUM Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. __VB00322__
Shipper's Bill of Lading No. __0600947__
Consignee's Reference/PO No.__VB00322__

Name of Carrier _____JBHT_____ Carrier's Code
(SCAC) _____

From **Consolidated Biscuit Co.**

18:28:46     July 12 2006

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

④

The property described below, is apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to its destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be preformed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

T
O  **SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE            FL    32209**

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked cofect.

CHECK BOX IF COLLECT. ☐

**COL
SEE BODY**

Delivering Carrier   JBHT   JB HUNT TRUCKING

Order No. VB00322        P.O. No. VB00322          Car or Vehicle Initials No. 49511

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 912 | ~~331003 CTN PURITY CHERRY~~ | 21888 | |
| 528 | ~~331005 CTN PURITY CHOC~~ | 12672 | |
| | CHIPBOARD | | |
| | TOTAL PALLETS   30 AT   50.0 LBS EACH | PALLETS IN/OUT    / 30 1500 | |
| | SEAL NOS.    774 | | |

| 1440 | ◄ TOTAL PIECES | TOTAL WEIGHT | 36060 |

Shipper Certification This is to certify that the above named materials are property classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____        Date _____

NOTE—Where the rate is dependant on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor        **Consolidated Biscuit Co.**

Shipper, Per _____                    Agent, Per _____

Permanent post office address of shipper
**Consolidated Biscuit Company**   McComb, OH  45858

FILE COPY

CBC 1354

THIS MEMORANDUM Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No.    VB00314
Shipper's Bill of Lading No.    0600939
Consignee's Reference/PO No. VB00314

Name of Carrier    JBHT    Carrier's Code
(SCAC)

**From**    Consolidated Biscuit Co.

17:06:35    July 11 2006

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable.

The property described below, is apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

④

To
SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE    FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier    JBHT    JB HUNT TRUCKING

Order No. VB00314    P.O. No. VB00314    Car or Vehicle Initials No. 42822

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 216 | CTN THRIFTY MAID GEORGIA CRACKERS (64,800) | 7128 | |
| 324 | CTN SNAPPY UNSALTED (89,100) | 12960 | |
| 420 | CTN PUREMAID SALTINES (105,000) | 15960 | |
| | CHIPBOARD | | |
| | PALLETS IN/OUT    / 30 | | |
| | TOTAL PALLETS 30 AT 50.0 LBS EACH    1500 | | |
| | **SEAL NOS.** 766 | | |
| 960 | ◄ TOTAL PIECES | TOTAL WEIGHT    37548 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.    Per    Date

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
per

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.    Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____    Agent, Per _____

Permanent post office address of shipper    FILE COPY
Consolidated Biscuit Company    McComb, OH 45858

CBC 1355

THIS MEMORANDUM   Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

At   Consolidated Biscuit Co.
     701 N. FOREST ST
     VALDOSTA, GA 31601

Carrier's Pro No.   VB00312
Shipper's Bill of Lading No.   0600937
Consignee's Reference/PO No. VB00312

Name of Carrier   JBHT   Carrier's Code
(SCAC)

From
Consolidated Biscuit Co.                              15:00:59   July 11 2006

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request,"
The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

④

C O N S I G N E D

SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE              FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE
Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.
CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier   JBHT   JB HUNT TRUCKING

Order No. VB00312      P.O. No. VB00312          Car or Vehicle Initials No. 42392

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 37 | 309316 CTN WINN DIXIE UNSALTED (10,175) | 1480 | |
| 466 | CTN WINN DIXIE SALTINES 128,150 | 18640 | |
| 504 | CTN THRIFTY MAID GEORGIA CRACKERS 151,200 | 16632 | |

CHIPBOARD

                                    PALLETS IN/OUT    / 30
TOTAL PALLETS   30 AT  50.0 LBS EACH        1500

SEAL NOS.   764

| 1007 | ◄ TOTAL PIECES | TOTAL WEIGHT | 38252 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.        Per _____   Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.   Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____        Agent, Per _____

Permanent post office address of shipper             FILE COPY
Consolidated Biscuit Company   McComb, OH  45858

