UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

Case No.: 3:05-bk-3817-3F1

WINN DIXIE STORES, INC.

        Debtor(s).
_____/

### TRIAL MEMORANDUM
### OF THE PROPERTY APPRAISER OF ESCAMBIA COUNTY

        The Property Appraiser of Escambia County, through the undersigned counsel, submits

the following Trial Memorandum in accordance with this Court's Order Scheduling Trial of

October 10, 2008:

### I.  Statement of the Claim.

        The trial of this matter has been set to resolve the Debtor's Objections to the claim of the

Tax Collector of Escambia County for the Debtors' unpaid ad valorem taxes for the tax years

2005 and 2006.  The Tax Collector's claims are compiled in Tab A hereto.  The Debtor filed its

objections on August 8, 2006.  See Tab B.  The Debtor included a specific schedule in which it

attempted to summarize the taxes in dispute in Escambia County, Florida.  See Tab C.

        Because the Debtor has paid 2004 taxes, however, no claim is at issue for 2004.  This

Court previously held "to the extent the Debtors seek to reduce their 2004 or 2005 tax liability

for taxes they have already paid and apply any reduction to offset other taxes, the Court does not

have jurisdiction to do so."  See Tab D, Order Jan. 19, 2007.[1]  The Tax Manager of Winn Dixie

---

[1]  The Property Appraiser further contends that there is no jurisdiction for any of the contested matters set for trial.
Under Section 194.171, Florida Statutes, there is no subject matter jurisdiction when a taxpayer fails to challenge an
assessment within 60 days of certification of the tax rolls.  Here, Winn Dixie did not assert any challenges to the
assessments at issue within the jurisdictional period.

confirmed in his deposition that all taxes for 2004 were paid. *Tansi Deposition, p. 11, l. 4.*
Therefore, only tax years 2005 and 2006 are at issue for purposes of trial.[2]

## A. The Property Appraiser's Assessment is Presumed to be Correct.

Florida law controls the outcome of this proceeding. *In Re: Litestream Technologies,
LLC,* 337 B.R. 705, 709 (M.D. Fla. 2006). The legal standards for this case are found in Florida
case law, Florida Statutes, and the Florida Constitution's requirement that "regulations shall be
prescribed which shall secure a just valuation of all property for ad valorem taxation . . . ." Art.
VI, § 4, Fla. Const.

The property appraiser's determination of just value is an exercise of administrative
discretion within the field of his or her expertise. *See Havill v. Scripps Howard Cable Co.,* 742
So. 2d 210, 212 (Fla. 1998); *Blake v. Xerox Corp.,* 447 So. 2d 1348 (Fla. 1984). Florida courts
have defined "just valuation" as being synonymous with "fair market value." *See Turner v.
Tokai Financial Servs., Inc.,* 767 So. 2d 494, 496 (2d DCA 2000) (citing *Walter v. Schuler,* 176
So. 2d 81, 85-86 (Fla. 1965)).

The Legislature has set forth eight factors which a property appraiser must consider to
assist the property appraiser in determining just valuation. §193.011, Fla. Stat. (2005); *Mazourek
v. Wal-Mart Stores, Inc.,* 831 So. 2d 85, 88 (Fla. 2002):

> (1) The present cash value of the property, which is the amount a willing
> purchaser would pay a willing seller, exclusive of reasonable fees and costs of
> purchase, in cash or the immediate equivalent thereof in a transaction at arm's
> length;

---

[2] Notwithstanding the Debtors' Objections, as summarized for Escambia County at Tab C hereto, all of the taxes for
real property have been paid. Thus, even though some real property parcels are included on Tab C, they are not at
issue in this case, as the taxes have been paid, even for tax year 2005. Specifically, the following real property
parcel numbers are NOT at issue, because they have been paid, despite their inclusion on Tab C:  10-3383-050, 09-
2001-100, 09-2026-505, 11-3376-600, 01-1643-000, 01-4560-000, 09-4548-930, 03-3563-705. Moreover, the
following tangible personal property parcel numbers are also not at issue, because all taxes have been paid, even for
2005:  001091188, 001091189, 002000004, 001087627, 001091190. These tangible personal property assessments
pertain to computers leased from third parties. Because all of these taxes have been paid, these amounts are not part
of this case.

(2)  The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable judicial limitation, local or state land use regulation, or historic preservation ordinance, and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor when the moratorium or judicial limitation prohibits or restricts the development or improvement of property as otherwise authorized by applicable law.  The applicable governmental body or agency or the Governor shall notify the property appraiser in writing of any executive order, ordinance, regulation, resolution, or proclamation it adopts imposing any such limitation, regulation, or moratorium;

(3)  The location of said property;

(4)  The quantity or size of said property;

(5)   The cost of said property and the present replacement value of any improvements thereon;

(6)  The condition of said property;

(7)  The income from said property; and

(8)  The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing, and allowance for unconventional or atypical terms of financing arrangements.   When the net proceeds of the sale of any property are utilized, directly or indirectly, in the determination of just valuation of realty of the sold parcel or any other parcel under the provisions of this section, the property appraiser, for the purposes of such determination, shall exclude any portion of such net proceeds attributable to payments for household furnishings or other items of personal property.

