**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., *et al.* | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |
| | ) | |

**WINN-DIXIE'S TRIAL MEMORANDUM**
**ON ITS OBJECTION TO TAX CLAIMS**
**AND MOTION FOR ORDER DETERMINING**
**TAX LIABILITIES (AS IT RELATES TO THE CLAIMS**
**OF ESCAMBIA AND OKALOOSA COUNTIES, FLORIDA)**

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Counsel for Winn-Dixie Stores, Inc.

## Table of Contents

Page

I.    Summary of Winn-Dixie's Objection to the Escambia and Okaloosa County Tax Claims ........................................................................ 2

    A.    The procedural history. .................................................................... 2

    B.    The substantive issues.................................................................... 3

II.    Facts which Winn-Dixie believes to be uncontested .................................... 5

III.    Facts which Winn-Dixie believes to be contested ....................................... 6

IV.    Winn-Dixie's Objection............................................................................. 6

    A.    This Court has authority to determine the amount Winn-Dixie owes for personal property taxes. .................................. 6

    B.    Under Florida law, property must be assessed at its "just value" through consideration of eight statutory factors prescribed by Section 193.011, Florida Statutes. ......................................................................................... 7

    C.    Florida courts utilize three approaches to value in determining the fair market value of personal property. ................. 11

    D.    The Assessors failed to "consider properly" Section 193.011(1)—"comparable sales"—in valuing Winn-Dixie's personal property. .......................................................... 13

        1.    The Assessors did nothing to determine whether there was a market for Winn-Dixie's equipment. ........................................................................ 14

        2.    The Assessors failed to calibrate their cost approach............................................................................ 17

        3.    The DOR has never calibrated its tables to any market data........................................................................ 20

    E.    The Court should adopt Winn-Dixie's valuation of its personal property as the "just value" of the property. .................... 22

F.   Winn-Dixie should not be bound by its tax returns' estimates of fair market value. ........................................................... 24

G.   The Assessors' jurisdictional issues have already been decided. ............................................................................................ 26

V.   Contested Legal Issues ................................................................................ 30

VI.   Legal Authority ............................................................................................ 30

VII.   Core Proceeding .......................................................................................... 31

VIII.   Settlement ..................................................................................................... 32

<u>Winn-Dixie's Trial Memorandum</u>

Winn-Dixie Stores, Inc. and twenty-three of its reorganized debtor affiliates (collectively, "Winn-Dixie"), submit this memorandum in accordance with the Court's orders scheduling trial (Doc. Nos. 21474 and 21586) on the following docket entries:

(i)    Florida Tax Collectors' Proof of Claim No. 12566;

(ii)   Winn-Dixie's Objection to Florida Tax Claims and Motion for Order Determining Tax Liabilities (Doc. No. 10046) as it relates to the tax claims of Escambia and Okaloosa counties;

(iii)  Escambia County Tax Collector's request for administrative expense (Doc. No. 14281);

(iv)   Escambia County Tax Collector's response to the Florida Tax Objection (Doc. No. 10605);

(v)    Escambia County Property Appraiser's response to the Florida Tax Objection (Doc. No. 15545);

(vi)   Escambia County Property Appraiser's amended response to the Florida Tax Objection (Doc. No. 15549);

(vii)  Okaloosa County Tax Collector's response to the Florida Tax Objection (Doc. No. 10606); and

(viii) Okaloosa County Property Appraiser's response to the Florida Tax Objection (Doc. No. 15882).

## I.    Summary of Winn-Dixie's Objection to the Escambia and Okaloosa County Tax Claims

A.    The procedural history.

This proceeding arises out of Winn-Dixie's objection to the proof of claim filed by the tax collectors for fifty-six Florida counties (the "Florida Tax Collectors"), including Escambia and Okaloosa (Claim No. 12566), and Winn-Dixie's motion for an order reducing its tax liabilities to those counties (the "Florida Tax Objection"; Doc. No. 10046).

The Florida Tax Collectors filed a motion to dismiss Winn-Dixie's Florida Tax Objection (the "Motion to Dismiss"; Doc. No. 10609) and an alternative motion to abstain (the "Motion to Abstain"; Doc. No. 10594).  After notice and hearing, this Court entered orders denying the Motion to Dismiss (except as to 2004 taxes) (the "Motion to Dismiss Order"; Doc. No. 14815) and the Motion to Abstain (Doc. No. 14816).  The Court's Motion to Dismiss Order directed Winn-Dixie to serve a copy of the order on the property appraisers for each county, which Winn-Dixie did.  The property appraisers for Escambia and Okaloosa counties subsequently filed their responses to Winn-Dixie's Florida Tax Objection.

The Florida Tax Collectors, *other* than the tax collectors for Escambia and Okaloosa counties, subsequently appealed this Court's orders on the Motion to Dismiss and Motion to Abstain.  The District Court affirmed, and the Florida Tax

Collectors, other than the tax collectors for Escambia and Okaloosa, have further appealed to the Eleventh Circuit Court of Appeal.

Because Escambia and Okaloosa counties did not appeal, Winn-Dixie's objection to the claims of Escambia and Okaloosa have been set for trial on March 12, 2009 by this Court's orders scheduling trial (Doc. Nos. 21474 and 21586).

B.     The substantive issues.

In 2004, 2005 and 2006, Winn-Dixie filed tangible personal property tax returns with the county property appraisers for each store in each of the fifty-six Florida counties in which Winn-Dixie had stores.  When Winn-Dixie filed those returns, Winn-Dixie included on the returns an estimate of value for the tangible personal property in those counties.  Those estimates were based on a rote application of depreciation tables published by the Florida Department of Revenue (the "DOR") and adopted by the property appraisers in all of those counties.

