6.

Westlaw.

831 So.2d 85                                                                                                          Page 1
831 So.2d 85, 27 Fla. L. Weekly S570, 27 Fla. L. Weekly S761, 27 Fla. L. Weekly S979
**(Cite as: 831 So.2d 85)**

▷

Supreme Court of Florida.
Alvin MAZOUREK, etc., et al., Petitioners,
v.
WAL-MART STORES, INC., Respondent.
**No. SC01-663.**

June 13, 2002.
Rehearing Denied Sept. 12 and Nov. 21, 2002.

Taxpayer filed suit against county property appraiser, county tax collector, and executive director of the Department of Revenue, challenging assessments of personal property for ad valorem taxation. After a bench trial, the Circuit Court, Hernando County, John W. Springstead, J., entered judgment for defendants. Taxpayer appealed and the District Court of Appeal, Pleus, J., 778 So.2d 346, reversed. Appraiser and the Department of Revenue sought review. The Supreme Court, Wells, C.J., held that sales tax paid by taxpayer on tangible personal property could properly be considered as part of original cost of personalty in cost approach valuation.

Decision of the District Court of Appeal quashed; case remanded with instructions.

West Headnotes

**[1] Taxation 371 ⊝⇒2529**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)5 Valuation of Property
                371k2529 k. Personal Property in General. Most Cited Cases
    (Formerly 371k350)
Sales tax paid by a taxpayer on tangible personal property could properly be considered as part of the original cost of personalty in a cost approach valuation of personalty for ad valorem taxation. West's F.S.A. Const. Art. 7, § 4; West's F.S.A. § 193.011.

**[2] Taxation 371 ⊝⇒2060**

371 Taxation
    371III Property Taxes
        371III(A) In General
            371k2060 k. In General. Most Cited Cases
    (Formerly 371k1)
An ad valorem tax is a tax assessed upon the value of property.

**[3] Taxation 371 ⊝⇒2446**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)2 Assessors and Proceedings for Assessment
                371k2444 Powers and Proceedings in Making Assessments in General
                    371k2446 k. Defects and Errors, and Presumption as to Regularity in General. Most Cited Cases
    (Formerly 371k319(2))

**Taxation 371 ⊝⇒2728**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)11 Evidence in General
                371k2724 Weight and Sufficiency of Evidence
                    371k2728 k. Valuation. Most Cited Cases
    (Formerly 371k485(3))
Property appraiser's assessment for ad valorem taxes is presumed correct, but such presumption is lost where the taxpayer demonstrates by a preponderance of the evidence that the property appraiser has failed to consider properly the statutory factors for just valuation. West's F.S.A. § 193.011.

**[4] Taxation 371 ⊝⇒2510**

371 Taxation

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

371III Property Taxes
   371III(H) Levy and Assessment
      371III(H)5 Valuation of Property
         371k2510 k. In General. Most Cited
Cases
   (Formerly 371k347)
Obligation upon the property appraiser is to "consider," but not necessarily apply, each statutory factor in determining just valuation for ad valorem taxation. West's F.S.A. § 193.011.

### [5] Taxation 371 ⬅︎2510

371 Taxation
   371III Property Taxes
      371III(H) Levy and Assessment
         371III(H)5 Valuation of Property
            371k2510 k. In General. Most Cited
Cases
   (Formerly 371k347)
Property appraiser's determination of assessment value for ad valorem taxation is an exercise of administrative discretion within the officer's field of expertise. West's F.S.A. § 193.011.

### [6] Taxation 371 ⬅︎2516

371 Taxation
   371III Property Taxes
      371III(H) Levy and Assessment
         371III(H)5 Valuation of Property
            371k2512 Real Property in General
               371k2516 k. Replacement Cost;
Depreciation and Obsolescence. Most Cited Cases
   (Formerly 371k348(4))
The "cost approach" to ad valorem tax valuation considers the cost that a prudent purchaser would pay to acquire an equally desirable substitute on the open market, and simply values the original, reproduction or replacement cost of the property, less an allowance for depreciation.

### [7] Taxation 371 ⬅︎2515

371 Taxation
   371III Property Taxes

371III(H) Levy and Assessment
      371III(H)5 Valuation of Property
         371k2512 Real Property in General
            371k2515 k. Market Value and Sale
Price; Comparable Sales. Most Cited Cases
   (Formerly 371k348(3))
Although the property appraiser must consider all of the statutory factors for just valuation for ad valorem taxation, he may discard entirely any that are not probative of fair market value under the circumstances. West's F.S.A. § 193.011.

### [8] Taxation 371 ⬅︎2510

371 Taxation
   371III Property Taxes
      371III(H) Levy and Assessment
         371III(H)5 Valuation of Property
            371k2510 k. In General. Most Cited
Cases
   (Formerly 371k347)

### Taxation 371 ⬅︎2699(7)

371 Taxation
   371III Property Taxes
      371III(H) Levy and Assessment
         371III(H)10 Judicial Review or Intervention
         371k2691 Review of Board by Courts
            371k2699 Proceedings for Review
and Parties
               371k2699(6) Scope and Extent
of Review
               371k2699(7) k. In General.
Most Cited Cases
   (Formerly 371k493.8)
The method of valuation and the weight to be given each statutory factor is left to the appraiser's discretion in valuing property for ad valorem taxation, and the decision will not be disturbed on review as long as each factor has been lawfully considered and the assessed value is within the range of reasonable appraisals. West's F.S.A. § 193.011.

### [9] Taxation 371 ⬅︎2699(7)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

831 So.2d 85
831 So.2d 85, 27 Fla. L. Weekly S570, 27 Fla. L. Weekly S761, 27 Fla. L. Weekly S979
(Cite as: 831 So.2d 85)

Page 3

371 Taxation
   371III Property Taxes
      371III(H) Levy and Assessment
         371III(H)10 Judicial Review or Intervention
            371k2691 Review of Board by Courts
               371k2699 Proceedings for Review and Parties
                  371k2699(6) Scope and Extent of Review
                    371k2699(7) k. In General.
Most Cited Cases
   (Formerly 371k493.8)
Because there are so many well-recognized approaches for arriving at an appraisal, the appraiser's decision may be overturned only if there is no reasonable hypothesis to support it.

*86 Mark Aliff, Assistant Attorney General, Tallahassee, FL; and Gaylord A. Wood, Jr., and B. Jordan Stuart of Wood & Stuart, P.A., New Smyrna Beach, FL, for Petitioners.

Stacy D. Blank and Robert E.V. Kelley, Jr. of Holland & Knight LLP, Tampa, FL, for Respondent.

Roy C. Young, General Counsel, Young, van Assenderp, Varnadoe & Anderson, P.A., Tallahassee, FL; and Victoria L. Weber and Rex D. Ware, Special Counsel, of Hopping, Green & Sams, P.A., Tallahassee, FL, for the Florida Chamber of Commerce, Amicus Curiae.

J. Ben Harrill of Figurski & Harrill, Holiday, FL, for Mike Wells as Pasco County Property Appraiser, Amicus Curiae.

John C. Dent, Jr., and Sherri L. Johnson of Dent & Cook, Sarasota, FL, for James Todora, as Property Appraiser of Sarasota County; Ed Crapo, as Property Appraiser of Alachua County; Timothy" Pete" Smith, as Property Appraiser of Okaloosa County; and Ervin Higgs, as Property Appraiser of Monroe County, Amici Curiae.

WELLS, C.J.

We have for review *Wal-Mart Stores, Inc. v. Mazourek,* 778 So.2d 346 (Fla. 5th DCA 2000), which expressly and directly conflicts with the decision in *Wal-Mart Stores, Inc. v. Todora,* 791 So.2d 29 (Fla. 2d DCA 2001), *notice invoking discretionary review filed,*No. SC01-1130 (Fla. May 18, 2001), and which affects a class of state or constitutional officers. We have jurisdiction, *see*art. V, § 3(b)(3), Fla. Const., quash the Fifth District's decision in *Mazourek,* and approve the Second District's opinion in *Todora.*

### PROCEDURAL HISTORY

Wal-Mart Stores, Inc. (Wal-Mart) operates two retail stores in Hernando County. Wal-Mart store 1213 is commonly referred to as a "superstore," and it opened in the fall of 1996. Wal-Mart store 967 is a conventional store. Within Hernando *87 County, Wal-Mart also operates a distribution center. Alvin Mazourek is the Hernando County Property Appraiser who assessed the value of Wal-Mart's real and tangible property existing as of January 1, 1997, the lien date, for ad valorem taxation purposes.

Wal-Mart instituted two suits against Mazourek, Leona Bechtelheimer, as Hernando County Tax Collector, and Larry Fuchs, as the Executive Director of the Florida Department of Revenue. The suits, which were consolidated, contended that Mazourek's assessments of Wal-Mart's tangible personal property within the two stores and the distribution center exceeded just valuation. Wal-Mart made a similar claim that Mazourek's assessment of certain real property and improvements thereon were incorrect. Mazourek counterclaimed and alleged that Wal-Mart failed to disclose for assessment multiple items of tangible personal property. Prior to trial, the real property issue was settled.

In a nonjury trial conducted before Circuit Judge John W. Springstead, Wal-Mart attempted to demonstrate that Mazourek failed to properly consider the factors listed in section 193.011, Florida

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 4

Statutes (1997), and that Mazourek's assessments exceeded just valuation. For instance, Wal-Mart alleged that the fair market value of store shelving and the Rapistan conveyer system used in the distribution center were much lower than the assessed amount. The tangible personal property supervisor in Mazourek's office used a mass appraisal cost approach to determine the assessment amount. The supervisor testified that he did not deduct sales tax paid by Wal-Mart on the assessed property when he determined the assessments.

The trial court concluded that Mazourek properly considered all factors enumerated in section 193.011 and that the mass appraisal cost approach method was appropriate in this case. The court further found that the "evidence clearly shows that sales tax, shipping, installation and the like are proper costs which must be included in a properly conducted cost approach." *Wal-Mart Stores, Inc. v. Mazourek,* Nos. 97-2994-CA & 97-3121-CA, order at 6 (Fla. 5th Cir. Ct. order filed Oct. 15, 1999). The trial court entered judgment in Mazourek's favor and ratified Mazourek's assessments of tangible personal property located at the distribution center and both stores. On the counterclaim issue, the trial court found that Wal-Mart failed to return items of tangible personal property for assessment at its distribution center and at the superstore. Consequently, the court ordered Wal-Mart to cooperate with Mazourek by listing all items of property not previously disclosed by Wal-Mart. Accordingly, judgment was entered in Mazourek's favor on the counterclaim issue.

The Fifth District Court of Appeal reversed both judgments, *see Mazourek,* 778 So.2d at 351-52, and held that sales tax paid by Wal-Mart on the items of tangible personal property must be excluded from consideration in establishing just value and that Mazourek's assessments lost their presumption of correctness because Mazourek failed to properly consider the section 193.011 factors. *See id.* at 350-51. As to the counterclaim issue, the district court concluded that Mazourek failed to exhaust his administrative remedies, and **\*88** therefore the judgment in Mazourek's favor could not stand. *See id.* at 352.

Mazourek and the Department of Revenue sought review in this Court, asserting conflict between the Fifth and Second District Courts of Appeal in respect to the issue concerning the property appraisers' inclusion of sales tax in an appraisal conducted pursuant to the cost approach. Mazourek's position is supported by numerous amicus filings by other Florida property appraisers, the property appraiser's association, the Association of Counties, Inc., and the Association of County Attorneys, Inc. An amicus brief in favor of Wal-Mart was filed by the Florida Chamber of Commerce, Inc.

