**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

### OKALOOSA COUNTY PROPERTY APPRAISER'S POST-TRIAL MEMORANDUM

Debtor Winn Dixie Stores, Inc. objected to claims filed by the Okaloosa County Tax Collector for unpaid property taxes in the 2005 and 2006 tax years. In its Objection to Florida Tax Claims filed in this Court, Winn Dixie requested that the Court adjust Winn Dixie's Okaloosa County property tax assessments to the following values:

| Store No. | Account No. | 2005 Requested Value | 2006 Requested Value |
|-----------|-------------|----------------------|----------------------|
| 0566 | 51272500 | $239,966 | $236,643 |
| 0551 | 51272503 | 198,119 | 189,461 |
| 0541 | 51272504 | 192,189 | 186,647 |
| 0558 | 00615010 | 203,342 | 196,724 |
| 0560 | 00014488 | 229,707 | 227,356 |
| 0567 | 00019064 | 3,768 | 5,149 |

These values were based on an appraisal by Brian Testo and Kevin Abrahani, which was not used by Winn Dixie at trial.  This Court entered an Order granting in part and denying in part Winn Dixie's Objection to Florida Tax Claims [Doc. 14815].  In that Order, the Court dismissed Winn Dixie's objection as it related to the 2004 taxes which had already been paid. The Court allowed Winn Dixie's objections to the unpaid 2005 and 2006 taxes to go forward as an adversary proceeding, but ordered Winn Dixie to serve a copy of the Order on the Property Appraisers and gave the Property Appraisers thirty days to respond.  The Property Appraisers

responded and a trial was held on March 12, 2009 regarding Winn Dixie's objections to the 2005

and 2006 assessments of its tangible personal property by the Okaloosa and Escambia County

Property Appraisers.

## SUMMARY OF ARGUMENT

Winn Dixie has not submitted any evidence to support the reduced values requested in its

Objections to Florida Tax Claims, as listed above.  The only evidence of value provided by Winn

Dixie was an appraisal by Jack West.  The appraisal contained a one-page summary of the values

claimed for five of the six stores in dispute, but the versions of the exhibits given to the Property

Appraiser's counsel did not include any calculations showing how the 2005 values were

calculated.  The appraisal contained a spreadsheet that purportedly showed the calculations used

to arrive at his 2006 values, but one of the values listed on the summary page did not match the

value listed on the spreadsheet, and the spreadsheet given to the Property Appraiser's counsel did

not contain any headings, making it impossible to review its accuracy.  Moreover, the evidence

showed that Mr. West's original appraisal of the property contained numerous substantive errors,

and that the revised appraisal submitted to the court, which was provided to the Property

Appraisers only two days before trial, was 20-30% higher than his original estimates of value.

Given these issues, Winn Dixie's evidence of value is insufficient to overturn the Property

Appraiser's assessment.

The Property Appraiser's assessment was calculated by applying the Department of

Revenue's recommended index factors, economic lives and depreciation schedule to the data

reported by Winn Dixie on its tax returns.  The returns were signed by representatives of Winn

Dixie under oath, and under penalty of perjury, and the DOR's tables are deemed prima facie

correct by statute.  The Property Appraiser's three expert witnesses all testified that the Property

Appraiser's methods were in compliance with the law, and that the approach taken by the Property Appraiser should result in an assessment that represents the just value of Winn Dixie's property. Moreover, the Property Appraiser's assessments were even less than or slightly higher than Winn Dixie's own estimates of value on its sworn tax returns. Given the inconsistency of Winn Dixie's estimates of value and the unreliability of its appraisal, the Property Appraiser's assessments, which were done in compliance with Florida law and which were supported by Winn Dixie's own tax returns, should be upheld.

**<u>BURDEN OF PROOF</u>**

At the trial of this case, this Court placed the burden of production of evidence on the Property Appraisers and indicated that it believed the Property Appraisers had the burden of proving that they had complied with all of the statutory guidelines (Tr. 28). In urging the Court to place the burden of production on the Property Appraisers, Winn Dixie's attorney cited to the case of *In re Arndt*, 201 B.R. 853 (M.D. Fla. 1996) (Tr. 24). This case had not been included in Winn Dixie's notice of legal authorities, nor was a copy provided to undersigned counsel at the trial, and thus the Property Appraiser's counsel did not have an opportunity to review and shepardize the case until after the Court had ruled on that issue.

Unfortunately for Winn Dixie, the *Arndt* case is no longer good law. In *Arndt*, the district court placed the burden of proof on the IRS to prove the validity and amount of its tax claim. *See id.* at 857. In doing so, the court noted that there was a split among the circuit courts of appeal as to which party had the burden of proof on an objection to claim in bankruptcy court. *See id.* The Eleventh Circuit had not yet weighed in on the issue, so the Middle District followed the circuits that had placed the burden of proof on the taxing authority. *See id.* at 858.

Subsequently, in 2000, the Supreme Court of the United States granted certiorari to resolve the conflict between the circuit courts on this issue. *See Raleigh v. Illinois Dep't of Rev.*, 530 U.S. 15, 20 (2000). The Supreme Court held that the burden of proof on a tax claim in bankruptcy court is a substantive matter to be determined by the applicable state substantive law. *See id*. In so holding, the Court noted that the Bankruptcy Code does not purport to alter the burden of persuasion *or the burden of production* on tax claims. *See id.* at 21. The Court also went on to refute all of the arguments made by the Middle District for placing the burden on the taxing authority. *See id.* at 24. Thus, the Middle District's decision in *Arndt* has been overruled by the U.S. Supreme Court and, in fact, in the later case of *In re Litestream Technologies*, 337 B.R. 705, 709-10 (M.D. Fla. 2006), the Middle District correctly place the burden of proof on the debtor.

