UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

WINN DIXIE STORES, INC.

      Debtor(s).

_____/

Case No.: 3:05-bk-3817-3F1

**POST-TRIAL MEMORANDUM OF
THE PROPERTY APPRAISER OF ESCAMBIA COUNTY**

The Property Appraiser of Escambia County, through the undersigned counsel, submits the following post-trial memorandum, as directed by the Court at the conclusion of the trial on March 12, 2009:

**I. Overview.**

The Debtor, Winn Dixie Stores, Inc. (Winn Dixie) has objected to certain unpaid ad valorem taxes on tangible personal property located in its stores in Escambia County. Originally, the debtor's objections were stated in broader fashion in the objections to the Tax Collector's claims. During trial, however, the parties distilled the matters in controversy during trial to the following years and stores in Escambia County:

**TAX YEAR 2005**

| Location No. | Address | Parcel No. | Tax Year | Taxing Authority's Assessed Value | WD Return "Taxpayers Estimate of FMV" |
|---|---|---|---|---|---|
| 0493 | 13019 Sorrento | 1066410-0 | 2005 | $613,480 | $629,164 |
| 0495 | 5975 Mobile Hwy | 1065900-1 | 2005 | $768,120 | $794,372 |
| 0495 | 5975 Mobile Hwy | 2010369-3 | 2005 | $20,310 | $31,238 |
| 0498 | 155 S Highway 29 | 1066411-8 | 2005 | $494,550 | $500,095 |
| 0504 | 7135 N 9th Ave | 1065800 | 2005 | $798,210 | $769,085 |
| 0506 | 312 E Nine Mile Rd | 1066400 | 2005 | $812,930 | $776,500 |
| 0535 | 50 S Blue Angel Pkwy | 1085474 | 2005 | $771,040 | $767,503 |
| 0556 | 4751 Bayou Blvd. | 1066200 | 2005 | $410,370 | $436,290 |
| 0565 | 400 N Navy Blvd. | 1066300 | 2005 | $540,010 | $543,029 |

**TAX YEAR 2006**

| Location No. | Address | Parcel No. | Tax Year | Taxing Authority's Assessed Value | WD Return "Taxpayers Estimate of FMV" |
|---|---|---|---|---|---|
| 0493 | 13019 Sorrento | 1066410-0 | 2006 | $628,410 | $633,092 |
| 0495 | 5975 Mobile Hwy | 1065900-1 | 2006 | $683,600 | $691,103 |
| 0498 | 155 S Highway 29 | 1066411-8 | 2006 | $467,050 | $460,103 |
| 0504 | 7135 N 9th Ave | 1065800 | 2006 | $714,620 | $698,157 |
| 0506 | 312 E Nine Mile Rd | 1066400 | 2006 | $713,580 | $687,461 |
| 0535 | 50 S Blue Angel Pkwy | 1085474 | 2006 | $671,080 | $664,150 |
| 0556 | 4751 Bayou Blvd. | 1066200 | 2006 | $433,220 | $459,651 |
| 0565 | 400 N Navy Blvd. | 1066300 | 2006 | $557,770 | $554,186 |

As reflected in the charts above, Winn Dixie contemporaneously calculated for each tax year its own "Taxpayer's Estimate of Fair Market Value" for each store on its tax returns. The returns and estimates of fair market value were sworn to by Winn Dixie Tax Managers. In some instances, Winn Dixie's sworn estimates exceeded the Property Appraiser's valuations. The

difference between Winn Dixie's sworn returns for both years and the Property Appraiser's assessments was negligible.[1]

At trial, no employee from Winn Dixie testified contrary to these sworn estimates of value. Instead, only one non-party witness, Mr. Jack West, testified for Winn Dixie. Mr. West testified to different values than Winn Dixie had estimated, even though Mr. West had never seen the equipment at issue. Mr. West rendered such testimony without reviewing any consummated sales transactions relating to any equipment comparable to the equipment appraised by the Property Appraiser. Trial Transcript, Vol. II., p. 195 (no inspections of equipment of Winn Dixie in Escambia County); p. 283 (did not look at any actual consummated market sales). Both Mr. West's report and his testimony were full of inconsistencies. He admitted at trial that his final summary report was not only missing an entire store, but that it also incorrectly reported the value of another Escambia County store by cutting its value in half on the summary page. Trial Transcript, Vol. II, pp. 224, 279.

