**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., *et al.* | ) | Chapter 11 |
| Reorganized Debtors. | ) | Jointly Administered |
| | ) | |

**WINN-DIXIE'S POST-TRIAL MEMORANDUM**
**ON ITS OBJECTION TO TAX CLAIMS**
**AND MOTION FOR ORDER DETERMINING**
**TAX LIABILITIES (AS IT RELATES TO THE CLAIMS**
**OF ESCAMBIA AND OKALOOSA COUNTIES, FLORIDA)**

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Counsel for Winn-Dixie Stores, Inc.

Table of Contents

Page

I.   Summary of Argument ................................................................................ 1

II.  Argument ................................................................................................... 3

   A.   Under Florida law, property must be assessed at its "just value" by considering eight statutory factors prescribed by section 193.011, Florida Statutes ............................... 3

   B.   The Appraisers failed to consider one of the eight statutory factors—comparable sales—in valuing Winn-Dixie's personal property ........................................................ 5

      1.   *The Appraisers did nothing to determine whether there was a market for Winn-Dixie's equipment* ............................................................................ 5

      2.   *The Appraisers failed to calibrate their cost approach appraisals with market data* ................................. 10

      3.   *The DOR has not calibrated its tables with market data or any other recognized technique for calibrating a mass appraisal model* ................................ 12

   C.   The Court should adopt Winn-Dixie's valuation as the fair market value of the property. ..................................... 17

   D.   All experts agreed that the DOR's Marshall & Swift tables are unreliable ........................................................ 22

   E.   Winn-Dixie should not be bound by the estimates of fair market value appearing on its tax returns ................................. 27

III. Conclusion ................................................................................................ 29

<u>Winn-Dixie's Post-Trial Memorandum</u>

Winn-Dixie Stores, Inc. and twenty-three of its reorganized debtor affiliates (collectively, "Winn-Dixie"), submit this memorandum in accordance with the Court's order at the conclusion of the trial that this Court conducted on March 12, 2009 on the following docket entries:

(i)     Florida Tax Collectors' Proof of Claim No. 12566;

(ii)    Winn-Dixie's Objection to Florida Tax Claims and Motion for Order Determining Tax Liabilities (Doc. No. 10046) as it relates to the tax claims of Escambia and Okaloosa counties;

(iii)   Escambia County Tax Collector's request for administrative expense (Doc. No. 14281);

(iv)    Escambia County Tax Collector's response to the Florida Tax Objection (Doc. No. 10605);

(v)     Escambia County Property Appraiser's response to the Florida Tax Objection (Doc. No. 15545);

(vi)    Escambia County Property Appraiser's amended response to the Florida Tax Objection (Doc. No. 15549);

(vii)   Okaloosa County Tax Collector's response to the Florida Tax Objection (Doc. No. 10606); and

(viii)  Okaloosa County Property Appraiser's response to the Florida Tax Objection (Doc. No. 15882).

## I.     Summary of Argument[1]

Under Florida law, the property appraiser's estimation of value is presumed to be correct if the appraiser considers the eight statutory criteria listed in section 193.011, Florida Statutes.  That presumption is rebuttable and can be overcome if the

---

[1]     Winn-Dixie incorporates by reference the Trial Memorandum (Doc. No. 22155) that Winn-Dixie submitted on March 5, 2009, in accordance with the Court's orders scheduling trial (Doc. Nos. 21474 and 21586).

taxpayer establishes a lower value with clear and convincing evidence. If the appraiser failed to consider even one of those eight factors, however, the appraiser loses the presumption of correctness, and the taxpayer can establish the correct value by only a preponderance of the evidence.

The Okaloosa County Property Appraiser and the Escambia County Property Appraiser (collectively, the "Appraisers") appraised Winn-Dixie's equipment using a cost approach methodology. Their cost approach appraisals were based entirely on depreciation tables published by the Florida Department of Revenue (the "DOR"). In using only the DOR's depreciation tables, the Appraisers failed to consider any market data indicating the price a willing buyer would pay a willing seller for Winn-Dixie's equipment, which is the first required statutory factor under section 193.011. For this reason, the Appraisers' valuations of Winn-Dixie's equipment do not have the benefit of the statutory presumption of correctness.

In contrast, Winn-Dixie engaged an independent appraiser, experienced in appraising equipment, who also performed a cost approach appraisal based on the remaining useful life of the equipment, but calibrated those results with market data, as required by the DOR, the American Society of Appraisers and the Appraisal Institute. As a result, Winn-Dixie established that the market value of its equipment was much lower than the Appraisers had estimated.

Because the preponderance of the evidence shows that Winn-Dixie's appraisal reflects the just value of its equipment, the Court should (i) find that Winn-Dixie's appraisal reflects the fair market value of Winn-Dixie's tangible personal property in

Escambia and Okaloosa Counties as of January 1, 2005 and 2006 and (ii) order the Tax Collectors for Okaloosa and Escambia Counties determine Winn-Dixie's ad valorem taxes for 2005 and 2006 based on those values.

## II.    Argument

### A.    Under Florida law, property must be assessed at its "just value" by considering eight statutory factors prescribed by section 193.011, Florida Statutes.

The Florida Constitution requires a "just valuation" of all property for ad valorem taxation. *See* Fla. Const. art. VII, § 4. The Florida Supreme Court has held that just valuation is "legally synonymous" with fair market value. *Walter v. Schuler*, 176 So. 2d 81, 85-86 (Fla. 1965). Fair market value "may be established by the classic formula that is the amount a 'purchaser willing but not obliged to buy would pay to one willing but not obliged to sell.'" *Id.* at 86 (citing *Root v. Wood*, 212 So. 2d 133 (Fla. 1945)).

To ensure that county property appraisers comply with article VII, section 4 of the Florida Constitution, the Florida Legislature enacted section 193.011, Florida Statutes, which provides eight factors that a property appraiser *must* consider in arriving at "just valuation" for ad valorem tax purposes. *See* Fla. Stat. § 193.011 (2008).

