UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In Re:

WINN-DIXIE STORES, INC., et. al                    Case No. 05-bk-03817-JAF
                                                   Chapter 11

                    Debtors.

_____/

## MOTION BY DAVID CLARK AND ANTOINETTE CLARK FOR DETERMINATION THAT CLAIMS HAVE NOT BEEN DISCHARGED AND PROSECUTION OF CLAIMS ARE NOT ENJOINED BY PLAN INJUNCTIONS

David Clark and Antoinette Clark (collectively, the "Clarks"), by and through their undersigned counsel, move for the entry of an Order determining that due to a lack of proper notice to the Clarks, certain claims against Winn-Dixie Stores, Inc. and/or its affiliated Debtors (collectively, "Winn-Dixie" or the "Debtors") arising out of severe personal injuries suffered by David Clark (1) have not been discharged by the confirmation of the Debtors' *Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors* (Dkt. No. 10058) (as confirmed, the "Plan") and (2) accordingly, the injunctions under the Plan do not enjoin the Clarks from prosecuting and recovering on their claims against Winn-Dixie in a related civil action currently pending in the Tenth Judicial Circuit Court in and for Polk County, Florida (the "State Court"). The unique grounds supporting the relief sought in this Motion are as follows:

## FACTUAL BACKGROUND

**A.      Relevant Bankruptcy Dates and Events**

1.      The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date") commencing the above-

styled bankruptcy cases (the "Bankruptcy Cases").    As of the Petition Date, the Clarks were not creditors of the Debtors and thus did not receive notice of the commencement of the Bankruptcy Cases.

2.      The Debtors' Plan was confirmed by Order of this Court dated November 9, 2006 (Dkt. 12440) (the "Confirmation Order").  Together, confirmation of the Plan and entry of the Confirmation Order purported to discharge certain claims against the Debtors pursuant to Section 1141(d) of the Bankruptcy Code.    In addition, the Plan and Confirmation Order purport to implement certain injunctions, including the "discharge injunction" established under Section 524 of the Bankruptcy Code, to prohibit the commencement or continuation of actions against the Debtors in connection with discharged claims (collectively, the "Plan Injunctions").    The Clarks were not provided with actual notice of the Plan, confirmation hearing, or entry of the Confirmation Order.  It appears from a review of this Court's docket that the effective date of the Debtors' Plan occurred on or about November 21, 2006 (the "Effective Date").

3.      Following the entry of the Confirmation Order, through certain filings including a December 6, 2006 *Notice of (A) Entry of Order Confirming Plan of Reorganization, (B) Occurrence of Effective Date of Plan, and (C) Bar Dates for Filing Claims Arising Before Effective Date and Other Administrative Claims* (Dkt. No. 12991) (the "Bar Date Notice"), January 5, 2007 was established as the deadline by which all creditors have to assert claims arising between the Petition Date (February 21, 2005) and the Effective Date (November 21, 2006) against the Debtors in the Bankruptcy Cases (the "Admin Claims Bar Date").    The Clarks were not served with the Bar Date Notice or otherwise provided actual notice of the Admin Claims Bar Date.

4.      On several occasions following the Bar Date Notice, the Debtors filed a *Supplemental Certificate of Service* (including, without limitation, Dkt. Nos. 13200, 13613, and 14543) (each a "Supplemental Bar Date Notice").  The Debtors apparently provided these Supplemental Bar Date Notices to creditors whose actual or potential claims against the Debtors had arisen following the original Bar Date Notice, or to creditors whom the Debtors had not previously identified and provided such notice. Creditors receiving these Supplemental Bar Date Notices appear to include personal injury claimants whom the Debtors seem to have subsequently identified as known creditors after the Debtors had provided their earlier notices of the Admin Claims Bar Date.  A review of the docket in the Bankruptcy Cases indicates that the Debtors provided the most recent Supplemental Bar Date Notice on or about January 4, 2007. Again, the Clarks have never been served with any of the Supplemental Bar Date Notices, nor did the Debtors otherwise provide them actual notice of the Admin Claims Bar Date.

5.      In summary, at no relevant time did the Debtors provide the Clarks with actual notice of the commencement of the Bankruptcy Cases, notice of the Admin Claims Bar Date, notice of confirmation of the Plan, or notice of entry of the Confirmation Order.

**B.      The Incident**

6.      On or about November 11, 2005 (almost nine months following the Petition Date and one year prior to the Effective Date) David Clark was seeking donations on behalf of a religious organization as an invitee in front of a grocery store located in Central Park Plaza in Lakeland, Polk County, Florida, that was operated by

Winn-Dixie (the "Store"). While Mr. Clark was standing in front of this Winn-Dixie store, at approximately 9:00 A.M. an automobile sped from the parking lot, hitting him and crashing inside of the building.   The incident injured Mr. Clark and caused significant property damage as evidenced by the photograph attached as **Exhibit "A"** (the "Incident").  Mr. Clark's injuries were very serious and the car's impact amputated his leg.

7.      Given its severity and grizzly nature, immediately after the Incident Winn-Dixie's store representatives contacted its corporate offices in Jacksonville, Florida. From its corporate offices, Winn-Dixie dispatched both its district manager and personnel from its risk management division to the Store.  These corporate representatives of Winn-Dixie conducted a thorough investigation of the Incident at the Store on the same day it had occurred.  As a result of that investigation, it appears that Winn-Dixie gathered a plethora of information about the Incident and prepared a number of reports and other documents related to the Incident (the "Incident Reports").

8.      Importantly, the Store and the property upon which this Incident occurred had been owned at all relevant times by an individual, Lawrence Heard ("Heard"), and not by Winn-Dixie.  Instead, Winn-Dixie occupied and used the Store pursuant to a commercial lease with Heard (the "Store Lease").

## C.      The State Court Lawsuit

9.      Following extensive medical treatments and recovery from his injuries (but well ahead of the applicable four (4) year statute of limitations), in November 2008 Mr. Clark and his wife filed suit against Heard in connection with the Incident in the State Court (the "Polk County Lawsuit").  In the Polk County Lawsuit, Mr. Clark alleges

that Heard's failure to install bollards[1], guardrails, or other protective devices between the parking lot and building entrance was a breach of Heard's duty to invitees (such as David Clark) to keep and maintain the Store in a reasonably safe condition, and such negligence caused the Incident and injuries to Mr. Clark.  Additionally, the Polk County Lawsuit alleges that Mr. Clark's wife, Antoinette Clark, suffered damages arising from the Incident including loss of care, comfort, services, and consortium in connection with Mr. Clark's injuries.

10.    Through responses to requests for admission propounded to Heard in the Polk County Lawsuit, the Clarks recently learned that Heard now contends that the Incident did not occur in a "common area" as defined in the Store Lease.  Under the Store Lease, Heard is responsible for maintaining the "common areas" of the subject property. In other words, Heard intends to assert that it was Winn-Dixie, not Heard, that was responsible for maintaining the area of the Store where the Incident occurred.

11.    In January 2009, to investigate Heard's assertions described above, in the context of the Polk County Lawsuit, trial counsel for the Clarks filed and served *Plaintiff's Subpoena Duces Tecum without Deposition* on Winn-Dixie as a non-party, which included a request for documents that constituted the Incident Reports.

