# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

                                          **Case No. 3:05-bk-3817-3F1**

WINN DIXIE STORES, INC.

        Debtor(s).

---

### CONSENT ORDER SCHEDULING TRIAL

The parties have consented to the entry of this Order as shown below.

    1.  The Trial on Claim #9953 filed by Visagent Corporation, is scheduled **for**
February 8, 2010 at 9:00 a.m. for 8 hours; February 9, 2010 at 9:00 a.m.
for 8 hours; February 10, 2010 at 9:00 a.m. for 8 hours; February 11, 2010
at 9:00 a.m. for 8 hours; and February 12, 2010 at 9:00 a.m. for 8 hours

---

**in Courtroom 4D, United States Courthouse, 300 N. Hogan St., Jacksonville, FL 32202.
The trial is only as to the issue of liability.**

    2.  The procedure set forth below shall control the handling of this proceeding.  No
variations or adjustments shall be made in the schedule without prior concurrence by the Court
upon request made by written notice.  Failure to comply with this Order shall result in
appropriate sanctions.

    Accordingly, it is **ORDERED** that the parties shall comply with the following measures:

    1.  Responsive Pleadings, Motions, and Objections:

        A.  Unless otherwise ordered by this court, any outstanding answers or responsive
pleadings shall be filed within (10) ten days of this order.

        B.  Any and all motions are to be filed not less than thirty (30) days prior to trial.

        C.  All properly filed objections and motions, not ruled on previously, shall be
heard at trial unless otherwise ordered by the Court.

        D.  Ten (10) days prior to trial, parties shall file with the court photocopies of any
legal authority relied on by counsel to support their respective positions.

E.  The procedure for filing motions is as follows:

(i).  All motions shall include or be accompanied by a legal memorandum or brief containing argument and citations of authorities.

(ii).  No later than ten (10) days from the date of service of a motion, each party opposing the motion shall file and serve a legal memorandum or brief containing argument and citations of authorities in opposition to the relief requested.  In the event no such response is filed, the court may deem the motion as unopposed and thereby consented.  The parties should not expect the Court to conduct a hearing prior to ruling on any pending motions.

(iii).  No later than five (5) days from the date of service of the opposing legal memorandum, the movant may file and serve a reply legal memorandum or brief, if desired.

(iv).  Upon the completion of this schedule, the motion will be at issue, under advisement, and ready for decision by the court.

(v).  Motions of any emergency nature may be considered and determined by the court at any time in its discretion.

2.  Exhibits and Witnesses:

A.  Each party's exhibit list, along with the other party's objections, is to be filed with the court 10 days prior to the trial.  Each party's exhibit list shall be served 20 days before trial.

B.  Each party's witness list, designating which witnesses the parties intends to call and which witnesses the party may call, shall be served and filed 60 days before trial and shall designate who each party intends to call as witness

C.  Counsel are responsible for the timely supplementation of their respective exhibit lists and witness lists with any additional exhibits and witnesses prior to the trial.

D.  Exhibits not objected to in writing within ten (10) days prior to the trial are deemed admitted.  The Court will resolve any objections at the trial.

E.  All exhibits to be used at the trial must be pre-marked and listed in accordance with Rule 9070-1 of the Local Rules of Practice and Procedure for the United States Bankruptcy Court for the Middle District of Florida.  Counsel may obtain from the clerk copies of blank form exhibit lists and exhibit identification tags that are to be used in complying with the requirements of this paragraph and the local rule.

F.  Each party shall compile and tab their exhibits and provide duplicate sets (i) at the trial for the judge, clerk, and witness stand, and (ii) twenty (20) days before trial to all counsel.

G.  **Appropriate Attire.**  You are reminded that Local Rule 5072-1(b)(16) requires that all persons appearing in court should dress in appropriate business attire consistent with their financial abilities.  Among other things, a coat and tie are appropriate for a man; a dress or pants suit is appropriate for a woman.

H.  Due to heightened security procedures, persons must present photo identification to enter the Courthouse and arrive early.

I.  Each party will serve expert disclosures for issues not relating to damages pursuant to Rule 26(a)(2), Federal Rules of Civil Procedure, no later than sixty days before trial, and any rebuttal expert disclosures no later than 45 days before trial.

3.  Discovery:

All discovery, except discovery relating to damages, is to be completed (10) ten days prior to the trial.  Conduct of any discovery that would require a later due date shall be permitted only on the order of the court or by filed stipulation of the parties, and only in proceedings that will not be delayed as a result.

4.  Trial Memorandum

The Trial Memorandum shall be filed twenty (20) days prior to the trial and shall contain:

**FOR THE DEBTORS:**

A.  A list of all pleadings and pending motions.

B.  A brief statement of the theory of debtor's defenses or counterclaims including legal authority for same.

C.  A brief summary of debtor's contentions of fact in support of each claim, the evidence relied upon to establish each of the facts contended.

**FOR THE CLAIMANT:**

A.  A brief statement of the theory of each claim including legal authority for same.

B.  A brief summary of contentions of facts in support of the legal theories and the evidence to be relied upon to establish each of the facts contended.

3

**FOR ALL PARTIES:**

A.  A statement of all admitted or uncontested facts.

B.  A brief statement of contested facts.

C.  A statement of contested legal issues.

D.  A list by each party identifying the portions (by line and page numbers) of the depositions it may use at trial for the purpose of original evidence.  (This paragraph does not apply to deposition testimony to be used for the purpose of impeachment).

E.  Any legal authority that the parties desire the court to consider.

F.  A statement that this is a core or non-core proceeding and that the party does or does not consent to the jurisdiction and entry of final orders or judgments by the Bankruptcy Judge of this Court.

G.  A statement that counsel has conferred with opposing counsel and has made a good faith endeavor to settle the above-captioned proceeding.

5.  Settlement:

Counsel for all parties shall confer (15) fifteen days prior to the trial and seek in good faith to settle the matter.  Any settled matters should be reported immediately to the court. In the event that a written stipulation is not complete, the provisions of the settlement shall be read into the record on the morning of the trial.

DATED  August          20    , 2009, in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

Copies to:
Attorney for Debtors
Attorney for Visagent Corporation

The parties consent to the entry of this Order:

RUBIN & RUBIN                          SMITH HULSEY & BUSEY

By                                     By
  Guy B. Rubin                            James A. Bolling

Attorneys for Claimant                 Attorneys for Debtors

4

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                          Case No.  05-03817-3F1

                           )

WINN-DIXIE STORES, INC., et al.,                Chapter 11

                           )

    Reorganized Debtors.                        Jointly Administered

_____)

## WINN-DIXIE'S EXPERT DISCLOSURE

Winn-Dixie Stores, Inc., on behalf of twenty-three of its subsidiaries and affiliates, as the Reorganized Debtors (collectively, "Winn-Dixie"), discloses, pursuant to Rule 26(a)(2), Fed.R.Civ.P., the identity of the witnesses described below who may be used at trial to present evidence under Rules 702, 703 or 705, Fed.R.Evid.

