**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**<u>JACKSONVILLE DIVISION</u>**

| | |
|---|---|
| In re: | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | Chapter 11 |
| Reorganized Debtors. | Jointly Administered |

**<u>WINN-DIXIE'S WITNESS DISCLOSURES</u>**

Winn-Dixie Stores, Inc., on behalf of twenty-three of its subsidiaries and affiliates, as the Reorganized Debtors (collectively, "Winn-Dixie"), pursuant to the parties' agreement at the December 23, 2009 hearing on Winn-Dixie's motion to limit the number of Visagent's witnesses, discloses the following descriptions of its witnesses' expected testimony, including the issues to which such testimony relates:

A.  <u>Brief descriptions of testimony</u>.

| Number | Description |
|---|---|
| 1A | "Truckload" or "TL" means a full or nearly full 48' or 53' trailer on a truck, and "Less than truckload" or "LTL" means a quantity less than a truckload. Combining LTL quantities to fill a truck does not convert the LTL's into a TL. Explanation of industry standards for the meaning, application and usage of the terms "TL" versus "LTL". |
| 1B | Winn-Dixie intended to limit the scope of the Service Agreement to truckloads (despite Winn-Dixie's aspirations). |
| 1C | Winn-Dixie negotiated the terms of the Service Agreement to limit the Agreement's exclusivity. |

| | |
|---|---|
| 2A | The scope of the Service Agreement is limited to goods Winn-Dixie purchased or resold through the internet or similar electronic means—and Winn-Dixie intended that it could continue to use its traditional means of diverting (despite Winn-Dixie's aspirations about the amount of business it could transact on Visagent's exchanges).[1] |
| 2B | During the term of the Service Agreement, Winn-Dixie purchased and resold diverted goods through purchase orders which were faxed between the parties. |
| 2C | Explanation of how Winn-Dixie purchased and resold diverted goods during the term of the Service Agreement, and tracked such transactions using Victory's Network Trading System. |
| 2D | Visagent's pitches to Winn-Dixie about its programs, software and processes including the Visagent Grocery Exchange, the Surplus Goods Exchange, the Alternate Sourcing Platform, the Supplier Direct Portal and the Outside Sales Catalog. |
| 2E | Winn-Dixie's use of Victory's Network Trading System. |
| 2F | Capabilities and functionality of Victory's Network Trading System and other diverters' trading systems. |
| 3A | Negotiation of the Service Agreement. |
| 3B | Communications about the terms of the Agreement before the parties executed the Agreement. |
| 3C | Communications about the terms of the Agreement after the parties executed the Agreement. |
| 4A | Visagent's exchanges lacked critical mass for many reasons, including:<br><br>• Distrust of Visagent because (i) of Visagent's connection to another diverter and (ii) of the people who worked at Visagent<br>• Using Visagent's exchanges would disclose a diverter's sources<br>• Visagent's exchanges were cumbersome and difficult to use<br>• Visagent's exchange rules were cumbersome and overly restrictive<br>• Visagent's rules included penalties<br>• Visagent's escrow requirements<br>• Visagent's exchanges did not have truck-building |

---

[1] By "diverting," Winn-Dixie means Winn-Dixie's transactions for consumer packaged goods purchased or resold in the secondary market.

2

|     |     |
| --- | --- |
|     | • capability |
|     | • Visagent's exchanges added an extra two percent cost to transactions |
|     | • Visagent's freight costs were not competitive |
|     | • Visagent's exchanges did not have sufficient buyers, sellers and/or postings |
|     | • The prices on Visagent's exchanges were not competitive |
|     | • Visagent's exchanges required that sellers have possession of the goods |
|     | • Visagent's exchanges did not fit the dynamics of diverting |
| 4B  | Visagent's exchanges lacked critical mass, thus frustrating or making impossible Winn-Dixie's performance under the Service Agreement. |
| 4C  | Communications with Visagent about complaints, inadequacies and improvements to Visagent's exchanges. |
| 5   | Winn-Dixie did not purchase or resell diverted goods through the internet or similar electronic means during the term of the Service Agreement outside of Visagent's exchanges. |
| 6   | Winn-Dixie did not breach the Service Agreement. |
| 7/8 | Until Visagent sued Winn-Dixie in state court, Visagent never claimed that Winn-Dixie had breached the Service Agreement. |
| 9A  | Winn-Dixie paid Visagent for Winn-Dixie's use of Visagent's exchanges in accordance with the Service Agreement and User Agreements. |
| 9B  | Winn-Dixie never used or shared with anyone else any of Visagent's proprietary information or so-called trade secrets. |
| 10  | Winn-Dixie made no false representations to Visagent. |
| 11A | Winn-Dixie did not conduct any trades, using Visagent's proprietary information or so-called trade secrets, with entities Visagent introduced Winn-Dixie to or anyone else. |
| 11B | Winn-Dixie records regarding trades (or lack of trades) with C&S Wholsalers and other retailers. |
| 12A | Winn-Dixie never approached Visagent about developing new procedures, software, operations or business for Winn-Dixie. |
| 12B | Winn-Dixie's involvement with Visagent, retailers and wholesalers related to the Visagent Grocery Exchange, the Surplus Goods Exchange, the Alternate Sourcing Platform, the Supplier Direct Portal and the Outside Sales Catalog. |
| 13  | Winn-Dixie did not violate any duties it owed to Visagent. |

