EXHIBIT D

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

WINN-DIXIE STORES, INC.,     CASE NO:   05-03817-3F1

        Debtor.
_____/

TRANSCRIPT OF PROCEEDINGS

      Hearing re:  Emergency Motion to Limit
Visagent's Witness List, filed by the Debtor, and an
Emergency Motion for Extension of Time to Submit
Rebuttal Expert Reports, filed by Visagent, before the
Honorable Jerry A. Funk, U.S. Bankruptcy Judge,
commencing at 2:40 p.m., on Wednesday, December 23,
2009, at the United States Courthouse, Room 4D,
300 North Hogan Street, Jacksonville, Florida, as
reported by Cindy Danese, Notary Public in and for the
State of Florida at Large.

- - -

STATEWIDE REPORTING SERVICE
233 East Bay Street, Suite 606
Jacksonville, Florida  32202
(904) 353-7706

0

2

1            A P P E A R A N C E S
2

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

```
 3
 4
 5       STEPHEN D. BUSEY, ESQUIRE
 6            Smith, Hulsey & Busey
              225 Water Street, Suite 1800
 7            Jacksonville, Florida  32202
 8            Attorney for Winn-Dixie Stores, Inc.
 9
10
11
12       GUY B. RUBIN, ESQUIRE
13            Rubin and Rubin, P.A.
              Post Office Box 395
14            Stuart, Florida  34995-0395
15            Attorney for Visagent Corporation.
16
17
18                        - - -
19
20
21
22
23
24
25
```
□

3

```
 1                P R O C E E D I N G S
 2   December 23, 2009                    2:40 p.m.
 3                        - - -
 4        THE COURT:  We're here on the case of
 5   Winn-Dixie Stores.  We have a motion to limit
 6   Visagent's witness list filed by the debtor, and a
 7   motion for extension of time to submit rebuttal
```

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

```
 8    expert reports filed by Visagent.
 9         We'll take appearances for the record.
10         MR. BUSEY:  Steve Busey for Winn-Dixie.
11         MR. RUBIN:  And Guy Rubin for the Visagent
12    Corporation.
13         THE COURT:  You've resolved partially or
14    something?
15         MR. BUSEY:  Yes, Your Honor.
16         THE COURT:  On which motion?
17         MR. BUSEY:  On the motion to limit the number
18    of witnesses.
19         THE COURT:  Yes.
20         MR. BUSEY:  I think we have an agreement which
21    I'll attempt to articulate.
22         Each side has agreed to limit their witness
23    list to a total of 40 witnesses, and we're going to
24    disclose to each other in writing what that witness
25    is going to testify about and the issue that we're
```

                                                    4

```
 1    going to address, and we're going to live with that
 2    in terms of the witness can't stray from that on
 3    the stand.  And that's it.
 4         THE COURT:  Mr. Rubin, is that right?
 5         MR. RUBIN:  Well, I think that's partially
 6    right.
 7         THE COURT:  See, I knew there was going to be
 8    something here.
 9         MR. RUBIN:  I think what we agreed to was that
10    and, in addition to that, that that brief
11    description of the expected testimony including the
```

Page 3

12          issues that they will address would only apply to

13          witnesses on our lists who have not been deposed to

14          date.

15              THE COURT:  Is that your understanding, Mr.

16          Busey?

17              MR. BUSEY:  It is.

18              THE COURT:  Thank you.

19              MR. RUBIN:  And those disclosures would be due

20          to be electronically served by e-mail from the

21          party to opposing party within 10 days from today.

22              THE COURT:  Okay.  That doesn't limit

23          anybody's -- if you want to take a deposition of

24          one of those people, either party could do that,

25          though.

                                                              5

1               MR. RUBIN:  Right.  The second part of the

2           stipulation is that each side will be limited to a

3           maximum of 40 witnesses on their total intend-to-

4           call and may-call list.  However, that limitation

5           will not apply to Visagent's ability to call "true"

6           rebuttal witnesses after the defense case is

7           presented.

8               THE COURT:  Fine.  Is that understood?

9               MR. BUSEY:  As long as the record reflects

10          that the word "true" is in italics.

11              THE COURT:  True rebuttal.  That's on this

12          record.  You're going to bring this to an order of

13          the court or something, put it in the form of an

14          order on this motion?

15              MR. BUSEY:  We will, Your Honor.  There's one

16          more part of it.

                         Page 4

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

17         MR. RUBIN:   Right.  And the last part was to

18    -- trying to eat this whale one bite at a time --

19    was that we have agreed that to facilitate the

20    anticipated need to depose these witnesses who are

21    on the lists, the disclosed lists, we've agreed to

22    stipulate to a maximum of seven additional

23    depositions from today forward, including expert

24    depositions that number would include, because

25    we've already taken nine each and so we would be

6

1    exceeding the local rule limitation of 10.

2         Is that right, Mr. Busey?

3         MR. BUSEY:   Seven per side.

4         MR. RUBIN:   Seven per side, including experts.

5         THE COURT:   That's good.  Okay.

6         MR. RUBIN:   And then I think that pretty much

7    encompasses what their motion is directed to.  And

8    then we have what I believe is a related motion

9    dealing with our obligations on the expert side.

10        THE COURT:   And there's been no stipulation as

11    to that.

12        MR. RUBIN:   No.

13        THE COURT:   Do you want to make some argument

14    before I rule?

15        MR. RUBIN:   If we're moving into that motion

16    now, yes.

17        THE COURT:   If you want to argue, go right

18    ahead.

19        MR. RUBIN:   Your Honor, our motion, which is

20    at Tab 2 of the book, is our motion for an

Page 5

21    extension of time to submit expert rebuttal

22    reports.

