**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC. et al | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## VISAGENT CORPORATION'S MOTION  FOR PARTIAL SUMMARY JUDGMENT

VISAGENT CORPORATION (hereinafter "VISAGENT"), a claimant herein, moves the Court pursuant to Federal Rules of Civil Procedure 56 for an Order granting VISAGENT CORPORATION partial summary judgment as to liability for breach of contract against WINN-DIXIE STORES, INC. and twenty-three (23) of its subsidiaries and affiliates, as the Reorganized Debtors (hereinafter the "DEBTORS" and/or "WINN-DIXIE" or "WD") since there are no material facts genuinely at issue. In support of the motion, VISAGENT states:

## SUMMARY OF THE ARGUMENT FOR PARTIAL SUMMARY JUDGMENT

VISAGENT is entitled to partial summary judgment on liability for breach of the Service Agreement as there are numerous examples of breaches for which there are no material disputed issues of fact or law.

There is no dispute as to the following facts:

a.      The Service Agreement was a three (3) year agreement executed between the parties (WD and Visagent) on June 15, 2001 with an effective date of June 28, 2001.

1

b.     The Service Agreement contained an integration clause in which the parties agreed that prior representations, promises, agreements and negotiations which are not set forth in the Service Agreement are of no force and effect and may be modified only by all parties in writing.

c.     The Service Agreement committed Visagent to provide access to an Internet e-commerce Exchange, other software solutions and logistics services that would allow WD to secure and distribute products for its retail grocery business over the course of a three year period.

d.     The Service Agreement required WD to give written notice with a 10-day cure period to VISAGENT if WD reasonably determined any change to the services or technology covered by the Service Agreement had a detrimental or negative effect on WD's use of the Exchange. WD had the right to immediately terminate the Service Agreement upon the expiration of the cure period if Visagent failed to remedy the change to WD's satisfaction. WD never gave any such written notice during the three (3) year term of the Service Agreement.

e.     The Service Agreement covered all of WD's wholesale business transactions for full or truckload quantities of consumer packaged goods (CPG) purchased or resold through the internet or similar electronic means, excluding purchases from manufacturers.

f.     The Service Agreement also prohibited WD from contracting for the services of an entity other than Visagent for its eCommerce transactions covered under the scope of the Service Agreement.

g.     Victory Wholesale Grocers (Victory) was already providing eCommerce services in-house at WD to acquire and sell the same goods covered by the Service Agreement at the time the Service Agreement was executed pursuant to the terms of a two-year written contract with Victory beginning July 10, 2000. Since that contract conflicted with the terms of the Service Agreement as stated immediately above in (f), the Service Agreement contained an exclusion for direct transactions between WD and Victory up through and including July 1, 2002.

h.     The Service Agreement entitled Visagent to a 2% fee for all transactions conducted by WD through the Visagent transaction process.

i.     There is no material factual dispute that WD breached the terms of the Service Agreement in multiple ways throughout virtually the entire three years of the contract by the following conduct:

1.     Soliciting orders from diverters via email for full or truckload quantities of product WD desired to sell

2.     Entering into a renewal contract with Victory in 2002 for eCommerce services to process transactions covered under the scope of the Service Agreement

3.     Use of internet or similar electronic means to purchase and resell full or truckload quantities of CPG through Victory's proprietary internet connected electronic purchasing system called the NTS. These breaches occurred during the first year of the Service Agreement by and through use of the NTS to conduct transactions with entities other than Victory. These breaches occurred

during the second and third years of the Service Agreement by and through use of the NTS to conduct transactions with all other entities including Victory.

As to items i(1) and i(2) above, WD has interposed no viable objection or defense to the claim, nor can it, to escape liability.  As to item i(3), WD attempts to parse words and confuse plain meaning in a hyper-technical defense through its experts, that a) using the NTS system for its eCommerce transactions was not purchasing or reselling CPG "through the internet or similar electronic means", and b) the Service Agreement did not cover CPG on trucks virtually full but comprised of multiple orders going to (outbound sales to diverters) or coming from (incoming purchases by WD ) a single buyer or seller respectively. These interpretations of the Service Agreement were never raised or even suggested by WD during the course of the contract. The WD executive who signed the Service Agreement, Phillip Payment, V.P., Director of Procurement, testified that WD stopped using Visagent's services because it was a tool that didn't work.  He also said if the tool had worked, Visagent would have processed all of WD's secondary market transactions as anticipated in the Service Agreement. That admission alone debunks WD's current defense theory.

The Service Agreement is clear and unambiguous. Under Florida law, which governs the Service Agreement by its own terms, no parole evidence is admissible to change or vary the plain terms of the Service Agreement.  A contract is a contract. Visagent performed all its obligations under the Service Agreement for the entire three year term of the contract.  WD did not. WD blatantly breached the terms of the Service Agreement and must be held accountable.  Visagent is entitled to proceed to the second phase of trial on damages without having to expend its limited resources on undisputed

issues of law and fact on the issue of liability. This Court need not waste five days on issues it is capable of deciding based upon unrefuted record evidence.

## **PROCEDURAL HISTORY**

1.     WINN-DIXIE filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005. VISAGENT, an unsecured creditor, filed Claim No. 9953 in July 2005. On January 8, 2010 VISAGENT filed its Second Amended Statement of Claim in the amount of $9,700,778, plus attorneys fees and costs. In the Second Amended Notice of Claim, VISAGENT contends WINN-DIXIE materially and substantially breached a Service Agreement entered into between the parties on June 15, 2001 with an effective date of June 28, 2001. Attached hereto as Exhibit "1" is a copy of the Second Amended Statement of Claim.

2.     In DEBTORS' Fourteenth Omnibus Objection to (A) Liability Claims and (B) No Liability Misclassified Claims, dated July 11, 2006, attached hereto as Exhibit "B", "No Liability Claims to be Disallowed," DEBTORS' stated the following grounds for disallowance of VISAGENT'S claim:

> NO LIABILITY ON ALLEGED BREACH OF SERVICE AGREEMENT AND RELATED THEORIES OF RECOVERY.  CLAIMANT CONTENDS DEBTORS BREACHED EXCLUSIVITY PROVISION IN SERVICE AGREEMENT, ENTITLING IT TO 2% OF ALL DEBTOR'S PURCHASES DURING THE APPLICABLE PERIOD. CLAIM CONTAINS NO SUPPORTING DOCUMENTATION AND NO EXPLANANTION OF DAMAGE CALCULATION. DEBTORS ABIDED BY EXCLUSIVITY PROVISION AND THERE WERE NO OUTSTANDING CLAIMS WHEN SERVICE AGREEMENT EXPIRED IN JUNE 2004.  UPON TERMINATION OF RELATED USER AGREEMENT, CLAIMANT WAS REQUIRED, BUT FAILED TO RETURN $25,000 DEPOSIT.  ACCORDINGLY, CLAIMANT OWES DEBTOR $25,000.

This is the one and only objection by WINN-DIXIE to Claim 9953. (Exhibit "2")

4.     DEBTORS did not file an amended Objection to Claim at any time during these proceedings.  The initial defense set forth in the Objections was that they "abided by the exclusivity provision" of the contract.  In effect, they claimed that they did not breach the contract.

5.     On April 18, 2007, VISAGENT forwarded its Second Set of Interrogatories to DEBTORS.  The following interrogatory was propounded and the following response given by DEBTORS on June 11, 2007:

Interrogatory No. 1:  Set forth each and every breach of Visagent to the Service Agreement and for each breach, identify the date and time of each breach, all documents referencing or supporting such breach and every witness to each breach.

Answer to Interrogatory No. 1:     Subject to Debtor's objections, Visagent did not perform under the Service Agreement because Visagent's Grocery Exchange failed to provide a platform for the sale or purchase of sufficient volumes of diverted grocery products.

Visagent also represented to Debtors that Visagent had no ownership or affiliated interested (sic) with any diverter organizations.  In fact, Visagent's management had a direct interest in a diverting business which operated from the same building as Visagent, a fact which Debtors contend affected Visagent's ability to attract enough users to the Grocery Exchange to make it a viable platform for the sale or purchase of sufficient volumes of diverted grocery products.

Tom Barr had knowledge of theses breaches. The documents showing goods purchased and sold on the Grocery Exchange, the documents reflecting Visagent's representations that it was not affiliated with Global Food Resources, Inc. evidence these breaches.

The answer essentially sets forth two (2) defenses:  the *lack of critical mass* defense and the *conflict of interest* defense. (Exhibit "3")

6.     On August 24, 2007, Tom Barr appeared as the corporate representative for the DEBTORS at a deposition pursuant to Federal Rule of Civil Procedure §30 (b) (6). He agreed to sit as the corporate representative and would answer questions concerning the areas of inquiry set forth in the Re-Notice of Deposition served upon him.

(Exhibit " 4 ": Transcript of WINN-DIXIE Corporate Representative-Barr, P. 10 L. 11-22, hereafter referred to as "WD CR-Barr P. _L. _")   DEBTORS' corporate representative was questioned about Interrogatory No. 1 of VISAGENT'S Second Set of Interrogatories and DEBTORS' response thereto, setting forth all of DEBTORS' defenses to VISAGENT'S claims. Once again, the corporate representative averred that there were only two (2) defenses to VISAGENT'S breach of contract claim.  The first defense was that VISAGENT failed to provide a platform with sufficient volume:  "Not enough users, not enough products." (Exhibit 5:  WD CR-Barr, P. 235 L. 4- P. 236 L. 18) The other defense was an alleged conflict of interest defense because I. Mark Rubin, VISAGENT'S Chief Executive Officer, was the President of Global Food Resources (Global), an actual importer/exporter of food and other products, but purported in this case to be a diverting company by DEBTORS. (Exhibit " 6 ": WD CR-Barr, P. 241 L. 10- P. 242 L. 5)   The WD Corporate Representative testified as follows:

 Q    Okay.  And we've already gone through that Winn-Dixie within two weeks of this service agreement being executed was aware that there was information indicating that Mark Rubin may have been an executive at Global Food Resources; right?
 A   I believe, yes, sir.
 Q   Okay.  Which you now say is a diverting house; right?
 A   It is a diverting house.
 Q    All right.  And Winn-Dixie didn't think it was serious enough to have any communications with Visagent about the effect on this service agreement for the remaining 2 years, 11 months, and 2 weeks of the contract; right?
 A   Yes.
 Q   So it must not have been that important; correct?
 MR. BOLLING:  Objection.
 A   It was important to me.
 Q   Right.  But not to Winn-Dixie?
 A   Apparently not.

*Apparently*, WD's knowledge concerning an affiliation between executives at VISAGENT and Global, or even a common ownership in those entities, was not

concerning enough to WD to raise as an issue with VISAGENT over the entire term of the Service Agreement.

7.      On May 7, 2009, during the continued deposition of DEBTORS' corporate representative occurred, counsel for VISAGENT asked Mr. Barr if WD considered VISAGENT's affiliation with or alleged misrepresentations about Global, and that affiliation causing an alleged lack of critical mass on the Visagent Exchange to be a breach of the Service Agreement. Mr. Barr stated he could not provide an answer to that question for WD. (Exhibit "7  ": Continued Deposition of WINN-DIXIE Corporate Representative,-Barr P. 13 L.7 – P. 14 L. 8) Mr. Barr was asked if he did anything as Corporate Representative appearing at deposition for WD to find out any other defenses WD had to this claim. Mr. Barr said "no". Id.

8.      Consequently, as the trial of this matter approaches in February 2010, DEBTORS' two (2) articulated defenses to the breach of contract claim are:

a.      VISAGENT did not have enough users or enough product listed on the Exchange, therefore DEBTORS were legally justified to violate their obligations under the Service Agreement, and

b.      Because VISAGENT's CEO was affiliated with exporter Global Food Resources, a conflict of interest existed, causing certain diverters not to use VISAGENT's procurement solutions, therefore DEBTORS were legally justified to violate their obligations under the Service Agreement

These two defenses are without any material factual or legal support and therefore are the proper subject of the instant partial summary judgment on the issue of liability for breaching the Service Agreement.

