# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:                                             Case No.  05-03817-3F1
                                        )
WINN-DIXIE STORES, INC., et al.,                   Chapter 11
                                        )
        Reorganized Debtors.                       Jointly Administered
⎿                                        )

## WINN-DIXIE'S TRIAL MEMORANDUM
## FOR FEBRUARY 8, 2010 TRIAL ON VISAGENT'S CLAIM

Winn-Dixie Stores, Inc., on behalf of twenty-three of its subsidiaries and affiliates, as the Reorganized Debtors (collectively, "Winn-Dixie"), submits this trial memorandum pursuant to the Court's August 20, 2009 Consent Order Scheduling Trial on Visagent Corporation's claim.

1.      *List of pleadings and pending motions*:

   a.   Visagent's initial claim for $132 million, filed July 29, 2005 (Claim No. 9953),

   b.   Visagent's amended claim for $132 million, filed July 23, 2006 (Docket No. 9448),

   c.   Visagent's second amended claim for $9.7 million, filed January 8, 2010 (Docket No. 22862),

   d.   Winn-Dixie's objection to Visagent's claim (Docket No. 9131), filed July 11, 2006,

    e.    Winn-Dixie's motion in limine to preclude Visagent from introducing opinion evidence (Docket No. 22861),

    f.    Visagent's motion to compel against Victory (Docket No. 22847), and

    g.    Visagent's motion for partial summary judgment (Docket No. 22863).

2.    *Statement of the case, with Winn-Dixie's defenses, including legal authorities.*

Visagent claims that Winn-Dixie breached the Service Agreement between the parties, claiming $9.7 million in damages.[1]  The Service Agreement required Winn-Dixie to use Visagent's exchange for truckloads of goods bought or resold through the Internet or similar electronic means:

> Scope of this Agreement:  This Agreement is intended to cover all of User's business transactions for full or truckload quantities of consumer packaged goods purchased or resold **[through the Internet or similar electronic means]** in a wholesale format, excluding purchases by User from the original manufacturer or its authorized representatives.  For the Term of this Agreement, User will not employ or contract for the services of an entity other than

---

[1] In Visagent's initial and amended claims, Visagent claimed that Winn-Dixie breached the Service Agreement *and* violated federal and state statutes in connection with what Winn-Dixie called the Outside Sales Catalog.  In Visagent's January 8, 2010 second amended claim, however, Visagent did not include the statutory claims and reduced its alleged damages from $132 million to $9.7 million.

> Provider [Visagent] for its eCommerce transactions
> covered under the scope of this Agreement.
>
> > Service Agreement (emphasis
> > in original).

Winn-Dixie did not breach the Service Agreement because Winn-Dixie did not purchase or resell goods "through the Internet or similar electronic means" outside of Visagent's exchange. The dispute between Visagent and Winn-Dixie is over the meaning of this language "through the Internet." Visagent argues that faxing, which Winn-Dixie traditionally used to transmit purchase orders, is a similar electronic means to the Internet. Winn-Dixie, however, understood that the phrase meant Visagent's new internet web-based exchange, and that Winn-Dixie could continue to use its traditional diverting methods, including faxing purchase orders, without violating Winn-Dixie's new agreement with Visagent.

Winn-Dixie also asserts that Winn-Dixie's purchasing and selling less than truckload (LTL) quantities did not breach the Service Agreement.

Regardless of the resolution of the parties' dispute over the meaning of the language "through the Internet," Winn-Dixie nevertheless contends that *any* performance by it under the Service Agreement was excused because Visagent's exchange never achieved the critical mass (volume of

goods and transactions) necessary to make the exchange achieve its intended purpose.

This matter involves diverting. Diverting is the secondary market for consumer packaged goods, in which the purchasers and sellers are not the original manufacturer. Diverters include brokers of diverted groceries, as well as retailers, like Winn-Dixie.

Diverting occurs because retailers have excess product that they do not want to sell directly to each other. For example, if Kellogg's offers ten truckloads of Frosted Flakes to Walgreens at the discount price of $28 per case, and Walgreens only needs eight truckloads, then Walgreens will sell two truckloads to diverters.

