### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC. et al | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

### VISAGENT CORPORATION'S TRIAL MEMORANDUM

VISAGENT CORPORATION (hereinafter "VISAGENT"), a claimant herein, pursuant to the Order of the Court dated August 20, 2009, hereby submits this Trial Memorandum.

## I.    Brief Statement Of The Theory Of Each Claim Including Legal Authority For Same.

In this contested claim, the Court is asked to determine if WINN-DIXIE STORES, INC. (hereinafter "WINN-DIXIE" and/or "WD") breached a negotiated three-year Service Agreement with VISAGENT signed on June 15, 2001, with an effective date of June 28, 2001. VISAGENT contends WINN-DIXIE materially breached the terms of the Service Agreement in numerous and multiple ways resulting in damages to VISAGENT, including accrued legal fees and expenses in the prosecution of this claim.

The Service Agreement required VISAGENT, for the three (3) year term of the Agreement, to provide access to its services, including an Internet e-commerce Exchange, other software solutions and logistics services that would allow WINN-DIXIE to purchase and sell products for its retail grocery business in the secondary market. For this service, WINN-DIXIE agreed to allow VISAGENT collect a 2% fee for all transactions. The Agreement covered all of WINN-DIXIE'S wholesale business

1

transactions for full or truckload quantities of Consumer Packaged Goods (hereinafter referred to as "CPG") purchased or resold through the Internet or similar electronic means, excluding purchases from manufacturers. The Service Agreement specifically prohibited WINN-DIXIE from contracting for the services of an entity other than VISAGENT for its eCommerce transactions covered under the scope of the Agreement. However, the Agreement specifically excluded transactions with VICTORY WHOLESALE GROCERS (hereinafter referred to as "VICTORY") for one (1) year because VICTORY was already providing eCommerce services, in-house, to WINN-DIXIE and to do otherwise would place WINN-DIXIE in the untenable position of squarely breaching its contract with VICTORY.

In pertinent part to this section of the Memorandum, the Service Agreement required WINN-DIXIE to give written notice, with an attendant ten (10) day cure period to VISAGENT if WINN-DIXIE reasonably determined any change to the services or technology covered by the Agreement had a detrimental or negative effect on WINN-DIXIE'S use of the Exchange. WINN-DIXIE had the right to immediately terminate the Service Agreement upon the expiration of the cure period if VISAGENT failed to remedy the complaint to WINN-DIXIE'S satisfaction. For the entire term of the Service Agreement, WINN-DIXIE never provided any such written notice to VISAGENT. In addition, the Agreement contained a contractual integration clause in which the parties agreed that prior representations, promises, agreements and negotiations not set forth in the contract were of no force and effect and the contract could be modified only in writing by the parties. The contract further provided: "If any party to this Agreement shall bring any suit or action against another for relief, declaratory or otherwise, arising

2

out of this Agreement, the prevailing party at trial and on appeal shall be entitled to recover against the other party, in addition to all court costs and disbursements, such sums as the court may adjudge to be reasonable attorney's and paralegal fees."

A valid contract is created where there is an offer, acceptance of the offer, consideration for the offer and acceptance and a meeting of the minds. <u>Med-Star Cent., v. Psychiatric Hospitals of Hernando County, 639 So. 2d 636 (Fla. 5th DCA 1994)</u>. <u>Jerome v. William A. Reid Const. Ltd., 307 So. 2d 248, 252 (Fla. 4th DCA 1975)</u>. <u>Groff Const., Inc. v. American Pride Building Co., LLC., 2007 WL 495316 (M.D.Fla.,2007)</u>. It is for this Court to determine whether "there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract." <u>Mehler v. Huston, 57 So.2d 836, 837 (Fla.1952)</u>. In deciding whether there has been a meeting of the minds, courts look not to "'the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties having meant the same thing but on their having said the same thing.' " <u>Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974)</u> (citation omitted). As recognized in <u>Blackhawk Heating & Plumbing Co., 302 So.2d at 408</u>:

> "Even though all details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." <u>17 C.J.S. Contracts § 31</u>.

The language of the Service Agreement is clear and unambiguous. The Service Agreement contains the following section:

> **Scope of this Agreement:** This Agreement is intended to cover all of User's business transactions for full or truckload quantities of consumer packaged goods purchased or resold through the Internet or similar electronic means in a wholesale format, excluding purchases by User from the original manufacturer or

3

its authorized representatives.  For the Term of this Agreement, User will not employ or contract for the services of an entity other than Provider for its E-commerce transactions covered under the scope of this Agreement.

