**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Reorganized Debtors.[1] | ) | Jointly Administered |

**REORGANIZED DEBTOR'S MOTION FOR AN ORDER IN AID OF MAKING
A FINAL DISTRIBUTION UNDER CONFIRMED REORGANIZATION PLAN**

Winn-Dixie Stores, Inc. ("Winn-Dixie") moves the Court (this "Motion"), under

§§ 105(a) and 1142(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

3020(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of

an order in the form attached as Exhibit A, in aid of making a final distribution of new Winn-

Dixie common stock ("New Common Stock") as provided for in Winn-Dixie's confirmed

reorganization plan, dated August 9, 2006 (as modified, the "Plan").[2]

**SUMMARY OF RELIEF REQUESTED**

The Plan provides for shares of New Common Stock to be distributed to

claimants. Under applicable nonbankruptcy law, Winn-Dixie must withhold taxes on

distributions to current or former employees. Recognizing this issue, the Plan requires claimants

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are reorganized debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc. With the exception of Winn-Dixie Stores, Inc., the related cases of these reorganized debtors were closed on March 22, 2007.

[2]     The Plan is available on the Court's docket at docket number 10058; the First Modification to the Plan is available on the Court's docket at docket number 11765. Capitalized terms not otherwise defined shall have the meaning set forth in the Plan.

who will owe withholding and similar taxes in connection with the distribution to pay those taxes before receiving any distribution under the Plan.  For the most part, these claimants hold claims based on participation in Winn-Dixie's Management Security Plan (the "MSP"), Supplemental Retirement Plan (the "SRP"), and Long-Term Incentive Plans (together with any other employee claimants and their beneficiaries, the "Employee Claimants"), and they overwhelmingly voted in favor of the Plan.  The Plan, however, does not explicitly set procedures or deadlines for Employee Claimants to pay those taxes.

Winn-Dixie has now resolved virtually all of its outstanding claims and is ready to make a final distribution in mid-June of this year.  Winn-Dixie has developed straightforward procedures to collect these taxes, but in order to carry-out its final distribution, Winn-Dixie needs to set deadlines (the "Winddown Deadlines"):

- May 26, 2010 will be the deadline for Employee Claimants to pay estimated taxes (the "Initial Deadline") in order to receive their distribution with other holders of Allowed Claims on or about the mid-June Distribution Date (as defined in the Plan).[3]  Winn-Dixie plans to give Employee Claimants at least two weeks from the date Winn-Dixie has sent the notice specifying the estimated tax due until the Initial Deadline.

- May 31, 2011 as the Final Deadline.  On or about this date, and to the extent that Winn-Dixie has not exercised the Net Distribution option described herein, any shares that have not been delivered to the Employee Claimants will revert to the Common Stock Reserve to be distributed in accordance with the Plan.[4]

---

[3]    Because the tax liability is based on the value of the New Common Stock on the distribution date, but Winn-Dixie must receive payment before issuing the shares, Winn-Dixie will estimate the amount expected to be due.  Once the distribution is made and the actual tax liability is known, Winn-Dixie will send those Employee Claimants who paid their estimated tax liability either (i) a check for any overpayment, or (ii) a bill for any underpayment, as the case may be.

[4]    Winn-Dixie proposes that it would have the option, if Employee Claimants do not pay their taxes, to cause the distribution of the shares to an Employee Claimant, less the number of shares equal in value to the tax, with the tax calculated by Winn-Dixie based on the New Common Stock's value as of approximately the date of the Net Distribution.  This net distribution could occur any time after the Initial Deadline.  Although Winn-Dixie believes such a net distribution (the "Net Distribution") would be permitted under the broad authority it is granted in the Plan (*see* Plan, §§ 6.17(h) and 8.9), it has not done so to date because tax obligations must be satisfied in cash by Winn-Dixie and such a Net Distribution results in the use of Winn-Dixie's cash.  Although the Net Distribution is the most

*(cont'd)*

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Court also retained jurisdiction to hear this matter pursuant to paragraph 63 of the Order Confirming Joint Plan of Reorganization of Winn-Dixie Stores, Inc. and Affiliated Debtors, entered on November 9, 2006 (the "Confirmation Order") (Dkt. No. 12440).

2.      Venue is proper pursuant to 28 U.S.C. § 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 1142(b) of the Bankruptcy Code and Bankruptcy Rule 3020(d).