CBC 1356

**HIS MEMORANDUM**  Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. __VB00304__
Shipper's Bill of Lading No. __0600929__
Consignee's Reference/PO No. __VB00304__
Name of Carrier __JBHT__ Carrier's Code
(SCAC) _____

**From** Consolidated Biscuit Co.

15:12:01    July  10 2006    ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

To:
SMURFIT-STONE
1580 WEST BEAVER ST

JACKSONVILLE              FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00304        P.O. No. VB00304        Car or Vehicle Initials No. 45596

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 270 | ~~331009 CTN WHOLE FOOD 16OZ UNSALTED~~ (74,125) | 10775 | |
| 588 | ~~331008 CTN WHOLE FOOD 16OZ SALTINE~~ (161,700) | 23520 | |
| 144 | 309837 CTN FASTCO 16OZ UNSALTED (39,700) | 5775 | |

PALLETS IN/OUT        / 28
TOTAL PALLETS   28 AT   50.0 LBS EACH        1400

SEAL NOS.   756

| 1002 | ◄ TOTAL PIECES | TOTAL WEIGHT | 41470 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____    Date _____

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor    Consolidated Biscuit Co.

Shipper, Per _____        Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858

FILE COPY

CBC 1357

THIS MEMORANDUM   Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. ___ VB00305
Shipper's Bill of Lading No. 0600930
Consignee's Reference/PO No. VB00305
Name of Carrier ___ JBHT ___ Carrier's Code
(SCAC) ___

**From**
Consolidated Biscuit Co.

15:53:52   July 10 2006

④

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request."
The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

To
SMURFIT-STONE
1580 WEST BEAVER ST.

JACKSONVILLE                    FL      32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader ___
Shipper Supr. ___
Plant Mgmt. ___
Date ___

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
PPD
SEE BODY

Delivering Carrier   JBHT   JB HUNT TRUCKING

Order No. VB00305          P.O. No. VB00305          Car or Vehicle Initials No. 50234

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 78 | 309841 CTN FASTCO 16OZ SALTINES (21,450) | 3120 | |
| 36 | 309837 CTN FASTCO 16OZ UNSALTED (9,900) | 1440 | |
| 547 | 309948 CTN SNAPPY SALTINES (150,425) | 21880 | |
| 30 | 309949 CTN SNAPPY UNSALTED (8,250) | 1200 | |
| 300 | CTN WINN DIXIE SALTINES (82,500) | 12000 | |

PALLETS IN/OUT      / 28
TOTAL PALLETS   28 AT   50.0 LBS EACH      1400

SEAL NOS.   757

| 991 | ◄ TOTAL PIECES | TOTAL WEIGHT | 41040 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per ___          Date ___

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per ___

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. **Consolidated Biscuit Co.**
Signature of Consignor

Shipper, Per ___          Agent, Per ___

Permanent post office address of shipper          FILE COPY
Consolidated Biscuit Company   McComb, OH 45858

THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. __VB00346__
Shipper's Bill of Lading No. __0600974__
Consignee's Reference/PO No. VB00346

Name of Carrier __BROW__ Carrier's Code
(SCAC) _____

**From** Consolidated Biscuit Co.

16:43:29    July 20 2006

④

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request."

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| | |
|---|---|
| T o | SMURFIT-STONE<br>1580 WEST BEAVER STREET<br><br>JACKSONVILLE        FL    32209 | **PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE<br><br>Loader _____<br>Shipper Supr. _____<br>Plant Mgmt. _____<br>Date | Freight charges are PREPAID unless marked collect.<br><br>CHECK BOX IF COLLECT. ☐<br>COL<br>SEE BODY |

Delivering Carrier  BROW    BROWN TRUCKING

| Order No. VB00346 | P.O. No. VB00346 | | Car or Vehicle Initials No. 24591 | |
|---|---|---|---|---|
| No.<br>Packages | Kind of Package, Description of Articles, Special<br>Marks, and Exceptions | | Weight<br>(Subj. to Corr.) | Date Code |
| 48 | BALES OF CARDBOARD (OCC) | | 25450 | |
| | | | | |
| | BALED OCC<br>RELEASE # MA61-0719-16 BALED OCC<br>PO # 4501187344<br>MEAD COTTONTON AL<br><br>FLOOR LOAD | | | |
| | **SEAL NOS.**    796 | | | |
| 48 | ◄ TOTAL PIECES | | TOTAL<br>WEIGHT    25450 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.    Per _____    Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. Consolidated Biscuit Co.
Signature of Consignor