"The obligation upon the property appraiser is for the property appraiser to 'consider,' but not necessarily apply, each factor." *Mazourek,* 831 So. 2d at 89.  *See also Higgs v. Good,* 813 So. 2d 178, 179 (Fla. 3d DCA 2002).  The property appraiser has considerable discretion in weighing these factors and calculating an assessed value.  *In Re:  Litestream Technologies,* LLC, 337 B.R. 705, 709 (M.D. Fla. 2006).

A presumption of correctness attaches to the property appraiser's assessment of property for ad valorem taxation purposes. *Havill,* 742 So. 2d at 212. Section 194.301, Florida Statutes, provides that the property appraiser's assessment must be accorded a presumption of correctness unless the taxpayer proves by a preponderance of the evidence that the property appraiser did not consider the criteria in Section 193.011. The presumption of correctness is lost only if the property appraiser does not consider each of the statutory factors contained in Section 193.011. *See Havill,* 742 So. 2d at 212.

If the presumption of validity is defeated, the taxpayer's burden is to prove by a preponderance of the evidence that the assessment exceeds just value. *See GTE Florida, Inc. v. Todora,* 854 So. 2d 731, 736 (Fla. 2d DCA 2003). If the presumption is not defeated, the taxpayer's burden of proof on that issue is by clear and convincing evidence. *See id.* Section 194.301 provides that "[i]f the record lacks competent substantial evidence meeting the just value criteria of s. 193.011, the matter shall be remanded to the property appraiser with appropriate directions from the Value Adjustment Board or the court."

**B.  Florida Law Heavily Favors Valuation of Tangible Personal Property Using a Cost Approach to Value.**

In this case, the Escambia County Property Appraiser utilized a cost approach to value. In doing so, the Escambia County Property Appraiser used the original cost data submitted to it by Winn-Dixie, the Debtor. The Property Appraiser then applied the Department of Revenue, Standard Measures of Value:  Tangible Personal Property Appraisal Guidelines (the "DOR Guidelines") to render the valuation of the Debtors' tangible personal property.

The Supreme Court of Florida has upheld the exact methodology used by the Property Appraiser in this case. In a case involving retail equipment, the Supreme Court specifically cited the DOR Guidelines as a valid source for the criteria necessary to render a valid cost approach to

value for retail tangible personal property. *Mazourek v. Wal-Mart Stores, Inc.*, 831 So. 2d 85 (Fla. 2002). This Court has, in turn, relied on *Mazourek* to conclude that a cost approach to value is an "appropriate method" of calculating valuations for tangible personal property. *In Re: Litestream Technologies, LLC*, 337 B.R. 705, 710 (M.D. Fla. 2006).

In *Litestream*, this Court held that the property appraiser appropriately exercised his discretion in valuing tangible personal property utilizing the cost approach. This Court rejected an argument similar to that made by the Debtor in this case that evidence of prices received at an auction sale was valid comparable sales evidence. This Court specifically held that the property appraiser did not abuse his discretion by disregarding the prices paid at such sales. *Id.* at 710; *see also Southern Bell Telephone and Telegraph Co. v. Markham*, 632 So. 2d 272, 276 (Fla. 4th DCA 1994)(taxpayer's sales study thrown out as fatally flawed and unreliable where sales were not verified and not close in time to dates of assessment). This Court's support for the cost approach taken in *Litestream* and the principles set forth in *Mazourek* support the Property Appraiser's methodology in this case.

The DOR Guidelines approved of in *Litestream* provide abundant support for the cost approach to value, as distinguished from two other accepted approaches, the income and comparable sales approach. In *GTE Florida, Inc. v. Todora*, 854 So. 2d 731 (Fla. 2d DCA 2003), the Court explained that the income approach to valuing tangible personal property is not a valid approach, because there is a risk that the intangible assets, including successful management and goodwill, may be factored into the overall valuation. The Court cited the DOR Guidelines in declaring that the "capitalization of earnings generated by a business through the use of tangible personal property such as equipment, machinery, etc., is not recommended as an accurate approach to value . . . ." *Id.* at 734. The Court also rejected a comparable sale

approach to value in the same case. The Court rejected the use of comparable sales "around the country" as a basis for finding adequate sales data for Sarasota County, Florida, holding that the "evidence of comparable sales failed to support its valuation of . . . property **in Sarasota County** . . . ." *Id.* at 735 and 737 (emphasis added). In *Havill v. Scripps Howard Cable Co.*, 742 So.2d 210, 213 (Fla. 1998), the Supreme Court of Florida again cited the DOR Guidelines and a preference for using a cost approach to value in tangible personal property assessments, given the absence of reliable evidence of comparable sales data and the risk that the income approach will include intangible value.