In 2006, Winn-Dixie retained an appraiser to determine whether the actual fair market value of all of its Florida tangible personal property was consistent with the amounts resulting from the application of the DOR's depreciation tables. As a result of that appraisal, Winn-Dixie determined that the use of the DOR's depreciation tables overstated the fair market value of its tangible personal property on its tax returns for at least the three preceding years.

Based on those findings, Winn-Dixie determined that it was in the best interests of its creditors to seek relief under Section 505 of the Bankruptcy Code to

3

reduce its tax obgations for tax years 2004-2006.  As a result, Winn-Dixie filed its Florida Tax Objection, which included a prayer for relief under Section 505.

Winn-Dixie believes that the Florida county appraisers did not follow Florida's statutory requirements for determining the fair market value of property for ad valorem tax purposes in each of those years because the appraisers did not consider any information regarding the market value of Winn-Dixie's furniture, fixtures and equipment as required by Florida Statutes.  Winn-Dixie believes that its independent appraisal properly considers all of the statutorily required criteria and establishes what its property was worth in 2005 and 2006.

The county property appraisers for Escambia and Okaloosa counties (collectively, the "Appraisers"), who have joined this proceeding pursuant to the Motion to Dismiss Order, assert that they properly considered all of the statutory criteria in determining the fair market value of Winn-Dixie's property and their assessments are presumptively correct.

Although Winn-Dixie seeks to reduce its property assessments in fifty-six counties, the trial on March 12, 2009 is limited to determining the fair market value of Winn-Dixie's tangible personal property in Escambia and Okaloosa counties as of January 1, 2005 and January 1, 2006.[1]  At the conclusion of the trial, the Court will determine the value of tangible personal property and the amount of

---

[1]  In its Motion to Dismiss Order, this Court determined that Winn-Dixie was not entitled to seek a refund of any portion of the 2004 taxes which Winn-Dixie had already paid, therefore the only tax years presently before the Court are for 2005 and 2006.

ad valorem taxes that Winn-Dixie owes to the tax collectors for those counties for those years, pursuant to the authority of 11 U.S.C. § 505.[2]

## II.    Facts which Winn-Dixie believes to be uncontested

- The Personal Property Tax Returns which Winn-Dixie submitted to the Appraisers in 2005 and 2006 accurately reflect Winn-Dixie's inventory of taxable personal property in each county.

- Winn-Dixie's tangible personal property in Okaloosa and Escambia counties are primarily comprised of grocery store equipment and fixtures such as refrigerator and freezer cases, shelving, kitchen equipment and point of sales terminals.

- The Appraisers determined the appraised value of Winn-Dixie's personal property using a "mass appraisal cost approach" by applying depreciation tables published by the DOR to the assets Winn-Dixie reported in its Personal Property Tax Returns.

- The Appraisers did nothing to investigate whether there was a market for used grocery store equipment during the relevant tax years.

---

[2] The Florida Tax Objection also challenged the interest rate applicable to unpaid pre-petition and post-petition taxes. Winn-Dixie and the Escambia and Okaloosa County *Tax Collectors* have, subject to this Court's approval, settled all matters relating to the applicable interest rate. Winn-Dixie has agreed to pay the taxes and accrued interest within sixty days of a final adjudication of the amount of the taxes for those two counties.

- The Appraisers did nothing to determine whether the application of the DOR's depreciation tables resulted in an accurate estimate of fair market value.

- The Appraisers did not review any market data to determine whether using the DOR's depreciation tables accounted for economic obsolescence, as recommended by the DOR.

III.  **Facts which Winn-Dixie believes to be contested**

- Winn-Dixie disputes that the Appraisers considered all eight criteria required by Section 193.011, Florida Statutes in determining the fair market value of the personal property.

- Winn-Dixie disputes that the DOR's depreciation tables utilized by the Appraisers accurately reflect the fair market value of the personal property.

- Winn-Dixie contends that the valuation method utilized by its appraiser—a market calibrated cost approach—more reliably reflects the fair market value of the personal property.

IV.  **Winn-Dixie's Objection**

A.  This Court has authority to determine the amount Winn-Dixie owes for personal property taxes.

Section 505 of the Bankruptcy Code authorizes this Court to determine the correct amount of Escambia and Okaloosa County Tax Collectors' tax claims:

> Except as provided in paragraph (2) of this subsection, the court may determine the *amount* or legality of *any tax*, any fine or penalty relating to a tax, or any addition to tax, *whether or not previously assessed, whether or not paid, and whether or not contested* before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

> 11 U.S.C. § 505 (emphasis added).

This authority includes determining the appropriate values to be used in calculating the correct tax amounts of the property in question. *See, e.g., In re MCorp Financial, Inc.*, 216 B.R. 596, 598 (Bankr. S.D. Tex. 1996) ("the court has jurisdiction to determine the value of the property and the amount of tax due").

B.      Under Florida law, property must be assessed at its "just value" through consideration of eight statutory factors prescribed by Section 193.011, Florida Statutes.

The Florida Constitution requires a "just valuation" of all property for ad valorem taxation. *See* Fla. Const. art. VII, § 4. The Florida Supreme Court has held that fair market value is "legally synonymous" with a just valuation. *Walter v. Schuler*, 176 So. 2d 81, 85-86 (Fla. 1965). In *Schuler*, the Supreme Court explained that fair market value "may be established by the classic formula that it is the amount a 'purchaser willing but not obliged to buy, would pay to one willing but not obliged to sell'." *Id*. at 86.