ANALYSIS

[1] The first issue we address is whether sales tax paid by a taxpayer on tangible personal property may properly be considered in a cost approach valuation of such personality. We conclude that there is no impediment in Florida law prohibiting property appraisers from including sales tax in the original cost of such personalty where a property appraiser determines the ad valorem assessment for that personalty using the cost approach pursuant to generally accepted appraisal methods.

[2] An ad valorem tax is a tax assessed upon the value of property. *See Collier County v. State,* 733 So.2d 1012, 1014 n. 2 (Fla.1999) (citing § 192.001(1), Fla. Stat. (1997)); *Smith v. American Airlines, Inc.,* 606 So.2d 618, 620 n. 2 (Fla.1992) (quoting *Black's Law Dictionary* 51 (6th ed.1990)). The Legislature has defined tangible personal property as "all goods, chattels, and other articles of value ... capable of manual possession and whose chief value is intrinsic to the article itself."§ 192.001(11)(d), Fla. Stat. (1997).

[3][4][5][6] Article VII, section 4, Florida Constitution, provides in pertinent part: "By general law regulations shall be prescribed which shall secure a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

831 So.2d 85
831 So.2d 85, 27 Fla. L. Weekly S570, 27 Fla. L. Weekly S761, 27 Fla. L. Weekly S979
(Cite as: 831 So.2d 85)

Page 5

just valuation of all property for ad valorem taxation ...." The phrase "just valuation" has been construed to mean "fair market value." *See Valencia Center, Inc. v. Bystrom,* 543 So.2d 214, 216 (Fla.1989) (citing *Walter v. Schuler,* 176 So.2d 81, 85-86 (Fla.1965) ("fair market value" legally synonymous with "just valuation")). The Legislature has enacted eight factors which a property appraiser must consider to assist the property appraiser in determining just valuation. *See*§ 193.011(1)-(8), Fla. Stat. (1997). That statute provides in relevant part:

In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:

(1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;

(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable judicial limitation, local or state land use regulation, or historic preservation ordinance, and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor ...;

*89 (3) The location of said property;

(4) The quantity or size of said property;

(5) The cost of said property and the present replacement value of any improvements thereon;

(6) The condition of said property;

(7) The income from said property;

(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, in-

cluding the costs and expenses of financing ....

§ 193.011, Fla. Stat. (1997). The property appraiser's assessment is presumed correct, but such presumption is lost where the taxpayer demonstrates by a preponderance of the evidence that the property appraiser "has failed to consider properly" the section 193.011 factors. *See*§ 194.301, Fla. Stat. (1997); *see also Havill v. Scripps Howard Cable Co.,* 742 So.2d 210, 212 (Fla.1998) ("If the property appraiser does not consider each of these statutory factors, the presumption of validity of the assessment is lost.") (citing *Straughn v. Tuck,* 354 So.2d 368, 371 (Fla.1978)). The obligation upon the property appraiser is for the property appraiser to "consider," but not necessarily apply, each factor. *See Havill,* 742 So.2d at 212. "The property appraiser's determination of assessment value [is] an exercise of administrative discretion within the officer's field of expertise." *Blake,* 447 So.2d at 1350. There are "three well-recognized approaches to determining the value of tangible personal property," *Havill,* 742 So.2d at 212, of which the cost approach is one. We previously have described the cost approach to valuation:

The "cost approach" considers the cost that a prudent purchaser would pay to acquire an equally desirable substitute on the open market. *The cost approach simply values the original, reproduction or replacement cost of the property, less an allowance for depreciation.* In the absence of comparable sales data, the *Manual of Instructions [for Property Tax Administration* ] recommends the use of the cost approach by county appraisers to determine the just value of tangible personal property.

*Id.* at 213 (emphasis added).

The *Manual of Instructions* provided to county property appraisers by the Florida Department of Revenue and in effect on the lien date in this case described the cost approach:

The first step in the cost approach is to obtain the *original cost* of the item and then determine the validity of the cost. If the item was purchased new

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in an open competitive market, then this approach becomes similar to the Market or Comparable sales approach. The most reliable source of cost data is the financial records of the property owner.

*Id.* at 5-6 (emphasis added). In obtaining the original cost for assessment purposes counsel for Mazourek and Wal-Mart acknowledged at oral argument that property appraisers in Florida for many years have consistently included sales tax as a part of the original cost paid by the taxpayer*90 when utilizing the cost approach. The record contains no information that consideration of sales tax paid in an assessment derived from the cost approach is a recently developed practice of Mazourek, and counsel conceded that although sales tax has in the past been included as a component of the assessment, no objection has been previously raised to this inclusion.

The inclusion of sales tax in the cost approach is supported by appraisal texts. For instance:

The cost approach can be applied to almost all types of personal property. Its application is especially well suited to the valuation of machinery and equipment, for which it is possible to identify make and model (model number) of the item, year acquired, and *total acquisition costs including freight, installation, taxes, and fees.*

International Ass'n of Assessing Officers, *Property Assessment Valuation* 360 (2d ed.1996) (emphasis added). When using the cost approach to value a fixed asset,FN1"the appraiser must verify whether costs of fixed assets *reflect all expenses necessary* to convert purchase price or acquisition cost to incorporate the cost of the asset brought to highest and best use." *Id.* at 369 (emphasis added). Similarly, another text advises:

> FN1. "Fixed assets are tangible property in a relatively permanent location." *Id.* at 347.

The first step in the cost approach is to determine

the proper level of current cost, cost of reproduction, which is the cost of producing or constructing a property in like kind or the cost of replacement, which is the cost of producing or constructing a property of equivalent utility. *The normal cost elementcluded in either the replacement or reproduction cost estimates are all direct and indirect costs.*
Machinery and Equipment Textbook Committee of the American Society of Appraisers, *Appraising Machinery and Equipment* 82 (John Alico ed., 1989) (emphasis added).

[7][8][9] The Fifth District Court of Appeal concluded in this case that sales tax paid by a taxpayer is an external cost of a sale that adds no value to the purchased item. *See Mazourek,* 778 So.2d at 350. The district court then held that Mazourek's assessment of Wal-Mart's tangible personal property lost its presumption of correctness because of the inclusion of sales tax. In contrast, the Second District in *Todora,* a case presenting Wal-Mart's challenge to the 1997 ad valorem tax assessment to its tangible personal property located in Sarasota County, concluded that the property appraiser could properly consider sales tax paid when using the cost approach. *See Todora,* 791 So.2d at 31. We approve the Second District Court of Appeal's opinion as follows:

In arriving at just valuation, the property appraiser must consider the eight factors set forth in section 193.011, Florida Statutes (1997). Although the property appraiser must consider all of the factors, he may discard entirely any that are not probative of fair market value **\*91** under the circumstances. *See Turner v. Tokai Fin. Servs., Inc.,* 767 So.2d 494 (Fla. 2d DCA 2000). The method of valuation and the weight to be given each factor is left to the appraiser's discretion, and the decision will not be disturbed on review as long as each factor has been lawfully considered and the assessed value is within the range of reasonable appraisals. *See Valencia Ctr., Inc. v. Bystrom,* 543 So.2d 214 (Fla.1989). Because there are so many well-recognized approaches for arriving at an appraisal, the appraiser's

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

831 So.2d 85
831 So.2d 85, 27 Fla. L. Weekly S570, 27 Fla. L. Weekly S761, 27 Fla. L. Weekly S979
(Cite as: 831 So.2d 85)

Page 7

decision may be overturned only if there is no reasonable hypothesis to support it. *See Daniel v. Canterbury Towers, Inc.,* 462 So.2d 497 (Fla. 2d DCA 1984).

In [the Sarasota] case, the property appraiser used the cost approach method of valuation. The cost approach requires an appraiser to adjust the original acquisition cost of the property to current market replacement cost. That figure is then adjusted for depreciation. We find no error in the selection of this method, particularly in light of Wal-Mart's statement in its petition to the Sarasota County Value Adjustment Board that the cost approach was the most feasible and appropriate method of valuation for the subject property.

....

Acquisition costs, the starting point for assessments of property under a cost approach, are generally recognized to include freight, installation, taxes, and fees. *See* Int'l Ass'n of Assessing Officers, Property Assessment Valuation 360 (2d ed.1996). As Judge Doughtie of the Eighth Judicial Circuit recently noted in a comprehensive analysis of the issue,

it is obvious that in determining how long to keep a fixture in use (which is what depreciation is really all about) the owner must consider all of the business costs involved in acquiring and installing the fixture. Part of the owner's decision to replace an item has be [sic] based on the total investment (including sales tax) he has in the item. This reasoning is supported by all of the authoritative appraisal texts recognized by the experts.

*Wal-Mart Stores, Inc. v. Crapo,* No. 97-CA-4728 (Fla. 8th Cir.Ct. Feb. 26, 2001).[FN2] We agree with this reasoning.

> FN2. The *Crapo* case presented Wal-Mart's challenge to the 1997 ad valorem tax assessment to its tangible personal property located in Alachua County. The *Crapo* case currently is pending before the

First District Court of Appeal. *See Wal-Mart Stores, Inc. v. Crapo,* No. 1D01-1203 (Fla. 1st DCA notice of appeal filed Mar. 29, 2001).

*Id.* at 30-31.

In a cost approach, inclusion of sales tax within the amount of the original cost is consistent with generally accepted appraisal practices. We find no basis upon which to hold that this appraisal practice is contrary to law or returns an assessment that exceeds just valuation.[FN3] Thus, we conclude*92 that the Fifth District Court of Appeal erred in finding that Mazourek's assessment of Wal-Mart's personalty lost its presumption of correctness on account of Mazourek's inclusion of sales tax paid.

> FN3. Our decision today finds support in case law from other jurisdictions. *See Xerox Corp. v. County of Orange,* 66 Cal.App.3d 746, 136 Cal.Rptr. 583, 591 (1977) ("The addition of taxes and freight charges to the list price ... is consistent with an appraisal approach that gives consideration to the consumer's cost in arriving at market value."); *see also State Dep't of Assessments & Taxation v. Metrovision of Prince George's County, Inc.,* 92 Md.App. 194, 607 A.2d 110, 119 (Spec.App.1992) ( "[C]ertain intangible expenses of tangible personal property may be included in the assessment of that property when using the cost method for valuation of personal property."); *Lionel Trains, Inc. v. Chesterfield Township,* 224 Mich.App. 350, 568 N.W.2d 685, 687 (1997) (deferring to Michigan Tax Tribunal's determination "that freight, sales tax, and installation could be appropriately included in the true cash value of personal property"); *but see Board of County Comm'rs of Leavenworth County v. McGraw Fertilizer Serv., Inc.,* 261 Kan. 901, 933 P.2d 698, 712 (1997) (sales tax cannot be included under Kansas constitu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tional provision requiring assessment at "retail cost when new").