Florida state substantive law provides that in all ad valorem tax challenges, the Property Appraiser's assessment shall be presumed correct. *See* §194.301, Fla. Stat. This presumption may only be lost if the taxpayer shows by a preponderance of the evidence that the Property Appraiser has failed to consider properly the criteria in §193.011, Fla. Stat., or that the Property Appraiser's assessment is arbitrarily based on appraisal practices which are different from the appraisal practices generally applied by the Property Appraiser to comparable property within the same class and within the same county. Section 194.301, Fla. Stat. further states that, unless the presumption is lost, the taxpayer has the burden of proving that the assessment exceeds just value by clear and convincing evidence. For evidence to be clear and convincing, the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy. *See In re J.R.,* 923 So.2d 1201, 1205-06 (Fla. 2d DCA 2006).

Thus, in order to overcome the strong presumption in favor of the Property Appraiser, Winn Dixie must prove that the Property Appraiser failed to consider one or more of the factors in §193.011.  Even if Winn Dixie succeeds in proving that the Property Appraiser failed to properly consider the factors of §193.011, Fla. Stat., Winn Dixie still has the burden of proving that the Property Appraiser's assessment exceeds just value.  *See* §194.301, Fla. Stat. (2005).  Also, Winn Dixie's opinion of value may not be adopted unless it is shown that Winn Dixie's appraiser properly considered all of the factors listed in §193.011 in forming his opinion of value.  *See Countryside Country Club v. Smith*, 573 So. 2d 14, 16 (Fla. 2d DCA 1990).  If Winn Dixie's evidence does not meet these requirements, the court must remand the assessment to the Property Appraiser with instructions for a reassessment, as it is not the function of the court to take the place of the property appraiser.  S*ee Todora v. Venice Golf and Country Club No. 1, Inc.,* 826 So.2d 406, 410 (Fla. 2d DCA 2000).

## STATEMENT OF THE FACTS

The evidence at trial established that the assessments in question were calculated by the mass appraisal cost approach, based on asset information reported by Winn Dixie and data promulgated by the Florida Department of Revenue ["DOR"] for the use of the Property Appraisers.  The DOR tables, which are prima facie correct under Florida law, were supported by the calibration study of appraiser and Certified Depreciation Specialist Steve Barreca.  By properly applying the DOR's tables to the data reported by Winn Dixie, the Property Appraiser properly considered the factors of section 193.011, Fla. Stat. and assessed the property at its just value.

It was undisputed that the cost approach is the appropriate method of assessing tangible personal property.  The evidence showed that the DOR promulgates a tangible personal property

tax form, which allows taxpayers to self-report the quantity, age and condition of their taxable assets (Tr. 144). The information requested on the form is specifically intended by the DOR to assist the property appraisers with performing a mass appraisal cost approach (Tr. 145). Rick Tansi, Winn Dixie's Manager of Sales, Use and Property Taxes, and Kevin Abrahani, one of Winn Dixie's appraisers, also agreed in their depositions that the State of Florida recommends the cost approach as the favored method of assessing tangible personal property (Tansi Depo. 26, Abrahani Depo. 47).

In the instant case, Winn Dixie filed tangible personal property tax returns in Okaloosa County in 2005 and 2006, which did not include any property categorized as machinery and equipment and which appeared to under-report point-of-sale equipment (WD Ex. 3,4; Tr. 113-14). Tony Biondi, the Tangible Personal Property Supervisor for the Okaloosa County Property Appraiser's Office, testified that the Property Appraiser generally accepts the costs reported on the taxpayer's tax return, but may re-categorize any items that have been miscategorized by the taxpayer, as Winn Dixie apparently did in this case (Tr. 108,113). After those corrections, Winn Dixie's reported costs were then trended to replacement cost new using the DOR's recommended index factors (Oka. Ex. 11; Tr. 108-09).

Mr. Biondi testified that his department of four persons handles approximately 16,000 tangible personal property returns each year (Tr. 103). Because the majority of the taxpayers file their returns close to the April 1st deadline and the tax roll is submitted to the DOR in late June, the Property Appraiser only has about three months to process all of the returns and assess each tangible personal property account (Tr. 103-04). Given those time constraints, the Property Appraiser cannot visit each taxpayer's facility (Tr. 106). Instead, the Property Appraiser relies on the taxpayers to truthfully self-report the quantity, age and condition of their property on their tax

returns (Tr. 106).  The tax return specifically instructs the taxpayer to report the condition of the property (Oka. Ex. 10 p.3).  If a taxpayer such as Winn Dixie does not report the condition of its property, the Property Appraiser assumes it is in average condition (Tr. 108).

The Property Appraiser depreciated the replacement cost new of Winn Dixie's property to fair market value using the DOR's recommended Economic Life Guide and Depreciation Schedule (Oka. Ex. 12,13;  Tr. 109-10).  Mr. Biondi testified that the Property Appraiser uses the mass appraisal cost approach because it is a recognized approach and an efficient method of assessing many properties (Tr. 105).  He testified that the Property Appraiser considers the eight criteria of section 193.011, Fla. Stat. in assessing tangible personal property (Tr. 105-06), and that the assessments reflected the just value of Winn Dixie's tangible property in Okaloosa County in 2005 and 2006 (Tr. 118).