There were other discrepancies between Mr. West's report and his testimony at trial. On the summary page of his report, Mr. West figured total Escambia value at $2,315,088 (tax year 2005) and $1,907,387 (tax year 2006). Winn-Dixie Ex. 25, p. 3. Contrast this with his trial testimony of values at $2,471,488 (tax year 2005) and $2,075,269 (tax year 2006). Trial Transcript, Vol. II, p. 225. At trial, Mr. West tried to account for this discrepancy by putting forth numbers for a missing Store 565, which he valued at $156,400 for tax year 2005 and $167,882 for tax year 2006. Trial Transcript, Vol. II, p. 224-25. The detail in his report did not

---

[1] There are other parcels identified in the original Debtors' Objections for Escambia County. However, Winn Dixie offered no evidence on the other parcels and those objections should be overruled. Winn Dixie's sole witness, Jack West, addressed only the parcel numbers identified in the charts above.

match these totals and included data for at least one store that was not contested, i.e., Escambia County Store 515.[2]

Witnesses from the Property Appraiser's Office (Ms. Jenny Grice), the Department of Revenue (Mr. Mike Zeigler), and a certified depreciation expert (Mr. Steven Barreca) all testified counter to Mr. West's testimony. Each of these witnesses testified that the appraisals were sound and based on a fundamental cost approach utilized throughout the nation and the State of Florida. They all testified that the appraisals of the Property Appraiser were done in conformance with Department of Revenue guidelines, which are based on reputable industry guidelines, Internal Revenue studies, Department of Revenue review and the assistance of outside consultants. The application of these DOR guidelines has been upheld by numerous Florida courts and also by this Court. In fact, all of the Property Appraiser's valuations on the basis of these established guidelines were corroborated by Winn Dixie's own contemporaneous, sworn estimates of value.

## II. The Property Appraiser exercised his discretion in a manner consistent with Florida law.

Florida law controls the outcome of this proceeding. *In Re: Litestream Technologies, LLC*, 337 B.R. 705, 709 (M.D. Fla. 2006). The legal standards for this case are found in Florida case law, Florida Statutes, and the Florida Constitution's requirement that "regulations shall be prescribed which shall secure a just valuation of all property for ad valorem taxation . . . ." Art. VI, § 4, Fla. Const.

The property appraiser's determination of just value is an exercise of administrative discretion within the field of his or her expertise. *See Havill v. Scripps Howard Cable Co.,* 742

---

[2] As of 24 hours prior to trial, Mr. West's schedules included no detailed data for tax year 2005. In fact, the copies of exhibits used at trial by counsel for the property appraisers had no detail data for tax year 2005. Although voluminous email were sent less than 24 hours before trial, purporting to show data for tax year 2005, the exhibit books of counsel were not updated by Winn Dixie. The undersigned counsel is not sure whether the actual exhibits introduced into evidence included 2005 data or whether the exhibits were like the exhibits in the books provided to the undersigned counsel by Winn Dixie's counsel.

So. 2d 210, 212 (Fla. 1998); *Blake v. Xerox Corp.,* 447 So. 2d 1348 (Fla. 1984). Florida courts have defined "just valuation" as being synonymous with "fair market value." *See Turner v. Tokai Financial Servs., Inc.,* 767 So. 2d 494, 496 (2d DCA 2000) (citing *Walter v. Schuler,* 176 So. 2d 81, 85-86 (Fla. 1965)).

The Legislature has set forth eight factors which a property appraiser must consider to assist the property appraiser in determining just valuation. §193.011, Fla. Stat. (2005); *Mazourek v. Wal-Mart Stores, Inc.,* 831 So. 2d 85, 88 (Fla. 2002). "The obligation upon the property appraiser is for the property appraiser to 'consider,' but not necessarily apply, each factor." *Mazourek,* 831 So. 2d at 89. *See also Higgs v. Good,* 813 So. 2d 178, 179 (Fla. 3d DCA 2002). The property appraiser has considerable discretion in weighing these factors and calculating an assessed value. *In Re: Litestream Technologies,* LLC, 337 B.R. 705, 709 (M.D. Fla. 2006).