In *Havill v. Scripps Howard Cable Co.*, 742 So. 2d 210 (Fla. 1998), the Florida Supreme Court recognized that there are "three well-recognized approaches to determining the value of tangible personal property." *Id.* at 212. They are (i) the "market approach" or "comparable sales approach," (ii) the "cost approach" and (iii) the "income approach." *Id.*

The DOR has adopted guidelines which county property appraisers utilize in determining the appraised value of personal property for ad valorem tax purposes. (Tr. 143-4; Debtors' Exhibit ("WD Ex.") 10: Florida Department of Revenue, *Standard Measures of Value: Tangible Personal Property Appraisal Guidelines* (the "*DOR Guidelines*")).

According to the *DOR Guidelines*, to arrive at "just value," the county property appraiser is *required* to (i) use one or more of the three approaches to value *and* (ii) take into consideration all eight factors of section 193.011:

> The appraisal official is *required to consider* the cost, market and income approaches, and *use* one of these approaches or a combination of these approaches in arriving at just value.   The eight factors in Section 193.011, F.S., *must be considered* in deriving just value.
>
> WD Ex. 10 (*DOR Guidelines)*, page 3 (emphasis added).

If a property appraiser "considers properly" all eight statutory factors, then the property appraiser's valuation is presumed to be correct and the taxpayer has the burden of proving by clear and convincing evidence that the property appraiser's valuations are in excess of "just value."   Fla. Stat. § 194.301 (2008).   However, according to the statutory scheme, if the property appraiser fails to "*consider properly*" even *one* of those factors, the appraiser's presumption of correctness is lost, and the taxpayer's burden is reduced to showing only by a *preponderance of the evidence* that the property appraiser's valuation is in excess of fair market value.   *Id.* (emphasis added).   "Proper consideration" of a statutory factor means more than just merely having "thought" about it.   *See*, *e.g.*, *Schultz v. TM Florida-Ohio Realty, Ltd.*

*P'ship*, 553 So. 2d 1203, 1206 (Fla. 2d DCA 1989) (consideration means more than "*merely having thought about the fair market value factor*"; emphasis added).

In this case, as shown below, the testimony of the Appraisers' witnesses showed that the Appraisers gave *no* consideration to the first factor of section 193.011, which is what a willing buyer would pay a willing seller for Winn-Dixie's equipment. *See* Fla. Stat. § 193.011(1) (2008). As a result the Appraisers' valuations lose their presumption of correctness.

      B.    The Appraisers failed to consider one of the eight statutory factors—comparable sales—in valuing Winn-Dixie's personal property.

All of the parties agree that a cost approach appraisal is the best method for appraising Winn-Dixie's equipment. In using the cost approach, however, the Appraisers did *nothing* to consider comparable sales when they appraised Winn-Dixie's assets. The Appraisers never even looked to see if there was a market for Winn-Dixie's assets.

      1.    *The Appraisers did nothing to determine whether there was a market for Winn-Dixie's equipment.*

Section 193.011(1) required the Appraisers to consider market data relating to sales of grocery store equipment when they appraised Winn-Dixie's equipment, *even though using the cost approach. See Wal-Mart Stores, Inc. v. Mazourek,* 778 So. 2d 346 (Fla. 5th DCA 2000) ("The property appraiser's admitted *failure to investigate*

*the availability of market data* indicates he *failed to* properly consider the factors set forth *in section 193.011(1)*"; emphasis added).[2]

Despite the requirements of the *DOR Guidelines*, neither of the Appraisers— *by their own admission*—did anything to determine whether there was a market for used grocery equipment, much less any comparable sales data.

Mr. Tony Biondi, the supervisor of the Tangible Personal Property Department for the Okaloosa Appraiser, testified in a very conclusory fashion that his office considers each of the eight factors listed in section 193.011 when it makes an assessment of a tax payer's property:

> Q      Are you also familiar with the eight criteria of Section 193.011?
>
> A      Yes, ma'am.
>
> Q      And does the property appraiser's office consider those criteria in making its assessments?
>
> A      Yes, sir (*sic*).
>
> Transcript, March 12, 2009 Hearing ("Tr.") 105-6.

On cross-examination, however, Mr. Biondi admitted no one from the Okaloosa Appraiser's office gave *any* consideration to whether there was a source of market data for Winn-Dixie's used equipment as required by section 193.011(1).  (Tr.

---

[2] The Florida Supreme Court ultimately quashed the Fifth District Court of Appeals' decision in *Wal-Mart* on other grounds.  In doing so, the Supreme Court found that there was other evidence before the trial court that supported its finding that the appraiser considered all eight factors under Section 193.011.  *See Mazourek v. Wal-Mart Stores, Inc.,* 831 So. 2d 85, 92 (Fla. 2002).  There is no such other evidence in this case.

129-33).   Mr. Biondi admitted that no one from his office ever tried to find out

whether there was a market for used grocery store equipment:

> Q      And before Mrs. Childress made her assessment
> of the Winn-Dixie stores in 2005, you don't believe that
> anybody from the Okaloosa County Appraiser's Office
> did anything to determine whether there was a market for
> used grocery store equipment do you?
>
> A      That's true.
>
> Q      And in 2006, before Mrs. Sandaal made her
> assessments, nobody from your office checked to see if
> there was a market for grocery store equipment, did
> they?
>
> A      Correct.

Tr. 131-2.

Mr. Biondi testified that Okaloosa Property Appraiser's office considered the

price Winn-Dixie originally paid for its equipment, which the Okaloosa Property

Appraiser apparently considers to be relevant market data.  (Tr. 115-6).  The tax

returns Winn-Dixie submitted to the Okaloosa Property Appraiser show that in 2005

and 2006, most of Winn-Dixie's equipment in Okaloosa County was old and used.