12.    In response, counsel for Winn-Dixie filed a *Motion to Quash and for Protective Order* (the "Motion to Quash") in February 2009.  In paragraph 8 of the Motion to Quash, Winn-Dixie states that "Plaintiff's Subpoena Duces Tecum without Deposition requests documentation that is privileged under the *work product doctrine*" (emphasis added) and goes on to delineate the protected items including, among other

---

[1] Bollards are the short vertical posts (usually constructed of concrete or metal) which are present near the front entrances of many commercial locations.  They are generally designed to provide for customer safety and property protection from vehicles near the entrances of these establishments.

things, "photographs, witness statements, written reports or written documents of any kind . . . and risk management analysis."[2]  A copy of Winn-Dixie's Motion to Quash is attached hereto as **Exhibit "B."**

13.     On January 20, 2009 (in the context of non-party discovery in the Polk County Lawsuit), the Clarks' trial counsel also took the deposition of Donald Darrel "Donnie" Wilson, who was an eyewitness and was Winn-Dixie's "location director" at the time of the Incident.  During his deposition, Mr. Wilson essentially testified, among other things, that:

- As soon as the Incident occurred, he and other Winn-Dixie personnel at the Store immediately contacted Winn-Dixie's corporate office, who then dispatched representatives from its risk management division (known as the "safety office") to investigate the Incident;
- Representatives from Winn-Dixie's corporate "safety office" arrived on the scene and conducted their investigation on the same day the Incident had occurred;
- Winn-Dixie's district manager was also contacted about the Incident and also came to the Store on that same day; and
- There were a number of subsequent communications and reports to supplement the information Winn-Dixie had gathered about the Incident.

The most relevant portions of Mr. Wilson's deposition are underlined in the pages of the deposition transcript attached as **Exhibit "C."**

D.     **Winn-Dixie's Assertion of the Discharge Injunction**

14.     As a result of these discovery efforts, in April 2009 the Clarks sought and promptly obtained a stipulation of Heard to amend their complaint in the Polk County Lawsuit to name Winn-Dixie as a party defendant.

15.     Around May 2009, the Clarks' trial counsel also requested a similar stipulation from Winn-Dixie's trial counsel.  Instead of agreeing to the stipulation,

---

[2] As discussed below, by asserting the protections of the work product doctrine Winn-Dixie has tacitly admitted that the Incident Reports were prepared "in anticipation of litigation," making the Clarks' claims arising from the Incident "known" or at least "reasonably ascertainable."

however, Winn-Dixie responded through a letter dated May 20, 2009 from its bankruptcy counsel and for the first time asserted that Clarks' claims are time-barred and had been discharged pursuant to confirmation of the Plan and Section 1141(d) of the Bankruptcy Code.  In fact, rather than attempting to assess and rectify what was a blatant denial of the Clarks' due process rights, Winn-Dixie's counsel instead threatened the Clarks' trial counsel with sanctions for violating the injunctions established by Section 524 of the Bankruptcy Code.  A copy of that letter is attached as **Exhibit "D."**

16.    Since that time, through counsel, the Clarks have diligently attempted to correspond with Winn-Dixie to amicably compromise and settle the issues arising from these notice and claims issues.  These efforts have been unsuccessful and only generated additional threats of sanctions from Winn-Dixie's counsel.

## RELIEF REQUESTED

17.    The Clarks seek this Court's entry of an order determining that (1) the Clarks' claims against Winn-Dixie are not discharged under the Plan pursuant to Bankruptcy Code 1141(d), and (2) the Clarks are not enjoined pursuant to Section 524 of the Bankruptcy Code or the Plan Injunctions, such that the Clarks are free to name Winn-Dixie as a party defendant and pursue their claims against Winn-Dixie in the Polk County Lawsuit.

## BASIS FOR RELIEF

18.    Winn-Dixie has asserted that the Clarks' claims against it were discharged as a result of confirmation of the Plan, and in support of its position look to Sections 1141(d) and 524(a) of the Bankruptcy Code. Specifically, Section 1141(d)(1)(A) of the Bankruptcy Code provides that:

... the confirmation of a plan (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not (i) a proof of the claim based on such debt is filed or deemed filed ... ; (ii) such claim is allowed under section 502 of this title; or (iii) the holder of such claim has accepted the plan…

and Section 524(a)(2) of the Bankruptcy Code provides that:

A discharge in a case under this title … (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived ....

19.    However, in taking that position Winn-Dixie glosses over the fact that as "known creditors" of Winn-Dixie, the Clarks were entitled to actual notice of the bankruptcy and the Admin Claims Bar Date from Winn-Dixie.  *See, e.g.* Spring Valley Farms, Inc., 863 F.2d 832 (11th Cir. 1989) (holding that Section 1141 of the Bankruptcy Code does not discharge the claim of a "known" pre-petition creditor to whom the debtor failed to provide actual notice of a claims bar date, even where that creditor had actual knowledge of the general existence of the bankruptcy proceedings) *and* In re Nuttall Equipment Co., 188 B.R. 732 (Bankr. W.D.N.Y. 1995)(reaching the same holding that Section 1141 did not discharge a "known" *post-petition* claim where debtor failed to provide that creditor with notice of administrative claims bar date and expressly acknowledging, in *dicta* contained in footnote 5 and elsewhere, that the same conclusion would be reached for a post-petition claim arising from personal injury).

20.    Thus, a threshold inquiry in this case is whether the Clarks were "known creditors" and entitled to actual notice, or "unknown creditors" for whom constructive-"publication" notice would suffice.  As stated in Arch Wireless, Inc. v. Nationwide Paging, Inc. (In re Arch Wireless), 534 F.3d 76 (1st Cir. 2008), a "known" creditor is one

whose claims and identity are actually known or *reasonably ascertainable* by the debtor. Id. at 81.  While notice by publication may be sufficient for unknown creditors, actual notice must be given to known creditors.  Id at 80-81.

21.     It almost defies belief that the Debtors have taken the position they were not required to provide actual notice to the Clarks because the Clarks' claims arising from the Incident were not "known" or "reasonably ascertainable."   The indisputable fact is Winn-Dixie knew the Clarks were creditors since the Incident in November 2005. Undeniably (1) the Incident resulted in gruesome injuries to Mr. Clark at the front of the Store during business hours, and caused significant property damage to the Store (and apparently even resulted in injuries to at least one Winn-Dixie employee) and (2) Winn-Dixie's corporate office was immediately notified and dispatched its district manager and risk management personnel to the Store on the day of the Incident to investigate and document it, and (3) more recently, Winn-Dixie has asserted that Florida's work product doctrine protects the Incident Reports and other documents because Winn-Dixie had prepared them in connection with the Incident, anticipating resulting claims being litigated against Winn-Dixie.[3]

22.     In light of these indisputable facts, Winn-Dixie cannot credibly deny that the Clarks and the claims they now seek to assert in the Polk County Lawsuit have not been "known" or "reasonably ascertainable" since the time of the Incident.  As the Arch Court recently pointed out, a "known creditor" is one, like the Clarks, whose claims are actually known or whose claims are "reasonably ascertainable" through a reasonably

---

[3] Under Fla.R.Civ.P. 1.280 and applicable decisional law, materials are protected from discovery if they were prepared by or for a party or its representative in anticipation of litigation.

diligent search of the debtor's own records (such as the Incident Reports).  Arch, 534 F.3d at 80-82.