    1.    Winn-Dixie may use the following witnesses, who Winn-Dixie has retained, to present opinion testimony:

        a.    Prof. Eileen Kraemer, whose written report is attached.

        b.    Mr. Robert Thomas, C.T.B., whose written report is attached.

    2.    Winn-Dixie may use fact witnesses listed on Winn-Dixie's witness list to also present opinion testimony.  These witnesses have not been

retained or specially employed to provide expert testimony in the case.  The duties of the Winn-Dixie employees do not regularly involve giving expert testimony.

SMITH HULSEY & BUSEY

By _____
Stephen D. Busey
James A. Bolling
Timothy R. Buskirk

Florida Bar Number 058314
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
tbuskirk@smithhulsey.com

Counsel for Winn-Dixie

### **Certificate of Service**

I certify that a copy of the foregoing document was furnished by electronic mail (the body of above, plus the body of the two expert reports, without the attachments to the reports) and by U.S. Mail (with the body of above, the two expert reports and all attachments to the reports), this 10th day of December, 2009.

_____
Attorney

680635.1

REPORT

I submit the following report regarding my opinions in the case of *In re Winn-Dixie Stores, Inc., et al.*; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3F1, Chapter 11:

I.     Opinions.

A.     The terms "a full truckload" and "truckload" mean the same thing in the shipping industry:  a quantity of goods that fully or nearly fully fill, by weight or volume, a 48' or 53' trailer on a truck.

B.     The term "less than truckload" in the shipping industry means a quantity of goods that is less than a truckload.

C.     If two or more "less than truckload" shipments are placed on a truck so that the truck is full, but the "less than truckload" shipments are destined for different locations, then each of the shipments is still a "less than truckload" shipment even though the truck is full.

II.     Bases and reasons for opinion.  The bases and reasons for my opinions include:

A.     My experience in the shipping industry.

B.     The attached definitions.

III.     Exhibits.  The documents described above.

IV.     Qualifications.  See my attached resume.  I have not authored any publications in the last ten years.

V.    Other cases. I have not testified before as an expert witness.

VI.   Compensation. Winn-Dixie has agreed to compensate me in accordance with the attached letter dated December 7, 2009.

_Robert Thomas_
Robert Thomas

Date: _12/10/09_

2

# The Random House
# College
# Dictionary

## REVISED EDITION

Based on **The Random House Dictionary of the English Language**

THE UNABRIDGED EDITION

JESS STEIN • EDITOR IN CHIEF

Case 3:05-bk-03817-JAF    Doc 22830-1    Filed 12/18/09    Page 13 of 44

**trounce** (trouns), *v.t.*, **trounced, trouncing.** 1. to beat severely; thrash. 2. to punish. 3. to defeat. (?) [< ME *trounce*] —**Syn. 1.** See **troop.**

**troupe** (trōōp), *n., v.,* **trouped, trouping.** —*n.* 1. a company, band, or group of singers, actors, or other performers, esp. one that travels about. —*v.i.* 2. to travel as a member of a theatrical company; barnstorm. [< F: *troop*] —**Syn. 1.** See **troop.**

**troup-er** (trōō'pər), *n.* 1. an actor, esp. in a touring company. 2. an experienced, devoted, and dependable performer, esp. a veteran actor.

**troup-i-al** (trōō'pē əl), *n.* any of several American birds of the family *Icteridae*, esp. one with brilliantly colored plumage, as *Icterus icterus*, of South America. [< F *troupiale* (so called from its gregariousness). See **troop.** -**IAL**]

**trou-ser** (trou'zər), *adj.* of or pertaining to trousers: *trouser cuffs.* [back formation from *trousers*]

**trou-sers** (trou'zərz), *n.* (construed as *pl.*) 1. Sometimes, **trou-ser.** Also called **pants.** a rather loose-fitting outer garment for the lower part of the body, having legs, usually of full length. Cf. **Bermuda shorts, breeches, knickers** (def. 1), **short** (def. 24a), **slacks.** 2. **pantalets.** [*trouse* (var. of *trews*) + (DRAW)ERS]

**trous-seau** (trōō'sō, trōō sō'), *n., pl.* **-seaux** (-sōz, -sōz'), **-seaus.** an outfit of clothing, household linen, etc., for a bride. [< F; MF *trousse* small bundle = *trusse bundle* (see **TRUSS**) + *-el* < L *-ēllus* dim. suffix]

**trout** (trout), *n., pl.* (esp. collectively) **trout,** (esp. referring to two or more kinds of species) **trouts.** 1. any of several game fishes of the genus *Salmo*, related to the salmon. Cf. brown trout, rainbow trout. 2. any of various game fishes of the salmon family of the genus *Salvelinus* and *Cristovomer.* Cf. brook trout (def. 1), char'. Dolly Varden (def. 2). 3. any of several unrelated fishes, as a bass, *Micropterus salmoides,* a drum of the genus *Cynoscion,* or a greenling of the genus *Hexagrammos.* [ME *trout(e),* OE *trūht* < L *tructa* < Gk *trōktēs* gnawer, a sea fish = *trōg(tēm)* (to) gnaw + *-tēs* n. suffix]
—**trout'like**´, *adj.*

**trout-perch** (trout'pûrch´), *n., pl.* **-perch-es,** (esp. collectively) **-perch.** a North American, fresh-water fish, *Percopsis omiscomaycus,* resembling both trouts and perches.

**trou-vère** (trōō vâr', F.), *pl.* **-vères** (-vârz', Fr. -vâr'). one of a class of medieval poets who flourished in northern France during the 12th and 13th centuries, wrote in langue d'oïl, and composed chiefly the chansons de geste and works on the themes of courtly love. Also, **trouveur.** Cf. troubadour (def. 1). [< F; OF *trovere* = *trov(er)* (to) find, compose (see **TROOVE**) + *-ere* < L *-ātor* -**ATOR**]

**trou-veur** (trōō vœr', F.; Fr. trōō vœr'), *n., pl.* **-veurs** (-vœrz', Fr. -vœr'). **trouvère.**

**Trou-ville** (trōō vēl'), *n.* a seaport in NW France, on the English Channel: resort. 6822 (1962). Also called **Trouville-sur-Mer** (trōō vēl'sūr mãr').