B.  The issues to which Winn-Dixie's witnesses' testimony relates.

| Issue No. | Issue |
|---|---|
| 1 | Whether the scope of the Service Agreement is limited to truckload quantities—and what was Winn-Dixie's intent in this regard? |
| 2 | The meaning of the language in the Service Agreement limiting the Agreement to goods Winn-Dixie purchased or resold through the internet or similar electronic means—and what was Winn-Dixie's intent in this regard? |
| 3 | The parties' intent regarding the Service Agreement. |
| 4 | Whether Visagent's exchanges lacked critical mass, thus frustrating or making impossible Winn-Dixie's performance under the Service Agreement? |
| 5 | Whether Winn-Dixie purchased or resold goods through the internet or similar electronic means during the term of the Service Agreement outside of Visagent's exchanges? |
| 6 | Whether Winn-Dixie breached the Service Agreement? |
| 7 | Whether the limitations period in the User Agreements for Visagent's Grocery Exchange and Surplus Goods Exchange bar all or part of Visagent's claim? |
| 8 | Whether Visagent waived all or part of its claim by not asserting it earlier? |
| 9 | Whether Winn-Dixie used or shared with anyone else any of Visagent's proprietary information or so-called trade secrets? |
| 10 | Whether Winn-Dixie made any false representations to Visagent? |
| 11 | Whether Winn-Dixie conducted any trades, using Visagent's so-called trade secrets, with entities Visagent introduced Winn-Dixie to? |
| 12 | Whether Winn-Dixie approached Visagent about developing new procedures, software, operations or business for Winn-Dixie? |
| 13 | Whether Winn-Dixie violated any duties it owed to Visagent? |

C.  Brief description of the expected testimony of each of Winn-Dixie's witnesses, including issues to which such testimony relates.

1.   Will-call witnesses.

| Witness | Description of testimony | Issues to which testimony relates |
| --- | --- | --- |
| Tom Barr | All descriptions, except 11B | All issues |
| Derrick Bryant | 11A and 11B | 11 and 13 |
| Bob Dufek | 1A, 2D, 3B, 3C, 9B, 10, 12A and 12B | 1, 2, 6, 9, 10, 12 and 13 |
| Kevin Gates | 1A, 1B, 1C, 2A, 2B, 2D, 3A, 3B, 3C, 9B, 10, 11A, 12A, 12B and 13 | 1, 2, 3, 6, 9, 10, 11, 12 and 13 |
| Seth Gaynor | 1A, 2B, 2C, 2D, 3C, 4A, 4B, 5, 6, 7/8, 9B, 10, 11A, 12A, 12B and 13 | All issues |
| Bruce Malcolm | 1A, 2B, 2C, 2D, 2E, 2F, 4A, 4B, 4C, 5, 9B, 11A and 13 | 1, 2, 4, 5, 6, 9, 11 and 13 |
| Patricia Mitchell | 1A, 1B, 1C, 2A, 2B, 3A, 3B, 3C, 4A, 4B, 4C, 5, and 6 | 1 through 6 |
| Rob Post | 1A, 2B, 2C, 2F, 4A, 4B, 5 | 1, 2, 4, 5 and 6 |
| Steven Rabb | 1A, 2B, 2C, 2F, 4A, 4B, 5 | 1, 2, 4, 5 and 6 |
| Bob Trader | 1A, 4A, 4B, 11A | 1, 4, 5, 6, 11 and 13 |
| Eric Weida | 1A, 2B, 2C, 2F, 4A, 4B, 5 | 1, 2, 4, 5 and 6 |

2.   May-call witnesses.

| Witness | Description of testimony | Issues to which testimony relates |
| --- | --- | --- |
| Denise Brymer | 11B | 11 and 13 |
| Deborah Kilosky | 11B | 11 and 13 |
| Dan Lafever | 1A, 2D, 6, 12A, 12B and 13 | 1, 6 and 13 |
| Dorothy Lamore | 11B | 11 and 13 |
| Fred MacDowell | 2B, 2C, 2E, 2F and 9B | 2, 9 and 13 |
| Debby Wade | 11B | 11 and 13 |

| Chris Wilson | 1A, 2B, 3C, 4A, 4B, 5, 6, 7/8, 10, 11A, 12B and 13 | 1 through 8 and 10 through 13 |
|---|---|---|
| Bev Yoap | 11A and 11B | 11 and 13 |

3. <u>Expert witnesses</u>. Descriptions of the testimony of Winn-Dixie's experts are contained in their written reports, which Winn-Dixie produced to Visagent on December 10, 2009. Prof. Kraemer's testimony will relate to the dissimilarity of the internet and facsimile, and Issue Nos. 2 and 6. Mr. Thomas' testimony will relate to Issue Nos. 1 and 6.

SMITH HULSEY & BUSEY

By  */s/ Timothy R. Buskirk*
　　Stephen D. Busey
　　James A. Bolling
　　Timothy R. Buskirk

Florida Bar Number 058314
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
tbuskirk@smithhulsey.com

Attorneys for Winn-Dixie

## Certificate of Service

I certify that a copy of the foregoing document was furnished electronically through the Court's CM/ECF electronic notification system to **Guy Bennett Rubin, Esq.**, Rubin & Rubin, Post Office Box 395, Stuart, Florida 34995, this 4th day of January, 2010.

                                                            */s/ Timothy R. Buskirk*
                                                                   Attorney

685131.1