23          Pursuant to the order setting trial in this

24    case, there was a stepped disclosure essentially,

25    which was if either side discloses expert

7

1    disclosures under Rule 26, which is a report, and

2    the elements of that report are defined, then the

3    other side would have I believe it's 15 days in

4    which to submit its rebuttal expert reports.  And I

5    assume that that means true rebuttal.

6          So on the very last day under this stipulated

7    order for Winn-Dixie to make such disclosures, they

8    did make such disclosure a couple of hours after

9    5:00 p.m.  I got it electronically and I looked at

10    the expert reports.

11          One of the reports, which we've included in

12    our motion as an exhibit, is exceedingly brief and

13    there's really not much information or data there

14    as required under Rule 26.

15          The other report by Dr. Kraemer, a Ph.D. in

16    computers and telecommunications out of the

17    University of Georgia, contains hundreds and

18    hundreds of pages of exhibits which are highly

19    technical which we received by delivery the next

20    day.  And in going through those materials, it's

21    very clear that just in order to understand what

22    she is going to say takes time, and then the

23    ability to go out and to obtain an expert witness

24    for rebuttal and to hire and make familiar the

25    facts of this case and how this testimony will

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

8

1    relate to the testimony will take more time than
2    the 15 days that are in the order setting trial.
3        We did not anticipate that need being so dire
4    and we didn't anticipate that the disclosure would
5    be on the very last day of the -- the 60th day
6    before trial is when it is.  That 60th day left two
7    weeks to be able to schedule these experts for
8    Winn-Dixie to be deposed so we could get their true
9    opinions and to then coordinate with our
10   prospective experts and get an expert report in to
11   oppose.
12       The very night that I received the electronic
13   transmission of the expert reports, I e-mailed to
14   Mr. Bowling and I asked him to clear dates for the
15   experts in the next two weeks.  And the response
16   was -- and I have the colloquy back and forth
17   attached to my motion and they're in the book --
18   essentially there's not going to be any time
19   between now and the Christmas break, which that's
20   the exact time which is contained in the 15 days
21   that we had to file the response of rebuttal
22   disclosures.  There's no time that the experts have
23   and there's no time that we have to conduct these
24   depositions.
25       And so although they did say -- Mr. Bowling

9

1    did say that:  We can get you those depositions but
2    they just won't be in December, they're going to

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

 3    have to be in January.

 4         Well, January just isn't good enough, because

 5    I think that if you take a look at the order

 6    setting trial, that the clear intent of the Court

 7    and the parties was that there would be a stepped

 8    disclosure to allow the party who is receiving the

 9    initial disclosure to be able to absorb it and to

10    respond to it with a true rebuttal expert.

11         And because of this -- I guess it's the

12    Christmas vacation period, although they haven't

13    said that, all they've said is that their experts

14    aren't available and they're not available.  So we,

15    knowing that we would need good cause to ask for an

16    expansion of the time that's provided for in the

17    trial order, we immediately filed the motion asking

18    for an expansion of that time.

19         When you exhibit good cause and you do it

20    within the time provided for in the rule or the

21    order, and ours is timely, the Court has the

22    discretion to grant or deny.  But if you don't use

23    due diligence in requesting the additional time

24    during the period in question, then according to

25    the cases that we found, then you're precluded from

                                              10

 1    asking for it later.

 2         We didn't want to let our time frame expire

 3    and then come after the fact to the Court and ask

 4    for it, and that's why we tried to set and we

 5    successfully set this as an emergency hearing, Your

 6    Honor, because we want an expansion of time, a

 7    reasonable period of time after we're able to

                         Page 8

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

```
 8        depose their experts in which to provide the
 9        rebuttal reports.
10             Discovery and the barring of late discovery is
11        judged by courts on whether or not it causes
12        prejudice to the other side, a prejudice analysis.
13             In this particular situation, Your Honor,
14        there's no prejudice whatsoever.  This is a report
15        for the defense which they would present in their
16        case in chief which is coming second.  Your Honor
17        already issued its order finding that this is a
18        complex case, the issues are different than a
19        normal bankruptcy case, and therefore the plaintiff
20        has the initial burden of proof to persuade that
21        the claim is valid.
22             So what we're looking for is a rebuttal to a
23        defense that they're asserting.  They already know
24        what the defense is, and their experts have given
25        opinions on some technical aspects related to their
```

                                                        11

```
 1        defenses.  Those defenses are not part of our
 2        presentation, they're part of their presentation.
 3             So our rebuttal reports would come in a
 4        rebuttal case.  They wouldn't precede in our case
 5        in chief.  If they did, I could see where
 6        Winn-Dixie might be saying that this is a surprise
 7        report that they're attempting to get in after a
 8        due date.  But it's not.  This is only a response
 9        to what they held until the very last moment, even
10        past the last moment to get their reports in, and
11        even there they didn't give us all the attachments
```
                              Page 9

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

12    to the report, which is required under the rule,

13    until the next day.  And the attachments to Dr.

14    Kraemer's report are literally hundreds and

15    hundreds of pages that were delivered in a box.

16        So I think that we've exhibited good cause.  I

17    think that it was the intent of the Court and the

18    parties to allow for a period of digestion of the

19    initial expert report information to be able to

20    prepare not in a hurried nature or fashion, and I

21    think that it was the holiday season juxtaposed

22    against this 15-day window that we have to provide

23    our rebuttal reports, and it's caused a problem.

24    It wasn't a problem of our own making, and we've

25    made an application on a timely basis.

                                                        12

1        And so we would ask the Court to simply give

2    us a reasonable period of time after Winn-Dixie

3    makes their experts available for deposition in

4    which to submit our rebuttal report.