## PERTINENT FACTS

### The Diverting Business[1]

9.      The purchase and sale of goods for profit by and between wholesalers, distributors and retailers outside of the manufacturer's intended channel of distribution is generally called "diverting". So called "diverted" goods are sold in what is commonly referred to as the secondary market.  These goods may be sold and resold in a wholesale format several times before they ultimately reach a traditional retail store shelf. Any party that participates in such a sale, including retailers, is generally called a "diverter".

Many grocery retailers, including Winn Dixie, treated their procurement departments as profit centers by buying and selling products on the secondary market.

Buying products from diverters created a way for the retailer to augment its mainline procurement process by acquiring millions of dollars of their overall purchasing requirements from resellers that could offer products at a price that is lower than any price quoted by the manufacturer.

This opportunity becomes available due to fractures in the pricing practices of manufacturers.  Many times a manufacturer will offer different prices to different customers, for the same product, for reasons related to region, season, quantity, type of buyer, etc.  Buyers that are offered the better pricing often over-buy with the intent to resell to other parties who don't have access the same low pricing.

Winn-Dixie, through its procurement department, engaged in these diverting practices to lower its overall cost structure for many products that would ultimately make

---

[1] The facts presented to the Court as background information relate to the time period in question in the Service Agreement (2001-2004) and the time frame immediately before and after such time period to provide proper context.

it to the store shelf <u>and</u> to resell for a profit many products that it had the capability to purchase below market value.

Because retailers typically do not have the tools or business processes necessary to trade directly with other retailers, they must use middlemen, known as Alternate Source Vendors. These "diverters" purchase and resell the products with a very comfortable profit margin, to complete the end to end diversion process. Of the two to three hundred middlemen that were regularly operating in the grocery diversion arena, there were only three or four that had annual sales in excess of $1Billion each. See Exhibit 8, Affidavit of I. Mark Rubin.

Some retailers would contract with these larger entities known as In-House Diverters to manage their secondary market transaction process.

Whether a retailer trades directly with a long list of Alternate Source Vendors or uses a single In-House Diverter to manage its Alternate Source Vendors, the elements of a transaction remain the same. A retailer's transaction in the grocery secondary market must include all of the following stages:

**For A Seller:**

a. Identify products available to be sold, either from inventory or from "deals" offered by the manufacturer but not yet in inventory;

b. Identify market pricing for subject product and compare with Seller's own cost basis to determine offering price;

c. Identify and communicate with potential buyers for subject product;

d. Negotiate price and terms, including freight logistics and payment;

e. Document transaction with Purchase Orders and Invoices;

    f.      Negotiate transportation for freight, if applicable;

    g.      Coordinate freight logistics, if applicable;

    h.      Collect payment

    i.      Manage discrepancies in quantity, quality or extraordinary transportation costs, as applicable;

    j.      Maintain communication throughout transaction with internal business units and with buyer.

**For A Buyer:**

    a.      Identify internal need (demand) for product;

    b.      Identify market pricing for subject product and compare with Buyer's own cost basis from the manufacturer to determine acceptable price;

    c.      Identify and communicate with potential sellers for subject product;

    d.      Negotiate price and terms, including freight logistics and payment;

    e.      Document transaction with Purchase Orders and Invoices;

    f.      Negotiate transportation for freight, if applicable;

    g.      Coordinate freight logistics, if applicable;

    h.      Issue payment;

    i.      Manage discrepancies in quantity, quality or extraordinary transportation costs, as applicable;

    j.      Maintain communication throughout transaction with internal business units and with seller.

10.     According to the terms of the initial Victory Contract (Exhibit "9 "), Victory was contractually obligated to provide the following to DEBTORS' corporate diverting department:

a..     Four Victory employees responsible to manage and track for all DEBTORS' grocery, HBC (health, beauty and cosmetics) and RX (OTC drugs) inbound/outbound diverted product.[2]

b.      Licenses and access to Victory's proprietary computer programming called Network Trading System ("NTS").

c.      Office equipment including copiers, fax machines and printers.

d..     A 10 cent per case rebate on all inbound grocery and HBC products, from all alternative source suppliers including a $300,000 rebate pre-payment.

e.      a guaranteed of 5% profit of the total volume of outbound sales of excess grocery and HBC.

In return DEBTORS agreed to the following terms as their obligations under the initial Victory Contract:

a.      A four (4) hour right of first refusal on all outbound offered product;.

b.      Office space for four Victory personnel at DEBTORS' headquarters;

c.      Access to DEBTORS' telephone lines and equipment; and

d.      Access to DEBTORS' information system and data so Victory could create and maintain an NTS item master file. (To do this, WD was required to, daily; send a large computer file that contained a snapshot of its system wide inventory via an

---

[2] These products are collectively known in the industry as Consumer Packaged Goods or "CPG".

Internet transmission called FTP.) (Exhibit " 10 ": Deposition of . Kevin Gates (WD Director of Business Support) P. 65 L. 7-P.66. L.23)

11.    According to WINN-DIXIE'S corporate representative, Tom Barr, Victory was ensconced at Winn-Dixie to "facilitate" the diverting process. (Exhibit " 11 ": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 35 L. 25 – P. 36 L. 9) Philip Payment believed this facilitation included Victory providing WINN-DIXIE "with software to allow visibility to the deals in the marketplace, or the diverter offerings in the marketplace. (Exhibit "12 ": Deposition of Philip Payment, P. 27 L. 19 – P. 28 L. 6) This arrangement placed Victory, a large diverting company, squarely inside WINN-DIXIE headquarters with Victory personnel working side-by-side with WINN-DIXIE employees buying and selling in the secondary markets.

12.    Victory's proprietary Network Trading System (NTS), was an internet-based informational system from which recommendations for product purchases and sales were derived.    (Exhibit "13 ": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 36 L. 10 – P. 39 L. 22) In addition to conducting diverting business utilizing telephones, facsimiles and e-mail, Victory, received electronic data transmissions from Winn-Dixie and other diverters with product information. (Exhibit " 14 ": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 45 L. 4 -  L. 20; Deposition of WINN-DIXIE Corporate Representative-Barr, P. 138 L.12 – P. 139 L. 5: Deposition of Philip Payment P. 31 L. 19 – P. 32 L. 9) The data was sent from retailers like WD to Victory headquarters in Springboro, Ohio by data transmission lines "through" the internet where the data was processed and then transmitted back to the retailer the next day with recommended transactions. (Exhibit "15  ": Deposition of

Michael Kresser – Victory CIO , -  P. 60 L. 9-P. 61 L. 23)  Victory personnel did not control the process of buying and selling goods, they controlled the pipeline of information WINN-DIXIE received from which to make those decisions. (Exhibit " 16 ": Deposition of Philip Payment P. 36 L. 17 – P. 37 L. 5)  In entering into the agreement with Victory, Mr. Payment was advancing WINN-Dixie's designed transition toward a more technology-driven solution to WINN-DIXIE'S diverting needs and saw this contract with Victory as a "step in the right direction." (See page 33 L. 1) Payment understood the Victory "system" to be a tool to increase efficiency over the prior legacy phone and fax method. (Exhibit " 17 ": Id.  P.32 L. 14 –P. 33L. 9)

13.      The new program was announced in a letter to "All Trading Partners," signed by Daryl Mills and Robert Carlson, Accounts Manager for Victory, in which they wrote:  "We would like to inform you of the new change to the WD Diverting Program. As of July 10, 2000 Victory Wholesale Grocers will be responsible for the entire diverting program….In order to provide the best program for WD, all diverters will be required to work within the new structure.  The following contacts are responsible for the diverting at WD: Robert Carlson, Bruce Malcolm, Mark Blouin...." (Exhibit " 18 ": VWG1000423)  For WINN-DIXIE, Tom Barr was the employee responsible for monitoring the program and supervising Victory employees. (Exhibit " 19 ": Deposition of Daryl W. Mills, P. 47 L.3 – L 9: P. 47 L. 18 – P. 48 L. 7)   Mr. Barr was a store manager for WINN-DIXIE from 1979 to 1988/89 and thereafter a product buyer until WINN-DIXIE centralized its procurement department. (Exhibit " 20 ": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 7 L. 16 – L. 18; P. 24 L. 12 – L. 15) He later became Alternate Source Manager (Exhibit "21  ": Deposition of WINN-DIXIE

Corporate Representative-Barr, P. 22 L. 8 – L. 19) and was responsible for signing off on all transactions processed through Victory's NTS. (Exhibit "22 ":Deposition of Daryl W. Mills, P. 52 L. 2 -L. 13)

14.     The Service Agreement was signed by Payment and Rubin on June 15, 2001, with an effective date of June 28, 2001. (Exhibit "23 ": WD 028739-WD 028744; Deposition of Philip Payment, P. 14L. 5 – L. 15) WINN-DIXIE does not assert the agreement was entered into through coercion or duress. (Exhibit " 24 ": Deposition of WINN-DIXIE Corporate Representative- Barr, P. 163 L. 24 – P. 164 L.14)     In pertinent part, the agreement provided as follows:

> **Term**: The term of this Agreement shall commence on the date specified above and shall remain in effect for a period of three (3) years
>
> \*       \*       \*
>
> During the term of this Agreement, Provider agrees to provide for User access to an Internet E-commerce Exchange, substantially similar to Version 1.4 of the Visagent Grocery Exchange, as previously tested by User, and such other software solutions and logistics services that will allow User to secure and distribute products for its business.  All services provided by Provider shall be at a level equal to or above the standard of the industry.  If Provider discontinues, modifies or changes any presently available service or content on the Exchange, in whole or in part, and User reasonably determines that such change has a detrimental or negative effect upon User's use of the Exchange, User shall provide written notice of same to Provider. If Provider fails to remedy such change to the satisfaction of User within ten (10) days thereafter, User shall have the right to terminate this Agreement immediately at such time.
>
> \*       \*       \*
>
> **Scope of this Agreement:** This Agreement is intended to cover all of User's business transactions for full or truckload quantities of consumer packaged goods purchased or resold through the Internet or similar electronic means in a wholesale format, excluding purchases by User from the original manufacturer or its authorized representatives.   For the Term of this Agreement, User will not employ or contract for the services of an entity

other than Provider for its E-commerce transactions covered under the scope of this Agreement.

**Exclusions**:  The following transactions are specifically excluded from the scope of this Agreement unless such transactions are facilitated through the Exchange.

> -Product movement between Winn-Dixie distribution centers or Winn-Dixie contracted distribution centers.

> -Direct User purchases for less than full or truckload quantities obtained from the inventory of wholesalers, which, as of the date of this Agreement, are providing electronic data transmissions detailing "in-stock" product availability.

> -Direct User transactions with the following entities:
> Victory Wholesale Grocers up through and including July 1, 2002
> WorldWide Retail Exchange
> Intesource, Inc.

**Fees:** User as a Buyer:  For all Exchange transactions in which User is a Buyer, the fee for Provider's services shall be included in the total Buyer's Product Cost and limited to two (2) percent of the sum of Seller's Product Price plus Deal Costs. User as a Seller: For all Exchange transactions in which User is a Seller, Provider's Service Fee is included in the Buyer's Product Cost.

Provider Fees do not include Deal Costs or items contained in the Schedule of Fees, as outlined in the User Agreement.  All transactions are calculated as follows:

Seller's Product Price + Deal Costs x .02 = Buyer's Product Cost

*       *       *

**Termination:**  User shall have the right to terminate this Agreement (i) upon breach by Provider of any term or condition of this Agreement, subject to the specific notice and cure provisions, if any, set forth herein; (ii) upon breach by Provider of any term or condition of the User Agreement, subject to specific notice and cure provisions set forth therein; or (iii) immediately upon breach by Provider of the Confidentiality Agreement.  Termination of this Agreement shall not relieve or release either Party from any liability incurred prior to the termination of the Agreement or the Confidentiality Agreement.