Traditional diverting involves communications among diverters by telephone, facsimile and e-mail. Retailers perform traditional diverting in-house with their own employees or through an in-house diverter. Starting in 2000, Winn-Dixie contracted for Victory Wholesale Grocers to conduct Winn-Dixie's in-house, traditional diverting. The term of this first Winn-Dixie/Victory contract was from July 2000 to July 2002.

Also in 2000, Visagent began to solicit Winn-Dixie to use Visagent's newly conceived, internet based Grocery Exchange. Visagent made a series of presentations to Winn-Dixie about the new efficiency of an internet based

Grocery Exchange.  Visagent expressly contrasted the Grocery Exchange to traditional diverting (phone, fax and e-mail).  According to Visagent, the Grocery Exchange was an eBay-like exchange, allowing diverters to post available items for sale, and to search for items they wanted to buy.  Visagent characterized the system as "point, click, buy," as contrasted to traditional diverting, which involved cumbersome, multi-layered communications in person, by phone, by facsimile and by e-mail.

During Visagent's presentations, Winn-Dixie learned that Visagent's exchange did not have truck-building capability.  Truck-building involves a the combination of less-then-truckload (LTL) quantities, each purchased by a different buyer, and combining them on a 48 foot or 53 foot trailer to make a  full truck or truckload (TL).  Visagent's presentations showed that Visagent only used Landstar as a trucking carrier.  Landstar was a TL carrier.  If a Visagent user bought a quantity of goods on Visagent's Grocery Exchange, the goods had to be shipped by Landstar and the purchaser had to pay for the whole truck regardless of whether the quantity of goods filled the trailer.

Truck-building is important to diverters in order to buy and sell "inventory."  Diverting can be broken down into two categories: "inventory" and "flip loads."  Only a few diverters actually own diverted product

5

maintained in "inventory."  Most diverters never own diverted products. They instead merely broker sales of "flip loads" between other diverters. Generally speaking, flip loads are sold in TL quantities and inventory is sold in LTL quantities.

It is important to diverters to build inventory orders of LTL quantities to fill a truck.  Diverters do not want to pay a TL carrier to haul solely an LTL quantity of goods to one buyer.  If a shipper is paying for the whole truck, it wants to fill the whole truck in order to reduce the freight cost per quantity of goods shipped.  Hauling "air" is unprofitable.

Because Visagent's Grocery Exchange was not able to build trucks (by combining inventory LTL's to different buyers), Winn-Dixie and Visagent ultimately agreed that the scope of what became the Service Agreement would be limited to TL quantities.  Before and after the parties entered into the Service Agreement, Visagent told Winn-Dixie that Visagent intended to make the exchange capable of truck-building.  But Visagent never did so.

After months of Visagent presentations, on May 11, 2001, Visagent presented Winn-Dixie with the first draft of the Service Agreement. Visagent's first version limited the scope of the Agreement to "full or truckload quantities."  After further discussion, on May 17, 2001, Visagent

6

presented Winn-Dixie with the second draft of the Service Agreement, which also limited the scope of the Agreement to "full or truckload quantities." Visagent's second draft of the Service Agreement also excluded direct trades between Winn-Dixie and Victory through July 1, 2002, the approximate end of the term of the first Winn-Dixie/Victory contract.

Visagent's second draft of the Agreement also proposed this exclusivity agreement:

> **Exclusivity**: During the term of this Agreement, User agrees to exclusively use the Exchange to facilitate and bring to completion all of its sales, purchases, and logistics transactions conducted under the Scope of this Agreement.… Accordingly, User shall post, purchase and sell all of the products subject to this Agreement into the Exchange.

Moreover, Visagent entitled the Service Agreement as "Exclusive Service Agreement." Winn-Dixie deleted "Exclusive" from the title of Visagent's second draft and deleted the "Exclusivity" provision quoted above. Winn-Dixie also expressly limited the scope of the Agreement to goods bought and resold "**[through the Internet]**", to reflect that Winn-Dixie was bargaining only for use of Visagent's new and different business model, and to allow Winn-Dixie to continue at the same time its traditional diverting through Victory.