.        "Where the determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only..." Angell v. Don Jones Ins. Agency, Inc., 620 So.2d 1012, 1014 (Fla. 2d DCA 1993).    Where the language is unambiguous, this Court can decide, as a matter of law, if the terms have been breached. Gray v. D & J Indus. Inc., 875 So.2d 683, 683 (Fla. 3d DCA 2004);  Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1360 (11th Cir. 1988).

Under Florida law, which governs the Service Agreement by its own terms, it is well settled that "when the terms of a voluntary contract are clear and unambiguous, ... the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995). Where the words of a contract are clear and definite, they must be understood according to their ordinary meaning. Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc., 609 So.2d 66, 68 (Fla. 4th DCA 1992). Thus, Florida law supports the obvious proposition that the terms of a contract control a court's interpretation. Barnes v. Diamond Aircraft Industries, Inc., 499 F. Supp 2d 1311, 1317 (S.D. Fla. 2007). However, a court may only resort to the process of interpretation when the words used in a contract are unclear.  Board of Public Instruction of Dade County v. Fred Howland, Inc., 243 So.2d 221 (Fla.3d DCA 1971). The ambiguity must exist on the face of the document itself before extrinsic matters may be considered by the court.  Gulf Cities Gas

4

Corp. v. Tangelo Park Service Company, 253 So.2d 744 (Fla.4th DCA 1971).

Contractual language must be read to have the plain meaning of the words used and the Court is bound by the plain meaning of those words. Marx v Clear Channel, 887 So.2d 405 (Fla. 4th DCA 2004). The Court may not change the terms of a contract to achieve what it might think is a more appropriate result. Rosenstein v Rosenstein, 976 So.2d 1148, 1149 (Fla. 4th DCA 2008). Under Florida law, the court's function in interpreting and enforcing a contract is to determine the parties' intent from the express terms of the contract, not the other way around. Financial Healthcare Associates, Inc. v. Public Health Trust of Miami-Dade County, 488 F.Supp.2d, 1231, 1239 (S.D. Fla.2007).

The language used in a contract is the best evidence of the intent and meaning of the parties. Moore v. Chodorow, 925 So.2d 457, 461 (Fla. App. 4th DCA 2006) "It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties, where contracts are clear and unambiguous, they should be construed as written and the court can give them no other meaning." Khosrow Maleki, P.A. v. MA Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. App. 4th DCA, 2000) Further, where the terms are unambiguous, the parties' intent must be discerned from the four corners of the document. Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank, 468 So.2d 399, 405 (Fla. 4th DCA), rev. denied, 480 So.2d 1295 (Fla.1985).

There are three elements to a breach of contract claim: a valid contract, a material breach and damages. To sustain a claim for breach of contract, VISAGENT must show that it performed its duties under the Service Agreement and that WINN-DIXIE failed to perform their part of the contract that amounts to a material breach. A breach is material if it goes to the essence of the contract. Friedman v. New York Life Ins. Co., 985 So.2d

56 (Fla. App. 4th, DCA 2008); <u>Beefy Trail, Inc. v. Beefy King International, Inc., 267 So.</u>

<u>2d 853, 857 (Fla. 4th DCA, 1972.)</u> The issue of whether a breach is material is a question

of fact to be decided by the fact finder. <u>Beefy Trail</u> at 858.

     The substantive law applicable to the case determines which facts are material.

<u>Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993)</u>. A material fact is one

that "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty</u>

<u>Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)</u>; <u>Alphin v. Sears,</u>

<u>Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir.1991)</u>. Accordingly, "[f]actual disputes

that are irrelevant or unnecessary will not be counted." <u>Anderson, 477 U.S. at 248, 106</u>

<u>S.Ct. 2505</u>. In rendering a decision based on state substantive law, a federal court must

"decide the case the way it appears the state's highest court would." E.g., <u>Royal Ins. Co.</u>

<u>of Am. v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir.2001)</u>.

## II.  Brief Summary Of The Contentions Of Fact In Support Of The Legal Theories And The Evidence To Be Relied Upon To Establish Each Of The Facts Contended.

     Although this Court has been intimately involved with this case for several years,

it is important for the Court to understand the nature of the "diverting business" in the

2001 to 2004 time frame. The purchase and sale of goods for profit by and between

wholesalers, distributors and retailers outside of the manufacturer's intended channel of

distribution is generally called "diverting". So called "diverted" goods are sold in what is

commonly referred to as the secondary market. These goods may be sold and resold in a

wholesale format several times before they ultimately reach a traditional retail store shelf.