## BACKGROUND

4.      On February 21, 2005 (the "Petition Date"), Winn-Dixie and twenty-three of its affiliates and subsidiaries filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of the cases to this Court.

5.      On August 9, 2006, Winn-Dixie filed the Plan.  On November 9, 2006, the Court entered the Confirmation Order.  The Plan became effective on November 21, 2006 (the "Effective Date").

_____

*(cont'd from previous page)*
advantageous way to complete the distribution under the Plan, certain contractual consents may need to be obtained by Winn-Dixie to proceed in this manner.  Thus, Winn-Dixie needs the option to proceed with either the reversion or the Net Distribution method, but will have to determine whether this Net Distribution option is advisable and/or possible as the distribution of the shares goes forward.

6.    The Plan provides for distributions of New Common Stock[5] to holders of five classes of Allowed Unsecured Claims.  Plan, § 4.3, at 17-20.  These classes include Noteholder Claims (Class 12), Landlord Claims (Class 13), Vendor/Supplier Claims (Class 14), Retirement Plan Claims (Class 15), and Other Unsecured Claims (Class 16).  *Id.*  Participants in Winn-Dixie's MSP and SRP (or a participant's beneficiaries) make up the holders of the Retirement Plan Claims.  *See* Plan, § 1.82, at 9.  The remaining Employee Claimants hold some of the Other Unsecured Claims.

7.    The Plan further provides that

> Reorganized Winn-Dixie shall (i) authorize on the Effective Date 400,000,000 shares of New Common Stock; issue on the initial Distribution Date (x) up to an aggregate of 50,000,000 shares of New Common Stock for distribution to holders of Allowed Unsecured Claims and (y) such additional number of shares of New Common Stock as is necessary to establish the Common Stock Reserve for Disputed Unsecured Claims, and (ii) reserve for issuance the number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of shares and options to be granted under the New Equity Incentive Plan.

*Id.*, § 6.5(a), at 23.

8.    Winn-Dixie made its initial distribution of New Common Stock beginning in December 2006.  To date, it has distributed an aggregate of 47,130,241 shares, of which it distributed more than 3.2 million to Employee Claimants, and the Disbursing Agent/Trustee holds about 6.8 million shares in reserve (the "Common Stock Reserve").  The Disbursing Agent also holds 105,019 shares on account of Allowed Claims that were not distributed earlier because, among other reasons, the claims relating to those shares were only very recently allowed.  Winn-Dixie maintained the Common Stock Reserve because the face amount of the claims then-

---

[5]    Of course, shares are distributed electronically under the direct registration system.

4

pending, hundreds of millions of dollars, required that number of shares be held in reserve.

Specifically, Winn-Dixie could not make any subsequent distribution while Visagent

Corporation's claim was pending because it needed to hold enough shares of New Common

Stock in the Common Stock Reserve to satisfy that claim.  Additionally, at the time of the initial

distribution, there were several unliquidated personal injury claims with a very high face amount

and Winn-Dixie needed to hold enough shares of New Common Stock in the Common Stock

Reserve to cover those claims as well.

9.    Virtually all claims entitled to a New Common Stock distribution have now been

resolved, the amount of shares of New Common Stock due to the Employee Claimants and all

other holders of Allowed Claims is known, and approximately 480,000 shares will be distributed

to Employee Claimants.  Thus, there is no longer any need to maintain the Common Stock

Reserve and Winn-Dixie can make its final distribution.  *See* Plan, § 9.3(b), at 36 (providing for

subsequent distributions).  Winn-Dixie expects to begin its final distribution in mid-June.

10.    In order to permit Employee Claimants to receive their shares on the date of the

final distribution, however, Winn-Dixie needs to set a deadline for Employee Claimants to pay

their taxes.  The Plan provides that paying taxes is a prerequisite to receiving a distribution.  It

provides:

> each holder of an Allowed Claim that is to receive a distribution pursuant to the
> Plan <u>shall have sole and exclusive responsibility for the satisfaction and payment
> of any tax obligations imposed by any governmental unit, including income,
> withholding, and other tax obligations</u>, on account of such distribution, and
> including, in the case of any holder of a Disputed Unsecured Claim that has
> become an Allowed Unsecured Claim, any tax obligation that would be imposed
> upon the Common Stock Reserve in connection with such distribution.

Plan, § 8.9, at 33 (emphasis added).  Section 8.9 further provides that

> no distribution shall be made to or on behalf of such holder pursuant to the Plan <u>unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations</u> or such tax obligation that would be imposed upon the Common Stock Reserve in connection with such distribution.