_____ Shipper, Per _____    FILE COPY    _____ Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company    McComb, OH  45858

THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _VB00344_
0600970
Shipper's Bill of Lading No. _____
Consignee's Reference/PO No _VB00344_

Name of Carrier _JBHT_ Carrier's Code
(SCAC) _____

From **Consolidated Biscuit Co.**

15:51:55    July  20 2006    ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| | |
|---|---|
| SMURFIT-STONE<br>1580 WEST BEAVER STREET<br><br>JACKSONVILLE        FL    32209 | **PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO<br>BE CORRECT BY THE FOLLOWING PEOPLE<br>Loader _____<br>Shipper Supr. _____<br>Plant Mgmt. _____<br>Date | Freight charges are PREPAID<br>unless marked collect.<br>CHECK BOX IF COLLECT. ☐<br>COL<br>SEE BODY |

Delivering Carrier _JBHT    JB HUNT TRUCKING_

Order No. _VB00344_      P.O. No. _VB00344_      Car or Vehicle Initials No. _565616_

| No.<br>Packages | Kind of Package, Description of Articles, Special<br>Marks, and Exceptions | Weight<br>(Subj. to Corr.) | Date Code |
|---|---|---|---|
| 30 | PALLETS OF CLEAR PS TRAYS | 8590 | |
| | | | |
| | CLEAR PS TRAYS | | |
| | PALLETS IN/OUT    / 30 | | |
| | TOTAL PALLETS   30 AT  50.0 LBS EACH    1500 | | |
| | SEAL NOS.   795 | | |
| 30 | ◄ TOTAL PIECES | TOTAL<br>WEIGHT   10090 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.        Per _____        Date _____

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. **Consolidated Biscuit Co.**
Signature of Consignor

Shipper, Per _____        FILE COPY        Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858

CBC 1360

HIS MEMORANDUM Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

Carrier's Pro No. _____ VB00343 _____
0600969
Shipper's Bill of Lading No. _____
Consignee's Reference/PO No. VB00343 _____

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

From
**Consolidated Biscuit Co.**

13:19:46    July 20 2006    ④

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper on request."

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| | |
|---|---|
| T O | SMURFIT-STONE<br>1580 WEST BEAVER STREET<br><br>JACKSONVILLE          FL      32209 | **PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE<br><br>Loader _____<br>Shipper Supr. _____<br>Plant Mgmt. _____<br>Date |

Freight charges are PREPAID unless marked collect.
CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00343          P.O. No. VB00343          Car or Vehicle Initials No. 50144

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 120 | S-778 TRAYS | 3371 | |
| 60 | T-268 TRAYS | 2929 | |
| 118 | S-494 TRAYS | 3434 | |
| | | | |
| | CLEAR PS TRAYS | | |
| | | | |
| | PALLETS IN/OUT      / 30 | | |
| | TOTAL PALLETS   30 AT   50.0 LBS EACH | 1500 | |
| | **SEAL NOS.**    794 | | |
| 298 | ◄ TOTAL PIECES | TOTAL WEIGHT   11234 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____      Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor **Consolidated Biscuit Co.**

Shipper, Per _____          Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858      FILE COPY

HIS MEMORANDUM  Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At  Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00342 _____
Shipper's Bill of Lading No. __ 0600968 __
Consignee's Reference/PO No. VB00342

Name of Carrier _____ Carrier's Code
(SCAC) _____

**From**
Consolidated Biscuit Co.

13:04:00     July  20 2006

④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

To: SMURFIT-STONE
1580 WEST BEAVER STREET
JACKSONVILLE          FL     32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 20 5 | PALLETS OF TOASY PASTERY FOIL WRAP<br>PALLETS OF CG CKY FOIL WRAP | 18577<br>3004 | |
| | | | |
| | FOIL FILM | | |
| | TOTAL PALLETS  25 AT  50.0 LBS EACH | PALLETS IN/OUT  / 25<br>1250 | |
| | SEAL NOS.   793 | | |
| 25 | ◄ TOTAL PIECES | TOTAL WEIGHT  22831 | |

Order No. VB00342     P.O. No. VB00342     Car or Vehicle Initials No.  230104

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____   Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor     Consolidated Biscuit Co.