The Department of Revenue is the agency which oversees property tax assessments in Florida. As the agency responsible for such oversight, the DOR's interpretations are entitled to deference. The DOR Guidelines were promulgated with the participation of industry. As Mr. Steve Barreca testified, the DOR Guidelines were based on "thousands" of market observations. *Barreca Deposition, p. 24-25, 27.* These Guidelines account for the various forms of depreciation, including functional and economic obsolescence, as engrained into the DOR Guidelines through the thousands of transactions observed in the market. *Barreca Deposition, p. 15, 25.*

The Property Appraiser of Escambia County applied the DOR Guidelines and tables in the assessment of the Debtors' tangible personal property in Escambia County. Winn Dixie tax professionals cite no disagreement with the application of the DOR Guidelines and depreciation tables. *Tansi Deposition, p. 18, l. 17-20; p. 19, l. 17-22.* In fact, one of the Debtors' consultants, Mr. West, used the DOR indices for Replacement Cost New factors in his own valuation. *West Deposition, p. 48.* Contrary to the Debtors' arguments, the Guidelines expressly

include consideration of both functional obsolescence and economic obsolescence in the calculation of depreciation. See Guidelines, e.g., at p. 12-14; *Barreca Deposition, p. 25.*

## II. Statement of Facts.

### A. Winn–Dixie's Sworn Estimates of Fair Market Value

For the 2005 and 2006 tax years, the Debtor submitted its own "Taxpayer's Estimate of Fair Market Value." The Debtor submitted its own estimate for each store for each tax year on sworn tax returns. The returns and estimates of fair market value were sworn to in 2006 by the Debtor's Tax Manager, Mr. Richard Tansi, a witness for the Debtor in this case. Prior to 2006, the estimates of fair market value were sworn to by Mr. Tansi's predecessor tax manager.

The following chart shows the variance between the Debtor's own sworn estimates of fair market value for the assessments at issue and the Property Appraiser's valuations:

### TAX YEAR 2005

| Location No. | Address | Parcel No. | Tax Year | Taxing Authority's Assessed Value | WD Return "Taxpayers Estimate of FMV" |
|---|---|---|---|---|---|
| 0483 | 13019 Sorrento | 2010368 | 2005 | $750 | $1,477 |
| 0493 | 13019 Sorrento | 1066410-0 | 2005 | $613,480 | $629,164.00 |
| 0495 | 5975 Mobile Hwy | 1065900-1 | 2005 | $768,120 | $794,372.00 |
| 0495 | 5975 Mobile Hwy | 2010369-3 | 2005 | $20,310 | $31,238.00 |
| 0498 | 155 S Highway 29 | 1066411-8 | 2005 | $494,550 | $500,095.00 |
| 0504 | 7135 N 9th Ave | 1065800 | 2005 | $798,210 | $769,085.00 |
| 0506 | 312 E Nine Mile Rd | 1066400 | 2005 | $812,930 | $776,500.00 |
| 0515 | 5975 Mobile Hwy | 2006447-3 | 2005 | $20,770 | $31,238.00 |
| 0535 | 50 S Blue Angel Pkwy | 1085474 | 2005 | $771,040 | $767,503.00 |
| 0556 | 4751 Bayou Blvd. | 1066200 | 2005 | $410,370 | $436,290.00 |
| 0565 | 400 N Navy Blvd. | 1066300 | 2005 | $540,010 | $543,029.00 |
| TOTAL | | | | $5,250,540.00 | $5,279,991.00 |

**TAX YEAR 2006**

| Location No. | Address | Parcel No. | Tax Year | Taxing Authority's Assessed Value | WD Return "Taxpayers Estimate of FMV" |
|---|---|---|---|---|---|
| 0483 | 13019 Sorrento | 2010368 | 2006 | $76,960 | $74,361.00 |
| 0493 | 13019 Sorrento | 1066410-0 | 2006 | $628,410 | $633,092.00 |
| 0495 | 5975 Mobile Hwy | 1065900-1 | 2006 | $683,600 | $691,103.00 |
| 0498 | 155 S Highway 29 | 1066411-8 | 2006 | $467,050 | $460,103.00 |
| 0504 | 7135 N 9th Ave | 1065800 | 2006 | $714,620 | $698,157.00 |
| 0506 | 312 E Nine Mile Rd | 1066400 | 2006 | $713,580 | $687,461.00 |
| 0515 | 5975 Mobile Hwy | 2006447-3 | 2006 | $17,060 | $24,886.00 |
| 0535 | 50 S Blue Angel Pkwy | 1085474 | 2006 | $671,080 | $664,150.00 |
| 0556 | 4751 Bayou Blvd. | 1066200 | 2006 | $433,220 | $459,651.00 |
| 0565 | 400 N Navy Blvd. | 1066300 | 2006 | $557,770 | $554,186.00 |
| TOTAL | | | | $4,963,350.00 | $4,947,150.00 |