To ensure that county tax collectors comply with art. VII, section 4 of the Florida Constitution, the Florida Legislature enacted Section 193.011, Florida

Statutes, which provides the factors that a property appraiser *must* consider in

arriving at "just valuation" for ad valorem tax purposes:

> In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser *shall* take into consideration the following factors:
>
> (1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;
>
> (2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration the legally permissible use of the property, including any applicable judicial limitation, local or state land use regulation, or historic preservation ordinance, and any zoning changes, concurrency requirements, and permits necessary to achieve the highest and best use, and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor when the moratorium or judicial limitation prohibits or restricts the development or improvement of property as otherwise authorized by applicable law. The applicable governmental body or agency or the Governor shall notify the property appraiser in writing of any executive order, ordinance, regulation, resolution, or proclamation it adopts imposing any such limitation, regulation, or moratorium;
>
> (3) The location of said property;
>
> (4) The quantity or size of said property;
>
> (5) The cost of said property and the present replacement value of any improvements thereon;

(6)  The condition of said property;

(7)  The income from said property; and

(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing, and allowance for unconventional or atypical terms of financing arrangements. When the net proceeds of the sale of any property are utilized, directly or indirectly, in the determination of just valuation of realty of the sold parcel or any other parcel under the provisions of this section, the property appraiser, for the purposes of such determination, shall exclude any portion of such net proceeds attributable to payments for household furnishings or other items of personal property.

Fla. Stat. § 193.011 (2008) (emphasis added).

If a property appraiser properly considers all eight statutory factors, then the property appraiser's valuation is presumed to be correct and the taxpayer has the burden of proving by clear and convincing evidence that the property appraiser's valuations are in excess of "just value." *See* Fla. Stat. § 194.301 (2008).

However, according to the statutory scheme, if the property appraiser fails to "*consider properly*" even *one* of those factors, the presumption of correctness is lost, and the taxpayer's burden is reduced to showing only by a *preponderance of the evidence* that the property appraiser's valuation is in excess of fair market value:

9

> **Presumption of correctness**.  In any administrative or judicial action in which a taxpayer challenges an ad valorem tax assessment of value, the property appraiser's assessment shall be presumed correct. This presumption of correctness is lost if the taxpayer shows by a preponderance of the evidence that either the property appraiser has failed to *consider properly* the criteria in s. 193.011 or if the property appraiser's assessment is arbitrarily based on appraisal practices which are different from the appraisal practices generally applied by the property appraiser to comparable property within the same class and within the same county. If the presumption of correctness is lost, the taxpayer shall have the burden of proving by a preponderance of the evidence that the appraiser's assessment is in excess of just value. If the presumption of correctness is retained, the taxpayer shall have the burden of proving by clear and convincing evidence that the appraiser's assessment is in excess of just value.

> Fla. Stat. § 194.301 (2008) (emphasis added).

Proper consideration of a statutory factor means more than just merely having "thought" about it.  *See*, *e.g.*, *Schultz v. TM Florida-Ohio Realty, Ltd. P'ship*, 553 So. 2d 1203, 1206 (Fla. 2d DCA 1989) (consideration means more than "*merely having thought about the fair market value factor";* emphasis added); *Daniel v. Canterbury Towers, Inc.*, 462 So. 2d 497, 502 (Fla. 2d DCA 1985) (holding that each factor must be "carefully considered and given such weight as the facts justify."); *Scripps Howard Cable Co. v. Havill*, 665 So. 2d 1071, 1077 (Fla. 5th DCA 1995) ("It is impossible to conclude that Ross could

have *properly* used the three different approaches *when he did not have all the information needed*."; emphasis added), *aff'd* 742 So. 2d 210 (Fla. 1998).

     C.     Florida courts utilize three approaches to value in determining the <u>fair market value of personal property.</u>

In *Havill v. Scripps Howard Cable Co.*, 742 So. 2d 210 (Fla. 1998), the Florida Supreme Court recognized that there are "three well-recognized approaches to determining the value of tangible personal property." *Id.* at 212. They are (i) the "market approach" or "comparable sales approach," (ii) the "cost approach" and (iii) the "income approach." *Id.* The Supreme Court described the three approaches as follows:

> The "market approach" or "comparable sales approach" analyzes the recent sales of similar property to arrive at the probable market price of the property being appraised.
>
>        \*\*\*
>
> The "cost approach" considers the cost that a prudent purchaser would pay to acquire an equally desirable substitute on the open market. The cost approach simply values the original, reproduction or replacement cost of the property, less an allowance for depreciation.
>
>        \*\*\*
>
> The "income approach" requires the property appraiser to estimate the future income that a prospective purchaser could expect to receive from the business enterprise. The business enterprise consists of all the assets of the business-tangible personal property, real property, and intangible assets. After estimating the

> future income, the property appraiser discounts the amount to present value by applying a capitalization rate. After completing the income approach, the appraiser has one value for the entire property. From this single value, the appraiser must attempt to deduct the values of real property, intangible assets, and other nontaxable items, to ensure that the income is solely attributable to the tangible personal property of the business enterprise.[3]

> *Havill,* 742 So. 2d at 212-13.

The DOR has adopted guidelines which county property appraisers utilize in determining the appraised value of personal property for ad valorem tax purposes. *See* Florida Department of Revenue, *Standard Measures of Value: Tangible Personal Property Appraisal Guidelines* (the "*DOR Guidelines*"). According to the *DOR Guidelines*, to arrive at "just value," the county property appraiser is *required* to consider each of the three approaches to value:

> The appraisal official is *required to consider* the cost, market and income approaches, and use one of these approaches or a combination of these approaches in arriving at just value.