We next consider whether Mazourek properly considered the section 193.011 factors. See § 194.301, Fla.Stat.(1997). On the basis of this record, we find that competent, substantial evidence supported the trial court's finding that Mazourek properly considered the section 193.011 factors. Morever, we find no error with the trial court's ratification of Mazourek's assessment of Wal-Mart's tangible personal property. See § 194.301, Fla.Stat.(1997)(where property appraiser properly considers the section 193.011 factors, "the taxpayer shall have the burden of proving by clear and convincing evidence that the appraiser's assessment is in excess of just value"). Accordingly, we conclude that the Fifth District Court of Appeal erred in reversing the assessments, and we quash the decision in *Mazourek.*[FN4]

> FN4. Because we quash the Fifth District Court of Appeal's decision in *Mazourek,* we do not need to address issues involving the purported new duties imposed upon property appraisers by the district court's opinion. With regard to Mazourek's counterclaim presented to the trial court, the district court reversed the trial court's judgment in favor of Mazourek on the counterclaim because Mazourek failed to exhaust his administrative remedies. *Mazourek,* 778 So.2d at 352. Neither party raised the counterclaim issue before this Court, and therefore we do not address the district court's decision on the counterclaim issue.

### CONCLUSION

We quash the decision of the Fifth District Court of Appeal in this matter and approve the Second District Court of Appeal's opinion in *Todora.* We remand with instructions that Mazourek's assessments of Wal-Mart's tangible personal property be affirmed.

It is so ordered.

SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
Fla.,2002.
Mazourek v. Wal-Mart Stores, Inc.
831 So.2d 85, 27 Fla. L. Weekly S570, 27 Fla. L. Weekly S761, 27 Fla. L. Weekly S979

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7.

Westlaw.

759 A.2d 360                                                    Page 1
334 N.J.Super. 305, 759 A.2d 360
(Cite as: 334 N.J.Super. 305, 759 A.2d 360)

C
Superior Court of New Jersey,
Law Division,
Bergen County.
S & D ENVIRONMENTAL SERVICES, INC. and
Edward McCracken, Plaintiffs,
v.
ROSENBERG RICH BAKER BERMAN & CO.,
P.A., Theodore S. Spritzer, Frank S. LaForgia and
Alan P. Levine, Defendants.
Decided Sept. 24, 1999.

Corporate taxpayer brought action against account-
ants to recover for failing to timely advise the tax-
payer to take steps to preserve its ability to employ
the cash method after reaching $5 million threshold
for mandatory use of accrual method. Accountant
moved for summary judgment. The Superior Court,
Bergen County, Yannotti, J.S.C., held that: (1) ac-
countants' bad advice was not actionable malprac-
tice, breach of contract, negligence, or fraud in light
of the taxpayer's statement on Form 3115 that it
kept an inventory and should always have used the
accrual method; (2) Consumer Fraud Act did not
apply; and (3) the bad advice was not a predicate
act of racketeering activity under the Racketeer In-
fluenced and Corrupt Organizations Act (RICO).

Motion granted.

West Headnotes

[1] Accountants 11A €══8

11A Accountants
    11Ak6 Contracts, Employment, and Compensa-
tion
        11Ak8 k. Performance of Contract; Duties
and Liabilities. Most Cited Cases
Accountants' alleged failure to timely advise cor-
porate taxpayer to take steps to preserve its ability
to employ the cash method of reporting income
after reaching $5 million threshold for mandatory
use of accrual method was not actionable malprac-

tice, breach of contract, negligence, or fraud in light
of the taxpayer's statement on Form 3115 that it
kept an inventory and should always have used the
accrual method. 26 U.S.C.A. § 448(b)(3).

[2] Estoppel 156 €══68(2)

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with
Previous Claim or Position in General. Most Cited
Cases
Judicial estoppel may be applied to prevent a party
from taking a position that contradicts a position
previously taken.

[3] Estoppel 156 €══68(2)

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with
Previous Claim or Position in General. Most Cited
Cases
The doctrine of judicial estoppel is intended to pre-
vent litigants from playing fast and loose with the
courts and assuming a position in one court entirely
different or inconsistent with that taken by him in
another court or proceeding with reference to the
same subject matter; its purpose is to protect the in-
tegrity of the judicial system.

[4] Estoppel 156 €══68(2)

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Pro-
ceedings
                156k68(2) k. Claim Inconsistent with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

759 A.2d 360
334 N.J.Super. 305, 759 A.2d 360
**(Cite as: 334 N.J.Super. 305, 759 A.2d 360)**

Page 2

Previous Claim or Position in General. Most Cited Cases
The doctrine of judicial estoppel may be applied where a party to a judicial proceeding asserts a position that contradicts a position previously taken in an administrative proceeding.

**[5] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim Inconsistent with Previous Claim or Position in General. Most Cited Cases
Corporate taxpayer's statement on Form 3115 that it kept an inventory and should always have used the accrual method judicially estopped it from claiming in a malpractice action that its accountants failed to timely advise the taxpayer to take steps to preserve its ability to employ the cash method of reporting income after reaching $5 million threshold for mandatory use of accrual method; even though the taxpayer explained the statement as a result of the malpractice, it was bound by the statement and its agreement with the Internal Revenue Service (IRS) in an attempt to avoid an audit.

**[6] Antitrust and Trade Regulation 29T ☞258**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(D) Particular Relationships
            29Tk254 Professionals
                29Tk258 k. Accountants and Tax Preparers. Most Cited Cases
    (Formerly 92Hk6 Consumer Protection)
Consumer Fraud Act did not apply to accountants' tax advice to corporation; the accountants gave the advice as professionals, and their advice did not pertain to any sale or transaction that covered by the Act. N.J.S.A. 56:8-1 et seq.

**[7] Antitrust and Trade Regulation 29T ☞128**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk126 Constitutional and Statutory Provisions
                29Tk128 k. Purpose and Construction in General. Most Cited Cases
    (Formerly 92Hk3 Consumer Protection)
The court's primary goal in construing the Consumer Fraud Act is to ascertain the Legislature's intent. N.J.S.A. 56:8-1 et seq.

**[8] Racketeer Influenced and Corrupt Organizations 319H ☞7**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk4 Racketeering or Criminal Activity
                319Hk7 k. Particular Acts. Most Cited Cases
Accountants' alleged acts of giving mistaken tax advice and preparing corporation's tax return using the wrong method of accounting (cash method, rather than accrual method) were not predicate acts of racketeering activity and, therefore, did not violate the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961(1).

**361*307 Jay I. Lazerowitz, Esq., Glennrock, Attorney for Plaintiffs.

Paul A. Carbon, Esq., Newark, (Morgan, Melhuish, Monahan, Arvidson, Abrutyn & Lisowski), Attorney for Defendants.


YANNOTTI, J.S.C.

Plaintiffs S & D Environmental Services, Inc. (S & D) and Edward McCracken, President of S & D, brought this action against the defendants Rosenberg Rich Baker Berman & Co., Theodore S.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

759 A.2d 360
334 N.J.Super. 305, 759 A.2d 360
(Cite as: 334 N.J.Super. 305, 759 A.2d 360)

Page 3

Spritzer, Frank S. LaForgia and Alvin P. Levine asserting claims of professional negligence, breach of contract, consumer fraud, common law negligence, common law fraud, *308 deceit, misrepresentation and violation of the Federal Racketeer Influenced **362 and Corrupt Organizations (RICO) Act, 18 U.S.C.A. §§ 1961-1968. Before the court is a motion by the defendants for summary judgment. For the reasons stated herein, the defendants' motion will be granted in its entirety and the complaint will be dismissed with prejudice.

I

The facts stated herein are drawn from the complaint and the evidentiary materials submitted on this motion. R. 4:46-2(c). For purposes of this motion, the court will consider the evidence and the inferences which may reasonably be drawn from same in a light most favorable to the plaintiff. Brill v. Guardian Life Ins. Co., 142 N.J. 520, 536, 666 A.2d 146 (1995).

The defendant Rosenberg Rich Baker Berman & Co. was retained by S & D in 1994 to provide general and specialized accounting services, including the preparation of federal tax returns. Defendants Spritzer, LaForgia and Levine are Rosenberg accountants who provided the services that form the basis for this action. Rosenberg and the individually named Rosenberg accountants will be referred to collectively as "Rosenberg" in this opinion. S & D claims that the federal tax advice provided to it by Rosenberg was erroneous and caused S & D to incur tax liabilities which could have been avoided had Rosenberg correctly advised it of its options and obligations under federal tax law.

The dispute concerns the manner in which S & D was required to report its income and expenditures for federal tax purposes. There are two methods of reporting-the cash method and the accrual method. If the cash method is employed, the taxpayer reports income when it is actually or constructively received, and reports expenditures when they are paid. When the accrual method is used, the taxpayer reports income in the year it is earned and the taxpayer reports expenses in the year in which the obligation to pay particular expenses arose.

*309 The federal tax code provides specific requirements for the use by corporations of the cash and accrual methods of accounting. As a general matter, a C-corporation may not employ the cash method. 26 U.S.C.A. § 448(a)(1). However, a C-corporation may use the cash method for its tax returns when the corporation's average annual gross receipts do not exceed $5 million for the three tax years prior to any current year. 26 U.S.C.A. § 448(b)(3). If the C-corporation's average annual gross receipts in the relevant three year period exceed $5 million, the corporation must convert from the cash method to the accrual method on the first day of the current tax year. See Litigation Support Report for S & D, prepared by Wilkin & Guttenplan, dated April 29, 1998, at 4. (hereinafter Wilkin Report).

An S-corporation is permitted to employ the cash method of accounting and is not subject to the $5 million gross receipts test in 26 U.S.C.A. § 448(b)(3). Any C-corporation that fails the $5 million test may elect to change to S-corporation status; however, this election must be made by the 15th day of the third month of the then current tax year. If the C-corporation converts to the status of an S-corporation, the corporation may continue to employ the cash method of accounting for tax purposes for the year in which the election is made and future tax years, unless the corporation is otherwise precluded from employing that method of accounting. Wilkin Report at 6.

According to S & D, the Internal Revenue Service (IRS) has taken the position that all corporations that have "inventory" must use the accrual method of accounting. The IRS's regulations require that inventories be kept "in all cases in which the purchase, or sale of merchandise is any kind of an income-producing        factor."        Regulation 1.446-1(a)(4)(i). A corporation which does not sell

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 4

"merchandise" but merely uses supplies in its business may use the cash method. Wilkin Report at 6-7.

**363 S & D further contends that under the Internal Revenue Code, when a taxpayer is required to change from the cash method to the accrual method, the taxpayer may make that change by filing *310 a Form 3115. The form must be filed no later than the date the corporation is required to file its tax return for the first year of the change. Wilkin Report at 5.

S & D reported its income on a cash basis from its inception as a corporate entity. Wilkin Report at 9. Although a C-Corporation, S & D claims it was permitted to employ the cash basis of accounting since its average annual gross receipts for any three tax years did not exceed $5 million. However, according to S & D, Rosenberg had information in November 1994 which indicated that S & D would not satisfy the $5 million gross receipts test. S & D contends that it was required by the Internal Revenue Code to use the accrual method of accounting for the tax year commencing on October 1, 1994 (the 1994 tax year), unless S & D elected S-corporation status. That election had to be made by December 15, 1994. Wilkin Report at 11.