Mr. Biondi also prepared a document showing that the Property Appraiser's assessments of Winn Dixie's property were close to, and in many cases lower than, Winn Dixie's own estimates of value, which were listed on its sworn tax returns (Tr. 115).  Specifically, Winn Dixie's sworn estimates of value compared with the Property Appraiser's assessments are as shown below, with an asterisk noting the assessments that were lower than Winn Dixie's sworn estimates of value:

| Store No. | 2005 (WD) | 2005 (PA) | 2006 (WD) | 2006 (PA) |
|---|---|---|---|---|
| 0586 | $573,285 | $586,733 | **$544,902** | **$538,456*** |
| 0551 | **463,404** | **458,319*** | 464,018 | **436,189*** |
| 0541 | 439,538 | 445,755 | **454,474** | **438,382*** |
| 0558 | 669,915 | 676,341 | **590,348** | **582,052*** |
| 0560 | 863,822 | 865,023 | 768,541 | 790,751 |
| 0308 | 24,383 | 25,075 | 22,675 | 23,650 |

Because the Property Appraiser relied on the DOR's recommended depreciation tables in his assessments, the Property Appraiser called DOR appraiser and Certified Public Accountant Mike Zeigler, who previously served as the Supervisor of the DOR's Tangible Personal Property Program (Tr. 142). Mr. Zeigler explained that the DOR assists the property appraisers and oversees the tax rolls (Tr. 143). As part of this function, the DOR also publishes index factors and depreciation tables for the property appraisers to use in assessing tangible personal property (Tr. 144). The DOR's Index Factors, Economic Life Guide and Depreciation Schedule are based on data from Marshall Valuation Service, which is a commonly-used service in the appraisal industry (Tr. 146-47). Marshall's data is based on information from the Internal Revenue Service that was developed over many years (Tr.147). The property appraisers are not required to use the DOR's economic lives, but they are recommended by the DOR (Tr. 148).

The DOR's tables are intended to account for physical depreciation and anticipated functional and economic obsolescence (Tr. 154). That includes any functional obsolescence associated with high-tech equipment due to the emergence of new technologies (Tr. 155). At one point, the DOR hired Steve Barreca to review and calibrate the tables (Tr. 153). Steve Barreca is an Accredited Senior Appraiser with the American Society of Appraisers and a Certified Depreciation Professional with the Society of Depreciation Professionals (Oka. Ex. 15) who has been doing depreciation, obsolescence and economic life studies for over 25 years (Tr. 13). In his study for the DOR, he developed economic lives and depreciation schedules that accounted for all forms of depreciation and obsolescence, except for external obsolescence that is specific to an individual taxpayer (Oka. Ex. 16; Barreca Depo. 19-20, 43). Although Mr. Barreca's recommended tables varied somewhat from the existing DOR tables, Mr. Barreca concluded that the DOR's existing tables captured all forms of obsolescence (Barreca Depo. 46).

8

Overall, Mr. Barreca's study supported the economic lives recommended by the DOR for store fixtures and equipment, and other property that is typically found in a grocery store (Oka. Ex. 16, 17). Some of Mr. Barreca's recommended lives were longer than the DOR's recommended lives, and would have resulted in a slightly higher value (Barreca Depo. 32-33). However, Mr. Barreca testified that, based on his analysis, if the Property Appraisers used the DOR's tables, their assessments would, if anything, slightly understate the value of Winn Dixie's property (Barreca Depo. 32).

To refute the Property Appraiser's assessments, Winn Dixie listed three appraisers as witnesses – Kevin Abrahani, Brian Testo and Jack West. However, at trial, the only appraiser to testify was Jack West. Mr. West, who, unlike Mr. Barreca, is not a depreciation specialist (Tr. 227), criticized the DOR tables, claiming that the data from Marshall Valuation Services on which the DOR tables are based is not reliable (Tr. 205). However, Winn Dixie's other appraiser, Brian Testo, had testified in his deposition that he considered the Marshall Valuation service economic lives to be a reputable guide (Testo Depo. 53).

Mr. West's first retroactive appraisal of the property was completed in December 2008 (Tr. 229), but not given to the Property Appraisers until a few weeks prior to trial. During his deposition, numerous errors were discovered. Specifically, although he emphasized throughout his testimony that effective age was critical, his initial appraisal erroneously assumed that all of the property was one year older than it actually was (Tr. 232). He mistakenly appraised the supplies at 3% of their original cost, rather than 100% of original cost, as required by law (Tr. 232). Also, he mistakenly appraised all of the machinery and equipment in the stores using a 9-year economic life, rather than a 12-year economic life, resulting in an erroneously low value (Tr. 232).

9

Upon discovering these errors, Mr. West prepared a revised appraisal report, which was given to the Property Appraisers' counsel two days before trial in a different format than the appraisal that was apparently entered in to evidence (WD Ex. 25; Tr. 89, 233-34, 269, 271).[1]  The revised appraisal amounts were, on average, 20% higher in 2005 and 30% higher in 2006 (Tr. 234), with some values almost doubling from the initial to the revised report (Tr. 235).