A presumption of correctness attaches to the property appraiser's assessment of property for ad valorem taxation purposes. *Havill,* 742 So. 2d at 212. Section 194.301, Florida Statutes, provides that the property appraiser's assessment must be accorded a presumption of correctness, unless the taxpayer proves by a preponderance of the evidence that the property appraiser did not consider the criteria in Section 193.011. The presumption of correctness is lost only if the property appraiser fails to consider each of the statutory factors contained in Section 193.011. *See Havill,* 742 So. 2d at 212. If the presumption of validity is defeated, the taxpayer's burden is to prove by a preponderance of the evidence that the assessment exceeds just value. *See GTE Florida, Inc. v. Todora,* 854 So. 2d 731, 736 (Fla. 2d DCA 2003). If the presumption is not defeated, the taxpayer's burden of proof on that issue is by clear and convincing evidence. *See id.*

In this case, the evidence is not disputed that the Property Appraiser considered all eight statutory criteria. Trial Transcript I, p. 80-81. No witness testified to the contrary. Ms. Grice testified for the Property Appraiser. Ms. Grice is a Certified Florida Evaluator, a certification granted by the International Association of Appraising Officers. Trial Transcript I, p. 77. She has served in the tangible personal property section of the Escambia County Property Appraiser's Office for 24 years. Trial Transcript I, p. 76. Having reviewed the statutory criteria in Section 193.011, Florida Statutes, Ms. Grice unequivocally confirmed that her office considered all eight criteria in reference to the Winn Dixie assessments at issue. *Id.*

Ms. Grice testified that the Property Appraiser's Office considered the sales comparison approach to value. Trial Transcript I, p. 81. However, she stated that such an analysis has to be based on "true market" sales. *Id.* Ms. Grice testified that her office concluded that the equipment salvage market was not a reliable indicator of value for installed equipment in use in an operating grocery store. She testified that there was no reliable data for true market sales for the installed equipment then in place at the Winn Dixie stores. *Id.*

Ms. Grice's testimony on this point was confirmed by Winn Dixie's expert, Mr. Jack West. Mr. West testified with respect to his own analysis on cross-examination:

**Q:** Ultimately, you relied on no data that showed actual consummated sales, is that correct?

**A:** No consummated sales, correct.

Trial Transcript II, p. 289. Mr. West was then asked about the USPAP principle upon which he had relied, which requires analysis of sales. He testified that no consummated sales data was available to him. Mr. West testified in response to cross-examination:

**Q:** So are you saying that sales in this case were not available to you?

**A:** Yes.

Trial Transcript I, p. 289.

Based on this record, it is undisputed that no reliable, comparable sales transactions were available to either party to conduct a sound sales comparison analysis. Nevertheless, the Property Appraiser gave additional consideration to other market data. The Property Appraiser collects data from all types of stores relating to sales of businesses. That data is collected by the Property Appraiser on line 9 of the tax returns. Trial Transcript I, p. 79. Ms. Grice testified that the Property Appraiser uses that sales data from the returns to acquire market information. Trial Transcript I, p. 79-80. She also testified that the Property Appraiser's Office examines data obtained from newspapers. Trial Transcript I, p. 80. Such data is used as a resource to gather information regarding sales of businesses in Escambia County. *Id.* The Property Appraiser also considers market data received from taxpayers. In this case, Winn Dixie did not provide any market data to the Property Appraiser. Trial Transcript I, p. 82.

Ms. Grice further testified that sales data for similar equipment was considered in other recent appraisal work, including the assessments for Wal-Mart, Target and K-Mart. Trial Transcript I, p. 82. The Property Appraiser's Office reviewed that market data and concluded that the data was not reliable. Trial Transcript I, p. 82. Based on this lack of quality in the market data, the Property Appraiser exercised his discretion and relied on a cost approach to value.

In conducting this cost approach, the Escambia County Property Appraiser used the original cost data submitted to it by Winn-Dixie. Trial Transcript I, p. 83. There is no dispute that this original cost data was correct. The Property Appraiser then applied the Department of Revenue, Standard Measures of Value: Tangible Personal Property Appraisal Guidelines (the

"DOR Guidelines") to render the valuation of the Debtors' tangible personal property. Trial Transcript I, p. 84.