(Respondent Okaloosa Appraiser Exhibits 1 and 2 ("Okaloosa Ex.")).  Mr. Biondi

offered no explanation as to how "market data" regarding the prices Winn-Dixie

originally paid for equipment years ago in the primary market has any relevance to

the prices that same equipment (now old and used) could fetch in 2005 or 2006 in the

used equipment market.

Ms. Jenny Grice, an assistant appraisal supervisor in the Tangible Personal

Property Department of the Escambia Appraiser's office, at first gave the same

7

conclusory testimony regarding the Escambia Appraiser's consideration of the section

193.011 factors:

> Q      What criteria does your office consider in coming up with an assessment?
>
> A      We consider all the statutory requirements in 193.011.
>
> ***
>
> Q      In this case, in the Winn-Dixie case, did the property appraiser consider all the eight criteria?
>
> A      Yes, sir.

Tr. 80-1.

Like Mr. Biondi, however, Ms. Grice admitted on cross-examination that the

Escambia Appraiser's office was not aware of any market data which could be

utilized to perform a market approach appraisal, nor did the Escambia Appraiser's

office make any effort to determine if such data existed:

> Q      Your office did not develop an estimate of market value for Winn-Dixie's property in 2005 and 2006 using a sales comparison approach, right?
>
> A      No, sir.
>
> Q      And that's because the Escambia County Appraiser's Office did not have any market data to support a sales comparison approach in 2005 and 2006; isn't that right?
>
> A      We were not aware of any source of any market data.

8

Q      And you weren't aware of any market data for used grocery store equipment at all, were you?

A      No, sir.

Q      Your office didn't even look for any data consisting of sales of used grocery store equipment in order to consider the sales comparison approach, did it?

A      No, sir.

Tr. 95-6.

The *DOR Guidelines* suggest a number of sources from which a county appraiser can obtain reliable market data for used equipment:

Market data relating to personal property may be obtained from:

*      Leasing companies
*      Commercial bankers
*      New and used equipment dealers
*      Trade and sales journals
*      Newspaper advertisements
*      Auction sales

WD Ex. 10 (*DOR Guidelines*), page 40.

The Appraisers admitted, however, that in spite of the *DOR Guidelines* they did not consult any of those sources.  (Tr. 97-8 and 128-129).  The testimony of Winn-Dixie's equipment appraiser, Jack West, indicates that the Appraisers could have determined in less than an hour that there was a viable, reliable marketplace for used equipment in Florida.  (Tr. 199-200 and 222).

2.      *The Appraisers failed to calibrate their cost approach appraisals with market data.*

Mr. Biondi and Ms. Grice testified that their offices utilized mass appraisal techniques to perform a cost approach appraisal by applying depreciation tables found in the *DOR Guidelines* to the original cost information for each of the assets listed in Winn-Dixie's tax returns.  (Tr. 83-4 and 106-10).  According to Michael Zeigler, a program revenue administrator in Property Tax Administration for the DOR, those tables are based on depreciation tables published by Marshall Valuation Services and are commonly referred to as the "Marshall & Swift tables." (Tr. 146-9).

According to the *DOR Guidelines*, however, the Appraisers should not have stopped there.   The *DOR Guidelines* required the Appraisers to consider market data—the *first* factor of section 193.011—to determine whether their cost approach results from the DOR Tables needed to be adjusted to reflect any changes in value not accounted for by the tables (*i.e.*, obsolescence):

> The *appraiser should look to the market for any evidence of a change in value* when formulating an estimate of the market value *using the cost approach*.  The appraiser should always consider what an informed purchaser would be willing to pay for the property as an installed operating unit when employed at its highest and best use. When valuing individual pieces of personal property using replacement cost new less depreciation, the residual percent good may be adjusted, if, in the appraiser's judgment, it is necessary *to account for obsolescence*.

> WD Ex. 10 (*DOR Guidelines*), page 41 (emphasis added).

Even Marshall Valuation Service says that its tables should not be used as the exclusive method of determining depreciation of equipment.    Instead, Marshall instructs that its tables should be used as a "check" against other appraisal methodologies:

> These tables are furnished primarily for the experienced equipment appraiser who has knowledge of the normal lives and retirement experiences of fixtures and equipment, *as a check against his other methods of determination of the total depreciation of equipment.*
>
> > WD Ex. 27 (*Marshall Valuation Service* excerpt), page 5 (emphasis added).

Mr. Biondi admitted that even though the *DOR Guidelines* require the appraiser to look to the market to determine whether an additional obsolescence factor needs to be taken into account, the Okaloosa Appraiser's office did not do that, and as a result, the Okaloosa Appraiser's office was not in a position to determine whether there was any external obsolescence affecting Winn-Dixie's property.  (Tr. 128-31). The fact is, *nobody* from the Okaloosa Appraiser's Office did *anything* to verify the accuracy of the DOR tables with sales data from the marketplace:

> Q      In 2005 and 2006, did anybody from your office attempt to verify the accuracy of the results of the DOR present worth table with sales data from the market place?
>
> A      To the best of my knowledge, neither one of those appraisers did.

> Q      That effort was not conducted by your office, was it?
>
> A      I don't believe it was.

Tr. 132.

Likewise, Ms. Grice admitted that the Escambia Appraiser's office never investigated whether there was any external obsolescence affecting the value of Winn-Dixie's equipment in 2005 or 2006 that would not have been accounted for in the DOR's tables, much less whether the tables accurately predicted sales prices:

> Q      And the Escambia County Property Appraiser's Office never investigated whether there was any functional or external obsolescence affecting the value of Winn-Dixie's equipment in 2005 or 2006, did it?
>
> A      No, sir.
>
> Q      Did the Escambia County Property Appraiser's Office try to determine whether the DOR tables were accurate at predicting the sales price?
>
> A      We rely heavily on the Department of Revenue to assure that those tables are correctly --
>
> Q      But your office made no independent determination of whether they were?
>
> A      No, sir.

Tr. 94.