23.      Notwithstanding the Debtors' knowledge of the Incident and the Clarks' injuries, the Debtors did not give the Clarks the mandated notices of the Bankruptcy Cases, the Plan's confirmation, or of any deadlines for filing claims in the Bankruptcy Cases prior to the Admin Claims Bar Date.  Clearly, Winn-Dixie knew the Clarks were the type of creditors entitled to proper notice of the Admin Claims Bar Date since it gave that actual notice on several other occasions to a number of other personal injury claimants to whose claims arose between the Petition Date and the Effective Date.

24.      As this Court has acknowledged, actual and potential claimants are entitled to actual personal notice of a bar date in a bankruptcy case as a matter of fundamental due process.  See, e.g., In re Leisure, 400 B.R. 837, 840 (Bankr.M.D.Fla. 2008)(citing the Spring Valley case and other case for the proposition that "[I]t is a fundamental principle of due process that known creditors are entitled to actual notice of the claims bar date before that creditor's claim can be extinguished").  Here, under that reasoning Winn-Dixie has denied the Clarks their due process rights.

25.      In summary, Winn-Dixie has essentially admitted the Clarks became "known creditors" as a result of the Incident between the Petition Date and the Effective Date.   It is also not seriously contested that the Debtor nevertheless failed to provide the Clarks with notice of the Admin Claims Bar Date, the confirmation hearing, or even the Bankruptcy Cases.  After denying the Clarks' fundamental due process by failing to provide them with notice and a corresponding opportunity to be heard in the Bankruptcy Cases, the Debtors now improperly assert the Clarks' claims were discharged by virtue of

confirmation of the Debtors' Plan, and seek to enjoin the Clarks from pursuing those claims.   It is well settled that if a debtor fails to give a known creditor adequate notice of its bankruptcy proceedings, that creditor should not be bound by the order discharging the debtor's obligations to that creditor or the related injunctions.   For those reasons, this Court should enter an order determining that confirmation of the Plan did not serve to discharge the Clarks' claims against Winn-Dixie arising from the Incident, and that Plan Injunctions do not impede the Clarks' right to pursue and recover on their claims against Winn-Dixie in the Polk County Lawsuit.

## CONCLUSION

26.     Accordingly, this Court should enter an order determining that because the Debtors' failed to provide the Clarks with the required bankruptcy notices, the Debtor denied the Clarks' fundamental due process and, as such, their claims arising from the Incident have not been discharged by confirmation of the Plan and Plan Injunctions do not apply to the Clarks.  As a result of that order, the Clarks would be free to add Winn-Dixie as a party defendant in the Polk County Litigation and pursue liquidation and recovery of their claims against Winn-Dixie in that State Court proceeding.

**WHEREFORE**, the Movants respectfully request this Court enter an Order determining that the Clarks' claims against Winn-Dixie have not been discharged and

that the Clarks are not enjoined from pursuing litigation and recovery on account of those claims against Winn-Dixie in the Polk County Lawsuit.

DATED this 18th day of August, 2009.

/s/ Chad S. Bowen
Chad S. Bowen
Florida Bar No. 0138290
**JENNIS & BOWEN, P.L.**
400 N. Ashley Drive, Suite 2540
Tampa, Florida 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
Email: cbowen@jennisbowen.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, by facsimile, electronic service and/or U.S. Mail, postage prepaid to **Leanne McKnight Prendergast,** Smith, Hulsey & Busey, 1800 Wachovia Bank Tower, 225 Water Street, Jacksonville, FL 32202 and **United States Trustee**, 501 E. Polk St., Ste. 1200, Tampa, FL 33602, Fax (813) 228-2303 and via the Court's CM/ECF system to those parties receiving CM/ECF service on this 18th day of August, 2009.

/s/ Chad S. Bowen
Chad S. Bowen

EXHIBIT "A"



EXHIBIT "B"

IN THE CIRCUIT COURT FOR THE TENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR POLK COUNTY
CIVIL DIVISION

DAVID CLARK and his wife,
ANTOINETTE CLARK,

        Plaintiffs,

Case No: 53-2008-CA-000477-0000-00
Division:   11

vs.

LAWRENCE HEARD,

        Defendant.

_____/

## MOTION TO QUASH AND FOR PROTECTIVE ORDER

Winn-Dixie Stores, Inc., a Florida Corporation, (hereinafter Winn-Dixie) a non-party to this action, moves this Court to Quash Defendant's Subpoena Duces Tecum with Deposition dated January 20, 2009 and Plaintiff's Subpoena for Video Deposition Duces Tecum dated January 26, 2009 and as grounds therefore states as follows:

1.    This cause of action arises out of a motor vehicle accident in which an individual drove her car through the store window of a Winn-Dixie store located in Lakeland, Florida. The Plaintiff allegedly suffered bodily injury.

2.    On January 20, 2009, Defendant served a Subpoena Duces Tecum with Deposition on Winn-Dixie unilaterally setting the deposition of a Winn-Dixie Corporate Representative for February 26, 2009 in Polk County. A true and correct copy of the Subpoena Duces Tecum with Deposition and corresponding Notice of Deposition are attached hereto as Exhibit "A".

3.      Similarly, on January 26, 2009, Plaintiffs served their own Subpoena for Video Deposition Duces Tecum on Winn-Dixie Stores, Inc. cross-noticing the deposition for February 26, 2009.  A true and correct copy of the Subpoena for Video Deposition Duces Tecum is attached hereto as Exhibit "B".

4.      Both Subpoenas were served to the store site in Lakeland. This store is not the custodian of the documents and thus, the Subpoenas were improperly served and should be quashed.

5.      Plaintiff served an additional Subpoena Duces Tecum without Deposition on February 17, 2009. This Subpoena appropriately served Winn-Dixie's Registered Agent.  A true and correct copy of the Subpoena Duces Tecum without Deposition is attached hereto as Exhibit "C".

6.      Plaintiff's Subpoenas together include a list of 20 topics.   Some are duplicative.   Nonetheless, this exhaustive list mostly includes documentation that is privileged under the work product doctrine or which includes information that is confidential and/or contains proprietary or sensitive financial information.

7.      Specifically, they request the following information that Winn-Dixie contends are confidential or contain confidential information:

        a) Lease agreement between Winn-Dixie Stores Inc. and Defendant;

        b) Insurance policy providing coverage for the subject property;

        c) Employee information of employees on the premises.

8.      In addition, Winn-Dixie contends that number 7 of Plaintiff's Subpoena for Video Deposition and numbers 1, 5, and 6 of Plaintiff's Subpoena Duces Tecum without

2

Deposition requests documentation that is privileged under the work product doctrine. Specifically, Winn-Dixie asserts the following requests include material that is protected by the work product privilege: photographs, witness statements, written reports or written documents of any kind, video tapes, audio tapes, video recordings, audio recordings, incident reports, loss reports, interviews, property damage estimates, repair orders, and risk management analysis.

9.    Winn-Dixie has attempted to resolve these issues without the need for Court intervention. Counsel for Defendant had no objection to postponing the deposition while these matters were resolved. Counsel for Plaintiff, however, refused to postpone the deposition without filing this Motion.