**trove** (trōv), *n.* something valuable or pleasing, esp. something that has been kept hidden or is discovered. [short for **TREASURE TROVE**]

**tro-ver** (trō'vər), *n. Law.* an action for the recovery of the value of personal property wrongfully converted by another to his own use. [< M.F. OF: to find, orig. stir up < L *turbāre* to disturb. See **TURBID**]

**trow** (trō), *v.t., v.i. Archaic.* to believe, think, or suppose. [ME *trow(e),* OE *trēow(i)an* to believe < *trēow* belief; akin to *leel* *true,* OE *trēawe,* God. *truum* to trust, believe. See **TRUST, TRUE**]

**trow-el** (trou'əl), *n., v.,* **-eled, -el-ing** or (*esp. Brit.*) **-elled, -el-ling.** —*n.* 1. any of various tools having a flat blade with a handle, used for depositing and working mortar, plaster, etc. 2. a similar tool with a curved, scoopla blade, used in gardening. —*v.t.* 3. to apply, shape, smooth, or dig with or as with a trowel. [ME *truel* < OF *truelle* < LL *truella* = L *tru(a)* ladle + *-ēlla* dim. suffix]

**troy** (troi), *adj.* expressed or computed in troy weights. [ME *troye,* named after *Troyes,* France, where it was standard]

**Troy** (troi), *n.* 1. Latin, Ilium. Greek, Ilion. an ancient ruined city in NW Asia Minor: site of Trojan War. 2. a city in E New York, on the Hudson River. 62,918 (1970). 3. a city in SE Michigan, near Detroit. 39,419 (1970).

**Troyes** (trwä), *n.* a city in NE France, SE of Paris, on the Seine: cathedrals. 65,308 (1962).

**troy weight´,** a system of weights in use for precious metals and gems.

**trp,** *Mil.* troop.

**tru-an-cy** (trōō'ən sē), *n., pl.* **-cies.** 1. the act or state of being truant. 2. the behavior of a truant. Also, **truantry.**

**tru-ant** (trōō'ənt), *n.* 1. a student who stays away from school without permission. 2. a person who shirks or neglects his duty. —*adj.* 3. absent from school without permission. 4. neglectful of duty or responsibility; idle. 5. of, pertaining to, or characteristic of a truant. —*v.i.* 6. to be truant. [ME < OF: vagrant, beggar < Celt; cf. Welsh *truan* wretched, wretch]

**tru-ant officer,** a public-school official who investigates unauthorized absences from school.

**tru-ant-ry** (trōō'ən trē), *n., pl.* **-ries.** truancy.

**truce** (trōōs), *n.* 1. a suspension of hostilities for a specified period of time by mutual agreement of the warring parties; armistice. 2. an agreement or treaty establishing this. [ME *trewes,* pl. of *trewe,* OE *trēow* belief, pledge, treaty. See **TRUE**]

**Tru-cial O-man** (trōō'shəl ō mãn'), a former name of United Arab Emirates. Also called **Trucial Coast,**

**Tru'cial Sheik'dome, Tru'cial States'.**

**truck¹** (truk), *n.* 1. any of various forms of vehicle for carrying loads, freight, etc., usually consisting of either a single self-propelled unit or of a trailer vehicle hauled by a tractor unit. 2. Also called **hand truck.** a barrowlike frame with low wheels, used to move heavy objects. 3. any of various wheeled devices for moving loads. 4. a group of two or more pairs of wheels in one frame, for supporting one end of a railroad car, locomotive, etc. 5. *Mint.* a circular or square piece of wood fixed on the head of a mast or the top of a flagstaff, usually containing small holes for signal halyards. —*v.t.* 6. to transport by a truck or trucks. 7. to put on a truck. —*v.i.* 8. to convey articles or goods on a truck. 9. to drive a truck. [back formation from **truckle** wheel. See **TRUCKLE**²]

**truck²** (truk), *n.* 1. *U.S.* vegetables raised for the market. 2. *Informal.* trash or rubbish: *That's a lot of truck.* 3. *Informal.* dealings: *I'll have no truck with him.* 4. barter. 5. See **truck system.** —*v.i.* 6. to exchange; trade. [ME *trukien* < OF *troquer* to exchange]

**truck³** (truk), *n.* 1. a shuffling jitterbug step. —*v.i.* 2. to dance with such steps. [special use of **TRUCK¹**]

**truck-age** (truk'ij), *n.* 1. conveyance by a truck or trucks. 2. the charge for this.

**truck-driv-er** (truk'drī'vər), *n.* a person who drives a truck.

**truck-er¹** (truk'ər), *n.* 1. a person who drives a truck: *truckdriver.* 2. a person whose business is truckin goods.

**truck-er²** (truk'ər), *n. U.S.* a truck farmer.

**truck' farm´,** *U.S.* a farm for the growing of vegetables for the market. Also called **truck' gar´den.** Cf. market garden. —**truck' farmer.** —**truck' farming.**

**truck-ing¹** (truk'ing), *n.* the act or business of conveying articles or goods on trucks. [**TRUCK¹** + **-ING**]

**truck-ing²** (truk'ing), *n.* 1. *U.S.* the growing of vegetables for the market. 2. commercial bartering. [**TRUCK²** + **-ING**]

**truck-le** (truk'əl), *v.t.,* **-led, -ling.** to submit or yield obsequiously or tamely (usually fol. by *to*). [special use of *truckle* to sleep on truckle bed. See **TRUCKLE²**] —**truck'-ler,** *n.*

**truck-le¹** (truk'əl), *n.* See **trundle bed.** [see ME *trocle* sheave, roller < AF < L *trochlea* pulley. See **TROCHLEA**]

**truck'le bed´,** See **trundle bed.**

**truck-load** (truk'lōd'), *n.* 1. an amount comprising a full or almost full load on a truck. 2. the minimum weight legally required for hauling shipments at a rate (**truck'load rate´**) below that charged for shipments under this minimum.

**truck-man** (truk'mən), *n., pl.* **-men.** 1. a person who drives a truck. 2. a man who is in the business of trucking goods, produce, etc.

**truck' sys´tem,** the system of paying wages in goods instead of money. Also called **truck trade.**

**truck´ trac´tor,** *Auto.* a motor truck with a short body and no cargo space, for hauling semitrailers.

**truck' trail´er,** *Auto.* a trailer designed to be drawn by a truck tractor or other motor truck.

**tru-cu-lent** (truk'yə lənt, trōō'kyə-), *adj.* 1. fierce; cruel; savagely brutal. 2. brutally harsh; vitriolic; scathing. 3. aggressively hostile; belligerent. [< L *truculentus* = *truc-* (comb. form of *trux* savage, grim) + *-lentus* -**LENT**] —**truc'u-lence, truc'u-len-cy,** *n.* —**truc'u-lent-ly,** *adv.* —**Ant. 1.** amiable, gentle.