5        THE COURT:  Do you have your experts already

6    hired now?

7        MR. RUBIN:  We've spoken to some experts, but

8    obviously, if the Court grants this motion, we are

9    going to have some time between now and then to

10    more formally retain them and get them information.

11        Obviously we didn't want to put the cart

12    before the horse, because today would be the last

13    day that we could disclose.  And so, if we don't

14    have the expansion, we're going to be precluded

15    from any rebuttal report, which would cause

16    prejudice to one party, again not of our own

                        Page 10

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

17     making.

18          So we're not going to be starting from

19     scratch, and we will have some lead time because we

20     haven't even been given hard dates for these

21     experts to be deposed.  But between now and the

22     date that they do give us to get these depositions

23     accomplished, we will have them retained, we will

24     have them ready to receive a deposition transcript

25     and whatever relevant materials from the case they

                                                    13

1      need to review, and then they'll be made available

2      for deposition if Winn-Dixie wants to depose them.

3          And that is where we kind of tie into the

4      first motion, because they will need additional

5      depositions to get that accomplished.

6          THE COURT:  Okay.  It seems like one expert is

7      only testifying to define what a full truck and a

8      partial truckload is.  That's it.

9          MR. RUBIN:  Yes.

10         THE COURT:  You've got to depose them on that?

11     I mean, you can get somebody that maybe has a

12     different definition.  I don't see where that --

13     the other one is very complex.  I don't have a

14     problem.

15         But I'm saying that anything less than a full

16     truckload is a partial truckload.  If you have two

17     partials, it makes a full, or something like that.

18         MR. RUBIN:  Your Honor, if that witness is

19     limited strictly to what is on that report and

20     nothing else, and I don't know what the Court's

                        Page 11

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

21      predilection is how much explanation you would

22      allow.

23          But that's the problem that I have, is that

24      there's no data.  If you look at the report, it's

25      based upon his knowledge in the industry.  Well,

14

1       you know, I think you do need to see what his

2       qualifications are to see whether he's legitimately

3       analyzing --

4           THE COURT:  I'm just commenting.

5           MR. RUBIN:  And that's why we phrase it that

6       way, that one is almost too simplistic to be a

7       legitimate expert witness, because, if that's all

8       he has to say, we've got 20 witnesses, fact

9       witnesses, in this case who are going to talk about

10      that same issue.  It's not even a proper subject

11      of an expert opinion.

12          THE COURT:  Well, I'm not getting into that.

13      I just hate to see you waste a deposition that

14      you're limiting yourself to.

15          You run your case, I try to run my trials.

16          Let me hear from Mr. Busey, if you want to

17      make some statements before I rule.

18          MR. BUSEY:  Thank you, Your Honor.

19          I think I heard Mr. Rubin say that he didn't

20      anticipate that a lawyer will wait until the last

21      day he has to do something to do it.  Let's put

22      that aside.

23          The motion and the entire argument is based on

24      a fundamentally incorrect premise, and that is that

25      Visagent is entitled to take the deposition of a

Page 12

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

                                                                15

1       witness, an expert witness we've disclosed, before
2       they choose and disclose their expert witness.
3            There's nothing that says that.  That's not
4       what the order contemplated.  There's no agreement
5       to that effect.
6            The order contemplated that we would disclose
7       60 days before trial our expert and, if they wanted
8       to have a rebuttal expert, they would disclose the
9       identity of that rebuttal expert 15 days later.
10      That doesn't allow for taking depositions in
11      between, and there's no reason.
12           They have the information they need to
13      identify and hire an expert witness.  They will
14      have the opportunity to take the deposition, but
15      they don't have the right or need to take the
16      deposition before they determine who they're going
17      to hire.
18           We have disclosed to them the expert witness
19      reports.  The one man is going to say that a full
20      truckload means full truckload, and the lady is
21      going to testify what through the Internet means,
22      which is a technical thing.  But they know full
23      well what this is and what she's going to testify
24      about and know what her qualifications are, and
25      they can go and identify an expert.

                                                                16

1            They have the information they need to hire
2       and identify an expert.  We didn't contemplate

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

3      that.  So that's not what the order says.

4           Now, as you weigh their request for relief,

5      you've got to look at the prejudice to Winn-Dixie.

6      If you grant their motion and they don't take the

7      deposition of our witnesses until early January,

8      and then they're going to have to hire their

9      witness and identify them and get a report to us,

10      when are we going to take their deposition before

11      the January 29th discovery cutoff?  And we're going

12      to be in the midst of very serious trial

13      preparation at that time.

14           And so it would be fundamentally prejudiced to

15      us, and it wasn't contemplated by the order to

16      which we all agreed, and they don't need it.  So we

17      ask that the motion be denied.

18           MR. RUBIN:  Your Honor --

19           THE COURT:  That's enough.

20           MR. RUBIN:  Thank you.

21           THE COURT:  The motion is granted in part and

22      denied in part.

23           You've got 15 days -- no.  Under the new

24      counting, 14 days to submit your expert report.

25      Mr. Busey's firm will make his experts available

                                                  17

1      for deposition during the first seven days of

2      January.  Your report will have already been

3      furnished or will be furnished if you -- I don't

4      how you can do it, but you've got 15 days from

5      today.