*       *       *

If Provider fails to meet the minimum service levels stated herein, or fails to provide services at or above the standard of the industry, User shall provide written notice of same to Provider.  If Provider fails to remedy such service problem to the satisfaction of User within ten (10) days thereafter, User shall have the right to terminate this Agreement immediately at such time.

**Miscellaneous:**   Provider and User each acknowledge that no representations, inducements, promises or agreements, oral or written, have been made by Provider or User, or anyone acting on behalf of Provider or User, which are not referenced or contained in this Agreement, and any prior agreements, promises, negotiations or representations with respect to the subject matter of this Agreement, whether written or oral, not expressly set forth in this Agreement are of no force or effect.  This Agreement may be amended or modified only by a writing signed by all parties to this Agreement.

15.    On February 11, 2008, Daryl Mills was deposed in this matter.  He was dispatched by Phillip Payment to negotiate the terms of the Service Agreement for WD prior to Payment's executing that document. Mr. Mills unequivocally testified that it was the intent of the Service Agreement to run all flip transactions through the Visagent exchange except for the exclusions as stated above in the Service Agreement which are limited to direct WD transactions with a) Victory for one year, b) WorldWide Retail Exchange and c) intesource, Inc. [3]

16.    On June 20, 2001, Mills sent a letter to all WINN-DIXIE's alternate source vendors publicly announcing WINN-DIXIE's decision to transition all of its secondary market business through Visagent's exchanges:

As part of WINN-DIXIE's continuing efforts to streamline operations and to better manage the Alternate Source Vendors, we have taken direct responsibility for the secondary procurement market.

---

[3] "Flip goods" is an industry term for goods bought and then re-sold in the same format and configuration as received from the manufacturer.. It is any quantity of goods. *See* Mills Dep. P. 111 L. 9 – P. 113 L. 15. (Exhibit "  25 ")

**WINN-DIXIE has retained the Visagent Corporation, an independent technology solutions provider, based in Jacksonville, to facilitate the end-to-end procurement of all flip goods that are purchased or sold on the secondary market.**

Effective June 29, 2001, all WINN-DIXIE flip transactions, will be facilitated through the anonymous, Internet based platform, known as VGE."

**Please do not phone, fax or E-mail WINN-DIXIE since the fundamental principle of the Exchange is anonymity.**

WINN-DIXIE's goal is to transact much more truckload business (Buying and selling) on the secondary market.

(Exhibit " 26 ":V 05558-05559) (emphasis added).

According to WINN-DIXIE'S corporate representative the intent of the letter was to advise diverters that in order to do business with WINN-DIXIE, they had to use Visagent's exchange. (Exhibit " 27 ": Deposition of WINN-DIXIE Corporate Representative – Barr, P. 194 L. 18 – P. 196 L.23)

17. This letter, created only five (5) days after the parties signed the Service Agreement contained no limiting language as to the goods to be bought and sold. Mills' intent was for **all** transactions from purchase order through delivery and receipt would be conducted through the exchange, regardless of truckload or less than truckload, and regardless what means the diverters wanted to use to communicate their orders. (Exhibit " 28 ": Deposition of Daryl W. Mills, P. 111 L. 9 – L.17]; P. 112 L. 14 – P. 113 L.15; P. 115 L. 1 – P. 116 L. 1)

18. With the Service Agreement signed, VISAGENT immediately worked to get WINN-DIXIE up and running on the exchange. Victory personnel were set up as Users, User training dates were scheduled and the VISAGENT website was updated with current events, news and information. (Exhibit " 29 ": V 08047-08048; V 07437-07438;

WD 25849) Meetings between the parties and presentations to WINN-DIXIE personnel continued. (Exhibit "30 ": V 012292-012293; WD 00255; WD 1004 V 08317; V 08154-08155 WD 29473-29492) WINN-DIXIE'S suggestions and comments were always given top priority. VISAGENT consistently provided a stellar service level. (Exhibit " 31 ": WD 28495) Visagent aggressively marketed the exchange and secured many users in a short period of time. See Exhibit 8, Affidavit of I. Mark Rubin.

19.     In keeping with the spirit of the Service Agreement, at an enormous cost Visagent added more services and tools for WINN-DIXIE, releasing enhancements as created, adding, software upgrades and customizing the program. (Exhibit " 32": V 07829; V 07445; V 07813-07814; V 07476; V 08182)   The 2.0 version of the program was launched in September, 2001.(Exhibit "33 ":   V 08154-08155; WD 00259; V 012291)   VISAGENT also installed  instant messaging for Tom Barr at WD.  (Exhibit " 34": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 50 L.18 –P. 51L. 8) Instant messaging is an internet communication tool which had not been used by WD before VISAGENT installed it on WD computers. VISAGENT discovered through production requests that Barr later used instant messaging to conduct trading of CPG in violation of the Service Agreement. See Exhibit 8, Affidavit of I. Mark Rubin.

20.     Mills was the proverbial cheerleader for the migration of all secondary WD business to Visagent exerting great efforts to insure success.  Rubin and Mills spoke regularly and Rubin voiced concerns about diverters who were not willing to join the exchange. (Exhibit "35 ": WD 0979)

21.     As expected, Barr received negative comments from WINN-DIXIE'S traditional diverting (alternate source) vendors regarding Visagent and the new way the

vendors were being forced to do business, however this resistance and push-back was not unexpected by either Visagent or Mills. See Exhibit 8, Affidavit of I. Mark Rubin.

22.    WD had every opportunity and right to negotiate any term it chose into the Service Agreement including threshold levels of diverter participation in the VISAGENT system or transaction volumes, or any other measuring stick it chose to employ to insure the system met the expectations of WD, but neither included or ever asked for such protective clauses in the Service Agreement. WD fully tested the system and was fully aware of its features, how easy or difficult the system was to use, and all other requirements of the system in terms, including escrow requirements for users, disclosure of product sourcing under certain circumstances, and all other points of potential resistance from diverters who would be required to enroll as Users in order to do business with WD through Visagent I-OPS. Furthermore, it is significant that the terms of the Service Agreement were negotiated over weeks during which time the WD Legal Department reviewed the terms of the Service Agreement, and made suggested amendments some of which were incorporated into the final version. See Exhibit 8, Affidavit of I. Mark Rubin.

23.    After discussions between Mills and VISAGENT regarding the diverter reaction, Mills instructed Victory's lead manager at WINN-DIXIE to send another message to all alternate source vendors.  In a letter dated September 21, 2001, on WINN-DIXIE letterhead, Carlson wrote:

> Recently, WINN-DIXIE asked all Diverter (s) to participate with other Diverter (s) using Visagent Corporation as a tool to offer and trade goods via the Internet.  This process is to replace the former method of faxes and numerous phone calls. Where most diverting companies have honored this request, a few have attempted to circumvent or disregard it.  This neglect of procedures is unacceptable.  We will have no choice but to completely

stop doing business with your company if you are currently conducting business in the following fashion:

> 1. Not posting with Visagent Corporation and instead calling to buy and/or sell product.
>
> 2. Calling to check on postings- either to inform us of your posting or to inquire if a posting belongs to WINN-DIXIE.
>
> 3. Calling frequently to chat or harassing our assistants in hopes of communicating with us directly.

Everyone has that hot item to buy and/or sell, when you take it upon yourself to continually call until you are able to corner one of us, you are risking permanently losing the ability to call on WINN-DIXIE for both you and your company.

(Exhibit " 36 ": WD 00260)

24.    Shortly after this letter was sent, Mills was "retired" by WINN-DIXIE. The circumstances surrounding Mills' retirement are murky. (Exhibit "37 ": Deposition of Philip Payment, P. 97L. 18 – P. 101 L. 3) Up until his retirement, Mills had no problem with the service level or technology provided by Visagent. (Exhibit "38 ": Deposition of Daryl W. Mills, P. 106  L. 21 – P. 107 L. 2)]

25.    After Mills left WINN-DIXIE, Barr was left to "interpret" the Service Agreement as he wished. Being part of the legacy structure the Visagent procurement model was designed to replace, and Barr being a personal friend and beneficiary of the largess of diverters, including Victory, Barr engaged in blatant violations of the Service Agreement.

26.    Barr testified in this matter that he never even read the Service Agreement until weeks or months after it was executed. (Exhibit " 39 ": Deposition of WD CR, P. 93 L. 4-23;, P. 161 L. 7-P. 162 L. 3) After Mills left the Procurement Department, Barr had

decided that things were not going to change in the diverting department at WINN-DIXIE.

27. Ed Mieskoski was hired by Phil Payment to replace Mills in October 2001 and only had a couple of day's transition time with Mills before he departed. (Exhibit " 40 ": Deposition of Daryl W. Mills, P. 19 L. 24 – P. 20 L. 11; P. 106 L. 3 – L. 18; Deposition of Edmund Mieskoski, P. 17 L. 4 –L. =6: P. 18 L. 1 – L. 23; P. 35 L. 5 – L. 6) Mieskoski reported to Payment, who in turn reported to Dan Lefever. (Exhibit " 41 ": Deposition of Edmund Mieskoski, P. 17 L. 21 – P. 18 L. 14)   Barr, Mike Nixon and Gates reported directly to Mieskoski. (Exhibit " 42 ": Deposition of Edmund Mieskoski, P. 19 L. 18 – P. 23 L. 19)

28. Mieskoski was not told by Payment to do anything different in the Visagent project than had been done by Mills. (Exhibit 43 Deposition of Edmund Mieskoski, P. 35 L. 9 – L. 12) Upon assuming this position, he culled information on all programs from his direct reports, i.e. Barr, but no one gave him the history of the WINN-DIXIE/VISAGENT alliance. Exhibit 44 Deposition of Edmund Mieskoski, P. 26 L. 1 – L. 18; P. 28 – L. 9 – L. 13) However, only a week after he started at his new position, he seems to have acquired a bias against the viability of the Visagent project. In an e-mail between Barr and Mieskoski on October 7, 2001, Barr advised that he had posted 41 trucks of Purina and paper on the exchange to which Mieskoski opined "want to take bets on how much is sold." Id Ex 45 (V 07930)

29. Acting proactively, Rubin wrote an e-mail to Mieskoski on December 10, 2001 with the subject line "WD/Visagent Status Report" and set forth a litany of projects that were suffering from inattention. (Exhibit " 46 ": WD 1082-1083) Among the issues

Rubin addressed to Mieskoski were, "There have been no postings by WD on the Grocery Exchange in the last 4 weeks. You can't sell if you don't Post. Likewise, despite significant savings buy opportunities, 0 buys by WD in the last 3 weeks. We have had record postings in this period of time from other Users. There are a number of deals that would have worked for WD. … We are seeing numerous savings opportunities that are not being taken advantage of by WD. ... "we have leveraged a significant part of our business on the WD relationship. We provided excellent service..." Id.  Rubin repeatedly voiced concern to Mieskoski about circumvention of VISAGENT's  exchange by WD and Victory on behalf of WD. (Exhibit " 47 ": WD 1046)