On June 13, 2001, Winn-Dixie forwarded Visagent's second draft back to Visagent, annotated to show Winn-Dixie's suggested changes.  On June 15, 2001, Visagent asked Winn-Dixie to add "or similar electronic means" to the scope of the agreement so that the scope covers "goods bought or resold **[through the Internet or similar electronic means]**" (emphasis in Service Agreement).  Winn-Dixie accepted the added phrase as being consistent with Winn-Dixie's intent, and the parties signed the Agreement on June 15, 2001.  So the scope of the signed Agreement reads as follows:

> Scope of this Agreement:  This Agreement is intended to cover all of User's business transactions for full or truckload quantities of consumer packaged goods purchased or resold **[through the Internet or similar electronic means]** in a wholesale format, excluding purchases by User from the original manufacturer or its authorized representatives.  For the Term of this Agreement, User will not employ or contract for the services of an entity other than Provider [Visagent] for its eCommerce transactions covered under the scope of this Agreement.
>
> Service Agreement (emphasis in original).

Because Winn-Dixie intended to be able to continue to perform traditional diverting, the Service Agreement's scope was limited to the diverted "goods purchased and resold **[through the Internet or similar**

**electronic means]**…" (emphasis in Service Agreement).  The phrase is in bold letters in the Agreement to emphasize this intent.

In entering into the Service Agreement, Winn-Dixie and Visagent both believed (and assumed) that Visagent's exchange would achieve critical mass.  Winn-Dixie *wanted* at some point to transition all of its diverting to Visagent's exchange to capture the mutually intended efficiencies of Visagent's "point, click, buy" Internet exchange.  Winn-Dixie obligated itself, however, to do business with Visagent only for truckloads actually purchased on the internet.

Under Winn-Dixie's traditional diverting through Victory, goods were not "purchased or resold through the Internet."  Winn-Dixie used Victory's Network Trading System to *identify* potential diverting of *inventory* products, which were either in Winn-Dixie's or other diverters' inventory.  Winn-Dixie did not use Victory's NTS system to actually buy or actually sell any product.  This is why Winn-Dixie was comfortable with the Service Agreement language agreed to by the parties.

Although Victory's national NTS system may have had capabilities to buy and sell product, neither Victory nor Winn-Dixie used them for Winn-Dixie diverting.  Winn-Dixie did not want to integrate Victory's NTS system into Winn-Dixie's procurement system, which Winn-Dixie closely guarded.

Diverters electronically transmitted their available inventory to Victory.  Winn-Dixie also electronically transmitted to Victory its buying and selling specifications and Winn-Dixie's inventory.  Victory's NTS system would then identify buying and selling *opportunities* for Winn-Dixie. The Victory employees in-house at Winn-Dixie printed the opportunities and hand-delivered the paper printouts to Winn-Dixie buyers.  The buyers would mark which buying and selling opportunities they wished to exercise and then returned the paper printouts to the Victory employees.

A Victory employee would then fax a request to the diverter to confirm that desired product was still available,  and the diverter would confirm by fax whether the product was still available.  If the product were still available, the Victory employee would *manually* prepare a Winn-Dixie purchase order and fax it to the diverter.  Winn-Dixie therefore literally purchased and resold goods in inventory (either Winn-Dixie's or another diverter's) *through faxed purchase orders*, not through the Internet.

Winn-Dixie would also fax or e-mail (outside Victory's NTS system) to diverters Winn-Dixie's inventory that Winn-Dixie was interested in selling.  The process thereafter matched the process following NTS's

identification of available goods (faxing confirmation of continued availability of product and faxing purchase orders).[2]

Diverters sent their flip load offers to the Victory employees at Winn-Dixie by fax or telephone. A Victory employee would then go through the same process as for inventory (hand delivering offer to W-D buyers, faxing confirmation of availability, and faxing manually prepared purchase order to the diverter).

It was the cumbersomeness and inefficiency of this Victory NTS process that Visagent represented to Winn-Dixie that Winn-Dixie could avoid with Visagent's new "point, click, buy" Internet exchange.