Any party that participates in such a sale, including retailers, is generally called a

"diverter". Many grocery retailers, including Winn Dixie, treated their procurement departments as profit centers by buying and selling products on the secondary market.

Buying products from diverters created a way for the retailer to augment its mainline procurement process by acquiring millions of dollars of their overall purchasing requirements from resellers that could offer products at a price that is lower than any price quoted by the manufacturer. This opportunity becomes available due to fractures in the pricing practices of manufacturers. Many times a manufacturer will offer different prices to different customers, for the same product, for reasons related to region, season, quantity, type of buyer, etc. Buyers that are offered the better pricing often over-buy with the intent to resell to other parties who don't have access the same low pricing.

Winn-Dixie, through its procurement department, engaged in these diverting practices to lower its overall cost structure for many products that would ultimately make it to the store shelf <u>and</u> to resell for a profit many products that it had the capability to purchase below market value.

Because retailers typically do not have the tools or business processes necessary to trade directly with other retailers, they must use middlemen, known as Alternate Source Vendors. These "diverters" purchase and resell the products with a very comfortable profit margin, to complete the end to end diversion process. Of the two to three hundred middlemen that were regularly operating in the grocery diversion arena, there were only three or four that had annual sales in excess of $1Billion each.

Some retailers would contract with these larger entities known as In-House Diverters to manage their secondary market transaction process. Whether a retailer trades directly with a long list of Alternate Source Vendors or uses a single In-House Diverter to

7

manage its Alternate Source Vendors, the elements of a transaction remain the same. A retailer's transaction in the grocery secondary market must include all of the following stages:

For A Seller:

a.   Identify products available to be sold, either from inventory or from "deals" offered by the manufacturer but not yet in inventory;
b.   Identify market pricing for subject product and compare with Seller's own cost basis to determine offering price;
c.   Identify and communicate with potential buyers for subject product;
d.   Negotiate price and terms, including freight logistics and payment;
e.   Document transaction with Purchase Orders and Invoices;
f.   Negotiate transportation for freight, if applicable;
g.   Coordinate freight logistics, if applicable;
h.   Collect payment
i.   Manage discrepancies in quantity, quality or extraordinary transportation costs, as applicable;
j.   Maintain communication throughout transaction with internal business units and with buyer.

For A Buyer:

a.   Identify internal need (demand) for product;
b.   Identify market pricing for subject product and compare with Buyer's own cost basis from the manufacturer to determine acceptable price;
c.   Identify and communicate with potential sellers for subject product;
d.   Negotiate price and terms, including freight logistics and payment;
e.   Document transaction with Purchase Orders and Invoices;
f.   Negotiate transportation for freight, if applicable;
g.   Coordinate freight logistics, if applicable;
h.   Issue payment;
i.   Manage discrepancies in quantity, quality or extraordinary transportation costs, as applicable;
j.   Maintain communication throughout transaction with internal business units and with seller.

The foregoing background information in connection with diverting, secondary marketplace for CPG goods and the elements or steps involved in a transaction to buy or sell in this market will be supported by evidence in the form of testimony by I. Mark Rubin, Robert Warren, Tom Barr, Robert Carlson, Simon Garwood, Neville Teagarden

and deposition testimony of Michael Kresser, Professor Eileen Kraemer, Ed Mieskowski, Daryl Mills, Philip Payment and Fred MacDowell.

a.    <u>The Service Agreement is a binding legal contract, which reflects a meeting of the minds between WNN-DIXIE and VISAGENT.</u>

VISAGENT made an offer to WINN-DIXIE to provide it with certain services and access to specialized technology, including the Visagent Grocery Exchange (VGE), for use in its procurement of wholesale CPG in the secondary marketplace for such goods. After a lengthy and exhaustive "vetting" process and test period by WINN-DIXIE, and also after a thorough review and negotiation of the proposed Service Agreement by its in-house legal department, the offer was accepted on June 15, 2001 by WINN-DIXIE by the act of the execution of that document by Philip Payment, a Vice President of WINN-DIXIE. The executed Service Agreement will be admitted into evidence and proffered by Visagent as the best evidence of the parties' agreement and their intentions.