*Id.* (emphasis added).  The Plan does not, however, set deadlines for when Employee Claimants must pay the taxes owed except to provide that arrangements must be made for payment before the distribution.

11.    The Plan gives Winn-Dixie the authority to "take such other actions that may be necessary or appropriate to effectuate the Plan."[6]  Plan, § 6.17(h), at 27.  Even with this broad authority, however, the Plan, is silent as to *when* Winn-Dixie must collect these taxes and it will be beneficial to the transparency of the process for this Court to set deadlines on notice.

---

[6]    Winn-Dixie used a different distribution mechanism when it made its initial 2006-2007 distribution to Employee Claimants, which allowed them to pay their taxes while simultaneously giving them the ability to trade their shares of New Common Stock.  Winn-Dixie is not using this same mechanism now because the tax liability should be manageable for most Employee Claimants.  Specifically, (i) this distribution is about 13% of the initial one, (ii) Employee Claimants received shares in the initial distribution worth considerably more than taxes payable now, and (iii) unlike the initial distribution, these shares are now liquid and can easily be sold at any time on NASDAQ.  Moreover, there is no requirement in the Plan to provide the cumbersome and expensive method used in the first distribution.  For these reasons, Winn-Dixie has concluded that the burdens of repeating the mechanism used for the initial distribution far outweigh any benefits.

**RELIEF REQUESTED**

12.     Winn-Dixie respectfully requests that the Court approve Winddown Deadlines as follows:

- May 26, 2010 as the Initial Deadline.  Employee Claimants must pay taxes by this date in order to receive the initial mid-June distribution of New Common Stock.

- May 31, 2011 as the Final Deadline.  On or about this date, and to the extent that Winn-Dixie has not exercised the Net Distribution option described herein, any shares that have not been delivered to the Employee Claimants will revert to the Common Stock Reserve[7] to be distributed in accordance with the Plan.[8]

**Notice and Distribution Procedures for the Winddown Deadlines**

13.     Initial Deadline.  In connection with the Initial Deadline, Winn-Dixie will use the following procedures:

(i)     Estimated Tax Notice.  Winn-Dixie's noticing agent will, on or about May 6, 2010, send a personalized notice (the "Estimated Tax Notice"), to each Employee Claimant eligible to participate in the final distribution.[9]  The Estimated Tax Notice will specify the Employee Claimant's estimated tax liability (the "Estimated Tax").  The Estimated Tax Notice will specify that a personal, certified or bank check, drawn on a U.S. bank for the Estimated Tax, must be received no later than Wednesday, May 26, 2010. Employee Claimants will also be required to agree to pay any deficiency between the Estimated Tax and the Actual Tax (as defined below).

---

[7]     Plan § 8.7 provides that shares that are unclaimed as of the second anniversary of the Effective Date will be transferred to the Common Stock Reserve:

> All claims for undeliverable distributions must be made on or before the second (2nd) anniversary of the Effective date, after which date all unclaimed property shall revert to the Reorganized Debtors . . . provided, however, that if any such unclaimed property is in the form of New Common Stock, such New Common Stock shall be transferred to the Common Stock Reserve for redistribution among holders of Unsecured Claims in accordance with the terms of the Plan.

Plan, § 8.7, at 33.  However, because the Effective Date was November 21, 2006, that date has obviously passed and for that reason a new date needs to be set.

[8]     See Plan, § 6.17(h), at 27 (authorizing Winn-Dixie to take "such other action as may be necessary or appropriate to effect the Plan."); Plan, § 8.9, at 33 (authorizing the Disbursing Agent to take "any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.").

[9]     Winn-Dixie will send all notices to Employee Claimants consistent with § 8.7 of the Plan.

(ii)     *Mid-June Distribution*.  Once Winn-Dixie has processed all payments received by May 26, 2010, Winn-Dixie will instruct its Disbursing Agent to make its final distribution to those Employee Claimants that have paid the Estimated Tax in full.

(iii)     *Actual Tax Notice*.  After this distribution, Winn-Dixie's noticing agent will send a second notice to Employee Claimants (the "Actual Tax Notice").  The Actual Tax Notice will specify the amount actually due on account of the New Common Stock (the "Actual Tax"), determined based on the value of the New Common Stock on the distribution date.  The Actual Tax Notice will differ depending on whether Employee Claimants (1) did not pay the Estimated Tax, (2) paid less in Estimated Tax than Actual Tax due, or (3) paid more in Estimated Tax than Actual Tax due.