Shipper, Per _____     FILE COPY     Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH  45858

CBC 1362

HIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00340
Shipper's Bill of Lading No. _____ 0600966
Consignee's Reference/PO No. VB00340

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

**From** Consolidated Biscuit Co.

15:10:39    July  19 2006

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

④

SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE        FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐

COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00340        P.O. No.  VB00340        Car or Vehicle Initials No.  51852

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 50 | BALES  OF  OCC | 26410 | |
| | RELEASE # 610-94793  (BALED OCC) | | |
| | FLOOR  LOAD | | |
| | SEAL NOS.    791 | | |
| 50 | ◄ TOTAL PIECES | **TOTAL WEIGHT** 26410 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____        Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.

Signature of Consignor  Consolidated Biscuit Co.

Shipper, Per _____        Agent, Per _____

FILE COPY

Permanent post office address of shipper
Consolidated Biscuit Company    McComb, OH  45858

CBC 1363



THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. __ VB00339 __
_____ 0600965 _____
Shipper's Bill of Lading No. _____
Consignee's Reference/PO No. VB00339

Name of Carrier ___ JBHT ___ Carrier's Code
(SCAC) _____

**From** Consolidated Biscuit Co.

14:15:38    July 19 2006    ④

'RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.'

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

**To**
SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE                    FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL

Delivering Carrier  JBHT   JB HUNT TRUCKING

Order No. VB00339       P.O. No. VB00339       Car or Vehicle Initials No. 41650

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subl. to Corr.) | Date Code |
|---|---|---|---|
| 156 | T-484 TRAYS | 4286 | |
| 9 | OLD FASHION TRAYS | 278 | |
| 90 | S-499 TRAYS | 2989 | |
| 45 | S-542 TRAYS | 2023 | |
| 12 | S778 TRAYS | 304 | |
| | CLEAR PS TRAYS | | |
| | PALLETS IN/OUT      / 30 | | |
| | TOTAL PALLETS   30 AT   50.0 LBS EACH | 1500 | |
| | SEAL NOS.    788 | | |
| 312 | ◄ TOTAL PIECES | TOTAL WEIGHT   11380 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____    Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement.
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.

Signature of Consignor    Consolidated Biscuit Co.

Shipper, Per _____         Agent, Per _____

FILE COPY

Permanent post office address of shipper
Consolidated Biscuit Company    McComb, OH 45858

CBC 1364

HIS MEMORANDUM  Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At**  Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. ____ VB00337
Shipper's Bill of Lading No. 0600963
Consignee's Reference/PO No. VB00337

Name of Carrier ____ JBHT ____ Carrier's Code
(SCAC) _____

**From**
Consolidated Biscuit Co.

16:22:40   July 18 2006   ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request."

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to its usual place of delivery at said destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

T  SMURFIT-STONE
O  1580 WEST BEAVER STREET

JACKSONVILLE           FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00337      P.O. No. VB00337      Car or Vehicle Initials No. 41583 .

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 171 | BIG SIXTY TRAYS | 6806 | |
| 84 | T-484 TRAYS | 2271 | |
| 4 | OLD FASHION TRAYS | 1043 | |
| | CLEAR PS TRAYS | | |
| | PALLETS IN/OUT      / 30 | | |
| | TOTAL PALLETS   30 AT   50.0 LBS EACH | 1500 | |
| | **SEAL NOS.**    787 | | |
| 259 | ◄ TOTAL PIECES | TOTAL WEIGHT   11620 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.      Per _____      Date

NOTE~Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement.
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.  Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____          Agent, Per _____

Permanent post office address of shipper        FILE COPY
Consolidated Biscuit Company   McComb, OH  45858