Based on the returns, Winn Dixie's sworn estimate exceeded the Property Appraiser's valuation of the assets in all of the Escambia County stores in tax year 2005 by $29,451. For tax year 2006, Winn Dixie's sworn estimate of value for all Escambia County stores is lower than the total assessment rendered by a mere $16,200. Thus, the difference between the Debtor's sworn estimates for both years and the Property Appraiser's assessments was negligible. The Debtor was satisfied with its sworn statement of value until it declared bankruptcy. After filing bankruptcy, Winn Dixie hired a consultant named Assessment Technologies to be paid on a contingency basis of 35% of taxes saved. It was only at that point that the Debtor decided to change its position and present an argument to this Court that the values were actually lower than its prior sworn statements.

This type of advocacy is barred by the doctrine of judicial estoppel. Generally, the doctrine of judicial estoppel bars one from taking a position in a judicial proceeding that is inconsistent with its prior position in an administrative or judicial forum. In *S&D Environmental Services, Inc. v. Rosenberg*, 739 A.2d 360 (N.J. 1999), the Court found that arguments in court

that are inconsistent with prior sworn statements on a tax return are barred by the doctrine of judicial estoppel. Here, the returns were filed by Winn Dixie as part of the administrative process for the collection of ad valorem taxation, as prescribed by Chapters 193 and 194, Florida Statutes. To flout that administrative process by taking a vastly different position in bankruptcy court, years after the sworn statements were made, should not be permitted.

At a minimum, the Property Appraiser's reliance on the sworn tax returns was within his discretion. As this Court held in *Litestream*: "The Property Appraiser did not abuse his discretion in calculating the assessed value by starting with the debtor's self-reported value and adjusting it for depreciation and replacement cost." 337 B.R. at 711. In essence, this Court has determined that such reliance on self-reported values on sworn returns of the taxpayer is reasonable.

In this case, the Tax Manager of Winn-Dixie, Mr. Richard Tansi, has testified that the Tax Manager's role is to personally review the property tax returns before they are filed. *Tansi Deposition, p. 6, l. 14.* Mr. Tansi has been a tax professional for 22 years. *Tansi Deposition, p. 8, l. 4.* As of the critical dates of assessment, that is January 1st of 2005 and 2006, Winn Dixie had no problem with its own estimates of fair market value. In fact, Winn Dixie and its Tax Manager had no basis for any belief that the assets were overassessed as of the critical dates of valuation. *Tansi Deposition, p. 16, l. 3-8.* Even when Assessment Technologies was hired on a contingency basis, their agents did not communicate with Winn Dixie to determine why Assessment Technologies' conclusions were inconsistent with their client's own estimates of value. *Abrahani Deposition, p. 102, l. 23-25 through p. 103, l. 1-2.* In fact, one of the third party consultants hired by Assessment Technologies considered an evaluation of Winn Dixie's numbers on its property tax returns to be not relevant to his work. *West Deposition, p. 17.*

Winn Dixie Tax Manager Mr. Tansi confirmed in his recent deposition that all of the information on the returns was true and correct. *Tansi Deposition, p. 27-28.* In addition, the consultant for Assessment Technologies, Mr. Abrahani, had no reason to doubt any of the information filed on the tax returns. *Abrahani Deposition, p. 26, l. 7-12.* As Tax Manager of Winn Dixie, Mr.Tansi took measures to ensure the information was correct. *Tansi Deposition, p. 27.* Thus, the returns were filed under oath, after ensuring the information was correct. After they were filed, Winn Dixie undertook no effort to contest or request a conference on the assessments with the Property Appraiser. It was not until bankruptcy had been filed that Winn Dixie personnel other than the Tax Manager decided to contest every assessment in the State of Florida and in other states.

### B. The Expert Reports

Notwithstanding the near equivalence of the Debtor's estimate of fair market value on its sworn returns and the Property Appraiser's valuations, the Debtor has developed a post-petition argument that it was overassessed for 2005 and 2006. Instead of relying on its own tax professionals, who had no disagreement with the assessments now at issue, Winn Dixie employed Assessment Technologies. Unlike Winn Dixie's tax professionals, however, Assessment Technologies' consultants did not have an opportunity to inspect the property at issue on the controlling date of January 1st of each tax year, because they were not retained until after the bankruptcy was filed.