> *DOR Guidelines*, p. 3 (emphasis added).

Because of the quantity of tangible personal property that county appraisers are required to appraise each year, appraisers utilize an appraisal technique

---

[3]  Because grocery store equipment does not directly produce an income stream, such as cell phone towers or vending machines do, it is undisputed in these proceedings that the income approach is not an appropriate method to appraise Winn-Dixie's property.

referred to as a mass appraisal.  *See Mazourek v. Wal-Mart Stores, Inc.,* 831 So. 2d

85, 87 (Fla. 2002).  Mass appraisals are a recognized method for appraising a large

universe of properties using standard methodology that is statistically supportable.

The *Uniform Standards of Professional Appraisal Practice* defines a mass

appraisal as*:*

> [T]he process of valuing a universe of properties as of
> a given date using standard methodology, employing
> common data, and allowing for statistical testing.
>
> Appraisal    Institute,    *Uniform
> Standards    of    Professional
> Appraisal    Practice*    ("USPAP")
> (2008-2009 Ed.), p. U-4.

Even  though  county  property  appraisers  utilize  mass  appraisals  to

determine  the  fair  market  value  of  taxpayer's  tangible  personal  property,  the

property appraisers are still required to consider all eight factors listed in Section

193.011.  *See Mazourek*, 813 So. 2d at 87-88.

> D.     The Appraisers failed to "consider properly" Section 193.011(1)—
>        "comparable sales"—in valuing Winn-Dixie's personal property.

In determining the "fair market value" of Winn-Dixie's personal property,

the  Appraisers  did  nothing  to  consider  comparable  sales  when  they  appraised

Winn-Dixie's  assets.   The  Appraisers  never  even  looked  to  see  if  there  was  a

market for Winn-Dixie's assets.

     1.    *The Appraisers did nothing to determine whether there was a market for Winn-Dixie's equipment.*

Section 193.011(1) requires the Appraisers to consider market data relating to sales of grocery store equipment.  *See Wal-Mart Stores, Inc. v. Mazourek,* 778 So. 2d 346 (Fla. 5th DCA 2000) ("The property appraiser's admitted *failure to investigate the availability of market data* indicates he *failed to* properly consider the factors set forth *in section 193.011(1)";* emphasis added).[4]  In *Havill v. Scripps Howard Cable Co.,* the Florida Supreme Court said that *proper* consideration of the market approach requires the appraiser to determine if there is an active market for the property that provides a source of reliable sales data:

> Prior to using [the market approach], the appraiser *must* determine if there is an active market for the property from which reliable sales data can be obtained.
>
> > *Havill*, 742 So. 2d at 212-13 (citing the DOR's *Manual of Instructions for Property Tax Administration*).

The *DOR Guidelines* suggest a number of sources from which a county appraiser can obtain reliable market data:

---

[4] The Florida Supreme Court ultimately quashed the Fifth District Court of Appeals' decision in *Wal-Mart* on other grounds.  In doing so, the Supreme Court found that there *was* evidence before the trial court that supported its finding that the appraiser considered all eight factors under Section 193.011.  *See Mazourek v. Wal-Mart Stores, Inc.,* 831 So. 2d 85, 92 (Fla. 2002).  There is no such evidence in this case.

> Market data relating to personal property may be obtained from:
>
> *      Leasing companies
> *      Commercial bankers
> *      New and used equipment dealers
> *      Trade and sales journals
> *      Newspaper advertisements
> *      Auction sales

*DOR Guidelines*, p. 40.

During his prior tenure as a Florida Circuit Court Judge, United States District Court Judge James Moody presided over Wal-Mart's state court challenge to the Hillsborough County Property Appraiser's assessment of Wal-Mart's furniture, fixtures and equipment in its Hillsborough County stores.  In *Wal-Mart Stores, Inc. v. Turner*, 7 Fla. L. Weekly Supp. 38b (Fla. 13th Cir. Ct. 1999), the county appraiser argued that (i) Section 193.011 did not require the appraiser to consider market data when appraising personal property, and (ii) even if it did, there was no market for used equipment. *See id*. at 1.  Judge Moody rejected the Hillsborough County Appraiser's argument that the county appraisers did not have to consider market data.  *See id.* at 5 ("the tax assessor failed to properly consider factor § 193.011(1) in determining just value"), because Judge Moody found that there was a "broad and established" market for used store equipment:

> The Court finds that there is a *broad and established* used equipment market in Hillsborough County. When a viable market is demonstrated, market factors should be used in determining just value for tangible personal property. *Hillsborough County v. Knight &*

> *Wall Co.*, 14 So. 2d 703 (Fla. 1943); *MacArthur Jersey Farm Dairy, Inc. v. Dade County*, 240 So. 2d 844 (Fla. 3d DCA 1970); *Aeronautical Communications Equipment, Inc. v. Metropolitan Dade County, et al.*, 219 So. 2d 101 (Fla. 3rd DCA 1969); *See also State of Florida, Department of Revenue Manual of Instructions*.

*Id.* at 3.

Despite the teaching of *Wal-Mart*—and the *requirements* of the *DOR Guidelines*—neither of the Appraisers, by their own admission, did anything to determine whether there was a market for used grocery equipment, much less any comparable sales data.

Mr. Tony Biondi, the supervisor of the Tangible Personal Property Department for the Okaloosa Appraiser, testified in his deposition that no one from his office ever investigated whether there was a market for used grocery store equipment.