S & D alleges that Rosenberg erred in its analysis of the relevant provisions of the federal tax law and failed to correctly advise S & D of its obligations and options for federal tax purposes. S & D's contentions are summarized in the report of its expert:

Rosenberg did not identify that S & D failed the IRC Section 448 "$5 million test" and did not advise S & D of its option of retaining their cash method of accounting by electing S-corporation status for the tax year beginning October 1, 1994. Rosenberg did not explain to S & D that it would be required to convert to the accrual method of accounting for the tax year beginning October 1, 1994, and that if S & D failed to convert to the accrual method of accounting, it would be violating U.S. tax law. Additionally, Rosenberg did not

inform S & D that in converting from the cash method of accounting to the accrual method of accounting, an adjustment to S & D's income to account for the difference between the cash method and the accrual method of accounting would be required by S & D for tax purposes over a four (4) year period under IRC Section 448(d)(7). [Wilkin Report at 11].

In or about December 1995, Rosenberg prepared S & D's tax returns for the 1994 tax year. Rosenberg prepared the return using the cash method. The return was signed by S & D's President and filed with the IRS. Wilkin Report at 14.

*311 At or about this same time, in December 1995, Rosenberg allegedly came to believe that S & D's average annual gross receipts for the three year period ending September 30, 1995 exceeded $5 million and that S & D would be required to change to the accrual method for the tax year which began October 1, 1995. (the 1995 tax year). Rosenberg suggested that S & D could covert to S-corporation status for the 1995 tax year.

S & D contends that this recommendation was a year too late. Wilkin Report at 21. Rosenberg raised the issue with S & D on the eve of the December 15 filing deadline for the election of S-corporation status. *Ibid.* Rosenberg advised S & D that the election of S-Corporation status would allow S & D to continue to file its tax returns employing the cash method of accounting. *Id.* at 25.

Rosenberg's recommendation prompted further discussions and analysis by S & D. S & D thereupon sought other advice concerning its tax options. S & D maintains that it then became clear that it could not employ the cash method on the tax return for the 1994 tax year because it had failed the $5 million gross receipts test and had not elected S-corporation status by December 15, 1994. Thus, according to S & D, although it could elect S-corporation status in December 1995, that election would allow it to employ the cash method on a going-forward basis but would not shield it **364

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

759 A.2d 360
334 N.J.Super. 305, 759 A.2d 360
(Cite as: 334 N.J.Super. 305, 759 A.2d 360)

Page 5

from potential tax liabilities for the 1994 year since its return did not employ the correct method of accounting. Wilkin Report at 29.

S & D retained Wilkin & Guttenplan to assist it with the tax issues it was facing. Wilkin provided S & D with a series of options to consider. Wilkin recommended that S & D volunteer to the IRS that S & D had "inventory" and adopt the accrual method of accounting for the tax year commencing October 1, 1995. Wilkin advised that by voluntarily coming forward to the IRS to correct an "erroneous" method of accounting, S & D would receive audit protection because the IRS would not be permitted to look *312 to a taxpayer's prior period and change the taxpayer's accounting method for that period. Wilkin Report at 33.

However, in order to qualify for such audit protection, the taxpayer must have employed the "erroneous" methodology for at least two years. S & D could not rely upon the taxpayer's failure to meet the $5 million test for purposes of the 1994 tax year because S & D had only employed the cash method based on that "error" for a single year. Wilkin recommended that S & D take the position that it had "inventory" in order to get audit protection because the use of the cash method based on that analysis meant that it had erroneously filed its tax returns on the cash method for more than the two years.

S & D maintains that it could have validly taken the position that it had "supplies" not "inventory," a position that would have allowed it to employ the cash method of accounting if it elected S-corporation status. But S & D opted to take the position that it had "inventory" and was required to employ the accrual method. S & D contends that this option was selected to avoid the potential of an IRS audit for the 1994 tax year, which could have resulted in a $1.4 million increase in its income for that year. Wilkin Report at 33.

On or about March 28, 1996, Wilkin filed with the IRS the Form 3115 for and on behalf of S & D. The

Form stated that S & D was voluntarily seeking approval of a change from the cash method to the accrual method of accounting. S & D stated in the application that it was a contractor engaged in the environmental services business and maintained an "inventory" of certain merchandise which S & D sold in connection with the provision of its services. The average annual cost of the merchandise exceeded $300,000 in the period from 1990-1995 and, therefore, was said to be "an income producing factor." Because the relevant IRS regulations require that the accrual method of accounting be employed when it is necessary to use an inventory, the application concluded, "[T]he taxpayer should have been using the accrual method of accounting since inception." The application was signed under *313 "penalties of perjury." The application was executed by Edward Wilkin of Wilkin & Gutterplan as representative of S & D. Exhibit D to Certification of Paul A. Carbon (Carbon Certification).

In January 1997, the IRS issued a letter ruling granting S & D's request to change its method of accounting. The IRS required S & D to execute a "Consent Agreement" which stated that the application was approved based on the facts presented and the representations made by the taxpayer. The IRS ruling contains a section called "Facts and Representations" which includes the fact that S & D maintained an inventory of merchandise for sale as part of its package of services. Exhibit F to Carbon Certification. Plaintiff Edward McCracken of S & D executed the consent agreement on March 4, 1997. *Ibid.*

S & D contends that since it elected to employ the accrual method of accounting it has paid a greater amount of taxes than would have been the case had it continued to employ the cash method. Its expert has calculated this difference to be $441,500. Wilkin Report at 44.

## **365 II

[1]  Rosenberg argues that summary judgment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

should be granted in its favor on Counts One (Accounting Malpractice), Two (Breach of Contract), Four (Common Law Negligence), Five (Common Law Fraud), Six (Misrepresentation), Seven (Deceit) and Nine (Punitive Damages) of the Complaint. These separately stated causes of action are based on the allegation that Rosenberg failed to take actions and render advice that would have allowed S & D to continue to employ the cash method of accounting for tax purposes. Rosenberg contends that claims based on this assertion cannot stand in light of S & D's statements on the Form 3115 that S & D had "inventory" and was required to employ the accrual method of accounting for tax purposes from its inception as a corporate entity.

In the court's opinion, the statements made by S & D on the Form 3115 warrant the entry of summary judgment in favor of *314 Rosenberg and the Rosenberg accountants on Counts One, Two, Four, Five, Six, Seven and Nine of the Complaint. The statements in the Form 3115 are wholly inconsistent with the key assertion advanced in this matter, specifically the assertion that Rosenberg committed professional malpractice and other actionable wrongs by failing to advise S & D in December of 1994 to take steps to preserve its ability to employ the cash method. S & D insists the advice rendered did not measure up to generally accepted professional standards even though it asserted in the Form 3115, under penalty of perjury, that it should have employed the accrual method of accounting from its inception as a corporation. This patent inconsistency thoroughly undermines the foundation of S & D's claims in this action and requires their dismissal.

[2][3] The inconsistency between the positions asserted in the Form 3115 and in this case also calls for the application of judicial estoppel. Judicial estoppel may be applied to prevent a party from taking a position that contradicts a position previously taken. *State, Department of Law & Public Safety v. Gonzalez,* 142 *N.J.* 618, 632, 667 *A.*2d 684 (1995). The doctrine is intended to prevent litigants from

"playing fast and loose with the courts" and assuming "a position in one court entirely different or inconsistent with that taken by him in another court or proceeding with reference to the same subject matter." *Levin v. Robinson, Wayne & LaSala,* 246 *N.J.Super.* 167, 178, 586 *A.*2d 1348 (Law Div.1990). The purpose of the doctrine is to protect the integrity of the judicial system. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 *F.*3d 355, 359 (3d Cir.1996). *See also EF Operating Corp. v. American Buildings,* 993 *F.*2d 1046, 1050 (3d Cir.), *certiorari denied,* 510 *U.S.* 868, 114 *S.Ct.* 193, 126 *L.Ed.*2d 151 (1993) ("It goes without saying that one cannot casually cast aside representations, oral or written, in the course of litigation, simply because it is convenient to do so.").

[4] The doctrine may be applied where, as here, a party to a judicial proceeding asserts a position that contradicts a position previously taken in an administrative proceeding. In *315McNemar v. Disney Store, Inc.,* 91 *F.*3d 610 (3d Cir.1996), the court applied judicial estoppel to bar an individual from asserting a claim under the Americans with Disabilities Act, the New Jersey Law Against Discrimination and certain other laws, claiming that he was a qualified individual with a disability because the litigant had previously represented to state and federal government agencies that he was totally disabled an unable to work. The court rejected the contention that the prior representations had to be made in judicial proceedings and determined that representations made to administrative agencies could form the basis for application of judicial estoppel. *See also Morton International Inc. v. General Acc. Ins. Co. of America,* 134 *N.J.* 1, 73-76, 629 *A.*2d 831 (1993) (insurance industry estopped from asserting a position in litigation that contradicts representations **366 made to Commissioner of Insurance concerning effect of certain policy exclusions).

[5] In this case, S & D is endeavoring to cast aside the position it previously took with the IRS. S & D asserted without qualification that it was required to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

759 A.2d 360
334 N.J.Super. 305, 759 A.2d 360
(Cite as: 334 N.J.Super. 305, 759 A.2d 360)

employ the accrual method of accounting on its tax returns from its inception as a corporation. It was able to avoid an assessment of additional taxes due to those statements. S & D has taken a contrary position in this matter. It argues that it could lawfully have employed the cash method of accounting for tax purposes and, further, that Rosenberg erred by failing to advise it to take steps to preserve its ability to file returns on the cash basis. The doctrine of judicial estoppel is intended to preclude a party from taking such patently inconsistent positions.

S & D maintains, however, that any inconsistency between the statements in the Form 3115 and its position in this case can be fully explained. S & D avers that it could have validly taken the position that it did not have "inventories," within the meaning of the relevant IRS regulations, and could have continued to employ the cash method of accounting as an S-Corporation. S & D claims it elected to file the Form 3115 to limit the potential for an audit and assessment on the return for the 1994 tax year which was *316 erroneously prepared by Rosenberg using the cash method. To obtain audit protection, S & D was required to make statements and representations that bound it to employ the accrual method of accounting for future tax years. S & D says that but for Rosenberg's erroneous advice and the potential for an assessment for the 1994 tax year due to that erroneous advice, S & D could validly have continued to employ the cash method.

These contentions are unavailing. The short answer to S & D's assertions is that it made its choice by filing the Form 3115 wherein it bound itself to employ the accrual method of accounting. S & D stated unequivocally under penalty of perjury that it had "inventories" and should have been filing its returns using the accrual method from the start of its corporate existence. The IRS approved the change in accounting methods based on those statements and representations. S & D signed a Consent Agreement with the IRS which explicitly stated that the application was approved based on the facts as stated by S & D in its application.

S & D surely is required to adhere to that agreement in any federal tax return filed with the IRS. S & D should be held to those same facts and representations in this action. It took the position that it was required to employ the accrual method from the inception of its corporate existence. It will not be permitted to pursue a cause of action against Rosenberg in this court on the theory that it was legally permitted to use the cash method.

It should be added that if S & D reasonably believed, as it contends in this matter, that it could lawfully employ the cash method of accounting for tax purposes, it could have elected S-corporation status and retained the ability to use the cash method for the 1995 tax year and future tax years. S & D could then have sought relief in this action for any additional taxes it may have been required to pay on the 1994 tax return due to some error or omission on Rosenberg's part in the preparation of that return.