The revised appraisal report that was admitted into evidence contained a summary page, which listed Mr. West's opinion of the values of the property in each Okaloosa County store as follows:

| Store No. | 2005 Value | 2006 Value |
|-----------|-----------|-----------|
| 0541 | $211,054 | $186,728 |
| 0551 | 183,204 | 145,193 |
| 0558 | 393,137 | 296,883 |
| 0560 | 486,633 | 445,040 |
| 0566 | 224,285 | 252,834 |

The summary sheet did not contain any values for Store No. 0308.  The calculations used to arrive at Mr. West's values for 2006 were set forth in Exhibit 22 to Mr. West's appraisal report, which consists of a 66 page spreadsheet, without any headings to show the significance of each number. The final value listed in the spreadsheet for Store No. 0541 did not match the final value listed on the summary page.  Also, nowhere in the report are there any calculations showing how Mr. West's 2005 values were calculated.  These errors and omissions, coupled with the

---

[1] The version provided to the Property Appraiser's counsel in Winn Dixie's exhibit notebooks included a 66 page spreadsheet, which had no headings and contained no data for 2005.  The day before trial, Winn Dixie's counsel e-mailed the Property Appraiser's counsel two new spreadsheets, but indicated that the spreadsheet in the exhibit notebooks was a complete copy of their exhibit.  Thus, for purposes of this Memorandum, the undersigned counsel is assuming that the appraisal entered into evidence is identical to the copy provided to her in Winn Dixie's exhibit notebooks.

substantial errors in Mr. West's initial appraisal report which were not corrected until pointed out by counsel for the Property Appraisers, serve to seriously undermine the credibility of Mr. West's appraised values.

To arrive at his final values, Mr. West developed estimates of value by an "Age/Life" method and a "Dealer Value" method.   Mr. West's "Age/Life" method appears to be similar to a cost approach calculation.  The "Dealer Value" apparently represented the prices that used equipment dealers charge for other grocery store equipment.  For his final value estimates for each store, Mr. West selected whichever value came out lower (WD Ex. 26 p.3; Tr. 244).

In calculating a value by the Age/Life method, Mr. West trended Winn Dixie's reported costs to replacement cost new using the DOR's equipment index factors (Tr. 245).  Rather than depreciating each piece of equipment by dividing the effective age of each item of equipment by its normal economic life, Mr. West based his depreciation on the overall average "effective age" of each *category* of equipment divided by the normal economic life for that type of equipment. Mr. West had no information about the condition of the property and admitted that his consideration of condition was limited solely to the collective age of the equipment in each store (Tr. 248, 254, 284).  This is contrary to the deposition testimony of Winn Dixie's other appraiser, Kevin Abrahani, who testified that the value of store shelving is affected more by its condition than its age (Abrahani Depo. 74).  It is also contrary to the ASA book cited by Mr. West, which states that, in estimating effective age, the appraiser must consider the effects of maintenance on the actual condition of the property (WD Ex. 22 p.73).

For his "Dealer Value," Mr. West did not perform a standard sales comparison approach. He admitted that he did not rely on documented sales transactions (Tr. 246, 285).  Rather, he used liquidation sales and listing prices for used grocery store equipment from used equipment

dealers (Tr. 246, WD Ex. 26).  Although he conceded that assessments in Florida must include sales tax, freight and installation costs, he did not know if the dealers' costs included any of those expenses (Tr. 295).

Mr. West justified his selection of the lower of the two values for each store by referring to the difference between the two values as a "Remaining Obsolescence Factor" ["ROF"]. Apparently, Mr. West contends that, if the Dealer Value is lower than the value calculated by the Age/Life approach, the difference must be attributable to obsolescence, and thus when the Dealer Value is lower, the Dealer Value must be used.  However, in the book "Valuing Machinery and Equipment:  The Fundamentals of Appraising Machinery and Technical Assets," the American Society of Appraisers ["ASA"] cautions appraisers about the possibility of "double-dipping" when using a remaining obsolescence factor (Oka. Ex. 7 p. 110).  The ASA points out that, unless the appraiser can determine the extent of functional obsolescence present in the market transactions used to determine the ROF, the appraiser must assume that the ROF includes all forms of obsolescence.  Thus, where the appraiser has already accounted for functional obsolescence in his cost approach calculations, it would be inappropriate to again deduct functional obsolescence by use of an ROF.  In the instant case, Mr. West accounted for some forms of obsolescence by trending some of the equipment costs downward, and in his selection of the effective age and normal economic life of each category of equipment. [2]  Thus, by applying an ROF without knowing what kind of obsolescence was included, Mr. West effectively "double-dipped" his obsolescence deduction.

---

[2]  The ASA book explains that the use of effective age and useful life in an age/life analysis measures more than just physical deterioration (WD Ex. 22 p.75).  Specifically, the use of an economic life, rather than physical life, accounts for obsolescence (WD Ex. 22 p. 565).

Mr. West criticized the DOR's tables for using a 20% residual factor to depreciate property that has outlived its economic life (Tr. 208). However, Mr. West admitted that property continues to have value as long as it is in use (Tr. 261) and, in his appraisal, he also used residual value factors as high as 25% to appraise categories of property that had exceeded their Normal Economic Life (WD Ex. 26). Specifically, on page 20 of his appraisal report, Mr. West states that he used an 11% residual on all assets 9 years or older. (WD Ex. 26 p. 20). However, he testified in court that the 11% residual factor was only used for store fixtures (Tr. 262). In fact, Exhibit 22 to his report shows that he used a 17% residual factor on POS equipment and a 25% residual factor for computers that had exceeded their economic life. For example, Exhibit 22 to his report shows that, while the normal economic life for computers is 4 years, the computers in Okaloosa Store 541, which had an effective age of 6.5 years, continued to be appraised by Mr. West at a 25% residual value.