As a check to the cost approach, the Property Appraiser consulted Winn Dixie's sworn estimates of value. Trial Transcript I, p. 78, 85. Based on that comparison, the Property Appraiser concluded that "our values were in line with the taxpayer's opinion of value." Trial Transcript I, p. 85. The taxpayer returns are utilized by the Property Appraiser as a check on their own methodology. In submitting the sworn estimates of value, Winn Dixie was giving its contemporaneous estimate of fair market value. Such an estimate of fair market value is not restricted to any particular method of valuation, such as the cost approach or the sales comparison approach. Trial Transcript I, p. 78. Presumably, such estimates by a taxpayer are based on a consideration of all relevant criteria.

In this case, Winn Dixie's estimates of fair market value were in line with the Property Appraiser's conclusions. Trial Transcript I, p. 85. Although Winn Dixie subsequently corresponded with the Property Appraiser after the returns were filed regarding their filing of bankruptcy, Winn Dixie provided no information to counter its prior estimates of fair market value. Trial Transcript I, p. 86-87. Even upon being contacted by the Property Appraiser's Chief Deputy, Keith Hodges, Winn Dixie did not provide any information to either support its prior estimates of fair market value or to detract from such figures. Trial Transcript, p. 87.

The tangible personal property tax return serves the additional function of allowing taxpayers to indicate if property is in poor condition. Trial Transcript I, p. 88. If the taxpayer indicates that property is in poor condition, the Property Appraiser investigates by contacting the taxpayer. Trial Transcript I, p. 88. In this manner, any unusual characteristics regarding deterioration or obsolescence can be detected. In this case, however, Winn Dixie did not indicate

that any of the assessed assets were in poor condition or experiencing any unusual levels of obsolescence. Trial Transcript I, p. 88. In fact, Mr. West testified that the type of equipment used by Winn Dixie was "typical" grocery store equipment that continued to maintain its essential function in the grocery business. Trial Transcript I, p. 268.

The Supreme Court of Florida has upheld the exact methodology used by the Property Appraiser in this case. In a case involving retail equipment, the Supreme Court specifically cited the DOR Guidelines as a valid source for the criteria necessary to render a valid cost approach to value for retail tangible personal property. *Mazourek v. Wal-Mart Stores, Inc.*, 831 So. 2d 85 (Fla. 2002). This Court has, in turn, relied on *Mazourek* to conclude that a cost approach to value is an "appropriate method" of calculating valuations for tangible personal property. *In Re: Litestream Technologies,* LLC, 337 B.R. 705, 710 (M.D. Fla. 2006).

In *Litestream*, this Court held that the property appraiser appropriately exercised his discretion in valuing tangible personal property utilizing the cost approach. The *Litestream* Court rejected an argument that evidence of prices received at an auction sale was valid comparable sales evidence. This Court specifically held that the property appraiser did not abuse his discretion by disregarding the prices paid at such sales. *Id.* at 710; *see also Southern Bell Telephone and Telegraph Co. v. Markham*, 632 So. 2d 272, 276 (Fla. 4th DCA 1994)(taxpayer's sales study thrown out as fatally flawed and unreliable where sales were not verified and not close in time to dates of assessment). This Court's support for the cost approach taken in *Litestream* and the principles set forth in *Mazourek* strongly support the Property Appraiser's methodology in this case.

The DOR Guidelines approved of in *Litestream* provide abundant support for the cost approach to value, as distinguished from the income and comparable sales approach. In *GTE*

*Florida, Inc. v. Todora*, 854 So. 2d 731 (Fla. 2d DCA 2003), the Court explained that the income approach to valuing tangible personal property is not a valid approach, because there is a risk that the intangible assets, including successful management and goodwill, may be factored into the overall valuation. The Court cited the DOR Guidelines in declaring that the "capitalization of earnings generated by a business through the use of tangible personal property such as equipment, machinery, etc., is not recommended as an accurate approach to value . . . ." *Id.* at 734. The Court also rejected a comparable sale approach to value in the same case. The Court rejected the use of comparable sales "around the country" as a basis for finding adequate sales data for Sarasota County, Florida, holding that the "evidence of comparable sales failed to support its valuation of . . . property **in Sarasota County** . . . ." *Id.* at 735 and 737 (emphasis added). In *Havill v. Scripps Howard Cable Co.*, 742 So.2d 210, 213 (Fla. 1998), the Supreme Court of Florida again cited the DOR Guidelines and a preference for using a cost approach to value in tangible personal property assessments, given the absence of reliable evidence of comparable sales data and the risk that the income approach will include intangible value.