3.      *The DOR has not calibrated its tables with market data or any other recognized technique for calibrating a mass appraisal model.*

According to Mr. Biondi and Ms. Grice, the Appraisers relied on the DOR to verify the accuracy of its tables. (Tr. 94 and 129).  During his direct examination by

12

the Appraisers, however, Mr. Zeigler acknowledged that the DOR has *never* tried to calibrate its depreciation tables with actual used equipment sales prices. (Tr. 155-6). On cross-examination, Mr. Zeigler admitted that for the relevant years, the DOR has not even *attempted* to obtain any market data to calibrate its depreciation schedules. (Tr. 179-81). There is no evidence that the DOR has *ever* done that.

The Appraisers will argue that the DOR's depreciation tables *have* been calibrated to market by reason of an equipment mortality study that the DOR commissioned in 2004. (Okaloosa Ex. 16: June 2004 BCRI Study to Develop Tangible Personal Property Depreciation Tables for the Florida Department of Revenue (the "Barreca Study")). The study, which was performed by an outside depreciation consultant, Stephen L. Barreca, was an analysis of the economic lives of various types of equipment for use in a cost approach mass appraisal analysis.[3] (Okaloosa Ex. 16, page 2). According to Mr. Zeigler, the DOR retained Mr. Barreca because the DOR realized that it had problems with the Marshall & Swift tables and that the tables needed to be updated. (Tr. 163-4). Despite the DOR's continued problems with the Marshall & Swift tables, Mr. Zeigler acknowledged that the DOR has not adopted Mr. Barreca's report. (Tr. 153-4 and 160-1). Mr. Zeigler testified that all the DOR did with the study was release it to the property appraisers and other interested constituents and "see what happened." (Tr. 153-4).

---

[3] It is questionable as to whether Mr. Barreca is an "independent" expert. In 2008, over *ninety-five percent* of Mr. Barreca's revenues came from governmental assessing officers. (Stephen L. Barreca, February 19, 2009, Deposition Transcript, pages 149-50). The transcripts of Mr. Barreca's February 10, 2009 and February 19, 2009 depositions ("Barreca Vol. I" and "Barreca Vol. II," respectively) and exhibits were admitted in evidence as Okaloosa Exhibit 20. Winn-Dixie's Exhibit List, Witness List and Deposition Designations (Doc. No. 22156) includes Winn-Dixie's designations of excerpts from Mr. Barreca's deposition transcripts for the Court's consideration.

The Appraisers argue that the Barreca Study proves that the DOR's depreciation tables result in values that are more conservative than fair market value. There are three problems with this argument:  (i) Mr. Barreca's study has not been recognized by anyone as a reliable method of estimating the fair market value of a piece of equipment (Barreca Vol. II, page 148), *c.f.,* Uniform Standards of Appraisal Practice Standard 6-4(c) ("In developing a mass appraisal, an appraiser must employ *recognized* techniques for calibrating mass appraisal models."; emphasis added);[4] (ii) Mr. Barreca acknowledged he never looked at any market transactions involving buyers or sellers to determine whether the results from his tables accurately estimate the amount a willing purchaser would pay a willing seller (Barreca Vol. I, pages  134 and 137); *c.f., Wal-Mart Stores, Inc. v. Turner,* 7 Fla. L. Weekly Supp. 38b at 4-5 (Fla. 13th Cir. Ct. 1997) ("there was no showing that the tables reflected the existing market"; Moody, J.); and (iii) Mr. Barreca's 2004 study contains no information relevant to the actual 2005 and 2006 condition of Winn-Dixie's personal property (Okaloosa Ex. 16 (Barreca Study), page 48).

For a mass appraisal to comply with USPAP, Standard 6-4 requires the appraiser to use "recognized techniques" to calibrate the mass appraisal model:

> In developing a mass appraisal, an appraiser must:
>
>           * * *
>
> (c)  employ recognized techniques for calibrating mass appraisal models.
>
>           WD Ex 24 (USPAP Standards).

---

[4]   The Uniform Standards of Appraisal Practice ("USPAP") are appraisal standards promulgated by the Appraisal Institute.  (WD Ex. 24).  Congress authorized the Appraisal Institute to promulgate standards for appraisal practice in 1987 in response to the 1980s savings and loan crisis.  (Tr. 192).

There is no evidence that Marshall & Swift has ever calibrated its tables.  Mr. Barreca admitted that even the publisher, Marshall & Swift, does not know how the tables were developed. (Barreca Vol. II, page 49).  Nor is there any evidence that Mr. Barreca's study is "a recognized technique for calibrating mass appraisal models." Even Mr. Barreca did not know:

> Q      Mr. Barreca, are the depreciation schedules in your report, Creditor's Exhibit 2, have they been generally accepted by the appraisal community at large as a method for estimating fair market value?
>
> A      I don't know.
>
> > Barreca Vol. II, page 148.

There also is no evidence that using the tables in Mr. Barreca's study will result in an estimation of the amount Winn-Dixie could expect to be paid for its equipment by a "purchaser willing but not obliged to buy."  *Walter v. Schuler,* 176 So. 2d at 86.  To the contrary, in his deposition, Mr. Barreca made it clear that he did not consider selling prices of equipment relevant to his study:

> Q      Okay.  So when you use the term "market," in describing your life observations, you're not talking about buyers and sellers in transactions where an item is sold?
>
> A      I'm not --
>
> Q      You're talking -- you're mainly talking about an economic decision by an owner to discard an item, correct?

15

A      We're certainly not looking at any sales price, and as I explained and won't -- you know, unless you want me to again, I'm not going to go into it. *We're not looking at the sales price*, but we are looking at the age of the equipment at which time it retired, and for whatever reason it was retired -- whatever the specific reasons might be, the overall encompassing reason it was retired is because it reached the end of its economic life to the owner.

> Barreca Vol. I, pages 141-2 (emphasis added).