WHEREFORE, Winn-Dixie respectfully requests this Court Grant its Motion to Quash and for Protective Order.

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished to **Lisha Bowen, Esquire**, Swope Rodante, P.A., 1234 East Fifth Avenue, Tampa FL 33605, Attorneys for Plaintiffs (facsimile / 813-223-3678) and **William Bracken, Jr., Esquire**, Crawford, Bracken & Snead, P.A., P.O. Box 5947, Lakeland, FL 33807, Attorneys for Lawrence Heard (facsimile / 863-647-5331) by mail and facsimile on February 26, 2009.

JOHN W. BUSSEY, III
Florida Bar No. 110503
Evan J. Small
Florida Bar No. 0057306
Wilson Elser Moskowitz Edelman & Dicker LLP
P. O. Box 531086
Orlando, FL 32853-1086
407-423-7287 - Phone
407-648-1376 – Facsimile
JWB:kw                ATTORNEYS FOR WINN-DIXIE STORES, INC.

3

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, FLORIDA. CIVIL ACTION

DAVID CLARK and his wife,
ANTOINETTE CLARK,

        Plaintiff,

vs.

LAWRENCE HEARD

        Defendant.

_____/

CASE NO:   2008 CA 000477
DIVISION:

SERVED THIS ____ DAY OF ____
20___ AT ____ A.M. ____ P.M.
LARRY CAMPBELL, SHERIFF OF LEON COUNTY, FL
BY _____ DS

## SUBPOENA DUCES TECUM FOR DEPOSITION

TO:    Person With The Most Knowledge of Winn Dixie's
       Policy Allowing the Plaintiff in the above case to collect
       money in front of the Winn Dixie store on November 8, 2005
       By Service on Corporation Services Company
       1201 Hayes Street
       Tallahassee, Florida 32301
       850-558-1500

SEAL
A TRUE COPY
*Larry Campbell*
SHERIFF, LEON COUNTY, FLORIDA

    **YOU ARE HEREBY COMMANDED** to appear before a person authorized by law to take depositions at **Charlton Reporting, 4909 Southfork Drive, Lakeland, Florida** on **February 26, 2009 at 2:30 p.m.** to testify in the above-styled cause and to have with you at said time and place the following:

1.    Any company policy concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

2.    Any correspondence with Lawrence Heard and/or any representative of Lawrence Heard concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

3.    Any correspondence with David Clark concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

4.    Any correspondence with Christian Program Ministry and/or any representative of Christian Program Ministry concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.



EXHIBIT
A

If you fail to appear, you may be in contempt of Court. You are subpoenaed to appear by the following attorneys and unless excused from this subpoena by these attorneys or the Court, you shall respond to this subpoena as directed.

**DATED** this 20th day of January 2009.

William B. Bracken, Jr.
For the Court

William B. Bracken, Jr.

William B. Bracken, Jr., FBN 0175943
Crawford, Bracken & Snead, P.A.
P.O. Box 5947
Lakeland, FL 33807
(863) 644-8929
Attorneys for Defendant, Heard



IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, FLORIDA.  CIVIL ACTION

DAVID CLARK and his wife,
ANTOINETTE CLARK,

            Plaintiff,                CASE NO:  2008 CA 000477
                                                DIVISION:  11

vs.

LAWRENCE HEARD

            Defendant.

_____ /

### DEFENDANT'S NOTICE OF TAKING DEPOSITION DUCES TECUM

    **PLEASE TAKE NOTICE** that the undersigned will take the following deposition by oral

examination for the purposes of discovery or for use at trial, or for other purposes as permitted under

the Florida Rules of Civil Procedure, before a member of a court reporting firm or other person

authorized to administer oaths not of counsel to the parties nor interested in the event of the cause:

| WITNESS | DATE & TIME | LOCATION |
|---|---|---|
| **Person with the most knowledge at Winn Dixie regarding allowing plaintiff to collect money in front of the store on November 8, 2005** | **February 26, 2009 @ 2:30 p.m.** | **Charlton Reporting**<br>**4909 Southfork Dr.**<br>**Lakeland, FL 33813**<br>**863-648-0639** |

*(Date & time cleared with Miko @ Ms. Bowen's office on January 2, 2009)*

to testify in the above-styled cause and to have with you at said time and place the following:

1.    Any company policy concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

2.    Any correspondence with Lawrence Heard and/or any representative of Lawrence Heard concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

3.    Any correspondence with David Clark concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

4.    Any correspondence with Christian Program Ministry and/or any representative of Christian Program Ministry concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.



*Notice in Compliance With Americans With Disabilities Act*

*In accordance with the Americans With Disabilities Act, if you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Crawford, Bracken & Snead, P.A. at (863) 644-8929, within two (2) working days of your receipt of this Notice of Taking Deposition; if you are hearing or voice impaired, call Florida Relay Service (800) 955-8771.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing has been forwarded by U.S. Mail on January 20, 2009, to **LISHA BOWEN, ESQ.**, 1234 E. 5th Avenue, Tampa, FL 33605.

William B. Bracken, Jr.

---

**SIDNEY M. CRAWFORD, FBN 191512**
**WILLIAM B. BRACKEN, JR., FBN 0175943**
Crawford, Bracken & Snead, P.A.
P.O. Box 5947
Lakeland, FL 33807
Telephone:    863-644-8929
Facsimile:    863-647-5331
Attorneys for Defendant

CC:    Charlton Reporting

A511213916

IN THE CIRCUIT COURT FOR THE TENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR POLK COUNTY
CIVIL DIVISION

DAVID CLARK and his wife,
ANTOINETTE CLARK,

    Plaintiffs,

vs.

LAWRENCE HEARD,

    Defendant.

_____/

CASE NO.:  53-2008-CA-000477-0000-00
DIVISION:    11

11 55
01-27-09
Lakeland
Robert
Rowen

### SUBPOENA FOR VIDEO DEPOSITION DECUS TECUM

STATE OF FLORIDA

TO:  Winn Dixie Stores, Inc.
    1305 Ariana Street West
    Lakeland, Florida 33803

FEB 2 ? 9

    YOU ARE COMMANDED TO APPEAR before a person authorized to take the video deposition at Charlton Reporting, 4909 Southfork Drive, Lakeland, Florida on February 26, 2009 at 2:30 p.m. for the taking of your deposition in this action.

### THE MATTERS UPON WHICH EXAMINATION IS REQUESTED ARE AS FOLLOWS:

1. Identification and discussion of any company policy, whether written or verbal, concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

2. Any communication with Lawrence Heard and/or any representative of Lawrence Heard concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

3. Any communication with David Clark concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

4. Any communication with Christian Program Ministry and/or any representative of Christian Program Ministry concerning solicitation on the property located at 1305 Ariana Street West, Lakeland, Florida.

5. Identification and explanation of the lease and any supplements or addendum between Lawrence Heard and Winn Dixie Stores, Inc. for the property located at 1305 Ariana Street West, Lakeland, Florida.