**Tru-deau** (trōō dō'), *n.* Pierre Elliot (pē er'), born 1921, Canadian statesman: prime minister since 1968.

**trudge** (truj), *v.,* **trudged, trudg-ing,** *n.* —*v.i.* 1. to walk, esp. laboriously or wearily. —*v.t.* 2. to walk laboriously or wearily along or over. —*n.* 3. a laborious or tiring walk; tramp. [?*trudzə* + (s)*lurdzə*] —**Syn. 1.** tramp. See **pace¹.**

**trudg-en** (truj'ən), *n. Swimming.* a stroke in which a double overarm motion and a scissors kick are used. Also called **trudgen stroke.** [named after John **Trudgen** (1852–1902), British swimmer]

**true** (trōō), *adj.,* **tru-er, tru-est,** *n., adv., v.,* **trued, tru-ing** or **tru-ing.** —*adj.* 1. in accordance with or not contrary to fact. 2. having a basis in fact: *not fiction, but a true story.* 3. being really such; authentic: *true vanilla flavoring.* 4. being such in the best or most desirable sense: *true statesmanship.* 5. loyal; faithful. 6. reflecting sincerely one's feelings or intentions: *true amusement.* 7. exact; accurate; of the proper form: *a true copy; a true surface.* 8. truth or accuracy; sure: *a true intuition; a true aim.* 9. *Biol.* conforming to the type, norm, or standard of structure of a particular group; typical: *The lion is a true cat.* 10. *Stockbreeding.* purebred. 11. *Naviig.* of a bearing, course, etc.) determined in relation to true north. 12. *Archaic.* truthful. 13. come true, to come to realization: *a dream that comes true.* —*n.* 14. exact or accurate formation, position, or adjustment: *to be out of true.* 15. the true, that which is true: truth. —*adv.* 16. in a true manner; truly. 17. exactly or accurately. 18. in conformity with the ancestral type: *to breed true.* —*v.t.* 19. to make true (esp. shape, adjust, place, etc., exactly or accurately. [ME *trewe,* OE *trēowe* loyal, trusty. Dutch (see **TROW, TRUCE**); akin to G *treu,* D *trouw.* Goth. *triggws,* Icel *tryggr*] —**Syn. 1.** factual, veracious. 5. trustworthy; staunch, constant, steady, unwavering.

**true' bill´,** *Law.* a bill of indictment endorsed by a grand jury as being sufficiently supported by evidence to justify a hearing of the case.

**true-blue** (trōō'blōō'), *adj.* unwaveringly loyal or faithful; staunch.

**true-born** (trōō'bôrn'), *adj.* genuinely or authentically so because of birth.

**true' bug´,** bug (def. 1).

**true' course,** *Navig.* a course whose bearing is given relative to the geographical meridian. Cf. compass course, magnetic course.

**true' fly´,** fly² (def. 1).

**true' fres´co,** fresco (def. 1).

**true-heart-ed** (trōō'här'tid), *adj.* 1. faithful; loyal. 2. honest; sincere. Also, **true'-heart´ed.** [late ME] —**true'heart´ed-ness,** *n.*

**true' jade,** jadeite or nephrite.



Brook trout,
*Salvelinus
fontinalis*
(Length 1½ ft.)



World Service Cargo - Glossary                                    Page 1 of 1









## Glossary

### Shipping Term

- **Bill of Landing** – the transportation documentation that acts as a contract of carriage between the shipper and carrier; also provides a receipt for the goods tendered to the carrier.
- **Consignee** – The receiver of a freight shipment.
- **Consignor** - The sender (shipper) of a freight shipment.
- **CWT** – Hundredweight or per 100 lbs.
- **Demurrage** – Charges that are assessed when consignor or consignee fail to load or unload shipments in specified time limits. Also known as detention.
- **Density** – The physical characteristic measuring mass in pounds per foot; affects equipment utilization and rate decisions.
- **FAK** – Freight all kinds; either a mixture of products and/or special rates begin applied.
- **Flatbeds** – Some shipments require that the main deck be free of walls or ceiling constraints. To facilitate loading or unloading, these shipments may require a flatbed trailer. A wide variety of flatbed trailers accommodate the trucking of almost any type of surface shipment. Flatbeds are also used for trucking anything that cannot be moved in a van, such as: special equipment; wide, long, oversized or heavy haul loads; or, any other type of trucking that can legally move by highway in North America.
- **Fuel Surcharge** – Surcharge imposed by carriers when fuel prices reach over certain levels.
- **Heavy Haul and Oversized Shipments** – Heavy haul and oversized are also known as over-dimensional shipments and can pose special challenges for shippers. Shipments can be both heavy haul and oversized in nature. Heavy haul shipments may require special routings because only certain highways allow extremely heavy vehicle weights. These shipments also may require special trucks and trailers or special permits issued by various state or local government agencies.
- **Intermodal** – Shipments moving two modes, ie: rail and ground.
- **LTL (Less-Than-Truckload)** – This is a shipment that does not fill and entire truckload. Specialized carriers provide service exclusively for this type of shipment. These providers services are priced by weight, density, value and ease of handling in combination with distance. Pricing is calculated based on cents per hundredweight rating. They also consider volumetric pricing, or dimensional weight pricing, if a commodity's density is the issue. Their services are readily available in the U.S. and Canada. The National Motor Freight Classification standards are commonly used in order to identify the best pricing for a particular commodity on a particular shipping lane. *Example: A 10,000 pound shipment of ball bearings takes up less space in a trailer than does 10,000 pounds of ping pong balls! Carriers commonly use a system of pricing that accounts for weight, as well as density, volume and distance.*
- **Pallet** – A small platform, usually 40 x 48 on which goods are placed. Depending on how it's loaded into the trailer, 22-24 pallet positions fit in a 48' trailer; 26-28 pallet positions I a 53' trailer.
- **Piggyback** – Rail-truck service. Same as intermodal.
- **Rail Shipments** – Rail shipments are also known as piggyback or intermodal shipments. Shipping by rail a cost effective alternative to over the road trucking, but has longer transit time, so if expense is more of a concern than time, rail service becomes a viable option.
- **SLC** – Shippers Load & Count; notation o Bill of Lading.
- **TOFC** – Trailer on Flatcar; truck trailer that ships on rail flatcar.
- **Team Service** – This can be the answer to the time-critical or intrinsically valuable large shipment. This is a service used when a shipment requires expedited delivery beyond what normal transit time can deliver. A two-person team drives in shifts and the truck is stopped only for fuel. Team drivers take turns sleeping, while the fresh driver is at the wheel. Although slightly more expensive due to additional labor costs, team service is used when critical shipments need to be moved quickly. These shipments may be so large or heavy that air freight costs are prohibitively expensive. Team service is the fastest, over-the-road shipping option available
- **Truckload** – Full truckloads (FTL or sometimes TL) utilizing van or flatbed trailers, depending upon shipment configuration.
- **Vans** – Many shipments are serviced by van trailers, especially loads comprised of loose cartons or unitized or palletized freight. (In order to determine an accurate cost



- Customers
- Employees
- Suppliers
- Investors
- Media
- About Us
-

-

# Customers

- Intermodal
- Features
- IMC - Intermodal Marketing Companies
- Motor Carrier Intermodal
- Less-Than-Truckload Intermodal (LTL)
- Mexico Intermodal
- International Intermodal
- FIRMS Codes

Report Emergencies
Contact UP Police:
1-888-877-7267

- Home
- Customers
- Intermodal

# Intermodal Glossary

A-B  C-D  E-G  H-K  L-O  P-R  S-U  V-Z

A-B

**J-1**
A report filled out during the ingate and outgate process. The J-1 details damage to the unit, container information, shipping information, drayman involved and time of ingate/outgate.

^Top

L-O

L

**Lading**
That which constitutes a load. The freight in or on a rail car, container or trailer.

**Landbridge**
Containerized marine traffic that is routed via rail across the United States on traffic between the Far East and Europe/Canada in lieu of all water routes.