6           You can supplement it later if you want, just

7      like they can supplement theirs, and that would
                          Page 14

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

```
 8      allow Winn Dixie the opportunity to schedule and
 9      take your expert's deposition.  And then we'll go
10      from there.
11          Who is going to do the order?  I guess you
12      better do the order, Mr. Rubin.
13          MR. RUBIN:  We can do the order.  I might have
14      misheard.  I thought you said 14 days, and then I
15      heard 15 days.
16          THE COURT:  14.  The new counting is 14 days.
17      Everything is supposed to be seven, 14.
18          MR. BUSEY:  Your Honor, let me ask you to add
19      something to the order, please.
20          THE COURT:  Certainly.
21          MR. BUSEY:  Mr. Rubin told us while we were
22      discussing discovery issues during the break that
23      he would not be available for depositions the last
24      two weeks in January.  So the order should also
25      address that Visagent has to make their witnesses
```

                                                      18

```
 1      to available to us during some period of time.
 2      He's going to give them to us, and then he says
 3      he's not available.
 4          MR. RUBIN:  Your Honor, with all due respect,
 5      I did not say that.  What I said was:  Don't expect
 6      me to be available on every day in the last two
 7      weeks because we have other deadlines in this case
 8      to attend to.
 9          THE COURT:  You're getting into semantics.
10      Don't count me being available on every day --
11          MR. RUBIN:  That's what I said, Your Honor.
```

                        Page 15

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

```
12              MR. BUSEY:  We're asking for assurances that
13      their witnesses will be available just like you're
14      giving them assurances --
15              THE COURT:  Absolutely.  You'll make those
16      witnesses available during that last week.
17              MR. RUBIN:  I guess we're talking about our
18      expert witnesses?
19              THE COURT:  Yes, the experts.
20              MR. BUSEY:  We're only talking about experts.
21              MR. RUBIN:  Yes, Your Honor.
22              THE COURT:  Put that in the order.
23              We're going to try this case in February.  I
24      hope I don't see you until the day of the trial.
25      I'll look forward to it.
```

                                                        19

```
1               The hearing is concluded.
2               MR. BUSEY:  You just said you hope you don't
3       see us until --
4               THE COURT:  Well, I'll be happy to see you,
5       but I hope we're not here to deal with this until
6       the trial date.
7               (Thereupon, at 3:10 p.m., the hearing was
8       concluded.)
9                                   - - -
10
11
12
13
14
15
16
```

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

17
18
19
20
21
22
23
24
25

☐

20

```
 1                    C E R T I F I C A T E
 2    STATE OF FLORIDA  )
 3    COUNTY OF DUVAL   )
 4            I, Cindy Danese, Notary Public, State of
 5    Florida at Large, do hereby certify that the attached
 6    represents the proceedings before the United States
 7    Bankruptcy Court, Middle District of Florida,
 8    Jacksonville Division, before the Honorable Jerry A.
 9    Funk, Bankruptcy Judge, in the matter of In Re:
10    Winn-Dixie Stores, Inc.; such transcript is an accurate
11    recordation of the proceedings which took place.  A
12    transcript of this proceeding has been produced on
13    December 29, 2009.
14
15
16                            STATEWIDE REPORTING SERVICE
17
18                            _____
                              CINDY DANESE
19
20
```

Page 17

12-23-09 hearing on WD's Motion to Limit Witnesses and Visagent's Motion for Ext of Time re Rebu

21

22

23

24

25

# EXHIBIT E

# REPORT OF WALTER WILLIAMSON

I submit the following report regarding my opinions in the case of *In re. Winn Dixie Stores, Inc., et. al.*; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3Fl, Chapter 11:

I.   **Opinions**

   A.   In the freight hauling or shipping industry, the term "a full truck" means a load being transported from one location in a trailer, full or nearly full, by weight or cargo cube area, destined for one or more locations over roadways.

   B.   In the freight hauling or shipping industry, the term "truckload" means a load being transported from one location, with any quantity of cargo or goods as determined by the party hiring the truck to be commercially viable or expedient given the needs of that party. Accordingly, a truckload is not determined by the area or weight of the cargo, but by the needs of the party shipping the goods. A truckload can be a truck which departs for one or more destinations full, by weight or cargo, but it can also be a truck transporting *any* quantity of contents, depending on the needs of the party hiring the truck.

   C.   For both full trucks and truckload quantity trucks, the party hiring the truck for delivery determines the route or "lane" traveled by the truck, based upon the maximum efficiency and profitability of the party hiring the truck.

   D.   The term "less than truckload" or "LTL" is a term of art for a specialized type of freight handled generally by a specialized carrier which handles smaller loads using a distribution system designed to pick up these smaller loads bring them to a central



distribution point and then re-route the loads according to their destination for maximum efficiency and profitability of the LTL carrier.

     E.     LTL carriers typically haul loads owned by many different parties transported in a single truck, while truckload carriers typically transport loads in a single truck owned by a single party.

     F.     Winn-Dixie's purchases and sales of consumer packaged goods that were depicted in the spreadsheets numbers V00001-V003709 were all truckload quantities.

II.    **Bases and reasons for opinion**. The bases and reasons for my opinion include the following:

     A.     My experience in the shipping industry.

     B.     Preliminary review of spreadsheets numbers V00001-V003709, together with review of selected bills of lading, Triceps receiving documents, and invoices.

III.    **Exhibits**.

     A.     None, but will be provided upon supplementation of this report.

IV.    **Qualifications**.

     A.     See my attached resume.

     B.     I have not authored any publications in the past ten (10) years.

V.    **Other cases**.

     A.     I have not testified previously as an expert witness.

VI.    **Compensation**.

     A.     Visagent Corporation has agreed to compensate me at the rate of $150 per hour.

Walter Williamson

Date: _JAN. 6 - 2010_

# EXHIBIT F

## REPORT OF NEVILLE D.E. TEAGARDEN

I hereby render my preliminary opinions in the case of *In re. Winn Dixie Stores, Inc., et. al.*; U.S. Bankruptcy Court, Middle District of Florida; Case No. 05-03817-3Fl, Chapter 11:

I.  **Opinions**

    A.  Victory NTS Trading System [NTS] uses the Internet or similar electronic means.

    B.  The NTS Trading System and its functions are considered to be B2B eCommerce, eCommerce, an Internet Trading Platform, and a system for eProcurement.