30.    The Visagent initiative was not a top priority for Mieskoski.  His first meeting with Visagent was around Nov 1, 2001. (Exhibit " 48 ": Deposition of Edmund Mieskoski, P. 35 L.15 – P. 36 L. 11; P. 54 L. 3 – L. 25; V 07803) He understood the Visagent program was a new model to replace the Victory model of in-house diverting. (Exhibit " 49": Deposition of Edmund Mieskoski, P.27 L. 2 – P. 28 lL. 6) Mieskoski saw no functional difference between the Victory program and the Visagent program. (Exhibit " 50 ": Deposition of Edmund Mieskoski, P. 138 L. 5 – L.16; P. 143 L. 4 – L. 11)  He further understood that WINN-DIXIE had made a commitment to use the model and that Visagent, in turn, had made a substantial financial commitment to fulfill the requirements of the Service Agreement to WINN-DIXIE. (Exhibit " 51 ": Deposition of Edmund Mieskoski, P. 33 L. 22 – P.34 L. 8) It was WINN-DIXIE'S intention to get as much offered on the exchange as technically feasible. (Exhibit "52 ": Deposition of Edmund Mieskoski, P. 53 L. 22 – P. 54 L. 2)

31.     During Mieskoski's tenure (October 2001 to June 2003), Visagent constantly came up with new approaches to facilitate WINN-DIXIE'S trading needs. (Exhibit " 53 ": Deposition of Edmund Mieskoski, P. 120 L. 20 – P. 121 L. 7) VISAGENT was responsive to all of WINN-DIXIE'S requests, attentive to their comments and followed up after meetings.  (Exhibit " 54 ": Deposition of Edmund Mieskoski, P. 93 L. 16 – L. 19) They were doing everything possible to meet WINN-DIXIE'S needs, provided excellent services and WINN-DIXIE never considered VISAGENT to be in breach of the Service Agreement. (Exhibit " 55 ": Deposition of Edmund Mieskoski, P.61 L. 4 – L.14; P. 751 L. 1 – P. 77 L. 22; Deposition of Edmund Mieskoski, P. 64 L. 24 – P. 65 L. 3) The only criticism was the lack of volume. ( Exhibit " 56 ": Deposition of Edmund Mieskoski , P. 145L. 20 –P. 146 L. 12)

32.     However, Mieskoski was well aware that WINN-DIXIE was the first big retailer on the exchange and their participation was necessary to build critical mass. Citation? Both he and VISAGENT expressed frustration at the volume level. His solution was to tell Barr to post everything that was available to be posted on the exchange, but he did not know if Barr did so.  (Exhibit "57  ": Deposition of Edmund Mieskoski, P. 62 L. 19 – P. 64 L. 22: P. 70 L. 4 – L. 18)  Barr would post items when prompted by Mieskoski and then complain to him that the exchange did not have enough action. (Exhibit "  58": V 011636) Every time, Rubin complained, Barr posted items on the exchange that were not "good movers" so he could say he was using the system. *See* Exhibit 8 He also did not believe that truckloads and less than truckloads were distinguishable for purposes of posting on the Visagent Exchange. (Exhibit " 59 ": Deposition of Edmund Mieskoski, P. 68 L. 23 – P. 69 L. 3)     Barr never told Mieskoski that he was only posting full

truckloads on the exchange.  (Exhibit "60 ":  Deposition of Edmund Mieskoski, P. 59 L. 1 – L. 7)

33.     At some point, Mieskoski sought out the advice of in-house counsel, Patricia Mitchell, Esq., on the exclusivity provision of the contract.  (Exhibit "61 ": Deposition of Edmund Mieskoski, P. 38 L. 5 – L. 11)   After meetings with attorneys, Mieskoski was not aware of **any** exclusion to the Visagent contract.  (Exhibit " 62 ": Deposition of Edmund Mieskoski, P.  57 L. 19 – P. 58 L. 7)

34.     The following are only a selected number of instances which show a constant and continuous pattern by Tom Barr sending offers to buy or sell CPG in full or truckload quantities by email, which is without question "through the internet or similar electronic means"

5-12-2003       e-mail offers to Purity (diverter) (PUR 0272-0273)

5-16-2003       e-mails to diverters with deal files. (WD 00003; PUR 0256)

5-22-2003       e-mails to diverters with deal files. (WD 00006; PUR 0251)

6-16-2003       e-mails to diverters with deal files. (WD 00007; PUR 0229)

7-2-2003        e-mails to diverters with deal files. (WD 00008) (PUR 0110)

7-15-2003       e-mails to diverters with deal files. (PUR 0202)

7-28-2003       e-mails to diverters with deal files. (PUR 0106-0108)

8-7-2003        e-mails to diverters with deal files (PUR 0199; WD 00013)

9-2-2003        e-mails to diverters with deal files (PUR 0196; WD 00014)

1-19-2004       email to diverters by Barr (PUR0176-7; WD 00045) (excel spread sheet attached to the email.)  (Cumulative Exhibit " 63 ")  The language of the email notes the sheets indicate list and sell prices, that there is availability "in several DC's", indicating

several distribution centers have excess inventory. Clearly a large quantity is being offered for sale.  The email suggests calling Barr or Bob Carlson rather than transacting the business through VISAGENT.[4]

Barr admitted in deposition that these kinds of emails he sent were sent to diverters with the intent to sell product outside of the Visagent Grocery Exchange (VGE). (Exhibit " 64": Deposition of WINN-DIXIE Corporate Representative-Barr, P. 99 L. 17 – P. 101 L. 5) Barr admitted that he sent these sheets with excel attachments through the internet. Exhibit " 65": (Id. at P. 96 L. 20 – P. 97 L.6; P. 97 L. 17 – L. 25]

35.   Additionally, Bob Carlson, on behalf of WD sent offers via email as established by documents subpoenaed from Purity Wholesale Brokers (6-26-2002 Carlson sent a WINN-DIXIE quote sheet to Purity). Exhibit "66 ": (PUR 0111)

36.   Visagent put forth enormous efforts to convince Barr to use the VGE, even suggesting supplying a VISAGENT employee to do all of Barr's postings to the exchange and to give him a daily recap (Exhibit " 67 ": WD 29439-29440; WD 29439-29440) an offering assistance in suggesting what to post, how to post and pricing. (Exhibit " 68 ": V 07827-07828)

37.   Despite the existence of the Service Agreement, during the first year of the contract, Payment decided the exchange was not working to WD's satisfaction and decided to "explore other diverting options."  Payment had no personal knowledge of any flaws in the system and never saw any of the information supporting the contention that the "tool" was

---

[4] WD produced no such spreadsheets to VISAGENT in discovery – the spreadsheets should be available as historical documents of WD, but were not produced and WD has provided no explanation why these spreadsheets are apparently missing.

not working. (Exhibit " 69 ":Deposition of Philip Payment,  P.20 L. 24 – P. 123 L. 17; P. 51 L. 9 – L. 24): P. 72 – L. 22- P. 73 L. 9)

38.    Unknown and unannounced to VISAGENT, WINN-DIXIE changed its direction from an independent-based sales and acquisition business process model (the VISAGENT business process) back to the in-house diverting model where sales and acquisition was managed by Victory. On February 7, 2002, five months prior to the expiration of initial Victory Contract, Victory sent a letter to Mieskoski at WINN-DIXIE suggesting a new agreement after expiration of that contract. (Exhibit "70 ": VWG 1000486-1000489) The proposal without question indicates Victory's NTS trading system, which was purported to be state of the art technology, was centered around conducting eCommerce "through the internet or similar electronic means".  The proposal stated,

> Victory will provide your corporate diverting department a license and access to Victory's proprietary Network Trading System (NTS). The NTS system will include all computer hardware necessary to run it and any data connections necessary to connect our on-site associates with the Victory/NTS central office location; The NTS modules provided will include full item comparison functionality, AUTOBUY processing, nationwide pricing and reporting modules. Victory will maintain and customize the NTS, as we mutually agree necessary to fit Winn-Dixie's specific and changing needs. This includes tuning and customizing the software to implement specific programs such as the creation of an inter-divisional diverting program …

It went on to state, "Victory will provide an NTS licenses (sic) to any WD associate who has and (sic) Internet connected PC.  This will allow WD associates to evaluate nationwide manufacturer deal information, monitor nationwide diverter pricing, analyze manufacturer non-divert programs and will permit WD to independently evaluate corporate diversion activity by using the NTS reporting module." In return, WD had to provide Victory with

access to WD's information and data systems in order to maintain master NTS electronic files. Id.

39.     One week later, Victory sent a letter to Mieskoski stating "...during the week of February 25 - March 1 (2002), Victory contracted with a diversion industry systems specialist, Fred MacDowell, to go on-site and review all aspects of the diversion operation at WD. The goal of this review was to insure that the NTS was being maximized in terms of features and efficiency and to meet directly with Tom Barr to review all aspects and features of the NTS and to determine what additional modifications were needed by WD.  …. From this process review, came 38 specific software change requests, some large and complex and some relatively simple. These requests fell into the following general categories: Increased efficiency and interfacing of diverting operations (20 items), Tom's specific change requests, which came as a result of Tom's analysis/comparison of NTS and other diverting software (5 items), Improved-Direct Load support for both inbound direct-load purchases as well as maximizing outbound flip-load opportunities (8 items) …. In addition to the above, we confirmed the integration of NTS with Biceps will be fairly seamless..... (Exhibit " 71 ": VWG 1000484-1000485).

40.     These statements clearly indicate the following points important to the Court's analysis. First, the systems specialist, Mr. MacDowell, had reviewed use of Victory's NTS, an electronic eCommerce trading tool, as the NTS was then currently operating at WD. Next, MacDowell was making suggestions as to how the NTS could be improved specifically for use in the WD Diverting Department, and those suggestions were directed to "interfacing of

diverting operations" at WD[5], support for inbound (buying) and outbound (selling) opportunities, and integration of NTS and Biceps[6].

41.    Unaware that WD was proceeding in a direction in violation of the terms and the spirit of the Service Agreement, VISAGENT continued to work tirelessly to meet WINN-DIXIE'S needs. All parties to the Service Agreement were cognizant that WINN-DIXIE was the flagship user for the Exchange and their full participation was necessary to create the volume necessary to make the exchange viable. See Exhibit 8, Affidavit of I. Mark Rubin.

42.    Through discovery in this matter, Visagent has uncovered that during its 2002 search for an in-house diverter, WD solicited a proposal to manage its diverting operation. Victory responded by comparing itself to the competition and touting the e-commerce capabilities of the company and the NTS.  (Exhibit "72 ": VWG 1000458-1000472)  On May 9, 2002, WD traveled to Victory's headquarters in Springboro, Ohio for a meeting. Victory took this opportunity to distinguish itself from Visagent in a speech given by Victory management:

> The NTS was developed to work with the Internet to create a massive alternate sourcing Exchange, in which any Diverter could place Offers and those Offers could be analyzed by our customers in an extremely simple and efficient manner. It does not attempt to hide sources, thus cutting off the customer from the actual source of the product. Another key aspect of the System is that it is 100% free to participate.  There are no fees to diverters or customers.  Victory does not collect a per transaction fees to facilitate a trade.

---

[5] Interface in the context of computers is defined as "equipment or programs designed to communicate information from one system of computing devices or programs to another. b. any arrangement for such communication." Dictionary.com 1/11/2010. See attached Exhibit 74

[6] Biceps was WD's "actual procurement system that the buyers would use on a daily basis to create orders for -- from our suppliers to replenish the warehouses."

(Exhibit " 73 ": VWG 1000490; VWG 1000475-1000483) In this presentation, Victory claimed that 75 diverters submit a total of 650,000 items for sale everyday and discussed AUTOBUY[7], a feature of the NTS software.