So, to prove Winn-Dixie breached the Service Agreement, Visagent must show that Winn-Dixie bought or resold "truckload quantities" "through the Internet or similar electronic means." Winn-Dixie denies that it bought or resold any diverted goods "through the Internet or similar electronic means" during the three year term of the Service Agreement other than through Visagent.

Shortly after the parties entered into the Service Agreement, Winn-Dixie informed Visagent—in writing—that the Agreement did not prevent

---

[2] A diverter may have incidentally indicated its desire to purchase Winn-Dixie inventory by e-mail, but that would be the exception to the rule. In any event, all transactions were by faxed purchase order.

Winn-Dixie from continuing to use Victory to perform traditional diverting on Winn-Dixie's behalf.

In any event, most of Winn-Dixie's diverting involved LTL quantities, and Winn-Dixie's diverting of LTL quantities under no circumstances could breach the Service Agreement.

Regardless of the resolution of the parties' dispute over the meaning of the language "through the Internet," Winn-Dixie's performance was excused because, through no fault of Winn-Dixie's, Visagent's exchange never achieved the critical mass necessary to make it practicable to Winn-Dixie.  Critical mass means that there was a sufficient volume of goods being bought and sold on Visagent's exchange that would permit Winn-Dixie to meet its needs to buy and sell diverted goods.

Winn-Dixie also repeatedly complained to Visagent—in writing—that Visagent's exchange lacked the critical mass necessary to make the exchange useful to Winn-Dixie.  Due to lack of participation by other diverters, there was never was enough product on the exchange to meet Winn-Dixie's diverting needs. During the entire term of the Service Agreement, Visagent never suggested that Winn-Dixie was in breach of the Service Agreement, despite Visagent's full knowledge of how Winn-Dixie conducted its diverting business.

Throughout the three-year term of the Service Agreement (6/28/01-6/27/04), Visagent's exchange measurably did not live up to promised and intended performance. During that term, Winn-Dixie had approximately $450 million in diverting transactions. For the years 2001 through 2004, however, Visagent's exchange transacted only $13 million in total business.

There are several reasons why Visagent's Exchange did not reach critical mass:

- Visagent lacked the capital necessary to market and develop the exchange.

- Diverters did not trust Visagent because (i) of Visagent's affiliations with another diverter and (ii) of the people who worked at Visagent. Diverters closely guard their sources of product. Using Visagent's exchange, however, would disclose a diverter's sources because Visagent was privy to where goods were picked up by Landstar.

- Visagent's exchange was cumbersome and difficult to use.

- Visagent's exchange rules were cumbersome and overly restrictive, and involved penalties that were not in effect under traditional diverting methods.

- Visagent required exchange users to post high escrow amounts.

- Visagent's exchange did not have truck-building capability.

- Visagent's exchange charged an extra two percent cost to each transaction.

- Visagent's freight costs were not competitive.

- Prices on Visagent's exchange were not routinely competitive.

13

- • Visagent's exchange required that sellers have possession of the goods posted by sellers (when many sellers (broker diverters) never had possession of the good).

- • Visagent's exchange did not fit the dynamics of diverting.

Because Visagent's exchange did not have the critical mass necessary to accomplish its purpose, Winn-Dixie did not renew the Service Agreement upon the Agreement's June 27, 2004 expiration.

According to the Restatement of Contracts, Visagent's exchange's lack of critical mass frustrated the purpose of the Service Agreement and therefore excused Winn-Dixie's performance:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> Restatement 2d of Contracts, § 261.

Section 261 of the Restatement 2d of Contracts was expressly adopted by Florida's First District Court of Appeal in *Leon County v. G.J. Gluesenkamp*, 873 So.2d 460, 463 (1st DCA 2004).

14

For all these reasons, Winn-Dixie has no liability to Visagent.