WINN-DIXIE will admit that it signed the Service Agreement after it conducted due diligence and a full opportunity to test the products and services of Visagent. The Service Agreement itself acknowledges same. ("Services" section) WINN-DIXIE will make no allegation the contract was procured by coercion or duress or that Mr. Payment was not authorized to execute the Service Agreement with the full authority necessary to bind WINN-DIXIE. The Debtor will make no contention that consideration was insufficient to support its obligations under the contract.; virtually all WINN-DIXIE employees deposed in this matter acknowledged VISAGENT expended an enormous amount of money and manpower both in advance of execution the Service Agreement in

9

the good faith anticipation of a commitment for three years of continuous business flow resulting for an executed contract, and then to further implement the terms of the Service Agreement including continued services and technology upgrades over the entire three years of the contract.   There was **never** any complaint about the level of service VISAGENT provided to WINN-DIXIE. There is no question that VISAGENT and WINN-DIXIE had a meeting of the minds as to the substantial material terms of the Service Agreement. In support of these contentions, VISAGENT will present the testimony, either live or by deposition, of WINN-DIXIE former and current employees, Tom Barr, Philip Payment, Daryl Mills, Kevin Gates and Edmund Mieskoski. VISAGENT will also present the testimony of I. Mark Rubin and Robert Warren.

b.      The terms of the Service Agreement are clear and unambiguous.

The Service Agreement was drafted in plain and unambiguous language understood by all of the principal parties to the negotiation and ultimate execution of the Agreement to have the same meaning and intent: for a period of three (3) years, virtually **all** of WINN-DIXIE'S transactions in the secondary market ("diverted goods") were to be conducted through the Visagent Grocery Exchange, except those direct transactions with Victory from the date of the Service Agreement until July 1, 2002.

WINN-DIXIE now, some nine years later, attempts to recast the clear language of the Service Agreement in hyper-technical terms to avoid liability, based upon the purported *understanding* of certain terms in the "Scope of the Agreement" by its lawyers and experts which differ from those representatives of WINN-DIXIE and VISAGENT who executed the actual document. The spirit and intent of this contract is best viewed through the eyes of those who made it: WINN-DIXIE'S management team of Daryl Mills

and Philip Payment and VISAGENT'S Chief Executive Officer, I. Mark Rubin. This testimony will be presented to the Court not to vary or alter the explicit terms of the Service Agreement, but rather to provide a proper context for consideration by the Court. WINN-DIXIE'S defenses are simply revisionist history.

Philip Payment, the WINN-DIXIE Vice president who signed the Service Agreement, in summing up WINN-DIXIE'S purported justification for breaching the Service Agreement, clearly defined the meaning of the words in the "Scope of the Agreement" section. He testified that Visagent was a "tool" that just did not work, but if it had worked, VISAGENT would have processed all of WINN-DIXIE'S secondary market transactions through its exchange. Yet, WINN-DIXIE never complained or otherwise provided any written notice to cure any purported or perceived deficiency in Visagent's services or technology and never asserted any breach of the agreement by Visagent until a claim was filed against it in this bankruptcy.

Visagent will also admit a letter authored by WINN-DIXIE's manager Daryl Mills, immediately after execution of the Service Agreement, showing the contemporaneous understanding of the scope of the contract. Visagent believes this is best indication of what WINN-DIXIE intended as to scope, as opposed to what its lawyers and corporate representatives say years later in the throes of this contested matter.

VISAGENT will present the testimony of Daryl Mills, Philip Payment, Edmund Mieskoski and I. Mark Rubin to support this contention, along with the 2001 letters of Daryl Mills and Robert Carlson.

WINN-DIXIE will contend the contract only meant to cover full trucks and have this Court ignore the word "or" in the phrase "full or truckload quantities". The scope of the Service Agreement was for "all business transactions for full or truckload quantities of consumer packaged goods...." The word "all" means every. The words "full or truckload quantities" plainly mean a full truck or any other load attached and hauled by a truck. "Full" cannot mean the exact same thing as 'truckload" under the basic tenet of contractual construction, which is to give meaning to every word, if possible. Because the word "or" separates two words, those two words are clearly alternatives and not the same thing.

Even if one accepts WINN-DIXIE's illogical interpretation however, Visagent should still prevail on liability because Visagent will prove hundreds, if not thousands, of undisputed full truckloads of CPG purchased and sold by WINN-DIXIE in the secondary market outside the Visagent Grocery Exchange. Since this is undisputed, that at a minimum, full truckloads were covered by the Service Agreement and WINN-DIXIE was obligated to use the Exchange for these transactions, then liability is established. Visagent will support this contention with WINN-DIXIE's historical transaction printouts, its bills of lading and its electronically produced and generated trade and payment confirmations Visagent will also support this contention with operating manuals and other materials describing Victory's NTS electronic internet-based ecommerce system together with testimony of Robert Thomas, WINN-DIXIE's own expert, Robert Warren, I. Mark Rubin, Robert Carlson, Tom Barr and Simon Garwood.