    (1)     *Claimants that Do Not Pay the Estimated Tax*.  In the case of Employee Claimants who have not paid the Estimated Tax by the Initial Deadline, the Actual Tax Notice will be a bill for their actual tax liability.

    (2)     *Estimated Tax Less Than Actual Tax Due*.  In the event the Estimated Tax paid by the Employee Claimant was less than the Actual Tax, the Actual Tax Notice will be a bill for the difference.

    (3)     *Estimated Tax Greater Than Actual Tax Due*.  In the event the Estimated Tax paid by the Employee Claimant was greater than the Actual Tax, the Actual Tax Notice will include a refund check.

(iv)     *Failure to Meet Initial Deadline*.  If any Employee Claimant does not pay his or her Estimated Taxes, then the Employee Claimant will not receive his or her distribution on the mid-June distribution date.  This provision includes Employee Claimants whose Estimated Tax payments are not received by May 26, 2010, and also includes those Employee Claimants who timely make payment but whose checks are dishonored.  These Employee Claimants will be eligible to participate in subsequent winddown distributions if they pay their taxes or, in the alternative, may receive shares should Winn-Dixie decide to make a Net Distribution.  This Net Distribution can be made at any time after the Initial Deadline, if Winn-Dixie chooses to make a Net Distribution.

14.     <u>Subsequent Distributions</u>.  After the mid-June distribution, Winn-Dixie shall have the authority to make subsequent distributions no less often than once a month for the first six

months with respect to Employee Claimants, if any, who have paid their Actual Tax by the end

of the previous month.  Thereafter, Winn-Dixie shall have the authority to make subsequent

distributions no less often than quarterly, until the Final Deadline, with respect to Employee

Claimants who have paid their Actual Tax by the end of the second month of the relevant quarter.

Notwithstanding the authority, at any time after the Initial Deadline, Winn-Dixie can choose to

make a Net Distribution.

15.    <u>Final Deadline</u>.  Shortly after the Final Deadline, if any shares have not been

distributed, Winn-Dixie should make its (i) final distribution to any remaining Employee

Claimants promptly after the applicable Actual Tax has been paid, the check has cleared and the

mechanical process of the distribution can be completed; or (ii) make the Net Distribution.  After

this date, any remaining shares held in the Common Stock Reserve because an Employee

Claimant has not paid his or her taxes, whether because the Employee Claimant cannot be

located, the Employee Claimant has not received a Net Distribution, or for any other reason, may,

as contemplated by the Plan, remain in the Common Stock Reserve for distribution pursuant to

the terms of the Plan, and will likely revert to Winn-Dixie should that amount be *de minimis*.[10]

---

[10]    There is no problem of leftover or undeliverable shares with respect to shares going to any Claimant other than Employee Claimants, because when the direct registration system statement is issued, the shares are issued irrevocably, and the statement cannot be cancelled even if it is returned as undeliverable.  Therefore, those shares would not revert to the Common Stock Reserve and will be treated under applicable nonbankruptcy law.  Thus, the only shares that should remain in the Common Stock Reserve will be on account of Employee Claimants that have not paid their taxes if Winn-Dixie has not made a Net Distribution.  Winn-Dixie anticipates that this number will be a *de minimis* amount and that the cost of distribution will exceed the value of the remaining shares.  Thus, Winn-Dixie anticipates that those shares will indefeasibly revert to Winn-Dixie at that time.  *See* Plan, §§ 8.6, 8.7 and 9.3(b), at 32, 33 and 36.  However, Winn-Dixie will not know whether these provisions will apply until after it makes a Net Distribution, or, if not, until after the Final Deadline.  However, should Winn-Dixie, at its option and in its sole discretion, choose to make the Net Distribution to those Employee Claimants, that would avoid those "leftover shares" remaining in the Common Stock Reserve, and complete the distribution process.

## BASIS FOR RELIEF

16.     Approving the Winddown Deadlines is necessary and appropriate to the

consummation of the Plan and the closing of Winn-Dixie's remaining chapter 11 case.

Bankruptcy Code § 1142(b) provides that

> The court may direct the debtor and any other necessary party to execute or
> deliver or to join in the execution or delivery of any instrument required to effect
> a transfer of property dealt with by a confirmed plan, and to perform any other act,
> including the satisfaction of any lien, that is necessary for the consummation of
> the plan.