CBC 1365

IIS MEMORANDUM   Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc**
CONSOLIDATED BISCUIT COMPANY

At Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. ___ VB00335 ___
___ 0600961 ___
Shipper's Bill of Lading No. ___

Consignee's Reference/PO No. VB00335

Name of Carrier ___ JBHT ___ Carrier's Code
(SCAC) ___

**From** Consolidated Biscuit Co.

14:44:04   July 18 2006

"RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request."
The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

④

SMURFIT-STONE
1580 WEST BEAVER STREET

JACKSONVILLE               FL     32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader ___
Shipper Supr. ___
Plant Mgmt. ___
Date ___

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT. ☐

COL
SEE BODY

Delivering Carrier  JBHT   JB HUNT TRUCKING

Order No. VB00335       P.O. No. VB00335       Car or Vehicle Initials No. 564224   -

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 5 | 9 1/16" COEX SALTINE W/UPC PRINT | 5617 | |
| 10 | 7 1/4" COEX | 7286 | |
| 11 | 9 1/16" COEX SALTINE | 15900 | |
| 2 | 15" COEX | 3286 | |

FIVE PALLETS IN NOSE OF TRAILER IS NATURAL HDPE FILM WITH BAR CODE ON IT

BALANCE OF TRAILER IS NATURAL HDPE FILM (NO PRINT)

PALLETS IN/OUT          / 28
TOTAL PALLETS 28 AT 50.0 LBS EACH          1400

**SEAL NOS.** 790

| 28 | ◄ TOTAL PIECES | TOTAL WEIGHT | 33489 | |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per ___        Date ___

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per ___

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per ___                          Agent, Per ___

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858

FILE COPY

THIS MEMORANDUM Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**cbc** CONSOLIDATED BISCUIT COMPANY

At **Consolidated Biscuit Co.**
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00304
Shipper's Bill of Lading No. _____ 0600960
Consignee's Reference/PO No. VB00304

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

From **Consolidated Biscuit Co.**

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

10:05:58    July  10 2006

④

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| To | PLEASE READ: THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE | Freight charges are PREPAID unless marked collect. |
|---|---|---|
| SMURFIT-STONE 1580 WEST BEAVER ST JACKSONVILLE          FL    32209 | Loader _____<br>Shipper Supr. _____<br>Plant Mgmt. _____<br>Date | CHECK BOX IF COLLECT. ☐<br>COL<br>SEE BODY |

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00304        P.O. No. VB00304        Car or Vehicle Initials No.  45596

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 270 | ~~331009 CTN WHOLE FOOD 16OZ UNSALTED~~ (74,125) | 10775 | |
| 588 | ~~331008 CTN WHOLE FOOD 16OZ SALTINB~~ (161,700) | 23520 | |
| 144 | 309837 CTN FASTCO 16OZ UNSALTED (39,700) | 5775 | |

TOTAL PALLETS   28 AT   50.0 LBS EACH

PALLETS IN/OUT   / 28
1400

SEAL NOS.   756

| 1002 | ◄ TOTAL PIECES | TOTAL WEIGHT | 41470 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____    Date _____

NOTE – Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. **Consolidated Biscuit Co.**
Signature of Consignor

Shipper, Per _____        Agent, Per _____

FILE COPY

Permanent post office address of shipper
Consolidated Biscuit Company   McComb, OH 45858

CBC 1367

IIS MEMORANDUM  Is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At**  Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. _____ VB00334
_____ 0600959
Shipper's Bill of Lading No. _____
Consignee's Reference/PO No. VB00334

Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC) _____

**From**  Consolidated Biscuit Co.                     14:43:11    July 17 2006    ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*

The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

SMURFIT-STONE
ᴛ 1580 WEST BEAVER STREET

JACKSONVILLE                    FL    32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE

Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date

Freight charges are PREPAID unless marked collect.