The Debtor has paid these consultants "several million" dollars, *Tansi Deposition, p. 34, l. 15,* even though there has been no adjudication of value to support the consultant's opinions. Assessment Technologies, in turn, hired Mr. Brian Testo and Mr. Kevin Abrahani to provide them with an opinion to support their argument for a tax savings. Mr. Testo is a high school

graduate who did not quite complete one year of junior college. *Testo Deposition, p. 4, l. 23-24*. Mr. Abrahani is not a certified appraiser. *Abrahani Deposition, p. 7, l. 4-5*. Moreover, Mr. Abrahani has never testified as an expert on any topic in any court. *Abrahani Deposition, p. 8, l. 5-7*.

Winn Dixie's experts have not reviewed the Escambia County or Okaloosa County assessments of Winn Dixie or any of the documents pertaining thereto. *Testo Deposition, p. 8, l. 14-20; West Deposition, p. 68-69*. In fact, Mr. Testo has no comment on the property appraiser's methodology in this case. *Testo Deposition, p. 60, l. 8-10*. Mr. Abrahani, who conducted the majority of the appraisal work based on extrapolated data compiled by Mr. Testo, admits having never done any prior appraisal under Florida property tax law. *Abrahani Deposition, p. 9, l. 7-9*. Although Mr. Abrahani acknowledged that the cost approach is favored in valuing tangible personal property in Florida, he also acknowledged that he made no attempt to calculate a valuation based on the cost approach. *Abrahani Deposition, p. 47, l. 4-16*.

Ultimately, Mr. Testo and Mr. Abrahani offered no criticism of the Property Appraiser's approach. Moreover, they offered no disagreement with any aspect of the DOR guidelines. *Abrahani Deposition, p. 47-48*. Winn Dixie belatedly decided to retain a third expert, Mr. Jack West. Unlike Winn Dixie's other consultants, Mr. West attempted a cost approach to value. Mr. West has never testified in court as an expert. *West Deposition, p. 5*. During the tax years at issue, Mr. West was not employed as an appraiser and was instead operating a health services business. *West Deposition, p. 8-9*.

In his assignment for Winn Dixie, Mr. West did not visit any Winn Dixie stores in Escambia County. *West Deposition, p. 14*. Thus, he has not seen the equipment that is the subject of the assessment in this case. *West Deposition, p. 19*. Mr. West also did not speak to

any store managers for Winn Dixie in Escambia County. *West Deposition, p. 19*. Mr. West has absolutely no knowledge of the condition of the appraised assets, other than their age. *West Deposition, p. 19-20*. Although he received Mr. Testo's report, Mr. West did not rely on it and did not consider it to be relevant to his task. *West Deposition, p. 16*. Ultimately, Mr. West produced an "appraisal" on December 8, 2008, nearly four years after the relevant date for the first tax year at issue. *West Deposition, p. 16*. Mr. West, although purporting to take a cost approach, ultimately adjusts his figures to a market approach by adjusting his valuation down for the equipment at issue to the prices that equipment dealers verbally told him would their asking prices. To gather this "market" data, Mr. West interviewed equipment dealers, but did not look at actual consummated sales of the equipment involved in this case. *West Deposition, p. 30-31; 71*.

In contrast to Mr. West, Mr. Testo and Mr. Abrahani avoided any semblance of a cost approach and instead purported to have done a comparison of "sales" by looking on the Internet for offering prices and thereby contriving a sales comparison appraisal. Mr. Testo did not know, for the most part, whether these listings on the Internet actually led to sales, nor was there any indication of the condition of the equipment listed or the motivations of the seller. Asked if the motivations of the seller can influence value, Mr. Testo said:    "No, I disagree."    *Testo Deposition, p. 24, l. 6; see also p. 69, l. 8-11*. On this point, Mr. Testo's analysis is not only internally inconsistent, but grossly out of line with the Florida standard for fair market value, in which the seller must be a willing seller who is not under any distress to sell. *See Litestream*, 337 B.R. at 710. As this Court held in *Litestream*, even consummated sales should not be considered under a sales approach when the sales were "not made by a willing seller." *Id.* at 710.

Here, the Winn Dixie consultants relied on lists of offering prices. Yet, a list price does not equate to a consummated sale. Moreover, without evidence of the condition of the property to be sold in these offerings, there can be no determination as to whether such sales are "comparable." Although there were some sales of assets at Winn Dixie stores, there was no indication of what was included in such sales. Therefore, Mr. Testo admitted that he did not use the data from sold Winn Dixie assets as part of his comparable sales analysis. *Testo Deposition, p. 10, l. 13-15.* Moreover, he conceded that he would not have relied on any sold stores that were going out of business. *Testo Deposition, p. 20, l. 17-19; Abrahani Deposition, p. 64-66.* Mr. Testo also admitted that he had "no idea" if the stores were sold to other grocery store chains, *Testo Deposition, p. 31, l. 23-25,* and that information on sold Winn Dixie stores and the equipment therein was "not in the scope of my work." *Testo Deposition, p. 32, l. 4.* Mr. West also was not provided with any asset listing from these sold stores, nor did he study the documentation from any of those sales of Winn Dixie stores. *West Deposition, p. 31.* These experts readily acknowledged that they did not know whether the store assets that were sold included all store assets or whether some of the assets or equipment may have been stored or transferred to other Winn Dixie stores. *Abrahani Deposition, p. 67.* In sum, the data for the sale of Winn Dixie stores was not corroborated and played no part in Mr. Testo's or Mr. Abrahani's analysis.