Ms. Jenny Grice, an assistant appraisal supervisor in the Tangible Personal Property Department of the Escambia Appraiser's office admitted in her deposition that the Escambia Appraiser's office was not aware of any market data which could be utilized to perform a market approach appraisal, nor did the Escambia Appraiser's office make any effort to determine if such data existed.

Winn-Dixie's evidence will show that, as in *Wal-Mart*, there is a "broad and established" market for used grocery store equipment that both Appraisers failed to consider and therefore—because of their failure to consider the statutory

requisite—their assessments are not entitled to a "presumption of correctness." The evidence also will show that the Appraisers' assessment (admittedly based on only the DOR's depreciation tables) grossly overstated the "just value" of Winn-Dixie's equipment.

> 2.    *The Appraisers failed to calibrate their cost approach appraisals.*

By applying the DOR's depreciation tables, the Appraisers merely applied a cost approach to assessing Winn-Dixie's personal property, utilizing mass appraisal techniques. Judge Moody explained the mass appraisal process in his *Wal-Mart* decision:

> The process of calculating values using the mass appraisal method involves the tax assessor taking the taxpayer's reported cost figures and plugging them into a standard mathematical formula. The original cost is adjusted by an inflation index to arrive at a reproduction cost (called a replacement cost by the tax assessor), which is then used with the standard depreciation table ("percent good table") to mathematically arrive at the value for tax assessment. According to John Tuskan, the tax assessor's employee who actually did the work, the assessment process took less than five minutes for each WAL-MART store. *No one from the tax assessor's office or the DOR ever obtained any market information to statistically test the accuracy of the tables used.*
>
> The table in question is supplied by the DOR to each county tax assessor and has been adjusted slightly in Hillsborough County by the local property assessor. The DOR obtained the table from the Marshall & Swift Company who publishes the Marshal Valuation Service ("MVS"), a source document purporting to

give information on the economic lives and depreciation of fixtures and equipment. The tables have been published by Marshall & Swift *since 1962 with little or no change*. . . . The economic life of an item is expressed within a range of years for various types of machinery and equipment. The DOR chose the midpoint of each range as an *assumed* economic life for items of an average condition.

*Wal-Mart Stores, Inc. v. Turner*, 7 Fla. L. Weekly Supp. 38b, p. 4 (Fla. 13th Cir. Ct. 1997) (emphasis added).

There is no meaningful difference between the Hillsborough County Appraiser's and the Appraisers' application of the mass appraisal cost approach. Just like the Hillsborough County Appraiser, the Appraisers did nothing more than "plugging" Winn-Dixie's original cost information "into a standard mathematical formula" to determine the value of Winn-Dixie's personal properties. *Id.*

Even though county appraisers utilize mass appraisal techniques to perform a cost approach appraisal, the *DOR Guidelines* still require the Appraisers to consider market data to determine whether the results from the DOR's depreciation tables need to be adjusted to reflect any changes in value not accounted for by the tables:

The *appraiser should look to the market for any evidence of a change in value* when formulating an estimate of the market value using the cost approach. The appraiser should always consider what an informed purchaser would be willing to pay for the property as an installed operating unit when employed at its highest and best use. When valuing individual

18

> pieces of personal property using replacement cost
> new less depreciation, the residual percent good may
> be adjusted, if, in the appraiser's judgment, it is
> necessary to account for obsolescence.

> *DOR Guidelines,* p. 41 (emphasis
> added).[5]

The comparison of the results of a mass appraisal utilizing the cost approach to actual market data is known as "calibrating" the mass appraisal to the market. *See* USPAP Standard 6-4(c) ("In developing a mass appraisal, an appraiser *must* employ recognized techniques for calibrating mass appraisal models."). In *Wal-Mart*, Judge Moody concluded that because the Hillsborough County Appraiser did not calibrate the DOR's depreciation tables with the market data, the appraiser had not "properly considered the market" as required by Section 193.011(1). As a consequence, Judge Moody concluded that the Hillsborough County Appraiser's assessment lost its statutory presumption of correctness:

> The Court finds that the mass appraisal technique is an
> acceptable technique for use by the tax assessor, and
> for all practical purposes, is the only economically
> feasible method. *But to consider the market, the mass
> appraisal tables must be calibrated to reflect real life
> market values.* Once calibrated, it would then be

---

[5] The practice of using the Marshall & Swift tables to accurately estimate fair market value without calibrating them is questionable, as "[t]here has been no market research done by Marshall & Swift on the validity of the tables since they were first published in 1962." *Wal-Mart v. Turner,* 7 Fla. L. Weekly Supp. 38b, p. 4 (Fla. 13th Cir. Ct. 1999).

appropriate to check market data on an annual basis to verify that the tables continue to fairly approximate the market.

\*\*\*

Standard Rule 6-3 contemplates calibration so that the process has considered the market. The calibration has to be statistically supportable. The tax appraiser need have sufficient market information to statistically validate the depreciation scale used in the table. *Here, there was no showing that the tables reflected the existing market.*

> *Wal-Mart v. Turner,* at 4-5 (citing Standard Rule 6-3 of the *Uniform Standards of Professional Appraisal Practice,* 1999 Edition; emphasis added).

3.      <u>The DOR has never calibrated its tables to any market data.</u>

The Appraisers will argue that the DOR's depreciation tables have been calibrated to market by reason of an equipment mortality study that the DOR commissioned in 2004. The study, which was performed by an outside depreciation expert, Stephen L. Barreca, was an analysis of the economic lives of various types of equipment for use in a cost approach mass appraisal analysis.[6] Mr. Barreca's study concluded that the economic lives of equipment were much longer than what the DOR's economic life tables estimate.