But S & D did not follow that course. It chose to file the Form 3115 and assert in that filing that it was legally required to employ the accrual method of accounting and had been so required since it *317 began as a corporation. By doing so, it secured the benefits of avoiding an assessment of additional taxes on the 1994 tax return. S & D now wishes to cast aside those sworn statements and advance an inconsistent theory in this action. Were the court to allow this, it would be permitting S & D to pursue a cause of action that is based on a theory wholly at variance with statements made by S & D to the IRS under penalty **367 of perjury. Judicial estoppel will be applied to preclude S & D from doing so.

Therefore, the defendants' motion for summary judgment on Counts One, Two, Four, Five, Six, Seven and Nine of the Complaint shall be granted.

III

[6] Rosenberg also moves for Summary Judgment

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

on Count Three of the Complaint, in which S & D alleges a violation of the Consumer Fraud Act, *N.J.S.A.* 56:8-1 *et seq.* Rosenberg maintains that the Act does not apply to representations made in the course of the provision of professional services. For the reasons that follow, Rosenberg's motion will be granted.

[7] The court's primary goal in construing the Consumer Fraud Act is to ascertain the Legislature's intent. *State v. Gonzalez,* 142 *N.J.* 618, 627, 667 *A.2d* 684 (1995). The starting point of that analysis is the language of the statute. *State v. Kittrell,* 145 *N.J.* 112, 122-23, 678 *A.2d* 209 (1996). The Act declares that the use or employment of unconscionable commercial practices, deceptions, frauds, false promises, misrepresentations or the knowing concealment of a material fact in connection with the sale of merchandise or real estate is an unlawful act. *N.J.S.A.* 56:8-2. Our Supreme Court has stated that the Act was designed to "prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate." *Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 372, 376-77, 371 *A.2d* 13 (1977).

\*318 In *Neveroski v. Blair,* 141 *N.J.Super.* 365, 358 *A.2d* 473 (App.Div.1976), the court held that the Consumer Fraud Act did not apply to services provided by real estate brokers. The court determined that "the entire thrust" of the Act is addressed to the sale of products and services to consumers "in the popular sense." *Id.* at 378, 358 *A.2d* 473. In the court's view, a real estate broker is "in a far different category from the purveyors of products or services or other activities." *Id.* at 379, 358 *A.2d* 473. Although not considered to be on the "same plane" as other professionals, such as lawyers or accountants, a real estate broker was considered to be "something beyond the ordinary commercial seller of goods or services." *Ibid.* The court added that it would be "ludicrous" to interpret the Act to apply to any of the "learned professions" since the nature of the services involved does not fall "into

the category of consumerism." *Ibid.*

In *Vort v. Hollander,* 257 *N.J.Super.* 56, 62, 607 *A.2d* 1339 (App.Div.), *certif. denied,* 130 *N.J.* 599, 617 *A.2d* 1221 (1992), the court considered whether the Act applied to professional services rendered by attorneys with regard to their clients' rights as owners of real estate. The court found that the Act was inapplicable. The court noted that although the Legislature had amended the law in 1975 to cover services provided by real estate brokers, the Legislature had not specifically applied the Act to professional services generally. Furthermore, as the court pointed out, the practice of law in New Jersey is regulated by the Supreme Court. The court added, "Had the Legislature intended to enter the area of attorney regulation it surely would have stated with specificity that attorneys were covered under the Consumer Fraud Act." *Vort,* 257 *N.J.Super.* at 62, 607 *A.2d* 1339.

The *Neveroski* and *Vort* decisions thus make clear that the Act does not apply to claims based on allegations that a member of a regulated profession provided negligent or wrongful advice. The Act has been amended to permit claims to be stated against real estate brokers but it has not been amended to cover claims against attorneys or other regulated professionals, such as accountants. \*319 Thus, the Act does not apply to the claims stated against Rosenberg and its accountants in this action.

\*\*368 The plaintiffs rely upon *Gilmore v. Berg,* 761 *F.Supp.* 358 (D.N.J.1991), and *Blatterfein v. Larken Associates et als.,* 323 *N.J.Super.* 167, 732 *A.2d* 555 (App.Div.1999), in support of their contention that the alleged wrongful advice by Rosenberg in this matter may form the basis for a claim under the Consumer Fraud Act. Neither case supports plaintiffs' contentions.

The *Gilmore* case was brought by two individuals who had purchased unregistered securities in a limited partnership. The partnership acquired certain commercial properties from a bankrupt entity for $2.5 million, and on the same day resold the prop-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 9

erties for greater sums. The plaintiffs claimed that these transactions were intended to diminish the value of their investments and made it unlikely that they would realize the profits and appreciation they expected when they purchased their shares in the limited partnership. One of the defendants was an accountant who reviewed financial projections of the limited partnership and signed a forecast letter included in the offering statement. In the letter, the accountant stated that the assumptions and rationale underlying the projected financial statements were reasonable. *Gilmore v. Berg,* 761 *F.Supp.* at 363. The federal district court denied the motion to dismiss the count alleging violations of the Consumer Fraud Act. The court found that the complaint contained facts alleging fraud in the sale of real estate, which sales are specifically covered by the Act.

A similar result was reached by the court in *Blatterfein v. Larken Associates, et als., supra,* where the court determined that a cause of action could be stated under the Act against the defendant architect by purchasers of custom designed homes. The court emphasized that the Act specifically covered real estate transactions. Plaintiffs' claims were not addressed to the specialized quality of the professional services provided by the defendant architect but were instead based on claims that the architect made false representations "of a rather commonplace variety" concerning*320 the building materials to be used to construct the homes, representations that were designed to induce the purchase of the homes by the plaintiffs. Such representations, bearing upon a transaction explicitly covered by the Act, fall within the actions or practices prohibited by the Act. *Blatterfein,* 323 *N.J.Super.* at 182-83, 732 *A.*2d 555.

Thus, both *Gilmore* and *Blatterfein* hold that the Consumer Fraud Act may be applied to certain professionals when their alleged wrongful actions are taken in connection with the sale of real estate. The Appellate Division in *Blatterfein* stated that the court's comment in *Neveroski* that those in the regulated professions are not subject to liability under

the Act "was premised on the recondite qualities of professional services." 323 *N.J.Super.* at 179, 732 *A.*2d 555. The *Blatterfein* case involved the architect's involvement in a scheme to market and sell properties and did not involve plaintiffs' rights as clients of a "learned professional" regulated under a scheme of professional or occupational licensure. *Id.* at 182, 732 *A.*2d 555. Similarly, as the *Blatterfein* court noted, the activities in *Gilmore* were deemed covered by the Act because the activities were "instrumental in a dubious sale of real estate." *Id.* at 180, 732 *A.*2d 555.

Since the *Neveroski* and *Vort* decisions concluded that the Consumer Fraud Act did not apply to the actions of "learned professionals," the Legislature has not seen fit to amend the Act to cover those actions. The courts have, however, permitted actions to proceed when the alleged wrongful conduct by professionals did not involve plaintiff's rights as clients of any professional but instead were linked to and were instrumental in a transaction covered by the Act. In the absence of such a factual link, a claim pertaining to a client's rights as a client of a learned professional is outside of the purview of the Act.

This case falls on the *Neveroski* and *Vort* side of the line. It involves claims **369 related to Rosenberg's actions in providing tax advice to plaintiffs. Accountants are professionals regulated under a scheme of professional licensure. See *N.J.S.A.* 45:2B-42, *et seq.*321 (regulation of accountants by New Jersey State Board of Accountancy). The advice at issue in this case did not pertain to any sale or transaction that is covered by the Consumer Fraud Act.

Accordingly, the defendants' motion for summary judgment will be granted and plaintiffs' claims for relief under the Consumer Fraud Act will be dismissed.

IV

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[8] Finally, Rosenberg moves for summary judgment on Count Eight in which the plaintiffs assert claims under the federal RICO statute. Plaintiffs claim that two or more of the defendants engaged in a pattern of rendering accounting and tax advice that was illegal and in contravention of the federal tax laws and, further, engaged in a conspiracy to prevent the plaintiff from learning "the truth of these laws." Complaint, Count Eight, paragraphs (a)(b). The plaintiffs further allege that defendants engaged in a conspiracy and encouraged S & D "to file documents with the Internal Revenue Service that would have been illegal." *Id.,* paragraph (c).

The federal RICO statute makes it unlawful "for any person employed by or associated with an enterprise" to conduct or participate, directly or indirectly, "in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 *U.S.C.A.* § 1962(c). The acts which qualify are set forth in 18 *U.S.C.A.* § 1961(1) and include acts chargeable under certain state and federal criminal laws, including mail and wire fraud. The alleged acts of "racketeering" must be related and must establish a threat of continued "racketeering activity." *H.J. Inc. et al. v. Northwestern Bell Telephone Co.,* 492 *U.S.* 229, 109 *S.Ct.* 2893, 106 *L.Ed.*2d 195 (1989).

The substance of plaintiffs' RICO allegations is set forth in the brief submitted on their behalf in opposition to the motion for summary judgment. Plaintiffs contend that the defendants operate an accounting firm which is alleged to be a separate entity for *322 RICO purposes. Plaintiffs further state that defendants engaged in the preparation of tax returns, which are sent through the mails to the IRS. Defendants charge for their services and the conduct complained of, according to plaintiffs, "involved repeated instances of preparation of tax returns, and other documents, which were false." Brief of Plaintiffs, in Opposition to the Motion for Summary Judgment.

The defendants have moved for summary judgment asserting that a cause of action cannot be stated

against them under RICO since they did not participate in "the operation and management" of S & D, citing *Reves v. Ernst & Young,* 507 *U.S.* 170, 113 *S.Ct.* 1163, 122 *L.Ed.*2d 525 (1993). The defendants also contend that the plaintiffs have failed to allege facts that constitute a "pattern of racketeering activity." The court agrees with the defendants that the facts alleged in this action do not add up to a "pattern of racketeering activity" under the federal RICO law.

The plaintiffs have alleged that the Rosenberg accountants blundered in their advice and that a tax return was prepared that employed the wrong method of accounting. Although the plaintiffs contend that the Rosenberg accountants knew or should have known that their advice was wrong and the tax return was "false," it has not come forward with sufficient facts to show that the actions complained of rise to the level of culpability required to state a cause of action under the federal RICO law. Simply stated, the giving of mistaken tax advice and the preparation of a tax return using the wrong method of accounting are not predicate acts of "racketeering activity" as defined in 18 *U.S.C.A.* § 1961(1).

**370 Therefore, the court will grant the defendants' motion for summary judgment on Count Eight of the Complaint.

IV

For the reasons stated herein, defendants' motion for summary judgment will be granted in its entirety and the complaint shall be dismissed with prejudice.

N.J.Super.L.,1999.
S & D Environmental Services, Inc. v. Rosenberg Rich Baker Berman & Co., P.A.
334 N.J.Super. 305, 759 A.2d 360

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

8.

Westlaw.

632 So.2d 272
632 So.2d 272, 19 Fla. L. Weekly D406
**(Cite as: 632 So.2d 272)**

Page 1

**H**

District Court of Appeal of Florida,
Fourth District.

SOUTHERN BELL TELEPHONE AND TELE-
GRAPH COMPANY, Appellants/Cross-Appellees,
v.
William MARKHAM, as Property Appraiser of
Broward County, Appellee/Cross-Appellant,
and
Broward County, a political subdivision of the State
of Florida, and Joseph Rosenhagen, as Broward
County Revenue Collector, Appellees.
**No. 92-3433.**

Feb. 23, 1994.