Moreover, while Mr. West testified that most of the equipment in the subject stores was at the end of the end of its normal economic life (Tr. 198), his appraisal states otherwise. According to his appraisal, in 2005, less than half of the stores in Okaloosa and Escambia County were at the end of their economic lives (WD Ex. 26 p.19). Thus, while Mr. West's statement may be true now in 2009, the equipment was, naturally, much newer on the date of the assessments in question.

Finally, Mr. West touted the use of data from the used equipment market as a cornerstone of his appraisal. However, Mr. Zeigler testified that the DOR has not tried to calibrate its tables with sales from the used equipment market because the used equipment market consists of equipment that is at the end of its economic life (Tr. 156). Mr. Zeigler also testified that the property appraisers should instead be considering the primary equipment market, which

considers the cost of the property when it is new (Tr. 156-57).  Steve Barreca agreed with Mr.

Zeigler, explaining that the used equipment market is a market for assets that have reached the

end of their useful life (Barreca Depo. 18).  Mr. Barreca testified that the used equipment market

is appropriate for determining liquidation value, not fair market value (Barreca Depo. 19).  He

also noted that the use of dealer's listing prices is problematic because it is often difficult to

determine the age, condition and utility of the property being listed so as to adjust for differences

between that property and the subject (Barreca Depo. 77).

Overall, Winn Dixie provided four different values to the Property Appraiser.  First,

Winn Dixie filed sworn tax returns, estimating the value of its property at amounts that were

lower or slightly higher than the Property Appraiser's assessments (WD Ex. 3, 4).  Second, Winn

Dixie filed a spreadsheet with its Objection to Florida Tax Claims, based on an appraisal by

Brian Testo and Kevin Abrahani, which was not put in evidence. Third, Winn Dixie gave the

Property Appraiser an appraisal by Jack West, which was riddled with errors.  And finally, Winn

Dixie submitted a second appraisal by Jack West, which contains no back-up for 2005, and

which was given to the Property Appraiser two days before trial.  Taken together, the sheer

quantity of different values proposed by Winn Dixie should cause the Court to be concerned

about the weight to give Mr. West's final appraisal.

## **ARGUMENT**

I.    WINN DIXIE IS ESTOPPED FROM CHALLENGING THE
      ASSESSMENTS, WHICH WERE SUPPORTED BY WINN DIXIE'S
      ESTIMATES OF VALUE ON ITS SWORN TAX RETURNS.

The Supreme Court of Florida has held that taxpayers who place valuations on their own

property for taxation that are accepted as correct by the assessing officers are estopped from

questioning such values.  *See City of Tampa v. Mugge*, 24 So. 489, 495 (Fla. 1898).  When Winn

14

Dixie filed its 2005 and 2006 tangible personal property tax returns in Okaloosa County, it

included an estimate of fair market value for each account, and signed a statement attesting that

"under penalty of perjury, I declare that I have read the foregoing tax return and the

accompanying schedules and statements and that the facts stated in them are true." (WD Ex.

3,4). Of the assessments being contested in this case, almost half of those accounts were

assessed by the Property Appraiser at an amount lower than the fair market value stated in Winn

Dixie's tax returns, and the remaining assessments were generally less than 5% higher than Winn

Dixie's estimates of value. (Oka. Ex. 14). Thus, under Florida law, Winn Dixie is estopped from

challenging the Property Appraiser's assessments of those five accounts that were assessed at an

amount lower than what Winn Dixie stated on its tax returns.

Other jurisdictions have gone further and held that, as a matter of public policy, a

taxpayer should be bound by its own statements as to the quantity, quality and value of taxable

personal property that is returned for taxation, regardless of whether the assessor adopts those

values. *See People of the State of Illinois v. Illinois Central Railroad Co.,* 112 N.E. 700, 715

(Ill. 1916), wherein the court stated:

> The decisions in the cases cited do not rest upon the usual principles of estoppel
> nor contain the elements usually required in courts of equity in the application of
> that doctrine. They seem to rest rather upon the principle that it is the duty of the
> taxpayer to see that the list of property is furnished to the proper officers, and that
> it is against public policy to permit him to make such schedule and then question
> its accuracy.

Similarly, in *Wal-Mart Stores, Inc. v. Todora*, 791 So. 2d 29, 30 n.1 (Fla. 2d DCA 2001), the

court upheld the property appraiser's assessment of Wal-Mart's store fixtures, and, in doing so,

specifically noted that, while Wal-Mart had asserted a variety of values during the litigation, the

estimate of value on its tangible personal property tax returns was only slightly less than the

property appraiser's ultimate assessment. The public policy set forth in the Illinois case is certainly applicable to the instant case where the Property Appraiser's assessments were either lower than or minimally higher than the taxpayer's statements of value. Thus, Winn Dixie should be estopped from challenging any of the subject assessments.

II.     THE PROPERTY APPRAISER PROPERLY CONSIDERED THE
        FACTORS OF §193.011, FLA. STAT.

Winn Dixie failed to prove that the Okaloosa County Property Appraiser had not properly considered the factors of section 193.011, Fla. Stat. To establish what factors the Property Appraiser had or had not considered, Winn Dixie did not even call as witnesses the persons who directly handled Winn Dixie's Okaloosa County assessments in the 2005 and 2006 tax years (Tr. 117). Rather, Winn Dixie relied solely on the testimony of its own appraiser, Jack West, who criticized the Property Appraisers generally for using a "basic cost approach" (59). However, all of the other appraisers had agreed that the cost approach is the most appropriate method for assessing tangible personal property for tax purposes (Tr. 105,145, Abrahani Depo. 47). Moreover, Winn Dixie's own Manager of Sales, Use and Property Taxes agreed that the cost approach is the favored method of assessing tangible personal property in Florida. (Tansi Depo. 26). Also, Florida law is clear that a disagreement between appraisers over the method to use or the weight to be accorded each factor is not sufficient to overcome the presumption in favor of a property appraiser's assessment. *See Bystrom v. Bal Harbour 101 Condo. Ass'n*, 502 So. 2d 1312, 1313 (Fla. 3d DCA 1987); *Turner v. Tokai Fin. Serv., Inc.*, 780 So. 2d 497 (Fla. 2d DCA 2000).