The Department of Revenue is the agency which oversees property tax assessments in Florida. As the agency responsible for such oversight, the DOR's interpretations are entitled to deference. The DOR Guidelines were promulgated with the participation of industry. As Mr. Steve Barreca testified, the DOR Guidelines were based on "thousands" of market observations. *Barreca Deposition, p. 24-25, 27.* These Guidelines account for the various forms of depreciation, including functional and economic obsolescence, as engrained into the DOR Guidelines through the thousands of transactions observed in the market. *Barreca Deposition, p. 15, 25.*

The Property Appraiser of Escambia County correctly applied the DOR Guidelines and tables in the assessment of the Debtors' tangible personal property in Escambia County. At a minimum, the Property Appraiser's reliance on the sworn tax returns was within his discretion. As this Court held in *Litestream*: "The Property Appraiser did not abuse his discretion in calculating the assessed value by starting with the debtor's self-reported value and adjusting it for depreciation and replacement cost." 337 B.R. at 711. In essence, *Litestream* concluded that such reliance on self-reported values on sworn returns of the taxpayer is reasonable. Based on the foregoing, the Property Appraiser's assessments in this case are presumed to be correct.

### III. The testimony of the solitary witness of Winn Dixie did not present clear and convincing evidence to support an alternative valuation.

Mr. West, the sole witness for Winn Dixie, was internally inconsistent in his own testimony and also inconsistent with other experts hired by Winn Dixie, whose testimony is in the record through the admission of deposition excerpts.[3] Winn Dixie did not offer the testimony of its Tax Manager, Mr. Tansi, at trial. In his deposition, Mr. Tansi had cited no disagreement with the application of the DOR Guidelines and depreciation tables. *Tansi Deposition, p. 18, l. 17-20; p. 19, l. 17-22.* Contrary to Winn Dixie's legal argument, the DOR Guidelines expressly consider both functional obsolescence and economic obsolescence in the calculation of depreciation. See Guidelines, e.g., at p. 12-14; *Barreca Deposition, p. 25.*

Mr. West did not derive values for the 2005 and 2006 tax years until he was retained much later in 2008. He had no knowledge of the condition of the assets in question and derived values far less than Winn Dixie's own contemporaneous values filed in its sworn tax returns. Such testimony should be barred by the doctrine of estoppel. *See City of Tampa v. Mugge*, 24

---

[3] See Trial Transcript, p. 188. The trial court admitted all deposition excerpts noted in Escambia County Property Appraiser's pretrial submissions. Those excerpts are found within Escambia County Property Appraiser Exhibits 14, 15 and 16.

So. 489, 495 (Fla. 1898)("Taxpayers who place valuations on their own property for taxation, and which are accepted as correct by the assessing officers . . . are estopped from questioning such values"). Generally, the doctrine also bars one from taking a position in a judicial proceeding that is inconsistent with a prior position in an administrative or judicial forum. In *S&D Environmental Services, Inc. v. Rosenberg*, 739 A.2d 360 (N.J. 1999), the Court found that arguments in court that are inconsistent with prior sworn statements on a tax return are barred by the doctrine of judicial estoppel. Here, the returns were filed by Winn Dixie as part of the administrative process for the collection of ad valorem taxation, as prescribed by Chapters 193 and 194, Florida Statutes. To flout that administrative process by taking a vastly different position in bankruptcy court, years after the sworn statements were made, should not be permitted.