Mr. Barreca went so far as to say that it would be *wrong* to consider sales prices in a cost approach to value:

Q      Mr. Barreca, for your study -- for the table you developed in your study, did you incorporate any used sales price data in coming up with those percentages?

A      No.  As we talked about in the first deposition, it would be *inappropriate* to factor into the depreciation tables sales prices.  What we look at --

Q      Okay.

A      --instead is we look at the remaining productive life of the equipment.  Depreciation factors in a depreciation table for valuation purposes represent the percentage of productive life remaining in the property, and sales prices do not factor into that.  Sales prices are used in the sale comparison approach.  Depreciation tables are used in the cost approach.[5]

> Barreca Vol. II, pages 133-4 (emphasis added).

---

[5]    Mr. Barreca is simply wrong here.  According to the American Society of Appraisers, of which Mr. Barreca is a member, "[i]n order for [the cost approach] to be used *effectively*, replacement cost new data *and fair market value data* for a sample of assets similar to the subject assets *must* be gathered."  (Okaloosa Ex. 7 (*Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets, American Society of Appraisers*, 2d ed.), page 103; emphasis added and Barreca Vol. I, page 12).

16

Finally, according to the indexes in Mr. Barreca's study, the data Mr. Barreca considered to develop his depreciation tables is not more recent than 2003.  (Okaloosa Ex. 16 (Barreca Study), page 48).  There is no evidence that Mr. Barreca considered *any data from any source* for the years 2005 and 2006.

In this case, the Appraisers admit they made *no* attempt to calibrate the DOR's depreciation tables to the market.  Moreover, the DOR's only attempt to calibrate its tables—Barreca's unadopted study—(i) never considered comparable sales as was required by section 193.011(1), (ii) did not comply with USPAP, and (iii) had no relevance to the years at issue.

Consequently, the Appraisers' admitted rote application of the DOR's uncalibrated tables do not reflect "the amount a willing purchaser would pay a willing seller" for Winn-Dixie's equipment, as required by the Florida Constitution and Section 193.011, Florida Statutes.

> C.     The Court should adopt Winn-Dixie's valuation as the fair market value of the property.

Winn-Dixie engaged an experienced equipment appraiser, Jack West, to appraise the equipment and fixtures at Winn-Dixie's stores in all Florida counties, including Escambia and Okaloosa, as of January 1, 2005 and 2006. (Tr. 193).  Mr. West is an Accredited Senior Appraiser who is certified as a Machinery and Technical Specialties/Machinery and Equipment Appraiser by the American Society of Appraisers.  (Tr. 190-1; WD Ex. 25: Property Valuation and Consulting Appraisal of Tangible Personal Property for Tax Years 2005 through 2008 (the "West Appraisal"), page 25).  Mr. West's expertise as an equipment appraiser has been

recognized by the Value Adjustment Boards of Pinellas County and Hillsborough County, for whom Mr. West serves as a special magistrate and an alternate special magistrate, respectively, to hear valuation disputes regarding tangible personal property. (Tr. 192; WD Ex. 25 (West Appraisal), page 25).[6]

Mr. West testified that, as an American Society of Appraisers Accredited Senior Appraiser, he is required to comply with the standards set forth in USPAP. (Tr. 191). Mr. West explained that to conduct his appraisal he considered each of the eight factors mandated by section 193.011. (Tr. 199-204).[7] Mr. West testified that he placed the greatest weight on factor number one, which is the price that a willing buyer and a willing seller would agree upon for the equipment he appraised. (Tr. 204). After properly considering all three approaches to value—market, cost and income—Mr. West said that he decided that the cost approach, *calibrated with market data*, provided the best method to determine the fair market value of Winn-Dixie's fixtures and equipment. (Tr. 204 and 215-217).

Mr. West explained that he performed a mass appraisal using methods recognized by the American Society of Appraisers, USPAP *and the DOR Guidelines* for appraising categories of equipment that were common to all Winn-Dixie stores. (Tr. 195-96; WD Exs. 10 and 24). According to Mr. West, the American Society of Appraisers defines mass appraisal as the process of "valuing a universe of properties

---

[6]   Value Adjustment Boards exist in every Florida county to conduct administrative hearings on issues related to ad valorem tax. *See* Fla. Stat. § 194.032 (2008). Larger counties are permitted to hire appraisers to serve as magistrates for the purposes of taking testimony and making recommendations to the Value Adjustment Board. *See* Fla. Stat. § 194.035 (2008). To hear issues regarding the valuation of tangible personal property the appraiser must be "a designated member of a nationally recognized appraiser's organization with not less than 5 year's experience in tangible personal property valuation." *Id.*

[7] Mr. West gave a credible and detailed explanation as to how he considered *each* of the eight factors in his appraisal process. (Tr. 199-204).

using statistical methods and calibration to pick up the behavior of assets across the universe." (Tr. 196). Mr. West testified that in the process of performing his mass appraisal he visited twelve stores that were representative of the ages of Winn-Dixie's stores in Okaloosa and Escambia Counties. (Tr. 195).

Using standard methods for appraising fixtures and equipment under a cost approach, Mr. West estimated the annual rate of depreciation of Winn-Dixie's grocery store equipment. (Tr. 213-215; WD Ex. 25 (West Appraisal), pages 16-24). To do that, Mr. West explained that he first estimated the cost to replace a used piece of equipment with a similar new one, commonly referred to as the "replacement cost new." (Tr. 201 and 215). After consulting several price indexes, including ones produced by the Bureau of Labor Statistics and Marshall Valuation Service, Mr. West said that he determined that the DOR's Equipment Index Factors accurately estimate the replacement cost new. (Tr. 215; WD Ex. 25 (West Appraisal), pages 16-7). Mr. West then estimated the normal economic lives of the various types of equipment used by Winn-Dixie. (Tr. 215). Mr. West's next step was to determine the effective age of the equipment in each of the stores. (Tr. 215). According to Mr. West, the effective age, which the *DOR Guidelines* say is "critical to the final estimate of value" (WD Ex. 10 (*DOR Guidelines*), page 35), takes into consideration the weight of investment, by age, in a group of assets. (Tr. 201-2).[8] After Mr. West determined the

---

[8]   Mr. West illustrated the importance of knowing the effective age of a group of assets by explaining that while a buyer of a store who is assessing the asking price for the store may want to know how much the seller originally invested in the store's assets, the buyer will be more interested in knowing the amount of time that has passed since the majority of the investment was made. The effective age of the store would provide that critical information. (Tr. 201-2).

effective age of the equipment, he estimated the percentage of value remaining in the equipment as compared to its replacement cost new. (Tr. 215).