EXHIBIT
B

01-26-'09 14:09  FROM-CHOICE LEGAL          8132730344          T-297  P003/006 F-611

6.  Identification and explanation of any policies of insurance that would have been in full force and effect on November 11, 2005, and providing coverage for the property located at 1305 Ariana Street West, Lakeland, Florida.

7.  Identification and explanation of any photographs, witness statements, written reports or written documents of any kind, video tapes, audio tapes, video recordings, audio recordings or any other materials in your possession, custody or control regarding the incident involving the Plaintiff on November 11, 2005, that occurred on the property located at 1305 Ariana Street West, Lakeland, Florida.

8.  Identification and explanation of any documents relating to the repair of the property located at 1305 Ariana Street West, Lakeland, Florida, following the November 11, 2005, crash that injured the Plaintiff.

9.  Identification and explanation of any agreement, whether written or verbal, between you and any other person or entity that would hold you harmless, indemnify you or defend you for any property damage or injuries that would have occurred on November 11, 2005, on the property located at 1305 Ariana Street West, Lakeland, Florida.

10. Identification and explanation of your understanding of the responsibility for the repair and maintenance of the property located at 1305 Ariana Street West, Lakeland, Florida.

11. Identification and explanation of why no bollards or other protective devices were placed in front of the Winn Dixie located at 1305 Ariana Street West, Lakeland, Florida.

12. Identification and explanation of the names, addresses and title of each Winn Dixie Stores, Inc. employee on the premises located at 1305 Ariana Street West, Lakeland, Florida on November 11, 2005.


*THE DEFENDANT IS REQUESTED TO NOTIFY PLAINTIFF, IN ADVANCE, THE NAME(S) OF THE INDIVIDUAL(S) WHO WILL BE DESIGNATED TO APPEAR AND TESTIFY ON BEHALF OF THE DEFENDANT, AND THE AREAS OF QUESTIONING UPON WHICH EACH WILL BE DESIGNATED TO TESTIFY.

> The deponent shall produce at the time and place of above-described deposition all documents, materials, and items that contain information about or relate to the areas of inquiry identified herein.

NOTE:   Any documents you contend are privileged will not be disclosed at deposition. However, please bring them and they will be marked sufficiently for identification to allow subsequent judicial determination as to the claimed privilege.

If you fail to appear, YOU MAY BE IN CONTEMPT OF COURT.

If you fail to appear, YOU MAY BE IN CONTEMPT OF COURT.

You are subpoenaed to appear by the following attorneys and unless excused from this Subpoena by these attorneys or the Court, you shall respond to this Subpoena as directed.

DATED on this 26 day of January 2009.

Lisha Bowen
For the Court

Attorney for Plaintiffs
Lisha Bowen
Florida Bar No.: 0169374
SWOPE RODANTE, P.A.
1234 East 5th Avenue
Tampa, Florida 33605
(813) 273-0017

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Swope, Rodante P.A., 1234 East 5th Ave., Tampa, Florida 33605; 800-491-9834; within two (2) working days of your receipt of this Subpoena.

IN THE CIRCUIT COURT FOR THE TENTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR POLK COUNTY
CIVIL DIVISION

DAVID CLARK and his wife,
ANTOINETTE CLARK,
                        CASE NO.:  53-2008-CA-000477-0000-00

     Plaintiffs,            DIVISION:  11

vs.

LAWRENCE HEARD,

     Defendant.

_____/

## SUBPOENA DUCES TECUM WITHOUT DEPOSITION

THE STATE OF FLORIDA

    TO:   Winn Dixie Stores, Inc.
           c/o Corporation Services Co., as Registered Agent
           1201 Hays Street
           Tallahassee, Florida 32301

YOU ARE COMMANDED to designate a records custodian to appear at Swope, Rodante P.A., **1234 East 5th Avenue, Tampa, Florida 33605** on the **10th day of March, 2009**, at **10:00** a.m., and to have with you at that time and place the following:

1. Any documents, including but not limited to incident reports or any documents regardless of its name that contains information regarding this incident, loss reports, interviews, property damage estimates, repair orders, risk management analysis, regarding an incident on November 8, 2005, at the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida involving David Clark, Blanche Garvin or Rose Chapman.

2. A copy of any policies of insurance that were in effect on November 8, 2005, that would provide coverage for bodily injuries sustained at the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida.

3. Any documents that would show who was employed and on duty at the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida on November 8, 2005. Any personal information regarding employees such as social security numbers and dates of birth are not being requested and may be redacted.



4. Any written communication, or any documents referencing a verbal communication, between any agent or employee of Winn Dixie and Lawrence Heard, or his employees or agents regarding bollards, guardrails or other type of protective devices at the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida.

5. Any audio or video tape of the inside or outside of the premises of Winn Dixie located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida, on November 8, 2005.

6. Any photographs depicting damage to the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida, as a result of the incident that occurred on November 8, 2005.

7. Any written communication or any documents referencing a verbal communication, between any agent or employee of Winn Dixie and Lawrence Heard, or his employees or agents regarding the incident involving David Clark, Blanch Garvin or Rose Chapman at the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida.

8. Any written communication, or any documents referencing a verbal communication, between any agent or employee of Winn Dixie and Lawrence Heard, or his employees or agents regarding the incident involving property damage or repairs to the Winn Dixie store located in the Central Park Plaza, at 1305 Ariana Street, in Lakeland, Florida.

NOTE: Any documents you contend are privileged will not be disclosed at deposition. However, please either provide a privilege log that complies with the Florida Rules of Civil Procedure and sufficiently identifies the documents so that others can assess the applicability of the claimed privilege, or bring them and they will be marked sufficiently for identification to allow subsequent judicial determination as to the claimed privilege.

These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You may comply with this Subpoena by providing legible copies of the items to be produced to the attorney whose name appears on this Subpoena on or before the scheduled date of production. You may condition the preparation of the copies upon the payment in advance of the reasonable cost of preparation. You may mail or deliver the copies to Swope, Rodante P.A.; 1234 East 5th Avenue, Tampa, Florida 33605 and thereby eliminate your appearance at the time and place specified above. You have the right to object to the production pursuant to this Subpoena at any time before production by giving written notice to the attorney whose name appears on this Subpoena. THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.

If you fail to:

(1)    Appear as specified; or

(2)    Furnish the records instead of appearing as provided above; or

(3)    Object to this subpoena,

you may be in contempt of court.  You are subpoenaed to appear by the following attorney and unless excused from this Subpoena by this attorney or the Court, you shall respond to this Subpoena as directed.

DATED on this 17th day of February, 2009.