**Landing Gear**
Moveable metal legs on the front of a semi-trailer which support the trailer when not connected to a tractor.

**Lift**
The process of moving a container or trailer to and or from a rail car.

**Live Load**
When a drayman stays with a container or trailer while being loaded or unloaded.

**Load Shift**
The term when the contents of a container or trailer are shifted inside the unit sometime after it leaves the actual origin and before it arrives at the final destination.

**Local Move**
A railroad movement in which only one road haul carrier participates. The one carrier serves both the origin and destination station.

**LTL (Less Than Truckload)**
A shipment that would not by itself fill the truck to capacity by weight or volume.

**Lumper**
A person hired to help unload a container or trailer instead of using the driver.

M

**Maintenance of Way**
The process of maintaining roadbed (rail, ties, ballast, bridges etc.) These materials are

RESUME OF WORK HISTORY

ROBERT D THOMAS

**2005 To Present:**

President of Suddath Transportation's services, Inc.(STS), a subsidiary of The Suddath Companies. STS is a licensed property broker which handles general commodity freight, specialized freight, air freight and ocean freight. We match our clients available shipments with available capacity in the truck load, LTL, Air and Ocean markets, in an effort to save them money, provide outstanding service, and to hopefully make a profit.

The day to day responsibilities require that I supervise all employees, which currently number 23 in 7 locations in 6 States. Employees are in 5 distinct groups. Operations, Logistics, Accounting, Sales, and Administrative.

**1997 To 2005**

President and General Manager of STS. In this position, I was tasked with growing STS in revenue and in staffing needs to meet the requirements of our clients. Having done so over a 5 year period, I was promoted to President.

**1987 To 1997**

General Manager of STS. In this position, I was responsible for day to day operations of the company as above.

**1984 To 1987**

Operations Manager of STS. In this position, I was responsible for the operations of the company, insuring that service requirements of all clients were meet on a daily and hourly basis. A staff of 4 worked for me at this time, booking the shipments with various carriers and for various customers, both LTL and Truckload.

This is the time period when I earned the Certified Transportation Broker (CTB) recognition. A CTB is an industry recognition of your talents at understand the laws and rules of the brokerage industry. This certification course consisted of 4 part testing taking over a period of months, performed by the Transportation Brokers Conference of America. Currently named the Transportation Intermediaries of America.

1981 to 1984

Long Distant Dispatcher, Suddath Relocation Services, (SRS). I worked with a team of dispatchers and support personal to direct all the household goods shipments of SRS. We managed a fleet of 75 over the road drivers and we matched up loads for the drivers, and found alternate carriers to service the excess shipments that we could not load on our own fleet.

1979 to 1981

Operations Manager of Suddath Relocations Services of Miami. I was in charge of the warehouse and all local contractors, local movers, and long distant drivers assigned to this location. Daily duties included dispatching crews to cover work load, running of the warehouse, order of packing material, and maintenance of the local fleet.

1977 to 1979

Operations Manager of Suddath Relocations Services of Atlanta. Duties were the same as above, however, this was a much smaller market with less employees, and less volume of business.

1976 to 1977

Contract Packer for Suddath Relocations Services of Atlanta. Responsibilities included packing household goods of relocating families for Suddath National Account shippers.

1975 to 1976

Local driver for Suddath Relocations Services of Atlanta. Responsible for moving household goods around Atlanta and the state of Georgia, as well as moving shipments of computers and medical equipment.

SMITH HULSEY & BUSEY

JAMES A. BOLLING
DIRECT 904.359.7719
JBOLLING@SMITHHULSEY.COM

December 7, 2009

Mr. Robert Thomas
Suddath Transportation Services, Inc.
815 South Main Street
Jacksonville, FL 32247

Re:  In re Winn-Dixie Stores, Inc., et al.; U.S. Bankruptcy Court,
     Middle District of Florida; Case No. 05-03817-3F1, Chapter 11

Dear Mr. Thomas:

We appreciate your willingness to provide expert testimony regarding Visagent Corporation's claim against Winn-Dixie in the referenced case. Winn-Dixie Stores, Inc. is retaining you on the following terms:

1.   Winn-Dixie will pay you $150 per hour for the time you devote to this matter,

2.   Winn-Dixie will pay your reasonable, actual expenses related to this matter,

3.   you will send your monthly invoices to us and we will forward the invoices to Winn-Dixie, and

4.   your monthly invoices will describe each of your activities, the amount of time devoted to each activity to the nearest tenth of an hour, and attach copies of receipts for any expenses over $25).

SMITH HULSEY & BUSEY

Mr. Robert Thomas
December 7, 2009
Page 2

     If you agree with these terms, please sign the acknowledgement below
and send the original of this letter to us.

Sincerely,

James A. Bolling

ACCEPTED AND AGREED:

_____  12/7/2009

Robert Thomas

680640.1

REPORT

I submit the following report regarding my opinions in the case: In re Winn-Dixie Stores, Inc., et al.; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3-F1, Chapter 11:

I.    Opinion

Standard facsimile (Fax) transmissions do not occur through the "Internet or similar electronic means." Rather, standard fax transmissions occur through the Public Switched Telephone Network (PSTN).

II.    Bases and Reasons for Opinion

The term Internet is defined as "an interconnected system of networks that connects computers around the world via the TCP/IP protocol" [West98]. TCP/IP (Transmission Control Protocol/Internet Protocol) is also known as the standard Internet Protocol Suite [IETF:RFC791, IETF:RFC793]. Internet Protocol is designed for use in interconnected systems of *packet-switched* computer communication networks [IETF:RFC791]. Thus, the defining hallmarks of technologies that may be thought of as "Internet or similar electronic means" are that they 1) occur across an interconnected system of packet-switched communication networks, and 2) rely on the use of the standard protocols in the Internet Protocol Suite.

1

The transmissions at issue in this case occurred between June 2001 and June 2004, used a standard (G3) Fax transceiver (a Fax machine), and do not meet the above definition, in that such standard Fax transmissions:

1) Are designed to take place over the public switched telephone network (PSTN), the network of the world's public *circuit-switched telephone networks*, originally a network of fixed-line analog telephone systems.  The Internet, on the other hand, is the network of the world's public *IP-based packet-switched networks*.

2) Do not employ the standard protocols of the Internet Protocol Suite [ITU:T.30].

Table 1 - Critical differences between Internet and Fax technologies

|  | Fax technology | Internet Technology |
|---|---|---|
| Network | A **circuit-switched** network, the public switched telephone network (PSTN) | A store-and-forward, **packet-switched** network |
| Internet Protocol | No | Yes |
| Addressing | E.163/E.164 addresses (telephone numbers) | IP address (e.g., 128.192.4.3), host name (e.g., ex.cs.uga.edu), or web address (e.g., http://www.ex.com:8080) |
| Standards body | (ITU-T), the International Telecommunications Union – Telecommunications Standardization Sector | (IETF), the Internet Engineering Task Force |

The distinction between Fax technology and Internet technology is further supported by the following observations, summarized in Table 1:

2

3) Fax technology uses *E.163/E.164 addresses*, more commonly known as telephone numbers, for addressing. Conversely, Internet-based communications use an IP address, host name (which converts to an IP address), or web address (which converts to an IP address and port number).