    C.  The Visagent Business Process uses the Internet or similar electronic means, and its functions are considered to be B2B eCommerce, eCommerce, an Internet Trading Platform, and a system for eProcurement.

    D.  The procurement of products in the method and manner in which Victory performed its services for Winn Dixie, as described in the undated and unsigned document entitled Explanation of Winn Dixie Diverting System was a business process that was conducted through the Internet or similar electronic means.

    E.  The procurement of products in the method and manner in which Visagent performed its services for Winn Dixie, as described in the Visagent Presentation dated April 2001 was a business process that was conducted through the Internet or similar electronic means.

    F.  Facsimile or "fax" is an electronic means of communication and is similar to the Internet as an electronic means of communication.

G. Email is an electronic means of communication and is similar to the Internet as an electronic means of communication.

H. Other electronic means of communication that are the same or similar to the Internet include but are not limited to Electronic Data Interface (EDI) and File Transfer Protocol (FTP).

I. The Visagent business process is a combination of Internet and similar electronic means and human services. It was intended to provide services to Winn Dixie for end to end transactions that include but are not limited to matching demand with supply, communicating and negotiating buy/sell functions, confirming orders, and facilitation services that include staging, logistics, financial settlement and dispute resolution.

J. Accordingly, it is my opinion that Winn Dixie, via the Service Agreement, committed to conduct all of its purchases and sales in the secondary market through Visagent.

K. While Victory was excluded from the restrictions in J. above for one year, Winn Dixie's 2002 contract with Victory violated the terms of the Service Agreement.

II. **Bases and reasons for opinion**. The bases and reasons for my opinion are derived from:

My educational training

My business experience

My review of the materials described in section III below

III. **Background Documents, References and Other Documents.**

A.  Victory NTS Training Manual ((Will be sent in separate email due to size – 3M)
B.  Victory NTS System Overview and Letter describing services to be provided to WD by Victory for the 2000-2002 Contract.
C.  Victory/WD 2000-2002 Contract
D.  NTS Requested Enhancements Memo 2002
E.  Victory/WD 2002 Renewal Contract
F.  Visagent Presentation to WD (WD April 2001) predating Service Agreement (Will be sent in separate email due to size – 3M)
G.  Winn Dixie/Visagent Service Agreement  (WD Service)
H.  VGE User Agreement-All Users were required agree to abide by the rules for use of the Exchange and other services.
I.  Letter from WD to Alternate Source Vendors announcing the relationship with Visagent
J.  Dr. Eileen Kraemer Expert Report (Disclosure)
K.  Explanation of Winn Dixie Diverting System-Unknown author-Developed by WD and serves as the basis for Kraemer opinion.

IV.  **Exhibits**.

A.  The documents described in III above.

V.  **Qualifications**.

A.  See my attached curriculum vitae.

B.  I have not authored any publications in the past ten (10) years.

VI.  **Other cases**.

A.  I have not testified previously as an expert witness.

VII.  **Compensation**.

A.  Visagent Corporation has agreed to compensate me at the rate of $200.00 per hour. *plus travel and other business related expenses.*

Neville D. E. Teagarden

Dated: 1/6/2010

# EXHIBIT G

*See page 2*

## SERVICE AGREEMENT

THIS SERVICE AGREEMENT is made as of the 28th day of June 2001 [Agreement], by and between Visagent Corporation [Provider], a Florida corporation, having principal offices at 2107 Hendricks Avenue, Jacksonville, Florida, 32207 and Winn-Dixie Stores, Inc., [User], a Florida corporation, having principal offices at 5050 Edgewood Court, Jacksonville, Florida 32254.

WHEREAS, Provider is a corporation organized and existent in accordance with the laws of the State of Florida, and is in the business of providing services including but not limited to the facilitation of eCommerce business-to-business transactions to the retail grocery industry by and through the use of the Visagent Grocery Exchange [Exchange];

WHEREAS, User is a corporation organized and existent in accordance with the laws of the State of Florida, and is in the business of retail grocery operations;

WHEREAS, the parties entered into a Letter of Intent and a Confidentiality Agreement on April 24, 2001;

WHEREAS, Provider and User desire to enter into this Agreement as more fully described below.

NOW, THEREFORE, for and in consideration of the mutual agreements herein contained, it is hereby agreed as follows:

**Term:** The term of this Agreement shall commence on the date specified above and shall remain in effect for a period of three (3) years unless terminated due to a breach of this Agreement or the Confidentiality Agreement as set forth below. This Agreement may be renewed for additional one-year terms by written agreement of the parties entered into not less than ninety (90) days prior to the expiration of this Agreement.

**User Agreement:** It is the intent of the parties that the terms of this Agreement shall supercede and prevail over any inconsistent or ambiguous provisions in the Rules of the Exchange and the Definitions, both of which are part of the User Agreement attached hereto as Exhibit "A" and incorporated by reference. If Provider desires to amend the User Agreement by posting changes or an amended User Agreement on the Visagent Grocery Exchange, Provider agrees to give prior or simultaneous written notice of same to User. As to User, if the amendments are acceptable, they shall be deemed in full force and effect from the date of posting. If User determines that such amendments are unacceptable, User shall provide written notice of same to Provider within ten (10) days after receipt of Provider's notice. If the parties are unable to reach agreement on the proposed amendment within ten (10) days thereafter, User shall have the right to terminate this Agreement immediately at such time.