Victory's CIO acknowledged that the NTS Purchases Module description published on its website by Victory in December 2000 described the capability of the system to handle "orders" for its customers; "once orders are created, they can be automatically distributed to diverters and/or other divisions by simply using the auto faxing or auto transmit function." Mr. Kresser claimed at deposition that this description was not completely accurate, that it should have read "pro forma orders." (Exhibit " 75 ": Deposition of Michael. Kresser, P. 71 L. 9- P. 72 L. 1)

Out of the May 9, 2002 meeting, Victory wrote a Memo, which, is clearly written to be distributed to WD as a recap of the prior months discussions and thoughts about NTS enhancements to the system then used at the WD Diverting Department. (Exhibit " 76 ": VWG 1000472-1000474) This memo even more clearly and conclusively shows how WD buying and selling is being conducted through the NTS at all levels of the transaction, from supply and demand analysis to price comparisons to suggesting trades to making actual trade decisions to tracking of trades and status of product pick-up and delivery. And further that all of these functions which are steps in the progression of a trade are being conducted "through the internet or similar electronic means". The Memo also contains a smoking gun of sorts, as

---

[7] Autobuy is "a set of computer programs that analyzed the customer's needs, customer pricing, analyzed source offerings and pricing, and utilizing a set of rules defined by the customer, attempted to create recommended buys programmatically which could be confirmed by phone, fax or e-mail. (Exhibit " 78 ":Dep. Kresser P. 40 L. 2- L. 24) Victory's brochures on the NTS boasted additional internet and electronic data functionality such as Item Review Module, Offer Review Module, Purchases Module, Quotes Module, Reporting Modules, Accrual/Rebate Processing Module, System Setup and Definition Module and Diverter Coordinator Support Functions Module. Id. at P. 71.

it even reveals that WD disclosed the legal impediment to entering into a new contract with Victory caused by the existence of the Service Agreement ("We understand that there are contractual issues surrounding this, but we still may be able to help you analyze these items and take advantage of the systems built into NTS....." -- referring to the inefficiencies of manually reviewing offers submitted by fax or email).[8]

43.     Presumably WD was concerned about its contract with Visagent but not enough to keep it from ultimately signing a new agreement with Victory anyway.  Below are relevant excerpts from the Memo:

INTEGRATION

We have also spent a lot of time reviewing the integration process in an attempt to **seamlessly interface the NTS System and personnel with the WD buying System.**

**It probably comes as no surprise to you that one of the largest inefficiencies we found in the process was the manual review of offers submitted via fax or E-mail. ..... We understand that there are contractual issues surrounding this, but we still may be able to help you analyze these items and take advantage of the systems built into NTS**.....As far as increasing the efficiency of quoting product for outbound sale, we are currently **moving the Quoting module to the web based screen** so that product identified as an outbound opportunity can be quickly and easily conveyed to the trade....

NTS WEB

We have completely rewritten the NTS Item Analyzer...."

Id.: VWG 1000472-1000474) From these passages, it is clear the NTS was a web based system, like Visagent's VGE as of the date of this Memo.

---

[8] This Memo was at least partially written by Michael J. Kresser, Victory's Chief Information Officer, (Exhibit " 78 ": Kresser Dep. P.145 L.23- p. 146 L. 23) Obviously Victory, which managed all WD diverting for the entire period of the Service Agreement considered fax and email as "similar electronic means" of receiving offers from diverters.

44.     On June 22, 2002, in direct violation of the Service Contract, WINN-DIXIE signed a contract with Victory for the continued use of Victory's NTS eCommerce system to facilitate the procurement of CPG goods. ("Victory Contract Number 2") (Exhibit "79  ": V05687-5690).   The terms were essentially the same as the previous contract although the NTS system was clearly advancing technologically and was even more web-based.

45.     WINN-DIXIE'S   corporate   representative   reluctantly   conceded   that Victory was an internet-based platform (Exhibit "80  ": Deposition of WINN-DIXIE Corporate Representative-Barr P. 186 L. 24 – P. 188 L. 19) and that VISAGENT was providing the same services as set forth in the Victory contract. (Exhibit " 81 ": Id P. 188 L. 20 –P. 189 L. 10)   Payment testified that he signed the contract with Victory because VISAGENT just did not work. (Exhibit " 82 ": Deposition of Philip Payment, P. 113 L. 10 – L. 14)  WINN-DIXIE never declared Visagent in breach of contract.  (Exhibit "83 ": Id. P. 113 L. 15 – P. 115 L. 9) Once Victory received this contract and knew it need not trade through the VGE for any of the CPG business it managed for WD, Victory thereafter canceled its own VGE User Agreement, as previously required by WD, and no longer was a User of the Visagent system for any trading. (Exhibit " 84": WD2 9264)

46.     WD shared it's perception that it had a legal problem associated with the Service Agreement with another diverter. In November 2002, after an October visit to WD where it presented its pitch to be the next potential WD in-house diver, Food Marketing Group (FMG), wrote, "Joe and I are very anxious to find a solution to the **contract challenge** (emphasis added) which you described to us allowing our companies to move forward to optimize your trading opportunities and shift your focus to the total

pursuit of lowest costs..." (Exhibit "85 ": V 012256-012257).  Some time later after an apparent scenario where FMG would get the business if WD would indemnify FMG against presumably a tortious interference claim by Visagent, FMG followed up with an e-mail to Ed Mieskoski on February 20, 2003 with the message, "I thought I would drop you a note to see if you have a response from legal on our request to indemnify?" (Exhibit " 86 ": V09947-09948)  Mieskoski responded that Lefever (Mr. Payment's boss) would review with legal. (Exhibit " 87 ": V 10236-1024; Deposition of Edmund Mieskoski, P. 127 L. 19 – P. 129 L. 13; P. 130 L. 21 – P. 131 L. 14)

47.    Sometime in late March, Rubin and Mieskoski met.  As a follow up to that meeting, Mieskoski sent an e-mail to Rubin asking for the elimination of the exclusivity provisions of the contract.  (Exhibit " 87 ": WD 00329) Obviously, WD believed it was obligated to VISAGENT on an exclusive basis for the provision of some part of its business, and not, as the WD corporate Representative testified, that WD's only obligation was to try to help make the Visagent system work.

48.    Meanwhile, Carlson continued to solicit selling product via emails. These solicitations resulted in actual deals between WINN-DIXIE and Purity.  On October 8, 2003, Carlson forwarded a quote sheet to the diverting community. Robert Horick, from Purity made a purchase from the sheet. (Exhibit "89 ": PUR 0102-0105) On November 28, 2003, Carlson sent out a quote sheet and Horick replied that he would "take it all." (Exhibit " 90": PUR 0097-0100)  On December 3, 2003, there appears to be yet another deal. (Exhibit " 91 ": PUR 0089-0095)  On February 3, 2004, Horick made seven (7) deals from a single quote sheet. (Exhibit " 92 ": PUR 0070-0081) and purchased two

trucks of paper products. (Exhibit " 93": PUR 0031-0034) On February 26, 2004, he made another three (3) deals. (Exhibit " 94": PUR 0067)

49.    On October 13, 2003, October 27, 2003 and December 8, 2003 Barr sent other like e-mails to the diverters:    "Attached are Offers that may be available in Full and/or LTL loads.  Please call..." (Exhibit " 95 ": WD 00026; WD 00034: WD 00036)  At his deposition, Barr confirmed that he sent this e-mal out to diverters using the internet to sell product outside of the Visagent Grocery Exchange. (Exhibit " 96 ": Deposition OF WINN-DIXIE Corporate Representative-Barr, P. 99 L. 17 – P. 101 L. 5; P. 101 L. 7 – P. 102 L. 6; P. 102 L. 8 – L. 21)

50.    In the discovery process, VISAGENT has found literally thousands of transactions that were conducted using the internet for truckloads of goods sold by WINN-DIXIE. On April 1, 2003, Carlson sent the following e-mail to WINN-DIXIE personnel:  Outbound Sales Opportunity:  "We sold a truck of Crisco to Victory WD PO# 022-69759.....I will contact you when WD receives payment for this product in order for you to release for shipment." (Exhibit " 97 ": PO 69759)  On the same day, he sold full trucks of Crisco, Stouffers and Post Cereal and sent e-mails to that effect. (Exhibit "98  ": PO 68982; PO 86286: PO 13732 & 13733; PO 14061; PO 13828 & 13827)  Typically, each e-mail would be followed with a wire confirmation and release sent by e-mail. These transactions are merely illustrative and not exhaustive.[9]

51.    On June 27, 2004, the Service Agreement expired by its own terms. About one month later, Visagent ceased operations. See Exhibit 8, Affidavit of I. Mark Rubin.

---

[9] VISAGENT expects to make a more comprehensive analysis through additional discovery efforts to determine if WD records are complete enough to accurately determine the true damages in this matter.

## APPLICABLE LAW AND ARGUMENT

### The standard of review

52.     Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Beal v. Paramount Pictures Corp., 20 F.3d 454, 458 (11th Cir. 1994). The purpose of summary judgment is to dispose of unsupported claims or defenses which, as a matter of law, do not raise issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Which facts are material depends on the substantive law applicable to the case. Harvey v. Lake Buena Vista Resort, LLC, 568 F.Supp2d 1354 (M.D. Fla., 2008) An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action. Anderson, 477 U.S. at 248.

53.     The party moving for summary judgment bears the initial burden of demonstrating to the Court "by reference to materials on file, that there is no genuine issue of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.604, 608 (11th Cir.1991); Watson v. Adecco Employment Service, Inc., 252 F.Supp.2d. 1347. 1352 (M.D.Fla. 2003) The movant may meet this standard by presenting evidence demonstrating the absence of a dispute of material fact, or by showing that the nonmoving party has not presented evidence in support of an element of its case which it bears the burden of proof.    Ceoltex, 477 U.S. at 322-323. A court "must draw all

reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-150 (2000) (discussing standard for granting judgment as a matter of law under Fed.R.Civ.P. 50, which mirrors the standard for granting summary judgment under Rule 56); Hinson v. Clinch County Bd. of Educ., 231 F.3d 821, 826-27 (11th Cir.2000). The Court considers the entire record, but must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves, 530 U.S. at 151: Hinson, 231 F. 3d at 827.

54.     Once the moving party has met its burden, the burden shifts to the non-moving party to show that there is a material issue of fact that precludes summary judgment. Clark, 929 F.2d at 608. The non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts, through affidavits or other forms of evidence provided for by the rules. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir., 1990); see also Anderson, 477 U.S. at 249-250 (if the evidence advanced by the moving party "is merely colorable, or is not significantly probative, summary judgment may be granted"); Matusushita Electronic Industrial Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986) (the non-moving party "must do mote than simply show that there is some metaphysical doubt as to the material facts')

55.     "[T]he inquiry is whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. A genuine issue of material fact exists where there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.  Haves v. City of Miami, 52 F. 3d 918, 921 (11th Cir. 1995). An issue of fact is genuine only if a reasonable if the trier of fact, considering the evidence presented could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-51, 106 S.Ct 2505, 91 L.Ed2d 202 (1986) The court's focus in ruling on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a  matter of law." Anderson, 477 U.S. at 252; Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

**THE SERVICE AGREEMENT ENTERED INTO BETWEEN
WINN-DIXIE AND VISAGENT IS A BINDING AND VALID CONTRACT**

56.     A valid contract is created where there is an offer, acceptance of the offer, consideration for the offer and acceptance and a meeting of the minds. Med-Star Cent., v. Psychiatric Hospitals of Hernando County, 639 So. 2d 636 (Fla. 5th DCA 1994). Jerome v. William A. Reid Const. Ltd., 307 So. 2d 248, 252 (Fla. 4th DCA 1975). Groff Const., Inc. v. American Pride Building Co., LLC., 2007 WL 495316 (M.D.Fla.,2007). VISAGENT tendered an offer to WINN-DIXIE, and after a lengthy and exhaustive "vetting" process and test period, the offer was accepted by WINN-DIXIE in the form of

the Service Agreement, dated June 15, 2001.  It is conceded by WINN-DIXIE that the Service Agreement was entered into after it conducted a due diligence period and had a full opportunity to test the technology and services to be provided.  The Service Agreement itself acknowledges same. ("Services" section) There is no allegation that the contract was entered into under coercion or duress or that Payment was not authorized to execute the Service Agreement with the authority to bind WINN-DIXIE to the terms. There is also no contention that there is any written complaint about the quality or level of service by VISAGENT during the term of the Service Agreement.