3.    *Brief summary of Winn-Dixie's contentions of fact, and Winn-Dixie's evidence on each contention.*

a.    <u>The parties' intent regarding the scope of the Service Agreement</u>.  Winn-Dixie will introduce the drafts of the Service Agreement, the Service Agreement and communications between the parties (and to diverters) regarding the scope of the Agreement.  Daryl Mills, Patricia Mitchell, Phillip Payment, Kevin Gates and Tom Barr will testify about the parties' intent.

b.    <u>Buying and reselling through the Internet or similar electronic means</u>.  In addition to the evidence regarding the parties' intent (see above), Tom Barr, Philip Payment, Daryl Mills, Ed Mieskoski, Seth Gaynor, Bruce Malcolm. Bob Carlson, Eric Weida, Rob Post, Steve Raab and Eileen Kraemer will testify about the meaning of these terms.

c.    <u>Truckload</u>.  In addition to the evidence regarding the parties' intent (see above), Winn-Dixie will introduce definitions of "truckload" and "less than truckload."  Tom Barr, Philip Payment, Daryl Mills, Ed Mieskoski, Seth Gaynor, Bruce Malcolm. Bob Carlson, Eric Weida, Rob Post, Steve Raab and Bob Thomas will testify about the meaning of these terms.

     d.    <u>Visagent's exchange's lack of critical mass</u>.  Winn-Dixie will introduce Winn-Dixie's complaints to Visagent about the Visagent exchange lack of critical mass, and written admissions by Visagent about the lack of critical mass.  Tom Barr, Philip Payment, Daryl Mills, Ed Mieskoski, Seth Gaynor, Bruce Malcolm. Bob Carlson, Eric Weida, Rob Post and Steve Raab will testify about the lack of critical mass.

     4.    *Statement of all admitted or uncontested facts*.  See Exhibit A.

     5.    *Statement of all admitted legal principals.* Florida substantive law governs this matter.

     6.    *Brief statement of contested facts*:

     a.    Whether Winn-Dixie breached the Service Agreement by buying and reselling goods "through the Internet" outside of Visagent's exchange.

     b.    Whether Winn-Dixie breached the Service Agreement by buying and reselling less than truckload quantities outside of Visagent's exchange.

     c.    Whether Winn-Dixie's performance under the Service Agreement was excused because Visagent's exchange never achieved the critical mass (volume of participants and goods) necessary make the exchange achieve its intended purpose.

16

7.      *Statement of contested legal issues*.  Whether Winn-Dixie may introduce evidence to explain the context of and the parties' intent regarding the disputed terms of the Service Agreement.

8.      *Line and page designations of deposition testimony may use as original (as opposed to impeachment) evidence*.  See Exhibit B.

9.      *Legal authority Winn-Dixie desires the Court to consider*.

a.      Restatement    2d    of    Contracts,    Chapter    11 (Impracticability of Performance and Frustration of Purpose).

b.      *Leon County v. G.J. Gluesenkamp*, 873 So.2d 460 (1st DCA 2004).

c.      *Berloni v. Della Casa*, 972 So.2d 1007 (Fla. 4th DCA 2008).

d.      *Langford v. Paravant*, 912 So.2d 359 (Fla. 5th DCA 2005).

e.      *Cantiere Nautico v. Luxury Marine*, 2009 W.L. 3538722 (S.D.Fla. 2009).

10.     *Statement of core proceeding*.  This is a core proceeding and Winn-Dixie consents to the jurisdiction and entry of final orders or judgments by the Bankruptcy Judge of this Court.

11.    *Statement of good faith endeavor to settle this matter.*  Winn-Dixie's attorneys have conferred with Visagent's attorneys and have made a good faith endeavor to settle this matter.

SMITH HULSEY & BUSEY


By  */s/ Timothy R. Buskirk*
        Stephen D. Busey
        James A. Bolling
        Timothy R. Buskirk

Florida Bar Number 058314
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
busey@smithhulsey.com

Attorneys for Winn-Dixie

## **Certificate of Service**

I certify that a copy of the foregoing document was furnished electronically through the Court's CM/ECF electronic notification system or by mail to **Guy Bennett Rubin, Esq.**, Rubin & Rubin, Post Office Box 395, Stuart, Florida 34995, this 20th day of January, 2010.