c.    <u>WINN-DIXIE admitted to breaching the terms of the Service Agreement.</u>

In actuality, there is no material factual dispute that WINN-DIXIE breached the terms of the Service Agreement, by the admissions of its own employees and its experts. There are at least three specific breaches:

i.    WINN-DIXIE personnel, and Victory personnel managing the diverting operation for WINN-DIXIE and acting for it, solicited orders from diverters via e-mail for full or truckload quantities of product WINN-DIXIE wanted to sell.  WINN-DIXIE bought and sold truckloads of products using e-mail and instant messaging.  These solicitations resulted in sales of product using the internet.  These facts were admitted by WINN-DIXIE'S Corporate Representative, Tom Barr and Robert Carlson, the Victory Manager for WINN-DIXIE'S Procurement Department. WINN-DIXIE concedes that the transmission of an e-mail is the use of the internet through testimony of Corporate Representative, Tom Barr and WINN-DIXIE expert Prof. Eileen Kraemer.

ii.    WINN-DIXIE substantially used VICTORY'S NTS internet-based system to buy and sell all of its CPG on the secondary market with other diverters during the entire term of the Service Agreement.  There are numerous transactions for the sale and purchase of full trucks processed by VICTORY personnel on behalf of WINN-DIXIE using the NTS system.  NTS, using the internet and electronic means similar to the internet was instrumental in every phase of the purchase and sale of goods by VICTORY for WINN-DIXIE.

Victory's proprietary NTS was an internet-based ecommerce procurement system from which recommendations for product purchases and sales were consummated.  In addition to conducting diverting business utilizing telephones, facsimiles and e-mail,

Victory received electronic data transmissions from WINN-DIXIE other retailers and other diverters with product information. The data was sent from retailers like WINN-DIXIE to VICTORY headquarters in Springboro, Ohio by data transmission lines "through" the internet where the data was then processed and transmitted back to the retailer the next day with recommended transactions.

Visagent will support these contentions with deposition or live testimony of WINN-DIXIE'S Corporate Representative, Tom Barr, deposition excerpts of Robert Carlson, the Victory Manager for WINN-DIXIE'S Procurement Department, deposition testimony of victory Chief information officer Michael Kresser and WINN-DIXIE expert Prof. Eileen Kraemer. Visagent will also support this contention with operating manuals and other materials describing Victory's NTS electronic internet-based ecommerce system.

iii.    WINN-DIXIE contracted with Victory in 2002 to conduct its buying and selling of CPG in the secondary market through an eCommerce provider.  The  wording in the Service Agreement excluding direct transactions between WINN-DIXIE and Victory for one year permitted WINN-DIXIE to avoid conflicting contracts with providers of similar services up until July 1, 2002. WINN-DIXIE's renewal contract with Victory in 2002 for eCommerce services was a direct breach of its contractual commitment to Visagent not to "employ or contract for the services of an entity other than Provider for its E-commerce transactions covered under the scope of this Agreement." In this 2002 contract, Victory agreed to process transactions for WINN-DIXIE which were subject to the Service Agreement, using internet or similar electronic means to purchase and resell quantities of CPG through Victory's proprietary internet-

connected NTS electronic purchasing system. To accomplish these sales and/or purchases, WINN-DIXIE was required to send large computer files to Victory, on a daily basis, containing a snapshot of its system-wide inventory via an Internet transmission called FTP.

Entering into a renewal contract with Victory was the blatant breach of a provision of the Service Agreement plainly designed to ensure a large volume of WINN-DIXIE business through the VGE in years 2 and 3 to compensate Visagent for its contractual commitments to WINN-DIXIE, financial and otherwise.

Visagent will support this contention through true copies of the July 2000 and June 2002 contracts between Victory and WINN-DIXIE, deposition or live testimony of WINN-DIXIE'S Corporate Representative, Tom Barr, deposition excerpts of Robert Carlson, the Victory Manager for WINN-DIXIE'S Procurement Department, deposition testimony of Victory Chief Information Officer Michael Kresser and WINN-DIXIE expert Prof. Eileen Kraemer, testimony of I. Mark Rubin, Robert Warren, and live or deposition testimony of Daryl Mills. Visagent will also support this contention with operating manuals and other materials describing Victory's NTS electronic internet-based ecommerce system.