Bankruptcy Rule 3020(d) similarly gives the Court authority to "issue any other order necessary

to administer the estate [other than the confirmation order]."  Finally, Bankruptcy Code § 105(a)

gives the Court authority to "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title."  Additionally, courts may clarify a plan when

a plan is silent on a matter or otherwise interpret plan provisions to address equitable concerns.

*See, e.g., In re Airadigm Commc'ns, Inc.*, 547 F.3d 763, 770 (7th Cir. 2008) (granting deference

to bankruptcy court's interpretation of a confirmed plan to award the FCC cramdown interest in

light of resolved question about FCC licenses, which deemed the FCC a secured creditor) (citing

*In re Terex Corp.*, 984 F.2d 170 (6th Cir. 1993)); *Beal Bank, S.S.B. v. Jack's Marine, Inc.*, 201

B.R. 376, 380 (E.D. Pa. 1996) ("However, a bankruptcy court may clarify a plan where it is

silent or ambiguous.  Bankruptcy courts can also use this authority to 'interpret' plan provisions

to further equitable concerns.") (internal citations omitted); *In re Ampace Corp.*, 279 B.R. 145,

152-53 (Bankr. D. Del. 2002) (same).

17.     Winn-Dixie needs the Winddown Deadlines to make its final distribution under

the Plan.  Winn-Dixie expects that the Winddown Deadlines will encourage Employee Claimants

to participate in the mid-June distribution.  Winn-Dixie anticipates it will quickly and cost-

10

effectively comply with applicable nonbankruptcy law, preserving value for the estate, and the

Employee Claimants will be better off because they will receive shares that they can immediately

trade on NASDAQ sooner rather than later.  Additionally, the reasonable number of mailings

dedicated to facilitating the process will enable Winn-Dixie to give notice to Employee

Claimants while minimizing the administrative costs attendant to any distribution.  Lastly, the

Final Deadline will give Winn-Dixie the finality it needs to close its remaining chapter 11 case.

18.     Although not facing this precise set of circumstances, other courts approve

procedures to facilitate closing cases when the plan consideration is shares of new common stock

distributed under a confirmed plan.  Three examples are *In re Northwest Airlines Corp.*, No. 05-

17930 (ALG) (Bankr. S.D.N.Y.); *In re Northwestern Corp.*, No. 03-12872 (KJC) (Bankr. D.

Del.); and *In re Refco, Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y.).  All these cases granted

relief for administrative convenience and to minimize costs for reorganized debtors.

19.     In *Northwest Airlines*, the reorganized debtors had created a general distribution

reserve for new common stock to be held back while the reorganized debtors continued their

claims resolution process.  The reorganized debtors proposed a reserve amount less than the total

amount of all disputed and allowed claims, and the court approved orders establishing sub-

reserves for holders of disputed claims that had objected to the amount held in reserve.  (Motion,

Dkt. No. 8258, at 4).  As they resolved claims, the reorganized debtors found the general

distribution reserve held enough shares to provide holders of disputed claims the same *pro rata*

distribution other creditors would receive; thus, the sub-reserves were no longer necessary.  (*Id.*,

at 6-7).  The court granted the reorganized debtors' request to dissolve the sub-reserves and

ordered that the shares held in the sub-reserves be transferred to the general distribution reserve.

(Order, Dkt. No. 8317).

11

20.    In *Northwestern*, the reorganized debtors had not anticipated that the claims resolution process would stretch for over four years, (Motion, Dkt. No. 3787, ¶ 10), and requested that the court determine that the disputed claims reserve was taxable as a grantor trust. (Motion, ¶ 16). The reorganized debtors sought this because under the tax laws, a company that owns a grantor trust is taxed only on the trust's income, not on any dividends the company pays or capital gains on the company's stock upon stock distributions. (Motion, ¶ 34). The court granted the motion. (Order, Dkt. No. 3816).