CHECK BOX IF COLLECT ☐

COL
SEE BODY

ᴅelivering Carrier  JBHT    JB HUNT TRUCKING

ᴅer No. VB00334        P.O. No. VB00334            Car or Vehicle Initials No. 47883

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 1 | PALLET WD OATMEAL PIE CTN 10,000 | 936 | |
| 3 | PALLET WD DEVILS FOOD PIE CTN 52,500 | 5328 | |
| 2 | PALLETS CTN WD ROYAL STRIPE PIE 35,000 | 3628 | |
| 1 | PALLET CTN WD VANILLA PIES 17,500 | 1840 | |
| 5 | PALLETS CTN WD CHOC. PIES 50,000 | 4652 | |
| 4 | PALLETS CTN WD CHOC PIES 60,000 | 6385 | |
| 2 | PALLETS CTN JUMBO CHOC ROYAL PIES 20,000 | 3264 | |
| 5 | PALLETS CTN WD WILD CHERRY PIES 87,500 | 9126 | |
| 1 | PALLET CTN ROYAL CAKE CHOC PIE 15,000 | 1513 | |
| 2 | PALLETS CTN ROYAL CAKE JUMBO BANANA PIE 20,000 | 3270 | |

CHIPBOARD

                                    PALLETS IN/OUT    / 26
TOTAL PALLETS  26 AT  50.0 LBS EACH            1300

**SEAL NOS.**    785

| 26 | ◀ TOTAL PIECES | TOTAL WEIGHT | 41242 | |
|---|---|---|---|---|

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.        Per        Date

ɴOTE – Where the rate is dependant on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of Consignor    Consolidated Biscuit Co.

Shipper, Per _____        Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company    McComb, OH  45858

FILE COPY

CBC 1368

**cbc** CONSOLIDATED BISCUIT COMPANY

THIS MEMORANDUM is an acknowledgement that a Bill of Lading has been issued and is not the Original Bill of Lading, nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

**At** Consolidated Biscuit Co.
701 N. FOREST ST
VALDOSTA, GA 31601

Carrier's Pro No. VB00333
Shipper's Bill of Lading No. 0600958
Consignee's Reference/PO No. VB00333
Name of Carrier _____ JBHT _____ Carrier's Code
(SCAC)

From Consolidated Biscuit Co.

14:16:39    July 17 2006    ④

*RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request.*
The property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

SMURFIT-STONE
1580 WEST BEAVER STREET
JACKSONVILLE              FL     32209

**PLEASE READ:** THIS LOAD COUNTED AND CERTIFIED TO BE CORRECT BY THE FOLLOWING PEOPLE
Loader _____
Shipper Supr. _____
Plant Mgmt. _____
Date _____

Freight charges are PREPAID unless marked collect.
CHECK BOX IF COLLECT. ☐
COL
SEE BODY

Delivering Carrier  JBHT    JB HUNT TRUCKING

Order No. VB00333    P.O. No. VB00333    Car or Vehicle Initials No. 40630

| No. Packages | Kind of Package, Description of Articles, Special Marks, and Exceptions | Weight (Subj. to Corr.) | Date Code |
|---|---|---|---|
| 120 | CTN OVEN GEM 8OZ HONEY GRAHAM 42,000 | 3678 | |
| 6 | PALLETS CTN OVEN GEM UNSALTED 80,795 | 11411 | |
| 5 | PALLETS CTN SUNNY SALTINES 69,000 | 13118 | |
| 82 | CTN OVEN GEM 16OZ CRACKERS 28,700 | 2914 | |
| 4 | ~~PALLETS SNAPPY UNSALTED~~ 52,000 | 7278 | |
| 1 | PALLET CTN GREGS SALTINES 8,945 | 679 | |

CHIPBOARD

PALLETS IN/OUT      / 25
TOTAL PALLETS   25 AT   50.0 LBS EACH      1250

SEAL NOS.    784

| 218 | ◄ TOTAL PIECES | TOTAL WEIGHT | 40328 |

Shipper Certification This is to certify that the above named materials are properly classified, packaged, marked and labeled, are in proper condition for transportation according to the applicable regulations of the DOT.

Per _____  Date _____

NOTE—Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding

per _____

For Freight Collect Shipments:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges. Consolidated Biscuit Co.
Signature of Consignor

Shipper, Per _____    FILE COPY    Agent, Per _____

Permanent post office address of shipper
Consolidated Biscuit Company  McComb, OH 45858

CBC 1369