Mr. Testo listed resources in his report for which he could not even identify the person interviewed or the data collected. *Testo Deposition, p. 54, l. 10 – p. 56, l. 10; Abrahani Deposition, p. 69-73.* Mr. West did not examine documented sales, and instead chose to simply engage in general conversations with equipment dealers. Mr. West did not inquire about all of the types of equipment involved in this case, instead limiting the discussion to general categories

of equipment. *West Deposition, p. 33.* Mr. West did not even ask for documentation of comparable sales. *West Deposition, p. 34, l. 17-19; p. 37; 44.* Mr. West used certain information, even though it pertained to greatly distressed sellers of equipment, even for transactions that had not been finalized. *West Deposition, p. 42-43.* Even though Mr. West generally relied on these verbal conversations with equipment dealers, he admitted that it is "obvious" that evidence of sales is better than information in a verbal statement from a dealer. *West Deposition, p. 43-44.* Mr. West also conceded that it was simply "impractical" to do an asset-by-asset valuation in this case. *West Deposition, p. 45.* Finally, he conceded that the installation costs, which must be included in the cost approach to value under Florida law, could not be calculated with reference to the prices given by the equipment dealers. *West Deposition, p. 63, 83.*

Mr. Testo wrote in his report that he relied on other unspecified "proprietary" data, but in his deposition, he admitted that he could not rely on that information and provided no detail as to what it contained. *Testo Deposition, p. 57, l. 22; p. 60, l. 7; p. 82, l. 9-13.* Mr. Abrahani acknowledged that, even though the report said the experts reviewed appraisals of similar companies, he had no such appraisals, *Abrahani Deposition, p. 67, l. 24,* and he did not know what companies were the subjects of those phantom appraisals. *Abrahani Deposition, p. 68, l. 3-5; p. 73, l. 3-5.* The report provides no basis for what they used and what they rejected, as there is no computation of any of the averages that they calculated in an attempt to support their valuations. Given these deficiencies in proof, such transactions are not probative of a sales comparison approach to value.

Mr. Testo and Mr. Abrahani testified that they would not have relied on sales prices obtained at auctions or liquidation sales. *Testo Deposition, p. 20, l. 20-23; Abrahani Deposition,*

*p. 162, l. 19-20 ("not a good indicator of probably fair market value because an auction is forced liquidation").* Thus, they did not utilize going out of business sales. *Abrahani Deposition, p. 166.* On this point, Mr. Barreca, expert for the Property Appraisers, corroborated the point, by testifying that reference to the used equipment market would not be probative of fair market value, but would instead yield a "marked-up salvage" value. *Barreca Deposition, p. 70.* Mr. West, for Winn Dixie, also confirmed that there is a difference between the assets in place and in use by Winn Dixie versus their value in the hands of an equipment dealer. *West Deposition, p. 21.* Yet, Mr. West did not provide any quantification of the difference in his report. *West Deposition, p. 22.*

The Winn Dixie consultants testified that they did not to rely on liquidations, auctions or going out of business transactions. Nevertheless, they inconsistently looked to Internet and E-Bay offerings without any idea as to the circumstances of the sales. Thus, the data they used could have been from auctions, liquidations, or going out of business prices, even though they proclaimed not to rely on such data. For these Internet and E-Bay offering prices, Mr. Testo admitted that he had "no idea" whether the seller was under duress. *Testo Deposition, p. 21, l. 8-11.* Mr. Abrahani agreed that not only would you not know whether the sellers on E-Bay were equipment dealers, you would not know whether they were selling under any duress or compulsion. *Abrahani Deposition, p. 163.*

Mr. Testo testified about the motivations of the seller on these Internet and E-Bay transactions: "I have no idea. Maybe the equipment dealer is **going out of business** tomorrow. I mean, I don't concern myself at all with the mental state of the seller." *Testo Deposition, p. 22, l. 8-14 (emphasis added).* Thus, on the one hand, they stated they would not use going out of

business sales, but on the other hand, they acknowledged that their data could have been from going out of business sales.