---

[6] The economic life of an asset is the number of years that a property can be used before it would be more economically efficient to replace it with a new property of its functional equivalent. *See* American Society of Appraisers, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets* (2d ed. 2005) ("*The Fundamentals of Appraising Machinery*") at 565.

The Appraisers will argue that the Barreca study proves that the DOR's depreciation tables result in values that are more conservative than fair market value. There are three problems with this argument: (i) Mr. Barreca's study has not been recognized by anyone as a reliable method of estimating the fair market value of a piece of equipment, *c.f.,* USPAP Standard 6-4(c) ("In developing a mass appraisal, an appraiser must employ *recognized* techniques for calibrating mass appraisal models.");[7] (ii) Mr. Barreca acknowledged he never looked at any market transactions involving buyers or sellers to determine whether the results from his tables accurately estimate the amount a willing purchaser would pay a willing seller; *c.f., Wal-Mart,* 7 Fla. L. Weekly Supp. 38b at 4-5 ("there was no showing that the tables reflected the existing market"); and (iii) Barreca's 2004 study contains no information relevant to the 2005 and 2006 condition of Winn-Dixie's personal property.

In this case, (i) the Appraisers made *no* attempt to calibrate the DOR's depreciation tables to the market, and (ii) the DOR's only attempt to calibrate its tables never considered comparable sales. Consequently, the Appraisers' rote application of the DOR's uncalibrated tables do not reflect "the amount a 'purchaser willing but not obligated to buy, would pay to one willing but not obligated to sell'" Winn-Dixie's personal property, *i.e.,* its "just value." *Walter v. Schuler,* 176 So. 2d 81, 86 (Fla. 1965).

---

[7]    In his deposition, Mr. Barreca said that he did not know whether his depreciation tables had been generally accepted in the appraisal community as a method for determining fair market values.

     E.    The Court should adopt Winn-Dixie's valuation of its personal property as the "just value" of the property.

Winn-Dixie engaged an experienced equipment appraiser, Jack West, to appraise the equipment and fixtures at Winn-Dixie's stores in all Florida counties, including Escambia and Okaloosa, as of January 1, 2005 and 2006.[8]  To conduct his appraisal, Mr. West considered the market, cost, and income approaches and made a determination of the fair market value of all of Winn-Dixie's tangible personal property in Florida for each of those years.  Based on Mr. West's appraisal, Winn-Dixie believes that the Appraisers significantly overestimated the values of Winn-Dixie's personal property in Escambia and Okaloosa counties.[9]

After considering all three approaches to value—market, cost and income—Mr. West decided that the cost approach, *calibrated to the market*, provided the best method to determine the fair market value of Winn-Dixie's fixtures and equipment.  Using recognized techniques for appraising fixtures and equipment under a cost approach, Mr. West developed tables to estimate the

---

[8]   Mr. West is an accredited Senior Appraiser who is certified as a Machinery and Technical Specialties/ Machinery and Equipment Appraiser by the American Society of Appraisers.

[9]   The Escambia Appraiser, by using the outdated DOR's depreciation tables, estimated that the fair market value of Winn-Dixie's personal property was $4,668,700 in 2005 and $4,311,560 in 2006.  Mr. West, on the other hand, investigated the market for used grocery store equipment and determined the fair market value of Winn-Dixie's personal property in Escambia County was $2,315,088 in 2005 and $1,907,387 in 2006.  The Okaloosa Appraiser, using the same DOR's depreciation tables, estimated that Winn-Dixie's personal property was worth $3,032,171 in 2005 and $2,785,830 in 2006.  According to Mr. West, however, the actual fair market value was $1,498,313 and $1,368,938 for those two years.

annual rate of depreciation of Winn-Dixie's grocery store equipment.[10]    Mr. West's tables measure the erosion in value of grocery store equipment over time as compared to the current cost to replace the equipment with its functional equivalent.

Mr. West then interviewed a number of reputable equipment dealers to determine what used grocery store equipment of different ages sells for in the secondary market.[11]  With that information, Mr. West adjusted or "calibrated" his depreciation table using actual market data, as required by USPAP Standard 6-3(c), and as recommended by the *DOR Guidelines*.  *See DOR Guidelines*, p. 41 ("The appraiser should *look to the market* for any evidence of a change in value when formulating the market value using the cost approach."; emphasis added). According to the American Society of Appraiser's text book, *The Fundamentals of Appraising Machinery*, the cost approach is not an effective appraisal methodology *unless* the appraiser compares the cost approach results with actual market data obtained from comparable sales transactions:

---

[10]  Depreciation is generally considered to have three forms: physical deterioration, functional obsolescence and economic obsolescence.  *See The Fundamentals of Appraising Machinery*, at 562.  "Physical deterioration" is the loss in value of a property due to the "using up of its economic life" as the result of wear and tear, exposure to the elements, etc.  *Id*. at 582.  "Functional obsolescence" refers to the loss in value of an asset as a result of its inefficiency when compared to a newer, more efficient asset.  *Id*. at 569. "Economic obsolescence" refers to the loss in value of an asset as the result of factors "external to the asset," such as the economics of an industry, the reduced demand for a product, etc.  *Id*. at 565.

[11]  Mr. West found that market value of used grocery store equipment drops precipitously in the first year (typically 40 to 50%).    Through the next eight years, the market value of grocery store equipment decreases at a more gradual rate (in the single digit range) from year to year.  After years nine and ten, the market prices rapidly decline again as the assets reach the end of their economic lives and can only be sold for scrap value.  Mr. West compares the rate at which the prices for grocery store equipment decrease over time to that of a new car.  According to data Mr. West obtained from Edmonds Annual Dealer Valuations, a new 2008 Chevrolet Malibu is only worth 58% of its original cost after just one year.