The Circuit Court, Broward County, C. Lavon
Ward, J., entered judgment approving assessed
value placed on operating personal property of tele-
phone utility. Utility appealed. The District Court
of Appeal, Stevenson, J., held that: (1) valuation
was appropriate, even though utility claimed that
property had been purchased with federal deferred
income tax funds and that utility would not be able
earn return on property for ratemaking purposes,
and (2) utility had failed to show that its property
was assessed at a higher ratio of assessed value to
market value than that applied to other taxpayers
generally.

Affirmed.

West Headnotes

**[1] Taxation 371 ☜2699(7)**

371 Taxation
371III Property Taxes
371III(H) Levy and Assessment
371III(H)10 Judicial Review or Interven-
tion
371k2691 Review of Board by Courts
371k2699 Proceedings for Review

and Parties
371k2699(6) Scope and Extent
of Review
371k2699(7) k. In General.
Most Cited Cases
(Formerly 371k493.8)
Trial court is bound to uphold property appraiser's
administrative determination of value, for ad valor-
em taxation purposes, if it is lawfully arrived at and
within range of reasonable appraisals, i.e., if it is
supported by any reasonable hypothesis of legality,
even if another method is superior.

**[2] Taxation 371 ☜2704**

371 Taxation
371III Property Taxes
371III(H) Levy and Assessment
371III(H)10 Judicial Review or Interven-
tion
371k2700 Further Judicial Review
371k2704 k. Scope of Review.
Most Cited Cases
(Formerly 371k493.8, 371k493.7(3))
On appellate review, trial court's findings of fact
and conclusions of law, regarding property ap-
praisers administrative determination of value in ad
valorem taxation case, are presumptively correct
and should not be overturned unless clearly erro-
neous.

**[3] Taxation 371 ☜2529**

371 Taxation
371III Property Taxes
371III(H) Levy and Assessment
371III(H)5 Valuation of Property
371k2529 k. Personal Property in Gen-
eral. Most Cited Cases
(Formerly 371k375(1))
Assessment of utility's personal property, for ad
valorem tax purposes, would be upheld, even
though utility claimed that property in question had
been purchased with funds from federal deferred in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

632 So.2d 272
632 So.2d 272, 19 Fla. L. Weekly D406
**(Cite as: 632 So.2d 272)**

Page 2

come tax on which it would ultimately not be al-
lowed to earn return for ratemaking purposes; ap-
praiser had considered point, and decided upon
valuation after considering requisite statutory
factors. West's F.S.A. § 193.011.

**[4] Taxation 371 ☞2127**

371 Taxation
    371III Property Taxes
        371III(B) Laws and Regulation
            371III(B)4 Constitutional Regulation and
Restrictions Concerning Equality and Uniformity
                371k2127 k. Discrimination as to Rate
or Amount. Most Cited Cases
        (Formerly 371k40(7))
Constitutional rights of taxpayer are infringed if his
property is assessed at percentage of value substan-
tially higher than percentage in which all other
property in county in generally assessed. U.S.C.A.
Const.Amend. 14.

**[5] Taxation 371 ☞2676**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)8 Review, Correction, or Setting
Aside of Assessment in General
                371k2676 k. Hearing. Most Cited Cases
        (Formerly 371k486)
Although "sales assessment ratio" studies, under
which scientific comparison is made of assessments
of properties with sale prices of statistically reliable
sample of properties that are actually sold in taxing
jurisdiction, are recognized as valid means of de-
termining assessment levels, whether study is prop-
erly designed and conducted is question of fact to
be gleaned from evidence.

**[6] Taxation 371 ☞2728**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment

                371III(H)11 Evidence in General
                    371k2724 Weight and Sufficiency of
Evidence
                        371k2728 k. Valuation. Most Cited
Cases
        (Formerly 371k375(1))
"Sales assessment ratio" study, submitted by utility
taxpayer opposing valuation of its personal prop-
erty for ad valorem tax purposes, which compared
assessments on its property with sales prices of
sample of properties actually sold in taxing juris-
diction, was fatally flawed and unreliable; among
other deficiencies, sales were not verified, study
contained insufficient number of commercial or in-
dustrial properties, and study included property
sold as much as six months after assessment date.
*273 James W. McBride and Anne M. Stolle of
Heiskell, Donelson, Bearman, Adams, Williams &
Kirsch, Washington, DC, Harris R. Anthony of
BellSouth Telecommunications, Inc., Miami, Peter
Forman of Gustafson, Stephens, Ferris, Forman &
Knight, P.A., Fort Lauderdale, and Richard W. Bell
of BellSouth Corp., Atlanta, GA, for appellants/
cross-appellees.

Gaylord A. Wood, Jr. of Wood & Stuart, P.A., Fort
Lauderdale, for appellee/cross-appellant William
Markham.

Robert A. Butterworth, Atty. Gen., Lee R. Rohe
and Ralph R. Jaeger, Asst. Attys. Gen., Tallahassee,
for appellee Dept. of Revenue, State of Fla.


STEVENSON, Judge.

Southern Bell Telephone and Telegraph Company
("Southern Bell"), appeals a final judgment approv-
ing the assessed value placed on its operating per-
sonal property for ad valorem tax purposes by the
Broward County property appraiser ("property ap-
praiser"). Southern Bell alleges that (1) the value
placed on its operating personal property by the
property appraiser for the 1989 tax year was ex-
cessive and, (2) that the property appraiser system-
atically failed to equalize the assessment of its op-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

erating property with that of other taxpayers in Broward County, thereby discriminating against Southern Bell in violation of equal protection under the United States constitution. Because this second claim posed a constitutional challenge to the assessment, the Florida Department of Revenue was joined as a party defendant pursuant to Section 194.181(5), Florida Statutes. We affirm the judgment of the trial court.

## *274 Valuation

After hearing five days of testimony from various expert witnesses, the trial court determined that the market value of Southern Bell's tangible personal property located in Broward County was properly assessed at $708,813,000.00. Southern Bell argues that the value placed on the property by the property appraiser was much higher than market value. Southern Bell's challenge to the value at which the property appraiser assessed its property focuses chiefly on the appraiser's alleged failure to recognize the effects of rate regulation on the market value of the property. Southern Bell contends that the ratemaking process is at the heart of valuation for a regulated public utility because ratemaking controls earnings. Southern Bell is only permitted to earn a return on rate base. Simply stated, rate base for a public utility is the net book cost (original costs less book depreciation) of properties used for intrastate and interstate services minus accumulated deferred federal income taxes [FN1].

> FN1. The accumulation of capital from deferred federal income taxes result because the IRS allows Southern Bell, for income tax purposes, to write off an accelerated amount of depreciation in the early years of an asset's life. Thus, the company pays less taxes, increases its cash flow and can utilize the funds to purchase tangible personal property. Of course, the company may eventually have to pay the balance of these taxes to the government.

In short, Southern Bell argues that its personal property purchased with federal deferred income taxes should not be taxed because it is not allowed to earn a return on such property. To the contrary, the property appraiser maintains that the personal property of Southern Bell must be assessed in fee simple even though it may have been purchased with a source of funds on which the owner cannot earn a return.

[1][2] Southern Bell's burden in this appeal is heavy. The trial court is bound to uphold a property appraiser's administrative determination of value if it is lawfully arrived at and within the range of reasonable appraisals, i.e., "if it is supported by any reasonable hypothesis of legality, even if another method is superior." *Blake v. Xerox Corp.,* 447 So.2d 1348, 1350 (Fla.1984). On appellate review, a trial court's findings of fact and conclusions of law are presumptively correct and should not be overturned unless clearly erroneous. *Florida E. Coast Ry. Co. v. Dep't of Revenue,* 620 So.2d 1051 (Fla. 1st DCA), *rev. denied,* 629 So.2d 132 (Fla.1993).

[3] The property appraiser's valuation, accepted by the trial court, is supported by competent expert testimony. The property appraiser's expert (a university professor emeritus who has taught extensively in the field of corporate finance including valuation of businesses) opined that net book cost of a regulated utility, plus deferred taxes if excluded from base rate, is its most appropriate valuation. He estimated that approximately 20% of Southern Bell's property is purchased with deferred taxes. Ratepayers receive the benefit of this financing structure through telephone service at a lower cost. Thus, the expert concluded that the customers have a property interest in the company through their deferred taxes because a certain part of the company's facilities are bought with these deferred taxes.

In *Valencia Center, Inc. v. Bystrom,* 543 So.2d 214 (Fla.1989), the court stated that:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

632 So.2d 272
632 So.2d 272, 19 Fla. L. Weekly D406
(Cite as: 632 So.2d 272)

Page 4

[T]he just valuation at which property must be assessed under the constitution and section 193.011 is synonymous with fair market value.... In arriving at fair market value, the assessor must consider, but not necessarily use, each of the factors set out in section 193.011. The particular method of valuation, and the weight to be given each factor, is left to the discretion of the assessor....FN2

> FN2. **193.011 Factors to consider in deriving just valuation.**-In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:
>
> (1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;
>
> (2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property....
>
> (3) The location of said property;
>
> (4) The quantity or size of said property;
>
> (5) The cost of said property and the present replacement value of any improvements thereon;
>
> (6) The condition of said property;
>
> (7) The income from said property; and
>
> (8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual costs and reasonable fees and costs of the sale....

*275 There, the court rejected the property owners'

attempt to have the assessments on its property reduced because more lucrative development of the property was restricted by a below market lease. The Florida Supreme Court reaffirmed "the general rule that in the levy of property tax the assessed value must represent all interests in the land" despite the existence of a mortgage, lease or sublease of the property. *Id.* at 217.

Similarly, in *Century Village v. Walker,* 449 So.2d 378 (Fla. 4th DCA), *rev. denied,* 458 So.2d 271 (Fla.1984), the owner of a shopping center was dissatisfied with the ad valorem tax assessment levied because many of its tenants' leases were well below the current market value for leased commercial space. This court approved the assessment, even though in determining value the property appraiser considered the actual income produced by the tenants as well as the rental value of the property unencumbered by the leases. The court, relying on *Department of Revenue v. Morganwoods Greentree, Inc.,* 341 So.2d 756 (Fla.1976), noted that the effect of an encumbrance will not per se reduce the assessment value of property, but nevertheless becomes one of the many factors the assessor must consider in determining the value of the property to be taxed.

In *Robbins v. Summit Apartments, Ltd.,* 586 So.2d 1068 (Fla. 3d DCA), *rev. denied,* 592 So.2d 682 (Fla.1991), the court held that a taxpayer had to pay an assessment based on the fair market value of the property even though HUD restrictions limited the income derived on the property. There, the subject property was a 237-unit apartment which was regulated by HUD and rent controlled. In approving the valuation method of the property appraiser, the court stated that:

[T]he valuation given by the taxpayer's expert failed to represent all of the interests in the property and failed to value the property as though the taxpayer possessed the property in fee simple. The appraiser's valuation, on the other hand, was properly based upon the fair market value of the unencumbered fee. *Id.* at 1069.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

632 So.2d 272
632 So.2d 272, 19 Fla. L. Weekly D406
**(Cite as: 632 So.2d 272)**

Page 5

In the instant case, there is no evidence that the property appraiser failed to consider all of the statutory factors enumerated in section 193.011, Florida Statutes. Indeed, the effects of rate regulation on Southern Bell's property is analogous to the below market leases encumbering the properties in *Valencia* and *Century Village* and the HUD restrictions encumbering the property in *Robbins*. In each of these situations the property appraiser considered the effects of the encumbrances on the property, but properly concluded that on balance with the many other factors under consideration, the encumbrances were not so genuinely disadvantageous as to diminish the overall fair value of the property. Based on such an analysis, and in view of the expert testimony in this record, Southern Bell has failed to show that the property appraiser did not follow the requirements of law or that the assessed value was not supported by a reasonable hypothesis of legality. *See Blake v. Xerox; Robbins; Bath Club, Inc. v. Dade County,* 394 So.2d 110 (Fla.1981); *Straughn v. Tuck,* 354 So.2d 368 (Fla.1977).