Tony Biondi of the Okaloosa County Property Appraiser's office explained that, in assessing tangible personal property, the Property Appraiser's office considers all of the factors

of section 193.011, Fla. Stat. by applying the DOR's duly-promulgated index factors, economic lives and depreciation schedules to the information reported by the taxpayers on their sworn tangible personal property tax returns (Tr. 105-06, 109-10).  Mr. West questioned the Property Appraisers' reliance on the DOR's tables, because he disagrees with the data from Marshall Valuation Service, on which the DOR tables are based (Tr. 205).  However, pursuant to section 195.032, Fla. Stat., the DOR's economic lives and depreciation tables, which are included in its Standard Measures of Value, are deemed prima facie correct.  Mike Zeigler of the DOR testified that the tables used by the Property Appraisers are recommended by the DOR, and that the tables account for all forms of anticipated functional and economic obsolescence (Tr. 148,154).  Also, Steve Barreca, an appraiser and Certified Depreciation Specialist who had previously been commissioned to develop new tables for the DOR, testified that, based on his study, the DOR tables captured all forms of obsolescence (Barreca Depo. 46).  One of Winn Dixie's appraisers, Brian Testo, testified in his deposition that he also considered Marshall Valuation Service's economic lives because Marshall is a reputable guide (Testo Depo. 53).

Seven of the eight factors of section 193.011, Fla. Stat. do not appear to be in dispute. Winn Dixie did not attempt to present any evidence that the Property Appraiser had failed to properly consider the highest and best use of the property or its location in Okaloosa County. The quantity and cost of the property were properly considered by using the quantity and costs reported by Winn Dixie on its tangible personal property tax returns (Tr.108).  Because Winn Dixie did not report the condition of its property, the Property Appraiser reasonably and properly concluded that the property was in average condition for its age.  (Tr. 108).   The income from the property and the net proceeds of the sale of the property were not considered applicable because the property is not rented and had not sold recently.  Although Winn Dixie focused much

of its attention on the Property Appraiser's consideration of obsolescence, obsolescence is not a factor that must be properly considered under section 193.011, Fla. Stat. in order for the Property Appraiser to retain his presumption of correctness.

Winn Dixie's primary contention seems to be that the Property Appraiser failed to properly consider section 193.011(1), Fla. Stat. – the present cash value of the property – by declining to assess Winn Dixie's store fixtures based on listing prices in the used equipment market. However, Florida courts have held that section 193.011(1), Fla. Stat. does not require that the appraiser look for comparable sales. *See Fla. East Coast Ry. Co. v. Dep't of Rev.*, 620 So. 2d 1051, 1058 (Fla. 1st DCA 1993). In the *Florida East Coast Railway* case, DOR appraiser Mike Ziegler testified that in appraising the property, he did not look for comparable sales of railroads. *See id.* The trial court upheld his assessment, finding that section 193.011(1), Fla. Stat. contemplates all three standard approaches to value – the cost, income and sales comparison approaches. *See id.* at 1057. The taxpayer disagreed, and argued on appeal that the "present cash value" factor only contemplated a sales comparison approach. *See id.* at 1058. The appellate court found the taxpayer's arguments unpersuasive, and held that the DOR's "stock and debt" method adequately considered the present cash value of the property. *See id.* at 1059. The court specifically noted that it disagreed with the taxpayer's contention that section 193.011(1), Fla. Stat. could only be properly considered by looking for comparable sales. *See id.*

This issue has also been addressed in the context of store fixtures and equipment. Several years ago, Wal-Mart filed similar actions in various Florida counties, arguing, among other things, that the property appraisers had erred by failing to conduct a sales comparison analysis using prices for store fixtures from used equipment dealers. In *Wal-Mart Stores, Inc. v. Mazourek*, 778 So. 2d 346, 348 (Fla. 5th DCA 2001), the property appraiser testified that he used

a mass appraisal cost approach, where the values were calculated by the use of a computer program that contained depreciation percentages and economic life guidelines. The property appraiser admitted that he did not consider any information from dealers of similar property, and that he did not make any adjustments for additional depreciation or obsolescence. *See id.* The trial court found that the property appraiser was not required to rely on the used equipment dealer's market, and that he properly rejected data from the salvage market. *See id.* This case was appealed, but the appellate decision was later quashed by the Supreme Court of Florida. *Mazourek v. Wal-Mart Stores, Inc.*, 831 So. 2d 85, 92 n.4 (Fla. 2002).

However, Wal-Mart later raised the same issues in a similar case in Sarasota County. In that case, the trial court ruled in favor of the property appraiser and Wal-Mart raised the same issues on appeal. The Second District Court of Appeal effectively dismissed Wal-Mart's arguments regarding sales in the used equipment market, stating that "although the parties raise several issues on appeal, the only issue that merits discussion is Wal-Mart's argument that any sales tax . . . is a cost of sale that must be deducted." *Wal-Mart Stores, Inc. v. Todora*, 791 So. 2d 29, 30 (Fla. 2d DCA 2001). The court then went on to hold that the property appraiser's selection of the cost approach was appropriate. *See id.* at 31. This decision was approved by the Supreme Court of Florida. *Mazourek*, 831 So. 2d at 92.