Unlike Mr. West, who was not hired until 2008, Mr. Tansi, Winn Dixie's Tax Manager, personally reviewed the property tax returns before they are filed. *Tansi Deposition, p. 6, l. 14*. Mr. Tansi has been a tax professional for 22 years. *Tansi Deposition, p. 8, l. 4*. As of the critical dates of assessment, that is January 1st of 2005 and 2006, Winn Dixie had no problem with its own estimates of fair market value. In fact, Winn Dixie and its Tax Manager had no basis for any belief that the assets were overassessed as of the critical dates of valuation. *Tansi Deposition, p. 16, l. 3-8.*

Mr. Tansi confirmed in his testimony that all of the information on the returns was true and correct. *Tansi Deposition, p. 27-28*. As Tax Manager of Winn Dixie, Mr.Tansi took measures to ensure the information was correct. *Tansi Deposition, p. 27*. Thus, the returns were filed under oath, after ensuring the information was correct. After they were filed, Winn Dixie undertook no effort to contest or request a conference on the assessments with the Property

Appraiser. It was not until bankruptcy had been filed that Winn Dixie personnel other than the Tax Manager decided to contest every assessment in the State of Florida and in other states.

Notwithstanding the near equivalence of Winn Dixie's contemporaneous estimate of fair market value on its sworn returns and the Property Appraiser's valuations, Winn Dixie developed a post-petition argument that it was overassessed for 2005 and 2006. Instead of relying on its own tax professionals, who had no disagreement with the assessments now at issue, Winn Dixie employed Assessment Technologies. Winn Dixie has paid these consultants "several million" dollars, *Tansi Deposition, p. 34, l. 15,* even though it later determined not to call them as witnesses in its case in chief. Ultimately, the experts used by Assessment Technologies, Mr. Testo and Mr. Abrahani, offered no criticism of the Property Appraiser's approach. Moreover, they offered no disagreement with any aspect of the DOR guidelines. *Abrahani Deposition, p. 47-48.*

Winn Dixie only belatedly decided to retain a third expert, Mr. Jack West, who was called at trial as Winn Dixie's only witness. Mr. West had never testified in court as an expert. Trial Transcript II, p. 267. Moreover, he is not a certified depreciation expert, as is Mr. Barreca, the Property Appraiser's witness. *Id.*

In his assignment for Winn Dixie, Mr. West did not visit any Winn Dixie stores in Escambia County. Trial Transcript II, p. 267. Moreover, he did not speak with any store managers at the stores at issue. Trial Transcript II, p. 268. Mr. West did not examine any consummated sales for the equipment at issue. Trial Transcript II, p. 283. Mr. West admitted

that he had absolutely no knowledge of the condition of the appraised assets, other than their age. Trial Transcript II, p. 284.[4]

Without having seen the equipment or reviewed any actual sales of similar equipment, Mr. West nevertheless produced an "appraisal" on December 8, 2008, nearly four years after the relevant date for the first tax year at issue. While purporting to conduct a cost approach, Mr. West ultimately adjusted his figures to a market approach by reducing his valuation for the equipment at issue to the prices that equipment dealers verbally told him would be their asking prices. To gather this "market" data, Mr. West interviewed equipment dealers, but did not look at actual consummated sales of the equipment involved in this case. Trial Transcript II, p. 284. He reviewed some sales of entire stores, but not the equipment at issue. Even when he looked at prices for stores sold as a whole, Mr. West did not bother to obtain the asset lists, so he was unable to determine what was actually included in such sales. Trial Transcript II, p. 283-84.

Mr. West had no knowledge of whether sellers of the stores were in distress, and he relied on at least one sale where the seller was admittedly being hounded by creditors. Trial Transcript II, p. 287. He did not study the documentation underlying those sales. Trial Transcript II, p. 284. Therefore, he did not know whether the sales of the entire stores included goodwill or other intangibles, nor did he know if the equipment was in good condition or even operable. On this point, Mr. West's analysis is grossly out of line with the Florida standard for fair market value, in which the seller must be a willing seller who is not under any distress to sell. *See Litestream*, 337 B.R. at 710. As this Court held in *Litestream,* even consummated sales should not be considered under a sales approach when the sales were "not made by a willing seller." *Id.* at 710.

---

[4] In fact, the only evidence of any inspection prior to trial was provided by the Escambia County Property Appraiser's office. Ms. Grice testified that the equipment was inspected in 2007 and the condition was verified. Trial Transcript, p. 85.

Mr. West admitted that actual sales are better than interviews with dealers. Trial Transcript II, p. 290-91. He further acknowledged that it was simply "impractical" to do a detailed valuation of the equipment at issue. Trial Transcript II, p. 291. While it was undisputed that installed cost was the appropriate measure of value, he admitted that he did not know the installation costs for the data he reviewed. Trial Transcript II, p. 295. Mr. West also admitted doing no analysis of any actual obsolescence. Mr. West testified: "I'm not valuing specific assets and taking the 1500 assets in the store and observing physical, functional and economic obsolescence from a cost perspective." Trial Transcript, p. 249.