For the final—and most important—step in his appraisal process, Mr. West said that he interviewed a number of reputable equipment dealers to determine what used grocery store equipment sells for in the secondary market. (Tr. 199-200, 215 and 220-221). Mr. West considered the prices paid for individual pieces of equipment, as well as installed operating units in complete store sales. (Tr. 24; WD Ex. 25 (West Appraisal), pages 10-15). With that information, Mr. West said that he adjusted or "calibrated" his depreciation table using actual market data, as required by USPAP Standard 6-3(c), *and* the *DOR Guidelines*. (Tr. 215-23). *See* WD Ex. 10 (*DOR Guidelines*), page 41 ("The appraiser should *look to the market* for any evidence of a change in value when formulating the market value using the cost approach."; emphasis added).[9]

Mr. West testified that, where appropriate, he applied a market based depreciation factor to the equipment's replacement cost new, which included the cost of freight and installation. (Tr. 249-52). According to Mr. West, that methodology is approved by the American Society of Appraisers. (Tr. 251-2). A summary of Mr. West's valuations of Winn-Dixie's equipment in Okaloosa and Escambia Counties for 2005 and 2006 is shown on the attached Exhibit A, which is based on Mr. West's trial testimony and data found in Mr. West's appraisal. (Tr. 223-25 and WD Ex. 25, page 3 and WD Ex. 25, Tab 22).

---

[9]  The Appraisers' criticize the quality of Mr. West's market data because he did not use verified sales. That criticism is misplaced. The American Society of Appraisers, USPAP and the DOR all recognize dealer asking prices as a valid source of sales data. (WD Ex. 10 (*DOR Guidelines*), pages 39 and 40; WD. Ex. 24 (USPAP), Standard 7-5 and Okaloosa Ex. 7 (*The Fundamentals of Appraising Machinery and Technical Assets*), pages 103).

According to the American Society of Appraiser's text book, *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets*—and despite Mr. Barreca's assertions to the contrary—the cost approach is not an effective appraisal methodology *unless* the appraiser compares the cost approach results with actual market data obtained from comparable sales transactions:

> In order for [the cost approach] to be used *effectively*, replacement cost new data and fair market value data for a sample of assets similar to the subject assets *must* be gathered. *Such a comparison is necessary to reconcile any potential differences between the cost approach and actual market data obtained from comparable sales transactions.*
>
> > Okaloosa Ex. 7 (*The Fundamentals of Appraising Machinery and Technical Assets*), page 103 (emphasis added).

As Mr. West testified, when utilizing the cost approach to perform a mass appraisal, both The American Society of Appraisers *and* the *DOR Guidelines* require the calibration of the results of a cost approach analysis to the market to in order to obtain an accurate estimation of value:

> Q      Okay.  Well is it your position that [the Special Note on Obsolescence on page 110 of *The Fundamentals of Appraising Machinery*] does not apply if you do a mass appraisal?
>
> A      It applies to mass appraisal, it's in the DOR guidelines, it's in the ASA.  It's the very first thing they teach.  *If there is a viable market and you're using the cost approach and you do not check to see if that market exists and you do not compare your results to the market,*

> *you have a real risk of overvaluing the property.*
> Because the cost approach is attempting to capture the
> obsolescence that reflects in what's going to happen
> between a buyer and a seller.
>
> *If there's a market and you finish your appraisal*
> *calculations, and you don't go to the market to check*
> *whether that calculation is correct, then you have an*
> *erroneous value.*
>
> Tr. 256-57 (emphasis added).

Mr. West testified that he was *required* to calibrate his cost approach appraisal in order to comply with USPAP.  (WD Ex. 23 (USPAP Standard 6-4(c)).  Because Mr. West created a model that he then calibrated, Mr. West's appraisal complies with USPAP Standard 6-4(c).  (Tr. 217-8).[10]

A comparison of the appraisal methodology utilized by the Appraisers—the rote application of the DOR's depreciation tables not calibrated with market data— with the appraisal methodology utilized by Mr. West—a recognized cost approach analysis calibrated with actual market data—makes it apparent that Mr. West's methodology results in a more accurate estimation of the fair market value of Winn-Dixie's personal property.

> D.    All experts agreed that the DOR's Marshall & Swift tables are
> unreliable.

In 2001 and 2004, Mr. Barreca gave a number of presentations to the DOR in which he criticized the Marshall & Swift depreciation tables used by the DOR (WD

---

[10]    And to the contrary, there was no evidence at trial that Mr. Barreca's study meets the USPAP calibration requirement.  Mr. Barreca does not even consider his study to be an appraisal.  He only called it an appraisal because he thought that would satisfy any attorneys who challenged the study.  (Barreca Vol. II, pages 130 and 132-3).

Exs. 18-21 and 23).  Those trial exhibits show that Mr. Barreca criticized the Marshall & Swift tables because they are:

> "30 years old and have never been updated."  WD Ex. 18 (2001 Barreca PowerPoint Presentation).

> "Dated, inconsistent with accepted theory and practice, and not supportable."  WD Ex. 18 (2001 Barreca PowerPoint Presentation).

> "Not realistic except for very low life table."  WD Ex. 18 (2001 Barreca PowerPoint Presentation).