LISHA BOWEN,
For the Court

Attorney for Plaintiff
SWOPE, RODANTE P.A.
1234 E. 5th Avenue
Tampa, FL 33605
(813) 273-0017
Florida Bar No.: 0169374

IN THE CIRCUIT COURT OF THE TENTH
JUDICIAL CIRCUIT IN AND FOR POLK, FLORIDA
CIVIL ACTION

- - - - - - - - - - - - - >
                                 :

DAVID CLARK, and his wife,    :
ANTOINETTE CLARK,                :
                                 :

     Plaintiff,          : CASE   2008 CA
                        : NO.:   000477

vs                            :
                                 :

LAWRENCE HEARD,              :
                                 :

     Defendant.           >

- - - - - - - - - - - - - -

COPY

DEPOSITION OF:   DONNIE WILSON

DATE:               January 20, 2009

PLACE:             Lucente & Associates
                    4320 W. Kennedy Blvd.
                    Suite 100
                    Tampa, Florida 33609

TIME:               2:30 to 3:30

REPORTED BY:       RUTH L. YURCHAK
                    Notary Public
                    State of Florida at Large

Pages 1 - 65

Page 2

1                         APPEARANCES

2


3  Appeared on behalf of Plaintiff:

4
            KATHRYN LEE, ESQUIRE
5           Swope, Rodante P.A.
            1234 5th Avenue East
6           Tampa, Florida 33605

7


8  Appeared on behalf of Defendant:

9
            WILLIAM B. BRACKEN, JR., ESQUIRE
10          Crawford, Bracken & Snead
            P.O. Box 5947
11          Lakeland, Florida 33807

12


13
   COURT REPORTER:
14

15          RUTH L. YURCHAK
            Lucente & Associates
16          4320 W. Kennedy Blvd.
            Suite 100
17          Tampa, Florida 33609
            (941) 748-3289
18          1-800-282-8275

19

20

21

22

23

24

25

1

I N D E X

2

Page

3    DIRECT EXAMINATION                          4
     BY MR. BRACKEN:

4

     CROSS-EXAMINATION                          39
5    BY MS. LEE:
     REDIRECT EXAMINATION                       58
6    BY MR. BRACKEN:
     CROSS-EXAMINATION                          59
7    BY MS. LEE:
     CERTIFICATE OF OATH                        64
8    CERTIFICATE OF REPORTER                    65

9

10

11

12

E X H I B I T S

13

Defense No.                                  Page
14

15    1.........................................26
      2.........................................37
16    3.........................................10

17

18

19

20

21

22

23

24

25

1

2

                    DONNIE WILSON,

3

4    having been duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. BRACKEN:

9        Q.   Mr. Wilson, can you give me your full name,

10   please?

11       A.   Donald Darrel Wilson.

12       Q.   And your current address?

13       A.   1034 Harvest Moon Drive, Seffner, Florida,

14   33584.

15       Q.   Who is your current employer?

16       A.   Winn-Dixie Stores, Incorporated.

17       Q.   How long have you been with Winn-Dixie?

18       A.   Altogether, about twenty-three years.

19       Q.   We're here about an incident that occurred

20   back in November of 2005 in Lakeland at the Ariana

21   (sic) Street Winn-Dixie store.  Did you work at that

22   store at the time?

23       A.   Yes, I did.

24       Q.   What was your position at the time?

25       A.   Location director.

1    Q.   Is that another name for a general manager of

2   the store?

3    A.   Store manager, head manager, whatever you want

4   to call it.

5    Q.   And you were essentially in charge of the

6   management of that store location?

7    A.   Yes.

8    Q.   What is your job now?

9    A.   The same.

10   Q.   At a different store?

11   A.   Yes.

12   Q.   What store?

13   A.   Save Right Store, 2659, it's owned by

14  Winn-Dixie.  It's located 2525 East Hillsborough

15  Avenue, Tampa, Florida 33610.

16   Q.   We had a brief discussion before we got

17  started here.  I apologize we got started a little

18  late.  I also apologize because we tried to do this

19  once before and we cancelled it.  And apparently you

20  didn't get notice, and I take responsibility for that,

21  and I apologize for inconveniencing you.

22       I do appreciate you coming out here today.

23  We're going to run through this as quickly as we can to

24  get you out of here as quickly as we can.  Some of my

25  questions may go a little quickly or may already talk

1      this accident occurred was on a Tuesday?

2          A.    Yes.

3          Q.    And you were off that day?

4          A.    Yes.

5          Q.    But you had come to the store before to pick

6      up your paycheck before this accident happened, is that

7      right?

8          A.    Correct.

9          Q.    And you were at the store when the accident

10     happened?

11         A.    Correct.

12         Q.    After the accident, and we'll get to the

13     accident itself in a little bit, but after the accident

14     were you involved at all in talking to witnesses or

15     interviewing anybody or taking photographs?

16         A.    No, not me personally, no.

17         Q.    Did safety people from this safety department

18     office come to the store while you were still there?

19         A.    Yes.

20         Q.    That day?

21         A.    One of them had arrived, I believe, yes.

22         Q.    Do you remember what you witnessed that person

23     doing?

24         A.    Mainly talking to associates who would have

25     been witnesses.  Getting a cleanup done on the floor

1   directly because there was hazardous chemicals on the

2   floor from the photo lab machine that was destroyed.

3       Q.   Other than cleaning up, obviously, and making

4   sure the store is safe going into the future, I'm more

5   concerned what investigation was done to document what

6   happened in this accident?

7       A.   I know he had spoken to all of the witnesses.

8   I'm sure photos were taken.  Honestly, I did not pay

9   that much attention, you know, they were handling that.

10      Q.   And I'm pretty clear on this, but were you

11  present for any of the investigation done by that

12  person such that you would overhear what witnesses told

13  that person?

14      A.   No, I was not.

15      Q.   Were you personally interviewed concerning the

16  accident by the safety office?

17      A.   Yes.

18      Q.   Was that interview confined basically to what

19  you saw happen or what was involved in that interview?

20      A.   Yeah, basically, what the company's

21  involvement was in the accident.  My actions in the

22  accident.

23      Q.   And I want to back up now and just talk about

24  some of your responsibilities as the location director

25  at that store before this accident and when this

1    Q.   To your knowledge was there any surveillance

2   videos or security cameras that would have caught this

3   incident?

4    A.   Not from our vantage point, no.  The store had

5   none.  I believe there were signs that may have said

6   that there was surveillance in the parking lot, now

7   whether that was true or not, I don't know.

8    Q.   But at least by your understanding and your

9   knowledge of the investigation done after this

10  accident, you've never been made aware of any video of

11  what happened?

12   A.   No.

13   Q.   Was it your understanding that whoever was in

14  charge of the store on any given day, whether it was

15  you, as the location director or the co-manager or

16  co-director, that that person had full control of the

17  storefront and whether people could solicit or not at

18  the storefront?

19   A.   They should, yes.

20   Q.   And to your knowledge, if I understood what

21  you said earlier that was not something that required

22  any communication with my client, Lawrence Heard?

23   A.   No, no.

24   Q.   To your knowledge at any time before this

25  accident -- well, first of all, the day after this

1   accident^ this can was your last day at this store, you

2   said, right?

3       A.   Correct.

4       Q.   Did you have any involvement with this store

5   after that last day?

6       A.    I believe I talked a few times on the phone

7   to the safety office.  I had to go over there several

8   weeks later to receive an award from the Lakeland

9   Police Department.

10      Q.   For what?

11      A.    For saving Mr. Clark's life, helping to save

12  his life.  And that presentation took place at that

13  store and other than that I had no interaction.

14      Q.   Assuming at any time after this accident you

15  never had to deal with Mr. Heard with respect to any

16  solicitors or anything like that?

17      A.   No, I have not.

18      Q.   And before this incident, including the day of

19  this incident, had you ever had to personally call Mr.

20  Heard or anybody associated with him to ask them to

21  issue a trespass or anything to get people to leave the

22  property?