4) Internet technology and Telephone/Fax technologies are overseen by different standards organizations. The standards and specifications for Internet technology are overseen by the IETF (Internet Engineering Task Force). In contrast, the standards and specifications for telephone networks are overseen by the International Telecommunications Union (ITU-T, formerly CCC-IT), an arm of the United Nations that oversees telephone-based technology. Fax technologies are telephone network-based, rather than Internet-based, and are thus overseen by the ITU rather than the IETF.

The Internet Engineering Task Force (IETF) is the principal body engaged in the development of new Internet standard specifications. As such, the IETF identifies and proposes solutions to pressing operational and technical problems in the Internet and makes recommendations to the Internet Engineering Steering Group (IESG) regarding the standardization of protocols.

Documents issued by the IETF are known as "Requests for Comment" or RFCs, each of which is designated by an RFC number. Once published, an RFC never changes. Modifications to an original RFC are assigned a new RFC number. Six types of RFCs exist: Proposed standards, Draft standards, and Internet standards

3

(sometimes called "full standards"), as well as Informational documents,
Experimental protocols, and Historic documents. Only the first three (proposed,
draft, and full) are standards within the IETF. Standards "begin life" as Internet
Drafts (not yet an RFC) and progress through the Proposed Standard phase to the
Draft Standard phase as separate RFCs. Important specifications eventually
become Internet Standards, as yet another RFC. Exhibit A contains a list of Internet
protocols and RFCs for representative Internet-based technologies.

    ITU is the primary United Nations agency for information and communication
technology issues. ITU coordinates the shared global use of the radio spectrum,
promotes international cooperation in assigning satellite orbits, and is involved in
establishing worldwide standards for communication systems. ITU-T is the
Telecommunications Standardization Sector of ITU.  The standards documents
produced by ITU-T are known as Recommendations (ITU-T Recs). Exhibit B
contains selected portions of ITU standards T.2 - T.4, T.30, T.37, and T.38, which
comprise the essential Fax standards.

III.    Clarification of Potential Misconceptions

    a)  Clarification of the role of Internet Fax and Fax-over-IP (FoIP) in the
          Winn-Dixie/Visagent Matter

Although Internet-based Fax was not in common use at the time of the Winn-
Dixie/Visagent agreement, some initial development of standards had begun, and
both the IETF and ITU-T had begun to formulate specifications. An Internet
Engineering Task Force Request for Comment [IETF:RFC2305] titled "A Simple

4

Mode of Facsimile Using Internet Mail" was issued as a Proposed Standard in March of 1998. In this RFC, an "IFax device" is defined as an Internet-accessible device capable of sending, receiving or forwarding Internet faxes. A message can be sent to an IFax device using an Internet mail address[IETF:RFC2305]. In contrast, a facsimile-capable device using T.4 [ITU:T.4] and the public switched telephone network (PSTN), is defined as a "G3Fax device". The conventions specified in [IETF:RFC2305] were designed to allow IFax devices to send images to other IFax devices and also to Internet-native systems, such as PCs with common email readers that can handle MIME mail and TIFF for Facsimile data. The specification of RFC2305 also provided for communication from Internet mail to an "Offramp gateway" (an offramp from the Internet to the PSTN), which would receive the document and forward it, using standard Fax technology over the PSTN, to a G3Fax. Revisions to this RFC were issued after the date of the Winn-Dixie/Visagent agreement in 2002 (draft-ietf-fax-service00 through 04)[RFC-editor]. The minutes of the FAX working group at the IETF-56 meeting in March of 2003 indicate that the proposal was still in revision at that time. RFC2305 was obsoleted with the issuance of RFC 3965 as a Draft Standard in December 2004[IETF:RFC3965].

An ITU-T Recommendation, titled "Procedures for the transfer of facsimile data via store-and-forward on the Internet" [ITU:T.37] was issued in June of 1998, and amended in September of 1999, March of 2001, and November of 2002. This document describes the technical features necessary for the Store-and-Forward 'Simple' mode of operation of facsimile document transmission via Internet Mail. The T.37 documents references the IETF RFC 2305 and describes the transfer of

image data as in RFC2305, and specifies that Internet mail addressing is used to specify the addresses of sending and receiving terminals.

The label on the Fax machine in use by Winn-Dixie during the term of the service agreement shows that it is a Canon H12204, which is a Canon Laser Fax 1060P, manufactured in February 2002. The specifications page of the User Guide for the device (Exhibit H) indicates that this is a Super-G3 device, designed to work on the Public Switched Telephone Network. I understand that other Fax machines used by Winn-Dixie during this time were also either G3 or Super-G3 devices. Super-G3 and G3 devices differ in that G3 devices communicate at a rate of 28800 Kbit/s while Super-G3 devices are capable of transmitting at 33600 Kbit/s when communicating with another Super-G3 device. That is, this device is designed for standard Fax transmissions, is not IFax/T.37-compliant, and is thus not capable of sending or receiving Internet Fax documents.

A later technology, known as Fax-over-IP (FoIP) is described in "Real-time Facsimile (T.38) – image/t38 MIME Sub-type Registration" [IETF:RFC3362], a Proposed Standard issued in August 2002 and in "Procedures for real-time Group 3 facsimile communication over IP networks" [ITU:T.38], first issued in June of 1998 and then superseded by editions 2 through 5 of the document between 2002 and 2007. In this approach to transmission of facsimile data, users attempt to make use of the Voice-over-IP (VoIP) facilities to carry Fax transmissions. VoIP systems are optimized for voice rather than data calls and employ lossy compressions algorithms (they lose data). As a result, conventional fax machines work poorly or not at all on VoIP systems due to network impairments such as delay, jitter, and

6

packet loss.  The typical scenario in which T.38 might be used today is through

T.38 Fax relay, in which a T.30 (standard) Fax device sends a fax over the PSTN to a

T.38 Fax gateway, which converts or encapsulates the T.30 protocol into a T.38 data

stream.  The data stream is then sent either to a T.38 enabled end point such as fax

machine or fax server or another T.38 Gateway that converts it back to PSTN or

analog signal and delivers  the fax to another T.30 (standard Fax) device.

In summary:

1) The machine used by Winn-Dixie is a facsimile-capable device using T.4

   [ITU:T.4] and the public switched telephone network (PSTN); it is a G3Fax

   device.  Thus, it is not capable of sending or receiving Internet-based Fax

   transmissions.  Rather, it receives only standard Fax transmissions, through

   the PSTN.