**Services:** The services to be provided hereunder are those described in this Agreement, supplemented by the terms and conditions in the User Agreement posted on the Visagent Grocery Exchange to the extent they do not conflict with the terms and conditions herein.

During the term of this Agreement, Provider agrees to provide for User access to an Internet e-commerce Exchange, substantially similar to Version 1.4 of the Visagent Grocery Exchange, as

1



EXHIBIT

previously tested by User, and such other software solutions and logistics services that will allow User to secure and distribute products for its business. All services provided by Provider shall be at a level equal to or above the standard of the industry. If Provider discontinues, modifies or changes any presently available service or content on the Exchange, in whole or in part, and User reasonably determines that such change has a detrimental or negative effect upon User's use of the Exchange, User shall provide written notice of same to Provider. If Provider fails to remedy such change to the satisfaction of User within ten (10) days thereafter, User shall have the right to terminate this Agreement immediately at such time.

The basis of the Provider's business is as follows:

*Visagent acts as an independent, neutral third party for the online procurement and distribution of products that are included in the User's normal business operations. As such, Visagent has developed an Internet based platform [Exchange] which allows for the facilitation and coordination of anonymous communication between buyers and sellers for the purchase and sale of products and the provision of logistics and banking services associated with completing end-to-end transactions. The Exchange provides a venue for sellers to post products they have available for sale [Availables] and for buyers to purchase products or post inquiries for items they want to purchase [Lookfors]. Visagent posts rules, policies and other conditions of use for the Exchange and its users. Each user is responsible for making its own determination as to whether to effect or consummate a transaction posted on the Exchange. At no time does Visagent hold title to any products bought or sold on the Exchange.*

**Scope of this Agreement:** This Agreement is intended to cover all of User's business transactions for full or truckload quantities of consumer packaged goods purchased or resold **[through the Internet or similar electronic means]** in a wholesale format, excluding purchases by User from the original manufacturer or its authorized representatives. For the Term of this Agreement, User will not employ or contract for the services of an entity other than Provider for its eCommerce transactions covered under the scope of this Agreement.

Exclusions: The following transactions are specifically excluded from the scope of this Agreement unless such transactions are facilitated through the Exchange.

-Product movement between Winn-Dixie distribution centers or Winn-Dixie contracted distribution centers.

-Direct User purchases for less than full or truckload quantities obtained from the inventory of wholesalers, which, as of the date of this Agreement, are providing electronic data transmissions detailing "in-stock" product availability.

-Direct User transactions with the following entities:
Victory Wholesale Grocers up through and including July 1, 2002
WorldWide Retail Exchange
intesource, Inc.

**Fees:** User as a Buyer: For all Exchange transactions in which User is a Buyer, the fee for Provider's services shall be included in the total Buyer's Product Cost and limited to two (2) percent of the sum of Seller's Product Price plus Deal Costs.

User as a Seller: For all Exchange transactions in which User is a Seller, Provider's Service Fee is included in the Buyer's Product Cost.

2

Provider Fees do not include Deal Costs or items contained in the Schedule of Fees, as outlined in the User Agreement. All transactions are calculated as follows:

$$\text{Seller's Product Price} + \text{Deal Costs} \times .02 = \text{Buyer's Product Cost}$$

**Service Level:**    Provider reserves the right to perform scheduled maintenance and to deploy enhancements, modifications and fixes [collectively, Maintenance] to the Exchange, as necessary. All Maintenance shall be performed on the following default schedule: Sunday, Saturday, non-peak weekday hours of the Exchange.

Use of the Exchange is based upon Internet Server availability and is subject to agreements by and between Provider and third-party vendors in the business of providing Internet bandwidth and hosting services. Provider is not in the business of providing these services and accordingly cannot warrant availability beyond the contractual responsibilities of third-party vendors. Provider may use multiple Internet Service Vendors during the Term of this Agreement. The current primary Internet Service Vendor has a national availability service level of 99.9% for the type of service required by Provider.

Third-party service levels notwithstanding, Provider shall provide Exchange access to User for a minimum of 90% of the time in any calendar month, including downtime and maintenance.

If Provider fails to meet the minimum service levels stated herein, or fails to provide services at or above the standard of the industry, User shall provide written notice of same to Provider. If Provider fails to remedy such service problem to the satisfaction of User within ten (10) days thereafter, User shall have the right to terminate this Agreement immediately at such time.

**Antitrust:**    The parties hereto believe strongly in competition. Federal and state antitrust laws are the rules under which competitive systems operate. It is the intent of the parties hereto to comply in all respects with the antitrust laws, and each party further agrees to conduct its business transactions contemplated by this Agreement, accordingly.

**Confidentiality:**    The *Mutual Confidentiality and Non-Disclosure Agreement* executed by the parties on April 24, 2001 [Confidentiality Agreement], is incorporated by reference into this Agreement and designated as Exhibit "B" hereto. In the event the Term of this Agreement is renewed, the parties hereby agree to amend the term of the Confidentiality Agreement so that it extends three (3) years after the expiration of this Agreement.

**Termination:** User shall have the right to terminate this Agreement (i) upon breach by Provider of any term or condition of this Agreement, subject to the specific notice and cure provisions, if any, set forth herein; (ii) upon breach by Provider of any term or condition of the User Agreement, subject to specific notice and cure provisions set forth therein; or (iii) immediately upon breach by Provider of the Confidentiality Agreement. Termination of this Agreement shall not relieve or release either Party from any liability incurred prior to the termination of the Agreement or the Confidentiality Agreement.

**Disputes:**    In the event that User has a dispute with a third party regarding a transaction arising out of use of the Exchange, User agrees to abide by the Rules of the Exchange for the resolution process thereof.