57.    It is for this Court to determine whether "there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract." Mehler v. Huston, 57 So.2d 836, 837 (Fla.1952). In deciding whether there has been a meeting of the minds, courts look not to "'the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties having meant the same thing but on their having said the same thing.' " Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974) (citation omitted). As recognized in Blackhawk Heating & Plumbing Co., 302 So.2d at 408:

"Even though all details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." 17 C.J.S. Contracts § 31.

There is no question that VISAGENT and WINN-DIXIE had a meeting of the minds to enter into the Service Agreement.

**THE LANGUAGE OF THE SERVICE AGREEMENT IS CLEAR AND
UNAMBIGUOUS  AND THERE IS NO GENUINE ISSUE OF FACT AS TO THE
INTERPRETATION.**

58.     The Service Agreement contains the following section:

**Scope of this Agreement:** This Agreement is intended to cover all of
User's business transactions for full or truckload quantities of consumer packaged
goods purchased or resold **[through the Internet or similar electronic means]**
in a wholesale format, excluding purchases by User from the original
manufacturer or its authorized representatives.  For the Term of this Agreement,
User will not employ or contract for the services of an entity other than Provider
for its E-commerce transactions covered under the scope of this Agreement.

Emphasis in original.

59.     "Where the determination of the issues of a lawsuit depends upon the
construction of a written instrument and the legal effect to be drawn therefrom, the
question at issue is essentially one of law only and determinable by entry of summary
judgment." Angell v. Don Jones Ins. Agency, Inc., 620 So.2d 1012, 1014 (Fla. 2d DCA
1993).     Where the language is unambiguous, the construction of the contract is a
question of law and may be resolved summarily. Gray v. D & J Indus. Inc., 875 So.2d
683, 683 (Fla. 3d DCA 2004);  Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354,
1360 (11th Cir. 1988).

60.     Under Florida law, it is well settled that "when the terms of a voluntary
contract are clear and unambiguous, ... the contracting parties are bound by those terms,
and a court is powerless to rewrite the contract to make it more reasonable or
advantageous for one of the contracting parties." Emergency Assocs. of Tampa, P.A. v.
Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995). Where the words of a contract are
clear and definite, they must be understood according to their ordinary meaning.
Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc., 609 So.2d 66, 68

(Fla. 4th DCA_1992). Thus, Florida law supports the obvious proposition that the terms of a contract control a court's interpretation.  Barnes v. Diamond Aircraft Industries, Inc., 499 F. Supp 2d 1311, 1317 (S.D. Fla. 2007).  However, it is settled law in Florida that a court may resort to the process of interpretation only when the words used in a contract are unclear.  Board of Public Instruction of Dade County v. Fred Howland, Inc., 243 So.2d 221 (Fla.3d DCA 1971).  The ambiguity must exist on the face of the document itself before extrinsic matters may be considered by the court.  Gulf Cities Gas Corp. v. Tangelo Park Service Company, 253 So.2d 744 (Fla.4th DCA 1971).

61.    Contractual language must be read to have the plain meaning of the words used and the Court is bound by the plain meaning of those words., Marx v Clear Channel, 887 So.2d 405 (Fla. 4th DCA 2004). The Court may not change the terms of a contract to achieve what it might think is a more appropriate result. Rosenstein v Rosenstein, 976 So.2d 1148, 1149 (Fla. 4th DCA 2008). Under Florida law, the court's function in interpreting and enforcing a contract is to determine the parties' intent from the express test of the contract, not the other was around.  Financial Healthcare Associates, Inc. v. Public Health Trust of Miami-Dade County, 488 F.Supp.2d, 1231, 1239 (S.D. Fla.2007).

62.    The language used in a contract is the best evidence of the intent and meaning of the parties.  Moore v. Chodorow, 925 So.2d 457, 461 (Fla. App. 4th DCA 2006) "It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties, where contracts are clear and unambiguous, they should be construed as written and the court can give them no other meaning." Khosrow Maleki, P.A. v. MA Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. App. 4th DCA, 2000) Further, where the terms are unambiguous, the parties' intent must be discerned from the

four corners of the document. <u>Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank,</u> 468 So.2d 399, 405 (Fla. 4th DCA), rev. denied, 480 So.2d 1295 (Fla.1985). On the other hand, "[w]hen a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." <u>Bacardi v. Bacardi,</u> 386 So.2d 1201, 1203 (Fla. 3d DCA 1980).

63.    The language of the Service Agreement plainly states that **all** of WINN-DIXIE'S business transactions in the secondary market for full or truckload sales or purchases using the internet or similar electronic means would be conducted through the Visagent Grocery Exchange. The key players who participated in the negotiation of the Service Agreement on the WINN-DIXIE side --- Mills and Payment ---definitively stated that the Service Agreement's expanse was that of **all** of WINN-DIXIE'S business, except for those transactions specifically excluded[10].    Payment, who signed the Service Agreement, expressly stated that had the system worked, i.e. had it acquired sufficient critical mass, WINN-DIXIE was obligated to use it exclusively. (Deposition of Philip Payment, P. 117 L. 14 – P. 118 L. 4) (Mieskoski, Mills successor, agreed.  Deposition of Edmund Mieskoski, P. 102 L. 10 – P. 104 L. 22

64.    WINN-DIXIE'S corporate representative, Barr, testified that the VISAGENT system was only a "tool" to be used at WINN-DIXIE'S discretion, only for

---

[10] Those exclusions are set forth separately the Service Agreement and excluded only: product movement between WD distribution centers, direct WD purchases for less than full or truckload quantities obtained from wholesaler inventories if such wholesalers were providing in-stock data transmissions to WD on the date of the Service Agreement (Counsel for WD has represented that there are no documents evidencing such transmissions to WD.), direct transactions between WD and Victory up through and including July 1, 2002, and direct purchases with the WWRE and intesource, Inc.

truckloads, and only when WINN-DIXIE chose an internet portal to transact business. (Deposition of WINN-DIXIE Corporate Representative-Barr P. 94 L. 8 – P. 95 L. 7) This interpretation belies credibility and reason. WD sought to relieve itself of the exclusivity provisions in communications between Mieskowski and Rubin. WD advised Victory and FMG it had "contractual challenges" to entering into another contract for an ecommerce procurement system. Mills and Payment conceded in depositions that the Service Agreement bound WD to use Visagent for all purchases except the specific exclusions.

65.    The wording of the section "Scope of the Agreement" is unambiguous. It is intended to cover "all business transactions for full or truckload quantities of consumer packaged goods…." The word "all" means every. The words "full or truckload quantities" have been in contention between the parties. VISAGENT avers that the agreement contemplated all commercially viable truckloads and is not limited to just "full" trucks. WINN-DIXIE contends that the agreement only meant to cover full trucks. This disagreement does not affect this Court's ability to find in VISAGENT'S favor on this motion, because whether there is or is not a distinction between full or truckload goes solely to the amount of damages, not whether there was a breach. Taking WINN-DIXIE'S position as correct *ad arguendo*[11], if VISAGENT can prove that there were truckloads using WD's definition of goods sold outside of the Exchange, other than in the exempted parameters, WINN-DIXIE has breached the contract and is liable for damages. The amount of damages would be contingent on the Court's ruling on the contextual

---

[11] VISAGENT addresses *infra*  why WD's position that "truckload" is the same as "full truck" and that a truck full of mixed orders is not a "truckload" or a "full truck" makes no logical or practical sense, and is conceded by WD's own shipping industry expert in the section entitled *WINN-DIXIE BOUGHT AND SOLD "TRUCKLOADS' OUTSIDE THE VISAGENT EXCHANGE IN VIOLATION OF THE SERVICE AGREEMENT AS CONFIRMED BY WINN-DIXIE'S OWN EXPERT*

meaning of the phrase "full or truckload quantities" in the damages phase of the trial.

66.     The phrase "….all of User's business transactions ….. *purchased or resold through the Internet or similar electronic means*" is also plain.  The Internet is a global system of interconnected computer networks that use the standard Internet Protocol Suite (TCP/IP) to serve billions of users worldwide. According to Gary Klingerman, WINN-DIXIE'S Senior Manager of Platform Engineering, e-mail travels through the internet. (Exhibit " 101 ": Deposition of Gary Klingerman, P. 72 L. 11 – P. 73 L. 4)  WINN-DIXIE'S Corporate Representative (Barr) repeatedly agreed that by sending e-mail the internet is being utilized. (Exhibit "  102": Continued Deposition of WINN-DIXIE Corporate Representative- Barr, P. 26 L. 18 – L. 21)  Rubin testified that "[T]he Internet or similar electronic means, that's what it means, one, the  Internet, and similar electronic means is anything that's electronic that substitutes for a laundry list of items that could be electronically transmitted.  Because the Internet is a conduit for transmission of information electronically.  So electronically if there's anything that's like the Internet that's electronic such as a fax, an e-mail, EDI, FTP, XML, those kinds of things." (Exhibit " 103 ":  Deposition of VISAGENT Corporate Representative, P. 173 L. 19 – P. 174 L. 9)  Accordingly, this phrase means essentially the same to the parties. Further still, it is conceded by Victory's Chief Information Officer in charge of development of the NTS, Michael Kresser, that the NTS, which was used in every phase of the buying of CPG by Victory for WD, is web-based, and uses electronic means similar to the internet to match and suggest products to buy, was used to track the purchase orders for all WD purchases of CPG during the entire term of the Service Agreement, was used to print the purchase orders and was not only connected to WD computers by a "tunnel through the

internet", but was installed on the computers of WD buyers, including Tom Barr. WD may argue that the actual buy or sell order was only faxed to WD, and was never received electronically via computer.   This argument fails for several reasons.   First, the transaction is more than just an actual order. An order cannot be completed successfully without all of the phases of the transaction both before and after the actual order as illustrated supra pp. 19-11. Virtually all of the other phases of the transaction involved use of the NTS which is an internet based system. Second, even faxes are similar electronic means to the internet. Both are electronic. Both send messages. Both translate the message to data, communicate the data over transmission lines, and reconstitutes the data as a message; computer to a screen and fax to either a computer screen or paper. Third, numerous emails from WD soliciting CPG transactions and emails responding with purchases have been submitted as exhibits to this Motion. Those are clearly through the internet, and that fact has been admitted by Barr as the WD corporate representative.

67.     By all account, the Network Trading System was internet based. (Exhibit " 104": Deposition of Robert Carlson, P. 53 L. 20 – P. 54 L. 8; Deposition of  WINN-DIXIE Corporate Representative-Gates, P. 71 L. 3 – 72 L. 2; Deposition of WINN-DIXIE Corporate Representative-Barr, P. 183 L. 9 – P.185 L. 5).    According to WINN-DIXIE, the NTS performed many of the same tasks as the VISAGENT system (Exhibit " 105 ": Deposition of WINN-DIXIE Corporate Representative-Gates, P. 58 L. 20 – P. 60 L. 2; Deposition of WINN-DIXIE Corporate representative-Barr, P. 188 L. 20 – P. 189 L. 10).

68.     The next word in the Service Agreement which describes the scope of the agreement is "e-commerce."  A basic definition is commerce conducted electronically (as

on the internet).   Klingerman agreed stating that e-commerce is "doing business over electronic means".  (Exhibit "106 ": Deposition of Gary Klingerman, P. 71 L. 18 – P. 72 L. 10) Philip Payment also said his understanding of the term is "business performed using the internet or other electronic means." (Exhibit " 107 ": Deposition of Philip Payment, P.87 L5)

69.    Accordingly, the language of the Service Agreement, attested by WINN-DIXIE's own representatives is clear and unambiguous.