_____*/s/ Timothy R. Buskirk*_____
Attorney

687380.1

Statement of all admitted or uncontested facts
Exhibit A to Winn-Dixie's Trial Memorandum

1.     WINN-DIXIE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005.

2.     VISAGENT CORPORATION, an unsecured creditor, filed Claim No. 9953 in July 2005.

3.     VISAGENT filed a Second Amended Statement of Claim in the amount of $9,700, 778, plus attorneys' fees and costs, on January 8, 2010.

4.     WINN-DIXIE and VISAGENT entered into a three (3) year Service Agreement, dated June 15, 2001, with an effective date of June 28, 2001.

5.     WINN-DIXIE filed a Fourteenth Omnibus Objection to (A) Liability Claims and (B) No Liability Misclassified Claims, dated July 11, 2006 "No Liability Claims to be Disallowed," stating the following objection to VISAGENT'S claim:

> NO LIABILITY ON ALLEGED BREACH OF SERVICE AGREEMENT AND RELATED THEORIES OF RECOVERY. CLAIMANT CONTENDS DEBTORS BREACHED EXCLUSIVITY PROVISION IN SERVICE AGREEMENT, ENTITLING IT TO 2% OF ALL DEBTOR'S PURCHASES DURING THE APPLICABLE PERIOD. CLAIM CONTAINS NO SUPPORTING DOCUMENTATION AND NO EXPLANANTION OF DAMAGE CALCULATION. DEBTORS ABIDED BY EXCLUSIVITY PROVISION AND THERE WERE NO OUTSTANDING CLAIMS WHEN SERVICE AGREEMENT EXPIRED IN JUNE 2004. UPON TERMINATION OF RELATED USER AGREEMENT, CLAIMANT WAS REQUIRED, BUT FAILED TO RETURN $25,000 DEPOSIT. ACCORDINGLY, CLAIMANT OWES DEBTOR $25,000.

6.    WINN-DIXIE submitted the following response on June 11, 2007 to an interrogatory propounded by VISAGENT:

Interrogatory No. 1: Set forth each and every breach of Visagent to the Service Agreement and for each breach, identify the date and time of each breach, all documents referencing or supporting such breach and every witness to each breach.

Answer to Interrogatory No. 1: Subject to Debtor's objections, Visagent did not perform under the Service Agreement because Visagent's Grocery Exchange failed to provide a platform for the sale or purchase of sufficient volumes of diverted grocery products.

Visagent also represented to Debtors that Visagent had no ownership or affiliated interested (sic) with any diverter organizations.  In fact, Visagent's management had a direct interest in a diverting business which operated from the same building as Visagent, a fact which Debtors contend affected Visagent's ability to attract enough users to the Grocery Exchange to make it a viable platform for the sale or purchase of sufficient volumes of diverted grocery products.

Tom Barr had knowledge of theses breaches. The documents showing goods purchased and sold on the Grocery Exchange, the documents reflecting Visagent's representations that it was not affiliated with diverter organizations, and the documents showing that Visagent was affiliated with Global Food Resources, Inc. evidence these breaches.

7.    VICTORY and WINN-DIXIE entered into a contract effective as of July 10, 2000.

8.    VICTORY and WINN-DIXIE entered into a second contract on June 22, 2002.

9.    Daryl Mills, on behalf of WINN-DIXIE, sent a letter to all Alternate Source Vendors on June 20, 2001.

10.    Robert Carlson of VICTORY sent a letter on WINN-DIXIE letterhead on September 21, 2001 to all Alternate Source Vendors.