## III.    Statement Of All Admitted Or Uncontested Facts.

a.       WINN-DIXIE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005.

b.       VISAGENT CORPORATION, an unsecured creditor, filed Claim No, 9953 in July 2005.

c.     VISAGENT filed a Second Amended Statement of Claim in the amount of

$9,700, 778, plus attorneys' fees and costs, on January 8, 2010.

d.     WINN-DIXIE and VISAGENT entered into a three (3) year Service Agreement,

dated June 15, 2001, with an effective date of June 28, 2001.

e.     WINN-DIXIE filed a Fourteenth Omnibus Objection to (A) Liability Claims and

(B) No Liability Misclassified Claims, dated July 11, 2006 "No Liability Claims to be

Disallowed," stating the following objection to VISAGENT'S claim:

"NO LIABILITY ON ALLEGED BREACH OF SERVICE AGREEMENT AND
RELATED THEORIES OF RECOVERY. CLAIMANT CONTENDS DEBTORS
BREACHED EXCLUSIVITY PROVISION IN SERVICE AGREEMENT, ENTITLING
IT TO 2% OF ALL DEBTOR'S PURCHASES DURING THE APPLICABLE PERIOD.
CLAIM   CONTAINS   NO   SUPPORTING   DOCUMENTATION   AND   NO
EXPLANANTION OF DAMAGE CALCULATION. DEBTORS ABIDED BY
EXCLUSIVITY PROVISION AND THERE WERE NO OUTSTANDING CLAIMS
WHEN SERVICE AGREEMENT EXPIRED IN JUNE 2004. UPON TERMINATION
OF RELATED USER AGREEMENT, CLAIMANT WAS REQUIRED, BUT FAILED
TO RETURN $25,000 DEPOSIT. ACCORDINGLY, CLAIMANT OWES DEBTOR
$25,000."

f.     WINN-DIXIE submitted the following response on June 11, 2007 to an

interrogatory propounded by VISAGENT:

Interrogatory No. 1: Set forth each and every breach of Visagent to the Service
Agreement and for each breach, identify the date and time of each breach, all documents
referencing or supporting such breach and every witness to each breach.

Answer to Interrogatory No. 1: Subject to Debtor's objections, Visagent did not perform
under the Service Agreement because Visagent's Grocery Exchange failed to provide a
platform for the sale or purchase of sufficient volumes of diverted grocery products.
     Visagent also represented to Debtors that Visagent had no ownership or affiliated
interested (sic) with any diverter organizations. In fact, Visagent's management had a
direct interest in a diverting business which operated from the same building as Visagent,
a fact which Debtors contend affected Visagent's ability to attract enough users to the
Grocery Exchange to make it a viable platform for the sale or purchase of sufficient
volumes of diverted grocery products.
     Tom Barr had knowledge of theses breaches. The documents showing goods
purchased and sold on the Grocery Exchange, the documents reflecting Visagent's
representations that it was not affiliated with diverter organizations, and the documents

16

showing that Visagent was affiliated with Global Food Resources, Inc. evidence these breaches.

g.    VICTORY and WINN-DIXIE entered into a contract effective as of July 10, 2000.

h.    VICTORY and WINN-DIXIE entered into a second contract on June 22, 2002.

i.    Daryl Mills, on behalf of WINN-DIXIE, sent a letter to all Alternate Source Vendors on June 20, 2001.

j.    Robert Carlson of VICTORY sent a letter on WINN-DIXIE letterhead on September 21, 2001 to all Alternate Source Vendors.

k.    The Service Agreement between the parties, as signed, was reviewed and approved by WINN-DIXIE'S Legal Department.

## IV.    Brief Statement Of Contested Facts.

Did WINN-DIXIE'S use of the NTS after June 28, 2002 violate the terms of the Service Agreement?

Did WINN-DIXIE use the internet or other similar electronic means to otherwise purchase CPG in violation of the Service Agreement?

Did WINN-DIXIE violate the Service Agreement by entering into a contract with VICTORY in 2002?

## V.    Statement Of Agreed Legal Issues.

Florida substantive law governs this matter.

## VI.    Statement Of Contested Legal Issues.

Can WINN-DIXIE interpose defenses to the breach of contract claim which were not contained in its Objection, Interrogatory Responses and testimony of its Corporate Representative?

17

.