21.    In *Refco*, a settlement agreement (incorporated in the confirmed plan) created a structure for distributing estate assets to two groups of creditors. (Motion, Dkt. No. 6949, ¶¶ 4-5). Over time, many of those creditors had sold their claims or were otherwise no longer actively participating in the case, and the plan administrator sought to avoid the "time-consuming, expensive and complex process" of having the groups of creditors determine the distribution mechanism for distributing preference recoveries that gave rise to Bankruptcy Code § 502(h) claims. (Motion, ¶ 9). The plan administrator instead proposed to simply distribute the amount at issue (approximately $3 million) to one of the two groups of creditors, and had previously given notice that he would seek to do so. (Motion, ¶ 11). The court granted the motion. (Order, Dkt. No. 6961).[11]

---

[11]    By comparison, in *In re UAL Corp.*, No. 02-48191 (ERW) (Bankr. N.D. Ill.), the court denied a claims trader's request to create floating record dates for distributions over the reorganized debtors' objection. In that case, the reorganized debtors wanted to keep one record date for distributions, because, *inter alia*, having floating record dates would cause undue expense. Specifically, it would "require the Reorganized Debtors to track post-confirmation transfers of claims *ad infinitum*," and would also shift the risk of a record owner not paying the claims trader to the reorganized debtors. (Response, Dkt. No. 15157, at 4-5). The court denied the motion. (Order, Dkt. No. 15270).

22.     Finally, approving the Winddown Deadlines does not prejudice Employee Claimants.  Although these deadlines were not established in the Plan, the Plan was crystal clear that Employee Claimants must pay taxes before receiving stock under the Plan, and they voted overwhelmingly in favor of the Plan.  In light of the fact that Winn-Dixie cannot continue to search indefinitely, Winn-Dixie has proposed a process fully consistent with the Plan.  Thus, the Final Deadline avoids an inequitable result.

## CONCLUSION

Wherefore, based on all of the foregoing facts and authorities, Winn-Dixie respectfully requests that the Court enter the order in the form attached as Exhibit A, approving the Winddown Deadlines, and granting Winn-Dixie such other relief as is just and proper.

Dated:  April 13, 2010.

SKADDEN, ARPS, SLATE, MEAGHER          SMITH HULSEY & BUSEY
& FLOM LLP

By:  /s/ Sally McDonald Henry              By:  /s/ Cynthia C. Jackson
    Sally McDonald Henry                    Stephen D. Busey
    Max S. Polonsky                         James H. Post
                                            Cynthia C. Jackson

Four Times Square                      Florida Bar Number 498882
New York, New York 10036               225 Water Street, Suite 1800
(212) 735-3000                         (904) 359-7700
(212) 735-2000 (facsimile)             (904) 359-7708 (facsimile)
sally.henry@skadden.com                cjackson@smithhulsey.com

Co-Counsel for Reorganized Debtors     Co-Counsel for Reorganized Debtors

834281-New York Server 2A - MSW

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Reorganized Debtors. [1] | ) | Jointly Administered |

**ORDER GRANTING REORGANIZED DEBTOR'S**
**MOTION FOR AN ORDER IN AID OF MAKING A**
**FINAL DISTRIBUTION UNDER CONFIRMED REORGANIZATION PLAN**

This case came before the Court for hearing on April 28, 2010, on the

Reorganized Debtor's Motion for an Order in Aid of Making a Final Distribution Under

Confirmed Reorganization Plan (Docket No. _____) (the "Motion").  Upon the record of the

hearing; and due and adequate notice of the Motion having been provided; and after due

deliberation, and sufficient cause appearing for granting the relief requested in the Motion, and it

appearing that the requested Winddown Deadlines [2] are necessary for the consummation of the

Reorganized Debtors' plan of reorganization within the meaning of 11 U.S.C. 1142(b) and 105(a),

and Bankruptcy Rule 3020(d); it is hereby

**ORDERED** that the Motion is GRANTED; and it is further

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are reorganized debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.  With the exception of Winn-Dixie Stores, Inc., the related cases of these reorganized debtors were closed on March 22, 2007.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**ORDERED** that May 26, 2010 will be the deadline for Employee Claimants to pay estimated taxes in order to receive the mid-June distribution of Common Stock; and it is further

**ORDERED** that on or about May 31, 2011, any shares that have not previously been delivered in the initial or any subsequent distributions or Net Distributions as provided for in the Motion, will either, at Winn-Dixie's option and in its sole discretion, (i) revert to the Common Stock Reserve subject to the provisions of the Plan or (ii) be distributed to that Employee Claimant less the number of shares equal in value to the appropriate taxes, with the number of shares needed to satisfy such tax calculated by Winn-Dixie; and it is further

**ORDERED** that the Court shall retain jurisdiction to hear any disputes arising under this Order.

Dated this _____ day of April, 2010 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Copy to:

Cynthia C. Jackson

[Cynthia C. Jackson is directed to serve a copy of the order on the limited service list and file a proof of service.]

842595-New York Server 2A - MSW