Mr. Testo admitted that his review of Internet and E-Bay listings was frequently not based on observations of verifiable sales. With respect to his file of "comps," he consistently noted that they were price offerings, not actual sales transactions. *Testo Deposition, p. 73, l. 21; p. 74, l. 2, 21; p. 75, l. 12; p. 76, l. 14; p. 77, l. 5, 25.* Mr. Testo typically did not know who the sellers were for these offerings nor did he know the motivations of the offerors. Mr. Abrahani was unaware of the distinctions in value that exist in different levels of trade. *Abrahani Deposition, p. 133-134.* This critical issue was therefore overlooked by the Debtors' experts. As Mr. Barreca pointed out, the market in which a used equipment dealer operates is not the appropriate marketplace for determining the value in use by Winn Dixie. Mr. Barreca noted: "The used equipment market is basically a market for assets that have reached the end of its useful life . . . . And so typically the used market is used for liquidation values, not fair market value, so that's problematic . . . .." *Barreca Deposition, p. 18-19.*

Under Florida law, "fair market value" is the standard for property tax valuations. A critical component of "fair market value" is the highest and best use to which the property can be used. In fact, the Legislature requires that highest and best use be considered. Yet, when one is looking at liquidation value, which is equivalent to whatever price one can get on an equipment dealer listing, that is the property's "lowest use." *Barreca Deposition, p. 71.* Thus, reference to the equipment dealer market would reflect liquidation values, not the highest and best use. Accordingly, the listings reviewed by Mr. Testo and Mr. Abrahani would not be pertinent to fair market value.

With respect to the question of obsolescence, Winn Dixie's consultants acknowledged that depreciation under a cost approach is intended to account for all forms of obsolescence. On the issue of functional or technological obsolescence, Mr. Testo could identify only computers and point of sale equipment as the type of equipment affected by this type of obsolescence. *Testo Deposition, p. 40, l. 13-14.* Yet, all experts agreed that the most that these items made up of the total assessment was five (5) percent. *Abrahani Deposition, p. 61, l. 13-17; West Deposition, p. 23.*

On the point of economic obsolescence, the Winn Dixie experts all conflicted. While Mr. Testo testified to an overabundance of used grocery store equipment on the market, this speculative theory was directly contradicted by Mr. West. *Cf. Testo Deposition, p. 43, l. 6-7* and *West Deposition, p. 36-37.* While Mr. Testo believed that an oversupply of grocery equipment has caused obsolescence, Mr. West said that there was no such oversupply. Although Mr. West disagreed with the idea that economic obsolescence is attributable to an oversupply of grocery store equipment on the market, Mr. West mathematically came up with a numerical factor for such obsolescence. His factor came with no explanation, however, as to the root cause for such obsolescence. Contrary to this testimony of Mr. West, the Tax Manager, Mr. Richard Tansi, testified that he cannot point to any equipment in Escambia County Winn Dixie stores which suffers from obsolescence. *Tansi Deposition, p. 22, l. 12-14; p. 23, l. 22-23.*

The Debtors' experts made no effort to assess all of the equipment involved in this case for comparison purposes. Instead, the Debtors' experts went to only 25 of the well over 300 total Winn Dixie stores. *Testo Report, p. 19.* Even for the 25 appraised stores, not all assets were valued on an asset-by-asset basis. *Testo Deposition, p. 81, l. 8-11.* Although Mr. Testo's uncredentialed associate visited two of the stores in Escambia County, that employee no longer

works with Mr. Testo. *Testo Deposition, p. 67, l. 3-17.* Mr. Testo did not visit any Winn Dixie store in Escambia County. *Testo Deposition, p. 67, l. 3-5.* Therefore, most of the stores in Escambia County were not appraised at all and none were appraised based on observations by Mr. Testo, Mr. Abrahani or Mr. West.

Ultimately, Mr. Testo and Mr. Abrahani took the stores that they actually appraised and then "rolled that appraised value to the rest of the stores." *Testo Deposition, p. 47, l. 5-6.* Mr. Abrahani testified that a line by line appraisal on the remaining stores was "not feasible." *Abrahani Deposition, p. 31, l. 4-8.* Therefore, a line by line appraisal for seven of the nine Winn Dixie stores in Escambia County was "not feasible" in this case, according to these Winn Dixie experts. *Abrahani Deposition, p. 31, l. 22-25.* On some occasions, there were types of assets that were in the non-appraised stores that were not present in the appraised stores. *Abrahani Deposition, p. 36, l. 11-12, 24-25.* On such occasions, Mr. Abrahani could not explain how he derived a percentage of cost for purposes of calculating fair market value on those types of assets. *Abrahani Deposition, p. 36, l. 11-25, through p. 37, l. 1-6.*

In their report, Mr. Testo and Mr. Abrahani came up with inexplicable errors in their calculations. For example, one grocery case was valued at 10% of the $495,620 cost to yield the obviously incorrect number of $51,500. *Testo Deposition, p. 52, l. 17-22.* In addition, the total values on their report could not be reconciled with the Debtors' objections, which were supposed to be based on their analysis. *Abrahani Deposition, p. 78-80.* When asked to explain the discrepancies, Mr. Abrahani stated under oath that he could not explain them. *Abrahani Deposition, p. 79.*