> In order for this methodology [the cost approach] to be used *effectively*, replacement cost new data and fair market value data for a sample of assets similar to the subject assets *must* be gathered. Such a comparison is *necessary* to reconcile any potential differences between the cost approach *and actual market data obtained from comparable sales transactions.*
>
> > *The Fundamentals of Appraising Machinery*, p. 103 (emphasis added).

A comparison of the appraisal methodology utilized by the Appraisers—the rote application of the DOR's depreciation tables not calibrated with market data—with the appraisal methodology utilized by Mr. West—a recognized cost approach analysis that he calibrated with actual market data—makes it apparent that Mr. West's methodology is a more reliable indication of the fair market value of Winn-Dixie's personal property. Accordingly, the Court should (i) reject the Appraisers' valuation of Winn-Dixie's personal property and (ii) adopt Mr. West's valuation as the one that reflects "just value" as required by article VII, section 4 of the Florida Constitution and Section 193.011, Florida Statutes.

F.    Winn-Dixie should not be bound by its tax returns' estimates of fair market value.

The Escambia Appraiser asserts that its assessments merely reflect the values that Winn-Dixie placed on its tax returns and Winn-Dixie should not be heard to challenge those values.

The Escambia Appraiser's argument is not grounded in reality.  In 2005 and 2006, Winn-Dixie, like most other commercial enterprises that own large amounts of equipment, utilized a commercially available software program to complete its tangible personal property tax returns.  That program incorporated the DOR's depreciation tables and is designed to mimic the values that the taxing authority themselves would ultimately place on the property by using those tables.  Because it was quick, efficient and less troublesome than individually estimating the fair market value of hundreds of thousands of taxable items, Winn-Dixie utilized this commercial software in preparing tax returns for many years.

When Winn-Dixie filed for bankruptcy, however, it was presented with the opportunity to utilize Section 505 of the Bankruptcy Code to provide Winn-Dixie an efficient, single-forum opportunity to have the court determine the appropriate amount of ad valorem taxes it owed to various taxing authorities.  As a fiduciary acting in the best interest of its creditors, Winn-Dixie was obligated to seek relief for its estate under Section 505.

The very purpose of Section 505 is to allow debtors-in-possession to contest tax liabilities so that the companies' prepetition inaction will not prejudice the estates' creditors:

> Section 505 was enacted to protect creditors "from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing condition, failed to contest.

* * *

25

> This is permitted on the ground that taxes with their priority pose a special problem for creditors, and creditors should not be prejudiced by a debtor's inaction.
>
> *In re Piper Aircraft Corp.,* 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994).

To accept the Appraisers' argument that Winn-Dixie has "admitted" that the Appraisers' estimates of fair market value are accurate would subvert the purposes of Section 505. This Court should not place any weight on the DOR-driven values contained in Winn-Dixie's 2005 and 2006 tax returns.[12]

G.    The Appraisers' jurisdictional issues have already been decided.

The Appraisers raise several procedural, jurisdictional and constitutional objections to the Florida Tax Objection, arguing that (i) the motion should have been filed as an adversary complaint instead of as a contested matter and a complaint should have been served on the Appraisers, (ii) the Court should abstain from hearing the Florida Tax Objection under 28 U.S.C. § 1334(c)(1), (iii) the Florida Tax Objection violates the Eleventh Amendment to the United States Constitution, (iv) Winn-Dixie waived their rights to contest the taxes under Florida

---

[12] Moreover, the evidence will show that Winn-Dixie put the Appraisers on written notice in 2005 and again in 2006 not to rely on Winn-Dixie's returns and that Winn-Dixie intended to challenge the assessments.

law, and (v) the Florida Tax Objection is barred by laches in that Winn-Dixie could have challenged the taxes in state court.[13]

The Florida Tax Collectors, including the Escambia and Okaloosa County Tax Collectors, raised all of these same issues in their Motion to Dismiss and their Motion to Abstain (collectively, the "Florida Tax Collectors Motions"), which this Court denied in its orders (i) granting in part and denying in part the motion to dismiss (Doc. No. 14815) and (ii) denying the motion to abstain (Doc. No. 14816) (collectively, the "Jurisdictional Orders").

The Appraisers are collaterally estopped from re-litigating those issues. The doctrine of collateral estoppel precludes re-litigation of an issue which has already been litigated and resolved in a prior proceeding. *See Pleming v. Universal-Rundle Corp.,* 142 F.3d 1354 (11th Cir. 1998). The elements that must be present for collateral estoppel to apply are:

> (1) the issue at stake is identical to the one involved in the prior proceeding;
>
> (2) the issue was actually litigated in the prior proceeding;
>
> (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and

---

[13] The Appraisers also argue that the Court lacks jurisdiction to grant a refund for Winn-Dixie's past overpayments. This objection was also raised by the Florida Tax Collectors and sustained by the Court. This issue is now on appeal to the Eleventh Circuit Court of Appeals. Winn-Dixie reserves the right to seek a refund of Winn-Dixie's past overpayments to the Escambia and Okaloosa County Tax Collectors in the event the Eleventh Circuit reverses that aspect of the Court's Motion to Dismiss Order.

> (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id*. at 1359.