### Equalization

[4] Southern Bell maintains that its taxable personal property in Broward County was assessed at more than 100 percent of market value and at a higher ratio of assessed value to market value than that applied to other taxpayers generally. Southern Bell insists that by refusing to assess it at the same level as other Broward County taxpayers, the property appraiser singled it out for discriminatory treatment. "[T]he constitutional rights of a taxpayer are infringed if his property is assessed at a percentage of value substantially higher than the percentage at which all other property in the county is generally assessed...." *Deltona Corp. v. Bailey,* 336 So.2d 1163, 1168 (Fla.1976).

**\*276** [5][6] In order to determine the ratio of assessment to market value of other property in Broward County generally, Southern Bell performed a sales assessment ratio study. A sales assessment ratio study is a scientific comparison of

the assessments of properties with the sales prices of a statistically reliable sample of properties that are actually sold in the taxing jurisdiction. Sales ratio studies are recognized as a valid means of determining assessment levels, but whether the study is properly designed and conducted is a question of fact to be gleaned from the evidence. *Southern Bell Tel. & Tel. v. County of Dade,* 275 So.2d 4 (Fla.1973). The property appraiser in the proceedings below established that the sales assessment ratio study presented by Southern Bell was fatally flawed and unreliable. Among other deficiencies, sales were not verified, the study contained an insufficient number of commercial or industrial properties and the study included property sold as much as six months *after* the assessment date of January 1, 1989. In view of the evidence presented below, the trial court did not err in concluding that Southern Bell failed to meet its burden of affirmatively establishing that it is entitled to a further reduction based on equal protection. *See Deltona.*

Lastly, we have considered the matters raised in the cross-appeal and find them to be without merit. Accordingly, the judgment of the trial court is affirmed.

DELL, C.J., and POLEN, J., concur.
Fla.App. 4 Dist.,1994.
Southern Bell Tel. and Tel. Co. v. Markham
632 So.2d 272, 19 Fla. L. Weekly D406

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

9.

Westlaw.

767 So.2d 494
767 So.2d 494, 25 Fla. L. Weekly D1278
**(Cite as: 767 So.2d 494)**

▷

District Court of Appeal of Florida,
Second District.
Rob TURNER, as Hillsborough County Property
Appraiser; and Larry Fuchs, as Executive Director
of the Florida Department of Revenue, Appellants,
v.
TOKAI FINANCIAL SERVICES, INC., d/b/a Master Lease, Appellee.
**No. 2D99-1857.**

May 24, 2000.

Taxpayer brought action against county property appraiser and executive director of Florida Department of Revenue, challenging tax assessment of tangible personal property. The Circuit Court, Hillsborough County, Manuel Menendez, Jr., J., reduced assessment. Appraiser and director appealed. The District Court of Appeal, Parker, Acting C.J., held that: (1) appraiser was not required to deduct costs of sale from market value of property, but (2) sections of property valuation statute which required appraiser to consider property's present cash value and net proceeds of sale of property did not only apply to valuations of real property.

Reversed and remanded.

West Headnotes

**[1] Amicus Curiae 27 ⟜3**

27 Amicus Curiae
    27k3 k. Powers, Functions, and Proceedings.
Most Cited Cases
Issue raised by amici on appeal, but not by parties to appeal, was not properly before appellate court, since amici lack standing to raise issues not raised by parties.

**[2] Taxation 371 ⟜2529**

371 Taxation

371III Property Taxes
    371III(H) Levy and Assessment
        371III(H)5 Valuation of Property
            371k2529 k. Personal Property in General. Most Cited Cases
    (Formerly 371k350)
Property appraiser can make deduction for costs of sale when determining fair market value of personal property for tax purposes when circumstances warrant it. West's F.S.A. § 193.011.

**[3] Taxation 371 ⟜2529**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)5 Valuation of Property
                371k2529 k. Personal Property in General. Most Cited Cases
    (Formerly 371k350)
Statute requiring property appraiser to consider costs of sale when determining fair market value of personal property for tax purposes does not require assessor to make deduction for costs of sale to every personal property tax assessment. West's F.S.A. § 193.011(8).

**[4] Statutes 361 ⟜205**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic
Aids to Construction
                361k205 k. In General. Most Cited

**Statutes 361 ⟜206**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic
Aids to Construction
                361k206 k. Giving Effect to Entire

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

767 So.2d 494
767 So.2d 494, 25 Fla. L. Weekly D1278
**(Cite as: 767 So.2d 494)**

Page 2

Statute. Most Cited Cases
All of statute's subsections must be read together in order to determine statute's meaning, and statute should be read so as to give meaning to each of the subsections.

**[5] Statutes 361 ⚛══209**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k204 Statute as a Whole, and Intrinsic Aids to Construction
                361k209 k. Same or Different Language. Most Cited Cases
Use of different terms in different portions of same statute is strong evidence that different meanings were intended.

**[6] Taxation 371 ⚛══2529**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)5 Valuation of Property
                371k2529 k. Personal Property in General. Most Cited Cases
    (Formerly 371k350)
Taxpayer was not entitled to deduct costs of sale from market value of its tangible personal property for tax assessment purposes, absent any evidence that costs of sale it sought to deduct were external costs or internal expenditures. West's F.S.A. § 193.011(8).

**[7] Taxation 371 ⚛══2160**

371 Taxation
    371III Property Taxes
        371III(B) Laws and Regulation
            371III(B)6 Taxation According to Value
                371k2160 k. In General. Most Cited Cases
    (Formerly 371k49)
Valuing property after costs of doing business have been deducted does not result in property tax as-

sessment at just value as required by State Constitution. West's F.S.A. Const. Art. 7, § 4; West's F.S.A. § 193.011(8).

**[8] Taxation 371 ⚛══2529**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)5 Valuation of Property
                371k2529 k. Personal Property in General. Most Cited Cases
    (Formerly 371k350)
Sections of statute governing property valuations which require property appraiser to consider present cash value of property and net proceeds of sale of property did not apply only to valuations of real property. West's F.S.A. § 193.011(1, 8).

**[9] Taxation 371 ⚛══2515**

371 Taxation
    371III Property Taxes
        371III(H) Levy and Assessment
            371III(H)5 Valuation of Property
                371k2512 Real Property in General
                    371k2515 k. Market Value and Sale Price; Comparable Sales. Most Cited Cases
    (Formerly 371k348(3))
Property appraiser must consider costs of sale when determining fair market value of property for tax purposes, regardless of whether actual sale has occurred. West's F.S.A. § 193.011(8).
**\*495** William D. Shepherd, General Counsel, Tampa, for Appellant Rob Turner.

Robert A. Butterworth, Attorney General, and Michael R. Kercher and Mark T. Aliff, Assistant Attorneys General, Tallahassee, for Appellant Larry Fuchs.

Stanley H. Beck, Hallandale, and Evan J. Langbein of Langbein & Langbein, P.A., Aventura, for Appellee.

Gaylord A. Wood, Jr., and B. Jordan Stuart of Wood & Stuart, P.A., New Smyrna Beach, for Wil-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

liam Markham and H.W." Bill" Suber, Amici Curiae.

Benjamin K. Phipps, Tallahassee, for Florida Association of Property Tax Professionals and Florida Taxpayers' Coalition, Amici Curiae.

*496 Steven L. Brannock,Robert E.V. Kelly, Jr., and David C. Borucke of Holland & Knight LLP, Tampa, for Wal-Mart Stores, Inc., Amicus Curiae.

PARKER, Acting Chief Judge.

Rob Turner, as Hillsborough County Property Appraiser, and Larry Fuchs, as Executive Director of the Florida Department of Revenue (collectively Turner), challenge the trial court's order requiring Turner to deduct certain costs of sale from the market value of tangible personal property when assessing it for ad valorem tax purposes, and requiring Turner to apply that deduction to Tokai Financial Services, Inc.'s (Tokai) 1997 tax assessment. We reverse.

[1] Tokai sued Turner, challenging the 1997 property tax assessment of its tangible personal property. The issue at trial was the value of some 500 pieces of office equipment: primarily copiers, fax machines, office furniture, and medical equipment. In his initial assessment, Turner utilized a "cost approach" to assess Tokai's equipment, applying depreciation to the original cost of the equipment. Turner made no adjustments for the functional or economic obsolescence of the equipment or for changes in the replacement cost of comparable new equipment. Tokai argued that its equipment should be assessed using the "market approach," valuing it based on its current market value in the used/ refurbished equipment market. Tokai presented expert testimony at trial concerning the market value of its equipment. The trial court agreed with Tokai, and reduced its assessment to the market value of the equipment as calculated by Tokai's expert. Turner does not challenge this reduction.[FN1]

FN1. Amicus Curiae Markham argued in

his brief that the trial court erred in finding that there was reliable data of comparable sales that Turner should have used to assess the property under the market approach. Because the parties to the appeal did not raise this issue and because amici lack standing to raise issues not raised by the parties, this issue was not properly before this court. See Acton v. Fort Lauderdale Hosp., 418 So.2d 1099, 1101 (Fla. 1st DCA 1982).

Tokai's expert also testified that, in her opinion, the assessment of Tokai's equipment should be further reduced from the market value to reflect certain costs of sale. These costs included 15 percent of the sales price for sales commissions, and an additional 5 percent of the sales price for advertising, warranties, delivery, installation, and product demonstration. Tokai's expert did not testify that Tokai had incurred these costs; rather, she testified that these were the expected costs of sale in the used/ refurbished equipment market. Based on this testimony, the trial court ordered Turner to reduce Tokai's assessment by an additional 20 percent to reflect these "costs of sale." It is this further reduction that Turner challenges in this appeal.

The single issue in this case is whether the trial court erred in ruling that costs of sale must be deducted from market value in order to arrive at just valuation for ad valorem tax purposes. The Florida Constitution requires that "regulations shall be prescribed which shall secure a just valuation of all property for ad valorem taxation...." Art. VII, § 4, Fla. Const. The Florida Supreme Court has defined "just valuation" as synonymous with "fair market value." See Walter v. Schuler, 176 So.2d 81, 85-86 (Fla.1965). Therefore, any deductions from "fair market value" mean that the property is not being valued at "just value." In light of this constitutional mandate and its interpretation by the supreme court, we must consider the application and effect of section 193.011, Florida Statutes (1997), which states:

**193.011 Factors to consider in deriving just valu-**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

767 So.2d 494
767 So.2d 494, 25 Fla. L. Weekly D1278
**(Cite as: 767 So.2d 494)**

Page 4

**ation.**-In arriving at just valuation as required under s. 4, Art. VII of the State Constitution, the property appraiser shall take into consideration the following factors:

**\*497** (1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length;

(2) The highest and best use to which the property can be expected to be put in the immediate future and the present use of the property, taking into consideration any applicable judicial limitation, local or state land use regulation, or historic preservation ordinance, and considering any moratorium imposed by executive order, law, ordinance, regulation, resolution, or proclamation adopted by any governmental body or agency or the Governor when the moratorium or judicial limitation prohibits or restricts the development or improvement of property as otherwise authorized by applicable law. The applicable governmental body or agency or the Governor shall notify the property appraiser in writing of any executive order, ordinance, regulation, resolution, or proclamation it adopts imposing any such limitation, regulation, or moratorium;

(3) The location of said property;

(4) The quantity or size of said property;

(5) The cost of said property and the present replacement value of any improvements thereon;

(6) The condition of said property;

(7) The income from said property; and

(8) The net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing, and allowance for unconventional or atypical terms of financing arrangements. When the net proceeds of the sale of any property are utilized, directly or in-

directly, in the determination of just valuation of realty of the sold parcel or any other parcel under the provisions of this section, the property appraiser, for the purposes of such determination, shall exclude any portion of such net proceeds attributable to payments for household furnishings or other items of personal property.