Mr. West also attempted to criticize the DOR tables for using a 20% residual value for equipment that is at the end of its economic life, claiming that this was significant because most of the equipment in the subject stores was at the end of its economic life (Tr. 198, 213). This testimony was contradicted on page 19 of Mr. West's appraisal report, which shows that in 2005, less than half of the subject property was at the end of its economic life (WD Ex. 26). In any event, all of the appraisers agreed that a residual value is necessary to account for the fact that

property continues to have some value as long as it is in use (Tr. 261).  In his appraisal, Mr. West also used residual factors as high as 25%.  (WD Ex. 26).

Thus, Winn Dixie's contention that the Property Appraiser did not adequately consider the factors of section 193.011, Fla. Stat. is not supported by the evidence or Florida law.  Because Winn Dixie cannot establish that the Property Appraiser failed to consider any of the factors of section 193.011, Fla. Stat., Winn Dixie has the burden of proving by clear and convincing evidence that the Property Appraiser's assessments exceeded just value.

III.     THE PROPERTY APPRAISER'S ASSESSMENTS DID NOT EXCEED
         THE JUST VALUE OF THE PROPERTY.

Regardless of whether the burden of proof is clear and convincing evidence or a preponderance of the evidence, Winn Dixie's evidence falls far short of the level needed to overturn the Property Appraiser's assessment under Florida law.  As an initial matter, the Property Appraiser's assessments are supported by Winn Dixie's own estimates of value, as sworn to under oath on its tangible personal property tax returns filed with the Property Appraiser.  This fact alone precludes Winn Dixie from meeting its burden of proof.

In its Objection to Florida Tax Claims [Doc. 14815], Winn Dixie set forth its opinion of the values of its property and asked this Court to reduce the assessments to those numbers.  However, no evidence was presented at trial that supported those requested values.  Although Winn Dixie alleged in its Objection to Florida Tax Claims that its requested values were supported by appraisals by Praport Associates, LLC and Brian Testo Associates, LLC, and both Brian Testo and Kevin Abrahani of Praport Associates were listed on Winn Dixie's witness list, neither of them were called to testify and the appraisal that allegedly supported Winn Dixie's requested values was curiously not introduced into evidence.

20

Instead, Winn Dixie relied on an appraisal by Jack West, which had been hastily revised after his deposition and given to the Property Appraisers two days before trial.  The appraisal did not contain a value for Okaloosa Store No. 0308, and did not contain any calculations showing how his 2005 values were calculated.  The calculations used for the 2006 values were apparently contained in a spreadsheet attached to the back of the appraisal, but the spreadsheet did not contain any headings that would allow a person to review the calculations, and, for Okaloosa Store No. 0541, the final value listed on the spreadsheet did not match the value listed on Mr. West's summary page.  The evidence showed that Mr. West's original appraisal contained numerous substantive errors that resulted in him doubling some of his original values in the revised appraisal submitted to the court.  Given the admitted problems with Mr. West's initial report, the validity of the values proposed in his latest appraisal are questionable, especially given the absence of back-up data for the 2005 values, the lack of headings on the 2006 spreadsheets, and the inconsistency in the values listed for Store No. 0541.

The evidence also demonstrated that Mr. West's values were artificially low because he accounted for obsolescence more than once in his calculations.  Mr. West accounted for functional obsolescence in his selection of the effective age and economic life to use for each category of equipment.  However, after arriving at his Age/Life (cost approach) value, if the Dealer Value was lower, he reduced the value to the lower Dealer Value, referring to the difference as a Remaining Obsolescence Factor (Tr. 244).  The ASA book states as follows with regard to Remaining Obsolescence Factors:

**A Special Note on Obsolescence**
*The appraiser should be aware when using market data as a measure of obsolescence that there exists a potential of "double-dipping" on obsolescence.* As an example, if market data from sales of certain machines suggests depreciation, or obsolescence, in excess of physical deterioration, this

> obsolescence represents an aggregate or sum of functional obsolescence (if present in the machine) and economic obsolescence.  If the appraiser cannot determine the extent of functional obsolescence inherent in the market transaction, the resultant measure of obsolescence is an aggregate obsolescence.  *The appraiser cannot use the aggregate obsolescence as a measure of simply economic obsolescence (or remaining obsolescence) for a subject machine for which the appraiser has already calculated functional obsolescence.*

(Oka. Ex. 7 p.110).  Mr. West did not make any attempt to determine why the dealers' prices indicated a lower value than his Age/Life value (Tr. 253-54).  Thus, his ROF was an aggregate adjustment that accounted for all forms of obsolescence.  Because he had already accounted for functional obsolescence in selecting the effective age and economic lives to use, he essentially accounted for functional obsolescence twice.

The Property Appraiser's assessment, on the other hand, was calculated by the generally-accepted mass appraisal cost approach.  The Property Appraiser relied on data provided by Winn Dixie itself, and tables promulgated by the DOR, which are deemed prima facie correct under Florida law.  *See* §195.032, Fla. Stat.  A representative from the DOR testified that the tables accounted for all forms of physical deterioration and anticipated obsolescence, and appraiser Steve Barreca, who had previously been commissioned to develop a new set of tables, testified that, if anything, the Property Appraiser's use of the DOR's tables could slightly understate the value of Winn Dixie's property.