Finally, Mr. West's testimony was contradictory from one sitting to the next. Even in the week before trial, his numbers changed substantially. Prior to trial, Mr. West was deposed and revealed a very low valuation based on his conversations with a handful of salvage equipment dealers. At his deposition, counsel for the Property Appraiser pointed out several, significant errors. Trial Transcript II, p. 230, 231, 232, 233, 272, 273. The worst error was Mr. West's miscalculation of the age of the appraised assets. Mr. West inflated the assets' actual lives, which then were inconsistent with Winn Dixie's own records. As Mr. West acknowledged at trial, counsel for the Property Appraiser "discovered" the error. Trial Transcript II, p. 232.

The necessary corrections due to restoring the assets to the correct and younger ages resulted in a doubling of the valuations for some stores. Trial Transcript II, p. 280-81. For example, Mr. West had Store #495 in Escambia County at a valuation of $224,380 up until shortly before trial, when he addressed these errors to yield a valuation of $450,430. Trial Transcript, pp. 279-280. The errors of Mr. West are not confined to his past reports. In the report produced at trial, which is now in evidence, there are highly significant errors. For example, Mr. West acknowledged on cross examination that the "summary page is wrong."

Trial Transcript, p. 279. This error reflects that Mr. West intended to double the valuation for Store #495, based on errors pointed out by counsel for the Property Appraiser at Mr. West's deposition, but failed to reflect that in his summary report. Thus, the summary now on file with the Court is admittedly wrong in showing a value of $224,380 for Store 495 in Escambia County, while the detail shows the much higher value of $450,430. Trial Transcript, Vol. II, p. 279.

Mr. West also admitted that he had nothing in the summary of his current report for Store 565 in Escambia County. *Id.; see* Winn Dixie Ex. 25, p. 3 and Tab 22. The inconsistencies were not only internal in his report, but there were also inconsistencies between his report and his testimony. For example, on the summary page of his report in evidence, Mr. West calculated total Escambia value at $2,315,088 (tax year 2005) and $1,907,387 (tax year 2006). Winn-Dixie Ex. 25, p. 3. These figures contrasted with his trial testimony of values at $2,471,488 (tax year 2005) and $2,075,269 (tax year 2006). Trial Transcript, Vol. II, p. 225. At trial, Mr. West tried to account for this discrepancy by putting forth numbers for a missing Store 565, which he valued at $156,400 for tax year 2005 and $167,882 for tax year 2006. Trial Transcript, Vol. II, p. 224-25. Yet, even these verbal adjustments in the middle of trial were not supported by the detail in the exhibit books, which was changing on a daily basis and including certain uncontested stores, e.g., Stores 483 and 515, in the detail, while omitting and erroneously reporting contested stores in the summary. Accordingly, this Court should not rely on Mr. West's report, as it is conceded to be rife with errors.

In contrast to Mr. West, the Property Appraiser's witness, Mr. Steve Barreca, not only engaged in an extensive analysis of the DOR tables, but he also concluded that the Property Appraisers of Escambia and Okaloosa Counties correctly applied the tables. *Barreca Deposition, p. 109.* Mr. Barreca testified that the values derived using a strict approach under the

DOR tables would be just under the value reached by Mr. Barreca's own tables. *Barreca Deposition, p. 32.* Mr. Barreca further opined that the values obtained using the DOR tables by the Escambia and Okaloosa property appraisers would reflect fair market value or a **"value slightly below fair market value."** *Barreca Deposition, p. 85-86.*

In 2004, Mr. Barreca was hired by the DOR to calibrate the useful lives in the DOR depreciation tables. *Barreca Deposition, p. 19-21.* Mr. Barreca established that the economic and functional obsolescence has been fully factored into the DOR tables through hundreds of thousands of market observations in many industries. *Barreca Deposition, p. 25, 45-46, 108-09.* The DOR tables are also fortified by the reputable studies of the Marshall Valuation Services. Trial Transcript, p. 146-47. As Mr. Ziegler from the Department of Revenue testified, the DOR guidelines are based not only on the Marshall Valuation Services, but also on data developed by the Internal Revenue Service. Trial Transcript, p. 147-48.