> "Difficult to defend."  WD Ex. 21 (2004 Barreca PowerPoint Presentation).

While testifying for the Appraisers as an expert witness *in support* of their use of the Marshall & Swift tables to estimate the value of Winn-Dixie's property, Mr. Barreca went as far as to say that he did not consider Marshall & Swift to be an authoritative source on appraisal and depreciation matters:

> I don't consider Marshall & Swift to -- to be an authoritative source on depreciation matters and -- and appraisal matters…

> Barreca Vol. II, page 107.

Mr. Zeigler from the DOR testified that the DOR knew that Mr. Barreca had problems with the Marshall & Swift tables, and the DOR eventually came to agree with Mr. Barreca:

> Q      Did you know in 2001 or in 2004 or anytime in between that Mr. Barreca was a critic of the Marshall-Swift depreciation tables?

***

A      I guess really the answer to your question is I
think I was aware that Mr. Barreca had problems with
the Marshall-Swift tables, and *eventually the Department
had problems with them.*

Q      But you never changed them, did you?

A      No sir.

***

Q      Did you know that in the time frame of 2001 to
2004 that Steve Barreca was critical of the Department's
depreciation tables because they were not calibrated to
market and that they relied upon the Marshall-Swift
tables which are 30 years old and have never been
updated?  Did you know about his criticism in that
regard in that time frame?

A      Well, you know, I don't know that the
Department really disagreed that we needed to update the
tables.  I mean, *We obviously had problems with the
tables* and were trying to do something about it, and so
that's why we hired him.

Tr. 160-61 and 163-64 (emphasis
added).

Mr. West agreed with Mr. Barreca and the DOR that there are problems with

the Marshall & Swift tables.  Mr. West testified that he has tried to compare the

depreciation of equipment indicated by the Marshall & Swift tables with the

depreciation dealers and appraisers see in the market, and he has determined that the

Marshall & Swift tables are not a reliable method to appraise used grocery store

equipment:

24

Q    Do you believe that using Marshall & Swift tables are a reliable method to appraise used grocery store equipment?

A    No, I do not.

Q    Why?

A    Well, because in my experience, I've never -- I've looked at the tables and I've tried to compare them to the assets and the deprecation that dealers and appraisers such as myself see in the marketplace, and there's no support.  For example, on the first there's no support that a dealer could sell a one-year-old asset for 92 percent of what it would sell for new.

*So I believe that it trips right out of the box, because assets have a fairly rapid deprecation even in year one.*

Tr. 205-6 (emphasis added).

As Mr. West explained, a significant problem with the Marshall & Swift tables is that they artificially cap the depreciation of assets when they reach the end of their useful lives—*without regard to what the asset is really worth*.   (Tr. 212-13). According to Mr. West, the majority of Winn-Dixie's equipment has an expected life of 9 years, at the end of which the Marshall & Swift tables assign a 20% residual factor (meaning that the asset is 80% depreciated).  (Tr. 197-8 and 208).   After year 9, regardless whether the asset is 10, 11 or 20 years old, the Marshall & Swift tables place the same value on the asset.  (Tr. 209 and 212-3).  Mr. West explained that the problem is best illustrated by the "fair market value" that the Marshall & Swift tables—and the Appraisers—place on a refrigerator case that cost Winn-Dixie $4,370 in 1985.  According to the *DOR Guidelines*, the fair market value of that 20 year old refrigerator in 2005 was over $1,000—and it's still worth more than a $1,000 in 2009.

25

(Tr. 211-13).    According to Mr. West, the refrigerator is almost three times past its

economic life and has a market value of $150, *if it even has a value*.  (Tr. 213).

Likewise, in his 2004 study of the DOR's tables, Mr. Barreca also said that he

believes that the DOR's tables "arbitrarily and inappropriately" truncate the residual

value factors:

> Some published depreciation tables used for valuation
> purposes are arbitrarily, and inappropriately, truncated
> when the age reaches the average economic life; as in the
> current FDOR published depreciation table.
>
> Okaloosa Ex. 16 (Barreca Study),
> page 29.

Mr. Zeigler testified that the DOR knew that Mr. Barreca believed that the

DOR's tables were not realistic.  (Tr. 16).  Mr. Zeigler's only explanation as to why

the DOR truncates the residual values in its depreciation tables at 20% was to say *that

is how Marshall & Swift does it*:

> Q    My question is:  Why does the table stop at 20 percent?
>
> A    Well, the main reason the table stops at 20 percent is
> because that's where Marshall Valuation Service stops
> their table that we utilized to develop this one.
>
> Q    So all you know is that's what Marshall did; is that right?
>
> A    Well, we've adopted their table and *that's what it is in
> the Marshall table, so that's why it's at 20 percent or 19
> or whatever it is*.
>
> Tr. 166-7 (emphasis added).

According to Mr. West, most of Winn-Dixie's equipment in Okaloosa and Escambia counties (as well as the rest of Florida) is old and at the end of its normal economic life. (Tr. 197-8).[11]  As Mr. West testified, to say that Winn-Dixie's old equipment has stopped depreciating because the equipment is at the end of its economic life *is just not realistic*. (Tr. 209). This is the fundamental flaw in the counties' appraisals.

The fact is, there is no competent evidence that the Appraisers' use of the DOR's tables to value Winn-Dixie's equipment resulted in an accurate estimate of the "fair market value" of used grocery store equipment.[12]

      E.      **Winn-Dixie should not be bound by the estimates of fair market value appearing on its tax returns.**

The Appraisers assert that their assessments merely reflect the values that Winn-Dixie placed on its tax returns and Winn-Dixie should not be heard to challenge those values.