23      A.   No.

24      Q.   Do you know if anybody else at your Winn-Dixie

25  store before this accident had ever had to do that?

1    to the accident about the accident?

2         A.    No.

3         Q.    I understand you may have spoken to some of

4    the employees there as well, but did you talk to

5    anybody about what had happened after the day of the

6    accident?

7         A.    No.

8         Q.    Other than writing out whatever report you

9    wrote out for Winn-Dixie?

10        A.    Yeah.

11        Q.    So we're clear, for the record, you pointed to

12   where you were.  Were you inside the store when this

13   happened or outside?

14        A.    Inside.

15        Q.    And when you say you were walking up from the

16   back of the store, you were towards the back from the

17   entrance, but inside?

18        A.    Yeah, I had parked around back that morning

19   because the receiving doors, which is where we bring

20   vendors in was in was open.  And I had walked in and

21   took a look at the back room and spoke to a few

22   associates.  And had walked out to what would have been

23   the, basically, the dairy side of the store, looked at

24   that department, spoke to a few associates and

25   proceeded to walk up front when this occurred.

1      A.   The solicitation information should have been

2 posted in the office.

3      Q.   Do you have a memory of it being posted at

4 that time?

5      A.   I don't remember back what -- you know, we

6 have a whole side of a wall with things posted it.  I'm

7 presuming it was, but I couldn't sit here and swear to

8 you.

9      Q.   Did you ever discuss solicitation policy

10 yourself, a verbal discussion with Mr. Jones?

11      A.   I don't recall any specific one, but I'm sure

12 at sometime or another we discussed it.

13      Q.   How long had Mr. Jones been at that store

14 location?

15      A.   He was there prior to me getting there.

16      Q.   You said a safety investigator appeared on the

17 scene after the accident.  Do you know the name of that

18 individual?

19      A.   Right offhand I'm not sure who they might have

20 called.  I believe it might have been a gentleman named

21 Mike Sloane.

22      Q.   So it was a male?

23      A.   Yes.

24      Q.   Caucasian?

25      A.   Yes.

Page 43

1    Q.   You also made a reference to, and if I

2    misheard you, I apologize.  At that time it was called

3    a safety office.  Does that name have a different name

4    now?

5    A.   I don't know if it does have a different name.

6    I know at that time there was a bigger office located

7    out of the Orlando division.  And I believe they still

8    have one representative in there, but the main, all of

9    the other things from that office were moved to

10   Jacksonville.

11   Q.   So the office might still have the same name,

12   but it's consolidated?

13   A.   Yeah, it's basically ran by one person and he

14   basically shifts reports from division to headquarters.

15   And instead the division handling it, everything would

16   basically go into headquarters.

17   Q.   You said you never discussed this accident

18   with Lawrence Heard.  What types of things did you have

19   contact with him about while you were the store manager

20   at this location?

21   A.   I just remember him coming by a couple of

22   times to visit and look at the shopping center.  He

23   would always ask was there any problems I had with

24   anything.  You know, just general questions about

25   anything that I knew needed to be fixed.  Did I have

1    drove through, a vehicle through something like that,

2    yeah.

3        Q.    Do you know if any of the employees -- I guess

4    at that point it wasn't your store anymore.  At this

5    Lakeland location were any of the employees injured in

6    this accident?

7        A.    I believe there were two that had slight

8    injuries.

9        Q.    Do you know who those were?

10       A.    I don't recall the name.  I know one was the

11   office associate that had opened that morning.  I want

12   to say her name was Sheila, but I can't recall her last

13   name and the photo lab manager.  And I don't recall her

14   name either.

15            MR. BRACKEN:  We deposed her.

16   BY MS. LEE:

17       Q.    Do you know if either of those two employees

18   filled out any documents or reports for their injuries?

19       A.    I'm sure they did.

20       Q.    So there are forms that an employee fills out?

21       A.    Yeah.  You basically fill out a notification

22   of accident.  I belive an E-Form that you fill out and

23   sent into the safety office.

24       Q.    And that went to a safety office and not to a

25   workers' comp carrier or anything like that?

1    A.    It probably went to several places.

2    Q.    But from your store level it went to a safety

3  office?

4    A.    Yeah.

5    Q.    Did you have to make any affirmative action to

6  make any calls or contact anybody at corporate about

7  this accident?

8    A.    I told Mr. Jones to -- I believe I told him to

9  get a hold of the district manager and then to call the

10  safety office.  But at that particular time I believe I

11  had just finished with Mr. Clark and was rather bloody

12  from the situation.

13    Q.    So Mr. Jones made those notification?

14    A.    Yeah.

15    Q.    Who was your district manager at that time?

16    A.    Lou Grinstead was at that time.

17    Q.    Can you spell his last name?

18    A.    G-R-I-N-S-T-E-A-D.

19    Q.    Do you have any reason to believe that Mr.

20  Jones did not contact the district manager and the

21  safety office?

22    A.    No, because the district manager showed up

23  that day, so I'm pretty sure he got a hold of him.

24    Q.    Did you take any photos at the scene?

25    A.    No.  Like I said, I was quite messy after

1    that.  It took me a while to clean the physical parts

2    of my body.  My clothing was, you know, had blood on it

3    and stuff.  So I didn't get too involved in the

4    investigative parts or the picture taking parts.

5        Q.   But you do know that there were people who did

6    take pictures?

7        A.   I believe there to have been.  I'm sure they

8    were.  I know police were taking photographs.  The fire

9    department were taking photographs, newspaper people

10   were taking photographs.

11       Q.   Did your safety officer take photographs?

12       A.   I'm sure.  I couldn't sit here and swear, but

13   you know after that it's kind of a confusing situation.

14       Q.   Did you personally make any reports about this

15   accident to the landlord?

16       A.   No, I wouldn't.  The landlords are generally

17   dealt with through the real estate office.

18       Q.   That actually goes to another one of my

19   questions.  When you were the store manager at this

20   location and you had problems with the physical

21   building, who you would contact?

22       A.   Real estate.

23       Q.   Did you have a particular person there or

24   would you just call?

25       A.   Mainly, we would do it though maintenance.

1    Q.   The managers below you, your managers in your

2  store.

3    A.   Yeah, whoever I seen, I'm sure it came up in

4  discussion whether it was about cleaning something up

5  or they may have said, hey, you know, you did a good

6  job or something like that.

7    Q.   Did you talk to anybody to find out if anybody

8  knew that Mr. Clark was outside of your store

9  soliciting outside your store for donations?

10   A.   I don't recall that particular conversation

11  coming up.  The only thing I remember possibly is

12  speaking to Mr. Jones is if this was one of the House

13  of David people.

14   Q.   So you asked him if it was?

15   A.   Yeah, if he knew if it was or not because that

16  was really the one that we had an issue with.  From

17  what I call, he said he wasn't sure.  So I'm not sure

18  if he had talked to Mr. Clark, either.  I mean,

19  honestly, I could have talked to Mr. Clark.  But the

20  way he looked that day compared to the way he may have

21  looked on a different day was obviously not going to be

22  the same.

23       And that wouldn't have been my concern.  I

24  know accidents happen and lawsuits occur that type of

25  thing, but that's really not -- what's first on your

Page 61

1    mind is, you know, if you see someone missing a leg, if

2    the leg is here, where is human being that it belongs

3    to and what can we do about this situation?