2) It is my understanding that Winn-Dixie did not subscribe to an Off-ramp (or

   On-ramp) gateway service through which Internet-based Fax transmissions

   could have been received (or sent), nor was this technology in common use

   at the time of the agreement.  Further, Winn-Dixie did not employ a VoIP

   (Voice-over-IP) adapter to attempt FoIP (Fax-over-IP).

   b) Role of telephone system in dial-up, and DSL access to the Internet

Dial-up  access is a form of Internet access that uses telephone lines [Cisco]. A

modem (modulator-demodulator) is used to send digital data (encoded as 0s and

1s) over a phone line to an Internet Service Provider's (ISP) node,  establishing a

modem-to-modem link. Thus, dial-up service acts as a specialized type of telephone

call, in which the tones transmitted over the standard telephone line are decoded at

the receiving end (the Internet Service Provider) and interpreted as Internet Protocol (IP) packets which are then directed to the Internet through the ISP's connection. In the same way, IP packets destined for the dial-up user that arrive at the Internet Service Provider from the Internet are encoded as tones and transmitted over the standard telephone line and interpreted at the user's end.

DSL (Digital Subscriber Line) service differs from a dial-up line in that it makes use of the same twisted pair copper wires as a regular telephone line, but does not take the form of a telephone call. Voice calls make use of a frequency range of 0 to 3,400 Hertz. However, the telephone wires are able to handle frequencies of up to several million Hertz. DSL makes use of this unused bandwidth to carry data, with separate channels for upstream and downstream communication. Thus, users of DSL are able to use the telephone while connected to their ISP. At the DSL Service Provider the voice communications enter the PSTN, while the digital data communications enter a DSL Access Multiplexer, which forwards data to and from the Internet through the DSL Service Provider's Internet connection.

Summary: While telephone lines may be used to carry Internet data from a user's computer to an Internet or DSL Service Provider, standard telephone communication occurs through the circuit-switched PSTN, while the routing of IP packets occurs through a store-and-forward packet-switched network, the Internet. Fax transmissions do not employ Internet Protocol, are a specialized type of telephone call, and occur through the circuit-switched PSTN, rather than through the packet-switched Internet.

8

IV.    Winn-Dixie's Diverting System

I have read the document entitled "Explanation of Winn-Dixie's Diverting System" (Exhibit E), which describes an "Identification Process" and a "Decision and Transaction Process". While the Identification Process employed FTP, an Internet protocol, the Decision and Transaction Process made no use of Internet or similar electronic means.

V.    Technologies that _are_ "Internet or similar electronic means"

At the time of the service agreement, a number of Internet and Internet-related technologies existed or had been proposed. These include not only TCP/IP, the definitive Internet Protocol Suite, but also FTP (File Transfer Protocol, SMTP (Simple Mail Transfer Protocol, commonly known as e-mail), and HTTP (Hypertext Transfer Protocol), which all exist as application layers in a protocol stack built on TCP/IP. Thus, each of these technologies may be considered "Internet or similar electronic means." Additional technologies that meet this definition include the following:

    a)  IP(v6)

Internet Protocol version 6 (IPv6) is the designated successor to IPv4 (known commonly as IP or Internet Protocol). IPv6 is an Internet Layer protocol for packet-switched networks, defined in December 1998 by the IETF as an Internet standard specification [IETF:RFC2460]. IPv6 differs from IPv4 in that it has a much larger address space, and implements new features that simplify aspects of address assignment and network renumbering when changing Internet connectivity

9

providers. Defined by the IETF and employing packet-switching, IPv6 is considered "Internet or similar electronic means."

b) Internet2

Internet2 is an advanced networking consortium and high-speed academic research network led by the research and education community[I2]. The Internet2 Network is a next-generation Internet Protocol and optical network designed to meet high-performance demands from research and education, and provides a secure network testing and research environment. Thus, while Internet2 is not synonymous with the Internet, Internet2 employs Internet Protocol and packet switching and is considered "Internet or similar electronic means."

c) B2B and E-commerce Technologies

As described in the Winn-Dixie/Visagent agreement, Visagent "is in the business of providing services including but not limited to the facilitation of ecommerce business-to-business transactions....". Various technologies related to such business-to-business (B2B) transactions may be considered to be "Internet or similar electronic means." These technologies include EDI, company websites, B2B hubs, e-procurement systems, and web services [Albrecht2005].

EDI, Electronic Data Interchange, is defined as the computer-to-computer exchange of structured information, by agreed message standards, from one computer application to another by electronic means and with a minimum of human intervention. EDI uses standard formats that facilitate transactions. The transmission of EDI data may occur over the Internet, or may be accomplished without Internet involvement. For example, one business may generate a CD

10

containing transaction data structured using EDI standard formats, and then mail that CD to a trading partner.

The World Wide Web (WWW), also known as "the Web" enables businesses to share documents across a generalized, global network. Sellers are able to publish company and product information via their web sites, and search engines assist buyers in finding and analyzing this information. Computers participating in the World Wide Web make use of the Hypertext Transfer Protocol (HTTP), a layer in a stack of protocols that includes Internet Protocol. Thus, WWW is considered "Internet or similar electronic means."

Other Internet-based B2B technologies include B2B Hubs, e-procurement systems, and Web Services. B2B Hubs are electronic market places that play the role of digital intermediaries [Bailey1997, Bakos1997], facilitating product information exchange and supporting product search, initial contact, negotiation, and settlement[Bakos1997, Bakos1998]. Typically, Hubs offer their own catalogs or link to the product catalog of sellers, thereby providing indexing services [Baron2000]. The underlying technology supporting such hubs typically involves the use of a Hub-specific web client, enabled through a web browser [Albrecht2005]. Thus, such B2B Hubs would be considered "Internet or similar electronic means."

VI.    Background Documents, References, and Other Documents

    A. Internet Engineering Task Force (IETF) documents

    B. International Telecommunications Union (ITU-T) documents

11

C.  Internet technology: brief history and description

D.  Fax technology: brief history and description

E.  Explanation of Winn-Dixie's Diverting System

F.  Service Agreement

G.  Excerpts from Mark Rubin's deposition testimony

H.  Fax machine label and excerpts from user guide

I.  References

J.  Resume

K.  Letter outlining compensation agreement

VII.    Exhibits

I will use the documents described in Section VI above as exhibits.

VIII.   Qualifications

See my attached resume (Exhibit J), which includes my publications during the past ten years.

IX.     Compensation

See attached letter (Exhibit K), dated August 31, 2009.

X.      Other cases

I have not previously testified as an expert witness.

Eileen T. Kraemer, PhD

Date:  12/9/09

12

EXHIBIT C

## James A. Bolling

| | |
|---|---|
| **From:** | James A. Bolling |
| **Sent:** | Thursday, December 10, 2009 6:53 PM |
| **To:** | Guy Rubin |
| **Cc:** | Gladys LaForge |
| **Subject:** | In re Winn-Dixie Stores, Inc., et al.; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3F1, Chapter 11 |

**Attachments:** thomas expert report winn-dixie visagent (00682727).PDF¤; kraemer expert report winn-dixie visagent (00682728).PDF¤; winn-dixie expert disclosure visagent 12-10-09 (00682726).PDF¤

Guy:

Attached is Winn-Dixie's expert disclosure with the bodies of the expert reports of Prof. Kraemer and Mr. Thomas. The reports have extensive attachments, which we are mailing to you along with hard copies of the attachments.