3

**Indemnification:** The parties intend that the following Indemnity shall replace and supercede, in its entirety, the "Indemnity" section set forth in the User Agreement:

User agrees to defend, indemnify and hold harmless Provider, its directors, officers, employees, and agents from and against any and all claims, costs, expenses, demands and damages (including reasonable attorneys' fees) arising out of, resulting from or incurred in connection with User's improper or negligent use of the Exchange, User's breach of this Agreement or the User Agreement or User's dispute with a third party regarding a transaction through the Exchange, except for disputes that arise out of the negligence or breach of this Agreement or the User Agreement by Provider or other third party.

IN NO EVENT AND UNDER NO CIRCUMSTANCE, LEGAL THEORY, TORT, CONTRACT OR OTHERWISE, WILL USER BE LIABLE TO PROVIDER OR ANY OTHER PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, LOSS OF POTENTIAL REVENUES, LOSS OF BUSINESS OPPORTUNITIES, PROFITS, BUSINESS INTERRUPTION, WORK STOPPAGE, COMPUTER FAILURE, LOSS OF PROGRAMS OR INFORMATION OR MALFUNCTION OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES OR ANY OTHER DAMAGES ARISING IN ANY WAY FROM USER'S ACCESS TO OR USE, OR ANY COMMERCE CONDUCTED BY OR THROUGH THE EXCHANGE, EVEN IF USER HAD BEEN INFORMED OR ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN ANY STATE OR JURISDICTION THAT DOES NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, USER'S LIABILITY SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW.

Provider shall have the right, at its own expense, to participate in the defense of any action or matter subject to indemnification by User hereunder. User agrees to keep Provider reasonably informed about the defense of such matters, and to confer with Provider prior to taking any action in settlement, compromise or other disposition of such matter.

**Miscellaneous:**     This Agreement (including the other agreements and documents referenced herein) constitutes the entire understanding and agreement of Provider and User with respect to the subject matter of this Agreement, and contains all of the covenants and agreements of Provider and User with respect to this Agreement. Provider and User each acknowledge that no representations, inducements, promises or agreements, oral or written, have been made by Provider or User, or anyone acting on behalf of Provider or User, which are not referenced or contained in this Agreement, and any prior agreements, promises, negotiations or representations with respect to the subject matter of this Agreement, whether written or oral, not expressly set forth in this Agreement are of no force or effect. This Agreement may be amended or modified only by a writing signed by all parties to this Agreement.

If any party to this Agreement shall bring any suit or action against another for relief, declaratory or otherwise, arising out of this Agreement, the prevailing party at trial and on appeal shall be entitled to recover against the other party, in addition to all court costs and disbursements, such sums as the court may adjudge to be reasonable attorney's and paralegal fees.

This Agreement shall be governed by and construed under the laws of the state of Florida without regard to principles of conflict of laws. The parties irrevocably consent to the jurisdiction

4

and venue of the state courts located in Duval County, Florida in connection with any action relating to this Agreement, except as otherwise specified herein.

The terms and provisions of the Agreement are confidential and proprietary and shall not be disclosed by either Party without the express written consent of the other unless specifically, and only to the extent, required by law.

This Agreement may be signed in counterparts, each of which shall be deemed to be an original and both of which shall constitute one Agreement. Facsimile signatures shall be deemed acceptable and binding.

Each party represents it has all requisite legal power and authority and has taken all action necessary or appropriate to enter into this Agreement and that its representative executing this Agreement is duly empowered to do so.

THE PARTIES have caused this Agreement to be executed by their duly authorized representatives.

Visagent Corporation

By: _____
    I. Mark Rubin
    Chief Executive Officer

Date: __6/5-01__

Winn-Dixie Stores, Inc.

By: _____
Name Printed: _Philip H. Peydinat Jr._
Title: _V.P. Director of Grocery Procurement_

Date: __6/5-01__

5

WD28743

# EXHIBIT H

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER DIRECTING VISAGENT CORPORATION TO PRESENT ITS CASE FIRST AT TRIAL

On February 21, 2005 Winn Dixie, Stores, Inc., on behalf of twenty-three of its subsidiaries and affiliates (collectively, "Winn Dixie"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Visagent Corporation ("Visagent") filed a claim, which was designated as Claim No. 9953, in July 2005. Visagent claims that Winn Dixie breached an agreement, which was entered into between it and Winn Dixie on June 15, 2001. According to Visagent, under the terms of the agreement Winn Dixie was obligated for three years to exclusively utilize the services of Visagent for the procurement and sale of all merchandise Winn Dixie acquired or sold through internet or similar electronic means, including any means utilizing facsimile, from and through the secondary market. The secondary market is comprised of all sources (buyers and sellers) of merchandise other than direct purchases and returns from original product manufacturers. Winn Dixie objected to Visagent's claim, asserting that it did not breach a duty to Visagent and that Visagent failed to adequately perform under the terms of the agreement.

On August 19, 2009 the Court conducted a status conference on Winn Dixie's Objection to Visagent's claim. At that hearing counsel for Visagent raised the issue of which party has the burden of proof at trial and which party would present its case first at trial.[1] The Court directed the parties to file memoranda no later than September 30, 2009 to assist it in making such a determination. The Court has reviewed the parties' memoranda.

Objections to claims are governed by 11 U.S.C. § 502(a) providing that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." Section 502(b) provides, "...if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount...." A proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f)(2009). The burden of proof is on an objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim." In re VTN, Inc., 69 B.R. 1005, 1008 (Bankr. S.D. Fla. 1987) (citing DeLorean Motor Co. Litig., 59 B.R. 329 (E.D. Mich. 1986)). If the objecting party rebuts the prima facie validity of the proof of claim, the claimant bears the burden of persuasion to substantiate the validity and the amount of the claim by a preponderance of the evidence. In re Taylor, 363 B.R. 303, 309 (Bankr. M.D. Fla. 2007).