## WINN-DIXIE'S INTERPRETATION OF "THOUGH THE INTERNET OR SIMILAR ELECTRONIC MEANS"

70.    VISAGENT is entitled to rely upon the interpretation by WD as stated by WD's Corporate Representative, Tom Barr.

71.    Astonishingly, Mr. Barr's interpretation on behalf of WD in this matter is that "[through the Internet or similar electronic means]" means only transactions in which WD buys or resells products through electronic means similar to the Visagent system.

72.    In his continued Deposition as WINN-DIXIE Corporate Representative, Mr. Barr said;:

> Q   And on Page 2 under "The scope of the agreement," where does Winn-Dixie assert that there's language which means an Internet-based platform like Visagent's?
> A   Similar electronic means.
> Q   Are you pointing to the bold, uh, in-bracket language, which if we read it completely says "through the Internet or similar electronic means"?
> A   Yes, sir.
> Q   Okay.  You would agree that that says nothing about a similarity to Visagent's system?
> A   Similar electronic means.
> **Q   Right.  As the Internet?**
> **A   No, as Visagent.**
> **Q  Okay.  So your reading of that bracket is to say that it's similar electronic means to Visagent's system?**
> **A   When it says "or similar electronic means," Visagent, yeah.**

Q   Okay.  I think you have agreed, though, that, uh, the Excels were sent through the Internet --

A   Yes.

Q   -- correct?  Well, if they were sent through the Internet, and this document says that it is intended to cover all of user's business transactions for full or truckload quantities of consumer packaged goods purchased or re-sold through the Internet -- and I

understand the "or" would mean one or the other.  Is that your understanding or Winn-Dixie's understanding, that the word "or" means one or the other?

A     Winn-Dixie interprets that to mean purchases or sales done through the Internet, uh, or a similar electronic means.

Q   Okay.  And that's fine.  We've agreed that these e-mails passed through the Internet with the Excel sheets, correct?

A   Yes.

Q   So would that not, then, be covered in this scope of the agreement?

A   No.

Q   Okay.  Based upon the interpretation of Winn-Dixie as you've just explained, correct?

A   Yes.

Q   Do you agree that these Excels that you sent to diverters, uh, were consumer package goods?

A   Yes.

Q   Do you agree that they were in wholesale format?

A   Yes.

Q    Do you agree that they were not, uh, being offered by the original manufacturer or its authorized representative?

A   Yes.

Q    Do you agree that they do not fall under any exclusion from the word exclusions, colon, up until the heading "Fees" in the next paragraph?  And take your time on this one.  I want you to be sure.

A   Yes.

MR. BOLLING:  Yes -- uh, what was the question?

Q   Yes meaning -- yes meaning there is no exclusion that would eliminate the, uh -- the facsim- -- the e-mail with the spreadsheet from the scope of the agreement?

A   Yes.

MR. BOLLING:  Objection.

Q   So the only reason that -- that those trade deals, if there was any transaction, would be based upon the interpretation by Winn-Dixie of the bracketed, bolded language which you've previously, uh, provided to us?

MR. BOLLING:  Objection.

A   Yes.

Q   You would agree that if the Court determines that that interpretation that you have said Winn-Dixie is taking is incorrect and that anything that passed through the Internet would be subject to the 2 percent fee, then Winn-Dixie would have breached its service agreement with Visagent?

MR. BOLLING:  Objection.

A    Would I agree?

Q    Would Winn-Dixie agree that if it's interpretation of that bracketed language is incorrect according to the Judge and if the Judge finds that anything that passed through the Internet which generated a transaction was subject to the service agreement, then would you agree that Winn-Dixie owes Visagent for all of those transactions?

MR. BOLLING:  Objection.

A    I wouldn't agree, but I would live with it.

(Continued Dep. Barr as Corp Rep. P. 27 L.2 – P.32 L. 10)

73.    By that interpretation of the bracketed language, all transactions through systems similar to Visagent's, including the NTS would be covered under the scope of the Service Agreement and must be processed through Visagent.    Accordingly, transactions outside VISAGENT's Exchange and buying process, such as those through the use of the NTS would be a violation of the explicit terms of the Service Agreement.

74..    According to WD 's own expert in computer technology and electronic commerce, Prof. Eileen T. Kraemer, both VISAGENT's system and the NTS system are ecommerce systems and both are B2B "hubs". Professor Kraemer testified NTS was a B2B Hub.

158:6    Q    Would the Victory system be described, in your
158:7  opinion, as a B2B hub?
158:8    A    So, first, I'm not sure that I have a complete
158:9  understanding of all of the elements of the Victory
158:10  system.
158:11    Q    Okay.  So would -- well, let's -- let me start
158:12  by saying this:
158:13    If the NTS system advertised itself to be an
158:14  Internet trading platform that facilitated product
158:15  information, information exchange, searching, contact, an
158:16  auto-buy selection program or module and a final
158:17  financial settlement, would that be -- would that fall
158:18  within the B2B hub category?
158:19    MR. BOLLING:  Objection.

158:20    A   If those things were to occur electronically,
158:21  yes.

She also testified VISAGENT was a B2B Hub:

159:24    Q   Fair enough.  Let me ask you to assume for a
159:25  moment that Visagent's process included the ability to
160:1  identify products through bar-code skews, UPC codes, and
160:2  also supported the ability to search for those codes.
160:3          If you make those assumptions, would you then
160:4  opine that Visagent's system was a B2B hub?
160:5    A   (Witness reviews document).
160:6          And I guess the other element is negotiation
160:7  that I'm not certain that it had.  I'm not sure how the
160:8  pricing portion of that worked.  And I think that's a
160:9  part of a B2B hub, as well.  But, otherwise, yes.

75.    To be clear, WD would have this Court believe that a transaction is limited

to  the specific act of hitting a send button on a fax machine. WD takes this position

because it claims this was the process used during the entire term of the Service

Agreement. Not coincidentally, this was the only part of the transaction process that can

be manual, not electronic and through the internet.  WD claims a transaction can be

divided between the identification of product phase, and the product selection phase. WD

admits the identification phase through NTS was electronic and through the internet.

However as pointed out *supra*, a transaction must pass though numerous phases to be a

reality in the real world.  And all of the other phases of the transaction through the NTS

were through internet means.

76.    Professor Kraemer also testified that  eCommerce is commerce conducted

thru the Internet.

155:18          Q   Okay.  Did you have an opportunity to look up
155:19          any definition of e-commerce?
155:20          A   I did.
155:21          Q   What did you find out there?

155:22        A   It is commerce conducted via the Internet.

77.     Victory acknowledges NTS it is an eCommerce system in its website materials. (Ex 108 Kresser Depo. P. 125 L 19 – P. 126. L.1)[12]   Professor Kraemer testified business by electronic means **is** eCommerce, and that the identification or advertising parts of an eCommerce system are nonetheless also part of the eCommerce system (Ex. 109Ex 110 Kraemer Dep. P. 162, 130 L. 21 – P. 131 L. 8.)  She also verified that the WD buying and selling network in the Procurement and Diverting Departments are run through networks which are similar electronic means to the internet! (Id at P. 141 L. 17 – P. 142 L. 18.)

141:17     Q   Right.  But if the Winn-Dixie buying system was
141:18  part of a server, a Winn-Dixie server that served many
141:19  computer workstations, TCP/IP would be a typical way to
141:20  access that; correct?
141:21     A   Right, whatever networking system they're
141:22  using.
142:6     A   So if it's Internet Protocol based, then it's
142:7  Internet or similar.
142:8  BY MR. RUBIN:
142:9     Q   Okay.  Can you think of any way that isn't
142:10  Internet Protocol based that these kinds of remote access
142:11  to a server would be communicated?
142:12        LAN access, large area network access, are you
142:13  familiar with that term?
142:14     A   Yes.  I mean, there have been other types of
142:15  networking, but I don't have a good alternative in mind.
142:16     Q   Okay.  All the ones you can think of would be
142:17  similar to the Internet, electronically?
142:18     A   Yes.

---

[12] 125:19   Q.  The sentence says -- whether you drafted it or someone else -- We also have eCommerce websites which convey our truckload direct sales opportunities to the trade.  What eCommerce websites did Victory have at this time?
125:24     A.  That is a reference to the next paragraph, which is, NTS functionality which supports and encourages the entry of offers via the Internet. See Ex 108

78.    Every document produced by WD (Bates Stamp Documents V00001-V03709), purported to be the "raw data" business records of WD,  listing individual sales and purchases transactions, to and from diverters in the secondary market during the term of the Service agreement, has a column which is the first column of the page, with a header identifying the corresponding numbers below as "NTS Order ID".  This confirms, as described by many WD and Victory employees at deposition, that every WD Purchase Order ("PO") during the term of the Service Agreement, whether it was being run through Visagent or not, was electronically tracked by the NTS system. Tom Barr as Corporate Representative testified as follows in this regard:

 Q    Let me try to understand this.  When you say the sales and purchases were pulled off of NTS, did NTS have the information only for purchases and sales that went through that system, or was that system utilized for all purchases and sales by Winn-Dixie regardless of whether Victory was involved?
MR. BOLLING:  Objection.
A    It was tracked through the NTS system.
Q    Was that comprehensive including all purchases and sales to and from Winn-Dixie in the secondary markets?
A    Was tracked through the NTS system.
Q    I understand that, but I don't know what the NTS system tracked so that's why I'm asking.
A    Sales and purchase.
Q     Does that include all sales and purchases to and from Winn-Dixie in the secondary markets during this time frame?
A    Yes.

*        *        *

Q    Okay.  Who put -- how did the -- for instance, the Visagent -- or the sales or purchases that went through the Visagent system, how did that information get into the NTS system?
A     Because of a manual purchase order that had to be made.  It -- it still had to be entered into our system regardless of "look, click, buy" and you're done. We still had to -- what we purchased off of that system had to be put into our system. NTS tracked it off of our system.
Q    Okay. So NTS pulled information out of your system, took that information, and you were able to get a report out of the NTS system of your own purchases and sales?

A    I would think that we put it into the – into the NTS system.

Q      When you say "we," is that Winn-Dixie employees, or is that Victory employees?

A    Victory employees.

Q    So they would have taken the purchase orders generated by the Visagent system, they would have taken that information and they would have manually key stroked that deal information into the NTS --

*      *      *

Q    Okay.  So Winn-Dixie would take that P.O., a duplicate of it, and give it to Victory so that they could put that information into their system?

A    That would be correct.

Professor Kraemer opined that order tracking is eCommerce which is internet or similar electronic means if it occurs over TCP/IP, the standard internet protocol.

142:23    Q    Is it your opinion that tracking an order after
142:24  a purchase is part of e-commerce?
142:25    A    Yes.
143:1    Q    If that process was done using the NTS through
143:2  TCP/IP, would that part of the process be through the
143:3  Internet or similar electronic means?
143:4    A    If it occurred over TCP/IP, it would be
143:5  Internet or similar.

From the NTS Training manual, we know NTS is internet based because NTS requires a connection to the internet.  See NTS Training Manual p.4 and both Victory contracts.

Professor Kraemer also opined that financial settlement is part of the eCommerce transaction.

143:25    Q    Right.  Well, if the financial settlement takes
144:1  place after the actual button is pressed that I want to
144:2  purchase something -- let's say that the money actually
144:3  changes hands a week, two weeks, a month later -- is that
144:4  part of the e-commerce transaction?
144:5    A    It can be.
144:6    Q    Is it typically?  Do you consider that to be
144:7  part of it?
144:8    A    If it's done electronically, it's part of

144:9  e-commerce.  If the check is in the mail, it would not be
144:10 e-commerce.
144:11     Q   Okay.  Wire, is that an electronic means of the
144:12 delivery of money?
144:13     A   So wire transfers would be electronic.  They
144:14 may or may not be Internet-based.
                              *        *        *
144:18     Q   Okay.  If wire confirmations from the party
144:19 that receives the money is advised by the bank we got
144:20 money on this particular transaction and the seller of
144:21 the item wants to confirm to the buyer that, yes, we
144:22 received your money, if that's done by e-mail, is that
144:23 through the Internet or similar electronic means?
144:24     A   E-mail is Internet-based.