11.    The Service Agreement between the parties, as signed, was reviewed and approved by WINN-DIXIE'S Legal Department.

Line and page designations
of deposition testimony Winn-Dixie may use
as original (as opposed to impeachment) evidence
<u>Exhibit B to Winn-Dixie Trial Memorandum</u>

1.    <u>Tom Bixby</u>:          Page 4, lines 16-21
                        Page 5, lines 10-11
                        Page 9, lines 21-25
                        Page 11, line 2–page 10, line 4
                        Page 13, line 12–page 14, line 1
                        Page 15, lines 10–25
                        Page 28, line 18 – page 29, line 1
                        Page 46, lines 4-10
                        Page 50, lines 3-9
                        Page 75, lines 4-12
                        Page 76, lines 19-23
                        Page 119, lines 6-15
                        Page 122, line 21 – page 123, line 20
                        Page 124, line 10-13

2.    <u>Michael Kresser</u>:   Page 37, lines 12-25
                        Page 38, lines 1-25
                        Page 39, lines 1-25
                        Page 40, lines 1-18
                        Page 41, lines 8-25
                        Page 42, lines 1-24
                        Page 58, lines 5-12
                        Page 65, lines 7-25
                        Page 66, lines 1-25
                        Page 67, lines 1-20
                        Page 70, lines 12-25
                        Page 71, lines 1-21
                        Page 73, lines 7-25
                        Page 74, lines 1-15
                        Page 76, lines 3-25
                        Page 77, lines 1-3
                        Page 80, lines 5-17
                        Page 101, lines 12-17

Page 105, lines 3-25
Page 106, lines 1-14
Page 124, lines 2-8
Page 178, lines 8-19

3.    <u>Rone Luczynski</u>:    Page 4, lines 9-10
Page 8, line 12 – page 9, line 9
Page 10, lines 12-15
Page 10, line 19 – page 11, line 3
Page 17, lines 6-15
Page 21, lines 1-17
Page 22, line 9 – page 23, line 11
Page 24, lines 6-9
Page 24, lines 14-18
Page 36, line 5 – page 37, line 2
Page 37, lines 8-9
Page 37, lines 14-23
Page 55, lines 10-18
Page 55, line 23 – page 57, line 2
Page 57, line 13 – page 58, line 19
Page 59, line 3 – page 62, line 2
Page 64, line 2 – page 65, line 5
Page 65, lines 13-25
Page 67, lines 6-17
Page 71, line 10 – page 72, line 4
Page 73, line 6 – page 74, line 18
Page 79, lines 4-13
Page 83, line 19 – page 84, line 5
Page 86, line 7 – page 87, line 7
Page 92, lines 10-20
Page 93, line 23 – page 94, line 7
Page 114, line 22 – page 115, line 7
Page 117, line 23 – page 118, line 19

4.    <u>Ed Mieskoski:</u>    Page 27, lines 2-10
Page 28, lines 4-8
Page 39, lines 22-23
Page 40, lines 1-8
Page 44, lines 3-7
Page 46, lines 25

24

Page 47, lines 1-13
Page 61, lines 19-25
Page 62, lines 19-25
Page 63, lines 1-16
Page 74, line 25
Page 75, lines 1-6
Page 76, lines 21-25
Page 77, lines 1-2
Page 101, lines 2-12
Page 103, lines 12-24

5.    Phil Payment:    Page 73, lines 1-9
Page 113, lines 15-23
Page 114, lines 7-20
Page 117, lines 14-20

6.    Mark Slater:    Page 5, lines 3-7
Page 5, line 21 – page 6, line 9
Page 10, lines 11-12
Page 31, line 8 – page 32, line 17
Page 42, line 8 – page 43, line 1
Page 45, lines 13-23
Page 58, lines 10-24
Page 64, line 19 – page 67, line 14
Page 69, lines 12-15
Page 69, line 18 – page 70, line 16
Page 87, line 2 – page 88, line 2
Page 91, line 7 – page 95, line 15
Page 95, line 16 – page 99, line 3
Page 101, lines 10-12

7.    Witnesses not yet deposed.  Winn-Dixie cannot yet designate the page and line numbers of the depositions of the following witnesses whose depositions have not yet been taken or completed:  Patricia Mitchell, Neville Teagarden, Fred MacDowell, William Williamson, Baltazar Garaygodobill, Steve Carr, Bruce Malcolm, Steve McLaughlin, Bob Trader, Rob Post, Eric Weida and Kyle Henderson.  In the meantime, Winn-Dixie designates the depositions entire transcripts.

687380.1