## VII. List identifying the portions (by line and page numbers) of the depositions VISAGENT may use at trial for the purpose of original evidence

**WINN-DIXIE Corporate Representative-Barr**

P. 10 L. 11- L. 22
P. 235 L. 4- P. 236 L. 18
P. 241 L. 10- P. 242 L. 5
P. 35 L. 25 – P. 36 L. 9
P. 36 L. 10 – P. 39 L. 22
P. 45 L. 4 - L. 20
P. 138 L.12 – P. 139 L. 5
P. 7 L. 16- L. 18
P. 24 L. 12 – L. 15
P. 22 L. 8 – L. 19
P. 163 L. 24 – P. 164 L. 14
P. 194 L. 18 – P. 196 L. 23
P. 50 L. 18 – P. 51 L.8
P. 93 L. 4 – L. 24
P. 161 L. 7 – P. 162 L. 3
P. 99 L. 17 – P. 101 L. 5
P. 96 L. 20 – P. 97 L. 6
P. 97 L. 17 – L. 25
P. 186 L. 24 – P. 188 L. 19
P. 188 L. 20 – P. 189 L. 10
P. 99 L. 17 – P. 101 L. 5
P. 101 L. 7- P. 102 L. 6
P. 102 L. 8 – L. 21
P. 94 L. 8 – P. 95 L. 7
P. 173 L. 19 – P. 174 L. 9
P. 183 L. 9 – P. 185 L. 5
P. 188 L. 20 -- P. 189 L. 10
P. 202 L. 22 – P. 203 L. 3
P. 172 L. 4 – L. 8
P. 231 L. 23 – P. 233 L. 12
P. 216 L. 5 –L. 25

**Continued Deposition of WINN-DIXIE Corporate Representative - Barr**

P. 13 L. 7- P. 14. L. 8
P. 26 L. 18 – L. 21
P. 27 L. 2 – P. 21 L. 10

**WINN-DIXIE Corporate Representative- Kevin Gates**

P. 65 L.. 7 - P.66. L.23
P. 71 L. 3 - P. 72 L. 2
P. 58 L. 20 – P. 60 L. 2


**Deposition of Robert Carlson**

P. 53 L. 20 P. 54 L. 8


**Deposition of Gary Klingerman**

P. 72 L. 11 – P. 73 L. 4
P. 71 L. 18 – P. 72 L. 10


**Deposition of Philip Payment**

P. 27 L. 19 – P. 28 L. 6
P. 31 L. 19 – P. 32 L. 9
P. 36 L. 17 – P. 37 L. 5
P. 32 L. 14 – P. 33 L. 9
P. 14 L. 5 – L. 15
P. 97 L. 18 – P. 101 L. 3
P. 20 L. 24 – P. 23 L. 17
P. 51 L. 9 – L. 24
P. 72 L. 22 – P. 73 L. 9
P. 113 L. 10 – L. 14
P. 113 L. 15 – P. 115 L. 9
P. 117 L. 14 – P. 118 L. 4
P. 87 L. 5 – P. 87 L. 25
P. 70 L. 10 – P. 71 L. 1
P. 79 L. 1 – P. 80 L. 4
P. 118 L. 5 – L. 24


**Deposition of Michael Kresser**

P. 60 L.9- P. 61 L. 23
P. 71 L. 9 – P. 72 L. 1
P. 40 L. 2 – L. 24

**Deposition of Daryl Mills**

P. 47 L. 3 – L. 9
P. 47 L. 18 – P. 48 L. 7
P. 52 L. 2 – L. 13
P. 111 L. 9 – P. 113 L.15
P. 115 L. 1 – P. 116 L. 1
P. 106 L. 21 – P. 107 L. 2
P. 19 L. 24 – P. 20 L. 11
P. 106 L. 3 – L. 18
P. 53 L. 9 – P. 59 L. 23

**Deposition of Edmund Mieskoski**

P. 17 L. 4 – L. 20
P. 18 L. 1 – L. 23
P. 35 L. 5 –L. 6
P. 17 L. 21 – P. 18 L. 14
P. 19 L. 18 – P. 23 L. 19
P. 35 L. 9 – L. 12
P. 26 L. 1 – l. 18
P. 28 L. 9 – L. 13
P.35 L. 15 – P. 36 L. 11
P. 54 L. 3 – L. 25
P. 27 L. 2 – P. 28 L. 6
P. 138 L. 5 – L. 16
P. 143 L. 4 – L. 11
P. 33 L. 22 – P. 34 L. 8
P. 53 L. 22 – P. 54 L. 2
P. 120 L. 20 – P. 121 L. 7
P. 93 L. 16 – L. 19
P. 61 L. 4- L. 14
P. 75 L. 1 – P. 77 L. 22
P. 64 L. 24 – P. 65 L. 3
P. 145 L. 20 – P. 146 L. 12
P. 62 L. 19 – P. 64 L. 22
P. 70 L. 4 – L. 18
P. 68 L. 23 – P. 69 L. 3
P. 59 L. 1 – L. 7
P. 38 L. 5 –L. 11
P. 57 L. 19 – P. 58 L. 7
P. 127 L. 19 – P. 129 L. 13
P. 130 L. 21 – P. 131 L. 14
P. 102 L. 10 – P. 104 L. 22