Mr. West's report had even more obvious errors. For equipment acquired in 2004 and valued on January 1, 2005 (less than one year later), Mr. West listed such equipment as if it were

two years old. *West Deposition, p. 79.* His report suffered from this systematic overestimation of the actual ages of all of the Winn Dixie assets. In fact, when asked if all of the ages were "wrong" on his schedule of the assets, Mr. West conceded: "Yes, it could be." *West Deposition, p. 79.* Mr. West never detected this highly material error on his own. *West Deposition, p. 80, l. 19.*

In contrast to the analysis of Internet offerings utilized by the Debtor, the Property Appraiser utilized the DOR and court recommended cost approach. The Property Appraiser correctly employed the DOR tables. Ms. Jenny Grice of the Property Appraiser's office is prepared to testify as to the methodology utilized. The results were corroborated by the Debtor's own sworn statements as to the value of the property at issue. The use of the DOR tables accounted for obsolescence. All parties agree that the cost approach accounts for obsolescence. *Testo Deposition, p. 44, l. 12-16.*

As testified to by Mr. Steve Barreca, who has done extensive analysis of the DOR tables, the Property Appraisers of Escambia and Okaloosa Counties correctly applied the tables. *Barreca Deposition, p. 109.* Mr. Barreca testified that the values derived using a strict approach under the DOR tables would be just under the value reached by Mr. Barreca's own tables. *Barreca Deposition, p. 32.* Mr. Barreca further opined that the values obtained using the DOR tables by the Escambia and Okaloosa property appraisers would reflect fair market value or a "value slightly below fair market value." *Barreca Deposition, p. 85-86.*

Mr. Barreca was hired by the DOR to calibrate the useful lives in the DOR depreciation tables. *Barreca Deposition, p. 19-21.* Mr. Barreca also established that the economic and functional obsolescence has been fully factored into the DOR tables through hundreds of thousands of market observations in many industries. *Barreca Deposition, p. 25, 45-46, 108-09.*

In addition, the DOR tables are based on the reputable studies of Marshall Valuation Services. Even the Debtor's expert, Mr. Testo, agreed that Marshall Valuation is a "reputable guide," *Testo Deposition, p. 53, l. 11-13,* which he also used as a resource for his report. *Id.; Abrahani Deposition, p. 63, l. 13-18.* Mr. Testo has not stated any disagreement with any aspect of the DOR Guidelines. *Testo Deposition, p. 71, l. 4-8.*

Although Mr. West expressed disagreement with the DOR depreciation lives, which were corroborated by thousands of market transactions, he utilized instead his own depreciation lives based on no more than interviews of dealers regarding general categories of assets. *West Deposition, p. 50.* Ironically, Mr. West admits that he has utilized other experts for criticizing the DOR depreciation tables, because he was not an expert on that topic. *West Deposition, p. 61.*

## CONCLUSION

In sum, the Property Appraiser's analysis, the Debtor's sworn estimates of value and Mr. Barreca's testimony, all support a finding that the assessments at issue are entirely reasonable and certainly within the broad discretion afforded the Property Appraiser in such matters. In contrast to the informal conversations and Internet listings relied on by Assessment Technologies' consultants, the Property Appraiser's analysis was based on a sound application of DOR guidelines, as approved of by this Court, the Florida Supreme Court, and experts in the field, who have analyzed thousands of actual market transactions to confirm the validity of such guidelines. The Debtor cannot show that the Property Appraisers in this case failed to consider the statutory criteria. Therefore, the assessments are presumed to be correct. The Debtors' evidence of uncorroborated listings of equipment in unknown condition by unknown sellers in

unknown circumstances falls far short from constituting clear and convincing evidence to defeat the sound assessments given in this case by the Property Appraisers.

WHEREFORE, the Property Appraiser of Escambia County respectfully requests that this Court uphold the assessments and the Tax Collectors' claims in full.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by electronic filing using CM/ECF system to Allan E. Wulbern, Esq., Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, FL 32202, Counsel for Reorganized Debtors; Sherri L. Johnson, Esq., Dent & Johnson, Chartered, 3415 Magic Oak Lane, Sarasota, FL 34230, Counsel for Okaloosa County Property Appraiser; Philip A. Bates, Esq., Philip A. Bates, P.A., 25 W. Cedar Street, Suite 550, Pensacola, FL 32501, Counsel for Escambia and Okaloosa County Tax Collectors, this 4th day of March, 2009.

ELLIOTT MESSER
Florida Bar No.: 054461
THOMAS M. FINDLEY
Florida Bar No.: 0797855
Messer, Caparello & Self, P.A.
Post Office Box 15579
Tallahassee, FL 32317
Telephone: (850) 222-0720
Facsimile: (850) 224-4359
Counsel for Property Appraiser Chris Jones