In this case, all four elements exist to preclude the Appraisers from re-litigating their objections.  As to the first element, the objections raised by the Appraisers are identical to the objections previously raised by the Escambia and Okaloosa County Tax Collectors in the Florida Tax Collectors Motions.  As to the second and third elements, those objections were actually litigated by the Escambia and Okaloosa County Tax Collectors, and the Court's determination on those objections was critical and necessary to the Jurisdictional Orders.  As to the fourth and last element, although the Appraisers were not parties to the Florida Tax Collectors Motions, the Appraisers are in privity with the Escambia and Okaloosa County Tax Collectors, which is sufficient to satisfy the fourth element under applicable Eleventh Circuit precedent.

Under Eleventh Circuit authority, the fourth element is satisfied where the person to be estopped, even though not a party in the previous suit, is in privity with a party from the previous suit.  *See E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1285 (11th Cir. 2004) ("[I]t must be established that the party in the second action was either a party in the previous action or a privy of the party in that action.").  For purposes of collateral estoppel, privity exits between officials of the same government acting in their official capacity as representatives of the

government. *See U.S. v. Rogers*, 960 F.2d 1501, 1509 (10th Cir. 1992) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is *res judicata* in relitigation of the same issue between that party and another officer of the government."); *State v. Combs*, 64 P.3d 135, 138 (Alaska App. 2003) ("Generally speaking, officials of the same government are in privity with each other.").  As stated by the Supreme Court of Connecticut:

> Since they represent not their own rights but the rights of the municipality *the agents of the same municipal corporation are in privity with each other and with the municipality.* When a judgment is rendered against an officer of a municipal corporation who sues or is sued in his official capacity, the judgment is binding upon the corporation, *and upon other officers of the same municipal corporation who represent the same interest.*
>
> *Wade's Dairy, Inc. v. Town of Fairfield*, 181 Conn. 556, 561 (Conn. 1980) (emphasis added).

Although the Appraisers were not parties to the previous objections at the time they were raised by the Escambia and Okaloosa County Tax Collectors, the Appraisers are officers of the same county governments as their respective tax collectors.  The Appraisers, therefore, are in privity with their respective county tax collectors and are collaterally estopped from re-litigating the objections adjudicated by the Jurisdictional Orders.

## V.     Contested Legal Issues

Whether the Appraisers are collaterally estopped from re-litigating the jurisdiction and abstention issues that were decided in the Jurisdictional Orders.

## VI.     Legal Authority

The following is the legal authority upon which Winn-Dixie may rely at trial.  Winn-Dixie may rely upon additional authority at trial or in any post-trial briefing.

1.     *Daniel v. Canterbury Towers, Inc.*, 462 So. 2d 497 (Fla. 2d DCA 1985)

2.     *E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280 (11th Cir. 2004)

3.     *Havill v. Scripps Howard Cable Co.*, 742 So. 2d 210 (Fla. 1998)

4.     *In re Lake Worth Generation, LLC*, 318 B.R. 894 (Bankr. S.D. Fla. 2004)

5.     *Mazourek v. Wal-Mart Stores, Inc.*, 831 So. 2d 85 (Fla. 2002)

6.     *In re MCorp Financial, Inc.*, 216 B.R. 596 (Bankr. S.D. Tex. 1996)

7.     *In re Piper Aircraft Corp.*, 171 B.R. 415 (Bankr. S.D. Fla. 1994)

8.     *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354 (11th Cir. 1998)

9.     *Schultz v. TM Florida-Ohio Realty, Ltd. P'ship*, 553 So. 2d 1203 (Fla. 2d DCA 1989)

10.    *Scripps Howard Cable Co. v. Havill*, 665 So. 2d 1071 (Fla. 5th DCA 1995)

11.    *State v. Combs*, 64 P.3d 135 (Alaska App. 2003)

12.    *U.S. v. Rogers*, 960 F.2d 1501 (10th Cir. 1992)

13.    *Wade's Dairy, Inc. v. Town of Fairfield*, 181 Conn. 556 (Conn. 1980)

14.    *Wal-Mart Stores, Inc. v. Mazourek*, 778 So. 2d 346 (Fla. 5th DCA 2000)

15.    *Wal-Mart Stores, Inc. v. Turner*, 7 Fla. L. Weekly Supp. 38b (Fla. 13th Cir. Ct. 1999)

16.    *Walter v. Schuler*, 176 So. 2d 81 (Fla. 1965)

17.    11 U.S.C. § 505

18.    28 U.S.C. § 1334(c)(1)

19.    Fla. Const. art. VII, § 4

20.    Fla. Stat. § 194.301 (2008)

21.    Fla. Stat. § 193.011 (2008)

## VII.    Core Proceeding

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). *See In re Lake Worth Generation, LLC*, 318 B.R. 894, 898 (Bankr. S.D. Fla. 2004). Winn-Dixie consents to the jurisdiction of the Court and the entry of final orders or judgments by the Court.

## VIII.  Settlement

The parties have made a good faith endeavor to settle the matter and have been unable to do so.

SMITH HULSEY & BUSEY


By    *s/ Allan E. Wulbern*
         Stephen D. Busey
         Allan E. Wulbern
         Beau Bowin

Florida Bar Number 0175511
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Counsel for Winn-Dixie

## **Certificate of Service**

I certify that a copy of this document has been furnished electronically through the CM/ECF electronic notification system this 4th day of March, 2009 to:

Thomas M. Findley, Esq.
Messer, Caparello & Self, P.A.
Post Office Box 15579
Tallahassee, Florida 32317

Sherri L. Johnson, Esq.
Dent & Johnson, Chartered
3415 Magic Oak Lane
Sarasota, Florida 34230

Philip A. Bates, Esq.
25 West Cedar St., Suite 550
Pensacola, Florida 32502

_____*s/ Allan E. Wulbern*_____
Attorney

00642669.4

33