Turner argues that the trial court's decision results in an unconstitutional application of the statute. Tokai argues that subsection (8) of the statute requires us to affirm the trial court's decision. After considering both the statute and the existing case law, we conclude that Turner's argument is correct for four reasons.

[2][3] First, the question in this case is not whether the property appraiser is allowed to make a deduction for costs of sale when determining fair market value. Clearly, the property appraiser can make such a deduction when the circumstances warrant it. *See Roden v. GAC Liquidating Trust,* 462 So.2d 92, 94 (Fla. 2d DCA 1985); *Southern Bell Tel. & Tel. Co. v. Broward County,* 665 So.2d 272, 275 (Fla. 4th DCA 1995). The question in this case is whether the property appraiser is required to make such a deduction. The plain language of the statute clearly indicates that no such deduction is required.

From its title, it is clear that section 193.011 requires only that the property appraiser consider the listed factors-not that he necessarily apply them. *See Parker v. State,* 406 So.2d 1089, 1092 (Fla.1981) (holding that a statute's title can assist in determining legislative intent). In addition, the language of the statute itself specifically requires only the consideration of the enumerated factors, not their application.

Further, in considering the application of this statute, the supreme court stated that "[i]n arriving at fair market value, the assessor must consider, but not necessarily use, each of the factors set out in section 193.011. The particular method of valuation, and the weight to be given each factor, is left to the discretion of the assessor...." **\*498***Valencia*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Ctr., Inc. v. Bystrom,* 543 So.2d 214, 216 (Fla.1989). *See also Roden,* 462 So.2d at 94; *Haines v. Holley,* 234 So.2d 152 (Fla. 2d DCA 1970); *Spanish River Resort Corp. v. Walker,* 497 So.2d 1299, 1303 (Fla. 4th DCA 1986) (noting that while the property appraiser must consider all eight criteria, the appraiser may "discard entirely" any criteria that is not probative of fair market value under the circumstances). We conclude that this court cannot require the property appraiser to apply a deduction for costs of sale to every personal property tax assessment. To do so would be to require the property appraiser to *apply* the value determined by subsection (8) when the statute requires only that the property appraiser *consider* that value.

[4][5] Second, all of the statute's subsections must be read together in order to determine the statute's meaning, and the statute should be read so as to give meaning to each of the subsections. *See Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So.2d 452, 455 (Fla.1992). However, the trial court's reading of the statute renders subsections (1) and (8) redundant. The trial court apparently found "reasonable fees and costs of purchase" in subsection (1) to be the same as "reasonable fees and costs of the sale" in subsection (8). We conclude it was error to read the statute in this way. *See Forsythe,* 604 So.2d at 456 (noting that it is a cardinal rule of statutory construction that courts should avoid readings that render parts of the statute meaningless); *Pinellas County v. Woolley,* 189 So.2d 217, 219 (Fla. 2d DCA 1966). The "use of different terms in different portions of the same statute is strong evidence that different meanings were intended." *Department of Prof'l Regulation v. Durrani,* 455 So.2d 515, 518 (Fla. 1st DCA 1984).

In reading the statute as a whole, it becomes apparent that the legislature intended these subsections to require the property appraiser to consider two different values. Subsection (1) requires the property appraiser to consider "[t]he present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase...." § 193.011(1), Fla. Stat. (1997). This subsection appears to consider the transaction from the buyer's perspective and excludes those reasonable fees and costs the buyer would incur over and above the present cash value. Subsection (8), on the other hand, requires the property appraiser to consider "[t]he net proceeds of the sale of the property, as received by the seller, after deduction of all of the usual and reasonable fees and costs of the sale, including the costs and expenses of financing...." § 193.011(8), Fla. Stat. (1997). This subsection appears to consider the transaction from the seller's perspective and excludes those reasonable fees and costs that the seller would pay out of the proceeds received from the buyer. When considered this way, it is clear that the "values" derived from subsections (1) and (8) may be different. The statute requires the property appraiser to consider these values, along with those derived from subsections (2) through (7), when determining just value. We reject Tokai's position that the statute requires the property appraiser to select the value generated by the application of subsection (8) and apply it in a blanket fashion to all assessments of tangible personal property.

Third, the purpose of section 193.011 is to assist property appraisers in discharging their constitutional obligation to tax property based on its just value. The supreme court has equated "just value" with "fair market value," and has held that fair market value "may be established by the classic formula that it is the amount a 'purchaser willing but not obligated to buy, would pay to one willing but not obligated to sell.' " *Walter,* 176 So.2d at 86. The question, then, becomes what costs of sale, if any, must be deducted from the amount the willing purchaser paid the willing seller in order to reach "fair market value."

[6] In attempting to define what costs should be deducted pursuant to the "costs *499 of sale" language in section 193.011(8), the Fourth District stated: "Such usual and reasonable fees and costs typically include reasonable attorney's fees,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

767 So.2d 494
767 So.2d 494, 25 Fla. L. Weekly D1278
(Cite as: 767 So.2d 494)

Page 6

broker's commissions, documentary stamp costs, survey costs, appraisal fees, and title insurance costs. Internal expenditures such as marketing costs are generally not included within the scope of this section." *Spanish River,* 497 So.2d at 1304 (quoting Note, *Ad Valorem Taxation of Time-Share Properties: Should Time-Share Estates be Separately Assessed and Taxed?,*37 U. Fla. L.Rev. 421, 436 (1985)). In this case, Tokai presented no evidence at trial concerning whether the "costs of sale" it sought to deduct were external costs or internal expenditures. In the absence of such evidence, Tokai failed to establish that a deduction for costs of sale under subsection (8) was proper.

Further, from the arguments in its brief and at oral argument, it appears that Tokai seeks to include various internal expenditures within the scope of subsection (8). For example, Tokai seeks a deduction for salesmen's commissions, apparently equating them with the broker's commissions referenced in *Spanish River.* However, when the salesman is an employee of the seller, commissions would seem to be an internal expenditure rather than an external cost of sale. In addition, Tokai's proposed deductions for advertising, warranties and product demonstration appear to be marketing costs which, as specifically noted in *Spanish River,* are generally not included as costs of sale under section 193.011(8). Therefore, we reject Tokai's argument that it should be allowed a deduction for these items.

[7] Turner admits that certain costs should be deducted from the sales price of an item in order to determine fair market value under some circumstances. For example, Turner notes that the property appraiser should deduct those amounts not properly included in the sales price, such as sales tax and extended warranties priced separately from the item.[FN2] However, in this case, Tokai seeks to have a "costs of sale" deduction for general costs of doing business. Valuing property after the costs of doing business have been deducted does not result in an assessment at "just value."

FN2. We note that Turner made this concession in the context of deductions for costs of sale under section 193.011(8) when the market value approach is being used. The issue of whether deductions for sales tax are appropriate in any other context was not briefed by any of the parties to this appeal and was not before this court. Therefore, we express no opinion as to whether sales tax is properly included or deducted during the valuation of tangible personal property in any other context or under any other valuation method.

Moreover, logic dictates that the "fair market value" of an item generally includes a component for costs of sale. When the willing, but not obligated, seller determines what price he will accept for a certain item of property, he takes into account those costs that he will incur in making the sale. These costs drive the seller's bottom line; i.e., the price below which he will not go. Therefore, the costs of sale have already been factored into the market value of the property when it is placed for sale. To allow a blanket deduction for costs of sale gives a windfall to the seller who has already accounted for them in his sales price.

Fourth, "[d]emocratic philosophy mandates that every taxpayer be treated consistently, and that everyone contribute his fair share, no more and no less, to the tax revenues." *ITT Community Dev. Corp. v. Seay,* 347 So.2d 1024, 1028 (Fla.1977); *Fuchs v. Robbins,* 738 So.2d 338, 341 (Fla. 3d DCA 1999). Tokai's fair share is measured by the fair market value of its personal property. Tokai should not be entitled to a lower tax assessment because it chose to expend excessive amounts on marketing its equipment.

If comparable sales establish the market value of two identical properties, we know of no court decision which would allow the *buyer* of the first parcel to *500 insist on a value 55% less than the second, because the *seller* of the former parcel chose to expend an inflated percentage sum to mar-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

767 So.2d 494
767 So.2d 494, 25 Fla. L. Weekly D1278
**(Cite as: 767 So.2d 494)**

Page 7

ket his property in order to obtain a purchaser.

*Spanish River,* 497 So.2d at 1304.

For all of the above reasons, both the language and the purpose of section 193.011 are thwarted by the trial court's order requiring Turner to deduct costs of sale from the fair market value of Tokai's equipment. Therefore, that portion of the trial court's order requiring a deduction of 20 percent from the fair market value of Tokai's equipment is reversed.

[8] In addition to his constitutional argument, Turner argues that the trial court erred for two additional reasons, both of which we reject. First, Turner argues that the legislature intended for subsections (1) and (8) to apply only to real property. While there is some legislative history to support this argument, no language limiting the application of these subsections exists in the enacted statute. Moreover, at least two courts have considered these subsections in the context of personal property. *See Havill v. Scripps Howard Cable Co.,* 742 So.2d 210 (Fla.1998); *Southern Bell,* 665 So.2d at 272. Therefore, this argument is without merit.

[9] Second, Turner argues that an actual sale must occur before the property appraiser must consider the costs of sale. Nothing in the statute requires an actual sale to occur before subsection (8) is triggered. Thus, the property appraiser must consider the costs of sale when determining fair market value regardless of whether an actual sale has occurred. *See Southern Bell Tel. & Tel. Co. v. Dade County,* 275 So.2d 4, 8 (Fla.1973) (noting that section 193.011 requires the property appraiser to put himself in the position of the parties to a hypothetical sale when considering the statutory factors if no actual sale has occurred). However, the actual sale of personal property may be one circumstance in which the property appraiser is required to apply the value that results from the application of subsection (8), rather than simply considering it. *See Bystrom v. Equitable Life Assurance Soc'y,* 416 So.2d 1133, 1144 (Fla. 3d DCA 1982) (noting that while subsection (8) must be considered in making

every assessment, it is only appropriately applied when there has been an actual sale).

Reversed and remanded.

CASANUEVA and DAVIS, JJ., Concur.
Fla.App. 2 Dist.,2000.
Turner v. Tokai Financial Services, Inc.
767 So.2d 494, 25 Fla. L. Weekly D1278

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.