In summary, no evidence was offered in support of the figures that Winn Dixie requested in its Objection to Florida Tax Claims, and the only evidence offered to show that the Property Appraiser's assessment was too high was the testimony of Jack West, whose appraisal work suffered from several serious deficiencies.  Moreover, Mr. West's appraisal was based on listing prices of used property at the end of its economic life, which all of the other appraisers agreed was inappropriate.  Based on this evidence, Winn Dixie failed to meet its burden of proof.

22

IV.  WINN DIXIE HAS NOT PROVIDED SUBSTANTIAL, COMPETENT
EVIDENCE OF VALUE THAT MEETS THE REQUIREMENTS OF
SECTION 193.011, FLA. STAT.

Even if the court finds that the Property Appraiser's assessment exceeded the fair market value of the property, the Plaintiff's opinion of value may not be adopted by the court unless it is shown that the Plaintiff also considered all of the factors listed in §193.011 in forming his opinion of value.  *See Countryside Country Club Inc. v. Smith,* 573 So.2d 14 (Fla. 2d DCA 1990).  Winn Dixie did not meet its burden of proving that Mr. West's appraisal properly considered the factors of section 193.011, Fla. Stat.  In particular, the evidence showed the he had not properly considered the cost and condition of the property, as required by sections 193.011(5) and (6), Fla. Stat.

Under Florida law, in assessing property by the cost approach, the appraiser must include all costs of acquisition, including freight, installation, taxes, and fees.  *See Mazourek v. Wal-Mart Stores, Inc.*, 831 So. 2d 85, 91 (Fla. 2002).  Likewise, when calculating the amount of depreciation to use based on sales of property in the market, if the original cost includes sales tax, freight and installation charges, then the appraiser must make sure that the sales used in his depreciation analysis also account for sales taxes, freight and installation charges.  The ASA book states that:

> When using [the remaining obsolescence factor] technique, it is important to make sure that the replacement cost new and the market data obtained both either consider, or do not consider, the effects of installation, shipping, engineering, and any indirect costs.  The results of this methodology can become skewed and misleading if costs such as these are erroneously included in one of the amounts and not in the other.

(Oka. Ex. 7 p.104).  Mr. West testified that, while Winn Dixie's reported costs included sales tax, freight and installation, his used equipment dealer prices did not (Tr. 250, 295).

Thus, by depreciating Winn Dixie's equipment based on dealer prices that did not include sales tax, freight and installation charges, Mr. West failed to properly consider the cost of the property.

Mr. West also acknowledged that the only knowledge that he had about the condition of the subject property and his alleged comparable properties was the age of the assets (Tr. 248, 284). However, Winn Dixie's other appraiser, Kevin Abrahani, testified in his deposition that the value of store shelving, which constitutes a significant portion of the subject property, is affected more by its actual condition than its age (Abrahani Depo. 74). There was no evidence that Mr. West made any attempt to ascertain the actual condition of the property.

Finally, if this Court concludes that the appraisers were required to consider comparable sales in order to properly consider the present cash value of the property, Mr. West's appraisal would fail to meet that criteria because, like the Property Appraiser, he also did not use actual sales to appraiser the property (Tr. 246, 285). Rather, he relied solely on liquidation sales and listing prices for used grocery store equipment dealers (Tr. 246, WD Ex. 26). This approach was criticized by all of the other appraisers who testified. Mr. Zeigler from the DOR testified that the used equipment market reflects the value of equipment that is at the end of its economic life, and that, for property tax purposes, the property appraisers should consider the primary equipment market (Tr. 156-57). Mr. Barreca agreed, and testified that the used equipment market indicates liquidation value, not fair market value (Barreca Depo. 18). This Court has also previously cautioned against relying on prices paid under such circumstances. *See In re Litestream Technologies, LLC*, 337 B.R. 705, 710 (M.D. Fla. Bankr. 2006) (holding that property appraiser did not abuse his discretion in declining to use an auction sale).

In addition to his failure to consider these factors, Mr. West's appraisal cannot be considered competent, substantial evidence of value, especially given the lack of calculations for 2005. Winn Dixie did not provide any evidence to support the values it originally claimed on its Objection to Florida Tax Claims, or any other values for that matter.  Thus, in the event that the Property Appraiser's assessments were overturned, the Court would be obliged to remand the assessment to the Property Appraiser to re-assess the property in accordance with the Court's instructions.  *See Todora v. Venice Golf & Country Club No. 1, Inc.*, 826 So. 2d 406 (Fla. 2d DCA 2000).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by electronic transmission to D.J. Baker, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square, New York, NY  10036, Stephen D. Busey, Esq., Cynthia C. Jackson, Esq., Allan E. Wulbern, Esq., and Beau Bowin, Esq., Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, FL  32202, Philip A. Bates, Esq., 25 W. Cedar Street, Suite 550, Pensacola, FL 32501 and Thomas M. Findley, Esq., Messer, Caparello & Self, P.A., Post Office Box 15579, Tallahassee, FL  32317 on this 8th day of June, 2009

DENT & JOHNSON, CHARTERED
3415 Magic Oak Lane
Post Office Box 3259
Sarasota, Florida  34230
Phone:  (941) 952-1070
Fax:    (941) 952-1094
E-mail:  sjohnson@dentjohnson.com

/s/ Sherri L. Johnson
SHERRI L. JOHNSON
Florida Bar No. 0134775

Y:\S02-6530\Post-Trial Memorandum.doc