Winn Dixie's expert, Mr. Testo, agreed that Marshall Valuation Service is a "reputable guide," *Testo Deposition, p. 53, l. 11-13,* which he also used as a resource for his report. *Id.; Abrahani Deposition, p. 63, l. 13-18.* Mr. West also cited Marshall Valuation Service as a resource for his section on normal economic lives of assets. Trial Exhibit 26, p. 18 (West Report). Even though Mr. West criticized the DOR Guidelines in his testimony, he ironically admitted that he utilized other experts for criticizing the DOR depreciation tables in the past, because he was not an expert on that topic. Trial Transcript, p. 294.

Ultimately, Mr. West's methodology based on conversations with salvage dealers, without any review of documentation of consummated sales, is completely deficient in terms of measuring fair market value. The experts that Winn Dixie did not call at trial, Mr. Testo and Mr. Abrahani, testified that they would not have relied on sales prices obtained at auctions or

liquidation sales. *Testo Deposition, p. 20, l. 20-23; Abrahani Deposition, p. 162, l. 19-20 ("not a good indicator of probably fair market value because an auction is forced liquidation").* Thus, they did not utilize going out of business sales. *Abrahani Deposition, p. 166.* On this point, Mr. Barreca, expert for the Property Appraisers, corroborated the point, by testifying that reference to the used equipment market would not be probative of fair market value, but would instead yield a "marked-up salvage" value. *Barreca Deposition, p. 70.*

Under Florida law, "fair market value" is the standard for property tax valuations. A critical component of "fair market value" is the highest and best use to which the property can be used. In fact, the Legislature requires, by operation of section 193.011(2), Florida Statutes, that highest and best use be considered. Yet, when one is looking at liquidation value, which is equivalent to whatever price one can get on an equipment dealer listing, that is the property's "lowest use." *Barreca Deposition, p. 71.* Reference to the equipment dealer market reflects liquidation values, not the highest and best use. Consequently, Mr. West's testimony should be disregarded in its entirety, because it does not comport with the legal standard for fair market value under existing Florida law.

## CONCLUSION

In sum, the Property Appraiser's analysis; Winn Dixie's contemporaneous, sworn estimates of value by its tax professionals; Mr. Zeigler's testimony; and Mr. Barreca's testimony, all support a finding that the assessments at issue are entirely reasonable and certainly within the discretion afforded the Property Appraiser. The Property Appraiser's analysis was based on a sound application of well established DOR guidelines, as approved of by this Court, the Florida Supreme Court, government regulators and experts in the field, who have analyzed thousands of actual market transactions to confirm the validity of the guidelines. Winn Dixie cannot show

that the Escambia County Property Appraiser failed to consider the statutory criteria. Therefore, the assessments are presumed to be correct. Winn Dixie's evidence of hearsay conversations about uncorroborated transactions, involving equipment in unknown condition, by unknown sellers, and in unknown circumstances (some in distress), does not constitute clear and convincing evidence to defeat the assessments made in this case by the Escambia County Property Appraiser.

WHEREFORE, the Property Appraiser of Escambia County respectfully requests that this Court uphold the assessments and the Tax Collectors' claims in full.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by electronic filing using CM/ECF system to Allan E. Wulbern, Esq., Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, FL 32202, Counsel for Reorganized Debtors; Sherri L. Johnson, Esq., Dent & Johnson, Chartered, 3415 Magic Oak Lane, Sarasota, FL 34230, Counsel for Okaloosa County Property Appraiser; Philip A. Bates, Esq., Philip A. Bates, P.A., 25 W. Cedar Street, Suite 550, Pensacola, FL 32501, Counsel for Escambia and Okaloosa County Tax Collectors, this 8th day of June, 2009.

          s/Thomas M. Findley
ELLIOTT MESSER
Florida Bar No.: 054461
THOMAS M. FINDLEY
Florida Bar No.: 0797855
Messer, Caparello & Self, P.A.
Post Office Box 15579
Tallahassee, FL 32317
Telephone: (850) 222-0720
Facsimile: (850) 224-4359
Counsel for Property Appraiser Chris Jones