The Appraisers' argument ignores reality. In 2005 and 2006, Winn-Dixie was in the throes of its bankruptcy case and did not have the time or staff to determine whether additional obsolescence adjustments needed to be made beyond the DOR tables as reflected on Winn-Dixie's tax returns for those years. (WD Exs. 11-14 and

---

[11]  Mr. Zeigler testified that it would be wrong to look to the used equipment market to appraise Winn-Dixie's equipment because the used equipment market is made up of equipment that has reached the end of its economic life. (Tr. 156). If Mr. Zeigler looked at Winn-Dixie's asset lists, he would realize that much of Winn-Dixie's equipment *is* at the end of its useful economic life, and therefore, the used equipment market *is* the best source for determining the fair market value of that equipment. (Okaloosa Exs. 1 and 2 and Respondent Escambia Appraiser Exs. 1A and 1B).

[12]  Although Mr. Zeigler testified that he believed that the DOR's depreciation tables account for all forms of obsolescence, Mr. Zeigler admitted that he is not an expert equipment appraiser or a depreciation expert, therefore, he is not qualified to give that opinion. (Tr. 154 and 172).

16).  Instead, Winn-Dixie simply utilized the standardized Department of Revenue published depreciation tables to file the tax returns on time.  (WD Exs. 11-14 and 16).

Moreover, at the same time, both in 2005 and 2006, Winn-Dixie affirmatively put the Appraisers on notice that Winn-Dixie's tax returns for those years *did not* accurately reflect the fair market values of the equipment listed in the returns.  (WD Exs. 11-14 and 16 and Tr. 90-2 and 119-21).  There consequently is no evidence that the Appraisers relied on the values Winn-Dixie reported to them.

When Winn-Dixie filed for bankruptcy, it was presented with the opportunity to utilize Section 505 of the Bankruptcy Code to provide Winn-Dixie an efficient, single-forum opportunity to have the court determine the appropriate amount of ad valorem taxes it owed to various taxing authorities.  As a fiduciary acting in the best interest of its creditors, Winn-Dixie appropriately sought relief for its estate under Section 505.

The very purpose of Section 505 is to allow debtors-in-possession to contest tax liabilities so that the companies' inaction will not prejudice the estates' creditors:

> Section 505 was enacted to protect creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing condition, failed to contest.
>
> * * *
>
> This is permitted on the ground that taxes with their priority pose a special problem for creditors, and creditors should not be prejudiced by a debtor's inaction.
>
> *In re Piper Aircraft Corp.,* 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994).

To accept the Appraisers' argument that Winn-Dixie has "admitted" that the Appraisers' estimates of fair market value are accurate would subvert the purposes of Section 505.

## III.    Conclusion

The Appraisers utilized out-of-date and unreliable Marshall & Swift depreciation tables to perform a cost approach appraisal of Winn-Dixie's property without considering any market data as required by Florida Statutes and *DOR Guidelines*.  As a result, the Appraisers' estimations of value do not have a presumption of correctness.

By comparison, Winn-Dixie engaged Mr. West, an experienced appraiser who performed an appraisal using recognized cost approach appraisal methodologies.  He then took the results of that cost approach appraisal and compared it to the market.  In the process, Mr. West determined that Winn-Dixie's equipment is old and at or past the end of its economic life, and that the actual market value of that equipment was substantially less than the values the Appraisers argue using the Marshall & Swift tables.

Based on the evidence, the Court should (i) sustain Winn-Dixie's objection to the tax claims of the Okaloosa and Escambia County Tax Collectors, (ii) find that Mr. West's market calibrated, cost approach appraisal of Winn-Dixie's equipment shown on Exhibit A reflects the fair market value of Winn-Dixie's equipment in Escambia and Okaloosa Counties as of January 1, 2005 and 2006,  and (iii) order the Tax

Collectors to recalculate Winn-Dixie's ad valorem personal property taxes for the years 2005 and 2006 based on those values.[13]

SMITH HULSEY & BUSEY


By   s/ Allan E. Wulbern
      Stephen D. Busey
      Allan E. Wulbern

Florida Bar Number 0175511
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
awulbern@smithhulsey.com

Counsel for Winn-Dixie

---

[13]  Because all of the experts agree that using the DOR's Marshall & Swift depreciation tables is not a reliable method to determine the fair market value of equipment, Winn-Dixie has established by clear and convincing evidence that Mr. West's market calibrated cost approach appraisal reflects the fair market value of Winn-Dixie's equipment.

## **Certificate of Service**

I certify that a copy of this document has been furnished electronically through

the CM/ECF electronic notification system this 8th day of June, 2009 to:


Thomas M. Findley, Esq.                Sherri L. Johnson, Esq.
Messer, Caparello & Self, P.A.         Dent & Johnson, Chartered
Post Office Box 15579                  3415 Magic Oak Lane
Tallahassee, Florida 32317             Sarasota, Florida 34230

Philip A. Bates, Esq.
25 West Cedar St., Suite 550
Pensacola, Florida 32502


                                    _____*s/ Allan E. Wulbern*_____
                                              Attorney


00655772

**EXHIBIT A**

JACK WEST APPRAISAL SUMMARY[1]

### Okaloosa County Store Values

| Store No. | 2005 | 2006 |
|---|---|---|
| 541 | $  211,054 | $  186,728 |
| 551 | 183,204 | 145,193 |
| 558 | 393,137 | 296,883 |
| 560 | 486,633 | 445,040 |
| 566 | 224,285 | 252,834 |
| Total | $1,498,313 | $1,326,678 |

### Escambia County Store Values

| Store No. | 2005 | 2006 |
|---|---|---|
| 493 | $  167,903 | $  174,635 |
| 495 | 439,849 | 450,430 |
| 498 | 208,514 | 214,547 |
| 504 | 435,465 | 408,151 |
| 506 | 461,269 | 397,707 |
| 535 | 439,911 | 332,808 |
| 556 | 162,177 | 155,159 |
| 565 | 156,400 | 167,882 |
| Total | $2,471,488 | $2,301,319 |

653965

---

[1] *See* Tr. 223-5 and 279; WD Ex. 25, page 3; and WD Ex. 25, Tab 22.