4        Q.   And I do appreciate that.  And I know Mr.

5    Clark is very thankful for what you have done.  What I

6    was trying to get out was whether or not Mr. Jones knew

7    that Mr. Clark and his friend were out front?

8        A.   I'm sure if he did he would have asked them to

9    leave.  I mean, that is just my opinion.

10       Q.   So you never had that discussion with him?

11       A.   No.  If I did, I don't recall it.  but I'm

12   sure if I did, he would have said, I asked him to

13   leave.  See, he was kind of a stickler on policies.

14   And Mr. Jones is an African-American also, but it

15   wouldn't have mattered to him whether Mr. Clark was or

16   not.  You know, he wouldn't have been over critical or

17   under critical either way, the policy was the policy.

18       Q.   And I think you said one of women that was

19   injured was the office manager who was there that day?

20       A.   I don't know if you call her office manager.

21   Basically, they ran the office, you know either opened

22   or closed it.

23       Q.   Was she the most senior person on front end

24   that day?

25       A.   Probably, besides Mr. Jones.

Page 62

1    Q.    Would Mr. Jones be stationed?

2    A.    No, he wouldn't be stationed up front, but

3  most day he would be up front.

4    Q.    Is that where you spend most of your time?

5    A.    Once you get the store walked and stuff, you

6  have some responsibilities up front, like armored

7  security coming up or something like that.  We always

8  have to have a manager and an office person doing that

9  kind of thing.  Customers want to talk to the manager.

10  Obviously, if you're the only one there, you get called

11  up.

12    Q.    When you received this subpoena for your

13  deposition today, did you contact your supervisor about

14  it?

15    A.    Yes, I did.

16    Q.    So your employer knows you are here today?

17    A.    He knew I was here last time.

18    Q.    Fair enough.  Did you ask if you could have an

19  attorney appear with you today?

20    A.    I didn't see any reason for it.  I spoke to

21  him about it.  He's like that's kind of curious, that's

22  been a while.  He was aware of the whole thing.

23    Q.    Who was this gentleman?

24    A.    Frank James, Junior.

25    Q.    He's your direct supervisor?

Page 63

1   A.   The district manager.

2   Q.   How large is the district?

3   A.   Twenty-two stores.

4   Q.   Just the Tampa Bay area?

5   A.   His go from Spring Hill to Apollo Beach

6   basically up and down.

7   Q.   Covering all of the Save Rights?

8   A.   No, Winn-Dixie.  I'm only Save Right on this

9   side of Florida.  The other ones are in Orlando and

10  Jacksonville.

11          MS. LEE:  I have no further questions.

12          *  *  *  *  *  *  *  *  *  *  *

13          (Whereupon the deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "D"

**LAW OFFICES**
**SMITH HULSEY & BUSEY**
1800 Wachovia Bank Tower
225 Water Street
Jacksonville, Florida 32202

Telephone 904-359-7700
Fax 904-359-7708

## FACSIMILE TRANSMITTAL SHEET

DATE:                 May 20, 2009

SH&B #:              10163.024595

TO:                      Lisha Bowen, Esq.
                            813-223-3678 Facsimile
                            813-273-0017 Telephone

FROM:                Leanne McKnight Prendergast

COMMENTS:

NUMBER OF PAGES SENT:_____*3*_____, INCLUDING COVER PAGE

SPECIAL INSTRUCTIONS:
IF YOU DO NOT RECEIVE ALL PAGES AS INDICATED, PLEASE CALL
CINDY AT (904) 359-7799.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO
WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED,
CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of
this message is not the intended recipient or the employee or agent responsible for delivering the message
to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us
immediately by telephone (collect), and return the original message to us at the above address via the U.S.
Postal Service. Thank you.

# SMITH HULSEY & BUSEY

LEANNE McKNIGHT PRENDERGAST
DIRECT 904.359.7802
LPRENDERGAST@SMITHHULSEY.COM

May 20, 2009

Lisha Bowen, Esq.
Swope, Rodante P.A.
1234 East 5th Avenue
Tampa, Florida 33605

Re:   In re Winn-Dixie Stores, Inc., *et al.*, Debtors; United States Bankruptcy
Court, Middle District of Florida, Jacksonville Division; Case No. 05-
03817-3F1, Chapter 11, Jointly Administered

David Clark, *et al.*, v. Lawrence Heard, Circuit Court, 10th Judicial
Circuit, Polk County, Florida, Case No. 53-2008-CA-000477-0000-00
Section 11

Dear Ms. Bowen:

This firm represents Winn-Dixie Stores, Inc., and its affiliates in the
referenced Chapter 11 cases.

On February 21, 2005, Winn-Dixie Stores, Inc., and its affiliates (collectively,
"Winn-Dixie") filed voluntary petitions for reorganization under Chapter 11 of the
United States Bankruptcy Code. On November 9, 2006, the Bankruptcy Court entered
an order confirming Winn-Dixie's Joint Plan of Reorganization (the "Confirmation
Order"). The Plan and Confirmation Order became effective on November 21, 2006
(the "Effective Date").

Pursuant to Section 1141(d) of the Code, the Confirmation Order discharged
Winn-Dixie from all claims arising prior to the Effective Date, whether or not (i) a claim
for such debt was filed, (ii) such claim was allowed or disallowed or (iii) the holder of
such claim accepted or rejected Winn-Dixie's Joint Plan of Reorganization. Each

SMITH HULSEY & BUSEY

Lisha Bowen, Esq.
May 20, 2009
Page 2

creditor whose claim was discharged is now barred, pursuant to Section 524(a) of the Code, from instituting or continuing any action or employing any process against Winn-Dixie to pursue such claims. Any action taken or order entered with respect to any discharged claims without Bankruptcy Court authorization is void as a matter of law.

We are in receipt of the Joint Stipulation to Permit Plaintiffs to File an Amended Complaint to Add Winn-Dixie Stores, Inc., as a Party filed in the referenced state court action. Because no timely administrative expense claim was filed with the Bankruptcy Court by or on behalf of the plaintiffs, however, the claims asserted in the proposed amended complaint attached to the stipulation are time-barred and discharged as set forth in the Confirmation Order. Accordingly, the filing of the amended complaint would be a violation of Section 524 of the Code and the Bankruptcy Court's Confirmation Order and therefore void as a matter of law.

By reason of the foregoing, we request that you withdraw the stipulation to file the amended complaint, and fax (or e-mail) and mail to us a copy of a file stamped notice of such withdrawal. Alternatively, if the amended complaint has already been filed, we demand that you dismiss the state court action as to Winn-Dixie and fax (or e-mail) and mail to us a copy of a file stamped notice of dismissal. If we do not receive a notice of withdrawal or dismissal by May 29, 2009, we will file a complaint for appropriate relief, including sanctions, against the plaintiffs and your firm in the Bankruptcy Court in Jacksonville, Florida. We will also seek the removal and transfer of the state court action to the Jacksonville Bankruptcy Court.

Very truly yours,

Leanne McKnight Prendergast

By facsimile and mail

c: John W. Bussey, III, Esq.
   William B. Bracken, Jr., Esq.

00654365