Jim

(904) 359-7719

12/17/2009

EXHIBIT D

**James A. Bolling**

| | |
|---|---|
| **From:** | Guy Rubin [grubin@rubinandrubin.com] |
| **Sent:** | Thursday, December 10, 2009 7:26 PM |
| **To:** | James A. Bolling |
| **Cc:** | Gladys LaForge |
| **Subject:** | RE: In re Winn-Dixie Stores, Inc., et al.; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3F1, Chapter 11 |

**Importance:** High

Jim,

Please hand-deliver the materials to 1649 Atlantic Blvd Jacksonville, 32207 tomorrow. Given the short time frames for rebuttal reports, I will need the documents tomorrow. Thanks.


From the desk of:

Guy Bennett Rubin, Esq.
Rubin & Rubin, Attorneys and Counselors
110 S.W. Atlanta Ave.
Stuart, Florida 34994
772.283.2004
772.283.2009 fax
grubin@rubinandrubin.com

This message was intended for a specific recipient and may contain privileged and confidential information, protected under state and federal law. If you received this message in error, or are not an intended recipient, please delete this message and contact my office advising of the inadvertent disclosure. Thank you.

---

**From:** James A. Bolling [mailto:jbolling@smithhulsey.com]
**Sent:** Thursday, December 10, 2009 6:53 PM
**To:** Guy Rubin
**Cc:** Gladys LaForge
**Subject:** In re Winn-Dixie Stores, Inc., et al.; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3F1, Chapter 11

Guy:
Attached is Winn-Dixie's expert disclosure with the bodies of the expert reports of Prof. Kraemer and Mr. Thomas. The reports have extensive attachments, which we are mailing to you along with hard copies of the attachments.
Jim
(904) 359-7719

The information contained in this communication may be confidential, is intended only for the use of the recipient(s) named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please return it to the sender immediately.


The information contained in this communication may be confidential, is intended only for the use of the recipient(s) named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please return it to the sender immediately.

EXHIBIT E

SMITH HULSEY & BUSEY

TIMOTHY R. BUSKIRK
DIRECT 904.359.7737
TBUSKIRK@SMITHHULSEY.COM

December 11, 2009

Guy Bennett Rubin, Esq.
c/o AccuBuild Companies
1649 Atlantic Boulevard
Jacksonville, Florida 32207

Re:    In re Winn-Dixie Stores, Inc., et al.; U. S. Bankruptcy Court, Middle
       District of Florida; Case No. 05-03817-3F1, Chapter 11

Dear Mr. Rubin:

Enclosed is Winn-Dixie's expert disclosure with expert reports (including attachments).

Sincerely,

*Timothy R. Buskirk*

Timothy R. Buskirk

By Hand Delivery
Enclosure

00682772

EXHIBIT F

## Tana L. Copeland

| | |
|---|---|
| **From:** | David L. Gay |
| **Sent:** | Thursday, May 07, 2009 10:44 AM |
| **To:** | 'Guy Rubin' |
| **Cc:** | Stephen D. Busey |
| **Subject:** | Expert Witnesses |

Mr. Rubin:

We intend to call Matthew Larson as an expert to testify about electronic data transmissions through the Internet or other means.  Mr. Larson is available for deposition on May 22.

Please identify by noon, Friday, May 8, any experts Visagent intends to call as witnesses, the issues each expert will address, and when each expert is available for deposition.

**David L. Gay**
Smith Hulsey & Busey
225 Water St., Ste. 1800
Jacksonville, Florida 32202
(904) 359-7860 (direct)
(904) 359-7708 (fax)
dgay@smithhulsey.com

1

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER DIRECTING VISAGENT CORPORATION TO PRESENT ITS CASE FIRST AT TRIAL

On February 21, 2005 Winn Dixie, Stores, Inc., on behalf of twenty-three of its subsidiaries and affiliates (collectively, "Winn Dixie"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Visagent Corporation ("Visagent") filed a claim, which was designated as Claim No. 9953, in July 2005. Visagent claims that Winn Dixie breached an agreement, which was entered into between it and Winn Dixie on June 15, 2001. According to Visagent, under the terms of the agreement Winn Dixie was obligated for three years to exclusively utilize the services of Visagent for the procurement and sale of all merchandise Winn Dixie acquired or sold through internet or similar electronic means, including any means utilizing facsimile, from and through the secondary market. The secondary market is comprised of all sources (buyers and sellers) of merchandise other than direct purchases and returns from original product manufacturers. Winn Dixie objected to Visagent's claim, asserting that it did not breach a duty to Visagent and that Visagent failed to adequately perform under the terms of the agreement.

On August 19, 2009 the Court conducted a status conference on Winn Dixie's Objection to Visagent's claim. At that hearing counsel for Visagent raised the issue of which party has the burden of proof at trial and which party would present its case first at trial.[1] The Court directed the parties to file memoranda no later than September 30, 2009 to assist it in making such a determination. The Court has reviewed the parties' memoranda.

Objections to claims are governed by 11 U.S.C. § 502(a) providing that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." Section 502(b) provides, "...if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount...." A proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f)(2009). The burden of proof is on an objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim." In re VTN, Inc., 69 B.R. 1005, 1008 (Bankr. S.D. Fla. 1987) (citing DeLorean Motor Co. Litig., 59 B.R. 329 (E.D. Mich. 1986)). If the objecting party rebuts the prima facie validity of the proof of claim, the claimant bears the burden of persuasion to substantiate the validity and the amount of the claim by a preponderance of the evidence. In re Taylor, 363 B.R. 303, 309 (Bankr. M.D. Fla. 2007).

---

[1] The trial is scheduled to commence on February 8, 2010.

2

The purpose of Rule 3001(f) is to reduce the time a court would be required to spend on objections and to reduce the time and expense for the usual creditor in a bankruptcy case. However, the transactions, which are the subject of Visagent's claim are complicated. Visagent's claim is not one that lends itself to a ready and simple determination and in that sense is not the ordinary claim to which Rule 3001(f) is directed. Rule 611(a) Fed.R.Evid. allows the Court to exercise control over the order of presentation of evidence. Under Rule 611(a) courts have broad discretion in controlling the order of presentation of evidence. The Court finds it appropriate to require Visagent to present its case first at trial. Visagent bears the burden of persuasion to substantiate the validity and amount of its claim by a preponderance of the evidence. Upon the foregoing, it is

**ORDERED:**

Visagent shall present its case first at trial. Visagent bears the burden of persuasion to substantiate the validity and amount of its claim by a preponderance of the evidence.

**DATED** this 6 day of November, 2009 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

**Copies to:**

Stephen D. Busey, Attorney for Winn Dixie
Guy Bennett Rubin, Attorney for Visagent

3