---

[1] The trial is scheduled to commence on February 8, 2010.

2

The purpose of Rule 3001(f) is to reduce the time a court would be required to spend on objections and to reduce the time and expense for the usual creditor in a bankruptcy case. However, the transactions, which are the subject of Visagent's claim are complicated. Visagent's claim is not one that lends itself to a ready and simple determination and in that sense is not the ordinary claim to which Rule 3001(f) is directed. Rule 611(a) Fed.R.Evid. allows the Court to exercise control over the order of presentation of evidence. Under Rule 611(a) courts have broad discretion in controlling the order of presentation of evidence. The Court finds it appropriate to require Visagent to present its case first at trial. Visagent bears the burden of persuasion to substantiate the validity and amount of its claim by a preponderance of the evidence. Upon the foregoing, it is

**ORDERED:**

Visagent shall present its case first at trial. Visagent bears the burden of persuasion to substantiate the validity and amount of its claim by a preponderance of the evidence.

**DATED** this 6 day of November, 2009 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

**Copies to:**

Stephen D. Busey, Attorney for Winn Dixie
Guy Bennett Rubin, Attorney for Visagent

3

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC. et al | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## NOTICE OF FILING AMENDED STATEMENT OF CLAIM BY VISAGENT CORPORATION

Visagent Corporation, one of the unsecured creditors herein, holding Claim No. 9953 in the amount of $131,875,000, by its attorneys, hereby file this as its Amended Statement of Claim:

**Amended Statement of Claim**

After many months of negotiations and the investment of substantial monetary and human capital by VISAGENT, a contract entitled SERVICE AGREEMENT was executed by both VISAGENT and WINN-DIXIE on June 15, 2001 with an effective date of June 28, 2001.

The term of the SERVICE AGREEMENT is three (3) years from the effective date. Under this agreement WINN-DIXIE was obligated to exclusively utilize the services of VISAGENT for the procurement and sale of all merchandise it acquired or sold, through the internet or similar electronic means, including any means utilizing facsimile, from and through the secondary market. This secondary market is comprised of all sources (buyers and sellers) of merchandise other than direct purchases and returns from original product manufacturers. Pursuant to the terms of the SERVICE

1

AGREEMENT, VISAGENT was entitled to a fee of 2% of all WINN-DIXIE transactions processed through VISAGENT.

WINN-DIXIE breached its contractual obligation to exclusively utilize VISAGENT's services for e-Commerce as provided in the SERVICE AGREEMENT. As a result, VISAGENT has suffered damages in the amount of 2% of all transactions in which WINN-DIXIE participated in the purchase or sale of goods in the secondary market, other than those through the Exchange.

WINN-DIXIE also violated state and federal laws in connection with trade secrets and proprietary information belonging to VISAGENT. This claim is based upon the WINN DIXIE Outside Sales Catalog program (OSC) developed specifically by VISAGENT for WINN-DIXIE. VISAGENT brought the OSC concept to WINN-DIXIE. VISAGENT used its contacts and relationships to introduce compatible trade partners to WINN-DIXIE to trade on a VISAGENT exchange or a custom designed trading platform managed by and through VISAGENT. WINN-DIXIE blatantly attempted to, and then did in fact build a business relationship with some or all of these introduced trading partners on their own by circumventing VISAGENT despite written and oral non-disclosure agreements protecting VISAGENT against such circumvention.

VISAGENT performed extensive services without compensation for WINN-DIXIE based upon promises that ALL Outside Sales Catalog business would be conducted by and through a VISAGENT Exchange. In reliance on said promises, VISAGENT developed a business model for WINN-DIXIE and trained its employees in this regard.

WINN-DIXIE intentionally, fraudulently or negligently encouraged and induced VISAGENT, through said promises, to continue to provide development, training and services toward the development of the OSC and other trading programs that would benefit WINN-DIXIE despite the fact that WINN-DIXIE actually had no intention to use the VISAGENT exchange as was promised. WINN-DIXIE was actually perpetrating a scheme to usurp the business opportunities brought to it by VISAGENT, stealing advanced technical trading knowledge and industry know-how from VISAGENT, without any intention of compensating VISAGENT. VISAGENT relied on these inducements to its detriment and suffered catastrophic damages as a result thereof.

### CERTIFICATE OF SERVICE

I certify that a true copy was sent via U.S. Mail and via electronic filing to Clerk of the Bankruptcy Court and to counsel for the Debtor this 23rd day of July, 2006.

**COUNSEL FOR VISAGENT CORPORATION**

Guy Bennett Rubin
Digitally signed by Guy Bennett Rubin
DN: CN = Guy Bennett Rubin, C = US
Date: 2006.07.23 07:34:37 -04'00'

GUY BENNETT RUBIN, ESQUIRE
Florida Bar No.: 691305
Rubin & Rubin
P.O. Box 395
Stuart, FL 34995
(772) 283-2004
(772) 283-2009 (facsimile)
guy.rubin@rubinandrubin.com

AND

PAUL M. HARDEN, ESQUIRE
Florida Bar No.: 129557
Rubin & Rubin

3

1301 Riverplace Blvd
Ste 2601
Jacksonville Florida 32207
904.3965731
904.3995461 (facsimile)

Copy furnished to:

Stephen D. Busey
James H. Post
Cynthia C. Jackson
**Smith Hulsey & Busey**
225 Water Street
Suite 1800
Jacksonville, FL 32202
Tel: (904) 359-7700
Fax: (904) 359-7708

4