Financial settlement of all WD transactions were made by email and tracked on

the NTS. *See* examples attached as composite Exhibit _.

## WINN-DIXIE MATERIALLY BREACHED THE SERVICE AGREEMENT

79.     There are three elements to a breach of contract claim: a valid contract, a

material breach and damages. To sustain a claim for breach of contract, VISAGENT

must show that it performed its duties under the Service Agreement and that WINN-

DIXIE failed to perform their part of the contract that amounts to a material breach.  A

breach is material if it goes to the essence of the contract.  Friedman v. New York Life

Ins. Co., 985 So.2d 56 (Fla. App. 4th, DCA 2008); Beefy Trail, Inc. v. Beefy King

International, Inc., 267 So. 2d 853, 857 (Fla. 4th DCA, 1972.) The issue of whether a

breach is material is a question of fact to be decided by the fact finder. Beefy Trail at 858.

The substantive law applicable to the case determines which facts are material.

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). A material fact is one

that "might affect the outcome of the suit under the governing law." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Alphin v. Sears,

Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir.1991). Accordingly, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. In rendering a decision based on state substantive law, a federal court must "decide the case the way it appears the state's highest court would." E.g., Royal Ins. Co. of Am. v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir.2001).

80.     WINN-DIXIE materially breached the Service Agreement in at least three ways:  (1) It bought and sold via emails and instant messaging; (2) it used Victory's NTS internet based system substantially to do its buying and selling of all of its CPG on the secondary market with other diverters in the first year of the Service Agreement and with Victory and other diverters in the second and third years of the Service Agreement; and (3)  it contracted with Victory in 2002 to conduct its buying and selling of CPG in the secondary market through an e-commerce provider.  All of these violations go to the very heart of the intent of the Service Agreement.

## WINN-DIXIE BOUGHT AND SOLD "TRUCKLOADS' OUTSIDE THE VISAGENT EXCHANGE IN VIOLATION OF THE SERVICE AGREEMENT AS CONFIRMED BY WINN-DIXIE'S OWN EXPERT

81.     WD attempts to limit its exposure to full trucks of product traded outside the VISAGENT exchange by a strained interpretation of the words "full or truckload quantities". The plain meaning of the words make clear that full and truckload are intended to mean two different things.  The two words are separated by the word "or". Basic contract interpretation of the word "or" would have the two words on either side meaning alternatives, not the same meaning.

82.     As described previously, WD bought (inbound) and sold (outbound) products on the secondary market. In order to prevail on liability, VISAGENT need not

prove every transaction was a full or truckload quantity; VISAGENT is required to prove only a single transaction under the scope of the Service Agreement was bought or sold outside of the VISAGENT Exchange to get to the trial on damages. VISAGENT deposed WD expert, Robert Thomas, its logistics and shipping expert. Mr. Thomas identified at least two transactions, one inbound, and one outbound, that he described as "truckload quantity".

83.    First, Exhibit 8 to his deposition, attached hereto as Exhibit 111 to this Motion, is an inbound Bill of Lading during the term of the Service Agreement from Victory as the seller, to WD as the buyer.  It reflects PO No. 70187. Mr. Thomas admitted this was a "truckload". See immediately below testimony. Exhibit 111 also includes printouts showing PO No. 70187 was tracked by the NTS System, or by electronic means.

|    |   |   |
|----|---|---|
| 8  |   | (Plaintiff's Exhibit No. 8 was marked for identification.) |
| 10 |   | BY MR. RUBIN: |
| 11 | Q | It's a three-page document. Does this appear to be a mixed load? |
| 13 | A | Yes, it does. |
| 14 | Q | Do you see the date in the upper right hand of Page 1? |
| 16 | A | 11 something of '03 maybe. |
| 17 | Q | November of '03? |
| 18 | A | It appears to be. |
| 19 | Q | On the last -- actually in the bottom sections of all three pages I think it might be more legible.  November of '03? |
| 22 | A | Yes. |
| 23 | Q | Single consignee, single shipper? |
| 24 | A | Yes. |
| 25 | Q | Last page, do you see the ship to weight, 39,522? |
| 2  | A | I guess we can agree that -- it looks to be that on mine. |
| **4**  | **Q** | **Truckload?** |
| **5**  | **A** | **That would appear to be as of this bill of lading.  Yes.** |

84.    Second, Exhibit 12 to Mr. Thomas' deposition, attached hereto as Exhibit 112 to this Motion, is an outbound Bill of Lading during the term of the Service

Agreement from WD as the seller, to Purity Wholesale as the buyer.  It reflects PO No. 12-902764. Mr. Thomas admitted this was a "truckload". See immediately below testimony. Exhibit 112 also includes two (2) emails from Robert Carlson, one dated March 20, 2003 confirming the sale, and another dated March 25, 2003 confirming receipt of the wire transfer to pay for this order, with the notation "Please consider this notice to release the product for shipment."   There can be no doubt this transaction substantially involved internet communications and other similar electronic means inherent to WD's transaction processing.

```
2       (Plaintiff's Exhibit No. 12 was marked
3       for identification.)
4   BY MR. RUBIN:
5       Q    Again, this is an outbound bill of lading from Winn-Dixie to Purity.
7       A    Yes.  Purity, Pantry -- I'm not sure.
8       Q    I'll ask you to assume that it's Purity Wholesale.
10      A    Okay.
11      Q    And the date is March 20 something, 2003?
13      A    Agreed.
14      Q    It appears to be a weight of 43,200?
15      A    Yes.
16      Q    There's no corrections on this one?
17      A    No.
18      Q    Does this appear to be a truckload?
19      A    It appears to be a truckload.
```

**WINN-DIXIE BREACHED THE SERVICE AGREEMENT WHEN IT EXECUTED THE VICTORY CONTRACT IN 2002.**

85.     The Service Agreement provides that WINN-DIXIE "will not employ or contract for the services of an entity other than Provider for its E-commerce transactions covered under the scope of this Agreement."   According to Mills, it was always the intention of WINN-DIXIE that the VISAGENT system was to replace Victory, because it was a superior software system.  (Ex 113 Deposition of Daryl W. Mills, P. 53 L. 9 – P. 59 L. 23)  WINN-DIXIE admitted that at the time the Service Agreement was signed, it

anticipated that Victory would not be continuing to do their in-house diverting at the expiration of the June 2000 contract. Ex 114 (Deposition of WINN-DIXIE Corporate Representative-Barr, P. 202 L. 22 – P. 203 L. 3)

86.    Nonetheless, WINN-DIXIE entered into an agreement with Victory on June 22, 2002 to manage WINN-DIXIE'S diverting department, using the Network Trading System. WINN-DIXIE admitted in the deposition of its corporate representative that the contract with Victory was to provide e-commerce services. (Ex 115 Deposition of WINN-DIXIE Corporate Representative, P. 172 L. 4 – L. 8) WINN-DIXIE'S justification for so flagrantly violating the agreement was that the VISAGENT system just did not work; ignoring the fact that there was no requirement in the contract to acquire certain trading volume and WD never made a written complaint with a demand to cure which is a condition precedent to the right to terminate the Service Agreement.  WD cannot be permitted to allow VISAGENT to continue to perform for the entire three year term, take all of the benefits of the Service Agreement and with impunity walk away from its commitment because it simply changed its mind.  This is the business equivalent of a child ordering a piece of chocolate cake at a restaurant, enjoying it until half is consumed, and then refusing to pay because he got tired of the taste.

## WINN-DIXIE VIOLATED THE SERVICE AGREEMENT REFUSING TO USE THE VISAGENT EXCHANGE EXCLUSIVELY

87.    It is crystal clear by the facts and the admission of WINN-DIXIE it they, in fact, did not use the VISAGENT Exchange exclusively for the purchase and sale of goods in the secondary market, as required in the Service Agreement. However, it has interposed only two defenses to the breach of contract claim:  there was not enough volume on the Exchange and there was a conflict of interest in that Rubin had an

affiliation with Global Food Resources.   Both of these defenses are not sustainable by law or fact.

88.     The Service Agreement did not include any baseline for volume to be posted on the Exchange as a minimum requirement for WINN-DIXIE to be obligated to exclusively use it.   There is no requirement of "critical mass" in the contract and there was no warranty. (Ex 116 Deposition of Philip Payment, P. 70 L. 10 – P. 71 L. 1; P. 79 L. 1 – P. 80 - L. 4; P. 118 L. 5 – L. 24).   WINN-DIXIE'S Corporate Representative testified that there was no provision in the contract that guaranteed volume or the number of users. (Ex 117 Deposition of WINN-DIXIE Corporate Representative-Barr, P. 231 L. 23 – P. 233 L. 12). Moreover, the WINN-DIXIE point man, Mills, had insisted on a three year contract to give VISAGENT the opportunity to become a viable company.   It was clearly anticipated by both parties that the Exchange would not operate at full capacity from the outset[13].   Further, it was clearly anticipated that WINN-DIXIE, the flagship User would fully participate and would force other diverters to use the Exchange by refusing to do business with them outside of the Exchange. WINN-DIXIE management acknowledged in deposition testimony that it was essential for WINN-DIXIE to participate fully in the program to insure its success. If WINN-DIXIE had used the system and did not operate outside of it, there would have been sufficient activity. WINN-DIXIE defends its breach by claiming that there was a lack of critical mass, but it caused the very deficiency it now interposes as the excuse for abandoning the Exchange and breaching the Service Agreement.

---

[13] The Victory exclusion for the first year of the Service Agreement acknowledges this fact.

89.    The second defense articulated by the WINN-DIXIE corporate representative is the conflict of interest defense:  because an officer of Visagent had an affiliation with Global Food Resources, WINN-DIXIE was justified in not living up to its side of the bargain.  However, as stated *supra,* WINN-DIXIE executives knew about this affiliation within days of the signing of the Service Agreement based upon a complaint from a diverter, Robert Horick, a personal friend of Tom Barr.[14] WD chose to do nothing with that information then and throughout the entire three years of the Service Agreement. It is hardly credible for WD to complain now or justify its non-compliance with the Service Agreement based on this information.

## CONCLUSION

WD's diverting process went into full disregard for honoring or even hiding the fact that they were breaching the Service Agreement. As a result WD's actions constitute a systemic failure to abide by the terms of the Service Agreement.  While this Court has bifurcated the issues of liability and damages, and only the former is under review here, it is obvious that most, if not all of the business transactions conducted by WD in the secondary market, during the terms of the Service Agreement, subject to limited exclusions as outlined in the Service Agreement, were in violations.

Based on the uncontroverted facts and admissions of WINN-DIXIE, there are no genuine issues of fact and VISAGENT is entitled to summary judgment on the breach of contract claim.

---

[14] Mr. Barr testified he engaged instant messaging with Mr. Horick about personal matters. (Deposition of WINN-DIXIE Corporate Representative-Barr, P. 216 L. 5).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original of this Motion has been electronically filed via ECF and that a true and correct copy of the foregoing has been furnished by electronic mail and by US regular Mail to: James Bolling, Esq. at Smith, Hulsey & Busey, Post Office Box 53315, Jacksonville, FL 32201, and James R. Office, Esquire, General Counsel, Victory Wholesale Group, 400 Victory Drive, Springboro, Ohio, on the 11th day of January, 2010.

Guy Bennett Rubin, Esq. (FBN 691305)
Attorneys for Visagent Corporation
**RUBIN & RUBIN**
P.O. Box 395
Stuart, Florida 34995
Telephone:     (772) 283-2004
Facsimile:     (772) 283-2009