**Deposition of Eileen Kraemer**

P. 158 L. 6 – L. 21
P. 159 L. 24 – P. 160 L. 9
P. 155 L. 18 – L. 22
P. 162 L. 1 – 25
P. 130 L. 21 – P. 131 L. 8
P. 141 L. 17 – P. 142 L. 18
P. 142 L. 23 – P. 143 L. 5
P. 143 L. 25 – P. 144 L. 24

**Deposition of Robert Thomas**

P. 3   L. 7 – P.4   L. 6
P. 5 L. 1 – 20

### VIII.   Legal authority VISAGENT wishes the Court to consider.

1. Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir.1991).
2. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)
3. Angell v. Don Jones Ins. Agency, Inc., 620 So.2d 1012, 1014 (Fla. 2d DCA 1993)
4. Barnes v. Diamond Aircraft Industries, Inc., 499 F. Supp 2d 1311, 1317 (S.D. Fla. 2007)
5. Beefy Trail, Inc. v. Beefy King International, Inc., 267 So. 2d 853, 857 (Fla. 4th DCA, 1972.)
6. Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla.1974)
7. Board of Public Instruction of Dade County v. Fred Howland, Inc., 243 So.2d 221 (Fla.3d DCA 1971)
8. Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995)
9. Financial Healthcare Associates, Inc. v. Public Health Trust of Miami-Dade County, 488 F.Supp.2d, 1231, 1239 (S.D. Fla.2007)
10. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993)
11. Friedman v. New York Life Ins. Co., 985 So.2d 56 (Fla. App. 4th, DCA 2008)
12. Gray v. D & J Indus. Inc., 875 So.2d 683, 683 (Fla. 3d DCA 2004)
13. Groff Const., Inc. v. American Pride Building Co., LLC., 2007 WL 495316 (M.D.Fla. 2007)
14. Gulf Cities Gas Corp. v. Tangelo Park Service Company, 253 So.2d 744 (Fla.4th DCA 1971)
15. Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc., 609 So.2d 66, 68 (Fla. 4th DCA 1992)
16. Jerome v. William A. Reid Const. Ltd., 307 So. 2d 248, 252 (Fla. 4th DCA 1975)
17. Khosrow Maleki, P.A. v. MA Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. App. 4th DCA, 2000)
18. Marx v Clear Channel, 887 So.2d 405 (Fla. 4th DCA 2004)

19. Med-Star Cent., v. Psychiatric Hospitals of Hernando County, 639 So. 2d 636 (Fla. 5th DCA 1994)
20. Mehler v. Huston, 57 So.2d 836, 837 (Fla.1952)
21. Moore v. Chodorow, 925 So.2d 457, 461 (Fla. App. 4th DCA 2006)
22. Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1360 (11th Cir. 1988)
23. Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank, 468 So.2d 399, 405 (Fla. 4th DCA), rev. denied, 480 So.2d 1295 (Fla.1985)
24. Rosenstein v Rosenstein, 976 So.2d 1148, 1149 (Fla. 4th DCA 2008)
25. Royal Ins. Co. of Am. v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir.2001)

*** Claimant reserves the right to supplement these cases at trial.

**IX.    Statement that this is a core or non-core proceeding and that VISAGENT does or does not consent to the jurisdiction and entry of final orders or judgments by the Bankruptcy Judge of this Court.**

This is a "core" proceeding with in the meaning of 28 U.S.C. § 157 (a) and

VISAGENT CORPORATION consents to the entry of the final orders or judgments by

the Bankruptcy Judge of this Court.

**X.    Statement that counsel has conferred with opposing counsel and has made a good faith endeavor to settle the above-captioned proceeding.**

The undersigned certifies that the parties have explored settlement of the

foregoing disputes and conferred in good faith, but a settlement is not forth coming.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document has been furnished via electronic filing this 20th day of January, 2010.

Guy Bennett Rubin, Esq.
Florida Bar No. 691305
Rubin & Rubin
P.O. Box 395
Stuart, FL 34995
(772) 283-2004
(772) 283-2009 fax

22